# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
MARTÍN JONATHAN BATALLA VIDAL, *et al.*,

                        Plaintiffs,

          -against-

CHAD WOLF, *et al.*,

                        Defendants.
_____

STATE OF NEW YORK, *et al.*,

                        Plaintiffs,

          -against-

DONALD TRUMP, *et al.*,

                        Defendants.
_____

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (VMS)**

**17-CV-5228 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

This is the most recent proceeding in the ongoing dispute over the Deferred Action for Childhood Arrivals ("DACA") program and the Trump Administration's efforts to end it. On July 28, 2020, Defendant Chad F. Wolf issued a memorandum that effectively suspended DACA pending the Department of Homeland Security's ("DHS") review of the program, following the Supreme Court's decision in *Dep't of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020). Plaintiffs in two related cases, *Batalla Vidal v. Wolf,* 16-cv-4756, and *State of New York v. Trump*, 17-cv-5228,[1] moved for leave to challenge the memorandum on the grounds (1) that Mr. Wolf was not lawfully serving as Acting Secretary of Homeland Security and therefore did not have authority to issue the memorandum; and (2) that the memorandum was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"). The court directed the

---

[1] Plaintiffs in the *Batalla Vidal* case are individual DACA recipients. Plaintiffs in the *New York* case are 16 states and the District of Columbia.

parties to first brief their cross-motions for partial summary judgment on the first question, (*see* Scheduling Order (Dkt. 307)),[2] and those motions are now before the court. (*See Batalla Vidal* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") (Dkt. 311); States' Mem. in Supp. of Mot. for Summ. J. ("States' Mem.") (States Dkt. 275); Gov't Mem. in Opp. and in Supp. of Cross Mot. for Summ. J. ("Gov't Opp.") (Dkt. 323); *Batalla Vidal* Pls.' Reply and Mem. in Opp. to Cross Mot. ("Pls.' Reply") (Dkt. 330); States' Reply and Mem. in Opp. to Cross Mot. ("States' Reply") (Dkt. 291); Gov't Reply ("Gov't Reply") (Dkt. 335).) Also before the court is the *Batalla Vidal* Plaintiffs' motion to certify a class. (*See* Pls.' Mem. in Supp. of Mot. to Certify Class ("Class Cert. Mem.") (Dkt. 309); Gov't Mem.in Opp. to Mot. to Certify Class ("Class Cert. Opp.") (Dkt. 326); Pls.' Reply ("Class Cert. Reply") (Dkt. 331).)

For the following reasons, the court holds that Mr. Wolf was not lawfully serving as Acting Secretary of Homeland Security under the Homeland Security Act ("HSA") when he issued the July 28, 2020 memorandum. Plaintiffs' motions for summary judgment are therefore GRANTED as to their claims under the HSA, and Defendant's cross-motions are DENIED. As to Plaintiffs' claims under the Federal Vacancies Reform Act ("FVRA"), to the extent they are not mooted by an appropriate remedy for the HSA violations, the court finds that the FVRA does not apply. Finally, Plaintiffs' motion for class certification is GRANTED.

The parties are DIRECTED to contact the court's Deputy by November 15, 2020 to schedule a conference to advise the court of any forthcoming motions for a preliminary injunction or summary judgment, pursuant to 5 U.S.C. 706(2)(C), in light of the

---

[2] For the sake of convenience, references to the docket ("Dkt.") cite to the docket in the *Batalla Vidal* matter. References to the docket in the *New York* matter are labelled as "States Dkt.".

court's decision with regard to the HSA. (*See* States' Mem. at 15, n. 9.)

## I.   BACKGROUND

The court assumes familiarity with the DACA program, the rescission of which it enjoined, on APA grounds, in an earlier phase of this litigation in February 2018. *See* 291 F. Supp. 3d 260 (E.D.N.Y. 2018). The Supreme Court reviewed that order and affirmed its reasoning under the APA, along with similar decisions of other district courts, in *Dep't of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020). In the wake of the *Regents* decision, Mr. Wolf suspended portions of the DACA program and made certain other amendments to the program via a memorandum (the "Wolf Memorandum") issued in July 2020. (*See* Wolf Memorandum ("Wolf Mem.") (Dkt. 297-1) at 1-2.) Specifically, Mr. Wolf instructed DHS personnel to (1) reject all pending and future initial requests for DACA; (2) reject all pending and future applications for advance parole—necessary for DACA recipients to leave and re-enter the United States—absent exceptional circumstances; and (3) require DACA recipients to renew their status under the program annually rather than every two years. (*See* Wolf Mem. at 1-2, 5.)

The question before the court is whether Mr. Wolf was lawfully serving as Acting Secretary of Homeland Security when he issued the Wolf Memorandum, or if any subsequent action taken cured its alleged deficiencies. There are five agency actions primarily relevant to the court's analysis and discussed below. The first three are amendments to DHS's order of succession made (or attempted) in February, April, and November of 2019. The fourth is the issuance of the Wolf Memorandum in July 2020. The fifth

is DHS's effort following the Wolf Memorandum to cure the deficiencies alleged in this case and in others like it currently pending in courts around the country.[3]

## A. "February Delegation" of February 15, 2019

According to the HSA and FVRA, when the office of Secretary of Homeland Security is vacant, an Acting Secretary is designated via an order of succession that begins with the Deputy Secretary of Homeland Security, followed by the Under Secretary for Management. *See* 6 U.S.C. § 113(a)(1)(A), (F); 5 U.S.C. § 3345(a)(1). Beyond that and "[n]otwithstanding [the FVRA], the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).

