**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| *and* | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| *and* | ) |
| | ) |
| STATE OF NEW JERSEY | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**DEFENDANT-INTERVENORS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Page(s)

I.      **Statement of the Issues to be Ruled upon by the Court** ............................................ 1

II.     **Summary of the Argument**.................................................................................. 1

III.    **Argument** ............................................................................................................. 3

    A.   Plaintiffs Fail to Cure the Legal and Factual Defects in Their Theories of Standing ..... 3

      1.   *Plaintiffs still have not proven that DACA causes them to suffer any direct, redressable injury* ................................................................................ 4

      2.   *Plaintiffs' Opposition further demonstrates the flaws in their* parens patriae *and special solicitude theories* ........................................................ 8

    B.   Federal Defendants' Attempt to Minimize The Wolf and Edlow Memos Demonstrates that this Case Continues to Lack Adversity ................................................. 11

IV.     **Conclusion**............................................................................................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Byrum v. Landreth,*
  566 F.3d 442 (5th Cir. 2009) ..................................................................................2

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019)...........................................................................................7

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020)................................................................................. *passim*

*Hargrave v. Fibreboard Corp.,*
  710 F.2d 1154 (5th Cir. 1983) ..............................................................................4

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)..................................................................................... *passim*

*Regents of the Univ. of Cal. v. Dep't of Homeland Sec.,*
  279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................5

*Univ. of Texas v. Camenisch,*
  451 U.S. 390 (1981)................................................................................................2

## I.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Defendant-Intervenors Karla Perez, *et al.* ("Defendant-Intervenors") respectfully submit this Reply in support of their Motion for Summary Judgment, *see* Dkt. 503, and request that the Court grant their Motion as to Plaintiffs' lack of standing.

## II.    SUMMARY OF THE ARGUMENT

Plaintiffs' and Federal Defendants' responses to Defendant-Intervenors' Motion reinforce why the Court should decline to reach the merits of Plaintiffs' claims.  Although Defendant-Intervenors moved for summary judgment, the burden remains on Plaintiffs to prove that DACA caused them to suffer a redressable injury.  Plaintiffs have not carried their burden.

Most fundamentally, Plaintiffs' Opposition fails to demonstrate that DACA caused Plaintiffs to suffer any harm through increased social-service costs, labor-market distortions, or any other theory of injury.  Plaintiffs *still* make no attempt to quantify their alleged direct injuries—relying instead on inapt citations to Defendant-Intervenors' evidence—and Plaintiffs fail to cabin their fatally overbroad theory of standing based on purported increases in state expenditures. Plaintiffs also do not explain away the flaws in their labor-market distortion theory, citing instead unconvincing and unqualified experts (and, again, Defendant-Intervenors' own evidence), all without proving that a *single U.S.-born worker in a Plaintiff state suffered an economic injury because of DACA*.  As a result, Plaintiffs' already faulty *parens patriae* and special solicitude arguments are unavailing.  Nor have Plaintiffs proven that any of their alleged injuries could be redressed, should this Court find that DACA is unlawful.  Indeed, Plaintiffs' wholly speculative "self-deportation" theory of redressability is even more tenuous in light of the Supreme Court's decision in *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020).  There, as Federal Defendants recognize in their Response, *see* Dkt. 527 at 2–3, 5, the Supreme Court held that, even assuming DACA is unlawful, the appropriate next step is to allow DHS to exercise its

1

discretion regarding DACA's future, including by considering whether to maintain deferred action for DACA recipients.  Plaintiffs fail in their Opposition to directly and convincingly address the impact of *Regents*, which further undermines their theory of redressability.

