```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION

 3     ************************************************************

 4     STATE OF TEXAS, ET AL          1:18-CV-00068

 5
       VS.                            HOUSTON, TEXAS
 6

 7     UNITED STATES OF AMERICA, ET
       AL                             DECEMBER 22, 2020
 8

 9     ************************************************************

10              TRANSCRIPT OF MOTION PROCEEDINGS
          HEARD BEFORE THE HONORABLE ANDREW S. HANEN
11               UNITED STATES DISTRICT JUDGE

12     ************************************************************

13     APPEARANCES:

14     FOR THE PLAINTIFFS:          MR. TODD LAWRENCE DISHER
                                    Office of the
15                                  Attorney General of Texas
                                    209 West 14th Street
16                                  8th Floor
                                    Austin, Texas 78701
17
                                    MR. ERIC ALAN HUDSON
18                                  Texas Attorney General
                                    300 West 15th Street
19                                  Austin, Texas 78711

20                                  MS. ELIZABETH MURRILL
                                    Office of the Attorney General
21                                  Louisiana Department of Justice
                                    1885 North 3rd Street
22                                  Baton Rouge, LA 70802

23

24
            Proceedings recorded by mechanical stenography,
25     transcript produced via computer.
```

```
 1    FOR THE INTERVENOR            MS. NINA PERALES
      DEFENDANTS                    MALDEF
 2    KARLA PEREZ, ET AL:           110 Broadway
                                    Suite 300
 3                                  San Antonio, Texas 78205

 4                                  DOUGLAS H. HALLWARD-DRIEMEIER
                                    Ropes & Gray LLP
 5                                  2099 Pennsylvania Avenue, NW
                                    Washington, DC 20006-6807
 6

 7    FOR THE INTERVENOR            MR. JEREMY M. FEIGENBAUM
      STATE OF NEW JERSEY:          Office of the
 8                                  New Jersey Attorney General
                                    RJ Hughes Justice Complex
 9                                  25 Market Street
                                    Trenton, New Jersey 80625
10

11    FOR THE FEDERAL DEFENDANTS:   MR. JOHN COGHLAN
                                    U.S. Department of Justice
12                                  PO Box 868
                                    Washington, DC 20044
13
                                    MR. DANIEL DAVID HU
14                                  U.S. Attorney's Office
                                    1000 Louisiana
15                                  Suite 2300
                                    Houston, Texas 77002
16

17    Official Court Reporter:      Lanie M. Smith, CSR, RMR, CRR
                                    Official Court Reporter
18                                  United States District Court
                                    Southern District of Texas
19                                  515 Rusk
                                    Room 8004
20                                  Houston, Texas 77002

21

22

23

24

25
```

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Thank you.  Be seated.

Good morning, Counsel.

We're here in the State of Texas versus United States, 18-cv-68.  Before we start, let me do a little housekeeping.

First of all, I appreciate the fact that our counsel from Washington and New Jersey came down here; and I know there was a motion to, one, let them appear by phone; and, two, to put off the hearing until early January.

We've had mixed results with phone, people trying to argue by phone and especially with the fact that we set up special lines so people could listen in.  We were having technology problems about letting some people argue but not everybody unmute and argue at the same time and maybe people that weren't lawyers arguing.  So that's why we couldn't do it by phone.

With regard to the hearing date, the general consensus, at least here in the Southern District -- and I don't know that anybody can really say what is what with regard to COVID -- is that the COVID situation will be worse after the holiday and it's better to do this before.

So we scheduled this to give enough distance away from Thanksgiving but before Christmas.  And so you can blame

1   me or COVID, whichever one you want to blame; but I appreciate

2   you being here.

3           As you can tell, we're trying to keep you as

4   socially distanced as possible.  When you're talking, if you

10:14AM  5   want to take off your mask, you're welcome to.  I have my mask

6   off, but I'm 6 feet away from everybody.  Plus these guys are

7   around me all the time anyway so if I have it, they have it.

8           We have covers on the microphones and we replace

9   those every time so make sure -- I'm going to have you speak

10:14AM  10  from your tables so, like, for instance, Ms. Perales, you're

11  going to want to make sure that microphone is facing you.

12          We don't have -- of course this is the courtroom

13  with the least technology.  We don't have -- you guys are just

14  going to have to speak loudly.

10:15AM  15          Anyway, I think we're all right there.  I'm

16  looking out in the audience.  We don't have many people here in

17  the audience, so I don't think we have to worry about social

18  distancing there.

19          Let me do, as I have in the past, some

10:15AM  20  preliminaries about really what we're here to talk about.  I

21  mean, we're here to talk about whether DACA was legally

22  created.  We're not talking about whether it's popular or

23  whether it's good policy or bad policy or, you know, whether

24  it's contrary to immigration policy as opposed to law.  We are

10:15AM  25  talking about whether it's contrary to law.

1        We're not talking about issues of border security

2  or any of the other popular themes that seem to pervade our

3  press and newspapers.  I mean, so let's stick to the facts

4  here.

10:16AM 5        As everyone here I think knows, to qualify for

6  DACA, you have to be in the country illegally.  There are a

7  number of -- six or seven different qualifications you have to

8  go through to be a DACA recipient.

9        But I mention that one because I don't want

10:16AM 10 anybody to walk away from this hearing thinking lawyers for

11 Texas or lawyers for the government or lawyers for the DACA

12 recipients or the lawyers for New Jersey are speaking in the

13 pejorative if they use the term "illegal alien" or "illegal

14 immigrant."

10:17AM 15       As you know, the Fifth Circuit has actually said

16 that's the term that ought to be used when we talk about this

17 because it describes someone from one country who is present in

18 another country without complying with that second country's

19 immigration laws.

10:17AM 20       And so while it may not sound or be politically

21 correct in today's parlance, popular parlance, it does apply

22 here in a certain context.  So I don't want anyone walking away

23 with the feeling that somebody on the other side is racist or

24 xenophobic or anti-immigrant just because they use the term

10:17AM 25 "illegal immigrant" or "illegal alien."

1              All right.  That having been said, let's turn to

2      the actual merits of why we're here today.  Procedurally we

3      have competing motions for summary judgment and I actually want

4      to start with the intervenors' motion first, the motion on

10:18AM  5      standing, unless there's some objection from any person, and

6      then circle back and take the State's motion for summary

7      judgment.

8              So who is going to take the lead on that?

9              MS. PERALES:  Your Honor, Douglas Hallward-Driemeier

10:18AM 10      will argue defendant-intervenors' motion for summary judgment;

11      however, a question for the Court whether and when the Court

12      might want to hear oral argument on the *Daubert* motion or the

13      motion to exclude testimony for the summary judgment phase?

14              THE COURT:  Why don't we do that first.  Are you going

10:19AM 15      to argue that, Ms. Perales?

16              MS. PERALES:  Yes, Your Honor.

17              THE COURT:  All right.  Why don't you lead off then.

18              MS. PERALES:  Thank you, Your Honor.

19              Before I start, I would like to introduce an

10:19AM 20      attorney who came with me from MALDEF today, Samantha Serna

21      Uribe; and also one of the DACA Intervenors is here with us

22      today.  Her name is Esther Jeon.

23              THE COURT:  All right.  Welcome to both of you.

24              MS. PERALES:  Thank you, Your Honor.

10:19AM 25              In our filing, which is Docket 390, the

defendant-intervenors DACA recipients request that the Court
not consider the testimony of two experts put forward by the
plaintiffs, Mr. Donald Deere and -- sorry.  Dr. Donald Deere
and Dr. Lloyd Potter.

When deciding motion for summary judgment, the
Court has the discretion to disregard an expert opinion that is
unreliable or irrelevant or both.  And the case here of course
is *Munoz versus Orr*.

And in *Munoz*, the Court excluded expert testimony
at the summary judgment stage because the methods were not in
accord with other experts and also that he made mistakes,
failed to consider other variables and made assumptions that
drove his conclusions.  We have very much the same situation
here as was presented in *Munoz*.

Dr. Deere is an economist.  He testifies
primarily in wage and hour cases and employment discrimination
cases.  He does not research or testify on the impact of
immigrants on the labor market.  He is not qualified to offer
the conclusions that he does.

But more importantly, his conclusions are
speculative.  He made assumptions about -- and this is with
respect to the interaction between the Affordable Care Act and
hiring of DACA recipients versus other authorized workers.

He only made assumptions, did no study of how
many businesses find themselves in this situation, how many

1    times any businesses have been faced with these equally

2    qualified candidates that are U.S. citizens and DACA that he

3    presented in his scenario.

4             He makes assumptions about how many hiring

10:21AM  5    managers know how the ACA penalty works, how many U.S. citizens

6    may or may not trigger the ACA penalty, when employers know --

7    at what point in the hiring process employers know somebody is

8    a DACA recipient.

9             He assumes further -- these are all assumptions

10:22AM 10   that he makes without any study at all -- that businesses would

11   favor a DACA recipient over a non-DACA recipient.  He assumes

12   no other variables would affect the hiring decision and all

13   other factors in the economy would remain constant.

14            Most importantly, Dr. Deere was unable to

10:22AM 15   document a single instance of this happening.  He didn't talk

16   to any employers.  He didn't create any actual fact that

17   supports his conclusions.

18            And we would also like to point the Court to

19   *Hathaway versus Bazany,* which similarly excluded an expert's

10:22AM 20   testimony for making so many assumptions that the conclusion

21   itself was not reliable.

22            In addition, the conclusions are irrelevant in

23   the sense that Dr. Deere isn't able to say that even if this

24   were to happen based on all of his assumptions, that there

10:23AM 25   would be any pressure on the labor market.  So qualifications,

the methodology and relevance are all present.

And similarly with the second expert, the demographer, Dr. Lloyd Potter, whose testimony is presented to argue that people will leave the state or leave the plaintiff states if they lose their DACA, Dr. Potter is not qualified to render opinions having to do with immigrant demography or the reasons why immigrants may stay or choose to leave the United States.

And he makes one central and incorrect assumption which dooms his analysis.  Dr. Potter conceded that he assumed that if somebody lost their work authorization, they would be unable to work in the United States; and that's not true.

When you lose your work authorization, you can still work in the United States.  You can work in a business that you own.  You can work in your family business that's owned by your family.  You can work as an independent contractor.  You can mow lawns for money.

And Dr. Potter conceded that he hadn't thought about any of those possibilities and ultimately he testified, quote, well, I hadn't really kind of thought the whole thing through, unquote.

His work further --

THE COURT:  Would working for your family be legal?

MS. PERALES:  If your family owns a restaurant, let's say, Your Honor, in the example that I gave and you're working

1    with your family members in the restaurant and you're not

2    work-authorized, yes, the work would be legal as long as you're

3    not --

4             THE COURT:  Would your family be breaking the law by

10:24AM  5    hiring you?

6             MS. PERALES:  If you're not an employee, no,

7    Your Honor.

8             THE COURT:  Okay.  I'm missing that.  You are making a

9    distinction between working and not an employee and I missed

10:25AM 10   that distinction.

11            MS. PERALES:  That's right, Your Honor, because not all

12   work is performed as an employee of the business.  If you're

13   self-employed or you're working with your family, not as an

14   employee but in a joint effort to run whatever enterprise is

10:25AM 15   being run, then your work is not unlawful and your parents are

16   not breaking the law by having you work with them.

17            THE COURT:  So if I owned a restaurant and my son is in

18   the country illegally and doesn't have work authorization, I

19   can still hire him to be a waiter in my restaurant?

10:25AM 20            MS. PERALES:  As long as he's not an employee, yes,

21   Your Honor.

22            THE COURT:  So if he's, what, an independent

23   contractor?

24            MS. PERALES:  He could be or he could just be helping

10:25AM 25   out and you could be supporting him.  As long as he's not an

1  employee, his work authorization or lack thereof doesn't come

2  into play.

3         THE COURT:  So if he was basically working for free,

4  just for the family good to help support the family and I

10:26AM  5  wasn't paying him a salary, then I, as the employer, would not

6  be illegal, breaking the law by hiring him?

7         MS. PERALES:  That's correct.

8         THE COURT:  Okay.  Go ahead.

9         MS. PERALES:  And so because Dr. Potter made this very

10:26AM  10  flawed assumption, he eventually conceded that he hadn't really

11  thought the whole issue through.

12         But in addition to that, his analysis is purely

13  based on speculation.  In his deposition, he agreed that he had

14  no studies or information, either his own information or

10:26AM  15  other's information, about DACA recipients' likelihood of

16  return if they lost DACA.

17         He relied on eight articles.  They don't support

18  his conclusion.  The articles that he relied on don't study

19  undocumented immigrants, did not study Texas, did not study

10:27AM  20  states with different work authorization verification schemes,

21  and did not analyze populations similar to DACA recipients.

22         Now, ultimately he expressed his opinion as the

23  idea that quote/unquote some people might return and when

24  pressed for a number, he testified somewhere between one and

10:27AM  25  everybody.  That testimony really reveals how speculative and

1    unsupported his analysis was.

2         Now, the Court said in its order on Docket 452

3    that the Court would treat the points raised in our motion as

4    objections to the expert testimony for the pending summary

10:27AM 5    judgment motion; and for that reason, we've reasserted the

6    motion in our response to the motion for summary judgment.

7         Now, the plaintiffs have responded in part going

8    to the weight and Mr. Disher will give his argument on that.

9    But the plaintiffs wrote in their response, which is at

10:28AM 10   Docket 411, quote, defendant-intervenors' arguments are better

11   resolved through cross-examination and contrary evidence than

12   in a motion such as this.

13        And we'll get to their response to summary

14   judgment a little bit later; but I wanted to point that out

10:28AM 15   because I think even the plaintiffs at this point have taken

16   the position that if there is competing evidence, even if the

17   Court doesn't completely exclude these experts, that a trial is

18   really the necessary forum to work out the weight or the

19   credibility of the experts.

10:28AM 20        Thank you.

21        THE COURT:  Mr. Disher, who wants to reply from your

22   side?

23        MR. DISHER:  Thank you, Your Honor.  Todd Disher for

24   the plaintiff states.

10:29AM 25        Just a brief introduction.  With me today is

1    Mr. Eric Hudson with our office as well as Elizabeth Murrill.

2    She is the solicitor general for the great State of Louisiana.

3            So just a couple of points in response to the

4    *Daubert* motion.  Of course, we filed a written reply which the

10:29AM  5    Court can review.

6            Obviously we're here on a motion for summary

7    judgment and as the Court weighs and considers our motion for

8    summary judgment, the Court can of course give the weight that

9    is due to the various expert testimony and expert declarations.

10:29AM 10    There's no need for the Court to resolve the motion to strike

11    at this point.  The Court will be presumed, in fact, to have

12    given it the weight that it's due.

13            Additionally the two conclusions from our experts

14    are, in fact, confirmed by many of the other witnesses in this

10:29AM 15    case as well as the plaintiffs' own expert.

16            First with Dr. Deere, the defendant-intervenors,

17    for example, have offered an opinion from Ike Brannon.  During

18    his deposition, Ike Brannon -- this is, again, all laid out in

19    our motion and various points in our pleadings -- Dr. Ike

10:30AM 20    Brannon confirmed what Dr. Deere said that for certain lawfully

21    present workers, be they citizens or other folks who are

22    lawfully present to work here, having the DACA recipients be

23    eligible to work, in fact, does increase competition for at

24    least certain segments of the population.

10:30AM 25            As far as Dr. Potter is concerned, this Court is

1    well aware of the survey from Dr. Wong -- again, an expert by

2    both the DACA Intervenors as well as the state of New Jersey --

3    who did a survey of DACA recipients and in his survey found

4    that a substantial portion of them were either highly likely or

10:30AM  5    somewhat likely to leave the country should DACA end.

6                I would also simply point out, as we have before,

7    that the defendant-intervenors have never once said should DACA

8    end all of the DACA recipients will stay in the country.  They

9    have never once said that.

10:30AM  10               And so Dr. Potter's declaration stands for the

11   very common sense principle that should DACA end and these

12   folks no longer be able to work here lawfully -- some of them

13   may be able to be supported by their family members, some of

14   them who are highly educated and qualified may not want to do

10:31AM  15   that -- so a certain percentage of them would likely leave the

16   country.

17               So, again, the Court can evaluate all of that

18   evidence for itself and give it the weight that it's due as the

19   Court has already done in ruling on our motion for preliminary

10:31AM  20   injunction citing to Dr. Deere's very basic proposition of

21   black-letter law that the ACA mandate does not apply to DACA

22   recipients as well as Dr. Potter's conclusion, which is of

23   course confirmed by the defendant-intervenors' own expert.

24               So we would just ask the Court to consider all of

10:31AM  25   that when it is ruling on the motion for summary judgment and

give it the weight that it's due.  There's no need to resolve

that issue on a motion to exclude the expert testimony.

THE COURT:  What do I do -- and, Mr. Disher, I'm asking

you; but I'm going to let Ms. Perales think about it and let

10:32AM  her respond to this too.

What do I do with the fact that, in theory at

least, if there's no DACA all the DACA recipients are removable

aliens and presumably should be removed if they're following

the INA -- if the government is following the INA?  I mean,

10:32AM  doesn't that prove Dr. Potter's theory?

MR. DISHER:  It does, Your Honor.  Again, we can't

quantify how many DHS is likely to remove at this point given

their limited resources; but, again, I think it is a very, you

know, indisputable idea that should DACA end, some percentage

10:32AM  of DACA recipients will leave the country whether it's

voluntarily or through some removable action.

THE COURT:  All right.  Thank you, Mr. Disher.

Ms. Perales, you want to weigh in on the question

I just asked?  So I mean, in theory to be a DACA recipient, you

10:33AM  either overstayed your visa or you came in the country

illegally.  And I think, at least when I looked at it last, it

was about 50/50 how people fell into those two categories.

I mean, either way, you would be removable; so

wouldn't the proof be in the pudding that if the government was

10:33AM  actually doing its job as that job is laid out in the INA,

1    those people would be removed, whether as Mr. Disher said,

2    voluntarily or involuntarily?

3         MS. PERALES:  Two answers for that, Your Honor, before

4    I get to the reply portion of what I wanted to say.  First of

10:33AM  5    all, and I hope I get a chance to talk about this a little bit

6    later in response to the motion for summary judgment, but DACA

7    recipients are removable even when they're DACA recipients.

8    Having DACA or having deferred action doesn't change the fact

9    that you are removable or that you are undocumented.

10:34AM  10         THE COURT:  But they have legal presence under DACA?

11         MS. PERALES:  Yes, and I hope to discuss that a little

12    bit later with Your Honor as well.  They have not legal

13    presence but lawful presence as that term has been coined.

14              So as to the second part of what I wanted to say,

10:34AM  15    DACA recipients have been here for a while.  They have been out

16    of status for a while.  If they were to lose DACA, the most

17    reasonable expectation is that they would continue in that

18    state of being present and lacking immigration status and

19    that's the state that they were in before they received DACA.

10:34AM  20              The fact that somebody is removable doesn't mean

21    that they are immediately placed in removal proceedings and I

22    think Mr. Disher acknowledged that to some degree.  And so it

23    does not support Dr. Potter's otherwise completely unsupported

24    speculation that people would leave -- perhaps one, perhaps

10:35AM  25    all.  He has no information and produced no information about

1    people leaving or their likelihood of leaving.

2              I would like to respond to plaintiffs' contention

3    which they have sort of made a theme in this litigation that

4    somehow the defendant-intervenors' experts testified in support

10:35AM  5    of plaintiffs' position.  There's plaintiffs' theme that

6    defendant-intervenors' experts have supported plaintiffs'

7    position.

8              And I want to point out that with respect to the

9    ACA and the competition and the DACA recipient purportedly

10:36AM  10    being hired instead of a U.S.-born worker, Dr. Perryman

11    expressed that he, quote, does not know one way or the other,

12    unquote, whether an employer has ever hired a DACA recipient

13    for a job that a U.S. citizen also applied for.

14              Dr. Brannon referenced statements regarding only

10:36AM  15    general economic principles rather than any actual empirical

16    evidence of DACA's effects on wages.

17              Dr. Perryman, who is often raised by the

18    plaintiffs, testified that he has no information that there are

19    DACA recipients competing for low-skill jobs with non-DACA

10:36AM  20    workers.

21              And then finally Dr. Ku, who is an expert on the

22    ACA, said that there has not been any overall decline in

23    employment for U.S.-born workers following implementation of

24    DACA and the ACA.

10:37AM  25              So there's just no support for what Dr. Deere is

saying, and there's also no support for what Dr. Potter is

saying.

Now, plaintiffs refer to Dr. Wong who is not our

expert.  So for the purpose of this, the defendant-intervenors

10:37AM  can't be collapsed into one entity.  In fact, our expert,

Dr. Perryman, has testified why the statement of Dr. Wong is

not reliable and should not be used to counteract the

statements of Dr. Potter.

And my colleague, Mr. Hallward-Driemeier, has

10:37AM  more on that with his portion of the argument.

So, Your Honor, these two expert reports don't

meet the standards for expert testimony.  They should be

excluded; and at the very least, they are part of a serious

dispute over material facts that would preclude summary

10:38AM  judgment on these questions.

THE COURT:  Mr. Feigenbaum, do you have a dog in this

fight?

MR. FEIGENBAUM:  Thank you, Your Honor.

New Jersey is deferring to the DACA intervenor

10:38AM  defendants and their counsel for discussing this motion.  We

agree with them and we agree that the evidence presented in

this will ultimately go to both Mr. Hallward Driemeier's motion

and the plaintiff state's motion.  We shouldn't be relying on

those experts.

10:38AM  THE COURT:  All right.  Mr. Coghlan, you or Mr. Hu want

1    to weigh in?

2         MR. COGHLAN:  Just briefly, Your Honor.

3              Your Honor, as defendants at the outset of this,

4    the federal defendants have pointed out they disagree that this

5    Court has *parens patriae* standing, but we also recognize the

6    Court has found that.

7              But on the standing issue, Your Honor, you know,

8    the federal defendants' view is that even if these experts are

9    excluded there, that would not change the Court's analysis as

10   previously ruled.  It's noted that it relied on Dr. Wong's

11   statements and finding that there was standing and so federal

12   defendants' view is that it would not necessarily change the

13   Court's analysis regardless of its --

14        THE COURT REPORTER:  Regardless of its?

15        MR. COGHLAN:  Regardless of its ultimate decision on

16   these experts.

17             But we also agree with counsel for Texas that the

18   Court can grant whatever weight it determines appropriate as to

19   each of their testimony.

20        THE COURT:  Okay.  All right.  Let's shift over then

21   and talk about standing.  Is it Hayward?  Hallward?

22        MR. HALLWARD-DRIEMEIER:  It's Hallward-Driemeier, a

23   mouthful if ever there was one.

24        THE COURT:  I'm missing an "I" on the "meier" part.  I

25   had a cheat sheet here and I was trying to read it.

1        MR. HALLWARD-DRIEMEIER:  It is hard enough when it is

2    spelled correctly.  It is even more difficult when not.

3              Well, I'm happy to be following Ms. Perales

4    because I'll certainly rely on much of what she said and

5    incorporate it into my own arguments.

6              I have three primary points.  The first is how

7    the standing issue differs from the Court's earlier decision in

8    the DAPA case, the Fifth Circuit's decision in the DAPA case.

9              The second is how the standing issue now differs

10   from the Court's decision on the preliminary injunction

11   decision.

12             And the third is how it differs from

13   *Massachusetts v. EPA*.  Those generally map on to the driver's

14   license cost, the DAPA decision.  The health care and schooling

15   costs, that's the PI.  And then the sort of *parens patriae*

16   issue or the special solicitude, that's the *Massachusetts*

17   decision.

18             Starting with driver's licenses, both this Court

19   and the Fifth Circuit specifically relied on the very concrete,

20   specific evidence that was provided in the DAPA litigation

21   about a direct cost to the State of Texas as a consequence of

22   DAPA and that was estimated in declarations to be between 130

23   and 170 --

24             Yes, Your Honor.

25             THE COURT:  (Addressing the court reporter.)  He's

1    saying "DAPA" with a D-A-P-A as opposed to "DACA."

2         THE COURT REPORTER:  Thank you.

3         MR. HALLWARD-DRIEMEIER:  Thank you, Your Honor, for

4    that clarification.  The record will be much better for it.

10:41AM  5         So in the Fifth Circuit's decision, the Court of

6    Appeals specifically said that it was only relying on that very

7    specific evidence of a very direct cost and that's at 809 F.3d

8    at Page 150.

9         Here by contrast, although it was initially pled

10:42AM  10   in the complaint, the plaintiffs have specifically disavowed

11   that they are making that argument relying on that evidence in

12   this case.  There was initially a document that was submitted

13   that included some of the declarations from the DAPA

14   litigation, but the Court granted our motion to exclude those

10:42AM  15   undisclosed witnesses and that was Docket 318.

16        And I'll note also that at Docket 105 at Page 3,

17   the plaintiffs specifically represented that they were, quote,

18   not relying on the Peters declaration in support of their PI.

19   So the specific cost that was relied on by the Court in that

10:42AM  20   litigation is not present here.

21        At the PI stage, the Court did rely on some

22   different types of expenses and those related to health care

23   and education.  Now, I'll note that in the DAPA litigation the

24   Court did not find those costs to be supportive of standing

10:43AM  25   because the Court noted that they were indirect damages and

1    moreover that they were not caused by DAPA and that's at 86

2    F.Supp.3d at 634.

3        THE COURT:  Of course DAPA hadn't been enacted at that

4    point.  It wasn't in existence.

10:43AM  5        MR. HALLWARD-DRIEMEIER:  That's true.  There was yet

6    another problem of speculation at that time.

7            But primarily the Court was relying on the fact

8    that those costs, health care and education, derived from the

9    presence of the individual rather than their lawful presence

10:44AM  10   and as a consequence there was both a causation and

11   redressability problem with relying on that and that's again at

12   Page 634 and 635.

13       THE COURT:  What do I do with -- and I'll ask the same

14   question I asked Ms. Perales and Mr. Disher a minute ago.  And

10:44AM  15   throughout the briefing, the intervenors' attack on the States'

16   evidence has been, well, you've got evidence of what illegal

17   immigrants may cause but you haven't split them out between

18   DACA and immigrants, other immigrants.

19           What do I do with the fact that Mr. Disher comes

10:44AM  20   back and says, well, if the -- under his take care claim, if

21   the federal government was doing what the INA told them to do,

22   there wouldn't be either one of them here and we would save all

23   of that money?

24       MR. HALLWARD-DRIEMEIER:  Well, Your Honor, with respect

10:45AM  25   to that claim, as we've noted in our papers, Congress only

1    appropriates enough resources for the government to remove a

2    very small fraction of the some 11 to 12 million undocumented

3    immigrants in the country in any given year.

4         And so it's not a failure to take care when

10:45AM   5    because of the appropriations that are available, the executive

6    by necessity has to prioritize among those --

7         THE COURT:  And let's say I agree with that argument.

8    I can tell you the judiciary wishes they would have

9    appropriated more money to us.  We would have better acoustics

10:46AM   10   in this courtroom.

11        But doesn't that play into them saying, okay,

12   that's fine and good.  They're not going to deport or remove

13   these people, but we still have to pay all the costs for them.

14        I mean, you can't have your cake and eat it too.

10:46AM   15   You can't say they're going to stay if DACA is removed and

16   there's not -- but there's not a cost involved in that.

17        MR. HALLWARD-DRIEMEIER:  Well, Your Honor, just to be

18   clear, my argument is that there's not a cost to their

19   presence.  Of course we believe that the overall benefits

10:46AM   20   outweigh the costs.

21        THE COURT:  No, I understand that.  That's very clear

22   from your briefs.

23        MR. HALLWARD-DRIEMEIER:  But with respect to costs,

24   we're not disagreeing that there are costs of presence,

10:46AM   25   although that has not been identified by any of their

witnesses.  They specifically disclaim tracking that or having
any idea of what that amount would be.  That was Smoot and
Lopez.  Smoot with respect to health care and Lopez with
respect to education specifically said they did not track DACA
recipients.  They did not have an idea what that number would
be.

        But with respect --

       THE COURT:  Well, it's impossible for them to do that,
isn't it?

       MR. HALLWARD-DRIEMEIER:  Well, it would not be
impossible if they were to track who was a DACA recipient and
who was not.  They don't because --

       THE COURT:  Well, they don't know who is and who isn't.

       MR. HALLWARD-DRIEMEIER:  Well, Your Honor, they're the
party bringing the case.  They have the burden of demonstrating
their standing.  They are the ones that have to come forward
with that evidence and they have not.

        But my point earlier that I was making was that
it was the same point that this Court made in the DAPA
litigation, that there was a failure of proof as to causation
and remedy because at most what the States had shown was that
there was a cost associated on average perhaps or
hypothetically with respect to some of presence and the
elimination of DAPA would not address those individuals'
presence in the state.

1        *Plyler versus Doe* says that the State has to

2    educate the student-age population whether they are here

3    lawfully or not.  So those students, if they are here, are

4    going to be educated whether DACA exists or is set aside and

10:48AM   5    so --

6            THE COURT:  But if they're not here?

7            MR. HALLWARD-DRIEMEIER:  Well, Your Honor, so that

8    goes -- there are several arguments that we would make with

9    respect to that.

10:48AM  10            You're right to say that the State -- that Texas

11    tries to fill the gap by suggesting that they would

12    self-remove.

13            THE COURT:  Or the government could remove them.

14            MR. HALLWARD-DRIEMEIER:  Well, Your Honor, of course

10:49AM  15    the idea that the government would remove, we've already noted

16    that the government's resources are only sufficient to remove a

17    very small percentage.  Your Honor --

18            THE COURT:  But I agree with that, but that doesn't

19    lessen the burden on the States, does it?

10:49AM  20            MR. HALLWARD-DRIEMEIER:  Well, it lessens --

21            THE COURT:  I mean, they still have to educate those

22    people because the Supreme Court has told them they have to do

23    it.

24            MR. HALLWARD-DRIEMEIER:  What it does, Your Honor, is

10:49AM  25    it breaks the chain of causation between their costs and the

existence of DACA and it breaks the argument that they have
with respect to --

THE COURT:  Why?  That I'm not following.  Why does
that --

10:49AM  MR. HALLWARD-DRIEMEIER:  Because DACA is not
responsible for their presence.  If the cost is a consequence
of the student's presence and DACA --

THE COURT:  Tell me how it's not responsible for their
presence because it gives them legal presence and so they're
10:49AM  not being removed, in theory at least, because they have DACA
status.

MR. HALLWARD-DRIEMEIER:  No, Your Honor.  And I go back
to the Court's own analysis in the DAPA litigation.  Absence of
DACA does not equate to the federal government removing those
10:50AM  individuals.  In fact, every piece of evidence would suggest
that they would not be removed.

Why?  Because, again, the federal government has
to prioritize and these individuals are the ones that would be
least prioritized and that's because they are in school,
10:50AM  they're just --

THE COURT:  No.  I agree with you on that.  But doesn't
that -- setting aside the standing, isn't the argument you just
made, doesn't that prove his take care claim?  I mean, you're
just arguing their take care claim for them.

10:50AM  MR. HALLWARD-DRIEMEIER:  No, Your Honor.  Again, I

1    think not.  And I go back to the fact that there is not enough

2    appropriated at Congress for the executive to remove all

3    persons who are not here lawfully or even a substantial number

4    of them.

10:51AM  5         THE COURT:  Is that the State's fault though?  You see,

6    the problem is that's all in the province and the federal

7    government is saying, States, you can't do this.  You can't

8    deport people.  You can't have your own immigration laws.  You

9    can't make presence in the state illegal.  I mean, all this has

10:51AM 10   been basically -- I'm using the word "preempted," but that's

11   probably an incorrect usage of the word.

12         But it's all been gobbled up by the federal

13   government because they've said, okay.  Immigration is a

14   federal -- you know, it's their deal.  They can run it.

10:51AM 15   States, you can't run it.

16         So when you say -- and this is not a rhetorical

17   question; this is a question.  When you say, okay.  We don't

18   have the money to do it even though their presence causes the

19   States damage, for a standing argument, doesn't that give them

10:51AM 20   damage?

21         MR. HALLWARD-DRIEMEIER:  Well, so, Your Honor, I would

22   like to separate two things out here and maybe I'll jump right

23   now because it seems most responsive to your question to the

24   *parens patriae* or special solicitude type of arguments that

10:52AM 25   they're making in reliance on *Massachusetts v. EPA*.

1              I think we all agree and I think it's evident in

2    Your Honor's PI opinion that *Massachusetts v. EPA*, first of all

3    is very unclear exactly what its holding is; and secondly I

4    would posit -- and I think I see some recognition of this in

10:52AM   5    Your Honor's opinion -- that that is the outer bounds.  The

6    majority of the Supreme Court now is not going to take it any

7    further.

8              And *Massachusetts v. EPA* does not support

9    standing by Texas --

10:52AM  10         THE COURT:  Haven't they taken it further with all

11   these cases against the Trump administration?

12         MR. HALLWARD-DRIEMEIER:  Your Honor, no.  There are

13   specific --

14         THE COURT:  I mean, I was hoping -- when I heard

10:52AM  15   Roberts was writing the *Regents* opinion, I was hoping it would

16   be on standing, but it wasn't.

17         MR. HALLWARD-DRIEMEIER:  Well, there's a difference

18   when a particular school has particular students in which it's

19   invested and those are going to be taken.  That's a very

10:53AM  20   different notion than the *parens patriae* standing.  That's a

21   direct harm -- the type that this Court identified in the DAPA

22   litigation, the Fifth Circuit did.  It's not *parens patriae*.

23              When you're talking about *parens patriae*, both in

24   *Massachusetts v. EPA*, the Court talked about it as a harm that

10:53AM  25   affects the State as a whole.  In that instance it was the

1    State's sovereign territory.  Literally its boundaries were

2    washing away, its coastline.

3                    In the *Alfred Snapp* case, it refers to an injury

4    to the residents of the state in general.  But in here so if

10:53AM 5    you're talking about that, well, then you do have to look at

6    what is the harm to the State in general?

7                    And the Supreme Court's decision in the *Regents*

8    case actually directly contradicts that.  In *Regents*, the Court

9    stresses the benefit of DACA to the State as a whole.  It notes

10:54AM 10   that the consequences of rescission would radiate out to

11   families including citizens, U.S. citizen children, to the

12   schools that these recipients attend; to the health care

13   providers --

14            THE COURT:  But isn't their argument just the flip side

10:54AM 15   of that?  Isn't their argument that that's the cost?  We have

16   the cost of that to the school; you know, to our general

17   population.

18                    Go ahead.  I'm sorry.

19            MR. HALLWARD-DRIEMEIER:  Well, again, if we're talking

10:54AM 20   about the sort of state as a whole, what DACA -- what the

21   *Regents* decision talks about is that rescinding DAPA would

22   constitute a loss of 215 billion in economic activity, 60

23   billion in federal taxes, and one and a quarter billion in

24   state taxes.

10:55AM 25                    So there's not an injury to the state as a whole

1   from DACA.  In fact, this is an instance of the State cutting

2   off its nose to spite its face in order to litigate a policy

3   difference with the federal government and that has never been

4   upheld as a basis for *parens patriae* standing.

10:55AM  5          So I think with respect to *parens patriae,* the

6   type of injury they assert is not the type that has ever been

7   recognized.  In fact, the Supreme Court's decision in *Regents*

8   suggests that there's a benefit to the State as a whole.  They

9   are trying in effect to assert an interest as between

10:55AM  10  individuals.

11          Even if you assume that there are some

12  individuals who lose out in the job to others, there are many,

13  many people in the state of Texas who benefit from it and

14  that's never been a situation where *parens patriae* standing has

10:55AM  15  been allowed.

16          But with respect to, again, going back to these

17  questions of the health care costs, the education costs and the

18  like, what the State is assuming, what its declarants have

19  assumed, is that the loss of work authorization means they

10:56AM  20  would depart the United States and that's what Dr. Potter

21  testified.

22          But there's no basis for that as Ms. Perales

23  discussed at length.  There was assumption upon assumption upon

24  assumption.  And specifically when Dr. Potter was asked how

10:56AM  25  many, you know, anywhere between two and all, he said to say

1    anymore, quote, would be speculation.  And that's at Page 878

2    of Document 225-5.  So there is no basis upon which to conclude

3    that people would depart.

4              But there's more that I would want to emphasize.

10:56AM  5    Two things more.  The first is that the *Regents* decision itself

6    further undermines any such assumption of causation and that's

7    because it stresses that there's a difference between the

8    benefits and forbearance of removal and so one can't assume

9    that there would be removal of individuals even if they lost

10:57AM  10   the work authorization.

11             And furthermore there's no reason to think that

12   those individuals, now that they know that, would self-remove.

13        THE COURT:  Why can't a witness or a Court for that

14   matter assume that the law will be complied with?

10:57AM  15        MR. HALLWARD-DRIEMEIER:  Well, Your Honor, we're

16   dealing with a population that is already present without

17   documentation and the question is whether they would

18   self-remove.

19        THE COURT:  Or not self-remove but be removed.

10:57AM  20        MR. HALLWARD-DRIEMEIER:  Well, Your Honor, we know from

21   history that the federal government does not have the resources

22   to remove all of the individuals and so they're not going to be

23   removed.  And this was precisely why the Court found there was

24   a lack of causation and redressability in DAPA.

10:58AM  25             And I want to point out one other thing and that

1    is even if one assumes that some people -- now, of course, they

2    rely on Professor Wong's survey for this.  Dr. Perryman or

3    Mr. Perryman had pointed out the flaws in the methodology in

4    terms of the way the survey was built.  We don't believe that

10:58AM  5    that is reliable and we certainly don't believe there's a basis

6    for summary judgment there because that would have to be put to

7    I think the witnesses' testimony and cross-examination but

8    certainly we have challenged that conclusion.

9            But even if one were to take that for granted, it

10:58AM  10   matters who would self-remove because Mr. Potter -- Dr. Potter

11   in his own deposition testimony acknowledged that families with

12   young children who are enrolled in school would be less likely

13   to remove themselves and so you're not going to see a

14   diminution in education expenses.

10:59AM  15           He said that the individuals who would be more

16   likely to self-remove might be college graduates.  Well, the

17   college graduates are not the ones who are relying on Texas's

18   emergency health care expenditures.

19           So there's a dissonance between who might, even

10:59AM  20   in speculating, self-remove and what the costs are that Texas

21   says it is incurring.  And so therefore this is both

22   contradicted.  It is contrary to what -- the premise of this is

23   contrary to what the Supreme Court said in *Regents* in terms of

24   equating loss of work authorization and departure or removal

11:00AM  25   from the United States.

1          And finally it assumes that the departures, even

2     if they were to happen, are evenly distributed whereas what we

3     know is that the ones who would stay are the ones who are more

4     likely causing any costs if there are any.

11:00AM   5          So I think for all of those reasons, Texas has at

6     the very least failed to carry its burden in its summary

7     judgment and we believe we have, in fact, carried our burden

8     for summary judgment on those issues.

9          THE COURT:  All right.  Mr. Feigenbaum, do you want to

11:00AM  10     weigh in on that?

11          MR. FEIGENBAUM:  Yes.  Thank you, Your Honor.

12          THE COURT:  I'm going to let you go and them go and you

13     can both beat up on Mr. Disher and then I'll let Mr. Disher go.

14          MR. FEIGENBAUM:  I think he can handle that.

11:01AM  15          So I just have three quick points understanding

16     that the counsel for DACA intervenors have covered the majority

17     of their motion just to respond to some of the questions that

18     Your Honor had about this issue.

19          So first on causation and redressability, again,

11:01AM  20     I think that Mr. Hallward-Driemeier hopefully identified that

21     the question is not about whether or not someone here has

22     lawful presence, but whether or not they're simply going to

23     remain in any of the plaintiff states.

24          And as a result, the question as a fact matter is

11:01AM  25     whether or not they're likely to still be there even if the

1    plaintiff states prevail and there is some sort of relief or

2    injunction entered against DACA.

3            And we think that the record is insufficient to

4    demonstrate that, certainly for them on summary judgment, in

11:01AM  5    favor of the DACA intervenors in the other direction because

6    they're not challenging the failure of Congress to appropriate

7    sufficient money in order to remove everyone.

8            Your Honor had, I think, some helpful questions

9    that got to, well, is there some sort of take care problem with

11:01AM  10   the fact that not everyone who is here without documentation

11   could ultimately be removed and as everyone agrees, it's just a

12   real fraction of that.

13           But of course the answer to that question,

14   whether there's a take care problem with the lack of

11:02AM  15   appropriation would be a resounding no, which is why plaintiff

16   states aren't bringing them here.

17           Congress all the time does not appropriate enough

18   money to enforce the law against all individuals who may be

19   violating it, whether that's in the immigration context,

11:02AM  20   whether that's in the drug context, whatever sort of law

21   enforcement context you want to pick.  It's never a take care

22   problem that Congress has not appropriated enough money to

23   fully remedy whatever perceived violations of the law or actual

24   violations of the law there may be.

11:02AM  25           But that's the hook that would tie to whether or

1    not someone is actually remaining in plaintiff states in

2    violation of the law is whether there's actually going to be

3    the enforcement apparatus and the funding to remove them.

4            So I think that helps to explain where there is a

11:02AM  5    break sufficient for the causation and redressability prong,

6    that's different between what DACA does and what the failure to

7    appropriate does and as a result why there may be standing on

8    these facts to go after the appropriations themselves and the

9    failure to appropriate enough money.  But again there's just no

11:03AM 10   constitutional or legal claim against that decision by

11   Congress.

12           The second point, and I think maybe New Jersey is

13   well situated to talk about this one, is that we think this

14   isn't at all like *Regents*.  I heard Your Honor ask, well, if

11:03AM 15   there was standing in a case like *Regents,* doesn't there sort

16   of have to be standing in a case like this?

17           But I think there's plenty of examples all the

18   time where you would have standing in one situation but not

19   standing in another.

11:03AM 20           So, for example, in the employment context if

21   someone is applying for a job and doesn't get it and they think

22   they were discriminated against in that process, they clearly

23   have standing in order to bring the Title VII claim about

24   whether or not they should have gotten the job.  Whether or not

11:03AM 25   they win will be a separate issue.

1        If someone else says, well, you hired Person X

2   and so I'm suing because you hired Person X, that's a very

3   different inquiry and you may not have standing to challenge

4   Person X's hiring if the defendant can show as a matter of fact

11:04AM   5   that actually you wouldn't have been hired anyway.

6        THE COURT:  Let me ask you a question because you raise

7   an interesting point.  Let's say you and I are in an accident

8   and I caused the accident and you sued me and my defense is you

9   weren't hurt, all right?  Is there a difference in the fact

11:04AM  10   that you have standing to sue me but maybe I win on causation

11   and damages?  So is there a difference between -- are you

12   really arguing causation or are you really arguing standing?

13        MR. FEIGENBAUM:  So I think that it depends.  I mean

14   obviously we think that causation is part of the broader

11:05AM  15   standing just like the injury prong.  So I think with that

16   hypothetical, you're positing someone that doesn't show any

17   injury whatsoever and we think of course that the DACA

18   intervenor counsel has walked through why there hasn't been a

19   substantiated injury at all.

11:05AM  20        My point is even if you think there might be an

21   injury, maybe you're pointing to the wrong thing; so maybe the

22   analogy to use the car example --

23        THE COURT:  That was probably a bad analogy really.

24        MR. FEIGENBAUM:  No.  I wanted to do that thing lawyers

11:05AM  25   do where they modify it in the way it helps them.

1          But ultimately I think the point here even if you

2     think there may be some tangible injury from a DACA recipient

3     remaining in the country and remaining in plaintiff states,

4     there need to be facts that show that that is linked to DACA

11:05AM   5     itself.

6          And given the lack of appropriations and given

7     what we all agree is true in this case as a matter of fact

8     which is that there cannot possibly be enough people that would

9     be removed to meet the entire population of undocumented

11:06AM  10     individuals -- adults or who arrived here as children -- that I

11     think that does become more of a causation and redressability

12     problem.  We're not really talking about DACA.  We're really

13     talking about the appropriations.

14          And then the third point that I wanted to make

11:06AM  15     just briefly is that whatever this Court ultimately concludes

16     about the standing motion itself -- and we'll get to this when

17     we talk about the remedy at the end of the last motion that

18     we're talking about -- but I do think it should also bear on

19     the remedy that this Court keeps in mind at the end of the day

11:06AM  20     is the substantiation of harm and the fact that we think there

21     hasn't been any showing of injury, let alone one caused by DACA

22     itself; but certainly that this case, I think, differs in kind

23     from the degree of harm that the states are trying to show,

24     both in the number of plaintiff states that are before

11:06AM  25     Your Honor but also in how many of them are trying to show harm

1    and the kind of harm they're trying to show.

2            So wherever this Court ultimately comes down on

3    the standing motion, we do believe the DACA intervenors' motion

4    should be granted.  We think it also will bear on the remedy as

11:07AM  5   well.

6            THE COURT:  Okay.

7            MR. FEIGENBAUM:  Thank you, Your Honor.

8            THE COURT:  Mr. Coghlan, anything from the federal

9    side?

11:07AM  10          MR. COGHLAN:  Very briefly, Your Honor.

11            As I suggested before, the federal defendants'

12    view is that the issues on standing that are before the Court

13    now are essentially the same as they were when we were in the

14    preliminary injunction phase, which the Court already addressed

11:07AM  15   and the ruling noted that there need not be a substantial

16    demonstration of injury, only some injury.

17            So, you know, the federal defendants' view is

18    that the facts have not materially changed in a way that would

19    affect the Court's prior analysis and we recognize that.

11:07AM  20          THE COURT:  Thank you.

21            All right.  Mr. Disher, do you want to defend

22    yourself?

23            MR. DISHER:  Thank you, Your Honor.

24            The defendant intervenors are essentially asking

11:07AM  25   this Court to judicially codify the one-way ratchet theory of

1    federal rights and benefits.

2         As the Court is well aware, states across the

3    country have sued repeatedly over attempted rescissions or

4    modifications to the DACA program.  No Court in the country has

11:08AM  5    ever denied states standing to sue over the rescission or

6    modification of DACA and yet they ask this Court to find that

7    these plaintiff states here do not have standing to challenge

8    the creation of the program.

9         In other words, the determination or modification

11:08AM  10   of that program can be challenged; but the creation of it,

11   according to them, cannot be challenged by a state.

12        And I would simply posit that that is not what is

13   required here and the plaintiff states absolutely have standing

14   to challenge the very thing that created their injury and their

11:08AM  15   harm.

16        As to the *Regents* opinion, all of the arguments I

17   heard about the *Regents* opinion may apply or might apply if

18   standing, as this Court is aware, was an accounting exercise,

19   but it is not.

11:08AM  20        So all we have to do under binding Fifth Circuit

21   precedent is prove some scintilla of injury and we certainly

22   have done that, not only with our evidence but the evidence

23   that the defendant-intervenors have introduced themselves.

24        Of course, Your Honor will recall the

11:09AM  25   cost-benefit analysis from Dr. Perryman, who in doing that had

to find not only the benefits but the costs and he estimated

the costs to Texas alone providing social services to DACA

recipients was over $250 million a year.

That cost-benefit analysis was used at the

preliminary injunction stage, and it continues to be used today

in the DACA intervenors' response to our motion for summary

judgment.

Regarding New Jersey's arguments, I would just

simply note that New Jersey in all of its written briefing in

the case has not challenged our standing to bring this claim.

They certainly challenge us on the merits, but they have not

ever alleged in their briefing that we lack standing because it

would be certainly an odd position for New Jersey to argue that

they have an interest in this case in order to intervene and

yet the plaintiff states don't have the sufficient interests to

support their standing to bring these claims in the first

place.

To this Court's point about the take care clause

claim, we agree with this Court that it proves the take care

clause claim, but it also proves the substantive and procedural

violations of DACA as well.

Yes, there are limited funds to remove certain

individuals; but what the federal government has done here is

say there is a class of individuals; we may or may not have

resources to remove them.  But instead what we are going to do

1       is grant them lawful presence to remain.

2                   And I heard the counsel for DACA intervenors say

3       DACA is not responsible for their presence.  DACA, in fact, is

4       what grants them lawful presence; and so, of course, we have

11:10AM  5       standing to challenge that grant as being unlawful pursuant to

6       Congress's duly enacted statutes.

7                   We as states do not have the power to enforce

8       immigration or remove anybody from our states so we have to

9       rely on the federal government to do that and the federal

11:11AM 10       government's actions are controlled by Congress and its duly

11       enacted immigration schemes.

12                   And what the federal government or -- excuse me.

13       What the executive branch has done is basically rewrite those

14       congressional mandates and doing so does indeed support our

11:11AM 15       injury to bring this claim.

16             THE COURT:  Thank you, Mr. Disher.

17             MR. HALLWARD-DRIEMEIER:  May I respond?

18             THE COURT:  You may.

19             MR. HALLWARD-DRIEMEIER:  Thank you, Your Honor.

11:11AM 20                   A few points.  Let me start with the one-way

21       ratchet.

22                   The states in the instance of challenging the

23       rescission of DACA were able to show the kind of very direct

24       particularized costs to the state that Texas showed in the DAPA

11:12AM 25       litigation but does not have here.

1          Specifically if the DACA recipients lose their

2     work authorizations and lose the health care that they have

3     privately as a consequence of their employment and then have to

4     rely instead on emergency, that would be an additional cost to

11:12AM   5     the State.  That does not support the conclusion that Texas

6     would like the Court to draw because Texas's theory of --

7          THE COURT:  You're assuming when you say that that they

8     all have health care.

9          MR. HALLWARD-DRIEMEIER:  Well, Your Honor, what we are

11:12AM   10     talking about is the loss of work authorization.

11          THE COURT:  I know, but if they're not working.  DACA

12     doesn't require them to work.

13          MR. HALLWARD-DRIEMEIER:  No, but they showed a specific

14     number of people who were working and as a consequence had

11:12AM   15     private insurance and would lose that insurance, that was a

16     direct injury that they were able to demonstrate.

17          THE COURT:  Well, wouldn't the direct injury be if

18     they're not working?  Wouldn't they have to cover those

19     people's health care?

11:13AM   20          MR. HALLWARD-DRIEMEIER:  Again, this goes to the point

21     earlier, the difference between presence and lawful presence.

22          The health care costs of those who are not

23     working and relying on the emergency system is because those

24     individuals are present.  It does not have to do with whether

11:13AM   25     they are or not lawfully present.

1          In fact, being lawfully present, to the extent

2     that it has a consequence, some are able to obtain work

3     authorizations and employment reduces --

4          THE COURT:  But aren't you essentially saying that the

11:13AM  5     DACA recipients, if DACA goes away, are just going to violate

6     the law and stay?  I mean, that's your argument.

7          MR. HALLWARD-DRIEMEIER:  Your Honor, am I arguing that

8     they're going to stay?  Yes.

9          THE COURT:  Okay.

11:13AM 10          MR. HALLWARD-DRIEMEIER:  The evidence is that they have

11     stayed.  They have been here.  In fact, they have to have been

12     here since 2007.

13          THE COURT:  Right.

14          MR. HALLWARD-DRIEMEIER:  They were here for years

11:14AM 15     before DACA existed; and as a consequence, it is a fair

16     conclusion that they will stay.  And because they are present,

17     there may be costs associated with that, but they are not

18     attributable to DACA.  In fact, they will increase if DACA is

19     rescinded.  So the State is again -- the State is not

11:14AM 20     proclaiming to remedy and rectify costs.  It's going to

21     self-impose additional costs.

22          Counsel for the government suggested that we're

23     here at the same as the PI.  No.  At the preliminary injunction

24     stage, the Court said that it was accepting the States'

11:14AM 25     allegations with respect to our motion to dismiss and also

noted that it was, quote, not deciding the motion on the merits.

Now Texas is asking you to decide the question on the merits, and it doesn't have the evidence to support it.  It suggests that -- Your Honor asked the question, I think, about whether causation is sort of part of this jurisdictional inquiry or part of the merits.

Here, the oddity of an APA claim is that causation is not part of their ultimate merits claim.  It is part of the standing inquiry.

So that's the point at which we have to decide that issue and they have to come forward at the motion for summary judgment stage with evidence to support it.

They didn't do so; but at the very least, our experts and declarants contest the evidence and would preclude summary judgment.

And then finally on the take care claim, the take care clause claim is not an APA claim; so to the extent that the Court believes that the APA cause of action special solicitude under *Massachusetts,* et cetera, is the hook for standing, that would not cover the take care clause claim.

THE COURT:  Wait.  Why?

MR. HALLWARD-DRIEMEIER:  Because it's not an APA claim.

THE COURT:  No.  I agree with that.

MR. HALLWARD-DRIEMEIER:  So in *Massachusetts v. EPA,*

1 the Supreme Court -- and, again, what I think is sort of the

2 outer edge of this notion of special solicitude and --

3    THE COURT:  You're singing my song.

4    MR. HALLWARD-DRIEMEIER:  Well, Your Honor, for

5 11 years --

6    THE COURT:  I wish there were more than just you.

7    MR. HALLWARD-DRIEMEIER:  -- sang that song repeatedly.

8 I wish they were singing it still.

9    But the fact is that there the Court relied on

10 the fact that the Clean Air Act had specifically provided a

11 cause of action for the procedural harm.

12    THE COURT:  Right.

13    MR. HALLWARD-DRIEMEIER:  And to the extent that the

14 Court believes that the APA provides a claim of that nature

15 here, we don't think it does; but it certainly would not

16 support the take care clause claim which is a constitutional

17 claim which does not have to do with DACA.  It has to do, as

18 Your Honor has said, with the fact that these individuals are

19 here and not being removed.  So I think there's a disconnect.

20    THE COURT:  Why don't they have -- let's say they can't

21 prove an APA standing.  Don't they have take care standing?

22    MR. HALLWARD-DRIEMEIER:  They would have to show

23 Article III standing to bring a take care clause claim --

24    THE COURT:  Right.

25    MR. HALLWARD-DRIEMEIER:  -- and they have not because

1    they don't have a direct injury and we've never seen the sort

2    of novel theories that they have about special solicitude or

3    *parens patriae.*

4              Of course, there's Supreme Court precedent that

11:17AM   5    says *parens patriae* is not a basis for bringing a suit against

6    the United States.  Clearly -- it's certainly never been a

7    basis of a suit against the United States for a constitutional

8    claim.

9              THE COURT:  Well, the interpretation of that by the

11:17AM  10    Supreme Court has basically been you can't sue the

11    United States for something they're doing, but you can sue them

12    to make them comply with their own law.

13              MR. HALLWARD-DRIEMEIER:  Well, Your Honor, with respect

14    to a statutory -- specific statutory command.  But the idea

11:18AM  15    that the take care clause has that kind of specificity to give

16    a cause of action -- I've never heard of the idea that that was

17    just a generalized cause of action that the State can bring

18    whenever it thought that the federal government wasn't doing

19    its job.

11:18AM  20              THE COURT:  I mean, setting aside the Clean Air Act,

21    that's essentially what they did in *Massachusetts versus EPA.*

22              MR. HALLWARD-DRIEMEIER:  But they did not rely on that.

23    They relied on a specific cause of action that Congress had

24    created based upon the procedural harm that was critical to the

11:18AM  25    Court's analysis there.

1        And if I haven't said it before, I do want to

2   stress Mr. Perryman's supplemental declaration which stress

3   that this 250 million figure that has been thrown around there

4   was something that was assumed for purposes of analysis that

11:19AM   5   showed that even if you assumed costs, the benefits were

6   greater.  He specifically said he did not study to determine

7   whether there were any costs of DACA and that he was unaware of

8   any studies that had been done to do that.

9        And of course we know that when plaintiffs'

11:19AM  10   declarants were asked about this status claim, that they had

11   never done such a study either.

12        It is the burden of the plaintiffs as movants for

13   summary judgment to come forward with evidence to support their

14   theory of injury and they have not done so; but at the very

11:19AM  15   least, whatever evidence there is, it's contested and would

16   preclude summary judgment.

17        THE COURT:  All right.

18        MR. DISHER:  Your Honor, I forgot to make one point;

19   and I'll be real brief.  I promise.  And if he wants to

11:19AM  20   respond, I certainly won't object to that.

21        Just one brief point to make.  I would just

22   simply point the Court back to Footnote 45 of your preliminary

23   injunction order talking about the redressability analysis to

24   vindicate a procedural right.

11:20AM  25        Of course, the Fifth Circuit in *Texas I* said

1   Texas had satisfied the third standing requirement,

2   redressability, in joining DAPA based on the procedural APA

3   claim could prompt DHS to reconsider the program which is all a

4   plaintiff must show when asserting a procedural right.

11:20AM   5            When Your Honor rules on our motion for

6   preliminary injunction, DHS was subject to no less than two

7   preliminary injunctions as well as a final order from the DC

8   Court.  That is no longer the case today, especially since the

9   Court in the Eastern District of New York vacated the Wolf and

11:20AM  10   the Edlow memos.

11            As we have laid out, DACA is now back in full

12   effect as it was when it was first issued in 2012 via the memo;

13   therefore, the Fifth Circuit's statement here about addressing

14   its procedural APA claim absolutely applies to this case now

11:20AM  15   given the posture that it is in.

16            So I would direct the Court to Footnote 45 and

17   note that we are now in a different spot for the purposes of

18   that footnote than we are today.

19            MR. HALLWARD-DRIEMEIER:  With respect, Your Honor, in

11:21AM  20   the *Texas I* case, the APA case, the redressability was that if

21   there was no work authorization, that lawful presence was

22   rescinded, then they would not be eligible for the driver's

23   license.  That was a very direct, just setting it aside, we

24   eliminated that cost.

11:21AM  25            Here, in order to show redressability, they have

1    to go through the self-removal theory and that is where we

2    contest that they have provided any evidence, much less summary

3    judgment evidence.

4                    With respect to the government's position,

11:21AM  5    Your Honor last time suggested it was not going to be swayed by

6    what is or is not going on in other courts which may or may not

7    be temporal, although the Wolf and Edlow memos have been set

8    aside, the government has indicated that it may appeal that

9    or -- and of course that would be one way to resolve it.  The

11:22AM 10    other way would be simply to have somebody appointed with

11    authority to enter the same.

12                    What's clear from *Regents* --

13            THE COURT:  Okay.  Somebody at DHS you're talking

14    about?

11:22AM 15            MR. HALLWARD-DRIEMEIER:  Yes, somebody at DHS.

16                    What's clear from *Regents* is that that is a call

17    for the United States to make and for DHS to make and that that

18    is a decision that must be made with an eye toward the reliance

19    interests as well as noting the difference between any benefits

11:22AM 20    that might flow from simple forbearance, which is the presence

21    as opposed to the lawful presence.

22                    So *Regents* emphasizes that presence does not go

23    away even if DACA goes away.  *Regents* also stresses that more

24    is within the discretion of DHS.

11:23AM 25                    And I don't think that it's the proper response

1  to the Court's order in *Batalla Vidal* to direct the government

2  now to take some action when the government could simply cure

3  that problem by a proper appointment.

4          Thank you.

11:23AM 5          THE COURT:  All right, Mr. Disher.  Let's turn to the

6  merits.  That would be your motion.

7          MR. DISHER:  Thank you, Your Honor.

8          As this Court is aware, no president, Democrat or

9  Republican, can override Congress's duly enacted law and yet

11:23AM 10  that is exactly what the Obama administration did with the 2012

11  DACA memorandum.

12          What's worse, President Obama admitted as much

13  himself.  Before his administration created DACA, he said,

14  quote, there are enough laws on the books by Congress that are

11:23AM 15  very clear in terms of how we have to enforce our immigration

16  system that for me to simply through executive order ignore

17  those congressional mandates, that would not conform with my

18  appropriate role as president.

19          His administration issued the 2012 DACA

11:24AM 20  memorandum anyway and after his administration issued that

21  memo, he again went on record to say, "I just took an action to

22  change the laws."

23          Of course, President Obama was not authorized to

24  take that action, as the Fifth Circuit ruled when it held that

11:24AM 25  DAPA and expanded DACA were unlawful.  They were, quote, flatly

1    impermissible with the controlling statutory framework.

2            The Supreme Court in the *Regents* opinion has now

3    affirmed this core tenant of this Court's prior ruling that

4    DACA, quote, does not announce a passive nonenforcement policy.

11:24AM  5    It created a program for conferring affirmative immigration

6    relief.  That comes from the majority opinion in the *Regents*

7    case.

8            Now, the context of that ruling is likewise

9    critical for this Court's analysis.  The majority held that in

11:25AM  10   ruling that DACA and the rescission of DACA is a reviewable

11   action.  That ruling is dispositive for both the substantive

12   and the procedural APA claims in front of this Court as well as

13   the take care clause claim.

14           THE COURT:  Why is it dispositive of the substantive

11:25AM  15   claim?

16           MR. DISHER:  Yes, Your Honor.

17           In so ruling, the Supreme Court has confirmed

18   that DACA is not a mere grant of removal forbearance.  DACA

19   went further than that.  DACA, as the Supreme Court has now

11:25AM  20   ruled, did not just forebear from removal.  It granted

21   affirmative lawful presence and the associated benefits to a

22   class of 1.5 million people, both of which the lawful status,

23   the lawful presence -- excuse me -- lawful presence as well as

24   the associated benefits are contrary to Congress's immigration

11:25AM  25   scheme.

1          Congress has said that some populations must and

2    some populations may be granted deferred action.  And neither

3    of those two populations are the eligible recipients for

4    deferred action through the DACA memorandum.

11:26AM  5          The Court could not -- excuse me.  Congress could

6    not have left such extreme power to the executive branch when

7    it has enacted and continues to refine and update its

8    congressional immigration scheme.

9          And, Your Honor, still to this day nobody in

11:26AM 10   front of Your Honor can come up with an answer to the most

11   basic question which is what is the limiting principle?

12         If the executive could grant lawful status --

13   excuse me -- lawful presence and the associated benefits to

14   these 1.5 million people, why can it not do the same for every

11:26AM 15   unlawfully present person in the United States?  That is not

16   within the executive's power and so, therefore, this grant of

17   deferred action surely must fail.

18         And that's to not even mention the use of advance

19   parole which DACA makes its recipients eligible for.

11:27AM 20         As we know now in discovery in this case, the

21   federal defendants estimate that 14,000 DACA recipients have

22   used DACA to adjust their status who otherwise could not have.

23         THE COURT:  Where is that in the record?

24         MR. DISHER:  Yes, Your Honor.  I believe it's Exhibit 3

11:27AM 25   to our motion.  Let me just pull it up so I make sure.  It's

actually Exhibit 2, which is at ECF 487-2.  It is a response from the federal government to the DACA intervenors' interrogatory.

They did the statistical sample that we had a hearing about in the past and based on that statistical sample of 500 individuals, they found that 484 of those individuals could not have adjusted their status but for using advance parole, which is made available to them only through the DACA program.  Extrapolating that percentage out to the entire population that has received DACA and adjusted their status later, the federal government estimates that with a plus-minus 1.5 percent margin of error, between 13,908 and 14,358 requesters did this.

In other words, they were not eligible to adjust their status, they got advance parole through DACA, and they have since adjusted their status.  And of course as the Court knows, adjusting their status is a step on the pathway to citizenship.

So despite the assurances from the Obama administration that DACA did not confer a pathway to citizenship, we know that the evidence proves otherwise.  The evidence shows that over 14,000 DACA recipients have now adjusted their status who could not have without the DACA program.  That is why DACA is a substantive violation of Congress's duly enacted laws.

1          As to the procedural aspect and why the *Regents*

2     opinion confirms our claims here, in his opinion Justice Thomas

3     says that DACA fundamentally altered immigration laws.

4          Quote, DACA is thus what is commonly called a

11:29AM 5     substantive or legislative rule.

6          And of course those type of rules are subject to

7     notice and comment rulemaking under the APA.  Now, that was

8     Justice Thomas, joined by Justice Alito and Justice Gorsuch.

9     But Justice Thomas recognizes what we must.  The majority --

11:29AM 10    and, again, this is a quote from Justice Thomas's opinion.

11         "The majority tacitly acknowledges as much" --

12    again, that DACA is a substantive or legislative rule that

13    required notice and comment rulemaking -- "as it must.

14    Otherwise, the majority would have to accept that DACA was

11:30AM 15    nothing more than a policy of prosecutorial discretion which

16    would make its rescission unreviewable."

17         The Court did not find that.  The Court found

18    that DACA is reviewable; therefore, extending that logic out,

19    it was a substantive or legislative rule that required notice

11:30AM 20    and comment rulemaking subject to the APA and, of course, the

21    2012 memo that instituted DACA did not go through that.

22         Likewise, Your Honor, the defendant-intervenors'

23    pleadings in this case make that -- say that very point.  Their

24    arguments are replete with the benefits that they have received

11:30AM 25    from DACA.  Those benefits are what make DACA a substantive or

1    legislative rule.

2              And they also on the flip side argue what they

3    stand to lose should the program be set aside.  If DACA was

4    nothing more than some guidance, then they would have no

11:30AM  5    argument about what they're going to lose should DACA be set

6    aside.

7              And, again, Your Honor, their own experts have

8    admitted this point.  The defendant-intervenors have designated

9    an expert in immigration named Shoba Wadhia.  Professor Wadhia

11:31AM 10    is a professor at Penn State University Law School.  She

11    authored a report concerning, quote, the history and use of

12    prosecutorial discretion, including specifically deferred

13    action.

14              Professor Wadhia also wrote a book called

11:31AM 15    *Beyond Deportation* and in it she acknowledges what we've been

16    saying all alone.  Deferred action, quote, may officially walk

17    like a discretionary act; but to individuals who are granted

18    this remedy, it quacks like a substantive benefit.  That's on

19    Page 87 of her book and that just confirms again what we've

11:31AM 20    been saying all along and she comes to the same conclusion

21    which we have been alleging since the beginning of this case.

22              This is on Page 152.  Quote, DHS must publish

23    deferred action as a regulation in the *Federal Register*.

24              Skipping two sentences:  Deferred action is the

11:32AM 25    kind of program that should be subject to notice and comment

1    rulemaking under the Administrative Procedure Act.

2             That is what we have been saying since we filed

3    this lawsuit in May of 2018, and their own expert agrees with

4    us.  That is why this Court must set aside the DACA program as

11:32AM  5    not only a substantive violation of the APA, a violation of the

6    executive's responsibility to take care that the laws are

7    faithfully executed, but for the very common sense

8    prosecution -- position that a program of this magnitude must

9    at least go through notice and comment rulemaking pursuant to

11:32AM 10    the APA.

11             Now, Your Honor, one additional thing I will

12    mention to Your Honor is that never before have we been in

13    front of this Court with DACA being in full force and effect.

14    It is now.

11:33AM 15             Based on the ruling out of the Eastern District

16    of New York, for the first time since we have filed this

17    lawsuit, the federal defendants are now accepting new

18    applications of DACA as well as processing advance parole for

19    DACA recipients which again can lead to that pathway to

11:33AM 20    citizenship.

21             But the legal analysis from the preliminary

22    injunction posture to today remains as true as ever.  DACA is

23    unlawful and therefore under the APA, it must be set aside.

24             There has been some mention about remanding the

11:33AM 25    decision to the agency to reconsider it or to provide more

1    explanation.  Your Honor, there's nothing else for the agency

2    to explain.  DACA is unlawful.

3            THE COURT:  I wonder if I -- well, I'll take up

4    remedies later on.

11:34AM 5        MR. DISHER:  Okay.  They simply -- as a matter of law,

6    they cannot do what they did.  Therefore, the remedy here is

7    simple.  The Court must set aside DACA pursuant to the terms of

8    the APA and there is nothing for the agency to do at this point

9    related to the program that it instituted with the 2012 memo.

11:34AM 10   Therefore it is up to this Court, in reviewing that agency

11   action under the terms of the APA, to set aside that program.

12           THE COURT:  Okay.  Thank you, Mr. Disher.

13               Ms. Perales, you want to take the ball on this?

14           MS. PERALES:  Thank you, Your Honor.

11:34AM 15       THE COURT:  Uh-oh.  She took off her mask.  You're in

16   for it now.

17           MS. PERALES:  I promise I won't pick up my binder and

18   drop it though.

19               Since 2018, the plaintiffs have pushed for a

11:34AM 20   merits ruling and they've done so at every turn.  But at the

21   center of this case the facts are missing that the plaintiffs

22   need to prevail.

23               This case is like a doughnut.  It has a lot of

24   thick legal argument around the outside but the center is

11:35AM 25   empty.  Plaintiffs have again invited this Court now to reach

1   the merits of DACA; but on this summary judgment record, the

2   Court need not and should not accept that invitation.

3           I would like to start with some disputed facts,

4   the first one related to discretion and then move to additional

11:35AM   5   material facts that are in genuine dispute.

6           THE COURT:  Before we even get to discretion, because I

7   don't know that my -- I want you to talk about it but let me

8   ask you -- I mean, this is the elephant in the room question.

9           Didn't *Regents* hold that APA applies to DACA?  I

11:35AM   10   mean, the majority opinion says it applies to DACA.  Six judges

11   agreed with that.  And the dissent said it applied to DACA and

12   we ought to hold it illegal now.

13          So I have all nine judges of the Supreme Court

14   saying that APA applies to DACA, don't I?

11:36AM   15          MS. PERALES:  The majority found that the rescission

16   was reviewable under the APA.

17          THE COURT:  And that the President or Secretary of

18   Homeland Security, whomever did the withdrawal, didn't comply

19   with the APA; but it went further than that.  It described, you

11:36AM   20   know, the opinion as, you know, being a lot more than

21   prosecutorial discretion.  It said it was an award of benefits.

22          MS. PERALES:  Our reading of the *Regents* decision,

23   Your Honor, is actually helpful to our position which is that

24   the Court made clear that DACA is an exercise of prosecutorial

11:37AM   25   discretion to defer removal of a particular individual.

1    THE COURT:  Okay.

2    MS. PERALES:  Which is consistent with our position.

3    THE COURT:  And with an award of benefits because

4    that's what they reversed the Trump administration on by saying

11:37AM  5    that they didn't consider the benefits.

6    MS. PERALES:  Well, *Regents* pointedly and very clearly

7    states that a couple of the things that are at issue that are

8    referred to as benefits, and that's primarily work

9    authorizations, flows from other regulations.

11:37AM  10    So in our reading of *Regents*, there's this really

11    strong separation between the decision to defer removal and the

12    preexisting, long-existing regulations on work authorizations.

13    THE COURT:  Well, first of all, I mean, in *Texas I*, the

14    Fifth Circuit didn't buy that argument; but more importantly,

11:38AM  15    and I'm looking at the employment authorization in the record,

16    and it says:  "Since approval of the form I-821D" -- and that's

17    the DACA form -- "is a prerequisite and since the EAD" -- which

18    is Employment Authorization document "is based upon a grant of

19    DACA."  That's what it says.

11:38AM  20    MS. PERALES:  Yes, Your Honor.  But the work

21    authorization regulations that have existed for many, many

22    years before DACA provide that an individual with deferred

23    action -- not DACA, but deferred action because all of this

24    came along before DACA.

11:38AM  25    THE COURT:  Right.

1          MS. PERALES:  An individual with deferred action may be

2     able to secure work authorization.  So this benefit, as it's

3     termed, of work authorization is distinct from what the Court

4     in *Regents* identified as the centerpiece of DACA, which is

11:39AM 5     deferred action or deferred removal.

6          THE COURT:  Okay.  I agree with that.

7          MS. PERALES:  And the plaintiffs have had abundant

8     amount of time to challenge work authorization regulations and

9     they have chosen not to.  So that piece is not at issue here.

11:39AM 10          When you receive DACA and you have deferred

11     action, you have benefitted from an exercise of discretion that

12     is favorable to you.  The government has said, "We know that

13     you're here.  We have decided not to move to remove you at this

14     time."

11:39AM 15          That deferred action then, under these long

16     preexisting regulations, allows you to apply for work

17     authorization and further requires you to demonstrate financial

18     need; but that was never challenged in this case.

19          So this is part of one of the facts actually,

11:40AM 20     Your Honor, that I was going to touch on which is that this

21     idea of DACA bestowing eligibility for various types of

22     benefits -- whether they're federal, whether they're state or

23     local -- is to some extent part of plaintiffs' legal argument

24     but it's really a fact about what DACA is.  DACA itself does

11:40AM 25     not give work authorization.  It's the preexisting regulations

1    that are not challenged here that allow somebody to apply.

2         THE COURT:  But I mean that argument was rejected by

3    the Fifth Circuit in *Texas I*.  Am I not bound by the

4    Fifth Circuit?

11:40AM   5         MS. PERALES:  *Regents* explains that the Fifth Circuit

6    found that the benefits of work authorization and other things

7    were problematic or inconsistent with the INA, but did not

8    touch and did not talk about the core of deferred action --

9         THE COURT:  I'm sorry.  I didn't hear that.

11:41AM   10        MS. PERALES:  I'm sorry.  The *Regents* Court explained

11   that the Fifth Circuit focused on work authorization and other

12   so-called benefits, but that the Fifth Circuit analysis did not

13   touch what is at the core of DACA, which is the decision to

14   defer action or defer removal proceedings against an

11:41AM   15   individual.  That's what the *Regents* Court has told us about

16   the import or the weight of the Fifth Circuit decision.

17        THE COURT:  Well, that's because I didn't in *Texas I*

18   say that anyone had to be removed or that the government

19   couldn't practice prosecutorial discretion.

11:42AM   20        MS. PERALES:  Your Honor said it and then the

21   Fifth Circuit said it and then the Court in *Regents* explains to

22   us that to the extent that this Court is bound by DAPA or

23   *Texas I*, there is a separation between the consideration of

24   these benefits and the consideration of deferred action at its

11:42AM   25   core which is a deferred action.  It's hard to paraphrase it.

1       THE COURT:  I was trying to do this same -- but I cut

2   Mr. Disher off a minute ago, but let's go ahead and plunge into

3   it then because your argument brings this up.

4       Let's say hypothetically the Court finds they

5   have standing, the states have standing and that it violates

6   the APA because there was no notice of comment.  Y'all have to

7   concede there was no notice of comment.

8       MS. PERALES:  There was no notice of comment,

9   Your Honor.

10      THE COURT:  All right.  Is there a difference -- and

11  I'm going to use this term not in its technical sense but in a

12  general sense so you understand what I'm saying -- I mean, the

13  severability sense because I read *Regents* as kind of saying

14  that, that the discretion that leads the DACA recipients here

15  but may severable from the benefits.

16      Is that what you're saying?

17      MS. PERALES:  We're not arguing severability,

18  Your Honor.

19      THE COURT:  I know, but I didn't mean that in the

20  technical sense.

21      MS. PERALES:  But I understand the question.  And I

22  think it would be best -- most accurate to say that our

23  position is that to the extent that the plaintiffs challenge

24  the benefits, they didn't sue against the things that they're

25  really complaining about, which is they did not sue to

invalidate the work authorization regulation which is

(c)(14) -- 247(c)(14).  They did not sue to invalidate that.

If that's the issue -- that is, the benefit of work

authorization -- and then once you pay into the system, you may

11:44AM  be able to --

THE COURT:  Well, but if they knock out DACA, they

knock out the right for these a million five people to work.

MS. PERALES:  If they didn't have DACA, they would not

have work authorization.  That's right.

THE COURT:  Right.

MS. PERALES:  But work authorization flows from

separate and free-standing regulations that plaintiffs did not

challenge; so to the extent that plaintiffs -- I apologize to

the court reporter -- to the extent that plaintiffs are

11:44AM  challenging the work authorization benefit, they should have

sued to invalidate the Regulation 247(c)(14).  They did not.

Same thing with advance parole.  Advance parole

is statutory.  It is for any undocumented individual.

So first of all, as a fact statement, DACA does

11:45AM  not confer eligibility for advance parole.  The statute is

clear.  It's 1152 -- I can get it for Your Honor.  1152 -- I

think it's -- I will find it for Your Honor -- on advance

parole.

It says:  Any individual -- I'm sorry.

11:45AM  8 USC 1182(d)(5)(A) says any undocumented person can apply for

1    advance parole; so, again, it's a fact issue.  DACA does not

2    provide eligibility for advance parole.

3          THE COURT:  Doesn't it apply eligibility for people who

4    have entered the country illegally?

11:45AM   5          MS. PERALES:  Say that again, Your Honor.

6          THE COURT:  As opposed to people who have overstayed

7    their visa, doesn't DACA allow for advance parole for those who

8    have entered the country illegally?

9          MS. PERALES:  DACA doesn't say anything about advance

11:46AM  10    parole.  The advance parole statute is open to any individual.

11          THE COURT:  So if I come in the country illegally and I

12    leave, I can come back in?  I don't have to wait ten years?

13          MS. PERALES:  If you entered without inspection,

14    Your Honor, and you were here out of status and you sought an

11:46AM  15    advance parole document as you are entitled to do under the

16    statute and you were granted it --

17          THE COURT:  Yeah; but if I am in the country illegally,

18    am I going to get that granted?

19          MS. PERALES:  Yes, you can.  The statute is plain on

11:46AM  20    its face that any individual can apply and receive an advance

21    parole document.  DACA doesn't say anything about advance

22    parole.  The advance parole statute doesn't say anything about

23    DACA.

24          THE COURT:  But all their -- I don't know what you call

11:47AM  25    them -- handbooks, worksheets, all the evidence says DACA

1    people get advance parole.

2         MS. PERALES:  Anybody can get advance parole.  DACA are

3    a subset of all people and anybody -- it is the case that

4    people apply for and receive advance parole routinely from the

11:47AM 5    United States government and plaintiffs haven't shown

6    otherwise.

7              They did talk about 484 DACA recipients who

8    adjusted status.  That is .69 percent of all DACA recipients as

9    estimated by the federal government.  This is not some wide

11:47AM 10   open door, this is not some component of DACA if only .69 of a

11   percent of DACA recipients are projected to have been able to

12   use it.

13        THE COURT:  And, Ms. Perales, Mr. Disher used the

14   figure of 1.5 million people.  Is that the figure you're kind

11:48AM 15   of working off of as well?

16        MS. PERALES:  No, Your Honor.  I brought because I was

17   moved by Your Honor's footnote in the preliminary injunction

18   opinion about --

19        THE COURT:  I shouldn't put so many footnotes.  I get

11:48AM 20   them quoted back to me by both sides.  I'm going to quit

21   writing footnotes.

22        MS. PERALES:  I have shared this with counsel.  I'm

23   just going to read it --

24        THE COURT:  Just give it to Charlotte.

11:48AM 25        MS. PERALES:  There you go.

1        These are the current numbers on the number of

2   individuals who are currently recipients of deferred action

3   under DACA.  It's about 645,000.

4        Your Honor pointed out that there were various

11:48AM  5   numbers at the time and of course the expert reports are always

6   going to be snapshots of whenever they were written.  But

7   that's the number that we're talking about right now is

8   645,000.

9        THE COURT:  And how many -- do we know how many people

11:49AM 10   got DACA status but let it expire?

11        MS. PERALES:  We know that at the high point there were

12   821,000 people who all had DACA at the same time, but I don't

13   know and now of course we're down significantly, about

14   180,000 --

11:49AM 15        THE COURT:  Do we know how many -- what the potential

16   DACA population is?  Now, that number should be dwindling, I

17   would think; but that's eligible for DACA but have not applied?

18        MS. PERALES:  I do not know of that number, Your Honor.

19   I don't think that number is in the record.

11:49AM 20        THE COURT:  Okay.  Because I think that's what

21   Mr. Disher's 1.5 included, people that had it, have it, or

22   could have it.

23        MS. PERALES:  At a certain point in time --

24   Mr. Disher's estimate may have been drawn from a certain point

11:49AM 25   in time.  As Your Honor has noted, there are people who are

1      aging out --

2           THE COURT:  It's a moving target.

3           MS. PERALES:  There are people aging out at the top and

4      there's a point -- it's a fixed number.  It's a fixed number of

11:50AM  5      people who can be eligible.

6                And so, Your Honor, what DACA is is actually a

7      disputed fact in this case.  We assert that DACA is the

8      decision to defer removal proceedings against an individual.

9      It is discretionary.  It is prosecutorial discretion.  It is

11:50AM 10      one by one after an evaluation of each individual person's DACA

11      application.

12                The things of which plaintiffs complain, the

13      hooks on which plaintiffs hang their hats spring from other

14      sources of either regulation or statute, the advance parole

11:50AM 15      statute and the work authorization regulations.

16                So, Your Honor -- this is a very long way of

17      answering Your Honor's question.  There are different pieces of

18      this picture and according to *Regents* almost the entire

19      decision of the majority in *Regents* is about these

11:51AM 20      distinctions.

21                And so it is our contention that under *Regents*,

22      there are these two components.  The plaintiffs don't challenge

23      the prosecutorial discretion, the decision not to move against

24      somebody individually for removal proceedings.  What the

11:51AM 25      plaintiffs do challenge is given to us by statutes and

1    regulations that are not at issue here and so it's not

2    appropriate to grant summary judgment to them.

3        THE COURT:  You don't think they're challenging the

4    whole ball of wax?

11:51AM  5        MS. PERALES:  I don't think there is a ball of wax,

6    Your Honor.

7        THE COURT:  Okay.

8        MS. PERALES:  There are no balls of wax, but there are

9    separate components of what is referred to as DACA.  One of

11:51AM  10   them is forbearance.  Another one is, according to the

11   plaintiffs, work authorization and advance parole.  Those

12   things come from elsewhere and they should be challenged in

13   their own lawsuits.

14        The plaintiffs are perfectly able to sue to

11:52AM  15   overturn the work regulations for deferred action recipients,

16   claiming it's outside the statutory authority.  They're also

17   perfectly capable of suing for the grants of advance parole to

18   DACA recipients as opposed to any other person who is here

19   unlawfully.  That's what the advance parole statute is all

11:52AM  20   about.  If they want to sue about that, they can.

21        What they did sue over though is DACA and DACA is

22   prosecutorial discretion and they already said in their

23   findings that they're not challenging that.

24        And so I think that's really what I mean by the

11:52AM  25   doughnut here is that there's really nothing when you get

1    really close in.

2           I did want to say and this -- we point this out

3    in our papers; but the legal argument about forbearance, just

4    focusing on forbearance.  It's our position that their legal

11:53AM  5    argument is flawed because it collapses immigration status

6    which the INA is very careful to set out.

7           THE COURT:  What do you mean by "collapses"?

8           MS. PERALES:  It collapses two things.  On the one

9    hand, immigration status which is provided for in the INA; and

11:53AM  10   on the other hand, the conditions that an individual finds

11   themselves in when they have deferred action.

12          Now, a deferred action recipient is still

13   undocumented.  Deferred action is revocable at any time, not

14   just by --

11:53AM  15   THE COURT:  Apparently not.  If you're President Trump,

16   I don't think he would agree with you.

17          MS. PERALES:  Yes.  Well, rescission -- the dispute

18   there, rescission is a little bit different from revocability

19   with respect to the individual.

11:53AM  20          I asked my husband this morning over breakfast

21   whether the Court would recognize the term NTA and my husband

22   responded, of course he would.

23          And I wanted to point out that the issuance of an

24   NTA by a border person, by a border official, either in the

11:54AM  25   area or at the checkpoint, automatically revokes DACA and there

1    are no procedural rights to contest them.

2              So DACA is not immigration status.  It has been

3    referred to as lawful presence, but lawful presence is not a

4    term you will find in the INA.  You can search for the term

11:54AM  5    "lawful presence," and it's not there.

6              It's a phrase that we use to describe a person

7    that the government has taken note of and decided not to place

8    into removal proceedings at that moment.

9              And so lawful presence is not immigration status;

11:54AM  10   and for this reason, the exercise of discretion not to move

11   against somebody in terms of removal is not the same thing as

12   granting that person immigration status in a way that would be

13   contrary to the INA.

14             So as to the substantive claim here, we would

11:55AM  15   want to point out to the Court that there is a very strong

16   distinction between what DACA recipients have in deferred

17   action and what the INA talks about which is who has status,

18   who can come, and who is removable.  Persons with deferred

19   action always remain removable.  It is not inconsistent with

11:55AM  20   the INA.

21             The last point that I would like to make is that

22   when you remove all of these things, what's really left is a

23   complaint by plaintiffs about the number of people who have

24   received deferred action under DACA.

11:55AM  25             And this Court has expressed that concern as

well.  The Court in its preliminary injunction opinion said it

remains outside the authority of the agency to defer action for

this many people.

And you know, my friend, Mr. Disher, has talked

about, well, there's no sort of cap on the number; but I would

like to focus on the bottom of that number for a minute.

If individual grants of DACA are lawful as an

exercise of prosecutorial discretion, DACA cannot be outside

the scope of executive authority.  And this is true as we move

through the numbers.

THE COURT:  So that the federal government -- or not

the federal government -- the executive branch can just grant

deferred action to every illegal alien in the United States?

MS. PERALES:  Absolutely not.

THE COURT:  That's what you just said.  You just do it

one by one by one by one by one and pretty soon, you know --

again, we can argue over how many illegal aliens there are in

the United States, somewhere between 13 and 20 million.

MS. PERALES:  The answer is that they cannot,

Your Honor.

THE COURT:  Okay.  What's to stop that?  That was the

question I asked in the prior case and no one could give me an

answer to.  The Fifth Circuit asked that question.  Justice

Roberts asked that question and the solicitor general couldn't

give him an answer.  Basically the answer they gave to the

1    Supreme Court was, well, we would never do that.

2         MS. PERALES:  So the answer is no, because deferred

3    action, and particularly as guided by the DACA memorandum, only

4    applies to a limited number of people -- that finite group that

11:57AM   5    we were talking about plus all of the discretionary

6    considerations that go through those 150 pages of standard

7    operating procedure --

8         THE COURT:  No.  But what's to keep them from saying,

9    okay, now we're just going to adjust the criteria and we're

11:57AM   10    going to move it from June 15, 2012, to June 15, 2021 --

11         MS. PERALES:  Well, but that's --

12         THE COURT:  -- and everybody that now complies who

13    changes the date gets deferred adjudication?  I'm sorry.

14    Deferred action.  I switched gears on you.

11:58AM   15         MS. PERALES:  Those days are behind me, Your Honor.

16         THE COURT:  Yes.

17         MS. PERALES:  I would say that that is not 2012 DACA.

18    If the question is is 2012 DACA substantively lawful, the

19    answer is yes and the answer is that it cannot apply to an

11:58AM   20    infinite number of people, it's very discretionary and that

21    only people who fulfilled the criteria are ever going to

22    receive that favorable consideration.  There is no infinite

23    number on the top.

24              But I would like to focus on the bottom because I

11:58AM   25    think it also helps illuminate the issue before the Court.  You

1  know, if the question is whether DACA is legal as to the people

2  who have received it, right, the answer is yes and plaintiffs

3  have not shown otherwise.

4         The plaintiffs do not say that Karla Perez, who

11:58AM  5  grew up in Pasadena, graduated from the University of Houston

6  School of Law, who now represents immigrant women who are

7  victims of violence in her work at a nonprofit, should not have

8  received DACA.

9         They don't say that Esther Jeon, who is with us

11:59AM  10  today, who also grew up in Houston and went to Harvard, where

11  she graduated in 2019, should not have received deferred action

12  after she underwent a careful and individualized review by the

13  agency.

14         Or -- and this is my last example -- Maria Diaz,

11:59AM  15  who is a nurse in Mission, Texas, who is working on the front

16  line of the COVID pandemic in the Valley, where it's

17  particularly severe as the Court knows.

18         The plaintiffs cannot identify any example where

19  anybody who has received deferred action shouldn't have and

11:59AM  20  this does go to the substantive lawfulness.  We want to urge

21  the Court not to just look at some hypothetical infinite

22  number, but also to look at the individualized decisions that

23  plaintiffs do not challenge as part of what makes DACA lawful.

24         Thank you.

12:00PM  25         THE COURT:  Thank you, Ms. Perales.

1          New Jersey, do you want to weigh in?

2          MR. FEIGENBAUM:  Yes.  Thank you, Your Honor.

3          There's three topics that New Jersey would like

4   to cover today; and as I understand it, we're saving remedies

12:00PM  5   for later so I will just focus on the first two, which is the

6   timing of the summary judgment motion and then the merits of

7   the motion itself.

8          So obviously plaintiff states are pursuing a

9   motion for summary judgment and they've framed it as what I

12:00PM  10   think would be termed a straightforward challenge to a 2012

11   DACA memorandum.

12          But in our view, the reality right now is much

13   more complicated.  In our brief, we discussed the federal

14   government's choice to supersede this memo with the Wolf and

12:00PM  15   Edlow memos and our views on the choice that had on the case.

16   But admittedly since that time, the case has remained something

17   of a moving target.

18          For one, the *Regents* EDNY order had led to

19   significant uncertainty over what framework exactly federal

12:01PM  20   defendants are implementing; and I know you'll hear from them

21   in a moment.

22          Given as well I think the ongoing federal

23   transition, this Court can expect further changes to that

24   framework soon.  So as a result, we think the easiest approach

12:01PM  25   for this Court to take is not the mootness finding that we

focused on primarily in our briefs but to follow the steps that federal courts typically and often take during federal transitions which is briefly pause the case and seek a status update as soon as the transition has been completed.

12:01PM          That's what this Court did with the DAPA litigation in *Texas I* and that's also what the Courts have repeatedly done in previous transitions.

          And I want to give four reasons why I think the disposition of this case in particular would materially benefit

12:01PM from an opportunity to hear from federal defendants after the inauguration.

          First, it will allow federal defendants to eliminate the current confusion over the precise policy or framework that is being implemented.

12:01PM          Second, it will ensure the best possible record for this Court to make fact-bound assessments over issues like DHS officer discretion.

          Third, it will eliminate any of the outstanding issues regarding lack of adversity or even any questions

12:02PM regarding lack of adversity.

          And fourth, it will allow for the orderly process that *Regents* envisioned.

          Of course, if this Court disagrees and reaches the merits of plaintiffs' motion, then New Jersey, like the

12:02PM DACA intervenors, believes that plaintiffs are not entitled to

1    summary judgment given the facts disputes that remain.

2         And then of course we will save for later our

3    perspective on what remedies would be appropriate if the Court

4    disagrees with all of that.

12:02PM 5         I thought I might begin with our discussion about

6    why it makes no sense not even to do a formal stay order or

7    formal pause on the case but simply, as is often the case in

8    summary judgment, not to actually issue any final ruling until

9    after the transition is complete so that federal defendants

12:02PM 10   could weigh in with a status update this Court would order

11   almost immediately a week or two after the transition is

12   completed.

13        The first is that as a general matter this is a

14   perfectly normal course for ways that federal courts handle

12:03PM 15   cases where policies can be a bit of a moving target during

16   transition and I think it's fair to say given the changes that

17   have happened since even we briefed this case, this case has

18   certainly been a moving target.

19        This Court took a similar action, as I noted, in

12:03PM 20   the DAPA litigation in *Texas I*, where the parties moved to have

21   this Court essentially stay proceedings from November of 2015

22   to February of 2017 to allow a change in administration to come

23   in and perhaps take a different approach and weigh in

24   differently on the lawfulness of the framework before the

12:03PM 25   Court.  And as the Court is well aware, that's exactly what

1       ultimately happened in the DAPA litigation.

2                   But I think there's another case from the

3       Southern District that I think is particularly illustrative

4       here and that's the *Veasey versus Abbott* case.  That's

12:03PM   5     Docket 2:13-193.

6                   That's a case that had been essentially ongoing

7       for three and a half years by the time the transition took

8       place and was in posttrial briefing and nevertheless the Court,

9       in an opinion by one of your colleagues for the

12:04PM   10    Southern District, nevertheless gave a continuance in 2017 to

11      allow for the transition from one leadership of the Department

12      of Justice to another DOJ leadership specifically on the basis

13      that they may change the position the federal government was

14      going to take.  That was the federal government challenging the

12:04PM   15    Texas voter ID law.  And as part of that challenge, that would

16      help illuminate the issues, even at post-trial briefing, in

17      front of the Court.

18                  The private plaintiffs in that case actually

19      opposed but the Court nevertheless allowed a stay on that

12:04PM   20    posture and as a result, it did materially change the issues

21      before this Court.

22                  This is not something unusual to this district by

23      any means.  Plenty of circuit courts, including the DC Circuit

24      in lots of environmental cases where changes in administration

12:04PM   25    will change the legal and factual issues presented to the

1    Court, they repeatedly have granted stays from the

2    President Bush EPA to the President Obama EPA, from the Obama

3    EPA to the Trump EPA.  And we have plenty of examples.

4         THE COURT:  Let me ask you a question though.  How can

12:05PM   5    they change what happened eight years ago?

6         MR. FEIGENBAUM:  So I think because this case always

7    arrives on a posture of seeking injunctive relief rather than

8    damages, what really always matters to this Court is what sort

9    of remedy it's going to think about prospectively and whether

12:05PM  10    there are any violations in the implementation.

11         I think this Court's PI opinion was incredibly

12    helpful in illuminating that you don't just look at the words

13    on the page, but you also look at the implementation of the

14    frameworks on the ground.

12:05PM  15         And so how something might have been implemented

16    in 2013 says far less about the injunctive requests that are

17    pending before this Court than how it's being implemented in

18    2019 or 2020.

19         And I think that segues nicely into the four

12:05PM  20    reasons we have why this Court in particular would benefit from

21    following that normal course during the federal transition,

22    because, again, we think it isn't just about the 2012 memo.

23         The first reason that I gave is that we think

24    we're in a period of some confusion right now or moving target,

12:06PM  25    whichever phrase this Court or any of the parties want to use.

And we think that in particular there's some question about how exactly the federal government wishes to implement DACA.

We spoke a lot about the Wolf and Edlow memos which we believed addressed, in large part if not entirely, the concerns about advance parole, the concerns about the lack of use of discretion on the ground, and other concerns about the types of various benefits that they went into some detail on about in both the Wolf and Edlow memos.

Now, plaintiff states to Your Honor this morning specifically said, "Well, now, because the Wolf and Edlow memos are set aside, this is the first time in the history of the case where the federal defendants are actually implementing DACA fully against us," which I think is a sort of notable comment.

And we actually don't think that's true because there's a lot of opening questions we still have about how federal defendants are implementing DACA and will be implementing DACA in light of the *Batalla Vidal* order out of EDNY.

Among other things, there's questions about whether the federal defendants will appeal and there's questions about whether the federal defendants are going to repromulgate a new version, a similar version of the Wolf memo by someone with due acting authority.

But even if they don't take those steps, there's

questions about how the *Batalla Vidal* order would be

implemented on the ground, even in the short-lived period until

a change in administration when issues around the authority for

this particular acting secretary all will by definition go

away.  So whatever we think of that order, it's clearly

short-lived in its context.

Among other things, we know that after *Regents*,

the federal defendants nevertheless held initial applications

and did not grant advance parole to DACA recipients and so it

is quite possible that applications are being accepted but not

finally adjudicated right now.

When it comes to initial DACA requests, it's

quite possible that advance parole is still not being granted

because, again, it is separate from the 2012 DACA memorandum

itself and applies to anyone who wishes to seek it even if in

this country.  Again, with nothing from the 2012 memorandum to

support their request.

So ultimately we have some serious questions that

hopefully federal defendants will be able to clear up for

Your Honor about how precisely the *Batalla Vidal* order and the

Wolf and Edlow memos all intersect and how they're being

implemented on the ground.  But the point is that all of that

confusion goes away in just a month.

It also helps that we will have federal

defendants that are going to be defending DACA in whatever

1    precise memo the federal defendants have for implementing DACA.

2          If that's the case, then any of the outstanding

3    questions that ever existed in this case around lack of

4    adversity also will necessarily go away.

12:08PM    5          And I know that at the PI stage of this case,

6    Your Honor made a number of findings regarding adversity, and I

7    just have two responses to that.

8          The first, and I'll get to this in just one

9    moment, is that the lived experience of this case, including

12:09PM    10   now at the summary judgment posture, I think help illuminate

11   the problems that this case has had and that this record has

12   had and that any decision will have with the way federal

13   defendants have been defending this case.

14          THE COURT:  Wait, wait, wait.  Explain that.

12:09PM    15          MR. FEIGENBAUM:  Of course.  So we think that having --

16   the difference between, I think, willing warriors among federal

17   defendants and reluctant warriors is significant.  Your Honor,

18   I think, rightly noted that DACA intervenors in New Jersey have

19   come in to vigorously defend DACA; and we're happy to be here

12:09PM    20   doing it.

21          But there are certain things we simply cannot do

22   that federal defendants are best able to do which is

23   effectively present to this Court sufficient -- the complete

24   picture, let's say, of discretion which, again, we think is

12:09PM    25   part and parcel of the whole analysis in this case.  And this

1    Court recognized at the PI stage there was competing evidence

2    of discretion going in each direction.

3            You know, I read the PI opinion.  I don't think

4    this one is a footnote.  I think I'm just talking about the

12:10PM  5    text here.

6            THE COURT:  Thank God.

7            MR. FEIGENBAUM:  This Court in the PI opinion spoke

8    about how there was evidence going in either way and even made

9    comments saying there's a genuine dispute here.

12:10PM  10           So one would expect that between the PI and SJ,

11   that you have willing federal defendants who are standing up to

12   defend the lawfulness of DACA.  They would be eager to present

13   information to this Court about how exactly DACA is being

14   implemented on the ground, including whether or not any

12:10PM  15   discretion is used.

16           Instead -- and we'll talk about this, I

17   understand, when we discuss the merits portion of summary

18   judgment -- we have plenty of requests to federal defendants

19   regarding information about how exactly discretion is used.

12:10PM  20           So we asked, please tell us everyone who was

21   denied and then tell us if they were denied, was it because

22   this person didn't, you know, quote/unquote meet the criteria

23   or was it because it was someone who met the criteria but

24   nevertheless did not warrant the discretionary act of DACA from

12:11PM  25   DHS.

1          That's one of the questions I think Your Honor

2     trained on in the PI stage, that it can be very difficult to

3     figure out from denial rates alone or general evidence alone

4     who exactly is being denied because this Court -- because DHS

12:11PM  5     thinks they didn't meet the criteria or because DHS thinks they

6     meet the criteria but shouldn't have their DACA request

7     granted.

8          So one would imagine that the federal government

9     would come forward with samples -- even if it's too burdensome

12:11PM 10     to look at the entire population of requests ever -- samples,

11     examples, a lot more information that could be provided.  And

12     instead, interrogatory after interrogatory, they said -- this

13     is at Pages 24 to 25 of the New Jersey records submission with

14     our summary judgment opposition -- they said it's too

12:11PM 15     burdensome based on the case needs to take steps like that,

16     which doesn't suggest it's impossible by any means.  And they

17     give hours estimates which certainly show it will take work but

18     is by no means impossible but based on the case needs are

19     choosing not to do it.

12:12PM 20          Well, a federal defendant that's committed to

21     defending DACA and the framework and showing that discretion is

22     inherent in the way DACA is implemented would think the cases

23     supported taking on very different verdicts and taking on very

24     different steps in order to show this Court exactly how DACA is

12:12PM 25     being implemented.

1          And we do think, as this Court recognized at the

2     PI stage, discretion is an extraordinarily important part of

3     this case.  It always has been.  I think it always will be.

4          And having federal defendants who are now eager

12:12PM   5     to build a record on discretion when they alone --

6          THE COURT:  Didn't I in the preliminary injunction,

7     didn't I basically assume that discretion was being used and

8     still found that the states were likely to prevail?

9          MR. FEIGENBAUM:  So that will take me to the merits,

10    but I just want to say that even --

11         THE COURT:  We've already talked about the merits.

12    We're talking about the merits --

13         MR. FEIGENBAUM:  Of course, Your Honor.  The only thing

14    I wanted to say -- and I am perhaps throat-clearing up to

12:13PM   15    that -- is that even if Your Honor stands by that view and

16    says, yes, at summary judgment I realize there's too much

17    discretion here to be sure that that part of the procedural

18    analysis doesn't work, I'm still standing by the rest of the

19    procedural analysis -- even if that's the case, I think

12:13PM   20    everyone agrees that given a case of this sensitivity, having a

21    short pause of a couple of weeks so that this Court can have a

22    full record and clarity on discretion -- which of course has

23    always been a part of this case, will be a part of any appeal

24    no matter which party ends up prevailing in this case -- I

12:13PM   25    think will be really useful to make sure that the case is

1   really in the best possible posture in its decision and for its

2   review.

3          I'm not talking about a long pause, right?

4   Summary judgment opinions obviously often take longer than a

12:13PM 5   month anyway and so I think all of this helps show the benefits

6   that federal defendants can bring to the actual record,

7   whatever the precise final legal judgment this Court draws.

8          But turning to that legal judgment, if I think

9   that's one merit point that I can make, and I'm happy to

12:13PM 10  substantiate it, it's that we think discretion really is part

11  and parcel of the entire analysis in this case, that it isn't

12  really possible to say, well, I accept that there's a genuine

13  dispute about discretion and I'll even assume that there's a

14  lot of discretion being used -- and, again, we can talk about

12:14PM 15  that, the evidence I think that shows that.

16          If this Court is going to assume such significant

17  amount of discretion, then I actually think that infuses the

18  entire analysis on both parts of the procedural APA analysis as

19  well as getting into the substantive APA analysis.

12:14PM 20          This Court had a question about whether *Regents*

21  just kind of ends that conversation and so I thought I would

22  start there.

23          THE COURT:  I think that's what I would like to hear.

24          MR. FEIGENBAUM:  So I don't think that *Regents* can be

12:14PM 25  dispositive here for four different reasons.

1          The first is that *Regents*, of course, makes the

2   point that this issue is reviewable, but it's all the time the

3   case that documents can be judiciously reviewable and

4   nevertheless not have to go through notice and comments and

5   nevertheless not be unlawful, right?  To be reviewable, of

6   course, is not automatically by definition unlawful.

7          So I think the *Shalala* opinion from the

8   Fifth Circuit, which of course has been an opinion this Court

9   is intimately familiar with from the DAPA case, itself doesn't

10  make any sense if you assume that reviewability and the notice

11  and comment.

12         The premise of course of *Shalala* is that a

13  document is going to be reviewable but nevertheless provides

14  the prongs to figure out whether or not under the procedural

15  APA it itself was going to be unlawful because it didn't go

16  through notice and comment.

17         And I think I can give an example that might be

18  helpful for showing why this would be.

19         Imagine, for example -- and this is a little born

20  of 2020.  Imagine there's a memo that goes out that says

21  something just to the effect of:  In reviewing individualized

22  requests for deferred action -- nothing more.  Just someone

23  bringing it to you -- DHS should be solicitous or consider if

24  they're involved in the distribution of the vaccine.  That's

25  all that it says.  It doesn't say anyone is entitled to

1    anything.  It says that's a factor you should think about you

2    might not have thought about in prior years.

3              That's obviously individual.  That's obviously an

4    instance of total discretion, and it's just a request to

12:16PM   5    consider a factor.

6              That said, it may be the case that someone has a

7    legal challenge to that sort of memo, maybe they've identified

8    a provision of the INA that says something to the effect of,

9    you know, medical work isn't supposed to be relative.

12:16PM  10              Again, this is all obviously hypothetical.

11              So they have a legal challenge and the challenge

12    would be reviewable to whether the memo is consistent with the

13    INA, but that same memo does not necessarily have to go through

14    notice and comment rulemaking because of the amount of

12:16PM  15    discretion that would mean.

16              So I think that is sort of proof in the pudding

17    that you can have an example where something is reviewable; but

18    nevertheless, because of the amount of discretion that

19    continues to exist under that particular memo, it doesn't have

12:16PM  20    to go through notice and comment rulemaking.

21              So I think this Court finds itself in the same

22    position it frankly did before *Regents* and that's not a huge

23    surprise, I think, for two other aspects of *Regents*.

24              First, plaintiff states are obviously counting up

12:17PM  25    what the justices have said in different opinions.  But I would

1    just note that the *Regents* majority included plenty of justices

2    who were obviously on one side of the equally divided court in

3    DAPA or on the other side.  It clearly had both.

4            So it's unlikely that the *Regents* majority was

5    meant to resolve the separate issue that was present in things

6    like DAPA, which involved notice and comment rulemaking.

7            Instead, if you look at *Regents* 1902, that's the

8    page cite, it specifically says that we understand these

9    benefits to come from separate regulations.

10           So I don't understand -- I take Mr. Disher's

11   point that there's language in *Regents* that talks about, you

12   know, affirmatively conferring benefits, the way DACA might be

13   appropriate, et cetera.

14           And there's certainly language for everyone in

15   *Regents* itself, but I think *Regents* was specifically staying

16   away from whether challenging the DACA memo itself would be the

17   way to get at what we view as the collateral benefits.

18       THE COURT:  Of course, that wasn't in front of the

19   Court in *Regents*.

20       MR. FEIGENBAUM:  I agree.  I agree it wasn't in front

21   of the Court in *Regents*, and that's why I think *Regents* isn't

22   dispositive of the question.  I think that's exactly right.

23           And so I think for all of those reasons, *Regents*

24   really can't be dispositive of the question and the Court is

25   left in the position it was before which is trying to figure

1    out on the record before it whether there's a procedural APA

2    problem and whether that's a substantive INA problem.

3            Now, as to the procedural APA problem, if I

4    could, I just wanted to highlight what I think are the five

12:18PM   5    best pieces of evidence of discretion and then I will

6    immediately move on to why we think the rights and benefits

7    prong alone, without considering discretion, isn't enough to

8    cross the procedural APA hurdle at summary judgment.

9            So the five best pieces of evidence that I think

12:18PM   10    really -- three of which weren't even before this Court at the

11    PI stage.  There's of course the internal DHS documents -- this

12    was at the PI stage -- where you have the Texas Service Center

13    in 2015 using what I term the neighbor test, essentially saying

14    you've got to figure out if this person would be someone you

12:19PM   15    would want as your neighbor.  That's Docket 215-1 at 405.

16            You also have internal testimony, this is the

17    Neufeld testimony that was before this Court at the PI stage,

18    Docket 6 at 279-96 where he specifically says DACA involves

19    discretion both in considering the factors and in deciding

12:19PM   20    whether someone merits discretion even once they've satisfied

21    the factors.

22            So we think those two pieces of evidence were

23    really helpful, but we think there's more now.

24            So we think the Wolf and Edlow memos, even if

12:19PM   25    they're set aside in *Batalla Vidal*, are incredibly illustrative

1    to the kind of discretion that DHS is using.

2              There's nothing in the *Batalla Vidal* order that

3    would prevent DHS from using greater discretion when they

4    review applications if that's what the leadership of DHS wants

12:19PM    5    them to be doing.

6              And so the Edlow memo in particular requires the

7    creation of new SOPs and new training materials that

8    specifically instruct all reviewing DHS agents on the amount of

9    discretion that they're supposed to use here.

12:20PM   10              So even if there was question before Wolf and

11    Edlow, there isn't question now.  And, again, this is an

12    injunctive relief case.  This is about whether the federal

13    defendants right here right now are violating the law and

14    therefore whether a federal court needs to step in.

12:20PM   15              So to a degree, that discretion is shot out after

16    Wolf and Edlow and there's nothing in the record to suggest

17    that they're lying or that the SOPs and new training materials

18    aren't being followed, then that's more evidence, I think,

19    still of discretion.

12:20PM   20              There's also the increase in the denial rates

21    that we've talked about back and forth in everything between

22    plaintiff states and the various intervenor defendants.

23              We have identified that for initial DACA

24    applications from 2018 -- I believe from September 2018 until

12:20PM   25    2020, we're now looking at something more like a 42 percent

1      denial rate.  There's some back and forth on the facts about

2      whether that's polluted by any individuals who simply weren't

3      eligible for DACA at all.

4              But, again, the sharp increase in the denial rate

12:20PM   5    based on the administration that has hostility to granting of

6      DACA requests, I think is really illustrative to the amount of

7      discretion that exists.

8              And then finally we also have on the record

9      federal defendants admitting, quote, anecdotally they are aware

12:21PM  10    of instances in which some individuals or at least two

11     individuals have received DACA -- or did not receive DACA that

12     otherwise were eligible for it.

13             Now, again, I'm not going to stake my hat on that

14     number itself even though it's just anecdotal, but I think

12:21PM  15    that's actually more proof of the adversity problem that we

16     have federal defendants who merely should be defending their

17     program specifically saying:  We're anecdotally aware, but

18     we're not going to run down more details, we're not going to

19     give you more information about how that worked, and we're not

12:21PM  20    going to be providing any samples to figure out how often

21     that's happening.  So there's a lot of evidence of discretion

22     here.

23             Now, I think Your Honor has said, okay.  I think

24     that there's discretion.  I'll accept that there's discretion.

12:21PM  25    Don't you lose anyway?

1          And I think that gets to the rights or benefits

2   prong.  And I think the basic principle here and the way to

3   think about this test is that this Court would have to find --

4   if it agrees with us on discretion or agrees there's genuine

12:22PM  5   material facts on discretion, that no amount of discretion, no

6   amount of discretion could show that this was a generalized

7   policy or even no amount of everything provided in this record

8   could show that that's --

9        THE COURT:  Why does that matter?

12:22PM 10        MR. FEIGENBAUM:  So the reason that that matters -- so

11   this Court in the PI opinion, I think, grapples with how these

12   prongs operate, whether in tandem or as two totally separate

13   prongs.

14         Obviously if they're two totally separate prongs

12:22PM 15   and both must be satisfied, then plaintiff states obviously

16   lose.

17         But this Court found that there are two factors

18   that come together in a single analysis.  Now, if that's right

19   and you've got two factors in the analysis, then sort of

12:22PM 20   necessarily the Court has to find that the other prong is so

21   strong that nothing on the discretion prong could overcome it,

22   no amount of discretion in that balancing analysis could be

23   enough to overcome what the rights or benefits prong shows.

24         And I don't think that could be quite right

12:23PM 25   because as I understood plaintiff states' position and even

1     aspects of the PI opinion, no one is saying that if an

2     individual totally separate from DACA requests deferred action

3     and receives deferred action in a truly one-off case, that that

4     alone would be the problem in and of itself --

12:23PM   5          THE COURT:  There's a third alternative though.

6          MR. FEIGENBAUM:  I'm sorry, Your Honor.  I didn't hear

7     that.

8          THE COURT:  There's a third alternative.  Instead of an

9     "and," it can be an "or."

12:23PM  10          MR. FEIGENBAUM:  Sure.  But I think my example would

11     work either way, and I can walk through.

12               So whether it's rights or benefits separate from

13     discretion still works on this one-off example.  So in the

14     one-off example, the person would have deferred action.  Let's

12:23PM  15     say -- I'll go back to my vaccine example.

16               Let's just say the inventor of the vaccine had

17     been here without documentation -- so, again, hypothetical --

18     and the federal defendants wish to defer an action for that

19     individual for the years while the vaccine is being distributed

12:23PM  20     because they would have concerns in that one-off case.

21               That would, based on the 1980s regulations that

22     have been in effect consistently since, mean that that person

23     would collaterally get work authorization.

24               The same rights would obtain, the same benefits

12:24PM  25     would obtain; but it's not at all clear to me that there's the

same legal problem by any means that this Court identified at

the PI stage.

THE COURT:  So all the talk that Justice Roberts made

in *Regents* about all the benefits that go along with DACA, I

mean, he was just wrong?

MR. FEIGENBAUM:  No, no, no, not at all.  And I know

better than to call the Chief Justice wrong, let alone in open

court.

I think I have two points on that.  The first is

our point is that essentially the wrong thing has always been

challenged here, so it's not that DACA leads to the collateral

effect.

So I think my one-off example is really obvious

there.  The challenge wouldn't be that this particular doctor

merited deferred action.  He would sue the federal defendants

and say, you violated some sort of notice and comment

requirement by not using notice and comment when you deferred

this person's -- when you granted this person deferred action.

Instead, you would say, sure, you granted him

deferred action.  You don't need to go through the notice and

comment.  That's a purely discretionary act.  You really used

your total discretion there.  That had collateral consequences.

The rights and benefits offend us and we're going to have to

challenge that regulation.

And Your Honor's point on severability, I think

1  is really illustrative and might help prove the point I'm

2  trying to make here.

3        THE COURT:  I don't know if it was my point or my

4  question.

12:25PM  5        MR. FEIGENBAUM:  I think it's fair.  The question, I

6  think, might serve a point I want to make is perhaps a fairer

7  way to say it.

8              So, you know, severability I think really

9  illustrates the problem here.  I think there's some thought

12:25PM  10  that what could happen or a possible remedy would be to defer

11  action but not to have any collateral consequences to come with

12  that, then that's not about the 2012 DACA memo itself at all.

13  And this, I think, *Regents* does stand for at Page 1902 of the

14  opinion.

12:26PM  15              The problem there would be with those preexisting

16  regulations which essentially set up an equation that said if

17  deferred action, then eligibility for work authorization if you

18  have economic necessity.

19              If that is always a problem for the person who

12:26PM  20  got the vaccine, the single individual who got it or DACA

21  recipients, then the problem is not the DACA memo and the

22  problem is not the one-off grant.  The problem would be with

23  the 1980s regulation, the one that set up this equation:  If

24  deferred action, then you would have work authorization

12:26PM  25  assuming economic necessity can be shown.

1           And, again, that could be challenged; and I don't

2      think *Regents* disposes of what has to be challenged.  That

3      could be challenged in a petition for rulemaking under

4      Section 553(c) and would not be part and parcel of the

12:27PM  5      challenge to DACA itself.

6           So we've always thought that a bit of the wrong

7      thing is being challenged here because the deferral of action

8      or the factors to consider in deferring action themselves do

9      not have to go through notice and comment rulemaking so long as

12:27PM 10      sufficiently high discretion is there.  Just as you don't need

11      notice and comment to defer the action of a single individual

12      who is receiving the vaccine and just as you don't need notice

13      and comment to say when you look at one-off applications,

14      please just consider the factor --

12:27PM 15           THE COURT:  What about the fact that Secretary

16      Napolitano's memo says:  For individuals who are granted

17      deferred action, the USCIS shall accept applications?  I mean,

18      that's part of the DACA memo.

19           MR. FEIGENBAUM:  So she's following the regulation in

12:27PM 20      that case.  I mean, she's just actually following the notice

21      and comment regulation.  I think it would be a real problem if

22      the DHS secretary in a memo is saying, you know, there's a

23      regulation on the books, but I don't particularly like it.  I

24      don't particularly want to follow it.

12:28PM 25           I think we would have questions about the

1    propriety of doing something like that.  She's not saying, I'm

2    creating some sort of new right from DACA itself that never

3    before existed.  Every deferred action -- and there are plenty

4    of deferred actions -- you know, family fairness.  This Court

12:28PM   5    is well aware of that history.  All of those examples tie to

6    the 1980s regulations and lead to the same equation that

7    Secretary Napolitano talked about in 2012.

8         And that's something that I think the Wolf and

9    Edlow memos are particularly instructive on.  You know, what

12:28PM   10    they say is we want to maximally use discretion and we want to

11    cut off advance parole.  We really don't think advance parole

12    is a live issue anymore in the way plaintiff states are talking

13    about because they make very, very clear you have to get a

14    one-off, meeting the statute, humanitarian reason, needing

12:28PM   15    life-saving treatment and a significant public benefit like law

16    enforcement reasons, national security reasons --

17         THE COURT:  Is there any viability to that memo

18    anymore?

19         MR. FEIGENBAUM:  So we think so.  So the Edlow memo

12:29PM   20    itself -- first of all, we think it could be viable if there's

21    an appeal, we think it could be viable if it's repromulgated.

22         And, again, we're just in a couple of weeks'

23    window right now with this authority problem, all of which is

24    clearly going to go away very soon.  That would get back to my,

12:29PM   25    you know, line of reasoning.

1         But even on the merits, we think that those memos

2    are instructive not for their formal, binding nature but

3    because the Edlow memo itself says we haven't granted advance

4    parole to a DACA recipient since 2017.  You don't need the memo

12:29PM 5    by someone who is validly appointed to accept that DHS is

6    identifying as a matter of fact that they know DACA does not

7    immediately lead to advance parole.

8         The Edlow memo itself said the 2012 memo did not

9    give anyone rights to advance parole, did not change the

12:29PM 10   standards for advance parole.  So, you DHS officers, who are

11   reviewing requests for advance parole, you need to look for the

12   statutory rules.

13   THE COURT:  But what you're arguing is that the states,

14   assuming they have a valid complaint and assuming they have

12:30PM 15   statutes, never can challenge anything because it's not the

16   DACA memo that's doing it.  It's how they're enforcing the DACA

17   memo, how they're implementing it.

18        So even though their handbook says you have to

19   give these people, let them apply for advance parole or you

12:30PM 20   have to let them apply and even though it's the DACA -- grants

21   of the DACA status that gives them the right to work or the

22   right to get an EAD, you know, by challenging DACA, you're not

23   challenging the right thing, you should be challenging all the

24   regulations that implement it and why aren't they challenging

12:30PM 25   that?  That's the whole -- again, back to my ball of wax, I

think.

MR. FEIGENBAUM:  Well, I think Ms. Perales has, you know, pushed back on the ball of wax.

But I think that very briefly the two main responses to that, the first is we've always said from day one we've never tried to hide the ball, that we think they're challenging the wrong thing when it comes to work authorization and this came up in the DAPA litigation as well.

THE COURT:  I know, and the Fifth Circuit rejected that argument.

MR. FEIGENBAUM:  So the Fifth Circuit had a very different set of concerns.  The Fifth Circuit did not have the evidence of discretion before Your Honor.  So in that context without that discretion the putative link to rights and benefits alone were of sufficient concern, because the Fifth Circuit perceived it as a class-wide grant of rights or benefits, which our point is that's not what's before this Court at summary judgment.  There are discretionary decisions under DACA and those are collateral consequences.  That's a very different scheme than a class-wide grant of rights or benefits.

Then they have separate issues under the substantive INA prong that don't apply to DACA involving direct conflict of provisions for parents.  So there are aspects the defendants want that really just don't ultimately control the

1    instant litigation.

2              So I think that that's parts of the point there.

3    But then the other point is the reason why it's always boiled

4    down to implementation is because plaintiff states themselves

12:32PM  5    asked this Court to ignore the language in the Napolitano memo

6    that talks about using discretion.  They think that's a lie and

7    they think *Texas I* substantiates that.

8              This Court found in the preliminary injunction

9    stage -- well, actually there is a lot of evidence that

12:32PM  10   suggests that was true.  So if we were just looking at the text

11   of the memo alone on discretion, it would be right there, that

12   finding of discretion would be proper; and the *Crane* case out

13   of Fifth Circuit basically made that point.

14             The plaintiff states are saying, well, in

12:32PM  15   implementation, it's not really and we're saying, well, then

16   you need to look at implementation as it develops over the

17   years.

18             And as it has developed over the years, it is

19   only more and more clear, including in this case, that there is

12:32PM  20   discretion in implementation and that discretion is great at

21   implementation and, therefore, this Court would have to find

22   that the rights or benefits of plaintiffs is so overwhelming,

23   that no amount of actual one-off calls for discretion would be

24   able to overcome it.

12:33PM  25             And we don't think that's the record or the case

law in front of this Court because we do think there's a lot of

discretion here that needs to get deferred into a merits ruling

to actually make those discretionary findings or have federal

defendants willing to present discretion to Your Honor, that I

12:33PM  think would really helpfully illuminate the issues and put a

finer point on the complete resolution of them because *Regents*

doesn't dispose of it and none of the other claims, I think,

do.  We really think discretion is the whole ball of wax still,

Your Honor.

12:33PM  THE COURT:  Okay.  Thank you.

MR. FEIGENBAUM:  Thank you, Your Honor.

THE COURT:  Here is what I'm going to do.  I'm going to

let Mr. Coghlan go and then let Mr. Disher respond and then

talk about remedies, but I want five minutes.  My Diet Coke is

12:33PM  running out.

MR. FEIGENBAUM:  Thank you, Your Honor.

(Court is in recess.)

THE COURT:  All right.  Be seated.

All right.  Mr. Coghlan, you or Mr. Hu want to

12:46PM  weigh in?

MR. COGHLAN:  Briefly, Your Honor.

Your Honor, the federal defendants and

specifically the Department of Homeland Security are still

considering the difficult questions on what the next steps

12:46PM  should be regarding DACA in light of the Supreme Court's

1    decision in *Regents.*

2            Your Honor, the Supreme Court did not opine on

3    the legality of DACA in its opinion.  It recognized that DHS

4    had the authority to rescind it if they wanted to.

12:47PM   5            What it did say was, and as Your Honor touched

6    on, that DACA was more than a symbol of nonenforcement policy,

7    that it's an inferred program for conferring affirmative

8    immigration relief and that it at least allows access to a

9    number of intended benefits including Medicare and Social

12:47PM   10   Security.  And as Your Honor suggested, because of that, the

11   Court found that it was appropriate for reviewing the APA.

12           So against that backdrop, Secretary Wolf in his

13   July memo -- and of course we recognize that memo was vacated

14   by the Court in the Eastern District of New York and defendants

12:47PM   15   are currently complying and taking every effort to comply with

16   that injunction.

17           But the policy concerns that were outlined in

18   Secretary Wolf's memo were still ones that DHS is considering.

19   And so what he said was whether to --

12:48PM   20       THE COURT REPORTER:  Would you repeat after "what he

21   said was"?

22       THE COURT:  When you're looking down to read, you're

23   lowering your voice.

24       MR. COGHLAN:  Understood, Your Honor.  My apologies for

25   that.

1       He said, whether to retain the DACA policy

2  presents significant questions of law and legal policy and

3  presents serious policy concerns that may warrant its full

4  rescission.  But at the same time I've concluded that fully

12:48PM  5  rescinding the policy would be a significant administration

6  decision that warrants additional careful consideration.

7       And that is still what the department is doing as

8  of today, Your Honor.  And so, you know, while it's continuing

9  to consider these concerns or consider these difficult issues,

12:48PM  10  it does plan to continue to implement DACA.  As we stand here

11  today, that would be under the terms of the Napolitano memo and

12  in compliance with the Eastern District of New York's

13  injunction which vacated the Wolf memo.  What's left

14  controlling is only the Napolitano memo at this point.

12:49PM  15       The Napolitano memo has been in effect this whole

16  time and has been affecting, impacting what is DACA this whole

17  time; so that has not changed since 2012.

18       But what has changed is kind of these additional,

19  the Wolf and Edlow memos which impacted directly how the

12:49PM  20  Napolitano memo was to be implemented.  Those have been vacated

21  and so right now it is only the Napolitano memo that is being

22  enforced.  DHS still plans to implement DACA under those terms

23  for the foreseeable future.

24       THE COURT:  Based on the court order?

12:49PM  25       MR. COGHLAN:  I'm sorry, Your Honor?

1          THE COURT:  Based on the New York court order?

2          MR. COGHLAN:  Well, the New York court order vacated

3    the Wolf memo and basically took that out of existence.  So all

4    that is left is the 2012 memo for now that is looking into -- I

12:49PM  5    will say the acting solicitor general has not made a

6    determination on appeal in the Eastern District case yet and I

7    don't want to say anything that would limit his ability to do

8    that.

9          But I think either way, the 2012 Napolitano memo

12:50PM 10    is still in effect and the department continues to abide by

11    that for the foreseeable future.

12          So as I've suggested, Your Honor, we appreciate

13    that this Court has already ruled as a matter of law that DACA

14    is likely substantively unlawful because it violates the INA

12:50PM 15    and the federal defendants acknowledge that it is bound by the

16    Fifth Circuit's precedential ruling as the legality of DAPA and

17    the standard of DACA in the Texas ruling and will very likely

18    not depart from its own prior rulings finding that DACA is

19    manifestly contrary to the statutory scheme promulgated by

20    Congress and the INA.

21          We do have views on the potential remedies,

22    Your Honor, but I understand --

23          THE COURT:  In just a moment.  I'm going to let

24    Mr. Disher -- I'm going to untie his hands and he can hit back.

12:50PM 25          MR. DISHER:  Thank you, Your Honor.  Happy to do it.  I

1      just have a few brief things to say in no particular order.

2            First of all, in relation to advance parole and

3      the discussion about who is or who is not eligible for advance

4      parole, I will just point the Court to our reply brief filed on

12:51PM  5      November 20th, Docket Number 529, ECF Page 14, where we had

6      cited to the U.S. Customs and Border Patrol's website on which

7      it, in fact, says:  "Aliens in the United States are not

8      eligible for advance parole if they are...in the United States

9      illegally."

12:51PM  10            DACA of course has removed that provision for its

11     recipients meaning that they are now eligible for advance

12     parole which can lead to that pathway to citizenship.

13            I heard the lawyer for the defendant-intervenors

14     frame this case as such.  She said DACA has two components and

12:51PM  15     I think everybody agrees on the first component which is

16     forbearance from removal.

17            But then she went on to say, plaintiffs argue

18     that there is a second component to DACA, which is work

19     authorization and the benefits that go along with that lawful

12:52PM  20     presence.

21            Your Honor, it's not just the plaintiffs that

22     argue that; nine justices of the United States Supreme Court

23     have now agreed with the plaintiffs' position on that point.

24            In particular, Chief Justice Roberts says, in no

12:52PM  25     uncertain terms DACA is not simply a nonenforcement policy.  In

1    short, the DACA memorandum does not announce a passive

2    nonenforcement policy.  It created a program for conferring

3    affirmative immigration relief.  The creation of that program

4    and its rescission is an action that provides focus for

12:52PM    5    judicial review.  The benefits attendant to deferred action

6    provide further confirmation that DACA is more than simply a

7    nonenforcement policy.

8            That is precisely what the plaintiffs are

9    challenging in this case.  It is not removal forbearance; it is

12:53PM    10    removal forbearance plus all of the attendant rights and

11    benefits granted to the DACA recipients through the executive

12    action.

13            DHS and the federal defendants, of course, they

14    could have issued a different memo and Chief Justice Roberts

12:53PM    15    again acknowledges this.  They could have issued a memo that

16    simply said, we are going to forebear from removing this

17    particular class of individuals.  But that does not mean that

18    these individuals are considered lawfully present and eligible

19    for all of the attendant benefits that come along with that.

12:53PM    20            And Chief Justice Roberts recognizes this in

21    Footnote 5, where he says lawful presence is a statutory

22    prerequisite for a receipt of certain benefits.  It is not the

23    same as forbearance nor does it flow inexorably from

24    forbearance.

12:54PM    25            So DHS could have potentially said, we are simply

forbearing from removing this particular class of people.  That
would be a completely different case.

But what this Court has in front of it is a memo
that does more; and that's, in fact, acknowledged by DHS itself
or -- excuse me -- USCIS.  And this is Exhibit 4 to our motion
for summary judgment which is the frequently asked questions.

Question Number 1:  "What is deferred action?"

It goes on and then it says:  "An individual who
has received deferred action is authorized by DHS to be present
in the United States and is therefore considered by DHS to be
lawfully present during the period deferred action is in
effect."

They did not have to say that.  They could have
said, we are simply forbearing from removing this group of
people; but of course they went further as now all of the
members of the Supreme Court have recognized.

In that recognition, just to respond to this idea
of discretion and how DACA is being implemented, in the Supreme
Court's recognition of those aspects of the DACA program, the
Supreme Court never once talks about discretion or how DACA is
being implemented, meaning that this Court only needs to look
at what DACA did the day that it was enacted and the rights and
benefits that flow from that program.

So we contend certainly that the evidence shows
that the federal defendants continue not to exercise

discretion.  There was no discretion being exercised before the

2017 rescission attempt and what the evidence shows is that

even since that attempted rescission, the grant of renewal DACA

applications is over 99 percent.

12:55PM      Again, that's all in our briefing.  So there was

no discretion when they were originally granted DACA status and

now there continues to be no discretion being used for that

population that has already received DACA.

But even setting discretion aside, as this Court

12:56PM   has acknowledged in ruling on the preliminary injunction and as

the Supreme Court has made clear, we don't even need to talk

about discretion to get to the fact that DACA itself, the 2012

memo is unlawful, both substantively and procedurally.

And then finally, Your Honor, there simply is no

12:56PM   reason to exercise additional delay in this case.  We of course

filed our lawsuit in May of 2018.  President Obama overstepped

his authority when his administration issued the DACA

memorandum in 2012, and nothing now can change that.

This Court is being asked to rule on the 2012

12:56PM   memorandum that created the DACA program.  There is no

additional reason now to delay.  That program was unlawful at

its inception, and it continues to be unlawful today.

THE COURT:  Okay.  All right.  Let's switch gears and

talk about remedies.

12:57PM      And I want to -- I'm giving everybody what I'll

1    call blanket immunity for right now that obviously -- and I'm

2    reading from the states' proposed order that the plaintiffs'

3    motion for summary judgment is granted and the 2012 memorandum

4    that created the DACA program is set aside.  So I assume that's

12:57PM  5    Mr. Disher's preferred remedy.

6                I'm assuming your preferred remedy, the

7    defendant-intervenors, is that I grant your summary judgment

8    and say they don't have standing.

9                So I'm taking those two things as assumptions and

12:58PM  10   I'm -- I know it's kind of in a little bizarre way to ask but I

11   think it needs to be probed.  Let's assume for a minute -- I'm

12   going to start with the intervenors.  Let's assume that Texas

13   convinces me that it either violates the APA or the take care

14   clause hypothetically.  I know you're not conceding anything.

12:58PM  15   What remedy should I -- what is the remedy?

16               MR. FEIGENBAUM:  Thank you, Your Honor.  We appreciate

17   the chance to chat about the remedies.

18               So I want to talk both briefly about the

19   plaintiff states' proposal for the set aside and then also what

12:58PM  20   our proposal, which would be I think a remand without vacating

21   the memo in the interim which is I think most consistent with

22   the *Regents* opinion.

23               THE COURT:  A remand to the DHS?

24               MR. FEIGENBAUM:  To DHS, yes.

12:58PM  25               So first I just want to talk briefly about the

set aside request and maybe we'll get some clarity this

morning.  But as I understood it, they're essentially saying,

well, under the plain terms of the statute, if you find that

the 2012 DACA memorandum is the operative one in front of you

and it's unlawful, then you have to just set it aside.

          And I don't totally -- if I'm following it

correctly, that essentially means that by that logic, there's

never any discretion.  Once you find summary judgment in a sort

of regulatory APA case, the relevant regulation or memo or

whatever is before you has to be just set aside or vacated.

          That's obviously contrary to the way the case law

works and to this Court's own concerns about sort of nationwide

injunctions.  If you're just automatically vacating any sort of

policy, memo, regulation in front of you based on the plain

language of the APA, then in every case, you're just on a

nationwide basis enjoining the memo.

          Maybe we'll get some clarity and I'm

misunderstanding the plaintiff states' position; but at least

if that's the position, then it's obviously a radical expansion

of the way that nationwide relief would work.

          THE COURT:  Well, it's the way it's worked not only in

the DAPA case; but it's the way it's worked in every case since

then.  And the reason -- and I don't know this.  I've not

talked to the various judges that handled the challenge to the

DACA rescission.  But the reason they all did -- when they

1   issued an injunction, they made it nationwide is because -- and

2   I say "all."  I mean, most of them -- is because it's hard to

3   slice and dice immigration law.

4            You can't say, okay, we're going to have

01:00PM  5   immigration law for Texas be X and for New Mexico and Arizona

6   be Y.  And if you remember, in the preliminary injunction order

7   I issued, I actually talked about that and it's one of the

8   reasons I'm raising it today.

9            I mean, you know, if there's a way to slice and

01:01PM 10   dice it, I think any court would welcome anything that made

11   sense.  Number one, on the scale of it, should it be

12   nationwide?  There have been, as you know, there have been some

13   people that say you should rule just for your circuit or just

14   for, you know -- but that would ruin the uniformity of it.

01:01PM 15            But I do want to hear those suggestions.  But

16   also I'm asking with regard to slicing and dicing, not

17   necessarily the scale of it, but the order itself then.  By

18   "order," I mean Secretary Napolitano's memo.

19            MR. FEIGENBAUM:  So in that case I think it gets to,

01:01PM 20   you know, let's just assume we're figuring out slicing and

21   dicing, what would we do here.  And so I can lead off with ours

22   and we can talk about the slicing.

23            So in terms of what we would propose --

24            THE COURT:  Those are all technical terms.  They go

01:02PM 25   with "ball of wax," "slicing and dicing."

        MR. FEIGENBAUM:  We're creating a whole new *Black's Law*
chapter today.

        THE COURT:  That's right.  Bryan Garner would be
thrilled.

01:02PM         MR. FEIGENBAUM:  Exactly.  So I just want to say why we
think remand without vacatur is the appropriate thing to do
here -- remanding to DHS without vacating it in the meantime.

        So the Fifth Circuit has walked through that as a
sort of ever-available option in APA cases, including cases
01:02PM where plaintiff states or any sort of plaintiff is coming
forward and saying, please set it aside, there's always the
option to remand without vacating.

        And the two factors that the Fifth Circuit has
identified, like the DC Circuit and like plenty of other
01:02PM circuits have done, is that you would do that sort of remand
without vacating in the interim based on the disruption that
any court order might have and based on the flexibility the
agency would have on remand.

        So I think of one case that's illustrative of
01:03PM that point but there are really quite a lot for that
proposition.  So it's essential in *Southwest Services versus
EPA.*  That's 220 F.3d 683, which is a 2000 decision from the
Fifth Circuit.  It's just illustrative.  There are a lot of
examples.

01:03PM         And we think those factors here are

1   extraordinarily compelling for pointing to not vacating

2   immediately before the memos that are in front of the Court and

3   instead remanding to DHS.

4          So the first is disruption.  This Court is well

5   aware of the way the egg has been scrambled because this Court

6   put quite a lot of detail on it in its preliminary injunction

7   opinion.

8          And so I will just note on top of that opinion,

9   we of course entirely agree with this point.  We think there's

10  a lot of new evidence in summary judgment that continues to

11  show the way individual DACA recipients will have their lives

12  entirely disrupted and then the effects that that will have on

13  states like New Jersey, local governments within New Jersey,

14  universities in New Jersey, and the medical industry within

15  New Jersey.

16         We've included all sorts of evidence at summary

17  judgment about doctors; women who do registration at COVID

18  testing sites; individuals who do site visits for distressed

19  homes, part of our Child Protection Program, even when they

20  know there's a COVID-positive parent there.

21         So there's extensive examples of disruption that

22  I think any sort of immediate injunction would have.

23         The second question comes to flexibility.  As

24  this Court has noted, this is an unusual case.  This is a case

25  where we have a Supreme Court opinion about a rescission of a

memo that is being challenged in this case; so it's obviously
not every day.

And what the Supreme Court identified in *Regents*
is that even assuming DACA is unlawful -- which, again, we are
assuming for this exact conversation -- so assuming DACA is
unlawful, DHS has extraordinary flexibility in how it needs to
think about reliance interests, what that means on the ground.

The *Regents* opinion specifically says:  Deciding
how to best address a finding of illegality going forward can
involve important policy choices, especially if the finding
concerns a program with the breadth of DACA.  Those policy
choices are for DHS.

Now, I'm not saying this Court doesn't have any
role in the slicing and dicing.  Of course it does.  But this
Court's role is exactly what *Regents* identified in the
rescission context, as the backstop to review what actions are
arbitrary and capricious.

The answer, if this Court believes DACA is
unlawful, is to remand to the agency in the first instance to
make the policy calls that *Regents* has said it can make and
that this Court would be telling it to make.

And then if the plaintiff states are unhappy with
the way the policy calls are made or any other parties are
unhappy, there will be a challenge in front of Your Honor and
Your Honor, in an arbitrary and capricious framework, will have

the opportunity to review the consistency with the law based on
the actions that were taken on remand.

That would be the normal course.  It wouldn't be
in light of the *Regents* opinion for this Court to, I think,
step out on a limb and decide the precise remedy.

The Supreme Court could have done that too.  If
that was the answer to a finding of unlawfulness, then *Regents*
would have done more.  But *Regents* said, we accept
unlawfulness, now, DHS, do your work on policy questions.

Federal defendants say that's the process that's
already ongoing and we imagine would continue ongoing after any
decision by the Court and so any decision by this Court should
be followed by a remand.

THE COURT:  Okay.  Anybody else want to weigh in?
Ms. Perales?

MR. DISHER:  I certainly do.

THE COURT:  Why did I know that?

MR. DISHER:  Thank you, Your Honor.

So as for the remedy, I think what New Jersey and
to a lesser extent the DACA intervenors are asking for is quite
extraordinary.  They're asking for this Court to -- again, in
the hypothetical -- find that an agency action is unlawful
contrary to the statutory authority that that agency has and
then let that agency action stay on the books while they try to
fix it.  Now --

1          THE COURT:  Well, can't they go back and fix it?

2     Couldn't they go back and propose DACA and have notice and

3     comment and come on through?

4          MR. DISHER:  A couple of things on that.

01:07PM  5          THE COURT:  All right.

6          MR. DISHER:  The remedy that we're seeking here --

7     first, just to be crystal clear -- is not simply an absolute

8     set aside, the 2012 DACA memorandum is gone as of today.

9     That's not what we're seeking.

01:07PM 10          That is the first step of what this Court should

11     do, but we fully acknowledge that the Court has the equitable

12     power to stay the effect of that set-aside for a certain period

13     of time.

14          And let me give the Court an example in this

01:07PM 15     particular context.  The district court from the District of

16     Columbia did exactly this with the 2017 rescission memo.  On a

17     summary judgment final ruling posture, the district court said,

18     the 2017 rescission is unlawful.  I am, therefore, setting it

19     aside as is mandated by the APA; but I'm going to stay the

01:08PM 20     effect of my ruling for a certain number of days to allow the

21     federal defendants to try to redo it.

22          We are in no way seeking an injunction saying

23     that the federal defendants can never retry to do anything.

24     But all we're here to decide about today is the only agency

01:08PM 25     action that's in front of the Court which is the 2012 DACA

1    memorandum.  So we are not, again, seeking an injunction saying

2    the federal defendants are precluded from ever doing anything

3    in this field ever again.  If they do that -- or I should say

4    maybe when they do that, we can reevaluate that agency action

01:08PM  5    on its merits; consider litigation against that; or if it

6    complies with all of the APA and the constitutional framework,

7    then it's great.

8              But all we're saying here today is that the 2012

9    DACA memorandum exceeded their statutory authority.  So the APA

01:09PM 10    is clear on what happens -- on what remedy is required in the

11    first instance which is to set it aside.

12             It is not, in fact, an injunction.  This is

13    different than a challenge to a statute.  And there's a really

14    good law review article called *The Writ-of-Erasure Fallacy* that

01:09PM 15    goes into this, written by Jonathan Mitchell, talking about the

16    difference between an injunction against a statute and an APA

17    challenge against an agency's action.  When the Court is asked

18    to rule on a statute, it cannot erase the statute, it merely

19    enjoins the governmental actor from enforcing that statute.

01:09PM 20             The APA is different.  If there is an APA

21    challenge to an agency action, the Court actually is empowered

22    and I would argue required to set that action aside as if it

23    never existed.  Not only is that what happened in the DC court,

24    but the Supreme Court in fact affirmed that remedy in the

01:09PM 25    *Regents* opinion saying that the DC court did it right.  They

1    affirmed the complete vacatur of the 2017 DACA memorandum.

2           And so we know from that reasoning that what this

3    Court has to do in the first instance is to set aside the 2012

4    DACA memorandum.  But we are not arguing by any means that the

01:10PM   5    Court's hands are then bound at that point because the Court

6    clearly has the authority to stay the effect of that ruling for

7    a certain period of days.

8           And that is why we have suggested to the Court

9    various options in our briefing about how best to do this and

01:10PM   10   this -- one would be a complete set aside of the DACA

11   memorandum but stay the effect of that for two years.  That

12   would allow some appellate review of this Honor's ruling, it

13   would also allow those who have existing grants of DACA some

14   certainty about when those grants would potentially end, but it

01:10PM   15   wouldn't be today, it wouldn't be tomorrow.  It would be kind

16   of an orderly wind down of the program.

17          Another example would be to stay the effect of

18   this Court's ruling as it applies to folks who have an existing

19   grant of DACA through the program.  In other words, no new

01:11PM   20   grants, no new advance parole, no renewals; but everybody who

21   has a DACA grant for the next year or two years, however long

22   it may be, you can let that expire, you know, based on its own

23   terms.

24          So just to be clear, we are not saying that this

01:11PM   25   Court has to set aside DACA today and all grants of deferred

action pursuant to the program are thereby vacated.  But what the Court has to do if it finds DACA unlawful, is to set aside the agency action in the first instance and then craft whatever remedy it may do on the back end.

There is simply no reason to leave the unlawful program in place while the federal defendants do whatever it is they're going to do if anything -- there's a chance that they don't do anything -- and then we have no effective relief.

And then also whatever action they do take, the history of this case has shown that that action is likely going to be bound up in federal litigation and so the only way for the plaintiffs to get an effective measure of relief in this case is for the 2012 memo to be set aside in the first instance and then we have proposed two different alternatives for the Court to exercise its equitable powers to consider whatever reliance interests there may be and help the process go through appellate review and allow DACA recipients to prepare for the ultimate set aside of the program.

THE COURT:  Mr. Coghlan, do you want to weigh in?

MR. COGHLAN:  Yes, Your Honor.

Your Honor, as I understand the hypothetical Your Honor placed before us is what to do if the Court decides that DACA is substantively unlawful, how to grant its remedies.

So as I understand that --

THE COURT:  We're waving good-bye to Louisiana.

1        MS. MURRILL:  Thank you.  It was nice being with you,

2    Judge.

3        MR. COGHLAN:  And the federal defendants' view,

4    Your Honor, is that you craft any remaining order in such a way

01:13PM  5    it still provides DHS with the opportunity to consider how to

6    conduct an orderly wind down of the program and consider the

7    reliance interests that were handed down by the Court in the

8    *Regents* decision.

9            If Your Honor intends to rule in this fashion, we

01:13PM 10    think the issues are complex enough that it would benefit from

11    additional limited, focused briefing purely on what that should

12    look like and how long it should take.

13            I think that it need not prevent the Court from

14    issuing a finding prior to that briefing, as the Court actually

01:13PM 15    did in EDNY, or issued its legal determination in that and

16    invited additional briefing from the parties on remedy.

17            You know, the issues here are complicated enough

18    and DHS is still working through them, as instructed by the

19    Court in *Regents*.

01:13PM 20            To that extent we think that whatever the Court

21    does, it should recognize that DHS will need some flexibility

22    and time to wind the program down if it is determined to be

23    unlawful.

24            And for more specifics, we think that the Court

01:14PM 25    would benefit from additional, again, limited, focused briefing

1    on this.

2            THE COURT:  All right.  Anyone else want to add

3    anything?

4            MR. FEIGENBAUM:  Your Honor, if I may, just two

5    clarifying points.

6                    The first is, you know, I had said in my initial

7    comments on remedy that I wasn't sure how broad the position of

8    plaintiff states was in terms of when you would have to do set

9    asides of regulations.

10                   I think the answer shows it actually is

11   extraordinarily sweeping if we're suggesting that you might be

12   required to do a full set aside of a regulation because

13   regulations are different from statutes.

14                   There's plenty of instances of remand without

15   vacatur, in which circuit courts -- DC Circuit, Fifth Circuit,

16   and so on and so forth -- have remanded to agencies for further

17   proceedings even after making a finding of unlawfulness.

18                   So the sort of idea that you would be required by

19   a finding of unlawfulness to issue some sort of set aside

20   instead of a remand without vacatur can't be right and would

21   also mean that *Regents* itself was wrong.

22                   *Regents* itself accepted a finding of unlawfulness

23   and nevertheless said that DHS had important following steps to

24   take.

25                   So, again, I think that that sort of sweeping

argument that you are bound to do some sort of set aside is

certainly inconsistent with *Regents* and circuit case law and

with Your Honor's own PI opinion where you talked in

considerable detail about preliminary injunction and the pros

01:15PM  and cons specifically in the context of setting aside the memo.

It wasn't a statute before Your Honor at the PI

stage, and so I think that that's an important point to

remember.

The only other thing I wanted to note is that

01:15PM  plaintiff states have identified a whole range of options for

Your Honor to consider, how long to stay some sort of ruling,

what way to do slicing and dicing, and so on and so forth.

We don't disagree that any and all of that would

be considered, we just think it needs to be considered by DHS

01:16PM  on remand because we think that's going to bring in all of

those questions about reliance that *Regents* all but begged,

urged DHS to do in the first instance.

We don't think that dispossesses plaintiff states

of any right to relief or any effective remedy.  It simply

01:16PM  suggests, as is normal and as *Regents* has asked for, that DHS

make the call in the first instance.

If it's taking too long, plaintiff states are

free to return to this Court for some sort of enforcement of

its prior remand to urge faster action from DHS.

01:16PM  And, of course, at the same time if DHS acts in

1    some way that plaintiff states believe is arbitrary and

2    capricious based on how they account for reliance interests,

3    then this Court is free to take action too.

4            So we're not suggesting that plaintiff states are

01:16PM  5    dispossessed of any opportunity or that this Court is prevented

6    effective relief or effective remedies.  We're just talking

7    about DHS having the opportunity in the first instance because

8    we think that's exactly what *Regents* suggested is supposed to

9    happen after a finding of unlawfulness.

01:16PM  10        THE COURT:  Well, if I do that, Mr. Feigenbaum, can't

11    DHS -- and this, again, is not rhetorical -- can't they just go

12    back and say, "Okay.  We like the Napolitano memo.  Let's put

13    it up for notice and comment"?

14        MR. FEIGENBAUM:  So Your Honor has a whole range of

01:17PM  15    options.  That's certainly an option that would be considered.

16    If Your Honor says, "This is unlawful because of a procedural

17    APA problem" and DHS upon remand wants to do notice and

18    comment, absolutely that's one of the options.

19           And so I do think that having a whole range of

01:17PM  20    options, but not vacating DACA in the meantime, is obviously

21    the best way to take into account reliance interests.

22          In Your Honor's example, a set aside of DACA

23    would, I think, create some chaos during the process of that

24    notice and comment rulemaking that you hypothesized because

01:17PM  25    individuals who remain removable but have associated collateral

1    benefits are going to be thrown into a real change of

2    circumstances while that proceeding is ongoing which is exactly

3    what remand without vacatur is meant to prevent and exactly

4    what *Regents* worked so hard to try to prevent in the way it

01:18PM  5    suggested that DHS go and make those policy calls about

6    reliance.

7           So I do think your hypothetical or your question

8    proves the point at the end of today that it makes sense not to

9    do an immediate set aside if one of the options on remand is

01:18PM  10   going to be the possibility for notice and comment rulemaking.

11   It would be much better to maintain the status quo, the status

12   quo that existed in part, as Your Honor noted, because of the

13   length of time it took for plaintiff states to bring this case.

14          And the number of individuals who are eligible

01:18PM  15   for DACA, who came forward and provided information to the

16   federal government in reliance on that, these are all reliance

17   interests that DHS needs to think about; that DHS, we

18   understand, is thinking about.

19          And this is an area where New Jersey and federal

01:18PM  20   defendants are in agreement.  This is an area they're thinking

21   about.

22      THE COURT:  Get that on the record.  They've actually

23   agreed on something.

24      MR. FEIGENBAUM:  It's possible.  Bold, highlighted,

01:18PM  25   et cetera.  So I do think we agree.

1          The last point is just that it's a long-standing

2     equitable principle, of course, that relief should not be

3     broader than is necessary to cure the harm.

4          The action this Court took in *Texas I* was when it

01:19PM   5     was facing 26 states where they were representing 50 percent of

6     the population and DAPA had not been implemented.

7          THE COURT:  Well, I think the last point that you hit

8     on is quite frankly the most important because DAPA had not

9     been implemented and the government took the position that if I

01:19PM   10    didn't enjoin them, they were going to implement it, like the

11    next week and it would create reliance issues once it was

12    implemented.  So this is a different situation completely.

13         MR. FEIGENBAUM:  You said it better than I did, so I

14    won't bear repeating it.

01:19PM   15         THE COURT:  All right.

16         MR. DISHER:  Your Honor, may I briefly respond?

17         THE COURT:  You may.  You can have the last word.

18         MR. DISHER:  Thank you.

19             On that last point about --

01:19PM   20         THE COURT:  Oh, if that were only true.  Go ahead,

21    Mr. Disher.

22         MR. DISHER:  That would be nice.  Maybe one day.

23             On that last point about reliance interest, one

24    thing to note on that is, of course, as we sit here today, DHS

01:20PM   25    and federal defendants are going to start and are, in fact,

1    starting to process initial DACA grants as well as the grants

2    of advance parole.

3              And as we pointed out in the reply, the eggs have

4    not been scrambled for those folks.  The reliance interests

01:20PM  5    that they may claim is vastly less.

6              And to the idea of reliance more generally, that

7    is -- we're cognizant of that, but that is why we have offered

8    the Court a couple of different options about how to do this

9    taking into account those reliance interests.

01:20PM  10              But I will still maintain that the right option

11    is to not allow the program to remain on the books if it is in

12    fact unlawful.  The instances in which there is remand without

13    vacatur, it normally arises in the context of an arbitrary or

14    capricious challenge.  In other words, the agency has not

01:21PM  15    explained its reasoning well enough and so the Court is going

16    to leave the action on the books but allow the agency to have

17    another crack at trying to explain their rationale.

18              In this case, Your Honor, there is no rationale

19    that DHS or the federal defendants can provide that makes DACA

01:21PM  20    lawful.  DACA is in excess of their statutory authority so it

21    is substantively unlawful and it was issued without notice and

22    comment rulemaking; so it is procedurally unlawful.

23              It's not as if we are complaining about the

24    reasoning and rationale that they gave in the first instance;

01:21PM  25    it's that they couldn't do this at all; and even if they could,

1    they did it the wrong way.

2              So there's no reason, if this Court finds that

3    DACA is unlawful, to let it remain on the books -- an unlawful

4    agency action on the books and yet remand it to the agency.

01:22PM  5              And any reliance interests that the New Jersey or

6    DACA intervenors bring up can be accounted for in that limited

7    stay of the effect of the Court's ruling as the DC Circuit

8    Court did.

9              And by the way, in the *Regents* case, of course,

01:22PM  10   that was an arbitrary and capricious challenge; but the Supreme

11   Court didn't remand it, didn't allow the decision to remain in

12   place to remand it to the agency to better explain their

13   reasoning.  The DC Court set the 2017 memo aside completely and

14   that is what the Supreme Court affirmed, even in the arbitrary

01:22PM  15   and capricious challenge, which is the proper context

16   potentially for remand with vacatur.

17             We are not in an arbitrary and capricious

18   challenge.  We are in a substantively and procedurally unlawful

19   context and therefore the proper remedy here in the first

01:22PM  20   instance is to set aside the program and then have the Court

21   use its powers of equity to enter some type of limited stay to

22   account for whatever reliance interests the Court deems

23   reasonable.

24             THE COURT:  Thank y'all.  I appreciate you coming here.

01:23PM  25             I apologize again for making some of you travel

1    in some cases great distances.  But as I said, it was the

2    measured judgment of the Southern District -- it's why we're

3    not starting jury trials on January 2nd, 3rd, 4th, we're

4    waiting until the 19th because we're worried about COVID and

01:23PM  5    the holidays.

6              And so I'm sorry to make y'all do that.  I

7    appreciate you coming.  Y'all stay safe, and have a good

8    holiday.

9              COURTROOM SECURITY OFFICER:  All rise.

10             (The proceedings were adjourned.)

11                        *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

     I, Lanie M. Smith, CSR, RMR, CRR, Official
Court Reporter, United States District Court, Southern District
of Texas, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and
understanding, from the record of the proceedings in the
above-entitled and numbered matter.


                /s/ Lanie M. Smith
                Official Court Reporter

## $

**$250** [1] - 40:3

## /

**/s** [1] - 129:6

## 1

**1** [1] - 107:7
**1.5** [5] - 51:22, 52:14, 53:12, 65:14, 66:21
**1000** [1] - 2:14
**105** [1] - 21:16
**11** [2] - 23:2, 45:5
**110** [1] - 2:2
**1152** [2] - 63:21
**1182(d)(5)(A** [1] - 63:25
**12** [1] - 23:2
**13** [1] - 71:18
**13,908** [1] - 53:12
**130** [1] - 20:22
**14** [1] - 105:5
**14,000** [2] - 52:21, 53:22
**14,358** [1] - 53:12
**14th** [1] - 1:15
**15** [2] - 72:10
**150** [2] - 21:8, 72:6
**152** [1] - 55:22
**15th** [1] - 1:18
**170** [1] - 20:23
**18-cv-68** [1] - 3:6
**180,000** [1] - 66:14
**1885** [1] - 1:21
**1902** [2] - 88:7, 95:13
**1980s** [3] - 93:21, 95:23, 97:6
**19th** [1] - 128:4
**1:18-CV-00068** [1] - 1:4

## 2

**2** [1] - 53:1
**20** [1] - 71:18
**2000** [1] - 112:22
**20006-6807** [1] - 2:5
**20044** [1] - 2:12
**2007** [1] - 43:12
**2012** [28] - 48:12, 50:10, 50:19, 54:21, 57:9, 72:10, 72:17, 72:18, 74:10, 78:22, 80:14, 80:16, 95:12, 97:7, 98:8, 103:17, 104:4, 104:9, 108:12, 108:18, 108:19, 109:3, 110:4, 116:8, 116:25, 117:8, 118:3, 119:13
**2013** [1] - 78:16
**2015** [2] - 76:21, 89:13
**2017** [8] - 76:22, 77:10, 98:4, 108:2, 116:16, 116:18, 116:1, 127:13
**2018** [5] - 56:3, 57:19, 90:24, 108:16
**2019** [2] - 73:11, 78:18

**2020** [4] - 1:7, 78:18, 86:20, 90:25
**2021** [1] - 72:10
**209** [1] - 1:15
**2099** [2] - 2:5
**20th** [1] - 105:5
**215** [1] - 29:22
**215-1** [1] - 89:15
**22** [1] - 1:7
**220** [1] - 112:22
**225-5** [1] - 31:2
**2300** [1] - 2:15
**24** [1] - 83:13
**247(c)(14)** [2] - 63:2, 63:16
**25** [2] - 2:9, 83:13
**250** [1] - 47:3
**26** [1] - 125:5
**279-96** [1] - 89:18
**2:13-193** [1] - 77:5
**2nd** [1] - 128:3

## 3

**3** [2] - 21:16, 52:24
**300** [2] - 1:18, 2:2
**318** [1] - 21:15
**390** [1] - 6:25
**3rd** [2] - 1:21, 128:3

## 4

**4** [1] - 107:5
**405** [1] - 89:15
**411** [1] - 12:10
**42** [1] - 90:25
**45** [2] - 47:22, 48:16
**452** [1] - 12:2
**484** [2] - 53:6, 65:7
**487-2** [1] - 53:1
**4th** [1] - 128:3

## 5

**5** [1] - 106:21
**50** [1] - 125:5
**50/50** [1] - 15:22
**500** [1] - 53:6
**515** [1] - 2:19
**529** [1] - 105:5
**553(c** [1] - 96:4

## 6

**6** [2] - 4:6, 89:18
**60** [1] - 29:22
**634** [2] - 22:2, 22:12
**635** [1] - 22:12
**645,000** [2] - 66:3, 66:8
**683** [1] - 112:22
**69** [2] - 65:8, 65:10

## 7

**70802** [1] - 1:22
**77002** [2] - 2:15, 2:20
**78205** [1] - 2:3
**78701** [1] - 1:16
**78711** [1] - 1:19

## 8

**8** [1] - 63:25
**8004** [1] - 2:19
**80625** [1] - 2:9
**809** [1] - 21:7
**821,000** [1] - 66:12
**86** [1] - 22:1
**868** [1] - 2:12
**87** [1] - 55:19
**878** [1] - 31:1
**8th** [1] - 1:16

## 9

**99** [1] - 108:4

## A

**Abbott** [1] - 77:4
**abide** [1] - 104:10
**ability** [2] - 104:7, 129:3
**able** [13] - 8:23, 14:12, 14:13, 41:23, 42:16, 43:2, 60:2, 63:5, 65:11, 68:14, 80:19, 81:22, 100:24
**above-entitled** [1] - 129:4
**absence** [1] - 26:13
**absolute** [1] - 116:7
**absolutely** [4] - 39:13, 48:14, 71:14, 123:18
**abundant** [1] - 60:7
**ACA** [6] - 8:5, 8:6, 14:21, 17:9, 17:22, 17:24
**accept** [7] - 54:14, 58:2, 85:12, 91:24, 96:17, 96:5, 98:5, 115:8
**accepted** [2] - 80:10, 121:22
**accepting** [2] - 43:24, 56:17
**access** [1] - 102:8
**accident** [2] - 36:7, 36:8
**accord** [1] - 7:11
**according** [3] - 39:11, 67:18, 68:10
**account** [4] - 123:2, 123:21, 126:9, 127:22
**accounted** [1] - 127:6
**accounting** [1] - 39:18
**accurate** [1] - 62:22
**acknowledge** [2] - 104:15, 116:11
**acknowledged** [4] - 16:22, 32:11, 107:4, 108:10
**acknowledges** [1] - 54:11, 55:15, 106:15
**acoustics** [1] - 23:9

**Act** [4] - 7:22, 45:10, 46:20, 56:1

**act** [3] - 55:17, 82:24, 94:21

**acting** [3] - 79:24, 80:4, 104:5

**action** [82] - 15:16, 16:8, 44:19, 45:11, 46:16, 46:17, 46:23, 50:2, 50:21, 50:24, 51:11, 52:2, 52:4, 52:17, 55:13, 55:16, 55:23, 55:24, 57:11, 59:23, 60:1, 60:5, 60:11, 60:15, 61:8, 61:14, 61:24, 61:25, 66:2, 68:15, 69:11, 69:12, 69:13, 70:17, 70:19, 70:24, 71:2, 71:13, 72:3, 72:14, 73:11, 73:19, 76:19, 86:22, 93:2, 93:3, 93:14, 93:18, 94:15, 94:18, 94:20, 95:11, 95:17, 95:24, 96:7, 96:8, 96:11, 96:17, 97:3, 106:4, 106:5, 106:12, 107:7, 107:9, 107:11, 115:22, 115:24, 116:25, 117:4, 117:17, 117:21, 117:22, 119:1, 119:3, 119:9, 119:10, 122:24, 123:3, 125:4, 126:16, 127:4

**actions** [4] - 41:10, 97:4, 114:16, 115:2

**activity** [1] - 29:22

**actor** [1] - 117:19

**acts** [1] - 122:25

**actual** [6] - 6:2, 8:16, 17:15, 34:23, 85:6, 100:23

**add** [1] - 121:2

**addition** [2] - 8:22, 11:12

**additional** [11] - 42:4, 43:21, 56:11, 58:4, 103:6, 103:18, 108:15, 108:21, 120:11, 120:16, 120:25

**additionally** [1] - 13:13

**address** [2] - 24:24, 114:9

**addressed** [2] - 38:14, 79:4

**Addressing** [1] - 20:25

**addressing** [1] - 48:13

**adjourned** [1] - 128:10

**adjudicated** [1] - 80:11

**adjudication** [1] - 72:13

**adjust** [3] - 52:22, 53:14, 72:9

**adjusted** [5] - 53:7, 53:10, 53:16, 53:23, 65:8

**adjusting** [1] - 53:17

**administration** [28:11, 50:10, 50:13, 50:19, 50:20, 53:20, 59:4, 76:22, 77:24, 80:3, 91:5, 103:5, 108:17

**Administrative** [1] - 56:1

**admitted** [2] - 50:12, 55:8

**admittedly** [1] - 74:16

**admitting** [1] - 91:9

**adults** [1] - 37:10

**advance** [41] - 52:18, 53:7, 53:15, 56:18, 63:17, 63:20, 63:22, 64:1, 64:2, 64:7, 64:9, 64:10, 64:15, 64:20, 64:21, 64:22, 65:1, 65:2, 65:4, 67:14, 68:11, 68:17, 68:19, 79:5, 80:9, 80:13, 97:11, 98:3, 98:7, 98:9, 98:10, 98:11, 98:19, 105:2, 105:3, 105:8, 105:11, 118:20, 126:2

**adversity** [5] - 75:19, 75:20, 81:4, 81:6, 91:15

**affect** [2] - 8:12, 38:19

**affecting** [1] - 103:16

**affects** [1] - 28:25

**affirmatively** [1] - 88:12

**affirmed** [4] - 51:3, 117:24, 118:1, 127:14

**Affordable** [1] - 7:22

**age** [1] - 25:2

**agencies** [1] - 121:16

**agency** [20] - 56:25, 57:1, 57:8, 57:10, 71:2, 73:13, 112:18, 114:19, 115:22, 115:23, 115:24, 116:24, 117:4, 117:21, 119:3, 126:14, 126:16, 127:4, 127:12

**agency's** [1] - 117:17

**agents** [1] - 90:8

**aging** [2] - 67:1, 67:3

**ago** [3] - 22:14, 62:2, 78:5

**agree** [16] - 18:21, 19:17, 23:7, 25:18, 26:21, 28:1, 37:7, 40:19, 44:24, 60:6, 69:16, 88:20, 113:9, 124:25

**agreed** [4] - 11:13, 58:11, 105:23, 124:23

**agreement** [1] - 124:20

**agrees** [4] - 34:11, 56:3, 84:20, 92:4, 105:15

**ahead** [4] - 11:8, 29:18, 62:2, 125:20

**Air** [2] - 45:10, 46:20

**AL** [3] - 1:4, 1:7, 2:2

**ALAN** [1] - 1:17

**Alfred** [1] - 29:3

**alien** [3] - 5:13, 5:25, 71:13

**aliens** [3] - 15:8, 71:17, 105:7

**Alito** [1] - 54:8

**allegations** [1] - 43:25

**alleged** [1] - 40:12

**alleging** [1] - 55:21

**allow** [13] - 61:1, 64:7, 75:12, 75:21, 76:22, 77:11, 116:20, 118:12, 118:13, 119:17, 126:11, 126:16, 127:11

**allowed** [2] - 30:15, 77:19

**allows** [2] - 60:16, 102:8

**almost** [2] - 67:18, 76:11

**alone** [11] - 37:21, 40:2, 55:16, 83:3, 84:5, 89:7, 93:4, 94:7, 99:15, 100:11

**altered** [1] - 54:3

**alternative** [2] - 93:5, 93:8

**alternatives** [1] - 119:14

**AMERICA** [1] - 1:7

**amount** [12] - 24:2, 60:8, 85:17, 87:14, 87:18, 90:8, 91:6, 92:5, 92:6, 92:7, 92:22, 100:23

**analogy** [2] - 36:22, 36:23

**analysis** [25] - 9:10, 11:12, 12:1, 19:9, 19:13, 26:13, 38:19, 39:25, 40:4, 46:25, 47:4, 47:23, 51:9, 56:21, 61:12, 81:25, 84:18, 84:19, 85:11, 85:18, 85:19, 92:18, 92:19, 92:22

**analyze** [1] - 11:21

**ANDREW** [1] - 1:10

**anecdotal** [1] - 91:14

**anecdotally** [2] - 91:9, 91:17

**announce** [2] - 51:4, 106:1

**answer** [13] - 34:13, 52:10, 71:19, 71:23, 71:25, 72:2, 72:19, 73:2, 114:18, 115:7, 121:10

**answering** [1] - 67:17

**answers** [1] - 16:3

**anti** [1] - 5:24

**anti-immigrant** [1] - 5:24

**Antonio** [1] - 2:3

**anyway** [6] - 4:7, 4:15, 36:5, 50:20, 85:5, 91:25

**APA** [40] - 44:8, 44:18, 44:19, 44:23, 45:14, 45:21, 48:2, 48:14, 48:20, 51:12, 54:7, 54:20, 56:5, 56:10, 56:23, 57:8, 57:11, 58:9, 58:14, 58:16, 58:19, 62:6, 85:18, 85:19, 86:15, 89:1, 89:3, 89:8, 102:11, 109:13, 110:9, 110:15, 112:9, 116:19, 117:6, 117:9, 117:16, 117:20, 123:17

**apologies** [1] - 102:24

**apologize** [2] - 63:13, 127:25

**apparatus** [1] - 35:3

**appeal** [5] - 49:8, 79:21, 84:23, 97:21, 104:6

**Appeals** [1] - 21:6

**appear** [1] - 3:10

**APPEARANCES** [1] - 1:13

**appellate** [2] - 118:12, 119:17

**application** [1] - 67:11

**applications** [8] - 56:18, 80:8, 80:10, 90:4, 90:24, 96:13, 96:17, 108:4

**applied** [3] - 17:13, 58:11, 66:17

**applies** [7] - 48:14, 58:9, 58:10, 58:14, 72:4, 80:15, 118:18

**apply** [14] - 5:21, 14:21, 39:17, 60:16, 61:1, 63:25, 64:3, 64:20, 65:4, 72:19, 98:19, 98:20, 99:23

**applying** [1] - 35:21

**appointed** [2] - 49:10, 98:5

**appointment** [1] - 50:3

**appreciate** [6] - 3:8, 4:1, 104:12, 109:16, 127:24, 128:7

**approach** [2] - 74:24, 76:23

**appropriate** [11] - 19:18, 34:6, 34:17, 35:7, 35:9, 50:18, 68:2, 76:3, 88:13, 102:11, 112:6

**appropriated** [3] - 23:9, 27:2, 34:22

**appropriates** [1] - 23:1

**appropriation** [1] - 34:15

**appropriations** [4] - 23:5, 35:8, 37:6, 37:13

**approval** [1] - 59:16

**arbitrary** [7] - 114:17, 114:25, 123:1, 126:13, 127:10, 127:14, 127:17

**are...in** [1] - 105:8

**area** [3] - 69:25, 124:19, 124:20

**argue** [12] - 3:13, 3:15, 3:16, 6:10, 6:15, 9:4, 40:13, 55:2, 71:17, 105:17,

105:22, 117:22

**arguing** [8] - 3:17, 26:24, 36:12, 43:7, 62:17, 98:13, 118:4

**argument** [22] - 6:12, 12:8, 18:10, 21:11, 23:7, 23:18, 26:1, 26:22, 27:19, 29:14, 29:15, 43:6, 55:5, 57:24, 59:14, 60:23, 61:2, 62:3, 69:3, 69:5, 99:10, 122:1

**arguments** [7] - 12:10, 20:5, 25:8, 27:24, 39:16, 40:8, 54:24

**arises** [1] - 126:13

**Arizona** [1] - 111:5

**arrived** [1] - 37:10

**arrives** [1] - 78:7

**Article** [1] - 45:23

**article** [1] - 117:14

**articles** [2] - 11:17, 11:18

**aside** [39] - 25:4, 26:22, 46:20, 48:23, 49:8, 55:3, 55:6, 56:4, 56:23, 57:7, 57:11, 79:11, 89:25, 108:9, 109:4, 109:19, 110:1, 110:5, 110:10, 112:11, 116:8, 116:12, 116:19, 117:11, 117:22, 118:3, 118:10, 118:25, 119:2, 119:13, 119:18, 121:12, 121:19, 122:1, 122:5, 123:22, 124:9, 127:13, 127:20

**asides** [1] - 121:9

**aspect** [1] - 54:1

**aspects** [4] - 87:23, 93:1, 99:24, 107:19

**assert** [3] - 30:6, 30:9, 67:7

**asserting** [1] - 48:4

**assessments** [1] - 75:16

**associated** [6] - 24:22, 43:17, 51:21, 51:24, 52:13, 123:25

**assume** [11] - 30:11, 31:8, 31:14, 84:7, 85:13, 85:16, 86:10, 109:4, 109:11, 109:12, 111:20

**assumed** [4] - 9:10, 30:19, 47:4, 47:5

**assumes** [4] - 8:9, 8:11, 32:1, 33:1

**assuming** [9] - 30:18, 42:7, 95:25, 98:14, 109:6, 114:4, 114:5

**assumption** [6] - 9:9, 11:10, 30:23, 30:24, 31:6

**assumptions** [8] - 7:12, 7:21, 7:24, 8:4, 8:9, 8:20, 8:24, 109:9

**assurances** [1] - 53:19

**attack** [1] - 22:15

**attempt** [1] - 108:2

**attempted** [2] - 39:3, 108:3

**attend** [1] - 29:12

**attendant** [3] - 106:5, 106:10, 106:19

**Attorney** [4] - 1:15, 1:18, 1:20, 2:8

**attorney** [1] - 6:20

**Attorney's** [1] - 2:14

**attributable** [1] - 43:18

**audience** [2] - 4:16, 4:17

**Austin** [2] - 1:16, 1:19

**authored** [1] - 55:11

**authority** [13] - 49:11, 68:16, 71:2, 71:9, 79:24, 80:3, 97:23, 102:4, 108:17,

115:23, 117:9, 118:6, 126:20

**Authorization** [1] - 59:18

**authorization** [31] - 9:11, 9:13, 10:18, 11:1, 11:20, 30:19, 31:10, 32:24, 42:10, 48:21, 59:15, 59:21, 60:2, 60:3, 60:8, 60:17, 60:25, 61:6, 61:11, 63:1, 63:4, 63:9, 63:11, 63:15, 67:15, 68:11, 93:23, 95:17, 95:24, 99:7, 105:19

**authorizations** [4] - 42:2, 43:3, 59:9, 59:12

**authorized** [4] - 7:23, 10:2, 50:23, 107:9

**automatically** [3] - 69:25, 86:6, 110:13

**available** [3] - 23:5, 53:8, 112:9

**Avenue** [1] - 2:5

**average** [1] - 24:22

**award** [2] - 58:21, 59:3

**aware** [9] - 14:1, 39:2, 39:18, 50:8, 76:25, 91:9, 91:17, 97:5, 113:5

---

# B

**backdrop** [1] - 102:12

**backstop** [1] - 114:16

**bad** [2] - 4:23, 36:23

**balancing** [1] - 92:22

**ball** [8] - 57:13, 68:4, 68:5, 98:25, 99:3, 99:6, 101:8, 111:25

**balls** [1] - 68:8

**based** [19] - 8:24, 11:13, 46:24, 48:2, 53:5, 56:15, 59:18, 83:15, 83:18, 91:5, 93:21, 103:24, 104:1, 110:14, 112:16, 112:17, 115:1, 118:22, 123:2

**basic** [3] - 14:20, 52:11, 92:2

**basis** [8] - 30:4, 30:22, 31:2, 32:5, 46:5, 46:7, 77:12, 110:16

**Batalla** [6] - 50:1, 79:18, 80:1, 80:20, 89:25, 90:2

**Baton** [1] - 1:22

**Bazany** [1] - 8:19

**bear** [3] - 37:18, 38:4, 125:14

**beat** [1] - 33:13

**become** [1] - 37:11

**BEFORE** [1] - 1:10

**begged** [1] - 122:16

**begin** [1] - 76:5

**beginning** [1] - 55:21

**behind** [1] - 72:15

**believes** [4] - 44:19, 45:14, 75:25, 114:18

**benefit** [14] - 29:9, 30:8, 30:13, 39:25, 40:4, 55:18, 60:2, 63:3, 63:15, 75:9, 78:20, 97:15, 120:10, 120:25

**benefits** [45] - 23:19, 31:8, 39:1, 40:1, 47:5, 49:19, 51:21, 51:24, 52:13, 54:24, 54:25, 58:21, 59:3, 59:5, 59:8, 60:22, 61:6, 61:12, 61:24, 62:15, 62:24, 79:7, 85:5, 88:9, 88:12, 88:17, 89:6, 92:1, 92:23, 93:12, 93:24, 94:4, 94:23, 99:15, 99:17, 99:21, 100:22, 102:9, 105:19,

106:5, 106:11, 106:19, 106:22, 107:23, 124:1

**benefitted** [1] - 60:11

**best** [10] - 62:22, 75:15, 81:22, 85:1, 89:5, 89:9, 114:9, 118:9, 123:21, 129:3

**bestowing** [1] - 60:21

**better** [8] - 3:23, 12:10, 21:4, 23:9, 94:7, 124:11, 125:13, 127:12

**between** [23] - 7:22, 10:9, 11:24, 20:22, 22:17, 25:25, 30:9, 30:25, 31:7, 32:19, 35:6, 36:11, 42:21, 49:19, 53:12, 59:11, 61:23, 70:16, 71:18, 81:16, 82:10, 90:21, 117:16

**Beyond** [1] - 55:15

**billion** [3] - 29:22, 29:23

**binder** [1] - 57:17

**binding** [2] - 39:20, 98:2

**bit** [6] - 12:14, 16:5, 16:12, 69:18, 76:15, 96:6

**bizarre** [1] - 109:10

**black** [1] - 14:21

**Black's** [1] - 112:1

**black-letter** [1] - 14:21

**blame** [2] - 3:25, 4:1

**blanket** [1] - 109:1

**boiled** [1] - 100:3

**bold** [1] - 124:24

**book** [2] - 55:14, 55:19

**books** [7] - 50:14, 96:23, 115:24, 126:11, 126:16, 127:3, 127:4

**Border** [1] - 105:6

**border** [3] - 5:1, 69:24

**born** [1] - 86:19

**bottom** [2] - 71:6, 72:24

**bound** [7] - 61:3, 61:22, 75:16, 104:15, 118:5, 119:11, 122:1

**boundaries** [1] - 29:1

**bounds** [1] - 28:5

**Box** [1] - 2:12

**branch** [3] - 41:13, 52:6, 71:12

**Brannon** [4] - 13:17, 13:18, 13:20, 17:14

**breadth** [1] - 114:11

**break** [1] - 35:5

**breakfast** [1] - 69:20

**breaking** [3] - 10:4, 10:16, 11:6

**breaks** [2] - 25:25, 26:1

**brief** [6] - 12:25, 47:19, 47:21, 74:13, 105:1, 105:4

**briefed** [1] - 76:17

**briefing** [11] - 22:15, 40:9, 40:12, 77:8, 77:16, 108:5, 118:9, 120:11, 120:14, 120:16, 120:25

**briefly** [9] - 19:2, 37:15, 38:10, 75:3, 99:4, 101:21, 109:18, 109:25, 125:16

**briefs** [2] - 23:22, 75:1

**bring** [10] - 35:23, 40:10, 40:16, 41:15, 45:23, 46:17, 85:6, 122:15, 124:13, 127:6

**bringing** [4] - 24:15, 34:16, 46:5, 86:23
**brings** [1] - 62:3
**broad** [1] - 121:7
**broader** [2] - 36:14, 125:3
**Broadway** [1] - 2:2
**brought** [1] - 65:16
**BROWNSVILLE** [1] - 1:2
**Bryan** [1] - 112:3
**build** [1] - 84:5
**built** [1] - 32:4
**burden** [5] - 24:15, 25:19, 33:6, 33:7, 47:12
**burdensome** [2] - 83:9, 83:15
**Bush** [1] - 78:2
**business** [3] - 9:14, 9:15, 10:12
**businesses** [3] - 7:25, 8:1, 8:10
**buy** [1] - 59:14
**bye** [1] - 119:25

## C

**c)(14** [1] - 63:2
**cake** [1] - 23:14
**candidates** [1] - 8:2
**cannot** [9] - 37:8, 39:11, 57:6, 71:8, 71:19, 72:19, 73:18, 81:21, 117:18
**cap** [1] - 71:5
**capable** [1] - 68:17
**capricious** [7] - 114:17, 114:25, 123:2, 126:14, 127:10, 127:15, 127:17
**car** [1] - 36:22
**Care** [1] - 7:22
**care** [30] - 20:14, 21:22, 22:8, 22:20, 23:4, 24:3, 26:23, 26:24, 29:12, 30:17, 32:18, 34:9, 34:14, 34:21, 40:18, 40:19, 42:2, 42:8, 42:19, 42:22, 44:17, 44:18, 44:21, 45:16, 45:21, 45:23, 46:15, 51:13, 56:6, 109:13
**careful** [3] - 69:6, 73:12, 103:6
**carried** [1] - 33:7
**carry** [1] - 33:6
**case** [89] - 7:7, 13:15, 20:8, 21:12, 24:15, 29:3, 29:8, 35:15, 35:16, 37:7, 37:22, 40:10, 40:14, 48:8, 48:14, 48:20, 51:7, 52:20, 54:23, 55:21, 57:21, 57:23, 60:18, 65:3, 67:7, 71:22, 74:15, 74:16, 75:3, 75:9, 76:7, 76:17, 77:2, 77:4, 77:6, 77:18, 78:6, 79:12, 81:2, 81:3, 81:5, 81:9, 81:11, 81:13, 81:25, 83:15, 83:18, 84:3, 84:19, 84:20, 84:23, 84:24, 84:25, 85:11, 86:3, 86:9, 87:6, 90:12, 93:3, 93:20, 96:20, 100:12, 100:19, 100:25, 104:6, 105:14, 106:9, 107:2, 108:15, 110:9, 110:11, 110:15, 110:22, 111:19, 112:19, 113:24, 114:1, 119:10, 119:13, 122:2, 124:13, 126:18, 127:9
**cases** [9] - 7:16, 7:17, 28:11, 76:15, 77:24, 83:22, 112:9, 128:1
**categories** [1] - 15:22
**causation** [13] - 22:10, 24:20, 25:25,

31:6, 31:24, 33:19, 35:5, 36:10, 36:12, 36:14, 37:11, 44:6, 44:9
**caused** [3] - 22:1, 36:8, 37:21
**causes** [1] - 27:18
**causing** [1] - 33:4
**Center** [1] - 89:12
**center** [2] - 57:21, 57:24
**centerpiece** [1] - 60:4
**central** [1] - 9:9
**certain** [12] - 5:22, 13:20, 13:24, 14:15, 40:22, 66:23, 66:24, 81:21, 106:22, 116:12, 116:20, 118:7
**certainly** [18] - 20:4, 32:5, 32:8, 34:4, 37:22, 39:21, 40:11, 40:13, 45:15, 46:6, 47:20, 76:18, 83:17, 88:14, 107:24, 115:16, 122:2, 123:15
**certainty** [1] - 118:14
**CERTIFICATE** [1] - 129:1
**certify** [1] - 129:3
**cetera** [3] - 44:20, 88:13, 124:25
**chain** [1] - 25:25
**challenge** [29] - 36:3, 39:7, 39:14, 40:11, 41:5, 60:8, 62:23, 63:13, 67:22, 67:25, 73:23, 74:10, 77:15, 87:7, 87:11, 94:14, 94:24, 96:5, 98:15, 110:24, 114:24, 117:13, 117:17, 117:21, 126:14, 127:10, 127:15, 127:18
**challenged** [13] - 32:8, 39:10, 39:11, 40:10, 60:18, 61:1, 68:12, 94:11, 96:1, 96:2, 96:3, 96:7, 114:1
**challenging** [13] - 34:6, 41:22, 63:15, 68:3, 68:23, 77:14, 88:16, 98:22, 98:23, 98:24, 99:7, 106:9
**chance** [2] - 16:5, 109:17, 119:7
**change** [13] - 16:8, 19:9, 19:12, 50:22, 76:22, 77:13, 77:20, 77:25, 78:5, 80:3, 98:9, 108:18, 124:1
**changed** [3] - 38:18, 103:17, 103:18
**changes** [4] - 72:13, 74:23, 76:16, 77:24
**chaos** [1] - 123:23
**chapter** [1] - 112:2
**Charlotte** [1] - 65:24
**chat** [1] - 109:17
**cheat** [1] - 19:25
**checkpoint** [1] - 69:25
**Chief** [4] - 94:7, 105:24, 106:14, 106:20
**Child** [1] - 113:19
**children** [3] - 29:11, 32:12, 37:10
**choice** [2] - 74:14, 74:15
**choices** [2] - 114:10, 114:12
**choose** [1] - 9:7
**choosing** [1] - 83:19
**chosen** [1] - 60:9
**Christmas** [1] - 3:25
**circle** [1] - 6:6
**circuit** [4] - 77:23, 111:13, 121:15, 122:2
**Circuit** [29] - 5:15, 20:19, 28:22, 39:20,

47:25, 50:24, 59:14, 61:3, 61:4, 61:5, 61:11, 61:12, 61:16, 61:21, 71:23, 77:23, 86:8, 99:9, 99:11, 99:12, 99:16, 100:13, 112:8, 112:13, 112:14, 112:23, 121:15, 127:7
**Circuit's** [4] - 20:8, 21:5, 48:13, 104:16
**circuits** [1] - 112:15
**circumstances** [1] - 124:2
**cite** [1] - 88:8
**cited** [1] - 105:6
**citing** [1] - 14:20
**citizen** [2] - 17:13, 29:11
**citizens** [4] - 8:2, 8:5, 13:21, 29:11
**citizenship** [4] - 53:18, 53:21, 56:20, 105:12
**claim** [29] - 22:20, 22:25, 26:23, 26:24, 35:10, 35:23, 40:10, 40:19, 40:20, 41:15, 44:8, 44:9, 44:17, 44:18, 44:21, 44:23, 45:14, 45:16, 45:17, 45:23, 46:8, 47:10, 48:3, 48:14, 51:13, 51:15, 70:14, 126:5
**claiming** [1] - 68:16
**claims** [4] - 40:16, 51:12, 54:2, 101:7
**clarification** [1] - 21:4
**clarifying** [1] - 121:5
**clarity** [5] - 84:22, 110:1, 110:17
**class** [6] - 40:24, 51:22, 99:16, 99:20, 106:17, 107:1
**class-wide** [2] - 99:16, 99:20
**clause** [9] - 40:18, 40:20, 44:18, 44:21, 45:16, 45:23, 46:15, 51:13, 109:14
**Clean** [2] - 45:10, 46:20
**clear** [15] - 23:18, 23:21, 49:12, 49:16, 50:15, 58:24, 63:21, 80:19, 93:25, 97:13, 100:19, 108:11, 116:7, 117:10, 118:24
**clearing** [1] - 84:14
**clearly** [7] - 35:22, 46:6, 59:6, 80:5, 88:3, 97:24, 118:6
**close** [1] - 69:1
**coastline** [1] - 29:2
**codify** [1] - 38:25
**COGHLAN** [10] - 2:11, 19:2, 19:15, 38:10, 101:21, 102:24, 103:25, 104:2, 119:20, 120:3
**Coghlan** [5] - 18:25, 38:8, 101:13, 101:19, 119:19
**cognizant** [1] - 126:7
**coined** [1] - 16:13
**Coke** [1] - 101:14
**collapsed** [1] - 18:5
**collapses** [3] - 69:5, 69:7, 69:8
**collateral** [6] - 88:17, 94:11, 94:22, 95:11, 99:19, 123:25
**collaterally** [1] - 93:23
**colleague** [1] - 18:9
**colleagues** [1] - 77:9
**college** [2] - 32:16, 32:17
**Columbia** [1] - 116:16
**coming** [3] - 112:10, 127:24, 128:7

**command** [1] - 46:14
**comment** [27] - 54:7, 54:13, 54:20, 55:25, 56:9, 62:6, 62:7, 62:8, 79:14, 86:11, 86:16, 87:14, 87:20, 88:6, 94:16, 94:17, 94:21, 96:9, 96:11, 96:13, 96:21, 116:3, 123:13, 123:18, 123:24, 124:10, 126:22
**comments** [3] - 82:9, 86:4, 121:7
**committed** [1] - 83:20
**common** [2] - 14:11, 56:7
**commonly** [1] - 54:4
**compelling** [1] - 113:1
**competing** [4] - 6:3, 12:16, 17:19, 82:1
**competition** [2] - 13:23, 17:9
**complain** [1] - 67:12
**complaining** [2] - 62:25, 126:23
**complaint** [3] - 21:10, 70:23, 98:14
**complete** [5] - 76:9, 81:23, 101:6, 118:1, 118:10
**completed** [2] - 75:4, 76:12
**completely** [5] - 12:17, 16:23, 107:2, 125:12, 127:13
**complex** [1] - 120:10
**Complex** [1] - 2:8
**compliance** [1] - 103:12
**complicated** [2] - 74:13, 120:17
**complied** [1] - 31:14
**complies** [2] - 72:12, 117:6
**comply** [3] - 46:12, 58:18, 102:15
**complying** [2] - 5:18, 102:15
**component** [3] - 65:10, 105:15, 105:18
**components** [3] - 67:22, 68:9, 105:14
**computer** [1] - 1:25
**concede** [1] - 62:7
**conceded** [3] - 9:10, 9:18, 11:10
**conceding** [1] - 109:14
**concern** [2] - 70:25, 99:15
**concerned** [1] - 13:25
**concerning** [1] - 55:11
**concerns** [10] - 79:5, 79:6, 93:20, 99:12, 102:17, 103:3, 103:9, 110:12, 114:11
**conclude** [1] - 31:2
**concluded** [1] - 103:4
**concludes** [1] - 37:15
**conclusion** [7] - 8:20, 11:18, 14:22, 32:8, 42:5, 43:16, 55:20
**conclusions** [6] - 7:13, 7:19, 7:20, 8:17, 8:22, 13:13
**concrete** [1] - 20:19
**conditions** [1] - 69:10
**conduct** [1] - 120:6
**confer** [2] - 53:20, 63:20
**conferring** [4] - 51:5, 88:12, 102:7, 106:2
**confirmation** [1] - 106:6
**confirmed** [4] - 13:14, 13:20, 14:23, 51:17
**confirms** [2] - 54:2, 55:19

**conflict** [1] - 99:24
**conform** [1] - 50:17
**confusion** [3] - 75:13, 78:24, 80:23
**Congress** [12] - 22:25, 27:2, 34:6, 34:17, 34:22, 35:11, 41:10, 46:23, 50:14, 52:1, 52:5, 104:20
**Congress's** [4] - 41:6, 50:9, 51:24, 53:25
**congressional** [3] - 41:14, 50:17, 52:8
**cons** [1] - 122:5
**consensus** [1] - 3:20
**consequence** [7] - 20:21, 22:10, 26:6, 42:3, 42:14, 43:2, 43:15
**consequences** [4] - 29:10, 94:22, 95:11, 99:19
**consider** [15] - 7:2, 7:12, 14:24, 59:5, 86:23, 87:5, 96:8, 96:14, 103:9, 117:5, 119:15, 120:5, 120:6, 122:11
**considerable** [1] - 122:4
**consideration** [4] - 61:23, 61:24, 72:22, 103:6
**considerations** [1] - 72:6
**considered** [5] - 106:18, 107:10, 122:14, 123:15
**considering** [4] - 89:7, 89:19, 101:24, 102:18
**considers** [1] - 13:7
**consistency** [1] - 115:1
**consistent** [3] - 59:2, 87:12, 109:21
**consistently** [1] - 93:22
**constant** [1] - 8:13
**constitute** [1] - 29:22
**constitutional** [4] - 35:10, 45:16, 46:7, 117:6
**contend** [1] - 107:24
**contention** [2] - 17:2, 67:21
**contest** [3] - 44:15, 49:2, 70:1
**contested** [1] - 47:15
**context** [14] - 5:22, 34:19, 34:20, 34:21, 35:20, 51:8, 80:6, 99:13, 114:16, 116:15, 122:5, 126:13, 127:15, 127:19
**continuance** [1] - 77:10
**continue** [4] - 16:17, 103:10, 107:25, 115:11
**continues** [7] - 40:5, 52:7, 87:19, 104:10, 108:7, 108:22, 113:10
**continuing** [1] - 103:8
**contractor** [2] - 9:17, 10:23
**contradicted** [1] - 32:22
**contradicts** [1] - 29:8
**contrary** [10] - 4:24, 4:25, 12:11, 32:22, 32:23, 51:24, 70:13, 104:19, 110:11, 115:23
**contrast** [1] - 21:9
**control** [1] - 99:25
**controlled** [1] - 41:10
**controlling** [2] - 51:1, 103:14
**conversation** [2] - 85:21, 114:5
**convinces** [1] - 109:13

**core** [4] - 51:3, 61:8, 61:13, 61:25
**correct** [3] - 5:21, 11:7, 129:3
**correctly** [2] - 20:2, 110:7
**cost** [14] - 20:14, 20:21, 21:7, 21:19, 23:16, 23:18, 24:22, 26:6, 29:15, 29:16, 39:25, 40:4, 42:4, 48:24
**cost-benefit** [2] - 39:25, 40:4
**costs** [21] - 20:15, 21:24, 22:8, 23:13, 23:20, 23:23, 23:24, 25:25, 30:17, 32:20, 33:4, 40:1, 40:2, 41:24, 42:22, 43:17, 43:20, 43:21, 47:5, 47:7
**Counsel** [1] - 3:4
**counsel** [8] - 3:9, 18:20, 19:17, 33:16, 36:18, 41:2, 43:22, 65:22
**counteract** [1] - 18:7
**counting** [1] - 87:24
**country** [18] - 5:6, 5:17, 5:18, 10:18, 14:5, 14:8, 14:16, 15:15, 15:20, 23:3, 37:3, 39:3, 39:4, 64:4, 64:8, 64:11, 64:17, 80:16
**country's** [1] - 5:18
**couple** [6] - 13:3, 59:7, 84:21, 97:22, 116:4, 126:8
**course** [49] - 4:12, 7:7, 13:4, 13:8, 14:23, 22:3, 23:19, 25:14, 32:1, 34:13, 36:17, 39:24, 41:4, 46:4, 47:9, 47:25, 49:9, 50:23, 53:16, 54:6, 54:20, 66:5, 66:13, 69:22, 75:23, 76:2, 76:14, 78:21, 81:15, 84:13, 84:22, 86:1, 86:6, 86:8, 86:12, 88:18, 89:11, 102:13, 105:10, 106:13, 107:15, 108:15, 113:9, 114:14, 115:3, 122:25, 125:2, 125:24, 127:9
**Court** [208] - 2:17, 2:17, 2:18, 6:11, 7:1, 7:6, 7:9, 8:18, 12:2, 12:3, 12:17, 13:5, 13:7, 13:8, 13:10, 13:11, 13:25, 14:17, 14:19, 14:24, 19:5, 19:6, 19:18, 20:18, 21:5, 21:14, 21:19, 21:21, 21:24, 21:25, 22:7, 24:19, 25:22, 28:6, 28:21, 28:24, 29:8, 31:13, 31:23, 32:23, 37:15, 37:19, 38:2, 38:12, 38:14, 38:25, 39:2, 39:4, 39:6, 39:18, 40:19, 42:6, 43:24, 44:19, 45:1, 45:9, 45:14, 46:4, 46:10, 47:22, 48:8, 48:9, 48:16, 50:8, 51:2, 51:12, 51:17, 51:19, 52:5, 53:16, 54:17, 56:4, 56:13, 57:7, 57:10, 57:25, 58:2, 58:13, 58:24, 60:3, 61:10, 61:15, 61:21, 61:22, 62:4, 69:21, 70:15, 70:25, 71:1, 72:1, 72:25, 73:17, 73:21, 74:23, 74:25, 75:5, 75:16, 75:23, 76:3, 76:10, 76:19, 76:21, 76:25, 77:8, 77:17, 77:19, 77:21, 78:1, 78:8, 78:17, 78:20, 78:25, 81:23, 82:1, 82:7, 82:13, 83:4, 83:24, 84:1, 84:21, 85:7, 85:16, 85:20, 86:8, 87:21, 88:19, 88:21, 88:24, 89:10, 89:17, 92:3, 92:11, 92:17, 92:20, 94:1, 97:4, 99:18, 100:5, 100:8, 100:21, 101:1, 101:17, 102:2, 102:11, 102:14, 104:13, 105:4, 105:22, 107:3, 107:16, 107:20, 107:21, 108:9, 108:11, 108:19, 113:2, 113:4, 113:5, 113:24, 113:25, 114:3, 114:13,

114:18, 114:21, 115:4, 115:6, 115:12, 115:21, 116:10, 116:11, 116:14, 116:25, 117:17, 117:21, 117:24, 118:3, 118:5, 118:8, 118:25, 119:2, 119:15, 119:22, 120:7, 120:13, 120:14, 120:19, 120:20, 120:24, 122:23, 123:3, 123:5, 125:4, 126:8, 126:15, 127:2, 127:8, 127:11, 127:13, 127:14, 127:20, 127:22, 129:2, 129:6

**COURT** [155] - 1:1, 3:3, 6:14, 6:17, 6:23, 9:23, 10:4, 10:8, 10:17, 10:22, 11:3, 11:8, 12:21, 15:3, 15:17, 16:10, 18:16, 18:25, 19:14, 19:20, 19:24, 20:25, 21:2, 22:3, 22:13, 23:7, 23:21, 24:8, 24:13, 25:6, 25:13, 25:18, 25:21, 26:3, 26:8, 26:21, 27:5, 28:10, 28:14, 29:14, 31:13, 31:19, 33:9, 33:12, 36:6, 36:23, 38:6, 38:8, 38:20, 41:16, 41:18, 42:7, 42:11, 42:17, 43:4, 43:9, 43:13, 44:22, 44:24, 45:3, 45:6, 45:12, 45:20, 45:24, 46:9, 46:20, 47:17, 49:13, 50:5, 51:14, 52:23, 57:3, 57:12, 57:15, 58:6, 58:17, 59:1, 59:3, 59:13, 59:25, 60:6, 61:2, 61:9, 61:17, 62:1, 62:10, 62:19, 63:6, 63:10, 64:3, 64:6, 64:11, 64:17, 64:24, 65:13, 65:19, 65:24, 66:9, 66:15, 71:11, 71:15, 71:21, 72:8, 72:12, 72:16, 73:25, 78:4, 81:14, 82:6, 84:6, 84:11, 85:23, 88:18, 92:9, 93:5, 93:8, 94:3, 95:3, 96:15, 97:17, 98:13, 99:9, 101:10, 101:12, 101:18, 102:20, 102:22, 103:24, 104:1, 104:23, 108:23, 109:23, 110:21, 111:24, 112:3, 115:14, 115:17, 116:1, 116:5, 119:19, 119:25, 121:2, 123:10, 124:22, 125:7, 125:15, 125:17, 125:20, 127:24

**court** [15] - 3:2, 20:25, 63:14, 88:2, 90:14, 94:8, 103:24, 104:1, 104:2, 111:10, 112:17, 116:15, 116:17, 117:23, 117:25

**Court's** [21] - 19:9, 19:13, 20:7, 20:10, 26:13, 29:7, 30:7, 38:19, 40:18, 46:25, 50:1, 51:3, 51:9, 78:11, 101:25, 107:19, 110:12, 114:15, 118:5, 118:18, 127:7

**courtroom** [2] - 4:12, 23:10

**COURTROOM** [1] - 128:9

**courts** [5] - 49:6, 75:2, 76:14, 77:23, 121:15

**Courts** [1] - 75:6

**cover** [3] - 42:18, 44:21, 74:4

**covered** [1] - 33:16

**covers** [1] - 4:8

**COVID** [7] - 3:22, 4:1, 73:16, 113:17, 113:20, 128:4

**COVID-positive** [1] - 113:20

**crack** [1] - 126:17

**craft** [2] - 119:3, 120:4

**Crane** [1] - 100:12

**create** [3] - 8:16, 123:23, 125:11

**created** [8] - 4:22, 39:14, 46:24, 50:13, 51:5, 106:2, 108:20, 109:4

**creating** [2] - 97:2, 112:1

**creation** [4] - 39:8, 39:10, 90:7, 106:3

**credibility** [1] - 12:19

**criteria** [6] - 72:9, 72:21, 82:22, 82:23, 83:5, 83:6

**critical** [2] - 46:24, 51:9

**cross** [3] - 12:11, 32:7, 89:8

**cross-examination** [2] - 12:11, 32:7

**CRR** [2] - 2:17, 129:2

**crystal** [1] - 116:7

**CSR** [2] - 2:17, 129:2

**cure** [2] - 50:2, 125:3

**current** [2] - 66:1, 75:13

**Customs** [1] - 105:6

**cut** [2] - 62:1, 97:11

**cutting** [1] - 30:1

# D

**DACA** [284] - 4:21, 5:6, 5:8, 5:11, 6:21, 7:1, 7:23, 8:2, 8:8, 8:11, 9:5, 11:15, 11:16, 11:21, 13:22, 14:2, 14:3, 14:5, 14:7, 14:8, 14:11, 14:21, 15:7, 15:14, 15:15, 15:19, 16:6, 16:7, 16:8, 16:10, 16:15, 16:16, 16:19, 17:9, 17:12, 17:19, 17:24, 18:19, 21:1, 22:18, 23:15, 24:4, 24:11, 25:4, 26:1, 26:5, 26:7, 26:10, 26:14, 29:9, 29:20, 30:1, 33:16, 34:2, 34:5, 35:6, 36:17, 37:2, 37:4, 37:12, 37:21, 38:3, 39:4, 39:6, 40:2, 40:6, 40:21, 41:2, 41:3, 41:23, 42:1, 42:11, 43:5, 43:15, 43:18, 45:17, 47:7, 48:11, 49:23, 50:11, 50:13, 50:19, 50:25, 51:4, 51:10, 51:18, 51:19, 52:4, 52:19, 52:21, 52:22, 53:2, 53:8, 53:10, 53:15, 53:20, 53:22, 53:23, 53:24, 54:3, 54:4, 54:12, 54:14, 54:18, 54:21, 54:25, 55:3, 55:5, 56:4, 56:13, 56:18, 56:19, 56:22, 57:2, 57:7, 58:1, 58:9, 58:10, 58:11, 58:14, 58:24, 59:17, 59:19, 59:22, 59:23, 59:24, 60:4, 60:10, 60:21, 60:24, 61:13, 62:14, 63:6, 63:8, 63:19, 64:1, 64:7, 64:9, 64:21, 64:23, 64:25, 65:2, 65:7, 65:8, 65:10, 65:11, 66:3, 66:10, 66:12, 66:16, 66:17, 67:6, 67:7, 67:10, 68:9, 68:18, 68:21, 69:25, 70:2, 70:16, 70:24, 71:7, 71:8, 72:3, 72:17, 72:18, 73:1, 73:8, 73:23, 74:11, 75:25, 79:2, 79:13, 79:17, 79:18, 80:9, 80:12, 80:14, 80:25, 81:1, 81:18, 81:19, 82:12, 82:13, 82:24, 83:6, 83:21, 83:22, 83:24, 88:12, 88:16, 89:18, 90:23, 91:3, 91:6, 91:11, 93:2, 94:4, 94:11, 95:12, 95:20, 95:21, 96:5, 96:18, 97:2, 98:4, 98:6, 98:16, 98:20, 98:21, 98:22, 99:19, 99:23, 101:25, 102:3, 102:6, 103:1, 103:10, 103:16, 103:22, 104:13, 104:17, 104:18, 105:10, 105:14, 105:18, 105:25, 106:1,

106:6, 106:11, 107:18, 107:19, 107:20, 107:22, 108:3, 108:6, 108:8, 108:12, 108:17, 108:20, 109:4, 110:4, 110:25, 113:11, 114:4, 114:5, 114:11, 114:18, 115:20, 116:2, 116:8, 116:25, 117:9, 118:1, 118:4, 118:10, 118:13, 118:19, 118:21, 118:25, 119:2, 119:17, 119:23, 123:20, 123:22, 124:15, 126:1, 126:19, 126:20, 127:3, 127:6

**DACA's** [1] - 17:16

**damage** [2] - 27:19, 27:20

**damages** [3] - 21:25, 36:11, 78:8

**DANIEL** [1] - 2:13

**DAPA** [32] - 20:8, 20:14, 20:20, 20:22, 21:1, 21:13, 21:23, 22:1, 22:3, 24:19, 24:24, 26:13, 28:21, 29:21, 31:24, 41:24, 48:2, 50:25, 61:22, 75:5, 76:20, 77:1, 86:9, 88:3, 88:6, 99:8, 104:16, 110:22, 125:6, 125:8

**date** [2] - 3:19, 72:13

**Daubert** [2] - 6:12, 13:4

**DAVID** [1] - 2:13

**days** [3] - 72:15, 116:20, 118:7

**DC** [10] - 2:5, 2:12, 48:7, 77:23, 112:14, 117:23, 117:25, 121:15, 127:7, 127:13

**deal** [1] - 27:14

**dealing** [1] - 31:16

**DECEMBER** [1] - 1:7

**decide** [4] - 44:3, 44:11, 115:5, 116:24

**decided** [2] - 60:13, 70:7

**decides** [1] - 119:22

**deciding** [4] - 7:5, 44:1, 89:19, 114:8

**decision** [32] - 8:12, 19:15, 20:7, 20:8, 20:10, 20:11, 20:14, 20:17, 21:5, 29:7, 29:21, 30:7, 31:5, 35:10, 49:18, 56:25, 58:22, 59:11, 61:13, 61:16, 67:8, 67:19, 67:23, 81:12, 85:1, 102:1, 103:6, 112:22, 115:12, 120:8, 127:11

**decisions** [2] - 73:22, 99:18

**declarants** [3] - 30:18, 44:15, 47:10

**declaration** [3] - 14:10, 21:18, 47:2

**declarations** [3] - 13:9, 20:22, 21:13

**decline** [1] - 17:22

**deems** [1] - 127:22

**Deere** [3] - 7:3, 7:15, 8:14, 8:23, 13:16, 13:20, 17:25

**Deere's** [1] - 14:20

**defend** [3] - 38:21, 81:19, 82:12

**defendant** [17] - 6:10, 7:1, 12:10, 13:16, 14:7, 14:23, 17:4, 17:6, 18:4, 36:4, 38:24, 39:23, 54:22, 55:8, 83:20, 105:13, 109:7

**defendant-intervenors** [8] - 7:1, 13:16, 14:7, 18:4, 39:23, 55:8, 105:13, 109:7

**defendant-intervenors'** [6] - 6:10, 12:10, 14:23, 17:4, 17:6, 54:22

**defendants** [45] - 18:20, 19:3, 19:4, 52:21, 56:17, 74:20, 75:10, 75:12, 76:9,

79:12, 79:17, 79:21, 79:22, 80:8, 80:19, 80:25, 81:1, 81:13, 81:17, 81:22, 82:11, 82:18, 84:4, 85:6, 90:13, 90:22, 91:9, 91:16, 93:18, 94:15, 99:25, 101:4, 101:22, 102:14, 104:15, 106:13, 107:25, 115:10, 116:21, 116:23, 117:2, 119:6, 124:20, 125:25, 126:19
**DEFENDANTS** [2] - 2:1, 2:11
**defendants'** [5] - 19:8, 19:12, 38:11, 38:17, 120:3
**defending** [4] - 80:25, 81:13, 83:21, 91:16
**defense** [1] - 36:8
**defer** [9] - 58:25, 59:11, 61:14, 67:8, 71:2, 93:18, 95:10, 96:11
**deferral** [1] - 96:7
**deferred** [50] - 16:8, 52:2, 52:4, 52:17, 55:12, 55:16, 55:23, 55:24, 59:22, 59:23, 60:1, 60:5, 60:10, 60:15, 61:8, 61:24, 61:25, 66:2, 68:15, 69:11, 69:12, 69:13, 70:16, 70:18, 70:24, 71:13, 72:2, 72:13, 73:11, 73:19, 86:22, 93:2, 93:3, 93:14, 94:15, 94:17, 94:18, 94:20, 95:17, 95:24, 96:17, 97:3, 97:4, 101:2, 106:5, 107:7, 107:9, 107:11, 118:25
**Deferred** [1] - 72:14
**deferring** [2] - 18:19, 96:8
**definition** [2] - 80:4, 86:6
**degree** [3] - 16:22, 37:23, 90:15
**delay** [2] - 108:15, 108:21
**Democrat** [1] - 50:8
**demographer** [1] - 9:3
**demography** [1] - 9:6
**demonstrate** [3] - 34:4, 42:16, 60:17
**demonstrating** [1] - 24:15
**demonstration** [1] - 38:16
**denial** [4] - 83:3, 90:20, 91:1, 91:4
**denied** [4] - 39:5, 82:21, 83:4
**depart** [3] - 30:20, 31:3, 104:18
**department** [2] - 103:7, 104:10
**Department** [4] - 1:21, 2:11, 77:11, 101:23
**departure** [1] - 32:24
**departures** [1] - 33:1
**deport** [2] - 23:12, 27:8
**Deportation** [1] - 55:15
**deposition** [3] - 11:13, 13:18, 32:11
**derived** [1] - 22:8
**describe** [1] - 70:6
**described** [1] - 58:19
**describes** [1] - 5:17
**designated** [1] - 55:8
**despite** [1] - 53:19
**detail** [3] - 79:7, 113:6, 122:4
**details** [1] - 91:18
**determination** [3] - 39:9, 104:6, 120:15
**determine** [1] - 47:6
**determined** [1] - 120:22
**determines** [1] - 19:18

**developed** [1] - 100:18
**develops** [1] - 100:16
**DHS** [53] - 15:12, 48:3, 48:6, 49:13, 49:15, 49:17, 49:24, 55:22, 75:17, 82:25, 83:4, 83:5, 86:23, 89:11, 90:1, 90:3, 90:4, 90:8, 96:22, 98:5, 98:10, 102:3, 102:18, 103:22, 106:13, 106:25, 107:4, 107:9, 107:10, 109:23, 109:24, 112:7, 113:3, 114:6, 114:12, 115:9, 120:5, 120:18, 120:21, 121:23, 122:14, 122:17, 122:20, 122:24, 122:25, 123:7, 123:11, 123:17, 124:5, 124:17, 125:24, 126:19
**Diaz** [1] - 73:14
**dice** [2] - 111:3, 111:10
**dicing** [5] - 111:16, 111:21, 111:25, 114:14, 122:12
**Diet** [1] - 101:14
**difference** [10] - 28:17, 30:3, 31:7, 36:9, 36:11, 42:21, 49:19, 62:10, 81:16, 117:16
**different** [24] - 5:7, 11:20, 21:22, 28:20, 35:6, 36:3, 48:17, 67:17, 69:18, 76:23, 83:23, 83:24, 85:25, 87:25, 99:12, 99:20, 106:14, 107:2, 117:13, 117:20, 119:14, 121:13, 125:12, 126:8
**differently** [1] - 76:24
**differs** [4] - 20:7, 20:9, 20:12, 37:22
**difficult** [4] - 20:2, 83:2, 101:24, 103:9
**diminution** [1] - 32:14
**direct** [11] - 20:21, 21:7, 28:21, 41:23, 42:16, 42:17, 46:1, 48:16, 48:23, 50:1, 99:23
**direction** [2] - 34:5, 82:2
**directly** [2] - 29:8, 103:19
**disagree** [2] - 19:4, 122:13
**disagreeing** [1] - 23:24
**disagrees** [2] - 75:23, 76:4
**disavowed** [1] - 21:10
**disclaim** [1] - 24:1
**disconnect** [1] - 45:19
**discovery** [1] - 52:20
**discretion** [78] - 7:6, 49:24, 54:15, 55:12, 58:4, 58:6, 58:21, 58:25, 60:11, 61:19, 62:14, 67:9, 67:23, 68:22, 70:10, 71:8, 75:17, 79:6, 81:24, 82:2, 82:15, 82:19, 83:21, 84:2, 84:5, 84:7, 84:17, 84:22, 85:10, 85:13, 85:14, 85:17, 87:4, 87:15, 87:18, 89:5, 89:7, 89:19, 89:20, 90:1, 90:3, 90:9, 90:15, 90:19, 91:7, 91:21, 91:24, 92:4, 92:5, 92:6, 92:21, 92:22, 93:13, 94:22, 96:10, 97:10, 99:13, 99:14, 100:6, 100:11, 100:12, 100:20, 100:23, 101:2, 101:4, 101:8, 107:18, 107:20, 108:1, 108:6, 108:7, 108:9, 108:12, 110:8
**discretionary** [8] - 55:17, 67:9, 72:5, 72:20, 82:24, 94:21, 99:18, 101:3
**discriminated** [1] - 35:22
**discrimination** [1] - 7:16

**discuss** [2] - 16:11, 82:17
**discussed** [2] - 30:23, 74:13
**discussing** [1] - 18:20
**discussion** [2] - 76:5, 105:3
**DISHER** [17] - 1:14, 12:23, 15:11, 38:23, 47:18, 50:7, 51:16, 52:24, 57:5, 104:25, 115:16, 115:18, 116:4, 116:6, 125:16, 125:18, 125:22
**Disher** [21] - 12:8, 12:21, 12:23, 15:3, 15:17, 16:1, 16:22, 22:14, 22:19, 33:13, 38:21, 41:16, 50:5, 57:12, 62:2, 65:13, 71:4, 101:13, 104:24, 125:21
**Disher's** [4] - 66:21, 66:24, 88:10, 109:5
**dismiss** [1] - 43:25
**dispose** [1] - 101:7
**disposes** [1] - 96:2
**disposition** [1] - 75:9
**dispositive** [5] - 51:11, 51:14, 85:25, 88:22, 88:24
**dispossessed** [1] - 123:5
**dispossesses** [1] - 122:18
**dispute** [5] - 18:14, 58:5, 69:17, 82:9, 85:13
**disputed** [2] - 58:3, 67:7
**disputes** [1] - 76:1
**disregard** [1] - 7:6
**disrupted** [1] - 113:12
**disruption** [3] - 112:16, 113:4, 113:21
**dissent** [1] - 58:11
**dissonance** [1] - 32:19
**distance** [1] - 3:24
**distanced** [1] - 4:4
**distances** [1] - 128:1
**distancing** [1] - 4:18
**distinct** [1] - 60:3
**distinction** [3] - 10:9, 10:10, 70:16
**distinctions** [1] - 67:20
**distressed** [1] - 113:18
**distributed** [2] - 33:2, 93:19
**distribution** [1] - 86:24
**District** [14] - 2:18, 2:18, 3:20, 48:9, 56:15, 77:3, 77:10, 102:14, 103:12, 104:6, 116:15, 128:2, 129:2
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [3] - 77:22, 116:15, 116:17
**divided** [1] - 88:2
**DIVISION** [1] - 1:2
**Docket** [9] - 6:25, 12:2, 12:10, 21:15, 21:16, 77:5, 89:15, 89:18, 105:5
**doctor** [1] - 94:14
**doctors** [1] - 113:17
**Document** [1] - 31:2
**document** [6] - 8:15, 21:12, 59:18, 64:15, 64:21, 86:13
**documentation** [3] - 31:17, 34:10, 93:17
**documents** [2] - 86:3, 89:11
**Doe** [1] - 25:1

**dog** [1] - 18:16
**DOJ** [1] - 77:12
**Donald** [2] - 7:3
**done** [12] - 14:19, 39:22, 40:23, 41:13, 47:8, 47:11, 47:14, 57:20, 75:7, 112:15, 115:6, 115:8
**dooms** [1] - 9:10
**door** [1] - 65:10
**doughnut** [2] - 57:23, 68:25
**Douglas** [1] - 6:9
**DOUGLAS** [1] - 2:4
**down** [10] - 3:9, 38:2, 66:13, 91:18, 100:4, 102:22, 118:16, 120:6, 120:7, 120:22
**Dr** [36] - 7:3, 7:4, 7:15, 8:14, 8:23, 9:3, 9:5, 9:10, 9:18, 11:9, 13:16, 13:19, 13:20, 13:25, 14:1, 14:10, 14:20, 14:22, 15:10, 16:23, 17:10, 17:14, 17:17, 17:21, 17:25, 18:1, 18:3, 18:6, 18:8, 19:10, 30:20, 30:24, 32:2, 32:10, 39:25
**draw** [1] - 42:6
**drawn** [1] - 66:24
**draws** [1] - 85:7
**DRIEMEIER** [42] - 2:4, 19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 48:19, 49:15
**Driemeier** [4] - 6:9, 18:9, 19:22, 33:20
**Driemeier's** [1] - 18:22
**driver's** [3] - 20:13, 20:18, 48:22
**drop** [1] - 57:18
**drove** [1] - 7:13
**drug** [1] - 34:20
**due** [5] - 13:9, 13:12, 14:18, 15:1, 79:24
**duly** [4] - 41:6, 41:10, 50:9, 53:25
**during** [6] - 13:17, 75:2, 76:15, 78:21, 107:11, 123:23
**dwindling** [1] - 66:16

**E**

**EAD** [2] - 59:17, 98:22
**eager** [2] - 82:12, 84:4
**early** [1] - 3:11
**easiest** [1] - 74:24
**Eastern** [5] - 48:9, 56:15, 102:14, 103:12, 104:6
**eat** [1] - 23:14
**ECF** [2] - 53:1, 105:5
**economic** [4] - 17:15, 29:22, 95:18, 95:25
**economist** [1] - 7:15
**economy** [1] - 8:13
**edge** [1] - 45:2
**Edlow** [16] - 48:10, 49:7, 74:15, 79:3,

79:8, 79:10, 80:21, 89:24, 90:6, 90:11, 90:16, 97:9, 97:19, 98:3, 98:8, 103:19
**EDNY** [3] - 74:18, 79:19, 120:15
**educate** [1] - 25:2, 25:21
**educated** [2] - 14:14, 25:4
**education** [5] - 21:23, 22:8, 24:4, 30:17, 32:14
**effect** [16] - 30:9, 48:12, 56:13, 86:21, 87:8, 93:22, 94:12, 103:15, 104:10, 107:12, 116:12, 116:20, 118:6, 118:11, 118:17, 127:7
**effective** [5] - 119:8, 119:12, 122:19, 123:6
**effectively** [1] - 81:23
**effects** [2] - 17:16, 113:12
**effort** [2] - 10:14, 102:15
**egg** [1] - 113:5
**eggs** [1] - 126:3
**eight** [1] - 11:17, 78:5
**either** [12] - 11:14, 14:4, 15:20, 15:23, 22:22, 47:11, 67:14, 69:24, 82:8, 93:11, 104:9, 109:13
**elephant** [1] - 58:8
**eligibility** [5] - 60:21, 63:20, 64:2, 64:3, 95:17
**eligible** [14] - 13:23, 48:22, 52:3, 52:19, 53:14, 66:17, 67:5, 91:3, 91:12, 105:3, 105:8, 105:11, 106:18, 124:14
**eliminate** [2] - 75:13, 75:18
**eliminated** [1] - 48:24
**elimination** [1] - 24:24
**ELIZABETH** [1] - 1:20
**Elizabeth** [1] - 13:1
**elsewhere** [1] - 68:12
**emergency** [3] - 32:18, 42:4, 42:23
**emphasize** [1] - 31:4
**emphasizes** [1] - 49:22
**empirical** [1] - 17:15
**employed** [1] - 10:13
**employee** [6] - 10:6, 10:9, 10:12, 10:14, 10:20, 11:1
**employer** [2] - 11:5, 17:12
**employers** [3] - 8:6, 8:7, 8:16
**Employment** [1] - 59:18
**employment** [6] - 7:16, 17:23, 35:20, 42:3, 43:3, 59:15
**empowered** [1] - 117:21
**empty** [1] - 57:25
**enacted** [7] - 22:3, 41:6, 41:11, 50:9, 52:7, 53:25, 107:22
**end** [9] - 14:5, 14:8, 14:11, 15:14, 37:17, 37:19, 118:14, 119:4, 124:8
**ends** [2] - 84:24, 85:21
**enforce** [3] - 34:18, 41:7, 50:15
**enforced** [1] - 103:22
**enforcement** [4] - 34:21, 35:3, 97:16, 122:23
**enforcing** [2] - 98:16, 117:19
**enjoin** [1] - 125:10

**enjoining** [1] - 110:16
**enjoins** [1] - 117:19
**enrolled** [1] - 32:12
**ensure** [1] - 75:15
**enter** [2] - 49:11, 127:21
**entered** [4] - 34:2, 64:4, 64:8, 64:13
**enterprise** [1] - 10:14
**entire** [6] - 37:9, 53:9, 67:18, 83:10, 85:11, 85:18
**entirely** [3] - 79:4, 113:9, 113:12
**entitled** [4] - 64:15, 75:25, 86:25, 129:4
**entity** [1] - 18:5
**environmental** [1] - 77:24
**envisioned** [1] - 75:22
**EPA** [12] - 20:13, 27:25, 28:2, 28:8, 28:24, 44:25, 46:21, 78:2, 78:3, 112:22
**equally** [2] - 8:1, 88:2
**equate** [1] - 26:14
**equating** [1] - 32:24
**equation** [3] - 95:16, 95:23, 97:6
**equitable** [3] - 116:11, 119:15, 125:2
**equity** [1] - 127:21
**erase** [1] - 117:18
**Erasure** [1] - 117:14
**Eric** [1] - 13:1
**ERIC** [1] - 1:17
**error** [1] - 53:12
**especially** [3] - 3:13, 48:8, 114:10
**essential** [1] - 112:21
**essentially** [11] - 38:13, 38:24, 43:4, 46:21, 76:21, 77:6, 89:13, 94:10, 95:16, 110:2, 110:7
**Esther** [2] - 6:22, 73:9
**estimate** [2] - 52:21, 66:24
**estimated** [3] - 20:22, 40:1, 65:9
**estimates** [2] - 53:11, 83:17
**ET** [3] - 1:4, 1:7, 2:2
**et** [3] - 44:20, 88:13, 124:25
**evaluate** [1] - 14:17
**evaluation** [1] - 67:10
**evenly** [1] - 33:2
**eventually** [1] - 11:10
**ever-available** [1] - 112:9
**evidence** [40] - 12:11, 12:16, 14:18, 17:16, 18:21, 20:20, 21:7, 21:11, 22:16, 24:17, 26:15, 39:22, 43:10, 44:4, 44:13, 44:15, 47:13, 47:15, 49:2, 49:3, 53:21, 53:22, 64:25, 82:1, 82:8, 83:3, 85:15, 89:5, 89:9, 89:22, 90:18, 91:21, 99:13, 100:9, 107:24, 108:2, 113:10, 113:16
**evident** [1] - 28:1
**exact** [1] - 114:5
**exactly** [16] - 28:3, 50:10, 74:19, 76:25, 79:2, 82:13, 82:19, 83:4, 83:24, 88:22, 112:5, 114:15, 116:16, 123:8, 124:2, 124:3
**examination** [2] - 12:11, 32:7
**example** [17] - 9:25, 13:17, 35:20,

36:22, 73:14, 73:18, 86:17, 86:19, 87:17, 93:10, 93:13, 93:14, 93:15, 94:13, 116:14, 118:17, 123:22

**examples** [6] - 35:17, 78:3, 83:1, 97:5, 112:24, 113:21

**exceeded** [1] - 117:9

**excess** [1] - 126:20

**exclude** [4] - 6:13, 12:17, 15:2, 21:14

**excluded** [4] - 7:9, 8:19, 18:13, 19:9

**excuse** [5] - 41:12, 51:23, 52:5, 52:13, 107:5

**executed** [1] - 56:7

**executive** [9] - 23:5, 27:2, 41:13, 50:16, 52:6, 52:12, 71:9, 71:12, 106:11

**executive's** [2] - 52:16, 56:6

**exercise** [8] - 39:18, 58:24, 60:11, 70:10, 71:8, 107:25, 108:15, 119:15

**exercised** [1] - 108:1

**Exhibit** [3] - 52:24, 53:1, 107:5

**exist** [1] - 87:19

**existed** [6] - 43:15, 59:21, 81:3, 97:3, 117:23, 124:12

**existence** [3] - 22:4, 26:1, 104:3

**existing** [3] - 59:12, 118:13, 118:18

**exists** [2] - 25:4, 91:7

**expanded** [1] - 50:25

**expansion** [1] - 110:19

**expect** [2] - 74:23, 82:10

**expectation** [1] - 16:17

**expenditures** [1] - 32:18

**expenses** [2] - 21:22, 32:14

**experience** [1] - 81:9

**expert** [18] - 7:6, 7:9, 9:2, 12:4, 13:9, 13:15, 14:1, 14:23, 15:2, 17:21, 18:4, 18:5, 18:11, 18:12, 55:9, 56:3, 66:5

**expert's** [1] - 8:19

**experts** [12] - 7:2, 7:11, 12:17, 12:19, 13:13, 17:4, 17:6, 18:24, 19:8, 19:16, 44:15, 55:7

**expire** [2] - 66:10, 118:22

**explain** [5] - 35:4, 57:2, 81:14, 126:17, 127:12

**explained** [2] - 61:10, 126:15

**explains** [2] - 61:5, 61:21

**explanation** [1] - 57:1

**expressed** [3] - 11:22, 17:11, 70:25

**extending** [1] - 54:18

**extensive** [1] - 113:21

**extent** [10] - 43:1, 44:18, 45:13, 60:23, 61:22, 62:23, 63:13, 63:14, 115:20, 120:20

**extraordinarily** [3] - 84:2, 113:1, 121:11

**extraordinary** [2] - 114:6, 115:21

**extrapolating** [1] - 53:9

**extreme** [1] - 52:6

**eye** [1] - 49:18

# F

**F.3d** [2] - 21:7, 112:22

**F.Supp.3d** [1] - 22:2

**face** [1] - 30:2, 64:20

**faced** [1] - 8:1

**facing** [2] - 4:11, 125:5

**fact** [44] - 3:8, 3:13, 8:16, 13:11, 13:14, 13:23, 15:6, 16:8, 16:20, 18:5, 22:7, 22:19, 26:15, 27:1, 30:1, 30:7, 33:7, 33:24, 34:10, 36:4, 36:9, 37:7, 37:20, 41:3, 43:1, 43:11, 43:18, 45:9, 45:10, 45:18, 60:24, 63:19, 64:1, 67:7, 75:16, 96:15, 98:6, 105:7, 107:4, 108:12, 117:12, 117:24, 125:25, 126:12

**fact-bound** [1] - 75:16

**factor** [2] - 87:1, 87:5, 96:14

**factors** [8] - 8:13, 89:19, 89:21, 92:17, 92:19, 96:8, 112:13, 112:25

**facts** [12] - 5:3, 18:14, 35:8, 37:4, 38:18, 57:21, 58:3, 58:5, 60:19, 76:1, 91:1, 92:5

**factual** [1] - 77:25

**fail** [1] - 52:17

**failed** [2] - 7:12, 33:6

**failure** [5] - 23:4, 24:20, 34:6, 35:6, 35:9

**fair** [3] - 43:15, 76:16, 95:5

**fairer** [1] - 95:6

**fairness** [1] - 97:4

**faithfully** [1] - 56:7

**Fallacy** [1] - 117:14

**familiar** [1] - 86:9

**families** [2] - 29:11, 32:11

**family** [11] - 9:15, 9:16, 9:23, 9:24, 10:1, 10:4, 10:13, 11:4, 14:13, 97:4

**far** [2] - 13:25, 78:16

**fashion** [1] - 120:9

**faster** [1] - 122:24

**fault** [1] - 27:5

**favor** [2] - 8:11, 34:5

**favorable** [2] - 60:12, 72:22

**February** [1] - 76:22

**federal** [81] - 19:4, 19:8, 19:11, 22:21, 26:14, 26:17, 27:6, 27:12, 27:14, 29:23, 30:3, 31:21, 38:8, 38:11, 38:17, 39:1, 40:23, 41:9, 41:12, 46:18, 52:21, 53:2, 53:11, 56:17, 60:22, 65:9, 71:11, 71:12, 74:13, 74:19, 74:22, 75:2, 75:10, 75:12, 76:9, 76:14, 77:13, 77:14, 78:21, 79:2, 79:12, 79:17, 79:21, 79:22, 80:8, 80:19, 80:24, 81:1, 81:12, 81:16, 81:22, 82:11, 82:18, 83:8, 83:20, 84:4, 85:6, 90:12, 90:14, 91:9, 91:16, 93:18, 94:15, 101:3, 101:22, 104:15, 106:13, 107:25, 115:10, 116:21, 116:23, 117:2, 119:6, 119:11, 120:3, 124:16, 124:19, 125:25, 126:19

**FEDERAL** [1] - 2:11

**Federal** [1] - 55:23

**feet** [1] - 4:6

**Feigenbaum** [3] - 18:16, 33:9, 123:10

**FEIGENBAUM** [35] - 2:7, 18:18, 33:11, 33:14, 36:13, 36:24, 38:7, 74:2, 78:6, 81:15, 82:7, 84:9, 84:13, 85:24, 88:20, 92:10, 93:6, 93:10, 94:6, 95:5, 96:19, 97:19, 99:2, 99:11, 101:11, 101:16, 109:16, 109:24, 111:19, 112:1, 112:5, 121:4, 123:14, 124:24, 125:13

**fell** [1] - 15:22

**few** [2] - 41:20, 105:1

**field** [1] - 117:3

**Fifth** [29] - 5:15, 20:8, 20:19, 21:5, 28:22, 39:20, 47:25, 48:13, 50:24, 59:14, 61:3, 61:4, 61:5, 61:11, 61:12, 61:16, 61:21, 71:23, 86:8, 99:9, 99:11, 99:12, 99:15, 100:13, 104:16, 112:8, 112:13, 112:23, 121:15

**fight** [1] - 18:17

**figure** [8] - 47:3, 65:14, 83:3, 86:14, 88:25, 89:14, 91:20

**figuring** [1] - 111:20

**filed** [5] - 13:4, 56:2, 56:16, 105:4, 108:16

**filing** [1] - 6:25

**fill** [1] - 25:11

**final** [4] - 48:7, 76:8, 85:7, 116:17

**finally** [6] - 17:21, 33:1, 44:17, 80:11, 91:8, 108:14

**financial** [1] - 60:17

**findings** [4] - 68:23, 81:6, 101:3

**fine** [1] - 23:12

**finer** [1] - 101:6

**finite** [1] - 72:4

**first** [43] - 3:8, 6:4, 6:14, 13:16, 16:4, 20:6, 28:2, 31:5, 33:19, 40:16, 48:12, 56:16, 58:4, 59:13, 63:19, 74:5, 75:12, 76:13, 78:23, 79:11, 81:8, 86:1, 87:24, 94:9, 97:20, 99:5, 105:2, 105:15, 109:25, 113:4, 114:19, 116:7, 116:10, 117:11, 118:3, 119:3, 119:13, 121:6, 122:17, 122:21, 123:7, 126:24, 127:19

**five** [4] - 63:7, 89:4, 89:9, 101:14

**fix** [2] - 115:25, 116:1

**fixed** [2] - 67:4

**flatly** [1] - 50:25

**flawed** [2] - 11:10, 69:5

**flaws** [1] - 32:3

**flexibility** [4] - 112:17, 113:23, 114:6, 120:21

**flip** [2] - 29:14, 55:2

**Floor** [1] - 1:16

**flow** [3] - 49:20, 106:23, 107:23

**flows** [2] - 59:9, 63:11

**focus** [4] - 71:6, 72:24, 74:5, 106:4

**focused** [4] - 61:11, 75:1, 120:11, 120:25

**focusing** [1] - 69:4

**folks** [4] - 13:21, 14:12, 118:18, 126:4

**follow** [2] - 75:1, 96:24

**followed** [2] - 90:18, 115:13
**following** [10] - 15:8, 15:9, 17:23, 20:3, 26:3, 78:21, 96:19, 96:20, 110:6, 121:23
**Footnote** [3] - 47:22, 48:16, 106:21
**footnote** [3] - 48:18, 65:17, 82:4
**footnotes** [2] - 65:19, 65:21
**FOR** [4] - 1:14, 2:1, 2:7, 2:11
**forbearance** [11] - 31:8, 49:20, 51:18, 68:10, 69:3, 69:4, 105:16, 106:9, 106:10, 106:23, 106:24
**forbearing** [2] - 107:1, 107:14
**force** [1] - 56:13
**forebear** [2] - 51:20, 106:16
**foregoing** [1] - 129:3
**foreseeable** [2] - 103:23, 104:11
**forgot** [1] - 47:18
**form** [2] - 59:16, 59:17
**formal** [3] - 76:6, 76:7, 98:2
**forth** [4] - 90:21, 91:1, 121:16, 122:12
**forum** [1] - 12:18
**forward** [8] - 7:2, 24:16, 44:12, 47:13, 83:9, 112:11, 114:9, 124:15
**four** [3] - 75:8, 78:19, 85:25
**fourth** [1] - 75:21
**fraction** [2] - 23:2, 34:12
**frame** [1] - 105:14
**framed** [1] - 74:9
**framework** [8] - 51:1, 74:19, 74:24, 75:14, 76:24, 83:21, 114:25, 117:6
**frameworks** [1] - 78:14
**frankly** [2] - 87:22, 125:8
**free** [4] - 11:3, 63:12, 122:23, 123:3
**free-standing** [1] - 63:12
**frequently** [1] - 107:6
**friend** [1] - 71:4
**front** [14] - 51:12, 52:10, 56:13, 73:15, 77:17, 88:18, 88:20, 101:1, 107:3, 110:4, 110:14, 113:2, 114:24, 116:25
**fulfilled** [1] - 72:21
**full** [5] - 48:11, 56:13, 84:22, 103:3, 121:12
**fully** [4] - 34:23, 79:13, 103:4, 116:11
**fundamentally** [1] - 54:3
**funding** [1] - 35:3
**funds** [1] - 40:22
**furthermore** [1] - 31:11
**future** [2] - 103:23, 104:11

## G

**gap** [1] - 25:11
**Garner** [1] - 112:3
**gears** [2] - 72:14, 108:23
**general** [11] - 3:19, 13:2, 17:15, 29:4, 29:6, 29:16, 62:12, 71:24, 76:13, 83:3, 104:5
**General** [4] - 1:15, 1:18, 1:20, 2:8
**generalized** [2] - 46:17, 92:6

**generally** [2] - 20:13, 126:6
**genuine** [4] - 58:5, 82:9, 85:12, 92:4
**given** [11] - 13:12, 15:12, 23:3, 37:6, 48:15, 67:25, 74:22, 76:1, 76:16, 84:20
**gobbled** [1] - 27:12
**God** [1] - 82:6
**good-bye** [1] - 119:25
**Gorsuch** [1] - 54:8
**government** [36] - 5:11, 15:9, 15:24, 22:21, 23:1, 25:13, 25:15, 26:14, 26:17, 27:7, 27:13, 30:3, 31:21, 40:23, 41:9, 41:12, 43:22, 46:18, 49:8, 50:1, 50:2, 53:2, 53:11, 60:12, 61:18, 65:5, 65:9, 70:7, 71:11, 71:12, 77:13, 77:14, 79:2, 83:8, 124:16, 125:9
**government's** [4] - 25:16, 41:10, 49:4, 74:14
**governmental** [1] - 117:19
**governments** [1] - 113:13
**graduated** [2] - 73:5, 73:11
**graduates** [2] - 32:16, 32:17
**grant** [18] - 19:18, 41:1, 41:5, 51:18, 52:12, 52:16, 59:18, 68:2, 71:12, 80:9, 95:22, 99:16, 99:20, 108:3, 109:7, 118:19, 118:21, 119:23
**granted** [18] - 21:14, 32:9, 38:4, 51:20, 52:2, 55:17, 64:16, 64:18, 78:1, 80:13, 83:7, 94:18, 94:19, 96:16, 98:3, 106:11, 108:6, 109:3
**granting** [2] - 70:12, 91:5
**grants** [10] - 41:4, 68:17, 71:7, 98:20, 118:13, 118:14, 118:20, 118:25, 126:1
**grapples** [1] - 92:11
**Gray** [1] - 2:4
**great** [4] - 13:2, 100:20, 117:7, 128:1
**greater** [2] - 47:6, 90:3
**grew** [2] - 73:5, 73:10
**ground** [6] - 78:14, 79:6, 80:2, 80:22, 82:14, 114:7
**group** [2] - 72:4, 107:14
**guidance** [1] - 55:4
**guided** [1] - 72:3
**guys** [2] - 4:6, 4:13

## H

**half** [1] - 77:7
**Hallward** [6] - 6:9, 18:9, 18:22, 19:21, 19:22, 33:20
**HALLWARD** [42] - 2:4, 19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 48:19, 49:15
**Hallward-Driemeier** [4] - 6:9, 18:9, 19:22, 33:20
**HALLWARD-DRIEMEIER** [42] - 2:4,

19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 48:19, 49:15
**hand** [2] - 69:9, 69:10
**handbook** [1] - 98:18
**handbooks** [1] - 64:25
**handed** [1] - 120:7
**handle** [2] - 33:14, 76:14
**handled** [1] - 110:24
**hands** [2] - 104:24, 118:5
**HANEN** [1] - 1:10
**hang** [1] - 67:13
**happy** [4] - 20:3, 81:19, 85:9, 104:25
**hard** [4] - 20:1, 61:25, 111:2, 124:4
**harm** [11] - 28:21, 28:24, 29:6, 37:20, 37:23, 37:25, 38:1, 39:15, 45:11, 46:24, 125:3
**Harvard** [1] - 73:10
**hat** [1] - 91:13
**Hathaway** [1] - 8:19
**hats** [1] - 67:13
**Hayward** [1] - 19:21
**health** [11] - 20:14, 21:22, 22:8, 24:3, 29:12, 30:17, 32:18, 42:2, 42:8, 42:19, 42:22
**hear** [7] - 6:12, 61:9, 74:20, 75:10, 85:23, 93:6, 111:15
**HEARD** [1] - 1:10
**heard** [6] - 28:14, 35:14, 39:17, 41:2, 46:16, 105:13
**hearing** [4] - 3:11, 3:19, 5:10, 53:5
**held** [3] - 50:24, 51:9, 80:8
**help** [5] - 11:4, 77:16, 81:10, 95:1, 119:16
**helpful** [5] - 34:8, 58:23, 78:12, 86:18, 89:23
**helpfully** [1] - 101:5
**helping** [1] - 10:24
**helps** [5] - 35:4, 36:25, 72:25, 80:24, 85:5
**hereby** [1] - 129:3
**hide** [1] - 99:6
**high** [2] - 66:11, 96:10
**highlight** [1] - 89:4
**highlighted** [1] - 124:24
**highly** [2] - 14:4, 14:14
**himself** [1] - 50:13
**hire** [1] - 10:19
**hired** [5] - 17:10, 17:12, 36:1, 36:2, 36:5
**hiring** [7] - 7:23, 8:4, 8:7, 8:12, 10:5, 11:6, 36:4
**history** [5] - 31:21, 55:11, 79:11, 97:5, 119:10
**hit** [2] - 104:24, 125:7

**hold** [2] - 58:9, 58:12
**holding** [1] - 28:3
**holiday** [2] - 3:23, 128:8
**holidays** [1] - 128:5
**Homeland** [2] - 58:18, 101:23
**homes** [1] - 113:19
**Honor** [127] - 6:9, 6:16, 6:18, 6:24, 9:25, 10:7, 10:11, 10:21, 12:23, 15:11, 16:3, 16:12, 18:11, 18:18, 19:2, 19:3, 19:7, 20:24, 21:3, 22:24, 23:17, 24:14, 25:7, 25:14, 25:17, 25:24, 26:12, 26:25, 27:21, 28:12, 31:15, 31:20, 33:11, 33:18, 34:8, 35:14, 37:25, 38:7, 38:10, 38:23, 39:24, 41:19, 42:9, 43:7, 44:5, 45:4, 45:18, 46:13, 47:18, 48:5, 48:19, 49:5, 50:7, 51:16, 52:9, 52:10, 52:24, 54:22, 55:7, 56:11, 56:12, 57:1, 57:14, 58:23, 59:20, 60:20, 61:20, 62:9, 62:18, 63:21, 63:22, 64:5, 64:14, 65:16, 66:4, 66:18, 66:25, 67:6, 67:16, 68:6, 71:20, 72:15, 74:2, 79:9, 80:20, 81:6, 81:17, 83:1, 84:13, 84:15, 91:23, 93:6, 99:13, 101:4, 101:9, 101:11, 101:16, 101:21, 101:22, 102:2, 102:5, 102:10, 102:24, 103:8, 103:25, 104:12, 104:22, 104:25, 105:21, 108:14, 109:16, 114:24, 114:25, 115:18, 119:20, 119:21, 119:22, 120:4, 120:9, 121:4, 122:6, 122:11, 123:14, 123:16, 124:12, 125:16, 126:18
**Honor's** [8] - 28:2, 28:5, 65:17, 67:17, 94:25, 118:12, 122:3, 123:22
**HONORABLE** [1] - 1:10
**hook** [2] - 34:25, 44:20
**hooks** [1] - 67:13
**hope** [2] - 16:5, 16:11
**hopefully** [2] - 33:20, 80:19
**hoping** [2] - 28:14, 28:15
**hostility** [1] - 91:5
**hour** [1] - 7:16
**hours** [1] - 83:17
**housekeeping** [1] - 3:7
**HOUSTON** [1] - 1:5
**Houston** [4] - 2:15, 2:20, 73:5, 73:10
**Hu** [2] - 18:25, 101:19
**HU** [1] - 2:13
**Hudson** [1] - 13:1
**HUDSON** [1] - 1:17
**huge** [1] - 87:22
**Hughes** [1] - 2:8
**humanitarian** [1] - 97:14
**hurdle** [1] - 89:8
**hurt** [1] - 36:9
**husband** [2] - 69:20, 69:21
**hypothesized** [1] - 123:24
**hypothetical** [7] - 36:16, 73:21, 87:10, 93:17, 115:22, 119:21, 124:7
**hypothetically** [3] - 24:23, 62:4, 109:14

**I**

**I-821D** [1] - 59:16
**ID** [1] - 77:15
**idea** [11] - 11:23, 15:14, 24:2, 24:5, 25:15, 46:14, 46:16, 60:21, 107:17, 121:18, 126:6
**identified** [11] - 23:25, 28:21, 33:20, 60:4, 87:7, 90:23, 94:1, 112:14, 114:3, 114:15, 122:10
**identify** [1] - 73:18
**identifying** [1] - 98:6
**ignore** [2] - 50:16, 100:5
**Ill** [1] - 45:23
**Ike** [3] - 13:17, 13:18, 13:19
**illegal** [10] - 5:13, 5:25, 11:6, 22:16, 27:9, 58:12, 71:13, 71:17
**illegality** [1] - 114:9
**illegally** [8] - 5:6, 10:18, 15:21, 64:4, 64:8, 64:11, 64:17, 105:9
**illuminate** [4] - 72:25, 77:16, 81:10, 101:5
**illuminating** [1] - 78:12
**illustrates** [1] - 95:9
**illustrative** [6] - 77:3, 89:25, 91:6, 95:1, 112:19, 112:23
**imagine** [4] - 83:8, 86:19, 86:20, 115:11
**immediate** [2] - 113:22, 124:9
**immediately** [5] - 16:21, 76:11, 89:6, 98:7, 113:2
**immigrant** [5] - 5:14, 5:24, 5:25, 9:6, 73:6
**immigrants** [7] - 7:18, 9:7, 11:19, 22:17, 22:18, 23:3
**immigration** [23] - 4:24, 5:19, 16:18, 27:8, 27:13, 34:19, 41:8, 41:11, 50:15, 51:5, 51:24, 52:8, 54:3, 55:9, 69:5, 69:9, 70:2, 70:9, 70:12, 102:8, 106:3, 111:3, 111:5
**immunity** [1] - 109:1
**impact** [1] - 7:17
**impacted** [1] - 103:19
**impacting** [1] - 103:16
**impermissible** [1] - 51:1
**implement** [5] - 79:2, 98:24, 103:10, 103:22, 125:10
**implementation** [8] - 17:23, 78:10, 78:13, 100:4, 100:15, 100:16, 100:20, 100:21
**implemented** [14] - 75:14, 78:15, 78:17, 80:2, 80:22, 82:14, 83:22, 83:25, 103:20, 107:18, 107:21, 125:6, 125:9, 125:12
**implementing** [6] - 74:20, 79:12, 79:17, 79:18, 81:1, 98:17
**import** [1] - 61:16
**important** [5] - 84:2, 114:10, 121:23, 122:7, 125:8
**importantly** [3] - 7:20, 8:14, 59:14

**impose** [1] - 43:21
**impossible** [4] - 24:8, 24:11, 83:16, 83:18
**INA** [17] - 15:9, 15:25, 22:21, 61:7, 69:6, 69:9, 70:4, 70:13, 70:17, 70:20, 87:8, 87:13, 89:2, 99:23, 104:14, 104:20
**inauguration** [1] - 75:11
**inception** [1] - 108:22
**included** [4] - 21:13, 66:21, 88:1, 113:16
**including** [8] - 29:11, 55:12, 77:23, 81:9, 82:14, 100:19, 102:9, 112:9
**inconsistent** [3] - 61:7, 70:19, 122:2
**incorporate** [1] - 20:5
**incorrect** [2] - 9:9, 27:11
**increase** [4] - 13:23, 43:18, 90:20, 91:4
**incredibly** [2] - 78:11, 89:25
**incurring** [1] - 32:21
**indeed** [1] - 41:14
**independent** [2] - 9:16, 10:22
**indicated** [1] - 49:8
**indirect** [1] - 21:25
**indisputable** [1] - 15:14
**individual** [21] - 22:9, 58:25, 59:22, 60:1, 61:15, 63:18, 63:24, 64:10, 64:20, 67:8, 67:10, 69:10, 69:19, 71:7, 87:3, 93:2, 93:19, 95:20, 96:11, 107:8, 113:11
**individualized** [3] - 73:12, 73:22, 86:21
**individually** [1] - 67:24
**individuals** [27] - 26:15, 26:18, 30:10, 30:12, 31:9, 31:12, 31:22, 32:15, 34:18, 37:10, 40:23, 40:24, 42:24, 45:18, 53:6, 55:17, 66:2, 91:2, 91:10, 91:11, 96:16, 106:17, 106:18, 113:18, 123:25, 124:14
**individuals'** [1] - 24:24
**industry** [1] - 113:14
**inexorably** [1] - 106:23
**inferred** [1] - 102:7
**infinite** [3] - 72:20, 72:22, 73:21
**information** [11] - 11:14, 11:15, 16:25, 17:18, 82:13, 82:19, 83:11, 91:19, 124:15
**infuses** [1] - 85:17
**inherent** [1] - 83:22
**initial** [5] - 80:8, 80:12, 90:23, 121:6, 126:1
**injunction** [25] - 14:20, 20:10, 34:2, 38:14, 40:5, 43:23, 47:23, 48:6, 56:22, 65:17, 71:1, 84:6, 100:8, 102:16, 103:13, 108:10, 111:1, 111:6, 113:6, 113:22, 116:22, 117:1, 117:12, 117:16, 122:4
**injunctions** [2] - 48:7, 110:13
**injunctive** [3] - 78:7, 78:16, 90:12
**injury** [18] - 29:3, 29:25, 30:6, 36:15, 36:17, 36:19, 36:21, 37:2, 37:21, 38:16,

39:14, 39:21, 41:15, 42:16, 42:17, 46:1, 47:14
  **inquiry** [3] - 36:3, 44:7, 44:10
  **inspection** [1] - 64:13
  **instance** [16] - 4:10, 8:15, 28:25, 30:1, 41:22, 87:4, 114:19, 117:11, 118:3, 119:3, 119:13, 122:17, 122:21, 123:7, 126:24, 127:20
  **instances** [3] - 91:10, 121:14, 126:12
  **instant** [1] - 100:1
  **instead** [10] - 17:10, 40:25, 42:4, 82:16, 83:12, 88:7, 93:8, 94:19, 113:3, 121:20
  **instituted** [2] - 54:21, 57:9
  **instruct** [1] - 90:8
  **instructed** [1] - 120:18
  **instructive** [2] - 97:9, 98:2
  **insufficient** [1] - 34:3
  **insurance** [2] - 42:15
  **intended** [1] - 102:9
  **intends** [1] - 120:9
  **interaction** [1] - 7:22
  **interest** [3] - 30:9, 40:14, 125:23
  **interesting** [1] - 36:7
  **interests** [12] - 40:15, 49:19, 114:7, 119:16, 120:7, 123:2, 123:21, 124:17, 126:4, 126:9, 127:5, 127:22
  **interim** [2] - 109:21, 112:16
  **internal** [2] - 89:11, 89:16
  **interpretation** [1] - 46:9
  **interrogatory** [3] - 53:3, 83:12
  **intersect** [1] - 80:21
  **intervene** [1] - 40:14
  **intervenor** [3] - 18:19, 36:18, 90:22
  **INTERVENOR** [2] - 2:1, 2:7
  **Intervenors** [2] - 6:21, 14:2
  **intervenors** [17] - 7:1, 13:16, 14:7, 18:4, 33:16, 34:5, 38:24, 39:23, 41:2, 55:8, 75:25, 81:18, 105:13, 109:7, 109:12, 115:20, 127:6
  **intervenors'** [11] - 6:4, 6:10, 12:10, 14:23, 17:4, 17:6, 22:15, 38:3, 40:6, 53:2, 54:22
  **intimately** [1] - 86:9
  **introduce** [1] - 6:19
  **introduced** [1] - 39:23
  **introduction** [1] - 12:25
  **invalidate** [3] - 63:1, 63:2, 63:16
  **inventor** [1] - 93:16
  **invested** [1] - 28:19
  **invitation** [1] - 58:2
  **invited** [2] - 57:25, 120:16
  **involuntarily** [1] - 16:2
  **involve** [1] - 114:10
  **involved** [3] - 23:16, 86:24, 88:6
  **involves** [1] - 89:18
  **involving** [1] - 99:23
  **irrelevant** [2] - 7:7, 8:22
  **issuance** [1] - 69:23

  **issue** [20] - 11:11, 15:2, 19:7, 20:7, 20:9, 20:16, 33:18, 35:25, 44:12, 59:7, 60:9, 63:3, 64:1, 68:1, 72:25, 76:8, 86:2, 88:5, 97:12, 121:19
  **issued** [10] - 48:12, 50:19, 50:20, 106:14, 106:15, 108:17, 111:1, 111:7, 120:15, 126:21
  **issues** [15] - 5:1, 33:8, 38:12, 75:16, 75:19, 77:16, 77:20, 77:25, 80:3, 99:22, 101:5, 103:9, 120:10, 120:17, 125:11
  **issuing** [1] - 120:14
  **itself** [27] - 8:21, 14:18, 31:5, 37:5, 37:16, 37:22, 60:24, 74:7, 80:15, 86:9, 86:15, 87:21, 88:15, 88:16, 91:14, 93:4, 95:12, 96:5, 97:2, 97:20, 98:3, 98:8, 107:4, 108:12, 111:17, 121:21, 121:22

### J

  **January** [2] - 3:11, 128:3
  **Jeon** [2] - 6:22, 73:9
  **JEREMY** [1] - 2:7
  **JERSEY** [1] - 2:7
  **Jersey** [21] - 2:8, 2:9, 3:9, 5:12, 14:2, 18:19, 35:12, 40:9, 40:13, 74:1, 74:3, 75:24, 81:18, 83:13, 113:3, 113:14, 113:15, 115:19, 124:19, 127:5
  **Jersey's** [1] - 40:8
  **job** [7] - 15:25, 17:13, 30:12, 35:21, 35:24, 46:19
  **jobs** [1] - 17:19
  **JOHN** [1] - 2:11
  **joined** [1] - 54:8
  **joining** [1] - 48:2
  **joint** [1] - 10:14
  **Jonathan** [1] - 117:15
  **JUDGE** [1] - 1:11
  **Judge** [1] - 120:2
  **judges** [3] - 58:10, 58:13, 110:24
  **judgment** [47] - 6:3, 6:7, 6:10, 6:13, 7:5, 7:10, 12:5, 12:6, 12:14, 13:7, 13:8, 14:25, 16:6, 18:15, 32:6, 33:7, 33:8, 34:4, 40:7, 44:13, 44:16, 47:13, 47:16, 49:3, 58:1, 68:2, 74:6, 74:9, 76:1, 76:8, 81:10, 82:18, 83:14, 84:16, 85:4, 85:7, 85:8, 89:8, 99:18, 107:6, 109:3, 109:7, 110:8, 113:10, 113:17, 116:17, 128:2
  **judicial** [1] - 106:5
  **judicially** [1] - 38:25
  **judiciary** [1] - 23:8
  **judiciously** [1] - 86:3
  **July** [1] - 102:13
  **jump** [1] - 27:22
  **June** [2] - 72:10
  **jurisdictional** [1] - 44:6
  **jury** [1] - 128:3
  **Justice** [15] - 1:21, 2:8, 2:11, 54:2, 54:8, 54:9, 54:10, 77:12, 94:3, 94:7, 105:24, 106:14, 106:20
  **justice** [1] - 71:23

  **justices** [3] - 87:25, 88:1, 105:22

### K

  **Karla** [1] - 73:4
  **KARLA** [1] - 2:2
  **keep** [2] - 4:3, 72:8
  **keeps** [1] - 37:19
  **kind** [13] - 9:20, 37:22, 38:1, 41:23, 46:15, 55:25, 62:13, 65:14, 85:21, 90:1, 103:18, 109:10, 118:15
  **knock** [2] - 63:6, 63:7
  **knows** [3] - 5:5, 53:17, 73:17
  **Ku** [1] - 17:21

### L

  **LA** [1] - 1:22
  **labor** [2] - 7:18, 8:25
  **lack** [9] - 11:1, 31:24, 34:14, 37:6, 40:12, 75:19, 75:20, 79:5, 81:3
  **lacking** [1] - 16:18
  **laid** [3] - 13:18, 15:25, 48:11
  **language** [4] - 88:11, 88:14, 100:5, 110:15
  **Lanie** [3] - 2:17, 129:2, 129:6
  **large** [1] - 79:4
  **last** [15] - 15:21, 37:17, 49:5, 70:21, 73:14, 125:1, 125:7, 125:17, 125:19, 125:23
  **Law** [3] - 55:10, 73:6, 112:1
  **law** [28] - 4:24, 4:25, 10:4, 10:16, 11:6, 14:21, 31:14, 34:18, 34:20, 34:23, 34:24, 35:2, 43:6, 46:12, 50:9, 57:5, 77:15, 90:13, 97:15, 101:1, 103:2, 104:13, 110:11, 111:3, 111:5, 115:1, 117:14, 122:2
  **lawful** [24] - 16:13, 22:9, 33:22, 41:1, 41:4, 42:21, 48:21, 49:21, 51:21, 51:22, 51:23, 52:12, 52:13, 70:3, 70:5, 70:9, 71:7, 72:18, 73:23, 105:19, 106:21, 126:20
  **lawfully** [9] - 13:20, 13:22, 14:12, 25:3, 27:3, 42:25, 43:1, 106:18, 107:11
  **lawfulness** [1] - 73:20, 76:24, 82:12
  **lawns** [1] - 9:17
  **LAWRENCE** [1] - 1:14
  **laws** [7] - 5:19, 27:8, 50:14, 50:22, 53:25, 54:3, 56:6
  **lawsuit** [3] - 56:3, 56:17, 108:16
  **lawsuits** [1] - 68:13
  **lawyer** [1] - 105:13
  **lawyers** [6] - 3:17, 5:10, 5:11, 5:12, 36:24
  **lead** [7] - 6:8, 6:17, 56:19, 97:6, 98:7, 105:12, 111:21
  **leadership** [3] - 77:11, 77:12, 90:4
  **leads** [2] - 62:14, 94:11
  **least** [15] - 3:20, 4:13, 13:24, 15:7, 15:21, 18:13, 26:10, 26:19, 33:6, 44:14,

47:15, 56:9, 91:10, 102:8, 110:18
**leave** [10] - 9:4, 9:7, 14:5, 14:15, 15:15, 16:24, 64:12, 119:5, 126:16
**leaving** [2] - 17:1
**led** [1] - 74:18
**left** [5] - 52:6, 70:22, 88:25, 103:13, 104:4
**legal** [20] - 9:23, 10:2, 16:10, 16:12, 26:9, 35:10, 56:21, 57:24, 60:23, 69:3, 69:4, 73:1, 77:25, 85:7, 85:8, 87:7, 87:11, 94:1, 103:2, 120:15
**legality** [2] - 102:3, 104:16
**legally** [1] - 4:21
**legislative** [4] - 54:5, 54:12, 54:19, 55:1
**length** [2] - 30:23, 124:13
**less** [5] - 32:12, 48:6, 49:2, 78:16, 126:5
**lessen** [1] - 25:19
**lessens** [1] - 25:20
**lesser** [1] - 115:20
**letter** [1] - 14:21
**letting** [1] - 3:15
**license** [2] - 20:14, 48:23
**licenses** [1] - 20:18
**lie** [1] - 100:6
**life** [1] - 97:15
**life-saving** [1] - 97:15
**light** [3] - 79:18, 101:25, 115:4
**likelihood** [2] - 11:15, 17:1
**likely** [12] - 14:4, 14:5, 14:15, 15:12, 32:12, 32:16, 33:4, 33:25, 84:8, 104:14, 104:17, 119:10
**likewise** [2] - 51:8, 54:22
**limb** [1] - 115:5
**limit** [1] - 104:7
**limited** [7] - 15:13, 40:22, 72:4, 120:11, 120:25, 127:6, 127:21
**limiting** [1] - 52:11
**line** [2] - 73:16, 97:25
**lines** [1] - 3:14
**link** [1] - 99:14
**linked** [1] - 37:4
**listen** [1] - 3:14
**literally** [1] - 29:1
**litigate** [1] - 30:2
**litigation** [16] - 17:3, 20:20, 21:14, 21:20, 21:23, 24:20, 26:13, 28:22, 41:25, 75:6, 76:20, 77:1, 99:8, 100:1, 117:5, 119:11
**live** [1] - 97:12
**lived** [3] - 80:2, 80:6, 81:9
**lives** [1] - 113:11
**Lloyd** [2] - 7:4, 9:3
**LLP** [1] - 2:4
**local** [2] - 60:23, 113:13
**logic** [2] - 54:18, 110:7
**long-existing** [1] - 59:12
**long-standing** [1] - 125:1

**look** [12] - 29:5, 73:21, 73:22, 78:12, 78:13, 83:10, 88:7, 96:13, 98:11, 100:16, 107:21, 120:12
**looked** [1] - 15:21
**looking** [6] - 4:16, 59:15, 90:25, 100:10, 102:22, 104:4
**Lopez** [1] - 24:3
**lose** [11] - 9:5, 9:13, 16:16, 30:12, 42:1, 42:2, 42:15, 55:3, 55:5, 91:25, 92:16
**loss** [4] - 29:22, 30:19, 32:24, 42:10
**lost** [3] - 9:11, 11:16, 31:9
**loudly** [1] - 4:14
**Louisiana** [4] - 1:21, 2:14, 13:2, 119:25
**low** [1] - 17:19
**low-skill** [1] - 17:19
**lowering** [1] - 102:23
**lying** [1] - 90:17

## M

**magnitude** [1] - 56:8
**main** [1] - 99:4
**maintain** [2] - 124:11, 126:10
**majority** [12] - 28:6, 33:16, 51:6, 51:9, 54:9, 54:11, 54:14, 58:10, 58:15, 67:19, 88:1, 88:4
**MALDEF** [2] - 2:1, 6:20
**managers** [1] - 8:5
**mandate** [1] - 14:21
**mandated** [1] - 116:19
**mandates** [2] - 41:14, 50:17
**manifestly** [1] - 104:19
**map** [1] - 20:13
**margin** [1] - 53:12
**Maria** [1] - 73:14
**Market** [1] - 2:9
**market** [2] - 7:18, 8:25
**mask** [3] - 4:5, 57:15
**Massachusetts** [9] - 20:13, 20:16, 27:25, 28:2, 28:8, 28:24, 44:20, 44:25, 46:21
**material** [3] - 18:14, 58:5, 92:5
**materially** [3] - 38:18, 75:9, 77:20
**materials** [2] - 90:7, 90:17
**matter** [11] - 31:14, 33:24, 36:4, 37:7, 57:5, 76:13, 84:24, 92:9, 98:6, 104:13, 129:4
**matters** [3] - 32:10, 78:8, 92:10
**maximally** [1] - 97:10
**mean** [32] - 4:21, 5:3, 15:9, 15:19, 15:23, 16:20, 23:14, 25:21, 26:23, 27:9, 28:14, 36:13, 43:6, 46:20, 58:8, 58:10, 59:13, 61:2, 62:12, 62:19, 68:24, 69:7, 87:15, 93:22, 94:5, 96:17, 96:20, 106:17, 111:2, 111:9, 111:18, 121:21
**meaning** [2] - 105:11, 107:21
**means** [8] - 30:19, 77:23, 83:16, 83:18, 94:1, 110:7, 114:7, 118:4

**meant** [2] - 88:5, 124:3
**meantime** [2] - 112:7, 123:20
**measure** [1] - 119:12
**measured** [1] - 128:2
**mechanical** [1] - 1:24
**medical** [2] - 87:9, 113:14
**Medicare** [1] - 102:9
**meet** [5] - 18:12, 37:9, 82:22, 83:5, 83:6
**meeting** [1] - 97:14
**meier** [1] - 19:24
**members** [3] - 10:1, 14:13, 107:16
**memo** [57] - 48:12, 50:21, 54:21, 57:9, 74:14, 78:22, 79:23, 81:1, 86:20, 87:7, 87:12, 87:13, 87:19, 88:16, 90:6, 95:12, 95:21, 96:16, 96:18, 96:22, 97:17, 97:19, 98:3, 98:4, 98:8, 98:16, 98:17, 100:5, 100:11, 102:13, 102:18, 103:11, 103:13, 103:14, 103:15, 103:20, 103:21, 104:3, 104:4, 104:9, 106:14, 106:15, 107:3, 108:13, 109:21, 110:9, 110:14, 110:16, 111:18, 114:1, 116:16, 119:13, 122:5, 123:12, 127:13
**memorandum** [18] - 50:11, 50:20, 52:4, 72:3, 74:11, 80:14, 80:16, 106:1, 108:18, 108:20, 109:3, 110:4, 116:8, 117:1, 117:9, 118:1, 118:4, 118:11
**memos** [12] - 48:10, 49:7, 74:15, 79:3, 79:8, 79:10, 80:21, 89:24, 97:9, 98:1, 103:19, 113:2
**mention** [4] - 5:9, 52:18, 56:12, 56:24
**mere** [1] - 51:18
**merely** [2] - 91:16, 117:18
**merit** [1] - 85:9
**merited** [1] - 94:15
**merits** [19] - 6:2, 40:11, 44:2, 44:4, 44:7, 44:9, 50:6, 57:20, 58:1, 74:6, 75:24, 82:17, 84:9, 84:11, 84:12, 89:20, 98:1, 101:2, 117:5
**met** [1] - 82:23
**methodology** [2] - 9:1, 32:3
**methods** [1] - 7:10
**Mexico** [1] - 111:5
**microphone** [1] - 4:11
**microphones** [1] - 4:8
**might** [16] - 6:12, 11:23, 32:16, 32:19, 36:20, 39:17, 49:20, 76:5, 78:15, 86:17, 87:2, 88:12, 95:1, 95:6, 112:17, 121:11
**million** [8] - 23:2, 40:3, 47:3, 51:22, 52:14, 63:7, 65:14, 71:18
**mind** [1] - 37:19
**minus** [1] - 53:11
**minute** [4] - 22:14, 62:2, 71:6, 109:11
**minutes** [1] - 101:14
**missed** [1] - 10:9
**missing** [3] - 10:8, 19:24, 57:21
**Mission** [1] - 73:15
**mistakes** [1] - 7:11
**misunderstanding** [1] - 110:18
**Mitchell** [1] - 117:15

**mixed** [1] - 3:12
**modification** [2] - 39:6, 39:9
**modifications** [1] - 39:4
**modify** [1] - 36:25
**moment** [4] - 70:8, 74:21, 81:9, 104:23
**money** [8] - 9:17, 22:23, 23:9, 27:18, 34:7, 34:18, 34:22, 35:9
**month** [2] - 80:23, 85:5
**mootness** [1] - 74:25
**moreover** [1] - 22:1
**morning** [4] - 3:4, 69:20, 79:9, 110:2
**most** [9] - 8:14, 16:16, 24:21, 27:23, 52:10, 62:22, 109:21, 111:2, 125:8
**motion** [44] - 3:10, 6:4, 6:6, 6:10, 6:12, 6:13, 7:5, 12:3, 12:5, 12:6, 12:12, 13:4, 13:6, 13:7, 13:10, 13:19, 14:19, 14:25, 15:2, 16:6, 18:20, 18:22, 18:23, 21:14, 33:17, 37:16, 37:17, 38:3, 40:6, 43:25, 44:1, 44:12, 48:5, 50:6, 52:25, 74:6, 74:7, 74:9, 75:24, 107:5, 109:3
**MOTION** [1] - 1:10
**motions** [1] - 6:3
**mouthful** [1] - 19:23
**movants** [1] - 47:12
**move** [7] - 58:4, 60:13, 67:23, 70:10, 71:9, 72:10, 89:6
**moved** [2] - 65:17, 76:20
**moving** [5] - 67:2, 74:17, 76:15, 76:18, 78:24
**mow** [1] - 9:17
**MR** [105] - 1:14, 1:17, 2:7, 2:11, 2:13, 12:23, 15:11, 18:18, 19:2, 19:15, 19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 33:11, 33:14, 36:13, 36:24, 38:7, 38:10, 38:23, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 47:18, 48:19, 49:15, 50:7, 51:16, 52:24, 57:5, 74:2, 78:6, 81:15, 82:7, 84:9, 84:13, 85:24, 88:20, 92:10, 93:6, 93:10, 94:6, 95:5, 96:19, 97:19, 99:2, 99:11, 101:11, 101:16, 101:21, 102:24, 103:25, 104:2, 104:25, 109:16, 109:24, 111:19, 112:1, 112:5, 115:16, 115:18, 116:4, 116:6, 119:20, 120:3, 121:4, 123:14, 124:24, 125:13, 125:16, 125:18, 125:22
**MS** [55] - 1:20, 2:1, 6:9, 6:16, 6:18, 6:24, 9:24, 10:6, 10:11, 10:20, 10:24, 11:7, 11:9, 16:3, 16:11, 57:14, 57:17, 58:15, 58:22, 59:2, 59:6, 59:20, 60:1, 60:7, 61:5, 61:10, 61:20, 62:8, 62:17, 62:21, 63:8, 63:11, 64:5, 64:9, 64:13, 64:19, 65:2, 65:16, 65:22, 65:25, 66:11, 66:18, 66:23, 67:3, 68:5, 68:8, 69:8, 69:17, 71:14, 71:19, 72:2, 72:11, 72:15, 72:17, 120:1
**Munoz** [3] - 7:8, 7:9, 7:14

**MURRILL** [2] - 1:20, 120:1
**Murrill** [1] - 13:1
**must** [12] - 48:4, 49:18, 52:1, 52:17, 54:9, 54:13, 55:22, 56:4, 56:8, 56:23, 57:7, 92:15

# N

**name** [1] - 6:22
**named** [1] - 55:9
**Napolitano** [9] - 97:7, 100:5, 103:11, 103:14, 103:15, 103:20, 103:21, 104:9, 123:12
**Napolitano's** [2] - 96:16, 111:18
**national** [1] - 97:16
**nationwide** [5] - 110:12, 110:16, 110:20, 111:1, 111:12
**nature** [2] - 45:14, 98:2
**necessarily** [5] - 9:12, 81:4, 87:13, 92:20, 111:17
**necessary** [2] - 12:18, 125:3
**necessity** [3] - 23:6, 95:18, 95:25
**need** [13] - 13:10, 15:1, 37:4, 38:15, 57:22, 58:2, 60:18, 94:20, 96:10, 96:12, 98:4, 98:11, 100:16, 108:11, 120:13, 120:21
**needing** [1] - 97:14
**needs** [9] - 83:15, 83:18, 90:14, 101:2, 107:21, 109:11, 114:6, 122:14, 124:17
**neighbor** [2] - 89:13, 89:15
**Neufeld** [1] - 89:17
**never** [19] - 14:7, 14:9, 30:3, 30:14, 34:21, 46:1, 46:6, 46:16, 47:11, 56:12, 60:18, 72:1, 97:2, 98:15, 99:6, 107:20, 110:8, 116:23, 117:23
**nevertheless** [10] - 77:8, 77:10, 77:19, 80:8, 82:24, 86:4, 86:5, 86:13, 87:18, 121:23
**NEW** [1] - 2:7
**new** [10] - 56:17, 79:23, 90:7, 90:17, 97:2, 112:1, 113:10, 118:19, 118:20
**New** [29] - 2:8, 2:9, 3:9, 5:12, 14:2, 18:19, 35:12, 40:8, 40:9, 40:13, 48:9, 56:16, 74:1, 74:3, 75:24, 81:18, 83:13, 102:14, 103:12, 104:1, 104:2, 111:5, 113:13, 113:14, 113:15, 115:19, 124:19, 127:5
**newspapers** [1] - 5:3
**next** [3] - 101:24, 118:21, 125:11
**nice** [2] - 120:1, 125:22
**nicely** [1] - 79:4
**NINA** [1] - 2:1
**nine** [2] - 58:13, 105:22
**nobody** [1] - 52:9
**non** [2] - 8:11, 17:19
**non-DACA** [2] - 8:11, 17:19
**none** [1] - 101:7
**nonenforcement** [5] - 51:4, 102:6, 105:25, 106:2, 106:7
**nonprofit** [1] - 73:7

**normal** [4] - 76:14, 78:21, 115:3, 122:20
**normally** [1] - 126:13
**North** [1] - 1:21
**nose** [1] - 30:2
**notable** [1] - 79:13
**note** [9] - 21:16, 21:23, 40:9, 48:17, 70:7, 88:1, 113:8, 122:9, 125:24
**noted** [11] - 19:10, 21:25, 22:25, 25:15, 38:15, 44:1, 66:25, 76:19, 81:18, 113:24, 124:12
**notes** [1] - 29:9
**nothing** [11] - 54:15, 55:4, 57:1, 57:8, 68:25, 80:16, 86:22, 90:2, 90:16, 92:21, 108:18
**notice** [27] - 54:7, 54:13, 54:19, 55:25, 56:9, 62:6, 62:7, 62:8, 86:4, 86:10, 86:16, 87:14, 87:20, 88:6, 94:16, 94:17, 94:20, 96:9, 96:11, 96:12, 96:20, 116:2, 123:13, 123:17, 123:24, 124:10, 126:21
**noting** [1] - 49:19
**notion** [2] - 28:20, 45:2
**novel** [1] - 46:2
**November** [2] - 76:21, 105:5
**NTA** [2] - 69:21, 69:24
**Number** [2] - 105:5, 107:7
**number** [26] - 5:7, 11:24, 24:5, 27:3, 37:24, 42:14, 66:1, 66:7, 66:16, 66:18, 66:19, 67:4, 70:23, 71:5, 71:6, 72:4, 72:20, 72:23, 73:22, 81:6, 91:14, 102:9, 111:11, 116:20, 124:14
**numbered** [1] - 129:4
**numbers** [3] - 66:1, 66:5, 71:10
**nurse** [1] - 73:15
**NW** [1] - 2:5

# O

**Obama** [7] - 50:10, 50:12, 50:23, 53:19, 78:2, 108:16
**object** [1] - 47:20
**objection** [1] - 6:5
**objections** [1] - 12:4
**obtain** [3] - 43:2, 93:24, 93:25
**obvious** [1] - 94:13
**obviously** [16] - 13:6, 36:14, 74:8, 85:4, 87:3, 87:10, 87:24, 88:2, 92:14, 92:15, 109:1, 110:11, 110:19, 114:1, 123:20
**odd** [1] - 40:13
**oddity** [1] - 44:8
**OF** [5] - 1:1, 1:4, 1:7, 1:10, 2:7
**offend** [1] - 94:23
**offer** [1] - 7:18
**offered** [2] - 13:17, 126:7
**Office** [3] - 1:14, 2:7, 2:14
**office** [2] - 1:20, 13:1
**OFFICER** [1] - 128:9
**officer** [1] - 75:17
**officers** [1] - 98:10

**official** [1] - 69:24
**Official** [4] - 2:17, 2:17, 129:2, 129:6
**officially** [1] - 55:16
**often** [5] - 17:17, 75:2, 76:7, 85:4, 91:20
**once** [7] - 14:7, 14:9, 63:4, 89:20, 107:20, 110:8, 125:11
**one** [70] - 3:10, 4:1, 5:9, 5:17, 6:21, 9:9, 11:24, 16:24, 17:11, 18:5, 19:23, 22:22, 29:23, 31:8, 31:25, 32:1, 32:9, 35:13, 35:18, 37:21, 38:25, 41:20, 47:18, 47:21, 49:9, 56:11, 58:4, 60:19, 67:10, 68:9, 68:10, 69:8, 71:16, 71:22, 74:18, 77:9, 77:11, 81:8, 82:4, 82:10, 83:1, 83:8, 85:9, 88:2, 93:1, 93:3, 93:13, 93:14, 93:20, 94:13, 95:22, 95:23, 96:13, 97:14, 99:5, 100:23, 110:4, 111:7, 111:11, 112:19, 118:10, 123:18, 124:9, 125:22, 125:23
**one-off** [9] - 93:3, 93:13, 93:14, 93:20, 94:13, 95:22, 96:13, 97:14, 100:23
**one-way** [2] - 38:25, 41:20
**ones** [6] - 24:16, 26:18, 32:17, 33:3, 102:18
**ongoing** [5] - 74:22, 77:6, 115:11, 124:2
**open** [3] - 64:10, 65:10, 94:7
**opening** [1] - 79:16
**operate** [1] - 92:12
**operating** [1] - 72:7
**operative** [1] - 110:4
**opine** [1] - 102:2
**opinion** [35] - 7:6, 11:22, 13:17, 28:2, 28:5, 28:15, 39:16, 39:17, 51:2, 51:6, 54:2, 54:10, 58:10, 58:20, 65:18, 71:1, 77:9, 78:11, 82:3, 82:7, 86:7, 86:8, 92:11, 93:1, 95:14, 102:3, 109:22, 113:7, 113:8, 113:25, 114:8, 115:4, 117:25, 122:3
**opinions** [3] - 9:6, 85:4, 87:25
**opportunity** [5] - 75:10, 115:1, 120:5, 123:5, 123:7
**opposed** [6] - 4:24, 21:1, 49:21, 64:6, 68:18, 77:19
**opposition** [1] - 83:14
**option** [4] - 112:9, 112:12, 123:15, 126:10
**options** [7] - 118:9, 122:10, 123:15, 123:18, 123:20, 124:9, 126:8
**oral** [1] - 6:12
**order** [30] - 3:2, 12:2, 30:2, 34:7, 35:23, 40:14, 47:23, 48:7, 48:25, 50:1, 50:16, 74:18, 76:6, 76:10, 79:18, 80:1, 80:5, 80:20, 83:24, 90:2, 103:24, 104:1, 104:2, 105:1, 109:2, 111:6, 111:17, 111:18, 112:17, 124:12
**orderly** [3] - 75:21, 118:16, 120:6
**originally** [1] - 108:6
**Orr** [1] - 7:8
**otherwise** [7] - 16:23, 52:22, 53:21,

54:14, 65:6, 73:3, 91:12
**ought** [2] - 5:16, 58:12
**outer** [2] - 28:5, 45:2
**outlined** [1] - 102:17
**outset** [1] - 19:3
**outside** [4] - 57:24, 68:16, 71:2, 71:8
**outstanding** [2] - 75:18, 81:2
**outweigh** [1] - 23:20
**overall** [2] - 17:22, 23:19
**overcome** [3] - 92:21, 92:23, 100:24
**override** [1] - 50:9
**overstayed** [2] - 15:20, 64:6
**overstepped** [1] - 108:16
**overturn** [1] - 68:15
**overwhelming** [1] - 100:22
**own** [16] - 9:15, 11:14, 13:15, 14:23, 20:5, 26:13, 27:8, 32:11, 46:12, 55:7, 56:3, 68:13, 104:18, 110:12, 118:22, 122:3
**owned** [2] - 9:16, 10:17
**owns** [1] - 9:24

## P

**page** [2] - 78:13, 88:8
**Page** [8] - 21:8, 21:16, 22:12, 31:1, 55:19, 55:22, 95:13, 105:5
**pages** [1] - 72:6
**Pages** [1] - 83:13
**pandemic** [1] - 73:16
**papers** [2] - 22:25, 69:3
**paraphrase** [1] - 61:25
**parcel** [3] - 81:25, 85:11, 96:4
**parens** [11] - 19:5, 20:15, 27:24, 28:20, 28:22, 28:23, 30:4, 30:5, 30:14, 46:3, 46:5
**parent** [1] - 113:20
**parents** [2] - 10:15, 99:24
**parlance** [2] - 5:21
**parole** [41] - 52:19, 53:8, 53:15, 56:18, 63:17, 63:20, 63:23, 64:1, 64:2, 64:7, 64:10, 64:15, 64:21, 64:22, 65:1, 65:2, 65:4, 67:14, 68:11, 68:17, 68:19, 79:5, 80:9, 80:13, 97:11, 98:4, 98:7, 98:9, 98:10, 98:11, 98:19, 105:2, 105:4, 105:8, 105:12, 118:20, 126:2
**part** [24] - 12:7, 16:14, 18:13, 19:24, 36:14, 44:6, 44:7, 44:9, 44:10, 60:19, 60:23, 73:23, 77:15, 79:4, 81:25, 84:2, 84:17, 84:23, 85:10, 96:4, 96:18, 113:19, 124:12
**particular** [15] - 28:18, 58:25, 75:9, 78:20, 79:1, 80:4, 87:19, 90:6, 94:14, 105:1, 105:24, 106:17, 107:1, 116:15
**particularized** [1] - 41:24
**particularly** [6] - 72:3, 73:17, 77:3, 96:23, 96:24, 97:9
**parties** [4] - 76:20, 78:25, 114:23, 120:16
**parts** [2] - 85:18, 100:2

**party** [2] - 24:15, 84:24
**Pasadena** [1] - 73:5
**passive** [2] - 51:4, 106:1
**past** [2] - 4:19, 53:5
**pathway** [4] - 53:17, 53:20, 56:19, 105:12
**patriae** [11] - 19:5, 20:15, 27:24, 28:20, 28:22, 28:23, 30:4, 30:5, 30:14, 46:3, 46:5
**Patrol's** [1] - 105:6
**pause** [4] - 75:3, 76:7, 84:21, 85:3
**pay** [2] - 23:13, 63:4
**paying** [1] - 11:5
**pejorative** [1] - 5:13
**penalty** [2] - 8:5, 8:6
**pending** [2] - 12:4, 78:17
**Penn** [1] - 55:10
**Pennsylvania** [1] - 2:5
**people** [44] - 3:12, 3:14, 3:15, 3:16, 4:16, 9:4, 11:23, 15:22, 16:1, 16:24, 17:1, 23:13, 25:22, 27:8, 30:13, 31:3, 32:1, 37:8, 42:14, 51:22, 52:14, 63:7, 64:3, 64:6, 65:1, 65:3, 65:4, 65:14, 66:9, 66:12, 66:21, 66:25, 67:3, 67:5, 70:23, 71:3, 72:4, 72:20, 72:21, 73:1, 98:19, 107:1, 107:15, 111:13
**people's** [1] - 42:19
**Perales** [12] - 4:10, 6:15, 15:4, 15:18, 20:3, 22:14, 30:22, 57:13, 65:13, 73:25, 99:2, 115:15
**PERALES** [53] - 2:1, 6:9, 6:16, 6:18, 6:24, 9:24, 10:6, 10:11, 10:20, 10:24, 11:7, 11:9, 16:3, 16:11, 57:14, 57:17, 58:15, 58:22, 59:2, 59:6, 59:20, 60:1, 60:7, 61:5, 61:10, 61:20, 62:8, 62:17, 62:21, 63:8, 63:11, 64:5, 64:9, 64:13, 64:19, 65:2, 65:16, 65:22, 65:25, 66:11, 66:18, 66:23, 67:3, 68:5, 68:8, 69:8, 69:17, 71:14, 71:19, 72:2, 72:11, 72:15, 72:17
**perceived** [2] - 34:23, 99:16
**percent** [6] - 53:12, 65:8, 65:11, 90:25, 108:4, 125:5
**percentage** [4] - 14:15, 15:14, 25:17, 53:9
**Perez** [1] - 73:4
**PEREZ** [1] - 2:2
**perfectly** [3] - 68:14, 68:17, 76:14
**performed** [1] - 10:12
**perhaps** [6] - 16:24, 24:22, 76:23, 84:14, 95:6
**period** [5] - 78:24, 80:2, 107:11, 116:12, 118:7
**Perryman** [6] - 17:10, 17:17, 18:6, 32:2, 32:3, 39:25
**Perryman's** [1] - 47:2
**person** [13] - 6:5, 52:15, 63:25, 68:18, 69:24, 70:6, 70:12, 82:22, 89:14, 93:14, 93:22, 94:18, 95:19
**Person** [3] - 36:1, 36:2, 36:4

**person's** [2] - 67:10, 94:18
**persons** [2] - 27:3, 70:18
**perspective** [1] - 76:3
**pervade** [1] - 5:2
**Peters** [1] - 21:18
**petition** [1] - 96:3
**phase** [2] - 6:13, 38:14
**phone** [4] - 3:10, 3:12, 3:13, 3:18
**phrase** [2] - 70:6, 78:25
**PI** [21] - 20:15, 21:18, 21:21, 28:2, 43:23, 78:11, 81:5, 82:1, 82:3, 82:7, 82:10, 83:2, 84:2, 89:11, 89:12, 89:17, 92:11, 93:1, 94:2, 122:3, 122:6
**pick** [2] - 34:21, 57:17
**picture** [2] - 67:18, 81:24
**piece** [2] - 26:15, 60:9
**pieces** [4] - 67:17, 89:5, 89:9, 89:22
**place** [5] - 40:17, 70:7, 77:8, 119:6, 127:12
**placed** [2] - 16:21, 119:22
**plain** [3] - 64:19, 110:3, 110:14
**plaintiff** [34] - 9:4, 12:24, 18:23, 33:23, 34:1, 34:15, 35:1, 37:3, 37:24, 39:7, 39:13, 40:15, 48:4, 74:8, 79:9, 87:24, 90:22, 92:15, 92:25, 97:12, 100:4, 100:14, 109:19, 110:18, 112:10, 114:22, 121:8, 122:10, 122:18, 122:22, 123:1, 123:4, 124:13
**PLAINTIFFS** [1] - 1:14
**plaintiffs** [36] - 7:3, 12:7, 12:9, 12:15, 17:18, 18:3, 21:10, 21:17, 47:12, 57:19, 57:21, 57:25, 60:7, 62:23, 63:12, 63:13, 63:14, 65:5, 67:12, 67:13, 67:22, 67:25, 68:11, 68:14, 70:23, 73:2, 73:4, 73:18, 73:23, 75:25, 77:18, 100:22, 105:17, 105:21, 106:8, 119:12
**plaintiffs'** [10] - 13:15, 17:2, 17:5, 17:6, 47:9, 60:23, 75:24, 105:23, 109:2
**plan** [1] - 103:10
**plans** [1] - 103:22
**play** [2] - 11:2, 23:11
**pleadings** [2] - 13:19, 54:23
**pled** [1] - 21:9
**plenty** [8] - 35:17, 77:23, 78:3, 82:18, 88:1, 97:3, 112:14, 121:14
**plunge** [1] - 62:2
**plus** [4] - 4:6, 53:11, 72:5, 106:10
**plus-minus** [1] - 53:11
**Plyler** [1] - 25:1
**PO** [1] - 2:12
**point** [60] - 8:7, 8:18, 12:14, 12:15, 13:11, 14:6, 15:12, 17:8, 22:4, 24:18, 24:19, 31:25, 35:12, 36:7, 36:20, 37:1, 37:14, 40:18, 42:20, 44:11, 47:18, 47:21, 47:22, 54:23, 55:8, 57:8, 66:11, 66:23, 66:24, 67:4, 69:2, 69:23, 70:15, 70:21, 80:22, 85:9, 86:2, 88:11, 94:10, 94:25, 95:1, 95:3, 95:6, 99:17, 100:2, 100:3, 100:13, 101:6, 103:14, 105:4, 105:23, 112:20, 113:9, 118:5, 122:7,

124:8, 125:1, 125:7, 125:19, 125:23
**pointed** [4] - 19:4, 32:3, 66:4, 126:3
**pointedly** [1] - 59:6
**pointing** [2] - 36:21, 113:1
**points** [8] - 12:3, 13:3, 13:19, 20:6, 33:15, 41:20, 94:9, 121:5
**policies** [1] - 76:15
**policy** [24] - 4:23, 4:24, 30:2, 51:4, 54:15, 75:13, 92:7, 102:6, 102:17, 103:1, 103:2, 103:3, 103:5, 105:25, 106:2, 106:7, 110:14, 114:10, 114:11, 114:20, 114:23, 115:9, 124:5
**politically** [1] - 5:20
**polluted** [1] - 91:2
**popular** [3] - 4:22, 5:2, 5:21
**population** [10] - 13:24, 25:2, 29:17, 31:16, 37:9, 53:10, 66:16, 83:10, 108:8, 125:6
**populations** [4] - 11:21, 52:1, 52:2, 52:3
**portion** [4] - 14:4, 16:4, 18:10, 82:17
**posit** [2] - 28:4, 39:12
**positing** [1] - 36:16
**position** [19] - 12:16, 17:5, 17:7, 40:13, 49:4, 56:8, 58:23, 59:2, 62:23, 69:4, 77:13, 87:22, 88:25, 92:25, 105:23, 110:18, 110:19, 121:7, 125:9
**positive** [1] - 113:20
**possibilities** [1] - 9:19
**possibility** [1] - 124:10
**possible** [8] - 4:4, 75:15, 80:10, 80:13, 85:1, 85:12, 95:10, 124:24
**possibly** [1] - 37:8
**post** [1] - 77:16
**post-trial** [1] - 77:16
**posttrial** [1] - 77:8
**posture** [7] - 48:15, 56:22, 77:20, 78:7, 81:10, 85:1, 116:17
**potential** [2] - 66:15, 104:21
**potentially** [3] - 106:25, 118:14, 127:16
**Potter** [13] - 7:4, 9:3, 9:5, 9:10, 9:18, 11:9, 13:25, 18:1, 18:8, 30:20, 30:24, 32:10
**potter's** [1] - 14:10
**Potter's** [3] - 14:22, 15:10, 16:23
**power** [4] - 41:7, 52:6, 52:16, 116:12
**powers** [2] - 119:15, 127:21
**practice** [1] - 61:19
**precedent** [2] - 39:21, 46:4
**precedential** [1] - 104:16
**precise** [4] - 75:13, 81:1, 85:7, 115:5
**precisely** [3] - 31:23, 80:20, 106:8
**preclude** [3] - 18:14, 44:15, 47:16
**precluded** [1] - 117:2
**preempted** [1] - 27:10
**preexisting** [4] - 59:12, 60:16, 60:25, 95:15
**preferred** [2] - 109:5, 109:6

**preliminaries** [1] - 4:20
**preliminary** [17] - 14:19, 20:10, 38:14, 40:5, 43:23, 47:22, 48:6, 48:7, 56:21, 65:17, 71:1, 84:6, 100:8, 108:10, 111:6, 113:6, 122:4
**premise** [2] - 32:22, 86:12
**prepare** [1] - 119:17
**prerequisite** [2] - 59:17, 106:22
**presence** [35] - 16:10, 16:13, 22:9, 23:19, 23:24, 24:23, 24:25, 26:6, 26:7, 26:19, 27:9, 27:18, 33:22, 41:1, 41:3, 41:4, 42:21, 48:21, 49:20, 49:21, 49:22, 51:21, 51:23, 52:13, 70:3, 70:5, 70:9, 105:20, 106:21
**present** [19] - 5:17, 9:1, 13:21, 13:22, 16:18, 21:20, 31:16, 42:24, 42:25, 43:1, 43:16, 52:15, 81:23, 82:12, 88:5, 101:4, 106:18, 107:9, 107:11
**presented** [5] - 7:14, 8:3, 9:3, 18:21, 77:25
**presents** [2] - 103:2, 103:3
**president** [2] - 50:8, 50:18
**President** [7] - 50:12, 50:23, 58:17, 69:15, 78:2, 108:16
**press** [1] - 5:3
**pressed** [1] - 11:24
**pressure** [1] - 8:25
**presumably** [1] - 15:8
**presumed** [1] - 13:11
**pretty** [1] - 71:16
**prevail** [3] - 34:1, 57:22, 84:8
**prevailing** [1] - 84:24
**prevent** [4] - 90:3, 120:13, 124:3, 124:4
**prevented** [1] - 123:5
**previous** [1] - 75:7
**previously** [1] - 19:10
**primarily** [4] - 7:16, 22:7, 59:8, 75:1
**primary** [1] - 20:6
**principle** [4] - 14:11, 52:11, 92:2, 125:2
**principles** [1] - 17:15
**prioritize** [2] - 23:6, 26:18
**prioritized** [1] - 26:19
**private** [2] - 42:15, 77:18
**privately** [1] - 42:3
**probed** [1] - 109:11
**problem** [23] - 22:6, 22:11, 27:6, 34:9, 34:14, 34:22, 37:12, 50:3, 89:2, 89:3, 91:15, 93:4, 94:1, 95:9, 95:15, 95:19, 95:21, 95:22, 96:21, 97:23, 123:17
**problematic** [1] - 61:7
**problems** [2] - 3:15, 81:11
**procedural** [18] - 40:20, 45:11, 46:24, 47:24, 48:2, 48:4, 48:14, 51:12, 54:1, 70:1, 84:17, 84:19, 85:18, 86:14, 89:1, 89:3, 89:8, 123:16
**procedurally** [4] - 6:2, 108:13, 126:22, 127:18
**Procedure** [1] - 56:1

**procedure** [1] - 72:7
**proceeding** [1] - 124:2
**Proceedings** [1] - 1:24
**proceedings** [9] - 16:21, 61:14, 67:8, 67:24, 70:8, 76:21, 121:17, 128:10, 129:4
**PROCEEDINGS** [1] - 1:10
**process** [7] - 8:7, 35:22, 75:21, 115:10, 119:16, 123:23, 126:1
**processing** [1] - 56:18
**proclaiming** [1] - 43:20
**produced** [2] - 1:25, 16:25
**Professor** [2] - 32:2, 55:14
**professor** [2] - 55:9, 55:10
**Program** [1] - 113:19
**program** [32] - 39:4, 39:8, 39:10, 48:3, 51:5, 53:9, 53:24, 55:3, 55:25, 56:4, 56:8, 57:9, 57:11, 91:17, 102:7, 106:2, 106:3, 107:19, 107:23, 108:20, 108:21, 109:4, 114:11, 118:16, 118:19, 119:1, 119:6, 119:18, 120:6, 120:22, 126:11, 127:20
**projected** [1] - 65:11
**promise** [2] - 47:19, 57:17
**prompt** [1] - 48:3
**promulgated** [1] - 104:19
**prong** [8] - 35:5, 36:15, 89:7, 92:2, 92:20, 92:21, 92:23, 99:23
**prongs** [4] - 86:14, 92:12, 92:13, 92:14
**proof** [4] - 15:24, 24:20, 87:16, 91:15
**proper** [5] - 49:25, 50:3, 100:12, 127:15, 127:19
**proposal** [2] - 109:19, 109:20
**propose** [2] - 111:23, 116:2
**proposed** [2] - 109:2, 119:14
**proposition** [2] - 14:20, 112:21
**propriety** [1] - 97:1
**pros** [1] - 122:4
**prosecution** [1] - 56:8
**prosecutorial** [9] - 54:15, 55:12, 58:21, 58:24, 61:19, 67:9, 67:23, 68:22, 71:8
**prospectively** [1] - 78:9
**Protection** [1] - 113:19
**prove** [5] - 15:10, 26:23, 39:21, 45:21, 95:1
**proves** [4] - 40:19, 40:20, 53:21, 124:8
**provide** [5] - 56:25, 59:22, 64:2, 106:6, 126:19
**provided** [7] - 20:20, 45:10, 49:2, 69:9, 83:11, 92:7, 124:15
**providers** [1] - 29:13
**provides** [4] - 45:14, 86:13, 106:4, 120:5
**providing** [2] - 40:2, 91:20
**province** [1] - 27:6
**provision** [2] - 87:8, 105:10
**provisions** [1] - 99:24
**public** [1] - 97:15

**publish** [1] - 55:22
**pudding** [2] - 15:24, 87:16
**pull** [1] - 52:25
**purely** [3] - 11:12, 94:21, 120:11
**purportedly** [1] - 17:9
**purpose** [1] - 18:4
**purposes** [2] - 47:4, 48:17
**pursuant** [4] - 41:5, 56:9, 57:7, 119:1
**pursuing** [1] - 74:8
**pushed** [2] - 57:19, 99:3
**put** [7] - 3:11, 7:2, 32:6, 65:19, 101:5, 113:6, 123:12
**putative** [1] - 99:14

**Q**

**quacks** [1] - 55:18
**qualifications** [2] - 5:7, 8:25
**qualified** [4] - 7:18, 8:2, 9:5, 14:14
**qualify** [1] - 5:5
**quantify** [1] - 15:12
**quarter** [1] - 29:23
**questions** [18] - 18:15, 30:17, 33:17, 34:8, 75:19, 79:16, 79:20, 79:22, 80:1, 80:18, 81:3, 83:1, 96:25, 101:24, 103:2, 107:6, 115:9, 122:16
**quick** [1] - 33:15
**quit** [1] - 65:20
**quite** [7] - 80:10, 80:13, 92:24, 112:20, 113:6, 115:20, 125:8
**quo** [2] - 124:11, 124:12
**quote** [15] - 9:20, 12:10, 17:11, 21:17, 31:1, 44:1, 50:14, 50:25, 51:4, 54:4, 54:10, 55:11, 55:16, 55:22, 91:9
**quote/unquote** [2] - 11:23, 82:22
**quoted** [1] - 65:20

**R**

**racist** [1] - 5:23
**radiate** [1] - 29:10
**radical** [1] - 110:19
**raise** [1] - 36:6
**raised** [2] - 12:3, 17:17
**raising** [1] - 111:8
**range** [3] - 122:10, 123:14, 123:19
**ratchet** [2] - 38:25, 41:21
**rate** [2] - 91:1, 91:4
**rates** [2] - 83:3, 90:20
**rather** [3] - 17:15, 22:9, 78:7
**rationale** [3] - 126:17, 126:18, 126:24
**reach** [1] - 57:25
**reaches** [1] - 75:23
**read** [5] - 19:25, 62:13, 65:23, 82:3, 102:22
**reading** [3] - 58:22, 59:10, 109:2
**real** [4] - 34:12, 47:19, 96:21, 124:1
**reality** [1] - 74:12
**realize** [1] - 84:16
**really** [38] - 3:21, 4:20, 9:20, 11:10,

11:25, 12:18, 36:12, 36:23, 37:12, 59:10, 60:24, 62:25, 68:24, 68:25, 69:1, 70:22, 78:8, 84:25, 85:1, 85:10, 85:12, 88:24, 89:10, 89:23, 91:6, 94:13, 94:21, 95:1, 95:8, 97:11, 99:25, 100:15, 101:5, 101:8, 112:20, 117:13
**reason** [13] - 12:5, 31:11, 70:10, 78:23, 92:10, 97:14, 100:3, 108:15, 108:21, 110:23, 110:25, 119:5, 127:2
**reasonable** [2] - 16:17, 127:23
**reasoning** [5] - 97:25, 118:2, 126:15, 126:24, 127:13
**reasons** [9] - 9:7, 33:5, 75:8, 78:20, 85:25, 88:23, 97:16, 111:8
**reasserted** [1] - 12:5
**receipt** [1] - 106:22
**receive** [5] - 60:10, 64:20, 65:4, 72:22, 91:11
**received** [11] - 16:19, 53:10, 54:24, 70:24, 73:2, 73:8, 73:11, 73:19, 91:11, 107:9, 108:8
**receives** [1] - 93:3
**receiving** [1] - 96:12
**recess** [1] - 101:17
**recipient** [11] - 5:8, 8:8, 8:11, 15:19, 17:9, 17:12, 24:11, 37:2, 69:12, 98:4
**recipients** [38] - 5:12, 7:1, 7:23, 11:21, 13:22, 14:3, 14:8, 14:22, 15:7, 15:15, 16:7, 16:15, 17:19, 24:5, 29:12, 40:3, 42:1, 43:5, 52:3, 52:19, 52:21, 53:22, 56:19, 62:14, 65:7, 65:8, 65:11, 66:2, 68:15, 68:18, 70:16, 80:9, 95:21, 105:11, 106:11, 113:11, 119:17
**recipients'** [1] - 11:15
**recognition** [3] - 28:4, 107:17, 107:19
**recognize** [5] - 19:5, 38:19, 69:21, 102:13, 120:21
**recognized** [5] - 30:7, 82:1, 84:1, 102:3, 107:16
**recognizes** [2] - 54:9, 106:20
**reconsider** [2] - 48:3, 56:25
**record** [19] - 21:4, 34:3, 50:21, 52:23, 58:1, 59:15, 66:19, 75:15, 81:11, 84:5, 84:22, 85:6, 89:1, 90:16, 91:8, 92:7, 100:25, 124:22, 129:4
**recorded** [1] - 1:24
**records** [1] - 83:13
**rectify** [1] - 43:20
**redo** [1] - 116:21
**redressability** [9] - 22:11, 31:24, 33:19, 35:5, 37:11, 47:23, 48:2, 48:20, 48:25
**reduces** [1] - 43:3
**reevaluate** [1] - 117:4
**refer** [1] - 18:3
**referenced** [1] - 17:14
**referred** [3] - 59:8, 68:9, 70:3
**refers** [1] - 29:3
**refine** [1] - 52:7
**regard** [3] - 3:19, 3:21, 111:16

**regarding** [7] - 17:14, 40:8, 75:19, 75:20, 81:6, 82:19, 101:25
**regardless** [2] - 19:13, 19:15
**Regardless** [1] - 19:14
**Regents** [73] - 28:15, 29:7, 29:8, 29:21, 30:7, 31:5, 32:23, 35:14, 35:15, 39:16, 39:17, 49:12, 49:16, 49:22, 49:23, 51:2, 51:6, 54:1, 58:9, 58:22, 59:6, 59:10, 60:4, 61:5, 61:10, 61:15, 61:21, 62:13, 67:18, 67:19, 67:21, 74:18, 75:22, 80:7, 85:20, 85:24, 86:1, 87:22, 87:23, 88:1, 88:4, 88:7, 88:11, 88:15, 88:19, 88:21, 88:23, 94:4, 95:13, 96:2, 101:6, 102:1, 109:22, 114:3, 114:8, 114:15, 114:20, 115:4, 115:7, 115:8, 117:25, 120:8, 120:19, 121:21, 121:22, 122:2, 122:16, 122:20, 123:8, 124:4, 127:9
**Register** [1] - 55:23
**registration** [1] - 113:17
**regulation** [11] - 55:23, 63:1, 67:14, 94:24, 95:23, 96:19, 96:21, 96:23, 110:9, 110:14, 121:12
**Regulation** [1] - 63:16
**regulations** [17] - 59:9, 59:12, 59:21, 60:8, 60:16, 60:25, 63:12, 67:15, 68:1, 68:15, 88:9, 93:21, 95:16, 97:6, 98:24, 121:9, 121:13
**regulatory** [1] - 110:9
**rejected** [2] - 61:2, 99:9
**related** [3] - 21:22, 57:9, 58:4
**relation** [1] - 105:2
**relative** [1] - 87:9
**relevance** [1] - 9:1
**relevant** [1] - 110:9
**reliable** [3] - 8:21, 18:7, 32:5
**reliance** [18] - 27:25, 49:18, 114:7, 119:16, 120:7, 122:16, 123:2, 123:21, 124:6, 124:16, 125:11, 125:23, 126:4, 126:6, 126:9, 127:5, 127:22
**relied** [7] - 11:17, 11:18, 19:10, 20:19, 21:19, 45:9, 46:23
**relief** [12] - 34:1, 51:6, 78:7, 90:12, 102:8, 106:3, 110:20, 119:8, 119:12, 122:19, 123:6, 125:2
**reluctant** [1] - 81:17
**rely** [6] - 20:4, 21:21, 32:2, 41:9, 42:4, 46:22
**relying** [8] - 18:23, 21:6, 21:11, 21:18, 22:7, 22:11, 32:17, 42:23
**remain** [9] - 8:13, 33:23, 41:1, 70:19, 76:1, 123:25, 126:11, 127:3, 127:11
**remained** [1] - 74:16
**remaining** [4] - 35:1, 37:3, 120:4
**remains** [2] - 56:22, 71:2
**remand** [21] - 109:20, 109:23, 112:6, 112:12, 112:15, 112:18, 114:19, 115:2, 115:13, 121:14, 121:20, 122:15, 122:24, 123:17, 124:3, 124:9, 126:12, 127:4, 127:11, 127:12, 127:16

**remanded** [1] - 121:16
**remanding** [3] - 56:24, 112:7, 113:3
**remedies** [9] - 57:4, 74:4, 76:3, 101:14, 104:21, 108:24, 109:17, 119:23, 123:6
**remedy** [24] - 24:21, 34:23, 37:17, 37:19, 38:4, 43:20, 55:18, 57:6, 78:9, 95:10, 109:5, 109:6, 109:15, 115:5, 115:19, 116:6, 117:10, 117:24, 119:4, 120:16, 121:7, 122:19, 127:19
**remember** [2] - 111:6, 122:8
**removable** [9] - 15:7, 15:16, 15:23, 16:7, 16:9, 16:20, 70:18, 70:19, 123:25
**removal** [16] - 16:21, 31:8, 31:9, 32:24, 49:1, 51:18, 51:20, 58:25, 59:11, 60:5, 61:14, 67:8, 67:24, 70:8, 70:11, 105:16, 106:9, 106:10
**remove** [23] - 15:12, 23:1, 23:12, 25:12, 25:13, 25:15, 25:16, 27:2, 31:12, 31:18, 31:19, 31:22, 32:10, 32:13, 32:16, 32:20, 34:7, 35:3, 40:22, 40:25, 41:8, 60:13, 70:22
**removed** [12] - 15:8, 16:1, 23:15, 26:10, 26:16, 31:19, 31:23, 34:11, 37:9, 45:19, 61:18, 105:10
**removing** [4] - 26:14, 106:16, 107:1, 107:14
**render** [1] - 9:6
**renewal** [1] - 108:3
**renewals** [1] - 118:20
**repeat** [1] - 102:20
**repeatedly** [4] - 39:3, 45:7, 75:7, 78:1
**repeating** [1] - 125:14
**replace** [1] - 4:8
**replete** [1] - 54:24
**reply** [5] - 12:21, 13:4, 16:4, 105:4, 126:3
**report** [1] - 55:11
**REPORTER** [3] - 19:14, 21:2, 102:20
**Reporter** [4] - 2:17, 2:17, 129:2, 129:6
**reporter** [2] - 20:25, 63:14
**REPORTER'S** [1] - 129:1
**reports** [2] - 18:11, 66:5
**represented** [1] - 21:17
**representing** [1] - 125:5
**represents** [1] - 73:6
**repromulgate** [1] - 79:23
**repromulgated** [1] - 97:21
**Republican** [1] - 50:9
**request** [5] - 7:1, 80:17, 83:6, 87:4, 110:1
**requesters** [1] - 53:13
**requests** [8] - 78:16, 80:12, 82:18, 83:10, 86:22, 91:6, 93:2, 98:11
**require** [1] - 42:12
**required** [7] - 39:13, 54:13, 54:19, 117:10, 117:22, 121:12, 121:18
**requirement** [2] - 48:1, 94:17
**requires** [2] - 60:17, 90:6
**rescind** [1] - 102:4

**rescinded** [2] - 43:19, 48:22
**rescinding** [2] - 29:21, 103:5
**rescission** [17] - 29:10, 39:5, 41:23, 51:10, 54:16, 58:15, 69:17, 69:18, 103:4, 106:4, 108:2, 108:3, 110:25, 113:25, 114:16, 116:16, 116:18
**rescissions** [1] - 39:3
**research** [1] - 7:17
**residents** [1] - 29:4
**resolution** [1] - 101:6
**resolve** [4] - 13:10, 15:1, 49:9, 88:5
**resolved** [1] - 12:11
**resounding** [1] - 34:15
**resources** [5] - 15:13, 23:1, 25:16, 31:21, 40:25
**respect** [17] - 7:22, 17:8, 22:24, 23:23, 24:3, 24:4, 24:7, 24:23, 25:9, 26:2, 30:5, 30:16, 43:25, 46:13, 48:19, 49:4, 69:19
**respond** [8] - 15:5, 17:2, 33:17, 41:17, 47:20, 101:13, 107:17, 125:16
**responded** [2] - 12:7, 69:22
**response** [8] - 12:6, 12:9, 12:13, 13:3, 16:6, 40:6, 49:25, 53:1
**responses** [2] - 81:7, 99:5
**responsibility** [1] - 56:6
**responsible** [3] - 26:6, 26:8, 41:3
**responsive** [1] - 27:23
**rest** [1] - 84:18
**restaurant** [4] - 9:24, 10:1, 10:17, 10:19
**result** [4] - 33:24, 35:7, 74:24, 77:20
**results** [1] - 3:12
**retain** [1] - 103:1
**retry** [1] - 116:23
**return** [3] - 11:16, 11:23, 122:23
**reveals** [1] - 11:25
**reversed** [1] - 59:4
**review** [10] - 13:5, 73:12, 85:2, 90:4, 106:5, 114:16, 115:1, 117:14, 118:12, 119:17
**reviewability** [1] - 86:10
**reviewable** [9] - 51:10, 54:18, 58:16, 86:2, 86:3, 86:5, 86:13, 87:12, 87:17
**reviewing** [5] - 57:10, 86:21, 90:8, 98:11, 102:11
**revocability** [1] - 69:18
**revocable** [1] - 69:13
**revokes** [1] - 69:25
**rewrite** [1] - 41:13
**rhetorical** [2] - 27:16, 123:11
**rightly** [1] - 81:18
**rights** [15] - 39:1, 70:1, 89:6, 92:1, 92:23, 93:12, 93:24, 94:23, 98:9, 99:14, 99:16, 99:20, 100:22, 106:10, 107:22
**rise** [1] - 128:9
**RJ** [1] - 2:8
**RMR** [2] - 2:17, 129:2
**Roberts** [6] - 28:15, 71:24, 94:3,

105:24, 106:14, 106:20
**role** [3] - 50:18, 114:14, 114:15
**Room** [1] - 2:19
**room** [1] - 58:8
**Ropes** [1] - 2:4
**Rouge** [1] - 1:22
**routinely** [1] - 65:4
**ruin** [1] - 111:14
**rule** [8] - 54:5, 54:12, 54:19, 55:1, 108:19, 111:13, 117:18, 120:9
**ruled** [4] - 19:10, 50:24, 51:20, 104:13
**rulemaking** [13] - 54:7, 54:13, 54:20, 56:1, 56:9, 87:14, 87:20, 88:6, 96:3, 96:9, 123:24, 124:10, 126:22
**rules** [3] - 48:5, 54:6, 98:12
**ruling** [22] - 14:19, 14:25, 38:15, 51:3, 51:8, 51:10, 51:11, 51:17, 56:15, 57:20, 76:8, 101:2, 104:16, 104:17, 108:10, 116:17, 116:20, 118:6, 118:12, 118:18, 122:11, 127:7
**rulings** [1] - 104:18
**run** [5] - 10:14, 10:15, 27:14, 27:15, 91:18
**running** [1] - 101:15
**Rusk** [1] - 2:19

## S

**safe** [1] - 128:7
**salary** [1] - 11:5
**Samantha** [1] - 6:20
**sample** [2] - 53:4, 53:5
**samples** [3] - 83:9, 83:10, 91:20
**San** [1] - 2:3
**sang** [1] - 45:7
**satisfied** [3] - 48:1, 89:20, 92:15
**save** [2] - 22:22, 76:2
**saving** [2] - 74:4, 97:15
**scale** [2] - 111:11, 111:17
**scenario** [1] - 8:3
**scheduled** [1] - 3:24
**scheme** [4] - 51:25, 52:8, 99:20, 104:19
**schemes** [2] - 11:20, 41:11
**school** [4] - 26:19, 28:18, 29:16, 32:12
**School** [2] - 55:10, 73:6
**schooling** [1] - 20:14
**schools** [1] - 29:12
**scintilla** [1] - 39:21
**scope** [1] - 71:9
**scrambled** [2] - 113:5, 126:4
**search** [1] - 70:4
**seated** [2] - 3:3, 101:18
**second** [8] - 5:18, 9:2, 16:14, 20:9, 35:12, 75:15, 105:18, 113:23
**secondly** [1] - 28:3
**Secretary** [6] - 58:17, 96:15, 97:7, 102:12, 102:18, 111:18
**secretary** [2] - 80:4, 96:22

**Section** [1] - 96:4
**secure** [1] - 60:2
**Security** [3] - 58:18, 101:23, 102:10
**SECURITY** [1] - 128:9
**security** [2] - 5:1, 97:16
**see** [3] - 27:5, 28:4, 32:13
**seek** [2] - 75:3, 80:15
**seeking** [5] - 78:7, 116:6, 116:9, 116:22, 117:1
**seem** [1] - 5:2
**segments** [1] - 13:24
**segues** [1] - 78:19
**self** [10] - 10:13, 25:12, 31:12, 31:18, 31:19, 32:10, 32:16, 32:20, 43:21, 49:1
**self-employed** [1] - 10:13
**self-impose** [1] - 43:21
**self-removal** [1] - 49:1
**self-remove** [7] - 25:12, 31:12, 31:18, 31:19, 32:10, 32:16, 32:20
**sense** [11] - 8:23, 14:11, 56:7, 62:11, 62:12, 62:13, 62:20, 76:6, 86:10, 111:11, 124:8
**sensitivity** [1] - 84:20
**sentences** [1] - 55:24
**separate** [12] - 27:22, 35:25, 63:12, 68:9, 80:14, 88:5, 88:9, 92:12, 92:14, 93:2, 93:12, 99:22
**separation** [2] - 59:11, 61:23
**September** [1] - 90:24
**serious** [3] - 18:13, 80:18, 103:3
**Serna** [1] - 6:20
**serve** [1] - 95:6
**Service** [1] - 89:12
**services** [1] - 40:2
**Services** [1] - 112:21
**set** [39] - 3:13, 25:4, 49:7, 55:3, 55:5, 56:4, 56:23, 57:7, 57:11, 69:6, 79:11, 89:25, 95:16, 95:23, 99:12, 109:4, 109:19, 110:1, 110:5, 110:10, 112:11, 116:8, 116:12, 117:11, 117:22, 118:3, 118:10, 118:25, 119:2, 119:13, 119:18, 121:8, 121:12, 121:19, 122:1, 123:22, 124:9, 127:13, 127:20
**set-aside** [1] - 116:12
**setting** [6] - 26:22, 46:20, 48:23, 108:9, 116:18, 122:5
**seven** [1] - 5:7
**severability** [4] - 62:13, 62:17, 94:25, 95:8
**severable** [1] - 62:15
**several** [1] - 25:8
**severe** [1] - 73:17
**Shalala** [2] - 86:7, 86:12
**shall** [1] - 96:17
**shared** [1] - 65:22
**sharp** [1] - 91:4
**sheet** [1] - 19:25
**shift** [1] - 19:20
**Shoba** [1] - 55:9

**short** [4] - 80:2, 80:6, 84:21, 106:1
**short-lived** [2] - 80:2, 80:6
**shot** [1] - 90:15
**show** [16] - 36:4, 36:16, 37:4, 37:23, 37:25, 38:1, 41:23, 45:22, 48:4, 48:25, 83:17, 83:24, 85:5, 92:6, 92:8, 113:11
**showed** [3] - 41:24, 42:13, 47:5
**showing** [3] - 37:21, 83:21, 86:18
**shown** [5] - 24:21, 65:5, 73:3, 95:25, 119:10
**shows** [6] - 53:22, 85:15, 92:23, 107:24, 108:2, 121:10
**side** [7] - 5:23, 12:22, 29:14, 38:9, 55:2, 88:2, 88:3
**sides** [1] - 65:20
**significant** [6] - 74:19, 81:17, 85:16, 97:15, 103:2, 103:5
**significantly** [1] - 66:13
**similar** [3] - 11:21, 76:19, 79:23
**similarly** [2] - 8:19, 9:2
**simple** [2] - 49:20, 57:7
**simply** [21] - 14:6, 33:22, 39:12, 40:9, 47:22, 49:10, 50:2, 50:16, 57:5, 76:7, 81:21, 91:2, 105:25, 106:6, 106:16, 106:25, 107:14, 108:14, 116:7, 119:5, 122:19
**singing** [2] - 45:3, 45:8
**single** [4] - 8:15, 92:18, 95:20, 96:11
**sit** [1] - 125:24
**site** [1] - 113:18
**sites** [1] - 113:18
**situated** [1] - 35:13
**situation** [6] - 3:22, 7:13, 7:25, 30:14, 35:18, 125:12
**six** [2] - 5:7, 58:10
**SJ** [1] - 82:10
**skill** [1] - 17:19
**skipping** [1] - 55:24
**slice** [2] - 111:3, 111:9
**slicing** [6] - 111:16, 111:20, 111:22, 111:25, 114:14, 122:12
**small** [2] - 23:2, 25:17
**Smith** [3] - 2:17, 129:2, 129:6
**Smoot** [1] - 24:2
**smoot** [1] - 24:3
**Snapp** [1] - 29:3
**snapshots** [1] - 66:6
**so-called** [1] - 61:12
**Social** [1] - 102:9
**social** [2] - 4:17, 40:2
**socially** [1] - 4:4
**solicitor** [3] - 13:2, 71:24, 104:5
**solicitous** [1] - 86:23
**solicitude** [5] - 20:16, 27:24, 44:20, 45:2, 46:2
**someone** [13] - 5:17, 33:21, 35:1, 35:21, 36:1, 36:16, 79:24, 82:23, 86:22, 87:6, 89:14, 89:20, 98:5
**somewhat** [1] - 14:5

**somewhere** [2] - 11:24, 71:18
**son** [1] - 10:17
**song** [2] - 45:3, 45:7
**soon** [4] - 71:16, 74:24, 75:4, 97:24
**SOPs** [2] - 90:7, 90:17
**sorry** [9] - 7:3, 29:18, 61:9, 61:10, 63:24, 72:13, 93:6, 103:25, 128:6
**sort** [31] - 17:3, 20:15, 29:20, 34:1, 34:9, 34:20, 35:15, 44:6, 45:1, 46:1, 71:5, 78:8, 79:13, 87:7, 87:16, 92:19, 94:16, 97:2, 110:8, 110:12, 110:13, 112:9, 112:10, 112:15, 113:22, 121:18, 121:19, 121:25, 122:1, 122:11, 122:23
**sorts** [1] - 113:16
**sought** [1] - 64:14
**sound** [1] - 5:20
**sources** [1] - 67:14
**SOUTHERN** [1] - 1:1
**southern** [1] - 2:18
**Southern** [5] - 3:20, 77:3, 77:10, 128:2, 129:2
**Southwest** [1] - 112:21
**sovereign** [1] - 29:1
**speaking** [1] - 5:12
**special** [6] - 3:14, 20:16, 27:24, 44:19, 45:2, 46:2
**specific** [7] - 20:20, 21:7, 21:19, 28:13, 42:13, 46:14, 46:23
**specifically** [21] - 20:19, 21:6, 21:10, 21:17, 24:1, 24:4, 30:24, 42:1, 45:10, 47:6, 55:12, 77:12, 79:10, 88:8, 88:15, 89:18, 90:8, 91:17, 101:23, 114:8, 122:5
**specificity** [1] - 46:15
**specifics** [1] - 120:24
**speculating** [1] - 32:20
**speculation** [4] - 11:13, 16:24, 22:6, 31:1
**speculative** [2] - 7:21, 11:25
**spelled** [1] - 20:2
**spite** [1] - 30:2
**split** [1] - 22:17
**spot** [1] - 48:17
**spring** [1] - 67:13
**stage** [15] - 7:10, 21:21, 40:5, 43:24, 44:13, 81:5, 82:1, 83:2, 84:2, 89:11, 89:12, 89:17, 94:2, 100:9, 122:7
**stake** [1] - 91:13
**stand** [3] - 55:3, 95:13, 103:10
**standard** [2] - 72:6, 104:17
**standards** [2] - 18:12, 98:10
**standing** [50] - 6:5, 19:5, 19:7, 19:11, 19:21, 20:7, 20:9, 21:24, 24:16, 26:22, 27:19, 28:9, 28:16, 28:20, 30:4, 30:14, 35:7, 35:15, 35:16, 35:18, 35:19, 35:23, 36:3, 36:10, 36:12, 36:15, 37:16, 38:3, 38:12, 39:5, 39:7, 39:13, 39:18, 40:10, 40:12, 40:16, 41:5, 44:10, 44:21, 45:21, 45:23, 48:1, 62:5, 63:12, 82:11, 84:18, 109:8, 125:1

**stands** [2] - 14:10, 84:15
**start** [8] - 3:6, 6:4, 6:19, 41:20, 58:3, 85:22, 109:12, 125:25
**starting** [3] - 20:18, 126:1, 128:3
**state** [14] - 9:4, 14:2, 16:18, 16:19, 24:25, 27:9, 29:4, 29:20, 29:24, 29:25, 30:13, 39:11, 41:24, 60:22
**STATE** [2] - 1:4, 2:7
**State** [16] - 3:5, 13:2, 20:21, 25:1, 25:10, 28:25, 29:6, 29:9, 30:1, 30:8, 30:18, 42:5, 43:19, 46:17, 55:10
**State's** [3] - 4:6, 27:5, 29:1
**state's** [1] - 18:23
**statement** [3] - 18:6, 48:13, 63:19
**statements** [3] - 17:14, 18:8, 19:11
**States** [24] - 2:18, 3:6, 9:8, 9:12, 9:14, 24:21, 25:19, 27:7, 27:19, 30:20, 32:25, 46:6, 46:7, 46:11, 49:17, 52:15, 65:5, 71:13, 71:18, 105:7, 105:8, 105:22, 107:10, 129:2
**states** [42] - 9:5, 11:20, 12:24, 27:15, 33:23, 34:1, 34:16, 35:1, 37:3, 37:23, 37:24, 39:2, 39:5, 39:7, 39:13, 40:15, 41:7, 41:8, 41:22, 59:7, 62:5, 74:8, 79:9, 84:8, 87:24, 90:22, 92:15, 97:12, 98:13, 100:4, 100:14, 112:10, 113:13, 114:22, 121:8, 122:10, 122:18, 122:22, 123:1, 123:4, 124:13, 125:5
**STATES** [3] - 1:1, 1:7, 1:11
**States'** [2] - 22:15, 43:24
**states'** [4] - 92:25, 109:2, 109:19, 110:18
**statistical** [2] - 53:4, 53:5
**status** [28] - 16:16, 16:18, 26:11, 47:10, 51:22, 52:12, 52:22, 53:7, 53:10, 53:15, 53:16, 53:17, 53:23, 64:14, 65:8, 66:10, 69:5, 69:9, 70:2, 70:9, 70:12, 70:17, 75:3, 76:10, 98:21, 108:6, 124:11
**statute** [16] - 63:20, 64:10, 64:16, 64:19, 64:22, 67:14, 67:15, 68:19, 97:14, 110:3, 117:13, 117:16, 117:18, 117:19, 122:6
**statutes** [4] - 41:6, 67:25, 98:15, 121:13
**statutory** [11] - 46:14, 51:1, 63:18, 68:16, 98:12, 104:19, 106:21, 115:23, 117:9, 126:20
**stay** [20] - 9:7, 14:8, 23:15, 33:3, 43:6, 43:8, 43:16, 76:6, 76:21, 77:19, 115:24, 116:12, 116:19, 118:6, 118:11, 118:17, 122:11, 127:7, 127:21, 128:7
**stayed** [1] - 43:11
**staying** [1] - 88:15
**stays** [1] - 78:1
**stenography** [1] - 1:24
**step** [4] - 53:17, 90:14, 115:5, 116:10
**steps** [6] - 75:1, 79:25, 83:15, 83:24, 101:24, 121:23
**stick** [1] - 5:3

**still** [23] - 9:14, 10:19, 23:13, 25:21, 33:25, 45:8, 52:9, 69:12, 79:16, 80:13, 84:8, 84:18, 90:19, 93:13, 101:8, 101:23, 102:18, 103:7, 103:22, 104:10, 120:5, 120:18, 126:10
**stop** [1] - 71:21
**straightforward** [1] - 74:10
**Street** [4] - 1:15, 1:18, 1:21, 2:9
**stress** [2] - 47:2
**stresses** [3] - 29:9, 31:7, 49:23
**strike** [1] - 13:10
**strong** [3] - 59:11, 70:15, 92:21
**student** [1] - 25:2
**student's** [1] - 26:7
**student-age** [1] - 25:2
**students** [2] - 25:3, 28:18
**studies** [2] - 11:14, 47:8
**study** [7] - 7:24, 8:10, 11:18, 11:19, 47:6, 47:11
**subject** [4] - 48:6, 54:6, 54:20, 55:25
**submission** [1] - 83:13
**submitted** [1] - 21:12
**subset** [1] - 65:3
**substantial** [3] - 14:4, 27:3, 38:15
**substantiate** [1] - 85:10
**substantiated** [1] - 36:19
**substantiates** [1] - 100:7
**substantiation** [1] - 37:20
**substantive** [15] - 40:20, 51:11, 51:14, 53:24, 54:5, 54:12, 54:19, 54:25, 55:18, 56:5, 70:14, 73:20, 85:19, 89:2, 99:23
**substantively** [6] - 72:18, 104:14, 108:13, 119:23, 126:21, 127:18
**sue** [11] - 36:10, 39:5, 46:10, 46:11, 62:24, 62:25, 63:2, 68:14, 68:20, 68:21, 94:15
**sued** [3] - 36:8, 39:3, 63:16
**sufficient** [6] - 25:16, 34:7, 35:5, 40:15, 81:23, 99:15
**sufficiently** [1] - 96:10
**suggest** [3] - 26:15, 83:16, 90:16
**suggested** [8] - 38:11, 43:22, 49:5, 102:10, 104:12, 118:8, 123:8, 124:5
**suggesting** [3] - 25:11, 121:11, 123:4
**suggestions** [1] - 111:15
**suggests** [4] - 30:8, 44:5, 100:10, 122:20
**suing** [2] - 36:2, 68:17
**suit** [2] - 46:5, 46:7
**Suite** [2] - 2:2, 2:15
**summary** [44] - 6:3, 6:6, 6:10, 6:13, 7:5, 7:10, 12:4, 12:6, 12:13, 13:6, 13:8, 14:25, 16:6, 18:14, 32:6, 33:6, 33:8, 34:4, 40:6, 44:13, 44:16, 47:13, 47:16, 49:2, 58:1, 68:2, 74:6, 74:9, 76:1, 76:8, 81:10, 82:17, 83:14, 84:16, 85:4, 89:8, 99:18, 107:6, 109:3, 109:7, 110:8, 113:10, 113:16, 116:17
**supersede** [1] - 74:14
**supplemental** [1] - 47:2

**support** [16] - 11:4, 11:17, 16:23, 17:4, 17:25, 18:1, 21:18, 28:8, 40:16, 41:14, 42:5, 44:4, 44:13, 45:16, 47:13, 80:17
**supported** [3] - 14:13, 17:6, 83:23
**supporting** [1] - 10:25
**supportive** [1] - 21:24
**supports** [1] - 8:17
**supposed** [3] - 87:9, 90:9, 123:8
**Supreme** [26] - 25:22, 28:6, 29:7, 30:7, 32:23, 45:1, 46:4, 46:10, 51:2, 51:17, 51:19, 58:13, 72:1, 101:25, 102:2, 105:22, 107:16, 107:18, 107:20, 108:11, 113:25, 114:3, 115:6, 117:24, 127:10, 127:14
**surely** [1] - 52:17
**surprise** [1] - 87:23
**survey** [5] - 14:1, 14:3, 32:2, 32:4
**swayed** [1] - 49:5
**sweeping** [2] - 121:11, 121:25
**switch** [1] - 108:23
**switched** [1] - 72:14
**symbol** [1] - 102:6
**system** [3] - 42:23, 50:16, 63:4

## T

**tables** [1] - 4:10
**tacitly** [1] - 54:11
**talks** [5] - 29:21, 70:17, 88:11, 100:6, 107:20
**tandem** [1] - 92:12
**tangible** [1] - 37:2
**target** [5] - 67:2, 74:17, 76:15, 76:18, 78:24
**taxes** [2] - 29:23, 29:24
**technical** [3] - 62:11, 62:20, 111:24
**technology** [2] - 3:15, 4:13
**temporal** [1] - 49:7
**ten** [1] - 64:12
**tenant** [1] - 51:3
**term** [9] - 5:13, 5:16, 5:24, 16:13, 62:11, 69:21, 70:4, 89:13
**termed** [2] - 60:3, 74:10
**terms** [14] - 32:4, 32:23, 50:15, 57:7, 57:11, 70:11, 103:11, 103:22, 105:25, 110:3, 111:23, 111:24, 118:23, 121:8
**territory** [1] - 29:1
**test** [2] - 89:13, 92:3
**testified** [6] - 9:19, 11:24, 17:4, 17:18, 18:6, 30:21
**testifies** [1] - 7:15
**testify** [1] - 7:17
**testimony** [15] - 6:13, 7:2, 7:9, 8:20, 9:3, 11:25, 12:4, 13:9, 15:2, 18:12, 19:19, 32:7, 32:11, 89:16, 89:17
**testing** [1] - 113:18
**TEXAS** [3] - 1:1, 1:4, 1:5
**Texas** [40] - 1:15, 1:16, 1:18, 1:19, 2:3, 2:15, 2:18, 2:20, 3:5, 5:11, 11:19, 19:17, 20:21, 25:10, 28:9, 30:13, 32:20,

33:5, 40:2, 41:24, 42:5, 44:3, 47:25, 48:1, 48:20, 59:13, 61:3, 61:17, 61:23, 73:15, 75:6, 76:20, 77:15, 89:12, 100:7, 104:17, 109:12, 111:5, 125:4, 129:3
**Texas's** [2] - 32:17, 42:6
**text** [2] - 82:5, 100:10
**Thanksgiving** [1] - 3:25
**THE** [159] - 1:10, 1:14, 2:1, 2:7, 2:11, 3:3, 6:14, 6:17, 6:23, 9:23, 10:4, 10:8, 10:17, 10:22, 11:3, 11:8, 12:21, 15:3, 15:17, 16:10, 18:16, 18:25, 19:14, 19:20, 19:24, 20:25, 21:2, 22:3, 22:13, 23:7, 23:21, 24:8, 24:13, 25:6, 25:13, 25:18, 25:21, 26:3, 26:8, 26:21, 27:5, 28:10, 28:14, 29:14, 31:13, 31:19, 33:9, 33:12, 36:6, 36:23, 38:6, 38:8, 38:20, 41:16, 41:18, 42:7, 42:11, 42:17, 43:4, 43:9, 43:13, 44:22, 44:24, 45:3, 45:6, 45:12, 45:20, 45:24, 46:9, 46:20, 47:17, 49:13, 50:5, 51:14, 52:23, 57:3, 57:12, 57:15, 58:6, 58:17, 59:1, 59:3, 59:13, 59:25, 60:6, 61:2, 61:9, 61:17, 62:1, 62:10, 62:19, 63:6, 63:10, 64:3, 64:6, 64:11, 64:17, 64:24, 65:13, 65:19, 65:24, 66:9, 66:15, 66:20, 67:2, 68:3, 68:7, 69:7, 69:15, 71:11, 71:15, 71:21, 72:8, 72:12, 72:16, 73:25, 78:4, 81:14, 82:6, 84:6, 84:11, 85:23, 88:18, 92:9, 93:5, 93:8, 94:3, 95:3, 96:15, 97:17, 98:13, 99:9, 101:10, 101:12, 101:18, 102:20, 102:22, 103:24, 104:1, 104:23, 108:23, 109:23, 110:21, 111:24, 112:3, 115:14, 115:17, 116:1, 116:5, 119:19, 119:25, 121:2, 123:10, 124:22, 125:7, 125:15, 125:17, 125:20, 127:24
**theme** [2] - 17:3, 17:5
**themes** [1] - 5:2
**themselves** [7] - 7:25, 32:13, 35:8, 39:23, 69:11, 96:8, 100:4
**theories** [1] - 46:2
**theory** [8] - 15:6, 15:10, 15:19, 26:10, 38:25, 42:6, 47:14, 49:1
**thereby** [1] - 119:1
**therefore** [12] - 32:21, 48:13, 52:16, 54:18, 56:23, 57:6, 57:10, 90:14, 100:21, 107:10, 116:18, 127:19
**thereof** [1] - 11:1
**they've** [6] - 27:13, 57:20, 74:9, 87:7, 89:20, 124:22
**thick** [1] - 57:24
**thinking** [3] - 5:10, 124:18, 124:20
**thinks** [2] - 83:5
**third** [6] - 20:12, 37:14, 48:1, 75:18, 93:5, 93:8
**Thomas** [3] - 54:2, 54:8, 54:9
**Thomas's** [1] - 54:10
**three** [5] - 20:6, 33:15, 74:3, 77:7, 89:10
**thrilled** [1] - 112:4
**throat** [1] - 84:14

**throat-clearing** [1] - 84:14
**throughout** [1] - 22:15
**thrown** [2] - 47:3, 124:1
**tie** [2] - 34:25, 97:5
**timing** [1] - 74:6
**Title** [1] - 35:23
**today** [22] - 6:2, 6:20, 6:22, 12:25, 40:5, 48:8, 48:18, 56:22, 73:10, 74:4, 103:8, 103:11, 108:22, 111:8, 112:2, 116:8, 116:24, 117:8, 118:15, 118:25, 124:8, 125:24
**today's** [1] - 5:21
**TODD** [1] - 1:14
**Todd** [1] - 12:23
**together** [1] - 92:18
**tomorrow** [1] - 118:15
**took** [8] - 50:21, 57:15, 76:19, 77:7, 104:3, 124:13, 125:4, 125:9
**top** [3] - 67:3, 72:23, 113:8
**topics** [1] - 74:3
**total** [2] - 87:4, 94:22
**totally** [4] - 92:12, 92:14, 93:2, 110:6
**touch** [3] - 60:20, 61:8, 61:13
**touched** [1] - 102:5
**toward** [1] - 49:18
**track** [2] - 24:4, 24:11
**tracking** [1] - 24:1
**trained** [1] - 83:2
**training** [2] - 90:7, 90:17
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 1:25, 129:3
**transition** [8] - 74:23, 75:4, 76:9, 76:11, 76:16, 77:7, 77:11, 78:21
**transitions** [2] - 75:3, 75:7
**travel** [1] - 127:25
**treat** [1] - 12:3
**treatment** [1] - 97:15
**Trenton** [1] - 2:9
**trial** [2] - 12:17, 77:16
**trials** [1] - 128:3
**tried** [1] - 99:6
**tries** [1] - 25:11
**trigger** [1] - 8:6
**true** [9] - 9:12, 22:5, 37:7, 56:22, 71:9, 79:15, 100:10, 125:20, 129:3
**truly** [1] - 93:3
**Trump** [4] - 28:11, 59:4, 69:15, 78:3
**try** [3] - 115:24, 116:21, 124:4
**trying** [11] - 3:12, 4:3, 19:25, 30:9, 37:23, 37:25, 38:1, 62:1, 88:25, 95:2, 126:17
**turn** [3] - 6:1, 50:5, 57:20
**turning** [1] - 85:8
**two** [33] - 3:11, 7:2, 13:13, 15:22, 16:3, 18:11, 27:22, 30:25, 31:5, 48:6, 52:3, 55:24, 67:22, 69:8, 74:5, 76:11, 81:7, 87:23, 89:22, 91:10, 92:12, 92:14, 92:17, 92:19, 94:9, 99:4, 105:14, 109:9, 112:13, 118:11, 118:21, 119:14, 121:4

**type** [6] - 27:24, 28:21, 30:6, 54:6, 127:21
**types** [3] - 21:22, 60:21, 79:7
**typically** [1] - 75:2

## U

**U.S** [7] - 2:11, 2:14, 8:2, 8:5, 17:13, 29:11, 105:6
**U.S.-born** [2] - 17:10, 17:23
**uh-oh** [1] - 57:15
**ultimate** [3] - 19:15, 44:9, 119:18
**ultimately** [10] - 9:19, 11:22, 18:22, 34:11, 37:1, 37:15, 38:2, 77:1, 80:18, 99:25
**unable** [2] - 8:14, 9:12
**unaware** [1] - 47:7
**uncertain** [1] - 105:25
**uncertainty** [1] - 74:19
**unclear** [1] - 28:3
**under** [22] - 16:10, 22:20, 39:20, 44:20, 54:7, 56:1, 56:23, 57:11, 58:16, 60:15, 64:15, 66:3, 67:21, 70:24, 86:14, 87:19, 96:3, 99:19, 99:22, 103:11, 103:22, 110:3
**undermines** [1] - 31:6
**understood** [3] - 92:25, 102:24, 110:2
**underwent** [1] - 73:12
**undisclosed** [1] - 21:15
**undocumented** [7] - 11:19, 16:9, 23:2, 37:9, 63:18, 63:25, 69:13
**unhappy** [2] - 114:22, 114:24
**uniformity** [1] - 111:14
**UNITED** [3] - 1:1, 1:7, 1:11
**United** [20] - 2:18, 3:5, 9:8, 9:12, 9:14, 30:20, 32:25, 46:6, 46:7, 46:11, 49:17, 52:15, 65:5, 71:13, 71:18, 105:7, 105:8, 105:22, 107:10, 129:2
**universities** [1] - 113:14
**University** [2] - 55:10, 73:5
**unlawful** [29] - 10:15, 41:5, 50:25, 56:23, 57:2, 86:5, 86:6, 86:15, 104:14, 108:13, 108:21, 108:22, 110:5, 114:4, 114:6, 114:19, 115:22, 116:18, 119:2, 119:5, 119:23, 120:23, 123:16, 126:12, 126:21, 126:22, 127:3, 127:18
**unlawfully** [2] - 52:15, 68:19
**unlawfulness** [6] - 115:7, 115:9, 121:17, 121:19, 121:22, 123:9
**unless** [1] - 6:5
**unlikely** [1] - 88:4
**unmute** [1] - 3:16
**unquote** [2] - 9:21, 17:12
**unreliable** [1] - 7:7
**unreviewable** [1] - 54:16
**unsupported** [2] - 12:1, 16:23
**untie** [1] - 104:24
**unusual** [2] - 77:22, 113:24
**up** [22] - 3:13, 27:12, 33:13, 52:10, 52:25, 57:3, 57:10, 57:17, 62:3, 73:5,

73:10, 80:19, 82:11, 84:14, 84:24, 87:24, 95:16, 95:23, 99:8, 119:11, 123:13, 127:6
**update** [3] - 52:7, 75:4, 76:10
**upheld** [1] - 30:4
**urge** [2] - 73:20, 122:24
**urged** [1] - 122:17
**Uribe** [1] - 6:21
**usage** [1] - 27:11
**USC** [1] - 63:25
**USCIS** [2] - 96:17, 107:5
**useful** [1] - 84:25

## V

**vacated** [7] - 48:9, 102:13, 103:13, 103:20, 104:2, 110:10, 119:1
**vacating** [7] - 109:20, 110:13, 112:7, 112:12, 112:16, 113:1, 123:20
**vacatur** [7] - 112:6, 118:1, 121:15, 121:20, 124:3, 126:13, 127:16
**vaccine** [6] - 86:24, 93:15, 93:16, 93:19, 95:20, 96:12
**valid** [1] - 98:14
**validly** [1] - 98:5
**Valley** [1] - 73:16
**variables** [2] - 7:12, 8:12
**various** [8] - 13:9, 13:19, 60:21, 66:4, 79:7, 90:22, 110:24, 118:9
**vastly** [1] - 126:5
**Veasey** [1] - 77:4
**verdicts** [1] - 83:23
**verification** [1] - 11:20
**version** [2] - 79:23
**versus** [8] - 3:5, 7:8, 7:23, 8:19, 25:1, 46:21, 77:4, 112:21
**via** [2] - 1:25, 48:12
**viability** [1] - 97:17
**viable** [2] - 97:20, 97:21
**victims** [1] - 73:7
**Vidal** [6] - 50:1, 79:18, 80:1, 80:20, 89:25, 90:2
**view** [8] - 19:8, 19:12, 38:12, 38:17, 74:12, 84:15, 88:17, 120:3
**views** [2] - 74:15, 104:21
**vigorously** [1] - 81:19
**VII** [1] - 35:23
**vindicate** [1] - 47:24
**violate** [1] - 43:5
**violated** [1] - 94:16
**violates** [3] - 62:5, 104:14, 109:13
**violating** [2] - 34:19, 90:13
**violation** [4] - 35:2, 53:24, 56:5
**violations** [4] - 34:23, 34:24, 40:21, 78:10
**violence** [1] - 73:7
**visa** [2] - 15:20, 64:7
**visits** [1] - 113:18
**voice** [1] - 102:23

**voluntarily** [2] - 15:16, 16:2
**voter** [1] - 77:15
**VS** [1] - 1:5

## W

**Wadhia** [3] - 55:9, 55:14
**wage** [1] - 7:16
**wages** [1] - 17:16
**wait** [5] - 44:22, 64:12, 81:14
**waiter** [1] - 10:19
**waiting** [1] - 128:4
**walk** [3] - 5:10, 55:16, 93:11
**walked** [2] - 36:18, 112:8
**walking** [1] - 5:22
**wants** [4] - 12:21, 47:19, 90:4, 123:17
**warrant** [2] - 82:24, 103:3
**warrants** [1] - 103:6
**warriors** [2] - 81:16, 81:17
**washing** [1] - 29:2
**Washington** [3] - 2:5, 2:12, 3:9
**waving** [1] - 119:25
**wax** [7] - 68:4, 68:5, 68:8, 98:25, 99:3, 101:8, 111:25
**ways** [1] - 76:14
**website** [1] - 105:6
**week** [2] - 76:11, 125:11
**weeks** [1] - 84:21
**weeks'** [1] - 97:22
**weigh** [9] - 15:18, 19:1, 33:10, 74:1, 76:10, 76:23, 101:20, 115:14, 119:19
**weighs** [1] - 13:7
**weight** [8] - 12:8, 12:18, 13:8, 13:12, 14:18, 15:1, 19:18, 61:16
**welcome** [3] - 4:5, 6:23, 111:10
**West** [2] - 1:15, 1:18
**whatsoever** [1] - 36:17
**whereas** [1] - 33:2
**whichever** [2] - 4:1, 78:25
**whole** [17] - 9:20, 11:11, 28:25, 29:9, 29:20, 29:25, 30:8, 68:4, 81:25, 98:25, 101:8, 103:15, 103:16, 112:1, 122:10, 123:14, 123:19
**wide** [3] - 65:9, 99:16, 99:20
**willing** [3] - 81:16, 82:11, 101:4
**win** [2] - 35:25, 36:10
**wind** [3] - 118:16, 120:6, 120:22
**window** [1] - 97:23
**wish** [3] - 45:6, 45:8, 93:18
**wishes** [3] - 23:8, 79:2, 80:15
**withdrawal** [1] - 58:18
**witness** [1] - 31:13
**witnesses** [3] - 13:14, 21:15, 24:1
**witnesses'** [1] - 32:7
**Wolf** [16] - 48:9, 49:7, 74:14, 79:3, 79:8, 79:10, 79:23, 80:21, 89:24, 90:10, 90:16, 97:8, 102:12, 103:13, 103:19, 104:3
**Wolf's** [1] - 102:18

**women** [2] - 73:6, 113:17
**wonder** [1] - 57:3
**Wong** [3] - 14:1, 18:3, 18:6
**Wong's** [2] - 19:10, 32:2
**word** [3] - 27:10, 27:11, 125:17
**words** [5] - 39:9, 53:14, 78:12, 118:19, 126:14
**work-authorized** [1] - 10:2
**worker** [1] - 17:10
**workers** [4] - 7:23, 13:21, 17:20, 17:23
**works** [3] - 8:5, 93:13, 110:12
**worksheets** [1] - 64:25
**worried** [1] - 128:4
**worry** [1] - 4:17
**worse** [2] - 3:22, 50:12
**Writ** [1] - 117:14
**Writ-of-Erasure** [1] - 117:14
**writing** [2] - 28:15, 65:21
**written** [4] - 13:4, 40:9, 66:6, 117:15
**wrote** [2] - 12:9, 55:14

# X

**X's** [1] - 36:4
**xenophobic** [1] - 5:24

# Y

**y'all** [4] - 62:6, 127:24, 128:6, 128:7
**year** [3] - 23:3, 40:3, 118:21
**years** [12] - 43:14, 45:5, 59:22, 64:12, 77:7, 78:5, 87:2, 93:19, 100:17, 100:18, 118:11, 118:21
**York** [5] - 48:9, 56:16, 102:14, 104:1, 104:2
**York's** [1] - 103:12
**young** [1] - 32:12
**yourself** [1] - 38:22