10:45:13

1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF TEXAS

3            — — —

   THE HONORABLE ANDREW S. HANEN, JUDGE PRESIDING
4
   STATE OF TEXAS, ET AL,        No. 1:18-CV-00068
5
                Plaintiff,
6
   vs.
7
   UNITED STATES OF AMERICA,
8  ET AL,

9                Defendant.

10        STATUS CONFERENCE HEARING

11    OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS

12            Houston, Texas

13        TUESDAY, MARCH 30, 2021

14
   APPEARANCES:
15
   For the Plaintiff:   WILLIAM T. THOMPSON, Assistant
16                       Attorney General

17                       PATRICK K. SWEETEN, Assistant
                         Attorney General
18

19
   For the Defendant,   JEFFREY S. ROBINS, Deputy
20 Defendant-           Director
   Intervenors, and
21 Federal              DANIEL D. HU, Chief
   Defendants:
22                       NINA PERALES, MALDEF

23                       MAYUR SAXENA, Assistant Attorney
                         General
24
                         DOUGLAS HALLWARD-DREMEIER,
25                       Attorney at Law

1

For the                  n/a
2  Interpreter:

3

Reported by:        Sean Gumm, RPR, CRR
4                      Official Court Reporter
                     United States District Court
5                      Southern District of Texas
                     sean_gumm@txs.uscourts.gov
6

7  Proceedings recorded by mechanical stenography.
   Transcript produced by Reporter on computer.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    PROCEEDINGS
─────────────────────────────────────────
2
3       (The following proceedings held in open court.)
4                      *   *   *
5       TUESDAY, MARCH 30, 2021 -- 11:09 A.M.
6                    --oOo--
7               THE COURT:  Okay.  We're here in
8    18-CV-68, State of Texas versus United States of
9    America.  I thank ya'll for being here.  Originally
10   requested hearing by Intervenors -- kind of status
11   conference is how I think they described it.  I
12   won't say I had ignored the request, but since the
13   basis of it was just a presidential statement, I
14   didn't see that that added anything to the picture.
15               You can tell from my order that set
16   this though, once the House had actually passed a
17   bill -- again, we all know that and, you know, $0.50
18   might find you a free cup of coffee somewhere, but
19   there did seem some movement, so it did seem like
20   there was a need to get together.
21               We have some new faces.  Let me
22   start my right to the left.  Mr. Hu, you are here
23   representing the United States.  Who is your
24   co-counsel?
25               MR. HU:  Mr. Jeff Robins, Your Honor.

4

11:11:19    1              THE COURT:  All right.

11:11:20    2                    Ms. Perales, you are here

11:11:22    3    representing the Intervenors?

11:11:24    4              MS. PERALES:  Yes, thank you, Your

11:11:26    5    Honor.  Also joined by Samantha Uribe (phonetic),

11:11:30    6    also of my office.

11:11:31    7              THE COURT:  Okay.

11:11:38    8              MR. HALLWARD-DREMEIER:  Douglas

11:11:42    9    Hallward-Dremeier from Ropes & Gray, Your Honor.

11:11:42   10    Also for the Defendant/Intervenors.

11:11:44   11              THE COURT:  Hello.

11:11:44   12              MR. SAXENA:  Good morning.  Mayur

11:11:47   13    Saxena from the State of New Jersey.

11:11:50   14              THE COURT:  Great.  And new people

11:11:52   15    representing the State of Texas.

11:11:55   16              MR. SWEETEN:  Yes, Your Honor.  As you

11:11:57   17    know, Mr. Disher left the office to go into private

11:12:00   18    practice and we now have Will Thompson who is Deputy

11:12:04   19    Chief, and also co-counsel.

11:12:06   20              THE COURT:  All right.  Great.  I'm

11:12:07   21    going to -- you can leave your mask on or take it

11:12:11   22    off.  We're going to speak from our seats.  Make

11:12:17   23    sure you have a microphone whether you have the mask

11:12:19   24    on or off.

