**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, *et al.*, )<br><br>Defendants, )<br><br>*and* )<br><br>KARLA PEREZ, *et al.*, )<br><br>Defendant-Intervenors, )<br>*and* )<br><br>STATE OF NEW JERSEY )<br><br>Defendant-Intervenor. ) | Case No. 1:18-CV-68 |

**DEFENDANT-INTERVENORS'
SUPPLEMENTAL BRIEF REGARDING THE IMPACT OF RECENT
DEVELOPMENTS IN THE LEGISLATIVE & EXECUTIVE BRANCHES**

## TABLE OF CONTENTS

Page(s)

I.   Statement of the Issues to be Ruled upon by the Court .................................................. 1

II.  Statement of the Nature & Stage of the Proceeding .................................................... 2

III. Summary of the Argument .................................................................................... 2

IV.  Argument .......................................................................................................... 3

    A.   The Acts Would Moot the Case, or So Substantially Change It that Plaintiffs' Previous Attempts to Distinguish DACA from Historical Examples of Deferred Action Would No Longer Apply ................................................................ 3

        1.   The Acts would cover all DACA recipients and nearly all individuals eligible for DACA ................................................................ 5

        2.   A drastic reduction in DACA's scope would present a very different substantive question in light of the even closer analogy to historical examples of deferred action. ................................................ 7

        3.   Plaintiffs exaggerate the supposed procedural hurdles preventing the Acts' passage. .................................................................... 9

    B.   DHS's Intent to Issue a Notice of Proposed Rulemaking Further Counsels in Favor of Waiting to Rule .......................................................................... 10

    C.   To the Extent the Acts or a New DHS Rule Would Not Moot the Case Entirely, Either Would Significantly Impact Plaintiffs' Standing, a Key Threshold Issue in this Litigation ...................................................................................... 13

    D.   If the Court Is Determined to Rule Now, It Should Remand DACA to DHS without Vacating It .................................................................................. 15

V.   Conclusion ...................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993)........................................................................16, 17, 19

*B.J. Alan Co., Inc. v. ICC,*
  897 F.2d 561 (D.C. Cir. 1990)....................................................................................11

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...................................................................................................20

*Cal. Communities Against Toxics v. U.S. Env't Prot. Agency,*
  688 F.3d 989 (9th Cir. 2012).......................................................................................16

*Cent. & S.W. Servs., Inc. v. U.S. Env't Prot. Agency,*
  220 F.3d 683 (5th Cir. 2000).......................................................................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) .........................................................................................*passim*

*Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.,*
  653 F.3d 1 (D.C. Cir. 2011).........................................................................................19

*Georgia v. Wheeler,*
  418 F. Supp. 3d 1336 (S.D. Ga. 2019) .......................................................................17

*Inter-Cont'l Promotions, Inc. v. MacDonald,*
  367 F.2d 293 (5th Cir. 1966).......................................................................................10

*N. Air Cargo v. U.S. Postal Serv.,*
  674 F.3d 852 (D.C. Cir. 2012)...............................................................................12, 16

*North Carolina v. U.S. Env't Prot. Agency,*
  550 F.3d 1176 (D.C. Cir. 2008)...................................................................................19

*Roho, Inc. v. Marquis,*
  902 F.2d 356 (5th Cir. 1990).......................................................................................20

*Shands Jacksonville Med. Ctr., Inc. v. Azar,*
  366 F. Supp. 3d 32 (D.D.C. 2018), *aff'd,* 959 F.3d 1113 (D.C. Cir. 2020) ............10

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015).............................................................................16

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ................................................................... 19

*Texas v. U.S. Env't Prot. Agency*,
   389 F. Supp. 3d 497 (S.D. Tex. 2019) ..................................................... 16

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .......................................................... *passim*

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) ................................................................................ 9

*Westchester Media v. PRL USA Holdings, Inc.*,
   214 F.3d 658 (5th Cir. 2000) ................................................................. 20

**Constitutions**

U.S. Const. art. I, § 7 ............................................................................... 10

**Statutes**

5 U.S.C. § 553 ......................................................................................... 10

8 U.S.C. § 1254a ................................................................................. 9, 10

**Proposed Legislation**

American Dream and Promise Act of 2021, H.R. 6, 117th Con. 1st Sess. (2021) ................ *passim*

Dream Act of 2021, S. 264, 117th Cong., 1st Sess. (2021) ................................... *passim*

**Other Authorities**

*The Dream Act: An Overview*, American Immigration Council (Mar. 16, 2021),
   https://www.americanimmigrationcouncil.org/research/dream-act-overview ......................... 6

## I.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Congress has in recent months made significant progress to address "the eligibility of the [Deferred Action for Childhood Arrivals ("DACA")] recipients to remain in the United States and to continue contributing their skills and abilities to the betterment of this country," an issue this Court has suggested is "crying out for a legislative solution."  Dkt. 319 at 115–16.  Two bills making their way through Congress—the Dream Act of 2021, S. 264, 117th Cong., 1st Sess. (2021),[1] introduced by Republican Senator Lindsey Graham and Democratic Senator Richard J. Durbin (the "Senate Bill"), and the American Dream and Promise Act of 2021, H.R. 6, 117th Con. 1st Sess. (2021),[2] which passed the House with 228 votes and bipartisan support (the "House Bill" and, together with the Senate Bill, the "Acts")—would make all DACA recipients and nearly all immigrants who are eligible for DACA also eligible for lawful permanent residence.  At the direction of President Joseph R. Biden, the Department of Homeland Security ("DHS") is also taking steps to "preserve and fortify DACA" in adherence "with applicable law." Ex. 550-1 at 1. According to Federal Defendants, DHS will, in the coming months, issue a Notice of Proposed Rulemaking concerning DACA.  *See* Dkt. 563.

