**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>     Defendants,[1]<br><br>*and*<br><br>KARLA PEREZ, *et al.*,<br><br>and<br><br>NEW JERSEY,<br><br>     Defendant-Intervenors. | Case No. 1:18-cv-00068 |

**FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
REQUEST FOR A STAY [ECF NO. 486]**

---

[1] Under Federal Rule of Civil Procedure 25(d)(1), the following individuals are automatically substituted as Defendants: Alejandro N. Mayorkas, Secretary of Homeland Security; Troy Miller, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection (CBP); Tae D. Johnson, Acting Director for U.S. Immigration and Customs Enforcement (ICE); Tracy Renaud, Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services (USCIS); Rodney S. Scott, Chief of the U.S. Border Patrol.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................ 1

ARGUMENT ....................................................................................................................... 3

     I.     Plaintiffs Lack Standing or a Viable Cause of Action to Challenge DACA. ....... 3

     II.    DACA Is Lawful. ........................................................................................... 6

          A.   DACA Is Substantively Lawful Under the INA. ....................................... 6

          B.   DACA Did Not Need to Go Through Notice-and-Comment Rulemaking. .11

     III.   DACA Does Not Violate the Take Care Clause. ...............................................14

     IV.   In the Alternative, the Court Should Craft a Narrow Remedy that Minimizes Disruption to DACA Recipients .....................................................................16

     V.    If This Court Grants Plaintiffs Immediate Relief, Then It Should Stay Its Ruling. ....................................................................................................................20

CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

**Federal Cases**

*Alfred L. Snapp & Son v. Puerto Rico*,
  458 U.S. 592 (1982) .................................................................................................. 4

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................17

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020) ................................................................................17

*Arpaio v. Obama*,
  27 F. Supp. 3d 185 (D.D.C. 2014) ................................................................... 14, 15

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................................................... 7

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................................................................. 6

*Campaign for S. Equality v. Bryant*,
  773 F.3d 55 (5th Cir. 2014) ....................................................................................20

*Citizens to Preserve Overton Park*,
  401 U.S. 402 (1971) ................................................................................................13

*Del. Dep't of Nat'l Res. & Envt'l Control v. FERC*,
  558 F.3d 575 (D.C. Cir. 2009) ................................................................................. 4

*DHS v. Regents of the University of California*,
  140 S. Ct. 1891 (2020) .....................................................................................*passim*

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ................................................................................................16

*EPIC v. DHS*, 653 F.3d 1, 5 (D.C. Cir. 2011) ........................................................12

*Florida Med. Ass'n. Inc. v. U.S. Dep't of Health, Educ. & Welfare*,
  601 F.2d 199 (5th Cir. 1979) ................................................................................... 5

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................................15

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ................................................................................. 6

*K.P. v. LeBlanc*,
  627 F.3d 115 (5th Cir. 2010) ............................................................................. 4

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ......................................................................................... 5

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................................................ 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 4, 5

*Lynch Properties, Inc. v. Potomac Ins. Co. of Illinois*,
  140 F.3d 622 (5th Cir. 1998) ........................................................................ 1, 13

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ........................................................................ 5

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) .......................................................................... 15

*NAACP v. Trump*,
  298 F. Supp. 3d 209 ......................................................................................... 9

*Radio-Television News Directors Ass'n v. F.C.C.*,
  184 F.3d 872 (D.C. Cir. 1999) .................................................................... 17, 18

*Rais v. Holder*, 768 F.3d 453 (6th Cir. 2014) .................................................... 12

*Regents of the University of California v. DHS*,
  908 F.3d 476 (9th Cir. 2018) ....................................................................... 7, 14

*Regents of the University of California v. DHS*,
  279 F. Supp. 3d 1011 (N.D. Cal.) .................................................................... 10

*Reliable Transfer Co. v. Blanchard*, 145 F.2d 551 (5th Cir. 1944) ...................... 16

*Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"),
  525 U.S. 471 (1999) .................................................................................. 3, 7, 15

*Romeiro de Silva v. Smith*,
  773 F.2d 1021 (9th Cir. 1985) ........................................................................ 14

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ............................................................................................ 4

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...................................................................................... 4

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ...................................................................................17

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) .................................................................................17

*Texas v. United States (Texas I)*,
    809 F.3d 134 (5th Cir. 2015) ...........................................................................*passim*

*Texas v. United States (Texas I)*,
    86 F. Supp. 3d 591 (S.D. Tex. 2014) ................................................................4, 13

*Texas v. United States*,
    352 F. Supp. 3d 665 (N.D. Tex. 2018) ..................................................................20

*Thomas v. Bryant*,
    919 F.3d 298 (5th Cir. 2019) .................................................................................18

*United States v. Armstrong*,
    517 U.S. 456 (1996) ..............................................................................................14

*United States v. Fausto*,
    484 U.S. 439 (1988) ................................................................................................6

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982) ..............................................................................................16

*Valentine v. Collier*,
    978 F.3d 154 (5th Cir. 2020) ...........................................................................18, 19

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ..............................................................................................16

**Federal Statutes**

5 U.S.C. § 553(b)(3)(B) .................................................................................................11

5 U.S.C. § 702 .................................................................................................................5

6 U.S.C. § 202(5) .........................................................................................................7, 8

8 U.S.C. § 1101(a)(15) .....................................................................................................7

8 U.S.C. § 1103(a) ...........................................................................................................8

8 U.S.C. § 1103(a)(1) .......................................................................................................7

