United States District Court
Southern District of Texas

**ENTERED**

July 16, 2021

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, ET AL.,
   *Plaintiffs,*

*v.*

THE UNITED STATES OF AMERICA, ET AL.,
   *Defendants,*

*and*

KARLA PEREZ, ET AL.;

STATE OF NEW JERSEY,
   *Defendant-Intervenors.*

Civil Action No. 1:18-CV-00068

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

## <u>MEMORANDUM AND ORDER</u>

Before the Court are the Motion for Summary Judgment filed by the Plaintiff States[1] (Doc. No. 486) and the competing Motion for Summary Judgment filed by the individual Defendant-Intervenors.[2] (Doc. No. 503). The Defendant-Intervenors have filed responses in opposition to the Plaintiff States' motion (Doc. Nos. 502, 504) and the Defendants[3] have also responded. (Doc. No. 501). The Plaintiff States combined their reply to these responses with their response to the individual Defendant-Intervenors' motion. (Doc. No. 529). The Defendants have also responded to the individual Defendant-Intervenors' motion. (Doc. No. 527). Finally, the Defendant-

---

[1] While the roster changed somewhat over the history of the case, the Plaintiff States are comprised of Texas, Alabama, Arkansas, Kansas, Louisiana, Mississippi, Nebraska, South Carolina, and West Virginia.

[2] The Defendant-Intervenors are 22 individual DACA recipients plus the State of New Jersey. The Court will refer to them collectively as "Defendant-Intervenors" unless there is a need to refer to them separately. When that occurs, the Court will refer to the DACA recipients as "individual Defendant-Intervenors" and the state as "New Jersey."

[3] The primary defendant is the United States of America, although the following individuals with some supervisory role over DACA have also been named: L. Francis Cissna, Thomas D. Homan, Kevin K. McAleenan, Kirstjen M. Nielsen, and Carla L. Provost. They may be referred to collectively as the "Government" or "Defendants." (The Government has not sought to substitute as parties the new Administration's personnel.)

Intervenors have replied to both of the responses to the individual Defendant-Intervenors' motion. (Doc. Nos. 528, 532).

The Plaintiff States argue in their motion and briefs that the Deferred Action for Childhood Arrivals (DACA) program is illegal because its creation violated, and its continued existence violates, the procedural and substantive aspects of the Administrative Procedure Act (APA). 5 U.S.C. § 500 *et seq*. The Plaintiff States also claim that the Executive Branch violated the "Take Care Clause"[4] of the United States Constitution when it instituted DACA. U.S. CONST. art. II, § 3.

In the individual Defendant-Intervenors' Motion for Summary Judgment, they argue that they are entitled to summary judgment because the Plaintiff States have not carried their burden to establish Article III standing. They emphasize that the Plaintiff States have not introduced evidence sufficient to show that they have suffered any concrete injury or that the remedy they seek would redress any such alleged injury. Defendant-Intervenors also contend that the Plaintiff States have failed to establish *parens patriae* standing or that they should be afforded special solicitude. Additionally, they claim that there is no actual case or controversy within the meaning of Article III because this case lacks adverseness. For these reasons, Defendant-Intervenors conclude that these threshold issues preclude this Court's review on the merits.

## I.     Factual Background

### A.     Creation of DACA

In 2012, after multiple failed attempts by Congress to pass an act granting lawful status to aliens who were illegally brought to this country as children, then-Department of Homeland Security (DHS) Secretary Janet Napolitano announced a new program called DACA. Her

---

[4] The Court, while using initial caps for ease of readability, acknowledges that "Take Care Clause" more often appears in print as "take Care Clause," which uses a lowercase initial letter in the word "take." This latter approach has been adopted by many scholars and authors because that is how it appears in most copies of the Constitution.

instructions were set forth in a three-page memorandum dated June 15, 2012 (the "DACA Memorandum").[5] The DACA Memorandum directed immigration enforcement officers not to remove "certain young people who were brought to this country as children" who met specific delineated criteria. For those who qualify, DACA allows them to remain in the country temporarily through a renewable two-year period of "deferred action."[6] An illegal alien[7] is eligible for DACA if he or she:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on [June 15, 2012];

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

---

[5] Doc. No. 487, Ex. 1, Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012).

[6] In at least one place in the Code of Federal Regulations, "deferred action" is characterized as "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R § 274a.1(c)(14); *see also Reno v. AAADC*, 525 U.S. 471, 483–84 (1999) (describing deferred action as the Executive abandoning the deportation endeavor "for humanitarian reasons or simply for its own convenience").

[7] The Court understands that some may find the phrase "illegal alien" offensive. The Court uses this term because it is used in official government documents as quoted by the Supreme Court in its seminal pronouncement pertaining to this area of law. *See Arizona v. United States*, 567 U.S. 387, 397 (2012). Moreover, "alien" and "immigrant" are defined statutory terms. *See* 8 U.S.C. §§ 1101(a)(3), (15). Furthermore, the Fifth Circuit explained why "illegal alien" is a preferable (and not pejorative) term in a case like this:

> "The usual and preferable term in [American English] is *illegal alien*. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, 'not having the requisite documents to enter or stay in the country legally.' But the word strongly suggests 'unaccounted for' to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.
>
> More than one writer has argued in favor of *undocumented alien* . . . [to] avoid[] the implication that one's unauthorized presence in the United States is a crime . . . . Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence 'illegal')."

*Texas v. United States*, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (quoting Bryan A. Garner, Garner's Dictionary of Legal Usage 912 (Oxford 3d ed. 2011)); *see also* Matthew Salzwedel, *The Lawyer's Struggle to Write*, 16 Scribes Journal of Legal Writing 69, 76 (2015) ("*[I]llegal alien* has going for it both history and well-documented, generally accepted use.").

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.

In turn, having deferred action makes DACA recipients eligible for various benefits. Generally, aliens are not eligible for any "Federal public benefit." 8 U.S.C. § 1611(a). Aliens who are "lawfully present in the United States," however, are eligible to apply for Social Security and Medicare, *id.* §§ 1611 (b)(2), (3), and a pre-existing regulation defining "lawfully present in the United States" includes "alien currently in deferred action status."[8] 8 C.F.R. § 1.3(a)(4)(vi).

Additionally, deferred action status makes recipients eligible to apply for work authorization pursuant to a pre-existing regulation, *see* 8 C.F.R. § 274a.12(c)(14), and the DACA Memorandum instructs U.S. Citizenship and Immigration Services (USCIS) to consider DACA applicants for work authorization. DACA took the further step of *requiring* its recipients to apply for work authorization. (Doc. No. 9, Ex. 20, USCIS, *DACA Toolkit: Resources for Community Partners*). Once a recipient has work authorization, he or she is eligible for a Social Security number, along with its attendant benefits.[9] 20 C.F.R. §§ 422.104(a)(2), 422.105(a); 8 C.F.R. § 1.3(a)(4)(vi). Further, DACA recipients are also eligible for certain state benefits, such as Texas's state-subsidized work-study program. *See* Tex. Educ. Code § 56.075(a)(1); 19 Tex. Admin. Code § 21.24(d)(5).

---

[8] DACA recipients must still meet the normal criteria to qualify for these benefits. Without lawful presence, however, even an alien who met those criteria would still be ineligible for the benefits. *See Texas I,* 809 F.3d at 148–49. In addition to Social Security and Medicare benefits, DACA recipients also can become eligible for benefits under the Railroad Retirement Act of 1974 and the Railroad Unemployment Insurance Act. 8 U.S.C. § 1611(b)(4).

[9] Among these benefits are earned income tax credits, which require a Social Security number, *see* 26 U.S.C. §§ 32(c)(1)(E), (m); *Texas I,* 809 F.3d at 149, and perhaps even the recent stimulus payments under the American Rescue Plan Act of 2021. *See* Kelly Anne Smith, *Third Stimulus Check: Do Non-U.S. Citizens Qualify?*, Forbes, Mar. 12, 2021.

Despite these benefits, the DACA Memorandum specifically concluded: "This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." The DACA Memorandum made up to 1.9 million otherwise removable aliens eligible for the program.[10] The DACA program started with approximately 152,431 applications in 2012, then DHS approved 370,521 applicants in 2013 and 158,397 in 2014.[11] As of 2018, 814,000 individuals had applied for and received "lawful presence" via DACA. (Doc. No. 225-3, Ex. 73 ¶ 16, Decl. of Dr. D. Massey).

In 2014, the new DHS Secretary, Jeh Johnson, attempted to create a sister program, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and to expand the DACA program ("Expanded DACA"). The total population of illegal aliens with lawful presence due to DACA, Expanded DACA, and DAPA could have been 5.8 million[12] (or over 50% of the estimated 11.3 million illegal aliens in the country[13]). Twenty-six states, including the

---

[10] Estimates provided to the Court differ in the total number of DACA-eligible individuals. According to evidence provided by the Defendant-Intervenors, this number could be as high as 1.9 million. (Doc. No. 225-4, Ex. 125 at 514, R. Gonzales et al., *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark*, Ctr. for Am. Progress (June 22, 2017)) (describing DACA as "a policy that temporarily defers deportations . . . for up to an estimated 1.9 million eligible unauthorized young adults"). Other estimates are more conservative. (*See, e.g.*, Doc. No. 225-3, Ex. 74 at 148, Decl. of M. Ray Perryman) (estimating "1.3 million people nationwide are eligible to apply for DACA . . . ."); J. Passel & M. Lopez, *Up to 1.7 Million Unauthorized Immigrant Youth May Benefit From New Deportation Rules*, Pew Research Center (Aug. 14, 2012). Rather than relying on extrinsic sources, arguments of counsel, or government statistics that frequently change, the Court instead will use a midrange number of approximately 1.5 million eligible individuals.

[11] Doc. No. 224-2 at 450, USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by FY, Quarter, Intake, Biometrics and Case Status FY 2012-2017 (March 31, 2018).

[12] *See Texas 1*, 809 F.3d at 148.

[13] Some parties, experts, and governmental units rely on an estimate that there are 11.3 million illegal aliens in the United States. That number seems to have originated with a study done by the Pew Research Center that estimated the illegal alien population as of March 2013. (*See* Doc. No. 225-2, Ex. 52, J. Passel et al., Pew Research Center, As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled (Sept. 3, 2014)). This study is now a number of years old and it is arguable whether the number is accurate. A more recent study by Yale University and the Massachusetts Institute of Technology pegs the number at closer to 22 million. M. Fazel-Zarandi et al., *The Number of Undocumented Immigrants in the United States: Estimates Based on Demographic Modeling with Data*

Plaintiff States, sued to enjoin the implementation of DAPA and Expanded DACA, which this Court preliminarily enjoined in 2015. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). That injunction was affirmed by the Fifth Circuit Court of Appeals, *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), and then later by a split vote in the Supreme Court of the United States. *United States v. Texas*, 136 S. Ct. 2271 (2016). This litigation will be referred to as *Texas I*.

Upon remand, the parties in *Texas I* asked this Court to postpone entering a scheduling order that would have governed the proceedings to a final conclusion on the merits. Throughout this time, the DACA Memorandum remained in force. Ultimately, the parties all agreed to dismiss the case:

> On June 15, 2017, the U.S. Department of Homeland Security released a memorandum entitled *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")*. On September 5, 2017, the Department released a memorandum entitled *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."* Given these memoranda rescinding the DAPA program and phasing out the DACA and Expanded DACA programs, Plaintiffs file this stipulation of voluntary dismissal. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii) (allowing plaintiffs to dismiss an action, without court order, by filing a stipulation of dismissal by all parties who have appeared).

(Doc. No. 473, *Texas I*).

This stipulation of dismissal was signed by the attorneys for the plaintiffs (a group that included all of the Plaintiff States in this case), the United States and the federal government defendants, and the putative DAPA recipients who had intervened. As is evident from its text, the stipulation was partly based upon the Government "phasing out the DACA . . . program[]." All

---

*From 1990 to 2016*, PLOS One (Sept. 21, 2018). Given the nature of individuals being in the country illegally, no person, entity, or governmental unit can really know the number of illegal aliens.

parties agreed to the stipulation, otherwise such a dismissal would have required court action.

**B.     Rescission of DACA and *Regents***

After *Texas I*, the Government attempted to phase out DACA, as it represented to the Plaintiff States it would, but other courts around the nation were asked to enjoin or vacate the attempt to end the program. These lawsuits included: *Batalla Vidal v. Trump*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018); *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018); *Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); and *Casa de Md. v. United States*, 284 F. Supp. 3d 758 (D. Md. 2018). The courts in the first three cases entered injunctions against the attempted DACA rescission. These cases were eventually appealed to and heard together by the Supreme Court in the case styled: *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) (hereinafter "*Regents*").

Meanwhile, in May 2018, the Plaintiff States filed the current case challenging the lawfulness of DACA as it was enacted in 2012. The Plaintiff States now seek the same result they thought they had achieved with the stipulation of dismissal in *Texas I*—that is, cessation of DACA. While finding that they would likely succeed on the merits, this Court denied the Plaintiff States' request for a preliminary injunction. (Doc. No. 319). Over the objections of the Plaintiff States, the resolution of this case was stayed pending the ruling in *Regents* because it was important to have the benefit of the Supreme Court's analysis before proceeding, particularly as the decision could have mooted this case.

Once the Supreme Court ruled, the parties were given adequate time to update their motions and briefs to include any relevant analysis of the *Regents* opinion. The Court then held a hearing at a time when it could be done safely, given the logistical complications presented by the COVID-19 pandemic.

The *Regents* opinion, written by Chief Justice John Roberts, dealt with DACA's attempted recission, but it has some relevance here. In 2017, the Attorney General, based in part on the *Texas I* litigation, concluded that DACA was unlawful and sent a letter to then-Acting DHS Secretary Elaine Duke to that effect. *Regents*, 140 S. Ct. at 1903. Based on that letter, the Acting Secretary issued a memorandum rescinding the DACA program. *Id.* Various stakeholders sued to enjoin the rescission. *Id.* The Chief Justice succinctly set out the exact questions the *Regents* Court needed to address: "The issues raised here are (1) whether the APA claims are reviewable, (2) if so, whether the rescission was arbitrary and capricious in violation of the APA, and (3) whether the plaintiffs have stated an equal protection claim." *Id.* at 1905.

In *Regents*, the Supreme Court found the Government's decision to rescind DACA was judicially reviewable. There is a general presumption of reviewability that can be rebutted by a showing that the action is committed to "agency discretion by law." 5 U.S.C. § 701(a)(2). An argument in *Regents*, in *Texas I*, and at the preliminary injunction stage in this litigation, was that DACA is an agency decision not to institute enforcement proceedings and as such neither its creation nor rescission is reviewable.

The Supreme Court disagreed with this argument and recognized that "DACA is not simply a non-enforcement policy." *Regents*, 140 S. Ct. at 1906. Instead, the DACA Memorandum created standardized proceedings by which USCIS solicits and reviews applications from eligible aliens. *Id.* The proceedings are effectively "adjudications," and the result of the adjudications is an affirmative act of approval. *Id.* The Supreme Court concluded that the DACA Memorandum therefore "created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an action that provides a focus for judicial review." *Id.* (cleaned up).

Having determined that the rescission of DACA was subject to judicial review, the Supreme Court found that "judicial review of agency actions is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). It continued on to explain: "Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply convenient litigating positions." *Id.* at 1909 (quotations omitted). Additionally, the *Regents* Court emphasized that procedural compliance, in the context of rescission, "promote[s] agency accountability, by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority." *Id.* (citations and quotations omitted). It also noted that the APA procedural requirement of notice and comment, a pivotal issue in the instant case, was not before it. *Id.* at 1903 n.1.

Central to the *Regents* decision was whether the rescission of DACA, under the circumstances presented, was arbitrary and capricious. The Court held that, in light of the Attorney General's reliance on the *Texas I* litigation, which did not question DHS's authority to forbear removal, the Acting Secretary's explanation for rescinding all of DACA (benefits *and forbearance*) was arbitrary and capricious under the APA. *Id.* at 1912–13. Additionally, the Acting Secretary's failure to consider the significant reliance interests that DACA had engendered was another, independent, reason that the rescission was arbitrary and capricious. *Id.* at 1913–14.

Justice Sonia Sotomayor (who disagreed with the majority's rejection of the equal protection challenge) and Justice Brett Kavanaugh (who opined that the Court should have considered the agency's later justifications) filed separate opinions. *Id.* at 1917, 1933.

Finally, the dissent filed by Justice Clarence Thomas and joined by Justices Samuel Alito and Neil Gorsuch addressed the ultimate issue that is before this Court—the legality of DACA's

creation. According to the dissenters, DHS was "without any statutory authorization" to create DACA, and, even if DHS did have such authority, the agency needed to go through "the requisite rulemaking process" to create DACA. *Id.* at 1918–19 (Thomas, J., dissenting). DACA was therefore an "unlawful program" whose rescission could not have possibly been arbitrary or capricious. *Id.* While a dissenting opinion does not carry the full force and compelling nature of a majority opinion, it is clear the dissenters found DACA to have been illegal *ab initio*.