In December 2016, former Secretary Jeh Johnson issued Revision 8 to DHS Delegation No. 00106, titled "DHS Orders of Succession and Delegations of Authorities for Named Positions." (DHS Delegation No. 00106, Revision 8 of Dec. 15, 2016 ("Johnson Delegation") (Dkt. 324-1) at ECF pp. 21.) On February 15, 2019, Secretary Kirstjen Nielsen issued Revision 08.4 (the "February Delegation") amending the Johnson Delegation. (*See* Gov't Resp. to Pls.' Rule 56.1 Statement ("56.1 Resp.") ¶ 13.) The February Delegation, consistent with the Johnson Delegation, set

---

[3] *See, e.g.* of *Casa de Maryland, Inc. v. Wolf*, -- F. Supp. 3d --, 20-cv-2119, 2020 WL 5500165 (D. Md. Sept. 11, 2020) (challenging DHS rules that overhaul the criteria for work authorizations for asylum applications); *Immigrant Legal Res. Ctr. v. Wolf*, -- F. Supp. 3d --, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) (challenging DHS rule that substantially raised fees for various immigration status and benefit applications); *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. 19-cv-3283, 2020 WL 5995206, at *18 (D.D.C. Oct. 8, 2020) (challenging the same as *Immigrant Legal Res. Ctr.*); *see also New York v. Wolf*, 20-cv-1127, 2020 WL 6047817 at *1, n. 1 (S.D.N.Y. Oct. 13, 2020) ("there is some doubt whether Wolf was then (and is now) lawfully exercising the authority of Acting Secretary of Homeland Security").

two separate tracks for delegating authority to an Acting Secretary in the event that the office of the Secretary became vacant, depending on the circumstances that led to the vacancy. The first track was for vacancies caused by the Secretary's death, resignation, or inability to perform the functions of the office. In that case, succession was set by Executive Order 13753 ("E.O. 13753") as follows: (1) the Deputy Secretary; (2) the Under Secretary for Management; (3) the Administrator of the Federal Emergency Management Agency ("FEMA"); and (4) the Director of the Cybersecurity and Infrastructure Security Agency ("CISA").[4] (*Id.* ¶¶ 14-15.) The second track applied when the Secretary was unavailable to act during a disaster or catastrophic emergency. (*Id.*) In that case, succession was governed by "Annex A" to the February Delegation. (*Id.*) At the time of the February Delegation, Annex A provided an identical order of succession as E.O. 13753, meaning that for succession purposes there was no practical difference, as of February 2019, how a vacancy occurred. (*Id.*)

### B. Secretary Nielsen's Resignation and "April Delegation" of April 10, 2019

Secretary Nielsen resigned her position, effective April 7, 2019, in a letter to President Trump. (*See* Nielsen Resignation (Dkt. 310-3) at ECF p. 181.) At the time, the office of Deputy Secretary was vacant. (56.1 Resp. ¶ 20.) Claire Grady was serving as the Under Secretary for Management and would have been next in the line of succession. However, on April 7 at 6:02 pm, President Trump announced via a tweet that Kevin McAleenan, who was serving as the Commissioner of U.S. Customs and Border Patrol ("CBP"), would become Acting Secretary. (*Id.* ¶ 18.) At 10:36

---

[4] The text of E.O. 13753 refers to the "Under Secretary for National Protection and Programs," which is the predecessor office to the Director of the Cybersecurity and Infrastructure Agency ("CISA"). (*See* 56.1 Resp. ¶ 16.)

pm, Secretary Nielsen tweeted that she would remain as Secretary until April 10, 2019.

On April 9, Secretary Nielsen signed a Memorandum from John Mitnick, DHS's General Counsel, titled "Designation of an Order of Succession to the Secretary," explicitly approving the document attached (the "April Delegation"). (*See* Memorandum of John Mitnick ("Mitnick Memorandum") (Dkt. 324-1) at ECF p. 2.) The April Delegation amended Annex A, such that the order of succession under it was, as relevant: (1) the Deputy Secretary; (2) the Under Secretary for Management; (3) CBP Commissioner; (4) FEMA Administrator; and (5) Director of the Cybersecurity and Infrastructure Security Agency ("CISA"). (*Id.* at ECF p. 3.) Immediately thereafter, Ms. Grady announced that she would resign as Under Secretary. (56.1 Resp. ¶ 21.) Thus, under the modified Annex A, Commissioner McAleenan would have been the lawful Acting Secretary, in line with the President's announcement, because both the Deputy Secretary and Under Secretary positions were vacant. However, the April Delegation did not change when Annex A, rather than E.O. 13753, governed. Annex A was, at that point, still only applicable in the event of the Secretary's unavailability during a disaster or catastrophic emergency.[5] Under E.O. 13753, Christopher Krebs, Director of CISA, would have been the Acting Secretary because the office of the FEMA Administrator was also vacant. (*Id.* ¶¶ 28-30.) On April 10, Secretary Nielsen and Under Secretary Grady officially resigned, and Mr. McAleenan began to perform the duties of Acting Secretary. (*Id.* ¶¶ 20-22.)

---

[5] The Government maintains that the April Delegation changed the order of succession in all cases. The court disagrees, for reasons discussed below.

### C.   "November Delegation" of November 8, 2019 and Mr. McAleenan's Resignation

On November 8, 2019, 212 days after he took the reins as Acting Secretary, Mr. McAleenan again changed DHS's order of succession (the "November Delegation"). (*See* McAleenan Mem. of Nov. 8, 2019 ("November Delegation") (Dkt. 324-1) at ECF p. 16.) Under the November Delegation, Annex A replaced E.O. 13753 as the operative document when the Secretary died, resigned, or became unable to perform the functions of the office, in addition to its application when the Secretary was temporarily unavailable in an emergency. (*See* November Delegation at ECF p. 16.) Further, the November Delegation changed Annex A's order of succession to be: (1) the Deputy Secretary; (2) the Under Secretary for Management; (3) the CBP Commissioner; and (4) the Under Secretary for Strategy, Policy, and Plans. (*Id.*) In effect, the Undersecretary for Strategy, Policy, and Plans—who had been 11th in the line of succession in the previous version of Annex A—now leapfrogged the FEMA Administrator, the CISA Director, and five others, in the order of succession. Five days later, on November 13, 2019, Mr. McAleenan resigned. (56.1 Resp. ¶ 33.) Mr. Wolf, then Undersecretary for Strategy, Policy, and Plans, assumed the role of Acting Secretary because the offices of the Deputy Secretary, the Under Secretary for Management, and the CBP Commissioner were vacant. (56.1 Resp. ¶¶ 34-35.)