Rather than confront the fundamental failings in their evidence and arguments, Plaintiffs use their Opposition to baldly assert that the Court has already concluded that Plaintiffs have standing to challenge DACA.  *See* Dkt. 529 at 13.  Plaintiffs' attempt to rely on the Court's *preliminary* conclusions in its decision *denying* Plaintiffs' motion for a preliminary injunction decision "fails, . . . because it improperly equates 'likelihood of success' with 'success.'"  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1981).  The Supreme Court has made clear that "the findings of fact and conclusions of law made by a court [deciding] a preliminary injunction are not binding" on its final judgment, and are therefore not issues that are *resolved* on the basis of a preliminary decision.  *Id.* at 395; *see also Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (distinguishing standards for preliminary injunction and summary judgment).  Indeed, as outlined fully in Defendant-Intervenors' opening brief, *see* Dkt. 504, and as described further below, the evidence developed during discovery, along with the Supreme Court's decision in *Regents*, shows that Plaintiffs have failed to prove that DACA causes them any redressable harm, as it is their burden to do.  As a result, the Court should grant summary judgment in favor of Defendant-Intervenors as to Plaintiffs' lack of standing.

Federal Defendants' Response also demonstrates that this case continues to lack the adversity that Article III requires.  Rather than fully defend DACA or support their argument that the Court should not reach the merits of Plaintiffs' claims, Federal Defendants join Plaintiffs in their attempt to minimize the fact that, through the Wolf and Edlow Memos, Federal Defendants significantly altered DACA, including by immediately rejecting any new applications for initial

DACA, limiting grants of advance parole, and cutting the period of deferred action in half. *Compare* Dkt. 504 at 13–15 (describing Wolf and Edlow Memos' significant changes to DACA), *with* Dkt. 527 at 1–2 (describing Wolf Memo's changes as "limited").  Federal Defendants' failed attempt to minimize these fundamental changes to DACA only underscores and reinforces this case's lack of adversity.

## III.    ARGUMENT

As the party invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing the three elements that are the "irreducible constitutional minimum of standing."   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Although Defendant-Intervenors moved for summary judgment, the burden remains on Plaintiffs to support each element of standing through competent evidence: "[i]n response to a summary judgment motion, [ ] the [Plaintiffs] can no longer rest on [ ] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'"  *Id.* at 561 (quoting Fed. R. Civ. P. 56(e)).  Plaintiffs' Opposition confirms that Plaintiffs cannot carry their burden.  And, although Plaintiffs' failure to prove that they have standing to challenge 2012 DACA alone is sufficient for the Court to grant Defendant-Intervenors' motion for summary judgment, Plaintiffs and Federal Defendants also fail to demonstrate that the case presents a justiciable controversy.

### A.    Plaintiffs Fail to Cure the Legal and Factual Defects in Their Theories of Standing

Plaintiffs' Opposition reinforces the empirical and theoretical flaws in their theory of direct standing.  Furthermore, because Plaintiffs' Opposition does not fill the gaps in their labor-market distortion theory, Plaintiffs have failed to prove any injury to a quasi-sovereign interest, which dooms their *parens patriae* and special solicitude arguments.

3

1.    *Plaintiffs still have not proven that DACA causes them to suffer any direct, redressable injury.*

Plaintiffs concede (by not disputing) that no Plaintiff State has actually quantified the harm that it suffers from any DACA recipient's presence in the state.  *See, e.g.*, *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1163–64 (5th Cir. 1983).  Because Plaintiffs cannot provide their own quantitative analysis proving that DACA causes them to incur additional costs to provide social services, *see* Dkt. 504 at 19 & n.5, Plaintiffs rely in their Opposition on Dr. M. Ray Perryman's analysis of the *beneficial* effects of DACA in Texas.  Dkt. 529 at 15–16.  For example, Plaintiffs suggest, based on statements Dr. Perryman made during his deposition, that Dr. Perryman calculated the actual costs Texas incurs as a result of DACA.  *Id.*  But Dr. Perryman made clear that, despite Plaintiffs' citation to his deposition, he is "not aware of any costs to the State of Texas a result of DACA" and he "provide[d] no evidence of such costs in [his] report or analysis."  Dkt. 400-2, Ex. 7 ¶ 6.  In fact, Dr. Perryman explicitly specified that he "did not conduct a study of whether DACA recipients imposed costs on the State of Texas," that he is "aware of no studies or other research that identifies such costs," and that his cost estimates "were assumptions and not based on any research or information linking DACA recipients to costs to the State of Texas."  *Id.* ¶¶ 8, 9.  Dr. Perryman's assumptions are not evidence, and, to defeat a motion for summary judgment, Plaintiffs must set forth specific *facts and evidence* demonstrating that they have suffered an injury.  *See Lujan*, 504 U.S. at 561. They have failed to do so, and this Court should reject the remarkable implication of Plaintiffs' arguments that mere assumptions, unsupported by *any* provable facts, are sufficient to warrant a grant of summary judgment and defeat Defendant-Intervenors' Motion.