11:12:22   25                    I scheduled this later than I

| | | |
|---|---|---|
| 11:12:27 | 1 | normally would schedule, like a nine o'clock |
| 11:12:30 | 2 | hearing.  But I wanted to give the folks from New |
| 11:12:32 | 3 | Jersey a chance to fly down and back in one day if |
| 11:12:35 | 4 | they so chose.  I wanted to give everybody else a |
| 11:12:39 | 5 | chance to get some sleep after they watched both |
| 11:12:44 | 6 | Baylor games last night.  Our Bears did okay, but |
| 11:12:52 | 7 | our lady Bears fell a basket short. |
| 11:12:55 | 8 | Anyway, Ms. Perales, do you want to |
| 11:13:00 | 9 | lead off or -- it's kind of your party. |
| 11:13:04 | 10 | MS. PERALES:  Thank you, Your Honor. |
| 11:13:07 | 11 | The Court's order today asked --  or made specific |
| 11:13:11 | 12 | reference to the passage of the Dream and Promise |
| 11:13:14 | 13 | Act in the U.S. House of Representatives. |
| 11:13:16 | 14 | THE COURT:  Let me interrupt you with |
| 11:13:18 | 15 | that, though.  I don't want to limit to that.  If |
| 11:13:20 | 16 | there's more information out there, I want to hear |
| 11:13:23 | 17 | it all. |
| 11:13:23 | 18 | MS. PERALES:  Thank you, Your Honor.  I |
| 11:13:24 | 19 | thought I would start there and mention that the |
| 11:13:26 | 20 | Dream and Promise Act passed U.S. House of |
| 11:13:30 | 21 | Representatives on March 18th and is currently |
| 11:13:32 | 22 | pending in the Senate. |
| 11:13:35 | 23 | We wanted to also draw the Court's |
| 11:13:37 | 24 | attention to a second bill called the Dream Act.  It |
| 11:13:41 | 25 | is in the Senate.  It is a Senate bill, as opposed |

11:13:43  1    to a House bill, and it is cosponsored by Senator

11:13:50  2    Durbin and Lindsey Graham.

11:13:50  3                    Both of those bills are similar in

11:13:53  4    the way that they offer a conditional residency to

11:13:56  5    young persons who came to the United States as

11:14:00  6    children.  The details are a little bit different,

11:14:04  7    but they are very similar.

11:14:06  8                    THE COURT:  Is the Senate version as

11:14:11  9    broad as the American Dream and Promise act?

11:14:16  10                   MS. PERALES:  I'm looking at my friend

11:14:17  11   from New Jersey, who has been studying both of those

11:14:20  12   bills.  I think there are differences on the margin,

11:14:23  13   Your Honor, but with respect to the Dreamer

11:14:27  14   population -- as opposed to TPS and some of those

11:14:29  15   other ones -- I believe they're fairly similar.

11:14:32  16                   THE COURT:  Okay.  Well, the reason I

11:14:34  17   ask, of course, Ms. Perales, is no secret.  You know

11:14:38  18   the lawsuit's constants have been you and me -- and

11:14:46  19   Mr. Hu, I'm sorry -- but we've talked about other

11:14:56  20   attempts by Congress to legalize the DACA

11:15:02  21   recipients.

11:15:03  22                   It's been argued to me, and with

11:15:05  23   some justification, that one of the reasons it

11:15:08  24   hasn't passed already is because it was always

11:15:11  25   joined with something else that one side or the

1  other found objectionable.

2         The House act seemed to -- while it

3  covered -- seemed to me it covered the DACA

4  recipients, it was broader than that and picked up a

5  lot more people.  That's why I was asking about the

6  Senate bill, if it was narrower.

7         MS. PERALES:  I don't know the answer

8  to that question, Your Honor.

9         THE COURT:  Okay.

10         MS. PERALES:  But I would -- I would be

11  happy to file a very short one-page advisory --

12         THE COURT:  Oh, I can -- I can -- I'll

13  find it.  You don't have to do that.

14         MS. PERALES:  Thank you, Your Honor.

15  There is quite a bit of energy around both of these

16  bills.  There is hope that they will both receive

17  hearings in the Senate, and there's been quite a bit

18  of discussion about how to get to passage in the

19  Senate that the Court will see in the news

20  everything from, you know, bipartisan support to the

21  Dreamer population, to possibly -- this is all

22  public information -- having this one or both of

23  these bills be incorporated into the next COVID

24  relief package, and/or passed under rules governing

25  reconciliation, as opposed to a 60-vote super

| | |
|---|---|
| 11:16:33 | 1 |
| 11:16:33 | 2 |
| 11:16:36 | 3 |
| 11:16:40 | 4 |
| 11:16:42 | 5 |
| 11:16:44 | 6 |
| 11:16:46 | 7 |
| 11:16:49 | 8 |
| 11:16:52 | 9 |
| 11:16:54 | 10 |
| 11:16:58 | 11 |
| 11:17:02 | 12 |
| 11:17:07 | 13 |
| 11:17:09 | 14 |
| 11:17:14 | 15 |
| 11:17:19 | 16 |
| 11:17:21 | 17 |
| 11:17:25 | 18 |
| 11:17:28 | 19 |
| 11:17:33 | 20 |
| 11:17:40 | 21 |
| 11:17:42 | 22 |
| 11:17:43 | 23 |
| 11:17:43 | 24 |
| 11:17:45 | 25 |

majority.