The issues before the Court are thus: (1) whether the Court should withhold judgment on DACA's merits in light of ongoing legislative and executive actions, which may moot Plaintiffs' case; and (2) if the Court determines to rule on DACA's merits now and find (contrary to Defendant-Intervenors' arguments) that DACA is unlawful, whether it should remand to DHS without vacatur.

---

[1] *See* S. 264 – Dream Act of 2021, https://www.congress.gov/bill/117th-congress/senate-bill/264?r=4&s=1.

[2] *See* H.R. 6 – American Dream and Promise Act of 2021, https://www.congress.gov/bill/117th-congress/house-bill/6.

## II.     STATEMENT OF THE NATURE & STAGE OF THE PROCEEDING

Plaintiffs re-filed their Motion for Summary Judgment ("MSJ") on October 9, 2020.  *See* Dkt. 486.  On November 6, 2020, Federal Defendants filed a Response, and Defendant-Intervenor New Jersey filed an Opposition to Plaintiffs' MSJ.  *See* Dkts. 501, 502.  That same day, Defendant-Intervenors Karla Perez, *et al.* (the "Perez Defendant-Intervenors," and, together with New Jersey, the "Defendant-Intervenors") also filed an Opposition to Plaintiffs' MSJ, as well as their own Motion for Summary Judgment as to Plaintiffs' Standing.  *See* Dkts. 503, 504.  The Court heard argument on the parties' summary judgment motions on December 22, 2020, and held a status conference on March 30, 2021, regarding the possible impact of the Acts on this litigation.  At that status conference, the Court permitted the parties to submit supplemental written responses.

## III.    SUMMARY OF THE ARGUMENT

In its decision denying Plaintiffs' Motion for a Preliminary Injunction, this Court held that Congress, not the judiciary, should determine DACA's future.  Dkt. 319 at 117.  Two years later, in *Department of Homeland Security v. Regents of the University of California*, the Supreme Court of the United States agreed that the political branches, not the courts, must address the "important policy choices" surrounding DACA.  140 S. Ct. 1891, 1910 (2020) ("*Regents*").  Congress and DHS are now actively working to address the issues this Court and the Supreme Court called on them to solve.

The Court should thus refrain from issuing a ruling that will likely soon be stale.  The Acts cover all DACA recipients and nearly all immigrants eligible for DACA, they have bipartisan support, and, contrary to Plaintiffs' arguments, the supposed supermajority requirement for the Acts' temporary protected status ("TPS")-related components is invalid and ineffective as a matter of law.  DHS's forthcoming Notice of Proposed Rulemaking—which Federal Defendants have indicated that DHS will, consistent with the new Administration's priorities, issue in the coming

months—also is likely to resolve all of Plaintiffs' claims.  As a result, the passage of either of the Acts or DHS's forthcoming rulemaking will likely either entirely moot the case or, at a minimum, require the Court to reexamine Plaintiffs' standing and reconsider numerous issues on the merits.[3] Consistent with guidance from the Supreme Court and the Court's own recognition that the political branches are best-suited to address questions relating to DACA, the Court should allow the political processes to play out before issuing a decision.  If the Court is inclined to rule in Plaintiffs' favor on the merits now, however, the Court should remand DACA to DHS without vacatur.  Remand without vacatur is an available—and the appropriate—remedy, particularly given that this remedy would both best support the ongoing activities of the political branches and protect DACA recipients and their families from severe disruption in the coming months.

## IV.  ARGUMENT

### A.  The Acts Would Moot the Case, or So Substantially Change It that Plaintiffs' Previous Attempts to Distinguish DACA from Historical Examples of Deferred Action Would No Longer Apply

If Congress passes either Act, Plaintiffs' case would be essentially moot.  Like DACA, the Acts apply to immigrants who entered the United States as children; have lived in the United States continuously for a specified period of time; have attained certain educational milestones; and have not committed certain crimes.  Although the Acts would also apply to a broader set of immigrants, they would cover ***nearly all*** immigrants currently eligible for DACA and ***all*** DACA recipients. As described in more detail below, the only immigrants who satisfy the general criteria for eligibility for an exercise of prosecutorial discretion under DACA who do ***not*** satisfy the general criteria to apply for an adjustment of status under either Act are the small number of immigrants

---

[3] Defendant-Intervenor New Jersey did not join the Perez Defendant-Intervenors' Motion for Summary Judgment with respect to standing.  Defendant-Intervenor New Jersey likewise does not join Argument IV.C below, in which the Perez Defendant-Intervenors address the potential impact of further legislative or regulatory action on their standing arguments.

who did not obtain a high school diploma or GED but who are honorably discharged veterans.[4] The Acts, however, also explicitly instruct the Secretary of Homeland Security to implement procedures to adjust the status of *all* immigrants who have already received and remain eligible to renew DACA.  *See* H.R. 6 (Ex. 1) § 102(b)(3)(B); S. 264 (Ex. 2) § 3(b)(4).  Because the Acts would extend to *all* DACA recipients and *virtually all* immigrants eligible for DACA, passage of either Act would virtually entirely moot Plaintiffs' case.  For that reason, the Court should allow Congress more time to act before it issues a ruling that may soon be mooted or vacated by the political branches.