8 U.S.C. § 1103(a)(3) ...................................................................................................7, 11

8 U.S.C. § 1154(a)(1)(D)(i) ................................................................... 7

8 U.S.C. § 1182(a)(9)(B)(ii) ................................................................ 11

8 U.S.C. § 1182(a)(9)(B)(i) ................................................................ 12

8 U.S.C. § 1182(a)(9)(C)(i)(I) ............................................................ 12

8 U.S.C. § 1182(d)(5)(A) ................................................................... 12

8 U.S.C. § 1227(d)(2) ......................................................................... 7

8 U.S.C. § 1252 .................................................................................. 6

8 U.S.C. § 1252(b)(9) ......................................................................... 6

8 U.S.C. § 1324a(h)(3) .................................................................. 8, 11

8 U.S.C. § 1611(b)(2) ......................................................................... 8

8 U.S.C. § 1611(b)(4) ......................................................................... 8

49 U.S.C. § 30301 .............................................................................. 7


Emergency Supplemental  Appropriations  Act for Defense, the Global  War on Terror, and
    Tsunami Relief, Pub. L. 109-13, 119 Stat. 231 ((2005) ............................ 7

DHS Appropriations  Act 2010,
    Pub. L. No. 111-83, 123 Stat. 214 (2009) .......................................... 15

Consol. Appropriations  Act 2014,
    Pub. L. No. 113-76, div. F., Tit. II, 128 Stat. 5, 251 (2014) ...................... 15


**Federal Regulations**

8 C.F.R. § 1.3(a)(4)(vi) .................................................................. 8, 11

8 C.F.R. § 212.5(f) ........................................................................... 12

8 C.F.R. § 214.14(d)(3) ..................................................................... 12

8 C.F.R. § 274a.12(c)(14) ............................................................. 8, 11

28 C.F.R. § 1100.35(b)(2) ................................................................. 12

**Federal Rules**

Fed. R. Civ. P. 25(d)(1) ............................................................................ 1

Fed. R. Civ. P. 56(c) ................................................................................. 1

**Other Authorities**

Immigration and Naturalization Service; Control of Employment of Aliens,
  52 Fed. Reg. 16,216 (May 1 , 1987) (codified at 8 C.F.R. Pts. 109 and 274a) ......................11

Immigration and Naturalization Service; Definition of the Term Lawfully Present in the United
  States for Purposes of Applying for Title II Benefits Under Section 401(b)(2) of Public Law
  104– 193, 61 Fed. Reg. 47,039 (Sept. 6, 1996) (codified at 8 C.F.R. Pt. 103) .......................11

Presidential Memorandum; Preserving and Fortifying Deferred Action for Childhood Arrivals
  (DACA), § 1, 86 Fed. Reg. 7053 (Jan. 25, 2021) ....................................................... 1, 2, 8, 9

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Plaintiff States' motion for summary judgment [ECF No. 486] challenges DACA as procedurally and substantively unlawful, raising both constitutional and Administrative Procedure Act ("APA") claims. Plaintiffs request declaratory relief and an order prohibiting new DACA grants. Summary judgment is appropriate where "there is no genuine issue of material fact" and "the moving party is entitled to a judgment as a matter of law." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The Court held a hearing on March 30, 2021, during which it permitted supplemental briefing on the motion by April 9.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Since June 2012, the Deferred Action for Childhood Arrivals ("DACA") policy has allowed over 700,000 individuals who arrived in the United States as children to contribute to society and the economy. These immigrants "have obeyed the law, and stayed in school or enlisted in the military." Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA), § 1, 86 Fed. Reg. 7053 (Jan. 25, 2021) ("Biden Mem."). Lawfully exercising its enforcement discretion, the Department of Homeland Security ("DHS") affords DACA recipients temporary forbearance from removal, making them eligible for work authorization and other benefits. DACA reflects the fact that Congress has not given DHS the resources to remove all 11 million noncitizens in the United States who might be subject to removal, and the agency therefore must exercise discretion in deciding how to deploy its limited resources.

The United States has long supported deferred action and now files this brief in defense of DACA. When this litigation began in 2018, the government was then in the process of rescinding the DACA policy. The Attorney General had concluded that the policy was unlawful in certain respects, and DHS had rescinded it on that basis. Consistent with that conclusion, the government previously agreed with Plaintiffs that, at least in some respects, the policy was unlawful. In *DHS*

*v. Regents of the University of California*, 140 S. Ct. 1891 (2020), however, the Supreme Court held that DHS's rescission of DACA was arbitrary and capricious under the APA. Following that decision, the Attorney General withdrew his determination that DACA was unlawful, and the United States now confirms its original position that DACA is lawful.

In furtherance of this lawful policy, President Biden has recently issued a presidential memorandum ordering the Secretary of Homeland Security, in consultation with the Attorney General, to "take all actions he deems appropriate, consistent with applicable law, to preserve and fortify DACA." Biden Mem. § 2. Those efforts—including forthcoming notice-and-comment rulemaking—are ongoing, and the government respectfully submits this Court should permit that process to continue unimpeded by any ruling on the 2012 DACA Memorandum.