Justice Thomas noted that the majority's failure to address DACA's creation was "an effort to avoid a politically controversial but legally correct decision" that would result in future "battles to be fought in this Court." *Id.* at 1919. While this controversial issue may ultimately return to the Supreme Court, the battle Justice Thomas predicted currently resides here and it is not one this Court can avoid.

## C.    DACA After *Regents*

After the *Regents* decision, DHS issued a series of letters and memoranda that attempted to limit the DACA program ("New DACA"). New DACA consisted of Attorney General William Barr's June 30, 2020 letter, Acting Secretary of DHS Chad Wolf's July 28, 2020 memorandum, and USCIS Deputy Director for Policy Joseph Edlow's August 21, 2020 memorandum.

New DACA spurred more litigation, which was addressed in *Batalla Vidal v. Wolf*, 16-CV-4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020). There, the district court held that New DACA was unlawful because "Mr. Wolf was without lawful authority to serve as Acting Secretary of DHS." *Id.* at, *1. As a result, the court vacated the memorandum and found that DACA is currently governed by the same terms as it was in 2012, before any attempted rescission. In the wake of *Batalla Vidal*'s resolution, New DACA has little bearing on the present litigation.

## II.    Issues Before and Not Before the Court

The Court is faced with five primary issues to resolve these competing summary judgment motions. Though this Court addressed many of these issues earlier in this litigation, they arose in the context of a request for preliminary injunction and on a somewhat more limited record. The five issues before the Court are:

1)    Do the Plaintiff States have standing to challenge DACA?

2)    Was DHS required by the APA to go through notice and comment rulemaking to institute DACA?

3)    Does DACA violate substantive immigration law in contravention of the APA?

4)    Did the Executive Branch violate the Take Care Clause of the Constitution with the creation and continued operation of DACA?

5)    If the Plaintiff States are correct, what relief should this Court grant?

While many of the amici curiae, and even the parties at times, have suggested or argued that other issues are related and should be addressed, the rulings of the Court are confined to these five issues.

## III.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

## IV.   Analysis

### A.   This Case Presents a Case or Controversy

The Constitution limits the exercise of judicial power to "Cases" and "Controversies." U.S. CONST. art. III, § 2. Under Article III, a case must present a genuine controversy between adverse parties to be justiciable. *See INS v. Chadha*, 462 U.S. 919, 939 (1983). Defendant-Intervenors initially argued that this case does not present an actual case or controversy because opposing sides are aligned: "[Plaintiff States] and [the Government] agree—DACA is unlawful." (Doc. No. 504 at 39). They also contended that under New DACA, the Government is no longer implementing the challenged policy, 2012 DACA. (Doc. No. 504 at 40).

When the federal government is a party, the "case or controversy" requirement is satisfied if the federal government continues to enforce the challenged policy. *United States v. Windsor*, 570 U.S. 744, 758–59 (2013). In *Windsor*, the Supreme Court considered whether a justiciable controversy existed when the Executive Branch enforced a statute against an individual despite agreeing with her that it was unconstitutional. The Supreme Court held that even where "the Government largely agree[s] with the opposing party on the merits of the controversy," the

Government's intent to enforce the challenged law provides sufficient adverseness to maintain jurisdiction over the suit. *Id.* at 759.

The Government's continued operation of DACA is analogous to the continued enforcement of the statute in *Windsor*. The alleged source of the Plaintiff States' injuries is the Government's enforcement of DACA, and this remains true whether or not the Government originally agreed with the Plaintiff States on the merits. Thus, the Defendant-Intervenors' contention that the Plaintiff States and the Government "are, in fact, aligned" is immaterial. (Doc. No. 504 at 39).

Even more to the point, New DACA, which Defendant-Intervenors relied upon to suggest that the Government has ceased to enforce 2012 DACA, is no longer in effect. *See Batalla Vidal*, 2020 WL 7121849, at *1 ("Accordingly, because Mr. Wolf was without lawful authority to serve as Acting Secretary of DHS, [New DACA] is VACATED."). After ruling that New DACA was unlawful, the court held that "all parties agree that the DACA program is currently governed by its terms as they existed prior to the attempted rescission of September 2017." *Id.* In other words, 2012 DACA is the policy in effect now.

Moreover, President Joseph Biden has recently signed a memorandum entitled, "Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)," which directs the DHS Secretary and the Attorney General to take actions consistent with applicable law "to preserve and fortify DACA." (Doc. No. 550-1). Consequently, the Government is enforcing and preserving the challenged program, 2012 DACA. The Government's latest filing also demonstrates that it staunchly defends DACA and strongly opposes the position of the Plaintiff States.[14] Its arguments

---

[14] A quick review of the argument section of the Table of Contents from the Government's latest brief demonstrates its positions are clearly opposed to those of the Plaintiff States. The headings read as follows: "1) Plaintiffs Lack Standing or a Viable Cause of Action to Challenge DACA; 2) DACA Is Lawful; 2a) DACA Is Substantively Lawful Under the INA; 2b) DACA Did Not Need to Go Through Notice-and-Comment Rulemaking; 3) DACA Does Not

are diametrically opposed to the Plaintiff States' positions and are aligned with the Defendant-Intervenors' positions.

Finally, this Court allowed all the intervenors into this lawsuit in order that they could challenge the Plaintiff States' positions. They have done that vehemently and ably. There can be no doubt that this case presents an Article III controversy. It has been fought hard and professionally by the lawyers for all concerned.

## B.     The Plaintiff States Have Standing

The Constitution's "Cases or Controversies" requirement gives rise to another doctrine to maintain the proper bounds of judicial power—standing to sue. U.S. CONST. art. III, § 2; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A federal court can exercise judicial power only when a plaintiff has demonstrated that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

Defendant-Intervenors contend that they are entitled to summary judgment because the Plaintiff States lack standing to sue. The Plaintiff States have the burden of establishing that at least one of the plaintiffs has Article III standing. *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."). The Court's analysis will concentrate on whether Texas has standing to sue because all parties have focused their standing arguments on DACA's impact in Texas.

---

Violate the Take Care Clause; 4) In the Alternative, the Court Should Craft a Narrow Remedy that Minimizes Disruption to DACA Recipients; and 5) If This Court Grants Plaintiffs Immediate Relief, Then It Should Stay Its Ruling." (Doc. No. 569 at 2).

The Plaintiff States assert several independent theories of standing and contend that under the Supreme Court's ruling in *Massachusetts v. EPA*, 549 U.S. 497 (2007), they are entitled to special solicitude when the Court makes its standing determination. An entitlement to special solicitude would inform the Court's standing analysis, so the Court first considers whether to afford Texas special solicitude. It will then consider whether the Plaintiff States have standing.

### 1.     Special Solicitude

The Supreme Court has explained that "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518. Rather, a state is afforded "special solicitude" when it alleges that a defendant "violated a congressionally accorded procedural right which affected the State's 'quasi-sovereign' interests in, for instance, its physical territory or lawmaking function." *Texas v. United States*, 6:21-CV-00003, 2021 WL 2096669, at *10 (S.D. Tex. Feb. 23, 2021) (citing *Massachusetts*, 549 U.S. at 520–21 and *Texas I*, 809 F.3d at 151–55). The Supreme Court has not been explicit about the consequences of having special solicitude in a standing analysis, but it appears that recognition of this status would mitigate perceived weaknesses in causation and redressability arguments. *Massachusetts*, 549 U.S. at 524 (finding causation and redressability, and rejecting the premise that "a small incremental step, because it is incremental, can never be attacked in a federal judicial forum").

The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis. *See Texas I*, 809 F.3d at 159 ("[T]he government theorizes that Texas's injury is not fairly traceable to DAPA because it is merely an incidental and attenuated consequence of the program. But *Massachusetts v. EPA* establishes that the causal connection is adequate. Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here."); *see also Texas*, 2021 WL 2096669,

at *20. Applying the law set out in *Massachusetts v. EPA* and *Texas I*, the Court finds that Texas is entitled to special solicitude.

In *Massachusetts v. EPA*, Massachusetts sued to challenge the decision of the Environmental Protection Agency (EPA) not to regulate certain vehicle emissions. The EPA argued that Massachusetts lacked standing to sue and sought dismissal of the case. The Supreme Court found that Massachusetts did have standing, based in part on the difference between a state seeking relief on behalf of its citizens and a normal litigant. *Massachusetts*, 549 U.S. at 518.

The Court came to this conclusion after determining that Massachusetts was entitled to special solicitude due to the presence of two factors: a procedural right to challenge the agency action and a quasi-sovereign interest in the state's territory. The Court first found that Massachusetts had a procedural right to sue because the Clean Air Act—which Massachusetts sued to enforce—provided a concomitant procedural right whereby Massachusetts could challenge the rejection of its rulemaking petition as arbitrary and capricious. *Id.* at 520.

The Supreme Court next emphasized Massachusetts's desire to protect its quasi-sovereign interest in its territory. *Id.* at 519. Expanding on precedent from 1907, it found that Massachusetts's desire to preserve sovereign territory in its coastline from the threat of rising sea levels constituted a quasi-sovereign interest. *See id.* ("Just as Georgia's independent interest 'in all the earth and air within its domain' supported federal jurisdiction a century ago, so too does Massachusetts's well-founded desire to preserve its sovereign territory today.") (quoting *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907)). The Court explained that Congress's command to the EPA to protect Massachusetts from the alleged harm took on a heightened significance because Massachusetts, in exchange for entering the union, had relinquished its "sovereign prerogatives" to regulate for itself the harms associated with air pollutants. *Id.* Finding both factors met, a procedural right to

challenge the inaction of the EPA and a quasi-sovereign interest in protecting its territory, the Supreme Court determined Massachusetts was entitled to special solicitude. *Id.* at 520.

For purposes of this special solicitude analysis, this Court does not write on a clean state. In *Texas I*, the Fifth Circuit ruled that Texas was entitled to special solicitude based upon facts substantially similar to those here. 809 F.3d at 151–55. It held that states had special solicitude to defend against DAPA and Expanded DACA's "institutional injury to their lawmaking authority." *Id.* at 154.

Considering the first factor, the Circuit found that Texas's procedural right under the APA to challenge DAPA and Expanded DACA was analogous to Massachusetts's procedural right to challenge the EPA's decisions not to promulgate emission standards. *Id.* at 152. The Fifth Circuit explained why the analysis from *Massachusetts* was applicable even though the Clean Air Act provided a more specific procedural right than the APA:

> The Clean Air Act's review provision is more specific than the APA's, but the latter is easily adequate to justify "special solicitude" here. The procedural right to challenge EPA decisions created by the Clean Air Act provided important support to Massachusetts because the challenge Massachusetts sought to bring—a challenge to an agency's decision *not to act*—is traditionally the type for which it is most difficult to establish standing and a justiciable issue. Texas, by contrast, challenges DHS's *affirmative decision* to set guidelines for granting lawful presence to a broad class of illegal aliens. Because the states here challenge DHS's decision to act, rather than its decision to remain inactive, a procedural right similar to that created by the Clean Air Act is not necessary to support standing.

*Id.* (second emphasis added). Just as in *Texas I*, the Plaintiff States here seek to challenge DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens. The Fifth Circuit's analysis, as applied to DAPA and Expanded DACA in *Texas I*, is equally applicable to Texas's procedural right to challenge DACA in the instant case. Therefore, Texas easily satisfies the first factor in the special solicitude analysis. Just like Massachusetts had a right to demand that the EPA enforce the Clean Air Act as Congress had commanded, the Plaintiff States

have a right under the APA to demand that DHS administer the immigration laws in the manner
dictated by Congress.

The Fifth Circuit's analysis of the second factor, the quasi-sovereign interest, is not as easy
to apply here. In *Texas I*, the majority found that DAPA affected the state's quasi-sovereign interest
by imposing "substantial pressure" on the states to "change their laws, which provide for issuing
driver's licenses to some aliens and subsidizing those licenses." *Id.* at 153. Here, Texas does not
allege injury due to driver's license costs. Nevertheless, Texas has demonstrated a quasi-sovereign
interest in its own economic well-being and that of its citizens to support its entitlement to special
solicitude in the standing analysis.

In *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, the Supreme Court recognized that a
state has a "quasi-sovereign interest in the health and well-being—both physical and economic—
of its residents in general." 458 U.S. 592, 607 (1982). It also recalled that it had "long recognized
that [such interests] extend beyond mere physical interests to *economic and commercial interests*."
*Id.* at 609 (emphasis added). The Supreme Court elaborated that any indirect effects of the
challenged conduct must be considered in the determination of whether the state has alleged injury
to "a sufficiently substantial segment of its population." *Id.* at 607. The Court remarked that a
helpful indicator of a quasi-sovereign interest is "whether the injury is one that the State, if it could,
would likely attempt to address through its sovereign lawmaking powers." *Id.*

Texas has successfully demonstrated a quasi-sovereign interest. Texas seeks to protect its
legal residents' economic and commercial interests from labor market distortion caused by DACA.
(Doc. No. 486 at 32; Doc. No. 104 ¶ 240). According to the Plaintiff States, DACA bypasses
Congress's comprehensive immigration framework to grant lawful presence, and thereafter work
authorizations, to unlawfully present individuals. DACA recipients may then compete with legally

present individuals for available jobs. (*See* Doc. No. 487, Ex. 14 ¶ 13, Decl. of D. Deere) (asserting that rise in eligible workers due to DACA increases competition in available jobs); (*id.*, Ex. 15 at 6–7, Depo. of I. Brannon) (stating presence of DACA recipients leads to increase in competition among similarly skilled workers in the workplace and impacts wages). Even Defendant-Intervenors' own experts could not escape the reality that DACA congests the workforce: "[W]ork authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers . . . ." (Doc. No. 487, Ex. 24 ¶ 6.a., Decl. of M. Wiehe & M. Hill).[15]

The Plaintiff States further argue that the Patient Protection and Affordable Care Act (ACA) exacerbates this problem. (Doc. No. 486 at 33–34). Under the ACA, certain large employers are generally required to offer health insurance to their full-time employees that provides "minimum essential coverage." *See* 26 U.S.C. § 4980h. An employer who offers coverage that does not provide minimum essential coverage will face a penalty if any of its employees purchases coverage on the insurance exchange and receives a premium subsidy. *See id.* DACA recipients, however, cannot receive a premium subsidy because, as aliens, they are generally prohibited from receiving any federal public benefit. 8 U.S.C. § 1611(A). Accordingly, an employer may offer to DACA-recipient employees coverage that does not provide minimum essential coverage without risking a penalty. This facet of the ACA can make DACA recipients less costly to employ for some employers, thereby incentivizing employers to hire DACA recipients over similarly qualified legal Texas residents. (*See* Doc. No. 487, Ex. 14 ¶ 24) ("[A]s a result of the interaction between the DHS Memorandum and the ACA, there will be relatively less

---

[15] The Supreme Court suggested that a court consider "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Alfred L. Snapp*, 458 U.S. at 607. Here the Plaintiff States would clearly attempt to address this issue, but they cannot legislate around DACA, because immigration policy falls within the sole ambit of the federal government. *Arizona*, 567 U.S. at 399 ("[T]he States are precluded from regulating conduct in a field that Congress . . . has determined must be regulated by its exclusive governance."). Unable to pass their own laws regarding immigration status or policy, the states are hamstrung by the federal government's action or inaction.

hiring of U.S. citizens and relatively lower wages on average for those who are hired.").

The very existence of a larger eligible workforce, even if one discounts the incentives provided by the ACA, necessarily contributes to a more competitive labor market, which makes it more difficult for legal residents of Texas to obtain work. Thus, Texas, on behalf of the Plaintiff States, has sufficiently shown that DACA conflicts with its own quasi-sovereign interest in the economic and commercial well-being of its legal residents.[16]

Defendant-Intervenors argue that dicta in a recent Supreme Court decision, *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), which was decided after *Texas I*, undermines the validity of the Fifth Circuit's finding that DAPA implicated the quasi-sovereign interests of the states. (Doc. No. 504 at 38). In particular, Defendant-Intervenors emphasize that in *Murphy* the Supreme Court explained that federal legislation that operates as "a direct command to the States" implicates sovereign interests, whereas federal governmental action that directly regulates private individuals does not. *Murphy*, 138 S. Ct. at 1479–81. According to Defendant-Intervenors, because "DACA is the latter, a mere exercise of federal enforcement discretion that directly affects only private parties (*i.e.*, DACA recipients)," it neither strips the states of their powers nor intrudes on their sovereignty in such a way that would support finding a quasi-sovereign interest. (Doc. No. 504 at

---

[16] The Plaintiff States' interest in protecting their residents is one of the hallmarks of special solicitude. In *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127 (E.D.N.Y. 2017), and the associated cases concerning DACA, 13 states and the District of Columbia were all found to have standing under the concept of special solicitude as set out in *Massachusetts v. EPA*. That court emphasized that this was especially true when the federal action in question was not enacted in compliance with the requirements of APA notice and comment. It held:

> Moreover, Washington has standing to challenge the procedures by which Defendants decided to end the DACA program, because "there is some possibility" that, if DHS complied with notice-and-comment . . . rulemaking procedures, it might "reconsider the decision." *See Massachusetts v. EPA*, 549 U.S. at 518, 127 S. Ct. 1438. Because Washington has established its standing to assert substantive and procedural APA . . . claims, the State Plaintiffs therefore have Article III standing to bring these claims. *See FAIR*, 547 U.S. at 53 n.3, 126 S. Ct. 1297.