### D.   Wolf Memorandum of July 28, 2020

On June 18, 2020, the Supreme Court held in *Regents* that DHS's rescission of the DACA program via a September 2017 memorandum issued by then-Acting Secretary Elaine Duke (the "Duke Memorandum") was arbitrary and capricious, in violation of the APA, for two reasons. First, the Court held that DHS failed to consider whether forbearance from removal proceedings for DACA recipients—one of the program's two key pillars—could

survive even if DACA's second pillar, eligibility for federal bene-
fits, violated the Immigration and Nationality Act, as the Fifth
Circuit held in *Texas v. United States*, 809 F.3d 134, 181-182 (5th
Cir. 2015). Second, the Court held that the Duke Memorandum
failed to consider the reliance interests that the DACA program
engendered in the five years it was operable, prior to the Trump
Administration's attempt to rescind it. *See Regents*, 140 S. Ct. at
1915.

With the rescission vacated, Plaintiffs argued that DHS was obli-
gated to fully reinstate the DACA program, without delay. (*See*
Pls.' Letter of July 21, 2020 (Dkt. 295).) Instead, Mr. Wolf, pur-
portedly in his capacity as Acting Secretary, issued a new
memorandum on July 28, 2020 (the "Wolf Memorandum"). (*See*
Mem. of Chad Wolf ("Wolf Mem.") (Dkt. 297-1).) The Wolf
Memorandum directed DHS to "reject all pending and future in-
itial requests for DACA, to reject all pending and future
applications for advance parole absent 'exceptional circum-
stances,' and to shorten DACA renewals" from two years to one
year, pending DHS's "thorough consideration of how to address
DACA in light of the Supreme Court's decision." (Wolf Mem. at
1-2.) Soon after, Plaintiffs informed the court of their intention
to move for summary judgment on the theory that the Wolf
Memorandum was void *ab initio* because Mr. Wolf was not law-
fully serving as Acting Secretary and that it violated the APA
because it was arbitrary and capricious. (*See* Pls.' Letter of Aug.
6, 2020 (Dkt. 302).) The court directed the parties to begin by
briefing their cross motions for partial summary judgment on
whether Mr. Wolf had lawful authority to issue the Wolf Memo-
randum. (*See* Scheduling Order.) Meanwhile, the Government
Accountability Office ("GAO") reported to Congress on August
14, 2020 that Mr. Wolf was named to his position "by reference
to an invalid order of succession" and referred to the Inspector
General of DHS the question of who should be serving as Acting
Secretary and what the fate should be of actions taken by Mr.

Wolf while he was serving unlawfully. (*See* 56.1 Resp. ¶¶ 47-49; GAO Decision B-331650 of Aug. 14, 2020 ("GAO Decision") (Dkt. 310-3) at ECF p. 165.)

### E. Gaynor Order and Wolf Ratification of September 2020

On September 10, 2020, FEMA Administrator Peter Gaynor exercised "any authority vested in [him] as Acting Secretary of Homeland Security" to designate a new order of succession (the "Gaynor Order"), identical to the November Delegation issued by Mr. McAleenan on November 8, 2019, under which Mr. Wolf purportedly became Acting Secretary. (*See* Order Designating the Order of Succession for the Sec'y of Homeland Sec. ("Gaynor Order") (Dkt. 324-1) at ECF p. 18.) Administrator Gaynor issued the order "out of an abundance of caution and to minimize any disruption occasioned by a recent Government Accountability Office opinion and recent challenges filed in Federal court alleging that the November 8, 2019, order of succession issued by then-Acting Secretary Kevin McAleenan was not valid." (*Id.* (citations omitted).) The logic of the Gaynor Order was that if the November Delegation was invalid, then E.O. 13753 would have been the operative document to fill the vacancy caused originally by Secretary Nielsen's resignation. Under E.O. 13753, Administrator Gaynor would have been in line to become Acting Secretary. Under that authority, which Administrator Gaynor "may have been granted," he purported to once again change the order of succession, reinstating Mr. Wolf as the lawful Acting Secretary. (*Id.*)

On September 18, 2020 in a "Ratification of Actions Taken," Mr. Wolf either (a) exercised his newly endowed authority from Administrator Gaynor to ratify or (b) redundantly affirmed—depending on one's view of the lawfulness of the November Delegation—each prior action he had taken as Acting Secretary including, as relevant here, the Wolf Memorandum suspending and modifying DACA. (*See* Ratification of Actions Taken by the

Acting Sec'y of Homeland Sec. ("Wolf Ratification") (Dkt. 327-1).) On October 7, 2020, Mr. Wolf issued a second ratification, also based on any authority he may or may not have received from the Gaynor Order, affirming a number of actions taken by Mr. McAleenan, as well as an August 21, 2020 Memorandum from Joseph Edlow, USCIS Deputy Director for Policy, that implemented the Wolf Memorandum. (*See* Ratification of Oct. 7, 2020 (Dkt. 337-1).)

DHS contends that Mr. Wolf was lawfully serving as Acting Secretary when he issued the Wolf Memorandum in July 2020. (*See* Gov't Reply at 16.) In the alternative, it argues that any deficiency at the time was subsequently cured by the Gaynor Order and the Wolf Ratification. (*See Id.* at 16.)[6]

## II. LEGAL STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7] At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

---

[6] President Trump nominated Mr. Wolf to serve as Secretary of Homeland Security on September 10, 2020 and his nomination is currently pending before the Senate. *See* https://www.congress.gov/nomination/116th-congress/2235?q=%7B%22search%22%3A%5B%22chad+wolf%22%5D%7D&s=1&r=1 (last accessed Nov. 13, 2020).