Plaintiffs' citation to New Jersey's evidence likewise fails to prove that Plaintiff States have incurred additional social-service expenses as a result of DACA.  Instead, New Jersey's

evidence—which demonstrates that New Jersey would in fact be harmed by DACA's rescission—fatally undermines Plaintiffs' claim that DACA *causes* a harmful increase in social-service expenditures.  Indeed, New Jersey's evidence suggests instead that the state would continue to provide social services to DACA recipients *even if DACA ended*.  *See* Dkt. 502 at 44–45.[1]  As a result, Plaintiffs' Opposition only underscores the fact that DACA itself does not *cause* any of Plaintiffs' purported social-service expenditures.  Even granting Plaintiffs' assumption that the Plaintiff States provide social-service expenditures to DACA recipients, which Plaintiff States have steadfastly been unable to provide *any* evidence of, any such assumed expenditures are not caused because DACA recipients "have DACA," but instead simply "because they are here."  *See* Dkt. 400-2, Ex. 7 ¶ 14.

Plaintiffs also have no response in their Opposition to Defendant-Intervenors' argument that, even if they could demonstrate some increase in social-service expenditures, Plaintiffs' theory of standing is fatally overbroad.  *See* Dkt. 504 at 20.  To reiterate: if Plaintiffs can demonstrate standing here, based solely on their unproven, and therefore speculative, allegations that their social-service expenditures have increased as a result of a federal policy, future states would have standing to challenge *any* federal action that theoretically increases a state's population or impacts a state's spending.  In today's highly polarized environment, such an expansive theory of liability would foreseeably result in an exponential growth of highly politicized and largely frivolous

---

[1] For similar reasons, Plaintiffs' citation, *see* Dkt. 529 at 13 n.7, to the district court's analysis of Maryland's and Minnesota's standing in *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1034 (N.D. Cal. 2018), likewise supports *Defendant-Intervenors*, not Plaintiffs.  In *Regents*, the court concluded that Maryland and Minnesota had standing to challenge DACA's rescission because rescinding DACA would "impos[e] higher healthcare costs on the state."  *Id.*  In other words, DACA's *rescission*, rather than DACA itself, would increase Maryland's and Minnesota's expenditures, and Maryland and Minnesota would incur any alleged social-service costs on DACA recipients *regardless of* DACA.  *See id.*  In any event, whether some DACA recipients in Maryland and Minnesota do not have employer-based health insurance does *not*, contrary to Plaintiffs' unsupported assertion, "acknowledge[] that DACA recipients without employer-based health insurance are currently imposing healthcare costs on Plaintiff States."  Dkt. 529 at 13 n.7.  Evidence of activity in states that are not participating in this litigation cannot substitute for the evidence Plaintiff States have failed to provide about activity within their own borders.

litigation.  For example, under Plaintiffs' theory of standing, states could challenge an increase in the Child Tax Credit, a federal regulation requiring automakers to improve seatbelt safety, or the Food and Drug Administration's approval of a vaccine or treatment that improves health outcomes for a particular virus or disease.  Plaintiffs' Opposition offers no facts or arguments—such as evidence that DACA recipients require disproportionate social-service expenditures or that any alleged costs to Plaintiffs outweigh DACA recipients' significant benefits to their states, *see id.* at 20, 27–28—that would distinguish this case from those hypotheticals.  In short, taking Plaintiffs' theory of social-service expenditure standing to its logical conclusion would render the "irreducible constitutional minimum" of injury-in-fact a nullity, "discarding a principle fundamental to the separate and distinct constitutional role of the Third Branch—one of the essential elements that identifies those 'Cases' and 'Controversies' that are the business of the courts rather than of the political branches."  *Lujan*, 504 U.S. at 560, 576.