So there's quite a bit of energy, quite a bit of action going around these bills.  And then of course Your Honor has seen the filing by Federal Defendants with respect to rulemaking.

I won't speak more about that, because that is for them to say, but I did just want to touch back on a couple of things in this case, which is that the Court in its preliminary injunction decision mentioned the Court's belief at that time that other branches were responsible for any new DACA-type policy.

The Supreme Court, in a sense, echoed the Court's position when it said at least at the outset that changes to DACA lie with the agency, or in this case Federal Defendants.

Given that DACA is evolving, we believe that it would be appropriate for the Court to stay its hand for at least awhile and not issue a decision on the 2012 DACA memo, which if it is not already moot will be moot soon.

THE COURT:  Okay.

MS. PERALES:  Thank you.

THE COURT:  Mr. Saxena, you want to weigh in?

| | | |
|---|---|---|
| 11:17:49 | 1 | MR. SAXENA:  Thank you, Your Honor. |
| 11:17:52 | 2 | Just for -- with regard to the two bills that you |
| 11:17:56 | 3 | mentioned, it is correct that they're comparable. |
| 11:18:01 | 4 | But H.R.6 is slightly more protective at the |
| 11:18:05 | 5 | margins. |
| 11:18:06 | 6 | For example:  The period of |
| 11:18:08 | 7 | continuous presence under H.R.6 begins in 2021, |
| 11:18:14 | 8 | whereas the period of continuous presence in the |
| 11:18:17 | 9 | Senate bill begins in 2017.  So there are |
| 11:18:21 | 10 | differences.  They're not entirely comparable. |
| 11:18:24 | 11 | For New Jersey's part, I would say |
| 11:18:29 | 12 | we are in agreement and that we are happy that the |
| 11:18:33 | 13 | coordinate branches are moving forward with the |
| 11:18:37 | 14 | processes, both at the Secretary of Homeland |
| 11:18:39 | 15 | Security level, and also potentially the |
| 11:18:44 | 16 | Legislature.  And we believe that the -- this type |
| 11:18:47 | 17 | of movement is -- is what is what people have been |
| 11:18:56 | 18 | waiting to happen. |
| 11:18:58 | 19 | THE COURT:  Mr. Robins, you want to |
| 11:18:59 | 20 | bring me up to date of what's going on from the |
| 11:19:04 | 21 | Fed's side? |
| 11:19:06 | 22 | MR. ROBINS:  Thank you, Your Honor. |
| 11:19:07 | 23 | Should I find myself a microphone? |
| 11:19:08 | 24 | THE COURT:  I think you are loud enough |
| 11:19:10 | 25 | right there, if you don't mind yelling. |

11:19:13    1            MR. ROBINS:  No problem, Your Honor.
11:19:14    2    At the outset, the Federal Defendants respectfully
11:19:18    3    agree with the Defendant-Intervenors and suggest the
11:19:21    4    best course of action, at this point, would be for
11:19:25    5    the Court to defer a ruling on the lawfulness of
11:19:27    6    DACA for a period of time in light of both the
11:19:29    7    pending legislation and the Department of Homeland
11:19:34    8    Security's rulemaking efforts.
11:19:35    9            With regard to the Dream Act --
11:19:39    10    specifically if enacted -- there likely would be no
11:19:40    11    need for this Court to pass on the legality of DACA.
11:19:46    12            Current DACA recipients would be
11:19:47    13    eligible to obtain relief under the new legislation,
11:19:50    14    and most likely moot this case.
11:19:53    15            Federal Defendants also note that
11:19:54    16    none of the legal objections raised to DACA by the
11:19:57    17    Plaintiffs would apply to legislative action taken
11:20:00    18    subsequently by Congress.  And an order potentially
11:20:04    19    finding DACA was either substantively or
11:20:07    20    procedurally unlawful would not alter the benefits
11:20:10    21    potentially inferred by subsequent legislation.
11:20:14    22            The additional point that Federal
11:20:18    23    Defendants have with regard to the Dream Act in
11:20:20    24    response to the Court's order has to do with the
11:20:22    25    disruptive effects of a potential injunction if not

11:20:26    1    stayed by this Court that that could have on DACA

11:20:30    2    recipients, and also as a Supreme Court recognized

11:20:34    3    other interests and equities that rely on DACA

11:20:38    4    recipients in -- as employment in various fields.