Plaintiffs' arguments at the March 30, 2021, status conference in favor of the Court taking immediate action are unavailing.  *First*, although the Acts in their current form would not apply to a very small subset of individuals eligible for DACA, the Acts do apply to *all* current DACA recipients, profoundly changing the nature of Plaintiffs' case and the Court's analysis.  Plaintiffs' argument that DACA violates substantive law depends fundamentally on the size of the immigrant population eligible for DACA.  *See, e.g.*, Dkt. 486 at 41–44 & n.6.  The Fifth Circuit's decision regarding the lawfulness of Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") in *Texas v. United States*, 809 F.3d 134, 170, 180–85 (5th Cir. 2015) ("*Texas DAPA*"), likewise relied significantly on DAPA's size to distinguish it from other historical

---

[4] *Compare* Dkt. 400-7, Ex. 36 at 1, *with* H.R. 6 (Ex. 1) § 102(b)(1)(D); S. 264 (Ex. 2) § 3(b)(1)(D).  At the March 30, 2021, status hearing, Plaintiffs also suggested that the Acts' "persecution bars," H.R. 6 (Ex. 1) § 102(b)(1)(C)(ii); S. 264 (Ex. 2) § 3(b)(1)(C)(ii), and "timing requirements" demonstrate that the Acts and DACA do not perfectly overlap. Plaintiffs are incorrect.  Individuals excluded by the Acts' persecution bars are also likely not eligible for DACA, first because DACA recipients came to the United States before reaching the age of sixteen, and second because DACA does not include, among those who are eligible for an exercise of prosecutorial discretion, individuals who "pose[] a threat to national security or public safety."  Dkt. 400-7, Ex. 36 at 1.  Moreover, it is unlikely that an agency official would exercise discretion to grant removal-forbearance to someone who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."  H.R. 6 (Ex. 1) § 102(b)(1)(C)(ii); S. 264 (Ex. 2) § 3(b)(1)(C)(ii); *see also* Dkt. 215 at 25 ("the supervisors and I also like to jokingly say that our standard is whether or not you would want to live next door to the person") (citation omitted).  And, as explained below, *see* note 6, any individual who satisfies DACA's continuous presence requirement *would also* satisfy the Acts' timing requirements.

examples of deferred action and to conclude that DAPA exceeded DHS's discretion to exercise individualized prosecutorial discretion.  And this Court has also previously suggested that its analysis of DACA's lawfulness could change if DACA affected fewer immigrants.  *See* Dkt. 319 at 85–86.  As a result, as the population of immigrants eligible for protection under DACA but not one of the Acts approaches zero, the legal questions in this case would change.  ***Second***, passage of either of the Acts is not as unlikely as Plaintiffs would have the Court believe.  Under the doctrine against legislative entrenchment, any supermajority requirement for TPS-related legislation is invalid, as previous Congresses cannot lawfully bind the current Congress.  In any event, Congress could address any TPS-related issues in separate legislation carved off from the Acts.

Because a legislative solution is on the horizon and because the passage of either Act (or similar legislation) would moot Plaintiffs' case altogether or would require Plaintiffs to dramatically reframe—and the Court to reconsider—their arguments about DACA's lawfulness, it would be premature and inefficient for the Court to rule on Plaintiffs' Motion for Summary Judgment now.

1.   *The Acts would cover all DACA recipients and nearly all individuals eligible for DACA.*

Like an immigrant's eligibility for adjustment of status under the Acts, an immigrant's eligibility for an exercise of prosecutorial discretion under DACA generally turns on the immigrant's date of entry to the United States; age at entry; educational achievements; and compliance with the law.  *Compare* H.R. 6 (Ex. 1) § 102(b)(1) *and* S. 264 (Ex. 2) § 3(b)(1), *with* Dkt. 400-7, Ex. 36 at 1.  DACA, however, generally imposes ***stricter*** eligibility requirements than either of the Acts.  To be eligible for DACA, an immigrant must have entered the United States at

a *younger* age,[5] been continuously present in the United States for a *longer* period of time,[6] achieved a similar set of educational or career milestones,[7] and avoided committing an even *broader* set of crimes.[8]  As a result, a broader set of immigrants would be eligible under the Acts as compared to DACA, and *nearly all* immigrants who satisfy DACA's general eligibility requirements for an exercise of prosecutorial discretion would *also* satisfy the general eligibility requirements for adjustment of status under the Acts.[9]  Indeed, whereas approximately 700,000 immigrants have received DACA, *see Regents*, 140 S. Ct. at 1901, the Migration Policy Institute estimates that approximately 3 million immigrants would qualify for conditional permanent resident status under H.R. 6 (and 2 million would be eligible under S. 264), and almost 1.1 million more immigrants (or 1 million more under S. 264) could become eligible by enrolling in school.[10]

---

[5] *Compare* Dkt. 400-7, Ex. 36 at 1 (under the age of sixteen), *with* H.R. 6 (Ex. 1) § 102(b)(1)(B) (eighteen or younger), *and* S. 264 (Ex. 2) § 3(b)(1)(B) (younger than eighteen).

[6] *Compare* Dkt. 400-7, Ex. 36 at 1 (continuous residence since June 15, 2007, and present in the United States on June 15, 2012), *with* H.R. 6 (Ex. 1) § 102(b)(1)(A) (continuous presence since January 1, 2021), *and* S. 264 (Ex. 2) § 3(b)(1)(A) (continuous presence since four years before Act's enactment).

[7] *Compare* Dkt. 400-7, Ex. 36 at 1 (currently in school; graduated from high school or obtained GED; or honorably discharged veteran), *with* H.R. 6 (Ex. 1) § 102(b)(1)(D) (admitted to institution of higher education or career and technical education school at the postsecondary level; obtained a high school diploma, GED, secondary-level career and technical education credential or certificate, or recognized postsecondary credential; or enrolled in secondary school or an education program assisting students in obtaining one of the foregoing credentials, certificates, or diplomas), *and* S. 264 (Ex. 2) § 3(b)(1)(D) (admitted to an institution of higher education; earned a high school diploma, GED, or commensurate award; or enrolled in secondary school or education program assisting students in obtaining one of the foregoing diplomas or commensurate credentials).