Particularly in light of the substantial reliance interests recognized by the Supreme Court in *Regents*, the government urges this Court not to terminate DACA in any respect or to issue any final decision in this case. Plaintiffs do not disagree with the Executive's "judgment that . . . immigrants" who qualify under DACA "should not be a priority for removal based on humanitarian concerns and other considerations," or even that DACA recipients substantially bolster Plaintiffs' own economies. Biden Mem., § 1; *see* ECF No. 529 at 17. It is thus unsurprising that Plaintiffs "are not seeking the immediate termination" of DACA. ECF No. 486 at 46; *see* ECF No. 529 at 20. Given Plaintiffs' own recognition that immediate termination is not required, there is no urgency for this Court to issue a final decision concerning claims that may well be substantially affected by the ongoing efforts of a coordinate Branch.

Were this Court nonetheless to issue a decision at this time, it should deny Plaintiffs' motion for summary judgment. DACA is substantively and procedurally valid. DACA is a lawful exercise of the Secretary's broad statutory authorities under the Immigration and Nationality Act

(INA). The Supreme Court has recognized and condoned the "regular practice" of the Executive Branch of according deferred action to individuals, as part of the "exercis[e] [of] enforcement discretion for humanitarian reasons or simply for its own convenience." *Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483–84 (1999). DACA does not prevent the commencement of removal proceedings at the government's discretion, and recipients gain no defense to removal. *See* ECF No. 400-7, Ex. 36 (Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children 4 (June 15, 2012) ("DACA Mem.")). The policy instead reasonably offers temporary forbearance to those individuals who all parties agree are among the lowest priorities for removal.

But even if the Court were to conclude that DACA is unlawful, it should afford DHS the opportunity on remand to correct any defects in the 2012 DACA Memorandum without vacating that memorandum and overturning the status quo in the meantime. Indeed, the Supreme Court has specifically held that, even if DACA is unlawful, DHS should still have "considerable flexibility in carrying out its responsibility" to address any concerns. *Regents*, 140 S. Ct. at 1914-15. Plaintiffs do not disagree. They contend that this Court should "provid[e] time"—and potentially two years—"for [DHS] to responsibly wind-down the program." ECF No. 529 at 20. This Court need not trigger a substantial upheaval of the lives of hundreds of thousands of DACA recipients, their employers, their schools, and their communities by requiring DHS to end DACA immediately, and Plaintiffs have offered no reason for the Court to reach that disruptive result.

## ARGUMENT

### I.   Plaintiffs Lack Standing or a Viable Cause of Action to Challenge DACA.

The Court should deny Plaintiffs' summary judgment motion because they lack Article III standing. Plaintiffs first assert *parens patriae* standing and standing based on their sovereign interests, but those theories have never been accepted by this Court, the Fifth Circuit, or the

Supreme Court. *See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (explaining that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government" on behalf of its citizens); *Texas v. United States* (*Texas I*), 86 F. Supp. 3d 591, 640 (S.D. Tex. 2014) (explaining, in response to standing assertion on the basis of sovereign interests, that "state standing by virtue of federal abdication is not well-established"); *Texas v. United States* (*Texas I*), 809 F.3d 134, 150 (5th Cir. 2015) (similar).[2]

Further, under any theory and even if the Court relies on the special solicitude accorded to States, Plaintiffs must demonstrate the irreducible Article III minima – an injury-in-fact that is fairly traceable to the challenged conduct. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). Injuries that are "hypothetical" or "conjectural" cannot establish standing. *Id.* And any "special solicitude" to States does not "eliminate the State [plaintiffs'] obligation to establish a concrete injury." *Del. Dep't of Nat'l Res. & Envt'l Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009). Plaintiffs must establish causation and redressability, such that a "favorable decision will relieve a discrete injury" traceable to DACA. *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010).

At summary judgment, Plaintiffs "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" that demonstrate their injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). It is inadequate for Texas to have asserted "*some* amount of costs," unquantified "increased social services expenses," or general "labor market distortions." ECF No. 319 at 105 (emphasis added). As the Court recognized, "[m]ost of Texas's own testimony

---

[2] The Court previously reasoned that, because "two of the four DACA rescission cases included states as plaintiffs," it is "difficult to conceive how states could have standing to challenge the rescission of the DACA program but not have standing to challenge its enactment." ECF No. 319 at 47 n.46. As the government has consistently argued, those States were not appropriate plaintiffs to challenge DACA's rescission either. Moreover, in those case, in those cases, States were not the sole plaintiffs—those claims were also brought by individual DACA recipients who had standing. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

and evidence concerning DACA recipients is encompassed in much larger figures that relates to costs incurred by the State for *all* illegal aliens or for unaccompanied alien children." *Id.* at 107. But at this stage, this "lesser level of precision and proof" is insufficient. *Id.* (citing *Florida Med. Ass'n Inc. v. HEW*, 601 F.2d 199, 203 n.2 (5th Cir. 1979)).

Despite DACA's nine-year existence, Plaintiffs identify no increased costs associated with the policy. Plaintiffs assert that Texas spends over $250 million in social services each year on DACA recipients. *See* ECF No. 486 at 28. But there is no reason to think that those individuals would realistically depart from the States or otherwise require fewer social services absent DACA. DACA applies to individuals (brought here as children) who were already "extremely unlikely to be deported," and who would thus in all likelihood remain in this country anyway. DACA simply enables them to become *more* productive members of the States' economies. *See* Secretary Jeh Johnson, Policies for the Apprehension, Detention and Removal of Undocumented Immigrants 3 (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo _prosecutorial_discretion.pdf. Moreover, it is impossible to assume that focusing removal efforts on DACA-eligible individuals rather than some other class of noncitizens (which is the result Plaintiffs seemingly suggest) would place the States in a *better* fiscal situation. As Defendants-Intervenors put it, "Plaintiffs have failed to establish that DACA recipients would leave their states, that social costs would decrease, or that U.S. citizens in the Plaintiff States would encounter increased job opportunities." ECF No. 504 (MALDEF's Brief in Support) at 24 (citations omitted).