*Duke*, 295 F. Supp. 3d at 158–59. Certainly, if the Plaintiff States had been given the opportunity to express the concerns raised here through a notice and comment procedure, "there is some possibility" that DHS might have taken a different course of action.

38). *Murphy*, however, does not support this argument.

*Murphy* discussed federal legislation *only* in the context of anti-commandeering[17] and preemption. *Murphy* never mentions special solicitude. In *Murphy*, sports leagues sued to enjoin New Jersey from enforcing a state law that partially repealed the state's prohibition on gambling. 138 S. Ct. at 1472. The Third Circuit affirmed a grant of summary judgment for the sports leagues on the basis that the New Jersey state law violated federal law, the Professional and Amateur Sports Protection Act (PASPA). *Id.* The Circuit opined that PASPA did not violate anti-commandeering principles because it did not force states to take any affirmative action. *Id.* at 1473. The Supreme Court reversed, finding that PASPA's provision making it unlawful for states to authorize sports gambling contravened the anti-commandeering doctrine because the "provision unequivocally dictate[d] what a state legislature may and may not do." *Id.* at 1478.

In reaching its holding, the Supreme Court reviewed some of its prior cases that discuss anti-commandeering and revisited federal laws that it had previously held do not violate the anti-commandeering doctrine. It recognized that those specific federal laws did not infringe on certain state "sovereign authorities" or "sovereign powers," because they "applied equally to state and private actors" and "did not regulate the States' sovereign authority to regulate their own citizens." *Id.* at 1478–79 (quotations omitted).

Defendant-Intervenors try to extrapolate from this Supreme Court review of anti-commandeering law the conclusion that DACA does not intrude upon Texas's quasi-sovereign interests because DACA applies only to private actors. (Doc. No. 504 at 38). First, the premise is

---

[17] According to the Supreme Court, the doctrine of anti-commandeering stands for the proposition that "the Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

wrong: DACA does not apply only to private actors. It applies equally to public actors.[18] Texas has over 110,000 DACA recipients and it must treat them as having lawful presence. (*See* Doc. No. 487, Ex. 22 ¶ 13, Supp. Decl. of D. Deere). Their presence and the need for Texas to provide services for them is certainly a public concern. As discussed below, the DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.

Second, while the concept of federalism informs both the doctrines of anti-commandeering and special solicitude, there is no precedent cited that relates the anti-commandeering doctrine to special solicitude. Likewise, there is no authority that dictates a state must argue an anti-commandeering violation to establish an entitlement to special solicitude. Here, Texas is not arguing that DACA violates any anti-commandeering principle (nor is there an argument that DACA would be illegal if passed by Congress). There is no clear link between a state's "sovereign interests" in the context of anti-commandeering and a state's *quasi*-sovereign interests in the context of special solicitude. *Murphy* does not mention special solicitude, quasi-sovereign interests, or standing in this context.[19] Accordingly, there is nothing in the decision that challenges the soundness of the Fifth Circuit's previous holding that Texas was entitled to special solicitude or indicates that such a finding is not applicable here. *See Texas I*, 809 F.3d at 154.

When states must "rely on the federal government to protect their interests," *id.*, special

___

[18] In reliance on *Massachusetts v. EPA*, various public actors have been held to have standing to challenge DACA's rescission, despite the fact that they are not DACA recipients, the only party the Defendant-Intervenors claim DACA affects. In *Regents of Univ. of California v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, these included the University of California (because the school recruited DACA students who might withdraw if they lost DACA status), California and Minnesota (because they employed DACA recipients whose loss would allegedly hurt their workforce and they wanted to protect the diversity of their public institutions), and the City of San Jose and the County of Santa Clara (due to concerns over the possible loss of employees and the cost to replace them). Even in this case New Jersey intervened to protect its workforce. (Doc. No. 42). Texas's interest in protecting its own workers is no less important.

[19] A concurring opinion in *Murphy* does mention standing in its discussion of the severability doctrine, that "often requires courts to weigh in on statutory provisions that no party has standing to challenge." 138 S. Ct. at 1487 (Thomas, J., concurring). That reference, however, has no bearing here.

solicitude is especially relevant. States undoubtedly rely on the federal government in the area of immigration because they cannot pass or enforce their own immigration laws: "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.

States are even prohibited from enforcing *federal* immigration laws:

> Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders. If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, "diminish[ing] the [Federal Government]'s control over enforcement" and "detract[ing] from the 'integrated scheme of regulation' created by Congress."

*Id.* at 402 (quoting *Wis. Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 288–89 (1986)). The Fifth Circuit has already found that Texas's interest in immigration regulation implicated the very same types of sovereignty concerns as Massachusetts's interest did in *Massachusetts v. EPA*:

> When the states joined the union, they surrendered some of their sovereign prerogatives over immigration. They cannot establish their own classifications of aliens, just as "Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] cannot negotiate an emissions treaty with China or India."

*Texas I*, 809 F.3d at 153 (quoting *Massachusetts*, 549 U.S. at 519). When, as here, a state has ceded its authority to regulate a certain area of the law, special solicitude is particularly warranted.

The primary avenue under our Constitution for a state to protect itself and its residents from unwanted federal action is through its elected officials in Congress. Congress has passed immigration laws, but, according to the Plaintiff States, the Executive Branch has refused to enforce those laws. If the Government's argument that a state lacks standing to complain about the Executive Branch's failure to enforce the law in court is accurate, then a state would have no recourse. This is not how our system of federalism was designed to work. The states gave up

certain rights when they joined the union in return for the promise of the federal government to abide by the Constitution and duly-enacted laws. If the Executive Branch refuses to do that, the courts provide the only avenue for redress.

Just as in *Massachusetts v. EPA* and *Texas I*, the Plaintiff States here must "rely on the federal government to protect their interest," *Texas I*, 809 F.3d at 154, and if the Executive Branch attempts to establish policies contrary to statute, Congress has provided the states a procedural vehicle in the APA to seek redress. Accordingly, the Plaintiff States have shown that Texas is entitled to special solicitude in the Court's standing analysis. To that end, the Plaintiff States are afforded the benefit of a relaxed standard in the traditional causation and redressability analysis of standing. *See id.* at 159.

### 2. *Parens Patriae* Standing

The Plaintiff States rely, in part, on the doctrine of *parens patriae* to establish an independent basis for standing in their suit. (Doc. No. 486 at 34). *Parens patriae* permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity. *See Alfred L. Snapp*, 458 U.S. at 601. The Supreme Court has explained: "[T]o have such [*parens patriae*] standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest." *Id.* The Plaintiff States argue that they may sue under *parens patriae* because DACA injures the economic interests of their legal residents.

Defendant-Intervenors argue that Plaintiff States may not invoke *parens patriae* because of the *Mellon* bar, which prohibits a state from acting in the role of *parens patriae* to sue the federal government to protect its citizens from the operation of a federal statute. *See Massachusetts v. Mellon*, 262 U.S. 447 (1923). According to Defendant-Intervenors, Plaintiff States are suing the federal government to protect their citizens from the operation of DACA. (Doc. No. 504 at 31–

32).[20] Defendant-Intervenors also argue that even if there were *parens patriae* standing available to the Plaintiff States, the Plaintiff States' evidence of their theory of harm—labor market distortion—is inadequate. (*Id.* at 33–34). They further urge that any alleged harm is outweighed by the economic benefits that DACA creates and that DACA, in fact, strengthens the Texas economy. (*Id.*).

Even assuming the *Mellon* bar applies to agency action, it would not operate to bar the Plaintiff States' claims. In *Massachusetts v. EPA*, the Supreme Court, citing *Georgia v. Pa. R.R.*, 324 U.S. 439 (1945), rejected the argument that *parens patriae* standing is categorically barred in suits against the federal government. 549 U.S. at 520 n.17. The majority noted that there is a "critical difference between allowing a State to protect her citizens *from* the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* (emphasis added) (quotations omitted). After *Massachusetts v. EPA*, it is clear the *Mellon* bar prohibits a state's use of *parens patriae* standing to shield its citizens from the operation of federal statutes, but permits a state to assert its rights under federal law.

Here, the Plaintiff States have demonstrated that they wish to assert rights under federal law, just as Massachusetts was asserting its rights under the Clean Air Act. The Plaintiff States bring this APA action to assert their procedural right of notice and comment as it pertains to DACA, to challenge the agency action as outside of DHS's statutory authority, and to enforce the statutory language of the Immigration and Nationality Act (INA) and other immigration provisions. The Plaintiff States are not seeking protection *from* the operation of federal law; they

---

[20] The *Mellon* bar applies to statutes. Throughout their argument, the Defendant-Intervenors attempt to gloss over the fact that the DACA Memorandum is *not* a federal statute.

want the Executive Branch to enforce the law as Congress has written it.[21] The *Mellon* bar is inapplicable.

Regarding the Defendant-Intervenors' challenge to the Plaintiff States' theory of harm, as summarized above in the special solicitude analysis, the Plaintiff States have demonstrated that DACA arguably causes the injury to their quasi-sovereign interest in the economic well-being of their legal residents. DACA causes that injury because it alone grants lawful presence and requires that USCIS accept applications from DACA recipients for work authorization, which enables recipients to compete with lawful workers for jobs. (*See* Doc. No. 487, Ex. 22 ¶ 13) ("[T]he addition of . . . 114,000 [work-eligible individuals] in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment."). Further, certain Texas employers are financially incentivized under the ACA to hire a DACA recipient over a legal Texas resident. (*See id.*, Ex. 14 ¶¶ 24–25). Without DACA, there would be fewer eligible workers competing in the Texas workplace.

The Defendant-Intervenors argue that DACA's alleged effect on employer's decision-making falls short of the causation requirement because DACA does not "inexorably" lead to eligibility for certain benefits. (Doc. No. 504 at 35). Contrary to this argument, the Supreme Court held in *Regents* that DACA confers the "benefits attendant to deferred action" and that its rescission would revoke "a deferred action program with associated benefits." 140 S. Ct. at 1906,

---

[21] The laws the Plaintiff States seek to enforce include, for example, the "comprehensive framework" of laws to protect American workers and combat "the employment of illegal aliens." *Arizona*, 567 U.S. at 404. This framework includes laws that make it illegal for employers to hire "unauthorized aliens" and laws that require employers to verify employment authorization status. *See* 8 U.S.C. §§ 1324a(a)(1)(A), (a)(1)(B), (a)(2), (b); 8 C.F.R. § 274a.10. Congress has also imposed sanctions on aliens who illegally accept employment, which include removal from the country, 8 U.S.C. § 1227(a)(1)(C)(i), 8 C.F.R. § 214.1(e), and loss of the ability to adjust status. 8 U.S.C. §§ 1255(c)(2), (8). Finally, Congress made it a crime for an unauthorized alien to obtain employment through fraudulent means. 18 U.S.C. § 1546(b). The Supreme Court found Congress's intent in passing these statutes was to protect state workers. *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183 (1991). These are the laws currently in effect, and the Plaintiff States may sue to enforce them.

1907. Moreover, Texas's entitlement to special solicitude shores up any alleged weaknesses presented by attenuated causation and redressability arguments. *Lujan*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.").

A recent decision of a federal district court in Florida supports Texas's injury and causation arguments. *Rodriguez v. Procter & Gamble Co.*, 465 F. Supp. 3d 1301 (S.D. Fla. 2020), *motion to certify appeal denied*, 499 F. Supp. 3d 1202 (S.D. Fla. 2020). In that case, the court considered whether a private employer who rejected applicants based on their DACA status violated 42 U.S.C. § 1981. The Court found that § 1981's protection against alienage discrimination extends to DACA recipients, after determining that 1) DACA recipients as a group are protected under § 1981; and 2) there is no meaningful distinction between discrimination on the basis of immigration status as opposed to alienage. *Id.* at 1315.

This ruling reinforces Texas's injury and causation arguments because it holds that employers no longer have the option to categorically choose to hire those with legal status over a DACA recipient. Under that district court's interpretation of § 1981, the law prohibits both public and private employers from facially discriminating against DACA recipients in the hiring process. In other words, an employer would have to give the same consideration to a DACA recipient as it would a citizen or legal resident. This interpretation of the law confirms the traceability of the Plaintiff States' alleged injuries back to DACA.

Finally, the Fifth Circuit has already rejected the Defendant-Intervenors' argument that the economic benefits that may stem from DACA outweigh any injuries caused by it, at least when it comes to standing. *See Texas I*, 809 F.3d at 155–56 ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship

with the defendant."). Thus, this Court need not and cannot engage in the type of "accounting exercise" that Defendant-Intervenors suggest. *Id.* at 156.

Having adequately addressed the concepts of injury and causation under *parens patriae*, the Plaintiff States must finally establish redressability, or the "likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Redressability turns on whether the plaintiff "personally would benefit in a tangible way from the court's intervention." *Id.* at 103 n.5. The Plaintiff States ask the Court to enjoin and set aside DACA. (Doc. No. 486 at 54–55). If this Court were to hold that DACA violated the law and then immediately vacate or enjoin the program, DACA recipients would no longer be entitled to work authorization under existing laws. Without this work authorization, DACA recipients would be far less likely, and perhaps even unable, to compete with the Plaintiff States' citizens and other legally present residents in the labor market. This diminished workforce would relieve the labor market distortion that creates the *parens patriae* injury. Thus, the Plaintiff States and their unemployed "personally would benefit in a tangible way from the court's intervention," satisfying redressability. *Steel Co.*, 523 U.S. at 103 n.5. In conclusion, the Plaintiff States have *parens patriae* standing.

### 3.      Standing for Healthcare, Education, and Social Services Costs

Plaintiff States also assert that they have standing independent of *parens patriae* because DACA has caused them to incur financial injuries "in the form of increased social services costs." (Doc. No. 486 at 36). The parties agree that DACA, by conferring lawful presence, makes recipients eligible for a variety of other state and federal benefits. (*Id.* at 19; Doc. No. 504 at 12). The Court finds the arguments set forth by the Plaintiff States have merit and finds that Texas has standing to sue based on costs incurred as a result of DACA.

First, the Plaintiff States have adequately shown that they bear the costs of medical services required by federal law. The Plaintiff States argue that DACA requires states to spend more money on healthcare by incentivizing otherwise unlawfully present aliens to remain in the Plaintiff States. (Doc. No. 486 at 36). For example, Texas spends tens of millions of dollars annually to provide emergency Medicaid services to illegal aliens. (Doc. No. 487, Ex. 27 ¶ 8, Decl. of M. Smoot) ("The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately . . . $90 million in SFY 2013; the estimate for SFY 2015 is $73 million."). That figure also encompasses the costs incurred due to non-DACA recipients, but Texas's over 110,000 DACA recipients in all probability make up some of those expenses. (*See* Doc. No. 487, Ex. 22 ¶ 13). Defendant-Intervenors' own expert corroborates that DACA recipients inevitably rely on emergency Medicaid services, part of which are funded by the state. (Doc. No. 487, Ex. 25 at 8:21–24, Depo. of R. Perryman) ("I assume there would be some people in the DACA population who are likely to have some type of care that is reimbursed in some way by the state."). Second, under *Plyer v. Doe*, 457 U.S. 202 (1982), every state must educate all children, regardless of their immigration status. Texas has similarly established for standing purposes that it bears the burden of increased education costs. (*See* Doc. No. 487, Ex. 28 ¶ 3, Decl. of L. Lopez) (speaking in terms of unaccompanied children but setting out annual education costs per child and cost of bilingual education).

In fact, Defendant-Intervenors' own expert estimated that DACA recipients overall impose a cost of over $250,000,000 on Texas per year and another $533,000,000 annually in costs to local Texas communities. (Doc. No. 487, Ex. 29, Estimated Annual Net Fiscal Benefits of DACA Recipients in Texas). If DACA recipients leave, Texas would no longer be obligated to pay for those costs associated with DACA recipients' entitlement to social services. Necessarily, this

would reduce some of the state's financial expenditures.

While the Defendant-Intervenors contest the calculations of the Plaintiff States' alleged injuries as "conjectural" or "overbroad," (Doc. No. 504 at 26), plaintiffs must only show *some* injury, not substantial injury, to establish standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("The injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle. . . . The injury in fact requirement under Article III is qualitative, not quantitative, in nature.") (cleaned up). Texas's evidence demonstrates injury. Though Texas has not demonstrated exactly what percentage of these costs is due to DACA recipients, at this stage, Texas need not prove the exact amount of damages from a particular individual when it otherwise shows it has been injured by the program.[22]

The Plaintiff States' injury argument in this regard is much less attenuated than the injury allegation in *Pennsylvania v. President of United States*, 930 F.3d 543 (3rd Cir. 2019). In that case, the Third Circuit found Pennsylvania had standing to prevent an alleged harm that had not occurred and might not ever occur—that some affected employees might not be able to afford contraceptives and might therefore turn to state-funded sources to pay for their contraceptives. *Pennsylvania*, 930 F.3d at 561–65. That finding was implicitly affirmed by the Supreme Court in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).[23] In the instant case, the costs incurred by the Plaintiff States are not contingent on two future events. They are incurring costs right now.