[7] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

## III. DISCUSSION

### A. Relevant Statutes

#### 1. Federal Vacancies Reform Act (FVRA)

The Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, replaced the Vacancies Act in 1998. *See* Pub. L. 105-277, § 151, 112 Stat. 2681(1998); *NLRB v. SW Gen., Inc.,* 137 S. Ct. 929, 936 (2017). As the Supreme Court has explained, relying largely on the expertise of Morton Rosenberg who has submitted an *amicus* brief in this case, the FVRA was a response to a perceived "threat to the Senate's advice and consent power." *SW Gen.*, 137 S. Ct. at 936. At the time of passage, approximately 20 percent of offices requiring a Presidential appointment and Senate confirmation ("PAS" offices) were held by temporary designees who had been in office beyond the Vacancies Act's 120-day limit. *Id.* In the decades before Congress adopted the FVRA, the Justice Department's Office of Legal Counsel took the position that the "housekeeping" statutes of individual agencies provided agency heads "independent authority apart from the Vacancies Act to temporarily fill vacant offices." *Id.* at 935; *see also* Amicus Br. of Morton Rosenberg ("Rosenberg Br.") (Dkt. 317-1) at 3. In response, the FVRA provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3347(a). The terms of the FVRA apply unless (1) an express statutory provision either "(A) authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or (B) designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity;" or (2) the President fills a vacancy with a recess appointment. *Id.*

11

The FVRA provides the default framework for who may temporarily fill PAS vacancies in acting capacities and under what constraints. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 24 (D.D.C. 2020). As relevant here, the FVRA provides that, "[i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office . . . the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." 5 U.S.C. § 3345(a). Alternatively, the "President (and only the President)" may appoint somebody other than the "first assistant" provided that person is already serving in a PAS office, or if that person had held a position of the GS-15 pay rate, or higher, for at least 90 days within the previous year. 5 U.S.C. § 3345(a)(2), (3). In turn, Section 3346 provides that, other than for vacancies caused by sickness, "the person serving as an acting officer as described under section 3345 may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs;" or, during the pendency of a Senate nomination, subject to certain limitations. 5 U.S.C. § 3346(a).[8] If an action is taken by a person who purports to act with the authority of an office to which the FVRA applies but who is not serving in accordance with the FVRA, that action "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d).

### 2. Homeland Security Act (HSA)

The FVRA replaced a patchwork of agency-specific "housekeeping statutes" with consistent default rules for temporarily filling vacant PAS positions with acting officeholders. (Rosenberg Br. at

---

[8] Notably, "a person may not serve as an acting officer for an office under this section, if . . . the President submits a nomination of such person to the Senate for appointment to such office." 5 U.S.C. § 3345(b)(1)(B).

3.) However, on its face, the FVRA allows Congress to expressly compliment or displace those default rules with agency-specific provisions. 5 U.S.C. § 3347(a)(1). In DHS's case, the Homeland Security Act expressly addresses agency vacancies. Under the HSA, the Deputy Secretary of Homeland Security "shall be the Secretary's first assistant for purposes of" the FVRA and the Under Secretary for Management "shall be first assistant to the Deputy Secretary" for FVRA purposes. 6 U.S.C. § 113(a)(1)(A), (F).

In addition, in 2016, Congress amended the HSA to add Section 113(g), which provides as follows:

(g) Vacancies

(1) Absence, disability, or vacancy of Secretary or Deputy Secretary

Notwithstanding chapter 33 of Title 5 [the FVRA], the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary.

(2) Further order of succession

Notwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary.

(3) Notification of vacancies

The Secretary shall notify the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives of any vacancies that require notification under sections 3345 through 3349d of Title 5 (commonly known as the "Federal Vacancies Reform Act of 1998").

13

*See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903(a), 130 Stat. 2001 (Dec. 23, 2016).

### B. Application

#### 1. FVRA

The court finds persuasive the reasoning of *Casa de Maryland, Inc. v. Wolf*, -- F. Supp. 3d --, 20-cv-2119, 2020 WL 5500165 (D. Md. Sept. 11, 2020) and *Immigrant Legal Res. Ctr. v. Wolf*, -- F. Supp. 3d --, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020). Because Mr. Wolf was designated Acting Secretary under the HSA and not the FVRA, the FVRA's 210-day limitation, and its enforcement provisions, do not apply.

Section 3345 contains the core framework of the FVRA. *See* 5 U.S.C. § 3345. Where there is a vacant PAS position, the first assistant to the office becomes the acting officer unless the President—and only the President—instead directs another PAS officer to perform the role, or so directs another person at the agency, who has served at a GS-15 level or above for at least 90 days. Any person "serving as an acting officer as described *under section 3345*" is limited to 210 days of service, with some allowances for Senate nomination processes and recesses not relevant here. 5 U.S.C. § 3346 (emphasis added). Section 3347 provides that "[s]ections 3345 and 3346 *are the exclusive means* for temporarily authorizing an acting official to perform the functions and duties of [a PAS office] . . . *unless*—a statutory provision expressly . . . (A) authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or (B) designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity[.]" 5 U.S.C. § 3347(a)(1) (emphasis added). Section 3348 contains the FVRA's enforcement provisions which Plaintiffs urge the court to apply. Under subsection

(b)(1), if an acting officer fails to serve "in accordance with sections 3345, 3346, and 3347," then "the office shall remain vacant." 5 U.S.C. § 3348(b)(1). And an "action taken by any person who is not acting under section 3345, 3346, or 3347 . . . shall have no force or effect."

Thus, according to the plain text of Section 3347, a statutory provision that expressly "authorizes . . . the head of an Executive department[] to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," displaces Sections 3345 and 3346, and necessarily displaces the limitations and enforcement mechanisms associated therewith. Here, the HSA constitutes such a provision, as it authorizes the Secretary of Homeland Security to "designate such other officers of the Department in further order of succession to serve as Acting Secretary" beyond the Deputy Secretary and Under Secretary for Management, who are "first assistants" for FVRA purposes. *See* 6 U.S.C. § 113(g). Although the HSA expressly invokes the FVRA to designate the Deputy Secretary and Under Secretary for Management as "first assistants," it also expressly grants the Secretary the power, should the "first assistant" offices both be vacant, to designate the "further order of succession" *notwithstanding* the FVRA. *See S.W. Gen.,* 137 S.Ct. at 939 (explaining that the "ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by").