Plaintiffs' Opposition also underscores their failure to satisfy their burden to prove that any of their alleged direct injuries are caused by DACA or could be redressed by a ruling in their favor. In their Opposition, Plaintiffs continue to rely exclusively on speculation[2] about how DACA recipients *might* react to DACA's termination, *see* Dkt. 529 at 16–17, rather than rebutting Defendant-Intervenors' evidence showing how DACA recipients actually behave.

For example, Plaintiffs do not challenge Defendant-Intervenors' evidence showing that DACA recipients remain in the United States rather than return to live in their country of origin, *see* Dkt. 504 at 22–23 (citing Dkt. 400-2, Ex. 8 ¶¶ 35–36), nor do Plaintiffs rebut Defendant-

---

[2] Contrary to Plaintiffs' argument, Defendant-Intervenors did not admit that "any federal policy," let alone DACA, does *in fact* affect the number of people in a state.  *Contra* Dkt. 529 at 17.  Instead, Plaintiffs' out-of-context citation to Defendant-Intervenors' statement about the likely effects of "*virtually* any federal policy," Dkt. 224 at 30 (emphasis added), adds only additional speculation, not evidence.  It also emphasizes that Plaintiffs' theory of standing is a slippery slope with no principled stopping point.

Intervenors' expert testimony demonstrating that DACA has not affected recent migration patterns. *See id.* at 23–24 (citing Dkt. 400-1, Ex. 2 ¶¶ 47–51, Dkt. 400-2, Ex. 12 ¶¶ 12–13). In the face of this evidence, and unlike in *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding standing based on evidence at trial demonstrating "the predictable effect of Government action on the decision of third parties" based on historical data about past behavior), which Plaintiffs cite for support, *see* Dkt. 529 at 17, Plaintiffs continue to offer only hypotheticals and flawed survey evidence. *See id.* at 16–17 (citing Dr. Tom Wong's survey, a declaration from an Associate Dean at Princeton, and a quote from a declaration from an Associate General Counsel at Microsoft). Plaintiffs also fault Defendant-Intervenors for not arguing that "not a single DACA recipient will leave the United States should DACA end," *id.* at 17, as if *Defendant-Intervenors* bore the burden to prove that Plaintiffs *lack* standing. In reality, however, it is Plaintiffs' burden to prove causation and redressability, *see Lujan*, 504 U.S. at 560–61, and Plaintiffs have failed to meet that burden. For example, Plaintiffs have failed to prove that DACA has, relative to the baseline pattern of migration, caused any additional individuals to remain in the United States, or that ending DACA would redress Plaintiff States' alleged injuries by causing additional individuals to leave.

Nor do Plaintiffs directly address Defendant-Intervenors' argument that *Regents* undermines Plaintiffs' claim that any alleged injuries could be redressed by a finding that DACA is unlawful. *See* Dkt. 504 at 25. *Regents* makes plain, however, that—even assuming DACA is unlawful—DHS need not terminate DACA or abandon a forbearance-only policy for DACA recipients. *See* 140 S. Ct. at 1912. Instead, *even assuming DACA is unlawful*, the appropriate next step is for DHS to exercise its discretion to address the "important policy choices" related to DACA's future. 140 S. Ct. at 1910. In exercising its discretion, DHS *must* consider "the options

of retaining forbearance or accommodating particular reliance interests." *Id.* at 1915.  Based on

its evaluation of DACA recipients' reliance interests, for example, DHS could consider "a broader

renewal period based on the need for DACA recipients to reorder their affairs," "more

accommodating termination dates for recipients caught in the middle of a time-bounded

commitment," or instructions to "immigration officials to give salient weight to any reliance

interests engendered by DACA when exercising individualized enforcement discretion." *Id.* at

1914.  In short, even assuming DACA is unlawful, DHS maintains discretion to continue to grant

deferred action.  In light of *Regents*, Plaintiffs therefore cannot satisfy their irreducible, threshold

burden to prove that their alleged injuries are redressable, no matter what this Court might rule on

the legality of DACA.