11:20:46    5                    And so, Federal Defendants know

11:20:48    6    that -- injunction absence to stay, that those

11:20:50    7    recipients -- that the current DACA recipients would

11:20:54    8    lose their DACA, work authorization, and pending

11:20:57    9    eligibility for adjustment of status if the Dream

11:20:59    10   Act becomes law.  And those are important factors

11:21:03    11   for the Court to consider.

11:21:04    12                   Next I'll turn to the anticipated

11:21:07    13   rulemaking, Your Honor, which Federal Defendants

11:21:12    14   also note -- we believe counsels the Court not to

11:21:15    15   act.  And so, on Friday the Department of Homeland

11:21:18    16   Security announced it intends to issue a notice of

11:21:22    17   rulemaking that would solicit comments on a DACA

11:21:25    18   regulation.

11:21:26    19                   That regulation would directly

11:21:29    20   address procedural concerns raised by the Court and

11:21:33    21   by Plaintiffs creating DACA guidance, and would

11:21:37    22   carefully address the substantive questions that

11:21:39    23   have been raised.

11:21:40    24                   At a minimum, that rulemaking, Your

11:21:43    25   Honor, would change the legal landscape.

| | |
|---|---|
| 11:21:50 | 1 |
| 11:21:51 | 2 |
| 11:21:54 | 3 |
| 11:21:59 | 4 |
| 11:22:02 | 5 |
| 11:22:08 | 6 |
| 11:22:11 | 7 |
| 11:22:14 | 8 |
| 11:22:16 | 9 |
| 11:22:18 | 10 |
| 11:22:20 | 11 |
| 11:22:22 | 12 |
| 11:22:24 | 13 |
| 11:22:28 | 14 |
| 11:22:30 | 15 |
| 11:22:33 | 16 |
| 11:22:35 | 17 |
| 11:22:40 | 18 |
| 11:22:42 | 19 |
| 11:22:46 | 20 |
| 11:22:51 | 21 |
| 11:22:55 | 22 |
| 11:22:58 | 23 |
| 11:23:03 | 24 |
| 11:23:04 | 25 |

THE COURT:  When is that going to happen?  I mean, I'm going to turn next to Texas. That's -- I mean, I can't really put words in Mr. Thompson's mouth and Mr. Sweeten's mouth, but I never hesitated to put words in Mr. Disher's mouth, but I anticipate them saying, "Judge, we've been waiting x-number of years."

So when do you expect the DHS to do something?

MR. ROBINS:  Your Honor, the timing of that is uncertain, but the Department of Homeland Security has authorized me to target that its targeted publication of the rule would occur within four to six months.

There are many factors that come into play in meeting that target and ability to do that, including the number of comments that come in due consideration of those comments.  But the Federal Defendants would note that in light of the delay and the challenge to the 2012 DACA by the State of Texas, the time that's passed sense that's gone into effect that those factors stack up in allowing an additional brief pause or respite before ruling on the question of legality.

THE COURT:  All right.  Do you have any

```
11:23:05   1   field -- I know I'm asking you to step into the
11:23:08   2   shoes of another branch -- but is there any feel
11:23:14   3   from the Justice Department to either of the two
11:23:18   4   acts Ms. Perales told us about?
11:23:23   5               MR. ROBINS:  No, Your Honor.  I don't
11:23:24   6   have a feel.  The Administration has indicated its
11:23:28   7   support for the Dream Act and unfortunately I have
11:23:33   8   no greater understanding or reading for the Court
11:23:39   9   today.
11:23:39  10               THE COURT:  All right.  Thank you,
11:23:43  11   Mr. Robins.
11:23:44  12               MR. ROBINS:  Thank you, Your Honor.
11:23:44  13               THE COURT:  Mr. Thompson, you and
11:23:46  14   Mr. Sweeten want to...
11:23:49  15               MR. THOMPSON:  Thanks very much, Your
11:23:50  16   Honor.  Will Thompson for the State of Texas.  If I
11:23:53  17   may, I'll first address the bill, and then I'll go
11:23:55  18   to the -- on the bill I guess I do have a feeling of
11:24:01  19   whether it's going to pass the Senate and I don't
11:24:03  20   think it is.  It's subject to the 60-vote threshold,
11:24:07  21   both because I think we anticipate someone will
11:24:10  22   filibuster it, but also because even if they don't
11:24:13  23   there's actually a point of order regarding Senate
11:24:14  24   rules.
11:24:15  25               I know this is kind of deep in the
```