[8] *Compare* Dkt. 400-7, Ex. 36 at 1 (immigrant must not have been convicted of a felony offense; a significant misdemeanor offense; or multiple misdemeanor offenses), *with* H.R. 6 (Ex. 1) § 102(c) (excluding minor traffic offenses and immigration offenses, and subject to waivers for certain misdemeanors, immigrant must not have been convicted of any felony offense, three or more misdemeanor offenses (excluding certain cannabis-related offenses), or most misdemeanor offenses of domestic violence), *and* S. 264 (Ex. 2) § 3(b)(1)(C)(iii) (immigrant must not have been convicted of any non-immigration offense punishable by a maximum term of imprisonment of more than 1 year or three or more non-immigration offenses on different dates and imprisoned for an aggregate of 90 days or more).

[9] An immigrant who has been honorably discharged from the Coast Guard or Armed Forces but has not obtained a high school diploma or GED and is not enrolled in school is eligible for DACA but does not satisfy the general eligibility requirements under the Acts. *Compare* Dkt. 400-7, Ex. 36 at 1, *with* H.R. 6 (Ex. 1) § 102(b)(1)(D) (eligibility limited to certain educational achievements or enrollments), *and* S. 264 (Ex. 2) § 3(b)(1)(D) (same).

[10] *See The Dream Act: An Overview*, American Immigration Council (Mar. 16, 2021), https://www.americanimmigrationcouncil.org/research/dream-act-overview.

The population of immigrants eligible for adjustment of status under the Acts thus not only almost entirely **overlaps** with the population of individuals eligible for DACA, but estimates show that the Acts would **materially expand** that population.

Moreover, the Acts make current DACA recipients eligible for an adjustment of status **specifically because they are DACA recipients**.  If the Senate Bill becomes law, for example, DHS will be required to "cancel the removal of, and adjust to the status of an [immigrant] lawfully admitted for permanent residence on a conditional basis" any immigrants who received and remain eligible for DACA.  S. 264 (Ex. 2) § 3(b)(4).[11]  Thus, if either Act becomes law, all DACA recipients and nearly all individuals eligible for DACA will receive legislative protection.

> 2. *A drastic reduction in DACA's scope would present a very different substantive question in light of the even closer analogy to historical examples of deferred action.*

Even if passage of either of the Acts does not entirely moot the case, the pending legislative action still counsels against the Court making a substantive decision about DACA's legal merits now.  As DACA's size narrows, the claim that *Texas DAPA* controls this case becomes ever more unfounded.  Indeed, the Executive Branch has long used deferred action to de-prioritize the removal of certain immigrant groups, *see, e.g.*, Dkt. 504 at 4–5 (collecting cases and examples); Dkt. 224 at 2–3 & n.1 (same), but throughout this case, Plaintiffs have urged the Court to disregard those historical exercises of deferred action by arguing that the previous policies were interstitial in nature and smaller in size.  Dkt. 486 at 43–44 & n. 6.  Plaintiffs' argument derives from the Fifth Circuit's opinion in *Texas DAPA*, which distinguished DAPA from the Executive Branch's previous deferred-action policies because those policies were interstitial to statutory schemes and because they did not apply to millions of immigrants, as DAPA did.  *See* 809 F.3d at 184–85.  In

---

[11] Similarly, under the House Bill, the Secretary of Homeland Security will be required to "establish a streamlined [application] procedure" for immigrants who received and remain eligible for DACA.  H.R. 6 (Ex. 1) § 102(b)(3)(B).

its decision denying Plaintiffs' Motion for a Preliminary Injunction, this Court expanded the Fifth Circuit's reasoning to DACA. *See* Dkt. 319 at 86–90. In the Court's view, unlike DACA, the "Family Fairness" policies of 1987 and 1990 were interstitial because "the policies' purpose was to delay prosecution until Congress could enact legislation providing the same benefits." *Id.* at 89. DACA's size also played a significant role in the Court's analysis: "The 1.5 million people DACA would permit to receive lawful presence and work authorization are still too numerous to fit into the individualized notion of deferred action that courts have found permissible in other contexts. Over a million individuals is still an outsized number, and it remains outside the authority of the agency to defer action for this many people." *Id.* at 86.

Passage of either of the Acts or similar legislation would thus fundamentally change the substantive issue facing the Court. First, although a small portion of individuals eligible for DACA may not receive legislative protection under the Acts, either proposed Act would drastically reduce DACA's size. As a result, even if the Court holds now that a deferred-action policy that applies to"[o]ver a million individuals is . . . outsized . . . and outside the authority of the agency," Dkt. 319 at 86, the Court would need to revisit this conclusion if DACA applies to significantly fewer immigrants after Congress legislates. Second, as legislative momentum continues to increase, DACA today plays a role similar to that of the Family Fairness policies of 1987 and 1990, as its purpose is increasingly "to delay prosecution until Congress [can] enact legislation providing the same benefits." Dkt. 319 at 89. As a result, if the Court decides Plaintiffs' challenge to DACA under *Texas DAPA* now, it will likely need to revisit its analysis later. Because of this uncertainty—and because any substantive decision the Court makes now may soon be moot—the Court should allow the ongoing legislative process to continue.

3.  *Plaintiffs exaggerate the supposed procedural hurdles preventing the Acts' passage.*

During the March 30, 2021, status conference, Plaintiffs erroneously suggested that the Acts would need a supermajority to pass the Senate because, in addition to granting lawful permanent residence to all (Senate Bill) or nearly all (House Bill) DACA recipients, they also grant lawful permanent residence to immigrants with TPS.  *See* 8 U.S.C. § 1254a(h) (requiring a supermajority in the Senate to approve an adjustment to lawful resident status for any immigrant with TPS); *see also* H.R. 6 (Ex. 1) § 102(b)(1) (making immigrants with TPS who satisfy other criteria eligible for an adjustment of status); S. 264 (Ex. 2) § 3(b)(1) (same).  If the TPS supermajority requirement did actually bind this Congress and stand as an obstacle to Congress's passage of either Act, Congress could avoid it by granting lawful permanent residence to DACA recipients in one bill and granting lawful permanent residence to immigrants with TPS in another, separate bill.  Congress need not do so, however, because the purported supermajority requirement violates the well-established preference against legislative entrenchment and in favor of the legislature's "last in time" expression, and it should not influence this Court's analysis.