Regardless, not only must Plaintiffs have Article III standing, they must be "aggrieved" under the "relevant statute" to satisfy the zone-of-interests requirement. 5 U.S.C. § 702; *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). Here, that means that *States* must be protected under a particular provision of the INA. *See, e.g., Mendoza v. Perez,*

754 F.3d 1002, 1016 (D.C. Cir. 2014). No relevant statutory provision protects a *State* from resident noncitizens obtaining deferred action, work authorization, or potential eligibility for benefits. Though the Fifth Circuit found that Texas satisfied the zone-of-interests requirement because of the costs to States "to subsidize driver's licenses or changing its statutes," *Texas I*, 809 F.3d at 163, Defendants respectfully disagree that the INA protects those states interests, and Plaintiffs do not meaningfully renew those contentions here.

Tellingly, the INA only provides *noncitizens* an opportunity for judicial review of removal policies, as part of its detailed review scheme. *See* 8 U.S.C. § 1252. Section 1252(b)(9) provides for review of removal actions and orders—including "policies-and-practices challenges," *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1035 (9th Cir. 2016)—only to "an alien" in removal proceedings. This detailed scheme for aliens is, in turn, "strong evidence that Congress intended to preclude [other plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988); *cf. Regents*, 140 S. Ct. at 1903, 1907 (permitting judicial review by "individual DACA recipients"). And it is thus "fairly discernible" from "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved" that only *noncitizens* may challenge such policies as DACA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345–47 (1984) (finding preclusion based on review scheme for "dairy handlers" but not "consumers"); *see Fausto*, 484 U.S. at 448 (precluding review based on "deliberate exclusion" of certain employees, and inclusion of others, in administrative and judicial review provisions).

## II.   DACA Is Lawful.

### A.   DACA Is Substantively Lawful Under the INA.

**1.** Plaintiffs' primary argument is that DACA is unlawful under the INA because the policy "prevents the removal of individuals whom Congress has deemed removable" and thus "nullif[ies] the clear text of the INA." ECF No. 486 at 44–45 (citing ECF No. 319 at 70). This is incorrect.

Congress has granted the Secretary broad authority to establish "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to carry out the "administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1). Congress has further provided that the Secretary "shall establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]." *Id* § 1103(a)(3). And Congress has repeatedly recognized the role of deferred action in DHS's implementation of the INA. *See id.* §§ 1101(a)(15), 1154(a)(1)(D)(i), 1227(d); 49 U.S.C. § 30301 note.

DACA is a lawful, responsible exercise of the Secretary's immigration authorities. The Supreme Court has recognized that the Secretary's authority encompasses the "regular practice" of according deferred action to individuals, as part of the "exercis[e] [of] enforcement discretion for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483–84; s*ee, e.g.*, 8 U.S.C. §§ 1154(a)(1)(D)(i)(II), (IV) (endorsing deferred action and work permits for certain domestic violence victims and their children); *id.* § 1227(d)(2) (providing that "denial of a request for an administrative stay of removal . . . shall not preclude the alien from applying for . . . deferred action"). Congress also confirmed that deferred action is available, in enacting the REAL ID Act of 2005, which permits such noncitizens to obtain a driver's license. Pub. L. 109-13, 119 Stat. 231, Div. B, § 202(c)(2)(B)(viii) (2005). Other federal courts have thus concluded that DACA is a lawful exercise of the Secretary's broad immigration authority, including his undeniable discretion to defer enforcement against individuals who pose little risk to their communities and the country. *See Regents of the University of California v. DHS*, 908 F.3d 476, 506–10 (9th Cir. 2018), *vacated in part and rev'd in part on other grounds*, 140 S. Ct. 1891 (2020); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 422–27 (E.D.N.Y. 2018), *vacated on other grounds*, 140 S. Ct. 1891 (2020).

The Supreme Court in *Regents* further confirmed that, because DHS is charged with "'[e]stablishing national immigration enforcement policies and priorities,'" deferred action "remain[s] squarely within [DHS's] discretion." 140 S. Ct. at 1911–12 (quoting 6 U.S.C. § 202(5)). DACA represents the sensible judgment of the Executive Branch that "certain undocumented immigrants who were brought to the United States as children, have obeyed the law, and stayed in school or enlisted in the military" simply "should not be a priority for removal." Biden Mem. § 1. Deferred action does not, as Plaintiffs principally claim, prevent removal: DACA recipients remain subject to removal proceedings at the government's discretion, and gain no defense to removal. *See* DACA Mem. at 1. DACA simply integrates those individuals into the social and economic systems of their communities, their States, and the Nation, as opposed to forcing them to operate from the shadows.

Plaintiffs assert that DACA does not grant "*only* forbearance from removal." ECF No. 529 at 7 (emphasis added). But Plaintiffs misunderstand the policy. Once a noncitizen has received deferred action, whether under DACA or otherwise, existing DHS regulations provide that the noncitizen may apply for work authorization, as deferred action recipients have been able to do for 40 years. *See* 8 U.S.C. §§ 1103(a), 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14); 46 Fed. Reg. 25,079, 25,081 (May 5, 1981). And further regulations promulgated pursuant to the INA make recipients of such deferred action eligible for certain state and federal benefits. *See* 8 U.S.C. § 1611(b)(2)–(4); 8 C.F.R. § 1.3(a)(4)(vi). None of those attendant benefits of deferred action is granted by the DACA policy itself nor distinguishes DACA from other grants of deferred action that Congress and the Supreme Court have long permitted. And DACA recipients may obtain those benefits only temporarily, as long as they qualify for deferred action. There is nothing novel about issuing

8

"temporary relief" that also enables individuals who remain in the country "to support themselves and their families, and to contribute to our economy, while they remain." Biden Mem. § 1.