Moreover, one of the district court cases giving rise to *Regents* (and likewise had standing

---

[22] Even if the Plaintiff States' experts did not provide exact numbers, the Defendant-Intervenors' expert did and his figures confirm the position of the Plaintiff States. (*See* Doc. No. 487, Ex. 29),

[23] In a recent opinion, Justice Alito confirmed that the Supreme Court implicitly found standing by the fact that it had ruled on the merits. *See California v. Texas*, 141 S. Ct. 2104, 2124 n.2 (Alito, J., dissenting) ("Although our opinion did not address the issue, we are required to consider Article III standing in every case that comes before us.").

implicitly affirmed by the Supreme Court), found that increasing healthcare costs to the state constituted an injury for purposes of Article III. In *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, the district court determined that Maryland's and Minnesota's allegations that "rescinding DACA will cause many DACA grantees to lose their employer-based health insurance, imposing higher healthcare costs on the state" were "sufficient to confer Article III standing." 279 F. Supp. 3d at 1034. As the Plaintiff States have pointed out, that analysis "acknowledges that DACA recipients without employer-based health insurance are currently imposing healthcare costs on Plaintiff States." (Doc. No. 529 at 18 n.7). It certainly supports the Plaintiff States' argument that healthcare costs to a state are a valid injury for purposes of Article III standing.[24]

Defendant-Intervenors attack the sufficiency of the Plaintiff States' evidence to support the traceability and redressability of the injury alleged to DACA. Some of that evidence includes Texas State Demographer Lloyd B. Potter's statement that "it is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S." (*Id.*, Ex. 32 ¶ 8, Decl. of Dr. L. Potter ).[25] It also includes a survey of 3,063 DACA recipients that revealed 22.3% were likely to leave the United States should DACA end.

---

[24] The Plaintiff States have also broadly argued that they have standing because the Supreme Court allowed states to challenge the *rescission* of DACA in *Regents*: "If States had standing to challenge the 2017 DACA rescission, they likewise have standing to challenge DACA." (Doc. No. 486 at 31). Indeed, in this very case, New Jersey pleaded that it had a right to intervene to protect its interests in its workforce (Doc. No. 42)—the very interest Texas is likewise using as a basis for standing. While the states in *Regents* and New Jersey here made similar arguments as the Plaintiff States, and while the rulings pertaining to those states are informative, those circumstances alone do not necessarily *require* the conclusion that the Plaintiff States have standing to sue here, because the injury to states arising from the rescission of DACA is arguably distinct from the injury to states arising from its enactment. Each case must rise or fall on its own merits.

[25] As explained in a separate order, Defendant-Intervenors have complained of Dr. Potter's declarations, and even filed a Motion to Strike (Doc. No. 390), which this Court has denied. Dr. Potter later conceded that that "he assumed loss of work authorization meant that a DACA recipient could not work in any capacity," and that he had not thought through all the implications of DACA recipients losing status. (*Id.* at 18). Regardless, Defendant-Intervenors have not rebutted the crux of his common-sense assertion—which is supported by other evidence—that without work authorization, some DACA recipients may lose their jobs and/or leave the United States.

(*Id.*, Ex. 31 at 4, Survey of T. K. Wong).[26] In fact, DACA recipients have expressed the sentiment that the key factor in their ability to remain in the United States is DACA. (*See, e.g.*, Doc. No. 504-2, Ex. 18 ¶ 8, Decl. of J. Park) ("Receiving deferred action is critical to my ability to live, work, and study in the United States."); (*see also id.*, Exs. 20, 21, 22).

To be sure, there is contrary evidence in the record that some DACA recipients would remain in the United States if the DACA program were terminated. (*See* Doc. No. 288 at 12) (addressing Defendant-Intervenors' testimony about their desire to remain in the country even if DACA ended); (Doc. No. 400-1, Ex. 2 ¶¶ 43–44, Decl. of B. Hines) (expert testifying that the rescission of DACA would not cause DACA recipients to leave the country); (Doc. No. 400-2, Ex. 9 ¶ 36, Decl. of R. Gonzales) (expert testifying that rather than self-deport, DACA recipients who lose DACA status would "return to the shadows"); (Doc. No. 400-2, Ex. 8 ¶¶ 35–36) (citing studies to show that DACA recipients do not return to countries of origin because of ties to the United States).

Nevertheless, the Court does not resolve factual disputes when determining standing. *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) ("When the defendant moves for summary judgment because of lack of standing, however, the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue."); *see also Harding v. Cnty. of Dall.*, 3:15-CV-0131-D, 2018 WL 1157166, at *7 (N.D. Tex. Mar. 5, 2018), *aff'd* 948 F.3d 302 (5th Cir. 2020) (deciding case should not be dismissed at summary judgment stage for lack of standing due to genuine disputes of fact, without resolving fact issues). The Plaintiff States have adequately alleged and have evidence to support

---

[26] That percentage would equate to over 20,000 individuals in Texas alone.

their claims. The fact that Defendant-Intervenors have contrary evidence at best creates a fact issue as to whether the Plaintiff States have suffered damages.

Defendant-Intervenors have not argued, nor could they, that no DACA recipients would leave the United States should DACA be terminated. Defendant-Intervenors themselves recognized this: "[A]ny federal immigration policy[] is certain to have consequences for whether there are more (or fewer) residents in a given state, with attendant changes in 'healthcare, education, and law enforcement costs.'" (Doc. No. 224 at 41). A plaintiff need not demonstrate that a defendant's actions are "the very last step in the chain of causation." *Bennet v. Spear*, 520 U.S. 154, 169 (1997); *see also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Because Article III requires no more than *de facto* causality, traceability is satisfied here.") (cleaned up). Especially considering the relaxed causation and redressability standards afforded to the Plaintiff States by their entitlement to special solicitude, any infirmity in Texas's demonstration that its injuries are fairly traceable to DACA, or redressable by a favorable outcome in this Court, is easily remedied. Texas has standing. Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff. *See Town of Chester*, 137 S. Ct. at 1651.

## C.   DACA is Reviewable under the APA

In *Regents*, the Supreme Court squarely held that DACA is reviewable under the APA: "In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. *The creation of that program*—and its rescission—is an 'action [that] provides a focus for judicial review.'" 140 S. Ct. at 1906 (emphasis added) (citations omitted). After *Regents*, there can be no dispute that DACA is reviewable under the APA.

## D.     Procedural APA Claim

The Plaintiff States argue that they are entitled to summary judgment because DHS did not

undergo the notice and comment rulemaking procedure as prescribed by the APA. The APA

provides that courts may "hold unlawful and set aside agency action . . . found to be . . . without

observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA imposes different

procedures that agencies must follow to promulgate rules.[27] At issue here is whether DHS was

required to comply with the notice and comment rulemaking procedure (or "informal rulemaking"

procedure[28]) described in 5 U.S.C. §§ 553(b) and (c) when it promulgated the DACA

Memorandum. Those sections of the APA provide that agencies must publish "[g]eneral notice of

proposed rule making" in the Federal Register, give "interested persons an opportunity to

participate in the rule making through submission of written data, views, or arguments with or

without opportunity for oral presentation," and, after consideration of such comments,

"incorporate in the rules adopted a concise general statement of their basis and purpose." There is

no dispute that DHS implemented the DACA Memorandum without undergoing notice and

comment rulemaking.

The notice and comment procedure's purpose is twofold: to encourage "public

participation and fairness to affected parties after governmental authority has been delegated to

---

[27] The parties do not dispute that the DACA Memorandum constitutes a "rule" under the APA. *See* 5 U.S.C. § 551(4) ("'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."); *see also* 5 U.S.C. § 551(5) ("'[R]ule making' means agency process for formulating, amending, or repealing a rule.").

[28] Notice and comment rulemaking is often referred to as "informal rulemaking" to distinguish it from "formal rulemaking" described in sections 556 and 557. *See* 5 U.S.C. § 553(c) ("When rules are required by statute to be made on the record after opportunity for an agency hearing [formal rulemaking], sections 556 and 557 of this title apply instead of this subsection."); *see also Perez v. Mortg. Bankers Ass'n,* 575 U.S. 92, 128 n.5 (2015) (Thomas, J., concurring) ("Although almost all rulemaking is today accomplished through informal notice and comment, the APA actually contemplated a much more formal process for most rulemaking. To that end, it provided for elaborate trial-like hearings in which proponents of particular rules would introduce evidence and bear the burden of proof in support of those proposed rules. *See* 5 U.S.C. § 556.").

unrepresentative agencies, and to assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (cleaned up). Still, Congress has recognized that agencies need "flexibility in dealing with limited situations where substantive rights are not at stake," *id.* at 1045, and has therefore provided two exceptions that allow an agency to forgo notice and comment. The informal rulemaking procedures do not apply:

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.[29]

5 U.S.C. § 553(b). The Government and the Defendant-Intervenors argue that the DACA Memorandum is a "general statement of policy" as provided in subsection A such that its adoption did not require notice and comment rulemaking.[30] (*See* Doc. No. 502 at 29).

A general statement of policy is one "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). The Fifth Circuit has articulated a two-factor test to determine whether an agency rule constitutes a general statement of policy. First, a general statement of policy "acts prospectively"—that is, it "may not have a present effect . . . [and] does not impose any rights and obligations." *Pros. &*

---

[29] None of the parties rely on subsection B.

[30] Even if the DACA Memorandum is a "general statement of policy" that did not have to undergo notice and comment rulemaking, it was still subject to the "publication" requirement of the APA—DHS was required to publish the DACA Memorandum in the Federal Register. 5 U.S.C. § 552(a)(1)(D) ("Each agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . substantive rules of general applicability adopted as authorized by law, and *statements of general policy* or interpretations of general applicability formulated and adopted by the agency.") (emphasis added). None of the parties have cited the Court to any evidence of compliance with this publication requirement.

*Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). Put another way, the policy "is not finally determinative of the issues or rights to which it is addressed." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978). Next, the policy statement "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Shalala*, 56 F.3d at 595. The analysis of these two factors overlaps some "because '[i]f a statement denies the decisionmaker discretion in the area of its coverage . . . then the statement is binding, and creates rights or obligations.'" *Texas I*, 809 F.3d at 171 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).

In addition, the agency's own characterization of the rule can be instructive in deciding whether it is merely a general statement of policy. The Fifth Circuit accords "some deference" to that characterization, but the focus is primarily "on the actual characteristics of the agency action." *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019). "The label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather, it is what the agency does in fact." *Shalala*, 56 F.3d at 596 (quoting *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (alteration omitted)). The agency's own characterization is viewed with "suspicion," *Texas I*, 809 F.3d at 171 (quoting *Shalala*, F.3d at 595) (alteration omitted), and it is what the agency and policy do in fact that matter more. *See Shalala*, 56 F.3d at 596. In *Texas I*, the Fifth Circuit gave little consideration to the agency's actual label and proceeded to analyze the factors by which a court distinguished between general statements of policy and rules that require informal rulemaking. This Court will follow that same format.[31]

---

[31] The Fifth Circuit's admonition to view an agency's characterization with suspicion is particularly apt in this instance. Here the agency argues DACA is a general statement of policy or, more specifically, an exercise of prosecutorial discretion. While this Court will follow the Fifth Circuit's guidance and proceed to determine whether it actually is a general statement of policy, neither the DACA Memorandum nor its underlying record supports the award of a wide

1.      **Rights and Obligations**

The Supreme Court's *Regents* opinion provides guidance as to the first prong of the test to determine whether an agency's rule is a general statement of policy. In *Regents*, the Supreme Court first had to determine whether the DACA Memorandum constituted a non-enforcement policy whose rescission—and creation—was not reviewable by courts. 140 S. Ct. at 1905–06. The Court found that the DACA Memorandum "did not merely 'refus[e] to institute proceedings' against a particular entity or even a particular class." *Id.* at 1906. Instead, it directed USCIS to establish processes to identify individuals who met the DACA criteria and begin the proceedings for deferred action. *Id.* The Supreme Court characterized these proceedings as "effectively adjudications" and found that the DACA Memorandum "created a program for conferring affirmative immigration relief." *Id.* Further, the Supreme Court recognized that "[t]he benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy." *Id.*

The question this Court must answer is: do the "benefits" that DACA confers, which make it more than a non-enforcement policy, also make it more than a general statement of policy? The Court is convinced that the benefits DACA confers also constitute rights. The Supreme Court recognized that "DACA recipients may request work authorization and are eligible for Social

---

array of benefits as falling in the category of prosecutorial discretion. Additionally, if one views the DACA Memorandum as a policy directed toward the conservation of DHS's resources, there is likewise no supporting data in the record. In fact, the most detailed discussion in the record is found in a letter from the House Judiciary Chair, who questioned this justification:

> Furthermore, we are concerned that DHS continues to use the excuse of 'limited resources' as a justification for its flagrant disregard of the law. The Congress has consistently provided every dollar requested since ICE's creation for immigration enforcement efforts, particularly Enforcement and Removal Operations . . . . We request that ICE utilize the extensive resources available to rigorously enforce the immigration laws of the United States and that ICE's future budget requests include the funds necessary to effectively support the men and women of ICE in executing their critical mission.

(Doc. No. 472-3 at 169–70).

Security and Medicare." *Id.* at 1906. DACA recipients have the "right" to these benefits. The record shows that more than 800,000 individuals have already received these rights, and more applicants are likely to come. (*See* Doc. No. 225-3, Ex. 73 ¶ 16). The same "benefits" that made DACA judicially reviewable in *Regents* constitute rights and obligations that distinguish it from a "general statement of policy" using the analysis from the Fifth Circuit.[32]

Additionally, another factor in determining whether a policy confers rights and obligations is whether it "acts prospectively" or instead has a "present effect." *Shalala*, 56 F.3d at 595. The DACA Memorandum was not a statement of future policy; DACA immediately went into effect. The DHS press release announcing the program, issued on the same date as the memorandum, began as follows: "Secretary of Homeland Security Janet Napolitano today announced that *effective immediately* . . . ." (Doc. No. 472-1 at 189) (emphasis added).

The DACA Memorandum was immediately applied to all who met the criteria, including those individuals who were already in removal proceedings and those who were "encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS)." The DACA Memorandum instructed DHS agents to "immediately exercise" their discretion and to "implement this memorandum." It also mandated USCIS to accept applications for work authorizations for anyone granted deferred action. For those not already in proceedings, USCIS was only given 60 days to get the program up and running. In fact, even though the memorandum was not issued until mid-June, by year's end 150,000 people had applied and more than 1,600 had been granted DACA status. (Doc. No. 224-2).

---

[32] This Court has already noted that DACA recipients have successfully defeated summary judgment in an employment rights class action case filed in Florida. That court's opinion put special emphasis on the fact that rejection by employers could undermine the DACA recipients' "deferred action status" as well as their ability "to exist in their community" because "DACA recipients are required to work." *See Rodriguez*, 465 F. Supp. 3d at 1314–15. Clearly, that court found DACA gave its recipients enforceable rights and imposed obligations on private employers.

Finally, the DACA Memorandum imposes obligations on private actors, individual states, and on the federal government. As previously discussed in the section on standing, DACA defers action against its recipients, which in turn gives them lawful presence, which then in turn obligates the states to spend money in various areas, including social services, education, and healthcare. In addition, it obligates the federal government to forebear from implementing immigration enforcement proceedings and, because the recipients have deferred action, extends the "benefits" that *Regents* described. The Court holds, therefore, that the DACA Memorandum imposes rights and obligations.

## 2.    Discretion

Next, the Court must consider whether the DACA Memorandum "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Shalala*, 56 F.3d at 595. "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Texas I*, 809 F.3d at 171 (quoting *Gen. Elec.*, 290 F.3d at 383) (alteration omitted). Accordingly, the Court must consider both whether the DACA Memorandum "appears on its face to be binding" and whether DHS applies DACA "in a way that indicates it is binding." *Id.*

The DACA Memorandum, in places, purports to confer discretion. It instructs agencies to review applications on a case-by-case basis and exercise discretion. The DACA Memorandum characterizes itself as an "exercise of prosecutorial discretion." Therefore, "[t]he DACA . . . Memo[] purport[s] to grant discretion." *Id.* at 173. Nevertheless, this does not end the analysis because "a rule can be binding if it is 'applied by the agency in a way that indicates it is binding.'" *Id.* (quoting *Gen. Elec.*, 290 F.3d at 383).

Determining whether the DACA Memorandum has been applied by DHS in a way that

indicates it is binding depends in part on whether the Court looks outside the Memorandum and its underlying record.[33] The DACA Memorandum itself also includes mandatory language that contradicts its purported conferral of discretion. It instructs agents as to what criteria to consider when determining whether to grant DACA status, and it is compulsory for the agents to use only those prescribed criteria. The Memorandum grants no discretion to the officers to vary from the imposed criteria in any way. Further, the record similarly reveals that, in practice, agency officials are not permitted to diverge from the DACA Memorandum's criteria. Even the Supreme Court in *Regents* found that DACA "instituted a standardized review process . . . ." 140 S. Ct. at 1906.