Mr. Wolf assumed the Acting Secretary role because he was Under Secretary for Strategy, Policy, and Plans and, under the November Delegation, fourth in line to assume the role behind the Deputy Secretary, the Under Secretary for Management, and the CBP Commissioner, which were all vacant at the time. Therefore, reading the statutes together, Mr. Wolf was designated pursuant to the Secretary's power under the HSA, notwithstanding the FVRA, to designate further succession beyond the "first assistants" who exist under the auspices of the FVRA. Because

Mr. Wolf did not assume the Acting Secretary role under Section 3345, Sections 3346 and 3348 do not apply to him. *See Casa de Maryland*, 2020 WL 5500165 at *18; *Immigrant Legal Res. Ctr.*, 2020 WL 5798269 at *10-11.[9]

---

[9] A plain reading of the statutory text produces a counterintuitive result: a 210-day limitation on the acting service of the Deputy Secretary and the Under Secretary for Management, who are designated by statute, but no limitation on those further down the line of succession, designated by the Secretary. The *Casa de Maryland* court surmised that perhaps Congress wished "to instill continuity in the functioning of the agency" in cases where DHS's top leadership positions were all vacant. *Casa de Maryland*, 2020 WL 5500165 at *19. Whatever the case, the court must "interpret the statute as it was written, not [] rewrite it as [Plaintiffs] believe Congress *could* have intended to write it." *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 336 (4th Cir. 2008) (emphasis in original).

To be sure, allowing acting officers to serve without time limitations and other enforcement mechanisms raises serious constitutional concerns. "The 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power because 'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism.'" *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991), quoting Gordon Wood, The Creation of The American Republic 1776–1787, p. 79 (1969) (internal citation omitted). As of November 14, 2020, it has been nearly 600 days since the Department of Homeland Security was led by a Senate-confirmed Secretary. (*See* 56.1 Resp. ¶ 17.) President Trump has validated concerns about the effects of circumventing the appointments process by saying of PAS vacancies: "I'm in no hurry … I have 'acting' [sic]. And my 'actings' are doing really great. I sort of like 'acting.' It gives me more flexibility." (*Id.* ¶ 11.) Without the time limitations of the FVRA, it could be possible to install a series of acting officers in order to avoid constitutionally required Senate approval.

One possible solution, offered by Plaintiffs, is to construe the power to issue further orders of succession under the HSA to reside only with a Senate confirmed "Secretary" and not with "Acting Secretaries." (*See* Pls.' Reply at 13.) The *Nw. Immigrant Rights Project* court reached that conclusion when considering the likelihood of success on the merits on an application for a preliminary injunction: "based on the text, structure, and purpose of the statute, the Court reads § 113(g)(2) as vesting in only the PAS Secretary

16

For these reasons, the court finds that Mr. Wolf was not elevated to the role of Acting Secretary under the FVRA, and therefore, the FVRA's limitations and enforcement provisions do not apply to him.

### 2. HSA

Congress gave the Secretary of Homeland Security the power to designate a further order succession for Acting Secretaries beyond the two statutory "first assistants." Secretary Nielsen exercised that power in the February and April Delegations. DHS failed to follow the order of succession as it was lawfully designated. Therefore, the actions taken by purported Acting Secretaries, who were not properly in their roles according to the lawful order of succession, were taken without legal authority.

When Secretary Nielsen resigned on April 10, 2019, the order of succession was set by the April Delegation and was straightforward. (*See* April Delegation at ECF p. 2-3; DHS Delegation Number 00106, Revision 08.5 of April 10, 2019 ("Revision 08.5") (Dkt. 324-1) at ECF p. 64; *see also* GAO Decision at ECF p. 169.) Under Section II of DHS's succession order, as amended by the April Delegation:

> A. In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly

---

the authority to 'designate such other officers of the Department in further order of succession to serve as Acting Secretary.' And that reading has the additional benefit of avoiding any constitutional concerns." 2020 WL 5995206, at *23. Because the court now finds that Mr. Wolf was not lawfully serving as Acting Secretary of DHS based on the plain text of the HSA and DHS's governance documents as they were written, it need not consider, at this moment, whether an Acting Secretary possesses the power to designate a further order of succession.

succession of officials is governed by Executive Order 13753, amended on December 9, 2016.

B. I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or emergency.

(Revision 08.5 at ECF p. 64; April Delegation at ECF p. 3.) Plainly, Secretary Nielsen's resignation fell under Section II.A., not II.B., and therefore E.O. 13753, not Annex A, applied. Under E.O. 13753, the order of succession was:

1) Deputy Secretary of Homeland Security [vacant on April 10, 2019];

2) Under Secretary for Management [vacant on April 10, 2019];

3) Administrator of the Federal Emergency Management Agency [vacant on April 10, 2019];

4) Director of the Cybersecurity and Infrastructure Agency ("CISA") [occupied by Christopher Krebs on April 10, 2019].

(See E.O. 13753 of Dec. 9, 2016 (Dkt. 310-3) at ECF p. 48; GAO Decision at ECF pp. 170-172.) Based on a straightforward application of E.O. 13753, Director Krebs should have assumed the role as Acting Secretary of Homeland Security. Instead, Mr. McAleenan purported to be Acting Secretary, although he possessed no statutory authority to do so. (See 56.1 Resp. ¶ 30.) Because Mr. McAleenan had no authority, the November Delegation—which had the effect of implanting Mr. Wolf as Acting Secretary of Homeland Security—was not an authorized agency action. Indeed, the fact that Mr. McAleenan attempted to replace

E.O. 13753 with Annex A in Section II.A. in the November Delegation is strong evidence that E.O. 13753 was the operative law at the time, and therefore that Mr. McAleenan was without authority to make the amendment. (*See* November Delegation at ECF p. 16.) Accordingly, Mr. Wolf did not possess statutory authority when he assumed the role of Acting Secretary in November 2019. *See Casa de Maryland*, 2020 WL 5500165 at *23; *Immigrant Legal Res. Ctr.* 2020 WL 5798269 at *9; GAO Decision at ECF p. 175.