> 2. *Plaintiffs' Opposition further demonstrates the flaws in their* parens patriae *and special solicitude theories.*

Although Plaintiffs must prove that they suffered some harm to a quasi-sovereign interest

to be entitled to *parens patriae* standing or special solicitude, *see* Dkt. 504 at 26, 31, Plaintiffs'

Opposition only underscores their failure to demonstrate the necessary injury.  Indeed, Plaintiffs'

continued reliance on their unqualified experts' faulty conclusions, *see* Dkt. 504 at 21 & n.6; *see*

*also* Dkts. 390, 415 (brief and reply in support of motion to strike Plaintiffs' experts), and their

inapposite and unpersuasive citations to Defendant-Intervenors' evidence, reveal the flaws in the

labor-market distortion theory at the heart of their *parens patriae* and special solicitude arguments.

In their Opposition, Plaintiffs do not distinguish or dispute Defendant-Intervenors'

evidence showing that DACA has not affected employment for U.S.-born workers.  *See* Dkt. 504

at 27, 30–31 & n.10 (citing Dkt. 400-1, Ex. 4 ¶¶ 21–30, Dkt. 400-2, Ex. 7 ¶¶ 18–26).  Plaintiffs

also fail to point to any evidence showing that, in any Plaintiff State, an employer hired a DACA

recipient rather than an equally-qualified U.S.-born worker, leaving that U.S.-born worker without

reasonably equivalent employment.  Nor, in their Opposition, do Plaintiffs convincingly explain why their experts' flawed and inconclusive testimony—which is grounded in hypotheticals, rather than specific empirical data, *see id.* at 21–22 (explaining faults in Dr. Lloyd Potter's testimony), 28–29 (explaining faults in Dr. Deere's testimony)—satisfies their burden to come forward with specific facts.  *See Lujan*, 504 U.S. at 561.  And Plaintiffs have introduced *no* evidence whatsoever demonstrating that their purported experts' hypotheticals remain true under the Wolf and Edlow Memos, which significantly limit grants of advance parole (including by preventing DACA recipients from using advance parole to travel abroad for employment-related purposes), cut the period of deferred action in half, and preclude initial DACA applications.  *See* Dkt. 504 at 17–18.

Instead, Plaintiffs unsuccessfully attempt to distort Defendant-Intervenors' evidence to satisfy the multi-step chain of inferences Plaintiffs must prove to demonstrate injury through labor-market distortions.  *See* Dkt. 529 at 14; *see also* Dkt. 504 at 30 (explaining chain of inferences necessary to support Plaintiffs' theory of harm and Plaintiffs' erroneous reliance on Defendant-Intervenors' experts).  For example, Plaintiffs cite a 2003 academic paper "introduced by the DACA Intervenors," Dkt. 529 at 14, but relied on by Plaintiffs' expert, *see* Dkt. 504 at 31, to support their theory.  That paper, which analyzes data that predates DACA by more than a decade, *see* Dkt. 400-8, Ex. 61 at 3, says nothing about *DACA*'s effect on the labor market, and it recognizes that its results are in tension with the general consensus in the economic literature that the "measured impact of immigration on the wage of native workers . . . seems to cluster around zero."  *Id.* at 2.  Similarly, Plaintiffs' reliance on New Jersey's "evidence of employers who have hired DACA recipients" also fails to satisfy Plaintiffs' burden.  Dkt. 529 at 14.  Plaintiffs suggest, for example, that Microsoft's employment of DACA recipients demonstrates that DACA causes labor market distortions.  *See id.*  The same evidence, however, could support exactly the opposite

conclusion:  the DACA recipients working at Microsoft may be difficult to replace, *see id.*, precisely because there are not enough equally qualified U.S.-born workers available to fill the DACA recipients' roles.  Of course, Defendant-Intervenors need not prove that no such U.S.-born workers exist; instead, as the parties invoking this Court's jurisdiction, Plaintiffs must prove that they do.  Plaintiffs have failed to meet their burden.[3]