11:24:16   1   weeds, but in 8 USC 1254(a), Paragraph H, in the

11:24:21   2   Code it actually creates a Senate rule that says it

11:24:24   3   is not within the order of the Senate to consider on

11:24:27   4   the floor a bill that would turn TPS aliens into

11:24:31   5   lawful permanent residents.  It provides the way to

11:24:35   6   get over that is a 60-vote threshold.

11:24:39   7          So there's a 60-vote threshold for

11:24:41   8   filibusters.  There's this independent reason of the

11:24:44   9   60-vote threshold for this bill.  So it hasn't

11:24:46   10  passed.  I don't think we should hold our breath on

11:24:49   11  waiting for it to pass.

11:24:52   12          With regard to Senator Durbin's

11:24:55   13  bill, I'll just note that Senator Durbin has

11:24:57   14  introduced substantially similar bills every year

11:25:00   15  and not one of them has passed.

11:25:02   16          We just don't -- there's no way

11:25:04   17  that can we expect any kind of timely action with

11:25:07   18  any kind of certainty -- I don't think.  With regard

11:25:10   19  to the Federal Government's notice of a potential

11:25:13   20  future notice of proposed rulemaking, it sounds like

11:25:17   21  it's potentially four to six months away.

11:25:19   22          I take it after that there will be

11:25:22   23  notice of comment.  We don't know what will happen

11:25:24   24  with that.  And certainly my friends on the other

11:25:27   25  side can't promise that the final rule will even

11:25:30   1   ever go into effect or what it will say.  Because

11:25:32   2   that would be contrary to the APA's requirement that

11:25:35   3   they thoughtfully considered the has-yet-to-happen

11:25:38   4   comments.

11:25:38   5                    But just -- we can imagine

11:25:40   6   hypothetically for the sake of argument that if

11:25:43   7   either one of these things happened what would be

11:25:45   8   the effect.  Well, with regard to the bill it

11:25:47   9   absolutely would not moot our challenge to DACA.

11:25:49   10                  THE COURT:  Okay.  Why is that?

11:25:51   11                  MR. THOMPSON:  Couple of reasons, Your

11:25:53   12   Honor.  One could imagine a bill that says, "There's

11:25:57   13   an existing DACA program created by executive

11:26:00   14   action, we hereby bless and ratify it."

11:26:05   15                  That's not what this bill does.  It

11:26:06   16   creates a separate program for separate eligibility

11:26:09   17   requirements.

11:26:09   18                  There's some overlap, of course,

11:26:11   19   but the eligibility requirements are not a complete

11:26:14   20   overlap.  So there will be people who are eligible

11:26:15   21   for DACA who would not able to proceed under this

11:26:17   22   bill, and vice versa.

11:26:19   23                  THE COURT:  Really?  Give me an

11:26:21   24   example?

11:26:21   25                  MR. THOMPSON:  Sure.  One example has

11:26:22   1   to do with the persecution requirement.  2012 DACA

11:26:26   2   notes -- there's nothing about persecution in there.

11:26:29   3   In the bill, one of the requirements is that people

11:26:31   4   applying not having previously committed acts of

11:26:33   5   persecution.

11:26:35   6              The timing is also different.  So

11:26:37   7   the document was tied to having been in United

11:26:39   8   States at the time --

11:26:40   9              THE COURT:  Wasn't the timing broad

11:26:42   10  enough that it would sweep up all the DACA people?

11:26:45   11  That's the way I read it.

11:26:48   12             MR. THOMPSON:  I don't think it would,

11:26:49   13  Your Honor.  It obviously depends on what sorts of

11:26:52   14  people exist out there in the world, but given the

11:26:55   15  large numbers it's not a complete overlap.

11:26:57   16             THE COURT:  Okay.