Specifically, as the Supreme Court of the United States has made clear, under the centuries-old principle of parliamentary sovereignty, "one legislature may not bind the legislative authority of its successors."  *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) (citing Blackstone, Commentaries on the Laws of England 90 (1765)).  According to this rejection of legislative entrenchment, "a general law may be repealed, amended or disregarded by the legislature which enacted it, and is not binding upon any subsequent legislature."  *Id.* (citation, alterations omitted).  The TPS supermajority rule, which Plaintiffs argue a past Congress enacted specifically to limit this Congress's actions, should thus not influence this Court's decisionmaking.  If Congress were to pass either of the Acts with a majority in the House and a majority in the Senate and the President

9

were to sign it, under the Constitution, the Act would become law, despite the conflicting clause in the earlier-enacted supermajority provision in the Immigration and Nationality Act. *See* U.S. Const. art. I, § 7. Indeed, when two statutory provisions conflict, as either of the Acts would in part with 8 U.S.C. § 1254a(h) if passed as currently drafted, such subsequent Act, *i.e.*, "the conflicting provision which is last in time or last in order of arrangement[,] prevails." *Inter-Cont'l Promotions, Inc. v. MacDonald*, 367 F.2d 293, 301 (5th Cir. 1966).

Without this supposed procedural hurdle impeding the Acts' passage, the Court should be even more hesitant to issue a decision that Congress may wholly moot or require the Court to substantially reconsider in the near future.

### B.   DHS's Intent to Issue a Notice of Proposed Rulemaking Further Counsels in Favor of Waiting to Rule

As Federal Defendants recently revealed, in the next several months, "the Department of Homeland Security . . . intends to issue a Notice of Proposed Rulemaking proposing a new regulation concerning Deferred Action for Childhood Arrivals (DACA)." Dkt. 563. Because DHS's forthcoming rule "to preserve and fortify DACA," Dkt. 550-1, would also fully or substantially moot Plaintiffs' suit, the Court should delay ruling on DACA's merits.

Plaintiffs cannot seriously dispute that DHS could cure DACA's purported procedural flaws if the rulemaking process set in motion by the agency's forthcoming action complies with the Administrative Procedure Act's requirements for notice-and-comment rulemaking. *See* 5 U.S.C. § 553. And, while Plaintiffs assert—without even seeing DHS's new proposed rule—that it will inevitably fail to cure DACA's supposed substantive flaws, nothing prevents DHS or any other agency from fixing any alleged substantive issues through a new or revised rule. *E.g.*, *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 366 F. Supp. 3d 32 (D.D.C. 2018), *aff'd*, 959 F.3d 1113 (D.C. Cir. 2020) (finding that a new agency rule issued in response to the court's remand without vacatur

was valid).

Furthermore the Supreme Court of the United States recently made clear in *Regents* that it disagrees with Plaintiffs' position that DHS is powerless to remedy DACA's supposed flaws, stating instead that "DHS has considerable flexibility in carrying out its responsibility." 140 S. Ct. at 1914. The Court indicated, for example, that DHS could issue a rule "instruct[ing] immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion." *Id.* The Supreme Court would not have expressed such deference to DHS or explained the "flexibility" that DHS has with respect to DACA if any solution DHS reached would inevitably be unlawful. Instead, far from concluding that no form of removal-forbearance could pass muster, the Supreme Court held that DHS has myriad options. *See id.* at 1914–15; *see also id.* at 1912 ("continuing forbearance remain[s] squarely within [DHS's] discretion"). In light of the Supreme Court's clear guidance that—absent congressional action—DHS is the appropriate party to resolve DACA's future, it would be premature for this Court to decide that Plaintiffs inevitably will raise the same objections to DHS's forthcoming rule or that such objections would have any merit. *See B.J. Alan Co., Inc. v. ICC*, 897 F.2d 561, 562 n.1 (D.C. Cir. 1990) ("[a]dministrative reconsideration is a more expeditious and efficient means of achieving adjustment of agency policy than is resort to the federal courts" (quoting *Pennsylvania v. ICC*, 590 F.2d 1187, 1194 (D.C. Cir. 1978)).[12]

Indeed, DHS's new rule could make even more explicit the discretionary criteria and judgments agency adjudicators already apply in practice, or it could require DHS personnel to

---

[12] *See also U.S. House of Representatives v. Burwell*, No. 16-5202, Dkt. 1649251 (D.C. Cir. Dec. 5, 2016) (Ex. 3) (granting opposed motion to hold appeal in abeyance pending Presidential transition in challenge to agencies' implementation of the Patient Protection and Affordable Care Act); *California v. U.S. Env't Prot. Agency*, No. 08-1178, Dkt. 1167136 (D.C. Cir. Feb. 25, 2009) (granting EPA's motion to hold case in abeyance pending agency's reconsideration of the challenged agency action) (Ex. 4).

establish standard operating procedures that even more clearly establish the adjudicators' use of discretion. *See* Dkt. 504 at 43–45 (presenting evidence of officials' discretion); Dkt. 224 at 40–45 (same). If DHS's new rule does further emphasize agency officials' already significant discretion, the discretion-related evidence the Court previously found equivocal would cut even more significantly against Plaintiffs and in favor of finding DACA substantively lawful. *See* Dkt. 504 at 41–45 (arguing that evidence of discretionary, case-by-case adjudication makes DACA lawful); Dkt. 224 at 40–45 (same); Dkt. 319 at 102 (holding, at preliminary injunction stage, that "Plaintiff States have not clearly shown an absence of discretion"). DHS's rulemaking might also revise other aspects of DACA, restricting or expanding its criteria or scope in light of public comments and further agency deliberation. Furthermore, DHS deserves an opportunity to explain how the version of DACA that emerges from notice-and-comment rulemaking comports with the Immigration and Nationality Act. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) (declining to vacate decisions of the U.S. Postal Service and observing that "we think it at least likely—in light of the deference we owe to the Postal Service's interpretations of the Act—that on remand, the Postal Service will be able to advance reasonable interpretations of the provisions at issue"). Rather than attempt to plant its flag on shifting terrain, the Court should wait for DHS's notice-and-comment rulemaking to take its course. Only by allowing that process to play out will the Court guarantee that its ruling will not be overtaken by subsequent events.