**2.** Plaintiffs rely on the Fifth Circuit's *Texas I* decision, but it has been significantly undercut by the Supreme Court's *Regents* decision. The Fifth Circuit held that the INA "cannot reasonably be construed as assigning decisions of vast economic and political significance, such as DAPA, to an agency." *Texas I*, 809 F.3d at 184. In *Regents*, however, the Supreme Court observed that the *Texas I* decision focused extensively on the benefits, such as work authorization and Medicare, that DAPA recipients were eligible for as a result of their deferred action, but that the decision did not grapple with DHS's authority to temporarily forebear from removing DAPA (or DACA) recipients. *Regents*, 140 S. Ct. at 1911–13. The Supreme Court both left open the possibility that the DACA policy is lawful in its current form, and noted, at a minimum, that nothing in the Fifth Circuit's decision precluded DHS from retaining the forbearance aspect of the current policy. *Id. Regents*'s suggestion that the INA permits DHS to adopt a policy granting removal forbearance to hundreds of thousands of individuals (even without a means of gainful employment or access to health insurance) is exceedingly difficult to square with the Fifth Circuit's basic holding that the INA precludes the DACA policy as it currently exists because it is an immigration policy of "vast economic and political significance."

Nor does the Fifth Circuit's DAPA analysis extend to this case. *Texas I*, 809 F.3d at 173 ("[A]ny extrapolation from DACA [to DAPA] must be done carefully."). First, the Fifth Circuit found that DAPA contradicted specific INA provisions, including "the INA's 'intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status.'" 809 F.3d at 179. However, "unlike DAPA, DACA has 'no analogue in the INA,'" and thus "the Fifth Circuit's statutory analysis is inapposite." *NAACP v. Trump*, 298 F. Supp. 3d 209,

238 (D.D.C. 2018) (cleaned up); *see Regents of the University of California, v. DHS*, 279 F. Supp. 3d 1011, 1042 (N.D. Cal.) ("An important criticism against DAPA would *not* apply against DACA, namely the fact that Congress had already established a pathway to lawful presence for alien parents of citizens (so that DAPA simply constituted a more lenient substitute route)."). Second, DACA applies to a far smaller group than DAPA (up to 10% of the total undocumented population versus 38% under DAPA). *See Texas I*, 809 F.3d at 147–48; *id*. at 174 ("Eligibility for DACA was restricted to a younger and less numerous population [than DAPA, and] involved self-selecting applicants, and those who expected to be denied relief were unlikely to apply.").

Plaintiffs rely on the lead dissent in *Regents* for the proposition that DACA is somehow a "complete[] overhaul" of immigration law, and that DACA "eviscerates the INA's deliberate statutory scheme." ECF No. 486 at 36 (quoting *Regents*, 140 S. Ct. at 1925 (Thomas, J. concurring in the judgment in part and dissenting in part)). But a dissenting opinion from the Supreme Court is not controlling in any court. And the majority in *Regents* left open the possibility that the DACA policy is lawful in its current form and held that DHS violated the APA by failing to consider whether the agency should retain the policy in some form. 140 S. Ct. at 1913. The majority made clear that, even if DACA recipients' eligibility for benefits were deemed problematic, that alone does "not cast doubt on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals." *Id*. at 1912 (quotation omitted).

Congress has granted the Secretary broad authority to set enforcement priorities, and broad discretion to grant relief from removal, and it has given DHS a limited budget that renders large-scale prosecutorial discretion unavoidable. The Secretary thus lawfully and reasonably adopted criteria to help identify those individuals arguably most deserving of relief and to grant them

temporary forbearance from removal—a decision that, by all accounts, is highly beneficial to the States and communities where DACA recipients reside.

### B.     DACA Did Not Need to Go Through Notice-and-Comment Rulemaking.

**1.** The decision to defer enforcement as to DACA recipients represents a "general statement of policy" that is exempt from notice and comment. 5 U.S.C. § 553(b)(3)(B). Such general statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993).

Plaintiffs' suggestion that DHS cannot announce forbearance to a *class* of aliens absent notice-and-comment rulemaking is unsupported. The mere fact that a policy establishes or even "discontinu[es]" an agency program available to a defined group does not mean that notice and comment is required. *Vigil*, 508 U.S. at 196 (ending regional program for handicapped Indian children). The question is on whether DHS is exercising "discretionary power." *Id.* at 197.

Plaintiffs further argue that the consequences of that forbearance (*i.e.*, work authorization and potential eligibility for affirmative benefits) require notice and comment, but the longstanding regulations establishing those benefits were promulgated through notice-and-comment rulemaking pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3). Those regulations provide that deferred action recipients are eligible for work authorization and Social Security benefits. *See* 8 C.F.R. § 274a.12(c)(14) (individual "who has been granted deferred action" may obtain work authorization in certain circumstances); *id.* § 1.3(a)(4)(vi) (individual with "deferred action" is considered "lawfully present" for purposes of applying for Social Security benefits); *see also* 52 Fed. Reg. 16,216 (1987) (work authorization); 61 Fed. Reg. 47,039 (1996) (Social Security benefits). This approach accords with Congress's own understanding that a noncitizen is lawfully present (for purposes of determining admissibility following departure from the country) during any "period of stay authorized by" DHS. 8 U.S.C. § 1182(a)(9)(B)(ii).