On the other hand, and assuming this Court is permitted to look beyond the administrative record,[34] there is a factual dispute as to whether agents, in practice, have discretion when determining whether an individual DACA applicant *meets* the prescribed criteria.

The Plaintiff States rely heavily on two different statements from DHS to argue that the personnel reviewing DACA applications are not genuinely free to exercise discretion. First, in *Texas I*, DHS could not find one example of anyone who had met all of the requirements in the DACA Memorandum who was turned down for a discretionary reason. *See Texas I*, 809 F.3d at 172. Second, some years later, Acting DHS Secretary Duke confirmed that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the [DACA Memorandum], but still has his or her application

---

[33] In response to various arguments made by the parties, the Court ordered the Government to file the complete administrative record. (Doc. No. 467). It subsequently filed that record. (Doc. No. 472).

[34] One could read the *Regents* opinion to indicate that the Court is confined in its examination to the DACA Memorandum and its underlying record. The Supreme Court held that it would not consider later agency explanations for its decision to rescind DACA. *Regents*, 140 S. Ct at 1907–10. The Court held, "[a]n agency must defend its actions based on the reasons it gave when it acted." *Id.* at 1909 (quotations omitted). This analysis does not translate directly to the posture of this case because in *Regents*, the Supreme Court was analyzing whether DACA's rescission, a decision that had not yet taken effect, was arbitrary and capricious. Still, the case may signify that the Court should not look beyond the record when making its ruling. In any event, the Court holds, as explained below, that the DACA Memorandum does not constitute a general statement of policy regardless of whether or not it looks beyond the Memorandum and its record. Accordingly, the Court need not resolve this question.

denied based solely upon discretion." (Doc. No. 6 at 23–24). The Government conceded this fact in earlier oral arguments in this case. (Doc. No. 277 at 36).

The Plaintiff States have brought forth other evidence on this point as well. The USCIS Texas Service Center, which handled DACA applications for many years, has never turned anyone down who met the DACA Memorandum criteria. (Doc. No. 284, Ex. 4). The Plaintiff States have also presented hundreds of pages of DHS manuals and procedures that instruct reviewers on each step they should take and what they may consider as evidence that the DACA applicant has satisfied each of the criteria. For example, in the DACA Toolkit, DHS states only those individuals who can prove through "verifiable documentation" that they meet the DACA Memorandum criteria will be eligible for deferred action. (Doc. No. 9, Ex. 20 at 70).

On the other hand, the Defendant-Intervenors point to an increase in the denial rate of DACA applications in recent years to demonstrate that agents are exercising discretion when determining whether individual applicants meet the set criteria. They also have provided this Court with multiple emails from instructors who teach the DACA processors that suggest a shift may have taken place following this Court's opinion in *Texas I* in early 2015. (*See, e.g.*, Doc. No. 215-1, Exs. 36, 37, 38). After that decision, DHS began denying (even in the Texas Service Center) more applications than it had in the first three years of the DACA program. Finally, Defendant-Intervenors produced a post-*Texas I* email from one instructor who, while talking about applying the established criteria, stated she liked to "jokingly say our standard is whether or not you would want to live next door to the person." (*Id.*, Ex. 38 at 405). While this Court will not opine on whether the "good neighbor" standard is one capable of refined precision or even whether it would be legally enforceable, if it were routinely being used, it would certainly be indicative of some exercise of discretion.

This competing summary judgment evidence indicates there is a factual dispute concerning whether agents reviewing DACA applications exercise discretion as to whether an applicant satisfies the fixed criteria. In a summary judgment context, the existence of a disputed fact, however, is only relevant if the fact is material. Here it is not. Even assuming that reviewing officers have some discretion as to whether an applicant meets the criteria delineated by the DACA Memorandum, they had no discretion to vary from the criteria: "If it appears that a so-called policy statement is in purpose or likely one that narrowly limits administrative discretion, it will be taken for what it is[—]a binding rule of substantive law." *Guardian*, 589 F.2d at 666–67; *see also Am. Bus Ass'n v. United States*, 627 F.2d 525, 530 (D.C. Cir. 1980) (policies at issue were "substantive agency action, for they define[d] a fairly tight framework to circumscribe the Board's statutorily broad power") (quotations omitted). The DACA Memorandum clearly "narrowly limits administrative discretion" and establishes "a tight framework," otherwise DHS agents could grant DACA status to applicants who do not meet the prescribed criteria.

Thus, the Court finds it does not need to resolve this factual dispute to answer the immediate question. Some agency orders are so impactful that the existence of some amount of discretion is not determinative. That premise is especially appropriate here, where whatever discretion exists must fit within the dictates of the DACA Memorandum.

Given the Fifth Circuit's description of the factors to determine whether an agency action constitutes a general statement of policy as "criteria" that "[w]e evaluate," *Texas I*, 809 F.3d at 171, this Court previously held that the factors are not essential elements and instead that "the Plaintiff States need not prove . . . both criteria; rather this Court evaluates each independently." (Doc. No. 319 at 103). Again evaluating each independently, the Court concludes that, even assuming the DACA Memorandum "genuinely leaves the agency and its decisionmakers free to

exercise discretion" as to whether the applicant meets the Secretary's criteria, *Shalala*, 56 F.3d at 595, it cannot be considered a general statement of policy under the APA because of the fixed criteria and because of the significant rights and obligations that it confers. A program of such magnitude, even if some discretion exists somewhere in the process, cannot fall within this "narrow" exception to the APA's notice and comment requirements. *Bowen*, 834 F.2d at 1044.

As recounted above, the purpose of the APA's informal rulemaking procedure is twofold. First, it encourages "public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Id.* Second, the procedure ensures that "the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Id.* These policy rationales would have undoubtedly been relevant here, confirming the conclusion that DACA cannot be considered a general statement of policy.

In his *Regents* dissent, Justice Thomas agreed with the majority that DACA was more than simply a non-enforcement policy. *See Regents*, 140 S. Ct. at 1918 (Thomas, J., dissenting). He further characterized DACA as a "substantive or legislative rule" that required notice and comment rulemaking, rather than a general statement of policy. *Id.* at 1927. He then posited that the "majority tacitly acknowledges as much, as it must. . . . Otherwise, the majority would have to accept that DACA was nothing more than a policy of prosecutorial discretion, which would make its rescission unreviewable." *Id.* at 1927 n.8 (citations omitted). Thus, according to Justice Thomas, since *Regents* was decided on the merits, each member of the *Regents* Court implicitly or explicitly acknowledged that DACA is not a general statement of policy. This Court agrees with that conclusion.

Accordingly, the Court holds that DHS was required to undergo notice and comment

rulemaking in order to adopt DACA. DHS failed to engage in the statutorily mandated process, so DACA never gained status as a legally binding policy that could impose duties or obligations.

**E.      Substantive APA Claim**

In *Texas I*, this Court elected not to address the substantive APA attack against DAPA and Expanded DACA because the entirety of the case was resolved on the procedural claims and courts routinely rule only on those issues necessary to resolve the case. *Manning v. Upjohn Co.*, 862 F.2d 545, 547 (5th Cir. 1989) ("Principles of judicial restraint dictate that if resolution of an issue effectively disposes of a case, [the court] should resolve the case on that basis without reaching any other issues that might be presented."). This Court would be inclined to follow this principle again, but for the latest filings submitted by the Government. The Government has notified the Court that it "intends to issue Notice of Proposed Rulemaking proposing a new regulation concerning Deferred Action for Childhood Arrivals (DACA) consistent with the President's Memorandum of January 20, 2021." (Doc. No. 563 at 2). That action, if performed appropriately, could resolve the procedural deficiencies discussed above.

The Government also expressed the position that rulemaking "could significantly affect the Court's analysis regarding DACA's substantive legality." (Doc. No. 569 at 19–20). It then asked in an alternative plea for relief that DACA be remanded without vacatur because there is a "likelihood that DHS's rulemaking will resolve many of the Court's concerns with DACA's lawfulness . . . ." (*Id.* at 24).

That being the case, the Court elects to address and rule on the alleged substantive flaws so DHS has a better appreciation of what it must address on remand. Therefore, following the lead of the Fifth Circuit in *Texas I*, the Court rules on these issues. *See Texas I*, 809 F.3d at 178

(affirming district court on procedural APA claim, but also analyzing substantive claim even though district court had not).

"[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). To that end, the APA provides that courts may "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The Plaintiff States argue, based primarily upon *Texas I*, that they are entitled to summary judgment that the DACA Memorandum was in excess of DHS's statutory jurisdiction or right. (Doc. No. 486 at 43). In their view, DACA is invalid because it violates the comprehensive immigration scheme that Congress has enacted.

In *Texas I*, the Fifth Circuit assumed without deciding that the *Chevron* deference rules applied to the agency's decision to enact DAPA and Expanded DACA. 809 F.3d at 178–79 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). This Court will do the same here. *Chevron* entails a two-step approach. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

### 1.    Congress has directly spoken on the precise question at issue.

The first step when reviewing an agency's interpretation of a statute that it administers is to apply the ordinary tools of statutory construction and determine whether Congress has directly spoken to the precise question at issue. *See Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. The Plaintiff States contend that Congress has directly spoken, through the INA and other immigration statutes, to the precise issue

of whether DHS has the authority to enact DACA. According to them, Congress has expressly foreclosed DHS's adoption of the DACA Memorandum.

In *Texas I*, the Fifth Circuit held that Congress had directly addressed the precise question of whether DHS could adopt DAPA and Expanded DACA. 809 F.3d at 179–81. It held that the comprehensive immigration framework that Congress had passed, with "limited ways in which illegal aliens can lawfully reside in the United States," showed that Congress had spoken on the issue and had precluded DHS from implementing DAPA and Expanded DACA. *Id.* at 179. The Court sees no reason that the Fifth Circuit's holding in *Texas I*, to the extent it applies, does not bind this Court in this case.

> **a.    Congress has not granted DHS the statutory authority to adopt DACA.**

The Government and Defendant-Intervenors assert that statutes that broadly grant authority to DHS authorize it to implement DACA. In *Texas I*, the Fifth Circuit rejected a similar argument. It held that neither of the two statutes that grant DHS authority broadly, 6 U.S.C. § 202(5)[35] or 8 U.S.C. § 1103,[36] nor any other statute,[37] provided the authority for DHS to implement DAPA or Expanded DACA. *See Texas I*, 809 F.3d at 183–84. The agency's interpretation of the statutes was overly broad, and the statutes did not convey the claimed authority to institute the programs. *Id.*

---

[35] "The Secretary . . . shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."

[36] *See* 8 U.S.C. § 1103(a)(3) ("[The Secretary] . . . shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."); § 1103(g)(2) ("The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.").

[37] The court also held that the agency could not rely on 8 U.S.C. § 1324a(h)(3), a "miscellaneous definitional provision" to enact sweeping changes to national immigration policy because "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Texas I*, 809 F.3d at 183 n.186 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

DHS had argued that those statutes allowed it to enact virtually any kind of deferred action program. The Fifth Circuit reasoned that the agency's interpretation of those statutes would allow the Secretary to grant lawful presence and work authorization to every illegal alien in the United States. *Id.* at 184. This possibility was highlighted in questions by Chief Justice Roberts in the arguments before the Supreme Court.[38] Given the INA's intricate system for allocating immigration status, the Fifth Circuit said that this limitless position was "untenable." *Id.* The same problem exists for DACA.

The Government and Defendant-Intervenors also argue that the authority "is inherent to DHS's prosecutorial rule in determining how to allocate its scarce resources to best enforce the nation's immigration laws." (Doc. No. 502 at 41). In other words, the Government argues DHS's authority is found in its inherent right to exercise prosecutorial discretion. While the law certainly grants some discretionary authority to the agency, it does not extend to include the power to institute a program that gives deferred action and lawful presence, and in turn, work authorization and multiple other benefits to 1.5 million individuals who are in the country illegally. The delegations of power to DHS "cannot reasonably be construed as assigning decisions of vast economic and political significance, such as [DACA], to an agency." *Texas I*, 809 F.3d at 183.

Moreover, the claim that DHS has an inherent right to create DACA as an exercise of prosecutorial discretion is unreasonable. "Although prosecutorial discretion is broad, it is not 'unfettered.' Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Id.* at 167.

Secretary Napolitano, when fielding questions from the Senate in April of 2012 (just before

---

[38] Transcript of Oral Argument at 19–20, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674), as quoted infra at 63–64.

the implementation of DACA), more or less admitted that DHS's power was limited to true forms

of prosecutorial discretion, like administratively closing a case:

> SEN. LEE: [G]iven the fact that the DREAM Act was not passed into law, what
> assurances can you give us or *what assurances can I give to my constituents when*
> *they approach me and suggest that perhaps there might be an effort under way to*
> *back-door these same factors in -- through regulatory channels that couldn't be*
> *passed through Congress?*
>
> SEC. NAPOLITANO: Senator, first, let me begin by saying, having worked in this
> field for decades now, we strongly need overall reform. And we strongly support
> the DREAM Act as a legislative enactment . . . .
>
> That being said, *what we have the capacity or only jurisdiction to do is to*
> *administratively close a case.* That doesn't give the person involved any kind of a
> green card or anything of that sort. It simply means their case is effectively
> suspended and they can remain the United States.

(Doc. No. 472-1 at 54, Hearing Testimony, Oversight of the Department of Homeland Security,

Apr. 25, 2012) (emphases added). This testimony indicates that the Secretary thought that DHS

only had authority to administratively close cases.[39] Mere administrative closure, which according

to the administrative record is the "preferred mechanism" for exercising discretion on a case-by-

case basis (*see* Doc. No. 472-2 at 35–36), would have been within the purview of prosecutorial

discretion.

　　In the underlying administrative record, DHS employees carefully delineated the difference

between prosecutorial discretion (which inherently accompanies any prosecutorial role) and what

DHS called "adjudicative discretion" (which it said must be based in a statute or regulation):

---

[39] Prior to the institution of DACA, President Barack Obama also agreed publicly that the Executive Branch could not accomplish the goals of the DREAM Act administratively: "With respect to the notion that I can just suspend deportation through executive order, that's just not the case because there are laws on the books that Congress has passed . . . ." Press Release, The White House Office of the Press Secretary, Remarks by the President at Univision Townhall (Mar. 28, 2011); *see also* Press Release, The White House Office of the Press Secretary, Remarks by the President in an Open for Questions Roundtable (Sept. 28, 2011) (answering a question about enacting the DREAM Act administratively with: "You have to pass bills through the Legislature, and then I can sign it. And if all the attention is focused away from the Legislative process, then that is going to lead to a constant dead-end.").

There are significant limitations to prosecutorial discretion, however.

First, in order to be a nonreviewable exercise of prosecutorial discretion, the decision must be a decision to *enforce*, or not to enforce, the law. An enforcement decision must be distinguished from an affirmative act of approval, or grant of a benefit, under a statute or other applicable law that sets guidelines for determining when the approval should be given. *Chaney*, 470 U.S. at 831. An enforcement decision is an exercise or nonexercise of an agency's *coercive* power over an individual's liberty or property. *Id.* at 832.

The doctrine of prosecutorial discretion applies to enforcement decisions, not benefit decisions. For example, a decision to charge, or not to charge, an alien with a ground of deportability is clearly a prosecutorial enforcement decision. By contrast, a grant of an immigration benefit, such as naturalization or adjustment of status, is a benefit decision that is not a subject for prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (distinguishing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).

(Doc. No. 472-2 at 201). Thus, prior to the institution of DACA, DHS knew that *only* the decision to enforce or not to enforce the law fell in the category of prosecutorial discretion. An award of deferred action, lawful presence, work authorization, and the other benefits attendant to DACA status "is not a subject for prosecutorial discretion." (*Id.*).

The administrative record also includes a document that provides instructional examples of the types of decisions that fall under prosecutorial discretion as opposed to those that fall in the category of adjudicative discretion. To name a few, it characterized decisions about "whom to arrest" and "whether to execute an order of removal" as exercises of prosecutorial discretion, but it described "adjustment of status" and "cancellation of removal" as exercises of adjudicative discretion. (*Id.* at 52–53). These examples strongly indicate that even DHS would have found DACA to be more than an exercise of prosecutorial discretion at the time it was created. The decision to award deferred action, with all of the associated benefits of DACA status, is outside the purview of prosecutorial discretion.