The Government Defendants now contend that the April Delegation meant something other than what it says. They argue that Secretary Nielsen signed only the April 9, 2019 Memorandum of DHS General Counsel John Mitnick, in which she stated, "I hereby designate the order of succession for the Secretary of Homeland Security" (*see* Mitnick Memorandum at ECF pp. 2-3) and that, therefore, Annex A should apply to vacancies, which implicate the "order of succession" that Secretary Nielsen sought to change. In their view, under the two tracks of the February Delegation, E.O. 13753 supplied the "order of succession" in the case of a vacancy, and Annex A supplied the order for "delegations of authority," relevant in the case of emergencies. (*See* Gov't Opp. at 9.) According to the Government, amending Annex A was *actually* intended to alter the order of succession in all cases, not just the delegations of authority covered by Annex A. (*See* Gov't Opp. at 7.) As further evidence, the Government offers a sworn declaration from Associate General Counsel Neal J. Swartz, from June 2020, in which he states that Annex A, as amended by Secretary Nielsen in April 2019, "controlled the succession order for every vacancy in the office of the Secretary, no matter the reason for the vacancy." (Decl. of Neal J. Swartz (Dkt. 324-1) at ECF p. 6.) Therefore, the Government urges the court to ignore official agency policy documents and invalidate the plain text of the April Delegation because it does not comport with her supposed intent, although it comports perfectly with the

text of her official order. The Government's reading of the documents is tortured. On the plain text, Secretary Nielsen amended the order of officials in Annex A but did nothing to change when Annex A applied, which was "in the event [the Secretary is] unavailable to act during a disaster or catastrophic emergency." (Revision 08.5 at ECF p. 64.) The court credits the text of the law over *ex post* explanations that the text means something other than what it says.

Based on the plain text of the operative order of succession, neither Mr. McAleenan nor, in turn, Mr. Wolf, possessed statutory authority to serve as Acting Secretary. Therefore, the Wolf Memorandum was not an exercise of legal authority.

### 3. The Gaynor Order and Wolf Ratification

The Government argues that even if the Wolf Memorandum was without legal authority when issued, any deficiency was cured when Administrator Gaynor "exercised 'any authority' he might have as Acting Secretary and designated an order of succession for the office under Section 113(g)(2)" which made Mr. Wolf Acting Secretary, after which Mr. Wolf ratified the Wolf Memorandum. (Gov't Reply at 15.) That argument is unpersuasive.

To begin, although litigants can make arguments in the alternative, the court is not aware of any authority that would allow a government official to take administrative action in the alternative. DHS is a large and complex organization with significant law enforcement and national security responsibilities. Congress and DHS, via the FVRA and HSA, have provided detailed contingency plans to ensure that somebody is accountable for the Department's mission. That purpose would be significantly undermined if DHS allowed two different people—Mr. Wolf and Administrator Gaynor—to simultaneously exercise the Secretary's power.

20

Moreover, DHS has not submitted any notice to Congress that Administrator Gaynor is currently serving as Acting Secretary of Homeland Security, which is required under 5 U.S.C. § 3349(a), because Secretary of Homeland Security is an office to which the FVRA applies. DHS has submitted FVRA notifications in the past for its Acting Secretaries who have purported to assume the office via the authority of the Secretary under 6 U.S.C. § 113(g)(2). (*See, e.g.,* FVRA Submission for Kevin McAleenan of April 11, 2019 (Dkt. 324-1) at ECF pp. 132-133.) There is no indication that Administrator Gaynor has ever been empowered by the agency to exercise the powers of the Acting Secretary, and there is every indication to the contrary. Even if Administrator Gaynor should be Acting Secretary, DHS cannot recognize his authority only for the sham purpose of abdicating his authority to DHS's preferred choice, and only in the alternative.[10]

The Gaynor Order did not make Mr. Wolf the lawful Acting Secretary of Homeland Security, and therefore, Mr. Wolf did not (and does not) possess the power to ratify any of his former actions.[11]

## IV. CLASS CERTIFICATION

The court now turns to the *Batalla Vidal* Plaintiffs' motion for class certification. The motion is GRANTED for the reasons below. As Defendants concede, all relief ordered by the court in this

---

[10] As discussed above, the court also reserves decision as to whether an Acting Secretary, rather than a Secretary, can designate an order of succession under 6 U.S.C. § 113(g). *See Nw. Immigrant Rights Project*, 2020 WL 5995206, at *23.

[11] Because the court finds that the Gaynor Order had no legal effect, it does not find it significant that the Government is now confused as to whether the order was issued after Mr. Wolf was nominated to be Secretary on September 10, 2020—as it originally claimed—or before. (See Defs.' Letter of Nov. 13, 2020 (Dkt. 341).) The court wishes the Government well in trying to find its way out of this self-made thicket.

21

matter is effective as to all named plaintiffs as well as to all members of the certified class. (*See* Gov't Opp. at 24.)

Plaintiffs seek to certify a DACA Class ("Class") to include all persons who are or will be *prima facie* eligible for deferred action under the terms of the DACA program as they were set out in the original policy memorandum of Secretary Janet Napolitano in June 2012 (the "Napolitano Memorandum"). (Class Cert. Mem. at 2.) They also seek to certify a Pending Applications Subclass ("Subclass"), to include all persons who had an application for deferred action through DACA—whether a first-time application or a renewal—pending at U.S. Citizenship and Immigration Services ("USCIS") on any date between June 30, 2020 and July 28, 2020 that have not been adjudicated in accordance with the 2012 Napolitano Memorandum.[12] (*Id.* at 3.) Plaintiffs also seek to specifically exclude from the Class and Subclass any "individuals who are *prima facie* eligible for deferred action through DACA and who bring a federal lawsuit challenging the Wolf Memorandum." (*Id.*)

### A. Legal Standard

To qualify for certification, a class must meet the prerequisites outlined in Federal Rule of Civil Procedure 23(a), including numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a); *see, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008). Numerosity requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Commonality means that "there are questions of law or fact common to the class." *Id.* 23(a)(2). "Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members," and "is satisfied when each class

---

[12] The Fourth Circuit issued its mandate following the *Regents* decision on June 30, 2020 and the Wolf Memorandum was issued on July 28, 2020.

member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010). Commonality and typicality "tend to merge into one another, so that similar considerations animate analysis of both." *Id.* The adequacy prerequisite ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

In addition to the Rule 23(a) prerequisites, "certification of the class must also be deemed appropriate under one of the three subdivisions of Rule 23(b)." *Brown*, 609 F.3d at 476. Finally, the Second Circuit has "recognized an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017).