By failing to identify a single U.S.-born worker in one of the Plaintiff States who suffered economic harm because of competition from DACA recipients, Plaintiffs have also left unaddressed one of the gaps in the evidentiary record that the Court specifically identified earlier in this case.  In its ruling denying Plaintiffs' motion for a preliminary injunction, the Court noted that "the record does not indicate why [DACA recipients] were chosen" for employment over other applicants.  Dkt. 319 at 39 & n.44.  The Court recognized that the reason "could be they were better qualified, cheaper to hire, or due to any number of other reasons."  *Id.*  The Court concluded, however, that at the preliminary injunction stage, it "d[id] not need to resolve every factual controversy to make a standing determination."  *Id.*  But the case has progressed passed the preliminary injunction stage, and to defeat Defendant-Intervenors' motion for summary judgment, Plaintiffs "can no longer rest on [ ] 'mere allegations.'"  *Lujan*, 504 U.S. at 561.  Without evidence showing that any adequately qualified applicant in any Plaintiff State suffered an economic injury because of competition from DACA recipients—and with credible, expert evidence suggesting

---

[3] Even if Plaintiffs could satisfy their burden to show that DACA recipients cause labor-market distortions, DACA recipients obtain work authorization through valid laws and regulations completely independent of DACA.  *See* Dkt. 504 at 40 & n.12; *see also* Dkt. 524-1 (Brief of *Amici Curiae* 54 Local Governments and Local Government Advocacy Organizations). As a result, even if Plaintiffs could demonstrate some injury to a quasi-sovereign interest, any alleged harm would be caused not by DACA, but by the separate laws and regulations that make DACA recipients eligible for work authorization.  Notably, in oral arguments at the Supreme Court in *California v. Texas*, No. 19-840 (Nov. 10, 2020), several Justices—including Chief Justice Roberts—appeared to cast doubt on whether a plaintiff has standing to challenge one government action (here, DACA) based on alleged injuries purportedly caused by a different government action (here, the separate laws and regulations making DACA recipients eligible for work authorization). *See* Tr. of Oral Arg. at 93–95, 108–11; *cf.* Dkt. 447.

exactly the opposite, *see, e.g.*, Dkt. 504 at 31—Plaintiffs have failed to satisfy their burden to show that DACA caused any labor-market distortions or harmed the economic well-being of their citizens.

As a result, even if *parens patriae* standing were as a general matter available to Plaintiffs in a suit against the Federal Government (and it is not, *see id.* at 25–26), and even if Plaintiffs were potentially entitled to special solicitude (which they are not, *see id.* at 31–32), Plaintiffs have failed to satisfy their burden to prove any injury to a quasi-sovereign interest, as they must to invoke either theory of standing.

**B.**     **Federal Defendants' Attempt to Minimize The Wolf and Edlow Memos Demonstrates that this Case Continues to Lack Adversity**

In their Response to Defendant-Intervenors' Motion for Summary Judgment, *see* Dkt. 527, Federal Defendants make no serious effort to defend DACA, or to argue that Plaintiffs have failed to satisfy their burden to prove that they have standing.  Instead, Federal Defendants repeat Plaintiffs' flawed argument that the Court's statements during an earlier, preliminary phase of the case—which were explicitly preliminary in nature and which were made before the conclusion of discovery or the Supreme Court's ruling in *Regents*—control the outcome now.  *See, e.g.*, *id.* at 1– 2.  As a result, this case continues (and would continue, even in the absence of the Wolf and Edlow Memos) to lack the adversity that Article III requires.  *See* Dkt. 504 at 33–36.

Federal Defendants' attempt to minimize the impact of the Wolf and Edlow Memos only underscores and reinforces the fact that this case lacks adversity.  In their Response, Federal Defendants do not highlight the fact that the significant changes to DACA introduced by the Wolf and Edlow Memos substantially strengthen their argument that the Court should not reach the merits of Plaintiffs' claims, and should instead follow the Supreme Court's instruction to allow DHS to continue to exercise its discretion regarding DACA's future, including by considering

reliance interests.  *See Regents*, 140 S. Ct. at 1910.  Instead, Federal Defendants join Plaintiffs in attempting to *downplay* the impact of the Wolf and Edlow Memos—the very memoranda that the Federal Defendants are currently *defending* in separate litigation—describing the fundamental changes to DACA these memoranda instituted, including their elimination of all initial DACA grants and significant limitations on grants of advance parole, *see* Dkt. 504 at 13–15, as "limited." *See* Dkt. 527 at 1–2; *see also* Dkt. 529 at 5.