11:26:58   17             MR. THOMPSON:  Right.  Different people

11:27:00   18  and it creates a different program.  So it's not --

11:27:03   19  the law -- if it became a law -- would not just say,

11:27:07   20  "You get all of the DACA benefits."

11:27:09   21             It actually would turn them into

11:27:11   22  lawful permanent residents -- or conditional, lawful

11:27:14   23  permanent residents.  So different people.

11:27:16   24  Different benefits.  Not yet -- essentially never a

11:27:19   25  law.

11:27:21  1              With regard to the potential

11:27:23  2  executive action from DHS, my friend on the other

11:27:27  3  side who was very careful in his wording said it

11:27:30  4  would address the procedural objections.

11:27:32  5              It might or might not.  Obviously

11:27:34  6  depends on what they do.  There might be a whole new

11:27:37  7  host of procedural objections, depending on how the

11:27:40  8  agency proceeds.  But what he didn't say was that it

11:27:42  9  would affect the substantive objections, because it

11:27:44  10 wouldn't.

11:27:45  11             Your Honor has previously ruled in

11:27:47  12 the PI order that this is not an ambiguous statutory

11:27:51  13 situation that is subject to *Chevron* deference.  So

11:27:54  14 there's nothing they can do through agency action

11:27:58  15 like rulemaking that affects the unlawfulness of the

11:28:02  16 program.  Unless Your Honor has --

11:28:04  17             THE COURT:  Let me ask you a different

11:28:05  18 question while I have you.  Let's assume I decide

11:28:11  19 that I -- I'm not going to wait because I think

11:28:19  20 we've counted up to -- I think we got up to 30

11:28:23  21 different bills that have been introduced and not

11:28:27  22 passed.  Still waiting for that may be like waiting

11:28:34  23 for -- but what would remedy -- let's say I rule and

11:28:41  24 I rule in your favor, what's the remedy?

11:28:46  25             MR. THOMPSON:  I think the standard

11:28:47  1    remedy under §706 of the APA is Vacatur, so the

11:28:52  2    statutory language is hold unlawful and set aside.

11:28:54  3    That's been interpreted to mean vacate the

11:28:59  4    underlying agency action.  In this case, the memo.

11:29:02  5            THE COURT:  Well, doesn't that, in a

11:29:06  6    way, play into what Mr. Robins was suggesting is --

11:29:12  7    you are suggesting I vacate it and send it back.

11:29:16  8                Wouldn't that be what they're doing

11:29:18  9    anyway?

11:29:20  10           MR. THOMPSON:  No, Your Honor.  Because

11:29:22  11   what they're doing now --

11:29:23  12           THE COURT:  We don't know what they're

11:29:25  13   doing.

11:29:25  14           MR. THOMPSON:  Right.

11:29:26  15           THE COURT:  Exactly, but isn't that

11:29:28  16   what they anticipate doing?

11:29:30  17           MR. THOMPSON:  I think the difference

11:29:31  18   is whether the 2012 memo remains in effect during

11:29:35  19   that period or not.  In addition, it's always

11:29:40  20   difficult to play this game, but I suspect that

11:29:43  21   given the failure to pass and take serious action on

11:29:46  22   DACA issues with the 2012 memo in place, perhaps the

11:29:51  23   2012 memo being out of the picture will provide

11:29:55  24   sufficient clarity, and the motivation for people to

11:29:57  25   act and, you know, political branchs to take more

11:30:01  1   responsibility on this issue.

11:30:02  2           THE COURT:  Okay.  I assume it's

11:30:03  3   ya'll's position that I should go ahead and rule?

11:30:09  4           MR. THOMPSON:  Yes, Your Honor.  And

11:30:10  5   we're heartily grateful to see that line in Your

11:30:12  6   Honor's order about not delaying any court action.

11:30:19  7           THE COURT:  All right.  Okay.  Thank

11:30:21  8   you.

11:30:21  9                   Ms. Perales, you or Mr. Saxena --

11:30:29  10  you know, as you know from the order that I wrote

11:30:31  11  that I am working on this.  I mean, what -- if you

11:30:38  12  could convince me otherwise, what time period would

11:30:40  13  you argue that I should wait?

11:30:49  14          MS. PERALES:  Your Honor, I have a lot

11:30:54  15  to say based on what Texas just said.  But to

11:30:56  16  address the Court's question, I think the point is

11:30:59  17  well taken that Texas delayed, I believe, six years

11:31:04  18  in filing its challenge.  So if we apply what

11:31:09  19  happened on the front end to --

11:31:11  20          THE COURT:  Wait six years?