Because DHS's forthcoming rule could thus moot (or at the very least require a new analysis of) both Plaintiffs' procedural ***and*** substantive challenges to DACA, the Court should avoid issuing a ruling on the merits while DHS actively makes the "important policy choices" the Supreme Court instructed it to make. *See Regents*, 140 S. Ct. at 1910. Furthermore, given the ***six years*** Plaintiffs waited to challenge DACA, it would not be unreasonable for this Court to wait

several *months* in order to ensure that its ultimate decision on DACA's merits is not immediately

mooted.  *See* Dkt. 319 at 108–09 (finding no "impediments suggested or convincing reasons given

for the fact that the Plaintiff States waited almost six years to file this suit").

> **C.    To the Extent the Acts or a New DHS Rule Would Not Moot the Case Entirely, Either Would Significantly Impact Plaintiffs' Standing, a Key Threshold Issue in this Litigation.**

Plaintiffs' theory of standing relies on the argument that, because DACA affects a

relatively large population, Plaintiff States have *probably* suffered some redressable injury—even

though they still have been unable to identify it.  Yet, the Acts cover all DACA recipients, and as

the population of immigrants without DACA who are eligible for DACA's protection but not

covered by one of the Acts approaches zero, Plaintiffs' hypothetical theories of injury become

even more speculative.  DHS's forthcoming rulemaking might also affect Plaintiffs' tenuous and

unproven standing argument in unpredictable ways by changing DACA's criteria or scope.  As a

result, the Court should not decide whether Plaintiffs have standing now based on hypotheticals

and probabilities that may soon change significantly.

To the extent there are a very limited number of immigrants eligible for but without DACA

who would be ineligible for adjustment of status under the Acts, passage of either of the Acts

would nonetheless fundamentally alter the case by making Plaintiffs States' argument as to

standing even more speculative.  As the Perez Defendant-Intervenors have explained, Plaintiffs

have *never* been able to show actual harm caused by DACA recipients.  *See, e.g.*, Dkt. 504 at 19

& n.5; Dkt. 532 at 3–11.  Instead, Plaintiffs have relied only on hypotheticals and assumptions to

advance their novel theories of standing.  *See* Dkt. 504 at 28–31 (explaining flaws in Plaintiffs'

labor-market theory of standing); *id.* at 18–24 (explaining flaws in Plaintiffs' social-services

expenditures theory of standing).  These hypotheticals and assumptions fundamentally rely on the

law of large numbers:  Because, Plaintiffs say, DACA "infus[es] the job market with hundreds of

thousands of additional workers who compete with Plaintiff States' legal residents for jobs," some employer somewhere must have hired a DACA recipient rather than a United States citizen, *see* Dkt. 486 at 26—even though Plaintiffs have consistently failed to identify even ***a single such worker***. *See* Dkt. 532 at 8–11.  Likewise, because of the number of DACA recipients, Plaintiffs say, some Plaintiff State must have spent some money on some DACA recipient somewhere, *see* Dkt. 486 at 27–28—even though not a single one of the States' witnesses has been able to identify such an expenditure or to show that any DACA recipient would "self-deport" if DACA ended.  *See* Dkt. 504 at 18–24 & n.5.

If either of the Acts becomes law, Plaintiffs' use of hypothetical injuries to support their novel theories of standing would be even more speculative and unfounded.  DHS's forthcoming rulemaking could change the DACA-eligible population in similar and unpredictable ways, adding further uncertainty to Plaintiffs' already hypothetical injuries.  These hypotheticals are insufficient to support standing in any event.  Moreover, the fewer the number of individuals eligible for (but without) DACA who are not granted adjustment of status by Congress or covered by DHS's new rule, the more unlikely it is that one of those individuals, should they receive DACA, would outcompete a United States citizen for a job, incur social services expenditures, or "self-deport" if DACA ended.  As the number of DACA-eligible individuals not otherwise protected from removal reaches or approaches zero, the hypothetical possibility that DACA causes Plaintiff States ***any*** redressable harm thus becomes ever-more negligible.

In *Texas DAPA*, the court expressed this basic logic as a legal principle:  when a state's theory of standing (like Plaintiff States' theory here) depends on the state hypothetically increasing expenditures on immigrants, the size of the immigrant population matters.  *See* 809 F.3d at 161–62.  In *Texas DAPA*, Texas was able to establish standing based on unproven state expenditures

*only* because of the large number of DAPA recipients potentially eligible for a driver's license. *See id.  Texas DAPA* is inapposite to the current posture of this case, given that here—unlike in *Texas DAPA*—Plaintiffs have disavowed any theory of standing based on driver's license costs. *See* Dkt. 319 at 35; *see also* Dkt. 105 at 3.  Nonetheless, *Texas DAPA*'s reasoning underscores the basic point that, where a plaintiff's theory of standing depends on a hypothetical probability that it suffered harm, that probability is negligible and insufficient to support standing where the relevant population is also negligible.