DHS and the former Immigration and Naturalization Service (INS) have, in a similar vein, promulgated regulations and issued policy guidance providing when noncitizens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (C)(i)(I). *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2). Furthermore, those agencies have long granted advance parole to noncitizens who are seeking to depart temporarily and return to the United States without a visa. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(f); *see also, e.g.*, *Rais v. Holder*, 768 F.3d 453, 456 n.2 (6th Cir. 2014).

Every challenged consequence of DACA, including lawful presence, work authorization, and eligibility for Social Security benefits, is provided for in the INA or in regulations promulgated under the INA that preceded DACA. The existence and congressional sanction of these benefits as part of a grant of deferred action contradicts Plaintiffs' claim that "DACA changed the law" in those respects. ECF No. 486 at 32. The DACA policy did not have to undergo notice and comment because it did not create any such substantive rights or benefits. Were the law otherwise, *any* grant of deferred action—whether categorical or individual—would require a substantive rule that went through notice and comment on the theory that it would trigger collateral benefits under pre-existing regulations. *See EPIC v. DHS*, 653 F.3d 1, 5 (D.C. Cir. 2011) ("[E]ven a rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule.").

In any case, even if DACA did not conform to the rulemaking requirements of the APA, DHS has announced its intention to initiate a new rulemaking proceeding regarding DACA. *See* Statement by Homeland Security Secretary Mayorkas on DACA (Mar. 26, 2021), https://www.dhs.gov/news/2021/03/26/statement-homeland-security-secretary-mayorkas-daca. That rulemaking is likely to moot Plaintiffs' procedural claims and could significantly affect the

Court's analysis regarding DACA's substantive legality. In light of these ongoing developments, a ruling on DACA's legality is inappropriate at this time.

**2.** Plaintiffs assert that DACA is not a general statement of policy because "Immigration Service Officers have no genuine discretion in adjudicating DACA applications." ECF No. 486 at 33 (citing *Texas I*, 86 F. Supp. 3d at 670). Plaintiffs' bare assertion offers no basis for summary judgment because the record demonstrates that DACA is adjudicated on a case-by-case basis. As this Court has found, "there is at least some evidence presented by the Defendant Intervenors to the contrary—that the actual individuals screening the applications may have some discretion," ECF No. 319 at 101-2, which would create a genuine issue of material fact that cannot be resolved on summary judgment. *See Lynch Props., Inc.,* 140 F.3d at 625.

The DACA policy requires case-by-case adjudication, *see* DACA Mem. at 1, and the record demonstrates that thousands of DACA requests are denied every year. *See* ECF No. 224-2 at 469 (75,510 initial DACA requests denied between 2012 to 2018). Plaintiffs offer no evidence to rebut the presumption that immigration officers comply with the DACA Memorandum's explicit instruction to make such individual determinations. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("[I]n the absence of clear evidence to the contrary, courts presume that public officers have properly discharged their official duties."). Instead, Plaintiffs offer only opinion and hearsay testimony that this Court already rejected. *See* ECF No. 319 at 100 n.105 ("This Court did not find either the deposition of Kenneth Palinkas, or the deposition of Michael Knowles . . . to be compelling."). Conversely, as the Ninth Circuit recognized:

> DACA's [2015] 5% denial rate—which did not include applications rejected for administrative deficiencies—is consistent with a discretionary program given that applicants self-select: "It should be expected that only those highly likely to receive deferred action will apply; otherwise, applicants would risk revealing their immigration status and other identifying information to authorities, thereby risking removal (and the loss of a sizeable fee)."

*Regents*, 908 F.3d at 507 (citing *Texas I*, 809 F.3d at 210 (King, J., dissenting)); *id.* ("[I]n fiscal year 2016, . . . the agency . . . denied 11,445; that is, 17.8% of the applications acted upon were denied.") (citing *Texas I*, 809 F.3d at 210 n.44); *see Arpaio v. Obama*, 27 F. Supp. 3d 185, 209 n.13 (D.D.C. 2014) (noting these statistics "reflect that . . . case-by-case review is in operation").[3]

The Fifth Circuit majority also noted that the DACA denial rate is low because DACA "involved self-selecting applicants, and those who expected to be denied relief were unlikely to apply" and applicants thus were less likely to have backgrounds that would warrant a discretionary denial notwithstanding satisfying the threshold criteria. *Texas I*, 809 F.3d at 174. Thus, Plaintiffs have not shown that DACA is nondiscretionary.

## III.    DACA Does Not Violate the Take Care Clause.

For many of the same reasons, DACA does not violate the Take Care Clause. As this Court noted, "the Take Care Clause is the source of the President's (and the Executive Branch's) power of prosecutorial discretion," ECF No. 319 at 64 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)), and DACA, "at least nominally, was instituted as an exercise of prosecutorial discretion." *Id.* That Plaintiffs do not agree with the exercise of that discretion does not somehow mean that the Secretary did not exercise discretion, or that there is an independent Take Care Clause claim. It is well-established that "the duty of the President in the exercise of the power to

---

[3] The Court's previous concern that the 2012 DACA Memorandum curtails discretion because it "instructs the agency on exactly what factors to use" when exercising discretion on an individual basis, ECF No. 319 at 99, is mistaken. The memorandum instructs: "The following criteria should be satisfied *before* an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum." DACA Mem. at 1 (emphasis added); *see Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024–25 (9th Cir. 1985) (INS operating instructions that provided specific factors to determine eligibility for deferred action, but used "may" instead of "shall," preserved the agency's discretion over deferred action regardless of eligibility).

see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867).