While Congress has allowed the Executive Branch to create regulations and to selectively

grant deferred action in some specific instances, it has reserved for itself the broad authority to regulate immigration. This is further evinced by the fact that Congress had already declined to give a DACA-like population legal status multiple times before DACA's creation:

> Immigrant Children's Educational Advancement and Dropout Prevention Act of 2001, H. R. 1582, 107th Cong., 1st Sess.; Student Adjustment Act of 2001, H. R. 1918, 107th Cong., 1st Sess.; DREAM Act, S. 1291, 107th Cong., 1st Sess. (2001); DREAM Act, S. 1545, 108th Cong., 1st Sess. (2003); Student Adjustment Act of 2003, H. R. 1684, 108th Cong., 1st Sess.; DREAM Act, S. 2863, 108th Cong., 2d Sess., Tit. XVIII (2003); DREAM Act of 2005, S. 2075, 109th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong., 2d Sess., Tit. VI, Subtitle C; American Dream Act, H. R. 5131, 109th Cong., 2d Sess. (2006); DREAM Act of 2007, S. 774, 110th Cong., 1st Sess.; DREAM Act of 2007, S. 2205, 110th Cong., 1st Sess.; STRIVE Act of 2007, H. R. 1645, 110th Cong., 1st Sess., Tit. VI, Subtitle B; Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong., 1st Sess., Tit. VI, Subtitle C; DREAM Act of 2009, S. 729, 111th Cong., 1st Sess.; American Dream Act, H. R. 1751, 111th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2010, S. 3932, 111th Cong., 2d Sess., Tit. V, Subtitle D; DREAM Act of 2010, S. 3827, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3962, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3963, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3992, 111th Cong., 2d Sess.; DREAM Act of 2010, H. R. 6497, 111th Cong., 2d Sess.; DREAM Act of 2011, S. 952, 112th Cong., 1st Sess.

*Regents*, 140 S. Ct. at 1919 n.2 (Thomas, J., dissenting). This consistent rejection shows Congress's clear intent not to take this action. In a related hearing, Secretary Napolitano testified to Congress that she would not take agency action in lieu of legislation to address the issue of aliens who had been brought to this country at a young age. She recognized that such action should come from Congress: "[W]e believe that Congress should address this and provide a legislative fix for this problem." (Doc. No. 472-1 at 139, Hearing Testimony, DREAM Act Senate Hearing, June 28, 2011). Nevertheless, less than a year later, DHS instituted DACA on its own.

On the same day the DACA Memorandum was issued, the President of the United States addressed the reasoning behind the new program. He first chided Congress for not passing the DREAM Act, then he said that DACA was being implemented due to "the absence of any

immigration action from Congress." Press Release, Office of the White House Press Secretary, Remarks by the President on Immigration (June 15, 2012).

Even after the implementation of the DACA Memorandum, Congress has continued to consider and reject proposals to protect a DACA-like population.[40] The Executive Branch cannot just enact its own legislative policy when it disagrees with Congress's choice to reject proposed legislation.

Congress has not given DHS the power to implement DACA, nor can DACA be characterized as authorized by DHS's inherent authority to exercise prosecutorial discretion.

> **b.** **The INA and related statutes provide a comprehensive statutory scheme for removal and allocation of lawful presence.**

Congress has already determined that the DACA-eligible population is removable through a variety of provisions in the INA. DACA beneficiaries entered the country either by overstaying a visa or by entering without inspection,[41] and the INA instructs that aliens in both classes are removable. Recipients who entered legally but overstayed their legal permission to be in the country are deportable under 8 U.S.C. § 1227(a)(1)(C)(i): "Any alien . . . who has failed to maintain the nonimmigrant status in which the alien was admitted . . . is deportable." An alien who is "deportable" under § 1227 is "removable." *Id.* § 1229a(e)(2).

Those who enter the country illegally are also removable. The INA defines "[a]n alien

---

[40] *See, e.g.*, Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744, 113th Cong., 1st Sess.; BRIDGE Act, S. 3542, 114th Cong., 2nd Sess.; BRIDGE ACT, H. R. 496, 115th Cong., 1st Sess.; Border Security and Immigration Reform Act of 2018, H. R. 6136, 115th Cong., 1st Sess.; S. 166, 116th Cong., 1st Sess.; American DREAM and Promise Act of 2019, H. R. 6, 116th Cong., 1st Sess.; DREAM Act of 2019, S. 874, 116th Cong., 1st Sess.

[41] While the Government has provided no exact number, according to one of the exhibits approximately half of the DACA population is present in the United States because they entered the country without inspection, and half are present because they have overstayed a visa. (*See* Doc. No. 225, Ex. 4, Glenn Kessler, *Did Obama Allow a 'Back Door' to Citizenship Through DACA?*, Wash. Post, Sept. 7, 2017) ("Robert Warren, a demographer and senior visiting fellow at the Center for Migration Studies, estimates that about 50 percent of the 1.258 million people eligible for DACA are visa overstays.").

present in the United States who has not been admitted" as an "applicant for admission," *id.*
§ 1225(a)(1), and further requires all applicants for admission to "be inspected by immigration
officers." *Id.* § 1225(a)(3). "[I]f the examining immigration officer determines that an alien seeking
admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for
a proceeding under section 1229a [of Title 8]." *Id.* § 1225(b)(2)(A). In a § 1229a removal
proceeding, the alien has the burden of proof to show that he or she is not removable for one of
two reasons: he or she is "clearly and beyond doubt entitled to be admitted and is not inadmissible
under section 1182"[42] or "by clear and convincing evidence" he or she is "lawfully present in the
United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(A)–(B). If the alien cannot carry
his or her burden of proof under one of these tests, he or she is deemed "removable." *Id.*
§ 1229a(e)(2).

Thus, all DACA applicants and recipients fall into a category for removal regardless of
their mode of entry. The DACA Memorandum prevents immigration officials from enforcing these
provisions of the INA, whether or not the recipient has entered removal proceedings, is "[currently]
in removal proceedings," or is "subject to a final order of removal regardless of their age." In other
words, DACA prevents the removal of its recipients, despite Congress having dictated their
eligibility for removal.[43]

Next, as the Fifth Circuit ruled in *Texas I*, the INA describes several detailed methods by
which immigrants may acquire lawful presence in the United States. *See Texas I*, 809 F.3d at 179

---

[42] Section 1182 describes various classifications of "Inadmissible Aliens" who are "ineligible to receive visas and
ineligible to be admitted to the United States." *Id.* § 1182(a).

[43] President Obama, before DACA was implemented, agreed with this underlying premise: "If Congress has laws on
the books that says that people who are not documented have to be deported, then I can exercise some
flexibility in terms of where we deploy our resources. . . . But there's a limit to the discretion that I can show because
I am obliged to execute the law. That's what the Executive Branch means. I can't just make the laws up by myself. So
the most important thing that we can do is focus on changing the underlying laws." *Transcript of President Barack
Obama with Univision*, L.A. Times, Oct. 25, 2010.

he

("Federal governance of immigration and alien status is extensive and complex.") (citing *Arizona*, 567 U.S. at 395). The INA specifies several particular groups of aliens for whom lawful presence is available[44] and groups of aliens eligible for "discretionary relief allowing [aliens in deportation proceedings] to remain in the country."[45] Congress has also passed a multitude of statutes allocating lawful presence to persons who have served in the armed forces[46] and persons seeking or possessing a higher education.[47] The *Texas I* court recognized that this statutory scheme did not encompass the groups of persons described by the DAPA and Expanded DACA programs at issue in that case. *See Texas I*, 809 F.3d at 179 ("Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA were it not enjoined."). Similarly, the statutory scheme does not encompass the population given lawful presence by DACA.

Where Congress has explicitly described a statutory scheme with the detail present in these circumstances, an agency may not supplant the scheme with its own methods. *See Hearth, Patio*

---

[44] *See, e.g.*, 8 U.S.C. §§ 1101(a)(20), 1255 (lawful-permanent-resident ("LPR") status); 1101(a)(15), 1201(a)(1) (nonimmigrant status); 1101(a)(42), 1157–59, 1231(b)(3) (refugee and asylum status); 1182(d)(5) (humanitarian parole); 1254a (temporary protected status).

[45] *Arizona*, 567 U.S. at 396 (citing 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)); *see also* 8 U.S.C. § 1227(d) (administrative stays of removal for T-and U-visa applicants (victims of human trafficking, or of various serious crimes, who assist law enforcement)).

[46] *See, e.g.*, 8 U.S.C. §§ 1438(a) (persons who lost United States citizenship because they served in the armed forces of a United States ally during World War II); 1439 (noncitizens who have served honorably in the United States armed forces for at least one year); 1440 (noncitizens who served in the United States armed forces during World War I, World War II, Korean hostilities, Vietnam hostilities, or other periods of military hostilities); 1440-1 (posthumous conferral of United Sates citizenship to noncitizens who died as a result of injuries incurred while serving in periods of hostilities).

[47] *See, e.g.*, 8 U.S.C. §§ 1101(a)(15)(F) (the "F-1" visa for full-time students) (the "F-2 visa" for dependents of full-time students) (the "F-3" visa for students from Canada and Mexico who commute across the border); 1101(a)(15)(H) (the "H-1B" visa for skilled workers) (the "H-4" visa for dependents of "H-1B" visa holders); 1101(a)(15)(J) (the "J-1" visa for students, scholars, trainees, teachers, professors, research assistants, specialists, or leaders in a field of specialized knowledge or skill participating in cultural exchange); 1101(a)(15)(L) (the "L-1A" visa for foreign employees of a corporation, executives or managers) (the "L-1B" visa for foreign employees of a corporation with specialized knowledge of the company's techniques or methodologies); 1101(a)(15)(M) (the "M-1" visa for vocational or technical students) (the "M-2 visa" for dependents of vocational or technical students).

& *Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 507 (D.C. Cir. 2013) (where Congress "employed specific statutory mechanisms" to delineate agency authority, the agency cannot "simply cho[o]se to ignore" the statutory scheme); *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("Disagreeing with Congress's expressly codified policy choices isn't a luxury administrative agencies enjoy."). In this instance, Congress's careful plan for the allotment of lawful presence forecloses the possibility that DHS may designate up to 1.5 million people to be lawfully present.

Ultimately, "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present," and Congress has not granted the Executive Branch free rein to grant lawful presence to persons outside the ambit of the statutory scheme. *Texas I*, 809 F.3d at 179.

### c. The INA provides a comprehensive statutory scheme for the allocation of work authorization.

The INA's statutory scheme intricately describes groups to whom Congress wishes to grant work authorization, delineating precise categories of aliens for whom work authorization is available. Where Congress has expressed its intent to provide certain groups of aliens with work authorization, it has promulgated specific laws requiring DHS to do so.[48] Further, Congress has specified particular instances where DHS "may" issue work authorization, specifically delegating to the agency areas in which it may exercise discretion.[49] Neither of these parts of Congress's

---

[48] *See, e.g.*, 8 U.S.C. §§ 1101(i)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T-visa); 1158(c)(1)(B), (d)(2) (asylum applicants and grantees); 1160(a)(4) (certain agricultural workers in lawful-temporary resident status); 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders), (p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U-visa); 1254a(a)(1)(B) (temporary-protected status holders); 1255a(b)(3)(B) (temporary-resident status holders).

[49] *See, e.g.*, 8 U.S.C. §§ 1158(d)(2) (asylum applicants); 1105a(a) (certain battered spouses of nonimmigrants); 1154(a)(1)(K) (grantees of self-petitions under the Violence Against Women Act); 1160(d)(3)(A) (agricultural worker preliminary applicants); 1184(p)(6) (deferred-action U-visa applicants).

statutory scheme include the DACA recipients. Congress has also specified that aliens not lawfully admitted for permanent residency with pending removal proceedings are *ineligible* for work authorization. 8 U.S.C. § 1226(a)(3). DACA specifically applies to individuals in removal proceedings and contradicts Congress's intent, as it enables those aliens to apply for work authorization.

DACA's work authorization also undermines the Immigration Reform and Control Act (IRCA). The Supreme Court has "often recognized that a 'primary purpose in restricting immigration is to preserve jobs for American workers.'" *Nat'l Ctr. for Immigrants' Rights*, 502 U.S. at 194 (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 889 (1984)). In 1986, "Congress enacted IRCA as a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). Through criminal and civil penalties for employers and civil penalties for employees, IRCA made it "illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers." *Id.* (citing 8 U.S.C. §§ 1324a(a)(1)(A), (a)(2)). Thus, it is illegal for employers to hire illegal aliens, including those eligible for DACA, but for the fact DACA allows its recipients to obtain work authorization.

DACA actually goes further to undermine Congress's intent to protect American workers as it *requires* applicants to apply for work authorization. (*See* Doc. No. 9, Ex. 20 at 23) ("In addition to the [DACA renewal and application form], all individuals must also submit a Form I-795, Application for Employment Authorization . . . ."). Requiring up to 1.5 million aliens to apply for work authorization contradicts the clear congressional purpose of preserving employment opportunities for those persons legally residing in the United States. The DACA program is therefore contrary to the immigration statutes and to Congress's goal of "closely guarding access

to work authorization and preserving jobs for those lawfully in the country." *Texas I*, 809 F.3d at 181.[50]

One law professor, while noting how compelling the equities are for DACA recipients, described the tension created by DACA's grant of employment eligibility as follows:

> Similarly, Congress has repeatedly warned that higher-than-specified levels of immigration could roil the job market, impairing the employment prospects and wage levels of U.S. citizens and lawful permanent residents. That deep-seated legislative anxiety impelled the 1986 Congress to provide for sanctions on employers hiring undocumented workers in a compromise that also provided immigrants with a major victory by legalizing a substantial number of undocumented persons living in the United States. In addition, Congress has restricted the ability of noncitizens without a legal status to obtain relief such as a reprieve from removal and a work permit. Sweeping awards of deferred action risk eroding Congress's limits.[51]

The author also noted that, at the time IRCA was passed, the Justice Department assured Congress that deferred action would be used sparingly:

> Seeking to reassure Congress and other stakeholders that grants of deferred action, typically including a work permit, *outside* IRCA would be small in number, the Justice Department stated in 1987 that the "number of aliens authorized to accept employment [pursuant to deferred action outside IRCA] is *quite small* and the impact on the labor market is *minimal*." *See* Classes of Aliens Eligible, 52 Fed. Reg. 46,092 (Dec. 4, 1987) (codified at 8 C.F.R. § 109) (emphasis added). Indeed, officials claimed that the number of work authorizations was *so small* that it was "previously considered to be *not worth recording*." *Id.* at 46,093 (emphasis added).[52]

Adding approximately 1.5 million workers is not "quite small," and, according to the parties and

---

[50] Defendant-Intervenors argue it is not the DACA Memorandum, but a separate federal regulation that permits DACA recipients to obtain work authorization. *See* 8 C.F.R. § 274a.12(c)(14) ("An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity for employment."). In *Texas I*, the Fifth Circuit specifically dispatched this argument by finding that such a reading—to allow the agency to issue employment authorization to any class of illegal aliens whom DHS declines to remove—would be outside the powers authorized by the INA. 809 F.3d at 168–69.

[51] Peter Margulies, *Rescinding Inclusion in the Administrative State: Adjudicating DACA, the Census, and the Military's Transgender Policy*, 71 Fla. L. R. 1429, 1471–72 (2019) (footnotes omitted).

[52] *Id.* at 1471 n.227.

amici curiae, their impact on the labor market is significant. Finally, adding 1.5 million new workers is certainly worth recording.[53]

DACA's impact on employment issues is certainly magnified by the ruling in *Rodriguez*, 465 F. Supp. 3d at 1301. As noted above, the court in that case held that Procter & Gamble ("P & G") could not limit its applicant pool for its internship program to citizens, nationals, LPRs, or other aliens admitted for residency. In other words, the court ruled P & G could be held liable for restricting its application pool to those with legal status—a status that DACA recipients do not share. The court held that P & G's restriction against accepting applications by DACA recipients violated § 1981 of the Civil Rights Act. 42 U.S.C. § 1981.

Thus, under the *Rodriguez* holding, an employer who might otherwise prefer to hire only those with legal status in the United States, in line with Congress's dictates, cannot do so. As a result, not only is it sometimes cheaper to hire DACA recipients due to their exclusion from being the source of ACA penalties, but it now may be illegal not to consider hiring DACA recipients. Thus, DACA is not only a way around Congress's provisions concerning residency and employment, it has apparently created a legally enforceable status that is directly contrary to law as designed by Congress.

> **d.    For some, DACA defies the statutory scheme by awarding advance parole and a clearer path to legal status.**

The Plaintiff States also complain that DACA contradicts the statutory scheme by allowing recipients access to "advance parole." Advance parole is a privilege that allows aliens to leave the

---

[53] The DACA Memorandum and the entire underlying record as produced by the Government gave no consideration to DACA's possible effects on American workers despite the fact that, prior to the creation of DACA, the Chair of the House Judiciary Committee wrote to the Secretary showing concern on this very issue:

> Ultimately, these memos may allow millions of illegal immigrants to remain in the United States in violation of existing law and regulations and compete with unemployed American and legal immigrant workers for scarce jobs. In the current environment, this effect is unconscionable.

(Doc. No. 472-3 at 156, Letter from Chairman of House Judiciary Committee to Secretary Napolitano, Sept. 12, 2011).