Where a suit "satisf[ies] the criteria set forth in subdivision (a) (*i.e.,* numerosity, commonality, typicality, and adequacy of representation)," including the implied ascertainability requirement, and "fit[s] into one of the three categories described in subdivision (b)," then a plaintiff may maintain a class action in federal court. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). "The moving party must demonstrate compliance with these rules by a preponderance of the evidence." *Hill v. City of New York*, 136 F. Supp. 3d 304, 352 (E.D.N.Y. 2015).

### B. Rule 23 Prerequisites

#### 1. Numerosity

Both the proposed Class and Subclass are sufficiently numerous that joinder would be impracticable. Plaintiffs estimate there are 1.1 million undocumented immigrants who are *prima facie* eligible for DACA who would comprise the Class. (*See* Class Cert. Mem. at 12; 56.1 Resp. ¶¶ 2-6.) With regard to the Subclass, the

exact number of individuals who had pending applications before USCIS between June 30 and July 28, 2020 is unknown. However, a USCIS Quarterly Report shows an average of about 32,000 renewal applications pending at any given time between March 2018 and June 2020. (Class Cert. Mem. at 13; USCIS Quarterly Report (Dkt. 309-4) at ECF p. 14.) Further, Plaintiff Make the Road New York alone had 166 clients with pending renewal applications on July 28, 2020, when Acting Secretary Wolf issued the Wolf Memorandum. (*See* Decl. of Javier Valdez (Dkt. 309-5) at ECF p. 55, ¶ 11.) The numerosity prerequisite is therefore met. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014) ("Numerosity is presumed for classes larger than forty members.").

### 2.  Commonality and Typicality

The proposed Class and Subclass also satisfy the commonality prerequisite because they present common issues of law and fact, the resolution of which does not require individual examination of a given class member's specific situation. Where an issue "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," the commonality prerequisite is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Indeed, "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* Where a movant "seeks to enjoin a practice or policy, rather than individualized relief, commonality is assumed." *Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 292 (S.D.N.Y. 2019). Here, the common issues for the Class are whether Mr. Wolf and Mr. McAleenan lawfully served as Acting Secretaries of DHS at the relevant times and whether the Wolf Memorandum was arbitrary and capricious in

violation of the APA. (*See* Fourth Amend. Compl. (Dkt. 308) ¶ 183.) The common issues for the Subclass are whether the members are entitled to have their applications adjudicated in accordance with the Napolitano Memorandum and whether DHS's failure to do so, as well as its failure to give notice that it was applying the Wolf Memorandum and the Edlow Memorandum, violated the due process rights of the class members. (*See id.* ¶ 184.) All of those questions are well-suited to class adjudication, as distinct policies that harmed Plaintiffs and for which they seek relief.

Plaintiffs have likewise satisfied the typicality prerequisite because the claims of the named plaintiffs "share the same essential characteristics," *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015), with those of the proposed members of each class. "[W]hen each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," typicality is satisfied. *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).

### 3. Adequacy

Plaintiffs have also satisfied the adequacy prerequisite. To satisfy that requirement, "the named plaintiffs must possess the same interests and suffer the same injuries as the class members. Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). The named plaintiffs have suffered the same injuries as the proposed class. Those without DACA protections face difficulties pursuing employment and education, as well as living with the constant threat of deportation from the only country they have ever known. (*See, e.g.*, Decl. of M.B.F. (Dkt. 309-5) at ECF p. 46.) Those with DACA protections are now in the tenuous position of having to renew their status each year,

25

imposing an air of uncertainty in every long-term decision they make. (*See, e.g.*, Decl. of Batalla-Vidal (Dkt. 309-5) at ECF p. 2, ¶¶ 2-3.) Without advance parole, DACA recipients cannot leave the country to see family, travel, or pursue career opportunities abroad. (*Id.* ¶¶ 4-5; Decl. of Alarcón (Dkt. 309-5) at ECF p. 7, ¶¶ 6-8; Decl. of Fernandez (Dkt. 309-5) at ECF p. 12, ¶¶ 5-8.)

The proposed classes, all subject to the Wolf and Edlow Memoranda, face the same challenges described by the named plaintiffs. Further, the remedies that Plaintiffs seek would provide the same relief to each member of the proposed classes. Plaintiffs assert they "are highly motivated to pursue this action vigorously to protect their interests and those of other class members," and have no conflicts of interest with the proposed classes. (*See* Class Cert. Mem. at 19.) They affirm that they have taken an active part throughout the litigation, and understand the impact these proceedings could have on DACA recipients writ large. (*Id.*) Therefore, the adequacy prerequisite is met.

### 4. Ascertainability

Plaintiffs have satisfied the ascertainability requirement. The Second Circuit "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 264. The Class members may be identified by relying on the same criteria outlined in the Napolitano Memorandum for determining DACA eligibility. The Subclass members may be identified based on whether they had pending DACA requests at any time between June 30, 2020 and July 28, 2020. Further, to ascertain those excluded from the proposed classes, the court must merely identify plaintiffs who have filed complaints in separate federal cases. These criteria are sufficiently objective to establish a Class and Subclass with definite boundaries, satisfying the ascertainability requirement.