Federal Defendants' (and Plaintiffs') attempt to minimize the Wolf and Edlow Memos, however, is misleading, and is yet more evidence of Federal Defendants' refusal to defend DACA (and, in turn, this action's lack of requisite adversity).  The Wolf Memo is explicit about its significant impact, describing "serious concerns" about the earlier version of DACA and explaining that DHS has determined "that some changes should immediately be made to the policy to limit its scope in the interim." Dkt. 504-2, Ex. 3 at 5.  In addition to implementing other changes, the Wolf Memo instructs DHS to immediately "[r]eject all initial DACA requests," "[l]imit the period of any deferred action . . . to one year," and "[r]eject all pending and future Form I-131 applications for advance parole . . . absent exceptional circumstances." *Id.* at 7–8.[4]  Simply put, these changes are significant and meaningful.

Although Federal Defendants now describe these sweeping changes as "limited," Dkt. 527 at 1–2, elsewhere, Federal Defendants have acknowledged the Wolf Memo's broader impact.  *See,*

---

[4] Plaintiffs suggest that the Wolf and Edlow Memos, along with the rescission memos, did not significantly affect the rate of discretionary denials because "applications from individuals who have never before applied for DACA can make it into the adjudication workflow." Dkt. 529 at 11–12. The evidence that Plaintiffs themselves cite, however, demonstrates that USCIS's "internal report suggests that there are only a handful of pre-rescission initial filings and about 2700 of the 'renewals as initials'." Dkt. 529-3, Ex. 3 at DEF 00008632. As a result, the denial rate would be significant even excluding these true initial applications. Plaintiffs also suggest that the approval rate for individuals seeking to renew DACA suggests that USCIS adjudicators do not exercise discretion. *See* Dkt. 529 at 12–13. But the fact that USCIS denies *any* renewal requests is telling: By definition, individuals who apply for a renewal have already satisfied the discretionary criteria in their initial application. That USCIS denies some of these applications makes clear that adjudicators are exercising discretion.

*e.g.*, Dkt. 504-2, Ex. 13 at 21 (Federal Defendants arguing that, in implementing the Wolf Memo, Wolf "considered the relevant record, explained his reasoning, and *expressly modified DHS's preexisting guidance for the exercise of enforcement discretion* regarding DACA requests" (emphasis added)).  By underplaying these significant changes to DACA, Federal Defendants again make plain that this case lacks the adversity that Article III demands, and that prudential considerations favor dismissal.  *See* Dkt. 504 at 33–36.

## IV.    CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court grant Defendant-Intervenors' motion for summary judgment as to Plaintiffs' lack of standing, deny Plaintiffs' motion for summary judgment, and allow DHS to continue its exercise of discretion regarding DACA.

Dated: November 30, 2020                                 Respectfully Submitted,


                                                                 **MEXICAN AMERICAN LEGAL
                                                                 DEFENSE AND EDUCATIONAL FUND**
                                                                 By:  */s/ Nina Perales*
                                                                 Nina Perales (Tex. Bar No. 24005046);
                                                                 (SD of Tex. Bar No. 21127)
                                                                 Attorney-in-Charge
                                                                 110 Broadway, Suite 300
                                                                 San Antonio, Texas 78205
                                                                 Phone: (210) 224-5476
                                                                 Facsimile: (210) 224-5382
                                                                 Email: nperales@maldef.org

                                                                 **ROPES & GRAY LLP**
                                                                 Douglas H. Hallward-Driemeier
                                                                 2099 Pennsylvania Ave NW
                                                                 Washington, DC 20006-6807
                                                                 (202) 508-4600
                                                                 (202) 508-4776 (direct dial)
                                                                 Douglas.Hallward-
                                                                 Driemeier@ropesgray.com
                                                                 (Admitted pro hac vice)

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

14

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on November 30, 2020, I electronically filed

the above and foregoing document using the CM/ECF system, which automatically sends

notice and a copy of the filing to all counsel of record.


*/s/ Nina Perales*
Nina Perales
Attorney for Defendant-Intervenors