11:31:14  21          MS. PERALES:  I would suggest six

11:31:18  22  years.

11:31:18  23          THE COURT:  That would make my law

11:31:19  24  clerks happy.

11:31:22  25          MS. PERALES:  We're here to serve.  I

11:31:27   1   would say that given the motion -- given -- given

11:31:34   2   events, given that DACA is evolving in this very

11:31:38   3   moment, whether it's by legislation or proposed

11:31:43   4   rulemaking -- obviously discussions are occurring

11:31:45   5   within DHS and possibly the administration about

11:31:50   6   whatever is going to come next that the six-year

11:31:54   7   delay by Texas means that the Court ought to give

11:32:00   8   enough time to have the rulemaking play itself out.

11:32:03   9           We disagree strongly that there's

11:32:05   10   no possible conceivable rulemaking that could

11:32:08   11   address the claims in this case.  It's just simply

11:32:11   12   not true.  I think Texas was more than happy to see

11:32:15   13   the prior administration's movement with respect to

11:32:21   14   changes to DACA.

11:32:22   15           That undercuts the argument that

11:32:25   16   they're making today.  And so we would urge the

11:32:28   17   Court to allow the rulemaking process to play itself

11:32:32   18   out.  Because as I mentioned earlier, any review of

11:32:37   19   this Court's decision -- you know, could potentially

11:32:41   20   could become moot by the time we get to that.

11:32:46   21           THE COURT:  Okay.

11:32:49   22           MR. SAXENA:  Your Honor, while

11:32:53   23   counsel's correct that, you know, we have seen

11:32:56   24   proposed legislation before, I would like to just

11:33:01   25   focus on the Department of Homeland Security

11:33:03  1  process.  That is the order of the process that

11:33:11  2  regions requires.

11:33:14  3                 There's -- there's relief

11:33:17  4  available, including remand to the agency for

11:33:20  5  further consideration.  DHS is already engaged in

11:33:25  6  the process as Your Honor noted.  Um, that process

11:33:29  7  can be allowed to play out.  We aren't just waiting

11:33:35  8  now.  There already has been a public announcement

11:33:38  9  that the process has begun.

11:33:43  10                And it is our position that we

11:33:44  11  should allow that process to play out as the Court

11:33:48  12  contemplated in *Regents*.

11:33:51  13                THE COURT:  Mr. Robins?

11:33:52  14                MR. ROBINS:  Very briefly, Your Honor.

11:33:53  15  First I would note -- if I omitted stating this -- I

11:33:56  16  would note for Your Honor in response to Texas's

11:33:59  17  comments that the Department does intend that their

11:34:03  18  notice of proposed rulemaking would carefully

11:34:06  19  address the substantive questions as well.

11:34:09  20                THE COURT:  How would it do that?

11:34:10  21                MR. ROBINS:  I don't know precisely how

11:34:13  22  it would intend to do that, Your Honor, but my

11:34:17  23  understanding is that there's room to do so and that

11:34:20  24  they intend to do that.

11:34:21  25                Let me transition that point to

11:34:23   1   Your Honor's question in terms of the timing if Your

11:34:28   2   Honor were to continue to wait.  I think at least

11:34:32   3   six months would be appropriate.  The reason why

11:34:37   4   would be is at that point we anticipate there would

11:34:40   5   be notice of proposed rulemaking out.

11:34:43   6              We would see what's happening with

11:34:45   7   the legislative efforts, and that seems a perfectly

11:34:49   8   appropriate time to take measure of where things are

11:34:52   9   and what further action is required.

11:34:57   10              And so, once that notice of

11:35:02   11   proposed rulemaking is out, Your Honor would be able

11:35:05   12   to see what the intended approach to the substantive

11:35:07   13   questions are.

11:35:08   14              THE COURT:  Well, if the -- if Congress

11:35:12   15   actually acted, it would moot your efforts, too,

11:35:17   16   depending on how it's raised.

11:35:19   17              MR. ROBINS:  It very well may.  Not

11:35:22   18   prepared to say, you know, with any definition the

11:35:25   19   extent of that.  I think there's several --

11:35:27   20              THE COURT:  I don't think anybody in

11:35:28   21   this courtroom's going to bet on what they think

11:35:31   22   Congress is going to do.

11:35:33   23              MR. ROBINS:  But as I come to a close,

11:35:36   24   Your Honor, let me also just note that if Your Honor

11:35:38   25   isn't inclined to wait for the legislative process

11:35:41  1   or the rulemaking that at least given there's been

11:35:45  2   change in administration, the Federal Defendants

11:35:47  3   would require the opportunity to submit a

11:35:50  4   supplemental brief that addresses both the

11:35:53  5   lawfulness of DACA to engage in that discussion, as

11:35:56  6   well as the appropriate remedy at this point.

11:35:59  7              Because remedy is a key question in

11:36:02  8   terms of how the Court should approach the reliance

11:36:07  9   interests of current DACA recipients.

11:36:09 10              THE COURT:  Okay.  I will give you and

11:36:11 11   anyone else -- if you want to file something -- but

11:36:14 12   do it by a week from this Friday.  I don't know --

11:36:22 13   what's that date?

11:36:23 14              THE CASE MANAGER:  The 9th.

11:36:25 15              THE COURT:  The 9th.

11:36:26 16              MR. ROBINS:  Thank you, Your Honor.

11:36:27 17              THE COURT:  All right.

11:36:30 18              MR. THOMPSON:  Your Honor, may I?

11:36:32 19   Thank you.  Just one final point.  This new point

11:36:35 20   about remand without making sure of being under the

11:36:38 21   APA, there's a raging debate in the D.C. Circuit

11:36:42 22   about the propriety of that as a remedy, but I don't

11:36:45 23   think anyone takes the position that that's an

11:36:48 24   appropriate remedy where the rule is substantively

11:36:50 25   number lawful.

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
| 11:36:51 | 1  | If it were an arbitrary capricious |
| 11:36:52 | 2  | problem based on poor reasoning or something, like |
| 11:36:54 | 3  | the Supreme Court said in the *Regents* case, that's |
| 11:36:56 | 4  | the time when a Court may potentially remand without |
| 11:36:59 | 5  | vacating. |
| 11:36:59 | 6  | But given the substantive |
| 11:37:01 | 7  | unlawfulness ruling in this Court, that's not an |
| 11:37:03 | 8  | option here. |
| 11:37:08 | 9  | THE COURT:  I see you grabbing your |
| 11:37:09 | 10 | mask.  That's the COVID equivalent of raising your |
| 11:37:15 | 11 | hand. |
| 11:37:17 | 12 | MR. SAXENA:  Your Honor, I just say we |
| 11:37:18 | 13 | respectfully disagree.  There is still a place for |
| 11:37:24 | 14 | the -- for the process.  DHS can take comment, can |
| 11:37:30 | 15 | -- do notice and comment on both -- can remedy |
| 11:37:34 | 16 | procedural defects and address substantive defects |
| 11:37:37 | 17 | as part of the process. |
| 11:37:38 | 18 | THE COURT:  Can they do both?  I mean, |
| 11:37:43 | 19 | could there be a remand and an appeal if I was to |
| 11:37:54 | 20 | rule in the favor of State of Texas? |
| 11:37:59 | 21 | MR. SAXENA:  So to that, Your Honor, I |
| 11:38:01 | 22 | would just say I think the principle there is that |
| 11:38:09 | 23 | the relief granted by the Court should be narrowly |
| 11:38:13 | 24 | tailored to address. |
| 11:38:15 | 25 | And, you know, a vacatur at this |

11:38:19  1   point, when the order of the process is already

11:38:22  2   started and could continue, um, through a remand in

11:38:26  3   our view it -- it is extra and it's not necessary to

11:38:32  4   readdress any harm.

11:38:35  5           THE COURT:  Okay.  All right.  Anyone

11:38:36  6   want to say anything?

11:38:39  7               Mr. Sweeten, Mr. Thompson, welcome

11:38:42  8   to the party.

11:38:44  9           MR. THOMPSON:  Thank you very much,

11:38:45  10  Your Honor.

11:38:45  11          THE COURT:  Thank you.  Ya'll stay

11:38:52  12  safe.

11:38:52  13          **(PROCEEDINGS ADJOURNED AT: 11:38 A.M.)**

          14                   ---oOo---

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1          C E R T I F I C A T E

2

3

4          I hereby certify that pursuant to Title 28,

5    Section 753 United States Code, the foregoing is a

6    true and correct transcript of the stenographically

7    reported proceedings in the above matter.

8          Certified on 04/05/2021.

9

10

11   _____
     Sean Gumm, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25