As a result, under *Texas DAPA*, even in the event that the Acts would not moot Plaintiffs' case entirely, the passage of either Act would significantly alter the Court's standing analysis. Plaintiffs' standing theories have, until now, depended on the hypothetical effects of populations in the hundreds of thousands.  With the passage of either of the Acts, Plaintiffs would have to account for the fact that Congress will have granted the vast, vast majority of individuals eligible for DACA and ***all*** current DACA recipients lawful permanent residence.  This means Plaintiffs' supposed harm would inevitably further dwindle, requiring the Court to reassess Plaintiffs' standing.  The effects of DHS's future rulemaking could be equally disruptive to Plaintiffs' theories of injury.  Thus, if the Court finds that Plaintiffs have standing now, that holding would very likely be moot and vacated on appeal if DHS promulgates a new rule or one of the Acts becomes law.

### D.    If the Court Is Determined to Rule Now, It Should Remand DACA to DHS without Vacating It

The pending Acts and DHS's forthcoming Notice of Proposed Rulemaking counsel against the Court issuing a ruling now.  However, if the Court is inclined to reach DACA's merits and find it invalid, the Court should remand DACA back to DHS without vacatur.  Remand without vacatur is an appropriate remedy, even where, as Plaintiffs allege, a rule suffers from serious shortcomings.

And, despite Plaintiffs' protestations to the contrary at the March 30, 2021, status hearing, remand without vacatur is an ***available*** remedy.   Each of the relevant factors—as well as the Supreme Court's decision in *Regents* and this Court's decision denying Plaintiffs' Motion for a Preliminary Injunction—counsels in favor of remand without vacatur.

Plaintiffs cannot seriously dispute that the Fifth Circuit has endorsed remand without vacatur in Administrative Procedure Act cases.   As recognized in this Circuit and others, vacatur is inappropriate when (1) there is a "serious possibility that the [agency] will be able to substantiate its decision" or (2) "vacating would be 'disruptive.'"   *Cent. & S.W. Servs., Inc. v. U.S. Env't Prot. Agency*, 220 F.3d 683, 692 (5th Cir. 2000) (citation omitted); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).   Moreover, remand without vacatur is ***not*** limited to allowing agencies to remedy procedural defects.   Instead, courts have remanded agency actions based on both their procedural ***and*** substantive defects.   For instance, in *Shands Jacksonville Medical Center v. Burwell*, the court remanded without vacating a rule about which plaintiffs complained of both procedural and substantive flaws.   139 F. Supp. 3d 240, 267–71 (D.D.C. 2015).   By way of another example, in *California Communities Against Toxics v. U.S. Env't Prot. Agency*, the Ninth Circuit found that an EPA rule was invalid due to serious substantive flaws in the agency's reasoning.   688 F.3d 989, 993–94 (9th Cir. 2012).   However, that court determined that the consequences of revoking the rule would be "severe" and thus warranted remand without vacatur.   *See id.*[13]   Remand without vacatur is also particularly appropriate where the agency is in the process of revising the rule at issue and vacatur would cause disruptive consequences in the administrative process.   *See Texas v. U.S. Env't Prot. Agency*, 389 F. Supp.

---

[13] *See also N. Air Cargo*, 674 F.3d at 861 (remanding "for a complete and authoritative agency interpretation" of an ambiguous statute, which could resolve claims that the agency had exceeded its statutory authority).

3d 497, 506 (S.D. Tex. 2019) ("[T]he Court finds that remand is the best remedy here as it will facilitate the Agencies' active attempts to improve on their work[.]"); *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1382 (S.D. Ga. 2019) (granting remand without vacatur where "an order vacating the Rule may cause disruptive consequences to the ongoing administrative process").

As Defendant-Intervenors have previously explained, the same two-factor *Allied-Signal* test embraced by this Circuit and applied by the district court in *Shands Jacksonville Medical Center* and the Ninth Circuit in *California Communities Against Toxics* counsels in favor of remand without vacatur here.  ***First***, there is a significant likelihood that DHS will be able to address any flaws with DACA.  Indeed, as described above, *see* Part IV.B, DHS is already in the process of preparing a Notice of Proposed Rulemaking regarding DACA.  Plaintiffs' request to vacate DACA ***while DHS is in the process of addressing it*** defies logic.  It also defies the Supreme Court's unambiguous directive in *Regents*:  there, the Supreme Court determined that the Attorney General's lawfulness determination did ***not*** absolve DHS of the discretion it was obligated to exercise regarding DACA's future.  *See, e.g.*, 140 S. Ct. at 1914.  The Supreme Court also instructed DHS to consider DACA recipients' and others' profound reliance interests in DACA when fashioning a remedy.  *See id.*  And as both the Supreme Court and this Court have emphasized, those reliance interests are best assessed and balanced by the political branches.  *See id.*; Dkt. 319 at 5–6, 117.  Therefore, should this Court determine to rule on DACA's merits now, and if it concludes that DACA is unlawful, it should remand DACA to DHS so that the agency can continue to amend DACA.

***Second***, the "disruptive consequences" of vacatur would be devastating to individual DACA recipients, their communities, and the public interest in general.  At the preliminary injunction stage, this Court correctly found that rescinding DACA would harm governments that

"lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries." Dkt. 319 at 113–14. These reliance interests have only grown stronger with the passage of time and become more acute as DACA recipients have helped states and communities respond to COVID-19.  DACA recipients are deeply integrated into their communities:  they help support their families, provide vital economic contributions through taxes, and own small businesses. *See, e.g.*, Dkt. 504-2, Ex. 18 ¶ 3; Dkt. 504-3, Ex. 26 ¶ 4.  New Jersey DACA recipients, for example, contribute an estimated $18.7 million per year in state income tax receipts.  Dkt. 215-1, Ex. 7 ¶ 7.  DACA recipients furnish services and advocacy to other vulnerable populations. *See, e.g.*, Dkt. 504-2, Ex. 17 ¶ 5; *id.*, Ex. 18 ¶ 5; *id.*, Ex. 19 ¶¶ 3–6, 13; *id.*, Ex. 21 ¶¶ 3, 8–9.  And DACA recipients continue to work in health care organizations to alleviate the pressures of the COVID-19 pandemic. *See, e.g.*, *id.*, Ex. 20 ¶ 3–4, 6.  In New Jersey, for instance, DACA recipients include doctors, critical workers conducting registration at COVID testing sites, and individuals performing site visits for distressed homes as part of New Jersey's Division of Child Protection and Permanency. *See* Dkt. 502 at 45–46; Dkt. 502-2, Ex. 12; *id.*, Ex. 19 ¶¶ 6, 9, 11; *id.*, Ex. 20 ¶¶ 4, 5–9.

DACA's vacatur would undoubtedly disrupt DACA recipients' lives and send shock waves through their communities, at exactly the time that the United States is starting to emerge from the pandemic.  As a specific example, New Jersey previously explained at the preliminary injunction stage that the State relies on its DACA-recipient residents in a number of ways and would be substantially harmed were this Court to vacate the 2012 Memo. See Dkt. 215 at 9, 41–46.  DACA recipients are valued employees at New Jersey's government agencies and public universities. Dkt. 215-1, Ex. 8; *id.*, Ex. 13.  Approximately 2,200 DACA-recipient students attend New Jersey public colleges and universities, which would be harmed by the loss of these motivated students and their

diverse life experiences, not to mention tuition revenue, if they could not afford to continue their studies due to losing work authorization. *Id.*, Ex. 3; *id.*, Ex. 26. Approximately 55% of DACA recipients have employer-sponsored health care, *id.*, Ex. 6 ¶¶ 46–47, and would likely be eligible for state-funded healthcare or have to receive uncompensated care if they lost their jobs, resulting in increased public health spending of approximately $7.6 million annually. *Id.* ¶ 57. And as New Jersey noted in its Opposition to Plaintiffs' Motion for Summary Judgment, companies in the United States have made hiring, recruiting, and organizational decisions in reliance on DACA. The ongoing legislative and executive actions focused on DACA only underscore the needless disruption that vacatur would cause; if this Court vacates DACA, DACA recipients may upend their families, communities, careers, and educations only for an action by the political branches to moot this Court's decision mere months later. The second *Allied-Signal* factor aims to prevent exactly this type of profound harm and immediate, avoidable disruption.

Even if the Court finds that only the latter *Allied-Signal* factor supports remand (and, to be clear, ***both*** do), the Court nonetheless retains the discretion to balance the equities and order remand without vacatur. Courts can and have opted to remand deficient rules back to the agency without vacatur solely because of vacatur's potentially devastating consequences. *See, e.g.*, *North Carolina v. U.S. Env't Prot. Agency*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (despite serious flaws in rule, remanding without vacatur where vacatur would have had significant disruptive consequences); *see also Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 653 F.3d 1, 8, 11 (D.C. Cir. 2011) (remand without vacatur appropriate because "vacating the . . . rule would severely disrupt an essential security operation"). Remand is particularly appropriate where "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *see also* Dkt. 319 at 115 (denying

Plaintiffs' motion for a preliminary injunction because "[h]ere, the egg has been scrambled"). To vacate DACA now would upend the status quo, causing unnecessary and harmful social and economic whiplash for DACA recipients, their communities, and their families, who anticipate a more permanent political solution in the near future. Thus, if the Court chooses to rule on DACA's merits now and finds that DACA violates the APA, it should remand DACA to DHS without vacatur, thereby allowing the political branches' momentum to continue unimpeded and DACA recipients' lives to continue without needless disruption.[14]

## V.    CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court allow the political processes to continue to play out and defer a decision on DACA's merits until either of the Acts has become law or, should it become apparent that neither Act will become law, DHS has completed its rulemaking process discussed above. Should the Court determine to act now and find that DACA is unlawful, Defendant-Intervenors respectfully request that the Court remand DACA to DHS without vacatur.

*[signature page follows]*

---

[14] If the Court nonetheless vacates DACA, any relief, including injunctive relief, granted to Plaintiffs should be stayed pending appeal. Moreover, the same considerable equities and public interests that weigh against vacating DACA likewise strongly counsel against granting an injunction. *See* Dkt. 502 at 42–48; Dkt. 504 at 46 n.15, 48–49. This is particularly true given that "any relief granted should be no broader than necessary to cure the effects of the [alleged] harm caused." *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (quoting *Soltex Polymer Corp. v. Fortex Indus.*, 832 F.2d 1325, 1329 (2d Cir. 1987)); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (holding "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 673 (5th Cir. 2000) (noting "rule that an equitable remedy should be no broader than the scope of the violation"). Here, ***not a single Plaintiff State*** has identified a public dollar spent on a DACA recipient, and no Plaintiff State has shown any injury flowing from labor market competition. *See, e.g.*, Dkt. 532 at 1; Dkt. 504 at 19 & n.5.

Dated: April 9, 2021                    Respectfully submitted,


**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
By: _____/s/_____
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org


**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-
Driemeier@ropesgray.com
(admitted pro hac vice)


**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com


*Attorneys for Perez Defendant-Intervenors*

By:   _____/s/_____

MAYUR P. SAXENA
Attorney-in-Charge
Assistant Attorney General
(Admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 648-3283
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Jeremy M. Feigenbaum, State Solicitor
(Admitted pro hac vice)
Melissa Medoway, Deputy Attorney General
(Admitted pro hac vice)
Tim Sheehan, Deputy Attorney General
(Admitted pro hac vice)

*Attorneys for Defendant-Intervenor State of New Jersey*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on April 9, 2021, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

_____/s/_____

Nina Perales
*Attorney for Perez Defendant-Intervenors*