Plaintiffs' argument that DACA "dispenses with certain immigration statutes . . . by declaring a class of aliens to henceforth be present lawfully," ECF No. 486 at 44, is incorrect because the INA authorizes DHS to adopt the DACA policy. DACA does not dispense with any immigration statutes; it implements them. As discussed above, deferred action has been a form of prosecutorial discretion available to immigration officers for decades, *see Arpaio*, 27 F. Supp. 3d at 193–94, and the Supreme Court has cited with approval the Executive's "regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483-84. *Regents* reaffirmed this approval by suggesting that, even on a large scale, DACA as a forbearance policy was within the DHS Secretary's authority. *Regents*, 140 S. Ct. at 1912 ("[C]ontinuing forbearance remained squarely within the discretion of [DHS].") Finally, Congress allocates funds sufficient to pursue removal of only approximately 3.75% of the total undocumented population.[4] *See* ECF No. 224 at 31–33; ECF No. 400-3, Ex. 15 ¶¶ 8–10. And DACA does not "prevent[] the removal of individuals whom Congress has deemed removable," ECF No. 486 at 36, as those individuals remain subject to removal; rather, DACA reflects the Secretary's legal authority to determine where to focus scant resources by temporarily deferring action for eligible low-priority individuals, who then obtain the

---

[4] Significantly, the government would not be *able* to target DACA recipients for removal without diverting resources from congressionally-identified higher-priority individuals, including violent criminals, gang members, and traffickers. *See* Consol. Appropriations Act 2014, Pub. L. No. 113-76, div. F., Tit. II, 128 Stat. 5, 251 (2014); DHS Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009); *see also Heckler v. Chaney*, 470 U.S. 821, 833 (1985) (Congress "may limit an agency's exercise of enforcement power if it wishes . . . by setting substantive priorities[.]").

opportunity to live and work lawfully under other, longstanding regulations. There is thus no ground to find that the Secretary was not exercising her discretion in promulgating DACA.

## IV.   In the Alternative, the Court Should Craft a Narrow Remedy that Minimizes Disruption to DACA Recipients

If this Court holds that DACA is unlawful, the proper remedy is to issue a declaratory judgment and remand to DHS for further proceedings. The Court should not order injunctive relief, and in particular, should not enjoin the continued operation of DACA during the pendency of any remand proceedings that may be required by the Court's judgment.

Injunctive relief is an "extraordinary" equitable remedy that "has never been regarded as strictly a matter of right." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "It is horn book law that . . . [an] injunction . . . calls for great caution and deliberation." *Reliable Transfer Co. v. Blanchard*, 145 F.2d 551, 552 (5th Cir. 1944). That is all the more true here, where an injunction would interfere with "[t]he power to regulate immigration," an "attribute of sovereignty" that has "been entrusted by the Constitution to the political branches." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982). Aside from a footnote, Plaintiffs have not even attempted to show that they are entitled to injunctive relief under the traditional four-factor test. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 393-94 (2006); *see also* ECF No. 529 at 18 n.12. This failure alone precludes an award of injunctive relief. Indeed, Plaintiffs have stated that they "are not seeking the immediate termination" of DACA. ECF No. 486 at 46. They agree that even if DACA is to be wound down, the process should be "orderly" and permit full appellate review before the Court's order has any effect. *Id.*

In *Regents*, the Supreme Court held that, even if DACA is unlawful, DHS should also have an opportunity to consider "what if anything to do about the hardship to DACA recipients." 140 S. Ct. at 1910, 1916. The Court noted that "how best to address a finding of illegality moving

forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA." *Id.* at 1910. The Court emphasized that "[t]hose policy choices are for DHS." *Id.* The Court concluded that the "appropriate recourse is therefore to remand to DHS so that it may consider the problem anew." *Id.* Here, DHS has already announced its intention to consider the policy anew. As noted, the Secretary has expressed his intention to issue a notice of proposed rulemaking concerning DACA. ECF No. 563.

In similar circumstances, courts generally remand to an agency for further consideration and implementation of a policy that conforms with the court's legal instructions, without vacating the agency's action or otherwise issuing an order with immediate effect, even if the court has determined that the agency acted unlawfully. "Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 389 (5th Cir. 2021). Remand without vacatur is also appropriate where vacatur would have "disruptive consequences." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *see Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (remanding without vacatur because "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante"); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518–19 (D.C. Cir. 2020) (remanding without vacatur despite substantively unlawful agency action).

If the Court finds DACA unlawful, the magnitude of the disruptive consequences and the likelihood that DHS's rulemaking will resolve many of the Court's concerns with DACA's lawfulness counsel in favor of remand without vacatur. DHS's decision to initiate a rulemaking could ameliorate any procedural deficiencies with the original policy and would provide an opportunity for the agency to consider the need for and advisability of substantive changes in the policy going forward. *See Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 872 (D.C.

Cir. 1999); (remanding to permit the agency to "commence a new rulemaking" and "possibly" implement "modifications" to its policy). The public interest is best served by allowing "politically accountable officials" to reconsider DACA and to effectuate any required changes in the first instance. *See Valentine v. Collier*, 978 F.3d 154, 166 (5th Cir. 2020); *Thomas v. Bryant*, 919 F.3d 298, 312 (5th Cir. 2019).

In 2018, this Court denied preliminary injunctive relief, finding that "the egg has been scrambled" because Plaintiffs had delayed challenging DACA for six years and in that time "many DACA recipients and others nationwide have relied upon it." ECF No. 319 at 115. The Court found that "[t]o try to put it back in the shell with only a preliminary injunction record, and perhaps at great risk to many, does not make sense nor serve the best interests of this country." *Id*. DACA is now nearly nine years old, and vacatur remains not in the best interests of the country.

The disruptive consequences of invalidating DACA immediately, particularly without permitting an orderly wind-down, would be immense. Recipients have depended on DACA to support themselves and their families and build their lives in the United States. They "have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program." *Regents*, 140 S. Ct. at 1914 (quoting Regents' brief). In denying a preliminary injunction, this Court recognized that enjoining DACA would cause "significant hardship" by making recipients "susceptible to immigration proceedings and eventual removal," depriving recipients of "their ability to work," and causing them to "lose their ability to travel within the United States and many other benefits" that flow from deferred action. ECF No. 319 at 113. The effects of halting DACA would further "radiate outward" to irreparably harm recipients' families and communities. *Regents*, 140 S. Ct. at 1914 (quoting Regents' brief). The impact would be felt by recipients' "200,000 U.S.-citizen children,"

*id.*, whose parents might be unable to provide for their family and might be exposed to removal. It would be felt by "the schools where DACA recipients study and teach," *id.*, which could lose valuable members of their student bodies and faculties, as well as tuition dollars. It would be felt by "the employers who have invested time and money in training," and who would have to pay enormous sums to hire and train replacements for hundreds of thousands of DACA recipients. *Id.*

Injunctive relief or vacatur that immediately terminates DACA would also cause significant disruption for federal, state, and local governments. It would undermine the federal government's efforts to efficiently identify enforcement priorities and would "interfer[e] with [the agency's] ability to perform its statutory duties" with the necessary "flexibility to address the facts on the ground" that "are ever-changing." *Valentine*, 978 F.3d at 165. Furthermore, 21 States and the District of Columbia have participated to highlight the disruption that they will suffer if DACA is enjoined. If DACA recipients are excluded from the lawful workforce, state and local governments have been estimated to face the loss of more than a billion dollars in tax revenue each year. *See Regents*, 140 S. Ct. at 1914 (citing Regents' brief). Economic damage would be felt across the country, with many billions of dollars in estimated lost economic activity and lost federal tax revenues. *Id.* Beyond these economic harms, "states, cities, and employers . . . could lose residents" who are integral to "various schools, municipalities, and industries." ECF No. 319 at 113-14. Local law enforcement would also be deprived of the benefits of deferred action, which encourages noncitizens who are not enforcement priorities to cooperate with law enforcement officers where they might otherwise fear coming forward. *See* ECF No. 400-1, Ex. 3 (Declaration of Art Acevedo, Houston Chief of Police) ¶¶ 10–15.

As this Court has recognized, maintaining "the status quo until a definitive decision" is reached will avoid these disruptive consequences. ECF No. 319 at 114–15. Withholding injunctive

relief and vacatur during the pendency of a remand to DHS will preserve the status quo and thereby prevent the "inevitable disruption that would arise from a lack of continuity and stability in [an] important area of the law" while DHS considers how best to implement any judgment issued by the Court. *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014).

## V.    If This Court Grants Plaintiffs Immediate Relief, Then It Should Stay Its Ruling.

For the reasons above, if the Court ultimately finds that DACA is unlawful and must be terminated immediately in any respect, a stay is warranted to maintain the status quo. If this Court issues immediate relief, and if it does not agree with Plaintiffs' own request to stay its ruling for two years pending appellate review, then Defendants respectfully request a stay of at a minimum thirty days for the Acting Solicitor General to consider whether to authorize appeal, and if appeal is authorized, for Defendants to submit a request for a stay pending appeal.

Denying a stay would cause immense irreparable harm to DACA recipients, their families and communities, and all levels of government. Yet as this Court has recognized, granting a stay would not prejudice Plaintiffs "given the delay in confronting DACA." ECF No. 319 at 115. Under these circumstances, the public interest plainly favors a stay. Even if this Court finds DACA unlawful, "because many everyday Americans would otherwise face great uncertainty," the Court's judgment should "be stayed during the pendency of [its] appeal." *Texas v. United States*, 352 F. Supp. 3d 665, 690 (N.D. Tex. 2018), *aff'd in part, vacated in part, remanded,* 945 F.3d 355 (5th Cir. 2019) (staying declaratory judgment that declared Affordable Care Act unconstitutional).

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and deny any immediate relief. If the Court grants immediate relief, it should stay its ruling for at a minimum thirty days so that the Acting Solicitor General may consider whether to authorize appeal, and if appeal is authorized, so that Defendants can submit a request for a stay pending appeal.

Dated: April 9, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

Respectfully submitted,

JEFFREY S. ROBINS
Attorney-in-Charge
Deputy Director

*/s/ James J. Walker*
JAMES J. WALKER
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4468
Fax: (202) 305-7000
Email: james.walker3@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 9, 2021, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ James J. Walker*
JAMES J. WALKER