United States and then lawfully re-enter the country without being turned away at a port of entry. (Doc. No. 487, Ex. 5, Dep't of Homeland Sec., *DACA Nat'l Standard Operation Procedures (SOP)* 135 (2013)) (citing 8 U.S.C. § 1182(d)(5)(A)). It is designed to be awarded only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). DACA, however, made the entire DACA population eligible to apply for advance parole, and expanded these two enumerated categories beyond their intended scope. Due to their DACA status, recipients are allowed to receive advance parole and then to travel outside the United States for a host of reasons, including work-related conferences, semester-abroad programs, and job interviews.[54] Congress did not intend advance "parole authority to create an ad hoc immigration policy or to supplement current immigration categories without Congressional approval." (Doc. No. 472-3 at 166–67).

In addition to DHS's generous interpretation of the phrases "urgent humanitarian reasons" and "significant public benefit" for DACA recipients, allocating advance parole to some DACA recipients subverts statutory law in two other ways: 1) it lets certain individuals adjust illegal status to lawful presence and then possibly to legal status by curing the "inadmissibility bar," and 2) it lets recipients avoid the statutory "unlawful presence bars." (*See* Doc. No. 219, Ex. 3, Lena Graber & Jose Magaña-Salgado, *DACA, Advance Parole, and Family Petitions*, Immigr. Legal Res. Ctr. (June 2016)).[55]

---

[54] *See* Doc. No. 487, Ex. 5 ("Generally, USCIS will only grant advance parole if the applicant's travel abroad will be in furtherance of: humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative; educational purposes, such as semester-abroad programs and academic research, or; employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas. Travel for vacation is not a valid basis for advance parole."). The Defendant-Intervenors have referred the Court to a New DACA memorandum, which states: "USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017." (Doc. No. 504-2, Ex. 2 at 33 n.7). The Court has not been informed of the standards USCIS is currently using. Regardless of what standards are being used, advance parole eligibility under DACA contradicts Congress's legislative scheme, at least for those recipients who originally entered the country illegally.

[55] This ten-page document was co-authored by one of the individual Defendant-Intervenors in this case.

First, DACA recipients' entitlement to apply for advance parole contradicts the statutory scheme by curing the bar for unlawful entry. (*See id.*). Ordinarily, an alien present in the United States may apply for an adjustment of status to change his or her legal immigration classification to that of an LPR (this is also known as receiving a "Green Card"). (*See id.*). There are several possible ways to do this, including an employment qualification or a specified family relationship (like marriage to a United States citizen), but applicants will be deemed inadmissible—that is, they will be unable to adjust their status—if they are present "without being admitted or paroled into the United States." (*Id.*) (citing 8 U.S.C. §§ 1182(a)(6)(A)(i), 1255). Generally, immigrants who first entered the United States without inspection are ineligible to adjust their status because they were not "admitted" legally when they first entered the country. (*Id.*) Approximately one half of the DACA population is in this category.[56]

DACA, through its advance parole eligibility, allows this segment to circumvent the "inadmissibility bar"— the requirement that aliens be "admitted or paroled into the United States" to adjust status. (*See id.*); (Doc. No. 487, Ex. 5) (describing procedures for processing advance parole applications for DACA recipients). Once a DACA recipient leaves the country and returns to the United States through advance parole, that individual, who would otherwise be subject to the inadmissibility bar, can now adjust status because he or she has been paroled legally back into the United States. (*See* Doc. No. 219, Ex. 23).[57] Thus, DACA's grant of advance parole eligibility

---

[56] *See* Kessler, *supra* note 41 (stating approximately half of DACA recipients overstayed a visa and half entered the country illegally).

[57] *See also* A. Molina, *Immigration: Undocumented College Students Find a Way to Study Abroad, Return Legally*, Press-Enterprise, Riverside California (Feb. 14, 2016); (Doc. No. 289, Ex. 299, Ben Harrington, Cong. Res. Serv., *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (2018)) ("Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already approved, so as to facilitate their re-entry. Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status).").

allows its recipients to directly circumvent the INA's statutory requirements.[58]

Through 2015, over 20,000 DACA recipients had been approved for advance parole, and of those, approximately 3,000 were subsequently granted an adjustment of status. (Doc. No. 224-2). Although this number may seem small compared to the possible DACA population of 1.5 million people, it is not insignificant. Despite the DACA Memorandum stating that it "confers no substantive right, immigration status or pathway to citizenship," DACA does, in fact, enable certain individuals to change their inadmissible status (due to unlawful entry) into an admitted/paroled category and in some cases then provides a clearer pathway to citizenship. This process is another way DACA directly undermines the deterrent effect intended by Congress.

Second, advance parole for DACA recipients subverts the "unlawful presence bars" instituted by statute. *See* 8 U.S.C. § 1182(a)(9)(B)(i). Under these provisions, an alien who entered the United States illegally or remained in the United States longer than allowed is unable to return to the United States upon leaving. *Id.* Individuals who have left the country after having been illegally present for more than 180 days must remain out of the United States for three years, and those illegally present for more than a year must remain out for ten years before they may again become admissible to the United States. *Id.* All of the DACA recipients have been in the country illegally for more than one year, so the ten-year bar would apply. DACA's grant of advance parole eligibility, however, allows DACA recipients to travel abroad and then return to the United States without complying with either the three- or ten-year bar. Through DACA, all of these recipients effectively avoid the dictates of Congress while thousands of other individuals who have complied

---

[58] This "loophole" is not needed by many DACA recipients who overstayed their visas, as they were "admitted" when they first entered the country. Also, all LPR applicants must still meet other requirements, such as having a family relationship. Nevertheless, for a number of DACA recipients, the program's grant of eligibility for advance parole allows them to adjust status where they otherwise would be barred by law.

with the law are waiting for their bar period to run. Thus, DACA is contrary to the statutory scheme devised by Congress.

### e. DACA fails *Chevron*'s first step.

In sum, DACA cannot withstand analysis under *Chevron*'s first step because Congress has directly addressed the precise issue at hand. It has not delegated the authority to adopt DACA to DHS. *See Chevron*, 467 U.S. at 842–43; *see also Texas I*, 809 F.3d at 179–81. Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the nation's immigration system. Against the backdrop of Congress's "careful plan," DHS may not award lawful presence and work authorization to approximately 1.5 million aliens for whom Congress has made no provision. *Texas I*, 809 F.3d at 186. DACA is "in excess of statutory jurisdiction" and "short of statutory right," and therefore violates the APA. 5 U.S.C. § 706(2). An agency's role is to administer the laws Congress passes, not to enact its own new legislative policy:

> However attractive it might be as a matter of policy, the DACA program appears to violate the proper respect for congressional primacy in lawmaking that should guide executive action, even when substantial exercises of prosecutorial discretion are inevitable. To the extent Congress has adopted overly broad and unduly harsh immigration laws, Congress should remain accountable for its choice. The executive branch should not presume the authority to let Congress off the hook.[59]

### 2. Even if Congress had not spoken directly on the issue, DHS's interpretation is not a reasonable one.

This Court's ruling at the first step of *Chevron* alone provides a sufficient ground to settle the question presented, but the Court will proceed to analyze the DACA program under the second step of *Chevron*. *See Texas I*, 809 F.3d at 183 n.191 ("Now, even assuming the government had survived *Chevron* Step One, we would strike down DAPA as manifestly contrary to the INA under

---

[59] Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 761 (2014).

Step Two.") (citing *Chevron*, 467 U.S. at 844; *Mayo Found.*, 562 U.S. at 53).

At the second *Chevron* step, if the relevant statute is silent or ambiguous, the court asks "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The court should uphold an agency's rule if it is "a reasonable interpretation of the enacted text," but should overturn it if it is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found.*, 562 U.S. at 58, 53 (quotations omitted). Stated differently, the Court must ask "whether Congress would have intended, and expected, courts to treat [the regulation] as within, or outside, its delegation to the agency of 'gap-filling' authority." *Id.* at 58 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007)).

DACA is not a reasonable interpretation of any statute and is "manifestly contrary" to the statutory scheme promulgated by Congress. *Texas I*, 809 F.3d at 186. For the same reasons discussed in this Court's analysis under the first step of *Chevron*, the program would not pass the second step: DACA is an unreasonable interpretation of the law because it usurps the power of Congress to dictate a national scheme of immigration laws and is contrary to the INA. DACA would grant lawful presence and work authorization to over a million people for whom Congress has made no provision and has consistently refused to make such a provision. *See King v. Burwell*, 576 U.S. 473, 474 (2015) ("[H]ad Congress wished to assign [a question of 'deep economic and political significance'] to an agency, it surely would have done so expressly.").

DHS's interpretation of its authority is especially unreasonable given the Supreme Court's precedent finding Congress intended to completely preempt further regulation in the area of immigration. The Supreme Court has found that state laws regulating the employment of aliens are preempted when they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," because they would interfere with "the careful balance

struck by Congress with respect to unauthorized employment of aliens." *Arizona*, 567 U.S. at 406 (quotations omitted). Like those state statutes, DACA not only interferes with the employer side of this balancing act, which makes it illegal for employers to hire those who are here illegally, but it interferes with the labor side as well.

In *Arizona*, the Supreme Court recounted the background as to why Congress did not impose criminal penalties on aliens working illegally. The Court quoted the report of a Commission set up by Congress that concluded such penalties would be "unnecessary and unworkable." *Id.* at 405.[60] They were unnecessary, at least in part, because the aliens already faced the loss of their ability to adjust status, 8 U.S.C. §§ 1255(c)(2), (8), and potential removal from the country. 8 U.S.C. § 1227(a)(1)(C)(i). DACA, of course, removes these consequences.

All of these measures enacted by Congress to protect American jobs for those legally in the country are undermined by DACA. Just as states cannot set up obstacles to the purposes and objectives of Congressional legislation, neither can an executive agency.

An exchange at the Supreme Court during *Texas I* further illustrates why DACA fails the second step of *Chevron* as an unreasonable interpretation of a silent or ambiguous statute. Chief Justice Roberts questioned whether there would be any limits to grants of deferred action if the Supreme Court were to adopt the Government's position:

> Chief Justice Roberts: Under your argument, could the President grant deferred removal to every unlawful – unlawfully present alien in the United States right now?
>
> General Verrilli: Definitely not.
>
> Chief Justice Roberts: Why not?

---

[60] The fact that Congress went so far as to set up a Commission to study immigration and employment policies and make recommendations should not be discounted. It demonstrates how seriously Congress took its role in formulating the resulting legislation.

General Verrilli: Here are the limits. Because the deferred action has - over time, there have been built up a set of administrative limits, which I'll talk about, some administrative policy limits, and then there's substantive statutory limits. The administrative policy limits are these: Deferred action has always been for the lowest priorities for removal. And everybody agrees –

Chief Justice Roberts: I'm sorry. By "administrative," you mean by the Executive branch?

General Verrilli: Correct. Yes. But –

Chief Justice Roberts: So that somehow binds the Executive branch now, the fact that – I mean, this hasn't been approved by the Executive branch prior to this point, either, and yet it's a fairly significant departure.

Transcript of Oral Argument at 19–20, *Texas I*, 136 S. Ct. 2271 (No. 15-674).

Counsel for the Government could not adequately answer the Chief Justice's question. The probing inquiry by the Chief Justice was not the first time this issue had been raised; this Court and the Fifth Circuit had asked the same question as well. The Solicitor General's response was, in effect, "the Executive Branch just would never do that." This response fell flat, since the Executive Branch was simultaneously attempting to give lawful presence to a combined DACA, Expanded DACA, and DAPA population of approximately 5.8 million individuals, over half of the country's 11.3 million estimated illegal aliens.[61] Nevertheless, using the Government's logic, echoed by the Defendant-Intervenors in this case, the Executive Branch could theoretically still give every illegal alien currently present in the United States lawful status, if DHS were to do it in smaller numbers, group-by-group. This cannot be a correct interpretation of the law.

The Court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Texas I*, 809 F.3d at 181 (quoting *FDA v. Brown & Williamson Tobacco*

---

[61] Obviously, the ambiguous limitations suggested by the Government, even if they do exist, would not bind any subsequent administration. One need only look at the transitions from the Obama to Trump to Biden administrations to see how rapidly the Executive Branch can alter its position on immigration matters.

*Corp.*, 529 U.S. 120, 133 (2000)). Common sense instructs that the creation of this program, as was true for the establishment of DAPA and Expanded DACA, is too important to be delegated to an administrative agency. Consequently, DHS's interpretation of its authority under the INA is faulty. In the end, the Fifth Circuit's reasoning in *Texas I* controls this case; it is binding case law for this Court, and the result here is inescapable.

### 3.   DACA is not supported by historical precedent.

Defendant-Intervenors also argue historical precedent provides a source of authority for the institution of DACA. (*See* Doc. No. 502 at 44–45). They cite past examples in which the Executive Branch has granted deferred action for particular groups of aliens and argue that those instances provide precedent for the program at issue here. This argument was made in *Texas I* as well.

In distinguishing previous deferred action programs from DAPA, in *Texas I* the Fifth Circuit noted that DAPA was not a bridge from one legal status to another. 809 F.3d at 184. Likewise, DACA is not a bridge from one legal status to another. By definition, the DACA recipients did not have a legal status to begin with and do not have legal status now. They have only lawful presence.

Next, the Fifth Circuit recognized that those programs, unlike DAPA, were "[mostly] done on a country-specific basis, usually in response to war, civil unrest, or natural disasters." *Id.* at 184. The same shortfalls present in *Texas I* are also present here, and DACA fares no better. It is not country- or area-specific and was not implemented in response to any natural disaster or other similar crisis. Despite Defendant-Intervenors' arguments, DACA is most similar to DAPA and Expanded DACA. Like those programs, the DACA program is not authorized by historical precedent.

Defendant-Intervenors highlight a particular example of deferred action—the "Family Fairness" policies of 1987 and 1990—as arguably analogous to the DACA program. These policies are attractive candidates for comparison because of their size: they provided deferred action for approximately 1.5 million individuals. (Doc. No. 502 at 44). The Fifth Circuit, however, already specifically rejected this analogy as well. *Texas I*, 809 F.3d at 185. Family Fairness was "interstitial to a statutory legalization scheme," because its purpose was to delay prosecution until Congress could enact legislation providing the same benefits, which it did when it passed the Immigration Act of 1990. *Id.* The Fifth Circuit concluded that Family Fairness was unlike DAPA because Congress had consistently declined to enact a DREAM Act, and DAPA was therefore not interstitial to any piece of legislation. *Id.* ("DAPA is far from interstitial: Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA.").

In fact, the President essentially admitted that DACA was not interstitial to legislation:

Now, both parties wrote this legislation. And a year and a half ago, Democrats passed the DREAM Act in the House, but Republicans walked away from it. It got 55 votes in the Senate, but Republicans blocked it. The bill hasn't really changed. The need hasn't changed. It's still the right thing to do. The only thing that has changed, apparently, was the politics.

\* \* \*

In the absence of any immigration action from Congress to fix our broken immigration system, what we've tried to do is focus our immigration enforcement resources in the right places.

Press Release, Office of the White House Press Secretary, Remarks by the President on Immigration (June 15, 2012). Thus, the President acknowledged that DACA was not interstitial to Congressional action. To the contrary, it was a program that the Executive Branch created because Congress refused to pass legislation.

Thus, the conclusion reached in *Texas I* applies here because DACA was not and is not interstitial to an act of Congress. In fact, just the opposite situation exists. Although the Defendant-Intervenors argue that DACA is a means of waiting for congressional action, given the nine-year history of failed legislation in Congress, it is an inescapable conclusion that DACA is not interstitial to any congressional action. Although Congress may someday enact such a DREAM Act, until it does, its continued failure to pass bills coextensive with the DACA population evinces a rejection of this policy.

   **4.    The differences between DAPA and DACA do not compel a different result.**

Defendant-Intervenors argue "the decision in *Texas I* does not control resolution of this case." (Doc. No. 502 at 46). They argue three major points in support of this contention: 1) the substantive APA analysis in *Texas I* focused exclusively on DAPA and not Expanded DACA or DACA; 2) while DAPA would have provided relief to a population already covered by specific statutory provisions, DACA has no such analogous statutes; and 3) far fewer people are eligible for DACA than were eligible for DAPA.

Initially, the Court agrees with the Defendant-Intervenors' contention that the substantive APA analysis in *Texas I* focused almost exclusively on DAPA, but the Fifth Circuit's judgment was not so limited; it applied to Expanded DACA as well.

Next, to distinguish DACA from DAPA, Defendant-Intervenors point to a passage in the *Texas I* opinion citing a specific collection of INA provisions that provides "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status . . . ." 809 F.3d at 179 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). The *Texas I* court held that DAPA was unlawful in part because it would effectively nullify that particular group of provisions and displace it with a new method for alien parents to acquire

status through their children. The Defendant-Intervenors argue that because no analogous set of provisions exists for DACA, the Fifth Circuit's ruling does not apply. The same argument was made to, and accepted by, the Ninth Circuit in *Regents*. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Regents*, 140 S. Ct. 1891 (2020) (hereinafter "*Ninth Circuit Regents*").

This Court, however, does not agree. First, the Fifth Circuit's ruling in *Texas I* did not rely exclusively on the existence of the provisions allowing illegal aliens to derive a lawful immigration classification from their children's immigration status. The court relied at least as much on DAPA's incompatibility with the INA's provisions for lawful presence and work authorization, as discussed above with respect to DACA. Moreover, the Fifth Circuit also held Expanded DACA unlawful. That program had no overlap with the cited provisions, and the court obviously did not rely on their existence in ruling against it.

Second, analogous provisions *do* exist regulating the lawful admission of children, as well as for students and veterans. Congress has passed many acts relating to the immigration of children, and at least two of them provide methods for attaining status that significantly overlap with the DACA age group: derivative citizenship and naturalization upon application. Congress has allocated a method for children to derive citizenship from a parent, whereby a child born outside of the United States may become a citizen if the child: 1) has an American citizen parent; 2) is under 18 years of age; 3) lives in the legal and physical custody of the American citizen parent; and 4) is a lawful permanent resident. 8 U.S.C. § 1431. Another provision provides for the naturalization of a child born outside the United States upon application of the parent, if the child: 1) has a U.S. citizen parent; 2) has a parent who has been physically present in the United States for at least five years, two after the age of fourteen; 3) is under 18 years of age; 4) is residing

outside of the United States in the legal and physical custody of the applicant; and 5) is temporarily present in the United States pursuant to a lawful admission. *Id.* § 1433.

With regard to veterans, Congress has enacted the following statutes: 8 U.S.C. §§ 1438(a) (persons who lost United States citizenship because they served in the armed forces of a United States ally during World War II); 1439 (noncitizens who have served honorably in the United States armed forces for at least one year); 1440 (noncitizens who served in the United States armed forces during World War I, World War II, Korean hostilities, Vietnam hostilities, or other periods of military hostilities); 1440-1 (posthumous conferral of United Sates citizenship to noncitizens who died as a result of injuries incurred while serving in periods of hostilities).

With regard to students, Congress has passed the following provisions: 8 U.S.C. §§ 1101(a)(15)(F) (the "F-1" visa for full-time students) (the "F-2 visa" for dependents of full-time students) (the "F-3" visa for students from Canada and Mexico who commute across the border); 1101(a)(15)(H) (the "H-1B" visa for skilled workers) (the "H-4" visa for dependents of "H-1B" visa holders); 1101(a)(15)(J) (the "J-1" visa for students, scholars, trainees, teachers, professors, research assistants, specialists, or leaders in a field of specialized knowledge or skill participating in cultural exchange); 1101(a)(15)(L) (the "L-1A" visa for foreign employees of a corporation, executives or managers) (the "L-1B" visa for foreign employees of a corporation with specialized knowledge of the company's techniques or methodologies); 1101(a)(15)(M) (the "M-1" visa for vocational or technical students) (the "M-2 visa" for dependents of vocational or technical students).

The Ninth Circuit apparently neglected this plethora of statutes when it made its ruling in *Ninth Circuit Regents*. Moreover, to the extent one agrees with the Ninth Circuit's assumption that no analogous statutes exist, the Plaintiff States' rejoinder might be that the reason they do not exist

is because Congress has rejected them repeatedly. The Executive Branch has no authority to add to or subtract from Congress's deliberately enacted body of work, especially in an area that the Constitution assigns primary authority to Congress. U.S. CONST. art. 1, § 1.[62]

Defendant-Intervenors also argue that DACA is different from DAPA because it affects fewer people. (*See* Doc. No. 502 at 46–47). The fact that DAPA was three times the size of DACA is of no *legal* significance. One of Defendant-Intervenors' experts is an immigration law professor and was Chief Counsel to USCIS during the time DACA was instituted. He found that a main difference between DACA and DAPA was the size:

> Q:    So earlier we had talked about the differences between DACA and DAPA; right? . . . One is the size of the population, which you said doesn't affect the merits of whether DACA and DAPA are legally the same thing; correct?
>
> A:    In my opinion, it should not have that effect.

(Doc. No. 284, Ex. 67 at 99:15–22, Depo. of S. Legomsky). Consequently, even one of the Defendant-Intervenors' own immigration policy experts found that the difference in the possible number of participants between DACA (1.5 million) and Expanded DACA–DAPA (4.3 million) should have no legal significance.

The Ninth Circuit, however, found this argument persuasive. It reasoned that a crucial factor for the Fifth Circuit's conclusion in *Texas I* that DAPA was illegal was the fact that the eligible population was so large. *See Ninth Circuit Regents*, 908 F.3d at 509 (citing *Texas I*, 809

---

[62] It is clear that well before DACA was implemented, the Executive Branch understood this limitation as was made clear by the President:

> Now, I swore an oath to uphold the laws on the books, but that doesn't mean I don't know very well the real pain and heartbreak that deportations cause. . . . we are enforcing flawed laws in the most humane and best possible way. Now, I know some people want me to bypass Congress and change the laws on my own . . . . But that's not how – that's not how our system works. . . . That's not how our democracy functions. That's not how our Constitution is written. So let's be honest. I need a dance partner here – and the floor is empty.

Press Release, The White House Office of the Press Secretary, Remarks by the President to the National Council of La Raza (July 25, 2011).

F.3d at 181). The Fifth Circuit had held it was unlikely Congress would "delegate a policy decision of such economic and political magnitude to an administrative agency." *Texas I*, 809 F.3d at 181 (quotations omitted). The record before the Ninth Circuit in *Regents* apparently showed that only 689,800 people were enrolled in DACA as of that time. 908 F.3d at 509. The Ninth Circuit therefore distinguished DACA from DAPA on this feature: "If the point is that the 'economic and political magnitude' of allowing 4.3 million people to remain in the country and obtain work authorization is such that Congress would have spoken to it directly, then surely it makes a difference that one policy has less than one-sixth the 'magnitude' of the other." *Id.* (quoting *Texas I*, 809 F.3d at 181).

The Ninth Circuit's explanations are far from convincing. First, it did not explain at what point the size of a group *would* become problematic. It also did not include all of the DACA-eligible individuals in its mathematical analysis. Thus, the comparison made by the Ninth Circuit was apples to oranges. It compared the number of *actual* DACA recipients to the number of *potentially* eligible individuals cited in *Texas I*. If size makes a difference as the Ninth Circuit claimed, this error is significant as the number of DACA-eligible individuals is larger than the population of eleven states and the District of Columbia.[63] Finally, the Ninth Circuit failed to address the question that all the *Texas I* judges, including the Chief Justice, asked: if the critical distinction is the population size, then why could DHS not just legalize all illegal aliens by doing it in smaller groups? These unanswered issues are critical and render this opinion unpersuasive. The 1.5 million people DACA would permit to receive lawful presence and work authorization are still too numerous to fit into the individualized notion of deferred action that courts have found

---

[63] *See* U.S. Dep't of Commerce, 2020 Census Apportionment Results (Apr. 26, 2021), https://www.census.gov/data/tables/2020/dec/2020-apportionment-data.html.

permissible in other contexts. As were DAPA and Expanded DACA, DACA is "foreclosed by Congress's careful plan." *Texas I*, 809 F.3d at 186.

Nothing in *Texas I* indicates that any of its reasoning should not equally apply to DACA. Further, as discussed previously, three Supreme Court justices have already agreed that DACA violates substantive immigration law. Justice Thomas stated pointedly in his *Regents* dissent that "Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions." 140 S. Ct. at 1922 (Thomas, J., dissenting).

There may yet be one other significant difference between DAPA and DACA, but it too has no effect on DACA's legality. Many of the amici curiae argue that DACA has garnered much national media attention and its recipients evoke the sympathy of the nation.[64] DACA affects a younger population. Many came to this country unlawfully or stayed in this country without permission through no fault of their own. Further, according to many of the amicus briefs, the DACA population is generally well-educated and better situated to contribute to the well-being of this nation than other immigrant populations. As a group they are law-abiding and hold responsible positions, despite their youth. These factors make the DACA population a much more appealing and sympathetic group. While these may be compelling policy rationales for DACA, they can have no effect on this Court's legal conclusion. "The law's function is understood to be to neutralize

---

[64] The Court notes that many states, organizations, cities, civic groups, and individuals are very sympathetic to and very supportive of the DACA recipients. These groups have provided this Court with amicus curiae briefs which, in addition to being helpful, are demonstrative displays of support. This comes as no surprise, as this Court is likewise enamored with the thought of young people overcoming many hardships and hurdles and becoming productive members, if not leaders, of our communities. The Judiciary, however, is not the branch of government that makes decisions based upon the popularity of an idea or because many are sympathetic toward or biased against a particular group or program. Congress is the branch of government that weighs competing public sentiments when it enacts or refuses to enact legislation. In fact, the House recently passed H.R.6, which would legalize a population similar to but not coextensive with the current DACA recipients. Thus, Congress should be the target for these policy arguments.

the emotionality that legal disputes arouse in the participants and lay observers."[65] As much as this Court might agree with these sentiments, and as popular as this program might be, the proper origination point for the DACA program was, and is, Congress.[66]

For the reasons provided above, DACA violates the substantive provisions of the APA.

## F.   Take Care Clause

The Plaintiff States argue they are entitled to summary judgment on their claim under the Take Care Clause of the Constitution. *See* U.S. CONST. art. II, § 3 (the President "shall take Care that the Laws be faithfully executed"). According to them, DACA amounts to a constitutional violation because "the Executive cannot exercise such legislative power—it cannot dispense with statutes addressing unlawful presence by declaring a class of aliens to henceforth be present lawfully." (Doc. No. 486 at 53).

In its order denying the preliminary injunction, this Court decided to "defer[] judgment on the Take Care Clause until a full hearing on the merits or until the appropriate court on appeal instructs it to decide the issue." (Doc. No. 319 at 67). If DHS's alleged acts or omissions related to DACA were unconstitutional, no action it takes to achieve compliance with the APA will remedy that flaw.

To resolve the issues concerning the legality of DACA, the Court need not address whether the Executive Branch has violated its duties under the Constitution. DACA's factual presentation has not changed since this Court's earlier opinion, in which the Court declined to rule on the Take Care Clause question. Moreover, the legal waterfront has not changed either; there is still a dearth

---

[65] Richard A. Posner, Frontiers of Legal Theory 226 (2001).

[66] In *Texas I*, Justice Anthony Kennedy noted that the starting place for immigration law changes should have been Congress. *See* Transcript of Oral Argument at 24, *Texas I*, 136 S. Ct. 2271 (No. 15-674) ("[T]he briefs go on for pages to the effect that the President has admitted a certain number of people and then Congress approves it. *That seems to me to have it backwards. It's as if that the President is setting the policy and the Congress is executing it. That's just upside down.*") (emphasis added).

of precedent on the Take Care Clause. Given that the Court has made a full disposition of the case without addressing the constitutional claim, it need not address this issue. *See Matal v. Tam*, 137 S. Ct. 1744, 1755 (2017) ("We have often stressed that it is important to avoid the premature adjudication of constitutional questions and that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable.") (cleaned up). Accordingly, the Court declines to rule upon the Plaintiff States' claim based upon the Take Care Clause.

### G.    Arbitrary and Capricious and Other Issues for Consideration on Remand

The Plaintiff States did not allege that DHS's actions were arbitrary and capricious under the APA as the plaintiffs in *Regents* did. Nevertheless, the Court will address that concept briefly as it is clearly a consideration for DHS should it elect to proceed on remand. While many other factors may fall under the rubric of "arbitrary and capricious," the Court will limit its discussion to the two reasons highlighted as flaws in DACA's attempted rescission in *Regents*: 1) failure to consider forbearance without benefits, and 2) failure to consider reliance interests.

First, the underlying DACA record points out in multiple places that while forbearance fell within the realm of prosecutorial discretion, the award of status and benefits did not. Despite this distinction, neither the DACA Memorandum nor the underlying record reflects that any consideration was given to adopting a policy of forbearance without the award of benefits. Second, for decades the states and their residents have relied upon DHS (and its predecessors) to protect their employees by enforcing the law as Congress had written it. Once again, neither the DACA Memorandum nor its underlying record gives any consideration to these reliance interests. Thus, if one applies the Supreme Court's rescission analysis from *Regents* to DACA's creation, it faces similar deficiencies and would likely be found to be arbitrary and capricious.

Additionally, throughout the *Texas I* litigation and this lawsuit, the parties and amici curiae have raised various other issues that might be considered in a reformulation of DACA. In no particular order, these include: 1) the benefits bestowed by the DACA recipients on this country and the communities where they reside[67]; 2) the effects of DACA or similar programs on legal and illegal immigration[68]; 3) the effects of DACA on the unemployed or underemployed legal residents of the states; 4) whether DACA amounts to an abandonment of the Executive Branch's duty to enforce the law as written (as the Plaintiff States have long claimed); 5) whether any purported new formulation violates the equal protection guarantees of the Constitution (as Justice Sotomayor was concerned that DACA's rescission would); and 6) the costs DACA imposes on the states and their respective communities.

Some of the more attenuated considerations might include: 1) the secondary costs imposed on states and local communities by any alleged increase in the number of illegal immigrants due to DACA[69]; and 2) what effect illegal immigration may have on the lucrative human smuggling and human trafficking activities of the drug cartels that operate on our southern border.[70] Finally,

---

[67] The record of this Court, and no doubt the records of the many rescission courts, are replete with facts, figures, and testimonials.

[68] The argument has been made that programs such as DACA may have a deleterious effect on legal immigration and have a motivating effect on illegal immigration. With regard to the former, the Court has only seen anecdotal reports, but with regard to the latter, a DHS official has actually testified under oath to that effect. *See* Testimony of Chief of the Rio Grande Valley Sector of the United States Border Patrol, Kevin Oaks, Cause No. B-14-119 (Doc. No. 38).

[69] While finding unbiased and accurate data or reports on the costs of illegal immigration is a difficult task, the Court cites as examples two sources that appear to be untainted by secondary motivations. The first study calculates the following 2018 costs for illegal immigration in Texas as follows: 1) emergent care ($95.8 billion); 2) elementary and secondary education ($1.5 billion); 3) higher education ($16.1 million); 4) health care ($890 million); and 5) criminal justice expenses ($374.2 million). *See* Rodriguez-Sanchez, *Undocumented Immigrants in Texas: A Cost Benefit Assessment*, Rice University's Baker Institute for Public Policy (2020). A second, smaller study, which concentrated on the costs incurred by one hospital in Corpus Christi (over 150 miles from the Mexico-United States border) in a three-year period (2011-2014), pegged those costs at between $3,513,000 and $19,610,000, depending on whether one used total costs or charges. *See* Kane, Richman, et al., *Costs and Characteristics of Undocumented Immigrants Brought to a Trauma Center by Border Patrol Agents in Southern Texas*, J. Emerg. Trauma Shock. 2019 Jan-Mar; 12(1):54-57.

[70] Estimates of the amount of money cartels charge immigrants to cross the Mexico-United States border vary greatly. According to the United Nations, these tolls (also colloquially referred to as *piso* or *brinco*) average $5,000 for

if DHS elects to justify DACA by asserting that it will conserve resources, it should support this conclusion with evidence and data. No such evidence is to be found in the administrative record or the DACA Memorandum. DHS should consider the costs imposed on or saved by all governmental units.

These are just a few concerns that have been raised by parties or amici curiae throughout the many years of the *Texas I* fight over DAPA and Expanded DACA and this litigation over DACA. The Court does not suggest by any means that this is an exhaustive list, and no doubt many more issues may arise throughout the notice and comment period. Further, the Court takes no position on how DHS (or Congress, should it decide to take up the issue) should resolve these considerations, as long as that resolution complies with the law.

## V.    Conclusion

DHS violated the APA with the creation of DACA and its continued operation. The Motion for Summary Judgment filed by the Plaintiff States is granted in part and denied in part. (Doc. No. 486). The Motion for Summary Judgment filed by the individual Defendant-Intervenors is denied. (Doc. No. 504). The Government's request for a remand without vacatur is granted in part and denied in part. (Doc. No. 569). The DACA Memorandum and the DACA program that it created are hereby vacated and remanded to DHS for further consideration, as requested.

Nevertheless, these rulings do not resolve the issue of the hundreds of thousands of DACA recipients and others who have relied upon this program for almost a decade. That reliance has not

---

Mexican nationals and closer to $7,500 for Central Americans. If one applies the low end of that range to the 749,834 immigrants encountered by the CBP between October 1, 2020 and April 30, 2021, that results in a gross number of almost four billion dollars. *See* U.N. Office on Drugs and Crime, *Global Study on Smuggling Migrants 2018* at 99, Sales No. E.18.IV.9; U.S. Customs and Border Protection (2021), Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. Given the nature of human smuggling, no person or entity can state with certainty the dollars involved, but no one can deny that it is a lucrative sideline for the major drug cartels.

diminished and may, in fact, have increased over time. Therefore, the order of immediate vacatur as it applies to current DACA recipients (but not the order of remand) is temporarily stayed until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court.

DHS may continue to accept new DACA applications and renewal DACA applications as it has been ordered to by the *Batalla Vidal* court cited above, but it is hereby enjoined from approving any new DACA applications and granting the attendant status. A separate injunction order will be entered to that effect. To be clear, neither this order nor the accompanying injunction requires DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that it would not otherwise take.

Signed this 16th day of July, 2021.

Andrew S. Hanen
United States District Judge