### 5. Rule 23(b)

Plaintiffs have also established that class certification is warranted under Rule 23(b)(2), in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). By issuing the Wolf Memorandum, Defendants' actions affected all members of the proposed Class, and declaratory or injunctive relief to vacate the Wolf Memorandum would be an appropriate remedy with respect to each Class member. Likewise, for the members of the proposed Subclass whose applications USCIS failed to review according to the Napolitano Memorandum, the same relief would be appropriate for all of its members.

### C. Government's Objections to Class Certification

The Government opposes class certification, arguing that it would interfere with existing parallel litigation, and that the proposed classes are overbroad and not ascertainable. (*See* Class Cert. Opp. at 1-2.) Specifically, the Government asserts the proposed classes are not administrable because Plaintiffs' claims overlap with related litigation pending in other district courts, and that the proposed exclusion of such other plaintiffs from the proposed classes is improper under Rule 23(b)(2). The Government also argues that the proposed Class definition is overbroad because it includes individuals who may never request DACA, creating standing issues, and that because the Class does not have a temporal limitation, it is not possible to ascertain potential class members. These arguments are unpersuasive for the following reasons.

First, the proposed exclusion of individuals who are *prima facie* eligible for DACA and pursue their own claims in other federal courts is proper under Rule 23(b). That exclusion also ensures that class certification in this case will not interfere with ongoing

parallel litigation. The Government argues that because Rule 23(b) is a "mandatory" class, it "provides no opportunity for . . . (b)(2) class members to opt out." *Wal-Mart*, 564 U.S. at 362. Although the Government is correct that Rule 23(b)(2) does not require district courts to give notice or the opportunity for class members to opt out, "the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in . . . (b)(2) class actions." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009). Further, the Government conflates opting out of class membership with a class definition that specifically excludes certain individuals. When an individual opts out of class membership, it means she will take no part in the outcome and is free to pursue, or not pursue, her own claims separately. Plaintiffs' proposed Class and Subclass definitions exclude only those individuals who actually bring their own claims in other federal courts. By excluding such individuals who bring separate claims, the class definitions ensure administrability and judicial economy.

Second, the proposed Class definition is not overbroad and is clearly ascertainable. Plaintiffs define the Class based on who is or will be eligible for DACA according to the same criteria outlined in the Napolitano Memorandum, including individuals who:

1) came to the United States under the age of sixteen;
2) have continuously resided in the United States for at least five years preceding June 15, 2012 and were present in the United States on June 15, 2012;
3) are currently in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans of the Coast Guard or Armed Forces of the United States;
4) have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and
5) are not above the age of thirty.

(Class Cert. Reply at 7 n. 6.) Contrary to the Government's contention that the Class is an amorphous "moving target," these criteria are sufficiently definite and temporally limited to allow the court to ascertain which individuals fall within the Class definition. (Class Cert. Opp. at 9.) As Plaintiffs correctly note, "DACA's requirements mean that class members will not be added *ad infinitum* . . . . The number of individuals who can meet the requirements is temporally limited and fixed." (Class Cert. Reply at 8.)

Third, the Government argues that because the Class includes individuals who may be eligible for DACA but have not yet applied (and may never do so), certification should be defeated on standing grounds. (Class Cert. Opp. at 9.) Although it is true that a "class must . . . be defined in such a way that anyone within it would have standing," it is also true that "[a]n injury-in-fact may simply be the fear or anxiety of future harm." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). As long as the Wolf Memorandum remains in effect, Class members who are otherwise eligible for DACA but have not yet applied share the same

kind of "distinct and palpable," *id.*, injury with the named plaintiffs who happen to have already applied for DACA and had their applications stalled or rejected. Consequently, the Class members' injuries are traceable to Defendant's conduct, and the relief sought by Plaintiffs would redress the harm for both the named plaintiffs and the Class members. Class members' standing is accordingly satisfied.

### D. Certification Order

Plaintiffs' motion for class certification is GRANTED. The court, having considered Plaintiffs' Motion for Class Certification and the declarations submitted in support thereof, orders as follows:

Pursuant to Rule 23(a) and (b)(2), the court CERTIFIES the following classes:

1) A **"DACA Class"** (for the claims challenging the appointment of Defendant Wolf and the legality of the 2020 Wolf Memorandum and its implementing guidance, including the Edlow Memorandum): All persons who are or will be *prima facie* eligible for deferred action under the terms of the 2012 Napolitano Memorandum; and

2) A **"Pending Applications Subclass"** (for the claims challenging the application of the 2020 Wolf Memorandum and its implementing guidance, including the Edlow Memorandum, to certain DACA applications): All persons who had an application for deferred action through DACA, whether an initial or renewal, pending at USCIS on any date between June 30, 2020, and July 28, 2020, that have not been or will not be adjudicated in accordance with the 2012 Napolitano Memorandum.

*Excluded* from the DACA Class and the Pending Applications Subclass are the individuals who are *prima facie*

eligible for deferred action through DACA and who bring a federal lawsuit challenging the Wolf Memorandum.

The court APPOINTS Martín Batalla Vidal, Antonio Alarcón, Eliana Fernandez, Carolina Fung Feng, Carlos Vargas, Johana Larios Sainz, Sonia Molina, Ximena Zamora, and M.B.F. as class representatives for the DACA Class. The court APPOINTS Plaintiffs Johana Larios Sainz, Sonia Molina, and M.B.F. as class representatives for the Pending Applications Subclass. The court APPOINTS the National Immigration Law Center, Jerome N. Frank Legal Services Organization at Yale Law School, and Make the Road New York as class counsel pursuant to Rule 23(g).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment, insofar as it alleges that Defendant Mr. Wolf was not lawfully serving as Acting Secretary of Homeland Security under the HSA when he issued the Wolf Memorandum, is GRANTED and the Government's cross-motion is DENIED. Plaintiffs' motion for class certification in the *Batalla Vidal* matter is GRANTED. The parties are DIRECTED to immediately contact the court's Deputy to schedule a conference to advise of any forthcoming motions for relief in light of the court's decision.

SO ORDERED.


Dated:     Brooklyn, New York
           November 14, 2020

                                        /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge