9810

## RULES AND REGULATIONS

acter, whether or not admitted to practice in accordance with § 292.3, if such individual is appearing without monetary or other material remuneration and files a written declaration to that effect, and if such representation is permitted by the special inquiry officer having the case under consideration, the regional commissioner, district director, or officer in charge of the suboffice having administrative jurisdiction over the office in which the case is pending, the Commissioner, or the Board.

(3) Any alien may be represented by an accredited official, in the United States, of the government to which the alien owes allegiance, if such official appears solely in his official capacity, and with the consent of the alien.

(4) An attorney, other than one described in § 1.1 (a) (3) of this chapter, residing outside the United States and licensed to practice law and in good standing in a court or courts of the country in which he resides and who is engaged in such practice may be permitted by any regional commissioner, district director, or officer in charge of a suboffice, the Commissioner, or any officer of the Central Office designated by him, or the Board, to file his appearance and be heard in any individual case. The regional commissioner and district director shall have authority to withhold granting permission to such attorney to appear before an officer under his jurisdiction, and may refer the application for permission to appear to the Board for its decision.

(5) No person who is a party to a case shall be denied the privilege of presenting oral argument in his own behalf before the Board if it has his case under consideration.

(6) Any person desiring to be heard as amicus curiae shall apply therefor to the Board; and the Board may grant such application if it deems it to be in the public interest.

(c) No person previously in the employ of the Department of Justice may be permitted to practice in a case in which he participated during the period of such employment.

§ 292.2 *Qualifications for admission to practice.* (a) Admission to practice shall be limited to persons who are citizens of the United States, who are of good moral character, and who are attorneys in good standing in the court or courts in which they are licensed to practice, or who are representatives of organizations of the character described in § 1.1 (a) (14) of this chapter.

(b) No person within any category set forth in § 292.6 may be admitted to practice.

§ 292.3 *Applications for admission to practice; decision.* (a) Applications for admission to practice may be filed with a regional commissioner, district director, the Commissioner, or the Chairman of the Board, at the option of the applicant. Such application shall be made in triplicate upon Form G–27. An application by an attorney shall be supported by a current certificate from a judge or clerk of the court in which the applicant is licensed to practice, or by a written statement of the district director or officer in charge of a suboffice of the Service certifying that upon inquiry he has ascertained and has personal knowledge that the applicant is so licensed. An application by the representative of an organization shall be supported by a statement of the appropriate officer or officers thereof, certifying that the applicant is its accredited representative and authorized to appear in its behalf in any case.

(b) The application, in triplicate, shall be transmitted to the Board by either the regional commissioner, district director, or Commissioner.

(c) As soon as practicable after receipt of the application the Board shall give consideration thereto. If the application is approved, written notation to that effect shall be made on the application and a certificate of admission to practice shall be issued to the licensee. If the conclusion is that the application shall be denied, the Board shall prepare a proposed order of denial, in which shall be stated the reasons for denying the application. The Board shall serve the proposed order on the applicant, either personally or by registered mail and obtain a return receipt therefor. The applicant shall be allowed a reasonable time, not less than ten days, in which to file exceptions to the proposed order and to submit a brief if desired. After receipt of the exceptions, or if none are received within three days after expiration of the period specified for filing of exceptions, the Board shall make such order as it may then determine appropriate, including authorizing a hearing for presentation of evidence or oral argument. If no exceptions are filed, the order of the Board shall be final, subject to review by the Attorney General under any of the circumstances described in § 6.1 (h) of this chapter. If exceptions have been filed and the order of the Board is that the application shall be denied, the Board shall refer the record to the Attorney General for review of its order. The order of the Attorney General shall be the final determination of the application.

(d) Admission of a representative shall terminate upon discontinuance of his authority to represent the organization named in his application.

§ 292.4 *Roster of attorneys.* The Board shall maintain an alphabetical roster of attorneys and of representatives of organizations. A copy of the roster shall be supplied to the Commissioner, and he shall be advised from time to time of changes therein.

§ 292.5 *Appearances; availability of records.* (a) An appearance shall be filed in writing on Form G–28 by attorneys or representatives appearing in each individual case. When an appropriate appearance has been filed in a case, substitution of attorneys or representatives may be permitted upon the written withdrawal of the attorneys or representatives of record or upon notice by the party to the case of his designation of new attorneys or representatives. If any attorney or representative of record authorizes another attorney or representative to act for him as an associate in a case, the latter will be heard if satisfactory evidence of his authoriza-

tion is presented and if he has been admitted to practice under this part.

(b) During the time a case is pending, the attorney or representative of record, or his associate, shall be permitted to review the record and, upon request, be lent a copy of the testimony adduced. The attorney or representative shall give his receipt for such copy and pledge that no copy thereof will be made, that he will retain it in his possession and under his control, and that it will be surrendered upon final disposition of the case, or upon demand by the Service or the Board.

§ 292.6 *Suspension and disbarment.* With the approval of the Attorney General, the Board may suspend or bar from further practice an attorney or representative, if it shall find that suspension or disbarment is in the public interest. The suspension or disbarment of an attorney or representative who is within one or more of the following categories shall be deemed to be in the public interest, for the purpose of this part, but the enumeration of such categories herein shall not be construed as establishing the exclusive grounds for suspension or disbarment in the public interest:

(a) Who charges or receives, either directly or indirectly, any fee or compensation for services which may be deemed to be grossly excessive in relation to the services performed by him in the case;

(b) Who, with intent to defraud or deceive, bribes, attempts to bribe, coerces, or attempts to coerce, by any means whatsoever, any person, including a party to a case, or an officer or employee of the Service or Board, to commit an act or to refrain from performing an act in connection with any case;

(c) Who wilfully misleads, misinforms, or deceives an officer or employee of the Department of Justice concerning any material and relevant fact in connection with a case;

(d) Who wilfully deceives, misleads, or threatens any party to a case concerning any matter relating to the case;

(e) Who solicits practice in any unethical or unprofessional manner, including, but not limited to, the use of runners, or advertising his availability to handle immigration, naturalization, or nationality matters;

(f) Who represents, as an associate, an attorney who, known to him, solicits practic in any unethical or unprofessional manner, including, but not limited to, the use of runners, or advertising his availability to handle immigration, naturalization, or nationality matters;

(g) Who has been temporarily suspended, and such suspension is still in effect, or permanently disbarred from practice in any court, Federal, State (including the District of Columbia), territorial, or insular;

(h) Who is temporarily suspended, and such suspension is still in effect, or permanently disbarred from practice in a representative capacity before any executive department, board, commission, or other governmental unit, Federal, State (including the District of Columbia), territorial, or insular;

(i) Who, by use of his name, personal appearance, or any device, aids and abets

AR2022_200142

an attorney to practice during the period of his suspension or disbarment, such suspension or disbarment being known to him;

(j) Who wilfully made false and material statements in his application for admission to practice, or in his appearance in any case;

(k) Who engages in contumelious or otherwise unprofessional conduct with respect to a case in which such attorney acts in a representative capacity, which in the opinion of the Board, would constitute cause for suspension or disbarment were the case pending before a court, or which, in such a judicial proceeding, would constitute a contempt of court;

(l) Who, having been furnished with a copy or copies of any portion of the record in any case, wilfully fails to surrender such copy or copies upon final disposition of the case or upon demand, or wilfully and without authorization makes and retains a copy or copies of the material furnished;

(m) Who has been convicted of a felony, or, having been convicted of any crime is sentenced to imprisonment for a term of more than one year;

(n) Who no longer possesses the qualifications required by § 292.2 for admission to practice;

(o) Who is the representative of an organization which is no longer recognized by the Board as being of the character described in § 1.1 (a) (14) of this chapter.

§ 292.7  *Admission to practice prior to December 24, 1952.*  Any person who immediately prior to the effective date of the regulations in this chapter and of the Immigration and Nationality Act was authorized to practice before the Service and the Board may continue to practice before the Service and the Board without making a new application for admission in accordance with the provisions of this part. Any such person shall be subject to the provisions of this part regulating the practice of attorneys and representatives.

§ 292.11  *Service upon and action by attorney, representative, or other person.*  (a) Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or requested of, the attorney or representative who has filed an appearance in the case as provided in § 292.5, or the person himself if there is no attorney or representative in the case.

(b) Whenever an examination is provided for by any of the provisions of this chapter in any case pending before the Service, the person involved shall have the right to be represented at the examination by an attorney or representative authorized to practice before the Service. The attorney or representative shall be permitted to examine or cross-examine

such person and witnesses, to introduce evidence, to make objections which shall be stated succinctly and entered on the record, and to submit briefs.

§ 292.12  *Service of decision and other papers.*  Except where specific provision is otherwise made in this chapter, whenever a decision, notice or other paper is required to be given or served, it shall be done by personal service, or certified or registered mail upon the person designated in § 292.11.

§ 202.61  *Procedure for suspension or disbarment; effect.*  (a) The regional commissioner may cause to be investigated any complaint or circumstance which establishes a prima facie case for the suspension or disbarment of any enrolled attorney or representative. If such investigation establishes to the satisfaction of the regional commissioner that suspension or disbarment proceedings should be instituted, he shall cause written charges to be preferred. A copy of such charges shall be served upon the respondent, either personally or by registered mail, with notice to show cause within a specified time, not less than 30 days, why he should not be suspended or disbarred from further practice. Such notice shall also advise the respondent that after answer has been made and the matter is at issue, if he so requests he will be given opportunity for a hearing before a representative of the regional commissioner. If hearing is requested, the regional commissioner will specify the time and place therefor and specially designate the officer who shall preside and the officer who shall present the evidence in support of the charges. The nonreceipt of answer within three days after expiration of the period prescribed to show cause shall be held a waiver of defense to the charges. If no hearing is requested in the answer, the regional commissioner may conduct any further required investigation to com-

plete the record, and without the necessity of any additional notice to the respondent, forward the completed record to the Board with his recommendation.

(b) The respondent, either with or without counsel, and the regional commissioner, by the Service officer within the purview of § 6.1 (e) of this chapter, shall have the privilege of appearing before the Board for oral argument at a time specified by the Board.

(c) The Board shall consider the record as presented by the regional commissioner as soon as practicable after its receipt and render its decision thereon. The order of the Board shall constitute the final disposition of the proceeding: *Provided, however,* That if the order would suspend or disbar the respondent, or if any one of the circumstances described in § 6.1 (h) of this chapter be present, the Board shall refer the record to the Attorney General for review of its decision and in such case the order of the Attorney General shall be the final determination of the proceeding.

(d) In case the final order against the respondent is for suspension or disbarment, the attorney or representative shall not thereafter be permitted to practice unless and until authorized so to do by the Board; and if disbarred, he shall surrender the certificate of his admission to the Board for cancellation.

---

### PART 299—IMMIGRATION FORMS

Sec.
299.1  Prescribed forms.
299.2  Forms available from the Superintendent of Documents.
299.3  Reproduction of forms by private parties.

  AUTHORITY: §§ 299.1 to 299.3 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103.

§ 299.1  *Prescribed forms.*  The following forms are hereby prescribed by the Attorney General for use in compliance with the provisions of Subchapters A and B of this chapter:

| Form No. | Title and description |
|---|---|
| AR-2 | Alien Registration form. |
| AR-2a | Supplemental Sheet, Alien Registration Form. |
| AR-4 | Fingerprint Card. |
| AR-11 | Alien's Change of Address Card. |
| Customs | |
| 7507 | General Declaration. |
| FS 256a | Immigrant Visa and Alien Registration. |
| G-27 | Application for Admission to Practice Before the Board of Immigration Appeals and the Immigration and Naturalization Service. |
| G-28 | Notice of Entry of Appearance as Attorney or Representative. |
| I-17 | Petition for Approval of School for Students. |
| I-20 | Certificate of Eligibility. |
| I-21 | Report of Initial Registration and Termination of Attendance of Nonimmigrant "F" Student. |
| I-24 | Application by Alien Student for Permission to Accept Employment. |
| I-38 | Special Inquiry Officer's Decision (Deportation). |
| I-39 | Special Inquiry Officer's Decision (Voluntary departure, alternate deportation). |
| I-53 | Address Report Card. |
| I-63 | Application for Preexamination. |
| I-79 | Notice of Intention to Fine Under Immigration and Nationality Act. |
| I-90 | Application for New Alien Registration Receipt Card in a Changed Name or in Lieu of One Lost, Mutilated, Destroyed or in Lieu of Form AR-3 or AR-103. |
| I-94 | Arrival-Departure Card. |
| I-95 | Crewman's Landing Permit. |
| I-100a | Alien Laborer's Permit and Identification Card. |
| I-100C | Alien Laborer's Permit. |
| I-102 | Application for copy of Alien Laborer's Permit in lieu of one lost, mutilated, or destroyed. |
| I-122 | Notice to Alien Detained for Hearing by Special Inquiry Officer. |
| I-126 | Annual Report of Status by Treaty Trader. |

AR2022_200143

9812

## RULES AND REGULATIONS

*Form No.*                   *Title and description*
I-129 _____ Petition for Classification of Quota Immigrant for Alien Whose Services are Needed Urgently in the United States.
I-129A____ Petition for Classification as Nonquota Immigrant for Minister of a Religious Denomination.
I-129B____ Petition for Permission to Import Nonimmigrant Aliens.
I-129C____ Application for Waiver of Excludability and Ineligibility to Obtain an Immigrant Visa under section 212 (a) (14) of the Immigration and Nationality Act.
I-131 _____ Application for Permit to Reenter the United States.
I-131A____ Instructions for Executing Application for Permit to Reenter the United States.
I-132 _____ Permit to Reenter the United States.
I-133 _____ Petition by United States Citizen for Issuance of Immigrant Visa.
I-133A____ Petition by Permanent Resident Alien for Issuance of Immigrant Visa.
I-138 _____ Subpena.
I-151 _____ Alien Registration Receipt and Border Crossing Card.
I-186 _____ Nonresident Alien Mexican Border Crossing Card.
I-190 _____ Application for Nonresident Alien Mexican Border Crossing Card.
I-191 _____ Application for Advance Permission to Return to Unrelinquished Domicile.
I-192 _____ Application for Advance Permission to Enter as Nonimmigrant.
I-193 _____ Application for Waiver of Passport and/or Visa.
I-200 _____ Warrant for Arrest of Alien.
I-202 _____ Authorization for Removal.
I-212 _____ Application for Permission to Reapply for Admission Into the United States After Deportation or Removal.
I-233 _____ Application to Adjust Immigration Status under Section 6 of the Refugee Relief Act of 1953.
I-243 _____ Application for Removal.
I-256A____ Application for Suspension of Deportation.
I-259 _____ Notice to Detain, Deport or Remove Aliens.
I-259A____ Agreement by Transportation Line to Assume Responsibility for Removal of Aliens.
I-287 _____ Alien Requiring Special Care and Attention.
I-290A____ Notice of Appeal to the Board of Immigration Appeals.
I-290B____ Notice of Appeal (to Regional Commissioner).
I-290C____ Notice of Certification.
I-304 _____ Power of Attorney for Immigration Bond Where Cash Deposited as Security.
I-305 _____ Receipt of Officer of Immigration and Naturalization Service for Cash Accepted as Security on Immigration Bond.
I-310 _____ Bond for Payment of Sums and Fines Imposed Under Immigration and Nationality Act.
I-312 _____ Designation of Attorney in Fact.
I-313 _____ Designation, Coupled With Interest, of Attorney in Fact.
I-317 _____ Blanket Bond for Departure of Aliens in Transit or Temporarily Admitted as Visitors for Business or Pleasure.
I-323 _____ Notice of Violation of Conditions of Bond.
I-324 _____ Bond for the Release of an Alien Under Exclusion Proceedings.
I-353 _____ Bond Conditioned for the Delivery of an Alien.
I-354 _____ Bond That Alien Shall Not Become a Public Charge.
I-377 _____ Bond for Maintenance of Status and Departure of Nonimmigrant Alien or Aliens.
I-391 _____ Notice of Cancellation of Bond.
I-414 _____ Receipt for Crew List.
I-418 _____ Passenger List—Crew List.
I-426 _____ Immediate and Continuous Transit Agreement Between a Transportation Line and the United States of America (special direct transit procedure).
I-506 _____ Application for Change of Nonimmigrant Status.
I-507 _____ Application for Status as Permanent Resident.
I-508 _____ Waiver of Rights, Privileges, Exemptions, and Immunities.
I-509 _____ Notice of Proposal to Change Status from Alien Admitted for Permanent Residence, to Nonimmigrant.
I-539 _____ Application to Extend Time of Temporary Stay.
N-105_____ Application to Create Record of Admission for Permanent Residence.

§ 299.2   *Forms available from the Superintendent of Documents.* The following forms required for compliance with the provisions of subchapter B of this chapter may be obtained, upon prepayment, from the Superintendent of Documents, Government Printing Office, Washington, D. C.: I–20, I–21, I–94, I–95, I–129, I–129A, I–129B, I–131, I–131A, I–133, I–133A, I–418, and I–539. A small supply of those forms shall be set aside by immigration officers for free distribution and official use.

§ 299.3   *Reproduction of forms by private parties.* The following forms required for compliance with the provisions of subchapter B of this chapter may be printed or otherwise reproduced by an appropriate duplicating process by private parties at their own expense:

I–20, I–21, I–94, I–95, and I–418. Forms printed or reproduced by private parties shall conform to the officially printed forms currently in use with respect to size, wording, arrangement, style and size of type, and paper specifications. Such forms and all entries required to be made thereon shall be printed or otherwise duplicated in the English language with black ink or dye that will not fade or "feather" within 20 years.

### Subchapter C—Nationality Regulations

PART 306—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED; VIRGIN ISLANDERS

Sec.
306.1   Persons eligible.
306.2   United States citizenship; when acquired.

Sec.
306.11   Preliminary application form; filing; examination.
306.12   Renunciation forms; disposition.

AUTHORITY: §§ 306.1 to 306.12 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 306, 332, 66 Stat. 237, 252; 8 U. S. C. 1406, 1443.

§ 306.1   *Persons eligible.* Any Danish citizen who resided in the Virgin Islands of the United States on January 17, 1917, and in those Islands, Puerto Rico, or the United States on February 25, 1927, and who had preserved his Danish citizenship by making the declaration prescribed by Article VI of the treaty entered into between the United States and Denmark on August 4, 1916, and proclaimed January 25, 1917, may renounce his Danish citizenship before any court of record in the United States irrespective of his place of residence, in accordance with the provisions of this part.

§ 306.2   *United States citizenship; when acquired.* Immediately upon making the declaration of renunciation as described in § 306.12 the declarant shall be deemed to be a citizen of the United States. No certificate of naturalization or of citizenship shall be issued by the clerk of court to any person obtaining, or who has obtained citizenship solely under section 306 (a) (1) of the Immigration and Nationality Act or under section 1 of the act of February 25, 1927.

§ 306.11   *Preliminary application form; filing; examination.* A person of the class described in § 306.1 shall submit to the Service on Form N–350 preliminary application to renounce Danish citizenship, in accordance with the instructions contained therein. The applicant shall be notified in writing when and where to appear before a representative of the Service for examination as to his eligibility to renounce Danish citizenship and for assistance in filing the renunciation.

§ 306.12   *Renunciation forms; disposition.* The renunciation shall be made and executed by the applicant under oath, in duplicate, on Form N–351 and filed in the office of the clerk of court. The usual procedural requirements of the Immigration and Nationality Act shall not apply to proceedings under this part. The fee shall be fixed by the court or the clerk thereof in accordance with the law and rules of the court, and no accounting therefor shall be required to be made to the Service. The clerk shall retain the original of Form N–351 as the court record and forward the duplicate to the district director exercising administrative naturalization jurisdiction over the area in which the court is located.

PART 310—REQUISITION OF FORMS BY CLERKS OF COURT

§ 310.11   *Application for official forms.* See §§ 332a.11 and 332a.12 of this chapter.

PART 312—EDUCATIONAL REQUIREMENTS FOR NATURALIZATION

Sec.
312.1   Educational examination of petitioners for naturalization.

AR2022_200144

Sec.
312.2  Ability to read, write, and speak English; exemption.

AUTHORITY: §§ 312.1 and 312.2 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 312, 332, 66 Stat. 239, 252; 8 U. S. C. 1423, 1443.

§ 312.1  *Educational examination of petitioners for naturalization.* A person applying for naturalization upon his own petition shall, before being naturalized, demonstrate a knowledge and understanding of the fundamentals of the history, and of the principles and form of government, of the United States. To this end the petitioner shall be questioned as to (a) the principal historical facts concerning the development of the United States as a republic, (b) the organization and principal functions of the Government of the United States, and of the States and local units of government, (c) his understanding of and attachment to the fundamental principles of the Constitution of the United States, and (d) the relation of the individual to the government—national, state, and local—the rights and privileges arising from that relationship, and the duties and responsibilities which result from it. The examination shall be conducted in simple language and shall avoid technical and extremely difficult questions.

§ 312.2  *Ability to read, write, and speak English; exemption.* A person who on December 24, 1952 was over fifty years of age and had been living in the United States for periods totaling at least twenty years, is exempt from demonstrating an understanding of the English language, as provided in section 312 (1) of the Immigration and Nationality Act, even though the periods totaling twenty years did not follow lawful admissions for permanent residence.

PART 316—GOOD MORAL CHARACTER

§ 316.1  *Good moral character; exceptions.* The requirement of section 316 of the Immigration and Nationality Act that no person shall be naturalized unless he is and has been during the periods referred to in that section a person of good moral character shall not apply to:

(a) Persons who acquire United States citizenship through the naturalization of a parent or parents under section 320 or 321 of the Immigration and Nationality Act.

(b) Danish citizens who make application to renounce their citizenship under section 306 (a) (1) of the Immigration and Nationality Act.

(c) Former United States citizens who make application to regain citizenship under section 324 (c) of the act.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies secs. 316, 320, 321, 324, 329, 332, 335, 402, 66 Stat. 242, 245, 246, 250, 252, 255, 275; 8 U. S. C. 1427, 1431, 1432, 1435 and note, 1440 note, 1443, 1446)

No. 236—Part II—57——7

PART 316a—RESIDENCE, PHYSICAL PRESENCE AND ABSENCE

Sec.
316a.1  Absence for which benefits of section 307 (b) or 308 of the Nationality Act of 1940 have been granted; effect on continuous residence requirement.
316a.21  Application for benefits with respect to absences; appeal.

AUTHORITY: §§ 316a.1 and 316a.21 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 316, 317, 332, 405, 66 Stat. 242, 243, 252, 280; 8 U. S. C. 1427, 1428, 1443, 1101 note.

§ 316a.1  *Absence for which benefits of section 307 (b) or 308 of the Nationality Act of 1940 have been granted; effect on continuous residence requirement.* No absence from the United States which commenced prior to the effective date of the Immigration and Nationality Act, whether or not it continued beyond that date, in connection with which an application for exemption from the usual residence requirements under the naturalization laws was made under section 307 (b) or 308 of the Nationality Act of 1940 and acted upon favorably by the Attorney General, shall be regarded as having broken the continuity of residence required by section 316 (a) of the Immigration and Nationality Act, provided that satisfactory proof that the absence was for a purpose described in section 307 (b) or 308 of the Nationality Act of 1940, is presented to the court, and provided that the provisions of section 316 (a) of the Immigration and Nationality Act are otherwise complied with.

§ 316a.21  *Application for benefits with respect to absences; appeal.* (a) An application for the residence benefits of section 316 (b) of the Immigration and Nationality Act to cover an absence from the United States for a continuous period of one year or more shall be submitted to the Service on Form N-470 in accordance with the instructions contained therein. The application shall be filed either before or after the applicant's employment commences but before the applicant has been absent from the United States for a continuous period of one year. There shall be submitted with the application a fee of $10.00.

(b) An application for the residence and physical presence benefits of section 317 of the Immigration and Nationality Act to cover any absences from the United States, whether before or after December 24, 1952, shall be submitted to the Service on Form N-470 in accordance with the instructions contained therein, either before or after the absence from the United States, or the performance of the functions or the services described in that section. There shall be submitted with the application a fee of $10.00.

(c) The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor and of his right to appeal within 10 days from the receipt of such notification in accordance with Part 7 of this chapter.

PART 317—TEMPORARY ABSENCE OF PERSONS PERFORMING RELIGIOUS DUTIES

Sec.
317.1  Absence for which benefits of section 308 of the Nationality Act of 1940 have been granted.
317.21  Application for benefits of section 317 of the Immigration and Nationality Act.

§ 317.1  *Absence for which benefits of section 308 of the Nationality Act of 1940 have been granted.* See § 316a.1 of this chapter.

§ 317.21  *Application for benefits of section 317 of the Immigration and Nationality Act.* See § 316a.21 of this chapter.

PART 318—PENDING DEPORTATION PROCEEDINGS

§ 318.1  *Warrant of arrest.* For the purposes of section 318 of the act, an order to show cause issued under Part 242 of this chapter shall be regarded as a warrant of arrest.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 242, 318, 332; 66 Stat. 208, as amended, 244, 252; 8 U. S. C. 1252, 1429, 1443)

PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS

Sec.
319.1  Person living in marital union with United States citizen spouse.
319.2  Person whose United States citizen spouse is employed abroad.
319.11  Procedural requirements.

AUTHORITY: §§ 319.1 to 319.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 319, 332, 66 Stat. 244, 252; 8 U. S. C. 1430, 1443.

§ 319.1  *Person living in marital union with United States citizen spouse.* A person of the class described in section 319 (a) of the Immigration and Nationality Act shall establish his good moral character, attachment to the principles of the Constitution of the United States, and favorable disposition to the good order and happiness of the United States for the period of three years immediately preceding the date of filing the petition and from that date to the time of admission to citizenship.

§ 319.2  *Person whose United States citizen spouse is employed abroad.* A person of the class described in section 319 (b) of the Immigration and Nationality Act shall establish an intention in good faith, upon naturalization, to reside abroad with the United States citizen spouse and to take up residence in the United States immediately upon the termination of the employment abroad of such spouse. It shall be established that at the time of filing of the petition for naturalization such person was in the United States pursuant to a lawful admission for permanent residence, and that he is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

AR2022_200145

§ 319.11 *Procedural requirements.* A person described in §§ 319.1 and 319.2 shall submit to the Service an application to file a petition for naturalization on Form N-400 in accordance with the instructions contained therein. The petition for naturalization of such person shall be filed on Form N-405, in duplicate.

PART 322—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED; CHILDREN OF CITIZEN PARENT

§ 322.11 *Procedural requirements.* An application to file a petition for naturalization in behalf of a child under section 322 or 323 of the Immigration and Nationality Act shall be submitted to the Service on Form N-402, in accordance with the instructions contained therein, by the United States citizen parent or parents or adoptive parent or parents. Such application shall be submitted in time to permit the naturalization of the child prior to its eighteenth birthday anniversary. The petition for naturalization shall be filed on Form N-407 in duplicate, in a naturalization court within whose jurisdiction the petitioning parent or parents and the child reside. There shall be included in the petition the affidavits of two credible witnesses, citizens of the United States, stating (a) the length of time the witnesses have known the petitioning parent or parents and the child, (b) that to the best of the witnesses' knowledge and belief the child is, and during the applicable period has been, a person of good moral character, attached to the principles of the Constitution, and well disposed to the good order and happiness of the United States, (c) that the child is qualified in all respects to become a citizen of the United States, (d) that the child is permanently residing with the petitioning parent or parents in the United States and the period of such residence and (e) in the case of an adopted child, the period of time they have known the child to be in the legal custody of the petitioning parent or parents and to be physically present in the United States. At the hearing on the petition the qualifications described in sections 322 and 323 of the Immigration and Nationality Act shall be proven by the oral testimony of witnesses in the manner provided in Part 335b of this chapter. A child, under this part, is not required to establish any particular period of residence in a State.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies secs. 322, 323, 332, 335, 66 Stat. 246, 252, 255; 8 U. S. C. 1433, 1434, 1443, 1446)

PART 323—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED; CHILDREN ADOPTED BY UNITED STATES CITIZENS

§ 323.11 *Procedural requirements.* See Part 322 of this chapter.

PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE

Sec.
324.11   Former citizen at birth or by naturalization; procedural requirements.

Sec.
324.12   A woman, citizen of the United States at birth, who lost or is believed to have lost citizenship by marriage and whose marriage has terminated; procedural requirements.
324.13   Women restored to United States citizenship by the act of June 25, 1936, as amended by the act of July 2, 1940.

AUTHORITY: §§ 324.11 to 324.13 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 324, 332, 337, 405, 66 Stat. 246, 252, 258, 280; 8 U. S. C. 1435, 1443, 1448, 1101 note.

§ 324.11 *Former citizen at birth or by naturalization; procedural requirements.* A former citizen of the United States of the class described in section 324 (a) of the Immigration and Nationality Act shall submit to the Service an application to file a petition for naturalization, on Form N-400 and Supplemental Form N-400A, in accordance with instructions contained therein. The petition for naturalization of such person shall be filed on Form N-405, in duplicate, in any naturalization court, regardless of the petitioner's residence, and need not aver that it is the intention of the petitioner to reside permanently in the United States. The petition shall be verified by at least two United States citizen witnesses as provided in § 334.21 of this chapter. At the hearing on the petition the qualifications described in sections 324 (a) and (b) of the Immigration and Nationality Act shall be proven in the manner provided in Part 335b of this chapter. The petition may be heard immediately, provided a certificate of examination on Form N-440, in duplicate, is attached thereto, as provided in § 332.12 of this chapter. If the final hearing on the petition is held within sixty days preceding the holding of a general election within the territorial jurisdiction of the naturalization court, the petitioner shall not be permitted to take the oath prescribed in Part 337 of this chapter prior to the tenth day next following such general election. There shall be inserted after averment 10 of Form N-405 at the time of the filing thereof an averment of the petitioner's loss of citizenship, as follows:

I was formerly a citizen of the United States by _____
(Indicate whether by birth or naturalization)
on _____ and lost my citizenship by marriage on _____
(Month day year)
to _____ a citizen or
(Name of husband)
subject of _____ I have
(Name of foreign country)
not acquired any other nationality by an affirmative act other than by marriage.

§ 324.12 *A woman, citizen of the United States at birth, who lost or is believed to have lost citizenship by marriage and whose marriage has terminated; procedural requirements.* A woman, formerly a citizen of the United States at birth, who applies in the United States to regain her citizenship under section 324 (c) of the Immigration and Nationality Act, shall submit to the Service a preliminary application to take the oath of allegiance, on Form N-401,

in accordance with the instructions contained therein. The oath may be taken before the judge or clerk of any naturalization court, regardless of the applicant's place of residence. The applicant shall establish that it is her intention, in good faith, to assume and discharge the obligations of the oath of allegiance and that her attitude toward the Constitution and laws of the United States renders her capable of fulfilling the obligations of such oath. The applicant shall not be naturalized if, within the period of ten years immediately preceding the filing of the application to take the oath of allegiance or after such filing and before taking such oath she is, or has been found to be within any of the classes of persons described in section 313 of the Immigration and Nationality Act. The eligibility of the applicant to take the oath shall be investigated by a member of the Service who shall make an appropriate recommendation to the naturalization court. The application to the court shall be made on Form N-408, in triplicate. The original shall be retained as a part of the court record and numbered consecutively in a separate series, and the duplicate forwarded to the appropriate district director with duplicates of other naturalization papers. After the applicant has taken the oath of allegiance, the clerk of court shall furnish the applicant, upon demand, the triplicate copy of Form N-408, properly certified, for which a fee not exceeding $5.00 may be charged. No charge shall be made by the clerk of court for the filing of Form N-408. In case the applicant does not demand the triplicate Form N-408, it shall be transmitted to the appropriate district director with the duplicate of said form. The oath of allegiance may be taken before any diplomatic or consular officer of the United States abroad, in accordance with such regulations as may be prescribed by the Secretary of State.

§ 324.13 *Women restored to United States citizenship by the act of June 25, 1936, as amended by the act of July 2, 1940.* A woman who was restored to citizenship by the act of June 25, 1936, as amended by the act of July 2, 1940, but who failed to take the oath of allegiance prescribed by the naturalization laws prior to December 24, 1952, may take the oath of allegiance prescribed by Part 337 before any naturalization court on or after December 24, 1952. Such woman shall comply with the procedural requirements of § 324.12 except that a fee not exceeding $1.00 may be charged if the woman demands the triplicate copy of Form N-408, properly certified.

PART 325—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: NATIONALS BUT NOT CITIZENS OF THE UNITED STATES

§ 325.1 *Residence and physical presence in the United States.* A national of the United States who is not a citizen thereof and who is otherwise qualified for naturalization may, if he becomes a resident of any State, be naturalized upon compliance with the applicable provisions of the Immigration and National-

AR2022_200146

ity Act. In the case of such a person, residence and physical presence within the United States or residence and physical presence within any of the outlying possessions of the United States for the period during which continuous residence and physical presence are required to be established under Chapter 2 of Title III of the Immigration and Nationality Act shall be regarded as residence and physical presence within the United States pursuant to lawful admission for permanent residence, within the meaning of section 316 (a) of the Immigration and Nationality Act. Such person shall, unless otherwise exempted therefrom, establish six months' residence within the State in which the petition for naturalization is filed, as required by section 316 (a) of the Immigration and Nationality Act.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies secs. 316, 325, 332, 66 Stat. 242, 246, 252; 8 U. S. C. 1427, 1436, 1443)

Part 327—Special Classes of Persons Who May Be Naturalized: Persons Who Lost United States Citizenship Through Service in Armed Forces of Foreign Country During World War II

Sec.
327.1   Period of service in armed forces.
327.11   Procedural requirements.

Authority: §§ 327.1 and 327.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 327, 332, 338, 344, 66 Stat. 248, 252, 259, 264; 8 U. S. C. 1438, 1443, 1449, 1455.

§ 327.1   *Period of service in armed forces.* A former citizen of the United States of the class described in section 327 of the Immigration and Nationality Act, who during World War II served in the armed forces of any country at war with a country with which the United States was at war after December 7, 1941, and before September 2, 1945, may be naturalized under this part if such service was on or after September 1, 1939, and before September 2, 1945, even though the United States was not at war during the period of his service, provided that such country was not at war with the United States during any period of his service. Such person is not subject to the provisions of section 318 of the Immigration and Nationality Act barring from naturalization a person against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest.

§ 327.11   *Procedural requirements.* A former citizen of the United States of the class described in section 327 of the Immigration and Nationality Act shall submit to the Service an application to file a petition for naturalization on Form N-400 and Supplemental Form N-400A, in accordance with the instructions contained therein. The petition for naturalization of such person shall be filed on Form N-405, in duplicate, with supplemental Form N-405A in triplicate, in any naturalization court. The original of Form N-405A shall be retained as part of the court record. After the oath of allegiance has been taken by the petitioner, the duplicate and triplicate copies of Form N-405A, bearing a copy of the

oath duly attested and certified by the clerk, shall be forwarded by the clerk of court to the appropriate district director. The district director shall file the duplicate copy with the Service record and transmit the triplicate copy to the Department of State. The petitioner shall pay to the clerk of the court of the naturalization court at the time of filing the petition a fee of $10, unless exempted therefrom under section 344 (h) of the Immigration and Nationality Act.

Part 328—Special Classes of Persons Who May Be Naturalized: Persons With Three Years Service in Armed Forces of the United States

Sec.
328.1   Whenever service is continuous.
328.2   Whenever service is not continuous; petition filed while still in service or within six months after termination of service.
328.3   Whenever service terminates more than six months before petition is filed.
328.4   Proof of qualifications.
328.11   Procedural requirements.

Authority: §§ 328.1 to 328.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 318, 328, 332, 334, 335, 66 Stat. 244, 249, 252, 254, 255; 8 U. S. C. 1429, 1439, 1443, 1445, 1446.

§ 328.1   *Whenever service is continuous*—(a) *Petition filed while still in service.* A person of the class described in section 328 (a) of the Immigration and Nationality Act, whose service in the armed forces of the United States aggregating three years has been continuous may, if his petition for naturalization is filed while still in the service, be naturalized, subject to the provisions of this part, upon compliance with the provisions of Chapter 2 of Title III of the Immigration and Nationality Act, except that no particular period of residence or physical presence in the United States or any State or within the jurisdiction of the naturalization court shall be required, and except that such person shall not be subject to the provisions of section 318 of the Immigration and Nationality Act barring from naturalization a person against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest. Such person shall establish that he is in the United States pursuant to a lawful admission for permanent residence occurring prior to the filing of the petition for naturalization, whether or not it occurred before or after the service in the armed forces.

(b) *Petition filed within six months after termination of service.* A person of the class described in paragraph (a) of this section, who has been separated from the service described therein prior to filing his petition for naturalization but who files his petition within six months after the termination of such service may be naturalized under the conditions and with the exemptions set forth in paragraph (a) of this section, except that he shall establish his residence in the United States, good moral character, attachment to the principles of the Constitution, and favorable disposition to the good order and happiness of the United States, for the period from the date of his separation from such

service to the date of the filing of his petition for naturalization and from the latter date to the date of his admission to citizenship, by affidavits and testimony of at least two United States citizen witnesses, in the manner provided in § 334.21 and Part 335b of this chapter.

§ 328.2   *Whenever service is not continuous; petition filed while still in service or within six months after termination of service.* A person of the class described in § 328.1 whose service aggregating three years was not continuous and who files a petition for naturalization while still in such service or within six months after the termination of such service may be naturalized under the conditions and with the exemptions set forth in § 328.1 (a) except that he shall establish his residence in the United States and State, good moral character, attachment to the principles of the Constitution of the United States, and favorable disposition to the good order and happiness of the United States, during the period or periods within five years immediately preceding the date of filing the petition and to the date of admission to citizenship, when not serving in the armed forces, by the affidavits and testimony of at least two United States citizen witnesses, for each such period, in the manner provided in § 334.21 and Part 335b of this chapter.

§ 328.3   *Whenever service terminates more than six months before petition is filed.* A person of the class described in § 328.1 or § 328.2, whose service aggregating three years terminated more than six months preceding the date of filing his petition for naturalization shall comply with the applicable provisions of Chapter 2 of Title III of the Immigration and Nationality Act except that service during the five years immediately preceding the date of filing the petition shall be considered as residence and physical presence within the United States.

§ 328.4   *Proof of qualifications.* A petitioner under this part shall establish his residence and physical presence in the United States and in the State in which his petition is filed, his good moral character, attachment to the principles of the Constitution, and favorable disposition to the good order and happiness of the United States during the periods of service referred to in §§ 328.1, 328.2, and 328.3 by the production of duly authenticated copies of the records of the executive departments having custody of the records of such service, which copies shall show the period or periods of such service, and that it was performed honorably or under honorable conditions. The petitioner shall also produce a certified statement from the appropriate executive department showing that he has never been discharged from the armed forces of the United States under other than honorable conditions. Such copies shall be accepted in lieu of the affidavits and testimony or depositions of witnesses for the period or periods of such service.

§ 328.11   *Procedural requirements.* A person of the class described in §§ 328.1, 328.2, or 328.3 shall submit to the Service

**RULES AND REGULATIONS**

an application to file a petition for naturalization on Form N-400, in accordance with the instructions contained therein. The duly authenticated copies of the records and the certified statements of the executive departments described in § 328.4 shall be requested by the applicant on Form N-426, in triplicate, and submitted to the Service with Form N-400. A person of the class described in § 328.1 or § 328.2 may file his petition for naturalization in any naturalization court, regardless of his place of residence; a person described in § 328.3 shall file his petition in a court having jurisdiction over his place of residence. The petition for naturalization shall be filed on Form N-405 in duplicate. There shall be inserted after averment 10 of Form N-405, at the time of the filing thereof, a description of the petitioner's service, as follows:

I entered the_____
       (Branch of service)
on _____ under Serial No. _____
   (Month, day, year)
and am now serving honorably (was honorably discharged on _____),
                         (Month, day, year)

The petitioner may be naturalized immediately, if he is still in the armed services, and a certificate of such examination on Form N-440, in duplicate, is attached to his petition, in accordance with § 332.12 of this chapter. The petition shall be verified by at least two United States citizen witnesses, as provided in § 334.21 of this chapter.

---

PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: VETERANS OF THE UNITED STATES ARMED FORCES WHO SERVED DURING WORLD WAR I OR WORLD WAR II

Sec.
329.1   World War I; definition.
329.2   Proof of character, attachment, and disposition.
329.21  Procedural requirements.

AUTHORITY: §§ 329.1 to 329.21 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 329, 332, 334, 335, 402, 66 Stat. 250, 252, 254, 255, 275; 8 U. S. C. 1440 and note, 1443, 1445, 1435 note.

§ 329.1  *World War I; definition.* For the purposes of section 329 of the Immigration and Nationality Act, World War I shall be deemed to have commenced on April 6, 1917, and to have ended on November 11, 1918.

§ 329.2  *Proof of character, attachment, and disposition.* A person of the class described in section 329 (a) or 402 (e) of the Immigration and Nationality Act, shall establish that he is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States, in the manner provided by § 334.21 and Part 335b of this chapter.

§ 329.21  *Procedural requirements.* A person of the class described in section 329 or 402 (e) of the act shall submit to the Service an application to file a petition for naturalization on Form N-400. The certification required by section 329 (b) (4) of the act to prove service shall be requested by the applicant on Form

N-426, in triplicate, and submitted with Form N-400. The petition for naturalization shall be filed on Form N-405, in duplicate, in any naturalization court, regardless of the residence of the petitioner. There shall be inserted after averment 10 of Form N-405, at the time of filing thereof, an averment as follows:

I served honorably in an active duty status in _____, under Service No. ___
     (Branch of service)
_____ from _____, 19__, to _____,
19__, and was separated under honorable conditions on _____, 19__. I entered such service at _____, _____
            (City)        (State)

The petition shall be verified by at least two United States citizen witnesses as provided in § 334.21 of this chapter. The petitioner may be naturalized immediately, provided a certificate of examination on Form N-440, in duplicate, is attached to the petition as provided in § 332.12 of this chapter.

---

PART 330—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SEAMEN

Sec.
330.1   Service on vessels after lawful admission for permanent residence; when deemed residence and physical presence in the United States.
330.3   Proof of qualifications.
330.11  Procedural requirements.

AUTHORITY: §§ 330.1 to 330.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 316, 330, 332, 334, 335, 66 Stat. 242, 251, 252, 254, 255; 8 U. S. C. 1427, 1441, 1443, 1445, 1446.

§ 330.1  *Service on vessels after lawful admission for permanent residence; when deemed residence and physical presence in the United States.* Service at any time after lawful admission for permanent residence, whether before or after the effective date of the Immigration and Nationality Act, on board vessels of the classes described in section 330 (a) (1) of the Immigration and Nationality Act, shall under the conditions specified in that section be deemed residence and physical presence within the United States within the meaning of section 316 (a) of the Immigration and Nationality Act.

§ 330.3  *Proof of qualifications—*(a) *Residence and physical presence in the United States.* Except as otherwise provided in this part, a person having the service described in this part shall prove that he has complied with all the applicable provisions of Chapter 2, Title III of the Immigration and Nationality Act, except that proof of residence and physical presence within the United States for the periods of such service shall be made by duly authenticated copies of the records of the executive departments or agencies having custody of the records covering the person's service on vessels of the United States Government, or by certificates from the masters of the vessels if service was on other than vessels of the United States Government, which records or certificates shall describe the vessels and the periods of service, and shall attest that during those periods the person served honorably or with good conduct.

(b) *Character, attachment, and disposition; State residence.* The records or certificates described in paragraph (a) of this section shall be accepted also as proof of good moral character, attachment to the principles of the Constitution, and favorable disposition to the good order and happiness of the United States for that portion of the service performed within the period of five years immediately preceding the date of the petition, as proof of residence within the State in which the petition is filed.

§ 330.11  *Procedural requirements.* A person claiming the benefits of § 330.1 shall submit to the Service an application to file a petition for naturalization, together with Supplemental Form N-400-B, in accordance with the instructions contained therein. The petition for naturalization shall be filed on Form N-405 in duplicate in a naturalization court having jurisdiction over the petitioner's place of residence. There shall be attached to, and made a part of the original and duplicate of, the petition for naturalization at the time of filing an affidavit of the petitioner sworn to before the clerk of court or an officer of the Service, on Form N-421, in duplicate, fully describing the vessel or vessels on which the petitioner has served and the periods of service. The petition shall be verified by at least two United States citizen witnesses, as provided in § 334.21 of this chapter.

---

PART 332—PRELIMINARY INVESTIGATION OF APPLICANTS FOR NATURALIZATION AND WITNESSES

Sec.
332.11  Investigation preliminary to filing petition for naturalization.
332.12  Certificate by examiner whenever petitioner is entitled to immediate hearing.
332.13  Use of record preliminary investigation.
332.14  Notice of proposed recommendation of denial; findings, conclusion, and recommendation.

AUTHORITY: §§ 332.11 to 332.14 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 335, 66 Stat. 252, 255; 8 U. S. C. 1443, 1446.

§ 332.11  *Investigation preliminary to filing petition for naturalization—*(a) *Scope of investigation.* Whenever practicable, each applicant for naturalization and his witnesses shall appear in person before an officer of the Service authorized to administer oaths, prior to the filing of a petition for naturalization, and give testimony under oath concerning the applicant's mental and moral qualifications for citizenship, attachment to the principles of the Constitution, and disposition to the good order and happiness of the United States, the qualifications of the witnesses, and the other qualifications to become a naturalized citizen as required by law. The investigation shall be uniform throughout the United States. During the interrogation of the applicant and at his request, his attorney or representative who has, when required, been admitted to practice in accordance with Part 292 of this chapter, may be permitted to be

*Friday, December 6, 1957*               **FEDERAL REGISTER**                        9817

present and observe the interrogation and makes note but shall not otherwise participate therein.

(b) *Conduct of investigation.* The Service officer, prior to the beginning of the investigation, shall make known to the applicant and the witnesses the official capacity in which he is conducting the investigation. The applicant and such witness shall be questioned under oath separately and apart from one another and apart from the public. The applicant shall be requested as to each assertion made by him in his application to file a petition and in any supplemental form. Whenever necessary, the written answers in the forms shall be corrected by the officer to conform to the oral statements made under oath. The Service officer, in his discretion, may have a stenographic transcript made, or prepare affidavits covering testimony of the applicant or witnesses. The questions to the applicant and the witnesses shall be repeated in different form and elaborated, if necessary, until the officer conducting the investigation is satisfied that the person being questioned fully understands them. At the conclusion of the investigation all corrections made on the application form and supplements thereto shall be consecutively numbered and recorded in the space provided therefor in the applicant's affidavit contained in the form. The affidavit shall then be subscribed and sworn to by the applicant and signed by the Service officer. The witnesses shall be questioned to develop their own credibility and competency as well as the extent of their personal knowledge of the applicant's qualifications to become a naturalized citizen. If the applicant is excepted from the requirement of reading and writing, and speaking English, the questioning, including the examination of the applicant's knowledge and understanding of the Constitution, history, and form of Government of the United States, may be conducted through an interpreter.

§ 332.12 *Certificate by examiner whenever petitioner is entitled to immediate hearing.* The officer or employee conducting the preliminary investigation shall execute a certificate of examination on Form N-440 in duplicate, for attachment to the original and duplicate petitions for naturalization, in any case in which the petitioner, under the provisions of the Immigration and Nationality Act applicable to his case, is entitled to an immediate hearing following examination by a representative of the Service.

§ 332.13 *Use of record of preliminary investigation.* The record of the preliminary investigation, including the executed and corrected application form and supplements thereto, affidavits, transcripts of testimony, documents, and other evidence, shall, in those cases in which a preliminary examination is to be held under Part 335 of this chapter, be submitted to the examiner designated to conduct such examination, for his use in examining the petitioner and witnesses. In those cases in which no preliminary examination is held the recommendation to the naturalization court shall be based upon the record of the preliminary in-

vestigation and such other evidence as may be available.

§ 332.14 *Notice of proposed recommendation of denial; findings, conclusion, and recommendation.* In those cases in which the recommendation to the court is for denial of the petition, and no preliminary examination under Part 335 of this chapter is held, an officer of the Service shall, as soon as practicable after the preliminary investigation has been concluded, prepare a memorandum in behalf of the Service in the manner described in § 335.12 of this chapter, and subject to review by the regional commissioner for presentation to the court at the final hearing. The petitioner shall be given written notice on Form N-425 advising him of the recommendation which will be made to the court and the specific reasons therefor. The notice and a copy of the memorandum shall be sent the petitioner by certified mail, return receipt requested, after review of the recommendation by the regional commissioner, if made, and at least thirty days prior to final hearing. The hearing before the court may be held less than thirty days after such notification if the petitioner agrees thereto.

### Part 332a—Official Forms

Sec.
332a.1  Official forms essential to exercise of jurisdiction.
332a.2  Official forms prescribed for use of clerks of naturalization courts.

Sec.
332a.11  Initial application for official forms.
332a.12  Subsequent application for official forms.
332a.13  Alteration of forms of petitions or applications for naturalization.

Authority: §§ 332a.1 to 332a.13 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 310, 332, 66 Stat. 239, 252; 8 U. S. C. 1421, 1443.

§ 332a.1 *Official forms essential to exercise of jurisdiction.* Before exercising jurisdiction in naturalization proceedings, the naturalization court shall direct the clerk of such court upon written application to obtain from the Service, in accordance with section 310 (c) of the Immigration and Nationality Act, proper forms, records, books, and supplies required in naturalization proceedings. Such jurisdiction may not be exercised until such official forms, records, and books have been supplied to such court. Only such forms as are supplied shall be used in naturalization proceedings. Where sessions of the court are held at different places, the judge of such court may require the clerk to obtain a separate supply of official forms, records and books for each such place.

§ 332a.2 *Official forms prescribed for use of clerks of naturalization courts.* The following described forms only shall be used by clerks of courts having naturalization jurisdiction, in the exercise of such jurisdiction:

| Form No. | Title and description |
|---|---|
| N-3 | Requisition for Forms and Binders. |
| N-4 | Monthly Report—Naturalization Papers forwarded. |
| N-5 | Continuation Sheet of Monthly Report—Naturalization Papers forwarded. |
| N-6 | Jacket for Naturalization Papers. |
| N-7 | Quarterly Abstract of Collections of Naturalization Fees. |
| N-11 | Penalty Envelope (addressed to the Central Office of Service). |
| N-12 | Penalty Envelope (to be addressed to any office of Service). |
| N-13 | Penalty Envelope (large—to be addressed to any office of Service). |
| N-50 | Receipt for Duplicate Petitions. |
| N-300 | Application to File Declaration of Intention. |
| N-315 | Declaration of Intention. |
| N-350 | Application to Renounce Danish Citizenship. |
| N-351 | Renunciation of Danish Citizenship. |
| N-400 | Application to File Petition for Naturalization. |
| N-400A | Supplement to Application to File Petition for Naturalization (under section 324 (a) or 327, Immigration and Nationality Act). |
| N-400B | Supplement to Application to File Petition for Naturalization (by a seaman, under section 330 of the Immigration and Nationality Act). |
| N-401 | Preliminary Form to take Oath of Allegiance (by a woman formerly a citizen, under section 324 (c) of the Immigration and Nationality Act, or the act of June 25, 1936, as amended). |
| N-402 | Application to File Petition for Naturalization in Behalf of a Child (under sections 322 or 323, Immigration and Nationality Act). |
| N-403 | Request to have Petition for Naturalization marked "Void". |
| N-404 | Request for Withdrawal of Petition for Naturalization. |
| N-405 | Petition for Naturalization (under general provisions of the Immigration and Nationality Act). |
| N-405A | Affidavit in Support of Petition for Naturalization (by a former citizen, under section 327 of the Immigration and Nationality Act). |
| N-407 | Petition for Naturalization (in behalf of a child, under section 322 or 323, Immigration and Nationality Act). |
| N-408 | Application to take Oath of Allegiance and Form of such Oath (by a woman formerly a citizen, under section 324 (c), Immigration and Nationality Act, or the Act of June 25, 1936, as amended). |
| N-410 | Motion for Amendment of Petition (application). |
| N-414 | Acknowledgment of Filing Petition for Naturalization. |
| N-421 | Affidavit in Support of Petition for Naturalization (by a seaman, under section 330, Immigration and Nationality Act). |
| N-451 | Affidavits of Witnesses (to Petition for Naturalization). |
| N-455 | Application for Transfer of Petition for Naturalization. |
| N-458 | Application to Correct Certificate of Naturalization. |
| N-480 | Naturalization Petitions Recommended to be Granted. |
| N-480 A | Order of Court granting Petitions for Naturalization. |

AR2022_200149

Form No.                    Title and description
N-481___ Naturalization Petitions Recommended to be Granted (continuation sheet).
N-483___ Naturalization Petitions Recommended to be Continued (and Order of Court).
N-484___ Naturalization Petitions Recommended to be Denied.
N-484 A_ Order of Court denying Petitions for Naturalization.
N-485___ Naturalization Petitions Recommended to be Granted (on behalf of children).
N-486___ Naturalization Petitions Recommended to be Denied (on behalf of children).
N-489___ Certification by Clerk of Court of the taking of Oath of Allegiance.
N-490___ Order of Court Granting Petitions for Naturalization.
N-491___ Order of Court Denying Petitions for Naturalization.
N-492___ Regional Commissioner's Recommendation that Petitions be Granted (and Order of Court).
N-493___ Regional Commissioner's Recommendation that Petitions be Denied (and Order of Court).
N-550___ Certificate of Naturalization.
N-580___ Application for a Certificate of Naturalization or Repatriation (under section 343 (a) of the Immigration and Nationality Act or 12th subdivision, section 4, of Act of June 29, 1906).

§ 332a.11 *Initial application for official forms.* Whenever the initial application for forms, records, books, and supplies is made by a State court of record, it shall be accompanied by a certificate of the Attorney General of the State, certifying that the said court is a court of record, having a seal, a clerk, and jurisdiction in actions at law or in equity, or at law and in equity, in which the amount in controversy is unlimited.

§ 332a.12 *Subsequent application for official forms.* Included with the initial supply of official forms, records, and books furnished to the various courts by the Service shall be Form N-3 entitled "Requisition for Forms and Binders," and thereafter such forms shall be used by clerks of courts in making requisition for forms, records, books, and supplies for use in naturalization proceedings in their respective courts.

§ 332a.13 *Alteration of forms of petitions or applications for naturalization.* The official forms for petitions or applications for naturalization to the court shall be altered by the clerk of the court as follows:

(a) *Insertion of applicable acts or sections of acts.* Whenever the petition form is designed for use under more than one act or more than one section of an act, by inserting under the title of the form the applicable act or section.

(b) *Exemption from residence or physical presence in the United States or State.* Whenever residence or physical presence in the United States or State for any specified period is not required, by striking out the allegations relating thereto and the statements in the affidavits of witnesses as to the period of United States or State residence or physical presence.

(c) *Exemption from lawful admission for permanent residence.* Whenever lawful admission for permanent residence is not required, by striking out the allegations relating thereto.

(d) *Exemption from intention to reside permanently in the United States.* Whenever intention to reside permanently in the United States is not required, by striking out the allegations relating thereto.

(e) *Supplemental affidavits filed with petition for naturalization.* Whenever a supplemental affidavit is filed with the petition, by adding to allegation 18 on Form N-405 "and supplemental affidavit on Form N-_____".

(f) *Oath of allegiance.* Whenever the petitioner or applicant for naturalization is exempt from taking the oath of allegiance prescribed in Part 337 of this chapter in its entirety, by striking from the oath of allegiance the inapplicable clauses.

---

PART 332b—INSTRUCTION AND TRAINING IN CITIZENSHIP RESPONSIBILITIES: TEXTBOOKS, SCHOOLS, ORGANIZATIONS

Sec.
332b.1 Public school instruction and training in citizenship responsibilities of applicants for naturalization.
332b.2 Sending names of candidates for naturalization to the public schools.
332b.3 Federal citizenship textbooks.
332b.4 Public school certificates as evidence of petitioner's educational progress.
332b.5 Cooperation with official National and State organizations.

AUTHORITY: §§ 332b.1 to 332b.5 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 346, 66 Stat. 252, 268; 8 U. S. C. 1443, 1457.

§ 332b.1 *Public school instruction and training in citizenship responsibilities of applicants for naturalization.* The Central Office and the field offices of the Service shall cooperate with appropriate authorities or organizations in the establishment and maintenance of classes within or under the supervision of the public schools for the preparation of naturalization applicants for their citizenship duties and responsibilities. Field officers shall visit such classes when practicable. Should applicants for naturalization who desire such preparation live in remote localities where the establishment of a class is impracticable, field officers shall communicate with the appropriate representative of the public schools for the purpose of making other suitable arrangements, if possible, for their instruction.

§ 332b.2 *Sending names of candidates for naturalization to the public schools.* Arrangements shall be made with the public schools by which the names and addresses of applicants for naturalization will be made available to such schools for the purpose of interesting applicants in attending public school classes in preparation for citizenship duties and responsibilities.

§ 332b.3 *Federal citizenship textbooks.* Citizenship textbooks, for the free use of applicants for naturalization

receiving instruction in or under the supervision of the public schools in preparation for citizenship, shall be prepared and distributed by the Service to the appropriate representatives of the public schools upon their signed requisitions therefor.

§ 332b.4 *Public school certificates as evidence of petitioner's educational progress.* Public school certificates attesting the attendance and progress records of petitioners for naturalization in citizenship classes shall be given weight by naturalization officers in determining the petitioner's knowledge and understanding of the fundamentals of the history, and of the principles and form of government of the United States, and his ability to read, write, and speak English, provided that approval of the courses of instruction, teaching, and examinations of the public schools issuing such certificates is given by the district director and the naturalization courts.

§ 332b.5 *Cooperation with official National and State organizations.* The Central Office and the field offices shall take steps to obtain the aid of and to cooperate with official National and State organizations in the Service's program of promoting instruction and training of applicants for naturalization for their citizenship duties and responsibilities. Similar action shall be taken in relation to duly accredited unofficial educational, social service, welfare, and other organizations having as one of their objects the preparation of applicants for naturalization for their citizenship duties and responsibilities.

---

PART 332c—PHOTOGRAPHIC STUDIOS

§ 332c.1 *Establishment of welfare photographic studios.* District directors shall, after investigation, make reports and recommendations to the Commissioner concerning the desirability of the establishment and operation by welfare organizations, without profit, of photographic studios, solely for the benefit of persons seeking to comply with the requirements of the immigration and naturalization laws. Quarters for such purpose must be in a building occupied by the Service, and be conducted under the supervision of the Commissioner. Such welfare organizations shall submit an annual accounting to the Commissioner of the conduct of such studio.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies sec. 332, 66 Stat. 252; 8 U. S. C. 1443).

---

PART 332d—DESIGNATION OF EMPLOYEES TO ADMINISTER OATHS AND TAKE DEPOSITIONS

§ 332d.1 *Designation of employees to administer oaths and take depositions.* All immigration officers and other officers or employees of the Service of an equal or higher grade are hereby designated to administer oaths and take depositions in matters relating to the administration of the naturalization and citizenship laws. In addition, such other employees as may be designated by a district director are hereby authorized to administer oaths.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies sec. 332, 66 Stat. 252; 8 U. S. C. 1443).

---

### PART 333—PHOTOGRAPHS

Sec.
333.1  Description of required photographs.
333.2  Attachment of photographs to documents.

AUTHORITY: §§ 333.1 and 333.2 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 333, 334, 66 Stat. 252, 253, 254; 8 U. S. C. 1443, 1444, 1445.

§ 333.1 *Description of required photographs.* Every applicant required to furnish photographs of himself under this subchapter shall submit three identical photographs which shall be 2 by 2 inches in size, unmounted, printed on a thin paper, have a light background, clearly show a full front view of the features of the applicant with head bare (unless the applicant is wearing a headdress as required by a religious order of which he is a member), with the distance from the top of the head to point of chin approximately 1¼ inches, and which shall have been taken within 30 days of the date they are furnished. The applicant, except in the case of a child or other person physically incapable of signing his name, shall sign each copy of the photograph with his full true name, in such manner as not to obscure the features. The signature shall be by mark if the applicant is unable to sign his name. If the applicant is a prospective petitioner for naturalization, the photographs shall be signed by him in the English language, unless the applicant is of the class exempted from signing a petition for naturalization in the English language, as provided by § 334.13 of this chapter, in which case the photographs may be signed in any language. In the case of a child unable to sign its name, the photographs shall be signed by the parent, parents, or guardian as may be appropriate, and the signature shall read "(insert name of parent, parents, or guardian) in behalf of (insert name of child)." The photographs shall be signed when submitted with an application if the instructions accompanying the application so require. If the instructions do not so require the photographs shall be submitted without being signed and shall be signed at such later time during the processing of the application as may be appropriate.

§ 333.2 *Attachment of photographs to documents.* There shall be securely and permanently attached to each original and duplicate certificate of naturalization and to each duplicate and triplicate declaration of intention issued by any clerk of court, and to each copy of a declaration of intention, certificate of naturalization or certificate of citizenship issued by the Service, a signed photograph of the applicant. In each case in which a seal is affixed, the imprint of a part of the seal shall be affixed so as to extend over the lower portion of the photograph in such manner as not to obscure the features of the applicant.

### PART 334—PETITION FOR NATURALIZATION

Sec.
334.1  Right to file petition or application for naturalization.

Sec.
334.2  Oath or affirmation of petitioner and witnesses.
334.3  Petitions for naturalization; numbering, indexing, binding.
334.11  Petition for naturalization and preliminary application.
334.12  Notification to appear for preliminary investigation and to file petition for naturalization.
334.13  Filing of petition for naturalization.
334.14  Investigation and report if applicant is sick or disabled.
334.15  Void petitions for naturalization.
334.16  Amendment of petition or application for naturalization.
334.17  Transfer of petition for naturalization.
334.18  Withdrawal of petition and failure to prosecute.
334.21  Verification of petition for naturalization; administration of oath.

AUTHORITY: §§ 334.1 to 334.21 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 334, 335, 66 Stat. 252, 254, 255; 8 U. S. C. 1443, 1445, 1446.

§ 334.1 *Right to file petition or application for naturalization.* No person shall be denied the right to apply for naturalization in accordance with the procedure prescribed in this subchapter to any court authorized to exercise naturalization jurisdiction.

§ 334.2 *Oath or affirmation of petitioner and witnesses.* The petition for naturalization shall be executed under the following oath (or affirmation) : "You do swear (affirm) that you know the contents of this petition for naturalization subscribed by you, and that the same are true to the best of your knowledge and belief."

The following oath (or affirmation) shall be administered to each of the witnesses who verify the petition: "You do swear (affirm) that the statements of fact you have made in the affidavits to this petition for naturalization subscribed by you are true to the best of your knowledge and belief."

§ 334.3 *Petitions for naturalization; numbering, indexing, binding.* Petitions for naturalization shall be numbered consecutively in the order in which they are filed, shall be filed chronologically in separate volumes, indexed, and made a part of the records of the naturalization court. Each such volume shall, upon completion, be permanently bound by the clerk of court. Whenever a petitioner's name has been changed by order of court the original and the changed name shall be entered by the clerk of court in the index of petitions for naturalization.

§ 334.11 *Petition for naturalization and preliminary application.* Except as otherwise provided in this subchapter, a person who has attained the age of eighteen years and who desires to apply for naturalization, shall make and file, in accordance with the provisions of this part, a sworn petition for naturalization, in duplicate. Such person shall, before filing the petition for naturalization, execute and submit to the Service preliminary application to file a petition for naturalization, Form N–400, in accordance with the instructions contained therein.

§ 334.12 *Notification to appear for preliminary investigation and to file pe-*

*tition for naturalization.* Following the submission of the preliminary application, the applicant shall be notified when and where to appear with his witnesses for preliminary investigation, as described in Part 332 of this chapter, and to file the petition for naturalization.

§ 334.13 *Filing of petition for naturalization.* The petition for naturalization and the duplicate copy thereof shall be filed by the petitioner, in person, with the clerk of the court or his authorized deputy and only in the office of the clerk, except that an applicant for naturalization who satisfactorily establishes that he is prevented by sickness or other disability from appearing in the office of the clerk, may file the petition for naturalization at such other place as may be designated by the clerk of court or his authorized deputy. Except as otherwise provided in this subchapter, the petition shall be on Form N–405 and shall contain an averment that it is the intention of the petitioner to reside permanently in the United States. The petition shall be signed by the petitioner in the English language, if physically able to write, unless the petitioner on December 24, 1952 was over fifty years of age and had been living in the United States for at least twenty years, in which case the petitioner may sign his name in any language. When the petition has been so filed, the clerk shall furnish to the petitioner an acknowledgment of the filing of the petition on Form N–414. The petitioner shall pay the clerk of the naturalization court, at the time the petition is filed, a fee of $10, unless the petitioner is exempt therefrom by section 344 (h) of the Immigration and Nationality Act.

§ 334.14 *Investigation and report if applicant is sick or disabled.* Whenever it appears that an applicant for naturalization may be unable, because of sickness or other disability, to present himself in the office of the clerk of a naturalization court to file a petition for naturalization, the district director shall cause an investigation to be conducted to determine the circumstances, and shall report the condition of the applicant to the clerk of court for the purpose of aiding the court to determine whether the clerk of court shall designate another place to file a petition for naturalization. The report shall show whether the sickness or disability is of a nature which so incapacitates the applicant as to prevent him from appearing personally in the office of the clerk of court.

§ 334.15 *Void petitions for naturalization.* If a petition for naturalization filed with the clerk of court is materially defective on its face, it shall nevertheless remain a part of the records of the court and the duplicate thereof disposed of, and the fee accounted for, in accordance with the provisions of Part 339 of this chapter. The Service shall inform the petitioner of the defect and the desirability of having the petition marked "Void" in order that the fee may be refunded or credited to the filing of another petition. If the petitioner desires to have the defective petition submitted to the court for a judicial ruling in lieu of having it marked "Void", no refund of

AR2022_200151

## RULES AND REGULATIONS

the fee shall be made. A request by the petitioner that his petition be marked "Void" shall be made on Form N–403, in duplicate, and submitted to the district director. If the request is approved by the district director the original shall be furnished the clerk of court for attachment to the petition and the clerk of court shall mark the petition "Void". The duplicate shall be retained in the field office file.

§ 334.16  *Amendment of petition or application for naturalization*—(a) *During pendency of petition or application.* An application to amend a petition or application for naturalization, while such application or petition is pending, shall be made by the petitioner or applicant on Form N–410, with copies thereof equal to the number of copies of the petition or application for naturalization, and presented to the court at the hearing on the petition or application for naturalization. When the court orders the petition or application amended, the original order shall be filed with the original petition or application and the copies attached to the respective copies of the petition or application.

(b) *After final action on petition or application.* Whenever an application is made to the court to amend a petition or application for naturalization after final action thereon has been taken by the court, a copy of the application shall be served upon the district director having administrative jurisdiction over the territory in which the court is located, in the manner and within the time provided by the rules of court in which application is made. A representative of the Service may appear at the hearing upon such application and be heard in favor of or in opposition thereto. When the court orders the petition amended, the clerk of court shall transmit a copy of the order to the district director for inclusion in the Service file.

§ 334.17  *Transfer of petition for naturalization*—(a) *Application for transfer.* A petitioner for naturalization who removes from the jurisdiction of the court in which his petition for naturalization is pending, may make application to the court on Form N–455, in quadruplicate, for transfer of the petition to a naturalization court having jurisdiction over his place of residence, or, if the petition was not required to be filed in a naturalization court having jurisdiction over his place of residence, to any other naturalization court exercising naturalization jurisdiction. The application shall be submitted, in accordance with the instructions contained therein, to the district director exercising administrative jurisdiction over the place where the court in which the petition is filed is located.

(b) *Action by district director.* If the district director consents to the transfer, he shall so indicate on each copy of Form N–455, which shall be filed with the clerk of court in which the petition is pending. If the district director does not consent to the transfer he shall so indicate on each copy of Form N–455 which shall be filed with the clerk of court, with a memorandum of the district director setting forth the reasons for the denial. The applicant shall be notified by the district director of the filing of Form N–455 with the clerk of court, and whether consent has been given by the district director.

(c) *Action by court in which petition is filed.* The court in which the petition is filed shall enter an order on Form N–455, in quadruplicate, approving or disapproving the application. If the application is approved, the original Form N–455 shall be filed with the naturalization record in the office of the clerk of court, the duplicate and triplicate copies, duly attested and certified, transmitted to the court to which the petition is to be transferred, and the quadruplicate copy transmitted to the district director. If the application is disapproved, the original Form N–455 shall be filed with the naturalization record in the office of the clerk of court and the remaining copies transmitted to the district director who shall notify the applicant of the disapproval.

(d) *Action by court to which petition is transferred.* The court to which the petition is to be transferred shall enter an order on the duplicate and triplicate copies of Form N–455, approving or disapproving the transfer. The duplicate copy shall be filed with the clerk of the court to which the petition is to be transferred, and the triplicate copy, duly attested and certified, transmitted to the clerk of the court in which the petition is filed. If the application is disapproved, the clerk of court receiving the triplicate copy shall notify the district director who shall notify the applicant of the disapproval.

(e) *Transfer of petition and record.* If the court to which the petition is to be transferred approves the transfer, the clerk of court in which the petition is filed shall file the triplicate copy of Form N–455 with the naturalization record and forward a certified copy of the petition, and the originals of all documents filed relating thereto, to the court to which the petition is being transferred, and notify the district director having administrative jurisdiction over the place in which the petition is filed, of the action taken. Upon receipt of the certified copy and record, the clerk of court to which the petition is transferred shall index it, number it consecutively in the order in which it is received, prefixed by the letters TR, and in a series separate from petitions originally filed in the court. The petition shall be made a part of the record of the naturalization court. No fee shall be charged by the clerk of the court to which the petition is transferred for the filing of the transferred petition or the issuance of a certificate of naturalization.

§ 334.18  *Withdrawal of petition and failure to prosecute.* (a) A petitioner who desires to withdraw his petition for naturalization after the filing thereof shall make request for withdrawal on Form N–404, in duplicate. The original shall be filed with the clerk of court and the duplicate with the office of the Service exercising administrative jurisdiction over the district in which the court is located. At the final hearing upon the petition, the officer in attendance shall inform the court whether the district director consents to the withdrawal of the petition. In cases in which the district director does not consent to the withdrawal, the court shall determine the petition on its merits.

(b) At the final hearing upon a petition for naturalization which the petitioner has failed to prosecute, the officer in attendance shall inform the court whether the district director consents to dismissal of the petition for lack of prosecution. In cases in which the district director does not move that the petition be dismissed for lack of prosecution, the court shall determine the petition on its merits.

§ 334.21  *Verification of petition for naturalization; administration of oath.* Every petition for naturalization shall, before it is filed, be verified by the petitioner, and by the affidavits of two credible witnesses, citizens of the United States, who shall appear in person either before a designated examiner or before the clerk of the court or his authorized deputy. Any such officer shall administer the required oaths to the petitioner and the witnesses. The witnesses shall sign the affidavits. The witnesses shall have and aver knowledge of the petitioner as to each place of his residence in the State where he is residing during the period of at least six months immediately prior to the filing of the petition unless the petitioner is exempted from the usual State residence requirement. If the petitioner has resided at two or more places in the State during the required six-month period and for this reason two witnesses cannot be procured to verify the petition as to all such residence, additional witnesses may be used and their affidavits shall be executed, in duplicate, on Form N–451, one copy of which shall be attached to the original petition and the other to the duplicate petition at the time of filing the petition. The witnesses shall state in their affidavits that they personally know that the petitioner is and has been a resident at such place for such period, the length of the petitioner's physical presence in the United States during such period, and that the petitioner is and has been during all such period of residence a person of good moral character, attached to the principles of the Constitution of the United States, well disposed to the good order and happiness of the United States, and in all respects qualified to become a citizen of the United States. If the petitioner is exempted from the usual State residence requirement, the witnesses shall state in their affidavits the period of time that they have personally known the petitioner to have been resident and physically present in the United States, and that such petitioner is, and, for the period required by the naturalization provisions applicable to the case, has been, a person of good moral character, attached to the principles of the Constitution of the United States, well disposed to the good order and happiness of the United States, and in all respects qualified to become a citizen of the United States.

AR2022_200152

PART 334a—DECLARATION OF INTENTION

Sec.
334a.11  Preliminary form for declaration of intention.
334a.12  Notification to applicant.
334a.13  Filing of declaration of intention.
334a.14  Execution and fee.
334a.15  Disposition.
334a.16  Declaration of intention; numbering, indexing, binding.

AUTHORITY: §§ 334a.11 to 334a.16 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 334, 339, 344, 66 Stat. 252, 254, 259, 264; 8 U. S. C. 1443, 1445, 1450, 1455.

§ 334a.11  *Preliminary form for declaration of intention.* Each prospective declarant shall, before making and filing a declaration of intention, submit to the Service an application therefor on Form N-300 in accordance with the instructions contained therein. The application may be submitted at any time after the applicant has been lawfully admitted for permanent residence and has attained the age of eighteen years.

§ 334a.12  *Notification to applicant.* Following approval of the application by the Service, the applicant shall be notified when and where to appear to make and file the declaration of intention.

§ 334a.13  *Filing of declaration of intention.* A clerk of court or his authorized deputy shall not accept a declaration of intention for filing, unless and until there shall have been received from the Service the applicant's approved Form N-300 authorizing the issuance of the declaration and showing that the applicant is residing in the United States pursuant to a lawful admission for permanent residence.

§ 334a.14  *Execution and fee.* The declaration of intention shall be executed by the alien under oath on Form N-315, in triplicate, before the clerk of any court exercising naturalization jurisdiction or his authorized deputy, regardless of the place of residence of the applicant, and only in the office of said clerk. The applicant may sign the declaration and the photographs affixed thereto in any language, or by mark if unable to write. The declarant shall pay the clerk of court, at the time the declaration of intention is filed, the statutory fee of $5.

§ 334a.15  *Disposition.* The original declaration of intention shall be retained and filed of record by the clerk of court, and the triplicate delivered forthwith to the alien. The duplicate, with Form N-300, shall be forwarded to the appropriate district director on the first day of the month following the month in which the declaration is filed, in accordance with § 339.2 of this chapter for inclusion in the declarant's file.

§ 334a.16  *Declaration of intention; numbering, indexing, binding.* Declarations of intention shall be numbered consecutively in the order in which they are filed in a series separate from petitions. They shall be filed chronologically in separate volumes, indexed, and made a part of the records of the naturalization court.

PART 335—PRELIMINARY EXAMINATION ON PETITIONS FOR NATURALIZATION

Sec.
335.11  Preliminary examination pursuant to section 335 (b) of the Immigration and Nationality Act.
335.12  Recommendations of the designated examiner and the regional commissioner; notice.
335.13  Notice of recommendation of designated examiner.

AUTHORITY: §§ 335.11 to 335.13 issued under sec. 103. 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 335, 66 Stat. 252, 255; 8 U. S. C. 1443, 1446.

§ 335.11  *Preliminary examination pursuant to section 335 (b) of the Immigration and Nationality Act*—(a) *When held.* Preliminary examinations shall be open to the public, and shall, where practicable, be held immediately after the petition for naturalization is filed with the clerk of the court unless, in the opinion of the district director, the interests of good administration would be better served by holding such examinations prior to the filing of the petition in the office of the clerk of court, but in no event shall such examinations be held before the petition has been properly executed by the petitioner and his verifying witnesses.

(b) *Conduct of examination.* Preliminary examinations shall be held before an employee of the Service, designated by the district director to conduct such proceedings and to make findings and recommendations thereon to the naturalization court, who shall be known as the "designated examiner." The petitioner and his witnesses and the witnesses produced on behalf of the Government shall be present. The designated examiner shall, prior to the commencement of the examination, make known to the petitioner his official capacity and that of any other officer of the Service who may participate in the proceeding. The designated examiner shall have before him the entire record of the preliminary interrogation, including the petitioner's application to file a petition for naturalization (Form N-400) and any other evidence or data that may be relevant or material to the inquiry. All testimony taken at the examination shall be under oath or affirmation administered by the designated examiner. The designated examiner may interrogate the petitioner and witnesses produced in behalf of the petitioner or the Government, and present evidence touching upon the petitioner's admissibility to citizenship. He shall regulate the course of the examination, rule upon applications for the issuance of subpenas and issue such subpenas in proper cases, grant or deny continuances, and rule on all objections to the introduction of evidence, which rulings shall be entered on the record. Evidence held by the designated examiner to be inadmissible shall nevertheless be received into the record subject to the ruling of the court. The petitioner and the Government shall have the right to present such oral or documentary evidence and to conduct such cross-examination as may be required

for a full and true disclosure of the facts. If the petitioner is not represented by an attorney or representative, the designated examiner shall assist the petitioner in the introduction of all evidence available in his behalf. All documentary or written evidence shall be properly identified and introduced into the record as exhibits by number, unless read into the record.

(c) *Assignment of examining officer at preliminary examination.* The district director may in his discretion assign an employee of the Service to act as examining officer at the preliminary examination. Such employee shall examine and cross-examine witnesses produced in behalf of the Government or the petitioner and present evidence pertinent to the petitioner's admissibility to citizenship. The designated examiner may take such part in the interrogation of the petitioner and witnesses and the introduction of evidence as he may deem necessary.

(d) *Stenographic reporting of proceedings; mechanical recording equipment.* A stenographer shall be in attendance whenever, in the opinion of the designated examiner, such attendance is desirable, and in every case to which an examining officer is assigned. The stenographer shall record verbatim the entire proceedings, including the oaths administered and rulings on objections, but shall not record arguments in support of objections, or statements made off the record with the consent of the petitioner. The stenographer shall certify that the transcribed minutes constitute a complete and accurate record of the examination. Whenever, in the opinion of the designated examiner the use of mechanical recording equipment in lieu of a stenographer is deemed desirable, the proceedings may be recorded by such equipment.

(e) *Issuance of subpenas; attendance and mileage fees.* Subpenas requiring the attendance of witnesses or the production of documentary evidence, or both, may be issued by the designated examiner, upon his own volition or upon written application of the petitioner or his attorney or representative, the examining officer, or the Service. Such written application shall specify, as nearly as may be, the relevance, materiality, and scope of the testimony or documentary evidence sought and show affirmatively that the testimony or documentary evidence cannot otherwise be produced. Subpenas shall be issued on Form I-138 and due record shall be made of their service. The subpena may be served by any person over 18 years of age, not a party to the case, designated to make such service by the district director. Mileage and fees for witnesses subpenaed under this section shall be paid by the party at whose instance the subpena is issued at rates allowed and under conditions prescribed by the naturalization court in which the petition is pending. Before issuing a subpena the designated examiner may require a deposit of an amount adequate to cover the fees and mileage involved. If the witness subpenaed neglects or refuses to testify or pro-

AR2022_200153

duce documentary evidence as directed by the subpena, the district director shall request the United States Attorney for the proper district to report such neglect or refusal to any court exercising naturalization jurisdiction and to file a motion in such court for an order directing the witness to appear and testify and to produce the documentary evidence described in the subpena.

(f) *Briefs.* At the conclusion of the preliminary examination the petitioner or his attorney or representative, and the examining officer if one was assigned, may submit briefs in support of arguments made or issues raised at the examination.

(g) *Representation by attorney or representative; absence of representative; advice to petitioner.* The petitioner may be represented by an attorney or a representative who has, where required, been admitted to practice before the Service in accordance with Part 292 of this chapter. If at any stage of the preliminary examination it appears to the designated examiner that he may recommend denial of the petition, or granting thereof with the facts to be presented to the court, he shall advise the petitioner of his right to be represented by an attorney or representative. A continuance of the examination shall be granted upon the petitioner's motion for the purpose of obtaining an attorney or representative. The petitioner's attorney or a representative shall be permitted to be present at all times during the preliminary examination or at any subsequent examinations and the petitioner shall not in any such examination or subsequent examinations be interrogated in the absence of his attorney or representative, unless the petitioner waives such appearance. The attorney or a representative shall be permitted to offer evidence to meet any evidence presented or adduced by the Government or the designated examiner. A petitioner who is not represented by an attorney or a representative shall be entitled to all the benefits and the privileges provided for in this section.

(h) *Designation of Service employees to conduct preliminary examinations.* All employees of the Service who have been designated to conduct preliminary examinations upon petitions for naturalization to any naturalization court and to make findings and recommendations thereon to such courts under the provisions of section 333 of the Nationality Act of 1940, as amended, and whose designations are still in force on December 24, 1952, are hereby designated under the provisions of section 335 of the Immigration and Nationality Act to conduct preliminary examinations upon petitions for naturalization to any naturalization court and to make findings and recommendations thereon to such courts. Designations under this paragraph and under paragraph (b) of this section shall remain in force until revoked.

§ 335.12   *Recommendations of the designated examiner and the regional commissioner; notice.* The designated examiner shall, as soon as practicable after conclusion of the preliminary ex-

amination, prepare an appropriate recommendation thereon for the court. If the designated examiner is of the opinion that the petition should be denied, or that the petition should be granted but the facts should be presented to the court, he shall prepare a memorandum containing a summary of the examination, findings of fact and conclusions of law, and his recommendation as to the final disposition of the petition by the court, and shall before final hearing, in those cases designated by the regional commissioner, submit the memorandum to him for his views and recommendation. No evidence dehors the record or evidence that would not be admissible in judicial proceedings under recognized rules of evidence shall be considered in the preparation of the memorandum. The regional commissioner shall return the designated examiner's memorandum, the record, and any memorandum prepared by the regional commissioner containing his own views and recommendation for presentation to the court.

§ 335.13   *Notice of recommendation of designated examiner—*(a)   *Recommendation that petition be denied.* When the designated examiner proposes to recommend denial of the petition, the petitioner or his attorney or representative shall be notified thereof on Form N-425 and furnish a copy of the designated examiner's memorandum. The notice shall be sent by certified mail, with return receipt requested, after any review made by the regional commissioner and at least thirty days prior to final hearing. The petitioner shall inform the Service in writing within thirty days from the date of the notice whether he desires a hearing before the court.

(b) *Recommendation that petition be granted.* When the designated examiner proposes to recommend granting of the petition and to present the facts and issues to the court, the petitioner or his attorney or representative shall be notified of the recommendation and furnished a copy of the designated examiner's memorandum prior to the date of the hearing, and after any review made by the regional commissioner.

(c) *Disagreement between recommendations of designated examiner and the regional commissioner.* In those cases reviewed by the regional commissioner in which his views and recommendations do not agree with those of the designated examiner, the notice required by paragraphs (a) and (b) of this section shall also advise the petitioner of the recommendation of the regional commissioner and that both recommendations will be presented to the court. There shall also be enclosed with such notice a copy of the regional commissioner's memorandum.

PART 335a—TRANSFER, WITHDRAWAL AND FAILURE TO PROSECUTE PETITION FOR NATURALIZATION

Sec.
335a.11   Transfer of petition; procedure.
335a.12   Withdrawal of or failure to prosecute petition; procedure.

§ 335a.11   *Transfer of petition; procedure.* See § 334.17 of this chapter.

§ 335.12   *Withdrawal of or failure to prosecute petition; procedure.* See § 334.18 of this chapter.

PART 335b—PROOF OF QUALIFICATIONS FOR NATURALIZATION: WITNESSES; DEPOSITIONS

Sec.
335b.1   Proof of residence and other qualifications.
335b.11   Substitution of witnesses; procedure.
335b.12   Depositions; procedure.

AUTHORITY:   §§ 335b.1 to 335b.12 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 267, 316, 332, 335, 336, 405, 66 Stat. 233, 242, 252, 255, 257, 280; 8 U. S. C. 1357, 1427, 1443, 1446, 1447, 1101 note.

§ 335b.1   *Proof of residence and other qualifications—*(a)   *Whenever State residence is required.* At the preliminary examination upon the petition for naturalization before a designated examiner, or if no preliminary examination is held, at the final hearing before the court, residence in the State in which the petitioner resides at the time of filing the petition, for at least six months immediately preceding the date of filing the petition and the other qualifications required by section 316 (a) of the Immigration and Nationality Act during such residence, shall be proved only by the oral testimony of two credible witnesses, citizens of the United States. Residence and other qualifications required by section 316 (a) of the Immigration and Nationality Act, for the period prior to such six-month period shall be proved either by depositions taken in accordance with § 335b.12 or by the oral testimony of at least two credible witnesses, citizens of the United States. If oral testimony is taken from witnesses who did not verify the petition, affidavits on Form N-451 shall be executed by such other witnesses, in duplicate, before the clerk of the court or the designated examiner, one copy of which shall be attached to the original petition and the other to the duplicate petition.

(b) *Whenever State residence is not required.* In any case in which State residence is not required to be established, the petitioner shall, at the preliminary examination before the designated examiner, or if no preliminary examination is held, at the final hearing before the court, prove his residence within the United States and the other qualifications required by section 316 (a) of the Immigration and Nationality Act, for such period as they have known the petitioner, by the oral testimony of two credible witnesses, citizens of the United States. That portion of the time during which the petitioner is required to establish residence within the United States and the other qualifications required by section 316 (a) of the Immigration and Nationality Act, which is not covered by the oral testimony of such witnesses, shall be proved either by depositions taken in accordance with § 335b.12, or by the oral testimony of at least two credible witnesses, citizens of the United States. If oral testimony is taken from witnesses who did not verify the petition, affidavits on Form N-451 shall be executed by them

and filed in the manner described in paragraph (a) of this section.

(c) *Whenever petitioner is absent from the United States.* A petitioner who has been granted the benefits of section 316 (b) of the Immigration and Nationality Act or section 307 (b) of the Nationality Act of 1940 to cover his absence from the United States for the purposes specified in that section shall not be required to establish his qualifications under section 316 (a) of the Immigration and Nationality Act for the period of his absences by the testimony of witnesses, as required by this part. The qualifications during such period may be established by any evidence satisfactory to the naturalization court.

(d) *Witnesses excused from final hearing.* If the testimony of the witnesses is heard at a preliminary examination under Part 335 of this chapter the witnesses may be excused by the designated examiner from appearance before the court at the final hearing, unless the petitioner otherwise demands or the court otherwise requires.

§ 335b.11 *Substitution of witnesses; procedure.* If the witnesses who verified the petition have not been excused from appearance at the final hearing and the petitioner is unable to produce such witnesses, other witnesses may be presented in their stead, upon notice given by the petitioner to the district director, within a reasonable time in advance of the date set for final hearing. If any of the verifying witnesses appear to be incompetent and the petitioner has acted in good faith in producing such witnesses, other witnesses may be substituted upon notice given in the manner described in this section. In no case shall a final hearing be held until after the substitute witnesses have been examined by the representative of the Service and an affidavit on Form N-451 has been executed in duplicate by the witnesses before such representative or the clerk of the court in the manner described in § 335b.1 (a).

§ 335b.12 *Depositions; procedure—* (a) *In the United States.* Depositions may be used to prove compliance with the requirements for naturalization during any period except the minimum period of State residence. Such depositions shall be taken only upon written interrogatories on Form N-462A. Except as otherwise provided in this section, they shall be made in the United States before an employee of the Service authorized to administer oaths and take depositions under Part 332d of this chapter, unless there is a likelihood of unusual delay or hardship, in which case the district director may authorize such depositions to be taken before a postmaster, without charge, or before a notary public or other person authorized to administer oaths for general purposes. In cases in which the depositions are taken other than before an employee of the Service or a postmaster, the petitioner, independently of the Service shall arrange with the officer who will take the depositions to defray all costs and expenses incident thereto. The petitioner or his attorney or representative may be present when the depositions are taken. Depositions taken under this section

shall be sent to the district director having administrative supervision over the territory in which the petition is pending and by him forwarded to the clerk of the naturalization court prior to the final hearing, for filing with the petition.

(b) *Outside the United States.* Petitioners for naturalization who, under sections of the Immigration and Nationality Act applicable to their cases, are exempt from the usual requirement of residence and physical presence in the United States, but who are required to establish good moral character, attachment to the principles of the Constitution, and favorable disposition to the good order and happiness of the United States for the period applicable to their cases, and who were absent from or were not residents of the United States during such period, may establish their qualifications during the period of absence by depositions taken outside the United States in the manner described in paragraph (a) of this section. Such depositions shall be taken before any employee of the United States designated for that purpose by the Commissioner. The petitioner shall be informed that he will be required to defray all costs and expenses of the person taking the depositions, as may be authorized by law and that the petitioner shall arrange with the deponents for the payment of such costs and expenses independently of the Service.

---

PART 335c—INVESTIGATIONS OF PETITIONERS FOR NATURALIZATION

§ 335c.1 *Investigations; authority to waive.* The authority to waive personal investigations of petitioners for naturalization under the provisions of section 335 (a) of the Immigration and Nationality Act may be exercised by district directors.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies secs. 316, 319, 322, 323, 328, 332, 335, 66 Stat. 242, 244, 246, 249, 252, 255; 8 U. S. C. 1427, 1430, 1433, 1434, 1439, 1443, 1446)

---

PART 336—PROCEEDINGS BEFORE NATURALIZATION COURT

Sec.
336.11 Notice to Service; personal representation of Government at naturalization proceedings.
336.12 Written report in lieu of personal representation.
336.13 Preparation of lists and orders of court for presentation at final hearing.
336.14 Presentation of recommendations of designated examiner and the regional commissioner at final hearing.
336.15 Final hearing; sickness or disability of petitioner; investigation.
336.16 Final hearing; waiver of 30-day period.
336.17 Substitution of witnesses; procedure.

AUTHORITY: §§ 336.11 to 336.17 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 335–337, 66 Stat. 252, 255, 257, 258; 8 U. S. C. 1443, 1446–1448.

§ 336.11 *Notice to Service; personal representation of Government at naturalization proceedings.* At least thirty days prior to the holding of any naturalization proceedings referred to in section 336 (d) of the Immigration and Na-

tionality Act, the clerk of the naturalization court shall give written notice to the appropriate district director of the time, date, and place of such proceedings. Such notice may be waived by the district director. Final naturalization hearings or other naturalization proceedings shall, whenever practicable, be attended personally by naturalization examiners or other members of the Service, who shall present to the court the views and recommendations of the designated examiner and the regional commissioner, as appropriate. In those cases in which the recommendation of the regional commissioner does not agree with that of the designated examiner, a member of the Service other than the person who conducted the preliminary examination shall, whenever practicable, represent the Service before the court. Such representative may cross-examine the petitioner and his witnesses and may call other witnesses and produce evidence concerning any matter affecting the petitioner's eligibility for naturalization. In cases in which it appears to be necessary, the representative in attendance at the proceedings, shall have a stenographic report made of the testimony given in the proceedings.

§ 336.12 *Written report in lieu of personal representation.* In any case in which a preliminary investigation or preliminary examination has been conducted pursuant to Part 332 or Part 335 of this chapter, and it is impracticable thereafter for a representative of the Service to be present at the final naturalization hearing, written notice of that fact shall be given by the Service to the court. The petitions set down for hearing shall be listed on the appropriate form prescribed by § 336.13. The grounds for objection, if any, shall be supported by the memoranda required by §§ 335.12 and 332.14 of this chapter. If continuance of the petition is desired, the basis therefor shall be set forth. The forms and memoranda shall be transmitted to the clerk of court, who shall submit the appropriate lists and orders to the court, in accordance with the procedure described in § 336.13.

§ 336.13 *Preparation of lists and orders of court for presentation at final hearing.* (a) At or prior to the final naturalization hearing the representative attending the hearing shall submit to the court lists and orders of court, in duplicate, on Forms N-480, N-480A, N-481, N-485, N-490, or N-492, as appropriate, for petitions recommended to be granted; on Form N-483 for petitions recommended to be continued; and on Forms N-484, N-484A, N-486, N-491, or N-493, as appropriate, for petitions recommended to be denied. The regional commissioner's list on Form N-492 or Form N-493, as appropriate, shall be signed by the district director. After the final hearing, and after any required amendments therein have been made, the presiding judge shall sign the orders of court.

(b) In any case in which a petitioner is not permitted to take the oath of allegiance until a fixed date following a general election, the order of court granting the petition shall be amended

by striking therefrom the words "and each having taken the oath of allegiance required by the naturalization laws and regulations" and inserting immediately following the word "America" the words "as of the date of and upon the taking of the oath of allegiance required by the naturalization laws and regulations at a date subsequent to ____ 19___." Following the taking of the oath of allegiance after a general election, pursuant to such amended order, the clerk of court shall prepare a list, in duplicate, on Form N–489, certifying that such oath was taken.

(c) When the court waives the taking of the oath of allegiance in the case of a child, the order of court granting the petition shall be amended by striking therefrom the words "each having taken" and inserting immediately following the word "regulations", a comma and the words "having been waived."

(d) The originals of all court orders and lists specified in this section shall be filed permanently in the court, and the duplicates forwarded by the clerk of court to the appropriate field office of the Service for retention by such office. The same disposition shall be made of any list presented to, but not approved by, the court.

§ 336.14 *Presentation of recommendations of designated examiner and the regional commissioner at final hearing.* At the final hearing or prior thereto, in addition to the lists prepared under § 336.13, there shall be presented to the court and made a part of the record in the case, the memoranda of the designated examiner and the regional commissioner prepared pursuant to the provisions of Part 332 or Part 335 of this chapter.

§ 336.15 *Final hearing: sickness or disability of petitioner; investigation.* Whenever it appears that a petitioner for naturalization may be unable, because of sickness or other disability, to appear in open court for final hearing upon his petition for naturalization, the district director shall cause an investigation to be conducted to determine the circumstances and shall report the condition of the petitioner to the clerk of court for the purpose of aiding the court to determine whether another place for the final hearing shall be designated. The report shall show whether the sickness or other disability is of a nature which so incapacitates the person as to prevent him from appearing in open court.

§ 336.16 *Final hearing: waiver of 30-day period.* A petitioner for naturalization may request the district director, in writing, to waive the thirty-day period following the filing of the petition referred to in section 336 (c) of the Immigration and Nationality Act. Such request may be made at any time after an application to file a petition for naturalization has been filed with the Service. The district director shall cause a full and complete investigation to be conducted and if such investigation satisfactorily establishes that such waiver will be in the public interest and will promote the security of the United States,

he may, in his discretion, grant the waiver. Notice of granting of the waiver shall be given to the clerk of court in writing.

§ 336.17 *Substitution of witnesses: procedure.* See § 335b.11 of this chapter.

PART 337—OATH OF ALLEGIANCE

Sec.
337.1 Oath of allegiance.
337.2 Persons naturalized by judicial action; effective date.
337.3 Renunciation of title or order of nobility.
337.11 Oath of renunciation and allegiance; sickness or disability of petitioner.

AUTHORITY: §§ 337.1 to 337.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 322, 323, 332, 337, 66 Stat. 246, 252, 258; 8 U. S. C. 1433. 1434, 1443, 1448.

§ 337.1 *Oath of allegiance*—(a) *Form of oath.* Except as otherwise provided in the Immigration and Nationality Act, a petitioner or applicant for naturalization shall, before being admitted to citizenship, take in open court the following oath of allegiance, to which he shall thereafter affix his signature on his petition or application for naturalization:

I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I will bear arms on behalf of the United States when required by the law; that I will perform noncombatant service in the armed forces of the United States when required by the law; that I will perform work of national importance under civilian direction when required by the law; and that I take this obligation freely without any mental reservation or purpose of evasion; so help me God.

(b) *Alteration of form of oath.* In those cases in which a petitioner or applicant for naturalization is exempt from taking the oath prescribed in paragraph (a) of this section in its entirety, the inapplicable clauses shall be deleted and the oath shall be taken in such altered form.

(c) *Obligations of oath.* A petitioner or applicant for naturalization shall, before being naturalized, establish that it is his intention, in good faith, to assume and discharge the obligations of the oath of allegiance, and that his attitude toward the Constitution and laws of the United States renders him capable of fulfilling the obligations of such oath.

§ 337.2 *Persons naturalized by judicial action; effective date.* Any person who was or shall hereafter be admitted to citizenship by the written order of a naturalization court, shall be deemed to be a citizen of the United States as of the date of taking the prescribed oath of allegiance. Whenever a waiver of such oath is granted by the court in the case of a child naturalized under section 322 or 323 of the Immigration and Nationality Act, the child shall become a citizen of the United States as of the date of such waiver.

§ 337.3 *Renunciation of title or order of nobility.* A petitioner for naturalization who has borne any hereditary title or has been of any of the orders of nobility in any foreign state, shall, in addition to taking the oath of allegiance prescribed by § 337.1, make under oath in open court an express renunciation of such title or order of nobility, in the following form:

I further renounce the title of_____
(give title or
_____ which I have heretofore held; or titles)

I further renounce the order of nobility
_____ to which I
(give the order of nobility)
have heretofore belonged.

§ 337.11 *Oath of renunciation and allegiance; sickness or disability of petitioner.* Whenever it appears that a petitioner for naturalization may be unable because of sickness or other disability to take the oath of allegiance in open court, the district director shall cause an investigation to be conducted to determine the circumstances, and shall report the condition of the petitioner to the naturalization court for the purpose of aiding the court to determine whether the oath may be taken at another place. The report shall show whether the sickness or other disability is of a nature which so incapacitates the person as to prevent him from appearing in open court.

PART 338—CERTIFICATE OF NATURALIZATION

Sec.
338.11 Execution and issuance.
338.12 Endorsement in case name is changed.
338.13 Spoiled certificate.
338.14 Delivery of certificates.
338.15 Signing of certificate.
338.16 Correction of certificates.

AUTHORITY: §§ 338.11 to 338.16 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 322, 323, 332, 333, 336, 338, 339, 66 Stat. 246, 252, 253, 257, 259; 8 U. S. C. 1433, 1434, 1443, 1444, 1449, 1450.

§ 338.11 *Execution and issuance.* When a petitioner for naturalization has duly taken and subscribed to the oath of allegiance and a final order admitting petitioner to citizenship has been duly signed by the court, a certificate of naturalization shall be issued by the clerk of the court on Form N–550, in duplicate. The certificates and the stub of the original thereof shall be signed by the petitioner. The certificate shall show under "former nationality" the name of the country of which the petitioner was last a citizen, as shown in the petition, even though petitioner may have been stateless at the time of admission to citizenship. The clerk or his deputy shall endorse the alien registration number on the stubs of the certificates, shall sign the certificates in his own handwriting, and enter on the stubs all the essential facts set forth in the certificates. Both copies of the certificate, including the stubs, shall be prepared in one operation on a typewriter with the use of carbon paper. Photographs shall be affixed to the original and duplicate certificates in the manner provided by Part 333 of this chapter. The stub of

AR2022_200156

*Friday, December 6, 1957*          **FEDERAL REGISTER**          9825

the original shall be removed and retained by the clerk of court and filed in an upright card file, or in a three by five inch card drawer. The original certificate shall be delivered to the petitioner. The duplicate copies of the certificates shall not be separated from their stubs and shall be forwarded to the appropriate office of the Immigration and Naturalization Service with all other duplicate papers in accordance with Part 339 of this chapter.

§ 338.12  *Endorsement in case name is changed.* Whenever the name of a petitioner has been changed by order of court as a part of a naturalization, the clerk of court shall make, date, and sign the following endorsement on the reverse side of the original and duplicate of the certificate of naturalization: "Name changed by decree of court from ----------------------, as a part of the naturalization," inserting in full the original name of the petitioner. A similar notation shall be made on the stubs of the original and duplicate certificate. The certificate of naturalization shall be issued and the stub of the original thereof signed by the petitioner in the name as changed.

§ 338.13  *Spoiled certificate.* Whenever a certificate of naturalization is damaged, mutilated, defaced or otherwise spoiled before delivery by the clerk, the original and duplicate, with stubs intact, shall be marked "Spoiled" and transmitted to the appropriate immigration and naturalization office, in the manner described in § 339.2 of this chapter, with the monthly report of the clerk on Form N–4.

§ 338.14  *Delivery of certificates.* No certificate of naturalization shall be delivered by the clerk of court in any case in which the representative of the Service in attendance at the final naturalization hearing notifies the clerk of court that the naturalized person has not surrendered his alien registration receipt card. Upon subsequent receipt of notice from the district director that he has waived the surrender of the card or that the card has been surrendered, the certificate shall be delivered by the clerk of court.

§ 338.15  *Signing of certificate.* If a child, who has been admitted to citizenship under section 322 or section 323 of the Immigration and Nationality Act is unable to sign his name, the certificate of naturalization shall be signed by the petitioning parent or parents, whether natural or adoptive, as may be appropriate, and the signature shall read "(insert name of petitioning parent or parents) in behalf of (insert name of naturalized child)." A naturalized person whose petition was signed by him in a foreign language may sign his certificate of naturalization in the same manner.

§ 338.16  *Correction of certificates.* Whenever a certificate of naturalization has been delivered which does not conform to the facts shown on the petition for naturalization, or a clerical error was made in preparing the certificate, an application on Form N–458 may be made by the naturalized person to the district

director exercising jurisdiction over the place in which the court is located to authorize the correction of the certificate. If the district director finds that a correction is justified and can be made without mutilating the certificate, he shall authorize the clerk of the issuing court on Form N–459, in duplicate, to make the necessary correction and to place a dated endorsement on the reverse of the certificate, over his signature and the seal of the court, explaining the correction. The authorization shall be filed with naturalization record, the corrected certificate returned to the naturalized person and the duplicate Form N–459 shall be endorsed to show the date and nature of the correction and endorsement made, and returned to the district director. No fee shall be charged the naturalized person for the correction. The district director shall forward such duplicate to the official Service file. When a correction would or does result in mutilation of the certificate, the district director may authorize the clerk of court on Form N–459, in duplicate, with the consent of the naturalized person, to issue without fee a new certificate from his supply, upon surrender of the incorrect certificate and submission of photographs. The surrendered certificate shall be marked "Spoiled" and transmitted to the district director with the duplicate copy of the new certificate and the duplicate Form N–459 appropriately endorsed, with the monthly report of the clerk on Form N–4. The original of the new certificate shall be delivered to the naturalized person. Objection shall be made by the Service to any application to the court for the alteration of a certificate of naturalization which would cause it to vary from the record on which the naturalization was granted.

---

**PART 339—FUNCTIONS AND DUTIES OF CLERKS OF NATURALIZATION COURTS**

Sec.
339.1   Administration of oath to declarations of intention and petitions for naturalization.
339.2   Monthly reports.
339.3   Relinquishment of naturalization jurisdiction.
339.4   Binding of naturalization records.
339.5   Numbering and indexing and filing of petitions for naturalization and declarations of intention.

AUTHORITY: §§ 339.1 to 339.5 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 339, 344, 66 Stat. 252, 259, 265; 8 U. S. C. 1443, 1450, 1455.

§ 339.1  *Administration of oath to declarations of intention and petitions for naturalization.* It shall be the duty of every clerk of a naturalization court to administer the required oath to each applicant for a declaration of intention. The clerk shall receive and file petitions and administer the required oaths to each petitioner and the witnesses to each petition, unless such petitioner and witnesses have executed the petition before a designated examiner.

§ 339.2  *Monthly reports.* Clerks of court shall on the first day of each month submit to the district director having administrative jurisdiction over

the place in which the court is located, a report on Form N–4, in duplicate, listing all declarations of intention and petitions for naturalization filed and all certificates of naturalization issued or spoiled during the preceding month, in accordance with the instructions contained in Form N–4. When at any time during the month the aggregate number of petitions and declarations filed reaches 100 the clerk shall on request of the district director forthwith forward such reports in accordance with the provisions of this section. The report shall be accompanied by all duplicate copies of declarations of intention and applications therefor on Forms N–300; by all duplicates of petitions for naturalization not previously delivered to a representative of the Service, and all duplicates of certificates of naturalization with stubs intact. The clerk of court shall show opposite the number of each petition in which the petitioner is exempt from payment of a naturalization fee under section 344 (h) of the Immigration and Nationality Act the letter "M". Opposite the name of each such case and at the bottom of the petition, the notation "No fee" shall be inserted. Void petitions shall be listed separately on Form N–4 and on Form N–7 and so indicated on such forms.

§ 339.3  *Relinquishment of naturalization jurisdiction.* Whenever a court relinquishes naturalization jurisdiction, the clerk of court shall, within ten days following the date of relinquishment, furnish the district director having administrative jurisdiction over the place in which the court is located, a certified copy of the order of court relinquishing jurisdiction. A representative of the Service shall thereafter examine the naturalization records in the office of the clerk of court and shall bind and lock them. The clerk of court shall return all unused forms and blank certificates of naturalization to the district director with his monthly report on Form N–4.

§ 339.4  *Binding of naturalization records.* Whenever a volume of petitions for naturalization, applications to take the oath of allegiance, declarations of intention, orders of court, or other documents affecting or relating to the naturalization of persons is completed, it shall be bound and locked by the clerk of court.

§ 339.5  *Numbering and indexing and filing of petitions for naturalization and declarations of intention.* See §§ 334.3 and 334a.16 of this chapter.

---

**PART 340—REVOCATION OF NATURALIZATION**

§ 340.11  *Investigation and report.* Whenever it appears that any grant of naturalization may have been procured by concealment of a material fact or by wilful misrepresentation, the facts shall be reported to the district director having jurisdiction over the naturalized person's last known place of residence. If the district director is satisfied that a prima facie showing has been made that grounds for revocation exist, he shall cause an investigation to be made and

AR2022_200157

report the facts in writing to the regional commissioner with a recommendation as to whether revocation proceedings should be instituted. If it appears that naturalization was procured in violation of section 1425 of Title 18 of the United States Code, the facts in regard thereto may be presented by the district director to the appropriate United States Attorney for possible criminal prosecution.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies secs. 332, 340, 66 Stat. 252, 260, as amended; 8 U. S. C. 1443, 1451)

---

PART 341—CERTIFICATES OF CITIZENSHIP

§ 341.1 *Application.* A person who claims to have derived United States citizenship through the naturalization of a parent or parents or through the naturalization or citizenship of a husband, or who claims to be a citizen at birth outside the United States under the provisions of any of the statutes or acts specified in section 341 of the act, or who claims to be a citizen at birth outside the United States under the provisions of section 309 (c) of the act, shall apply for a certificate of citizenship on Form N–600. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor and of his right to appeal within 10 days from the receipt of such notification in accordance with Part 7 of this chapter. If the application is granted, the certificate shall be issued on Form N–560 or N–562, as appropriate. The applicant shall, unless he is too young to understand the meaning thereof, take and subscribe to, before an officer or employee of the Service authorized to administer oaths, the oath of renunciation and allegiance prescribed by Part 337 of this chapter. Thereafter, delivery of the original of the certificate shall be made to the applicant, or to his parent or guardian, either personally or by certified mail, and the recipient's signed receipt therefor shall be obtained.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 287, 309, 332, 333, 337, 341, 344; 66 Stat. 233, 238, 252, 254, 258, 263, 264; 8 U. S. C. 1357, 1409, 1443, 1444, 1448, 1452, 1455)

---

PART 343—CERTIFICATE OF NATURALIZATION OR REPATRIATION; PERSONS WHO RESUMED CITIZENSHIP UNDER SECTION 323 OF THE NATIONALITY ACT OF 1940, AS AMENDED, OR SECTION 4 OF THE ACT OF JUNE 29, 1906

Sec.
343.1    Application.
343.11   Disposition of application.

AUTHORITY: §§ 343.1 and 343.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 343, 344, 405, 66 Stat. 252, 263, 264, 280; 8 U. S. C. 1443, 1454, 1455, 1101 note.

§ 343.1 *Application.* A person who lost citizenship of the United States incidental to service in one of the allied armies during World War I or II, or by voting in a political election in a country not at war with the United States during World War II, and who was naturalized under the provisions of section 323 of the Nationality Act of 1940, as amended, or a person who, before January 13, 1941,

resumed United States citizenship under the twelfth subdivision of section 4 of the act of June 29, 1906, may obtain a certificate evidencing such citizenship by making application therefor on Form N–580.

§ 343.11 *Disposition of application—* (a) *Issuance of certificate; delivery.* If it shall appear to the satisfaction of the district director that the applicant is a citizen, and that he has been naturalized or repatriated as claimed, a certificate of naturalization on Form N–582 or a certificate of repatriation on Form N–581 shall be issued by the district director and the original delivered in person, in the United States only, upon his signed receipt therefor.

(b) *Application denied.* If the district director denies the application, the applicant shall be notified of the reasons therefor and of his right to appeal within 10 days from the date of receipt of such notification in accordance with the provisions of Part 7 of this chapter.

---

PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS

Sec.
343a.1   Applications for replacement of or for new naturalization or citizenship paper.
343a.11   Disposition of application.

AUTHORITY: §§ 343a.1 and 343a.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 324, 332, 343, 344, 405, 66 Stat. 246, 252, 263, 264, 280; 8 U. S. C. 1435, 1443, 1454, 1455, 1101 note.

§ 343a.1 *Applications for replacement of or for new naturalization or citizenship paper—*(a) *Lost, mutilated, or destroyed naturalization papers.* A person whose declaration of intention, certificate of naturalization, citizenship, or repatriation, or whose certified copy of proceedings under the act of June 25, 1936, as amended, or under section 317 (b) of the Nationality Act of 1940, or under section 324 (c) of the Immigration and Nationality Act, has been lost, mutilated, or destroyed, may apply on Form N–565 for a new paper in lieu thereof.

(b) *New certificate in changed name.* A naturalized citizen whose name has been changed after naturalization by order of court or by marriage, may apply on Form N–565 for a new certificate of naturalization, or of citizenship, in the changed name.

§ 343a.11 *Disposition of application—* (a) *New certificate issued.* If an application for a new certificate of naturalization, citizenship, or repatriation is approved, the new certificate shall be issued by the district director and delivered in person upon the applicant's signed receipt therefor. The new certificate shall be numbered to correspond to the number of the paper which it replaces. Certificates issued to evidence naturalization which occurred prior to September 27, 1906, shall be consecutively numbered, the number in each instance being preceded by the letters "OL". New certificates issued under this part shall be on the following forms:

Form N–570 to replace a certificate of naturalization or repatriation, and Form N–561 to replace a certificate of citizenship issued by the Service. When a new certificate of naturalization is issued in a changed name, the district director shall notify the clerk of the naturalization court on Form N–240 of the action taken.

(b) *New declarations issued.* If an application for a new declaration of intention is approved, the new declaration of intention shall be issued by the district director on Form N–321 or Form N–325 and the original delivered to the applicant upon his signed receipt therefor.

(c) *New certified copy of repatriation proceedings issued.* If an application for a new certified copy of the proceedings under the act of June 25, 1936, as amended, or under section 317 (b) of the Nationality Act of 1940, or under section 324 (c) of the Immigration and Nationality Act is approved, there shall be issued by the district director a certified, positive photocopy of the record of the proceedings filed with the Service, whether such record be a duplicate of the court proceedings or a copy of the proceedings conducted at an embassy, legation, or consulate. If subsequent to the naturalization or repatriation the applicant's name has been changed by marriage, and if appropriate documentary evidence of such change is submitted with the application, the certification of the positive photocopy shall show both the name in which the proceedings were had and the changed name. The new certified copy shall be personally delivered to the applicant, who shall sign a receipt therefor.

(d) *Application denied.* If the district director denies the application, the applicant shall be notified of the reasons therefor and of his right to appeal within 10 days from the date of receipt of such notification in accordance with the provisions of Part 7 of this chapter.

---

PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE

Sec.
343b.1   Application.
343b.11   Disposition of application.

AUTHORITY: §§ 343b.1 and 343b.11 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 343, 344, 66 Stat. 252, 263, 264; 8 U. S. C. 1443, 1454, 1455.

§ 343b.1 *Application.* A naturalized citizen who desires to obtain recognition as a citizen of the United States by a foreign state shall submit an application on Form N–577.

§ 343b.11 *Disposition of application—* (a) *Issuance of certificate.* If the application is granted, a special certificate of naturalization on Form N–578 shall be issued by the district director and forwarded to the Secretary of State for transmission to the proper authority of the foreign state.

(b) *Application denied.* If the district director denies the application, the applicant shall be notified of the reasons therefor and of his right to appeal within 10 days from the date of receipt

**AR2022_200158**

of such notification in accordance with the provisions of Part 7 of this chapter.

## PART 343c—CERTIFICATIONS FROM RECORDS

§ 343c.1  *Application for certification of naturalization record of court or certificate of naturalization or citizenship.* An application for certification of a naturalization record of any court, or of any part thereof, or of any certificate of naturalization, repatriation, or citizenship, under section 343 (e) of the act for use in complying with any statute, Federal or State, or in any judicial proceeding, shall be made on Form N-585.

(Sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interprets or applies secs. 332, 333, 343, 344, 66 Stat. 252, 253, 263, 264; 8 U. S. C. 1443, 1444, 1454, 1455)

## PART 344—FEES COLLECTED BY CLERKS OF COURT

Sec.
344.1  Division of the year for accounting for naturalization fees.
344.2  Fees in United States courts; remittance.
344.3  Fees in other than United States courts; United States District Courts in Alaska; remittance.
344.4  Fees in the District Courts at the Virgin Islands and Guam; remittance.
344.5  Time for report of and accounting for fees collected.

AUTHORITY: §§ 344.1 to 344.5 issued under sec. 103, 66 Stat. 173; 8 U. S. C. 1103. Interpret or apply secs. 332, 344, 66 Stat. 252, 264; 8 U. S. C. 1443, 1455.

§ 344.1  *Division of the year for accounting for naturalization fees.* For the purpose of accounting for and reporting naturalization fees quarterly by clerks of courts, the fiscal year shall end on June 30 of any given calendar year and shall be divided as follows: the first quarter shall end September 30; the second quarter ends December 31; the third quarter ends March 31; and the fourth quarter ends June 30.

§ 344.2  *Fees in United States courts; remittance.* All fees collected for declarations of intention and petitions for naturalization by clerks of United States district courts (except in Alaska, and the District Courts of Guam and the Virgin Islands of the United States) shall be forwarded quarterly by a remittance payable to the order of the "Immigration and Naturalization Service, Department of Justice," to the regional commissioner having administrative jurisdiction over the place in which the court is located.

§ 344.3  *Fees in other than United States courts; United States District Courts in Alaska; remittance.* One-half of all fees collected for declarations of intention and petitions for naturalization by clerks of courts other than United States courts, and one-half of all such fees collected by the clerks of the United States district courts in Alaska, up to $6,000 in any one fiscal year shall be similarly remitted to the regional commissioner in the manner provided in § 344.2. Where the collections during the first quarter of any fiscal year equal or exceed $1,500, the clerk shall remit all in excess of $750; and whenever such collections for the first and second quarters equal or exceed $3,000, the clerk shall remit all in excess of $1,500; and whenever the collections for the first three quarters of the fiscal year equal or exceed $4,500, the clerk shall remit all in excess of $2,250; and whenever the total collections for any fiscal year equal or exceed $6,000, the clerk shall remit all fees or moneys so collected in excess of $3,000.

§ 344.4  *Fees in the District Courts at the Virgin Islands and Guam; remittance.* All fees collected for declarations of intention and petitions for naturalization by the clerk of the District Court of the Virgin Islands of the United States shall be paid into the Treasury of Virgin Islands. All such fees collected by the clerk of the District Court of Guam shall be paid into the Treasury of Guam. However, such clerks shall report the fees collected to the regional commissioner having administrative jurisdiction over the place in which the court is located, in accordance with § 344.5.

§ 344.5  *Time for report of and accounting for fees collected.* The accounting for naturalization fees collected and the payment of fees turned over to the regional commissioner as provided in §§ 344.2, 344.3 and 344.4 shall be made on Form N-7 within thirty days from the close of each quarter of each and every fiscal year.

## PART 344a—COPIES OF AND INFORMATION FROM RECORDS

§ 344a.1  *Copies of and information from records.* See Part 2 of this chapter.

## PART 402a—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: ALIENS ENLISTED IN THE UNITED STATES ARMED FORCES UNDER ACT OF JUNE 30, 1950, AS AMENDED BY SECTION 402 (e) OF THE IMMIGRATION AND NATIONALITY ACT

Sec.
402a.1  Proof of character, attachment and disposition.
402a.11  Procedural requirements.

§ 402a.1  *Proof of character, attachment and disposition.* See § 329.2 of this chapter.

§ 402a.11  *Procedural requirements.* See § 329.21 of this chapter.

## PART 499—NATIONALITY FORMS

§ 499.1  *Prescribed forms.* The following forms are hereby prescribed by the Attorney General for use in compliance with the provisions of Subchapter C of this chapter:

| Form No. | Title and description |
|---|---|
| I-138 | Subpena. |
| N-3 | Requisition for Forms and Binders. |
| N-4 | Monthly Report—Naturalization Papers Forwarded. |
| N-5 | Continuation Sheet of Monthly Report—Naturalization Papers Forwarded. |
| N-6 | Jacket for Naturalization Papers. |
| N-7 | Quarterly Abstract of Collections of Naturalization Fees. |
| N-11 | Penalty Envelope (addressed to the Central Office of Service). |
| N-12 | Penalty Envelope (to be addressed to any office of Service). |
| N-13 | Penalty Envelope (large—to be addressed to any office of Service). |
| N-50 | Receipt for Duplicate Petitions. |
| N-240 | Form letter concerning issuance of new certificate of naturalization. |
| N-300 | Application to File Declaration of Intention. |
| N-305 | Form letter notifying alien that Form N-300 has been forwarded to the clerk of the court. |
| N-315 | Declaration of Intention. |
| N-321 | Declaration of Intention (in lieu of old edition lost, mutilated or destroyed). |
| N-325 | Declaration of Intention in lieu of one lost, mutilated or destroyed). |
| N-350 | Application to Renounce Danish Citizenship. |
| N-351 | Renunciation of Danish Citizenship. |
| N-400 | Application to File Petition for Naturalization. |
| N-400A | Supplement to Application to File Petition for Naturalization (under sec. 324 (a) or 327, Immigration and Nationality Act). |
| N-400B | Supplement to Application to File Petition for Naturalization (by a seaman, under sec. 330 of the Immigration and Nationality Act). |
| N-401 | Preliminary Form to take Oath of Allegiance (by woman formerly a citizen, under sec. 324 (c) of the Immigration and Nationality Act, or the Act of June 25, 1936, as amended). |
| N-402 | Application to File Petition for Naturalization in Behalf of a Child (under sec. 322 or 323, Immigration and Nationality Act). |
| N-403 | Request to have Petition for Naturalization marked "Void". |
| N-404 | Request for Withdrawal of Petition for Naturalization. |
| N-405 | Petition for Naturalization (under general provisions of the Immigration and Nationality Act). |
| N-405A | Affidavit in Support of Petition for Naturalization (by a former citizen, under sec. 327 of the Immigration and Nationality Act). |
| N-407 | Petition for Naturalization (in behalf of a child, under sec. 322 or 323, Immigration and Nationality Act). |
| N-408 | Application to take Oath of Allegiance and Form of Such Oath (by a woman formerly a citizen, under sec. 324 (c), Immigration and Nationality Act, or the Act of June 25, 1936, as amended). |
| N-410 | Motion for Amendment of Petition (application). |
| N-414 | Acknowledgment of Filing Petition for Naturalization. |
| N-421 | Affidavit in Support of Petition for Naturalization (by a seaman, under sec. 330, Immigration and Nationality Act). |
| N-425 | Notice to Petitioner of Proposed Recommendation of Denial of Petition for Naturalization. |
| N-426 | Certification of Military or Naval Service. |

AR2022_200159

| Form No. | Title and description |
|---|---|
| N-440 | Certificate of Examination. |
| N-451 | Affidavits of Witnesses (to Petition for Naturalization). |
| N-452 | Statement of Witness. |
| N-455 | Application for Transfer of Petition for Naturalization. |
| N-458 | Application to Correct Certificate of Naturalization. |
| N-459 | Authorization to Clerk of Court to Correct Certificate of Naturalization. |
| N-460 | Notice to Take Depositions. |
| N-462A | Interrogatories in Depositions of Witnesses. |
| N-470 | Application to Preserve Residence for Naturalization Purposes (under section 316 (b) or 317, Immigration and Nationality Act). |
| N-480 | Naturalization Petitions Recommended To Be Granted. |
| N-480A | Order of Court granting Petitions for Naturalization. |
| N-481 | Naturalization Petitions Recommended To Be Granted (Continuation sheet). |
| N-483 | Naturalization Petitions Recommended To Be Continued (and Order of Court). |
| N-484 | Naturalization Petitions Recommended To Be Denied. |
| N-484A | Order of Court Denying Petitions for Naturalization. |
| N-485 | Naturalization Petitions Recommended To Be Granted (on behalf of children). |
| N-486 | Naturalization Petitions Recommended To Be Denied (on behalf of children). |
| N-489 | Certification by Clerk of Court of the Taking of Oath of Allegiance. |
| N-490 | Order of Court Granting Petitions for Naturalization. |
| N-491 | Order of Court Denying Petitions for Naturalization. |
| N-492 | Regional Commissioner's Recommendation that Petitions be Granted (and Order of Court). |
| N-493 | Regional Commissioner's Recommendation that Petitions be Denied (and Order of Court). |
| N-550 | Certificate of Naturalization. |
| N-560 | Certificate of Citizenship. |
| N-561 | Certificate of Citizenship. |
| N-562 | Certificate of Citizenship. |
| N-565 | Application for a New Naturalization or Citizenship Paper. |
| N-570 | Certificate of Naturalization. |
| N-577 | Application for a Special Certificate of Naturalization to Obtain Recognition as a Citizen of the United States by a Foreign State. |
| N-578 | Special Certificate of Naturalization. |
| N-580 | Application for a Certificate of Naturalization or Repatriation (under sec. 343 (a) of the Immigration and Nationality Act or 12th subdivision, sec. 4, of Act of June 29, 1906). |
| N-581 | Certificate of Repatriation. |
| N-582 | Certificate of Naturalization. |
| N-585 | Application for Information From or Copies of Immigration and Naturalization Records. |
| N-600 | Application for Certificate of Citizenship. |

Dated: December 3, 1957.

J. M. SWING,
*Commissioner of Immigration and Naturalization.*

[F. R. Doc. 57-10125; Filed, Dec. 5. 1957; 8:51 a. m.]

**16216**     **Federal Register** / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

(iii) Paragraph (23) (narcotics), except for a single offense of simple possession of thirty grams or less of marijuana;

(iv) Paragraphs (27) (prejudicial to the public interest), (28) (communists), and (29) (subversive);

(v) Paragraph (33) (participated in Nazi persecution).

(4) *Special rule for determination of public charge.* An alien who has a consistent employment history which shows the ability to support himself or herself and his or her family even though his or her income may be below the poverty level is not excludable under paragraph (g)(3)(ii) of this section. The alien's employment history need not be continuous in that it is uninterrupted. It should be continuous in the sense that the alien shall be regularly attached to the workforce, has an income over a substantial period of the applicable time, and has demonstrated the capacity to exist on his or her income and maintain his or her family without recourse to public cash assistance. This regulation is prospective in that the Service shall determine, based on the alien's history, whether he or she is likely to become a public charge. Past acceptance of public cash assistance within a history of consistent employment will enter into this decision. The weight given in considering applicability of the public charge provisions will depend on many factors, but the length of time an applicant has received public cash assistance will constitute a significant factor.

(5) *Public cash assistance and criminal history verification.* Declarations by an applicant that he or she has not been the recipient of public cash assistance and/or has not had a criminal record are subject to a verification of facts by the Service. The applicant must agree to fully cooperate in the verification process. Failure to assist the Service in verifying information necessary for proper adjudication may result in a denial of the application.

(h) *Departure.* An applicant for adjustment to lawful permanent resident status under section 245A(b)(1) of the Act who was granted lawful temporary resident status under section 245A(a) of the Act, shall be permitted to return to the United States after such brief and casual trips abroad, as long as the alien reflects a continuing intention to adjust to lawful permanent resident status. However, such absences from the United States must not exceed the periods of time specified in § 245.3(b)(2) of this chapter in order for the alien to maintain continuous residence as specified in the Act.

(i) *Decision.* The applicant shall be notified in writing of the decision, and, if the application is denied, of the reason therefor. A party affected under this part by an adverse decision is entitled to file an appeal on Form I-694.

(j) *Appeal process.* An adverse decision under this part may be appealed to the Associate Commissioner, Examinations (Administrative Appeals Unit). Any appeal with the required fee shall be filed with the Regional Processing Facility within thirty (30) days after service of the Notice of Denial in accordance with the procedures of § 103.3(a) of this chapter. An appeal received after the thirty (30) day period has tolled will not be accepted. The thirty (30) day period includes any time required for service or receipt by mail.

(k) *Motions.* The Regional Processing Facility director may *sua sponte* reopen and reconsider any adverse decision. When an appeal to the Associate Commissioner, Examinations (Administrative Appeals Unit) has been filed, the INS director of the Regional Processing Facility may issue a new decision that will grant the benefit which has been requested. The director's new decision must be served on the appealing party within forty-five (45) days of receipt of any briefs and/or new evidence, or upon expiration of the time allowed for the submission of any briefs.

(l) *Certifications.* The regional processing facility director may, in accordance with § 103.4 of this chapter, certify a decision to the Associate Commissioner, Examinations (Administrative Appeals Unit) when the case involves an unusually complex or novel question of law or fact.

(m) *Date of adjustment to permanent residence.* The status of an alien whose application for permanent resident status is approved shall be adjusted to that of a lawful permanent resident as of the date indicated on the application fee receipt issued at a Service Legalization Office.

Dated: April 28, 1987.

**Alan C. Nelson,**
*Commissioner.*

[FR Doc. 87-9895 Filed 4-30-87; 8:45 am]

**BILLING CODE 4410-10-M**

---

**8 CFR Parts 109 and 274a**

**[INS No. 1023-87]**

**Control of Employment of Aliens**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule adds Part 274a and redesignates Part 109 with amendments as Part 274a, Subpart B, by: (1) Defining terms to clarify the regulations; (2) adding new sections to establish procedures for the verification of employment eligibility for workers in the United States; (3) delineating new sections to establish enforcement and process procedures for violations; (4) redesignating Part 109 (Employment Authorization) as Subpart B of Part 274a to consolidate into one part what would otherwise be dispersed regulations. The rule is necessitated by the Immigration Reform and Control Act of 1986, Pub. L. 99-603, which amended the Immigration and Nationality Act (Act) by adding provisions prohibiting the unlawful employment of aliens. These provisions make it unlawful to hire, recruit or refer for a fee for employment, unauthorized aliens in the United States. The rule provides for an employment eligibility verification system designed to prevent the employment of unauthorized aliens. The statute mandates the Attorney General to issue regulations implementing these provisions not later than June 1, 1987.

**EFFECTIVE DATE:** June 1, 1987.

**FOR FURTHER INFORMATION CONTACT:** Walter D. Cadman, Deputy Assistant Commissioner, Investigations Division, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-2997.

**SUPPLEMENTARY INFORMATION:** Since 1972 numerous attempts have been made by Congress and recent Administrations to pass immigration reform legislation. The imposition of sanctions on employers has been a central element of nearly all such attempts with the view that curbing illegal immigration would not be effective without such sanctions. The Select Commission on Immigration and Refugee Policy was established by Congress in October 1978. It was created to review immigration policy issues, assess the impact of legal and illegal immigrants on the nation, and recommend changes in policy and practice. The Commission made a series of over 70 recommendations concerning these issues in its final report in May 1981. Those recommendations included the imposition of employer sanctions to control illegal immigration. Thereafter a Cabinet level task force reviewed the Select Commission Report and other recommendations on immigration reform. In 1981 and 1982 alone some 28 hearings were conducted by House and

AR2022_200161

Senate immigration subcommittees on proposed immigration reform.

Since 1975 INS has vigorously worked in the spirit of cooperation with employers on an ad hoc basis to encourage a policy of employing only U.S. citizens and aliens lawfully authorized to work in the United States. The success of this effort, called Operation Cooperation, has been encouraging, but with the limits of INS resources and lack of statutory backing such programs have been of limited effectiveness. Mandatory compliance is the only effective mechanism that reduces "pull" factors that encourage rather than discourage illegal immigration.

On November 6, 1986, the President signed into law the Immigration Reform and Control Act of 1986, Pub. L. 99–603, (IRCA). This legislation is the most comprehensive reform of our immigration laws in 35 years. The employer sanctions provisions of IRCA constitute one of three cornerstones on which immigration policy is based. The other two are increased enforcement measures and legalization.

Section 101 of IRCA is designed to control the unlawful employment of aliens in the United States by imposing civil and criminal penalties on those persons and entities that hire, or that recruit or refer for a fee unauthorized aliens. Section 101 of IRCA amends the Act by adding section 274A which closes a large gap in the enforcement of our immigration laws by: (1) Making it unlawful to hire, recruit or refer for a fee unauthorized aliens; (2) requiring those who hire, or who recruit or refer for a fee individuals for employment, to verify both the identity and employment eligibility of such individuals and (3) making it unlawful to continue to employ unauthorized aliens hired after November 6, 1986. While section 112 of IRCA amends section 274(a) of the Act (which sets forth criminal penalties for individuals who harbor illegal aliens), employment of illegal aliens in and of itself does not constitute harboring under section 274(a) of the Act as amended.

Since enactment of IRCA, INS has been working to develop these rules along with a balanced enforcement policy. On January 20, 1987, INS published a notice in the **Federal Register** to solicit comments from the public and other interested parties concerning draft rules implementing the employer provisions of IRCA. Interested parties were also provided with preliminary working drafts for review and comment. Numerous comments were received from a wide cross-section of society.

These comments were reviewed and evaluated in the development of a proposed rule, published in the **Federal Register** on March 19, 1987. The proposed rule invited comment on all issues, particularly those concerning: the nature of verification; the mandatory and universal aspect of the requirements for employers to complete and maintain the designated form; the range of documents which should be accepted under the regulation to establish identity; the guidelines relating to the role of state employment agencies in the issuance of verification certificates; the application of penalties to procedural as well as substantive violations of the Act; and the necessary changes to prior Part 109 of the regulations, redesignated as Subpart B of Part 274a in the proposed rule.

**Public Comments**

*General Information*

Approximately 4,000 comments were received from the public during the comment period. Additionally, hundreds of telephone calls were received. Commentors represented a very broad spectrum of American society and included private citizens; agricultural, business, industrial and labor organizations; Congressional sources and governmental entities at the federal, state, and local levels; educational institutions; voluntary agencies; interest groups and organizations; and law firms. Because many of these commentors provided their views on several different sections of the proposed rules within one response, the figures provided below are approximate as to the number of comments received in each area of concern. INS is appreciative of the number of responses and instructive comments, which clearly reflect the broad public interest in this statute.

The comments received in many instances enlightened Service officials concerning prevailing buisness and industry practices, and the problems which employers face in verification and the other responsibilities imposed by IRCA. As a result, there are some significant refinements in the rule, which INS believes are in the public interest and that represent a logical outgrowth of the comments. While the final rule may not satisfy the concerns of everyone who commented, INS believes that most issues have been addressed in the spirit of mutual dialogue. Every effort has been made to minimize the impact of our requirements on the affected parties, consistent with the statute; and to ensure continuity with other agencies' guidelines and definitions, to the extent possible. Furthermore, INS expects that

these guidelines will prove sufficiently flexible so that employers and others required to comply with statutory and regulatory procedures will be able to do so in ways that suit current personnel hiring, recruiting and referring practices with minimal disruption.

INS will continue to encourage voluntary cooperation and compliance along with traditional enforcement in achieving the goal of this legislation. INS has established a new office for Employer and Labor Relations to administer a program of education and cooperation with employers and other affected entities. Many public appearances have been made by INS officials in the last few months to inform and solicit comments from interested parties. INS envisions a balanced approach between education and cooperation, and strict enforcement of penalties for egregious and persistent violators. INS will continue to develop agency guidelines and policies which further the goals of education, information, and employer awareness as effective methods of ensuring public support and voluntary compliance.

Consistent with this intent, INS wishes to remind the public that IRCA and Title VII of the Civil Rights Act prohibit discrimination in employment, or recruitment or referral for a fee for employment, on the basis of national origin. Additionally, IRCA generally prohibits discrimination on the basis of citizenship status in the case of a citizen or intending citizen. There are serious penalties which may be applied to those who violate the anti-discrimination laws of the United States. It is important to recognize that the purpose of the employer verification provisions of IRCA is not to discriminate against those with the right to work in the United States, regardless of their alienage or citizenship status. Rather, the purpose is to halt unlawful employment of those not entitled to work, and thus to have an ameliorative effect on illegal immigration to the United States. Application of the verification laws and voluntary compliance by employers will enhance job opportunities for lawfully authorized workers.

*Comments Received*

1. Recruiters and Referrers

By far the vast majority of comments (over 3,100), and the most contentious, related to the Service's proposed regulations in regard to recruiters and referrers. Many professionals in this industry were concerned that: (1) They would have to retroactively verify the

AR2022_200162

status of individuals whom they had recruited or referred since enactment of IRCA; (2) they would be prospectively required to perform verifications on all individuals recruited or referred, despite the fact that many of these individuals would either express no interest in the recruitment, or would not be hired as the result of referral; and (3) they would have to perform face-to-face verifications, despite prevailing industry practices relating to telephonic recruitments over long distances where there is no opportunity for such verifications.

INS carefully scrutinized the public comments received relating to this issue and performed an analysis of the extent of regulatory flexibility which was permitted by statute. Although it was determined that an absolute waiver of requirements for recruiters and referrers was beyond the permissible statutory scope, the Service has significantly modified the terms under which such entities may comply. Under the final rule: (1) Recruiters and referrers will not be required to retroactively verify individuals recruited or referred during the period, given the impossibility of this task; (2) the regulations have been amended so that referrers and recruiters need to verify within three business days of hiring only those individuals actually hired as the result of the referral; and (3) the verification procedures for recruiters and referrers have been amended to permit completion of the process by those who act as agents in their interest. This includes, but is not limited to affiliates, notaries, attorneys, national organizations, and even employers who hire the referred individuals. In this way, verifications used not be performed in person by the recruiter or referrer. These modifications to the proposed rule will greatly alleviate the concerns expressed by recruiters and referrers over the verification process. By statute, however, liability still rests with the recruiter or referrer.

## 2. Use of Agents

A similar concern expressed in the comments received from some employers and others indicated misunderstanding regarding their ability to use commonly accepted legal principles to delegate verification responsibilities through contractual or business arrangements. Approximately 75 responses were received on this concern. The definition of the term "employer" found in 8 CFR 274a.1(g) and the verification procedures outlined for recruiters and referrers in 8 CFR 274a.2(b)(1)(iv) specifically permit these arrangements. These provisions of the

regulations incorporate the concepts found in the Fair Labor Standards Act. They provide great flexibility in the use of intermediaries for verification, because, rather than establish a restrictive definition of agent, they permit verification by anyone "acting in [the employer's recruiter's or referrer's] interest." Employers, recruiters, and referrers may use central clearing houses or similar organizations to satisfy the document verification requirements of the Act. However, liability remains with the employer, the recruiter, or the referrer for any failure of the third party to satisfy the requirements of law.

## 3. Retroactive Verification

Another similar concern was expressed by employers concerning their responsibility to retroactively verify employees who were hired subsequent to enactment but prior to June 1, 1987. Approximately 50 responses were received on this issue. Recognizing these concerns, INS has taken the following steps in the final rule: (1) Employees who were hired but quit or were terminated within this period need not be verified; (2) employees who were hired within this period and continue to be employed, must be verified on or before September 1, 1987; and (3) as stated above, recruiters and referrers need not verify individuals recruited or referred within the period. Many concerns were expressed to INS about the lack of availability of a final Form I-9 during the public education period prior to June 1. INS recognizes that some employers took the step, in good faith, of commencing retroactive verification of employees using the version of the form which was published for comment with the proposed rule on March 19, 1987. In such instances, INS will accept verifications which were performed using this form as satisfying the requirements of the law and regulations. However, only the finalized Form I-9 should be used for verifications performed on or after June 1.

## 4. Union Hiring Halls

Approximately 60 comments were received on the issue of whether union hiring halls constituted a form of recruitment or referral for a fee based upon union dues paid. Opinions were divided on this matter. The final rule excludes union hiring halls from such inclusion. INS does not believe inclusion of these entities was within Congressional intent. However, such arrangements may be included in contractual or collective bargaining agreements between unions and

employers where they are in the interests of both parties.

## 5. Definition of Hire

The Service in its proposed rules defined "hire" as the "actual commencement of employment of an employee . . ." This aroused public concern as to the appropriate time for completion of the verification process. Approximately 20 comments were received in this regard. INS realizes that employers with decentralized operations may actually hire an individual well in advance of the time that the employee commences work. While the regulations state that the Service wishes to stress that verification may be completed either at the time of an individual's acceptance of an offer of employment or at the time employment actually commences.

## 6. State Employment Agency Verification

The rule provides for procedures relating to verification by a state employment agency. These procedures were developed on the basis of discussions with state employment agencies. INS also attended several open forums at which state employment agencies were well represented. INS anticipates that future modifications to this rule will be forthcoming in order to further develop standardized certification forms and procedures for all state agencies which choose to exercise the option to issue certifications which is granted them under the statute.

## 7. Pre-enactment ("Grandfather") Status

The proposed rule specified that a pre-enactment employment status is retained by an individual even though temporarily interrupted because of leave for study, illness, pregnancy, or transfer from one location to another with the same company. It provided that status would be lost by termination, exclusion, or deportation. Approximately 15 comments were received from the public, including labor law attorneys familiar with other agencies' definitions and procedures. The commentors recommended that the rule address other temporary employment interruptions. INS has considered these suggestions, and adopted several of them, including: Strikes and layoffs where there is a reasonable basis for believing that the individual will be reemployed by the same employer; promotions or demotions within the same company and intracompany transfers; and other temporary leaves which have been

**AR2022_200163**

approved by the employer. The public is directed to the regulations for other examples of interruptions which do not cause loss of the pre-enactment status of the individual.

The public should be aware that pre-enactment status pertains to the continued employment of individuals hired, recruited, or referred prior to November 7, 1986 only. It does not accord an illegal alien the right to remain in the United States.

## 8. Independent Contractor

Several business entities (approximately 25) provided their views on this aspect of the proposed regulations. They recommended that INS include the term "independent contractor" among the definitions in the regulations. The final rule specifies criteria and factors that are to be considered in determining whether a particular business arrangement constitutes an agreement with an independent contractor as opposed to an employee. The criteria and factors which have been enumerated are consistent with current Internal Revenue Service guidelines. Those who engage the labor services of an independent contractor are not responsible for verification of the employment eligibility of the employees of the independent contractor. However, contracts may not be used for the purposes of circumventing the employment eligibility verification requirements of employees.

## 9. Three-day Period for Completion of Verification

Approximately 30 comments were received on this proposed rule from various sources, including governmental employing entities. Commentors generally believed that the three-day period for completion of verification is sufficient. However, it was recommended that an exception be made for an individual who does not possess an acceptable document and needs to secure one for verification. It was noted that even large numbers of United States citizens are not in possession of certain documents and may need additional time to obtain them. Commentors were concerned that failure to provide an exception to the three-day requirement might result in unemployment of authorized workers who are awaiting replacement or initial issuance of documents.

The final rule allows an exception in cases where an individual has lost a document or has not yet obtained a document necessary for either identity or work authorization purposes. In such a case, the individual is required to present a receipt for the application of

the document within three days, and present the required document itself within twenty-one days.

## 10. Identification Documents

The proposed rule required employees to present an employer with a document or documents that establish identity and employment eligibility. With regard to documents that establish identity alone, the proposed rule required presentation of a state-issued driver's license or state-issued identification card except where the individual is under sixteen years old or lives or works in one of the eight states that does not issue an identification card. The statute allows the Attorney General to designate alternative identity documents for individuals covered by the two exceptions.

Approximately 60 responses concerned this issue. Public comment was received from a variety of sources, including private individuals, several colleges, and some agricultural enterprises such as produce farmers. Many strongly opposed these restrictions on the use of alternative documents. Commentors noted that the requirement would be extremely confusing for employers and unnecessarily burdensome for individuals who do not have a driver's license or identification card, yet might have one of the designated alternative documents.

The final rule establishes an expanded list of identity documents and permits parents or guardians to sign the Form I–9 on behalf of minors under sixteen years of age. Documents from this expanded list can be used by anyone in any state for the purpose of establishing identity.

In terms of number and variety, the list contains a wide range of identity documents and is based upon recommendations received in response to the proposed rule. The list has been defined in consideration of the recency of the legislation and in recognition of the fact that a comprehensive but reasonable list is in the interest of the public at this time.

The statute mandates that any alternative identity document provide a "reliable means of identification." The Congress, both in the statute and in its legislative history, expressed a particular concern with fraud in the verification system. For these reasons, INS will closely monitor the reliability and integrity of the list of alternative identity documents. After a sufficient period of time has elapsed to enable the public to become accustomed to and familiar with the law, and based upon information acquired from system

monitoring, INS may propose amendments to this list.

## 11. I–9 Retention

In response to public comment, the one-year period of validity of the I–9 for rehiring purposes has been expanded to three years in the final rule. This period coincides with the minimum retention period required for the Form I–9. Also, INS believes that this three year rehire provision adequately deals with the concerns of temporary help companies. Such temporary help companies can rehire the same individual without limit during a three year period (beginning on the date the Form I–9 was initially completed) as long as the individual remains authorized to work.

## 12. Authority to Inspect I–9

There were numerous public comments on the proposed rule regarding inspection of the Form I–9. The Service believes that the final rule requiring employers to produce the Form I–9 for inspection upon request of an INS officer after three days notice is well within our statutory authority. IRCA provides at section 274A(B)(3) that "the person or entity must retain the form (Form I–9) and make it available for inspection by officers of the Service or the Department of Labor beginning on the date . . ." The final regulations specify that INS will provide employers or others with three days advance notice of an inspectional visit, in order that they may comply with a request for production of the Form I–9. IRCA does not require Service officers to present a subpoena or warrant prior to a request to inspect. Furthermore, they will be permitted to produce the forms to the Service office which is located closest to the place where the forms have been retained, if different from where the demand was made. However, this does not preclude INS from obtaining warrants based on probable cause, for entry onto the premises of suspected violators without advance notice. The past experience of many agencies with similar responsibilities has proven the occasional necessity of such actions, where serious, repeated violators are concerned.

## 13. Good Faith Defense

An employer, recruiter, or referrer who establishes that he or she has acted in good faith to comply with the verification requirements of the regulations will have established an affirmative yet rebuttable defense that he or she has in fact complied with the law with respect to such hiring, recruiting, or referral. An employer,

AR2022_200164

16220     **Federal Register** / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

recruiter, or referrer must attest on Form I–9 that he or she has verified the employment eligibility and identity of an individual hired, recruited, or referred. This attestation may be made if the document or combination of documents examined in the verification process reasonably appears on its face to be geniune.

14. Organization of Subpart B: Employment Authorization

The rule redesignates Part 109, with amendments, as Part 274a, Subpart B, employment authorization. In response to public comments, § 274a.12, classes of aliens authorized to accept employment, has been expanded to identify aliens not previously identified in Part 109, and has also been subdivided to clarify and articulate classes of aliens who are or may be authorized to accept employment in the United States. The section contains three paragraphs generally categorizing these classes, which include: (1) Aliens authorized employment incident to status, whose employment authorization is not restricted in terms of location or type of employment and who need not seek employment authorization from INS; (2) aliens authorized employment with a specific employer incident to status, whose employment is subject to the restrictions imposed upon the particular nonimmigrant classification; and (3) aliens who must apply to INS for employment authorization. Within these paragraphs, the rule contains a comprehensive listing of employment authorization classifications.

15. Nonimmigrant Student Employment Authorization

In response to the proposed rule, numerous institutions of higher learning urged INS to retain the procedure concerning on-campus employment for full-time students, and for students in a work-study program which is part of the regular curriculum available within the student's program of study. The final regulations incorporate these recommendations by classifying on-campus employment as employment which is incident to the student's status. Academic institutions will need to comply with the employment verification requirements of IRCA with respect to these nonimmigrant students.

16. Employment Authorization for Temporary Workers, Exchange Visitors, and Intra-company Transferrees

In response to public comments, the final rule provides for an automatic extension of employment authorization for a period of 120 days for H, J, and L

nonimmigrants who have filed timely applications for extensions of stay. The automatic extension of employment authorization is valid only for an alien who continues employment with the same employer. In the event that INS is unable to adjudicate such an application for extension of status within the 120 day period, the alien may apply for employment authorization pursuant to the application procedure defined in the rule. Thus the regulations address continued employment authorization for employment-related classifications of nonimmigrant aliens during periods when extensions of stay are pending. They also recognize the possibility of delays in the processing of applications for extensions of stay, and provide an application procedure in the event of any unusual delay. These provisions were added in direct response to the recommendations of commentors.

17. Interim Employment Authorization

The final rule requires INS to adjudicate an application for employment authorization within sixty days from the date of the receipt by INS of the application or the date of the receipt of a returned application. Any application for employment authorization not adjudicated within sixty days will result in an automatic grant to the applicant of interim employment authorization for a period of up to 120 days. In promulgating this rule, INS recognizes the importance of expeditious processing of employment authorization applications. As in the case of the rule regarding employment authorizations for certain nonimmigrant extension applicants, this regulation was developed in response to public comment.

18. Automatic Termination of Temporary Employment Authorization

In the past, Service practice was not uniform in the grant of temporary work authorization to certain aliens such as nonimmigrants and parolees. These individuals were sometimes granted work authorization for indefinite periods of time despite its "temporary" nature, on Service Form I–94 or other documents. In order to reconcile this inconsistency with the terms of IRCA, INS has specified in the regulations that any temporary employment authorization granted prior to June 1, 1987, pursuant to 8 CFR 109.1(b) or its redesignation as § 274a.12(c), shall automatically terminate on the date specified by the Service on the document issued to the alien, or on June 1, 1988, whichever is earlier. Any document issued by the Service prior to

June 1, 1987 that authorizes temporary employment for an indefinite period beyond June 1, 1988 will become null and void on June 1, 1988, and must be surrendered to the Service on the date of the document's expiration or on June 1, 1988, whichever is earlier. The public is advised that no notice of intent to revoke or other Service advisory is necessary under this rule.

Automatic termination of such employment authorization does not preclude a subsequent application for employment authorization. The rule requires the issuance of a new employment authorization provided that the alien remains eligible for employment in the United States. This regulation is not applicable to an alien whose employment authorization is inherent in his or her status, such as a lawful permanent resident.

This rule is promulgated for the sole purpose of enabling INS to replace the multiplicity of outstanding employment authorization documents with a standard, uniform document. INS is taking this step because it believes this transition to a new uniform document is in the interest of employers and those aliens authorized to work in the United States.

This rule is a major rule within the context of E.O. 12291 in terms of the effect it will have on the national economy. A Regulatory Impact Analysis in conjunction with a Regulatory Flexibility Analysis as required by 5 U.S.C. 603 and 604, is available for review by the public upon request.

The information collection requirements contained in this regulation have been submitted to and cleared by OMB under the Paperwork Reduction Act.

List of Subjects

*8 CFR Part 109*

Aliens, Employment.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment.

For the reasons set out in the preamble, INS amends Chapter I of Title 8 of the Code of Federal Regulations as follows:

**PART 109—EMPLOYMENT AUTHORIZATION**

1. Part 109 is removed and reserved.
2. A new Part 274a is added to read as follows:

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

### Subpart A—Employer Requirements

Sec.
274a.1   Definitions.
274a.2   Verification of employment eligibility.
274a.3   Continuing employment of unauthorized aliens.
274a.4   Good faith defense.
274a.5   Use of labor through contract.
274a.6   State employment agencies.
274a.7   Pre-enactment provisions for employees hired prior to November 7, 1986.
274a.8   Prohibition of indemnity bonds.
274a.9   Enforcement procedures.
274a.10  Penalties.
274a.11  Special rule for legalization, special agricultural worker and Cuban/Haitian entrant adjustment applicants.

### Subpart B—Employment Authorization

274a.12  Classes of aliens authorized to accept employment.
274a.13  Application for employment authorization.
274a.14  Termination of employment authorization.

**Authority:** Secs. 101, 1103, 274A of the Immigration and Nationality Act. 8 U.S.C. 1101, 1103, 1324A.

### Subpart A—Employer Requirements

#### § 274a.1   Definitions.

For the purpose of this chapter—

(a) The term "unauthorized alien" means, with respect to employment of an alien at a particular time, that the alien is not at that time either: (1) Lawfully admitted for permanent residence, or (2) authorized to be so employed by this Act or by the Attorney General;

(b) The term "entity" means any legal entity, including but not limited to, a corporation, partnership, joint venture, governmental body, agency, proprietorship, or association;

(c) The term "hire" means the actual commencement of employment of an employee for wages or other remuneration;

(d) The term "refer for a fee" means the act of sending or directing a person or transmitting documentation or information to another, directly or indirectly, with the intent of obtaining employment in the United States for such person, for remuneration whether on a retainer or contingency basis; however, this term does not include union hiring halls that refer union members or non-union individuals who pay union membership dues;

(e) The term "recruit for a fee" means the act of soliciting a person, directly or indirectly, and referring that person to another with the intent of obtaining employment for that person, for remuneration whether on a retainer or contingency basis; however, this term does not include union hiring halls that refer union members or non-union individuals who pay union membership dues;

(f) The term "employee" means an individual who provides services or labor for an employer for wages or other remuneration but does not mean independent contractors as defined in paragraph (j) of this section or those engaged in casual domestic employment as stated in paragraph (h) of this section;

(g) The term "employer" means a person or entity, including an agent or anyone acting directly or indirectly in the interest thereof, who engages the services or labor of an employee to be performed in the United States for wages or other remuneration. In the case of an independent contractor or contract labor or services, the term "employer" shall mean the independent contractor or contractor and not the person or entity using the contract labor;

(h) The term "employment" means any service or labor performed by an employee for an employer within the United States, including service or labor performed on a U.S. vessel or U.S. aircraft which touches at a port in the United States, but does not include casual employment by individuals who provide domestic service in a private home that is sporadic, irregular, or intermittent;

(i) The term "State employment agency" means any State government unit designated to cooperate with the United States Employment Service in the operation of the public employment service system;

(j) The term "independent contractor" includes individuals or entities who carry on independent business, contract to do a piece of work according to their own means and methods, and are subject to control only as to results. Whether an individual or entity is an independent contractor, regardless of what the individual or entity calls itself, will be determined on a case-by-case basis. Factors to be considered in that determination include, but are not limited to, whether the individual or entity: Supplies the tools or materials; makes services available to the general public; works for a number of clients at the same time; directs the order or sequence in which the work is to be done and determines the hours during which the work is to be done. The use of labor or services of an independent contractor are subject to the restrictions in section 274A(a)(4) of the Act and § 274a.5 of this part;

(k) The term "pattern or practice" means regular, repeated, and intentional activities, but does not include isolated, sporadic, or accidental acts.

#### § 274a.2   Verification of employment eligibility.

A. *General.* This section states the requirements and procedures persons or entities must comply with when hiring, or when recruiting or referring for a fee, individuals in the United States, or continuing to employ aliens knowing that the aliens are (or have become) unauthorized aliens. The Form I-9, Employment Eligibility Verification Form, has been designated by the Service as the form to be used in complying with the requirements of this section. The Form I-9 may be obtained in limited quantities at INS District Offices, or ordered from the Superintendent of Documents, Washington, DC 20402. The Form I-9 may be photocopied or printed without regard to the restrictions set forth in § 299.4 of this Chapter. Employers need only complete the Form I-9 for individuals who are hired after November 6, 1986 and continue to be employed after May 31, 1987. Employers shall have until September 1, 1987 to complete the Form I-9 for individuals hired from November 7, 1986 through May 31, 1987. Recruiters and referrers for a fee need complete the Form I-9 only for those individuals who are recruited or referred after May 31, 1987. In conjunction with completing the Form I-9, an employer or recruiter or referrer for a fee must examine documents that evidence the identity and employment eligibility of the individual. The employer or recruiter or referrer for a fee and the individual must each complete an attestation on the Form I-9 under penalty of perjury. However, if an individual attests to an employer or recruiter or referrer for a fee, that he or she is an alien who intends to apply or has applied for benefits under the provisions of section 245A or 210 of the Act or section 202 of the Immigration Reform and Control Act of 1986, then the individual is authorized to work in the United States until September 1, 1987 without providing the employer or the recruiter or referrer for a fee with documentary evidence of work authorization. In this case, the employer, or the recruiter or referrer for a fee, should follow the procedures set forth in § 274a.11 of this part. Employers and recruiters and referrers for a fee who fail to comply with the employment verification requirements set forth in paragraph (b) of this section shall be subject to penalties as stated in § 274a.10 of this part.

AR2022_200166

(b) *Employment verification requirements*—(1) *Examination of documents and completion of Form I–9.*

(i) An individual who is hired or is recruited or referred for a fee for employment must:

(A) Complete Section 1—"Employee Information and Verification" on the Form I–9 at the time of hiring; or if an individual is unable to complete the Form I–9 or needs it translated, someone may assist him or her. The preparer or translator must read the Form to the individual, assist him or her in completing Section 1—"Employee Information and Verification," and have the individual sign or mark the Form in the appropriate place. The preparer or translator should then complete the "Preparer/Translator Certification" portion of the Form I–9; and

(B) Present to the employer or the recruiter or referrer for a fee documentation as set forth in paragraph (b)(1)(v) of this section establishing his or her identity and employment eligibility within the time limits set forth in paragraphs (b)(1)(ii) through (v) of this section. However, pursuant to the "Special Rule" set forth in § 274a.11 of this part, legalization, special agricultural worker, and Cuban/Haitian entrant adjustment applicants are authorized to work without presenting documentation establishing work authorization until September 1, 1987.

(ii) except as provided in paragraph (b)(viii) of this section, an employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, must within three business days of the hire:

(A) Physically examine the documentation presented by the individual establishing identity and employment eligibility as set forth in paragraph (b)(1)(v) of this section; and

(B) Complete Section 2—"Employer Review and Verification" on the Form I–9.

(iii) An employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, who hires an individual for employment for a duration of less than three business days must comply with paragraphs (b)(1)(ii)(A)–(B) of this section before the end of the employee's first working day.

(iv) A recruiter or referrer for a fee for employment must comply with paragraphs (b)(1)(ii)(A)–(B) of this section within three business days of the date the referred individual was hired by the employer. Recruiters and referrers may designate agents to complete the employment verification procedures on their behalf including but not limited to notaries, national associations, or employers. If a recruiter or referrer designates an employer to

complete the employment verification procedures, the employer need only provide the recruiter or referrer with a photocopy of the Form I–9.

(v) The individual may present either an original document that establishes both employment authorization and identity, or an original document that establishes employment authorization and a separate original document that establishes identity. The document identification number and expiration date (if any) should be noted in the appropriate space provided on the Form I–9. An employer or a recruiter or referrer for a fee may not specify which document or documents an individual is to present.

(A) The following documents are acceptable to evidence both identity and employment eligibility:

(*1*) United States passport;

(*2*) Certificate of United States Citizenship, INS Form N–560 or N–561;

(*3*) Certificate of Naturalization, INS Form N–550 or N–570;

(*4*) An unexpired foreign passport which:

(*i*) contains an unexpired stamp therein which reads, "Processed for I–551. Temporary Evidence of Lawful Admission for permanent residence. Valid until ———. Employment authorized." or

(*ii*) has attached thereto a Form I–94 bearing the same name as the passport and contains an employment authorization stamp, so long as the period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the Form I–94.

(*5*) Alien Registration Receipt Card, INS Form I–151 or Resident Alien INS Form I–551, provided that it contains a photograph of the bearer;

(*6*) Temporary Resident Card, INS Form I–688;

(*7*) Employment Authorization Card, INS Form I–688A.

(B) The following documents are acceptable to establish identity only:

(*1*) For individuals 16 years of age or older:

(*i*) a state-issued driver's license or state-issued identification card containing a photograph. If the driver's license or identification card does not contain a photograph, identifying information should be included such as: Name, date of birth, sex, height, color of eyes, and address;

(*ii*) School identification card with a photograph;

(*iii*) Voter's registration card;

(*iv*) U.S. military card or draft record;

(*v*) Identification card issued by federal, state, or local government agencies or entities;

(*vi*) Military dependent's identification card;

(*vii*) Native American tribal documents;

(*viii*) United States Coast Guard Merchant Mariner Card;

(*ix*) Driver's license issued by a Canadian government authority;

(*2*) For individuals under age 16 who are unable to produce a document listed in paragraph (b)(1)(v)(B)(*1*) of this section, the following documents are acceptable to establish identity only:

(*i*) School record or report card;

(*ii*) Clinic doctor or hospital record;

(*iii*) Daycare or nursery school record.

(*3*) Minors under the age of 16 who are unable to produce one of the identity documents listed in paragraph (b)(1)(v)(B) (*1*) or (*2*) of this section are exempt from producing one of the following procedures are followed:

(*i*) The minor's parent or legal guardian completes on the Form I–9 Section 1—"Employee Information and Verification" and in the space for the minor's signature, the parent or legal guardian writes the words, "minor under age 16."

(*ii*) The minor's parent or legal guardian completes on the Form I–9 the "Preparer/Translator certification."

(*iii*) The employer or the recruiter or referrer for a fee writes in Section 2—"Employer Review and Verification" under List B in the space after the words "Document Identification #" the words, "minor under age 16."

(C) The following are acceptable documents to establish employment authorization only:

(*1*) A social security number card other than one which has printed on its face "not valid for employment purposes";

(*2*) An unexpired reentry permit, INS Form I–327;

(*3*) An unexpired Refugee Travel document, INS Form I–571;

(*4*) A Certification of Birth issued by the Department of State, Form FS–545;

(*5*) A Certification of Birth Abroad issued by the Department of State, Form DS–1350;

(*6*) An original or certified copy of a birth certificate issued by a State, county, or municipal authority bearing a seal;

(*7*) An employment authorization document issued by the Immigration and Naturalization Service;

(*8*) Native American tribal document;

(*9*) United States Citizen Identification Card, INS Form I–197;

(*10*) Identification card for use of resident citizen in the United States, INS Form I–179.

AR2022_200167

(vi) If an individual is unable to provide the required document or documents within the time periods specified in paragraphs (b)(1)(ii) and (iv) of this section, the individual must present a receipt for the application of the document or documents within three days of the hire and present the required document or documents within 21 days of the hire.

(vii) If an individual's employment eligibility document expires, the employer or the recruiter or referrer for a fee must update the Form I–9 to reflect that the individual is still authorized to work in the United States; otherwise the individual may no longer be employed, recruited, or referred. In order to update the Form I–9, the employee or referred individual must present a document that either shows continuing employment eligibility or is a new grant of work authorization. The employer or the recruiter or referrer for a fee should review this document, and if it appears to be genuine and to relate to the individual, update the form by noting the document's identification number and expiration date of the Form I–9.

(viii) An employer is not required to reverify an employee's employment eligibility as set forth in paragraphs (b)(1)(i)—(v) of this section if the employee is continuing his or her employment and at all times has a reasonable expectation of employment. "Continuing employment" includes but is not limited to situations where:

(A) The employee takes approved paid or unpaid leave on account of study, illness or disability of a family member, illness or pregnancy, maternity or paternity leave, vacation, union business, or other temporary leave approved by the employer;

(B) The employee is promoted, demoted, or gets a pay raise;

(C) The employee is laid off for lack of work;

(D) The employee is on strike or in a labor dispute;

(E) The employee is reinstated after disciplinary suspension for wrongful termination, found unjustified by any court, arbitrator, or administrative body, or otherwise resolved through reinstatement or settlement;

(F) The employee transfers from one distinct unit of an employer to another distinct unit of the same employer; the employer may transfer the employee's Form I–9 to the receiving unit; or

(G) The employee continues his or her employment with a related, successor, or reorganized employer, provided that the employer obtains and maintains from the previous records and Forms I–9 where applicable. For this purpose, a

related, successor, or reorganized employer includes:

(1) The same employer at another location;

(2) An employer who continues to employ some or all of a previous employer's workforce in cases involving a corporate reorganization, merger, or sale of stock or assets; or

(3) An employer who continues to employ some or all of another employer's workforce where both employers belong to the same multi-employer association and employees continue to work in the same bargaining unit under the same collective bargaining agreement.

(2) *Retention and Inspection of Form I–9.* (i) Form I–9 must be retained by an employer or a recruiter or referrer for a fee for the following time periods:

(A) In the case of an employer, three years after the date of the hire or one year after the date the individual's employment is terminated, whichever is later;

(B) In the case of a recruiter or referrer for a fee, three years after the date of the referral.

(ii) Any person or entity required to retain Forms I–9 in accordance with this section shall be provided with at least three days notice prior to an inspection of the Forms by an authorized Service officer. At the time of inspection, the Forms I–9 must be made available at the location where the request for production was made, or if the Forms I–9 are kept at another location, at the nearest Service office to that location. No subpoena or warrant shall be required for such inspection. Any refusal or delay in presentation of the Forms I–9 for inspection is a violation of the retention requirements as set forth in section 274A(b)(3) of the Act. In addition, if the person or entity has not complied with a request to present the Forms I–9, any Service officer listed in section 242.1 of this chapter may compel production of the Forms I–9 by issuing a subpoena.

(3) *Copying of documentation.* An employer or a recruiter or referrer for a fee may, but is not required to, copy a document presented by an individual solely for the purpose of complying with the verification requirements of this section. If such copy is made, it must be retained with the Form I–9. The retention requirements in paragraph (b)(2) of this section do not apply to the photocopies.

(4) *Limitation on use of Form I–9.* Any information contained in or appended to the Form I–9, including copies of documents listed in paragraph (c) of this section used to verify an individual's identity or employment eligibility, may

be used only for enforcement of the Act and Sections 1001, 1028, 1546, or 1621 of Title 18, United States Code.

(c) *Employment verification requirements in the case of hiring an individual who was previously employed.* (1) When an employer hires an individual whom he or she has previously employed, if the employer has previously completed the Form I–9 and complied with the verification requirements set forth in paragraph (b) of this section with regard to the individual, the employer may (in lieu of completing a new Form I–9) inspect the previously completed Form I–9 and:

(i) If upon inspection of the Form I–9 relating to the individual, the employer determines that the Form I–9 relates to the individual and that the individual is eligible to work, no additional verification or new Form I–9 need be completed if the individual is hired within three years of the initial execution of the Form I–9; or

(ii) If upon inspection of the Form I–9, the employer determines that the individual is no longer eligible to work in the United States, the employer shall not rehire the individual unless he or she follows the updating procedures in paragraph (b)(1)(vii) of this section.

(2) For purposes of retention of the Form I–9 by an employer for a previously employed individual hired pursuant to paragraph (c)(1) of this section, the employer shall retain the Form I–9 for a period of three years commencing from the date of the initial execution of the Form I–9 or one year after the individual's employment is terminated, whichever is later.

(d) *Employment verification requirements in the case of recruiting or referring for a fee an individual who was previously recruited or referred.* (1) When a recruiter or referrer for a fee refers an individual for whom he or she has previously completed a Form I–9, and the recruiter or referrer has completed the Form I–9 and complied with the verification requirements set forth in paragraph (b) of this section with regard to the individual, the recruiter or referrer may (in lieu of completing a new Form I–9) inspect the previously completed Form I–9 and:

(i) If upon inspection of the Form I–9 relating to the individual, the recruiter or referrer determines that the Form I–9 relates to the individual and that the individual is authorized to work, no additional verification or new Form I–9 need be completed if the individual is referred within three years of the initial execution of the Form I–9; or

(ii) If upon inspection of the Form I–9, the recruiter or referrer determines that

AR2022_200168

the individual is no longer authorized to work in the United States, the recruiter or referrer shall not refer the individual for employment unless he or she follows the updating procedures in paragraph (b)(1)(vii) of this section.

(2) For purposes of retention of the Form I–9 by a recruiter or referrer for a previously referred individual pursuant to paragraph (d)(1) of this section, the recruiter or referrer shall retain the Form I–9 for a period of three years commencing from the date of the initial execution of the Form I–9.

### § 274a.3   Continuing employment of unauthorized aliens.

An employer who continues the employment of an employee hired after November 6, 1986, knowing that the employee is or has become an unauthorized alien with respect to that employment, is in violation of section 274(a)(2) of the Act.

### § 274a.4   Good faith defense.

An employer or a recruiter or referrer for a fee for employment who shows good faith compliance with the employment verification requirements of § 274a.2(b) of this part shall have established a rebuttable affirmative defense that the person or entity has not violated section 274A(a)(1)(A) of the Act with respect to such hiring, recruiting, or referral.

### § 274a.5   Use of labor through contract.

Any person or entity who knowingly uses a contract, subcontract, or exchange entered into, renegotiated, or extended after the date of enactment, to obtain labor or services of an unauthorized alien shall be considered to have hired the alien for employment in the United States in violation of section 274A(a)(1)(A) of the Act.

### § 274a.6   State employment agencies.

(a) *General.* A state employment agency as defined in § 274a.1 of this part may, but is not required to, verify employment eligibility pursuant to section 274A(b) of the Act. However, should a state employment agency choose to do so, it must:

(1) Complete the verification process for all individuals referred;

(2) Complete the verification process in accordance with the requirements of § 274a.2(b) of this part;

(3) Issue to an individual it refers a certification as set forth in paragraph (c) of this section, in which case an employer who hires the individual shall be deemed to have complied with the verification requirements of § 274a.2(b)(1) of this part, provided that the certification is retained by the employer in the same manner prescribed

for Form I–9 in § 274a.2(b)(2) of this part; and

(4) Require the surrender of the certification back to the agency by the individual referred, if he or she is not hired as a result of the referral.

(b) *Compliance with the provisions of section 274A of the Act.* State employment agencies which choose to verify employment eligibility of individuals pursuant to § 274a.2(b) of this part shall comply with all provisions of section 274A of the Act and the regulations issued thereunder, and are subject to the penalties provided in § 274a.10 of this part for failure to comply.

(c) *Procedures for state employment agency certification.* All certifications issued by a state employment agency pursuant to paragraph (a)(3) of this section shall conform to the following standards. They must:

(1) Be issued on official agency letterhead, signed by an appropriately designated official, and contain the embossed seal of the agency;

(2) Be addressed to the particular employing entity to which the individual is referred, and contain identifying data concerning the individual being referred;

(3) Certify that the state agency has complied with the requirements of section 274A(b) of the Act concerning verification of the identity and employment eligibility of the individual referred, and determined that the individual is authorized to work in the United States;

(4) Clearly stipulate any restrictions, conditions, or other limitations which relate to the individual's employment eligibility in the United States; and

(5) State that the employer is not required to reverify the individual's identity or employment eligibility, but must retain the certification letter in lieu of Form I–9.

(d) *Procedures for individuals who are certified by state employment agencies.* Any individual referred to a potential employer by a state employment agency pursuant to this section shall present the original certification to that employer. If the referred individual is hired, the certification shall be provided by the individual to the employer for retention. If the referred individual is not hired, the original cetification shall be surrendered by the individual to the state employment agency which issued the certificate. No copies shall be made of this certification, except as provided in paragraph (e) of this section.

(e) *Retention of state employment agency certifications.* Certifications issued by state employment agencies pursuant to this section shall be retained

in the same manner and for the same period as Form I–9:

(1) In original form by the state employment agency, upon surrender by the individual referred if he or she is not hired; or

(2) In duplicate form by the state employment agency if the individual referred is hired; and

(3) In original form by the employer if the individual referred is hired.

### § 274a.7   Pre-enactment provisions for employees hired prior to November 7, 1986.

(a) The penalties provisions as set forth in section 274A (e) and (f) of the Act for violations of section 274A (a)(2) and (b) of the Act shall not apply to the "continuing employment" of an employee who was hired prior to November 7, 1986. For purposes of this section, "continuing employment" is defined in § 274a.2(b)(vi) of this part.

(b) For purposes of this section, an employee who was hired prior to November 7, 1986 shall lose his or her pre-enactment status if the employee:

(1) Quits; or

(2) Is terminated by the employer; the term termination shall include, but is not limited to, situations in which an employee is subject to seasonal employment; or

(3) Is excluded or deported from the United States or departs the United States under an order of voluntary departure.

### § 274a.8   Prohibition of indemnity bonds.

(a) *General.* It is unlawful for a person or other entity, in hiring or recruiting or referring for a fee for employment of an individual, to require the individual to post a bond or security, to pay or agree to pay an amount, or otherwise to provide a financial guarantee or indemnity, against any potential liability arising under this part relating to such hiring, recruiting, or referring of the individual. However, this prohibition does not apply to performance clauses which are stipulated by agreement between contracting parties.

(b) *Penalty.* Any person or other entity who requires any individual to post a bond or security as stated in this section shall, after notice and opportunity for an administrative hearing in accordance with section 274A(e)(3)(B) of the Act, be subject to a civil fine of $1,000 for each violation and to an administrative order requiring the return to the individual of any amounts received in violation of this section or, if the individual cannot be located, to the general fund of the Treasury.

AR2022_200169

**§ 274a.9  Enforcement procedures.**

(a) *Procedures for the filing of complaints.* Any person or entity having knowledge of a violation or potential violation of section 274A of the Act may submit a signed, written complaint in person or by mail to the Service office having jurisdiction over the business or residence of the potential violator. The signed, written complaint must contain sufficient information to identify both the complainant and the potential violator, including their names and addresses. The complaint should also contain detailed factual allegations relating to the potential violation including the date, time and place that the alleged violation occurred and the specific act or conduct of the employer alleged to constitute a violation of the Act. Written complaints may be delivered either by mail to the appropriate Service office or by personally appearing before any immigration officer at a Service office.

(b) *Investigation.* The Service may conduct investigations for violations on its own initiative and without having received a written complaint. When the Service receives a complaint from a third party, it shall investigate only those complaints which have a reasonable probability of validity. If it is determined after investigation that the person or entity has violated section 274A of the Act, the Service shall issue and serve upon the alleged violator a citation or a Notice of Intent to Fine. Service officers shall have reasonable access to examine any relevant evidence of any person or entity being investigated.

(c) *Citation and notice of intent to fine.* If after investigation the Service determines that a person or entity has violated section 274A of the Act for the first time during the citation period (June 1, 1987 through May 31, 1988) the Service shall issue a citation. If after investigation the Service determines that a person or entity has violated section 274A of the Act for the second time during the citation period or for the first time after May 31, 1988, the proceeding to assess administrative penalties under section 274A of the Act is commenced by the Service by issuing a Notice of Intent to Fine on Form I-762. Service of this Notice shall be accomplished pursuant to Part 103 of this chapter. The person or entity identified in the Notice of Intent to Fine shall be known as the respondent. The Notice of Intent to Fine may be issued by an officer defined in § 242.1 of this chapter with concurrence of the District Counsel or his or her designee.

(1) *Contents of the notice of intent to fine.* (i) The Notice of Intent to Fine will contain a concise statement of factual allegations informing the respondent of the act or conduct alleged to be in violation of law, a designation of the charge(s) against the respondent, the statutory provisions alleged to have been violated, and the penalty that will be imposed.

(ii) The Notice of Intent to Fine will provide the following advisals to the respondent:

(A) That the person or entity has the right to representation by counsel of his or her own choice at no expense to the government;

(B) That any statement given may be used against the person or entity;

(C) That the person or entity has the right to request a hearing before an Administrative Law Judge pursuant to 5 U.S.C. 554–557, and that such request must be made within 30 days from the service of the Notice of Intent to Fine ;

(D) That the Service will issue a final order in 45 days if a written request for a hearing is not timely received and that there will be no appeal of the final order.

(d) *Answer to notice of intent to fine.* (1) If a respondent contests the issuance of a Notice of Intent to Fine, he or she must, by mail, serve a written answer responding to each allegation listed in the Notice and request a hearing within thirty days from the issuance of the Notice.

(2) If the respondent does not file an answer within thirty days, the Service shall issue a final order to which there is no appeal.

**§274a.10  Penalties.**

(a) *Criminal penalties.* An employer or a recruiter or referrer for a fee who engages in a pattern and practice of violating section 274A(a)(1)(A) or (a)(2) of the Act, may be fined not more than $3,000 for each unauthorized alien, imprisoned for not more than six months for the entire pattern or practice, or both, notwithstanding the provisions of any other Federal law relating to fine levels.

(b) *Civil penalties.* An employer or a recruiter or referrer for a fee may face civil penalties for a violation of section 274A of the Act. Civil penalties may be imposed by the Service or an Administrative Law Judge for violations under section 274A of the Act. In determining the level of the penalties that will be imposed, a finding of more than one violation in the course of a single proceeding or determination will be counted as a single violation. However, a single violation will include penalties for each unauthorized alien

who is determined to have been knowingly hired or recruited or referred for a fee.

(1) A respondent found by the Service (if the respondent fails to request a hearing) or an Administrative Law Judge (at a hearing) to have knowingly hired or to have knowingly recruited or referred for a fee unauthorized alien for employment in the United States or to have knowingly continued to employ an unauthorized alien, shall be subject to the following order:

(i) To cease and desist from such behavior;

(ii) To pay a civil fine according to the following schedule:

(A) First violation—not less than $250 and not more than $2,000 for each unauthorized alien; or

(B) Second violation—not less than $2,000 and not more than $5,000 for each unauthorized alien; or

(C) More than two violations—not less than $3,000 and not more than $10,000 for each unauthorized alien; and

(iii) To comply with the requirements of section 274a.2(b) of this part, and to take such other remedial action as is appropriate.

(2) A respondent determined by the Service (if a respondent fails to request a hearing) or by an Administrative Law Judge to have failed to comply with the employment verification requirements as set forth in § 274a.2(b) of this part, shall be subject to a civil penalty in an amount of not less than $100 and not more than $1,000 for each individual with respect to whom such violation occurred. In determining the amount of the penalty, consideration shall be given to:

(i) The size of the business of the employer being charged;

(ii) The good faith of the employer;

(iii) The seriousness of the violation;

(iv) Whether or not the individual was an unauthorized alien; and

(v) The history of previous violations of the employer.

(3) Where an order is issued with respect to a respondent composed of a distinct, physically separate subdivision which does its own hiring or its own recruiting or referring for a fee for employment (without reference to the practices of, or under the control of or common control with, another subdivision) the subdivision shall be considered a separate person or entity.

(c) *Enjoining pattern or practice violations.* If the Attorney General has reasonable cause to believe that a person or entity is engaged in a pattern or practice of employment, recruitment or referral in violation of section 274A(a)(1)(A) or (2) of the Act, the

AR2022_200170

**16226** Federal Register / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

Attorney General may bring civil action in the appropriate United States District Court requesting relief, including a permanent or temporary injunction, restraining order, or other order against the person or entity, as the Attorney General deems necessary.

### §274a.11 Special rule for legalization, special agricultural worker, and Cuban/Haitian entrant adjustment applicants.

An individual who claims to be eligible, and who intends to apply or has applied, for benefits pursuant to section 245A or 210 of the Act or section 202 of the Immigration and Reform and Control Act of 1986, is authorized to work without presenting an employer or a recruiter or referrer for a fee with documentary evidence of work authorization. When an individual indicates to an employer or a recruiter or referrer for a fee that he or she claims to qualify for such benefits and that he or she intends to apply or has applied for such benefits, he or she shall attest to that fact by checking on the Form I-9, the third box of Part 1 (Employee Information and Verification) and noting "Special Rule" in the space after "Alien Number A_____" and "September 1, 1987" in the space after "expiration of employment authorization." The individual must also provide a document listed in § 274a.2(b)(1)(v)(B) of this part that establishes identity. The employer shall follow all of the employment verification procedures set forth in § 274a.2(b) of this part except that the employer or the recruiter or referrer for a fee shall note on the Form I-9 that the individual has stated his or her intention to seek such benefits by writing on the Form I-9 in Section 2—"Employer Review and Verification" under List C ("Documents that Establish Employment Eligibility") in the space after "Document Identification" the words "Special Rule" and in the space after "Expiration Date," "September 1, 1987". After September 1, 1987, such individuals, employers and recruiters and referrers for a fee will be required to fully comply with all provisions of § 274a.2(b) of this part. Employers, recruiters, and referrers, however, may update the Form I-9 if they follow the procedures set forth in § 274a.2(b)(2) of this part.

### Subpart B—Employment Authorization

### § 274a.12 Classes of aliens authorized to accept employment.

(a) *Aliens authorized employment incident to status.* Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes, and specific employment authorization need not be requested:

(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I-151 or Form I-551 issued by the Service;

(2) An alien admitted to the United States as a lawful temporary resident pursuant to section 245A or 210 of the Act, as evidenced by an employment authorization document issued by the Service;

(3) An alien admitted to the United States as a refugee pursuant to section 207 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(4) An alien paroled into the United States as a refugee for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(5) An alien granted asylum under section 208 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(6) An alien admitted to the United States as a nonimmigrant fiance or fiancee pursuant to section 101(a)(15)(K) of the Act, or an alien admitted as the child of such alien, for the period of admission of the United States, as evidenced by an employment authorization document issued by the Service;

(7) An alien admitted as a parent (N-8) or dependent child (N-9) of an alien granted permanent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a citizen of the Federated States of Micronesia (CFA/FSM) or of the Marshall Islands (CFA/MIS) pursuant to agreements between the United States and the former trust territories, as evidenced by an employment authorization document issued by the Service;

(9) An alien granted suspension of deportation under section 244(a) of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(10) An alien granted withholding of deportation under section 243(h) of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or

(11) An alien who has been granted extended voluntary departure by the Attorney General as a member of a nationality group pursuant to a request by the Secretary of State. Employment is authorized for the period of time in that status as evidenced by Form I-___ issued by the Service.

(b) *Aliens authorized for employment with a specific employer incident to status.* The following classes of nonimmigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. An alien in one of these classes is not issued an employment authorization document by the Service:

(1) A foreign government official (A-1 or A-2), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government entity;

(2) An employee of a foreign government official (A-3), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government official;

(3) A foreign government official in transit (C-2 or C-3), pursuant to § 214.2(c) of this chapter. An alien in this status may be employed only by the foreign government entity;

(4) A nonimmigrant crewman (D-1 or D-2) pursuant to § 214.2(d), and Parts 252 and 253, of this chapter. An alien in this status may be employed only in a crewman capacity on the vessel or aircraft of arrival, or on a vessel or aircraft of the same transportation company, and may not be employed in connection with domestic flights or movements of a vessel or aircraft;

(5) A nonimmigrant treaty trader (E-1) or treaty investor (E-2), pursuant to § 214.2(e) of this chapter. An alien in this status may be employed only by the treaty-qualifying company through which the alien attained the status. Employment authorization does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E'1" or "E-2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant student (F-1) pursuant to § 214.2(f)(9) of this chapter. An alien in this status may be employed only in accordance with the following conditions:

(i) On campus for not more than twenty hours a week while school is in session; or

AR2022_200171

(ii) On campus full time when school is not in session if the student is eligible and intends to register for the next term or session. In addition, a nonimmigrant student (F–1) may engage in a work-study program as part of the regular curriculum available within the student's program of study in accordance with the conditions specified in § 214.2(f)(10) of this chapter;

(7) A representative of an international organization (G–1, G–2, G–3, or G–4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G–5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to § 214.2(h) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extent to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J–1), pursuant to § 214.2(j) of this chapter. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the United States Information Agency;

(12) An intra-company transferee (L–1), pursuant to § 214.2(l) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO–1, NATO–2, NATO–3, NATO–4, NATO–5 and NATO–6), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by NATO;

(14) An attendant, servant or personal employee (NATO–7) of an alien admitted as a NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6, pursuant to § 214.2(o) of this chapter. An alien admitted under this classification may be employed only by

the NATO alien through whom the status was obtained; or

(15) A nonimmigrant alien within the class of aliens described in paragraphs (b)(9), (11), and (12) of this section whose status has expired but who has filed a timely application for an extension of such status pursuant to §214.2 of this chapter. These aliens are authorized to continue employment with the same employer for a period not to exceed 120 days beginning on the date of the expiration of the authorized period of stay. If the alien's application for extension of stay has not been adjudicated within this period, the alien may apply to the district director for employment authorization pursuant to paragraph (c)(15) of this section.

(c) *Aliens who must apply for employment authorization.* Any alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions indicated in the regulations or cited on the employment authorization document;

(1) An alien spouse or unmarried dependent son or daughter of a foreign government official (A–1 or A–2) pursuant to § 214.2(a)(2) of this chapter, or the dependent of an employee of a foreign government official (A–3) pursuant to § 214.2(a)(3) of this chapter;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:

(i) Is seeking off-campus employment authorization due to economic necessity pursuant to § 214.2(f) of this Chapter;

(ii) Is seeking employment for purposes of practical training pursuant to § 214.2(f) of this chapter. The alien may be employed only in an occupation which is directly related to his or her course of studies; or

(iii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669), if such international organization provides written certification to the district director having jurisdiction over the intended place of employment that the proposed employment is within the scope of the organization's sponsorship;

(4) An alien spouse or unmarried dependent son or daughter of an officer or employee of an international organization (G–4) pursuant to § 214.2(g) of this chapter;

(5) An alien spouse or minor child of an exchange visitor (J–2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M–1) student seeking employment for practical training pursuant to § 214.2(m) of this chapter following completion of studies if such employment is directly related to the student's course of study;

(7) A dependent of an alien classified as NATO–1 through NATO–7 pursuant to § 214.2(n) of this chapter;

(8) Any alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(9) Any alien who has filed an application for adjustment of status to lawful permanent resident pursuant to Part 245 of this chapter. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(10) Any alien who has filed an application for suspension of deportation pursuant to Part 244 of this chapter, if the alien establishes an economic need to work. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(11) Any alien paroled into the United States temporarily for emergent reasons or reasons deemed strictly in the public interest pursuant to § 212.5 of this chapter;

(12) Any deportable alien granted voluntary departure, either prior to or after hearing, for reasons set forth in §242.5(a)(2) (v), (vi), or (viii) of this chapter may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any extension granted beyond such date. Factors which may be considered in adjudicating the employment application of an alien who has been granted voluntary departure are the following:

(i) The length of voluntary departure granted;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Whether there is a reasonable chance that legal status may ensue in the near future; and

AR2022_200172

**16228**    **Federal Register** / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

(iv) Whether there is a reasonable basis for consideration of discretionary relief.

(13) Any alien against whom exclusion or deportation proceedings have been instituted, who does not have a final order of deportation or exclusion, and who is not detained may be granted temporary employment authorization if the district director determines that employment is appropriate. Factors which may be considered by the district director in adjudicating the employment application of such an alien are the following:

(i) The existence of the economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Whether there is a reasonable chance that legal status may ensue in the near future; and

(iv) Whether there is a reasonable basis for consideration of discretionary relief;

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) A nonimmigrant alien within the class of aliens described in paragraphs (b)(9), (11), and (12) of this section whose application for extension of stay has not been adjudicated within the 120-day period as set forth in paragraph (b)(15) of this section.

(d) *Basic criteria to establish economic necessity.* Title 45—Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under §274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.

**§ 274a.13   Application for employment authorization.**

(a) *General.* An application (in the form of a written request) for employment authorization by an alien under § 274.12(c) of this chapter shall be filed with the district director having jurisdiction over the applicant's residence. Except for paragraph (c)(8) of this section, the approval of an application for employment authorization shall be within the

discretion of the district director. Where economic necessity is identified as a factor, the alien must provide information regarding his or her assets, income, and expenses on the application for employment authorization.

(b) *Approval of application.* If the application is granted, the alien shall be notified of the decision and issued employment authorization for a specific period of time. Such authorization shall be subject to any conditions noted on the employment authorization document.

(c) *Denial of application.* If the application is denied, the applicant shall be notified in writing of the decision and the reasons for the denial. There shall be no appeal from the denial of the application.

(d) *Interim employment authorization.* The district director shall adjudicate the application for employment authorization within 60 days from the date of receipt of the application by the Service or the date of receipt of a returned application by the Service. Failure to complete the adjudication within 60 days will result in the grant of interim employment authorization for a period not to exceed 120 days. Such authorization shall be subject to any conditions noted on the employment authorization document. However, if the district director adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the employment authorization granted under this section shall automatically terminate.

**§ 274a.14   Termination of employment authorization.**

(a) *Automatic termination of employment authorization.*

(1) Employment authorization granted under § 274a.12(c) of this chapter shall automatically terminate upon the occurrence of one of the following events:

(i) The expiration date specified by the Service on the employment authorization document is reached;

(ii) Exclusion or deportation proceedings are instituted (however, this shall not preclude the authorization of employment pursuant to § 274.12(c) of this part where appropriate); or

(iii) The alien is granted voluntary departure.

(2) Termination of employment authorization pursuant to this paragraph does not require the service of a notice of intent to revoke; employment authorization terminates upon the occurrence of any event enumerated in paragraph (a)(1) of this section.

However, automatic revocation under this section does not preclude reapplication for employment authorization under § 274.12(c) of this part.

(b) *Revocation of employment authorization*— (1) *Basis for revocation of employment authorization.* Employment authorization granted under § 274a.12(c) of this chapter may be revoked by the district director:

(i) Prior to the expiration date, when it appears that any condition upon which it was granted has not been met or no longer exists, or for good cause shown, or

(ii) Upon a showing that the information contained in the application is not true and correct.

(2) *Notice of intent to revoke employment authorization.* When a district director determines that employment authorization should be revoked prior to the expiration date specified by the Service, he or she shall serve written notice of intent to revoke the employment authorization. The notice will cite the reasons indicating that revocation is warranted. The alien will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.

(c) *Automatic termination of temporary employment authorization granted prior to June 1, 1987.* (1) Temporary employment authorization granted prior to June 1, 1987, pursuant to 8 CFR 109.1(b), or its redesignation as § 274a.12(c) of this part, shall automatically terminate on the date specified by the Service on the document issued to the alien, or on June 1, 1988, whichever is earlier. Automatic termination of temporary employment authorization does not preclude a subsequent application for temporary employment authorization.

(2) A document issued by the Service prior to June 1, 1987, that authorizes temporary employment authorization for any period beyond June 1, 1988, is null and void pursuant to paragraph (c)(1) of this section, and must be surrendered to the Service on the date that the temporary employment authorization terminates or on June 1, 1988, whichever is earlier. The alien shall be issued a new employment authorization document at the time the document is surrendered to the Service if the alien is eligible for temporary employment authorization pursuant to § 274a.12(c) of this chapter.

(3) No notice of intent to revoke is necessary for the automatic termination of temporary employment authorization pursuant to this part.

Dated: April 28, 1987.

Alan C. Nelson,

*Commissioner, Immigration and Naturalization Service.*

[FR Doc. 87–9896 Filed 4–30–87; 8:45 am]

BILLING CODE 4410—AR2022_200173

57 FR 28700-02, 1992 WL 142927(F.R.)

NOTICES

DEPARTMENT OF JUSTICE

(INS No. 1459-92)

RIN 1115-AC30

Deferral of Enforced Departure for Salvadorans

Friday, June 26, 1992

**\*28700**  AGENCY: Immigration and Naturalization Service, Justice.

**\*28701**  ACTION: Notice of deferral of enforced departure for Salvadorans.

SUMMARY: The President has directed that the Immigration and Naturalization Service (the Service) defer, until June 30, 1993, the enforced departure of Salvadoran nationals who have been granted Temporary Protected Status (TPS) under the provisions of section 303 of the Immigration Act of 1990. The Salvadoran TPS program will expire on June 30, 1992, as stipulated by the Act. This notice automatically extends until October 31, 1992, employment authorization previously granted to a Salvadoran who registered for the first period, and then re-registered for the second period, of TPS.

EFFECTIVE DATE: July 1, 1992.

FOR FURTHER INFORMATION CONTACT:Pearl B. Chang or Marcela C. Moglia, Senior Immigration Examiner, Immigration and Naturalization Service, Examinations Division, 425 I Street, NW., room 7122, Washington, DC 20536, Telephone (202) 514-3240.

SUPPLEMENTARY INFORMATION: Section 303 of the Immigration Act of 1990, Public Law 101-649, dated November 29, 1990, designated El Salvador as a special TPS country for a period of eighteen (18) months beginning January 1, 1991, and ending June 30, 1992. Eligible Salvadorans who registered under this special TPS program were granted employment authorization in six-month increments. In accordance with the statute, the Service has served on the Salvadorans registering for the final period of TPS an order to show cause (OSC) which establishes a date for deportation proceedings after the TPS designation terminates.

However, because El Salvador cannot currently accommodate the repatriation of approximately 150,000 people granted TPS, President Bush has directed that the deportation of Salvadoran nationals who were granted TPS not be enforced before June 30, 1993. The deferred enforced departure (DED) is available to all of the Salvadorans who were granted TPS during the initial registration period between January 1, 1991, and October 31, 1991, and who have re-registered for the second period. Eligible Salvadorans who apply for benefits under DED will be granted employment authorization until June 30, 1993.

Eligible Salvadorans may request DED by mailing or submitting in person, depending on the practice of the District Office having jurisdiction over their place of residence, a completed Form I-765 any time before June 30, 1993. (Applicants should inquire about the filing procedures at the local INS office.) No fee is required for DED registration. Form I-765 will be filed with the required fee of $60 only if the alien is requesting employment authorization. The Service will adjudicate the I-765 and grant employment authorization on Form I-688B until June 30, 1993, as appropriate. DED applicants who have been issued an OSC pursuant to TPS bearing a hearing date of March 30, 1993, will be provided a notice that such hearing is canceled. A new hearing date will be scheduled at a later time.

The Service anticipates that the majority of the 150,000 eligible Salvadorans will seek to renew their employment authorization under DED on or about July 1, 1992, to avoid interruption in employment authorization. To allow the Service sufficient time to effect an orderly renewal of employment authorizations for this inordinately large group of applicants, the Service is granting

an automatic extension until October 31, 1992, of the validity of any employment authorization document (EAD) which expires on or after December 31, 1991 and was previously issued to a TPS Salvadoran pursuant to 8 CFR 274a.12(a)(12). Affected Salvadorans should apply for renewal of their EADs at least three months before the expiration of the automatic extension (that is, no later than July 31, 1992) to ensure continuous employment authorization.

Employers of TPS Salvadorans whose employment authorization is automatically extended until October 31, 1992, pursuant to this notice, must accept for purposes of verifying or reverifying employment eligibility an Employment Authorization Document (EAD), Form I-688B, bearing an expiration date of December 31, 1991, or later and containing a notation "274a.12(a)(12)" on the face of the document under "Provision of Law."

Dated: June 19, 1992.

Gene McNary,

Commissioner, Immigration and Naturalization Service.

(FR Doc. 92-15068 Filed 6-25-92; 8:45 am)

BILLING CODE 4410-10-M

---

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

order's termination. However, a handler would continue to be required to maintain records of milk receipts and sales into another Federal order marketing area and report them to the market administrator of the other marketing area. In addition, if a handler's sales into another Federal order marketing area become a large enough percentage of a handler's milk receipts, a handler would be pooled under another order and incur the same reporting, recordkeeping and payment obligations it currently has under the Black Hills order.

Termination of the order will remove government enforcement of minimum prices to handlers and to producers that are determined by supply and demand conditions. It will also remove other stabilizing features of the regulatory program such as: an impartial audit of handler records to insure payment to dairy farmers and to verify the reported uses of milk; the assurance to farmers of accurate weighing, testing, classification and accounting for milk; and the existence of marketing information to evaluate market performance. Thus, it is likely that market conditions would tend to become less orderly or stable. However, it must be assumed that the consequences of the removal of the regulatory program have been considered by the cooperative association that has requested the action, and that possibly other approaches have or will be made to replace the stabilizing influence of the order.

Regardless of the possible economic effects of the order termination on the small entities involved, a termination is required by the Agricultural Marketing Agreement Act of 1937, as amended, whenever a termination is requested by a majority of the producers engaged in the production of milk for sale in the marketing area in a representative period determined by the Secretary. Black Hills Milk Producers, as the cooperative association representing all of the producers whose milk is pooled under the Black Hills milk order, has requested that the order be terminated.

**Determination**

It is hereby determined that termination of the Black Hills, South Dakota, order, Part 1075, is favored by a majority of the producers engaged in the production of milk for sale in the marketing area in the representative period, determined to be June 1996, and that such producers produced more than 50 percent of the milk produced for sale in the Black Hills, South Dakota, milk marketing area in such representative period.

It is also determined that notice of proposed rule making and public procedure thereon is impracticable, unnecessary and contrary to the public interest. Section 608(c)(16)(B) of the Agricultural Marketing Agreement Act of 1937, as amended, requires that if a majority of the producers engaged in the production of milk for sale in the marketing area in a representative period determined by the Secretary favor termination of the order, and such producers produced more than 50 percent of the milk produced for sale in the marketing area in the representative period, that such order shall be terminated. It is therefore necessary that the provisions of the order, as amended, subject to specific exceptions, be terminated effective October 1, 1996.

**List of Subjects in 7 CFR Part 1075**

Milk marketing orders.

**Order**

Pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601 *et seq.*) it is hereby ordered that all provisions of the order, as amended, regulating the handling of milk in the Black Hills, South Dakota, marketing area (7 CFR Part 1075) except § 1075.1, which incorporates the General Provisions in Part 1000, are hereby terminated effective October 1, 1996.

Milk marketing orders.

For the reason set forth in the preamble, 7 CFR Part 1075 is amended as follows:

**PART 1075—MILK IN THE BLACK HILLS, SOUTH DAKOTA, MARKETING AREA**

1. The authority citation for 7 CFR Part 1075 continues to read as follows:

**Authority:** (Secs. 1–19, 48 Stat. 31, as amended; 7 U.S.C. 601–674).

**§§ 1075.2 through 1075.85   [Removed]**

2. In part 1075 §§ 1075.2 through 1075.85 and their undesignated center headings are removed effective October 1, 1996.

Dated: August 30, 1996.

**Michael V. Dunn,**

*Assistant Secretary, Marketing and Regulatory Programs.*

[FR Doc. 96–22786 Filed 9–5–96; 8:45 am]

**BILLING CODE 3410–02–P**

**DEPARTMENT OF JUSTICE**

**Immigration and Naturalization Service**

**8 CFR Part 103**

[AG Order No. 2054–96; INS No. 1792–96]

**RIN 1115–AE51**

**Definition of the Term Lawfully Present in the United States for Purposes of Applying for Title II Benefits Under Section 401(b)(2) of Public Law 104–193**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Interim rule with request for comments.

---

**SUMMARY:** This interim rule amends the Immigration and Naturalization Service (Service) regulations to define the term ''an alien who is lawfully present in the United States'' so that the Social Security Administration may determine which aliens in the United States are eligible for benefits under title II of the Social Security Act. Aliens who are considered ''lawfully present in the United States,'' however, must otherwise satisfy the requirements for benefits under title II of the Social Security Act in order to receive social security benefits.

**DATES:** This rule is effective September 6, 1996. Written comments must be received on or before November 5, 1996.

**ADDRESSES:** Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS number 1792–96 on your correspondence. Comments are available for public inspection at this location by calling (202) 514–3048 to arrange an appointment.

**FOR FURTHER INFORMATION CONTACT:** Derek C. Smith, Assistant General Counsel, Office of the General Counsel; or Sophia Cox, Adjudications Officers, Adjudications Division; Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–2895 or (202) 514–5014.

**SUPPLEMENTARY INFORMATION:** On August 22, 1996, the President signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Personal Responsibility Act), Pub. L. 104–193. Section 401(a) of the Personal Responsibility Act provides that, subject to limited exceptions, only ''qualified aliens,'' as defined under section 431, may receive Federal public benefits,

**47040**   **Federal Register** / Vol. 61, No. 174 / Friday, September 6, 1996 / Rules and Regulations

including retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, and unemployment benefits, among others.

Section 431(b) of the Personal Responsibility Act defines the term "qualified alien" to mean the following six groups of aliens:

(1) Aliens who are lawfully admitted for permanent residence under the Immigration and Nationality Act (Act);

(2) Aliens who are granted asylum under section 208 of the Act;

(3) Refugees admitted into the United States under section 207 of the Act;

(4) Aliens who are paroled into the United States under section 212(d)(5) of the Act for a period of at least 1 year;

(5) Aliens whose deportation is being withheld under section 243(h) of the Act; and

(6) Aliens who are granted conditional entry pursuant to section 203(a)(7) of the Act as in effect prior to April 1, 1980.

Section 401(b)(2) of the Personal Responsibility Act, however, provides an exception, which allows aliens who are "lawfully present in the United States," as determined by the Attorney General, to receive benefits under title II of the Social Security Act. (Title II benefits include, for example, retirement benefits.) The purpose of this regulation, therefore, is to define the term "an alien who is lawfully present in the United States," as required under section 401(b)(2) of the Personal Responsibility Act, thereby enabling the Social Security Administration to determine whether aliens who are not "qualified aliens" are eligible to receive title II benefits, if they are lawfully present in this country. This definition is made solely for the purpose of determining an alien's eligibility for payment of title II social security benefits, as required under section 401(b)(2) of the Personal Responsibility Act, and is not intended to confer any immigration status or benefit under the Immigration and Nationality Act.

In determining which aliens are lawfully present for the purposes of section 401(b)(2) of Public Law 104–193, the Service had to distinguish among many classes of aliens in the United States. The characteristic common to all the classes of aliens defined as "lawfully present in the United States" is that their presence in the United States has been sanctioned by a policy determination that a particular class of aliens should be allowed to remain in the United States, and that policy determination has almost always been implemented by an official act having the force of law. Each

of the five categories defined as lawfully present fits within this rationale. First, the Service has concluded that Congress intended for qualified aliens, as defined in section 431(b) of the Personal Responsibility Act, to be included in the definition of lawfully present. Second, aliens who have been inspected and admitted to the United States and have not violated their status are lawfully present under the terms of the Immigration and Nationality Act. Third, an alien who has been paroled into the United States is lawfully present pursuant to section 212(d)(5) of the Act. However, persons who are paroled in order to determine whether or not they must be excluded under the Act are not lawfully present because no determination has been made as to the lawfulness of their presence, and they are allowed into the United States to avoid having to keep them in detention while they wait proceedings. Fourth, aliens who belong to one of the seven classes of aliens listed in section 103.12(a)(4) of this rule have been permitted to remain in the United States either by an act of Congress or through some other policy determination affecting that class of aliens. Aliens in temporary resident status pursuant to section 210 or 245A of the Act, aliens under Temporary Protected Status (TPS) pursuant to section 244A of the Act, and Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649 are all in lawful status under the Act. Cuban-Haitian entrants, aliens in deferred action status, aliens under Deferred Enforced Departure, and aliens who are the spouses and children of a United States citizen with an approved visa petition all remain in the United States under a Presidential or administrative policy that permits them to do so. Finally, applicants for asylum and withholding of deportation are permitted to remain in the United States because section 208(a) of the Act requires the Attorney General to create a procedure for adjudicating claims for asylum made by aliens physically present in the United States. Section 208(a) of the Act was passed to implement the obligations of the United States under the Convention Relating to the Status of Refugees, of July 28, 1951, as incorporated into the Protocol Relating to the Status of Refugees, of January 31, 1967.

**Good Cause Exception**

This interim rule is effective upon publication in the **Federal Register** although the Service invites post-promulgation comments and will address any such comments in a final rule. For the following reasons, the

Service finds that good cause exists for adopting this rule without the prior notice and comment period ordinarily required by 5 U.S.C. 553(b). Section 401(b)(2) of Pub. L. 104–193 requires the Attorney General to define the term "an alien lawfully present in the United States" so that the Social Security Administration can determine which aliens are eligible for payment of title II social security benefits under the terms of the Social Security Act. Absent a definition of "an alien lawfully present in the United States," section 401(a) of Pub. L. 104–193 requires the Social Security Administration to suspend payments under title II for aliens who are not "qualified aliens" (as defined under section 431(b)) and who file applications on or after September 1, 1996. It is therefore impracticable to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b).

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities, because this regulation affects individuals, not small entities.

**Executive Order 12866**

This interim rule is considered by the Department of Justice, Immigration and Naturalization Service, to be a "significant regulatory action" under E.O. 12866, section 3(f), Regulatory Planning Review, and it has been submitted to the Office of Management and Budget for review under E.O. 12866.

**Executive Order 12988**

This interim rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of E.O. 12988.

**Executive Order 12612**

This regulation will not have a substantial direct effect on the States, on the relationships between the National government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with E.O. 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

**List of Subjects in 8 CFR Part 103**

Administrative practice and procedure, Authority delegations

(Government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS

1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; L.E.O. 12356; 47 FR 14874, 15557; 3 CFR 1982 Comp., p. 166; 8 CFR part 2.

2. A new § 103.12 is added to read as follows:

### § 103.12   Definition of the term "lawfully present" aliens for purposes of applying for Title II social security benefits under Public Law 104–193.

(a) *Definition of the term an "alien who is lawfully present in the United States."* For the purposes of section 401(b)(2) of Pub. L. 104–193 only, an "alien who is lawfully present in the United States" means:

(1) A qualified alien as defined in section 431(b) of Pub. L. 104–193;

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending exclusion proceedings under 236(a) of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(a)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because the Attorney General has decided for humanitarian or other public policy reasons not to initiate deportation or exclusion proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244A of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) Pub. L. 99–603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status pursuant to Service Operations Instructions at OI 242.1(a)(22);

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of deportation under section 243(h) of the Act who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) *Non-issuance of an Order to Show Cause and non-enforcement of deportation and exclusion orders.* An alien may not be deemed to be lawfully present solely on the basis of the Service's decision not to, or failure to, issue an Order to Show Cause or solely on the basis of the Service's decision not to, or failure to, enforce an outstanding order of deportation or exclusion.

Dated: September 4, 1996.

**Janet Reno,**

*Attorney General.*

[FR Doc. 96–22963 Filed 9–4–96; 3:10 pm]

**BILLING CODE 4410–10–M**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

#### 14 CFR Part 39

**[Docket No. 96–SW–08–AD; Amendment 39–9740; AD 96–18–15]**

**RIN 2120–AA64**

### Airworthiness Directives; Bell Helicopter Textron, A Division of Textron Canada Ltd. Model 222, 222B, 222U, and 230 Helicopters

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This amendment supersedes an existing airworthiness directive (AD) 96–01–08, which superseded Priority Letter AD 95–23–02, both of which were applicable to certain serial-numbered Bell Helicopter Textron, A Division of Textron Canada Ltd. (BHT) Model 222, 222B, 222U, and 230 helicopters, that currently requires an initial check of both surfaces of each tail rotor blade (blade) for cracks; an inspection of the blade skin if a crack of a specified size or location is found in the paint; and replacement of the blade if a crack is found in the blade skin. This AD requires the same actions as required by the existing AD, but expands the applicability to include additional blade part numbers (P/N). This amendment is prompted by three incidents in which a crack developed in the stainless steel blade skins due to sanding marks on the blades that occurred during the manufacturing process on BHT Model 230 helicopters, which are similar in design to the Model 222, 222B and 222U helicopters. The actions specified by this AD are intended to prevent failure of a blade due to a fatigue crack, loss of the tail rotor and tail rotor gear box, and subsequent loss of control of the helicopter.

**DATES:** Effective September 23, 1996.

Comments for inclusion in the Rules Docket must be received on or before November 5, 1996.

**ADDRESSES:** Submit comments in triplicate to the Federal Aviation Administration (FAA), Office of the Assistant Chief Counsel, Attention: Rules Docket No. 96–SW–08–AD, 2601 Meacham Blvd., Room 663, Fort Worth, Texas 76137.

**FOR FURTHER INFORMATION CONTACT:** Mr. Charles Harrison, Aerospace Engineer, Rotorcraft Certification Office, Rotorcraft Directorate, FAA, Fort Worth, Texas 76193–0170, telephone (817) 222–5447, fax (817) 222–5960.

**SUPPLEMENTARY INFORMATION:** On November 3, 1995, the FAA issued priority letter AD 95–23–02, applicable to certain serial-numbered BHT Model 222, 222B, 222U, and 230 helicopters, to require an initial check of both surfaces of each blade for cracks; an inspection of the blade skin if a crack of a specified size or location was found in the paint; and replacement of the blade if a crack was found in the blade skin. That action was prompted by two incidents in which a crack developed in the stainless steel blade skins on BHT Model 230 helicopters. In one of these incidents, the blade failed during flight. Subsequent investigation revealed fatigue cracks originating from sanding marks on the blade skin. The cracks were located just outboard of the stainless steel blade doubler. That condition, if not corrected, could result in failure of a blade due to a fatigue crack, loss of the tail rotor and tail rotor gear box, and subsequent loss of control of the helicopter. Subsequent to the issuance of the priority letter AD, the FAA issued AD 96–01–08 to publish the



# FEDERAL REGISTER

Vol. 80          Wednesday,

No. 37           February 25, 2015

Part IV

# Department of Homeland Security

8 CFR Parts 214 and 274a
Employment Authorization for Certain H–4 Dependent Spouses; Final Rule

**10284** **Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 214 and 274a**

[CIS No. 2501–10; DHS Docket No. USCIS–2010–0017]

**RIN 1615–AB92**

**Employment Authorization for Certain H–4 Dependent Spouses**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security ("DHS" or "Department") regulations by extending eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants who are seeking employment-based lawful permanent resident ("LPR") status. Such H–1B nonimmigrants must be the principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140), or have been granted H–1B status in the United States under the American Competitiveness in the Twenty-first Century Act of 2000, as amended by the 21st Century Department of Justice Appropriations Authorization Act. DHS anticipates that this regulatory change will reduce personal and economic burdens faced by H–1B nonimmigrants and eligible H–4 dependent spouses during the transition from nonimmigrant to LPR status. The final rule will also support the goals of attracting and retaining highly skilled foreign workers and minimizing the disruption to U.S. businesses resulting from H–1B nonimmigrants who choose not to pursue LPR status in the United States. By providing the possibility of employment authorization to certain H–4 dependent spouses, the rule will ameliorate certain disincentives for talented H–1B nonimmigrants to permanently remain in the United States and continue contributing to the U.S. economy as LPRs. This is an important goal considering the contributions such individuals make to entrepreneurship and research and development, which are highly correlated with overall economic growth and job creation. The rule also will bring U.S. immigration policies concerning this class of highly skilled workers more in line with those of other countries that are also competing to attract and retain similar highly skilled workers.

**DATES:** This final rule is effective May 26, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Oppenheim, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–1470.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Major Provisions of the Regulatory Action
  D. Summary of Costs and Benefits
  E. Effective Date
II. Background
  A. Current Framework
  B. Proposed Rule
  C. Final Rule
III. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Classes Eligible for Employment Authorization
  1. Comments Supporting the Rule
  2. Comments Requesting Expansion of the Rule
  3. Comments Opposing the Rule
  4. Comments Requesting a More Restrictive Policy
  C. Legal Authority To Extend Employment Authorization to Certain H–4 Dependent Spouses
  D. Comments on the Analysis of Executive Orders 12866 and 13563
  1. Comments Related to Labor Market Impacts
  2. Comments on the Volume Estimate and Methodology
  3. Comments on Specific Costs and Benefits Discussed in the Analysis
  E. Comments on the Application for Employment Authorization
  1. Streamlined or Modernized Filing Procedures
  2. Employment Authorization Document (Form I–766) Validity Period
  3. EAD Renewals
  4. Acceptable Evidentiary Documentation
  5. Concurrent Filings
  6. Premium Processing
  7. Automatic Extensions of Work Authorization
  8. Filing Fees
  9. *Possible Restrictions on EADs Issued to H–4 Dependent Spouses*
  10. Circular EADs
  11. Form I–765 Worksheets
  12. Other Related Issues
  F. Fraud and Public Safety Concerns
  1. Falsifying Credentials and Marriage Fraud
  2. Prohibition Related to Felony Charges and Convictions
  3. Unauthorized Employment
  4. Employer Abuse of H–1B Nonimmigrants and H–4 Dependent Spouses
  G. General Comments
  H. Modifications to the H–1B Program and Immigrant Visa Processing
  1. H–1B Visa Program
  2. Immigrant Visa Processing and Adjustment of Status
  I. H–1B Nonimmigrant's Maintenance of Status
  J. Environmental Issues
  K. Reporting
  L. Implementation
IV. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Purpose of the Rule
  3. Volume Estimate
  4. Costs
  5. Benefits
  6. Alternatives Considered
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act
V. Regulatory Amendments

## I. Executive Summary

### A. Purpose of the Regulatory Action

DHS does not currently extend eligibility for employment authorization to H–4 dependents (spouses and unmarried children under 21 years of age) of H–1B nonimmigrants. *See* 8 CFR 214.2(h)(9)(iv). The lack of employment authorization for H–4 dependent spouses often gives rise to personal and economic hardships for the families of H–1B nonimmigrants. Such hardships may increase the longer these families remain in the United States. In many cases, H–1B nonimmigrants and their families who wish to acquire LPR status in the United States must wait many years for employment-based immigrant visas to become available. These waiting periods increase the disincentives for H–1B nonimmigrants to pursue LPR status and thus increase the difficulties that U.S. employers have in retaining highly educated and highly skilled nonimmigrant workers. These difficulties can be particularly acute in cases where an H–1B nonimmigrant's family is experiencing economic strain or other stresses resulting from the H–4 dependent spouse's inability to seek employment in the United States. Retaining highly skilled workers who intend to acquire LPR status is important to U.S. businesses and to the Nation given the contributions of these individuals to U.S. businesses and the U.S. economy. These individuals, for example, contribute to advances in entrepreneurship and research and development, which are highly correlated with overall economic growth and job creation.

In this final rule, DHS is amending its regulations to extend eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants to support the retention

AR2022_200180

of highly skilled workers who are on the path to lawful permanent residence. DHS expects this change to reduce the economic burdens and personal stresses that H–1B nonimmigrants and their families may experience during the transition from nonimmigrant to LPR status while, at the same time, facilitating their integration into American society. As such, the change will ameliorate certain disincentives that currently lead H–1B nonimmigrants to abandon efforts to remain in the United States while seeking LPR status, thereby minimizing disruptions to U.S. businesses employing such workers. The change will also support the U.S. economy, as the contributions H–1B nonimmigrants make to entrepreneurship and research and development are expected to assist overall economic growth and job creation. The rule also will bring U.S. immigration policies concerning this class of highly skilled workers more in line with those of other countries that compete to attract similar highly skilled workers.

*B. Legal Authority*

The authority of the Secretary of Homeland Security (Secretary) for this regulatory amendment can be found in section 102 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 112, and section 103(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1103(a), which authorize the Secretary to administer and enforce the immigration and nationality laws. In addition, section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's authority to extend employment to noncitizens in the United States.

*C. Summary of the Major Provisions of This Regulatory Action*

On May 12, 2014, DHS published a notice of proposed rulemaking, which proposed to amend DHS regulations at 8 CFR 214.2(h)(9)(iv) and 274a.12(c) to extend eligibility for employment authorization to H–4 dependent spouses of H–1B nonimmigrants if the H–1B nonimmigrants either: (1) Are the principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140); or (2) have been granted H–1B status pursuant to sections 106(a) and (b) of the American Competitiveness in the Twenty-first Century Act of 2000, Public Law 107– 273, 116 Stat. 1758, as amended by the 21st Century Department of Justice Appropriations Act, Public Law 107– 273, 116 Stat. 1758 (2002) (collectively referred to as "AC21"). *See* Employment Authorization for Certain H–4 Dependent Spouses, 79 FR 26886 (May 12, 2014). After careful consideration of public comments, DHS is adopting the proposed regulatory amendments with minor wording changes to improve clarity and readability.[1] Also, DHS is making additional revisions to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) to permit H–4 dependent spouses under this rule to concurrently file an Application for Employment Authorization (Form I–765) with an Application to Extend/Change Nonimmigrant Status (Form I–539).

*D. Summary of Costs and Benefits*

In preparing this final rule, DHS updated its estimates of the impacted population by examining more recent data, correcting data entry errors made in calculating the population of H–4 dependent spouses assumed to be in the backlog, and revising the estimate of the population eligible pursuant to AC21. This final rule is expected to result in as many as 179,600 H–4 dependent spouses being eligible to apply for employment authorization during the first year of implementation. As many as 55,000 H–4 dependent spouses will be eligible to apply for employment authorization each year after the first year of implementation. DHS stresses that these are maximum estimates of the number of H–4 dependent spouses who may become eligible to apply for employment authorization. Although the estimates are larger than those provided in the preamble to the proposed rule, the initial year estimate (the year with the largest number of potential eligible applicants) provided in this final rule still represents far less than one percent of the overall U.S. workforce. DHS's rationale for this rule thus remains unchanged, especially as the changes made in this rule simply alleviate the long wait for employment authorization that these H–4 dependent spouses endure through the green card process, and accelerate the timeframe within which they generally will become eligible to apply for employment authorization (such as when they apply for adjustment of status).

The costs associated with this final rule stem from filing fees and the opportunity costs of time associated with filing an Application for Employment Authorization, Form I–765 ("Application for Employment Authorization" or "Form I–765"), as well as the estimated cost of procuring two passport-style photos. These costs will only be borne by the H–4 dependent spouses who choose to apply for employment authorization. The costs to the Federal Government of adjudicating and processing the applications are covered by the application fee for Form I–765.

DHS expects these regulatory amendments to provide increased incentives to H–1B nonimmigrants and their families who have begun the immigration process to remain permanently in the United States and continue contributing to the Nation's economy as they complete this process. DHS believes these regulatory changes will also minimize disruptions to petitioning U.S. employers. A summary of the costs and benefits of the rule is presented in Table 1.

TABLE 1—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%

[$Millions]

|  | Year 1 estimate (179,600 filers) | Sum of years 2–10 (55,000 filers annually) | Total over 10-year period of analysis* |
|---|---|---|---|
| 3% Discount Rate: |  |  |  |
| Total Costs Incurred by Filers @3% ............................................... | $76.1 | $181.3 | $257.4 |
| 7% Discount Rate: |  |  |  |
| Total Costs Incurred by Filers @7% ............................................... | 73.2 | 146.1 | 219.3 |

[1] In this final rule, DHS has amended its estimate of the volume of individuals who may become eligible to apply for employment authorization pursuant to this rulemaking. The impact on the U.S. labor market resulting from this change is negligible, and the justification for the rule remains unaffected by this change.

TABLE 1—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%—Continued

[$Millions]

| | Year 1 estimate (179,600 filers) | Sum of years 2–10 (55,000 filers annually) | Total over 10-year period of analysis * |
|---|---|---|---|
| Qualitative Benefits | This rule is intended to remove a disincentive to pursuing lawful permanent resident (LPR) status due to the potentially long wait for employment-based immigrant visas for many H–1B nonimmigrants and their family members. This rule will encourage H–1B nonimmigrants who have already taken steps to become LPRs to not abandon their efforts because their H–4 dependent spouses are unable to work. By encouraging H–1B nonimmigrants to continue in their pursuit of becoming LPRs, this rule would minimize disruptions to petitioning U.S. employers. Additionally, eligible H–4 dependent spouses who participate in the labor market will benefit financially. DHS also anticipates that the socioeconomic benefits associated with permitting H–4 spouses to participate in the labor market will assist H–1B families in integrating into the U.S. community and economy. | | |

\* Note: Totals may not sum due to rounding.

### E. Effective Date

This final rule will be effective on May 26, 2015, 90 days from the date of publication in the **Federal Register**. *DHS has determined that this 90-day effective date is necessary to guarantee that* USCIS will have sufficient resources available to process and adjudicate Applications for Employment Authorization filed by eligible H–4 dependent spouses under this rule while maintaining excellent customer service for all USCIS stakeholders, including H–1B employers, H–1B nonimmigrants, and their families. With this 90-day effective date, USCIS will be able to implement this rule in a manner that will avoid wholesale delays of processing other petitions and applications, in particular those H–1B petitioners seeking to file petitions before the FY 2016 cap is reached. DHS believes that this effective date balances the desire of U.S. employers to attract new H–1B workers, while retaining current H–1B workers who are seeking employment-based LPR status.

### II. Background

#### A. Current Framework

Under the H–1B nonimmigrant classification, a U.S. employer or agent may file a petition to employ a temporary foreign worker in the United States to perform services in a specialty occupation, services related to a Department of Defense (DOD) cooperative research and development project or coproduction project, or services of distinguished merit and ability in the field of fashion modeling. *See* INA section 101(a)(15)(H)(i)(b), 8

U.S.C. 1101(a)(15)(H)(i)(b); 8 CFR 214.2(h)(4). To employ a temporary nonimmigrant worker to perform such services (except for DOD-related services), a U.S. petitioner must first obtain a certification from the U.S. Department of Labor (DOL) confirming that the petitioner has filed a labor condition application (LCA) in the occupational specialty in which the nonimmigrant will be employed. *See* 8 CFR 214.2(h)(4)(i)(B) and 8 CFR 214.2(h)(1)(ii)(B). Upon certification of the LCA, the petitioner may file with U.S. Citizenship and Immigration Services (USCIS) a Petition for a Nonimmigrant Worker (Form I–129 with H supplements) (''H–1B petition'' or ''Form I–129''').

If USCIS approves the H–1B petition, the approved H–1B status is valid for an initial period of up to three years. USCIS may grant extensions for up to an additional three years, such that the total period of the H–1B nonimmigrant's admission in the United States does not exceed six years. *See* INA section 214(g)(4), 8 U.S.C. 1184(g)(4); 8 CFR 214.2(h)(9)(iii)(A)(*1*), (*3*), and 8 CFR 214.2(h)(15)(ii)(B)(*1*). At the end of the six-year period, the nonimmigrant generally must depart from the United States unless he or she: (1) Falls within one of the exceptions to the six-year limit;[2] (2) has changed to another

nonimmigrant status; (3) or has applied to adjust status to that of an LPR.[3] *See* INA sections 245(a) and 248(a), 8 U.S.C. 1255(a) and 1258(a); 8 CFR 245.1 and 8 CFR 248.1. The dependents (*i.e.,* spouse and unmarried children under 21 years of age) of the H–1B nonimmigrants are entitled to H–4 status and are subject to the same period of admission and limitations as the H–1B nonimmigrant. *See* 8 CFR 214.2(h)(9)(iv).

For H–1B nonimmigrants seeking to adjust their status to or otherwise acquire LPR status through employment-based (EB) immigration, an employer generally must first file a petition on their behalf. *See* INA section 204(a), 8 U.S.C. 1154(a). An H–1B nonimmigrant may seek LPR status under one of the following five EB preference categories:

---

[2] These exceptions to the six-year limit include those authorized under sections 104(c) and 106(a) and (b) of AC21. Under sections 106(a) and (b) of AC21, an H–1B nonimmigrant who is the beneficiary of a permanent labor certification application or an employment-based immigrant petition that was filed at least 365 days prior to reaching the end of the sixth year of H–1B status may obtain H–1B status beyond the sixth year, in one year increments. *See* AC21 sections 106(a)-(b),

as amended. Another exception is found in section 104(c) of AC21. Under that provision, H–1B nonimmigrants with approved Form I–140 petitions who are unable to adjust status because of per-country visa limits are able to extend their H–1B stay in three-year increments until their adjustment of status applications have been adjudicated. *See* AC21 section 104(c).

[3] For H–1B nonimmigrants performing DOD-related services, the approved H–1B status is valid for an initial period of up to five years, after which the H–1B nonimmigrants may obtain up to an additional five years of admission for a total period of admission not to exceed 10 years. *See* 8 CFR 214.2(h)(9)(iii)(A)(*1*), (*3*),(*15*)(ii)(B)(*2*). These H–1B nonimmigrants cannot benefit from AC21 sections 106(a) or (b), because those sections solely relate to the generally applicable six-year limitation on H–1B status under INA section 214(g)(4), whereas the requirements for H–1B status for DOD-related services, including the 10-year limitation, were established in section 222 of the Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978; *see* 8 U.S.C. 1101 note. This rule, however, will authorize eligibility for employment authorization of H–4 dependents of H–1B nonimmigrants performing DOD-related services if the H–1B nonimmigrant is the beneficiary of an approved I–140 petition.

AR2022_200182

• First preference (EB–1)—Aliens with extraordinary ability, outstanding professors and researchers, and certain multinational executives and managers;

• Second preference (EB–2)—Aliens who are members of the professions holding advanced degrees or aliens of exceptional ability;

• Third preference (EB–3)—Skilled workers, professionals, and other workers;

• Fourth preference (EB–4)—Special immigrants (*see* INA section 101(a)(27), 8 U.S.C. 1101(a)(27)); and

• Fifth preference (EB–5)—Employment creation immigrants. *See* INA section 203(b), 8 U.S.C. 1153(b).

Generally, the second (EB–2) and third (EB–3) preference categories require employers to obtain an approved permanent labor certification from DOL prior to filing an immigrant petition with USCIS on behalf of the worker. *See* INA section 212(a)(5)(A), 8 U.S.C. 1182(a)(5)(A); 8 CFR 204.5(a). To apply for adjustment to LPR status, the alien must be the beneficiary of an immigrant visa that is immediately available. *See* INA sections 201(a), 203(b) and (d), and 245(a); 8 U.S.C. 1151(a), 1153(b) and (d), 1255(a).

The EB–2 and EB–3 immigrant visa categories for certain chargeability areas are oversubscribed, causing long delays before applicants in those categories, including H–1B nonimmigrants, are able to obtain LPR status. U.S. businesses employing H–1B nonimmigrants suffer disruptions when such workers are required to leave the United States at the termination of their H–1B status as a result of these delays. To ameliorate those disruptions, Congress enacted provisions in AC21 that allow for the extension of H–1B status past the sixth year for workers who are the beneficiaries of certain pending or approved employment-based immigrant visa petitions or labor certification applications. *See* S. Rep. No. 106–260, at 22 (2000) (''These immigrants would otherwise be forced to return home at the conclusion of their allotted time in H–1B status, disrupting projects and American workers. The provision enables these individuals to remain in H–1B status until they are able to receive an immigrant visa number and acquire lawful permanent residence through either adjustment of status in the United States or through consular processing abroad, thus limiting the disruption to American businesses.'').

DHS cannot alleviate the delays in visa processing due to the numerical limitations set by statute and the resultant unavailability of immigrant

visa numbers.[4] DHS, however, can alleviate a significant obstacle that may encourage highly skilled foreign workers to leave the United States,[5] thereby preventing significant disruptions to U.S. employers in furtherance of the congressional intent expressed through AC21.

*B. Proposed Rule*

On May 12, 2014, DHS published a proposed rule in the **Federal Register** at 79 FR 26886, proposing to amend:

• 8 CFR 214.2(h)(9)(iv) to extend eligibility for employment authorization to H–4 dependent spouses of H–1B nonimmigrants if the H–1B nonimmigrants either: are the principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140);[6] or have been granted H–1B status pursuant to sections 106(a) and (b) of AC21; and

• 8 CFR 274a.12(c) by adding paragraph (26) listing the H–4 dependent spouses described in revised 8 CFR 214.2(h)(9)(iv) as a new class of aliens eligible to request employment authorization from USCIS. Aliens within this class would only be authorized for employment following approval of their Application for Employment Authorization (Form I–765) by USCIS and receipt of an Employment Authorization Document (Form I–766) (''EAD'').

DHS also proposed conforming changes to Form I–765. DHS proposed adding

[4] The worldwide level of EB immigrant visas that may be issued each fiscal year is set at 140,000 visas, plus the difference between the maximum number of immigrant visas which may be issued under section 203(a) of the INA, 8 U.S.C. 1153(a) (relating to family-sponsored immigrants) and the number of visas used under that section for the previous fiscal year. *See* INA section 201(d), 8 U.S.C. 1151(d). These EB visa numbers are also limited by country. Generally, in any fiscal year, foreign nationals born in any single country may use no more than 7 percent of the total number of immigrant visas available in the family- and employment-based immigrant visa classifications. *See* INA section 202(a)(2), 8 U.S.C. 1152(a)(2).

[5] These obstacles, moreover, may discourage highly skilled foreign workers from seeking employment in the United States in the first instance. This final rule will diminish that possibility.

[6] The H–1B nonimmigrant must be the principal beneficiary of the approved I–140 petition, not the derivative beneficiary, consistent with the preamble to the proposed rule: ''Specifically, DHS is proposing to limit employment authorization to H–4 dependent spouses only during AC21 extension periods granted to the H–1B principal worker or after the *H–1B principal has obtained an approved Immigrant Petition for Alien Worker.*'' *See* 79 FR at 26891 (emphasis added); *see also id.* at 26896 (estimating ''annual demand flow of H–4 dependent spouses who would be eligible to apply for initial work authorization under this proposed rule . . . based on: (1) the number of approved Immigrant Petitions for Alien Worker (Forms I–140) where the principal beneficiary is currently in H–1B status'').

H–4 dependent spouses described in the proposed rule to the classes of aliens eligible to file the form, with the required fee. DHS also proposed a list of the types of supporting documents that may be submitted with Form I–765 to establish eligibility.

DHS received nearly 13,000 public comments to the proposed rule. An overwhelming percentage of commenters (approximately 85 percent) supported the proposal, while a small percentage of commenters (approximately 10 percent) opposed the proposal. Approximately 3.5 percent of commenters expressed a mixed opinion about the proposal.

*C. Final Rule*

In preparing this final rule, DHS considered all of the public comments contained in the docket. Although estimates of the current population of H–4 dependent spouses who will be eligible for employment authorization pursuant to this rule have changed, the effect of the revision does not affect the justification for the rule, and DHS is adopting the regulatory amendments set forth in the proposed rule with only minor, non-substantive changes to 8 CFR 214.2(h)(9)(iv) to improve clarity and readability. These technical changes clarify that an H–4 dependent spouse covered by this rule should include with his or her Application for Employment Authorization (Form I–765) evidence demonstrating that he or she is currently in H–4 status and that the H–1B nonimmigrant is currently in H–1B status. Also, in response to public comments regarding filing procedures for Applications for Employment Authorization (Forms I–765) under this rule, DHS is making conforming revisions to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) to permit H–4 dependent spouses under this rule to concurrently file the Form I–765 with an Application to Extend/Change Nonimmigrant Status (Form I–539).

The rationale for the proposed rule and the reasoning provided in its background section remain valid with respect to these regulatory amendments. This final rule does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to this rulemaking. This final rule also does not change the procedures or policies of other DHS components or federal agencies, or resolve issues outside the scope of this rulemaking. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov,* docket number USCIS–2010–0017.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received nearly 13,000 comments during the 60-day public comment period. Commenters included, among others, individuals, employers, academics, labor organizations, immigrant advocacy groups, attorneys, and nonprofit organizations. More than 250 comments were also submitted through mass mailing campaigns.

While opinions on the proposed rule varied, a substantial majority (approximately 85 percent) of commenters supported the extension of employment authorization to the class of H–4 dependent spouses described in the proposed rulemaking. Supporters of the proposed rule agreed that it would help the United States to attract and retain highly skilled foreign workers; alleviate economic burdens on H–1B nonimmigrants and their families during the transition from nonimmigrant to LPR status; and promote family unity. Some supporters also stated that the rule furthers women's rights, noting the impact the rule's change will have on promoting financial independence for the H–4 dependent spouse, potentially reducing factors which could lead to domestic violence, and assuaging negative health effects (such as depression).[7] Others voiced the belief that this rule aligns with core U.S. values, asserting that employment authorization should be considered a constitutional or human rights issue or an issue of equal opportunity.

Commenters commonly stated that if spouses are authorized for employment, families would be more stable, contribute more to their local communities, and more fully focus on their future in the United States. Additionally, commenters outlined ways they thought this proposal would help the U.S. economy, such as by increasing disposable income, promoting job creation, generating greater tax revenue, and increasing

home sales. Several commenters agreed that extending employment authorization as described in the rule will promote U.S. leadership in innovation by strengthening the country's ability to recruit and retain sought-after talent from around the world. Finally, some commenters noted that this rule would facilitate U.S. businesses' ability to create additional U.S. jobs by improving the retention of workers with critical science, technology, engineering and math (STEM) skills.

The approximately 10 percent of commenters who opposed the proposed rule cited to potential adverse effects of the rule, including displacement of U.S. workers, increasing U.S. unemployment, and lowering of wages. Some commenters expressed concern that the rule may negatively affect other nonimmigrant categories. Other commenters were concerned that this rule may cause the lowering of minimum working standards in certain sectors of the economy, such as in the Information Technology sector. Some commenters questioned DHS's legal authority to promulgate this regulatory change.

About 3.5 percent of commenters had a mixed opinion about the proposed regulation. Some of these commenters were concerned about the size and scope of the class made eligible for employment authorization under the rule; some argued that the described class is too restrictive, while others argued that it is too broad. Other commenters expressed concern about the possibility of fraud. Approximately 200 commenters (about 1.5 percent of commenters) submitted responses that are beyond the scope of this rulemaking, such as comments discussing U.S. politics but not addressing immigration, submissions from individuals who sent in their resumes or discussed their professional qualifications without opining on the proposed rule, and comments on the merits of other commenter's views, but not on the proposed changes.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by commenters.

### B. Classes Eligible for Employment Authorization

#### 1. Comments Supporting the Rule

The comments supporting the proposed rule largely underscored the positive socioeconomic benefits this

rule would have for certain H–1B nonimmigrants and their H–4 dependent spouses. For example, several commenters noted that while they knew about the restriction on H–4 employment before coming to the United States, they did not anticipate such a long wait to apply for LPR status or the emotional toll that long-term unemployment would take on them and their families. Other commenters noted they have not been able to apply for a social security card or a driver's license in certain states because they do not have an Employment Authorization Document (EAD) (Form I–766). Approximately 200 commenters noted that the current policy of allowing only the H–1B nonimmigrant to work often led to family separation or the decision to immigrate to other countries that authorize employment for dependent spouses.

A few commenters described their families as dual H–1B nonimmigrant households and supported the principle of both spouses working. These commenters voiced appreciation for the changes in the proposed rule, which will allow the H–4 dependent spouse to seek employment while the H–1B nonimmigrant continues to pursue permanent residence.

More than a thousand commenters believe this change will help U.S. businesses retain highly skilled H–1B nonimmigrants. More than 500 commenters asserted that the addition of skilled H–4 dependent spouses into the workforce will help U.S. employers. More than 60 commenters stated that they had planned to move out of the United States, but will instead remain and pursue LPR status as a result of this rule change. Approximately two dozen commenters noted that they had already moved out of the United States due to the prohibition on employment for H–4 dependent spouses. Several commenters stated that they are planning to leave the United States in the near future because H–4 dependent spouses cannot work under the current rules.

Nearly 400 commenters who supported the final rule also asserted that the regulation should be implemented without change as a matter of fairness. According to the comments, the regulation will help H–1B nonimmigrants and their families who have maintained legal status for years, contributed to the economy, and demonstrated the intent to permanently remain in the United States.

The overwhelmingly positive responses from the public to the proposed rule has strengthened DHS's view, as expressed in the proposed rule,

---

[7] An H–4 dependent spouse who is the victim of domestic violence may be independently eligible for employment authorization under certain circumstances. As noted in the proposed rule, section 814(b) of the Violence Against Women Act and Department of Justice Reauthorization Act of 2005 (VAWA 2005), Public Law 109–162, amended the INA by adding new section 204(a)(1)(K), 8 U.S.C. 1154(a)(1)(K), which provides for employment authorization incident to the approval of a VAWA self-petition. Section 814(c) of VAWA 2005 amended the INA by adding new section 106, which provides eligibility for employment authorization to battered spouses of aliens admitted in certain nonimmigrant statuses, including H–1B status.

AR2022_200184

that extending employment authorization eligibility to the class of H–4 dependent spouses of H–1B nonimmigrants described in this rulemaking will have net beneficial results. Among other things, the rule will increase the likelihood that H–1B nonimmigrants will continue to pursue the LPR process through completion. DHS further believes that this rule will provide increased incentives to U.S. employers to begin the immigrant petitioning process on behalf of H–1B nonimmigrants, encourage more H–1B nonimmigrants to pursue lawful permanent residence, and bolster U.S. competitiveness. This rule will also decrease workforce disruptions and other harms among U.S. employers caused by the departure from the United States of H–1B nonimmigrants for whom businesses have filed employment-based immigrant visa petitions. This policy supports Congress' intent in enacting AC21. *See* S. Rep. No. 106–260, at 2–3, 23 (2000).

A handful of commenters supporting the proposed rule requested clarification on whether H–4 dependent spouses will be permitted to file for employment authorization based on their classification as an H–4 dependent spouse if they have a pending adjustment of status application. DHS confirms that under this rule, H–4 dependent spouses with pending adjustment of status applications are still eligible for employment authorization on the basis of their H–4 classification. They may choose to apply for employment authorization based on either the H–4 dependent spouse category established by this rule under new 8 CFR 274a.12(c)(26) or the adjustment of status category under 8 CFR 274a.12(c)(9).

Another commenter asked if H–4 dependent spouses of H–1B nonimmigrants who have extended their stay under section 104(c) of AC21 would be eligible for work authorization. DHS confirms that H–4 dependent spouses of H–1B nonimmigrants who have extended their stay under section 104(c) of AC21 are eligible for employment authorization under this rule. Section 104(c) of AC21 applies to a subset of the H–1B nonimmigrants who are the principal beneficiaries of approved Form I–140 petitions.[8] Because this rule provides

eligibility for employment authorization to H–4 dependent spouses of all H–1B nonimmigrants who are the principal beneficiaries of approved Form I–140 petitions, it captures the section 104(c) subset. DHS has thus determined that it is unnecessary to include section 104(c) of AC21 as a separate basis for employment authorization eligibility in this rule.

2. Comments Requesting Expansion of the Rule

i. H–4 Dependent Spouses of H–1B1, H–2 and H–3 Nonimmigrants

Slightly over 200 commenters requested that DHS extend eligibility for employment authorization to the H–4 dependent spouses of H nonimmigrants who are not in H–1B status (H–1B1, H–2 and H–3 nonimmigrants), and not only to the spouses of certain H–1B nonimmigrants who have begun the process of permanent residence through employment.[9] Some of these commenters expressed that this expansion would also help U.S. competitiveness by attracting more skilled workers from abroad.

DHS has determined that expansion of employment authorization beyond the class of H–4 dependent spouses described in the proposed rule is not appropriate at this time, and it has therefore not included such an expansion in this final rule. First, the Department believes this rule best achieves DHS's goals of helping U.S. employers minimize potential disruptions caused by the departure from the United States of certain highly skilled workers, enhancing U.S. employer's ability to attract and retain such workers, and increasing America's economic competitiveness.

Second, DHS notes two significant differences between H–1B nonimmigrants and other H nonimmigrants under the immigration laws. The INA explicitly permits H–1B nonimmigrants to have what is known as "dual intent," pursuant to which an H–1B nonimmigrant may be the beneficiary of an immigrant visa petition filed under section 204 of the INA or otherwise seek LPR status without evidencing an intention to

abandon a foreign residence for purposes of obtaining or maintaining H–1B status. *See* INA 214(h); *see also* 8 CFR 214.2(h)(16). Further, in enacting AC21, Congress permitted H–1B nonimmigrants who are the beneficiaries of certain pending or approved employment-based immigrant visa petitions or labor certification applications to remain in the United States beyond the six-year statutory maximum period of stay. Congress therefore has passed legislation specifically encouraging, and removing impediments to, the ability of H–1B nonimmigrants to seek LPR status, such that they may more readily contribute permanently to United States economic sustainability and growth. Congress has not extended similar benefits to other H nonimmigrants, including H–1B1 (Free Trade Agreement specialty workers from Chile and Singapore), H–2A (temporary agricultural workers), H–2B (temporary nonagricultural workers), or H–3 nonimmigrants (trainees). Extending employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants, and not to H–4 dependent spouses of other H nonimmigrants, thus serves to advance the Department's immediate interest in furthering the aims of AC21.[10]

Finally, as noted in the proposed rule, DHS may consider expanding H–4 employment eligibility in the future. *See Ctr. for Biological Diversity* v. *EPA,* 722 F.3d 401, 410 (D.C. Cir. 2013) (observing that "'agencies have great discretion to treat a problem partially'") (quoting *City of Las Vegas* v. *Lujan,* 891 F.2d 927, 935 (D.C. Cir. 1989)); *Lamers Dairy Inc.* v. *U.S. Dep't of Agric.,* 379 F.3d 466, 475 (7th Cir. 2004) ("[T]he government must be allowed leeway to approach a perceived problem incrementally. Similarly, equal protection does not require a governmental entity to choose between attacking every aspect of a problem or not attacking the problem at all.") (quotation marks omitted) (citing *FCC* v. *Beach Commc'ns,* 508 U.S. 307,

---

[8] *See* Mem. from Donald Neufeld, Acting Assoc. Dir., Domestic Operations, USCIS, Supplemental Guidance Relating to Processing Forms I–140 Employment-Based Immigrant Petitions and I–129 H–1B Petitions, and I–485 Adjustment Applications Affected by the American Competitiveness in the Twenty-First Century Act of 2000 (AC21) (Pub. L. 106–313), as amended, and the American

Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Title IV of Div. C. of Public Law 105–277, at 6 (May 30, 2008) ("AC21 § 104(c) is applicable when an alien . . . is the beneficiary of an *approved* I–140 petition.") (emphasis in original).

[9] The H–4 classification includes dependents of H–2A temporary agricultural workers, H–2B temporary nonagricultural workers, H–3 trainees, H–1B specialty occupation workers, and H–1B1 Free Trade Agreement specialty occupation workers from Singapore and Chile. *See* INA 101(a)(15)(H); *see also* 8 CFR 214.2(h)(9)(iv).

[10] As noted in the proposed rule, to ease the negative impact of immigrant visa processing delays, Congress intended that the AC21 provisions allowing for extension of H–1B status past the sixth year for workers who are the beneficiaries of certain pending or approved employment-based immigrant visa petitions or labor certification applications would minimize disruption to U.S. businesses employing H–1B workers that would result if such workers were required to leave the United States. *See* S. Rep. No. 106–260, at 22 (2000) ("These immigrants would otherwise be forced to return home at the conclusion of their allotted time in H–1B status, disrupting projects and American workers. The provision enables these individuals to remain in H–1B status until they are able to receive an immigrant visa number and acquire LPR status either through adjustment of status in the United States or through consular processing abroad, thus limiting the disruption to American businesses.").

AR2022_200185

**10290** Federal Register / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

316 (1993); and *Dandridge* v. *Williams,* 397 U.S. 471, 487 (1970)).

### ii. H–4 Dependent Spouses of All H–1B Nonimmigrants

Over 150 commenters noted that all dependent spouses of other nonimmigrant categories, such as the spouses of L–1 (intracompany transferee), E–1 (treaty trader), E–2 (treaty investor), and E–3 (Australian specialty occupation workers) nonimmigrants, are eligible to apply for employment authorization These commenters stated that because the employment-based nonimmigrant categories are similar to each other, all H–4 dependent spouses of H–1B nonimmigrants—rather than only certain subclasses of H–4 dependent spouses—likewise should be eligible for employment authorization.

DHS, however, recognizes an important difference between the dependent spouse category of H–1B nonimmigrants and those of L–1, E–1, E–2, and E–3 nonimmigrants. Specifically, Congress directed by statute that DHS grant employment authorization to all spouses of L–1, E–1, E–2, and E–3 nonimmigrants.[11] See Public Law 107–124 (2002) (amending the INA to expressly authorize employment for spouses of E nonimmigrants); Public Law 107–125 (2002) (same for spouses of L nonimmigrants); *see also* INA section 214(c)(2)(E) & (e)(6), 8 U.S.C. 1184(c)(2)(E) & (e)(6). Congress has not provided such statutory direction with respect to the spouses of H–1B nonimmigrants. Thus, the fact that the INA authorizes dependent spouses of L and E nonimmigrants for U.S. employment does not indicate that H–4 dependent spouses of all H–1B nonimmigrants also must be authorized to work.

In extending such employment authorization through regulation, DHS studied congressional intent with respect to H–1B nonimmigrants. Although Congress has not specifically required extending employment authorization to dependent spouses of H–1B nonimmigrants, Congress did recognize in AC21 the importance of addressing the lengthy delays faced by such workers seeking to obtain LPR status. Consistent with this congressional concern, and the legal authorities vested in the Secretary of Homeland Security described in Section C, below, DHS has chosen to limit this

regulation within that statutory framework, and the Department declines to extend the changes made by this rule to the H–4 dependent spouses of all H–1B nonimmigrants at this time.

### iii. Employment Authorization Incident to Status

Over 60 commenters requested that H–4 dependent spouses be granted employment authorization "incident to status," which would relieve the need to apply for employment authorization before receiving it. These commenters generally recommended that DHS provide employment authorization incident to status by authorizing the employment of H–4 dependent spouses through amendment to 8 CFR 274a.12(a) instead of 8 CFR 274a.12(c), which provides employment authorization through case-by-case, discretionary adjudications of each individual request.[12] For those classes of aliens listed in 8 CFR 274a.12(a), employment authorization is automatic upon the grant of immigration status. Examples of classes of aliens who are employment authorized incident to status under 8 CFR 274a.12(a) are LPRs, asylees, and refugees.

DHS is unable to classify H–4 dependent spouses described in this rule as employment authorized incident to status. Unlike other noncitizens who are employment authorized incident to status, H–4 dependent spouses will not be eligible for employment authorization based solely on their immigration status. Rather, H–4 dependent spouses must meet certain additional conditions before they can be granted employment authorization, and current USCIS systems cannot automatically and independently determine whether such conditions have been met. USCIS systems, for example, cannot independently or automatically determine whether an H–4 dependent spouse has the requisite spousal relationship to an H–1B nonimmigrant who either is the beneficiary of an approved Form I–140 petition or has been granted H–1B nonimmigrant status under sections 106(a) and (b) of AC21; that determination must be made by a USCIS adjudicator. DHS has therefore determined that it must require the filing of an application requesting employment authorization, *see* 8 CFR

274a.12(c) and 8 CFR 274a.13, before it can extend employment authorization to the class of H–4 dependent spouses described in this rule. This application process will ensure that only eligible H–4 dependent spouses receive a grant of employment authorization and proper documentation evidencing such employment authorization, and will avoid granting employment authorization to ineligible spouses.

### iv. Employment Authorization at Different Points in Time

More than a dozen commenters requested that the class of H–4 dependent spouses who are eligible for employment authorization be expanded by permitting them to file at points in time different from those provided in the proposed rule. DHS carefully considered these suggestions for determining when an H–4 dependent spouse should be eligible for employment authorization. For the reasons that follow, DHS has determined that it will not adopt the commenters' suggestions in this final rule.

### (1) H–1B Nonimmigrants With Pending PERM Labor Certifications or Form I–140 Petitions

Some commenters requested that DHS make H–4 dependent spouses eligible for employment authorization when their H–1B nonimmigrant spouses have filed permanent (PERM) labor certifications with DOL.[13] Other commenters suggested providing such eligibility when H–1B nonimmigrants have Form I–140 petitions or adjustment of status applications pending with USCIS.

DHS believes that the basis for eligibility in the proposed rule reasonably addresses H–4 dependent spouses' interests in obtaining employment authorization at the earliest possible time in advancing the Department's policy goals of attracting and retaining highly skilled workers and promoting compliance with U.S. immigration laws. In furtherance of these goals, DHS has chosen to limit eligibility for employment authorization to cases where the H–1B nonimmigrant either: (1) Is the principal beneficiary of an approved Form I–140 and thus is on a path to lawful permanent residence that is reasonably likely to conclude successfully; or (2) has been granted H–

---

[11] DHS is implementing the statutory provisions authorizing employment of spouses of L–1, E–1, E–2, and E–3 nonimmigrants, though the regulations have not been revised.

[12] DHS regulations provide for three categories of persons eligible for employment authorization: (1) aliens authorized for employment incident to status, *see* 8 CFR 274a.12(a); (2) aliens authorized to work for a specific employer incident to status, *see* 8 CFR 274a.12(b); and (3) aliens who must apply to USCIS for employment authorization, *see* 8 CFR 274a.12(c).

[13] Currently, employers seeking to file immigrant visa petitions on behalf of noncitizens in certain employment-based preference categories must first obtain a labor certification under DOL's PERM program. *See generally* INA sections 204(b), 212(a)(5); 8 U.S.C. 1154(b), 1182(a)(5); 8 CFR 204.5(k)–(l); 20 CFR pt. 656.

1B status under sections 106(a) and (b) of AC21. This approach provides several benefits to the Department.

Among other things, the approach allows DHS to confirm a significant record of compliance with U.S. immigration laws, which indicates the likelihood of continued compliance in the future. Requiring an approved Form I–140 petition, for example, reduces the risk of frivolous labor certification and immigrant visa petition filings for the purpose of making H–4 dependent spouses eligible for employment authorization, because the approval of the petition generally signifies that the foreign worker is eligible for the underlying immigrant classification. In contrast, authorizing employment immediately upon the filing of a PERM application or Form I–140 petition (rather than after the 365-day waiting period or the approval of the Form I–140 petition) could produce a reasonable possibility of granting employment authorization to an H–4 dependent spouse where the H–1B nonimmigrant's case might not be approvable and the H–1B nonimmigrant has a relatively shorter record of compliance with U.S. immigration laws. The eligibility requirements in this rule also allow for better control of processing, as it is difficult for USCIS to track another agency's filings, such as PERM applications. Finally, with respect to the comment suggesting that employment should be authorized at the point when an adjustment of status application is pending, Department regulations already provide eligibility for employment authorization in that situation. *See* 8 CFR 274a.12(c)(9).

(2) H–1B Nonimmigrants Who Are Eligible for AC21 Extensions Under Sections 106(a) and (b)

Some commenters expressed support for an alternative policy that would extend employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants who are eligible for, but have not yet been approved for, extensions of status under sections 106(a) and (b) of AC21. DHS declines to adopt such a policy because it creates the possibility of granting employment authorization to H–4 dependent spouses of H–1B nonimmigrants who are later denied the extension of H–1B status. For instance, a labor certification or Form I–140 petition may have been timely filed on behalf of the H–1B nonimmigrant 365 days prior to the prospective expiration of his or her six-year limitation of stay, thus making the H–1B nonimmigrant eligible for an extension under AC21. But the labor certification or Form I–140 petition

ultimately may be denied before the H–1B nonimmigrant files for and receives the AC21 extension. Additionally, if the individual is determined to be ineligible for the H–1B extension, he or she would no longer be maintaining H–1B status and the U.S. employer will be unable to retain the worker. Accordingly, DHS believes the sounder policy is to extend employment authorization to H–4 dependent spouses of H–1B nonimmigrants who have been *granted* H–1B status pursuant to AC21, ensuring that such H–1B nonimmigrants are maintaining H–1B status and are significantly down the path to obtaining LPR status.

(3) Pending Form I–140 Immigrant Petitions With New Employer

Fewer than a dozen commenters requested that DHS extend employment authorization to H–4 dependent spouses in cases where the H–1B nonimmigrants have transferred their employment to a new employer and are in the process of obtaining approval of a new Form I–140 petition. As noted above, however, authorizing employment based solely on the filing (rather than the approval) of a PERM application or Form I–140 petition is likely to encourage frivolous filings to allow the H–4 dependent spouse to obtain employment authorization while the filings remain pending. DHS thus is not extending this rule on the basis of pending PERM applications or Form I–140 petitions. By requiring that a Form I–140 petition first be approved, DHS will further disincentivize frivolous filings and better serve the goal of extending the immigration benefit of this rule to only those spouses of H–1B nonimmigrants who are genuinely on the path to lawful permanent residence.

v. H–4 Minors

Less than 40 commenters requested that DHS authorize employment for certain H–4 dependent minor children whose H–1B nonimmigrant parent is the beneficiary of an approved Form I–140 or has been granted an extension of his or her authorized period of admission in the United States under AC21. These commenters cited concerns about H–4 dependent children being unable to obtain the same types of work experience as their peers, being unable to afford post-secondary education in the United States, and losing eligibility for H–4 status through age (known as ''aging-out'' [14]) before their parents can

file for adjustment of status. Some commenters also raised fairness concerns, given the eligibility under DHS deferred action policies that make eligible for employment authorization certain individuals who came to the United States unlawfully as children under the age of 16.[15]

DHS declines to adopt the commenters' suggestions to expand eligibility for employment authorization to H–4 dependent minor children. As reflected by the comments, DHS does not view the employment of dependent minor children in the United States as a significant deciding factor for an H–1B nonimmigrant considering whether to remain in the United States and seek LPR status while continuing employment with his or her U.S. employer. Also, as stated in the proposed rule, extending employment eligibility to certain H–4 dependent spouses will alleviate a significant portion of the potential economic burdens that H–1B nonimmigrants currently may face, such as paying for academic expenses for their children, during the transition from nonimmigrant to LPR status as a result of the inability of their dependent family members to work in the United States.

Additionally, limiting employment authorization to H–4 dependent spouses is consistent with the treatment of dependent minors in other nonimmigrant employment categories (such as the L and E nonimmigrant categories), which provide employment authorization to dependent spouses but not dependent children. And in the instances where DHS has extended eligibility for employment authorization to minor children, foreign policy reasons have been an underlying consideration. DHS has extended eligibility for employment authorization to minors within the following nonimmigrant categories: Dependents of Taipei Economic and Cultural

---

[14] To qualify as a ''child'' for purposes of the immigration laws, an individual generally must be unmarried and under the age of 21. *See* INA section 101(b)(1), 8 U.S.C. 1101(b)(1). The Child Status Protection Act (CSPA) amended the INA by

permitting certain individuals over the age of 21 to continue to qualify as a child for purposes of certain immigration benefits. *See* Public Law 107–208 (2002). If an individual becomes too old to qualify as a child under the immigration law, and in turn no longer can derivatively benefit from a petition or application on behalf of a parent, he or she is described as ''aging out.''

[15] On June 15, 2012, the Secretary of Homeland Security announced that certain aliens who came to the United States as children and meet several guidelines may request consideration for deferred action from removal for a period of two years, subject to renewal. This policy is generally referred to as Deferred Action for Childhood Arrivals (DACA). On November 20, 2014, the Secretary announced expanded eligibility guidelines for consideration under the DACA policy and extended the period of deferred action and work authorization from two years to three years.

Representative Office (TECRO) E–1 nonimmigrants; J–2 dependent children of J–1 foreign exchange visitors; dependents of A–1 and A–2 foreign government officials; dependents of G–1, G–3, and G–4 international organization officials; and dependents of NATO officials. Each of these instances involves foreign policy considerations that are not present in the H–1B nonimmigrant program.

DHS also declines to extend employment authorization to H–4 dependent children who age out and lose their H–4 status. Providing work authorization in such circumstances would encourage such individuals to violate the terms of their authorized stay. Moreover, comments suggesting that the Department should make changes to prevent H–4 dependent minor children from aging out are outside the scope of this rulemaking, which in no way involves the ability of a minor to maintain H–4 status or eligibility for LPR status as a derivative beneficiary of a parent's immigrant petition.

Finally, the circumstances of persons eligible for consideration of Deferred Action for Childhood Arrivals (''DACA'') are distinct from those of H–4 dependent minor children, and the policy for authorizing employment for individuals who have received deferred action has no bearing on whether H–4 dependent minor children should be eligible to apply for employment authorization. The DACA program concerns the departmental exercise of prosecutorial discretion with the aim of ensuring that limited DHS enforcement resources are appropriately focused on the Department's highest enforcement priorities. The policy aims underlying this rule, as described above, are different, and for the reasons already discussed do not justify extending employment authorization to the H–4 dependent children of H–1B nonimmigrants.

vi. Principal Beneficiaries

A few dozen commenters requested that the rule also allow H–1B nonimmigrants to receive Employment Authorization Documents (EADs), which authorize employment without regard to employer, incident to status.[16] One commenter requested that DHS provide one EAD to households in which both spouses have H–1B status in order to avoid necessitating one of the spouses to change to H–4 status. A few commenters requested an EAD for an H–1B nonimmigrant whose spouse is also in H–1B status, but has been granted a different length of stay.

DHS declines to adopt the commenters' suggestions regarding EADs for H–1B nonimmigrants. If an H–1B nonimmigrant would like to apply for an EAD as the dependent spouse of an eligible H–1B nonimmigrant, he or she must first change to H–4 status. Moreover, issuance of an EAD to an H–1B nonimmigrant authorizing employment other than with his or her petitioning employer is incompatible with the H–1B classification, which allows employment only with the petitioning employer.[17] If an H–1B nonimmigrant works on an EAD for an employer other than his or her petitioning employer, he or she may be violating the terms and conditions of his or her petition and, therefore, may no longer be maintaining a valid nonimmigrant status.

vii. H–4 Dependent Spouses Not Selected in the H–1B Lottery

Less than 20 commenters requested a carve-out for H–4 dependent spouses who had filed an H–1B petition but who were not selected in the H–1B computer-generated random selection process (''H–1B lottery'').[18] Although DHS appreciates the frustration that may result from not being selected in the H–1B lottery, the Department declines to extend eligibility for employment authorization to these H–4 dependent spouses. This rule is not a substitute for the H–1B program and is not intended to circumvent the H–1B lottery. A primary purpose of this rule is to help U.S. businesses retain the H–1B nonimmigrants for whom they have already filed an employment-based immigrant petition. Expanding the rule to help nonimmigrants in other situations does not directly support this goal.

viii. Other Nonimmigrant Categories

Less than 20 commenters requested that DHS authorize employment for the dependents of principals in other employment-based nonimmigrant classifications, such as dependents of O–1 nonimmigrants (O–3)[19] and TN nonimmigrants (TD).[20] One commenter specifically requested employment authorization for children of O–1 and TN nonimmigrant highly skilled workers who are on the path to lawful permanent residence.

DHS declines to expand eligibility for employment authorization in this rule to the dependents of principals with other nonimmigrant classifications. DHS is narrowly tailoring the expansion of eligibility for employment authorization to meet several policy objectives, including the goal of helping U.S. businesses retain highly skilled H–1B nonimmigrants who are on the path to lawful permanent residence. DHS may consider expanding employment authorization to other dependent nonimmigrant categories in the future.

Moreover, there are significant differences between the H–1B nonimmigrant classification on the one hand, and the O–1 and TN classifications on the other, that inform the Department's decision to limit applicability of this rule to only H–4 dependent spouses. The spouses of H–1B nonimmigrants, for example, generally have greater need for the benefits of this rule than the spouses of O–1 nonimmigrants. O–1 nonimmigrants typically apply for LPR status through the EB–1 immigrant visa preference category, which has not historically suffered from visa backlogs. This allows the spouses of O–1 nonimmigrants to generally obtain employment authorization much more quickly than the spouses of H–1B nonimmigrants who typically seek LPR status through the EB–2 and EB–3 preference categories, which have historically been subject to lengthy backlogs.

[16] The commenters' refer to these unrestricted EADs as ''open market'' EADs. In contrast, classes of aliens listed in 8 CFR 274a.12(b), such as H–1B nonimmigrants, are authorized for employment only with a specific employer.

[17] *See* INA sections 101(a)(15)(H)(i)(b) (requiring that DOL determine and certify that ''the *intending employer* has filed'' an LCA) (emphasis added), 212(n) (establishing LCA requirements applicable to employers of H–1B nonimmigrants), 214(c) (requiring employers file petitions with the Secretary of Homeland Security to employ an H–1B nonimmigrant); 8 U.S.C. 1101(a)(15)(H)(i)(b), 1182(n), 1184(c).

[18] If USCIS receives more than a sufficient number of H–1B petitions to reach the general statutory cap of 65,000 visas or the 20,000 cap under the advanced degree exemption during the filing period, *see* INA section 214(g)(1)(A), (5)(C), 8 U.S.C. 1184(g)(1)(A), (5)(C), USCIS holds a computer-generated random selection process, or lottery, to select enough petitions to meet the statutory caps. *See* 8 CFR 214.2(h)(8)(ii)(B). USCIS rejects and returns cap-subject petitions not randomly selected, with filing fees, unless a petition is found to be a duplicate filing.

[19] An O–3 nonimmigrant is a dependent of an O–1 nonimmigrant. The O–1 nonimmigrant classification applies to individuals who possess extraordinary ability in the sciences, arts, education, business, or athletics, or who have a demonstrated record of extraordinary achievement in the motion picture or television industry and have been recognized nationally or internationally for those achievements. *See* INA section 101(a)(15)(O), 8 U.S.C. 1101(a)(15)(O); 8 CFR 214.2(o).

[20] A TD nonimmigrant is a dependent of a TN nonimmigrant. The TN nonimmigrant classification permits qualified Canadian and Mexican citizens to seek temporary entry into the United States to engage in business activities at a professional level. *See* INA section 214(e), 8 U.S.C. 1184(e); 8 CFR 214.6.

The spouses of TN nonimmigrants are also not similarly situated to the spouses of H–1B nonimmigrants. Unlike H–1B status, TN status stems from an international agreement—the North American Free Trade Agreement (NAFTA)—negotiated between the United States and foreign nations. As such, changes to that status implicate reciprocal international trade and foreign policy concerns that are generally not implicated with respect to the H–1B classification and are beyond the scope of this rulemaking.

3. Comments Opposing the Rule

Approximately ten percent of commenters opposed extending employment authorization to the class of H–4 dependent spouses described in the proposed rule. Many of these commenters were generally concerned that the rule would result in the displacement of U.S. workers; exacerbation of the nation's unemployment rate; and a decrease in wages. All comments discussing economic issues, both in opposition to and in support of the proposed rule, are discussed in Part III, Public Comments on Proposed Rule, Section D, Comments on Executive Orders 12866 and 13563.

Commenters also questioned whether the change in the proposed rule is actually necessary in light of other provisions of U.S. immigration law. Other commenters suggested that the proposed rule would have an adverse impact on other immigration categories or nationalities. DHS has carefully considered these concerns. But for the reasons that follow, DHS has decided to finalize the rule as proposed.

i. Change Unnecessary

More than 20 commenters believed that because current immigration laws provide the ability for H–4 dependent spouses to change status to an employment-authorized category, the proposed rule would not provide any additional incentives for H–1B nonimmigrants to remain in the United States and continue to pursue LPR status. One commenter stated that most of the comments posted on *www.regulations.gov* failed to indicate that potential immigrants have abandoned the immigration process, or have decided against coming to the United States in the first place, because their spouses would not be authorized to work.

DHS disagrees with these commenters and believes that the changes made by this rule are warranted. DHS acknowledges that thousands of commenters who voiced support for the rule did not provide specific reasons for

their support, including whether H–1B nonimmigrants were abandoning their applications for LPR status. DHS notes, however, that more than 60 commenters specifically indicated they planned to abandon their pursuit of lawful permanent residence without the changes in the proposed rule. Approximately, two dozen commenters stated that they left the United States because the current regulations preclude H–4 dependent spouses from engaging in employment. And several U.S. employers submitted comments in which they describe the loss of valued H–1B nonimmigrants because of the restriction on spousal employment. These employers noted that the changes in the proposed rule would help to align America's immigration laws with the policies of other countries that allow spousal employment. DHS agrees with these employers and other commenters who supported the proposed rule, and the Department believes that this change will support U.S. businesses and strengthen U.S. competitiveness. DHS also believes that this rule will fulfill its intended purpose and encourage certain highly skilled H–1B nonimmigrants to remain in the United States and continue to pursue their efforts to become LPRs.

ii. Impact on Other Categories or Nationalities

Less than 80 commenters suggested that the proposed rule would harm persons in other nonimmigrant categories or with certain nationalities. A few commenters who had changed status from H–4 status to F–1 nonimmigrant student status, for example, thought the rule was unfair because F–1 nonimmigrant graduates who had exhausted their Optional Practical Training had no path to employment authorization except through another principal nonimmigrant classification, such as the H–1B classification. These commenters argued that the rule would put recent F–1 nonimmigrant graduates at a disadvantage because they would have to go through the H–1B petition process whereas the qualifying H–4 dependent spouses would be eligible for an EAD authorizing employment without regard to employer.

DHS appreciates these commenters' concerns but does not believe that the changes made by this rule will adversely affect other classifications or specific nationalities. Rather, DHS expects that this rule will help to partially alleviate the adverse impact of oversubscription of certain chargeability categories in the EB–2 and EB–3 categories on certain H–1B

nonimmigrants and their families, without negatively impacting others. DHS has narrowly tailored this rule to provide employment authorization to only those H–4 dependent spouses of H–1B nonimmigrants who have taken active steps to become LPRs. The rule does not affect any other nonimmigrant category, nor does the rule make distinctions among persons of different nationalities. Moreover, as noted throughout this rule, DHS expects that because of the small size of the newly eligible class of workers, the rule should not negatively impact the employment of persons in other nonimmigrant categories. DHS also notes that the H–4 dependent spouses at issue may already obtain employment authorization when they file their applications to adjust status; this rule simply accelerates the timeframe in which they may enter the labor market.

iii. Impact on Universities

Several commenters suggested that because it is common for H–4 dependent spouses to change status to F–1 nonimmigrant student status to enhance their marketability and use their time productively, universities may lose revenue from decreased enrollment if such H–4 dependent spouses are allowed to work pursuant to this rule. DHS carefully considered but declined to address these concerns. First, this rule does not directly regulate U.S. institutions of higher education or its students (including F–1 nonimmigrants), and any impacts on university enrollments or revenues would be an indirect impact of this rule. Second, the rule merely expands the choices available to H–4 dependent spouses. While the rule expands the ability for such individuals to obtain employment authorization, it does nothing to restrict or otherwise change their ability to engage in study to the extent authorized by the Department in accordance with law. Third, even if the opportunity for employment authorization may mean that fewer H–4 dependent spouses eventually choose to enroll as nonimmigrant students, it is not clear how this rule could significantly impact revenues at colleges and universities considering the relatively small number of people impacted by this rule.[21] Indeed, other

[21] According to Department of Education statistics, approximately 21 million students are expected to enroll in postsecondary degree-granting institutions in fall 2014. *See http://nces.ed.gov/fastfacts/display.asp?id=372.* Given the relatively large student population enrolled in American schools and the narrow population impacted by this rule, DHS believes this rule would not significantly impact net college enrollments.

commenters noted that this rule could actually help university enrollment, as the increased ability for H–1B nonimmigrant families to generate income would further enable the H–1B nonimmigrant and H–4 dependent spouse to engage in higher education or contribute towards the higher education of their children. Consequently, it is uncertain if the net impact of this rule is to reduce overall enrollment and revenues, given the offsetting effects of this rule suggested by commenters. Commenters did not provide statistics or data demonstrating that this rule will have significant adverse effects on U.S. institutions of higher education or that DHS should limit employment opportunities for H–4 dependent spouses to protect revenue sources. Finally, DHS notes that it received several supportive comments both from representatives of the academic community and also from self-identified H–4 dependent spouses who viewed this rulemaking as positive.

### 4. Comments Requesting a More Restrictive Policy

Slightly over 180 commenters suggested limiting employment authorization to a more restricted class of H–4 nonimmigrants. For the reasons discussed below, DHS has determined that it will not adopt the commenters' suggestions in this final rule.

### i. Certain Skills or Sectors

A number of commenters recommended granting employment authorization only to H–4 dependent spouses who have certain skills or work in certain sectors of the economy. Other commenters requested that DHS limit employment authorization under the rule to H–4 dependent spouses who hold advanced degrees from U.S. universities or have degrees in certain subjects, such as subjects in STEM fields. Some commenters were concerned that eligible H–4 dependents will be able to compete across all occupations, not just skilled professions.

DHS declines to restrict employment authorization eligibility to H–4 dependent spouses with certain skills or degrees. A primary purpose of this rule is to help U.S. employers retain H–1B nonimmigrant employees who have demonstrated the intent to become LPRs, which would provide substantial benefits to these employers and the U.S. economy. This rule is intended to provide this incentive to H–1B nonimmigrants regardless of the academic backgrounds of their H–4 dependent spouses. Limiting the rule to benefit only H–1B nonimmigrants

whose H–4 dependent spouses have certain skills or hold certain educational credentials would undermine the effectiveness of this rule.

### ii. Reciprocity

A number of commenters recommended limiting employment authorization to H–4 dependent spouses who are from countries that authorize employment for spouses of U.S. citizens in a similar immigration status abroad (*i.e.,* when there is reciprocity). DHS's focus in this rule, however, is on retaining H–1B nonimmigrants for the benefit of U.S. employers and the U.S. economy, including by helping businesses minimize expensive disruptions caused by the departures from the United States of certain highly skilled H–1B nonimmigrants. As noted above, limiting the rule to affect only a subset of H–1B nonimmigrant families based on reciprocity would weaken the rule's efficacy. Moreover, reciprocity would implicate foreign policy considerations that are outside the scope of this rulemaking.

### iii. Limiting Employment Authorization Based on AC21 Extensions

A few commenters requested that DHS extend eligibility for employment authorization only to the H–4 dependent spouses of H–1B nonimmigrants who are beneficiaries of AC21 extensions. DHS discussed this option in the proposed rule. The Department appreciates this suggestion, but believes that also extending employment authorization to the spouses of H–1B nonimmigrants who are the beneficiaries of approved Form I–140 petitions more effectively accomplishes the goals of this rulemaking. For the benefit of U.S. businesses and the U.S. economy, DHS believes the rule should provide incentives for those workers who have established certain eligibility requirements and demonstrated intent to reside permanently in the United States and contribute to the U.S. economy. Extending employment authorization to H–4 dependent spouses of H–1B nonimmigrants with either approved Form I–140 petitions or H–1B status granted pursuant to sections 106(a) and (b) of AC21 encourages a greater number of professionals with high-demand skills to remain in the United States. Moreover, by tying eligibility for employment authorization to approved Form I–140 petitions, DHS is reaching the H–4 dependent spouses of H–1B nonimmigrants granted status under section 104(c) of AC21. DHS thus declines to exclude from this rule the

spouses of H–1B nonimmigrants who have approved Form I–140 petitions.

### C. Legal Authority To Extend Employment Authorization to Certain H–4 Dependent Spouses

Over 40 commenters questioned DHS's legal authority to extend employment authorization to certain H–4 dependent spouses, often emphasizing that employment for spouses of L and E nonimmigrants is expressly authorized by statute.[22] Several commenters argued that it was the role of Congress, not the Executive Branch, to create immigration laws.

DHS disagrees with the view that this rule exceeds the Secretary's authority. In the INA, Congress provided the Secretary with broad authority to administer and enforce the immigration laws. The Secretary is expressly authorized to promulgate rules and "perform such other acts as he deems necessary for carrying out his authority" based upon considerations rationally related to the immigration laws. INA section 103(a)(3), 8 U.S.C. 1103(a)(3). Congress also provided the Secretary with the more specific statutory authority to set by regulation the conditions of nonimmigrant admission. INA section 214(a), 8 U.S.C. 1184(a). These provisions grant the Secretary broad discretion to determine the most effective way to administer the laws. *See Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA "need not specifically authorize each and every action taken by the Attorney General [(now Secretary of Homeland Security)], so long as his action is reasonably related to the duties imposed upon him"); *see also Arizona* v. *United States,* 132 S. Ct. 2492, 2499 (2012) (noting "broad discretion exercised by immigration officials" under the immigration laws).

More specifically, section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes that employment may be authorized by statute or by the Secretary. *See Arizona Dream Act Coalition* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as "permissive" and largely "unfettered"). Thus, the commenters' arguments that DHS lacks authority to grant employment eligibility to H–4 dependent spouses because Congress

---

[22] *See* INA section 214(c)(2)(E), (e)(6); 8 U.S.C. 1184(c)(2)(E), (e)(6).

has not specifically required it by statute are misplaced. The fact that Congress has directed the Secretary to authorize employment to specific classes of aliens (such as the spouses of E and L nonimmigrants) does not mean that the Secretary is precluded from extending employment authorization to other classes of aliens by regulation as contemplated by section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B).[23]

*D. Comments on the Analysis of Executive Orders 12866 and 13563*

1. Comments Related to Labor Market Impacts

Of the approximately ten percent of commenters who generally opposed the rule, a majority of those commenters asserted that allowing eligible H–4 dependent spouses to receive employment authorization would have negative economic impacts. Chief among these concerns was the impact of the proposed rule on the U.S. labor market. Many commenters believed that the proposed rule would increase competition for jobs; exacerbate the nation's unemployment rate; drive down wages; and otherwise negatively impact native U.S. workers. A few commenters also suggested that allowing H–4 dependent spouses to enter the labor market would negatively impact highly skilled H–1B nonimmigrants.

DHS appreciates these viewpoints and has carefully considered the potential for negative labor market impacts throughout this rulemaking. DHS affirms its belief expressed in the proposed rule that any labor market impacts will be minimal. As a preliminary matter, this regulatory change applies only to the H–4 dependent spouses of H–1B nonimmigrants who have actively taken certain steps to obtain LPR status. As such, the rule simply accelerates the timeframe by which these spouses are able to enter the U.S. labor market. Importantly, the rule does not require eligible H–4 spouses to submit an application for an EAD, nor does the granting of an EAD guarantee that H–4 spouses will obtain employment. Further, the relatively small number of people affected by the rule limits any impact the rule may have on the labor market. Although DHS, in this final rule, increased its estimate of the number of H–4 dependent spouses who might benefit from the rule, the maximum number of such spouses who could request employment authorization and actually enter the labor market in the initial year (the year with the largest number of potential applicants) represents only 0.1156 percent of the overall U.S. civilian labor force. This increased estimate does not change the Department's conclusion that this rule will have minimal labor market impacts.

Moreover, with respect to the potential that this rule and the policy goals of retaining certain highly skilled H–1B nonimmigrants may cause native-worker displacement and wage reduction, DHS notes that there is a large body of research that supports the findings that immigration of highly skilled workers is beneficial to the U.S. economy and labor market in the long-term. For example, several commenters provided studies that refuted arguments that highly skilled immigrants are used for "cheap labor," [24] while many others offered evidence that showed the positive effects of immigration, and particularly high-skilled immigration, on the U.S. labor market.[25] These commenters pointed to a Congressional Budget Office report and academic study [26] that showed that immigration generally produces a modest increase in the wages of native-born workers in the long-run, and that any negative economic effects—in the form of wages—are largely felt by other immigrant workers with similar education and skill levels. DHS also notes that the Immigration and Nationality Act's employment-related antidiscrimination provision, enforced by the Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices, prohibits employment discrimination in hiring, firing and recruiting and referring for a fee based on citizenship status. In general, employers may not reject U.S. workers in favor of nonimmigrant visa holders based on citizenship status. INA section 274B(a)(1)(B), 8 U.S.C. 1324b(a)(1)(B).

From a labor market perspective, it is important to note that there are not a fixed number of jobs in the United States. Basic principles of labor market economics recognize that individuals not only fill jobs, but also stimulate the economy and create demand for jobs through increased consumption of goods and services. On this point, approximately 2,600 commenters thought that the regulation as proposed will stimulate the U.S. economy through the spillover effects associated with dual-income households, thus leading to increased spending throughout the economy, greater investments in real estate, the potential for job creation, and increased tax revenue. Relatedly, other commenters expressed their belief that the rule will bolster U.S. competitiveness, economic strength and innovation. A few commenters noted that the proposal will enhance the ability of U.S. businesses to attract and retain highly skilled immigrants, resulting in potential economic gains to U.S. companies and the U.S. economy.

In addition, commenters also highlighted several social benefits of the proposed rule, including: Family unification; overall family financial security and stability; providing a means for H–4 dependent spouses to be financially independent; and significantly aiding the H–1B nonimmigrant and his or her family in integrating into American culture and communities. DHS appreciates these comments and agrees that the rule will provide economic and social benefits to the H–1B nonimmigrant worker and his or her family as they wait to obtain LPR status.

---

[23] Moreover, in the few instances in which Congress has determined to limit employment authorization for certain classes of aliens, it has done so expressly. *See* INA section 208(d)(2), 8 U.S.C. 1158(d)(2) ("An [asylum] applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum."); INA section 236(a)(3), 8 U.S.C. 1226(a)(3) (restricting employment authorization for aliens who have been arrested and are in removal proceedings unless the alien is a lawful permanent resident "or otherwise would (without regard to removal proceedings) be provided work authorization"); INA section 241(a)(7), 8 U.S.C. 1231(a)(7) (providing that alien who has been ordered removed is ineligible for work authorization unless the Secretary finds that the alien cannot be removed for lack of a country willing to receive the alien or "the removal of the alien is otherwise impracticable or contrary to the public interest").

[24] For example, commenters cited to the following studies in refuting the claim that H–1B workers are a source of cheap labor: Lofstrom, M. & Hayes, J., "H–1Bs: How Do They Stack Up to US Born Workers? IZA Discussion Paper No. 6259" (Dec. 2011), *available at http://ssrn.com/abstract=1981215*; Rothwell, J. & Ruiz, N. "H–1B Visas and the STEM Shortage: A Research Brief" (May 11, 2013), *available at http://ssrn.com/abstract=2262872.*

[25] Commenters cited to the following to highlight positive effects of highly skilled immigration: National Foundation for American Policy, "H–1B Visas and Job Creation" (Mar. 2008), *available at http://www.nfap.com/pdf/080311h1b.pdf.*

[26] Commenters cited to the following studies in highlighting the effects of immigration: Congressional Budget Office, "The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act," June 18, 2013, *available at http://www.cbo.gov/sites/default/files/cbofiles/attachments/44346-Immigration.pdf;* Mathews, D., "No, the CBO Report Doesn't Mean Immigration Brings Down Wages," June 19, 2013, *available at http://www.washingtonpost.com/blogs/wonkblog/wp/2013/06/19/no-the-cbo-report-doesnt-mean-immigration-brings-down-wages/;* Ottaviano, G. &

Peri, G., *Rethinking the Effects of Immigration on Wages* (March 2010), *available at http://economics.ucdavis.edu/people/gperi/site/papers/rethinking-the-effect-of-immigration-on-wages.*

**10296** **Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

Finally, a few commenters suggested that allowing H–4 dependent spouses to enter the labor market would negatively impact the job prospects of highly skilled H–1B nonimmigrants. These commenters generally suggested, without providing empirical support, that by allowing H–4 dependent spouses to have an EAD, U.S. employers will prefer to hire such individuals rather than to go through the additional effort of hiring an H–1B nonimmigrant. DHS appreciates these concerns but lacks data on the skillsets or educational levels of H–4 dependent spouses to indicate that they will take jobs that are typically held by highly skilled H–1B nonimmigrants. Nor, as noted above, is the U.S. labor market static; individuals who supply labor also create demand for labor through increased consumption and other spending. The fact that this rule provides employment authorization only to H–4 dependent spouses who are tied to an H–1B nonimmigrant who is sufficiently on the path to LPR status further mitigates the possibility that this rule will cause employers to hire H–4 dependent spouses over H–1B nonimmigrants. DHS anticipates that employers will continue to fully utilize the H–1B program and does not believe that this rule will adversely affect the job prospects of H–1B nonimmigrants.

2. Comments on the Volume Estimate and Methodology

Of the ten percent of commenters who opposed the rule, many felt that the Department's estimates of the potential eligible population were too low. Two commenters suggested that DHS employ a different methodology to arrive at the estimated number of likely eligible H–4 dependent spouses. One commenter provided highlighted excerpts of the Yearbook of Immigration Statistics, as published by the DHS Office of Immigration Statistics, containing statistics on individuals who had obtained LPR status under employment-based preference categories. The commenter highlighted the total number of spouses who had adjusted status to lawful permanent residence and the total number of individuals who adjusted to LPR status under the first through third employment-based preference categories. DHS assumes that the commenter was suggesting that DHS simply apply that historical average to estimate the number of H–4 dependent spouses who will be eligible to apply for employment authorization under this rule.

DHS appreciates this response and carefully considered this approach. However, that approach fails to account for those H–1B nonimmigrants and their families who are currently in the backlog waiting for immigrant visas. Furthermore, that approach would also overstate the likely number of H–4 dependent spouses who would be eligible to apply for employment authorization under this rule. That is so because the approach does not account for the proportion of employment-based adjustment applicants who are in H–1B status as compared to those adjusting from another nonimmigrant status. Moreover, not all spouses of H–1B nonimmigrants are currently in H–4 nonimmigrant status. For these reasons, DHS disagrees with the commenters' suggested approach to estimating the volume of H–4 dependent spouses who will be eligible to apply for employment authorization under this rule. Estimating the eligible population by taking into account the backlog of H–1B nonimmigrants who have approved I–140 petitions but are unable to adjust status due to a lack of available immigrant visas, along with the estimated future flow of newly eligible spouses, is a more accurate methodology for estimating the number of H–4 dependent spouses whom this rule may impact.

DHS has carefully considered ways to estimate the volume of potential H–4 dependent spouses who will be eligible to apply for employment authorization under this rule. Based on comments received that questioned whether the estimated volume of such spouses was too low, DHS reviewed and updated its estimates in preparing this final rule. DHS acknowledges that there is some uncertainty in this analysis, but believes its methodology offers the best available estimates.

Although the estimate of H–4 dependent spouses who could be eligible to apply for employment authorization increased in this final rule,[27] the findings and impacts of the rule remain essentially the same. In the first year, if all 179,600 H–4 dependent spouses who DHS estimates may be eligible under the rule were to enter the U.S. labor market, that population would still constitute a small fraction of one percent of the overall U.S. civilian workforce. And many of these H–4 dependent spouses will be able to seek employment even without this rule, as immigrant visa numbers become available and H–1B nonimmigrant families become eligible to file for adjustment of status. As noted previously, this rule simply accelerates

the timeframe in which certain H–4 dependent spouses are able to enter the labor market.

Notwithstanding the revised volume estimates, the basis for this rule, as discussed throughout the proposed rule and this final rule, remains accurate. DHS is taking this action to further incentivize H–1B nonimmigrants and their families to continue to wait and contribute to the United States through an often lengthy waiting period for an immigrant visa to become available. DHS expects that these actions will also benefit U.S. employers by decreasing the labor disruptions that occur when H–1B nonimmigrants abandon the permanent resident process.

3. Comments on Specific Costs and Benefits Discussed in the Analysis

One commenter believed that the proposed rule overstated the potential costs and understated the benefits of the rule. Specifically, the commenter alleged that DHS' estimates for cost per applicant were exaggerated because DHS included the monetized opportunity costs associated with applying for employment authorization. That same commenter also believed that DHS failed to stress the economic and social benefits of the rule. Another commenter believed that the proposed rule failed to acknowledge the economic losses incurred by the current inability of H–4 dependent spouses to work.

DHS has carefully considered these comments and does not believe that the potential costs and benefits were either under- or overestimated. In the proposed rule, DHS highlighted the economic benefits to both the H–4 dependent spouse and the H–1B family unit that would accrue from additional income. In addition, in the proposed rule DHS discussed the societal integration benefits that would accrue to the H–4 dependent spouse and the H–1B family that would come from the spouse's ability to participate in the U.S. labor market. DHS disagrees with comments that the application costs were inflated because we assigned a valuation to the H–4 dependent spouse's time. DHS acknowledged in the proposed rule that these spouses do not currently work. DHS decided to use the minimum wage as a reasonable proxy to estimate the opportunity costs of their time. DHS disagrees with the questionable notion that just because these spouses are not currently able to participate in the labor market, they do not face opportunity costs and/or assign valuation in deciding how to allocate their time. As such, DHS utilized a reasonable approach in assigning value to their time.

---

[27] Please refer to Section IV.C. of this document for a deeper discussion of the final estimate of the impact of this rule.

AR2022_200192

**Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations **10297**

*E. Comments on the Application for Employment Authorization*

Over 180 commenters raised issues related to employment authorization, including filing procedures, premium processing, validity periods, renewals, evidentiary documentation, concurrent filings for extension of stay/change of status, automatic extensions of employment authorization, and filing fees. DHS carefully considered these comments and addresses them below.

1. Streamlined or Modernized Filing Procedures

Commenters urged DHS and USCIS to utilize streamlined or modernized filing procedures for Applications for Employment Authorization (Forms I–765) submitted by H–4 dependent spouses. USCIS is moving from a paper-based application and adjudication process to an electronic one through the development of an Electronic Immigration System (''USCIS ELIS''). When complete, USCIS ELIS will allow customers to electronically view their applications, petitions or requests, receive electronic notification of decisions, and electronically receive real-time case status updates. This is a global effort affecting all USCIS benefit request programs and, therefore, is outside the scope of this rulemaking. DHS will notify the public when USCIS is prepared to begin accepting electronic filings of Applications for Employment Authorization by eligible H–4 dependent spouses. DHS will begin accepting Applications for Employment Authorization (Forms I–765) submitted by certain H–4 dependent spouses on the effective date of this rule, May 26, 2015. This effective date is intended to prevent an overlap of H–1B cap season and an initial filing surge of Forms I–765 under 8 CFR 274a.12(c)(26). As a result, USCIS will be able to implement this program in a manner that will avoid prolonged delays of processing other petition and application types, in particular those H–1B petitions seeking an FY 2016 cap number. It will also allow USCIS to maintain excellent customer service for all USCIS stakeholders, including H–1B employers, H–1B nonimmigrants and their families.

2. Employment Authorization Document (Form I–766) Validity Period

Nine commenters requested that DHS issue the Employment Authorization Document (EAD) (Form I–766) with a validity period that matches the H–4 dependent spouse's status. Related to this request, another commenter requested a three-year validity period to

match the H–1B and H–4 authorized periods of admission. DHS agrees with commenters that to reduce possible cases of unauthorized employment, the EAD validity period should match the H–4 dependent spouse's length of authorized admission. Thus, in issuing an EAD to an otherwise eligible H–4 dependent spouse, DHS generally will authorize a validity period that matches the H–4 spouse's remaining authorized period of admission, which may be as long as three years in cases not involving DOD-related services. This policy will ensure that USCIS does not grant employment authorization to an H–4 dependent spouse who is not eligible for the benefit. It will also likely reduce the number of times that H–4 dependent spouses may need to request renewal of their employment authorization.

One commenter requested that DHS issue a probationary EAD with a six-to twelve-month validity period, at the end of which the H–4 dependent spouse would have to prove that he or she is working legally and paying taxes. DHS declines to adopt this suggestion. The EAD that DHS will issue H–4 dependent spouses pursuant to this rule is evidence of employment authorization to lawfully work in the United States for any employer. DHS is not aware of any risk factors—such as fraud, criminal activity, or threats to public safety or national security—associated with H–4 dependent spouses as a whole that would support imposing a six-month validity period. Moreover, the administrative burden resulting from additional adjudications and the possibility of gaps in employment authorization, together with the burdens this limitation would place on the H–4 dependent spouse, make imposing a six-month validity period unreasonable.

Regarding the suggestion that H–4 dependent spouses should be required to prove that they pay taxes as a condition of obtaining or maintaining work authorization, DHS does not require proof of payment of taxes for any of the classes of aliens eligible to file the Application for Employment Authorization. As a preliminary matter, issuance of an EAD does not require an H–4 dependent spouse to work. Nor does issuance of the EAD guarantee that an H–4 dependent spouse will find employment and therefore be required to pay taxes on any income earned through such employment. Moreover, DHS is not aware of any evidence, and the commenter provided none, indicating that H–4 dependent spouses are likely to engage in tax evasion or other tax-related unauthorized activity if they are provided employment

authorization pursuant to this rule. At the same time, USCIS would face significant operational burdens if it were required to collect and verify tax documents for each H–4 dependent spouse seeking employment authorization under this rule.

3. EAD Renewals

Five commenters requested that DHS allow H–4 dependent spouses to apply for EAD renewals up to six months in advance, in part to align with the time frame permitted for filing of the Petition for a Nonimmigrant Worker (Form I–129) to extend the H–1B nonimmigrant's status. As explained below in Section III.E.5, DHS will permit those H–4 dependent spouses seeking to concurrently file their Form I–765 application with their Application to Extend/Change Nonimmigrant Status (Form I–539), and if applicable their spouses' Form I–129 petition, to file up to six months in advance of the requested start date. Please note, however, that USCIS will not adjudicate the Form I–765 application until a determination has been made on the underlying Form I–539 application and/ or Form I–129 petition. The time at which an H–4 dependent spouse will be eligible to apply for an EAD renewal will vary, as it is dependent on actions taken by the H–1B nonimmigrant, including actions to maintain and extend his or her H–1B status, as well as the H–4 dependent spouse's status.

4. Acceptable Evidentiary Documentation

Several commenters submitted comments related to the Application for Employment Authorization (Form I–765) and to the evidence required to be submitted by applicants with the application. One commenter asked DHS to make changes to assist applicants in obtaining acceptable evidentiary documentation. This commenter requested that USCIS provide the H–4 dependent spouse, upon request, with his or her immigration case related paperwork, such as the original underlying petition. Another commenter requested that DHS provide clarification about the evidentiary standard relating to AC21 eligibility.

In conjunction with the proposed rule, DHS proposed conforming revisions to the Form I–765 application to add H–4 dependent spouses described in this rule to the classes of aliens eligible to file the form. Concurrent with publication of this final rule, DHS has made further changes to the form. DHS has made clarifying changes to improve readability of the form instructions describing the types of

**10298** **Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

documentary evidence that may be submitted in support of the application. As further discussed in Part III.F.1 relating to marriage fraud concerns, DHS also has revised the regulatory text in 8 CFR 214.2(h)(9)(iv) and the form instructions to clarify that supporting documentary evidence includes proof of marriage. Finally, DHS has revised the form itself to include a check box that self-identifies the applicant as an eligible H–4 dependent spouse. DHS believes that adding the check box for H–4 dependent spouses to the form will aid in the efficient processing of the form by facilitating USCIS's ability to match the application with related petitions that are integral to determining the H–4 dependent spouse's eligibility for employment authorization, as discussed below in Part III.E.5.

DHS appreciates the concerns regarding the difficulty that some applicants may face in obtaining the necessary documentation to support the Form I–765 application. DHS's revisions in this final rule to 8 CFR 214.2(h)(9)(iv) and the instructions to Form I–765 provide for flexibility in the types of evidentiary documentation that may be submitted by applicants. If the H–4 dependent spouse cannot submit the primary evidence listed in the form instructions, he or she may submit secondary evidence, such as an attestation that lists information about the underlying Form I–129 or Form I–140 petition, so that an adjudicator may be able to match the Form I–765 application with the underlying petition(s). Such information may include the petition receipt number, the beneficiary's name and/or the petitioner's name. If secondary evidence does not exist or cannot be obtained, an applicant may demonstrate this and submit two or more sworn affidavits by non-parties who have direct knowledge of the relevant events and circumstances. This approach should address the situation where the H–4 dependent spouse is unable to access the immigration paperwork relating to the H–1B nonimmigrant. Notwithstanding the option for submitting secondary evidence, if an applicant prefers to obtain the primary evidence listed in the form instructions from USCIS for submission with the Form I–765, the applicant may make a request for documents maintained by USCIS by following established procedures for making such requests under the Freedom of Information Act (FOIA). *See http://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia/how-file-foia-privacy-act-request/how-file-foiapa-request.* DHS

declines to establish new procedures for making document requests that are applicable only to applicants who are H–4 dependent spouses. The established FOIA process for making document requests promotes fairness, uniformity, and administrative efficiency, while ensuring that privacy protections are enforced.

Finally, in response to the comment on the evidentiary standard that will apply to H–4 dependent spouses, DHS notes that such spouses will have to meet the same burden of proof (*i.e.,* preponderance of the evidence) as other applicants for employment authorization. *See, e.g., Matter of Chawathe,* 25 I. & N. Dec. 369, 376 (AAO 2010) (describing ''preponderance of the evidence'' standard).

5. Concurrent Filings

A couple of commenters requested that DHS allow eligible H–4 dependent spouses to file the Application for Employment Authorization (Form I–765) concurrently with an Immigrant Petition for Alien Worker (Form I–140) or an Application to Extend/Change Nonimmigrant Status (Form I–539). For the reasons that follow, DHS agrees to allow Form I–765 to be concurrently filed with Form I–539, but not with Form I–140.

DHS currently permits an H–4 dependent spouse to file Form I–539 concurrently with a Petition for a Nonimmigrant Worker (Form I–129) filed on behalf of the H–1B nonimmigrant. This provides several efficiencies, as the status of the H–4 dependent spouse is based on the resolution of the H–1B nonimmigrant's Form I–129 petition and both forms may be processed at the same USCIS locations. For similar reasons, DHS has decided to permit H–4 dependent spouses to file Applications for Employment Authorization (Forms I–765) concurrently with certain related benefit requests: Applications to Extend/Change Nonimmigrant Status (Forms I–539) and, if applicable, with Petitions for a Nonimmigrant Worker (Form I–129). As noted previously, DHS has decided to issue EADs with validity dates that match their authorized periods of admission. That period of admission is determined as part of the Form I–539 application adjudication, which, in turn, is largely dependent on the H–1B nonimmigrant's period of admission determined as part of the Form I–129 adjudication. Because adjudication of those forms are interrelated, and because they are submitted to the same USCIS locations, DHS has determined

that it is reasonable to allow those forms to be concurrently filed.

DHS, however, cannot extend the courtesy of concurrent filing with Form I–140 immigrant visa petitions filed on behalf of the H–1B nonimmigrant. Presently, Forms I–129 and I–539 are not processed at the same USCIS locations in which Form I–140 petitions are adjudicated. As a result, each form must be filed separately at the USCIS Service Center location having jurisdiction over the relevant form. Additionally, determining the spousal relationship between the H–1B nonimmigrant and the H–4 dependent spouse is not a necessary part of the adjudication of the Form I–140 petition.[28] To permit concurrent filing of Form I–765 with Form I–140 would undermine DHS' efforts to facilitate efficient processing of both benefit requests.

DHS also notes that it cannot adjudicate a Form I–765 filed by an H–4 dependent spouse until the Department has made a determination regarding the H–1B nonimmigrant's eligibility for H–1B status under sections 106(a) and (b) of AC21 or until a Form I–140 petition has been approved. Prior to adjudicating such Form I–765, DHS must also make a determination that the H–4 dependent spouse remains eligible for H–4 status. As such, DHS amends the current rule to clarify that the 90-day clock specified in 8 CFR 274a.13(d) authorizing DHS to issue interim employment authorization if the Form I–765 is not adjudicated within 90 days is not triggered until necessary eligibility determinations have been made on the underlying nonimmigrant status for the H–1B nonimmigrant and the H–4 dependent spouse. If the H–4 dependent spouse's employment authorization is based on a favorable eligibility determination relating to the nonimmigrant status of either the H–1B nonimmigrant or the H–4 dependent spouse, the 90-day clock is triggered when that eligibility determination is made. Alternatively, if employment authorization is based on a favorable eligibility determination relating to the nonimmigrant status of both the H–1B nonimmigrant and the H–4 dependent spouse, the 90-day clock is not triggered until an eligibility determination is made on both. Accordingly, DHS is making conforming amendments to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) in this final rule and the instructions to Form I–765. These amendments permit H–4

---

[28] Unlike the I–140 adjudication, adjudication of Form I–539 requires evidence of such spousal relationship.

**Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations **10299**

dependent spouses under this rule to concurrently file their Form I–765 with related benefit requests, specified in the form instructions to include their Application to Extend/Change Nonimmigrant Status (Form I–539), and if applicable, their spouse's Form I–129 petition. As a result of the amendments, the 90-day clock described in 8 CFR 274a.13(d) would also not start until after a determination has been made on the underlying H–1B status, H–4 status, or both.

6. Premium Processing

Three commenters requested premium processing service for H–4 dependent spouses seeking to file Applications for Employment Authorization (Forms I–765). These commenters highlighted the benefit that the extra premium processing fees could bring to USCIS. DHS appreciates these comments, but has decided not to extend premium processing to Form I–765 applications filed by H–4 dependent spouses in conjunction with this rulemaking. DHS currently offers premium processing service for certain employment-based petitions and applications, including H–1B, L, and E nonimmigrant worker petitions and certain EB–1, EB–2 and EB–3 immigrant visa petitions. Extending premium processing to Form I–765 applications, however, presents operational concerns and would be inconsistent with procedural realities for USCIS. The agency, for example, would be unable to comply with premium processing requirements on any Form I–765 application that is contingent on the adjudication of a concurrently filed Application to Extend/Change Nonimmigrant Status (Form I–539). Due to these and other operational concerns, DHS will not extend premium processing service to Form I–765 applications, including applications filed by H–4 dependent spouses under this rule at this time.

7. Automatic Extensions of Work Authorization

One commenter requested an automatic extension of work authorization for 240 days after an H–4 dependent spouse's EAD expires. DHS, however, is concerned with improperly granting employment authorization to an H–4 dependent spouse who is ineligible for it. As the validity of the H–4 dependent spouse's eligibility for employment authorization will be tied to his or her authorized period of admission, automatic extensions of employment authorization without review of the underlying extension of stay applications for the H–

1B nonimmigrant and H–4 dependent spouse could result in employment authorization being extended to individuals who will eventually be determined ineligible for this benefit. DHS thus declines to adopt this recommendation.

To avoid any potential gaps in employment authorization when seeking an extension of employment authorization, DHS recommends that the H–4 dependent spouse timely file all necessary applications. DHS's policy to permit concurrent filing of Forms I–539, I–129, and I–765 should also help H–4 dependent spouses avoid gaps in employment authorization, as these forms may be filed concurrently up to six months in advance of date of need.

8. Filing Fees

Several commenters submitted remarks on the filing fees without expressing support for or opposition to the fees. Additionally, some commenters asserted that USCIS would benefit from an increased volume of fees, and another commenter requested that the U.S. Government help pay for immigration-related application fees.

DHS is bound by statutes and regulations governing its collection of fees in connection with immigration benefit requests. *See* INA section 286(m)–(p), 8 U.S.C. 1356(m)–(p); 8 CFR 103.7. DHS generally must set application fees at a level that enables it to recover the full costs of providing services, including the costs of similar services provided without charge to certain other applicants. But DHS may offer assistance with respect to immigration-related application fees in the form of fee waivers. Discretionary fee waivers are provided on a case-by-case basis when the party requesting the benefit is unable to pay the prescribed fee and the waiver request is consistent with the underlying benefit being requested. *See* 8 CFR 103.7(c)(1).

For the reasons that follow, DHS believes that it would be unlikely that H–4 dependent spouses would be unable to pay the prescribed fee for the Application for Employment Authorization (Form I–765). By definition, H–4 dependent spouses are married to H–1B nonimmigrants who are employed and earning a salary of at least the prevailing wage in their occupation. H–4 dependent spouses will thus generally be unable to establish that they cannot pay the fee prescribed for the Form I–765 application. For these reasons, DHS declines to establish a general fee waiver for the Form I–765 filed by eligible H–4 dependent spouses under this rule. *See* 8 CFR 103.7(d). USCIS

will consider fee waiver requests on a case-by-case basis. *See* 8 CFR 103.7(c)(3)(viii). As noted above, given the nature of the H–1B nonimmigrant's employment, a showing of inability to pay as required by the regulation would be the exception rather than the rule.

9. Possible Restrictions on EADs Issued to H–4 Dependent Spouses

A few commenters recommended imposing certain restrictions on employment authorization issued to H–4 dependent spouses, such as: Creating a cap on the number of EADs that could be granted to H–4 dependent spouses; prohibiting the H–1B nonimmigrant and H–4 dependent spouse from having the same employer or working in the same occupation; prohibiting employers from replacing an American veteran with an H–1B nonimmigrant; restricting H–4 work authorization to certain employers; creating a National Registry of Jobs that H–4 dependent spouses would be allowed to apply for; forcing individuals to surrender their foreign passports when they obtain U.S. citizenship as a way of proving allegiance; allocating EADs in a proportionate manner based on nationality; and requiring H–4 dependent spouses to pay for training programs for U.S. citizens.

DHS declines to incorporate the suggested restrictions into this final rule. A primary purpose of this rule is to assist U.S. employers in retaining certain highly skilled H–1B nonimmigrants. Allowing certain H–4 dependent spouses to apply for employment authorization removes a disincentive that currently undermines this goal. Imposing the suggested restrictions, such as numerical caps or per-country quotas, would limit the effectiveness and purpose of this rule. Additionally, DHS believes that EADs provide inherent protections that mitigate the risk of abuse and exploitation. Because these EADs may be used to work for any employer, workers are free to find new employment at any point during the EAD's validity, including if they are dissatisfied with their pay or working conditions. Finally, DHS reiterates that the individuals being provided employment authorization under this rule belong to a class of aliens that is already likely to enter the U.S. labor market with EADs. In sum, DHS does not believe that extending eligibility for employment authorization to H–4 dependent spouses will lead to the broad exploitation of EADs.

**10300**    **Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

## 10. Circular EADs

One commenter noted that this rule could lead to "circular EADs," whereby spouses who are both eligible for H–1B status may switch status (H–1B to H–4 and vice versa) so that one spouse may maintain an EAD at all times. This commenter conveyed the concern that H–1B nonimmigrants might initiate the primary steps towards permanent residence, then switch back and forth between H–1B and H–4 statuses to stay in the United States forever.

DHS acknowledges that H–1B nonimmigrants will be able to change status, as permitted by law. DHS believes it is extremely unlikely, however, that an H–1B nonimmigrant will seek to remain in the United States forever by switching between nonimmigrant statuses as a result of this rule. The rule is intended to benefit those H–1B nonimmigrants who are already well on the path to lawful permanent residence and, therefore, seek to remain in the United States permanently on this basis. Although the waiting period for an immigrant visa may be lengthy, there is an end date as indicated on the Department of State's Visa Bulletin. So any incentive to switch between statuses indefinitely would be weighed by the nonimmigrant against the benefits of obtaining LPR status, including the ability to work in the United States without being tied to a specific employer and the ability of the H–4 dependent spouse to work without needing to periodically apply and pay for an EAD. Moreover, with lawful permanent residency, an individual is eligible to apply for U.S. citizenship, generally after five years, and to petition for relatives to immigrate to the United States, benefits that are not available to persons with H–1B or H–4 status.

## 11. Form I–765 Worksheets

One commenter expressed concern that H–4 dependent spouses would need to demonstrate economic need for employment because of the reference in the Paperwork Reduction Act section of the proposed rule to the Form I–765 Worksheet (Form I–765WS). DHS is clarifying that H–4 dependent spouses are not required to establish economic need for employment authorization. H–4 dependent spouses are not required to submit Form I–765WS with their Application for Employment Authorization (Form I–765). DHS has corrected this error in the form instructions to the Application for Employment Authorization (Form I–765).

## 12. Other Related Issues

Several commenters sought guidance on issues tangential to the issuance of employment authorization to H–4 dependent spouses. For example, one commenter asked for clarification on the type of status that an H–4 dependent spouse will receive when readmitted into the United States after traveling abroad. Another commenter wanted to know if an H–4 dependent spouse could work from home in the United States for his or her native country employer on the native country salary. Because this rulemaking is limited to extending eligibility for employment authorization to H–4 dependent spouses and does not make changes to admission requirements or conditions of employment authorization, DHS considers these questions outside the scope of this rulemaking. Please consult the USCIS Web site at *www.uscis.gov* or contact USCIS Customer Service at 1–800–375–5283 for current guidance.

Finally, several commenters requested clarification about EAD processing and adjudication times. USCIS posts current processing times on its Web site and encourages interested stakeholders to consult *www.uscis.gov* if they have questions about adjudication times.[29]

## F. Fraud and Public Safety Concerns

Over 100 commenters raised concerns related to fraud and public safety, including issues related to resume fraud, marriage fraud, participation by individuals with criminal records, unauthorized employment, and employer abuse in the H–1B program. Strict consequences are already in place for immigration-related fraud and criminal activities, including inadmissibility to the United States, mandatory detention, ineligibility for naturalization, and removability. *See, e.g.,* INA sections 101(f), 212(a)(2) & (a)(6), 236(c), 237(a)(1)(G) & (a)(2), 318; 8 U.S.C. 1101(f), 1182(a)(2) & (a)(6), 1226(c), 1227(a)(1)(G) & (a)(2), 1429. Nevertheless, the Department welcomes suggestions to further prevent fraud and protect public safety in the implementation of its programs. The Department carefully considered these comments and addresses them below.

### 1. Falsifying Credentials and Marriage Fraud

Over 100 commenters anticipated that certain H–4 dependent spouses would

falsify their resumes or qualifications or marry for immigration purposes. With respect to potential resume fraud, DHS notes that eligibility for employment authorization for H–4 dependent spouses will not depend in any way on their professional or educational qualifications or their resumes. It will be up to potential employers to verify the qualifications of H–4 dependent spouses they may be seeking to hire. This concern is therefore outside the scope of this rulemaking.

With respect to marriage fraud, DHS is revising 8 CFR 214.2(h)(9)(iv) to clarify that establishing eligibility for employment authorization under this rule requires evidence of the spousal relationship between the H–4 dependent spouse and the H–1B nonimmigrant. DHS is also making conforming revisions to the form instructions to Form I–765 to require that H–4 dependent spouses submit proof of marriage to the H–1B nonimmigrant with the form. USCIS officers are specially trained to recognize indicia of fraud, including marriage fraud and falsified documents, and review other immigration petitions for these circumstances as well. If such fraud is suspected, the relevant USCIS officer may refer the case to the local fraud unit for further inquiry. USCIS may also submit leads related to significant fraud to U.S. Immigration and Customs Enforcement for criminal investigation. DHS believes that current fraud-detection training, mechanisms for detecting and investigating fraud, and fraud-related penalties are sufficient for deterring and detecting marriage fraud in this context.

### 2. Prohibition Related to Felony Charges and Convictions

Two commenters requested a prohibition against participation by anyone charged with, awaiting trial for, or convicted of a felony. DHS appreciates the commenters' concerns over public safety and notes that the eligibility for employment authorization extended by this rule to certain H–4 dependent spouses is discretionary. DHS officers will consider any adverse information—including criminal convictions, charges, and other criminal matters—on a case-by-case basis.

### 3. Unauthorized Employment

A few commenters thought that this rule would help curb any unauthorized employment in which H–4 dependent spouses are currently engaging. Additionally, several commenters raised concerns that this rule could encourage illegal immigration and increase the number of undocumented workers in

---

[29] For example, as of January 26, 2015, the processing time at the California Service Center (CSC) for the Application for Employment Authorization, Form I–765, ranged from 3 weeks to 3 months depending on the basis for the Form I–765. *See https://dashboard.uscis.gov/index.cfm?formtype=12&office=2&charttype=1.*

AR2022_200196

**Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations **10301**

the United States. DHS disagrees that this rule may encourage illegal immigration. DHS believes that this rule will provide options to certain H–4 dependent spouses allowing them to engage in authorized employment. Individuals eligible for employment authorization under this rule must have been granted H–4 status and must remain in such lawful status before they can be granted employment authorization pursuant to this rule. An H–4 dependent spouse who engaged in unauthorized employment would not have been maintaining lawful H–4 status and therefore would be ineligible for this new benefit. Therefore, the Department does not believe that this rule will incentivize unauthorized employment or any other illegal activities.

### 4. Employer Abuse of H–1B Nonimmigrants and H–4 Dependent Spouses

A number of commenters raised concerns over potential employer abuse of H–1B nonimmigrants and H–4 dependent spouses. These concerns included failure to pay prevailing wages and demanding long hours without adequate compensation. DHS appreciates these concerns and maintains that employers must not intimidate, threaten, restrain, coerce, blacklist, discharge or otherwise discriminate or take unlawful action against any employee. Violators face severe penalties. *See* INA 212(n)(2)(C)(iv), 8 U.S.C. 1182(n)(2)(C)(iv). DHS takes seriously any potential abuse of H–1B nonimmigrants and H–4 dependent spouses and encourages any workers who feel that their rights have been violated by their employers to file a complaint with DOL or another appropriate entity, such as the Equal Employment Opportunity Commission.[30] Any concerns raised by commenters regarding H–1B nonimmigrants and worker protections in the H–1B program, however, are outside the scope of this rulemaking.

### G. General Comments

Over 300 commenters submitted feedback about general immigration issues. A few commenters expressed support for or opposition to immigration. Comments ranged from requesting DHS to discontinue all types of immigration to underscoring the need for comprehensive reform of the immigration laws to general support of immigration. DHS is charged with administering the immigration laws enacted by Congress, and only Congress can change those laws. The comments described above are therefore outside the scope of this rulemaking. DHS, however, is committed to comprehensive immigration reform that creates a workable system that strengthens border security, improves the U.S. economy, unites families, and preserves national security and public safety.

Additionally, fewer than a dozen commenters objected to the ability of non-U.S. citizens to submit comments on the proposed rule. As noted in that rule, DHS welcomed comments from all interested parties and did not place any restrictions based on citizenship or nationality.

### H. Modifications to the H–1B Program and Immigrant Visa Processing

#### 1. H–1B Visa Program

##### i. Circumventing the H–1B Cap

A few commenters suggested that employers may try to exploit this regulation by using it to avoid the H–1B numerical cap and hiring more foreign specialty occupation workers than permitted by the statute. As a preliminary matter, DHS cannot agree with the premise that hiring an individual with general (rather than employer-specific) employment authorization constitutes circumvention of the cap on H–1B nonimmigrants. This is particularly so when such employment authorization is contingent on being married to an individual who was selected in the H–1B program and is subject to the cap. Moreover, commenters provided no evidence or data that would support the contention that this rule will be used by employers and H–4 dependent spouses to circumvent the cap. For example, DHS does not have, and commenters did not provide, data on the skillsets or educational levels of H–4 dependent spouses to indicate that they will generally qualify for jobs that are typically held by highly skilled H–1B nonimmigrants. Finally, it is unlikely that highly skilled individuals who could independently qualify under the H–1B program will instead opt to enter the United States as H–4 dependent spouses and subject themselves to lengthy periods of unemployment with the intent to circumvent the H–1B cap. As noted previously, this rule provides eligibility for employment authorization only to those H–4 dependent spouses who are married to certain H–1B nonimmigrants who have taken substantial steps, generally taking many years, towards obtaining permanent residence. Such an individual may eventually obtain a job for which an H–1B nonimmigrant could possibly have qualified, but the Department does not consider this a circumvention of the H–1B cap.

##### ii. Elimination or Modification of the H–1B program

More than a dozen commenters requested that the H–1B program be terminated. An approximately equal number of commenters requested that the H–1B visa cap be eliminated or modified in various ways. Several commenters requested that DHS increase the number of visas available, other commenters asked DHS to eliminate the H–1B visa cap, while others recommended decreasing the number of visas available.

DHS cannot address the commenters' suggestions in this rulemaking. The H–1B program is required by statute, which also sets the current cap on H–1B visa numbers. Congressional action is thus required to address the commenters' concerns, as the Secretary does not have the authority to eliminate the program or change the visa cap without congressional action. The suggested changes are thus outside the scope of this rulemaking.

Additionally, one commenter requested that DHS allow for more flexible filing times for H–1B visas. This request would require DHS to amend its H–1B regulations, which currently provide that an H–1B petition may not be filed or approved earlier than six months before the date of actual need for the beneficiary's services. *See* 8 CFR 214.2(h)(9)(i)(B). This rulemaking, however, does not make substantive changes to the H–1B program or its regulations. The request is thus outside the scope of this rulemaking.

##### iii. More Flexible Change of Status From H–1B to H–4

One commenter requested a modification of the H–1B program to allow a family member who has been in the United States for more than five years to choose between H–1B and H–4 status. To some extent, H–1B nonimmigrants currently have this option. An H–4 dependent spouse may seek classification as an H–1B nonimmigrant if an employer files a petition on his or her behalf. As long as one of the spouses maintains H–1B status, the other is eligible for H–4 status. However, the underlying H–1B status is connected to the need of a U.S.

---

[30] An individual can submit a Nonimmigrant Worker Information Form, Form WH–4, with DOL. This form was authorized by the American Competitiveness and Workforce Improvement Act (ACWIA) of 1998. *See* INA sections 212(n)(2)(G), 8 U.S.C. 1182(n)(2)(G). It is available on-line at *http://www.dol.gov/whd/forms/wh-4.pdf.*

AR2022_200197

**10302** **Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

employer. To the extent that the commenter is suggesting a change to this requirement such that both spouses could be present in the United States in H–4 status, such a change would require congressional action and, therefore, is beyond the scope of this rulemaking.

iv. Applying for H–1B Status and Cap Exemption

One commenter recommended that H–4 dependent spouses be allowed to apply for H–1B visas and be exempt from the cap. This final rule does not prohibit H–4 dependent spouses from seeking and obtaining H–1B status. Once an H–4 spouse seeks to change to H–1B status, he or she is subject to annual limitations on H–1B nonimmigrants. Only Congress can exempt groups of individuals from the statutory H–1B numerical limitations. This request is therefore beyond the scope of this rulemaking.

v. Dependents of G Principal Nonimmigrants

One commenter requested that DHS change its G visa regulations to allow dependents of principal G visa holders to more freely obtain a different visa classification (such as H–1B classification). Such a change is outside the scope of this rulemaking.

2. Immigrant Visa Processing and Adjustment of Status

Over 30 commenters requested the elimination of the worldwide quotas for immigrant visas.[31] One commenter requested allowing the submission and receipt of applications for adjustment of status when visas are not available, and another requested that the rule include provisions to expedite the permanent residence process for the EB–2 and EB–3 preference categories. Several commenters requested that USCIS grant EADs to LPR applicants while they wait for their immigrant visas. Another commenter requested that USCIS grant one skilled worker visa per eligible family unit (rather than per each individual family member), for the purpose of reducing backlogs. One commenter requested that USCIS establish a procedure by which those in the process of seeking LPR status could ''pre-register'' their intention to apply to adjust status.

DHS appreciates feedback from the public regarding possible changes to the

immigration laws and the system for obtaining LPR status. DHS, however, will not respond to these comments as they do not address changes to the regulations made by this rulemaking and are therefore outside the scope of this rulemaking.

*I. H–1B Nonimmigrant's Maintenance of Status*

Several commenters asked for more information about the effect that an H–1B nonimmigrant's loss of employment or change of employer would have on the H–4 dependent spouse's employment authorization. As stated in the proposed rule, the H–4 dependent's status is tied to the H–1B nonimmigrant's status. Thus, if the H–1B nonimmigrant fails to maintain status, the H–4 dependent spouse also fails to maintain status and would therefore no longer be eligible for employment authorization. Under current regulations, DHS may seek to revoke employment authorization if, prior to the expiration date of such authorization, any condition upon which it was granted has not been met or no longer exists. *See* 8 CFR 274a.14(b).

*J. Environmental Issues*

In the proposed rule, DHS requested comments relating to the environmental effects that might arise from the proposed rule. Nine commenters submitted related feedback, noting general environmental issues that come with an increased population. DHS appreciates these comments but notes that the vast majority of the population immediately affected by the rule is already in the United States and has been here for a number of years while waiting for their immigrant visas. The H–4 dependent spouses affected by this rule generally will eventually be able to seek employment even without this rule, as immigrant visa numbers become available and H–1B nonimmigrant families become eligible to file for adjustment of status. As noted previously, this rule simply accelerates the timeframe in which these individuals are able to enter the labor market.

*K. Reporting*

A few commenters requested more information about how DHS will monitor the outcome of the final rule, such as by tracking EAD adjudications for H–4 dependent spouses and publishing annual reports. DHS maintains statistics on all immigration benefit programs and will monitor H–4 EAD adjudications and include relevant information in its annual reports in

accordance with current reporting protocols.

*L. Implementation*

Several hundred commenters requested that the rule be implemented as soon as possible. One commenter requested that a sunset provision be included in the rule. At the end of the sunset period, the commenter recommended that DHS evaluate the program, and, if the results are positive, expand it. DHS believes that a general sunset provision would not be practicable or fair as it would require DHS to provide different periods of employment authorization to H–4 dependent spouses depending on when they become eligible to apply. Further, DHS considers a sunset provision to be at odds with the rule's purpose, which is to retain highly skilled workers who often have a multi-year wait before being eligible to apply for permanent residence.

With respect to implementation of this rule, DHS must consider the 30-day effective date requirement at 5 U.S.C. 553(d) as well as USCIS's implementation requirements. Based on these factors, DHS has decided that this rule will be effective 90 days from the date of publication, May 26, 2015.

**IV. Statutory and Regulatory Requirements**

*A. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100,000,000 in 1995 adjusted for inflation to 2014 levels by the Consumer Price Index for All Urban Consumers is $155,000,000.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155,000,000 in 2014 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

---

[31] Section 201(d) of the INA, 8 U.S.C. 1151(d), prescribes the worldwide level of employment-based immigrants. Section 203(b) of the INA, 8 U.S.C. 1153(b), prescribes the preference allocation for employment-based immigrants. Section 202 of the INA, 8 U.S.C. 1152, prescribes per country levels for family-sponsored and employment-based immigrants.

*B. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

*C. Executive Orders 12866 and 13563*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action" under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

DHS is amending its regulations to extend eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants who either: (1) Are principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140); or (2) have been granted H–1B status under sections 106(a) and (b) of AC21.

1. Summary

Currently, USCIS does not issue work authorization to H–4 dependent spouses. To obtain work authorization, the H–4 dependent spouse generally must have a pending Application to Register Permanent Resident Status or Adjust Status or have changed status to another nonimmigrant classification that permits employment. AC21 provides for an authorized period of admission and employment authorization beyond the typical six-year limit for H–1B nonimmigrants who are seeking permanent residence. This final rule will extend eligibility for employment authorization to H–4 dependent spouses where: the H–1B nonimmigrant is the principal beneficiary of an approved Form I–140 petition; or the H–1B nonimmigrant has been granted status pursuant to sections 106(a) and (b) of AC21.

DHS has updated its estimate of the population of H–4 dependent spouses who will be impacted by the rule. DHS estimates the current population of H–4 dependent spouses who will be eligible for employment authorization could initially be as many as 179,600 after taking into account the backlog of H–1B nonimmigrants who have approved I–140 petitions, or who are likely to have such petitions approved, but who are unable to adjust status because of the lack of immigrant visas. For ease of analysis, DHS has assumed that those H–4 dependent spouses in the backlog population will file for employment authorization in the first year of implementation. DHS estimates the flow of new H–4 dependent spouses who could be eligible to apply for initial employment authorization in subsequent years may be as many as 55,000 annually. Even with the increased estimate of H–4 dependent spouses who could be eligible to apply for employment authorization, DHS still affirms in the initial year (the year with the largest number of eligible applicants) that the rule will result in much less than a one percent change in the overall U.S. labor force.

DHS is unable to determine and does not include in this analysis the filing volume of H–4 dependent spouses who will need to renew their employment authorization documents under this rule as they continue to wait for immigrant visas. Eligible H–4 dependent spouses who wish to apply for employment authorization must pay the $380 filing fee to USCIS, provide two passport-style photos, and incur the estimated 3-hour-and-25-minute opportunity cost of time burden associated with filing an Application for Employment Authorization (Form I–765). After monetizing the expected opportunity cost and combining it with the filing fee[32] and the estimated cost associated with providing two passport-style photos, an eligible H–4 dependent spouse applying for employment authorization will face an anticipated total cost of $436.18.

The maximum anticipated annual cost to eligible H–4 dependent spouses applying for initial employment authorization in Year 1 is estimated at $78,337,928 (non-discounted), and $23,989,900 (non-discounted) in subsequent years. The 10-year discounted cost of this rule to eligible H–4 dependent spouses applying for employment authorization is $257,403,789 at 3 percent and $219,287,568 at 7 percent. Table 2 shows the maximum anticipated estimated costs over a 10-year period of analysis for the estimate of 179,600 applicants for initial employment authorization, and the 55,000 applicants expected to file for initial employment authorization annually in subsequent years.

TABLE 2—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%

[$Millions]

|  | Year 1 estimate (179,600 filers) | Sum of Years 2–10 (55,000 filers annually) | Total over 10-year period of analysis * |
|---|---|---|---|
| 3% Discount Rate: | | | |
| Total Costs Incurred by Filers @3% ........................... | $76.1 | $181.3 | $257.4 |
| 7% Discount Rate | | | |
| Total Costs Incurred by Filers @7% ........................... | 73.2 | 146.1 | 219.3 |

[32] The filing fee is assumed to be a reasonable approximation for USCIS's costs of processing the application. *See* INA section 286(m), 8 U.S.C. 1356(m).

Table 2—Total Costs and Benefits of Initial Employment Authorization for Certain H–4 Dependent Spouses 10-Yr Present Value Estimates at 3% and 7%—Continued

[$Millions]

| | Year 1 estimate (179,600 filers) | Sum of Years 2–10 (55,000 filers annually) | Total over 10-year period of analysis * |
|---|---|---|---|
| Qualitative Benefits ............................................................................ | This rule is intended to remove a disincentive to pursuing LPR status due to the potentially long wait for employment-based immigrant visas for many H–1B nonimmigrants and their family members. This rule will encourage H–1B nonimmigrants who have already taken steps to become LPRs to not abandon their efforts because their H–4 dependent spouses are unable to work. By encouraging H–1B nonimmigrants to continue in their pursuit of becoming LPRs, this rule would minimize disruptions to petitioning U.S. employers. Additionally eligible H–4 dependent spouses who participate in the labor market will benefit financially. DHS also anticipates that the socioeconomic benefits associated with permitting H–4 spouses to participate in the labor market will assist H–1B families in integrating into the U.S. community and economy. | | |

*Note: Totals may not sum due to rounding.

2. Purpose of the Rule

According to the most recently released reports prepared by the DHS Office of Immigration Statistics, in Fiscal Year (FY) 2013 a total of 990,553 persons became LPRs of the United States.[33] Most new LPRs (54 percent) were already living in the United States and obtained their LPR status by applying for adjustment of status within the United States.[34]

Employment-based immigrant visas accounted for approximately 16 percent of the total number of persons obtaining LPR status, and 30 percent of total LPRs who adjusted status in FY 2013. In FY 2013, there were a total of 161,110 LPRs admitted under employment-based preference visa categories. Of these 161,110 individuals, "priority workers" (first preference or EB–1) accounted for 24 percent; "professionals with advanced degrees" (second preference or EB–2) accounted for 39 percent; and "skilled workers, professionals, and other workers" (third preference or EB–3) accounted for 27 percent.[34]

Based on historical trends, H–1B nonimmigrants seeking to adjust status to lawful permanent residence will most likely adjust under the EB–2 and EB–3 preference categories, with a much smaller amount qualifying under the EB–1 preference category. As of January 2015, the employment-based preference categories are "current" and have visas available, *except* for Chinese and Indian nationals seeking admission under the second preference category and

individuals of all nationalities seeking admission under the third preference category.[35] Thus, the employment-based categories under which H–1B nonimmigrants typically qualify to pursue LPR status are the very categories that are currently oversubscribed.[36]

In many cases, the timeframe associated with seeking lawful permanent residence is lengthy, extending well beyond the six-year period of stay allotted by the H–1B nonimmigrant visa classification. As a result, retention of highly educated and highly skilled nonimmigrant workers can become challenging for U.S. employers. Retaining highly skilled persons who intend to acquire LPR status is important when considering the contributions they make to the U.S. economy, including advances in research and development and other entrepreneurial endeavors, which are highly correlated with overall economic growth and job creation. By some estimates, immigration was responsible for one quarter of the explosive growth in patenting in past decades, and these

innovations have the potential to contribute to increasing U.S. gross domestic product (GDP).[37] In addition, over 25 percent of tech companies founded in the United States from 1995 to 2005 had a key leader who was foreign-born.[38] Likewise, the Kauffman Foundation reported that immigrants were more than twice as likely to start a business in the United States as the native-born in 2012, and a report by the Partnership for a New American Economy found that more than 40 percent of Fortune 500 companies in 2010 were founded by immigrants or their children.[39] Additionally, in March 2013, the House Committee on the

[33] See DHS Office of Immigration Statistics, Annual Flow Report, U.S. Lawful Permanent Residents: 2013 (May 2014), *available at* http://www.dhs.gov/sites/default/files/publications/ois_lpr_fr_2013.pdf.

[34] Id.

[35] See Department of State Bureau of Consular Affairs, December 2014 Visa Bulletin (Nov. 7, 2014), *available at* http://travel.state.gov/content/dam/visas/Bulletins/visabulletin_January2015.pdf.

[36] See Wadhwa, Vivek, et al., *Intellectual Property, the Immigration Backlog, and a Reverse Brain-Drain—America's New Immigrant Entrepreneurs, Part III, Center for Globalization, Governance & Competitiveness* (Aug. 2007), *available at* http://www.cggc.duke.edu/documents/IntellectualProperty_theImmigrationBacklog_andaReverseBrainDrain_003.pdf. Note: The report examined the 2003 cohort of employment-based immigrants and showed that 36.8 percent of H-1B nonimmigrants that adjust status do so through the EB-3 category and another 28 percent do so through the EB-2 category, while only 4.62 percent adjust through the EB-1 category.

[37] See generally Jennifer Hunt & Marjolaine Gauthier-Loiselle, *How Much Does Immigration Boost Innovation?*, Nat'l Bureau of Econ. Research, Sept. 2008, *available at* http://www.nber.org/papers/w14312.

[38] See Wadhwa, Vivek, et al., "America's New Immigrant Entrepreneurs," Report by the Duke School of Engineering and the UC Berkeley School of Information (Jan. 4, 2007) *available at* http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf; see also Wadhwa, Vivek, et al., *Intellectual Property, the Immigration Backlog, and a Reverse Brain-Drain—America's New Immigrant Entrepreneurs, Part III, Center for Globalization, Governance & Competitiveness* (Aug. 2007), *available at* http://www.cggc.duke.edu/documents/IntellectualProperty_theImmigrationBacklog_andaReverseBrainDrain_003.pdf; cf. Preston, Julia, "Work Force Fueled by Highly Skilled Immigrants," *N.Y. Times*, Apr. 15, 2010, *available at* http://www.nytimes.com/2010/04/16/us/16skilled.html?_r=1.

[39] See Fairlie, Robert,"Kauffman Index of Entrepreneurial Activity: 1996–2012," The Ewing Marion Kauffman Foundation. Apr. 2013, *available at* http://www.kauffman.org/what-we-do/research/2013/04/kauffman-index-of-entrepreneurial-activity-19962012; Partnership for a New American Economy, 2011, The "New American" Fortune 500, *available at*http://www.nyc.gov/html/om/pdf/2011/partnership_for_a_new_american_economy_fortune_500.pdf.

AR2022_200200

**Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations **10305**

Judiciary held a hearing on Enhancing American Competitiveness Through Skilled Immigration, providing some members of the business community with an opportunity to provide their perspectives on immigration. The witnesses represented various industries, but underscored a unified theme: Skilled immigrants are contributing significantly to U.S. economic competitiveness and it is in our national interest to retain these talented individuals.[40]

As noted above, this rule is intended to reduce the disincentives to pursue lawful permanent residence due to the potentially long wait for immigrant visas for many H–1B nonimmigrants and their families. Also, this rule will encourage those H–1B nonimmigrants who have already started the process for permanent residence not to abandon their efforts because their H–4 dependent spouses are unable to work.

3. Volume Estimate

Due to current data limitations, DHS is unable to precisely track the population of H–4 dependent spouses tied to H–1B nonimmigrants who have an approved Immigrant Petition for Alien Worker (Form I–140) or who have been granted H–1B status under the provisions of AC21. DHS databases are currently "form-centric" rather than "person-centric." As USCIS transforms its systems to a more fully electronic process, there will be a shift from application- and form-based databases to one database that tracks information by the applicant or petitioner and which will improve DHS's ability to track the number of potential H–4 employment authorization applicants.

In the proposed rule, DHS estimated that as many as 100,600 H–4 dependent spouses would be eligible to apply for employment authorization in the first year, and as many as 35,900 H–4 dependent spouses would be eligible to apply annually in subsequent years. The estimates provided in the proposed rule have been updated in this final rule. In an effort to provide a reasonable approximation of the number of H–4 dependent spouses who will be eligible for employment authorization under this final rule, DHS has compared historical data on persons obtaining LPR status against employment-based immigrant demand estimates. Based on current visa availability, DHS believes that dependent spouses of H–1B

nonimmigrants who are seeking employment-based visas under the second or third preference categories will be the group most impacted by the provisions of this rule, because certain chargeability areas in these preference categories are currently oversubscribed. In addition, in line with the goals of this rule and AC21, and based on immigration statistics, we assume that the large majority of H–4 dependent spouses who will be eligible for this provision are residing in the United States and will seek to acquire LPR status by applying to adjust status with USCIS rather than by departing for an indeterminate period to pursue consular processing of an immigrant visa application overseas. This assumption is supported by immigration statistics on those obtaining LPR status. In FY 2013, there were a total of 161,110 employment-based immigrant visa admissions, of which 140,009 (or 86.9 percent) obtained LPR status through adjustment of status in the United States.[41] This analysis limits the focus and presentation of impacts based only on the employment-based preference immigrant population seeking to adjust status to that of a lawful permanent resident, rather than the employment-based preference immigrant population seeking to obtain an immigrant visa through consular processing.

DHS will extend eligibility to apply for employment authorization to the H–4 dependent spouses of H–1B nonimmigrants who are principal beneficiaries of approved Form I–140 petitions or who have been granted H–1B status pursuant to sections 106(a) and (b) of AC21. Therefore, DHS assumes that the volume of H–4 dependent spouses newly eligible for employment authorization is comprised of two estimates: (1) an immediate, first year estimate to the current backlog of Form I–140 petitions; and (2) an annual estimate based on future demand to immigrate under employment-based preference categories. Extending eligibility for employment authorization to H–4 dependent spouses is ultimately tied to the actions taken by the H–1B nonimmigrant; therefore, the overall volume estimate is based on the population of H–1B nonimmigrants who have taken steps to acquire LPR status under employment-based preference categories.

DHS has estimated the number of persons waiting for LPR status in the first through third employment-based preference categories as of June 30, 2014. In this analysis, the estimated number of persons waiting for an immigrant visa is referred to as the "backlog" and includes those with an approved Form I–140 petition as of June 30, 2014 and those with a filed Form I–140 petition that is pending as of June 30 but is likely to be approved in the future.[42] Currently, the first preference employment-based (EB–1) visa category is not oversubscribed. Therefore, DHS believes that the majority of H–4 dependent spouses applying for employment authorization under this rule will be those whose H–1B principals are seeking to adjust status under the second or third preference category. However, as there are persons with pending Form I–140 petitions in the first preference category that are approved or likely to be approved based on historical approval rates, and because the provisions of AC21 apply to these individuals, DHS has included them in this analysis.[43] Additionally, DHS has examined detailed characteristics about the LPR population for FY 2009–FY 2013 to further refine this estimate.[44] We have laid out each of our assumptions and methodological steps for both the backlog and annual estimates of H–4 dependent spouses who will be eligible to apply for employment authorization. Again, the estimates are based on the actions and characteristics of the H–1B nonimmigrant (e.g., whether the H–1B nonimmigrant reports being married) because the H–4 dependent spouse's

---

[40] See Enhancing American Competitiveness through Skilled Immigration: Hearing before the H. Judiciary Subcomm. on Immigration, 113th Cong. 15 (2013), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-113hhrg79724/pdf/CHRG-113hhrg79724.pdf.

[41] See DHS Office of Immigration Statistics, 2013 Yearbook of Immigration Statistics, Table 6, *available at* http://www.dhs.gov/yearbook-immigration-statistics-2013-lawful-permanent-residents* (compare statistics listed under "total employment-based preferences" and "adjustment of status employment-based preferences").

[42] Source for backlog estimation: USCIS Office of Policy & Strategy analysis of data obtained from the USCIS Office of Performance and Quality. Analysis based on CLAIMS3 data captured in approved Immigrant Petition for Alien Worker (Form I–140). Of the Form I–140 petitions that were approved or pending as of June 30, 2014, USCIS allocated those that were pending that were "likely to be approved" based on USCIS approval rates in order to more accurately estimate the cases in the backlog.

[43] Despite the fact that a beneficiary is in a preference category where a visa is immediately available, and the beneficiary is able to apply to adjust status to an LPR immediately upon the filing of the I–140 petition, DHS is including estimates of first-preference LPRs that have an approved Form I–140 or are waiting for Form I–140 approval as of June 30, 2014 for which we are unable to determine that an adjustment of status application has been concurrently filed. As mentioned previously, principal beneficiaries of Form I–140 petitions and their dependents who are eligible to file for adjustment of status also are eligible for employment authorization.

[44] Source: USCIS Office of Policy & Strategy analysis of data obtained from DHS Office of Immigration Statistics. Analysis based on CLAIMS3 data captured in Application to Register Permanent Residence or Adjust Status (Form I–485) records approved in the FY 2009–13 period.

eligibility to apply for employment authorization is tied to the steps taken on behalf of the H–1B nonimmigrant to acquire LPR status under an employment-based preference category.

a. Backlog Estimate

The estimate of the number of individuals who are the principal beneficiaries of either an approved Form I–140 petition or a Form I–140 petition that is likely to be approved and who are waiting for an immigrant visa in the EB–1, EB–2, and EB–3 categories is shown in Table 3. Importantly, the number of principal workers shown in Table 3 is not limited only to those individuals who are currently in H–1B status. The estimates in Table 3 include

aliens who are currently in H–1B and other nonimmigrant statuses, as well as those seeking to immigrate under employment-based preference categories who are currently abroad.

TABLE 3—DHS ESTIMATE OF BACK-LOG (PRINCIPALS ONLY) AS OF JUNE 30, 2014

| Preference category | Principal workers |
|---|---|
| EB–1 ......................................... | 9,000 |
| EB–2 ......................................... | 146,500 |
| EB–3 ......................................... | 78,500 |

DHS is unable to precisely determine the number of H–1B nonimmigrants in

the backlog who will be impacted by this rule. Instead, DHS examined detailed statistics of those obtaining LPR status from FY 2009–2013, and used this information as a proxy to refine the estimate of principal workers in the backlog that DHS expects to be married H–1B nonimmigrants seeking to adjust status. That estimate provides the basis for approximating the number of H–4 dependent spouses who will be impacted by this rule.[45] Table 4 presents the assumptions and steps taken to determine the upper-bound estimate of H–4 dependent spouses who are represented in the backlog and will likely now be eligible to apply for work authorization.

TABLE 4—STEPS TAKEN TO ARRIVE AT THE UPPER-BOUND FINAL ESTIMATE OF H–4 DEPENDENT SPOUSES OF H–1B NONIMMIGRANTS WHO ARE IN THE "BACKLOG" [46]

| Assumption and/or Step | EB–1 | EB–2 | EB–3 | Total |
|---|---|---|---|---|
| (1) Principal workers in the backlog (as of June 30, 2014) ........................................... | 9,000 | 146,500 | 78,500 | 234,000 |
| (2) Historical percentage of principal workers who obtained LPR Status through adjustment of status, average over FY 09–FY13 data .................................................... | 96.1% | 98.2% | 89.3% | .................. |
| (3) Estimated proportion of the backlog that DHS assumes will adjust status (rounded) ......................................................................................................................... | 8,649 | 143,863 | 70,128 | 222,640 |
| (4) Historical percentage of those who adjusted status who were H–1B nonimmigrants, average over FY 09–FY13 data .............................................................. | 32.5% | 89.3% | 61.6% | .................. |
| (5) DHS estimated proportion of the assumed H–1B nonimmigrants who adjusted status (rounded) ....................................................................................................... | 2,811 | 128,470 | 43,199 | 174,480 |
| (6) Historical percentage of H–1B principal workers who adjusted status and who reported being married, average over FY 09–FY13 data ............................................... | 81.1% | 72.6% | 67.2% | .................. |
| (7) DHS estimated proportion of the assumed H–1B nonimmigrants who adjusted status and who report being married (rounded) ............................................................... | 2,280 | 93,269 | 29,030 | 124,579 |
| (8) Final Estimate of H–1B Nonimmigrants in the Backlog Potentially Impacted by the Final Rule (Rounded Up) | | | | 124,600 |

As shown in Table 4, DHS estimates there are approximately 124,600 H–1B nonimmigrants currently in the backlog for an immigrant visa under the first through third employment-based preference categories who are married. Accordingly, DHS assumes by proxy that there could be as many as 124,600 H–4 dependent spouses of H–1B nonimmigrants currently in the backlog who could be initially eligible to apply for employment authorization under this rule. DHS does not have a similar way to parse out the backlog data for those classified as "dependents" to capture only those who are spouses rather than children. Furthermore, DHS recognizes that the estimate of H–4 dependent spouses in the backlog who will now be eligible to apply for

employment authorization is a maximum estimate since there is no way to further refine this estimate by determining the immigration or citizenship status of the spouses of H–1B nonimmigrants who report being married. For instance, the spouse of the H–1B nonimmigrant could reside abroad, be a U.S. citizen or LPR, or be in another nonimmigrant status that confers employment eligibility. Additionally, H–4 dependent spouses who may be eligible for employment authorization under this rule may decide not to work and therefore not apply for an EAD. Accordingly, DHS believes that the estimate of 124,600 represents an upper-bound estimate of H–4 dependent spouses of H–1B

nonimmigrants currently waiting for immigrant visas.

b. Annual Demand Estimate

The annual demand flow of H–4 dependent spouses who will be eligible to apply for initial employment authorization under the final rule is based on: (1) The number of Form I–140 petitions approved where the principal beneficiary is currently in H–1B status; and (2) the number of extensions of stay petitions approved for H–1B nonimmigrants pursuant to AC21.[47] Petitioners request extensions of stay or status for an H–1B nonimmigrant using the Petition for a Nonimmigrant Worker (Form I–129). Section 104(c) of AC21 allows for extensions of stay for an H–1B nonimmigrant who has an

---

[45] *Id.*

[46] Note: In the proposed rule, there was a data compilation error in step 4 for EB–2 estimates of the H–1B population which carried through the calculations. Instead of 19,159 reported in the proposed rule as the estimated proportion of H–1B nonimmigrants that adjusted their status to EB–2 and reported being married, that total should have

read approximately 60,000. The proposed rule's total estimate of H–1B in the backlog as of September 2012 (step 8 of the calculation) should have read approximately 106,000 based on FY 08—FY 11 data.

[47] There may be a very limited number of instances where an individual could be abroad and obtain an H–1B nonimmigrant visa pursuant to

AC21; however, USCIS is unable to precisely determine this limited population due to current system limitations. As such, this analysis focuses only on those cases where an H–1B nonimmigrant is currently in the United States and requesting an extension of their H–1B status pursuant to AC21.

AR2022_200202

approved Form I–140 petition but is unable to apply to adjust to LPR status because of visa unavailability. Sections 106(a) and (b) of AC21 allow for extensions of stay for an H–1B nonimmigrant on whose behalf a labor certification application or a Form I–140 petition was filed at least 365 days prior to reaching the end of the sixth year of his or her H–1B status.

In the preamble of the proposed rule, DHS used colloquial language to describe the basis for H–1B nonimmigrants to be eligible for extensions of their stay under section 106 of AC21. It is typical to describe H–1B nonimmigrants who are eligible for AC21 extensions as those H–1B nonimmigrants who are the beneficiaries of a labor certification application or Form I–140 petition that *has been pending for at least 365 days* prior to reaching the end of the sixth year of H–1B status. This colloquial description was used in the proposed rule; however, this language does not accurately describe AC21 eligibility. Per the statute, an H–1B nonimmigrant is eligible for an extension of stay pursuant to AC21 provided that they are the beneficiary of a labor certification application or a Form I–140 petition that has been *filed* at least 365 days prior to the end of their sixth year of H–1B status. From a practical standpoint, neither the labor certification nor the Form I–140 petition needs to remain pending adjudication for 365 days or more to qualify for an extension pursuant to AC21.

It may be helpful to illustrate this description using a graphical illustration of a case where an H–1B nonimmigrant would generally be eligible for an extension of his or her maximum period of stay pursuant to AC21, even though neither the labor certification application nor the Form I–140 petition remain pending with DOL or DHS, respectively, for a year or more.

In this illustration, the H–1B nonimmigrant would be eligible for extension of his or her stay pursuant to sections 106(a) and (b) of AC21, even though his or her labor certification was certified in 6 months and the Form I–140 petition had only been pending for two months at the time of AC21 extension.

In this final rule's preamble, DHS is correcting the description of how H–1B nonimmigrants become eligible for extensions of stay pursuant to sections 106(a) and (b) of AC21. Importantly, this language change does not impact who ultimately qualifies to apply for employment authorization under this final rule. The informal language used in the preamble of the proposed rule also does not impact the USCIS adjudication of petitions to authorize H–1B status pursuant to AC21. Accurately describing the statutory conditions of AC21 does, however, necessitate that DHS amend its estimate of the annual flow projections of H–4 dependent spouses who may be eligible to apply for employment authorization. In the proposed rule, DHS estimated the number of H–4 dependent spouses who would be eligible to apply for work authorization pursuant to AC21 by examining historical data of labor certifications or Form I–140 petitions pending for a year or more with the DOL and DHS, respectively. In contrast, this final rule examines the historical data of extensions of stay petitions approved for nonimmigrants currently in H–1B status to estimate the volume of H–4 dependent spouses eligible to apply for work authorization pursuant to AC21.

To recap, this rule will permit certain H–4 dependent spouses of H–1B nonimmigrants to be eligible to apply for employment authorization provided that the H–1B nonimmigrants are: (1) The principal beneficiaries of an approved Form I–140 petition, or (2) granted H–1B status pursuant to sections 106(a) and (b) of AC21. The annual flow estimate will therefore be based on historical data of these two categories. USCIS began tracking those cases that were approved for an extension pursuant to AC21 on October 17, 2014; in the past, USCIS databases have not captured and stored this information.[48] An extension of stay request may be submitted on behalf of H–1B nonimmigrants at any point throughout their authorized maximum six-year period of stay, or to extend stay beyond the maximum six years pursuant to AC21. Typically, an extension of stay request seeking eligibility pursuant to AC21 would be at least the second extension request filed on behalf of that H–1B nonimmigrant. The historical data of H–1B nonimmigrants who have been approved for extensions of stay include all requests, only some of which relate to extensions pursuant to AC21.

The number of approved Form I–140 petitions and approved Form I–129 extension of stay petitions where the beneficiary currently has H–1B status is presented in Table 5.

TABLE 5—FORM I–140 AND FORM I–129 (EXTENSION OF STATUS OR STAY (EOS) ONLY) APPROVALS FOR BENEFICIARIES CURRENTLY IN H–1B NONIMMIGRANT STATUS

| Fiscal year | Form I–140 approvals | Form I–129 Extensions of status/ stay approvals |
|---|---|---|
| 2010 ................. | 48,511 | 116,363 |
| 2011 ................. | 54,363 | 163,208 |
| 2012 ................. | 45,732 | 125,679 |
| 2013 ................. | 43,873 | 158,482 |
| 2014 ................. | 42,465 | 191,531 |
| 5-Year Average | 46,989 | 151,053 |

Based on approximately 90 days of tracking data (which is all that is

[48] On October 17, 2014, USCIS began capturing this information during the adjudication of Form I–129 petitions. Importantly, the tracking of cases that were approved for extension pursuant to AC21 do not distinguish between cases approved under section 104 and cases approved under section 106. There is thus a potential for overlap between the estimate of cases approved under AC21 and the estimate of persons with approved Form I–140 petitions.

currently available), DHS estimates that 18.3 percent of approved extension of stay requests filed on behalf of H–1B nonimmigrants are approved pursuant to AC21. Assuming this proportion holds constant, DHS estimates that annually it will approve approximately 27,643 [49] extension of stay requests pursuant to AC21. Importantly, because the tracking of extensions pursuant to AC21 does not distinguish between those cases adjudicated under section 104(c) of AC21 and those cases adjudicated under section 106 of AC21, there is likely some overlap in the baseline estimate of 27,643 and the estimate of persons who have approved I–140 petitions. Because DHS is unable to parse out the individuals who have extended their status pursuant to section 104(c) of AC21, and because such persons may have approved I–140 petitions, DHS may be overestimating the annual number of H–4 dependent spouses who will be eligible to apply for initial employment authorization. However, while there is uncertainty that may result in overstating the annual estimates, DHS relied on the best available information to arrive at this estimate. Thus, for purposes of this analysis, DHS will use 74,632 [50] as the baseline projection of H–1B nonimmigrants who have started the immigration process.

To refine the annual flow projection estimates, DHS has chosen to estimate the proportion of applications filed in the first through third employment-based preference categories. Additionally, since DHS has already limited the historical counts in Table 5 to those approved petitions where the beneficiary's current nonimmigrant classification is H–1B, DHS has made the assumption that the petitions shown in Table 5 represent H–1B nonimmigrants who are physically present in the United States and intend to adjust status. As shown in Table 4, the historical proportion of H–1B nonimmigrants obtaining LPR status under EB–1, EB–2, and EB–3 categories who reported being married was 81.1 percent, 72.6 percent, and 67.2 percent, respectively, resulting in an average of 73.6 percent. Applying this percentage to the baseline projection results in an annual flow estimate of 55,000 (rounded). [51] Again, due to the fact that

DHS is unable to estimate the proportion of H–1B nonimmigrants granted extensions of status pursuant only to section 106 of AC21, and because DHS is unable to determine the immigration or citizenship status of spouses of H–1B nonimmigrants who report being married, this is an upper-bound estimate of H–4 dependent spouses who could be eligible to apply for employment authorization under the rule.

Therefore, DHS estimates that this rule will result in a maximum initial estimate of 179,600 [52] H–4 dependent spouses who could be newly eligible to apply for employment authorization in the first year of implementation, and an annual flow of as many as 55,000 who are newly eligible in subsequent years.

#### 4. Costs

##### i. Filer Costs

The final rule will permit certain H–4 dependent spouses to apply for employment authorization in order to work in the United States. Therefore, only H–4 dependent spouses who decide to seek employment while residing in the United States will face the costs associated with obtaining employment authorization. The costs of the rule will stem from filing fees and the opportunity costs of time associated with filing Form I–765.

The current filing fee for Form I–765 is $380. The fee is set at a level to recover the processing costs to DHS. Applicants for employment authorization are required to submit two passport-style photos along with the application, which is estimated to cost $20.00 per application based on Department of State estimates. [53] DHS estimates the time burden of completing this application to be 3 hours and 25 minutes. DHS recognizes that H–4 dependent spouses do not currently participate in the U.S. labor market, and, as a result, are not represented in national average wage calculations. However, to provide a reasonable proxy of time valuation, DHS chose to use the minimum wage to estimate the opportunity cost consistent with methodology employed in other DHS rulemakings when estimating time

burden costs for those who are not work authorized.

The Federal minimum wage is currently $7.25 per hour. [54] In order to anticipate the full opportunity cost to petitioners, we multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement for a total of $10.59 per hour. [55] Based on this wage rate, H–4 dependent spouses who decide to file Form I–765 applications will face an estimated opportunity cost of time of $36.18 per applicant. [56] Combining the opportunity costs with the fee and estimated passport-style photo costs, the total cost per application will be $436.18. [57] In the first year of implementation, DHS estimates the total maximum cost to the total of H–4 dependent spouses who could be eligible to file for an initial employment authorization will be as much as $78,337,928 (non-discounted), and $23,989,900 annually in subsequent years. The 10-year discounted cost of this rule to filers of initial employment authorizations is $257,403,789 at 3 percent, while the 10-year discounted cost to filers is $219,287,568 at 7 percent. Importantly, in future years the applicant pool of H–4 dependent spouses filing for employment authorization will include both those initially eligible and those who will seek to renew their EADs as they continue to wait for visas to become available. DHS could not project the number of renewals as the volume of H–4 dependent spouses who will need to renew is dependent upon visa availability, which differs based on the preference category and the country of nationality. H–4 dependent spouses needing to renew their employment authorization will still face a per-application cost of $436.18.

---

[49] Calculation: 151,053 (5-year average of I–129 extension of stay approvals) × 18.3 percent = 27,643 extensions approved pursuant to AC21.

[50] Calculation: 46,989 (5-year average of Form I–140 approvals) × 18.3 percent = 27,643 (annual estimate of approved extensions of stay pursuant to AC21) = 74,632 baseline estimate.

[51] Calculation: 74,632 × 73.6 percent = 54,929 or 55,000 rounded up to the nearest hundred.

[52] Calculation: Backlog of 124,600 plus annual demand estimate for married H–1Bs of 55,000 = 179,600.

[53] DOS estimates an average cost of $10 per passport photo in the Paperwork Reduction Act (PRA) Supporting Statement found under OMB control number 1450–0004. A copy of the Supporting Statement is located on Reginfo.gov at *http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201102-1405-001* (see question #13 of the Supporting Statement) (accessed Oct. 21, 2014).

[54] U.S. Dep't of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009, *available at http://www.dol.gov/dol/topic/wages/minimumwage.htm.*

[55] The calculation to burden the wage rate: $7.25 × 1.46 = $10.59 per hour. *See* Economic News Release, U.S. Dep't of Labor, Bureau of Labor Statistics, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (June 2014), *available at http://www.bls.gov/news.release/archives/ecec_09102014.htm* (viewed Oct. 23, 2014).

[56] Calculation for opportunity cost of time: $10.59 per hour × 3.4167 hours (net form completion time) = $36.18.

[57] Calculation for total application cost: $380 (filing fee) + $20 (cost estimate for passport photos) + $36.18 (opportunity cost of time) = $436.18.

## ii. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of Form I–765 in accordance with this requirement. As such, there are no additional costs to the Federal Government resulting from this rule.

## iii. Impact on States

Currently, once visas are determined to be immediately available, H–1B nonimmigrants and their dependent family members may be eligible to apply for adjustment of status to that of a lawful permanent resident. Upon filing an adjustment of status application, the H–4 dependent spouse is eligible to request employment authorization. This rule will significantly accelerate the timeframe by which qualified H–4 dependent spouses are eligible to enter the U.S. labor market. As a result of the changes made in this rule, certain H–4 dependent spouses will be eligible to request employment authorization well before they are eligible to apply for adjustment of status. Even with the change in the maximum number of H–4 dependent spouses who may be impacted as reported in the proposed rule and this final rule, DHS maintains that the expected outcomes are the same. DHS believes that this regulatory change will encourage families to stay committed to the immigrant visa process during the often lengthy wait for employment-based status whereas, otherwise, they may leave the United States and abandon immigrant visa processing altogether. As such, DHS presents the geographic labor impact of this rule even though this rule does not result in "new" additions to the labor market; it simply accelerates the timeframe by which they can enter the labor market. As mentioned previously, DHS estimates this rule can add as many as 179,600 additional persons to the U.S. labor force in the first year of implementation, and then as many as 55,000 additional persons annually in subsequent years. As of 2013, there were an estimated 155,389,000 people in the U.S. civilian labor force.[58]

Consequently, 179,600 additional available workers in the first year (the year with the largest number of eligible applicants) represent a little more than one-tenth of a percent, 0.1156 percent, of the overall U.S. civilian labor force (179,600/155,389,000 × 100 = 0.1156 percent).[59]

The top five States where persons granted LPR status have chosen to reside are: California (20 percent), New York (14 percent), Florida (10 percent), Texas (9 percent), and New Jersey (5 percent).[60] While allowing certain H–4 dependent spouses the opportunity to work will result in a negligible increase to the overall domestic labor force, the states of California, New York, Florida, Texas, and New Jersey may have a slightly larger share of additional workers compared with the rest of the United States. Based on weighted average proportions calculated from FY 2009–2013, and assuming the estimate for first year impacts of 179,600 additional workers were distributed following the same patterns, DHS anticipates the following results: California could receive approximately 35,920 additional workers in the first year of implementation; New York could receive approximately 25,144 additional workers; Florida could receive approximately 17,960 additional workers; Texas could receive approximately 16,164 additional workers; and New Jersey could receive approximately 8,980 additional workers. To provide context, California had 18,597,000 persons in the civilian labor force in 2013.[61] The additional 35,920 workers who could be added to the Californian labor force as a result of this rule in the first year would represent less than two-tenths of a percent of that state's labor force (35,920/18,597,000 × 100 = 0.1931 percent). As California is the state estimated to receive the highest number of additional workers, the

impact on the states civilian labor force is minimal.

## 5. Benefits

As previously mentioned, once this rule is finalized, these amendments will increase incentives of certain H–1B nonimmigrants who have begun the process of becoming LPRs to remain in the United States and contribute to the U.S. economy as they complete this process. Providing the opportunity for certain H–4 dependent spouses to obtain employment authorization during this process will further incentivize H–1B nonimmigrants to not abandon their intention to remain in the United States while pursuing LPR status. Retaining highly skilled persons who intend to become LPRs is important when considering the contributions of these individuals to the U.S. economy, including advances in research and development and other entrepreneurial endeavors. As previously discussed, much research has been done to show the positive impacts on economic growth and job creation from highly skilled immigrants. In addition, these regulatory amendments will bring U.S. immigration policies more in line with the policies of other countries that seek to attract skilled foreign workers. For instance, in Canada spouses of temporary workers may obtain an "open" work permit allowing them to accept employment if the temporary worker meets certain criteria.[62] As another example, in Australia, certain temporary work visas allow spousal employment.[63]

This final rule will result in direct, tangible benefits for the spouses who will be eligible to enter the labor market earlier than they would have otherwise been able to do so due to the lack of immigrant visas. While there will be obvious financial benefits to the H–4 dependent spouse and the H–1B nonimmigrant's family, there is also evidence that participating in the U.S. workforce and improving socio-economic attainment has a high correlation with smoothing an

[58] *See* News Release, United States Dep't of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment—2013 Annual Averages, Table 1 "Employment status of the civilian noninstitutional population 16 years of age and over by region,

division, and state, 2012–13 annual averages" (Feb. 28, 2014), *available at http://www.bls.gov/ news.release/archives/srgune_02282014.pdf.*

[59] Note that even with the changed estimate from the proposed rule, the finding remains consistent; the overall impact to the U.S. labor force is a fraction of one percent.

[60] DHS Office of Immigration Statistics, Annual Flow Reports, "U.S. Legal Permanent Residents" for 2009–2012 and "U.S. Lawful Permanent Residents: 2013," *available at http://www.dhs.gov/ immigration-statistics-publications#0.* Author calculated percentage distributions by State weighted over FY 2009–2013 (rounded).

[61] *See* News Release, U.S. Dep't of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment—2013 Annual Averages, Table 1, Employment status of the civilian noninstitutional population 16 years of age and over by region, division, and state, 2012– 13 annual averages (Feb. 28, 2014), *available at http://www.bls.gov/news.release/archives/srgune_ 02282014.pdf.*

[62] *See* Canadian Government, Citizenship and Immigration Canada, Help Centre under Topic "Work Permit—Can my spouse or common-law partner work in Canada?", *available at http:// www.cic.gc.ca/english/helpcentre/index-featured-can.asp#tab1* (last visited Jan. 13, 2015).

[63] *See* Australian Government, Dep't of Immigration and Citizenship, Temporary Work (Skilled) visa (subclass 457), *available at http:// www.immi.gov.au/Visas/Pages/457.aspx* (last visited Jan. 13, 2015).

immigrant's integration into American society.[64]

Prior to this rule being effective, H–4 dependent spouses were not able to apply for employment authorization until they were eligible to submit their applications for adjustment of status or otherwise acquire a nonimmigrant status authorizing employment. The amendments to the regulations made by this final rule accelerate the timeframe by which H–4 dependent spouses of H–1B nonimmigrants who are on the path to being LPRs are able to enter into the U.S. labor market.

6. Alternatives Considered

One alternative considered by DHS was to permit employment authorization for all H–4 dependent spouses. As explained in both the proposed rule and in response to public comments, DHS declines to extend the changes made by this rule to H–4 dependent spouses of all H–1B nonimmigrants at this time. Such an alternative would offer eligibility for employment authorization to those spouses of nonimmigrant workers who have not taken steps to demonstrate a desire to continue to remain in and contribute to the U.S. economy by seeking lawful permanent residence. In enacting AC21, Congress was especially concerned with avoiding the disruption to U.S. businesses caused by the required departure of H–1B nonimmigrants (for whom the businesses intended to file employment-based immigrant visa petitions) upon the expiration of the workers' maximum six-year period of authorized stay. *See* S. Rep. No. 106–260, at 22 (2000). This rule further alleviates these concerns.

Another alternative considered was to limit employment eligibility to just those H–4 dependent spouses of H–1B nonimmigrants who extended their status under the provisions of AC21. As discussed in Section 3.b.6 of this Executive Order 12866/13563 assessment, DHS databases began tracking the number of extensions of H–1B status that were approved pursuant to AC21 on October 17, 2014. Historically DHS did not capture this information. Based on approximately 90 days of case history, DHS believes that

approximately 18.3 percent of all extension of stay applications filed on behalf of H–1B nonimmigrants are approved pursuant to AC21. DHS estimates that there could be as many as 27,643[65] H–1B nonimmigrants with extensions of stay requests that were approved pursuant to AC21. Further, DHS estimates that there could be as many as 20,400[66] married H–1B nonimmigrants who are granted an extension of stay pursuant to AC21. This alternative would also result in some fraction of the backlog population being eligible for employment authorization in the first year after implementation, but DHS is unsure of what portion of the backlog population has been granted an extension under AC21. However, DHS believes that this alternative is too limiting and fails to recognize that other H–1B nonimmigrants and their H–4 dependent spouses also experience long waiting periods while on the path to lawful permanent residence. One of the primary goals of this rulemaking is to provide an incentive to H–1B nonimmigrant families to continue on the path to obtaining LPR status in order to minimize the potential for disruptions to U.S. businesses caused by the departure from the United States of these workers. The Department believes that also extending employment authorization to the spouses of H–1B nonimmigrants who are the beneficiaries of approved Form I–140 petitions more effectively accomplishes the goals of this rulemaking, because doing so incentivizes these workers, who have established certain eligibility requirements and demonstrated intent to reside permanently in the United States and contribute to the U.S. economy, to continue their pursuit of LPR status. Thus, extending employment authorization to H–4 dependent spouses of H–1B nonimmigrants with either approved Form I–140 petitions or who have been granted H–1B status pursuant to sections 106(a) and (b) of AC21 encourages a greater number of professionals with high-demand skills to remain in the United States.

*D. Regulatory Flexibility Act*

USCIS examined the impact of this rule on small entities under the Regulatory Flexibility Act (RFA), 5

U.S.C. 601(6). A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business under the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than fifty thousand people). After considering the impact of this rule on such small entities, DHS has determined that this rule will not have a significant economic impact on a substantial number of small entities. The individual H–4 dependent spouses to whom this rule applies are not small entities as that term is defined in 5 U.S.C. 601(6). Accordingly, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

*E. Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule requires that eligible H–4 dependent spouses requesting employment authorization complete an Application for Employment Authorization (Form I–765), covered under OMB Control number 1615–0040. As a result of this final rule, this information collection will be revised. DHS has received approval of the revised information collection from OMB.

DHS submitted the proposed revisions to Form I–765 to OMB for review. DHS has considered the public comments received in response to the publication of the proposed rule. Over 180 commenters raised issues related to employment authorization requests, including filing procedures, premium

---

[64] *See* Jiménéz, Tomás, *Immigrants in the United States: How Well Are They Integrating into Society?* (2011) Washington, DC: Migration Policy Institute, *available at http://www.migrationpolicy.org/ research/immigrants-united-states-how-well-are-they-integrating-society; see also* Terrazas, Aaron, *The Economic Integration of Immigrants in the United States: Long- and Short-Term Perspectives* (2011) Washington, DC: Migration Policy Institute, *available at http://www.migrationpolicy.org/ research/economic-integration-immigrants-united-states.*

[65] Calculation: 151,053 (5-year average of I–129 extension of stay approvals) × 18.3 percent = 27,643 extensions approved pursuant to AC21.

[66] Calculation: 27,643 (extensions approved pursuant to AC21) × 73.6 percent (average percentage of H–1B nonimmigrants who adjust to LPR status that report being married) = 20,345 or 20,400 (rounded up).

AR2022_200206

**Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations **10311**

processing, validity periods, renewals, evidentiary documentation, concurrent filings for extension of stay/change of status, automatic extensions of employment authorization, filing fees, and marriage fraud. One commenter asked for clarification regarding whether H–4 dependent spouses under this rule are required to demonstrate economic need for employment authorization using the Form I–765 Worksheet (I–765WS).

DHS's responses to these comments appear under Part III.E. and F. USCIS has submitted the supporting statement to OMB as part of its request for approval of this revised information collection instrument.

DHS has revised the originally proposed Form I–765 and form instructions to clarify the supporting documentation that applicants requesting employment authorization pursuant to this rule must submit with the form to establish eligibility, and to state that USCIS will accept Forms I–765 filed by such applicants concurrently with Forms I–539. DHS has also revised the Form I–765 to include a check box for the applicant to identify him or herself as an H–4 dependent spouse. The inclusion of this box will aid USCIS in its efforts to more efficiently process the form for adjudication by facilitating USCIS's ability to match the application with related petitions integral to the adjudication of Form I–765. DHS does not anticipate any of these changes will result in changes to the previously reported time burden estimate. The revised materials can be viewed at *www.regulations.gov.*

Lastly, DHS has updated the supporting statement to reflect a change in the estimate for the number of respondents that USCIS projected would submit this type of request from 1,891,823 respondents to 1,981,516 respondents. This change of the initially projected number of respondents is due to better estimates regarding the general population of I–765 filers, in addition to this final rule's revised estimate on the new number of applicants that will request EADs, which results in a change of the estimated population of aliens that DHS expects could file Form I–765. Specifically, in the proposed rule USCIS estimated that approximately 58,000 new respondents would file requests for EADs as a result of the changes prompted by this rule. USCIS has revised that estimate and projects in this final rule that approximately 117,300 new respondents will be able to file a Form I–765. With this change on the number of Form I–765 application filers, the estimate for the total number of

respondents has been updated. The current hour inventory approved for this form is 7,140,900 hours, and the requested new total hour burden is 8,159,070 hours, which is an increase of 1,018,170 annual burden hours.

## V. Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change, except for conforming amendments to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) and minor punctuation and wording changes in 8 CFR 214.2(h)(9)(iv) to improve clarity and readability.

## List of Subjects

### 8 CFR Part 214

Administrative practice and procedure, Aliens, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 214—NONIMMIGRANT CLASSES

■ 1. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Public Law 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 2. Section 214.2 is amended by revising paragraph (h)(9)(iv) to read as follows:

### §214.2  Special requirements for admission, extension, and maintenance of status.

\*     \*     \*     \*     \*

(h) \* \* \*

(9) \* \* \*

(iv) *H–4 dependents.* The spouse and children of an H nonimmigrant, if they are accompanying or following to join such H nonimmigrant in the United States, may be admitted, if otherwise admissible, as H–4 nonimmigrants for the same period of admission or extension as the principal spouse or parent. H–4 nonimmigrant status does not confer eligibility for employment

authorization incident to status. An H–4 nonimmigrant spouse of an H–1B nonimmigrant may be eligible for employment authorization only if the H–1B nonimmigrant is the beneficiary of an approved Immigrant Petition for Alien Worker, or successor form, or the H–1B nonimmigrant's period of stay in H–1B status is authorized in the United States under sections 106(a) and (b) of the American Competitiveness in the Twenty-first Century Act of 2000 (AC21), Public Law 106–313, as amended by the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273 (2002). To request employment authorization, an eligible H–4 nonimmigrant spouse must file an Application for Employment Authorization, or a successor form, in accordance with 8 CFR 274a.13 and the form instructions. If such Application for Employment Authorization is filed concurrently with another related benefit request(s), in accordance with and as permitted by form instructions, the 90-day period described in 8 CFR 274.13(d) will commence on the latest date that a concurrently filed related benefit request is approved. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship and that the principal H–1B is the beneficiary of an approved Immigrant Petition for Alien Worker or has been provided H–1B status under sections 106(a) and (b) of AC21, as amended by the 21st Century Department of Justice Appropriations Authorization Act, the H–1B beneficiary is currently in H–1B status, and the H–4 nonimmigrant spouse is currently in H–4 status.

\*     \*     \*     \*     \*

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 3. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; Title VII of Public Law 110–229; 48 U.S.C. 1806; 8 CFR part 2.

■ 4. Section 274a.12 is amended by adding a new paragraph (c)(26), to read as follows:

### §274a.12  Classes of aliens authorized to accept employment.

\*     \*     \*     \*     \*

(c) \* \* \*

(26) An H–4 nonimmigrant spouse of an H–1B nonimmigrant described as eligible for employment authorization in 8 CFR 214.2(h)(9)(iv).

\*     \*     \*     \*     \*

■ 5. Section 274a.13 is amended by revising the first sentence of paragraph (d), to read as follows:

**§ 274a.13   Application for employment authorization.**

\*      \*      \*      \*      \*

(d) *Interim employment authorization.* USCIS will adjudicate the application within 90 days from the date of receipt of the application, except as described in 8 CFR 214.2(h)(9)(iv), and except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). \*   \*   \*

\*      \*      \*      \*      \*

**Jeh Charles Johnson,**
*Secretary.*
[FR Doc. 2015–04042 Filed 2–24–15; 8:45 am]
**BILLING CODE 9111–97–P**

# Rules and Regulations

Federal Register

Vol. 46, No. 86

Tuesday, May 5, 1981

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each month.

## DEPARTMENT OF AGRICULTURE

**Rural Electrification Administration**

**7 CFR Part 1701**

**Public Information; Appendix A—REA Bulletins**

**AGENCY:** Rural Electrification Administration; USDA.

**ACTION:** Final rule.

**SUMMARY:** REA hereby amends Appendix A—REA Bulletins to issue a new Bulletin 345–10, REA Standard PC-6, Acceptance Testing Procedures for Cable Television Systems, to establish testing procedures and minimum acceptable performance criteria for REA-financed CATV systems.

**EFFECTIVE DATE:** April 22, 1981.

**FOR FURTHER INFORMATION CONTACT:** Claude F. Buster, Jr., Chief, Transmission Branch, Telecommunications Engineering and Standards Division, Rural Electrification Administration, Room 1367, South Building, U.S. Department of Agriculture, Washington, D.C. 20250, telephone (202) 447–3917. The Final Impact Analysis Statement describing the options considered in developing this rule and the impact of implementing each option is available on request from the above office.

**SUPPLEMENTARY INFORMATION:** Pursuant to the Rural Electrification Act, as amended (7 U.S.C. 901 et seq.), REA hereby issues Bulletin 345–10, Acceptance Testing Procedures for Cable Television Systems. This action is issued in conformance with Executive Order 12291, and has been determined to be "not major."

This program is listed in the Catalog of Federal Domestic Assistance as 10.853, Community Antenna Television Loans and Loan Guarantees.

REA, in its effort to assure the best, most cost-effective telecommunications for rural America, and to assure loan security, hereby issues a new Bulletin 345–10. This action will provide REA borrowers, contractors, engineers, and other interested parties with information on acceptance test procedures and minimum acceptable performance criteria for REA-financed CATV systems.

A notice of Proposed Rule Making was published in the **Federal Register** on January 16, 1981. However, no public comments were received in response to the notice.

## PART 1701—APPENDIX A [AMENDED]

Appendix A to 7 CFR Part 1701 is amended to include new Bulletin 345–10, PC–6.

Dated: April 22, 1980.

John H. Arnesen,

*Assistant Administrator—Telephone.*

[FR Doc. 81–13453 Filed 5–4–81; 8:45 am]

**BILLING CODE 3410-15-M**

## 7 CFR Part 1701

**Public Information; Appendix A—REA Bulletins, Bulletin 345–52, REA Standards PC–5A, Service Entrance and Station Protector Installations and PC–5B, Station Installations**

**AGENCY:** Rural Electrification Administration, USDA.

**ACTION:** Final rule.

**SUMMARY:** REA hereby amends Appendix A—REA Bulletins to revise Bulletin 345–52 to include the REA Standard for Station Installations, PC–5B. Issuance of PC–5B completes the process of separating the original PC–5, Specification for Station Installations, into two documents. This was necessitated by the adoption of the REA 515g Construction Contract. The first portion of the revised bulletin, PC–5A, Standard for Service Entrance and Station Protector Installations, was issued as a final rule on January 22, 1980, in the Federal Register.

**EFFECTIVE DATE:** April 20, 1981.

**FOR FURTHER INFORMATION CONTACT:** Harry M. Hutson, Chief, Outside Plant Branch, Telecommunications Engineering and Standards Division, Rural Electrification Administration, Room 1342, South Building, U.S.

Department of Agriculture, Washington, D.C. 20250, telephone (202) 447–3827. The Impact Analysis Statement describing the options considered in developing this rule and the impact of implementing each option is available on request from the above office.

**SUPPLEMENTARY INFORMATION:** Pursuant to the Rural Electrification Act, as amended (7 U.S.C. 901 et seq.), REA hereby revises Bulletin 345–52 to provide for the inclusion of PC–5B, Station Installations. REA Bulletin 345–52 now includes PC–5A, issued on January 22, 1980, and PC–5B issued herewith. This action has been issued in conformance with Executive Order 12291, Federal Regulations, and has been determined to be "not major."

This program is listed in the Catalog of Federal Domestic Assistance as 10.851 Rural Telephone Loans and Loan Guarantees.

REA, in its effort to assure the best, most cost-effective telecommunications service for rural America, proposed the review of Bulletin 345–52 to include PC–5B. This action will provide REA borrowers, contractors, engineers, and other interested parties with detailed information on station installation practices. A Notice of Proposed Rulemaking was published in the Federal Register on January 13, 1981. However, no public comments were received in response to the notice.

## PART 1701—APPENDIX A [AMENDED]

Appendix A to 7 CFR Part 1701 is amended to include revised bulletin 345–52, REA Standard PC–5B.

Dated: April 20, 1981.

John H. Arnesen,

*Assistant Administrator—Telephone.*

[FR Doc. 81–13451 Filed 5–4–81; 8:45 am]

**BILLING CODE 3410-15-M**

## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service**

**8 CFR Part 109**

**Employment Authorization to Aliens in the United States**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

**SUMMARY:** This final rule adds a new Part 109 to Chapter I of Title 8 of the Code of Federal Regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. The new rules are necessary to codify the various Service Operations Instructions and policy statements in one place in the regulations so that the public may conveniently locate the rules on employment authorization for aliens and the standards which are applicable.

**EFFECTIVE DATE:** June 4, 1981.

**FOR FURTHER INFORMATION CONTACT:**
For General Information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633–3048.

For Specific Information: Richard R. Spurlock, Immigration Examiner, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633–2361.

**SUPPLEMENTARY INFORMATION:** On March 28, 1980, a proposed rule was published in the **Federal Register** (45 FR 19563) to add a new part 109 to Chapter I of existing regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. Section 109.1(a) Classes of aliens eligible, identifies the classes of aliens who are authorized to be employed in the United States as a condition of their admission without specific authorization from the Service. "Employment authorization" in § 109.1(a) means that the aliens may engage in activities solely related to the status in which they were admitted. For example, an "A" diplomat may engage in activities related to his diplomatic functions; and an "L–1" intra-company transferee may engage in activities solely related to the purposes set forth in the visa petition. Paragraph (b) of § 109.1 describes the classes of aliens who may apply for discretionary work authorization based upon their financial need and that of their families. Section 109.2 sets forth the criteria under which a district director may revoke previously granted work authorization. It also sets forth notification requirements to the alien and allows submission of rebuttal evidence by the alien.

In response to the publication of the proposed rule in the **Federal Register**, approximately 30 responses were received from various commenters including immigration reform federations, attorneys, community service groups, and Service employees. All responses were given careful consideration. Most commenters fully supported the codification of criteria

and procedures for work authorization of aliens in the United States. However, there was wide diversity of opinion as to whether the Service should be strict or permissive when granting work authorization.

Several commenters expressed concern that § 109.1(a) did not adequately cover all categories for nonimmigrants who are permitted to work while in the United States. Five additional classes of nonimmigrant aliens who are authorized to work in the United States have been added to this part.

In addition, the wording has been revised for certain categories to conform to the provisions of the Refugee Act of 1980.

There was opposition expressed by several commenters for the showing of economic need as a pre-requisite to work authorization; they contend that such a requirement will unduly burden the alien and Service. To alleviate this burden the regulation has been amended to provide for a simple statement to be submitted by the alien attesting to his/her assets, income and expenses to be used by the district director in granting work permission.

Title 45 Public Welfare, Part 1060, Attachment A, Community Services Administration (CSA) Income Poverty Guidelines, apply to all financially assisted grants under the Economic Opportunity Act. It is provided that agencies may use these guidelines for other administrative or statistical purposes as appropriate. The Service has incorporated the CSA poverty guidelines by reference in § 109.1(b) of the regulations. The acceptance of the alien's statement as to financial status and the use of the income poverty guidelines should overcome objections to the absence of articulated standards or guidelines.

A number of commenters labeled as unfair the requirement that the alien's application for asylum under section 208 of the Act be "prima facie approvable" before his/her employment would be authorized. The wording has been changed to read "non-frivolous application" so as to include any application for asylum where a substantive claim of persecution is made.

It was also suggested that the proposed rule be amended to include nunc-pro-tunc employment authorization for asylum applicants.

Section 209 of the I. & N. Act provides that an alien granted asylum pursuant to section 208 may be adjusted to the status of permanent resident alien notwithstanding the exclusionary provisions of section 245(c) of the Act.

Therefore, the alien granted asylum is not prejudiced by the absence of a nunc-pro-tunc employment authorization provision in Part 109.

Several writers claimed that the principle of due process will be violated because the district director's authority to revoke employment authorization under § 109.2 is not reviewed by someone other than the person who made the initial decision. The Service's position is that the review by a district director is at an appropriate level of responsibility to insure due process.

Section 109.2 provides for the district director to notify the alien of his intent to revoke employment authorization when it appears that one or more of the conditions on which it was granted no longer exist. The alien is given an opportunity to present countervailing evidence within 15 days of the notice as to why his/her permission to work should not be revoked. Employment in the United States is not an inherent right of the aliens described in § 109.1(b). Their employment authorization is a matter of administrative discretion because humanitarian or economic needs warrant administrative action. The Service has authority to withdraw the work authorization when one or more of the factors for eligibility cease to exist, or for good cause shown.

After carefully evaluating the comments received as discussed above, Chapter I of Title 8 of the Code of Federal Regulations is amended by adding a new Part 109 to read as follows:

## PART 109—EMPLOYMENT AUTHORIZATION

Sec.
109.1 Classes of aliens eligible.
109.2 Revocation of employment authorization.

**Authority:** Sec. 103, 245(c); (8 U.S.C. 1103, 1255(c))

### § 109.1 Classes of aliens eligible.

(a) *Aliens authorized employment incident to status.* The following classes of aliens are authorized to be employed in the United States as a condition of their admission or subsequent change to one of the indicated classes, and specific authorization need not be requested:

(1) A lawful permanent resident alien.

(2) An alien admitted to the United States as a refugee under section 207 of the Act.

(3) An alien paroled into the United States as a refugee.

(4) An alien granted asylum under section 208 of the Act.

**AR2022_200210**

(5) An alien admitted to the United States as a nonimmigrant fiance or fiancee.

(6) An alien admitted in one of the following classifications, or whose status has been changed to such classification under section 247, 248 of the Act:

(i) A foreign government official (A–1), or (A–2).

(ii) An employee of a foreign government official (A–3).

(iii) A nonimmigrant visitor for business (B–1).

(iv) A nonimmigrant crewman (D–1).

(v) A nonimmigrant treaty trader or investor (E–1), or (E–2).

(vi) A representative of an international organization (G–1), (G–2), (G–3), or (G–4).

(vii) A personal servant of an employee or representative of an international organization (G–5).

(viii) A temporary worker or trainee (H–1), or (H–2), or (H–3).

(ix) An information media representative (I).

(x) An exchange visitor (J–1).

(xi) An intra-company transferee (L–1).

The employment authorization is limited solely to the extent and conditions described for the corresponding classifications in section 101(a)(15) of the Act, 8 CFR Part 214, and 22 CFR 63.24.

(b) *Aliens who must apply for work authorization.* Any alien within a class of aliens described in this section may apply for work authorization to the district director in whose district the alien resides:

(1) Any alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed:

(i) Alien spouse or unmarried dependent son or daughter of a foreign government official (A–1), or (A–2) as provided in § 214.2(a) of this chapter.

(ii) Alien nonimmigrant student (F–1) as provided in § 214.2(f) of this chapter.

(iii) Alien spouse or an unmarried dependent son or daughter of an officer or employee of an international organization (G–4) as provided in § 214.2(g) of this chapter.

(iv) Alien spouse of an exchange visitor (J–2) as provided in § 214.2(j) of this chapter.

(2) Any Alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case.

(3) Any alien who has properly filed an application for adjustment of status

pursuant to section 245 of the Act may be granted permission to be employed for the period of time necessary to decide the case.

(4) Any alien who has applied to an immigration judge under § 242.17 of this chapter for suspension of deportation pursuant to section 244(a) of the Act may be granted permission to be employed for the period of time necessary to decide the case: *Provided,* The applicant can establish an economic need to work.

(5) Any deportable alien granted voluntary departure prior to commencement of a hearing under § 242.5(a)(v), (vi), or (viii) of this chapter may be granted permission to be employed for the period of time prior to voluntary departure: *Provided,* The alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment. Factors which may be considered in granting employment authorization to an alien who has been granted voluntary departure:

(i) Length of voluntary departure granted;

(ii) Dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Reasonable chance that legal status may ensue in the near future; and

(iv) Reasonable basis for consideration of discretionary relief.

(6) Any alien in whose case the district director recommends consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority: *Provided,* The alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment. The Community Service Administration Income Poverty Guidelines, Appendix 22 CFR 42.91(a)(iii) shall be used as the basic criteria to establish economic necessity for employment authorization requests where the alien's need to work is a factor. The applicant shall submit a signed statement listing his/her assets, income, and expenses as evidence of his/her economic need to work. Permission to work granted on the basis of the applicant's statement may be revoked under § 109.2 upon a showing that the information contained in the statement was not true and correct.

### § 109.2 Revocation of employment authorization.

(a) *Basis for revocation of employment authorization.* Employment authorization granted under § 109.1(b) of this part may be revoked by the district

director when it appears that one or more of the conditions upon which it was granted no longer exist, or for good cause shown.

(b) *Notice of intent to revoke employment authorization.* When a district director determines that employment authorization should be revoked, he/she shall serve notice of the reasons and the intention to revoke on the alien. The alien will be granted a period of fifteen days from the date of service of notice in which to submit evidence why the authorization should not be revoked. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.

### Certification

In accordance with 5 U.S.C. 605(b), this rule will not have a significant economic impact on a substantial number of small entities nor is it a major rule as defined in E.O. 12291. The rule codifies, under one part of the regulations, existing Service practice and procedures relating to employment authorization for aliens. This codification will enable the public to find all the rules on employment authorization in one convenient part.

Dated: April 20, 1981.

**David Crosland,**

*Acting Commissioner of Immigration and Naturalization.*

[FR Doc. 81–13460 Filed 5–4–81; 8:45 am]

**BILLING CODE 4410–10–M**

---

## 8 CFR Part 212

**Documentary Requirements: Nonimmigrants; Waivers; Admission of Certain Inadmissible Aliens; Parole; Revision of Border Crossing Card Procedures**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

**SUMMARY:** This final rule adds reference to Form I–586, Nonresident Alien Border Crossing Card, which has replaced the older version, Form I–186. Necessarily included are revised instructions for use, application, voidance, and replacement procedures for border crossing cards, particularly, the new Form I–586.

**EFFECTIVE DATE:** June 4, 1981.

**FOR FURTHER INFORMATION CONTACT:**

For general information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, DC 20536. Telephone: (202) 633–3048.

**AR2022_200211**

# Proposed Rules

Federal Register

Vol. 45, No. 60

Wednesday, March 26, 1980

---

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF JUSTICE

## Immigration and Naturalization Service

## 8 CFR Part 109

## Employment Authorization

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule adds a new Part 109 to Chapter I of the existing regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. Service procedures for the grant of employment authorization are contained in various sections of the Service's Operations Instructions and in numerous policy statements direct to Service field offices. The proposed regulations are intended to codify the various procedures and criteria in one place in the regulations so that the public may conveniently locate the rules on employment authorization for aliens and the standards which are applicable.

**DATE:** Representations must be received on or before May 27, 1980.

**ADDRESSES:** Please submit representations, in duplicate, to the Commissioner of Immigration and Naturalization, Room 7100, 425 Eye Street, NW., Washington, D.C. 20536.

**FOR FURTHER INFORMATION CONTACT:**
For general information:

Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633-3048.

For specific information:

Harry Klajbor, Deputy Assistant Commissioner, Adjudications, Immigration and Naturalization Service. Telephone: (202) 633-3229.

**SUPPLEMENTARY INFORMATION:** On July 25, 1979 proposed regulations were initially published in the **Federal Register** (44 FR 43480) proposing to add a new Part 109 to the regulations codifying the procedures and criteria for

the grant of employment authorization to aliens in the United States. Under the initial proposal, nonimmigrant aliens maintaining status were to continue to comply with existing regulations relating to permissible employment for their particular nonimmigrant status. Other aliens were to apply to the district director for discretionary grants of employment authorization if prima facie entitled to an immigration benefit (such as adjustment of status, suspension of deportation, asylum) which if granted, would make the alien eligible to remain in the United States permanently or for an indefinite period of time. The proposed regulation also provided that the discretionary grant of employment authorization was dependent upon establishing financial necessity for such employment.

Interested persons were given until September 24, 1979, to submit written comments, suggestions, or arguments. Careful consideration was given to all written responses received by the Service. In view of these comments the proposed rule has been significantly modified so as to require publication again as a proposed rule for public comment.

The current proposal amending Chapter I of Title 8 of the Code of Federal Regulations adds a new § 109.1(a) General, which sets forth the classes of aliens who are authorized to be employed in the United States as a condition of their admission without specific authorization from the Service. Paragraph (b) of § 109.1 describes the classes of aliens who may apply for discretionary work authorization based upon their financial needs and that of their families. Section 109.2, consisting of two subsections, sets forth the criteria to be used by the district director in revoking previously granted discretionary work authorizations, and the requirement to serve notice of intent to revoke as well as a fifteen day period within which to submit rebutal evidence by the alien.

The Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and Nationality Act which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act. The Attorney General's authority has been delegated to the Commissioner of Immigration and

Naturalization by 28 CFR 0.105. The authority of the Attorney General to authorize employment of aliens in the United States as a necessary incident of his authority to administer the Act was specifically recognized by the Congress in the enactment of section 6 of P.L. 95-571. That provision amended section 245(c) of the Act to bar from adjustment of status any alien (other than an immediate relative of a United States citizen) who after January 1, 1977 engages in unauthorized employment prior to filing an application for adjustment of status.

Therefore, it is proposed to amend Chapter I of Title 8 of the Code of Federal Regulations by adding a new Part 109 as set forth below:

## PART 109—EMPLOYMENT AUTHORIZATION

Sec.
109.1  General.
109.2  Revocation of employment authorization.

Authority: Sec. 103 and 245(c); (8 U.S.C. 1103 and 1255(c))

§ 109.1  General.

(a) The following classes of aliens are authorized to be employed in the United States as a condition of their admission or subsequent change to one of the indicated classes, and specific authorization need not be requested:

(1) A lawful permanent resident alien.

(2) An alien permitted conditional entry under section 203(a)(7) of the Act.

(3) An alien paroled into the United States as a refugee.

(4) An alien who has been granted asylum pursuant to 8 CFR Part 108.

(5) An alien who has been admitted as a nonimmigrant fiance/fiancee.

(6) An alien who has been admitted as a nonimmigrant in one of the following classifications, or whose status has been changed to such classification pursuant to section 247 or 248 of the Act, but only to the extent described in 8 CFR Part 214 for such classification:

(i) A treaty trader or investor (E-1, E-2).

(ii) A temporary worker or trainee (H-1, H-2, H-3).

(iii) An information media representative (I).

(iv) An exchange visitor (J).

(v) An intra-company transferee (L).

(b) The classes of aliens listed below may apply for employment authorization to a district director under the

circumstances set forth below. The decision of the district director shall be final and no appeal shall lie from his denial of an application for employment authorization:

(1) An alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed to the extent permitted by 8 CFR 214.1 and 8 CFR 214.2.

(i) An alien dependent of a nonimmigrant having A–1, A–2 or G–4 classification.

(ii) An alien student (F–1).

(iii) An alien spouse of an exchange visitor (J–2).

(2) A deportable alien who has been granted voluntary departure prior to commencement of hearing pursuant to 8 CFR 242.5(a)(2) (v), (vi), (vii), or (viii), may be granted permission to be employed for the period of voluntary departure: *Provided,* The alien establishes to the satisfaction of the district director that he is financially unable to maintain himself (and family, if any) without employment.

(3) An alien who has been granted voluntary departure by an immigration judge to be effected as of a date 60 days or more thereafter, may be granted permission to be employed for the period of voluntary departure, provided the alien establishes to the satisfaction of the district director that he is financially unable to maintain himself without employment.

(4) An alien who has filed an application for asylum pursuant to 8 CFR Part 108 may be granted permission to be employed for the period necessary to decide the case, provided the application is prima facie approvable and provided the alien establishes to the satisfaction of the district director that he is financially unable to maintain himself (and family, if any) without employment.

(5) An alien who has properly filed an application for adjustment of status pursuant to section 245 of the Act may be granted permission to be employed for the period necessary to decide the case.

**§ 109.2 Revocation of employment authorization.**

(a) Employment authorization which has been granted pursuant to § 109.1(b) may be revoked by the district director when it shall appear that one or more of the conditions upon which it was granted no longer obtains.

(b) When the district director determines that employment authorization should be revoked, he shall serve notice of his reasons and intention to revoke on the alien, who

will be granted a period of fifteen days in which to submit evidence why the authorization should not be revoked. The decision by the district director shall be final and no appeal shall lie from his decision to revoke employment authorization.

**Public Comment Invited**

In accordance with 5 U.S.C. 533, the Service invites representations of interested parties on this proposed rule. All relevant data, views, or arguments submitted on or before May 27, 1980, will be considered. Representations should be submitted in writing, in duplicate, to the Commissioner of the Immigration and Naturalization Service at the address shown at the beginning of this notice.

Dated: March 20, 1980.

David Crosland,

*Acting Commissioner of Immigration and Naturalization.*

[FR Doc. 80–9181 Filed 3–25–80; 8:45 am]

BILLING CODE 4410–10–M

**NUCLEAR REGULATORY COMMISSION**

**10 CFR Part 19**

**Informal Conference During Inspection; Notice of Proposed Rulemaking**

**AGENCY:** U.S. Nuclear Regulatory Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Nuclear Regulatory Commission (NRC) is proposing an amendment to its regulations which is intended to facilitate the exchange of information during and after inspections of licensed facilities and to expedite the resolution of inspection findings. The amendment under consideration would establish a procedure for holding informal conferences at any time during or after an inspection to which both the NRC inspector and licensee could invite, as either determines appropriate, individuals with legitimate interests in matters pertaining to the inspection.

**DATES:** Comment period expires May 12, 1980.

**ADDRESSES:** Interested persons are invited to submit written comments to the Secretary of the Commission, U.S. Nuclear Regulatory Commission, Washington, D.C. 20555, Attention: Docketing and Service Branch.

**FOR FURTHER INFORMATION CONTACT:** Mr. Robert E. Alexander, Office of Standards Development, U.S. Nuclear Regulatory Commission, Washington, D.C. 20555 (Phone 301–444–5975).

**SUPPLEMENTARY INFORMATION:** Paragraph 19.14(a) of 10 CFR 19 states that "each licensee shall afford to the Commission at all reasonable times opportunity to inspect materials, activities, facilities, premises, and records pursuant to the regulations in this chapter." Procedures established by the Office of Inspection and Enforcement of the NRC include entrance and exit meetings with licensee representatives for the purpose of discussing matters pertaining to inspections. These meetings are necessary for an orderly and complete inspection process, and are used by the NRC inspectors to clarify inspection objectives and procedures and discuss inspection findings, including the resolution of apparent items of noncompliance with regulatory requirements.

The intent of this proposed rulemaking is twofold: first, to codify in the regulations the current practice of holding meetings with licensee representatives during NRC inspections and second, to allow NRC inspectors to invite to these meetings, individuals with specific and legitimate interest in the inspection. Under Part 19, licensees have the prerogative of choosing representatives, including their own employees and consultants, to attend inspection meetings with the NRC inspectors. The NRC, on the other hand, has essentially no option (under the rule) concerning who should attend such meetings. The proposed rule change would give NRC the prerogative of having present individuals that have a specific and legitimate interest in attending the meeting; for example:

a. A representative of the workers who has submitted a request for inspection under § 19.16 of the regulations; or

b. A worker who has an expressed interest in the inspection which has been brought to the attention of the NRC according to §§ 19.15 or 19.16 of the regulations.

The proposed rulemaking responds to a request from several unions interested in being involved in inspections related to radiological conditions in the work environment. In addition, the NRC Office of Inspection and Enforcement believes that having the option to invite interested individuals and, in some cases, expert consultants to meetings with licensee representatives would increase the effectiveness of inspection conferences. These informal conferences have considerable value in terms of clarifying inspection objectives and procedures, and discussing inspection findings including the resolution of possible items of non-compliance with

AR2022_200213

(2) *Slight.*—Majority of the eyes less than ½ inch but more than ⁹⁄₁₆ inch or more than ¹³⁄₁₆ inch but less than 1 inch.

(3) *Large eyed.*—Eyes in excess of ¹³⁄₁₆ inch.

(4) *Small eyed.*—Eyes less than ¹¹⁄₁₆ inch.

(i) With respect to eyes and texture as it relates to gassy and sweet holes:

(1) *Slight.*—No more than 3 occurrences per any given 2 square inches.

(2) *Gassy.*—Gas holes of various sizes which may be scattered.

(3) *Sweet holes.*—Spherical gas holes, glossy in appearance; usually about the size of BB shot.

(j) With respect to eyes and texture as it relates to nesty:

(1) *Very slight.*—Occurrence limited to no more than 5% of the total area of the cheese.

(2) *Slight.*—Occurrence more than 5% but less than 10% of the total area of the cheese.

(3) *Nesty.*—An overabundance of small eyes in a localized area.

(k) With respect to eyes and texture as it relates to one-sided and uneven:

(1) *Slight.*—Eyes evenly distributed throughout at least 90% of the total cheese area.

(2) *Definite.*—Eyes evenly distributed throughout at least 75% but less than 90% of the total cheese area.

(3) *One sided.*—Cheese which is reasonably developed on one side and underdeveloped on the other as to eye development.

(4) *Uneven.*—Cheese which is reasonably developed in some areas and underdeveloped in others as to eye development.

(l) With respect to eyes and texture as it relates to overset and underset:

(1) *Very slight.*—Number of eyes present exceed or fall short of the ideal by limited amount.

(2) *Slight.*—Number of eyes present exceed or fall short of the ideal by a moderate amount.

(3) *Afterset.*—Small eyes caused by secondary fermentation.

(4) *Overset.*—Excessive number of eyes present.

(5) *Underset.*—Too few eyes present.

(m) With respect to finish and appearance:

(1) *Very slight.*—Detected only upon very critical examination.

(2) *Slight.*—Detected only upon critical examination.

(3) *Definite.*—Not intense but detectable.

(4) *Checked rind.*—Numerous small cracks or breaks in the rind.

(5) *Huffed.*—The cheese becomes rounded or oval in shape instead of flat.

(6) *Mold on rind surface.*—Mold spots or areas which have formed on the rind surface.

(7) *Mold under wrapper or covering.*— Mold spots or area that have formed under the wrapper or on the cheese.

(8) *Soft Spots.*—Spots which are soft to the touch and usually faded and moist.

(9) *Soiled Surface.*—Milkstone, rust spots, grease, or other discoloration on the surface of the cheese.

(10) *Uneven.*—One side of the cheese is higher than the other.

(11) *Wet rind.*—A wet rind is one in which the moisture adheres to the surface of the rind and which may or may not soften the rind or cause discoloration.

(n) With respect to color:

(1) *Slight.*—Detectable only upon critical examination.

(2) *Acid cut.*—Bleached or faded appearance which sometimes varies throughout the cheese.

(3) *Bleached surface.*—A faded coloring beginning at the surface and extending inward a short distance.

(4) *Colored spots.*—Brightly colored areas (pink to brick red or gray to black) of bacteria growing in readily discernible colonies randomly distributed throughout the cheese.

(5) *Dull or faded.*—A color condition lacking in luster.

(6) *Mottled.*—Irregular-shaped spots or blotches in which portions are light colored and others are higher colored. Also, unevenness of color due to combining two different vats, sometimes referred to as "mixed curd."

(7) *Pink ring.*—A color condition which usually appears pink to brownish red and occurs as a uniform band near the cheese surface and may follow eye formation.

Signed at Washington, DC on October 8, 1986.

**James C. Handley,**

*Administrator.*

[FR Doc. 86–23204 Filed 10–27–86; 8:45 am]

**BILLING CODE 3410-02-M**

---

**DEPARTMENT OF JUSTICE**

**Immigration and Naturalization Service**

**8 CFR Part 109**

**Employment Authorization**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Petition for rulemaking.

**SUMMARY:** Part 109 of 8 CFR, entitled Employment Authorization, describes at § 109.1(a) the classes of aliens who are authorized to be employed in the United States as a condition of their nonimmigrant classification, and at § 109.1(b), the classes of aliens who may apply for work authorization. The Service has received a petition for rulemaking which seeks to rescind 8 CFR 109.1(b) on the ground that the Service has exceeded its statutory authority in promulgating this rule.

**DATES:** Written comments must be submitted on or before December 29, 1986.

**ADDRESS:** Please submit comments in duplicate to the Director, Office of Policy Directives and Instructions, Immigration and Naturalization Service, 425 I Street, NW., Room 2011, Washington, DC 20536.

**FOR FURTHER INFORMATION CONTACT:**

For General Information: Loretta Shogren, Director, Policy Directives and Instructions, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633–4048

For Specific Information: Michael Shaul, Senior Immigration Examiner, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633–3946

**SUPPLEMENTARY INFORMATION:**

**Comments invited**

The Service, in publishing the petition for rulemaking, is inviting the public to comment and assist it in determining whether to proceed with the rulemaking sought by the petition. Interested persons are requested to participate by reviewing the information provided by the petitioner and submitting their views in writing. Comments should agree with or challenge arguments made in the petition and offer additional information in support of their position. It should be noted that the Service is not proposing a regulatory rule for adoption and has not taken a position on the petition. The Service will reach a conclusion on the merits of the petition after it has had an opportunity to evaluate it carefully in the light of the comments received. If the Service concludes that it should initiate rulemaking on the petition, a proposed rule will be published for public comment. For the convenience of commenters, the current regulation at 8 CFR 109.1(b) which the petitioner seeks to rescind is reprinted below, followed by the petition.

Regulation petitioner seeks to rescind:

§ 109.1 *classes of aliens eligible.*

\*       \*       \*       \*       \*

(b) *Aliens who must apply for work authorization.* Any alien within a class of aliens described in this section must apply for work authorization to the district director in whose district the alien resides:

(1) Any alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed:

(i) Alien spouse or unmarried dependent son or daughter of a foreign government official (A–1) or (A–2) as provided in § 214.2(a)(2) of this title, or the dependent of an employee as provided by § 214.2(a)(3) of this title.

(ii) Alien nonimmigrant student (F–1) as provided in § 214.2(f) of this chapter.

(iii) Alien spouse or an unmarried dependent son or daughter of an officer or employee of an international organization (G–4) as provided in § 214.2(g) of this chapter.

(iv) Alien spouse or minor child of and exchange visitor (J–2) as provided in § 214.2(j) of this title.

(2) Any alien who filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case.

(3) Any alien who has properly filed an application for adjustment of status to permanent resident alien may be granted permission to be employed for the period of time necessary to decide the case.

(4) Any alien paroled into the United States temporarily for emergent reasons or for reasons deemed strictly in the public interest: *Provided,* The alien established an economic need to work.

(5) Any alien who has applied to an immigration judge under § 242.17 of this chapter for suspension of deportation pursuant to section 244(a) of the Act may be granted permission to be employed for the period of the time necessary to decide the case: *Provided,* The alien establishes an economic need to work.

(6) Any deportable alien granted voluntary departure, either prior to hearing or after hearing, for reasons set forth in § 242.5(a)(2) (v), (vi), or (viii) of this chapter may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any extension granted beyond such date. Factors which may be considered in granting employment authorization to an alien who has been granted voluntary departure:

(i) Length of voluntary departure granted;

(ii) Dependent spouse and/or children in the United States who rely on the alien for support;

(III) Reasonable chance that legal status may ensure in the near future; and

(iv) Reasonable basis for consideration of discretionary relief.

(7) Any alien in whose case the district director recommends consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority; *Provided,* The alien establishes to the satisfaction of the district director.

(8) Any excludable or deportable alien who has posted an appearance and delivery bond may be granted temporary employment authorization if the District Director determines that employment is appropriate under § 103.6(a)(2)(iii) of this chapter.

\* \* \* \* \*

The petition in full is published below.

Dated: October 22, 1986.

Richard E. Norton,

*Associate Commissioner, Examinations, Immigration and Naturalization Service.*

Petition:

## I. Introduction

The Federation for American Immigration Reform ("FAIR"), on behalf of its members throughout the country, hereby requests the Immigration and Naturalization Service ("INS") to rescind 8 CFR 109.1(b). The INS has acted beyond its statutory authority and contrary to the purpose of the Immigration and Nationality Act when it promulgated 8 CFR 109.1(b), which allows illegal or temporarily present aliens to apply for and receive work authorization.

## II. The Issue

Whether the Attorney General has the authority to grant work authorization to certain classes of aliens who have not been authorized by Congress to work in this country.

## III. Background

8 CFR 109.1 describes two sets of aliens who may be eligible to seek employment in the United States: Aliens who are authorized to work as a "condition of their admission or subsequent change to one of the indicated classes" [listed in 109.1(a)], and aliens who must apply for work authorization to the district director of the district in which the alien resides [listed in 109.1(b)]. Aliens in the latter category must also prove that they are financially unable to maintain themselves. 8 CFR 109.1(c).

The Immigration and Naturalization Service claims that section 103(a) of the Immigration and Nationality Act, 8 U.S.C.1103(a), which authorizes the Attorney General to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the INA, empowers the Attorney General to grant work authorization and issue the regulations in 8 CFR 109.[1] The

INS also claims the authority of the Attorney General to authorize employment of aliens was "specifically recognized by the Congress in the enactment of section 6 of Pub. L. 95–571."[2] This provision amended section 245(c) of the INA, 8 U.S.C. 1155(c),[3] to bar from adjustment of status any alien engaged in unauthorized employment.

The INS has been receiving and granting applications for work authorization from the classes of aliens listed in 8 CFR 109.1(b) even though Congress has not expressly authorized these classes to work.

## IV. Discussion

The INS is currently granting work authorization to classes of aliens who have not been authorized by the Immigration and Nationality Act to receive work authorization. The Attorney General claims he has the authority to do this under his power to prescribe regulations to carry out the INA as set out in section 103(a), 8 U.S.C. 1103(a).[4] When the INS promulgates regulations, however, such regulations must conform with and further the purposes of the INA. *Wang* v. *Immigration and Naturalization Service,* 602 F.2d. 211, 213 (9th Cir. 1979).

8 CFR 109.1(b), which authorizes employment to be granted to certain groups of aliens at the discretion of the Attorney General, is *contrary* to one of the key purposes of the INA, which is to protect American workers and working conditions. As the Supreme Court has stated:

[a] primary purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are therefore admitted to work in this country only if they "will not adversely affect the wages and working conditions of the workers in the United States similarly employed."

*Sure-Tan, Inc.* v. *NLRB,*—— U.S. ——, 104 S.Ct. 2803, 2810 (1984), quoting 8 U.S.C. 1182(a)(14) *and citing* S. Rep. No. 748, 89th Cong., lst Sess. 15 (1965), *reprinted in* 1965 U.S. Code Cong. & Admin. News, p. 3328.

---

³ *Infra.* n. 10.

⁴ When the INS first proposed a rule to codify the procedures and criteria for the grant of employment authorization to aliens in the United States, it published a notice of its proposed rule in the Federal Register. 44 FR 43480 (1979). The INS explained its authority to issue the rule as follows:

The Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and Nationality Act which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act.

---

¹ 44 FR 43480 (1979); *See also* Letter from Alan C. Nelson, Commissioner, INS to Roger Conner, Executive Director, FAIR (March 28, 1986), attached as Appendix A.

AR2022_200215

*A. The Regulation is Inconsistent With the Purpose of the INA*

One of the principal purposes of American immigration laws has always been to protect American workers and working conditions. As early as 1885, Congress enacted legislation prohibiting the entry of contract laborers. Act of February 26, 1885, 23 Stat. 332.

The intent of the INA was to protect Americans from the importation of cheap foreign labor, which would reduce wages by increasing the supply of labor. H.R. Rep. No. 1365, 82nd Cong., 2d Sess., *reprinted* in 1952 U.S. Code, Cong. & Admin. News 1653, 1662. In every revision of the INA, Congress re-emphasized the protection of American jobs and working conditions from foreign competition on American soil.[5]

In enacting the INA of 1952, Congress expressed its concern for protecting American labor:

While the bill [INA of 1952] will remove the "contract labor clauses" from the law, it provides strong safeguards for American labor. . . . It is the opinion of this committee that [212(a)(14), the labor certification provisions] will adequately *provide for the protection* of American labor against an influx of aliens entering the United States *for the purpose of performing skilled or unskilled labor* where the economy of individual localities is not capable of absorbing them at the time they desire to enter this country.

H.Rep. No. 1365, 82d Cong., 2d Sess. (1952), reprinted in 1952 U.S. Code Cong. & Admin. News 1653, 1705 [Emphasis added].

In the legislative history of the Immigration and Nationality Amendments of 1965, Congress repeated its desire to protect U.S. workers from the impact of cheap foreign labor. S. Rep. No. 748, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.Code Cong. & Admin. News 3328, 3333. Senator Saltonstall stated that the 1965 Amendments:

. . . have included provisions to facilitate the entry of skilled workers while taking precautionary measures to insure that American jobs and working conditions will be protected.

Cong. Rec.—Senate, September 20, 1965 at 24441. Senator Clark, a cosponsor of the 1965 Amendments, stated:

In this regard let me say that the bill before us offers even more protection to American workers. . . .

---

[5] See, H.R. Rep. No. 1015, 65th Cong., 3d Sess. at 8 (1919); H.R. Rep. No. 4, 67th Cong., 1st Sess. at 3 (1921), accompanying the Quota Act of 1921 (42 Stat. 5); H.R. Rep. N. 1621 67th Cong., 4th Sess. at 23–27 (1923); H.R. Rep. No. 176, 68th Cong., 1st Sess. at 15–17 (1924); H.R. Rep. No. 350, 68th Cong., 1st Sess. at 21–23 (1924), accompanying H.R. 7995, which was enacted as the Immigration Act of 1924 (43 Stat. 153).

*Id.* at 24500.

Hence, the legislative history of the immigration laws makes clear that one of the INA's key purposes is the protection of American workers and working conditions. This purpose was recently re-affirmed by Congress in the Immigration and Nationality Act Amendments of 1976, Pub. L. 94–571, 90 Stat. 2703. In the House report accompanying the bill, Congress stated:

The labor certification provision set forth in Section 212(a)(14) of the Immigration and Nationality Act is intended to protect the domestic labor force.

H.R. Rep. No. No. 1553, 94th Cong., 2d Sess. (1976) reprinted in 1976 U.S. Code Cong. & Admin. News 6073, 6082.

The courts have also recognized this purpose in numerous opinions. As early as 1929, in *Karnuth* v. *United States,* 279 U.S. 231 (1929), the Supreme Court reviewed the legislative history of the INA, and acknowledged Congress' intent to protect U.S. workers from cheap foreign competition:

The various acts of Congress since 1916 evince a progressive policy of restricting immigration. *The history of this legislation points clearly to the conclusion that one of its great purposes was to protect American labor against the influx of foreign labor.*

*Karnuth,* 279 U.S. at 242–44 [Emphasis added].

More recent decisions also recognize this purpose. In *Virginia Agricultural Growers Association* v. *U.S. Department of Labor,* 756 F. 2d 1025 (4th Cir. 1985), the 4th Circuit Court of Appeals stated that:

VAGA's [Virginia Agricultural Growers Association] argument that the . . . rule contradicts the INA's underlying policy is grounded on the statute's goal of admitting needed seasonal foreign labor. VAGA downplays, however, the *statute's concurrent purpose of protecting American labor.*

Id. at 1028 [Emphasis added]. *See also, Production Tool Corp.* v. *Employment and Training Administration, Dept. of Labor,* 688 F. 2d 1161, 1168 (7th Cir. 1982) ("Congress enacted § 212(a)(14) to protect the domestic labor force from competition and adverse working conditions as a result of foreign workers entering; the labor market"); *Wang* v. *INS,* 602 F.2d 211 (9th Cir. 1979); *Mehta* v. *INS,* 574 F. 2d. 701 (2d Cir. 1978); *Silva* v. *Secretary of Labor,* 518 F. 2d 301 (1st Cir. 1975).

Finally, the Immigration and Naturalization Service explicitly recognizes as the purpose of the INA the protection of American workers:

The Constitution clearly permits the government to put conditions in the nature of employment restrictions on the entry of aliens into the United States, as part of the nation's sovereign power to limit the entry of aliens. *Congress exercised this power by enacting the Immigration and Nationality Act which creates an elaborate scheme for classifying aliens. The scheme was intended to protect American labor;* it does so by imposing work-related preconditions, or conditions, on all but a few carefully limited categories of aliens.

Brief for Appellant at 12, *National Center for Immigrants Rights, Inc* v. *Immigration and Naturalization Service,* No. 84–5504 (9th Cir.) (appeal of District Court granting preliminary injunction in favor of appellees) [Emphasis added]. *See, National Center for Immigrants Rights, Inc.* v. *Immigration and Naturalization Service,* 743 F.2d 1365 (9th Cir. 1984).

By allowing the classes of aliens listed in 8 CFR 109.1(b) to receive work authorization, the INS is undermining one of the purposes for which Congress enacted the INA: The protection of American jobs. The granting of work authorization to deportable aliens and nonimmigrants not authorized by statute to work allows such aliens to compete directly with American workers for jobs.[6] This is in direct conflict with the purpose for which the INA was enacted.

Furthermore, both the INS and the Department of Labor have admitted that the "primary purpose of the work authorization requirement is to monitor the nature and volume of jobs available within the United States which aliens fill." Memorandum of Amici Curiae United States Department of Labor and United States Immigration and Naturalization Service at 17, *Ibarra* v. *Texas Employment Commission,* No. L–83–44–CA (E.D. Tex. 1986).

Yet, 8 CFR 109.1 does not contain any requirements that the INS determine whether the granting of work authorization will adversely affect

---

[6] There have been no guidelines promulgated by the INS to determine whether a grant of work authorization to these aliens would adversely affect the wages or working conditions of local citizens or legal aliens. The closest the INS comes to an attempt to protect American labor and labor conditions is in 8 CFR 103.6(a)(iii). This regulation provides a list of factors to be considered in the imposition of the bond condition barring unauthorized employment. The first factor calls for "Safeguarding employment opportunities for United States citizens and legal resident aliens;" and the second factor is the "impact on and dislocation of American workers by alien's employment." However, the factors listed in 8 CFR 103.6(a)(iii) are only to be considered in connection with the imposition of the bond condition barring unauthorized employment and an appearance and delivery bond. There is no language in either 8 CFR 103.6(a)(iii) or 109.1 that states that these factors are to apply in determining whether an alien is granted work authorization, with the exception of 8 CFR 109.1(b)(6).

AR2022_200216

Case 1:18-cv-00068   Document 607-3   Filed on 11/03/22 in TXSD   Page 76 of 504

American labor or working conditions.[7] The INS admits that it does not keep statistics on the number of aliens that are granted work authorization under 8 CFR 109.1(b). Letter from Alan C. Nelson, Commissioner, INS to Roger Conner, Executive Director, FAIR (March 28, 1986) (discussing work authorization), *supra*, n. 1. The INS is granting work authorization without knowing whether the aliens will be competing with American workers for jobs, or whether such authorization is having the effect of lowering wages and working conditions.[8] Thus, under the holding in *Wang* v. *Immigration and Naturalization Service,* 602 F.2d 211 (9th Cir. 1979), 8 CFR 109.1(b) is an unlawful regulation since it neither conforms with or furthers the purpose of the INA.

*B. The Regulations as Promulgated by the INS is an Ultra Vires Act*

The INS claims the authority to grant work authorization to non-immigrants

---

[7] The only provision that provides for such a determination is in section 212(a)(14) of the INA, the labor certification provision. This section calls on the Secretary of Labor to determine and certify that there are not sufficient workers available in the occupation the alien wishes to perform. The labor certification provision does not apply to nonimmigrants seeking work authorization under 8 CFR 109.1, but to aliens who are seeking to enter the U.S. to perform skilled or unskilled labor. See section 212(a)(14) of the INA, 8 U.S.C. 1182(a)(14).

[8] Many scholars and the Supreme Court have recognized that the employment of illegal immigrants results in depressed wages and working conditions for American workers, especially lowskilled workers.

The Supreme Court has recognized the effect that employment of illegal aliens has on the domestic work force:

Employment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions.

*De Canas* v. *Bica,* 424 U.S. 351, 356 (1976). *See also, Sure-Tan, Inc.* v. *National Labor Relations Board,* —— U.S. ——, 104 S.Ct. 2803, 2810 (1984).

*See also* North. Testimony before the Select Commission on Immigration and Refugee Policy (The presence of undocumented workers depresses the labor market, resulting in depressed wages and working conditions for people they compete with); Teitelbaum, *Immigration, Refugees and American Business,* National Chamber Foundation (1984) (Principal losers due to illegal immigration are those domestic workers with labor market characteristics similar to the illegal immigrants, i.e. youths, women, disadvantage American minorities); Immigration Reform and *Control Act: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary,* 98th Cong., 1st Sess. (1983) (Statement of Robert W. Searby, Deputy Under Secretary of Labor for International Labor Affairs) (The Department of Labor support of employer sanctions as best way to protect low-skilled American and legal immigrant workers from competition with undocumented aliens).

under Section 103 of the INA,[9] and that Congress had acquiesced in the Attorney General's power to grant work authorization when it amended section 245(c)[10] of the INA.[11] 45 FR 19563 (1980).

Not only is 8 CFR 109.1(b) inconsistent with the INA, it was promulgated without proper statutory authorization by Congress. 8 CFR 109.1(b) gives the Attorney General wide discretion to authorize aliens to engage in employment, regardless of whether Congress has authorized employment for that class of alien.

However, in the House report accompanying Pub. L. 94–571 (which amended section 245(c)), Congress indicated that the reason for enacting this provision was to "deter many nonimmigrants from violating the conditions of their admission by obtaining unauthorized employment." H.R. Rep. No. 1553, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code, Cong. & Admin. News 6073, 6084. There is no indication in the Report that Congress had recognized the power of the INS to authorize any or all aliens to seek any and all types of employment in the U.S. Congress continued to allow only a few classes of aliens to work. Congress would not have made such a dramatic shift in emphasis without comment.

A careful review of the language contained in the provisions in the INA that created the classes of aliens listed in 8 CFR 109.1(b),[12] along with their accompanying legislative history,[13]

---

[9] *Supra,* n. 4 and accompanying text.

[10] Section 245(c) of the INA states:

The provisions of this section [adjustment of status of nonimmigrants to permanent residents] shall not be applicable to . . . (2) an alien (other than an immediate relative as defined in section 201(b)] who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status.

[11] In the commentary to the proposed rule, the INS explained Congress' acquiescence in the granting of work authorization to aliens as follows:

The authority of the Attorney General to authorize employment of aliens in the United States as a necessary incident of his authority to administer the Act was *specifically recognized* by the Congress in the enactment of section 6 of Pub. L. 95–571. That provision amended section 245(c) of the Act to bar from adjustment of status any alien (other than an immediate relative of a United States citizen) who after January 1, 1977 engages in unauthorized employment prior to filing an application for adjustment of status.

45 FR 19563 (1980) [Emphasis added].

[12] See, Section 214(a), 208(a), 245, 244(a) and (e), 236, 237, 241, 242 of the INA.

[13] *See,* Section 208 of the INA, 8 U.S.C. 1158, along with S. Rep. No. 256, 96th Cong., 2nd Sess., *reprinted in* 1980 U.S. Code Cong. & Ad. News 141, 156 and H. Conf. Rep. No. 781, 96th Cong., 2nd Sess., *reprinted in* 1980 U.S. Code Cong. & Ad. News 160, 161; Section 214 of the INA, 8 U.S.C. 1184, along with H. Rep. No. 851, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 2750,

reveals no Congressional intent to allow these classes of aliens to engage in employment while in the United States. There is no statutory authority for the classes of aliens listed in 8 CFR 109.1(b) to engage in employment. Therefore, the regulation is contrary to the purpose of the INA, and beyond INS's delegated authority.

The political branches of the federal government have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country. *Chae Chan Ping* v. *United States [Chinese Exclusion Case],* 130 U.S. 581, 609 (1889). This power lies in the first instance with Congress. *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950). "Over no conceivable subject is the legislative power of Congress more complete." *Oceanic Steam and Navigation Co.* v. *Stranahan,* 214 U.S. 320 (1909).

Thus, it is up to Congress to decide which classes of aliens may be granted work authorization, not the INS. *Lapina* v. *Williams,* 232 U.S. 78 (1914) ("Congress . . . prescribe[s] the terms and conditions upon which [aliens] may enter and remain in this country.") If Congress wanted the aliens listed in 8 CFR 109.1(b) to engage in employment, it would have passed legislation allowing it. *I.N.S* v. *Phinpathya,* 464 U.S. 183, 196 (1984) ("Congress designs the immigration laws, and it is up to Congress to temper the laws' rigidity").

The INS must comply with the grant of statutory authority given it. *Lloyd Sabaudo Societa Anonima Per Azioni* v. *Elting,* 287 U.S. 329, 335 (1932). There is no support in the INA for the granting of work authorization to those aliens listed in 8 CFR 109.1(b). The INS has promulgated a regulation that is beyond its delegated authority. Therefore, the regulation promulgated in 8 CFR 109.1(b) is unlawful and should be rescinded, or amended to include only those aliens who have been authorized by Congress

---

2757; Section 245 of the INA, 8 U.S.C. 1255, along with S. Rep. No. 2133, 85th Cong., 2nd Sess., *reprinted in* 1958 U.S. Code Cong. & Ad. News 3698, S. Rep. No. 748, 89th Cong., 1st Sess., *reprinted in* 1965 U.S. Code Cong. & Ad. News 3328, 3343, H. Conf. Rep. No. 1101, 89th Cong., 1st Sess., *reprinted in* 1965 U.S. Code Cong. & Ad. News 3353, 3354, H. Rep. No. 1553, 94th Cong., 2nd Sess., *reprinted in* 1976 U.S. Code Cong. & Ad. News 6073, 6084, and H. Rep. No. 264, 97th Cong., 1st Sess., *reprinted in* 1981 U.S. Code Cong. & Ad. News 2577.

The legislative history accompanying the 1952 Immigration and Nationality Act applies to each of the above Sections as well as to Section 244 of the INA, 8 U.S.C. 1152. *See,* H. Rep. No. 1365, 65th Cong., 2nd Sess. *reprinted in* 1952 U.S. Code Cong. & Ad. News 1653, and H. Conf. Rep. No. 2096, 65th Cong., 2nd Sess. *reprinted in* 1952 U.S. Code Cong. & Ad. News 1753.

to be engaged in employment in the United States.

## C. The Regulation Undermines the Labor Certification Provision

Congress enacted section 212(a)(14) to protect American jobs and working conditions. 8 CFR 109.1(b) allows an alien effectively to circumvent the labor certification provisions of section 212(a)(14) of the INA, 8 U.S.C. 1182(a)(14). The relevant language of section 212(a)(14) states:

Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, [are ineligible to receive visas and are excluded from admission to the United States], unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that (A) there are not sufficient workers who are able, willing, qualified . . . and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

The language of the statute is clear. Aliens may not enter the United States to work if they would compete directly with Americans for jobs or would adversely affect Americans' wages and working conditions. Nor may an alien already here adjust status on the basis of needed skills if they would take jobs away from Americans.

The Secretary of Labor is responsible for certifying to the Attorney General that there is a shortage of workers to perform certain jobs and that the employment of an alien will not adversely affect wages and working conditions. 20 CFR 656.1(a). The burden of proof is on the alien to obtain his labor certification. 20 CFR 656.2(b). The Secretary of Labor has set up two schedules:

Schedule A, which lists occupations for which an alien may apply for labor certification due to insufficient numbers of American workers or lack of adverse effects on wages and working conditions, 20 CFR 656.10; and

Schedule B, which lists occupations that have an ample supply of American workers and for which employment of aliens could adversely affect wages and working condition, 20 CFR 656.11.

There is an elaborate mechanism to implement section 212(a)(14) of the INA involving the INS, the Department of Labor and the Department of State. Allowing statutorily unauthorized aliens to apply for and receive work authorization allows aliens who might otherwise have been turned down for admission to the United States to perform skilled or unskilled labor to

circumvent the labor certification process.

For example, an alien who was previously not allowed to enter the U.S. to perform labor listed on Schedule B could simply enter the United States as a visitor for pleasure, overstay his visa, and apply for suspension of deportation or voluntary departure. The alien would receive work authorization until deportation or voluntary departure. Hence, the alien has effectively thwarted the labor certification provisions. The alien has come here for the purpose of employment without being certified by the Department of Labor.

Since the INS does not determine, in granting work authorization, whether the alien's employment will compete with citizens and resident aliens, the alien may be directly competing with Americans for a job which has an ample supply of American workers. Congress wanted to protect American labor through the labor certification process. 8 CFR 109.1(b) negates congressional intent.

*International Union of Bricklayers and Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985) (*Bricklayers II; See also, International Union of Bricklayers and Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985) (*Bricklayers I*)), presented a similar problem. In *Bricklayers II*, a union challenged an INS "Operating Instruction" (OI) issuing visas to foreign laborers.[14] The union claimed that the OI in question violated the INA because it was inconsistent with specific provisions and the legislative intent of the Act.[15]

[14] INS Operating Instruction 214.2(b)(5) provided that an alien may be classified as a "temporary visitor for business" nonimmigrant if the alien: Is to receive no salary or other remuneration from a United States source (other than an expense allowance or other reimbursement for expenses incidental to the temporary stay) . . . (and is) coming to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S. or to train U.S. workers to perform such service . . .

OI 214.2(b)(6) allows foreign laborers to circumvent the labor certification provisions of the INA. The usual procedure for aliens coming to perform skilled or unskilled labor is to apply for a H–2 visa, or "temporary worker" visa. However, in order to receive an H–2 visa, the petitioning employer must apply for labor certification from the Secretary of Labor. Aliens applying for a "temporary visitor for business" visa (B–1), on the other hand, do not have to seek labor certification.

[15] Sections 101(a)(15)(B), which defines a temporary visitor for business as: An alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business . . .

The court, in finding for the union, said the OI contravened the language of the two provisions by "[authorizing] the issuance of a B–1 visa to an alien coming to this country to perform skilled or unskilled labor." The court further explained:

More importantly, the Operations Instruction authorizes the issuance of a nonimmigrant visa to a person performing skilled or unskilled labor, though qualified Americans may be available to perform the work involved. The Operations Instruction therefore lacks the safeguards contained in section 101(a)(15)(H)(ii) of the Act . . .
*Id.,* at 1399.

8 CFR 109.1(b) suffers the same problems as the OI in *Bricklayers II*. The regulation allows aliens granted work authorization to compete with American workers for jobs. Furthermore, the safeguards that section 212(a)(14) of the INA provides to protect American workers and working conditions from the adverse affects of incoming foreign labor are not present in 8 CFR 109.1(b), which covers only aliens applying for work authorization in this country.

The court in *Bricklayers* stated, after a careful review of the legislative history of the INA:

The foregoing legislative history demonstrates that one of Congress' central purposes in the Act was the protection of American labor. . . . Thus, to the extent that the INS Operations Instruction 214.2(b)(5) permits aliens to circumvent the restrictions enacted by Congress [in sections 101(a)(15)(B) and 101(a)(15)(H)(ii)], the Operations Instruction is inconsistent with both the language and the legislative intent of the Act.

*Id.,* at 1401.

8 CFR 109.1(b) allows aliens who have been denied entry to the U.S. to perform skilled or unskilled labor the possibility of circumventing section 212(a)(14) of the INA. These aliens could enter the country on a nonimmigrant visa or without inspection and later apply for work authorization. Following the holding in Bricklayers, a regulation that is both contrary to the language of the Act, in this case section 212(a)(14), and the legislative intent of the Act, must be withdrawn.

## V. Petition

Now, therefore, because the INS has promulgated a regulation, 8 CFR

and Section 101(a)(15)(H)(ii), which defines a temporary worker nonimmigrant as: An alien having a residence in a foreign country which he has no intention of abandoning . . . (and ) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country . . .

AR2022_200218

109.1(b), that is inconsistent with the purpose of the INA, undermines the labor certification provisions of section 212(a)(14) of the INA, and grants work authorization to aliens who have not been authorized by Congress to be allowed to seek employment in this country. FAIR respectfully requests that the Immigration and Naturalization Service: Rescind 8 CFR 109.1(b).

Daniel A. Stein,
Barnaby W. Zall,
1424 Sixteenth St. NW.
Washington, DC 20036
(202) 328–7004

*Attorneys for the Federation for American Immigration Reform.*

[FR Doc. 86–24329 Filed 10–27–86; 8:45 am]
**BILLING CODE 4410–10–M**

---

## NUCLEAR REGULATORY COMMISSION

### 10 CFR Part 50

[Docket No. PRM–50–44]

### Committee to Bridge the Gap; Petition for Rulemaking; Extension of Comment Period

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Petition for rulemaking; Extension of comment period.

**SUMMARY:** On September 3, 1986 (51 FR 31341), the NRC published a notice of receipt of a petition for rulemaking filed by the Committee to Bridge the Gap. The petition requested that the Commission amend its regulations to require operators of reactors that use graphite as a moderator or reflector to (1) prepare and submit for NRC approval fire response plans and evacuation plans for a graphite fire and, (2) measure the energy stored in their graphite, and revise their safety analyses to consider the risks and consequences of a graphite fire in their facilities. The notice of receipt requested public comment on the petition and established a comment closing date of November 3, 1986.

In response to requests from the U.S. Department of Commerce, University of Missouri, Oregon State University, Worcester Polytechnic Institute, and North Carolina State University, the NRC has agreed to extend the comment period on PRM–50–44 for 90 days from the original comment closing date.

**DATE:** The comment period for PRM–50–44 has been extended from November 3, 1986 to February 3, 1987.

**ADDRESSES:** A copy of the petition for rulemaking is available for public inspection in the Commission's Public

Document Room, 1717 H Street, NW., Washington, DC. A copy of the petition may be obtained by writing to the Division of Rules and Records, Office of Administration, U.S. Nuclear Regulatory Commission, Washington, DC 20555.

All persons who desire to submit written comments concerning the petition for rulemaking should send their comments to the Secretary of the Commission, U.S. Nuclear Regulatory Commission, Washington, DC 20555, Attention: Docketing and Service Branch.

**FOR FURTHER INFORMATION CONTACT:**
Michael T. Lesar, Acting Branch Chief, Rules and Procedures Branch, Division of Rules and Records, Office of Administration, U.S. Nuclear Regulatory Commission, Washington, DC 20555, Telephone: 301–492–7758 or Toll Free: 800–368–5642.

Dated at Washington, DC this 23d day of October 1986.

For the Nuclear Regulatory Commission.

**Samuel J. Chilk,**
*Secretary of the Commission.*

[FR Doc. 86–24330 Filed 10–27–86; 8:45 am]
**BILLING CODE 7590–01–M**

---

### 10 CFR Part 50

### Emergency Planning and Preparedness; Withdrawal

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Withdrawal of proposed rule.

**SUMMARY:** The Commission is withdrawing its proposed amendment to 10 CFR Part 50 which would have explicitly incorporated into Commission regulations the decision reached in the *San Onofre* and *Diablo Canyon* licensing proceedings that no specific emergency preparedness measures need be established to account for earthquakes. The withdrawal of the proposed rule will not have a significant effect on emergency preparedness requirements established in August 1980 (45 FR 55402).

**FOR FURTHER INFORMATION CONTACT:**
E. Neil Jensen, Office of the General Counsel, U.S. Nuclear Regulatory Commission, Washington, DC 20555, Telephone (202) 634–1493; or Michael T. Jamgochian, Division of Regulatory Applications, Office of Nuclear Regulatory Research, U.S. Nuclear Regulatory Commission, Washington, DC 20555, Telephone (301) 443–7657.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 21, 1984, the Commission published proposed amendments to its emergency planning requirements at 10 CFR 50.47 and 10 CFR Part 50, Appendix E (49 FR 49640). The proposed rule stated that neither emergency response plans nor evacuation time analyses need consider the impact on emergency planning of earthquakes which cause, or occur proximate in time with, an accidental release of radioactive material from a nuclear power reactor. These amendments proposed to explicitly adopt by rule the Commission's interpretation of its existing rules in the Commission's *San Onofre* and *Diablo Canyon* decisions. *Southern California Edison Company, et al.* (San Onofre Nuclear Generating Station, Units 2 and 3), CLI–81–33, 14 NRC 1091 (1981); *Pacific Gas and Electric Company* (Diablo Canyon Nuclear Power Plant, Units 1 and 2), CLI–84–12, 20 NRC 249 (August 10, 1984), *San Luis Obispo Mothers for Peace v. NRC,* 751 F.2d 1287 (D.C. Cir. 1984), *rehearing en banc granted,* 760 F.2d 1320, *aff'd en banc,* 789 F.2d 26 (1986).

The Commission stated in the *Diablo Canyon* decision that it would undertake a generic rulemaking "to address whether the potential for seismic impacts on emergency planning is a significant enough concern for large portions of the nation to warrant the amendment of the regulations to specifically consider those impacts" and "to obtain additional information to determine whether, in spite of current indications to the contrary, cost effective reductions in overall risk may be obtained by the explicit consideration of severe earthquakes in emergency response planning." CLI–84–12, 20 NRC 249, 254–55.

The proposed rule permitted a 30-day comment period. This period was extended until February 27, 1985 (see 50 FR 3797, dated January 28, 1985).

### The Proposed Rule

In the proposed rule, the Commission requested that commenters address the merits of three possible alternatives:

1. Adoption of the proposed rule explicitly incorporating the Commission interpretation in *San Onofre* and *Diablo Canyon* not to consider the impacts of earthquakes in emergency planning;

2. Leaving the issue open for adjudication on a case-by-case basis; or

3. Requiring by rule that emergency plans specifically address the impacts of earthquakes.

AR2022_200219

51 FR 45338-01, 1986 WL 122274(F.R.)

PROPOSED RULES

DEPARTMENT OF JUSTICE

8 CFR Part 109

Employment Authorization; Classes of Aliens Eligible

Thursday, December 18, 1986

**\*45338**  AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Extension of comment period of petition for rulemaking.

SUMMARY: Passage of Pub. L. 99-603 created a new section of law containing a definition of "unauthorized alien" that appears to have a direct bearing on the issues to be considered in the petition for rulemaking published October 28, 1986 (51 FR 39385). The Service has extended the deadline for submitting written comments in order to allow the public additional opportunity to study the petition in view of the new law.

DATE: Comments are now due on or before January 28, 1987.

ADDRESS: Please submit comments in duplicate to the Director, Office of Policy Directives and Instructions, Immigration and Naturalization Service, 425 I Street, NW., Room 2011, Washington, DC 20536.

FOR FURTHER INFORMATION CONTACT:

FOR GENERAL INFORMATION: Loretta Shogren, Director, Policy Directives and Instructions, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-3048

FOR SPECIFIC INFORMATION: Michael L. Shaul, Senior Immigration Examiner, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-3946

SUPPLEMENTARY INFORMATION: On October 28, 1986 the Immigration and Naturalization Service ("the Service") published a Petition for Rulemaking based upon a petition which had been received from the Federation for American Immigration Reform ("FAIR") setting forth the position that the Service had exceeded its authority in promulgating regulations at 8 CFR 109.1(b) allowing illegal or temporarily present aliens to apply for and receive work authorization. The Service published the FAIR petition without comment and invited the public to comment and assist the Service in determining whether to proceed with the rulemaking sought by the petition. The October 28, 1986 notice in the Federal Register called for the submission of written comments on or before December 29, 1986.

On November 6, 1986 the Immigration Reform and Control Act of 1986 (Pub. L. 99-603) became law. Public Law 99-603 created section 274A of the Immigration and Nationality Act. Included in that section is a definition of the term "unauthorized alien" at 274A(h)(3):

DEFINITION OF UNAUTHORIZED ALIEN—As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General.

Because this new section of law appears to have a direct bearing on the issues to be resolved in consideration of the FAIR petition, the Service is requesting that comments be made in light of this definition of "unauthorized alien". The Service is also

extending the period for submission of written comments by thirty days until January 28, 1987 in order to allow the public sufficient time to study the matter in light of this new factor.

Dated: December 15, 1986.

Richard E. Norton,

Associate Commissioner, Examinations, Immigration and Naturalization Service.

[FR Doc. 86-28398 Filed 12-17-86; 8:45 am]

BILLING CODE 4410-10-M

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

46092

# Proposed Rules

Federal Register

Vol. 52, No. 233

Friday, December 4, 1987

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service**

**8 CFR Part 109**

[INS Number: 1026-87]

**Employment Authorization; Classes of Aliens Eligible**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Petition for rulemaking; denial.

**SUMMARY:** On October 28, 1986 (51 FR 39385) the Immigration and Naturalization Service ("the Service") published a petition for rulemaking submitted by the Federation for American Immigration Reform ("FAIR"). The petition sought the rescission of 8 CFR 109.1(b) relating to employment authorization for aliens in the United States because the petitioner believed that the Service had exceeded its authority in promulgating the regulation. In publishing the FAIR petition, the Service explained that it was taking no position on the issues raised in the petition, but was seeking comments from interested parties. The period for submission of comments was initially designated as from October 28, 1986 to December 29, 1986, but was extended on December 18, 1986 until January 28, 1987 to afford the public an opportunity to submit comments in light of the Immigration Reform and Control Act of 1986. Upon a thorough review of the comments received, the Service now denies the petition.

**DATES:** The petition is denied as of December 4, 1987.

**FOR FURTHER INFORMATION CONTACT:** Michael L. Shaul, Senior Immigration Examiner, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-3946.

**SUPPLEMENTARY INFORMATION:** In publishing the FAIR petition to rescind 8 CFR 109.1(b) the Service sought

comments from interested parties concerning the issues raised in the petition. The Service took no position on the merits of the petition at the time of publication, preferring to carefully evaluate the petition in light of comments from the public.

Subsequent to the publication of the petition, the Immigration Reform and Control Act of 1986 (IRCA) became law. Section 101 of IRCA amended the Immigration and Nationality Act by adding section 274(a) relating to the unlawful employment of aliens. Accordingly, on May 1, 1987 (52 FR 16190) the Service published regulations relating to IRCA which (among other things) transferred 8 CFR Part 109 to 8 CFR Part 274a and significantly expanded the material covered. Although 8 CFR Part 109 has now been removed, this denial of rulemaking will continue to refer to the regulation discussed in the petition as 8 CFR Part 109 for the sake of clarity.

The Service received a total of 99 responses during the period designated for submission of comments, and one response from the Department of the Treasury subsequent to the closing date. Of the 99 comments, 46 were in favor of the petition and 53 were opposed. Comments were received from a wide spectrum of interested parties, ranging from local to national to international governmental entities, and from private individuals to business and educational institutions to public interest groups. Likewise, the extent of the comments ranged from simple statements of support or opposition to fairly thorough legal and historical discussions. Some writers chose to comment only on the one or two aspects of the petition with which they were most familiar, while others chose to comment on all aspects. Regardless of the source, the extent or the scope, all comments were carefully reviewed and the arguments presented taken into account. Finally, the Service would like to express its appreciation to all who took the time to submit comments.

The FAIR petition presented three premises for rescinding the regulation. The remainder of this discussion will deal with each of these premises in light of the comments received from persons on both sides of the issues:

*Premise A: The Regulation is Inconsistent With the Purpose of the Immigration and Nationality Act ("the Act")*

The petitioner contends that the purpose of the Act is the protection of the American labor force, and that because the regulation is inconsistent with this purpose, it should be rescinded. Opponents of the petition counter that FAIR has over-simplified the purpose of the Act. In fact, the Act is a very complex statute which has many different purposes, some of which may appear at time to be in conflict with others. Among the goals of the Act not mentioned by FAIR are: Supporting international exchange, encouraging family reunion, protecting those who fear persecution, facilitating diplomatic relations, fulfilling international treaty requirements, providing due process for deportable aliens, and (in certain instances) providing some measure of humanitarian assistance to meritorious cases. Since each of the categories of aliens authorized to accept employment by 8 CFR 109.1(b) relates to at least one of these goals, the regulation is not inconsistent with the purposes of the Act.

Additionally, FAIR states that the labor certification requirements of section 212(a)(14) of the Act are being circumvented because the Service does not keep statistical records of the number of aliens permitted to work under the provisions of 8 CFR 109.1(b). Although the Service has not kept such records in the past, it has never been unconcerned with the impact of the regulation on the American labor market. While recognizing the other goals of the Act, the Service has taken reasonable measures to protect the labor market. The employment authorized by 8 CFR 109.1(b) is normally of very limited duration and only under conditions set forth in that Part or in other Parts referred to in the regulation. These conditions, combined with the fact that most of the classes enumerated in 8 CFR 109.1(b) are very small to begin with, mean that the total number of aliens authorized to accept employment is quite small and the impact on the labor market is minimal. The regulatory conditions include:

1. The dependent of a foreign government official or international organization employee is not allowed to

AR2022_200222

accept employment in a "Schedule B" occupation. This schedule, prepared by the Department of Labor, lists those occupations for which a labor certificate may not be granted.

2. A nonimmigrant student may accept on-campus employment only if it does not displace a United States resident, may accept employment for practical training only in areas where such training is not available in his or her homeland, and may accept employment due to economic necessity only after completion of the first year of studies and after establishing that the need was unforeseeable.

3. The spouse of an exchange visitor may not be authorized employment for the support of the principal alien.

4. An asylum applicant who has filed a frivolous application may not be granted employment authorization.

5. An adjustment applicant must first be the beneficiary of an immigrant visa petition (unless the applicant qualifies as a "special immigrant") and an immigrant visa number (if required) must be immediately available.

6. An applicant for suspension of deportation must establish that he or she has an economic need to work.

7. A deportable alien under voluntary departure must establish that he or she merits favorable exercise of the district director's discretion. The regulation sets forth four conditions to be considered by the district director in reaching his decision.

8. An alien who has been placed in deferred action status must establish an economic need to work.

Furthermore, it should be noted that although the number of aliens authorized to work under 8 CFR Part 109 (now 8 CFR Part 274A) is relatively small and was previously considered to be not worth recording statistically, the Service is exploring ways of formalizing procedures for requesting employment authorization which will result in the generation of statistical reports.

*Premise B: The Regulation as Promulgated by the INS is an Ultra Vires Act*

This second premise is directly related to the first. FAIR contends that the Attorney General had no statutory authority to promulgate regulations and rejects the Service's stated position that the relevant authority was conferred upon the Attorney General by section 103(a) of the Act as passed by Congress. That section states, in pertinent part:

The Attorney General shall be charged with the administration and enforcement of this Act and all other laws relating to the

immigration and naturalization of aliens, except, insofar as this Act or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling. * * * He shall establish such regulations * * * as he deems necessary for carrying out his authority under the provisions of this Act.

The authority of the Attorney General is not limited to the enforcement of one section of the Act dealing with labor certifications; it extends to the administration and enforcement of the Act as a whole. In determining what regulations are necessary for carrying out his authority, the Attorney General cannot operate in a vacuum, but must view the Act as it relates to multiple national and international policy issues. As Emanuel Celler, Chairman of the House Committee on the Judiciary, stated when the 1952 Act was under consideration: "the law * * * affects basically foreign policy, constitutional guarantees, public welfare, the health, the economy, and the productivity of the Nation." (Congressional and Administrative News, 82nd Congress, Second Session, 1952, v.2, p. 1750). It requires a simplistic view of the purposes of the Act and a narrow view of the mission of the Service to contend that regulations should be promulgated solely for the purpose of preventing any aliens without labor certification from being authorized to accept employment. Assuming for the sake of argument that section 103(a) of the Act did not vest in the Attorney General the necessary authority to promulgate 8 CFR 109.1(b), such authority is apparent in the new section 274A.(h)(3) of the Act which was created by the Immigration Reform and Control Act of 1986. Section 274A.(h)(3) reads:

Definition of Unauthorized Alien.—As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or the Attorney General.

Despite the fact that on December 18, 1986 (51 FR 45338) the Service published this definition and extended the time for submission of comments until January 28, 1987, very few of the petition's proponents even mentioned the new Act. One notable exception was the petitioner itself, which submitted a supplemental statement supporting the petition. The petitioner claimed that the phrase "authorized to be so employed

by this Act or the Attorney General" does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act. On the contrary, the only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.

*Premise C: The Regulation Undermines the Labor Certification Provision*

While there can be no doubt that the classes of aliens enumerated in the regulation are authorized to work without first having to obtain a labor certification, the contention that the labor certification provision is undermined is without foundation. In creating the labor certification process, Congress intended that it apply only to certain classes of aliens: third, sixth and nonpreference immigrants and H-2 nonimmigrants. Creation of the process in no way implies that Congress intended to restrict the authority of the Attorney General to promulgate regulations necessary for the administration of the Act, including regulations which authorize certain aliens to accept employment under appropriate circumstances. By limiting the circumstances under which aliens may be granted employment authorization (as discussed above), the Attorney General has assured that the regulations do not circumvent the intent of the labor certification provisions of the statute.

Upon consideration of all of the representations made by the petitioner, the comments submitted by interested parties, the legislative history of the Act and other relevant factors, it has been determined that the petition for rulemaking is without merit. Accordingly, the petition is hereby denied.

Dated: November 30, 1987.

**Richard E. Norton,**

*Associate Commissioner, Examinations, Immigration and Naturalization Service.*

[FR Doc. 87–27905 Filed 12–3–87; 8:45 am]

BILLING CODE 4410-10-M

AR2022_200223

Case 1:18-cv-00068 Document 607-3 Filed on 11/03/22 in TXSD Page 83 of 504

50359), paragraph (a), Table I is amended as follows:

**§ 905.305 Orange, grapefruit, tangerine, and tangelo regulation 5.**

(a) * * *

TABLE I

| (1) | (2) | (3) | (4) |
|-----|-----|-----|-----|
| Variety | Regulation period | Minimum grade | Minimum diameter (inches) |
| Tangerines: | | | |
| Dancy | Nov. 9, 1981, thru Nov. 15, 1981. | U.S. No. 1. | 2⅟₁₆ |
| Dancy | Nov. 16, 1981, thru Dec. 6, 1981. | U.S. No. 1. | 2⅟₁₆ |

* * * * *

(Secs. 1–19, 48 Stat. 31, as amended: 7 U.S.C. 601–674)

Dated: November 6, 1981.

D. S. Kuryloski,

*Deputy Director, Fruit and Vegetable Division, Agricultural Marketing Service.*

[FR Doc. 81–32768 Filed 11–12–81; 8:45 am]

BILLING CODE 3410-02-M

## Agricultural Marketing Service

**7 CFR Part 910**

[Lemon Reg. 333; Lemon Reg. 332, Amdt. 1]

## Lemons Grown in California and Arizona; Limitation of Handling

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** This action establishes the quantity of California-Arizona lemons that may be shipped to the fresh market during the period November 15–21, 1981, and increases the quantity of lemons that may be shipped during the period November 8–14, 1981. Such action is needed to provide for orderly marketing of fresh lemons for the periods specified due to the marketing situation confronting the lemon industry.

**DATES:** The regulation becomes effective November 15, 1981, and the amendment is effective for the period November 8–14, 1981.

**FOR FURTHER INFORMATION CONTACT:** William J. Doyle, 202–447–5975.

**SUPPLEMENTARY INFORMATION:** *Findings.* This rule has been reviewed under Secretary's Memorandum 1512–1 and Executive Order 12291 and has been designated a "non-major" rule. This regulation and amendment are issued under the marketing agreement, as amended, and Order No. 910, as amended (7 CFR Part 910), regulating the

handling of lemons grown in California and Arizona. The agreement and order are effective under the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674). The action is based upon the recommendations and information submitted by the Lemon Administrative Committee and upon other available information. It is hereby found that this action will tend to effectuate the declared policy of the act.

This action is consistent with the marketing policy for 1981–82. The marketing policy was recommended by the committee following discussion at a public meeting on July 7, 1981. A regulatory impact analysis on the marketing policy is available from William J. Doyle, Acting Chief, Fruit Branch, F&V, AMS, USDA, Washington, D.C. 20250, telephone 202–447–5975.

The committee met and publicly on November 9, 1981, at Los Angeles, California, to consider the current and prospective conditions of supply and demand and recommended a quantity of lemons deemed advisable to be handled during the specified weeks. The committee reports the demand for lemons is good.

It is further found that it is impracticable and contrary to the public interest to give preliminary notice, engage in public rulemaking, and postpone the effective date until 30 days after publication in the Federal Register (5 U.S.C. 553), because of insufficient time between the date when information became available upon which this regulation and amendment are based and the effective date necessary to effectuate the declared policy of the act. Interested persons were given an opportunity to submit information and views on the regulation at an open meeting, and the amendment relieves restrictions on the handling of lemons. It is necessary to effectuate the declared purposes of the act to make these regulatory provisions effective as specified, and handlers have been apprised of such provisions and the effective times.

Information collection requirements (reporting or recordkeeping) under this part are subject to clearance by the Office of Management and Budget and are in the process of review. These information requirements shall not become effective until such time as clearance by the OMB has been obtained.

**PART 910—LEMONS GROWN IN CALIFORNIA AND ARIZONA**

1. Section 910.633 is added as follows:

**§ 910.633 Lemon Regulation 333.**

The quantity of lemons grown in California and Arizona which may be handled during the period November 15, 1981, through November 21, 1981, is established at 230,000 cartons.

2. Section 910.632 Lemon Regulation 332 (46 FR 55082) is revised to read as follows:

**§ 910.632 Lemon Regulation 332.**

The quantity of lemons grown in California and Arizona which may be handled during the period November 8, 1981, through November 14, 1981, is established at 235,000 cartons.

(Secs. 1–19, 48 Stat. 31, as amended; 7 U.S.C. 601–674)

Dated: November 10, 1981.

D. S. Kuryloski,

*Director, Fruit and Vegetable Division, Agricultural Marketing Service.*

[FR Doc. 81–33028 Filed 11–12–81; 2:24 pm]

BILLING CODE 3410-02-M

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

**8 CFR Part 109**

## Employment Authorization; Revision to Classes of Aliens Eligible

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

**SUMMARY:** This final rule adds to the classes of aliens who may be authorized employment and clarifies the conditions under which they may seek employment authorization. The revision is necessary to provide codification of the implied authority which exists by statute. Under this rule, certain aliens, paroled into the United States, and those granted voluntary departure may, under certain conditions of economic need, be granted work authorization.

**EFFECTIVE DATE:** November 12, 1981.

**FOR FURTHER INFORMATION CONTACT:** For General Information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536, Telephone: (202) 633–3048.

For Specific Information: Richard R. Spurlock, Immigration Examiner, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536, Telephone: (202) 633–2361.

**SUPPLEMENTARY INFORMATION:** On May 5, 1981, the Immigration and Naturalization Service published its final rule, "Part 109—Employment

AR2022_200224

Authorization" in the Federal Register (46 FR 25079). Part 109 codified the procedures and criteria for granting employment authorization to aliens in the United States. This new part became effective June 4, 1981.

Subsequently, it became evident that aliens paroled into the United States temporarily for emergent reasons or for reasons deemed strictly in the public interest were not explicitly covered as a class under Part 109. Although section 212(d)(5)(A) of the Act authorizes the exercise of discretion regarding the conditions of parole for such alien, and which implies work authorization, this new class of aliens is added to Part 109 of 8 CFR to avoid any uncertainty. Similarly, the new rule also provides that an alien who is deportable, and has been granted voluntary departure, either *prior to* leaving, or *after* hearing, may be granted work authorization for that period of time up to the date set for voluntary departure. This includes extending the work authorization where the district director grants an extension or extensions of the departure date.

The Poverty Income Guidelines (45 CFR 1060.2) referred to in paragraph (c) are based upon the official poverty line established by the Office of Management and Budget and revised by the Secretary of Health and Human Services at least annually as required under section 673(2) of the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97–35, 95 Stat. 512.

Accordingly, this revision to Part 109 of 8 CFR adds a new subparagraph (4) to § 109.1(b) regarding work authorization for parolees; renumbers former subparagraph (4) to subparagraph (5); adds a new subparagraph (6) to expand upon the conditions under which a deportable alien who has been granted voluntary departure may be authorized employment; renumbers former subparagraph (6) to (7); and adds paragraph (c) *Basic criteria to establish economic necessity.* Other minor editorial changes are also made to improve readability and the entire § 109.1 is republished for reader convenience.

Compliance with 5 U.S.C. 553 as to notice of proposed rule making and delayed effective date is not required because the rule is interpretative.

In accordance with 5 U.S.C. 605(b) the Commissioner of Immigration and Naturalization certifies that this rule will not have a significant economic impact on a substantial number of small entities.

This rule is not a major rule within the meaning of section 1(b) of E.O. 12291.

Accordingly, Chapter I of Title 8 of the Code of Federal Regulations is amended as follows:

## PART 109—EMPLOYMENT AUTHORIZATION

1. Part 109 is amended by revising § 109.1 to read as follows:

### § 109.1  Classes of aliens eligible.

(a) *Aliens authorized employment incident to status.* The employment authorization is limited solely to the extent and conditions described for the corresponding classifications in section 101(a)(15) of the Act, 8 CFR Part 214, 22 CFR Part 41, and 22 CFR 514.24. The following classes of aliens are authorized to be employed in the United States as a condition of their admission or subsequent change to one of the indicated classes, and specific authorization need not be requested:

(1) A lawful permanent resident alien.

(2) An alien admitted to the United States as a refugee under section 207 of the Act.

(3) An alien paroled into the United States as a refugee.

(4) An alien granted asylum under section 208 of the Act.

(5) An alien admitted to the United States as a nonimmigrant fiance or fiancee.

(6) An alien admitted in one of the following classifications, or whose status has been changed to such classification under section 247 or 248 of the Act:

(i) A foreign government official (A–1), or (A–2).

(ii) An employee of a foreign government official (A–3).

(iii) A nonimmigrant visitor for business (B–1).

(iv) A nonimmigrant crewman (D–1).

(v) A nonimmigrant treaty trader or investor (E–1), or (E–2).

(vi) A representative of an international organization (G–1), (G–2), (G–3), or (G–4).

(vii) A personal servant of an employee or representative of an international organization (G–5).

(viii) A temporary worker or trainee (H–1), (H–2), or (H–3).

(ix) An information media representative (I).

(x) An exchange visitor (J–1).

(xi) An intra-company transferee (L–1).

(b) *Aliens who must apply for work authorization.* Any alien within a class of aliens described in this section must apply for work authorization to the district director in whose district the alien resides:

(1) Any alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed:

(i) Alien spouse or unmarried dependent son or daughter of a foreign government official (A–1), or (A–2) as provided in § 214.2(a) of this chapter.

(ii) Alien nonimmigrant student (F–1) as provided in § 214.2(f) of this chapter.

(iii) Alien spouse or an unmarried dependent son or daughter of an officer or employee of an international organization (G–4) as provided in § 214.2(g) of this chapter.

(iv) Alien spouse of an exchange visitor (J–2) as provided in § 214.2(j) of this chapter.

(2) Any alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case.

(3) Any alien who has properly filed an application for adjustment of status to permanent resident alien may be granted permission to be employed for the period of time necessary to decide the case.

(4) Any alien paroled into the United States temporarily for emergent reasons or for reasons deemed strictly in the public interest: *Provided,* The alien establishes an economic need to work.

(5) Any alien who has applied to an immigration judge under § 242.17 of this chapter for suspension of deportation pursuant to section 244(a) of the Act may be granted permission to be employed for the period of time necessary to decide the case: *Provided,* The alien establishes an economic need to work.

(6) Any deportable alien granted voluntary departure, either prior to hearing or after hearing, for reasons set forth in § 242.5(a)(2) (v), (vi), or (viii) of this chapter may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any extension granted beyond such date. Factors which may be considered in granting employment authorization to an alien who has been granted voluntary departure:

(i) Length of voluntary departure granted;

(ii) dependent spouse and/or children in the United States who rely on the alien for support;

(iii) reasonable chance that legal status may ensue in the near future; and

(iv) reasonable basis for consideration of discretionary relief.

(7) Any alien in whose case the district director recommends

consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority: *Provided,* The alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment.

(c) *Basic criteria to establish economic necessity.* Title 45—Public Welfare, Poverty Income Guidelines, 45 CFR 1060.2 shall be used as the basis criteria to establish economic necessity for employment authorization requests where the alien's need to work is a factor. The applicant shall submit a signed statement listing his/her assets, income, and expenses as evidence of his/her economic need to work. Permission to work granted on the basis of the applicant's statement may be revoked under § 109.2 upon a showing that the information contained in the statement was not true and correct.

(Sec. 103, 66 Stat. 173 (8 U.S.C. 1103); sec. 212, 66 Stat. 182, as amended (8 U.S.C. 1182); sec. 245, 66 Stat. 217, as amended (8 U.S.C. 1255))

Dated: October 19, 1981.

Doris M. Meissner,

*Acting Commissioner of Immigration and Naturalization.*

[FR Doc. 81-32826 Filed 11-12-81; 8:45 am]

BILLING CODE 4410-10-M

---

# DEPARTMENT OF AGRICULTURE

## Food Safety and Inspection Service

### 9 CFR Part 381

[Docket No. 77-765C]

## Hog Scald Agents, Poultry Scald Agents, Denuding Agents

**AGENCY:** Food Safety and Inspection Service, USDA.

**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects a final rule by the Food Safety and Inspection Service, USDA. The primary focus of the rule is to amend the Federal meat and poultry inspection regulations by permitting the use of additional substances in scalding hog and poultry carcasses, and denuding beef and lamb tripe. This correction will only affect the chart of approved poultry scald agents contained in § 381.147(f)(3) of the poultry products inspection regulations (9 CFR 381.147(f)(3)).

**FOR FURTHER INFORMATION CONTACT:** Donald D. Derr, Deputy Director, Food Ingredient Assessment Division, Science Program, Food Safety and Inspection Service, U.S. Department of Agriculture, Washington, DC 20250, (202) 447-7680.

**SUPPLEMENTARY INFORMATION:**
Background

In the October 5, 1981, Federal Register (46 FR 48901) the Food Safety and Inspection Service published a final rule amending the Federal meat inspection regulations to permit the use of additional substances for scalding hog carcasses and denuding beef and lamb tripe. It also amended the Federal poultry products inspection regulations to permit the use of specified substances for scalding poultry carcasses. Further, the chemical name of specific substances were revised to coincide with new nomenclature. The Federal poultry products inspection regulations were amended to be consistent with the Federal meat inspection regulations by requiring the containers of any of those substances permitted to be used in the poultry scalding process to bear labels showing the substance's name, and the concentration of the substance to be used in the process. The rule also amended the Federal meat and poultry products inspection regulations to require the container labels to show use directions reflecting any limitations on substances contained in the preparation.

This correction of an inadvertent error only affects the table listing the restrictions on the use of substances in poultry products in § 381.147(f)(3) of the Federal poultry products inspection regulations (9 CFR 381.147(f)(3)) which appears on page 48904. The table should be corrected as follows: under the "Class of substance" titled "Poultry scald agents; must be removed by subsequent cleaning operations"; the amount of the substance "Potassium hydroxide", should be changed from "Do" to read "Sufficient for purpose".

All other information contained in the final rule remains unchanged.

Done at Washington, DC, on November 9, 1981.

Donald L. Houston,

*Administrator, Food Safety and Inspection Service.*

[FR Doc. 81-32832 Filed 11-12-81; 8:45 am]

BILLING CODE 3410-DM-M

---

# NATIONAL CREDIT UNION ADMINISTRATION

### 12 CFR Part 701

## Deregulation of Lending Policies, Amortization and Payment of Loans, and Lines of Credit; Correction

**AGENCY:** National Credit Union Administration.

**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects a citation in § 701.24, NCUA's Refund of

Interest Regulation. The cited subsection was recently redesignated (46 FR 38673) but the sentence substituting the new numbering for the old numbering in the Refund of Interest Regulation was inadvertently deleted. This document corrects the refund of interest regulation to comport with the new numbering.

**FOR FURTHER INFORMATION CONTACT:** Barbara A. Burrows, Attorney-Advisor, Office of General Counsel, National Credit Union Administration, 1776 G Street, N.W., Washington, D.C. 20456, Telephone: (202) 357-1030.

Dated: November 6, 1981.

Rosemary Brady,

*Secretary of the NCUA Board.*

(12 U.S.C. 1757)

## PART 701—ORGANIZATION AND OPERATION OF FEDERAL CREDIT UNIONS

Accordingly, 12 CFR 701.24 is corrected by revising paragraph (b) to read as follows.

### § 701.24   Refund of Interest.

\*    \*    \*    \*    \*

(b) The amount of interest refund to each member shall be determined as a percentage of the interest paid by the member. Such percentage may vary according to classifications of loans established pursuant to 12 CFR 701.21–1(b).

\*    \*    \*    \*    \*

[FR Doc. 81-32775 Filed 11-12-81; 8:45 am]

BILLING CODE 7535-01-M

---

### 12 CFR Part 721

## Insurance and Group Purchasing Activities; Extension of Effective Date

**AGENCY:** National Credit Union Administration.

**ACTION:** Extension of effective date.

**SUMMARY:** The National Credit Union Administration Board has extended the effective date of revised Part 721, insurance and group purchasing activities, of the Rules and Regulations to April 1, 1982.

**EFFECTIVE DATE:** The effective date of these regulations is extended to April 1, 1982.

**ADDRESS:** National Credit Union Administration, 1776 G Street, N.W., Washington, D.C. 20456.

**FOR FURTHER INFORMATION CONTACT:** Linda M. Cohen, Director, Office of Consumer Affairs, at the above address. Telephone: (202) 357-1080.



# FEDERAL REGISTER

Vol. 76      Monday,

No. 167      August 29, 2011

Part III

## Department of Homeland Security

8 CFR Parts 1, 100, et al.
Immigration Benefits Business Transformation, Increment I; Final Rule

**53764** **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 1, 100, 103, 204, 207, 208, 209, 211, 212, 213a, 214, 223, 235, 236, 238, 240, 241, 244, 245, 245a, 248, 264, 265, 270, 274a, 287, 292, 299, 301, 310, 312, 316, 319, 320, 322, 324, 325, 328, 329, 330, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 343a, 343b, 343c, 392, and 499**

[CIS No. 2481–09; DHS Docket No. USCIS–2009–0022]

RIN 1615–AB83

**Immigration Benefits Business Transformation, Increment I**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule; request for comments.

**SUMMARY:** The Department of Homeland Security (DHS) is amending its regulations to enable U.S. Citizenship and Immigration Services (USCIS) to migrate from a paper file-based, non-integrated systems environment to an electronic customer-focused, centralized case management environment for benefit processing. This transformation process will allow USCIS to streamline benefit processing, eliminate the capture and processing of redundant data, and reduce the number of and automate its forms. This transformation process will be a phased multi-year initiative to restructure USCIS business processes and related information technology systems. DHS is removing references to form numbers, form titles, expired regulatory provisions, and descriptions of internal procedures, many of which will change during transformation. DHS is also finalizing interim rules that permitted submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form and that removed references to filing locations for immigration benefits. In addition, in this rule DHS is publishing the final rule for six other interim rules published during the past several years, most of which received no public comments.

**DATES:** *Effective date:* This rule is effective November 28, 2011.

*Comment date:* Written comments must be submitted on or before October 28, 2011.

**ADDRESSES:** You may submit comments, identified by DHS docket number USCIS–2009–0022 by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* You may submit comments directly to USCIS by e-mail at *uscisfrcomment@dhs.gov.* Include DHS docket number USCIS–2009–0022 in the subject line of the message.

• *Mail:* Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020. To ensure proper handling, please reference DHS docket number USCIS–2009–0022 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020. Contact Telephone Number is (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Dan Konnerth, Policy Chief, Office of Transformation Coordination, U.S. Citizenship and Immigration Services, Department of Homeland Security, 633 Third St., NW., Washington, DC 20529–2210. Contact Telephone Number is (202) 233–2381.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Background
  A. Introduction
  B. Authority
  C. USCIS Transformation Initiative
  D. How Transformation Will Work
  E. Other Regulatory Changes Necessary for the Transformation Initiative
III. The Changes Made by This Rule
  A. Removing References to Form Numbers and Form Titles
  B. Removing References to Position Titles Within USCIS
  C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices
  D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests
  E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes
  F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency and To Remove Duplicative Information
IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule
V. Discussion of Other Interim Final Rules Being Finalized
  A. Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, RIN 1615–AA24
  B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615–AA57
  C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615–AA96
  D. Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004, RIN 1615–AB32
  E. Classification of Certain Scientists of the Commonwealth of Independent States and the Baltic States as Employment-Based Immigrants, RIN 1615–AB14
  F. Revoking Grants of Naturalization, RIN 1615–AA30
VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule
VII. Regulatory Requirements
  A. Administrative Procedure Act
  B. Unfunded Mandates Reform Act of 1995
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Executive Order 12866
  E. Executive Order 13132
  F. Executive Order 12988 Civil Justice Reform
  G. Paperwork Reduction Act
  H. Regulatory Flexibility Act

## I. Public Participation

Interested persons are invited to submit written data, views, or arguments on all aspects of this rule. Comments that will provide the most assistance to USCIS in developing these procedures will reference a specific portion of this rule, explain the reason for any recommended change, and include data, information, or authority that support the recommended change.

*Instructions:* All submissions must include the component name and DHS docket number USCIS–2009–0022. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received go to *http://www.regulations.gov.* Submitted comments may also be inspected at the Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020.

## II. Background

### A. Introduction

U.S. Citizenship and Immigration Services (USCIS) receives approximately six million immigration benefit requests each year, comprised of more than fifty types of applications and petitions. USCIS historically accepted paper applications and depended on paper files. These applications and

AR2022_200228

paper files were the only means for USCIS to adjudicate applications and petitions and that paper-based process, by contemporary standards, was inefficient. Until recently, USCIS processed on paper all immigration benefits, verified the identity of applicants, and provided other government agencies with the information required to quickly identify criminals and possible terrorists.

USCIS is modernizing its processes and systems in light of the development of technology to accommodate and encourage greater use of electronic data submission, to include e-filing and electronic interaction. USCIS will not eliminate paper filing at this time but will convert the data from paper filing to an electronic medium when the completed form is received. USCIS will then operate in an electronic environment fostering greater operational efficiency, provide transparency, and improve access to information through online accounts for those who do business with USCIS.

The Department of Homeland Security (DHS) and USCIS began the transformation of USCIS operations by eliminating regulatory references to filing locations for immigration benefits, thereby permitting USCIS to more rapidly adjust filing locations to meet demand and operational needs and to provide that information on petition and application forms and through other means, such as on the USCIS Web site. *See Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision to Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms,* 74 FR 26933 (June 5, 2009) ("Filing Location Rule").

DHS is expanding on the Filing Location Rule by affording additional flexibility for applicants and petitioners to file, and for USCIS to receive and process, benefit requests, biometrics, and supporting documentation in an electronic environment. For example, amendments in this rule to 8 CFR 103.2(a)(1) (relating to filing), 8 CFR 103.2(a)(7) (relating to receipt dates), and 8 CFR 103.8 (relating to delivery of notices) each replace language geared solely to paper files and benefit requests with language that is equally applicable in a paper or electronic environment.

*B. Authority*

The Government Paperwork Elimination Act (GPEA), Public Law 105–277, tit. XVII, section 1703, 112 Stat. 2681, 2681–749 (Oct. 21, 1998), 44 U.S.C. 3504 note, provides that, when possible, Federal agencies use electronic forms, electronic filing, and electronic submissions to conduct agency business with the public. GPEA establishes the means for the use and acceptance of electronic signatures. This rule will significantly enhance the ability of USCIS to fully implement GPEA. The Homeland Security Act of 2002, Public Law 107–296, section 102, 116 Stat. 2135 (Nov. 25, 2002), 6 U.S.C. 112, and the Immigration and Nationality Act of 1952, as amended (INA or Act), section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security with administration and enforcement of the immigration and naturalization laws. DHS implemented an electronic signature provision for immigration benefit filings with USCIS in 2003. *Electronic Signature on Applications for Immigration and Naturalization Benefits,* 68 FR 23010 (April 29, 2003). The Secretary promulgates this final rule under the broad authority to administer the Department of Homeland Security, and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority.

DHS is also adding new fees to the USCIS fee regulations as required by recent legislation. Effective August 13, 2010, Public Law 111–230 imposes additional fees on certain H–1B and L–1 nonimmigrants. 124 Stat. 2485 (Aug. 13, 2010); New 8 CFR 103.7(b)(1)(v).

*C. USCIS Transformation Initiative*

USCIS is engaged in an enterprise-wide transformation effort to implement new business processes and to improve service, operational efficiency, and national security. USCIS's new operational environment will employ online accounts, such as those used by many private sector organizations.

Applicants and petitioners will be able to access individualized accounts that will provide electronic access to information on how to apply for benefits, allow easier filing, and permit applicants and petitioners, and their representatives, to track the status of open applications and petitions. Applicants and petitioners will be able to use a secure USCIS Internet Web site to access accounts "on-demand" in an electronic service environment available at all times.

USCIS will develop new automated case management tools to access data electronically, prevent the loss of information, and provide adjudicators with a comprehensive view of an alien's immigration history. USCIS's electronic environment will facilitate and expedite information collection, reduce benefit fraud and result in more consistent and efficient decisions. USCIS is supplementing existing paper filing options by adding more user-friendly electronic filing options.

USCIS will improve many of its internal security, operational efficiency, and public service capabilities as transformation proceeds. USCIS will first allow the creation of accounts for various applicants, followed by enhanced e-filing and case management capabilities, and then improve reporting and Freedom of Information Act (FOIA), 5 U.S.C. 552, tools. Once deployed, these tools will be applied and made available to the immigrant, humanitarian, and nonimmigrant applicant populations.

USCIS's transformation to an electronic environment is based on three objectives and long-term benefits: enhanced national security and integrity of filings, public service, and operational efficiency. USCIS's transformation will use modern electronic audit and investigative methods to improve national security and integrity by identifying potential fraud and other risks by effectively collecting, analyzing and sharing information used to verify an alien's or other individual's identity and eligibility for various immigration benefits. USCIS will use a more complete picture of an alien's immigration history by analyzing information across benefit applications, thus exposing those attempting to perpetrate fraud or who are otherwise ineligible for immigration benefits. For example, an applicant's or beneficiary's marital or employment history in an existing agency file or in another pending application may provide relevant information that differs from the information in the application or petition being adjudicated. A responsible and transparent approach toward the handling of such personal information protects the rights of individuals and organizations interacting with USCIS and thereby fosters their trust and cooperation. At the same time, this approach facilitates authorized sharing of information with partner components of DHS—such as U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—in a secure environment that better protects against unauthorized disclosures. This approach will facilitate authorized sharing of information with partner agencies—such as the Department of State (DOS) and the Department of Justice (DOJ). In addition, electronic transmission and storage of information is faster, less costly and more secure than the physical movement of paper files.

**AR2022_200229**

USCIS will improve public service by adjudicating requests for benefits more accurately and quickly, and by providing more timely and accurate information about immigration benefits and the status of benefit requests. Applicants, petitioners, and their representatives will have access to relevant forms, instructions, case status, and other actions and information through online accounts that organize information and transactions to meet their needs. DHS will continue to ensure the confidentiality of its immigration records in accordance with the requirements of the law, including the Privacy Act, 5 U.S.C. 552a,[1] and 8 CFR 208.6. USCIS's transformation to an electronic environment will enable it to become an innovative and agile organization that better understands its workload and best uses all available resources, investing in its people and infrastructure to ensure cost-effective and consistent results.

*D. How Transformation Will Work*

USCIS adopted a ''person-centric'' business approach to transformation based on establishing various types of individual and organizational accounts. The key to this approach is encouraging individual applicants, petitioners, beneficiaries, organizations, legal representatives, and others who interact with USCIS to access their own online accounts. Applicants, petitioners, and others will be able to electronically submit benefit requests with supporting documentation, access status information regarding pending benefit requests, change their addresses and contact information, obtain FOIA-related materials, and comply with some registration requirements of the Immigration and Nationality Act.

USCIS's transformation will create an end-to-end electronic adjudicative process encompassing an alien's entire immigration lifecycle, unlike the current process that uses multiple systems and focuses on each individual benefit request. Data initially provided by account holders will be reused, if appropriate, to reduce data entry required for subsequent benefit requests. Additional and revised data will be used to update and enhance account information. Account data submitted to support various immigration benefit transactions will be verified, where feasible and appropriate, through links to other internal and external data systems, potentially reducing the need for applicants and petitioners to provide certain forms of supporting evidence and reducing potential requests for evidence from USCIS.

USCIS's transformation will eventually affect all aspects of USCIS benefit processing operations and technology. This operational concept is intended to standardize processes across USCIS operations relating to case intake, biometrics, background checks, adjudication, scheduling, and notifications. USCIS benefit adjudication operations will be changed incrementally from a paper- and hard copy file-based process to an electronic process, making it possible to process benefit requests more efficiently. With the implementation of these improvements, USCIS will enhance the overall process.

*E. Other Regulatory Changes Necessary for the Transformation Initiative*

DHS anticipates that additional regulatory changes will be required over the next several years as the transformation of USCIS to an electronic environment progresses. DHS expects, for example, to revise regulations pertaining to filing and handling of immigrant benefit requests to lead to computer system enhancements applied to immigrant applications and benefits. DHS will not make transformation-related changes to 8 CFR part 214 at this time, but will publish a separate rulemaking to address business transformation as well as reorganizing and simplifying that part.

**III. The Changes Made by This Rule**

DHS is amending those parts of chapter I of 8 CFR that regulate affidavits of support, citizenship and naturalization, employment authorization, nonimmigrant benefits (other than part 214) and related waivers, permanent resident documents, refugee and asylum processing, Temporary Protected Status, and travel documents. These amendments are best understood by the changes effected, rather than as individual amendments to the regulations.

*A. Removing Form Title and Number References, and Adding Filing Definitions*

DHS is removing references to form numbers and form titles. At this time, USCIS will continue to accept paper submission of most applications, petitions, and benefit requests, although it will phase out references to mandatory use of specific forms for specific purposes in the regulations. Mandating in regulations specific form numbers reduces USCIS's ability to modify its business processes to reflect filing procedures in an electronic environment. Form names and numbers will continue to exist for reference purposes but will not be specifically referenced in the regulations. This rule is an early step in the transformation process and purposely does not remove all form references from all regulations affecting USCIS procedures at this time. Forms identified by number will continue to appear until other parts of DHS regulations are amended to address transformation requirements. The list of prescribed forms will be removed from 8 CFR parts 299 and 499, although USCIS will continue to refer to form numbers on its Internet Web site, at *http://www.uscis.gov,* and public information telephone scripts. DHS components ICE, and CBP will likewise continue to refer to form numbers on their Internet Web sites, *http://www.ice.gov,* and *http://www.cbp.gov.*

In most instances, DHS is removing form names and numbers by replacing the form reference with a generic statement, such as ''the form designated by USCIS.'' Removal of these references from a paragraph or section in some instances, however, requires changes which cannot be achieved through replacement of a term or phrase. In those instances, the entire paragraph is revised.

DHS is removing references to the specific forms known by form numbers: AR–11, G–28, G–325, I–90, I–94, I–102, I–129, I–130, I–131, I–191, I–192, I–193, I–212, I–290B, I–407, I–512, I–539, I–551, I–566, I–589, I–590, I–601, I–602, I–607, I–644, I–688, I–730, I–765, I–797, I–797A, I–797B, I–821, I–854, I–864, I–864A, I–864P, I–865, I–907, I–914, I–917, I–918, N–300, N–400, N–426, N–565, N–600, and N–643. This list is not intended to be exhaustive, nor are all references to the listed forms removed by this final rule. Additional references to these and other USCIS forms will be phased out in subsequent rules. DHS is not removing references to forms that primarily affect the functions of DHS components other than USCIS.

Enumerating OMB control numbers for USCIS information collection requirements in regulations is no longer necessary and, therefore, 8 CFR 100.7 is being removed. OMB control numbers continue to be displayed on USCIS forms pursuant to the Paperwork

---

[1] The Privacy Act grants United States citizens and lawful permanent residents the right to access and amend their records. DHS policy, as a matter of discretion, permits nonimmigrant aliens equivalent ability to access and correct records. *Memorandum for Directorate and Component Leadership from Hugo Teufel III, Chief Privacy Officer, DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons,* Memorandum 2007–1 (January 19, 2007), found at *http://www.dhs.gov/xlibrary/assets/privacy/privacy_policyguide_2007-1.pdf.*

**Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations   **53767**

Reduction Act, 44 U.S.C. 3512, and on the USCIS Internet Web site.

DHS is adding new definitions for "application," "petition," and "benefit request" to transition from "forms" to either paper or electronic instruments used to seek various immigration benefits. The terms "application" and "petition" are used together, separately, and interchangeably in many sections of chapter I of the 8 CFR and this rule does not affect every reference to those terms. The term "benefit request" is often used in the sections amended by this rule in place of application or petition in the interest of economy of words, to reduce the ambiguity and confusion resulting from the constant use of both terms, improve readability, and to add flexibility for describing what a particular capability may be called when it is converted to an electronic interaction. No substantive change results from defining these terms in this rule.

As the USCIS transformation initiative progresses, electronic versions of forms and digital images of supporting documents will largely replace paper forms and documents for adjudication and records retention purposes. USCIS will specify the process and standards for the transmission of electronic benefit requests and supporting documents on its Internet Web site, but it is intended that these standards will accommodate the technology in most home and public computers so as to be widely accessible.

DHS is adding a definition of "form instructions" to establish that the term refers to the most recent, approved version of such instructions available through the USCIS Internet Web site, regardless of the fact that other editions of these instructions may exist and be in circulation through other sources. Whether published in paper form or on the USCIS web site, all form and form instructions will continue to comply with Paperwork Reduction Act requirements, including public notice and comment periods. 44 U.S.C. 3507. In addition to traditional instructions appended to a USCIS form, the term as defined by this rule encompasses the process information (*e.g.,* filing locations, instructions on the process for submission of supporting documents) that USCIS publishes on its Internet Web site in addition to those traditional instructions, and may also include non-form and non-substantive guidance such as appendices, exhibits, guidebooks, or manuals.

USCIS does not publish its Registration for Classification as Refugee, Form I–590, with instructions for the U.S. Refugee Admissions Program (USRAP), for general public use. Access to the USRAP is managed by DOS, and implemented by its overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Registration for Classification as Refugee. As such, the term "form instructions" includes process information that USCIS publishes about the USRAP.

DHS is adding a definition for the terms "execute" or "executed" when referring to completion of an application or petition to expand a benefit to ensure consistency across paper and electronic media.

## B. Removing References to Position Titles Within USCIS

Wherever possible, DHS is removing references to official position titles used within DHS or used in the past by the former Immigration and Naturalization Service (INS). These titles include director, district director, and commissioner as well as position descriptions such as examiner or adjudicator. Both position titles and delegated authority to perform specific duties assigned to USCIS employees are subject to change, potentially rendering regulatory references inaccurate or delaying implementation of planned operational changes. DHS is revising those titles and position descriptions with USCIS, DHS, or other component names, as appropriate and necessary to provide DHS with the operational flexibility required to facilitate adjudication in an electronic environment. DHS is also replacing obsolete references to the Attorney General, substituting the Secretary where appropriate.

DHS is, for example, amending 8 CFR 103.7(d) by removing the specific titles of USCIS employees who are designated to certify official immigration records. DHS and USCIS will delegate authority to appropriate officials who may be required to fulfill this responsibility.

## C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices

The definition of "Service" in newly designated 8 CFR 1.2 is amended to provide flexibility and promote the goals of transformation. The regulations in chapter I of the 8 CFR contain provisions that, to varying degrees, govern facets of all of the immigration components of DHS—CBP, ICE, and USCIS. Where DHS has determined that the section being amended by this rule applies only to USCIS, that defined acronym is inserted to replace the

previously named office, position, title, or component. Where the section pertains to an action that may have been taken by INS, or a function that is the purview of or shared with another component, the term "the Service" is retained or inserted. Thus, "the Service" in 8 CFR may refer to any immigration-related component of DHS, including USCIS, ICE, or CBP. As DHS does not purport to revise every paragraph within 8 CFR, the absence of a change to an existing usage of "Service" in a particular context does not necessarily indicate a position with respect to component authority in that context. Similarly, remaining references to the former Immigration and Naturalization Service and the acronym INS are replaced by more accurate terms.

## D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests

Some parts of the regulations include details of the internal processing and handling of benefit requests or descriptions relating to submission of paper versions of benefit request forms. Administrative filing requirements, locations, and procedures will not be prescribed in regulations but will be outlined in more flexible methods of conveying instructions. This modification will not change eligibility criteria or evidentiary standards. *See, e.g.,* 8 CFR 212.7(a)(3) ("* * * If the application is approved the director shall complete Form I–607 for inclusion in the alien's file."). *See also* 8 CFR 214.2(l)(5)(ii)(E), ("* * * The consular officer shall also endorse all copies of the alien's Form I–129S with the blanket L–1 visa classification and return the original and one copy to the alien. When the alien is inspected for entry into the United States, both copies of the Form I–129S shall be stamped to show a validity period not to exceed three years and the second copy collected and sent to the appropriate Regional Service Center for control purposes.") These details are not essential to the regulations, do not add substantive requirements or impose limitations, and unnecessarily burden the text of the regulations. To the extent that this information is required to be published, 5 U.S.C. 552(a)(1)(A), (B), DHS will publish an organization and functions rule in part 2 of 8 CFR. DHS is removing these types of provisions because they are subject to change during transformation and because such information is more appropriately included within field manuals and other instructional materials that USCIS can readily revise and describe in more detail.

**AR2022_200231**

**53768**   **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

Terms such as ''in writing,'' ''written decision,'' and ''written notice'' have not been removed because an electronic transmission constitutes a valid writing. GPEA provides: ''Electronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form.'' Public Law 105–277, tit. XVII, section 1707, 112 Stat. at 2681–751 (Oct. 21, 1998) . GPEA defines electronic signature as ''*  *  * a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message; and indicates such person's approval of the information contained in the electronic message.'' *Id.* Thus, as provided in GPEA, a notice on the status of a request for benefits, a request for additional evidence, and a notice of approval or denial of a request for benefits may be effected by electronic communication if that method is requested by the person who has requested the benefit, notwithstanding a regulatory provision that requires such notice to be ''in writing.'' Nonetheless, for clarity's sake, 8 CFR 103.8 provides that electronic delivery of notices suffices in appropriate circumstances. *See* new 8 CFR 103.8.

*E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes*

DHS is also removing regulatory provisions that have expired because of statutory lapses or self-executing time limits, or that are obsolete, and to make non-discretionary corrections to provisions affected by statutory amendments or extensions of time. In addition, DHS revises obsolete statutory and regulatory citations.

DHS is adding three paragraphs to USCIS fee regulations to reflect statutory fees which are already collected but which were not previously included in regulations. *See* new 8 CFR 103.7(b)(1)(i)(CCC)–(EEE). The additions provide the $1500 or $750 fee for filing certain H–1B petitions required by the American Competitiveness and Workforce Improvement Act (ACWIA), the additional fee of $500 for filing certain H–1B and L petitions established by Section 426 of the Visa Reform Act of 2004, and the additional $150 fee for H–2B petitions required by the Real ID Act of 2005. *See,* respectively, INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B); INA section 214(c)(12)(C), 8 U.S.C. 1184(c)(12)(C); INA section

214(c)(13)(C), 8 U.S.C. 1184(c)(13)(B). These fees are used, generally, for training, scholarships, and fraud detection and prevention. INA sections 286(s), (v), 8 U.S.C. 1356(s), (v). USCIS determines liability for both of these fees and calculates the amount due through a series of questions on the H and L petition form. The determination process is unchanged by this rulemaking. Provisions are also added to prescribe a fee of $2000 for certain H–1B nonimmigrants or $2250 for certain L–1 nonimmigrants as required by recent legislation. Public Law 111–230, section 402, 124 Stat. 2488 (Aug. 13, 2010). Fees collected pursuant to these sections are deposited in the General Fund of the Treasury. *Id,* at section 402(c). DHS is not required to publish these fees in the CFR since the statute is clear in requiring their collection and use. Nevertheless, most USCIS stakeholders know to refer to 8 CFR 103.7 for the proper USCIS fees, and DHS believes it is a better practice to make sure that these statutorily mandated fees are also clearly delineated along with the fees established administratively by DHS through rulemaking.

Section 209.1(f) is a companion provision to match the existing provision in 8 CFR 209.2(b), which sets out the process and standards for asylees seeking adjustment of status who require a waiver of inadmissibility. Since both refugees and asylees applying for adjustment of status are subject to identical standards for waivers of inadmissibility these standards are now reflected in this section addressing both types of applicants. INA section 209(c), 8 U.S.C. 1159(c).

Since the statutory cap on adjustment by asylees has been removed, the text referencing that cap—at 8 CFR 209.1(a)(1)(vi) and the sentence that follows—are removed. For the same reason, 8 CFR 209.2(a)(2) is revised by removing the last three sentences of the paragraph. *See* Public Law 109–13, tit. I, section 101(g), 119 Stat. 302 (May 11, 2005), 8 U.S.C. 1101 note.

DHS is revising 8 CFR 209.2(d) to clarify that a medical examination, including compliance with vaccination requirements, is required of asylees applying for adjustment of status. The vaccination supplement no longer exists as a stand-alone document but rather is incorporated into the medical examination. Form instructions provide detailed guidance regarding the medical examination requirement.

DHS is removing 8 CFR 212.8 and 212.9, relating to nonpreference investor visas and to former third and sixth

preference employment-based visas, because the provisions are obsolete. The provisions of the Act that provided for these visas were repealed by section 111 of the Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (Nov. 29, 1990).

DHS is removing 8 CFR 212.11, which regards the admissibility of an alien who has been convicted of a violation of a law relating to a controlled substance because it is redundant. This section provided that in determining the admissibility of an alien who has been convicted of a violation of any law relating to a controlled substance, the term controlled substance as used in section 212(a)(23) of the Act shall mean the same as that referenced in the Controlled Substances Act, 21 U.S.C. 801, *et seq.* Section 212(a)(2) of the Act governs inadmissibility for criminal acts and Section 212(a)(2)(A)(i)(I) specifically includes violations of the Controlled Substance Act. INA section 212(a)(2)(A)(i)(II), 8 U.S.C. 1182(a)(2)(A)(i)(II).

DHS revised Section 244.17 to reflect current policies and procedures for re-registration of TPS beneficiaries.

DHS is removing 8 CFR 245.1(e)(2) as obsolete. This section provided for the adjustment of status of certain nonimmigrant registered nurses in accordance with the Immigration Nursing Relief Act of 1989, Public Law 101–238, 103 Stat. 2099 (Dec. 18, 1989), 8 U.S.C. 1182 note. The application period for this provision ended on March 20, 1995, and USCIS no longer has pending applications related to this provision. This regulation also makes related conforming changes to 8 CFR 245.1(g)(1) and 245.2(a)(5)(ii).

Section 245.9 is removed. This section provided for adjustment of status for certain Chinese nationals pursuant to the Chinese Student Protection Act, Pub. L. 102–404, 106 Stat. 1969 (Oct. 9, 1992). The application period for this provision ended June 30, 1994, and USCIS no longer has pending applications related to this provision. *Id.*

Section 245.12 is removed. This section provided for adjustment of status for certain Polish and Hungarian parolees pursuant to section 646 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, 110 Stat. 3009 (Sep. 30, 1996). Persons eligible for benefits under this provision must have been paroled into the U.S. prior to December 31, 1991. USCIS has not received applications pursuant to this section for several years and is unlikely to receive any in the future. Public Law 104–208, 110 Stat. 3009 (Sep. 30, 1996).

Section 245.13 is removed. This section provided for adjustment of status for certain nationals of Nicaragua and Cuba pursuant to section 202 of the Nicaragua Adjustment and Central American Relief Act, Public Law 105–100, 111 Stat. 2160, 2193 (Nov. 19, 1997). The application period for benefits under this provision ended April 1, 2000. USCIS no longer has pending applications pursuant to this provision. *Id.*

Section 245.20 is removed . This section provided for adjustment of status of Syrians granted asylum under the Syrian Adjustment Act, Public Law 106–378, 114 Stat. 1442 (Oct. 27, 2000). Eligibility under this provision required entry prior to Dec. 31, 1991. USCIS no longer has pending applications pursuant to this provision and is unlikely to receive any in the future.

Section 245.21 is revised because the Consolidated Appropriations Act of 2005 amended the Indochinese Parolee Act to eliminate the 3-year filing window and 5,000 visa limit.

Parts 264 and 265 are revised to encompass management of fingerprinting, registration, and address reporting requirements in an electronic environment and to remove obsolete references.

This rule adds 8 CFR 316.6 and revises 8 CFR 316.5, 8 CFR 322.2, and 8 CFR 341.5 to conform to the amendments to the Act by the National Defense Authorization Act (NDAA 2008), Public Law 110–181, 122 Stat. 3 (Jan. 28, 2008). The NDAA 2008 provides certain immigration benefits for any qualifying spouse or child of a member of the Armed Forces. Specifically, the NDAA 2008 amended section 319(e) of the Act; 8 U.S.C. 1430(e), to allow certain spouses of members of the Armed Forces to count any qualifying time abroad as continuous residence and physical presence in the United States for purposes of naturalization and to permit such naturalization to occur outside the United States. INA section 319(e), 8 U.S.C. 1430(e); INA section 322(d), 8 U.S.C. 1433(d); 8 U.S.C. 1443a.

This rule revises 8 CFR 319.3 to conform to the amendments to the INA by the National Defense Authorization Act (NDAA 2004), Public Law 108–136, 117 Stat. 1565 (Nov. 24, 2003), which provides certain immigration benefits relating to the naturalization of any qualifying surviving child or parent of a member of the Armed Forces. Specifically, NDAA 2004 provides for the naturalization of any qualifying surviving child or parent of a member of the Armed Forces who dies during a period of honorable service, a benefit

only previously afforded to surviving spouses. INA section 319(d), 8 U.S.C. 1430(d).

This rule revises 8 CFR 322.3 to conform to the various legislative amendments to the Act. Specifically, 8 CFR 322.3(a) was revised to conform to the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273, enacted on November 2, 2002, which amended section 322 of the Act to allow U.S. citizen grandparents and U.S. citizen legal guardians to apply for naturalization on behalf of a child born and residing outside of the United States. Public Law 107–273, 116 Stat. 1758 (Nov. 2, 2002); *see* INA section 322, 8 U.S.C. 1433(a). Such an application by the U.S. citizen grandparent or U.S. citizen legal guardian can be made within 5 years of the death of a U.S. citizen parent of a child who could otherwise have been the beneficiary of an application for naturalization under section 322 of the Act. *See Id.* This change will conform the regulations to legislation and current practice.

In addition, current 8 CFR 322.3(a) requires the citizen parent (or, as appropriate, grandparent or guardian) to include with the application a request concerning when the applicant would like to have the child's naturalization interview scheduled. The form instructions elicit the information needed to schedule the interview. Therefore, there is no need for a separate provision on this point in 8 CFR 322.3(a).

This rule revises 8 CFR 322.3(b) to conform to the amendments to the Act made by the Intercountry Adoption Act of 2000, Public Law 106–279, which added a definition of certain adoptees to section 101(b)(1)(G) of the Act on October 6, 2000. 114 Stat. 825 (Oct. 6, 2000). The new definition describes children adopted in a foreign state that is a party to the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption of May 22, 1993. INA section 101(b)(1)(G), 8 U.S.C. 1101(b)(1)(G). That definition under section 101(b)(1)(G) of the Act corresponds to the visa categories IH–3 and IH–4 and became effective when the Hague Adoption Convention entered into force in the United States on April 1, 2008. *See id.* USCIS implemented the Intercountry Adoption Act by publishing an interim rule, "Classification of Aliens as Children of United States Citizens Based on Intercountry Adoptions Under the Hague Convention," on October 4, 2007. *See* 72 FR 56831 (Oct. 4, 2007). The additional changes in this rule conform

to the requirements codified on that date and which have been followed since April 1, 2008.

In addition, several expired and obsolete naturalization-related regulatory provisions have been removed, including 8 CFR: 312.3(a) (standardized citizenship testing), 329.5 (natives of the Philippines with active duty service during World War II), 332.2 (establishment of photographic studios), 334.16–334.18 (naturalization petitions), 335.11–335.13 (naturalization petitions), 338.11 and 338.12 (naturalization court processes), 339.2(c) (reports relating to petitions filed prior to October 1, 1991), and 340.1 (reopening of a naturalization application by a district director pursuant to section 340(h) of the Act).

In 8 CFR 312.3, paragraph (a) is removed because the "standardized citizenship testing" for applicants for naturalization ended on August 30, 1998. *See* 63 FR 25080 (May 6, 1998).

Section 329.5 is removed because the filing period for submitting an application for naturalization under section 405 of the Immigration Act of 1990, the corresponding statutory naturalization authority, expired on February 3, 1995. *See* 8 CFR 329.5(e).

Sections 334.16–334.18, 335.11–335.13, and 339.2(c) are removed because they relate to any "petition for naturalization" filed prior to October 1, 1991. Such petitions were under the jurisdiction of the naturalization court until that date. *See* 8 CFR 310.4; INA section 310, 8 U.S.C. 1421.

*F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency, and To Remove Duplicative Information*

DHS is reorganizing 8 CFR part 1 (Definitions) and 8 CFR part 103 (Immigration Benefits, Biometric Requirements, Availability of Records), without substantive change. The reorganization of these sections does not introduce new obligations, requirements, or procedures. The reorganization is designed to simplify and rearrange existing regulatory requirements in a manner which is easier for the public to identify and understand. This rulemaking also removes regulatory provisions which repeat statutory or other regulatory information or which restate filing information that USCIS routinely includes in its form instructions. None of the changes made effect a substantive change in the law. DHS is also reorganizing certain parts of 8 CFR without substantive change. DHS intends, in the recodification of these regulations, to conform to the understood policy, intent, and purpose of the original regulations, with such

AR2022_200233

amendments and corrections as will remove ambiguities, contradictions, and other imperfections.

The regulations pertaining to filing and adjudication of immigration benefits are contained in 8 CFR 103.2. That section also incorporates the specific requirements contained in USCIS form instructions. *See* 8 CFR 103.2(a)(1). Repeating or paraphrasing parts of this information within other regulations that relate to specific benefits is unnecessary, possibly confusing, and may be inaccurate. Such repetition can lead the reader to conclude that a provision is somehow uniquely applicable to that particular benefit type. For example, "* * * The director shall consider all the evidence submitted and such other evidence as he or she may independently require to assist his or her adjudication" is repetitive information found within another regulation. *See* 8 CFR 214.2(h)(9)(i). Or, "* * * A copy of a document submitted in support of a visa petition filed pursuant to section 214(d) of the Act and this paragraph may be accepted, though unaccompanied by the original, if the copy bears a certification by an attorney, typed or rubber-stamped, in the language set forth in § 204.2(j) of this chapter. However, the original document shall be submitted if requested by the Service" is both repetitive and inaccurate because the referenced paragraph and procedure no longer exist. *See also* 8 CFR 214.2(k)(1).

This rule organizes 8 CFR part 103 into four subparts: subpart A—Applying for Benefits, Surety Bonds, Fees; subpart B—Biometric Requirements; subpart C—Reserved; and subpart D—Availability of Records.

Section 103.1 is removed. The delegation of authority, formerly found in 8 CFR 103.1(a), was redundant of authority specified in 8 CFR 2.1. Section 103.2(a) is revised, primarily to describe alternate procedures for electronic submission of benefit requests with digital images of supporting documentation. With the definition of "benefit request" added in 8 CFR part 1, the terms "application" and "petition" are being replaced by the term "benefit request" to reduce possible confusion regarding the use of specific paper versions of forms traditionally required to apply for benefits. As stated earlier, the terms "petition" and "application" are not being replaced throughout the rest of this chapter I and will be accorded the meaning now ascribed to them in 8 CFR part 1. Although this paragraph was recently revised, the additional changes made by this rule will clarify filing procedures for both the current

environment and the electronic environment.

Section 103.2, paragraph (a)(7) is revised to describe establishment and recordation of filing dates for benefit requests in an electronic environment. That paragraph had previously described procedures that reflected regular mail, hand delivery, and internal actions of USCIS for physically handling paper, such as stamping files with dates by hand. Specific internal procedures for determining how receipt dates and times are to be associated with a particular benefit request for which date and time are appropriate, or even essential, will be established for requests that will be received electronically, in paper format, or both. USCIS realizes that the date of filing is very important when a benefit request has a deadline or a date-specific impact on eligibility. Such benefit requests are not affected by this rule because the date the benefit request is received by USCIS will still be recorded in the system. While the internal process for recording the date when a request is received or complete will not be promulgated, the ability of filers of a benefit request to obtain a definitive receipt date will not be affected by removing the requirement for USCIS to stamp receipt dates.

In addition, 8 CFR 103.2(a)(7) is revised to eliminate possible inconsistency with 8 CFR 103.2(a)(1), clarifying that USCIS may reject a benefit request if data was not been entered in required fields. Further, 8 CFR 103.2(a)(7)(iii) is added to codify the current policy that there is no appeal when a case is rejected in accordance with this section. In USCIS parlance, the term "rejected" means that the benefit request and fee payment are returned for failure to comply with all filing requirements without being fully considered, and can be re-filed when properly completed, while "denied" means that the request is fully adjudicated and considered, and the applicant is determined ineligible for the benefit sought. Appeals of rejections are generally returned without consideration. Therefore, this change is only clarifying and has no substantive effect.

Section 103.2(b)(1) is revised to update terminology and to clarify that every applicant or petitioner must remain eligible for the benefit request at the time of adjudication and that every benefit request must be submitted with all prescribed supporting documentation. USCIS longstanding policy and practice, as well as a basic tenet of administrative law, is that the decision in a particular case is based on

the administrative record that exists at the time the decision is rendered. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402 (1972). Thus, the granting of any benefit request by DHS is not based solely on what is provided at the time of the initial request and is contingent on the fact that circumstances will not change during the processing of a benefit request in such a way so as to render the applicant ineligible. This change will reduce any confusion that may exist for those who believe that eligibility is based solely on what is provided at the time of the initial request and instead will clarify that eligibility is subject to change if circumstances change while processing occurs. This clarification may be especially important in the transformed electronic environment. This revision is not a substantive change in eligibility criteria and is thus appropriate for this final rule.

Sections 103.2, paragraphs (b)(4) and (b)(5) are revised to refer applicants and petitioners to form instructions and other sources for information on the format in which supporting documentation must be submitted. It is generally unnecessary to specify the form that an evidentiary document must be in unless a higher degree of authenticity is required than a photocopy or reasonably legible facsimile. The form instructions for a benefit request will clearly spell out when a copy, original, certified, notarized, or other specific type of document is required to meet the applicable evidentiary standard. In its transformation initiative, DHS wants to accept and use scanned or electronic documents whenever possible and believes that this approach will also be the most convenient method for the public. As stated, regulatory provisions that reflect a paper application process impede that goal. Allowing a digital format instead of a copy would not affect a person's eligibility for a benefit. Thus, this change is made without prior public comment.

This rule also eliminates express reference to Form G–884, currently used to request the return of original documents, and advises the public to follow USCIS instructions for requesting such documents. Eliminating reference to a specific form promotes greater regulatory flexibility and better accommodates future processing efficiencies. USCIS anticipates using the current form for several years during the transformation process and will continue to provide instructions for requesting the return of paper documents retained in DHS files through its Internet Web site, the USCIS

**Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations    **53771**

Customer Service Center, or other methods. *See* new 8 CFR 103.2(b)(4).

Section 103.3 is amended by revising the term ''shall file'' to read ''must submit'' and revising the phrase ''with the office where the unfavorable decision was made'' to read ''as indicated in the applicable form instructions'' in the last sentence in paragraph (a)(2)(i). This change will make this section more consistent with the changes made and terminology used in the Filing Location Rule. The word ''shall'' is less clear than ''must'' so substituting ''must'' clarifies the provision without changing the clear meaning. While the terms ''file'' and ''filing'' are not changed throughout 8 CFR by this rule, the amendment is apt in this instance for clarity because the term ''file'' seems to imply a paper environment, as opposed to ''submit,'' which lends itself more clearly to both paper and electronic submissions. The provision requiring submission to a certain office location is removed in favor of form instructions which, as defined in this rule, will provide the flexibility to centralize or otherwise shift appeals based on future needs and developments. No substantive change is made to eligibility requirements.

As transformation progresses, USCIS develops system interfaces with other government information systems, reducing reliance on various forms of documentation currently supplied by benefit applicants. For example, proof of military service is more readily obtained by USCIS directly from the Department of Defense than from the applicant. Section 103.2, paragraph (b)(5) has been amended to clarify that USCIS may waive submission of documentation that it may obtain through direct interfaces.

Section 103.5a is redesignated as 103.8 and revised. This revision provides for electronic delivery of notices instead of paper notices in appropriate circumstances at the petitioner's or applicant's request. Absent such a request, a mailed paper notice remains the default option at this time. Amendments to the descriptions of routine and personal service used for delivery of notices now include a specific provision for the use of electronic media for such purposes. For consistency of process, this rule amends other sections to remove specific requirements of the notice and instead cross references the notice and service provisions in 8 CFR 103.8.

Section 103.5b is redesignated as 103.9 and revised. References to Form I–824, currently used to request further action on an approved benefit request, are removed. As transformation progresses, it is envisioned that the need

for this form will diminish because account holders will request the services currently provided by the form by accessing their own accounts.

Section 103.7, paragraph (d) is amended to remove specific references to officials authorized to certify immigration forms. This change will give USCIS flexibility to delegate authority for this activity to various officials as necessary for efficiency.

Section 103.2, paragraph (e), relating to fingerprint requirements, is revised and redesignated as sections 103.16 and 103.17. These sections have been reorganized and revised to reflect that most USCIS biometric collection is now accomplished digitally at USCIS offices. Paragraph (c) of 8 CFR 103.2, explaining the consequences of failure to provide biometric information, must be read in conjunction with 8 CFR 103.2(b)(13), which provides standard exceptions for such failure. This regulation removes references to specific offices where applicants must report for biometrics collection to allow USCIS greater flexibility for handling such matters. USCIS will continue to provide such information through other means.

Newly designated 8 CFR 103.17 describes biometric service fee collection requirements formerly described in 8 CFR 103.2(e). Revisions to this section more clearly reflect existing regulatory requirements regarding the authorized collection of biometrics.

Sections 103.8 through 103.11 and sections 103.21 through 103.36, which pertain to Freedom of Information and Privacy Act requests, are removed because they are outdated. Current DHS policies and procedures on these subjects are contained in 6 CFR part 5. New 8 CFR 103.42 has been added to direct readers to the DHS regulations.

Regulations relating to submission and consideration of benefit requests are located at 8 CFR 103.2(a)(1) (general filing instructions), 8 CFR 103.2(b)(1) (demonstrating eligibility for the benefit), 8 CFR 103.2(b)(16)(ii) (consideration of evidence in discretionary decisions), and in the form instructions such as for Form I–129 ''*   *   * By signing this form you have stated, under penalty of perjury (28 U.S.C. 1746) that all information and documentation submitted with this form are true and correct. You have also authorized the release of any information from your records that USCIS may need to determine eligibility for the benefit you are seeking and consented to USCIS verification of such information.'' Accordingly, because processing and handling information which is broadly applicable to all USCIS

benefit types is set forth in both 8 CFR 103.2 and in the instructions to various forms, USCIS is removing such information from regulations governing consideration of specific benefits.

Section 207.1(a) is revised to instruct prospective applicants to ''submi[t] an application, including biometric information, in accordance with form instructions.'' The term ''form instructions'' is in turn defined in 8 CFR 1.2 as those prescribed by USCIS on its official Internet Web site currently, notwithstanding other versions in circulation, and may also include non-form guidance such as appendices, exhibits, guidebooks, or manuals. In the context of the U.S. Refugee Admissions Program (USRAP), USCIS does not publish its Form I–590, with instructions, for general public use. Instead, access to the USRAP is managed by the DOS, and implemented by its contracted overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Form I–590. As such, the term ''form instructions,'' as defined in 8 CFR 1.2 and used in 8 CFR 207.1(a), does not refer to traditional instructions appended to a USCIS form, but rather the process information that USCIS publishes about the USRAP.

Sections 207.1, paragraphs (b) and (c) are revised by consolidating the existing firm resettlement rule in paragraph (b) and removing paragraph (c). To emphasize the legal relevance of the firm resettlement analysis, this revision moves the third sentence of original paragraph (b) to the forefront. This consolidated provision more clearly articulates that the ''considerations'' enumerated in new paragraphs (b)(1) through (b)(3) apply to the firm resettlement analysis generally and not, as may be misconstrued from the existing, bifurcated structure, only to an analysis of whether an applicant is ''not firmly resettled.'' No substantive changes are made by these structural modifications of the firm resettlement rule.

Re-numbered paragraph 207.2(a) has also been re-titled from ''hearing'' to ''interview,'' to better reflect the nature of USCIS interaction with refugee applicants. No substantive change is intended.

Section 207.7(d) is amended by eliminating an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation, this rule eliminates an express

requirement that "separate" petitions be filed for each qualifying family member, in favor of guidance that petitioners file "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members. This change will accommodate the adoption of such efficiencies without need for a future rulemaking.

Section 207.7(b)(3) is amended by adding an opening phrase to the last sentence, "[f]or a derivative inside or arriving in the United States." While this section, entitled "Benefits," applies to both paragraphs (f)(1) (derivative in the United States) and (f)(2) (derivative outside the United States), the last sentence was added to clarify that the benefit of employment authorization, incident to refugee status, becomes available to overseas beneficiaries, not upon approval of the family petition, but upon travel and their admission into the United States as refugees.

Section 208.1(b) is revised by replacing "The Director of International Affairs" with "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)" where it first appears and with "Associate Director of RAIO" in later references. Similarly, section 208.2(a) is revised by replacing "Office of International Affairs" in the title with "Refugee, Asylum, and International Operations (RAIO)," and by replacing "the Office of International Affairs" wherever it appears with "RAIO." As stated earlier this rule removes specific officers' titles, functions, and authorities where possible, and employee authorities are generally established pursuant to 8 CFR section 2.1. However, DHS has determined that the roles, functions, and authorities of asylum officers and who they report to are sufficiently distinct as provided in the INA so as to preclude substitution of USCIS for those titles where they appear in the Code of Federal Regulations. For example, INA section 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), under the expedited removal statute, defines "asylum officer" as an "* * * immigration officer who (i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and (ii) is supervised by an officer who meets the conditions described in clause (i) and has had

substantial experience adjudicating asylum applications." Retaining these titles is not expected to impair USRAP and RAIO from applying the principles of transformation to their operations in the future.

Section 208.5(b)(1)(ii) is revised to perfect an amendment made in the Filing Location Rule. In that rule, 8 CFR 208.4(b) was revised by referring applicants to the instructions on the Form I–589 for specific filing information and thereafter by eliminating specific instructions contained in former sections 208.4(b)(1)–(5). This rule implements a conforming amendment to that earlier revision by removing the phrase "pursuant to § 208.4(b)" in the last sentence of 8 CFR 208.5(b)(1)(ii).

Moreover, the Filing Location Rule replaced the term "district director" with "DHS office" in two locations. With the elimination of the reference to the "district director" in former 8 CFR 208.4(b)(5) (relating to asylum applications filed with the district director), the remaining reference to "the DHS office" in new 8 CFR 208.5(b)(1)(ii) lacks an anchor to an earlier reference. To avoid confusion as to whether a specific DHS office is empowered under this provision, 8 CFR 208.5(b)(1)(ii) is revised by replacing "the DHS office" with simply "DHS" wherever it appears.

Section 208.7(c) is amended by replacing a mandatory requirement (if applicable) to submit "proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review." In anticipation of future system efficiencies afforded by transformation that may allow USCIS to gather the data directly from the Executive Office for Immigration Review (EOIR) within the Department of Justice and federal courts, USCIS is modifying this provision by replacing the mandatory production requirement with more flexible text: "* * * USCIS may require that an alien establish * * *". Until such time that system improvements are in place, USCIS will continue to require production of such evidence and will communicate such requirements through form instructions, as defined in 8 CFR 1.2.

Section 208.21(c) is amended by removing an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation,

this rule eliminates an express requirement that "separate" petitions be filed for each qualifying family member, in favor of "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members.

Section 208.21(d) is revised similar to section 208.21(c) and for the same reasons.

Section 209.1(c) is amended by removing the last clause relating to a vaccination supplement completed by a designated civil surgeon. USCIS recently consolidated the separate vaccination supplement and record of the medical examination into one form, Report of Medical Examination and Vaccination Record. Thus the language referring to a separate supplement is outdated. Relevant guidance will continue to be available in form instructions. This language is also deleted in anticipation of future processing efficiencies wherein civil surgeons may have online accounts through which they may submit reports directly to USCIS instead of completing paper forms.

Section 209.2(e) is revised by removing the first two sentences of the original paragraph, retaining only the last sentence. In the original paragraph, there was an internal inconsistency between the first sentence (requiring interview of all applicants) and the third sentence (allowing USCIS to determine whether an interview was warranted). This revision retains only the sentence that allows USCIS to determine on a case-by-case basis whether an interview is warranted. This result is consistent with the companion paragraph at existing 8 CFR 209.1(d) (refugee adjustment interviews) and current USCIS practice.

Section 209.2(f) is revised for purposes of plain language. To align with the companion paragraph at 8 CFR 209.1(e), text was added stating that USCIS will notify a denied applicant of the right to renew an adjustment request in removal proceedings before EOIR. Otherwise, no substantive change is intended.

Section 223.2 is reorganized and revised for clarity in addition to removing references to forms. The revision also clarifies existing authority to accept and process requests for refugee travel documents overseas.

Several paragraphs within 8 CFR part 264 are revised and reorganized for

clarity. Section 264.1 (registration and fingerprinting requirements) is revised and reorganized, removing obsolete instructions, general information duplicated in 8 CFR 103.2, and fingerprinting requirements now described in 8 CFR 103.16. Section 264.5, paragraph (d) (replacement of permanent resident cards for conditional residents) is revised to remove information included on the form instructions for Form I–90. New 8 CFR 264.5(h) is added to replace information previously located in 8 CFR 264.1(h). Section 264.6 is revised to remove obsolete instructions and for clarity.

**IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule**

DHS published an interim rule with request for comments revising 8 CFR 103.2(a)(2) to permit submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form. *Electronic Signature on Applications and Petitions for Immigration and Naturalization Benefits,* 68 FR 23010 (April 29, 2003). That rule implemented the electronic filing and the acceptance of electronic signatures requirement of GPEA and meet the requirements of section 461 of the Homeland Security Act of 2002 for a study of the feasibility of online filing and to establish an electronic tracking system for applications in order to provide applicants with access to the status of their applications. Public Law 107–296 title IV, subtitle E, section 461, 118 Stat. 2202 (Nov. 22, 2002), 6 U.S.C. 278.

USCIS received 13 public comments relating to the interim rule. Virtually all commenters supported the use of electronic signatures and urged USCIS to do more to promote a more robust and user-friendly electronic filing environment. Several of the commenters made specific proposals recommending enhancements to the current limited electronic filing procedures available to applicants and petitioners. Various commenters suggested enhancements to the electronic filing process, such as acceptance of credit cards for electronic payment, re-use of data for subsequent transactions, interfaces and compatibility with commercial immigration software, standards for electronic submission of supporting documents, provisions for attorney-client electronic collaboration in the preparation of benefit requests, improvements to current biometric collection procedures, and protection of the privacy of data. DHS encourages

these types of comments in response to this rulemaking. The comments will not be addressed here individually because they exceed the scope of the interim rule, which was limited to the electronic signature process. The broad subject of the comments, electronic filing of USCIS benefit requests, will be more fully addressed as the USCIS transformation progresses.

Several commenters raised concerns about the security of electronic signatures and described the pros and cons of various existing technologies. The interim rule did not specify the technology which will be employed by USCIS for the capture and verification of electronic signatures. As the transformation initiative is implemented, USCIS will explore alternatives and adopt an appropriate solution which is fully compliant with DHS security standards and ensures privacy. Therefore, no changes are made to the interim rule as a result of the comments received and the interim rule is adopted as final without change.

**V. Discussion of Other Interim Final Rules Being Finalized**

USCIS conducted a review of current and past agency regulatory activities and identified six interim rules for which no public comments were received and which were never completed as final rulemakings. Because some of the provisions of these interim rules are now either expired or further modified by this rulemaking, DHS is adopting them as final and, where appropriate, removing or revising the regulatory language. The interim rules that are adopted as final include:

• Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, 64 FR 27660 (May 21, 1999);

• Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, 66 FR 27445 (May 17, 2001);

• Eliminating the Numerical Cap on Mexican TN Nonimmigrants, 69 FR 11287 (March 10, 2004);

• Allocation of H–1B Visas Created by the H–1B Visa Reform Act of 2004, 70 FR 23775 (May 5, 2005);

• Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and Baltic States as Employment-Based Immigrants, 70 FR 21129 (April 25, 2005); and

• Revoking Grants of Naturalization, 65 FR 17127 (March 31, 2000).

A summary of, the legal authority for, the public comments received on, and the changes made to each of these interim rules is as follows:

*A. Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, RIN 1615–AA24*

This interim rule required that all sponsorship agreements be secured before an applicant is granted admission as a refugee at a U.S. port-of-entry (POE). This is a separate decision from whether or not such persons can be admitted to the U.S. in refugee status. This rule permits advantageous treatment for applicants for refugee status who have their eligibility interviews with a DHS officer scheduled before a sponsorship agreement has been secured.

This rule implemented section 702 of the Immigration Act of 1990 (IMMACT 90), Public Law 101–649, 104 Stat. 4978 (Nov. 29, 1990). It allowed a U.S. citizen, a lawful permanent resident petitioner, or an alien applicant for permanent resident status to seek an exemption from the general prohibition against approval of immigration benefits based upon a marriage entered into while the beneficiary or applicant was under deportation, exclusion or related judicial proceedings. The rule established procedures to allow persons with bona fide marriages to obtain immigration benefits without complying with the two year foreign residency requirements instituted by the Immigration Marriage Fraud Amendments of 1988 (IMFA). This rule amended 8 CFR 204.2 and 245.1. USCIS is not modifying these provisions in the current rule.

The Act authorized the Attorney General to admit refugees to the United States under certain conditions. INA section 207, 8 U.S.C. 1157. There is no requirement for an applicant to have secured sponsorship in advance of a determination that he or she meets the Act's definition of refugee. INA section 101(a)(42), 8 U.S.C. 1101(a)(42). This rule clarified that sponsorship is a requirement separate and apart from the determination that an applicant is classified as a refugee.

USCIS received no comments on this interim final rule.

The interim rule amended 8 CFR 207.2. That section is revised further by this rule to accommodate transformation by removing form numbers, job titles, extraneous provisions, and internal procedure. USCIS has not changed the substance of the provisions added by the interim rule.

*B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615–AA57*

This rule provided adjustment of status to lawful permanent residents for

certain nationals of Syria. The interim rule discusses the eligibility requirements and sets forth procedures for the application of persons wanting to adjust their status.

The Act provides that all aliens granted asylum are eligible to apply for adjustment of status 1 year after being granted asylum, subject to a maximum of 10,000 per year. INA section 209, 8 U.S.C. 1159. Pub. L. 106–378, 114 Stat. 825 (Oct. 27, 2000), waived the annual limit for a group of Jewish Syrian nationals who were allowed to depart Syria and enter the United States after December 31, 1991, and who were subsequently granted asylum in the United States.

No public comments were received.

This final rule removes 8 CFR 245.20 which was added by the interim rule. That provision is obsolete because no eligible applicants remain.

### C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615–AA96

This interim rule eliminated the annual numerical cap on Mexican Professionals under the North American Free Trade Agreement (NAFTA). It also eliminated the petition for a Mexican-based NAFTA professional and the corresponding labor condition application (LCA) requirement. Mexican citizens who come to the U.S. under a TN classification must apply directly to DOS for a visa. DOS will then adjudicate the alien's eligibility for TN classification. Upon approval and issuance of a visa, the alien may then apply for admission to the United States. These changes to the regulations are consistent with NAFTA's requirement that the annual numerical cap and petition provisions for Mexican professionals sunset by January 1, 2004.

On December 17, 1992, the United States, Canada and Mexico signed the North American Free Trade Agreement (NAFTA), which entered into force on January 1, 1994. Public Law 103–182, title I, section 101, 107 Stat. 2061 (1993), 19 U.S.C. 3311. NAFTA allows for the temporary entry of qualified businesspersons from each of the parties to the agreement. *See* Public Law 103–182, title III, section 341(a), 107 Stat. 2116 (1993), 19 U.S.C. 3401. Professionals under the NAFTA are admitted to the United States as Trade NAFTA (TN) nonimmigrant aliens. INA section 214(e), 8 U.S.C. 1184(e). In Appendix 1603.D.4 of NAFTA, NAFTA established an annual numerical ceiling of 5,500 on Mexican TN admissions for a period of 10 years. NAFTA Appendix 1603.D.4, INA section 214(e)(4), (5), 8 U.S.C. 1184(e)(4), (5). The interim rule

eliminated the annual numerical cap for citizens of Mexico seeking a TN visa as required by expiration of the 10-year period. *Id.*

No public comments were received.

This rule finalizes the interim rule without change.

### D. Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004, RIN 1615–AB32

This interim rule implemented changes made by the Omnibus Appropriations Act for Fiscal Year 2005 to the numerical limits of H–1B nonimmigrant visa category and the fees for filing of H–1B petitions. It also: (1) Informed the public of procedures USCIS used to allocate in fiscal year 2005, as well as for the future fiscal years starting with fiscal year 2006; (2) amended and clarified the process that USCIS will use in the future in allocating all petitions subject to numerical limitations under the Act; and (3) alerted the public about additional fees that must accompany certain H–1B petitions.

An H–1B nonimmigrant is an alien employed in a specialty occupation or a fashion model of distinguished merit and ability. INA section 101(a)(15)(H), 8 U.S.C. 1101(a)(15)(H); 8 CFR 214.2(h)(4). A specialty occupation requires theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree in the specific specialty as a minimum qualification for entry into the United States. *Id.* The Act provides that the number of nonimmigrants who may be issued H–1B visas or granted H–1B status may not exceed 65,000 per fiscal year. INA section 214(g), 8 U.S.C. 1184(g). The 65,000 cap does not include H–1B employees of institutions of higher education, nonprofit research organizations, or governmental research organizations. The H–1B Visa Reform Act of 2004 added a third exception to the 65,000 limit, by providing that an additional 20,000 visas would be available for an alien who has earned a master's or higher degree from a United States institution of higher education. Omnibus Appropriations Act for Fiscal Year 2005, Public Law 108–447, div. J, title IV, 118 Stat. 2809 (Dec. 8, 2004); INA section 214(g)(5)(C), 8 U.S.C. 1184(g)(5)(C). This law also raised the American Competitiveness and Workforce Improvement Act of 1998 fee (ACWIA) to $1,500 or $750, depending on the size of the employer, and imposed a $500 fraud prevention and detection fee (fraud fee) on certain employers filing H–1B petitions. *Id;* INA section 214(c)(9), 8 U.S.C. 1184(c)(9).

These fees are required in addition to the base USCIS filing fee.

No public comments were received.

This rule finalizes the interim rule without change.

### E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615–AB14

This interim rule codified the new sunset date of September 30, 2006, for the Soviet Scientists Immigration Act of 1992 (SSIA). The SSIA allowed USCIS to allot visas to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states with expertise in nuclear, chemical, biological, or other high-technology field or defense projects. The rule also codified a new numerical limit of 950 visas (excluding spouses and children if accompanying or following to join).

The SSIA provided that up to 950 immigrant visas may be allotted to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states if the scientists or engineers had expertise in nuclear, chemical, biological or other high technology fields or were working on such high technology defense projects, as defined by the Attorney General. Public Law 102–395, title VI, section 610, 106 Stat. 1874 (Oct. 6, 1992); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A). This program expired on October 24, 1996. The Foreign Relations Authorization Act, Fiscal Year 2003 reinstated the program and, among other changes not applicable to this interim rule, provided that it would expire 4 years from the date of enactment. Public Law 107–228, div. B, title XIII, section 1304(d), 116 Stat. 1437 (Sept. 30, 2002); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A).

No public comments were received.

This rule removes provisions pertaining to the SSIA because they have expired. 8 CFR 204.10.

### F. Revoking Grants of Naturalization, RIN 1615–AA30

This rule amended the process by which the Service would administratively reopen and revoke a grant of naturalization. This interim rule changed the burden of proof that the Service would use in revocation proceedings and made other changes to the administrative process. 65 FR 17127 (March 31, 2000).

The Secretary has sole authority to grant a person naturalization as a United States citizen. INA section 310(a), 8 U.S.C. 1421(a). The Act also provides

DHS with the authority "to correct, reopen, alter, modify, or vacate an order naturalizing [a] person" as a United States citizen. INA section 340(h), 8 U.S.C. 1451(h). The interim rule was promulgated under this authority.

No public comments were received.

This rule removes regulations that were invalidated on July 20, 2000, by the Ninth Circuit Court of Appeals in a nationwide class action lawsuit. *Gorbach* v. *Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc). That decision held that the Attorney General lacked the statutory authority to promulgate regulations permitting revocation of citizenship of a naturalized citizen through administrative proceedings. *Id. See also* INA sections 310(a), 340(a), (h), 8 U.S.C. 1421(a), 1451(a), (h). The government did not seek Supreme Court review of that decision, thus USCIS is precluded from issuing those regulations to revoke naturalization. This rule removes the applicable regulations from 8 CFR 340.10.

## VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule

On June 5, 2009, DHS published an interim rule in the **Federal Register** "Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision To Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms." The rule revised many sections of the 8 CFR, many of which are further revised by this rulemaking.

USCIS received only three comments in response to this rulemaking: one from an immigration practitioner, one from an organization of immigration practitioners, and one from an organization representing businesses which frequently rely on international personnel. A discussion of those comments follows.

One commenter noted that the revision to 8 CFR 214.2(l)(2)(i) apparently unintentionally added to the petitioner's burden by requiring that "the petitioner shall advise * * * whether *a previous petition has been filed* for the same beneficiary * * *" whereas the original language stated "the petitioner shall advise * * * whether *it has filed* a petition for the same beneficiary." (Emphasis in original). Although this change was inadvertent and not intended to affect any right, the requirement as revised is entirely consistent with both the INA and the current form instructions. The Act limits the amount of time an alien can spend in the United States as an L–1 or H nonimmigrant (not just for a particular petitioner). *See* section 214(c)(2)((D) of the Act, 8 U.S.C. 1184.2(c)(2)(D). The current Form I–129, Supplement L, question 2 requires submission of copies of USCIS-issued documents relating to periods of H or L stay in the United States during the past seven years. It does not limit such submission to documents relating to the current petitioner. Accordingly, USCIS has not adopted the commenter's suggestion that we revert to the prior language.

The commenter made an additional comment regarding the omission of the word "of" from the first sentence in 8 CFR 214.2(l)(2)(ii). USCIS appreciates notification by the commenter of the typographical error which will be corrected in this rule. As previously discussed, 8 CFR part 214 will be reorganized in a future transformation-related rulemaking.

Another commenter suggests that USCIS avail itself of the opportunity to revise 8 CFR 212.7 to reflect the fact that K nonimmigrants may apply for a waiver only pursuant to section 212(d)(3) of the Act and that such persons may only apply for a waiver under section 212(h) or 212(i) of the Act at the time of application for adjustment of status. The commenter noted that both the regulation and form instruction for Form I–601, Application for Waiver of Ground of Inadmissibility, are incorrect. USCIS appreciates the comment and the commenter's suggestions may be addressed in a future rulemaking or with a form revision. However, the interim rule was limited to removing filing jurisdiction limitations from regulations. Thus the commenter's suggestion exceeds the scope of the changes made and will not be adopted in this rulemaking.

The final commenter addressed the removal of filing jurisdictions from regulations. The commenter expresses its concern that an accelerated process for changing filing locations could have an adverse impact on the public. The commenter was especially concerned about situations involving statutory or regulatory deadlines for filing where the public may have insufficient notice of the proposed change.

The same commenter, while supportive of USCIS' transformation efforts, offered several suggestions to minimize the potential adverse impacts of this rulemaking. The commenter recommended that, at each place the regulations are amended, to direct the public to "instructions on the form," and that USCIS add a phrase to explain that form instructions will be available on line, that any change to the filing instructions will be provided to the public by formal announcement no less than 30 days in advance of the change, and that when a filing jurisdiction changes, USCIS offices formerly designated to receive such filings continue to accept them for at least 180 days after the effective date of the change.

USCIS understands and appreciates the commenter's concerns. We realize that numerous changes in filing instructions and locations may be confusing. It is our intent to reduce filing locations and complexity, and change them less often, not more. In the case of time-sensitive benefit requests, USCIS will keep such factors in mind when making changes and make adjustments to the change schedule so as to not result in missing a deadline because of the filing location change.

The commenter suggested that the preamble language describing the USCIS National Customer Service Center (NCSC) as a source of information regarding filing locations be removed because its membership has not gotten consistently reliable information from this source. The commenter recommended that USCIS customer service representatives be directed to consult the online form instructions before offering any advice to applicants regarding filing location. USCIS regrets any incorrect information that may be provided and always endeavors to provide the NCSC staff with information regarding filing requirements so questions may be answered. USCIS encourages the public to report possible erroneous or outdated messages so that they may be corrected. No change to the interim rule is made as a result of this comment.

The commenter also suggests that information about changes to form and filing instructions be posted in a consistent and prominent location on USCIS Web site along with a chronological list of all changes to form instructions, including filing location changes. As the interim rule stated, filing locations are provided on USCIS form instructions. The current official version of the form and instructions are the versions on the USCIS Internet Web site for forms, *http://www.uscis.gov/ forms*. Also, the USCIS home page will alert the public and stakeholders of any recent or planned filing location changes. In addition, USCIS will continue to publicize filing location changes with press releases. Additional suggestions for improving the Web site and information sharing are welcome.

The commenter also suggested that regulations mandate a 180-day transition period for filing location changes, during which USCIS would

accept such benefit requests at both the prior and new filing location. USCIS works to ensure that benefit requests are not rejected as a result of abrupt changes in filing location. USCIS announces filing changes well in advance and generally includes a transition period considering all factors and circumstances surrounding the change. However, forwarding mail from offices that formerly handled requests to the new office is very expensive and an inefficient use of USCIS fee revenue. USCIS will provide as much lead time as possible before making filing changes and will implement the changes in such a way so as to minimize the impacts of the change. However, a 180 day implementation period for each filing change is impracticable and will not be adopted.

The commenter also expressed a concern that USCIS intends to stop producing and distributing a paper version of its form instructions. As transformation continues, the filing of paper forms is expected to decrease substantially as USCIS expects electronic means to become the preferred filing method. As was the goal of GPEA and has been the experience of other Federal agencies that provide electronic filing options, in the future certain forms or requests may lend themselves to a totally electronic submission with no paper option. Nevertheless, at this time, as stated elsewhere in this preamble, USCIS will continue to provide paper versions of most forms and instructions as well as portable document format or other electronic versions through its Internet Web site. Further, the electronic versions of form instructions will parallel the written form instructions precisely, so the method chosen should cause no inconsistencies in benefit eligibility or adjudication.

The commenter also suggested that USCIS provide access to earlier versions of forms and instructions. Following a form's revisions, USCIS often provides that previous version of the form are acceptable until further notice or for a prescribed period. However, when changes are made to a form because eligibility criteria are changed by law or regulation, the previous version of a form may be outdated, incomplete, and unacceptable. Further, for ease of administration and consistency in adjudication, USCIS prefers to receive the most current version so the employee reviewing the form knows where to look for the required data elements. Thus USCIS sees little value in providing previous versions of forms as a general policy or requirement, and

the commenter's suggestion has not been adopted.

The commenter also suggested that any elimination of geographically-based jurisdiction should be coupled with a new model for determining such jurisdiction. The interim rule gave USCIS greater flexibility to alter filing locations, but it does not change how internal responsibilities for adjudicating benefit requests are prescribed. For many benefit requests, notwithstanding their removal from the CFR, filing locations will seldom or not change. USCIS will continue to make changes in filing, appearance or jurisdictional requirements with the convenience of and service to applicants, petitioners, and beneficiaries as a primary concern. Thus, in response to this comment, methods of determining jurisdiction are not revised in this rule.

## VII. Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act (APA) requires DHS to provide public notice and seek public comment on substantive regulations. *See* 5 U.S.C. 553. The APA, however, excludes certain types of regulations and permits exceptions for other types of regulations from the public notice and comment requirement. DHS issues this rule without providing the opportunity for prior notice and comment for the reasons described below. DHS nevertheless invites comments on this rule and will consider all timely comments submitted during the public comment period as described in the "Public Participation" section.

*Removal of form numbers and titles, position titles, and procedural guidance, and reorganization and clarification of 8 CFR.* The Administrative Procedure Act (APA) excepts from the prior notice and opportunity for comment requirements "* * * rules of agency organization, procedure or practice." 5 U.S.C. 553(b)(A). This rule removes form numbers and titles, position titles, and procedural guidance, reorganizes and clarifies parts of 8 CFR, and makes changes such as removing Form I–129, district director, instructions for retaining copies of documents, and instructions for forwarding of files. Accordingly, to the extent that this rule adopts rules of agency organization, procedure or practice, those portions of the rule are excepted from the notice-and-comment requirements under 5 U.S.C. 553(b)(A).

*Remove and update outdated provisions.* This rule removes provisions of 8 CFR where statutory authorization has expired, corrects

provisions required by statutory amendments or extensions, removes extraneous or outdated provisions, and corrects erroneous references. For example, this rule removes references to the Irish Peace Process Cultural and Training Program Act because that law was repealed in 2005 and removes nonpreference investor visas and third and sixth preference employment-based visas because authorization for these visas was repealed in 1990. This rule is a ministerial action necessary to conform regulations with law. Therefore, advance public notice and an opportunity for public comment is unnecessary and not in the public interest. *See* 5 U.S.C. 553(b)(3)(B).

### B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### D. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review, and does not require an assessment of potential costs and benefits under section 6(a)(3) of that Order. The Office

of Management and Budget has not reviewed it under Executive Order 12866.

There will be no additional costs incurred by any individual or business as a result of the changes in this rule. The rule will clarify and revise existing regulations and does not alter the regulations in a significant manner. Once transformation is complete, USCIS applicants, petitioners, representatives, and others will realize a significant savings in time and effort when submitting immigration benefit requests, seeking case status information, and communicating with USCIS.

### E. Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 Civil Justice Reform

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. Public Law 104–13, 109 Stat. 163 (May 22, 1995). This rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

### H. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental

jurisdictions, and small organizations during the development of their rules. When an agency makes changes effective through a final rule for which notice and comment are not necessary, the RFA does not require an agency to prepare a regulatory flexibility analysis. Accordingly, USCIS has not prepared a regulatory flexibility analysis.

### List of Subjects

#### 8 CFR Part 1

Administrative practice and procedure, Immigration.

#### 8 CFR Part 100

Organization and functions (Government agencies).

#### 8 CFR Part 103

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

#### 8 CFR Part 204

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 207

Immigration, Refugees, Reporting and recordkeeping requirements.

#### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 209

Aliens, Immigration, Refugees.

#### 8 CFR Part 211

Immigration, Passports and visas, Reporting and recordkeeping requirements.

#### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

#### 8 CFR Part 213a

Administrative practice and procedure, Aliens, Immigrants.

#### 8 CFR Part 223

Immigration, Refugees, Reporting and recordkeeping requirements.

#### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 236

Administrative practice and procedure, Aliens, Immigration.

#### 8 CFR Part 238

Air Carriers, Aliens, Government contracts, Maritime carriers.

#### 8 CFR Part 240

Administrative practice and procedure, Immigration.

#### 8 CFR Part 241

Administrative practice and procedure, Aliens, Immigration.

#### 8 CFR Part 244

Aliens, Reporting and recordkeeping requirements.

#### 8 CFR Part 245

Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 245a

Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 248

Aliens, Reporting and recordkeeping requirements.

#### 8 CFR Part 264

Reporting and recordkeeping requirements.

#### 8 CFR Part 265

Aliens, Reporting and recordkeeping requirements.

#### 8 CFR Part 270

Administrative practice and procedure, Aliens, Employment, Fraud; Penalties.

#### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

#### 8 CFR Part 287

Immigration, Law enforcement officers.

#### 8 CFR Part 292

Administrative practice and procedure, Immigration, Lawyers, Reporting and recordkeeping requirements.

#### 8 CFR Part 299

Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 301

Citizenship and naturalization, Reporting and recordkeeping requirements.

**53778**   **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

*8 CFR Part 310*

Citizenship and naturalization, Courts.

*8 CFR Part 312*

Citizenship and naturalization, Education.

*8 CFR Part 316*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 319*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 320*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 322*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 324*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 325*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 328*

Citizenship and naturalization, Military personnel, Reporting and recordkeeping requirements.

*8 CFR Part 329*

Citizenship and naturalization, Military personnel, Veterans.

*8 CFR Part 330*

Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 332*

Citizenship and naturalization, Education, Reporting and recordkeeping requirements.

*8 CFR Part 333*

Citizenship and naturalization.

*8 CFR Part 334*

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 335*

Administrative practice and procedures, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 336*

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 337*

Citizenship and naturalization, Courts.

*8 CFR Part 338*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 339*

Citizenship and naturalization, Courts.

*8 CFR Part 340*

Citizenship and naturalization, Law enforcement.

*8 CFR Part 341*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 342*

Administrative practice and procedure, Citizenship and naturalization.

*8 CFR Part 343*

Citizenship and naturalization.

*8 CFR Part 343a*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 343b*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 343c*

Archives and records, Citizenship and naturalization, Courts.

*8 CFR Part 392*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 499*

Citizenship and naturalization.

Accordingly, the interim rules published at 68 FR 23010, on April 29, 2003; 64 FR 27660 on May 21, 1999; 66 FR 27445 on May 17, 2001; 69 FR 11287 on March 10, 2004; 70 FR 23775 on May 5, 2005; 70 FR 21129 on April 25, 2005; and 65 FR 17127 on March 31, 2000 are adopted as final without change, and chapter I of title 8 of the Code of Federal Regulations is amended as follows.

■ 1. Part 1 is revised to read as follows:

## PART 1—DEFINITIONS

Sec.
1.1   Applicability.
1.2   Definitions.
1.3   Lawfully present aliens for purposes of applying for Social Security benefits.

**Authority:** 8 U.S.C. 1101; 8 U.S.C. 1103; 5 U.S.C. 301; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.*

### §1.1   Applicability.

This part further defines some of the terms already described in section 101 and other sections of the Immigration and Nationality Act (66 Stat. 163), as amended, and such other enactments as pertain to immigration and nationality. These terms are used consistently by components within the Department of Homeland Security including U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.

### §1.2   Definitions.

As used in this chapter I, the term:
*Act* or *INA* means the Immigration and Nationality Act, as amended.
*Aggravated felony* means a crime (or a conspiracy or attempt to commit a crime) described in section 101(a)(43) of the Act. This definition applies to any proceeding, application, custody determination, or adjudication pending on or after September 30, 1996, but shall apply under section 276(b) of the Act only to violations of section 276(a) of the Act occurring on or after that date.
*Application* means benefit request.
*Arriving alien* means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.
*Attorney* means any person who is eligible to practice law in, and is a member in good standing of the bar of,

the highest court of any State, possession, territory, or Commonwealth of the United States, or of the District of Columbia, and is not under any order suspending, enjoining, restraining, disbarring, or otherwise restricting him or her in the practice of law.

*Benefit request* means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose.

*Board* means the Board of Immigration Appeals within the Executive Office for Immigration Review, Department of Justice, as defined in 8 CFR 1001.1(e).

*Case,* unless the context otherwise requires, means any proceeding arising under any immigration or naturalization law, Executive Order, or Presidential proclamation, or preparation for or incident to such proceeding, including preliminary steps by any private person or corporation preliminary to the filing of the application or petition by which any proceeding under the jurisdiction of the Service or the Board is initiated.

*CBP* means U.S. Customs and Border Protection.

*Commissioner* means the Commissioner of the Immigration and Naturalization Service prior to March 1, 2003. Unless otherwise specified, references after that date mean the Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Day,* when computing the period of time for taking any action provided in this chapter I including the taking of an appeal, shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday.

*Department or DHS,* unless otherwise noted, means the Department of Homeland Security.

*Director or district director* prior to March 1, 2003, means the district director or regional service center director, unless otherwise specified. On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to

such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also mean such other official, including an official in an acting capacity, within U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

*EOIR* means the Executive Office for Immigration Review within the Department of Justice.

*Executed* or *execute* means fully completed.

*Form* when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in paper format or in an electronic format as prescribed by USCIS on its official Internet Web site. The term Form followed by an immigration form number includes an approved electronic equivalent of such form as may be prescribed by the appropriate component on its official Internet Web site.

*Form instructions* means instructions on how to complete and where to file a benefit request, supporting evidence or fees, or any other required or preferred document or instrument with a DHS immigration component. Form instructions prescribed by USCIS or other DHS immigration components on their official Internet Web sites will be considered the currently applicable version, notwithstanding paper or other versions that may be in circulation, and may be issued through non-form guidance such as appendices, exhibits, guidebooks, or manuals.

*ICE* means U.S. Immigration and Customs Enforcement.

*Immigration judge* means an immigration judge as defined in 8 CFR 1001.1(l).

*Immigration officer* means the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention

enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

*Lawfully admitted for permanent residence* means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. Such status terminates upon entry of a final administrative order of exclusion, deportation, or removal.

*Petition.* See Benefit request.

*Practice* means the act or acts of any person appearing in any case, either in person or through the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with DHS.

*Preparation,* constituting practice, means the study of the facts of a case and the applicable laws, coupled with the giving of advice and auxiliary activities, including the incidental preparation of papers, but does not include the lawful functions of a notary public or service consisting solely of assistance in the completion of blank spaces on printed DHS forms, by one whose remuneration, if any, is nominal and who does not hold himself or herself out as qualified in legal matters or in immigration and naturalization procedure.

*Representation* before DHS includes practice and preparation as defined in this section.

*Representative* refers to a person who is entitled to represent others as provided in 8 CFR 292.1(a)(2) through (6) and 8 CFR 292.1(b).

*Respondent* means an alien named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with 8 CFR 242.1 (1997) as it existed prior to April 1, 1997.

*Secretary,* unless otherwise noted, means the Secretary of Homeland Security.

**AR2022_200243**

*Service* means U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and/or U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Service counsel* means any immigration officer assigned to represent the Service in any proceeding before an immigration judge or the Board of Immigration Appeals.

*Transition program effective date as used with respect to extending the immigration laws to the Commonwealth of the Northern Mariana Islands* means November 28, 2009.

*USCIS* means U.S. Citizenship and Immigration Services.

**§ 1.3   Lawfully present aliens for purposes of applying for Social Security benefits.**

(a) *Definition of the term an "alien who is lawfully present in the United States."* For the purposes of 8 U.S.C. 1611(b)(2) only, an "alien who is lawfully present in the United States" means:

(1) A qualified alien as defined in 8 U.S.C. 1641(b);

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending removal proceedings under section 240 of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(b)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) of Pub. L. 99–603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status;

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) *Non-issuance of a Notice to Appear and non-enforcement of deportation, exclusion, or removal orders.* An alien may not be deemed to be lawfully present solely on the basis of DHS's decision not to, or failure to:

(1) Issue a Notice to Appear; or

(2) Enforce an outstanding order of deportation, exclusion or removal.

**PART 100—STATEMENT OF ORGANIZATION**

■ 2. The authority citation for part 100 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 8 CFR part 2.

**§ 100.7   [Removed]**

■ 3. Section 100.7 is removed.

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 4. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.;* E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 5. The heading for part 103 is revised as set forth above.

■ 6. In part 103, §§ 103.1 through 103.10 are designated under the following subpart A heading:

**Subpart A—Applying for Benefits, Surety Bonds, Fees**

**§ 103.1   [Removed and Reserved]**

■ 7. Section 103.1 is removed and reserved.

■ 8. Section 103.2 is amended by:

■ a. Removing the phrases "petition or application" and "application or petition" and adding in its place the phrase "benefit request"; and by removing the phrase "petitions and applications" and adding in its place the phrase "benefit requests" whenever they appear in the following places:

■ i. Paragraph (a)(2);
■ ii. Paragraph (a)(3);
■ iii. Paragraph (a)(7)(ii);

■ iv. Paragraph (b)(6);
■ v. Paragraph (b)(7);
■ vi. Paragraph (b)(8)(i);
■ vii. Paragraph (b)(8)(ii);
■ viii. Paragraph (b)(8)(iii);
■ ix. Paragraph (b)(9) introductory text;
■ x. Paragraph (b)(9)(ii);
■ xi. Paragraph (b)(10)(i);
■ xii. Paragraph (b)(10)(ii);
■ xiii. Paragraph (b)(11);
■ xiv. Paragraph (b)(12);
■ xv. Paragraph (b)(13)(i);
■ xvi. Paragraph (b)(13)(ii);
■ xvii. Paragraph (b)(14);
■ xviii. Paragraph (b)(15); and
■ xix. Paragraph (b)(18); and
■ b. Revising the section heading;
■ c. Revising paragraph (a)(1);
■ d. Revising the term "BCIS" to read "USCIS" in paragraph (a)(2) last sentence;
■ e. Revising the term "§ 1.1(f)" to read "§ 1.2" in paragraph (a)(3) first sentence;
■ f. Revising paragraph (a)(6);
■ g. Revising paragraph (a)(7)(i) and adding paragraph (a)(7)(iii);
■ h. Revising paragraph (b)(1);
■ i. Revising paragraph (b)(4);
■ j. Revising the phrase "by submitting a properly completed and signed Form G–884 to the adjudicating USCIS office" to read "in accordance with instructions provided by USCIS" in paragraph (b)(5) last sentence;
■ k. Revising the term "application, petition" to read "benefit request" in paragraph (b)(7) last sentence;
■ l. Revising the term "in writing" to read "communicated by regular or electronic mail" in paragraph (b)(8)(iv) first sentence;
■ m. Revising the second sentence in paragraph (b)(17)(i);
■ n. Revising paragraph (b)(19); and
■ o. Removing paragraph (e).

The revisions and addition read as follows:

**§ 103.2   Submission and adjudication of benefit requests.**

(a) *Filing.* (1) *Preparation and submission.* Every benefit request or other document submitted to DHS must be executed and filed in accordance with the form instructions, notwithstanding any provision of 8 CFR chapter 1 to the contrary, and such instructions are incorporated into the regulations requiring its submission. Each benefit request or other document must be filed with fee(s) as required by regulation. Benefit requests which require a person to submit biometric information must also be filed with the biometric service fee in 8 CFR 103.7(b)(1), for each individual who is required to provide biometrics. Filing fees and biometric service fees are non-refundable and, except as otherwise

provided in this chapter I, must be paid when the benefit request is filed.

* * * * *

(6) *Where to file.* All benefit requests must be filed in accordance with the form instructions.

(7) *Receipt date.* (i) *Benefit requests submitted.* A benefit request which is not signed and submitted with the correct fee(s) will be rejected. A benefit request that is not executed may be rejected. Except as provided in 8 CFR parts 204, 245, or 245a, a benefit request will be considered received by USCIS as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format. The receipt date shall be recorded upon receipt by USCIS.

* * * * *

(iii) *Rejected benefit requests.* A benefit request which is rejected will not retain a filing date. There is no appeal from such rejection.

(b) *Evidence and processing.* (1) *Demonstrating eligibility.* An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication. Each benefit request must be properly completed and filed with all initial evidence required by applicable regulations and other USCIS instructions. Any evidence submitted in connection with a benefit request is incorporated into and considered part of the request.

* * * * *

(4) *Supporting documents.* Original or photocopied documents which are required to support any benefit request must be submitted in accordance with the form instructions.

* * * * *

(17) * * *

(i) * * * These records include alien and other files, arrival manifests, arrival records, Department index cards, Immigrant Identification Cards, Certificates of Registry, Declarations of Intention issued after July 1, 1929, Permanent Resident Cards, or other registration receipt forms (provided that such forms were issued or endorsed to show admission for permanent residence), passports, and reentry permits. * * *

* * * * *

(19) *Notification of decision.* The Service will notify applicants, petitioners, and their representatives as defined in 8 CFR part 1 in writing of a decision made on a benefit request. Documents issued based on the approval of a request for benefits will be sent to the applicant or beneficiary.

* * * * *

### § 103.3   [Amended]

■ 9. Section 103.3 is amended by:
■ a. Revising the term "shall file" to read "must submit" and revising the phrase "with the office where the unfavorable decision was made" to read "as indicated in the applicable form instructions" in the last sentence in paragraph (a)(2)(i); and
■ b. Revising the term "§ 103.9(a) of this part" to read "8 CFR 103.10(e)" in paragraph (c) last sentence.

### §§ 103.8 through 103.11   [Removed]

■ 10. Sections 103.8 through 103.11 are removed.

### § 103.5a   [Redesignated as § 103.8]

■ 11. Section 103.5a is redesignated as § 103.8.
■ 12. Newly redesignated § 103.8 is amended by:
■ a. Revising the section heading;
■ b. Revising the paragraph (a) heading;
■ c. Revising paragraphs (a)(1);
■ d. Removing the "." at the end of paragraph (a)(2)(iv), and adding a "; or" in its place; and by
■ e. Adding paragraph (a)(2)(v).
The revisions and addition read as follows:

### § 103.8   Service of decisions and other notices.

* * * * *

(a) *Types of service*—(1) *Routine service.* (i) Routine service consists of mailing the notice by ordinary mail addressed to the affected party and his or her attorney or representative of record at his or her last known address, or

(ii) If so requested by a party, advising the party of such notice by electronic mail and posting the decision to the party's USCIS account.

(2) * * *

(v) If so requested by a party, advising the party by electronic mail and posting the decision to the party's USCIS account.

* * * * *

### § 103.5b   [Redesignated as § 103.9]

■ 13. Section 103.5b is redesignated as § 103.9.
■ 14. Section 103.7 is amended by:
■ a. Revising the term "BCIS" to read "USCIS" wherever that term appears in paragraph (a)(1);
■ b. Adding new paragraphs (b)(1)(i)(CCC), (DDD), and (EEE).
The revisions and addition read as follows:

### § 103.7   Fees.

* * * * *

(b) * * *

(1) * * *

(i) * * *

(CCC) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* $1500 or $750 for filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions.

(DDD) *Fraud detection and prevention fee.* $500 for filing certain H–1B and L petitions, and $150 for H–2B petitions as described in 8 CFR 214.2(h)(19).

(EEE) *Public Law 111–230 fee.* Petitioners who are required to submit the Fraud Detection and Prevention Fee described in paragraph (b)(1)(i)(DDD) of this section are also required to submit an additional $2000 for an H–1B petition or an additional $2250 for an L–1 petition if:

(*1*) The petitioner employs 50 or more persons in the United States;

(*2*) More than 50 percent of those employees are in H–1B or L–1 status; and

(*3*) The petition is filed prior to the expiration of section 402 of Public Law 111–230.

* * * * *

■ 15. Newly redesignated § 103.9 is revised to read as follows:

### § 103.9   Request for further action on an approved benefit request.

(a) *Filing a request.* A person may request further action on an approved benefit request as prescribed by the form instructions. Requests for further action may be submitted with the original benefit request or following the approval of such benefit.

(b) *Processing.* The request will be approved if the requester has demonstrated eligibility for the requested action. There is no appeal from the denial of such request.

### § 103.12   [Removed]

■ 16. Section 103.12 is removed.

### § 103.37   [Redesignated as § 103.10]

■ 17. Section 103.37 is redesignated as § 103.10.
■ 18. Newly redesignated § 103.10 is amended by:
■ a. Redesignating paragraphs (g), (h), and (i) as paragraphs (b), (c), and (d) respectively;
■ b. Revising the term "paragraph (f) of this section" to read "paragraph (c) of this section or 8 CFR 1003.1(h)(2)" in newly redesignated paragraph (b)(2); and by
■ c. Adding paragraph (e).
The addition reads as follows:

### § 103.10   Precedent decisions.

* * * * *

(e) *Precedent decisions.* Bound volumes of designated precedent

decisions, entitled "Administrative Decisions under Immigration and Nationality Laws of the United States," may be purchased from the Superintendent of Documents, U.S. Government Printing Office. Prior to publication in volume form, current precedent decisions are available from the Department of Justice, Executive Office for Immigration Review's Virtual Law Library at: *http://www.justice.gov/ eoir/vll/libindex.html.*

■ 19. Section 103.16 is added under an added subpart B heading to read as follows:

## Subpart B—Biometric Requirements

### § 103.16   Collection, use and storage of biometric information.

(a) *Use of biometric information.* Any individual may be required to submit biometric information if the regulations or form instructions require such information or if requested in accordance with 8 CFR 103.2(b)(9). DHS may collect and store for present or future use, by electronic or other means, the biometric information submitted by an individual. DHS may use this biometric information to conduct background and security checks, adjudicate immigration and naturalization benefits, and perform other functions related to administering and enforcing the immigration and naturalization laws.

(b) *Individuals residing abroad.* An individual who is required to provide biometric information and who is residing outside of the United States must report to a DHS-designated location to have his or her biometric information collected, whether by electronic or non-electronic means.

■ 20. Section 103.17 is added under subpart B to read as follows:

### § 103.17   Biometric service fee.

(a) *Required fees.* DHS will charge a fee, as prescribed in 8 CFR 103.7(b)(1), for collecting biometric information at a DHS office, other designated collection site overseas, or a registered State or local law enforcement agency designated by a cooperative agreement with DHS to provide biometric collection services, to conduct required law enforcement checks, and to maintain this biometric information for reuse to support other benefit requests. Requests for benefits must be submitted with the biometric service fee for all individuals who are required to submit biometric information and a biometric services fee and who reside in the United States at the time of filing for the benefit.

(b) *Non-payment of biometric service fee.* (1) If a benefit request is received by DHS without the correct biometric service fee, DHS will notify the applicant, petitioner, and, when appropriate, the applicant or petitioner's representative, of the deficiency, and no further action will be taken on the benefit request until payment is received. Failure to submit the correct biometric service fee in response to a notice of deficiency within the time allotted in the notice will result in denial of the benefit request. There is no appeal from the denial of a benefit request for failure to submit the correct biometric service fee. A motion to reopen a benefit request denied for failure to submit the correct biometric service fee will be granted only on proof that:

(i) The correct biometric service fee was submitted at the time of filing the benefit request;

(ii) The correct biometric service fee was submitted in response to the notice of deficiency within the time allotted in the notice; or

(iii) The notice of deficiency was sent to an address other than the address on the benefit request or the notice of representation, or the applicant or petitioner notified DHS, in writing, of a change of address or change of representation subsequent to filing and before the notice of deficiency was sent and the DHS notice of deficiency was not sent to the new address.

(2) If the reason for the deficiency in the biometric service fee is that a check or financial instrument used to pay the biometric service fee is returned as not payable, the remitter must be allowed 14 calendar days to pay the fee and any associated service charges. If the fee and charges are not paid within 14 calendar days, the benefit request will be denied.

### §§ 103.20–103.36   [Removed and Reserved]

■ 21. Sections 103.20 through 103.36 are removed.

## Subpart C—[Reserved]

■ 22. Add reserved subpart C.

■ 23. Sections 103.38 through 103.41 are designated under the following subpart D heading:

## Subpart D—Availability of Records

\* \* \* \* \*

■ 24. In § 103.41, paragraph (c) is revised to read as follows:

### § 103.41   Genealogy request fees.

\* \* \* \* \*

(c) *Manner of submission.* The application and fee must be submitted in accordance with form instructions.

■ 25. Section 103.42 is added under subpart D to read as follows:

### § 103.42   Rules relating to the Freedom of Information Act (FOIA) and the Privacy Act.

Immigration-related regulations relating to FOIA and the Privacy Act are located in 6 CFR part 5.

## PART 204—IMMIGRANT PETITIONS

■ 26. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255, 1641; 8 CFR part 2.

### § 204.3   [Amended]

■ 27. Section 204.3 is amended by:
■ a. Revising the term "§ 103.2(e) of this chapter" to read "8 CFR 103.16" and the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear in paragraph (c)(3); and by
■ b. Revising the term "BCIS" to read "USCIS", the term "Form I–600" to read "petition", and the term "I–600A" to read "advance processing request" wherever the terms appear in paragraph (h)(3)(ii).

### § 204.4   [Amended]

■ 28. Section 204.4 is amended by:
■ a. Revising the term "§ 103.2(e) of this chapter to read "8 CFR 103.16" in the second sentence in paragraph (d)(1); and by
■ b. Removing the phrase ", Form I– 360," in the last sentence in paragraph (d)(1).

### § 204.6   [Amended]

■ 29. In § 204.6, paragraph (l) is removed and reserved.

### § 204.10   [Removed and Reserved]

■ 30. Section 204.10 is removed and reserved.

### § 204.302   [Amended]

■ 31. In § 204.302, paragraph (b), first sentence, is amended by revising the term "8 CFR 1.1(i), (j) and (m)," to read "8 CFR 1.2".

### § 204.310   [Amended]

■ 32. In § 204.310, paragraph (b), first sentence, is amended by revising the term "8 CFR 103.2(e)" to read "8 CFR 103.16".

## PART 207—ADMISSION OF REFUGEES

■ 33. The authority citation for part 207 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

■ 34. Section 207.1 is revised to read as follows:

## §207.1   Eligibility.

(a) *Filing.* Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by submitting an application, including biometric information, in accordance with the form instructions, as defined in 8 CFR 1.2.

(b) *Firmly resettled.* Any applicant (other than an applicant for derivative refugee status under 8 CFR 207.7) who has become firmly resettled in a foreign country is not eligible for refugee status under this chapter I. A refugee is considered to be ''firmly resettled'' if he or she has been offered resident status, citizenship, or some other type of permanent resettlement by a country other than the United States and has traveled to and entered that country as a consequence of his or her flight from persecution. Any applicant who claims not to be firmly resettled in a foreign country must establish that the conditions of his or her residence in that country are so restrictive as to deny resettlement. In determining whether or not an applicant is firmly resettled in a foreign country, the officer reviewing the matter shall consider the conditions under which other residents of the country live:

(1) Whether permanent or temporary housing is available to the refugee in the foreign country;

(2) Nature of employment available to the refugee in the foreign country; and

(3) Other benefits offered or denied to the refugee by the foreign country which are available to other residents, such as right to property ownership, travel documentation, education, public welfare, and citizenship.

(c) *Immediate relatives and special immigrants.* Any applicant for refugee status who qualifies as an immediate relative or as a special immigrant shall not be processed as a refugee unless it is in the public interest. The alien shall be advised to obtain an immediate relative or special immigrant visa and shall be provided with the proper petition forms to send to any prospective petitioners. An applicant who may be eligible for classification under sections 203(a) or 203(b) of the Act, and for whom a visa number is now available, shall be advised of such eligibility but is not required to apply.

■ 35. Section 207.2 is revised to read as follows:

## §207.2   Applicant processing.

(a) *Interview.* Each applicant 14 years old or older shall appear in person before an immigration officer for inquiry under oath to determine his or her eligibility for admission as a refugee.

(b) *Medical examination.* Each applicant shall submit to a medical examination as required by sections 221(d) and 232(b) of the Act.

(c) *Sponsorship.* Each applicant must be sponsored by a responsible person or organization. Transportation for the applicant from his or her present abode to the place of resettlement in the United States must be guaranteed by the sponsor.

■ 36. Section 207.3 is revised to read as follows:

## §207.3   Waivers of inadmissibility.

(a) *Authority.* Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved.

(b) *Filing requirements.* An applicant may request a waiver by submitting an application for a waiver in accordance with the form instructions. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial if the application is denied. There is no appeal from such decision.

■ 37. Section 207.4 is revised to read as follows:

## §207.4   Approved application.

Approval of a refugee application by USCIS outside the United States authorizes CBP to admit the applicant conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved. There is no appeal from a denial of refugee status under this chapter.

■ 38. Section 207.5 is revised to read as follows:

## §207.5   Waiting lists and priority handling.

Waiting lists are maintained for each designated refugee group of special humanitarian concern. Each applicant whose application is accepted for filing by USCIS shall be registered as of the date of filing. The date of filing is the priority date for purposes of case control. Refugees or groups of refugees may be selected from these lists in a manner that will best support the policies and interests of the United States. The Secretary may adopt appropriate criteria for selecting the refugees and assignment of processing priorities for each designated group based upon such considerations as reuniting families, close association with the United States, compelling humanitarian concerns, and public interest factors.

■ 39. Section 207.7 is amended by:

■ a. Revising the term ''U.S. Attorney General'' to read ''Secretary'' in paragraph (b)(5);

■ b. Revising paragraph (d);

■ c. Removing the last two sentences in paragraph (e); and

■ d. Revising paragraph (f).

The revisions read as follows:

## §207.7   Derivatives of refugees.

\* \* \* \* \*

(d) *Filing.* A refugee may request accompanying or following-to-join benefits for his or her spouse and unmarried, minor child(ren) (whether the spouse and children are inside or outside the United States) by filing a petition in accordance with the form instructions. The petition may only be filed by the principal refugee. Family members who derived their refugee status are not eligible to request derivative benefits on behalf of their spouses and child(ren). A petition must be filed for each qualifying family member within 2 years of the refugee's admission to the United States, unless USCIS determines that the filing period should be extended for humanitarian reasons. There is no time limit imposed on a family member's travel to the United States once the petition has been approved, provided that the relationship of spouse or child continues to exist and approval of the petition has not been subsequently revoked. There is no fee for this petition.

\* \* \* \* \*

(f) *Approvals.* (1) *Spouse or child in the United States.* When a spouse or child of a refugee is in the United States and the petition is approved, USCIS will notify the refugee of such approval. Employment will be authorized incident to status.

(2) *Spouse or child outside the United States.* When a spouse or child of a refugee is outside the United States and the petition is approved, USCIS will notify the refugee of such approval. USCIS will send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the refugee's spouse or child is located.

(3) *Benefits.* The approval of the petition shall remain valid for the duration of the relationship to the refugee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the

AR2022_200247

principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of a refugee. For a derivative inside or arriving in the United States, USCIS will issue a document reflecting the derivative's current status as a refugee to demonstrate employment authorization, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization.

\* \* \* \* \*

■ 40. Section 207.9 is revised to read as follows:

### § 207.9  Termination of refugee status.

The refugee status of any alien (and of the spouse or child of the alien) admitted to the United States under section 207 of the Act will be terminated by USCIS if the alien was not a refugee within the meaning of section 101(a)(42) of the Act at the time of admission. USCIS will notify the alien in writing of its intent to terminate the alien's refugee status. The alien will have 30 days from the date notice is served upon him or her in accordance with 8 CFR 103.8, to present written or oral evidence to show why the alien's refugee status should not be terminated. There is no appeal under this chapter I from the termination of refugee status by USCIS. Upon termination of refugee status, USCIS will process the alien under sections 235, 240, and 241 of the Act.

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 41. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### § 208.1  [Amended]

■ 42. Section 208.1 is amended by:
■ a. Revising in the last sentence of paragraph (a)(1) the term "8 CFR parts 3 and 103, where applicable" to read "8 CFR parts 103 and 1003, as applicable"; and
■ b. Revising in paragraph (b) the term "The Director of International Affairs" to read "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)".

### § 208.2  [Amended]

■ 43. Section 208.2 is amended in paragraph (a) by revising the paragraph heading to read: "Refugee, Asylum, and International Operations (RAIO)" and by revising the terms "the Office of

International Affairs" and "The Office of International Affairs" to read: "RAIO" wherever they appear.

### § 208.5  [Amended]

■ 44. Section 208.5 is amended by:
■ a. Removing the phrase ", pursuant to § 208.4(b)," in the last sentence of paragraph (b)(1)(ii);
■ b. Revising the phrase "The DHS office" to read "DHS" and by revising the phrase "the DHS office" to read "DHS" in paragraph (b)(1)(ii); and
■ c. Revising the term "Attorney General" to read "Secretary" in paragraph (b)(2).

■ 45. Section 208.7 is amended by:
■ a. Revising the phrase "submit a Form I–765, Application for Employment Authorization" to read "request employment authorization" in paragraph (a)(1), first sentence;
■ b. Revising the term "Form I–765" to read "employment authorization request" in paragraph (a)(1), last sentence;
■ c. Revising the phrase "the Service" to read "USCIS" in paragraph (a)(2), first sentence;
■ d. Revising the phrase "the Commissioner" to read "USCIS" in paragraph (b), introductory text; and
■ e. Revising paragraph (c), introductory text.

The revision reads as follows:

### § 208.7  Employment authorization.

\* \* \* \* \*

(c) *Supporting evidence for renewal of employment authorization.* In order for employment authorization to be renewed under this section, the alien must request employment authorization in accordance with the form instructions. USCIS may require that an alien establish that he or she has continued to pursue an asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting one of the following, depending on the stage of the alien's immigration proceedings:

\* \* \* \* \*

### § 208.9  [Amended]

■ 46. In § 208.9, paragraph (b) is amended by removing the phrase "electronically or through any other means designated by the Attorney General".

### § 208.10  [Amended]

■ 47. Section 208.10 is amended by revising the term "the Office of International Affairs" to read "USCIS" in the third sentence.

### § 208.12  [Amended]

■ 48. In § 208.12, paragraph (a) is amended by revising the term "the Office of International Affairs, other Service offices," to read "other USCIS offices".

### § 208.14  [Amended]

■ 49. In § 208.14, paragraph (b) is amended by revising the term "Office of International Affairs" to read "RAIO".
■ 50. Section 208.21 is amended by revising paragraphs (c) and (d) to read as follows:

### § 208.21  Admission of the asylee's spouse and children.

(c) *Spouse or child in the United States.* When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's application, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, regardless of the status of that spouse or child in the United States, in accordance with the form instructions. The petition must be filed by the asylee for each qualifying family member within 2 years of the date in which he or she was granted asylum status, unless it is determined by USCIS that this period should be extended for humanitarian reasons. Upon approval of the petition, USCIS will notify the asylee of such approval. Employment will be authorized incident to status. To demonstrate employment authorization, USCIS will issue a document reflecting the derivative's current status as an asylee, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization. The approval of the derivative benefits petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

(d) *Spouse or child outside the United States.* When a spouse or child of an alien granted asylum is outside the United States, the asylee may request accompanying or following-to-join benefits for his or her spouse or child(ren) by filing a separate petition for each qualifying family member in accordance with the form instructions. A petition for each qualifying family member must be filed within 2 years of the date in which the asylee was granted asylum, unless USCIS determines that the filing period should be extended for

humanitarian reasons. When a petition is approved, USCIS will notify the asylee of such approval. USCIS will also send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located. The approval of the petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

\* \* \* \* \*

■ 51. Section 208.24 is amended by:

■ a. Revising paragraph (a) introductory text;

■ b. Revising paragraph (b) introductory text; and by

■ c. Revising the term "§ 3.2 or § 3.23 of this chapter" to read 8 CFR 1003.2 and 8 CFR 1003.23" and by revising the term "the Service" to read "USCIS", wherever the term appears in paragraph (f).

The revisions read as follows:

### § 208.24 Termination of asylum or withholding of removal or deportation.

(a) *Termination of asylum by USCIS*. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of USCIS if, following an interview, the asylum officer determines that:

\* \* \* \* \*

(b) *Termination of withholding of deportation or removal by USCIS*. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of USCIS if the asylum officer determines, following an interview, that:

\* \* \* \* \*

■ 52. Section 208.30 is amended by revising paragraph (d)(3) to read as follows:

### § 208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\* \* \* \* \*

(d) \* \* \*

(3) The alien may be required to register his or her identity.

\* \* \* \* \*

### § 208.31 [Amended]

■ 53. In § 208.31, paragraph (a) is amended by revising the term "The Service" to read "USCIS" in the last sentence.

## PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

■ 54. The authority citation for part 209 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 55. Section 209.1 is amended by:

■ a. Revising paragraph (a)(1);

■ b. Revising paragraph (b);

■ c. Removing from paragraph (c) last sentence the phrase ", by submitting with the adjustment of status application a vaccination supplement, completed by a designated civil surgeon in the United States";

■ d. Revising paragraphs (d) and (e); and

■ e. Adding paragraph (f).

The revisions read as follows:

### § 209.1 Adjustment of status of refugees.

\* \* \* \* \*

(a) *Eligibility*. (1) Every alien in the United States who is classified as a refugee under 8 CFR part 207, whose status has not been terminated, is required to apply to USCIS one year after entry in order for USCIS to determine his or her admissibility under section 212 of the Act, without regard to paragraphs (4), (5), and (7)(A) of section 212(a) of the Act.

\* \* \* \* \*

(b) *Application*. Upon admission to the United States, every refugee entrant will be notified of the requirement to submit an application for permanent residence one year after entry. An application for the benefits of section 209(a) of the Act must be submitted along with the biometrics required by 8 CFR 103.16 and in accordance with the applicable form instructions.

\* \* \* \* \*

(d) *Interview*. USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(e) *Decision*. USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request for permanent residence in removal proceedings under section 240 of the Act. If the applicant is found to be admissible for permanent residence under section 209(a) of the Act, USCIS

will approve the application, admit the applicant for lawful permanent residence as of the date of the alien's arrival in the United States, and issue proof of such status.

(f) *Inadmissible Alien*. An applicant who is inadmissible to the United States as described in 8 CFR 209.1(a)(1), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions.

■ 56. Section 209.2 is amended by:

■ a. Revising the term "the director" to read "USCIS" whenever that term appears in paragraph (a)(2);

■ b. Removing the undesignated paragraph at the end of paragraph (a)(1);

■ c. Removing the second, third, and last sentences in paragraph (a)(2); and

■ d. Revising paragraphs (b) through (f).

The revisions read as follows:

### § 209.2 Adjustment of status of aliens granted asylum.

\* \* \* \* \*

(b) *Inadmissible Alien*. An applicant who is not admissible to the United States as described in 8 CFR 209.2(a)(1)(v), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions. An applicant for adjustment under this part who has had the status of an exchange alien nonimmigrant under section 101(a)(15)(J) of the Act, and who is subject to the foreign resident requirement of section 212(e) of the Act, shall be eligible for adjustment without regard to the foreign residence requirement if otherwise eligible for adjustment.

(c) *Application*. An application for the benefits of section 209(b) of the Act may be filed in accordance with the form instructions. If an alien has been placed in removal, deportation, or exclusion proceedings, the application can be filed and considered only in proceedings under section 240 of the Act.

(d) *Medical examination*. For an alien seeking adjustment of status under section 209(b) of the Act, the alien shall

submit a medical examination to determine whether any grounds of inadmissibility described under section 212(a)(1)(A) of the Act apply. The asylee is also required to establish compliance with the vaccination requirements described under section 212(a)(1)(A)(ii) of the Act.

(e) *Interview.* USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(f) *Decision.* USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request in removal proceedings under section 240 of the Act. If the application is approved, USCIS will record the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application, but not earlier than the date of the approval for asylum in the case of an applicant approved under paragraph (a)(2) of this section.

## PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS

■ 57. The authority citation for part 211 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

■ 58. Section 211.1 is amended by:
■ a. Revising paragraph (b)(3); and
■ b. Removing paragraph (d).

The revision reads as follows:

### §211.1   Visas.

(b) * * *

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an unexpired immigrant visa, permanent resident card, or reentry permit, the alien may file an application for a waiver of this requirement with the DHS officer with jurisdiction over the port of entry where the alien arrives. To apply for this waiver, the alien must file the designated form with the fee prescribed in 8 CFR 103.7(b)(1). If the alien's permanent resident card was lost or stolen and the alien has been absent for less than one year, rather than the waiver application the alien must apply for a replacement card as described in 8 CFR 264.5. In the exercise of discretion, the DHS officer who has jurisdiction over the port of entry where the alien arrives may waive the alien's lack of an immigrant visa, permanent

resident card, or reentry permit and admit the alien as a returning resident if DHS is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, permanent resident card, or reentry permit. Filing a request to replace a lost or stolen card will serve as both application for replacement and as application for waiver of passport and visa, without the obligation to file a separate waiver application.

* * * * *

### §211.2   [Amended]

■ 59. In § 211.2, paragraph (b) is amended in the second sentence by revising the phrase "file Form I–193, Application for Waiver of Passport and/ or Visa", to read "apply on the form specified by USCIS".

■ 60. Section 211.3 is amended by:
■ a. Revising the section heading; and
■ b. Revising the term "Form I–551" to read "a permanent resident card" whenever the term appears in the first sentence.

The revision reads as follows:

### §211.3   Expiration of immigrant visa or other travel document.

* * * * *

### §211.5   [Amended]

■ 61. Section 211.5 is amended by:
■ a. Revising the phrase "Form I–551 or I–688 shall become" to read "the alien's permanent resident card becomes" in the last sentence in paragraph (b); and
■ b. Revising the term "on Form I–90" to read "in accordance with 8 CFR 264.5" in the last sentence of paragraph (c).

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 62. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255; 8 U.S.C. 1185 note (Pub. L. 108–458, § 7209, 118 Stat. 3638; Public Law 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### §212.1   [Amended]

■ 63. In § 212.1, paragraph (n) is removed and reserved.

### §212.2   [Amended]

■ 64. Section 212.2 is amended by revising the term "the Form I–212" or "Form I–212" to read "the application" wherever it appears in the following places:
■ a. Paragraph (b)(1);

■ b. Paragraph (b)(2);
■ c. Paragraph (e), in the last sentence;
■ d. Paragraph (f);
■ e. Paragraph (i)(1) introductory text; and
■ f. Paragraph (i)(2).

■ 65. Section 212.2 is further amended by:
■ a. Revising the term "sections 212(a)(17) and 212(d)(3)(A) of the Act and § 212.4 of this part" to read "sections 212(a)(9)(A) and 212(d)(3)(A) of the Act and 8 CFR 212.4" in the second sentence of paragraph (b)(1);
■ b. Revising the phrase "Form I–212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal," to read "an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions," in the last sentence of paragraph (b)(1);
■ c. Revising the phrase "an application on Form I–212" to read "the application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions" in paragraph (c)(1)(ii);
■ d. Revising the phrase "the Form I–212 to the Service office with jurisdiction over the area within which the consular officer is located" to read "the application to the designated USCIS office" in paragraph (c)(2);
■ e. Revising the phrase "Form I–212" to read "the waiver request on the form designated by USCIS" in the first sentence in paragraph (d);
■ f. Revising the phrase "Form I–601, Application for Waiver of Grounds of Excludability, must be filed simultaneously with the Form I–212" to read "he or she must file both waiver requests simultaneously with USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the last sentence in paragraph (d).
■ g. Revising the phrase "Form I–212, Application for Permission to Reapply" to read "the application on the form designated by USCIS" in the second sentence in paragraph (e);
■ h. Revising the phrase "file Form I–212" to read "apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence in paragraph (g)(1) introductory text;
■ i. Removing the last sentence in paragraph (g)(1) introductory text;
■ j. Removing paragraphs (g)(1)(i) and (ii);
■ k. Revising the term "8 CFR 245.15(t)(2)" to read "8 CFR 245.15(t)(2) or 8 CFR 245.13(k)(2)" in the first sentence of paragraph (g)(2);

■ l. Revising the phrase ''Form I–212 or Form I–601 concurrently with the Form I–131, Application for Travel Document'' to read ''waiver form concurrently with the parole request'' in the first sentence in paragraph (g)(2);
■ m. Removing the last sentence in paragraph (g)(2); and
■ n. Revising the phrase ''section 212(a)(16) or (17) of the Act'' to read ''section 212(a)(9)(A) of the Act'' in the second sentence of paragraph (j).

### §212.3   [Amended]

■ 66. In §212.3, paragraph (a) is amended by revising the phrase ''Form I–191, Application for Advance Permission to Return to Unrelinquished Domicile'' to read ''the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions''.

### §212.4   [Amended]

■ 67. Section 212.4 is amended by:
■ a. Revising the term ''Form I–192 to the district director in charge of the applicant's intended port of entry prior to the applicant's arrival in the United States'', to read ''the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), and in accordance with the form instructions'' in the first sentence in paragraph (b);
■ b. Removing the term ''of Form I–854, Inter-Agency Alien Witness and Informant Record,'' in the first sentence of paragraph (j)(1); and
■ c. Revising the phrase ''the Commissioner shall'' to read ''USCIS will'' in the first sentence in paragraph (j)(1);
■ d. Revising the phrase ''The Commissioner'' or ''the Commissioner'' to read ''USCIS'' wherever the term appears in the second and third sentences in paragraph (j)(1); and
■ e. Revising the phrase ''the Commissioner'' to read ''USCIS'' in the second sentence in paragraph (j)(2).

### §212.5   [Amended]

■ 68. In §212.5, paragraph (f) is amended by revising the term ''Form I–512'' to read ''an appropriate document authorizing travel''.

■ 69. Section 212.7 is amended by:
■ a. Revising the section heading;
■ b. Revising the paragraph (a)(1);
■ c. Revising paragraph (a)(3);
■ d. Revising in paragraph (a)(4), fourth sentence, the phrase ''deportable in a deportation proceeding'' to read ''deportable in deportation proceedings or removable in removal proceedings'';
■ e. Revising the paragraph (b)(1);
■ f. Removing paragraph (b)(3);
■ g. Revising in the first sentence in paragraph (b)(4)(i) the phrase ''section

212(a) (1) or (3) (because of mental retardation or because of a past history of mental illness)'' to read ''section 212(a)(1)(A)(iii) of the Act'' and the phrase ''an executed Form I–601 to the consular or Service office'' to read ''a waiver request'';
■ h. Removing the last sentence in paragraph (b)(4)(i);
■ i. Redesignating paragraphs (b)(4) and (5) as paragraphs (b)(2) and (3), respectively;
■ j. Revising the term ''Form I–612'' to read ''the form designated by USCIS'' in paragraph (c)(5);
■ k. Revising the term ''the Service'' to read ''USCIS'' in the last sentence in paragraph (c)(9)(vi) introductory text;
■ l. Removing the phrase ''with the Service'' in the first sentence in paragraph (c)(9)(vi)(B); and
■ m. Revising the term ''Form I–797 (and/or I–797A and I–797B)'' to read ''the USCIS approval notice'' in paragraph (c)(9)(vi)(B)(*1*).
The revisions read as follows:

### §212.7   Waiver of certain grounds of inadmissibility.

(a) *Filing and adjudication of waivers under sections 212(g), (h), or (i) of the Act.* (1) *Application procedures.* Any alien who is inadmissible under sections 212(g), (h), or (i) of the Act who is eligible for a waiver of such inadmissibility may file on the form designated by USCIS, with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. When filed at the consular section of an embassy or consulate, the Department of State will forward the application to USCIS for a decision after the consular official concludes that the alien is otherwise admissible.

\*     \*     \*     \*     \*

(3) *Decision.* USCIS will provide a written decision and, if denied, advise the applicant of appeal procedures in accordance with 8 CFR 103.3.

\*     \*     \*     \*     \*

(b) *Section 212(g) waivers for certain medical conditions.* (1) *Application.* Any alien who is inadmissible under section 212(a)(1)(A)(i), (ii), or (iii) of the Act and who is eligible for a waiver under section 212(g) of the Act may file an application as described in paragraph (a)(1) of this section. The family member specified in section 212(g) of the Act may file the waiver application for the applicant if the applicant is incompetent to file the waiver personally.

\*     \*     \*     \*     \*

### §212.8   [Removed and Reserved]

■ 70. Section 212.8 is removed and reserved.

### §212.9   [Removed and Reserved]

■ 71. Section 212.9 is removed and reserved.
■ 72. Section 212.10 is revised to read as follows:

### §212.10   Section 212(k) waiver.

Any applicant for admission who is in possession of an immigrant visa, and who is inadmissible under section 212(a)(5)(A) or 212(a)(7)(A)(i) of the Act, may apply at the port of entry for a waiver under section 212(k) of the Act. If the application for waiver is denied, the application may be renewed in removal proceedings before an immigration judge as provided in 8 CFR part 1240.

### §212.11   [Removed and Reserved]

■ 73. Section 212.11 is removed and reserved.

### §212.14   [Amended]

■ 74. Section 212.14 is amended by:
■ a. Revising the phrase ''a completed Form I–854, Inter-Agency Alien Witness and Informant Record,'' to read ''an application for S nonimmigrant status on the form designated for such purposes'' in paragraph (a)(1)(i);
■ b. Revising the phrase ''a completed Form I–854'' to read ''the completed application'' in the first sentence of paragraph (a)(2)(iii);
■ c. Revising the phrase ''Form I–854 requesting'' to read ''completed application for'' in the second sentence of paragraph (a)(2)(iii); and
■ d. Revising the phrase ''a Form I–854'' to read ''the application'' in paragraph (a)(2)(iii), last sentence.

### §212.15   [Amended]

■ 75. Section 212.15 is amended by:
■ a. Revising the phrase ''shall submit Form I–905, Application for Authorization to Issue Certification for Health Care Workers'' to read ''must apply on the form designated by USCIS in accordance with the form instructions'' in the first sentence of paragraph (j)(1) introductory text;
■ b. Revising the phrase ''As required on Form I–905, the'' to read ''The'' in the last sentence of paragraph (j)(1), introductory text;
■ c. Revising the term ''shall submit Form I–905'' to read ''must apply'' in the first sentence of paragraph (j)(2)(i);
■ d. Revising the phrase ''shall submit Form I–905, Application for Authorization to Issue Certification for Health Care Workers with the appropriate fee contained in 8 CFR 103.7(b)(1)'' to read ''must apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in

AR2022_200251

accordance with the form instructions'' in the first sentence in paragraph (j)(2)(ii);

■ e. Revising the phrase ''After receipt of Form I–905, USCIS shall, in all cases,'' to read ''USCIS will'' in paragraph (j)(3)(i);

■ f. Removing the phrase ''to the Associate Commissioner for Examinations'' from paragraph (j)(3)(iii);

■ g. Revising the phrase ''a Form I–905 requesting,'' to read ''a request for'' in the second sentence of paragraph (l); and

■ h. Revising the term ''Form I–905'' to read ''the request'' in the second sentence of paragraph (m)(2) introductory text.

### §212.16   [Amended]

■ 76. Section 212.16 is amended by

■ a. Revising the term ''Form I–192'' to read ''the request on the form designated by USCIS'', by revising the term ''the Service'' to read ''USCIS'', and by revising the phrase ''completed Form I–914 application package'' to read ''application'' in paragraph (a);

■ b. Revising the terms ''the Commissioner'', ''The Service'', and ''the Service'' to read ''USCIS'' wherever those terms appear in paragraph (b); and by

■ c. Revising the term ''The Commissioner'' to read ''USCIS'' in paragraph (d).

■ 77. Section 212.17 is amended by:

■ a. Revising paragraph (a); and by

■ b. Revising the term ''Form I–192'' to read ''the waiver'' wherever the term appears in paragraph (b).

The revision reads as follows:

### §212.17   Applications for the exercise of discretion relating to U nonimmigrant status.

(a) *Filing the waiver application.* An alien applying for a waiver of inadmissibility under section 212(d)(3)(B) or (d)(14) of the Act (waivers of inadmissibility), 8 U.S.C. 1182(d)(3)(B) or (d)(14), in connection with a petition for U nonimmigrant status being filed pursuant to 8 CFR 214.14, must submit the waiver request and the petition for U nonimmigrant status on the forms designated by USCIS in accordance with the form instructions. An alien in U nonimmigrant status who is seeking a waiver of section 212(a)(9)(B) of the Act, 8 U.S.C. 1182(a)(9)(B) (unlawful presence ground of inadmissibility triggered by departure from the United States), must file the waiver request prior to his or her application for reentry to the United States in accordance with the form instructions.

\*   \*   \*   \*   \*

## PART 213A—AFFIDAVITS OF SUPPORT ON BEHALF OF ALIENS

■ 78. The authority citation for part 213a continues to read as follows:

**Authority:** 8 U.S.C. 1183a; 8 CFR part 2.

### §213a.1   [Amended]

■ 79. Section 213a.1 is amended by:

■ a. Revising in the definition of *household income* the phrase ''signed a U.S. Citizenship and Immigration Services (USCIS) Form I–864A, Affidavit of Support Contract Between Sponsor and Household Member'' to read ''signed the form designated by USCIS for this purpose'';

■ b. Revising in the definition of *household size,* in the second sentence in paragraph (1), the term ''Form I–864'' to read ''affidavit of support,'' wherever the term appears;

■ c. Revising in the definition of *joint sponsor* the term ''a Form I–864'' to read ''an affidavit of support'';

■ d. Revising in the definition of *sponsor* the term ''a Form I–864'' to read ''an affidavit of support''; and

■ e. Revising in the definition of *substitute sponsor* the term ''a Form I–864'' to read ''the affidavit of support'' and the term ''the Form I–130 or I–129F'' to read ''a relative or fiancé(e) petition''.

■ 80–82. Section 213a.2 is amended by:

■ a. Revising paragraphs (a)(1)(i) through (a)(1)(v)(A);

■ b. Revising the phrase ''Form I–864 or Form I–864A'' to read ''affidavit of support or required affidavit of support attachment form'' in the first sentence of paragraph (a)(1)(v)(B);

■ c. Revising the phrase ''Form I–864 and any Form I–864A'' to read ''affidavit of support and any required affidavit of support attachment'' in the last sentence of paragraph (a)(1)(v)(B);

■ d. Revising the phrase ''the Form I–130 or Form I–600 immigrant visa petition (or the Form I–129F petition, for a K nonimmigrant seeking adjustment)'' to read ''relative, orphan or fiancé(e) petition'' in the first sentence of paragraph (b)(1);

■ e. Revising the phrase ''in Form I–864P Poverty Guidelines'' to read ''the Poverty Guidelines'' in paragraph (c)(2)(i)(A);

■ f. Revising the term ''Form I–864'' to read ''affidavit of support'' in paragraph (c)(2)(iii)(A)(*2*);

■ g. Revising paragraph (c)(2)(iii)(C);

■ h. Revising the phrase ''filed USCIS Form I–407, Abandonment of Lawful Permanent Resident Status'' to read ''abandoned permanent resident status, executing the form designated by USCIS for recording such action'' in paragraph (e)(2)(i)(C);

■ i. Revising the phrase ''Form I–864 or Form I–864A'' to read '' affidavit of support and any required attachments'' wherever the term appears in paragraph (f);

■ j. Revising the phrase ''the signed Form(s) I–864 (and any Form(s) I–864A)'' to read ''any relevant affidavit(s) and attachments'' in paragraph (g)(1); and

■ k. Revising paragraphs (g)(2)(i) and (ii).

■ l. Section 213a.2 is further amended by revising the terms ''Form I–864'', ''the Form I–864'', and ''a Form I–864'' to read ''an affidavit of support'' wherever those terms or phrases appear in the following places:

■ i. Paragraph (b), introductory text;

■ ii. Paragraph (b)(1);

■ iii. Paragraph (b)(2);

■ iv. Paragraph (c)(1)(i)(B);

■ v. Paragraph (c)(2)(i)(A);

■ vi. Paragraph (c)(2)(i)(B);

■ vii. Paragraph (c)(2)(i)(C)(*2*);

■ viii. Paragraph (c)(2)(i)(C)(*4*);

■ ix. Paragraph (c)(2)(i)(D);

■ x. Paragraph (c)(2)(ii)(C);

■ xi. Paragraph (c)(2)(iii)(D);

■ xii. Paragraph (c)(2)(v);

■ xiii. Paragraph (c)(2)(vi);

■ xiv. Paragraph (d);

■ xv. Paragraph (e)(1);

■ xvi. Paragraph (e)(2)(i) introductory text;

■ xvii. Paragraph (e)(2)(i)(D);

■ xviii. Paragraph (e)(2)(ii);

■ xix. Paragraph (e)(3); and

■ xx. Paragraph (f) heading.

■ m. Section 213a.2 is further amended by revising the terms ''Form I–864A'', ''the Form I–864A'', or ''a Form I–864A'' to read ''an affidavit of support attachment'' wherever those terms or phrases appear in the following places:

■ i. Paragraph (c)(2)(i)(C)(*1*);

■ ii. Paragraph (c)(2)(i)(C)(*2*);

■ iii. Paragraph (c)(2)(i)(C)(*3*);

■ iv. Paragraph (c)(2)(i)(C)(*4*);

■ v. Paragraph (c)(2)(i)(C)(*5*);

■ vi. Paragraph (c)(2)(i)(D);

■ vii. Paragraph (c)(2)(iii)(B) introductory text;

■ viii. Paragraph (c)(2)(v);

■ ix. Paragraph (c)(2)(vi);

■ x. Paragraph (e)(1);

■ xi. Paragraph (e)(2)(i) introductory text;

■ xii. Paragraph (e)(2)(i)(D);

■ xiii. Paragraph (e)(2)(ii);

■ xiv. Paragraph (e)(3); and

■ xv. Paragraph (f) heading.

The revisions read as follows:

### §213a.2   Use of affidavit of support.

(a) *Applicability of section 213a affidavit of support.* (1)(i)(A) In any case specified in paragraph (a)(2) of this section, an intending immigrant is

inadmissible as an alien likely to become a public charge, unless the qualified sponsor specified in paragraph (b) of this section or a substitute sponsor and, if necessary, a joint sponsor, has executed on behalf of the intending immigrant an affidavit of support on the applicable form designated by USCIS in accordance with the requirements of section 213A of the Act and the form instructions. Each reference in this section to the affidavit of support or the form is deemed to be a reference to all such forms designated by USCIS for use by a sponsor for compliance with section 213A of the Act.

(B) If the intending immigrant claims that, under paragraph (a)(2)(ii)(A), (C), or (E) of this section, the intending immigrant is exempt from the requirement to file an affidavit of support, the intending immigrant must include with his or her application for an immigrant visa or adjustment of status an exemption request on the form designated by USCIS for this purpose.

(ii) An affidavit of support is executed when a sponsor signs and submits the appropriate forms in accordance with the form instructions to USCIS or the Department of State, as appropriate.

(iii) A separate affidavit of support is required for each principal beneficiary.

(iv) Each immigrant who will accompany the principal intending immigrant must be included on the affidavit. See paragraph (f) of this section for further information concerning immigrants who intend to accompany or follow the principal intending immigrant to the United States.

(v)(A) Except as provided for under paragraph (a)(1)(v)(B) of this section, the Department of State consular officer, immigration officer, or immigration judge will determine the sufficiency of the affidavit of support based on the sponsor's, substitute sponsor's, or joint sponsor's reasonably expected household income in the year in which the intending immigrant filed the application for an immigrant visa or for adjustment of status, and based on the evidence submitted with the affidavit of support and the Poverty Guidelines in effect when the intending immigrant filed the application for an immigrant visa or adjustment of status.

*     *     *     *     *

(c) *     *     *

(2) *     *     *

(iii) *     *     *

(C) *Joint sponsor.* A joint sponsor must execute a separate affidavit of support on behalf of the intending immigrant(s) and be willing to accept joint and several liabilities with the sponsor or substitute sponsor. A joint sponsor must meet all the eligibility requirements under paragraph (c)(1) of this section, except that the joint sponsor is not required to file a visa petition on behalf of the intending immigrant. The joint sponsor must demonstrate his or her ability to support the intending immigrant in the manner specified in paragraph (c)(2) of this section. A joint sponsor's household income must meet or exceed the income requirement in paragraph (c)(2)(iii) of this section unless the joint sponsor can demonstrate significant assets as provided in paragraph (c)(2)(iv)(A) of this section. The joint sponsor's household income must equal at least 125 percent of the Poverty Guidelines for the joint sponsor's household size, unless the joint sponsor is on active duty in the Armed Forces and the intending immigrant is the joint sponsor's spouse or child, in which case the joint sponsor's household income is sufficient if it equals at least 100 percent of the Poverty Guidelines for the joint sponsor's household size. An intending immigrant may not have more than one joint sponsor, but, if the joint sponsor's household income is not sufficient to meet the income requirement with respect to the principal intending immigrant, any spouse and all the children who, under section 203(d) of the Act, seek to accompany the principal intending immigrant, then the joint sponsor may specify on the affidavit that it is submitted only on behalf of the principal intending immigrant and those accompanying family members specifically listed on the affidavit. The remaining accompanying family members will then be inadmissible under section 212(a)(4) of the Act unless a second joint sponsor submits an affidavit(s) on behalf of all the remaining family members who seek to accompany the principal intending immigrant and who are not included in the first joint sponsor's affidavit. There may not be more than two joint sponsors for the family group consisting of the principal intending immigrant and the accompanying spouse and children.

*     *     *     *     *

(g) *     *     *

(2)(i) To avoid inadmissibility under section 212(a)(4) of the Act, an alien who applies for an immigrant visa, admission, or adjustment of status as an alien who is following-to-join a principal intending immigrant must submit a new affidavit(s) of support, together with all documents or other evidence necessary to prove that the new affidavits comply with the requirements of section 213A of the Act and 8 CFR part 213a.

(ii) When paragraph (g)(2)(i) of this section requires the filing of a new affidavit for an alien who seeks to follow-to-join a principal sponsored immigrant, the same sponsor who filed the visa petition and affidavit of support for the principal sponsored immigrant must file the new affidavit on behalf of the alien seeking to follow-to-join. If that person has died, then the alien seeking to follow-to-join is inadmissible unless a substitute sponsor, as defined by 8 CFR 213a.1, signs a new affidavit that meets the requirements of this section. Persons other than the person or persons who signed the original joint affidavits on behalf of the principal sponsored immigrant may sign a new joint affidavit on behalf of an alien who seeks to follow-to-join a principal sponsored immigrant.

*     *     *     *     *

■ 83. Section 213a.3 is revised to read as follows:

### § 213a.3   Change of address.

(a) *Submission of address change.* (1) *Filing requirements.* If the address of a sponsor (including a substitute sponsor or joint sponsor) changes while the sponsor's support obligation is in effect, the sponsor shall file a change of address notice within 30 days, in a manner as prescribed by USCIS on its address change form instructions.

(2) *Proof of mailing.* USCIS will accept a photocopy of the change of address form together with proof of the form's delivery to USCIS as evidence that the sponsor has complied with this requirement.

(3) *Electronic notices.* USCIS will provide the sponsor with a receipt notice for an address change.

(4) *Alien sponsors.* If the sponsor is an alien, the sponsor must still comply with the requirements of 8 CFR 265.1 to notify USCIS of his or her change of address.

(b) *Civil penalty.* If the sponsor fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(A) of the Act. Except, if the sponsor, knowing that the sponsored immigrant has received any means-tested public benefit, fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(B) of the Act. The procedure for imposing a civil penalty is established at 8 CFR part 280.

AR2022_200253

## §213a.4   [Amended]

■ 84. Section 213a.4 is amended by:
■ a. Revising the term ''8 CFR 103.5a(a)(2)'' to read ''8 CFR 103.8(a)(2)'' in paragraph (a)(1)(i); and
■ b. Revising the phrases ''a Form I–864 or Form I–864A'' and ''the Form I–864 or Form I–864A'' to read ''an affidavit of support'' in the first sentence in paragraph (a)(3).

■ 85. Section 213a.5 is revised to read as follows:

### §213a.5   Relationship of this part to other affidavits of support.

Nothing in this part precludes the continued use of other affidavits of support provided by USCIS in a case other than a case described in §213a.2(a)(2). The obligations of section 213A of the Act do not bind a person who executes such other USCIS affidavits of support. Persons sponsoring an Amerasian alien described in section 204(f)(2) of the Act remain subject to the provisions of section 204(f)(4)(B) of the Act and 8 CFR 204.4(i), as appropriate.

## PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS

■ 86. The authority citation for part 223 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, Nov. 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

■ 87. Section 223.2 is revised to read as follows:

### §223.2   Application and processing.

(a) *Application.* An applicant must submit an application for a reentry permit, refugee travel document, or advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(b) *Filing eligibility.* (1) *Reentry permit.* An applicant for a reentry permit must file such application while in the United States and in status as a lawful permanent resident or conditional permanent resident.

(2) *Refugee travel document.* (i) Except as provided in paragraph (b)(2)(ii) of this section, an applicant for a refugee travel document must submit the application while in the United States and in valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act or is a permanent resident who received such status as a direct result of his or her asylum or refugee status.

(ii) *Discretionary authority to accept a refugee travel document application from an alien not within the United States.* As a matter of discretion, the Service office with jurisdiction over a port-of-entry or pre-flight inspection location where the alien is seeking admission, or the overseas Service office where the alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who departed from the United States without having applied for such refugee travel document, provided the officer:

(A) Is satisfied that the alien did not intend to abandon his or her refugee or asylum status at the time of departure from the United States;

(B) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(C) The alien has been outside the United States for less than 1 year since his or her last departure.

(c) *Ineligibility.* (1) *Prior document still valid.* An application for a reentry permit or refugee travel document will be denied if the applicant was previously issued a reentry permit or refugee travel document which is still valid, unless it was returned to USCIS or it is demonstrated that it was lost.

(2) *Extended absences.* A reentry permit issued to a person who, since becoming a permanent resident or during the last five years, whichever is less, has been outside the United States for more than four years in the aggregate, shall be limited to a validity of one year, except that a permit with a validity of two years may be issued to:

(i) A permanent resident described in 8 CFR 211.1(a)(6) or (a)(7);

(ii) A permanent resident employed by a public international organization of which the United States is a member by treaty or statute, and his or her permanent resident spouse and children; or

(iii) A permanent resident who is a professional athlete who regularly competes in the United States and worldwide.

(3) *Permanent resident entitled to nonimmigrant diplomatic or treaty status.* A permanent resident entitled to nonimmigrant status under section 101(a)(15)(A), (E), or (G) of the Act because of occupational status may only be issued a reentry permit if the applicant executes and submits with the application, or has previously executed

and submitted, a written waiver as required by 8 CFR part 247.

(d) *Effect of travel before a decision is made.* Departure from the United States before a decision is made on an application for a reentry permit or refugee travel document will not affect the application.

(e) *Processing.* USCIS may approve or deny a request for a reentry permit or refugee travel document as an exercise of discretion. If it approves the application, USCIS will issue an appropriate document.

(f) *Effect on proceedings.* Issuance of a reentry permit or refugee travel document to a person in exclusion, deportation, or removal proceedings shall not affect those proceedings.

(g) *Appeal.* Denial of an application for a reentry permit or refugee travel document may be appealed in accordance with 8 CFR 103.3.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 88. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 U.S.C. 1185 note (Pub. L. 108–458, § 7209, 118 Stat. 3638).

### §235.3   [Amended]

■ 89. In § 235.3, paragraph (b)(1)(i) is amended by revising the term ''§ 1.1(q) of this chapter'' to read ''8 CFR 1.2.''

### §235.8   [Amended]

■ 90. In § 235.8, paragraph (e) is amended by revising the term ''§ 1.1(q) of this chapter'' to read ''8 CFR 1.2.''

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 91. The authority citation for part 236 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

### §236.2   [Amended]

■ 92. In § 236.2, paragraph (a) is amended by revising the term ''§ 103.5a(c) of this chapter'' to read ''8 CFR 103.8(c)''.

### §236.16   [Amended]

■ 93. Section 236.16 is amended by revising the phrase ''using Form I–131, Application for Travel Document'' to read ''in accordance with 8 CFR

223.2(a)'' in the first sentence and revising the phrase ''the district director'' to read ''USCIS'' in the second sentence.

## § 236.18  [Amended]

■ 94. In § 236.18, paragraph (b) is amended by revising the term ''§ 103.5a of this chapter'' to read ''8 CFR 103.8(a)(2)'' wherever that term appears.

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

■ 95. The authority citation for part 238 continues to read as follows:

   **Authority:** 8 U.S.C. 1228; 8 CFR part 2.

■ 96. In § 238.1, paragraph (b)(2)(i) is amended by revising the term ''§§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter'' to read ''8 CFR 103.8''.

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 97. The heading for part 240 is revised as set forth above.

■ 98. The authority citation for part 240 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; sections 202 and 203, Pub. L. 105–100, 111 Stat. 2160, 2193; section 902, Pub. L. 105–277, 112 Stat. 2681; 8 CFR part 2.

■ 99. Section 240.67 is amended by revising paragraph (a) introductory text to read as follows:

### § 240.67  Procedure for interview before an asylum officer.

   (a) *Fingerprinting requirements.* USCIS will notify each applicant 14 years of age or older to appear for an interview only after the applicant has complied with fingerprinting requirements pursuant to 8 CFR 103.16, and USCIS has received a definitive response from the FBI that a full criminal background check has been completed. A definitive response that a full criminal background check on an applicant has been completed includes:

*      *      *      *      *

## PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

■ 100. The authority citation for part 241 continues to read as follows:

   **Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1223, 1224, 1225, 1226, 1227, 1228, 1231, 1251, 1253, 1255, 1330, 1362; 18 U.S.C. 4002, 4013(c)(4); Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101, et seq.); 8 CFR part 2.

## § 241.4  [Amended]

■ 101. In § 241.4, paragraph (d)(2), first sentence is amended by revising the term ''8 CFR 103.5a'' to read ''8 CFR 103.8''.

■ 102. Section 241.5 is amended by revising paragraph (a)(5) to read as follows:

### § 241.5  Conditions of release after removal period.

   (a) * * *
   (5) A requirement that the alien provide DHS with written notice of any change of address in the prescribed manner.

*      *      *      *      *

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 103. The authority citation for part 244 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

## § 244.3  [Amended]

■ 104. Section 244.3 is amended by:
■ a. Revising the term ''the Service'' to read ''USCIS'' in the first sentence in paragraph (b);
■ b. Removing the phrase ''of grounds of inadmissibility on Form I–601 (Application for waiver of grounds of excludability)'' in the second sentence in paragraph (b);
■ c. Revising the term ''The Service'' to read ''USCIS'' in paragraph (c) introductory text.

## § 244.4  [Amended]

■ 105. In § 244.4, paragraph (b) is amended by revising the term ''section 243(h)(2) of the Act'' to read ''section 208(b)(2)(A) of the Act''.

## § 244.5  [Amended]

■ 106. In § 244.5, paragraph (a) is amended by revising the term ''the Attorney General'' to read ''DHS'' wherever the term appears.

■ 107. Section 244.6 is revised to read as follows:

### § 244.6  Application.

   (a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific Federal Register notice that announces the procedures for TPS registration or re-registration, and 8 CFR 103.2, except as otherwise provided in this section, with the appropriate fees and biometric information as described in 8 CFR 103.7(b)(1), 103.16, and 103.17.
   (b) An applicant for TPS may also request employment authorization

pursuant to 8 CFR 274a. Those applicants between the ages of 14 and 65 who are not requesting authorization to work will not be charged a fee for an application for employment authorization.

## § 244.7  [Amended]

■ 108. Section 244.7 is amended by:
■ a. Revising the phrase ''Form I–821, Application for Temporary Protected Status'' to read ''the form designated by USCIS with any prescribed fees and in accordance with the form instructions'' in paragraph (a); and
■ b. Revising the term ''Attorney General'' to read ''DHS'' in paragraph (b).

## § 244.9  [Amended]

■ 109. In § 244.9, paragraph (a)(4) is amended by revising the phrase ''Form I–551 or Form I–94'' to read ''evidence of admission for lawful permanent residence or nonimmigrant status''.

■ 110. Section 244.10 is amended by:
■ a. Revising the section heading; and
■ b. Revising paragraphs (a), (b) (c) and (d).
   The revisions read as follows:

### § 244.10  Decision and appeal.

   (a) *Temporary treatment benefits.* USCIS will grant temporary treatment benefits to the applicant if the applicant establishes prima facie eligibility for Temporary Protected Status in accordance with 8 CFR 244.5.
   (b) *Temporary Protected Status.* Upon review of the evidence presented, USCIS may approve or deny the application for Temporary Protected Status in the exercise of discretion, consistent with the standards for eligibility in 8 CFR 244.2, 244.3, and 244.4.
   (c) *Denial.* The initial decision to deny Temporary Protected Status, a waiver of inadmissibility, or temporary treatment benefits shall be in writing served in person or by mail to the alien's most recent address provided to the Service and shall state the reason(s) for the denial. Except as otherwise provided in this section, the alien will be given written notice of his or her right to appeal. If an appeal is filed, the administrative record shall be forwarded to the USCIS AAO for review and decision, except as otherwise provided in this section.
   (1) If the basis for the denial of the Temporary Protected Status constitutes a ground for deportability or inadmissibility which renders the alien ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c), the decision shall

include a charging document which sets forth such ground(s).

(2) If such a charging document is issued, the alien shall not have the right to appeal the USCIS decision denying Temporary Protected Status as provided in 8 CFR 103.3. However, the decision will also apprise the alien of his or her right to a *de novo* determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(d) *Administrative appeal.* The appellate decision will be served in accordance with 8 CFR 103.8. If the appeal is dismissed, the decision must state the reasons for dismissal.

(1) If the appeal is dismissed on appeal under 8 CFR 244.18(b), the decision shall also apprise the alien of his or her right to a *de novo* determination of eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(2) If the appeal is dismissed, USCIS may issue a charging document if no charging document is presently filed with the Immigration Court.

(3) If a charging document has previously been filed or is pending before the Immigration Court, either party may move to re-calendar the case after the administrative appeal is dismissed.

\* \* \* \* \*

### § 244.11 [Amended]

■ 111. Section 244.11 is amended by revising the term ''§ 3.3 of this chapter'' to read ''8 CFR 1003''.

### § 244.12 [Amended]

■ 112. Section 244.12, is amended by:
■ a. Revising the term ''the INS'' to read ''USCIS'' in paragraphs (a) and (c); and
■ b. Revising the phrase ''appealed to the Administrative Appeals Unit'' to read ''pending administrative appeal'' in paragraph (d).

### § 244.14 [Amended]

■ 113. Section 244.14 is amended by:
■ a. Revising the term ''*director*'' to read ''*USCIS*'' in paragraph (a) heading;
■ b. Revising the term ''The director'' to read ''USCIS'' in paragraph (a) introductory text;
■ c. Revising the term ''the district director'' to read ''USCIS'' in paragraph (a)(2) last sentence;
■ d. Revising the term ''Attorney General'' to read ''DHS'' in paragraph (a)(3);
■ e. Revising the term ''*director*'' to read ''*USCIS*'' in paragraph (b) heading; and by

■ f. Revising the term ''§ 240.14(a)(3)'' to read ''8 CFR 244.14(a)(3)'' and the term ''§ 103.5a of this chapter'' to read ''8 CFR 103.8(a)(2)'' in paragraph (b)(1).

### § 244.16 [Amended]

■ 114. In § 244.16, the term ''the Department of Justice'' is revised to read ''DHS''.

■ 115. Section 244.17 is revised to read as follows:

### § 244.17 Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated or redesignated for more than one year by DHS. Applicants for periodic re-registration must apply during the registration period provided by USCIS. Re-registering applicants will not need to re-pay the TPS application fee that was required for initial registration except that aliens requesting employment authorization must submit the application fee for employment authorization. The biometric service fee described in 103.7(b), or an approved fee waiver, will be required of applicants age 14 and over. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests them to do so.

(b) If an alien fails to register without good cause, USCIS will withdraw Temporary Protected Status. USCIS may, for good cause, accept and approve an untimely registration request.

■ 116. Section 244.18 is amended by revising paragraphs (b) and (d) to read as follows:

### § 244.18 Issuance of charging documents; detention.

\* \* \* \* \*

(b) The filing of the charging document by DHS with the Immigration Court renders inapplicable any other administrative, adjudication or review of eligibility for Temporary Protected Status. The alien shall have the right to a *de novo* determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18. Review by the Board of Immigration Appeals shall be the exclusive administrative appellate review procedure. If an appeal is already pending before the Administrative Appeals Office (AAO), USCIS will notify the AAO of the filing of the charging document, in which case the pending appeal shall be dismissed and the record of proceeding returned to

the jurisdiction where the charging document was filed.

\* \* \* \* \*

(d) An alien who is determined by USCIS deportable or inadmissible upon grounds which would have rendered the alien ineligible for such status as provided in 8 CFR 244.3(c) and 8 CFR 244.4 may be detained under the provisions of this chapter pending removal proceedings. Such alien may be removed from the United States upon entry of a final order of removal.

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 117. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 118. Section 245.1 is amended by:
■ a. Revising the term to ''section 214(k)'' to read: ''section 214(l)'' in the last sentence in paragraph (c)(2);
■ b. Removing and reserving paragraph (e)(2);
■ c. Revising the third sentence in paragraph (g)(1); and by
■ d. Removing the fourth sentence in paragraph (g)(1).

The revision reads as follows:

### § 245.1 Eligibility.

\* \* \* \* \*

(g) \* \* \*

(1) \* \* \* A preference immigrant visa is considered available for accepting and processing if the applicant has a priority date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current). \* \* \*

\* \* \* \* \*

### § 245.2 [Amended]

■ 119. Section 245.2 is amended by removing the phrase '', except when the applicant has established eligibility for the benefits of Public Law 101–238'' in the second sentence in paragraph (a)(5)(ii).

■ 120. In § 245.7, paragraph (a) is revised to read as follows:

*§ 245.7 Adjustment of status of certain Soviet and Indochinese parolees under the Foreign Operations Appropriations Act for Fiscal Year 1990 (Pub. L. 101–167).* (a) *Application.* Each person applying for benefits under section 599E of Public Law 101–167, 103 Stat. 1195, 1263, must file an application on the form prescribed by

USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\* \* \* \* \*

### §245.9 [Removed and Reserved]

■ 121. Section 245.9 is removed and reserved.

■ 122. In §245.10, paragraph (n)(2) is revised to read as follows:

### §245.10 Adjustment of status upon payment of additional sum under Public Law 103–317.

\* \* \* \* \*

(n) \* \* \*

(2) To demonstrate physical presence on December 21, 2000, the alien may submit copies of documents issued by the former INS or EOIR such as arrival-departure forms or notices to appear in immigration court.

\* \* \* \* \*

■ 123. In §245.11, remove the last two sentences in paragraph (f) and add a new sentence to read as follows:

### §245.11 Adjustment of aliens in S nonimmigrant classification.

\* \* \* \* \*

(f) \* \* \* The applicant may request employment authorization or permission to travel outside the United States while the application is pending by filing an application pursuant to 8 CFR 274a.13 or 8 CFR 223.2.

\* \* \* \* \*

### §245.12 [Removed and Reserved]

■ 124. Section 245.12 is removed and reserved.

### §245.13 [Removed and Reserved]

■ 125. Section 245.13 is removed and reserved.

■ 126. Section 245.15 is amended by:
■ a. Revising the phrase "Advance Authorization for Parole (Form I–512)" to read "advance parole authorization" and revising the phrase "Advance Authorization for Parole" to read "authorization" in paragraph (c)(4)(ii);
■ b. Revising paragraph (g)(1);
■ c. Revising paragraph (n)(1);
■ d. Revising the phrase "the Director of the Nebraska Service Center verifies that Service" to read "USCIS verifies that DHS" and by revising the term "the Director may approve" to read "USCIS may approve" in the first sentence in paragraph (n)(2);
■ e. Revising the term "the Service" to read "USCIS" in the second sentence in paragraph (n)(2);
■ f. Revising paragraph (s)(1);
■ g. Revising paragraph (t)(1);
■ h. Revising the phrase "an Application for Travel Document (Form I–131) with the Nebraska Service Center, at P.O. Box 87245, Lincoln, NE 68501–7245" to read "a request on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence of paragraph (t)(2)(i); and
■ i. Revising the term "Form I–485" to read "application for adjustment of status" in the second sentence in paragraph (t)(2)(i).

The revisions read as follows:

### §245.15 Adjustment of Status of Certain Haitian Nationals under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA).

\* \* \* \* \*

(g) \* \* \*

(1) *Filing of applications with USCIS.* USCIS has jurisdiction over all applications for the benefits of section 902 of HRIFA as a principal applicant or as a dependent under this section, except for applications filed by aliens who are in pending immigration proceedings as provided in paragraph (g)(2) of this section. All applications filed with USCIS for the benefits of section 902 of HRIFA must be submitted on the form designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. After proper filing of the application, USCIS will instruct the applicant to appear for biometrics collection as prescribed in 8 CFR 103.16.

\* \* \* \* \*

(n) \* \* \*

(1) *Application for employment authorization.* An applicant for adjustment of status under section 902 of HRIFA who wishes to obtain initial or continued employment authorization during the pendency of the adjustment application must file an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The applicant may submit the application either concurrently with or subsequent to the filing of the application for HRIFA benefits.

\* \* \* \* \*

(s) *Action of immigration judge upon referral of decision by a notice of certification.* (1) *General.* Upon the referral by a notice of certification of a decision to deny the application, in accordance with paragraph (r)(3) of this section, the immigration judge will conduct a hearing to determine whether the alien is eligible for adjustment of status under section 902 of HRIFA in accordance with this paragraph (s)(1).

\* \* \* \* \*

(t) \* \* \*

(1) *Travel from and return to the United States while the application for adjustment of status is pending.* If an applicant for benefits under section 902 of HRIFA desires to travel outside, and return to, the United States while the application for adjustment of status is pending, he or she must file a request for advance parole authorization on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Unless the applicant files an advance parole request prior to departing from the United States and USCIS approves such request, his or her application for adjustment of status under section 902 of HRIFA is deemed to be abandoned as of the moment of departure. Parole may only be authorized pursuant to the authority contained in, and the standards prescribed in, section 212(d)(5) of the Act.

\* \* \* \* \*

■ 127. Section 245.18 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraph (d)(1);
■ c. Revising the term "the Service" to read "USCIS" in paragraph (d)(2); and
■ d. Revising the last sentence in paragraph (k).

The revisions read as follows:

### §245.18 Physicians with approved employment-based petitions serving in a medically underserved area or a Veterans Affairs facility.

\* \* \* \* \*

(d) *Employment authorization.* (1) Once USCIS has approved a petition described in paragraph (a) of this section, the alien physician may apply for permanent residence and employment authorization on the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\* \* \* \* \*

(k) \* \* \* Such physicians may apply for advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\* \* \* \* \*

### §245.20 [Removed and Reserved]

■ 128. Section 245.20 is removed and reserved.

■ 129–130. Section 245.21 is amended by:
■ a. Adding the word "and" at the end of paragraph (a)(3);
■ b. Removing paragraph (a)(4);
■ c. Redesignating paragraph (a)(5) as paragraph (a)(4);
■ d. Revising paragraph (b);
■ e. Revising the second sentence in paragraph (d)(1);

■ f. Revising paragraph (d)(2);
■ g. Revising the last sentence in paragraph (f);
■ h. Revising paragraph (h);
■ i. Revising paragraph (i);
■ j. Revising the terms, "Service" and "Service's" to read "USCIS'" in paragraph (j);
■ k. Removing paragraph (m); and
■ l. By revising the terms "The Service" and "the Service" to read "USCIS" wherever the terms appear in the following paragraphs:
■ i. Paragraph (a) introductory text;
■ ii. Paragraph (c);
■ iii. Paragraph (d) introductory text;
■ iv. Paragraph (d)(4);
■ v. Paragraph (g)(3);
■ vi. Paragraph (j);
■ vii. Paragraph (k); and
■ viii. Paragraph (l).
The revisions read as follows:

### § 245.21 Adjustment of status of certain nationals of Vietnam, Cambodia, and Laos.

\* \* \* \* \*

(b) *Application.* An applicant must submit an application on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Applicants who are 14 through 79 years of age must also submit the biometrics service fee described in 8 CFR 103.17.

\* \* \* \* \*

(d) \* \* \*
(1) \* \* \* An alien who is eligible for adjustment of status under section 586 of Public Law 106–429 may request a stay of removal during the pendency of the application. \* \* \*
(2) DHS will exercise its discretion not to grant a stay of removal, deportation, or exclusion with respect to an alien who is inadmissible on any of the grounds specified in paragraph (m)(3) of this section, unless there is substantial reason to believe that USCIS will grant the necessary waivers of inadmissibility.

\* \* \* \* \*

(f) \* \* \* In order to obtain a waiver for any of these grounds, the applicant must submit an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\* \* \* \* \*

(h) *Employment authorization.* Applicants who want to obtain employment authorization based on a pending application for adjustment of status under this section may apply on the form specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(i) *Travel while an application to adjust status is pending.* An applicant who wishes to travel outside the United States while the application is pending must obtain advance permission by filing the application specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\* \* \* \* \*

■ 131. In § 245.22, paragraph (c) is revised to read as follows:

### § 245.22 Evidence to demonstrate an alien's physical presence in the United States on a specific date.

\* \* \* \* \*

(c) *DHS-issued documentation.* An applicant for permanent residence may demonstrate physical presence by submitting DHS-issued (or predecessor agency-issued) documentation such as an arrival-departure form or notice to appear in immigration proceedings.

\* \* \* \* \*

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 132. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a, and 1255a note.

■ 133. The heading for part 245a is revised as set forth above.

### § 245a.4 [Amended]

■ 134. In § 245a.4, paragraph (b)(16), third sentence is amended by revising the term "§ 103.5a(b) of this Act" to read "8 CFR 103.8(b)".

### § 245a.12 [Amended]

■ 135. In § 245a.12, paragraph (b) introductory text, third sentence is amended by revising the term "fingerprinting as prescribed in § 103.2(e) of this chapter" to read "fingerprinting as prescribed in 8 CFR 103.16".

### § 245a.37 [Amended]

■ 136. In § 245a.37, paragraph (b) is amended by revising the term "§ 103.5a of this chapter" to read "8 CFR 103.8" wherever that term appears.

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 137. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

### § 248.1 [Amended]

■ 138. Section 248.1 is amended by:

■ a. Revising the term "the Service" to read "USCIS" in paragraph (b) introductory text;
■ b. Revising the term "the Service" to read "USCIS" in paragraph (b)(1);
■ c. Revising the phrase "The district director or service center director shall" to read "USCIS will" in the second sentence in paragraph (c)(1);
■ d. Revising the phrase "The district director or service center director" to read "USCIS" in the last sentence in paragraph (c)(3); and
■ e. Removing the phrase "before the Service" in the last sentence in paragraph (c)(3).

■ 139. Section 248.3 is amended by:
■ a. Adding introductory text;
■ b. Revising paragraph (a);
■ c. Revising paragraph (b);
■ d. Revising the phrase "Form I–539 and be accompanied by a Form I–566, completed and endorsed in accordance with the instructions on that form" to read "the prescribed application accompanied by the appropriate endorsement from the Department of State recommending the change of status" in the second sentence in paragraph (c);
■ e. Removing and reserving paragraph (d);
■ f. Revising the term "sections 101(a)(15)(E), (H), (I), (J), (L), or (Q)(ii) of the Act" to read "sections 101(a)(15)(E), (H), (I), (J), or (L) of the Act" in paragraph (e)(2);
■ g. Revising the term "the district director" to read "USCIS" in the last sentence in paragraph (f); and
■ h. Revising the phrase "Form I–539, Application to Extend/Change Nonimmigrant Status, with the appropriate fee, and Form I–854, Inter-Agency Alien Witness and Informant Record, with attachments" to read "the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (h) introductory text.

The revisions read as follows:

### § 248.3 Petition and application.

Requests for a change of status must be filed on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b) and in accordance with the form instructions.

(a) *Petition by employer.* An employer must submit a petition for a change of status to E–1 treaty trader, E–2 treaty investor, H–1C, H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–2, P–3, Q–1, R–1, or TN nonimmigrant.

(b) *Application by nonimmigrant.* (1) *Individual applicant.* Any nonimmigrant who seeks to change status to:

(i) A dependent nonimmigrant classification as the spouse or child of

a principal whose nonimmigrant classification is listed in paragraph (a) of this section, or

(ii) Any other nonimmigrant classification not listed in paragraph (a) of this section must apply for a change of status on his or her own behalf.

(2) *Multiple applicants.* More than one person may be included in an application where the co-applicants are all members of a single family group and either all hold the same nonimmigrant status or one holds a nonimmigrant status and the co-applicants are his or her spouse and/or children who hold derivative nonimmigrant status based on the principal's nonimmigrant status.

\* \* \* \* \*

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 140. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1201a, 1301–1305; 8 CFR part 2.

■ 141. Section 264.1 is amended by:
■ a. Removing the entry for Form "I–485A" from the table in paragraph (a);
■ b. Removing the entries for Forms "I–688", "I–688A" and "I–688B" from the table in paragraph (b);
■ c. Adding the entries for "Form I–862" and "Form I–863" in proper numerical sequence in the table in paragraph (b);
■ d. Revising paragraph (c);
■ e. Revising the term "Service" to read "USCIS" in paragraph (d);
■ f. Revising paragraph (g); and
■ g. Removing paragraphs (h) and (i).
The revisions read as follows:

### § 264.1   Registration and fingerprinting.

\* \* \* \* \*

(b) \* \* \*

Form No. and Class

\* \* \* \* \*

Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

\* \* \* \* \*

(c) *Replacement of alien registration.* Any alien whose registration document is not available for any reason must immediately apply for a replacement document in the manner prescribed by USCIS.

\* \* \* \* \*

(g) *Registration and fingerprinting of children who reach age 14.* Within 30

days after reaching the age of 14, any alien in the United States not exempt from alien registration under the Act and this chapter must apply for registration and fingerprinting, unless fingerprinting is waived under paragraph (e) of this section, in accordance with applicable form instructions.

(1) *Permanent residents.* If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, he must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form instructions. The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. USCIS will issue the alien new evidence of alien registration.

(2) *Others.* In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration.

### § 264.2    [Amended]

■ 142. In § 264.2, paragraph (d) is amended by revising the term "be fingerprinted on Form FD–258, Applicant Card, as prescribed in § 103.2(e) of this chapter" to read "be fingerprinted as prescribed in 8 CFR 103.16."

■ 143. Section 264.5 is amended by:
■ a. Revising paragraph (a);
■ b. Revising the term "Form I–90" to read "the designated form" wherever the term appears in paragraphs (c)(1) and (2);
■ c. Revising paragraph (d) introductory text;
■ d. Revising paragraph (e);
■ e. Revising paragraph (g) and by
■ f. Adding paragraphs (h) and (i).
The revisions read as follows:

### § 264.5   Application for replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 103.7(b)(1); except that no fee is required for an application filed pursuant to paragraphs (b)(7) through (9) of this section, or paragraphs (d)(2) or (4) of this section.

\* \* \* \* \*

(d) *Conditional permanent residents required to file.* A conditional permanent resident whose card is expiring may apply to have the conditions on residence removed in accordance with 8 CFR 216.4 or 8 CFR

216.6. A conditional resident who seeks to replace a permanent resident card that is not expiring within 90 days may apply for a replacement card on the form prescribed by USCIS:

\* \* \* \* \*

(e) *Supporting documentation.* (1) The prior Permanent Resident Card must be surrendered to USCIS if a new card is being requested in accordance with paragraphs (b)(2) through (5) and (b)(8) and (9) of this section.

(2) A request to replace a Permanent Resident Card filed pursuant to paragraph (b)(4) of this section must include evidence of the name change such as a court order or marriage certificate.

(3) A request to replace a Permanent Resident Card in order to change any other biographic data on the card must include documentary evidence verifying the new data.

\* \* \* \* \*

(g) *Eligibility for evidence of permanent residence while in deportation, exclusion, or removal proceedings.* A person in deportation, exclusion, or removal proceedings is entitled to evidence of permanent resident status until ordered excluded, deported, or removed. USCIS will issue such evidence in the form of a temporary permanent resident document that will remain valid until the proceedings are concluded. Issuance of evidence of permanent residence to an alien who had permanent resident status when the proceedings commenced shall not affect those proceedings.

(h) *Temporary evidence of registration.* USCIS may issue temporary evidence of registration and lawful permanent resident status to a lawful permanent resident alien who is departing temporarily from the United States and has applied for issuance of a replacement permanent resident card if USCIS is unable to issue and deliver such card prior to the alien's contemplated return to the United States. The alien must surrender such temporary evidence upon receipt of his or her permanent resident card.

(i) *Waiver of requirements.* USCIS may waive the photograph, in person filing, and fingerprinting requirements of this section in cases of confinement due to advanced age or physical infirmity.

■ 144. Section 264.6 is revised to read as follows:

### § 264.6   Application for a nonimmigrant arrival-departure record.

(a) *Eligibility.* USCIS may issue a new or replacement arrival-departure record to a nonimmigrant who seeks:

(1) To replace a lost or stolen record;
(2) To replace a mutilated record; or
(3) Was not issued an arrival-departure record pursuant to 8 CFR 235.1(h)(1)(i), (iii), (iv), (v), or (vi) when last admitted as a nonimmigrant, and has not since been issued such record but now requires one.

(b) *Application.* A nonimmigrant may request issuance or replacement of a nonimmigrant arrival-departure record by applying on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(c) *Processing.* A pending application filed under paragraph (a) of this section is temporary evidence of registration. If the application is approved, USCIS will issue an arrival-departure document. There is no appeal from the denial of this application.

## PART 265—NOTICES OF ADDRESS

■ 145. The authority citation for part 265 is revised to read as follows:

**Authority:** 8 U.S.C. 1103 and 1305.

■ 146. Section 265.1 is revised to read as follows:

### § 265.1    Reporting change of address.

Except for those exempted by section 263(b) of the Act, all aliens in the United States required to register under section 262 of the Act must report each change of address and new address within 10 days of such change in accordance with instructions provided by USCIS.

## PART 270—PENALTIES FOR DOCUMENT FRAUD

■ 147. The authority citation for part 270 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, and 1324c; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 104–134, 110 Stat. 1321.

### § 270.2    [Amended]

■ 148. Section 270.2 is amended by revising the term ''§ 103.5a(a)(2) of this chapter'' to read ''8 CFR 103.8(a)(2)'' wherever that term appears in the following places:
■ a. Paragraph (d) and
■ b. Paragraph (i).

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 149. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

■ 150. Section 274a.12 is amended by:
■ a. Revising the term ''BCIS'' to read ''USCIS'' wherever that term appears in paragraph (a)(5);

■ b. Revising paragraph (b)(6)(iv);
■ c. Revising the term ''BCIS'' to read ''USCIS'' in paragraph (c) introductory text;
■ d. Revising paragraph (c)(1);
■ e. Revising paragraph (c)(4); and
■ f. Removing and reserving paragraph (c)(23).

The revisions read as follows:

### § 274a.12    Classes of aliens authorized to accept employment.

*      *      *      *      *

(b) * * *
(6) * * *
(iv) An employment authorization document under paragraph (c)(3)(i)(C) of this section based on a 17-month STEM Optional Practical Training extension, and whose timely filed employment authorization request is pending and employment authorization issued under paragraph (c)(3)(i)(B) of this section has expired. Employment is authorized beginning on the expiration date of the authorization issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days; or

*      *      *      *      *

(c) * * *
(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

*      *      *      *      *

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

*      *      *      *      *

■ 151. Section 274a.13 is amended by:
■ a. Revising paragraph (a);
■ b. Removing the term ''INS'' in paragraph (b); and
■ c. Revising paragraph (d).

The revision reads as follows:

### § 274a.13    Application for employment authorization.

(a) *Application.* Aliens authorized to be employed under sections 274a.12(a)(3), (4), (6) through (8), (a)(10) through (15), and (a)(20) must file an application in order to obtain documentation evidencing this fact.

(1) Aliens who may apply for employment authorization under 8 CFR 274a.12(c), except for those who may apply under 8 CFR 274a.12(c)(8), must apply on the form designated by USCIS

with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The approval of applications filed under 8 CFR 274a.12(c), except for 8 CFR 274a.12(c)(8), are within the discretion of USCIS. Where economic necessity has been identified as a factor, the alien must provide information regarding his or her assets, income, and expenses.

(2) An initial employment authorization request for asylum applicants under 8 CFR 274a.12(c)(8) must be filed on the form designated by USCIS in accordance with the form instructions. The applicant also must submit a copy of the underlying application for asylum or withholding of deportation, together with evidence that the application has been filed in accordance with 8 CFR 208.3 and 208.4. An application for an initial employment authorization or for a renewal of employment authorization filed in relation to a pending claim for asylum shall be adjudicated in accordance with 8 CFR 208.7. An application for renewal or replacement of employment authorization submitted in relation to a pending claim for asylum, as provided in 8 CFR 208.7, must be filed, with fee or application for waiver of such fee.

*      *      *      *      *

(d) *Interim employment authorization.* USCIS will adjudicate the application within 90 days from the date of receipt of the application, except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days. Such authorization will be subject to any conditions noted on the employment authorization document. However, if USCIS adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the interim employment authorization granted under this section will automatically terminate as of the date of the adjudication and denial.

## PART 287—FIELD OFFICERS; POWERS AND DUTIES

■ 152. The authority citation for part 287 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; Homeland Security Act of

2002, Pub. L. 107–296 (6 U.S.C. 1, *et seq.*); 8 CFR part 2.

## § 287.5 [Amended]

■ 153. Section 287.5 is amended by:
■ a. Removing the phrase "as defined in 8 CFR 103.1(b)" in paragraph (a) introductory text;
■ b. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(1)(viii); and
■ c. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(2)(viii).

## § 287.7 [Amended]

■ 154. In § 287.7, paragraph (b)(8) is amended by revising the term "the BCIS" to read "USCIS".

## PART 292—REPRESENTATION AND APPEARANCES

■ 155. The authority citation for part 292 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1252b, 1362.

## § 292.1 [Amended]

■ 156. Section 292.1 is amended by revising the terms "§ 1.1(f) of this chapter" and "8 CFR 1.1(f)" to read "8 CFR 1.2" wherever the term appears in the following places:
■ a. Paragraph (a)(1); and
■ b. Paragraph (a)(6) first sentence.

## § 292.3 [Amended]

■ 157. Section 292.3 is amended by revising the terms "8 CFR 1.1(f)" and "8 CFR 1.1(j)", to read "8 CFR 1.2" in paragraph (a)(2);
■ 158. Section 292.4 is amended by revising paragraph (b) to read as follows:

## § 292.4   Appearances.

\*    \*    \*    \*    \*

(b) A party to a proceeding and his or her attorney or representative will be permitted to examine the record of proceeding in accordance with 6 CFR part 5.

## PART 299—IMMIGRATION FORMS

■ 159. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103; 8 CFR Part 2.

■ 160. Section 299.1 is revised to read as follows:

## § 299.1   Prescribed forms.

A listing of USCIS, ICE, and CBP approved forms referenced in chapter I can be viewed on the Office of Management and Budget Web site at *http://www.reginfo.gov.* A listing of approved USCIS forms can also be viewed on its Internet Web site.

## § 299.3   [Removed and Reserved]

■ 161. Section 299.3 is removed and reserved.

## § 299.5   [Removed and Reserved]

■ 162. Section 299.5 is removed and reserved.

## PART 301—NATIONALS AND CITIZENS OF THE UNITED STATES AT BIRTH

■ 163. The authority citation for part 301 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1401; 8 CFR part 2.

■ 164. Section 301.1 is amended by revising paragraph (a)(1) to read as follows:

## § 301.1   Procedures.

(a) \*  \*  \*
(1) As provided in 8 CFR part 341, a person residing in the United States who desires to be documented as a United States citizen pursuant to section 301(h) of the Act may apply for a passport at a United States passport agency or may submit an application on the form specified by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). The applicant will be notified when and where to appear before a USCIS officer for examination on his or her application.

\*    \*    \*    \*    \*

## PART 310—NATURALIZATION AUTHORITY

■ 165. The authority citation for part 310 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1421, 1443, 1447, 1448; 8 CFR 2.1.

## § 310.2   [Amended]

■ 166. Section 310.2, first sentence, is amended by revising the term "The Service" to read "USCIS" and the term "Service district" to read "Service district, as defined in 8 CFR 316.1,"

## PART 312—EDUCATIONAL REQUIREMENTS FOR NATURALIZATION

■ 167. The authority citation for part 312 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1423, 1443, 1447, 1448.

■ 168. Section 312.1 is amended by revising paragraph (c) to read as follows:

## § 312.1   Literacy requirements.

\*    \*    \*    \*    \*

(c) *Literacy examination.* (1) *Verbal skills.* The ability of an applicant to speak English will be determined by a designated immigration officer from the applicant's answers to questions normally asked in the course of the examination.

(2) *Reading and writing skills.* Except as noted in 8 CFR 312.3, an applicant's ability to read and write English must be tested in a manner prescribed by USCIS. USCIS will provide a description of test study materials and testing procedures on the USCIS Internet Web site.

■ 169. Section 312.2 is amended by revising paragraph (c) to read as follows:

## § 312.2   Knowledge of history and government of the United States.

\*    \*    \*    \*    \*

(c) *History and government examination.* (1) *Procedure.* The examination of an applicant's knowledge of the history and form of government of the United States must be given orally in English by a designated immigration officer, except:
(i) If the applicant is exempt from the English literacy requirement under 8 CFR 312.1(b), the examination may be conducted in the applicant's native language with the assistance of an interpreter selected in accordance with 8 CFR 312.4 but only if the applicant's command of spoken English is insufficient to conduct a valid examination in English;
(ii) The examination may be conducted in the applicant's native language, with the assistance of an interpreter selected in accordance with 8 CFR 312.4, if the applicant is required to satisfy and has satisfied the English literacy requirement under 8 CFR 312.1(a), but the officer conducting the examination determines that an inaccurate or incomplete record of the examination would result if the examination on technical or complex issues were conducted in English, or
(iii) The applicant has met the requirements of 8 CFR 312.3.
(2) *Scope and substance.* The scope of the examination will be limited to subject matters prescribed by USCIS. In choosing the subject matters, in phrasing questions and in evaluating responses, due consideration must be given to the applicant's:
(i) Education,
(ii) Background,
(iii) Age,
(iv) Length of residence in the United States,
(v) Opportunities available and efforts made to acquire the requisite knowledge, and
(vi) Any other elements or factors relevant to an appraisal of the adequacy of the applicant's knowledge and understanding.

AR2022_200261

■ 170. Section 312.3 is revised to read as follows:

### §312.3   Testing of applicants who obtained permanent residence pursuant to section 245A of the Act.

An applicant who has obtained lawful permanent resident alien status pursuant to section 245A of the Act, and who, at that time, demonstrated English language proficiency in reading and writing, and knowledge of the government and history of the United States through either an examination administered by USCIS or the INS or a standardized section 312 test authorized by the USCIS or the INS for use with Legalization applicants as provided in section 245A(b)(1)(D)(iii) of the Act, will not be reexamined on those skills at the time of the naturalization interview. However, such applicant, unless otherwise exempt, must still demonstrate his or her ability to speak and understand English in accordance with 8 CFR 312.1(c)(1) and establish eligibility for naturalization through testimony in the English language.

## PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION

■ 171. The authority citation for part 316 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1427, 1443, 1447; 8 CFR part 2.

■ 172. Section 316.1 is revised to read as follows:

### §316.1   Definitions.

As used in this part, the term:

*Application* means any form, as defined in 8 CFR part 1, on which an applicant requests a benefit relating to naturalization.

*Residence in the Service district where the application is filed* means residence in the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization, regardless of where or how USCIS may require such benefit request to be submitted, or whether jurisdiction for the purpose of adjudication is relocated or internally reassigned to another USCIS office.

*Service district* means the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization.

### §316.2   [Amended]

■ 173. In §316.2, paragraph (a)(5) is amended by removing the end the phrase '', and in which the alien seeks to file the application''.

■ 174. Section 316.4 is amended by:

■ a. Revising paragraph (a);

■ b. Removing paragraph (b); and

■ c. Redesignating paragraph (c) as paragraph (b).

The revision reads as follows:

### §316.4   Applications; documents.

(a) The applicant will apply for naturalization in accordance with instructions provided on the form prescribed by USCIS for that purpose.

\* \* \* \* \*

■ 175. Section 316.5 is amended by adding paragraph (b)(6) to read as follows:

### §316.5   Residence in the United States.

\* \* \* \* \*

(b) \* \* \*

(6) *Spouse of military personnel.* Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as residence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(i) The spouse of a member of the Armed Forces;

(ii) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(iii) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

\* \* \* \* \*

■ 176. Section 316.6 is added to read as follows:

### §316.6   Physical presence for certain spouses of military personnel.

Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as physical presence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(a) The spouse of a member of the Armed Forces;

(b) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(c) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

## PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS

■ 177. The authority citation for part 319 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1430, 1443.

### §319.1   [Amended]

■ 178. In §319.1, paragraph (a)(5) is amended by removing the phrase ''and in which the alien has filed the application''

■ 179. Section 319.3 is amended by revising paragraph (a) to read as follows:

### §319.3   Surviving spouse, child, or parent of a United States citizen who died during a period of honorable service in an active duty status in the Armed Forces of the United States.

(a) *Eligibility.* To be eligible for naturalization under section 319(d) of the Act, the surviving spouse, child, or parent of a United States citizen must:

(1) Establish that his or her citizen spouse, child, or parent died during a period of honorable service in an active duty status in the Armed Forces of the United States and, in the case of a surviving spouse, establish that he or she was living in marital union with the citizen spouse, in accordance with 8 CFR 319.1(b), at the time of the citizen spouse's death;

(2) At the time of examination on the application for naturalization, reside in the United States pursuant to a lawful admission for permanent residence;

(3) Be a person of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States; and

(4) Comply with all other requirements for naturalization as provided in 8 CFR 316, except for those contained in 8 CFR 316.2(a)(3) through (6).

\* \* \* \* \*

■ 180. Section 319.11 is amended by revising paragraph (a) introductory text to read as follows:

### §319.11   Filing of application.

(a) *General.* An applicant under this part must submit an application for naturalization in accordance with the form instructions with the fee required by 8 CFR 103.7(b)(1). An alien spouse applying for naturalization under section 319(b) of the Act who is described in 8 CFR 319.2 must also submit a statement of intent containing the following information about the

**Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations **53799**

citizen spouse's employment and future intent:

\* \* \* \* \*

## PART 320—CHILD BORN OUTSIDE THE UNITED STATES AND RESIDING PERMANENTLY IN THE UNITED STATES; REQUIREMENTS FOR AUTOMATIC ACQUISITION OF CITIZENSHIP

■ 181. The authority citation for part 320 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

■ 182. Section 320.3 is amended by:
■ a. Revising paragraph (a); and
■ b. Revising paragraph (b)(1) introductory text.

The revisions read as follows:

### § 320.3   How, where, and what forms and other documents should be filed?

(a) *Application.* Individuals who are applying for a certificate of citizenship on their own behalf should submit the request in accordance with the form instructions on the form prescribed by USCIS for that purpose. An application for a certificate of citizenship under this section on behalf of a child who has not reached the age of 18 years must be submitted by that child's U.S. citizen biological or adoptive parent(s), or legal guardian.

(b) *Evidence.* (1) An applicant under this section must establish eligibility as described in 8 CFR 320.2. An applicant must submit the following supporting evidence unless such evidence is already contained in USCIS administrative file(s):

\* \* \* \* \*

■ 183. Section 320.5 is revised to read as follows:

### § 320.5   Decision.

(a) *Approval of application.* If the application for the certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship.

(b) *Denial of application.* If the decision of USCIS is to deny the application for a certificate of citizenship under this section, the applicant will be advised in writing of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) *Subsequent application.* After an application for a certificate of

citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

## PART 322—CHILD BORN OUTSIDE THE UNITED STATES; REQUIREMENTS FOR APPLICATION FOR CERTIFICATE OF CITIZENSHIP

■ 184. The authority citation for part 322 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

### § 322.1   [Amended]

■ 185. Section 322.1 is amended, in the definition of "adopted child" by revising "section 101(b)(1)(E) or (F)" to read "section 101(b)(1)(E), (F) or (G)".
■ 186. Section 322.2 is amended by:
■ a. Revising the section heading; and by
■ b. Adding paragraph (c) to read as follows:

### § 322.2   Eligibility.

\* \* \* \* \*

(c) *Exceptions for children of military personnel.* Pursuant to section 322(d) of the Act, a child of a member of the Armed Forces of the United States residing abroad is exempt from the temporary physical presence, lawful admission, and maintenance of lawful status requirements under 8 CFR 322.2(a)(5), if the child:

(1) Is authorized to accompany and reside abroad with the member of the Armed Forces pursuant to the member's official orders; and

(2) Is accompanying and residing abroad with the member of the Armed Forces.

■ 187. Section 322.3 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraph (a);
■ c. Revising paragraph (b)(1)(viii);
■ d. Revising paragraph (b)(1)(xi);
■ e. Revising paragraph (b)(1)(xii);
■ f. Revising paragraph (b)(1)(xiii); and
■ g. Revising paragraph (b)(2), the first sentence.

The revisions read as follows:

### § 322.3   Application and supporting documents.

(a) *Application.* A U.S. citizen parent of an alien child (including an adopted child) may file an application for the child to become a citizen and obtain a certificate of citizenship under section

322 of the Act by submitting an application on the form prescribed by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). If the U.S. citizen parent has died, the child's U.S. citizen grandparent or U.S. citizen legal guardian may submit the application, provided the application is filed not more than 5 years after the death of the U.S. citizen parent.

(b) \* \* \*

(1) \* \* \*

(viii) Evidence that the child is present in the United States pursuant to a lawful admission and is maintaining such lawful status, or evidence establishing that the child qualifies for an exception to these requirements as provided in 8 CFR 322.2(c) pursuant to section 322(d) of the Act. Such evidence may be presented at the time of interview when appropriate;

\* \* \* \* \*

(xi) For adopted orphans applying under section 322 of the Act, a copy of notice of approval of the orphan petition and supporting documentation for such petition (except the home study) or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IR–3 (Orphan adopted abroad by a U.S. citizen) or IR–4 (Orphan to be adopted by a U.S. citizen);

(xii) For a Hague Convention adoptee applying under section 322 of the Act, a copy of the notice of approval of the Convention adoptee petition and its supporting documentation, or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IH–3 (Hague Convention Orphan adopted abroad by a U.S. citizen) or IH–4 (Hague Convention Orphan to be adopted by a U.S. citizen); and

(xiii) Evidence of all legal name changes, if applicable, for the child, U.S. citizen parent, U.S. citizen grandparent, or U.S. citizen legal guardian.

(2) If USCIS requires any additional documentation to make a decision on the application, the parents may be asked to provide that documentation under separate cover or at the time of interview. \* \* \*

■ 188. Section 322.4 is revised to read as follows:

### § 322.4   Interview.

The U.S. citizen parent and the child must appear in person before a USCIS officer for examination on the application under this section. If the U.S. citizen parent is deceased, the

AR2022_200263

child's U.S. citizen grandparent or U.S. citizen legal guardian who filed the application on the child's behalf must appear.

■ 189. Section 322.5 is revised to read as follows:

### §322.5   Decision.

(a) *Approval of application.* If the application for certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship. The child is a citizen as of the date of approval and administration of the oath of allegiance.

(b) *Denial of application.* If the USCIS decision is to deny the application for a certificate of citizenship under this section, the applicant will be furnished with the reasons for denial and advised of the right to appeal in accordance with the provisions of 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) *Subsequent application.* After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

### PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW

■ 190. The authority citation for part 324 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1435, 1443, 1448, 1101 note.

### §324.2   [Amended]

■ 191. In § 324.2, paragraph (b) is amended by revising the term ''N–400, as required by § 316.4 of this chapter'' to read ''the form designated by USCIS in accordance with the form instructions and with the fee prescribed in 8 CFR 103.7(b)(1) as required by 8 CFR 316.4''.

### §324.3   [Amended]

■ 192. In § 324.3, paragraph (b)(1) is amended by revising the phrase ''an Application for Naturalization, form N– 400, to USCIS'' to read ''an application for naturalization on the form prescribed by USCIS''.

■ 193. Section 324.5 is revised to read as follows:

### §324.5   Former citizen of the United States whose naturalization by taking the oath is authorized by a private law.

A former citizen of the United States whose naturalization by taking the oath before any naturalization court or office of USCIS within the United States is authorized by a private law must submit an application on the form specified by USCIS, without fee, in accordance with the form instructions.

### PART 325—NATIONALS BUT NOT CITIZENS OF THE UNITED STATES; RESIDENCE WITHIN OUTLYING POSSESSIONS

■ 194. The authority citation for part 325 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1436, 1443.

### §325.4   [Amended]

■ 195. In § 325.4, paragraph (b)(3) is amended by revising the term ''Service district in the United States where the application is filed'' to read ''Service district, as defined in 8 CFR 316.1,''.

### PART 328—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH 1 YEAR OF SERVICE IN THE UNITED STATES ARMED FORCES

■ 196. The authority citation for part 328 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1439, 1443.

■ 197. Section 328.4 is revised to read as follows:

### §328.4   Application and evidence.

(a) *Application.* An applicant for naturalization under section 328 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) *Evidence.* The applicant's eligibility for naturalization under 8 CFR 328.2(a) or (b) will be established only by the certification of honorable service by the executive department under which the applicant served or is serving.

### PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH ACTIVE DUTY OR CERTAIN READY RESERVE SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES

■ 198. The authority citation for part 329 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

■ 199. Revise § 329.4 to read as follows:

### §329.4   Application and evidence.

(a) *Application.* An applicant for naturalization under section 329 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) *Evidence.* The applicant's eligibility for naturalization under 8 CFR 329.2(a), (b), or (c)(2) will be established only by a certification of honorable service by the executive department under which the applicant served or is serving.

### §329.5   [Removed]

■ 200. Section 329.5 is removed.

### PART 330—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SEAMEN

■ 201. The authority citation for part 330 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

### §330.2   [Amended]

■ 202. In § 330.2, paragraph (a) is amended by revising the phrase ''Application for Naturalization, Form N–400.'' to read ''application on the form designated by USCIS.''.

### PART 332—NATURALIZATION ADMINISTRATION

■ 203. The authority citation for part 332 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447.

■ 204. Section 332.1 is revised to read as follows:

### §332.1   Designation of USCIS employees to administer oaths and conduct examinations and hearings.

(a) *Examinations.* All USCIS officers are hereby designated to conduct the examination for naturalization required under section 335 of the Act, provided that each officer so designated has received appropriate training.

(b) *Hearings.* Section 336 of the Act authorizes USCIS officers who are designated under paragraph (a) of this

section to conduct hearings under that section.

(c) *Depositions.* All USCIS officers who are designated under paragraph (a) of this section are hereby designated to take depositions in matters relating to the administration of naturalization and citizenship laws.

(d) *Oaths and affirmations.* All USCIS officers who are designated under paragraph (a) of this section are hereby designated to administer oaths or affirmations except for the oath of allegiance as provided in 8 CFR 337.2.

§§ 332.2, 332.3, and 332.4 [Removed and Reserved]

■ 205. Sections 332.2, 332.3, and 332.4 are removed and reserved.

## PART 333—PHOTOGRAPHS

■ 206. The authority citation for part 333 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

■ 207. In § 333.1, paragraph (a) is revised to read as follows:

### § 333.1   Description of required photographs.

(a) Every applicant who is required to provide photographs under section 333 of the Act must do so as prescribed by USCIS in its form instructions.

\* \* \* \* \*

■ 208. Section 333.2 is revised to read as follows:

### § 333.2   Attachment of photographs to documents.

A photograph of the applicant must be securely and permanently attached to each certificate of naturalization or citizenship, or to any other document that requires a photograph, in a manner prescribed by USCIS.

## PART 334—APPLICATION FOR NATURALIZATION

■ 209. The authority citation for part 334 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

■ 210. In § 334.2, paragraph (a) is revised to read as follows:

### § 334.2   Application for naturalization.

(a) An applicant may file an application for naturalization with required initial evidence in accordance with the general form instructions for naturalization. The applicant must include the fee as required in 8 CFR 103.7(b)(1).

\* \* \* \* \*

■ 211. Section 334.11 is amended by:
■ a. Revising the term "Form N–300" to read "the form specified by USCIS, in accordance with the form instructions" in paragraph (a); and by

■ b. Revising paragraph (b).
The revised reads as follows:

### § 334.11   Declaration of intention.

\* \* \* \* \*

(b) *Approval.* If approved, USCIS will retain the application in the file and advise the applicant of the action taken.

\* \* \* \* \*

§§ 334.16–334.18   [Removed]

■ 212. Sections 334.16 through 334.18 are removed.

## PART 335—EXAMINATION ON APPLICATION FOR NATURALIZATION

■ 213. The authority citation for part 335 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447.

■ 214. Section 335.2 is amended by:
■ a. Revising the term "Service" to read "USCIS" and the term "§ 332.1 of this chapter" to read "8 CFR 332.1" in paragraph (a);
■ b. Revising the terms "The Service" and "Service" to read "USCIS" wherever that term appears in paragraph (b) introductory text;
■ c. Revising paragraph (b)(3);
■ d. Revising the terms "the Service officer", "The Service officer" and "the Service" to read "USCIS" wherever the terms appear in paragraph (c);
■ e. Revising paragraph (d)(2);
■ f. Revising the term "Service" to read "USCIS" wherever the term appears in paragraph (e); and
■ g. Revising the term "Service" to read "USCIS" and the term "§ 312.4 of this chapter" to read "8 CFR 312.4" wherever the terms appear in paragraph (f).

The revisions read as follows:

### § 335.2   Examination of applicant.

\* \* \* \* \*

(b) \* \* \*

(3) Confirmation from the Federal Bureau of Investigation that the fingerprint data submitted for the criminal background check has been rejected.

\* \* \* \* \*

(d) \* \* \*

(2) *Service of subpoenas.* Subpoenas will be issued on the form designated by USCIS and a record will be made of service. The subpoena may be served by any person over 18 years of age, not a party to the case, designated to make such service by USCIS.

\* \* \* \* \*

### § 335.3   [Amended]

■ 215. Section 335.3 is amended by revising the terms "The Service officer" and "the Service officer" to read

"USCIS" wherever the terms appear in the following places:
■ a. Paragraph (a); and
■ b. Paragraph (b).

### § 335.4   [Amended]

■ 216. Section 335.4 is amended by revising the phrase "the Service officer designated in § 332.1 of this chapter" to read "the USCIS officer described in 8 CFR 332.1".

### § 335.5   [Amended]

■ 217. Section 335.5 is amended by revising the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear.

■ 218. Section 335.6 is amended by revising the term "the Service" to read "USCIS" wherever the term appears in the following places:
■ a. Paragraph (a);
■ b. Paragraph (b); and
■ c. Paragraph (c).

■ 219. Section 335.7 is revised to read as follows:

### § 335.7   Failure to prosecute application after initial examination.

An applicant for naturalization who has appeared for the examination on his or her application as provided in 8 CFR 335.2 will be considered as failing to prosecute such application if he or she, without good cause being shown, either failed to excuse an absence from a subsequently required appearance, or fails to provide within a reasonable period of time such documents, information, or testimony deemed by USCIS to be necessary to establish his or her eligibility for naturalization. USCIS will deliver notice of requests for appearance or evidence as provided in 8 CFR 103.8. In the event that the applicant fails to respond within 30 days of the date of notification, USCIS will adjudicate the application on the merits pursuant to 8 CFR 336.1.

### § 335.9   [Amended]

■ 220. Section 335.9 is amended by:
■ a. Revising the phrase "Service office to the Service office" to read "USCIS office to the USCIS office" in paragraph (a); and
■ b. Revising the term "district director" to read "USCIS" and the term "the Service's" to read "USCIS'" in paragraph (b).

### § 335.10   [Amended]

■ 221. Section 335.10 is amended by revising the terms "the Service" and "the district director" to read "USCIS" wherever the terms appear.

AR2022_200265

**§§ 335.11 through 335.13    [Removed]**

■ 222. Sections 335.11 through 335.13 are removed.

## PART 336—HEARINGS ON DENIALS OF APPLICATIONS FOR NATURALIZATION

■ 223. The authority citation for section 336 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1447, 1448.

**§ 336.1    [Amended]**

■ 224. Section 336.1 is amended by:
■ a. Revising the phrase "the Service shall" to read "USCIS will" in the first sentence in paragraph (a); and
■ b. Revising the phrase "may be made in person or by certified mail to the applicant's last known address" to read "must be by personal service as described in 8 CFR 103.8" in paragraph (c).

■ 225. Section 336.2 is revised to read as follows:

**§ 336.2    USCIS hearing.**

(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

(b) Upon receipt of a timely request for a hearing, USCIS will schedule a review hearing, within a reasonable period of time not to exceed 180 days from the date upon which the appeal is filed. The review will be with an officer other than the officer who conducted the original examination or who rendered determination upon which the hearing is based, and who is classified at a grade level equal to or higher than the grade of the examining officer. The reviewing officer will have the authority and discretion to review the application for naturalization, to examine the applicant, and either to affirm the findings and determination of the original examining officer or to re-determine the original decision in whole or in part. The reviewing officer will also have the discretion to review any administrative record which was created as part of the examination procedures as well USCIS files and reports. He or she may receive new evidence or take such additional testimony as may be deemed relevant to the applicant's eligibility for naturalization or which the applicant seeks to provide. Based upon the complexity of the issues to be reviewed or determined, and upon the necessity of conducting further examinations with respect to essential naturalization requirements, such as literacy or civics knowledge, the reviewing immigration officer may, in his or her discretion, conduct a full *de novo* hearing or may utilize a less formal review procedure, as he or she deems reasonable and in the interest of justice.

(c) *Improperly filed request for hearing.* (1) *Request for hearing filed by a person or entity not entitled to file.* (i) *Rejection without refund of filing fee.* A request for hearing filed by a person or entity who is not entitled to file such a request must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) *Request for hearing by attorney or representative without proper Form G–28.* If a request for hearing is filed by an attorney or representative who has not properly filed a notice of entry of appearance as attorney or representative entitling that person to file the request for hearing, the appeal will be considered as improperly filed. In such a case, any filing fee will not be refunded regardless of the action taken. The reviewing official will ask the attorney or representative to submit a proper notice of entry within 15 days of the request. If such notice is not submitted within the time allowed, the official may, on his or her own motion, under 8 CFR 103.5(a)(5)(i), make a new decision favorable to the affected party without notifying the attorney or representative. The request for hearing may be considered properly filed as of its original filing date if the attorney or representative submits a properly executed notice entitling that person to file the request for hearing.

(2) *Untimely request for hearing.* (i) *Rejection without refund of filing fee.* A request for hearing which is not filed within the time period allowed must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) *Untimely request for hearing treated as motion.* If an untimely request for hearing meets the requirements of a motion to reopen as described in 8 CFR 103.5(a)(2) or a motion to reconsider as described in 8 CFR 103.5(a)(3), the request for hearing must be treated as a motion and a decision must be made on the merits of the case.

■ 226. Section 336.9 is amended by:
■ a. Revising the term "the Service" to read "USCIS" in paragraph (a);
■ b. Revising paragraph (b); and
■ c. Revising the term "Service" to read "USCIS" in paragraph (d).

The revision reads as follows:

*   *   *   *   *

(b) *Filing a petition.* Under these procedures, an applicant must file a petition for review in the United States District Court having jurisdiction over his or her place of residence, in accordance with Chapter 7 of Title 5, United States Code, within a period of not more than 120 days after the USCIS final determination. The petition for review must be brought against USCIS, and service of the petition for review must be made upon DHS and upon the USCIS office where the hearing was held pursuant to 8 CFR 336.2.

*   *   *   *   *

## PART 337—OATH OF ALLEGIANCE

■ 227. The authority citation for part 337 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1448; 8 CFR Part 2.

■ 228. Section 337.2 is revised to read as follows:

**§ 337.2    Oath administered by USCIS or EOIR.**

(a) *Public ceremony.* An applicant for naturalization who has elected to have his or her oath of allegiance administered by USCIS or an immigration judge and is not subject to the exclusive oath administration authority of an eligible court pursuant to section 310(b) of the Act must appear in person in a public ceremony, unless such appearance is specifically excused under the terms and conditions set forth in this part. Such ceremony will be held at a time and place designated by USCIS or EOIR within the United States (or abroad as permitted for certain applicants in accordance with 8 U.S.C. 1443a) and within the jurisdiction where the application for naturalization was filed, or into which the application for naturalization was transferred pursuant to 8 CFR 335.9. Naturalization ceremonies will be conducted at regular intervals as frequently as necessary to ensure timely naturalization, but in all events at least once monthly where it is required to minimize unreasonable delays. Naturalization ceremonies will be presented in such a manner as to preserve the dignity and significance of the occasion.

(b) *Authority to administer oath of allegiance.* The Secretary may delegate authority to administer the oath of allegiance prescribed in section 337 of the Act to such officials of DHS and to immigration judges or officials designated by the Attorney General as may be necessary for the efficient administration of the naturalization program.

(c) *Execution of questionnaire.* Immediately prior to being administered the oath of allegiance, each applicant must complete the questionnaire on the

form designated by USCIS. USCIS will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, USCIS will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and he or she will not be administered the oath.

### § 337.3   [Amended]

■ 229. Section 337.3 is amended by revising the terms ''the Service'' and ''the district director'' to read ''USCIS'' whenever the terms appear in the following places:
■ a. Paragraph (a) introductory text;
■ b. Paragraph (a)(4);
■ c. Paragraph (b); and
■ d. Paragraph (c).

### § 337.7   [Amended]

■ 230. Section 337.7 is amended by revising the terms ''the Service'' and ''Service'' to read ''USCIS'' whenever the terms appear in the following places:
■ a. Paragraph (a); and
■ b. Paragraph (b).
■ 231. Section 337.8 is revised to read as follows:

### § 337.8   Oath administered by the courts.

(a) *Notification of election.* An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.2(d) must notify USCIS at the time of the filing of, or no later than at the examination on, the application of his or her election to have the oath of allegiance administered in an appropriate court having jurisdiction over the applicant's place of residence.

(b) *Certificate of eligibility.* (1) *Exclusive jurisdiction.* In those instances falling within the exclusive jurisdiction provision of section 310(b)(1)(B) of the Act, USCIS will notify the court of the applicant's eligibility for admission to United States citizenship by notifying the clerk of the court within 10 days of the approval of the application.

(2) *Non-exclusive jurisdiction.* In those instances in which the applicant has elected to have the oath administered in a court ceremony, USCIS will notify the clerk of the court in writing that the applicant has been determined by the USCIS to be eligible for admission to United States citizenship upon taking the requisite oath of allegiance and renunciation in a public ceremony. If a scheduled hearing date is not available at the time of notification, USCIS will notify the applicant in writing that the applicant has been approved but no ceremony date is yet available.

(c) *Preparation of lists.* (1) At or prior to the oath administration ceremony, the representative attending the ceremony will submit to the court, in duplicate, lists of persons to be administered the oath of allegiance and renunciation. After the ceremony, and after any required amendments and notations have been made to the lists, the clerk of the court will sign the lists.

(2) The originals of all court lists specified in this section will be filed permanently in the court, and the duplicates returned by the clerk of the court to USCIS. The same disposition will be made of any list presented to, but not approved by, the court.

(d) *Personal representation of the government at oath administration ceremonies.* An oath administration ceremony must be attended by a representative of USCIS who will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, the USCIS representative will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and the court will not administer the oath to such applicant.

(e) *Written report in lieu of personal representation.* If it is impractical for a USCIS representative to be present at a judicial oath administration ceremony, written notice of that fact will be given by the USCIS to the court. The list of persons to be administered the oath of allegiance and renunciation, forms, memoranda, and certificates will be transmitted to the clerk of the court, who will submit the appropriate lists to the court.

(f) *Withdrawal from court.* An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.3(d) who has elected to have the oath administered in a court oath ceremony may, for good cause shown, request that his or her name be removed from the list of persons eligible to be administered the oath at a court oath ceremony and request that the oath be administered by an immigration judge or USCIS. Such request must be in writing to the USCIS office which granted the application and must cite the reasons for the request. USCIS will consider the good cause shown and the best interests of the applicant in making a decision. If it is determined that the applicant will be permitted to withdraw his or her name from the court ceremony, USCIS will give written notice to the court of the applicant's withdrawal, and the applicant will be scheduled for the next available oath ceremony, conducted by an Immigration

Judge or USCIS, as if he or she had never elected the court ceremony.

### § 337.9   [Amended]

■ 232. In § 337.9, paragraph (a) is amended by removing the phrase '', administered either by the Service or an immigration judge''.

## PART 338—CERTIFICATE OF NATURALIZATION

■ 233. The authority citation for part 338 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

■ 234. Section 338.1 is revised to read as follows:

### § 338.1   Execution and issuance of certificate.

(a) *Issuance.* When an applicant for naturalization has taken and subscribed to the oath of allegiance in accordance with 8 CFR part 337, USCIS will issue a Certificate of Naturalization at the conclusion of the oath administration ceremony.

(b) *Contents of certificate.* The certificate must be issued to the applicant in accordance with section 338 of the Act in his or her true, full, and correct name as it exists at the time of the administration of the oath of allegiance. The certificate must show, under ''country of former nationality,'' the name of the applicant's last country of citizenship, as shown in the application and USCIS records, even though the applicant may be stateless at the time of admission to citizenship.

### § 338.3   [Amended]

■ 235. Section 338.3 is amended by revising the terms ''the Service'' and the term ''the district director'' to read ''USCIS''.
■ 236. Section 338.5 is revised to read as follows:

### § 338.5   Correction of certificates.

(a) *Application.* Whenever a Certificate of Naturalization has been delivered which does not conform to the facts shown on the application for naturalization, or a clerical error was made in preparing the certificate, an application for issuance of a corrected certificate may be filed, without fee, in accordance with the form instructions.

(b) *Court-issued certificates.* If the certificate was originally issued by a clerk of court under a prior statute and USCIS finds that a correction is justified and can be made without mutilating the certificate, USCIS will authorize the issuing court to make the necessary correction and to place a dated endorsement of the court on the reverse

of the certificate explaining the correction. The authorization will be filed with the naturalization record of the court, the corrected certificate will be returned to the naturalized person, and the duplicate will be endorsed to show the date and nature of the correction and endorsement made, and then returned to USCIS. No fee will be charged the naturalized person for the correction.

(c) *USCIS-issued certificates.* If the certificate was originally issued by USCIS (or its predecessor agency), and USCIS finds that a correction was justified, the correction shall be made to the certificate and a dated endorsement made on the reverse of the certificate.

(d) *Administrative actions.* When a correction made pursuant to paragraphs (b) or (c) of this section would or does result in mutilation of a certificate, USCIS will issue a replacement Certificate of Naturalization and destroy the surrendered certificate.

(e) *Data change.* The correction will not be deemed to be justified where the naturalized person later alleges that the name or date of birth which the applicant stated to be his or her correct name or date of birth at the time of naturalization was not in fact his or her name or date of birth at the time of the naturalization.

**§§ 338.11 through 338.13   [Removed and Reserved]**

■ 237. Sections 338.11 through 338.13 are removed and reserved.

**PART 339—FUNCTIONS AND DUTIES OF CLERKS OF COURT REGARDING NATURALIZATION PROCEEDINGS**

■ 238. The authority citation for part 339 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1448.

**§ 339.1   [Amended]**

■ 239. Section 339.1 is amended by revising the phrase ''the Service pursuant to § 338.1 of this chapter'' to read ''USCIS in accordance with 8 CFR 338.1''.

■ 240. Section 339.2 is revised to read as follows:

**§ 339.2   Monthly reports.**

(a) *Oath administration ceremonies.* Clerks of court will on the first day of each month or immediately following each oath ceremony submit to USCIS a report listing all oath administration ceremonies held and the total number of persons issued the oath at each ceremony, in accordance with USCIS instructions. The report will include a list of persons attending naturalization oath ceremonies during the month, and

certified copies of any court orders granting changes of name.

(b) *Petitions filed for de novo hearings.* The clerk of court must submit to USCIS a monthly report of all persons who have filed *de novo* review petitions before the court. The report shall include each petitioner's name, alien registration number, date of filing of the petition for a *de novo* review, and, once an order has been entered, the disposition.

(c) *Other proceedings and orders.* The clerk of court must forward to USCIS copies of the records of such other proceedings and other orders instituted on or issued by the court affecting or relating to the naturalization of any person as may be required from time to time.

(d) *Use of reports for accounting purposes.* State and federal courts may use the reports as a monthly billing document, submitted to USCIS for reimbursement in accordance with section 344(f)(1) of the Act. USCIS will use the information submitted to calculate costs incurred by courts in performing their naturalization functions. State and federal courts will be reimbursed pursuant to terms set forth in annual agreements entered into between DHS and the Administrative Office of United States Courts.

**PART 340—REVOCATION OF NATURALIZATION**

■ 241. The authority citation for part 340 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

**§ 340.1   [Removed and reserved]**

■ 242. Section 340.1 is removed and reserved.

■ 243. Section 340.2 is revised to read as follows:

**§ 340.2   Revocation proceedings pursuant to section 340(a) of the Act.**

(a) *Recommendations for institution of revocation proceedings.* Whenever it appears that any grant of naturalization may have been illegally procured or procured by concealment of a material fact or by willful misrepresentation, and a prima facie case exists for revocation pursuant to section 340(a) of the Act, USCIS will make a recommendation regarding revocation.

(b) *Recommendation for criminal prosecution.* If it appears to USCIS that a case described in paragraph (a) of this section is amenable to criminal penalties under 18 U.S.C. 1425 for unlawful procurement of citizenship or naturalization, the facts will be reported to the appropriate United States

Attorney for possible criminal prosecution.

**PART 341—CERTIFICATES OF CITIZENSHIP**

■ 244. The authority citation for part 341 continues to read as follows:

**Authority:** Pub. L. 82–414, 66 Stat. 173, 238, 254, 264, as amended; 8 U.S.C. 1103, 1409(c), 1443, 1444, 1448, 1452, 1455; 8 CFR part 2.

■ 245. Section 341.1 is revised to read as follows:

**§ 341.1   Application.**

An application for a certificate of citizenship by or in behalf of a person who claims to have acquired United States citizenship under section 309(c) of the Act or to have acquired or derived United States citizenship as specified in section 341 of the Act must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the instructions on the form.

■ 246. Section 341.2 is amended by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Revising the phrase ''at the district director's option'' to read ''at the discretion of USCIS'' in paragraph (b)(1);
■ c. Revising the phrase ''A district director shall assign an officer of the Service to'' to read ''USCIS will'' in the first sentence in paragraph (d);
■ d. Removing the phrase ''to the district director'' in the last sentence in paragraph (d); and
■ e. Removing paragraph (g).
The revision reads as follows:

**§ 341.2   Examination upon application.**

(a) * * *

(1) *When testimony may be omitted.* An application may be processed without interview if the USCIS officer adjudicating the case has in the administrative file(s) all the required documentation to establish the applicant's eligibility for U.S. citizenship, or if the application is accompanied by one of the following:

*        *        *        *        *

**§ 341.3   [Amended]**

■ 247. Section 341.3 is amended by revising the phrase ''an officer of the Service or a United States consular official'' to read ''a DHS or Department of State official''.

■ 248. Section 341.5 is revised to read as follows:

**§ 341.5   Decision.**

(a) *Adjudication.* USCIS may adjudicate the application only after the

appropriate approving official has reviewed the report, findings, recommendation, and endorsement of the USCIS officer assigned to adjudicate the application.

(b) *Approval.* If the application is granted, USCIS will prepare a certificate of citizenship and, unless the claimant is unable by reason of mental incapacity or young age to understand the meaning of the oath, he or she must take and subscribe to the oath of renunciation and allegiance prescribed by 8 CFR 337 before USCIS within the United States. Except as provided in paragraph (c), delivery of the certificate in accordance with 8 CFR 103.2(b)(19) and 8 CFR 103.8 must be made in the United States to the claimant or the acting parent or guardian.

(c) *Approval pursuant to section 322(d) of the Act.* Persons eligible for naturalization pursuant to section 322(d) of the Act may subscribe to the oath of renunciation and allegiance and may be issued a certificate of citizenship outside of the United States, in accordance with 8 U.S.C. 1443a.

(d) *Denial.* If USCIS denies the application, the applicant will be furnished the reasons for denial and advised of the right to appeal in accordance with 8 CFR 103.3.

(e) *Subsequent application.* After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion to reopen or reconsider in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7.

## §§ 341.6 and 341.7   [Removed]

■ 249. Sections 341.6 and 341.7 are removed.

## PART 342—ADMINISTRATIVE CANCELLATION OF CERTIFICATES, DOCUMENTS OR RECORDS

■ 250. The authority citation for part 342 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1453.

■ 251. Section 342.2 is revised to read as follows:

### § 342.2   Service of notice.

The notice required by 8 CFR 342.1 must be by personal service as described in 8 CFR 103.8(a)(2).

## PART 343—CERTIFICATE OF NATURALIZATION OR REPATRIATION; PERSONS WHO RESUMED CITIZENSHIP UNDER SECTION 323 OF THE NATIONALITY ACT OF 1940, AS AMENDED, OR SECTION 4 OF THE ACT OF JUNE 29, 1906

■ 252. The authority citation for part 343 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1443, 1454, and 1455.

### § 343.1   [Amended]

■ 253. Section 343.1 is amended in the first sentence by revising the term "therefor on Form N–580" to read: "in accordance with USCIS instructions".

## PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS

■ 254. The authority citation for part 343a is revised to read as follows:

**Authority:** 8 U.S.C. 1101 note, 1103, 1435, 1443, 1454, and 1455.

■ 255. Section 343a.1 is amended by:
a. Revising the phrase "shall apply on Form N–565 for a new paper in lieu thereof" to read "must apply on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (a);
■ b. Revising the phrase "shall apply on Form N–565" to read "must apply" in paragraph (b); and
■ c. Revising paragraph (c).
The revision reads as follows:

### § 343a.1   Application for replacement of or new papers relating to naturalization, citizenship, or repatriation.

\*     \*     \*     \*     \*

(c) *Adjudication and disposition.* (1) *Interview.* The applicant shall only be required to appear in person for interview under oath or affirmation in specific cases. Those cases which necessitate an interview enabling an officer to properly adjudicate the application at the office having jurisdiction will be determined by USCIS.

(2) *Approval.* If an application for a new certificate of naturalization, citizenship, or repatriation or a new declaration of intention is approved, the new certificate or declaration will be issued and delivered by personal service in accordance with 8 CFR 103.8(a)(2). If an application for a new certified copy of the proceedings under the Act of June 25, 1936, as amended, or under section

317(b) of the Nationality Act of 1940, or under section 324(c) of the Immigration and Nationality Act, or under the provisions of any private law is approved, a certified photocopy of the record of the proceedings will be issued. If, subsequent to naturalization or repatriation, the applicant's name was changed by marriage, the certification of the photocopy will show both the name in which the proceedings were conducted and the changed name. The new certified copy will be delivered to the applicant in accordance with 8 CFR 103.8(a)(2).

(3) *Denial.* If the application is denied, the applicant shall be notified of the reasons for the denial and of the right to appeal in accordance with 8 CFR 103.3.

### § 343a.2   [Amended]

■ 256. Section 343a.2 is amended by revising the terms "Service" and "the Service" to read "USCIS" and the term "Form N–565" to read "an application" wherever those terms appear.

## PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE

■ 257. The authority citation for part 343b continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1454, 1455.

### § 343b.1   [Amended]

■ 258. Section 343b.1 is amended by revising the term "Form N–565" to read "the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions".

■ 259. Section 343b.3 is revised to read as follows:

### § 343b.3   Interview.

When the application presents a prima facie case, USCIS may issue a certificate without first interviewing the applicant. In all other cases, the applicant must be interviewed. The interviewing officer must provide a complete written report of the interview before forwarding the application for issuance of the certificate.

■ 260. Section 343b.4 is revised to read as follows:

### § 343b.4   Applicant outside of United States.

If the application is received by a DHS office outside the United States, an officer will, when practicable, interview the applicant before the application is forwarded to USCIS for issuance of the certificate. When an interview is not practicable, or is not conducted because the application is submitted directly to USCIS in the United States, the

AR2022_200269

certificate may nevertheless be issued and the recommendation conditioned upon satisfactory interview by the Department of State. When forwarding the certificate in such a case, USCIS will inform the Secretary of State that the applicant has not been interviewed, and request to have the applicant interviewed regarding identity and possible expatriation. If identity is not established or if expatriation has occurred, the Department of State will return the certificate to USCIS for disposition.

■ 261. Section 343b.11 is revised to read as follows:

### § 343b.11   Disposition of application.

(a) *Approval.* If the application is granted, USCIS will prepare a special certificate of naturalization and forward it to the Secretary of State for transmission to the proper authority of the foreign state in accordance with procedures agreed to between DHS and the Department of State, retain the application and a record of the disposition in the DHS file, and notify the applicant of the actions taken.

(b) *Denial.* If the application is denied, the applicant will be notified of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3.

## PART 343c—CERTIFICATIONS FROM RECORDS

■ 262. The authority citation for part 343c is revised to read as follows:

**Authority:** 5 U.S.C. 552; 8 U.S.C. 1103.

### § 343c.1   [Amended]

■ 263. Section 343c.1 is amended by revising the term "Form G–641" to read "the form designated by USCIS in accordance with the form instructions".

## PART 392—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WHO DIE WHILE SERVING ON ACTIVE DUTY WITH THE UNITED STATES ARMED FORCES DURING CERTAIN PERIODS OF HOSTILITIES

■ 264. The authority citation for part 392 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440 and note, and 1440–1; 8 CFR part 2.

■ 265. In § 392.2, paragraph (d)(2) is revised to read as follows:

### § 392.2   Eligibility for posthumous citizenship.

\*   \*   \*   \*   \*

(d) \* \* \*

(2) The certification required by section 329A(c)(2) of the Act to prove military service and service-connected death must be requested by the applicant on the form designated by USCIS in accordance with the form instructions. The form will also be used to verify the decedent's place of induction, enlistment, or reenlistment.

■ 266. Section 392.3 is amended by:

■ a. Revising the term "the Service" to read "USCIS" in the last sentence in paragraph (a)(2);

■ b. Revising paragraph (b); and

■ c. Revising paragraph (c).

The revisions read as follows:

### § 392.3   Application for posthumous citizenship.

\*   \*   \*   \*   \*

(b) *Application.* An application for posthumous citizenship must be submitted on the form designated by USCIS in accordance with the form instructions.

(c) *Application period.* An application for posthumous citizenship must be filed no later than two years after the date of the decedent's death.

\*   \*   \*   \*   \*

■ 267. In § 392.4, paragraphs (a) and (e) are revised to read as follows:

### § 392.4   Issuance of a certificate of citizenship.

(a) *Approval of application.* When an application for posthumous citizenship under this part has been approved, USCIS will issue a Certificate of Citizenship to the applicant in the name of the decedent.

\*   \*   \*   \*   \*

(e) *Replacement certificate.* An application for a replacement Certificate of Citizenship must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

## PART 499—[REMOVED]

■ 268. Part 499 is removed.

**Janet Napolitano,**
*Secretary.*

[FR Doc. 2011–20990 Filed 8–26–11; 8:45 am]

**BILLING CODE 9111–97–P**

55 FR 6058-01, 1990 WL 336041(F.R.)

NOTICES

DEPARTMENT OF JUSTICE

Information Collections Under Review

Wednesday, February 21, 1990

**\*6058  February 12, 1990.**

The Office of Management and Budget (OMB) has been sent the following collection of information proposals for review under the provisions of the Paperwork Reduction Act (44 U.S.C. chapter 35) and the Paperwork Reduction Reauthorization Act since the last list was published. Entries are grouped into submission categories, with each entry containing the following information: (1) The titles of the form/collection; (2) the agency form number, if any, and the applicable component of the Department sponsoring the collection; (3) how often the form must be filled out or the information is collected; (4) who will be asked or required to respond, as well as a brief abstract; (5) an estimate of the total number of respondents and the amount of time estimated for an average respondent to respond; (6) an estimate of the total public burden (in hours) associated with the collection; and (7) an indication as to whether section 3504(h) of Public Law 96-511 applies. Comments and/or suggestions regarding the item(s) contained in this notice, especially those regarding the estimated public burden and the associated response time, should be directed to the OMB reviewer, Mr. Edward H. Clarke, on (202) 395-7340 and to the Department of Justice's Clearance Officer, Mr. Larry E. Miesse, on (202) 633-4312. If you anticipate commenting on a form/collection, but find that time to prepare such comments will prevent you from prompt submission, you should notify the OMB reviewer and the DOJ Clearance Officer of your intent as soon as possible. Written comments regarding the burden estimate or any other aspect of the collection may be submitted to Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503, and to Mr. Larry E. Miesse, DOJ Clearance Officer, SPS/JMD/5031 CAB, Department of Justice, Washington, DC 20530.

**New Collection—Expedited Review Requested**

(1) Declaration of Ineligible Family Member of Legalized Alien.

(2) I-817, Immigration and Naturalization Service.

(3) On occasion.

(4) Individuals or households. In order to deal in a humanitarian way with approximately one million ineligible spouses and children of legalized aliens, the INS will process requests for permision to remain in the United States and receive employment authorization (Family Fairness Program).

(5) 1,000,000 estimated respondents at .25 hours each.

(6) 250,000 estimated annual burden hours.

(7) Not applicable under 3504(h).

Larry E. Miesse,

Department Clearance Officer, Department of Justice.

BILLING CODE 4410-10-M

**TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE**

[FR Doc. 90-3928 Filed 2-20-90; 8:45 am]

BILLING CODE 4410-10-C

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**5238** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, and 274a**

[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]

**RIN 1615–AC04**

### International Entrepreneur Rule

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security (DHS) regulations to implement the Secretary of Homeland Security's discretionary parole authority in order to increase and enhance entrepreneurship, innovation, and job creation in the United States. The final rule adds new regulatory provisions guiding the use of parole on a case-by-case basis with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. If granted, parole would provide a temporary initial stay of up to 30 months (which may be extended by up to an additional 30 months) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States.

**DATES:** This final rule is effective July 17, 2017.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–1470.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  D. Summary of Changes From the Notice of Proposed Rulemaking
  E. Summary of Costs and Benefits
  F. Effective Date
II. Background
  A. Current Framework
  B. Final Rule
III. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority
  C. Significant Public Benefit
  D. Definitions
  E. Application Requirements
  F. Parole Criteria and Conditions
  G. Employment Authorization
  H. Comments on Parole Process
  I. Appeals and Motions To Reopen
  J. Termination of Parole
  K. Opposition to the Overall Rule
  L. Miscellaneous Comments on the Rule
  M. Public Comments on Statutory and Regulatory Requirements
IV. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Purpose of the Rule
  3. Volume Estimate
  4. Costs
  5. Benefits
  6. Alternatives Considered
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), confers upon the Secretary of Homeland Security the discretionary authority to parole individuals into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. As described in more detail below, the final rule would establish general criteria for the use of parole with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid growth and job creation that they would provide a significant public benefit to the United States. In all cases, whether to parole a particular individual under this rule is a discretionary determination that would be made on a case-by-case basis.

Given the complexities involved in adjudicating applications in this context, DHS has decided to establish by regulation the criteria for the case-by-case evaluation of parole applications filed by entrepreneurs of start-up entities. By including such criteria in regulation, as well as establishing application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis, DHS

expects to facilitate the use of parole in this area.

Under this final rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation. DHS believes that such potential would be indicated by, among other things, the receipt of (1) significant capital investment from U.S. investors with established records of successful investments or (2) significant awards or grants from certain Federal, State, or local government entities. The final rule also includes alternative criteria for applicants who partially meet the thresholds for capital investment or government awards or grants and can provide additional reliable and compelling evidence of their entities' significant potential for rapid growth and job creation. An applicant must also show that he or she has a substantial ownership interest in such an entity, has an active and central role in the entity's operations, and would substantially further the entity's ability to engage in research and development or otherwise conduct and grow its business in the United States. The grant of parole is intended to facilitate the applicant's ability to oversee and grow the start-up entity.

DHS believes that this final rule will encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation, and dynamism. Particularly in light of the complex considerations involved in entrepreneur-based parole requests, DHS also believes that this final rule will provide a transparent framework by which DHS will exercise its discretion to adjudicate such requests on a case-by-case basis under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

### B. Legal Authority

The Secretary of Homeland Security's authority for the proposed regulatory amendments can be found in various provisions of the immigration laws. Sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), provides the Secretary the authority to administer and enforce the immigration and nationality laws. Section 402(4) of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 202(4), expressly authorizes the

Secretary to establish rules and regulations governing parole. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole for urgent humanitarian reasons or significant public benefit to applicants for admission temporarily on a case-by-case basis.[1] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's general authority to extend employment authorization to noncitizens in the United States. And section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

### C. Summary of the Final Rule Provisions

This final rule adds a new section 8 CFR 212.19 to provide guidance with respect to the use of parole for entrepreneurs of start-up entities based upon significant public benefit. An individual seeking to operate and grow his or her start-up entity in the United States would generally need to demonstrate the following to be considered for a discretionary grant of parole under this final rule:

1. *Formation of New Start-Up Entity.* The applicant has recently formed a new entity in the United States that has lawfully done business since its creation and has substantial potential for rapid growth and job creation. An entity may be considered recently formed if it was created within the 5 years immediately preceding the date of the filing of the initial parole application. *See* 8 CFR 219.12(a)(2), 8 CFR 103.2(a)(7).

2. *Applicant is an Entrepreneur.* The applicant is an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial

grant of parole; and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. *See* final 8 CFR 212.19(a)(1). Such an applicant cannot be a mere investor.

3. *Significant U.S. Capital Investment or Government Funding.* The applicant can further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.

b. *Government grants.* The applicant may show that the start-up entity has received significant awards or grants from Federal, State or local government entities with expertise in economic development, research and development, or job creation. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received monetary awards or grants totaling $100,000 or more from government entities that typically provide such funding to U.S. businesses for economic, research and development, or job creation purposes.

c. *Alternative criteria.* The final rule provides alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment or government funding may be considered for parole under this rule if he or she provides additional reliable and compelling evidence that they would provide a significant public benefit to the United States. Such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

This final rule states that an applicant who meets the above criteria (and his or her spouse and minor, unmarried children,[2] if any) generally may be

considered under this rule for a discretionary grant of parole lasting up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. An applicant will be required to file a new application specifically tailored for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit under this rule, along with applicable fees. Applicants will also be required to appear for collection of biometric information. No more than three entrepreneurs may receive parole with respect to any one qualifying start-up entity.

USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through background checks and other means, to determine whether the applicant has satisfied the above criteria, whether the specific applicant's parole would provide a significant public benefit, and whether any negative factors exist that warrant denial of parole as a matter of discretion. To grant parole, adjudicators will be required to conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion.

If parole is granted, the entrepreneur will be authorized for employment incident to the grant of parole, but only with respect to the entrepreneur's start-up entity. The entrepreneur's spouse and children, if any, will not be authorized for employment incident to the grant of parole, but the entrepreneur's spouse, if paroled into the United States pursuant to 8 CFR 212.19, will be permitted to apply for employment authorization consistent with new 8 CFR 274a.12(c)(34). DHS retains the authority to revoke any such grant of parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS has reason to believe that the approved application involves fraud or misrepresentation. *See* new 8 CFR 212.19(k).

As noted, the purpose of this parole process is to provide qualified entrepreneurs of high-potential start-up entities in the United States with the improved ability to conduct research and development and expand the entities' operations in the United States so that our nation's economy may

---

[1] In sections 402 and 451 of the HSA, Congress transferred from the Attorney General to the Secretary of Homeland Security the general authority to enforce and administer the immigration laws, including those pertaining to parole. In accordance with section 1517 of title XV of the HSA, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the HSA, tit. XV, section 1517). Authorities and functions of DHS to administer and enforce the immigration laws are appropriately delegated to DHS employees and others in accordance with section 102(b)(1) of the HSA, 6 U.S.C. 112(b)(1); section 103(a) of the INA, 8 U.S.C. 1103(a); and 8 CFR 2.1.

[2] The terms "child" and "children" in this proposed rule have the same meaning as they do

under section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1) (defining a child as one who is unmarried and under twenty-one years of age).

benefit from such development and expansion, including through increased capital expenditures, innovation, and job creation. The final rule allows individuals granted parole under this rule to be considered for re-parole for an additional period of up to 30 months (2.5 years) if, and only if, they can demonstrate that their entities have shown signs of significant growth since the initial grant of parole and such entities continue to have substantial potential for rapid growth and job creation.

An applicant under this rule will generally need to demonstrate the following to be considered for a discretionary grant of an additional period of parole:

1. *Continuation of Start-Up Entity.* The entity continues to be a start-up entity as defined by the proposed rule. For purposes of seeking re-parole, an applicant may be able to meet this standard by showing that the entity: (a) Has been lawfully operating in the United States during the period of parole; and (b) continues to have substantial potential for rapid growth and job creation.

2. *Applicant Continues to Be an Entrepreneur.* The applicant continues to be an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (a) Continues to possess a significant (at least 5 percent) ownership interest in the entity at the time of adjudication of the grant of re-parole; and (b) continues to have an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and continuing to grow its business in the United States. This reduced ownership amount takes into account the need of some successful start-up entities to raise additional venture capital investment by selling ownership interest during their initial years of operation.

3. *Significant U.S. Investment/ Revenue/Job Creation.* The applicant further validates, through reliable supporting evidence, the start-up entity's continued potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Additional Investments or Grants.* The applicant may show that during the initial period of parole the start-up entity received additional substantial investments of capital, including through qualified investments from U.S. investors with established records of successful investments; significant

awards or grants from U.S. government entities that regularly provide such funding to start-up entities; or a combination of both. An applicant would generally be expected to demonstrate that the entity received at least $500,000 in additional qualifying funding during the initial parole period. As noted previously, any private investment that the applicant is relying upon as evidence that the investment criterion has been met must be made by qualified U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. Government awards or grants must be from U.S. federal, state or local government entities with expertise in economic development, research and development, or job creation.

b. *Revenue generation.* The applicant may show that the start-up entity has generated substantial and rapidly increasing revenue in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity reached at least $500,000 in annual revenue, with average annualized revenue growth of at least 20 percent, during the initial parole period.

c. *Job creation.* The applicant may show that the start-up entity has demonstrated substantial job creation in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity created at least 5 full-time jobs for U.S. workers during the initial parole period.

d. *Alternative criteria.* As with initial parole, the final rule includes alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole will continue to provide a significant public benefit. As discussed above, such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

As indicated above, an applicant who generally meets the above criteria and merits a favorable exercise of discretion may be granted an additional 30-month period of re-parole, for a total maximum period of 5 years of parole under 8 CFR 212.19, to work with the same start-up entity based on the significant public benefit that would be served by his or her continued parole in the United States. No more than three

entrepreneurs (and their spouses and children) may receive such additional periods of parole with respect to any one qualifying entity.

As with initial parole applications, USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through verification methods, to determine whether the applicant has satisfied the above criteria and whether his or her continued parole would provide a significant public benefit. To be re-paroled, adjudicators will be required to conclude, based on the totality of the circumstances, both: (1) That the applicant's continued parole would provide a significant public benefit, and (2) that the applicant continues to merit parole as a matter of discretion. If the applicant is re-paroled, DHS retains the authority to revoke parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the application involved fraud or made material misrepresentations.

The entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. At any time prior to reaching the 5-year limit for parole under this final rule, such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or as a lawful permanent resident pursuant to an EB–2 National Interest Waiver). Because parole is not considered an admission to the United States, parolees are ineligible to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. For example, if such individuals are approved for a nonimmigrant or employment-based immigrant visa classification, they would generally need to depart the United States and apply for a visa with the Department of State (DOS) for admission to the United States as a nonimmigrant or lawful permanent resident.

Finally, DHS is making conforming changes to the employment authorization regulations at 8 CFR 274a.12(b) and (c), the employment eligibility verification regulations at 8 CFR 274a.2(b), and fee regulations at 8 CFR 103.7(b)(i). The final rule amends 8 CFR 274a.12(b) by: (1) Adding entrepreneur parolees to the classes of

aliens authorized for employment incident to their immigration status or parole, and (2) providing temporary employment authorization for those applying for re-parole. The final rule amends 8 CFR 274a.12(c) by extending eligibility for employment authorization to the spouse of an entrepreneur paroled into the United States under 8 CFR 212.19. The final rule amends 8 CFR 274a.2(b) by designating the entrepreneur's foreign passport and Arrival/Departure Record (Form I–94) indicating entrepreneur parole as acceptable evidence for employment eligibility verification (Form I–9) purposes.[3] The final rule also amends 8 CFR 103.7(b)(i) by including the fee for the new Application for Entrepreneur Parole form.

### D. Summary of Changes From the Notice of Proposed Rulemaking

Following careful consideration of public comments received, including relevant data provided by stakeholders, DHS has made several modifications to the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on August 31, 2016. *See* 81 FR 60129. Those changes include the following:

• *Minimum Investment Amount.* In the final rule, DHS is responding to public comment regarding proposed 8 CFR 212.19(b)(2)(ii)(B)(*1*), a provision that identifies the qualifying investment amount required from one or more qualified investors. In the NPRM, DHS proposed a minimum investment amount of $345,000. Based on data provided by the public, DHS is revising this figure to $250,000. Thus, under the final rule, an applicant would generally be able to meet the investment standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. In addition, DHS has increased the timeframe during which the qualifying investments must be received from 365 days to 18 months immediately preceding the filing of an application for initial parole.

• *Definition of Entrepreneur: Ownership Criteria.* In the final rule,

---

[3] Additionally, DHS is making a technical change to this section by adding the Department of State (DOS) Consular Report of Birth Abroad (Form FS–240) to the regulatory text and to the "List C" listing of acceptable documents for Form I–9 verification purposes. This rule departs from the Notice of Proposed Rulemaking by not adding "or successor form" after Form FS–240. DHS determined that inclusion of the phrase is unnecessary and may cause confusion in the future.

DHS is revising proposed 8 CFR 212.19(a)(1), a provision that defines the term "entrepreneur," and establishes a minimum ownership percentage necessary to meet the definition. In the NPRM, DHS proposed that the entrepreneur must have an ownership interest of at least 15 percent for initial parole, and 10 percent for re-parole. In response to public comment, DHS is modifying this requirement to allow individuals who have an ownership interest of at least 10 percent in the start-up entity at the time of adjudication of the initial grant of parole, and at least a 5 percent ownership interest at the time of adjudication of a subsequent period of re-parole, to qualify under this definition.

• *Qualified Investment Definition.* DHS is revising proposed 8 CFR 212.19(a)(4), which establishes the definition of a qualified investment. In the NPRM, DHS proposed that the term "qualified investment" means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of equity or convertible debt issued by such entity. In response to public comment, DHS is modifying this definition to include other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry.

• *Qualified Investor Definition.* DHS is revising proposed 8 CFR 212.19(a)(5), which establishes the definition of a qualified investor. In the NPRM, DHS proposed that an individual or organization may be considered a qualified investor if, during the preceding 5 years: (i) The individual or organization made investments in start-up entities in exchange for equity or convertible debt in at least 3 separate calendar years comprising a total within such 5-year period of no less than $1,000,000; and (ii) subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. In this final rule, the minimum investment amount has been decreased from the originally proposed $1,000,000 to $600,000. The requirement that investments be made in at least 3 separate calendar years has also been removed from this final rule. DHS is also making revisions to the form of investment made by the individual or organization consistent

with the change to the qualified investment definition by adding "or other security convertible into equity commonly used in financing transactions within their respective industries."

• *Start-up Entity Definition.* In the final rule, DHS is revising the definition of a start-up entity as proposed in 8 CFR 212.19(a)(2). In the NPRM, DHS proposed that an entity may be considered recently formed if it was created within the 3 years preceding the date of filing of the initial parole request. In response to public comment, DHS is modifying this provision so that an entity may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the initial parole request. Additionally, for purposes of paragraphs (a)(3) and (a)(5) of this section, which pertain to the definitional requirements to be a qualified investor or qualified government award or grant, respectively, DHS made corresponding changes in this final rule such that an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

• *Job Creation Requirement.* In the final rule, DHS is revising proposed 8 CFR 212.19(c)(2)(ii)(B)(*2*), a provision that identifies the minimum job creation requirement under the general re-parole criteria. In the NPRM, DHS proposed that an entrepreneur may be eligible for an additional period of parole by establishing that his or her start-up entity has created at least 10 qualified jobs during the initial parole period. In response to public comment, DHS is modifying this provision so that an entrepreneur may qualify for re-parole if the start-up entity created at least 5 qualified jobs with the start-up entity during the initial parole period.

• *Revenue Generation.* In the final rule, DHS is clarifying proposed 8 CFR 212.19(c)(2)(ii)(B)(*3*), a provision that identifies the minimum annual revenue requirement under the general re-parole criteria. DHS has clarified that for the revenue to be considered for purposes of re-parole, it must be generated in the United States.

• *Parole Validity Periods.* In the final rule, DHS is revising proposed 8 CFR 212.19(d)(2) and (3), which are provisions that identify the length of the initial and re-parole periods. In the NPRM, DHS proposed (1) a potential initial period of parole of up to 2 years beginning on the date the request is approved by USCIS and (2) a potential period of re-parole of up to 3 years beginning on the date of the expiration

of the initial parole period. First, DHS revised 8 CFR 212.19(d)(2) to correct that the initial parole period would begin running on the date the individual is initially paroled into the United States. Second, in response to public comment, DHS revised 8 CFR 212.19(d)(2) and (3) to provide 2 potential parole periods of up to 30 months each, rather than an initial 2-year period followed by a potential 3-year period of re-parole. Specifically, 8 CFR 212.19(d)(2) now provides that an applicant who meets the eligibility criteria (and his or her spouse and minor, unmarried children, if any) may be considered under this rule for a discretionary grant of an initial parole period of up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. DHS also revised in this final rule the period of re-parole in 8 CFR 212.19(d)(3) to reduce the period of re-parole from 3 years to 30 months in order to extend the initial parole period, while still maintaining the overall 5-year period of parole limitation.

• *Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(a)(10), a provision that defines material changes. The final rule adds the following to the definition of material changes: "a significant change with respect to ownership and control of the start-up entity." This reflects a change from the originally proposed language of any significant change to the entrepreneur's role in or ownership and control in the start-up entity or any other significant change with respect to ownership and control of the start-up entity. Additionally, the final rule at 8 CFR 212.19(a)(1) adds language that permits the entrepreneur during the initial parole period to reduce his or her ownership interest, as long as at least 5 percent ownership is maintained. This provision was revised in response to a number of public comments that requested that DHS reconsider how and when material changes should be reported.

• *Reporting of Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(j), a provision that describes reporting of material changes. DHS is revising 8 CFR 212.19(j) to allow DHS to provide additional flexibility in the future with respect to the manner in which material changes are reported to DHS. The final rule also makes conforming changes based on changes to the definition of entrepreneur.

• *Termination of Parole.* In the final rule, DHS is revising proposed 8 CFR 212.19(k)(2), a provision that describes automatic termination of parole. The final rule makes conforming revisions to this provision based on changes to the definition of entrepreneur and to the material change provisions.

*E. Summary of Costs and Benefits*

DHS does not anticipate that this rule will generate significant costs and burdens to private or public entities. Costs of the rule stem from filing fees and opportunity costs associated with applying for parole, and the requirement that the entrepreneur notify DHS of any material changes.

DHS estimates that 2,940 entrepreneurs will be eligible for parole annually and can apply using the Application for Entrepreneur Parole (Form I–941). Each applicant for parole will face a total filing cost—including the application form fee, biometric filing fee, travel costs, and associated opportunity costs—of $1,591, resulting in a total cost of $4,678,336 (undiscounted) for the first full year the rule will take effect and any subsequent year. Additionally, dependent family members (spouses and children) seeking parole with the principal applicant will be required to file an Application for Travel Document (Form I–131) and submit biographical information and biometrics. DHS estimates approximately 3,234 dependent spouses and children could seek parole based on the estimate of 2,940 principal applicants. Each spouse and child 14 years of age and older seeking parole will face a total cost of $765 per applicant,[4] for a total aggregate cost of $2,474,914.[5] Additionally, spouses who apply for work authorization via an Application for Employment Authorization (Form I–765) will incur a total additional cost of $446 each. Based on the same number of entrepreneurs, the estimated 2,940 spouses[6] will incur total costs of $1,311,830 (undiscounted). The total cost of the rule to include direct filing costs and monetized non-filing costs is estimated to be $8,136,571 annually.

DHS anticipates that establishing a parole process for those entrepreneurs who stand to provide a significant public benefit will advance the U.S. economy by enhancing innovation, generating capital investments, and creating jobs. DHS does not expect significant negative consequences or labor market impacts from this rule; indeed, DHS believes this rule will encourage entrepreneurs to pursue business opportunities in the United States rather than abroad, which can be expected to generate significant scientific, research and development, and technological impacts that could create new products and produce positive spillover effects to other businesses and sectors. The impacts stand to benefit the economy by supporting and strengthening high-growth, job-creating businesses in the United States.

*F. Effective Date*

This final rule will be effective on July 17, 2017, 180 days from the date of publication in the **Federal Register**. DHS has determined that this 180-day period is necessary to provide USCIS with a reasonable period to ensure resources are in place to process and adjudicate Applications for Entrepreneur Parole filed by eligible entrepreneurs and related applications filed by eligible dependents under this rule without sacrificing the quality of customer service for all USCIS stakeholders. USCIS believes it will thus be able to implement this rule in a manner that will avoid delays of processing these and other applications.

## II. Background

*A. Discretionary Parole Authority*

The Secretary of Homeland Security has discretionary authority to parole into the United States temporarily "under conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any individual applying for admission to the United States," regardless of whether the alien is inadmissible. INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[7] The Secretary's parole authority is expansive. Congress did not define the phrase "urgent humanitarian reasons or significant public benefit," entrusting interpretation and application of those

---

[4] On October 24, 2016, U.S. Citizenship and Immigration Services published a final rule establishing a new fee schedule for immigration benefits and services (81 FR 73292). The new filing fees for Form I–131 and Form I–765, $575 and $410, respectively, will be effective on December 23, 2016. This final rule uses those new filing fees in estimating costs to potential applicants under this rule.

[5] For parole requests for children under the age of 14, only the filing fee will be required, as such children do not appear for biometric collection. Applicants under the age of 14 and over the age of 79 are not required to be fingerprinted. However, they may still be required to attend a biometrics appointment in order to have their photographs and signatures captured.

[6] DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

[7] Although section 212(d)(5) continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Arrabally,* 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).

standards to the Secretary. Aside from requiring case-by-case determinations, Congress limited the parole authority by restricting its use with respect to two classes of applicants for admissions: (1) Aliens who are refugees (unless the Secretary determines that "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled . . . rather than be admitted as a refugee" under INA section 207, 8 U.S.C. 1157), *see* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B); and (2) certain alien crewmen during a labor dispute in specified circumstances (unless the Secretary "determines that the parole of such alien is necessary to protect the national security of the United States"), INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A).

Parole decisions are discretionary determinations and must be made on a case-by-case basis consistent with the INA. To exercise its parole authority, DHS must determine that an individual's parole into the United States is justified by urgent humanitarian reasons or significant public benefit. Even when one of those standards would be met, DHS may nevertheless deny parole as a matter of discretion based on other factors.[8] In making such discretionary determinations, USCIS considers all relevant information, including any criminal history or other serious adverse factors that would weigh against a favorable exercise of discretion.

Parole is not an admission to the United States. *See* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); *see also* 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Parole may also be terminated at any time in DHS's discretion, consistent with existing regulations; in those cases, the individual is "restored to the status that he or she had at the time of parole." 8 CFR 212.5(e); *see also* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[9]

DHS regulations at 8 CFR 212.5 generally describe DHS's discretionary parole authority, including the authority to set the terms and conditions of parole. Some conditions are described in the regulations, including requiring reasonable assurances that the parolee

will appear at all hearings and will depart from the United States when required to do so. *See* 8 CFR 212.5(d).

Each of the DHS immigration components—USCIS, U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE)—has been delegated the authority to parole applicants for admission in accordance with section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). *See* 8 CFR 212.5(a). The parole authority is often utilized to permit an individual who is outside the United States to travel to and come into the United States without a visa. USCIS, however, also accepts requests for "advance parole" by individuals who seek authorization to depart the United States and return to the country pursuant to parole in the future. *See* 8 CFR 212.5(f); Application for Travel Document (Form I–131). Aliens who seek parole as entrepreneurs under this rule may need to apply for advance parole if at the time of application they are present in the United States after admission in, for example, a nonimmigrant classification, as USCIS is unable to grant parole to aliens who are not "applicants for admission." *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Advance authorization of parole by USCIS does not guarantee that the individual will be paroled by CBP upon his or her appearance at a port of entry.[10] Rather, with a grant of advance parole, the individual is issued a document authorizing travel (in lieu of a visa) indicating "that, so long as circumstances do not meaningfully change and the DHS does not discover material information that was previously unavailable, . . . DHS's discretion to parole him at the time of his return to a port of entry will likely be exercised favorably." [11]

Currently, upon an individual's arrival at a U.S. port of entry with a parole travel document (*e.g.,* a Department of State (DOS) foil, Authorization for Parole of an Alien into the United States (Form I–512L), or an Employment Authorization Document (Form I–766)), a CBP officer at a port of entry inspects the prospective parolee. If parole is authorized, the CBP officer issues an Arrival/Departure Record (Form I–94) documenting the grant of parole and the length of the parolee's

authorized parole period. *See* 8 CFR 235.1(h)(2). CBP retains the authority to deny parole to a parole applicant or to modify the length of advance parole authorized by USCIS. *See* 8 CFR 212.5(c).

Because parole does not constitute an admission, individuals may be paroled into the United States even if they are inadmissible under section 212(a) of the INA, 8 U.S.C. 1182(a). Further, parole does not provide a parolee with nonimmigrant status or lawful permanent resident status. Nor does it provide the parolee with a basis for changing status to that of a nonimmigrant or adjusting status to that of a lawful permanent resident, unless the parolee is otherwise eligible.

Under current regulations, once paroled into the United States, a parolee is eligible to request employment authorization from USCIS by filing a Form I–765 application with USCIS. *See* 8 CFR 274a.12(c)(11). If employment authorization is granted, USCIS issues the parolee an employment authorization document (EAD) with an expiration date that is commensurate with the period of parole on the parolee's Arrival/Departure Record (Form I–94). The parolee may use this EAD to demonstrate identity and employment authorization to an employer for Form I–9 verification purposes as required by section 274A(a) and (b) of the INA, 8 U.S.C. 1324a(a) and (b). Under current regulations, the parolee is not employment authorized by virtue of being paroled, but instead only after receiving a discretionary grant of employment authorization from USCIS based on the Application for Employment Authorization.

Parole will terminate automatically upon the expiration of the authorized parole period or upon the departure of the individual from the United States. *See* 8 CFR 212.5(e)(1). Parole also may be terminated on written notice when DHS determines that the individual no longer warrants parole or through the service of a Notice to Appear (NTA). *See* 8 CFR 212.5(e)(2)(i).

*B. Final Rule*

Following careful consideration of public comments received, DHS has made several modifications to the regulatory text proposed in the NPRM (as described above in Section I.C.). The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to these regulatory amendments. Section III of this final rule includes a detailed summary and analysis of public comments that are pertinent to the proposed rule and DHS's role in

---

[8] The denial of parole is not subject to judicial review. *See* INA section 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii); *Bolante* v. *Keisler,* 506 F.3d 618, 621 (7th Cir. 2007).

[9] The grounds for termination set forth in 212.19(k) are in addition to the general grounds for termination of parole described at 8 CFR 212.5(e).

[10] *See Matter of Arrabally,* 25 I. & N. Dec. at 779 n.6 (citing 71 FR 27585, 27586 n.1 (May 12, 2006) ("[A] decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-entry, should DHS determine that parole is no longer warranted.")).

[11] *Id.*

administering the International Entrepreneur Rule. A brief summary of comments deemed by DHS to be out of scope or unrelated to this rulemaking, making a detailed substantive response unnecessary, is provided in Section III.K. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov,* docket number USCIS–2015–0006.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received 763 comments during the 45-day public comment period. Of these, 43 comments were duplicate submissions and approximately 242 were letters submitted through mass mailing campaigns. As those letters were sufficiently unique, DHS considered all of these comment submissions. Commenters consisted primarily of individuals but also included startup incubators, companies, venture capital firms, law firms and representatives from State and local governments. Approximately 51 percent of commenters expressed support for the rule and/or offered suggestions for improvement. Nearly 46 percent of commenters expressed general opposition to the rule without suggestions for improvement. For approximately 3 percent of the public comments, DHS could not ascertain whether the commenter supported or opposed the proposed rule.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by commenters.

### B. Legal Authority

*Comments.* One commenter supported DHS's stated authority for promulgating this regulation and said that the INA grants the Secretary of Homeland Security the authority to establish policies governing parole and that efforts to reduce barriers to entrepreneurship via regulatory reform directly addresses DHS's mandate, "to ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." On the other hand, some commenters questioned DHS's authority to implement this rule. A commenter asserted that the rule created a new visa category which is under the exclusive purview of Congress, and therefore an illegal extension of authority by the

executive branch. Another commenter indicated that the proposed rule is too vague regarding whether "the agency intends to grant parole to aliens already present in the United States," and questioned whether the proposed exercise of parole authority is supported by legislative history, is consistent with the INA's overall statutory scheme, and whether "significant public benefit parole" as outlined in this rule is "arbitrary and capricious."

*Response.* DHS agrees with the commenter that contended that the Secretary has authority to promulgate this rule. As noted above, DHS's authority to promulgate this rule arises primarily from sections 101(b)(1)(F) and 402(4) of the HSA; sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3); section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5); and section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B). The Secretary retains broad statutory authority to exercise his discretionary parole authority based upon "significant public benefit."

DHS disagrees with the comment asserting that the proposed rule would effectively create a new visa category, which only Congress has the authority to do. *See* INA section 101(a)(15), 8 U.S.C. 1101(a)(15) (identifying nonimmigrant categories). Congress expressly empowered DHS to grant parole on a case-by-case basis, and nothing in this rule uses that authority to establish a new nonimmigrant classification. Among other things, individuals who are granted parole— which can be terminated at any time in the Secretary's discretion—are not considered to have been "admitted" to the United States, *see* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and cannot change to a nonimmigrant category as a parolee, *see* INA section 248(a), 8 U.S.C. 1258(a). Nor does parole confer lawful permanent resident status. To adjust status to that of a lawful permanent resident, individuals generally must, among other things, be admissible to the United States, have a family or employment-based immigrant visa immediately available to them, and not be subject to the various bars to adjustment of status. *See* INA section 245(a), (c), (k); 8 U.S.C. 1255(a), (c), (k); 8 CFR 245.1.

DHS further disagrees with the comment that this rule is inconsistent with the legislative history on parole. Under current law, Congress has expressly authorized the Secretary to grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. The statutory language in place today is somewhat

more restrictive than earlier versions of the parole authority, which did not always require case-by-case review and now includes additional limits on the use of parole for refugees and certain alien crewmen. *See* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B) (refugees); INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A) (alien crewmen); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, sec. 602(a)– (b), 110 Stat. 3009–689 (1996) (changing the standard for parole). But the statute clearly continues to authorize the granting of parole. Across Administrations, moreover, it has been accepted that the Secretary can identify classes of individuals to consider for parole so long as each individual decision is made on a case-by-case basis according to the statutory criteria. *See, e.g.,* 8 CFR 212.5(b) (as amended in 1997); Cuban Family Reunification Parole Program, 72 FR 65,588 (Nov. 21, 2007). This rule implements the parole authority in that way.

In addition to the concerns described above, one commenter argued that the proposed rule did not clearly explain whether "the agency intends to grant parole to aliens already present in the United States." DHS believes it is clear under this rule that an individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA sections 212(d)(5)(A), 235(a)(1); 8 U.S.C. 1182(d)(5)(A), 1225(a)(1). As further discussed in section III.H. of this rule, moreover, DHS does not contemplate using this rule to grant requests for parole in place for initial requests for parole.

*Comment:* A commenter objected to the extension of employment authorization by this rule to entrepreneur parolees for the sole purpose of engaging in entrepreneurial employment, stating that DHS is barred from doing so given the comprehensive legislative scheme for employment-based temporary and permanent immigration.

*Response:* DHS disagrees with the commenter. Under a plain reading of INA section 103(a), 8 U.S.C. 1103(a), the Secretary is provided with broad discretion to administer and enforce the Nation's immigration laws and broad authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the [INA]," *see* INA section 103(a)(3), 8 U.S.C. 1103(a)(3). Further, the specific definitional

provision at section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which was raised by the commenter, presumes that employment may be authorized by the Secretary and not just by statute. *See Arizona Dream Act Coal.* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1048, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as "permissive" and largely "unfettered"). The fact that Congress has directed the Secretary to authorize employment to specific classes of foreign nationals in certain statutory provisions does not diminish the Secretary's broad authority under other statutory provisions to administer the immigration laws, including through the extension of employment authorization. *See generally* 8 CFR 274a.12 (identifying, by regulation, numerous "classes of aliens authorized to accept employment").

## C. Significant Public Benefit

*Comment:* One commenter stated that the quality of the jobs created should be a factor in determining whether the entrepreneur's parole will provide a significant public benefit. The commenter suggested formalizing some form of priority criteria.

*Response:* Under this final rule, evidence regarding job creation may be considered in determining whether to parole an individual into the United States for "significant public benefit." An entrepreneur may be considered for an initial period of parole if the entrepreneur's start-up entity has received a qualifying investment or grant. Alternatively, if the entity has received a lesser investment or grant amount, the entrepreneur may still be considered for parole by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS in determining whether the evidence, when combined with the amount of investment, grant or award, establishes that the entrepreneur will provide a significant public benefit to the United States. As with initial parole determinations, evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS to determine whether the entrepreneur should be granted re-parole.

Given the way job creation will already be considered, DHS believes it is unnecessary to make "job quality" its own separate criterion in determining whether to grant parole or re-parole. It is also unclear how the commenter believes DHS should apply any such criterion. Under this final rule, DHS will evaluate the totality of the circumstances, including the evidence about job creation, in determining whether to parole an individual into the United States for significant public benefit.

## D. Definitions

### 1. Entrepreneur—Ownership Criteria

*Comments:* Several commenters expressed concern with the 15 percent "substantial ownership interest" requirement in the definition of "entrepreneur" in the proposed rule. One such commenter said the 15 percent "substantial ownership interest" requirement is only reasonable for smaller startups and proposed that the rule also separately include a dollar amount to satisfy the "substantial ownership interest" requirement (*e.g.,* 15 percent ownership interest or ownership interest valued at $150,000 or more). Several commenters recommended that the final rule reduce the initial parole threshold from 15 to 10 percent and reduce the re-parole threshold from 10 to 5 percent. Other commenters suggested that 10 percent ownership per individual would be a more appropriate threshold because some start-ups may be founded by teams of founders that need to split equity and requiring more than 15 percent ownership might be too restrictive and limit business creativity and growth.

*Response:* Consistent with the commenters' concerns and suggestions, DHS is revising the definition of entrepreneur in this final rule to reduce the ownership percentage that the individual must possess. *See* 8 CFR 212.19(a)(1). Based on further analysis, DHS believes that the thresholds from the proposed rule could have unnecessarily impacted an entrepreneur's ability to dilute his or her ownership interest to raise additional funds and grow the start-up entity. In this final rule, an individual may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. DHS believes that the revised

ownership percentage requirements in this final rule adequately account for the possibility of equity dilution, while ensuring that the individual continues to have a substantial ownership interest in, and assumes more than a nominal financial risk related to, the start-up entity.

Given that this is a new and complex process, DHS declines to adopt a separate option of establishing substantial ownership interest based on a valuation of the entrepreneur's ownership interest. DHS believes that the percentages provided within the final rule offer clear guidance to stakeholders and adjudicators as to what constitutes a substantial ownership interest regardless of the industry involved. Reliance upon valuations of an owner's interest would unnecessarily complicate the adjudicative review process, could potentially increase fraud and abuse, and may be burdensome for the applicant to obtain from an independent and reliable source. DHS, therefore, believes that the best indicator of an entrepreneur's ownership interest is the individual's ownership percentage since that is easy for an applicant to establish and provides an objective indicator for DHS to assess. DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

### 2. Other Comments on Entrepreneur Definition

*Comment:* One commenter stated that, in defining who counts as an "entrepreneur," the rule should take into account whether an individual has been successful in the past, including by having previously owned and developed businesses, generated more than a certain amount of revenue, created more than a certain number of jobs, or earned at least a certain amount.

*Response:* Under this final rule, evidence regarding an entrepreneur's track record may be considered in determining whether to parole an individual into the United States for "significant public benefit." The final rule's definition of entrepreneur requires the applicant to show that he or she both: (1) Possesses a substantial ownership interest in the start-up entity, and (2) has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. *See* new 8 CFR 212.19(a)(1). Some of the factors suggested by the commenter are

relevant evidence that the applicant can submit to show that he or she is well-positioned to substantially assist the entity with the growth and success of its business. DHS will also evaluate the totality of the evidence to determine whether an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. Given the way an entrepreneur's track record may already be considered on a case-by-case basis, DHS believes it is unnecessary to make the specific factors identified by the commenter their own separate criteria in determining whether to grant parole or re-parole.

*Comment:* A few commenters recommended that DHS clarify the term "well-positioned" as used in the definition of "entrepreneur." *See* final 8 CFR 212.19(a)(1) (requiring an international entrepreneur to prove that he or she "is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business"). The commenters believe that the proposed rule did not explain how an applicant would demonstrate that he or she is "well-positioned." The commenters recommend that the "substantial ownership interest" test in the same provision should provide a rebuttable presumption that the entrepreneur is "well-positioned" and that the "significant capital financing" requirements reflect the market demand for the entrepreneur to grow the business.

*Response:* DHS believes that both the proposed rule and this final rule sufficiently explain how an applicant may establish that he or she is "well-positioned" to grow the start-up entity. An applicant may generally establish that he or she is well-positioned to advance the entity's business by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial grant of parole, and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. Such an applicant cannot be a mere investor. The applicant must be central to the entity's business and well-positioned to actively assist in the growth of that business, such that his or her presence would help the entity create jobs, spur research and development, or provide other benefits to the United States. Whether an applicant has an "active and central

role," and therefore is well-positioned to advance the entity's business, will be determined based on the totality of the evidence provided on a case-by-case basis. Such evidence may include:

• Letters from relevant government agencies, qualified investors, or established business associations with an understanding of the applicant's knowledge, skills or experience that would advance the entity's business;

• news articles or other similar evidence indicating that the applicant has received significant attention and recognition;

• documentation showing that the applicant or entity has been recently invited to participate in, is currently participating in, or has graduated from one or more established and reputable start-up accelerators;

• documentation showing that the applicant has played an active and central role in the success of prior start-up or other relevant business entities;

• degrees or other documentation indicating that the applicant has knowledge, skills, or experience that would significantly advance the entity's business;

• documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise;

• a position description of the applicant's role in the operations of the company; and

• any other relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States.

Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain applicants meet the "well-positioned" requirement. The burden of proof remains with the applicant.

*Comment:* One commenter representing a group of technology companies recommended that DHS add the term "intellectual property" as a metric that an adjudicator would take into consideration when determining the "active and central role" that the international entrepreneur performs in the organization. The commenter noted that it had several member companies that have non-citizen inventors on a key patent application, and have had core intellectual property developed by non-citizens, often within the university environment. In many of these situations, the non-citizen inventors were unable to obtain work

authorization and join the emerging startup company, resulting in loss of key technical ability, delay, and additional cost for the startup company to achieve market success. The commenter believes this rule could alleviate this investment risk.

*Response:* As discussed above, an applicant for parole under this rule may provide any relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States. Such evidence includes documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise. DHS will consider such evidence to determine whether the applicant performs, or will perform, an active and central role in the start-up entity.

Given the breadth of evidence that can already be considered in these determinations, DHS declines to amend the definition of "entrepreneur" in 8 CFR 212.19(a)(1) to include some consideration of "intellectual property" as a specific metric to determine if the applicant will have an active and central role in the start-up entity. DHS believes it is appropriate to allow for sufficient flexibility in the definition for adjudicators to evaluate each case on its own merits. Given the considerable range of entrepreneurial ventures that might form the basis for an application for parole under this rule, DHS believes that such flexibility is important to ensure that cutting edge industries or groundbreaking ventures are not precluded from consideration simply because of an overly rigid or narrow definition of "entrepreneur."

*Comment:* One commenter noted that DHS's inclusion of criteria in section IV.B.1. of the NPRM, "Recent Formation of a Start-Up Entity," is reminiscent of criteria used in the O–1 nonimmigrant classification for individuals with extraordinary ability, except for the focus on entrepreneurial endeavors. The commenter especially welcomed the final "catch-all" that referenced "any other relevant, probative, and credible evidence indicating the entity's potential for growth." The commenter asserted that as it pertains to "newspaper articles," one of the major difficulties of the O–1 petition process is the lack of awareness by adjudicators of tech-press publications, such as Recode or TechCrunch. The commenter explained that coverage in these publications is very valuable to startups, and forcing startups to garner traditional media coverage in publications like the *Wall Street Journal* or the *New York*

*Times* is often counterproductive towards the entrepreneur's success.

*Response:* DHS agrees with the commenter that the list of evidence provided in the preamble to the NPRM and this final rule provides an illustrative, non-exhaustive list of the types of evidence that might be submitted by an applicant to establish that he or she meets the definition of entrepreneur in 8 CFR 212.19(a)(1). Applicants may submit any relevant, probative and credible evidence that demonstrates the entity's potential for growth, including tech-press publications.

*Comment:* One commenter recommended broadening the proposed requirement that the parolee play a central role in operations. The commenter noted that the DHS November 2014 memorandum,[12] which initially directed USCIS to develop a proposed rule under the Secretary's parole authority, refers to researchers, not just managers or founders. The commenter stated that in the technology world, "technical founders" are key employees who lead the research and development phase, and recommended that these technical founders be included even if they are not managing overall operations. To keep this expansion targeted, the commenter recommended requiring a technical founder to have an advanced degree in a STEM field from a U.S. institution of higher education.

*Response:* DHS agrees that "technical founders" are often key employees who play an important role in the development and success of a start-up entity. DHS disagrees, however, with the commenter's assertion that the definition of entrepreneur in 8 CFR 212.19(a)(1) does not sufficiently encompass technical founders. Technical founders can perform a central and active role in the operations of their start-up entity, and may be well-positioned, due to their knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. The definition of "entrepreneur" is not limited to those individuals who manage the overall operations of the start-up entity. Thus, DHS believes it is unnecessary to broaden the definition of "entrepreneur" in the way the commenter suggests.

*Comment:* One commenter suggested that the rule should provide a clear-cut definition of a typical entrepreneur.

This commenter asserted that the draft rule does not adequately account for situations where a typical entrepreneur partially qualifies or does not qualify for parole, but nevertheless seeks to start a business in the United States. The commenter stated that USCIS and the White House should plan to have a separate case study team to evaluate each application.

*Response:* DHS believes that the rule provides a reasonable and clear definition of an entrepreneur. This rule is not designed or intended to provide parole to everyone who seeks to be an entrepreneur, but will instead provide a framework for case-by-case determinations based upon specified criteria for determining that a grant of parole in this context provides a significant public benefit. The framework in this rule is consistent with DHS's parole authority under INA section 212(a)(5), 8 U.S.C. 1182(a)(5), and is based on the statutory authorization to provide parole for significant public benefit. Each application for parole under this rule will be adjudicated by an Immigration Services Officer trained on the requirements for significant public benefit parole under 8 CFR 212.19. DHS believes that a separate case-study team could unnecessarily complicate and delay adjudications and declines to adopt the commenter's suggestion.

### 3. Definition of Start-Up Entity—"Recently-Formed" and the 3-year Limitation

*Comment:* Several commenters expressed concern with the definition of "start-up entity" and the requirement that an entity, in order to satisfy that definition, must have been created within the 3 years immediately preceding the parole request filing date. A few individual commenters said that the 3-year limitation could be inadequate in certain situations, such as when investing in an inactive business with other co-founders to initiate the start-up, or when investing in high-priority areas like healthcare, biotechnology, and clean energy that have long gestation times. A couple of individual commenters said that the 3-year limitation may not be necessary given the other, more stringent requirements in the proposed rule. Some commenters provided the following recommendations relating to the 3-year limitation: Eliminate the limitation, lengthen the period to 5 years, lengthen the period to 10 years, or include a case-by-case provision allowing for submissions that may satisfy the definition of "start-up entity." One commenter recommended

that "recently formed" should include entities formed within the last 10 years, and also requested that where applicable, DHS accept alternative evidence to determine and establish that the company is a "start-up" entity, such as letters of attestation from investors, industry experts within a particular niche field, and government agencies that speak to the average growth cycle of a new company within a particular area. A few commenters stated that the 3-year limitation was appropriate.

*Response:* In response to these comments, DHS revised proposed 8 CFR 212.19(a)(2) and the definition of "start-up entity" in this final rule to require that the entity must have been formed within the 5 years immediately preceding the filing of the initial parole application, rather than 3 years as proposed. DHS believes that this definition appropriately reflects that some entities, particularly given the industry in which the entity operates, may require a longer gestation time before receiving substantial investment, grants, or awards. This 5-year limitation continues to reflect the Department's intention for parole under this final rule: To incentivize and support the creation and growth of new businesses in the United States, so that the country may benefit from their substantial potential for rapid growth and job creation. DHS recognizes that the term "start-up" is usually used to refer to entities in early stages of development, including various financing rounds used to raise capital and expand the new business, but the term "goes beyond a company just getting off the ground."[13] Limiting the definition of "start-up" in this proposed rule to entities that are less than 5 years old at the time the parole application is filed is a reasonable way to help ensure that the entrepreneur's entity is the type of new business likely to experience rapid growth and job creation, while still allowing a reasonable amount of time for the entrepreneur to form the business and obtain qualifying levels of investor financing (which may occur in several rounds) or government grants or awards.

### 4. Other Comments on the Definition of Start-Up Entity

*Comment:* One commenter said that formation should be defined to be either the creation of a legal entity under which the activities of the business

[12] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

[13] U.S. Small Business Administration, Startups & High Growth Businesses, available at *https://www.sba.gov/content/startups-high-growth-businesses* ("In the world of business, the word 'startup' goes beyond a company just getting off the ground.").

would be conducted or the effective date of an agreement between the entrepreneur and an existing business to launch the business activities as a start-up, branch, department, subsidiary, or other activity of an existing business entity. Another commenter suggested that DHS consider restructuring (*e.g.*, use successor-in-interest rules) and other pivots (in terms of changes in the service or product, as well as markets) during the 3-year period immediately preceding the filing of the parole application and at time of application for re-parole.

*Response:* DHS appreciates the commenters' suggestions and notes that recent formation within the definition of "start-up entity" in 8 CFR 212.19(a)(2) is already limited to the creation of the entity within the 5 years immediately preceding the filing date of the alien's initial parole request. DHS further declines to amend 8 CFR 212.19(a)(2) to broaden what may be considered "recently formed" to include the effective date of an agreement between the entrepreneur and an existing business to launch new business activities, restructurings and other pivots. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter suggested that start-up entities under this rule should be limited to businesses that fill a need that is currently not being fulfilled in the United States.

*Response:* One of the goals of this final rule is to increase and enhance entrepreneurship, innovation, and job creation in the United States; and, under this rule, evidence regarding the expected contributions of a start-up entity will be considered in determining whether to parole an individual into the United States. A successful start-up entity, particularly one with high-growth potential, will fulfill an identified business need. For example, the entrepreneur may be starting the business to alter an existing industry through innovative products or processes, innovative and more efficient methods of production, or cutting-edge research and development to expand an existing market or industry. It is also unclear from the commenter's suggestion how "business need" would be defined, and DHS believes that attempting to do so in this rule could result in an overly restrictive definition that fails to account for future innovation, would be unnecessarily rigid, and would lessen the rule's ability

to retain and attract international entrepreneurs who will provide a significant public benefit to the United States.

*Comment:* An individual commenter requested that staffing companies be included as a type of startup.

*Response:* In this final rule, and for purposes of parole under this program, DHS defines a "start-up entity" as a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(a)(2). The rule requires that entities meet certain specified criteria for obtaining parole, but the rule does not specifically exclude staffing companies from participating if they otherwise meet these criteria. DHS therefore will not revise the definition of start-up entity in this rule as requested by the commenter.

*Comment:* One commenter asserted that the rule fails to specify how a start-up entity can demonstrate that it has "lawfully done business" or "has substantial potential for rapid growth and job creation." The commenter recommended revising the definition to more closely align with 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H) by instead requiring evidence that the entity is or will be engaged in the regular, systematic, and continuous provision of goods or services. This commenter suggested that the submission of expert witness testimony by a reputable third party, such as a recognized professor or leader in the start-up entity's proposed field, should be given deference and treated under the final rule as a rebuttable presumption establishing that the start-up "has substantial potential for rapid growth and job creation."

*Response:* DHS declines to adopt the commenter's suggested changes in this final rule. DHS believes that an applicant can demonstrate the start-up entity's lawful business activities through many different means and will keep this requirement flexible to account for the many differences among start-up entities. Such evidence might include, but is not limited to, business permits, equipment purchased or rented, contracts for products or services, invoices, licensing agreements, federal tax returns, sales tax filings, and evidence of marketing efforts.

DHS believes that the rule provides a clear framework for establishing that a start-up entity has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(b)(2)(ii) and (iii). An applicant generally must satisfy the criteria in 8 CFR 212.19(b)(2)(ii) to be

considered for parole under this rule. An applicant who only partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii) may still be eligible for consideration for parole under this rule if the applicant provides additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS recognizes that the rule does not provide specific evidence that must be submitted in order to satisfy the alternative criteria in 8 CFR 212.19(b)(2)(iii). DHS believes that providing a specific set of evidence would have the unintended effect of narrowing a provision that was designed to allow for the submission of any evidence that the applicant believes may establish the substantial potential of his or her start-up entity, recognizing that such evidence may vary depending on the nature of the business and the industry in which it operates. DHS believes that it is important to retain criteria that provide flexibility to the applicant and DHS. Such flexibility is consistent with DHS's parole authority and the case-by-case nature of each parole determination as required by statute. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

DHS does not believe that the rule should be revised to align with 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H). The requirements set forth in 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H) relate specifically to eligibility for classification as an L–1 nonimmigrant and are not necessarily relevant to the requirements set forth in this rule, which are specifically designed to provide the framework by which USCIS will determine whether to grant parole to certain individuals for significant public benefit. Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain entities have substantial potential for rapid growth and job creation. The burden of proof remains with the applicant.

5. Qualified Government Award or Grant

*Comment:* One commenter stated that the rule's grant-based criteria for consideration focused too narrowly on awards made by government entities The commenter noted that entrepreneurs seek grants from a variety of sources and that funding from non-profits or not-for-profit entities (such as U.S. universities) can be significant sources of start-up capital. The

commenter requested that the rule be revised to allow entrepreneurs of non-profit start-up entities to qualify for parole under this program based on the receipt of charitable grants.

*Response:* DHS appreciates the commenter's suggestion, but declines to adopt the suggestion in this final rule to include charitable grants as a type of qualifying grant or award under 8 CFR 212.19(a)(3). DHS believes, given the nature of charitable grants, that they would not present the same level of validation regarding the entity's high-growth potential as would a grant or award from a Federal, State, or local government entity with expertise in economic development, research and development, or job creation. Since the validating quality of a substantial government grant or award is an important factor DHS will rely upon to determine if the entrepreneur will provide a significant public benefit to the United States, and since that same validating quality does not necessarily extend to charitable grants or awards, DHS declines to adopt the commenter's suggestion. DHS notes, however, that nothing in this final rule prohibits entrepreneurs from accepting charitable grants or pointing to such funding as evidence that parole would be justified and that they merit a favorable exercise of discretion. Moreover, given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter noted that the definition of qualified government award or grant and the phrase ''federal, state, or local government entity,'' are ambiguous as to whether an entrepreneur may qualify under the rule based on a grant by a foreign government. According to the commenter, the rule does not explicitly state that the ''federal, state, or local government entity'' needs to be restricted to entities in the United States. The commenter encouraged USCIS to adopt a broad approach in determining which kinds of grants may qualify and to allow entrepreneurs to qualify if their start-up entity attracts substantial foreign government financing. The commenter also suggested that USCIS and CBP should again emphasize that parole may be discretionarily denied in cases that could risk national security or impair international relations.

*Response:* While DHS always maintains the ability to deny parole in its discretion, including in those cases where there may be a national security

or foreign relations concerns, DHS declines to expand the definition of qualified government grant or award to include grants or awards from a foreign governmental entity. To eliminate potential confusion, DHS is revising the definition as proposed to specifically exclude foreign government entities. The receipt of significant funding from certain U.S. federal, state or local government entities is an important factor that DHS will weigh in determining if the entrepreneur will provide a significant public benefit to the United States. DHS believes that significant funding from certain U.S. federal, state or local governmental entities is a strong indicator of a start-up entity's substantial potential for rapid growth, including through enhancing innovation, generating revenue, obtaining significant additional investments of capital, and creating jobs. Such government entities regularly evaluate the potential of U.S. businesses, so the choice to provide a significant award or grant to a particular start-up entity can be a compelling indicator of that start-up's substantial potential for rapid growth and job creation. Because these government entities are formed to serve the U.S. public, their choice to fund a particular business may be more indicative than that of a foreign government as to whether the business's operations would provide a significant public benefit in the United States. DHS believes that the reliability and weight of the independent assessment performed by certain U.S. federal, state or local governmental entities before issuing a grant or award does not necessarily extend to grants or awards made by foreign governmental entities. DHS therefore declines to adopt the commenter's suggestion to revise the rule to include funding from foreign governmental entities as one of the criteria in 8 CFR 212.19(a)(3).

### 6. Qualified Investment

*Comment:* Some commenters suggested that DHS define ''capital'' broadly to include cash, cash equivalents, secured or unsecured loan proceeds, payments for or obligations under binding leases, the value of goods, equipment, and intangible property such as patent rights, trademarks, trade secrets, and distinctive ''know how.''

*Response:* DHS declines to adopt the commenters' suggestions. ''Qualified investment'' as a general criterion for parole is limited to a specific monetary investment in the form of equity or convertible debt, to ensure that the investment is easily valued as well as

significant in nature. This promotes fair and efficient administration of the process under this rule, while also ensuring the integrity of that process. In addition, equity investments and convertible debt investments both involve a distinctive level of expert review, due diligence, and oversight. For example, according to the Small Business Administration, venture capital firms and angel investors typically review a business plan and evaluate a start-up's management team, market, products and services, operating history, corporate governance documents, and financial statements before making an equity investment.[14] Such investment generally also involves active monitoring via board participation, strategic marketing, governance, and capital structure.[15] While non-monetary contributions made to a start-up entity may not be considered as a qualified investment for purposes of the general criteria of a parole determination under this rule, the rule does not prohibit such contributions and they may be considered as evidence under the alternative criteria at 8 CFR 212.19(b)(2)(iii) and (c)(2)(iii) to establish that the start-up entity has, or continues to have, substantial potential for rapid growth and job creation.

*Comment:* One commenter stated that the requirement that start-up capital must be equity or convertible debt may be too limiting given the venture finance markets today. The commenter said that other investment instruments are commonly used by sophisticated market participants, and that such investments might not technically be considered equity or convertible debt even though they are bona fide capital investments. The commenter recommended that the definition be made ''future-proof'' by creating a catch-all for other investment instruments that are convertible, exchangeable, or exercisable for equity in the start-up, regardless of the name of the investment instrument.

*Response:* DHS understands that the regulatory text may not capture all possible future investment instruments and has amended the regulatory text to capture other commonly used convertible securities now and in the future. The final rule defines ''qualified investment'' as an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up

---

[14] Venture Capital, *https://www.sba.gov/starting-business/finance-your-business/venture-capital/venture-capital.*

[15] *Id.*

entity that is a purchase from such entity of its equity, convertible debt or other security convertible into its equity commonly used in financing transactions within such entity's industry. DHS believes that this definition, in practice, will apply to other securities convertible into equity (other than convertible debt) that are or become commonly used within the start-up entity's industry, and DHS may issue additional guidance in the future regarding such securities as necessary. Given that this program is new and complex, DHS has decided to take an incremental approach and will consider potential modifications in the future after it is able to assess implementation of the rule and its impact on operational resources.

### 7. Qualified Investor

*Comment:* Several commenters, including associations and individual commenters, stated that the proposed "qualified investor" definition is more stringent than the "accredited investor" definition adopted by the Securities and Exchange Commission (SEC). Several commenters stated that many angel investors, especially newer investment firms and angels, would not be considered "qualified investors" under this rule. One of these commenters suggested revising the definition of a qualified investor using the guidelines set forth by AngelList, which requires all syndicate leads on their site to have registered as accredited investors, to have made at least two direct investments in technology start-ups, and to have attracted additional funding beyond the syndicate lead. Some commenters generally stated that many potentially high-growth firms started by international entrepreneurs will not qualify for parole or re-parole because the business did not receive an investment from a qualified U.S. investor, and encouraged the rule to be more flexible to allow for additional sources of capital.

*Response:* In response to comments received, DHS is revising proposed 8 CFR 212.19(a)(5), which provides the definition of a qualified investor. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years, the individual or organization made investments in start-up entities in exchange for equity or convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS has

removed the proposed requirement that the total investment amount be made in 3 separate calendar years and, consistent with its analysis of relevant investment data, reduced the amount from $1,000,000 to $600,000.[16] DHS is also making revisions consistent with the change to the qualified investment definition by adding "other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry." DHS agrees with commenters that the qualified investor requirement is more stringent than the SEC "accredited investor" definition, but believes the additional parameters for qualified investors under the rule are appropriate. The "accredited investor" definition for SEC purposes is focused on the investing entity's assets or the individual investor's net worth or annual income,[17] not on the investor's

---

[16] To arrive at this sum, DHS relied on the $250,000 median seed round for active firms that successfully exited accelerators, as is described more fully in in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule notice. Second, DHS multiplied this figure by 2.4, which is an estimate of the average number of investments made over a five-year period by qualified investors. DHS arrived at the figure for average investments over five years using the following methodology. DHS used the "investor graph" section of the Seed DB data set to extract investment round information for investors that have invested in various startup accelerators' portfolio companies. The search engine is not set up in a manner in which random sampling can be done, so DHS obtained data for nine accelerators chosen from the 2016 Seed Accelerator Rankings project (SARP), the report of which is found at: *http://seedrankings.com/pdf/ sarp_2016_accelerator_rankings.pdf.* SARP ranks accelerators via a composite scoring system based on various metrics, including funding value averages and exit performance, and produces a list of the top-rated accelerators, although there is no pre-set number of accelerators that can appear in the ranking list each year. In the 2016 SARP report there were twenty-three Seed Accelerators ranked out of a total of 160 that the program tracks. DHS was able to extract investment round data from nine of the twenty-three SARP ranked accelerators, for a total of about 3,600 individual investment rounds. Next, DHS grouped these rounds for the five-year period October 2011–November 2016 to result in 3,085 records. Next, DHS removed duplicates to parse the list into records for unique investor names. As a result, 1,329 unique investors remained. Dividing the 3,085 by 1,329 investors yields an average of 2.4, which DHS used as a reasonable estimate of the average number of investments that qualified investors made in a five year period, at least for the specific accelerators involved. DHS notes that there are several caveats to this analysis. First, the data only includes investments made through accelerators. If non-accelerator investments were included, for which DHS could not obtain data, the average would likely be higher. Second, some rounds did not include an amount and some investor names appeared with variations. DHS conducted several data runs based on different filtering techniques and generally the range of average investments was between 2.32 and 2.5.

[17] 17 CFR 230.501(a).

track record of successfully investing in start-up entities. An investor's successful track record of investing in start-up entities provides an important measure of objective validation that DHS will rely upon as part of evaluating whether granting parole to a particular individual would provide a significant public benefit.

DHS also declines to adopt the investor track record criteria associated with AngelList's requirements, as DHS believes that the past success of qualified investors can be demonstrated sufficiently by utilizing the criteria set forth in the final rule. DHS has maintained the requirements under 8 CFR 212.19(a)(5)(ii) as evidence that the investor has had previous successful investments, which are similar to certain criteria for a start-up entity to demonstrate eligibility for re-parole under this rule. *See* final 8 CFR 212.19(a)(5)(ii).

*Comment:* A joint submission from an advocacy group and a non-profit organization proposed that DHS create a "whitelist" of qualified investors and modify the rule such that any start-up receiving an investment from a whitelisted investor proceed through an expedited review process. The commenter said that this would both streamline the parole process and diminish the burden on adjudicators to analyze the merits of often complicated technology companies. The commenter said that the qualification process for such an investor whitelist could be significantly more robust than the rule's proposed definition of "qualified investor" and should be updated on an annual or biannual basis. Another joint submission suggested the creation of a "Known Qualified Investor" program, similar to the "Known Employer" pilot program recently created by DHS in a different context, to assist the overall adjudication process.

*Response:* DHS appreciates the commenters' suggestions. The Known Employer program referenced by the commenter remains in a pilot stage. DHS will assess the effectiveness of the Known Employer program after the pilot is complete, and then determine whether the program should be made permanent. If the program is successful, DHS will assess whether it may be expanded to other adjudication contexts. Committing to use a similar program in the context of this rulemaking would thus be premature. DHS also declines to adopt the commenters' suggestion to create a "whitelist of qualified investors" and an expedited process for applications based on investment from such investors at this time. Given that this is a new and

complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after the Department has assessed the implementation the process and its impact on operational resources.

## 8. Evidence Required To Establish Qualified Investor

*Comment:* Several commenters expressed concern about the burden of proving that investors have met the revenue and job creation criteria in the definition of qualified investor, which the commenters said could prevent investors from participating. One commenter stated that early-stage investors usually do not keep records of employees or the revenues of their portfolio companies, and that those companies would not be inclined to respond to paperwork requests from their investors that do not relate to their own success. Another commenter said that some investors do not make their investments known publicly and the vast majority of investors do not make public their returns (let alone the number of jobs created). Another commenter said that the rule should only require evidence of publicly available information, concluding that it would be too invasive to require disclosure of confidential employee data or other confidential financial information of third-party companies that have no ties to the start-up entity related to the parole applicant. A few commenters requested that DHS allow venture capitalists, accelerators, and incubators to register so that they would not be required to produce the evidence of their qualifications with each parole application.

*Response:* DHS does not believe that providing evidence of revenues generated or jobs created by entities in which the investor previously invested is overly burdensome or would require the investor to publicly reveal otherwise sensitive information. DHS believes, given the significance of an investor's track record of successful investment in start-ups to the determination of significant public benefit, that the need for this evidence outweighs the potential burden on the applicant and investor to compile and submit it. However, as DHS continues to assess the implementation of the process once the rule is final, the Department will consider potential ways to modify the process given the kinds of issues raised by these comments.

## 9. Foreign Funding/Investment

*Comment:* Several commenters provided input on the proposed requirement that "qualified investor"

funds must come from either U.S. citizens, lawful permanent residents, or entities that are majority owned and controlled by U.S. citizens or lawful permanent residents. Nearly all commenters on this topic expressed concerns about this requirement as a major limiting factor of the rule. Some commenters focused on the potential economic benefits of broadening the definition of "qualified investor" to include foreign investment. These commenters asserted that it would be economically beneficial to allow non-U.S. investments, as there are many experienced investors from outside the United States that could bring direct foreign investment into the country and create jobs. Another commenter stated that, by limiting qualification to domestic investors, DHS is foregoing a critical opportunity to attract foreign entrepreneurs and their investments.

*Response:* DHS disagrees with the assertion that this rule precludes or otherwise discourages foreign investment. This rule does not preclude entrepreneurs from seeking and obtaining investment from any number of sources, whether that is foreign investment, personal funds, or funds from friends and family. This rule, however, does limit the types of investment that will be considered by DHS as a qualifying investment for purpose of determining if the entrepreneur and his or her start-up entity meet the requirements for consideration for parole set out in 8 CFR 212.19. DHS believes it is important to limit the type and source of investment that will be considered a qualifying investment, since the investment is meant to serve in part as an objective way to help ensure and validate that the start-up entity's activities will benefit the United States. DHS does not believe investments from foreign sources—which are significantly more difficult for DHS to evaluate for legitimacy and screen for indicators of fraud and abuse—would provide the same measure of objective validation.

*Comment:* Multiple commenters stated that eligibility criteria should focus exclusively on the location of the start-up entity and its related growth and job creation, not on the citizenship and residence of the investor. Some commenters stated that excluding foreign investors from the definition of "qualified investors" is unduly limiting, because many high-potential international entrepreneurs might not have a pre-existing relationship with a U.S.-based investor. Commenters state that such entrepreneurs, especially if living in other countries, would have difficulty attracting investment from

U.S. investors and becoming eligible for parole under this rule. Another commenter cited data concluding that foreign entrepreneurs currently outside of the United States are at a particular disadvantage, as they lack access to U.S.-based angel and venture funding.

*Response:* DHS agrees that the U.S. location of the start-up entity and its related growth and job creation should be a critical component of eligibility under this rule in order to help ensure the exercise of parole is justified by significant public benefit to the United States. DHS believes, however, that the "qualifying investor" must also be a U.S. citizen or lawful permanent resident or an entity that is majority owned or controlled by U.S. citizens or lawful permanent residents. DHS can evaluate more rapidly, precisely, and effectively whether these investors have an established track record of prior investments, in part due to greater access to relevant and reliable records. Such investors will also be subject to the laws of the United States, which provides some additional assurance that the entrepreneurs they back will provide a significant public benefit to the United States.

DHS is not prohibiting foreign investors from investing in the entrepreneur's start-up entity, but rather is simply limiting those investors that can serve as "qualified investors" for purposes of establishing the entrepreneur's eligibility for parole under this rule. DHS anticipates that entrepreneurs living outside the United States will be able to demonstrate eligibility for parole consideration under this rule, whether based on investment from U.S. investors, grants or awards from certain U.S. Government entities, or a mixture of alternative criteria. For all the reasons above, the definition of "qualified investor" will help DHS manage an efficient process for adjudicating requests under this rule while appropriately screening for potential fraud or abuse and ensuring that each grant of parole is justified by significant public benefit to the United States.

*Comment:* Other commenters focused on specific ways that DHS might allow applicants to use foreign investment to establish their eligibility for parole consideration, including by limiting such investment to the entrepreneur's country of origin, or to only those foreign investors who do not present a national security concern. A few commenters asserted that DHS has the capability to verify the bona fides of foreign investors through, for example, the following mechanisms: Making inquiries through U.S. embassy officials,

requesting resumes and the investment history for foreign angel investors, requesting similar documentation used by EB–5 petitioners to establish their lawful source of funds, and consulting publicly available data on reputable foreign investors with a history of successful investments in various countries. Some commenters provided suggestions for alternative or revised definitions relating to foreign investors that could remain easily verifiable by DHS, with the burden being on the investor, including (1) professionally managed funds with at least $10 million under management and registered with the local jurisdiction, and (2) angel investors that have made credible investments in U.S. companies under the same standards as U.S. "qualified investors." Finally, an individual commenter expressed concerns that even investments from U.S. sources could be suspect, and could serve as a pass-through for ineligible investors such as the entrepreneur's family or foreign nationals.

*Response:* While DHS understands that international entrepreneurs can attract legitimate investment capital from non-U.S. sources, DHS believes—as explained at greater length above—that it is appropriate and important to require that a "qualified investment" come from a U.S. source as one of the general criteria to establish that the start-up entity has the substantial potential for rapid growth and job creation. DHS is prepared to monitor the bona fide nature of such U.S.-based investments, as described in greater detail above. Moreover, the rule neither precludes an applicant from securing funding from non-U.S. sources nor precludes such funding from being considered, non-exclusively, under the alternative criteria at 8 CFR 212.19(b)(2)(iii) or (c)(2)(iii). Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

### 10. Self-Funding/"Bootstrapping"

*Comment:* Several commenters argued that entrepreneurs should be able to demonstrate eligibility for parole under this rule not only through funding from U.S. investors or U.S. Government entities, but also through self-financing (known as "bootstrapping"). One commenter noted that many highly successful start-up founders initially grew their companies through bootstrapping, not by raising capital from external investors.

*Response:* DHS declines to expand the definition of "qualified investment" to

include self-funding by the entrepreneur applicant. DHS believes that this definition should include only those investors who have a history of making similar investments over a 5-year period and who can demonstrate that at least two of the entities receiving such investments have subsequently experienced significant growth in revenue or job creation. *See* final 8 CFR 212.19(a)(5). DHS believes that the investment of a substantial amount of capital by qualified investors in an entrepreneur's start-up entity can serve as a strong indication of the entity's substantial and demonstrated potential for rapid business growth and job creation. Self-funding, while a rational financing strategy for many entrepreneurs, does not provide the same objective and external validation that DHS requires in assessing whether granting parole to an individual is justified based on significant public benefit.

### 11. Other Comments on Qualified Investors

#### a. Crowdfunding

*Comment:* Several commenters stated that the rule should allow crowdfunding as a qualified investment. These commenters noted that entrepreneurs have raised over a billion dollars in investments through various types of crowdfunding platforms, which serve to broaden the base of available investors and demonstrate a venture's potential growth. Commenters also cited the Jumpstart Our Business Startups Act (JOBS Act) of 2012, which created a national regulatory framework for securities-based crowdfunding platforms in particular, along with public statements suggesting that securities-based crowdfunding is recognized by Congress and the Administration as a valuable and increasingly-used investment tool. One commenter also stated that allowing the use of crowdfunding platforms would increase the pool of potential applicants for entrepreneurial parole and could provide a workable intermediary for foreign investment in eligible start-up entities. One commenter suggested potential requirements that would facilitate the use of crowdfunding investment sources, such as setting a threshold amount for eligible crowdfunding investments and confirming that such investments have been deposited in the start-up entity's bank account after the end of the crowdfunding campaign.

*Response:* DHS appreciates the commenters' suggestions. Investments made in a start-up entity through an

SEC-compliant intermediary, such as an SEC-compliant crowdfunding platform, will be treated no differently for purposes of this rule than had the investments been made directly. In order to promote the integrity of adjudications under this rule, DHS declines to make changes to the definition of "qualified investor" that would effectively treat funds generated through crowdfunding platforms as a different class of eligible investment. DHS notes, however, that evidence of a successful donation-based or securities-based crowdfunding campaign could be provided under the rule's alternative eligibility criteria.

#### b. Established U.S. Investors

*Comment:* One commenter questioned the requirement that capital be received "from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities." The commenter stated that the requirement increases the relative bargaining power of established investors working with entrepreneurs seeking parole under this rule, while diminishing that of new venture capital firms, new angel investors, and new start-up accelerators. The commenter stated that if it is kept in its current form, the rule is not clear whether an investment from a non-established investor would jeopardize the parole eligibility of an entrepreneur whose start-up entity is also funded by established investors.

*Response:* The definition of "qualified investor, including the requirement that an investor have a history of substantial investment in successful start-up entities, is intended to help ensure that such investors are bona fide and not concealing fraud or other illicit activity—and thus protect the integrity of the parole process under this rule. The definition is also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit.

DHS emphasizes that the rule does not prohibit investment from U.S. investors who do not have an established track record of substantial investment in start-up entities under the rule's definition of "qualified investor." Any investment from an investor who is not a qualified investor, however, will not count toward the minimum investment criteria associated with the initial parole period or re-parole period. DHS will, of course, monitor all

elements of an application for evidence of fraud or other illegal or illicit activities. It will also assess the totality of the evidence in evaluating whether granting parole to an entrepreneur is justified by significant public benefit.

### c. Approved Regional Centers

*Comment:* One commenter requested that USCIS-approved Regional Centers (based on an approved Form I–924) be allowed to qualify as established U.S. investors. The commenter stated that investment by a Regional Center in a U.S. start-up entity would be a natural extension of what Regional Centers already do, since Regional Centers pool investment for qualified EB–5 visa projects.

*Response:* DHS believes it is important to limit qualifying investors to those who have an established record of successful investments in start-up entities. DHS believes that such a record would include, during the 5-year period immediately preceding the filing of the parole application, one or more investments in other start-up entities in exchange for equity or convertible debt comprising a total of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS will require monetary commitments, rather than non-monetary commitments such as credit for in-kind value (*e.g.,* credit for services), given the difficulty of valuing such commitments and the potential for fraud and abuse. The applicant would also need to show that, subsequent to such investment by the investor, at least 2 such entities each created at least 5 qualified jobs or achieved at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. *See* final 8 CFR 212.19(a)(5)(ii).

As described in greater detail above, these criteria are intended to ensure that investors are bona fide and thus protect the integrity of the parole process under this rule. They are also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit. DHS declines to adopt a special provision for regional centers approved to participate in the EB–5 visa program. Although such centers are not categorically excluded from the definition of "qualified investor" under this rule, they would need to meet all the same criteria as any other qualified investor.

### 12. Qualified Jobs

#### a. Qualifying Employee

*Comments:* Two commenters recommended that DHS broaden the definition of the term "qualifying employee." One commenter stated that the term should include any individual authorized to work in the United States, regardless of immigration status, to avoid creating a conflict for employers who are prohibited from discriminating based on an individual's citizenship or immigration status. Another commenter advocated for the inclusion of independent contractors in the definition of qualifying employee.

*Response:* DHS declines to expand the definition of qualifying employee, which already includes a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. *See* final 8 CFR 212.12(a)(7). DHS believes that creating jobs for these individuals is more likely to provide a significant public benefit given their stronger ties to the United States. Similarly, DHS believes that entrepreneurs and start-up entities that create positions for employees are more likely to provide a significant public benefit than those who rely only on arrangements with independent contractors. Such arrangements would generally have a weaker nexus to the start-up entity, may not have been created as a direct result of the start-up entity's activities, and could be more difficult to validate. Nothing in this rule either supersedes or conflicts with nondiscrimination laws enacted under the Immigration Reform and Control Act (IRCA).[18] Under existing law, it would generally be an unfair immigration-related employment practice for an entity to discriminate against someone authorized to work in the United States because of that person's national origin or, in the case of a "protected individual," citizenship status. *See* 8 U.S.C. 1324b(a) (generally prohibiting such practices, subject to specific exceptions, and defining "protected individual" to include U.S. citizens, lawful permanent residents, and certain other immigrants). This rule does not permit any such otherwise prohibited practices. Instead, it uses the creation of jobs for U.S. citizens, permanent residents, and other authorized immigrants as one indication of the

benefit created by an entrepreneur's start-up entity.[19]

#### b. Full-Time Employment

*Comments:* Several commenters said that the rule should have a more flexible definition of "full-time employment." One commenter said that the definition of the term should not require the job to be filled for at least a year and should include job-sharing arrangements. Another commenter recommended that the definition of full-time employment include combinations of part-time positions.

*Response:* DHS declines to expand the definition of full-time employment to include jobs filled for less than a year by a qualifying employee, job-sharing arrangements, and combinations of part-time jobs. DHS believes that the creation of long-term and full-time positions is a more reliable indicator that an entrepreneur's start-up entity is continuing to yield significant public benefit. Jobs filled for less than a year could be temporary or seasonal, thus limiting the duration and impact of the benefit. Additionally, including job-sharing or combinations of part-time positions could significantly complicate adjudications. The final rule, moreover, already reduces by half the threshold number of jobs to qualify for a re-parole period, making it all the more reasonable to require that each of such jobs be full-time positions as part of the criteria for ensuring that granting parole to an international entrepreneur is justified by significant public benefit.[20]

### 13. Material Change

*Comment:* One commenter recommended that the final rule expressly exempt from the definition of "material change" transitions that are typical within start-ups, such as a company's (1) pivoting its products or services; (2) bringing on board a significant round of funding that could dilute the entrepreneur's ownership interest; (3) changing the role of a founder to meet the needs of the growing company; or (4) by virtue of a foreseeable stock or asset acquisition, executing a merger into or with a related or unrelated entity, or some other form of corporate restructuring. A few

---

[18] Public Law 99–603 section 102, 100 Stat. 3359 (Nov. 6, 1986); INA section 274B.

[19] It is important to note that job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

[20] As explained earlier, job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

AR2022_200288

commenters recommended that DHS clarify what constitutes a "material change" given the rapidly evolving nature of start-ups.

*Response:* DHS appreciates the concerns expressed by commenters regarding the material change definition in the NPRM. This final rule reflects changes that help clarify what constitutes a material change, with the understanding that start-up entities are likely to experience a variety of transitions as part of their legitimate development and growth. DHS disagrees, however, that all of the events listed by commenters should be specifically exempted from the definition of material change. Some changes to the start-up entity can clearly impact the determination of whether the entrepreneur provides, or will continue to provide, a significant public benefit to the United States. It is essential to the rule's integrity that such material changes are clearly defined and reported to DHS. In the final rule, DHS has outlined those changes that DHS believes are critical to the continuing eligibility of the entrepreneur to be granted parole based on a significant public benefit to the United States. Specifically, the final rule maintains that the following changes are material: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution, or cessation of operations of the start-up entity; and the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity. DHS has revised the definition of "material change" to include the cessation of the entrepreneur's qualifying ownership interest in the start-up entity.

DHS recognizes that not all changes to the ownership structure of a start-up entity constitute a change of such significance that it would reasonably affect the outcome of the determination of whether the entrepreneur provides, or

continues to provide, a significant public benefit to the United States. DHS has revised the final rule to limit material change regarding ownership changes only to "a significant change with respect to ownership and control of the start-up entity." For example, a significant change with respect to ownership and control of the start-up entity may include a transfer of equity in the start-up entity that results in an owner or owners not previously identified on the Application for Entrepreneur Parole (Form I–941) collectively acquiring a controlling stake in the entity. DHS recognizes that achieving a significant round of funding for the start-up entity during the initial parole period may often constitute the very qualifying investment that renders the entrepreneur eligible for a re-parole period under this rule's significant public benefit test, despite diluting the entrepreneur's ownership interest. While DHS will make these determinations on a case-by-case basis, DHS does not anticipate that such significant changes with respect to ownership and control of the start-up entity will often result in termination of parole. A full vetting of new investors with a significant ownership interest, however, can provide DHS with additional insights into the start-up entity's activities in the United States and will help DHS ensure the entrepreneur is continuing to provide a significant public benefit to the United States. In the future, DHS may issue additional guidance on the scope of such significant changes in ownership interest if deemed necessary.

DHS believes these changes are sufficient to clarify the definition of "material change" in regulation and to provide entrepreneurs with sufficient detail about the kinds of changes that could impact their eligibility and must be reported. Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*E. Application Requirements*

1. Application for Entrepreneur Parole

*Comments:* One commenter supported the Application for Entrepreneur Parole (Form I–941), and called it "ideal" because without the form applicants must attempt to list information on existing application forms that do not specifically relate to entrepreneurs. Another commenter requested that the application process resemble the Canadian express entry immigration system and be simplified

so that the assistance of an attorney is not required.

*Response:* DHS agrees with the comment that the Form I–941 is beneficial for capturing information specific to parole requests filed under this rule. DHS declines to model the application process for parole under this rule after the Canadian express entry program as that program is a points system designed to manage applications for permanent residence under certain Canadian federal economic immigration programs.[21] DHS has attempted to develop the Form I–941 to be as simple as possible for applicants while capturing sufficient information to enable adjudicators to make appropriate case-by-case decisions under the statutory and regulatory requirements for parole.

2. Submissions of Documentary/ Supporting Evidence

*Comment:* Two commenters expressed concern that the evidentiary requirements were excessive and that start-up entities operating in "stealth-mode" would not be able to provide letters or media articles. Both commenters suggested that evidence of a significant capital investment from a qualified investor should be sufficient to demonstrate the potential for rapid growth and job creation.

*Response:* As an initial matter, DHS recognizes there may be legitimate reasons for operating a start-up in a manner that does not attract significant public attention. In part for this reason, this final rule extends the definition of start-up entity to include entities formed within the 5 years immediately preceding the filing date of the applicant's initial parole request. DHS believes that start-up entities that are seeking to operate without significant public attention will generally have sufficient time to emerge from that status prior to the parole application.

DHS agrees with the commenters that evidence of having received substantial investment from a qualified investor may be sufficient to establish that the start-up entity has the potential for rapid growth and job creation (one factor in making parole determinations under this rule). *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). DHS understands that other evidence that may be required to establish eligibility for parole consideration under this rule, including whether the applicant is well-positioned to advance the entity's business, may not be a matter of public record. DHS believes, however, that even an entrepreneur operating a company in

---

[21] *http://www.cic.gc.ca/english/express-entry/.*

"stealth mode" should generally be able to provide such evidence for purposes of satisfying the requirements of this rule. Indeed, for entrepreneurs to be paroled under this rule, they must persuade adjudicators, based on the totality of the evidence, that they will provide a significant public benefit.

3. Application Requirements of Spouses and Minor Children

*Comment:* DHS received a few comments supporting the provision in the proposed rule allowing the spouse and children of an entrepreneur granted parole under this rule to also apply for and be granted parole in the United States in order to accompany or ultimately join the entrepreneur. One commenter also supported the proposal to allow the spouse, if granted parole, to obtain employment authorization in the United States in order to work and help support the entrepreneur's family.

*Response:* DHS agrees with these comments. Each spouse or child seeking parole must independently establish eligibility for parole based on significant public benefit (or, alternatively, for urgent humanitarian reasons), and that the individual merits a favorable exercise of discretion. In a case in which an entrepreneur has been granted parole based on significant public benefit under this rule, DHS may consider granting parole to the entrepreneur's spouse and children who provide a significant public benefit by maintaining family unity and thereby further encouraging the entrepreneur to operate and grow his or her business in the United States—and to provide the benefits of such growth to the United States.

Under this final rule, spouses of entrepreneur parolees who wish to obtain employment authorization must apply for an EAD pursuant to 8 CFR 274a.12(c)(34), consistent with current parole policy that allows parolees to apply for employment authorization. DHS agrees with the commenter that allowing spouses of entrepreneurs to apply for work authorization may alleviate a significant portion of the potential economic burdens that entrepreneurs and their families may face, such as paying for education expenses for their children, and to ensure that they satisfy the condition on their parole that they maintain household income that is greater than 400 percent of the Federal poverty line, as they grow and develop their start-up entities. Moreover, extending employment authorization to the spouse may further incentivize an international entrepreneur to bring a start-up entity to the United States—along with new jobs,

innovation, and growth—rather than create it in another country.

4. Other Comments on Application Requirements

*Comment:* One commenter asked that DHS clarify the application procedures for Canadians and whether they may apply at the border or whether they must visit a U.S. consulate prior to requesting to be paroled at a U.S. port of entry.

*Response:* Canadians and applicants from other countries may apply for parole under this rule while inside or outside of the United States. If the applicant's parole request is approved, the applicant would request to be paroled by Customs and Border Protection at a U.S. port of entry after arriving from outside the United States. Canadian nationals who will be appearing at a U.S. port of entry directly from Canada will not have to visit a U.S. consulate prior to appearing at the port of entry and requesting that CBP grant parole. Canadian nationals who will not be appearing at a U.S. port of entry directly from Canada, and will instead be travelling to the United States from another country abroad to request a grant of parole may, similar to other applicants, have to visit a U.S. consulate first in order to obtain travel documentation (*e.g.,* a boarding foil) that allows the individual to travel to a U.S. port of entry. In all cases, however, the individual must have an approved Form I–941 before the individual may appear at the port-of-entry to request a grant of parole.

*F. Parole Criteria and Conditions*

1. Minimum Investment

*Comment:* Numerous commenters— including advocacy groups, law firms, associations, and individual commenters—argued that the proposed rule's minimum investment criterion for the initial parole period would set too high an eligibility bar for many high-potential entrepreneurs. Citing a range of different kinds of evidence, several commenters argued that the proposed $345,000 threshold represented significantly more capital than is actually needed by most start-ups initially and would unnecessarily exclude from consideration some entrepreneurs whose entities would create significant public benefit in the United States.

*Response:* In response to public comments, DHS is reducing the proposed minimum investment of $345,000 to $250,000 in the final rule. *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). Multiple public comments

recommended setting the threshold at $250,000, and DHS's further analysis of seed and angel investment data indicates that this level is reasonable. As is described more fully in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule, DHS's analysis of investments received by a set of new firms that graduated from startup accelerator programs revealed that the median seed investment was $250,000.[22] Following the intent of this final rule to increase and enhance entrepreneurship, innovation, and job creation in the United States, DHS determined that investment amounts that entrepreneurs would need to meet to be considered for parole under this rule should be more in line with typical early investment rounds, rather than the higher investment levels typical of later rounds. In each individual case, DHS must be persuaded that granting parole would provide a significant public benefit and that the person requesting parole merits a favorable exercise of discretion.

*Comment:* One commenter stated that there should not be a minimum investment amount and suggested that the rule instead establish minimum revenue amounts. Several other commenters suggested that evidence of rapid revenue growth should be a standalone eligibility criterion for the initial parole period under 8 CFR 212.19(b)(2)(ii).

*Response:* DHS disagrees with the suggestion that there should not be a minimum investment amount. Establishing a minimum investment amount based on available data provides a clear and predictable benchmark for how an applicant may demonstrate that a start-up entity has substantial potential for rapid growth and job creation (one factor in making parole determinations under this rule). If international entrepreneurs are unable to meet the threshold investment amount but have received some qualified investments or qualified government awards or grants, they may alternatively qualify for parole consideration under this rule if they partially meet the threshold criteria and provide "other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." *See* final 8 CFR 212.19(b)(2)(iii).

---

[22] The data utilized by DHS is provided publicly by SeedDB: *http://seed-db.com/accelerators,* as well as the Angel List: *https://angel.co/,* and the Angel Capital Association (ACA): *https://www.angelcapitalassociation.org/.*

AR2022_200290

**5256** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

DHS disagrees with the suggestion that evidence of rapid revenue growth or generation of a certain amount of revenue should be a separate criterion under 8 CFR 212.19(b)(2)(ii). In setting threshold criteria, DHS intends to identify reliable indicators of a start-up entity's substantial potential for rapid growth and job creation and, ultimately, of the significant public benefit that a grant of parole would provide in an individual case. DHS does not believe that revenue should be the sole external validation factor as compared to substantial funding from qualified U.S. investors and government entities for initial parole applications. DHS reiterates, however, that a start-up entity's revenue may be taken under consideration, both under the "alternative criteria" test and as part of the totality of evidence relevant to whether the grant of parole in an individual case would be justified by significant public benefit and the person requesting parole deserves a favorable exercise of discretion. *See* 8 CFR 219.2(b)(2)(iii), 219.2(c)(2)(B)(iii).

*Comment:* Several individual commenters recommended that the investment threshold be based upon the type of business activity.

*Response:* In an effort to provide a reasonable level of simplicity and predictability in the final rule, DHS decided to utilize a single investment threshold rather than several amounts based on the type of business activity. DHS believes that determining multiple investment thresholds based on business activity or industry would be unduly complicated, making adjudications more labor-intensive and increasing processing times. DHS believes that using a single investment threshold, backed by available data, is a reasonable approach and provides a clearer benchmark for applicants, investors, and adjudicators.

*Comment:* Some commenters provided input on the requirement that funding be received within the preceding 365 days. A CEO roundtable agreed that the $345,000 threshold was an appropriate amount, but questioned the 365-day requirement, recommending that the rule be changed to require that only 65 percent of the investment to have occurred within the last 365 days. A trade association and a joint submission from a professional association and a non-profit organization recommended that the investment occur within a 3-year window. As an alternative, the trade association stated that some of a start-up entity's capital that would otherwise count toward the qualified investment amount should do so even if its ultimate

receipt by the start-up entity is contingent upon the approval of parole.

*Response:* DHS is revising the proposed requirement that the substantial investment be received within the 365 days immediately preceding the filing of the application for initial parole. The final rule increases this period from 12 months (365 days) to 18 months. DHS made this change based on feedback that it often takes longer than 12 months for a start-up to secure and receive investment funding. This revised requirement still ensures that a qualified investor or government entity has recently validated (within 18 months) the start-up entity's potential for rapid growth and job creation. With respect to the comment suggesting that DHS accept funding contingent upon approval of parole toward the qualified investment amount, DHS believes that funds contingent on the occurrence of a future event, such as a grant of parole to the entrepreneur, would not satisfy the general criteria in 8 CFR 212.19(b)(2)(ii). DHS notes, however, that such funds may be considered under the alternative criteria in 8 CFR 212.19(b)(2)(iii) if the entrepreneur partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii)(B), since DHS may consider such contingent funds as other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Given that this process is a new and complex one, DHS has decided to take an incremental approach and will consider the suggested modification in the future after assessing the implementation of the rule and its impact on operational resources.

2. Minimum Government Grants or Awards

*Comment:* Several commenters argued that DHS should require less than $100,000 to meet the eligibility criteria based on a start-up entity's receipt of government grants and awards. An individual commenter said that most government grants were well beneath the $100,000 minimum threshold in the proposed rule. Another individual commenter recommended a $50,000 government grant threshold. By contrast, one commenter stated that the $100,000 minimum investment for government grants and awards is too low to start a meaningful business and suggested increasing the amount to $500,000 or more. Several commenters stated that the $100,000 grant threshold aligns with the timing of the Federal Small Business Innovation Research

(SBIR)[23] and Small Business Technology Transfer (STTR) awards and dollar amounts.

*Response:* DHS declines to make the suggested changes to the minimum government grant or award threshold. In light of the range of comments received on increasing or decreasing the minimum grant amount, DHS believes its proposed minimum grant amount is reasonable. Because government entities regularly evaluate the potential of U.S. businesses, the choice to provide a significant award or grant to a particular start-up entity will often be a strong indicator of that start-up's substantial potential for growth and job creation. Additionally, because government entities are by definition formed to serve the public, the choice by such an entity to fund a particular business generally indicates the government entity's independent assessment that the business's operations would provide a significant public benefit—and can be a strong indicator of a start-up entity's substantial potential for rapid growth and job creation. The specific $100,000 minimum government funding threshold identified in this final rule is based in part on the fact that seed funding awards ("Phase I" awards) from the Federal SBIR/STTR program are generally below $150,000.

3. Initial Parole Alternative Criteria

*Comment:* Several commenters offered suggestions for the factors to be considered by DHS under the rule's alternative criteria for the initial parole period, such as adding a metric for number of users or customers of the entrepreneur's start-up entity, the start-up entity's social impact, and the start-up entity's national scope or location in a low- or middle-class neighborhood. Other commenters proposed the following factors: The applicant's academic degree; participation in or training from a start-up accelerator; prior success as demonstrated by market share from patented innovations, annual sales volume, or job creation; and

---

[23] The Small Business Innovation Research (SBIR) program is coordinated by the Small Business Administration to seed capital for start-up businesses. It is designed to stimulate technological innovation among small private-sector businesses, and it is the largest source of seed capital in the United States for technology driven start-ups, funding between 5,000 and 7,000 projects a year. The "first phase" award is an innovation grant made for initial eligibility and corresponds to the start-up of the commercial business and proof of "concept phase"—the average award amounts vary by department, but most SBIR Phase I awards are made at or below $150,000. The Phase I awards are geared towards financing the startup of the private commercial entity and also the innovation and research and development (R&D) that the enterprise undertakes.

demonstrated success using alternative funding platforms.

*Response:* DHS agrees with these suggestions. DHS may consider the following additional types of evidence, among others, as factors under the alternative criteria for those applicants who partially satisfy 8 CFR 212.19(b)(2)(ii):

• number of users or customers;
• revenue generated by the start-up entity;
• social impact of the start-up entity;
• national scope of the start-up entity;
• positive effects on the start-up entity's locality or region;
• success using alternative funding platforms, including crowdfunding platforms;
• the applicant's academic degrees;
• the applicant's prior success in operating start-up entities as demonstrated by patented innovations, annual revenue, job creation, or other factors; and
• selection of the start-up entity to participate in one or more established and reputable start-up accelerators or incubators.

With respect to start-up accelerators and incubators, DHS expects to evaluate them on several relevant factors, including years in existence, graduation rates, significant exits by portfolio start-ups, significant investment or fundraising by portfolio start-ups, and valuation of portfolio start-ups.

DHS understands that some applicants will be able to establish that their start-up entity is likely to grow rapidly and create jobs based on other factors beyond only the amount of capital investment or government funding received, which is why DHS has not limited the types of evidence that may be considered under the alternative criteria at 8 CFR 212.19(b)(2)(iii) for those who only partially meet the initial threshold criteria at 8 CFR 212.19(b)(2)(ii)(B).

*Comment:* One commenter suggested linking the rule's application to applications for other initiatives, such as National Minority Supplier Development Council Certification and, when applicable, Minority Women Based Entrepreneur Certification.

*Response:* DHS appreciates the commenters' suggestions but declines to adopt these factors as evidence of substantial potential for rapid business growth or job creation. Nothing in this rule prohibits or discourages entrepreneurs from participating in initiatives or certification processes designed to help promote more diverse and inclusive entrepreneurship. DHS does not believe, however, that such initiatives and certifications

independently provide sufficient external validation that a start-up entity has the substantial potential for rapid growth or job creation and meets the "significant public benefit" requirement under this rule. Evidence that the start-up is involved with certain initiatives in the public interest can, however, be considered a positive factor in determining whether an entrepreneur merits a grant of parole as a matter of discretion. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said the term "reliable and compelling evidence" in proposed 8 CFR 212.19(b)(2)(iii), with respect to the start-up entity's substantial potential for rapid growth and job creation, is too vague and should be elaborated on further in the regulatory text.

*Response:* DHS disagrees with the commenter's suggestion to elaborate further in 8 CFR 212.19(b)(2)(iii) on the type of evidence that may be submitted and considered as reliable and compelling. DHS believes that this alternative criterion should be flexible so as not to restrict the types of evidence that may be submitted and relied upon to determine if the start-up entity has substantial potential for rapid growth and job creation. DHS believes that such flexibility is important given the case-by-case nature of these discretionary parole determinations. An applicant for parole under this rule who does not meet the threshold capital investment or government funding criteria in 8 CFR 212.19(b)(2)(ii)(B) may submit any evidence that the applicant believes is reliable and compelling to support the claim that the applicant's start-up entity has substantial potential for rapid growth and job creation. DHS, after reviewing the application and all of the evidence submitted in support of the application, will make a determination as to whether the applicant is eligible for parole consideration under the relevant statutory and regulatory standards, and as to whether the person seeking parole merits a favorable exercise of discretion.

*Comment:* One commenter asserted that securing an investment from a U.S. investor or obtaining a U.S. government grant or award is not a viable option for most people.

*Response:* DHS believes that qualified investments or government funding are appropriate factors to consider when assessing the ability of a start-up entity to achieve rapid growth and job creation

(one factor in making parole determinations under this rule). DHS, however, understands that some start-up entities with the potential to yield significant public benefit may have legitimate economic or strategic reasons to not pursue or accept capital investment or government funding at the levels set forth in 8 CFR 212.19(b)(2)(ii)(B). Therefore, DHS has provided in the rule an alternative criterion for further consideration of those applications where the applicant only partially satisfies the capital investment or government funding thresholds, but provides additional reliable and compelling evidence that establishes the substantial potential of the start-up entity for rapid growth and job creation.

*Comment:* A commenter suggested that, instead of focusing on capital investment and job creation criteria, DHS should focus on whether the start-up entity would be in industries in traded sectors. The commenter proposed that the following industries would qualify: Manufacturing, software publishers, Internet publishing, and research and development services.

*Response:* While DHS recognizes the benefits of increased exports to the U.S economy, it declines to limit eligible start-up entities to traded sectors, since start-up entities in a much wider set of industries can yield significant public benefit to the United States through rapid growth and job creation.

*Comment:* A commenter requested that DHS form an advisory group of industry experts to recommend alternative criteria.

*Response:* DHS afforded an opportunity for notice and comment on the NPRM and expressly sought proposals for alternative criteria from the public. DHS does not believe that forming a new advisory group is necessary at this time.

*Comment:* One commenter suggested that the term "rapid growth" should be determined based on factors pertaining to the start-up entity's industry, normal business growth in the industry, geographic area, and the amount of investment in the entity. The commenter also recommended that the term "substantial potential" take into account the start-up entity's particular geographic area rather than a national scale.

*Response:* While the industry- and geography-specific factors suggested by the commenter may be taken into consideration by DHS as part of the totality of the circumstances for a given application, DHS believes that the general and alternative eligibility criteria provided in the final rule are

**5258** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

sufficient to determine if a start-up entity has the substantial potential for rapid growth and job creation, and provide a more predictable framework by which these parole applications will be adjudicated than would a more mechanical and unduly rigid consideration of the variables suggested by the commenter.

### 4. Re-parole Criteria

#### a. Minimum Investment or Grants/ Awards

*Comment:* Several commenters discussed the proposed re-parole eligibility criteria at 8 CFR 212.19(c)(2)(ii)(B)(*1*), namely that the applicant's start-up entity has received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period. Most commenters argued that this funding level was unduly high, especially given the duration of the initial parole period.

*Response:* DHS declines to adjust the $500,000 funding threshold. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS believes that $500,000 is a reasonable level for re-parole. An industry report on startups shows the median seed investment round for the first half of 2016 was $625,000, which rose from $425,000 in 2015. This figure is valuable because it includes seed rounds for firms that participate with accelerators and that often start out with investment rounds below $100,000.[24] The median for angel group seed investments is reported at $620,000 as the annual average over 2013–2015, which rose sharply to $850,000 in 2015 from a median of $505,000 from the previous two years. Venture capital round sizes are even larger, as the 2014 median round size for both seed and startup stage venture rounds was $1,000,000.

DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to seek and receive qualified investments or government funding, to meet the re-parole criteria. If an entrepreneur is unable to meet the minimum funding

criterion, moreover, he or she may still be eligible for re-parole based on revenue generated or jobs created. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*) and (*3*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

#### b. Minimum Annual Revenue

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(*3*), which establishes an eligibility threshold when the applicant's start-up entity has reached at least $500,000 in annual revenue and averaged 20 percent in annual revenue growth during the initial parole period. Most commenters suggested alternative approaches, arguing that start-ups are often legitimately focused on the development of an innovative product or service, and not on generating early revenue. Another commenter stated that the revenue criterion is reasonable.

*Response:* DHS declines to adjust these criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS chose $500,000 in revenue and 20 percent annual revenue growth as threshold criteria because, after consulting with SBA, DHS determined these criteria: (1) Would be reasonable as applied across start-up entities regardless of industry or location; and (2) would serve as strong indications of an entity's potential for rapid growth and job creation (and that such entity is not, for example, a small business created for the sole or primary purpose to provide income to the owner and his or her family). As noted, DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to meet the minimum revenue threshold for re-parole. If an entrepreneur is unable to meet the minimum revenue requirement, he or she may still be eligible under the minimum investment or job creation criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*) and (*2*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

*Comment:* An individual commenter suggested that DHS should include in the rule a criterion for user growth, rather than revenue growth, as many

start-ups focus more on growing their number of users in their early years.

*Response:* DHS declines to include user growth as a stand-alone criterion for establishing eligibility for re-parole. DHS, however, may consider user growth as a factor when evaluating an entrepreneur's eligibility under the alternative criteria provision. The list of factors provided in the preamble to the proposed rule was intended only to illustrate the kinds of factors that DHS may consider as reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

As noted in the NPRM, DHS is not defining in regulation the specific types of evidence that may be deemed "reliable and compelling" at this time, because DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant the Secretary's exercise of discretion in granting parole based on significant public benefit. DHS believes, however, that such evidence would need to be compelling to demonstrate that the entrepreneur's presence in the United States would provide a significant public benefit. DHS will evaluate on a case-by-case basis whether such evidence—in conjunction with the entity's substantial funding, revenue generation, or job creation—establishes that the applicant's presence in the United States will provide a significant public benefit during a re-parole period.

*Comment:* An individual commenter suggested that the minimum annual revenue threshold for re-parole be set as just enough to sustain the entrepreneur's salary and continue business operations.

*Response:* The final rule states that the start-up entity must be of a type that has the substantial potential to experience rapid growth and job creation, including through significant levels of capital investment, government awards or grants, revenue generation, or job creation during the re-parole period. These factors are intended to help DHS identify the types of start-up entities that are most likely to provide a significant public benefit, while excluding entities without such potential—such as a business with limited growth potential created by an entrepreneur for the sole or primary purpose of providing income to the entrepreneur and his or her family.[25] Because this latter type of business is less likely to experience rapid growth

---

[24] The report on the seed median is published as a newsletter by Crunchbase and is found at: *https://techcrunch.com/2016/09/07/crunchbase-sees-rise-in-average-seed-round-in-2016/*. The Angel group median round size is obtained from the Angel Resource Institute's annual (2015) "Halo Report," found at *http://angelresourceinstitute.org/reports/halo-report-full-version-ye-2015.pdf*. The venture capital figures are obtained from the Ernst and Young Venture Capital Insights Report (4th quarter 2014) and are found at: *http://www.ey.com/ Publication/vwLUAssets/Venture_Capital_Insights_4Q14_-_January_2015/%24FILE/ey-venture-capital-insights-4Q14.pdf*.

[25] Erik Hurst & Benjamin Wild Pugsley, "What Do Small Businesses Do?" (Aug. 2011), *available at http://www.brookings.edu/~/media/files/programs/es/bpea/2011_fall_bpea_papers/2011_fall_bpea_conference_hurst.pdf*.

AR2022_200293

and job creation, DHS believes it is unlikely that the entrepreneur of such a business would be able to meet the significant public benefit requirement for a grant of parole. Establishing a minimum annual revenue threshold for re-parole that would, by definition, cover only an entrepreneur's salary and continue business operations would not likely help identify whether an entrepreneur's activity in the United States would provide a significant public benefit. DHS therefore declines to adopt the commenter's suggestion.

c. Minimum Jobs Created

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(*2*), which establishes an eligibility threshold for applicants whose start-up entities have created at least 10 qualified jobs within the start-up entities during the initial parole period. Most commenters argued that this job creation requirement was unduly high or that the time period for compliance was too short.

*Response:* Based on comments received, DHS has lowered the job creation criterion for re-parole from 10 to 5 qualified jobs. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*). DHS agrees with commenters that requiring 10 jobs to satisfy this criterion may be unduly high for many start-ups, even those with demonstrated substantial potential for rapid growth and job creation. DHS believes that the creation of 5 qualifying jobs during the initial period of parole is sufficient to determine that the start-up entity continues to have substantial potential for rapid growth and job creation, particularly in light of the substantial capital investment, government funding, or other reliable and compelling evidence that supported the initial parole determination. In each case, DHS must be persuaded that re-parole is justified by significant public benefit and that the person seeking re-parole merits a favorable exercise of discretion. As discussed elsewhere in this preamble, DHS has also extended the initial period of parole from 2 years to 30 months, in order to allow additional time for start-up entities to grow, obtain additional substantial funding, generate substantial revenue, or create jobs. *See* 8 CFR 212.19(c)(2)(iii).

d. Re-Parole Alternative Criteria

*Comment:* One commenter suggested that DHS should consider taxes paid by a start-up entity as a criterion for re-parole, leaving the task to DHS to define the threshold of the amount and type of taxes paid.

*Response:* DHS declines to adopt the commenter's suggestion. DHS believes that a start-up entity would have to generate a significant level of revenue or job creation (which are already criteria under this rule) to meet any separate, standalone tax-based threshold. Any such additional criterion would therefore be unlikely to be particularly probative in determining whether re-parole is justified by significant public benefit or the person seeking re-parole merits a favorable exercise of discretion. DHS therefore declines to include the payment of taxes as a stand-alone eligibility criterion.

*Comment:* A commenter suggested that if DHS lowers the funding and job creation thresholds for re-parole, there should be no need for alternative criteria.

*Response:* While DHS did reduce the job creation threshold for re-parole in the final rule, DHS believes that parolees should have the flexibility to present other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Examples of such evidence are provided above, in the discussion on alternative criteria for the initial parole period. DHS believes that it is important to retain such flexibility in the final rule, consistent with the case-by-case nature of these parole determinations. DHS, therefore, has not adopted the commenter's suggestions.

5. Authorized Periods of Parole

*Comment:* Several commenters discussed the initial 2-year parole period at 8 CFR 212.19(d)(2). Most commenters argued that the 2-year period was unduly short, as start-ups with significant potential for rapid growth and job creation may require more time to meet re-parole eligibility requirements. Some commenters suggested having a 3-year initial period of parole and a 2-year period of re-parole. Other commenters suggested a range for initial parole from 3 to 5 years. A number of comments discussed the overall duration of the parole periods, the majority of which advocated for longer periods ranging from 6 to 10 years in total. Some of these commenters based the need for an extended parole period on the typical duration of the start-up growth path from seed funding to venture capital financing to exit (through an initial public offering or a merger or acquisition).

*Response:* Based on the comments received, DHS is changing the maximum periods for initial parole and re-parole to 30 months (2.5 years) each, for a total maximum parole period under this rule of up to 5 years. The additional time for the initial parole period will provide entrepreneurs with more time to receive additional qualified investments or government funding, increase revenue, or create qualified jobs sufficient to meet the eligibility criteria for an additional period of parole. While this change does reduce the length of the re-parole period, DHS believes that this approach is necessary to provide additional time during the initial period of parole while maintaining the same maximum overall parole period of 5 years. DHS further believes that a 5-year total maximum parole period is consistent with the amount of time successful start-up entities generally require to realize rapid growth and job creation potential. Moreover, an entrepreneur of a start-up entity that is almost 5 years old when the parole application is filed would have the possibility to obtain up to 5 years of parole, which would allow the entity to realize its rapid growth and job creation potential by the time it is 10 years old—and to provide those benefits in the United States.[26] DHS retains the discretion to provide any length of parole to an applicant, including a period shorter than 30 months where appropriate. DHS also notes that although USCIS would designate an appropriate initial parole period upon approval of the Application for Entrepreneur Parole, CBP would retain its authority to deny parole to an applicant or to modify the length of parole authorized by USCIS upon issuing parole at the port of entry, consistent with CBP's discretion with respect to any advance authorization of parole by USCIS.

---

[26] Estimates based on the Census Bureau Business Dynamics Statistics suggest that on average 55 percent of new firms survived after 3 years, but 80 percent of the firms that survived 3 years also made it through 5 years. Dane Stangler and Jared Konczal "Give me your entrepreneurs, your innovators: Estimating the Employment Impact of a Startup Visa", Ewing Marion Kauffman Foundation (Feb. 2013), available at *http://www.kauffman.org/~/media/kauffman_org/research%2Oreports%20and%20covers/2013/02/startup_visa_impact_final.pdf;* "*CrunchBase Reveals: The Average Successful Startup Raises $41M, Exits at $242.9M,*" Techcrunch.com (Dec. 14, 2013), available at *http://techcrunch.com/2013/12/14/crunchbase-reveals-the-average-successful-startup-raises-41m-exits-at-242-9m/; see also* TruBridge Capitol Partners, *Why the 'Next Billion Dollar Startup' Is not Always the Next IPO,* Forbes, Apr. 15, 2015, available at *http://www.forbes.com/sites/truebridge/2015/04/15/why-next-billion-dollar-startup-not-always-next-ipo/* ("From 2001–2004, the average age of a company at its public exit was 5.4 years. . . . From 2009–2012, the average age was 7.9.").

**5260** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

## 6. Limitation on Number of Entrepreneurs

*Comment:* Several commenters addressed 8 CFR 212.19(f) in the proposed rule, which states that no more than three entrepreneurs may be granted parole based on the same start-up entity. Most commenters on this provision recommended that DHS increase the number of entrepreneurs, with suggestions to increase the maximum number to 4 or 5. Several other commenters, including a trade association and a professional association, supported the proposed rule's limit of 3 entrepreneurs obtaining parole under this rule based on the same start-up entity. An individual commenter stated that DHS should allow for additional entrepreneurs to qualify for parole based on the same start-up entity, not only at the time of application but also at a later date, asserting that it is very common for technology companies to introduce multiple co-owners over time that are key personnel vital to the operations of the start-up entity.

*Response:* DHS appreciates the comments regarding this limitation and recognizes that some start-ups may initially have more than 3 founders or owners. After reviewing all comments, DHS declines to increase the number of entrepreneurs permitted to request parole related to the same start-up entity, and will retain the current limit of no more than 3 eligible entrepreneur applicants per start-up entity. *See* final 8 CFR 212.19(f). As an initial matter, DHS believes it would be difficult for a larger number of entrepreneurs associated with the same start-up entity to each meet the eligibility criteria and comply with the conditions on parole while ultimately developing a successful business in the United States. A higher number of entrepreneurs associated with the same start-up entity may affect the start-up's ability to grow and succeed, and may even result in the startup's failure, thus preventing the goals of the parole process under this rule from being realized.[27] Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that each entrepreneur's

parole will provide a significant public benefit.

The limitation, moreover, will help strengthen the integrity of the international entrepreneur parole process in various ways. Among other things, limiting the number of individuals that may be granted parole under this rule in connection with the same start-up entity will provide an additional safeguard against an entity being used as a means to fraudulently allow individuals to come to the United States. Such a limit diminishes, for example, the incentive to dilute equity in the start-up entity as a means to apply for parole for individuals who are not bona fide entrepreneurs. Finally, DHS clarifies that the rule does not require that additional entrepreneurs, up to 3 entrepreneurs per start-up entity, apply for parole based on the same start-up entity at the same time.

## 7. Income-Related Conditions on Parole

*Comment:* Several commenters discussed the proposed rule's provision requiring that entrepreneurs paroled into the United States must maintain a household income that is greater than 400 percent of the Federal poverty line for their household size, as defined by the Department of Health and Human Services. Many of these commenters discussed the financial difficulties faced by start-ups and argued that the income requirements were unduly high or suggested other alternatives. The majority of commenters on this issue stated that entrepreneurs in start-up endeavors typically do not take a salary or take a minimal salary in the early years. Several commenters recommended lowering this income threshold, with many suggesting lowering it to 100 percent, while others suggested alternatives of 125 percent, 200 percent, or 250 percent of the Federal poverty level. An individual commenter recommended that DHS institute a minimum yearly income requirement of $80,000, while another individual commenter stated that DHS should adopt a more nuanced approach that takes into account factors like standard of living, unemployment rates, and economic growth by state. Other commenters recommended that DHS allow for other types of compensation, in the form of benefits or rewards, in addition to salary to satisfy the income-related conditions on parole. Another individual commenter stated that DHS should use the income threshold already established by the Affidavit of Support,[28] which is set at 125 percent

above the poverty guidelines. Lastly, one commenter said the "significant public benefit" determination should not just be applied to entrepreneurs who meet a particular income or wealth criterion, but should be liberally applied to all entrepreneurs who are seeking to build and grow a business.

*Response:* DHS appreciates the concerns raised by these commenters, but declines to adopt the commenter's suggestion to eliminate or alter the income-related condition on parole. Establishing this income-related condition on parole is consistent with the Secretary's discretionary authority to grant parole "under conditions as he may prescribe." INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). As stated in the NPRM, DHS established this income threshold to ensure that applicants seeking parole under this rule will have sufficient personal economic stability to make significant economic and related contributions to the United States. Those policy goals remain valid and are appropriate in guiding the decision to retain the requirement that the household income of an entrepreneur requesting parole under this rule be greater than 400 percent of the Federal poverty line.

Under this rule, DHS will take steps to ensure that each grant of parole will provide a positive net benefit to the economy of the United States, consistent with the statutory framework authorizing parole only for significant public benefit absent urgent humanitarian issues. In addition to considering all the other positive evidence—from job creation to investment to growth—DHS includes the income threshold as an additional safeguard that the entrepreneur and his or her family will not be eligible to draw upon Federal public benefits or premium tax credits under the Health Insurance Marketplace of the Affordable Care Act. Furthermore, Secretary Johnson indicated in his memorandum titled "Policies Supporting U.S. High-Skilled Business and Workers" that such thresholds would be created so that individuals would not be eligible for these public benefits or premium tax credits in light of the purpose of the policy.[29]

DHS emphasizes that the funding amounts received by a start-up entity from governmental sources or from

[27] Max Marmer, Bjoern Lasse Herrmann, Ertan Dogrultan, Ron Berman, *Startup Genome Report Extra on Premature Scaling,* Startup Genome Report: Premature scaling v 1.2 (Mar. 2012 ed.) (explaining that "hiring too many people too early" in a start-up's development is one of several reasons that most start-ups fail), available at *https://s3.amazonaws.com/startupcompass-public/StartupGenomeReport2_Why_Startups_Fail_v2.pdf.*

[28] Affidavits of Support, filed using Form I–134 or I–864, are required for certain immigrants to

show that they have adequate means of financial support and are not likely to rely on the U.S. government for financial support.

[29] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

qualified investors in order to meet the rule's eligibility thresholds are distinct from the possible sources of salary payments to the individual entrepreneur. Nothing in this rule prevents a start-up entity from raising higher funding levels than the minimum parole eligibility thresholds, and from a wider set of funders than those in the rule's definitions of qualified investors and government entities. DHS intends for the eligibility criteria for parole to be useful independent validation tools for assessing the significant growth and job creation potential of the start-up entity. While there is certainly validity to the arguments made by some of the commenters that many entrepreneurs do not take large salaries, choosing instead to re-invest available funds back into the start-up entity or to take other forms of non-cash compensation, DHS must establish criteria that protect the overall policy goals of this rule in accordance with the requirements of the INA. The income-related requirements offer a clear and predictable mechanism for DHS to have a strong measure of confidence that the entrepreneur and his or her family, while paroled into the United States under this rule, will be net positive contributors to the American economy.

8. Reporting of Material Changes

*Comment:* Several commenters discussed the proposed requirement that entrepreneurs report any material changes during a parole period to DHS by submitting a new application for parole. Most commenters argued that such a requirement would be onerous given the constantly changing nature of start-ups. A law firm argued that requiring entrepreneurs to report and reapply when there are pending actions against the start-up entity or entrepreneur would be unfair, as both are entitled to due process, and suggested a reporting requirement only if an adverse judgment were issued. An individual commenter stressed that a $1,200 fee to report every material change would create a major financial burden for entrepreneurs.

*Response:* DHS recognizes that the nature of start-up entities involves constant change. DHS also appreciates the concerns regarding the administrative and financial burden placed on entrepreneurs by additional filings. DHS believes, however, that the revised definition of material change in the final rule will help to clarify the situations in which the entrepreneur must notify the agency of material changes, and thus limit the administrative and financial burdens on the entrepreneur. Specifically, DHS

understands that start-ups may have frequent ownership changes over the course of successive funding rounds, and thus has revised the definition of "material change" regarding ownership changes to cover only those that are "significant" in nature. Clarifying the scope of the material change definition also limits the reporting requirement, which should help reduce the anticipated burden on entrepreneurs. DHS also emphasizes that the rule requires notification of pending actions only in the context of a criminal case or other action brought by a government entity, while actions brought by private individuals or entities are not considered "material changes" until a settlement, judgment, or other final determination is reached. DHS does not believe that the material change reporting requirement under this rule will impact an individual's due process or would otherwise be unfair. DHS believes, however, that it is important for an entrepreneur granted parole under this rule to immediately inform USCIS if certain actions are brought against the entrepreneur or his or her start-up entity.

*Comment:* One commenter recommended that the process of addressing material changes would be improved if DHS were to implement a policy similar to the "deference" policy it applies in the EB–5 investor program. Such a policy provides that DHS will defer to prior determinations regarding certain documentary evidence used to establishing program eligibility requirements absent fraud, misrepresentation, a mistake of law or fact, or a material change.

*Response:* As discussed above, DHS decided to narrow and clarify the definition of "material change" in order to address commenters' concerns about reporting burdens. In the absence of specific suggestions, DHS could not ascertain from this comment what aspect of the EB–5 deference policy could be applied under this rule. DHS believes it is important for this rule to provide mechanisms, including the requirement to report material changes, to ensure that parole continues to be justified by significant public benefit in each particular case.

*Comment:* A joint submission from a professional association and a non-profit organization stated that, where a material change filing is mandated by the rule, the entrepreneur should only be required to file an update with USCIS, instead of being required to re-file an entire parole or re-parole application.

*Response:* As explained above, while DHS appreciates that a new filing may

appear burdensome to the entrepreneur, DHS believes that a new filing is necessary in order to re-evaluate the entrepreneur's eligibility when such material changes occur. Material changes, by their definition, may affect the entrepreneur's ability to demonstrate that the start-up entity has potential for rapid growth and job creation, and whether the entrepreneur will continue to provide a significant public benefit to the United States. Therefore, at present, the entrepreneur must file a new application to allow DHS the opportunity to determine the entrepreneur's continued eligibility for parole. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

9. Other Comments on Parole Criteria and Conditions

*Comment:* Several comments expressed concern that the rule did not require that the entrepreneur receive prevailing wages for their work, with some commenters expressing concern that the only wage requirements relate to the Federal Poverty Level.

*Response:* DHS appreciates commenters' concerns regarding prevailing wages. Unlike some employment-based visa classifications, however, the intention of this parole process is not to address labor shortages in the United States. Rather, it is to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States. DHS believes that requiring the parolee to maintain a household income of greater than 400 percent of the Federal Poverty Level adequately ensures that he or she will have sufficient personal economic stability to provide a significant public benefit to the United States through entrepreneurial activities.

*Comment:* One commenter recommended that DHS should not require an applicant's start-up entity to receive investment prior to the initial application for parole; that DHS should recognize cash infusions during the growth period of a start-up entity as eligibility criteria for re-parole; and that at the end of the initial parole period, if the venture is deemed successful, no additional funding milestones should be required for re-parole eligibility.

*Response:* DHS appreciates the comment but declines to revise the rule as suggested. DHS believes that the alternative criteria provided in this rule to determine if the start-up entity has

AR2022_200296

substantial potential for rapid growth and job creation provide sufficient flexibility for those entrepreneurs who may have received amounts of qualified investments or government funding that are less than those required to satisfy the general criteria for parole consideration under this rule. The determination that the entity has substantial potential for rapid growth and job creation will be made based on the evidence in the record at the time the parole application is adjudicated, rather than the possibility that the entity may receive cash infusions at some point in the future. If cash infusions from various sources are received by the start-up entity during the period of initial parole, evidence of such cash infusions may be taken into consideration if the entrepreneur applies for re-parole. DHS, however, does not believe that cash infusions into the start-up entity during the initial parole period will independently suffice to establish that the entity continues to have the significant potential for rapid growth and job creation. Infusions of cash, as a general matter, do not have the same validating qualities as do evidence of additional investment from qualifying investors, grants or awards from qualifying government entities, significant revenue growth, or job creation.

*Comment:* One commenter asserted that entrepreneurs who have left their start-up entity should not have their parole status immediately revoked. The commenter suggested that DHS issue guidance and options for entrepreneurs who leave their start-up entity but have contributed to the significant public benefit of the United States. A similar comment recommended that individuals be able to remain in the United States under parole and qualify for re-parole if a second start-up meets the requirements of the rule. Another related comment argued that entrepreneurs whose start-up entities fail should be given a second chance, in order to account for the dynamism and uncertainty inherent in new businesses.

*Response:* DHS appreciates the commenters' suggestions. As a matter of statutory authority, once, in the opinion of DHS, the purpose of parole has been served, parole should be terminated. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS emphasizes that the purpose of granting parole under this rule is to allow an entrepreneur to grow a start-up entity in the United States with substantial potential for rapid growth and job creation, by working in an active and central role for the entity. Accordingly, DHS will not continue

parole for entrepreneurs who are no longer actively working in a central role with the start-up entity that served as the basis for the initial parole application. The individual's activity through a new start-up entity, however, could serve as a basis for a new grant of parole if all requirements for such parole are met.

*Comment:* One commenter suggested that DHS should utilize the same methodology for granting parole for entrepreneurs as defined in a proposed nonimmigrant visa classification in a Senate bill, S. 744, 113 Cong. section 4801(2013).

*Response:* DHS appreciates the comment but declines to adopt the commenter's suggestion. Under this rule, DHS has identified a process for implementing the Secretary's existing statutory authority to grant parole consistent with section 212(d)(5) of the INA. DHS does not believe it is advisable to import in this rule the standards from unenacted legislation focused on nonimmigrant visas rather than discretionary grants of parole.

### G. Employment Authorization

#### 1. Automatic Employment Authorization Upon Parole

*Comment:* One commenter suggested that if employment authorization were deemed incident to parole, rather than through a follow-up application, then the regulations governing employment verification would need to be amended to permit employment by the parolee and spouse without an EAD.

*Response:* DHS agrees that the employment verification provisions of the regulations should be appropriately revised. In this final rule, and as proposed, DHS is revising the employment eligibility verification regulations by expanding the foreign passport and Form I–94 document combination described at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include Forms I–94A containing an endorsement that an individual is authorized to work incident to parole. This document combination was previously acceptable only for certain nonimmigrants authorized to work for a specific employer incident to status pursuant to 8 CFR 274a.12(b), which the final rule amends to include those paroled into the United States as entrepreneurs under this rule. *See* final 8 CFR 274a.12(b)(37).

However, in this final rule, and as proposed, only the entrepreneur parolee is accorded employment authorization incident to his or her parole. *See* final 8 CFR 274a.12(b). Given the basis for parole, it is essential to limit any delays

in the entrepreneur's own employment authorization. Such delays could create difficulties for the entrepreneur's operation of the start-up entity, as he or she would be prohibited from working until work authorization was approved, and would frustrate the very purpose for paroling the entrepreneur into the United States. As an entrepreneur's spouse would not be coming for the same kind of specific employment purpose, DHS does not believe there is a similar need to provide him or her work authorization incident to parole. Instead, this rule adds a new provision making the spouse of an entrepreneur parolee eligible to seek employment authorization. *See* final 8 CFR 274a.12(c)(34). Based on this provision and 8 CFR 274.13(a), an entrepreneur's spouse seeking employment authorization under this rule would need to file an Application for Employment Authorization (Form I–765) with USCIS in accordance with the relevant form instructions.

*Comment:* One commenter expressed concern that the proposed employment authorization provision is too narrow in scope. The commenter stated that DHS should clarify that employment with an entity that is under common control as the start-up entity, such as a subsidiary or affiliate, would be permissible.

*Response:* Under the final rule, the entrepreneur parolee's employment authorization is limited to the specific start-up entity listed on the Application for Entrepreneur Parole, Form I–941. This limitation helps ensure that the entrepreneur's work is consistent with the purposes for which parole was granted, especially since parole applications will be evaluated based in part on the activities and performance of that particular start-up entity. DHS appreciates that there are certain circumstances in which some flexibility could further the purpose of encouraging entrepreneurship, innovation, economic growth, and job creation in the United States. Given that this is a new process however, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

*Comment:* One commenter stated that difficulties obtaining a work visa have caused many entrepreneurs to move out of the United States.

*Response:* DHS agrees with the commenter's statement. While this rule does not address all of the difficulties that entrepreneurs may face, or make legislative changes that only Congress can make, DHS believes it will encourage international entrepreneurs

AR2022_200297

to develop and grow their start-up entities—and provide the benefits of such growth—in the United States. Entrepreneurs paroled into the United States under this rule will be authorized to work for the start-up entity for the duration of the parole (and any re-parole) period.

2. Spousal Employment

*Comment:* Several commenters, including a business incubator, asserted that spouses should be granted employment authorization and argued that spouse employment authorization will entice more entrepreneurs to come to the United States. Several other commenters stated that, in order to attract the best entrepreneurial talent, spouses of entrepreneur parolees should automatically receive work authorization incident to status without the need to apply separately.

*Response:* DHS agrees with commenters that extending employment authorization to spouses of entrepreneur parolees is important to help attract entrepreneurs to establish and grow start-up entities in the United States. For reasons provided above, however, DHS disagrees that these spouses must be provided with employment authorization incident to their parole. Instead, these spouses may seek employment authorization under 8 CFR 274a.12(c)(34).

*Comment:* A few commenters stated opposition to permitting employment authorization for the spouses of international entrepreneurs.

*Response:* DHS disagrees with the commenters' opposition to allowing an entrepreneur's spouse to apply for employment authorization. Permitting spouses to seek employment authorization is an important aspect of the rule's intent to attract international entrepreneurs who may provide a significant public benefit by growing their start-up entities in the United States.

*Comment:* One commenter objected to spousal employment authorization unless it is restricted to the same new high-potential start-up entity that served as the basis for the parole.

*Response:* DHS disagrees with the suggestion that spousal employment should be authorized only for employment with the start-up entity that served as the basis of parole for the entrepreneur. Nothing in this rule prevents people married to each other from applying for parole associated with the same start-up entity. But DHS believes that it is not appropriate or necessary to limit the employment of an entrepreneur's spouse to that entity. Making those spouses eligible to seek

employment from a broader range of employers can further the central purpose of the rulemaking—encouraging international entrepreneurs to develop and grow their start-up entities within the United States and provide the benefits of such growth to the United States. It may also encourage entrepreneurs to create more jobs outside the family through the start-up entity, furthering the benefits provided to others in the United States. DHS therefore declines to revise the rule as suggested.

*H. Comments on the Parole Process*

1. Ability of Individuals To Qualify for Parole Under This Rule

*Comment:* Two individual commenters asked what kind of immigration status or visa an international entrepreneur should maintain in order to be eligible to apply for parole under this rule. The commenters expressed concern about the types of activities that would need to be conducted in the United States prior to a parole application in order to establish a business, obtain funds from investors, and otherwise qualify for the parole under this rule. These commenters also expressed concern about requiring prior investment as a condition for parole, and that investors would be hesitant to make such an investment in a start-up entity if the entrepreneur lacked an immigrant or nonimmigrant visa. A professional association stated that, since parole does not constitute formal admission to the United States, it will likely be very difficult for international entrepreneurs without formal immigration status to enter into long-term contracts, raise significant investment capital, and employ people.

*Response:* This final rule aims to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are in turn expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy. Under this final rule, an international entrepreneur may request parole in accordance with the form instructions. The final rule provides that individuals seeking initial parole under this program must present themselves at a U.S. port of entry to be paroled into the United States; there is no requirement that an international entrepreneur currently be in the United States or maintain any prior immigration status. DHS notes, however, that under the statute governing parole authority, individuals

who have already been admitted to the United States are ineligible to be considered for parole inside the United States because only applicants for admission are eligible to be considered for parole. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Individuals who have been admitted in a nonimmigrant classification, and are currently in the United States pursuant to that admission, may not be paroled, even if they have overstayed their admission, unless they first depart the United States.

DHS appreciates that international entrepreneurs may face many challenges in starting and growing a business in the United States, including attracting investment capital or government grants or awards. DHS disagrees with the premise, however, that qualifying investors will be very reluctant to make a qualifying investment in a start-up entity that is wholly or partially owned by an individual that will be seeking a grant of parole under this rule. DHS believes that there are a myriad of factors that go into a decision to invest significant funds in a start-up entity. While the underlying immigration status, or lack thereof, of the start-up entity's owner(s) may be a factor presenting a degree of additional risk, DHS believes that this rule will effectively mitigate some of that risk by providing a known framework under which certain significant public benefit parole requests will be reviewed and adjudicated. This final rule provides investors and entrepreneurs with greater transparency into the evaluation process and manner in which such requests will be reviewed, so that those individuals and entities can weigh the various risks and benefits that might apply to the particular investment decision being considered. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

2. Waiver for Entrepreneurs Presently Failing To Maintain Status

*Comment:* An individual commenter stated that international entrepreneurs already in the United States should be able to receive a waiver in order to establish eligibility for parole under this rule if they do not have a valid prior immigration status. Another commenter suggested that immigration status violations, such as unauthorized employment, should not be grounds for denying parole under this rule and, if parole is granted, any prior

**5264** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

unauthorized employment that was used to meet the requirements for parole should be disregarded for purposes of any future immigration applications.

*Response:* As discussed above, eligibility for parole under INA section 212(d)(5), 8 U.S.C. 1182(d)(5), is not wholly dependent upon an individual's current immigration status. Unauthorized employment or a prior status violation will not necessarily preclude an individual from qualifying for parole under this rule. However, the fact that an entrepreneur has worked without authorization, is out of status, or not legally present in the United States would be considered in determining whether DHS should grant parole under its discretionary authority. All requests for a discretionary grant of parole are adjudicated on a case-by-case basis and ultimately determined by evaluating all positive and negative factors.

DHS will not adopt the commenter's suggestion to disregard, for purposes of any future immigration applications, any prior unauthorized employment that was used to meet the requirements for parole. DHS believes that such a provision would require a statutory change, as eligibility for certain benefits is barred by statute if the applicant previously worked without authorization.[30]

### 3. Relationship Between Parole and Various Nonimmigrant Visa Classifications

#### a. Pathway for Current Nonimmigrants To Use Entrepreneur Parole

*Comment:* Some commenters expressed concern that it would be challenging for foreign students, recent graduates of U.S. universities, and other nonimmigrants presently in the United States to meet this rule's requirements for parole consideration under the constraints of their current visas. These commenters said that the rule should allow these individuals a realistic and clear pathway to easily utilize parole, and should clarify that potential applicants currently in the United States in nonimmigrant status will not be violating their existing visa status when taking the necessary steps to establish eligibility for significant public benefit parole. One commenter requested that students in F–1 nonimmigrant status and eligible to work on Curricular Practical Training (CPT) or Optional Practical Training (OPT) should become eligible for parole under the rule if they founded a start-up and raised $100,000 in capital.

*Response:* DHS appreciates that some entrepreneurs who are present in the United States and who might otherwise qualify for parole under this program may be unable to engage in certain activities given the limitations placed on their nonimmigrant status, making it difficult, for example, for them to raise significant capital for a start-up entity. DHS, however, disagrees with the commenters' assertion that individuals present in the United States in F–1 nonimmigrant status will be unable to meet the requirements for parole under this program, such as starting a business and raising significant investment, without violating their F–1 nonimmigrant status. For example, an individual in F–1 status who has obtained OPT employment authorization may start and work for his or her own business in the United States. The OPT employment, and thus the business, must relate to the F–1 nonimmigrant's program of study and can occur either before (pre-completion OPT) or after the completion of a program of study (post-completion OPT).[31] Additional requirements apply to F–1 nonimmigrants who are otherwise eligible for a STEM OPT extension, such as establishing that their STEM OPT employer will have a valid employer-employee relationship with the F–1 OPT nonimmigrant, but those additional requirements do not pertain to the initial 12-month OPT period, and in any event do not present an absolute bar against entrepreneurial activities. DHS believes that it is certainly realistic that an F–1 nonimmigrant in the United States can start a business during his or her OPT period, and during that time can take steps to obtain significant investment in the start-up entity, which the individual may then rely upon if applying for parole under this rule. DHS declines to adopt the commenters' suggestion to include in this rule a blanket provision stating that potential applicants currently in the United States in nonimmigrant status will not be violating their existing status when taking steps to establish eligibility for parole. Such changes would pertain to the statutory and regulatory limitations placed on various nonimmigrant classifications and are outside the scope of this rule.

DHS believes that this final rule provides a realistic and clear option for certain entrepreneurs to actively grow their qualifying start-up entity in the United States. As discussed below, parole is not a nonimmigrant status, and individuals present in the United States

in a nonimmigrant status will not be able to change status or otherwise be granted parole without first departing the United States and appearing at a U.S. port of entry for inspection and parole. Under this final rule, however, an individual present in the United States in a nonimmigrant status may apply for and obtain an approval of the Application for Entrepreneur Parole (Form I–941). Filing and obtaining approval of a Form I–941 application under this rule will not, by itself, constitute a violation of the individual's nonimmigrant status. After approval of the Form I–941 application, if the individual decides to rely upon parole to actively grow his or her business in the United States, the individual will need to appear at a U.S. port of entry for a final parole determination to allow him or her to come into the United States as a parolee.

This final rule already provides appropriate criteria under which all applications will be reviewed, including those submitted by an F–1 nonimmigrants. As indicated in this final rule, one basis on which an individual may be considered for parole under this rule is if he or she has raised at least $250,000 in investment capital from a qualifying investor (and meets certain other criteria). Individuals who raise a substantial amount of capital from a qualifying investor, but less than $250,000, may still qualify for and be granted parole under other criteria identified in the rule—including the receipt of a qualifying government grant or award or other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

#### b. Switching Between Nonimmigrant Status and Parole

*Comment:* Several commenters raised questions or provided suggestions regarding switching from a nonimmigrant status to parole, or from parole to a nonimmigrant status. Specifically, one commenter asked what her status would be if she were in the United States as an H–4 nonimmigrant, authorized to work pursuant to an EAD, but nevertheless pursued parole under this rule. Another commenter suggested that DHS should include a provision in this rule that expressly allows someone to switch from nonimmigrant status to parole, and from parole to nonimmigrant status, similar to DHS's policy to terminate and restore the H–1B or L–1 status of certain individuals who have temporarily departed the United States but came back using an advance parole document that was

---

[30] *See, e.g.,* INA section 245(c), 8 U.S.C. 1255(c).

[31] *https://studyinthestates.dhs.gov/training-opportunities-in-the-united-states.*

AR2022_200299

issued based on a pending Form I–485 application for adjustment of status.

*Response:* DHS declines to adopt a provision in this rule allowing individuals to change between nonimmigrant status and parole while in the United States. An individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Moreover, an individual who has been paroled into the United States cannot change to nonimmigrant status without leaving the United States, as INA section 248, 8 U.S.C. 1258, only permits individuals who are maintaining nonimmigrant status to change to another nonimmigrant status. If an individual who has been paroled into the United States under this rule has a petition for nonimmigrant classification approved on his or her behalf, he or she would have to leave the United States and pursue consular processing of a nonimmigrant visa application before seeking to return to the United States.

c. Entrepreneur Pathways and Entrepreneur Parole

*Comment:* One commenter stated that the international entrepreneur parole rule should complement and not supplant prior USCIS policy pertaining to entrepreneurs, including those reflected on the USCIS Entrepreneur Pathways Web site.[32] The commenter, while expressing concerns with aspects of existing policies pertaining to entrepreneurs and this rule, suggested that if an entrepreneur cannot qualify for parole under this rule, USCIS should encourage the entrepreneur to seek a visa associated with his or her start-up entity under the existing immigrant or nonimmigrant visa system. Specifically, the commenter suggested that the final rule should expressly include an amendment to the H–1B regulations to allow approval of an H–1B petition under the policies articulated on the Entrepreneur Pathways Web site, and that USCIS adjudicators should see an express statement in the final rule that, notwithstanding the existence of this rule, the H–1B visa remains available for working owners of start-up entities. The commenter noted that the USCIS Entrepreneur Pathways Web site also provides guidance for entrepreneurs to use other existing nonimmigrant visa classifications (*e.g.,* L–1, O, and E visas) that could be more advantageous to the

entrepreneur than the parole rule, so adjudicators should continue to approve petitions in that spirit. The commenter asserted that the unique requirements under the parole rule, such as a threshold investment amount, should not be allowed to "bleed into and taint" the adjudicatory process for securing employment-based visas traditionally used by entrepreneurs.

*Response:* DHS appreciates the commenter's suggestions, but the suggested changes to the H–1B regulations are outside the scope of this rulemaking. DHS agrees with the commenter that parole under this program is intended to complement, and not supplant, other options that may already exist for entrepreneurs under other immigrant and nonimmigrant visa classifications. This rule does not alter existing rules or policies regarding the ability of entrepreneurs to qualify for any immigrant or nonimmigrant status. This rule does, however, provide an additional avenue for entrepreneurs to consider when exploring options that may be available to them to grow a start-up entity in the United States.

4. Travel Document Issuance

*Comment:* A commenter urged DHS to grant multiple-entry parole to foreign nationals so that they may travel internationally and return to the United States, as this is not explicit in the regulation. The commenter stated that this ability is essential to ensure that entrepreneurs can raise additional funds and market innovations worldwide. In addition, this commenter stated that some foreign nationals may begin their businesses and seek entrepreneur parole while in nonimmigrant status in the United States, such as in F–1 or H–1B nonimmigrant status (and thus seek to depart the United States with advance parole and then request parole from CBP upon their return to a U.S. port of entry). The commenter suggested that the regulation clarify how these foreign nationals will be able to return to the United States.

*Response:* DHS notes that individuals who have been admitted to the United States, such as those in nonimmigrant status, are not eligible to be granted parole unless they first depart the United States. DHS clarifies that any immigration status violations by any applicant for parole, including those related to their entrepreneurial efforts, will be taken into account as negative factors in the case-by-case determination of whether the applicant merits an exercise of discretion to grant parole, though they will not necessarily

prohibit the individual from obtaining a grant of parole under this rule.

DHS recognizes that international travel can be essential for the success of some start-up entities. Under existing law, an individual's authorized period of parole ends each time he or she departs the United States. *See* 8 CFR 212.5(e)(1)(i). DHS may, however, authorize advance parole before departure and can specify that such authorization is valid for multiple uses. An entrepreneur granted advance parole would be able to leave the country, present himself or herself at a port of entry upon return, and request a subsequent grant of parole for the remaining period of his or her initially granted parole period. At such time, DHS must then inspect the individual and determine whether or not to grant parole into the United States.[33] If the individual is granted parole, he or she may only be paroled for up to the time initially granted. Any time spent outside the United States after the parole period is initiated will count against the total period of parole, so that the total time period of the parole period remains consistent with the date of initial parole granted by CBP.

5. Parole in Place

*Comment:* Several commenters requested that DHS allow parole-in-place under this rule. Some of these commenters stated that parole-in-place should be added so that individuals already in the United States in a nonimmigrant status, such as H–1B or F–1 nonimmigrant status, can apply for and be granted parole under this rule without having to depart the United States. Several other commenters noted that DHS has the jurisdiction to allow parole-in-place for spouses or dependents, as they do for military family members, and that this could be applied to the International Entrepreneur Rule. Some commenters argued that the requirement to be out of the country to apply for parole under this rule puts an unnecessary financial burden on applicants who are already residing in the United States.

*Response:* DHS appreciates, but declines to adopt, the commenters' suggestions that parole-in-place be allowed under this rule for individuals already in the United States in H–1B or F–1 nonimmigrant status. Only applicants for admission are eligible to

---

[32] *See https://www.uscis.gov/eir.*

[33] This process is not appropriately described as "multiple-entry parole." Parole does not constitute an admission to the United States, INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and parole terminates upon the individual's departure from the United States, 8 CFR 212.5(e)(1)(i).

be considered for parole, thus precluding individuals who have already been admitted from being considered for parole inside the United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Such individuals are not eligible for parole, regardless of whether they have overstayed their admission, unless they first depart the United States.

6. Comments on Options After 5-Year Total Parole Period Ends

*Comment:* Many commenters provided views on the options available to entrepreneurs who have exhausted their up to 5 years of eligibility for parole under this rule. Some commenters were concerned that the rule does not provide a direct path to lawful permanent residence, which could limit the investment prospects for start-up entities. Other commenters were concerned that including such a path could exacerbate current immigrant visa backlogs and thus disadvantage those already in the queue for immigrant visa numbers.

A number of commenters were more broadly concerned that the overall uncertainty inherent in parole may discourage entrepreneurs from using this rule to start and grow their businesses in the United States. One particular commenter expressed concerns about an entrepreneur's ability to demonstrate nonimmigrant intent for purposes of a visa that does not permit dual intent. Others wanted DHS to consider entrepreneurs who have completed a 5-year parole period, and whose start-ups continue to demonstrate growth, as eligible for an EB–2 immigrant visa with a National Interest Waiver based upon the economic benefit to the United States. Other commenters urged DHS to establish *prima facie* eligibility for lawful permanent residence based on 3 years of parole under this rule. Still others wanted assurance that an individual who is the beneficiary of an approved immigrant petition would keep his or her priority date for purposes of receiving lawful permanent residence if he or she were granted parole under this rule.

*Response:* DHS appreciates the wide range of comments about immigration options for entrepreneurs after the end of their authorized period or periods of parole under this rule. Nothing in this rule forecloses otherwise available options for international entrepreneurs who are granted parole. DHS further notes that this rule does not impact existing rules and policies pertaining to

retention of priority dates in the immigrant petition context. The rule does not, however, establish a direct path to lawful permanent residence by creating a new immigrant visa classification for international entrepreneurs, which could only be done by Congress.

As discussed in the NPRM, the entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. Such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or lawful permanent residence through employer sponsorship). Individuals who are granted parole under this rule may ultimately be able to qualify for an EB–2 immigrant visa with a National Interest Waiver. If an entrepreneur is approved for a nonimmigrant or employment-based immigrant visa classification, he or she would generally be required to depart the United States and apply for a visa at a U.S. embassy or consulate abroad. As noted above, because parole is not considered an admission to the United States, parolees will be unable to apply to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. DHS does not believe that merely being granted parole under this rule would prevent an individual from demonstrating nonimmigrant intent for purposes of obtaining a subsequent nonimmigrant visa for entry into United States. DHS believes that this rule presents sufficient clarity and predictability for many individuals who want to establish and grow their businesses in the United States, and will contribute significantly to economic growth and job creation here. Such positive outcomes may be relevant in the event that entrepreneurs granted parole under this rule later seek to apply for an existing nonimmigrant or immigrant visa.

*I. Appeals and Motions To Reopen*

*Comment:* Several commenters requested that applicants be allowed to file appeals or motions to reconsider adverse parole decisions. A business association requested that submissions of motions to reopen or motions for reconsideration result in uninterrupted employment authorization for the parolee.

*Response:* DHS appreciates but declines to adopt these suggestions.

DHS has concluded that granting a right of appeal following a decision to deny entrepreneur parole would be inconsistent with the discretionary nature of the adjudication and contrary to how DHS treats other parole decisions. The final rule also precludes applicants from filing motions to reopen or for reconsideration under 8 CFR 103.5(a)(1). DHS retains its authority and discretion, however, to reopen or reconsider a decision on its own motion as proposed. *See* final 8 CFR 212.19(d)(4). Applicants may alert DHS, through existing customer service channels, that they believe that a decision to deny parole was issued in error and include factual statements and arguments supporting such claims.

Because the determination to grant or deny a request for parole is discretionary, the parole process in this final rule may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner. Parole determinations would continue to be discretionary, case-by-case determinations made by DHS, and parole may be revoked or terminated at any time in accordance with the termination provisions established by this rule at 8 CFR 212.19(k). Parolees under this final rule would assume sole risk for any and all costs, expenses, opportunity costs, and any other potential liability resulting from a revocation or termination of parole. A grant of parole would in no way create any reliance or due process interest in obtaining or maintaining parole or being able to remain in the United States to continue to operate a start-up entity or for other reasons.

*J. Termination of Parole*

1. Discretionary Authority To Revoke/Terminate Parole

*Comments:* One commenter expressed concern that the basis for terminating parole is subjective, particularly with respect to reporting material changes. This commenter suggested that USCIS should limit such reporting to adverse judgments, since entrepreneurs and start-up entities are entitled to due process. Other commenters requested that USCIS adjudicators be specifically trained on entrepreneurship issues so that they can make the most informed decisions regarding parole.

*Response:* USCIS is committed to providing sufficient training on entrepreneurship issues for those adjudicators who will be assigned to adjudicating entrepreneur parole

requests. DHS does not believe that further revisions to the rule are necessary to protect against possible unfair or inconsistent determinations among adjudicators. By statute, parole decisions are discretionary and must be made on a case-by-case basis. This rule establishes transparent parameters for termination of parole, including automatic termination and termination on notice. Automatic termination applies at the expiration of parole, or upon written notification to DHS from the entrepreneur parolee that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. *See* final 8 CFR 212.19(k)(2). Termination on notice with an opportunity for the entrepreneur to respond is authorized by 8 CFR 212.19(k)(3). These bases for termination are tied to objective facts regarding eligibility for parole, thereby placing all parolees on the same footing.

The commenter expressed particular concern regarding terminations based on material changes. DHS believes that this concern is sufficiently addressed by the parameters set by this rule's definition of material change. Under this rule, material change means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. *See* final 8 CFR 212.19(a)(10). This rule provides further guidance by listing several examples illustrating material changes, including: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up

entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity. *See* final 8 CFR 212.19(a)(10).

2. Notice and Decision

*Comments:* A couple of commenters suggested that DHS provide notice and opportunity to respond before terminating parole.

*Response:* DHS agrees with the commenters that providing the entrepreneur parolee with notice and an opportunity to respond prior to termination is reasonable in certain scenarios, such as when grounds for termination require an assessment of the underlying case by the adjudicator. However, where no such assessment is required, DHS believes that automatic termination is appropriate. The NPRM provided for termination at DHS's discretion, including automatic termination in limited circumstances and termination on notice under a range of circumstances deemed appropriate by DHS. This rule finalizes that proposal without change. *See* final 8 CFR 212.19(k)(2) and (3). Under this rule, therefore, DHS will generally provide notice of termination and an opportunity to respond where it believes that:

(1) The facts or information contained in the request for parole were not true and accurate;

(2) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(3) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess the required ownership stake in the start-up entity;

(4) The alien otherwise violated the terms and conditions of parole; or

(5) Parole was erroneously granted.

Automatic termination will apply upon the expiration of parole or if DHS receives written notice from the parolee informing DHS that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. DHS believes that these bases for automatic termination clearly evidence that the entrepreneur no longer qualifies for parole under this rule; therefore, notice and opportunity to respond are unnecessary. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. This rule also finalizes the provision indicating that the

decision to terminate parole may not be appealed, that USCIS will not consider a motion to reopen or reconsider a decision to terminate parole, and, upon its own motion, USCIS may reopen or reconsider a decision to terminate. *See* final 8 CFR 212.19(k)(4).

3. Other Comments on Application Adjudication and Parole Termination

*Comments:* Multiple commenters suggested an expedited or premium processing option for entrepreneur parole applicants. Some of these commenters suggested a maximum 30-day adjudication time period.

*Response:* While DHS appreciates the concern for timely adjudications, at this time DHS declines to include premium or expedited processing as part of the final rule. DHS may consider the possibility of premium processing or expedited processing after assessing implementation of the rule and an average adjudication time for processing requests for parole under this rule has been determined.

*K. Opposition to the Overall Rule*

*Comment:* Multiple commenters expressed overall opposition to the rule, stating that there is no reason to add an additional parole process for highly trained and talented entrepreneurs when visa and residency pathways already exist, such as the O nonimmigrant visa, EB–5 immigrant visa, or EB–2 immigrant visa based on a National Interest Waiver. Other commenters asserted that the United States needs to limit immigration, not create more immigration programs. Several individual commenters argued that the U.S. Government should reform other visa programs, such as the H–1B nonimmigrant classification, and address the current immigrant visa backlog before creating more programs. Several individual commenters asserted that taxpayer money should be used on domestic issues, such as reviving the American economy, rebuilding infrastructure, promoting national security, and supporting veterans, rather than on administering a parole process for international entrepreneurs.

*Response:* DHS disagrees with the commenters' assertions that sufficient avenues for international entrepreneurs already exist. DHS believes that this final rule will, by further implementing authority provided by Congress, reduce barriers standing in the way of innovation and entrepreneurial activity that will benefit the U.S. economy.[34]

---

[34] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the U.S. is a struggle,* The
Continued

This final rule provides an avenue for innovative entrepreneurs to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of this rule, these innovative entrepreneurs might be delayed or discouraged altogether in contributing innovation, job creation, and other benefits to the United States.

DHS also disagrees with the commenters' assertions that reforms should be made to the H–1B nonimmigrant classification and that the immigrant visa backlog should be addressed before this rule is finalized. Parole is an entirely separate option within the Secretary's authority to allow individuals to come to the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. While DHS appreciates the commenters' sentiment that changes should be made in other contexts, the exact changes contemplated by the commenters are unclear, are outside the scope of this rulemaking, or would require congressional action.

DHS also disagrees with the assertion that taxpayer funds will be misallocated to process applications for parole under this final rule. Applicants for parole under this rule will be required to submit a filing fee to fully cover the cost of processing of applications.

*L. Miscellaneous Comments on the Rule*

1. Additional Suggested Changes to the Rule

*Comments:* A number of commenters suggested additional changes to the final rule that are beyond the scope of this rulemaking. These comments proposed changes to the regulations governing certain nonimmigrant programs, namely: Employment of F–1 nonimmigrant students through Optional Practical Training (OPT); annual H–1B numerical limitations; "period of stay" duration for L–1 nonimmigrants starting a new office in the United States; and merging significant public benefit parole with the O–1 visa program. A commenter suggested providing Employment Authorization Documents or lawful permanent resident status to individuals who obtained their Master's degrees in the United States. Other commenters

suggested providing tax incentives to established U.S. corporations that would agree to mentor immigrant entrepreneurs, or establishing a system of compensation for certain senior citizens in the United States to mentor immigrant entrepreneurs. Other commenters recommended balancing parole for entrepreneurs with refugee admissions.

*Response:* DHS thanks commenters for these suggestions but declines to make changes to the rule as these comments are outside the scope of this rulemaking.

*Comment:* A joint submission from an advocacy group and professional association recommended that DHS consider parole for individuals who work in social services fields that do not command a high income or who might otherwise perform work in the national interest.

*Response:* This final rule is aimed at international entrepreneurs who will provide a significant public benefit to the United States—which could include entrepreneurs whose startup entities operate in the field of social services, so long as they meet the criteria for parole in this final rule. Furthermore, this rule does not limit the Secretary's broader authority to grant parole to other applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

2. Information/Guidance

*Comment:* One commenter recommended that DHS make parole data from the program publicly available.

*Response:* While DHS did not propose to disclose parole data related to this rule, DHS appreciates the commenter's suggestion, and may consider making such data publicly available after this rule is implemented.

*Comment:* Other commenters suggested that DHS provide additional guidance to those granted parole under this rule and to provide resources for small start-ups interested in applying for the rule.

*Response:* DHS will evaluate whether to provide additional guidance following publication of this final rule and an assessment of its implementation.

*Comment:* One commenter suggested that DHS add a provision to the rule for retrospective review, in order to analyze the effects of the rule's implementation.

*Response:* DHS agrees with the commenter's suggestion that the effects of the rule, after its implementation, should be reviewed; however, DHS does not believe adding a provision to the final regulatory text requiring such

review is necessary. DHS intends to review all aspects of this parole rule and process subsequent to its implementation and consistent with the direction of Executive Order 13563. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said these rules should serve as a guide, but that companies and entrepreneurs should be analyzed on case-by-case basis.

*Response:* DHS may grant parole on a case-by-case basis under this rule if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion.

*Comment:* An individual commenter suggested that DHS should, as part of its assessment of parole applications under this rule, evaluate the performance of applicants' prior start-ups in their home countries.

*Response:* DHS agrees with the commenter and believes that the performance of applicants' prior start-ups in their home countries is the type of evidence already contemplated by the final rule both under the alternative criteria provisions and as part of the determination as to whether an applicant merits a favorable exercise of discretion. The alternative criteria allow an applicant who partially meets one or more of the general criteria related to capital investment or government funding to be considered for initial parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would provide a significant public benefit to the United States. Such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation. DHS is not defining the specific types of evidence that may be deemed "reliable and compelling" at this time, as DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant DHS's exercise of discretion in granting parole based on significant public benefit.

3. Comments Regarding the E–2 Nonimmigrant Classification

*Comment:* Several commenters submitted comments regarding the E–2 nonimmigrant classification. The majority supported the inclusion of E–2 businesses into the parole process under this rule. Several companies and an individual commenter further recommended that the rule should

---

Guardian, Sept. 14, 2014, available at *http:// www.theguardian.com/business/2014/sep/14/ foreign-tech-entrepreneurs-visa-us-struggle*; Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals*, April 11, 2014, available at *http:// immigrationimpact.com/2014/04/11/majority-of-u- s-patents-granted-to-foreign-individuals/* ("Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.").

accommodate E–2 businesses already in the United States.

*Response:* The final rule lays out specific criteria for determining the kind of start-up enterprise that has substantial potential for job growth and job creation, and for assessing whether an individual entrepreneur's parole would be justified by significant public benefit. DHS believes it is unnecessary to identify these enterprises even more specifically than in this final rule. DHS notes that the rule does not prevent individuals who might otherwise qualify for an existing immigrant or nonimmigrant classification from applying for parole under this rule.

*Comment:* One commenter stated that the proposed rule is much more complicated than the E–2 nonimmigrant classification, and that DHS should incorporate elements of the E–2 program into this rule's parole process.

*Response:* DHS disagrees with the commenter's suggestion.[35] A grant of parole under this rule is based on a determination that the individual will provide a significant public benefit to the United States. Eligibility for E–2 nonimmigrant classification is based on different standards, and DHS believes that applying E–2 requirements would not suffice to meet the statutory requirements for parole and establish that an individual merits a favorable exercise of discretion. DHS therefore declines to adopt the commenter's suggestion.

*Comment:* A commenter suggested that the proposed rule is unnecessary since the E–2 program already supports international entrepreneurs.

*Response:* DHS disagrees with the commenter's statement. The E–2 program allows nationals of a treaty country (a country with which the United States maintains a qualifying Treaty of Friendship, Commerce and Navigation or its equivalent) to be admitted to the United States when investing a substantial amount of capital in a U.S. business. Foreign entrepreneurs from nontreaty countries, such as Brazil, China, India, Israel, or Russia, are currently not eligible for an E–2 nonimmigrant visa. Also, the E–2 category requires the entrepreneur to invest his or her own funds, and is therefore not applicable to entrepreneurs relying upon funds from investors or government entities to build and grow their business. DHS believes that this rule provides a viable option,

consistent with the Secretary's parole authority, to allow entrepreneurs to build and grow their businesses in the United States, providing significant public benefit here.

### 4. Usefulness of the Rule

*Comment:* Multiple commenters argued that this rule will not necessarily help international entrepreneurs succeed, because there are too many restrictions in place for foreign residents to qualify. One commenter asserted that the rule as proposed is too complex and its goals will be impossible to achieve.

*Response:* DHS disagrees with these assertions. DHS acknowledges that this final rule will not benefit all international entrepreneurs seeking to enter or remain in the United States. As several commenters have stated, the final rule does not and cannot create a new visa classification specifically designed for international entrepreneurs, which is something that can only be done by Congress. This final rule, however, provides an additional option that may be available to those entrepreneurs who will provide a significant public benefit to the United States. This parole option complements, but does not supplant, current immigrant and nonimmigrant visa classifications for which some international entrepreneurs might qualify to bring or keep their start-up entities in the United States.

The requirements governing eligibility for consideration for parole under this rule establish a high evidentiary bar that must be met in order to assist DHS in its determination that the individual will provide a significant public benefit to the United States. DHS, however, does not agree with the commenter's assertion that the requirements are impossible for all entrepreneurs to meet. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

### 5. Include On-Campus Business Incubators in the Rule

*Comment:* One commenter urged USCIS to tie eligibility for parole to an applicant's participation in business incubators and accelerators located on U.S. university and college campuses that allow international entrepreneurs to grow start-up companies. The commenter stated that these programs meet the goal of the rule while providing benefits on a local and national scale. The commenter elaborated that the proposed rule only contemplates a traditional start-up arrangement, which creates

requirements based on ownership interest, type of investor, and amount of money invested. The commenter asserted that international entrepreneurs that engage with campus-based incubators cannot meet these requirements because the structure and opportunities provided by a higher education institution do not follow the traditional models. The commenter urged DHS to create alternative criteria to recognize the role higher education plays in fostering international entrepreneurs.

*Response:* DHS appreciates the comment but will not adopt changes to the rule in response. DHS recognizes and values the important role that incubators and accelerators located on a U.S. university or college campuses perform in the entrepreneur community. DHS believes, however, that the framework provided by this rule does allow DHS to consider, in its discretionary case-by-case determination, the fact that the start-up entity is participating in such an incubator or accelerator. DHS believes that evidence of such participation is one factor to be weighed for those individuals who do not fully meet the general capital investment or government funding criteria and are relying on additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS believes that reliable and compelling evidence may, depending on all the circumstances, include evidence that the start-up entity is participating in a reputable incubator or accelerator located on a U.S. university or college campus.

### 6. Objection to Use of the Word "Parole"

*Comment:* Multiple commenters objected to the use of the word "parole" to describe the provisions in this rule. Commenters are concerned that use of the word in an immigration context will be confused with the use of the word in the criminal context. A commentator suggested using the term "conditional status" or "provisional status."

*Response:* DHS declines to accept the commenters' suggestion. "Parole" is a term established by statute at section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). The use of that term in the INA should not be confused with the word's usage in non-immigration contexts. Use of alternative terms as suggested by the commenter would be misleading.

---

[35] The E–2 nonimmigrant classification allows a national of a treaty country (a country with which the United States maintains a treaty of commerce and navigation) to be admitted to the United States when investing a substantial amount of his or her own capital in a U.S. business.

## 7. Concern Over Possible Exploitation of Entrepreneurs

*Comment:* Two commenters suggested that international entrepreneurs would be vulnerable to exploitation by venture capital investors under this rule. The commenters compare the influence of venture capitalists over entrepreneurs granted parole to the influence of employers over H–1B employees. One commenter expressed concern that the rule could allow a venture capitalist almost total dominance over the international entrepreneur's life, through the threat of withdrawing funding and thereby triggering termination of parole.

*Response:* DHS disagrees with the commenters' assertions that the final rule will facilitate such exploitation of international entrepreneurs by venture capital investors. As a general matter, venture capitalists and other investors cannot easily withdraw funding from a start-up entity once this investment transaction has been duly executed. Once an entrepreneur has applied for parole on the basis of prior investment, and has been granted such parole, the investor will not be in a position to directly interfere with the entrepreneur's continued eligibility during the parole period. The final rule will not create significant new conditions for exploitation that do not already exist currently for international entrepreneurs—or for that matter, domestic entrepreneurs—in the United States.

*Comment:* One commenter stated that the United States should be mindful of what may happen to poorer countries when the United States attracts their best entrepreneurs.

*Response:* DHS stresses that application for parole under this rule is voluntary and has the primary goal of yielding significant public benefit for the United States. DHS believes that applicants will assess economic and business conditions both in the United States and in other countries and will consider these conditions, along with numerous others, in the decision to apply for parole under this rule. DHS does not believe that the rule itself, which authorizes parole only for a limited period of time and under specific limited circumstances, will create significant negative consequences for poorer countries. Additionally, positive spillovers from new innovations are not limited to the specific country in which they were developed. Parole under this rule in no way prevents an entrepreneur contributing to the economy of his or her home, including through remittance payments or upon return. Furthermore, individuals may be interested in returning to their home countries in the future for a variety of reasons, including the temporary nature of parole.

### M. Public Comments on Statutory and Regulatory Requirements

#### 1. Regulatory Impact Analysis

*Comment:* Two commenters suggested alternative estimates for the number of applicants that could apply to this rule. One commenter estimated that 5,000 international entrepreneurs will apply for parole under this rule. This estimate was approximately 2,000 more entrepreneurs than the estimate provided by DHS. Another commenter stated that the rule's eligibility criteria are narrow and therefore, the rule would cause fewer than 3,000 people to apply.

*Response:* DHS recognizes that uncertainty in business and economic conditions, as well as data limitations, make it difficult to accurately predict how many entrepreneurs will apply for parole under this rule. However, as discussed in the "Volume Projections" section of this rule, DHS utilized limited data available to estimate that approximately 2,940 entrepreneurs could seek parole each year. This estimate was bolstered by an alternative estimate based on accelerator investment round data that DHS analyzed. Given limits on DHS's information about such entrepreneurs and that this is a new process, DHS does not know how many people within the estimated eligible population will actually apply. Additionally, fluctuations in business and economic conditions could cause the number of applications to vary across years.

While one commenter estimates that the eligible number of entrepreneurs will be higher than the DHS estimate, another commenter estimates it will be lower. Neither of the commenters provided a basis or data from which their figures were derived. DHS reaffirms that the estimate provided in this rule is reasonable. The assessment is based on analysis of data and publicly available information, and reflects, where data and analysis allow, reasonable medians or averages.

*Comment:* One commenter argued that the rule would only benefit certain special-interest venture capitalists.

*Response:* DHS respectfully disagrees with this commenter. Fundamentally, this rule is designed to yield significant public benefit to the United States—including through economic growth, innovation, and job creation—and not to any particular private-sector interest group. While some venture capital firms may benefit from the rule by having new opportunities to invest in start-up entities that would not have otherwise been able to locate in the United States, this is also true for a range of other "qualified investors" as defined in the rule. Moreover, many international entrepreneurs may qualify for parole under this rule without having raised private-sector capital investment at all, since funding from government entities is also an eligibility criterion.

*Comment:* Several commenters stated that the rule would provide significant economic benefits.

*Response:* DHS agrees with these commenters that the rule will provide significant economic benefits to the United States. As discussed in the proposed rule and elsewhere in this section, DHS believes that this rule will help the United States compete with programs implemented by other countries to attract international entrepreneurs. International entrepreneurs will continue to make outsized contributions to innovation and economic growth in the United States.

*Comment:* Several commenters provided feedback on the costs of applications. One commenter stated that the fees were reasonable. Another commenter suggested allowing market prices to determine parole costs, essentially allowing those entrepreneurs with more likelihood of success to invest in parole opportunities. Still other commenters stated that the application fee was too high, especially compared to various visa applications.

*Response:* DHS appreciates commenters' feedback on the costs for applications. DHS determines the costs of applications through a biennial fee study it conducts, which reviews USCIS' cost accounting process and adjusts fees to recover the full costs of services provided by USCIS. The established fees are necessary to fully recover costs and maintain adequate service by the agency, as required by INA section 286(m); 8 U.S.C. 1356(m).

*Comment:* Several commenters generally stated support for the rule because it will likely improve innovation for local and regional economic areas. Another commenter stated support for the rule because it would increase intangible assets.

*Response:* DHS concurs with this expectation that the rule will foster innovation at the local and regional level. Studies on entrepreneurs reveal that they are key drivers of innovation throughout the United States, and that such innovation benefits local, regional, and the national economy through technical progress and improvements in efficiency and productivity. The rule's

eligibility criteria focus on start-ups with high growth potential, and DHS expects that new firms started by entrepreneurs covered by the rule will conduct research and development, expand innovation, and bring new technologies and products to market in addition to creating jobs in the United States. These activities will produce benefits that will spill over to other firms and sectors.

DHS also agrees with the commenter on impacts to intangible assets. Intangible assets are generally integrated into a firm's or sector's total assets and have become important in broad analyses of productivity and efficiency. Such assets can include proprietary software, patents, and various forms of research and development. This rule is intended to attract the types of ventures that will increase intangible assets.

a. Job Creation

*Comment:* Many commenters agreed that this rule will help create jobs and significantly benefit the U.S. economy. A commenter noted that immigrants have helped to found one quarter of U.S. firms and therefore allowing more international entrepreneurs would result in new job creation. Commenters also mentioned that immigrants have historically been successful in creating and establishing new businesses, which in turn create jobs in the United States. Commenters also more specifically endorsed the need to provide more investment opportunities for venture capitalists and angel investors who indirectly create jobs. Finally, commenters from the technology industry stated that attracting entrepreneurs to the Unites States to operate in high unemployment areas could provide access to new jobs where they are most needed.

*Response:* DHS appreciates the commenters' support of this rule with regard to attracting international entrepreneurs, and emphasizes that job creation for U.S. workers is one of the rule's primary goals, as discussed in the Regulatory Impact Analysis (RIA).

b. Impact on Native U.S. Entrepreneurs and Native U.S. Workers

*Comment:* Several commenters suggested the rule will have negative consequences for native U.S. entrepreneurs and native U.S. workers. These commenters were concerned that the rule would be disadvantageous to native U.S. entrepreneurs and would create incentives for venture capital firms to find international entrepreneurs instead of investing in native U.S. entrepreneurs. The commenters argued that job creation could be accomplished

through investment of native U.S. entrepreneurs instead of foreign entrepreneurs. Several commenters also stated that the government should assist U.S. entrepreneurs and workers before helping international entrepreneurs. Commenters also mentioned that the need for international innovators was overstated and that the number of native U.S. innovators is already adequate. Finally, these commenters asserted that foreign workers are often exploited for cheap labor and harm job prospects for native U.S. workers.

*Response:* DHS disagrees with these commenters' assertion that the rule will have negative impacts on native U.S. entrepreneurs and native U.S. workers. This rule focuses on identifying entrepreneurs associated with start-up entities with significant potential for bringing growth, innovation, and job creation in the United States. Much research supports the conclusion that high-growth firms drive job creation for workers in the United States, including for native U.S. workers. As discussed in further detail in the RIA, research also shows that immigrants have been outsized contributors to business ownership and entrepreneurship in the United States and abroad. Self-employment rates for immigrants are higher than for the native U.S. population. As discussed in the RIA, although one economic study has suggested that a very small number of native U.S. entrepreneurs may be displaced by international entrepreneurs, other researchers have noted that the finding merely raises the possibility that such displacement could occur without providing evidence that it actually does.[36] DHS reiterates, moreover, that the numbers of entrepreneurs who may be eligible for parole under this rule is limited and that the aim of the rule is to increase overall entrepreneurial activity and significant economic benefit throughout the United States. In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

c. Impact on Innovation

*Comment:* Several commenters provided feedback on the rule's impact on innovation. Two commenters stated that this type of international entrepreneurship supports innovation in the United States. Another commenter stated that the rule would not help foreign innovators because of complications with patents and modeling designs.

*Response:* DHS agrees with the commenters that stated that this rule supports innovation in the United States. Entrepreneurs tend to engage in research and development in order to develop and commercialize new products and technologies, and often stimulate patents and other intellectual capital linked to these efforts. DHS does not agree with the commenter that stated the rule is not helpful to foreign innovators because of issues with patents and modeling designs, and DHS sees no basis for this comment. Nothing in the rule poses specific burdens or constraints on the ability of entrepreneurs to seek and obtain patents or other intellectual capital.

2. Review Under the National Environmental Policy Act (NEPA)

*Comment:* An advocacy organization stated that all rules, including immigration rules, are subject to review under the National Environmental Policy Act. The commenter suggested that, at minimum, an Environmental Assessment be conducted to account for the growth-inducing impacts that would occur with an influx in population under this rule.

*Response:* DHS agrees that NEPA applies to this, as to every, final rulemaking. As explained in section IV.E of this preamble, the rule has been reviewed for environmental effects and found to be within two categorical exclusions from further review because experience has shown rules of this nature have no significant impacts on the environment. DHS also notes that any entrepreneurial ventures undertaken will be governed by local, state and federal laws and regulations, including those protecting human health and the environment. We disagree with the commenter's assertion that an Environmental Assessment is required.

3. Proposed Information Collections Under the Paperwork Reduction Act

a. Employment Eligibility Verification, Form I–9

*Comment:* An individual commenter suggested that List A documents should be updated to include the verified

---

[36] Compare Fairlie, R.W., and B.D. Meyer. ''The effect of immigration on native self-employment.'' *Journal of Labor Economics* 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/ papers/published/jole%202003%20- %20native%20se.pdf,* with, *e.g.,* Magnus Lofstrom, ''Immigrants and Entrepreneurship,'' Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/ immigrants-and-entrepreneurship.pdf.*

driver's licenses (sample attached and included in the file) that meet federal guidelines and require the presentation of the same documentation needed to obtain a passport. The commenter stated that it is no longer reasonable for those who receive a verified license and who paid the premium necessary for the processing of the extra documents, to have to locate their birth certificate and social security card in order to complete the Form I–9 process.

*Response:* DHS presumes that by "verified driver's licenses" the commenter is referring to State driver's licenses that comply with the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 302. The specific suggestion about amending List A on Form I–9, which would have wide-ranging effect and not be limited to entrepreneurs under this rule, is outside the scope of this rulemaking. This rule and accompanying form revisions limit changes to List A of Form I–9 to the modification of an existing document specified at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include individuals authorized to work incident to parole.

b. Application for Entrepreneur Parole, Form I–941

*Comment:* DHS received a public comment that stated that the time burden estimate of 1.33 hours for the respondent to complete the information collection was too low.

*Response:* DHS appreciates and agrees with this comment. Based on further review of the information collection and public comments on this specific issue, DHS is revising the estimated time burden from 1.33 hours to 4.7 hours for Form I–941 respondents.

4. Comments and Responses to Impact on Small Businesses

*Comment:* The U.S. Small Business Administration, Office of Advocacy (SBA) commented by supporting the goals of this rule, but expressed concern that the rule could significantly impact small entities. The SBA commented that the proposed rule was erroneously certified under the Regulatory Flexibility Act (RFA). The SBA stated that the only international entrepreneurs eligible for this parole program are those with significant ownership stakes in a start-up entity formed in the previous three years. The SBA also stated that the thresholds to qualify for parole were directly tied to the ability of the entrepreneur's start-up to produce significant public benefit to the United States. The SBA noted that under the proposed rule, an entrepreneur is not permitted to transfer work authorization to another start-up

entity, and that these restrictions could impact start-up entities if the entrepreneur were no longer eligible to stay in the United States. For these reasons, SBA concluded that this rule directly impacts start-up entities. The SBA recommended that DHS submit a supplemental analysis on the impact of the final rule on small entities.

*Response:* DHS has concluded that a RFA certification statement for this final rule is appropriate. This final rule does not regulate small entities nor does it impose any mandatory requirements on such entities. Instead, it provides an option for certain individual entrepreneurs to seek parole on a voluntary basis. There are no compliance costs or direct costs for any entity, small or otherwise, imposed by this rule since it does not impose any mandatory requirements on any entity. Historically, when an employer petitions on behalf of an individual or employee, DHS has provided an RFA analysis for the impact to small businesses. However, under this rule, a small entity or an employer does not apply for parole on behalf of an employee; instead, an entrepreneur applies for parole on a voluntary basis on his or her own behalf, and only those eligible individuals seeking parole would be subject to the anticipated costs of application. Entrepreneurs with an ownership stake in a start-up make the cost-benefit decision to voluntarily apply for parole.

In both the RFA and SBA's Guide for Government Agencies on the RFA, government agencies are required to consider significant alternatives to the rule when providing a full RFA analysis. Among the kinds of alternatives that SBA suggests considering include "the exemption for certain or all small entities from coverage of the rule, in whole or in part." [38] Even if this rule directly impacted small entities and DHS were required to engage in an analysis to minimize negative impacts of the rule on small entities by exempting them from the rule, that alternative would only harm small entities, which would no longer be able to benefit from the rule's allowing entrepreneurs to seek parole and work authorization.

The SBA also commented on various policy issues on the eligibility of entrepreneurs in this rule. Notwithstanding DHS' belief that entrepreneurs when filing for parole are not small entities, DHS has carefully

considered all those comments and has made policy changes in this final rule to address the comments. Specifically, the SBA commented that thresholds to qualify for parole are directly tied to the ability of the international entrepreneur's start-up to produce significant public benefit for the United States. DHS has considered this comment along with other public comments on this issue and has made the decision to lower the eligible threshold investment amount for initial parole from the proposed $345,000 in the NPRM to $250,000 in the final rule. Additionally, in the NPRM and in this final rule, DHS has provided some flexibility and alternative criteria for those entrepreneurs meeting partial eligibility requirements, as described in further detail in the preamble.

SBA also commented that the rule only allows the entrepreneur to work for the business identified on the parole application without providing leniency in transferring the work authorization to another entity. The SBA further comments that the start-up entity may be imperiled if the entrepreneur is no longer eligible to stay in the United States. The eligibility criteria for consideration for parole under this rule require an entrepreneur to have recently formed a new entity in the United States with substantial potential for rapid growth and job creation. Before an application for parole under this rule is approved, USCIS must make a discretionary determination that the entrepreneur is well-positioned to provide a significant public benefit to the United States. Therefore, these eligibility criteria are not limiting entrepreneurs, but aimed at ensuring that only those entrepreneurs with high growth potential are eligible for parole consideration under this rule. DHS has also provided avenues for an additional parole period specifically to prevent instability of a start-up entity.

DHS reiterates that RFA guidance allows an agency to certify a rule, instead of preparing an analysis, if the rule is not expected to have a significant economic impact on a substantial number of small entities.[39] DHS reiterates that this rule does not regulate small entities. Any costs imposed on businesses will be driven by economic and business conditions and not by the

---

[38] The Regulatory Flexibility Act, 5 U.S.C. 603(c)(4). The Small Business Administration's RFA Guide for Government, p. 38, available at *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

[39] *See* SBA, Office of Advocacy, "A Guide for Government Agencies; "How to Comply with the Regulatory Flexibility Act, Implementing the President's Small Business Agenda and Executive Order 13272" (May 2012), available at: *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

voluntary participation for benefits from this rule.

## IV. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2015 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is $155 million.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155 million in 2015 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

This is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

### C. Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action'' under section 3(f) of

Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

### 1. Summary

This final rule is intended to add new regulatory provisions guiding the use of parole with respect to individual international entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential is indicated by, among other things, the receipt of significant capital financing from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. The regulatory amendments will provide the general criteria for considering requests for parole submitted by such entrepreneurs.

DHS assesses that this final rule will, by further implementing authority provided by Congress, reduce a barrier to entry for new innovative research and entrepreneurial activity in the U.S. economy.[40] Under this final rule, some additional international entrepreneurs will be able to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of the rule, these innovative entrepreneurs might be delayed or discouraged altogether in bringing innovation, job creation, and other benefits to the United States.

Based on review of data on startup entities, foreign ownership trends, and Federal research grants, DHS expects that approximately 2,940 entrepreneurs, arising from 2,105 new firms with investment capital and about 835 new firms with Federal research grants, could be eligible for this parole program annually. This estimate assumes that each new firm is started by one person despite the possibility of up to three owners being associated with each start-up. DHS has not estimated the potential for increased demand for parole among foreign nationals who may obtain

substantial investment from U.S. investors and otherwise qualify for entrepreneur parole, because changes in the global market for entrepreneurs, or other exogenous factors, could affect the eligible population. Therefore, these volume projections should be interpreted as a reasonable estimate of the eligible population based on past conditions extrapolated forward. Eligible foreign nationals who choose to apply for parole as an entrepreneur will incur the following costs: A filing fee for the Application for Entrepreneur Parole (Form I–941) in the amount of $1,200 to cover the processing costs for the application; a fee of $85 for biometrics submission; and the opportunity costs of time associated with completing the application and biometrics collection. After monetizing the expected opportunity costs and combining them with the filing fees, an eligible foreign national applying for parole as an entrepreneur will face a total cost of $1,591. Any subsequent renewals of the parole period will result in the same previously discussed costs. Filings to notify USCIS of material changes to the basis for the entrepreneur's parole, when required, will result in similar costs; specifically, in certain instances the entrepreneur will be required to submit to USCIS a new Form I–941 application to notify USCIS of such material changes and will thus bear the direct filing cost and concomitant opportunity cost. However, because the $85 biometrics fee will not be required with such filings, these costs will be slightly lower than those associated with the initial parole request and any request for re-parole.

Dependent spouses and children who seek parole to accompany or join the principal applicant by filing an Application for Travel Document (Form I–131), will be required to submit biographical information and biometrics as well. Based on a principal applicant population of 2,940 entrepreneurs, DHS assumes a total of 3,234 spouses and children will be eligible for parole under this rule. Each dependent will incur a filing fee of $575, a biometric processing fee of $85 (if 14 years of age and over) and the opportunity costs associated with completing the Form I–131 application and biometrics collection.[41] After monetizing the expected opportunity costs associated with providing biographical information to USCIS and submitting biometrics and combining it with the biometrics

---

[40] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the US is a struggle,* The Guardian, Sept. 14, 2014, available at *http://www.theguardian.com/business/2014/sep/14/foreign-tech-entrepreneurs-visa-us-struggle;* Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals,* April 11, 2014, available at *http://immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* (''Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.'').

[41] The filing fees have been updated and reflect those promulgated in the 2016 Fee Rule (1615–AC09, CIS No. 2577–15 DHS Docket No. USCIS–2016–0001).

**5274** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

processing fee, each dependent applicant will face a total cost of $765. DHS is also allowing the spouse of an entrepreneur paroled under this rule to apply for work authorization. Using a one-to-one mapping of principal filers to spouses, the total population of spouses eligible to apply for work authorization is 2,940. To obtain work authorization, the entrepreneur's spouse will be required to file an Application for Employment Authorization (Form I–765), incurring a $410 filing fee and the opportunity costs of time associated with completing the application. After monetizing the expected opportunity costs and combining it with the filing fees, an eligible spouse will face a total additional cost of $446 (rounded). DHS expects that applicants will face the above costs, but does not anticipate that this rule will generate significant additional costs and burdens to private entities, or that the rule will generate additional processing costs to the government to process applications. While applicants may face a number of costs linked to their business or research endeavors, these costs will be driven by the business and innovative activity that the entrepreneur is engaged in and many other exogenous factors, not the rule itself or any processes related to the rule. Thorough review of academic, business, and policy research does not indicate that significant expected costs or negative consequences linked to attracting international entrepreneurs are likely to occur. As such, DHS expects that the negative consequences, if any, will be greatly exceeded by the positive effects of this rule.

In each case in which an entrepreneur will be granted parole under this rule, DHS will have made a determination that parole will yield a significant public benefit and that the person requesting parole merits a favorable exercise of discretion. Consistent with those decisions, the rule is expected to produce broad economic benefits through the creation of new business ventures that otherwise would not be formed in the United States. These businesses are likely to create significant additional innovation, productivity, and job creation. It is reasonable to conclude that investment and research spending on new firms associated with this rule will directly and indirectly benefit the U.S. economy and create jobs for American workers. In addition, innovation and research and development spending are likely to generate new patents and new technologies, further enhancing innovation. Some portion of the international entrepreneurs likely to be attracted to this parole process may develop high-growth and high-impact firms that can be expected to contribute disproportionately to U.S. job creation. In summary, DHS anticipates that this rule will produce positive effects that would greatly exceed any negative consequences.

Using an estimate of 2,940 annual applications for significant public benefit entrepreneur parole as developed in the ensuing volume projections section of this analysis, DHS anticipates the total cost of this rule for principal filers who face a total per applicant cost of $1,591 to be $4,678,336 (undiscounted) annually for any given year. (These estimates focus only on principal initial filers, not entrepreneurs who might be eligible for a re-parole period of up to 30 months, or their spouses.) Dependent spouses and children who must submit the Form I–131 application and biometrics will face a per-applicant cost of $765, for a total of $2,474,914 (undiscounted). Dependent spouses who apply for employment authorization will face a per applicant cost of $446, which DHS projects will total $1,311,830 (undiscounted). Adding together the costs for the principal filers and family members—including filing costs, costs of submitting biometrics, and monetized opportunity costs—yields a total cost of this rule for the first year, 2017 and subsequently 2018, of $8,465,080 (undiscounted). The total annual cost of the rule of $8,465,080 can be expected for each subsequent year in the ten-year period. The total ten-year undiscounted cost is $84,650,081.

## 2. Background and Purpose of the Rule

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole applicants for admission to the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, research and development and other forms of innovation, and job creation in the United States. The rule will establish general criteria for the use of parole with respect to individual entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States.

The purpose of the rule is to attract talented entrepreneurs to the United States who might otherwise choose to pursue such innovative activities abroad, or otherwise be significantly delayed in growing their companies in the United States, given the barriers they presently face. In addition to the benefits associated with entrepreneurial innovation, including new products, business networks, and production efficiencies that such activities are likely to generate, entrepreneurs have been and remain vital to economic growth and job creation in the United States and have generated a cohort of high-growth firms that have driven a highly disproportionate share of net new job creation.[42]

A body of research documents both the importance of entrepreneurial activity to the U.S. economy and its link to immigration. In this background section, DHS does not attempt to comprehensively summarize this large body of work but instead focuses on specific aspects central to the purpose of the rule and to its potential impacts.[43] In summary, DHS focuses on the role of new entrepreneurial firms in job creation in the United States, and the role that immigrant entrepreneurs have played in innovation and the high technology sector.

The labor market of the United States is highly dynamic. DHS analysis of data published by the U.S. Department of Labor's Bureau of Labor Statistics (BLS) indicates that between 2004 and 2013, on average about 847,000 firms were "born" each year and 784,000 "died."[44] To illustrate the extent of the labor market churn, since 1980 the private sector has generated about 16.3 million gross jobs annually but an average of only about 1.4 million net jobs annually. In both general business cycle expansions and contractions, large numbers of jobs are created and destroyed, comprising a key dynamic in the forces of creative destruction.[45]

---

[42] See Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, High-employment-growth firms: Defining and counting them, Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1–2, available at: http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.

[43] DHS notes that the body of research concerning immigration in general and its impact on the labor market, most notably germane to earnings and employment of domestic workers, is not addressed in the present analysis.

[44] Figures were obtained from the BLS, Business employment Dynamics, Table 8, "Private sector establishment births and deaths, seasonally adjusted:" available at http://www.bls.gov/news.release/cewbd.t08.htm. Firm "births" in these data only include new firms and thus exclude new franchises and expansions of existing firms.

[45] See Ryan Decker, John Haltiwanger, Ron Jarmin, and Javier Miranda, The Role of

Research into the highly dynamic and volatile labor market in the United States has evolved. Earlier focuses on small- and new-firm size as the primary co-determinants of job creation has been reoriented to focus on the role of a relatively small subset of entrepreneurial firms.

This rule focuses on identifying entrepreneurs associated with types of start-up firms that are more likely to experience high growth, contribute to innovation, and create jobs in the United States. This deliberate focus is critical to ensuring that parole in individual cases is justified by significant public benefit. Research has shown that the average start-up company does not survive long.[46] Most new firms do not add much net job creation either, as they are not focused on achieving high growth. By some estimates, the vast majority—as much as 95 percent—of all new firms are not substantial job creators or innovators.[47] About 95 percent of new firms start with fewer than 20 employees, and about the same percentage ultimately close with fewer than 20 employees, indicating that business turnover is heavily influenced by small firms.[48]

There is significant research, however, demonstrating that a small subset of new firms tends to be highly dynamic and to contribute disproportionately to net job creation. The BLS has highlighted the role of the small subset of high-growth firms that comprise about 2 percent of all firms but have accounted for 35 percent of gross job gains in recent years. ''High-growth

firms'' are defined by the BLS and the Organization for Economic Cooperation (OECD) as those with at least ten employees that grow by at least 20 percent for each of 3 consecutive years based on employment. As of 2012, there were 96,900 high-growth firms in the United States that had created about 4.2 million jobs.[49] A key finding by the BLS is that high-growth firms especially add jobs in their first ten years, though they generally continue to add a diminishing number of new jobs even after that period of time to the extent they survive. Job creation in the United States for the last several decades has been driven primarily by high-growth firms that tend to be young and new, and by a smaller number of surviving high-growth firms that age for a decade or more.[50]

This highly disproportionate, ''up or out'' dynamism of high-growth firms has been substantiated by many researchers. The SBA reported that about 350,000 ''high impact firms''— defined as enterprises whose sales have at least doubled over a 4-year period and which have an employment growth quantifier of 2 or more over the same period—generated almost all net new jobs in the United States between 1994 and 2006.[51] The Kauffman Foundation, a leading institute on research, data collection, and advocacy for entrepreneurial activity, reports that the top-performing one percent of firms generates roughly 40 percent of new job creation, and, the fastest of them all— the ''gazelles''—comprising less than one percent of all companies, generated roughly ten percent of new jobs.[52] The

same general result has been found internationally; the OECD reports that between three percent and six percent of all firms can be considered high-growth firms but about one percent can be considered the even more high-performing ''gazelles.''[53]

Despite the finding across a large number of studies that small new firms tend to exhibit an ''up or out'' dynamic in which a small number survive to age five to become high-growth firms or ''gazelles,'' other key findings that have emerged in the literature suggest that the growth and performance of new firms, even high-growth firms, vary substantially (as indicated by metrics that include labor productivity, profitability, revenue, and research and development intensity).[54] Models that can sort out various business characteristics and economic conditions to predict high-growth probabilities are still in nascent stages. Nevertheless, this rule includes threshold criteria for parole consideration meant to identify entrepreneurs associated with the kinds of promising start-up entities that appear more likely to contribute to American innovation, economic development, and job creation. As described in more detail below, businesses started and run by immigrants have propelled these kinds of broadly shared economic benefits for many years.

Broadly speaking, high-growth entrepreneurs engage in research and development (R&D) in order to develop and commercialize new products and technologies. Several studies have found that such entrepreneurs tend to engage in R&D spending in the first year, tend to attract patents and other forms of intellectual capital, and tend to attract venture capital financing.[55]

*Entrepreneurship in U.S. Job Creation and Economic Dynamism,* Journal of Economic Perspectives—Vol. 28, Number 3 (Summer 2014), pp. 3–24, available at: *http://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.28.3.3.*

[46] According to BLS findings, ''20 percent of newly created establishments don't survive their first year in business, 32 percent don't survive their first two years, and 50 percent don't survive their first 5 years.'' *See* Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, *High-employment growth firms: Defining and counting them,* Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1, available at: *http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.*

[47] *See* Jason Wiens and Chris Jackson, *The Importance of Young Firms for Economic Growth,* Ewing Marion Kauffman Foundation (2014), pp. 1–2, available at: *http://www.kauffman.org/~/media/kauffman_org/resources/2014/entrepreneurship%20policy%20digest/september%202014/entrepreneurship_policy_digest_september2014.pdf; see also* Hurst, Erik, and Benjamin Wild Pugsley. 2011; *What Do Small Businesses Do?* Brookings Paper on Economic Activity, no. 2 (2011), pp. 73–142.

[48] *See* Headd, Brian, *An Analysis of Small Business and Jobs,* SBA Office of Advocacy (2010), p. 6, available at: *https://www.sba.gov/sites/default/files/files/an%20analysis%20of%20small%20business%20and%20jobs(1).pdf.*

[49] *See* R. Clayton et al. (June 2013), supra n. 50, p. 2–4. For a description of the methodology utilized to measure high growth firms, see OECD, *OECD-Eurostat Manual on Business Demography Statistics* (2007), pp. 59–65, available at: *http://www.oecd.org/std/39974460.pdf.*

[50] For specific detailed information on survival rates and employment creation at various intervals along the HGF life-span, see R. Decker et al. (2014), *supra* n. 53, pp. 6–24. The BLS and others use the term ''gazelles'' to differentiate the fastest growing young HGFs.

[51] *See* Spencer Tracy, Jr., *Accelerating Job Creation in America: The Promise of High-Impact Companies,* SBA Office of Advocacy (2011), pp. 1–4, available at: *https://www.sba.gov/sites/default/files/advocacy/HighImpactReport.pdf; see also* Acs, Zoltan, William Parsons, and Spencer L. Tracy, Jr, *High-Impact Firms: Gazelles Revisited; Study* prepared for the SBA, Office of Advocacy (2008), p. 1, available at: *http://www.sba.gov/advo/research/rs328tot.pdf.* The SBA high-impact cohort is about 6.3% of all firms, which is higher than the 2% high-growth category found in the BLS studies. The SBA cohort is larger because the criteria are slightly less restrictive and it includes older firms.

[52] *See* Dane Stangler, *High-Growth Firms and the Future of the American Economy, Kauffman Foundation Research Series: Firm Formation and Economic Growth* (2010), p. 2, available at: *http://www.kauffman.org/~/media/kauffman_org/*

research%20reports%20and%20covers/2010/04/highgrowthfirmsstudy.pdf.

[53] David B. Audretsch, *Determinants of High-Growth Entrepreneurship,* report prepared for the OECD/DBA International Workshop on High-growth firms: local policies and local determinants, OECD, p. 2–5, available at: *http://www.oecd.org/cfe/leed/Audretsch_determinants%20of%20high-growth%20firms.pdf.*

[54] *See* R. Decker et al (2014), *supra* n. 53, pp. 5–7; *see also* Davis, Steven J., R. Jason Faberman, John Haltiwanger, Ron Jarmin, and Javier Miranda, *Business Volatility, Job Destruction, and Unemployment.* American Economic Journal: Macroeconomics 2(2) (2010): 259–87. Research and development intensity is typically measured as the ratio of research and development spending to revenue, net income, or overall costs.

[55] *See* Shah, Sonali K. and Winston Smith, Sheryl and Reedy, E. J., *Who are User Entrepreneurs? Findings on Innovation, Founder Characteristics, and Firm Characteristics,* The Kauffman Firm Survey (Feb. 2012), pp. 2–5, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2012/02/whoareuserentrepreneurs.pdf.*

**5276** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

Immigrants have been central contributors to business ownership and entrepreneurship in the United States and abroad. According to OECD data, self-employment rates for immigrants are higher than those of the native-born populations in many counties, including in the United States.[56] Based on the most recent data available from the U.S. Census Bureau, 12.9 percent of the United States population was foreign-born. Their rate of self-employment is about 30 percent higher than that of the native-born population (7.7 percent vs. 5.9 percent; n=1.8 million). The Census Bureau's 2012 Survey of Business Owners showed that 14.4 percent of U.S. firms were owned by at least one person not born a citizen of the United States.[57] Two studies based on samples of U.S firms found slightly higher r foreign-born ownership rates.[58]

Many high-growth firms are involved in activities classified in the STEM (science, technology, engineering, and math) fields. The high concentration of immigrant entrepreneurs in these industries has garnered much attention. Between 2006 and 2012, one-third of companies financed with venture capital that made an initial public offering had an immigrant founder, a sharp rise from seven percent in 1980. These companies have generated 66,000 jobs and $17 billion in sales.[59] A survey of entrepreneurs in technology-oriented privately held companies with venture backing also showed about one-third were foreign born, and 61 percent held at least one patent.[60]

Further evidence points to similar findings. Between 1995 and 2005, 25 percent of science and technology focused businesses founded in the United States had a foreign-born chief executive or lead technologist. In 2005, those companies generated $52 billion in sales revenue and employed 450,000 workers. In Silicon Valley, the share of immigrant-founded start-ups increased to 52 percent by 2005. In 2006, foreign nationals residing in the United States were involved (as inventors or co-inventors) in about 26 percent of patent applications filed that year. Immigrant founders of Silicon Valley firms tend to be highly educated, with 96 percent holding bachelor's degrees and 74 percent holding advanced degrees, and with three-quarters of the latter in STEM fields. As of 2010, according to one study, more than 40 percent of the Fortune 500 companies had been founded by an immigrant or the child of an immigrant.[61]

To reiterate, high-growth firms tend to be new and young, and one of their primary contributions to the highly dynamic labor market of the United States has been through job creation. High-growth firms tend to innovate and focus on developing new products and services. The intense involvement of immigrant entrepreneurs in successful technology-driven activities suggests substantial economic contributions. While measuring the precise value and impact of innovation is difficult and still at a nascent stage in research, many economists believe innovation creates positive externalities and spillover effects that further drive economic growth.[62]

Notwithstanding the research on the positive effects of high-growth entrepreneurship, there is some evidence of a long-term slowing in start-up dynamism and entrepreneurial activity in the United States; this trend began several decades ago, driving many economists to advocate for policies that attract more entrepreneurs in general.[63] Many business entrepreneurial advocacy centers have also advocated in recent years for the United States to enact a formalized pathway for immigrant entrepreneurs. DHS is aware of one estimate of the potential benefits of a theoretical start-up visa (which, as an entirely new visa classification, only Congress can create). A Kauffman Foundation study (2013) estimated that, under certain conditions, the establishment of a start-up visa program could lead to the creation of between 500,000 and 1.6 million new jobs after ten years.[64] The potential benefits of attracting immigrant entrepreneurs have not gone unnoticed internationally. Thirteen of the thirty-five nations that are part of the Organization of Economic Cooperation and Development (OECD) have enacted special immigration programs for entrepreneurs, although the eligibility criteria vary among them to a significant extent.[65]

3. Population of Entrepreneurs Potentially Eligible

DHS cannot precisely predict the volume of new businesses that will start in the United States due to this rule. DHS has instead examined available data to provide a broad estimate of the population of individual entrepreneurs who may be eligible to request parole consideration under this rule. Given limits on DHS's information about such entrepreneurs, DHS does not know how many people within the estimated eligible population will actually seek such consideration; the estimates contained in this section represent an approximation to the size of the eligible population. DHS has estimated the population of entrepreneurs potentially eligible for parole under this rule based on two sub-groups: (1) Foreign individuals who seek to come to the United States to start a new business with financial backing from a qualified U.S. investor; and (2) foreign individuals who seek to come to the United States to start a new business as recipients of U.S. funded and awarded

---

[56] OECD, *Migrant Entrepreneurship in OECD Countries,* prepared by Maria Vincenza Desiderio (OECD) and Josep Mestres-Domènech for the Working Party on Migration (2011), pp. 141–144, available at: *http://www.oecd.org/els/mig/Part%20II_Entrepreneurs_engl.pdf.* This, and many other similar studies and analyses are based on self-employment rates, which are a proxy, but not a perfect measure, of business ownership, because some ownership structures such as partnerships, that could involve a foreign-born owner, are generally not considered to be proprietary.

[57] The categorization of "foreign-born" does not differentiate between lawful permanent residents and naturalized citizens. It also does not provide details of the firm history, implying that some firms owned by persons not born in the United States could have been founded by U.S. citizens and sold to foreign-born persons.

[58] *See* David M. Hart, Zoltan J. Acs, and Spencer L. Tracy, Jr., *High-tech Immigrant Entrepreneurship in the United States.;* report developed under a contract with the Small Business Administration, Office of Advocacy (2009), page 8, available at: *https://www.sba.gov/sites/default/files/advocacy/rs349tot_0.pdf;* see also Robert W. Fairlie and Magnus Lofstrom, *Immigration and Entrepreneurship,* Institute for the Study of Labor (2013), p. 1, available at: *http://ftp.iza.org/dp7669.pdf.* The foreign born ownership rates for U.S. firms reported in these papers is 16% and 18.2%, in order.

[59] This information is found from various sources and found in Stuart Anderson, *American Made 2.0. How Immigrant Entrepreneurs Continue to Contribute to the United States Economy,* National Foundation for American Policy, sponsored by the National Venture Capital Association (NVCA) (2013), pp. 3–7.

[60] *Id.* at pp. 2–5.

[61] Vivek Wadhwa, *Foreign-Born Entrepreneurs: An Underestimated American Resource,* Ewing Marion Kauffman Foundation (2008), pp. 2–6, available at: *http://www.kauffman.org/~/media/kauffman_org/z_archive/article/2008/11/wadhwatbook09.pdf.*

[62] *See SMEs, Entrepreneurship and Innovation,* OECD (2010), pp 26–28, available at: *http://www.oecd.org/berlin/45493007.pdf.*

[63] *See* R. Decker et al. (2014), supra n. 53, p. 16–22.

[64] *See* Dane Stangler and Jared Konczal, *Give Me your Entrepreneurs, Your innovators; Estimating the Employment Impact of a Startup Visa,* Ewing Marion Kauffman Foundation, (Feb. 2013), pp. 1–3, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2013/02/startup_visa_impact_finalsada.* The estimates are based on a fixed pool of 75,000 startup visas for a 10-year period, in which firm deaths each year cycle some of visa to new entrants.

[65] Most programs have been enacted after 2010. A country list and some descriptive data can be found at Jean-Christophe Dumont, *Investor Visas in OECD Countries,* OECD Conference on Global High-Skilled Immigration Policy, The National Academies Board on Science, Technology and Economic Policy (2014), available at: *http://sites.nationalacademies.org/cs/groups/pgasite/documents/Web page/pga_152202.pdf.*

AR2022_200311

research grants and who intend to conduct the concomitant research in the United States. DHS assumes that each member of the eligible population will start a business and that the general criterion for investment from a qualified investor (*e.g.,* venture capital firms, angel investors, or accelerators or incubators) be set at $250,000, while for government grants or awards the general criterion will be $100,000. Based on these amounts, DHS analyzed various past endeavors for the potential sources of funds. DHS estimates that approximately 2,940 foreign nationals annually could be eligible to apply for parole under this rule. Table 1 summarizes the analysis by source of funds.

TABLE 1—NUMBER OF ENTRE-
PRENEURS POTENTIALLY ELIGIBLE

| Sub-group | Annual eligibility |
|---|---|
| New firms funded with investment capital ............... | 2,105 |
| New firms funded with U.S. grants or awards ............... | 835 |
| Total ............................... | 2,940 |

DHS has no way of predicting with certainty the actual number of foreign nationals who will seek parole under this rule over time, as the size of the eligible population could change significantly. DHS acknowledges that the estimate of eligible individuals annually is an approximation based on past foreign ownership and start-up capital amounts. The analysis utilized to estimate the potential eligible population is also based implicitly on assumptions that: (1) The rule will not significantly change the frequency of U.S. funded grant applications from international researchers; and (2) that the rule will not significantly affect the market for international entrepreneurs and the market for the types of investment structures the rule will involve. Based on these assumptions and the data limitations, DHS projects that for the first full year that the rule will be effective, annual eligibility will be approximately 2,940.[66] DHS projects

that this number will hold steady for the second year as well. The next section provides key data and analytical approaches utilized to arrive at the estimates of eligible individuals. DHS first considers volume estimates of eligible individuals based on official U.S. data. The resulting estimates based on official data are those utilized for the cost projections of the rule. Due to particular constraints in the data, DHS follows with an alternative method of volume estimation of eligible individuals that adds robustness to the official estimate.

Volume Projections Data and Methodology

A. Grants

Because U.S.-funded research grants may be a qualifying investment under this rule, DHS obtained publicly available data on federally funded grants for fiscal years 2013–2015.[67] Although numerous agencies within the Federal Government award grants to foreign-born individuals, most are humanitarian or development focused.[68] For this reason DHS parsed the very large data set comprising 1.7 million records to obtain a viable analytical cohort. First, the records were filtered to capture Federal Government agencies that award grants to both United States and foreign-born recipients. Secondly, the records were sorted to only include the Federal Government agencies that award grants focused on "projects," thereby excluding block and assistance grants.[69] The foreign-born cohort used for the eligibility projections excluded grants made to recipients in U.S. territories, as such recipients may be subject to special considerations outside the

parole parameters.[70] DHS also excluded grant amounts recorded as negative, zero, and trivial amounts of less than $1,000—such values were recorded if grants were rescinded or for some other reason not ultimately funded. On average, 138,447 grants comprised the annual resulting analytical cohort derived from the above filtering procedures. Of that total, a small portion, 2,043 grants, or 1.5 percent, were awarded to foreign-born individuals. Having determined a reasonable eligibility threshold of $100,000, DHS proceeded to the next step, to determine the potential annual eligible population of grant-sourced researchers. Over the period of analysis, 41 percent of the Federal grants awarded to foreign recipients equaled or surpassed the $100,000 benchmark, for an average of 835 annually.

B. Investment Capital

To estimate the number of potential new entrepreneurial start-ups, DHS obtained and analyzed data from the BLS and the Census Bureau. From the BLS Business Employment Dynamics (BED) data suite, DHS obtained the number of private establishments aged 1 year or less for nine broad sectors likely to be involved in innovative activity, in order to focus on entrants.[71] Although a reasonable proxy, the number of establishments aged 1 year or less is not a perfect measure of firm start-ups (births). The chosen metric may

[66] DHS emphasizes that the total is a broad estimate, as the Department has no means to determine the demand for entrepreneurial parole, changes in the eligible population that the rule may cause, time-variant possibilities, and application preferences. These conditions could change, if, for example, some foreign researchers see parole as attractive and apply for federally funded grants that they otherwise might not have applied for in the absence of the rule. In addition, volume estimates should be interpreted to apply to only initial applications, not considerations for re-parole at some future point in time. Lastly, the market for the

types of investments involved, such as venture capital, are fluid and becoming more global in scope. DHS has no means to determine how the evolution of these investment markets will affect, or be affected by, the rule.

[67] The data were obtained from USASpending.gov: *https://www.usaspending.gov/Pages/Default.aspx.* From the homepage, the data can be accessed from the linked "data download" section. The files were obtained on April 20, 2015.

[68] It is certainly the case that U.S. State governments and other governmental entities issue research grants that foreign recipients could potentially utilize for parole eligibility. However, DHS is not aware of any database that collects and provides such data publicly.

[69] The Federal entities that awarded scientific focused research to foreign recipients were: Agricultural Resource Service, National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration, Department of Defense, National Aeronautics and Space Administration, National Oceanic and Atmospheric Administration, National Institute of Standards and Technology, and National Science Foundation. The U.S. Department of State and the Agency for International Development (USAID) were excluded from the analysis.

[70] There is a particular way in which the data germane to foreign grants were parsed and analyzed. There are two possible foreign indicators listed for each grant. One is the "principal place" involving the research and the other is the "recipient country." The incumbent volume projections are based on the latter because this indicator generally implies that the grant was made to a person or institution outside the United States. The former is not used because this indicator could apply to grants awarded to U.S. or foreign persons in order to conduct the ensuing research outside the United States. Implicit in this analysis is that persons awarded U.S.-funded grants that are overseas could conduct their research and innovation in the United States, and are not otherwise precluded from doing so, even if the focus of such research is in a foreign country.

[71] The BLS data is found at *http://www.bls.gov/bdm/bdmage.htm.* DHS utilized the "Establishment age and survival BED data for nation by major industry" set and figures from Table 5, "Number of private sector establishments by age," for the nine major sectors shown in Table 2. The BLS does provide figures on firm births that could be used in the present analysis. However, DHS chose establishment age data because it is broken down in a way that corresponds precisely to the innovating sectors, discussed below. The firm birth data is not categorized in the exact same manner. The nine major sectors were chosen to envelope the approximately 430 individual activities that DHS considers to involve "science, technology, engineering, and math" (STEM). The full list based on the 2012 update can be found at: *http://www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf.*

overstate births, by including expansions and new franchises of existing businesses. Conversely, it may understate the actual number of start-ups, because some fraction of firms does not survive the first year (the data are tabulated in March of the respective year such that the establishments aged 1 year and less are those that opened within the previous year but remained in business as of March of the following year), and those that opened in the previous year and were still in business but had not reached 2 years of age. DHS utilized the relevant figure for March 2015, because the latter is the most recent figure reported in the BED dataset.

For each sector, DHS obtained the corresponding share of firms owned by a person "not born a citizen of the United States" from the Census Bureau's Survey of Business Owners

data set.[72][73] For brevity, we utilize the term "foreign" here to describe such firms. The foreign share was obtained by dividing the number of foreign-owned private firms in a sector by the total number of reporting firms in the same sector. This share applies to firms that have a least one owner who was not born in the United States but does not differentiate between various types of ownership structures. The figure for new firms obtained from the BLS BED data was multiplied first by the foreign share to generate an estimate of firms per sector started by a person not born in the United States.

Next, DHS attempted to calculate how many of the firms were started with at least $250,000, the minimum investment threshold that the rule sets. The SBO data provides ranges of such startup capital amounts but DHS could not conduct a precise estimate because

the data do not provide a category bound by the threshold minimum. In fact, the encompassing tranche is very large, from $249,500 to $1 million in range. The SBO does not provide actual cohort data or other information from which DHS could evaluate the distribution and, therefore, DHS has no way of ascertaining how many firms in this large range will occupy the $250,000 to $1 million segment. As a result, DHS relied on the share of firms in this tranche and the additional tranches over $1,000,000 relative to the share of all firms reporting for the sector, and recognizes that the volume projection is likely larger than is realistic. An additional assumption is that the startup threshold is the same for businesses with native and foreign-born founders. The relevant data and estimates per sector are shown in Table 2.

TABLE 2—SUMMARY OF ENTREPRENEUR ESTIMATES

| Sector | New firms | Foreign share (%) | Start-up threshold (%) | Annual eligible |
|---|---|---|---|---|
| Agriculture | 10,182 | 4.9 | 2.5 | 12 |
| Utilities | 1,204 | 10.8 | 5.5 | 7 |
| Manufacturing | 29,883 | 11.0 | 5.4 | 178 |
| Information | 22,855 | 11.9 | 2.0 | 55 |
| Professional Services * | 165,425 | 12.8 | 1.2 | 248 |
| Management | 7,334 | 7.3 | 20.2 | 108 |
| Waste Services | 66,161 | 16.4 | 0.9 | 94 |
| Education | 15,226 | 11.9 | 0.7 | 13 |
| Health Care | 210,977 | 18.0 | 3.7 | 1,391 |
| Total | .................... | .................... | .................... | 2,105 |

* Abbreviation for "Professional, Scientific, and Technical Services".

As is discussed in the preamble, DHS has revised two substantive components of the eligibility criteria for this final rule. Foremost, the general investment amount requirement has been lowered from $345,000 to $250,000. DHS believes that the volume estimate of entrepreneurs based on investment capital will be higher than the 2,105 presented above but cannot make a determination of exactly how much higher. The reason is that the lower investment amount will allow some firms to be created that otherwise would not at the higher amount proposed initially, but the Census Bureau capital

size bin relevant to the level proposed is the $249,500 to $1 million in range, which includes both figures. Because DHS does not have data on the distribution of amounts within this range, the entire bin was included in the proposed estimates and is retained in the final estimates. However, as is described below, DHS has conducted an alternative method of estimation—to include updates from the initial proposal based on new information and data—that compares very closely to the estimated total volume of 2,940. Specifically, an alternative estimate of total volume annually is 2,920.

C. An Alternative Estimate of Entrepreneurs Based on Investment Structures

DHS recognizes the imperfections in estimating the potential population of eligible entrepreneurs based on extrapolating past conditions of foreign ownership rates and capital thresholds. The main benefit of this method is that it is based on official data. A main limitation is that it assumes that the annual crop of firms created are entrepreneurial and the types of firms covered by the parole process in the rule. In practice, some, but not all, will

---

[72] The Census SBO data are found at: *http://www.census.gov/data/tables/2012/econ/sbo/2012-sbo-characteristics.html*. The foreign ownership figures per sector are found under "Characteristics of Business owners," Table SB1200CSBO11: "Statistics for Owners of Respondent Firms by Whether the Owner Was Born in the United States by Gender, Ethnicity, Race, and Veteran Status for the U.S." and the startup capital data are found under Characteristics of Businesses, Table SB1200CSB16: "Statistics for All United States

Firms by Total Amount of Capital Used to Start or Acquire the Business by Industry, Gender, Ethnicity, Race, and Veteran Status for the United States: 2007." The foreign ownership share of firms is provided in the table and thus did not need to be calculated by DHS. The SBO data are part of the 2012 survey for which data was released publicly between February and June 2016.

[73] A possible source of upward bias in the foreign ownership share and hence the estimate of eligible entrepreneurs is that this share does not

differentiate between foreign owners who came to the United States to open a business and those who acquired one after being in the United States for some period of time (*e.g.*, lawful permanent residents or naturalized citizens). A general finding among the literature on this topic is that many foreign-born business owners were driven to start a business by "push" factors in the labor market after arrival in the United States. DHS does not have a means to parse out the ownership rate in a more granular way to account for such differences.

be innovators, even though the present analysis focuses on the sectors of the economy linked to STEM activity (DHS is not aware of any methods or data that can allocate a research-innovation share of firms to each sector). A second limitation is that the DHS method of measuring new firms in the context of the rule is imprecise. The final rule revised the definition of "start-up entity" in 8 CFR 212.19(a)(2) to include firms that were formed up to 5 years prior to the filing of the application for parole, compared to three years as proposed in the NPRM. However, the BLS cohort of new firms utilized for the volume projections is 1 year of age or less, not five or even three years, and is thus a smaller estimate of the number of new firms that could be eligible. This limitation cannot be overcome because of the manner in which the survival cohorts are presented.[74] Because the volume projections are derived from information obtained from official sources—the BLS and Census Bureau—DHS retains them for purposes of the costs and volume estimates of the rule. DHS believes, however, that an alternative method of estimation will inform readers and strengthen the regulatory analysis by providing a viable comparison to the official projections. In this alternative approach, DHS focuses on business accelerators and incubators (described together as "accelerators" for brevity). By analyzing the foreign component of these structures, data permitting, an alternative estimate of entrepreneurs can be obtained for comparison purposes.

DHS obtained publicly available information from Seed-DB, which provides data on U.S. accelerators collected from industry associations and fee-based data providers such as Crunchbase, which is a large data provider for venture capital, angel investors, and accelerators.[75] From the Seed-DB Web site DHS utilized the fee to "firms that have exited" to collect the cohort of firms that underwent accelerators and then exited via an acquisition or public offering. Next, DHS parsed the data to capture firms that reported total funding, exit value, and were not recorded as "dead" (last accessed on Nov. 7, 2016). The parsing described above yielded a cohort of 89 firms. DHS followed the Seed-DB links to Crunchbase for each firm and extracted the seed round, recording its value.[76] Analysis of the investment rounds reveals that the median is $250,000. Having determined a median seed round size from the data, DHS next attempted to estimate a foreign share of accelerated firms. The exit cohort from which the median was calculated did not provide such information, hence DHS turned to the Seed-DB data suite that lists the total number of companies incubated for each accelerator and the countries that the companies were located in. Since there is wide variation in the number of companies per incubator, ranging from 1 to over a thousand, DHS grouped the incubators by country and then weighted each one for its share of total companies. The resulting weighted average indicates that one quarter of incubated companies were foreign.[77] Having determined a median seed round and a foreign share estimate, the final point required is the number of firms to apply these figures to. Based on the most recent data from the Center for Venture Research, the 2013–2015 annual average for angel financed firms in the seed and startup phase was 33 percent, which equals 23,336 firms annually. Multiplying this average number of firms by 0.25 to capture the foreign share and then by 0.5 to reflect the median and also the investment level DHS has set yields an annual estimate of 2,920.

This estimate compares well to the official total volume estimate of 2,940. The accelerator data captures seed rounds that involve venture capital, angel, accelerator investments, and grants, which is why it is compared to the total volume estimate.

## D. Potential Variability in the Volume Projections

This section discusses several potential cohorts involving entrepreneurial activity that is difficult to estimate.

In light of the potential benefits to the U.S. economy and job creation, DHS is proposing this rule to provide a mechanism that, consistent with the requirements of the INA, encourages international entrepreneurs described herein to form and create innovative firms in the United States. In 2011, DHS began outreach and stood up the Entrepreneurs in Residence initiative to try to encourage entrepreneurship among foreign nationals.[78] DHS began tracking the number of foreign nationals who indicated interest in starting up an entrepreneurial endeavor at some point during their admission as an H–1B nonimmigrant. Over four fiscal years (FY 2010–2013), an average of 77 foreign nationals indicated such interest. In light of the relatively small numbers of foreign nationals who indicated their entrepreneurial intentions, DHS believes that considering parole requests under this rule will promote further innovation and other economic benefits in addition to those created by existing programs and policies used by foreign nationals to pursue high-growth entrepreneurial activity in the United States. When the rule is effective, there could be some small substitution effects as some portion of this cohort could switch to seeking parole instead of relying on other existing nonimmigrant programs and policies. DHS, however, does not believe such substitution will occur on a large scale because the ability to be admitted to the United States as a nonimmigrant offers materially more benefits and protections than parole.

In addition, the rule lists a number of ancillary conditions for eligibility—and conversely a number of conditions that

---

[74] Specifically, the BLS BED provides the number of firms surviving to a specific age and below. For example, the five year cohort includes all firms started within five years surviving up to that point, and so on for younger cohorts. However, the data does not count the number of firms within each survival cohort by their true age. Hence, the five year survivals do not include firms that started up and may have died after three years that could have been eligible at one time. Therefore, the five year survival cohort significantly undercounts the number of firms that will potentially have been considered new in the context of the final rule. Conversely, adding up the survival cohorts to a point, say year five, will significantly over-count the number of firms considered new in the context of the final rule. The reason is that a firm that survived four years and went on to age five will be included in both the five and four year cohort, not to mention the younger ones. Thus, adding the two (age four and five) cohorts together would double count the survivor. This problem is less onerous for firms aged one or zero.

[75] The Seed-DB information is found at *www.seed-db.com/*.

[76] For most of the firms in the exit cohort, the initial round of investment date-wise was also the smallest round in terms of value and labeled as the "seed" or "angel" round. For about 10 percent of the firms however, determining which round to use for the analysis was not straightforward and DHS had to utilize some discretion. For example, for some firms the seed round was listed after other rounds, such as venture capital or Series A rounds. For others, the seed round was not the smallest round recorded. DHS does not know why these anomalies are present but proceeded to choose the "seed round" regardless of its dating or amount. The only exception was in the few cases in which the seed round post-dated other rounds and was larger in amount. In these few cases the initial round was chosen, regardless of what investment type it was.

[77] This foreign share found by DHS in the analysis corresponds strongly to a finding in a study of high technology firms that found that 24 percent of such firms were founded by a foreign born person. *See America's New Immigrant Entrepreneurs*, Vivek Wadhwa, AnnaLee Saxenian, Ben Rissing, and Gary Gereffi, available at: *http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf*.

[78] Source: "USCIS Announces 'Entrepreneurs in Residence Initiative,'" available at: *http://www.uscis.gov/news/public-releases-topic/business-immigration/uscis-announces-entrepreneurs-residence-initiative; see also http://www.uscis.gov/eir/visa-guide/entrepreneur-visa-guide*.

will leave individuals unlikely or unable to be paroled into the United States (or continue to be paroled in the country). Because ancillary conditions can be considered for eligibility, the actual volume may be smaller than the estimates herein. Two examples are that, under the rule, applicants must maintain household income greater than 400 percent of the poverty line and that the qualifying start-up capital cannot come from family members. The volume estimates presented in this analysis assume all ancillary eligibility conditions are met.

Finally, two potential elements of the eligible population are considered. First, as alluded to in the summary, the volume estimates and ensuing cost estimates assume one individual owner for each new firm; under the rule, DHS will allow up to three individuals per firm to seek parole but does not attempt to estimate how many of the startups could have more than one owner. Second, the volume estimate for grants is based on Federal awards only. DHS will consider eligibility based on State or local grants and awards, including those from State or local Economic Development Corporations (EDCs). However, unlike in the case of Federal awards, there is not a database capturing State and local grants or the transmission mechanisms through which some Federal grants are distributed to other entities, such as EDCs, and as such DHS was unable to estimate the number of entrepreneurs potentially eligible for parole as a result of receiving State and local grants.

### 4. Costs

#### A. Principal Filer Costs

The rule will permit certain foreign nationals to apply for a 30-month (2.5-year) initial period of parole into the United States provided they meet the eligibility criteria. Those who seek such parole into the United States will face the costs associated with the application, which involve a $1,200 application fee plus other costs, detailed below. The costs will stem from filing fees and the opportunity costs of time associated with filing the Application for Entrepreneur Parole (Form I–941).

The filing fee for the Form I–941 application is $1,200. The fee is set at a level intended to recover the anticipated processing costs to DHS.[79]

In addition, DHS is proposing that applicants for parole as an entrepreneur submit biometrics and incur the $85 biometric services fee. Because entrepreneurs could start firms in any number of occupations, DHS believes it is appropriate to utilize the mean hourly wage for all occupations, which is $22.71.[80] In order to anticipate the full opportunity cost to petitioners, DHS multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, for a total of $33.16 per hour.

DHS estimates that the application will take 4.7 hours to complete. After DHS receives the application and fees, if the applicant is physically present in the United States, USCIS will send the applicant a notice scheduling him or her to visit a USCIS Application Support Center (ASC) for biometrics collection. Along with the $85 biometric services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity cost of traveling to an ASC, the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours. DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[81] By applying the

$33.16 hourly time value for applicants to the total biometrics-related time burden, DHS finds that the opportunity cost for a principal applicant to travel to and from an ASC, and to submit biometrics, will total $121.68.[82] In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[83] DHS assumes that each individual will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants.

DHS estimates that each principal parole applicant will incur the following costs: $1,285 in filing fees to cover the processing costs for the application and biometrics; $306.27 after summing the monetized cost of travel to submit biometrics, the total opportunity costs of time of the initial applications, biometrics, and estimated travel costs, resulting in a total cost of $1,591.27 per application, rounded to $1,591.[84] If DHS receives 2,940 applications from persons eligible to apply, DHS anticipates that such applications will result in annual filing fee transfers of $3,777,900 (undiscounted), which comprise the application fee and cost of submitting biometrics, and opportunity and other burden costs of $900,436 for a total annual cost of $4,678,366. Any subsequent renewal of the parole period will result in costs similar to those previously discussed, with the exceptions of travel costs, since the applicant will not be required to depart the United States and re-enter. Similarly, the same costs will result for material changes requiring the filing of amended applications, with the exception of the travel costs noted above and costs associated with biometrics collections, including the time and travel to an ASC.

---

[79] USCIS calculates its fees to recover the full cost of USCIS operations, including meeting national security, customer service, and adjudicative processing goals. As with other fees, USCIS uses Activity Based Costing (ABC) to assign costs to specific benefit requests. This model uses completion rates (actual or estimated depending on whether the benefit type is already being

adjudicated) to calculate a fee or fee adjustment for a benefit type. A completion rate reflects an average time an adjudicator spends actually working on a case but does not include ''queue'' or wait times. Because parole under this rule has not yet been implemented, the completion rate used is based on a 4-hour estimate provided by USCIS' subject matter experts. At this time, USCIS has estimated that 30 additional staff will be required to satisfy the forecasted workload associated with this rule. However, USCIS requires adjudicators to report actual adjudication hours and case completions by benefit type. This reporting will occur after this rule is implemented. Adjudication hours will be divided by the number of completions for the same time period to determine the *actual* average completion rate. This rate will be used in future fee adjustments and will help determine future staffing allocations necessary to handle the projected workload for parole under this rule.

[80] Please see U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program, National Occupational Employment and Wage Estimates, United States (May 2014), available at: *http://www.bls.gov/oes/2014/may/oes_nat.htm*.

[81] Foreign nationals who submit their applications from outside the United States will still be required to pay the $85 biometric processing fee and travel to a USCIS office abroad, if available, or a U.S. embassy or consulate office for biometric processing at the time of travel document issuance. Due to data limitations, and to capture general

impacts of the rule, DHS has estimated costs of submitting biometrics under the assumption that all applicants are traveling to an ASC in the United States.

[82] Calculation: $33.16 * 3.67 hours = $121.68.

[83] Calculation: 50 miles multiplied by $0.575 per mile equals $28.75. See 79 FR 78437 (Dec. 30, 2014) for GSA mileage rate.

[84] Calculation: $1,285 + 306; $1,285 is the sum of the direct cost of the $1,200 filing fee and the $85 cost of biometrics. The $306(rounded) figure is obtained by adding the cost of travel ($28.75) plus the total opportunity cost of $277, the latter of which is the product of the total time burden (8.37 hours) and the average burdened hourly wage ($33.16).

B. Dependent Spouses and Children

The rule will require all dependent family members (spouses and children) accompanying or joining the entrepreneur to file an Application for Travel Document (Form I–131), and will require all spouses and children 14 years of age through age 79 to submit biometrics.[85] Those spouses and children will face the costs associated with filing the application and submitting biometrics. DHS recognizes that many dependent spouses and children do not currently participate in the U.S. labor market, and as a result, are not represented in national average wage calculations. In order to provide a reasonable proxy for time valuation, DHS has to assume some value of time above zero and therefore uses an hourly cost burdened minimum wage rate of $10.59 to estimate the opportunity cost of time for dependent spouses. The value of $10.59 per hour represents the Federal minimum wage with an upward adjustment for benefits.[86] The value of $10.59 per hour is consistent with other DHS rulemakings when estimating time burden costs for those who are not authorized to work.[87]

DHS will require dependents of parole applicants (spouses and children of the parole applicant) to file an Application for Travel Document (Form I–131). There is a $575 filing fee associated with the Form I–131 application, and DHS estimates it will take 3.56 hours to complete each submission. In addition to filing the Form I–131 application, each dependent spouse and child 14 years of age and over will be required to submit biometric information (fingerprints, photograph, and signature) by attending a biometrics services appointment at a designated USCIS Application Support Center (ASC). The biometrics processing fee is $85.00 per applicant. In addition to the $85 biometrics services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity and mileage costs of traveling to an ASC, and the opportunity cost of submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours.[88] DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours. In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[89] DHS has assumed that each applicant will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants. DHS also assumed all children were over the age of 14 for the purposes of this analysis and, therefore, this cost estimate may be slightly overestimated.

DHS projects that approximately 3,234 dependents will be required to file a Form I–131 application and submit biometrics, based on the estimate of 2,940 principal applicants and using a multiplier for expected family members of 1.1.[90] The total cost for those spouses and children requesting parole under this program includes the filing fee, biometrics processing fee, travel costs associated with biometrics processing, and the opportunity cost of filing the Form I–131 application and submitting biometrics. The total time burden is 7.23 hours. At the cost-burdened wage, the total opportunity cost is $76.53. Adding the $28.75 cost of travel, the total non-filing cost is estimated to be $105.28, and the total cost per applicant is $765.28. At the projection of 3,234 applicants, the non-filing cost is $340,474 (undiscounted), and combined with filing costs of $2,134,440, the total estimated cost for dependents germane to the Form I–131 application is $2,474,914.

In addition, DHS is allowing independent employment authorization for spouses of entrepreneurs granted parole under this rule. DHS will permit these individuals to apply for employment authorization by filing a Form I–765 application. To estimate the number of potential persons applying for employment authorization, DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur paroles.

The current filing fee for the Form I–765 application is $410.00. The fee is set at a level to recover the processing costs to DHS. Based on the projection of 2,940 applicants, the total filing cost is $1,205,400 (undiscounted). DHS estimates the time burden of completing the Form I–765 application is 3.42 hours.[91] At the cost-burdened wage, the total opportunity cost is $36.20. At the projection of 2,940 applicants, the non-filing cost is $106,430 (undiscounted) and combined with filing costs of $1,205,400 the total estimated cost for spouses germane to the Form I–765 application is $1,311,830.

In addition to the filing costs, applicants for parole may face other costs associated with their entrepreneurial activities. These could include the administrative costs of starting up a business, applying for grants, obtaining various types of licenses and permits, and pursuing qualified investments. However, these costs apply to the entrepreneurial activity and the business activity that the applicant has chosen to be involved in and are not driven by the parole process or other governmental functions attributable to the rule itself. Hence, DHS does not attempt to estimate, quantify, or monetize such costs.

Lastly, DHS recognizes that some individuals who were lawfully admitted in the United States in certain nonimmigrant classifications may seek

---

[85] Note: If a child under the age of 14 requires a travel document, he or she will need to appear for biometrics by traveling to an ASC, but will not be required to pay a biometrics fee.

[86] U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009. Available at *http://www.dol.gov/dol/topic/wages/minimumwage.htm*. The calculation for total employer costs for employee compensation for dependent spouses and children of principals with an approved Form I–140: $7.25 per hour × 1.46 = $10.59 per hour.

[87] See "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[88] DHS has estimated travel distances and ensuing travel times at 2.5 hours in prior rulemakings. *See, e.g.*, "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[89] See U.S. General Services Administration Web site for Privately Owned Vehicle (POV) Mileage Reimbursement Rates, *http://www.gsa.gov/portal/content/100715* (accessed Aug. 8, 2015).

[90] The multiplier of 1.1 was obtained from DHS estimates of the average historical ratio of principal versus dependent recipients of lawful permanent resident status. DHS studies based on statistics obtained from office of Immigration Statistics reveal that multipliers for the employment preference categories EB–1, EB–2, and EB–3 range from 2.04 to 2.27. DHS believes that 2.1. is a reasonable multiplier for the estimates and utilized this multiplier in regulatory assessments involved in American Competitiveness in the Twenty-First Century Act, (AC21) provisions, specifically: "Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers'' (RIN 1615–AC05), rule. Because the Form I–131 filings relevant to this rule do not apply to principals, only spouses and dependent children, DHS believes it is valid to subtract 1 from the 2.1 multiplier to yield the final multiplier of 1.1.

[91] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–765 (OMB control number 1615–0040). The PRA Supporting Statement can be found at Question 13 on *Reginfo.gov* at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201502-1615-004*.

parole. Individuals who are present in the United States at the time their parole application is approved, based on admission as a nonimmigrant, will have to depart the United States and appear at a U.S. port of entry in order to be granted parole since USCIS is unable to grant parole to individuals who are not applicants for admission. *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5). These individuals will be ineligible for a change of status under section 248 of the INA, 8 U.S.C. 1258. Such applicants will therefore bear the travel costs of exit and returning to a port of entry. However, because there are no similar programs for comparison, DHS cannot determine the demand for parole or substitution effects from other classifications and thus cannot estimate, quantify, or monetize such potential travel costs. Finally, because the program allows for re-parole under conditions that DHS has set, entrepreneurs and their spouse and children, if applicable, will likely face filing and opportunity costs associated with applying for re-parole. However, DHS has no means of estimating the share of the potential eligible population that will seek and be eligible for re-parole, hence re-parole conditions are not included in this analysis. In summary, DHS believes that it is possible that there could be some substitution into the parole program from other programs and such applicants and dependents will incur travel and possible other costs related to exit and requesting a grant of parole at a U.S. port of entry.

## C. Potential for Negative U.S. Labor Market Impacts

DHS does not expect the rule to generate significant costs or negative consequences. Extensive review of information relevant to immigrant entrepreneurship indicates that while much about the impact of such entrepreneurship is not known, there is no reason to expect that substantial negative consequences, including adverse impact on domestic workers, are likely. The possibility that immigrant entrepreneurs may displace ("crowd-out") native entrepreneurs has been raised by a few researchers. One study indicated that a very small number of native entrepreneurs were possibly displaced by immigrant entrepreneurs.[92] However, because of difficulties in controlling for a large amount of variables related to

entrepreneurship, other researchers have noted that this finding only raises the possibility that displacement could not be ruled out completely, but did not actually provide evidence that it had actually occurred.[93] Another study, conducted by the Brookings Institution, did not find displacement but acknowledged that more research and refined control techniques, along with longitudinal data, will need to be studied before ruling out the possibility completely.[94] In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

DHS recognizes that the potential inclusion of spouses can incur labor market implications and possibly impact U.S. workers. As was noted in previous sections of the regulatory impact analysis, DHS did not attempt to assess or measure the labor market impact of the estimated entrepreneurs potentially eligible for parole because as founders of firms, these persons will not affect the labor market in the same way as other workers. Although spouses could have labor market impacts as new labor market entrants, DHS believes such potential impacts will be negligible. The main reason is that the size of the potential new cohort is very small. As of the end of 2015, there were an estimated 157,130,000 people in the U.S. civilian labor force.[95] Consequently, the estimated "new" available workers in the first year will represent approximately 0.001 percent of the overall U.S. civilian labor force.[96] DHS believes this fraction is too small

to have a significant impact on the labor market.

While the figures above apply to the general U.S. labor force, DHS recognizes that concentration of new labor force entrants can impact specific labor markets. DHS believes that any such potential impacts linked to this rule will be insignificant. The NVCA and other sources of information that DHS reviewed indicates that while the area of California known as Silicon Valley has traditionally been, and continues to be, the primary recipient geographically for technology startup capital, other large urban centers on the East Coast and, even more recently, parts of the Mid- and Mountain West have seen increased technology startup activity. To provide just one example of a potential area-specific impact, DHS considered the San Jose-San Francisco-Oakland (CA) Combined Statistical Area (CSA) conjoining the seven Metropolitan Statistical Areas (MSAs) and nine encompassed counties constituting the economic linkages of Silicon Valley. Based on data from the BLS, the population of this CSA is about 8.6 million (as of May 2014) and the employed population (a narrower measure of the labor market than the labor force) about 3.75 million. If the share of new entrants is based on the proportion of venture capital to the area, which is 42 percent, then 2,746 spousal entrants could impact the area.[97] Assuming such entrants gain employment, this cohort represents just 0.02 percent of the employed population of the specific CSA.

## D. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of the Form I–941 application based on notional application filing volumes and estimated resource commitments. During the biennial fee review, DHS

---

[92] Fairlie, R.W., and B.D. Meyer, *The effect of immigration on native self-employment*, Journal of Labor Economics 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf*.

[93] *See* Magnus Lofstrom, *Immigrants and Entrepreneurship*, Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf*.

[94] *See* Zoltan J. Acs and David M. Hart, *Immigration and High-Impact, High-Tech Entrepreneurship*, Brookings, Issues in Technological innovation (Feb. 2011), available at *http://www.brookings.edu/research/papers/2011/02/immigration-hart-acs*.

[95] *See* News Release, United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment–2015 Annual Averages, Table 1 "Employment status of the civilian non-institutional population 16 years of age and over by region, division, and state, 2014–15 annual averages" (Mar. 24, 2016), available at *http://www.bls.gov/news.release/pdf/srgune.pdf*.

[96] Source: United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistic. Figure applies to seasonally adjusted level for December 2014, available at: *http://data.bls.gov/timeseries/LNS11000000*. Calculation for new worker labor force share: 1813/157,130,000.

[97] The employment figures are provided by the BLS, Occupational Employment Statistics (OES), found at: *http://www.bls.gov/oes/current/oes_42100.htm*. The population data is provided by the Census Bureau, which tabulates CSAs: "Combined Statistical Area Totals Dataset: Population and Estimated Components of Change: April 1, 2010 to July 1, 2014" (CSV), 2014 Population Estimates. United States Census Bureau, Population Division. March 2015. The information on the venture capital share for the region is found in the NVCA 2015 yearbook, and is found in figure 8, p. 14. The calculation is as follows: (.42 ×1813) = 761, which is then divided by the CSA population of 3,750,000.

will examine whether the fee is sufficient to recover the full costs of adjudication, as required by the INA.

5. Benefits

As referenced previously, evidence suggests that innovation-focused start-ups contribute disproportionately to job creation. The rule will reduce entry barriers, and thus support efforts by international entrepreneurs to generate entrepreneurial activity in the United States.

The rule is expected to generate important net benefits to the U.S. economy. For one, expenditures on research and development by the grant-based researchers that DHS has identified that could qualify for entrepreneur parole will generate direct and indirect jobs. In addition, this research-focused spending could potentially generate patents, intellectual property, licensing, and other intangible assets that can be expected to contribute to innovation and technological advances and spill over into other sectors of the overall economy. DHS acknowledges that it is extremely difficult to gauge the precise economic value of such assets and that peer-reviewed research in this area is still nascent. Despite the nascent stage of the research and the difficulty of measuring quantitatively the benefit of innovation driven by new high technology firms, a large body of research indicates that the innovation driven by entrepreneurs contributes directly to economic growth, generates important efficiencies and cost reductions for firms that utilize such innovation, and increases productivity and profitability for firms that benefit indirectly through new products generated by such innovation.

Lastly, DHS believes that many of the start-up firms operated by international entrepreneurs during the parole period could eventually become high-growth firms that generate exceptionally high levels of economic activity and contribute disproportionately to job creation in the United States.

*D. Regulatory Flexibility Act*

In accordance with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601(6), DHS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people).

In the proposed rule, DHS certified that this rule would not have a

significant impact on a substantial number of small entities. DHS made this determination based on the following facts: This is not a mandatory rule; this rule only impacts those individual entrepreneurs who make the voluntary decision to apply for parole; and this rule does not regulate the business entities in any way. After reviewing public comments, including the formal letter submitted on the record by the U.S. Small Business Administration's Office of Advocacy (Advocacy), DHS maintains its certification that the rule does impose a significant impact on a substantial number of small entities. For a full discussion of the DHS response to the letter submitted by Advocacy, please see Section III.M.4 of this preamble.

Individuals are not defined as a ''small entity'' by the RFA. The rule will not mandate that all individuals apply for parole. This rule provides flexibilities and options that do not currently exist for individuals who wish to establish or operate a start-up business in the United States. Importantly, the rule does not require any individuals or businesses, including those created by foreign nationals, to seek parole—either generally or as a specific condition for establishing or operating a business in the United States. Rather, as mentioned previously, this rule is intended to provide an additional flexibility for foreign individuals who are unable to obtain another appropriate nonimmigrant or immigrant classification, in order to facilitate the applicant's ability to oversee and grow the start-up entity. If any individual believes this rule imposes a significant economic impact, that individual could simply choose not to seek parole under the rule and thus incur no economic impact. As discussed previously, this rule imposes direct filing costs of $1,285 (which includes the $1,200 application fee and the $85 biometrics fee), plus $194 in time-related opportunity costs for those individuals who do choose to apply for parole as entrepreneurs under the rule. This cost is relatively minor when considering the costs of starting up a new business and the capital necessary to start a business.

Under the general term ''entrepreneur,'' DHS includes those who desire to form firms with investment funds from certain U.S. investors. For purposes of the RFA, the regulatory requirements place compliance costs and establish eligibility criteria for the individual requesting consideration for parole under this rule. DHS believes that the costs of application for parole will burden the individual applicant, and

not the entrepreneurial venture (firm). This rule will not alter or change the normal procedure for fundraising or other start-up administrative costs that occur in forming a business entity. Such costs are not direct costs of this rule and could include, but are not limited to, business application fees, legal fees, and licensing that precede significant infusions of investment, the latter of which are primarily utilized for operational and capital expenses in order to produce goods or services.

It is possible that some of the 2,940 estimated entrepreneurs who could be eligible for parole annually could involve business structures in which the filing fees are paid by a business entity. In the event that small business entities are impacted by this rule because they choose to pay the filing fees on behalf of an individual entrepreneur, DHS believes that the filing cost of $1,285 per application will be insignificant compared to such entities' annual gross revenues, potential for revenue, and other economic activity.

For businesses that may pay the filing costs, the expected impact to such businesses will be small. For businesses that utilize either the minimum threshold of $100,000 for a qualifying government grant or award or $250,000 in capital investment to source the filing costs, such costs will constitute 1.3 percent and 0.4 percent, respectively, of the total capital amount. These relatively low cost proportions apply to those firms that only obtain the minimum investment amounts and have no other source of funding or revenues. In addition, DHS analyzed the cost impact relative to more typical RFA indices. DHS analysis of Census Bureau data on the smallest firms found that the average revenue based on sales receipts for firms with no paid employees is $309,000, while the average for firms with one to four paid employees is $411,000.[98] The filing cost relative to these averages is 0.42 percent and 0.31 percent, respectively.

DHS also analyzed the average revenue for new firms. Since the rule defines a new firm as one that is less than five years old at the time the initial parole application is filed, DHS grouped private sector firms for the 2012 survey as those responding that the year of

---

[98] The data utilized for the analysis are found in the SBO Table SB1200CSA09, ''Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012, 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/2012-sbo.html.* The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA09&prodType=table.* The figures are rounded from $309,279 and $410,900, respectively.

AR2022_200318

establishment was either 2012, 2011, 2010, 2009, or 2008. DHS obtained the average revenue per firm and then weighted the average by the yearly proportion of firms. Based on the resulting weighted average of $162,000, such new firms will face a filing-cost burden of 0.8 percent.[99] DHS notes that there is a large difference between the revenue of new firms with paid employees and those without such employees (*i.e.,* sole proprietors). For the latter, average revenues are about $34,000, and the cost burden will be 3.8 percent. However, because a central component of this parole program requires a demonstration of significant public benefit in the form of economic activity and job growth, DHS does not anticipate that sole proprietors will be eligible to participate in this program.

In summary, DHS believes that per-applicant costs will be primarily incurred by the individual (which is not covered by the RFA), any direct cost due to this rule will be relatively minor, and these costs will only be borne by those who voluntarily choose to apply for parole under this rule. While the applicant for parole may be the owner of a firm that could be considered small within the definition of small entities established by 5 U.S.C. 601(6), DHS considers the applicants to be individuals at the point in time they are applying for parole, particularly since it is the individual and not the entity that files the application and it is the individual whose parole must provide a significant public benefit under this rule. Furthermore, even if firms do voluntarily decide to incur the compliance costs on behalf of the individual requesting consideration for parole under this rule, the only compliance costs those businesses will be permitted to incur will be the filing costs for the applications. As indicated previously, based on the comparison metric used, those costs are expected to be insignificant.

Based on the evidence presented in this RFA section and throughout this preamble, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

---

[99] The data utilized for the analysis are found in the SBO Table SB1200CSCB11, ''Statistics for All U.S. Firms by Year the Business Was Originally Established or Self-Employment Activity Begun by Industry, Gender, Ethnicity, Race, and Veteran Status for the U.S.: 2012: 2012 Survey of Business Owners: *http://census.gov/library/publications/ 2012/econ/2012-sbo.html*. The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/ pages/productview.xhtml?pid=SBO_2012_ 00CSCB11&prodType=table*. The average revenue figure is rounded from $162,293.

## E. National Environmental Policy Act

DHS Directive (Dir) 023–01 Rev. 01 establishes the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA. 40 CFR parts 1500 through 1508.

The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions (''categorical exclusions'') which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Directive 023–01 Rev. 01 establishes Categorical Exclusions that DHS has found to have no such effect. Dir. 023–01 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Directive 023–01 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Dir. 023–01 Rev. 01 section V.B (1)–(3).

DHS analyzed this action and does not consider it to significantly affect the quality of the human environment. This rule provides criteria and procedures for applying the Secretary's existing statutory parole authority to entrepreneurs in a manner to assure consistency in case-by-case adjudications. DHS has determined that this rule does not individually or cumulatively have a significant effect on the human environment because it fits within two categorical exclusions under DHS Directive 023– 01 Rev. 01, Appendix A, Table 1. Specifically, the rule fits within Categorical Exclusion number A3(a) for rules strictly of an administrative or procedural nature and A3(d) for rules that interpret or amend an existing regulation without changing its environmental effect.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Fewer than 3,000 individuals, an insignificant number in the context of the population of the United States, are projected to receive parole through this program. Furthermore, any ventures will be governed by local, state and federal laws and regulations, including those protecting the human health and the environment. Therefore, this rule is categorically excluded from further NEPA review.

## F. Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## H. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule involves a new information collection and makes revisions to the existing information collections as follows:

Overview of Information Collection, Application for Entrepreneur Parole, Form I–941

This final rule requires that an applicant requesting entrepreneur parole complete an Application for Entrepreneur Parole, Form I–941, and is considered a new information collection under the PRA. USCIS did receive one comment regarding the time burden of this form and, upon review of the work involved to review the form, gather necessary information to support the submission, and the time required to complete and submit the form, USCIS has revised the estimated hour burden per response to 4.7 hours.

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals, other than those filing an application on the basis of a material change, are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Entrepreneur Parole, Form I–941.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–941, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Businesses and other for profit; Not-for-profit Institutions.

f. *An estimate of the total annual numbers of respondents:* 2,940.

g. *Hours per response:* The estimated hour per response for Form I–941 is 4.7 hours; the estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 17,258 hours.

Overview of Information Collection, Application for Travel Document Form I–131, OMB Control No. 1615–0013

DHS is revising the collection by including spouses and children seeking parole on the basis of an entrepreneur parolee.

In addition to revising the form and form instructions, DHS is revising the estimate of total burden hours has increased due to the addition of this new population of Application for Travel Document, Form I–131, filers, and the increase of burden hours associated with the collection of biometrics from these applicants.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by dependents of individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Travel Document, Form I–131.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Application for Travel Document, Form I–131, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 594,324.

The total number of respondents includes the additional population of 3,234 individuals as estimated previously in the analysis in Section IV.C.

g. *Hours per response:* The estimated hour per response for Form I–131 Supplement is 1.9 hours; the estimated hour burden per response for the biometric processing is 1.17 hours; the estimated hour burden per response for the passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 1,372,928 hours.

Overview of Information Collection, Employment Eligibility Verification, Form I–9, OMB Control No. 1615–0047

In accordance with new 8 CFR 274a.2(b)(1)(v)(A)(*5*), DHS is revising the Employment Eligibility Verification, Form I–9, Lists of Acceptable Documents, List A item 5 to replace "nonimmigrant alien" with "individual," to replace "alien's nonimmigrant" with "individual," and to add "or parole" after "status" in List A item 5.b.(2). With these changes the acceptable List A document is described as the following: For an individual authorized to work for a specific employer because of his or her status or parole, a foreign passport and Form I–94 (or Form I–94A) that has the same name as the passport and has an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole. DHS is also updating the Lists of Acceptable Documents, List C so that the most current version of the certification or report of birth issued by the Department of State is acceptable for Form I–9.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This form was developed to facilitate compliance with section 274A of the Immigration and Nationality Act, which prohibits the knowing employment of unauthorized aliens. This information collection is necessary for employers, agricultural recruiters and referrers for a fee, and state employment agencies to verify the identity and employment authorization of individuals hired (or recruited or referred for a fee, if applicable) for employment in the United States.

c. *Title of Form/Collection:* Employment Eligibility Verification.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–9, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Business or other for-profit; Individuals or households; State, local or Tribal Government.

f. *An estimate of the total annual numbers of respondents:* 78 million employers and 78 million individuals. (The total number of responses will be only 78 million responses. Each response involves an employer and an individual who is being hired.)

g. *Hours per response:*
• Time Burden for Employees—20 minutes (.33 hours) total;
• Time Burden for Employers—10 minutes (.17 hours) total;
• Time Burden for Recordkeeping—5 minutes (.08 hours) total

h. *Total Annual Reporting Burden:* Approximately 40,600,000 total annual burden hours.

Overview of Information Collection, Application for Employment Authorization, Form I–765, OMB Control No. 1615–0040

DHS is making minor revisions to the form instructions to reflect changes made by this final rule that allow spouses of an entrepreneur parolee to request employment authorization.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

This form was developed for individual aliens to request employment authorization and evidence of that employment authorization. The form is being amended to add a new class of aliens eligible to apply for employment authorization, specifically a spouse of an entrepreneur parolee described as eligible for employment authorization under this rule. Supporting documentation demonstrating eligibility must be filed with the application. The form lists examples of relevant documentation.

c. *Title of Form/Collection:* Application for Employment Authorization, Form I–765.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–765, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 2,139,523.

This total represents the aggregate estimate for this information collection, to include the additional estimate of 2,940 respondents under this rule.

g. *Hours per response:* The estimated hour per response for Form I–765 is 3.42 hours; the estimated hour burden per response for biometric processing is 1.17 hours; the estimated hour burden per response for Form I–765 WS is .5 hours; the estimated hour burden per response for passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 8,985,859 hours.

**Regulatory Amendments**

DHS adopted most of the proposed regulatory amendments without change.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.7 is amended by adding paragraph (b)(1)(i)(KKK) to read as follows:

**§ 103.7  Fees.**

\*    \*    \*    \*    \*

(b) \*  \*  \*

(1) \*  \*  \*

(i) \*  \*  \*

(KKK) *Application for Entrepreneur Parole (Form I–941).* For filing an application for parole for entrepreneurs: $1200.

\*    \*    \*    \*    \*

**PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE**

■ 3. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Add § 212.19 to read as follows:

**§ 212.19  Parole for entrepreneurs.**

(a) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Entrepreneur* means an alien who possesses a substantial ownership interest in a start-up entity and has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. For purposes of this section, an alien may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. During the period of initial parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of initial parole, maintain at least a 5 percent ownership interest in the entity. During the period of re-parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of parole, maintain an ownership interest in the entity.

(2) *Start-up entity* means a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. An entity that is the basis for a request for parole under this section may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the alien's initial parole request. For

purposes of paragraphs (a)(3) and (5) of this section, an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

(3) *Qualified government award or grant* means an award or grant for economic development, research and development, or job creation (or other similar monetary award typically given to start-up entities) made by a federal, state, or local government entity (not including foreign government entities) that regularly provides such awards or grants to start-up entities. This definition excludes any contractual commitment for goods or services.

(4) *Qualified investment* means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of its equity, convertible debt, or other security convertible into its equity commonly used in financing transactions within such entity's industry. Such an investment shall not include an investment, directly or indirectly, from the entrepreneur; the parents, spouse, brother, sister, son, or daughter of such entrepreneur; or any corporation, limited liability company, partnership, or other entity in which such entrepreneur or the parents, spouse, brother, sister, son, or daughter of such entrepreneur directly or indirectly has any ownership interest.

(5) *Qualified investor* means an individual who is a U.S. citizen or lawful permanent resident of the United States, or an organization that is located in the United States and operates through a legal entity organized under the laws of the United States or any state, that is majority owned and controlled, directly and indirectly, by U.S. citizens or lawful permanent residents of the United States, provided such individual or organization regularly makes substantial investments in start-up entities that subsequently exhibit substantial growth in terms of revenue generation or job creation. The term "qualified investor" shall not include an individual or organization that has been permanently or temporarily enjoined from participating in the offer or sale of a security or in the provision of services as an investment adviser, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent or credit rating agency, barred from association with any entity involved in the offer or sale of securities or provision of such

AR2022_200321

services, or otherwise found to have participated in the offer or sale of securities or provision of such services in violation of law. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years:

(i) The individual or organization made investments in start-up entities in exchange for equity, convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000; and

(ii) Subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent.

(6) *Qualified job* means full-time employment located in the United States that has been filled for at least 1 year by one or more qualifying employees.

(7) *Qualifying employee* means a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. This definition shall not include independent contractors.

(8) *Full-time employment* means paid employment in a position that requires a minimum of 35 working hours per week. This definition does not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

(9) *U.S. business entity* means any corporation, limited liability company, partnership, or other entity that is organized under federal law or the laws of any state, and that conducts business in the United States, that is not an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments.

(10) *Material change* means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. Such changes include, but are not limited to, the following: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination

concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity.

(b) *Initial parole*—(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file an Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for parole under this section if the alien demonstrates that a grant of parole will provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (b)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien is an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity is a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(*1*) Received, within 18 months immediately preceding the filing of an application for initial parole, a qualified investment amount of at least $250,000 from one or more qualified investors; or

(*2*) Received, within 18 months immediately preceding the filing of an application for initial parole, an amount of at least $100,000 through one or more qualified government awards or grants.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (b)(2)(ii)(A) of this section and partially meets one or both of the criteria in paragraph (b)(2)(ii)(B) of this section may alternatively meet the standard described in paragraph (b)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(c) *Additional periods of parole*—(1) *Filing of re-parole request form.* Prior to the expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file the Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for re-parole under this section if the alien demonstrates that a grant of parole will continue to provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (c)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien continues to be an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity continues to be a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(*1*) Received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period;

(*2*) Created at least 5 qualified jobs with the start-up entity during the initial parole period; or

(*3*) Reached at least $500,000 in annual revenue in the United States and averaged 20 percent in annual revenue growth during the initial parole period.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (c)(2)(ii)(A) of this section and partially meets one or more of the criteria in paragraph (c)(2)(ii)(B) of this section may alternatively meet the standard

AR2022_200322

described in paragraph (c)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(d) *Discretionary authority; decision; appeals and motions to reopen*—(1) *Discretionary authority.* DHS may grant parole under this section in its sole discretion on a case-by-case basis if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. In determining whether an alien's presence in the United States will provide a significant public benefit and whether the alien warrants a favorable exercise of discretion, USCIS will consider and weigh all evidence, including any derogatory evidence or information, such as but not limited to, evidence of criminal activity or national security concerns.

(2) *Initial parole.* DHS may grant an initial period of parole based on the start-up entity listed in the request for parole for a period of up to 30 months from the date the individual is initially paroled into the United States. Approval by USCIS of such a request must be obtained before the alien may appear at a port of admission to be granted parole, in lieu of admission.

(3) *Re-parole.* DHS may re-parole an entrepreneur for one additional period of up to 30 months from the date of the expiration of the initial parole period. If the entrepreneur is in the United States at the time that USCIS approves the request for re-parole, such approval shall be considered a grant of re-parole. If the alien is outside the United States at the time that USCIS approves the request for re-parole, the alien must appear at a port of entry to be granted parole, in lieu of admission.

(4) *Appeals and motions to reopen.* There is no appeal from a denial of parole under this section. USCIS will not consider a motion to reopen or reconsider a denial of parole under this section. On its own motion, USCIS may reopen or reconsider a decision to deny the Application for Entrepreneur Parole (Form I–941), in accordance with 8 CFR 103.5(a)(5).

(e) *Payment of biometric services fee and collection of biometric information.* An alien seeking parole or re-parole under this section will be required to pay the biometric services fee as prescribed by 8 CFR 103.7(b)(1)(i)(C). An alien seeking an initial grant of parole will be required to submit biometric information. An alien seeking re-parole may be required to submit biometric information.

(f) *Limitations.* No more than three entrepreneurs may be granted parole under this section based on the same start-up entity. An alien shall not receive more than one initial grant of entrepreneur parole or more than one additional grant of entrepreneur re-parole based on the same start-up entity, for a maximum period of parole of five years.

(g) *Employment authorization.* An entrepreneur who is paroled into the United States pursuant to this section is authorized for employment with the start-up entity incident to the conditions of his or her parole.

(h) *Spouse and children.* (1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file an Application for Travel Document (Form I–131). Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. A biometric services fee is required to be filed with the application. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

(2) The spouse and children of an entrepreneur granted parole under this section may be granted parole under this section for no longer than the period of parole granted to such entrepreneur.

(3) The spouse of the entrepreneur parolee, after being paroled into the United States, may be eligible for employment authorization on the basis of parole under this section. To request employment authorization, an eligible spouse paroled into the United States must file an Application for Employment Authorization (Form I–765), in accordance with 8 CFR 274a.13 and form instructions. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship.

(4) Notwithstanding 8 CFR 274a.12(c)(11), a child of the entrepreneur parolee may not be authorized for and may not accept employment on the basis of parole under this section.

(i) *Conditions on parole.* As a condition of parole under this section, a parolee must maintain household income that is greater than 400 percent of the federal poverty line for his or her household size as defined by the Department of Health and Human Services. USCIS may impose other such reasonable conditions in its sole discretion with respect to any alien approved for parole under this section, and it may request verification of the parolee's compliance with any such condition at any time. Violation of any condition of parole may lead to termination of the parole in accordance with paragraph (k) of this section or denial of re-parole.

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee (not including any biometric fees), in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

(k) *Termination of parole*—(1) *In general.* DHS, in its discretion, may terminate parole granted under this section at any time and without prior notice or opportunity to respond if it determines that the alien's continued parole in the United States no longer provides a significant public benefit. Alternatively, DHS, in its discretion, may provide the alien notice and an opportunity to respond prior to terminating the alien's parole under this section.

(2) *Automatic termination.* Parole granted under this section will be automatically terminated without notice upon the expiration of the time for which parole was authorized, unless the alien timely files a non-frivolous application for re-parole. Parole granted under this section may be automatically terminated when USCIS receives written notice from the entrepreneur parolee that he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity in accordance with paragraph (j) of this section. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. If parole is terminated, any employment authorization based on that parole is automatically revoked.

(3) *Termination on notice.* USCIS may terminate on notice or provide the entrepreneur or his or her spouse or children, as applicable, written notice of

its intent to terminate parole if USCIS believes that:

(i) The facts or information contained in the request for parole were not true and accurate;

(ii) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(iii) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity;

(iv) The alien otherwise violated the terms and conditions of parole; or

(v) Parole was erroneously granted.

(4) *Notice and decision.* A notice of intent to terminate issued under this paragraph should generally identify the grounds for termination of the parole and provide a period of up to 30 days for the alien's written rebuttal. The alien may submit additional evidence in support of his or her rebuttal, when applicable, and USCIS will consider all relevant evidence presented in deciding whether to terminate the alien's parole. Failure to timely respond to a notice of intent to terminate will result in termination of the parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole (if parole has not already been terminated), unless otherwise specified. Any further immigration and removal actions will be conducted in accordance with the Act and this chapter. The decision to terminate parole may not be appealed. USCIS will not consider a motion to reopen or reconsider a decision to terminate parole under this section. On its own motion, USCIS may reopen or reconsider a decision to terminate.

(l) *Increase of investment and revenue amount requirements.* The investment and revenue amounts in this section will be automatically adjusted every 3 years by the Consumer Price Index and posted on the USCIS Web site at *www.uscis.gov.* Investment and revenue amounts adjusted under this paragraph will apply to all applications filed on or after the beginning of the fiscal year for which the adjustment is made.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Section 274a.2 is amended by:
■ a. Revising paragraphs (b)(1)(v)(A)(*5*) and (b)(1)(v)(C)(*2*);
■ b. Removing paragraph (b)(1)(v)(C)(*3*); and
■ c. Redesignating paragraphs (b)(1)(v)(C)(*4*) through (*8*) as paragraphs (b)(1)(v)(C)(*3*) through (*7*).

The revisions read as follows:

### § 274a.2 Verification of identity and employment authorization.

\*　\*　\*　\*　\*

(b) \*　\*　\*
(1) \*　\*　\*
(v) \*　\*　\*
(A) \*　\*　\*

(*5*) In the case of an individual who is employment-authorized incident to status or parole with a specific employer, a foreign passport with an Arrival/Departure Record, Form I–94 (as defined in 8 CFR 1.4) or Form I–94A, bearing the same name as the passport and containing an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole;

\*　\*　\*　\*　\*

(C) \*　\*　\*

(*2*) Certification or report of birth issued by the Department of State, including Forms FS–545, DS–1350, FS–240;

\*　\*　\*　\*　\*

■ 7. Section 274a.12 is amended by:
■ a. Revising paragraph (b) introductory text;
■ b. Removing the word "or" at the end of paragraph (b)(24);
■ c. Removing the period at the end of paragraph (b)(25) and adding "; or" in its place;
■ d. Adding and reserving paragraphs (b)(26) through (36);
■ e. Adding paragraph (b)(37);
■ f. Revising paragraph (c)(11); and
■ g. Adding paragraph (c)(34).

The revisions and additions read as follows:

### § 274a.12 Classes of aliens authorized to accept employment.

\*　\*　\*　\*　\*

(b) *Aliens authorized for employment with a specific employer incident to*

*status or parole.* The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole or of their admission in, or subsequent change to, the designated nonimmigrant classification. An alien in one of these classes is not issued an employment authorization document by DHS:

\*　\*　\*　\*　\*

(37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240-day period and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

(c) \*　\*　\*

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

\*　\*　\*　\*　\*

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

\*　\*　\*　\*　\*

Jeh Charles Johnson,
*Secretary of Homeland Security.*
[FR Doc. 2017–00481 Filed 1–13–17; 8:45 am]
**BILLING CODE 9111–97–P**

required to be closed pursuant to 5 U.S.C. 552b(c)(1)(A) & (B) The second agenda item, a discussion of potential NSTAC study topics, will address areas of critical cybersecurity vulnerabilities and priorities for Government. Government officials will share data with NSTAC members on initiatives, assessments, and future security requirements across public and private sector networks. The information will include specific vulnerabilities within cyberspace that affect the United States' information and communication technology infrastructures and proposed mitigation strategies. Disclosure of this information to the public would provide criminals with an incentive to focus on these vulnerabilities to increase attacks on the Nation's critical infrastructure and communications networks. As disclosure of this portion of the meeting is likely to significantly frustrate implementation of proposed DHS actions, it is required to be closed pursuant to 5 U.S.C. 552b(c)(9)(B).

**Helen Jackson,**
*Designated Federal Officer for the NSTAC.*
[FR Doc. 2017–19793 Filed 9–15–17; 8:45 am]
**BILLING CODE 9110–9P–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Office of the Secretary**

**Notice of Availability for Memorandum on Rescission of Deferred Action for Childhood Arrivals**

**AGENCY:** Office of the Secretary, Department of Homeland Security.
**ACTION:** Notice of availability.

**SUMMARY:** In a memorandum dated September 5, 2017, the Acting Secretary of the Department of Homeland Security (DHS) rescinded the June 15, 2012 DHS memorandum entitled ''Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'' The September 5, 2017 memorandum is available on the DHS Web site at the following location: *https://www.dhs.gov/news/2017/09/05/ memorandum-rescission-daca.*

**SUPPLEMENTARY INFORMATION:** On June 15, 2012, then Secretary of Homeland Security Janet Napolitano issued a memorandum entitled ''Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'' The 2012 memorandum established the policy known as Deferred Action for Childhood Arrivals (DACA).

On September 5, 2017, Acting Secretary of Homeland Security Elaine Duke issued a memorandum entitled ''Rescission of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.' '' The September 5, 2017 memorandum rescinded the June 15, 2012 memorandum and directed DHS personnel to take all appropriate actions to execute a wind-down of the DACA program consistent with the parameters established in the memorandum. The September 5, 2017 memorandum is available on the DHS Web site at the following location: *https://www.dhs.gov/news/2017/09/05/ memorandum-rescission-daca.*

Dated: September 11, 2017.

**Elaine C. Duke,**
*Acting Secretary of Homeland Security.*
[FR Doc. 2017–19794 Filed 9–15–17; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[Docket No. DHS–2017–0038]**

**Privacy Act of 1974; System of Records**

**AGENCY:** Department of Homeland Security, Privacy Office.
**ACTION:** Notice of Modified Privacy Act System of Records.

**SUMMARY:** In accordance with the Privacy Act of 1974, the Department of Homeland Security (DHS) proposes to modify a current DHS system of records titled, ''Department of Homeland Security/U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection—001 Alien File, Index, and National File Tracking System of Records.'' This system of records contains information regarding transactions involving an individual as he or she passes through the U.S. immigration process, some of which may also be covered by separate Systems of Records Notices. DHS primarily maintains information relating to the adjudication of benefits, investigation of immigration violations, and enforcement actions in Alien Files (A-Files). Alien Files became the official file for all immigration records created or consolidated since April 1, 1944. Before A-Files, many individuals had more than one file with the agency. To streamline immigration recordkeeping, legacy Immigration and Naturalization Service issued each individual an Alien Number, allowing the agency to create a single file for each individual containing that individual's official immigration record. DHS also uses other immigration files to support administrative, fiscal, and legal needs.

**DATES:** Submit comments on or before October 18, 2017. This modified system will be effective upon publication. New or modified routine uses will become effective October 18, 2017.

**ADDRESSES:** You may submit comments, identified by docket number DHS–2017–0038 by one of the following methods:

• *Federal e-Rulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 202–343–4010.

• *Mail:* Jonathan R. Cantor, Acting Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528–0655.

**FOR FURTHER INFORMATION CONTACT:** For general questions, please contact: Donald K. Hawkins, (202) 272–8000, Privacy Officer, U.S. Citizenship and Immigration Services, 20 Massachusetts Avenue NW., Washington, DC 20529. For privacy questions, please contact: Jonathan R. Cantor, (202) 343–1717, Acting Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528–0655.

**SUPPLEMENTARY INFORMATION:** As DHS moves to conducting more immigration actions in an electronic environment and U.S. Citizenship and Immigration Services (USCIS) adjudicates more immigration benefits and requests for action in its USCIS Electronic Immigration System, DHS no longer considers the paper A-File as the sole repository and official record of information related to an individual's official immigration record. An individual's immigration history may be in the following materials and formats: (1) A paper A-File; (2) an electronic record in the Enterprise Document Management System or USCIS Electronic Immigration System; or (3) a combination of paper and electronic records and supporting documentation.

The Department of Homeland Security, therefore, is updating the ''Department of Homeland Security/U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection–001 Alien File, Index, and National File Tracking System of Records notice to: (1) Redefine which records constitute the official record of an individual's immigration history to include the following materials and formats: (a) The paper A-File, (b) an electronic record in the Enterprise Document Management System or U.S. Citizenship and Immigration Services Electronic Immigration System, or (c) a

combination of paper and electronic records and supporting documentation; (2) clarify that data originating from this system of records may be stored in a classified paper A-File or classified electronic network; (3) provide updated system locations; (4) update category of individuals covered by this System of Records Notice, to include individuals acting as legal guardians or designated representatives in immigration proceedings involving an individual who is physically or developmentally disabled or severely mentally impaired (when authorized); Civil Surgeons who conduct and certify medical examinations for immigration benefits; law enforcement officers who certify a benefit requestors cooperation in the investigation or prosecution of a criminal activity; and interpreters; (5) expand the categories of records to include the following: country of nationality; country of residence; the USCIS Online Account Number; social media handles, aliases, associated identifiable information, and search results; and the Department of Justice (DOJ), Executive Office for Immigration Review and Board of Immigration Appeals proceedings information; (6) add and describe the purpose for the USCIS Electronic Immigration System, Electronic Document Management System, and Microfilm Digitization Application System; (7) expand the data elements used to retrieve records; (8) update the parameters for retention and disposal of A–Files; (9) add the Microfilm Digitization Application System retention schedule; (10) update system manager to Associate Director, Immigration Records and Identity Services; (11) update record source categories to include publicly available information obtained from the internet, public records, public institutions, interviewees, commercial data providers, and information obtained and disclosed pursuant to information sharing agreements; and (12) update routine use E to comply with new policy contained in Office of Management and Budget Circular A–108. Additionally, this notice includes non-substantive changes to simplify the formatting and text of the previously published notice. The exemptions for the existing system of records notice will continue to be applicable for this updated system of records notice. This modified system of records notice will be included in the DHS's inventory of record systems.

## I. Background

In accordance with the Privacy Act of 1974, 5 U.S.C. 552a, the DHS U.S. Citizenship and Immigration Services

(USCIS), U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP) proposes to update and reissue a current DHS system of records titled, ''DHS/USCIS– ICE–CBP–001 Alien File, Index, and National File Tracking System of Records.''

DHS implements U.S. immigration law and policy through USCIS' processing and adjudication of applications and petitions submitted for citizenship, asylum, and other immigration benefits. USCIS also supports national security by preventing individuals from fraudulently obtaining immigration benefits and by denying applications from individuals who pose national security or public safety threats. DHS implements U.S. immigration policy and law through ICE's law enforcement activities and CBP's inspection and border security processes.

Legacy immigration and naturalization agencies previously collected and maintained information concerning all immigration and inspection interactions. Before Alien Files (A-Files), many individuals had more than one file with the agency requiring legacy personnel to search multiple records systems and indexes for all records pertaining to one individual. The former Immigration and Naturalization Services (INS) introduced A-Files and issued each individual an Alien Number (A-Number) allowing INS to create one file for each individual containing the entire agency's records for the subject. Legacy immigration case file records that were not consolidated into the A-File are still maintained since these records hold historical value and are shared with government agencies and members of the public who request this information for mission-related and genealogy purposes.

The Alien File, Index, and National File Tracking System of Records is the official record system that contains information regarding the transactions of an individual as he or she passes through the U.S. immigration process. Currently, A-Files may be maintained in two formats: Paper A-Files or electronic A-Files within the Enterprise Document Management System (EDMS). The official record will now take three possible forms: (1) Records contained within the paper A-File; (2) records contained within the electronic record from EDMS or USCIS Electronic Immigration System (USCIS ELIS); or (3) a combination of paper and electronic records and supporting documentation. The A-File serves as the official record of an individual's immigration history.

It is used in immigration proceedings before U.S. Department of Justice (DOJ) immigration judges and the Board of Immigration Appeals (BIA), and is the official record used in Federal court litigation and other official agency business transactions. USCIS is the custodian of the A-File and the documents contained within it that are derived from various systems belonging to USCIS, ICE, and CBP. All three components create, contribute information to, and use A-Files, hence this joint System of Records Notice (SORN).

A notice detailing this system of records was last published in the **Federal Register** on November 21, 2013, as the DHS/USCIS/ICE/CBP001 Alien File, Index, and National File Tracking System of Records, 78 FR 69864. DHS is updating the DHS/USCIS/ICE/CBP– 001 Alien File, Index, and National File Tracking System of Records to include the following substantive changes: (1) Redefine which records constitute the official record of an individual's immigration history to include the following materials and formats: (a) The paper A-File, (b) the electronic A-File, or (c) a combination of paper and electronic records and supporting documentation; (2) clarify that data originating from this system of records may be stored in a classified paper A-File or classified electronic network; (3) provide updated system locations; (4) update category of individuals covered by this SORN to include individual acting as legal guardians or designated representatives in immigration proceedings involving individuals who are physically or developmentally disabled or severely mentally impaired (when authorized); Civil Surgeons who conduct and certify medical examinations for immigration benefits; and law enforcement officers who certify a benefit requestors cooperation in the investigation or prosecution of a criminal activity; and interpreters; (5) expand the categories of records to include country of nationality; country of residence; the USCIS Online Account Number; social media handles, aliases, associated identifiable information, and search results; and information regarding the DOJ Executive Office for Immigration Review (EOIR) and BIA proceedings; (6) add and describe the purpose of the USCIS ELIS, EDMS, and Microfilm Digitization Application System (MiDAS); (7) expand data elements used to retrieve records; (8) update the parameters for retention and disposal of paper A-Files and electronic A-Files; (9) include the MiDAS retention schedule; (10) change system

manager to Associate Director, Immigration Records and Identity Services (IRIS); (11) update record source categories to include publicly available information obtained from the internet, public records, public institutions, interviews, commercial data providers, and information shared obtained through information sharing agreements; and (12) update routine use E to comply with Office of Management and Budget Circular A–108.

Consistent with DHS's information sharing mission, information stored in the DHS/USCIS/ICE/CBP–001 Alien File, Index, and National File Tracking System of Records may be shared with other DHS components that have a need to know the information to carry out their national security, law enforcement, immigration, intelligence, or other homeland security functions. In addition, information contained within the DHS/USCIS/ICE/CBP–001 Alien File, Index, and National File Tracking System of Records may be shared with appropriate Federal, State, local, tribal, territorial, foreign, or international government agencies consistent with the routine uses set forth in this system of records notice. The exemptions for the existing system of records notice will continue to be applicable for this system of records notice. Additionally, this modified system will be included in DHS's inventory of record systems.

## II. Privacy Act

The Privacy Act embodies fair information practice principles in a statutory framework governing the means by which Federal Government agencies collect, maintain, use, and disseminate individuals' records. The Privacy Act applies to information that is maintained in a "system of records." A "system of records" is a group of any records under the control of an agency from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual. In the Privacy Act, an individual is defined to encompass U.S. citizens and lawful permanent residents. Additionally, and similarly, the Judicial Redress Act (JRA) provides a statutory right to covered persons to make requests for access and amendment to covered records, as defined by the JRA, along with judicial review for denials of such requests. In addition, the JRA prohibits disclosures of covered records, except as otherwise permitted by the Privacy Act.

Below is the description of the DHS/USCIS/ICE/CBP–001 Alien File, Index, and National File Tracking System of Records. In accordance with 5 U.S.C.

552a(r), DHS has provided a report of this system of records to the Office of Management and Budget and to Congress.

### SYSTEM NAME AND NUMBER:

Department of Homeland Security (DHS) U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP)–001 Alien File, Index, and National File Tracking System of Records.

### SECURITY CLASSIFICATION:

Unclassified, sensitive, for official use only, and classified. The data may be retained in classified paper A-File or on classified networks. The nature and character of the underlying classification of these records will not change unless it is combined with classified information.

### SYSTEM LOCATION:

Records are maintained in (1) paper A-Files; (2) electronic A-Files in EDMS and USCIS ELIS; (3) Central Index System (CIS); (4) MiDAS; and (5) National File Tracking System (NFTS). Other applications, as Enterprise Citizenship and Immigrations Services Centralized Operational Repository (eCISCOR) and the Person Centric Query Service (PCQS), may retrieve information from the aforementioned applications.

*Paper A-Files:* Paper A-Files are primarily located at the National Records Center in Lee's Summit, Missouri and component field offices. Paper A-Files may also be located at Headquarters, Regional, District, and other USCIS File Control Offices (FCO) throughout the United States and foreign countries as detailed on the agency's Web site, *http://www.uscis.gov.* A-Files may also be located at ICE and CBP offices and facilities.

*EDMS:* EDMS contains electronic A-Files.

*USCIS ELIS:* USCIS ELIS contains electronic A-Files. USCIS ELIS is an online, electronic account and case management system that stores information submitted or integrated into the system for the processing of specific applications, petitions, or requests. Submissions may originate in an electronic format or be converted to an electronic format from paper and include forms, supporting documentation associated with each submission notices of agency action (*e.g.,* appointment notices, requests for evidence or originals, notices of intent to deny, or withdrawal notice and other final agency decisions) on a specific application, petition, or request,

whether filed directly online or received by USCIS in a paper format and subsequently scanned for integration into the USCIS ELIS. USCIS ELIS also stores the USCIS Online Account Number and biographic information about the individual filing a request for an immigration decision or agency action that can be used to retrieve information about other immigration requests that may have been filed by the individual.

*CIS:* CIS serves as a DHS-wide index of key information for A-Files (whether paper or electronic). CIS contains information on individuals who interact with DHS. The system contains biographic information on those individuals which can be used to retrieve additional information from other systems. However, A-Files are not contained in CIS.

*MiDAS:* MiDAS contains digitized copies of immigration-related records that were created between 1893 and 1975.

*NFTS:* NFTS has the location information for all A-File records (whether paper or electronic). NFTS allows DHS to track and log the movement of paper A-Files in a centralized database, and provide timely and accurate access to the immigration case file location. This system facilitates USCIS' ability to efficiently manage and streamline access to immigration files under its control.

The databases maintaining the above information are located within the DHS data center in the Washington, DC metropolitan area as well as throughout the country. Access to these electronic systems is possible at USCIS sites at Headquarters and in the field offices throughout the United States, at appropriate facilities under the jurisdiction of DHS, and other locations at which officers of DHS component agencies may be posted or operate to facilitate DHS's homeland security mission.

### SYSTEM MANAGER(S):

Associate Director, Immigration Records and Identity Services, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529.

### AUTHORITY FOR MAINTENANCE OF THE SYSTEM:

Authority for maintaining this system is in Sections 103 and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103 and 1360), and the regulations issued pursuant thereto; and Section 451 of the Homeland Security Act of 2002 (Pub. L. 107–296), codified at 6 U.S.C. 271.

AR2022_200327

**PURPOSE(S) OF THE SYSTEM:**

The purpose of this system of records is to facilitate administration of benefits and enforcement of provisions under the INA and related immigration statutes. A-Files (whether paper or electronic), immigration case files, CIS, MiDAS, and NFTS are used primarily by DHS employees for immigration processing and adjudication, protection of national security, and administering and enforcing immigration and nationality laws and related regulations and policy. These records also assist DHS with detecting violations of immigration and nationality laws; supporting the referral of such violations for prosecution or other appropriate enforcement action; supporting law enforcement efforts and inspection processes at the U.S. borders; as well as to carry out DHS enforcement, immigration, intelligence, and or other homeland security functions.

The purpose of the A-File is to document and maintain the official record of an individual's immigration applications, petitions, and requests, as well as enforcement transactions as he or she passes through the U.S. immigration process. The official records in the A-Files consist of paper and electronic records of the individual's transactions through the immigration process including records of immigration benefit requests and requests for agency action filed with USCIS, but does not include all case processing and decisional data.

The purpose of the EDMS is to store the A-File electronically and to share the A-File more efficiently within DHS and with external agencies.

The purpose of USCIS ELIS is to maintain the A-File of certain paper- and electronically-filed benefit request forms with USCIS, in addition its electronic case processing, adjudication, and management functions. The associated information and data for cases maintained in USCIS ELIS for case processing, adjudication, and management functions are covered under other USCIS SORNs.

The purpose of CIS is to maintain a repository of electronic data that summarizes the history of an immigrant or non-immigrant in the adjudication process. In addition, CIS maintains information about individuals of interest to the U.S. Government for investigative purposes. Information contained within CIS is used for immigration benefit determination and for immigration law enforcement operations by USCIS, ICE, and CBP.

The purpose of MiDAS is to maintain a repository of historical immigration case files for use by government agencies for mission-related purposes such as assisting in the determination to grant or deny a government benefit or to conduct law enforcement or other investigations. Furthermore, USCIS makes records of deceased subjects available to members of the public who request them for genealogy and other historical research purposes.

The purpose of NFTS is to account for the specific location of immigration files, and to track the request and transfer of immigration files.

**CATEGORIES OF INDIVIDUALS COVERED BY THE SYSTEM:**

• Lawful permanent residents;
• Naturalized U.S. citizens;
• Individuals when petitioning for benefits under the INA, as amended, on behalf of another individual;
• Individuals acting as legal guardians or designated representatives in immigration proceedings involving an individual who has a physical or developmental disability or mental impairment (as authorized under the INA);
• Individuals who receive benefits under the INA;
• Individuals who are subject to the enforcement provisions of the INA;
• Individuals who are subject to the INA and:
○ Are under investigation by DHS for possible national security threats or threats to the public safety,
○ were investigated by DHS in the past,
○ are suspected of violating immigration-related criminal or immigration-related civil provisions of treaties, statutes, regulations, Executive Orders, and Presidential Proclamations administered by DHS, or
○ are witnesses and informants having knowledge of such violations;
• Relatives and associates of any of the individuals listed above who are subject to the INA;
• Individuals who have renounced their U.S. citizenship;
• Civil Surgeons who are required to conduct and certify medical examinations for immigration benefits; and law enforcement officers who certify a benefit requestor's cooperation in the investigation or prosecution of a criminal activity;
• Preparers assisting an individual seeking an immigration benefit or agency action under the INA;
• Interpreters assisting an individual seeking an immigration benefit or agency action under the INA;
• Attorneys or representatives recognized by USCIS or accredited by the BIA; or
• Law enforcement officers who certify a benefit requestor's cooperation in the investigation or prosecution of a criminal activity.

**Note:** Individuals may fall within one or more of these categories.

**CATEGORIES OF RECORDS IN THE SYSTEM:**

A. A-Files contain official record material about each individual for whom DHS has created a record under the INA such as: Naturalization certificates; various documents and attachments (*e.g.*, birth and marriage certificates); applications, petitions, and requests for immigration determinations or agency action under the immigration and nationality laws; reports of arrests and investigations; statements; other reports; records of proceedings before or filings made with the U.S. immigration courts and any administrative or federal district court or court of appeal; correspondence; and memoranda. Specific data elements may include:

• A-Numbers;
• Receipt file number(s);
• Full name and any aliases used;
• Physical and mailing addresses (to include U.S. and foreign);
• Phone numbers and email addresses;
• Social Security number (SSN);
• Date of birth;
• Place of birth (city, state, and country);
• Country of citizenship;
• Country of nationality;
• Country of residence;
• Gender;
• Physical characteristics (height, weight, race, eye and hair color, photographs, fingerprints);
• Government-issued identification information (*i.e.*, passport, driver's license):
  ○ Document type;
  ○ Issuing organization;
  ○ Document number; and
  ○ Expiration date;
• Military membership and/or status;
• Arrival/Departure information (record number, expiration date, class of admission, etc.);
• Federal Bureau of Investigation (FBI) Identification Number/Universal Control Number;
• Fingerprint Identification Number;
• Immigration enforcement history, including, but not limited to, arrests and charges, immigration proceedings and appeals, and dispositions including removals or voluntary departures;
• Immigration status;
• Family history;
• Travel history;
• Education history;
• Employment history;
• Criminal history;
• Professional accreditation information;

- Medical information;
- Information regarding the status of Department of Justice (DOJ), Executive Office of Immigration Review (EOIR) and (BIA) proceedings, if applicable;
- Specific benefit eligibility information as required by the benefit being sought;
- Social media handles and aliases, associated identifiable information, and search results; and
- Cassette/audio tapes, audio-visual/videotapes, CDs, DVDs, or transcripts of immigration interviews.

B. CIS contains information on those individuals who during their interactions with DHS have been assigned an A-Number. The system contains biographic information on those individuals, allowing DHS employees to quickly review the individual's immigration status. The information in the system can then be used to retrieve additional information on the individual from other systems. The information in the system can be used to request the paper A-File from the USCIS FCO that has custody of the A-File. Specific data elements may include:

- A-Number(s);
- Full name and any aliases used;
- SSN;
- Date of birth;
- Place of birth (city, state, and country);
- Country of citizenship;
- Country of nationality;
- Gender;
- Government issued identification information (*i.e.*, passport, driver's license):
  - Document type;
  - Issuing organization;
  - Document number;
  - Expiration date;
  - Arrival/Departure information (record number, expiration date, class of admission, etc.);
- Immigration status;
- Father and Mother's first name;
- FBI Identification/Identification Universal Control Number;
- Fingerprint Identification Number;
- Immigration enforcement history, including arrests and charges, immigration proceedings and appeals, and dispositions including removals or voluntary departures; and
- NFTS file location and status information.

C. EDMS contains official record material about each individual for whom DHS has created a record pursuant to the INA and the same information as contained in the as a paper A-File except for material that cannot be scanned from the paper A-File (*e.g.*, cassette/audio tapes, audio-visual/video tapes, CDs, or DVDs).

D. USCIS ELIS contains official record information and material used to determine an outcome on an immigration application, petition, or request or request agency action, such as supporting documentation, and notices of agency action on the specific immigration request. USCIS ELIS also stores the USCIS Online Account Number biographic information about the individual seeking an immigration benefit or requesting agency action that can be used to retrieve information about other requests filed by the individual, and the electronic copy of the naturalization or certificate of citizenship. Specific data elements may include, but are not limited to:

- Full Name;
- Aliases;
- Physical and mailing addresses;
- A-Number;
- USCIS Online Account Number;
- SSN;
- Date of birth and/or death;
- Country of citizenship;
- Country of nationality;
- Country of residence;
- Place of birth;
- Gender;
- Marital status;
- Military membership or status;
- Phone and fax numbers (including mobile phone numbers);
- Email address;
- Immigration status;
- Biometric information (*e.g.*, fingerprints, photographs, signature) and other information used to conduct background and security checks;
- Physical description (*e.g.*, height, weight, eye color, hair color, race, ethnicity, identifying marks like tattoos or birthmarks);
- Government issued identification information (*i.e.*, passport, driver's license):
  - Document type;
  - Issuing organization;
  - Document number; and
  - Expiration date;
- Immigration benefit type and/or agency action requested (*e.g.*, deferred action);
- Supporting documentation as necessary (*e.g.* birth, marriage, and divorce certificates; licenses; academic diplomas and transcripts; appeals, requests for rehearing, and motions to reopen or reconsideration; explanatory statements; and unsolicited information submitted voluntarily by the individual seeking an immigration benefit or requesting agency action or family members in support of the request);
- Notices and communications, including:
  - Requests for evidence;
  - Notices of intent to deny, fine, or terminate; and

- Proofs of benefit (*e.g.*, Employment Authorization Card, Permanent Resident Card);
- Signature;
- Fee payment information (*e.g.*, credit card number, *Pay.gov* Payment Tracking Number);
- Audio-visual recordings, including interviews and naturalization ceremonies;
- Travel history;
- Education history;
- Work history;
- Records regarding organization membership or affiliation;
- Family relationships (*e.g.*, parent, spouse, sibling, child, other dependents);
- Information regarding the status of DOJ, EOIR and BIA proceedings, if applicable;
- Case processing information such as the date an immigration request was filed or received by USCIS; status of such a request; location of record; other control number when applicable; and fee receipt data;
- Representative information, including:
  - Name;
  - Law Firm/recognized organization;
  - Physical and mailing addresses;
  - Phone and fax numbers;
  - Email address;
  - Attorney Bar Card Number or equivalent;
  - Bar membership;
  - BIA representative accreditation authorization and expiration dates;
  - Law practice restriction(s) explanation; and
  - Signature.
- Preparer and Interpreter information, including:
  - Full Name;
  - Business or Organization name;
  - Physical and mailing addresses;
  - Phone and fax numbers;
  - Email address; and
  - Signature.

E. NFTS contains the location of the A-File whether paper or electronic. Specific data elements include:

- A-Number;
- Receipt File Number;
- Primary immigration file tracking number (*e.g.*, A-Number, Receipt File Number, Certificate Number (C-Number), and Temporary Number (T-Number));
- Location of the paper A-File and Receipt File within the USCIS FCO, as well as the history of who has maintained the paper A-File, including the component, section, and employee; and
- Name of the USCIS FCO that has jurisdiction over a case maintained in USCIS ELIS and any transfer of jurisdiction to another USCIS office.

AR2022_200329

F. MiDAS is an online interactive application system that provides an automated means for searching an index to legacy immigrant records opened or indexed prior to 1975. The MiDAS Search Engine includes the Flexoline Index, documenting the issuance of A–Numbers to individuals between August 1940 and 1948, as well as a card index to physical A-Files opened between April 1, 1944 and 1975. MiDAS index data may be used to create or update a CIS record of an A-Number issued or A-File opened prior to 1975. Specific A-File index data elements may include, but are not limited to:

• A-Number;
• C-Number;
• Full name;
• Date of birth; and
• Place of birth (city, state, and country).

**RECORD SOURCE CATEGORIES:**

Basic information contained in DHS records is supplied by individuals on Department of State (DOS) and DHS applications and forms. Other information comes from publicly available information obtained from the Internet, public records, public institutions, interviewees, commercial data aggregators, inquiries or complaints from members of the general public and members of Congress, referrals of inquiries or complaints directed to the President or Secretary of Homeland Security, information shared through information sharing agreements, reports of investigations, sworn statements, correspondence, official reports, memoranda, and written referrals from other entities, including federal, state, and local governments, various courts and regulatory agencies, foreign government agencies, and international organizations.

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND PURPOSES OF SUCH USES:**

Information in this system of records contains information relating to persons who have pending or approved benefit requests for special protected classes and should not be disclosed pursuant to a routine use unless disclosure is otherwise permissible under the confidentiality statutes, regulations, or policies applicable to that information. For example, information relating to persons who have pending or approved benefit requests for protection under the Violence Against Women Act, Seasonal Agricultural Worker or Legalization claims, the Temporary Protected Status of an individual, and information relating to nonimmigrant visas protected under special confidentiality provisions

should not be disclosed pursuant to a routine use unless disclosure is otherwise permissible under the confidentiality statutes, regulations, or policies applicable to that information. These confidentiality provisions do not prevent DHS from disclosing information to the DOJ and Offices of the United States Attorney as part of an ongoing criminal or civil investigation.

In addition to those disclosures generally permitted under 5 U.S.C. 552a(b) of the Privacy Act, all or a portion of the records or information contained in this system may be disclosed outside DHS as a routine use pursuant to 5 U.S.C. 552a(b)(3) as follows:

A. To DOJ, including Offices of the U.S. Attorneys, or other federal agency conducting litigation or in proceedings before any court, adjudicative, or administrative body, when it is relevant or necessary to the litigation and one of the following is a party to the litigation or has an interest in such litigation:

1. DHS or any component thereof;
2. Any employee or former employee of DHS in his/her official capacity;
3. Any employee or former employee of DHS in his/her individual capacity when DOJ or DHS has agreed to represent the employee; or
4. The United States or any agency thereof.

B. To a congressional office from the record of an individual in response to an inquiry from that congressional office made at the request of the individual to whom the record pertains.

C. To the National Archives and Records Administration (NARA) or General Services Administration pursuant to records management inspections being conducted under the authority of 44 U.S.C. 2904 and 2906.

D. To an agency or organization for the purpose of performing audit or oversight operations as authorized by law, but only such information as is necessary and relevant to such audit or oversight function.

E. To appropriate agencies, entities, and persons when:

1. DHS determines that information from this system of records is reasonably necessary and otherwise compatible with the purpose of collection to assist another federal recipient agency or entity in (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach; or

2. DHS suspects or has confirmed that there has been a breach of this system of records; and (a) DHS has determined that as a result of the suspected or confirmed breach, there is a risk of harm to individuals, harm to DHS (including its information systems, programs, and operations), the Federal Government, or national security; and (b) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with DHS's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

F. To contractors and their agents, grantees, experts, consultants, and others performing or working on a contract, service, grant, cooperative agreement, or other assignment for DHS, when necessary to accomplish an agency function related to this system of records. Individuals provided information under this routine use are subject to the same Privacy Act requirements and limitations on disclosure as are applicable to DHS officers and employees.

G. To an appropriate Federal, State, tribal, local, international, or foreign law enforcement agency or other appropriate authority charged with investigating or prosecuting a violation or enforcing or implementing a law, rule, regulation, or order, when a record, either on its face or in conjunction with other information, indicates a violation or potential violation of law, which includes criminal, civil, or regulatory violations and such disclosure is proper and consistent with the official duties of the person making the disclosure.

H. To appropriate Federal, State, tribal, local, or foreign governmental agencies or multilateral governmental organizations responsible for investigating or prosecuting the violations of, or for enforcing or implementing, a statute, rule, regulation, order, or license, when DHS believes the information would assist in enforcing applicable civil or criminal laws.

I. To third parties during the course of a law enforcement investigation to the extent necessary to obtain information pertinent to the investigation.

J. To an organization or person in either the public or private sector, either foreign or domestic, when there is a reason to believe that the recipient is or could become the target of a particular terrorist activity or conspiracy, or when the information is relevant to the protection of life, property, or other vital interests of a person.

K. To clerks and judges of courts exercising naturalization jurisdiction for

the purpose of granting naturalization and administering naturalization oaths, and to enable such courts to determine eligibility for naturalization or grounds for revocation of naturalization.

L. To courts, magistrates, administrative tribunals, opposing counsel, parties, and witnesses, in the course of immigration, civil, or criminal proceedings before a court or adjudicative body when it is necessary or relevant to the litigation or proceeding and the following is a party to the proceeding or has an interest in the proceeding:

1. DHS or any component thereof; or
2. Any employee of DHS in his or her official capacity; or
3. Any employee of DHS in his or her individual capacity when the DOJ or DHS has agreed to represent the employee; or
4. The United States or any agency thereof.

M. To an attorney or representative (as defined in 8 CFR 1.2) who is acting on behalf of an individual covered by this system of records in connection with any proceeding before USCIS, ICE, or CBP or the DOJ EOIR, as required by law or as deemed necessary in the discretion of the Department.

N. To DOJ (including Offices of the United States Attorneys) or other federal agency conducting litigation or in proceedings before any court, adjudicative, or administrative body, when necessary to assist in the development of such agency's legal and/or policy position.

O. To DOS in the processing of petitions or applications for benefits under the INA, and all other immigration and nationality laws including treaties and reciprocal agreements; or when DOS requires information to consider and/or provide an informed response to a request for information from a foreign, international, or intergovernmental agency, authority, or organization about an alien or an enforcement operation with transnational implications.

P. To appropriate Federal, State, local, tribal, territorial, or foreign governments, as well as to other individuals and organizations during the course of an investigation by DHS or the processing of a matter under DHS's jurisdiction, or during a proceeding within the purview of the immigration and nationality laws, when DHS deems that such disclosure is necessary to carry out its functions and statutory mandates.

Q. To an appropriate Federal, State, local, tribal, territorial, or foreign government agency or organization, or international organization, lawfully

engaged in collecting law enforcement intelligence, whether civil or criminal, or charged with investigating, prosecuting, enforcing, or implementing civil or criminal laws, related rules, regulations, or orders, to enable these entities to carry out their law enforcement responsibilities, including the collection of law enforcement intelligence and the disclosure is appropriate to the proper performance of the official duties of the person receiving the information.

R. To an appropriate Federal, State, local, tribal, territorial, foreign, or international agency, if the information is relevant to a requesting agency's decision concerning the hiring or retention of an individual, or issuance of a security clearance, license, contract, grant, or other benefit, or if the information is relevant to a DHS decision concerning the hiring or retention of an employee, the issuance of a security clearance, license, contract, grant, or other benefit.

S. To an appropriate Federal, State, local, tribal, territorial, foreign, or international agency, if DHS determines: (1) The information is relevant and necessary to that agency's decision concerning the hiring or retention of an individual, or issuance of a security clearance, license, contract, grant, or other benefit; and (2) failure to disclose the information is likely to create a substantial risk to government facilities, equipment, or personnel; sensitive information; critical infrastructure; or public safety.

T. To appropriate Federal, State, local, tribal, or foreign governmental agencies or multilateral governmental organizations for the purpose of protecting the vital interests of a data subject or other persons, including to assist such agencies or organizations in preventing exposure to, or transmission of a communicable or quarantinable disease or to combat other significant public health threats; appropriate notice will be provided of any identified health threat or risk.

U. To an individual's current employer to the extent necessary to determine employment eligibility or to a prospective employer or government agency to verify whether an individual is eligible for a government-issued credential that is a condition of employment.

V. To a former employee of DHS, in accordance with applicable regulations, for purposes of: Responding to an official inquiry by a federal, state, or local government entity or professional licensing authority; or facilitating

communications with a former employee that may be necessary for personnel-related or other official purposes when DHS requires information or consultation assistance from the former employee regarding a matter within that person's former area of responsibility.

W. To the Office of Management and Budget (OMB) in connection with the review of private relief legislation as set forth in OMB Circular No. A–19 at any stage of the legislative coordination and clearance process as set forth in the Circular.

X. To the U.S. Senate Committee on the Judiciary or the U.S. House of Representatives Committee on the Judiciary when necessary to inform members of Congress about an alien who is being considered for private immigration relief.

Y. To a Federal, State, tribal, or local government agency and/or to domestic courts to assist such agencies in collecting the repayment of loans, or fraudulently or erroneously secured benefits, grants, or other debts owed to them or to the U.S. Government, or to obtain information that may assist DHS in collecting debts owed to the U.S. Government.

Z. To an individual or entity seeking to post or arrange, or who has already posted or arranged, an immigration bond for an alien, to aid the individual or entity in (1) identifying the location of the alien; (2) posting the bond; (3) obtaining payments related to the bond; or (4) conducting other administrative or financial management activities related to the bond.

AA. To a coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

BB. Consistent with the requirements of the INA, to the Department of Health and Human Services (HHS), the Centers for Disease Control and Prevention (CDC), or to any state or local health authorities, to:

1. Provide proper medical oversight of DHS-designated Civil Surgeons who perform medical examinations of both arriving aliens and of those requesting status as lawful permanent residents; and

2. Ensure that all health issues potentially affecting public health and safety in the United States are being or have been, adequately addressed.

CC. To a Federal, State, local, tribal, or territorial government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.

AR2022_200331

DD. To the Social Security Administration (SSA) for the purpose of issuing a SSN and card to an alien who has made a request for a SSN as part of the immigration process and in accordance with any related agreements in effect between the SSA, DHS, and DOS entered into pursuant to 20 CFR 422.103(b)(3), 422.103(c)(3), and 422.106(a), or other relevant laws and regulations.

EE. To Federal and foreign government intelligence or counterterrorism agencies or components when DHS becomes aware of an indication of a threat or potential threat to national or international security, or when such use is to conduct national intelligence and security investigations or assist in anti-terrorism efforts.

FF. To third parties to facilitate placement or release of an individual (*e.g.*, at a group home, homeless shelter) who has been or is about to be released from DHS custody, but only such information that is relevant and necessary to arrange housing or continuing medical care for the individual.

GG. To an appropriate domestic government agency or other appropriate authority for the purpose of providing information about an individual who has been or is about to be released from DHS custody who, due to a condition such as mental illness, may pose a health or safety risk to himself/herself or to the community. DHS will only disclose information about the individual that is relevant to the health or safety risk they may pose and/or the means to mitigate that risk (*e.g.*, the individual's need to remain on certain medication for a serious mental health condition).

HH. To foreign governments for the purpose of coordinating and conducting the removal of individuals to other nations under the INA; and to international, foreign, and intergovernmental agencies, authorities, and organizations in accordance with law and formal or informal international arrangements.

II. To a Federal, State, local, territorial, tribal, international, or foreign criminal, civil, or regulatory law enforcement authority when the information is necessary for collaboration, coordination, and de-confliction of investigative matters, prosecutions, and/or other law enforcement actions to avoid duplicative or disruptive efforts and to ensure the safety of law enforcement officers who may be working on related law enforcement matters.

JJ. To the DOJ Federal Bureau of Prisons and other Federal, State, local, territorial, tribal, and foreign law enforcement or custodial agencies for the purpose of placing an immigration detainer on an individual in that agency's custody, or to facilitate the transfer of custody of an individual from DHS to the other agency. This will include the transfer of information about unaccompanied minor children to HHS to facilitate the custodial transfer of such children from DHS to HHS.

KK. To Federal, State, local, tribal, territorial, or foreign governmental or quasi-governmental agencies or courts to confirm the location, custodial status, removal, or voluntary departure of an alien from the United States, in order to facilitate the recipients' exercise of responsibilities pertaining to the custody, care, or legal rights (including issuance of a U.S. passport) of the removed individual's minor children, or the adjudication or collection of child support payments or other debts owed by the removed individual.

LL. To a Federal, State, tribal, territorial, local, international, or foreign government agency or multilateral governmental organization for the purpose of consulting with that agency or entity: (1) To assist in making a determination regarding redress for an individual in connection with the operations of a DHS component or program; (2) for the purpose of verifying the identity of an individual seeking redress in connection with the operations of a DHS component or program; or (3) for the purpose of verifying the accuracy of information submitted by an individual who has requested such redress on behalf of another individual.

MM. To family members, guardians, committees, friends, or other agents identified by law or regulation to receive notification, decisions, and other papers as provided in 8 CFR 103.8 from DHS or EOIR following verification of a familial or agency relationship with an alien when DHS is aware of indicia of incompetency or when an immigration judge determines an alien is mentally incompetent.

NN. To the news media and the public, with the approval of the Chief Privacy Officer in consultation with counsel, when there exists a legitimate public interest in the disclosure of the information or when disclosure is necessary to preserve confidence in the integrity of DHS or is necessary to demonstrate the accountability of DHS's officers, employees, or individuals covered by the system, except to the extent the Chief Privacy Officer determines that release of the specific information in the context of a particular case would constitute a clearly unwarranted invasion of personal privacy.

OO. To domestic governmental agencies seeking to determine the immigration status of persons who have applied to purchase/obtain a firearm in the United States, pursuant to checks conducted on such persons under the Brady Handgun Violence Prevention Act or other applicable laws.

**POLICIES AND PRACTICES FOR STORAGE OF RECORDS:**

Records in this system are stored electronically or on paper in secure facilities in a locked drawer behind a locked door. The records may be stored on magnetic disc, tape, and digital media.

**POLICIES AND PRACTICES FOR RETRIEVAL OF RECORDS:**

DHS/USCIS retrieves records by searching in CIS using the following data alone or in any combination:
• A-Number;
• Full name;
• Alias;
• Sounds-like name with or without date of birth;
• Certificate of Citizenship or Naturalization Certificate number;
• Driver's License number;
• FBI Identification/Universal Control Number;
• Fingerprint Identification Number;
• I–94 admission number;
• Passport number;
• SSN; or
• Travel Document number.
DHS/USCIS retrieves records by searching electronic A–Files in EDMS by any of the following fields alone or in any combination:
• A-Number;
• Last name;
• First name;
• Middle name;
• Aliases;
• Date of birth;
• Country of birth;
• Gender; and
• Through a full text-based search of records contained in the electronic A–File (based on optical character recognition of the scanned images).
DHS/USCIS retrieves records by searching in USCIS ELIS using the following data alone or in any combination:
• Full Name;
• Aliases;
• A-Number;
• USCIS Online Account Number;
• Date of birth;
• Immigration benefit type and/or agency action requested (*e.g.,* deferred action);

- Fee receipt data;
- Date benefit request was filed;
- Date benefit request was received;
- Representative name;
- Preparer name; and
- Interpreter name.

DHS/USCIS retrieves the location of A-Files, whether paper or electronic, by searching in NFTS using the following data:

- A-Number;
- USCIS Online Account Number; or
- Receipt File Number.

DHS/USCIS retrieves genealogy records and requests in MiDAS by searching the following data alone or in any combination:

- Requestor's first name;
- Requestor's last name;
- Requestor's Case and/or Control Number;
- Record subject's A–Number or immigration case file number;
- Record subject's first name;
- Record subject's last name; and
- Record subject's alias.

**POLICIES AND PRACTICES FOR RETENTION AND DISPOSAL OF RECORDS:**

The official A-File record may take three possible forms: (1) Records contained within the paper A-File; (2) records contained within the electronic record from EDMS or USCIS ELIS; or (3) a combination of paper and electronic records and supporting documentation. A-File records are maintained in accordance with N1–566–08–11. DHS/USCIS transfers A-Files to the custody of NARA 100 years after the individual's date of birth.

CIS records are maintained in accordance with N1–566–10–01. CIS is an internal DHS-mission critical system that contains records that serve as a finding aid to agency case files. Records in CIS are permanently retained because they are the index of the A-File, summarize the history of an immigrant in the adjudication process, and identify the A-File location(s).

NFTS records are maintained in accordance with N1–566–06–01. NFTS records are temporary and deleted when they are no longer needed for agency business. NFTS records associated with an A-File will be retained on a permanent basis even after the A-File has been retired to NARA to retain accurate recordkeeping. Other immigration case files with a shorter retention period will have the associated NFTS record destroyed or deleted once the file has been destroyed.

MiDAS information (data and electronic images) pertaining to correspondence with the public and government requestor is retained and disposed every six years in accordance

with the NARA General Records Schedules 4.2 and 14. The immigration case files contained in MiDAS are retained permanently. Records are transferred to NARA after 100 years after the last completed action.

Records replicated on the unclassified and classified networks for analysis and vetting will follow the same retention schedule.

**ADMINISTRATIVE, TECHNICAL, AND PHYSICAL SAFEGUARDS:**

DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored. Access to the computer system containing the records in this system is limited to those individuals who have a need to know the information for the performance of their official duties and who have appropriate clearances or permissions.

**RECORD ACCESS PROCEDURES:**

The Secretary of Homeland Security has exempted this system from the notification, access, and amendment procedures of the Privacy Act, and those of the Judicial Redress Act (JRA) if applicable, because it is a law enforcement system. However, DHS/USCIS will consider individual requests to determine whether or not information may be released. Thus, individuals seeking access to and notification of any record contained in this system of records, or seeking to contest its content, may submit a request in writing to the Chief Privacy Officer and USCIS Freedom of Information Act (FOIA) Officer, whose contact information can be found at *http://www.dhs.gov/foia* under "Contacts Information." If an individual believes more than one component maintains Privacy Act records concerning him or her, the individual may submit the request to the Chief Privacy Officer and Chief Freedom of Information Act Officer, Department of Homeland Security, Washington, DC 20528–0655. Even if neither the Privacy Act nor the Judicial Redress Act provide a right of access, certain records about you may be available under the FOIA.

When seeking records about yourself from this system of records or any other Departmental system of records, your request must conform with the Privacy Act regulations set forth in 6 CFR part 5. You must first verify your identity, meaning that you must provide your full name, current address, and date and place of birth. You must sign your

request, and your signature must either be notarized or submitted under 28 U.S.C. 1746, a law that permits statements to be made under penalty of perjury as a substitute for notarization. While no specific form is required, you may obtain forms for this purpose from the Chief Privacy Officer and Chief Freedom of Information Act Officer, *http://www.dhs.gov/foia* or 1–866–431–0486. In addition, you should:

- Explain why you believe the Department would have information on you;
- Identify which component(s) of the Department you believe may have the information about you;
- Specify when you believe the records would have been created; and
- Provide any other information that will help the FOIA staff determine which DHS component agency may have responsive records.

If your request is seeking records pertaining to another living individual, you must include a statement from that individual certifying his/her agreement for you to access his/her records.

Without the above information, the component(s) may not be able to conduct an effective search, and your request may be denied due to lack of specificity or lack of compliance with applicable regulations.

**CONTESTING RECORD PROCEDURES:**

For records covered by the Privacy Act or covered JRA records, see "access procedures" above.

**NOTIFICATION PROCEDURES:**

See "Record Access procedure."

**EXEMPTIONS PROMULGATED FOR THE SYSTEM:**

The Secretary of Homeland Security has exempted this system from the following provisions of the Privacy Act pursuant to 5 U.S.C. 552a(j)(2): 5 U.S.C. 552a(c)(3), (c)(4), (d), (e)(1), (e)(2), (e)(3), (e)(4)(G), (e)(4)(H), (e)(4)(I), (e)(5), (e)(8), (e)(12), (f), (g)(1), and (h). Additionally, the Secretary of Homeland Security has exempted this system from the following provisions of the Privacy Act pursuant to 5 U.S.C. 552a(k)(1) and (k)(2): 5 U.S.C. 552a(c)(3), (d), (e)(1), (e)(4)(G), (e)(4)(H), (e)(4)(I), and (f).

When this system receives a record from another system examined in that source system under 5 U.S.C. 552a(j)(2), DHS will claim the same exemptions for those records that are claimed for the original primary systems of records from which they originated and claims any additional exemptions set forth here.

**HISTORY:**

DHS/USCIS/ICE/CBP–001 Alien File, Index, and National File Tracking

System of Records, 78 FR 69864 (Nov. 21, 2013); Alien File, Index, and National File Tracking SORN, 76 FR 34233l (Jun. 13, 2011); Alien File (A-File) and Central Index System (CIS) Systems of Records 78 FR 1755 (Jan. 16, 2007).

**Jonathan R. Cantor,**

*Acting Chief Privacy Officer, Department of Homeland Security.*

[FR Doc. 2017–19365 Filed 9–15–17; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Immigration and Customs Enforcement

**[OMB Control Number 1653–0038]**

### Agency Information Collection Activities: Student and Exchange Visitor Information System (SEVIS); Extension, Without Change, of a Currently Approved Collection

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**NOTICE:** 60-day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The information collection is published in the **Federal Register** to obtain comments from the public and affected agencies.

**DATES:** Comments are encouraged and will be accepted for sixty days until November 17, 2017.

**ADDRESSES:** Written comments and suggestions regarding items contained in this notice and especially with regard to the estimated public burden and associated response time should be directed the Department of Homeland Security (DHS), PRA Clearance Officer, U.S. Immigrations and Customs Enforcement, 801 I Street NW., Mailstop 5800, Washington, DC 20536–5800.

**SUPPLEMENTARY INFORMATION:** Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

### Overview of This Information Collection

(1) *Type of Information Collection:* Extension, without change, of a currently approved information collection.

(2) *Title of the Form/Collection:* Student and Exchange Visitor Information System (SEVIS).

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Forms I–17 and I–20; U.S. Immigration and Customs Enforcement.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary Non-profit institutions and individuals or households. SEVIS is an Internet-based data-entry, collection and reporting system. It collects information on SEVP-certified schools via the Form I–17, "Petition for Approval of School for Attendance by Nonimmigrant Student," and collects information on the F and M nonimmigrant students that the SEVP-certified schools admit into their programs of study via the Forms I–20s: "Certificate of Eligibility for Nonimmigrant (F–1) Student Status—For Academic and Language Students" and "Certificate of Eligibility for Nonimmigrant (M–1) Student Status—For Vocational Students".

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:*

| Number of respondents | Form name/Form No. | Average burden per response (in hours) |
|---|---|---|
| 280,000 .......... | Certificate of Eligibility for Nonimmigrant (F–1) Student Status—For Academic and Language Students/ICE Form I–20 (Students). | 0.5 |
| 90,000 ............ | Certificate of Eligibility for Nonimmigrant (M–1) Student Status—For Academic and Language Students/ICE Form I–20 (Spouse/Dependents). | 0.5 |
| 280,000 .......... | Optional Practical Training 12 Month Request/No Form ..................................................................................... | 0.083 |
| 12,000 ............ | Optional Practical Training 17 Month Extension Request/No Form ................................................................... | 0.083 |
| 5,525 .............. | Maintenance of SEVP Certification/ICE Form I–17 ......................................................................................... | 4 |

(6) *An estimate of the total public burden (in hours) associated with the collection:* 1,027,884 annual burden hours.

Dated: September 12, 2017.

**Scott Elmore,**

*PRA Clearance Officer, Office of the Chief Information Officer, U.S. Immigration and Customs Enforcement, Department of Homeland Security.*

[FR Doc. 2017–19713 Filed 9–15–17; 8:45 am]

**BILLING CODE 9111–28–P**

AR2022_200334

Mulligan, George D.
Murphy, Brian J.
Murray, James M.
Muzyka, Carolyn L.
Nally, Kevin J.
Nelson, Mickey
Neufeld, Donald W.
Neumann, Elizabeth
Neumeister, James
Nevano, Gregory C.
Newsome III, Leonza
Nuebel Kovarik, Kathy
Nunan, Joanna M.
Ondocin, Michael A.
Owen, Todd C.
Padilla, Kenneth
Palmer, David J.
Paramore, Faron K.
Parker, Debra F.
Paschall, Robert D.
Patel, Kalpesh A.
Patterson, Leonard E.
Paul, Kshemendra
Perazzo, Stephen F.
Perez, Nelson
Perez, Robert E.
Perryman, Janet J.
Piccone, Colleen C.
Pietropaoli, Lori A.
Pineiro, Marlen
Podonsky, Glenn S.
Pohlman, Teresa R.
Porto, Victoria
Price, Corey A.
Prince, David A.
Prosnitz, Susan M.
Provost, Carla L.
Quinn, Cameron
Rabin, John L.
Raymond, John J.
Renaud, Daniel M.
Renaud, Tracy L.
Rexrode, Kathryn S.
Richardson, Gregory A.
Ries, Lora L.
Riordan, Denis C.
Robbins, Timothy S.
Robinson, Terri A.
Rodi III, Louis A.
Rodriguez, Waldemar
Roessler, John E.
Rogers, Debra A.
Roncone, Stephen A.
Rosenberg, Ronald M.
Rosenblum, Marc R.
Roth, Aaron E.
Roy, Donna M.
Ruppel, Joanna
Rynes, Joel C.
Sahakian, Diane V.
Salazar, Rebecca A.
Salazar, Ronald M.
Saltalamachea, Michael
Salvano-Dunn, Dana
Saunders, Ian C.
Scott, Kika M.
Selby, Cara M.
Sellers, Frederick E.
Sevier, Adrian
Seymour, Donna K.
Shah, Dimple
Shaw, David C.
Short, Tracy L.
Short, Victoria D.
Sibley, Matthew W.
Sloan, Terry G.

Smislova, Melissa
Smith, Brenda B.
Smith, Frederick B.
Smith, Stewart D.
Spero, James
Spradlin, Ryan L.
Staton, Jack P.
Stephens, Celisa M.
Stiefel, Nathaniel I.
Stough, Michael S.
Sulc, Brian
Sutherland, Dan W.
Swain, Donald R.
Swartz, Neal J.
Sykes, Gwendolyn
Taylor, Clothilda
Taylor, Robin M.
Teeple, Brian
Thompson, John E.
Thompson, Kirt
Tomney, Christopher J.
Travis, Matthew K.
Ulrich II, Dennis A.
Valverde, Michael
Van Houten, Ann
Velarde, Barbara Q.
Venture, Veronica
Villanueva, Raymond
Wade, David S.
Wagner, John P.
Wallen, Steven
Walters, Thomas J.
Walton, Kimberly H.
Ware, Bryan S.
Wasowicz, John A.
Watkins, Tracey
Watson, Andre R.
Whalen, Mary Kate
Wheaton, Kelly D.
Whittenburg, Cynthia F.
Wolf, Chad
Wong, Ricardo A.
Wong, Sharon M.
Wonnenberg, David
Wright, Christopher J.
Wuco, Frank
Yarwood, Susan A.
Young, Edward E.
Zangardi, John A.
Zuckowski, Laura B.

Dated: October 2, 2019.

**Greg Ruocco,**

*Manager, Executive Resources Policy, Office of the Chief Human Capital Officer.*

[FR Doc. 2019–22155 Filed 10–9–19; 8:45 am]

**BILLING CODE 9112–FC–P**

---

# DEPARTMENT OF HOMELAND SECURITY

**[Docket No. DHS–2019–0042]**

## Privacy Act of 1974; System of Records

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice of a Modified System of Records.

---

**SUMMARY:** In accordance with the Privacy Act of 1974, the Department of

Homeland Security (DHS) proposes to modify and reissue a current DHS system of records titled, ''DHS/U.S. Citizenship and Immigration Services (USCIS)-007 Benefits Information System.'' This system of records describes DHS/USCIS collection, maintenance, processing, and adjudication of naturalization, lawful permanent residence, and other immigrant and nonimmigrant immigration-related requests (hereinafter collectively referred to as ''immigration requests'') submitted to USCIS in accordance with U.S. immigration law. DHS/USCIS also uses the records contained in the Benefits Information System (BIS) to prevent individuals from fraudulently obtaining immigration and naturalization benefits and to deny immigration and naturalization requests submitted by individuals who pose national security or public safety threats. The BIS may also be used in support of employee performance and production reporting purposes, as well as track an employee or contractor's workload and efficiency in processing a particular immigration request, managing workloads, and providing statistical analyses to USCIS leadership.

**DATES:** Submit comments on or before November 12, 2019. This modified system will be effective upon publication. New or modified routine uses will be effective November 12, 2019.

**ADDRESSES:** You may submit comments, identified by docket number DHS–2019–0042 by one of the following methods:

• *Federal e-Rulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 202–343–4010.

• *Mail:* Jonathan R. Cantor, Acting Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528–0655.

*Instructions:* All submissions received must include the agency name and docket number DHS–2019–0042. All comments received will be posted without change to *http:// www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received, go to *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For general questions, please contact: Donald K. Hawkins, (202) 272–8030, *uscis.privacycompliance@uscis.dhs.gov,* Privacy Officer, U.S. Citizenship and Immigration Services, 20 Massachusetts

AR2022_200335

**Federal Register** / Vol. 84, No. 197 / Thursday, October 10, 2019 / Notices **54623**

Avenue NW, Washington, DC 20529. For privacy questions, please contact: Jonathan R. Cantor, (202) 343–1717, *Privacy@hq.dhs.gov,* Acting Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528–0655.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In accordance with the Privacy Act of 1974, 5 U.S.C. 552a, the Department of Homeland Security (DHS) U.S. Citizenship and Immigration Services (USCIS) proposes to modify and reissue a current DHS system of records titled, "DHS/USCIS–007 Benefits Information System."

DHS/USCIS oversees lawful immigration and non-immigration to the United States and is responsible for the administration of immigration, non-immigration, and naturalization adjudication functions and for establishing many immigration policies and priorities. In executing its mission, DHS/USCIS performs functions that include the intake, review, and adjudication of the following types of benefits:

(1) Family-Based;
(2) Employment-Based;
(3) Humanitarian-Based;
(4) Adoption-Based; and
(5) Citizenship and Naturalization-Based.

The BIS System of Records Notice (SORN) covers the processing of immigrant and nonimmigrant immigration-related requests.[1] The Secretary of Homeland Security also has the discretion to review and grant other types of immigration requests.[2] The BIS SORN is specific to USCIS's collection, use, maintenance, dissemination, and storage of immigration-related request information, including case processing and decisional data.[3] USCIS records case processing information, such as date the immigration related request was filed or received by USCIS, request status, location of record, other control number (when applicable), fee receipt data, status of USCIS appointments and interviews, date of issuance of a notice,

and whether the request form was referred to the Fraud Detection and National Security Directorate for review. Decisional data such as an approval/ denial code is also stored in BIS. Information within BIS may also be stored in an immigration file (such as an Alien File).[4]

DHS/USCIS is publishing this modified system of records notice to make several changes for transparency and to describe new initiatives. The purpose of this SORN has been expanded to track an employee or contractor's workload and efficiency in processing a particular benefit request, managing workloads, and providing statistical analyses to USCIS leadership.

The categories of individuals covered by this SORN has been expanded to include prospective accredited representatives seeking to be recognized by the Board of Immigration Appeals, as well as add a new category to cover the collection, maintenance, and use of obligors (surety) and their agents.

New categories of records have been added relating to immigration requestors, which includes country of residence; credit scores and reports; public benefit application, receipt, and certification for receipt information; publicly available social media information and other publicly available information, which may be collected during the course of the benefit adjudication process. New categories of records have been added relating to attorneys and current and/or prospective representatives, which includes USCIS Online Account Number, other identifying numbers (*e.g.*, Attorney Bar Number or equivalent), educational and training history, work history and qualifications, academic and professional achievements, and letters of recommendations. New categories of records have been added relating to bond obligors and their agents including name, identification number(s), contact information (including address, telephone number, email address), signature, and power of attorney. Biometric information and background check results have been removed from remove existing categories of records relating to immigration requestors, derivatives, and family members because they are covered under DHS/

USCIS–018 Immigration Biometric and Background Check SORN.

DHS/USCIS–017 Refugee Case Processing and Security Screening Information SORN and DHS/USCIS–018 Immigration Biometric and Background Check SORN have been added as record source categories, and DHS/USCIS–002 Background Check Service SORN and DHS/USCIS–003 Biometric Storage System SORN have been removed as record source categories.

The routine use section of this SORN has been modified, including updating Routine Use E and adding Routine Use F to comply with requirements set forth by OMB Memorandum M–17–12, "Preparing for and Responding to a Breach of Personally Identifiable Information," (Jan. 3, 2017); expanding Routine Use V to cover the sharing of information with the petitioning employers to aid in the approval or denial of request to become a permanent resident; updating Routine Use Z to replace Immigration Judge with Federal Judge; adding Routine Use BB for disclosure to government agencies for the purposes of testing new technology; adding Routine Use CC for disclosure to federal, state, local, and tribal public benefit granting agencies to ascertain whether public benefits have been issued to the benefit requestor; adding Routine Use DD for the disclosure to an individual or entity seeking to post or arrange bond; and adding Routine Use EE for the disclosure of petition outcomes to labor unions in instances in which USCIS approves or denies a petition submitted with a union consultation.

Finally, the retention schedules have been modified to reflect disposition schedule by form type and actions, and expand the retention of data in certain case management systems to up to 50 years.

Consistent with DHS's information sharing mission, information stored in DHS/USCIS–007 Benefits Information System may be shared with other DHS Components that have a need to know the information to carry out their national security, law enforcement, immigration, intelligence, or other homeland security functions. In addition, DHS/USCIS may share information with appropriate federal, state, local, tribal, territorial, foreign, or international government agencies consistent with the routine uses set forth in this system of records notice.

Further, specifically, USCIS may share BIS information with DHS's U.S. Immigration and Customs Enforcement (ICE) Financial Operations—Burlington regarding fees charged during the various immigration requests processes

---

[1] This SORN covers all immigrant and nonimmigrant benefit requests, with the exception of requests for asylum, refugee, and intercountry adoption.

[2] For example, USCIS reviews applications for Deferred Action. Deferred Action is a discretionary determination to defer a deportation of an individual as an act of prosecutorial discretion. Deferred Action can be granted by USCIS or a federal immigration judge.

[3] The Immigration Biometric Background Check SORN covers the background check process, while the Benefits Information System SORN covers the storage of background check results. See 83 FR 36950 (July 31, 2018).

[4] The Alien File or A-File is the official record regarding the transactions of an individual as he or she passes through the U.S. immigration and inspection process. The Alien File contains information relating to immigration benefits processing, protection of national security, and administering and enforcing immigration and nationality laws and related statutes.

to ensure collection of debts. The primary mission of the ICE Financial Operations—Burlington is to collect debts resulting from an individual's participation in DHS benefits programs. As such, through DHS's ICE Financial Operations—Burlington office, BIS information may be shared with credit reporting agencies.

This modified system will be included in DHS's inventory of record systems.

## II. Privacy Act

The Privacy Act embodies fair information practice principles in a statutory framework governing the means by which Federal Government agencies collect, maintain, use, and disseminate individuals' records. The Privacy Act applies to information that is maintained in a "system of records." A "system of records" is a group of any records under the control of an agency from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual. In the Privacy Act, an individual is defined to encompass U.S. citizens and lawful permanent residents. Additionally, the Judicial Redress Act (JRA) provides covered persons with a statutory right to make requests for access and amendment to covered records, as defined by the JRA, along with judicial review for denials of such requests. In addition, the JRA prohibits disclosures of covered records, except as otherwise permitted by the Privacy Act.

Below is the description of the DHS/ USCIS–007 Benefits Information System System of Records.

In accordance with 5 U.S.C. 552a(r), DHS has provided a report of this system of records to the Office of Management and Budget and to Congress.

### SYSTEM NAME AND NUMBER:

Department of Homeland Security (DHS)/U.S. Citizenship and Immigration Services (USCIS)-007 Benefits Information System.

### SECURITY CLASSIFICATION:

Unclassified and Classified.

### SYSTEM LOCATION:

Records are maintained at the U.S. Citizenship and Immigration Services Headquarters in Washington, DC, and DHS/USCIS service centers and domestic and international field offices. Records are also maintained in DHS/ USCIS information technology (IT) systems (e.g., Computer Linked Application Information Management

System (CLAIMS) 3, USCIS Electronic Immigration System (ELIS), Case and Activity Management for International Operations (CAMINO)).

### SYSTEM MANAGER(S):

Chief, Immigration Records and Identity and Information Management Division (IIMD), *fieldrequests@uscis.dhs.gov,* U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529.

### AUTHORITY FOR MAINTENANCE OF THE SYSTEM:

Sections 103 and 290 of the Immigration and Nationality Act, as amended (8 U.S.C. secs. 1103 and 1360), the regulations issued pursuant thereto; and Section 451 of the Homeland Security Act of 2002 (Pub. L. 107–296).

### PURPOSE(S) OF THE SYSTEM:

The purpose of this system is to permit USCIS's collection, use, maintenance, dissemination, and storage of paper and electronic immigration-related request information, including case processing and decisional data. These records assist in the processing of immigrant and nonimmigrant benefit requests and other immigration-related requests from the time when USCIS collects the information from the immigration-related requestor until the case receives a final decision in the relevant case management system.[5] This system of records enables DHS/USCIS to process benefit requests electronically, determine the status of pending benefit requests, account for and control the receipt and disposition of any fees and refunds collected, conduct searches pursuant to requests under the Freedom of Information Act (FOIA) and Privacy Act, and locate related physical and automated files to support DHS/USCIS responses to inquiries about these records. This system of records may also be used in support of monitoring employee performance and production reporting purposes, including tracking an employee or contractor's workload and efficiency in processing a particular benefit request, managing workloads, and providing statistical analyses to USCIS leadership.

DHS/USCIS maintains a replica of some or all of the data in application databases on DHS unclassified and classified networks to allow for analysis and vetting consistent with the above stated purposes and this published notice.

### CATEGORIES OF INDIVIDUALS COVERED BY THE SYSTEM:

Categories of individuals covered by this system include (1) individuals who have filed, for themselves or on the behalf of others (benefit requestors and beneficiaries and other immigration-related requestors), requests for immigration benefits and other requests under the Immigration and Nationality Act as amended, and/or who have submitted fee payments or received refunds from such requests; (2) current, former, and potential derivatives of requestors (family members); (3) sponsors (e.g., employers, law enforcement officers, or other individuals); (4) attorneys; (5) prospective representatives seeking recognition from and current accredited representatives recognized by USCIS and/or by the Board of Immigration Appeals (Representatives); (6) interpreters; (7) individuals who assist in the preparation of the immigration-related request forms (Preparers); (8) individuals who make fee payments on behalf of the immigration-related requestor; (9) physicians who conduct immigration-related medical examinations; and (10) obligors (surety) and their agents.

### CATEGORIES OF RECORDS IN THE SYSTEM:

*Information about benefit requestors, beneficiaries, and family members may include:*
- Full name;
- Alias(es);
- Physical, destination, and mailing addresses (including foreign and domestic);
- Unique Identifying Numbers (e.g., Alien Number, USCIS Online Account Number, Social Security number (SSN), and Data Universal Numbering System (DUNS) Number);
- Date of birth or death;
- Nationality and/or Place of Birth (including city, region, and country of birth);
- Country or countries of citizenship;
- Country of Residence;
- Gender and/or sex;
- Marital status;
- Military status;
- Phone and fax numbers;
- Email address;
- Immigration status;
- Publicly available social media information and information from public-facing websites;
- Responses to questions on immigration benefit forms (e.g., have you ever claimed to be a U.S. citizen; do you owe any federal, state, or local taxes)
- Government-issued identification (e.g., passports, driver's license, national ID):

---

[5] This system of records does not cover requests for intercountry adoption, asylum, or refugee status.

○ Document type;
○ Issuing country and/or organization;
○ Document number;
○ Issue Date;
○ Expiration date;
• Notices and communications, including:
○ Receipt notices;
○ Requests for Evidence;
○ Notices of Intent to Deny;
○ Proofs of benefit;
• Type of benefit requested;
• Signature (wet and digital);
• Immigration-related request fee payment information (*e.g.,* credit card number, *Pay.gov* Payment Tracking Number); and
• Audio-visual recordings, including interviews and naturalization ceremonies.

Benefit-specific eligibility information about benefit requestor, beneficiaries, and family members may include:
• Other unique identifying numbers (*e.g.,* Department of State (DOS)-Issued Personal Identification Number, ICE Student and Exchange Visitor Number, USCIS E-Verify Company Identification Number);
• Arrival/Departure Information;
• Immigration history (*e.g.,* citizenship/naturalization certificate number, apprehensions, removals, explanations);
• Familial relationships (*e.g.,* parent, spouse, sibling, child, other dependents);
• Relationship Practices (*e.g.,* polygamy, custody, guardianship);
• USCIS Receipt/Case Number;
• Personal background information (*e.g.,* involvement with national security threats; criminal offenses; Communist Party membership; participation in torture, genocide, killing, injuring, forced sexual contact, limiting or denying others religious beliefs, weapons distribution, or combat training; service in military or other armed groups, work in penal or detention systems);
• Records regarding organization membership or affiliation;
• Health information (*e.g.,* vaccinations, referrals, communicable diseases, physical or mental disorders or disabilities, prostitution, drug or alcohol abuse);
• Travel history;
• Education history;
• Employment history;
• Professional accreditation information;
• Financial information (*e.g.,* credit scores and reports, income, expenses, scholarships, savings, assets, property, financial support, supporter information, life insurance, debts, encumbrances, and tax records);

• Public benefit information (*e.g.,* applications and receipt, as well as certication of receipt of pubic benefits);
• Supporting documentation as necessary (*e.g.,* birth, marriage, and divorce certificates; licenses; academic diplomas; academic transcripts; appeals or motions to reopen or reconsider decisions; explanatory statements; deoxyribonucleic acid (DNA) results; and unsolicited information submitted voluntarily by the benefit requestor or family members in support of a benefit request);
• Physical description (*e.g.,* height, weight, eye color, hair color, race, ethnicity, identifying marks like tattoos or birthmarks);
• Description of relationships between benefit requestors, representatives, preparers, and family members;
• Information regarding the status of Department of Justice (DOJ), Executive Office of Immigration Review (EOIR) proceedings, if applicable; and
• Case processing information such as date benefit requests were filed or received by USCIS, benefit request status, location of record, other control number when applicable, and fee receipt data.

Information about Benefit Sponsors may include:
• Full name;
• Gender and/or sex;
• Physical and mailing addresses;
• Phone and fax numbers;
• Country of domicile;
• Date of birth;
• Place of birth;
• Citizenship information;
• SSN;
• A-Number;
• USCIS Online Account Number;
• Employment information;
• Financial information (*e.g.,* income, expenses, scholarships, savings, assets, property, financial support, supporter information, life insurance, debts, encumbrances, tax records);
• Position and relationship to an organization (*e.g.,* manager of a company seeking formal recognition by USCIS);
• Family relationships (*e.g.,* parent, spouse, sibling, natural, foster, and/or adopted child, other dependents); and
• Relationship practices (*e.g.,* polygamy, custody, guardianship).

Information about Attorneys and current and/or prospective Accredited Representatives include:
• Name;
• USCIS Online Account Number
• Other identifying numbers (*e.g.,* Attorney Bar Card Number or equivalent);
• Law firm/recognized organization;

• Physical and mailing addresses;
• Phone and fax numbers;
• Email address;
• Bar membership and Bar number;
• Accreditation date;
• Board of Immigration Appeals Representative Accreditation;
• Expiration date;
• Law Practice Restriction explanation;
• Educational and training history;
• Work history and qualifications;
• Academic and professional achievements;
• Letters of recommendation; and
• Signature.

Information about Preparers and Interpreters may include:
• Full name;
• Organization;
• Business State ID number;
• Employer Tax Identification Number;
• Physical and mailing addresses;
• Email address;
• Phone and fax numbers;
• Relationship to benefit requestor; and
• Signature.

Information about individuals who make fee payments on behalf of the immigration-related requestor includes:
• Name;
• Email address;
• Phone number;
• Mailing address; and
• Payment information.

Information about Physicians may include:
• Full name;
• Organization name;
• Physical and mailing addresses;
• Phone number;
• Fax number;
• Professional experience;
• License number;
• Other Physician Identifying Number(s);
• Licensing state and date of issuance;
• Type of degree/license (such as medical doctor, doctor of osteopathy, or clinical psychologist);
• Type of medical practice;
• Examination dates of the benefit requestor;
• Clinical methods used to diagnose benefit requestor;
• Email address; and
• Signature.

Information about obligor (surety) and its agents (co-obligor) may include:
• Name;
• Unique Identifying Number (*e.g.,* Taxpayer Identification Number (TIN), Employer Identification Number (EIN), SSN (in some cases, the obligor's TIN or EIN may be the individual's SSN, and DUNS Number));

- Address (Street, City, State and Zip Code);
- Telephone Number;
- Email Address;
- Power of Attorney (evidencing authority to act on behalf of the surety) and Power of Attorney number;
- Signature; and
- Information about bond (*e.g.*, receipt number and bond amount).

**RECORD SOURCE CATEGORIES:**

DHS/USCIS obtains records from the immigration requestor, his or her Representative, Physician, Preparer, Interpreter, or obligor and its agents. DHS/USCIS personnel may input information as they process a case, including information from internal and external sources to verify whether a requestor or family member is eligible for the immigration-related request. BIS also stores and uses information from the following USCIS, DHS, and other federal agency systems of records:

- DHS/USCIS/ICE/CBP–001 Alien File, Index, and National File Tracking System of Records, September 18, 2017 (82 FR 43556);
- DHS/USCIS–005 Inter-Country Adoptions, November 8, 2016 (81 FR 78614);
- DHS/USCIS–006 Fraud Detection and National Security Records (FDNS), August 8, 2012 (77 FR 47411);
- DHS/USCIS–010 Asylum Information and Pre-Screening System of Records, November 30, 2015 (80 FR 74781);
- DHS/USCIS–017 Refugee Case Processing and Security Screening Information System of Records, October 19, 2016 (81 FR 72075);
- DHS/USCIS–018 Immigration Biometric and Background Check Records System of Records, July 31, 2018 (83 FR 36950);
- DHS/CBP–011 U.S. Customs and Border Protection TECS, December 19, 2008 (73 FR 77778);
- DHS/ICE–001 Student and Exchange Visitor Information System, January 5, 2010 (75 FR 412);
- DHS/ICE–011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), October 19, 2016 (81 FR 72080);
- DHS/CBP–021 Arrival and Departure Information System (ADIS), November 18, 2015 (80 FR 72081);
- JUSTICE/EOIR–001 Records and Management Information System, January 25, 2007 (72 FR 3410);
- JUSTICE/FBI–002 The FBI Central Records System, January 25, 2007 (72 FR 3410);
- JUSTICE/FBI–009 Fingerprint Identification Records System (FIRS), January 25, 2007 (72 FR 3410);
- DOL/ETA–7 Employer Application and Attestation File for Permanent and Temporary Alien Workers, January 10, 2012 (77 FR 1728);
- STATE–05 Overseas Citizens Services Records, May 2, 2008 (73 FR 24343);
- STATE–26 Passport Records, July 6, 2011 (76 FR 34966);
- STATE–39 Visa Records, October 25, 2012 (77 FR 65245); and
- TREASURY/FMS–017 Collections Records, May 15, 2009 (74 FR 23006).

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND PURPOSES OF SUCH USES:**

Information in this system of records contains information relating to individuals who received benefit requests for special protected classes and should not be disclosed pursuant to a routine use unless disclosure is otherwise permissible under the confidentiality statutes, regulations, or policies applicable to that information. For example, information relating to individuals who received benefit requests for protection under the Violence Against Women Act, Seasonal Agricultural Worker or Legalization claims, the Temporary Protected Status of an individual, and information relating to nonimmigrant visas protected under special confidentiality provisions should not be disclosed pursuant to a routine use unless disclosure is otherwise permissible under the confidentiality statutes, regulations, or policies applicable to that information. These confidentiality provisions do not prevent DHS from disclosing information to the DOJ and U.S. Attorneys Offices as part of an ongoing criminal or civil investigation.

In addition to those disclosures generally permitted under 5 U.S.C. 552a(b) of the Privacy Act, all or a portion of the records or information contained in this system may be disclosed outside DHS as a routine use pursuant to 5 U.S.C. 552a(b)(3) as follows:

A. To DOJ, including the U.S. Attorney's Offices, or other federal agencies conducting litigation or proceedings before any court, adjudicative, or administrative body, when it is relevant or necessary to the litigation or proceeding and one of the following is a party to the litigation or proceeding or has an interest in such litigation or proceeding:

1. DHS or any component thereof;
2. Any employee or former employee of DHS in his/her official capacity;
3. Any employee or former employee of DHS in his/her individual capacity, only when DOJ or DHS has agreed to represent the employee; or

4. The United States or any agency thereof.

B. To a congressional office from the record of an individual in response to an inquiry from that congressional office made at the request of the individual to whom the record pertains.

C. To the National Archives and Records Administration (NARA) or General Services Administration pursuant to records management inspections being conducted under the authority of 44 U.S.C. secs. 2904 and 2906.

D. To an agency or organization for the purpose of performing audit or oversight operations as authorized by law, but only such information as is necessary and relevant to such audit or oversight function.

E. To appropriate agencies, entities, and persons when (1) DHS suspects or has confirmed that there has been a breach of the system of records; (2) DHS has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, DHS (including its information systems, programs, and operations), the Federal Government, or national security; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with DHS's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

F. To another federal agency or federal entity, when DHS determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

G. To an appropriate federal, state, tribal, local, international, or foreign law enforcement agency or other appropriate authority charged with investigating or prosecuting a violation or enforcing or implementing a law, rule, regulation, or order, when a record, either on its face or in conjunction with other information, indicates a violation or potential violation of law, which includes criminal, civil, or regulatory violations, and such disclosure is proper and consistent with the official duties of the person making the disclosure.

H. To contractors and their agents, grantees, experts, consultants, and others performing or working on a contract, service, grant, cooperative

AR2022_200339

agreement, or other assignment for DHS, when necessary to accomplish an agency function related to this system of records. Individuals provided information under this routine use are subject to the same Privacy Act requirements and limitations on disclosure as are applicable to DHS officers and employees.

I. To clerks and judges of courts exercising naturalization jurisdiction for the purpose of filing applications for naturalization and to enable such courts to determine eligibility for naturalization or grounds for revocation of naturalization.

J. To the Department of State for the purpose of assisting in the processing of benefit requests under the Immigration and Nationality Act, and all other immigration and nationality laws including treaties and reciprocal agreements.

K. To appropriate federal, state, tribal, and local government law enforcement and regulatory agencies, foreign governments, and international organizations, as well as to other individuals and organizations during the course of an investigation by DHS or the processing of a matter under DHS jurisdiction, or during a proceeding within the purview of the immigration and nationality laws, when DHS deems that such disclosure is necessary to carry out its functions and statutory mandates to elicit information required by DHS to carry out its functions and statutory mandates.

L. To an appropriate federal, state, local, tribal, foreign, or international agency, if the information is relevant and necessary to a requesting agency's decision concerning the hiring or retention of an individual; issuance of a security clearance, license, contract, grant, or other benefit; or if the information is relevant and necessary to a DHS decision concerning the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant, or other benefit and when such disclosure is appropriate to the proper performance of the official duties of the person making the request.

M. To the Office of Management and Budget in connection with the review of private relief legislation as set forth in OMB Circular No. A–19 at any stage of the legislative coordination and clearance process as set forth in the Circular.

N. To an attorney or representative (as defined in 8 CFR 1.1(j)) who is acting on behalf of an individual covered by this system of records in connection with any proceeding before DHS/USCIS or

the DOJ Executive Office for Immigration Review.

O. To a federal, state, tribal, or local government agency to assist such agencies in collecting the repayment of loans, fraudulently or erroneously secured benefits, grants, or other debts owed to them or to the U.S. Government, or to obtain information that may assist USCIS in collecting debts owed to the U.S. Government;

P. To a foreign government to assist such government in collecting the repayment of loans, fraudulently or erroneously secured benefits, grants, or other debts owed to it, provided that the foreign government in question:

1. Provides sufficient documentation to establish the validity of the stated purpose of its request; and

2. Provides similar information to the United States upon request.

Q. To a coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

R. Consistent with the requirements of the Immigration and Nationality Act, to the Department of Health and Human Services (HHS), the Centers for Disease Control and Prevention (CDC), or to any state or local health authorities, to:

1. Provide proper medical oversight of DHS-designated civil surgeons who perform medical examinations of both arriving foreign nationals and of those requesting status as a lawful permanent resident; and

2. To ensure that all health issues potentially affecting public health and safety in the United States are being, or have been, adequately addressed.

S. To a federal, state, or local government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.

T. To the Social Security Administration (SSA) for the purpose of issuing a Social Security number and card to an alien who has made a request for a Social Security number as part of the immigration process and in accordance with any related agreements in effect between the SSA, DHS, and the Department of State entered into pursuant to 20 CFR 422.103(b)(3); 422.103(c); and 422.106(a), or other relevant laws and regulations.

U. To a former employee of DHS, in accordance with applicable regulations, for purposes of responding to an official inquiry by a federal, state, or local government entity or professional licensing authority or facilitating communications with a former employee that may be necessary for

personnel-related or other official purposes when the Department requires information or consultation assistance from the former employee regarding a matter within that person's former area of responsibility.

V. To an individual's prospective or current employer to the extent necessary to determine employment eligibility (*e.g.,* pursuant to the Form I–140, *Immigrant Petition for Alien Worker*) or, USCIS may share information with the petitioning employers to aid in the approval or denial of a request to become a permanent resident.

W. To a federal, state, or local agency, or other appropriate entities or individuals, or through established liaison channels to selected foreign governments, in order to provide intelligence, counterintelligence, or other information for the purposes of intelligence, counterintelligence, or antiterrorism activities authorized by U.S. law or Executive Order.

X. To approved federal, state, and local government agencies that grant public benefits, licenses, grants, governmental credentials, or for any other statutorily authorized purpose when the immigration status of the benefit applicant is legally required and an approved Memorandum of Agreement or Computer Matching Agreement (CMA) is in place between DHS and the entity.

Y. To the Department of Labor for enforcement of labor certification violations and violations of U.S. labor laws.

Z. To the news media and the public during the course of naturalization ceremonies administered by USCIS or a Federal Judge. Pursuant to 8 CFR 337.2 individuals to be naturalized are generally required to appear in a public ceremony, unless an appearance is specifically excused.

AA. To the Department of Treasury to perform initial processing of benefit requests and to accept and resolve payment and any related issues.

BB. To appropriate federal, state, local, tribal, or foreign governmental agencies or multilateral governmental organizations, with the approval of the Chief Privacy Officer, when DHS is aware of a need to use relevant data, that relate to the purpose(s) stated in this SORN, for purposes of testing new technology.

CC. To federal, state, local, and tribal benefit granting agencies (*e.g.,* Social Security, housing, food, unemployment) to ascertain whether public benefits have been issued to the immigration requestor.

DD. To an individual or entity seeking to post or arrange, or who has already

posted or arranged, an immigration bond for an alien, to aid the individual or entity in (1) identifying the location of the alien; (2) posting the bond; (3) obtaining payments related to the bond; or (4) conducting other administrative or financial management activities related to the bond.

EE. To a consulting entity (*e.g.*, a labor organization or management organization) that provided an advisory opinion on a petition to USCIS seeking O or P nonimmigrant classification. USCIS may disclose the outcome of the petition to the consulting entity that provided an advisory opinion on the petition.

FF. To the news media and the public, with the approval of the Chief Privacy Officer in consultation with counsel, when there exists a legitimate public interest in the disclosure of the information; when disclosure is necessary to preserve confidence in the integrity of DHS; or when disclosure is necessary to demonstrate the accountability of DHS's officers, employees, or individuals covered by the system, except to the extent the Chief Privacy Officer determines that release of the specific information in the context of a particular case would constitute a clearly unwarranted invasion of personal privacy.

**POLICIES AND PRACTICES FOR STORAGE OF RECORDS:**

DHS/USCIS stores records in this system electronically or on paper in secure facilities, such as in a locked drawer or behind a locked door. The records may also be stored on magnetic disc, tape, and digital media.

**POLICIES AND PRACTICES FOR RETRIEVAL OF RECORDS:**

DHS/USCIS may retrieve records by using any of the data elements listed above or a combination thereof. This may include, but is not limited to, name, date of birth, Alien Number, SSN, USCIS Online Account Number, and Receipt Number.

**POLICIES AND PRACTICES FOR RETENTION AND DISPOSAL OF RECORDS:**

USCIS receives and adjudicates immigration request forms. Each form type is governed by a respective retention schedule and each form type's retention period is dictated by USCIS's final action on the form (*e.g.*, approved, denied, abandoned, withdrawn, administratively closed, and rejected). Immigration request forms and supplemental documentation that constitute the official record of an individual's immigration history are stored in the individual's paper and/or electronic Alien File. The Alien File

records are permanent, whether hard copy or electronic. DHS/USCIS is eligible to transfer Alien Files to the custody of NARA 100 years after the individual's date of birth.

USCIS uses multiple case management systems for the processing, adjudication, and management of paper and electronically filed immigration request forms. Each case management system retains records in accordance with NARA-approved retention schedules. Generally, information is retained between 25–50 years from the last completed action. The duration of the NARA-approved retention schedules allows USCIS to address any follow-up inquiries or requests related to the immigration request form, including inquiries related to law enforcement, public safety, national security, and to FOIA and Privacy Act matters. These retention periods allow USCIS to provide as much information as possible to an individual regarding his or her immigration history.

Electronic notices and communications associated with an immigration request, to include Approval or Denial letters, Requests for Evidence, Notices of Intent to Deny, Appeal/Motion Responses, etc., are retained for 13 years after the last completed action with respect to the benefit.

Records of electronic appointments with USCIS are maintained for 60 days after the date of the appointment.

Daily reports generated by associated information technology systems are maintained in accordance with the general records retention schedule that permits USCIS to destroy reports when no longer needed.

Records replicated on the unclassified and classified networks for analysis and vetting will follow the same retention schedule.

**ADMINISTRATIVE, TECHNICAL, AND PHYSICAL SAFEGUARDS:**

DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored. Access to the computer system containing the records in this system is limited to those individuals who have a need to know the information for the performance of their official duties and who have appropriate clearances or permissions.

**RECORD ACCESS PROCEDURES:**

Individuals seeking access to and notification of any record contained in

this system of records, or seeking to contest its content, may submit a request in writing or electronically to the Chief Privacy Officer or USCIS's FOIA Officer, whose contact information can be found at *http://www.dhs.gov/foia* under "Contact Information." If an individual believes more than one component maintains Privacy Act records concerning him or her, the individual may submit the request to the Chief Privacy Officer and Chief FOIA Officer, Department of Homeland Security, Washington, DC 20528–0655. Even if neither the Privacy Act nor the Judicial Redress Act provides a right of access, certain records may be available under the FOIA.

When an individual is seeking records about himself or herself from this system of records or any other Departmental system of records, the individual's request must conform with the Privacy Act regulations set forth in 6 CFR part 5. The individual must first verify his/her identity, meaning that the individual must provide his/her full name, current address, and date and place of birth. The individual must sign the request, and the individual's signature must either be notarized or submitted under 28 U.S.C. 1746, a law that permits statements to be made under penalty of perjury as a substitute for notarization. While no specific form is required, an individual may obtain forms for this purpose from the Chief Privacy Officer and Chief FOIA Officer, *http://www.dhs.gov/foia* or 1–866–431–0486. In addition, the individual should:

• Explain why he or she believe the Department would have information being requested;

• Identify which component(s) of the Department he or she believe may have the information;

• Specify when the individual believes the records would have been created; and

• Provide any other information that will help the FOIA staff determine which DHS component agency may have responsive records;

If an individual's request is seeking records pertaining to another living individual, the first individual must include a statement from the second individual certifying that individual's agreement for the first individual to access his/her records.

Without the above information, the component(s) may not be able to conduct an effective search, and the individual's request may be denied due to lack of specificity or lack of compliance with applicable regulations.

**CONTESTING RECORD PROCEDURES:**

For records covered by the Privacy Act or covered JRA records, see ''Record Access Procedures'' above. Any individual, regardless of immigration status, may file a request to access his or her information under the FOIA. Throughout the benefit determination process, and prior to USCIS making a determination to deny a benefit request, USCIS provides individuals with the opportunity to address and correct the information.

**NOTIFICATION PROCEDURES:**

See ''Record Access Procedures'' above.

**EXEMPTIONS PROMULGATED FOR THE SYSTEM:**

None. However, when this system receives a record from another system exempted under 5 U.S.C. 552a, DHS will claim the same exemptions for those records that are claimed for the original primary systems of records from which they originated.

**HISTORY:**

81 FR 72069 (October 19, 2016); 73 FR 56596 (September 29, 2008).

**Jonathan R. Cantor,**

*Acting Chief Privacy Officer, Department of Homeland Security.*

[FR Doc. 2019–22156 Filed 10–9–19; 8:45 am]

**BILLING CODE 9111–17–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7022–N–01]**

**60-Day Notice of Proposed Information Collection: Opportunity Zone Grant Certification Form**

**AGENCY:** Office of Field Policy and Management, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* December 9, 2019.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; telephone 202–402–3400 (this is not a toll-free number) or email at *Colette.Pollard@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

**FOR FURTHER INFORMATION CONTACT:** Alex Stowe, Advisor, Field Policy and Management, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email *alexander.d.stowe@hud.gov* or telephone 202–402–5309. This is not a toll-free number. Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339. Copies of available documents submitted to OMB may be obtained from Mr. Stowe.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

## A. Overview of Information Collection

*Title of Information Collection:* Certification of Consistency With Opportunity Zone Initiative-Related Activity.

*OMB Approval Number:* 2501–.

*Type of Request:* New Collection.

*Form Number:* HUD–XXXX Certification for Opportunity Zone Preference Points.

*Description of the need for the information and proposed use:* This collection is a new collection regarding information for preference points in certain competitive federal grants and technical assistance applications. In accordance with Executive Order 13853, Establishing the White House Opportunity and Revitalization Council (''WHORC'' or ''Council''), signed by President Trump on December 12, 2018, the Department of Housing and Urban Development (HUD) has added preference points to grants in an effort to strategically target investment in communities designated as Opportunity Zones. To ensure that HUD's resources are being used to further the mission of the Executive Order and the WHORC Implementation Plan (published April 17, 2019), HUD has drafted the proposed certification form. This form will certify that valuable HUD resources are in fact being targeted to and expended in America's most economically distressed areas, including Opportunity Zones. Additionally, it will enable HUD to gather and analyze the most accurate data regarding the use of taxpayer funds; specifically, how they are being utilized by our grantee partners to support the President's mission of revitalizing distressed communities. The collection of this information will help to guide the Department through future grant awards and inform HUD's strategy to maximize non-profit and private sector investment.

Additionally, pending approval of this form on HUD's behalf, we anticipate that the following Agencies will also implement this form: Agriculture, Commerce, Education, Justice, Health and Human Services, Labor, Transportation, Interior, Commerce, Energy, Veterans Affairs, the Small Business Administration and the Environmental Protection Agency. Public and private investment in America's historically overlooked communities will be used to increase the supply of affordable housing to bolster economic development, support entrepreneurship, promote neighborhood safety, and expand employment and educational opportunities. For more information about the mission of the WHORC and to learn about the activities and vision of the federal agencies that comprise the Council, visit *https://www.hud.gov/sites/dfiles/Main/documents/WHORC-Implementation-Plan.pdf.*

*Respondents (i.e., affected public):* HUD grant applicants applying for preference points for activities conducted within or benefiting designated Qualified Opportunity Zone census tracts.

TABLE—EUP MICROBIAL PESTICIDES PRODUCT ANALYSIS DATA REQUIREMENTS—Continued

| Test guideline No. | Data requirement | All use patterns | Test substance | | Test notes |
|---|---|---|---|---|---|
| | | | MP | EP | |
| **Physical and Chemical Characteristics** | | | | | |
| 830.6302 ...... | Color ................................................................. | R | TGAI ................................ | TGAI ................................ | .......... |
| 830.6303 ...... | Physical state ................................................... | R | TGAI ................................ | TGAI ................................ | .......... |
| 830.6304 ...... | Odor ................................................................. | R | TGAI ................................ | TGAI ................................ | .......... |
| 830.6313 ...... | Stability to normal and elevated temperatures, metals, and metal ions. | R | TGAI ................................ | TGAI ................................ | .......... |
| 830.6317 ...... | Storage stability ............................................... | R | TGAI and MP ..................... | TGAI and EP ..................... | .......... |
| 830.6319 ...... | Miscibility .......................................................... | R | MP .................................... | EP ..................................... | 5 |
| 830.6320 ...... | Corrosion characteristics ................................... | R | MP .................................... | EP ..................................... | 6 |
| 830.7000 ...... | pH ..................................................................... | R | TGAI ................................ | TGAI ................................ | .......... |
| 830.7100 ...... | Viscosity ........................................................... | R | MP .................................... | EP ..................................... | 7 |
| 830.7300 ...... | Density/relative density/bulk density (specific gravity). | R | TGAI ................................ | TGAI ................................ | .......... |

(d) * * *

3. Required for each isolate of a microbial pesticide. Isolates must be deposited with an agreement to ensure that the sample will be maintained and will not be discarded for the duration of the associated experimental use permit(s).

* * * * *

[FR Doc. 2012–21430 Filed 8–29–12; 8:45 am]

BILLING CODE 6560–50–P

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## 45 CFR Part 152

[CMS–9995–IFC2]

RIN 0938–AQ70

## Pre-Existing Condition Insurance Plan Program

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS).

**ACTION:** Amendment to interim final rule with request for comments.

**SUMMARY:** This document contains an amendment regarding program eligibility to the interim final regulation implementing the Pre-Existing Condition Plan program under provisions of the Patient Protection and Affordable Care Act. In light of a new process recently announced by the Department of Homeland Security, eligibility for the program is being amended so that the program does not inadvertently expand the scope of that process.

**DATES:** *Effective date.* These interim final regulations are effective on August 30, 2012.

*Comment date.* Comments are due on or before October 29, 2012.

*Applicability date.* This amendment to the interim final regulation generally applies to individuals on August 30, 2012.

**ADDRESSES:** Written comments may be submitted to any of the addresses specified below. Please do not submit duplicates.

All comments will be made available to the public. *Warning:* Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments are posted on the Internet exactly as received, and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

In commenting, please refer to file code CMS–9995–IFC2. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission. You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may mail written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9995–IFC2, P.O. Box 8016, Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human

Services, Attention: CMS–9995–IFC2, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments only to the following addresses prior to the close of the comment period:

a. For delivery in Washington, DC— Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–4492 in advance to schedule your arrival with one of our staff members.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web

AR2022_200343

site as soon as possible after they have been received: *http:// www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. EST. To schedule an appointment to view public comments, phone 1–800–743–3951.

**FOR FURTHER INFORMATION CONTACT:** Alexis Ahlstrom, Centers for Medicare & Medicaid Services, Department of Health and Human Services, at (202) 690–7506.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act of 2010 (Reconciliation Act), Public Law 111–152, was enacted on March 30, 2010 (collectively, "Affordable Care Act"). Section 1201 of the Affordable Care Act prohibits issuers of non-grandfathered health insurance coverage from denying coverage or inflating rates based on health status or medical history in policy years beginning on or after January 1, 2014. In light of the fact that these protections will not take effect until 2014, section 1101 of the Affordable Care Act directs the Secretary of Health and Human Services to establish, either directly or through contracts with states or nonprofit private entities, a temporary high risk health insurance pool program to provide immediate access to coverage for eligible uninsured Americans with pre-existing conditions. (Hereafter, we generally refer to this program as the Pre-Existing Condition Insurance Plan program, or the PCIP program.) The PCIP program provides coverage to eligible uninsured Americans with pre-existing conditions until 2014, when the protections under section 1201 of the Affordable Care Act referenced above take effect and coverage is available through the Affordable Insurance Exchanges established under section 1311 or 1321 of the Act.

HHS previously issued an interim final regulation implementing section 1101 of the Affordable Care Act. This interim final rule was published in the **Federal Register** on July 30, 2010 (75 FR 45014). For the reasons explained

below, HHS is now issuing an amendment to this interim final rule.

## II. Overview of the Amendment to the Interim Final Rule

The interim final rule issued on July 30, 2010, provided information on the administration of the PCIP program, eligibility for and enrollment in the program, program benefits, program oversight, program funding, coordination with state laws and programs, and the transition to coverage through the Affordable Insurance Exchanges. Under section 1101(d) of the Affordable Care Act and codified by the July 30, 2010 interim final rule at 45 CFR 152.14(a)(1) through (3), an individual is eligible to enroll in a PCIP if he or she: (1) Is a citizen or national of the United States or is lawfully present in the United States (as determined in accordance with section 1411 of the Affordable Care Act[1]); (2) has not been covered under creditable coverage (as defined in section 2701(c)(1) of the Public Health Service Act as of the date of enactment of the Affordable Care Act—that is, March 23, 2010) during the 6-month period prior to the date on which he or she is applying for coverage through the PCIP; and (3) has a pre-existing condition, as determined in a manner consistent with guidance issued by the Secretary of HHS. We further provided in § 152.14(a)(4) of the interim final rule that an individual must be a resident of a state that falls within the service area of the PCIP.

In the interim final rule, HHS defined "lawfully present" as having a similar meaning as that given to "lawfully residing" in Medicaid and the Children's Health Insurance Program (CHIP), as set forth in a State Health Official letter issued by the Centers for Medicare & Medicaid Services (CMS) on July 1, 2010.[2] The July 30, 2010 interim final rule codified the definition of "lawfully present" at § 152.2.

Subsequent regulations implementing the Affordable Insurance Exchanges, 45 CFR 155.20 (77 FR 18310, March 27, 2012), and the premium tax credits, 26 CFR 1.36B–1(g) (77 FR 30377, May 23, 2012), issued by HHS and the Department of the Treasury respectively, define "lawfully present"

by a cross-reference to the definition in § 152.2.

On June 15, 2012, the Department of Homeland Security (DHS) announced that it will consider providing temporary relief from removal by exercising deferred action on a case-by-case basis with respect to certain individuals under age 31 who meet DHS's guidelines, including that he or she came to the United States as children and does not present a risk to national security or public safety.[3] This process is referred to by DHS as Deferred Action for Childhood Arrivals (DACA).[4]

As DHS has explained, the DACA process is designed to ensure that governmental resources for the removal of individuals are focused on high priority cases, including those involving a danger to national security or a risk to public safety, and not on low priority cases.[5] Because the reasons that DHS offered for adopting the DACA process do not pertain to eligibility for Medicaid or CHIP, HHS has determined that these benefits should not be extended as a result of DHS deferring action under DACA. Concurrent with this amendment, CMS is issuing a State Health Official letter providing that individuals whose cases are deferred under DHS's DACA process will not be eligible under the state option.[6] As it also would not be consistent with the reasons offered for adopting the DACA process to extend health insurance subsidies under the Affordable Care Act to these individuals, HHS is amending its definition of "lawfully present" in the PCIP program, so that the PCIP program interim final rule does not inadvertently expand the scope of the DACA process.

Under the amended rule, individuals with deferred action under the DACA process are not eligible to enroll in the PCIP program. As the PCIP program definition of "lawfully present" is incorporated into the rules governing the Affordable Insurance Exchanges and the premium tax credits, individuals whose cases are deferred under the DACA process also will not be eligible to enroll in coverage through the Affordable Insurance Exchanges and, therefore, will not receive coverage that

---

[1] Section 1411 of the Affordable Care Act describes the procedures to be employed for determining eligibility for coverage through the Affordable Insurance Exchanges, and for the premium tax credits and cost-sharing reductions that will help eligible individuals afford such coverage.

[2] See State Health Official (SHO) Letter #10–006/ CHIPRA #17 at: *http://downloads.cms.gov/cmsgov/ archived-downloads/SMDL/downloads/ SHO10006.pdf.*

[3] June 15, 2012 Memorandum of Secretary of Homeland Security Janet Napolitano, at: *http:// www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.*

[4] Consideration of Deferred Action for Childhood Arrivals, at: *http://www.uscis.gov/ childhoodarrivals.*

[5] *See supra* nn. 4–5.

[6] *http://www.medicaid.gov/Federal-Policy-Guidance/Downloads/SHO-12-002.pdf.*

AR2022_200344

could make them eligible for premium tax credits under Treasury regulations (see 26 CFR 1.36–2(a)(1)) or for cost-sharing reductions starting in 2014.[7] This is consistent with the rationale above.

We invite comment on the determination to exclude these individuals from eligibility for the PCIP program and from eligibility for coverage through the Affordable Insurance Exchanges, with the consequences noted above with respect to the premium tax credits and the cost-sharing reductions.

## III. Interim Final Regulation and Waiver of Delay of Effective Date

Under the Administrative Procedure Act (APA) (5 U.S.C. 551, *et seq.*), while a notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations, this is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.

HHS has determined that issuing this regulation in proposed form, such that it would not become effective until after public comment, would be contrary to the public interest. Because the PCIP program—a temporary program with limited funding—is currently enrolling eligible individuals and providing benefits for such enrollees, it is important that we provide clarity with respect to eligibility for this new and unforeseen group of individuals as soon as possible, before anyone with deferred action under the DACA process applies to enroll in the PCIP program.

HHS is issuing this amendment as an interim final rule with comment so as to provide the public with an opportunity for comment on the amendment, including to gather public comment on the implications of the amendment.

The APA also generally requires that a final rule be effective no sooner than 30 days after the date of publication in the **Federal Register**. This 30-day delay in effective date can be waived, however, if an agency finds good cause as to why the effective date should not

be delayed, and the agency incorporates a statement of the finding and its reason in the rule issued.

For the same reason that we are issuing an interim final rule, we are making it effective immediately; that is, because the PCIP program—a temporary program with limited funding—is currently enrolling eligible individuals and providing benefits for such enrollees, it is important that we provide clarity with respect to the eligibility of this new and unforeseen group of individuals as soon as possible, before anyone with deferred action under the DACA process applies to enroll in the PCIP program.

## IV. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

## V. Statutory Authority

The amendment to the interim final regulation is adopted pursuant to the authority contained in section 1101 of the Patient Protection and Affordable Care Act (Pub. L. 111–148).

## List of Subjects in 45 CFR Part 152

Administrative practice and procedure, Health care, Health insurance, Penalties, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR part 152 as follows:

## PART 152—PRE-EXISTING CONDITION INSURANCE PLAN PROGRAM

■ 1. The authority citation for part 152 continues to read as follows:

**Authority:** Sec. 1101 of the Patient Protection and Affordable Care Act (Pub. L. 111–148).

■ 2. Section 152.2 is amended by adding paragraph (8) to the definition of "lawfully present" to read as follows:

## § 152.2  Definitions.

\*      \*      \*      \*      \*

*Lawfully present* means— \*  \*  \*

\*      \*      \*      \*      \*

(8) *Exception.* An individual with deferred action under the Department of Homeland Security's deferred action for childhood arrivals process, as described in the Secretary of Homeland Security's June 15, 2012, memorandum, shall not be considered to be lawfully present with respect to any of the above categories in paragraphs (1) through (7) of this definition.

\*      \*      \*      \*      \*

Dated: August 24, 2012.

**Marilyn Tavenner,**

*Acting Administrator, Centers for Medicare & Medicaid Services.*

Approved: August 27, 2012.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2012–21519 Filed 8–28–12; 4:15 pm]

**BILLING CODE 4120–01–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 54

[WC Docket Nos. 10–90, 07–135, 05–337, 03–109; GN Docket No. 09–51; CC Docket Nos. 01–92, 96–45; WT Docket No. 10–208; DA 12–1155]

### Connect America Fund

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this Order, the Wireline Competition Bureau (Bureau) clarifies certain rules relating to Phase I of the Connect America Fund. Commission staff have received informal inquiries from price cap companies on certain implementation aspects of the rules governing Connect America Fund Phase I. The Bureau also makes an amendment to one of the Commission's rules to fix a clerical error relating to the support for carriers serving remote areas of Alaska.

**DATES:** Effective October 1, 2012.

**FOR FURTHER INFORMATION CONTACT:** Joseph Cavender, Wireline Competition Bureau, (202) 418–7400 or TTY: (202) 418–0484.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Wireline Competition Bureau Order in WC Docket Nos. 10–90, 07–135, 05–337, 03–109; GN Docket No. 09–51; CC Docket Nos. 01–92, 96–45; WT Docket No. 10–208; DA 12–1155, released on July 18, 2012. The full text

---

[7] This is consistent with prior guidance issued by DHS: "If my case is deferred, will I be eligible for premium tax credits and reduced cost sharing through Affordable Insurance Exchanges starting in 2014? No. The Departments of Health and Human Services and the Treasury intend to conform the relevant regulations to the extent necessary to exempt individuals with deferred action for childhood arrivals from eligibility for premium tax credits and reduced cost sharing. This is consistent with the policy under S. 3992, the Development, Relief, and Education for Alien Minors (DREAM) Act of 2010." See Consideration of Deferred Action for Childhood Arrivals, *http://www.uscis.gov/ childhoodarrivals.*

**Federal Register** / Vol. 86, No. 14 / Monday, January 25, 2021 / Presidential Documents          **7053**

# Presidential Documents

Memorandum of January 20, 2021

## Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)

### Memorandum for the Attorney General [and] the Secretary of Homeland Security

By the authority vested in me as President by the Constitution and the laws of the United States, it is hereby ordered as follows:

**Section 1.** *Policy.* In 2012, during the Obama-Biden Administration, the Secretary of Homeland Security issued a memorandum outlining how, in the exercise of prosecutorial discretion, the Department of Homeland Security should enforce the Nation's immigration laws against certain young people. This memorandum, known as the Deferred Action for Childhood Arrivals (DACA) guidance, deferred the removal of certain undocumented immigrants who were brought to the United States as children, have obeyed the law, and stayed in school or enlisted in the military. DACA and associated regulations permit eligible individuals who pass a background check to request temporary relief from removal and to apply for temporary work permits. DACA reflects a judgment that these immigrants should not be a priority for removal based on humanitarian concerns and other considerations, and that work authorization will enable them to support themselves and their families, and to contribute to our economy, while they remain.

**Sec. 2.** *Preserving and Fortifying DACA.* The Secretary of Homeland Security, in consultation with the Attorney General, shall take all actions he deems appropriate, consistent with applicable law, to preserve and fortify DACA.

**Sec. 3.** *General Provisions.* (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law.

(c) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The Secretary of Homeland Security is authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, January 20, 2021*

[FR Doc. 2021–01769
Filed 1–22–21; 11:15 am]
Billing code 4410–10–P

AR2022_200347

of such plant is the handler during the month) at such pool plant.

Four cooperative associations representing a substantial number of producers on the market requested the suspension. The basis for the request is that current marketing conditions require the four associations to handle an increasing quantity of reserve milk supplies during July and August because the demand for milk supplies by their regular fluid outlets this summer is substantially below normal. They indicated that this situation is aggravated by the fact that milk production of their member producers is heavier than normal this summer.

The proponent cooperatives state that their reserve milk supplies are customarily moved directly from member farms to nonpool manufacturing plants. However, because of current marketing conditions, they expect their reserve milk supplies during July and August 1979 to exceed the quantity of producer milk that may be diverted to nonpool manufacturing plants under the order's present diversion limitations. Without the suspension, the cooperatives believe that a substantial part of the milk of their member producers who have regularly supplied the fluid market would have to be moved uneconomically, first to pool plants and then to the nonpool manufacturing plants in order to still maintain producer status for such milk in July and August 1979.

Signed at Washington, D.C. on July 20, 1979.

Irving W. Thomas

*Acting Deputy Administrator, Marketing Program Operations.*

[FR Doc. 79–22981 Filed 7–24–79; 8:45 am]

BILLING CODE 3410-02-M

---

**DEPARTMENT OF JUSTICE**

**Immigration and Naturalization Service**

**[8 CFR Part 109]**

**Proposed Rules for Employment Authorization for Certain Aliens**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Proposed Rule.

**SUMMARY:** The Immigration and Naturalization Service proposes to add a new Part to its regulations to codify the procedures and criteria for the grant of employment authorization to aliens in the United States. Service procedures for the grant of employment authorization are contained in several

different places in the Operations Instructions and in various informal policy statements directed at Service field offices and the proposed regulations are intended to codify in one place in the regulations the procedures to be followed in granting employment authorization to certain aliens in the United States.

**DATES:** Representations must be received on or before September 24, 1979.

**ADDRESSES:** Please submit written representations, in duplicate, to the Commissioner of Immigration and Naturalization, Room 7100, 425 Eye Street NW., Washington, D.C. 20536.

**FOR FURTHER INFORMATION CONTACT:** James G. Hoofnagle, Jr., Instructions Officer, Immigration and Naturalization Service. Telephone: (202) 633–3048.

**SUPPLEMENTARY INFORMATION:** The Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and Naturalization Act which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act. The Attorney General's authority has been delegated to the Commissioner of Immigration and Naturalization by 28 CFR 0.105. The authority of the Attorney General to authorize employment of aliens in the United States as a necessary incident of his authority to administer the Act was specifically recognized by the Congress in the enactment of section 6 of Pub. L. 95–571. That provision amended section 245(c) of the Act to bar from adjustment of status any alien (other than an immediate relative of a United States citizen) who after January 1, 1977 engages in unauthorized employment prior to filing an application for adjustment of status.

Service procedures for the grant of employment authorization are contained in several different places in the Operations Instructions and in various informal policy statements directed at Service field offices. The proposed regulations will for the first time codify existing employment authorization procedures.

Under the proposal, aliens who are nonimmigrants maintaining status will continue to comply with the existing regulations relating to permissible employment for their particular nonimmigrant status. Other aliens may apply to the district director for discretionary grant of employment authorization if the alien is an applicant for, and is prima facie entitled to, an immigration benefit (such as adjustment

of status, suspension of deportation, asylum) which if granted would make him eligible to remain in the United States permanently or for an indefinite period of time. An alien who, as an exercise of the Service's prosecutorial discretion, has been allowed to remain in the United States for an indefinite or extended period of time will also be eligible to apply. The proposed regulation states that the application for employment authorization may be granted if the alien establishes that he is financially unable to maintain himself during the applicable period.

In the light of the foregoing, it is proposed to amend Chapter I of Title 8 of the Code of Federal Regulations by adding a new Part 109, as set forth below.

**PART 109—EMPLOYMENT AUTHORIZATION**

Sec.

109.1   Application.

109.2   Criteria.

Authority: Sec. 103 and 245(c); (8 U.S.C. 1103 and 1255(c))

**§ 109.1   Application.**

(a) An alien who is maintaining a lawful nonimmigrant status in the United States under section 101(a)(15) of the Act may apply for employment authorization only to the extent permitted by §§ 214.1 and 214.2 of this chapter.

(b) An alien who is not maintaining a lawful nonimmigrant status may apply for employment authorization if he:

(1) establishes to the satisfaction of the district director that he has a prima facie claim of entitlement to a benefit which, if granted, would make him eligible to remain permanently or indefinitely in the United States; or

(2) has been granted permission to remain in the United States for an indefinite or extended period of time by the Immigration and Naturalization Service.

**§ 109.2   Criteria**

An alien described in § 109.1(b) may be granted employment authorization by the district director until the completion of administrative processing, or the completion of the period for which he will be permitted to remain by the Immigration and Naturalization Service, if the alien establishes to the satisfaction of the district director that he is financially unable to maintain himself during that period. No appeal shall lie from a district director's denial of an application for employment authorization under this part.

AR2022_200348

## Public Comment Invited

In accordance with 5 U.S.C. 553, the Service invites representations of interested parties on this proposed rule. All relevant data, views, or arguments submitted on or before September 24, 1979, will be considered. Representations should be submitted in writing, in duplicate, to the Commissioner of the Immigration and Naturalization Service at the address shown at the beginning of this notice.

Dated: July 19, 1979.

Leonel J. Castillo,
*Commissioner of Immigration and Naturalization.*

Department of Justice
*Immigration and Naturalization Service, July 20, 1979*

*Certification*

By virtue of the authority vested in me by Title 8, Code of Federal Regulations, Part 103 a regulation issued by the Attorney General pursuant to Section 103 of the Immigration and Nationality Act,

I hereby certify that the annexed documents are originals. or copies thereof, from the records of the said Immigration and Naturalization Service, Department of Justice, relating to a Notice of Proposed Rulemaking re amendment of 8 CFR Part 109.

File No. CO 845–P, of which the Attorney General is the legal custodian by virtue of Section 103 of the Immigration and Nationality Act.

James A. Kennedy,
*Associate Commissioner, Management, Immigration and Naturalization Service.*

[FR Doc. 79–22959 Filed 7–24–79; 8:45 am]

BILLING CODE 4410–10—M

## CIVIL AERONAUTICS BOARD

### [ 14 CFR Part 383]

[SPDR–71, Docket 34997, dated July 19, 1979]

### Consumer Protections for Members of Scheduled-Service Tour Groups

**AGENCY:** Civil Aeronautics Board.

**ACTION:** Advance Notice of Proposed Rulemaking.

**SUMMARY:** The Civil Aeronautics Board requests comments on new consumer protection provisions for tours operated on scheduled air service. Views are sought on whether consumer protection rules are needed for scheduled-service tours, on the CAB's statutory authority to prescribe such rules, and on the form those rules should take. A petition for rulemaking on this subject was filed by Mr. Steven K. Morrison.

**DATES:** Comments by: October 23, 1979; reply comments by: November 22, 1979.

Comments and relevant information received after these dates will be considered by the Board only to the extent practicable.

Requests to be put on the Service List by: August 7, 1979.

Applications for compensation for the cost of participating in this proceeding by: August 24, 1979.

The Docket Section prepares the Service List and sends it to each person listed, who then serves his comments on others on the list.

**ADDRESSES:** Twenty copies of comments should be sent to Docket 34997, Civil Aeronautics Board, 1825 Connecticut Avenue NW., Washington, D.C. 20428. Individuals may submit their views as consumers without filing multiple copies. Comments may be examined in Room 711, Civil Aeronautics Board, 1825 Connecticut Avenue NW., Washington, D.C., as soon as they are received.

**FOR FURTHER INFORMATION CONTACT:** About the proposed rule—David Schaffer, Office of the General Counsel, Civil Aeronautics Board, Washington, D.C. 20428; (202) 673–5442. About compensated public participation—Russell Patterson, Office of the Managing Director or; (202) 673–5189.

**APPLICATIONS FOR COMPENSATED PARTICIPATION:**

Because the Board believes that broad public participation will be particularly useful in deciding what, if any, rules are needed to protect members of scheduled-service tour groups, and because we went to hear all relevant viewpoints, we explicitly invite applications for compensation to participate in this rulemaking proceeding. The closing date for applications for financial assistance is August 24, 1979. Eligibility criteria and procedures for compensation are set out in 14 CFR Part 304 (43 FR 56878, December 5, 1978). That part and a handbook explaining the program are available from the Distribution Section, Publications Services Division, Civil Aeronautics Board, Washington, D.C. 20428.

**SUPPLEMENTARY INFORMATION:**

In SPR–156, 44 FR 12971, March 9, 1979, the Board adopted consumer protection amendments to its Public Charter rule, 14 CFR Part 380. These amendments applied only to tour operators utilizing charter service. During the comment period preceding that rule, some commenters argued that the consumer protection rules should also be made applicable to scheduled service tour operators.

The Federal Trade Commission (FTC) stated in its comment that most of the problems addressed in that rule were also faced by tourists who travel by scheduled air service. It claimed that extending the rule to cover scheduled tour packages was justified by both statutory and case law and that such an extension would allow the board to formulate non-discriminatory rules to insure that one portion of the industry did not gain an unjustified competitive advantage.

Non-charter tours were not covered by SPR–156 because such action was beyond the scope of that rulemaking. To have included non-charter tours would have required an additional proposal and delayed needed regulation.

The Board recognizes that there may be consumer problems on tours operated on scheduled air transportation. The board has received a petition from Mr. Steven K. Morrison asking the Board to amend its rules to apply the charter consumer protection provisions to all tour packages and particularly to those "sold by a scheduled commercial airline." This notice is the Board's response to that petition. The Morrison petition is not, however, the only indication of problems in this area. There is also considerable Congressional concern about consumer abuse by the air travel industry. The House Subcommittee on Commerce, Consumer, and Monetary Affairs of the Committee on Government Operations held hearings on this problem in April. In addition, the Board has logged about 1500 complaints involving tours conducted with scheduled air transportation in the past 3 years.

We do not know whether the problem is serious enough to warrant imposing new regulation on non-charter operators. We receive fewer consumer complaints about scheduled service than about charters, although the former involved more passengers. This may indicate a lower rate of consumer problems for scheduled-service tours. The lower rate may also result from the greater involvement of the airline. With a charter tour, the passenger is dealing with an independent operator, who in turn buys space from an airline. The charter operator is the principal in the transaction with the consumer, and the choice of airline is often not a major consideration in the consumer's selection of a tour. It is thus the charter operator who gets complaints and is liable when there are consumer problems. Although most operators are well-established and conscientious, they may not always be in a position to offer

AR2022_200349

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103 and 212**

[CIS No. 2519–2011; DHS Docket No. USCIS–2012–0003]

**RIN 1615–AB99**

## Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** On April 2, 2012, U.S. Citizenship and Immigration Services (USCIS) published a proposed rule to amend its regulations to allow certain immediate relatives of U.S. citizens who are physically present in the United States to request provisional unlawful presence waivers prior to departing from the United States for consular processing of their immigrant visa applications. This final rule implements the provisional unlawful presence waiver process. It also finalizes clarifying amendments to other provisions within our regulations. The Department of Homeland Security (DHS) anticipates that these changes will significantly reduce the length of time U.S. citizens are separated from their immediate relatives who engage in consular processing abroad. DHS also believes that this new process will reduce the degree of interchange between the U.S. Department of State (DOS) and USCIS and create greater efficiencies for both the U.S. Government and most provisional unlawful presence waiver applicants.

DHS reminds the public that the filing or approval of a provisional unlawful presence waiver application will *not:* Confer any legal status, protect against the accrual of additional periods of unlawful presence, authorize an alien to enter the United States without securing a visa or other appropriate entry document, convey any interim benefits (*e.g.,* employment authorization, parole, or advance parole), or protect an alien from being placed in removal proceedings or removed from the United States in accordance with current DHS policies governing initiation of removal proceedings and the use of prosecutorial discretion.

**DATES:** This final rule is effective March 4, 2013.

**FOR FURTHER INFORMATION CONTACT:** Roselyn Brown-Frei, Office of Policy and Strategy, Residence and Naturalization Division, U.S. Citizenship and Immigration Services,

Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2099, Telephone (202) 272–1470 (this is not a toll free number).

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of the Major Provisions of the Regulatory Action
  C. Costs and Benefits
II. Legal Authority
III. Background
  A. Notice of Intent
  B. Proposed Rule
  C. Final Rule
IV. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority To Implement the Provisional Unlawful Presence Waiver Process
  C. Eligibility for the Provisional Unlawful Presence Waiver
  D. Filing Requirements and Fees
  E. Adjudication
  F. Denials, Motions To Reopen or Reconsider, and Appeals
  G. Effect of Pending or Approved Provisional Unlawful Presence Waivers
  H. Automatic Revocation
  I. Comments on Form I–601A, Application for Provisional Unlawful Presence Waiver
  J. Miscellaneous Comments
  K. Comments on Executive Orders 12866/13563 Analysis
V. Regulatory Amendments
VI. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  D. Executive Order 13132
  E. Executive Order 12988 Civil Justice Reform
  F. Paperwork Reduction Act
  G. Regulatory Flexibility Act

**SUPPLEMENTARY INFORMATION:**

# I. Executive Summary

## A. Purpose of the Regulatory Action

### 1. Need for the Regulatory Action

Certain spouses, children, and parents of U.S. citizens (immediate relatives) who are in the United States are not eligible to apply for lawful permanent resident (LPR) status while in the United States. Instead, these immediate relatives must travel abroad to obtain an immigrant visa from the Department of State (DOS) to return to the United States to request admission as an LPR, and, in many cases, also must request from the Department of Homeland Security (DHS) a waiver of inadmissibility as a result of their unlawful presence in the United States. Currently, these immediate relatives

cannot apply for the waiver until after their immigrant visa interviews abroad. As a result, these immediate relatives must remain outside of the United States, separated from their U.S. citizen spouses, parents, or children, while USCIS adjudicates their waiver applications. In some cases, waiver application processing can take well over one year, prolonging the separation of these immediate relatives from their U.S. citizen spouses, parents, and children. In addition, the action required for these immediate relatives to obtain LPR status in the United States—departure from the United States to apply for an immigrant visa at a DOS consulate abroad—is the very action that triggers the unlawful presence inadmissibility grounds under section 212(a)(9)(B)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(a)(9)(B)(i). As a result of the often lengthy processing times and uncertainty about whether they qualify for a waiver of the unlawful presence inadmissibility grounds, many immediate relatives who may qualify for an immigrant visa are reluctant to proceed abroad to seek an immigrant visa.

### 2. Provisional Unlawful Presence Waiver Process

Through this final rule, DHS is changing its current process for the filing and adjudication of certain waivers of inadmissibility for eligible immediate relatives of U.S. citizens, who are physically present in the United States but will proceed abroad to obtain their immigrant visas. The new waiver process will allow eligible immediate relatives to apply for a provisional unlawful presence waiver while they are still in the United States and before they leave to attend their immigrant visa interview abroad. DHS anticipates that this new provisional unlawful presence waiver process will significantly reduce the time that U.S. citizens are separated from their immediate relatives. USCIS's approval of an applicant's provisional unlawful presence waiver prior to departure also will allow the DOS consular officer to issue the immigrant visa without further delay, if there are no other grounds of inadmissibility and if the immediate relative is otherwise eligible to be issued an immigrant visa.

### 3. Legal Authority

The Homeland Security Act of 2002, Public Law 107–296 (Homeland Security Act of 2002), section 102, 116 Stat. 2135, 6 U.S.C. 112, and INA section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security

AR2022_200350

(Secretary) with the administration and enforcement of the immigration and naturalization laws. The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The regulation governing certain inadmissibility waivers is 8 CFR 212.7. The fee schedule for provisional unlawful presence waiver applications is found at 8 CFR 103.7(b)(1)(i)(AA).

*B. Summary of the Major Provisions of the Regulatory Action*

On April 2, 2012, U.S. Citizenship and Immigration Services (USCIS) published a Notice of Proposed Rulemaking (NPRM), which outlined the provisional unlawful presence waiver process. *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 77 FR 19902 (April 2, 2012). After careful consideration of the public comments, DHS adopts most of the proposed regulatory amendments without change, except for the provisions noted below:

1. Section 103.7(c)(3)(i)

In the proposed rule, DHS noted in the supplementary text that applicants for a provisional unlawful presence waiver cannot seek a fee waiver for the Form I–601A filing fees or the required biometric fees. *See* 77 FR at 19910. DHS incorrectly referenced proposed regulatory text at 8 CFR 103.7(b)(1)(i)(C) and inadvertently omitted the correct citation to the regulatory provision being amended and the amendatory text. DHS has corrected this error and has included an amendment to 8 CFR 103.7(c)(3) in this final rule to clarify that fee waivers are not available for the biometric or filing fees for the Form I–601A. *See* section 103.7(c)(3)(i).

2. Section 212.7(a)(4)(iv)

DHS proposed an amendment to 8 CFR 212.7(a)(4) to provide that termination of an alien's conditional LPR status also would result in automatic revocation of an approved waiver of inadmissibility. *See* 77 FR at 19912 and 19921. Several commenters noted that INA section 216(f), 8 U.S.C. 1186a(f), only allows for automatic revocation of waivers of inadmissibility approved under INA sections 212(h)

and (i), 8 U.S.C. 1182(h) and (i). DHS agrees and has revised the amendment to 8 CFR 212.7(a)(4) to clarify that automatic revocation of approved waivers upon termination of conditional resident status only applies to approved waivers based on INA sections 212(h), 8 U.S.C. 1182(h) (waivers for certain criminal offenses), and INA section 212(i), 8 U.S.C. 1182(i) (waivers for fraud or willful misrepresentation of a material fact). *See* section 212.7(a)(4)(iv).

3. Section 212.7(e)(1)

During discussions about the proposed provisional unlawful presence waiver process and how it would affect aliens in removal proceedings, a question arose regarding the authority of Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) immigration judges (IJs) and whether IJs would adjudicate Forms I–601A for aliens in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I–601A waivers centralized and adjudicated by one agency, USCIS, especially given the intended streamlined nature of the process and the need for close coordination with DOS once a waiver is decided. DHS therefore added a new paragraph to clarify that the *Application for Provisional Unlawful Presence Waiver,* Form I–601A, will be filed only with USCIS, even if an alien is in removal proceedings before EOIR. *See* section 212.7(e)(1).

4. Section 212.7(e)(2)

DHS restructured this provision and added language to make clear that approval of the provisional unlawful presence waiver is discretionary and does not constitute a grant of any lawful immigration status or create a period of stay authorized by the Secretary for purposes of INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* section 212.7(e)(2)(i). DHS also clarified that a pending or approved provisional unlawful presence waiver does not authorize any interim benefits such as employment authorization or advance parole. *See* section 212.7(e)(2)(ii).

5. Section 212.7(e)(3)

Many commenters asked DHS to expand eligibility for the provisional unlawful presence waiver process to other categories of aliens seeking to immigrate to the United States. DHS considered the commenters' suggestions but is limiting the provisional unlawful presence waiver to immediate relatives of U.S. citizens. After assessing the effectiveness of the new provisional

unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process to other categories.

6. Former Section 212.7(e)(4)(ii)(H)

DHS initially proposed to reject a provisional unlawful presence waiver application if an alien has not indicated on the application that the qualifying relative is a U.S. citizen spouse or parent. *See* 77 FR at 19922. DHS has determined that this criterion is more appropriate for an adjudicative decision and that this assessment should not be made through a review during the intake process. Thus, DHS has deleted this rejection criterion in the final rule.

7. Section 212.7(e)(4)(iv)

DHS proposed excluding aliens from the provisional unlawful presence waiver process who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that the Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may

**538**   **Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations

reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State initially acted to schedule an initial immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based, prior to the date of publication of this final rule. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

### 8. Section 212.7(e)(4)(v)

DHS initially proposed excluding all aliens who were in removal proceedings from the provisional unlawful presence waiver process, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; or (3) removal proceedings had been administratively closed but subsequently were reopened to grant voluntary departure. *See* 77 FR at 19922. In this final rule, DHS has not used the initial proposed categories of aliens above. Rather, DHS has decided to allow aliens in removal proceedings to participate in this new provisional unlawful presence waiver process if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. *See* section 212.7(e)(4)(v). Aliens whose removal proceedings are terminated or dismissed are covered in the general population of aliens who are eligible to apply for a provisional unlawful presence waiver. Aliens who have had their NTAs cancelled by ICE are also covered in the general population of aliens who are eligible to apply for a provisional unlawful presence waiver, since their removal proceedings were never initiated through filing of an NTA with EOIR.

Through this final rule, the Form I–601A and its accompanying instructions, and additional information published on the USCIS Web site, DHS also will notify such applicants that, if granted the provisional unlawful presence waiver, applicants should seek termination or dismissal of their removal proceedings. The request for termination or dismissal should be granted *before* they depart for their immigrant visa interviews to avoid possible delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. *See* section 212.7(e)(2). Finally, DHS has made conforming changes to the filing requirements in section 212.7(e)(5)(i) to include aliens who are in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A.[1]

### 9. Section 212.7(e)(4)(ix)

For operational reasons, DHS initially proposed rejecting applications filed by aliens who previously filed a Form I–601A with USCIS. DHS designed the provisional unlawful presence waiver process to streamline waiver and immigrant visa processing by closely tying adjudication of the Form I–601A to the National Visa Center (NVC) immigrant visa processing schedule. DHS considered the potential impact of multiple filings on this schedule, the possible delays to the immigrant visa process, and the potential for agency backlogs.

Many commenters, however, expressed concern that limiting the program to one-time filings could potentially exclude individuals who otherwise would qualify for the provisional unlawful presence waiver.

Upon consideration of these comments, DHS agrees that an alien could have compelling reasons for filing another provisional unlawful presence application, especially in cases where an alien's circumstances have changed or the alien was a victim of individuals or entities not authorized to practice immigration law. DHS agrees that a one-time filing limitation is too restrictive and is removing the single filing limitation. If an individual's provisional unlawful presence waiver request is

denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing prior to final adjudication, or whose Form I–601A is denied, can apply for a traditional waiver by filing Form I–601, Application for Waiver of Grounds of Inadmissibility, with the USCIS Lockbox, after he or she attends the immigrant visa interview abroad and after DOS conclusively determines that the individual is inadmissible on a ground(s) that is waivable. DHS, therefore, has removed this provision from the final rule.

### 10. Section 212.7(e)(5)(ii)

DHS corrected a typographical error in the prefatory language to this section, removing the term "application" the second time it appears in the paragraph. *See* section 212.7(e)(5)(ii).

### 11. Section 212.7(e)(5)(ii)(A)

DHS proposed a list of rejection criteria for Forms I–601A filed at the Lockbox, including the criterion to reject for failure to pay the required or correct fee for the waiver application. *See* 77 FR at 19922. DHS inadvertently referenced the biometric fee as a basis for rejection in the supplementary information. *See* 77 FR at 19911. DHS has modified the regulatory text to make clear that a Form I–601A will only be rejected for failure to pay the required or correct application filing fee and not the biometric fee. *See* section 212.7(e)(5)(ii)(A).

### 12. Section 212.7(e)(5)(ii)(G)

DHS proposed rejecting provisional unlawful presence waiver applications filed by aliens who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially

---

[1] DHS recognizes that this is a departure from the long-standing principle in immigration law and policy that aliens must establish eligibility not only at the time of filing but also up until the time USCIS adjudicates the case. *See, e.g., Matter of Isidro-Zamorano,* 25 I&N Dec. 829, 830–31 (BIA 2012) (explaining the "well established" principle that application for an immigration benefit is "continuing" and that eligibility is determined at the time of adjudication, not at the time of application). However, DHS believes that a departure from this general principle is permissible and warranted in this limited context, especially since the provisional unlawful presence waiver process is purely discretionary. Furthermore, the provisional unlawful presence waiver is not valid while the alien remains in the United States. It only takes effect after the alien departs from the United States, appears for his or her immigrant visa interview, and is determined by DOS to be otherwise eligible for an immigrant visa, in light of the approved I–601A provisional unlawful presence waiver.

**AR2022_200352**

acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her immigrant visa interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien if USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule an immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner. *See* section 212.7(e)(5)(ii)(G).

### 13. Section 212.7(e)(9)

DHS initially proposed that aliens who were denied a provisional unlawful presence waiver could not file a new Form I–601A. Instead, such aliens would have to leave the United States for their immigrant visa interviews and file a Form I–601, Application for Waiver of Grounds of Inadmissibility, after the Department of State determined they were inadmissible. Some commenters were concerned that limiting aliens to a single filing of an I–601A would potentially bar aliens from

qualifying for a provisional unlawful presence waiver, especially when they may have experienced changed circumstances that would result in extreme hardship to the U.S. citizen spouse or parent. In light of these concerns, DHS has amended this final rule to allow aliens who are denied a provisional unlawful presence waiver to file another Form I–601A, based on the original approved immigrant visa petition. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another Form I–601A under paragraph (e) provided the alien meets all of the requirements. The alien's case must be pending with the Department of State, and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

### 14. Section 212.7(e)(10)

DHS has amended this provision to allow an applicant to withdraw a previously-filed provisional unlawful presence waiver application before final adjudication and file another Form I–601A, in accordance with the form instructions and with the required filing and biometric services fees. *See* section 212.7(e)(10).

### 15. Section 212.7(e)(14)(iv)

DHS clarified the language in section 212.7(e)(14)(v) to specify that a provisional unlawful presence waiver is automatically revoked if the alien, at any time before or after the approval of the provisional unlawful presence waiver, or before the immigrant visa is issued, reenters or attempts to reenter the United States without being admitted or paroled. *See* section 212.7(e)(14)(iv).

### C. Costs and Benefits

This final rule is expected to result in a reduction of the time that U.S. citizens are separated from their immediate relatives, thus reducing the financial and emotional hardship for these families. In addition, the Federal Government should achieve increased efficiencies in processing immigrant visas for individuals subject to the unlawful presence inadmissibility bars under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). We expect costs to the Federal government of the provisional unlawful presence waiver process to be offset by the additional fee revenue collected for form processing.

DHS estimates the discounted total ten-year cost of this rule will range from approximately $196 million to

approximately $538.1 million at a seven percent discount rate. Compared to the current waiver process, this rule requires that provisional unlawful presence waiver applicants submit biometric information. Included in the total cost estimate is the cost of collecting biometrics, which DHS estimates will range from approximately $32.9 million to approximately $56.6 million discounted at seven percent over ten years. Also included in the total cost estimate are the costs faced by those who choose to file new provisional unlawful presence waiver applications based on the same approved immediate relative petition if their original Form I–601A is denied or withdrawn, which DHS decided to allow in response to public comments to the proposed rule. Individuals that file a new Form I–601A will still face the biometric and Form I–601A filing fees and opportunity costs, which we estimate will range from approximately $56.2 million to approximately $96.7 million discounted at seven percent over ten years. In addition, as this rule significantly streamlines the current process, DHS expects that additional applicants will apply for the provisional unlawful presence waiver. To the extent that this rule induces new demand for immediate relative immigrant visas, additional immigration benefit forms, such as the Petition for Alien Relative, Form I–130, will be filed compared to the pre-rule baseline. These additional forms will involve fees being paid by applicants to the Federal Government for form processing and additional opportunity costs of time being incurred by applicants to provide the information required by the forms. The cost estimate for this rule also includes the impact of this induced demand, which DHS estimates will range from approximately $106.9 million to approximately $384.8 million discounted at seven percent over ten years.

Estimates for the costs of the rule were developed assuming that current demand for requesting waivers of grounds of inadmissibility based only on unlawful presence is constrained because of concerns that families may endure lengthy separations under the current system. Due to uncertainties as to the degree of the current constraint of demand, DHS used a range of constraint levels with corresponding increases in demand to estimate the costs. The costs for each increase in demand are summarized below.

ESTIMATED INCREASE IN COSTS WITH AN INCREASE IN DEMAND OF:

| | 25% | 50% | 75% | 90% |
|---|---|---|---|---|
| **Cost of Biometrics Collection and Processing** | | | | |
| 10 year Costs Undiscounted ................................................ | $46,803,460 | $59,088,534 | $71,373,907 | $78,746,295 |
| Total 10 year Costs Discounted at 7% ................................... | 32,907,683 | 42,030,423 | 51,153,460 | 56,628,050 |
| Total 10 year Costs Discounted at 3% ................................... | 39,926,220 | 50,653,297 | 61,380,675 | 67,818,069 |
| **Cost of Biometrics Collection and Processing and Form I–601A for Re-filers** | | | | |
| 10 year Costs Undiscounted ................................................ | $79,942,420 | $100,924,521 | $121,908,872 | $134,499,783 |
| Total 10 year Costs Discounted at 7% ................................... | 56,207,656 | 71,788,866 | 87,371,675 | 96,721,450 |
| Total 10 year Costs Discounted at 3% ................................... | 68,195,707 | 86,516,943 | 104,840,098 | 115,834,193 |
| **Costs of Applications for the Additional (Induced) Demand for Immigrant Visas** | | | | |
| 10 year Costs Undiscounted ................................................ | $143,931,692 | $287,854,640 | $431,775,838 | $518,143,249 |
| Total 10 year Costs Discounted at 7% ................................... | 106,881,772 | 213,757,395 | 320,631,489 | 384,766,730 |
| Total 10 year Costs Discounted at 3% ................................... | 125,678,197 | 251,348,945 | 377,018,045 | 452,432,274 |
| **Total Costs to New Applicants** | | | | |
| 10 year Costs Undiscounted ................................................ | $270,677,572 | $447,867,695 | $625,058,617 | $731,389,326 |
| Total 10 year Costs Discounted at 7% ................................... | 195,997,110 | 327,576,683 | 459,156,625 | 538,116,229 |
| Total 10 year Costs Discounted at 3% ................................... | 233,800,123 | 388,519,186 | 543,238,818 | 636,084,535 |

## II. Legal Authority

The Homeland Security Act of 2002, Public Law 107–296 (Homeland Security Act of 2002), section 102, 116 Stat. 2135, 6 U.S.C. 112, and section 103 of the INA, 8 U.S.C. 1103, charge the Secretary with administration and enforcement of the immigration and naturalization laws. The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The regulation governing certain inadmissibility waivers is 8 CFR 212.7. The fee schedule for provisional unlawful presence waiver applications is found at 8 CFR 103.7(b)(1)(i)(AA).

## III. Background

### A. Notice of Intent

On January 9, 2012, DHS published a notice in the **Federal Register**— Provisional Waivers of Inadmissibility for Certain Immediate Relatives of U.S. Citizens, 77 FR 19902 (Jan. 9, 2012)— announcing its intent to change the current process for certain applications for waivers of inadmissibility filed in connection with an immediate relative immigrant visa application. The notice explained the proposed process that DHS was considering and that DHS

would further develop a proposal, which it would ultimately finalize through the rulemaking process.

On January 10, 2012, USCIS conducted a stakeholder engagement to discuss the Notice of Intent. More than 900 people participated via telephone and in person. USCIS provided an overview of how the proposed process changes may affect filing and adjudication. USCIS also addressed questions from stakeholders. Topics covered included eligibility, procedures, and consequences of an approval or denial of a provisional unlawful presence waiver.

### B. Proposed Rule

On April 2, 2012, DHS published a proposed rule in the **Federal Register**, proposing to amend the regulations to revise the process for applying for waivers of inadmissibility. *See* 77 FR 19902. DHS received over 4,000 public comments to the proposed rule. Comments were submitted by individuals, immigrant advocacy groups, attorneys, accredited representatives, religious organizations and leaders, individuals in academia, Members of Congress, and members of the media. Some comments also were submitted through mass mailing campaigns or petitions, expressing support for, or opposition to, the provisional unlawful presence waiver process. DHS counted each petition or mass mailing as one comment, but acknowledged the number of signatures associated with each comment.

Opinions on the proposed rule varied. A large number of comments (3,442)

were favorable and supported the implementation of the new provisional unlawful presence waiver process. A few hundred commenters (430) opposed the proposed rule, in many instances because of a misperception that the provisional unlawful presence waiver process would grant legal status to aliens not lawfully present in the United States and allow them to remain in the United States permanently. DHS also received 310 comments, some of which did not address any aspect of the proposed rule or reflect a commenter's support or opposition to the proposed rule. These 310 commenters also did not make any specific suggestions that related to the proposed rule. Finally, DHS received a comment in the form of a petition signed by 118,593 individuals who opposed the proposed rule; the signed petition, however, reflected the same misperception[2] about the provisional unlawful presence waiver process as seen in some of the comments from others who opposed the rule.

In preparing this final rule, DHS considered these public comments and other relevant materials contained in the docket. All comments may be reviewed at the Federal Docket Management System (FDMS) at *http://*

---

[2] The petition incorrectly summarized the substance and nature of the proposed rule. The petition also erroneously concluded that the provisional unlawful presence waiver process granted aliens not lawfully present in the United States a temporary legal status in the United States and put them on the "fast track" to permanent legal status—neither of which can occur under this final rule.

*www.regulations.gov,* docket number USCIS–2012–0003.

*C. Final Rule*

This final rule adopts most of the regulatory amendments set forth in the proposed rule without change. The rationale for the proposed rule and the reasoning provided in its preamble remain valid with respect to these regulatory amendments. DHS also has made several clarifying changes to the regulatory text, based on suggestions from commenters and on policy decisions made after publication of the proposed rule. The changes to the regulatory text are summarized in Section V below. This final rule also adopts, without change, the regulatory amendment clarifying 8 CFR 212.7(a)(1) and (3). This final rule does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the provisional unlawful presence waiver process or the clarifying amendments to 8 CFR 212.7(a). This final rule also does not change the procedures or policies of other DHS components or federal agencies, or resolve issues outside the scope of this rulemaking. After assessing the effectiveness of the provisional unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process in the future.

## IV. Public Comments on the Proposed Rule [3]

*A. Summary of Public Comments*

The 60-day public comment period for the proposed rule ended on June 1, 2012. Commenters included individuals, immigrant advocacy groups, attorneys, and accredited representatives, as well as religious organizations and leaders, individuals in academia, Members of Congress, and members of the media. Some comments also were submitted through mass mailing campaigns or petitions, expressing support for, or opposition to, the provisional unlawful presence waiver process. The majority of comments came from supporters of the proposed rule who agreed that it would promote family unity and reduce the length of time immediate relatives (spouses, children, and parents of a U.S. citizen over the age of 21 years) would

be separated from the U.S. citizen petitioner. Many also agreed that it would relieve the financial burdens that the current process places on American families, encourage individuals to obtain a lawful status, and benefit the United States generally. Numerous commenters shared their personal stories about the hardships they experienced after being separated from their loved ones, and applauded DHS for taking a step to reduce such scenarios in the future.

Several commenters strongly disagreed with the proposed provisional unlawful presence waiver process, arguing that the Executive Branch did not have the legal authority to make the proposed changes without approval from Congress. Other commenters argued that the proposed rule was unconstitutional. Many commenters who opposed the change believed that the current immigration laws are not properly enforced and that DHS favors illegal aliens over legal immigrants. Some commenters also believed that DHS was rewarding illegal behavior by publishing this rule. These commenters stated that this rule would only encourage illegal immigration and fraud, would be harmful to the American economy, and that the Federal Government's money would be better invested in assisting U.S. citizens and legal immigrants, rather than illegal aliens and their U.S. citizen families. A few commenters opposed the proposed rule because they believed that it is unfair to exclude individuals outside the United States from eligibility for the proposed provisional unlawful presence waiver process or because the requirements articulated in the rule (for example, the lack of protection from removal) were too stringent or not helpful.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses them in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by the commenters. DHS received few or no comments on the following topics: (1) The rejection criteria, (2) withdrawals, and (3) the validity of an approved provisional unlawful presence waiver.

*B. Legal Authority To Implement the Provisional Unlawful Presence Waiver Process*

Several commenters questioned DHS's legal authority to implement the provisional unlawful presence waiver process. Commenters argued that the proposed rule was unconstitutional and that it was the role of Congress, not the

Executive Branch, to create immigration laws and policy. DHS disagrees with the view that this rule exceeds the Secretary's legal authority.

Congress has plenary authority over immigration and naturalization and, through its legislative power, may enact legislation establishing immigration law and policy. *See, e.g., Arizona* v. *United States,* 132 S. Ct. 2492, 2498 (2012) (''The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations.'') (citations omitted); *see also Fiallo* v. *Bell,* 430 U.S. 787, 792 (1977). The Executive Branch, which includes DHS, is charged with implementing the laws passed by Congress. Through section 102 of the Homeland Security Act of 2002, 106 Stat. 2135, 6 U.S.C. 112, and INA section 103, 8 U.S.C. 1103, Congress has specifically charged the Secretary with the administration and enforcement of the immigration and naturalization laws. The Secretary is authorized to promulgate rules and ''perform such other acts as he deems necessary for carrying out his authority'' based upon considerations rationally related to the immigration laws. INA section 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary has broad discretion to determine the most effective way to administer the laws. *See, e.g., Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA ''need not specifically authorize each and every action taken by the Attorney General [(now Secretary of Homeland Security)], so long as his action is reasonably related to the duties imposed upon him''); *see also Arizona,* 132 S. Ct. at 2499 (noting ''broad discretion exercised by immigration officials'' under the immigration laws).

The provisional unlawful presence waiver process is not a substantive change to the immigration laws but a procedural change in the way that a specific type of waiver application can be filed with USCIS. Generally, individuals who are required by law to obtain a waiver of inadmissibility must apply for the waiver through the procedures prescribed by the Secretary, as permitted under the Homeland Security Act and the INA. Current waiver filing procedures for an individual processing an immigrant visa application abroad at a consular post require the individual to apply for a waiver of grounds of inadmissibility

---

[3] USCIS received some comments prior to the official comment period, including two letters signed by over 200 immigrant advocate organizations. Most of the concerns or suggestions made by the pre-publication commenters were captured through other public comments submitted during the official period.

while outside the United States and after his or her immigrant visa interview. Under this final rule, DHS is permitting a category of aliens—certain immediate relatives of U.S. citizens who will be pursuing an immigrant visa application at a consular post abroad—to file an application for a provisional unlawful presence waiver of inadmissibility due to unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), while still in the United States. By creating these new filing procedures, DHS anticipates that the immigrant visa waiver process will become more efficient for the U.S. Government and for U.S. citizens and their immediate relatives. It will reduce the length of time American families are separated while the immigrant visa applicant is going through the immigrant visa process. The applicant may remain in the United States with his or her family until the time the applicant must depart from the United States to attend his or her immigrant visa interview.

## C. Eligibility for the Provisional Unlawful Presence Waiver

### 1. Preference Categories

A large number of commenters focused on who is eligible to participate in the provisional unlawful presence waiver process. Some commenters believed the proposed rule was too restrictive and excluded many individuals who also could benefit from the new process. Others asked why DHS was not expanding eligibility to all families and their close immediate or distant relatives such as in-laws, grandparents, aunts and uncles. The commenters also asked why DHS did not include all family-sponsored or employment-based immigrants, especially if aliens in a particular immigrant visa category had current visa availability. The commenters argued that there was no discernible difference between immediate relatives and preference aliens who have current visa availability. The commenters also indicated that the hardships of lengthy family separation are just as compelling for LPR families as they are for U.S. citizen families. The commenters also asked that, if DHS will not expand the provisional unlawful presence waiver process to all LPR families, DHS should at least consider expanding the provisional unlawful presence waiver process to LPRs who have U.S. citizen children.

Several Congressional commenters argued that there was no compelling, legal, operational or other rationale that would justify DHS's decision to limit

the provisional unlawful presence waiver process to immediate relatives. The Congressional commenters stated that it was unambiguous that Congress intended the unlawful presence waiver under section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), to be available to immediate relatives and certain preference aliens, including unmarried adult children of U.S. citizens and LPR spouses and children. The Congressional commenters thought that DHS's distinction could not be justified based on DHS's reading of congressional intent. Instead, the Congressional commenters argued that DHS would be ignoring clear congressional intent and cause the provisional unlawful presence waiver process to be underutilized by entire categories of persons for whom the waiver is now available. Finally, many commenters believed that expanding the provisional unlawful presence waiver process to preference categories would offer more measurable benefits to USCIS and DOS and would facilitate legal immigration by encouraging a more sizeable population to seek to adjust their status.

Suggestions for additional eligibility criteria or categories of eligible aliens varied but most commenters asked DHS to consider expanding eligibility to: (1) All preference categories generally; (2) unmarried sons and daughters of U.S. citizens who are over the age of 21 years; (3) married sons and daughters or siblings of U.S. citizens; (4) spouses and minor children of LPRs; (5) parents of minor U.S. citizen children; (6) children who were brought to the United States when young, such as those aliens who would qualify under the proposed Development, Relief and Education for Alien Minors (DREAM) Act [4]; (7) preference aliens who have lived in the United States for more than 10 years; (8) family members of personnel in the U.S. Armed Forces, including the National Guard, reserves, and veterans; and (9) any preference category with current visa availability.

The focus of the provisional unlawful presence waiver process is to reduce the impact of the current waiver process on U.S. citizens by reducing the time U.S. citizens are separated from their immediate relatives. DHS chose to limit eligibility to immediate relatives of U.S. citizens not only because the immigrant

[4] The DREAM Act, a bill that aims to permit children of undocumented immigrants, who were brought to the United States at a young age, to obtain a legal status if they meet certain criteria. Versions of the DREAM Act have been introduced and reintroduced on several occasions, including most recently in May 2011, but none has passed Congress to date. *See, e.g.,* Development, Relief and Education for Alien Minors Act of 2011, S. 952, 112th Cong.

visas for this category are always available, but also because it is consistent with Congress' policy choice to prioritize family reunification of immediate relatives of U.S. citizens over other categories of aliens. For example, family-sponsored and employment-based categories have annual numerical limits, whereas there are no numerical limits on the availability of immigrant visas to immediate relatives. *Compare* INA section 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), *with* INA section 203(a), (b), 8 U.S.C. 1153(a), (b). Focusing on U.S. citizens as part of this discretionary process also is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens and between classes of aliens in immigration laws and policies. *See, e.g., Fiallo,* 430 U.S. at 792; *Mathews* v. *Diaz,* 426 U.S. 67, 81 (1976).

DHS also believes that focusing the provisional unlawful presence waiver process on immediate relatives of U.S. citizens is consistent with recognized government interests in encouraging eligible long-time LPRs to naturalize so that their spouses, parents, and children under the age of 21 years can become immediate relatives and also benefit from this new process. *See, e.g., City of Chicago* v. *Shalala,* 189 F.3d 598, 608 (7th Cir. 1999).

Family-sponsored and employment-based preference categories have annual numerical limits. Therefore, preference categories carry an inherent risk that they may become oversubscribed; if an individual's immigrant visa is based upon a preference category, his or her immigrant visa may become unavailable at any given time upon oversubscription of the preference category. Retrogression of visa availability can have a direct, adverse impact on agency backlogs and processing.

DHS appreciates the comments from the public on these issues and has given them serious consideration. DHS will consider future expansion of the program after DHS and DOS have assessed the effectiveness of the provisional unlawful presence waiver process and the operational impact it may have on existing agency processes and resources *See Beach Commc'ns* v. *FCC,* 508 U.S. 307, 316 (1993) (observing that policymakers ''must be allowed leeway to approach a perceived problem incrementally''). For these reasons, DHS has not adopted the commenters' suggestions. At this time, the provisional unlawful presence waiver process will remain available only to individuals who are immediate relatives of U.S. citizens (*i.e.,* spouses, children, and parents (if the U.S. citizen

is at least 21 years of age)), as defined in INA section 201(b), 8 U.S.C. 1151(b).

2. Aliens Outside the United States

Numerous commenters asked DHS to extend eligibility to individuals who are currently outside the United States. Commenters argued that immediate relatives who had already departed from the United States to consular process or who voluntarily left the United States to avoid the consequences of removal should not be punished for their actions. Some commenters also felt that it was unfair to speed up the process for individuals residing illegally in the United States, while not doing anything for those individuals who departed the United States voluntarily to comply with the rules. Many commenters shared their personal stories about the difficulties of long-term separation from their spouses and the impact it had on them and their children. Most commenters wanted their family members abroad to have the opportunity to participate in a faster, more effective process or for DHS to at least provide some other form of relief to overcome the effects of the 3-year and 10-year bars for these individuals.

DHS recognizes that there are many difficulties faced by U.S. citizens when their immediate relatives must obtain waivers while outside the United States. DHS, however, believes that creating a provisional unlawful presence waiver process abroad would be duplicative of DOS's current immigrant visa processes and USCIS's current Form I–601, Application for Waiver of Grounds of Inadmissibility waiver process, which would not be an efficient use of agency resources.

To alleviate some of the delays in overseas waiver processing, USCIS recently centralized Form I–601 filings such that individuals located outside the United States now file the Form I–601 in the United States where USCIS has sufficient resources at its service centers to accommodate filing surges.[5] Applicants who need waivers are no longer required to schedule a ''waiver filing'' appointment with the U.S. Embassy or consulate, which in some cases required applicants to wait up to two months just for these waiver filing appointments. Centralization of Form I–601 filings from abroad should significantly reduce the time individuals must spend abroad, waiting to receive immigrant visas so they can

return to the United States. Centralizing Form I–601 filings in this manner also will significantly reduce the current backlog that exists at USCIS international offices. In addition, as of June 4, 2012, when USCIS began to implement centralized filing of Forms I–601 for individuals outside of the United States, USCIS had approximately 10,200 cases pending. USCIS has dedicated additional resources on a temporary basis to expeditiously process the cases filed prior to centralization, as well as those that individuals continue to file at the USCIS Field Office in Ciudad Juarez, Mexico through December 4, 2012.[6] USCIS anticipates that it will complete processing of all cases pending in USCIS offices abroad within approximately six months of the effective date of this rule.

For these reasons, DHS did not adopt the commenters' suggestions, and individuals who are already outside of the United States must pursue a waiver of inadmissibility through the current Form I–601 process. The provisional unlawful presence waiver process will remain available only to those individuals who are currently in the United States and will be departing for consular processing abroad.

3. Aliens Who Cannot Establish Extreme Hardship to a U.S. Citizen Spouse or Parent

Several commenters objected to the exclusion from the provisional unlawful presence waiver process of immediate relatives of U.S. citizens who could establish extreme hardship only to an LPR spouse or parent. Commenters argued that this restriction limited the number of individuals who could benefit from the provisional unlawful presence waiver process and that there was no rational basis for the limitation. Some also believed that applicants will submit ''weak'' extreme hardship claims relating to a qualifying U.S. citizen relative when the real hardship would be to an LPR spouse or parent. Commenters also asked that DHS allow individuals to make a showing of extreme hardship to their U.S. citizen children.

DHS has carefully considered these comments and the recommended changes. However, DHS will not adopt the suggested changes at this time. As stated in the proposed rule, a primary

purpose for creating the provisional unlawful presence waiver process is to reduce the amount of time U.S. citizens are separated from their immediate relatives. Focusing on hardship to U.S. citizens is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens. It also is consistent with the Secretary's authority to administer the immigration laws and determine the most efficient means for effectuating the provisional unlawful presence waiver process. See 77 FR at 19908. Finally, DHS cannot include children as qualifying relatives for purposes of the extreme hardship determination because the statute only permits a showing of extreme hardship to a spouse or parent as a basis for granting the waiver. See INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). Only Congress has the power to amend the immigration laws to add other individuals who can be qualifying relatives for purposes of the extreme hardship determination.

DHS is open to considering expanding the provisional unlawful presence waiver process to include lawful permanent residents as qualifying relatives after DHS has a better understanding of the impact of the provisional unlawful presence waiver process on agency resources and operations.

4. Aliens in Removal Proceedings

Numerous commenters asked DHS to expand eligibility for the provisional unlawful presence waiver to include aliens in removal proceedings. Some commenters suggested that DHS include anyone who is in removal proceedings, without further qualifications. Others suggested that DHS include aliens in removal proceedings if they: (1) Were granted prosecutorial discretion; (2) were the primary caretakers for U.S. citizens; (3) were previously granted voluntary departure; or (4) had their cases administratively closed. Commenters also believed that the provisional unlawful presence waiver process undermines DHS's ongoing prosecutorial discretion initiative. A few commenters also said DHS should eliminate the requirement that aliens with administratively closed cases pursue voluntary departure because it was too complicated and could result in separation from a U.S. citizen spouse, parent, or child if the alien fails to comply with the terms and conditions of voluntary departure. Several commenters criticized the use of voluntary departure, arguing that the time frames for voluntary departure in many instances would be too short (60 or 120 days) to cover the time needed

---

[5] As of June 4, 2012, most individuals abroad, who have applied for certain visas and have been found inadmissible by a DOS consular officer, must mail Forms I–601 directly to a USCIS Lockbox facility. For more information, please visit the USCIS Web site at *www.uscis.gov.*

[6] USCIS provided a transition period during which individuals who are processing their immigrant visa applications through the U.S. consulate in Ciudad Juarez, Mexico, could file their I–601 applications either with the Lockbox facility or at the USCIS Ciudad Juarez Field Office. This transition period ended on December 4, 2012.

for the adjudication of the Form I–601A and the time the applicant needs to prepare for departure after approval of the provisional unlawful presence waiver request. Other commenters suggested that DHS include any alien who has been issued a Notice to Appear (NTA). They reasoned that, if the purpose of the provisional unlawful presence waiver is to avoid hardship to U.S. citizens, it should make no difference whether or not an NTA has been issued. One commenter also requested that DHS allow individuals who have a fear of returning to their home countries to participate in the provisional unlawful presence waiver process.

Several immigrant advocacy groups asked DHS to allow individuals to file the provisional unlawful presence waiver application *before* termination of removal proceedings or a grant of voluntary departure. The commenters argued that allowing individuals to apply for the provisional unlawful presence waiver while still in proceedings would ensure that USCIS, and not U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP), is the first agency to determine if an applicant qualifies for the waiver. If the applicant's provisional unlawful presence waiver is approved, then the applicant could seek termination or dismissal of his or her case. The advocacy groups stated that many individuals subject to removal, whether detained or non-detained, were unrepresented and could be confused by the various barriers to filing the provisional unlawful presence waiver application. They also argued that allowing an individual to file the provisional unlawful presence waiver application while proceedings are pending would ensure that unrepresented aliens are not left with having to choose between seeking avenues of relief in removal proceedings and pursuing an immigrant visa abroad.

Finally, one commenter asked DHS to clarify the three options noted in the proposed rule at 8 CFR 212.7(e)(3)(v) through 212.7(e)(3)(vii) (*i.e.*, termination/dismissal, cancellation of NTA, administrative closure with voluntary departure) for aliens in removal proceedings. The commenter noted that two of the provisions, 8 CFR 212.7(e)(3)(v) (termination/dismissal) and 212.7(e)(3)(vii) (administrative closure with voluntary departure) in the proposed rule, conflicted because aliens who chose to pursue voluntary departure would need to have their cases recalendared before an IJ. Recalendaring of the alien's case would

result in the alien being barred under 8 CFR 212.7(e)(3)(v), because the removal proceedings would still be pending and not "terminated or dismissed." The commenter also recommended that the final rule make clear that USCIS can only accept a provisional unlawful presence waiver once DHS, through ICE's Office of Chief Counsel, affirmatively consents to it in the removal proceedings.

After careful consideration of all comments on this issue, DHS has decided to limit eligibility for the provisional unlawful presence waiver process to individuals whose removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. Under its prosecutorial discretion (PD) policies, ICE has been reviewing cases pending before EOIR and all incoming cases to ensure that they are aligned with the agency's civil enforcement priorities and that ICE is effectively using its finite resources. For cases that ICE determines are not enforcement priorities, it exercises its discretion where appropriate, typically by moving for administrative closure. *See* Memorandum by ICE Director John T. Morton in his June 17, 2011 memorandum and the subsequent November 17, 2011 directive from Peter S. Vincent, Principal Legal Advisor to all attorneys at the ICE Office of Chief Counsel. DHS, however, is not limiting eligibility solely to cases administratively closed under the ICE case-by-case review initiative, but also is allowing any alien whose case is administratively closed and has not been recalendared at the time of filing the Form I–601A to participate in the provisional unlawful presence waiver process. In addition, individuals in removal proceedings whose cases are deferred pursuant to the Deferred Action for Childhood Arrivals (DACA) [7] process may also request that ICE seek administrative closure once USCIS defers action in their cases.

If the Form I–601A is approved for an alien whose proceedings have been administratively closed, the alien should seek termination or dismissal of the proceedings, without prejudice, by EOIR. The request for termination or dismissal should be granted *before* the alien departs for his or her immigrant visa interview abroad. Applicants who leave the United States before their

removal proceedings are terminated or dismissed may experience delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility, such as INA section 212(a)(6)(B), 8 U.S.C. 1182(a)(6)(B) (failure to attend a removal proceeding without reasonable cause), or INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (aliens who have been ordered removed or who depart from the United States while an order of removal is outstanding). *See Matter of Sanchez-Herbert,* 26 I&N Dec. 43 (BIA 2012) (holding that an IJ is required to issue an in absentia removal order (rather than terminating proceedings) even though the alien previously had departed from the United States, if the alien had proper notice of the hearing and DHS establishes the alien's removability). ICE intends to work with individuals to facilitate the timely termination or dismissal of an individual's removal proceedings once he or she obtains a provisional unlawful presence waiver.

Focusing on this subset of aliens in removal proceedings is consistent with the Department's established enforcement priorities. Individuals who received administrative closure are likely individuals whom ICE or EOIR has determined, on a case-by-case basis or as a matter of policy, to be non-enforcement priorities. This includes individuals whose cases are deferred through the DACA process. Given that these individuals have been determined to not be enforcement priorities because of their compelling equities (*e.g.*, their long-term presence in the United States or their connection to U.S. citizen relatives), DHS determined that they should be able to participate in the provisional unlawful presence waiver process. DHS may consider expanding eligibility for the provisional unlawful presence waiver process to other subsets of aliens in removal proceedings in the future and after implementation of this final rule.

Aliens whose cases are deferred, whether authorized by ICE or by USCIS through approval of a Form I–821D, Consideration of Deferred Action for Childhood Arrivals, must meet all requirements under 8 CFR 212.7(e) to receive a provisional unlawful presence waiver. Deferred action does not override or modify the eligibility requirements specified in this final rule. Thus, aliens whose cases have been deferred but have final orders of removal or other grounds of inadmissibility beyond unlawful presence will remain ineligible for a provisional unlawful presence waiver.

---

[7] On June 15, 2012, the Secretary of Homeland Security issued a memorandum to USCIS, CBP, and ICE, regarding the exercise of prosecutorial discretion with respect to certain individuals who came to the United States as children. See the USCIS Web site—*www.uscis.gov*—for more information about the DACA process.

## 5. Aliens With Final Orders of Removal and Previously Removed

Numerous commenters requested that DHS allow aliens with final orders of removal to participate in the provisional unlawful presence waiver process. The commenters offered a variety of suggestions, many of which came out of their own personal circumstances. For example, some commenters suggested that DHS include aliens with final removal orders who: (1) Are currently detained pending removal; (2) had their removal orders temporarily suspended; (3) are still in the United States and had final orders of removal issued within the last five to 10 years or, alternatively, issued more than 10 years ago; (4) were determined by DHS to warrant a favorable exercise of prosecutorial discretion; (5) were previously granted voluntary departure; (6) were granted voluntary departure but overstayed by 10 years; (7) are subject to in absentia final orders of removal due to ineffective assistance of counsel; (8) have been removed for a noncriminal ground of inadmissibility; (9) have obtained advanced consent to reapply for admission to the United States; or (10) were previously removed, regardless of whether the alien is abroad or still inside the United States. A few commenters indicated that those with final orders of removal should be included if they are married to U.S. citizens and have children. Most commenters stated that U.S. citizen family members of aliens with final orders of removal face the same hardships as those with relatives subject to inadmissibility based on unlawful presence in the United States.

DHS considered these suggestions and has concluded that it will not expand the provisional unlawful presence waiver process to include aliens with final removal orders. Generally, aliens who have outstanding final orders of removal may be inadmissible on a variety of grounds other than unlawful presence, such as criminal offenses (INA section 212(a)(2), 8 U.S.C. 1182(a)(2)) and fraud and misrepresentation (INA section 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C)). In addition, any alien who is subject to a final order of removal, decides to leave the United States, and subsequently seeks admission, is inadmissible as an alien with a prior removal under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A). Similarly, any alien who has been ordered removed or who has been unlawfully present in the United States for an aggregate period of a year or more and subsequently attempts to enter or reenter the United States without being admitted is inadmissible under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C), and may have his or her final order of removal reinstated under INA section 241(a)(5), 8 U.S.C. 1231(a)(5). The provisional unlawful presence waiver is only available to an alien who, upon departure from the United States, would be inadmissible only due to accrual of unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). Thus, a large percentage of aliens in removal proceedings will not be eligible for a provisional unlawful presence waiver. As a result, DHS has concluded that, because the success of this new provisional unlawful presence waiver process relies on its efficient, streamlined approach and close coordination with the NVC, the provisional unlawful presence waiver process will not be expanded to include aliens with final removal orders.

## 6. Aliens With Scheduled Immigrant Visa Interviews

Several commenters asked DHS to include aliens in the provisional unlawful presence waiver process regardless of whether they had an immigrant visa interview scheduled in the past. Several commenters objected to this ground of ineligibility, arguing that it was irrational and served no purpose or was arbitrary, capricious and cruel. Several commenters stated that many individuals already had cancelled their immigrant visa interviews after publication of the Notice of Intent on January 9, 2012 (77 FR 19902). An immigrant advocacy group asked DHS to include applicants with previously scheduled interviews. The group acknowledged that allowing such applicants to reschedule immigrant visa interviews would create an additional administrative burden on DOS, but believed that it would ensure equity among those immediate relatives seeking to legalize their status while minimizing the length of time they are separated from their families. The advocacy group also believed that failure to include this group would only create confusion and ultimately ineligibility for the very individuals who the rule is supposed to help.

Several commenters suggested that DOS return the immigrant visa application packet to the NVC once an alien files a provisional unlawful presence waiver. Another commenter suggested that the petitioner should be allowed to fly to the consulate abroad, retrieve the immigrant visa application packet, and return it to the NVC so DHS could adjudicate the waiver and the NVC could match the immigrant visa application packet to the approved provisional unlawful presence waiver. One commenter suggested that aliens should be allowed to resubmit the immigrant visa application package to the NVC so that they could file the provisional unlawful presence waiver application. Some commenters also asked DHS to give individuals still in the United States the option to either postpone their immigrant visa interviews so they could file the provisional unlawful presence waiver or proceed with consular processing.

Several commenters were concerned that the time periods for filing and adjudication of a provisional unlawful presence waiver application, filing of the immigrant visa application, and DOS scheduling of the immigrant visa interview were too short. The commenters believed that it created timing issues for immigration law practitioners in terms of advising their clients on filing the Form I–601A and paying the immigrant visa fee. The commenters stated that once the immigrant visa fee was paid, DOS would schedule the immigrant visa interview potentially before USCIS adjudicated the Form I–601A and, as a result, the applicant would be ineligible for the provisional unlawful presence waiver. Finally, one commenter requested that DHS implement a grace period of at least one year after publication of the final rule during which applicants who had scheduled immigrant visa interviews could participate in the provisional unlawful presence waiver process.

DHS disagrees that limiting eligibility to aliens who have not had their immigrant visa interviews scheduled has no rational basis. DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS immigrant visa process. By including aliens who were scheduled for an interview prior to the date of publication of this final rule, the projected volume of cases could significantly increase and would create backlogs not only in the provisional unlawful presence waiver process, but also in adjudication of other USCIS benefits. The increased volume would also adversely impact DOS and their immigrant visa process.

For these reasons, DHS will not expand the provisional unlawful presence waiver to include individuals whose immigrant visa interviews were scheduled before the date of publication of this final rule January 3, 2013. DHS now adds language to the final rule to

clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

DHS has clarified the regulatory text at 8 CFR 212.7(e)(4) and (5)(ii) so that aliens clearly understand that if the Department of State scheduled the alien for his or her initial immigrant visa interview prior to the date of publication of this final rule, the Form

I–601A will be rejected and returned to the applicant with the associated filing and biometric fees or denied. The Form I–601A will be rejected even if the applicant's interview is rescheduled *after* the date of publication of this final rule. USCIS will verify with DOS whether the applicant's immigrant visa interview was scheduled before the date of publication of this final rule.

## 7. Aliens With Other Grounds of Inadmissibility

Several commenters asked DHS to consider expanding the provisional unlawful presence waiver process to include additional grounds of inadmissibility and the waivers associated with such grounds. These commenters specifically referenced waivers such as the waiver for certain criminal grounds of inadmissibility under INA section 212(h), 8 U.S.C. 1182(h), for fraud and misrepresentation under INA section 212(i), 8 U.S.C. 1182(i), and for alien smuggling under INA section 212(d)(11), 8 U.S.C. 1182(d)(11). Some commenters suggested that DHS include any waiver that has the same extreme hardship standard into the provisional unlawful presence waiver process. Other commenters believed that it would be more efficient to resolve all grounds of inadmissibility at the same time. They suggested that DHS include all grounds of inadmissibility that can be waived and currently appear on the Form I–601. The commenters believed this change would alleviate the need for aliens to file multiple waiver requests at the time of their immigrant visa interviews.

Several commenters stated that an individual should not be precluded from filing a provisional unlawful presence waiver application if the individual: (1) Was previously arrested, especially if there was no conviction or the conviction was for a crime involving moral turpitude (CIMT) that meets the petty offense exception under INA section 212(a)(2)(A)(ii), 8 U.S.C. 1182(a)(2)(A)(ii); (2) violated his or her status; (3) worked without authorization; or (4) made a false claim to U.S. citizenship under INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(ii). A few commenters also requested that USCIS make an affirmative finding that a specific ground of inadmissibility does not apply to an applicant. The commenters requested that such a finding be either persuasive or binding on DOS consular officers.

Finally, some commenters were confused about the effect of the provision that allows USCIS to deny a provisional unlawful presence waiver

application if USCIS has a ''reason to believe'' that the alien will be inadmissible on grounds other than unlawful presence. The commenters argued that DHS should not deny a provisional unlawful presence waiver simply because DHS has reason to believe that the applicant was convicted of a crime, especially since some crimes are not automatic bars to admission to the United States in a lawful immigration status and, upon further review, would not be considered convictions or criminal offenses for immigration purposes.

DHS has considered these comments but will not adopt the suggested changes. The goal of the provisional unlawful presence waiver process is to facilitate immigrant visa issuance for immediate relatives of U.S. citizens who are otherwise admissible [8] to the United States except for the 3-year and 10-year unlawful presence bars, which are triggered upon departure from the United States. DOS, not USCIS, determines if an immigrant visa applicant is eligible for an immigrant visa and whether there are any grounds of inadmissibility that may bar issuance of the immigrant visa. If USCIS were to consider other grounds of inadmissibility beyond unlawful presence, it would create backlogs in the adjudication of the provisional unlawful presence waivers and, in turn, adversely impact DOS's immigrant visa process. In particular, to assess an application for a waiver of inadmissibility based on fraud, misrepresentation, or criminal history, an individual generally must undergo vetting through an in-person interview at a USCIS Field Office. Since DOS already conducts an in-depth in-person interview as part of the immigrant visa process, DHS believes that such a full review by USCIS would be duplicative of DOS's efforts.

DHS, however, intends to uphold its responsibility to protect the integrity and security of the immigration process by conducting full background and security checks to assess whether an individual may be a threat to national security or public safety. To maintain a streamlined process, USCIS will, however, only conduct a limited review of the waiver application to determine if: (1) The individual has self-reported a ground of inadmissibility that would render him or her ineligible for the provisional unlawful presence waiver;

---

[8] An alien will not be inadmissible for being present in the United States without admission or parole under INA section 212(a)(6)(A)(i), 8 U.S.C. 1182(a)(6)(A)(i), or for lacking proper immigrant entry documents under INA section 212(a)(7)(A), 8 U.S.C. 1182(a)(7)(A), once he or she leaves the United States to attend a consular interview.

(2) the results of the background checks reveal conduct or actions that potentially would make an individual ineligible for an immigrant visa; or (3) the individual has engaged in activities that could impact the discretionary determination regarding whether he or she warrants a favorable exercise of discretion. If USCIS determines that there is reason to believe that the alien *may* be inadmissible to the United States at the time of his or her immigrant visa interview based on another ground of inadmissibility other than unlawful presence, USCIS will deny the request for the provisional unlawful presence waiver. USCIS's determination on the provisional unlawful presence waiver is not a *conclusive* finding of inadmissibility. It also is not an assessment of whether a particular crime or pattern of conduct would ultimately bar an individual from obtaining a legal status under the immigration laws.

Aliens who may have other grounds of inadmissibility are not precluded from obtaining a waiver of such grounds (if permitted by law) and ultimately an immigrant visa. The individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. If the ground(s) of inadmissibility identified by the DOS consular officer can be waived, the individual can file a Form I–601 along with any supporting documentation or evidence needed to demonstrate eligibility for the waiver and ultimately the immigrant visa.

### 8. Aliens in Temporary Protected Status

Several commenters asked DHS to clarify how the provisional unlawful presence waiver process affects aliens in Temporary Protected Status (TPS) and to ensure that such aliens are included in the provisional unlawful presence waiver process. DHS does not believe these additions to the eligibility criteria are necessary.

Any alien who meets the requirements of the provisional unlawful presence waiver process and who is consular processing abroad can obtain a provisional unlawful presence waiver regardless of the alien's current status in the United States.[9] An alien

currently registered for TPS under INA section 244, 8 U.S.C. 1254a, is considered to be maintaining lawful nonimmigrant status[10] for purposes of adjustment of status or change of status. *See* INA section 244(f)(4), 8 U.S.C. 1254a(f)(4). A grant of TPS, however, does not cure an unlawful entry prior to the alien's grant of TPS or any unlawful presence the alien may have accrued prior to being granted TPS. *See Serrano* v. *U.S. Att'y Gen.,* 655 F.3d 1260 (11th Cir. 2011). If the TPS beneficiary needs a waiver of inadmissibility for unlawful presence, that alien is in the same position as any other alien who needs a waiver of inadmissibility under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), at the time of the immigrant visa processing abroad. As a result, TPS applicants who are immediate relatives of U.S. citizens can participate in the provisional unlawful presence waiver process if they are pursuing consular processing of an immigrant visa abroad.

### 9. Additional Eligibility Criteria

A few commenters suggested that DHS consider limiting or adding eligibility criteria to better prioritize aliens who may be eligible for the provisional unlawful presence waiver process. Two commenters suggested that DHS require an individual to have a minimum amount of time in the United States unlawfully (*e.g.,* two, three, or five years) before he or she could file a provisional unlawful presence waiver. Another commenter suggested that DHS limit eligibility to aliens who were married to a U.S. citizen prior to the effective date of this final rule. One commenter suggested limiting the eligibility criteria solely to aliens physically present in the United States, who are immediate relatives with an approved Form I–130, and who are at least 17 years of age. Several commenters suggested that DHS give priority to aliens who are minors and aliens who show good moral character, have no criminal record, and demonstrate that they have been productive and responsible as evidenced by paying taxes, mortgages, and self-sufficiency. Finally, several commenters requested that DHS base approval of the provisional unlawful presence waiver on factors such as: (1) Having good moral character; (2) having no criminal record; (3) not having abused government benefits; (4) putting

children through school; (5) paying taxes; (6) being married to a U.S. citizen or having U.S. citizen children; or (7) owning a home.

DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS/NVC immigrant visa process. DHS, however, did not adopt these limitations or restrictions. The commenters' suggestions are already part of the overall analysis of whether an individual warrants the grant of the provisional unlawful presence waiver as a matter of discretion. The factors that play into the discretionary analysis are not limited to one particular set of factors, *see, e.g., Matter of Cervantes-Gonzalez,* 22 I. & N. Dec. 560, 566 (BIA 1999); as part of the application for provisional unlawful presence waiver, an applicant should set forth any favorable discretionary factor he or she considers relevant to the adjudication. By setting restrictions on the number of years of unlawful presence or the date when an individual married the U.S. citizen, DHS would exclude a subset of immediate relatives of U.S. citizens who are or would be otherwise eligible. DHS, therefore, has not adopted these suggestions and retains the eligibility criteria listed in 8 CFR 212.7(e)(3).

### D. Filing Requirements and Fees

#### 1. Concurrent Filing

Many commenters asked DHS to allow concurrent filing of the Form I–130 or Form I–360, Form I–601A, and, if needed, the Form I–212, Application for Permission to Reapply for Admission Into the United States After Deportation or Removal. Several commenters noted that USCIS does adjudicate some Form I–212s in the United States pursuant to the regulations at 8 CFR 212.2(j) and in certain cases may grant the Form I–212 conditionally in anticipation of the individual's departure. Other commenters argued that applicants should be allowed to file the provisional unlawful presence waiver at any stage of immigrant petition or visa process. Several commenters said that DHS could avoid duplicating efforts by processing multiple applications at the same time. The commenters believed it was inefficient for DHS not to allow concurrent filing and an injustice to waiver applicants to maintain separate processes for the Form I–601A and Form I–212, especially when the separate processes have the effect of increasing the time applicants must

---

[9] USCIS also received two comments asking whether alien crewman could apply for a provisional unlawful presence waiver. As stated above, any alien in the United States who qualifies as an immediate relative and has an approved Form I–130 or Form I–360 may apply for the provisional unlawful presence waiver, irrespective of his or her current immigration status, if otherwise eligible.

[10] INA section 244(f)(4), 8 U.S.C. 1254a(f)(4), provides that, during the period that an alien is granted temporary protected status, the alien is considered as being in or maintaining lawful status as a nonimmigrant for purposes of adjustment of change of status.

spend outside the United States and away from their families. The commenters asked DHS to at least examine the feasibility of concurrently processing these applications before the alien has to leave for his or her immigrant visa interview. Finally, one commenter suggested that USCIS should allow applicants to submit the Form I–601A and Form I–212 prior to the filing of the Form I–130.

DHS has considered these comments but believes that concurrent filing, or allowing filing of the Form I–601A before the immediate relative petition, would undercut the efficiencies USCIS and DOS will gain through the streamlined provisional unlawful presence waiver process. Currently, Form I–130 denials are appealable to the DOJ, EOIR Board of Immigration Appeals (BIA), and if the alien challenges the denial, USCIS would either have to hold the provisional unlawful presence waivers until the Form I–130 was decided on appeal or deny the Form I–601A but reopen it if the appeal is decided favorably for the alien. Both scenarios are inefficient and could cause USCIS to incur additional costs for storing the provisional unlawful presence waiver applications and transferring any A-files or receipt files between offices until the administrative appeal process is complete. DHS developed this provisional unlawful presence waiver process in close coordination with DOS to ensure that both agencies could efficiently complete the waiver and immigrant visa process concurrently within a short timeframe. Allowing the filing of the Form I–601A after the Form I–130 or Form I–360 is approved is more efficient for USCIS and often is more efficient for the applicant as well. Therefore, DHS will not accept concurrently filed Forms I–130 and I–601A, or allow for the filing of the Form I–601A before approval of the immediate relative petition.

Moreover, DHS will not permit concurrent filing of Forms I–601A and I–212. While an individual can obtain advance, conditional consent to reapply for inadmissibility under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (prior removal or departure under order of removal), while still in the United States, DHS will not incorporate the Form I–212 in the provisional unlawful presence waiver presence process at this time for the following reasons.

First, most applicants seeking a provisional unlawful presence waiver will not have A-files. However, every I–212 applicant with a prior removal order has an A-file because he or she was in removal proceedings. If

concurrent filing of Forms I–601A and I–212 is permitted, USCIS in each case would have to request and review the applicant's A-file—a process that can cause significant delay. This extra procedural step in turn would create significant delays in USCIS processing of provisional unlawful presence waiver applications.

Second, individuals currently may file an administrative appeal with the Administrative Appeals Office (AAO) of a decision denying their Form I–212. Consequently, if concurrent filing of Forms I–601A and I–212 is permitted, and the Form I–212 is denied and an appeal taken, USCIS would have to hold the applicant's Form I–601A until the I–212 appeal is decided and, if the applicant seeks review in federal court, until the litigation is resolved. The streamlined Form I–601A process is designed to avoid these extra procedural steps, which would create backlogs in USCIS adjudication of the provisional unlawful presence waiver.

Form I–212 also is used to seek consent to reapply to overcome inadmissibility for unlawful reentry after a prior immigration violation under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C).[11] Aliens who are subject to this ground of inadmissibility cannot seek consent to reapply until they have been outside of the United States continuously for 10 years. Therefore, allowing the Form I–212 to be filed concurrently with the Form I–601A might mistakenly imply that those inadmissible under INA section 212(a)(9)(C) can file in the United States and at an earlier time.

## 2. Filing Fees

One commenter stated that applying the current Form I–601 filing fee to the Form I–601A was fiscally irresponsible. The commenter argued that DHS does not know how many provisional unlawful presence waivers it will receive or adjudicate and, therefore, cannot accurately determine the case workload or what resources it will need to cover the actual costs for adjudicating the Form I–601A. The commenter suggested that DHS increase the filing fee to $650 plus $85 for the biometric fee to avoid a fiscal shortfall. Several commenters stated that DHS should require provisional unlawful presence waiver applicants to pay a fine or fee ($5,000 to $20,000) to remain in the United States and obtain LPR status

---

[11] The regulations governing the processing of advance, conditional consent to reapply in the United States at 8 CFR 212.2(j) do not apply to aliens who are subject to this ground of inadmissibility. *See Matter of Torres-Garcia,* 23 I&N Dec. 866 (BIA 2006).

through an immigrant visa if eligible for the provisional unlawful presence waiver; some of these commenters believed that this fine or fee would help reduce the national debt.

Many opponents of the provisional unlawful presence waiver process indicated that the costs of implementation are too expensive and that the U.S. Government should not spend money on illegal aliens. The commenters believed that DHS was using tax money to support the new process. Additionally, two commenters recommended that DHS establish a premium processing fee to expedite processing of the provisional unlawful presence waiver. The commenters also suggested that DHS give special consideration to federal employees and those currently serving in active duty, reserve personnel, and veterans of the U.S. Armed Forces. Some commenters believed that individuals who did not commit any felonies should not have to pay a fee. Several commenters stated that the filing fee was either too high or too low. Some commenters stated that DHS should permit fee waivers because the fees were too high; others said that DHS should double the fee to offset the costs for implementing the new process because the Form I–601A fee was too low. Some commenters also indicated that fee waivers would be appropriate for aliens seeking the provisional unlawful presence waiver because most of them have low incomes, and that this is especially true for aliens who work in the agricultural and similar service sectors and cannot afford to cover the filing costs required by USCIS. Another commenter argued that the elimination of a fee waiver violated the Due Process Clause of the U.S. Constitution's Fifth Amendment because it was not legislated by Congress as was done in the context of INA section 245(i), 8 U.S.C. 1255(i). Finally, two commenters said that the provisional unlawful presence waiver process was too expensive and as a result would be at risk for underuse.

With regard to the immigrant visa fee that must be paid to DOS, several commenters mentioned that the DOS immigrant visa (IV) fee is only valid for one year. They were concerned that the period for adjudication of the provisional unlawful presence waiver might last longer than USCIS expects. The commenters asked DHS to state in the regulation that pending provisional unlawful presence waiver applications maintain the validity of the IV fees, so that applicants would not forfeit the IV fees and have to repay them in the future. Some commenters also indicated that the requirement to pay the

immigrant visa fee before filing the provisional unlawful presence waiver was confusing. DHS's responses to these views are divided into the four categories below.

(i) Authority To Charge Immigration Fees

Congress has given the Secretary broad authority to administer and enforce the immigration and naturalization laws of the United States. As part of this broad authority, the Secretary has discretion to set filing fees for immigration benefits at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigrant applicants. INA section 286(m), 8 U.S.C. 1356(m). The Secretary also has authority to set fees needed to recover administrative costs. The fee revenue collected under INA section 286(m), 8 U.S.C. 1356(m), remains available to DHS to provide immigration and naturalization benefits and ensures the collection, safeguarding, and accounting of fees by DHS. INA section 286(n), 8 U.S.C. 1356(n).

The Secretary has discretion to waive filing fees or exempt certain types of benefit requests from the fee requirements. The Secretary also has broad discretion to waive any fee when an individual's circumstances warrant such a waiver. Aliens who request a fee waiver are not entitled to the waiver as a matter of law,[12] nor do they have a cognizable due process interest in a discretionary fee waiver. The denial of a fee waiver request is a matter of discretion. The agency also has not provided for administrative appeals of such discretionary decisions.

None of the money used for USCIS adjudication of the provisional unlawful presence waiver comes from appropriated funds. As a fee-based agency, USCIS is primarily funded by applicants seeking immigration benefits. Applicants are required to pay their own fees. USCIS uses these fees to process applicants benefit requests and to cover its administrative costs. USCIS,

however, will not, as a matter of discretion, grant fee waivers for the provisional unlawful presence waiver or associated biometric fee.

(ii) Premium Processing of the Provisional Unlawful Presence Waiver

The Secretary has established a premium processing fee for certain employment-based immigration benefit requests under INA section 286(u), 8 U.S.C. 1356(u). USCIS provides premium processing for certain benefit types if an authorized applicant or petitioner pays a surcharge of $1,225 for the service. The surcharge is paid in addition to the filing fees for the immigration benefit requested. USCIS's Premium Processing Service (PPS) generally provides faster processing times and adjudication. USCIS guarantees 15-calendar-day processing to those who choose to use the PPS. In general, if USCIS cannot make a final decision on the applicant's benefit request within this period, USCIS will refund the PPS fee. *See* 8 CFR 103.7(e)(2). Even if the PPS fee is refunded, USCIS will endeavor to continue expedited processing of the underlying benefit request.

DHS, however, cannot extend premium processing to family-based applications or to waivers of inadmissibility that accompany such applications because INA section 286(u), 8 U.S.C. 1356(u), only allows premium processing for employment-based petitions and applications. Therefore, DHS is not adopting this suggestion. DHS, however, reminds applicants that they can request expedited adjudication of a provisional unlawful presence waiver in accordance with current USCIS expedite guidance.[13]

(iii) Fee Level for the Provisional Unlawful Presence Waiver

DHS has adopted the current cost for adjudicating an Application for Waiver of Ground of Inadmissibility, Form I–601($585), as the initial filing fee that will be required for the Form I–601A. DHS decided to set the fee for the provisional unlawful presence waiver process to be the same as the current Form I–601 waiver application fee because the population that will be eligible for the provisional unlawful presence waiver is a subset of those individuals who would otherwise have to file under the current Form I–601 process. Also, the adjudication of the Form I–601A will be comparable to the adjudication of a Form I–601 requesting

waiver of inadmissibility pursuant to INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v).

Costs to the Federal Government include the possible costs of additional adjudication personnel associated with increased volume and the associated equipment (computers, telephones) and occupancy costs (if additional space is required). However, we expect these costs to be offset by the additional fee revenue collected for form processing. DHS will consider the impact of the provisional unlawful presence waiver process workflow and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends.

(iv) DOS Immigrant Visa Fee

DOS is the agency in charge of NVC procedures. The NVC procedures are outlined in the information materials that applicants receive from the NVC. As long as the applicant follows NVC procedures, and has informed the NVC of the filing of the provisional unlawful presence waiver, as outlined in the NVC procedures, the fact that a Form I–601A is pending will not result in the invalidation of the NVC processes. A pending I–601A also will not affect the validity of DOS immigrant visa fee and applicants will not be required to resubmit the DOS immigrant visa fee solely due to the Form I–601A processing, provided the applicant complies with all DOS processing requirements.

3. Limitations on Filing of Provisional Unlawful Presence Waivers

Many commenters questioned why DHS would limit the number of provisional unlawful presence waiver applications that could be filed by an individual applicant. Some commenters stated that many applicants will be unrepresented, and, as a result of their lack of knowledge or understanding of the immigration process, could be denied solely for technical reasons, such as failure to present the proper documents. Commenters also stated that some pro se aliens may obtain inadequate, erroneous, or unscrupulous legal assistance, which could result in their cases being denied. The commenters argued that precluding these individuals from filing another Form I–601A would be unduly harsh and that DHS's duty of fairness to applicants should trump the agency's interest in administrative efficiency and finality. Several commenters also disagreed with the limitation on filing,

---

[12] One commenter referred to INA section 245(i) as an example in which Congress authorized fee waivers and asserted that USCIS cannot exclude fee waivers in the provisional unlawful presence waiver process. Congress has legislated when certain categories of aliens are exempt from paying certain immigration fees. The authority, however, to waive the provisional unlawful presence waiver application fee lies with the Secretary through her authorities under INA sections 103 and 286(m), 8 U.S.C. 1103 and 1356(m), among others. The fact that Congress has provided for fee waivers in different situations does not preclude the Secretary from exercising her discretionary authority not to provide for fee waivers in the context of this rule.

[13] For guidance on USCIS expedite procedures, please visit *www.uscis.gov*.

especially when an applicant withdraws his or her initial filing.

One commenter requested that USCIS return the fee if the waiver application is withdrawn. Some commenters also found it a cumbersome and costly approach to require individuals whose waivers are denied or withdrawn to file another waiver through the regular process after the consular interview. A few commenters requested that USCIS assign another officer to adjudicate a new Form I–601A, if the prior provisional unlawful presence waiver request was denied or withdrawn. Finally, some commenters believed that it was unjust to exclude applicants from the provisional unlawful presence waiver process if they had pending adjustment of status applications.

DHS appreciates the valid concerns of these commenters and recognizes that if it implemented the regulatory text as published in the NPRM, aliens with compelling circumstances could be precluded from obtaining a provisional unlawful presence waiver. For these reasons, DHS is removing the single-filing limitation. If an individual's provisional unlawful presence waiver request is denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing or whose Form I–601A is denied can apply for a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. If the ground(s) of inadmissibility identified by the DOS consular officer can be waived, the individual can file a Form I–601 along with any supporting documentation or evidence needed to demonstrate eligibility for the waiver and ultimately the immigrant visa. Since USCIS has now centralized adjudication of Forms I–601 filed by aliens abroad, USCIS anticipates that the processing time in the traditional Form I–601 waiver process will be reduced.

Applicants and their attorneys or accredited representatives also are reminded that they may address or correct mistakes by supplementing a pending Form I–601A waiver request

with additional evidence or correcting the request before USCIS makes a final decision in the case. USCIS will take into consideration any evidence received when making the decision.

### 4. Biometrics

Several commenters were concerned about the biometrics requirement and the potential harm to applicants, especially if they were denied a provisional unlawful presence waiver. One commenter believed that the biometrics requirement should be eliminated because it would make applicants hesitant to apply for the provisional unlawful presence waiver because of a perceived inherent danger for undocumented persons to work so closely with the U.S. Government. One commenter stated that, when DHS collects biometrics from applicants, it demands a great amount of personal information that could put applicants at risk. The commenter believed that the information collected from biometrics could be incriminating and used to initiate investigations. The commenter also noted that the proposed rule failed to offer applicants any protection from being placed in removal proceedings. One commenter claimed that the collection of biometrics was another way for DHS to "find fault" with the applicant and bar waiver approval. Finally, several commenters believed that DHS should allow all individuals to provide biometrics at a U.S. Embassy or consulate and, therefore, should include aliens outside the United States.

After consideration of these comments, DHS is not modifying the biometrics requirement. Requiring collection of biometrics helps USCIS determine if an alien is potentially subject to another ground of inadmissibility or if there are negative factors or conduct that may affect whether the individual warrants a favorable exercise of discretion. DHS only collects the biographic information needed to run such checks and to adjudicate any requested immigration benefit. Requiring biometrics also is consistent with the agency's enforcement priorities and necessary to ensure that an individual granted a Form I–601A is not a national security risk or public safety threat. USCIS will continue to follow its existing Notice to Appear (NTA) policies to determine whether the agency will initiate removal proceedings against a particular individual or refer them to ICE. Finally, DHS will not permit capture of biometrics abroad because the Form I–601A process is a domestic process that applies only to aliens who are present in the United States at the time of filing,

and DOS already collects an applicant's biometrics at the U.S. Embassy or consulate abroad as part of the immigrant visa application process.

### 5. The Minimum Age (17 Years) Requirement

Several commenters objected to the requirement that applicants must be 17 years of age or older to file a provisional unlawful presence waiver. The commenters argued that the requirement is confusing and suggested eliminating it altogether. One commenter suggested changing the minimum age from 17 to 18 years old. The commenters asked DHS to provide clear instructions to the public that individuals do not begin to accrue unlawful presence until they are 18 years old and stated that it would be best if applicants judged on their own whether and when they should file the provisional unlawful presence waiver application.

It is important for DHS to maintain the flexibility to reject applications filed by applicants under the age of 17 so these applicants are not precluded from filing another waiver application in the future. This approach would allow an applicant to save the cost for filing an unnecessary waiver application until the waiver is actually needed. This approach of allowing individuals who are 17 years or older request a provisional unlawful presence waiver also enables more efficient processing of the immigrant visa application for immediate relative children who are under the age of 18 years and therefore have not yet accrued unlawful presence, but who very possibly will turn 18 years old before the DOS consular interview, accrue unlawful presence subsequent to such time, and potentially trigger the bars under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), upon a departure. If these children must wait until they have turned 18 years old and thereafter accrued at least 180 days of unlawful presence to file a Form I–601A, it may be the case that by that time DOS will have already scheduled a consular interview, thereby precluding the alien from eligibility for this process and leading to the hardship to U.S. citizen parents that this rulemaking intends to avoid.

### 6. Effect of the Child Status Protection Act (CSPA)

Several commenters asked DHS to clarify that the Child Status Protection Act (CSPA) provisions, which protects certain children from aging-out of eligibility for certain immigration benefits, be applied to the agency's definition of "immediate relative" for purposes of access to the provisional

unlawful presence waiver process. DHS clarifies in the Form I–601A instructions that an applicant will remain eligible for a provisional unlawful presence waiver so long as he or she remains an ''immediate relative'' as defined in the INA, as amended by the CSPA. Thus, an aged-out child may still qualify as an ''immediate relative'' for purposes of access to the provisional unlawful presence waiver process as long as the child is classified as an immediate relative under the INA. *See* INA section 201(f), 8 U.S.C. 1151(f).

*E. Adjudication*

1. Extreme Hardship—Standards and Training

Numerous commenters questioned DHS's policy on extreme hardship. Many urged DHS to issue more detailed guidance on extreme hardship, arguing that the term is unclear and potentially subjects applicants to arbitrary decision-making by USCIS officers. Other commenters indicated that clear guidance would allow individuals to better assess their chances for an approval. One commenter even provided DHS with a list of suggestions for consideration when creating new policy guidance on extreme hardship determinations. A number of commenters requested that DHS ensure, through training, that the extreme hardship standard is applied evenly and consistently, and that extreme hardship assessments include consideration of the financial and emotional effects of separation. Many commenters thought that the current extreme hardship standard applied by USCIS is too rigid and should be relaxed. Several commenters also asked DHS to conduct extensive training for domestic USCIS officers, specifically on country conditions, which are critical to making an extreme hardship determination. The commenters stated that USCIS personnel who adjudicate waivers abroad already are highly trained, have intimate familiarity with specific country conditions, and are knowledgeable about conditions in the applicant's home country. The commenters were concerned that, without extensive training, USCIS officers in the United States may adopt a more restrictive approach. The commenters wanted USCIS to ensure that country-specific knowledge is not lost once waiver processing is moved stateside. Several commenters also mentioned that USCIS should use the adjudicator's manual and standard operating procedures created by the Refugee, Asylum, and International Operations Directorate (RAIO) because they explain the entire process, standard of review, and other requirements. The commenters stated that this manual is an invaluable resource and that USCIS should create a similar one for the provisional unlawful presence waiver process and make it publicly available.

Extreme hardship is a statutory requirement that an applicant must meet to qualify for an unlawful presence waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The INA does not define the term, and federal courts have not specifically defined extreme hardship through case law. The BIA has stated that extreme hardship is not a definable term of fixed and inflexible meaning, but that the elements to establish extreme hardship are dependent upon the facts and circumstances of each case. *See Matter of Cervantes-Gonzalez,* 22 I&N Dec. 560, 565 (BIA 1999). When USCIS assesses whether an applicant has established extreme hardship, USCIS looks at the totality of the applicant's circumstances and any supporting evidence to determine whether the qualifying relative will experience extreme hardship.

In this final rule, USCIS is not modifying how it makes extreme hardship determinations or how it defines extreme hardship. Consistent with how USCIS currently makes extreme hardship determinations, USCIS will consider all factors and supporting evidence that an applicant submits with his or her provisional unlawful presence waiver application. USCIS also has included in the Form I–601A instructions examples of factors to help provisional unlawful presence waiver applicants understand what can be provided to establish the required extreme hardship to a U.S. citizen spouse or parent. USCIS will thoroughly train officers to adjudicate provisional unlawful presence waivers, create standard operating procedures specific to the Form I–601A process, and monitor implementation and conduct further training if necessary.

2. Presumption of Extreme Hardship

Several commenters asked DHS to apply a presumption of extreme hardship if the applicant has to file a new Form I–601 waiver application because the DOS consular officer determined that the applicant was inadmissible on other grounds that can be waived. The commenters argued that the extreme hardship would already be established as part of the provisional unlawful presence waiver application and USCIS should not have to re-adjudicate that aspect of the waiver.

Many commenters believed that USCIS should automatically find extreme hardship exists in certain circumstances. The commenters argued that extreme hardship should be found based solely on: (1) Separation of the U.S. citizen from his or her immediate relative; (2) dangerous conditions in the applicant's home country; (3) the fact that the U.S. citizen and undocumented alien have a U.S. citizen child; (4) the fact that the applicant would be separated from his or her children for three or 10 years; (5) being a student in the United States; or (6) the fact that the applicant was brought into the United States at a young age and that he or she could qualify under the DREAM Act if enacted. Some commenters also suggested that DHS publish clear criteria for extreme hardship and include factors such as the length of time an alien has been married, the existence of children, the payment of taxes, strong ties to the United States and life-long assets, lack of eligibility for adjustment of status, and the loss of a business. The commenters believed that setting out clear criteria would help applicants better understand how to meet the extreme hardship standard.

Several Congressional commenters stated that DHS has already established a precedent in its regulations that includes a presumption of extreme hardship for certain Salvadorans and Guatemalans under the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, as amended, citing 8 CFR 1240.64(d)(1). These Congressional commenters believed that DHS could include similar regulations and even create a rebuttable presumption that an extreme hardship requirement has been satisfied when applicants would be required to remain for prolonged periods of time in dangerous locations. The Congressional commenters further argued that DHS could determine if a location was dangerous by whether DOS awards danger pay to its employees serving in such locations, citing 5 U.S.C. 5928 (awarding danger pay when there is a ''civil insurrection, civil war, terrorism, or wartime conditions''). Many commenters also stated that the rule should, at a minimum, consider the dangerousness of a location as a highly-relevant factor during the adjudication. One commenter also suggested that extreme hardship should be found if the U.S. citizen has to relocate to a country where Peace Corps does not send its personnel because it is too dangerous.

DHS is not modifying how it makes extreme hardship determinations or defining extreme hardship for purposes of the provisional unlawful presence

waiver process. DHS also is not creating presumptions of extreme hardship. As indicated previously, extreme hardship is not a definable term and elements to establish extreme hardship are dependent upon the facts and circumstances of each case. Consistent with existing practice, USCIS will continue to consider all factors and supporting evidence that an applicant submits with his or her provisional unlawful presence waiver application in assessing if the applicant has established the requisite extreme hardship. DHS also has included in the Form I–601A instructions examples of factors to help provisional unlawful presence waiver applicants understand what types of documents can be provided to establish the required extreme hardship to a U.S. citizen spouse or parent.

In terms of re-adjudicating prior extreme hardship and discretionary determinations, DHS will not alter its position on this point. Every extreme hardship determination and discretionary determination is based on a careful consideration of the evidence of record at the time the determination is made. If the DOS consular officer determines that a new ground of inadmissibility applies in the applicant's case, USCIS may consider that as a new, material factor when assessing whether the applicant continues to warrant a favorable exercise of discretion. As such, USCIS reserves the authority to reopen and reconsider, on its own motion, an approval or a denial of a provisional unlawful presence waiver application at any time, including when new factors come to light after the provisional unlawful presence waiver applicant's immigrant visa interview.

### 3. Eliminating the Extreme Hardship Requirement

Several commenters suggested that DHS completely eliminate the extreme hardship requirement for purposes of the provisional unlawful presence waiver, rather than try to define it. Others argued that immediate relatives should not have to prove extreme hardship at all, especially if married to a U.S. citizen.

Congress enacted the provisions of the INA that describe the statutory requirements for obtaining a waiver of inadmissibility under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). DHS, as part of the Executive Branch, does not have the authority to dispense with any statutory requirement. As a result, DHS cannot eliminate extreme hardship as a

requirement or approve a provisional unlawful presence waiver for an individual who has not established that he or she meets all the statutory requirements set by Congress. Only Congress can change the minimum statutory requirements individuals must meet to qualify for a waiver of inadmissibility. USCIS, therefore, cannot adopt these suggestions.

### 4. Timelines for Adjudication; Interviews

Several commenters urged DHS to establish clear timeframes for adjudication of the provisional unlawful presence waiver and for immigrant visa issuance. The commenters stated that without a clear pronouncement, the uncertainties about the duration of the adjudication process would discourage applicants from taking advantage of the provisional unlawful presence waiver process. Some commenters believed that it would be beneficial if provisional unlawful presence waiver applicants could be interviewed to establish extreme hardship and the bona fides of the marriage and recommended that USCIS interview applicants electronically or through a remote interview process. The commenters also suggested combining the interview for Form I–130 with the interview for Form I–601A. One commenter believed that allowing applicants to be interviewed for the provisional unlawful presence waiver would result in what the commenter called ''more humane adjudications.''

DHS declines to adopt these suggestions. In terms of processing times, DHS generally publishes the estimated processing times for particular immigration benefits and for the local offices where an applicant's case would be adjudicated. *See https://egov.uscis.gov/cris/ processTimesDisplayInit.do* (USCIS case processing times). For the provisional unlawful presence waiver application, USCIS and DOS are coordinating closely to make sure that the timing of the approval of a provisional unlawful presence waiver application is close to the time of the scheduled immigrant visa interview abroad. DOS estimates that it will schedule the applicant for an immigrant visa interview within two to three months after approval of the provisional unlawful presence waiver and the applicant's submission of the required immigrant visa processing documents to DOS. This timeframe allows the immediate relative the opportunity to remain united with his or her U.S. citizen spouse or parent until shortly before his or her immigrant visa interview and will allow DOS to

adjudicate an immigrant visa shortly after the applicant appears for his or her interview. DHS also believes that this streamlined process will significantly shorten the length of time immediate relatives must remain outside the United States before they can rejoin their U.S. citizen relatives.

In most instances, the provisional unlawful presence waiver application will be adjudicated at the USCIS National Benefits Center (NBC). USCIS will adjudicate the applications based on the applicant's responses in the Form I–601A, any supporting documentation, and any results from background and security checks. The NBC does not conduct on-site interviews. In cases where an interview would be required, USCIS would have to transfer the applicant's information and A-File/ Receipt File to the local district office and schedule the applicant for an interview, which could take several months. Thus, a requirement to interview all provisional unlawful presence waiver applicants would undermine the goal of this new streamlined process. Through the streamlined provisional unlawful presence waiver process, DHS hopes to reduce the time it takes for an applicant to receive a decision from USCIS and complete the immigrant visa process abroad. DHS, however, has reserved its authority to request that a provisional unlawful presence waiver applicant appear for an interview.

### 5. Requests for Evidence and Notices of Intent To Deny

Several commenters believed that DHS should generously use Requests for Evidence (RFEs) and Notices of Intent to Deny (NOIDs) to clarify any weaknesses or deficiencies in an alien's provisional unlawful presence waiver application before USCIS renders a decision. Otherwise, some eligible applicants might be unnecessarily excluded from the process. Several commenters asked DHS to expand the use of RFEs to any aspect of the provisional unlawful presence waiver application and not just limit it to the extreme hardship determination. The commenters believed that this change would allow applicants to submit all evidence necessary to establish eligibility for the waiver and give USCIS more information about an applicant's admissibility rather than automatically issuing a denial. With respect to NOIDs, several commenters argued that USCIS should issue a NOID instead of a denial, especially if other grounds of inadmissibility were detected. The commenters also stated that USCIS should issue a NOID to at least let the

applicant know which grounds of inadmissibility USCIS believes may come up at the immigrant visa interview.

As stated in the proposed rule, DHS is committed to issuing RFEs to address applications it receives that are missing critical information related to extreme hardship or if applications are missing critical information related to whether the alien merits a favorable exercise of discretion. USCIS officers also retain the discretion to issue an RFE on any issue or subject matter, if the adjudicator believes that additional evidence will aid in the adjudication. DHS anticipates that most RFEs will focus on the substantive determination on extreme hardship and any factors that may establish that the applicant warrants a favorable exercise of discretion.

USCIS will not issue NOIDs in this provisional unlawful presence waiver process, notwithstanding the provisions of 8 CFR 103.2(b)(16). A NOID provides an applicant or petitioner with an opportunity to review and rebut derogatory information of which he or she is unaware. In the provisional unlawful presence waiver process, USCIS will not be conducting a full admissibility assessment and, as a result, will not be issuing a NOID describing all possible grounds of inadmissibility. USCIS, instead, will be deciding an individual's eligibility based on his or her responses to the Form I–601A questions and the results from the applicant's background and security checks. Most applicants would be aware of their prior criminal or immigration history and the potential that these offenses might make them ineligible for the requested benefit. If an individual's provisional unlawful presence waiver application is ultimately denied, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS that he or she intends to file a new I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. At that time, the applicant can make his or her case about whether a particular criminal offense or immigration violation renders the applicant ineligible for the immigrant visa. If needed, the applicant will have an opportunity to file all required waivers and appeal any denial of the Form I–601 application to the AAO.

*F. Denials, Motions To Reopen or Reconsider, and Appeals*

1. Denials and Motions To Reopen/ Reconsider

Several commenters stated that USCIS should not deny a provisional unlawful presence waiver solely because there are other grounds of inadmissibility. The commenters suggested that USCIS approve the provisional unlawful presence waiver and then inform the applicant of any other potential grounds of inadmissibility or ineligibility discovered during adjudication of the provisional unlawful presence waiver application. Some commenters recommended that DHS allow an applicant to file a motion to reopen or reconsider if the provisional unlawful presence waiver application is denied, giving the applicant a chance to rebut DHS's findings. Several commenters and immigrant advocacy groups urged DHS to loosen restrictions on filing of motions to reopen or reconsider. The commenters argued that these are due process protections that are "integral parts of our legal system." The commenters urged DHS to allow such motions especially in cases of changed circumstances, erroneous denials, deficient applications filed by pro se applicants, and deficient or improper filings by "notarios" and individuals not authorized to practice immigration law in the United States. The commenters recommended that DHS do significant public outreach to familiarize potential applicants with the new provisional unlawful presence waiver process and ensure that immigrants are aware of notario practices. The commenters also asked DHS to place warnings in the instructions to the provisional unlawful presence waiver application and post them on the USCIS Web page to help applicants to avoid scams. The commenters suggested that DHS provide applicants with links to all 50 State Bar Associations so that applicants may contact the state bars to ensure that the person assisting them is a licensed attorney or accredited representative who is authorized to practice immigration law.

With regard to DHS's concern with substantial delays in immigrant visa processing if motions to reopen or multiple filings were permitted, the commenters stated that DHS would still expend additional resources on cases where an applicant is denied a provisional unlawful presence waiver and must go abroad to apply again with USCIS for a waiver of inadmissibility. The commenters also noted that USCIS and DOS would have to coordinate processes anyway if the waiver application is denied or when the agency elects to reopen and deny the waiver on its own motion. Finally, several commenters said that DHS should give the applicant a chance to file a new provisional unlawful presence waiver application if the first request is denied. The commenters noted that most applicants have been in the United States for extended periods of time and have not traveled abroad because of the uncertainty in the process, the hardships, and potential dangers in their home countries. According to these commenters, if USCIS denied waiver applications for this group and did not permit a second filing in the United States, most of these applicants would simply choose to remain in the United States unlawfully and without status.

DHS understands the concerns of the commenters but nonetheless believes that allowing motions to reopen or reconsider would undercut the efficiencies USCIS and DOS will gain through the streamlined provisional unlawful presence waiver process. DHS also has determined that allowing motions to reopen or reconsider could significantly interfere with the operational agreements between USCIS and DOS and could substantially delay waiver and immigrant visa processing. To alleviate some of the commenters' concerns, however, USCIS has eliminated the filing limitation initially proposed in the NPRM. Consequently, if an individual's provisional unlawful presence waiver request is ultimately denied, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS that he or she intends to file a new I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible.

As indicated in the proposed rule, DHS is retaining its authority and discretion to reopen or reconsider a decision on its own motion. For the provisional unlawful presence waiver process, USCIS may reopen the decision and deny or approve the provisional

unlawful presence waiver at any time if USCIS finds that the decision was issued in error or approval is no longer warranted. USCIS will follow the requirements of 8 CFR 103.5(a)(5) before reopening a case and denying a waiver application.

DHS agrees with the need for public outreach and materials specific to the provisional unlawful presence waiver process to help potential applicants avoid being the victims of scams by individuals who are not authorized to practice immigration law. USCIS has already begun an initiative, the Unauthorized Practice of Immigration Law (UPIL) initiative, to inform the public about individuals who are not authorized to practice immigration laws and has held several stakeholders outreach engagements on the topic. For more details about this initiative, please visit the USCIS Web site at *www.uscis.gov/avoidscams.*

### 2. Denials and Initiation of Removal Proceedings

Several commenters questioned the usefulness of the proposed rule, especially because it did not contain any confidentiality provisions or make clear what would happen to an individual if a provisional unlawful presence waiver is denied. Many thought that undocumented individuals will be hesitant or deterred from filing the provisional unlawful presence waiver as it would expose their status in the United States and cause their families even more stress. Numerous commenters asked DHS to implement a confidentiality provision so that the denial of the provisional unlawful presence waiver request does not automatically trigger removal proceedings or notice to ICE that the individual's case was denied; others requested that DHS include a "nonremovability" clause in the regulatory text. Some commenters also urged USCIS to work closely with CBP to ensure that CBP will not initiate removal proceedings against an alien who is departing the United States to attend the immigrant visa interview.

DHS is committed to focusing its finite enforcement resources on its enforcement priorities, including individuals who pose a threat to public safety or national security. As indicated in the proposed rule, DHS will follow current agency policy for issuance of Notices to Appear (NTAs). *See www.uscis.gov/NTA.* However, consistent with its civil enforcement priorities, DHS does not envision initiating removal proceedings against aliens or referring aliens to ICE whose provisional unlawful presence waiver

applications have been approved. Similarly, consistent with its civil enforcement priorities, DHS also does not envision initiating removal proceedings against aliens whose Form I–601As are denied or withdrawn prior to final adjudication. Pursuant to its existing policy governing issuance of NTAs and referrals to ICE,[14] an individual whose request for a provisional unlawful presence waiver is denied or who withdraws the Form I–601A prior to final adjudication will typically be referred to ICE only if he or she is considered a DHS enforcement priority—that is, if the individual has a criminal history, has committed fraud, or otherwise poses a threat to national security or public safety. Given USCIS's existing NTA policy, which appropriately focuses USCIS's referrals to ICE on individuals who are considered DHS enforcement priorities, DHS will not create a "nonremovability" clause or confidentiality provision to preclude automatic initiation of removal proceedings. DHS will follow the NTA issuance policy in effect at the time of the adjudication to determine if it will initiate removal proceedings against an applicant whose Form I–601A provisional unlawful presence waiver application is denied. Furthermore, if DHS discovers acts, omissions, or post-approval activity that would meet the criteria for NTA issuance or determines that the provisional unlawful presence waiver was granted in error, DHS may issue an NTA, consistent with DHS's NTA issuance policy, as well as reopen the provisional unlawful presence waiver approval and deny the waiver request.

### 3. Appeals

Several commenters argued that DHS should permit appeals of denials while the applicant is in the United States. The commenters claimed that denial of a provisional unlawful presence waiver was equivalent to a final waiver denial and should be subject to appeal rights similar to those allowed for the current Form I–601 denials that are filed with the AAO. One commenter argued that not allowing aliens to appeal essentially meant that DHS would adjudicate all waivers favorably. The commenter also stated that denying appeals would not meet the due process requirements. A

few commenters urged DHS to allow appeals at least in cases in which there were questions of law, errors, or changed circumstances. Finally, several commenters stated that DHS, by relegating certain questions of inadmissibility to either DOS or federal court, was abdicating its authority to interpret the law for grounds of inadmissibility where no waiver is available.

DHS disagrees with these positions. There is no cognizable due process interest in access to or eligibility for a discretionary, provisional unlawful presence waiver of inadmissibility. *See, e.g., Champion* v. *Holder,* 626 F.3d 952, 957 (7th Cir. 2010) ("To articulate a due process claim, [the individual] must demonstrate that she has a protected liberty or property interest under the Fifth Amendment. Aliens have a Fifth Amendment right to due process in some immigration proceedings, but not in those that are discretionary.") (citations omitted). The provisional unlawful presence waiver process is purely discretionary and no alien has a right to obtain a waiver from the Secretary of Homeland Security.[15]

Even assuming that such an interest exists, none of the commenters cite any case or statute that supports the claim that the Due Process Clause of the Fifth Amendment *requires* an Executive agency to provide for administrative appeal of an agency decision. Section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704, does permit an agency to provide an administrative appeal and if the agency chooses to do so, the agency can also, by regulation, make the filing of an administrative appeal a necessary prerequisite to judicial review. *See Darby* v. *Cisneros,* 509 U.S. 137 (1993). But nothing in section 10(c) or the *Darby* decision *mandates* that an agency must provide for an administrative appeal.[16] In upholding

---

[14] *See* USCIS Memorandum, Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in cases Involving Inadmissible and Removable Aliens (Nov. 7, 2011), available at: *http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/NTA%20PM%20(Approved%20as%20final%2011-7-11).pdf.*

[15] Even with respect to ordinary Form I–601 waivers, Congress specifically gave the Secretary discretion to decide who should or should not be granted an unlawful presence waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). This discretion is not diminished by the fact that one element of that determination rests on a legal requirement—satisfying the extreme hardship standard. Even if an applicant establishes extreme hardship, the Secretary is not required to favorably exercise her discretion in the adjudication of the waiver. *See Matter of Mendez-Moralez,* 21 I&N Dec. 296, 301 (BIA 1996) ("Extreme hardship is a requirement for eligibility, but once established it is but one favorable discretionary factor to be considered.").

[16] To the contrary, the Court's conclusion in *Darby* that pursuing an administrative appeal is a prerequisite to judicial review only if required by statute or the agency chooses to provide for such an administrative appeal and also chooses to make it mandatory strongly suggests that an agency is not

the BIAs' practice of ''affirmance without opinion'' of immigration judge decisions, for example, several courts of appeals have recognized that Due Process does not require an agency to provide for administrative appeal of its decisions. *See, e.g., Zhang* v. *U.S. Dep't of Justice,* 362 F.3d 155, 157 (2d Cir. 2004); *Loulou* v. *Ashcroft,* 354 F.3d 706, 709 (8th Cir. 2003); *Falcon Carriche* v. *Ashcroft,* 350 F.3d 845, 850 (9th. Cir. 2003); *Mendoza* v. *U.S. Att'y Gen.,* 327 F.3d 1283, 1289 (11th Cir. 2003); *Albathani* v. *INS,* 318 F.3d 365, 376 (1st Cir. 2003); *Guentchev* v. *INS,* 77 F.3d 1036, 1037–38 (7th Cir. 1996).

Finally, if USCIS denies an alien's Form I–601A, the alien has two alternate avenues for obtaining a waiver of inadmissibility: (1) Filing a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver or (2) filing a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. The Form I–601 is appealable to the AAO.

Appeals should be reserved for actions that are based on a comprehensive assessment of the applicant's admissibility. Jurisdiction over the final admissibility determination in the context of the Form I–601 lies with the AAO and with DOS in the context of the immigrant visa eligibility determination. It would be an inefficient use of resources for DHS to allow an administrative appeal of a decision that does not take into consideration the full inadmissibility determination or any other factors that may be discovered during the course of the immigrant visa interview abroad. DHS, therefore, is retaining its policy of not affording an administrative appeal of the denial of a provisional unlawful presence waiver application.

*G. Effect of Pending or Approved Provisional Unlawful Presence Waivers*

Many commenters asked USCIS to consider allowing aliens with pending provisional unlawful presence waiver applications to travel and work while waiting for a decision from USCIS to travel abroad for their immigrant visa interview. Several commenters also suggested that individuals with pending provisional unlawful presence waiver applications be given Social Security numbers and driver's licenses. Some

---

required to allow for administrative appeal at all, in the absence of a statutory mandate.

---

commenters requested that aliens not accrue unlawful presence during the pendency of Form I–601A or while waiting for their immigrant visa interview. The commenters believed that a pending provisional unlawful presence waiver application should ''stop the clock'' on any immigration violation. Another commenter stated that the final rule should clearly specify that the pendency of a Form I–601A protects an individual from further accrual of unlawful presence and places the individual in a period of stay authorized by the Secretary described in INA section 212(a)(9)(B)(ii), 8 U.S.C. 1182(a)(9)(B)(ii). Finally, several commenters stated that approval of the provisional unlawful presence waiver should guarantee immigrant visa issuance and the right to return to the United States.

A waiver of inadmissibility is an ancillary benefit to a primary application that would give an alien legal immigrant status; the waiver, by itself, does not convey a legal status. In the provisional unlawful presence waiver process, the primary application is the immigrant visa over which DOS, not USCIS, has jurisdiction. The waiver only addresses grounds of inadmissibility (in this instance, unlawful presence) that may preclude DOS from issuing the immigrant visa at the time of the applicant's interview abroad. If DOS approves the immigrant visa, the alien can be admitted to the United States as a LPR, assuming CBP determines that he or she is otherwise admissible and entitled to the immigrant visa classification. *See* INA sections 204(e), 211(a), and 221(h); 8 U.S.C. 1154(e), 1181(a), and 1201(h). Interim benefits provided on the basis of something pending with DHS or DOJ are granted only in connection with a pending application for an immigration status within the United States. DHS does not have authority to issue Social Security numbers; the Social Security Administration has sole jurisdiction over the issuance of Social Security numbers. Finally, DHS has no authority to issue driver's licenses; the issuance of these types of documents are governed by the laws and regulations of the individual U.S. states, which prescribe the conditions for obtaining and issuance of identification cards and drivers' licenses.

As stated in the proposed rule, the approval of a provisional unlawful presence waiver does not create a lawful immigration status, extend any authorized period of stay, protect aliens from removal or law enforcement action, or grant any other immigration benefits, including temporary work

authorization and advance parole. DHS is not altering its position on interim benefits as initially stated in the proposed rule. Finally, the grant of a provisional unlawful presence waiver does not guarantee that an individual with an approved immigrant visa will be admitted to the United States by CBP.

Operationally, USCIS and DOS have coordinated closely on this streamlined process and the close timeframe between processing of the Form I–601A approval and the immigrant visa application will encourage individuals to speed up the consular process and to depart from the United States as quickly as possible. Any issuance of interim benefits or specific authorized periods of stay will hinder this goal and the integrity of the program. DHS added language to the final rule to make clear that applicants are not eligible for interim benefits and that a pending or approved application for provisional unlawful presence waiver does not authorize any interim benefits. *See* section 212.7(e)(2).

DHS reminds the public that the filing or approval of a provisional unlawful presence waiver application will *not:* (1) Confer any legal status; (2) protect against the accrual of additional unlawful presence; (3) authorize an alien to enter the United States without securing a visa or other appropriate entry document; (4) convey any interim benefits (*e.g.,* employment authorization, advance parole, or eligibility to be paroled based solely on a pending or approved Form I–601A); or (5) protect an alien from being placed in removal proceedings or removed from the United States, in accordance with current DHS policies governing initiation of removal proceedings and use of prosecutorial discretion.

*H. Automatic Revocation*

Several commenters questioned the regulatory text in proposed 8 CFR 212.7(a)(4)(iv), which provides for automatic termination of the validity of an approved waiver under INA section 216(f), 8 U.S.C. 1186a(f), when the conditional resident status of an alien admitted under INA section 216, 8 U.S.C. 1186a, is terminated. The commenters argued that this provision was contrary to the INA and should be removed from the final rule. The commenters noted that under INA section 216(f), 8 U.S.C. 1186a(f), waivers under INA section 212(h), 8 U.S.C. 1182(h) (for certain criminal grounds of inadmissibility), and INA section 212(i) 8 U.S.C. 1182(h) (for fraud or misrepresentation), are the only types of waivers that are automatically terminated upon termination of

conditional resident status. As a result, they assert, DHS lacks the authority to implement this regulatory change when Congress has already clearly spoken on the matter.

A few commenters also argued that DHS should eliminate automatic revocation or adjudicate revocations separate and apart from the provisional unlawful presence waiver process. The commenters believed that it would be more efficient for DHS to reserve the right to review an approved provisional unlawful presence waiver rather than automatically revoke it, especially when DOS determines that the applicant is subject to another ground of inadmissibility or there are other negative discretionary factors that were not considered at the time of the Form I–601A adjudication. The commenters also opined that DHS would not need to re-adjudicate any portion of the waiver that has the same or lesser standard needed for waiving the newly discovered ground of inadmissibility (*e.g.,* if the new ground of inadmissibility required a showing of extreme hardship, DHS could simply adopt the provisional unlawful presence waiver determination on extreme hardship, when adjudicating the waiver request for the new ground of inadmissibility).

DHS agrees that the statute at INA section 216(f), 8 U.S.C. 1186a(f), only addresses automatic revocation of approved waivers under INA sections 212(h) or (i). As a result, it has clarified that the amendment to 8 CFR 212.7(a)(4), regarding treatment of certain waivers upon the termination of conditional resident status under INA section 216(f), 8 U.S.C. 1186a(f), and automatic revocation of approved waivers of inadmissibility, only applies to approved waivers based on INA sections 212(h) and (i), 8 U.S.C. 1182(h) and (i), and is revising 8 CFR 212.7(a)(4) accordingly.

As to revocations, DHS has not adopted the commenters' suggestions. DHS believes that revocation of an approved case requires an assessment of the facts and circumstances as they existed at the time the case was approved as well as any newly discovered information that may have affected the officer's decision or discretion at the time of adjudication. When USCIS reviews a case for possible revocation, USCIS looks at the facts and law at the time the case was approved to determine if the applicant was in fact eligible for the benefit requested. USCIS also reviews any newly discovered information to see if it is relevant and could have potentially affected the officer's discretionary assessment in the case. Since the provisional unlawful presence waiver is a discretionary process, DHS will retain its authority on revocations and its position on automatic revocations. Consistent with 8 CFR 103.2(b)(16), if USCIS discovers derogatory information that was unknown to the applicant, USCIS will provide notice of such information and give the applicant an opportunity to respond prior to any decision to deny the application. DHS, however, will not allow aliens to appeal a decision to revoke a provisional unlawful presence waiver.

*I. Comments on Form I–601A, Application for Provisional Unlawful Presence Waiver, and the Form Instructions*

DHS invited the public to comment on the proposed rule and the Form I–601A and the instructions to accompany the form. DHS has considered the comments to the Form I–601A and the form instructions. While DHS has not adopted all suggestions made by commenters, below is a list of changes to the form and instructions that DHS incorporated as a result of these comments.

1. Comments on Form

a. Part 1, Information About Applicant—Immigration or Criminal History Records

Several commenters suggested that USCIS allow individuals in removal proceedings to apply for provisional unlawful presence waivers if their removal proceedings had been administratively closed pursuant to ICE's Prosecutorial Discretion (PD) initiative. Several commenters also stated that this section of the form was confusing and/or inaccurate. Specifically, the commenters believed this section was inaccurate because it indicates that an applicant will be ineligible for a provisional unlawful presence waiver if the applicant answers "Yes" to certain questions relating to other possible grounds of inadmissibility. The commenters also believed the questions were too broad to lead to a firm finding of inadmissibility and should be amended to say that the applicant "may" not be eligible and that USCIS "may" deny the application if the applicant answers "Yes" to those questions. These commenters also identified specific inaccuracies and provided suggested edits to revise this section.

DHS has amended the final rule to indicate that an individual in removal proceedings may apply for a provisional unlawful presence waiver if the individual's removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. DHS is not limiting eligibility solely to individuals whose cases were closed pursuant to the ICE Prosecutorial Discretion (PD) initiative. Any alien whose removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A, can apply for a provisional unlawful presence waiver. If USCIS approves the provisional unlawful presence waiver for an individual whose removal proceedings are administratively closed, the individual should seek termination or dismissal of his or her removal proceedings before departing the United States to appear at the immigrant visa interview to avoid possible delays in his or her immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. DHS has updated the form and its instructions accordingly.

DHS has incorporated many of the commenters' suggested edits while rewriting this part of the form to clarify ambiguities and to correct inaccuracies. DHS also has revised the form and instructions to clarify that USCIS "may" find an applicant ineligible for a provisional unlawful presence waiver if USCIS determines that there is *reason to believe* the Department of State may find the applicant ineligible for a ground of inadmissibility other than unlawful presence. Regardless of whether USCIS approves or denies the provisional unlawful presence waiver, an immigrant visa applicant should present evidence of eligibility and any documents needed to establish admissibility to the consular officer at the time of his or her immigrant visa interview. The approval of a provisional unlawful presence waiver does not guarantee that the consular officer will find the applicant eligible for an immigrant visa. Also, the denial of a provisional unlawful presence waiver does not preclude the applicant from filing a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A.

Alternatively, the applicant can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after his or her immigrant visa interview at the U.S. Embassy or consulate abroad. The

AR2022_200370

purpose of these eligibility questions is not for USCIS to pre-adjudicate immigrant visa eligibility, but to limit the provisional unlawful presence waiver process to individuals whose only potential ground of inadmissibility is based on prior unlawful presence in the United States. All other potential grounds of inadmissibility and/or ineligibility need to be addressed with the consular officer during the immigrant visa interview.

Finally, one commenter suggested that the form be enhanced by incorporating a detailed questionnaire, similar to that of Form I–601, aimed at uncovering other potential grounds of inadmissibility.

DHS did not include a detailed questionnaire covering every potential ground of inadmissibility because the Form I–601A may only be used to waive unlawful presence. The purpose of the section entitled "Immigration or Criminal History Records" is to give applicants an opportunity to explain any possible immigration or criminal history records which USCIS may uncover during routine system and background checks. DHS will not make any changes to the form based on this comment.

b. Part 2, Information About Immediate Relative Petitions and Consular Processing

Many commenters suggested that DHS allow individuals to cancel or reschedule their immigrant visa interviews in order to seek a provisional unlawful presence waiver.

In response to these suggestions, DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS immigrant visa process. By including aliens who were scheduled for an interview prior to the publication of this final rule, the projected volume of cases could significantly increase and would create backlogs not only in the provisional unlawful presence waiver process, but also in adjudication of other USCIS benefits. The increased volume would also adversely impact DOS and its immigrant visa process.

For these reasons, DHS will not expand the provisional unlawful presence waiver to include individuals whose immigrant visa interviews were scheduled before the date of publication of this final rule January 3, 2013, even if the consulate or individual cancelled or rescheduled the immigrant visa interview *after* the date of publication of this final rule. DHS adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.*, the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

USCIS will reject or deny any Form I–601A filed by an alien who was scheduled for an interview prior to the date of publication of this final rule, even if the alien's interview is rescheduled *after* the date of publication of this final rule. DHS has updated the form and its instructions accordingly.

c. Part 3, Information About Qualifying Relative

Many commenters asked DHS to allow eligible applicants to show extreme hardship to a LPR spouse or parent, if applicable, since the statute authorizes a waiver of unlawful presence based on a showing of extreme hardship to a spouse or parent who is either a U.S. citizen or LPR.

DHS has considered these comments but is not adopting the suggested change. As stated in the proposed rule, a primary purpose for creating the provisional unlawful presence waiver process is to reduce the separation of U.S. citizens and their immediate relatives. Focusing on hardship to U.S. citizens is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens. It also is consistent with the Secretary's authority to administer the immigration laws and determine the most efficient means for effectuating the waiver process. *See* 77 FR at 19908.

d. Interviews

One commenter suggested that when USCIS requires an interview for a provisional unlawful presence waiver, USCIS should allow the applicant to choose to either appear at a local USCIS field office for an in-person interview or have a video-conferenced interview with an adjudicator at a USCIS service center using appropriate technology (*e.g.*, Skype).

DHS reviewed these comments but did not adopt the suggestions. DHS does not anticipate that many provisional unlawful presence waiver applicants will require an in-person interview. Also, USCIS does not conduct interviews at the NBC, namely because of its remote location and the type of benefit requests adjudicated by that center, which are generally paper-based decisions. USCIS also will not conduct video interviews in lieu of in-person interviews when such interviews are required. Therefore, DHS will not make the suggested change to the form.

2. Comments on Instructions

a. Eligibility Criteria—Pending Adjustment Applications

Several commenters were confused about what it means to have a pending application for adjustment of status and did not understand why this would affect eligibility for a provisional unlawful presence waiver.

DHS will not remove the restriction for individuals who have an application for adjustment of status pending with

USCIS. Individuals who are eligible to obtain LPR status while inside the United States through the adjustment of status process and intend to pursue LPR status through that process do not need the provisional unlawful presence waiver. The provisional unlawful presence waiver is only valid for the purpose of seeking an immigrant visa outside the United States. To avoid confusion, DHS has updated the form instructions to clarify that this restriction only applies to individuals with a pending Form I–485, Application to Register Permanent Residence or Adjust Status.

b. Limitations on Filing of Provisional Unlawful Presence Waivers

Many commenters suggested that DHS remove the restriction to the number of times an individual may seek a provisional unlawful presence waiver or modify it to allow re-filing of the provisional unlawful presence waiver application.

DHS considered these comments and has changed the final rule to reflect that if an individual's provisional unlawful presence waiver request is denied or withdrawn prior to final adjudication, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS of his or her intent to file a new Form I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. DHS has updated the form and instructions accordingly.

c. Qualifying Relatives

One commenter suggested adding "child" as a qualifying relative for establishing extreme hardship. DHS cannot adopt this suggestion because Congress limited the qualifying relationship for purposes of establishing extreme hardship to spouses or parents. DHS cannot change this statutory requirement.

d. Child Status Protection Act

One commenter asked DHS to clarify in the Form I–601A instructions how the provisional unlawful presence waiver relates to children who benefit from the CSPA. DHS has added language to the Form I–601A

instructions to make clear applicants will remain eligible for a provisional unlawful presence waiver as long as the applicants remain "immediate relatives" as defined in the INA, as amended by the CSPA. Thus, an aged-out child may still qualify as an "immediate relative" for purposes of access to the provisional unlawful presence waiver process as long as the child is classified as an immediate relative under the INA.

e. Statement From Applicant

One commenter suggested adding a sentence in Part 5 of the instructions to explain that applicants may supplement their statements on extreme hardship and factors warranting a favorable exercise of discretion with an attached letter. DHS added the information as requested to the Form I–601A instructions.

f. Penalties

One commenter suggested adding a reminder in the instructions that applicants read the section entitled "Penalties" before the applicant signs the application. DHS added the reminder on the form and in the form instructions, as requested.

g. Required Documents—Check List

One commenter suggested adding a checklist to assist applicants with information on the types of documents and statements that should be submitted with the provisional unlawful presence waiver application. DHS added a separate section with a checklist as requested.

h. Unauthorized Practice of Immigration Law

One commenter suggested adding a warning regarding the unauthorized practice of immigration law.

DHS agrees with this suggestion. In 2011, USCIS started an initiative—the Unauthorized Practice of Immigration Law (UPIL) initiative—to educate the public about potential fraud and scams in the immigration context. USCIS has posted information about the UPIL initiative on its Web site. DHS encourages applicants to review the information at *www.uscis.gov/ avoidscams*. DHS also has added a link to this Web site on the form instructions.

*J. Miscellaneous Comments*

1. Statutory Changes

A large number of supporters of the rule indicated that the proposed rule did not go far enough. The commenters asked DHS to allow individuals who were eligible for the provisional

unlawful presence waiver but ineligible for adjustment of status to remain in the United States and adjust their status to a LPR. Several commenters asked DHS to reinstate INA section 245(i), 8 U.S.C. 1255(i). Others asked if DHS could reduce the number of years an alien must remain outside the United States because of unlawful presence under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). A few commenters also asked if DHS could include a waiver of INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(i) (false claim to U.S. citizenship). Some commenters asked DHS to grant waivers even if the applicants did not meet all statutory requirements. One commenter said that DHS should eliminate the discretionary portion of the waiver in its entirety. Others wanted DHS to simply grant legal status to individuals married to U.S. citizens, irrespective of whether they had an approved petition or needed a provisional unlawful presence waiver. They argued that if an individual is the spouse of a U.S. citizen then such an individual should simply be able to become a LPR of the United States.

Congress has prescribed the statutory requirements for obtaining LPR status through adjustment of status in the United States. Congress also established the current grounds of inadmissibility and the conditions for any waivers associated with such grounds. DHS does not have the authority to change or dispense with those statutory requirements. DHS cannot reinstate INA section 245(i), 8 U.S.C. 1225(i), or take any action that would grant permanent resident status to individuals who do not meet the statutory requirements for that status. Only Congress can amend the statutory requirements that individuals must meet to qualify for adjustment of status. DHS, therefore, cannot adopt these recommendations. However, DHS supports comprehensive immigration reform, and DHS will implement any legislation that may be enacted by Congress, including any authorized extension of INA section 245(i), 8 U.S.C. 1225(i).

2. Fraud Detection and Prevention; National Security

Some commenters argued that the Federal Government's focus should be on enforcement and deterring illegal entry and marriage fraud. Others opined that the provisional unlawful presence waiver process was a "back door" through which illegal immigrants who pose a threat to national security could be granted a waiver and LPR status.

A core mission of DHS is to protect national security, public safety, and the

integrity of the immigration process. DHS has a number of preventative measures in place, as provided by law and through agency policy, to address matters relating to national security and fraud. DHS incorporates these measures through regulations and standard operating procedures that bolster the adjudications process. USCIS's Fraud Detection and National Security (FDNS) Directorate focuses on its fraud and national security mission. FDNS investigates fraud and national security issues relating to the immigration benefit process and makes appropriate referrals to ICE, DOJ, and other law enforcement agencies. USCIS has established standard operating procedures in field offices for referrals to FDNS on potential fraud cases that may require additional review. USCIS's Office of Policy and Strategy is responsible for developing future benefit fraud assessments. For fraud prevention, FDNS has initiated fraud training for Immigration Services Officers (ISOs) to detect any patterns or increase in fraudulent practices in a particular application type or area of the United States. Additionally, USCIS already has processes in place, including requiring additional interviews and home site visits, conducted by specially trained immigration officers throughout the United States, to assess whether a marriage was entered into to evade immigration laws. These processes provide strong tools for combating potential fraud.

Congress provided several measures aimed at preventing marriage fraud, focusing especially on the potential for fraud in marriages of less than two years' duration. For instance, Congress mandated that aliens married less than two years generally are subject to conditional resident status for two years after admission as an immigrant. *See* INA section 216, 8 U.S.C. 1186a; 8 CFR part 216; 8 CFR 235.11. Once USCIS approves an immediate relative petition for an alien married to a U.S. citizen, and DOS determines that the alien is admissible and eligible for an immigrant visa, the alien can seek admission to the United States as an LPR. If, however, the alien married the U.S. citizen less than two years before the date of admission, the alien is admitted conditionally for a two-year period.

In general, the U.S. citizen petitioner and the conditional permanent resident must jointly seek to remove the conditions within the 90-day period immediately preceding the second anniversary of the date the alien obtained conditional permanent residence status. If the U.S. citizen

petitioner and the conditional permanent resident fail to do so, the alien's conditional permanent resident status is terminated automatically, and any waiver granted in connection with the status under INA sections 212(h) or (i), 8 U.S.C. 1182(h) or (i), is automatically terminated. Furthermore, if USCIS determines that the marriage was entered into to evade the immigration laws, USCIS cannot approve future petitions for that alien. *See* INA section 204(c), 8 U.S.C. 1154(c). USCIS also reserves the authority, as it does generally for other benefit requests, to interview the alien and the U.S. citizen spouse in connection with the provisional unlawful presence waiver application in the exercise of discretion.

Another preventive measure is the provisional unlawful presence waiver requirement that the applicant appear for biometrics capture at a USCIS Application Support Center (ASC). The biometrics requirement allows USCIS to run thorough background and security checks on individuals seeking an immigration benefit to determine if an alien is not only potentially subject to other grounds of inadmissibility or not eligible for a favorable exercise of discretion, but also whether the alien poses a national security or public safety risk.

## 3. Backlog Reduction

One commenter suggested that DHS first clear all application backlogs abroad and at the AAO before implementing any new process. Commenters also indicated that DHS should give special consideration to individuals who have a pending waiver application that was filed abroad.

USCIS has already undertaken several efforts to reduce the backlogs in adjudication, both abroad and at the AAO. As of June 4, 2012, USCIS has implemented centralization of certain Form I–601 filings in the United States. USCIS has dedicated additional resources on a temporary basis to expeditiously process the cases filed prior to centralization. USCIS anticipates that the residual cases filed prior to centralization and during the transition period that recently ended on December 4, 2012, will be completed within about six months of the effective date of this final rule. By moving most of the adjudication case load to the United States for these cases, USCIS expects to reduce the filing and processing times for overseas filers of Form I–601.

The AAO has also undertaken various backlog reduction efforts in the context of administrative appeals. Since July 2011, the waiver adjudication branch of

the AAO has reduced processing time from 27 to 19 months, and reduced the number of cases in the backlog by more than 1,400. USCIS anticipates this rate of reduction to continue and plans on reducing processing time for waivers to 6 months by June 2013. These various efforts demonstrate the Department's continued commitment to timely adjudication of waivers and customer service with the resources available.

## 4. Other Immigrant Visa Requirements

A few commenters suggested that individuals who are eligible for the provisional unlawful presence waiver should have the option to complete the medical examination required for immigrant visa issuance in either the United States or abroad. DHS did not adopt this suggestion.

DOS has jurisdiction for health-related inadmissibility determinations in the overseas immigrant visa application context; DOS, therefore, requires immigrant visa applicants to have the required medical examination performed by a DOS-designated panel physician abroad. *See* 22 CFR 42.66. DOS and the Centers for Disease Control and Prevention within the Department of Health and Human Services set the criteria and parameters for these medical exams depending on country conditions. While USCIS has designated civil surgeons for certifications in other contexts, these civil surgeons are not recognized by DOS and therefore cannot complete the required medical examination for purposes of the visa issuance abroad. Operationally, allowing provisional unlawful presence waiver applicants to complete the medical examination in the United States could cause delays and backlogs at DOS. DHS, therefore, will not adopt this suggestion.

## 5. Departure Requirement and Third-Country Processing

Several commenters asked why approved provisional unlawful presence waiver applicants are required to return to their home country to complete the immigrant visa requirement. The commenters suggested that these applicants should not have to travel to a dangerous place like Ciudad Juarez, Mexico, but instead complete their process in a safe third country like Canada. Many commenters said that requiring individuals to depart would have a significant impact on U.S. citizen family members, especially if the individual is the primary financial provider for the family. The commenters also said that departure would cause U.S. citizen family members to become dependent on the U.S. Government if

the immediate relative had to remain outside of the United States for a prolonged period of time. Several other commenters suggested that DHS eliminate the departure requirement altogether or at least allow provisional unlawful presence waiver applicants to be interviewed in the United States or pick up their immigrant visa at their country's embassy in the United States. Finally, several Congressional commenters urged DHS to coordinate with DOS so that provisional unlawful presence waiver applicants do not have to return home. The commenters stated that the departure requirement should be eliminated entirely or, alternatively, that DOS should identify additional consulates for processing of the provisional unlawful presence waiver and immigrant visa issuance. The commenters also suggested that DOS's NVC could assign immigrant visa petitions and provisional unlawful presence waiver applications to designated consular posts in safe and convenient locations, citing the authority as part 9 of the Foreign Affairs Manual (FAM) section 42.61, Note 2.1. Finally, the commenters said that DHS should consider using its parole authority broadly to eliminate the need for immediate family members to travel abroad to obtain an immigrant visa to which they are entitled under current law.

DOS has jurisdiction over consular processing and setting the location for immigrant visa application filing and interviews. *See* 22 CFR 42.61. DHS, therefore, will not alter this requirement and, as stated above, cannot change the statutory requirements for adjustment of status in the United States. In response to the request for DHS to broadly use its parole authority for provisional unlawful presence waiver applicants, DHS will continue to exercise its authority to parole applicants for admission into the United States on a case-by-case basis, reviewing the unique circumstances and facts that relate to each individual's case to determine whether the individual's circumstances warrant a discretionary grant of parole based on urgent humanitarian factors or as a significant public benefit. INA section 212(d)(5), 8 U.S.C. 1182(d)(5). With this rule, DHS is not changing its current policy on the use of its parole authority.

### 6. Comprehensive Immigration Reform

Many commenters, including numerous individuals who signed group petitions, said that the focus should be on comprehensive immigration reform (CIR) rather than a ''patchwork'' of small initiatives that do not fix the current broken immigration system as a whole. While the commenters generally supported some type of CIR, their views on what should be included in a CIR bill varied significantly.

Some commenters stated that CIR is needed to legalize the current immigrant population in the United States and to create guest worker programs that will benefit the U.S. economy. The commenters argued that legalization will result in significant economic benefits to the United States and help solve many of our current immigration problems. These commenters supported the idea of reuniting U.S. citizen families and stated that the Administration should focus on legal immigration and naturalization to ensure that immigrants are fully aware of the rights and opportunities available to them.

Many commenters opposed the provisional unlawful presence waiver process because they believed it would encourage illegal immigration and that it was a form of ''backdoor amnesty.'' Some commenters believed that Congress should enact stronger penalties against those who enter illegally and enforce the current laws against those who deliberately violated U.S. immigration law. The commenters also believed that the focus should be on border security and legal immigration, not on aliens who made the choice to come to the United States illegally. One commenter noted that the current immigration policy was not working and that the United States needs a ''comprehensive top down rewrite'' of all the immigration laws. A few commenters were opposed to the provisional unlawful presence waiver process because they believed it was politically motivated and not designed to fix the current immigration system.

Fixing the current immigration system is a top priority for DHS, and the Administration is committed to comprehensive immigration reform. Congress has the power to amend the immigration laws to create a workable system that unites families, improves the U.S. economy, and preserves national security and public safety. USCIS will do everything possible to prepare for successful implementation of any comprehensive immigration reform legislation and ensure that the integrity of the U.S. immigration system is maintained.

### 7. Transformation

Several commenters urged DHS to convert the provisional unlawful presence waiver process and immigrant visa process to an electronic process. The commenters believed that if applicants and attorneys could file online, they would save money, time, paper, and the mailing costs that currently accompany paper filings. The commenters stated that E-filing is consistent with USCIS's current Transformation Initiative.

DHS agrees with the commenters that it should move toward electronic filing of immigration benefits. In fact, USCIS already is transforming its immigration benefit process and recently launched its new electronic filing and adjudication system known as USCIS Electronic Immigration System (USCIS ELIS). USCIS ELIS allows individuals to establish a USCIS ELIS online account and, currently, to apply online for an extension or change of their nonimmigrant status for certain visa types. USCIS ELIS also enables USCIS officers to review and adjudicate online filings from multiple agency locations across the country. USCIS believes that the Transformation Initiative is an important step forward for the agency and is working to expand system features and functionality in additional releases this calendar year and beyond. In future releases of USCIS ELIS, USCIS will add form types and functions, including waivers of inadmissibility, gradually expanding the system to cover filing and adjudication of all USCIS immigration benefits. USCIS will notify the public when such expansions and additions of form types occur.

### K. Comments on the EO 12866/13563 Analysis

DHS received several comments on the volume projection included in the analysis, especially as it relates to the DHS projection of additional demand. Many commenters believed that application volume is understated. One commenter stated that the Federal Government stands to earn over one billion dollars from the change. Another commenter suggested that DHS examine rates of use of health care and public education as points for comparison in determining demand for the provisional unlawful presence waiver. This commenter suggested that using undocumented immigrant access to health care and public education as models will reveal that the provisional unlawful presence waiver is at risk for underuse. Many commenters noted that the costs of obtaining an immigrant visa limit those who can afford to apply for the provisional unlawful presence waiver and that increasing the cost with required biometric submission is another barrier to participation. A commenter was concerned the cost of this rule would add to the national debt. Another commenter argued that current

immigration laws and the provisional unlawful presence waiver rule disproportionately impact children of immigrant families who have a greater likelihood to be either low-income or living under the poverty line and are not as likely to have resources needed to make use of the waiver option.

As stated repeatedly throughout the analysis, DHS was unable to precisely project application volumes for the provisional unlawful presence waiver due to unavailability of data on those who are unlawfully present. Historical estimates show only aliens who have taken the steps to obtain an immigrant visa. DHS did conduct a reasonable methodological approach based on those who have made use of inadmissibility waivers under the current process.

DHS does not believe that using public health and education records would better refine our estimates. As the commenter noted, these services are underutilized by undocumented immigrants. Furthermore, neither these models nor the others that were examined differentiate undocumented immigrants with U.S. citizen immediate relatives from those undocumented immigrants with other immigrant/citizen family compositions. Since only immediate relatives of U.S. citizens may apply for provisional unlawful presence waivers, DHS does not believe that using the suggested models will offer a more reliable means of estimating the additional demand.

While DHS acknowledges that the costs of obtaining an immigrant visa may be a constraint on demand, and agree these costs will have more impact on low-income immigrant families, the only additional cost of the provisional unlawful presence waiver process beyond the existing waiver process is the costs incurred for submitting biometrics. Relative to the other costs, biometric costs represent approximately eight percent of the total cost of obtaining an immediate relative immigrant visa. The costs of obtaining an immigrant visa are not costs of this rule. Finally, this final rule will not add to the national debt. As explained in the proposed rule at 77 FR 19919, this final rule is not expected to impose additional costs on the federal government since the fee revenues collected should offset the form processing cost.

## V. Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change, except for the following provisions noted below:

### 1. Section 103.7(c)(3)(i)

In the proposed rule, DHS noted in the supplementary text that applicants for a provisional unlawful presence waiver cannot seek a fee waiver for the Form I–601A filing fees or the required biometric fees. *See* 77 FR at 19910. DHS incorrectly referenced proposed regulatory text at 8 CFR 103.7(b)(1)(i)(C) and inadvertently omitted the correct citation to the regulatory provision being amended and the amendatory text. DHS has corrected this error and has included an amendment to 8 CFR 103.7(c)(3)(i) in this final rule to clarify that fee waivers are not available for the biometric fee or filing fees for the Form I–601A. *See* section 103.7(c)(3)(i).

### 2. Section 212.7(a)(4)(iv)

DHS proposed an amendment to 8 CFR 212.7(a)(4) to provide that termination of an alien's conditional LPR status also would result in automatic revocation of an approved waiver of inadmissibility. *See* 77 FR at 19912 and 19921. Several commenters noted that INA section 216(f), 8 U.S.C. 1186a(f), only allows for automatic revocation of waivers of inadmissibility approved under INA sections 212(h) and (i), 8 U.S.C. 1182(h) and (i). DHS agrees and has revised the amendment to 8 CFR 212.7(a)(4) to clarify that automatic revocation of approved waivers upon termination of conditional resident status only applies to approved waivers based on INA section 212(h), 8 U.S.C. 1182(h) (waivers for certain criminal offenses) and INA section 212(i), 8 U.S.C. 1182(i) (waivers for fraud or willful misrepresentation of a material fact). *See* section 212.7(a)(4)(iv).

### 3. Section 212.7(e)(1)

During discussions about the proposed provisional unlawful presence waiver process and how it would affect aliens in removal proceedings, a question arose regarding the authority of DOJ IJs and whether IJs would adjudicate Forms I–601A for aliens in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I–601A waivers centralized and adjudicated by one agency, USCIS, especially given the streamlined nature of the process and the need for close coordination with DOS once a waiver is decided. DHS, therefore, added a new paragraph to clarify that the Application for Provisional Unlawful Presence Waiver, Form I–601A, will be filed only with USCIS even if an alien is in removal

proceedings before EOIR. *See* section 212.7(e)(1).[17]

### 4. Section 212.7(e)(2)

DHS restructured this provision and added language to make clear that approval of the provisional unlawful presence waiver is discretionary and does not constitute a grant of any lawful immigration status or create a period of stay authorized by the Secretary for purposes of INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* section 212.7(e)(2)(i). DHS also clarified that a pending or approved provisional unlawful presence waiver does not authorize any interim benefits such as employment authorization or advance parole. *See* section 212.7(e)(2)(ii).

### 5. Section 212.7(e)(3)

Many commenters asked DHS to expand eligibility for the provisional unlawful presence waiver process to other categories of aliens seeking to immigrate to the United States.

DHS considered the commenters' suggestions but is limiting the provisional unlawful presence waiver to immediate relatives of U.S. citizens. After assessing the effectiveness of the provisional unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process to other categories.

### 6. Former Section 212.7(e)(4)(ii)(H)

DHS initially proposed to reject a provisional unlawful presence waiver application if an alien has not indicated on the application that the qualifying relative is a U.S. citizen spouse or parent. *See* 77 FR at 19922. DHS has determined that this criterion is more appropriate for an adjudicative decision and that this assessment should not be made through a review during the intake process. Thus, DHS has deleted this rejection criterion in the final rule.

### 7. Section 212.7(e)(4)(iv)

DHS proposed excluding aliens from the provisional unlawful presence waiver process who were already scheduled for their immigrant visa

---

[17] Under 8 CFR 1240.1(a)(1)(ii), immigration judges (IJs) have authority to adjudicate certain waiver applications made by aliens in removal proceedings. However, IJs will not be adjudicating provisional unlawful presence waiver applications under this rule because all aliens who are in removal proceedings—including those whose cases were administratively closed and have been recalendared or who are subject to an administratively final order of removal are ineligible for the provisional unlawful presence waiver by operation of this final rule. *See* 8 CFR 212.7(e)(4).

interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

### 8. Section 212.7(e)(4)(v)

DHS initially proposed excluding all aliens who were in removal proceedings

from the provisional unlawful presence waiver process, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; and (3) cases had been administratively closed but subsequently were reopened to grant voluntary departure. *See* 77 FR at 19922. In this final rule, DHS allows aliens in removal proceedings to participate in this new provisional unlawful presence waiver process but only if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. *See* section 212.7(e)(4)(v). Through this final rule, the Form I–601A and its accompanying instructions, and additional information published on the USCIS Web site, DHS also will notify such applicants that, if granted a provisional unlawful presence waiver, applicants should seek termination or dismissal of their removal proceedings. The request for termination or dismissal should be granted *before* they depart for their immigrant visa interviews to avoid possible delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. *See* section 212.7(e)(2). Finally, DHS made conforming changes to the filing requirements in section 212.7(e)(5)(i) to include aliens who are in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A.

### 9. Section 212.7(e)(4)(ix)

For operational reasons, DHS initially proposed rejecting applications filed by aliens who had previously filed a Form I–601A provisional unlawful presence waiver application with USCIS. DHS designed the provisional unlawful presence waiver process to streamline waiver and immigrant visa processing by closely tying adjudication of the Form I–601A to the NVC's immigrant visa processing schedule. DHS considered the potential impact of multiple filings on this schedule, the possible delays to the immigrant visa process, and the potential for agency backlogs.

Many commenters, however, expressed concern that limiting the program to one-time filings could potentially exclude individuals who otherwise would qualify for the provisional unlawful presence waiver.

Upon consideration of these comments, DHS agrees that an alien could have compelling reasons for filing another provisional unlawful presence application, especially in cases where an alien's circumstances have changed

or the alien was a victim of individuals or entities not authorized to practice immigration law. For these reasons, DHS agrees that a one-time filing limitation is too restrictive and is removing the single-filing limitation in this final rule. If an individual's provisional unlawful presence waiver request is denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing prior to final adjudication, or whose Form I–601A is denied, can apply for a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. DHS, therefore, has removed this provision from the final rule.

### 10. Section 212.7(e)(5)(ii)

DHS corrected a typographical error in the prefatory language to this section, removing the term ''application'' the second time it appears in the paragraph. *See* section 212.7(e)(5)(ii).

### 11. Section 212.7(e)(5)(ii)(A)

DHS proposed a list of rejection criteria for Forms I–601A filed at the Lockbox, including the criterion to reject for failure to pay the required or correct fee for the waiver application. *See* 77 FR 19922. DHS inadvertently referenced the biometric fee as a basis for rejection in the supplementary information. *See* 77 FR 19911. DHS has modified the regulatory text to make clear that a Form I–601A will only be rejected for failure to pay the required or correct filing fee and not the biometric fee. *See* section 212.7(e)(5)(ii)(A). Individuals who have failed to pay the required or correct biometric fee will be notified of that failure. 8 CFR 103.7(b). USCIS will not process or adjudicate applications filed by individuals who do not pay the required or correct biometric fee.

### 12. Section 212.7(e)(5)(ii)(G)

DHS proposed rejecting provisional unlawful presence waiver applications filed by aliens who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at

19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her immigrant visa interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien if USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule an initial immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner. *See* section 212.7(e)(5)(ii)(G).

### 13. Section 212.7(e)(9)

DHS initially proposed that aliens who were denied a provisional unlawful presence waiver could not file a new Form I–601A. Instead, such aliens would have to leave the United States for their immigrant visa interviews and file a Form I–601, Application for Waiver of Grounds of Inadmissibility, after the Department of State determined they were inadmissible. Some commenters were concerned that limiting aliens to a single filing of an I–601A would potentially bar aliens from qualifying for a provisional unlawful presence waiver, especially when they may have experienced changed circumstances that would result in extreme hardship to the U.S. citizen spouse or parent. In light of these concerns, DHS has amended this final rule to allow aliens who are denied a provisional unlawful presence waiver to file another Form I–601A, based on the original approved immigrant visa petition. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another provisional unlawful presence waiver application under paragraph (e) provided the alien meets all of the requirements. The alien's case must be pending with the Department of State and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

### 14. Section 212.7(e)(10)

DHS has amended this provision to allow an applicant to withdraw a previously-filed provisional unlawful presence waiver application prior to final adjudication and file another Form I–601A. *See* section 212.7(e)(10).

### 15. Section 212.7(e)(14)(iv)

DHS clarified the language in section 212.7(e)(14)(v) to specify that a provisional unlawful presence waiver is automatically revoked if the alien, at any time before or after the approval of the provisional unlawful presence waiver, or before the immigrant visa is issued, reenters or attempts to reenter the United States without being admitted or paroled. *See* section 212.7(e)(14)(iv).

## VI. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.

Although this rule does exceed the $100 million expenditure threshold (adjusted for inflation), this rulemaking does not contain such a mandate. The provisional unlawful presence waiver process is a voluntary program for aliens that are immediate relatives of U.S. citizens intending to become legal permanent residents. The requirements of Title II of the Act, therefore, do not apply and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

DHS considers this rule a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. DHS was not able to estimate with precision the increase in demand due to this rule; therefore, we estimated costs using range scenario analysis. The final rule expanded eligibility for the provisional unlawful presence waiver process to aliens in removal proceedings whose cases have been or will be administratively closed, provided that the case has not been recalendared at the time of Form I–601A filing and that the alien is otherwise eligible. Due directly to this expansion, there is a possibility that the rule will have an impact on the economy of $100 million or more in the first year of implementation. If demand for the provisional unlawful presence waiver increases by 50 percent, 75 percent, or 90 percent, then the total impact on the economy would be approximately $107.8 million (undiscounted), $157.8 million (undiscounted), or $187.7 million (undiscounted), respectively, in the first year. By year 2, the total impact to the economy if demand for the provisional unlawful presence waiver increases by 50 percent, 75 percent, or 90 percent, is $33.2 million (undiscounted), $45.7 million (undiscounted), or $53.1 million (undiscounted), respectively. The impact of the rule is directly associated with the increased demand in legalizing immigration status by applying for legal permanent resident status via consular processing and participating in the provisional unlawful presence waiver process. The impact includes filing fees, time, and travel costs of complying with this final rule. The costs of this final rule will fall exclusively on alien immediate relatives of U.S. citizens that reside in the United States and must request a waiver for unlawful presence. This rule will not result in a major

increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is a ''significant regulatory action'' that is economically significant under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget has reviewed this regulation. This effort is consistent with Executive Order 13563's call for agencies to ''consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned.''

1. Summary

The final rule will allow certain immediate relatives of U.S. citizens who are physically present in the United States to apply for a provisional unlawful presence waiver of the 3-year or 10-year bar for accrual of unlawful presence prior to departing for consular processing of their immigrant visa. This new provisional unlawful presence waiver process will be available to an alien whose only ground of inadmissibility is, or would be, the 3-year or 10-year unlawful presence bar. DHS anticipates that the changes made in this final rule will result in a reduction in the time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. In addition, the Federal Government will achieve increased efficiencies in processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar.

Since publication of the proposed provisional unlawful presence waiver rule, DOS published an updated fee schedule for consular services which did the following with respect to this rule: (1) Reduced the immediate relative visa fee from $330 to $230; (2) increased the immigrant visa security surcharge fee from $74 to $75; and (3) discontinued charging a separate fee for the immigrant visa surcharge and instead embedded the fee in the immigrant visa application fees.[18] DHS has incorporated these changes and updated data into our final analysis.

DHS estimates the discounted total ten-year cost of this rule will range from approximately $196 million to approximately $538.1 million at a seven percent discount rate. Compared with the current waiver process, this rule requires that provisional unlawful presence waiver applicants submit biometric information. Included in the total cost estimate is the cost of collecting biometrics, which we estimate will range from approximately $32.9 million to approximately $56.6 million discounted at seven percent over ten years. Also included in the total cost estimate are the costs faced by those who choose to file a new provisional unlawful presence waiver application based on the same approved immediate relative petition if their original Form I–601A is denied or withdrawn, which DHS decided to allow in response to public comments to the proposed rule. Aliens that file a new Form I–601A will still face the biometric and Form I–601A filing fees and opportunity costs, which we estimate will range from approximately $56.2 million to approximately $96.7 million discounted at seven percent over ten years. In addition, as this rule significantly streamlines the current process, DHS expects that additional applicants will apply for the provisional unlawful presence waiver compared to the current waiver process. To the extent that this rule induces new demand for immediate relative visas, additional immigration benefit forms, such as the Petitions for Alien Relative, Form I–130, will be filed compared to the pre-rule baseline. These additional forms will involve fees being paid by applicants to the Federal Government for form processing and additional opportunity costs of time being incurred by applicants to provide the information required by the forms. The cost estimate for this rule also includes the impact of this induced demand, which we estimate will range from approximately $106.9 million to approximately $384.8 million discounted at seven percent over ten years.

A key uncertainty that impacts any cost estimate of this rule is the uncertainty involving the actual number of people that will avail themselves of this streamlined provisional unlawful presence waiver process. DHS is not aware of any data that will allow us to estimate with precision the increase in demand due to this rule. In this final rule DHS has made the careful determination to expand eligible participation to aliens in removal proceedings whose cases are administratively closed and have not been recalendared at the time of filing the Form I–601A, and who are otherwise eligible for the provisional unlawful presence waiver. DHS has accounted for any potential additions to the volume estimate as a result of these changes in the final analysis. Statistics compiled by the Department of Justice (DOJ) Executive Office of Immigration Review (EOIR) indicate there have been a total of 70,276 cases that were administratively closed at the immigration courts or the Board of Immigration Appeals (BIA) where the sole charge is INA 212(a)(6)(A)(i).[19] DHS has no way of knowing precisely how many of the 70,276 cases are immediate relatives of U.S. citizens and are otherwise eligible for the provisional unlawful presence waiver, so we have applied similar range analysis to estimate the additional population surge resulting from the influx of cases previously administratively closed. In addition to this static influx that could occur with previously administratively closed cases, permitting aliens in removal proceedings whose cases are administratively closed when this rule becomes effective or administratively closed but not recalendared at the time of filing the Form I–601A could add approximately 700 to 2,500, annually, to our volume estimate. Lastly, allowing applicants the ability to re-file a Form I–601A if the initial application was denied or withdrawn will result in an increase to our volume estimates. A review of USCIS Form I–601 processing statistics indicated a denial rate of 34%. A review of USCIS completion statistics for the current I–601 waiver process did not indicate a statistical trend for withdrawals. DHS has assumed in this final analysis that the same denial rate of 34% will apply for the provisional waiver for unlawful presence application, and in an effort to present the maximum projected impact, has

---

[18] *See* 77 FR 18907.

[19] Source: Department of Justice, EOIR, Office of Planning, Analysis, and Technology; statistics include cases completed from January 1, 1992–December 5, 2012. Data compiled on December 5, 2012.

calculated cost impacts based on the assumption that every applicant with a denied or withdrawn Form I–601A will file a new Form I–601A. For cost estimating purposes, DHS has analyzed the cost of an increase in demand of 25%, 50%, 75% and 90% compared to the existing waiver process.

Table 1 provides an estimate of the annualized cost of this rule, in 2012 dollars, at three percent and seven percent discount rates, over the range of demand increases of 25%, 50%, 75%, and 90% compared to the existing waiver process and also qualitative benefits. The annualized cost of this rule will range from approximately $27.9 million annualized to $76.6 million (7 percent discount rate) and approximately $27.4 million to $74.6 million (3 percent discount rate).

TABLE 1—ANNUALIZED COSTS AND BENEFITS
[2013–2022, dollar amounts expressed in millions]

| | 3% Discount rate | | | | 7% Discount rate | | | |
|---|---|---|---|---|---|---|---|---|
| | Range analysis for demand increases by: | | | | Range analysis for demand increases by: | | | |
| | 25% | 50% | 75% | 90% | 25% | 50% | 75% | 90% |
| COSTS: Annualized monetized costs .... | $27.4 | $45.5 | $63.7 | $74.6 | $27.9 | $46.6 | $65.4 | $76.6 |
| Annualized quantified, but unmonetized costs. | None | | | | None | | | |
| Qualitative (unquantified) costs | None | | | | None | | | |
| BENEFITS: Annualized monetized benefits | None | | | | None | | | |
| Annualized quantified, but unmonetized benefits. | This rule will reduce the amount of time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. | | | | This rule will reduce the amount of time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. | | | |
| Qualitative (unquantified) bene-fits. | Federal Government will achieve increased efficiencies by streamlining the processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar. | | | | Federal Government will achieve increased efficiencies by streamlining the processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar. | | | |

2. Problems Addressed by the Rule

Currently, aliens undergoing consular processing of their immediate relative visas cannot apply for an unlawful presence waiver until the consular officer determines that they are inadmissible during their immigrant visa interviews. The current unlawful presence waiver process requires these immediate relatives to remain abroad until USCIS adjudicates the waiver. DOS can only issue the immigrant visa upon notification from USCIS that the waiver has been approved. As previously mentioned, the processing time under the current waiver process can take over one year. Because of these lengthy processing times, U.S. citizens may be separated from their immediate relative family members for prolonged periods resulting in financial, emotional, and humanitarian hardships. Promoting family unification is an important objective of the immigration laws. *See Holder* v. *Martinez Gutierrez,* 132 S. Ct. 2011, 2019 (2012).

The final rule will permit certain immediate relatives to apply for a provisional unlawful presence waiver prior to departing from the United States. USCIS will adjudicate the provisional unlawful presence waiver and, if approved, provide notification to DOS so that it is available to the consular officer at the immigrant visa interview. If the consular officer

determines there are no other impediments to admissibility and that the alien is otherwise eligible for issuance of the immigrant visa, the visa can be immediately issued. DHS anticipates that this process change will significantly reduce the amount of time U.S. citizens are separated from their immediate alien relatives. In addition, the changes will streamline the immigrant visa waiver process, thereby increasing efficiencies for both USCIS and DOS in the issuance of immediate relative immigrant visas.

3. The Population Affected by the Rule

As explained above, only certain immediate relatives undergoing consular processing for an immigrant visa who would be inadmissible based on accrual of unlawful presence at the time of the immigrant visa interview will be eligible to apply under the proposed waiver process. Immediate relatives of U.S. citizens who are seeking adjustment of status in the United States are not affected. Immediate relatives who are eligible for adjustment of status in the United States generally include those who were admitted to the United States on nonimmigrant visas (student, tourist, etc.) or who were paroled, including those who are present in the United States after the expiration of their authorized periods of stay. In addition,

immediate relatives that self-petition, using USCIS Form I–360, as battered spouses and/or children of U.S. citizens or LPRs are able to seek adjustment of status in the United States. While all immediate relative aliens can choose to pursue consular processing if they wish, due to the financial strain and family separation inherently involved in consular processing, we have chosen to exclude aliens that are eligible to adjust status in the United States from this economic analysis.

In most instances, aliens present in the United States without having been admitted or paroled are not eligible to adjust their status and must leave the United States for immigrant visa processing at a U.S. Embassy or consulate abroad. Because these aliens are present in the United States without having been admitted or paroled, many already have accrued more than 180 days of unlawful presence and, if so, would become inadmissible under the unlawful presence bars upon their departure from the United States to attend their immigrant visa interviews. While there may be limited exceptions, the affected population would consist almost exclusively of alien immediate relatives present in the United States without having been admitted or paroled. In addition, the final rule expands eligibility to aliens in removal proceedings whose cases are

AR2022_200379

administratively closed and have not been recalendared at the time of filing the Form I–601A and to aliens who are in receipt of a charging document, Notice to Appear, that has not yet been filed with the immigration courts. In both of these instances the aliens must still meet all other eligibility requirements in order to apply for the provisional unlawful presence waiver. Finally, the final rule removes the one-time filing restriction and allows aliens to file a new provisional unlawful presence waiver application on the same approved immediate relative petition if the initial Form I–601A is denied or withdrawn prior to final adjudication.

DHS does not maintain data on the number of immediate relatives present in the United States who would qualify under the unlawful presence waiver process. The DHS Office of Immigration Statistics (DHS OIS) estimates that the population of unauthorized immigrants (those present without admission or parole) residing in the United States is approximately 11.6 million as of January 2010.[20] While all persons affected by the rule are within the estimated population of 11.6 million, it is estimated that only a portion are immediate relatives of U.S. citizens who meet the criteria required for the new process.

Other estimates are equally inconclusive on the number of immediate relatives of U.S. citizens who are subject to the unlawful presence bars. For example, the Pew Hispanic Trust estimates that there are 9.0 million persons[21] living in mixed status families in the United States that include at least one unauthorized adult alien and at least one U.S.-born child. This, and associated information from the Pew Hispanic Trust, does not provide a reliable means for the calculation of how many of the individuals in these families are U.S.

citizens rather than alien immediate relatives, or the proportion of persons with unlawful presence who are the relatives of LPRs rather than U.S. citizens.[22] Nor do these data indicate how many persons within these families are under the age of 18[23] or have alternative methods of normalizing their immigration status without having to leave the United States and, consequently, are unlikely to be affected by the provisional unlawful presence waiver process.

Data from different sources cannot be reliably combined because of differences in their total estimates for different categories, the estimation and collection methodologies used, or other reasons of incompatibility. Absent information on the number of aliens who are in the United States without having been inspected and admitted or paroled and who are immediate relatives of U.S. citizens, DHS cannot reliably estimate the affected population of the rule.

### 4. Demand

DHS expects that the final rule will increase demand for both immigrant visa petitions for alien relatives and applications for waivers of inadmissibility. Existing demand is constrained by the current process that requires individuals to leave the United States and be separated for unpredictable and sometimes lengthy amounts of time from their immediate relatives in the United States in order to obtain an immigrant visa to become an LPR. Immediate relatives eligible for LPR status if issued a waiver of inadmissibility may be reluctant to avail themselves of the current process because of the length of time that they may be required to wait outside the United States before they can be admitted as LPRs.

The provisional unlawful presence waiver process will allow an immediate relative who meets the eligibility criteria to apply for a provisional unlawful presence waiver and receive a decision on that application before departing from the United States for a consular interview. This streamlined process may reduce the reluctance of aliens who may wish to obtain an immigrant visa to become an LPR but are deterred by the lengthy separation from family members

imposed by the current process and uncertainty related to the ultimate success of obtaining an approved inadmissibility waiver.

The costs associated with normalizing a qualifying immediate relative's status also may be a constraint to demand. These current costs include:[24]

1. Petition for Alien Relative, Form I–130, to establish a qualifying relationship to a U.S. citizen; cost to the petitioner of fee paid = $420.00.

2. Application for Waiver of Grounds of Inadmissibility, Form I–601, to obtain a waiver of inadmissibility for unlawful presence; cost to applicant of fee paid = $585.00.

3. Time and expense of preparing the evidence to support the "extreme hardship" requirements for a waiver of inadmissibility. The evidentiary requirements could include sworn statements from family members, friends and acquaintances, medical records, psychiatric/psychological records, school records, evidence of illness of family members, financial information and tax returns, letters from teachers, support letters from churches and community organizations, evidence of health and emotional problems that may result from the separation, and other such documentation; costs of evidentiary requirements are variable and based on the specific facts of individual cases.

4. Travel from the United States to the immediate relative's home country or country where the visa is being processed, and any additional living expenses required to support two households while awaiting an immigrant visa; cost of travel to consular interview are variable and dependent upon the specific circumstances of individual cases.

5. Immigrant visa processing fees paid to: (a) The Department of State ($230), processed on the basis of a USCIS-approved I–130 petition; and b) USCIS ($165). Total cost to the applicant of fees paid = $395.00.

6. An Affidavit of Support Under Section 213A of the Act, Form I–864; cost to petitioner of fee paid = $88.00.

7. Other forms, affidavits, etc. as required for individual applications; cost are variable.

The costs listed above are not new to this rule; they are the current costs faced by aliens who are inadmissible for

---

[20] Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011,* available at *http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf.* **Note:** The OIS estimate of the unauthorized population residing in the United States in January 2010 was revised from a previous OIS estimate of 10.8 million. The revised 2010 estimate of 11.6 million is derived from the 2010 American Community Survey which uses population estimates based on the 2010 Census, whereas the previously released 2010 estimate was derived from the 2000 Census. The OIS estimate of the unauthorized population residing in the United States in January 2011 was 11.5 million, a decrease of 0.87% when compared to the 2010 estimate of 11.6 million.

[21] Pew Hispanic Trust, *Unauthorized Immigrants: Length of Residency, Patterns of Parenthood* 6 (Dec. 2011), available at *http://www.pewhispanic.org/files/2011/12/Unauthorized-Characteristics.pdf.*

[22] The provisional unlawful presence waiver process will only be available to alien immediate relatives of U.S. citizens, not to alien relatives of lawful permanent residents.

[23] In the Pew Hispanic Trust report, *Unauthorized Immigrants: Length of Residency, Patterns of Parenthood,* "families" are defined as adults age 18 and older who live with their minor children (i.e., younger than 18) and unmarried, dependent children younger than 25.

[24] Fees quoted are as of June 2012. Source for DOS fees: *http://travel.state.gov/visa/temp/types/types_1263.html#perm.* Source for USCIS fees: *http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD&vgnextchannel=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD.*

AR2022_200380

unlawful presence and must undergo consular processing for immediate relative immigrant visas.

Under the provisional unlawful presence waiver process, aliens must submit biometrics after filing the provisional unlawful presence waiver application, along with the corresponding fee (currently $85.00). Submission of biometrics to DHS is separate from the DOS immigrant visa security surcharge that recovers costs to DOS associated with providing enhanced border security. Since publication of the proposed provisional unlawful presence waiver rule, DOS published an updated fee schedule for consular services which did the following as respects this rule: (1) Reduced the immediate relative visa fee from $330 to $230; (2) increased the immigrant visa security surcharge fee from $74 to $75; and (3) discontinued charging a separate fee for the immigrant visa surcharge and instead embedded the fee in the immigrant visa

application fees.[25] The requirement to submit biometrics to DHS in order to apply for a provisional unlawful presence waiver, with the associated fee, time, and travel costs, would be a small portion of the total costs of the immigrant visa application process.

As there are no annual limitations on the number of immediate relative visas that can be issued, the increase in the annual demand for waivers would be determined by the size of the affected population and the increased propensity to apply. As previously mentioned, a potential increase in demand might be limited, as is current demand, by the costs previously noted.

With the absence of an estimate of the affected population, we have calculated an estimate for the increase in demand based on historical records and assumptions on the range of demand. Forecasts of demand based on historical volumes of immediate relatives who are seeking waivers for unlawful presence are limited, at best, due to the lack of data. Historical estimates show only

those aliens who have taken the steps to obtain an immigrant visa to become LPRs. The data are silent, however, on that population of aliens who have not initiated action to become LPRs due to current uncertainties and risks. Therefore, we recognize that the estimates provided may understate what may actually occur when this rule becomes effective.

The current level of demand, shown in Table 2, is a result of the existing constraints described previously: the possibility of lengthy separation of immediate relatives and their U.S. citizen relatives; uncertainty of the ultimate success of obtaining an approved inadmissibility waiver; and the financial constraints (costs). Because of the variability in timing between when immigrant visa petitions and waiver applications are submitted and adjudicated and the time when an immigrant visa is issued, comparisons between the totals within a single year are not meaningful.

TABLE 2—HISTORICAL IMMIGRATION DATA—FISCAL YEARS 2001 THROUGH 2010

| Fiscal year | Petitions for immediate alien relative, form I–130 [26] | Immediate relative visas issued | Ineligibility finding [27] | Ineligibility overcome [28] |
|---|---|---|---|---|
| 2001 | [29] 592,027 | 172,087 | 5,384 | 6,157 |
| 2002 | 321,577 | 178,142 | 2,555 | 3,534 |
| 2003 | 357,081 | 154,760 | 3,301 | 1,764 |
| 2004 | 330,514 | 151,724 | 4,836 | 2,031 |
| 2005 | 290,777 | 180,432 | 7,140 | 2,148 |
| 2006 | 309,268 | 224,187 | 13,710 | 3,264 |
| 2007 | 344,950 | 219,323 | 15,312 | 7,091 |
| 2008 | 412,297 | 238,848 | 31,069 | 16,922 |
| 2009 | 455,864 | 227,517 | 24,886 | 12,584 |
| 2010 | 471,791 | 215,947 | 22,093 | 18,826 |
| 10 year average | 388,615 | 196,297 | 13,029 | 7,432 |
| Ineligibility Findings overcome (10 year average) | n/a | n/a | n/a | 57.0% |

**Note:** Sums may not total due to rounding.
Sources: Petitions for Alien Relative, Form I–130, query of USCIS Performance Analysis System by USCIS' Office of Performance and Quality, Data Analysis and Reporting Branch. Immediate relative visas issued are from individual annual Report(s) of the Visa Office, Department of State Visa Statistics, accessible at http://travel.state.gov/visa/statistics/statistics 1476.html. Ineligibility data are also from the individual annual report(s) of the Visa Office, Department of State Visa Statistics and appears in Table XX of each annual report.

---

[25] See 77 FR 18907. DHS has revised the cost estimates in this final rule to reflect the updated DOS fee schedule.

[26] Numbers in this column differ from the proposed rule (77 FR 19915) as the proposed rule inadvertently used data for preference aliens. We've corrected the table to account for immediate relative petitions filed using Form I–130. We note the ten year average here of 388,615 differs by less than two percent from the ten year average of 395,919 used in the proposed rule. We recognize that immediate relative petitions also can be filed by certain aliens using the Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360. Immediate relative petitions filed for the Amerasian classification are filed for aliens that are already outside the United States so we do not believe these aliens would benefit from the provisional unlawful presence waiver requirements. Additionally, self-petitioning

battered spouses and children covered under the Violence Against Women Act (VAWA) are able to seek adjustment of status in the United States regardless of whether they have been inspected and admitted or paroled into the United States, see INA section 245(a). Moreover, self-petitioning battered spouses and children typically are exempt from accruing unlawful presence for purposes of INA section 212(a)(9)(B)(i). See INA section 212(a)(9)(B)(iii)(IV). While beneficiaries of immediate relative petitions for a widow(er) of a U.S. citizen may avail themselves of the provisional unlawful presence waiver, in the period 2001–2010, the ten-year average for these petitions was 594. For purposes of clarity in the assumptions and the future calculations of impact, we have decided not to include this population in the immediate relative petition volumes given the relatively negligible

filing volumes. Note: The current filing fee for Form I–360 is $405 for a widow(er) of a U.S. citizen.

[27] Both the Ineligibility Finding and Ineligibility Overcome columns refer only to ineligibility in which the grounds of inadmissibility were the 3-year or the 10-year unlawful presence bar. This figure is not limited to immigrant petitioners who are immediate relatives of U.S. citizens; it also includes relatives of LPRs. Ineligibility findings were low between 2001 and 2005/2006 because many individuals were not seeking immigrant visas through the consular process overseas; instead, they adjusted to lawful permanent resident status stateside under INA section 245(i).

[28] Id. Ineligibility Findings/Ineligibility Overcome includes alien relatives who are not affected by the rule. Comparisons between the totals of Ineligibility Findings/Ineligibility Overcome within a single

Continued

As is evident, each of the data sets in Table 2 demonstrates a wide variability. The estimate of future demand under the new process would be determined by the number of ineligibility findings. The data for Ineligibility Findings and Ineligibility Overcome in Table 2 refer only to ineligibility where the grounds of inadmissibility were the 3-year or the 10-year unlawful presence bar. This data, however, also includes alien relatives of LPRs (or preference aliens) who are not affected by this rule. DHS has provided the data in Table 2 to provide historical context noting that the last three years of ineligibility findings are well above the 10-year historical average. For this reason, DHS used the estimate for the future filings for waivers of inadmissibility made by the USCIS Office of Performance and Quality (OPQ), Data Analysis and Reporting Branch, as the basis for the

estimated future filings. The current OPQ estimate for future waivers of inadmissibility is approximately 24,000 per year. Currently, 80 percent (or 19,200) of all waivers of inadmissibility are filed on the basis of inadmissibility due to the unlawful presence bars.[30] This estimate is further confirmed when examining the most recent 5-year period between FY 2006–FY 2010 where the average unlawful presence ineligibility finding is approximately 21,400. In light of the recent upward trend of immediate relative visas issued and ineligibility findings presented in Table 2, OPQ's estimate of 19,200 applications for waivers of unlawful presence represents as reasonable of an approximation as possible for future demand based on available data of the current waiver process.

DHS anticipates that the changes to create a new provisional unlawful presence waiver process will encourage

immediate relatives who are unlawfully present to initiate actions to obtain an immigrant visa to become LPRs when they otherwise would be reluctant to under the current process. As confidence in the new process increases, we would expect demand to trend upward. DHS estimates were formulated based on general assumptions of the level of constraints on demand removed by the rule. DHS does not know of any available data that would enable a more precise calculation of the increases in filing propensities or an increase in the number of inadmissibility findings or the percentage of inadmissibility findings where the inadmissibility bar is overcome.

Table 3 indicates the estimate of demand under the current process. This is the baseline demand expected in the absence of the rule.

TABLE 3—BASELINE ESTIMATES OF GROWTH IN PETITIONS FOR ALIEN RELATIVES AND INELIGIBILITY FINDINGS BASED ON UNLAWFUL PRESENCE UNDER THE CURRENT PROCESS

| Fiscal year | Petitions for alien immediate relative, Form I–130[31] | Ineligibility finding[32] |
|---|---|---|
| Year 1 | 402,217 | 19,709 |
| Year 2 | 416,294 | 20,398 |
| Year 3 | 430,864 | 21,112 |
| Year 4 | 445,945 | 21,851 |
| Year 5 | 461,553 | 22,616 |
| Year 6 | 477,707 | 23,408 |
| Year 7 | 494,427 | 24,227 |
| Year 8 | 511,732 | 25,075 |
| Year 9 | 529,642 | 25,952 |
| Year 10 | 548,180 | 26,861 |
| 10 Year Totals | 4,718,560 | 231,209 |

**Note:** Sums may not total due to rounding.

Based on the data available on requests for waivers under the current process, Table 3 forecasts the number of findings of inadmissibility due to accrual of unlawful presence. The results presented in Table 3 are meant to show forecasts for future demand for waivers due to unlawful presence bars under the current process. DHS assumes that in every case where a consular officer determines inadmissibility based

on unlawful presence, the alien would apply for a waiver. Thus, Table 3 represents the baseline totals we expect in the absence of the provisional unlawful presence waiver process.

In these calculations, the petitions for an alien relative made by U.S. citizens are expected to increase annually by the 3.5 percent compound annual growth rate for the undocumented population for the previous 10 years based on

reports by the DHS OIS.[33] This is an imperfect calculation, as the undocumented population has declined since its peak in 2007,[34] but because of the data association problems noted previously, DHS used the 10-year (long term) compound average growth rate.

The ineligibility findings in Table 3 are calculated using the estimate of 19,200 average annual waivers filed on the basis of unlawful presence, which

year are not meaningful because of the variability in timing between when an ineligibility finding is made and when (and if) it is overcome.

[29] The number of Petitions for Alien Relative, Form I–130, filed in 2001 is high because many filed petitions in anticipation of the INA section 245(i) sunset date, which occurred on April 30, 2001.

[30] The 80 percent estimate was calculated by USCIS based on data from all Forms I–601 completed by USCIS abroad from August 2010 to October 2011 and comparing those that listed only unlawful presence as an inadmissibility ground.

[31] The first year estimate for the baseline demand of I–130 petitions is the 10 year average of 388,615 multiplied by the 3.5 percent compound annual growth rate for the undocumented population for the previous 10 years reported in the DHS Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011.* Subsequent years are increased at the same 3.5 percent growth rate. As a comparison, the U.S. population as a whole rose at a compound annual growth rate of 0.930 percent over the same period.

[32] Ineligibility Findings are calculated at the USCIS estimate of 0.049 per alien immediate relative petition.

[33] DHS Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011.* The 3.5 percent (rounded) compound annual growth rate is calculated from the estimated populations of unauthorized immigrants living in the United States in 2000 (8.5 million) and in 2010 (11.6 million).

[34] *Id.*

equates to 0.049 ineligibility findings for every alien relative petition based on the 10-year average. Again, these calculations are imperfect since ineligibility findings are based on immigrant visas granted for the alien relative population (both immediate relative and family preference).

DHS does not have data available that would permit an estimation of the escalation of change in this variable. Thus, this estimate of future petitions for alien relatives and ineligibility findings is based on a range of assumptions concerning the current constraint on demand. As a result, Table 4 provides a scenario analysis utilizing estimates of various amounts of constraint on demand. For example, an assumption that demand is currently constrained by 25 percent would mean that there would be a 25 percent increase from the baseline in the number of Form I–601A applications for each year under the new provisional unlawful presence waiver process. The findings of this range analysis are presented in Table 4.

TABLE 4—ESTIMATES OF INADMISSIBILITY FINDINGS REQUIRING AN UNLAWFUL PRESENCE WAIVER, FORM I–601A ASSOCIATED WITH THE INCREASED DEMAND OF THE RULE

| Year | Expected demand for Form I–601A with current constrained demand of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
|---|---|---|---|---|
| Year 1 | 24,636 | 29,563 | 34,490 | 37,446 |
| Year 2 | 25,498 | 30,598 | 35,697 | 38,757 |
| Year 3 | 26,390 | 31,669 | 36,947 | 40,113 |
| Year 4 | 27,314 | 32,777 | 38,240 | 41,517 |
| Year 5 | 28,270 | 33,924 | 39,578 | 42,971 |
| Year 6 | 29,260 | 35,111 | 40,963 | 44,475 |
| Year 7 | 30,284 | 36,340 | 42,397 | 46,031 |
| Year 8 | 31,344 | 37,612 | 43,881 | 47,642 |
| Year 9 | 32,441 | 38,929 | 45,417 | 49,310 |
| Year 10 | 33,576 | 40,291 | 47,006 | 51,036 |
| 10-Year Totals | 289,012 | 346,814 | 404,617 | 439,298 |

**Note:** Numbers may not total due to rounding.

In response to comments on the proposed rule, DHS has made the careful determination to expand participation in the provisional unlawful presence waiver process to immediate relative aliens in removal proceedings whose cases have been or will be administratively closed and have not been recalendared at the time of filing the Form I–601A. Aliens who are in removal proceedings whose cases have been or will be administratively closed are likely comprised primarily of aliens who would need to seek immigration relief via DOS consular processing. Thus, we believe that such individuals are also already accounted for in the volume estimates provided above which were based on historical filings of Form I–601 to waive the unlawful presence ground. However, to not understate the volume, we examined historical case resolution statistics of immigration proceedings provided by EOIR. Historical statistics are silent on the volume of cases that have been administratively closed and later recalendared.

Based on statistics compiled by EOIR, 66,365 cases at the immigration court level and 3,911 cases at the BIA (for a total of 70,276 cases) were administratively closed since 1992 where the sole charge is INA

212(a)(6)(A)(i).[35] DHS has no way of knowing precisely how many of the 70,276 previously administratively closed cases would be immediate relatives of U.S. citizens and otherwise eligible for the provisional unlawful presence waiver. In an effort to be balanced in our estimate, it would be incorrect to assume that every removal proceeding case that was administratively closed in the past will also meet the requirements under the provisional unlawful presence waiver process. Therefore, we will provide a range analysis to estimate the proportion that would be eligible to participate over a similar range of assumptions as used in calculating induced demand. In this instance, however, we will assume that removal proceeding cases that are eligible to participate would range from 25–90 percent, where 25 percent means that 25 percent of the administratively closed cases also meet the remaining provisional unlawful presence waiver requirements. Since cases that were administratively closed in the past represent a static statistic, we only reflect this potential influx in one year of our volume projections. Thus, the addition made to the volume estimate in

Year 1 to account for estimates of additional Form I–601A filings from aliens whose removal proceedings have been be administratively closed are: 17,569 (25 percent of 70,276 cases); 35,138 (50 percent); 52,707 (75 percent); and 63,249 (90 percent).

Similarly, DHS estimated increases to the yearly volume projection in order to account for those aliens with cases that will be administratively closed and therefore eligible to apply for the provisional unlawful presence waiver, provided they meet the additional requirements. DHS examined EOIR historical case resolution statistics over the five-year period FY 2007–FY 2011 to determine an appropriate average number of cases that are administratively closed from which to base this yearly estimate on. Those findings are presented in Table 5.

TABLE 5—NUMBER OF ADMINISTRATIVELY CLOSED CASES—FISCAL YEARS 2007 THROUGH 2011 [36]

| Fiscal year | Number |
|---|---|
| 2007 | 7,966 |
| 2008 | 8,409 |
| 2009 | 7,885 |

[35] Source: EOIR, Office of Planning, Analysis, and Technology; statistics include cases completed from January 1, 1992–December 5, 2012. Data compiled on December 5, 2012.

[36] Source: Executive Office for Immigration Review Office of Planning, Analysis, and Technology FY 2011 Statistical Year Book February 2012, available at: http://www.justice.gov/eoir/statspub/fy11syb.pdf.

TABLE 5—NUMBER OF ADMINISTRATIVELY CLOSED CASES—FISCAL YEARS 2007 THROUGH 2011 [36]—Continued

| Fiscal year | Number |
|---|---|
| 2010 ............................................... | 8,939 |
| 2011 ............................................... | 6,337 |
| 5-yr Average ................................. | 7,907 |

In examining the data over the five-year span (presented in Table 5), there is no obvious upward or downward trend, so for the purpose of simplifying, DHS assumes no growth in this statistic. Over the 20-year period of analysis of EOIR's statistics of administratively closed cases, DHS determined that 35% of all administratively closed cases were those where the sole charge is unlawful presence.[37] Assuming this proportion will continue to hold, we estimate that EOIR would administratively close 2,768 cases per year where the sole charge is unlawful presence.[38] Again, DHS has no way of knowing precisely how many of the 2,768 estimated unlawful presence administratively closed cases will be aliens who are immediate relatives of U.S. citizens and otherwise eligible for the provisional unlawful presence waiver process. Applying the same range analysis based on participation rates, DHS has made the following yearly additions to the volume estimate of additional Form I–601A filings to account for those aliens whose removal proceedings have been or will be administratively closed: 692 (25 percent of 5-year average 2,768); 1,384 (50 percent), 2,076 (75 percent); and 2,492 (90 percent). The final estimate for future filings of the provisional unlawful presence waiver considers both induced demand relative to the current process and the participation rate of aliens in removal proceedings whose cases have been or will be administratively closed. This final estimate is presented in Table 6.

TABLE 6—FINAL ESTIMATES OF INADMISSIBILITY FINDINGS REQUIRING AN UNLAWFUL PRESENCE WAIVER, FORM I–601A

[Table 4 plus an adjustment for aliens in removal proceedings whose cases have been or will be administratively closed and have not been recalendared]

| Year | Expected demand for Form I–601A with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 .................................................................. | 42,897 | 66,085 | 89,274 | 103,188 |
| Year 2 .................................................................. | 26,191 | 31,982 | 37,774 | 41,249 |
| Year 3 .................................................................. | 27,083 | 33,053 | 39,023 | 42,606 |
| Year 4 .................................................................. | 28,007 | 34,161 | 40,316 | 44,010 |
| Year 5 .................................................................. | 28,963 | 35,309 | 41,655 | 45,463 |
| Year 6 .................................................................. | 29,952 | 36,496 | 43,040 | 46,967 |
| Year 7 .................................................................. | 30,976 | 37,725 | 44,474 | 48,524 |
| Year 8 .................................................................. | 32,036 | 38,997 | 45,957 | 50,135 |
| Year 9 .................................................................. | 33,133 | 40,313 | 47,493 | 51,802 |
| Year 10 ................................................................ | 34,269 | 41,676 | 49,083 | 53,528 |
| 10-Year Totals ................................................ | 313,501 | 395,793 | 478,084 | 527,467 |

**Note:** Numbers may not total due to rounding.

Table 7 is the expected marginal increase in inadmissibility waiver initial applications due to the final rule implementing the provisional unlawful presence waiver process. These estimates are obtained by subtracting the baseline estimates in Table 3 (without the rule) from the estimates when the rule becomes effective in Table 6.

TABLE 7—FINAL ESTIMATES OF THE ADDITIONAL INELIGIBILITY FINDINGS REQUIRING AN INADMISSIBILITY WAIVER UNDER THE RULE (INDUCED DEMAND) [39]

[Table 6 minus Table 3]

| Year | Additional ineligibility findings requiring an inadmissibility waiver with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 .................................................................. | 23,189 | 46,377 | 69,565 | 83,479 |
| Year 2 .................................................................. | 5,792 | 11,584 | 17,375 | 20,851 |
| Year 3 .................................................................. | 5,971 | 11,941 | 17,911 | 21,494 |
| Year 4 .................................................................. | 6,155 | 12,310 | 18,465 | 22,159 |
| Year 5 .................................................................. | 6,347 | 12,693 | 19,039 | 22,847 |
| Year 6 .................................................................. | 6,544 | 13,088 | 19,632 | 23,559 |

[37] Statistic calculated by DHS based on EOIR statistics on administratively closed cases from January 1, 1992–December 5, 2012. According to the EOIR report, there were a total of 189,566 aliens whose cases have been administratively closed at immigration court. Of those, a total of 66,365 cases were administratively closed at the immigration court where the sole charge is INA 212(a)(06)(A)(i). [Calculation: 66,365/189,566 = 0.3501 or 35% (rounded)] Similarly, there was a total of 11,279 aliens whose cases have been administratively closed at the BIA. Of those, a total of 3,911 cases were administratively closed at the BIA where the sole charge is INA 212(a)(06)(A)(i). [Calculation: 3,911/11,279 = 0.3468 or 35% (rounded)].

[38] Calculation: 35% of the 5-year average of administratively closed cases (7,907) = 2,768 (rounded).

[39] The increased ineligibility findings in Table 6 are the difference in ineligibility findings from the different assumptions of level of constrained demand or participation rate (as respects those in removal proceedings whose cases have been administratively closed) in Table 5 and the baseline ineligibility findings shown in Table 2.

Federal Register/Vol. 78, No. 2/Thursday, January 3, 2013/Rules and Regulations **571**

TABLE 7—FINAL ESTIMATES OF THE ADDITIONAL INELIGIBILITY FINDINGS REQUIRING AN INADMISSIBILITY WAIVER UNDER THE RULE (INDUCED DEMAND) [39]—Continued

[Table 6 minus Table 3]

| Year | Additional ineligibility findings requiring an inadmissibility waiver with current constrained demand or participation rate of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 7 ............................................................. | 6,749 | 13,498 | 20,247 | 24,297 |
| Year 8 ............................................................. | 6,961 | 13,922 | 20,883 | 25,060 |
| Year 9 ............................................................. | 7,181 | 14,361 | 21,541 | 25,850 |
| Year 10 ........................................................... | 7,408 | 14,815 | 22,222 | 26,667 |
| 10 Year Totals ................................................. | 82,292 | 164,583 | 246,875 | 296,258 |

**Note:** Numbers may not total due to rounding.

Lastly, in response to public comments on the proposed rule, DHS has made the decision to not reject provisional unlawful presence waiver applications from aliens who previously submitted a Form I–601A application that either was denied or withdrawn. This means that an alien can file a new provisional unlawful presence waiver application on the basis of the original approved immediate relative petition. DHS has examined USCIS I–601 processing data over the 5-year period, FY 2007–2011. The average denial rate over that 5-year period is 34%.[40]

Internal USCIS review of I–601 historical application data indicated that withdrawals of Form I–601s were not a significant occurrence. At this time, DHS is unable to project a trend associated with the frequency of cases that are denied or withdrawn and later the alien chooses to re-file a waiver application. In an effort to present the maximum volume projection of I–601A re-filers, we have made the following assumptions: (1) The five-year denial rate of 34% calculated for Form I–601s will hold for Form I–601As; and (2) for every I–601A that is denied, we assume

that the alien will file an additional I–601A. We believe that showing the maximum volume projections under those assumptions will sufficiently account for those cases that are withdrawn. The volume projection of I–601A re-filers is shown in Table 8, and is based on a 34% denial rate for all initial filings presented in Table 6. We have chosen to present the re-filing volume projections separately because re-filers would be able to base the re-filed application on the initial immediate relative petition.

TABLE 8—FINAL ESTIMATES OF DENIED OR WITHDRAWN PROVISIONAL UNLAWFUL PRESENCE WAIVER APPLICATIONS WHERE AN ALIEN WOULD RE-FILE A NEW FORM I–601A

[Assumes that 34% of all initial applications in Table 6 will be denied or withdrawn]

| Year | Estimate of denied or withdrawn applications requiring a re-filed Form I–601A assuming the same demand and participation rates of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 1 ............................................................. | 14,585 | 22,469 | 30,354 | 35,084 |
| Year 2 ............................................................. | 8,905 | 10,874 | 12,844 | 14,025 |
| Year 3 ............................................................. | 9,209 | 11,239 | 13,268 | 14,487 |
| Year 4 ............................................................. | 9,523 | 11,615 | 13,708 | 14,964 |
| Year 5 ............................................................. | 9,848 | 12,006 | 14,163 | 15,458 |
| Year 6 ............................................................. | 10,184 | 12,409 | 14,634 | 15,969 |
| Year 7 ............................................................. | 10,532 | 12,827 | 15,122 | 16,499 |
| Year 8 ............................................................. | 10,893 | 13,259 | 15,626 | 17,046 |
| Year 9 ............................................................. | 11,266 | 13,707 | 16,148 | 17,613 |
| Year 10 ........................................................... | 11,652 | 14,170 | 16,689 | 18,200 |
| 10-Year Totals ................................................. | 106,593 | 134,571 | 162,551 | 179,341 |

**Note:** Numbers may not total due to rounding.

## 5. Costs

The final rule will require provisional unlawful presence waiver applicants to submit biometrics to USCIS. This is the only new cost applicants will incur under the provisional unlawful presence waiver process in comparison to the current waiver process. The other

costs of the rule emanate from the increase in the demand created by the provisional unlawful presence waiver process. These other costs include the fees and preparation costs for forms prepared by individuals who we believe take the initiative to normalize their immigration status where they

otherwise would not due to existing constraints previously described under the current I–601 waiver process.

For the biometric collection, the immediate relative alien will incur the following costs associated with submitting biometrics with an application for the provisional unlawful

---

[40]Source: USCIS Office of Performance and Quality, Data Analysis and Reporting Branch.

Query of CIS Consolidated Operational Repository

for I–601 receipts, approval and denials for FY 2007—2011; report generated December 8, 2011.

presence waiver: the required USCIS fee and the opportunity and mileage costs of traveling to a USCIS ASC to have the biometric recorded.

The current USCIS fee for collecting and processing biometrics is $85.00. In addition, DHS estimates the opportunity costs for travel to an ASC in order to have the biometric recorded based on the cost of travel (time and mileage) plus the average wait time to have the biometric collected. While travel times and distances will vary, DHS estimates that the average round-trip distance to an ASC will be 50 miles, and that the average time for that trip will be 2.5 hours. DHS estimates that an alien will wait an average of one hour for service and to have biometrics collected.

DHS recognizes that the individuals impacted by the rule are unlawfully present and are generally not eligible to work; however, consistent with other DHS rulemakings, we use wage rates as a mechanism to estimate the opportunity or time valuation costs associated with the required biometric collection. The Federal minimum wage is currently $7.25 per hour.[41] In order to anticipate the full opportunity cost of providing biometrics, DHS multiplied the minimum hourly wage rate by 1.44 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, which equals $10.44 per hour.[42] In addition, the cost of travel includes a mileage charge based on the estimated 50 mile round trip at the General Services Administration rate of $0.555 per mile, which equals $27.75 for each applicant.[43]

Using an opportunity cost of time of $10.44 per hour and the 3.5 hour estimated time for travel and service and the mileage charge of $27.75, DHS estimates the cost per provisional unlawful presence waiver applicant to be $64.29 for travel to and service at the ASC.[44] When the $85.00 biometric fee is added, the total estimated additional cost per provisional unlawful presence waiver over the current waiver process is $149.29. All other fees charged by USCIS and DOS to apply for immediate relative visas remain the same under the current and provisional unlawful presence waiver processes.[45]

The incremental costs of the biometric requirement of the rule are computed as the $149.29 cost per provisional unlawful presence waiver multiplied by the total number of applicants for provisional unlawful presence waivers applying after the final rule is effective. This population is represented in Table 6. The incremental costs of the additional biometric requirement are shown in Table 9.

TABLE 9—COSTS OF BIOMETRIC REQUIREMENT TO IMMEDIATE RELATIVES FILING A PROVISIONAL UNLAWFUL PRESENCE WAIVER APPLICATION

[Table 6 multiplied by $149.29]

| Year | Additional inadmissibility waiver application fees with current constrained demand or participation rate of | | | |
| --- | --- | --- | --- | --- |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $6,404,093 | $9,865,830 | $13,327,715 | $15,404,937 |
| Year 2 | 3,910,054 | 4,774,593 | 5,639,280 | 6,158,063 |
| Year 3 | 4,043,221 | 4,934,482 | 5,825,744 | 6,360,650 |
| Year 4 | 4,181,165 | 5,099,896 | 6,018,776 | 6,570,253 |
| Year 5 | 4,323,886 | 5,271,281 | 6,218,675 | 6,787,171 |
| Year 6 | 4,471,534 | 5,448,488 | 6,425,442 | 7,011,703 |
| Year 7 | 4,624,407 | 5,631,965 | 6,639,523 | 7,244,148 |
| Year 8 | 4,782,654 | 5,821,862 | 6,860,921 | 7,484,654 |
| Year 9 | 4,946,426 | 6,018,328 | 7,090,230 | 7,733,521 |
| Year 10 | 5,116,019 | 6,221,810 | 7,327,601 | 7,991,195 |
| 10-Year Totals Undiscounted | 46,803,460 | 59,088,534 | 71,373,907 | 78,746,295 |
| 10-Year Totals Discounted at 7.0 percent | 32,907,683 | 42,030,423 | 51,153,460 | 56,628,050 |
| 10-Year Totals Discounted at 3.0 percent | 39,926,220 | 50,653,297 | 61,380,675 | 67,818,069 |

**Note:** Numbers may not total due to rounding.

In addition to the costs of the biometric requirement, DHS expects that the rule will induce an increase in demand for immediate relative visas, which will generate new fees paid to the USCIS and DOS. As the only new requirement imposed by this rule on provisional unlawful presence waiver applicants compared with the current waiver process is biometrics, fees collected for filing forms that are already required (such as the Form I–130) are not costs of this rule. The new fee revenue, however, is that generated by the additional demand shown in Table 7, and from transfers made by applicants to USCIS and DOS to cover the cost of processing the forms. In addition to the fees, there are nominal preparation costs associated with completing the forms. We estimate the amount of these fees and their associated preparation costs to give a more complete estimate of the impact of this rule. We consider the fee values to be a reasonable proxy for the underlying costs of this rule. The additional fees and preparation costs are shown in Table 10.

In determining the preparation cost for the forms, different labor rates were used depending on the citizenship status of the petitioner. If the form is completed by the alien immediate relative (Form I–601A), the loaded minimum wage of $10.44 per hour was used. If the form is completed by a U.S.

---

[41] U.S. Dep't of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009, available at: *http://www.dol.gov/dol/topic/wages/minimumwage.htm.*

[42] U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group, Dec. 2011, available at *http://www.bls.gov/news.release/archives/ecec_03142012.htm.*

[43] *See* 77 FR 22786.

[44] ($10.44 per hour × 3.5 hours) + ($0.555 per mile × 50 miles) = $64.29.

[45] The Application for a Provisional Waiver of Inadmissibility, Form I–601A, will carry the same USCIS fee as Form I–601.

AR2022_200386

citizen, we used the mean hourly wage for ''all occupations'' as reported by the Bureau of Labor Statistics and then adjusted that wage upward to account for the costs of employee benefits, such as annual leave, for a fully loaded hourly wage rate of $31.31.[46] The times to complete the forms are based on the estimated burden time reported for the individual forms.

These costs and appropriate fees paid to USCIS and DOS are calculated by the formula:

1. Cost of Form I–130: Preparation cost = ($31.31 × 1.5 hours) = $46.97; USCIS fee to cover processing cost = $420.00. Total cost = $466.97

2. Cost of Form I–601A: Preparation cost = ($10.44 × 1.5 hours) = $15.66; USCIS fee to cover processing costs = $585.00. Total cost = $600.66

3. Cost of Form I–864: Preparation cost = ($31.31 × 6.0 hours) = $187.86; DOS fee to cover processing costs = $88.00. Total cost = $275.86

4. Cost of Immigrant Visa: Preparation cost of Form DS–230 = ($10.44 × 1.0 hour) = $10.44; Processing Fees: DOS fee to cover processing costs = $230; USCIS fee to cover processing costs = $165. Total cost = $405.44.

Based on the above, the total costs per application: ($466.97 + 600.66 + 275.86 + 405.44) = $1,748.93.

TABLE 10—COSTS FOR PREPARING AND FILING USCIS AND DOS FORMS

[Table 7 multiplied by $1,748.93]

| Year | Additional preparation costs and filing fees with current constrained demand or participation rate of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 1 | $40,555,938 | $81,110,127 | $121,664,315 | $145,998,927 |
| Year 2 | 10,129,803 | 20,259,605 | 30,387,659 | 36,466,939 |
| Year 3 | 10,442,861 | 20,883,974 | 31,325,085 | 37,591,501 |
| Year 4 | 10,764,664 | 21,529,328 | 32,293,992 | 38,754,540 |
| Year 5 | 11,100,459 | 22,199,168 | 33,297,878 | 39,957,804 |
| Year 6 | 11,444,998 | 22,889,996 | 34,334,994 | 41,203,042 |
| Year 7 | 11,803,529 | 23,607,057 | 35,410,586 | 42,493,752 |
| Year 8 | 12,174,302 | 24,348,603 | 36,522,905 | 43,828,186 |
| Year 9 | 12,559,066 | 25,116,384 | 37,673,701 | 45,209,841 |
| Year 10 | 12,956,073 | 25,910,398 | 38,864,722 | 46,638,716 |
| 10 Year Totals Undiscounted | 143,931,692 | 287,854,640 | 431,775,838 | 518,143,249 |
| 10 Year Totals Discounted at 7.0 percent | 106,881,772 | 213,757,395 | 320,631,489 | 384,766,730 |
| 10 Year Totals Discounted at 3.0 percent | 125,678,197 | 251,348,945 | 377,018,045 | 452,432,274 |

**Note:** Sums may not total due to rounding.

The totals in Table 10 are calculated by multiplying the induced demand shown in Table 7 by the $1,748.93 shown above. DHS acknowledges there are additional costs to the existing process, such as travel from the United States to the immediate relative's home country where the immigrant visa is being processed and the additional expense of supporting two households while awaiting an immigrant visa. Such costs are highly variable and depend on the circumstances of the specific petitioner. We did not estimate the impacts of these variable costs. To the

extent that this rule allows immediate relatives to reduce the time spent in their home country, we expect a proportionate reduction in these costs. These cost savings represent a benefit of this rule.

In addition, the final rule has removed the limitation that allowed aliens to file only one Form I–601A on the basis of an approved immediate relative petition. In response to public comment, DHS will allow an alien to file a new Form I–601A based on the same approved immediate relative petition if the initial Form I–601A is

denied or withdrawn. If an alien chooses to file a new provisional unlawful presence waiver application, the alien would face the biometric costs (including biometric fees and travel to the ASC to submit biometrics) and the fee and preparation costs associated with Form I–601A. As previously established, the biometric costs are $149.29 and the Form I–601A costs are $600.66 per applicant. The total costs associated with the estimated population volume are presented in Table 11.

TABLE 11—COSTS ASSOCIATED WITH APPLICANTS THAT RE-FILE FORM I–601A AFTER THE INITIAL FORM I–601A IS DENIED OR WITHDRAWN

[Table 8 multiplied by $749.95]

| Year | Additional costs for applications that are denied and re-filed over the range analysis of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 1 | $10,938,021 | $16,850,627 | $22,763,982 | $26,311,246 |
| Year 2 | 6,678,305 | 8,154,956 | 9,632,358 | 10,518,049 |
| Year 3 | 6,906,290 | 8,428,688 | 9,950,337 | 10,864,526 |

[46] The $31.31 rate is calculated by multiplying the $21.74 average hourly wage for all occupations May 2011 (available at *http://www.bls.gov/oes/2011/ may/oes_nat.htm*) by the 1.44 fully loaded multiplier.

TABLE 11—COSTS ASSOCIATED WITH APPLICANTS THAT RE-FILE FORM I–601A AFTER THE INITIAL FORM I–601A IS DENIED OR WITHDRAWN—Continued

[Table 8 multiplied by $749.95]

| Year | Additional costs for applications that are denied and re-filed over the range analysis of | | | |
| --- | --- | --- | --- | --- |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 4 | 7,141,774 | 8,710,669 | 10,280,315 | 11,222,252 |
| Year 5 | 7,385,508 | 9,003,900 | 10,621,542 | 11,592,727 |
| Year 6 | 7,637,491 | 9,306,130 | 10,974,768 | 11,975,952 |
| Year 7 | 7,898,473 | 9,619,609 | 11,340,744 | 12,373,425 |
| Year 8 | 8,169,205 | 9,943,587 | 11,718,719 | 12,783,648 |
| Year 9 | 8,448,937 | 10,279,565 | 12,110,193 | 13,208,869 |
| Year 10 | 8,738,417 | 10,626,792 | 12,515,916 | 13,649,090 |
| 10-Year Totals Undiscounted | 79,942,420 | 100,924,521 | 121,908,872 | 134,499,783 |
| 10-Year Totals Discounted at 7.0 percent | 56,207,656 | 71,788,866 | 87,371,675 | 96,721,450 |
| 10-Year Totals Discounted at 3.0 percent | 68,195,707 | 86,516,943 | 104,840,098 | 115,834,193 |

**Note:** Sums may not total due to rounding.

The total cost to applicants is shown in Table 12 as the sum of Table 9, Table 10, and Table 11.

TABLE 12—TOTAL COSTS TO APPLICANTS OF THE FINAL RULE

[Sum of Tables 9–11]

| Year | Estimated total cost at current constrained demand or participation rate of | | | |
| --- | --- | --- | --- | --- |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $57,898,052 | $107,826,583 | $157,756,013 | $187,715,110 |
| Year 2 | 20,718,162 | 33,189,154 | 45,659,297 | 53,143,051 |
| Year 3 | 21,392,372 | 34,247,144 | 47,101,166 | 54,816,677 |
| Year 4 | 22,087,603 | 35,339,893 | 48,593,083 | 56,547,045 |
| Year 5 | 22,809,853 | 36,474,349 | 50,138,095 | 58,337,702 |
| Year 6 | 23,554,023 | 37,644,613 | 51,735,204 | 60,190,697 |
| Year 7 | 24,326,409 | 38,858,631 | 53,390,853 | 62,111,325 |
| Year 8 | 25,126,162 | 40,114,053 | 55,102,544 | 64,096,488 |
| Year 9 | 25,954,429 | 41,414,276 | 56,874,124 | 66,152,230 |
| Year 10 | 26,810,510 | 42,758,999 | 58,708,239 | 68,279,001 |
| 10 Year Totals Undiscounted | 270,677,572 | 447,867,695 | 625,058,617 | 731,389,326 |
| 10 Year Totals Discounted at 7.0 percent | 195,997,110 | 327,576,683 | 459,156,625 | 538,116,229 |
| 10 Year Totals Discounted at 3.0 percent | 233,800,123 | 388,519,186 | 543,238,818 | 636,084,535 |

**Note:** Sums may not total due to rounding.

Costs to the Federal Government include the possible costs of additional adjudication personnel associated with increased volume and the associated equipment (computers, telephones) and occupancy costs (if additional space is required). However, we expect these costs to be offset by the additional fee revenue collected for form processing. As previously explained, DHS has adopted the current cost for adjudicating an Application for Waiver of Ground of Inadmissibility, Form I–601($585), as the initial filing fee that will be required for the Form I–601A. DHS will consider the impact of the provisional unlawful presence waiver process workflow and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends. Consequently, we do not believe that this rule will impose additional costs on the Federal Government.

6. Benefits

The benefits of the rule are the result of streamlining the immigrant visa waiver process. The primary benefits of the provisional unlawful presence waiver process changes are qualitative and result from reduced separation time for U.S. citizens and their immediate relatives. In addition to the obvious humanitarian and emotional benefits derived from family reunification, we also anticipate significant financial benefits accruing to the U.S. citizen due to the shortened period he or she would have to financially support the alien relative abroad. DHS is currently unable to estimate the average duration of time an immediate relative must spend abroad while awaiting waiver adjudication under the current process, and so cannot predict how the time spent apart would be reduced under the provisional unlawful presence waiver process. As a result of streamlining the

**575**

unlawful presence waiver process, there also could be workflow efficiencies realized by both USCIS and DOS. The new process will enable USCIS to process and adjudicate the provisional unlawful presence waivers domestically. As a result, USCIS may be able to move a large part of its workload to Service Centers or field offices with resources that are less expensive than overseas staffing resources and that are flexible enough to accommodate filing surges. In addition, the new provisional unlawful presence waiver process will allow DOS to review these cases once, as opposed to the current unlawful presence process where these cases are reviewed twice, at a minimum. DHS anticipates that the new process will make the immigrant visa process more efficient.

### D. Executive Order 13132

This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### E. Executive Order 12988 Civil Justice Reform

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

### F. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule requires that an applicant requesting a provisional unlawful presence waiver complete an *Application for Provisional Waiver of Unlawful Presence,* Form I–601A. This form is considered new information collection and is covered under the PRA. USCIS is currently seeking approval of this newly created instrument from OMB.

DHS submitted Form I–601A to OMB for review. OMB temporarily assigned an OMB Control Number, 1615–0123, to the form and also filed comments in accordance with 5 CFR 1320.11(c). DHS has considered the comments received in response to the publication of the proposed rule and the comments submitted by OMB concerning the creation of the Form I–601A. DHS' response to the comments appears in this final rule and in an appendix to the supporting statement that accompanies this rule. USCIS has submitted the supporting statement to OMB as part of its request for approval of this new information collection instrument.

On April 2, 2012, DHS published a proposed rule, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* in the **Federal Register** at 77 FR 19902. In the PRA section of that rule, DHS inadvertently indicated that USCIS would be seeking to revise a currently approved information collection instrument. DHS, however, should have indicated that it would be requesting the approval of a new information collection instrument, *Application for Provisional Unlawful Presence Waiver,* Form I–601A. This final rule corrects that error.

Despite the inadvertent error in the notice inserted in the PRA portion of the proposed rule, DHS clearly communicated to the public, in other parts of the proposed rule, that it was considering the creation of a new information collection instrument, Form I–601A, to be able to collect information required from certain immediate relatives of U.S. citizens seeking a provisional unlawful presence waiver of the unlawful presence inadmissibility ground. USCIS received comments from the public on the proposed Form I–601A. Those comments have been addressed under part IV (Public Comments on Proposed Rule).

Lastly, DHS has updated the supporting statement to reflect a change in the estimate for the number of respondents that USCIS projected would submit this type of request from 38,277 respondents to 62,348 respondents. This change of the initially projected estimate is due to the final rule's expansion of the eligibility criterion initially proposed, which results in an increase of the estimated population of aliens that DHS expects could file Form I–601A. With the increase in the total number of respondents, DHS has increased the total annual burden hours to 166,469 hours. In addition, DHS has revised the originally proposed form I–601A and its instructions to include the changes as discussed in Part IV (Public Comments on the Proposed Rule) and the appendix of the supporting statement. The revised materials can be viewed at *www.regulations.gov.*

### G. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act and certifies that this rule will not have a significant economic impact on a substantial number of small entities. The factual basis for this determination is that this rule directly regulates individuals who are the immediate relatives of U.S. citizens seeking to apply for an unlawful presence waiver of inadmissibility in order to be eligible to obtain an immigrant visa outside the United States. The impact is on these persons as individuals, so that they are not, for purposes of the Regulatory Flexibility Act, within the definition of small entities established by 5 U.S.C. 601(6). DHS received no public comments challenging this certification.

## VII. Amendments

### List of Subjects

#### 8 CFR Part 103

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information; Privacy, Reporting and recordkeeping requirements, Surety bonds.

#### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

Accordingly, USCIS amends chapter I of title 8 of the Code of Federal Regulations as follows.

AR2022_200389

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2.

■ 2. Section 103.7 is amended by revising paragraphs (b)(1)(i)(AA) and (c)(3)(i) to read as follows:

### § 103.7   Fees.

\*   \*   \*   \*   \*
(b) \* \* \*
(1) \* \* \*
(i) \* \* \*
(AA) *Application for Waiver of Ground of Inadmissibility (Form I–601) and Application for Provisional Unlawful Presence Waiver (I–601A).* For filing an application for waiver of grounds of inadmissibility or an application for a provisional unlawful presence waiver: $585.

\*   \*   \*   \*   \*
(c) \* \* \*
(3) \* \* \*
(i) Biometric Fee, except for the biometric fee required for provisional unlawful presence waivers filed under 8 CFR 212.7(e).

\*   \*   \*   \*   \*

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); 8 CFR part 2. Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Section 212.7 is amended by:
■ a. Revising paragraphs (a)(1), (a)(3), and (a)(4); and
■ b. Adding paragraph (e).
The revisions and addition read as follows:

### § 212.7   Waivers of certain grounds of inadmissibility.

(a)(1) *Application.* Except as provided by 8 CFR 212.7(e), an applicant for an immigrant visa, adjustment of status, or a K or V nonimmigrant visa who is inadmissible under any provision of section 212(a) of the Act for which a waiver is available under section 212 of the Act may apply for the related waiver by filing the form designated by USCIS, with the fee prescribed in 8 CFR

103.7(b)(1), and in accordance with the form instructions. Certain immigrants may apply for a provisional unlawful presence waiver of inadmissibility as specified in 8 CFR 212.7(e).

\*   \*   \*   \*   \*

(3) *Decision.* If the waiver application is denied, USCIS will provide a written decision and notify the applicant and his or her attorney or accredited representative and will advise the applicant of appeal procedures, if any, in accordance with 8 CFR 103.3. The denial of a provisional unlawful presence waiver is governed by 8 CFR 212.7(e).

(4) *Validity.* (i) A provisional unlawful presence waiver granted according to paragraph (e) of this section is valid subject to the terms and conditions as specified in paragraph (e) of this section. In any other case, approval of an immigrant waiver of inadmissibility under this section applies only to the grounds of inadmissibility, and the related crimes, events, or incidents that are specified in the application for waiver.

(ii) Except for K–1 and K–2 nonimmigrants and aliens lawfully admitted for permanent residence on a conditional basis, an immigrant waiver of inadmissibility is valid indefinitely, even if the applicant later abandons or otherwise loses lawful permanent resident status.

(iii) For a K–1 or K–2 nonimmigrant, approval of the waiver is conditioned on the K–1 nonimmigrant marrying the petitioner; if the K–1 nonimmigrant marries the K nonimmigrant petitioner, the waiver becomes valid indefinitely, subject to paragraph (a)(4)(iv) of this section, even if the applicant later abandons or otherwise loses lawful permanent resident status. If the K–1 does not marry the K nonimmigrant petitioner, the K–1 and K–2 nonimmigrants remain inadmissible for purposes of any application for a benefit on any basis other than the proposed marriage between the K–1 and the K nonimmigrant petitioner.

(iv) For an alien lawfully admitted for permanent residence on a conditional basis under section 216 of the Act, removal of the conditions on the alien's status renders the waiver valid indefinitely, even if the applicant later abandons or otherwise loses lawful permanent resident status. Termination of the alien's status as an alien lawfully admitted for permanent residence on a conditional basis also terminates the validity of a waiver of inadmissibility based on sections 212(h) or 212(i) of the Act that was granted to the alien. Separate notification of the termination

of the waiver is not required when an alien is notified of the termination of residence under section 216 of the Act, and no appeal will lie from the decision to terminate the waiver on this basis. If the alien challenges the termination in removal proceedings, and the removal proceedings end in the restoration of the alien's status, the waiver will become effective again.

(v) Nothing in this subsection precludes USCIS from reopening and reconsidering a decision if the decision is determined to have been made in error.

\*   \*   \*   \*   \*

(e) *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives.* The provisions of this paragraph (e) are applicable to certain aliens who are pursuing consular immigrant visa processing as an immediate relative of a U.S. citizen.

(1) *Jurisdiction.* All applications for a provisional unlawful presence waiver, including an application for a provisional unlawful presence waiver made by an alien in removal proceedings before the Executive Office for Immigration Review, must be filed with USCIS, with the fees prescribed in 8 CFR 103.7(b), and in accordance with the form instructions.

(2) *Provisional Unlawful Presence Waiver; In General.* (i) USCIS may adjudicate applications for a provisional unlawful presence waiver of inadmissibility based on section 212(a)(9)(B)(v) of the Act filed by eligible aliens described in paragraph (e)(3) of this section. USCIS will only approve such provisional unlawful presence waiver applications in accordance with the conditions outlined in paragraph (e) of this section. Consistent with section 212(a)(9)(B)(v) of the Act, the decision whether to approve a provisional unlawful presence waiver application is discretionary and does not constitute a grant of a lawful immigration status or a period of stay authorized by the Secretary.

(ii) A pending or an approved provisional unlawful presence waiver does not authorize any interim immigration benefits such as employment authorization or advance parole. Any application for a travel document or request for employment authorization that is submitted in connection with a provisional unlawful presence waiver application will be rejected.

(3) *Eligible aliens.* Except as provided in paragraph (e)(4) of this section, an alien may be eligible to apply for and receive a provisional unlawful presence

AR2022_200390

waiver for the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act if he or she meets the requirements in this paragraph. An alien may be eligible to apply for or receive a waiver if he or she:

(i) Is present in the United States at the time of filing the application for a provisional unlawful presence waiver, and for biometrics collection at a USCIS ASC;

(ii) Upon departure, would be inadmissible only under section 212(a)(9)(B)(i) of the Act at the time of the immigrant visa interview;

(iii) Qualifies as an immediate relative under section 201(b)(2)(A)(i) of the Act;

(iv) Is the beneficiary of an approved immediate relative petition;

(v) Has a case pending with the Department of State based on the approved immediate relative petition and has paid the immigrant visa processing fee as evidenced by a State Department Visa Processing Fee Receipt;

(vi) Will depart from the United States to obtain the immediate relative immigrant visa; and

(vii) Meets the requirements for a waiver provided in section 212(a)(9)(B)(v) of the Act, except the alien must show extreme hardship to his or her U.S. citizen spouse or parent.

(4) *Ineligible Aliens.* Notwithstanding paragraph (e)(3) of this section, an alien is ineligible for a provisional unlawful presence waiver under paragraph (e) of this section if:

(i) USCIS has reason to believe that the alien may be subject to grounds of inadmissibility other than unlawful presence under section 212(a)(9)(B)(i)(I) or (II) of the Act at the time of the immigrant visa interview with the Department of State;

(ii) The alien is under the age of 17;

(iii) The alien does not have a case pending with the Department of State, based on the approved immediate relative petition, and has not paid the immigrant visa processing fee;

(iv) The Department of State initially acted to schedule the immigrant visa interview prior to January 3, 2013 for the approved immediate relative petition on which the provisional unlawful presence waiver is based, even if the interview has since been cancelled or rescheduled *after* January 3, 2013;

(v) The alien is in removal proceedings, unless the removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A;

(vi) The alien is subject to a final order of removal issued under section 217, 235, 238, or 240 of the Act or a final order of exclusion or deportation under former 236 or 242 of the Act (pre-April 1, 1997), or any other provision of law (including an in absentia removal order under section 240(b)(5) of the Act);

(vii) The alien is subject to reinstatement of a prior removal order under section 241(a)(5) of the Act; or

(viii) The alien has a pending application with USCIS for lawful permanent resident status.

(5) *Filing.* (i) An application for a provisional unlawful presence waiver of the unlawful presence inadmissibility bars under section 212(a)(9)(B)(i)(I) or (II) of the Act, including an application by an alien in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A, must be filed in accordance with 8 CFR part 103 and on the form designated by USCIS. The prescribed fee under 8 CFR 103.7(b)(1) and supporting documentation must be submitted in accordance with the form instructions.

(ii) An application for a provisional unlawful presence waiver will be rejected and the fee and package returned to the alien if the alien:

(A) Fails to pay the required filing fee for the provisional unlawful presence waiver application or to pay the correct filing fee;

(B) Fails to sign the provisional unlawful presence waiver application;

(C) Fails to provide his or her family name, domestic home address, and date of birth;

(D) Is under the age of 17;

(E) Does not include evidence of an approved petition that classifies the alien as an immediate relative of a U.S. citizen;

(F) Fails to include a copy of the fee receipt evidencing that the alien has paid the immigrant visa processing fee to the Department of State; or

(G) Has indicated on the provisional unlawful presence waiver application that the Department of State initially acted to schedule the immigrant visa interview prior to January 3, 2013, even if the interview was cancelled or rescheduled *after* January 3, 2013.

(6) *Biometrics.* (i) All aliens who apply for a provisional unlawful presence waiver under this section will be required to provide biometrics in accordance with 8 CFR 103.16 and 103.17, as specified on the form instructions.

(ii) *Failure to appear for biometrics capture.* If an alien fails to appear for biometrics capture, the provisional unlawful presence waiver application will be considered abandoned and denied pursuant to 8 CFR 103.2(b)(13).

The alien may not appeal or file a motion to reopen or reconsider an abandonment denial under 8 CFR 103.5.

(7) *Burden of proof.* The alien has the burden to establish eligibility for the provisional unlawful presence waiver as described in this paragraph of this section, and under section 212(a)(9)(B)(v) of the Act, including that the alien merits a favorable exercise of the Secretary's discretion.

(8) *Adjudication.* USCIS will adjudicate the provisional unlawful presence waiver application in accordance with this paragraph of this section and section 212(a)(9)(B)(v) of the Act, except the alien must show extreme hardship to his or her U.S. citizen spouse or parent. USCIS also may require the alien and the U.S. citizen petitioner to appear for an interview pursuant to 8 CFR 103.2(b)(9). If USCIS finds that the alien does not meet the eligibility requirements for the provisional unlawful presence waiver as described in paragraph (e) of this section, or if USCIS otherwise determines in its discretion that a waiver is not warranted, USCIS will deny the waiver application. Notwithstanding 8 CFR 103.2(b)(16), USCIS may deny an application for a provisional unlawful presence waiver without prior issuance of a request for evidence or notice of intent to deny.

(9) *Notice of Decision.* USCIS will notify the alien and the alien's attorney of record or accredited representative of the decision in accordance with 8 CFR 103.2(b)(19). USCIS also may notify the Department of State. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another provisional unlawful presence waiver application under paragraph (e) of this section, provided the alien meets all of the requirements in this part, and the alien's case must be pending with the Department of State. An alien also may elect to file a Form I–601, Waiver of Grounds of Inadmissibility, pursuant to paragraph (a)(1) of this section after departing the United States, appearing for his or her immigrant visa interview at the U.S. Embassy or consulate abroad, and after the Department of State determines the alien's admissibility and eligibility for an immigrant visa. Accordingly, denial of a request for a provisional unlawful presence waiver is not a final agency action for purposes of section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704.

(10) *Withdrawal of waiver requests.* An alien may withdraw his or her request for a provisional unlawful presence waiver at any time before USCIS makes a final decision. Once the

case is withdrawn, USCIS will close the case and notify the alien and his or her attorney or accredited representative. The alien may file a new Form I–601A, in accordance with the form instructions and required fees. The alien's case must be pending with the Department of State and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

(11) *Appeals and Motions To Reopen.* There is no administrative appeal from a denial of a request for a provisional unlawful presence waiver under this section. The alien may not file, pursuant to 8 CFR 103.5, a motion to reopen or reconsider a denial of a provisional unlawful presence waiver application under this section.

(12) *Approval and Conditions.* A provisional unlawful presence waiver granted under this section:

(i) Does not take effect unless, and until, the alien who applied for and obtained the provisional unlawful presence waiver:

(A) Departs from the United States;

(B) Appears for an immigrant visa interview at a U.S. Embassy or consulate; and

(C) Is determined to be otherwise eligible for an immigrant visa by a Department of State consular officer in light of the approved provisional unlawful presence waiver.

(ii) Waives the alien's inadmissibility under section 212(a)(9)(B) of the Act only for purposes of the application for an immigrant visa and admission to the United States as an immediate relative of a U.S. citizen pursuant to the approved immediate relative petition (Form I–130 or I–360) upon which the provisional unlawful presence waiver application was based.

(iii) Does not waive any ground of inadmissibility other than the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act.

(13) *Validity.* Until the provisional unlawful presence waiver takes full effect as provided in paragraph (e)(12) of this section, USCIS may reopen and reconsider its decision at any time. Once a provisional unlawful presence waiver takes full effect as defined in paragraph (e)(12) of this section, the period of unlawful presence for which the provisional unlawful presence waiver is granted is waived indefinitely, in accordance with and subject to paragraph (a)(4) of this section.

(14) *Automatic Revocation.* The approval of a provisional unlawful presence waiver is revoked automatically if:

(i) The consular officer determines at the time of the immigrant visa interview that the alien is ineligible to receive a visa under section 212(a) of the Act other than under section 212(a)(9)(B)(i)(I) or (II) of the Act;

(ii) The immigrant visa petition approval associated with the provisional unlawful presence waiver is at any time revoked, withdrawn, or rendered invalid but not otherwise reinstated for humanitarian reasons or converted to a widow or widower petition;

(iii) The immigrant visa registration is terminated in accordance with section 203(g) of the Act, and has not been reinstated in accordance with section 203(g) of the Act; or

(iv) The alien, at any time before or after approval of the provisional unlawful presence waiver or before an immigrant visa is issued, reenters or attempts to reenter the United States without being inspected and admitted or paroled.

**Janet Napolitano,**
*Secretary.*

[FR Doc. 2012–31268 Filed 1–2–13; 4:18 pm]

**BILLING CODE 9111–97–P**

**46788**   **Federal Register** / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103, 106, 204, 211, 212, 214, 216, 217, 223, 235, 236, 240, 244, 245, 245a, 248, 264, 274a, 286, 301, 319, 320, 322, 324, 334, 341, 343a, 343b, and 392**

**[CIS No. 2627–18; DHS Docket No. USCIS– 2019–0010]**

**RIN 1615–AC18**

**U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule adjusts certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). It also removes certain fee exemptions, changes fee waiver requirements, alters premium processing time limits, and modifies intercountry adoption processing. USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. Therefore, the Department of Homeland Security (DHS) is adjusting USCIS fees by a weighted average increase of 20 percent, adding new fees for certain immigration benefit requests, establishing multiple fees for nonimmigrant worker petitions, and limiting the number of beneficiaries for certain forms. This final rule is intended to ensure that USCIS has the resources it needs to provide adequate service to applicants and petitioners.

**DATES:** This final rule is effective October 2, 2020. Any application, petition, or request postmarked on or after this date must be accompanied with the fees established by this final rule.

**FOR FURTHER INFORMATION CONTACT:** Kika Scott, Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2130, telephone (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
 A. Purpose of the Regulatory Action
 B. Legal Authority
 C. Summary of the Final Rule Provisions
 D. Summary of Costs and Benefits
 E. Effect on the Department of Justice's Executive Office for Immigration Review (EOIR)
 F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking
II. Background
 A. History
 B. Authority and Guidance
 C. Basis for Fee Adjustments
 D. Final Rule
III. Response to Public Comments on the Proposed Rule
 A. Summary of Public Comments
 B. Comments Expressing General Support for the NPRM
 C. Comments Expressing General Opposition to the NPRM
  1. Immigration Policy Concerns
  2. Other General Opposition
  3. Proposed Fees Are Unconstitutional
  4. Rule Will Have Negative Effects on Applicants
  5. Rule Will Have Negative Effects on the Economy and Employers
  6. Comments on the DACA Renewal Fee
 D. Comments on Legal Adequacy of the Rule
 E. Comments on Fee Waivers
  1. Limits on Eligible Immigration Categories and Forms
  2. Fee Waiver Income Requirements
  3. Means-Tested Benefits
  4. Public Charge Rule
  5. Financial Hardship
  6. Public Charge Ground of Inadmissibility and Affidavit of Support Requirements
  7. Discretionary Fee Waivers
  8. Fee Waiver Documentation
  9. Cost of Fee Waivers
  10. Changes to Form I–912, Request for Fee Waiver
  11. Suggestions
 F. Comments on Fee Exemptions
  1. EAD (Form I–765) Exemption
  2. TPS
 G. Comments on Specific Fees
  1. Fees for Online Filing
  2. Biometric Services Fee
  3. Genealogy Fees, Forms G–1041, Genealogy Index Search Request, and G– 1041A, Genealogy Records Request
  4. Form I–90, Application To Replace Permanent Resident Card
  5. Form I–131, Application for Travel Document, Refugee Travel Documents
  6. Form I–131A, Application for Travel Document (Carrier Documentation)
  7. Form I–192, Application for Advance Permission To Enter as a Nonimmigrant
  8. Form I–193, Application for Waiver of Passport and/or Visa
  9. Form I–290B, Notice of Appeal or Motion
  10. Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant
  11. Form I–485, Application To Register Permanent Residence or Adjust Status
  12. Form I–526, Immigrant Petition by Alien Investor
  13. Form I–589, Application for Asylum and Withholding of Removal Fee
  14. Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I– 600A/I–600
  15. Form I–601A, Application for Provisional Unlawful Presence Waiver
  16. Form I–751, Petition To Remove Conditions on Residence
  17. Form I–765, Application for Employment Authorization
  18. Form I–817, Application for Family Unity Benefits
  19. Form I–821D, DACA Renewal Fee
  20. Form I–829, Petition by Investor To Remove Conditions on Permanent Resident Status
  21. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))
  22. Forms I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and I– 924A, Annual Certification of Regional Center
  23. Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant
  24. Form N–400, Application for Naturalization
  25. Other Naturalization and Citizenship Forms
 H. Comments on Changes to Form I–129, Petition for a Nonimmigrant Worker
 I. Premium Processing
 J. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)
 K. Comments on Other General Feedback
 L. Cost Analysis and DHS Rationale for Fee Adjustments
  1. Workload Projections
  2. Completion Rates
  3. USCIS Staffing
  4. Cost Baseline
  5. Alternative Funding Sources
 M. ICE Transfer
 N. Processing Times and Backlogs
 O. Fee Payment and Receipt Requirements
 P. Fees Shared by CBP and USCIS
 Q. Paperwork Reduction Act (PRA) Comment Responses
 R. Statutory and Regulatory Responses
  1. General Comments on the Regulatory Impact Analysis
  2. Methodology Issues
  3. Other Comments on the Cost-Benefit Analysis
  4. Impacts on Lower-Income Individuals and Families
  5. Impacts on Immigrant Populations in Distinct Geographic Areas
  6. Immigrants' Access to Legal and Supportive Services
  7. Impacts on Students From Low Income Families
  8. Impacts on Victimized Groups and Other Vulnerable Populations
  9. Impacts to Industries That Use H–2A Workers
  10. Effects on Other Federal Agencies
IV. Statutory and Regulatory Requirements
 A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)
 B. Regulatory Flexibility Act
  1. Final Regulatory Flexibility Analysis (FRFA)
  a. A Statement of Need for, and Objectives of, the Rule

b. A statement of the Significant Issues Raised by the Public Comments in Response to the Initail Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

c. The Response of the Agency to any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Rule, and a Detailed Statement of Any Change Made to the Final Rule as a Result of the Comments

d. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available

e. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

f. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

C. Congressional Review Act

D. Unfunded Mandates Reform Act

E. Executive Order 13132 (Federalism)

F. Executive Order 12988 (Civil Justice Reform)

G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments

H. Family Assessment

I. National Environmental Policy Act (NEPA)

J. Paperwork Reduction Act

K. Signature

## List of Acronyms and Abbreviations

ABC    Activity-Based Costing
the Act   Homeland Security Act of 2002
ADA    Americans with Disabilities Act
AOP    Annual Operating Plan
APA    Administrative Procedure Act
ASVVP    Administrative Site Visit and Verification Program
ASC    Application Support Center
BLS    Bureau of Labor Statistics
CAA    Cuban Adjustment Act of 1966
CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP    U.S. Customs and Border Protection
CEQ    Council on Environmental Quality
CFO    Chief Financial Officer
CFR    Code of Federal Regulations
CNMI    Commonwealth of the Northern Mariana Islands
CUNY    City University of New York
DACA    Deferred Action for Childhood Arrivals

DHS    Department of Homeland Security
DOJ    Department of Justice
DOL    Department of Labor
DOS    Department of State
EAD    Employment Authorization Document
EB–5    Employment-Based Immigrant Visa, Fifth Preference
EIN    Employer Identification Number
E.O.    Executive Order
EOIR    Executive Office for Immigration Review
FBI    Federal Bureau of Investigation
FDMS    Federal Docket Management System
FOIA    Freedom of Information Act
FPG    Federal Poverty Guidelines
FR    Federal Register
FRFA    Final Regulatory Flexibility Analysis
FVRA    Federal Vacancies Reform Act
FY    Fiscal Year
GAO    Government Accountability Office
GDP    Gross Domestic Product
ICE    U.S. Immigration and Customs Enforcement
IEFA    Immigration Examinations Fee Account
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act
INA    Immigration and Nationality Act of 1952
INS    Immigration and Naturalization Service
IRS    Internal Revenue Service
ISAF    International Security Assistance Forces
IT    information technology
LCA    Labor Condition Application
LGBTQ    Lesbian, gay, bisexual, transgender, and questioning
IOAA    Independent Offices Appropriations Act
LIFO    Last In, First Out
LPR    Lawful Permanent Resident
MOAs    Memoranda of Agreement
MPP    Migrant Protection Protocols
NACARA    Nicaraguan Adjustment and Central American Relief Act
NAICS    North American Industry Classification System
NARA    National Archives and Records Administration
NEPA    National Environmental Policy Act
NOID    Notice of Intent to Deny
NPRM    Notice of Proposed Rulemaking
NRC    National Record Center
OIG    DHS Office of the Inspector General
OIRA    Office of Information and Regulatory Affairs
OMB    Office of Management and Budget
PA    Privacy Act
PII    Personally Identifiable Information
PRA    Paperwork Reduction Act of 1995
PRC    Permanent Resident Card
Privacy Act   Privacy Act of 1974
Pub. L.   Public Law
RFE    Request for Evidence
RFA    Regulatory Flexibility Act
RIA    Regulatory Impact Analysis
SAVE    Systematic Alien Verification for Entitlements
SBA    Small Business Administration
SCRD    Signature Confirmation Restricted Delivery
Secretary   The Secretary of Homeland Security
SIJ    Special Immigrant Juvenile
SNAP    Supplemental Nutrition Assistance Program

SSI    Supplemental Security Income
Stat.    U.S. Statutes at Large
STEM    Science, Technology, Engineering, and Mathematics
TPS    Temporary Protected Status
TVPA    Trafficking Victims Protection Act of 2000
TVPRA    The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UAC    Unaccompanied Alien Child
UMRA    Unfunded Mandates Reform Act of 1995
U.S.C.    United States Code
USCIS    U.S. Citizenship and Immigration Services
VAWA    Violence Against Women Act
VPC    Volume Projection Committee

## I. Executive Summary

### A. Purpose of the Regulatory Action

This final rule adjusts certain immigration and naturalization benefit request fees charged by USCIS. It also makes changes related to setting, collecting, and administering fees. Fee schedule adjustments are necessary to recover the full operating costs associated with administering the nation's lawful immigration system and safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefit, while protecting Americans, securing the homeland, and honoring our values. This final rule also makes certain adjustments to fee waiver eligibility, filing requirements for nonimmigrant workers, premium processing service, and other administrative requirements.

### B. Legal Authority

DHS's authority is in several statutory provisions. Section 102 of the Homeland Security Act of 2002 (the Act),[1] 6 U.S.C. 112, and the Immigration and Nationality Act of 1952 (INA) section 103, 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. Further, authority for establishing fees is found in INA section 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants").[2]

---

[1] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

[2] The longstanding interpretation of DHS is that the "including" clause in INA section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* INA

Continued

*C. Summary of the Final Rule Provisions*

DHS carefully considered the public comments received. This final rule adopts, with appropriate changes, the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on November 14, 2019. *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements;* Proposed rule, 84 FR 62280. This final rule also relies on all the justifications articulated in the NPRM, except as reflected below.

This final rule makes the following changes as compared to the NPRM:

• Does not provide for the transfer of Immigration Examinations Fee Account (IEFA) funds collected by USCIS to U.S. Immigration and Customs Enforcement (ICE). 84 FR 62287; ''U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,'' Proposed Rule; Extension of Comment Period; Availability of Supplemental Information, 84 FR 67243 (Dec. 9, 2019).

• Removes the proposed fee ($275) for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, filed for renewal of Deferred Action for Childhood Arrivals (DACA). 84 FR 62320, 62362; proposed and new 8 CFR 106.2(a)(38).

• Reassigns National Record Center (NRC) costs that do not directly apply to the genealogy program, thereby setting genealogy fees lower than proposed. 84 FR 62315, 62316, 62362; proposed 8 CFR 106.2(c)(1) and (2); new 8 CFR 106.2(c)(1) and (2).

• Realigns $10 million of anticipated IEFA costs for the Office of Citizenship to account for citizenship grants appropriations received via the FY 2019—2020 DHS appropriation bills. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019).

• Provides a $50 reduction in the fee for Form I–485, Application to Register Permanent Residence or Adjust Status, filed in the future for principal applicants who pay the $50 fee for Form I–589 and are subsequently granted asylum. New 8 CFR 106.2(a)(17)(ii).

• Provides that petitioners for and recipients of Special Immigrant Juvenile (SIJ) classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile

court or a state child welfare agency, may submit requests for fee waivers for Form I–485 and associated forms; and explains the documentation requirement for SIJs. New 8 CFR 106.3(a)(2)(i) and (a)(3).

• Provides that an Afghan or Iraqi Interpreter, an Iraqi National employed by or on behalf of the U.S. Government, or an Afghan National employed by the U.S. Government or the International Security Assistance Forces (ISAF) may submit requests for fee waivers for Form I–485 and associated forms.[3] New 8 CFR 106.3(a)(2)(ii).

• Provides that requestors who meet the requirements of INA section 245(l)(7), 8 U.S.C. 1255(l)(7) may also request a fee waiver for the Forms N–400, N–600, and N–600K. New 8 CFR 106.3(a)(3).

• Also provides that SIJs who are placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency and Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or ISAF may submit requests for fee waivers for Forms N–400, N–600, and N–600K. New 8 CFR 106.3(a)(2)(i) and (a)(3).

• Clarifies that the Violence Against Women Act (VAWA) self-petitioner classification includes individuals who meet the requirements of INA section 101(a)(51) and anyone otherwise self-petitioning due to battery or extreme cruelty pursuant to the procedures in INA section 204(a) *See* new 8 CFR 106.3(a)(1)(i).

• Consolidates the Director's discretionary provision on fee waivers to remove redundancy. See proposed 8 CFR 106.3(b) and (c); 84 FR 62363 (containing the text that is being consolidated). New 8 CFR 106.3(b).

• Moves proposed 8 CFR 106.3(d)(1) and (d)(2) (not permitting a fee waiver for a requestor who is subject to the affidavit of support, already a sponsored immigrant, or subject to the public charge inadmissibility ground) to 8 CFR 106.3(b)(1) and (b)(2) (governing waivers provided by the USCIS Director), because an affidavit of support and the public charge inadmissibility ground are not applicable to applicants who are otherwise eligible for fee waivers in this rule). New 8 CFR 106.3(b).

• Clarifies the fee waiver request documentation requirements for VAWA, T, and U requestors who may not have access to documentation of household income. New 8 CFR 106.3(f)(5).

• Provides that the fee for forms currently available for online filing with USCIS and filed online will be $10 lower than the fee for the same paper forms. New 8 CFR 106.2(d).

• Requires a separate $30 biometric services fee for Form I–765 filed by pending asylum applicants and applicants for status as a long-term resident from the Commonwealth of the Northern Mariana Islands (CNMI). New 8 CFR 106.2(a)(32)(i).

• Separates fee exemptions for Form I–765 for renewal or replacement of an Employment Authorization Document and clarifies the provisions related to VAWA self-petitioners who are eligible for a fee exemption. New 8 CFR 106.2(a)(32).

• Incorporates a $10 fee for the registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens. *See* old 8 CFR 103.7(b)(1)(i)(NNN), 84 FR 60307 (Nov. 8, 2019); new 8 CFR 106.2(c)(11). The final regulation at 8 CFR 103.2(a)(1) also clarifies that all USCIS fees are generally non-refundable, regardless of whether they apply to a benefit request, another adjudication and naturalization service, or other requests such as H–1B Registration, DACA, Civil Surgeon Designation, and Genealogy requests.

• Updates 8 CFR 244.6(b) to clarify the Temporary Protected Status (TPS) related fee provisions in accordance with the NPRM. *See* 84 FR 62301 (stating that the rule proposed to remove the Form I–765 fee exemption for Temporary Protected Status if the individual is filing an initial TPS application and is under 14 years of age or over 65 years of age).

• DHS will maintain the DACA policy fees as in effect before September 5, 2017, at $410 for employment authorization and $85 for biometric services. New 8 CFR 106.2(a)(32)(vi).

• Makes other minor non-substantive and clarifying changes.

DHS summarizes the final fees in Table 1. The table excludes fees established and required by statute and those that DHS cannot adjust. The table only calculates the change in the current fee. If an applicant, petitioner, or requestor must file additional forms as a result of policy changes in this rule, then the individual changes to a single

---

section 286(m), 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

[3] As described in section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006) as amended; section 602(b) of the Afghan Allies Protection Act of 2009, Public Law 111–8, title VI (Mar. 11, 2009), as amended, 8 U.S.C. 1101 note; and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110–181 (Jan. 28, 2008).

fee may not represent the total change
in fees for every circumstance.

TABLE 1—NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES

| Immigration benefit request | Current fee $ | Final fee $ | Change ($) | Percentage change |
|---|---|---|---|---|
| I–90 Application to Replace Permanent Resident Card (online filing) | 455 | 405 | −50 | −11 |
| I–90 Application to Replace Permanent Resident Card (paper filing) | 455 | 415 | −40 | −9 |
| I–102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 445 | 485 | 40 | 9 |
| I–129 Petition for a Nonimmigrant worker | 460 | N/A | N/A | N/A |
| I–129CW, I–129E&TN, and I–129MISC | 460 | 695 | 235 | 51 |
| I–129H1 | 460 | 555 | 95 | 21 |
| I–129H2A—Named Beneficiaries | 460 | 850 | 390 | 85 |
| I–129H2B—Named Beneficiaries | 460 | 715 | 255 | 55 |
| I–129L | 460 | 805 | 345 | 75 |
| I–129O | 460 | 705 | 245 | 53 |
| I–129H2A—Unnamed Beneficiaries | 460 | 415 | −45 | −10 |
| I–129H2B—Unnamed Beneficiaries | 460 | 385 | −75 | −16 |
| I–129F Petition for Alien Fiancé(e) | 535 | 510 | −25 | −5 |
| I–130 Petition for Alien Relative (online filing) | 535 | 550 | 15 | 3 |
| I–130 Petition for Alien Relative (paper filing) | 535 | 560 | 25 | 5 |
| I–131 Application for Travel Document | 575 | 590 | 15 | 3 |
| I–131 Refugee Travel Document for an individual age 16 or older | 135 | 145 | 10 | 7 |
| I–131 Refugee Travel Document for a child under the age of 16 | 105 | 115 | 10 | 10 |
| I–131A Application for Travel Document (Carrier Documentation) | 575 | 1,010 | 435 | 76 |
| I–140 Immigrant Petition for Alien Worker | 700 | 555 | −145 | −21 |
| I–191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | 930 | 790 | −140 | −15 |
| I–192 Application for Advance Permission to Enter as Nonimmigrant (CBP) [4] | 585 | 1,400 | 815 | 139 |
| I–192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) | 930 | 1,400 | 470 | 51 |
| I–193 Application for Waiver of Passport and/or Visa | 585 | 2,790 | 2,205 | 377 |
| I–212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 930 | 1,050 | 120 | 13 |
| I–290B Notice of Appeal or Motion | 675 | 700 | 25 | 4 |
| I–360 Petition for Amerasian, Widow(er), or Special Immigrant | 435 | 450 | 15 | 3 |
| I–485 Application to Register Permanent Residence or Adjust Status [5] | 1,140 | 1,130 | −10 | −1 |
|  | 750 | 1,130 | 380 | 51 |
| I–526 Immigrant Petition by Alien Investor | 3,675 | 4,010 | 335 | 9 |
| I–539 Application to Extend/Change Nonimmigrant Status (online filing) | 370 | 390 | 20 | 5 |
| I–539 Application to Extend/Change Nonimmigrant Status (paper filing) | 370 | 400 | 30 | 8 |
| I–589 Application for Asylum and for Withholding of Removal | 0 | 50 | 50 | N/A |
| I–600/600A Adoption Petitions and Applications | 775 | 805 | 30 | 4 |
| I–600A Supplement 3 Request for Action on Approved Form I–600A | N/A | 400 | N/A | N/A |
| I–601 Application for Waiver of Ground of Excludability | 930 | 1,010 | 80 | 9 |
| I–601A Provisional Unlawful Presence Waiver | 630 | 960 | 330 | 52 |
| I–612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | 930 | 515 | −415 | −45 |
| I–687 Application for Status as a Temporary Resident | 1,130 | 1,130 | 0 | 0 |
| I–690 Application for Waiver of Grounds of Inadmissibility | 715 | 765 | 50 | 7 |
| I–694 Notice of Appeal of Decision | 890 | 715 | −175 | −20 |
| I–698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | 1,670 | 1,615 | −55 | −3 |
| I–751 Petition to Remove Conditions on Residence | 595 | 760 | 165 | 28 |
| I–765 Application for Employment Authorization (Non-DACA) | 410 | 550 | 140 | 34 |
| I–765 Application for Employment Authorization (DACA only) [6] | 410 | 410 | 0 | 0 |
| I–800/800A Adoption Petitions and Applications | 775 | 805 | 30 | 4 |
| I–800A Supplement 3 Request for Action on Approved Form I–800A | 385 | 400 | 15 | 4 |
| I–817 Application for Family Unity Benefits | 600 | 590 | −10 | −2 |
| I–824 Application for Action on an Approved Application or Petition | 465 | 495 | 30 | 6 |
| I–829 Petition by Investor to Remove Conditions | 3,750 | 3,900 | 150 | 4 |
| I–881 Application for Suspension of Deportation or Special Rule Cancellation of Removal [7] | 285 | 1,810 | 1,525 | 535 |
|  | 570 | 1,810 | 1,240 | 218 |
| I–910 Application for Civil Surgeon Designation | 785 | 635 | −150 | −19 |
| I–924 Application For Regional Center Designation Under the Immigrant Investor Program | 17,795 | 17,795 | 0 | 0 |
| I–924A Annual Certification of Regional Center | 3,035 | 4,465 | 1,430 | 47 |
| I–929 Petition for Qualifying Family Member of a U–1 Nonimmigrant | 230 | 1,485 | 1,255 | 546 |
| N–300 Application to File Declaration of Intention | 270 | 1,305 | 1,035 | 383 |
| N–336 Request for Hearing on a Decision in Naturalization Proceedings (online filing) | 700 | 1,725 | 1,025 | 146 |

AR2022_200396

TABLE 1—NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES—Continued

| Immigration benefit request | Current fee $ | Final fee $ | Change ($) | Percentage change |
|---|---|---|---|---|
| N–336 Request for Hearing on a Decision in Naturalization Proceedings (paper filing) | 700 | 1,735 | 1,035 | 148 |
| N–400 Application for Naturalization (online filing) | 640 | 1,160 | 520 | 81 |
| N–400 Application for Naturalization (paper filing)[8] | 640 | 1,170 | 530 | 83 |
| | 320 | 1,170 | 850 | 226 |
| N–470 Application to Preserve Residence for Naturalization Purposes | 355 | 1,585 | 1,230 | 346 |
| N–565 Application for Replacement Naturalization/Citizenship Document (online filing) | 555 | 535 | −20 | −4 |
| N–565 Application for Replacement Naturalization/Citizenship Document (paper filing) | 555 | 545 | −10 | −2 |
| N–600 Application for Certificate of Citizenship (online filing) | 1,170 | 990 | −180 | −15 |
| N–600 Application for Certificate of Citizenship (paper filing) | 1,170 | 1,000 | −170 | −15 |
| N–600K Application for Citizenship and Issuance of Certificate (online filing) | 1,170 | 935 | −235 | −20 |
| N–600K Application for Citizenship and Issuance of Certificate (paper filing) | 1,170 | 945 | −225 | −19 |
| USCIS Immigrant Fee | 220 | 190 | −30 | −14 |
| Biometric Services (Non–DACA)[9] | 85 | 30 | −55 | −65 |
| Biometric Services (DACA only)[10] | 85 | 85 | 0 | 0 |
| G–1041 Genealogy Index Search Request (online filing) | 65 | 160 | 95 | 146 |
| G–1041 Genealogy Index Search Request (paper filing) | 65 | 170 | 105 | 162 |
| G–1041A Genealogy Records Request (online filing) | 65 | 255 | 190 | 292 |
| G–1041A Genealogy Records Request (paper filing) | 65 | 265 | 200 | 308 |

## D. Summary of Costs and Benefits

Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs

[4] Because the FY 2016/2017 fee review and resulting fee change were based on USCIS's costs for processing inadmissibility waivers and not CBP's costs, the Form I–192 fee remained $585 when filed with and processed by CBP. *See* 8 CFR 103.7(b)(1)(i)(P); 81 FR 73307.

[5] Currently, there are two fees for Form I–485. *See* 8 CFR 103.7(b)(1)(i)(U). The $750 fee is applied to "an applicant under the age of 14 years when [the application] is (i) submitted concurrently with the Form I–485 of a parent, (ii) the applicant is seeking to adjust status as a derivative of his or her parent, and (iii) the child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent." *See* 84 FR 62305. With this rule, DHS removes the reduced child fee. *See* section III.G.11.b. Form I–485 Child Fee. Additionally, DHS adds a $1,080 fee for certain asylum applicants. *See* section III.G.11.c. Form I–485 Reduced Fee for Asylees and new 8 CFR 106.2(a)(17)(ii).

[6] DHS will maintain the DACA fees at $410 for employment authorization and $85 for biometric services. *See* section III.C.6. Comments on DACA Renewal Fee of this preamble; new 8 CFR 106.2(a)(32)(vi).

[7] Currently there are two USCISs fees for Form I–881: $285 for individuals and $570 for families. *See* 8 CFR 103.7(b)(1)(i)(QQ)(1). EOIR has a separate $165 fee. DHS does not change the EOIR fee with this rule.

[8] Currently, there are two fees for paper filing of Form N–400. *See* 8 CFR 103.7(b)(1)(i)(BBB). This final rule eliminates the reduced fee option for an applicant whose documented income is greater than 150 percent and not more than 200 percent of the Federal poverty level. *See* section III.G.24.c of this final rule or 84 FR 62317 for the proposed rule.

[9] As explained in this preamble and NPRM, this rule only requires the separate biometric services fee in certain cases. *See* section III.G.2. Biometric Services Fee of this preamble; 84 FR 62302; new 8 CFR 103.7(a)(2), 106.2(a)(32)(i), and 106.2(a)(37)(iii).

[10] *See* footnote 6.

and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rulemaking has been designated an "economically significant regulatory action" under section 3(f)(1) of E.O. 12866. Accordingly, it has been reviewed by the Office of Management and Budget (OMB). E.O. 13771 directs agencies to reduce regulation and control regulatory costs. Because the estimated impacts range from costs to cost savings, this final rule is considered neither regulatory or deregulatory under E.O. 13771. Details on the estimated impacts of this final rule can be found in the rule's economic analysis, section 2.

This final rule adjusts certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). It also removes certain fee exemptions, changes fee waiver requirements,[11] alters premium processing time limits, and modifies intercountry adoption processing. This final rule removes the proposed fee that was introduced in the NPRM of this rule for Form I–821D;[12]

[11] Also, in this final rule DHS Consolidates the Director's discretionary provision on fee waivers to remove redundancy. 84 FR 62363. Proposed and new 8 CFR 106.3.

[12] 84 FR 62320, 62362; proposed and new 8 CFR 106.2(a)(2)(38).

it does not provide for the proposed transfer of any Immigration Examination Fee Account (IEFA) funds collected by USCIS to ICE;[13] it reassigns the proposed National Record Center (NRC) costs that do not directly apply to the genealogy program, thereby setting genealogy fees lower than proposed;[14] and it now allows for a $10 reduction in filing fee for applicants who file online for forms that are electronically available by USCIS rather than submit paper applications.[15]

The fee schedule that went into effect on December 23, 2016 was expected to yield approximately $3.4 billion of average annual revenue during the FY 2019/2020 biennium period. This represents a $0.9 billion, or 36 percent, increase from the FY 2016/2017 fee rule projection of $2.5 billion. *See* 81 FR 26911. The projected revenue increase is due to higher fees as a result of the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted approximately 5.9 million workload receipts and 4.9 million fee-paying receipts, excluding biometric services. *See* 81 FR 26923–4. However, the FY 2019/2020 fee review forecasts approximately 8.5 million total workload receipts and 7.0 million fee-paying receipts, excluding biometric

[13] 84 FR 62287, 84 FR 67243. This final rule does not transfer funds to ICE. Therefore, DHS removes $207.6 million for ICE from its cost baseline, resulting in lower fees than if DHS pursued the transfer of funds.

[14] 84 FR 62315, 62316, 62362; proposed and new 8 CFR 106.2(c)(1)–(c)(2); new 8 CFR 106.2(c)(1)–(c)(2).

[15] New 8 CFR 106.2(d).

AR2022_200397

services. This represents a 44 percent increase to workload and a 43 percent increase to fee-paying receipt assumptions.[16]

For the 10-year implementation period of the rule, DHS estimates the annualized costs of the rule to be $13,856,291, annualized at either 3- and 7-percent discount rates. DHS estimates the annualized cost savings to be $6,192,201 to $22,546,053. DHS estimates the annualized net societal costs and savings of the rule to range from costs of $7,664,090 to savings of $8,689,762. Over the 10-year implementation period of the rule, DHS estimates the annualized transfers to the government from applicants/petitioners to be $551,842,481, annualized at either 3- and 7-percent discount rates. Over the same 10-year implementation period of the rule, DHS estimates the annualized transfers of the rule between different groups of fee-paying applicants and/or petitioners to specific form populations is $832,239,426, annualized at either 3- and 7-percent discount rates.

The final revenue increase is based on USCIS costs and volume projections available at the time of the USCIS fee review. A full analysis of these regulatory provisions and their impacts can be found in the stand-alone Regulatory Impact Analysis found in the docket of this rulemaking and in the statutory and regulatory requirements section of this preamble.

### E. Effect on the Department of Justice's Executive Office for Immigration Review (EOIR)

DHS notes possible ancillary effects of this final rule on the fees charged by the Executive Office for Immigration Review (EOIR). In the NPRM, DHS proposed a fee for a Form I–589 filed with DHS only. Whether the fee also will apply to a Form I–589 filed with EOIR is a matter within the jurisdiction of the Department of Justice (DOJ) rather than DHS, subject to the laws and regulations governing the fees charged in EOIR immigration proceedings. 84 FR 62318. DHS does not directly set any fees for DOJ. DHS did not collaborate with DOJ to calculate or incorporate the costs for DOJ adjudication and naturalization services into the USCIS Activity-Based Costing (ABC) model used for this final rule. After the NPRM was published, DOJ published a rule that proposed to increase the fees for

those EOIR applications, appeals, and motions that are subject to an EOIR-determined fee, based on a fee review conducted by EOIR. 85 FR 11866 (Feb. 28, 2020). EOIR also stated that its proposed rule would not affect the fees that have been established by DHS with respect to DHS forms for applications that are filed or submitted in EOIR proceedings. *Id.* at 11871. DOJ did not propose any revisions to 8 CFR 1103.7(b)(4)(ii) in its rule that would change its longstanding use of DHS forms and fees. Rather, EOIR proposed to revise its regulations to make changes conforming to the DHS NPRM, namely the transfer of DHS's fee schedule from 8 CFR 103.7 to the new 8 CFR part 106. *Id.* Consequently, in immigration court proceedings, EOIR will continue to charge fees established by DHS for DHS forms, including the fees that DHS is establishing in this final rule, which include but are not limited to the fees for Form I–485, Application to Register Permanent Residence or Adjust Status; Form I–589, Application for Asylum and Withholding of Removal Fee;[17] and Form I–601, Application for Waiver of Grounds of Inadmissibility.

### F. Effect of COVID–19 Pandemic on the USCIS Fee Review and Rulemaking

DHS acknowledges the broad effects of the COVID–19 international pandemic on the United States broadly and the populations affected by this rule. USCIS has seen a dramatic decline in applications and petitions during the COVID–19 pandemic which has also resulted in an unprecedented decline in revenue. DHS has no comparable historical data that can be used to project the scope, duration, and total effect this will have on USCIS' revenue. As a result, USCIS is monitoring its revenue collections daily. In April 2020, USCIS projected that USCIS' non-premium revenue for April 2020 through September 2020 would fall approximately 59 percent below USCIS' initial FY 2020 annual operating plan revenue projection based on the dramatic reduction in fees received during the pandemic. The projections show that USCIS would receive $1.1 billion less in non-premium revenue in the second half of the fiscal year than previously forecast.[18] USCIS cannot

absorb that large of a revenue loss and have enough funding to sustain operations at the same level as prior to the pandemic. Therefore, DHS has provided technical assistance identifying for Congress USCIS funding needs to help cover payroll and other fixed costs in FY 2020 ($571 million) and to have enough carryover ($650 million) available during the first quarter of FY 2021 to continue operations while new fees continue to be collected. The additional revenue provided by this rule addresses the difference between the costs of USCIS operations and USCIS revenue for the biennial period as projected at the time of the USCIS fee review. The amount of funding identified in DHS's technical assistance to Congress would restore USCIS' financial situation to its pre-rule status and would not obviate the need for DHS to adjust USCIS' fees to address the projected disparity between costs and revenue identified in this rule.

DHS makes no changes in this rule in response to the pandemic. USCIS considers all available data at the time it conducts its fee review. USCIS conducted most of the FY 2019/2020 fee review in FY 2017, before the emergence of the pandemic. At that time, USCIS did not foresee, and could not reasonably have foreseen, the effects of such a pandemic on USCIS receipt, revenue, or cost projections during the FY 2019/2020 biennial period, and we cannot project the effects at this time. The projections in this rule were based on conventional conditions, and with no way of knowing or being able to predict the long-term effects of COVID–19 at this point, DHS must assume that filing volumes will return to near previous levels within a reasonable period. Thus, DHS proceeds with this rulemaking on the basis of the FY 2019/2020 USCIS fee review and associated projections. Consistent with past practice and as required by the CFO Act, USCIS will evaluate all available data at the time it conducts future fee reviews, including data related to the COVID–19 pandemic and any potential effects on USCIS workload volumes, revenue, or costs. DHS will consider these effects in future fee rules.

## II. Background

### A. History

On November 14, 2019, DHS published a proposed rule in the **Federal Register** (docket USCIS–2019–

---

[16] *See* FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum, which is part of the docket for this final rule. DHS revised the volumes to exclude DACA and change fee-paying assumptions for Forms N–400, N–600, and N–600K, as discussed later in this preamble.

[17] No fee would apply where an applicant submits a Form I–589 for the sole purpose of seeking withholding of removal under INA section 241(b)(3), 8 U.S.C. 1231(b)(3), or protection from removal under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). *See* 85 FR 11871.

[18] In April 2020, USCIS revised its internal annual operating plan revenue projections based on

observed receipt patterns for each form during the pandemic. The annual operating plan revenue projections are not the same as the fee review revenue projections, and revisions to them do not adjust the results of the USCIS fee review.

0010). *See* 84 FR 62280. In consideration of requests to extend the comment period and to provide additional time for the public to review supplemental information, on December 9, 2019, DHS published a proposed rule; extension of comment period; availability of supplemental information; and extended the comment deadline from December 16, 2019 through December 30, 2019. 84 FR 67243 (Dec. 9, 2019). Then on January 24, 2020, DHS further extended the comment period until February 10, 2020. *See* 85 FR 4243 (Jan. 24, 2020). In addition, DHS announced that it would consider comments received during the entire public comment period, including comments received since December 30, 2019. *Id.* In this final rule, DHS will refer to these three documents collectively as the proposed rule or NPRM.

### B. Authority and Guidance

DHS issues this final rule consistent with INA section 286(m), 8 U.S.C. 1356(m) and the Chief Financial Officers (CFO) Act, 31 U.S.C. 901–03 (requiring each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides and to recommend changes to the agency's fees).

This final rule is also consistent with non-statutory guidance on fees, the budget process, and federal accounting principles. *See* OMB Circular A–25, 58 FR 38142 (July 15, 1993) (establishing federal policy guidance regarding fees assessed by federal agencies for government services); [19] Federal Accounting Standards Advisory Board Handbook, Version 17 (06/19), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4 (generally describing cost accounting concepts and standards, and defining "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (identifying various classifications of costs to be included and recommending various methods of cost assignment); [20] *see also* OMB Circular A–11, Preparation, Submission, and Execution of the Budget, section 20.7(d), (g) (June 29, 2018) (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees)[21] DHS uses OMB Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in section III.B. of the preamble. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of IEFA costs.[22]

Finally, this final rule accounts for, and is consistent with, congressional appropriations for specific USCIS programs. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019).

### C. Basis for Fee Adjustments

DHS conducted a comprehensive fee review for the FY 2019/FY 2020 biennial period. It identified a projected average annual cost and revenue differential of $1,262.3 million between the revenue anticipated under current fees and the anticipated full cost of providing immigration adjudication and naturalization services. DHS revises the estimated cost and revenue differential to $1,035.9 million in this final rule. In the final rule, DHS has removed $226.4 million of average annual estimated costs related to the immigration adjudication and naturalization services provided by ICE and the Deferred Action for Childhood Arrival (DACA) policy from the budget projection used to calculate the fees in the NPRM. DHS issues this final rule to adjust USCIS' fee schedule to recover the full cost of providing immigration adjudication and naturalization services.

TABLE 2—REVISED IEFA NON-PREMIUM COST AND REVENUE PROJECTIONS COMPARISON

| IEFA Non-Premium Cost and Revenue Projections Comparison | | | |
|---|---|---|---|
| Comparison | FY 2019 | FY 2020 | FY 2019/2020 average |
| Non-Premium Revenue .................................................. | $3,408,233,376 | $3,408,233,376 | $3,408,233,376 |
| Non-Premium Budget .................................................... | $4,331,978,119 | $4,556,386,463 | $4,444,182,291 |
| Difference .................................................................... | ($923,744,743) | ($1,148,153,087) | ($1,035,948,915) |

### D. Final Rule

Following careful consideration of public comments received, DHS made modifications to the NPRM's regulatory text, as described above. Rationale provided in the background section of the NPRM remains valid, except as described in this regulatory preamble. Section III of this preamble includes a detailed summary and analysis of the public comments. Comments and supporting documents may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov*, docket number USCIS–2019–0010.

### III. Response to Public Comments on the Proposed Rule

#### A. Summary of Public Comments

DHS received a total of 43,108 public comment submissions in Docket USCIS–2019–0010 in response to the NPRM.[23] DHS reviewed all the public comments received in response to the NPRM and addresses relevant comments in this final rule, grouped by subject area. The majority of comment submissions were from individual and anonymous commenters. Other commenters included healthcare providers; research institutes and universities; law firms and individual attorneys; federal, state, local, and tribal

[19] Available at *https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf* (last viewed 03/06/2020).

[20] Available at *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (last viewed 03/06/2020).

[21] Available at *https://www.whitehouse.gov/wp-content/uploads/2018/06/a11_2018.pdf* (last viewed 03/06/2020).

[22] OMB Circulars A–25 and A–11 provide nonbinding internal Executive Branch direction for the development of fee schedules under the Independent Offices Appropriations Act (IOAA) and appropriations requests, respectively. *See* 5 CFR 1310.1.

[23] Of the 43,108 public comment submissions received, 12,114 were posted to

*www.regulations.gov*. The other 30,994 submissions were designated "inactive—do not post" and included form copies, duplicates, and non-germane submissions.

elected officials; state and local government agencies; religious and community organizations; advocacy groups; unions; as well as trade and business organizations. While some commenters wrote that they supported the NPRM, the vast majority of commenters opposed all or part of it.

## B. Comments Expressing General Support for the NPRM

*Comment:* Several commenters expressed general support for the NPRM. Most did not state precise reasons for their support. Examples of the rationale for some of the generally supportive comments include: Fees are a small price to pay for the benefits of immigration; the burden of immigration should fall on the applicants and not on U.S. taxpayers; the fees will discourage fraudulent immigration; USCIS must have funds to operate; and the rule would benefit the U.S. government. A few commenters suggested that fees should be even higher than DHS proposed. One commenter generally supported the proposal and wrote that the methodology used in the biennial fee review was accurate and fully compliant with statutory requirements set forth at INA sections 286(m) and (n), 8 U.S.C. 1356(m), (n). This commenter said the fee review was also compliant with OMB and Federal Accounting Standards Board standards for budgeting and financial management.

*Response:* DHS appreciates that some commenters support the NPRM. However, it has not separately summarized these comments and does not make any changes in this final rule because of them.

## C. Comments Expressing General Opposition to the NPRM

Many commenters generally opposed the NPRM, including the proposed fees, magnitude of the fee adjustments, charging fees in general, and specific proposed policy changes. DHS summarized and responded to the public comments as follows:

### 1. Immigration Policy Concerns

*Comment:* Many commenters opposed fee adjustments for policy reasons generally suggesting that the fees will be harmful. The comments are summarized as follows:
- Immigration is important to the United States and the NPRM betrays or is contrary to American values.
- USCIS has an enormous and far-reaching impact and it is imperative that USCIS consider the harmful human effects of the proposed fee increases.
- The fee increase is an attack on immigrants and vulnerable populations.

- The fees would especially affect people of color; the rule implements and displays the racial animus that officials have expressed, is designed to keep non-white immigrants out of the U.S., limits people of color from becoming lawful permanent residents or U.S. citizens, and would have a negative effect on the Latin population.
- The rule is cruel, inhumane, nationalistic, fascist, racist, xenophobic, intended to limit voting rights to the wealthy, and deter green card holders from seeking citizenship.
- The fee increases will create financial hardships for low-income immigrants and the increased cost of renewing residency cards would make it more difficult for immigrants to obtain employment or provide proof of their immigration status.
- Low income immigrants will be forced to choose between providing for basic needs and pursuing immigration benefits.
- The fee increase is an attack on the immigrant and refugee communities who already face discrimination, language barriers, lack of services, poverty, marginalization, persecution, trauma, and fear.
- High fees could result in healthcare avoidance and other negative impacts on foreign-born individuals, as well as their U.S. citizen family members.
- The rule would harm LGBTQ or HIV positive noncitizens.
- The rule's adverse and disparate impact on immigrants of color renders the proposed rule arbitrary and capricious in contravention of federal anti-discrimination protections.
- The rule creates roadblocks to the integration of immigrants.
- The rule attempts to establish discriminatory policies that have been judicially enjoined and to prevent fair and equal access to the U.S. immigration system.
- The proposed fee increase would prevent many immigrants from seeking and obtaining the right to vote. A commenter questioned whether the increase was intentionally seeking to suppress potential low- and middle-income immigrant voters.
- DHS should remove financial barriers clearly intended to target the poor to encourage people to use the legal immigration process.
- Increased fees and removal of fee waiver categories in the proposed rule would result in more applicants being put into removal proceedings.
- The proposal would worsen USCIS' already bad reputation.
- USCIS is engaging in partisan machinations rather than acting as a neutral federal agency.

- The proposal would increase predatory and fraudulent immigration services scams and USCIS will need to enhance its efforts to combat these harmful practices.
- The proposal would negatively impact familial integrity and family unity and would increase the financial strain on immigrants' household resources that would be better spent on improving the family's welfare.
- The proposal, along with the previous public charge rule, demonstrates DHS' ''animus towards low-income immigrants seeking family unity'' and urged the agency to instead facilitate family unity regardless of immigrants' finances.
- The proposal would create an ''invisible wall'' that would block many hard-working noncitizens from accessing immigration benefits and would cause long-term family separation.

*Response:* DHS proposed adjustments to USCIS' fee schedule to ensure full cost recovery. DHS did not target any particular group or class of individuals, or propose changes with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation or to block individuals from accessing immigrant benefits. With limited exceptions as noted in the NPRM and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This rule is consistent with DHS's legal authorities. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS proposed changes in fee waiver policies to ensure that those who benefit from immigration benefits pay their fair share of costs, consistent with the beneficiary-pays principle as described in the Government Accountability Office report number GAO–08–386SP.[24]

In certain instances, DHS deviates from the beneficiary-pays principle to establish fees that do not represent the estimated full cost of adjudication. For example, DHS proposed a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, when filed with USCIS. This fee deviates from the beneficiary-pays principle by holding the fee well below the estimated

---

[24] GAO, *Federal User Fees: A Design Guide* (May 29, 2008), available at *https://www.gao.gov/ products/GAO-08-386SP.* (last accessed Feb. 24, 2020).

cost of adjudication. The $50 fee for affirmative asylum filings is not intended to recover the estimated full cost of adjudication. Instead, it is intended to limit the increase of other fees that must otherwise be raised to cover the estimated full cost of adjudicating asylum applications. Fee adjustments are not intended to advance any policy objectives related to influencing the race or nationality of immigrants, deterring immigration and naturalization, or affecting voting.

DHS adjusts the USCIS fee schedule in this final rule to provide for recovery of the estimated full cost of immigration adjudication and naturalization services. DHS notes that the fees are the same for all people who submit benefit requests regardless of their physical, cultural, or individual characteristics. The commenters state that DHS has discriminatory intent or pretext for this rulemaking, but they provide no evidence to support that statement. DHS has complied with all relevant legal and statutory authorities, including the Immigration and Nationality Act (INA) and the Administrative Procedure Act (APA). DHS rejects the claim that its justifications for adjusting the fees are pretextual or intended to obscure its true intent, or that nefarious reasons like voter suppression and racial animus are behind the fee adjustments, and DHS declines to make any changes in this final rule on these bases.

2. Other General Opposition

*Comment:* Many commenters expressed general opposition to the proposed increase in USCIS fees. Commenters stated:

• USCIS should find a way to increase its margins without causing detriment to the populations it serves.

• The NPRM was not justifiable and USCIS should increase its own efficiency instead of charging more and providing less service.

• The rule's objectives are pretextual, and its goal of fully recovering costs is undermined by the series of USCIS policies and practices that increase the agency's costs and inefficiencies. USCIS fails to describe alternatives to those policies and practices in the proposed rule.

• USCIS should not increase fees when it has inefficiencies such as performing three different background and biological checks on a single applicant.

• USCIS policy failings and inefficient resource allocation are creating the need for increased fees. Commenters provided examples such as the following:

○ Failure to revise policies to keep costs within current fees;
○ Failure to hire and train already budgeted staff;
○ Extensive and frivolous use of a Request for Evidence (RFE) and Notice of Intent to Deny (NOID);
○ "Extreme vetting";
○ Lengthy suspension of longstanding premium processing services for certain applications;
○ The current lockbox system;
○ Increased and unnecessary in-person interviews;
○ Ramped up denaturalization efforts;
○ Resources spent litigating improperly denied applications; and
○ Actions that increased appeals and motions.

Many of these commenters said the NPRM does not account for agency inefficiencies resulting from these policies or how increased revenue would mitigate them and that USCIS should end them before seeking additional fees from applicants.

After listing several policy changes leading to USCIS inefficiencies, one commenter said these policies and requiring fee increases would, in key respects, transfer the costs of the agency's own inefficiencies to the public. The commenter also wrote that the NPRM suggests that the agency could expand implementation of at least some of these "misguided measures." The commenter concluded that it is therefore unsurprising that the NPRM fails to provide any meaningful evidence that the changes it proposes would relieve case processing delays or otherwise improve agency performance; rather, the proposed rule assumes that lengthy delays will persist.

*Response:* DHS will continue to explore efficiencies that improve USCIS services. DHS may incorporate corresponding cost savings into future biennial fee reviews and rulemakings accordingly. Nevertheless, USCIS must recover the estimated full cost of providing immigration adjudication and naturalization services, including services provided at no or reduced charge to asylum applicants and other immigrants. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters suggested tax solutions instead of fee increases. One commenter stated that because they were an American, the U.S. government should raise the commenter's taxes instead of raising fees for citizenship applications. Another commenter suggested that the U.S. government should tax large corporations to fund public services. One commenter opposed the regulation

for three reasons: The department managers should be requesting additional funding from Congress to meet legal requirements, reimbursements between USCIS and DHS "are not to be addressed directly by the users of services required to be provided by the executive branch," and the executive branch is required to provide certain services regardless of cost.

*Response:* DHS has no opinion on whether Congress should pass any new laws to address fees for adjudication and naturalization services. However, DHS reiterates that this final rule complies with current laws. Consistent with DHS' statutory authority, user fees are the primary source of funding for USCIS. *See* INA section 286(m), 8 U.S.C. 1356(m). This final rule adjusts those user fees to provide for full cost recovery to USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that new administrative procedures instituted in the last 3 years serve as barriers to naturalization and immigration rather than as security precautions.

*Response:* Under the law, DHS must fund USCIS operations, including the vetting of individuals who want to enter the United States, using fees. The security screening, background checks, and interviews are all vitally necessary to ensuring that bad actors do not exploit the legal immigration system to enter the United States and undertake actions that harm citizens and conflict with our national values. USCIS must carry out those functions as part of the vetting process and these functions are funded by fees.

*Comment:* Some commenters said that USCIS should maintain the current fee schedule as-is and revisit the issue after further review of the efficiency and effectiveness of current policies, or possible review of the U.S. system of immigration policy by future terms of Congress.

*Response:* In its FY 2019/2020 fee review, USCIS estimated that there is a gap of more than $1 billion annually between the revenue collections projected under the previous fee schedule and the resources USCIS needs to meet its operational needs to address incoming workloads. Therefore, if DHS did not adjust fees in this final rule, USCIS' pending caseload would likely continue to grow and applicants and petitioners would experience longer processing times. DHS declines to adopt the commenter's suggestion in this final rule.

3. Proposed Fees Are Unconstitutional[25]

*Comment:* Several commenters wrote that the proposed USCIS fee rule violates one or more provisions of the United States Constitution. These comments are summarized as follows:

• By removing fee waivers for most categories of cases, USCIS is conditioning fundamental rights, such as the ability to vote, on the ability to pay, engaging in discrimination prohibited by the Constitution because it affects one race more than another, and using the ''beneficiary pays'' principle as a pretextual argument to conceal an intent to discriminate against racial minorities.

• Raising the citizenship application fee to over $1,000 is like imposing a ''poll'' tax on future voters, which is outlawed by the 24th amendment to the U.S. Constitution.

• Naturalization is an especially important immigration benefit, as it is the only one referenced in the Constitution.

• Depriving low-income immigrants of their due process rights through significant economic obstacles to immigration benefits is contrary to the Equal Protection Clause of the 14th Amendment.[26]

• The intent of the rule is unconstitutional because it is intended to directly exclude individuals based on their economic class.

*Response:* DHS is not adjusting the USCIS fee schedule with any undisclosed motivation or intent other than to recover the estimate full cost of adjudication and naturalization services. The new fees are not insubstantial, but DHS disagrees with the commenters' assertions that the fees in this final rule will have an effect on the economic class or number of applicants. DHS has no data that would indicate that the populations noted by the commenters will be precluded from submitting benefit requests. As stated in other parts of this final rule, DHS must study the adequacy of its fee schedule biennially. If this final rule results in a significant reduction in the number of requests submitted for immigration benefits, DHS can adjust to address that result in a future fee rule. Therefore, DHS does not agree that the new fees violate the U.S. Constitution.

---

[25] For constitutional claims against the $50 asylum fee see the General Comments on the Asylum Fee section of this preamble.

[26] The commenter likely meant the equal protection component of the Fifth Amendment Due Process Clause.

4. Rule Will Have Negative Effects on Applicants

*Comment:* Many commenters wrote that the NPRM, including the fee schedule and limited fee waivers, would have negative effects on applicants, including the following:

• Impede legal immigration;
• Block low-income immigrants from achieving citizenship and the associated benefits;
• Disproportionately impact Asian immigrants and Asian Americans;
• Encourage illegal immigration;
• Prevent immigrants from being contributing members of society;
• Cause immigrants to rely on public assistance;
• Make it difficult to become documented;
• Cost DHS more money for deportations;
• Prevent nonimmigrants and their families from accessing the American Dream;
• Make it difficult for immigrants to make a better life for themselves and their families;
• Make it more difficult for immigrant residents in South Carolina to maintain lawful status, secure work authorization, and provide support for their families;
• Make it more difficult for people to immigrate and for lawyers to obtain clients;
• Dissuade citizens and lawful permanent residents (LPRs) from bringing their family members to the U.S and family support is a relevant factor in economic mobility;
• Promote ''healthcare avoidance'' and exacerbate medical needs when immigrants finally emerge in care systems, resulting in increased costs for the health and human services sectors;
• Cause significant negative effects on Latino immigrants;
• Punish immigrants who did their utmost to obey immigration laws;
• Adversely impact populations already much less likely to apply for and obtain naturalization, such as survivors of domestic violence, sexual assault, and human trafficking. Further discouraging naturalization among these populations would harm their chances of reuniting with family through immediate relative petitions and undermine applicants' sense of security in the United States.
• The fee increases making naturalization less accessible for low-income immigrants would yield poor health outcomes among children.
• The proposal, along with other policies, serves to disrupt access to programs that address social

determinants of health and contribute to individuals' and families' well-being.

*Response:* DHS is unable to quantify how many people will not apply because they do not have access to fee waivers and we acknowledge that some individuals will need to save, borrow, or use a credit card in order to pay fees because they may not receive a fee waiver. DHS also recognizes that if individuals borrow or use a credit card, they are likely also responsible for the filing fee, and any additional interest cost accruing on the loan or credit card. DHS does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply. However, DHS disagrees that the fees will result in the negative effects the commenters' suggested. DHS believes that immigration to the United States remains attractive to millions of individuals around the world and that its benefits continue to outweigh the costs noted by the commenters. Therefore, DHS believes the price elasticity for immigration services is inelastic and increases in price will have no impact on the demand for these services. This is true for all immigration services impacted by this rule. DHS also does not believe that the NPRM is in any way discriminatory in its application and effect. Therefore, DHS declines to make changes in this final rule in response to these comments.

5. Rule Will Have Negative Effects on the Economy and Employers

*Comment:* Multiple commenters stated that the NPRM would have negative direct and indirect impacts on local, state, regional and the United States' economy, as well as businesses and employers. These comments are summarized as follows:

• Immigrants provide crucial labor in agriculture, construction, healthcare, hospitality, and other industries, and they need an ample workforce from which to draw.
• Lawful permanent residents becoming citizens is important to the economy of the United States, and those positive economic impacts reach across generations.
• Immigrants can contribute more to the economy with access to legal documentation.
• Higher fees affect lower-skilled laborers who are in demand in several industries. Immigrants are key contributors to the U.S. labor force and the proposed fee change would impede immigration to the detriment of the labor force.

• The rule could cost the United States potential future taxpayers. This impact could result in a long-term economic loss.

• Immigrants are the backbone of industry and the economy, often responsible for significant job creation and innovation.

• An increase in fees will negatively affect U.S. companies that pay immigration fees on behalf of their employees.

• The proposed fee increases will result in the decrease of immigration applications, negatively affecting the government.

• The increased fees will create a financial barrier to protection from deportation and work authorization, thus making it more expensive to participate on the U.S. economy.

• Immigrants will be the primary source of future U.S. labor growth. Limiting working class immigration is contrary to the interests of the U.S. society and economy. Similarly, naturalization boosts American democracy, economy, and diversity.

• Increased fees will negatively affect the U.S. workforce because employees who may be eligible to naturalize will no longer have access to naturalization.

• The fees would be detrimental to immigrant students' success and the nation's economic prosperity.

• Improved immigration status allows low-income immigrants to rise out of poverty and contribute economically to their communities with access to better jobs and opportunities.

• The rule will damage regional and national economies by stymieing immigration and the benefits that flow from it.

• The proposed rule would have a negative ripple effect on U.S. citizens because of the economic benefits derived from immigrants.

• These changes would not only impact individual applicants who may be unable to work due to delays in their pursuit of work authorization, but also family members and employers who may have to lay off valuable employees.

• Immigrant communities in rural areas with high levels of poverty live paycheck to paycheck and the proposed fee increases would make immigration benefits less accessible to working-class and vulnerable individuals.

• Raising fees would undermine the jobs and wages of domestic workers with limited education performing low-skill jobs.

• The proposed rule would increase unemployment among immigrant workers.

• The proposed fee increases and the revocation of fee waivers would increase economic and administrative burdens on State and local government workforces.

• The destabilizing effects of barriers to naturalization would create undue financial burdens on municipalities that outweigh any stated benefits of the proposal.

• Immigrant entrepreneurs and small business owners generate "tens of billions of dollars" in business revenue.

• Immigrants make important contributions in research and science. Four of eight Nobel Prize Laureates from the United States in 2019 were foreign born and 34 percent of all Nobel Prize Laureates from the United States were immigrants.

• Scientific discovery is dependent on the ability to travel freely and the rule would limit the ability of scholars to study and work in the United States.

• The proposal would adversely impact the direct care and nursing home industries' abilities to hire and retain sufficient staff. These industries are increasingly reliant on immigrants to staff positions.

• The H–2A program provides the citrus industry with reliable foreign labor. The cost increase for H–2A petitions was excessive and other cost in the industry were also increasing.

• The increased fees, coupled with restrictions to fee waivers, would result in many fewer residents accessing a desired immigration status for which they are eligible simply because they cannot afford to apply.

• Impeding an individual's ability to achieve a secure immigration status because of poverty is unacceptable and unconscionable.

*Response:* DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede or limit legal immigration. DHS's rule in no way is intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 and has no data that would indicate that the fees for family based benefit requests, lawful permanent residence, and naturalization in this final rule would prevent applicants from being filed. DHS agrees that immigrants are crucial for agriculture, construction, healthcare, hospitality, almost all industries, immigrants are a source of future U.S. labor growth, many immigrants are successful entrepreneurs, and that welcoming new citizens helps the U.S. economy. DHS acknowledges in its analyses accompanying this rule that the higher fees must be paid by U.S. companies that hire foreign nationals, but DHS has no data that indicates that higher fees will affect the supply of lower-skilled laborers, impede immigration to the detriment of the labor force, result in aliens being unable to work, cause employers to lay off employees, undermine the jobs and wages of domestic workers with limited education performing low-skill jobs, or increase unemployment among immigrant workers. DHS knows that immigrants make important contributions in research, science, and we have no data that supports the assertion that the increased fees and restrictions on fee waivers would result in many fewer residents accessing a desired immigration status for which they are eligible simply because they cannot afford to apply.

*Comment:* A commenter requested that DHS more thoroughly analyze the costs of impeding access to naturalization, which include long-term reduced economic and social mobility for affected populations.

*Response:* DHS recognizes the contributions that naturalized citizens make to American society. However, USCIS must fund itself through fees unless DHS receives a Congressional appropriation to do so. DHS does not have any data to establish that these fees, though required, are a significant impediment to naturalization or economic and social mobility. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 (*e.g.* N–400 filing volumes grew from less than 600,000 in FY 2009 to approximately 750,000 in FY 2011; similarly, N–400 filing volumes grew from less than 800,000 in FY 2015 to nearly 1 million in FY 2017). In an effort to apply fees more equitably to the beneficiary of each benefit request, DHS must increase the fee for Form N–400, Application for Naturalization, in this final rule. As stated in the proposed rule and elsewhere in this final rule, DHS performs a biennial review of the fees collected by USCIS and may recommend changes to future fees. DHS declines to conduct further analysis on

this issue or make changes in this final rule in response to this comment.

*Comment:* Many commenters wrote about the benefits of naturalization, the effect of naturalization on the economy and how the current application fee and proposed fee discourages naturalization. These comments are summarized as follows:

• Immigrants contribute to the economy by paying taxes, and they should have easy access to naturalization.

• Naturalization increases support for American political institutions, workforce diversity, strengthens employee productivity and retention, and creates well-informed community members.

• Raising fees for naturalization could discourage immigrants from seeking citizenship, negatively affecting the economy.

• Naturalization is a key driver in allowing immigrants to fully integrate into our society, economically contribute to the U.S. economy.

• Everyone benefits from residents naturalizing.

• Naturalization increases net taxable income, GDP, individual earnings, employment rates, homeownership, federal, state, and city tax revenues, and higher education, etc.

• Naturalization decreases government benefit expenditures.

• Citizenship promotes social benefits, higher rates of health insurance, English proficiency, quality of employment, and buy-in to U.S. democratic principles.

• Naturalization increases engagement in civic life.

• The proposal would increase profits for private companies that benefit from financial obstacles to naturalization.

• In its proposal, DHS incorrectly stated that naturalization applicants will find some way to come up with the fee and failed to prove that the proposal would not shrink revenues due to a reduction in submitted applications.

• The proposed fee increases would place citizenship and the "American dream" out of reach for many immigrants.

• Costs associated with naturalization were already prohibitively high and DHS should refrain from any efforts to make naturalization and other immigration benefits even less accessible.

• Research from the Journal on Migration and Human Security that found there were approximately 9 million LPRs eligible to naturalize and the proposed naturalization fee increase would make naturalization unaffordable for low-income and working-class people.

• The Immigrant Legal Resource Center and Stanford University's Immigration Policy Lab study demonstrates current fee levels already prevent a considerable share of low-income immigrants from applying for citizenship, as well as a 40 percent increase in application rates when low-income immigrants are given vouchers to cover application fee costs.

• Compliance with immigration and naturalized citizenship laws was already an "arduous and risky" process and USCIS should estimate the impact on compliance for immigrants seeking to follow such laws.

• USCIS should implement a system to account for individuals who cannot afford to comply with immigration and citizenship laws due to the proposed fee increases.

• An analysis from the American Immigration Council shows that the cost of citizenship has become a systemic barrier and the proposal would raise naturalization fees even higher.

• An analysis from the Center for Migration Studies that found 39 percent of those eligible for naturalization live in households with incomes below 150 percent of Federal Poverty Guidelines (FPG) and the proposal would price out naturalization-eligible individuals from pursuing citizenship to the detriment of their families and communities.

• A hypothetical family of four would have to pay an additional $3,115 over a 3-year period to maintain their status and secure citizenship.

• The "road to naturalization eligibility may be lengthy, unpredictable and costly," and the proposed fee increases and changes to fee waiver eligibility would impact immigrants who must file concurrent applications for spousal petitions, work authorizations, and adjustment of status. These changes would cost $4,680 over a 4-year period, an amount the commenter described as "prohibitive."

• Existing costs for immigration benefits already pose challenges for immigrant families and DHS should not increase fees by such an unprecedented amount.

*Response:* DHS recognizes the economic and societal value of nonimmigrants, immigration, and naturalization. DHS agrees that new citizens and naturalization are of tremendous economic and societal value and generally agrees with the points made by, and the studies cited by, commenters. DHS is not adjusting the USCIS fee schedule with an intent to impede, reduce, limit, or preclude naturalization and did not propose to adjust the USCIS fee schedule to reduce, limit, or preclude immigration in any way for any specific immigration benefit request, population, industry or group, including members of the working class. However, DHS must adjust the USCIS fee schedule to recover the full cost of providing immigration adjudication and naturalization services. While fully aware of the benefits that immigrants provide to society, DHS must fund USCIS with fees unless DHS receives a Congressional appropriation to do so.

DHS acknowledges that the fee for Form N–400, Application for Naturalization is increasing by a greater percentage than the total increase in USCIS costs and the average increase in fees generally. The fee for this form is increasing more than for most other forms because DHS has historically held the fee for Form N–400, Application for Naturalization, below the estimated cost to USCIS of adjudicating the form in recognition of the social value of citizenship. Immigration services provide varying levels of social benefit, and previously DHS accounted for some aspect of the social benefit of specific services through holding fees below their cost. However, in this final rule DHS is emphasizing the beneficiary-pays principle of user fees. This approach means that the fee for Form N–400 will now represent the estimated full cost to USCIS of adjudicating the form, plus a proportional share of overhead costs and the costs of providing similar services at reduced or no charge to asylum applicants and other immigrants. In other words, the fee for Form N–400 will now be determined in the same manner as most other USCIS fees. Because DHS has held the fee for Form N–400 below full cost in the past, adjusting to full cost requires an increase in excess of the volume-weighted average increase of 20 percent. If DHS did not increase the fee for Form N–400 this amount, other fees would need to increase further to generate the revenue necessary to recover full cost, including the costs of the N–400 not covered by its fee. DHS believes the increase in the fee for Form N–400 is fully justified. Finally, DHS does not believe the new Form N–400 fee will deter naturalization or that the new fees established in this final rule will prevent immigrants from receiving immigration benefits. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 (*e.g.* N–400 filing volumes grew from less than 600,000 in FY 2009 to approximately 750,000 in FY 2011; similarly, N–400 filing volumes grew

from less than 800,000 in FY 2015 to nearly 1 million in FY 2017). Therefore, DHS declines to make any changes in this final rule in response to this comment.

*Comment:* One commenter stated that the higher fees would result in fewer clients for their advocacy organization. As a result, the group might have to let go of some staff. Another commenter wrote that the proposal would harm its city's efforts to create a welcoming environment for immigrants. The commenter described programs like Citizenship Day in Boston intended to make immigration legal services more accessible and said the proposal would undermine these efforts. The proposed fee changes and elimination of fee waivers would harm agencies that carry out the DOJ's Office of Legal Access Programs mission as these agencies would lose clients as naturalization and other applications become less affordable, resulting in a reduction of funding and potential staff layoffs. The commenter also said these agencies would need to change their informational and educational materials if the proposed rule is implemented, resulting in increased design, printing, and distribution costs.

A commenter stated that while it does not provide direct social or legal services, it frequently fields questions from transgender individuals and their family members, attorneys, and other organizations about government policies and individuals' legal rights, including questions about immigration. The commenter wrote that if the proposed rule is adopted, it will need to expend considerable resources to comprehend and explain changes to the public and will see an increase in requests for information. The commenter said USCIS should also consider the impact of the proposed rule on organizations like theirs, and on organizations that provide direct services to immigrants applying for immigration benefits.

A commenter said the proposal would harm its organization's mission and ability to sustain itself financially. The commenter said 90 percent of its funding comes from the State of Washington's allocation for the Washington New Americans Program and is tied to certain contractual obligations, including that the organization complete 1,000 naturalization applications, host various workshop events, and screen around 2,000 green card holders for eligibility each year, among other conditions. The commenter said its ability to meet these numbers and its success rate would be adversely impacted if the proposed fee increases and elimination of fee waivers

become finalized. One commenter wrote that the proposal would present challenges for non-profit organizations providing legal assistance to low-income immigrants because it would reduce the number of clients who connect with services for which they are eligible, and would require increased outreach by an already overworked staff.

Another commenter wrote that the proposal would interfere with state and local non-profit programs that provide services to help individuals navigate the immigration process. The commenter said that if the proposal is implemented, such programs in Washington State anticipate that the increased demand for fee reimbursement will outpace other services. The commenter wrote that many organizations providing immigration services are dependent on reasonable application fees and would be at risk of disappearing if fees increase above current levels. Another commenter said the proposal would interfere with its organizational mission and would hamper the work done by other non-profit entities serving immigrant communities. The commenter wrote that its organization is funded primarily by city and state grants, with specific funding attached to specific numbers of low-income immigrants served and that the proposal would undermine its ability to meet grant requirements. The commenter said in the previous year, it had processed hundreds of applications that it would not have been able to file under the proposed removal of fee waivers for certain application types. Many commenters wrote that the proposed fee increases would deter immigrants from using qualified legal services, an outcome that the commenters stated would complicate USCIS processing. The commenter said that if these actors are left unchecked, they will end up diverting thousands of dollars away from the agency.

Commenters said the proposed fee increases and elimination of fee waivers would disrupt organizations that provide legal assistance and other services to immigrants because of a reduction in the number of clients served, an inability to meet contractual requirements, and loss of financial support through contracts or grants. One commenter said their city partners with immigration legal service organizations to help immigrants secure needed benefits because income-based barriers to such benefits already exist. One commenter said their office assists 1,000 constituents annually who already face burdens navigating the immigration system.

Some commenters suggested that because the fee increases will discourage many immigrants from utilizing qualified legal assistance to assist with applications, USCIS will encounter challenges and inefficiencies in processing due to less complete or less accurate applications being filed. Other commenters wrote that the proposal would increase the prevalence of ''notario'' fraud and other types of consumer fraud against immigrants, who would be more likely to turn to dishonest providers of legal and other assistance due to the proposed fee increases. Another commenter agreed that the fee increases would decrease immigrants' ability to afford counsel, and referred to a 2014 study from Stanford Law School that found detained immigrants were three times more likely to win deportation cases when they were assisted by attorneys. The commenter also cited research from the New York Immigrant Family Unity Project from November 2017 that demonstrated for every 12 individuals who received counsel under the organization's ''universal representation model,'' 11 would have been deported without access to an attorney. The commenter concluded that non-profit organizations that are already under-resourced will have to step in to provide services if immigrants lack income to hire attorneys. Some commenters suggested that the proposed rule would not only impact immigrant populations, but also legal aid organizations providing services to such populations and students who benefit from programs and clinics designed to support low-income populations.

*Response:* DHS recognizes the value of the various groups that assist individuals navigate its regulations and forms. However, USCIS strives to develop rules and forms that are user-friendly, can be easily completed by the public, and require no legal or professional assistance. As stated before, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation. Previous fee adjustments had no discernible effect on the number of benefit requests filed. This final rule amends fee waiver requirements and divides the Form I–129 into multiple forms, but otherwise makes no major changes to any immigration benefit requests. DHS will continue to explore efficiencies that

improve USCIS services. DHS may incorporate corresponding cost savings into future biennial fee reviews and rulemakings accordingly. Therefore, DHS declines to make any changes in this final rule as a result of these comments.

*Comment:* One commenter cited a Bureau of Labor Statistics study (2017–2018), which indicates that the unemployment rate for foreign-born men (3.0 percent) was smaller than the unemployment rate for native-born men (4.2 percent), as a benefit to the United States.

*Response:* DHS appreciates the comment and agrees that foreign-born workers are dependable employees who are important to the U.S. economy.

6. Comments on the DACA Renewal Fee

*Comment:* Many commenters generally opposed higher DACA fees. Commenters stated:

• Current DACA fees are high and an increase to renewal fees would make it difficult for people to afford legal immigration processes.

• It would be unjust to charge students and families to pay more to maintain DACA.

• Many DACA recipients are in school, early in their careers, or have young children, and therefore cannot afford the fee increases.

• DACA fees would make it difficult for individuals to renew their work permits and they could lose the ability to work legally in the United States. The proposed fee increase would cause emotional and financial hardships for the families of DACA recipients.

• DACA fees will suppress/undermine the DACA policy while legal status is undetermined.

• The DACA renewal fee will discourage DACA recipients from seeking citizenship.

• High fees are the reason only 800,000 of the 1.3 million DACA-qualified individuals have requested DACA.

• The fee increases will reduce the number of DACA recipients who are able to renew their deferred action and complete higher education. DACA recipients often live paycheck-to-paycheck and must support family members financially. The renewal fees already present a burden and the proposed increase would exacerbate the hardship.

• DACA is a prerequisite for in-state tuition in many states, and increased fees would cause many DACA recipients to lose their DACA and give up their pursuit of higher education.

• DACA has been instrumental in helping many recipients access better educational and professional opportunities and better support their families.

• Many DACA recipients have lived in the United States since early childhood, and this rule would place them in danger of removal from the only country they consider home.

• DACA recipients have, in some cases, shown to be dedicated to serving their communities through Teach For America.

• Without the contributions of DACA recipients the United States would lose $433.3 billion in GDP and $24.6 billion in Social Security and Medicare contributions.

• DACA renewals should be funded by increased taxes rather than by placing the burden on DACA requestors, who are vulnerable.

• USCIS needs to offer justification for increasing DACA fees from an economic standpoint.

*Response:* In light of the concerns raised by commenters, as well as the recent Supreme Court Decision in *DHS et al* v. *Regents of the Univ. of Cal. et al,* No. 18–587 (S.Ct. June 18, 2020), DHS will not impose a fee for Form I–821D. Therefore, there is no fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, in this final rule, and USCIS will not receive revenue from Form I–821D. DHS has removed the estimated costs and staff directly attributable to the DACA policy from its cost baseline used in its fee calculations for this final rule, consistent with past practice. *See* 81 FR 26903, 26914 (May 4, 2016) (explaining that USCIS excludes from the fee calculation model the costs and revenue associated with programs and policies that are temporary in nature such as DACA). In this final rule, DHS adjusts other fees to recover the anticipated overhead and cost reallocation that the NPRM associated with DACA fees, including Forms I–765 and I–821D.

In light of the recent Supreme Court ruling and attendant changes to DHS' operations relating to the DACA policy DHS will maintain the DACA fees as in effect before the rescission on September 5, 2017 at $410 for employment authorization and $85 for biometric services. New 8 CFR 106.2(a)(32)(vi).

*D. Comments on Legal Adequacy of the Rule*

*Comment:* Multiple commenters stated that the rule was arbitrary and capricious, contrary to law, and in violation of the Administrative Procedure Act for various reasons, summarized as follows:

• The fee increase is excessive particularly for naturalization and adjustment of status.

• Fee increases will frustrate the substantive policies promoted in the INA.

• The proposal was a pretext for decreasing legal immigration.

• The fee of $2,000 to change the status of a single family member is a thinly veiled effort to bring the recently enjoined public charge regulations and health insurance proclamation to life and circumvent the judicial injunctions on that rule.

• In emphasizing the beneficiary-pays principle, the rule abandons prior motivations to tailor fees based on users' ability to pay. The 2008 Government Accountability Office (GAO) report to Congress entitled, *Federal User Fees: A Design Guide,* undermines USCIS' sudden switch to the beneficiary-pays principle, and USCIS has elevated the beneficiary-pays principle as a pretext for restricting and deterring legal immigration against the will of Congress.

• The rule's objectives are pretextual, and its goal of fully recovering costs is undermined by the series of USCIS policies and practices that increase the agency's costs and inefficiencies. USCIS fails to describe alternatives to those policies and practices in the proposed rule.

• The proposed rule fails to determine a social good that results from equity among application fees, with no evidence, data, or rational connection between that good and the stated goal of equity.

• The agency failed to adequately describe the terms or substance of the proposed rule in accordance with APA.

• The NPRM's rationale and fee increases are arbitrary because the amount of revenue that would be generated is much bigger than the projected shortfall at USCIS and some fees would increase more than others.

• Not all fees are being changed proportionally or rationally, and some fee decreases and increases appear completely arbitrary and do not align with the agency's reasoning.

• The rule lacks a detailed description of how or why the costs of adjudication have increased so dramatically as to necessitate such a large fee increase.

• The rule cites to INA section 286(m) multiple times for the Congressional mandate that authorizes the DHS to charge fees "at a level that will recover the full costs of adjudication," but fee increases should be supported with details of what those "costs" actually

are, and they should be itemized in a way that clearly justifies the price.
• The public has the right to know the specific details of the projected budget shortfall and how proposed fee changes would be allocated to meet the projected deficit.
• Some fee increases are larger than others.
• It is arbitrary to eliminate fee caps for some but not all categories, and the rationale provided for not limiting fee increases for some benefit requests is inadequate. If limited fee increases were continued for all previously limited requests some proposed fees could increase by as much as $1,185 with the average of those changes being an increase of $12 per immigration benefit request.
• The rule contains clear and measurable hypocrisy in that USCIS claims that prior policy must fall in the face of the agency's newfound insistence on the ''beneficiary-pays principle,'' but it violates this principle for certain form types because USCIS proposes to maintain a 5 percent limit on fee increases without specific justification for each.
• The proposed rule's invocation of the ''beneficiary-pays principle'' is not made in good faith in that USCIS is still willing to support subsidies for some users (*e.g.*, adoptive parents and religious institutions) and even a high premium on others (*e.g.*, ''regional center'' investment groups). ''regional center'' investment groups).
• Contrary to DHS's rationales for the rule, increased fees will not improve USCIS' efficiency or allow the agency to provide better service to applicants.

*Response:* INA section 286(m), 8 U.S.C. 1356(m) authorizes DHS to recover the full cost of providing immigration adjudication and naturalization services, including the cost of services provided at reduced or no charge to asylum applicants and other immigrants through the USCIS fee schedule. This final rule complies with the INA, as DHS estimated the cost of providing immigration adjudication and naturalization services over the biennial period and adjusts USCIS' fee schedule to recover those costs. DHS has explained its rational basis for adjusting USCIS fees in the proposed rule and this final rule. The docket and administrative record document the bases for the changes and show that the fee adjustments in this final rule are not motivated by any purpose other than those expressly stated in this rulemaking. This final rule intends to recover the estimated full cost of providing immigration adjudication and naturalization services and is not a

pretext to implement the Inadmissibility on Public Charge Grounds final rule, as indicated by a commenter. DHS notes that the Public Charge final rule was implemented nationwide on February 24, 2020, after the Supreme Court of the United States stayed the last remaining injunction on that final rule on February 21, 2020.

This final rule also complies with the APA. DHS issued an NPRM in the **Federal Register** on November 14, 2019, and a Supplemental Notice on December 9, 2019. DHS accepted public comments on the proposed rule through February 10, 2020. DHS fully considered the issues raised in the public comments and made some adjustments in response, as detailed in responses throughout this final rule.

DHS disagrees with commenters' assertions that the fees established in this final rule are unjustified because the fees differ in amount or are not being changed ''proportionally.'' In most instances, DHS sets the fees based on the estimated full cost of providing the relevant immigration adjudication or naturalization service. Some services cost USCIS more to provide than others, resulting in fees that differ in relation to how costly the applicable service is. Furthermore, the costs to USCIS of providing a given service may evolve over time in a manner that is different than the cost of providing another service. Thus, when DHS adjusts the USCIS fee schedule, not all fees are adjusted ''proportionally.'' For example, as DHS explains in the NPRM and elsewhere in this rule, DHS determined that it would be appropriate to limit the fee increase for several forms while not limiting the fee increase for other forms to reduce the cost burden placed upon other fee-paying applicants, petitioners, and requestors.

DHS reiterates that this final rule complies with the all current laws. Therefore, DHS declines to make changes in this final rule in response to these comments.

*Comment:* Numerous issues permeate the NPRM and result in such a vague rule change as to invalidate the entire proposal. The NPRM fails to disclose the actual weighted average fee increase or fee increases associated with individual form types and many unrelated changes are proposed without supporting documentation for each of these proposed changes. The commenter wrote that other open-ended language in this proposal also improperly subverts the legal requirements of this notice process by granting exclusive powers to the Attorney General to set such fees and fee waiver regulations and create such USCIS forms without future public

notices. The commenter wrote that other open-ended language in this proposal also improperly subverts the legal requirements of this notice process by granting exclusive powers to the Attorney General to set such fees and fee waiver regulations and create such USCIS forms without future public notices.

*Response:* DHS has provided sufficient details of the bases for the fee adjustments in the NPRM, this final rule, and supporting documentation. As clearly stated earlier, the INA authorizes the use of fees for funding USCIS. However, the law does not prescribe a method for USCIS fee setting. As explained in the supporting documentation that accompanies this final rule, USCIS follows guidance provided by OMB Circular A–25 and has leveraged an ABC methodology in the last five fee reviews. USCIS' use of commercially available ABC software to create financial models has enabled it to align with the Federal Accounting Standards Advisory Board's (FASAB's) *Statement of Federal Financial Accounting Standards Number 4* on managerial cost accounting concepts, which provides guidelines for agencies to perform cost assignments in the following order of preference: (1) Directly tracing costs wherever feasible and economically practicable; (2) Assigning costs on a cause-and-effect basis; or (3) Allocating costs on a reasonable and consistent basis.[27]

USCIS is a worldwide operation of thousands of employees with myriad responsibilities and functions. The commenter's expectations of absolute precision are unattainable for setting the fees for such a large organization that provides a wide range of services and immigration benefit requests. DHS has provided rational connection to the law, its needs, policy choices, calculations, and fees established in this final rule, even if the rational basis may require following mathematical calculations and defensible estimates.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters said that the excessive fee increase and limiting fee waivers would indirectly make wealth a dispositive requirement for immigration benefits, effectively adopting a ''wealth test'' for citizenship and similar immigrant benefits that will deter non-citizens from seeking lawful immigration status in violation of the INA and which the legislature never

---

[27] FASAB, *Statement of Federal Financial Accounting Standards 4*, available at *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (last viewed 03/06/2020).

intended. A commenter said DHS's proposal to eliminate most fee waivers and exemptions, coupled with dramatic fee hikes for most immigrants, breaks from decades of executive practice and ignores clear Congressional intent to create a fair and accessible immigration system. The commenter said DHS has declined, despite congressional requests, to consider the effect of eliminating reduced fees on applicants for naturalization or to maintain fee waivers for such applicants.

A commenter said USCIS' policy of recovering the full cost of application processing is a choice, not a legal requirement. Specifically, the commenter said USCIS cites INA section 286(m), 8 U.S.C. 1356(m) as the basis of its policy, but this section states merely that the agency "may be set at a level that will ensure recovery of the full costs of providing all such services." Therefore, the statute is permissive, not mandatory. The commenter went on to say that USCIS also cites OMB Circular A–25, but this document is only policy guidance that lacks the force of law and, by its own terms, provides for exceptions to this general policy. The commenter also said that since USCIS has used its discretion to set fees for several forms at levels that would not recover its full costs, it should go further in shifting costs away from applications that would help working immigrant families acquire, maintain, or document lawful status and citizenship. Similarly, another commenter said USCIS is not required by law to recover its costs on the backs of applicants, many of whom are low-income; the relevant section of the INA is permissive, not mandatory.

A commenter said the proposed rule ignores Congressional intent, citing a 2018 House Appropriations Committee report (H. Rep. No. 115–948) and the bipartisan, bicameral conference report accompanying the omnibus appropriations act for Fiscal Year 2019 (H. Rep. No. 116–9), both of which stated that "USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines (FPG), who are not currently eligible for a fee waiver." Although the NPRM states that "USCIS appreciates the concerns of this recommendation and fully considered it before publishing this proposed rule," the commenter said USCIS provides no evidence that it either "appreciates" or "fully

considered" these directives from Congress. Instead, the commenter said the agency is eliminating fee waivers and naturalization fee reductions in direct contravention of Congressional will. A couple of other commenters also cited the same Congressional directives, stating that DHS has ignored these directives without rational explanation.

Another commenter said that, by solely focusing on "full cost recovery" regardless of an immigrant's ability to pay and under the false pretense of equity, DHS is restricting immigration to only those who can afford it. The commenter said this is a "backhanded attempt" to introduce a merit-based immigration system without legislation. The commenter said Congress has already shown it does not wish to enact a merit-based immigration system and the DHS should not be able to go around the will of Congress. Similarly, another commenter said the changes serve to circumvent Congressional oversight of the immigration system by effectively eliminating statutory paths to immigration status by making them unaffordable and inaccessible to those who qualify.

Another commenter said these fees would effectively impose a means test for U.S. residence and citizenship, and that these immigration benefits is of such importance that any related policy should be determined by Congressional legislation. A commenter said a limit should be placed on USCIS' ability to raise fees without Congressional approval, concluding that such policies should only be passed by Congressional authority.

A commenter said the administration is attempting to reshape American immigration policy, ignoring Congress' plenary power and attempting to make the immigration process established by Congress inaccessible to eligible immigrants. Similarly, another commenter said USCIS is imposing financial tests cloaked under the rule-making process to reshape the demographics of the American society by excluding those who are not wealthy and asylum-seekers who are largely from Central America, Latin America, Africa, and Asia.

A commenter said the rule would significantly deter family-based immigration, contrary to Congressional intent. The commenter said that the effect of the rule will promote employment-based immigration at the expense of family-based immigration because immigrants who arrive on employment-based visas are typically well-educated, can speak English proficiently, have sufficient assets, and have solid employment prospects. The

commenter said the effect of the proposed rule will be to favor wealthy or higher-skilled immigrants over families, and in turn reverse over a half century of bedrock immigration policy in the United States. The commenter concluded that Congress did not delegate DHS the authority to implement such sweeping reform of our immigration laws.

Another commenter said Congress needs a clear expenditure plan in order to monitor if the funds are being used as warranted, which is not present in the current proposal. Similarly, a commenter said the proposed fee schedule is inconsistent with statutory framework because it lacks a valid analysis as to how the proposal might achieve the policy objectives it "allegedly would further."

*Response:* DHS adjusts the fees for immigration benefit requests in this final rule to recover the estimated full cost of providing immigration adjudication and naturalization services, as provided by law. In adjusting the fees, DHS is not imposing a "wealth test" or otherwise attempting to erect barriers to immigration and rejects any implication that its justifications for adjusting the fees are pretexts to obscure any other motivation.

INA section 286(m), 8 U.S.C. 1356(m) authorizes DHS to recover the full cost of providing immigration adjudication and naturalization services, including the cost of services provided at no charge to asylum applicants and other immigrants through the USCIS fee schedule. This final rule complies with the INA, as DHS estimated the cost of providing immigration adjudication and naturalization services over the biennial period and adjusts USCIS' fee schedule to recover those costs.

This final rule also complies with the APA. DHS issued an NPRM in the **Federal Register** on November 14, 2019, and a Supplemental notice on December 9, 2019. DHS accepted public comments on the proposed rule through February 10, 2020. DHS fully considered the issues raised in the public comments and made some adjustments in response, as detailed elsewhere in this final rule. DHS provides responses to those comments in this final rule.

*Comment:* One commenter stated that the proposed rule was not ripe for comment, because DHS did not provide a final, definitive set of fees but instead provided a range of potential outcomes that were possible.

*Response:* DHS disagrees that the proposed rule was not ripe for comment. DHS provided multiple options for proposed fee schedules and

explained that the final outcome would be one of the proposed scenarios or another outcome within the range of the alternatives proposed. The fee schedule adopted in this final rule falls within the range of outcomes DHS provided in the NPRM. The policies implemented in this final rule are identical to, or are logical outgrowths of, those contained in the NPRM.

The intent of the comment period provided under the APA is to allow agencies to consider public feedback on proposed rules and make changes as appropriate. Because a single change made in response to public comments may affect multiple fees, it is impossible to provide a final set of fees in an NPRM unless it were to be adopted without any modification, thereby negating the value of public feedback. Therefore, the NPRM was fully ripe for public comment, and DHS declines to make any adjustments in response to this comment.

*Comment:* Two commenters wrote that the NPRM has no force or effect because Mr. Wolf does not have a valid legal claim to the office of DHS Secretary. The commenters detailed the required line of succession required by Executive Order 13753 after the departure of Secretary Nielsen, which according to the commenters should not have led to Mr. McAleenan. The commenters then stated that, even if President Trump lawfully departed from E.O. 13753 when Mr. McAleenan was designated, his authority was limited to 210 days under the Vacancies Act, but Mr. McAleenan purported to serve as Acting Secretary for a year and a half. The commenters stated that, because Mr. Wolf's appointment to Secretary was a result of Mr. McAleenan's unlawful amendment to the order of succession, Mr. Wolf has no legal claim to the office of the Secretary, and the action he has taken in promulgating the proposed rule shall have "no force or effect."

Similarly, other commenters said the rule violates the Appointments Clause and the Federal Vacancies Reform Act (FVRA) because it was promulgated under the unlawful authority of Kenneth Cuccinelli. The commenters detailed the requirements of the FVRA and the succession line leading to Mr. Cuccinelli's appointment. The commenters concluded that, since Mr. Cuccinelli has not succeeded to the Acting Director of USCIS position pursuant to the FVRA, his designation was void, and thus, the rule that was proposed under his purported authority should have "no force or effect" and its adoption would be unlawful.

Another commenter said it is improper to issue a significant rule when the authority of DHS and USCIS leadership is in question. The commenter said the significant changes proposed are egregious when the agency lacks confirmed leadership to exercise authority pursuant to the law. The commenter wrote that legal challenges to the authority of agency leadership are currently pending and a letter from the House Committee on Homeland Security to the GAO that questions the legality Chad Wolf's appointment as Acting DHS Secretary and Kenneth Cuccinelli's appointment as Senior Official Performing the Duties of the Deputy Secretary. The commenter wrote that the lack of responsible authorities makes it inappropriate for the agency to make the radical and untested policy shifts it proposes.

*Response:* DHS disagrees that Mr. Cuccinelli was unlawfully appointed in violation of the Appointments Clause or the Federal Vacancies Reform Act. In any event, it is unnecessary to discuss the merits of Mr. Cuccinelli's appointment, because the proposed rule only proposed changes to DHS regulations and requested comments. It did not effectuate any change that would be amount to a final action taken by Mr. Cuccinelli or any DHS official. In addition, neither the NPRM nor this final rule were signed by Mr. Cuccinelli. Thus, while DHS believes that Mr. Cuccinelli is lawfully performing the duties of the Director of USCIS and using the title Senior Official Performing the Duties of Director of USCIS, and the Senior Official Performing the Duties of the Deputy Secretary of Homeland Security, whether that is true is immaterial.

The NPRM was signed by Kevin K. McAleenan and this final rule is signed by Chad F. Wolf, both as Acting Secretary of Homeland Security. Contrary to the comment, Secretary Wolf is validly acting as Secretary of Homeland Security. Under INA section 103(a)(1), 8 U.S.C. 1103(a)(1), the Secretary of Homeland Security is charged with the administration and enforcement of the INA and all other immigration laws (except for the powers, functions, and duties of the Secretary of State and Attorney General). The Secretary is also authorized to delegate his or her authority to any officer or employee of the agency and to designate other officers of the Department to serve as Acting Secretary. *See* 8 U.S.C. 103 and 6 U.S.C. 113(g)(2). The HSA further provides that every officer of the Department "shall perform the functions specified by law for the

official's office or prescribed by the Secretary." 6 U.S.C. 113(f).

On April 9, 2019, then-Secretary Nielsen, who was Senate confirmed, used the authority provided by 6 U.S.C. 113(g)(2) to establish the order of succession for the Secretary of Homeland Security. This change to the order of succession applied to any vacancy. Exercising the authority to establish an order of succession for the Department pursuant to 6 U.S.C. 113(g)(2), superseded the FVRA and the order of succession found in E.O. 13753.

As a result of this change and pursuant to 6 U.S.C. 113(g)(2), Mr. McAleenan, who was Senate confirmed as the Commissioner of CBP, was the next successor and served as Acting Secretary without time limitation. Acting Secretary McAleenan was the signing official of the proposed rule. Acting Secretary McAleenan subsequently amended the Secretary's order of succession pursuant to 6 U.S.C. 113(g)(2), placing the Under Secretary for Strategy, Policy, and Plans position third in the order of succession below the positions of the Deputy Secretary and Under Secretary for Management. Because these positions were vacant when Mr. McAleenan resigned, Mr. Wolf, as the Senate confirmed Under Secretary for Strategy, Policy, and Plans, was the next successor and began serving as the Acting Secretary. Therefore, both the NPRM and this final rule were lawfully signed by the Acting Secretary of Homeland Security.

*Comment:* A commenter opposed the proposal because it would result in family separation and would run counter to the family-based immigration system Congress intended to create through the INA. Another commenter wrote that the proposal conflicts with the principle of family unity because it interferes with the right to choose to live with family members and disrupts the INA's goal of family unity.

*Response:* In adjusting the USCIS fee schedule in this final rule, DHS complies with all relevant legal authorities. DHS does not intend to erect barriers to family unity or reunification. This final rule adjusts the USCIS fee schedule to recover the estimated full cost of providing immigration adjudication and naturalization services.

DHS declines to adjust this final rule in response to these comments.

*Comment:* A commenter wrote that the proposed transfer of $112.3 million in IEFA ICE fees violates the Appropriations Clause of the Constitution. The commenter wrote that the use of the IEFA to fund any activities of ICE circumvented the

Appropriations Clause and other laws that prohibit the transfer of funds without statutory authorization. Another commenter wrote that enactment of the FY 2020 appropriations package in December clarified USCIS' understanding of its Congressional mandate and spending authority, but that the agency had failed to acknowledge this package in its January 2020 notice regarding the fee proposal. The commenter wrote that funding provided by Congress in that bill should have resolved open questions about the fee schedule, and that USCIS' failure to propose a fee schedule based on "no transfer of funding" in its January 2020 notice precludes the public from providing fully informed feedback.

*Response:* DHS is not moving forward with the proposed transfer of IEFA funds to ICE in this final rule. Please see the ICE Transfer Section (Section III.L) of this final rule for more information.

*Comment:* Multiple commenters requested that DHS extend the public comment period to 60 days to allow more time to review the proposed rule and to develop responses. Commenters stated that the length of the NPRM was greater than that of earlier fee rules, but commenters had less time to respond to this rule. Multiple commenters suggested that the timing of the comment period over multiple holidays hindered the ability of the public to respond to the proposed rule.

*Response:* DHS understands that the general policy of the Executive Branch is that agencies should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days, for rules that are determined to be significant by OMB's Office of Information and Regulatory Affairs (OIRA). *See* E.O. 12866, Regulatory Planning and Review, 58 FR 51735 (Oct 4, 1993), Sec. 6(a)(1). (E.O. 12866). However, circumstances may warrant a shorter comment period and the minimum required by the APA is 30-days. 5 U.S.C. 553(d). On January 24, 2020, DHS reopened the comment period for an additional 15-days and accepted public comments through February 10, 2020. *See* 85 FR 4243. Thus, the public was provided a comment period of 61 days to review the NPRM, revised information collections, supporting documents, other comments, and the entire docket contents. In addition, comments received between December 30, 2019, and January 24, 2020, were also considered. As a result, although in three separate notices, the public was afforded more time to comment than

required by E.O. 12866, the APA, and the Paperwork Reduction Act (PRA).

*Comment:* One commenter wrote that USCIS promised to provide public review of its cost model software; however, it did not provide access when the commenter reached out to the provided contact. Later, that same commenter along with several other commenters submitted a comment that referenced a February 3, 2020, meeting during which USCIS hosted a demonstration of its ABC cost-modeling software, as promised in the original proposed rule. A commenter wrote that USCIS gave stakeholders just one week to write comments on the cost-assignment software before the end of the comment period. The commenter said USCIS should never force stakeholders to review and provide a formal response to a complex financial proposal within the space of just one week, and it should not impose such an impossible deadline upon analysis of a sophisticated tool that is the foundation of the rule. A commenter asked why the public's ability to provide informed comment on the software was unfairly limited to an in-person demonstration with no phone or online access, asserting that the process limited the ability of stakeholders to request and analyze relevant information. Another commenter also said USCIS' presentation did not allow meaningful public engagement. Another commenter wrote that none of the information received was made available to the rest of the public, which the commenter said would have generated additional important perspectives.

*Response:* DHS met all requirements under the APA in affording commenters who requested a meeting with DHS to review the ABC software the opportunity to provide public comments. The public was offered a chance to meet with USCIS experts and review the software and every party who requested an appointment to review the software was provided an appointment and a review. DHS did not provide additional time beyond the end of the public comment period for the meeting participants to provide feedback because doing so would have advantaged the feedback of those commenters relative to the rest of the public.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter said DHS has not complied with the Treasury General Appropriations Act by failing to assess whether the proposed rule strengthens or erodes the stability or safety of the family, increases or decreases disposable income or poverty of families

and children, and is warranted because the proposed benefits justify the financial impact on the family.

*Response:* As stated in the Family Assessment Section of this final rule (Section IV.H), DHS does not believe that this rulemaking will have a negative financial impact on families. DHS disagrees with commenter's assertions about the effects of the proposed fees and does not agree that the data provided by the commenter indicates that the fees established in this final rule will affect the financial stability and safety of immigrant families. As stated elsewhere in response to similar comments, based on the number of filings received after past fee increases, DHS does not anticipate that the fees would affect application levels or that it will create barriers to family reunification or stymie noncitizens seeking to adjust their status or naturalize. DHS must have sufficient revenue to operate USCIS or its service to all people who file immigration benefit requests could suffer, persons who are not eligible could improperly be approved for a status, or a person who wants to harm the United States and its residents may not be properly vetted. Thus, the benefits of the fees outweigh the costs they impose.

*E. Comments on Fee Waivers*

*Comment:* Many commenters, without providing substantive rationale or supporting data, stated that they oppose the elimination of fee waivers in the rule. Some commenters stated that fee waivers are a matter of public policy and reflect American values. The commenters further stated that the rule would increase dependence on debt to finance applications, the fees are already difficult to pay, and this change will allow only affluent individuals and families to immigrate legally. Commenters indicated that the elimination of almost all fee waivers would cause a substantial burden and prevent large numbers of people from accessing immigration relief and submitting a timely application, and even force applicants to forgo the assistance of reputable and licensed counsel in order to save money to pay the fees.

Commenters also stated that fee waivers should continue to be available for low-income individuals and their elimination would result in financial hardship for immigrant and mixed-status families, resulting in immigrants delaying or losing immigration status due to financial considerations. Commenters also discussed the benefits of fee waivers to immigrants, including helping families to improve their

stability, to financially support themselves, and to fully integrate into their communities while allowing them to allocate funds for higher education. Commenters further stated that fee waivers help families be secure, stable, and financially stronger, and help them integrate into their communities. Commenters stated that the proposed fee increases and elimination of fee waivers would prevent many individuals and families from engaging with the legal immigration system, including putting benefits such as naturalization, lawful permanent residence, and employment authorization out of reach for people who face financial hardship and low-income individuals by serving as a ''metaphorical border wall.'' Commentators indicated that fee waivers are commonly used by low-income and vulnerable immigrants, especially students and their families, and the rule would leave essential immigration benefits accessible primarily to the affluent.

A commenter disagreed with USCIS' statement in the NPRM that changes in fee waiver policy would not impact application volume because research suggests price increases for naturalization applications are a significant barrier for lower income noncitizens. Another commenter provided data from several sources and wrote that immigrants tend to have higher rates of poverty and that fee waivers are an important asset for immigrants looking to maintain legal status. Another commenter stated that fee waivers serve to permit those with an ''inability to pay'' the same opportunity as others and denying access to fee waivers divides the ''opportunity pool.'' Another commenter wrote that applicants may, instead of going into debt, have to forego other expenses such as housing, childcare, transportation, and healthcare in order to apply. A commenter wrote that the elimination of fee waivers would force families to forego necessities such as food, shelter, transportation, education, and healthcare to pay for proof of lawful status that allows them to work. A commenter wrote that USCIS eliminating the fee waiver altogether for non-humanitarian applications directly contradicts USCIS' previous statements regarding the revision to Form I–912.

*Response:* To align fee waiver regulations more closely with the beneficiary-pays principle, DHS proposed to limit fee waivers to immigration benefit requests for which USCIS is required by law to consider a fee waiver. *See* proposed 8 CFR 106.3.

DHS acknowledges that this is a change from its previous approach to fee setting and believes that these changes will make USCIS' fee schedule more equitable for all immigration benefit requests by requiring fees to be paid mostly by those who receive and benefit from the applicable service. Additionally, DHS believes that making these changes to the fee waiver policy would ensure that fee-paying applicants do not bear the costs of fee-waived immigration benefit requests. DHS does not agree that individuals will be prevented from filing applications or receiving immigrant benefits.

DHS provided notice in its FY 2016/2017 USCIS fee rule that in the future it may revisit the USCIS fee waiver guidance with respect to what constituted inability to pay under the previous regulation, 8 CFR 103.7(c). *See U.S. Citizenship and Immigration Services Fee Schedule,* Proposed Rule, 81 FR 26903–26940, 26922 (May 4, 2016). INA section 286(m), 8 U.S.C. 1356(m) authorizes, but does not require, that DHS set fees to recover the full cost of administering USCIS adjudication and naturalization services. That statute also authorizes setting such fees at a level that will recover the costs of services provided without charge, but it does not require that DHS provide services without charge.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters stated that USCIS has neither explained its significant departure from its prior reasoning and practice nor satisfactorily justified limiting fee waivers for naturalization and several other application categories. A commenter stated that the proposed changes concerning fee waivers represents a ''massive and inadequately explained shift in policy'' that it would create a crippling burden on low-income immigrants compounded with previous recent fee waiver changes.

*Response:* DHS understands that the NPRM and this final rule represent a change from previous guidance on fee waivers. Due to the cost of fee waivers and inconsistency of current regulations with the beneficiary-pays principle emphasized in the NPRM and this final rule, DHS is limiting fee waivers to immigration benefit requests for which USCIS is required by law to consider a request or where the USCIS Director exercises favorable discretion as provided in the regulation, as well as a few other instances. In addition, DHS is allowing fee waivers for certain associated humanitarian programs

including petitioners and recipients of SIJ classification and those classified as Special Immigrants based on an approved Form I–360 as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces. Although these changes do limit the number of people eligible for fee waivers, as previously discussed, the changes also limit increases to fees for forms that previously had high rates of fee waiver use.

*Comment:* Some commenters provided information specific to a geographic area or political subdivision. One commenter added that reductions in fee waivers would in turn cause sweeping consequences to applicants, safety net programs, and state and county economies. One commenter wrote that the proposal would significantly harm New York as a whole because fee waivers allow indigent and low-income immigrants to obtain lawful status, which puts them on the path to social and economic security. The commenter cited data showing that New York's immigrants account for $51.6 billion of the State's tax revenue and stated that New York would lose much needed support if fewer immigrants are unable to legally work and live in the United States. Another commenter cited data showing that immigrant-led households in Oregon paid $1.7 billion in federal taxes and over $736.6 million in State taxes and stated that the proposed change would prohibit many of these immigrant from fully participating in their local economies. Another commenter calculated the costs a family with an income of 150 percent of the FPG level would face living in Boston, writing that fee waivers are vital to such families maintaining their immigration status or naturalizing.

*Response:* DHS disagrees that the fee waiver regulations in this final rule would prohibit immigrants from participating in local and state economies or affect safety net programs. This final rule does not prevent any person from submitting a benefit request to USCIS or prohibit immigrants from obtaining services or benefits from state or local programs. DHS declines to make changes in this final rule in response to this comment.

*Comment:* Another commenter stated that limiting fee waivers would result in a greater number of applicants delaying submitting applications due to financial hardship. The commenter wrote that applicants would therefore live without authorization for which they are

lawfully eligible for a longer time period, resulting in negative impacts to their financial and emotional security.

*Response:* DHS acknowledges that the changes in the fee waiver provisions may impose a burden on applicants who may have previously been eligible for a fee waiver. However, DHS does not have data indicating that individuals will delay submitting applications and petitions in response to the fee waiver policy changes. USCIS accepts credit cards to pay for a USCIS request sent to one of the USCIS Lockboxes. While DHS acknowledges that the use of a credit card may add interest expenses to the fee payment, a person can generally use a debit or credit card to pay their benefit request fee and does not have to delay their filing until they have saved the entire fee. DHS declines to make changes in this final rule in response to this comment.

*Comment:* A few commenters said that eliminating fee waivers is a racist attempt to prevent immigration from poorer countries. Commenters indicated that eliminating fee waivers would be discriminatory against immigrants who have limited incomes, who are willing to work for everything they get, want a better life for their children, desire to improve their communities, and the rule would put immigration benefits out of reach for people who face financial hardship.

*Response:* DHS changes to fee waiver availability in this rule have no basis in race or discriminatory policies. DHS is not limiting fee waivers to discriminate against any group, nationality, race, or religion, to reduce the number of immigrants, or limit applications for naturalization. Rather, the change is to alleviate the increase of fees for other applicants and petitioners who must bear the cost of fee waivers as previously discussed. DHS does not anticipate a reduction in receipt volumes because of the fee waiver policy changes. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters stated that the curtailment of fee waivers disregards a Senate Appropriations Committees' directive that USCIS was to ''report on the policies and provide data on the use of fee waivers for four fiscal years in 90 days,'' which is not provided in the NPRM.

*Response:* DHS has previously provided the required reports to Congress. The Congressional reporting requirements do not include a limit on USCIS fees or limit the authority of DHS to provide discretionary fee waiver eligibility criteria or guidelines. They also do not require publication in the NPRM or the **Federal Register** as the commenter implies. Therefore, DHS does not believe this final rule disregards the directive for reporting to Congress and declines to make changes in this final rule in response to these comments.

1. Limits on Eligible Immigration Categories and Forms

*Comment:* Many commenters stated that USCIS should maintain fee waivers for all current categories and that the proposed fee waiver changes would make essential benefits such as citizenship, green card renewal, and employment authorization inaccessible for low-income immigrants.

*Response:* DHS has always implemented USCIS fee waivers based on need and since 2007, has precluded fee waivers for individuals that have financial means as a requirement for the status or benefit sought. *See Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule;* Proposed Rule, 72 FR 4887–4915, 4912 (Feb 1, 2007). As discussed in the NPRM, under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay. *See* 84 FR 62298. IEFA fee exemptions, fee waivers, and reduced fees for low income households adhere to this principle. Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee-exempt, fee-waived, or fee-reduced. For example, if only 50 percent of a benefit request workload is fee-paying, then those who pay the fee will pay approximately twice as much as they would if everyone paid the fee. By paying twice as much, they pay for their benefit request and the cost of the same benefit request for which someone else did not pay.

In prior years, USCIS fees have given significant weight to the ability-to-pay principle by providing relatively liberal fee waivers and exemptions and placing the costs of those services on those who pay. In the FY 2016/2017 fee rule, DHS noted that the estimated annual dollar value of waived fees and exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review. *See* 81 FR 26922 and 73307. DHS set the fees in the FY 2016/2017 fee rule based on those estimates of the level of fee waivers and exemptions by increasing other fees accordingly. To the extent that waivers and exemptions exceed the estimates used to calculate fees, USCIS forgoes the revenue. While DHS acknowledges that the fee adjustments established in this final rule are not insubstantial to an applicant of limited means, DHS does not believe that they make immigration benefits inaccessible to low income applicants. Thus, DHS will not shift the costs from all low-income applicants to other fee-paying applicants and petitioners in this final rule.

DHS declines to make changes in this final rule in response to these comments.

a. Categories or Group of Aliens

*Comment:* A commenter stated that while USCIS may claim it is not required to waive any fees for vulnerable applicants such as the disabled and elderly, federal laws, such as the Americans with Disabilities Act (ADA) and Rehabilitation Act, do require that fees and benefits are kept within reach of protected and vulnerable populations.

*Response:* DHS disagrees with the commenter's assertion. Section 504 of the Rehabilitation Act, applicable to USCIS, provides that qualified individuals with a disability shall not be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program or activity conducted by a federal executive agency. USCIS immigration benefit request fees are generally applicable and do not violate that provision. Congress did not specifically provide for an immigration benefit request fee exemption or waiver for individuals with disabilities. DHS generally does not assess fees to applicants for any accommodations requested by the applicants for physical access to USCIS facilities when required for interviews, biometrics submission, or other purposes. Therefore, the USCIS fee schedule established in this final rule does not violate the Rehabilitation Act. The ADA does not generally apply to USCIS programs, but to the extent that it provides guidance on the expectations for a Federal agency's accommodations for a qualified individual with a disability, the fees that DHS is establishing in this final rule also fully comply with the ADA.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Commenters stated that the proposed limits on fee waivers would threaten disabled immigrants and deny them access to citizenship. The commenter wrote that disabled lawful permanent residents rely on Supplemental Security Income (SSI), but that LPRs must naturalize within 7 years to sustain this benefit. The commenter stated that removing the naturalization fee waiver would drive

these disabled LPRs to homelessness and desperation, with negative societal consequences and no benefit. A commenter added that LPRs with disabilities lose SSI benefits 7 years after their entry, and, thus, that the proposed rule could deny members of this population access to basic necessities. A commenter wrote that citizens are eligible for SSI, but such benefits are only available to some non-citizens for up to seven years. The commenter wrote that the increase in naturalization fees would "create an insurmountable barrier" for disabled non-citizens to naturalize, and thus creates a "finite timeline" during which a non-citizen can receive important needed benefits like SSI.

*Response:* DHS disagrees that removing the application for naturalization fee waiver would drive disabled applicants into homelessness, despair, or deny them access to citizenship. Normally, if an applicant entered the United States on or after August 22, 1996, he or she is not eligible for SSI for the first 5 years as a lawfully admitted permanent resident, unless he or she is a qualified alien, as provided under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[28] Some categories of aliens who are eligible, including asylees and refugee, may be limited to a maximum of 7 years of SSI. Generally, an alien may apply for naturalization after 5 years as an LPR. This final rule does not prohibit eligible aliens from obtaining SSI benefits or naturalizing. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Commenters stated that fee waivers should be available for both affirmative and defensive asylum seekers. One commenter stated that DHS failed to justify its decision to forgo fee waivers for asylum applications, since the agency did not analyze data from other fee waiver processes to determine whether the fee waivers would offset the cost recovery of the asylum fee. Another commenter said that if fee waivers will offset the revenue from the asylum fee, then the entire fee should be abandoned.

One commenter said that the asylum fee should be established at $366 while allowing Form I–589 applications to be submitted with a fee waiver application, stating that many asylees are able to pay the full fee. The fee waiver application process would better allow USCIS to detect fraud while serving as a sworn statement of financial status, circumventing the need for universal verification which consumes agency resources.

The fee waiver for asylum applications would, according to this commenter, enable indigent applicants to be granted asylum, upholding the U.S.'s non-refoulement obligations. The commenter also stated that defensive applications should be subject to the same fees as affirmative applications, so long as a fee waiver remains available.

One commenter wrote that the elimination of fee waivers would require immigrants with few economic resources to finance the cost of their own oppression referencing that applicants who have a legal basis for asylum claims will be forced to pay the fees associated with that claim with no discretion or real procedural mechanism for accessing a fee waiver. The commenter indicated that immigrants living in this country often arrived as economic refugees and do not have economic resources, especially given the difficulties in obtaining employment without status. The commenter stated that forcing some of the most marginalized communities to pay, for instance, a $1,170 filing fee (more than 3 weeks wages for a low-income earner) makes a mockery of the country's values.

*Response:* DHS acknowledges the commenters' concerns related to fees and fee waivers for asylum seekers and asylees. As stated in the NPRM and in this final rule, DHS is not providing fee waivers for the $50 asylum application fee. DHS's decision to establish a mandatory $50 fee is justified. The $50 fee would generate an estimated $8.15 million of annual revenue. If DHS permits fee waiver requests, it legitimately assumes that the cost of administering the fee waiver request review process may exceed the revenue, thereby negating any cost recovery achieved from establishment of the fee. *See* 84 FR 62319. Although the INA authorizes DHS to set fees "at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," INA section 286(m), 8 U.S.C. 1356(m), DHS establishes a $50 fee for Form I–589, which is well below the estimated full cost of adjudicating the application.

The statutory authorization for fees allows, but does not require, imposition of a fee equal to the full cost of the services provided. The INA provides that DHS may impose fees for the consideration of asylum and employment authorization applications that are not to exceed the estimated costs of adjudicating the applications. *See* INA section 208(d)(3), 8 U.S.C. 1158(d)(3).[29] INA section 208(d)(3) also states, "[n]othing in this paragraph shall be construed to require [DHS] to charge fees for adjudication services provided to asylum applicants, or to limit the authority of [DHS] to set adjudication and naturalization fees in accordance with section 286(m)." Thus, DHS is permitted to charge asylum applicants the same fee for employment authorization that it charges all others for employment authorization. The fee for Form I–765 is calculated in accordance with INA section 286(m), 8 U.S.C. 1356(m). DHS considered the effect of a non-waivable fee for the Form I–589 on affirmative asylum seekers and believes that the fee does not create a barrier to asylum for indigent applicants. The imposition of any fees for defensive asylum applications filed with EOIR is a matter that falls within the jurisdiction of the Department of Justice, rather than DHS, subject to the laws and regulations governing fees charged in immigration court proceedings before EOIR. Under those regulations, EOIR charges the fee established by DHS for a DHS form and determines the availability of a fee waiver for a DHS form based on whether DHS allows such a waiver. *See* 8 CFR 1103.7(b)(4)(ii), (c).

Further, the fees align with U.S. international treaty obligations and domestic implementing law. As indicated in the NPRM, DHS believes that the asylum fee may arguably be constrained in amount, but is not prohibited, by the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention") and the 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol").[30] *See* 84 FR 62318–19; 1951 Refugee Convention, 19 U.S.T. 6259,

---

[28] See Title IV of Public Law 104–193, 110 Stat. 2105, 2260–77 (Aug 22, 1996). For information on who is a qualified alien see eligible for SSI, see *Under What Circumstances May A Non-Citizen Be Eligible For SSI?* available at *https://www.ssa.gov/ssi/spotlights/spot-non-citizens.htm* (last visited June 5, 2020).

[29] This section states, "The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments."

[30] 1951 Convention relating to the Status of Refugees, *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137; 1967 Protocol relating to the Status of Refugees, *open for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267. Although the United States is not a signatory to the 1951 Refugee Convention, it adheres to Articles 2 through 34 by operation of the 1967 Refugee Protocol, to which the United States acceded on Nov. 1, 1968.

AR2022_200413

189 U.N.T.S. 137; 1967 Refugee Protocol, 19 U.S.T. 6223, 606 U.N.T.S. 267. The 1951 Refugee Convention and the 1967 Refugee Protocol, as incorporated by reference, address the imposition of fees on individuals seeking protection, and limit ''fiscal charges'' to not higher than those charged to their nationals in similar situations. *See* Article 29(1) of the 1951 Refugee Convention, and 1967 Refugee Protocol, as incorporated by reference. Domestic implementing law, which is consistent with international treaty obligations, authorizes the Attorney General to ''impose fees for the consideration of an application for asylum, for employment authorization under this section [208], and for adjustment of status under section 209(b).'' INA section 208(a)(3), 8 U.S.C. 1158(a)(3). Thus, as provided in the NPRM and in this final rule, no fee waivers are available to asylum seekers in connection with filing Form I–589 or for Form I–765 with USCIS. Notably, unaccompanied alien children in removal proceedings who file an application for asylum with USCIS are exempt from the Form I–589 fee. New 8 CFR 106.2(a)(20).

As proposed in the NPRM and stated in this final rule, DHS exempts applicants filing as refugees under INA section 209(a), 8 U.S.C. 1159(a), from the filing fee for adjustment of status applications (Form I–485). *See* 8 CFR 106.2(a)(17)(iii). Asylees are not exempt from the Form I–485 filing fee, and neither asylees nor refugees are exempt from naturalization fees (Form N–400). The fee waiver regulations are consistent with the INA and international treaty obligations, which allow for the imposition of fees, and do not require that DHS offer these applicants fee waivers. *See* INA section 208(a)(3), 8 U.S.C. 1158(a)(3).

DHS considered extending the fee waiver rules that apply to SIJ, SIVs, T, U and VAWA applicants to asylum seekers, asylees, and refugees. However, in reviewing the data on the number of applicants for various forms, DHS concluded that the populations of asylum applicants, refugees, and asylees are substantial enough that a fee waiver would have caused a greater increase to the I–765 and N–400 fees, for example, thereby increasing the burden upon other applicants. As explained in the NPRM, initial applicants with pending asylum applications, aliens who have not yet established eligibility for asylum, account for approximately 13 percent of the total Form I–765 workload volume forecast. *See* 84 FR 62320. Continuing to exempt this population of aliens which is only

eligible to obtain an EAD due to an asylum application pending for a certain amount of time from the Form I–765 fee or permitting fee waivers would have further increased the proposed fee, meaning that fee-paying EAD applicants would pay a higher amount to fund the cost of EADs for asylum applicants. Therefore, DHS limited fee waiver availability to only those categories of humanitarian programs that had limited populations to avoid increasing other fees. The limitation of fee waiver availability conforms with the beneficiary pays principle, and unlike the asylum seeker, asylee, and refugee population, such limited fee waiver availability does not pass on a significant burden to other applicants.

Notwithstanding these considerations and changes, DHS retains the authority in the final rule for the Director of USCIS to waive any fee if he or she determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. *See* 8 CFR 106.3(b). As provided in the NPRM, USCIS will continue to notify the general public of eligibility for fee waivers for specific forms under this provision through policy or website updates. *See* 84 FR 62300. Individuals who may qualify for such a fee waiver will still need to meet the requirements to request a fee waiver as provided in 8 CFR 106.3(b).

In this final rule, DHS consolidates the provisions regarding the USCIS Director's discretion to provide fee waivers in the proposed 8 CFR 106.3(b) and 8 CFR 106.3(c), as proposed 8 CFR 106.3(b) was redundant.

*Comment:* Multiple commenters wrote that the proposal eliminating the fee waivers would severely affect vulnerable immigrants and survivor-based immigration. Several commenters stated that the elimination of fee waivers will harm the most vulnerable populations, such as domestic violence or human trafficking survivors, and those in times of crisis. One commenter stated fee waivers should be available to individuals seeking humanitarian relief and lacking the ability to pay. Several commenters stated that the elimination of most fee waivers discriminates against immigrants who are low income, elderly, and have disabilities and undermines humanitarian protection for victims of gender-based violence and other crimes. Multiple commenters wrote that eliminating the availability of fee waivers would only create an insurmountable economic barrier to low-income, vulnerable immigrants and lawful permanent residents, such as survivors of domestic violence, sexual

assault, human trafficking, gender-based abuses, and other crimes, as well as their children. A few commenters wrote that access to fee waivers helps survivors and their children rebuild their lives; break free from the cycle of abuse; heal; and protect themselves, their children, and the community. Commenters stated that USCIS should instead focus on ensuring that low-income and other vulnerable immigrants have access to immigration relief for which they are eligible.

One commenter said that access to fee waivers is essential for survivors because it allows them to replace confiscated immigration documents such as permanent resident cards or employment authorization cards. The commenter stated that without fee waivers, survivors would be unable to pay these filing fees and would have to choose between going without these documents or putting their lives in danger to retrieve documents from potentially dangerous situations.

Multiple commenters wrote that while fee waivers for certain survivor-related applications will remain, the proposed rule ignores the fact that survivors may pursue other routes to secure immigration status other than those specifically designed for crime survivors. The commenters stated that, by removing waivers for these other routes, the proposed rule would harm survivors. One commenter indicated for a survivor of family violence, the ability to apply for a fee waiver was crucial to be able to obtain an EAD and gain some financial stability and independence from her abusive spouse. The commenter indicated that, as an example, a fee waiver allows a client to be able to maintain employment eligibility at her minimum wage job. Without the ability to apply for a fee waiver for all related applications the client would have faced additional barriers that would have prohibited her from obtaining financial independence from the abuser and lawful status. One commenter stated that the proposal ignores the fact that survivors of human trafficking may pursue other routes to secure immigration status and in these instances, survivors will no longer have access to fee waivers. Some commenters drew upon their experiences counseling those seeking immigration benefits to underscore their opposition to further restricting access to legal immigration via unaffordable filing fees or the elimination of fee waivers. A commenter said the elimination of fee waivers would place ''the majority'' of its clients in a precarious position because they do not have funds to pay fees out of pocket and will have to

choose between borrowing money and pursuing immigration benefits that would improve their lives. The commenter wrote that many of its clients were "cut off" from financial institutions and described the dangers of borrowing from "predatory lending mechanisms" or from family members who may use the debt owed as "currency for their abusive behavior" in some circumstances. The commenter also said the increased fees for work authorization would leave many immigrants vulnerable to victimization, citing a report from Public Radio International.

Many commenters also wrote that the proposed changes for necessary ancillary forms, included I–765, I–601, I–192, and I–929, would impose significant fee increases that survivors often cannot afford. Another commenter stated that the elimination of fee waivers, combined with the increased fees for N–400, would put those escaping violence in the position of having to choose between expending resources to become a U.S. citizen or covering basic necessities for their families.

A commenter said individuals with U nonimmigrant status or other humanitarian-based immigration benefits should not be "priced out" of remaining with their families. Another commenter said more than 94 percent of domestic violence survivors suffer financial abuse, and many receive some form of means-tested benefits that may preclude them from applying for fee waivers in the naturalization process. The commenter said fee waivers were critical for ensuring such vulnerable individuals have the opportunity to pursue citizenship.

*Response:* DHS is not intending to further harm survivors of domestic violence, human trafficking, or other crimes. In fact, DHS continues to exempt VAWA self-petitioners, individuals who are victims of a severe form of human trafficking and who assist law enforcement in the investigation or prosecution of those acts of trafficking or qualify for an exception (who may qualify for T nonimmigrant status), and individuals who are victims of certain crimes and have been, are being, or are likely to be helpful to the investigation or prosecution of those crimes (who may qualify for U nonimmigrant status) from paying a fee for the main benefit forms: Form I–360 for VAWA, and Forms I–914 and I–918 for T and U nonimmigrants including family members, respectively. *See* 8 CFR 106.2(a)(16)(ii), (a)(45) and (a)(46). DHS believes that maintaining access to fee waivers for these

vulnerable populations mitigates any concerns that the increase in certain fees would limit access for protected categories of individuals. In addition, in response to commenters' concerns regarding the ability for the VAWA, T nonimmigrant, U nonimmigrant and Special Immigrant (Afghan and Iraqi translators) populations to pay for the cost of naturalization applications, DHS decided to expand the ability of these populations to apply for a fee waiver for Form N–400, Application for Naturalization, Form N–600, Application for Certificate of Citizenship, and Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. *See* 8 CFR 106.3(a)(3).

*Comment:* One commenter referred to a study from the National Resource Center on Domestic Violence that found means-tested benefits support financial security and independence and are "critically important" for survivors of domestic violence, sexual assault, and human trafficking. The commenter said recipients of means-tested benefits are, by definition, of limited financial means and need these benefits to meet their basic needs. The commenter said restricting the availability of fee waivers would harm survivors of domestic violence and other forms of gender-based violence, and cited research demonstrating the widespread incidence and devastating economic impacts of such violence.

*Response:* DHS does not intend to further harm domestic violence or human trafficking survivors. In fact, the rule continues to exempt those applying for VAWA, T, and U benefits from certain fees and allows them to request fee waivers for other forms as provided by statute. DHS believes that maintaining access to fee waivers for these populations mitigates any concerns that the increase in certain fees would limit access for protected categories of individuals. *See* 8 CFR 106.3(a).

*Comment:* A commenter stated that Congress mandated that DHS permit applicants to apply for a waiver of any fees associated with VAWA benefits, T nonimmigrant filings, U nonimmigrant filings, or an application for VAWA cancellation of removal or suspension of deportation. In doing so, Congress recognized that ensuring equal access to immigration protections was crucial for crime survivors to achieve safety and security. Many commenters also wrote that the proposed rule undermines Congressional intent to make humanitarian relief accessible to victims. Another commenter stated that the proposed rule clearly violates

Congressional intent, as reiterated in a December 2019 House Appropriations Committee report, by imposing fees on individuals who have received humanitarian protection and subsequently seek adjustment of status and other immigration benefits which they cannot afford. The commenters said low-income survivors will not apply for benefits due to the barriers they will encounter in demonstrating their eligibility for fee waivers and that the proposed rule "undermines" bi-partisan Congressional intent with respect to VAWA-based relief. Commenters stated that the language runs counter to existing law as Congress did not place any conditions on the availability of fee waivers for survivors when it codified the use of fee waivers for filing a VAWA self-petition, a T nonimmigrant status application or U nonimmigrant status petition, or an application for VAWA cancellation or suspension of deportation. Other commenters wrote that USCIS should automatically waive fees for all forms associated with applications for T nonimmigrant status, U nonimmigrant status, and VAWA self-petitioners to make humanitarian immigration relief accessible to victims.

*Response:* DHS exempts VAWA self-petitioners, applicants for T nonimmigrant status, and petitioners for U nonimmigrant status from paying a fee for the main benefit forms: Form I–360 for VAWA, and Forms I–914 and I–918 for T and U nonimmigrants including family members, respectively. Thus, DHS is making relief accessible to the populations noted by the commenters.

Further, this final rule complies with the law's requirements [31] to permit these applicants to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status. *See* new 8 CFR 106.3(a)(1). DHS agrees that Congress did not place any conditions on the availability of fee waivers for a VAWA self-petition, a T nonimmigrant status application, or U nonimmigrant status petition, or an application for VAWA cancellation or suspension of deportation, but DHS disagrees that any legislation requires or implies or that Congress intended that USCIS provide free adjudications for all of their associated benefit requests. Congress has codified several fee exemptions or fee limits. *See, e.g.,* INA section 328(b)(4), 8 U.S.C. 1439(b)(4) (fee exemption for Military Naturalization Based on Peacetime Service); INA section 244(c)(1)(B), 8

---

[31] *See* INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

U.S.C. 1254a(c)(1)(B) (the registration fee for TPS is limited to $50, although additional fees may be collected for biometrics and associated services, *See* 8 U.S.C. 1254b. Congress has also appropriated funds for adjudication and certain naturalization services. *See, e.g.,* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2020). Congress has not provided for a fee exemption, fee cap, or appropriated funds for VAWA self-petitioners, T nonimmigrant status applicants, and U nonimmigrant status petitioners. To the contrary, the statute directs DHS to allow applications for fee waivers, rather than to waive all such fees, evidencing Congress's intent for DHS to evaluate the individual merits of such requests. DHS appreciates the concerns about affordability, but, while many victim requesters are in poor financial condition, being a victim does not equate to being poor, and DHS may require that the victim requester document eligibility for a fee waiver. Therefore, DHS makes no changes in the final rule as a result of these comments.

*Comment:* Commenters stated that while applications and petitions for survivor-based relief do not have fees, applicants must frequently file ancillary forms whose fees are increasing under the proposed rule or may seek status through other immigration categories. The commenter stated that by eradicating fee waivers for other types of applications and petitions, the proposed rule ignores the facts that survivors of domestic violence, sexual assault, human trafficking, and other gender-based abuses may pursue other routes to secure immigration status which lack such explicit protections. They also noted that fee waivers will no longer be available for any naturalization applications and many other forms in non-survivor based cases, like legal permanent residence applications; work permit applications; and Form I–751, Petition to Remove Conditions on Residence; among others. Another commenter said the final rule would need to more explicitly address the

protections and exemptions for humanitarian visa categories because the proposed rule contained contradictory and confusing language and many potential applicants would not necessarily be aware of special protections to which they are entitled.

Other commenters requested that USCIS withdraw the proposed rule, because it would create barriers to accessing immigration benefits for victims, and immigration benefits are essential for survivors to escape abuse and become self-sufficient after they have been victimized. Commenters stated that the rule ignores survivors of domestic violence, who have a spotty employment history or lack of savings, or both, and survivors of human trafficking, who may spend many months waiting for compensation from litigation or before they are able to recuperate their lost wages.

Other commenters detailed how economic abuse affects survivors' finances, including precluding victims from working, destroying their work uniforms and equipment, preventing them from getting to work or an interview, and other tactics that impact a victim's financial independence and impede their ability to pay filing fees. One commenter specifically noted that VAWA self-petitioners often have limited financial means, are often homeless after escaping their abusers, and suffer from physical and mental health issues. The commenter stated that the little money they do have is needed to help them maintain independence from their abusers and provide for their families. One commenter wrote that USCIS should focus on ensuring vulnerable immigrants have access to immigration relief for which they are eligible. The commenters stated that fee waivers for survivor-based immigration protections have helped survivors improve their lives by allowing them to obtain employment authorization and legal status without having to request funds from their abusers or forgo food or housing in order to pay fees. In the context of VAWA, T, and U applicants, another commenter stated that the fee increases did not take into account areas

of the country, such as the San Francisco Bay Area, where living expenses and housing costs are high. They said such a fee increase also does not consider the mandatory expense of the obligatory medical exam (Form I–693, Report of Medical Examination and Vaccination Record) that in their experience ranges anywhere from $300 to $700 and for which there is no fee waiver.

*Response:* DHS acknowledges the concerns commenters have raised and does not intend to unduly burden any alien, particularly those who have been victimized. To avoid confusion and clarify the applicability of the rule, DHS reiterates that the rule continues to exempt the VAWA, T, and U populations from fees for the main benefit forms and allows them to submit fee waiver requests for any associated forms up to and including the application for adjustment of status, as provided by statute. For example, there are no fees for the following forms: VAWA-based Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Form I–914, Application for T Nonimmigrant Status; and Form I–918, Petition for U Nonimmigrant Status. In addition, VAWA, T, and U filers may submit a request for a fee waiver for associated forms, including Forms I–765, I–131, I–212, and I–601, among other forms.

Additionally, in response to commenters' concerns regarding the ability for the victim population to pay for the cost of naturalization applications, DHS will permit this population to request a fee waiver for Form N–400, Application for Naturalization; Form N–600, Application for Certificate of Citizenship; and Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. The table below provides the full list of forms these applicants and petitioners may apply for that are either exempt from fees or eligible for fee waivers. DHS repeats these applicants, generally, do not have to pay the fees for the initial main benefit forms that provide the immigration status or benefit.

TABLE 3—CATEGORIES AND FORMS WITHOUT FEES OR ELIGIBLE FOR FEE WAIVERS

| Category | Main immigration benefit requests [32] | Associated forms |
|---|---|---|
| Violence Against Women Act (VAWA) self-petitioners and derivatives as defined in INA section 101(a)(51) or individuals otherwise self-petitioning for immigrant classification or seeking adjustment of status due to abuse by a qualifying relative [33]. | Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee for VAWA-based filings). Form I–485, Application to Register Permanent Residence or Adjust Status. Form I–751, Petition to Remove Conditions on Residence. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)). | Form I–131, Application for Travel Document.[34] Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal. Form I–290B, Notice of Appeal or Motion. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization (no initial fee for principals).[35] Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Victims of Severe Form of Trafficking (T nonimmigrant) [36]. | Form I–914, Application for T Nonimmigrant Status (no fee). Form I–914 Supplement A, Application for Family Member of T–1, Recipient (no fee). Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons (no fee). Form I–485, Application to Register Permanent Residence or Adjust Status. | Form I–131, Application for Travel Document. Form I–192, Application for Advance Permission to Enter as a Nonimmigrant. Form I–193, Application for Waiver of Passport and/or Visa. Form I–290B, Notice of Appeal or Motion. Form I–539, Application to Extend/Change Nonimmigrant Status. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization (no initial fee for principals). Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Victims of Criminal Activity (U nonimmigrant) [37]. | Form I–918, Petition for U Nonimmigrant Status (no fee). Form I–918, Supplement A, Petition for Qualifying Family Member of U–1 Recipient (no fee). Form I–918 Supplement B, U Nonimmigrant Status Certification (no fee). Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant. Form I–485, Application to Register Permanent Residence or Adjust Status. | Form I–131, Application for Travel Document. Form I–192, Application for Advance Permission to Enter as a Nonimmigrant. Form I–193, Application for Waiver of Passport and/or Visa. Form I–290B, Notice of Appeal or Motion. Form I–539, Application to Extend/Change Nonimmigrant Status. Form I–765, Application for Employment Authorization (no initial fee for principals). Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Employment authorization for battered spouses of A, G, E–3, or H nonimmigrants [38]. | Form I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse (no initial fee). | None. |
| Battered spouses or children of a lawful permanent resident or U.S. citizen and derivatives under INA section 240A(b)(2) [39]. | None with USCIS ......................................... | Form I–601, Waiver of Grounds of Inadmissibility. Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Temporary Protected Status [40] ... | Form I–821, Application for Temporary Protected Status. Biometric Services Fee. | Form I–131, Application for Travel Document. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization. |
| Special Immigrant Juveniles (SIJ) who have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency at the time of filing. | Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee). Form I–485, Application to Register Permanent Residence or Adjust Status. | Form I–131, Application for Travel Document.[41] Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal. Form I–290B, Notice of Appeal or Motion. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization. Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |

TABLE 3—CATEGORIES AND FORMS WITHOUT FEES OR ELIGIBLE FOR FEE WAIVERS—Continued

| Category | Main immigration benefit requests [32] | Associated forms |
|---|---|---|
| Special Immigrant as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces. | Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee). Form I–485, Application to Register Permanent Residence or Adjust Status (no fee). | Form I–131, Application for Travel Document (no fee). Form I–290B, Notice of Appeal or Motion (no fee). Form I–765, Application for Employment Authorization (no fee). Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |

Although DHS is increasing fees for various forms to account for the cost of adjudication, the victim populations identified here will be eligible to apply for a fee waiver for most forms if their income is at or below 125 percent of the FPG. As stated previously, the law does not require, and DHS declines to adopt,

the recommendation to automatically waive fees for all forms associated with VAWA, T, and U filings or to withdraw the rule in its entirety. USCIS is funded through fees, and taxpayer dollars are not used to fund USCIS adjudication and naturalization services. The cost associated with applications and petitions that have been fee waived is paid from fees collected from other benefit requests. DHS believes that maintaining access to fee waivers for these vulnerable populations mitigates any concerns that the increase in the fees will limit access for protected categories of individuals.

As the commenters point out, the law provides specific immigration benefits for those who have been victimized and provides protections and flexibilities for these populations to address their particular concerns. This final rule complies with those provisions.

*Comment:* Another commenter provided statistics describing the economic condition of the population served by non-profit legal service providers in its State and wrote that the proposal would increase the strain on these important organizations. The commenter noted that nearly 90 percent of the 25 legal service providers surveyed in its state represented applicants for humanitarian immigration benefits, such as VAWA petitions, trafficking victims on T nonimmigrant applications, or asylum applicants. The commenter stated the proposal would create a chilling effect on all clients served by these organizations, regardless of the benefits for which they qualify, and could ultimately jeopardize these organizations' budgets due to a reduction in the number of cases served.

*Response:* As stated previously, DHS appreciates the services that charitable, community based, non-governmental, and non-profit organizations provide to the immigrant community. DHS declines, however, to exempt from fees all forms associated with VAWA, T, and

U filings. Organizations providing services to the VAWA, T, and U population will continue to be able to request fee waivers for forms associated with these filings in addition to a fee exemption for the main benefit request (*i.e.,* Form I–360, Form I–914, and Form I–918 have no fee for these populations).

*Comment:* One commenter stated that the proposed Form I–912 instructions "create additional burdens that are ultra vires to the statute permitting fee waivers for survivor-based cases, notably with the phrase 'due to your victimization.'" The commenter stated that survivors should not have to demonstrate a nexus between their victimization and their lack of income or proof of income. The commenter also stated that this non-statutory requirement is burdensome on survivors, as they may face obstacles obtaining or providing proof of income for reasons that may or may not be related to their victimization and will prevent many survivors from accessing critical benefits. Several commenters said low-income survivors will not apply for benefits due to the barriers they will encounter in demonstrating their eligibility for fee waivers and that the proposed rule undermines bi-partisan Congressional intent with respect to VAWA-based relief. Many commenters stated that the additional limits on fee waiver eligibility criteria combined with the stringent documentation requirements for fee waivers (*e.g.,* Form I–912 instructions that survivors need to "demonstrate a nexus between their victimization and lack of income or proof of income) will prevent many survivors from qualifying or applying for fee waivers. A commenter stated that, whether intentional or not, the proposed rule will act as a barrier to status for the crime survivors we serve and, coupled with the stringent documentation requirements for fee waivers, will prevent many survivors from qualifying

---

[32] Some immigration benefit requests may not have a fee for the specific category.

[33] *See* INA sections 101(a)(51) and 204(a), 8 U.S.C. 1101(a)(51) and 1154(a); INA section 245(l)(7), 8 U.S.C. 1255(l)(7); Public Law 110–457, 122 Stat. 5044 (Dec. 23, 2008); 22 U.S.C. 7101 *et seq.* This category includes applicants for waivers of the joint filing requirement for Form I–751 based on battery and extreme cruelty; victims of battery or extreme cruelty as a spouse or child under the Cuban Adjustment Act Public Law 99–603, 100 Stat. 3359 (November 6, 1986) (as amended), 8 U.S.C. 1255a; applicants adjusting based on dependent status under the Haitian Refugee Immigrant Fairness Act, Public Law 105–277, 112 Stat. 2681 (October 21, 1998), 8 U.S.C. 1255, for battered spouses and children; and applicants for Suspension of Deportation or Special Rule Cancellation of Removal (Form I–881) under the Nicaraguan Adjustment and Central American Relief Act, Public Law 105–100, 111 Stat. 2163 (Nov. 19, 1997), for battered spouses and children.

[34] Currently, fees for Form I–131 are exempt if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007. *See* 8 CFR 103.7(b)(1)(i)(M)(4). However, DHS implements changes to this policy in this final rule as explained in this preamble. New 8 CFR 106.2(a)(7)(iv).

[35] Form I–360 allows a principal self-petitioner to request an EAD incident to case approval without submitting a separate Form I–765. Form I–765 is required for employment authorization requests by derivative beneficiaries.

[36] *See* INA section 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of a severe form of trafficking in persons).

[37] *See* INA section 101(a)(15)(U), 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of certain criminal activity).

[38] *See* INA section 106, 8 U.S.C. 1105a.

[39] *See* INA section 240A(b)(2), 8 U.S.C. 1229b(b)(2), and INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

[40] *See* INA section 244, 8 U.S.C. 1254a.

[41] Currently, fees for Form I–131 are exempt if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007. *See* 8 CFR 103.7(b)(1)(i)(M)(4). However, DHS proposes changes to the policy in this final rule as explained later in this preamble. New 8 CFR 106.2(a)(7)(iv).

for fee waivers.'' A commenter said the proposed Form I–912 instructions create additional burdens for crime survivors from qualifying for fee waivers, and USCIS should continue to accept applicant-generated fee waiver requests. One commenter said USCIS had received many comments on a previous attempt to modify the fee waiver form from stakeholders concerned about the negative impact those changes would have on immigrant survivors of violence and wrote that the current proposal would make these problems worse. The commenter said survivors of violence would be adversely impacted by the heightened documentation requirements, specifically the provision that survivors would have to demonstrate that their inability to comply with documentation requirements was due to their victimization. The commenter said the proposal failed to reference any exceptions to the vague ''victimization'' standard despite USCIS' prior recognition that the requirement to provide documentation from the Internal Revenue Service (IRS) would disadvantage immigrant survivors.

*Response:* To obtain a fee waiver, an applicant must demonstrate that he or she is at or below 125 percent of the FPG, meet the other criteria as provided in the rule, and provide the information and evidence available in order to establish eligibility. The applicant need only provide sufficient information to establish why the documentation is not available and not that it is unavailable directly or indirectly as a result of the victimization. The form provides space for explanations and attachments are accepted, but a separate declaration is unnecessary. Although not required by statute, USCIS has provided flexibilities in the instructions for the VAWA, T, and U populations permitting them to submit information regarding their inability to obtain documentation on their income with their fee waiver request. DHS will presume that the inability of this group of applicants to submit certain evidence is the result of the victimization and abuse and not require proof of a nexus between victimization and the inability to pay, but the request must demonstrate inability to pay to the extent necessary for USCIS to grant a discretionary fee waiver. All applicants for a fee waiver are subject to the evidence requirements as provided in the revised form instructions, which include more flexible rules with respect to the groups these comments mention. If individuals are unable to obtain documents without contacting the abuser, they can explain

why they are unable to obtain such documentation and submit other evidence to demonstrate their eligibility. Obtaining information from the IRS in transcripts, a W–2, or proof of non-filing, if applicable, is sufficient documentation to establish the necessary income or lack of income.

*Comment:* A few commenters discussed the processing times for survivor-based forms of immigration protections, citing increased adjudication time for filings such as petitions for U nonimmigrant status and Violence Against Women Act (VAWA) self-petitions. Commenters said slow processing times can lead to increased homelessness, violence, or a return to abusive relationships for victims and that USCIS has failed to address how these fees will improve processing times. One commenter cited several sources and wrote that new fees would not result in improved processing but instead would contribute to, and escalate, violence.

*Response:* DHS understands the commenter's concerns regarding processing times. Processing times are impacted by several factors, and any changes based on the rule would limitedly impact these populations. The rule continues to exempt the VAWA, T, and U populations from certain fees and allows them to submit fee waiver requests for any forms up to adjustment of status. *See* new 8 CFR 106.2(a)(16), (a)(32)(ii), (a)(45) and (a)(46); 8 CFR 106.3(a)(3). In the final rule DHS is permitting a request for a fee waiver on the application for naturalization or certificate of citizenship for these categories. *See* new 8 CFR 106.3(a)(3). DHS disagrees that this final rule would result in increased processing times or contribute to escalating violence on these populations, particularly as the additional resources made available from increased fees may enable USCIS to limit growth in pending caseloads. As DHS states elsewhere in this rule, DHS is adjusting fees in this final rule because they are insufficient to generate the revenue necessary to fund USCIS at levels adequate to meet its processing time goals. The new fees will allow USCIS to hire more people to adjudicate cases and possibly prevent the growth of backlogs.

*Comment:* A commenter stated that the proposed rule is not detailed enough about whether refugees are exempt from fees including the Form I–765 fees and whether asylees and SIJ petitioners and recipients will be eligible for fee waivers. The commenter also stated that DHS fails to understand that individuals are forced to file fee waivers when DHS places fees for benefits out of the reach

of most low to moderate income applicants and that the inability to access identity documents exacerbates homelessness and unemployment, concluding that elimination of fee waivers is arbitrary and capricious.

*Response:* DHS acknowledges the concerns of the commenter related to the availability of fee waivers for refugees and asylees, and other vulnerable applicants and petitioners. DHS will continue to provide a fee exemption for the initial Form I–765 for individuals who were granted asylum (asylees) or who were admitted as refugees. *See* 84 FR 62301. DHS is also continuing to provide a fee exemption to refugees for Form I–485. *See* 84 FR 62360; new 8 CFR 106.2(a)(17)(iii). In addition, the fee that DHS charges for refugee travel documents will continue as a lesser fee, linked to the fee for a U.S. passport book, rather than the estimated full cost of adjudication. *See* 84 FR 62306.

At the USCIS Director's discretion, USCIS may waive or exempt the fee for any form, including those filed by asylees and refugees. *See* 8 CFR 106.3(b), (e). That provision is similar to, but somewhat more limited than, the authority that was in 8 CFR 103.7(d) for the Director of USCIS to provide for the waiver or exemption of any fee if doing so was in the public interest. The new provision provides that the Director determines that such action is an emergent circumstance or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. *See* 8 CFR 106.3(b), (e). As was stated in the NPRM, USCIS will notify the public of the availability of fee waivers for specific forms under this provision through external policy guidance, website updates, and communication materials. *See* 84 FR 62300. Individuals who qualify for such a fee waiver would still need to meet the requirements to request a fee waiver as provided in the new 8 CFR 106.3(b) and (d). In this final rule, DHS consolidated the provisions regarding the USCIS Director's discretion in 8 CFR 106.3(b) and 8 CFR 106.3(c), as the proposed provision in the NPRM, 8 CFR 106.3(b), was redundant.

In response to commenters' concerns, DHS will also allow petitioners for and recipients of SIJ classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, to submit requests for fee waivers for Form I–485 and associated forms, as well as Forms N–400, N–600, and N–600K. *See* 8 CFR 106.3(a)(2)(i). DHS does not believe that the final rule eliminates fee waivers for

these applicants or blocks access to identity documents.

*Comment:* Several commenters stated that the elimination of fee waivers will harm the most vulnerable populations, such as domestic violence or human trafficking survivors, and those in times of crisis. One commenter stated fee waivers should be available to individuals seeking humanitarian relief and lacking the ability to pay. One commenter suggested that it would make better fiscal sense and would result in better outcomes for USCIS if the agency automatically waives fees for all forms associated with applicants for T nonimmigrant status, petitioners for U nonimmigrant status, and VAWA self-petitioners because fee waivers would facilitate non-profits' efforts to help these applicants file these forms quickly. A commenter wrote that delays in application submission due to limitations on fee waivers would result in delayed justice for individuals because immigration practitioners will be forced to spend more time on each case.

*Response:* DHS acknowledges the commenters' concerns and clarifies that this final rule continues to exempt the VAWA, T and U populations from certain fees and allows them to request fee waivers on other forms as previously discussed. *See* 8 CFR 106.2(a)(16)(ii), (a)(45) and (a)(46), 8 CFR 106.3. Furthermore, in response to concerns expressed by the public, DHS provides in this final rule that those populations may also request a fee waiver for Forms N–400, N–600, and N–600K. *See* 8 CFR 106.3(a)(3). DHS believes that by continuing to provide the opportunity to request fee waivers, the final rule will not unduly burden these populations or delay the submission of their applications and petitions.

*Comment:* A commenter opposed the new form's request for applicants to self-identify as survivors. The commenter stated that most types of humanitarian relief covered by Form I–912 "are subject to certain protections and sanctions" relating to privacy and confidentiality and requested that USCIS clarify that the disclosure of personal information in these sections complies with protections codified at 8 U.S.C. 1367.

*Response:* DHS takes seriously its responsibility to properly protect sensitive information in its possession.[42] DHS follows the Privacy

Act requirements, which apply to information that is maintained in a "system of records" from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifier particular assigned to the individual. Information from forms is collected and maintained consistent with the Privacy Act of 1974 [43] (Privacy Act) and the System of Records Notice (SORN), which identifies the purpose for which Personally Identifiable Information (PII) is collected, from whom and what type of PII is collected, how the PII is shared externally (routine uses), and how to access and correct any PII maintained by DHS.[44] With regard to 8 U.S.C. 1367 protections, DHS remains committed to our obligations under the statute and applies the required protections to all information pertaining to individuals with a pending or approved VAWA, T, or U petition or application, which includes information provided on Form I–912.

*Comment:* Several commenters stated that SIJ petitioners and recipients, a vulnerable group, are missing from USCIS' list of groups retaining access to fee waivers. A commenter stated that this proposal will hinder the ability of juveniles who receive SIJ classification to fully integrate into the United States, due to excessive costs, and that it will result in other unintended consequences, particularly for unaccompanied minors. Such consequences include difficulty finding sponsors and a lower level of legal representation. Commenters further noted that the proposed fee increases would burden SIJ petitioners and recipients who have no means to pay for the fees when applying for adjustment of status. The commenter stated that SIJ petitioners and recipients are children who have suffered abuse, neglect, or abandonment by at least one of their parents. The commenter stated that SIJs benefit immensely from obtaining work authorization, as working lets the SIJs take control over their lives, provide for themselves, and begin to build a brighter future. The commenter stated that adjustment offers them the chance to permanently put down roots in the United States, putting the trauma in their pasts behind them. One

commenter stated that in passing the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA),[45] Congress made amendments to the SIJ statute to provide "permanent protection for certain at-risk children." The commenter further stated that not providing fee waivers to SIJs would preclude at-risk children from accessing fee waivers and thus clearly violate Congressional intent to permanently protect these at-risk children. Another commenter said that the hardship would be particularly acute for those SIJ petitioners in foster care, who have limited or no access to the funds necessary to seek adjustment of status with USCIS.

*Response:* The TVPRA [46] requires DHS to permit certain applicants to apply for fee waivers for "any fees associated with filing an application for relief through final adjudication of the adjustment of status." INA section 245(l)(7), 8 U.S.C. 1255(l)(7), provides that "The Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U), 1105a, 1229b(b)(2), and 1254a(a)(3) of this title (as in effect on March 31, 1997)." These provisions do not include SIJ petitioners or recipients. Therefore, DHS is not mandated to allow SIJs to apply for fee waivers. Nevertheless, after considering the commenters' concerns, DHS agrees that SIJ petitioners who are wards of the state are particularly vulnerable. Therefore, DHS will allow petitioners for and recipients of SIJ classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, to request that the fees for Form I–485 and associated forms be waived. *See* 8 CFR 106.3(a)(i).

In addition, DHS is including Forms N–400, N–600, and N–600K as forms eligible for a fee waiver for multiple categories of applicants. *See* 8 CFR 106.3(a)(3). Table 3 above provides a list of forms eligible for fee waivers based on SIJ classification.

*Comment:* A commenter stated that limits on categories eligible for fee waivers and elimination of a need-based benefit as a way to qualify for a fee

---

[42] *See* generally Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed

strict controls to minimize the risk of compromising the information that is being stored.").

[43] *See* 5 U.S.C. 552.

[44] *See* generally Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored.").

[45] *See* The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, 112 Stat. 5044 (Dec. 23, 2008).

[46] *See* title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

waiver will have an especially heavy impact on the homeless, who often have difficulty providing required documents and must file applications for replacement of lost or stolen immigration documents.

*Response:* This final rule does not prohibit aliens who are homeless from applying for or receiving a fee waiver if he or she is a member of one of the designated categories.

*Comment:* Multiple commenters opposed lowering the income limit for fee waivers to 125 percent of the FPG as it would disqualify many immigrants, including survivors of crime who are statutorily protected, from receiving fee waivers for immigration benefits. Many commenters stated that the proposed rule fails to acknowledge that immigrants, especially survivors of crimes, often do not have access to financial documents or proof of their income for various reasons, including informal jobs (*e.g.*, babysitting or yard work) that pay cash; the fact that limited earnings do not require taxes to be filed; and that abusers often have control of all financial documents, destroy records, or prevent victims from attaining financial independence. One commenter wrote that since many individuals would not fall within the proposed, narrower financial eligibility criteria, victims of labor trafficking may turn to jobs with exploitative employers or back to traffickers in order to pay the fees for adjustment of status or other ancillary forms.

*Response:* DHS acknowledges that some applicants may no longer qualify for fee waivers if their income was higher than 125 percent of the FPG but lower than 150 percent of the FPG. However, many applicants may otherwise have income below 125 percent and, therefore, still qualify. Consistent with the statute, this final rule specifically permits aliens described in the TVPRA, including those seeking benefits under VAWA, as well as T and U nonimmigrants,[47] to request fee waivers for ''any fees associated with filing an application for relief through final adjudication of the adjustment of status.'' [48] The TVPRA provision requires DHS to allow these applicants to request fee waivers; however, the TVPRA does not require fee exemptions or set the FPG level for waivers. DHS declines to make changes in this final rule in response to this comment.

---

[47] *See* title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

[48] *See id.*

**b. Fee Waivers for Specific Forms**

*Comment:* Commenters opposed eliminating the fee waiver for naturalization, as well as lawful permanent residence, employment authorization, and other applications. Numerous commenters opposed the proposed elimination of fee waivers for Form I–90, Form I–765, Form I–485, forms for applicants exempt from the public charge inadmissibility ground, Form I–751, and naturalization and citizenship-related forms.

*Response:* DHS is not eliminating all fee waivers for Forms I–485 and I–765 and is allowing fee waiver requests for certain humanitarian programs for naturalization and citizenship related forms as applicable. *See* 8 CFR 106.3(a). *See* Table 3: Categories and Forms Without Fees or Eligible for Fee Waivers. DHS will continue to accept fee waiver requests from applicants who meet the requirements of INA section 245(l)(7), 8 U.S.C. 1255(l)(7). *Id.* As explained in the NPRM, the INA requires DHS to permit fee waiver requests from certain immigrant categories and for certain forms; limiting fee waiver requests reduces the fee increases for all immigration benefits and places the fee costs on the benefit recipient instead of an unrelated party.

DHS notes, however, that the law requires DHS to ''permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 101(a)(15)(T), 101(a)(15)(U), 106, 240A(b)(2), and 244(a)(3) (as in effect on March 31, 1997).'' DHS appreciates that aliens will often file multiple requests simultaneously or shortly after each other, including requests for asylum, SIJ classification, T nonimmigrant status, U nonimmigrant status, humanitarian parole, or deferred action. However, that a request may be filed simultaneously with a status included in section 245(l)(7), 1255(l)(7), or while it is pending, does not make such a request an ''application for relief'' ''associated with filing'' for the purposes of fee waiver eligibility under that provision of law. USCIS will generally reject a fee waiver request and the associated benefit request that asserts that it is ''associated'' and eligible for a fee waiver simply because it is simultaneous or filed while another benefit request is pending.

DHS will not make changes to its fee waiver regulations in this final rule in response to these comments.

*Comment:* A few commenters said the Form I–90 should remain fee waivable,

as the form is necessary to renew permanent resident cards. The commenters stated that without the fee waiver, applicants would be unable to renew their status and escape poverty. A commenter wrote that eliminating a fee waiver option for an I–90 would be ''egregious.'' The commenter stated that immigrants with expired legal status or employment authorization often get caught in a vicious cycle of being unable to prove they have permission to work, preventing them from earning funds to cover filing fees and thus perpetuating their inability to procure work authorization.

Several commenters stated that removing fee waivers for forms such as the I–90 and the N–565 would prevent or significantly delay applicants from being able to apply for and maintain employment. The commenters stated that the change could likewise prevent applicants from having proof of their eligibility for certain public benefits, as many applicants, especially survivors of crime and homeless immigrants, have primary documents that have been stolen, lost, or destroyed, often by abusers.

*Response:* DHS disagrees that eliminating the fee waivers for the I–90 would be ''egregious,'' or that it will prevent or significantly delay applicants from being able to apply for and maintain employment. Applicants would still be eligible to obtain proof of status, and public benefit granting agencies have access to the Systematic Alien Verification for Entitlements (SAVE) program which validates an alien's immigration status. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that children should not be subject to fees for Form I–485 or for EAD applications while their asylum or adjustment of status application is pending because doing so would impose multiple hardships. The commenter stated that EADs serve as a de facto identification document and are frequently a precursor to obtaining access to state and federal services, as well as access to a social security number, which is a common prerequisite for enrolling in school, obtaining health insurance, or receiving preventative care.

A commenter wrote that senior citizens have extremely limited financial situations but are often able to renew their Permanent Resident cards or apply for citizenship with a fee waiver. The commenter stated that eliminating this fee waiver, while also raising the form fees, would put these applications out of reach.

AR2022_200421

*Response:* DHS disagrees that this final rule prevents asylees, children, or seniors from obtaining documentation of status. Immigrants are provided a stamp in their passports that they can use as documentation of lawful permanent resident status upon adjustment of status or their entry into the United States as a lawful permanent resident. Further, an alien's LPR card, which provides documentation of LPR status, and therefore employment eligibility, is generally valid for 10 years. For those without approved status, applicants may use their receipt notices to identify they have applied for the applicable immigration status. Schools, insurance companies, and doctors' offices should not require a permanent resident card or an employment authorization document from a child and DHS cannot adjust the fees for obtaining such documents based on such unofficial uses and unnecessary requirements. Further, DHS disagrees that this final rule imposes greater burdens on these aliens accessing public benefits or services. Public benefit granting agencies verify the immigration status of aliens through the SAVE program. DHS declines to make changes in this final rule on the basis of these comments.

*Comment:* A commenter wrote that it is unjust to allow fee waivers for Form I–751 for VAWA self-petitioners but not for individuals who are submitting a waiver for joint spousal filing of Form I–751 due to battery or cruelty by the U.S. citizen spouse. A commenter said the petition to remove conditions on residence should remain accessible, especially for survivors of domestic violence. Similarly, a few commenters stated that, if USCIS were to eliminate fee waivers for Form I–751, some victims of violence could be subject to deportation or to the threats of their abusers.

*Response:* DHS recognizes the concerns of commenters and clarifies that this final rule continues to allow an individual to request a fee waiver when he or she is filing a waiver of the Form I–751 joint filing requirement because they were subject to battery or extreme cruelty. *See* 8 CFR 106.3(a). The term ''VAWA self-petitioner'' as defined in INA section 101(a)(51)(C), 8 U.S.C. 1101(a)(51)(C), includes individuals filing a waiver of the joint filing requirement based on battery or extreme cruelty. Thus, USCIS will continue to accept requests for fee waivers for Form I–751 when filed with a waiver of the joint filing requirement based on battery or extreme cruelty, as provided by statute.

*Comment:* A few commenters stated that eliminating fee waivers for work authorization applications would cause further harm to asylum seekers. At least one commenter stated that elimination of fee waivers for asylum seekers would have a disproportionately negative impact on the people who most need asylum. Another commenter wrote that individuals with pending asylum cases before USCIS are required to renew their employment authorization every year, and without fee waivers, employment authorization filing fees would cut significantly into their paychecks and make it more difficult for them to provide for their families. Another commenter said USCIS should neither eliminate the waiver of the initial filing fee for Form I–765, Application for Employment Authorization, nor increase the filing fee. The commenter further stated this would make it harder for asylum seekers to apply for an EAD.

*Response:* DHS acknowledges the concerns of the commenters related to asylum seekers applying for EADs. Charging a fee for adjudication services is in line with INA section 208(d)(3), which provides that ''[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title.'' Noncitizens are generally required to pay adjudication fees, and asylum seekers, in particular, are subject to several statutory and regulatory requirements that carefully regulate the circumstances under which they may qualify for employment authorization, including a mandatory waiting period before they may even apply for employment authorization. USCIS is continuing to provide a fee exemption for the initial Form I–765 filing for individuals who were granted asylum (asylees) or who were admitted as refugees. Therefore, there is no fee waiver request necessary for asylees filing an initial Form I–765. Asylees and refugees will generally continue to be required to pay the fee for renewal EADs. Finally, as a point of clarification, DHS notes that, at the time of publication of this rule, the validity period for an EAD for asylum seekers is two years (not one year, as asserted by the commenter) which should be sufficient time for asylum seekers to factor the required renewal EAD fee into their budget. Therefore, for the reasons above, DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters opposed the elimination of fee waivers, including for Form I–765, which would unfairly limit the access to immigration benefits for students who cannot afford their request for employment authorization.

*Response:* USCIS must incur the costs of adjudicating a Form I–765 submitted by a student, and DHS does not believe it should shift that cost to other fee payers. Moreover, certain nonimmigrant students are required to establish the financial means to support themselves for the duration of their stay. *See* 8 CFR 214.2(f)(1)(i)(B); *see also* 8 CFR 214.2(m)(1)(i)(B). That requirement also applies to students who are eligible to request employment authorization for pre- and post-completion training programs. Therefore, DHS believes that this final rule would not cause undue burdens to student visa holders. DHS declines to make changes in this final rule in response to these comments.

### c. Form N–400 Fee Waivers

*Comment:* Numerous commenters said that USCIS should maintain existing fee waivers for naturalization applications, especially given the proposed increase of naturalization fees. Citing a 2017 Report to Congress, several commenters stated that naturalization is one of the most frequently requested application types for fee waivers and that over 500 of their clients a year would probably forgo the opportunity to become citizens of the United States if the proposed rule were adopted. Commenters wrote that removal of fee waivers will price many individuals out of naturalization and would discourage individuals from applying for fee waivers and citizenship. Citing various studies, a few commenters detailed how fee waivers increased naturalization rates. Citing to the USCIS Fee Waiver Policies and Data, Fiscal Year 2017 Report to Congress, USCIS (Sept. 17, 2017), a commenter stated because of the benefits of naturalization, the naturalization application is one of the form types most frequently associated with fee waiver requests. Several commenters emphasized the importance of fee waivers to naturalization, citing the number of applicants who qualify for fee waivers through City University of New York's Citizenship Now! program. One commenter stated that CUNY Citizenship Now!, which runs one of the most prominent citizenship and naturalization clinics in New York, reports that 54.8 percent of naturalization applicants they assist qualify for fee waivers, while the same is true for 75.6 percent of Form N–600

applicants and 65.8 percent for Form I–90 applicants.

An individual commented that the proposed naturalization fee increase would prevent residents from seeking citizenship, citing data on financial and administrative barriers as bars to naturalization. Commenters also cited a 2018 Stanford Immigration Policy Lab study from Hainmueller et al. in stating that the application fees discourage naturalization. Other commenters cited the same study and stated that offering "fee vouchers" increased naturalization application rates by about 41 percent or from 37 percent to 78 percent. Several commenters wrote that immigrants want to naturalize, citing the Migration Policy Institute figures on rising annual rates of naturalization. Commenters also cited a Yasenov et al. study demonstrating that the introduction of Form I–912 waivers had the greatest impact on naturalization applicants with low levels of income and education. A commenter cited a surge of naturalization applications before a fee increase in 2008 as evidence of the role of fees in naturalization decisions.

A few commenters stated that, since naturalization is one of the form types for which fee waivers are most frequently submitted, the change would have a profound negative impact on vulnerable immigrants, including asylum seekers, who must naturalize to obtain legal rights. A commenter stated that 2.1 million immigrants are eligible for naturalization in the State of California, of whom 1 million individuals would be severely impacted by a rise in the cost of an application fee and 768,024 live in Los Angeles County. Other commenters also provided figures on the numbers of immigrants eligible for naturalization in Minnesota, and Washington. Other commenters provided similar figures for programs in California, Michigan, Boston, Houston, and New York. A commenter cited a *Fortune* article stating that, in 2017, almost 40 percent of naturalization applications received a fee waiver.

Commenters wrote that 9 million permanent residents are eligible for citizenship across the United States, citing an Office of Immigration Statistics publication, a study by Warren and Kerwin, and a Pew Research paper. A few commenters wrote that, of these, 3 million are under 150 percent of the FPG, 1 million are between 150 and 200 percent of FPG, and 1.7 million are between 200 and 300 percent FPG. Another commenter cited a 2014 University of Southern California study in concluding that over half of naturalization applicants would lose

access to waivers as a result of the proposed rule.

Some commenters wrote that without fee waivers, applicants for naturalization would take longer to apply or not apply and this would also hinder state and local governments' efforts to facilitate naturalization. Some commenters stated that fee waivers have been essential to increasing naturalization and that they pay for themselves many times over. A commenter requested that DHS more thoroughly analyze the costs of impeding access to naturalization, which include long-term reduced economic and social mobility for impacted populations.

*Response:* DHS agrees that the naturalization application is one of the forms affected by the limitation of the fee waivers. Fees for other applicants and petitioners must increase to recover the cost of adjudicating fee-waived applications and petitions. In this final rule, DHS limits the availability of fee waivers for Form N–400 to mitigate the additional cost burden that other fee-paying applicants must bear. This is consistent with the beneficiary-pays principle emphasized throughout the NPRM and this final rule. If USCIS continued to accept fee waiver requests for Form N–400 under the previous eligibility criteria, the fee would be higher than established in this final rule. The reduction in the availability of fee waivers for Form N–400 is not intended to discourage, deter, or otherwise limit access to naturalization for any group, category, or class of individual. In response to public comments received on the NPRM, DHS is expanding the immigration benefit requests for which it will accept fee waiver requests from statutorily protected populations to include Forms N–400, N–600, and N–600K, and to certain SIJs and Afghan and Iraqi interpreters as described elsewhere in this final rule. DHS believes that expanding fee waiver eligibility mitigates concerns that the fee increase for Form N–400 unduly burdens or otherwise prevents naturalization for these populations.

DHS acknowledges that the fee for Form N–400 increases in this final rule by more than most other forms. The large fee increase for Form N–400 is because DHS previously held the fee for Form N–400 below the full estimated cost of adjudication. In this final rule, DHS emphasizes the beneficiary-pays principle and declines to hold the fee for Form N–400 artificially low. DHS believes that increasing the Form N–400 fee to the estimated full cost of its adjudication will alleviate the increased

burden of higher fees placed upon other immigration benefits.

*Comment:* Some commenters stated that eliminating fee waivers for naturalization and other form types most frequently associated with fee waiver requests undermines Congressional intent. Commenters stated that Congress has called on USCIS to keep the pathway to citizenship affordable and accessible, and opposed the proposed elimination of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee.

*Response:* USCIS appreciates the concerns of this recommendation and fully considered it before publication. Nevertheless, DHS determined that the current trends and level of fee waivers are not sustainable. Work that USCIS provides for free or below cost affects other fee-paying applicants by making their fees higher, so DHS can recover USCIS' full cost. DHS is trying to make the USCIS fee schedule more consistent with the beneficiary-pays principle. As shown in the supporting documentation that accompanies this final rule, the number and dollar value of approved fee waiver requests has remained high during periods of economic improvement. That indicates that, as the economy declines the number of fee waiver requests could increase to a level that could threaten the ability of USCIS to deliver programs without disruption. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters stated that the NPRM violates Congressional intent since USCIS has not supplied any data, research, or other actual factual evidence to show whether the current naturalization fees would be "a barrier to naturalization for those earning between 150 percent and 200 percent FPG," let alone the effect of the proposal to significantly increase the naturalization fees and eliminate fee waivers.

*Response:* DHS is unaware of any statute that requires DHS to document that the fees it establishes to recover USCIS' costs will not be a barrier to naturalization. DHS has complied with the economic analysis requirements of Executive Orders. There is no legal requirement to comply with language in a Congressional briefing that does not become law, aside from cooperation with the Congressional oversight function. DHS has carefully considered Congress' view of these issues, as well as the statutory and fiscal limitations under which USCIS operates and declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters noted that without fee waivers many naturalized citizens who required waivers to become citizens would not have been able to afford to apply for naturalization and that a high percentage of applicants currently use or apply for waivers.

*Response:* DHS recognizes the commenters' concerns. However, as stated elsewhere throughout this final rule, USCIS must recover its costs through user fees. DHS does not believe that current high levels of fee waiver usage are sustainable. Further, DHS believes that it would be equitable for fee-paying applicants to continue to bear the high costs of fee waiver usage through the fees that they pay. DHS declines to make changes in this final rule in response to these comments.

2. Fee Waiver Income Requirements

*Comment:* Many commenters opposed restricting the income requirements from 150 percent of FPG to 125 percent because such a restriction would be unjustified, especially since no estimates were provided as to how many people it would impact. Many commenters stated that lowering the standard to 125 percent will negatively affect many in cities and states across the country who are unable to pay fees and still have a very low income. Household income does not take into account the dramatically different costs of living throughout the country, complex living arrangements (such as mixed-status households or households supporting family members in another country), or the variety of circumstances that may render individuals unable to pay fees. One commenter stated that the income requirement would negatively impact many individuals because even those above the 125 percent FPG are unable to provide for their daily essentials due to the high cost of living in Los Angeles County. A commenter went on to state that the income standard should be tied to an inability to pay particular fees at the time of application since fee waiver consideration is focused on an individual's financial circumstances at that particular point.

*Response:* As provided in the NPRM, because of the costs of fee waivers, and because the current fee waiver regulations are inconsistent with the beneficiary-pays principle, DHS proposed to limit fee waivers to immigration benefit requests for which USCIS is required by law to consider a fee waiver or where the USCIS Director decides a fee waiver should be available. *See* 8 CFR 106.3.

As the commenters point out, and as explained in the NPRM, USCIS issued policy guidance in 2011 to streamline fee waiver adjudications and make them more consistent across offices and form types nationwide. *See* Policy Memorandum, PM–602–0011.1, *Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule;* Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26 (Mar. 13, 2011) ("2011 Fee Waiver Policy"). The 2011 Fee Waiver Policy provided that USCIS would generally waive fees for applicants who are receiving a means-tested benefit, have a household income at or below 150 percent of the FPG, or were experiencing financial hardship. The 2011 Fee Waiver Policy interpreted 8 CFR 103.7(c) regarding what would be considered inability to pay and the evidence required. The 2011 Fee Waiver Policy established the 150 percent of the FPG income level that the commenters recommended retaining, but that policy was not binding on USCIS officers and the three criteria were not codified as a regulation. DHS proposed in the NPRM to codify an income level based on the FPG that would be a binding requirement for future fee waivers.

DHS recognizes that the FPG are not responsive to differences in the cost of living around the nation. However, DHS establishes the fee waiver eligibility criterion of household income of less than 125 percent of FPG in this final rule because it is consistent with the income necessary to provide an affidavit of support necessary to sponsor an immigrant. *See* 8 CFR 106.3(c). Furthermore, DHS does not generally provide special consideration for residents of a particular geographic area.

DHS believes that these changes will make the fee increase more equitable for all immigration benefit requests by requiring fees for services to be paid by those who benefit. In addition, DHS believes that making these changes to the fee waiver policy will ensure that fee-paying applicants do not bear the increasing costs of application fees being waived. In response to public comments received on the NPRM, DHS is expanding the immigration benefit requests for which it will accept fee waiver requests from statutorily protected populations to include Forms N–400, N–600, and N–600K. Although DHS acknowledges that the rule reduces the number of applicants eligible for fee waivers, DHS does not agree that aliens will be prevented from filing application or receiving immigrant benefits.

*Comment:* A few commenters wrote that "equity is not a federal policy goal"

and USCIS fails to recognize that encouraging exemptions and waivers for individuals in vulnerable circumstances or who are unable to pay fees would actually advance equity. The commenter stated that 125 percent of the FPG is not an appropriate marker to whether an individual can afford to pay a large fee on top of normal living expenses and so the fee waiver qualification threshold should remain at 150 percent of poverty level, "to serve as an apt indicator of whether a potential applicant for naturalization or other benefits can afford to support him- or herself and, in addition, to pay significant application fees of hundreds or thousands of dollars." Another commenter stated that DHS rationalized that 125 percent is an appropriate marker for FPG because it is the minimum required to qualify as a sponsor for an intending immigrant. The commenter stated that these situations are not comparable because sponsoring an immigrant may not cost very much, and sponsored immigrants are generally authorized to work and do not actually rely upon sponsors for subsistence. The commenter stated that in contrast, when determining eligibility for a fee waiver, USCIS must consider whether an individual can afford to pay a large fee on top of their normal living expenses, and it is therefore appropriate that FPG remain at 150 percent.

Several commenters provided figures of the numbers of clients they serve who are below the 150 percent FPG line and qualify for waivers. A commenter specifically calculated the costs that a family at the 150 percent FPG limit would face living in Boston, writing that fee waivers are vital to such families maintaining their immigration status or naturalizing.

One commenter cited a study of 21 cities which showed that 33 percent of those eligible to naturalize had incomes up to 150 percent of FPG. The study also found that 16 percent of LPRs eligible to naturalize of Mexican origin have incomes between 150 and 200 percent FPG, compared to 8 percent of European-origin immigrants eligible to naturalize. The commenter used this data to support their comment that the income requirements would reduce or eliminate access to citizenship for all but the wealthy and privileged.

*Response:* The 150 percent of the FPG threshold currently used for fee waiver eligibility is higher than the threshold used in the public charge inadmissibility and affidavit of support contexts. DHS has decided that limiting fee waivers to households with incomes at or below 125 percent of the FPG is appropriate because it would be consistent with other determinants of

low income or financial wherewithal used in USCIS adjudications, such as the affidavit of support requirements under INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4) and 1183a. *See* 8 CFR 106.3(c). DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter stated that USCIS should respect the rights of veterans to petition for a fee waiver for spouses and children regardless of income.

*Response:* DHS appreciates the sacrifices of members of the Armed Forces and veterans. USCIS charges no Form N–400 fee to an applicant who meets the requirements of INA sections 328 or 329 with respect to military service as provided by the law. *See* 8 CFR 106.2(b)(3)(c). In addition, there is no Form N–600 fee for any application filed by a member or veteran of any branch of the U.S. Armed Forces. *See* 8 CFR 106.2(b)(63)(c). DHS proposed adjustments to USCIS' fee schedule to ensure full cost recovery. DHS did not target any particular group, or class of individuals or propose changes with the intent to deter requests from any immigrants based on their financial or family situation or to block individuals from access immigrant benefits. With limited exceptions as noted in the NPRM and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This rule is consistent with DHS's legal authorities. See INA section 286(m), 8 U.S.C. 1356(m). DHS proposed changes in fee waiver policies to ensure that those who benefit from immigration benefits pay their fair share of costs, consistent with the beneficiary-pays principle as described in the Government Accountability Office report number GAO–08–386SP. In addition, there is no law that requires a fee waiver or exemption for spouses or children of members of the Armed Forces or veterans. DHS declines to make changes in this final rule in response to these comments.

3. Means-Tested Benefits

*Comment:* A commenter recommended that USCIS use proof of receipt of a means-tested public benefit as evidence to demonstrate inability to pay the prescribed fee under the new rule.

*Response:* The commenter is requesting that USCIS continue to follow guidance that USCIS issued

under its previous fee waiver regulations. Before 2010, USCIS allowed fee waiver applicants to submit requests in a variety of ways and undertook a holistic analysis of the applicant's finances to determine inability to pay. 75 FR 58974. In 2010, DHS decided that the USCIS fee waiver process would benefit from standardization. *Id.* By the 2010 rule DHS amended 8 CFR 103.7(c) to provide, on a discretionary basis, fee waivers for certain services, subject to two conditions: (1) The applicant is "unable to pay" the fee; and (2) a "waiver based on inability to pay is consistent with the status or benefit . . . ." 8 CFR 103.7(c)(1). DHS also required that waiver requests be in writing and state the reasons for and provide evidence in support of the claim of inability to pay. *Id.* at 103.7(c)(2). After the 2010 rule, DHS developed a new form to facilitate the fee waiver process: Request for Fee Waiver, Form I–912.[49] *See* Agency Information Collection Activities: Form I–912; New Information Collection; Comment Request, 75 FR 40846 (July 14, 2010). USCIS also published the 2011 Fee Waiver Policy providing further guidance as to adjudication of fee waiver requests. The 2011 guidance provided that as proof of inability to pay under 8 CFR 103.7(c), USCIS would accept: (1) Evidence of receipt of a means-tested benefit; (2) evidence of household income at or below 150 percent of the FPG; or (3) evidence of financial hardship.

In the NPRM, DHS proposed multiple changes to the then-existing fee waiver regulations, explained our need to and reasoning for doing so, and in accordance with the Paperwork Reduction Act, posted the proposed revised Form I–912, Request for Fee Waiver, and its instructions in this final rule's docket for the public to review and comment on its information collection requirements. *See* 84 FR 62296–62301, and 62356. The proposed regulations for fee waivers provided that DHS would provide, on a discretionary basis, fee waivers for certain services, subject to the following conditions: (1) A waiver of fees would be limited to aliens with annual household incomes at or below 125 percent of the FPG; (2) a waiver of fees would not be provided to a requestor who is seeking an immigration benefit for which he or she: Is subject to the affidavit of support requirements under INA section 213A, 8 U.S.C. 1183a, and is already a sponsored immigrant as defined in 8 CFR 213a.1, or is subject to the public charge

inadmissibility ground under INA section 212(a)(4), 8 U.S.C 1182(a)(4); and (3) a request for a fee waiver must be submitted on the form prescribed by USCIS in accordance with the form instructions. Proposed 8 CFR 106.3(d); 84 FR 62363.

DHS is adopting the general fee waiver eligibility guidelines as proposed with a clarification. New 8 CFR 106.3. Proposed 8 CFR 106.3(d)(1) and (d)(2) (not permitting a fee waiver for a requestor who is subject to the affidavit of support, already a sponsored immigrant, or subject to the public charge inadmissibility ground) are not applicable to applicants who are statutorily eligible for fee waivers or those additional immigration benefit requests (SIV and certain SIJ applicants) that we are making eligible for a fee waiver in this final rule. Therefore, DHS removed those limitations from the general fee waiver provision and included it in 8 CFR 106.3(b) governing waivers provided by the USCIS Director. New 8 CFR 106.3.

By removing the more ambiguous term "inability to pay" in favor of more clearly defined, straightforward requirements, DHS is imposing on the fee waiver request process greater consistency and equity. Receipt of any means-tested benefit would no longer automatically satisfy the new regulation's requirements for demonstrating inability to pay. USCIS has also considered if means-tested benefits that are awarded using 125 percent of the FPG would be acceptable evidence of the 125 percent of the FPG household income requirement in addition to the other criteria in new 8 CFR 106.3(d). However, implementing that criterion would require USCIS to determine the income requirements that all jurisdictions across the United States use to determine eligibility for each means-tested benefit. In addition, USCIS would be required to continually monitor those requirements for any changes by individual jurisdictions and programs. Therefore, DHS has determined that such a policy would be unnecessarily burdensome for USCIS to administer and decided not to revise the Form I–912 instructions to permit any usage of a means-tested benefit as evidence for a fee waiver.

*Comment:* One commenter noted that using the Paperwork Reduction Act to introduce a revised fee waiver form, with new requirements, in October 2019 in lieu of using a NPRM and then eliminating fee waivers in this rule, was a waste of the public's time to review both documents. A few commenters stated that eligibility based on receipt of a means-tested benefit was due to be

[49] The form is now called Form I–912, Request for Fee Waiver.

AR2022_200425

eliminated by the revised fee waiver form challenged in *City of Seattle* v. *DHS,* 3:19–cv–7151–MMC (N.D. Cal., filed Oct. 31, 2019) but the court in that case preliminarily enjoined the revised fee waiver form on a nationwide basis, thereby affecting USCIS' plans to constrict eligibility standards for fee waivers. Other commenters stated that USCIS has already eliminated the means-tested benefit criterion for fee waivers, which drastically limited access to immigration benefits, and that the proposed rule narrows the criteria for fee waivers even further and eliminates the financial hardship criterion entirely which means 400,666 individuals annually would be detrimentally affected. Another commenter stated that changes in Form I–912 and fee waiver requirements in the NPRM are an attempt to get around the injunction of the 2019 fee waiver rules because it eliminates fee waivers for most applicants. The commenter stated that the proposal seeks to restrict legal immigration and naturalization for poor and non-white people. Another commenter recommended that while the Form I–912 revision is enjoined by the U.S. District Court for the Northern District of California, USCIS should request public comment on a new proposed Form I–912 that maintains options to demonstrate qualification through receipt of means-tested benefits, financial hardship, or income of up to 150 percent of the FPG. The commenter wrote that USCIS is required by the injunction to restart the information collection request clearance process anew for a revised Form I–912 that conforms to the Court's decision. The commenter wrote that the Form I–912 proposed with the USCIS's November 14, 2019 NPRM does not meet the Court's specifications, and USCIS may not move forward with implementation of this revised Form I–912 based on the present notice-and-comment process.''

*Response:* These comments refer to the effort by USCIS to revise the USCIS policy guidance on fee waivers. On September 28, 2018, USCIS published a 60-day notice in the **Federal Register** requesting comments on the then-proposed revised Form I–912 and instructions and posted the documents for review in docket USCIS–2010–0008 at *www.regulations.gov. See* 83 FR 49120 (Sept. 28, 2018). The revisions to Form I–912, Request for Fee Waiver, revised the evidence USCIS would consider in evaluating inability to pay, required federal income tax transcripts to demonstrate income, and required use of the Form I–912 for fee waiver requests. USCIS complied with the Paperwork Reduction Act and the Office of Information and Regulatory Affairs, OMB (OIRA) approved the form changes on October 24, 2019.[50] On October 25, 2019, USCIS published the revised Form I–912 and instructions, along with corresponding revisions to the USCIS Policy Manual and a Policy Alert. The revised Form and Manual took effect on December 2, 2019.

DHS did not consider this rulemaking's impact when undertaking the Form I–912 revisions that took effect on December 2, 2019, because DHS was proposing comprehensive reforms to fee waivers which were not certain to occur and the rulemaking was separate and independent of the form and policy change that took effect on December 2, 2019. USCIS was forgoing hundreds of millions of dollars each year to fee waivers, and it decided not to wait for the comprehensive DHS fee rulemaking while it continued to forgo increasing amounts of revenue as more fees were waived. 84 FR 26138 (June 5, 2019). Nonetheless, on December 11, 2019, the U.S. District Court for the Northern District of California held that the Form I–912 revisions that took effect on December 2, 2019 required notice and comment rulemaking to effectuate, and the revised Form I–912, the Policy Manual revisions, and an October 25, 2019 Policy Alert announcing the revisions were preliminarily enjoined nationwide. *See* Order Granting Pls.' Mot. for Nationwide Prelim. Inj., *City of Seattle* v. *DHS,* 3:19–cv–7151–MMC (N.D. Cal., Dec. 11, 2019). By stipulation of the parties and as agreed to by the court, that injunction will remain in place pending publication of this final rule. The injunction in *City of Seattle* does not impose any requirements on subsequent revisions of the Form I–912 nor otherwise affect USCIS's ability to move forward with implementation of the Form I–912 revised in accordance with the notice-and-comment process completed by this rulemaking. In fact, the injunction in *City of Seattle* contemplates that the 2019 fee waiver policy changes were lawful but for compliance with the procedures required by the Administrative Procedure Act that are met by publication of this final rule.

*Comment:* Commenters stated that proving household income through USCIS' process is needlessly burdensome, intended to discourage applications, and that the fee waiver application process and 125 percent FPG limit is duplicative with means-testing requirements for other government programs where individuals have already passed a thorough income eligibility screening by government agencies. Several commenters specifically requested maintaining the means-tested benefits criterion as it is the least burdensome and most accessible application criterion for vulnerable immigrant populations.

*Response:* DHS understands that removing the means-tested benefit criterion will require people to obtain different documentation than they previously would have to establish eligibility for a fee waiver. DHS agrees that the burden will increase but has determined that the documentation required to establish income is the best approach to establish eligibility. DHS does not believe that the burden that will be imposed by the new requirements is excessive for a requestor to receive the free adjudication of his or her immigration benefit request. USCIS is 96 percent funded by fees and must charge fees to cover its costs. Although the means-tested benefits criterion will no longer be an option under the revised fee waiver regulations, eligible applicants may request fee waivers under the criterion of having income at or below 125 percent of the FPG. Thus, staff and volunteers at nonprofit community organizations should already be familiar with the remaining criterion for fee waiver eligibility. DHS has considered the burden on applicants and those that provide them aid and determined that the benefits of the policy change exceed the potential additional burden. DHS disagrees that its fee waiver income requirements are duplicative with state means-tested benefit requirements because, as stated earlier, many public benefits have different income thresholds for eligibility in different states. Therefore, DHS has determined that relying on a consistent income threshold and not using a means-tested benefits for eligibility will best provide consistency in applying the requirements.

4. Public Charge Rule

*Comment:* Comments stated that DHS claims that USCIS uses 125 percent of the FPG as the standard for public charge and affidavit of support purposes and cites 8 CFR 212.22(b)(4)(i)(A), but DHS's proposed public charge rule is currently enjoined. The commenters state that because of court orders, USCIS has not been using 125 percent of the federal poverty guidelines as the standard for public charge purposes to date, and this rule is an improper attempt to codify the enjoined public charge rule.

---

[50] The approved package is available at *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201910-1615-006#* (last visited Feb. 17, 2020).

*Response:* On February 24, 2020, DHS implemented the Public Charge Grounds Final Rule nationwide after the Supreme Court of the United States stayed the last remaining injunction.[51] In addition, the 125 percent of the FPG threshold is not only used in public charge inadmissibility determinations, but also is the standard by which the sufficiency of an affidavit of support is based, as established by Congress under INA section 213A, 8 U.S.C. 1183a. As provided in the NPRM, USCIS generally uses 125 percent of the FPG as the minimum income threshold to be considered a positive factor in the totality of the circumstances in public charge inadmissibility determinations as the threshold. Congress also identified 125 percent of FPG as a threshold for establishing the sufficiency of the affidavit of support under INA section 213A, 8 U.S.C. 1183a. The threshold for fee waiver eligibility under previous regulations of 150 percent of the FPG was higher than the threshold used in the public charge inadmissibility and affidavit of support context. DHS believes limiting fee waivers to households with incomes at or below 125 percent of the FPG, as set forth in this final rule, and aligning the fee waiver rule with the public charge inadmissibility rule and the affidavit of support requirements set forth in INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4) and 1183a, will best provide consistency in applying the income requirements in immigration benefit administration.

5. Financial Hardship

*Comment:* One commenter wrote that the proposed elimination of fee waiver eligibility based on extraordinary hardship (sic financial hardship) was not explained and is alarming and unjustified. USCIS does not acknowledge or explain its apparent decision to cease accepting evidence or granting fee waivers related to temporary illness and injury, recessions, bankruptcy, or any other of the myriad situations that may render qualified people unable to pay fees but that cannot be characterized as natural disasters. The commenter wrote that this change would prevent deserving individuals from accessing immigration and naturalization benefits and violate the principles of due process that govern rulemaking and other federal administrative action.

*Response:* DHS believes that a provision for financial hardship is unnecessary as past fee waivers

requested using the financial hardship criterion were minimal, accounting for only 1.2 percent of all requests. A detailed distribution of the approved Fee Waiver Requests can be found in the RIA. *See* Section D, Tables 5–8. While DHS acknowledges that the fee adjustments established in this final rule are not insubstantial to an applicant of limited means, DHS does not believe that they make immigration benefits inaccessible to low income applicants who have financial hardships. DHS is therefore not making changes based on this comment.

6. Public Charge Ground of Inadmissibility and Affidavit of Support Requirements

*Comment:* Several commenters disagreed with USCIS' claim that it would be appropriate to restrict household income criteria to 125 percent FPG to be consistent with the public charge inadmissibility final rule and the statutory and regulatory requirement applicable to affidavit of support, writing that they are separate and unrelated legal concepts. Multiple commenters opposed the proposal to make fee waivers unavailable to applicants who are subject to the public charge ground of inadmissibility, those who are subject to the affidavit of support requirement under INA section 213A, 8 U.S.C. 1183a, and those who are already sponsored immigrants. The commenters stated that the proposal would disproportionately harm low- and moderate-income families, including many immigrant survivors and their children. Many commenters stated that most family-sponsored immigrants must supply an affidavit of support regardless of income. They stated that, because the affidavit of support contract terminates only after specific criteria are met (*e.g.,* sponsored immigrant becomes a U.S. citizen, dies, or departs the United States), barring these immigrants from receiving fee waivers would result in an additional barrier for low-income immigrants regardless of their actual need and would have a disproportionate effect on low-income Asian immigrants and U.S. citizens of Asian descent, especially as most Asian immigrants become permanent residents through family sponsorship and require affidavits of support. A commenter wrote that the proposal will further punish people who have the misfortune of poor health, are struggling to survive, and have chronic, severe pain. The commenter wrote that such individuals are too sick to work full-time and require an affidavit of support from family members or friends. A few commenters

expressed worry that barring fee waivers for individuals subject to the public charge ground of inadmissibility would add more strain on an already overburdened legal service providers to low-income immigrants, resulting in a general decrease in capacity of pro bono services. A few commenters stated that there is no burden on USCIS to continue processing fee waiver applications for immigrants subject to affidavit of support nor any basis to disqualify those subject to affidavits of support from receiving fee waivers.

*Response:* DHS agrees that, in general, family sponsored immigrants are subject to the public charge ground of inadmissibility and are required to submit a sufficient affidavit of support under INA section 213A, 8 U.S.C. 1883a, and therefore may not be eligible to request a fee waiver under this final rule. The NPRM generally limited fee waiver eligibility to those statutorily eligible for fee waivers, which are limited to VAWA, T, U and TPS applicants. Family and employment related benefit requests were not generally included as being eligible for fee waivers in the NPRM. As discussed in the NPRM, under IIRIRA, certain immigrant categories are required to submit an enforceable affidavit of support executed by a sponsor.[52] Although sponsors are not required to assist an alien with fees associated with immigration benefits, sponsors generally must demonstrate that they are able to maintain the sponsored alien at an annual income of not less than 125 percent of the FPG.[53] INA section 213A, 8 U.S.C. 1183a, formalized requirements of a legally enforceable affidavit of support, specified who is eligible to be a sponsor, which aliens require an Affidavit of Support Under Section 213A of the INA, the scope of a sponsor's obligations, and how the affidavit may be enforced.[54] These provisions were intended to ''encourage immigrants to be self-reliant in accordance with national immigration policy.''[55] DHS believes it is inconsistent with the affidavit of

---

[51] *See Wolf* v. *Cook County,* 140 S.Ct. 681 (2020).

[52] *See* INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4), and 1183a. See also Div. C, Title V of Public Law 104–208, 110 Stat. 3009, 3009–670 (September 30, 1996).

[53] *See* INA section 213A. A sponsor who is on active duty (other than active duty for training) in the U.S. armed forces and who is petitioning for a spouse or child only has to demonstrate the means to maintain an annual income equal to at least 100 percent of the FPG.

[54] See INA section 213A, 8 U.S.C. 1183a. See Section 551 of the IIRIRA, Public Law 104–208, 110 Stat. 3009 (1996).

[55] See H.R. Rep. 104–828, at 241 (Sept. 24, 1996) (Conf. Rep.).

support requirements to allow this population to request fee waivers.[56]

Further, the current fee waiver regulation allows people who are applying for immigration benefits for which a public charge inadmissibility determination is not made—advance permission to enter as a nonimmigrant, a waiver for passport and/or visa, adjustment of status, or a waiver of the grounds of inadmissibility—to file a fee waiver request. *See* 8 CFR 103.7(c)(4) (stating that certain fees may be waived "only for an alien for which a determination of their likelihood of becoming a public charge under section 212(a)(4) of the Act is not required at the time of an application for admission or adjustment of status").

The rule provides that an alien who is subject to the affidavit of support requirements under INA section 213A, 8 U.S.C. 1183a, or is already a sponsored immigrant as defined in 8 CFR 213a.1 unless the applicant is seeking a waiver of the joint filing requirement to remove conditions on his or her residence based on abuse; or subject to the public charge inadmissibility ground under INA section 212(a)(4), 8 U.S.C. 1182(a)(4) is not eligible for a fee waiver. See New 8 CFR 106.3(b). DHS declines to make any changes in this final rule in response to these comments.

*Comment:* One commenter stated that the proposal would place an unnecessarily cumbersome requirement on those who are already receiving some form of assistance and require additional assistance in order to improve their immigration status. Another commenter stated that many survivors of crime and domestic violence would be negatively impacted because many survivors receive CalWORKS, a California public benefits program.

A commenter stated that the proposal is unfair and discriminatory because it could severely affect the naturalization process based on receiving public benefits, even if this occurred years before an application for citizenship. The commenter also stated that temporary assistance in a time of hardship should not be an opportunity for any country to deny its people the path to citizenship.

*Response:* This final rule does not prevent individuals from requesting or receiving any public benefits, as defined in, PRWORA, 8 CFR 212.21(b), or other provision, for which they are eligible. Further, this final rule does not consider the receipt of public benefits as part of the eligibility requirements. Instead,

DHS would look to the immigrant or nonimmigrant category the alien holds or is seeking and their income in order to determine whether he or she qualifies to submit a fee waiver request.

DHS notes that VAWA self-petitioners as defined under INA section 101(a)(51) and anyone otherwise self-petitioning due to battery or extreme cruelty pursuant to the procedures in section 204(a), 8 U.S.C. 1101(a)(51) and 1154(a), T nonimmigrants, U nonimmigrants, battered spouses of A, G, E–3, or H nonimmigrants, battered spouses or children of a lawful permanent resident or U.S. citizen as provided under INA section 240A(b)(2), and TPS applicants are generally not subject to the public charge inadmissibility provision or the affidavit of support requirements. Therefore, under this final rule, these applicants are not precluded from requesting a fee waiver. *See* 8 CFR 106.3. Furthermore, certain Special Immigrant Juveniles and Afghan and Iraqi translators are also not precluded from requesting a fee waiver under this final rule, as they are not subject to the public charge inadmissibility determination or the affidavit of support requirement.[57] *Id.* DHS has updated the provision to clarify these aliens are not subject to these eligibility requirements. See new 8 CFR 106.3(c).

*Comment:* Multiple commenters said that, because abusive spouses may be the sponsor holding the affidavits of support, it was critical to keep fee waivers available to those subject to the affidavit of support under INA section 213A, 8 U.S.C. 1183a. The commenter wrote that doing so would help ensure that immigrant survivors are not compelled to return to their abusers to seek immigration benefits.

*Response:* An applicant under the VAWA provisions is generally not subject to the affidavit of support requirements.[58] In addition, fee waiver requests do not require information regarding the income of an abusive spouse. DHS believes that its continued provision of fee waivers for VAWA, T, and U categories mitigates any concerns that changes to fee waiver eligibility will unduly burden or otherwise harm the victims of abusive spouses. *See* Table 3: Categories and Forms Without Fees or Eligible for Fee Waivers. DHS declines to make changes in this final rule in response to these comments.

**7. Discretionary Fee Waivers**

*Comment:* Several commenters opposed narrowing discretionary authority that would prevent many family-based immigrants from receiving fee waivers and would disadvantage recipients of certain humanitarian benefits, such as Special Immigrant Juveniles (SIJs) and Cuban Adjustment Act applicants.

Some commenters said the proposed limitations on the Director's discretion to grant fee waivers are arbitrary and unsupported by any evidence. The commenters stated that no explanation, data, or examples were provided indicating why the concern over the Director having too much discretion requires changing well-established precedent. Another commenter stated that the rule does not provide a basis for the guidelines of how the Attorney General shall determine which designated group of victims of calamities will be granted access to fee waivers.

*Response:* In this final rule, DHS retains the authority in the regulations for the Director of USCIS to waive any fee if the Director determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. DHS notes that the Director's discretionary provision has never been and is not intended for whole categories of aliens to request fee waivers directly to the Director. *See* 75 FR 58974 (encouraging those who believe that they have a sufficiently sympathetic case or group of cases in any type of benefit request to submit a request to their USCIS local office for a waiver under 8 CFR 103.7(d)). The discretionary provision is meant to provide for discrete and limited fee waivers when there are emergent circumstances. *See* 75 FR 33464. DHS has further consolidated the Director's discretionary provisions as it is not limited by category but is also not intended to allow for individual applications from broad categories of individuals. In addition the provisions regarding eligibility were consolidated to clarified who may not qualify based on the alien being subject to the affidavit of support requirements under section 213A of the Act or already a sponsored immigrant as defined in 8 CFR 213a.1 (unless the applicant is seeking a waiver of the joint filing requirement to remove conditions on his or her residence based on abuse), or being subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

---

[56] See Div. C, Title V of Public Law 104–208, 110 Stat. 3009, 3009–670 (September 30, 1996).

[57] *See* INA sections 212(a)(4) and 213A,8 U.S.C. 1182(a)(4) and 1183a. *See also* 8 CFR 212.23(a)(4) and (10).

[58] *See* INA section 212(a)(4)(E)(i), 8 U.S.C. 1182(a)(4)(E)(i). *See also* 8 CFR 212.23(a)(20).

Further, DHS does not believe that the rule disadvantages recipients of humanitarian benefits. For example, DHS believes that the imposition of a fee or a lack of a fee waiver does not infringe upon the ongoing protections offered by the Cuban Adjustment Act of 1966 (CAA). The CAA allows Cuban natives or citizens living in the United States who meet certain eligibility requirements to apply to become lawful permanent residents.[59] Applicants under the CAA have previously paid fees. Under the CAA, a native or citizen of Cuba who has been inspected and admitted and paroled into the United States and who has been physically present in the United States for at least one year may apply for permanent residency in the United States. An alien under the CAA submits Form I–485, Application to Register Permanent Residence or Adjust Status, and does not need to file a visa petition or have an immigrant visa immediately available to him or her.[60] Generally, when an alien has a pending Form I–485, he or she may apply for employment authorization by filing a Form I–765, Application for Employment Authorization.[61] For this reason, DHS believes that aliens who benefit from the CAA have unique advantages compared to other humanitarian populations, such as asylum seekers, who may have to wait months or years before being eligible to apply to become a lawful permanent resident. The CAA does not prohibit the charging of fees for applicants, and DHS believes that the imposition of a fee or a lack of a fee waiver does not infringe upon the ongoing protections that the CAA affords to qualified individuals.

As provided in the NPRM, USCIS will continue to notify the general public of eligibility for fee waivers for specific forms under 8 CFR 106.3 through policy or website updates. Individuals who may qualify for such a fee waiver will still need to meet the requirements to request a fee waiver as provided in 8 CFR 106.3(b) and (d).

As discussed above, in response to commenters' concerns, DHS will allow petitioners for and recipients of SIJ classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, to submit requests for fee waivers for Form I–485 and associated forms, as well as Forms N–400, N–600, and N–600K. *See*

Table 3: Categories and Forms Without Fees or Eligible for Fee Waivers.

*Comment:* A few commenters wrote that, at a minimum, USCIS should allow a proactive application process for discretionary fee waivers. These would allow individuals to alert USCIS to their need for a waiver of an application fee rather than having to wait to receive an invitation from USCIS first.

*Response:* DHS has clarified the USCIS Director's fee waiver provision at 8 CFR 106.3(b) and 106.3(c) in this final rule because it was not necessary to have a separate section authorizing the Director to waive fees for groups or individuals. See new 8 CFR 106.3(b). Proposed 8 CFR 106.3(c) could be used to grant group or individual fee waivers, thus proposed 8 CFR 106.3(b) was redundant. As provided in new 8 CFR 106.3(b), the Director of USCIS may authorize the waiver, in whole or in part, of a form fee required by 8 CFR 106.2 that is not otherwise waivable under this section, if the Director determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. New 8 CFR 106.3(b) authorizes the Director to designate a group eligible for fee waivers as appropriate. As previously indicated, DHS notes that the Director's discretionary provision has never been and is not intended for whole categories of aliens to request fee waivers directly to the Director. *See* 75 FR 58974. Although many applicants may believe they personally need a waiver of an application fee, the discretionary provision is meant to provide for discrete and limited fee waivers when there are emergent circumstances and the other eligibility requirements are met. Therefore, DHS is maintaining the provision that individuals may not directly submit requests for fee waivers to the USCIS Director.

*Comment:* The commenter stated that the proposal to make Form I–765 fee waivers discretionary for affirmative asylum seekers may cause additional burdens for low-income households.

*Response:* DHS acknowledges the commenter's concern; however, as stated in the NPRM and in this final rule, fee waivers for the Form I–765 will not be available to asylum seekers. *See* 84 FR 62296–62301. USCIS is continuing to provide a fee exemption for the initial Form I–765 filing for individuals who were granted asylum (asylees) or who were admitted as refugees. Therefore, there is no fee waiver request necessary for asylees filing an initial Form I–765. Asylees and refugees will generally continue to be

required to pay the relevant fee for renewal EADs. As indicated previously, DHS has clarified the provisions regarding the USCIS Director's discretion as it relates to fee waivers in 8 CFR 106.3(b), as the individual provision in the proposed 8 CFR 106.3(b) was redundant.

### 8. Fee Waiver Documentation

*Comment:* A commenter recommended that USCIS expand the types of documentary evidence accepted in support of fee waiver applications. Several commenters stated that applicants should not be required to procure additional new documents, such as federal tax transcript, to demonstrate household income. The commenters stated that, obtaining a transcript would substantially complicate the process of applying for a fee waiver because individuals may not have access to a computer and several days to six weeks or more may be required to wait on delivery via the mail. Some commenters indicated that the proposal creates a burdensome new requirement that many applicants will be unable to meet, either because it's too difficult to obtain the documentation or because they were too poor to file taxes with a foreign government.

*Response:* USCIS currently requests copies of income tax returns from applicants requesting fee waivers. Tax transcripts are easily requested through the Internal Revenue Service (IRS) website or paper filing and are free to taxpayers. USCIS cannot accept incomplete copies of tax returns or copies that are not signed or submitted to the IRS to support fee waiver requests, because they may not validly reflect the applicant's household income. USCIS believes that the proposed change will reduce its administrative burden for fee waiver processing and reduce the number of fee waiver requests that are rejected because of improper documentation, inadequate information, and no signatures for household members. In terms of the non-filing letter from the IRS, USCIS is concerned about not receiving documentation of no-income. Therefore, obtaining information from the IRS in transcripts, a W–2, or proof of non-filing, if applicable, is sufficient documentation to establish the necessary income or no income. DHS believes that, while this might place a small additional burden on applicants, the change will ultimately benefit applicants by mitigating future rejections and ensuring that fees are waived for deserving applicants.

*Comment:* A commenter stated the proposed changes would increase the

[59] See *https://www.uscis.gov/greencard/caa* (last accessed 03/10/2020).

[60] See Public Law 89–732 (1966).

[61] See *https://www.uscis.gov/greencard/caa* (last accessed 03/10/2020).

inefficiencies in processing fee waiver requests, place an unnecessary burden on the Internal Revenue Service (IRS) for requests for documentation from immigrants, and add burden on USCIS increasing the complexity of adjudicating fee waiver requests. Plus, USCIS would need to continuously track the IRS transcript request processes.

*Response:* As part of its regular operations, the Internal Revenue Service (IRS) provides customer service including providing tax transcripts. Tax transcripts can be obtained by calling the IRS or submitting a request online, through the mail or by fax. As the IRS, and other federal, state, and local agencies regularly provide information and services to their customers as part of their daily operations, the proposed form changes should have a minimal impact on them. The Department of the Treasury was provided with the proposed and final rule to review, and they did not object to the requirement for the tax transcript.

*Comment:* A commenter stated that requiring separate fee waiver submissions for derivative family members was overly burdensome and provided USCIS data to demonstrate that survivors applying for humanitarian protections frequently included derivative family members in their applications. Many commenters stated that requiring each applicant to submit their own form when applying for fee waivers imposes a large, duplicative burden on applicants. Commenters recommended that family members should be allowed to continue submitting a single fee waiver application with all relevant information collected in one location. Another commenter said survivors applying for humanitarian protections frequently included derivative family members in their applications and provided USCIS data to demonstrate this fact.

*Response:* Over 90 percent of the fee waiver requests filed were for individual applicants[62] and many other forms are already required to be submitted individually. Therefore, DHS does not believe that requiring Form I–912 for each applicant or petitioner in a household will unduly burden applicants. The change will reduce the number of fee waiver requests that are rejected for failure to obtain all signatures of included family members. DHS has determined that the benefit of fewer rejections exceeds the small

increase in burden that this change may add for a small percentage of fee waiver requests.

*Comment:* A commenter recommended that USCIS continue to allow use of applicant generated, non-form fee waiver requests and objected to option of a written statement being eliminated from Form I–918, Petition for U Nonimmigrant Status.

*Response:* Adjudicating ad hoc fee waiver requests has proven to be difficult for USCIS due to the varied quality and information provided in ad hoc letter requests. Form I–912 is easy to complete, and it provides standardization that will assist USCIS in our review of requests. In addition, there is no filing fee for Form I–918. Therefore, DHS declines to make changes in this final rule in response to this comment and will require submission of Form I–912 to request a fee waiver.

## 9. Cost of Fee Waivers

*Comment:* Many commenters stated that DHS' application of the beneficiary-pays principle is arbitrary, capricious, unsupported, and unjustified. Commenters indicated that restricting the income requirements from 150 percent of FPG to 125 percent is unjustified, especially because DHS did not estimate how many people the change would affect. Multiple commenters opposed the beneficiary-pay model as it would not be a fair or just system, writing that it ignores the inequities that exist across incomes and that the ability-to-pay model has been working for years. A commenter wrote that DHS' justification that the use of fee waivers have increased in a good economy was faulty, writing that DHS cited statistics for USCIS fee waivers from FY 2008 to 2011—a period of economic recession. Another commenter said that DHS' argument that fee waivers have become too costly to sustain fails to account for recent fee increases or indicate whether fee waiver volume has changed. The commenter wrote that fee waivers between 2016 and 2017 did not increase and the NPRM does not acknowledge the recent decline in fee waivers in FY 2018.

*Response:* DHS explained in the NPRM that fee waivers had increased to unmanageable levels and that DHS had to do something to curtail the amount of free services being provided by USCIS. In prior years, USCIS' fees have given significant weight to the ability-to-pay principle and shifted the costs of certain benefit requests to other fee payers. In the FY 2016/2017 fee rule, DHS noted that the estimated annual forgone revenue from fee waivers and

exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review.[63] *See* 81 FR 26922 and 73307. In the FY 2016/2017 NPRM, DHS estimated that the increase in fee waivers accounted for 9 percent of the 21 percent weighted average fee increase. *See* 81 FR 26910. In the same NPRM, DHS provided notice that in the future it may revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c). *See* 81 FR 26922.

In this final rule, DHS is aligning USCIS' fees more closely to the beneficiary-pays principle. Without the changes to fee waiver policy implemented in this final rule, fees would increase by a weighted average of 30 percent, which is 10 percent more than in the fee schedule implemented in this final rule. In an effort to mitigate the total weighted average fee increase and preserve equitable distribution of costs for adjudication and naturalization services, DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters stated that USCIS' justification to make the fee schedule more equitable with the beneficiary-pays approach fails to consider the effect on applicants or benefits resulting from fee waivers. A few commenters stated that setting fees at full cost recovery would be inadequate as it does not take into account the benefits side of the equation, such as the added earnings of citizenship relative to prior earnings as a legal immigrant. The commenters stated that including benefits would show that all costs are indeed paid and covered.

A few commenters wrote that USCIS has taken actions that increase operating costs (*e.g.,* extreme vetting, re-interviewing individuals, enhanced background checks, decrease in staffing) which the department now seeks to pass onto the public via the beneficiary-pays principle and by eliminating fee waivers.

*Response:* Consistent with historical practice, this final rule sets fees at a level to recover the estimated full operating costs of USCIS, the entity within DHS that provides almost all immigration adjudication and

---

[62] *See* Tables 10–11. Distribution of Total Approved Applicants per Fee Waiver Request (Form I–912) in the RIA.

[63] Since USCIS includes a projection for fee waivers/fee exemptions when setting its fees to recover full cost, it does not forgo revenue unless the total dollar amount of actual fee waivers/fee exemptions exceeds the projected amount that was included in the fee setting process. The dollar amount of actual fee waivers/fee exemptions in excess of the projected amount included in the fee setting process is considered foregone revenue.

naturalization services. *See* Homeland Security Act of 2002, Public Law 107–296, sec. 451, 116 Stat. 2142 (Nov. 26, 2002) (6 U.S.C. 271). The statute authorizes recovery of the full costs of providing immigration adjudication and naturalization services. As provided in the NPRM and RIA, the fees account for all anticipated operational costs and adjudicative actions based on the best information available at the time USCIS conducted the FY 2019/2020 fee review.

DHS considered the effects of the revised fee schedule on applicants and petitioners, as documented in the RIA, Final Regulatory Flexibility Analysis (FRFA), SEA and relevant sections of this final rule. As noted elsewhere in this preamble, DHS is not required to conduct a cost-benefit analysis of the impacts on all applicants of each change in a fee or change in USCIS fees or fee-related regulations. As stated elsewhere in this preamble,[64] DHS is required by OMB Circular A–4 to include all total projected costs, benefits, and transfers annualized and monetized over a specified implementation period, which for this final rule is 10 years. The final rule intends to merely recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services, including services provided without charge to asylum applicants and other immigrants.

However, this rule sets fees to offset USCIS costs to provide immigration adjudication and naturalization services at an adequate level. DHS anticipates that applicants and petitioner will consider the potential benefits, including the potential for increased earnings as noted by the commenter, weigh those benefits against the cost of applying, including the fee, and decide if the benefits outweigh the costs. DHS believes that many LPRs will determine that the benefits of naturalization, including the prospect of additional earnings, exceed the cost of the fee for Form N–400.

*Comment:* Another commenter wrote that there are errors and a lack of supporting documentation in the NPRM. They stated that this lack of information made it impossible to verify or understand calculations that USCIS relies on to justify the proposed changes to the fee waivers. The commenter provided the following examples and criticisms:

[64] Section IV A, Statutory and Regulatory Requirements, Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs).

• ''In the FY 2019/2020 fee review, USCIS determined that without changes to fee waiver policy, it would forgo revenue of approximately \$1,494 million.''—supporting document states foregone revenue for 2017 was \$367,243,540.
• ''The proposed fee schedule estimates \$962 million forgone revenue from fee waivers and fee exemptions.''—no supporting documents.
• ''The difference in forgone revenue is \$532 million.''—no supporting documents.
• ''Without changes to fee waiver policy, fees would increase by a weighted average of 31 percent, which is 10 percent more than in the proposed fee schedule.''—no supporting documents.
• ''As shown in the supporting documentation for this rule, the number and dollar volume of fee waiver requests and foregone revenue has trended upward during periods of economic improvement. That indicates that, should the economy worsen, the number of fee waiver requests will increase to a level that could threaten the ability of USCIS to deliver programs without disruption.''—While there is supporting documentation for this statement, its meaning is unclear as no analysis is given comparing the fee waiver usage to economic performance.
• ''In the FY 2016/2017 fee rule, DHS noted that the estimated annual forgone revenue from fee waivers and exemptions has increased markedly, from \$191 million in the FY 2010/2011 fee review to \$613 million in the FY 2016/2017 fee review.''
• USCIS miscalculated the surcharge needed to add onto other fees to make up for lost revenue.

*Response:* All examples cited by the commenter do not directly impact fee calculations. Rather, they are byproduct estimates of multiple operational data elements including fees, workload receipts, and fee-paying receipts. Additional information on the historical dollar value of approved fee waiver requests is located in the supporting documentation that accompanies this final rule. Additionally, DHS used the best available information at the time it conducted the FY 2019/2020 fee review to calculate fees and does not calculate a surcharge to add onto other fees. Instead, it estimates the total cost of performing USCIS' anticipated workload by form and divides those costs by the estimated fee-paying volume for each form.

Regarding the commenter's question about the volume of fee waiver requests increasing during periods of a good economy, as indicated in the NPRM,

DHS determined that the current trends and level of fee waivers are not sustainable. As shown in the supporting documentation that accompanies this final rule, the number and dollar value of approved fee waiver requests has remained high during periods when the U.S. economy was improving. As the economy worsens, the number of fee waiver requests could increase to a level that could threaten the ability of USCIS to deliver programs without disruption. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter wrote that USCIS data is incomplete as it only shows fee waiver trends through FY 2017 and requested the data on fee waiver approval rates for the past two fiscal years be released.

*Response:* The NPRM contained information USCIS had available at the time it conducted the FY 2019/2020 fee review. It provides more than adequate data upon which to base the fee waiver regulatory changes made in this final rule. However, in response to the commenter and to demonstrate that fee waiver levels remain high, DHS has included FY 2018 and FY 2019 fee waiver data in the supporting documentation that accompanies this final rule for informational purposes. DHS has also included the actual dollar value of approved fee waiver requests for FY 2013–FY 2019.

10. Changes to Form I–912, Request for Fee Waiver

*Comment:* One commenter recommended that USCIS revert to and retain the previous version of Form I–912 (03/13/2018 edition).

*Response:* DHS declines to revert to the previous version of the form as this final rule establishes revised criteria for eligibility. The Form I–912 version submitted with this final rule incorporates the relevant provisions.

*Comment:* One commenter recommended that USCIS restore helpful language in instructions and forms that clarifies that applicants need only meet one of multiple possible grounds of qualification for a fee waiver and clarify that applicants only need to provide documentation for one basis. A commenter also noted that the proposed Form I–912 contains provisions that are difficult to understand, citing the request for applicants to include ''a receipt number'' (Part 1, Question A) as an example. One commenter recommended that Part 1. Question 1.A's instruction should be changed to, ''[i]f available, provide the receipt number'' as the applicant may not yet have a receipt number.

*Response:* DHS clarified the provision regarding the basis of eligibility for a fee waiver by indicating that the applicants should select the basis for qualification. DHS added a clarification to the form to indicate that the receipt number is only required if the applicant has already been provided with a receipt number.

*Comment:* One commenter stated that Part 1, ''Question 1.B's new guidelines allowing fee waivers for those impacted by a disaster are unclear. The form states in Part 1 that in order to be eligible, these applicants must have an annual household income at or below 125 percent of the FPG. They must then provide information about their income in Part 3, discussed in more detail below. However, in Part 3, number 11 they are asked to provide information about their expenses, debt, or losses incurred in the disaster. It is unclear why this additional information is needed, if the applicant has already been required to document their income at or below 125 percent of the FPG. This information request does not fit into the eligibility guidelines based on income and is not relevant to USCIS' adjudication. We recommend either deleting item 11 in Part 3, or expanding the eligibility guidelines to include financial hardship for those impacted by a disaster who are unable to document low income. The same commenter later noted that ''Question #11 is redundant, as stated above, and we recommend that it be deleted.''

*Response:* DHS agrees that an applicant or petitioner impacted by a disaster who is otherwise eligible for a fee waiver would only need to provide documentation of income at or below 125 percent of the FPG and would not need to provide evidence of expenses, debt, or losses incurred in the disaster. DHS has removed the additional question from the form.

*Comment:* One commenter stated that Part 3 asks for gross income, but neither the form nor the instructions define the term. 'Gross income' needs to be explained, especially for those who are not able to simply refer to the ''gross income'' line on their tax return. We recommend that USCIS define 'gross income' on the form just below the heading for Part 3 and in the corresponding instructions. The commenter also recommends that Part 3., Question 6 explicitly instruct applicants where to find their gross income.

*Response:* Gross income includes wages, dividends, capital gains, business income, retirement distributions as well as other income

without any adjustments.[65] This clarification has been added to Form I–912 instructions.

*Comment:* One commenter recommended increasing the chart in Part 3., Question 4 from four (4) spaces total for listing household members to six (6) spaces, along with instructions above the chart for what to do if the applicant needs more spaces. Alternatively, they also recommend providing the chart again in Part 7. for those who need more space to list household members.

*Response:* Requestors should use the Additional Information section if more space is required. DHS is not modifying the form in response to this comment. Adding additional charts or rows will unnecessarily increase the form length.

*Comment:* Commenters recommended explicitly instructing applicants that they need to attach a copy of their federal income tax transcripts.

*Response:* DHS has added an additional form instruction to indicate that requestors should provide income tax return transcripts.

*Comment:* One commenter stated that Part 3., Question 10 ''is a catch-all for describing special circumstances. Applicants could easily miss it. We recommend adding a new item number after 10 for those who have no income or are homeless to describe their circumstances, *e.g.,* '[i]f you have no income and/or are homeless, you may use this space to provide additional information.' ''

*Response:* To limit the burden on applicants, DHS will not be adding a question. However, question 10 has been updated to clarify that the space may be used for additional information which may include a statement about lack of income. Although a homeless person without income would generally qualify for a fee waiver based on income at or below 125 percent of the FPG, being homeless does not make an applicant eligible for a fee waiver.

### 11. Suggestions

*Comment:* A few commenters suggested alternatives to narrowing the requirements for fee waivers and changing their standards of evidence including limiting fee waivers allowed for specific applications (for example the first 25,000 fee waivers for Form I–90), have a lottery for fee waivers (for example: For those paying with credit card they can be entered in a lottery and if chosen the application is free, if not,

then the card will be charged); offer fee reductions; and lower the threshold to 150 percent or 175 percent instead. A few commenters stated that partial fee waivers, with mechanisms such as reduced fees, sliding scale fee schedules, and family caps, should be used to facilitate applications from low- and middle-income immigrants. Several commenters wrote that USCIS should retain the previous fee waiver eligibility criteria.

*Response:* DHS recognizes that filing fees are a burden for some people of limited financial means. However, as previously stated, the cost of fee waivers and reduced fees are borne by all other fee payers, because they must be transferred to those who pay a full fee to ensure full cost recovery. DHS believes that it is more equitable to base fees on the beneficiary-pays principle. Thus, USCIS takes a relatively careful position with respect to transferring costs from one applicant to another through the expansion of fee waiver eligibility and discounting fees. To set fees at various levels based on income, as suggested by the commenter, would require deviation from the underlying fee-setting methodology and require some of the costs for those applications to be reassigned to other benefit requests. Therefore, DHS did not incorporate a reduced fee, sliding scale, or family cap in this final rule or the other suggestions provided by commenters.

*Comment:* Others suggested USCIS set a higher limit of at least 200 percent instead of 125 percent FPG.

*Response:* DHS will not adopt the suggestion to increase the income requirement to 200 percent of the poverty line. As previously discussed, DHS selected the 125 percent of the FPG threshold as it is consistent with the income threshold in other areas related to immigration benefit adjudication, the public charge inadmissibility rule, and affidavit of support requirements under INA section 213A, 8 U.S.C.1183a, and 8 CFR 212.22(b)(4).

### F. Comments on Fee Exemptions

*Comment:* One commenter opposed USCIS' proposal to remove most fee exemptions and to formalize limits to its discretion to provide fee exemptions. The commenter stated that USCIS failed to provide any rationale to justify this regulatory constraint. The commenter said narrowing the regulatory authority of the Director of USCIS to receive requests and waive fees for a case or specific class of cases would unnecessarily tie the hands of future policymakers. The commenter also stated that it is unclear how this

---

[65] See IRS, Definition of Adjusted Gross Income, available at *https://www.irs.gov/e-file-providers/definition-of-adjusted-gross-income* (last visited March 7, 2020).

authority would be exercised and how USCIS would adequately publicize any such exercise of discretion.

*Response:* DHS authorized the USCIS Director to approve and revoke exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 CFR 103.7(c) in 2010. *See* old 8 CFR 103.7(d); 75 FR 58, 961, 58990. Since then, that provision has been implemented effectively without providing publicly available guidance for how a person may request that the Director exercise that authority for an individual who feels like he or she is worthy of special consideration by the Director. USCIS receives several million fee-paying requests per year and to permit an individual to request a fee waiver from the Director using authority that may only be delegated to one other person could result in an unmanageable level of requests. USCIS has approved waiver eligibility and group exemptions in the case of natural disasters or significant USCIS errors. DHS explained in the proposed rule that it was concerned that the current authority provides too much discretion to a future Director to expand fee exemptions and waivers beyond what may be fiscally sound and shifting burden to just a few fee payers. In the 2010 fee rule, DHS stated that it thought the limits that it was imposing in that rule on fee waivers would ensure that fee waivers are applied in a fair and consistent manner, that aliens who are admitted into the United States will not become public charges, and that USCIS will not shift an unreasonable amount of costs to other fee-paying benefit requests.[66] Unfortunately, that goal was not achieved, and as stated in the NPRM, the current level of fee waivers is not sustainable. *See* 84 FR 62300. Thus, prescribing a limit in the regulations on the ability of future Directors to waive or exempt fees on a discretionary basis was determined to be necessary. Nevertheless, based on the use of 8 CFR 103.7(d) by Directors since 2010, the restrictions are consistent with the relief that has been provided; thus new 8 CFR 106.3(b) and (c) is not a major departure from how that provision has been applied.

Table 4 below provides a list of filing fee exemptions as provided in the rule. See new 8 CFR 106.2.

### TABLE 4—FILING FEE EXEMPTIONS [67]

| Form [68] | Eligibility category | Reason for filing (if applicable) | Final rule regulation section | Statutory or regulatory authority if applicable |
|---|---|---|---|---|
| I–90, Application to Replace Permanent Resident Card. | Applicant who has reached his or her 14th birthday and the existing card expires after his or her 16th birthday. | N/A | 8 CFR 106.2(a)(1) | 8 CFR 264.5(a). |
| I–102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. | For nonimmigrant member of the U.S. Armed Forces. | Initial Filing | 8 CFR 106.2(a)(2)(i) | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| | For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component. | Initial Filing. | 8 CFR 106.2(a)(ii). | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| | For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement. | Initial Filing | 8 CFR 106.2(a)(ii) | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker. | For filing Form I–129CWR, Semiannual Report for CW–1 Employers. | N/A | 8 CFR 106.2(a)(4)(B)(iii) | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| I–129F, Petition for Alien Fiancé(e). | For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130. | N/A | 8 CFR 106.2(a)(5)(ii) | Previous regulations at 8 CFR 103.7(b)(1)(i)(K). |
| I–131, Application for Travel Document. | Applicants who filed USCIS Form I–485 on or after July 30, 2007, and before October 2, 2020 and paid the Form I–485 fee. | Any application | 8 CFR 106.2(a)(7)(iv) | Required by regulations in effect at the time the request was filed. |
| | Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(7)(iv) | National Defense Authorization Act for Fiscal Year 2008, Public Law 110–181 (Jan 28, 2008) and Omnibus Appropriations Act, 2009 Public Law 111–8 (Mar. 11, 2009). |
| I–360 Petition for Amerasian, Widow(er), or Special Immigrant. | • A petition seeking classification as an Amerasian;<br>• A self-petition for immigrant classification as an abused spouse or child of a U.S. citizen or lawful permanent resident or an abused parent of a U.S. citizen son or daughter; or<br>• A petition for special immigrant juvenile classification; or<br>A petition seeking special immigrant visa or status an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(16) | Policy based on INA section 245(l)(7). |
| Form I–485, Application to Register Permanent Residence or Adjust Status. | Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(17)(iii) | National Defense Authorization Act for Fiscal Year 2008, Public Law 110–181 (Jan 28, 2008) and Omnibus Appropriations Act, 2009 Public Law 111–8 (Mar. 11, 2009). |
| | Applicants filing as refugees under INA section 209(a). | Any application | | *Previous 8 CFR 103.7(b)(1)(i)(U)(3).* |

---

[66] 75 FR 58973.

[67] In general, USCIS exempts a fee for an application or request to replace a document based on USCIS error.

[68] Some supplemental forms may not have fees as the fees are part of the main form, including Form I–130A, Supplemental Information for Spouse Beneficiary, Form I–485 Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), Form I–539A Supplemental Information for Application to Extend/Change Nonimmigrant Status.

[69] If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiary birth siblings, no additional fee is required.

[70] No additional fee for a Form I–800 is required when filing for children who are birth siblings.

[71] Re-registration applicants must still pay the biometric services fee.

TABLE 4—FILING FEE EXEMPTIONS[67]—Continued

| Form[68] | Eligibility category | Reason for filing (if applicable) | Final rule regulation section | Statutory or regulatory authority if applicable |
|---|---|---|---|---|
| I–485 Supplement A, Adjustment of Status under Section 245(i). | When the applicant is an unmarried child less than 17 years of age, when the applicant is the spouse, or the unmarried child less than 21 years of age of a legalized alien and who is qualified for and has properly filed an application for voluntary departure under the family unity program. | N/A | 8 CFR 106.2(a)(17)(iv) | INA section 245(i). |
| I–290B, Notice of Appeal or Motion. | For an appeal or motion for denial of a petition for a special immigrant visa from an individual for a special immigrant status as an Afghan or Iraqi Interpreter, or Iraqi or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(14)(ii) | National Defense Authorization Act for Fiscal Year 2008, Public Law 110–181 (Jan 28, 2008) and Omnibus Appropriations Act, 2009 Public Law 111–8 (Mar. 11, 2009). |
| I–539, Application to Extend/Change Nonimmigrant Status. | Nonimmigrant A, G, and NATO | | 8 CFR 106.2(a)(19) | 8 CFR 106.3(e)(5)—Agreement between the U.S. government and other nations. |
| I–589, Application for Asylum and for Withholding of Removal. | Applications filed by unaccompanied alien children who are in removal proceedings. | | 8 CFR 106.2(a)(20) | Public Law 110–457, 122 Stat. 5044 (2008). |
| I–600, Petition to Classify Orphan as an Immediate Relative.[69] | First Form I–600 filed for a child on the basis of an approved Application for Advance Processing of an Orphan Petition, Form I–600A, during the Form I–600A approval or extended approval period. | | 8 CFR 106.2(a)(21)(i) | Previous 8 CFR 103.7(b)(1)(i)(Y), (Z). |
| I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600. | Filed in order to obtain a first extension of the approval of the Form I–600A or to obtain a first time change of non-Hague Adoption Convention country during the Form I–600A approval period. | | 8 CFR 106.2(a)(23)(i)(A) | Previous 8 CFR 103.7(b)(1)(i)(Y), (Z). |
| I–765, Application for Employment Authorization. | Refugee | Initial EAD | 8 CFR 106.2(a)(32)(ii)(B) | Policy. |
| | Paroled as refugee | Initial EAD | 8 CFR 106.2(a)(32)(ii)(C) | Policy. |
| | Asylee | Initial EAD | 8 CFR 106.2(a)(32)(ii)(C) | Policy. |
| | N–8 or N–9 nonimmigrant | Initial EAD | 8 CFR 106.2(a)(32)(ii)(G) | 8 CFR 106.3(e)(5)—Agreement between the U.S. government and another nation or nations. |
| | Victim of severe form of trafficking (T–1 nonimmigrant). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(D) | Policy based on INA section 245(l)(7). |
| | Victim of qualifying criminal activity (U–1 nonimmigrant). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(E) | Policy based on INA section 245(l)(7). |
| | Dependent of certain government and international organizations, or NATO personnel. | Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(ii)(F) 8 CFR 106.2(a)(32)(iv)(C) | Based on 106.3(e)(5)—An agreement between the U.S. government and another nation or nations. |
| | Taiwanese dependent of Taipei Economic and Cultural Representative Office TECRO E–1 employees. | Initial EAD, Renewal EAD, Replacement EAD. | N/A | 8 CFR 106.3(e)(5)—An agreement between the U.S. government and another nation or nations. |
| | VAWA Self-Petitioners as defined in section 101(a)(51)(D) of the Act (Applicant adjusting under the Cuban Adjustment Act for battered spouses and children (principal) who has a pending adjustment of status application (Form I–485)). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(I) | Policy based on INA section 245(l)(7). |
| | VAWA Self-Petitioners as defined in section 101(a)(51)(E) of the Act (Applicant adjusting based on dependent status under the Haitian Refugee Immigrant Fairness Act for battered spouses and children (principal) who has a pending adjustment of status application (Form I–485)). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(I) | Policy based on through INA 245(l)(7). |
| | VAWA Self-Petitioners as defined in section 101(a)(51)(F) of the Act (Applicant adjusting under the Nicaraguan Adjustment and Central American Relief Act for battered spouses and children (principal) who has a pending adjustment of status application (Form I–485)). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(I) | Policy based on INA section 245(l)(7). |
| | Applicant for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces ("ISAF"). | Initial EAD, Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(ii)(J) | Public Law 110–181 (Jan 28, 2008) and Public Law 111–8 (Mar. 11, 2009). |
| | An applicant who filed USCIS Form I–485 on or after July 30, 2007 and before [INSERT EFFECTIVE DATE OF 2018/2019 FEE RULE] and paid the Form I–485 filing fee. | Initial EAD, Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(ii)(A) | Required by regulations in effect when form was filed. |
| | Principal VAWA Self-Petitioners who have approved petitions pursuant to section 204(a) of the Act. | Initial EAD | 8 CFR 106.2(a)(32)(ii)(H) | Policy based on INA section 245(l)(7). |
| | Any current Adjustment of Status or Registry applicant filed for adjustment of status on or after July 30, 2007, and before [INSERT EFFECTIVE DATE OF 2018/2019 FEE RULE] and paid the appropriate Form I–485 filing fee. | Initial EAD, Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(iv)(A) | Required by regulations in effect when form was filed. |
| | Request for replacement Employment Authorization Document based on USCIS error. | Replacement EAD | 8 CFR 106.2(a)(32)(iii) | 8 CFR 106.3(e)(6). |
| I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse. | Any applicant | N/A | 8 CFR 106.2(a)(32)(v) | Policy based on INA section 245(l)(7). |
| I–800, Petition to Classify Convention Adoptee as an Immediate Relative.[70] | The first Form I–800 filed for a child on the basis of an approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, during the Form I–800A approval period. | Initial Filing | 8 CFR 106.2(a)(33)(i) | 8 CFR 103.7(b)(1)(i)(JJ), (LL). |
| Form I–800A Supplement 3, Request for Action on Approved Form I–800A. | Filed in order to obtain a first extension of the approval of the Form I–800A or to obtain a first time change of Hague Adoption Convention country during the Form I–800A approval period. | N/A | 8 CFR 106.2(a)(35)(i)(A) | 8 CFR 103.7(b)(1)(i)(JJ)(1). |

**AR2022_200434**

TABLE 4—FILING FEE EXEMPTIONS [67]—Continued

| Form [68] | Eligibility category | Reason for filing (if applicable) | Final rule regulation section | Statutory or regulatory authority if applicable |
|---|---|---|---|---|
| I–821, Application for Temporary Protected Status [71]. | Any applicant | Re-registration | 8 CFR 106.2(a) | INA section 245(l)(7). |
| I–821D, Consideration of Deferred Action for Childhood Arrivals. | Any requestor | | 8 CFR 106.2(a)(38) | Policy decision based on *DHS et al.* v. *Regents of the Univ. of Cal. et al.,* No. 18–587 (S.Ct. June 18, 2010). |
| I–914, Application for T Nonimmigrant Status. | Any applicant | N/A | 8 CFR 106.2(a)(45) | Policy but based on INA section 245(l)(7). |
| I–918, Petition for U Nonimmigrant Status. | Any applicant | N/A | 8 CFR 106.2(a)(46) | Policy but based on INA section 245(l)(7). |
| N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA). | An applicant who has filed an Application for Naturalization under sections 328 or 329 of the Act with respect to military service and whose application has been denied. | N/A | 8 CFR 106.2(b)(2) | *See* INA secs. 328(b)(4), 329(b)(4). |
| N–400, Application for Naturalization. | An applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service. | N/A | 8 CFR 106.2(b)(3) | *See* INA secs. 328(b)(4), 329(b)(4). |
| N–565, Application for Replacement Naturalization/Citizenship Document. | Application is submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate that contains an error. | N/A | 8 CFR 106.2(b)(5)(ii) | Policy based on 8 CFR 106.3(e)(6). |
| Form N–600, Application for Certificate of Citizenship. | Member or veteran of any branch of the U.S. Armed Forces. | N/A | 8 CFR 106.2(b)(6) | Based on National Defense Authorization provisions. |
| Other—Claimant under section 289 of the Act. | Claimant | N/A | 8 CFR 106.2(c)(9) | INA 289. |

## 1. EAD (Form I–765) Exemption

*Comment:* A commenter stated that DHS should not charge a fee for applications for employment authorization for individuals granted withholding of removal, indicating that it violates United States treaty obligations under Article 17 of the Refugee Convention. Individuals who have been granted withholding of removal have been found by an immigration judge to meet the legal definition of a refugee, and are authorized to remain lawfully in the United States for as long as that status continues, citing to INA section 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.16, 1208.24. The commenter indicated that the U.S. Supreme Court has recognized that withholding of removal is the mechanism by which the United States implements its obligation under Article 33 of the Refugee Convention to ensure that refugees are not returned to a place where they will face persecution, citing to *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987). The commenter wrote that just as much as asylees, individuals granted withholding of removal have a right, under Article 17(1) of the Refugee Convention, to obtain authorization to work on the most favorable terms that the United States allows to nationals of a foreign country. The commenter also indicated that Australia only charges the equivalent of 25 U.S. dollars—half of what DHS proposes to charge for asylum applications.

Another commenter said the imposition of a fee for work authorization for those individuals who have been granted withholding of removal is in conflict with the U.S. legal obligations. The commenter said such individuals have an urgent, recognized humanitarian need to live and work in the United States, and therefore, USCIS should continue its historic practice of exempting these individuals from work authorization fees.

*Response:* DHS is continuing to provide a fee exemption for the initial Form I–765, Application for Employment Authorization, for individuals who were granted asylum (asylees) or who were admitted as refugees, consistent with Article 17(1) of the 1951 Convention relating to the Status of Refugees (as incorporated in the 1967 Protocol relating to the Status of Refugees). *See* 84 FR 62302; 8 CFR 106.2(a)(32)(ii)(B). Consistent with past practice, asylees and refugees submitting a Form I–765 for EAD renewals will generally be required to pay the relevant fee. *See* 8 CFR 106.2(a)(32).

However, DHS is not providing a fee exemption for initial requests for an EAD for individuals granted withholding of removal. *See* 84 FR 62301. Fees associated with access to protection and work authorization do not jeopardize United States compliance with its non-refoulement obligations under Article 33 of the 1951 Refugee Convention. The United States ensures compliance with non-refoulement obligations not through the asylum process, but through the withholding of removal provisions, currently codified at section 241(b)(3) of the INA. *See INS* v. *Stevic,* 467 U.S. 407 (1984). USCIS uses the Form I–589 solely to adjudicate affirmative applications for asylum. It is immigration judges, within the Department of Justice, who evaluate withholding of removal claims in the context of removal proceedings before them. The asylum process "does not correspond to Article 33 of the 1951 Convention, but instead corresponds to Article 34" of the 1951 Refugee Convention, which provides that party states "shall as far as possible facilitate the assimilation and naturalization of refugees." *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987) (quotation marks omitted). As the Supreme Court has recognized, Article 34 is "precatory" and "does not require [an] implementing authority actually to grant asylum to all those who are eligible." *Id.* Further, although the United States is a party to the 1967 Refugee Protocol, which incorporates both Articles 33 and 34 of the 1951 Refugee Convention, the Protocol is not self-executing. *See, e.g., Stevic,* at 428 n.22. It is the withholding statute at INA section 241(b)(3) and the asylum statute at INA section 208 that, respectively, constitute the U.S. implementation of these treaty obligations. Nothing in either of these two provisions precludes the imposition of a filing fee for asylum applications or work authorization for those granted withholding of removal. Imposition of asylum application and work authorization filing fees are fully consistent with United States domestic implementing law and Article 17 of the 1951 Refugee Convention, which relates to refugees engaging in employment. *See Weinberger* v. *Rossi,* 456 U.S. 25, 34 (1982) (noting the general presumption that United States law conforms to U.S. international treaty obligations). DHS has further clarified the immigrant categories eligible for fee exemptions and clarified which renewal and

replacement EAD are eligible for fee exemptions. *See* new 106.2(a)(32).

2. TPS

*Comment:* Another commenter stated that fee exemption limitations would be especially harmful to TPS applicants. The commenter added that USCIS is planning to charge TPS applicants a separate biometric service fee, even though the proposal bundles that cost for every other category of benefit applicant. The commenter concluded by saying TPS applicants would be required to pay $570 to obtain TPS protections and begin to earn an income, which is unaffordable.

*Response:* In this final rule, DHS removes the Form I–765 fee exemption in 8 CFR 244.6(b) for TPS if the individual is an initial TPS registrant and is under 14 years of age or over 65 years of age, and DHS establishes a biometric services fee of $30 for TPS applicants and re-registrants. As we stated in the NPRM, DHS is removing the fee exemption because application fees from other form types have always been used to fund the costs of processing fee-exempt filings. Continuing to exempt these populations from paying associated fees would result in the costs of their requests being borne by the other proposed fees. Thus, DHS determined that initial TPS registrants under 14 years of age or over 65 years of age should pay for their own EAD.

The biometric services fee that TPS applicants and re-registrants must pay is changed from $85 to $30, a reduction of $55 per filing. This $30 fee, which will be required regardless of age, reflects the cost of providing biometric services to TPS applicants and re-registrants. *See* new 8 CFR 244.17(a). This biometric services fee will partially offset the increase in the fee or the removal of the fee exemption for Form I–765, Application for Employment authorization, so that the total cost of applying for Temporary Protected Status and requesting employment authorization for those who would not have been exempt from the Form I–765 fee is increasing from $545 [72] to $630 for initial TPS applicants.[73] The cost of re-registering for TPS and requesting employment authorization will increase from $495 [74] to $580.[75] DHS notes that TPS applicants and re-registrants may request fee waivers. *See* 8 CFR 106.3.

The commenter correctly noted that DHS did not incorporate the cost of biometrics into the cost of Form I–821, Application for Temporary Protected Status. In this final rule, DHS incorporates the cost of providing biometric services into the underlying fee for most applications and petitions. However, the maximum fee for Form I–821, Application for Temporary Protected Status is set in legislation at $50 for initial TPS applicants and $0 for re-registrants. *See* INA section 244a(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B). Therefore, DHS is not able to increase the fee for Form I–821 and cannot incorporate the cost of biometrics into the form fee. Thus, DHS maintains a separate biometric service fee for TPS registrants and re-registrants and requires the biometric services fee for re-registrants under age 14 to recover the full cost of providing such services. New 8 CFR 106.3(a)(37)(iii) and 244.17(a).

DHS declines to make changes in this final rule based on this comment. DHS also notes that 8 CFR 244.6(b) is updated to be consistent with new 8 CFR 106.2 and 106.3 in relation to the Form I–765 fees for TPS.

*G. Comments on Specific Fees*

1. Fees for Online Filing

*Comment:* A few 545 suggested that, rather than just raising the fees, USCIS should focus on processing times and becoming more efficient, stating that the process is "severely paper intensive" and could benefit from a more streamlined electronic process. One commenter cited a 2005 report from DHS Office of the Inspector General (OIG) which found that USCIS information technology (IT) systems were primarily paper-based and duplicative, and that USCIS' ability to process immigration benefits was inefficient. Another commenter stated that USCIS has done little to shift to digital applications despite prior fee hikes. One commenter said paper filing is extremely laborious for petitioners, and that many of the concerns that led USCIS to propose higher fees and beneficiary limits could be solved by implementing electronic filing. Another commenter outlined the benefits of moving to electronic process, including cost savings and the ability for "essential workers to arrive on time."

One commenter stated that USCIS has failed to deliver promised improvements to its online filing abilities and other modernization initiatives that would result in more streamlined operations. The same commenter stated that in 2019, legal service providers still reported many challenges in utilizing USCIS online filing systems, and that modernization continues to be pushed on to USCIS customers even to the detriment of customer service. A commenter wrote that they were concerned about USCIS moving to online filing based on their experiences with the Department of State's National Visa center; they were frustrated by software glitches and processing issues (*e.g.*, lost documents, erroneous file rejection, lack of information after lengthy waits on hold) which the commenter said should be addressed before fees are raised. One commenter stated if USCIS wants to save money, it should stop requiring an endless flow of paperwork. The commenter provided a list of forms that businesses in the CNMI must fill out when new employees are hired and stated that the redundancy wasted both their and USCIS' time and resources. The commenter referred to a bill from Congressman Sablan that would give long-term CW Visa personnel permanent status and stated their hope that there will not be constant paperwork required for those requests.

*Response:* On March 13, 2017, the President signed Executive Order 13781, entitled "Comprehensive Plan for Reorganizing the Executive Branch."[76] The order instructed the Director of OMB to propose a plan to improve the efficiency, effectiveness, and accountability of the Executive Branch. The resulting June 2018 OMB Report, "Delivering Government Solutions in the 21st Century" recognized that an overarching source of government inefficiency is the outdated reliance on paper-based processes and prioritized the transition of Federal agencies' business processes and recordkeeping to a fully electronic environment.[77] The report noted that Federal agencies collectively spend billions of dollars on paper management, including the processing, moving, and maintaining of large volumes of paper records and highlighted the key importance of data, accountability, and transparency.[78]

---

[72] Total of $545 equals $50 for Form I–821 plus $85 biometric services fee plus $410 for Form I–765.

[73] Total of $630 equals $50 for Form I–821 plus $30 biometric services fee plus $550 for Form I–765.

[74] Total of $495 equals $85 biometric services fee plus $410 for Form I–765.

[75] Total of $580 equals $30 biometric services fee plus $550 for Form I–765.

[76] E.O. 13781, 82 FR 13959 (Mar 16, 2017).

[77] OMB, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* 18 (2018), available at *https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.*

[78] *Id.* at 100.

Even more significantly, it cites USCIS' electronic processing efforts as an example of an agency initiative that aligns with the prioritized reforms.[79]

DHS understands that, while USCIS has embraced technology in adjudication and recordkeeping, it remains bound to the significant administrative and operational burdens associated with paper submissions. The intake, storage, and handling of paper require tremendous operational resources, and the information recorded on paper cannot be as effectively standardized or used for fraud and national security, information sharing, and system integration purposes. Technological advances have allowed USCIS to develop accessible, digital alternatives to traditional paper methods for handling requests. Every submission completed online rather than through paper provides direct and immediate cost savings and operational efficiencies to both USCIS and filers—benefits that will accrue throughout the immigration lifecycle of the individual and with the broader use of online filing and e-processing.

As various online functions are developed, USCIS makes them available to the public, providing the option of engaging with USCIS either online or on paper. DHS recognizes that, if presented with optional new technology, people adopt new practices at varying rates.[80] In this case, the complexity of the immigration benefit request system may exacerbate the tendency toward the status quo. Those familiar with paper-based forms and interactions may feel there is no reason to change a method that has worked for them.

DHS agrees that transitioning to e-processing for benefit requests is an important step in improving the service and stewardship of USCIS and to promote the objectives of the Government Paperwork Elimination Act, E-Government Act, and E.O. 13781.[81] Therefore, and in response to the public comments, USCIS has calculated the amount of upfront cost savings that it recognizes from an online versus paper filing in the current environment and determined that it saves approximately $7 per submission. To encourage the shift of those capable of filing online into the electronic channel and increase the usage of USCIS e-processing for those forms for which online filing is currently available, DHS will set the fees for online filing at an amount $10 lower than the fees established in this final rule for filing that form on paper. New 8 CFR 106.3(d).[82] See Table 5: Fees for Online Filing for a comparison of paper and online filing fees.

TABLE 5—FEES FOR ONLINE FILING

| Immigration benefit request | Online filing fee | Paper filing fee | Difference |
|---|---|---|---|
| I–90 Application to Replace Permanent Resident Card | $405 | $415 | $10 |
| I–130 Petition for Alien Relative | 550 | 560 | 10 |
| I–539 Application to Extend/Change Nonimmigrant Status | 390 | 400 | 10 |
| N–336 Request for Hearing on a Decision in Naturalization Proceedings | 1,725 | 1,735 | 10 |
| N–400 Application for Naturalization | 1,160 | 1,170 | 10 |
| N–565 Application for Replacement Naturalization/Citizenship Document | 535 | 545 | 10 |
| N–600 Application for Certificate of Citizenship | 990 | 1,000 | 10 |
| N–600K Application for Citizenship and Issuance of Certificate | 935 | 945 | 10 |
| G–1041 Genealogy Index Search Request | 160 | 170 | 10 |
| G–1041A Genealogy Records Request | 255 | 265 | 10 |

DHS adjusts USCIS' fee schedule in this final rule to ensure it recovers the estimated full cost of providing immigration adjudication and naturalization services. USCIS' cost baseline reflected in this final rule accounts for the costs of intake and adjudication of applications received online and on paper. To provide for full cost recovery, DHS adjusts the fees for filing applications on paper when online filing is available to be higher than those fees viewed to be in the absence of the lower fees for online filing. The increased revenue anticipated from the higher fees for those forms when filed on paper will offset the reductions in revenue anticipated from the lower fees for online filing. USCIS will further evaluate the effects of these changes in future biennial fee reviews.

As for the comments directed at the Department of State (DOS) online processing, USCIS has no control over the efficacy of DOS systems. DHS may learn from the DOS issues, however, and will, of course, work to minimize any glitches.

*Comment:* Some commenters wrote that switching to online filing would create a barrier to immigrants without access to technology, and the option should exist to choose between e-filing and paper submissions.

*Response:* USCIS does not require that any immigration benefit request be filed online. Filing on paper remains a valid option. However, this final rule specifies that forms currently eligible for online filing will be $10 more if filed on paper.

*Comment:* A few commenters recommended USCIS maintain the current fees for processing Form I–129 petitions for H–2A beneficiaries until the online Electronic Immigration System (ELIS) can be established and USCIS can conduct a robust analysis to more accurately determine an appropriate fee schedule consistent with Federal guidelines for user fees.

*Response:* USCIS must recover its full cost of providing immigration adjudication and naturalization services. DHS adjusts the fees for forms that are currently eligible for online filing to be $10 lower if filed online than the fee for the same forms filed on paper to reflect the known cost-savings to USCIS of receiving an application electronically. DHS declines to delay adjusting the fee for Form I–129H2A

---

[79] *Id.* at 101–02.

[80] Brian Kennedy & Cary Funk, Pew Research Group, *28 percent of Americans are 'strong' early adopters of technology* (July 12, 2016), *available at* http://www.pewresearch.org/fact-tank/2016/07/12/28-of-americans-are-strong-early-adopters-of-technology/; Charlie Wells, The Wall Street Journal, *Forget Early Adopters: These People are Happy to Be Late* (Jan. 26, 2016), *available at https:// www.wsj.com/articles/forget-early-adopters-these-people-are-happy-to-be-late-1453827437.*

[81] *See* President's Management Council, Executive Office of the President, *President's Management Agenda 7* (2018), *available at https:// www.whitehouse.gov/wp-content/uploads/2018/04/ThePresidentsManagementAgenda.pdf.*

[82] U.S. Customs and Border Protection accepts USCIS Forms I–192 and I–212 online. Available at *https://www.cbp.gov/travel/international-visitors/e-safe* (last viewed Mar. 27, 2020). However, USCIS has no data on the cost of online filing with CBP. Therefore, this $10 online fee reduction applies to USCIS forms submitted to USCIS only.

because USCIS must recover its full costs.

DHS does not provide for a lower online filing fee for Form I–129H2A in this final rule. As described above, DHS is increasing the fees for filing an application on paper above the level it would otherwise establish when the application is also eligible for online filing. This will provide for full cost recovery by USCIS. However, because online filing is not yet available for Form I–129H2A, DHS cannot increase the fee for a paper filing to offset the anticipated reduction in revenue from a lower fee for online filing and still provide for full cost recovery. If DHS raised the fee for filing Form I–129H2A on paper in anticipation of future online filing and a lower fee for filing online, USCIS would recover revenue in excess of its estimated full cost of adjudication until such time as online filing and a lower online filing fee are available. Thus, DHS cannot establish lower fees for online filing for Form I–129H2A or any other applications for which online filing is not yet available, and still provide for full cost recovery. DHS may consider a lower fee for Form I–129H2A if filed online in future rulemakings if Form I–129H2A is available for online filing.

2. Biometric Services Fee

*Comment:* One commenter questioned why USCIS would forego approximately $220,884,315 in biometric services fee revenue. The commenter added that the NPRM allows for biometric services fees for TPS applicants and those filing EOIR forms; therefore, there should continue to be a fee for this service. The commenter concluded that if DHS implements this proposal, it will be confusing for applicants, attorneys, and government staff to implement and it will lead to delays in proper filing of applications and petitions. The same commenter recommended that USCIS use the biometric services fee to supplement fraud investigations or consider raising this fee in order to provide additional revenue.

*Response:* The commenter misunderstands DHS's approach to recovering the estimated full cost of providing biometric services. Although DHS eliminates the separate biometrics service fee of $85 for many application types in this final rule, it establishes fees for most forms to reflect the estimated full cost of adjudication, including the cost of biometric services that are typically associated with that form. Thus, DHS will continue to recover the cost of providing biometric services, but it will do so by adjusting form fees to reflect the total cost of an

adjudication, including providing biometric services. DHS will not forego any revenue associated with the biometric services fee because of this change.

DHS believes that this change in its method of recovering the cost of biometric services will provide benefits to applicants and USCIS. Most applicants and petitioners will no longer need to determine if they must submit a separate biometric services fee in addition to the fee for their request. DHS believes that this will reduce confusion among requestors and decrease rejections for incorrect fees. Fewer rejections for incorrect fees should increase administrative efficiency for USCIS. As provided in new 8 CFR 103.17, DHS is also establishing a separate biometric services fee for additional requests for which it could not include the costs to USCIS of administering biometric services in the ABC model used for the NPRM. First, DHS codified revised 8 CFR 208.7(a)(1)(i), which requires that biometrics be submitted for an application for employment authorization from an applicant for asylum or to renew such an EAD. See Asylum Application, Interview, and Employment Authorization for Applicants, 85 FR 38532, 38626 (June 26, 2020); new 8 CFR 208.7(a) (1)(i). That rule takes effect on August 25, 2020. Second, on February 19, 2020, USCIS implemented the Commonwealth of the Northern Mariana Islands (CNMI) long-term resident status program. It was created by the Northern Mariana Islands Long-Term Legal Residents Relief Act. 48 U.S.C. 1806(e)(6).[83]

Applicants must file Form I–955, Application for CNMI Long-Term Resident Status, together with Form I–765, Application for Employment Authorization, by August 17, 2020. When the CNMI long-term resident status program was established, USCIS required that a biometric services fee be submitted with the Form I–765.[84] Because the CNMI long-term resident program and fee NPRM were under development simultaneously, DHS was unable to include the cost of biometric

services for CNMI long-term resident program in the ABC model for the NPRM. Therefore, the fee for Form I–765 does not include the costs for that service. DHS proposed new 8 CFR 103.17 in contemplation of the need for a separate fee in the future if biometric services was required by regulations or policy, but where the costs had not been considered in setting the benefit request fee. As a result, and consistent with the actions taken for TPS, EOIR forms, and in accordance with new 8 CFR 103.17, DHS requires that CNMI long-term resident applicants and applicants for asylum who are applying for employment authorization submit a $30 biometric services fee with their Form I–765. 8 CFR 106.2(a)(32)(i)(A), (B).

*Comment:* One commenter opposed a separate biometric services fee for TPS applicants, stating that USCIS is breaching Congress's $50 cap on TPS filing by imposing a separate biometric fee.

*Response:* The commenter is correct in stating that the fee for Form I–821, Application for Temporary Protected Status, is statutorily limited to $50 for initial TPS applicants and $0 for re-registrants. *See* INA section 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B). However, the commenter is incorrect in stating that charging TPS applicants and re-registrants a separate biometric services fee constitutes a breach of any statute. DHS has specific statutory authority to collect "fees for fingerprinting services, biometric services, and other necessary services" when administering the TPS program. *See* 8 U.S.C. 1254b.

Before this final rule, all TPS applicants and re-registrants aged 14 and older were subject to the $85 biometric services fee, in addition to any applicable fees for Forms I–821 and I–765. Therefore, adjusting the biometric services fee for TPS applicants and re-registrants to $30 represents a $55 reduction in the biometric services fee that these individuals may pay. DHS also notes that TPS applicants and re-registrants may apply for fee waivers based on eligibility criteria established by USCIS.

In this final rule, DHS removes the Form I–765 fee exemption in 8 CFR 244.6(b) for TPS if the individual is an initial TPS registrant and is under 14 years of age or over 65 years of age, and DHS establishes a biometric services fee of $30 for TPS applicants and re-registrants. As we stated in the NPRM, DHS is removing the fee exemption because fees from other form types have always been used to fund the costs of processing fee-exempt filings. Continuing to exempt these populations

---

[83] *See,* CNMI Long-Term Resident Status, available at *https://www.uscis.gov/working-united-states/cnmi-long-term-resident-status* (last reviewed/updated Feb. 19, 2020).

[84] *See* USCIS Form I–765, Application for Employment Authorization, page 23 (stating, "Special Instructions for Applicants for Commonwealth of the Northern Mariana Islands (CNMI) Long-Term Resident Status—(c)(37). All applicants under this category must pay the biometric services fee of $85. The biometric services fee and the filing fee for the I–765 application cannot be waived."). Available at *https://www.uscis.gov/i-765.*

from paying associated fees would result in the costs of their requests being borne by the other proposed fees. Thus, DHS determined that initial TPS registrants under 14 years of age or over 65 years of age should pay their own Form I–765 fee and biometric services fee. The biometric services fee that TPS applicants and re-registrants must pay is changed from $85 to $30, a reduction of $55 per filing. This $30 fee, which will be required regardless of age, reflects the cost of providing biometric services to TPS applicants and re-registrants. *See* new 8 CFR 244.17(a).

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A few commenters stated that including a biometrics screening and fee for children under 14 is unnecessary and that it is inappropriate to charge a single fee for Form I–485 that includes the cost of biometrics to both adults and children under 14 years of age who do not submit biometric information. A few commenters stated that imposing a biometric services fee where USCIS does not capture biometric data would deter families from entering the United States as a unit.

*Response:* As explained previously, DHS will expand the collection of biometric information for TPS re-registrants under the age of 14, remove the biometrics fee exemption from 8 CFR 244.17(a), and revise the form instructions for Form I–821 to require a $30 biometrics service fee from every TPS registrant regardless of age. *See* 84 FR 62303 and 62368. This change assigns the costs of TPS applications and re-registrations to those who benefit from them. DHS uses biometrics beyond criminal history background checks to include identity management and verification in the immigration lifecycle. Therefore, biometrics will be collected without age limitation, although it may be waived at DHS's discretion.

DHS also acknowledges that this final rule increases the fees for children under 14 years old who file an I–485 concurrently with a parent filing an I–485 by eliminating the reduced I–485 child fee. This final rule establishes the fee for Form I–485, Application to Register Permanent Residence or Adjust Status, at $1,130 for all applicants.

The commenters correctly wrote that the Form I–485 fee established in this final rule includes the average cost of biometric services associated with processing those applications. The inclusion of biometric services reduces the average cost of Form I–485 and the final fee established in this final rule. Processing a given application may be more or less costly than processing another application of the same type

because of the evidence and other factors that adjudicators may consider. Therefore, DHS establishes its fees, unless otherwise noted, at a level sufficient to recover the estimated full cost of adjudication. DHS calculated the Form I–485 fee to reflect the full cost of adjudication, including the average cost of biometric services associated with those applications.

DHS declines to make changes in this final rule in response to these comments.

3. Genealogy Fees, Forms G–1041, Genealogy Index Search Request, and G–1041A, Genealogy Records Request

*Comment:* Numerous commenters generally opposed increasing fees for genealogy search and records requests. Other commenters, many identifying themselves as professional genealogists and/or individual family genealogists, opposed the proposed increased fees, stating that they oppose the fee increase for the following reasons:

• No other government record or research request fees are close to the proposed increased costs.

• The 500 percent fee hike is unjustified, especially after fees tripled 3 years ago.

• The NPRM did not present data or specifics to substantiate the costs. DHS cannot claim such fees are necessary to cover costs when USCIS did not provide cost analysis to support the claim. The proposed fees for G–1041 and G–1041A are arbitrary and capricious.

• The nature of genealogical research often requires broad investigation, requiring several search and record requests.

Some commenters stated that the reasoning presented in the NPRM does not make sense, and expressed doubt that the cost of providing these services could possibly have risen enough in 3 short years to justify an increase of this magnitude, including:

• Workload volume submitted in Tables 1 and 5 are the same and do not indicate any increase in workload after the increase in fee schedules;

• Table 4 shows a combined total increase of only 7,200 requests in the last three years;

• Table 24 shows how costs will be *reduced* to the agency by decreasing the administrative burden through electronic versions of records;

• The proposal provides no real basis of comparison of real costs;

• DHS does not currently have enough data to estimate the effects for small entities; and

• The expected use in the next fiscal year shows almost no impact to USCIS.

*Response:* DHS recognizes commenters' concerns regarding the scope of the fee increases for Forms G–1041 and G–1041A in the NPRM. The proposed increase reflected changes in USCIS' methodology for estimating the costs of the genealogy program to improve the accuracy of its estimates. In response to public comments on the proposed genealogy fee increases, USCIS further refined the methodology used to estimate genealogy program costs. Based on the refined methodology, this final rule establishes a fee for Form G–1041, Genealogy Index Search Request, when filed online as $160 and $170 when filed on paper. Using the same methodology refinement, DHS establishes a fee for Form G–1041A, Genealogy Records Request, when filed online as $255 and $265 when filed by paper.

INA section 1356(t)(1) authorizes DHS to set the genealogy fee for providing genealogy research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. USCIS must estimate the costs of the genealogy program because it does not have a discrete genealogy program operating budget. Nor does USCIS discretely identify and track genealogy program expenditures. The same office that researches genealogy requests, the National Records Center, also performs other functions, such as FOIA operations, retrieving, storing, and moving files. In the FY 2016/2017 fee rule, DHS estimated the costs of the genealogy program indirectly using projected volumes and other information. The projected costs included a portion of Lockbox costs, genealogy contracts, and other costs related to the division that handles genealogy, FOIA, and similar USCIS workloads. *See* 81 FR 26919. This estimation methodology underestimated the total cost to USCIS of processing genealogy requests by not fully recognizing costs associated with the staff required to process genealogical requests. Therefore, other fees have been funding a portion of the costs of the genealogy program, and DHS is correcting that in this rule.

In FY 2018, USCIS incorporated the genealogy program into the National Records Center (NRC). This change enabled USCIS to revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staffing devoted to the genealogy program. DHS estimated the costs of the genealogy program using this methodology for the first time in its FY 2019/2020 fee review

and subsequently proposed to base the fees for Forms G–1041 and G–1041A on these revised cost estimates. DHS did not apply cost reallocation to the fees for Forms G–1041 and G–1041A. DHS believes that these revised cost estimates and fees reflect more accurately the true costs to USCIS of operating the genealogy program than the previous indirect estimation methodology.

As requested by public comments received on the NPRM, USCIS examined the proposed genealogy fees, and decided to further refine its cost estimation for the genealogy program. For this final rule, USCIS reviewed the costs attributable to the NRC to identify those that directly support the genealogy program. USCIS determined that some NRC costs do not directly support the genealogy program and are not attributable to Forms G–1041 and G–1041A. USCIS removed the non-attributable costs to the genealogy program from its cost estimates for Forms G–1041 and G–1041A. USCIS maintained in its genealogy program cost estimates a proportional share of NRC overhead costs based on the number of staff at the NRC supporting the genealogy program. Thus, USCIS reduced its estimate of the genealogy program's total cost by $0.9 million. In this final rule, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $160, the fee for a paper filed G–1041 as $170, the fee for Form G–1041A, Genealogy Records Request, when filed online as $255, and the fee for a paper filed G–1041A as $265 to reflect its revised, lower cost estimates directly attributable to the USCIS genealogy program. To the extent that DHS will no longer recover a full proportionate share of the NRC's costs via fees for Forms G–1041 and G–1041A, USCIS will recover those costs through the fees assessed for other immigration benefit requests.

DHS appreciates the public's feedback on the USCIS genealogy program and has implemented changes in this final rule in response to these comments.

*Comment:* Some commenters claimed that taxpayers have already paid to acquire, manage, and store these records. Taxpayers already support the government substantially and should not be charged for access to records.

*Response:* DHS understands the commenters' concerns regarding the potential for duplicative payment. However, USCIS does not receive taxpayer funds for the genealogy program, nor do taxes pay for the acquisition, management, or storage of records in USCIS' custody. Therefore, DHS must recover the estimated full cost of the genealogy program, including managing and storing records, via USCIS' fee schedule.

When DHS receives a request for genealogical records, it must identify whether USCIS possesses relevant records, retrieve, and review them for release where appropriate. These activities incur costs beyond the general costs of record management and storage that DHS incorporates into other immigration benefit request fees via the Records Management activity. USCIS estimates the costs of the genealogy program via the Research Genealogy activity, as shown in the Cost Objects section of the supporting documentation that accompanies this final rule. Therefore, DHS establishes fees for Forms G–1041 and G–1041A to recover these additional costs. DHS has explicit authority to recover the costs of providing genealogical services via genealogy fees. *See* 8 U.S.C. 1356(t).

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Some commenters opposing the fee increase focused on income and ability-to-pay, such as the following:

• The increased fees would be far beyond the financial means of most average Americans and make it impossible for genealogists and families to make and pay for requests. Only the rich and wealthiest would be able to access these records.

• Many individuals doing genealogy research tend to be older and on limited income.

• A few commenters said that 2018 data from the Federal Reserve Board indicated that the proposed increased fees would place access to Federal public records beyond the financial capabilities of an estimated 40 percent of Americans. Many commenters stated that records should be easily obtainable to all and not used to generate revenue for the government.

*Response:* DHS recognizes the concerns of commenters and acknowledges the substantial increase in the fees for Forms G–1041 and G–1041A. In response, USCIS refined its cost estimation methodology for the genealogy program as described above. In this final rule, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $160, the fee for a paper filed G–1041 as $170, the fee for Form G–1041A, Genealogy Records Request, when filed online as $255, and the fee for a paper filed Form G–1041A as $265 to reflect its revised, lower cost estimates for operating the USCIS genealogy program.

In this final fee rule, DHS emphasizes the beneficiary-pays principle. Consistent with its approach to most other fees addressed in this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at a level that reflects the estimated full cost of providing those services. DHS does not establish these fees to limit access to genealogical records, and they do not augment government tax revenue. DHS declines to require other individuals filing immigration benefit requests to subsidize users of the genealogy program.

*Comment:* Multiple commenters stated that the proposed fee increases for record requests seems to be a punishment for citizens who want access to ancestors' records. Multiple individuals stated that USCIS would be "holding them hostage" by demanding exorbitant and unjustified fees to access documents on immigration ancestors. The commenters wrote that these records should already be publicly accessible under the law.

*Response:* DHS rejects the characterization of the proposed fees as a way to punish or hold hostage individuals who seek records related to their ancestors via the USCIS genealogy program. In this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at a level sufficient to recover the estimated full cost of providing access to genealogical records, as provided for by law. *See* INA section 286(t), 8 U.S.C. 1356(t). DHS is not motivated by any other consideration and declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that USCIS most likely has indices of all files in digital form, therefore the time required to type a name into a computer, read the result, and email it to the requester is a matter of minutes and the salary and benefits of the employees do not justify a fee of $240. A few commenters stated that USCIS should publish the figures for the "actual out-of-pocket costs" of searching indices and providing copies of records found and the estimate of the number of requests likely to be processed so that the public can judge whether the fees are appropriate to the cost of providing the service.

*Response:* DHS acknowledges that USCIS possesses indices of many different types and series of records. These indices aid USCIS in efficiently identifying records that may be related to a given genealogical request. However, to fulfill genealogical records requests, USCIS incurs costs beyond identifying records that may be relevant

to a particular inquiry. In addition to identifying relevant records, USCIS must retrieve the relevant records and manually review them before release to ensure compliance with federal privacy statutes. In addition to these direct costs, USCIS also incurs overhead costs associated with storing and managing the records, including relevant facilities costs. In this final rule, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041, Genealogy Index Search Request, to be $160 when filed online and the total cost of completing a paper Form G–1041, Genealogy Index Search Request, to be $170. Therefore, DHS establishes the fee for Form G–1041 as $160 when filed online and a paper filed Form G–1041 as $170. In this final rule, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041A, Genealogy Records Request, to be $255 when filed online and the total cost of completing a paper Form G–1041A, Genealogy Records Request, to be $265. Therefore, DHS establishes the fee for Form G–1041A as $255 when filed online and the fee for a paper filed Form G–1041A as $265.

*Comment:* Many commenters stated that it was vital to be able to obtain records and family artifacts held in files about their ancestors' immigration to the United States and path to becoming Americans. A commenter stated that the records provide information that genealogists often cannot find in any other extant record. Some commenters said public access and researching genealogy helps educate themselves, their children, and other generations on important parts of immigration history, such as the Chinese Exclusion Act and the Holocaust. Multiple commenters wrote ''an informed and educated citizenry is essential for our democracy to continue to prosper.'' A few commenters said studies show that children perform better in school if they know about their ancestors. A few commenters wrote that genealogy research is an integral part of the Church of Jesus Christ of Latter-day Saints and the proposed increase in fees would be a burden to those of that faith. Some commenters said that Daughters of the American Revolution and Native Americans search records to confirm applications for memberships. Ancestral history projects research American slaves brought to South Carolina and Virginia. A fee increase would negatively affect legitimate organizations that keep detailed, complete, and accurate records of American history and would forestall efforts to complete the histories of minority citizens. A few commenters stated that USCIS genealogy records contain information no longer found in Europe, where the Nazis destroyed records during World War II.

*Response:* DHS recognizes the importance of genealogical records and the connections they can provide to immigrant ancestors. In this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at a level sufficient to recover the estimated full cost of providing access to genealogical records, as provided for by law. *See* INA section 286(t), 8 U.S.C. 1356(t). The fees established in this final rule are intended to recover the estimated full cost of providing genealogical record services and are not motivated by any other consideration. DHS declines to make changes in in this final rule in response to these comments.

*Comment:* Several commenters wrote that the information provided is essential as part of an application process to those pursuing dual citizenship.

*Response:* DHS recognizes the value of genealogical records to individuals who are pursuing dual citizenship. However, as an agency funded primarily through user fees, USCIS must recover the full cost of the services it provides. Consistent with the beneficiary-pays principle emphasized throughout this final rule, DHS declines to require other immigration benefit requestors to subsidize individuals requesting genealogical services from USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few individuals stated that affordable access to genealogy is important to helping determine genetic medical problems and allowing family members to take proactive precautions that foster improved public health as well as substantial cost-savings by federal and state financial medical services.

*Response:* DHS recognizes that individuals may value and request genealogical records for many different reasons. However, DHS is not aware of any data demonstrating the monetary value of health information that may be derived from such records. Consistent with the beneficiary-pays principle emphasized throughout this final rule, DHS declines to require other immigration benefit requestors to subsidize individuals requesting genealogical services from USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters stated that the proposed fees are far from advancing the goals of the USCIS Genealogy Program and instead would likely be the demise of the program. Some commenters wrote that the proposed increase in fees would price-out and prevent researchers from accessing records, significantly reducing the number of requests for documents, and essentially closing down USCIS' Genealogy Program. Many commenters stated that the proposed increase in fees appears intentionally designed to put an end to people using the Genealogy Program. Numerous commenters addressed how the hefty charges for the initial research, regardless of whether USCIS identified any records, would be by itself a substantial deterrent to genealogical research.

*Response:* DHS acknowledges the substantial increase in fees for Forms G–1041 and G–1041A in this final rule. In this final rule, DHS established the fees for Forms G–1041 and G–1041A to recover the estimated full cost to USCIS of providing genealogical services. In setting these fees, DHS is not motivated by any other consideration. DHS does not intend to discourage individuals from requesting genealogical records, to deter genealogical research, or to eliminate the USCIS genealogy program. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Many commenters wrote that the proposed change would be in violation of the Freedom of Information Act (FOIA). Some further commented that the proposed fees are inexplicable given that USCIS often directs a majority of requests to the FOIA program for processing. Several commenters questioned how there could be a charge, other than standard FOIA fees, if the information is available via FOIA. Some commenters wrote that a charge of $240 to simply search an index is unacceptably high compared to standard DHS cost and timeframes for FOIA requests because this fee would equal 6 hours of searching the Master Index, when index searches should usually be able to be completed in an hour or less, undercutting the intent of the FOIA.

*Response:* There is no conflict between the Freedom of Information Act and DHS' operation of the USCIS genealogical program. Nor is USCIS constrained in establishing fees for its genealogical services to the levels established under FOIA. USCIS formerly processed requests for historical records under USCIS' Freedom of Information Act (FOIA)/ Privacy Act (PA) program but the demand for historical records grew dramatically. Because the records were not subject to FOIA exemptions, that

process was not the most suitable for genealogy request. *See Establishment of a Genealogy Program;* Proposed rule, 71 FR 20357–20368 (April 20, 2006). The genealogy program was established to relieve the FOIA/PA program from burdensome requests that require no FOIA/PA expertise, place requesters and the Genealogy staff in direct communication, provide a dedicated queue and point of contact for genealogists and other researchers seeking access to historical records, and cover expenses through fees for the program. and, reduce the time to respond to requests. *Id* at 20364. In this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at levels sufficient to recover the estimated full cost of providing access to genealogical records, as provided for by law. *See* INA section 286(t), 8 U.S.C. 1356(t). In this final rule, using the refined methodology described above, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041, Genealogy Index Search Request, to be $160 when filed online and the total cost of completing a paper Form G–1041, Genealogy Index Search Request, to be $170. Therefore, DHS establishes the fee for Form G–1041 as $160 when filed online and a paper filed Form G–1041 as $170. In this final rule, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041A, Genealogy Records Request, to be $255 when filed online and the total cost of completing a paper Form G–1041A, Genealogy Records Request, to be $265. Therefore, DHS establishes the fee for Form G–1041A as $255 when filed online and the fee for a paper filed Form G–1041A as $265.

DHS appreciates the commenters' concerns regarding differences between the FOIA process and the genealogical index search and records request processes. Before 2017, the USCIS staff who processed FOIA requests also processed some genealogical records requests, particularly records from 1951 or later. However, USCIS moved the genealogical program to the NRC in 2017. Since that time, dedicated USCIS genealogical staff process all genealogical records requests. Commenters are mistaken in stating that the genealogy program sends appropriately filed genealogy requests through the FOIA process. DHS acknowledges that both FOIA requests and genealogical records requests are subject to review under the Privacy Act of 1974 to ensure that USCIS does not inappropriately release information to third parties. However, USCIS'

genealogy program is distinct from the FOIA program and the fees DHS establishes for Forms G–1041 and G–1041A reflects the estimated full cost of only the USCIS genealogy program. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Numerous commenters stated that USCIS needs to comply with its own retention schedules and send appropriate records to NARA, as required by law. Multiple commenters wrote that requests for documents, such as A-files, visa and registry files, and alien registration forms, should already be at NARA per law and for a minimal cost. Some commenters wrote that NARA could manage records more efficiently, accessed more freely, and reproduced more economically, as preserving and providing access to historical records of the federal government is one of NARA's core missions and areas of expertise. Many commenters requested information on USCIS' plan and timeline to move all the records to NARA for release.

*Response:* DHS acknowledges that many records in USCIS' possession are due to be transferred to NARA under its existing records retention schedules. USCIS strives to adhere to its records retention schedules and transfer files to NARA expeditiously when records are eligible for transfer. Unfortunately, issues such as incomplete/non-existent file indices or other operational difficulties may inhibit and delay such transfers. USCIS works with NARA to address all such issues and expects to transfer more files to NARA in the near future. DHS agrees that NARA is the appropriate repository for permanently retained records. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* Many commenters stated that implementation of increased fees should not occur without careful explanation and discussion of alternatives. Several commenters suggested alternatives, including rolling back or reducing fees for record requests, aligning an increase with inflation rates, charging less for family genealogy, allowing NARA to provide free or much lower cost access to the files, digitizing all documents and allowing access on-line, transferring records to an appropriate repository, and/or limiting USCIS holdings to non-historical records. A commenter suggested that all pre-1948 indices and records be copied to NARA, following a federal government census rule that information can be disclosed after 72 years. A few commenters wrote that encouraging requests via electronic submissions for index searches and

documents, as stated in the proposed rule, and digitization of records is worthy, as it should result in lower fees, greater efficiency, and ease of use, not the reverse.

*Response:* DHS appreciates and agrees with the commenters' reasoning that filing index search requests and records request online increases efficiency and, all else equal, reduces the cost to USCIS of providing the associated services. To reflect these reduced costs, in this final rule, DHS implements a fee of $160 for Form G–1041, Genealogy Index Search, when filed online and a fee of $170 for a paper filed Form G–1041. Similarly, DHS implements a fee of $255 for Form G–1041A, Genealogy Records Request, when filed online and a fee of $265 for a paper filed Form G–1041A. The difference between the fee for a form filed online and a form filed on paper represents the estimated reduction in cost to USCIS of providing the relevant service.

DHS also appreciates commenters' suggestions to reduce the fees for record requests. As described above, in response to public comments received on its NPRM, USCIS further refined its cost estimation methodology for the genealogy program. These refinements reduced the estimated cost of the USCIS genealogy program by $0.9 million, leading to a commensurate reduction in the fees for Forms G–1041 and G–1041A from the levels proposed in the NPRM.

DHS evaluated alternatives to increasing the genealogy fees. Unfortunately, alternative approaches such as increasing the fees for Forms G–1041 and G–1041A by the rate of inflation would not enable USCIS to recover the estimated full cost of providing genealogical services. Such an approach would require other immigration benefit requestors to subsidize the USCIS genealogy program. As stated elsewhere, consistent with the beneficiary-pays principle emphasized throughout this final rule, DHS declines to require other immigration benefit requestors to subsidize the USCIS genealogy program.

*Comment:* A couple of commenters suggested other changes to the proposed fees, including basing the cost on the number of pages and time for staff to prepare the records for transmission as well as using some of the new funds to fix problems that exist with managing records at USCIS (*e.g.,* losing indexes or records, staffing issues). A few commenters wrote that if a search returns no information, then USCIS should not charge a fee or should issue a partial refund.

*Response:* DHS understands the commenters' suggestions. However,

USCIS must recover the cost of its operations through user fees. DHS is setting the fees for Form G–1041 and G–1041A at levels that represent the estimated full cost to USCIS of providing genealogical services. These fees represent the estimated average cost of completing an index search or a records request. USCIS does not track or differentiate the costs incurred based on the number of pages of documents involved in a request, nor does USCIS track the time each individual genealogy request requires. Charging a la carte fees as suggested would be burdensome to administer because we would need to track the time spent on every request and invoice for payment. That system would not function properly, or efficiently or provide for full cost recovery. DHS declines to adopt the commenters' suggestion to establish the fees for Forms G–1041 and G–1041A using this method.

Furthermore, DHS incurs costs associated with index searches and records requests regardless of whether DHS ultimately identifies relevant records that can be provided to the requestor. Refunding the fee for Form G–1041 and G–1041A that do not result in records or information provided to the requestor would defy the principles of full cost recovery. DHS declines to require other applicants and petitioners to subsidize the cost of processing Forms G–1041 and G–1041A when those requests do not identify information for release to the requestor.

*Comment:* Several commenters suggested repealing the tax cuts implemented by President Trump that resulted in a substantial budget deficit instead of implementing the proposed increase in fees.

*Response:* The USCIS genealogy program is funded by user fees, consistent with statutory authority. *See* INA section 286(t), 8 U.S.C. 1356(t). DHS is adjusting the fees for Forms G–1041 and G–1041A to reflect USCIS' estimated full cost of providing the relevant services.

*Comment:* One commenter said that although immigration fees should not increase, non-immigration related genealogical search fees should increase to recover those costs.

*Response:* DHS thanks the commenter for their input but declines to adopt the recommendation. DHS is adjusting the fees for Forms G–1041 and G–1041A to reflect USCIS' estimated full cost of providing the relevant services.

4. Form I–90, Application To Replace Permanent Resident Card

*Comment:* A commenter stated that the $40 reduction would not lead to any real financial relief to LPRs who want to apply for naturalization when the citizenship fees will increase by 83 percent. The commenter stated that, due to long processing times, many citizenship applicants must, for all practical purposes, pay the fees for both Forms I–90 and N–400, which total $1,585, in order to keep green cards up to date. The commenter said it failed to see how this "miniscule" reduction in Form I–90 fees helps the agency accomplish its goals.

*Response:* In this final rule, DHS adjusts the fee for Form I–90, Application to Replace Permanent Resident Card, to $405 when filed online and the fee for a paper filed Form I–90 to $415. Most applicants for Form I–90 must pay the current $455 fee plus an $85 biometric services fee, thus making the total current fees $540. These amounts represent USCIS' estimated full cost adjudicating Form I–90, including the cost of providing similar services without charge to asylum applicants and other immigrants. In setting these fees, DHS intends to achieve full cost recovery for USCIS, as provided in law, while emphasizing the beneficiary-pays principle of user fees. DHS is not motivated by any other consideration in establishing these fees, thus, we did not consider any interplay between the fees for Forms I–90 and N–400 in the NPRM, nor do we in the final rule. The new fee for Form I–90 of $405 when filed online represents a $50 decrease from the previous fee of $455. The new fee for a paper filed Form I–90 of $415 represents a $40 decrease from the previous fee of $455. The new fees include the cost of biometric services, thus making the total decrease $135 when filed online or $125 when filed on paper. These adjustments reflect efficiencies USCIS has achieved in adjudicating Form I–90, thereby reducing the estimated cost of adjudication. The lower fee for Form I–90 when filed online reflects the estimated cost savings to USCIS of receiving the application online. These fee adjustments are intended to ensure that the fees accurately reflect the estimated full cost of adjudication. DHS declines to make any adjustments in response to this comment.

*Comment:* Another commenter said, by not only increasing the N–400 fee but also reducing the Form I–90 fee, the proposed rule would further discourage Form N–400 applicants from naturalizing and obtaining the full benefits of citizenship for both themselves and our nation. Similarly, another commenter said decreasing the Form I–90 fee while increasing the Form N–400 fee appears to be a conscious policy decision by USCIS to keep LPRs from applying for U.S. citizenship.

*Response:* DHS acknowledges that this final rule establishes increased fees for Form N–400 ($1,160 if filed online and $1,170 if filed on paper) while reducing the fees for Form I–90 ($405 if filed online and $415 if filed on paper) DHS does not intend to discourage naturalization and is not motivated by any consideration other than achieving full cost recovery while emphasizing the beneficiary-pays principle in establishing these fees. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter said that the Form I–90 fee decrease is puzzling considering the current processing and adjudication of the corresponding benefits. The commenter said a simple renewal of a permanent resident card currently takes up to 11 months, wondered why issuing a new card takes that long, and it seems unlikely that these processing times will improve with a decreased fee.

*Response:* DHS acknowledges that USCIS' processing times for Form I–90 have exceeded its goals. However, USCIS has achieved efficiencies in adjudicating Form I–90 that have reduced the relative cost per adjudication. Thus, in this final rule DHS implements a fee for Form I–90, Application to Replace Permanent Resident Card, of $405 when filed online and a $415 fee for a paper filed Form I–90. DHS appreciates the implication that it may charge more for Form I–90, but to maintain consistency with full cost recovery. DHS declines to make any adjustments in this final rule in response to this comment.

5. Form I–131, Application for Travel Document, Refugee Travel Documents

*Comment:* A commenter stated that comparing Form I–131, Application for Travel Document, to a passport to set the fee for refugee travel documents is inappropriate because passports are valid for 10 or 5 years versus the 1 year for the Refugee Travel Document. The commenter recommended that refugee travel documents be valid for longer than a year for this reason and because other countries often require that travel documents be valid for 6 months beyond the expected period of stay. Furthermore, the commenter stated that adult U.S. passport renewals do not include a $35 execution fee, implying that DHS should not consider the execution fee in establishing the fee for a refugee travel document.

*Response:* DHS declines the commenter's request to extend the validity length of refugee travel documents (RTD). DHS did not propose

changes to the validity length of the RTD that is codified at 8 CFR 223.3(a)(2) and, besides the commenter, we do not think the public would think that an increase to the validity length of an RTD would be a subject open for public comment in a rule dealing primarily with fees. The fee for an RTD is linked to the fee for a passport since Article 28 of the 1951 U.N. Convention Relating to the Status of Refugees (''1951 Refugee Convention''), and the 1967 U.N. Protocol Relating to the Status of Refugees ''the 1967 Refugee Protocol''), which, by reference, adopts articles 2 through 34 of the 1951 Refugee Convention, requires state parties to issue documents for international travel to refugees lawfully staying in their territory and that fees charged for such documents shall not exceed the lowest scale of charges for national passports. *See* United Nations Protocol Relating to the Status of Refugees, Jan. 13, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 1967 Refugee Protocol. Consistent with past practice, DHS is increasing the fee for Form I–131, Application for Travel Document, when requesting a refugee travel document by $10, the amount of increase in the cost of a U.S. passport to $145 for adults and $115 for children. However, the term of an approved RTD is not related to that of a passport, and it will not be changed in this rule.

6. Form I–131A, Application for Travel Document (Carrier Documentation)

*Comment:* A few commenters opposed the fee increase for Form I–131A. One of these commenters questioned why the fee is being increased by $435, or 76 percent, when USCIS would only have to reimburse the Department of State (DOS) with $385 to replace lost documents. A commenter asked if DHS had considered the effect of this ''massive'' fee increase on a vulnerable population. Some commenters claimed DOS would not have to be reimbursed if USCIS international offices had not been closed.

*Response:* DHS acknowledges that the $1,010 fee established in this final rule for Form I–131A, Application for Travel Document (Carrier Documentation), represents a substantial increase of $435 relative to the previous fee. Consistent with full cost recovery and the beneficiary-pays principle emphasized throughout this final rule, the new fee of $1,010 represents USCIS' estimated full cost of adjudicating Form I–131A, including the cost of providing similar services to asylum applicants and other immigrants without charge, at the time of USCIS' FY 2019/2020 fee review.

Before Form I–131A was published, USCIS had completion rate data specific to providing carrier boarding documents. However, DHS did not use that completion rate data to establish a separate Form I–131A fee when it published Form I–131A. Instead, DHS set the Form I–131A fee to be the same as for other travel documents. Establishing Form I–131A and requiring fee payment using *Pay.gov* standardized requirements that were somewhat different or informal before the creation of Form I–131A. While not discussed in the FY 2016/2017 fee rule, DHS believed that the standardized Form I–131A might reduce the completion rate, and the cost, of the workload. When USCIS conducted its FY 2019/2020 fee review, it separated completion rate data for Forms I–131 and I–131A and proposed separate fees. At this point, Form I–131A existed for several years, so the completion rate data reflect the standardized process. Thus, we are setting a more accurate fee to reflect the full cost of adjudicating Form I–131A. The final fee for Form I–131A reflects the cost of USCIS processing, including the costs of USCIS reimbursement to DOS for action taken on behalf of USCIS. At the time of its FY 2019/2020 fee review, USCIS did not yet have sufficient information regarding office closures and the transfer of responsibilities between USCIS and the DOS to accurately reflect anticipated changes in the average cost of adjudicating Form I–131A. Thus, any potential cost savings related to the reduction in the number of offices USCIS maintains abroad are not included in this final rule. USCIS will incorporate all newly available information in its next fee review.

Commenters who claimed that USCIS would not need to reimburse the Department of State had it maintained its previous international presence are mistaken. USCIS reimburses DOS for all work performed on its behalf. This includes work performed on behalf of USCIS in locations where USCIS is not present and in locations where USCIS has an office. As USCIS has never had a presence in all countries where an individual may need to file Form I–131A, DOS has always adjudicated some Forms I–131A on behalf of USCIS. Altering USCIS's international presence did not change this operational necessity. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter wrote that DHS failed to apprise stakeholders of its reasoning for the substantial increase to the Form I–131A fee. The commenter added that there is no justification for

charging LPRs for the privilege of returning to their homes, jobs, and families.

*Response:* DHS disagrees with the commenter's assertion that DHS failed to explain or justify the fee increase for Form I–131A. In the NPRM, DHS explained that in the FY 2016/2017 fee review, USCIS calculated a single fee for Forms I–131 and I–131A. *See* 84 FR 62306 (Nov. 14, 2019). DHS clarified that in the FY 2019/2020 fee review, USCIS calculated a separate fee for Form I–131A to reflect differences between Form I–131 and Form I–131A, including the fact that Form I–131A is adjudicated abroad, where costs are typically greater than the cost of adjudicating an equivalent form domestically. This differentiation between Form I–131 and Form I–131A is consistent with the beneficiary-pays principle of user emphasized throughout the NPRM and this final rule, as it ensures that the fee an applicant pays better reflects the estimated full cost to USCIS of adjudicating the application. DHS declines to make changes in this final rule in response to the comment.

*Comment:* One commenter claimed these new fees are an attempt prevent LPRs from becoming U.S. citizens.

*Response:* DHS rejects the claim that its decision to adjust the fee for Form I–131A to $1,010 is motivated by any consideration other than USCIS achieving full cost recovery. The fee of $1,010 represents USCIS' estimated full cost of adjudicating Form I–131A, including the cost of providing similar services to asylum applicants and other immigrants without charge, at the time of USCIS' FY 2019/2020 fee review. DHS declines to make changes in this final rule in response to this comment.

7. Form I–192, Application for Advance Permission To Enter as a Nonimmigrant

*Comments:* A commenter said it did not oppose a fee increase associated with Form I–192 but wrote that the fee increase is quite high for an application fee that, if approved, grants entry to the U.S. for a relatively short time. The commenter said the proposal would cost Canadian citizens $1,400 on average and questioned whether USCIS was considering increasing the duration of authorized presence in the U.S. to a minimum of 5 years and a maximum of 10 years.

Many commenters suggested that the $485 or 52 percent increase for fees related to visa applications for victims of crime and victims of trafficking in persons is ''outrageous.'' A commenter wrote that the proposal to raise the Form I–192 fee defeats the purpose of

the U-visa, which protects victims of crime. The commenter wrote that raising fees to make this protection inaccessible to victims of crime runs counter to Congress' intent to provide protection to such victims for "compelling humanitarian and public policy/safety reasons." Another commenter stated that the $485 increase for Form I–192 was particularly steep for U nonimmigrant status petitioners who often have medical bills related to being victims of crimes and who may not work before the submission of the application.

A few commenters said that raising the fee for Form I–192 may make it harder, if not impossible, for survivors of crime to petition for U nonimmigrant status. One commenter suggested that because survivors of domestic violence often have suffered financial abuse and survivors of human trafficking often have suffered financial exploitation, they will likely be unable to pay the fees.

A commenter indicated that the increase in the filing fee for Form I–192, combined with the elimination of a fee waiver for this form, would effectively eliminate a statutorily available waiver of inadmissibility for many applicants and prevent those inadmissible immigrants from obtaining status.

Multiple commenters stated that the NPRM ignores the fact that many applicants for survivor-based relief must also file ancillary forms that do have fees, including Form I–192.

*Response:* DHS acknowledges a considerable increase of the fee for Form I–192, Application for Advance Permission to Enter as a Nonimmigrant. The new fee established in this final rule represents the estimated full cost of adjudication. [85] *See* INA section 286(m), 8 U.S.C. 1356(m). As with other USCIS fees, the fee amount is derived from the cost to USCIS of providing the relevant service; the fee is not related to the duration of the benefit received. Therefore, DHS did not evaluate potential changes in the duration of authorized presence as part of this final rule.

DHS recognizes the commenters' concerns regarding vulnerable populations, particularly applicants for

---

[85] In accordance with INA section 286(m), 8 U.S.C. 1356(m), USCIS total costs include the cost of similar services provided without charge to asylum applicants and other immigrants, which encompass fee exemptions, waivers, and setting fees below the amount suggested by the model. Throughout the remainder of this rule, when USCIS refers to the estimated full costs of adjudication, in the interest of the economy of words and improving readability, that term includes the cost of services provided without charge to asylum applicants and other immigrants in accordance with the INA.

T nonimmigrant status and petitioners for U nonimmigrant status, who use Form I–192. Consistent with its commitment to preserve access to required fee waivers for populations identified in statute, the fee for Form I–192 will remain waivable for those seeking T and U nonimmigrant status, provided that those applicants file Form I–912, Request for Fee Waiver and demonstrate that they meet the requisite criteria for approval. *See* 8 CFR 106.3. DHS believes that maintaining access to fee waivers for these populations mitigates any concerns that the fee increase for Form I–192 would limit access to protections.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Another commenter stated that most of its clients who are pursuing T or U nonimmigrant status must file supplemental forms that often have very high fees, including Form I–192. The commenter indicated that most of the issues disclosed require very little, if any, further adjudication from USCIS, and, therefore, the fee is unnecessary and unfair.

*Response:* USCIS data also indicates that most aliens pursuing T and U nonimmigrant status must file Form I–192. Those aliens may request a fee waiver. DHS disagrees that Form I–192 requires little effort by USCIS. USCIS evaluates the evidence regarding the inadmissibility charges present (immigration violations, criminal issues, potential fraud, etc.) and the alien's responses and evidence provided to address those charges. Depending on the number of inadmissibility grounds and complexity of the individual filing, those adjudications may require considerable time and resources.

In many cases, aliens file Form I–192 with U.S. Customs and Border Protection, which adjudicates those filings. In the NPRM, DHS explained that USCIS had incorporated cost and workload volume information from CBP into its cost model to determine a single fee for Form I–192 that reflects the estimated full average cost of adjudicating Form I–192 for CBP and USCIS. *See* 84 FR 62321.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* One commenter stated that Form I–192 was created to encourage eligible individuals to complete the immigrant visa process abroad, promote family unity, and improve administrative efficiency.

*Response:* Form I–192, Application for Advance Permission to Enter as a Nonimmigrant, is not part of the immigrant visa process. It appears that

the commenter may have confused Form I–192 with Form I–601A, Application for Provisional Unlawful Presence Waiver. DHS declines to make changes in this final rule in response to the comment.

**8. Form I–193, Application for Waiver of Passport and/or Visa**

*Comment:* One commenter said that the proposed 377 percent fee increase for Form I–193 is "startling." Another commenter stated that the 377 percent increase is "outrageous" given the time and effort required to fill out and adjudicate the form with just one page of content. The commenter also stated that a small number of applicants use the form to travel, usually in extenuating circumstances beyond the control of the applicant. As such, it is unlikely that there would be a high incidence of fraud or abuse to justify such a fee increase. The commenter also said that it is unreasonable to expect applicants to pay the $2,790 fee on the spot.

*Response:* DHS acknowledges a substantial increase in the fee for Form I–193. In its NPRM, DHS explained that USCIS incorporated cost and workload volume information from CBP into its ABC model to determine a single fee for Form I–193 that reflects the estimated full average cost of adjudicating Form I–193 for CBP and USCIS. *See* 84 FR 62321. CBP adjudicates most filings of Form I–193 and incurs a majority of the costs associated with adjudication. As documented in the NPRM, in FY 2017 CBP incurred an estimated $18.0 million in costs to adjudicate filings of Form I–193. This final rule establishes the fee for Form I–193 at a level sufficient to recover the full average estimated cost of adjudication for both USCIS and CBP.

DHS declines to make changes in this final rule in response to these comments.

**9. Form I–290B, Notice of Appeal or Motion**

*Comment:* A commenter stated that increasing the fee for Form I–290B places U-visa petitioners at risk of not being able to exercise their due process rights and threatens their ability to appeal or reopen their petition. Another commenter recommended that USCIS fully refund the filing fee for Form I–290B if the agency determines, after adjudicating, that the underlying petition denial was the result of clear USCIS error.

*Response:* DHS recognizes the importance of maintaining access to Form I–290B to ensure that individuals have the ability to appeal or file a

motion to reopen or reconsider a decision. In recognition of this, DHS deviated from the beneficiary-pays principle to transfer some of the costs for adjudicating Form I–290B to all other fee payers. The proposed fee for Form I–290B was far below the estimated cost to USCIS of processing I–290B filings, an increase of only 5 percent. *See* 84 FR 62293. In this final rule, DHS adjusts the fee for Form I–290B from $675 to $700, an increase of approximately 3.7 percent. Furthermore, in the NPRM, DHS clarified that Form I–290B would remain fee-waivable for VAWA self-petitioners, applicants for T nonimmigrant status and petitioners for U nonimmigrant status, petitioners, and T nonimmigrant status applicants. *See* 84 FR 62297. DHS believes that maintaining access to fee waivers for vulnerable populations mitigates any concerns that the fee increase for Form I–290B would limit access for protected categories of individuals.

In general, USCIS does not refund a fee or application regardless of the decision on the application. There are only a few exceptions, such as when USCIS made an error which resulted in the application being filed inappropriately or when an incorrect fee was collected.

DHS declines to make changes in this final rule in response to these comments.

10. Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant

*Comment:* Multiple commenters opposed the proposed fee increase for Form I–360, stating that it would harm the ability of religious organizations to petition for their workers. Commenters stated that this would impact the non-profit organizations associated with these religious workers and the communities that they support.

*Response:* DHS recognizes the importance of maintaining access to Form I–360 for individuals and organizations. In recognition of this, DHS proposed in the NPRM to deviate from the beneficiary-pays principle, transfer some of the costs for adjudicating Form I–360 to all other fee payers, and hold the fee for Form I–360 far below the estimated full cost to USCIS of processing I–360 petitions, proposing to increase the fee by only 5 percent. *See* 84 FR 62293. The fee to recover full cost would have exceeded $5,500.[86] Such a high fee would place an unreasonable burden on petitioners. In this final rule, DHS adjusts the fee for

---

[86] *See* the FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation in the docket for more information.

---

Form I–360 from $435 to $450, an increase $15 or approximately 3.4 percent as discussed in the proposed rule. DHS declines to make changes in this final rule in response to these comments.

11. Form I–485, Application To Register Permanent Residence or Adjust Status

a. Debundling Interim Benefits

*Comment:* Multiple commenters wrote that the proposed debundling of interim benefits led to excessive fees. Many commenters stated that the steep increase in fees, along with the elimination of waivers will make adjustment of status unattainable for many low-income and working-class people. A few commenters said this change would create a catch-22 where immigrants with low income can afford to apply to adjust but cannot afford to seek employment authorization. A commenter stated that the proposed change would force highly skilled workers to pay $1,075 more for dual-intent visas than H–1B or L–1 dual-visa applicants. Other comments wrote that charging fees for concurrently filed ancillary Forms I–765 and I–131 with Adjustment of Status applications, along with renewals, would create a perverse incentive for USCIS to delay interim benefit and Form I–485 adjudications in order to receive additional funds. A few commenters wrote the proposed changes would force immigrants out of the legal immigration system. Other commenters added that this change could contribute to family separation. A commenter claimed USCIS ignores the fact that children will need to have a travel authorization, and therefore will still need to file Form I–131 for advance parole. One commenter stated this change will deny immigrants the path to citizenship. Another commenter said USCIS' purpose is an attempt to discourage families from being able to afford to apply for legal permanent residence.

*Response:* DHS acknowledges the total cost increase for adjustment of status applicants who request interim benefits. The fees DHS establishes in this final rule accurately reflect the estimated full cost of adjudicating those applications, including the cost of providing similar services to asylum applicants and other immigrants without charge. USCIS did not realize the operational efficiencies envisioned when it introduced bundled filings for interim benefits and adjustment of status applications, which was implemented to address the same commenter accusation of a revenue incentive. *See* 72 FR 4894 (stating,

''This creates the perception that USCIS gains by processing cases slowly.''). USCIS has no data to indicate that it takes less time to adjudicate interim benefits bundled with an I–485 than it does to adjudicate standalone I–131 and I–765 filings. Therefore, DHS declines to adopt the commenters' recommendation to continue bundled adjustment of status filings; this final rule eliminates bundling.

Individuals applying for adjustment of status are not required to request a travel document or employment authorization. With bundled interim benefits, individuals may have requested interim benefits that they did not intend to use because it was already included in the bundled price. Debundling allows individuals to pay for only the services actually requested. Thus, many individuals may not pay the full combined price for Forms I–485, I–131, and I–765.

DHS and USCIS are not profit-seeking entities. Neither benefit from delays in Form I–485 adjudications that may result in individuals filing for additional interim benefits. USCIS would use any revenue received to fund immigration adjudication services and minimize future fee increases.

After adjusting the results of the FY 2019/2020 fee review to account for removal of the ICE transfer, exclusion of the DACA renewal fee, and other changes, DHS establishes the fee for Form I–131, Application For Travel Document, as $590 and the fee for Form I–765, Application for Employment Authorization as $550.

b. Form I–485 Child Fee

*Comment:* Some commenters opposed this provision because of its effect on families and children. A commenter said this NPRM would burden families who would be required to pay an increased total cost for multiple concurrent adjustments and create barriers for low-income and working-class individuals. Another commenter said this change would have a negative effect of children and youth, either delaying their ability to unite with family or deterring it completely.

*Response:* DHS acknowledges a substantial increase in the fee for Form I–485 for child applicants who are under 14 years old and are filing with at least one parent. Consistent with the beneficiary-pays principle of user fees emphasized throughout this final rule, DHS adjusts the fee for all Forms I–485, except those filed by refugees, to $1,130 to reflect the estimated full cost of adjudication. This fee represents an increase of $380 relative to the previous fee of $750. DHS declines to make

AR2022_200446

changes in this final rule in response to these comments.

*Comment:* A commenter cited USCIS' justification for removal of the reduced fee for children because processing them is not distinguished by age. The commenter stated that, if the completion rate is influenced by time to adjudicate (*e.g.,* conduct background checks), this would likely be shorter for children. The commenter said USCIS has not provided data or analysis to address this concern, and that this an extreme hike for a small portion of applications.

*Response:* USCIS used the data available at the time when it conducted the FY 2019/2020 fee review to determine the fee for Form I–485. USCIS does not have data to support the commenter's contention that that the time required to adjudicate a Form I–485 (*i.e.,* the completion rate) is less for a child's application than for an adult's application, because USCIS data does not separate Form I–485 adjudications by the age of the applicant. *See* 84 FR 62305 and 81 FR 73301. Therefore, USCIS calculated the estimated average cost of adjudicating all Forms I–485. In this final rule, DHS adjusts the fee for all Forms I–485, except those filed by refugees, to $1,130 to reflect the estimated full cost of adjudication.

DHS declines to make changes in this final rule in response to the comment.

c. Form I–485 Reduced Fee for Asylees

*Comment:* Multiple commenters highlighted the cost to asylum applicants and asylees of filing Form I–589, Form I–765, and if granted asylum, Form I–485 to adjust status. A commenter stated, ''Regarding asylee Form I–485 applications, this proposed rule would cause a significant harm to be placed on those who have come to the United States after fleeing persecution in their country of origin. After waiting years for an asylum interview and sometimes more than a year after that interview for a grant of asylum, an asylee should not have any additional obstacles placed on their path to obtaining a green card, which they will use to show their lawful presence and employment authorization. This proposed change is an unnecessary impediment to asylees' integration in our society and economy.'' Another commenter wrote that the elimination of fee waivers for adjustments of status, including asylees, runs counter to the intent of Congress and will create a significant barrier that will prevent many asylees from regularizing their immigration status. Another commenter reiterated that the high fees for Form I–485 and ancillary benefits and the elimination of fee

waivers will make adjustment of status unattainable for many low-income and working class people, particularly asylees. The commenter stated that increasing the overall cost of adjustment of status would undermine family unity and prevent many low-income individuals from becoming permanent residents.

*Response:* DHS recognizes the additional burden placed on asylum applicants with the introduction of a $50 fee for Form I–589 in this final rule. Therefore, DHS establishes in this final rule a reduced fee of $1,080 for Form I–485 when filed by an individual who has been granted asylum after having paid the $50 fee for Form I–589 as a principal applicant. *See* new 8 CFR 106.2(a)(16)(ii). The reduced fee will be available to otherwise qualifying individuals regardless of whether USCIS or EOIR ultimately granted the asylum claim. DHS reiterates, as it did in the NPRM and this final rule, that DHS does not intend to deter asylum applications with the introduction of the $50 fee for Form I–589. DHS believes that effectively refunding the Form I–589 fee for approved asylees when they adjust will ensure that individuals with legitimate asylum claims do not experience a net increase in cost through the time they adjust status to that of lawful permanent resident as a result of the new fee for Form I–589.

DHS provides in this final rule that only one Form I–485 reduced fee filing will be available per Form I–589 fee paid. This approach ensures that USCIS will only provide a single $50 discount for each Form I–589 filing that ultimately results in a grant of asylum, meaning that the total value of fee reductions available to Form I–485 applicants will match the value of Form I–589 fees collected from those applicants. DHS makes the reduced fee available only to the principal applicant on an approved Form I–589 for which the $50 fee was paid. The reduced fee Form I–485 may not be transferred from the principal applicant to derivatives listed on the same Form I–589 or to other derivative beneficiaries. If DHS provided all individuals granted asylum the opportunity to file Form I–485 with a reduced fee, the ultimate value of the fee reductions could exceed the value of the revenue generated from the Form I–589 fee, resulting in a net cost to USCIS that must be passed on to other fee payers. Similarly, DHS provides that an individual qualifying for the Form I–485 reduced fee may file Form I–485 only once utilizing the reduced fee. If USCIS accepts a Form I–485 filed with the reduced fee and subsequently denies the application, that applicant may reapply

as permitted but will not qualify for the reduced fee on any subsequent filing. This ensures that the value of the fee reductions will not exceed the value of the Form I–589 fees paid by the affected applicants. If USCIS rejects a Form I–485 filed by an asylee with a reduced fee, the applicant will not have used their single reduced fee filing, and the applicant may reapply and qualify for the reduced fee.

DHS did not change its cost projections, volumes forecasts, or revenue anticipated from Form I–485 in this final rule in response to the introduction of the reduced fee for Form I–485. DHS does not anticipate receiving any Form I–485 filings during the FY 2019/2020 biennial period for this fee rule that are eligible for the reduced fee. This reflects the fact that asylum applicants will begin to pay the $50 fee for Form I–589, a pre-requisite to qualify for the reduced fee Form I–485, as of the effective date of this final rule. Those asylum applicants must have their claims adjudicated and approved before becoming eligible to adjust status one year after their asylum claim was granted. Thus, DHS does not anticipate any reduced fee Form I–485 filings until more than 1 year after the effective date of this final rule. Furthermore, because DHS anticipates no reduced fee filings during FY 2019/2020, USCIS anticipates no costs during FY 2019/2020 associated with charging less than the estimated full cost of adjudication of Form I–485 that must be reallocated to other fee-paying applicants. Therefore, no fees increase in this final rule as a result of the introduction of the reduced fee Form I–485, and the fee for Form I–485 would remain $1,130 even in the absence of the reduced fee. USCIS will evaluate the Form I–485 reduced fee in future fee reviews using all available data at that time, consistent with its evaluation of all other fees.

d. Other Form I–485 Comments

*Comment:* A commenter said USCIS' proposed changes to Supplement A to Form I–485 have no justification. The commenter said USCIS proposes removing from the Supplement A form the instruction that there is no fee for certain persons. The commenter stated that USCIS is making it even more difficult for applicants to identify the few instances where they are not obligated to pay large fees. The commenter wrote that the change would obfuscate the fact that some individuals are exempted from paying the fee by statute, leading fewer people to apply because they would erroneously believe they must pay the fee. The commenter

also wrote that the provision creates a way for USCIS to re-investigate granted adjustments under INA section 245(i), 8 U.S.C. 1255(i), going back more than 20 years, resulting in potentially stripping lawful permanent residents of their status.

*Response:* DHS erroneously stated in the NPRM that it proposed deleting text from Form I–485, Supplement A, related to those categories of adjustment applicants who are not required to pay the $1,000 sum. No such text appears on the form itself, but rather is found in the instructions. DHS will retain the language concerning the exceptions from paying the INA section 245(i), 8 U.S.C. 1255(i) sum in the Instructions for Form I–485 Supplement A, and in the rule.

*Comment:* A commenter recommended phasing in the increased Form I–485 fee over several years. A commenter recommended that the validity period of employment authorization and advance parole for dependent children also be increased from 1 to 2 years.

*Response:* In this final rule, DHS adjusts the fee for all Form I–485 applications, except those filed by refugees, to $1,130 to reflect the estimated average full cost of adjudication. DHS declines to adopt the commenter's suggestion of phasing in the increased fee over time, because USCIS would not be able to achieve full cost recovery during the phase-in period. DHS also declines to adopt the recommendation to extend the validity period of employment authorization and advance parole for dependent children.

*Comment:* A commenter opposed deleting language regarding 245(i) penalty fee exemptions from the regulations.

*Response:* In this final rule, DHS includes language in 8 CFR 106.2(a)(17) detailing the categories of applicants for adjustment of status under INA section 245(i), 8 U.S.C. 1255(i) who are not required to submit the $1,000 sum per the statute.

*Comment:* One commenter said that the increased fee for the Form I–485, when considered in combination with the separate fees for the Form I–765 and Form I–131, will have negative impacts on industries that use the Employment-Based Third Preference Unskilled Workers (Other Work) category, such as meat/poultry processers, home healthcare providers, hospitality/lodging employees.[87] The commenter

assumes that the rate of pay for workers in those industries is not as high as in other fields and the fees represent a larger percentage of those worker's wages.

*Response:* The NPRM emphasizes the beneficiary-pays principle. DHS believes that a single fee for Form I–485 will reduce the burden of administering separate fees and better reflect the estimated full cost of adjudication. By making the filing fee equal for all applicants, whether they are family-based or employment-based, the cost of adjudication for the benefit of each individual applicant will be sustained by that applicant, and other applicants are not burdened with subsidizing the cost of adjudication. In this final rule, DHS adjusts the fee for all Form I–485 applications, except those filed by refugees and certain Special Immigrants, to $1,130 to reflect the estimated average full cost of adjudication. *See* 8 CFR 106.2(a)(17)(iii).

Requiring fees paid for each renewal of interim benefits, such as employment or travel authorization, also aligns with the beneficiary-pays principal by preventing other applicants from being burdened with fees for benefits they do not wish to receive or subsidizing fees for benefits for which they do not apply. The fee increases associated with Form I–485 and interim benefits are not exclusive to employment-based applicants and therefore are not adjusted based on the filing category or rate of pay of workers.

DHS declines to make changes in this final rule in response to the comment.

12. Form I–526, Immigrant Petition by Alien Investor

*Comment:* A commenter said the fee review for EB–5 forms, such as Form I–526, failed to meet the objectives of ensuring USCIS has adequate resources and to recover the full operating costs of administering the national immigration benefits system. The commenter said the fee increase for Form I–526 was too low to balance the workload increase reported by USCIS and would not reverse the current "critically inadequate" service associated with this form. The commenter also said the fee increase was too low given that this fee is paid by affluent immigrant investors "who value time." The commenter cited USCIS data to demonstrate that the processing time associated with Form I–526 had increased since 2016 and wrote that time spent processing this application was likely to increase due to the EB–5 Immigrant Investor Program

Modernization regulation that went into effect on November 21, 2019. *See* 84 FR 35750. The commenter wrote that the 9 percent increase in the fee for this form suggests that USCIS considers the 3–4-year processing time for this form to be acceptable. However, the commenter also wrote that USCIS' projected workload volume for Form I–526 was "three times too high" considering data from 2018–2019. The commenter said the EB–5 Immigrant Investor Program Modernization regulation would dampen demand for use of this form and suggested that the number of form receipts for 2020 would be less than the 5,000 average annual receipts from 2018–2019. The commenter wrote that due to this overestimation of the number of Form I–526 receipts, the fee analysis "overestimates revenue and underestimates receipt fees needed to cover costs." The commenter said that if the number of Form I–526 receipts is closer to 4,000, the $16 million in revenue would not provide enough financial resources to cover costs and provide adequate service. The commenter suggested that USCIS had failed to consider the future workload associated with "thousands" of Form I–526 submissions that are still pending from previous years in its fee analysis, and that the agency should account for "an environment of long backlogs and falling receipts" in revising the fee for this form. The commenter reiterated that the current processing time for this form was far too long and stated that the agency should consider targeting more reasonable processing times for this form, such as the 240-day target recently suggested in the U.S. Senate. Another commenter wrote that USCIS had overestimated the workload volume associated with Form I–526.

*Response:* In its fee reviews, USCIS evaluates the estimated cost of processing all incoming workloads to determine the fees necessary to recover full cost. USCIS does not consider the cost of processing existing pending workloads in setting fees, as setting fees on that basis would place the burden of funding the processing of previously received applications and petitions on future applicants. Thus, DHS declines to include the cost of all pending Form I–526 workload in this analysis and final rule.

DHS acknowledges that USCIS' volume projections for Form I–526 in the FY 2019/2020 fee review substantially exceed the receipts in FY 2018 and FY 2019. As with other forms, USCIS created its volume projections for Form I–526 using the best information available at the time it conducted the FY 2019/2020 fee review. The commenter is

---

[87] See USCIS, *Employment-Based Immigration: Third Preference EB–3,* available at *https://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-third-*

*preference-eb-3* (last reviewed/updated March 27, 2020).

correct in stating that if USCIS has overestimated the receipt volume for Form I–526, then it has also overestimated the amount of revenue that the revised Form I–526 fee will generate. Such a scenario would also imply that USCIS had overestimated the total amount of costs to be recovered, as fewer staff would be necessary to adjudicate the newly received Forms I–526. However, it is possible that, as the commenter contends, if USCIS overestimated the anticipated volume of Form I–526 filings, it underestimated the Form I–526 fee that would be necessary to recover the full cost of adjudication. USCIS will review and reevaluate all fees during its next biennial fee review. If USCIS determines that the fee is insufficient to recover full cost, DHS may adjust the fee through a future rulemaking.

DHS acknowledges that current processing times for Form I–526 extend far beyond its processing time goals. DHS believes that adjusting USCIS fees to provide for full cost recovery constitutes the best means of addressing resource constraints that have led to growth in pending caseloads. DHS declines to make changes in this final rule in response to the comment.

Form I–539, Application To Extend/Change Nonimmigrant Status

*Comment:* A commenter opposed the proposed fee increase for Form I–539 because it would pose a financial burden to clients who are survivors of violence and U nonimmigrants.

*Response:* DHS acknowledges that this final rule increases the fee for Form I–539 to $390 if filed online and $400 if filed on paper. However, DHS disagrees with the commenter's assertion that the fee increase for Form I–539 would unduly burden U nonimmigrants. In its NPRM, DHS clarified that those seeking or holding T and U nonimmigrant status would remain eligible to apply for fee waivers for Form I–539 and other associated forms. *See* 84 FR 62297. DHS believes that maintaining access to fee waivers for these vulnerable populations mitigates any concerns that the increase in the fee for Form I–539 would limit access for protected categories of individuals. DHS declines to make changes in this final rule in response to the comment.

13. Form I–589, Application for Asylum and Withholding of Removal Fee

*Comment:* Multiple commenters generally opposed charging asylum applicants a fee. Commenters stated:

• DHS should not expect people fleeing harm and in need of protection to pay a fee.

• These individuals often have few economic resources, the few resources that they do have are necessary for survival.

• They should not endure the added burden of a fee to gain asylum and other immigration services.

• Asylum seekers joining family in the United States are often financially dependent on their family members, and an asylum fee would create an additional burden on their families.

• Asylum should not be based on an applicant's socio-economic status.

• Fees would be detrimental to survivors of torture, impacting their mental health and well-being by obstructing access to live and work in the United States.

• A $50 fee would further endanger asylum seekers' health and safety.

• DHS should consider asylum seekers' humanity and suggested that the rule dehumanized the issue.

• Commenters rejected the notion that those seeking asylum represent a cost that the nation must recoup.

• If the revenue from these fees were being used to assistance to those seeking asylum, they would be less opposed to the fee increases.

• DHS did not provide adequate justification for charging an asylum fee.

*Response:* DHS acknowledges the humanitarian plight of legitimate asylum seekers. In recognition of the circumstances of many of these applicants, DHS establishes a $50 fee for Form I–589 for most applicants (unaccompanied alien children in removal proceedings who file Form I–589 with USCIS are not required to pay the fee). DHS expects that charging this fee will generate some revenue to offset adjudication costs, but DHS is not aligning the fee with the beneficiary-pays principle, because the estimated cost of adjudicating Form I–589 exceeds $50. As DHS stated in its NPRM, it does not intend to recover the full cost of adjudicating asylum applications via the Form I–589 fee. *See* 84 FR 62318. Instead, DHS establishes a $50 application fee to generate some revenue to offset costs. DHS will recover the additional costs of asylum adjudications (via fee reallocation) by charging other fee-paying applicants and petitioners more, consistent with historical practice and statutory authority. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS does not intend to discourage meritorious asylum claims or unduly burden any applicant, group of applicants, or their families.

In the NPRM, DHS provided substantial justifications for establishing an asylum application fee. DHS explained that USCIS has experienced a continuous, sizeable increase in the affirmative asylum backlog over the last several years. DHS explored ways to alleviate the pressure that the asylum workload places on the administration of other immigration benefits and determined that a minimal fee would mitigate fee increases for other immigration benefit requests. *See* 84 FR 62318. DHS estimated the cost of adjudicating Form I–589 and considered asylum fees charged by other nations. DHS also considered the authority provided in INA section 208(d)(3), various fee amounts, whether the fee would be paid in installments over time or all at once, if the fee would be waivable, and decided to establish a minimal $50 fee.

As stated in the NPRM, DHS believes that the fee can be paid in one payment, would generate revenue to offset costs, and not be so high as to be unaffordable to an indigent applicant. *See* 84 FR 62319. Further, DHS has provided the advance notice of and the reasons for the change in its longstanding policy as required by the APA. This change will only apply prospectively to asylum applications filed after the effective date of this final rule.

Nevertheless, as a result of the concerns raised by commenters, DHS is providing in this final rule that Form I–485 filed in the future for principal asylum applicants who pay the Form I–589 fee of $50 and are granted asylum and apply for adjustment of status will pay a fee that is $50 less than other Form I–485 filers. *See* new 8 CFR 106.2(a)(17)(ii). DHS will provide only one reduced fee per Form I–589 filing fee paid. If a Form I–485 filing with a $50 reduced fee is denied, USCIS will not accept future discounted I–485 filings from the same applicant. That is because DHS anticipates a one-to-one relationship between the fees collected and discounts provided. If an approved principal asylee were to file multiple Forms I–485 with the reduced fee, it could illogically result in the $50 fee for Form I–589 causing a net revenue loss to USCIS. DHS will not deviate from its primary objective of this final rule to set fees at a level necessary to recover estimated full cost by allowing multiple I–485 reduced fee filings. Unaccompanied alien children in removal proceedings who filed Form I–589 with USCIS, and thus did not pay the $50 Form I–589 fee, are not eligible to file Form I–485 with the reduced fee.

*Comment:* Additional commenters on the asylum fee generally opposed the

proposed fees for asylum indicating that the proposal runs counter to U.S. ideals, and stated:

• The United States has no precedent in international law to charge for asylum, the fee does not support the humanitarian interests of the United States, would be against the values of the United States and Congressional intent, and our moral and constitutional obligation to provide sanctuary to those who need it.

• The United States would become one of only four countries to charge such a fee if DHS implemented the proposal.

• Processing asylum requests is a fundamental right guaranteed by international agreements to which the United States adheres.

• The United States should endeavor to resolve, rather than exacerbate, humanitarian crises and the U.S. is required under domestic and international law to provide refuge to people fleeing violence and seeking protection in the United States.

• Significant changes to the conditions of asylum services should be carried out by Congress, and not through administrative processes.

• Charging a fee for asylum requests is discrimination and an attempt to block legal immigration of people of color and/or non-wealthy backgrounds.

• The right to seek and to enjoy asylum from persecution is enshrined in the United Nations Universal Declaration of Human Rights of 1948 and supported by the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees.

• The United States is obligated to accept asylum seekers under international and domestic law, and therefore should not refuse asylum seekers because of an inability to pay the fee. Thus, the proposed asylum fees would be a dereliction of legal duty and violate the 1951 Refugee Convention, which prevents signatory countries from taking any action that would "in any matter whatsoever" expel or return a refugee to a place where his or her life or freedom would be threatened."

• The creation of an asylum fee suggests that the United States will shy away from international problems rather than confront them.

• One commenter said that under the Universal Declaration of Human Rights, the United States is obligated by international law to accept refugees and accord them certain rights and benefits, such as access to courts.

• A fee for asylum violates the INA and that Congress did not intend to authorize fees for asylum applicants, but

instead intended that the cost services to asylum seekers should be paid by fees from the IEFA.

*Response:* DHS disagrees with commenters' assertions that an asylum fee violates the INA, that there is no precedent in international law for charging a fee for asylum applications, and that charging a fee is discriminatory and against the values, morals, and Constitution of the United States. DHS also disagrees that the United States is required to provide asylum to those fleeing violence and seeking protection, as the United States' non-refoulement obligations are met by the statutory withholding of removal provisions at INA section 241(b)(3). Asylum is a discretionary benefit available to those who meet the definition of a refugee and who are not otherwise ineligible.

Although the United States is a party to the 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention"), the Protocol is not self-executing. *See INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984). The asylum statute at INA section 208 and withholding of removal statute at INA section 241(b)(3) constitute the U.S. implementation of international treaty obligations related to asylum seekers. The asylum provisions of the INA do not preclude the imposition of a filing fee for asylum applications. INA section 208(d)(3), 8 U.S.C. 1158(d)(3) specifically authorizes the Attorney General to impose a fee for the consideration of an asylum application that is less than the estimated cost of adjudicating the application.

Furthermore, DHS believes that the asylum fee may arguably be constrained in amount, but a fee is not prohibited by the 1951 Refugee Convention, 1967 Refugee Protocol, United States constitution, or domestic implementing law. Article 29(1) of the 1951 Refugee Convention and the 1967 Refugee Protocol, as incorporated by reference, refers to the imposition of fees on those seeking protection, and limits "fiscal charges" to not higher than those charged to nationals of a given country for similar services, but does not bar the imposition of such fiscal charges. The $50 fee is reasonably aligned with the fees charged to United States nationals for other immigration benefit requests. Thus, a $50 fee for asylum applications is in line with international and domestic law.

DHS also considered the asylum fees charged by other nations, including Australia, Fiji, and Iran. A $50 fee is in

line with the fees charged by these other nations. DHS further believes that the $50 fee would not require an applicant to spend an unreasonable amount of time saving to pay the fee.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* With regard to the Form I–589 fee and the fee for an initial Form I–765 filed by an asylum applicant, commenters stated:

• Asylum seekers should not have to pay for an asylum application or an associated work permit because they are not authorized to work for months once in the United States and would have no way of earning money to pay for the fees.

• Asylum seekers in detention, who earn at most $1 a day would have no way to pay the $50 fee.

• Asylum seekers are not allowed to work more than 4 hours a day and are thus unable to pay increased fees.

• Asylum seekers who are poor or need to "quickly flee situations of peril or harm" would be harmed by the asylum fee proposal, and that such individuals would not be able to earn enough money to pay asylum fees once in detention.

• Asylum seekers are often minors with no means to support themselves and therefore cannot afford an asylum fee.

*Response:* DHS acknowledges the commenters' concerns about asylum seekers' ability to pay the fees for the asylum application and associated EAD. DHS considered the effect of the fees on asylum seekers and believes the fees would not impose an unreasonable burden on applicants or prevent asylum seekers from seeking protection or EAD. DHS also acknowledges that the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, provides a range of protections for unaccompanied alien children. As such, DHS excluded unaccompanied alien children in removal proceedings, a particularly vulnerable population, from the imposition of the $50 asylum application fee.

The services that USCIS provides at no cost or below cost impacts the final fees imposed on other fee-paying applicants. However, DHS seeks to make the USCIS fee schedule more equitable for all applicants and petitioners in this final rule. Therefore, DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that asylum seekers provide services to the United States, such as investments in their education and pay taxes, that DHS

should consider before increasing asylum fees. Several commenters stated that DHS should not raise asylum fees because asylum seekers are important to the U.S. economy and workforce.

*Response:* DHS acknowledges that asylum seekers invest in their educations and pay taxes like other immigrants do. When considering whether to increase or establish new fees, including fees for asylum seekers, USCIS examined its recent budget history, service levels, and immigration trends, and also assessed anticipated costs, revenue, and operational demands. USCIS has experienced a continuous, sizeable increase in the affirmative asylum backlog and explored ways to alleviate the pressure that the asylum workload places on USCIS. As stated in the NPRM, DHS does not intend to recover the estimated full cost of adjudicating asylum applications via the Form I–589 fee. 84 FR 62318. DHS will recover the additional costs of asylum adjudications (via cost reallocation) by charging other fee-paying applicants and petitioners more for other types of applications.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Many commenters addressed gender-based violence as a reason for women and girls fleeing their countries of origin to seek asylum in the United States. Another commenter stated that an asylum fee will disproportionately impact women and minorities. Several commenters discussed domestic violence survivors who rely on asylum status and work authorization for protection. Some commenters said that young people flee sexual and physical violence, and even torture. One commenter said survivors often have no support systems in the U.S. and therefore face homelessness and economic hardship, which are two of the three most urgent and prevalent systemic challenges, confronting immigrant women in the U.S. A couple of commenters said the asylum seekers who flee domestic violence are often eligible for asylum as well as other types of humanitarian immigration benefits, such as U nonimmigrant status. In certain instances, it makes sense for survivors to apply for different types of relief simultaneously as they may get access to work authorization faster under one type of relief, which, in turn, can help them avoid being financially dependent on their abuser. Therefore, the commenter said an asylum fee may force survivors to choose between different types of immigration relief to their detriment. A commenter discussed rates of gender-based violence in El Salvador, Honduras, Guatemala,

Venezuela, and China and concluded that sexual violence survivors seeking asylum in the U.S. are often doing so as a last resort because there is little hope of finding protection and safety from their abusers and assailants in their home countries. Therefore, an asylum fee would make it virtually impossible for the most vulnerable immigrant survivors of horrific domestic and sexual abuse to live free from the violence of their abusers. A commenter discussed the gender-based and gang violence that causes people to flee their countries and claimed that the $50 asylum fee would serve to enable smugglers and traffickers to pay the fees for asylum seekers to extort their help in smuggling enterprises.

*Response:* DHS recognizes the challenges that gender-based violence survivors face when fleeing from the violence of their abusers. This final rule establishes the Form I–589 fee at only $50 because DHS believes it is not an unreasonable amount. DHS disagrees that the fee forces applicants to choose between applying for different forms of relief or protection and enables smugglers and traffickers to extort applicants. DHS does not believe that establishing an asylum application fee of $50 unduly burdens or harms any applicants. DHS carefully assessed the costs associated with the adjudication of asylum applications and other types of immigration benefit requests and concluded that the $50 fee for asylum applications is warranted. The approximate cost of adjudicating an asylum application is $366. A $50 fee is well below the full cost of adjudicating the application. Moreover, the asylum application fee is in line with international treaty obligations under the 1951 Refugee Convention, as incorporated by reference in the 1967 Refugee Protocol, and domestic implementing law.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that USCIS is promising the same inadequate service it has been providing in the past few years and is asking immigrant and refugee families to pay more to not get their applications processed. The commenter stated that the proposal to charge for asylum applications contradicts the 2005 Notice of Adjustment of the Immigration Benefit Application Fee Schedule which states, ''fees collected from persons filing immigration benefit applications and petitions are deposited into the Immigration Examinations Fee Account and are used to fund the full cost of providing immigration benefits,

including the full cost of providing benefits such as asylum and refugee admission for which no fees are assessed.''

*Response:* DHS acknowledges the concerns of the commenter related to delays in the processing of applications. DHS has experienced a continuous, sizeable increase in the affirmative asylum backlog over the last several years. One of the ways in which DHS seeks to alleviate the pressure of the increasing workload on the administration of immigration benefits is to charge a $50 fee for asylum applications. The fee will generate some revenue to help offset costs. As far as the 2005 notice is concerned, it described the asylum fee requirements, but does not preclude the establishment of a fee.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters wrote that they question the statutory authority to charge a fee to asylum applicants. Commenters stated that United States is obligated to accept asylum seekers under international and domestic law, and therefore should not refuse asylum seekers because of an inability to pay the fee. One commenter wrote that charging an asylum fee would have global consequences effecting the standard of care and rule of law in humanitarian protections. Comments stated that the United States has no precedent in international law to charge for asylum, a fee for asylum applications is discriminatory, and a fee for asylum is against the values of the United States.

*Response:* DHS recognizes the vulnerable situations of many individuals who apply for asylum. DHS considered all of the points the commenters raised when deciding to establish an asylum application fee. INA section 208(d)(3), 1158(d)(3) specifically authorizes the Attorney General to impose a fee for the consideration of an asylum application that is less than the estimated cost of adjudicating the application. As stated in the NPRM, DHS considered the authority provided in INA section 208(d)(3), whether the fee would be paid in installments or over time, and various fee amounts. DHS decided to establish a $50 fee because it could be paid in one payment, would generate some revenue to offset costs, and not be so high as to be unaffordable to even an indigent alien. 84 FR 62320. Thus, the lack of resources that asylum applicants possess and the burdens that they face contributed to DHS's decision to establish a minimal $50 fee.

Furthermore, DHS disagrees that there is no precedent in international law for charging an asylum application fee. DHS believes that the asylum application fee may arguably be constrained in amount, but a fee is not prohibited by the 1951 U.N. Convention Relating to the Status of Refugees (''1951 Refugee Convention''), 1967 U.N. Protocol Relating to the Status of Refugees (''1967 Refugee Protocol''), United States constitution, or domestic implementing law. Article 29(1) of the 1951 Refugee Convention and the 1967 Refugee Protocol, as incorporated by reference, refers to the imposition of fees on those seeking protection, and limits ''fiscal charges'' to not higher than those charged to nationals of a given country for similar services, but does not bar the imposition of such fiscal charges. The $50 fee is reasonably aligned with the fees charged to United States nationals for other immigration benefit requests.

*Comment:* One commenter stated that if asylum seekers have to pay for their own initial Employment Authorization Document (EAD), it is likely that asylees will not apply for an EAD, which may be used against them when USCIS adjudicates their asylum application.

*Response:* DHS infers that the commenter is suggesting that asylum applicants will pursue unauthorized employment rather than pay the Form I–765 fee to lawfully obtain an EAD, and that will result in USCIS denying their application because they worked in the U.S. without authorization. DHS expects that asylum applicants will not pursue such an option and instead find a lawful way to pay the fee. As DHS noted in the NPRM, initial applicants with pending claims of asylum are a large workload volume for USCIS. In this final rule, DHS emphasizes that the person receiving the benefit should pay the fee. While DHS appreciates the need for asylum seekers to obtain lawful employment while their applications are pending, Congress has made it clear that fees primarily fund USCIS. After analyzing the costs of EADs for asylum applicants and considering the other factors raised by the commenters, DHS maintains its position that asylum applicants should pay the fee for the initial and renewal EADs.

*Comment:* Some commenters wrote that the fee for asylum applications would cause the U.S. to break its treaty obligations and contradicts the intent of the 1980 Refugee Act. Some commenters agreed and more specifically stated that the proposal would conflict with Congressional intent to offer humanitarian assistance to those fleeing persecution regardless of national origin, race, age, gender, or financial status. A commenter said requiring asylum applicants to pay a fee violates the principle of non-refoulement because it would likely result in the expulsion of potential refugees merely on the basis of their financial status, and since the imposition of the asylum application fees would also be a barrier to apply for relief under the Convention Against Torture, it also conflicts with U.S. treaty commitments. Multiple commenters indicated an inability to pay the proposed fee would hinder asylum seekers' ability to apply for asylum and gain needed protection, thereby forcing asylum seekers to return to their country of origin to face further persecution and even death. A commenter wrote that the asylum fee proposal would increase the number of cases sent to immigration courts because individuals would not have the funds to pay for asylum applications. A few commenters stated that the unprecedented fee would restrict life-saving access to the legal system.

A commenter provided a lengthy comment on the 1951 Refugee Convention and the Refugee Act of 1980, stating that courts have interpreted the federal regulations establishing the asylum process and the INA as creating a constitutionally protected right to petition the United States for asylum. This in turn triggers the safeguards of the Fifth Amendment's Due Process Clause. The commenter said, because the proposed fee would operate as complete bar to some asylum seekers' ability to exercise their constitutionally protected right to petition for asylum, it violates the guarantee of due process that accompanies that right. The commenter stated that the rule should therefore be rejected. The commenter also said DHS has also failed to consider Article 32 of the 1951 Refugee Convention, which provides that refugees shall be expelled only pursuant to a decision reached in accordance with due process of law. The commenter said the United States cannot recognize the right to apply for asylum as a component of due process for the purposes of its own Constitution while contending that Article 32 of the 1951 Refugee Convention can be satisfied without such a guarantee. Similarly, the commenter said DHS neglects Article 3's guarantee of equal protection by facially discriminating among refugees based on wealth and disparately affecting refugees based on national origin or race. Another commenter spoke of several court cases that set due process and equal protections precedent for asylees: (1) *Mathews* v. *Eldridge,* 424 U.S. 319 (1976), (2) *Griffin* v. *Illinois,* 351 U.S. 12, 19 (1956), (3) *Smith* v. *Bennett,* 365 U.S. 708 (1961), and (4) *Burns* v. *State of Ohio,* 360 U.S. 252, 258 (1959).

Some commenters pointed to the 1994 asylum reform initiative, which sought to impose a $130 fee on asylum applicants but was withdrawn following extraordinary opposition from the public. The argument that won then is applicable now, the commenter wrote, and that charging for an asylum application is contrary to United States international obligations to permit refugees to seek asylum in the United States and in violation of 8 U.S.C. 1158(a)(1).

Several commenters noted that the vast majority of signatories to the 1951 Refugee Convention or 1967 Refugee Protocol do not charge an asylum fee. Multiple commenters wrote that the U.S. would become just the fourth nation to charge fees for asylum. Similarly, a commenter said only three countries currently charge a fee for asylum because such a policy is ''universally considered'' dangerous, discriminatory, and wrongheaded. Similarly, several comments stated that the United States has been a world leader in refugee protection for a long time and wrote that if the U.S. begins charging fees for asylum, other nations may choose to follow suit. The commenters described this outcome as ''disastrous'' given the increasing need for refugee resettlement worldwide. A commenter wrote that imposing a fee for asylum seekers is not feasible and would break with international precedent by denying such individuals access to ''a universal human right.'' A commenter suggested there was a global consensus for rejecting fees for refugees and asylum seekers and wrote that any additional barriers to asylum adjudication could result in ''even more deaths.'' Another commenter expounded on this point and questioned why USCIS neglected to discuss why most nations do not charge fees for asylum. The commenter also requested that USCIS ''investigate the context of migration'' in the nations that do charge fees for asylum, and said that, of these, only Australia was another ''Western'' nation. One commenter stated that charging a fee for asylum would place the U.S. ''in the same position as countries that abuse human rights'' and would contravene the work the U.S. has done to become a leader in refugee protection. A few commenters said that a fee for Form I–589 would make the United States the first, and only, country to charge asylum applicants to

access protection with no possibility of fee waiver.

One commenter wrote that Australia's direct cash assistance to asylum seekers has no equivalent in the United States. Another commenter added that Australia, whose policies towards asylum seekers have garnered international criticism, charges half of what DHS proposes to charge for asylum applications. A commenter noted that the United States will now have harsher asylum regulations than Iran, whose policies allow asylum seekers to obtain a fee waiver.

*Response:* DHS disagrees that the establishment of an asylum application fee is in violation of United States international treaty obligations, the principle of non-refoulement, and domestic implementing law. Although the United States is a party to the 1967 Refugee Protocol, which incorporates Articles 2 through 34 of the 1951 Refugee Convention, the Protocol is not self-executing. *See, e.g., Stevic,* at 428 n.22. The asylum statute at INA section 208 and withholding of removal statute at INA section 241(b)(3) constitute the U.S. implementation of international treaty obligations related to asylum seekers. DHS believes that the asylum application fee may arguably be constrained in amount but is not prohibited by the 1951 U.N. Convention Relating to the Status of Refugees (''1951 Refugee Convention''), 1967 U.N. Protocol Relating to the Status of Refugees (''1967 Refugee Protocol''), United States constitution, or domestic implementing law. Article 29(1) of the 1951 Refugee Protocol, and as incorporated by reference in the 1967 Refugee Protocol, refers to the imposition of fees on refugees, and limits ''fiscal charges'' to not higher than those charged to nationals of a given country for similar services. A $50 fee is reasonably aligned with the fees charged to U.S. nationals for other immigration benefit requests. Moreover, INA section 208(d)(3), 8 U.S.C. 1158(d)(3), specifically authorizes DHS to impose a fee for the consideration of an asylum application that is less than the estimated cost of adjudicating the application. The approximate cost of an asylum application is $366. Thus, a $50 fee for asylum applications is in line with U.S. international treaty obligations and domestic implementing law.

DHS disagrees with the commenters' assertions that a $50 fee would operate as a complete bar on asylum seekers' ability to apply for asylum and access to equal protection and due process of law. The commenter refers to Article 32 of the 1951 Refugee Convention, which provides that ''[t]he expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law.'' The commenter also refers to Article 3 of the 1951 Refugee Convention, which states that the provisions of the Convention shall apply ''to refugees without discrimination as to race, religion, or country of origin.'' DHS believes that the establishment of a minimal fee of $50 to apply for asylum is not cost-prohibitive or overly burdensome for asylum seekers. This final rule does not bar asylum seekers from filing asylum applications. Also, charging a $50 fee for an asylum application does not restrict an asylum seeker's access to a decision reached in accordance with due process of law or discriminate against refugees.

Moreover, DHS does not intend to recover the estimated full cost of adjudicating the asylum application, as the fee amount is well below the approximate full cost of $366 for adjudicating an asylum application. DHS maintains that charging a fee for asylum applications will help alleviate the pressure that the growing asylum workload places on the administration of other immigration benefits and would generate some revenue to help offset costs.

As discussed in the NPRM, DHS requested a report from the Law Library of Congress on fees charged to asylum applicants by countries that are a party to the 1951 Refugee Convention and/or its 1967 Refugee Protocol. The Law Library of Congress surveyed the 147 signatory countries to the 1951 Refugee Convention and/or the 1967 Refugee Protocol, and of 147 countries, identified three countries that charge a fee for initial applications for asylum or refugee protection. DHS considered the asylum fees charged by other nations, including Australia, Fiji, and Iran, and the $50 fee is in line with the fees charged by these other nations. *See* 84 FR 62319.

DHS disagrees with commenters' assertions that charging a fee for asylum would place the United States in the same position as countries that abuse human rights and would contravene the work the United States has done to become a leader in refugee protection. DHS acknowledges the comments related to the policies of other nations, such as Australia and Iran. Each nation has its own unique needs and different asylum workloads. Given the growing scale of the affirmative asylum workload in the United States, DHS explored ways to alleviate the pressure of the affirmative asylum workload. DHS believes that establishing a minimal fee of $50 for Form I–589 would help USCIS generate revenue and offset costs, as well as mitigate fee increases for other immigration benefit requests.

*Comment:* Some commenters said the asylum application fee, Migrant Protection Protocols (MPP), CBP ''metering,'' and ''safe third country agreements'' are counter to the international legal principle of non-refoulement and indicate a clear effort on the part of the administration to dismantle asylum in the United States.

*Response:* The commenter's concerns regarding MPP, CBP ''metering'', and safe third country agreements are outside of the scope of this rulemaking and DHS provides no response to those subjects in this final rule. DHS believes that fees associated with access to asylum and work authorization in the United States are not prohibited by the 1951 U.N. Convention Relating to the Status of Refugees (''1951 Refugee Convention''), 1967 U.N. Protocol Relating to the Status of Refugees (''1967 Refugee Protocol''), United States constitution, or domestic implementing law, and do not run counter to the principle of non-refoulement. Article 29(1) of the 1951 Refugee Convention, and as incorporated by reference in the 1967 Refugee Protocol, refers to the imposition of fees on refugees seeking protection, and limits ''fiscal charges'' to not higher than those charged to nationals of a given country for similar services, but does not bar the imposition of such fiscal charges. The $50 fee is reasonably aligned with the fees charged to United States nationals for other immigration benefit requests. INA Section 208(d)(3) authorizes the imposition of fees for asylum applications. The asylum application fee is in line with domestic implementing law and does not contravene international treaty obligations.

*Comment:* Some commenters suggested that migration patterns in the U.S. are unique and questioned whether the proposed rule was a racist and xenophobic response to increasing levels of immigration from Latin America. Some commenters discussed the characteristics of common countries of origin for asylees. Two commenters wrote that the asylum fee provision would impact thousands of Asian immigrants, and provided data from FY 2017 that shows 27,759 Chinese immigrants and 4,057 Indian immigrants applied for asylum, accounting for 12 percent and 2.9 percent of asylum seekers. Another commenter stated that approximately 1.5 million Africans have left Africa for the United States or Europe since 2010,

according to the United Nations, and that Nigeria was the seventh most represented country of origin for affirmative asylum cases filed in the U.S. from 2016–2018 according to a DHS report. Another commenter claimed that the asylum fee is indicative of xenophobia and racial animus toward those from Mexico and Central America, as Mexico, Haiti, El Salvador, Honduras, and Guatemala, respectively, had the highest denial rates of the 10 nationalities with the most asylum decisions between 2012 and 2017 (according to a 2018 report by CNN). The commenter claimed that high denial rates for people from these countries are partly due to the inaccessibility of legal assistance, and higher fees will exacerbate the disparity. One commenter stated that if the United States is not willing to address the root causes of migration, it cannot also place a fee on asylum seekers fleeing the violence and poverty of the countries that the U.S. refuses to aid.

*Response:* DHS disagrees that the asylum application fee is a racist and xenophobic response to increasing levels of migration and acknowledges the concerns of the commenters related to asylum seekers fleeing violence and poverty. Asylum is a discretionary benefit available to those who meet the definition of a refugee and are otherwise eligible. DHS recognizes that many legitimate asylum seekers face poverty and violence and considered the challenging circumstances that many asylum seekers face when deciding to establish a minimal fee of $50. The fee is well below the cost of adjudicating the asylum application, which is consistent with INA section 208(d)(3). The establishment of an asylum application fee is not animated by racism or xenophobia, but rather, it is animated by a need to respond to the increasing affirmative asylum workload and generate some revenue to offset costs. USCIS must address these issues regardless of the myriad factors that contribute to individuals claiming asylum in the United States.

*Comment:* Some commenters discussed the impact of an asylum fee on children. One commenter said the proposed rule disregards the best interests of children, as it would charge unaccompanied children for applying for asylum, writing that children should not have to shoulder the burden of the large backlog of cases and slow processing of immigration applications. One commenter said that 56 percent of the applications from Central America were filed by unaccompanied children, many of whom are fleeing the most high-volume countries of origin and are

in danger without the help of the U.S. Another commenter noted that derivative applicants who do not file independent asylum applications cannot assert their own, independent claims. Many asylum-seeking families submit individual applications for all family members to pursue every possible avenue of relief for all family members. The cost per application will have a negative impact on these families. Multiple commenters wrote that applying a fee to asylum applications could result in deportations or compel vulnerable children and families to return to countries they fled, risking continued persecution or death. Several commenters pointed out that asylum seekers are in danger of human trafficking and other crimes, and that the asylum fee bars them from the protections that legal status affords. A few commenters stated that asylum should only be based on evidence of perceived or actual persecution and not whether asylum seekers have financial assets. A commenter suggested the asylum fee proposal was ''cruel and inhumane'' and that asylum seekers should not have to prioritize asylum fees over feeding their families.

*Response:* DHS acknowledges the commenters' concerns about the potential effects of the asylum application fee on children and their families. DHS recognizes that the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, provides a range of protections for unaccompanied alien children. DHS excludes unaccompanied alien children in removal proceedings, a particularly vulnerable population, from the imposition of a $50 asylum application fee. 8 CFR 106.2(a)(20).

DHS acknowledges the commenters' concerns about asylum seekers' ability to pay fees for multiple asylum applications depending on the circumstances of principal and derivative applicants, including children. DHS considered the effect of a fee on asylum seekers and believes it would not impose an unreasonable burden on applicants or prevent asylum seekers from seeking protection. The services that USCIS provides at no or below cost impacts the fees imposed on other fee-paying applicants. DHS seeks to make the USCIS fee schedule more equitable for all applicants and petitioners. Nevertheless, DHS considered the challenges that asylum seekers face and establishes an asylum application fee that is well below the cost of adjudicating the application.

*Comment:* Multiple commenters discussed the very limited resources

with which asylum seekers come to the U.S., and the resulting inaccessibility of transportation, housing, healthcare, and other necessities. Several commenters noted that asylum seekers are ineligible for public assistance programs unless and until they are granted asylum, and they rely on nonprofit and community resources for housing, basic toiletries, school supplies, clothing, and public transportation. The commenters claim that the asylum fee unjustly burdens those who need resources and support the most. One commenter cited a Human Rights Watch publication to claim that asylum seekers' financial resources often fail to cover the bare necessities of life, such as food, medicine, and shelter. Another commenter said that many asylum seekers do not have financial resources because of ''the nature of flight from perilous situations,'' and wrote that asylum seekers are considered ''non-qualified'' immigrants for the purposes of qualification for federal public assistance.

One commenter said that USCIS claims the $50 fee is large enough to produce a revenue stream while small enough to remain affordable. The commenter cited a Washington Post article that discusses the extreme poverty of asylum seekers to emphasize the inability of these people to pay any fee, no matter how small. Another commenter added that USCIS should take into account $50 as a percentage of Gross National Income (GNI) in asylees' home countries, citing World Bank and TRAC Immigration data. A commenter wrote that the $50 fee for asylum would not be a deterrent for some asylum seekers, but that the ''calculus is not so simple'' for others who will not be able to afford the fee. The commenter provided anecdotes about the personal backgrounds of asylum seekers to provide context about the challenging financial situations many asylum seekers or refugees face.

*Response:* DHS acknowledges the challenges that asylum seekers face, including extreme poverty and limited access to resources. In recognition of these circumstances, DHS establishes a minimal $50 fee for Form I–589 for most applicants (unaccompanied alien children in removal proceedings who file Form I–589 with USCIS are not required to pay the fee). DHS considered various fee amounts and whether the fee would be paid in installments over time. DHS has established a minimal $50 fee that can be paid at one time, would not require an applicant to save for an unreasonable amount of time, would generate revenue to offset costs, and would not be so high as to be

unaffordable to an indigent applicant. *See* 84 FR 62319. DHS does not intend to recover the full cost of adjudicating asylum applications via the Form I–589 fee. DHS will recover the additional costs of asylum adjudications by charging other fee-paying applicants and petitioners more. DHS does not intend to discourage meritorious asylum claims or unduly burden any applicant, group of applicants, or their families.

*Comment:* A commenter stated that this NPRM functions under the ''deterrence paradigm'' to prevent asylum seekers from coming to the United States. They claimed that such deterrence policies do not work, citing a report by the American Immigration Council which showed that comprehensive knowledge of the dangers and possible futility of seeking asylum had little impact on the intentions of Hondurans to seek asylum in 2014.

*Response:* DHS does not intend to deter legitimate asylum seekers from filing asylum applications via the $50 asylum application fee. The goals behind establishing a $50 asylum application fee include alleviating the pressure of the growing affirmative asylum workload on the administration of other immigration benefit requests and generating some revenue to offset costs. DHS believes the minimal fee of $50 is not unreasonably burdensome and does not prevent legitimate asylum seekers from submitting asylum applications.

*Comment:* A few commenters indicated that the $50 fee does not mitigate the fee increase of other immigration benefit requests. One of these commenters stated that since DHS will still rely on other benefit requesters to cover the costs of the asylum process, as authorized by Congress, the decision to charge an asylum fee is unacceptable.

A few commenters reasoned that, because the process costs around $300 per applicant, a $50 fee would not meaningfully address the deficit associated with asylum adjudication but would still be prohibitively expensive for vulnerable people. One commenter added that this is an arbitrary departure from the ''full cost'' standard required for federal agencies, and that USCIS should charge applicants the full cost of adjudicating the application.

One commenter cited the Asylum Division's quarterly statistics, which indicate that DHS experienced a 40 percent decrease in affirmative filings between 2017 and 2018. The commenter stated that USCIS is unable to alleviate a growing backlog despite a drop in affirmative filings. Two commenters cited a Migration Policy Institute study

which shows that many factors contributing to the backlog are the result of U.S. policies.

*Response:* DHS carefully assessed the costs associated with the adjudication of asylum applications and other types of immigration benefit requests and concluded that the $50 fee for asylum applications is warranted. A minimal fee would mitigate the fee increase of other immigration benefit requests. DHS also relied on INA section 208(d)(3), which provides that ''fees shall not exceed the Attorney General's costs in adjudicating'' the asylum application. The approximate cost of adjudicating an asylum application is $366, and thus, the fee is below the full cost of adjudicating the application. The lower fee amount represents DHS's efforts to balance the needs and interests of USCIS in generating some revenue to offset costs against the socio-economic challenges faced by some asylum seekers.

DHS acknowledges the comments related to the growing affirmative asylum backlog, which played into DHS's decision to establish an asylum application fee. USCIS has taken several actions to address the affirmative asylum backlog, including: Identifying and employing strategies to maximize efficiencies in case processing across workloads; increasing adjudicative capacity by expanding its field office workforce and continuing significant facilities expansion; and reverting to reform scheduling, also known as Last In, First Out (LIFO) scheduling, which involves scheduling the most recently filed applications for interviews ahead of older filings. *See* USCIS announcement on Last in, First Out scheduling (January 2018), available at *https://www.uscis.gov/news/news-releases/uscis-take-action-address-asylum-backlog.* LIFO scheduling has contributed to a decrease in the growth of the asylum backlog. Even though USCIS has taken a range of measures to address the backlog, the number of pending affirmative asylum cases remains high.

*Comment:* One commenter cited a 2011 New York Immigrant Representation Study to say that with decreased ability to support themselves, asylum seekers would be far less likely to afford legal counsel and therefore have less chance of prevailing on their asylum claims.

*Response:* DHS believes that a minimal fee of $50 will not prevent asylum seekers from securing legal counsel or affect their chance of prevailing on their asylum claims. Asylum seekers may secure legal counsel as needed to assist them with

the asylum application process. This final rule does not hinder or affect asylum seekers' access to counsel. With or without legal counsel, asylum applicants are given the opportunity to provide the information needed for an adjudicator to make a decision about their eligibility for asylum. DHS declines to make any changes in this final rule in response to the comment.

## 14. Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600

*Comment:* A commenter supported changes in the handling of Hague Adoption Convention Transition Cases, commenting that their personal experience in the adoption process had been very difficult. The commenter stated that having a prescribed system would be an improvement.

*Response:* DHS appreciates the support for the changes in handling intercountry adoption cases and agrees that the prescribed system is an improvement upon previous practice.

## 15. Form I–601A, Application for Provisional Unlawful Presence Waiver

*Comment:* Multiple commenters opposed increasing the fee for Form I–601A because it would harm family unity, discourage the use of consular processing, and undermine the use of Form I–601A to improve efficiency.

*Response:* DHS recognizes that Form I–601A can aid family unity and improve administrative efficiency through the use of consular processing. However, DHS disagrees with the commenters' contention that the fee increases enacted in this final rule for Form I–601A, from $630 to $960, undermines those goals. DHS adjusts the fee for Form I–601A to reflect the estimated full cost of adjudication. If DHS did not adjust fee to provide for USCIS to recover full cost, USCIS would be unable to devote sufficient resources to adjudication to limit the growth of pending caseload, thereby undermining the goals of family unity and efficient processing.

DHS declines to make adjustments in this final rule in response to these comments.

*Comment:* A commenter opposed the fee increase for Form I–601A because such waivers have allowed thousands of immigrants to pursue lawful permanent residence through consular processing. The commenter said the proposed increase for this waiver application, in conjunction with the costs of consular processing, would discourage immigrants from seeking lawful status and place them at risk of removal and long-term separation from their families.

AR2022_200455

*Response:* DHS recognizes that the provisional waiver process has enabled family unity and the use of consular processing to gain lawful permanent residence. However, DHS disagrees with the commenter's assertion that the fee increase for Form I–601A will discourage immigrants from seeking lawful status or result in long-term separation for families. DHS believes that the fee increase of $330, from $630 to $960, likely represents a small portion of the overall cost of utilizing consular processing to pursue lawful permanent residence. DHS also notes that noncitizens with an approved Form I–601A still trigger the unlawful presence ground of inadmissibility found in INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) upon departure.

DHS declines to make changes in this final rule in response to the comment.

### 16. Form I–751, Petition To Remove Conditions on Residence

*Comment:* Multiple commenters wrote regarding increases in the fee for Form I–751. Commenters wrote that the fee for Form I–751 would cause individuals who are unable to afford the new fee failing to petition to remove the conditions on their permanent residence, thereby losing their conditional lawful permanent resident status.

*Response:* DHS recognizes the importance of Form I–751 to individuals in conditional lawful permanent resident status. However, DHS disagrees with the commenters' contention that the fee increase for Form I–751, from $595 to $760, will render Form I–751 unaffordable to these individuals. Conditional lawful permanent residents have nearly two years between gaining that status and the 90-day period in which they are required to file Form I–751, during which they are able to work and save to afford the fee, or they may pay with a credit card. DHS adjusts the fee for Form I–751 to reflect the estimated full cost of adjudication and declines to make adjustments in this final rule in response to these comments.

*Comment:* Many commenters indicated the Form I–751 fee increase and elimination of the fee waiver would make it more difficult for low-income families to file timely and could have severe consequences, including the conditional resident's loss of lawful status and the risk of being placed into removal proceedings. A commenter stated that the unbundling and resulting increase in the fee for adjustment of status and ancillary applications, and the increased fee for provisional waivers could prevent low-income individuals

from applying for immigration benefits. The commenter asked that USCIS hold current fees in place or increase the fees by a modest amount. One commenter said the proposed change would affect many older applicants who maybe be on fixed incomes, as well as people in single-income households.

*Response:* DHS acknowledges the changes in fee waiver eligibility and the increase in the fee for Form I–751 implemented in this final rule will render the process of removing conditions on lawful permanent resident status more expensive for individuals. However, DHS disagrees with the commenters' contention that the fee increase for Form I–751, from $595 to $760, will render Form I–751 unaffordable to these individuals. Conditional lawful permanent residents have nearly two years between gaining that status and the 90-day period in which they are required to file Form I–751, during which they are able to work and save to afford the fee.

DHS declines to adjust this final rule in response to these comments.

### 17. Form I–765, Application for Employment Authorization

*Comment:* A commenter wrote that Form I–765 fees are causing students to consider leaving the United States following graduation, removing talented workers from the U.S. economy and tax base. The commenter stated that the proposal would further disincentivize foreign students from studying in the United States. A commenter also wrote that the proposed fee increases could impede immigrant student's career advancement.

*Response:* DHS acknowledges the sizeable increase in the Form I–765 fee implemented in this final rule, adjusting the fee from $410 to $550. DHS adjusts the fee for Form I–765 to reflect the estimated full cost of adjudication. Although DHS recognizes that this fee increase imposes an additional burden on nonimmigrant students seeking employment authorization for Optional Practical Training, off-campus employment under the sponsorship of a qualifying international organization, or due to severe economic hardship, DHS is unaware of data to support the commenter's contention that fee for Form I–765 serves to deter students from coming to the United States. DHS declines to exempt students from the increased filing fee because USCIS must determine the student's eligibility under the applicable regulations at the time of application and the fee is necessary to recover the full costs of the adjudication. DHS does not believe the fee is an unreasonable burden for

students who need employment-based training. DHS believes that employment in the United States will continue to appeal to individuals despite an increase of $140 in the cost of applying for an EAD.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Multiple commenters opposed the change to charge asylum applicants for their first Form I–765, Application for Employment Authorization. The comments are summarized as follows:

• Charging asylum seekers for the first work permit creates a "catch 22" situation where people cannot work so cannot afford to pay their asylum fees and may incentivize people to work illegally.

• USCIS should not charge $50 for asylum applications and further charge for an EAD while asylum cases are pending.

• Requiring individuals who are not authorized to work to pay such a substantial fee to acquire work authorization is cruel and counterintuitive.

• Asylum seekers have historically not been charged for their initial EAD because their flight from their country of origin leaves them in dire financial situations, and they often lack family support in the United States to assist them.

• Requiring asylum applicants to pay for an initial EAD before they have authorization to work will worsen the already precarious situation of a vulnerable population.

• People subject to the fee have already spent substantial time and money to get to the United States, have likely spent time in immigration detention, and have not been authorized to work since leaving their home country.

• USCIS should continue to exempt asylum seekers from fees associated with EADs because these individuals would not be able to afford fees before they can legally work. It did not make sense to charge asylum seekers for work permits before being granted protection.

• The EAD fee for asylum seekers will act as an unjust deterrent for asylum seekers.

• To levy an asylum fee in conjunction with the EAD fee was beyond contemplation and abominable and questioned how the government could expect asylum-seekers to obtain funds to cover these costs.

• The proposal was far from benign and employers could pay this work permit fee.

• This fee will force asylum applicants into seeking unauthorized

work, putting them at a higher risk of exploitation, placing an undue burden on investigative agencies, and ultimately putting those applicants in danger of facing further consequences for attempting to work without authorization.

• A fee for an initial work permit is illogical, because the U.S. benefits from self-sufficiency of asylum seekers and should therefore want to expedite the employment authorization process.

• It will burden local communities and service providers that must provide social services to asylum applicants unable to work.

• Local communities will suffer lost wages and tax revenue, as well as the labor that would otherwise be provided by asylees.

• State, local, community, and religious organizations will attempt to cover the EAD fee for asylum seekers, straining their resources and preventing them from serving more people.

• Preventing asylum seekers from authorized work restricts them from lawfully paying a fee for asylum.

• Allowing asylum seekers to have work authorization benefits local economies by asylum seekers paying taxes, filling skills gaps, and building the workforce.

• Asylees often bring a wide range of skills and experience and are useful to many businesses, and that the proposal would deny U.S. businesses of the opportunity to hire these workers.

• Nearly 65 percent of the asylum seekers in the commenter's program arrive in the U.S. with experience in STEM and healthcare fields.

• Employers would have difficulty finding labor substitutes if asylum seekers were kept out of the workforce. USCIS should conduct additional analysis on the impact of new fees for employment authorization.

• USCIS has not calculated the losses to tax revenue and the broader economy associated with a reduced number of asylees in the U.S.

• Asylees often come to the U.S. with in-demand skills, including skills that would be useful in the healthcare and information technology sectors, and the USCIS should estimate the costs borne to employers who would use asylees.

*Response:* DHS acknowledges the concerns of the commenters related to the requirement of a fee ($550) for initial filings of Form I–765 for applicants with pending asylum applications. Initial EAD applicants with pending asylum applications account for a large volume, approximately 13 percent, of the Form I–765 workload forecast and DHS has decided to no longer provide this service for free. Charging initial Form I–

765 applicants with pending asylum applications allows DHS to keep the fee for all fee-paying EAD applicants lower. Asylum applicants will pay no more and no less than any other EAD applicant (except for those who are eligible for a fee waiver) for the same service.

DHS is acting in compliance with Section 208(d)(3) of the INA, which provides that, ''[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).'' DHS believes that charging asylum applicants for EADs does not impose an unreasonable burden on asylum seekers. This final rule does not impose or seek to impose any obligation on the part of employers, states, or community or religious organizations to pay the Form I–765 fee. Also, this final rule does not seek to burden local communities or service providers. DHS declines to make changes in this final rule in response to these comments.

USCIS disagrees that charging asylum seekers for the first work permit creates a conflict between contradictory conditions where aliens cannot work to pay their asylum fees and may incentivize people to work illegally. No asylum applicant may receive employment authorization before 180 days have passed since the filing of his or her asylum application. INA section 208(d)(2), 8 U.S. C. 1158(d)(2); 8 CFR 208.7(a)(1). This requirement has been in effect for over twenty years. *See,* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Section 604, Public Law 104–208; see also 62 FR 10337. Thus, an asylum seeker is unlikely to come to the United States expecting to be authorized to work immediately. Asylum seekers can, and do, rely on their own means, as well as family or community support to economically sustain themselves in the United States during the period of time that they are not employment authorized.

*Comment:* Several commenters wrote that if asylum seekers are unable to obtain employment authorization, they may be unable to pay for legal counsel, which will make it more difficult for them to prevail on the asylum applications. One commenter cited ''Accessing Justice: The Availability & Adequacy of Counsel in Immigration Proceedings,'' a study that showed that among non-detained individuals in immigration court, those with counsel saw success in 74 percent of cases

compared with 13 percent of those unrepresented.

*Response:* DHS recognizes the economic challenges faced by asylum seekers. However, DHS does not believe that charging asylum seekers for a work authorization application will prevent them from obtaining legal counsel. DHS does not believe that the EAD fee is unduly burdensome for asylum seekers. Furthermore, DHS is acting within the scope of its statutory authority to establish fees for adjudication services, in accordance with INA sections 208(d)(3) and 286(m). DHS declines to make changes in response to these comments.

*Comment:* A commenter stated that fee exemptions for EAD applications by asylees should apply not only to initial applications, but also renewals. The commenter said the original rationale was that the initial EAD lasts for 2 years, and it was expected that asylees would be granted lawful permanent residence within that two-year period. Currently, however, the processing times for permanent residence by asylees range up to 26 months, so the commenter said USCIS should eliminate the fee for applications for renewal of employment authorization filed by asylees.

*Response:* DHS acknowledges the concerns related to processing times for EADs and adjustment of status applications. DHS does not believe that the fee for renewal EAD filings will present an insurmountable burden for asylees. Asylees are employment authorized incident to their status. DHS will continue to exempt asylees from the initial Form I–765 fee. However, considering that they are employment authorized incident to their status as an asylee and the EAD is matter of convenience and not necessary for ongoing employment, asylees submitting I–765 renewal applications will be required to pay the relevant fee, unless the asylee filed for adjustment of status on or after July 30, 2007 and before October 2, 2020 and paid the Form I–485 filing fee. DHS declines to adjust this final rule in response to these comments.

*Comment:* One commenter suggested that initial asylum applicants seeking employment authorization should be exempt from fees. Instead, they propose that the Form I–765 fee should increase by $10 to offset the cost.

*Response:* DHS appreciates the commenter's suggestion. DHS considered continuing to exempt asylum applicants from paying for their first Form I–765 filing. However, to more closely align with the beneficiary-pays principle, DHS declines to require other fee-paying applicants to subsidize

AR2022_200457

the cost of adjudicating the initial EAD applications of asylum applicants. DHS declines to adopt the change suggested by this commenter.

*Comment:* One commenter pointed out that work-eligible unaccompanied children need access to EADs in order to access housing, food, and clothing. Many minors reach adulthood before their Form I–589 application is adjudicated, losing access to foster care and other financial support, leaving them as reliant on work as adult applicants. Another commenter said that women and children will be particularly affected by the EAD application fee and stated that a fee waiver is necessary for these applications. Given that asylum seekers do not have access to social welfare benefits, women are especially at risk of hunger, abuse, homelessness, trafficking, and other coercive employment practices. This commenter cited data from the Women's Refugee Commission which emphasizes the benefits of employment for women who have experienced trauma, as many asylees have.

*Response:* DHS acknowledges that asylum applicants need access to employment authorization. DHS does not believe that this final rule hinders or prevents asylum seekers from applying for employment authorization. DHS believes that the EAD fee is not unduly burdensome for asylum seekers and is acting within the scope of its statutory authority to establish fees for adjudication services, in accordance with INA sections 208(d)(3) and 286(m). Regarding unaccompanied alien children (UAC), a UAC may be in the custody of the U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR) or residing with a sponsor. *See* 8 U.S.C. 1232(b) and (c). A UAC should not need an EAD for an identity document, and to the extent that they do, the sponsor for the UAC is generally responsible for his or her Form I–765 fee. After turning 18, the same policy considerations for charging them for the Form I–765 apply as for charging all adults.

*Comment:* A few commenters claimed that the processing time for EAD applications is too long as is, and the new Form I–765 fee will present an unsurmountable burden. Doubling the waiting period, along with the $490 fee, presents an unjust financial hurdle for many asylum seekers and will prevent them from attaining self-sufficiency through work.

*Response:* DHS acknowledges that the fee and waiting period for the initial EAD may be an economic challenge to some asylum applicants, but DHS

disagrees that it is insurmountable or unduly burdensome. Many asylum seekers spend thousands of dollars to make the journey to the United States. It is not unduly burdensome to require that asylum seekers plan and allocate their financial resources to pay a fee that all other noncitizens must also pay. USCIS must incur the costs of adjudicating Form I–765 submitted by an asylum seeker, and DHS does not believe it should shift that cost to other fee payers. Charging a fee for adjudication services is in line with INA section 208(d)(3), which provides that ''[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title.'' DHS declines to make changes in this final rule in response to these comments.

**18. Form I–817, Application for Family Unity Benefits**

*Comment:* A commenter said the fee decrease for Form I–817 is puzzling in light of the current processing and adjudication of the corresponding benefits because this form currently experiences inordinate delays for processing.

*Response:* DHS acknowledges that processing times for many forms, including Form I–817, have exceeded USCIS' processing time goals. DHS is setting the fee for Form I–817 at the level sufficient to recover the estimated full cost of adjudicating USCIS's anticipated workload receipt volumes. DHS hopes to be able to devote sufficient resources to Form I–817 adjudication to reduce pending caseload. DHS declines to make any adjustments in this final rule in response to the comment.

**19. Form I–821D, DACA Renewal Fee**

*Comment:* Many commenters wrote that they opposed the Form I–821D DACA renewal fees. Commenters stated that increasing DACA fees would make it difficult for individuals to renew their work permits and individuals could lose the ability to work legally in the United States. Commenters highlighted that many DACA requestors are students and may have difficulty paying the proposed fee in addition to the fee for filing Form I–765. Commenters wrote that the proposed fee increase would cause emotional and financial hardships for the families of DACA recipients. Commenters stated that the imposition of a fee for DACA would constitute an attempt to terminate the DACA program.

Some comments stated that the Supreme Court might decide the future of the DACA program in the next few months; therefore, DACA recipients should not pay more for an uncertain benefit.

*Response:* DHS will not impose the proposed Form I–821D, Consideration of Deferred Action for Childhood Arrivals fee. It is not included in this final rule. USCIS will not receive any revenue from Form I–821D. Therefore, DHS removed the marginal costs directly attributable to the DACA policy from its cost baseline that informs the fee calculations for this final rule. The revenue DHS anticipated from the Form I–821D DACA fee in its NPRM to recover costs associated with overheads and cost reallocation will be collected through adjustments to the other fees addressed in this final rule.[88] DACA requestors will continue to pay the fees in place before September 5, 2017, $410 for Form I–765, Application for Employment Authorization, as well as a separate biometric services fee of $85.

*Comment:* Multiple commenters suggested that the ability to receive immigration protection and work authorization under DACA is crucial for immigrant survivors of domestic and sexual violence. The commenters cited a DOJ special report from December 2014 which indicates that women between the ages of 18 and 24 experience the highest rate of rape and sexual assault when compared to women of other age groups. The commenters stated that because most DACA requestors are young immigrants, the DACA eligible population is particularly vulnerable to violence and abuse.

One commenter said that increasing the DACA renewal fee by 55 percent will jeopardize the employment of domestic abuse survivors. The commenter stated that when a DACA holder is a victim of domestic violence and becomes eligible for U nonimmigrant status, it is important that they be able to renew their DACA and related work permits while they wait for their U nonimmigrant status so that can remain employed and not have to

---

[88] Although DHS requires DACA requestors to continue paying the fee for Form I–765, it has removed all DACA workload and fee-paying volume projections from USCIS' ABC model due to our decision to not impose a fee for Form I–821D in this final rule, consistent with Scenario D of the NPRM and the FY 2016/2017 fee rule. In this rules to establish USCIS fees, DHS has generally not relied on revenue from sources that are temporary in nature, including DACA. *See* 81 FR 73312. Including temporary programs in the model would allocate fixed costs and overhead to these programs, thereby introducing financial risk because USCIS would not be able to recover full cost if they are discontinued.

financially rely on their abusers. The commenter stated that processing time for petitions for U nonimmigrant status is between 52.3 and 53 months.

*Response:* DHS will not impose a fee for Form I–821D in this final rule. However, DACA requestors will continue to be required to submit Form I–765 for an EAD. To request a DACA renewal, DHS will continue to require the $410 Form I–765 fee and the $85 biometric services fee that were in effect before September 5, 2017. Furthermore, DHS reiterates that Form I–918 has no fee and Form I–192 remains fee waivable for U nonimmigrant status petitioners.

DHS declines to make changes in this final rule in response to these comments.

20. Form I–829, Petition by Investor To Remove Conditions on Permanent Resident Status

*Comment:* A commenter said the fee review for EB–5 forms, such as Form I–829, failed to meet the objectives of ensuring USCIS has adequate resources and to recover the full operating costs of administering the national immigration benefits system. The commenter said the modest 4 percent increase for Form I–829 fee is clearly too low for adequate service and noted that despite the form having a statutory requirement to be adjudicated within 90 days of filing, the processing time for this form is currently between 22 and 45 months.

*Response:* DHS acknowledges that processing times for many forms, including Form I–829, have exceeded the goals established by USCIS. Furthermore, DHS acknowledges its obligation to adjudicate Form I–829 filings within 90 days of the filing date or interview, whichever is later. *See* INA section 216(c)(3)(A)(ii), 8 U.S.C. 1186b(c)(3)(A)(ii). In this final rule, DHS adjusts the fee for Form I–829 to $3,900 to reflect the estimated full cost of adjudication. In estimating the full cost of adjudication, USCIS considers the costs to adjudicate incoming workloads and does not consider the resources necessary to adjudicate existing pending caseloads. If USCIS considered the cost to adjudicate existing, pending caseloads in its fee reviews, this would require future immigration benefit requestors to subsidize the cost of adjudicating previously received applications and petitions. DHS will not require future applicants and petitioners to subsidize the adjudication of existing, pending caseloads.

DHS declines to make changes in this final rule in response to the comment.

21. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))

*Comment:* A commenter said that the NPRM provided no explanation for the 532 percent fee increase for Form I–881. The commenter questioned if adjudication had changed drastically to justify the fee increase. Similarly, a couple commenters stated that USCIS' justifications did not explain the fee increase and the proposal was contrary to the purpose of the Nicaraguan Adjustment and Central American Relief Act (NACARA).

*Response:* DHS disagrees with the commenters' contention that DHS failed to explain or justify the fee increase for Form I–881. This final rule adjusts the fee for Form I–881 from $285 for individuals or $570 for families to a single fee of $1,810. As stated in the NPRM, DHS has not adjusted the fee for Form I–881 since 2005. Thus, the fee has not reflected USCIS' estimated full cost of adjudication since that time. The large increase results from a need for the fee to recover its proportionate share of USCIS' estimated full costs. In this final rule, DHS adjusts the fee for Form I–881 to reflect the estimated full cost of adjudication.

DHS declines to make change in this final rule in response to these comments.

22. Forms I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and I–924A, Annual Certification of Regional Center

*Comment:* A commenter said the filing fee for Form I–924 is "already vastly out of proportion" with the work required to process the form. The commenter said the current fee of $17,795 may be appropriate for entities seeking a new regional center designation or an approval of an exemplar Form I–526 petition but is not reasonable for smaller-scale changes like a change to a regional center's name, ownership, or organizational structure. The commenter suggested there should be a much lower fee to accompany such minor changes (which are mandatory notifications to USCIS).

Another commenter said the fee adjustment for Forms I–924 and I–924A fails to meet the agency's stated objectives of adjusting fees to ensure USCIS has the necessary resources to provide adequate service to applicants and can recover the full operating costs associated with administering the immigration benefits system.

*Response:* DHS acknowledges that there may be a difference between the cost of adjudicating a Form I–924 filing that requests a new regional center designation and a filing that amends an existing regional center. However, DHS does not have data to document the difference in effort and cost between different types of Form I–924 filings. Thus, DHS estimated the full cost of adjudication for Form I–924 based on an estimate of the average level of effort required to adjudicate Form I–924. As noted in the rule initially establishing the $17,795 for this form, the proposed fee "was determined using USCIS's standard fee-setting methodology, based on the number of hours required to adjudicate Form I–924. These adjudications require economists and adjudications officers to thoroughly review extensive business documents, economic impact analyses, and other project-related documents." [89]

DHS disagrees with the commenter's contention that the fee for Form I–924 is too low to provide adequate service. In its fee review, USCIS estimated that the fee for Form I–924 necessary to reflect the full, estimated cost of adjudication would be less than the existing fee of $17,795. In recognition of the resources available to I–924 filers and to limit the fee increases for other form types, DHS decided to maintain the fee for Form I–924 at the current level of $17,795 in this final rule.

DHS declines to make changes in this final rule in response to these comments.

23. Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant

*Comment:* Multiple commenters suggested the proposed $1,285 or 559 percent increase in the Form I–929 fee is excessive. The commenters stated that the petition benefits crime victims' family members. A commenter said the proposed fee would create a financial hardship for immigrant families and the proposed rule ignores the fact that survivors of domestic violence, sexual assault, and human trafficking may desperately need timely processing of ancillary applications to escape and overcome abuse. Another commenter said the proposed increase would inhibit a vulnerable population from reuniting with spouses, children, and in the case of minors, parents—directly in tension with congressional intent. A commenter indicated this increase would make applying extremely difficult for individuals who have

---

[89] USCIS, *U.S. Citizenship and Immigration Services Fee Schedule,* 81 FR 73292, 73310 (Oct. 24, 2016).

qualified family members. A commenter stated that it is important to incentivize individuals to come forward and report when they have been the victim of a crime and by keeping derivative applications for U-visa applicants affordable, USCIS would ensure that agencies prioritize public safety and family unity.

*Response:* DHS recognizes the importance of Form I–929 for promoting family unity for U nonimmigrants and their family members. In recognition of this importance, and consistent with its commitment to maintain fee waiver availability of statutorily protected classes of individuals, DHS proposed in the NPRM to continue to make the fee for Form I–929 waivable for those who file Form I–912, Request for Fee Waiver, and meet the fee waiver eligibility criteria. *See* 84 FR 62297. In this final rule, DHS reaffirms that the fee for Form I–929 will remain waivable for petitioning U nonimmigrants or lawful permanent residents who file Form I–912, Request for Fee Waiver, and meet the fee waiver eligibility criteria. DHS believes that maintaining access to fee waivers for this vulnerable population mitigates any concerns that the increase in the fee for Form I–929 would inhibit family unity.

In this final rule, DHS establishes the fee for Form I–929 as $1,485 to reflect the estimated full cost of adjudication, which includes the anticipated cost of fee waivers for Form I–929. DHS recognizes that this represents a significant increase of $1,255 in the fee. DHS notes that this increase is due, in part, to its commitment to preserve access to fee waivers for certain vulnerable populations. Because DHS anticipates that many filers will meet the fee waiver criteria, USCIS must charge fee-paying applicants more to recover the cost of processing fee-waived forms.

DHS declines to make changes in this final rule in response to these comments.

### 24. Form N–400, Application for Naturalization

#### a. N–400 Fee Increase

*Comment:* Some commenters stated that USCIS does not have statutory authority for raising the naturalization fees.

*Response:* DHS disagrees that USCIS does not have the statutory authority to raise naturalization fees. The Form N–400 fee adjustment is consistent with INA section 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full

costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants")[90] and the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees). Currently, there are no statutory provisions that require USCIS to limit the naturalization application fee. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* Many commenters stated that Congress has asked USCIS to keep citizenship affordable, consistent with Congressional intent, USCIS has historically followed this directive by using other fees to subsidize naturalization fees, and that the proposed increase in naturalization fees and removal of fee waivers violates Congressional intent. A commenter provided quotations from 2010 and 2016 rulemakings stating this policy objective and wrote that USCIS is arbitrarily departing from the policy of reducing economic barriers to naturalization. Commenters also cited the U.S. Code's citizenship criteria and noted the absence of economic status. Commenters cited the 2019 DHS Appropriations Act and a recent Congressional Committee report in making this argument and especially opposing the removal of fee waivers for Form N–400. A commenter also cited Consolidated Appropriations Acts from 2012, 2017, and 2019 as evincing Congressional intention to reduce financial barriers to naturalization. The commenter also quoted a Senate Committee report from 2015 and House Committee report from 2020 to the same effect. Another commenter provided two House of Representatives reports from 2018 and 2019, also writing that the proposal contravenes Congressional intent.

Multiple commenters stated that the proposal "undermin[es] the special consideration that obtaining U.S. citizenship deserves." A commenter wrote that USCIS irrationally dismissed Congressional instructions to remove barriers to naturalization by relying on a principle of "self-sufficiency" that USCIS asserts without support. Another

commenter stated that USCIS acknowledged its departure from Congressional intent, and that its stated justification—a "hypothetical concern" that waivers could disrupt services—is insufficient. A commenter stated that, while reducing the subsidy provided by other immigration fees to naturalization may be appropriate, it is cynical of USCIS to use naturalization fees to fund ICE while making no commitment to reducing the months-or-years-long wait times for citizenship interviews. A commenter provided a citation to a USCIS statement reaffirming the special consideration given for naturalization in making fee determinations.

A commenter stated that increasing naturalization fees would impact families and that DHS must therefore perform a "family policymaking assessment," citing a 1998 Omnibus Appropriations Act. The commenter wrote that N–400s are the forms most likely to impact immigrant families.

A commenter wrote that the Northern District of California issued a nationwide preliminary injunction, effective December 2, 2019, barring USCIS from limiting access to naturalization for LPRs.

Two commenters cited the United Nations Declaration of Human Rights' statement that the right to a nationality also includes the right to "change [one's] nationality," and therefore there should be no arbitrary barriers that prevent naturalization.

One commenter cited a 2012 Migration Policy Institute study which found that the United States lags behind other English-speaking countries in naturalization rates, writing that these countries have made active attempts to encourage naturalization. A few commenters emphasized the role of naturalization in providing personal security for immigrants, particularly those who are in danger of worker exploitation without the full legal rights of citizenship. A commenter requested that DHS more thoroughly analyze the costs of impeding access to naturalization, which include long-term reduced economic and social mobility for impacted populations.

*Response:* DHS recognizes the importance of naturalization to individual beneficiaries and American society as a whole. However, there are no specific provisions in the law (including the INA or the United Nations Declaration of Human Rights) that require USCIS to set fees to encourage individuals to obtain U.S. citizenship.

In response to comments, DHS provides that the fee for Form N–400 will remain fee waivable for VAWA self-

---

[90] The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

petitioners T and U nonimmigrants, SIJ petitioners and recipients who have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, and Special Immigrant Afghan and Iraqi translators. DHS is aware of the United Nations' Universal Declaration of Human Rights, and we agree with the declaration's article 15 which provides that everyone has the right to a nationality and no one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.[91] Congress has authorized DHS to fund USCIS naturalization services from fees, and does not fund USCIS through appropriations. *See* INA section 286(m), 8 U.S.C. 1356(m). Our fees are set using notice and comment rulemaking as permitted by law and we provide a robust explanation of the need for the fees and respond to public comments. Furthermore, the fee for an application for naturalization will be $1,170 and fee waivers will be available to VAWA, T, U, SIJ and Afghan/Iraqi SIV applicants. *See* new 8 CFR 106.2(b)(3) and 106.3(a)(3). DHS recognizes that some applicants would need to pay for the fees absent a fee waiver but does not believe the increase will prevent people from filing for naturalization. As previously indicated, USCIS monitors the proportion of lawful permanent residents who naturalize over time and this tracking has a high degree of accuracy and the most recent published analysis shows that the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period.

*Comment:* An individual commenter stated that the rule's justification—that fee increases are needed to cover costs—does not support the Form N–400, Application for Naturalization, fee increase. The commenter wrote that USCIS' projected cost increases are only 13 or 20 percent and the proposal would raise fees by 60 percent.

*Response:* DHS acknowledges that the fee for Form N–400, Application for Naturalization, is increasing by a greater percentage than the total increase in USCIS costs and the average increase in fees generally. DHS is raising the fee for Form N–400 from $640, plus the $85 biometric services fee, if applicable, to a total fee including biometric services fee of $1,160 if filed online or $1,170 if filed on a paper application. The estimated average fee of $1,165 is $445,

or 61.4 percent, above the previous combined cost of Form N–400 and the biometric services fee.

The fee for this form is increasing more than for most other forms because DHS has historically held the fee for Form N–400 below the estimated cost to USCIS of adjudicating the form in recognition of the social value of citizenship. However, in this final rule DHS is emphasizing the beneficiary-pays principle for establishing user fees. This means that the fee for Form N–400 will now represent the estimated full cost to USCIS of adjudicating the form, plus a proportional share of overhead costs and the costs of providing similar services at a reduced or no charge to asylum applicants and other immigrants. In other words, the fee for Form N–400 will now be determined in the same manner as most other USCIS fees. Because DHS has held the fee for Form N–400 below full cost in the past, adjusting to full cost requires an increase in excess of the volume-weighted average increase of 20 percent. If DHS did not increase the fee for Form N–400 this amount, other fees would need to increase further to generate the revenue necessary to recover full cost, including the costs of Form N–400 not covered by its fee. Thus, DHS believes the increase in the fee for Form N–400 is fully justified.

*Comment:* Many commenters opposed the proposed fee increase by comparing its 60 percent increase against the 4 percent inflation rate over the same period. A commenter recommended that DHS raise the fee for Form N–400 to $737.70, to account for inflation. A commenter wrote that DHS should base naturalization fee increases on inflation only. Another commenter stated that, adjusted for inflation since its original price in 1985, the citizenship application should cost $85, rather than the $725 it currently is or the proposed $1,170. Likewise, another commenter cited a Stanford News article in commenting that the inflated price of naturalization applications should only be $80.25. Another commenter stated that, if inflated since 1994, the current naturalization fee would be $95. Another commenter recommended that naturalization fees be set at a percentage of the taxable income reported by applicants over the past 2 years. A commenter stated that the proposed naturalization fee increases should be phased in over a number of years in order to reduce its burden on applicants.

*Response:* DHS appreciates the recommendations but neither adjusting the fee for Form N–400 by inflation nor phasing the fee increase in gradually

over time would result in sufficient revenue to recover the cost of adjudicating and processing Form N–400. DHS is increasing the fee for Form N–400, Application for Naturalization, to recover the full cost of adjudication. The revenue generated by the previous fee is insufficient to recover the full cost of adjudication. DHS held the current N–400 fee at less than the cost of adjudication when it last adjusted the fee on December 23, 2016. *See* 81 FR 73307. In this final rule, DHS emphasizes the beneficiary-pays principle of user fees so that applicants will be primarily responsible for covering the cost of adjudicating their applications. This requires an increase in the fee for Form N–400 to $1,160 for online filing or $1,170 for paper filing. Phasing in the increase over multiple years would require increasing other fees by greater amounts to generate the revenue necessary to cover the costs not recovered due to the lower Form N–400 fee. Therefore, DHS declines to adopt the commenters' suggestions.

*Comment:* A commenter stated that the fees for Forms N–400 and N–600 should not be more than $500, and indicated that DHS should decrease the fees so that more immigrants can afford to apply without relying on a fee waiver. The commenter stated that the fee increase is a hardship and referenced refugees, Special Immigrant Visas, and Afghan/Iraqi interpreters should pay lower fees for humanitarian reasons.

*Response:* Charging a limited fee shifts the cost of processing and adjudicating those benefits to other applicants and petitioners, which is not equitable given the significant increase in Form N–400 filings in recent years.[92] The new fees for Forms N–600 and N–400 implement the beneficiary-pays principle, which ensures that those individuals who receive a benefit pay for the processing of the relevant application, petition, or request. The N–400 fees of $1,160 if filed online and $1,170 if filed on paper are set to recover the full cost of adjudicating the Form N–400.[93] In addition, DHS has provided in the final rule that certain Afghan/Iraqi interpreters are eligible for N–400 fee waivers, provided that they file Form I–912, Request for Fee Waiver, and meet the fee waiver eligibility requirements. *See* 8 CFR 106.3.

---

[91] *See* Universal Declaration of Human Rights, Available at *https://www.ohchr.org/EN/UDHR/Documents/UDHR_Translations/eng.pdf* (last viewed March 16, 2020).

[92] Based on filing volume trends in recent years, USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* NPRM Table 4: Workload Volume Comparison.

[93] For more information, see Appendix VII: Final Fees by Immigration Benefit Request that accompanies this final rule.

*Comment:* An individual commenter stated that the rule's justification—that fee increases are needed to cover costs—does not support the naturalization fee increase. The commenter wrote that USCIS' projected cost increases are only 20 percent and the proposal would raise fees by 60 percent.

*Response:* As stated in the NPRM, in crafting prior fee rules, DHS reasoned that setting the Form N–400 fee at an amount less than its estimated costs and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration.[94] DHS now believes that shifting costs to other applicants in this manner is not equitable given the significant increase in Form N–400 filings in recent years.[95] Therefore, DHS proposes to no longer limit the Form N–400 fee to a level below the cost of adjudication, thereby mitigating the fee increase of other immigration benefit requests and implementing the beneficiary-pays principle. In this final rule, DHS institutes a $1,160 fee for Form N–400 if filed online and a fee of $1,170 if filed on paper to recover the full cost of adjudicating the Form N–400, as well as the cost of similar service provided without charge to asylum applicants and other immigrants.[96]

DHS acknowledges that the fee for Form N–400, Application for Naturalization, is increasing by a greater percentage than the total increase in USCIS costs and the average increase in fees generally. DHS is raising the fee for Form N–400, Application for Naturalization, from $640, plus the $85 biometric services fee, if applicable, to a fee of $1,160 if filed online or $1,170 if filed on a paper application. The estimated average fee of $1,165 is $445, or 61.4 percent, above the previous combined cost of Form N–400 and the biometric services fee.

*Comment:* Multiple commenters requested that USCIS ensure that naturalization remain affordable. A commenter stated that the cost and fees are a significant amount and discourages immigrants from applying to become US citizens. The commenter cited to a 2015 Pew Research Center asked Mexican green-card holders additional 13 percent of Mexican and 19 percent of non-Mexican lawful immigrants identified financial and administrative barriers, mainly the cost of naturalization. Two commenters said that barriers to naturalization disproportionately endanger Mexican workers, who are more likely to experience worker exploitation and four times more likely to die in the workplace than U.S.-born workers. Another commenter indicated that the naturalization fee amounted to a month's gross income for an immigrant and therefore would make it too difficult to afford citizenship applications. Another commenter indicated that the naturalization fee represents 50 to 100 percent of a foreign resident's monthly income. A commenter questioned the naturalization application fee increased based on 2 hours of work and asked about the hourly wage or a week's salary for a typical American household. Another commenter opposed USCIS' rationale, writing that while it may receive more naturalization applications, naturalization adjudication levels remain flat despite receipt increases. An individual commented that the proposed naturalization fee increase would prevent residents from seeking citizenship, citing data on financial and administrative barriers as bars to naturalization. Another individual described the extent of the fee's burden by comparing it against the average income of immigrants.

A commenter wrote that the proposal would act as a barrier to immigrants with middle or lower class income and cited an analysis from the Pew Research Center that found immigrants age 16 and over who arrived in the U.S. in the past five years had median annual earnings of $24,000, and those who arrived in the U.S. in the last ten years had median annual earnings of $32,000. The commenter cited another analysis from the same organization showing the U.S. foreign-born population was 44.4 million in 2017, and that 800,000 immigrants applied for naturalization in 2018. One commenter provided citations to various sources detailing the widespread lack of adequate savings among many Americans, particularly black and Latino households, and that the proposal would deprive families of the ability to work and pursue opportunities. The commenter said the proposal would cause "irreparable harm" to families forced out of the legal immigration system by unaffordable fees.

*Response:* DHS understands that the increase for the naturalization application may affect those applying. As explained in the NPRM, in crafting prior fee rules, DHS reasoned that setting the Form N–400 fee at an amount less than its estimated cost and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration.[97] DHS now believes that shifting costs to other applicants in this manner is not equitable given the significant increase in Form N–400 filings in recent years.[98] Therefore, DHS will no longer limit the Form N–400 fee, thereby mitigating the fee increase of other immigration benefit requests and implementing the beneficiary-pays principle. In this final rule, DHS institutes a fee of $1,160 for Form N–400 if filed online and a fee of $1,170 if filed on a paper form to recover the full cost of adjudicating the Form N–400.[99]

*Comment:* A commenter faulted USCIS' economic model for the Form N–400 fee increases. The commenter wrote that USCIS increased the activity-based cost (ABC) model baseline with no explanation, failed to account for fee waivers, increased the model output for Form N–400 by 18 percent, and failed to account for the cost-savings of online Form N–400 filings. A commenter stated that the proposal belies its "beneficiary-pays" principle by charging naturalization applicants a higher amount than the cost of processing of their own applications, subsidizing other immigration-related expenditures. Likewise, another commenter wrote that the proposal arbitrarily departs from past practice of capping the "model output" increase to 5 percent, setting the new level at 18–19 percent. A commenter wrote that the proposed naturalization fee increase could actually be detrimental to USCIS finances, as fewer immigrants would apply. The commenter faulted USCIS' rationale as failing to discuss operational effectiveness despite increasing fees beyond projected processing volume increases and failing to justify a $745-per-hour processing cost for naturalization applications—a cost exceeding that charged by private lawyers to corporate clients. The commenter also cited Government Finance Officers Association guidelines in writing that high-demand benefits are made affordable by government entities.

---

[94] *See, e.g.,* 75 FR 33461; 81 FR 26916.

[95] Based on filing volume trends in recent years, USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* Table 4: Workload Volume Comparison.

[96] For more information, see Appendix VII: Final Fees by Immigration Benefit Request of the supporting documentation that accompanies this final rule.

[97] *See, e.g.,* 75 FR 33461; 81 FR 26916.

[98] Based on filing volume trends in recent years, USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* NPRM Table 4: Workload Volume Comparison.

[99] For more information, see Appendix VII: Final Fees by Immigration Benefit Request of the supporting documentation that accompanies this final rule.

*Response:* DHS understands the commenter's concerns regarding the effect the fee increase on USCIS' financial well-being. DHS recognizes that, if the increase in fee for Form N–400 discouraged significant numbers of individuals from naturalizing, USCIS could realize less revenue than with a lower fee for Form N–400. However, DHS believes that most individuals will continue to value American citizenship, even if it is more expensive to naturalize. In the wake of past increases in the fee for Form N–400, USCIS has not experienced a decline in application volumes. DHS does not anticipate that Form N–400 application volumes will decrease following the fee increase in this final rule.

DHS notes that the critiques of its ABC model misunderstand what model outputs represent, how they incorporate fee waivers, and how they translate into final fees. The model never limits the model output for any form type. The model output represents the estimated fee-paying unit cost for a given form. Meaning, the model output would recover the full cost of adjudicating that form type, given the anticipated fee-paying rate for that form. However, given that DHS determined to limit the fee increase for certain form types, USCIS must reallocate costs that will not be recovered by the lower, limited fees to other form types. Thus, the fees for most form types are greater than the calculated model outputs in order to generate revenue sufficient to cover the cost of adjudicating form types with fees held below the model output and ensure that USCIS achieve full cost recovery overall. DHS acknowledges that, in past fee rules, DHS has limited the increase in the fee for Form N–400 below the model output for that form. This choice forced other fee-paying applicants to pay higher fees and bear the cost of generating the revenue that was not recovered from the Form N–400 fees because of the lower fee. In the NPRM, DHS noted that it no longer believes this approach to setting the fee for Form N–400 is equitable, given high volumes of Form N–400 filings, the significant amount of costs other fee-paying applicants would have to bear if DHS limited the increase in fee for Form N–400, and its emphasis on the beneficiary-pays principle of user fees. Therefore, DHS disagrees that this change in practice is arbitrary.

The commenter is mistaken in calculating the cost per hour to process Form N–400 as $745. As with all USCIS fees, the fee for Form N–400 reflects not only the direct costs of processing an individual Form N–400 filing but also the cost of providing similar services at no or reduced charge to asylum applicants and other immigrants. Furthermore, each fee incorporates costs related to USCIS overheads and general administrative costs. In this final rule, DHS establishes a fee of $1,160 for Form N–400 if filed online and a fee of $1,170 if filed on paper to reflect the full cost to USCIS of processing these filings. DHS believes it has fully justified these fees.

*Comment:* Another commenter faulted DHS' abandonment of the "ability-to-pay" principle, asking for more transparency as to the changes in N–400 trends and how other applicants subsidized naturalization. The commenter also stated that DHS' assumption that applicants will continue to submit applications regardless of their eligibility for a fee waiver is unfounded. The commenter provided another citation to the proposal where DHS appears to recognize that removing fee waivers would impact application decisions, and then states that it cannot predict the proposal's impact on applications. A different commenter stated that, in a footnote, USCIS indicates that the true intent of the proposal is to impose a "self-sufficiency" principle and impose barriers to naturalization contrary to Congressional intent. A commenter also stated that when President Johnson signed the Immigration and Naturalization Act of 1965 into law, it ushered in our modern era with a more equitable system.

*Response:* The quote of President Johnson cited by the commenter referred to the elimination of the previous quota system that had severely restricted the number of people from outside Western Europe who were allowed to immigrate to the United States. The 1965 Act did not discuss the fees for naturalization. The 1965 Act did not provide for specific fee exemptions or waivers. DHS considered the self-sufficiency principles as established by Congress along with other provision of the law and the added cost to other fee-paying applicants and petitioners. DHS believes that it is neither equitable nor in accordance with the principle of self-sufficiency that Congress has frequently emphasized, to continue to force certain other applicants to subsidize fee-waived and reduced-fee applications for naturalization applicants who are unable to pay the full cost fee.

*Comment:* A commenter contrasted the proposed rule against a speech from Vice President Pence where he stated, "America has the most generous system of legal immigration in the history of the world," writing that the proposal would be inconsistent with this statement. The commenter also provided statistics of the number of immigrants who naturalize in the United States against higher figures from Australia, Canada, and the United Kingdom.

*Response:* DHS does not agree that this final rule is inconsistent with the Vice-President's statement.[100] The statement did not include any references to fee or fee waivers or exemptions, instead the statement references the ability of different people with different backgrounds to be able to naturalize. The rate of naturalization has increased over the years and DHS does not believe that this final rule would have a significant effect on the number of people filing Form N–400.

*Comment:* A commenter claimed that USCIS has failed to provide the evidence necessary for the agency to save money by no longer providing printed N–400 forms for people with low technology literacy, requiring them to access the forms at public libraries and community organizations. The commenter wrote that USCIS has failed to account for the impact those savings had on the agency's budget, as well as on the ability of LPRs to submit their naturalization applications.

*Response:* As the commenter points out, DHS is encouraging applicants to file online when they can, moving toward modernizing all of our services, minimizing the use of paper, and increasing agency efficiency through technology. It requires 10 days to receive forms after ordering them from the phone and mail service, as opposed to immediate access via the website. All USCIS forms are easily accessible by visiting the USCIS website, and applicants may either file electronically or download the form and submit it in paper format according to the form instructions. If an individual visits a USCIS office, we will direct them to digital tools and USCIS Contact Center phone number. Understanding some individuals may not have access to the digital tools, our staff will make them aware of resources, such as libraries that offer free computer online services, including many that offer a Citizenship Corner. USCIS works closely with accredited community-based organizations and local libraries to provide access to information and computers. Public libraries can be a resource for immigration information, and many have a Citizenship Corner where the public can visit and learn more about the citizenship process

[100] Remarks by Vice President Pence at a Naturalization Ceremony, July 4, 2019, available at *https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-naturalization-ceremony* (last visited March 9, 2020).

libraries may also have computers that the public may use to access forms, complete, and print them. USCIS has enjoyed a costs savings from reducing the storage and mailing of paper forms, as well as destroying unused stocks of paper forms when versions changed, but not enough of a savings to have an appreciable effect on the new fees in this final rule.

*Comment:* A commenter recommended several alternatives to the proposed fee increases, including bundling fees for Forms I–90 and N–400, offering premium processing at a fee, offering tiered pricing for Form N–400, and offering fee reductions based on applicant's income taxes. A commenter suggested that USCIS adopt a sliding scale application fee for naturalization based on income. Another commenter suggested a payment installment plan for immigrants who cannot pay the full amount at once, as well as micro-loans. The commenter also suggested the creation of a citizenship foundation similar to that which funds the National Park Service.

*Response:* As previously indicated, DHS recognizes that filing fees are a burden for some people of limited financial means. Creating and maintaining a new system of tiered pricing, family caps, installments plans, or micro-loans would be administratively complex and would require even higher costs than in the NPRM. Such payment systems would require staff dedicated to payment verification and necessitate significant information system changes to accommodate multiple fee scenarios for every form. The costs and administrative burden associated with implementing such a system would require additional overall fee revenue. However, as previously stated, the cost of fee waivers and reduced fees are borne by all other fee payers because they must be transferred to those who pay a full fee to ensure full cost recovery. DHS believes that it is more equitable to align with the beneficiary-pays principle. Thus, USCIS takes a relatively careful position with respect to transferring costs from one applicant to another through the expansion of fee waiver eligibility and discounting fees. To set fees at various levels based on income, as suggested by the commenter, would require deviation from the underlying fee-setting methodology and require some of the costs for those applications to be reassigned to other benefit requests. Therefore, DHS did not incorporate a reduced fee, sliding scale, or family cap in this final rule or the other suggestions provided by commenters.

*Comment:* One commenter took issue with the use of terms like "moral turpitude" and "good moral character" since these terms lack a legal definition. The commenter said the proposed fee increases would prevent many LPRs from pursuing citizenship, and that the lack of a legal definition for certain terms would increase the amount of time individuals are at risk of losing legal status.

*Response:* DHS did not propose a change to the eligibility provisions for benefit requests such as adjustment of status to lawful permanent resident or naturalization, for which a "crime involving moral turpitude" and "good moral character" may be relevant statutory terms. Therefore, we are not including changes to those terms in the final rule.

b. Effect on Naturalization Applicants

*Comment:* Many comments offered various comments on the effects of the proposed naturalization fee increase on naturalization applicants. Commenters wrote that the new fees:

• Would prevent residents from seeking citizenship, citing data on financial and administrative barriers as bars to naturalization.

• Will not just delay, but ultimately prevent low income and poor immigrants from naturalizing, and the U.S. is engaging in implicit racism, citing the U.S.'s history of denying citizenship based on race.

• The proposal would punish immigrants who did their utmost to obey immigration laws.

• The proposal would harm the Latino community—more than half of the immigrants currently eligible to naturalize are Latino while 71 percent of the population that face the greatest barriers to naturalization are Latino.

• Naturalization fees are a significant bar to Mexican immigrants becoming U.S. citizens with 13 percent of Mexican and 19 percent of non-Mexican lawful immigrants identifying financial and administrative barriers, mainly the cost of naturalization, as a reason preventing their naturalization.

• 2.1 million immigrants are eligible for naturalization in the state of California, and the new fee would severely affect 1 million Californians including 768,024 that live in Los Angeles County.

• The proposal would increase immigrants' dependence on predatory financing in order to support their naturalization applications.

• Would harm eligible parents of U.S. children who will either have to pay a higher fee or forgo naturalization, subjecting themselves and their children to the stresses of uncertain status.

• The mental health problems and traumas faced by children of undocumented parents would be exacerbated.

• The increase is harmful—the United States Census Bureau reported that between 1970 and 2010 the percentage of foreign-born populations who naturalized decreased from 64 percent to 44 percent, A 20 percent decrease in 40 years is a drastic drop and one reason for this is due to the increased in prices for naturalization applications.

• Naturalization provides personal security for immigrants, particularly those who are in danger of worker exploitation without the full legal rights of citizenship.

• Citizenship helps members of immigrant communities to feel secure enough to report crime, which improves neighborhood safety.

• Limiting working class immigration would be contrary to the interests of the U.S. society and economy.

• Naturalization boosts American democracy, economy, and diversity.

• Everyone benefits from residents naturalizing, citing a study showing that naturalization increases net taxable income and GDP.

• Naturalization increases individual earnings. A San Francisco Pathways to Citizenship Initiative study program's participants used financial assistance to afford the naturalization application fee. The funds provided by the city to support such fees "would be depleted almost immediately" if the proposed rule goes into effect.

• Citizenship promotes social benefits, such as English proficiency, quality of employment, and buy-in to U.S. democratic principles.

• Naturalization improves immigrant language skills.

• If half of LPRs naturalized, GDP would increase between $37 and $52 billion annually.

• LPRs must navigate many hurdles to naturalize, and that at a certain point, the United States misses out on the benefits of high naturalization rates because of these hurdles. Naturalization boosts American democracy, economy, and diversity, citing a Catholic Immigration Network study.

• Naturalization increases civic engagement, naming many naturalized citizens who have gone on to hold elected office.

• A 2015 Urban Institute study shows that naturalization increased individual earnings by 8.9 percent, employment rates by 2.2 percent, and

AR2022_200464

homeownership by 6.3 percent, with the earnings and employment improvements resulting in $5.7 billion of additional income in the 21 cities studied and increases home ownership and incomes.

• If eligible immigrants naturalized, federal, state, and city revenues would increase by $20 billion while New York City government benefit expenditures would decrease by $34 million.

• A 2015 Urban Institute study demonstrates that if just half of eligible immigrants in the United States naturalize, it would increase GDP by $37–52 billion, annually, and if all eligible immigrants in 21 U.S. cities naturalized, home ownership would increase by more than 45,000 people and an additional $2 billion in tax revenue would be recognized.

• A 2002 Bratsberg et al. study showed that naturalization led to wage increases as observed in the same individuals over time.

• A 2012 Migration Policy Institute study shows naturalization contributes to increased economic growth through consumer spending.

• Several show the current application fee discourages naturalization, and that naturalization positively impacts wages, the economy, and immigrants' integration into society.

• A 2019 Migration Policy Institute study shows that naturalized citizens over the age of 25 have similar levels of post-secondary education to U.S.-born citizens and that, through naturalization, these immigrants can better integrate into and contribute to their local communities. The naturalization fee increases have caused the number of immigrants eligible to naturalize but not doing so to 9 million, and the proposal would diminish U.S.-specific human capital.

• A 2019 Center for Migration Studies paper shows the impact of naturalization on college degree attainment, English-language skills, employment in skilled occupations, healthcare, poverty level, and home ownership.

*Response:* DHS appreciates and acknowledges all of the positive aspects of naturalization. DHS does not intend for the new fees to prevent individuals from applying for naturalization, that they require applicants to depend on predatory financing to pay naturalization application fees, and we do not believe the rule will have those effects. Therefore, DHS declines to make any changes in this final rule on these bases.

USCIS monitors the proportion of lawful permanent residents who naturalize over time. This analysis has

a high degree of accuracy because it uses administrative data rather than survey data (as the Census does) to assess changes in naturalization patterns. The most recent published analysis shows that the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period.[101] DHS does not have any data that indicates that this trend would change.

*Comment:* A commenter stated that all asylees rely on naturalization for the right to petition for certain family members. The commenter stated that with the additional financial burden of naturalization fees, family reunification for asylees will be delayed or prevented.

*Response:* DHS recognizes that asylees may petition for family members after completing the naturalization process. DHS wants every person eligible to apply for naturalization to submit an application. Likewise, we encourage anyone eligible to petition for the immigration of qualifying family members. DHS does not believe that asylees would be unduly burdened by naturalization fees and does not agree that naturalization fees would prevent or delay family reunification for asylees. DHS is also unaware of any specific statutory provision requiring DHS to provide naturalization applications to asylees with limited fees. DHS declines to make any changes in this final rule in response to this comment.

*Comment:* Another commenter stated that the NPRM would further disadvantage people with disabilities and chronic mental health conditions, contrary to Congressional intent to make immigration benefits available to eligible noncitizens regardless of disability. The commenter wrote that, in addition to the increased naturalization fees, people with disabilities and chronic mental health conditions often must pay to appeal erroneous findings by USCIS officers who conduct naturalization interviews with no medical training and make assumptions regarding their clients' disabilities.

*Response:* DHS is adjusting its fees in this final rule to recover the estimated full cost of providing adjudication and naturalization services. As the commenter suggests, DHS is applying the fees in this final rule to all applicants regardless of their having a disability or not. The comment seems to equate physical disability and mental health conditions with poor financial

condition, but DHS does not know that to generally be the case, and DHS is not basing fee policies on that assumption but rather emphasizing the beneficiary-pays principle. Further, USCIS monitors the proportion of lawful permanent residents who naturalize over time. This analysis has a high degree of accuracy because it uses administrative data rather than survey data (as Census does) to assess changes in naturalization patterns. The most recent published analysis shows that the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period.[102] DHS declines to make changes in this final rule in response to the comment.

#### c. N–400 Reduced Fee

*Comment:* Commenters stated that the fee waiver and partial fee waiver would be eliminated for families with income between 150 percent and 200 percent of the poverty level and almost eliminated for everyone else. A commenter indicating the eliminating the reduced fee for people with incomes from 150 to 200 percent of the FPG would make it too difficult for immigrants to afford citizenship. An individual commenter mentioned the fee waiver and partial fee waiver system strengthened by the Obama administration, and stated that this rule would eliminate these options for families with income between 150 percent and 200 percent of the poverty level and almost eliminate waivers for everyone else.

*Response:* DHS acknowledges that eliminating the reduced fee for the naturalization application will limit the number of people who receive a reduced fee and slightly increase the number of people who are required to pay the full fee. However, few applicants have requested the reduced fee since its creation and significantly fewer applicants than predicted took advantage of the reduced fee option. In other words, the reduced fee option was not widely received, and DHS does not believe its elimination will significantly hinder the number of people who cannot pay the full fee established in this final rule.

The estimated total number of approved reduced fee requests in fiscal year 2017 was 3,624 (0.83 percent). The total number of denied reduced fee requests was 733. In total, DHS estimates the annual number of requests for a reduced Form N–400 fee that

---

[101] *See* USCIS, Trends in Naturalization Rates: FY 2014 Update (November 2016), available at *https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports/Trends-in-Naturalization-Rates-FY14-Update.pdf.*

[102] *See* USCIS Trends in Naturalization Rates: FY 2014 (November 2016) Update, available at *https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports/Trends-in-Naturalization-Rates-FY14-Update.pdf.*

would be filed absent the proposed change is 4,357 (0.6 percent). For comparison, the total number of Form N–400 filed in fiscal year 2017 was 581,998. *See* Table 38 in the RIA.

DHS proposes to eliminate the reduced fee in order to recover the estimated full cost for naturalization services. In addition, eliminating the Form I–942 will reduce the administrative burden on the agency to process the Form I–942. USCIS would recover the cost of adjudicating Form N–400 and not transfer Form N–400 costs to other form fees.

### d. Case Processing

*Comment:* A commenter wrote that the proposed naturalization fee increase is not supported by any improvement in quality of services. It added that, in 1998, INS announced a fee increase but claimed that it would only follow a reduction in the backlog and acceleration of processing speeds. The commenter contrasted this statement against the current backlog of 700,000, cited from a 2019 Colorado State Advisory Committee paper. The commenter also provided a lengthy quotation from a 2017 OIG report stating that USCIS has introduced operational inefficiencies as processing times doubled and naturalization interviews were cancelled. The commenter mentioned the suspension of InfoPass services specifically as an example of diminished customer service.

A commenter wrote that the proposal would compound policies made at the local level which are already increasing barriers to naturalization, such as the USCIS field office in Seattle's 2019 decision to shift caseloads to offices more than 142 or 174 miles away.

A commenter provided figures of the LPRs eligible to naturalize and the backlogs in Denver and that the fee increase will further deter eligible adults from naturalizing.

A commenter claimed that without increasing fees, with automation and management reforms, the Form N–400 processing period in their region has decreased to an average of less than 12 months, undermining the necessity of a fee increase.

*Response:* DHS does not believe the rule changes will delay processing or deny access. USCIS will adapt and change its process as necessary to avoid or minimize any delays in case processing. Nevertheless, by enabling USCIS to hire more employees to process requests, including requests on hand, USCIS also believes the new fees will help reduce backlogs.

### 25. Other Naturalization and Citizenship Forms

*Comment:* A commenter opposed the Form N–600 fee increase, writing that USCIS would receive more revenue and avoid administrative difficulties if the fee were reasonable. A commenter opposed the fee increase for Forms N–600 and N–535 [sic], stating that no explanation has been provided to explain why those increases are necessary.

*Response:* DHS disagrees with this comment. DHS calculated the estimated cost to USCIS of adjudicating Form N–600. This change aligns more closely with the beneficiary-pays principle to ensure that individuals who receive an immigration benefit or service from USCIS bear the cost of providing that benefit or service. Therefore, DHS believes the fee as established is reasonable based on USCIS costs.

*Comment:* A commenter stated that the Form N–600 fee is especially cruel as it has been inflated for years, "not getting their certificate of citizenship limits their college options, and most families have more than one child."

*Response:* DHS disagrees that the fees for Forms N–600 and N–600K were inflated for years. As noted in the FY 2016/2017 fee rule, the current fees for Forms N–600 and N–600K assumed that approximately one third of applicants would receive a fee waiver. *See* 81 FR 73928. To recover full cost, DHS set the fees for Forms N–600 and N–600K at a level for fee-paying applicants to cover the cost of fee-waived work. *Id.*

In this fee rule, the fees for Forms N–600 and N–600K are decreasing mainly because of the proposed limitation of fee waivers, which will enable greater cost recovery for several form types and limit the need for cost reallocation to fee-paying applicants. The proposed fees provide for the full recovery of costs associated with adjudicating the forms. In addition, DHS is providing fee waivers for the humanitarian categories for Forms N–400, N–600, and N–600K.

In addition, not obtaining a certificate of citizenship does not limit a person's college options because there are other means to establish citizenship. Upon meeting the requirements of INA 320, children of U.S. citizens automatically acquire U.S. citizenship. Applying for a certificate of citizenship is only one means to acquire proof of such citizenship. Applicants who acquired U.S. citizenship may also obtain a passport to establish proof of citizenship. Further, some colleges permit nonimmigrants and lawful permanent residents to attend college.

*Comment:* Commenters opposed the proposed fees for the following naturalization and related forms:

• N–300, Application to File Declaration of Intention;

• N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA); and

• N–470, Application to Preserve Residence for Naturalization Purposes.

These commenters stated that immigrants who need to file these special forms would face additional barriers to naturalization.

Commenters indicated that some immigrants use Form N–300 in order to work in certain states. The proposed rule would increase this fee by 389 percent, to $1,320 or five weeks of minimum wage take-home pay.

Some immigrants use Form N–336 to file an appeal if their naturalization application is denied by USCIS. The proposed rule would increase this fee by 151 percent, to $1,755 or seven weeks of minimum wage take-home pay. The commenter stated that USCIS provided no justification for its Form N–336 fee increase and that the increase would especially affect the most vulnerable populations by charging a total of $2,925 to navigate a faulty system.

Some immigrants use Form N–470 if they plan to work abroad for a U.S. company, university, or government agency before applying for U.S. citizenship. The proposed rule would increase this fee by 351 percent, to $1,600 or six weeks of minimum wage take-home pay.

The comment stated that in all of these cases, immigrants living in the United States could be prevented from increasing their income, obtaining the right to vote, and reuniting with family members abroad because they are unable to afford the proposed naturalization fees.

*Response:* Consistent with full cost recovery and the beneficiary-pays principle emphasized throughout this final rule, the new fees represents USCIS' estimated full cost of adjudicating the forms at the time of USCIS' FY 2019/2020 fee review. USCIS used all available data at the time it conducted its fee review to estimate the full cost of adjudication for benefit requests. DHS does not believe that the changes in the fees will limit the ability of noncitizens to obtain the required documentation to be eligible to work if qualified.

### H. Comments on Changes to Form I–129, Petition for a Nonimmigrant Worker

*Comment:* Multiple commenters objected to the increase in fees for

petitions requesting O and P nonimmigrant status. Commenters highlighted the increased costs and burdens to U.S.-based petitioners, including non-profit organizations, small entities, and cultural institutions. Some commenters objected to treating petitions for O and P visa classifications differently, as DHS proposed to create Form I–129O for entities to petition for O visa classification and Form I–129MISC to petition for P visa classification and other categories of nonimmigrant visas. A commenter wrote that the proposed Form I–129MISC would only further delay P-visa classification processing, especially as P, Q, R, and H–3 visa classifications are vastly different. Another commenter said the I–129MISC classifications are so vastly different that there is a higher risk that an officer will apply certain criteria to the P visa classification that is only applicable to another classification. A few commenters stated Form I–129MISC is an inappropriate option for P visa classification and instead suggest combining P visa classification form with Form I–129O or creating a separate P visa classification form to replicate I–129O with minor modifications.

*Response:* DHS acknowledges similarities between the uses of O and P nonimmigrant visa classifications. However, USCIS currently records time per adjudication (*i.e.,* completion rates) for Form I–129 petitions requesting O visa classification discretely so we are able to calculate a separate fee for the O nonimmigrant classification. Time spent adjudicating petitions requesting P visa classification are aggregated with the time spent adjudicating all of the nonimmigrant classifications requested using the new Form I–129MISC. Thus, USCIS is unable to distinguish the time spent adjudicating petitions requesting P nonimmigrant workers from the time spent on adjudicating requests for the other types of workers included in Form I–129MISC, and therefore we have not calculated a separate fee for the P classification. Therefore, DHS declines commenters' suggestions to charge the same amount for petitions requesting O nonimmigrant classification and P nonimmigrant classification and implements fees based on data that show adjudications of O nonimmigrant petitions require more staff, and are therefore more costly, than adjudications of petitions for nonimmigrant classifications that may be requested using Form I–129MISC. DHS will revisit the fees for all of the new Forms I–129 that are created in this rule in the next biennial fee review.

*Comment:* Commenters on the effect of the religious worker program stated:
• That the proposed changes to Form I–129 unduly burden religious organizations because religious workers have limited means to petition for R nonimmigrants, hindering their ability to provide pastoral care while respecting vows of poverty.
• Petitioners requesting R nonimmigrant workers currently pay a $460 fee for Form I–129. Under the proposal, the fee would be $705, a $245 or 53 percent increase.
• The steep fee increases would have a chilling effect on U.S. religious workers and would burden religious orders and their vital work in American communities.
• International religious workers provide critical pastoral care and social services for American parishioners and communities.
• These fees would disproportionately affect small religious organizations that serve a charitable function in our society.

*Response:* In this final rule, DHS adjusts the fees for all types of Form I–129 to reflect the estimated full cost of adjudication. DHS does not believe that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners, churches, religious organizations, or small entities who wish to petition for a nonimmigrant religious worker. DHS realizes that many religious workers have limited means and some take a vow of poverty, but the R–1 religious worker does not petition for his or her own employment and is not responsible for paying the Form I–129 fee, because the organization is required to submit Form I–129 and pay the fee. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter noted that the changes to the way USCIS reviews and adjudicates H–1B petitions have resulted in slower processing times, shifting standards for approval of petitions, and an increase in Requests for Evidence (RFEs).

*Response:* DHS is unsure how the commenter thinks changes in H–1B nonimmigrant adjudications impact this rulemaking. DHS is breaking the Form I–129 into several forms that will focus the information collected and instructions on the nonimmigrant category. DHS anticipates that this will result in more efficient completion and adjudication of the forms and declines to make changes in this final rule in response to the comment.

*Comment:* Many commenters called the 25-person limit for Form I–129 petition for H–2A, O, or P performers "arbitrary." A few commenters stated that USCIS fails to provide any information or data supporting the 25-person limit or increased fees. One commenter questioned how USCIS determined their per worker/petition cost because it would cost the same to have a petitioner with one beneficiary as it would to have a petitioner with 25 beneficiaries. A few commenters suggested that the proposed 25-beneficiary cap as applied to arts ensembles would multiply costs for arts organizations and would preclude them from considering larger performing groups. The commenters also said the 25-beneficiary cap would create "new risks for USCIS confusion" and unnecessary processing delays. A commenter suggested that O- and P-nonimmigrant classifications also limit the numbers of beneficiaries on a single petition, reasoning that USCIS should not apply the same fee for cases with fewer beneficiaries. Some commenter's stated that the separating of I–129 will create confusion and delays.

*Response:* DHS disagrees with commenters that the separating of Form I–129 will create confusion and delays. USCIS is limiting the number of named beneficiaries to 25 that may be included on a single petition for H–2A, H–2B, H–3, O,[103] P, Q, E, and TN workers. As previously discussed in section I of the preamble of the NPRM, limiting the number of named beneficiaries simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with low beneficiary counts who effectively subsidize the cost of petitioners filing petitions with high beneficiary counts.

DHS acknowledges similarities between the uses of O and P nonimmigrant classifications. Annual receipt data for each nonimmigrant classification petitioned for on Form I–129 can be found in the Regulatory Impact Analysis throughout Section (K) and more specifically Table 7. However,

---

[103] While O–1 petitions are limited to a single named beneficiary, a petition for O–2 nonimmigrant workers may include multiple named beneficiaries in certain instances. *See* 8 CFR 214.2(o)(2)(iii)(F).

USCIS currently records time per adjudication (*i.e.* completion rates) for Form I–129 petitions requesting O nonimmigrants discretely, but records time spent adjudicating petitions requesting P nonimmigrants aggregated form such that it is combined with the time spent adjudicating all classes of nonimmigrant classifications that may be requested using the new Form I–129MISC. Thus, USCIS is unable to distinguish the time spent adjudicating petitions requesting P nonimmigrants from the time spent on adjudicating requests for the other types of visas included in Form I–129MISC. Therefore, DHS cannot charge a separate fee for P nonimmigrants or charge the same amount for petitions requesting O and P nonimmigrants. DHS implements fees based on data that show adjudications of O nonimmigrant petitions require more staff, and are therefore more costly, than adjudications of petitions for nonimmigrant workers that may be requested using Form I–129MISC. The evidence suggests that the additional fee in this final rule does not represent a significant economic impact on these entities.

*Comment:* A few commenters wrote that applicants with one or two beneficiaries are subsidizing applications with multiple beneficiaries, which could further diminish, if not eliminate, farmers' margins. A few commenters indicated that limiting petitions to 25 named beneficiaries and requiring farmers to file separate petitions would create an immense paperwork burden; multiplying the costs to access the H–2A program; and increasing the workload for USCIS as well as for farmers who produce labor intensive agricultural commodities.

*Response:* DHS agrees that petitions with one or two named beneficiaries subsidize petitions with greater numbers of named beneficiaries, because petitions with fewer named workers require less time to process but pay the same fee. In this final rule, DHS adjusts the fees for all types of Form I–129 to reflect the estimated average cost of adjudication for the relevant form. Setting the fee at the level of the average cost necessarily entails some cross-subsidization between petitions that are less costly to adjudicate and those that are more costly to adjudicate.

DHS data indicates that the limit of 25 named beneficiaries per petition established in this final rule will significantly limit the amount of cross-subsidization between petitions with few named workers and many named workers. Previously a single petition might contain a single named worker or

hundreds of named workers, implying a high level of cross-subsidization, given the disparity between the cost of adjudicating a petition with a single named worker and the cost of adjudicating a petition with hundreds of named workers. Limiting the number of named beneficiaries per petition to 25 effectively limits the amount of cross-subsidization per petition, because it limits the maximum disparity in the number of background checks to 24 $(25 - 1)$ and overall cost of adjudications between petitions.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters suggested a flat application fee with an add-on fee per beneficiary.

*Response:* DHS considered and rejected the approach suggested by the commenter. Past experience has demonstrated to DHS the complexity of administering sliding scale fees. DHS believes that the system implemented in this final rule of limiting an individual petition to a maximum of 25 named beneficiaries minimizes the administrative complexity, while also clearly delineating the cost for individual petitioners. DHS acknowledges that this system continues cross-subsidization between petitions that include few named beneficiaries and those that include 25 named beneficiaries, but DHS determined that 25 was a logical number because USCIS immigration services officers could generally adjudicate a petition with 1–25 named workers in 2 hours. 84 FR 62309. DHS believes that the administrative simplicity of this system outweighs concerns about cross-subsidization.

*Comment:* Some commenters generally opposed limiting the number of H–2A beneficiaries and increasing fees. One commenter opposed the fee changes for named and unnamed beneficiaries. The commenter stated DHS lacks a large amount of data, including the amount of time and effort required to process these petitions. Several commenters expressed support for USCIS lowering the fees for unnamed I–129 petitions, but opposed increasing the fees for a Form I–129 with named beneficiaries. One commenter stated that USCIS' justification for separating fees for named and unnamed petitions are valid, but due to the significantly higher filing fee for petitions filled with a named worker, petitioners will be incentivized to file unnamed worker petitions and require significantly more resources to be expended by the State Department in order for workers to obtain their visas.

A commenter stated that the department failed to explain why it does not discuss an option of using improved technology to reduce processing time for named beneficiary petitions.

*Response:* In this final rule, DHS establishes the fee for each Form I–129 subtype at the estimated average cost of adjudication. DHS used all available data at the time it conducted its fee review to estimate the cost of adjudication for Form I–129 subtype. DHS disagrees with the commenter who wrote that USCIS did not have sufficient data.

DHS acknowledges that some petitioners may choose to file petitions for unnamed workers with a lower fee than petitions for named workers with a higher fee. However, choosing to petition for unnamed workers also incurs additional costs associated with consular processing. Furthermore, in some instances, petitioners may need to submit petitions for named workers. Thus, DHS does not believe its changes to the fee structure for petitions with named and unnamed beneficiaries will substantially change petitioner behavior.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter stated that members of its trade association would face a 529 percent increase in filing costs because of the proposed Form I–129 H2A changes. The commenter stated that this change is contrary to Congressional intent and that USCIS' justification relies on it performing duplicative background checks on workers who have already been vetted by the Department of State. A few commenters doubted that USCIS could use background checks to determine whether workers have left the country for 3 months after 3 years, reasoning that CBP officials do not record land-based departures from the country. One commenter suggested USCIS develop an entry and exit system to help track the amount of time a worker has spent in and out of the country and having an online system should expedite the process and allow USCIS and the petitioner to get an approval at a more efficient speed. Another commenter said that forgoing the full background check and instead just doing a shorter update background check on petitions for workers who already possess a visa and who are already in the United States could save extraordinary amounts of time, money, and effort.

*Response:* USCIS must conduct full background checks on named workers and does not merely check to determine how much time the worker has spent

outside of the United States. In this final rule, DHS establishes the fee for Form I–129H2A at the level estimated to represent the full cost of adjudication. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Many commenters generally opposed the changes to the Form I–129 and its fees as it applies to the arts, writing that artists should be treated better and the arts should be promoted. A commenter stated that the proposal would diminish the quality of arts in the United States, as artists would be unable to afford to tour and make a living from their craft. Commenters indicated that the proposal would harm local communities, small businesses, and non-profits, as artists would be unable to afford to perform here. A commenter wrote that artists' contribution to the U.S. market is greater than what they actually "earn," mentioning that artists help draw in international demand. Commenters also stated that international artists provide a vital service in promoting cultural exchange and U.S. soft diplomacy. A commenter wrote that its art school teaches Scottish music, and hindering the school's ability to procure Scottish talent would operate to the detriment of the school, its students, and the community it serves. One commenter stated their organization already navigates significant uncertainty in gaining approval for petitions, due to lengthy processing times, uneven application of statutes and policies, and extensive and even unwarranted requests for further evidence to support petitions. The commenter stated that the proposed fees would only exacerbate these issues for performers. A few commenters said this NPRM would make it harder for their businesses to hire foreign musicians. Some commenters said the proposal would create financial barriers that will harm U.S. arts organizations and the local economies these organizations support. The commenters stated that if artists are unable to come to the U.S., the public will be denied the opportunity to "experience international artistry." One commenter that provides legal services to overseas artists and performance groups wrote that the proposal would negatively impact their business and its clients, many of whom are small businesses.

*Response:* DHS agrees with the commenters' views of the arts a vitally important and beneficial. Nevertheless, the fees DHS establishes in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and

naturalization services. DHS does not intend to deter or unduly burden petitioners requesting workers in the arts, but any preferential treatment provided to petitioners for performers and musicians is borne by other petitioners, applicants, and requestors. DHS declines to require other applicants and petitioners subsidize the cost of petitioning for workers in the arts.

*Comment:* Some commenters discussed the rule's impact on farmers and the H–2A program. Several commenters said their use of H–2A workers allows them to have trained and trusted labor that has been properly vetted through the USCIS system. Likewise, several commenters said the proposed increase of H–2A filing fees would be especially harmful considering the difficulty farmers have obtaining enough and dependable domestic workers. A commenter stated that the proposed increase of H–2A filing fees would contravene the Executive Order on Buy American and Hire American. In contrast, one commenter expressed support for increased fees and rationalized that fees would improve their ability to compete with farms that spend less on labor and make it more appealing for farms to consider hiring citizens.

*Response:* In this final rule DHS adjusts the fees for all types of Form I–129 to reflect the estimated full cost of adjudication. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Multiple commenters referenced an OIG report titled "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors." A few commenters said USCIS uses this report as justification for their proposed changes, but they claimed the audit separates filings into small (1–10), medium (11–40) and large (more than 40) and does not suggest limiting the number of beneficiaries to specifically 25. One commenter said the report explicitly refrains from recommending a change in fees, noting that collecting more detailed cost data will be critical for USCIS to "inform its H–2 petition fee setting activities." Another commenter quoted the report saying that a "flat fee is not consistent with Federal guidelines that beneficiaries pay for the full (or actual) cost of services provided or that established user fees be based on costs and benefits."

*Response:* DHS appreciates commenters' references to the report by the DHS Office of the Inspector General. As stated in the NPRM, DHS establishes separate fees of forms for different types of Form I–129 filings to distinguish the different cost of adjudicating different

kinds of petitions. DHS believes that the changes implemented in this final rule, including establishing a maximum limit of 25 named beneficiaries per petition, and differentiated fees based on whether a petition requests named or unnamed workers, are consistent with and responsive to the recommendation of the DHS OIG report.

Consistent with the recommendations highlighted by commenters, DHS used detailed cost data to distinguish between the average cost of adjudicating petitions with named and unnamed beneficiaries where applicable. In establishing different fees that distinguish the differences in the average cost of adjudication, DHS addresses concerns that the previous flat fees were not consistent with the beneficiary-pays principle of user fees.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters stated that USCIS does not provide any data, evidence, or information in its proposed rule regarding the costs associated with conducting site visits through the Administrative Site Visit and Verification Program (ASVVP). The commenters added that USCIS has failed to articulate how these site visit costs are not already covered by the $500 Fraud Prevention and Detection Fee and other related fees submitted by petitioners for certain categories of nonimmigrant workers, such as for certain H–1B and L workers. One commenter concluded that USCIS must disclose this data so that the public can fully evaluate whether the increased fees that USCIS is proposing accurately encompass the ASVVP costs associated with adjudicating certain categories of nonimmigrant workers.

*Response:* DHS disagrees with the commenter's assertion that DHS failed to provide any data related to the costs of the ASVVP program. In the supporting documentation published on November 14, 2019 to accompany the NPRM, DHS identified $5.4 million in payroll and travel costs of the ASVVP program. As DHS described in the NPRM, USCIS attributed these costs to the relevant form types in proportion to their share of the total ASVVP costs of $5.4 million. Form I–129H1 received $3.6 million of these costs while Form I–129L received $0.6 million, Form I–129MISC received $1.0 million, and Form I–360 received $0.1 million. These figures do not sum to $5.4 million due to rounding.

USCIS cannot use revenue from the statutory Fraud Prevention and Detection Fee to cover the costs of the ASVVP program. USCIS scopes all

activities funded by the Fraud Detection and Prevention Fee outside of its fee reviews, because DHS is unable to adjust the fee by rulemaking. Furthermore, USCIS, by statute, does not retain the entirety of the Fraud Detection and Prevention Fee. As explained in the NPRM, the USCIS FY 2019/2020 fee review, like previous fee reviews, estimates the costs to be recovered by fees deposited into the Immigration Examinations Fee Account. Unlike the fees addressed in this rulemaking, the Fraud Detection and Prevention Fee is not deposited into the IEFA. Instead, that revenue is deposited into the Fraud Detection and Prevention Account and is used for different purposes beyond the scope of this final rule. DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter opposed the increased L–1 application fees and took issue with USCIS' rationale that the fee is based on ''the completion rate for the average of L–1 petitions.'' The commenter stated that if USCIS diverted resources away from adjudicating L–1 petitions, imposing adjudicatory criteria unauthorized by INA or USCIS regulations, and issuing unnecessary, duplicative RFEs, the completion rate for L–1 nonimmigrants would return to its historical norm.

*Response:* USCIS used the most recent data available at the time it conducted the FY 2019/2020 fee review. Contemplating alternatives suggested by the commenter are beyond the scope of this rulemaking. DHS declines to make changes in this final rule in response to the comment.

*Comment:* A few commenters wrote to oppose the fee increases for transitional workers in the Commonwealth of the Northern Mariana Islands (CNMI). These commenters stated the proposed fees would put a financial burden on businesses and the economic development of CNMI. A commenter wrote that the CNMI was still recovering from recent disasters and noted that the economy had barely stabilized after Super Typhoon Yutu hit in October of 2018. The commenter referred to a U.S. Department of the Interior report that documented the shortage of U.S.-eligible workers affecting businesses in the Commonwealth and said the proposed fee increase of 53 percent for Petitions for a CNMI-only Nonimmigrant Transitional Worker would place a financial burden on businesses still recovering from disasters. The commenter requested that the increase for this petition be tabled, citing the provisions of U.S. Public Law 110–229 that detailed Congress' intent to grant

the Commonwealth as much flexibility as possible in maintaining existing businesses and other revenue sources.

*Response:* In this final rule, DHS establishes fees that reflect the average cost of adjudication. DHS declines to make other applicants and petitioners subsidize petitions for transitional workers in the CNMI and does not make changes in response to these comments.

*I. Premium Processing*

*Comment:* Multiple commenters opposed the proposal to lengthen the timeframe for USCIS to take an adjudicative action on petitions filed with a request for premium processing from 15 calendar days to 15 business days. Commenters stated that the proposed change would reduce the level of service that USCIS provides to petitioning entities and delay the arrival of greatly needed workers, thereby imposing an economic cost on petitioners. Multiple commenters said the relaxation of the premium processing deadline would result in slower adjudications, higher prices, and slowed hiring.

*Response:* DHS acknowledges that some petitioners may wait up to four or more days longer for USCIS to take an adjudicative action on a petition for which a petitioner has requested premium processing service. DHS further acknowledges that this may result in slightly longer waits for workers for petitioning entities. However, DHS disagrees that adjusting the timeframe for adjudicative action on a petition for which premium processing service has been requested from 15 calendar days to 15 business days would meaningfully harm petitioning entities. DHS was not able to quantify the estimated cost to petitioning entities of these additional delays.

DHS is adjusting the timeframe for premium processing for multiple reasons. The current timeframe does not consider the days on which USCIS staff are unavailable to adjudicate cases, such as when there is a federal holiday or inclement weather preventing employees from coming to work. Therefore, a surge in applications may coincide with a period when USCIS staff have substantially less than 15 working days to receipt and adjudicate a petition with premium processing. In the past, there have been instances when USCIS was unable to adjudicate all of the petitions for which petitioners requested premium processing within the 15-calendar day timeframe. This led USCIS to refund the premium processing fee for petitions that were not adjudicated within 15 calendar days

and to temporarily suspend premium processing service. DHS believes that extending the premium processing timeframe from 15 calendar days to 15 business days will allow USCIS adequate time to take adjudicative action on petitions and will provide petitioners with a consistent and predictable experience. Therefore, DHS declines to adopt the commenters' suggestions.

*Comment:* Multiple commenters said that the premium processing delay would harm American businesses that face workforce gaps and that the cost of premium processing service reduces arts organizations' budgets for other activities. The commenters wrote that the change to the premium processing timeline would exacerbate these inefficiencies and increase uncertainty. Additionally, it would only further lower USCIS' accountability standards. A commenter similarly stated that increasing the premium processing timeframe would adversely impact businesses that pay premium processing fees because of their urgent workforce needs, and they suggested that further delays to the processing timeline would have a ''chilling effect'' on the overall process. One comment stated that changing the premium processing time will deter businesses from doing business in the United States. Another commenter added that in many cases, the issuance of an RFE is a stalling technique and that if DHS premium processing regulations to be 15 business days instead on calendar days that senseless and unnecessary RFEs will not continue.

*Response:* DHS understands that sometimes a petitioning employer needs USCIS to take quick adjudicative action. However, as stated in the NPRM, DHS believes that changing from calendar days to business days may reduce the need for USCIS to suspend premium processing for petitions during peak seasons. This may permit USCIS to offer premium processing to more petitioning businesses each year. DHS believes the possibility that a petitioner requesting premium processing service may need to wait a few additional days for adjudicative action is a small cost to impose for being able to expand premium processing to more requests and reduce the likelihood for future suspensions of premium processing service. DHS does not think additional days will reduce the desire of businesses to request premium processing. DHS also disagrees with the assertion that USCIS issues RFEs as a stalling tactic. USCIS officers issue RFEs, in their discretion, to provide the petitioner an opportunity to supplement

the record when eligibility has not been established. USCIS officers do not send RFEs just because they are near the 15-day maximum time for action.

*Comment:* Commenters requested that USCIS reinstate the "traditional expedite" option for non-profits that seek to enhance the cultural and social interest in the United States.

*Response:* USCIS has implemented an expedite policy for certain petitions in the past. Whether a petitioner seeks to enhance the cultural and social interest in the United States may have been considered when USCIS decided to favorably exercise its discretion when considering expedite requests. However, expedited processing is a policy that is implemented using guidance and not governed by regulations. DHS is amending USCIS' fees and fee-related regulations in this final rule that require notice and comment rulemaking to effectuate. Petitioners do not pay a fee when submitting an expedite request, and the decision to grant or deny an expedite request does not affect the fees required for the underlying petition. Thus, expedite policy is outside the scope of this rulemaking. DHS may consider whether to provide expedited processing for certain petitions based on its workload in other areas and ability to meet promised deadlines. Also, depending on the immigrant or nonimmigrant classification sought, the petitioner may request premium processing service by filing Form I–907 and paying the associated fee. This final rule, though, makes no changes in response to this comment.

*Comment:* A commenter asked if DHS would consider the additional revenue received by USCIS from higher premium processing fees as another revenue stream.

*Response:* DHS understands that the commenter is suggesting that USCIS consider additional revenue from higher premium processing fees. The INA permits DHS to charge and collect a premium processing fee for employment-based petitions and applications. The fee revenue must be used to provide certain premium-processing services to business petitioners and to make infrastructure improvements in the adjudications and customer service processes. By statute, the premium processing fee must be paid in addition to any applicable petition/application fee. The statute provides that DHS may adjust this fee according to the Consumer Price Index. *See* INA section 286(u), 8 U.S.C. 1356(u); Public Law 106–553, App. B, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000). DHS increased the USCIS premium processing fee in both

2018 and 2019. *See* 83 FR 44449 (Aug 31, 2018) (increasing the fee to reflect inflation from \$1,225 to \$1,410); 84 FR 58303 (Oct. 31, 2019) (increasing the fee from \$1,410 to \$1,440).

DHS regularly considers if USCIS' premium processing fee should be adjusted considering the rate of inflation, cost, and revenue needs. DHS prefers to adjust the premium processing fee outside of rules, like this one, that adjust fees comprehensively based on USCIS' full costs recovery model. The primary reason is because the premium processing fee may be adjusted by inflation; notice and comment rulemaking is not required. *See* 84 FR 58304. In addition, USCIS regularly analyzes whether to remove eligible categories based on its ability to meet demand or designate new benefit requests as eligible for premium processing in accordance with previous 8 CFR 103.7(e); new 8 CFR 106.4. For example, DHS recently determined that a few categories of employment authorization documents qualify as employment-based petitions and applications for business customers under INA section 286(u), 8 U.S.C. 1356(u). Thus, USCIS is considering permitting premium processing requests for qualifying categories of employment authorization that may be requested on USCIS Form I–765. When and if USCIS decides to provide premium processing for additional requests, USCIS will announce on its website, those requests for which premium processing may be requested, the dates upon which such availability commences and ends, and any conditions that may apply. New 8 CFR 106.4(e). This final rule, though, makes no changes in response to this comment and adjusts only USCIS' non-statutory, non-premium processing fees that DHS has the authority to adjust for full cost recovery via public notice and comment rulemaking.

### J. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)

*Comment:* DHS received many comments on the change in how DHS interprets the statutory language in Public Law 114–113 to change the benefit requests to which the fee would apply. The comments are summarized as follows:

• USCIS lacks the authority to create such a fee increase and that only Congress has this authority.

• USCIS lacks the authority to reinterpret language from Public Laws 111–230 (2010) and 114–113 (2015) and that the proposal invents ambiguity that does not exist with respect to the

extension of the \$4,000 or \$4,500 fee to extension petitions.

• Extending the Public Law 114–113 fee for qualifying H–1B and L–1 petitions is contrary to Congressional intent and represents an effort to deter legal immigration from certain countries. DHS's interpretation of Public Law 114–113 is inconsistent with the agency's historical regulatory interpretation.

• Congress set the amounts and parameters for the fees and Public Law 111–230 (2010) and Public Law 114–113 (2015) do not support the revisions.

• Congress' consistent reenactment of the statute without changing the statute's meaning with respect to when the fee is required suggests Congressional intent that the scope of the 9–11 Response fee continue.

• Examples of Congress' use of the language in Public Law 114–113 demonstrate that the DHS interpretation is not consistent with the intent of Congress.

• Congress provided clear and unambiguous language instructing DHS that the additional fee be combined with the fraud prevention and detection fee and the proposed change is an effort to thwart the plain instruction of Public Law 114–113.

• Language from Public Laws 111–230 and 114–113 support that the current statutory language was not ambiguous and the addition of the word combined in 2015 in Public Law 114–113 was not merely a clarifying edit as stated in the NPRM and Congress' actions over the past decade make it clear that the filing fee does not apply to extension petitions.

• Federal courts would not grant *Chevron* deference to the agency's effort to reinterpret the word combined because it is a non-complex, nontechnical word in common public usage and the agency does not have special expertise in determining the definition of combined.

• This interpretation is not only correct, it is mandated by the statutory language.

• Congress limited the circumstances requiring the 9–11 Response fee to only those for an application for admission and this language does not naturally apply to applicants for extension of time, for an amendment to terms, or for a change in status.

• The fees would negatively affect employers because it would require them to pay the fee multiple times for the same employee because the duration of an approval may be less than one year.

• Companies that hire from countries like India, where beneficiaries may wait

for an immigrant visa number for decades, would have to file extensions until the worker becomes a permanent resident.

• Because USCIS routinely limits the expiration date of Form I–797 approval notices to the end date of the specific contract, resulting in short approval periods, employers will be forced to file extension petitions once the Statement of Work is renewed, incurring new filing and legal fees. The fee would result in employers opting not to hire or extend nonimmigrant employees which would have negative impacts on workers, companies, and the overall economy. H–1B and L–1 workers benefit the economy by increasing business efficiency, reducing costs for specialized work, and filling workforce gaps.

*Response:* DHS disagrees with the commenters' assertions that the statutory language is unambiguous or that DHS does not have the authority to interpret the statutory language. The statutory text refers to, among other things, an increase to H–1B and L–1 filing and fraud prevention and detection fees. Such fees are typically collected by DHS, either by USCIS upon the filing of an H–1B or L–1 petition or by CBP for certain visa-exempt L–1 nonimmigrants. The statutory text clearly shows that Congress intended DHS, in addition to the U.S. Department of State, to administer Public Law 114–113 and collect the associated fees. Such authority is also consistent with the general authority provided to DHS under INA section 214(a) and (c)(1), 8 U.S.C. 1184(a) and (c)(1), as well as, by incorporation, the specific authority provided in INA section 214(c)(12), 8 U.S.C. 1184(c)(12). DHS also explained in the NPRM how the statutory text is ambiguous, and that explanation remains unchanged.

DHS understands that it must provide a valid explanation of its changed position and provide a reasoned explanation for disregarding facts that underlay the prior policy. *See Encino Motorcars, LLC,* v. *Navarro,* 136 S.Ct. 2117, 2125 (2016). DHS acknowledges the commenters' concerns about the effect of our change in interpretation on petitioning employers, and that the statute is open to different interpretations. However, DHS is providing considerable advance notice of this change to those affected by it, and the fee will only apply to future petitioners after the effective date of this final rule. DHS may change its initial interpretation when engaging in rulemaking and consider different interpretations when deciding to continue with a current policy. *See, Chevron, U.S.A., Inc.* v. *Natural*

*Resources Defense Council, Inc.* 467 U.S. 837, 863 (1984). As we stated in the NPRM, DHS believes that the Public Law 114–113 fee should apply to all extension of stay petitions because that interpretation gives meaning to all of the statutory text. That interpretation is also the most consistent with the goal of the statute to ensure employers that overly rely on H–1B or L nonimmigrant workers' pay an additional fee by making the fee applicable to petitions, including extensions of H–1B or L status, filed by employers that meet the statute's 50 employee/50 percent test, regardless of whether or not the fraud fee also applies. 84 FR 62322. In other words, the fee should apply to all H–1B or L–1 petitions, whether for new employment or an extension of stay. Consequently, DHS makes no changes in response to these comments.

*Comment:* A commenter requested that USCIS reinstate policy memoranda related to deference, such as the 2004 USCIS Memorandum, The Significance of a Prior CIS Approval of a Nonimmigrant Petition in the Context of a Subsequent Determination Regarding Eligibility for Extension of Petition Validity. The commenter also requested that USCIS enforce 8 CFR 214.2(1)(14)(i) to provide appropriate deference to officers' prior decisions regarding L–1. The commenter wrote that this would mitigate the need for fee increases for L1-nonimmigrant petition filings.

*Response:* DHS has no intent to reinstate the 2004 memo in this fee rule. This final rule is focused on establishing appropriate fees for different nonimmigrant worker classifications and not altering existing evidentiary requirements, such as those found at 8 CFR 214.2(l)(14)(i). Consequently, the changes suggested by this commenter were not mentioned or proposed in the NPRM and are outside the scope of this final rule.

### K. Comments on Other General Feedback

*Comment:* Commenters wrote that fees should be raised based on inflation or social security cost of living increases, and that fee increases would be unnecessary if USCIS trained its officers.

*Response:* As explained in the NPRM and this final rule, DHS adjusts USCIS' fee schedule to ensure full cost recovery. DHS cannot guarantee that future inflation rates or social security cost of living adjustments applied to fees will yield sufficient revenue to ensure full cost recovery. In other words, adjusting fees by inflation or social security cost of living adjustments may be insufficient to recover the full

cost of providing adjudication and naturalization services. As a result, DHS rejects the notion that fees should be raised based on inflation or social security cost of living increases and will continue to comply with the CFO Act by evaluating fees on a biennial basis and recommending adjustments to USCIS' fee schedule, as necessary.

*Comment:* A commenter opposed scenario A and stated that it would be unreasonable for the agency to compel the public to evaluate six different scenarios. The commenter added that, in order for the final rule to be valid, it must include only the fee schedule that the public was given adequate time to evaluate, and the agency may not use the final rule to codify a "suite of alternative fee schedules" that it can switch between at will without public comment.

*Response:* DHS stated in the NPRM that subject to certain limitations, the proposed fees may change in the final rule based on policy decisions, in response to public comments, intervening legislation, and other changes. 84 FR 62327. To reduce the uncertainty that such conditions present to the affected public, USCIS proposed six fee scenarios that lay out what the fees would be if certain conditions materialize and present a range of fees. *Id.* DHS disagrees that the public is incapable of reviewing and commenting on multiple proposed fee scenarios. The fee schedule adopted in this final rule falls within the range of the six scenarios. The policies implemented in this final rule are the same, or are logical outgrowths of, those contained in the NPRM.

The intent of the comment period provided under the APA is to allow agencies to consider public feedback on proposed rules and make changes as appropriate. Because a single change made in response to public comments may affect multiple fees, it is impossible to provide a final set of fees in a NPRM unless it were to be adopted without any modification, thereby negating the value of public feedback. DHS declines to make any adjustments in the final rule in response to these comments.

*Comment:* A commenter said the severability provision suffers from "logical outgrowth" concerns, stating that it would do nothing to protect a final rule if key provisions of the proposed rule changed so much in the final rule that the public was not given fair notice. In contrast, a commenter stated they "wholly" agreed with the severability provision because the provisions each part function independent of other provisions. The commenter supported codifying the

intent that provisions be severable to protect the goals of the proposed rule.

*Response:* DHS is unsure of the relationship between a logical outgrowth and severability to which the commenter refers. DHS is making no changes in this final rule that the public would not view as a possibility based on the contents of the proposed rule. DHS realizes that many parts of this final rule are interrelated, but most are severable and can be implemented independently from the remainder of this final rule's provisions.

DHS declines to make any adjustments in the final rule in response to these comments.

*Comment:* A commenter wrote that DHS should allow applicants to elect their delivery method for their secure document, DHS failed to justify why the agency is adopting Signature Confirmation Restricted Delivery (SCRD) to deliver secure documents, and DHS should publish a notice in the **Federal Register** each time USCIS proposes to add SCRD to any additional document beyond Permanent Resident Cards, Employment Authorization Cards, and Travel Booklets. One commenter supported SCRD as the sole method of delivery for secure documents. Another commenter wrote that it is an unnecessary burden to place on low-income or rural residents to travel to the post office or arrange to hold a secure document for pick-up.

*Response:* USCIS may use the United States Postal Service (USPS) Secure Confirmation Restricted Delivery (SCRD) service for delivery of all USCIS secure identification documents: Permanent Resident Card, Employment Authorization Document, and Travel Document Booklets once this final rule is effective. New 8 CFR 103.2(b)(19)(iii)(A). USCIS already uses SCRD when documents are returned by USPS as undeliverable after being sent by Priority Mail with Delivery Confirmation. USCIS plans to use only USPS initially for SCRD when appropriate because only the USPS can deliver to post office boxes and military addresses (*i.e.,* APO addresses). Other delivery services like FedEx or UPS would just leave the package on the doorstep, require a signature, or require it to be picked up. In addition, the current application process does not support choosing a different delivery method, although DHS is exploring more delivery methods as a future capability.

USPS's Signature Confirmation Restricted Delivery (SCRD) product requires the addressee to provide proof of identification and sign for delivery of their secure document. Applicants may also designate an agent to sign on their behalf, by notifying USPS and completing PS Form 3801, Standing Delivery Order, or PS Form 3801–A, Agreement by a Hotel, Apartment House, or similar. SCRD permits USCIS and applicants to track their document utilizing the USPS website up to when the document is delivered. The authority for USCIS to use the SCRD process will improve tracking and accuracy of delivery and will improve resolution of questions from applicants. Recipients will also have the ability to change their delivery location by going to the USPS website and selecting "hold for pickup" to arrange for pickup at a post office at a date and time that suits them. It is not unnecessarily cumbersome or unreasonable to expect document recipients to undertake the time and expense to ensure that documents as important as those issued by USCIS get into the right people's hands.

*L. Cost Analysis and DHS Rationale for Fee Adjustments*

*Comment:* Many commenters stated that USCIS proposed a 21 percent fee increase without evidence that it will improve immigration benefit services. Some commenters suggested that USCIS should find ways to revise the NPRM and include data that would make the connection between fee and efficiency increases in the adjudication process, as currently there is no evidence linking the two. Other commenters wrote that USCIS should rescind inefficient policies rather than increase fees to subsidize them, higher fees pass the costs of USCIS inefficiency to the public, fee hikes are not justified because USCIS has record long processing times, and needs to revert to its prior procedures for processing cases before increasing fees.

*Response:* As explained in the NPRM, USCIS considered all cost and operational data that was available at the time it conducted the FY 2019/2020 fee review, including data related to potential cost-saving measures. It does not account for recent cost-saving initiatives for which data was not yet available at that time. However, USCIS will evaluate and incorporate any relevant cost-savings data into its next biennial fee review. To the extent that potential process efficiencies are recognized in the next biennial fee review, cost-savings may lessen the impact of future fee adjustments.

Similarly, DHS recognizes that certain USCIS policies may increase the cost of completing its work. USCIS accounted for those cost increases where it had data available at the time it conducted

the FY 2019/2020 fee review. It does not account for recent policy initiatives that may increase costs for which data were not available at the time of the FY 2019/2020 fee review. In its next biennial fee review, USCIS will continue the practice of using all available data to determine total costs and appropriate fees to recover those costs.

DHS believes that USCIS policies are necessary for the agency to effectively achieve its mission and fulfil statutory mandates. USCIS faithfully adheres to immigration law and carefully considers the pros, cons, costs, and ramifications of all policy initiatives it undertakes. In its FY 2019/2020 fee review, USCIS estimated total costs to the agency of providing immigration adjudication and naturalization services. In the NPRM and this final rule, DHS has fully explained and justified the cost increases that necessitate USCIS fee adjustments.

*Comment:* Another commenter criticized USCIS' use of the ABC model to predict the cost of adjudicating forms. The commenter wrote that the model predicts different costs in 2019 compared to 2016 with no explanation, USCIS increased the ABC model baseline with no explanation and USCIS' explanation for "low volume reallocation" is used as a pretext for the Department's policy priorities.

*Response:* USCIS' cost projections for the FY 2019/2020 biennial period have increased relative to the FY 2016/2017 biennial period. However, DHS disagrees with the commenter's assertion that it provided no explanation of the change in USCIS' costs between 2016 and 2019. The NPRM provides USCIS' FY 2018 AOP amount used as a baseline to inform FY 2019/2020 cost projections. It also explains projected cost increases over the FY 2019/2020 biennial period from that FY 2018 baseline, including the need for additional staff, pay adjustments for existing staff, and other net additional costs. *See* 84 FR 62286 (Nov. 14, 2019). Additionally, DHS clarifies that USCIS' ABC model does not predict costs. Instead, it assigns cost projections to operational activities and then to immigration benefit requests as explained in the supporting documentation that accompanies this final rule.

DHS categorically denies that "low volume reallocation" or "cost reallocation" is a pretext with any intent other than to exercise its discretion to limit the fee for certain applications and petitions in recognition that fees set at the ABC model output for these forms would be overly burdensome and possibly unaffordable for the affected

applicants, petitioners, and requestors.[104] In its discretion, DHS determined that it would be appropriate to limit the fee increase for the following forms, while also rounding to the nearest $5 increment:

• Form I–290B, Notice of Appeal or Motion,

• Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant,

• Form I–600, Petition to Classify Orphan as an Immediate Relative,

• Form I–600A, Application for Advance Processing of an Orphan Petition,

• Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600,

• Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative,

• Form I–800A, Application for Determination of Suitability To Adopt a Child From a Convention Country, and

• Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

In the NPRM, DHS explained that limiting the fee increase for these forms requires DHS to shift the costs to other fee-paying applicants, petitioners, and requestors via increased fees for other forms. If USCIS did not perform cost reallocation, then fees for other applications and petitions would be lower than those implemented in this final rule, and USCIS would not recover its estimated full cost of providing immigration adjudication and naturalization services. As explained in the NPRM, DHS determined that it would deviate from previous fee rules by not limiting the fee increase for the following forms:

• Form I–601A, Provisional Unlawful Presence Waiver,

• Form I–765, Application for Employment Authorization,

• Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant,

• Form N–300, Application to File Declaration of Intention,

• Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings,

• Form N–400, Application for Naturalization, and

• Form N–470, Application to Preserve Residence for Naturalization Purposes.

DHS outlined in its NPRM that other fees would be lower in recognition of

additional revenue anticipated from the fee increases for these forms. The primary objective of not limiting the fee increase for these forms is to reduce the cost burden placed upon other fee-paying applicants, petitioners, and requestors.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Commenters attended a February 3, 2020 meeting with USCIS to observe the ABC cost modeling software. In follow-up comments, the attendees said that many questions remain outstanding about how USCIS developed its proposal. Many of their follow-up comments were the same as those made by other commenters, which are responded to in other sections of this preamble. Some of their comments were unique due to observations of the software, including:

• Why have the costs for Form N–400s risen so dramatically,

• Can USCIS explain the 900 line items in the budget,

• Scenario modeling other than references to the six Scenarios A–F as described in the proposed rule, and

• USCIS explained that cost reallocation takes place outside of the ABC model but did not show the spreadsheet.

*Response:* In its NPRM, DHS provided the public with an opportunity to request an appointment to view the ABC software that USCIS uses to help calculate immigration benefit fees. *See* 84 FR 62281. The purpose of the February 3, 2020 meeting was to provide an overview of the software and demonstrate how it works. In other words, USCIS allowed these public commenters (who requested an appointment) to view the software and showed them how it leverages operational data inputs (*i.e.,* FY 2019/ 2020 cost baseline, receipt volume projections, and completion rates) to determine the activity costs and fee-paying unit costs that inform proposed fees. A discussion regarding cost increases associated with Form N–400 and a detailed explanation of each USCIS budget line item was outside the scope of this meeting, which was focused on the ABC software. USCIS officials did not provide deliberative materials or supplemental information to these public commenters that is not in the record for the NPRM and in the docket. Although briefly discussed, the public commenters did not specifically ask USCIS officials during the meeting to view the separate spreadsheet used to calculate cost reallocation. However, as explained in the supporting documentation that accompanies this final rule, cost reallocation is simply the

process USCIS uses to reassign costs to each form fee to ensure full cost recovery. Total reassigned costs are the sum of the products of the fee-paying volume and model output for those forms with fees held below the model output, less the sum of the products of the fee-paying volume and the final fees for those same forms. Explained another way, a spreadsheet assigns the cost of limited fee increases or workload without fees to the fees that DHS does not limit for various policy reasons. We call this process cost reallocation. USCIS multiplies the fee-paying receipt forecast by the model output for each form. This calculates a total cost for that form. For the fees that DHS does not limit, we use the total cost for each form to reallocate the cost of limited fee increases or workload without fees. As a result, forms with the highest cost receive a larger share of cost reallocation. While terminology may have been different,[105] this is the same process that DHS used in the previous three fee rules. *See* 84 FR 62294. DHS believes that assigning more costs to forms with the highest cost is in line with the beneficiary pays principal emphasized throughout this rule.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Another commenter discussed information needed, but not provided at the meeting (even upon request in some cases) in order to understand how the software works. Because USCIS has failed to provide stakeholders with the opportunity to analyze the entire set of relevant information that USCIS has used to calculate the proposed new fees, the commenter opposed the entire new rule and requested that USCIS continue using the current fee schedule until USCIS provides access to the ''FULL SET'' of information it used and enough organized time to submit comments.

*Response:* The purpose of the February 3, 2020 meeting was to provide an overview and demonstration of the ABC software that USCIS uses to calculate immigration benefit fees. As was offered in the NPRM, USCIS officials provided the attendees with complete information on the inputs for the fee calculations and explained how the software works. An attendee posed several questions that would have

---

[104] DHS may reasonably adjust fees based on value judgments and public policy reasons where a rational basis for the methodology is propounded in the rulemaking. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

[105] Previous proposed IEFA fee schedules referred to limited fee increases as ''low volume reallocation'' or ''cost reallocation.'' The FY 2016/ 2017 proposed fee schedule used both phrases. *See* 81 FR 26915. The FY 2010/2011 and FY 2008/2009 proposed fee schedules used the phrase ''low volume reallocation.'' *See* 75 FR 33461 and 72 FR 4910, respectively.

required USCIS to provide deliberative information, granular assumptions underlying all aspects of the USCIS budget, an in-depth explanation of particular fee adjustments, and policy rationale associated with the Form N–400 fee (in excess of what is in the NPRM and supporting documentation). The questions asked went beyond the software demonstration, would have expanded the meeting considerably, and would have provided the attendee additional information that was not relevant. DHS believes that all relevant information is readily available in the NPRM and supporting documentation.

DHS declines to make changes in this final rule as a result of the comment.

1. Workload Projections

*Comment:* Multiple commenters stated that USCIS used unreasonable workload receipt projections in its cost model. One commenter cited figures in Table 5 of the NPRM detailing the average annual fee-paying receipts projection and said that they do not reflect the stated subtotals and grand totals. Similarly, another commenter said USCIS has not explained the source for its data on volume projections entered into the ABC model. Commenters also highlighted concerns with projected workload and fee-paying receipts for certain individual form types such as Form I–526.

*Response:* DHS acknowledges that workload receipt volume projections used in the FY 2019/2020 fee review did not materialize in FY 2019 exactly as forecasted. USCIS' Volume Projection Committee (VPC) developed workload volume projections for the FY 2019/2020 fee review in FY 2017. The VPC considers all available data at the time it finalizes projections, including statistical forecasts for each form, analysis of recent trends, and consideration of future policy initiatives that are known at that time. The VPC integrates this information with subject matter expertise and judgement to provide unified volume projections by form type for use in the biennial fee review and other operational planning purposes.

Certain filing trends have changed since USCIS forecasted the FY 2019/2020 fee review workload and fee-paying receipt volumes. USCIS simply cannot predict all filing changes that will affect actual receipt volumes. USCIS used the best information available at the time it conducted the FY 2019/2020 fee review to develop workload and fee-paying receipt volume forecasts.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Some commenters stated that USCIS based its workload receipt forecasts on limited and unrepresentative data, using data only from June 2016 to May 2017. Commenters stated that USCIS did not explain why it chose this period. A commenter also said that USCIS' fee-paying volume assumptions reflect "filing trends and anticipated policy changes," but it is not clear how USCIS accounted for these factors. Another commenter said that projected volumes do not account for current processing times. Estimates used FY 2016–2017 data, but processing times have increased since then.

*Response:* The commenters are generally mistaken. DHS did not use a single 12-month period of data to project anticipated workloads for the FY 2019/2020 biennial period. To establish workload projections, USCIS' VPC always evaluates the best available information, including historical application volumes and trends, including data that extend far beyond a single 12-month period. For example, USCIS used 10 years of data to estimate Form I–90 renewals. In accordance with this procedure, USCIS evaluated all available information at the time it conducted the FY 2019/2020 fee review to establish its workload projections for the biennial period. *See* 84 FR 62289. Therefore, DHS rejects the claims that its volume forecasts are unsubstantiated.

USCIS did use data from the June 2016 to May 2017 period to estimate a proportion of individuals who pay the filing fee by form type. In its NPRM, DHS referred to this proportion as "fee-paying percentage." *See* 84 FR 62290. DHS used this data to calculate fee-paying volumes for each form type under current policy and to estimate the effects of policy changes in the NPRM. DHS used data from the June 2016 to May 2017 period because it was the most current data available at the time USCIS conducted the FY 2019/2020 fee review and using a full year of data can smooth out fluctuations that may occur from month to month. DHS believes that use of this data is correct and appropriate and declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that the NPRM does not make clear whether projected receipts only include new applications anticipated in 2020, or also includes applications in the backlog.

*Response:* DHS reiterates that all workload figures in this final rule are projected volumes and do not include

existing pending caseload. 84 FR 62288 (stating that revenue estimates were based on *projected* volumes).

*Comment:* A commenter who attended the February 3, 2020 software review meeting at USCIS stated that evidence does not support the projected figure for future Form N–400 filings. The commenter stated that receipts may decrease because of the fee increase and elimination of fee waivers. The NPRM says USCIS adjudicated 830,673 Forms N–400 in FY 2016/2017 and expects to adjudicate 913,500 in the FY 2020–21 biennium. The commenter understood from the meeting that USCIS "surveyed its staff," but said it does not know how staff came up with the application volume data to arrive at their volume projections. The commenter questioned USCIS' assertion that they will receive more N–400s than in the previous year given the drastic fee increases the agency seeks.

*Response:* DHS used the best information available at the time USCIS conducted the FY 2019/2020 fee review to develop receipt volume projections. The VPC considered all relevant statistical forecasts, recent trend analysis, and subject matter expertise. It also considered the potential effects of future policy changes. The VPC does not survey staff generally. Instead, the VPC considers input of subject matter experts in conjunction with statistical forecasts to determine a final volume forecast.

2. Completion Rates

*Comment:* A commenter wrote that USCIS should use completion rates to estimate all activity costs as was done in the previous USCIS fee rulemaking. A commenter wrote that the NPRM provides only some completion rates, but the information by itself is not useful in assessing justifications for proposed fee increases. A commenter wrote that Table 6 in the NPRM demonstrates that completion rates for most forms are as low as 1–2 hours, indicating that most forms include fees at a cost of hundreds of dollars an hour. A commenter wrote that the completion rates for Form N–400 with a filing fee of $1,170 come out to a cost of $745.22 an hour, whereas an EB–5 form for a wealthy investor includes a filing fee of $4,015 at a rate of $464 an hour. The commenter asked why it costs USCIS so much less to work on Form I–526, which is a much more complicated and time consuming petition requiring very specialized and more experienced officers, than that required to adjudicate Form N–400. Other commenters also mentioned the disparate hourly rates between Form N–400 and EB–5 workload, stating that the proposed fees

are not supported by the costs of completion and that the cost per completion rate for these forms shows the fees are a wealth test.

*Response:* It is not accurate to say that USCIS used completion rates to estimate all activity costs in the previous rulemaking. In the last three fee rules, USCIS used completion rates to assign costs from the Make Determination activity to individual cost objects (*i.e.,* forms). USCIS continued this approach in the FY 2019/2020 fee review. The fees DHS enacts in this final rule are based on the same methodology that was used in previous fee rules.

DHS understands the skepticism induced by simply dividing a form's proposed fee by the completion rate in an attempt to estimate the hourly processing cost. However, the calculation performed by the commenter does not accurately represent the per hour cost of adjudicating a particular form. Such a calculation presumes that all costs are associated with the Make Determination activity and ignores the costs associated with other activities, such as the Issue Document activity, that are not based on completion rates. In addition, all fees greater than the model output (*i.e.,* receive cost reallocation) represent the full amount of both the estimated cost of adjudicating the form and other costs associated with providing similar services at no or reduced charge to asylum applicants and other immigrants. USCIS' fees must recover estimated full costs, not just the direct costs to adjudicate forms.[106]

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter criticized USCIS for not disclosing actual case completion per hour statistics in the NPRM or supporting documentation.

*Response:* DHS provided completion rates (hours per completion) in Table 6 of the NPRM. *See* 84 FR 62292. Appendix Table 10 of the supporting documentation that accompanies this final rule also includes them.

*Comment:* A commenter wrote that USCIS does not explain whether prior year expenses used in calculations for immigration application fees under Section IV(B) include activities that courts later enjoined, or whether the calculation included legal costs related to litigating the issues in court. If so, the

commenter asked that USCIS recalculate expense and completion rates.

*Response:* As explained in the NPRM, proposed fees are informed by cost projections for the FY 2019/2020 biennial period. *See* 84 FR 62888. DHS does not use prior year expenses to calculate immigration benefit request fees. Additionally, as stated in the supporting documentation that accompanies this final rule, USCIS does not track actual costs by immigration benefit request. Therefore, DHS does not believe that an additional explanation is necessary and declines to make changes in this final rule in response to the comment.

### 3. USCIS Staffing

*Comment:* Multiple commenters wrote that the NPRM seeks to justify fee increases by a need for more staffing, yet USCIS has employees performing enforcement work for ICE and CBP. Other commenters supported the addition of employees to improve USCIS case processing times.

*Response:* In response to the migration crisis at the United States southern border, USCIS did provide staff on detail to ICE for clerical assistance in the creation and management of immigration case files. USCIS detailed the staff to ICE without reimbursement as provided in law. *See* Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Public Law 116–26, tit. III (Jul. 1, 2019). This temporary support to ICE represented a miniscule proportion of total USCIS staff. Marginal costs associated with this effort are not in this final rule, as USCIS did not assume an additional staffing requirement for this workload in the FY 2019/2020 fee review. Additionally, DHS does not assign USCIS employees to perform enforcement work for ICE and CBP.

DHS proposed to hire additional USCIS employees for the reasons stated in the NPRM. USCIS estimates that it must add an additional 1,960 positions in FY 2019/2020 (relative to FY 2018 authorized staffing levels) to address incoming workload.[107] However, the fee schedule that has been in place since December 23, 2016 is insufficient to fund this additional staffing requirement. The total estimated staffing requirement of 20,820 in this final rule

represents an increase of 6,277 or 43 percent from the FY 2016/2017 fee rule (14,543). DHS believes that this estimate is lawful and fully justified based on the best information available to USCIS at the time it conducted the FY 2019/2020 fee review.

*Comment:* Another commenter said USCIS indicates that it uses a staffing model to predict needs based on workload receipts and target processing times, but USCIS has not identified target processing times or described its method for calculating workload receipts, other than to explain that a committee looked at trends and models. Further, the commenter said it is not clear what outputs that staffing model generated.

*Response:* DHS uses multiple, different techniques to forecast USCIS' workloads. Ultimately, the VPC reviews, deliberates, and reaches a final consensus on every forecast, as described in the NPRM and elsewhere in this final rule. DHS uses these workload forecasts as inputs to Staffing Allocation Models, which determine the estimated staffing requirements for USCIS. DHS outlines USCIS' total estimated IEFA authorized staffing requirement by directorate in Appendix Table 7 of the supporting documentation that is in the docket for this final rule. *See* 84 FR 62281. DHS declines to make changes in this final rule as a result of the comment.

*Comment:* A commenter said USCIS needs to fill important open positions in order to address significant backlogs, citing a 2019 USCIS report to Congress.

*Response:* DHS concurs with this commenter's statement. This is one reason why DHS is adjusting USCIS' fees in this final rule. DHS believes that the final fees will yield additional revenue that USCIS can use to hire and fill additional positions necessary for adjudicating incoming workload. The ability to adjudicate incoming workload may help USCIS mitigate future backlog growth.

*Comment:* A commenter wrote that USCIS does not explain why the NPRM includes funding for a 44 percent increase in staffing levels from FY 2016/2017, or why this increase was not anticipated in the 2016 fee rule just 3 years earlier. The same commenter stated that USCIS should at the very least provide the public with a version of fee review supporting documentation Appendix Table 6 that goes back 10 years, broken down by directorate, and actual staffing numbers for each fiscal year. Similarly, another commenter said USCIS fails to explain why the increase of 5,000 in staff from 2018 to 2019 is merited.

---

[106] *See* FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum, which is part of the docket for this final rule. It provides more information on how USCIS conducted the fee review and defines the activities in it.

[107] This represents 138 fewer positions than reflected in the NPRM due to the removal of estimated additional staff associated with DACA. See the Form I–821D, DACA Renewal Fee section for additional information regarding why DHS is not implementing a fee for Form I–821D in this final rule.

*Response:* DHS articulated in the NPRM that, ''This additional staffing requirement reflects the fact that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes, particularly for work types that do not currently generate fee revenue, have grown.'' *See* 84 FR 62286. Although USCIS used all available data at the time it conducted the FY 2016/2017 fee review, it necessarily used historical data and trends to inform its projections. USCIS was unable to foresee these additional staffing needs at the time it implemented the FY 2016/2017 fee rule because of nearly unprecedented growth in workloads such as credible fear and affirmative asylum. Furthermore, USCIS could not perfectly anticipate all policy and operational changes that influence adjudication times.

USCIS cannot afford the estimated staffing requirement necessary to address its incoming workload under the previous fee structure. If USCIS maintains current staffing levels, DHS believes that backlogs would grow. Therefore, DHS adjusts USCIS' fees in this final rule to generate additional revenue that may be used to fund staff that will adjudicate incoming workload and potentially mitigate or stabilize future backlog growth.

DHS declines to make changes in this final rule in response to these comments.

### 4. Cost Baseline

*Comment:* Multiple commenters claimed that DHS did not adequately explain the growth in USCIS costs from the FY 2016/2017 fee rule and that DHS failed to provide justifications for 57 percent of the increase in costs from the previous fee rule. A commenter stated that USCIS dismisses the option of reducing projected costs with a single sentence and is a ''fatal defect'' in the NPRM. Other commenters said that in overstating workload volumes, DHS overestimated the costs to be recovered by USCIS' fee schedule.

*Response:* In its NPRM, DHS highlighted changes from USCIS' FY 2018 Annual Operating Plan (AOP) to the FY 2019/2020 cost baseline. *See* 84 FR 62286. The authorized staffing levels and FY 2018 AOP costs are higher than FY 2016/2017 fee rule projections. After the FY 2016/2017 fee rule became effective on December 23, 2016, USCIS funded additional staff and other agency initiatives through a combination of additional revenue resulting from higher fees and available carryover funds. Per Figure 4 of the supporting documentation that accompanies this final rule, USCIS expected to draw down its carryover funds in FY 2019 and FY 2020 because base operating costs were projected to exceed incoming revenue. In other words, USCIS forecasted an annual operating deficit in both years. DHS determined that USCIS

cannot sustain recurring annual operating deficits of this magnitude and continue to fund itself in this manner, necessitating an adjustment to the fee schedule based on the results of the FY 2019/2020 fee review.

As detailed in the NPRM, a primary driver of cost growth from the FY 2018 AOP to the FY 2019/2020 cost baseline is payroll for on-board and new staff. *See* 84 FR 62286. This staff is necessary to process the projected workload receipt volume, which exceeds USCIS' current workload capacity. Strategic investments in staffing may help USCIS mitigate or stabilize future backlog growth. Furthermore, net additional costs include non-pay general expense enhancements for requirements such as secure mail shipping for permanent resident cards and other secure documents ($27 million), USCIS headquarters consolidation ($32 million), increased background checks ($18 million), IT modernization efforts ($32 million), customer engagement center ($23 million), and inflationary increases for contracts. This final rule does not transfer funds to ICE or implement new DACA fees. Therefore, DHS removed $207.6 million for ICE and $18.7 million of DACA costs in this final rule. Table 6 is a revised crosswalk summary from the FY 2018 AOP to the FY 2019/2020 cost baseline used to inform the fee schedule in this final rule.

#### TABLE 6—REVISED COST BASELINE PROJECTIONS
[FY 2019/2020 fee review IEFA non-premium budget (in millions)]

| | |
|---|---|
| Total Base FY 2018 IEFA Non-Premium Budget | $3,585.6 |
| Plus: Net Spending Adjustments | 217.2 |
| Total Adjusted FY 2018 IEFA Non-Premium Budget | 3,802.8 |
| Plus: Transfer to ICE | |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 280.2 |
| Plus: Net Additional Costs | 249.0 |
| Total Adjusted FY 2019 IEFA Non-Premium Budget | 4,332.0 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 218.6 |
| Plus: Net Additional Costs | 5.8 |
| Total Adjusted FY 2020 IEFA Non-Premium Budget | 4,556.4 |

DHS did not overstate its projected costs for recovery via USCIS' fee schedule. Generally, whenever an overestimate of workload and/or fee-paying receipts materialize, proposed fees are often understated. For example, assume there is a total cost estimate of $100.00 for an agency to recover via one user fee. If there were 100 projected fee-paying applicants to assign a total cost estimate of $100.00 to, then the proposed fee would be $1.00. However,

if the actual fee-paying receipt volume materialized at half or 50, then the proposed fee should have been double or $2.00 to recover full cost because there were fewer fee-paying applicants to absorb the $100.00. Using this same example, even if the $100.00 was high due to an overestimate of volume projections and it should have been only $80.00 (to account for a notional marginal cost change), the proposed fee would remain $2.00 ($80.00/50 = $1.60

or $2.00 when rounded to the nearest whole dollar).[108] As previously explained, USCIS uses the best information available at the time it conducts biennial fee reviews.[109]

[108] In reality, a lower receipt volume often does not produce a cost reduction within the span of a two-year period due to fixed costs associated with facilities, staff, and other overhead.

[109] OMB Circular A–25 clarifies that ''full cost shall be determined or estimated from the best available records of the agency, and new cost

Forecasts may not materialize exactly as initially projected due to many factors. Consequently, USCIS reevaluates its fees on a biennial basis and makes adjustments, if necessary.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter stated that USCIS rests the proposed new fees on the outcome of a budget model but gives little indication of how it derived the budget in the first place. For example, USCIS states that the budget is derived from the FY 2018 AOP, but it is not clear from the proposal and supplemental material what estimates, assumptions, or operating practices this plan embodies or why this plan is relevant (instead of a more recent plan or actual operating figures). In addition, the commenter said USCIS states that its budget reflects an "adequate level of operations," plus "funding for [certain] enhancements," but does not explain either concept. The commenter also said the proposal does not give commenters a full understanding of other aspects of the budget, including the ICE funds transfer, staff salaries and benefits, what assumptions are driving the estimates of budget growth, how much carryover USCIS is budgeting for or how that affects the proposed fees, and how USCIS plans to use premium processing revenue or why such revenue does not offset any of the fees that USCIS proposes based on its non-premium budget.

*Response:* As explained in the supporting documentation that accompanies this final rule, USCIS establishes an AOP (detailed budget execution plan) at the beginning of each fiscal year that is consistent with the annual spending authority enacted by Congress. The FY 2018 AOP is USCIS' basis for the FY 2019/2020 cost baseline, which informs proposed fees in the NPRM and final fees in this final rule. DHS clarifies that USCIS considers an "enhancement" to be additional funding in excess of the base annual operating plan. This estimated additional funding (*i.e.,* cost projections) are outlined in both the NPRM and Cost Baseline section of this final rule.

Information and assumptions about USCIS' carryover are located in the IEFA Non-Premium Carryover Projections section of the supporting documentation that accompanies this final rule. Additionally, premium processing revenue, as explained in the Premium Processing section of this final

accounting systems need not be established solely for this purpose."

rule, may only be used for limited purposes as provided by law.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Commenters identified differences between their estimate of USCIS' expenditures in FY 2018–2019 and DHS' cost estimates for those years in the NPRM. The commenters contended that DHS appears to have substantially overstated USCIS' FY 2018–2020 costs. Additionally, commenters noted that USCIS' FY 2019–2021 congressional justifications convey lower amounts than DHS' cost estimates in the NPRM.

*Response:* The commenters' conclusion that USCIS' FY 2018–2019 actual expenditures are less than its cost estimates for those years in the NPRM is correct. Furthermore, the commenters' observation that USCIS' FY 2019–2021 congressional justifications requested less budgetary authority than the cost estimates for those years in the NPRM is also correct. However, contrary to the commenters' assertions, this does not mean that DHS overstated USCIS' costs or that USCIS does not need to collect the amount of revenue it identified in the NPRM.

DHS developed cost estimates for addressing projected incoming workloads during the FY 2019/2020 period. As identified in the NPRM, USCIS is unable to fully fund its estimated budgetary requirements (*i.e.,* FY 2019/2020 cost baseline or cost projections) via the existing fee schedule, thereby necessitating fee adjustments in this final rule. Thus, USCIS expended less in FY 2018–2019 than its cost projections for addressing incoming workloads precisely because it did not have sufficient available resources to meet its estimated budgetary requirements. Similarly, the congressional justifications cited by the commenters reflect USCIS' estimates, at different points in time, of the funds it would be able to execute based on anticipated resources available to the agency under current policy and fees, rather than the cost projections of addressing incoming workloads forecasted during the FY 2019/2020 fee review. Therefore, DHS's NPRM cost projections differ from actual expenditures and congressional justifications because they reflect USCIS' estimated budgetary requirements to fully address projected incoming workloads as of a particular point in time.

Given that USCIS did not have available resources equivalent to its estimated budgetary needs in FY 2018 and 2019, it was not able to hire the number of staff estimated by its Staffing

Allocation Models. The underfunding of USCIS' requirements increased processing times and backlogs. USCIS' fee schedule must recover the estimated costs of addressing incoming workloads to ensure that it has sufficient resources to operate and limit the future growth of processing times and backlogs.

DHS declines to make adjustments in this final rule in response to these comments.

*Comment:* Similarly, a commenter stated that the NPRM uses opaque and invalid budget assumptions and neither the proposed rule nor the commenter's meeting with USCIS have provided any way for the public to adequately understand, much less analyze, future costs and revenue estimates. The commenter said cost and revenue baselines are not aligned, as USCIS is using two completely different time periods to inform its proposed fee rule: A relatively antiquated time period (June 2016 to May 2017) as the baseline for revenues, and a relatively recent time period (FY 2018) as the baseline for costs. The commenter characterized this as "perplexing" given that USCIS surely knows its actual costs and revenues for any prior fiscal year. The commenter also detailed their analysis that concluded that projected costs and revenues do not match actual costs and revenues, which the commenter said raises several issues that USCIS must explain to the public.

*Response:* DHS disagrees with the commenter's contention that USCIS' budget assumptions are opaque and invalid. The commenter is incorrect in stating that USCIS used two completely different time periods to determine revenue and cost projections for the FY 2019/2020 fee review and that the revenue and cost baseline are not aligned. USCIS used data from June 2016 to May 2017 to determine one data element, fee-paying percentages, that informed its FY 2019 and FY 2020 revenue forecasts. This is only one data input among several that USCIS considers in forecasting revenue. DHS maintains that its use is appropriate. Furthermore, USCIS used the same data to inform the FY 2018 AOP, insofar as it was also an input into the FY 2018 USCIS revenue forecast.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter wrote that there is an especially great burden on USCIS to disclose a full and transparent accounting for why it requires an average annual budget of $4.67 billion, as the role of the agency's cost-modeling software is simply to accept this number "as a received truth" and allocate it among all of the various form types. This commenter said USCIS provides

almost no explanation for why it is projecting such high costs, especially when the agency's actual costs in FY 2018, 2019, and 2020 were so much lower than its own projections.

*Response:* DHS acknowledges that USCIS' actual expenditures in FY 2019 were less than the projected costs in this final fee rule. Furthermore, the commenter is correct in stating that the FY 2019 and FY 2020 cost projections in the NPRM exceed the total budget authority requested for USCIS in the Congressional Justifications that accompany the President's annual budget proposal for those years. This reflects the fact that the revenue generated under the previous USCIS fee schedule was insufficient to adequately fund the agency's needs. The President's budget proposal did not request authority for USCIS to spend money that it was not expecting to have. The difference between the cost projections and actual USCIS expenditures across this time manifested in backlog growth and unmet operational needs. It does not reflect inaccurate projections of the cost to USCIS of fully funding its operational requirements.

DHS has fully explained and justified USCIS' projected costs to meet its operational requirements and address its projected workload. Therefore, DHS declines to make changes in this final rule in response to the comment.

*Comment:* Commenters stated that, during a meeting with USCIS Office of the Chief Financial Officer, the group discussed the timing and availability of information in the FY 2019/2020 fee review. A commenter stated that the cost-modeling software uses information from 2017, which precedes most of the notable USCIS policy changes of the past 3 years. The commenter stated that USCIS apparently attempts to predict how costs for a given form type will change in the future, but there has been no comprehensive modeling of the many recent developments that would tend to reduce agency costs and put downward pressure on user fees.

The commenter stated that USCIS does not appear to have accounted for many recent policy changes because data was not available "at the time it conducted this fee review." The commenters wrote that more recent data could change the number of people applying for immigration benefits, and thus USCIS' budget estimates and fee calculations. Another commenter stated that the rule does not suggest that USCIS has estimated and accounted for the combined effect of these multiple initiatives, nor could it have done so comprehensively as the Administration's adoption of new initiatives that could affect the number of people seeking immigration benefits has continued even since April 2019 when USCIS completed its fee review and November 2019 when DHS published the NPRM. The commenter said this also raises serious questions about whether the fee review complies with the statutory requirement for USCIS to conduct such a review and make recommendations based on the relevant "costs incurred." The commenter said the proposal's reliance on 2018 cost projections is unreasonable. The commenter said more recent data and projections were available or could have been if USCIS had waited just a bit longer, and USCIS provides no reason that 2018 figures are more relevant. The same commenter said the proposal is additionally unreasonable because it is based on projections for FY 2019 and FY 2020, a period that has nearly passed. The commenter said USCIS should have based its modeling on more recent data and projected results for the time period when any new fee rule would be in effect.

A commenter wrote that USCIS excludes savings and benefits already realized such as efficiencies gained through investments in information technology, closures of international offices, and lower refugee intake. Similarly, a commenter wrote that the RIA fails to present data and evidence on a number of recent changes designed to reduce costs, including limiting the availability of printed study materials, no longer providing printed Forms N–400, centralizing all customer inquiries and complaints on a call center, and introducing electronic filing for many benefits.

*Response:* DHS acknowledges that it did not incorporate cost increases or savings from policy initiatives for which data was not available at the time USCIS conducted the FY 2019/2020 fee review. DHS rejects the implication that it inappropriately failed to account for future policy initiatives. DHS must adjust USCIS fees through notice and comment rulemaking which, especially for a rule with a billion-dollar impact, is a lengthy process that requires policy planning, analysis, a proposed rule, reading and responding to comments, and a final rule. DHS must publish a final rule that only makes changes that are a logical outgrowth from the proposed rule, and a totally new budget with minor changes in costs or savings cannot be substituted between the proposed and final rules, although we adjust for substantial sums based on intervening legislation as we did for appropriated funds for ICE and the Citizenship and Integration Grant Program discussed elsewhere. The immigration policy environment changes so frequently that if USCIS were to delay finalizing a fee review until cost data was available for all future policy initiatives, DHS would be unable to adjust fees timely, thereby posing a fiscal risk to USCIS. Biennial fee reviews must reflect USCIS' cost projections as of a particular point in time as best can be determined. The same logic applies to other operational metrics including completion rates, revenue forecasts, and workload projections. USCIS always leverages the best information available at the time it conducts a biennial fee review, but it necessarily results in some costs or savings realized or to be realized not being incorporated in the final fees simply due to the passage of time for rule development and finalization.

In recognition of the constantly evolving immigration policy environment and its obligations under the INA and the CFO Act, USCIS regularly conducts biennial fee reviews. The two-year review mandate in the CFO Act forces fee setting agencies to address the effects of just these sorts of policy and practice changes on their fees; otherwise, bureaucratic inertia could cause an agency to not address the soundness of their fees versus costs and services. As it is, the two-year period provides agencies with a reasonable period within which to regularly address such issues, subject to the time constraints of notice and comment rulemaking previously mentioned. To the extent that the recent policy initiatives identified by the commenters affect USCIS' costs, those effects will be captured in USCIS' next biennial fee review. If the totality of new initiatives reduces USCIS' costs, it may result in lower fees in the future for applicants and petitioners.

DHS declines to make changes in this final rule in response to the comments.

*Comment:* A commenter wrote that their own estimates suggest USCIS is attempting to increase revenue by around 49 percent over current revenue projections based on estimated growth in applications. The commenter said this is an extraordinary amount of revenue extracted from its most vulnerable users.

*Response:* DHS is unable to replicate the commenter's estimate and does not know the source or validity of these calculations. Regardless, as explained in the NPRM and this final rule, DHS must adjust USCIS' fees to recover the estimated full cost of providing adjudication and naturalization services. DHS declines to make changes

in this final rule in response to this comment.

*Comment:* A commenter said that USCIS states that it recognizes revenue when work is completed, asserting that the implications of this accounting principle on USCIS' budget and fee modeling is not clear but could be quite significant. For example, the commenter said it is unclear whether revenue estimates are based on actual cash flow or the amount of revenue that is recognized in a current year or if USCIS' budget is inflated with the costs of processing applications for which USCIS received a fee in a prior year.

*Response:* DHS clarifies that all figures in the USCIS fee review, NPRM, and this final rule reflect projected costs, workload and associated revenue for the FY 2019/2020 biennial period. DHS did not overstate or inflate the USCIS' cost baseline because it does not include workload for which USCIS received a fee in a prior year.

DHS declines to make changes in this final rule in response to the comment.

5. Alternative Funding Sources

*Comment:* Commenters wrote that funding for USCIS should come from another source. Multiple commenters indicated that Congress should provide appropriations to USCIS to decrease the burden on immigrants. Some commenters also indicated that USCIS did not consider the $10 million appropriation for citizenship grants in setting its fees.

*Response:* As stated in the NPRM, fees have funded USCIS since its inception. Approximately 97 percent of USCIS' annual funding comes from fees. USCIS must rely on fees until the law changes or Congress appropriates funding. For FY 2019 and FY 2020, Congress appropriated $10 million for the Citizenship and Integration Grant Program. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2020). At the time USCIS conducted the FY 2019/2020 fee review, Congress had not appropriated $10 million for the Citizenship and Integration Grant Program. As a result, USCIS did not expect to receive the appropriations in FY 2019 or FY 2020. Therefore, USCIS' FY 2018 AOP and FY 2019/2020 fee review cost baseline accounted for these funds in the IEFA non-premium budget. In this final rule, DHS clarifies that $10 million (IEFA non-premium funds; not appropriated funds) remains in the cost baseline for other agency initiatives. However, USCIS does not assign $10 million to only naturalization-related

forms (*i.e.,* N–336, N–400, N–565, N–600, and N–600K) in its final ABC model because Congress appropriated funds for the Citizenship and Integration Grant Program. Instead, USCIS reassigns $10 million of non-premium funds to other fee-paying forms, thereby reducing the costs assigned to and final fees for naturalization-related forms.

DHS declines to make any changes in this final rule in response to these comments.

*M. ICE Transfer*

*Comment:* Many commenters wrote that they disagree with the proposed transfer of USCIS IEFA funds to ICE. They provided a number of reasons for their objections. Another commenter concluded that eliminating the revenue transfer to ICE enforcement would reduce USCIS' claimed need to eliminate ability-to-pay waivers.

*Response:* DHS removed the transfer of IEFA funds to ICE from this final rule because Congress appropriated $207.6 million to ICE in FY 2020. *See* Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019). DHS may fund activities conducted by any component of the department that constitute immigration adjudication and naturalization services using the IEFA. *See* INA section 286(m), (n), 8 U.S.C. 1356(m), (n). Nevertheless, the fees established by this final rule are not calculated to provide funds to ICE.

*Comment:* A commenter suggested that USCIS use the money currently spent on detention by ICE to instead streamline and simplify the application process.

*Response:* Congress appropriates funds for ICE Enforcement and Removal Operations. Those funds are not available for use by USCIS. DHS declines to make changes in this final rule in response to this comment.

*Comment:* A commenter wrote that recent legislative action suggested USCIS would abandon the plan to transfer funds to ICE, so the commenter asked that USCIS confirm in this final rule that it does not have the authority to transfer IEFA funds to ICE collected.

*Response:* DHS may fund activities conducted by any component of the department that constitute immigration adjudication and naturalization services using the IEFA. *See* INA section 286(m), (n), 8 U.S.C. 1356(m), (n). DHS removed the transfer of IEFA funds to ICE from this final rule because Congress appropriated $207.6 million to ICE in FY 2020. *See* Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019).

The fees established in this final rule are not calculated to provide funds to ICE.

*N. Processing Times and Backlogs*

*Comment:* A commenter wrote that USCIS should focus on the processing times and becoming more efficient. The commenter also suggested that USCIS could benefit from a more streamlined electronic process. One commenter wrote that electronic filing glitches, lost documents, erroneous rejections, and lengthy holds should be addressed before fees are raised. One commenter said USCIS should increase filing technology and training of Service Officers to ensure they have the legal knowledge of the regulations and have the platform to adjudicate cases efficiently. The commenter said technology allocations should specifically focus on electronic filing systems that can reduce processing times and make document and forms submission from U.S. employers seamless.

*Response:* DHS strives to save money, be efficient, and process all requests in a timely manner while maintaining the integrity of the United States immigration system. USCIS agrees with commenters that electronic filing, processing, and record keeping for immigration benefit requests is likely to provide operational efficiencies that could aid USCIS in better using its existing resources and potentially reduce processing times and backlogs. Although USCIS is aggressively moving to expand e-processing to more form types, its current operational needs dictate that it must increase fees to cover projected costs. If USCIS realizes operational efficiencies through the expansion of electronic benefit request filing and processing, those cost savings will be reflected in upcoming fee reviews and may result in future fees that are lower than they would have been in the absence of such efficiencies. Training, software, and equipment costs are part the IEFA budget. USCIS encourages its employee to discuss with their supervisor if they believe that they lack the resources necessary to do their jobs.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Many commenters who opposed the NPRM noted that immigration benefit request backlogs and processing times have increased under the current administration despite a fee increase in December 2016. Many commenters stated that since 2010, USCIS increased filing fees by weighted averages of 10 percent and 21 percent but has not achieved any

associated improvement in processing times, backlogs, or customer service. Commenters cited reports stating that during that same period USCIS' backlog has increased by more than 6,000 percent and that the overall average case processing time increased 91 percent between 2014 and 2018. Commenters wrote that fees should not increase until USCIS improves its efficiency and management. Commenters wrote that an increase in fees must be accompanied by improvement in processing times, reduced backlogs, improved customer service, and services that do not discriminate against the working class, low-income applicants, and others who face financial hardships.

*Response:* DHS recognizes the continued growth of USCIS case processing backlogs since it last adjusted the USCIS fee schedule on December 23, 2016. *See* 81 FR 73292 (Oct. 24, 2016). The fees established at that time proved insufficient to fund USCIS at the level necessary to prevent growth in case processing backlogs. USCIS' costs grew more than expected at that time because of disproportionate growth in humanitarian workloads that did not generate revenue, increased adjudicative time requirements per case for many different workloads (*i.e.*, increased completion rates), additional staff, and other factors.

DHS is adjusting fees in this final rule because they are insufficient to generate the revenue necessary to fund USCIS at levels adequate to meet its processing time goals. Adjustments to USCIS' fee schedule will generate more revenue to fund the operational requirements necessary to meet projected incoming workloads and prevent further deterioration in processing times. The new fees will allow USCIS to hire more people to adjudicate cases and possibly prevent the growth of backlogs. USCIS will continue to explore possibilities for business process efficiencies. Future fee adjustments will reflect any efficiencies realized by USCIS.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter suggested that USCIS should internally review its processes and determine how they might be streamlined before increasing fees. A few commenters stated that increased RFEs and mandatory in-person interviews, among other policies, are labor intensive and should be addressed to decrease the backlog before fees are increased.

*Response:* USCIS continually evaluates its processes and pursues efficiencies to the greatest extent possible. As explained in the NPRM,

USCIS considered all cost and operational data that was available at the time it conducted the FY 2019/2020 fee review, including potential process efficiencies. It does not account for recent process efficiencies for which data was not yet available at the time. However, USCIS will evaluate and capture any relevant cost-savings data for process efficiencies during its next biennial fee review. To the extent that potential process efficiencies are recognized in the next biennial fee review, cost-savings may lessen the impact of future fee adjustments.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter said an increase in fees would only further burden those who seek services and are repeatedly met with inefficiency, long wait times, and the inability to get answers. This commenter said USCIS has taken away services, such as the ability to make InfoPass appointments online, and rerouted those inquiries to Customer Service Center where wait times to receive calls back make emergency situations that require an InfoPass appointment even more frustrating. Another commenter also mentioned the difficulty in making InfoPass appointments as an example of how USCIS services have declined in recent years due to mismanagement. Commenters said USCIS should end policies and practices that raise fees to support the continued administration of backlog-expanding policies and practices.

*Response:* USCIS continually evaluates potential operational efficiencies. Reductions in the use of in-person appointments through InfoMod enable USCIS to redirect resources to adjudication, potentially improving overall customer service. USCIS evaluates and incorporates all available information on both cost-savings and cost increases as part of its biennial fee reviews, including the effects of policy changes and their impact on operational processes. This final rule adjusts USCIS' fee schedule to recover the estimated full cost of providing immigration adjudication and naturalization services; removing or reconsidering all USCIS policies and practices is beyond the scope of this rulemaking.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Another commenter noted that USCIS' only concrete plan was to spend money on reducing fraud, which would not efficiently reduce the backlog.

*Response:* DHS disagrees with the commenter's statement that its only

concrete plan is to spend more money on reducing fraud. USCIS intends to use revenue from the fees to fund multiple initiatives, including increased staffing across the agency. DHS adjusts USCIS' fee schedule in this final rule to recover the estimated full cost of providing immigration adjudication and naturalization services for anticipated incoming workloads. USCIS does not incorporate the cost of addressing existing pending caseloads in its biennial fee reviews, as it would be inequitable to require new applicants and petitioners to pay for the cost addressing previously submitted applications and petitions for which USCIS already collected fees. To the extent fee adjustments result in additional revenue for USCIS, those additional resources may help limit future growth in pending caseload. DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters noted USCIS' failure to implement the recommendations of the USCIS Ombudsman's Report, which provides a number of recommendations for improving adjudication times. One of these commenters said DHS's failure to consider, address, or implement recommendations from other federal government offices is telling, asserting that these changes are simply intended to make the asylum process more challenging for asylum applicants, and to deter asylum applicants.

*Response:* DHS notes that one of the USCIS Ombudsman's recommendations is to address delays in processing Form I–765 by ensuring sufficient staffing resources are available to provide for timely adjudication. DHS adjusts USCIS' fee schedule in this final rule, including the fee for Form I–765, to provide for the recovery of full estimates of the costs of providing immigration adjudication and naturalization services. The Ombudsman did not recommend an increase in the Form I–765 fee; however, adjusting the fee schedule will enable USCIS to devote more resources, including staffing, to the adjudication of all applications and petitions, including Form I–765. DHS reiterates that it does not intend to make the asylum process more complicated.

DHS declines to make changes in this final rule in response to these comments.

## O. Fee Payment and Receipt Requirements

*Comment:* Multiple commenters opposed the proposal to allow DHS to require the payment of certain fees by particular methods, as described in the relevant form instructions. Commenters

wrote that any potential future requirement to pay fees through electronic means such as *Pay.gov* would limit the ability of individuals who lack access to bank accounts or credit cards to apply for immigration benefits. Commenters also wrote that requiring payment through electronic means would restrict the availability of immigration benefits for individuals who lack computer and internet access. Commenters stated that it is important to maintain the ability to pay fees using cashier's checks and money orders, because they are available to individuals without access to other banking services, such as a credit card. Another commenter cited data from the New York City Department of Consumer and Worker Protection, which found that less than two-thirds of immigrant households in New York have access to products such as checking and savings accounts and that 11 percent are unbanked and 22 percent are underbanked. A few commenters cited Federal Deposit Insurance Corporation numbers in writing that the proposal would inhibit the immigrant portion of the "unbanked" and "underbanked" households in the United States from applying.

Multiple commenters said prohibiting cashier's checks or money orders would disproportionately affect low-income immigrants and a few commenters indicated it would impose a substantial burden on asylum seekers. One commenter said 85 percent of the immigrant clients they help need to use money orders, and this provision would negatively affect them. Commenters said the proposal would lead to wide scale confusion and inefficiency among immigrant and advocacy groups and requested that USCIS continue to accept cashier's checks and money orders.

*Response:* In this final rule, DHS does not restrict the method of payment for any particular immigration benefit request. This final rule clarifies the authority for DHS to prescribe certain types of payments for specific immigration benefits or methods of submission. DHS does not have data specific to USCIS benefit requestors' access to the internet and/or banking but understands that particular populations submitting requests may have attributes that make access to a bank account more or less challenging. DHS acknowledges that some requestors may not use banks or use them on a limited basis for a number of reasons. However, any person who can purchase a cashier's check or money order from a retailer can just as easily purchase a pre-paid debit card that can be used to pay their benefit request fee.[110] In addition, since 2018 requesters can use a credit card to pay for a USCIS form filing fee that gets sent to and processed by one of the USCIS lockboxes, or split the fees between more than one credit card.[111] The credit card used does not have to be the applicant's; however, the person who is the owner of the credit card must authorize use of his or her credit card. Therefore, DHS believes that requiring the use of a check, credit, or debit card will not prevent applicants or petitioners from paying the required fees. In addition, resources such as libraries offer free online services, access to information and computers that the public may use to access forms, complete, print or submit them. Nevertheless, in evaluating future changes to acceptable means of payment for each immigration benefit request, DHS will consider the availability of internet access and different means of payment to the affected populations.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters raised concerns about nonrefundable fees and rejecting checks over 365 days old, which they said were listed in the NPRM without explanation. The commenters stated that relevant fees should be refundable in certain situations, including when an applicant's health or family conditions have changed or when an immigrant is denied on a clear USCIS error.

*Response:* DHS provided a complete explanation of its reasoning behind its proposed stale check or refund requirements. *See* 84 FR 62295 and 62296. In addition, DHS is continuing its policy to issue fee refunds if there is a clear USCIS error, but we will not codify that discretionary practice as a requirement on USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter suggested that USCIS should publish any restriction of payment in the **Federal Register**. The commenter also suggested that USCIS should accept financial instruments regardless of their age and, if it does not process, give applicants 14 days to correct any payment errors. The commenter wrote that USCIS should not be rejecting applicants because of payment problems unknown to them or out of their control.

*Response:* DHS declines to publish any change in acceptable payment instruments in the **Federal Register**. However, where DHS limits acceptable instruments locally, nationwide, or for certain USCIS benefit requests, it issues multiple communications and provides sufficient advance public notice to minimize adverse effects on any person who may have plans to pay using methods that may no longer be accepted.[112] As far as the age of payment instruments, as stated in the NPRM, USCIS generally accepts and deposits payments dated up to one-year before they are received although 6 months old is a general standard often followed in the financial services industry. *See* 84 FR 62295. Because of the large volume of payments that USCIS receives on a daily basis, handling dishonored payments adds unnecessary administrative burden to its intake process. Assigning employees to handle defective payments and, as suggested by the commenter, holding filings and billing for fees that were not properly submitted, is an opportunity cost to USCIS because those employees could otherwise adjudicate immigration benefit requests. DHS believes that it is the responsibility of the remitter to submit proper fees. USCIS will take ameliorative action if a payment error is caused by the agency. However, USCIS has no obligation to insulate filers from a payment problem caused by the requester's financial institution, agent, lawyer, third party check validation service, or similar parties. DHS makes no changes in response to these comments.

## P. Fees Shared by CBP and USCIS

*Comment:* One commenter suggested that previous fee reviews failed to account for the actual adjudication costs of these forms. They questioned if CBP costs were accounted for in previous fee reviews.

*Response:* DHS acknowledges that previous adjustments to the USCIS fee schedule did not account for CBP costs for instances where CBP uses the same form as USCIS. DHS set those fees using USCIS costs and CBP collected the fee that was established. This final rule refines the fee calculation by considering CBP costs and workload volumes in establishing the fees for shared forms. However, CBP workload volumes and associated revenue are backed out from the fee schedule shown in the NPRM and this final rule because

---

[110] See, *e.g.,* Visa Prepaid Cards, at *https:// usa.visa.com/pay-with-visa/cards/prepaid-cards.html* (last viewed 2/24/20).

[111] *See* USCIS Expands Credit Card Payment Option for Fees *https://www.uscis.gov/news/news-releases/uscis-expands-credit-card-payment-option-fees.*

[112] *See, e.g.,* USCIS Updates Fee Payment System Used in Field Offices, available at *https:// www.uscis.gov/news/news-releases/uscis-updates-fee-payment-system-used-field-offices* (Last Reviewed/Updated: 3/07/2019).

AR2022_200482

that revenue is not available to USCIS for the purposes of funding its immigration adjudication and naturalization services. This ensures that USCIS' projected revenue matches its estimated costs of adjudication.

*Comment:* A commenter said that the hike in fees shared by CBP and USCIS are drastic and unjustified because the cost to legalize status will rise to thousands of dollars per person.

*Response:* DHS recognizes that adjustments to the fees for forms shared by USCIS and CBP represent a sizeable increase in the cost of those forms. However, the fees adopted in this final rule represent the estimated full cost of adjudication. DHS declines to make changes to the final fee schedule on the basis of this comment.

*Comment:* Another commenter questioned why the NPRM did not include more recent information regarding CBP costs and suggested that if CBP needs the revenue, they should have their own higher fees or fund their operations through annual appropriations.

*Response:* DHS used the most recent CBP data available at the time USCIS conducted the FY 2019/2020 fee review. It includes cost and workload volume information from FY 2017 as the basis for FY 2019/2020 projections. This is consistent with the data used to develop all other workload and cost projections represented in the fee schedule. The fees set in this final rule that affect CBP are only those forms that USCIS prescribes, but CBP shares for certain functions. DHS has determined that it is appropriate to set the fees for these forms at a level sufficient to ensure that both USCIS and CBP recover the estimated full cost of adjudication, including the cost of providing similar services at no charge to other immigrants. Therefore, DHS makes no changes in this final rule in response to the comment.

### Q. Paperwork Reduction Act (PRA) Comment Responses

*Comment:* Multiple commenters noted that the increased requirements and additional evidence required for filing the Form I–912, Request for Fee Waiver should increase the time burden to applicants. This includes one commenter who noted that the submitted "Instructions for request for fee waiver" states that the form will take 1 hour and 10 minutes per response, but the currently approved form states it would take 2 hours and 20 minutes. The commenter said USCIS did not provide rationale on why the newly revised form would take half the time when it has not been simplified. A commenter stated

that the proposed changes to Form I–912 would present burdens to applicants with increased evidence requirements and repetitious and extraneous information collection. The commenter recommended that USCIS revert and retain the previous version of Form I–912.

*Response:* DHS agrees that it used an outdated burden estimate in the NPRM. In this final rule, DHS has updated the estimated time burden for Form I–912 from 1 hour and 10 minutes to the currently approved 2 hours and 20 minutes.

*Comment:* One commenter noted that using the Paperwork Reduction Act to introduce a revised fee waiver form, with new requirements, in October 2019 in lieu of using a NPRM and then eliminating fee waivers in this rule, was a waste of the public's time to review both documents. A few commenters stated that eligibility based on receipt of a means-tested benefit was due to be eliminated, but the case *City of Seattle,* a court placed a nation-wide injunction on that action, thereby affecting USCIS' plans to constrict eligibility standards for fee waivers. USCIS has already eliminated the means-tested benefit criteria for fee waivers, which drastically limited access to immigration benefits. The proposed rule narrows the criteria for fee waivers even further and eliminates the financial hardship criteria entirely which means 400,666 individuals annually, about the population of Tampa, FL, would be detrimentally impacted. Another commenter stated that the fee increases are an attempt to get around the currently enjoined 2019 fee waiver rules because it eliminates fee waivers for most applicants. The commenter stated that the proposal seeks to restrict legal immigration and naturalization for "poor and non-white people." Another commenter recommended that while the Form I–912 revision is enjoined by the U.S. District Court for the Northern District of California that USCIS request public comment on a new proposed Form I–912 that maintains options to demonstrate qualification through receipt of means-tested benefits, financial hardship, or income of up to 150 percent of the federal poverty level. The commenter wrote that USCIS is required by the injunction to restart the information collection request clearance process anew for a revised I–912 form that conforms to the Court's decision. The commenter wrote that because the version of the Form I–912 published as supporting material to USCIS's November 14, 2019 NPRM, for which comment periods with a cumulative total length of slightly more than 60

days are now ending, does not meet the Court's specifications, USCIS may not move forward with implementation of this revised I–912 based on the present notice-and-comment process."

*Response:* The comment refers to the effort by USCIS to revise the USCIS policy guidance on fee waivers. On September 28, 2018, USCIS published a 60-day notice in the **Federal Register** requesting comments on the revised Form I–912 and instructions and posted the documents for review in docket USCIS–2010–0008 at *www.regulations.gov.* 83 FR 49120 (Sept. 28, 2018). The revisions to the fee waiver form revised the evidence USCIS would consider in evaluating inability to pay, required federal income tax transcripts to demonstrate income, and required use of the Form I–912 for fee waiver requests. USCIS complied with the Paperwork Reduction Act and the Office of Information and Regulatory Affairs, OMB (OIRA) approved the form changes on October 24, 2019.[113] On October 25, 2019, USCIS published the revised Form I–912 and instructions, along with corresponding revisions to the USCIS Policy Manual and a Policy Alert. The revised form and manual took effect on December 2, 2019.

DHS did not consider this rulemaking's impact on that policy change because DHS was proposing comprehensive reforms to fee waivers which were not certain to occur, and the rulemaking was separate and independent of the October 25, 2019, form and policy change. USCIS was losing hundreds of millions of dollars each year to fee waivers and it decided not to wait for the comprehensive DHS fee rulemaking while it continued to "forgo increasing amounts of revenue as more fees are waived." 84 FR 26138 (June 5, 2019). Nonetheless, on December 11, 2019, the revised Form I–912 was preliminarily enjoined, nationwide, by the U.S. District Court for the Northern District of California. *See* Order Granting Pls.' Mot. for Nationwide Prelim. Inj., *City of Seattle* v. *DHS,* 3:19–cv–7151–MMC (N.D. Cal., Dec. 11, 2019). By stipulation of the parties and as agreed to by the court, that injunction will remain pending publication of this final rule. The injunction does not require that USCIS may only revise the Form I–912 in a way that conforms to the Court's decision. Nonetheless, while this final rule is not affected by *City of Seattle,* the decision in that case only requires that the October 25, 2019 fee waiver policy

[113] The approved package is available at *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201910-1615-006#* (last visited Feb. 17, 2020).

changes required notice and comment rulemaking to effectuate. DHS is conducting notice and comment rulemaking with this final rule and the *City of Seattle* injunction does not prevent USCIS from moving forward with implementation of the Form I–912 revision in accordance with this rulemaking.

*Comment:* Several commenters stated that the proposed rule also fails to comply with a federal agency's requirements under the Paperwork Reduction Act by failing to provide the public with a 60-day opportunity to comment on the collection of information under the proposal. One commenter states that "when proposed rule was initially published on November 14, 2019, it provided 60 days for the public to submit comments on draft forms and instructions. USCIS then posted no fewer than 145 such documents on *regulations.gov* for public review. Then, on December 9, 2019, published another proposed rule that reduced the period for public comments on draft forms and instructions to only 45 days. This clear breach of the Paperwork Reduction Act (PRA) leaves insufficient time for the public to adequately comment on the massive volume of form changes proposed by the agency. USCIS must therefore extend the comment period for PRA review by at least another 30 days." Another commenter stated that "while the extension notice of December 9, 2019 extends the public comment period, it simultaneously shortens it for the related forms, in violation of the Paperwork Reduction Act.[114] The extension notice states: DHS also notes and clarifies the comment period for the information collection requests (forms) that the proposed rule would revise in accordance with the Paperwork Reduction Act. The comment period for the NPRM will end on December 30, 2019, including comments on the forms DHS must submit to OMB for review and approval under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501– 12. The NPRM contained erroneous references to comments being accepted for 60 days from the publication date of the proposed rule. The commenter requests that the public comment period be open for 60 days.

*Response:* DHS regrets any erroneous references in the NPRM. Nevertheless, as the commenters have indicated, DHS published the proposed revisions to the information collection requirements for public comment for a cumulative period

of more than 60 days. Thus, DHS has complied with the public comment period requirements of 5 CFR 1320.11 for the information revisions associated with this rule.

*Comment:* A commenter wrote that the collection of a valid domestic address for named workers in a Form I– 129 petition is duplicative given that USCIS conducts a background check for named beneficiaries listed on Form I– 129. The commenter also wrote that USCIS "failed to articulate in its proposed rule why this new question is necessary."

*Response:* DHS disagrees with the comment that this question is duplicative. Providing a valid domestic address for the beneficiary helps USCIS to conduct the background check and otherwise ensure the integrity of the information provided on the Form I– 129. In addition, USCIS will use a beneficiary's U.S. address to notify them if USCIS denies a request to change status or extend stay.

*Comment:* A commenter wrote that, "USCIS [should] adopt a timeline that allows for a sufficient grace period and does not conflict with high-volume filing seasons" when implementing the new forms and recommended a six- month grace period. The commenter wrote that USCIS should consider high- volume filing seasons, for which petitioners prepare months in advance, noting that "refusing to accept a prior version of a form during that time could cause undue burden on the public."

*Response:* DHS will not adopt the recommendation to provide a minimum six-month grace period before the new forms are mandatory for submission. DHS does not believe that requiring use of the new forms immediately will cause undue burden on the public. The proposed forms essentially incorporate the same information as the previous forms, but the new forms are shorter because they are focused on the specific nonimmigrant classification. In addition, DHS believes the public has had sufficient notice of the proposed forms. DHS first published the NPRM on November 14, 2019, subsequently extended the comment period on December 9, 2019, and the rule is not effective until 60-days after publication. USCIS will consider high-volume filing seasons when establishing the implementation process for these new forms.

*Comment:* A commenter wrote, "about the inclusion of E-Verify questions on each of the new [Forms I– 129], even when participation in E- Verify is not mandated for participation in nonimmigrant program *(sic)*, as it could be used inappropriately to target

employers for enforcement action." The commenter recommended that USCIS either remove the E-Verify questions from where it is not mandated, or add language to the form instructions to say that ". . . these questions are optional and are not outcome determinative, such that if a petitioner leaves the information blank it will not result in a rejection." The commenter also pointed out a typographical error.

*Response:* USCIS does not accept the recommendation to remove E-Verify- related questions on Forms I–129 where participation is not mandated. Petitioners who choose not to participate in E-Verify are not required to enroll in the system; only those who are already enrolled will need to provide E-Verify information. Requiring the petitioner's name as listed in E- Verify, as well as their E-Verify Company Identification Number or Client Company Identification Number, if applicable, protects the interests of U.S. workers by preventing fraud and abuse of E-Verify and employment eligibility rules. Having this information on all of the I–129 versions maximizes E-Verify's reliability and integrity by confirming that certain categories of employees who are authorized for employment with a specific employer incident to status are working for the employer specified on the petition.

USCIS Form Instructions indicate that all questions should be answered fully and accurately. They also provide direction to write "N/A" or "None" when a question doesn't apply to the applicant, petitioner, requestor or beneficiary.

USCIS reviewed all of the new I–129 forms and corrected typographical errors related to the E-Verify questions.

*Comment:* A commenter pointed out that on Form I–129H1, ". . . in Part 2. Information about this Petition, question 1, Item 1D repeats Item #1C. It appears it should read 'Free Trade, Chile (H– 1B1).' " The commenter also wrote that they recommended ". . . that Part 5. Basic Information About the Proposed Employment and Employer, questions 9 and 10 be struck as they ask for information that is beyond what is required for eligibility for H–1B status.

*Response:* USCIS has updated Form I– 129H1, Part 1., Item Number 1, Item 1D. Regarding Part 5., Item Numbers 9 and 10, these questions relate to the "experience required for the position" and "special skills" for the position, both of which are relevant to determining if the wage level selected on the Labor Condition Application (LCA) corresponds to the position as described in the petition. Per 20 CFR 655.705(b), while the U.S. Department

---

[114] Paperwork Reduction Act of 1995, Public Law 104–13, §451(b), 110 Stat. 163 (1995) (codified at 44 U.S.C. 3501 *et seq.*)].

of Labor ''administers the labor condition application process,'' the U.S. Department of Homeland Security (DHS) ''determines whether the petition is supported by an LCA which corresponds with the petition.''

Petitioner's responses to these questions provide USCIS with a more complete picture of the requirements for the proffered position. This may help to reduce RFEs on this topic, as USCIS officers will have additional information when initially adjudicating the case.

*Comment:* A commenter wrote that they appreciated that ''. . . specific program requirements have been laid out in the instructions . . .'' for the new Form I–129H2A and Form I–129H2B that ''. . . will be helpful for newer employers, agents, and attorneys.'' The commenter objected, however, to the ''. . . additional requirements for each program that have not been previously required that are either burdensome or too broad'' and that USCIS could ascertain them ''. . . through its own systems . . .'' The commenter also indicated that, ''. . . Part 6. Petitioner and Employer Obligations, question 14, which requires the H–2A petitioner and each employer to consent to ''allow Government access'' to the H–2A worksite is overly broad and goes beyond 8 CFR 214.2(h)(5)(vi) which only requires consent to ''allow access to the site by DHS officers.''

*Response:* The data collections included in Form I–129H2A and Form I–129H2B have a regulatory basis. While they might technically be ascertainable through USCIS systems, this would result in substantially greater operational burdens and, hence, greater expense being passed onto petitioners. It is also reasonable that petitioners should properly be on record whether the relevant requirements are met.

Regarding the Petitioner and Employer Obligations, Item Number 14, USCIS has changed the language to ''DHS access.''

*Comment:* A commenter wrote that the requirement on Form I–129H2B for the petitioner ''. . . to provide evidence of why substitution is necessary and that the requested number of workers has not exceeded the number of workers on the approved temporary labor certification . . .'' could be ''. . . burdensome on the petitioner and delay processing.'' The commenter also suggested that Forms I–129H2A and I–129H2B be reviewed for consistency, noting that helpful language about what evidence to provide appeared in one of these forms but not in the other.

*Response:* The H–2B Substitution regulation at 8 CFR 214.2(h)(6)(viii) states that to substitute beneficiaries

who were previously approved for consular processing but have not been admitted with aliens who are currently in the United States, the petitioner shall file an amended petition with fees at the USCIS Service Center where the original petition was filed, with a statement explaining why the substitution is necessary and evidence that the number of beneficiaries will not exceed the number allocated on the approved temporary labor certification, such as employment records or other documentary evidence to establish that the number of visas sought in the amended petition were not already issued. Thus this requirement is clearly supported by the regulations.

USCIS has reviewed the forms for consistency and updated Form I–129H2B to include the appropriate note under Part 3., Item Number 24.

*Comment:* A commenter wrote that proposed Form I–129MISC ''. . . would make applications for R nonimmigrant workers less efficient and more confusing.'' The commenter stated that, ''The current version of the form is organized and follows a clear structure . . .'' but that ''. . . the proposed revised Form I–129 moves from one topic to another, not following a logical progression.'' The commenter also wrote that, ''. . . certain questions are redundant and . . . broaden the scope of the question needlessly.''

*Response:* The comment does not specify how the organization fails to follow the progression of the regulation. Notably, the new Form I–129MISC structure contains much of the eligibility information in the main petition. The R Supplement is limited to questions about the beneficiary's family, the relationship between the foreign and U.S. organizations, and the attestation, including attestation regarding secular employment, as required by R–1 regulations. 8 CFR 214.2(r)(8). Plus, petitioners no longer must search through lengthy instructions that do not apply to their petition.

*Comment:* One commenter wrote that on Form I–129MISC, ''Part 1, Question #10 does not include an option to select ''Not Applicable'' if a Social Security number is not available.''

*Response:* USCIS has added an ''(as applicable)'' parenthetical to the U.S. Social Security Number field on the form. Per USCIS Form Instructions, all questions should be answered fully and accurately. Any questions that do not pertain to the applicant, petitioner, requestor or beneficiary should be answered with ''N/A'' or ''None,'' according to the instructions.

*Comment:* A commenter noted that, ''Part 2, Question #3 requests that a

petitioner for amended status provide the receipt number of the petition they seek to amend. However, in Part 3, Question #17, the petitioner would have to enter the receipt number again. This is repetitive. There are several bases for classification in which a previous receipt number would be necessary for adjudication.'' The commenter ''. . . recommend[ed] that USCIS consolidate and only request a receipt number once for any basis that would be applicable.''

*Response:* On Form I–129MISC, Part 2 relates to information about the basis for the filing (new employment, continued employment, change of status, or amended petition), and, if an amended petition, asks for the receipt number of the petition being amended. Part 3, on the other hand, seeks information about the beneficiary, requesting the most recent petition or application number for the beneficiary. These requests are not necessarily duplicative as a previous receipt number does not always mean the filing is an amended petition. Eliminating the question about the receipt number of the petition to be amended in Part 2 would make matching the amended petition with the original petition more burdensome.

*Comment:* A commenter wrote that, ''Part 4, Questions #9 and #10 ask if the beneficiary has ever been granted or denied the classification requested. The current version of the form limits the scope of these questions to the last 7 years. By removing the time limitation on this question, USCIS is requesting information that may be overly burdensome for petitioners and beneficiaries to provide, if the information has been lost over time. Information beyond 7 years is also unnecessary for USCIS' adjudication, as that time period would necessarily encompass enough time to demonstrate that a beneficiary who had spent the maximum 5 years in a previous R–1 status had spent the requisite one year outside the United States to be eligible for readmission.''

*Response:* USCIS notes that P–1A individual athletes have a 10-year admission period when your account for their initial and extension period of stay while other P categories may have their period of stay extended in one-year increments. 8 CFR 214.2(p)(14). While the R–1 classification does have a 5-year limit, USCIS will count only time spent physically in the United States in valid R–1 status toward the 5-year maximum period of stay, and an R–1 may be able to ''recapture'' time when he or she has resided abroad and has been physically present outside the United States for the immediate prior year. 8 CFR

AR2022_200485

214.2(r)(6).[115] Thus the time the beneficiary may have been in R–1 status in the United States may be longer than the immediately preceding 7 years in some scenarios. USCIS does not believe the questions to be overly burdensome since we are not initially requiring supporting evidence.

*Comment:* A commenter pointed out a typographical error in Part 5., Question #6 of Form I–129MISC. " 'If the answered 'No' . . .' should be 'If you answered 'No'.' "

*Response:* USCIS has corrected this typographical error.

*Comment:* A commenter wrote that, "R–1 Classification Supplement Section 1, Question #18 has been revised to provide less context and detail for this request for information about secular employment. Specifically, the phrase '[i]f the position is not a religious vocation . . . has been removed, making the question much broader than the previous version. This broad question is more difficult for petitioners to answer and could result in answers that create more confusion for adjudicators."

*Response:* In the R–1 Classification Supplement, Section 1, Item Number 18, removal of the phrase "[i]f the position is not a religious vocation . . ." aligns the question to the relevant regulatory text. Specifically, the regulation at 8 CFR 214.2(r)(8)(xi) requires the prospective employer to attest "[t]hat the alien will not be engaged in secular employment," without regard to the type of religious worker position that the beneficiary will hold. As to the commenter's concern that the revised wording creates a "much broader" question that is more difficult to answer, we note that it remains a yes or no question, requiring further explanation only if the prospective employer answers "no" to the required statement.

*R. Statutory and Regulatory Responses*

1. General Comments on the Regulatory Impact Analysis

*Comment:* One commenter cited the APA and Supreme Court precedent, stating that the asylum fee is such a departure from prior policy that the agency must provide a "reasoned analysis for the change." The commenter wrote that the agency provided no evidence, analysis, or discussion to support its conclusions, and that under the APA and Executive Orders 12866 and 13563, USCIS failed to identify and evaluate all potential economic and non-economic costs and ensure that those costs are outweighed by benefits and that the regulations impose the least burden to society. The commenter wrote that E.O. 12866 requires agencies to assess all costs and benefits and should select those approaches that maximize benefits (including potential economic, environment, public health and safety), and other disadvantages; distributive impacts, and equity.

*Response:* DHS has identified and evaluated potential economic and non-economic costs as summarized in table 7 of the Executive Orders 12866 and 13563 sections of this rule, table 1 of the Regulatory Impact Analysis, and in the Small Entity Analysis document. As stated in multiple places in this final rule, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation. DHS will continue to explore efficiencies that improve USCIS services and may incorporate corresponding cost savings into future biennial fee reviews and rulemakings accordingly.

*Comment:* Multiple commenters generally stated that the RIA does not accurately analyze the impact of reduced economic activity generated by immigrants as a result of more arduous immigrant requirements under this rule. Some commenters requested that USCIS analyze whether reduced administrative costs as a result of increased fees would be offset by a reduction in the economic value generated by immigrants due to more costly fees. Similarly, a commenter wrote that the proposed rule does not account for the harm posed by increased naturalization fees such as reduced wages, broken families, and increased vulnerability to domestic violence.

*Response:* DHS notes that previous fee increases in 2007, 2010 and 2016 have had no discernible effect on the number of filings that USCIS received.[116]

DHS recognizes the contributions that naturalized citizens make to American society. However, USCIS must fund itself through fees. DHS does not have any data to establish that these fees, though required, are a significant impediment to naturalization or economic and social mobility. As stated in the proposed rule and elsewhere in this final rule, DHS performs a biennial review of the fees collected by USCIS and may recommend changes to future fees. DHS reviewed research cited by commenters as evidence that the cost increases discussed in the rule would be a barrier to immigration and found no evidence to support the conclusion that the fee changes would have a quantifiable causal effect on wages, family cohesion or domestic violence. DHS declines to conduct further analysis on this issue or make changes in this final rule in response to this comment.

DHS recognizes the economic and societal value of nonimmigrants, immigration, and naturalization. DHS agrees that new citizens and naturalization are of tremendous economic and societal value and generally agrees with the points made by, and the studies cited by, commenters. DHS is not adjusting the USCIS fee schedule to impede, reduce, limit, or preclude naturalization and did not propose to adjust the USCIS fee schedule to reduce, limit, or preclude immigration in any way for any specific immigration benefit request, population, industry or group, including members of the working class.

DHS acknowledges that some individuals will need to save, borrow, or use a credit card in order to pay fees because they may not receive a fee waiver. DHS does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply. However, DHS disagrees that the fees will result in the negative effects the commenters' suggested. DHS believes that immigration to the United States remains attractive to millions of individuals around the world and that its benefits continue to outweigh the costs noted by the commenters. DHS also does not believe that the NPRM is in any way discriminatory in its application and effect. DHS did not target any particular group or class of individuals. Therefore, DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that the RIA does not consider the costs to the families and communities of asylum seekers who will need to help cover fees for indigent individuals.

*Response:* DHS did not consider the costs to the families and communities of asylum seekers, who will need assistance with fees for indigent individuals who are more likely to be asylum seekers. DHS expects that charging this fee will generate some revenue to offset adjudication costs but is not aligning with the beneficiary-pays

---

[115] *See* Procedures for Calculating the Maximum Period of Stay for R–1 Nonimmigrants, available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2012/March/R-1_Recapture_%20AFM_Update_3-8-12.pdf.*

[116] *See* RIA, Section M: Fee Waivers.

AR2022_200486

**46882**    **Federal Register** / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

principle, as the estimated cost of adjudicating Form I–589 exceeds $50. DHS recognizes that these families and communities will have to find a way to pay, whether through their communities, friends, loans, or credit cards. DHS discusses the impact of the asylum fee and determines that some applicants may no longer apply for asylum in Section P, Charge a Fee for Form I–589 Application for Asylum and for Withholding, of the final RIA. DHS notes that some applicants would be able to find other means to pay for this application fee, such as borrowing money or using a credit card. DHS is not able to estimate the effect of the new $50 fee on asylum applicants who may not be able to afford the new fee and cannot accurately or reliably predict how many applicants would no longer apply for asylum as result of the $50 fee.

*Comment:* Multiple commenters wrote that USCIS failed to sufficiently analyze the price elasticity or price sensitivity of naturalization applications, and as a result total agency revenue could actually decrease due to reduced naturalization applications from higher fees under the proposed rule. One commenter cited research demonstrating that subsidizing naturalization fees for low income individuals increased applications by 41 percent. A commenter wrote that USCIS argues that the lack of a fee waiver will not affect the number of requests filed, however research shows that fee waiver standardization increased applications for low income immigrants. A commenter wrote that USCIS fails to produce an incremental analysis considering the difference in money flow between the original situation and the proposed changes.

*Response:* DHS acknowledges that one randomized control trial mentioned by the commenter observed a 41 percent increase in applications for naturalization amongst immigrants randomly selected to have their filing fees paid by an outside party. Commenters cited another study's findings that standardization of the fee waiver process, and incorporation of the FPG for determining eligibility resulted in the largest increases in naturalization rates for low-income immigrants. While DHS acknowledges immigrants facing financial challenges encounter added difficulty paying filing fees, these studies highlight the impact of removing fees entirely on many immigrants who would not have naturalized without full subsidization or waiver, thus these effects are not informative of price sensitivity in the context of this rule.

DHS has not omitted data describing the price sensitivity to fees, rather, the agency has no data describing the myriad complex and changing unobservable factors that may affect each immigrant's unique decision to file for a particular immigration benefit. DHS notes that previous fee increases in 2007, 2010 and 2016 have had no discernible effect on the number of filings that USCIS received.[117]

*Comment:* A commenter wrote that USCIS failed to present an accurate analysis of increased administrative processing costs under the proposed rule, wherein ''hundreds of thousands'' of means-tested applicants will begin submitting fee waiver requests under the household income basis.

*Response:* Based on the OIDP survey, as described in the RIA, approximately 16.36 percent of all fee waiver applications become ineligible by lowering the income criteria from 150 percent to 125 percent of the FPG. As a result, DHS estimates about 22,940 fewer fee waiver applications will be eligible for a fee waiver according to the approval eligibility criterion to limit fee waivers to households with income at or below 125 percent of FPG. *See* 8 CFR 106.3. Therefore, DHS disagrees that USCIS failed to present an accurate analysis of increased administrative processing costs under the proposed rule.

*Comment:* A commenter wrote that the RIA suggests that USCIS cannot reliably predict the number of asylum applicants who would be deterred by the proposed rule's $50 fee, but then argues it would be a smaller number without providing any data to back the claim.

*Response:* As stated in the NPRM RIA and in this Final Rule RIA (Section P), DHS agrees with the commenter that USCIS cannot reliably estimate the numbers of asylum applications who may not be able to afford the $50 fee for Form I–589. DHS does not believe that the new fee will deter asylum applications, and the commenter provides no data to support its claim that it will.

### 2. Methodology Issues

*Comment:* Some commenters had issue with the timelines used in the RIA. A commenter wrote that the proposed rule covers a 10-year implementation period, but USCIS' calculations do not show the impact of fees on workload over a 10 year period. A commenter wrote that the RIA uses receipts from June 2016 to May 2017 to make revenue projections for FY 2019/2020, however USCIS does not explain why this time frame is used or why it

doesn't align with the Federal government's fiscal quarters.

*Response:* The calculations in this rule's RIA estimate the annual amounts of each proposed change in Table 1. In further detail of each proposed change, transfers, costs, or cost savings are displayed in relation to the affected population. USCIS then shows the total costs over 10-years discounted at 3 percent and 7 percent (*see* RIA Section 2—Total Estimated Transfers and Costs of Regulatory Changes) as suggested by regulatory in guidance. *See* Circular A–4, (Sept. 17, 2003).[118] The preamble of this rule bases receipt and revenue projection data covering two years due to the biennial fee study. This study is repeated and analyzed every two years. However, USCIS does not choose to alter its fee schedule through regulation every two years. Therefore, the impacts in the RIA cover a longer timeline to estimate the perpetual impacts of this rule.

*Comment:* A commenter provided the following criticism of the methodologies and data used by USCIS in developing the RIA:

• USCIS estimates 1 hour and 10 minutes to complete Form I–912 when the actual OMB approved burden is 2 hours and 20 minutes.

• USCIS states that data on fee waiver requests were not available due to limitations, but the agency does not explain what their limitations are.

• USCIS used fee waiver data from lockbox facilities in October 2017 but does not report any data related to the surveys and provides no insight into why data for just one month is appropriate for cost projections.

*Response:* DHS agrees with the commenter that the time burden estimate utilized in the proposed rule was incorrect. For this final rule, USCIS has accounted for the new burden places on applicants as the current time burden for Form I–912 of 1 hour and 10 minutes to 2 hours and 20 minutes under this rule. The cost calculations for the final rule have been updated accordingly. DHS used data that was collected from a statistically valid random sample from October 2, 2017 to October 27, 2017 on approved fee waivers. Using a standard statistical formula based on the average annual fee waiver population, DHS determined that a random sample size of 384 applications was necessary to yield statistically significant results with a 95 percent confidence level and a 5 percent confidence interval. USCIS analyzed

---

[117] *See* RIA, Section M: Fee Waivers

[118] Available at: *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.* (Sept. 17, 2003) (last viewed April 2, 2020).

data on 4,431 approved fee waiver requests, which exceeded the necessary sample size of 384 for statistical significance. The study of statistics allows us to apply the results from this statistically valid random sample to the population of fee waivers resulting in the same results 95 percent of the time. This data from the survey is in Section (E) of the Regulatory Impact Analysis and Table 10 of the RIA displays the overall approvals, denials, and foregone revenue estimates of a 5-year average. Additionally, DHS has included the raw data of the survey questions and results in the appendix Office of Intake Production (OIDP) Fee Waiver Results from October 2, 2017 to October 27, 2017 stand-alone RIA found in the docket of this final rulemaking.

*Comment:* Similarly, another commenter provided the following critiques of the methodologies and data used by USCIS in developing the RIA:

• USCIS underestimates the need and subsequent costs that a number of applicants will have for legal representation in completing new form requirements as well as opportunity costs of time for HR specialists and attorneys used in the economic analysis.

• The economic analysis showed that services previously provided without user fees are a transfer from the Federal government to the applicant, however this is not accurate as tax revenues do not support the functions of USCIS.

*Response:* While DHS acknowledges that some attorneys charge higher fees than those used in the economic analysis, the agency continues the standard practice of using BLS average occupational earnings estimates. Similarly, it is acknowledged that some petitioners may incur additional legal fees. The economic analysis does not describe every immigrants' situation, rather, DHS presents our best estimates of the impact of the rule. In addition, form fees that required no change in time burden, documentation, or biographical information will be a transfer from current fee-paying applicants and/or petitioners to those filing for a particular immigration benefit using a form with a revised form fee. The RIA calculates the new costs and/or cost savings to applicants/ petitioners, from the impact of each policy decision. In this final rule, each policy justification is included in the RIA summary table, with the estimated benefits of the provision. Cost savings and benefits are displayed for both the applicant(s)/petitioner(s) and the DHS. Once the new fees are established, DHS calculates the opportunity costs of the time burden required for completing the applicable impacted forms. If the only

change in the rule to a specific benefit request is to increase the fee, the RIA does not specifically calculate the total amount of new fees per year that will be paid for all filings of that particular benefit because those amounts and the new fee times projected volume are already included in the tables and text describing the fee calculation model. Finally, DHS does not include the costs for applicants to hire legal representation in completing forms because DHS does not require that applicants hire anyone to assist them in preparing USCIS benefit requests.

*Comment:* A commenter wrote that USCIS excludes savings and benefits already realized such as efficiencies gained through investments in IT, closure of international offices, and lower refugee intake. A commenter wrote that the RIA fails to present data and evidence on a number of recent changes designed to reduce costs including limiting the availability of printed study materials, no longer providing printed N–400 forms, centralizing all customer inquiries and complaints on a call center, and introducing electronic filing for many benefits.

*Response:* DHS acknowledges that there are these costs savings. The RIA calculates cost savings and efficiencies to applicants/petitioners that are built into the ABC model. Despite the money saved it still leads USCIS to these fee changes. In this final rule, each policy justification is included in the RIA summary table, with the estimated benefits of the provision. Cost savings and benefits are displayed for both the applicant(s)/petitioner(s) and the DHS. Once the new fees are established, DHS calculates the opportunity costs of the time burden required for completing the applicable impacted forms. If the only change in the rule to a specific benefit request is to increase the fee, the RIA does not specifically calculate the total amount of new fees per year that will be paid for all filings of that particular benefit because those amounts and the new fee times projected volume are already included in the tables and text describing the fee calculation model.

### 3. Other Comments on the Cost-Benefit Analysis

*Comment:* A commenter wrote that the proposed rule does not consider less costly alternatives to raising fees such as reducing operating costs, drawing on carryover funds, or seeking discretionary appropriations from Congress. The commenter also suggested that USCIS should analyze the impacts of slowly increasing the proposed fees on a year by year basis

until reaching the desired level in order to avoid disruption. Another commenter also said USCIS fails to consider less burdensome alternatives.

*Response:* As mentioned in response to a previous comment, for FY 2019 and FY 2020, Congress appropriated $10 million for the Citizenship and Integration Grant Program. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2020). Other than that, USCIS receives no appropriations to offset the cost of adjudicating immigration benefit requests.[119] As a consequence of this funding structure, taxpayers do not bear any costs related to the IEFA and bear only a nominal burden to fund USCIS. However, in the event appropriations that would materially change IEFA fees are provided, then DHS could pursue a rulemaking to adjust fees appropriately.

DHS considered alternatives such as using existing carryover funds instead of adjusting fees. However, DHS determined that USCIS has insufficient carryover funds to obviate the need to adjust fees. As stated in the Supporting Documentation accompanying this rule, USCIS projected that, if DHS did not adjust fees, USCIS would exhaust all of its existing carryover funds during the FY 2019/2020 biennium, reaching a carryover balance of –$1.069 billion at the end of FY 2020. USCIS cannot have a negative carryover balance, as a negative carryover balance indicates that USCIS has incurred costs greater than its available financial resources. USCIS must maintain a positive carryover balance to ensure that USCIS is able meet its financial obligations at times when USCIS operating costs temporarily exceed its revenues.

DHS does not believe that gradually adjusting the USCIS fee schedule over multiple years represents a reasonable alternative to this final rule, as such an approach would ensure that USCIS does not recover full cost and is not able to fully fund its operational requirements while the new fees are phased-in. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that the cost analysis provided in the NPRM was "incomplete and arbitrary" and rejected the NPRM's "allegation" that the agency's operations are conducted efficiently. The commenter cited Congressional testimony and an article from the American Immigration Lawyers Association that discussed

---

[119] Congress provides USCIS with appropriations for the E-Verify program.

USCIS' decreased cost-effectiveness and changes to operational procedures that have increased costs without tangible improvements to adjudication quality.

*Response:* USCIS analyzed the impacts of this rule using the best available data at the time the analysis was written in an objective manner. USCIS's goal in the analysis was to produce an objective assessment of the cost, benefits, and transfers associated with this rule as required by Executive Orders 12866 and 13563. DHS believes these operational changes are necessary to ensure that applicants seeking immigration benefits are properly vetted and eligible for the benefit for which they have applied.

### 4. Impacts on Lower-Income Individuals and Families

*Comment:* One commenter cited research from the Kaiser Family Foundation, the Urban Institute and the Foundation for Child Development, demonstrating that even though U.S. citizen children with an immigrant parent are more likely to live in families with a full-time worker, such families still experience economic hardships that carry adverse health and developmental outcomes for children. The commenter cited research from various other sources documenting the impact of economic hardships and stated that the proposal would exacerbate such hardships. The commenter wrote that changes to the fee waiver program would discourage low-income families from applying for needed benefits and may lead to family separation, an outcome that would carry profound negative impacts on child health and well-being. The commenter also said that "decades of research" demonstrates that family stability supports early childhood health and development and wrote that the fee increases making naturalization less accessible for low-income immigrants would yield poor health outcomes among children. A commenter addressed the proposed rule's potential impact on health care, including forgone medical care, increased detrimental health conditions, and increased costs to the health care system. The commenter suggested there would be cost increases for State Medicaid programs and urged USCIS to fully analyze and explain such costs.

*Response:* DHS recognizes that the fee increases may create an economic hardship for some families. Furthermore, DHS acknowledges the studies and data cited suggesting that many families struggle to afford healthcare and connecting such financial risks to adverse health and developmental outcomes in children.

However, collectively these studies suggest that the incomes of some immigrant families may result in adverse outcomes, rather than that present USCIS fees have caused such outcomes. The comments do not indicate that net costs of the final rule would be improved by shifting the costs of certain benefit requests to other requestors.

### 5. Impacts on Immigrant Populations in Distinct Geographic Areas

*Comments:*

• Citing economic conditions in the State of California, including information about earnings, the State's high poverty rate, and the increasing costs of housing, commenters underscore their opposition to all aspects of the proposed rule that would act as a barrier between low-income immigrants and benefits for which they qualify.

• One million individuals would be adversely impacted by the proposed rule in Los Angeles County. There are 1.5 million immigrants in Los Angeles and the proposed rule would impede their ability to apply for, or renew, immigration benefits allowing them to work, attend school, and access critical community services.

• The immigrant community would have to choose between using their income to provide for their families or applying for immigration benefits for which they qualify.

• The proposal would make it nearly impossible for more than 50,000 low-income non-citizens in San Francisco to seek or renew immigration benefits.

• Individuals in full-time, minimum wage jobs would need to dedicate a full month's salary towards green card applications and many immigrants earn even less and may not be able to afford immigration benefits at all.

• Alameda county is the fourth most diverse county in the nation with more than half a million immigrants, and that 90,000 adults eligible for naturalization in the county would be faced with insurmountable barriers in securing their status, keeping communities together, and participating fully in civic life. The proposal would exacerbate existing socio-economic and health disparities in San Joaquin Valley in California which suffers from socio-economic and health disparities, including the fact that over half of the area's residents are enrolled in Medicaid and nearly 20 percent use SNAP benefits and more than 40 percent of children are living with at least one foreign-born parent.

• The American Immigration Council found 357,652 Minnesota residents (or

6.6 percent of the State's total population) were U.S.-born Americans with at least one immigrant parent, and that "nearly half" of all the immigrants in Minnesota were naturalized citizens. The rule would have a disproportionately negative impact on low-income and vulnerable immigrants and would limit access to essential immigration benefits to the wealthy.

*Response:* This rule in no way is intended to reduce, limit, or preclude any specific immigration benefit request from any population, industry, or group. DHS acknowledges that individuals earning the federal minimum wage may need to use an entire paycheck to pay the filing fee for Form I–485. While studies indicate that some lawful immigrants who have not naturalized cite administrative and financial barriers as a reason for not naturalizing, this alone does not establish that previous fee levels were prohibitive. Similarly, financial support provided by communities to local immigrants does not establish that these immigrants would be unable to afford fees set by this rule. None of the studies cited by commenters conclude that the rule would explicitly preclude access to any specific immigration benefit request, population, industry, or group. USCIS must fund its operations from fees regardless of state and regional economic conditions, the costs of housing, household earnings, and poverty. This final rule provides for some fee waivers and does not preclude individuals from receiving public benefits or pursuing higher-paying opportunities for work in more affordable communities.

### 6. Immigrants' Access to Legal and Supportive Services

*Comment:* One commenter wrote that workshops run by non-profit immigration legal service providers are "the most efficient model" to help vulnerable populations seek immigration relief and wrote that the proposed changes to the fee waiver forms would make it harder for these providers to complete applications in the workshop setting. The commenter also said the proposed rule would "decrease the resources practitioners can dedicate to actual legal representation" due to the increased burden associated with generating Forms I–912 that are already denied at a high rate, and without cause, by USCIS. One commenter said their organization, and other organizations like Kids in Need of Defense, provide social services and legal assistance to unaccompanied children, and wrote that if organizations that provide such

AR2022_200489

services pro bono "must find ways to subsidize unreasonable fees," they may have to reduce the number of children they serve. Another commenter that provides services to survivors of gender-based violence said if their organization must divert resources towards fundraising for application fees it may be unable to serve the same volume of clients.

*Response:* DHS recognizes the challenges that gender-based violence survivors face when fleeing from the violence of their abusers. In addition, there continues to be no fees for Form I–914 or I–918 for applications for T or U non-immigrant status. DHS believes that these fee exemptions and waivers mitigate concerns that other provisions of this final rule may harm victims of abuse and domestic violence. The RIA calculates the new costs and/or cost savings to applicants/petitioners from the impact of each policy decision. In this final rule, each policy justification is included in the RIA summary table, with the estimated benefits of the provision. Cost savings and benefits are displayed for both the applicant(s)/petitioner(s) and the DHS.

DHS does not include the costs for applicants to hire legal representation in completing forms because DHS does not require that applicants hire anyone to assist them in preparing USCIS benefit requests. Similarly, DHS recognizes comments concerning individuals and community organizations that choose to donate valuable assistance to applicants, but DHS finds no evidence that the rule prevents organizations from choosing to continue providing a level of assistance. DHS declines to make changes in this final rule in response to these comments.

## 7. Impacts on Students From Low Income Families

*Comment:* One commenter stated the proposed rule would have "far-reaching effects" on employers, international students, H–1B nonimmigrants, L–1 nonimmigrants, EB–5 investors, DACA recipients, asylum seekers, and those seeking naturalization, and provided a "visual representation" of the proposed fee schedule increases that shows the average increase will be "far greater" than the 21 percent average increase cited in the proposal.

*Response:* The commenter does not provide details or explanations of the far-reaching impacts that it estimates will result from an increase in USCIS immigration benefit request fees that DHS can address in this final rule short of abandoning the rule altogether. When DHS increased USCIS fees in 2007, 2010, and 2016 there were no far

reaching impacts on the classifications and applicants that the comment mentions, aside from, as discussed elsewhere in this final rule, a large increase in the number of fee waivers granted to naturalization applicants since 2010. DHS is increasing the fees that USCIS charges for immigration adjudication and naturalization services to recover the costs of running its programs. DHS can readjust the fees in its next fee rulemaking that follows its next biennial fee review if necessary. Still, in this final rule, DHS is addressing the issues that the commenter touches on by expanding fee waivers and exemptions from what was proposed, not charging a DACA renewal fee, and not transferring any fee revenue to ICE.

*Comment:* One commenter cited research from the Community College Research Center at Columbia University demonstrating that more than a third of community college students come from families with incomes less than $20,000 per year, and research from the Migration Policy Institute showing immigrants and their children make up nearly a third of community colleges' student population. The commenter said immigrant-origin students at community colleges face unique challenges, and cited research demonstrating that such students are more likely to apply for financial aid, are typically "debt inverse," and cover most of their own educational expenses. The commenter said the proposed fee increases and elimination of fee waivers will prove "punishing" for hard-working, low-income immigrant students by denying them opportunities to adjust their status, pursue citizenship, and apply for DACA renewal.

A commenter said more than 600 Latina girls participate in one of its programs with a 99 percent high school graduation rate and wrote that the prohibitive costs for immigration benefits would hinder this success since many of these participants work full time while attending school. Another commenter said the proposal would generate additional cost burdens for economically disadvantaged students and their families, placing "the dream of completing a degree" out of reach for many students. The commenter also wrote that 46 percent of the Latino population aged 18 and over in its area were born outside the United States, while only 4 percent of Latinos under age 18 were born outside the United States. The commenter stated this statistic meant that the proposal would have a strong negative effect on

immigrant families already struggling to support their college-age children.

*Response:* DHS acknowledges the studies and statistics presented by commenters demonstrating that paying for college is a significant challenge for many students, more so for students of lower income. These studies also show that community college and student loans are among the existing market-oriented solutions available to mitigate the cost burden of pursuing higher education. DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with the intent to deter requests from low-income immigrants seeking to reunite with family or based on race, financial, or family situation.

## 8. Impacts on Victimized Groups and Other Vulnerable Populations

*Comment:* A commenter suggested that the costs associated with the proposed rule vastly outweighed any benefits of the proposed rule and said DHS had not attempted to quantify the cost associated with being unable to receive protections under a winning asylum claim. The commenter said the proposal did not offer any evidence that a $50 fee for asylum applications would deter "frivolous filings" and wrote that DHS' goal in promulgating the proposal was simply to reduce the number of people filing asylum claims. The commenter also said the introduction of a $490 fee for employment authorization would negatively impact asylum seekers and the "overstretched" organizations that assist asylum seekers.

*Response:* DHS does not believe that establishing an asylum application fee of $50 unduly burdens or harms any applicants. DHS carefully assessed the costs associated with the adjudication of asylum applications and other types of immigration benefits and concluded that the $50 fee for asylum applications is warranted. The approximate cost of adjudicating an asylum application is $366, and the $50 fee is well below the full cost of adjudicating the application. Moreover, the asylum application fee is in line with international treaty obligations under the 1951 Refugee Convention, as incorporated by reference in the 1967 Refugee Protocol, and domestic law.

DHS recognizes the economic challenges faced by asylum seekers. However, DHS does not believe that charging asylum seekers for a work authorization application will prevent them from obtaining legal counsel. DHS does not believe that the EAD fee is unduly burdensome for asylum seekers.

*Comment:* Many commenters wrote that immigrants are particularly vulnerable to violence or abuse, and cited research from the *Journal of Interpersonal Violence* demonstrating that immigrant women are more likely than U.S. born women to suffer violence or death from intimate partners. The commenters wrote that this problem was especially acute among Asian and Pacific Islander populations, citing research from the *Asian Pacific Institute on Gender-Based Violence.* The commenters wrote that the proposed fee schedule increases would reinforce abusers' ability to use immigration status and financial circumstances as tools to abuse victims, citing research from various sources documenting the tactics used and the frequency of such abuse. The commenters said it was "crucial" for immigrant survivors of abuse to access immigration relief in order to ensure they can "seek and find safety." One commenter said the proposal would make it harder for victims of abuse to apply for immigration relief independently of their abusers and said the proposed elimination of fee waivers was "frustrating the intent of Congress" to enable victims to escape "unhealthy power dynamics." A commenter wrote that the proposal to limit the availability of fee waivers and increase fees would negatively impact survivors of domestic violence because the changes would deprive this vulnerable population of the opportunity to pursue immigration protections that Congress specifically provided for them.

*Response:* In this final rule, VAWA self-petitions, applications for T nonimmigrant status application, petitions for U nonimmigrant status and applications for VAWA cancellation or suspension of deportation are fee exempt, and fee waivers will remain available for all ancillary forms associated with these categories. DHS believes that these fee exemptions and waivers mitigate concerns that other provisions of this final rule may harm victims of abuse and domestic violence. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter wrote that the proposal would disproportionally impact women, children, and older adults because these populations often depend on means-tested public benefits or familial support due to their inability to find work. Another commenter cited research from various sources documenting the numbers of U.S. born children living with an undocumented family member and the fact that many of these children are born to DACA-

eligible parents. The commenter described the consequences of children living with an undocumented parent, including the fear of being separated from their families and higher rates of post-traumatic stress disorder or similar mental health problems. The commenter cited research from several sources demonstrating how U.S. born children of undocumented parents stand to benefit when their parents achieve legal status. The commenter said the proposal would make it harder for undocumented parents to achieve adjustment of status and wrote that their children and families would be harmed by the family's reduction of disposable income due to the fee increases.

*Response:* DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their race, financial, or family situation. While one commenter shared survey results indicating many undocumented immigrants are eligible to adjust their status, this alone does not suggest this rule would preclude them from doing so. DHS recognizes such individuals will consider many factors, including future earnings and costs, before deciding if, how and when to adjust their status. DHS appreciates and acknowledges all of the positive contributions of immigrants to the United States.

*Comment:* Some commenters cited data from a variety of sources to underscore their comment that the proposal would create barriers that disproportionately harm low-income immigrant women. The research cited by the commenters demonstrated that immigrant women are at a higher risk of economic insecurity due to pay disparities and other forms of discrimination, that domestic violence carries severe economic consequences including jeopardizing women's job prospects, that immigrant women are vulnerable to abuse from employers, and that women take on a disproportionate share of caregiving responsibilities. The commenters said these factors would make it more difficult for immigrant women to account for the "onerous cost increases" in the proposed rule and would be deprived of access to immigration benefits at a higher rate than males. Another commenter cited research from the National Women's Law Center demonstrating that Latinas make $0.54 cents for every dollar earned by a white, non-Hispanic male, and have less

resources to spend on necessities despite the fact that Latinas are "breadwinners" in more than 3 million households. The commenter wrote that the proposed fee increases and elimination of fee waivers would make it less likely that Latinas could become U.S. citizens.

*Response:* DHS acknowledges the comments about Latina women, but DHS is not adjusting its fees with a planned effect on any particular group or class of individuals. This rule adjusts USCIS' fee schedule to recover its cost. With limited exceptions as noted in the NPRM and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This is consistent with DHS's legal authorities. *See* INA section 286(m), 8 U.S.C. 1356(m).

As stated previously, the USCIS fee changes in 2007, 2010 and 2016 had no effect on the number of benefit requests received.[120] The commenters simply assert that the fees are too high for certain potential benefit request filers without providing data to support their assertions. DHS has no way to effectively determine how these new fees will affect anyone, but DHS believes that benefit request filings will not decrease substantially.

*Comment:* Some commenters wrote that survivors of violence may pursue immigration benefits through non-humanitarian channels and would no longer have access to fee waivers under the proposed rule. The commenters said the elimination of fee waivers, coupled with the increased fees for naturalization, would force LPR survivors to choose between providing basic necessities for their families and pursuing citizenship.[121] A commenter said the heightened standards for fee waiver eligibility, combined with increased fees for naturalization or adjustment of status, would cause irreparable harm to survivors of gender-based violence. The commenter said that access to immigration relief and regularization of immigration status increases employment opportunities and decreases vulnerability to continued abuse for survivors, and that survivors should not have to choose between pursuing citizenship and

---

[120] *See* RIA, Section M: Fee Waivers.

[121] National Women's Law Center; California Partnership to End Domestic Violence; Illinois Coalition Against Domestic Violence; National Partnership for New Americans; Texas RioGrande Legal Aid, Inc.

acquiring food and shelter for their families.

*Response:* DHS recognizes the challenges that gender-based violence survivors face when fleeing from the violence of their abusers. Victims of abuse that file a VAWA self-petition, an application T nonimmigrant status or petition for U nonimmigrant status, or an application for VAWA cancellation or suspension of deportation are fee exempt, and fee waivers remain available for filing all ancillary forms associated with these categories. DHS proposed adjustments to USCIS' fee schedule to ensure full cost recovery. DHS did not target any particular group or class of individuals. With limited exceptions as noted in the NPRM and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services.

*Comment:* Another commenter wrote that removing the financial hardship grounds for fee waivers "overlooks" the financial challenges survivors of violence face, including ruined credit scores, high levels of debt, relocation costs, medical bills from injuries, and attorney and court costs. The commenter also said the heightened documentation requirements, including the time-consuming process of obtaining IRS documents, would negatively impact survivors because they often need to move quickly to meet deadlines and avoid delays in filing that would harm the merits of their applications in adjudication. The commenter wrote that the proposed rule falls short of the "any credible evidence" standard Congress mandated for humanitarian-based benefit requests by "impermissibly requiring specific types of evidence," such as IRS documentation.

*Response:* To obtain a fee waiver, an applicant must demonstrate that he or she is at or below 125 percent of the FPG, and submit the form along with the information and evidence available in order to establish eligibility. The applicant need only provide sufficient information to establish why the documentation is not available and not that it is unavailable directly or indirectly as a result of the victimization. The form provides space for explanations and attachments are accepted, but a separate declaration is unnecessary. Although not required by statute, USCIS has provided flexibilities in the instructions for the VAWA, T, and U populations, permitting them to submit information regarding their inability to obtain documentation on their income with their fee waiver request. DHS will presume that the inability of this group of applicants to

submit certain evidence is the result of the victimization and abuse and not require proof of a nexus between victimization and the inability to pay, but the request must demonstrate inability to pay to the extent necessary for USCIS to grant a discretionary fee waiver. All applicants for a fee waiver are subject to the evidence requirements as provided in the revised form instructions, which include more flexible rules with respect to the groups these comments mention. If individuals are unable to obtain documents without risking further abuse, they can explain why they are unable to obtain such documentation and submit their other evidence to demonstrate their eligibility. Obtaining information from the IRS in transcripts, a W–2, or proof of non-filing, if applicable, is sufficient documentation to establish the necessary income or no income.

*Comment:* Several comments were submitted about LGBTQ asylum seekers and transgender applicants. These comments are summarized as follows:

• LGBTQ people suffer significant economic hardships, have past medical conditions and traumas, language barriers that make it more difficult to find housing and employment, difficulty finding legal services, and other challenges.

• The proposal would disproportionately impact transgender people because they are more likely to be indigent and are frequently seeking asylum as they seek to escape "extraordinary levels of violence and persecution."

• Violence and persecution towards transgender people was well-documented in reports and analyses from the U.S. Department of State and various other sources.

• LGBTQ asylum seekers face dangers in their countries of origin which do not protect them from violence and oppression.

• According to the United Nations High Commissioner for Refugees, 88 percent of LGBTQ asylum seekers and refugees fleeing persecution from the Northern Triangle have faced sexual or gender-based violence in their home country.

• LGBTQ and HIV-positive individuals sometimes seek asylum in the United States as a result of persecution by their own families and communities and often cannot rely on family or community networks in the United States for financial support and therefore require the United States to intervene.

• A commenter that serves the LGBT community, survivors of misogyny, homophobia, transphobia, family

rejection, and gang violence said the proposed fee increases would be especially burdensome for the populations it serves and increase filing fees for its clients by $22,700 annually.

• The proposal would further victimize and isolate LGBTQ refugees seeking asylum and many older LGBTQ people who have lived in the U.S. for many years.

• LGBTQ, women, and minors would be "hardest hit" by the proposed fee increases given the pervasive nature of gender inequity and prejudice against LGBTQ populations.

*Response:* DHS acknowledges that asylum applicants face challenges. DHS is not adjusting the USCIS fee schedule to reduce, limit, or preclude any individuals or groups of individuals from requesting asylum or seeking any other type of immigration benefit and does not intend to discourage meritorious asylum claims or unduly burden any applicant or group of applicants. More broadly, DHS is adjusting the USCIS fee schedule to recover the full cost of providing immigration adjudication and naturalization services (with some exceptions, as stated earlier). However, in recognition of the circumstances particular to asylum applicants, DHS is not aligning the fee with the beneficiary-pays principle and does not intend to recover the full cost of adjudicating Form I–589 asylum applications. Instead, DHS is establishing a $50 fee for Form I–589 even though the estimated adjudication costs exceed $50. DHS has determined that the only exception to the fee should apply to unaccompanied alien children in removal proceedings who file Form I–589 with USCIS. DHS does not believe that it is reasonable or appropriate to make additional exceptions to the fee, particularly on the basis of factors tied to underlying asylum claims.

DHS expects that charging a $50 fee to asylum applicants except for the narrow group of unaccompanied alien children will generate some revenue to offset adjudication costs. With respect to charging a fee to initial Form I–765 EAD applicants with pending asylum applications, DHS will be able to keep the fee for all fee-paying EAD applicants lower. Asylum applicants will pay no more and no less than any other EAD applicant (except for those who are eligible for a fee waiver) for the same service.

DHS is acting in compliance with sections 208(d)(3) of the INA, which provides that, "[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to

asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).'' DHS believes that charging asylum applicants for asylum applications and EADs does not impose an unreasonable burden on asylum seekers.

*Comment:* One commenter wrote that foreign national students represent the majority of science, technology, engineering and mathematics (STEM) graduates from master's degree and Ph.D. programs, and that these students help fill the demand for ''high-level technical talent,'' permit U.S. universities to sustain competitive STEM programs, and help cement America's role as a leader in technological innovation. The commenter discussed the demand for highly skilled technical workers and cited research showing that there were 3.3 million STEM job openings in 2016, but only 568,000 students graduating with STEM degrees. The commenter said that employers of all sizes, and across industries, faced challenges in securing high-skilled, available candidates, and that issues relating to ''employment immigration'' were of utmost importance to the technology industry. The commenter expressed their support for comprehensive immigration reform that meets employers' demands in a globally competitive and digital economy. Another commenter said the proposal would accelerate the loss of U.S. information technology jobs. The commenter said access to information technology workers on H–1B nonimmigrant workers was critical for the industry and wrote that the proposal would make U.S.-based information technology projects ''less economically viable.'' The commenter said proposed fee increases would make it more difficult to create and retain information technology jobs in the U.S.

*Response:* DHS recognizes that immigrants and international students make significant contributions to the U.S. technology industry. The commenter's suggestion that high demand by globally competitive firms for high-skilled occupations would be affected by the fee changes is not clearly explained or supported with evidence.

## 9. Impacts to Industries That Use H–2A Workers

*Comment:* A commenter provided statistics detailing the economic condition of farmworkers in the U.S. and said many of its farmworker clients struggle to meet their families' financial needs despite working long hours. The commenter cited figures from the Department of Labor (DOL) showing that farmworkers' average household income ranged from $20,000 to $24,999 per year, and that 33 percent of farmworkers have family incomes below 100 percent of FPG. The commenter said farmworkers' wages are low ''through no fault of their own'' and wrote that farm work is seasonal by nature, a fact that causes periods of unemployment and fluctuating incomes throughout the year. The commenter drew upon its experience serving farmworker clients in remarking that low-wage farm work should not indicate an immigrant's inability to be self-sufficient. The commenter also said a majority of its clients use fee waivers or other forms of financial assistance to pay for applications and wrote that the combination of fee increases and the elimination of fee waivers would mean that its communities will be hard hit.

*Response:* The commenters do not offer evidence to support their claims that the new fees will result in the negative effects suggested. Seasonal farmworkers employed as H–2A workers are not required to pay any fees or expenses for recruitment, travel, or USCIS petitions, so it is assumed that the immigrant workers that the commenter is referencing immigrated to the U.S. as beneficiaries of a petition for a family member. In that case, the immigrant will be subject to an affidavit of support from a family member who must support them at an income above 125 percent of FPG. If the farmworker is a TPS registrant, then they may request a fee waiver.

DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with intent or effect of deterring requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation.

*Comment:* Some commenters opposed the proposed rule increasing burdens on employers participating in the H–2A program. One commenter wrote that farmworkers help sustain the $47 billion agriculture industry and that immigrants have supplied the industry with a needed workforce. One commenter stated its members need H–2A workers because there are no domestic workers willing to perform jobs its members need. The commenter wrote that the proposal would diminish employers' use of the H–2A program, an outcome that the commenter also wrote would lead to the elimination of jobs in certain sectors, slowed economic growth, and reduced national security due to a less secure food supply.

Another commenter said the proposal would make it cost prohibitive for small farms and ranchers to remain in production and suggested that the loss of agricultural production was a national security concern. One commenter suggested that the proposal, in conjunction with Policy Memo PM–602–0176, would increase ranchers costs by 274 percent (rather than 87 percent). The commenter wrote that since agricultural producers are price takers, they are unable to pass these extra costs onto consumers and would see their margins depleted. The commenter said it would support a flat application fee with an additional add-on for each beneficiary (such as $425 per application and $10 per beneficiary). Other commenters stated that the proposed increase would hurt agriculture businesses because they cannot pass down additional costs to consumers. One commenter stated low-wage H–2A agricultural workers would have their fees increased by four times the amount of H–1B workers, who are more likely to be able to afford the proposed increased, which highlights the ''deeply flawed'' perspective that those workers that serve as the backbone of our agricultural industry are less necessary to the U.S. economy. A commenter wrote these increased fees could lead to decreased participation in the H–2A program. A commenter indicated that the proposed increase of H–2A filing fees would burden the livestock industry, substantially and disproportionately harming small businesses.

*Response:* DHS understands the need for nonimmigrant workers to meet seasonal demands in agriculture in the United States and is sympathetic to the costs for agricultural employers involved in doing so. With that in mind, DHS notes, preliminarily, that the current fee for Form I–129 is $460, and DHS is imposing a fee for new Forms I–129H2A of $415 for petitions for unnamed workers—an actual reduction in the filing fee from the current $460. We note that the filing fee for named H–2A workers, however, will be increasing from $460 to $850 per petition, with a maximum of 25 named workers per each H–2A petition. The change in these filing fees, as provided in this final rule, is consistent with the recommendation of the DHS Office of the Inspector General (OIG) of March 6, 2017.[122] That report reviewed whether the fee structure associated with the filing of

---

[122] DHS OIG, *H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors* (Mar. 6, 2017), *available at www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

H–2 petitions is equitable and effective, and recommended separate fees for petitions with named workers, which, due to the need to verify eligibility of individually named workers, is more costly to USCIS than the costs associated with adjudicating petitions filed on behalf of unnamed workers.[123] Consistent with the OIG's recommendation, USCIS conducted a study to address the inequities identified in the OIG report, and, based on its study, USCIS determined that the filing fees in this final rule reflect the relative costs to USCIS in processing these two different types of H–2A petitions. USCIS also notes that limiting the number of beneficiaries in an H–2A petition with named workers to a maximum of 25 is intended not only to make the processing of such petitions more efficient, but to provide better data on the actual costs of adjudicating various nonimmigrant classifications, thereby permitting USCIS to refine its fee calculations in the future to better reflect relative costs.

10. Effects on Other Federal Agencies

Many commenters wrote about their predictions of the problems that the fee rule would cause other Federal agencies and their employee. Those commenters wrote that the new USCIS fees would result in the following:

• Would place an unnecessary burden on the IRS by requiring fee waiver applicants to provide IRS documentation to demonstrate their eligibility.

• Would require IRS verification and did not consider whether the IRS was prepared to handle a substantial increase in requests for documents.

• The increases to employment authorization application fees may place vulnerable workers in exploitative arrangements which would make DOL incur increased burden for enforcing federal workplace laws.

• Increased immigrants' fear of government officials would hamper DOL workplace investigations and enforcement.

• Would cause the IRS to lose income revenue from a reduction in asylum applications and would need to dedicate more resources to investigations of tax liability for unauthorized employment.

• DOL would need to investigate more incidences of wage theft and unsafe working conditions because many asylum seekers would be forced

into the unauthorized workforce due to their inability to afford work authorization fees.

*Response:* With regard to the documentation required from the IRS for fee waivers, all other Federal agencies, including the Department of the Treasury and Department of Labor, reviewed the NPRM through the interagency review process and provided no objections, thus DHS believes that the IRS and DOL can handle any additional workload arising from this rule.

## IV. Statutory and Regulatory Requirements

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

The fee schedule that went into effect on December 23, 2016 was expected to yield approximately $3.4 billion of average annual revenue during the FY 2019/2020 biennial period. This represents a $0.9 billion, or 36 percent, increase from the FY 2016/2017 fee rule projection of $2.5 billion. *See* 81 FR 26911. The projected revenue increase is due to higher fees as a result of the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted approximately 5.9 million total workload receipts and 4.9 million fee-paying receipts, excluding biometric services. *See* 81 FR 26923–4. However, the FY 2019/2020 fee review forecasts approximately 8.5 million total workload receipts and 7.0 million fee-paying receipts, excluding biometric services. This represents a 44 percent increase to workload and a 43 percent increase to fee-paying receipt assumptions.[124]

Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rulemaking has been designated an "economically significant

regulatory action" under section 3(f)(1) of E.O. 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB). E.O. 13771 directs agencies to reduce regulation and control regulatory costs. Because the estimated impacts range from costs to cost savings, this final rule is considered neither regulatory or deregulatory under E.O. 13771. Details on the estimated impacts of this final rule can be found in the rule's economic analysis, section 2.

This final rule adjusts certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). It also removes certain fee exemptions, changes fee waiver requirements,[125] alters premium processing time limits, and modifies intercountry adoption processing. This final rule removes the proposed fee that was introduced in the NPRM of this rule for Form I–821D;[126] it does not provide for the proposed transfer of any Immigration Examination Fee Account (IEFA) funds collected by USCIS to ICE;[127] it reassigns the proposed National Record Center (NRC) costs that do not directly apply to the genealogy program, thereby setting genealogy fees lower than proposed;[128] and it now allows for a $10 reduction in filing fee for applicants who file online for forms that are electronically available by USCIS rather than submit paper applications.[129]

USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. Therefore, DHS adjusts USCIS fees by a weighted average increase of 20 percent, adds new fees for certain immigration benefit requests, establishes multiple fees for nonimmigrant worker petitions, and limits the number of beneficiaries for certain forms. This final rule is intended to ensure that USCIS has the resources it needs to provide adequate service to applicants and petitioners. It also makes changes related to setting, collecting, and administering fees. DHS has kept certain fees, such as the fee for the Form

---

[123] DHS OIG, *H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors* (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

[124] *See* FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum, which is part of the docket for this final rule. DHS revised the volumes to exclude DACA and change fee-paying assumptions for Forms N–400, N–600, and N–600K, as discussed later in this preamble.

[125] Also, in this final rule DHS consolidates the Director's discretionary provision on fee waivers to remove redundancy. 84 FR 62363. New 8 CFR 106.3.

[126] 84 FR 62320, 62362; proposed and new 8 CFR 106.2(a)(2)(38).

[127] 84 FR 62287, 84 FR 67243. This final rule does not transfer funds to ICE. Therefore, DHS removes $207.6 million for ICE from its cost baseline, resulting in lower fees than if DHS pursued the transfer of funds.

[128] 84 FR 62315, 62316, 62362; proposed and new 8 CFR 106.2(c)(1)–(c)(2); new 8 CFR 106.2(c)(1)–(c)(2).

[129] New 8 CFR 106.2(d).

N–400, Application for Naturalization, below the level indicated by the fee setting model based on policy choices, or provided that certain fees may be waived, transferring the costs not covered by the lower or waived fee to other benefit requests. However, in this rule, DHS is focusing on the beneficiary pays principle and assigning fees to those who are going to directly reap the benefits of the applicable immigration benefit request. DHS's policy shift to the beneficiary-pays, as detailed in the preamble, recognizes that different immigration services provide varying levels of societal net benefits (whether economic or humanitarian), and previously DHS accounted for some aspects of the social benefit of specific services through holding fees below their cost.[130] However, DHS believes that the beneficiary-pays principle is generally more equitable and has largely

adopted it in this fee rule. Regardless, fee schedule adjustments are necessary to recover the full operating costs of administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits, while protecting Americans, securing the homeland, and honoring our values. This final rule also makes certain adjustments to fee waiver eligibility, filing requirements for nonimmigrant workers, the premium processing service, and other administrative requirements.

For the 10-year implementation period of the rule, DHS estimates the annualized costs of the rule to be $13,856,291, annualized at either 3- and 7-percent discount rates. DHS estimates the annualized cost savings to be $6,192,201 to $22,546,053. DHS estimates the annualized net societal

costs and savings of the rule to range from costs of $7,664,090 to savings of $8,689,762. Over the 10-year implementation period of the rule, DHS estimates annualized transfers to the government from applicants/petitioners to be $551,842,481 annualized at either 3- and 7-percent discount rates. Over 10-year implementation period of the rule, DHS estimates the annualized transfers of the rule between different groups of fee-paying applicants and/or petitioners to specific form populations is $832,239,426, annualized at either 3- and 7-percent discount rates.

The final revenue increase is based on USCIS costs and volume projections available at the time of the USCIS fee review. Table 7 provides a detailed summary of the provisions of this final rule and their impacts.

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE SUMMARY

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (a) Reduced Fees for Filing Online.<br>• Form I–90, Application to Replace Permanent Resident Card<br>• Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)<br>• Form N–400, Application for Naturalization<br>• Form N–565, Application for Replacement Naturalization/Citizenship Document<br>• Form I–130/130A, Petition for Alien Relative<br>• Form N–600, Application for Certificate of Citizenship<br>• Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322<br>• Form I–539/539A, Application To Extend/Change Nonimmigrant Status<br>• Form G–1041, Genealogy Index Search Request<br>• Form G–1041A, Genealogy Records Request | USCIS does not require that immigration benefit requests be filed online. Voluntarily, filing on paper remains a valid option. However, for forms currently eligible for online filing, the fee will be $10 more if filed on paper. | Quantitative:<br>Applicants—<br>• A transfer of $6.1 million annually from applicants/petitioners who will pay $10 more for those same filings on paper to fee-paying applicants/petitioners filing eligible forms online for a particular immigration benefit or request as a result of the final applicable USCIS filing fees.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• None.<br>Qualitative:<br>Applicants—<br>• Facilitates electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases.<br>• Results in more accurately prepared and supported requests accompanied by necessary evidence and documentation. Reduces the need for USCIS to request additional data, clarifying information, or documents.<br>• Reduce the collection of unnecessary or duplicative information as the system guides requestors to provide responses that comply with requirements and instructions that are pertinent to their benefit requests<br>DHS/USCIS—<br>• USCIS will save in reduced intake and storage costs at the USCIS Lockbox or other intake facilities. Based on current USCIS internal lockbox analysis at this time, each submission completed online rather than through paper provides a cost savings of $7 per submission and operational efficiencies to both USCIS and filers—benefits that will accrue throughout the immigration lifecycle of the individual and with the broader use of online filing and e-processing.<br>• USCIS also realizes cost savings from no longer having to send paper-based notices, requests, and other communications to requestors via mail.<br>• Decrease the risk of mishandled, misplaced, or damaged files; increase availability of administrative records; and decrease occasionally lost paper files; electronic records would not be physically moved around to different adjudication offices. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities. |

---

[130] Government Accountability Office (GAO), *Federal User Fees: A Design Guide* (May 29, 2008), available at *https://www.gao.gov/products/GAO-08-386SP.* (last accessed Feb. 24, 2020).

**AR2022_200495**

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE SUMMARY—Continued

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (b) Secure Mail Initiative. | USCIS will use the Signature Confirmation Restricted Delivery as a method of delivery of secure documents for USCIS. | Quantitative:<br>Applicants—<br>• None.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• DHS will experience a cost of $34.5 million from the United States Postal Service (USPS) for total mail cost, which includes Signature Confirmation Restricted Delivery confirmation to re-send secure documents to the proper recipient. When they fail to make it to their proper recipient. | Quantitative:<br>Applicants—<br>• Applicants with unstable addresses or who move often will be more certain to receive their documents.<br>Qualitative:<br>Applicants—<br>• USCIS and applicants can track their document using the USPS website up to when the document is delivered.<br>• Recipients will also have the ability to change their delivery location by going to the USPS website and selecting "hold for pickup" to arrange for pickup at a post office at a date and time that suits them.<br>DHS/USCIS—<br>• Ensure secure and important identity documents issued by USCIS are delivered to the address of person to whom they rightfully belong.<br>• Will reduce the likelihood of mis-delivered documents that could be mis-used. |
| (c) Clarify Dishonored Check Re-presentment Requirement and Fee Payment Method, and Non-refundability. | DHS is changing this provision in this rule that if a check or other financial instrument used to pay a fee is returned as unpayable *because of insufficient funds*, USCIS will re-submit the payment to the remitter institution one time.<br>If the remitter institution returns the instrument used to pay a fee as unpayable a second time, USCIS will reject the filing. USCIS will not re-deposit financial instruments returned as unpayable for a reason other than insufficient funds.<br>In addition, DHS may reject a request that is accompanied by a check that is dated more than 365 days before the receipt date.<br>DHS is also clarifying that fees are non-refundable regardless of the result of the immigration benefit request or how much time the request requires to be adjudicated. | Quantitative:<br>Applicants—<br>• None.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• None.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• By clarifying the dishonored fee check re-presentment processes, USCIS will reduce administrative burdens and processing errors associated with fee payments.<br>• In the event that the bank that issues the credit card rescinds the payment of a fee to USCIS, USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fee in accordance with 31 CFR 901–904 (Federal Claims Collection Standards). Clarifying that fees are due regardless of the result or how long the decision takes, and there are no refunds, is expected to result in USCIS losing fewer credit card disputes. |
| (d) Eliminate $30 Returned Check Fee. | DHS is removing the $30 charge for dishonored payments. | Quantitative:<br>Applicants—<br>• None.<br>Qualitative:<br>Applicants—<br>• There may be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | Quantitative:<br>Applicants—<br>• $0.17 million annual savings.<br>Qualitative:<br>Applicants—<br>• The current $30 charge and the potential of having a benefit request rejected encourages applicants to provide the correct filing fees when submitting an application or petition.<br>• Applicants who submit bad checks will no longer have to pay a fee.<br>DHS/USCIS—<br>• DHS will not have to seek payment of the $30 fee if payment is dishonored resulting in a savings to USCIS as it spends more to collect the $30 returned payment charges than the $30 itself. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. This expense would no longer be necessary with this change.<br>• DHS assumes that the current $30 charge and the potential of having a benefit request rejected encourages applicants to provide the correct filing fees when submitting an application or petition. |
| (e) Removal of Fee waivers. | DHS is limiting fee waivers to statutorily-mandated fee waivers and two other humanitarian programs and to those applicants who have an annual household income of less than 125% of the Federal Poverty Guidelines (FPG). Additionally, fee waiver applicants cannot have been admitted into the United States subject to an affidavit of support under INA section 213A, 8 U.S.C 1183a or be subject to the public charge inadmissibility ground under INA section 212(a)(4), 8 U.S.C. 1182 (a)(4). | Quantitative:<br>Applicants—<br>• A transfer of $368.3 million annually to those applicants who previously received a fee waiver from different groups of fee-paying applicants. These transfers derive from applicable USCIS filing fees.<br>DHS/USCIS—<br>• None.<br>Qualitative:<br>Applicants—<br>• Limiting fee waivers may adversely affect some applicants' ability to apply for immigration benefits.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• Current fee-paying applicants are no longer burdened with covering the costs for those applicants who currently receive fee waivers.<br>DHS/USCIS—<br>• None.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• This provision may reduce administrative costs to USCIS of adjudicating fee waiver requests. It may also reduce the amount of training or guidance necessary to adjudicate unique fee waiver requests. |

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE SUMMARY—Continued

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (f) Fee Exemptions. | DHS is removing the fee exemptions for an initial request for an employment authorization document (EAD) for the following classifications:<br><br>• Citizen of Micronesia, Marshall Islands, or Palau;<br>• Granted Withholding of Deportation;<br>• Temporary Protected Status (TPS) if filing an initial TPS application for individuals under 14 years of age or over 65 years of age.<br>• Applicant for Asylum and Withholding of Deportation or Removal. | Quantitative:<br>Applicants—<br>• A transfer of $3.9 million annually in filing fees to the categories listed in the provision that are no longer exempted from different groups of fee-paying applicants of Form I–765.<br><br>Qualitative:<br>Applicants—<br>• This could result in lost wages for the workers who may not be able to afford the costs of filing Form I–765 and lost productivity for the employers that hire these workers. The lost wages and productivity can be considered as costs of the forgone benefits.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• None.<br><br>Qualitative:<br>Applicants—<br>• The removal of fee exemptions for these populations may reduce further increases of other fees to the fee-paying population.<br>DHS/USCIS—<br>• Continuing to provide these fee exemptions would result in the costs of those services being transferred to the fees for other forms.<br>• Removing the exemptions allows DHS to recover the costs of adjudication of Form I–765 for these categories from those who benefit from the service instead of other fee payers. |
| (g) Changes to Biometric Services Fee. | DHS is incorporating the biometric services cost into the underlying immigration benefit request fee instead of charging a flat $85 biometric services fee.<br><br>DHS will require a $30 biometric services fee for an applicant for asylum or an alien approved for parole who applies for employment authorization (c)(8)'s, TPS initial applications and re-registrations, EOIR applicants, and term CNMI resident program applicants. | Quantitative:<br>Applicants—<br>• $12.4 million costs for asylum applicants paying the biometrics service fee and for those completing and submitting new Form I–600A/600 Supplement 3.<br><br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• $15.0 million in transfers from the government to fee paying applicants/petitioners for, EOIR, TPS, and term CNMI resident applicants resulting from a $55 reduction in biometrics service fees per applicant.<br><br>Qualitative:<br>Applicants—<br>• Simplifies the process to submit payments.<br>• May result in fewer incorrect payments and therefore, fewer rejected applications.<br>• Biometric costs incorporated into the fee will actually correspond to the services provided.<br>DHS/USCIS—<br>• Eliminating the separate payment of the biometric services fee will decrease the administrative burden required to process both a filing fee and biometric services fee for a single benefit request.<br>• USCIS can assign a biometric cost to the form fee that is based on the appropriate contract instead of a standard cost. |
| (h) Discontinue bundling of interim benefits when Forms I–765 and I–131 are filed concurrently with pending Form I–485 or when a Form I–485 is pending. | DHS is requiring separate fees for Forms I–765 and/or I–131 when filed concurrently with Form I–485 or when a Form I–485 is pending. | Quantitative:<br>Applicants—<br>• A transfer of $597.3 million from those applicants who file for Forms I–765 and/or I–131 concurrently filed with Form I–485 or while it is pending to different groups of fee-paying applicants.<br><br>Qualitative:<br>Applicants—<br>• None. | Quantitative:<br>Applicants—<br>• Not estimated.<br><br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• The provision will isolate stand-alone interim benefit applicants from those concurrently filing Form I–485 allowing USCIS to more accurately assess fee-paying percentages, fee-paying volumes, and fees for all three benefit types.<br>• Easier to administer separate fees than to determine if the Forms I–131 and/or I–765 is supposed to be free or require a fee.<br>• Form I–485 applicants will be treated the same as other applicants for employment authorization and advance parole. Requests for interim benefits associated with a pending Form I–485 will be adjudicated the same as all other requests for interim benefits. |
| (i) Form I–485 Fee for Children Under 14, Filing with Parent. | DHS is requiring payment of the full $1,130 fee for a child under the age of 14 years when concurrently filing Form I–485 with a parent. | Quantitative:<br>Applicants—<br>• A transfer of $11.4 million from applicants who concurrently file a Form I–485 with a child under the age of 14 to different groups of fee-paying applicants.<br><br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• Not estimated.<br><br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• Easier to administer one single fee for Form I–485 will reduce the burden of adjudication and better reflect the cost of adjudication. |
| (j) Allow Individuals with Advance Parole to use Form I–131A, Application for Travel Document (Carrier Documentation) | DHS is expanding the population eligible to use Form I–131A to include individuals with advance parole documents. | Quantitative:<br>Applicants—<br>• A transfer of $10.1 annually to applicants who file Form I–131A from different groups of applicants. | Quantitative:<br>Applicants—<br>• None. |

AR2022_200497

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE SUMMARY—Continued

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (k) Separating Form I–129, Petition for a Nonimmigrant Worker, into Different Forms, and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition. | DHS is separating the Petition for a Nonimmigrant Worker, Form I–129, into several forms with different corresponding fees. DHS also is imposing a limit of 25 named beneficiaries per petition where multiple beneficiaries are permitted. | Qualitative:<br>Applicants—<br>• In addition to the filing fee, DHS estimated a qualitative per unit cost per applicant for the opportunity cost of time for completing Form I–131A and submitting one passport-sized photo of $32.66 per unit application cost.<br>DHS/USCIS—<br>• None.<br>Quantitative:<br>Applicants—<br>• A transfer of $75.1 million in filing fees of visa category specific petitions from petitioners using the specific new Form I–129 classification forms to different groups of fee-paying petitioners.<br>DHS/USCIS—<br>• Not estimated.<br><br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | Qualitative:<br>Applicants—<br>• Individuals who lose their advance parole cards while abroad now have a defined process to receive carrier documentation to return to the U.S.<br>DHS/USCIS—<br>• None.<br>Quantitative:<br>Applicants—<br>• $5.9 million if HR specialist file, $12.8 million if in-house lawyers file, or $22.3 million if outsourced lawyers file in annual savings to the petitioners filing Form I–129 new visa category specific petitions. The annual savings will be in the Form I–129 opportunity costs of time to complete the different form classifications.<br>DHS/USCIS—<br>• None.<br>Qualitative:<br>Applicants—<br>• Separating forms will reduce the need to navigate lengthy instructions that do not apply to their petition.<br>DHS/USCIS—<br>• By splitting the form and introducing several different fees, this provision will simplify or consolidate the information requirements for petitioners and applicants as well as better reflect the cost to adjudicate each specific nonimmigrant classification type. |
| (l) Extend premium processing timeframe from 15 calendar days to 15 business days. | DHS is changing the premium processing timeframe from 15 calendar days to 15 business days. | Quantitative:<br>Applicants—<br>• Not estimated.<br>Qualitative:<br>Petitioners—<br>• An employer may lose some productivity but USCIS has no way to estimate what that loss may be.<br>• Applicants and employers may have to wait 4 days or longer for decisions on their cases<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• Not estimated.<br>Qualitative:<br>Petitioners—<br>• Removes petitioner expectation of 15 calendar day processing to allow for better business planning. Premium processing is for quick adjudication and certainty, but they lose no productivity from the additional 4 days.<br>DHS/USCIS—<br>• USCIS will have additional time to process a petition before it has to issue a refund for not meeting the guaranteed timeline.<br>• In addition, the extra time will allow USCIS to avoid suspending premium processing service as often as has recently been required when premium processing request volumes are high. |
| (m) Creation of Form I–600A/600 Supplement 3, Request for Action on Approved For I–600A/I–600 and new fee. | DHS is creating a new form, Form I–600 Supplement 3, Request for Action on an Approved Form I–600A/I–600 and new fee to clarify the regulations and formalize current practice for requests for action on approved Forms I–600A/I–600.<br>DHS is altering the validity period for a Form I–600A approval in an orphan case from 18 to 15 months to remove inconsistencies between Form I–600A approval periods and validity of the Federal Bureau of Investigation (FBI) background check. | Quantitative:<br>Applicants—<br>• $0.14 million costs for completing and submitting new Form I–600A/600 Supplement 3.<br><br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• $0.13 million in costs for processing and reviewing the new Form I–600A/600 Supplement 3. | Quantitative:<br>Applicants—<br>• None.<br><br>Qualitative:<br>Applicants—<br>• Improve and align the adjudication and approval processes for adoptions from countries that are party to the Hague Adoption Convention and countries that are not.<br>• Clarify the process for applicants who would like to request an extension of Form I–600A/I–600 and/or another type of approved change to their application/petition.<br>DHS/USCIS—<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not.<br>• Changing the validity period to 15 months will make the Form I–600A approval periods consistent with the validity of FBI biometric related background checks. The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates. |

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE
SUMMARY—Continued

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (n) Changes to Genealogy Search and Records Requests. | DHS is changing how USCIS processes genealogy requests. DHS is expanding the use of electronic genealogy requests; changing the search request process so that USCIS can provide requesters with digital records, if they exist; and changing the genealogy fees. DHS is also offering an online filing fee, for those genealogy searches and records requests. | Quantitative: Applicants— • DHS estimates the new annual costs to file Form G–1041 index search requests and Form G–1041A records requests will be $1.3 million annually. Qualitative: Applicants— • In addition to the filing fee increase, DHS estimated qualitative per unit cost of $14.70 per index search requests and records request. DHS/USCIS— • USCIS will still need to mail some records in cases where requestors who cannot submit the forms electronically need to submit paper copies of both forms with required filing fees. | Quantitative: Applicants— • Index search and records requestors who file online, will pay a reduced fee of $10 dollars compared to those who file by paper. Qualitative: Applicants— • Genealogy search and records request process changes will increase accuracy and decrease wait times for requestors. • Fewer individuals may need to file Form G–1041A to request a record if it is provided digitally in response to a Form G–1041 filing. DHS/USCIS— • Reduce costs for mailing, records processing, and storage costs because electronic versions of records requests will reduce the administrative burden on USCIS. • USCIS will save $16 to $45 per index search service and $26 to $55 for each textual file retrieved. • The provisions are streamlining the genealogy search and records request process increases accuracy. |
| (o) Remove Reduced Fee for Naturalization Applicants Using Form I–942, Request for Reduced Fee. | DHS is eliminating the reduced fee option for Form N–400 that applies to applicants whose documented household income is greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines. | Quantitative: Applicants— • A transfer of $3.7 million annually from applicants who previously filed Form N–400 with the reduced fee. These individuals will no longer be able to request a reduced Form N–400 fee using Form I–942 from different fee-paying applicants. Qualitative: Applicants— • Applicants will have a total per unit cost for N–400 applications of $182.12 (opportunity cost to file, biometric collection and travel) with the increased filing fee. DHS/USCIS— • None. | Quantitative: Applicants— • None. Quantitative: Applicants— • $0.05 million annual quantitative savings to the applicants filing for a N–400 will be in the I–942 opportunity costs of time, to complete the form being eliminated. DHS/USCIS— • A qualitative benefit to DHS by eliminating the Form I–942 will reduced the administrative burden on the agency to process the Form I–942. |
| (p) Charge for an initial Form I–765 while an asylum application is pending. | DHS will require a fee for an initial Application for Employment Authorization, Form I–765, when asylum applicants apply for asylum or file an Application for Asylum and for Withholding of Removal, Form I–589. Currently, USCIS exempts these initial applicants from a fee with pending asylum applications. | Quantitative: Applicants— • A transfer of $118.8 million annually to applicants who file an initial Form I–765 with a pending asylum application from different fee-paying applicants. • Applicants could have costs in lost wages and employers could have costs in terms of lost productivity. DHS/USCIS— • None. | Quantitative: Applicants— • Other EAD applicants will not be required to subsidize EADs for pending asylum applicants. Qualitative: Applicants— • None. DHS/USCIS— • None. |
| (q) Charge a fee for Form I–589, Application for Asylum and for Withholding of Removal. | DHS will require a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal. | Quantitative: Applicants— • A transfer of $5.5 million from Asylum applicants filing Form I–589 to different fee-paying applicants. Qualitative: Applicants— • Some applicants may not be able to afford this fee and will no longer be able to apply for asylum. | Quantitative: Applicants— • $0.74 million in transfers from the government to asylum I–589 applicants who will pay a reduced fee of $50 for Form I–485 Application to Register Permanent Residence or Adjust Status from $1,130 to $1,080 because their I–589 was approved. Qualitative: Applicants— • None. DHS/USCIS— • None. |
| (r) Combining Fees for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 [NACARA]). | DHS is combining the current multiple fees charged for an individual or family into a single fee for each filing of Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100, the Nicaraguan Adjustment and Central American Relief Act [NACARA]). | Quantitative: Applicants— • A transfer of $0.43 million annually to those who apply for suspension of deportation or special rule cancellation of removal under NACARA using Form I–881 from different groups of fee-paying individuals. Qualitative: Applicants— • None. DHS/USCIS— • None. | Quantitative: Applicants— • $0.03 million in savings from the reduced passport-style photos requirement. They currently have to provide 4 photos and now they will only be required to provide 2 which will save each applicant money and by not traveling to ASC facilities, for biometric collection/submission. Qualitative: Applicants— • None. DHS/USCIS— • Combining the two IEFA fees into a single fee will streamline the revenue collections and reporting. • A Single Form I–881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE SUMMARY—Continued

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (s) Clarify who must pay a 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1. | DHS will apply the 9–11 Response and Biometric Entry-Exit Fee to all covered petitions (meaning those meeting the 50 employee/ 50 percent H–1B or L test), whether for new employment or extension. | Quantitative:<br>Applicants—<br>• A transfer of $199.2 million in petition fees to the government from fee paying petitioners for extensions into the 9–11 Response Biometric Entry-Exit account.<br>Qualitative:<br>Applicants—<br>• None.<br>DHS/USCIS—<br>• None. | Quantitative:<br>Applicants—<br>• None.<br>Qualitative:<br>Applicants—<br>• Fee will consistently be applied to all H–1B or L–1 petitions, whether for new employment or extension.<br>DHS/USCIS—<br>• The collected fees will help increase the 9–11 Response and Biometric Entry-Exit fee account for biometric entry-exit screening, deficit reduction, and other public purposes funded by general Treasury revenues. |

A full regulatory impact analysis (RIA) of this final rule can be found in the docket at *www.regulations.gov*. In addition to the impacts summarized here, Table 8 presents the accounting statement as required by Circular A–4.[131]

TABLE 8—OMB A–4 ACCOUNTING STATEMENT ($, 2019), PERIOD OF THE ANALYSIS 2020–2029

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| *Benefits:* | | | | |
| Annualized Monetized Benefits over 10 years ..................... | N/A<br>N/A | N/A<br>N/A | N/A.<br>N/A. | |
| Annualized quantified, but un-monetized, benefits. Unquantified Benefits .............. | USCIS sets fees at levels sufficient to cover the full cost of the corresponding services associated with fairly and efficiently adjudicating immigration benefit requests and at a level sufficient to fund overall requirements and general operations, including the full costs of processing immigration benefit requests and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants at no charge; and the full cost of providing similar benefits to others at no or reduced charge.<br>This final rule will help reduce the administrative and adjudication process for USCIS more efficient. Limiting fee waivers may reduce administrative costs to USCIS of adjudicating fee waiver requests. It may also reduce the amount of training or guidance necessary to adjudicate unique fee waiver requests.<br>Removing the exemptions allows DHS to recover the costs of adjudicating Form I–765 for these categories from those who benefit from the service instead of other fee payers. Continuing to provide these fee exemptions would result in the costs of those fee services being transferred to the fees for other forms. This final rule will help reduce the administrative and adjudication process for USCIS more efficient. | | | RIA. |
| *Costs:* | | | | |
| Annualized monetized costs over 10 years (discount rate in parenthesis) ........ | N/A ..............................<br>N/A .............................. | (3%) $7,664,090 ...........<br>(7%) $7,664,090 ........... | (3%) −$8,689,762 .........<br>(7%) −$8,689,762 ......... | RIA. |
| Annualized quantified, but un-monetized, costs ................................. | | N/A | | |
| Qualitative (unquantified) costs ................................. | DHS is unable to quantify how many people will not apply because they do not have access to fee waivers and we acknowledge that some individuals will need to save, borrow, or use a credit card in order to pay fees because they do not have recourse to a fee waiver. DHS does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply.<br>While DHS acknowledges immigrants facing financial challenges encounter added difficulty paying filing fees, any potential effects are expected to be indirect reductions in consumption of other goods with relatively more elastic demand. DHS is unable to quantify the extent to which the rule could result in some immigrants choosing to live in less costly areas, seeking out higher earnings opportunities, curtailing other purchases or rethinking their immigration altogether.<br>DHS has not omitted data describing the price sensitivity to fees, rather, the agency has no data describing the myriad complex and changing unobservable factors that may affect each immigrant's unique decision to file for a particular immigration benefit. DHS notes that previous fee increases in 2007, 2010 and 2016 have had no discernible effect on the number of filings that USCIS received, and, in response to public comments, acknowledges that evidence presented indicating naturalization increases when previous fees were waived entirely does not support the claim that immigration benefits are sensitive to the changes implemented by this rule.[132] DHS does not know the individual financial circumstances of each applicant/ petitioner applying for a particular immigration benefit. | | | |

---

[131] OMB Circular A–4 is available at: *www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf.*

[132] *See* RIA, Section E: Removal Fee Waivers.

AR2022_200500

**46896**  **Federal Register** / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

TABLE 8—OMB A–4 ACCOUNTING STATEMENT ($, 2019), PERIOD OF THE ANALYSIS 2020–2029—Continued

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| | DHS believes that immigration to the United States remains attractive to millions of individuals around the world and that its benefits continue to outweigh the costs associated. Therefore, DHS believes the price elasticity of demand for immigration services is inelastic and increases in price will have a minimal or no impact on the demand for these services. This is true for all immigration services impacted by this rule. USCIS will look at future rulemakings, to encourage other forms being made available (either in phases by benefits requests or a certain number per year), to file online as DHS shifts to a more electronic immigration system. USCIS will still need to mail some records in cases where requestors who cannot submit the forms electronically need to submit paper copies of both forms with required filing fees, as a result of changes to Genealogy Search and Records Requests. | | | |
| *Transfers:* Annualized monetized transfers: From whom to whom? Annual transfer payments from specific form populations to different groups of fee-paying applicants/petitioners for a particular immigration benefit or request. | (3%) $832,239,426 ...... (7%) $832,239,426. | ..................................... | ..................................... | RIA. |
| Annualized monetized transfers: From whom to whom? Annual transfer payments to Government from Fee-Paying applicants/petitions. | (3%) $551,842,481 ...... (7%) $551,842,481. | ..................................... | ..................................... | RIA. |
| Miscellaneous analyses/category | Effects. | | | |
| Effects on state, local, and/or tribal governments | None. | | | Preamble. |
| Effects on small businesses .......................................................... | The fees in this rule will not have a significant economic impact on a substantial number of small entities for entities filing Forms I–129, I–40, I–360, I–910. The impact of this final rule for those entities that file Forms I–129, I–140, I–360, I–910, I–924, and G–1041/1041A that submit petitions on behalf of nonimmigrant and immigrant workers will face an increase or decrease in filing fees. DHS is unable to estimate the number of G–1041 index searches and G–1041A records requests considered small; however, some will receive a reduced fee and savings, by filing online. Therefore, DHS does not currently have sufficient data on the requestors for the genealogy forms to definitively assess the estimate of small entities for these requests. DHS is unable to estimate by how much because DHS does not know how many individuals will have access to a computer and/or internet capability. The case management tracking system used by DHS for genealogy requests does not allow for requestor data to be readily pulled. I–924/I–924A Regional centers are difficult to assess because there is a lack of official data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors. | | | FRFA and Small Entity Analysis (SEA). |
| Effects on wages .......................................................................... Effects on Growth ........................................................................ | None. None. | | | None. None. |

## B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, or governmental jurisdictions with populations of less than 50,000.[133] A detailed Small Entity Analysis is available in the docket of this rulemaking at *http:// www.regulations.gov.*

Individuals, rather than small entities, submit the majority of immigration and naturalization benefit applications and petitions. This final rule will primarily affect entities that file and pay fees for certain immigration benefit requests. Consequently, there are six categories of USCIS benefits that are subject to a small entity analysis for this final rule: Petition for a Nonimmigrant Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924.

Following the review of available data, DHS does not believe that the increase in fees in this final rule will have a significant economic impact on a substantial number of small entities that are filing Form I–129, Form I–140, Form I–910 or Form I–360. DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I–924. DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. DHS is publishing this Final Regulatory Flexibility Analysis (FRFA) to respond to public comments and provide further information on the likely impact of this rule on small entities.

[133] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632.

AR2022_200501

### 1. Final Regulatory Flexibility Analysis (FRFA)

#### a. A Statement of Need for, and Objectives of, the Rule

DHS issues this final rule consistent with INA section 286(m),[134] which authorizes DHS to charge fees for adjudication and naturalization services at a level to ''ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants,'' and the CFO Act,[135] which requires each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees. DHS is adjusting the fee schedule for DHS immigration and naturalization benefit applications after conducting a comprehensive fee review for the FY 2019/2020 biennial period and determining that current fees do not recover the full costs of services provided. DHS has determined that adjusting the fee schedule is necessary to fully recover costs adjustments are necessary to associated with administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits, while protecting Americans, securing the homeland, and honoring our values.

#### b. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of any Changes Made in the Proposed Rule as a Result of Such Comments

*Comment:* Some commenters wrote that the proposed rate increase would certainly suppress the ability of hundreds of thousands of people to research their family history. These commenters stated this would have a significant economic impact on a substantial number of small entities and prevent businesses from making profits providing information to others.

*Response:* DHS acknowledges the scope of the increase in fees for Form G–1041 and G–1041A. DHS recognizes that some small entities may be impacted by these increased fees but cannot determine how many or the exact impact.[136] USCIS receives fewer than

10,000 genealogy requests each year, so the fees should not affect hundreds of thousands of people as the commenter mentions.

DHS took into consideration all of the comments pertaining to Form G–1041 Genealogy Index Search Request and G–1041A Genealogy Record Request fees from the proposed and lowered the fees in this final rule. The fee for the Genealogy Index Search Request, Form G–1041 is increasing from $65 to $160, an increase of $95 (146 percent) for those who use the electronic form. The fee for Form G–1041A will increase from $65 to $265, an increase of $200 (308 percent) for those who mail in this request. DHS is setting the fee $10 lower for requesters who use the electronic version and file this request online. The fee for Form G–1041A is increasing from $65 to $255, an increase of $190 (292 percent) for those who use the electronic form.

In this final rule, DHS adjusts the fees for all categories of Form I–129 to reflect the estimated full cost of adjudication. The evidence provided in the stand-along Small Entity Analysis available in the docket of this rulemaking suggests that the additional fees in this rule do not impose a significant economic impact on a substantial number of small entities. As for the comment stating that low-wage H–2A agricultural workers would have their fees increased, this rule imposes no fees on H–2A workers because the petitioning entity is prohibited from passing any of the costs of the recruitment, hiring, petitioning, travel or housing to the H–2A worker. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter said the proposed rule is contrary to the RFA because it fails to take into account the burdens of its regulatory actions on small entities, including small businesses and non-profits. Several commenters stated that USCIS should revise its RFA analysis to consider the economic impact of the proposed rule on small entities that file or pay for any immigration benefits applications.

*Response:* As required by the RFA, DHS considered whether this rule will have a significant economic impact on a substantial number of small entities. DHS also considered all types of entities as required by the RFA including small businesses, small not for profits, and small governmental jurisdictions that filed petitions with USCIS. The full analysis of these findings are found in the stand-alone Small Entity Analysis

for this final rule found in the docket of this rulemaking.

*Comment:* A commenter said the majority of livestock producers are family businesses that play a critical role in the production of food and fiber products in the United States and require labor during several different periods each year. The commenter stated these businesses must fill out named beneficiary petitions for extension of stay, and that with marginal cost increases between 44 and 87 percent, small business employers will ''disproportionately bear the burden'' of the proposed fee increases.

*Response:* This final rule in no way is intended to reduce, limit, or prevent the filing of a request for any specific immigration benefit by any population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. DHS acknowledges that some employers will pay the increased Form I–129H–2A fee; however, they will only have to submit one petition based on the number of named beneficiaries.

The SEA analyzed the impacts of this rule on entities that were considered small based on employee count or revenue. Entities with missing revenue data were excluded. Among the 346 small entities with reported revenue data, all experienced an economic impact of considerably less than 2 percent with the exception of 11 entities. Those 11 small entities with greater than a 2 percent impact filed multiple petitions and had a low reported revenue. Therefore, these small entities may file fewer petitions as a result of this rule. Depending on the immigration benefit request, the average impact on all 346 small entities with revenue data ranges from −0.12 to 0.63 percent as shown in Table 7, of the SEA. In other words, no matter which version of the newly separated Form I–129 is applicable, the absolute value of the average impact on the described 346 small entities is less than 1 percent. DHS does not believe that the benefit request fees established by this final rule would make an individual forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS.

The SEA outlines using the subscription or public-use databases identified previously. DHS assembled revenue and employment information on these entities and determined that 556, or 85.5 percent of these petitioners met the definition of small entities. Of those that we determined could be classified as small entities, 71 percent had annual revenues of less than a

---

[134] See 8 U.S.C. 1356(m).

[135] See 31 U.S.C. 901–03.

[136] *See* economic analysis (RIA) Section M *Changes to Genealogy Search and Records Requests* and Section E in the SEA for further detailed

information pertaining to the economic impact on small entities.

million and approximately 9 percent of them had petitioned for five or more workers over that year. Thus, DHS does not believe that the final rule will have a significant impact on a substantial number of small entities in any one industry, including agriculture.

*Comment:* A commenter wrote that the Small Entity Analysis (SEA) presented in the NPRM was inaccurate because it failed to include the proposal's impact on hundreds of non-profit service providers that support LPRs' pursuit of naturalization. The commenter stated that many of these organizations cover costs related to legal consultation and preparation with their own resources, and that the agency should analyze how these organizations would be impacted by the proposal.

*Response:* Organizations that help applicants complete naturalization applications are not the subject of the regulations being revised in this rule, or the relevant statute, INA section 386(m), 8 U.S.C. 1356(m), which authorizes USCIS to set fees and provide discretionary fee waivers to applicants. *See* 5 U.S.C. 603(b)(4) (requiring only "a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities *which will be subject to the requirement*" (emphasis added)); *see* 5 U.S.C. 603(b)(3) (requiring only "a description of and, where feasible, an estimate of the number of small entities *to which the proposed rule will apply*" (emphasis added)); *see also Mid-Tex Elec. Co-op., Inc.* v. *FERC,* 773 F.2d 327, 342 (D.C. Cir. 1985) (finding "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy" and limiting the impact analysis requirement "to small entities subject to the proposed regulation"). Therefore, any impacts on such organizations are too indirect to require inclusion in the SEA since the RFA only requires consideration of direct impacts to small entities. Additionally, the naturalization applicants themselves are individuals and therefore are not subjects for RFA consideration.

*Comment:* Another commenter stated that one example of how the rule's cost analysis is unsupported by evidence is USCIS' conclusion that only 1 percent of small businesses would be impacted. The commenter said the methodology used relies upon the *lack* of signups/registrations on several website directories, but nowhere does the agency use the data it actually collects from businesses in every I–129 form

submitted (*e.g.,* company size, gross and net income, number of employees requested), all of which the commenter said is readily available within USCIS. Moreover, the commenter said the DOL's Labor Condition Application and Program Electronic Review Management (PERM) usage listing employers and numbers of employees sought shows the top 10–20 users are major corporations, while small and midsize businesses hire between 1–10 people a year, most often one-offs. The commenter said the fact that these companies mostly hire just one worker explains that the overall cost and bureaucracy is a barrier to employer participation.

*Response:* USCIS does not collect revenue and the number of employees for all categories of Forms I–129, as stated in the stand-alone SEA. Therefore, USCIS relied on a third-party sources (Hoover's, Cortera, Manta, and Guidestar) to obtain this information (see table 4 of the SEA). DHS obtained petitioner data filed for Forms I–129 from internal databases for fiscal year 2017 (FY 2017), spanning from October 2016 to September 2017.[137] This petitioner data included the employer firm name, city, state, ZIP code, employer identification number (EIN),[138] number/type of filing, and petitioner or beneficiary name. Filing data did not include information needed to classify the entity according to size standards, such as revenue or number of employees, so DHS used third party sources to obtain this information. Therefore, for the analysis of the effects on Forms I–129, DHS used several data sources to capture information on the characteristics of entities required to pay these fees.

One of the databases used by USCS was Hoover's online database of U.S. entities, a subscription service of Dun & Bradstreet. Hoover's covers millions of companies and uses revenue from several years and is one of the largest and most respected databases of company data. A majority of the entities in the SEA sample size were found in Hoovers. From these sources, DHS determined the North American Industry Classification System (NAICS) code,[139] revenue, and employee count for each entity in the sample. A list of NAICS codes for each entity matched in

Forms I–129, I–140, I–910 and I–360 can be found in Appendix A, along with the SBA threshold for each industry cluster.[140] In order to determine an entity's size, DHS first classified each entity by its NAICS code, and then used the SBA size standards to compare the requisite revenue or employee count threshold for each entity. Based on the NAICS code, some entities are classified as small based on their annual revenue and some based on the number of employees. Comment: A commenter wrote these fees would disproportionately affect small religious organizations that serve a charitable function in our society.

*Response:* DHS disagrees that these fees would disproportionately affect small religious organizations. USCIS used internal data as indicated below in section (B)(1)(d), of the FRFA, including entities who petition on behalf of foreign religious workers. DHS used the same databases mentioned previously to search for information on revenue and employee count. DHS used the same method as with Forms I–129 and I–140 to conduct the SEA based on a representative sample of the impacted population. As detailed in Section D of the SEA, DHS determined that, based on the standard statistical formula, 420 randomly selected entities from a population of 760 unique entities filed Form I–360 petitions. Therefore, DHS was able to classify 388 of 420 entities as small entities that filed Form I–360 petitions, including combined non-matches (5), matches missing data (74), and small entity matches (309). DHS also used the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar). The 74 matches missing data that were found in the databases lacked revenue or employee count data.

DHS determined that 388 out of 420 (92.4 percent) entities filing Form I–360 petitions were small entities.

Similar to other forms analyzed in this RFA, DHS calculated the economic impact of this rule on entities that filed Form I–360 by estimating the total costs associated with the final fee increase for each entity. Among the 309 small entities with reported revenue data, each would experience an economic impact considerably less than 1.0 percent. The greatest economic impact imposed by this final fee change totaled 0.35 percent and the smallest totaled 0.000002 percent. The average impact on all 309 small entities with revenue

---

[137] Source: DHS, USCIS, Office of Performance and Quality.

[138] An Employer Identification Number (EIN) is a nine-digit number that U.S. Internal Revenue Service assigns in the following format: XX–XXXXXXX. It is used to identify the tax accounts of employers. Employer Identification Number, p 2. *https://www.irs.gov/pub/irs-pdf/p1635.pdf.*

[139] U.S. Census Bureau, NAICS code listing: *http://www.census.gov/eos/www/naics/.*

[140] SBA size standards effective October, 2017. Visited April, 2018. *https://www.sba.gov/wp-content/uploads/2017/10/SBA_Size_Standards_Table.pdf.*

data was 0.01 percent. DHS also analyzed the final costs of this rule on the petitioning entities relative to the costs of the typical employee's salary. Guidelines suggested by the SBA Office of Advocacy indicate that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the entities in the sector.[141] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $53,290 for clergy,[142] $46,980 for directors of religious activities and education,[143] and $35,860 for other religious workers.[144] Based on an average of 1.5 religious workers [145] petitioned for per entity, the additional average annual cost would be $22 per entity.[146] The additional costs per entity in this final rule represent only 0.04 percent of the average annual salary for clergy, 0.05 percent of the average annual salary for directors of religious activities and education, and 0.06 percent of the average annual salary for all other religious workers.[147] Therefore, using average annual labor cost guidelines, the additional regulatory compliance costs in this final rule are not significant.

c. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Rule, and a Detailed Statement of Any Change Made to the Final Rule as a Result of the Comments

No comments were filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA).

d. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available

Entities affected by this rule are those that file and pay fees for certain immigration benefit applications and petitions on behalf of a foreign national. These applications include Form I–129, Petition for a Nonimmigrant Worker; Form I–140, Immigrant Petition for an Alien Worker; Form I–910, Civil Surgeon Designation; Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program. Annual numeric estimates of the small entities impacted by this fee increase total (in parentheses): Form I–129 (77,571 entities), Form I–140 (22,165 entities), Form I–910 (428 entities), and Form I–360 (698 entities).[148] DHS was not able to determine the numbers of regional centers or genealogy requestors that would be considered small entities, therefore does not provide numeric estimates for Form I–924 or Forms G–1041 and G–1041A.[149]

This rule applies to small entities, including businesses, non-profit organizations, and governmental jurisdictions filing for the above benefits. Forms I–129 and I–140, will see a number of industry clusters impacted by this rule. *See* Appendix A of the SEA for a list of impacted industry codes for Forms I–129, I–140, I–910, and I–360. Of the total 650 small entities in the sample for Form I–129, most entities were small businesses (556 or 85.5 percent) with 41 small not-for-profit entities and only 4 small governmental jurisdictions. Similarly, of the total 550 small entities in the sample

for Form I–140, most entities were small businesses (402 or 73.1 percent) with 6 small not-for-profit entities and 0 small governmental jurisdictions. The fee for the application for civil surgeon designation (Form I–910) will apply to physicians requesting such designation. There were 300 small entities in the sample for Form I–910, consisting of 270 small governmental jurisdictions and 270 (or 90 percent) small entities that were either small businesses or small not-for-profits. The fee for Amerasian, widow(er), or special immigrants will apply to any entity petitioning on behalf of a religious worker. Finally, Form I–924 will impact any entity seeking designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Captured in the dataset for Form I–924 is also Form I–924A, which regional centers must file annually to establish continued eligibility for regional center designation for each fiscal year.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G–1041 and G–1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals.[150] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and therefore could not be segregated within the pool of data. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS assumes genealogists have access to a computer and the internet. DHS is unable to estimate the online number of index searches and records requests; however, some will receive a reduced fee and cost savings, by filing online. Therefore, DHS does not currently have sufficient data on the requestors for the genealogy forms to definitively assess the estimate of small entities for these requests. though DHS is unable to estimate by how much because DHS does not know how many individuals will have access to a computer and/or internet capability.

a. Petition for a Nonimmigrant Worker, Form I–129

DHS is separating Form I–129, Petition for a Nonimmigrant Worker,

---

[141] Office of Advocacy, Small Business Administration, ''A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act'', page 19: *https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf.*

[142] Bureau of Labor Statistics, U.S. Department of Labor, ''Occupational Employment Statistics, May 2018, ''Clergy'': *https://www.bls.gov/oes/2018/may/oes212011.htm.*

[143] Bureau of Labor Statistics, U.S. Department of Labor, ''Occupational Employment Statistics, May 2018, ''Directors of Religious Activities and Education'': *https://www.bls.gov/oes/2018/may/oes212099.htm.*

[144] Bureau of Labor Statistics, U.S. Department of Labor, ''Occupational Employment Statistics, May 2018, ''Religious Workers, All Other'': *https://www.bls.gov/oes/may/oes212099.htm.*

[145] USCIS calculated the average filing per entity of 1.5 petitions, from the Form I–360 Sample with Petition Totals in Appendix E, of the SEA for the U.S. Citizenship and Immigration Services Fee Schedule NPRM. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–360 petitions) = 618/420 = 1.5 average petitions filed per entity.

[146] Calculation: 1.5 average petitions per entity * $15 increase in petition fees = approximately $22 additional total cost per entity.

[147] Calculation: $22 per entity/$53,290 clergy salary × 100 = .04 percent;

$22 per entity/$46,980 directors of religious activities and education × 100 = .05 percent;

$22 per entity/$35,860 other religious workers × 100 = .06 percent.

[148] Calculation: 90,726 Form I–129 * 85.5 percent = 77,571 small entities; 30,321 Form I–140 * 73.1 percent = 22,165 small entities; 476 Form I–910 * 90.0 percent = 428 small entities; 760 Form I–360 * 91.9 percent = 698 small entities.

[149] Small entity estimates are calculated by multiplying the population (total annual receipts for the USCIS form) by the percentage of small entities, which are presented in subsequent sections of this analysis.

[150] See Genealogy Program, 73 FR 28026 (May 15, 2008) (final rule).

into several forms with different corresponding fees, from the previous $460. Currently, employers may use Form I–129, to petition for CW, E, H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, or R–1 nonimmigrant workers. As applicable, employers also may use Form I–129 to apply for E–1, E–2, E–3, or TN nonimmigrant status for eligible workers. DHS is separating the Petition for a Nonimmigrant Worker, Form I–129, into several forms. These forms will include information from the various supplemental forms for specific types of workers. DHS will have different fees for these new forms. The final fees are calculated at a more detailed level than the current fees.

The current fee for Form I–129 is $460. DHS will impose the following fees for new Forms I–129 (separated into new forms by worker type):

- Form I–129H1, Petition for Nonimmigrant Worker: H–1 Classifications—$555
- Form I–129H2A, Petition for Nonimmigrant Worker: H–2A Classification (Named Beneficiaries)—$850
- Form I–129H2B, Petition for Nonimmigrant Worker: H–2B Classification (Named Beneficiaries)—$715
- Form I–129L, Petition for Nonimmigrant Worker: L Classifications—$805
- Form I–129O, Petition for Nonimmigrant Worker: O Classifications—$705
- I–129E&TN, Application for Nonimmigrant Worker: E and TN

Classifications; and I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification—$695

- Form I–129H2A, Petition for Nonimmigrant Work Classification: H–2A Classification (Unnamed Beneficiaries)—$415
- Form I–129H2B, Petition for Nonimmigrant Worker: H–2B Classification (Unnamed Beneficiaries)—$385.

For petitioners filing Form I–129 for H–2A and H–2B workers with only unnamed beneficiaries, DHS will impose a lower fee than the current filing fee. DHS will increase the fee when filed for all other worker types. The fee adjustments and percentage increases or decreases are summarized in Table 9.

TABLE 9—USCIS FEES FOR SEPARATED FORMS I–129 FOR FISCAL YEAR 2019/2020

| Immigration benefit request | Current fee | Final fee | Fee increase/ decrease | Percent change |
|---|---|---|---|---|
| Form I–129H1—Named Beneficiaries | $460 | $555 | $95 | $21 |
| Form I–129H2A—Named Beneficiaries | 460 | 850 | 390 | 85 |
| Form I–129H2A—Unnamed Beneficiaries | 460 | 415 | −45 | −10 |
| Form I–129H2B—Named Beneficiaries | 460 | 715 | 255 | 55 |
| Form I–129H2B—Unnamed Beneficiaries | 460 | 385 | −75 | −16 |
| Form I–129O | 460 | 705 | 245 | 53 |
| Form I–129 L1A/L1B/LZ Blanket | 460 | 805 | 345 | 75 |
| Forms I–129CW, I–129E&TN, and I–129MISC | 460 | 695 | 235 | 51 |

Source: USCIS FY 2019/2020 Final Fee Schedule (see preamble).

Using a 12-month period of data on the number of Form I–129 petitions filed from October 1, 2016 to September 31, 2017, DHS collected internal data for each filing organization including the name, Employer Identification Number (EIN), city, state, zip code, and number/type of filings. Each entity may make multiple filings. For instance, there were receipts for 530,442 Form I–129 petitions, but only 90,726 unique entities that filed those petitions. Since the filing statistics do not contain information such as the revenue of the business, DHS used third party sources of data to collect this information. DHS used a subscription-based, online database—Hoover's—as well as three open-access databases—Manta, Cortera, and Guidestar—to help determine an organization's small entity status and then applied Small Business Administration size standards to the entities under examination.[151]

The method DHS used to conduct the SEA was based on a representative sample of the impacted population with respect to each form. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 384 entities, which included using a 95 percent confidence level and a 5 percent confidence interval for a population of 90,726 unique entities filing Form I–129 petitions. Based on previous experience conducting small entity analyses, DHS expects to find 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size that was approximately 69 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 650 randomly selected entities from a population of 90,726 unique entities that filed Form I–129 petitions.

Of the 650 searches for small entities that filed Form I–129 petitions, 473 searches returned a successful match of a filing entity's name in one of the databases and 177 searches did not match a filing entity. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing

entities not found in the online database are likely to be small entities. As a result, in order to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 473 matches for Form I–129, DHS determined 346 to be small entities based on revenue or employee count and according to their assigned North American Industry Classification System (NAICS) code. Therefore, DHS was able to classify 556 of 650 entities as small entities that filed Form I–129 petitions, including combined non-matches (177), matches missing data (33), and small entity matches (346). Using the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), the 33 matches missing data found in the databases lacked applicable revenue or employee count data.

DHS determined that 556 of 650 (85.5 percent) of the entities filing Form I–129 petitions were small entities. Furthermore, DHS determined that 346 of the 650 entities searched were small entities based on sales revenue data,

---

[151] U.S. Small Business Administration, Office of Advocacy, Size Standards Table effective August 19, 2019. Available at *https://www.sba.gov/document/support--table-size-standards.*

which were needed to estimate the economic impact of this final rule. Since these 346 small entities were a subset of the random sample of 650 entity searches, they were statistically significant in the context of this research. In order to calculate the economic impact of this rule, DHS estimated the total costs associated with the final fee increase for each entity and divided that amount by the sales revenue of that entity.[152] Based on the final fee increases for Form I–129, DHS calculated the average economic impact on the 346 small entities with revenue data as summarized in Table 10.

TABLE 10—ECONOMIC IMPACTS ON SMALL ENTITIES WITH REVENUE DATA

| Immigration benefit request | Fee increase/ decrease | Average impact percentage |
|---|---|---|
| Form I–129H1 | $95 | 0.15 |
| Form I–129H2A—Named Beneficiaries | 390 | 0.63 |
| Form I–129H2A—Unnamed Beneficiaries | −45 | −0.07 |
| Form I–129H2B—Named Beneficiaries | 255 | 0.41 |
| Form I–129H2B—Unnamed Beneficiaries | −75 | −0.12 |
| Form I–129L | 345 | 0.56 |
| Form I–129O | 245 | 0.40 |
| Forms I–129CW, I–129E&TN, and I–129MISC | 235 | 0.38 |

Source: USCIS calculation.

Among the 346 small entities with reported revenue data, all experienced an economic impact of considerably less than 2 percent with the exception of 11 entities. Those 11 entities with greater than a 2 percent impact filed multiple petitions and had a low reported revenue, for any immigration benefit request made using separate Forms I–129. Therefore, these small entities may file fewer petitions as a result of this rule. Depending on the type of immigration benefit request, the average impact on all 346 small entities with revenue data ranges from −0.12 to 0.63 percent, as shown in the supporting comprehensive SEA. Therefore, the average economic impact on the described 346 small entities is less than 1 percent, regardless of which newly separate Form I–129 petition is applicable. The evidence suggests that the changes in fees imposed by this rule do not represent a significant economic impact on these entities.

b. Immigrant Petition for an Alien Worker, Form I–140

USCIS is decreasing the fee to file Immigrant Petition for an Alien Worker, Form I–140, from $700 to $555, a decrease of $145 (21 percent). Using a 12-month period of data on the number of Form I–140 petitions filed from October 1, 2016 to September 31, 2017, DHS collected internal data similar to that of Form I–129. The total number of Form I–140 petitions filed was 139,439, with 30,321 unique entities that filed petitions. DHS used the same databases previously mentioned to search for information on revenue and employee count.

DHS used the same method as with Form I–129 to conduct the SEA based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 383 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 30,321 unique entities for Form I–140 petitions. Based on previous experience conducting small entity analyses, DHS expected to find 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size that was approximately 44 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 550 randomly selected entities from a population of 30,321 unique entities that filed Form I–140 petitions.

Of the 550 searches for small entities that filed Form I–140 petitions, 480 searches successfully matched the name of the filing entity to names in the databases and 70 searches did not match the name of a filing entity. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing entities not found in the online databases are likely to be small entities. As a result, in order to prevent underestimating the number of small entities this rule would affect, DHS conservatively considers all of the non-matched entities as small entities for the purpose of this analysis. Among the 480 matches for Form I–140, DHS determined 324 to be small entities based on revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 402 of 550 entities as small entities that filed Form I–140 petitions, including combined non-matches (70), matches missing data (8), and small entity matches (324). Using the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), the 8 matches missing data that were found in the databases lacked applicable revenue or employee count statistics.

DHS determined that 402 out of 550 (73.1 percent) entities filing Form I–140 petitions were small entities. Furthermore, DHS determined that 324 of the 550 searched were small entities based on sales revenue data, which were needed to estimate the economic impact of the final rule. Since these 324 were a small entity subset of the random sample of 550 entity searches, they were considered statistically significant in the context of this research. Similar to Form I–129, DHS calculated the economic impact of this rule on entities that filed Form I–140 by estimating the total cost savings associated with the final fee decrease for each entity and divided that amount by sales revenue of that entity.

Among the 324 small entities with reported revenue data, each would experience an economic impact of less than −2 percent. Using the above methodology, the greatest economic

---

[152] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity * $X difference in current fee from final fee)/Entity Sales Revenue.

impact by this fee change totaled −1.74 percent and the smallest totaled −0.00000006 percent, resulting in a cost savings as shown in the supporting comprehensive SEA. The average impact on all 324 small entities with revenue data was −0.06 percent. Because of the fee decrease, these small entities will see a cost savings per application in filing fees based on petitions. The negative number represents cost savings to the petitioner. Therefore, the larger it is, the greater the cost savings for the petitioners. The average impact on all 324 small entities with revenue data was −0.06 percent. The evidence suggests that the decreased fee in this final rule does not represent a significant economic impact on these entities.

In addition to the individual Form I–129 and Form I–140 analyses, USCIS analyzed any cumulative impacts of these form types to determine if there were any impacts to small entities when analyzed together. USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN. Only 1 entity had an EIN that overlapped in both samples; this was a small entity that submitted 3 Form I–129 petitions and 1 Form I–140 petition. Due to little overlap in entities in the samples and the relatively minor impacts on revenue of fee increases of Forms I–129 and I–140, USCIS does not expect the combined impact of these two forms to be an economically significant burden on a substantial number of small entities.

### c. Application for Civil Surgeon Designation, Form I–910

By law, a civil surgeon is a physician designated by USCIS to conduct immigration medical examinations for individuals applying for an immigration benefit in the United States. Form I–910 is used by a physician to request that USCIS designate him or her as a civil surgeon to perform immigration medical examinations in the United States and complete USCIS Form I–693, Report of Medical Examination and Vaccination Record.

DHS is decreasing the fee for Civil Surgeon Designations, Form I–910, from $785 to $635, a decrease of $150 (19 percent). Using a 12-month period of data from October 1, 2016 to September 31, 2017, DHS reviewed collected internal data for Form I–910 filings. The total number of Form I–910 applications was 757, with 476 unique entities that filed applications. The third-party databases mentioned previously were used again to search for revenue and employee count information.

Using the same methodology as the Forms I–129 and I–140, USCIS conducted the SEA based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 213 entities, which included using a 95 percent confidence level and a 5 percent confidence interval on a population of 476 unique entities for Form I–910. USCIS conducted searches on 300 randomly selected entities from a population of 476 unique entities for Form I–910 applications, a sample size approximately 40 percent larger than the minimum necessary.

Of the 300 searches for small entities that filed Form I–910 applications, 266 searches successfully matched the name of the filing entity to names in the databases and 34 searches did not match the name of a filing entity. DHS assumes filing entities not found in the online databases are likely to be small entities. DHS also assumes all of the non-matched entities as small entities for the purpose of this analysis. Among the 266 matches for Form I–910, DHS determined 189 to be small entities based on their revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 270 of 300 entities as small entities that filed Form I–910 applications, including combined non-matches (34), matches missing data (47), and small entity matches (189). DHS also used the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), and the 8 matches missing data that were found in the databases lacked revenue or employee count statistics.

DHS determined that 270 out of 300 (90 percent) entities filing Form I–910 applications were small entities. Furthermore, DHS determined that 189 of the 300 entities searched were small entities based on sales revenue data, which were needed in order to estimate the economic impact of this final rule. Since the 189 entities were a small entity subset of the random sample of 300 entity searches, they were statistically significant in the context of this research.

Similar to the Forms I–129 and I–140, DHS calculated the economic impact of this rule on entities that filed Form I–910 by estimating estimated the total savings associated with the final fee decrease for each entity and divided that amount by sales revenue of that entity. Among the 189 small entities with reported revenue data, all experienced an economic impact considerably less than 1.0 percent. The

greatest economic impact imposed by this final fee change totaled −1.50 percent and the smallest totaled −0.001 percent. The average impact on all 189 small entities with revenue data was −0.116 percent. The decreased fee will create cost savings for the individual applicant of $150. The negative number represents cost savings to the applicant. Therefore, the larger it is, the greater the cost savings for the applicants. The evidence suggests that the decreased fee by this final rule does not represent a significant economic impact on these entities.

### d. Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360

DHS is increasing the fee for applicants who file using Form I–360 from $435 to $450, an increase of $15 (4 percent), including entities who petition on behalf of foreign religious workers. Using a 12-month period of data on the number of Form I–360 petitions filed from October 1, 2016 to September 31, 2017, DHS collected internal data on filings of Form I–360 petitioners who file for foreign religious workers. The total number of Form I–360 petitions was 2,446, with 760 unique entities that filed petitions. DHS used the same databases mentioned previously to search for information on revenue and employee count.

DHS used the same method as with Forms I–129 and I–140 to conduct the SEA based on a representative sample of the impacted population. To identify a representative sample, DHS used a standard statistical formula to determine a minimum sample size of 332 entities, which included using with a 95 percent confidence level and a 5 percent confidence interval on a population of 760 unique entities for Form I–360 petitions. To account for missing organizations in the online subscription and public databases, DHS selected a sample size that was approximately 27 percent larger than the necessary minimum to allow for non-matches (filing entities that could not be found in any of the four databases). Therefore, DHS conducted searches on 420 randomly selected entities from a population of 760 unique entities that filed Form I–360 petitions.

Of the 420 searches for small entities that filed Form I–360 petitions, 415 searches successfully matched the name of the filing entity to names in the databases and 5 searches did not match the name of the filing entities in the databases. DHS assumes that filing entities not found in the online databases are likely to be small entities. As a result, in order to prevent underestimating the number of small

entities this rule would affect, DHS conservatively assumes to consider all of the non-matched entities as small entities for the purpose of this analysis. Among the 415 matches for Form I–360, DHS determined 309 to be small entities based on revenue or employee count and according to their NAICS code. Therefore, DHS was able to classify 388 of 420 entities as small entities that filed Form I–360 petitions, including combined non-matches (5), matches missing data (74), and small entity matches (309). DHS also used the subscription-based, online databases mentioned above (Hoover's, Manta, Cortera, and Guidestar), the 74 matches missing data that were found in the databases lacked revenue or employee count data.

DHS determined that 388 out of 420 (92.4 percent) entities filing Form I–360 petitions were small entities. Furthermore, DHS determined that 309 of the 420 searched were small entities based on sales revenue data, which were needed to estimate the economic impact of this final rule. Since 309 small entities were a subset of the random sample of 420 entity searches, they were statistically significant in the context of this research.

Similar to other forms analyzed in this RFA, DHS calculated the economic impact of this rule on entities that filed Form I–360 by estimating the total costs associated with the final fee increase for each entity. Among the 309 small entities with reported revenue data, each would experience an economic impact considerably less than 1.0 percent. The greatest economic impact imposed by this final fee change totaled 0.35 percent and the smallest totaled 0.000002 percent. The average impact on all 309 small entities with revenue data was 0.01 percent.

DHS also analyzed the final costs of this rule on the petitioning entities relative to the costs of the typical employee's salary. Guidelines suggested by the SBA Office of Advocacy indicate that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the entities in the sector.[153] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $53,290 for clergy,[154] $46,980 for directors of

religious activities and education,[155] and $35,860 for other religious workers.[156] Based on an average of 1.5 religious workers [157] petitioned for per entity, the additional average annual cost would be $22 per entity.[158] The additional costs per entity in this final rule represent only 0.04 percent of the average annual salary for clergy, 0.05 percent of the average annual salary for directors of religious activities and education, and 0.06 percent of the average annual salary for all other religious workers.[159] Therefore, using average annual labor cost guidelines, the additional regulatory compliance costs in this final rule are not significant.

e. Genealogy Requests. Genealogy Index Search Request Form G–1041 and Genealogy Record Request, Form G–1041A

DHS is increasing the fee to file both types of genealogy requests: Form G–1041, Genealogy Index Search Request, and Form G–1041A, Genealogy Record Request. The fee to file Form G–1041 will increase from $65 to $170, an increase of $105 (162 percent increase) for those who mail in this request on paper. In this rule, increases the fee for requestors who use the online electronic Form G–1041 version from the current $65 to $160, an increase of $95 (146 percent). The fee for Form G–1041A will increase from $65 to $265, an increase of $200 (308 percent) for those who mail in this request on paper. The fee for Form G–1041A is increasing from $65 to $255, an increase of $190 (292 percent) for those who use the electronic form.

Based on DHS records for calendar years 2013 to 2017, there was an annual average of 3,840 genealogy index search requests made using Form G–1041 and there was an annual average of 2,152

genealogy records requests made using Form G–1041A. DHS does not have sufficient data on the requestors for the genealogy forms to determine if entities or individuals submitted these requests.

DHS has previously determined that individuals usually make requests for historical records.[160] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and, therefore, DHS could not separate these data from the dataset. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. Therefore, DHS currently does not have sufficient data to definitively assess the impact on small entities for these requests.

However, DHS must still recover the full costs of this program. As stated in the preamble to this rule, reducing the filing fee for any one benefit request submitted to DHS simply transfers the additional cost to process this request to other immigration and naturalization filing fees.

For this rule, DHS is expanding the use of electronic genealogy requests to encourage requesters to use the electronic versions of Form G–1041 and Form G–1041A. DHS is changing the search request process so that USCIS may provide requesters with electronic records, if they exist, in response to the initial index request. These final changes may reduce the time it takes to request and receive genealogy records, and, in some cases, it will eliminate the need to make multiple search requests and submit separate fees. Moreover, DHS notes that providing digital records in response to a Form G–1041 request may reduce the number of Form G–1041A requests that will be filed because there would already be a copy of the record if it was previously digitized. As a result, the volume of Form G–1041A requests USCIS receives may decrease, though DHS is unable to estimate by how much. DHS recognizes that some small entities may be impacted by these proposed increased but cannot determine how many or the exact impact.

DHS recognizes that some small entities may be impacted by these increased fees but cannot determine how many or the exact impact.

---

[153] Office of Advocacy, Small Business Administration, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act", page 19: *https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf*

[154] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, "Clergy": *https://www.bls.gov/oes/2018/may/oes212011.htm*

[155] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, "Directors of Religious Activities and Education": *https://www.bls.gov/oes/2018/may/oes212099.htm*

[156] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, "Religious Workers, All Other": *https://www.bls.gov/oes/2018/may/oes212099.htm*.

[157] USCIS calculated the average filing per entity of 1.5 petitions, from the Form I–360 Sample with Petition Totals in Appendix E, of the SEA for the U.S. Citizenship and Immigration Services Fee Schedule NPRM. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–360 petitions) = 618/420 = 1.5 average petitions filed per entity.

[158] Calculation: 1.5 average petitions per entity * $15 increase in petition fees = approximately $22 additional total cost per entity.

[159] Calculation: $22 per entity/$53,290 clergy salary × 100 = .04 percent;

$22 per entity/$46,980 directors of religious activities and education × 100 = .05 percent;

$22 per entity/$35,860 other religious workers × 100 = .06 percent.

[160] *See* "Establishment of a Genealogy Program; Proposed Rule," 71 FR 20357—20368 (April 20, 2006). Available at: *https://www.regulations.gov/document?D=USCIS-2006-0013-0001*.

f. Regional Center Under the Immigrant Investor Program, Form I–924 and I–924A

As part of the Immigration Act of 1990, Public Law 101–649, 104 Stat. 4978 (Nov. 29, 1990), Congress established the EB–5 immigrant visa classification to incentivize employment creation in the United States. Under the EB–5 program, lawful permanent resident (LPR) status is available to foreign nationals who invest the required amount in a new commercial enterprise that will create at least 10 full-time jobs in the United States. *See* INA section 203(b)(5), 8 U.S.C. 1153(b)(5). A foreign national may also invest a lower amount in a targeted employment area defined to include rural areas and areas of high unemployment. *Id.;* 8 CFR 204.6(f). The INA allots 9,940 immigrant visas each fiscal year for foreign nationals seeking to enter the United States under the EB–5 classification.[161] *See* INA section 201(d), 8 U.S.C. 1151(d); INA section 203(b)(5), 8 U.S.C. 1153(b)(5). Not fewer than 3,000 of these visas must be reserved for foreign nationals investing in targeted employment areas. *See* INA section 203(b)(5)(B), 8 U.S.C. 1153(b)(5)(B).

Enacted in 1992, section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1993, Public Law 102–395, 106 Stat. 1828 (Oct. 6, 1992), established a pilot program that requires the allocation of a limited number of EB–5 immigrant visas to individuals who invest through DHS-designated regional centers.[162] Under the Regional Center Program, foreign nationals base their EB–5 petitions on investments in new commercial enterprises located within USCIS-designated ''regional centers.'' DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment. *See* 8 CFR 204.6(e). While all EB–5 petitioners go through the same petition process, those petitioners participating in the Regional Center Program may meet statutory job creation requirements based on economic projections of either *direct* or *indirect* job creation, rather than only on jobs directly created by the new commercial enterprise. *See* 8 CFR 204.6(j)(4)(iii), (m)(3). As of August 12, 2019, there were 826 USCIS-approved Regional Centers.[163] Requests for regional center designation must be filed with USCIS on Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program. *See* 8 CFR 204.6(m)(3)–(4). Once designated, regional centers must provide USCIS with updated information to demonstrate continued eligibility for the designation by submitting a Form I–924A, Annual Certification of Regional Center, on an annual basis or as otherwise requested. *See* 8 CFR 204.6(m)(6)(i)(B).

DHS will not adjust the fee for Form I–924. The current fee to file Form I–924 is $17,795. However, DHS is increasing the fee for Form I–924A from $3,035 to $4,465 per filing, an increase of $1,430 (47 percent). Using a 12-month period of data on the number of Forms I–924 and I–924A from October 1, 2016 to September 31, 2017, DHS collected internal data on these forms. DHS received a total of 280 Form I–924 applications and 847 Form I–924A applications.

Regional centers are difficult to assess because there is a lack of official data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways and can involve multiple business and financial activities, some of which may play a direct or indirect role in linking investor funds to new commercial enterprises and job-creating projects or entities.

Regional centers also pose a challenge for analysis as the structure is often complex and can involve many related business and financial activities not directly involved with EB–5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above market return differentials. In the past, DHS has attempted to treat the regional centers similar to the other entities in this analysis. DHS was not able to identify most of the entities in any of the public or private databases. Furthermore, while regional centers are an integral component of the EB–5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either $900,000 for TEA projects or $1.8 million for a non-TEA projects per investor)[164] that get invested into an NCE. Such investments amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

The information provided by regional centers as part of the Forms I–924 and I–924A does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions in an attempt to analyze the small entity status of regional centers.[165] In the DHS final rule ''EB–5 Immigrant Investor Program Modernization,'' DHS analyzed the estimated administrative fees and revenue amounts for regional centers. DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be $1,250,000 over the period fiscal years 2014 to 2017. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities

---

[161] An immigrant investor, his or her spouse, and children (if any) will each use a separate visa number.

[162] Current law requires that DHS annually set aside 3,000 EB–5 immigrant visas for regional center investors. Public Law 105–119, sec. 116, 111 Stat. 2440 (Nov. 26, 1997). If this full annual allocation is not used, remaining visas may be allocated to foreign nationals who do not invest in regional centers.

[163] USCIS Immigrant Investor Regional Centers: *https://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers* (last reviewed/updated Aug. 20, 2019).

[164] U.S. Department of Homeland Security, USCIS—EB–5 Immigrant Investor Program Modernization, Final Rule. *See* 84 FR 35750. Dated July 24, 2019. Available at *https://www.govinfo.gov/content/pkg/FR-2019-07-24/pdf/2019-15000.pdf*. This amount by investor is determined between a designated Target Employment Area and non-Target Employment Area.

[165] The methodology used to analyze the small entity status of regional centers is explained in further detail in Section D of the RFA section within DHS final rule ''EB–5 Immigrant Investor Program Modernization,'' available at 84 FR 35750.

based on existing information, DHS would assume existing regional centers with revenues equal to or less than $446,500 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact. If DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[166]

e. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

This final rule imposed lower or higher fees for filers of Forms I–129. DHS is changing the following fees for new Forms I–129 (separated into new forms by worker type). The new fee structure as it applies to the small entities outline above, resulting the following fees: I–129H1 ($555), I–129H2A (Named Beneficiaries, $850) I–129H2A (Unnamed Beneficiaries, $415), I–129H2B (Named, $715), I–129H2B (Unnamed, $385), I–129O ($705), I–129L ($805), I–129CW ($695), I–129E&TN ($695), I–129MISC (Includes H–3, P, Q, or R Classifications, $695), I–140 ($555), I–910 ($635), I–924 ($17,795), I–924A ($4,465), Form I–360 ($450), G–1041 ($170 paper, $160 online) and G–1041A ($265 paper, $255 online). This final rule does not require any new professional skills for reporting.

f. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered By the Agency Which Affect the Impact on Small Entities Was Rejected

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees

collected for other immigration benefits. Without an increase in fees, DHS will not be able to maintain the level of service for immigration and naturalization benefits that it now provides. DHS has considered the alternative of maintaining fees at the current level with reduced services and increased processing times but has determined that this will not be in the interest of applicants and petitioners. Therefore, this alternative was rejected. While most immigration benefit fees apply to individuals, as described previously, some also apply to small entities. DHS seeks to minimize the impact on all parties, but in particular small entities.

Another alternative to the increased economic burden of the fee adjustment is to maintain fees at their current level for small entities. The strength of this alternative is that it assures that no additional fee-burden is placed on small entities; however, small entities will experience negative effects due to the service reductions that will result in the absence of the fee adjustments in this final rule. Without the fee adjustments provided in this final rule, significant operational changes to USCIS would be necessary. Given current filing volume considerations, DHS requires additional revenue to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as Federal and contract staff, infrastructure spending on information technology and facilities, and training. Depending on the actual level of workload received, these operational changes could result in longer processing times, a degradation in customer service, and reduced efficiency over time. These cuts would ultimately represent an increased cost to small entities by causing delays in benefit processing and reductions in customer service.

For reasons explained more fully elsewhere in the preamble to the final rule, DHS chose the approach contained in this final rule.

*C. Congressional Review Act*

DHS has sent this final rule to the Congress and to the Comptroller General under the Congressional Review Act, 5 U.S.C. 801 *et seq.* The Administrator of the Office of Information and Regulatory Affairs has determined that this final rule is a "major rule" within the meaning of the Congressional Review Act. This rule will be effective at least 60 days after the date on which Congress receives a report submitted by DHS under the Congressional Review Act, or 60 days after the final rule's publication, whichever is later.

*D. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The inflation-adjusted value equivalent of $100 million in 1995 adjusted for inflation to 2019 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is approximately $168 million based on the Consumer Price Index for All Urban Consumers.[167]

While this final rule may result in the expenditure of more than $100 million by the private sector annually, the rulemaking is not a "Federal mandate" as defined for UMRA purposes.[168] The payment of immigration benefit fees by individuals or other private entities is, to the extent it could be termed an enforceable duty, one that arises from participation in a voluntary Federal program, applying for immigration status in the United States.[169] This final rule does not contain such a mandate. The requirements of Title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

*E. Executive Order 13132 (Federalism)*

This final rule does not have federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in

---

[166] Calculation: 1 percent of $446,500 = $4,465 (the new fee for Form I–924A).

[167] *See* U.S. Bureau of Labor Statistics, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, available at https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202003.pdf* (last visited June 2, 2020).

Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2019); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2019 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(255.657 − 152.383)/152.383] * 100 = (103.274/152.383) * 100 = 0.6777 * 100 = 67.77 percent = 68 percent (rounded)

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.68 = $168 million in 2019 dollars.

[168] *See* 2 U.S.C. 658(6).

[169] *See* 2 U.S.C. 658(7)(A)(ii).

AR2022_200510

accordance with section 6 of Executive Order 13132, it is determined that this final rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This final rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3 of E.O. 12988.

*G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments*

This final rule does not have "tribal implications" because it does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

*H. Family Assessment*

Section 654 of the Treasury and General Government Appropriations Act, 1999 (Pub. L. 105–277) requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether the regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) if the regulatory action financially impacts families, are justified; (6) may be carried out by State or local government or by the family; and (7) establishes a policy

concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the determination is affirmative, then the Agency must prepare an impact assessment to address criteria specified in the law. DHS has no data that indicates that the rule will have any impacts on disposable income or the poverty of certain families and children, including U.S. citizen children. A family may have to delay applying until they have saved funds for a fee set by this final rule, or pay the fee using a credit card. Nevertheless, DHS believes that the benefits of the new fees justify the financial impact on the family. DHS determined that this rulemaking's impact is justified and no further actions are required. DHS also determined that this final rule will not have any impact on the autonomy or integrity of the family as an institution.

*I. National Environmental Policy Act (NEPA)*

This final rule adjusts certain immigration and naturalization benefit request fees charged by USCIS. It also makes changes related to setting, collecting, and administering fees. Fee schedule adjustments are necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits, while protecting Americans, securing the homeland, and honoring our values. This final rule also makes certain adjustments to fee waiver eligibility, filing requirements for nonimmigrant workers, premium processing service, and other administrative requirements.

DHS analyzes actions to determine whether NEPA applies to them and if so what degree of analysis is required. DHS Directive (Dir) 023–01 Rev. 01 and Instruction Manual (Inst.) 023–01–001 Rev. 01 establish the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508. The CEQ regulations allow Federal agencies to establish, with CEQ review and

concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Instruction 023–01–001 Rev. 01 establishes such Categorical Exclusions that DHS has found to have no such effect. Inst. 023–01–001 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Inst. 023–01–001 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions;

(2) the action is not a piece of a larger action; and

(3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Inst. 023–01–001 Rev. 01 section V.B(1)–(3).

DHS has analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis. This final rule fits within the Categorical Exclusion found in DHS Inst. 023–01–001 Rev. 01, Appendix A, Table 1, number A3(d): "Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect." This final rule is not part of a larger action. This final rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this final rule is categorically excluded from further NEPA review.

*J. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). The Information Collection table 11 below shows the summary of forms that are part of this rulemaking.

Table 11—Information Collection

| OMB No. | Form No. | Form name | Type of information collection. |
|---|---|---|---|
| 1615–0105 .................. | G–28 ........................... | Notice of Entry of Appearance as Attorney or Accredited Representative. | No material or non-substantive change to a currently approved collection. |
| 1615–0096 .................. | G–1041 ...................... | Genealogy Index Search Request ................. | No material or non-substantive change to a currently approved collection. |
|  | G–1041A ................... | Genealogy Records Request (For each microfilm or hard copy file). |  |

AR2022_200511

TABLE 11—INFORMATION COLLECTION—Continued

| OMB No. | Form No. | Form name | Type of information collection. |
|---------|----------|-----------|--------------------------------|
| 1615–0079 .................. | I–102 .......................... | Application for Replacement/Initial Non-immigrant Arrival-Departure Document. | No material or non-substantive change to a currently approved collection. |
| 1615–0111 .................. | I–129CW .................... | Petition for a CNMI-Only Nonimmigrant Transitional Worker. | No material or non-substantive change to a currently approved collection. |
|  | I–129CWR .................. | Semiannual Report for CW–1 Employers. |  |
| 1615–0146 .................. | I–129E&TN ................ | Application for Nonimmigrant Worker: E and TN Classifications. | New Collection. |
| 1615–0001 .................. | I–129F ........................ | Petition for Alien Fiancé(e) ............................ | No material or non-substantive change to a currently approved collection. |
| 1615–0009 .................. | I–129H1 ...................... | Petition for Nonimmigrant Worker: H–1 Classifications. | Revision of a Currently Approved Collection. |
| 1615–0150 .................. | I–129H2A ................... | Petition for Nonimmigrant Worker: H–2A Classification. | New Collection. |
| 1615–0149 .................. | I–129H2B ................... | Petition for Nonimmigrant Worker: H–2B Classification. | New Collection. |
| 1615–0147 .................. | I–129L ........................ | Petition for Nonimmigrant Worker: L Classifications. | New Collection. |
| 1615–0145 .................. | I–129MISC ................ | Petition for Nonimmigrant Worker: H–3, P, Q, or R Classifications. | New Collection. |
| 1615–0148 .................. | I–129O ....................... | Petition for Nonimmigrant Worker: O Classifications. | New Collection. |
| 1615–0012 .................. | I–130 .......................... | Petition for Alien Relative .............................. | No material or non-substantive change to a currently approved collection. |
|  | I–130A ........................ | Supplemental Information for Spouse Beneficiary. |  |
| 1615–0013 .................. | I–131 .......................... | Application for Travel Document ................... | Revision of a Currently Approved Collection. |
| 1615–0135 .................. | I–131A ........................ | Application for Travel Document (Carrier Documentation). | Revision of a Currently Approved Collection. |
| 1615–0015 .................. | I–140 .......................... | Immigrant Petition for Alien Worker ................ | No material or non-substantive change to a currently approved collection. |
| 1615–0016 .................. | I–191 .......................... | Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act. | No material or non-substantive change to a currently approved collection. |
| 1615–0017 .................. | I–192 .......................... | Application for Advance Permission to Enter as Nonimmigrant. | No material or non-substantive change to a currently approved collection. |
| 1615–0018 .................. | I–212 .......................... | Application for Permission to Reapply for Admission Into the United States After Deportation or Removal. | No material or non-substantive change to a currently approved collection. |
| 1615–0095 .................. | I–290B ........................ | Notice of Appeal or Motion ............................ | No material or non-substantive change to a currently approved collection. |
| 1615–0020 .................. | I–360 .......................... | Petition for Amerasian, Widow(er), or Special Immigrant. | No material or non-substantive change to a currently approved collection. |
| 1615–0023 .................. | I–485 .......................... | Application to Register Permanent Residence or Adjust Status. | No material or non-substantive change to a currently approved collection. |
|  | I–485A ........................ | Supplement A to Form I–485, Adjustment of Status Under Section 245(i). |  |
|  | I–485J ........................ | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j). |  |
| 1615–0026 .................. | I–526 .......................... | Immigrant Petition by Alien ............................ | No material or non-substantive change to a currently approved collection. |
| 1615–0003 .................. | I–539 .......................... | Application to Extend/Change Nonimmigrant Status. | No material or non-substantive change to a currently approved collection. |
| 1615–0003 .................. | I–539A ........................ | Supplemental Information for Application to Extend/Change Nonimmigrant Status. | No material or non-substantive change to a currently approved collection. |
| 1615–0067 .................. | I–589 .......................... | Application for Asylum and for Withholding of Removal. | Revision of a Currently Approved Collection. |
| 1615–0028 .................. | I–600 .......................... | Petition to Classify Orphan as an Immediate Relative. | Revision of a Currently Approved Collection. |
|  | I–600A ........................ | Application for Advance Processing of an Orphan Petition. |  |
|  | I–600/A SUPP1 .......... | Form I–600A/I–600 Supplement 1, Listing of Adult Member of the Household. |  |
|  | I–600/A SUPP2 .......... | Form I–600A/I–600 Supplement 2, Consent to Disclose Information. |  |
|  | I–600/A SUPP3 .......... | Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600. |  |
| 1615–0029 .................. | I–601 .......................... | Application for Waiver of Grounds of Inadmissibility. | No material or non-substantive change to a currently approved collection. |
| 1615–0123 .................. | I–601A ........................ | Application for Provisional Unlawful Presence Waiver. | No material or non-substantive change to a currently approved collection. |

TABLE 11—INFORMATION COLLECTION—Continued

| OMB No. | Form No. | Form name | Type of information collection. |
|---|---|---|---|
| 1615–0030 .................... | I–612 ......................... | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended). | No material or non-substantive change to a currently approved collection. |
| 1615–0032 .................... | I–690 ......................... | Application for Waiver of Grounds of Inadmissibility. | No material or non-substantive change to a currently approved collection. |
| 1615–0034 .................... | I–694 ......................... | Notice of Appeal of Decision Under Sections 245A or 210 of the Immigration and Nationality Act. | No material or non-substantive change to a currently approved collection. |
| 1615–0035 .................... | I–698 ......................... | Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA). | No material or non-substantive change to a currently approved collection. |
| 1615–0038 .................... | I–751 ......................... | Petition to Remove Conditions on Residence | No material or non-substantive change to a currently approved collection. |
| 1615–0040 .................... | I–765 ......................... | Application for Employment Authorization ...... | Revision of a Currently Approved Collection. |
| 1615–0005 .................... | I–817 ......................... | Application for Benefits Under the Family Unity Program. | No material or non-substantive change to a currently approved collection. |
| 1615–0043 .................... | I–821 ......................... | Application for Temporary Protected Status ... | No material or non-substantive change to a currently approved collection. |
| 1615–0044 .................... | I–824 ......................... | Application for Action on an Approved Application or Petition. | No material or non-substantive change to a currently approved collection. |
| 1615–0045 .................... | I–829 ......................... | Petition by Investor to Remove Conditions on Permanent Resident Status. | No material or non-substantive change to a currently approved collection. |
| 1615–0072 .................... | I–881 ......................... | Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Sec. 203 of Pub. L. 105–100). | No material or non-substantive change to a currently approved collection. |
| 1615–0082 .................... | I–90 ......................... | Application to Replace Permanent Resident Card. | No material or non-substantive change to a currently approved collection. |
| 1615–0048 .................... | I–907 ......................... | Request for Premium Processing Service ...... | No material or non-substantive change to a currently approved collection. |
| 1615–0114 .................... | I–910 ......................... | Application for Civil Surgeon Designation ...... | No material or non-substantive change to a currently approved collection. |
| 1615–0116 .................... | I–912 ......................... | Request for Fee Waiver ................................... | Revision of a Currently Approved Collection. |
| 1615–0099 .................... | I–914 ......................... | Application for T nonimmigrant status ........... | No material or non-substantive change to a currently approved collection. |
| 1615–0104 .................... | I–918 ......................... | Petition for U nonimmigrant status ................ | No material or non-substantive change to a currently approved collection. |
| 1615–0061 .................... | I–924 ......................... | Application for Regional Designation Center Under the Immigrant Investor Program. | No material or non-substantive change to a currently approved collection. |
|  | I–924A ....................... | Annual Certification of Regional Center. |  |
| 1615–0106 .................... | I–929 ......................... | Petition for Qualifying Family Member of a U–1 Nonimmigrant. | No material or non-substantive change to a currently approved collection. |
| 1615–0136 .................... | I–941 ......................... | Application for Entrepreneur Parole .............. | No material or non-substantive change to a currently approved collection. |
| 1615–0133 .................... | I–942 ......................... | Application for Reduced Fee ......................... | Discontinuation |
| 1615–0122 .................... | Immigrant Fee ........... | Fee paid for immigrant visa processing ......... | No material or non-substantive change to a currently approved collection. |
| 1615–0050 .................... | N–336 ....................... | Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336. | No material or non-substantive change to a currently approved collection. |
| 1615–0052 .................... | N–400 ....................... | Application for Naturalization ........................ | No material or non-substantive change to a currently approved collection. |
| 1615–0056 .................... | N–470 ....................... | Application to Preserve Residence for Naturalization Purposes. | No material or non-substantive change to a currently approved collection. |
| 1615–0091 .................... | N–565 ....................... | Application for Replacement of Naturalization/Citizenship Document. | No material or non-substantive change to a currently approved collection. |
| 1615–0057 .................... | N–600 ....................... | Application for Certification of Citizenship ...... | No material or non-substantive change to a currently approved collection. |
| 1615–0087 .................... | N–600K ..................... | Application for Citizenship and Issuance of Certificate under Section 322. | No material or non-substantive change to a currently approved collection. |

Various USCIS Forms

This final rule will require non-substantive edits to the forms listed above where the Type of Information Collection column states, ''No material/non-substantive change to a currently approved collection.'' These edits include: Updates to the fees collected, including changes to the collection of

biometric services fees; modification of various form instructions to conform with changes to USCIS Form I–912; modification to USCIS Form N–400 to conform with the discontinuation of USCIS Form I–942; modification to various form instructions to conform with changes to the conditions for fee exemptions; removal of the returned

check fee; text clarifying that a second presentment is limited to NSF checks, addition of language regarding delivery requirements of certain secured documents; general language modification of fee activities within various USCIS forms. Accordingly, USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form

OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.[170]

USCIS Form I–129H1

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for a Nonimmigrant Worker: H–1B Classifications.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129H1; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant classification and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form to petition USCIS for classification of an alien as an H–1B nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay of an H–1B or H–1B1 nonimmigrant worker or to change the status of an alien currently in the United States as a nonimmigrant to H–1B or H–1B1. The form serves the purpose of standardizing requests for H–1B and H–1B1 nonimmigrant workers and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under the H–1B or H–1B1 nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129H1 is 402,034 and the estimated hour burden per response is 4 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,608,136 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual

cost burden associated with this collection of information is $207,047,510.

USCIS Form I–129H2A

*Overview of information collection:*
(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for a Nonimmigrant Worker: H–2A Classifications.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129H2A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested H–2A nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer or agent uses this form to petition USCIS for classification of an alien as an H–2A nonimmigrant. An employer or agent also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for H–2A nonimmigrant workers and ensuring that basic information required for assessing eligibility is provided by the petitioner. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129H2A is 12,008 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection Named Worker Attachment for Form I–129H2A is 65,760 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection Joint Employer Supplement for Form I–129H2A is 5,000 and the estimated hour burden per response is 0.167 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 69,739 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,184,120.

USCIS Form I–129H2B

*Overview of information collection:*
(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: H–2B Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129H2B; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested H–2B nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer or agent uses this form to petition USCIS for classification of an alien as an H–2B nonimmigrant. An employer or agent also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers and ensuring that basic information required for assessing eligibility is provided by the petitioner. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129H2B is 6,340 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection Named Worker Attachment for Form I–129H2B is 58,104 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 48,072 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $3,265,100.

USCIS Form I–129L

*Overview of information collection:*
(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: I–129L Classification.

(3) *Agency form number, if any, and the applicable component of the DHS*

---

[170] As stated earlier DHS is removing the $30 fee for dishonored fee payment instruments. EOIR will make conforming changes to its affected forms separately. . .

*sponsoring the collection:* I–129L; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on Form I–129L to determine a petitioner and beneficiary's eligibility for L–1A and L–1B classification. The form is also used to determine eligibility for an LZ Blanket petition. An employer uses this form to petition USCIS for classification of the beneficiary as an L–1 nonimmigrant. An employer also uses this form to request an extension of stay or change of status on behalf of the beneficiary. The form standardizes these types of petitioners and ensures that the information required for assessing eligibility is provided by the petitioner about themselves and the beneficiary. The form also enables USCIS to compile data required for an annual report to Congress assessing the effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129L is 42,871 and the estimated hour burden per response is 3 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 128,613 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $22,078,565.

USCIS Form I–129O

*Overview of information collection:*
(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: O Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129O; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer (or agent uses this form to petition USCIS for classification of an alien as an O nonimmigrant worker. An employer or agent also uses

this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under certain nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129O is 25,516 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection Attachment 1—Additional Beneficiary for Form I–129O is 1,189 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 77,143 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $13,140,740.

USCIS Form I–129MISC

*Overview of information collection:*
(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–129MISC; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant classification and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form to petition USCIS for classification of an alien as an H–3, P, Q, or R nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay of an H–3, P, Q, or R nonimmigrant worker or to change the status of an alien currently in the United States as a nonimmigrant to H–3, P, Q, or R. The form serves the

purpose of standardizing requests for H–3, P, Q, or R nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under the H–3, P, Q, or R nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129MISC is 28,799 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection H–3 Classification Supplement to Form I–129MISC, Petition for Nonimmigrant Worker: H–3, P, Q, or R Classification is 1,449 and the estimated hour burden per response is 0.25 hours; the estimated total number of respondents for the information collection P Classification Supplement to Form I–129MISC is 18,524 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection Q–1 International Cultural Exchange Alien Supplement to Form I–129MISC is 295 and the estimated hour burden per response is 0.167 hours; the estimated total number of respondents for the information collection R–1 Classification Supplement to Form I–129MISC is 1 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the information collection Attachment 1-Additional Beneficiary for Form I–129MISC is 8,531 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 107,847 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $14,831,485.

USCIS Form I–129E&TN

*Overview of information collection:*
(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker: E and TN Classification.

(3) *Agency form number, if any, and the applicable component of the DHS*

*sponsoring the collection:* I–129E&TN; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit; Not-for-profit institutions. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant classification and/or requests to extend or change nonimmigrant status. An employer agent, or applicant uses this form to apply to USCIS for classification of an alien as an E–1, E–2, E–3, or TN nonimmigrant. An employer, agent, applicant, or CNMI investor also uses this form to request an extension of stay in one of these classifications for an alien or for themselves, or to change the status of an alien currently in the United States as a nonimmigrant or their own status if they are currently in the United States as a nonimmigrant to E–1, E–2, E–3, or TN. The form serves the purpose of standardizing requests for nonimmigrant workers in these classifications and ensuring that basic information required for assessing eligibility is provided by the applicant. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–129E&TN is 12,709 and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the information collection E–1/E–2 Classification Supplement to Form I–129E&TN is 4,236 and the estimated hour burden per response is 1.45 hours; the estimated total number of respondents for the information collection E–3 Classification Supplement to Form I–129E&TN is 2,824 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the information collection NAFTA Supplement to Form I–129E&TN is 7,349 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 50,768 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,545,135.

## USCIS Form I–131

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Travel Document, Form I–131; Extension, Without Change, of a Currently Approved Collection.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–131; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Certain aliens, principally permanent or conditional residents, refugees or asylees, applicants for adjustment of status, aliens in Temporary Protected Status (TPS), and aliens abroad seeking humanitarian parole who need to apply for a travel document to lawfully enter or reenter the United States. Lawful permanent residents may now file requests for travel permits (transportation letter or boarding foil).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–131 is 464,900 and the estimated hour burden per response is 1.9 hours; the estimated total number of respondents for biometrics processing is 86,000 and the estimated hour burden per response is 1.17 hours, the estimated total number of respondents for passport-style photos is 360,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,163,930 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $143,654,100.

## USCIS Form I–131A

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Carrier Documentation.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–131A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses the information provided on Form I–131A to verify the status of permanent or conditional residents, and aliens traveling abroad on an Advance Parole Document (Form I–512 or I–512L) or Employment Authorization Documents (EAD) with travel endorsement (Form I–766) and to determine whether the applicant is eligible for the requested travel document.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–131A is 5,100 and the estimated hour burden per response is .92 hours; biometrics processing is 5,100 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 10,659 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $919,275.

## USCIS Form I–589

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Asylum and for Withholding of Removal.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–589; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. Form I–589 is necessary to determine whether an alien applying for asylum and/or withholding of removal in the United States is classified as a refugee and is eligible to remain in the United States.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of USCIS respondents for the information collection in Form I–589 is approximately 114,000, and the estimated annual respondents for Form I–589 filed with DOJ is approximately 150,000. The estimated hour burden per response is 13 hours per response; and the estimated number of respondents providing biometrics to USCIS is 110,000, and to DOJ (collected on their behalf by USCIS) is 150,000. The estimated hour burden per response for biometrics submissions is 1.17 hours.

**46912** Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection for USCIS is 1,610,700 hours, and for DOJ is 2,125,500.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information for USCIS is estimated to be $46,968,000 and for DOJ is $61,800,000.

USCIS Form I–600, I–600A, Supplement 1, Supplement 2, Supplement 3

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition to Classify Orphan as an Immediate Relative; Application for Advance Processing of an Orphan Petition; Supplement 1, Listing of an Adult Member of the Household; Supplement 2, Consent to Disclose Information; Supplement 3, Request for Action on Approved Form I–600A/I–600.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–600, Form I–600A, Form I–600A/I–600 Supplement 1, Form I–600A/I–600 Supplement 2, Form I–600A/I–600 Supplement 3; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. A U.S. citizen prospective/adoptive parent may file a petition to classify an orphan as an immediate relative under section 201(b)(2)(A) of the INA. A U.S. citizen adoptive parent may file a petition to classify an orphan as an immediate relative through Form I–600 under section 101(b)(1)(F) of the INA. A U.S. citizen prospective adoptive parent may file Form I–600A in advance of the Form I–600 filing and USCIS will make a determination regarding the prospective adoptive parent's eligibility to file Form I–600A and his or her suitability and eligibility to properly parent an orphan. If there are other adult members of the U.S. citizen prospective/adoptive parent's household, as defined at 8 CFR 204.301, the prospective/adoptive parent must include Form I–600A/I–600 Supplement 1 when filing both Form I–600A and Form I–600. A Form I–600A/I–600 Supplement 2, Consent to Disclose Information, is an optional form that a U.S. citizen prospective/adoptive parent may file to authorize USCIS to disclose case-related information that would otherwise be protected under the Privacy Act, 5 U.S.C. 552a, to adoption service providers or other individuals. Form I–600A/I–600 authorize d disclosures will assist USCIS in the adjudication of Forms I–600A and I–600. USCIS has created a new Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600, for this information collection. Form I–600A/I–600 Supplement 3 is a form that prospective/adoptive parents must use if they need to request action such as an extended or updated suitability determination based upon a significant change in their circumstances or change in the number or characteristics of the children they intend to adopt, a change in their intended country of adoption, or a request for a duplicate notice of their approved Form I–600A suitability determination.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–600 is 1,200 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600A is 2,000 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 1 is 301 and the estimated hour burden per response is 1 hour; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 2 is 1,260 and the estimated hour burden per response is 0.25 hours; the estimated total number of respondents for the information collection Form I–600/I–600A Supplement 3 is 1,286 and the estimated hour burden per response is 1 hours; the estimated total number of respondents for the Home Study information collection is 2,500 and the estimated hour burden per response is 25 hours; the estimated total number of respondents for the Biometrics information collection is 2,520 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the Biometrics—DNA information collection is 2 and the estimated hour burden per response is 6 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 70,562.40 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $7,759,232.

USCIS Form I–765

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–765; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if an alien is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Aliens in many immigration statuses are required to possess an EAD as evidence of work authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–765 is 2,286,000 and the estimated hour burden per response is 4.5 hours; the estimated total number of respondents for the information collection I–765WS is 302,000 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection biometrics is 302,535 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection passport photos is 2,286,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 11,934,966 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

USCIS Form I–912

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for Fee Waiver.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–912; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses the data collected on this form to verify that the applicant is unable to pay for the immigration benefit being requested. USCIS will consider waiving a fee for an application or petition when the applicant or petitioner clearly demonstrates he or she is eligible based on 8 CFR 106.3. Form I–912 standardizes the collection and analysis of statements and supporting documentation provided by the applicant with the fee waiver request. Form I–912 also streamlines and expedites USCIS' approval, or rejection of the fee waiver request by clearly laying out the most salient data and evidence necessary for the determination of inability to pay. Officers evaluate all information and evidence supplied in support of a fee waiver request when making a final determination. Each case is unique and is considered on its own merits. If the fee waiver is granted, the application will be processed. If the fee waiver is not granted, USCIS will notify the applicant and instruct him or her to file a new application with the appropriate fee.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–912 is 116,832 and the estimated hour burden per response is 2.33 hours; the estimated total number of respondents for the information collection DACA Exemptions is 108 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection Director's Exemption Provision in new 8 CFR 106.3(e) is 20 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 272,368 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $438,600.

USCIS Form I–942

This final rule discontinues the use of Form I–942, Request for Reduced Fee, because DHS is eliminating the option to request a reduced fee. Accordingly, USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–D, and amended information

collection instruments to OMB for review and approval in accordance with the PRA.

*Differences in information collection request respondent volume and fee model filing volume projections.*

DHS acknowledges that the estimates of annual filing volume in the PRA section of this preamble are not the same as those used in the ABC model used to calculate the fee amounts in this rule. For example, the fee calculation model estimates 163,000 annual Form I–589 filings while the PRA section estimates the average annual number of respondents will be 114,000. The model projects 2,455,000 Form I–765 filings while the estimated total number of respondents for the information collection I–765 is 2,096,000. As stated in the NPRM and section III.L.1 of this preamble, the VPC forecasts USCIS workload volume based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality) or correlations with historical events to forecast receipts. Workload volume is used to determine the USCIS resources needed to process benefit requests and is the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model. DHS uses a different method for estimating the average annual number of respondents for the information collection over the three-year OMB approval of the control number, generally basing the estimate on the average filing volumes in the previous 3 or 5 year period, with less consideration of the volume effects of planned or past policy changes. Nevertheless, when the information collection request is nearing expiration, USCIS will update the estimates of annual respondents based on actual filing volumes that occur after this final rule takes effect in the submission to OMB. The PRA burden estimates are generally updated at least every three years. Thus, DHS expects that the PRA estimated annual respondents will be updated to reflect the actual effects of this proposed rule within a relatively short period after a final rule takes effect.

*K. Signature*

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, is delegating the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the **Federal Register**.

List of Subjects

*8 CFR Part 103*

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, and Surety bonds.

*8 CFR Part 106*

Immigration, User fees.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 211*

Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Foreign officials, Health professions, Reporting and recordkeeping, requirements, Students.

*8 CFR Part 216*

Administrative practice and procedure, Aliens.

*8 CFR Part 217*

Air carriers, Aliens, Maritime carriers, Passports and visas.

*8 CFR Part 223*

Aliens, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirement.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 240*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure; Immigration.

*8 CFR Parts 245 and 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

**46914** **Federal Register** / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

*8 CFR Parts 248 and 264*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 286*

Air carriers, Immigration, Maritime carriers, Reporting and recordkeeping requirements.

*8 CFR Parts 301 and 319*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Parts 320 and 322*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 324*

Citizenship and naturalization, Reporting and recordkeeping requirements, Women.

*8 CFR Part 334*

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Parts 341, 343a, 343b, and 392*

Citizenship and naturalization, Reporting and recordkeeping requirements.

Accordingly, DHS proposes to amend chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 103—IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 31 U.S.C. 9701; 48 U.S.C. 1806; Pub. L.107–296, 116 Stat. 2135 (6 U.S.C. 101 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54, 125 Stat 550. Pub. L. 115–218.

■ 2. The heading for part 103 is revised to read as set forth above.
■ 3. Section 103.2 amended:
■ a. By revising the last sentence of paragraph (a)(1) and adding a new last sentence;
■ b. By revising paragraph (a)(7)(ii)(D);
■ c. In paragraph (b)(9) introductory text, by removing "8 CFR 103.7(b)(1)(i)(C)" and adding in its place

"8 CFR 106.2" in the second sentence; and
■ d. By revising paragraph (b)(19)(iii). The revisions read as follows:

### § 103.2   Submission and adjudication of benefit requests.

(a) * * *
(1) * * * All USCIS fees are generally are non-refundable regardless of if the benefit request or other service is approved, denied, or selected, or how much time the adjudication or processing requires. Except as otherwise provided in this chapter I, fees must be paid when the request is filed or submitted.

*       *       *       *       *

(7) * * *
(ii) * * *
(D) Submitted with the correct fee(s). If a check or other financial instrument used to pay a fee is returned as unpayable because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is returned as unpayable a second time, the filing may be rejected. Financial instruments returned as unpayable for a reason other than insufficient funds will not be redeposited. If a check or other financial instrument used to pay a fee is dated more than one year before the request is received, the payment and request may be rejected.

*       *       *       *       *

(b) * * *
(19) * * *
(iii) *Secure identity documents.* (A) USCIS may send secure identification documents, such as a Permanent Resident Card or Employment Authorization Document, only to the applicant or self-petitioner unless the applicant or self-petitioner specifically consents to having his or her secure identification document sent to a designated agent, their attorney or accredited representative or record, as specified on the form instructions.

(B) The designated agent, or attorney or accredited representative, will be required to provide identification and sign for receipt of the secure document.

*       *       *       *       *

### § 103.3   [Amended]

■ 4. Section 103.3 is amended in paragraph (a)(2)(i) by removing "§ 103.7 of this part" and adding in its place "8 CFR 106.2".

### § 103.5   [Amended]

■ 5. Section 103.5 is amended in paragraph (a)(1)(iii)(B) by removing "§ 103.7" and adding in its place "8 CFR 106.2".

■ 6. Section 103.7 is revised to read as follows:

### § 103.7   Fees.

(a) *DOJ fees.* Fees for proceedings before immigration judges and the Board of Immigration Appeals are described in 8 CFR 1003.8, 1003.24, and 1103.7.

(1) *USCIS may accept DOJ fees.* Except as provided in 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any EOIR proceeding may be paid to USCIS. Payment of a fee under this section does not constitute filing of the document with the Board or with the immigration court. DHS will provide the payer with a receipt for a fee and return any documents submitted for a fee relating to any immigration court proceeding.

(2) *DHS–EOIR biometric services fee.* Fees paid to and accepted by DHS relating to any immigration proceeding as provided in 8 CFR 1103.7(a)(3) must include an additional $30 for DHS to collect, store, and use biometric information.

(3) *Waiver of Immigration Court fees.* An immigration judge or the Board may waive any fees prescribed under this chapter for cases under their jurisdiction to the extent provided in 8 CFR 1003.8 and 1003.24.

(b) *USCIS fees.* USCIS fees will be required as provided in 8 CFR part 106.

(c) *Remittances.* Remittances to the Board of Immigration Appeals must be made payable to the "United States Department of Justice," in accordance with 8 CFR 1003.8.

(d) *Non-USCIS DHS immigration fees.* The following fees are applicable to one or more of the immigration components of DHS:

(1) *DCL System Costs Fee.* For use of a Dedicated Commuter Lane (DCL) located at specific U.S. ports-of-entry by an approved participant in a designated vehicle:

(i) $80.00, or

(ii) $160.00 for a family (applicant, spouse and minor children); plus,

(iii) $42 for each additional vehicle enrolled.

(iv) The fee is due after approval of the application but before use of the DCL.

(v) This fee is non-refundable, but may be waived by DHS.

(2) *Petition for Approval of School for Attendance by Nonimmigrant Student* (Form I–17). (i) For filing a petition for school certification: $3,000 plus a site visit fee of $655 for each location required to be listed on the form;

(ii) For filing a petition for school recertification: $1,250 plus a site visit

AR2022_200519

fee of $655 for each new location required to be listed on the form.

(3) *Form I–68.* For application for issuance of the Canadian Border Boat Landing Permit under section 235 of the Act:

(i) $16.00, or

(ii) $32 for a family (applicant, spouse and unmarried children under 21 years of age, and parents of either spouse).

(4) *Form I–94.* For issuance of Arrival/Departure Record at a land border port-of-entry: $6.00.

(5) *Form I–94W.* For issuance of Nonimmigrant Visa Waiver Arrival/Departure Form at a land border port-of-entry under section 217 of the Act: $6.00.

(6) *Form I–246.* For filing application for stay of deportation under 8 CFR part 243: $155.00.

(7) *Form I–823.* For application to a PORTPASS program under section 286 of the Act:

(i) $25.00, or

(ii) $50.00 for a family (applicant, spouse, and minor children).

(iii) The application fee may be waived by DHS.

(iv) If biometrics, such as fingerprints, are required, the inspector will inform the applicant of the current Federal Bureau of Investigation fee for conducting background checks prior to accepting the application fee.

(v) The application fee (if not waived) and fingerprint fee must be paid to CBP before the application will be processed. The fingerprint fee may not be waived.

(vi) For replacement of PORTPASS documentation during the participation period: $25.00.

(8) *Fee Remittance for F, J, and M Nonimmigrants* (Form I–901). The fee for Form I–901 is:

(i) For F and M students: $350.

(ii) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.

(iii) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.

(iv) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

(9) *Special statistical tabulations:* The DHS cost of the work involved.

(10) *Monthly, semiannual, or annual ''Passenger Travel Reports via Sea and Air'' tables.* (i) For the years 1975 and before: $7.00.

(ii) For after 1975: Contact: U.S. Department of Transportation, Transportation Systems Center, Kendall Square, Cambridge, MA 02142.

(11) *Request for Classification of a citizen of Canada to engage in professional business activities pursuant to section 214(e) of the Act (Chapter 16 of the North American Free Trade Agreement):* $50.00.

(12) *Request for authorization for parole of an alien into the United States:* $65.00.

(13) *Global Entry.* Application for Global Entry: $100.

(14) *U.S. Asia-Pacific Economic Cooperation (APEC) Business Travel Card.* Application fee: $70.

(15) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

■ 7. Section 103.17 is revised to read as follows:

## § 103.17   Biometric services fee.

DHS may charge a fee to collect biometric information, to provide biometric collection services, to conduct required national security and criminal history background checks, to verify an individual's identity, and to store and maintain this biometric information for reuse to support other benefit requests. If a benefit request as defined in 8 CFR 1.2 must be submitted with a biometric services fee, 8 CFR part 106 will contain the requirement. When a biometric services fee is required, a benefit request submitted without the correct biometric services fee may be rejected.

■ 8. Section 103.40 is revised to read as follows:

## § 103.40   Genealogical research requests.

(a) *Nature of requests.* Genealogy requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Forms.* USCIS provides on its website at *https://www.uscis.gov/genealogy* the required forms in electronic versions: Genealogy Index Search Request, or Genealogy Records Request.

(c) *Required information.* Genealogical Research Requests may be submitted to request one or more separate records relating to an individual. A separate request must be submitted for each individual searched. All requests for records or index searches must include the individual's:

(1) Full name (including variant spellings of the name and/or aliases, if any).

(2) Date of birth, at least as specific as a year.

(3) Place of birth, at least as specific as a country and preferably the country name at the time of the individual's immigration or naturalization.

(d) *Optional information.* To better ensure a successful search, a Genealogical Research Request may include each individual's:

(1) Date of arrival in the United States.

(2) Residence address at time of naturalization.

(3) Names of parents, spouse, and children if applicable and available.

(e) *Additional information required to retrieve records.* For a Genealogy Records Request, requests for copies of historical records or files must:

(1) Identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record as follows:

(i) C-Files must be identified by a naturalization certificate number.

(ii) Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number.

(iii) Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(2) [Reserved]

(f) *Information required for release of records.* (1) Documentary evidence must be attached to a Genealogy Records Request or submitted in accordance with the instructions on the Genealogy Records Request form.

(2) Search subjects will be presumed deceased if their birth dates are more than 100 years before the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of USCIS that the subject is deceased.

(3) Documentary evidence of the subject's death is required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits).

(g) *Index search.* Requestors who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number, may submit a request for index search. An index search will determine the existence of responsive historical records. If no record is found, USCIS will notify the requestor accordingly. If records are found, USCIS will give the requestor electronic copies of records stored in digital format for no additional fee. For records found that are stored in paper format, USCIS will give the requestor the search results, including the type of record found and the file number or other information identifying the record. The requestor can use index search results to submit a Genealogy Records Request.

(h) *Processing of paper record copy requests.* This service is designed for

requestors who can identify a specific record or file to be retrieved, copied, reviewed, and released. Requestors may identify one or more files in a single request.

### § 103.41   [Removed and Reserved]

■ 9. Section 103.41 is removed and reserved.

■ 10. Part 106 is added to read as follows:

## PART 106—USCIS FEE SCHEDULE

Sec.
106.1   Fee requirements.
106.2   Fees.
106.3   Fee waivers and exemptions.
106.4   Premium processing service.
106.5   Authority to certify records.
106.6   DHS severability.

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 115–218.

### § 106.1   Fee requirements.

(a) Fees must be submitted with any USCIS benefit request or other request in the amount and subject to the conditions provided in this part and remitted in the manner prescribed in the relevant form instructions, on the USCIS website, or in a **Federal Register** document. The fees established in this part are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed in 8 CFR 106.2.

(b) Fees must be remitted from a bank or other institution located in the United States and payable in U.S. currency. The fee must be paid using the method that USCIS prescribes for the request, office, filing method, or filing location, as provided in the form instructions or by individual notice.

(c) If a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn:

(1) The provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(2) If the benefit request was approved, the approval may be revoked upon notice. If the approved benefit request requires multiple fees, this provision will apply if any fee submitted is not honored. Other fees that were paid for a benefit request that is revoked under this provision will be retained and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed to the USCIS Administrative Appeals Office, in accordance with 8 CFR 103.3 and the applicable form instructions.

### § 106.2   Fees.

(a) *I Forms*—(1) *Application to Replace Permanent Resident Card, Form I–90.* For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name: $415.

(2) *Application for Replacement/ Initial Nonimmigrant Arrival-Departure Document, Form I–102.* For filing an application for Arrival/Departure Record, Form I–94, or Crewman's Landing Permit, Form I–95, to replace one lost, mutilated, or destroyed: $485.

(i) For nonimmigrant member of the U.S. armed forces: No fee for initial filing;

(ii) For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component: No fee for initial filing;

(iii) For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA): No fee for initial filing.

(3) *Petition or Application for a Nonimmigrant Worker, Form I–129.* For filing a petition or application for a nonimmigrant worker:

(i) Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker, Form I–129H1: $555.

(ii) Petition for H–2A Nonimmigrant Worker, Form I–129H2A, with 1 to 25 named beneficiaries: $850.

(iii) Petition for H–2A Nonimmigrant Worker, Form I–129H2A, with only unnamed beneficiaries: $415.

(iv) Petition for H–2B Nonimmigrant Worker, Form I–129H2B, with 1 to 25 named beneficiaries: $715.

(v) Petition for H–2B Nonimmigrant Worker, Form I–129H2B, with only unnamed beneficiaries: $385.

(vi) Petition for L Nonimmigrant Worker, Form I–129L: $805.

(vii) Petition for O Nonimmigrant Worker, Form I–129O, with 1 to 25 named beneficiaries: $705.

(viii) Petition or Application for E, H–3, P, Q, R, or TN Nonimmigrant Worker, Forms I–129E or I–129MISC, with 1 to 25 named beneficiaries: $695.

(4) *Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW.* For an employer to petition on behalf of beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI): $695, plus the following fees:

(i) CNMI education funding fee:

(A) $200 per beneficiary per year.

(B) DHS may adjust this fee once per year by notice in the **Federal Register** based on the amount of inflation according to the change in the unadjusted All Items Consumer Price Index for All Urban Consumers (CPI–U) for the U.S. City Average published by the Bureau of Labor Statistics since the fee was set on June 18, 2020.

(ii) A fraud prevention and detection fee: $50 per employer filing a petition.

(iii) For filing Form I–129CWR, Semiannual Report for CW–1 Employers: No fee.

(5) *Petition for Alien Fiancé(e), Form I–129F.* (i) For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $510.

(ii) For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130: No fee.

(6) *Petition for Alien Relative, Form I–130.* For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act: $560.

(7) *Application for Travel Document, Form I–131.* For filing an application for travel document:

(i) $145 for a Refugee Travel Document for someone 16 or older.

(ii) $115 for a Refugee Travel Document for a child under 16.

(iii) $590 for advance parole and any other travel document except Form I–131A.

(iv) There is no fee for applicants who filed USCIS Form I–485 on or after July 30, 2007, and before October 2, 2020, and paid the Form I–485 fee, or for applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF").

(8) *Application for Travel Document (Carrier Documentation), Form I–131A.* For filing an application to allow a lawful permanent resident, conditional permanent resident or other alien traveling abroad on an Advance Parole Document (Form I–512 or I–512L) or Employment Authorization Documents (EAD) with travel endorsement (Form I–766), to apply for carrier documentation to board an airline or other transportation carrier to return to the United States: $1,010.

(9) *Immigrant Petition for Alien Workers, Form I–140.* For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act: $555.

(10) *Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA), Form I–191.* For filing an application for

discretionary relief under section 212(c) of the Act: $790.

(11) *Application for Advance Permission to Enter as Nonimmigrant, Form I–192.* For filing an application for discretionary relief under section 212(d)(3), (d)(13), or (d)(14) of the Act, except in an emergency case or where the approval of the application is in the interest of the U.S. Government: $1,400.

(12) *Application for Waiver of Passport and/or Visa, Form I–193.* For filing an application for waiver of passport and/or visa: $2,790.

(13) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.* For filing an application for permission to reapply for admission by an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense: $1,050.

(14) *Notice of Appeal or Motion, Form I–290B.* For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction: $700. In addition:

(i) The fee will be the same for appeal or a motion to reopen a denial of a benefit request with one or multiple beneficiaries.

(ii) There is no fee for an appeal or motion associated with a denial of a petition for a special immigrant visa filed by or on behalf of an individual seeking special immigrant status as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF").

(15) *Request for Cancellation of Public Charge Bond, Form I–356.* $25.

(16) *Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360.* For filing a petition for an Amerasian, Widow(er), or Special Immigrant: $450. The following requests are exempt from this fee:

(i) A petition seeking classification as an Amerasian;

(ii) A self-petition for immigrant classification as an abused spouse or child of a U.S. citizen or lawful permanent resident or an abused parent of a U.S. citizen son or daughter; or

(iii) A petition for special immigrant juvenile classification; or

(iv) A petition seeking special immigrant visa or status an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF").

(17) *Application to Register Permanent Residence or Adjust Status, Form I–485*—(i) *Most permanent residence applications.* For filing an application for permanent resident status or creation of a record of lawful permanent residence: $1,130.

(ii) *Asylees.* For the first Form I–485, Application to Register Permanent Residence or Adjust Status, filed by individuals who have paid the $50 fee for Form I–589 and are subsequently granted asylum based on that Form I–589: $1,080.

(iii) *Refugees and Special Immigrants.* There is no fee if an applicant is filing as a refugee under section 209(a) of the Act or for applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF").

(iv) *Adjustment of Status Under Section 245(i), Form I–485 Supplement A.* Persons seeking to adjust status under the provisions of section 245(i) of the Act must submit a sum of $1,000 in addition to the fee for filing the Form I–485, unless payment of the additional sum is not required under section 245(i) of the Act. The additional sum is not required when the applicant is an unmarried child less than 17 years of age, when the applicant is the spouse, or the unmarried child less than 21 years of age of a legalized alien and who is qualified for and has properly filed an application for voluntary departure under the family unity program.

(18) *Immigrant Petition by Alien Investor, Form I–526.* For filing a petition for an alien investor: $4,010.

(19) *Application To Extend/Change Nonimmigrant Status, Form I–539.* For filing an application to extend or change nonimmigrant status: $400. For nonimmigrant A, G, and NATO: No fee.

(20) *Application for Asylum and for Withholding of Removal, Form I–589.* For filing an application for asylum status: $50. There is no fee for applications filed by unaccompanied alien children who are in removal proceedings.

(21) *Petition to Classify Orphan as an Immediate Relative, Form I–600.* For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act.

(i) There is no fee for the first Form I–600 filed for a child on the basis of an approved Application for Advance Processing of an Orphan Petition, Form I–600A, during the Form I–600A approval or extended approval period.

(ii) Except as specified in paragraph (a)(21)(iii) of this section, if more than one Form I–600 is filed during the Form I–600A approval period, the fee is $805 for the second and each subsequent Form I–600 petition submitted.

(iii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiary birth siblings, no additional fee is required.

(22) *Application for Advance Processing of an Orphan Petition, Form I–600A.* For filing an application for determination of suitability and eligibility to adopt an orphan: $805.

(23) *Request for Action on Approved Form I–600A/I–600, Form I–600A/I–600 Supplement 3:* $400.

(i) This filing fee:

(A) Is not charged if Form I–600A/I–600 Supplement 3 is filed in order to obtain a first extension of the approval of the Form I–600A or to obtain a first time change of non-Hague Adoption Convention country during the Form I–600A approval period.

(B) Is charged if Form I–600A/I–600 Supplement 3 is filed in order to request a new approval notice based on a significant change and updated home study, unless a first extension of the Form I–600A approval or first time change of non-Hague Adoption Convention country is also being requested on the same Supplement 3.

(C) Is $400 for second or subsequent extensions of the approval of the Form I–600A, second or subsequent changes of non-Hague Adoption Convention country, requests for a new approval notice based on a significant change and updated home study, and requests for a duplicate approval notice permitted with Form I–600A/I–600 Supplement 3 with the filing fee.

(ii) Form I–600A/I–600 Supplement 3 cannot be used to:

(A) Extend eligibility to proceed as a Hague Adoption Convention transition case beyond the first extension once the Convention enters into force for the new Convention country.

(B) Request a change of country to a Hague Adoption Convention transition country for purposes of becoming a transition case if another country was already designated on the Form I–600A or prior change of country request.

(iii) Form I–600A/I–600 Supplement 3 may only be used to request an increase the number of children the applicant/petitioner is approved to adopt from a transition country if the additional child is a birth sibling of a child who the applicant/petitioner has adopted or is in the process of adopting, as a transition case, and is identified and petitioned for

while the Form I–600A approval is valid, unless the new Convention country prohibits such birth sibling cases from proceeding as transition cases.

(24) *Application for Waiver of Grounds of Inadmissibility, Form I–601.* For filing an application for waiver of grounds of inadmissibility: $1,010.

(25) *Application for Provisional Unlawful Presence Waiver, Form I–601A.* For filing an application for provisional unlawful presence waiver: $960.

(26) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended), Form I–612.* For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act: $515.

(27) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act, Form I–687.* For filing an application for status as a temporary resident under section 245A(a) of the Act: $1,130.

(28) *Application for Waiver of Grounds of Inadmissibility, Form I–690.* For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $765.

(29) *Notice of Appeal of Decision under Sections 245A or 210 of the Immigration and Nationality Act (or a petition under section 210A of the Act), Form I–694.* For appealing the denial of an application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $715.

(30) *Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA), Form I–698.* For filing an application to adjust status from temporary to permanent resident (Pub. L. 99–603): $1,615.

(31) *Petition to Remove Conditions on Residence, Form I–751.* For filing a petition to remove the conditions on residence based on marriage: $760.

(32) *Application for Employment Authorization, Form I–765:* $550.

(i) A $30 biometric services must be included with a Form I–765 filed by:

(A) An asylum applicant with a pending Form I–589.

(B) An applicant for status as a long-term resident of the Commonwealth of the Northern Mariana Islands.

(ii) There is no fee for an initial Employment Authorization Document for:

(A) An applicant who filed USCIS Form I–485 on or after July 30, 2007, and before October 2, 2020, and paid the Form I–485 fee;

(B) Refugees and aliens paroled as a refugee;

(C) Aliens granted asylee status;

(D) Victims of Severe Forms of Trafficking (T–1);

(E) Nonimmigrant Victim of Criminal Activity (U–1);

(F) Dependents of certain government and internal organizations or NATO personnel;

(G) N–8 (Parent of alien classed as SK3) and N–9 (Child of N–8) nonimmigrants;

(H) Principal VAWA Self-Petitioners who have approved petitions pursuant to section 204(a) of the Act;

(I) VAWA Self-Petitioners as defined in section 101(a)(51)(D), (E), and (F) of the Act;

(J) Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces (''ISAF''); and

(iii) Request for replacement Employment Authorization Document based on USCIS error: No fee.

(iv) There is no fee for a renewal or replacement Employment Authorization Document for:

(A) Any current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before October 2, 2020, and paid the appropriate Form I–485 filing fee.

(B) Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces: And

(C) Dependent of certain foreign government, international organization, or NATO personnel.

(v) *An Application for Employment Authorization for Abused Nonimmigrant Spouse, Form I–765V:* No fee.

(vi) The Form I–765 fee for initial and renewal requestors of Consideration of Deferred Action for Childhood Arrivals is $410. Requestors of Consideration of Deferred Action for Childhood Arrivals must also pay a biometric services fee of $85 for an initial, renewal, or to replace their employment authorization document.

(33) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* (i) There is no fee for the first Form I–800 filed for a child on the basis of an approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, during the Form I–800A approval period.

(ii) Except as specified in paragraph (a)(33)(iii) of this section, if more than one Form I–800 is filed during the Form I–800A approval period, the fee is $805 for the second and each subsequent Form I–800 petition submitted.

(iii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiary birth siblings, no additional fee is required.

(34) *Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A.* For filing an application for determination of suitability and eligibility to adopt a child from a Hague Adoption Convention country: $805.

(35) *Request for Action on Approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A Supplement 3:* $400.

(i) This filing fee:

(A) Is not charged if Form I–800A Supplement 3 is filed in order to obtain a first extension of the approval of the Form I–800A or to obtain a first time change of Hague Adoption Convention country during the Form I–800A approval period.

(B) Is charged if Form I–800A Supplement 3 is filed in order to request a new approval notice based on a significant change and updated home study, unless a first extension of the Form I–800A approval or first time change of Hague Adoption Convention country is also being requested on the same Supplement 3.

(ii) Is $400 for second or subsequent extensions of the Form I–800A approval, second or subsequent changes of Hague Adoption Convention country, requests for a new approval notice based on a significant change and updated home study, and requests for a duplicate approval notice, permitted with the filing of a Form I–800A, Supplement 3 and the required filing fee: $400.

(36) *Application for Family Unity Benefits, Form I–817.* For filing an application for voluntary departure under the Family Unity Program: $590.

(37) *Application for Temporary Protected Status, Form I–821.* (i) For first time applicants: $50 or the maximum permitted by section 244(c)(1)(B) of the Act.

(ii) There is no fee for re-registration.

(iii) A Temporary Protected Status (TPS) applicant or re-registrant must pay $30 for biometric services unless

AR2022_200523

exempted in the applicable form instructions.

(38) *Application for Deferred Action for Childhood Arrivals, Form I–821D.* No fee.

(39) *Application for Action on an Approved Application, Form I–824:* $495.

(40) *Petition by Investor to Remove Conditions, Form I–829.* For filing a petition by an investor to remove conditions: $3,900.

(41) *Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100), Form I–881.*

(i) $1,810 for adjudication by DHS.

(ii) $165 for adjudication by EOIR. If the Form I–881 is referred to the immigration court by DHS, the $1,810 fee is required.

(42) *Application for Authorization to Issue Certification for Health Care Workers, Form I–905:* $230.

(43) *Request for Premium Processing Service, Form I–907.* The Request for Premium Processing Service fee will be as provided in 8 CFR 106.4.

(44) *Application for Civil Surgeon Designation, Form I–910:* $635. There is no filing fee for:

(i) A medical officer in the U.S. Armed Forces or

(ii) A civilian physician employed by the U.S. Government who examines members and veterans of the U.S. Armed Forces and their dependents at a military, Department of Veterans Affairs, or U.S. Government facility in the United States.

(45) *Application for T Nonimmigrant Status, Form I–914:* No fee.

(46) *Petition for U Nonimmigrant Status, Form I–918:* No fee.

(47) *Application for Regional Center Designation under the Immigrant Investor Program, Form I–924:* $17,795.

(48) *Annual Certification of Regional Center, Form I–924A.* To provide updated information and certify that a Regional Center under the Immigrant Investor Program has maintained its eligibility: $4,465.

(49) *Petition for Qualifying Family Member of a U–1 Nonimmigrant, Form I–929.* For a principal U–1 nonimmigrant to request immigration benefits on behalf of a qualifying family member who has never held U nonimmigrant status: $1,485.

(50) *Application for Entrepreneur Parole, Form I–941.* For filing an application for parole for an entrepreneur: $1,200.

(51) *Public Charge Bond, Form I–945:* $25.

(b) *N Forms*—(1) *Application to File Declaration of Intention, Form N–300.*

For filing an application for declaration of intention to become a U.S. citizen: $1,305.

(2) *Request for a Hearing on a Decision in Naturalization Proceedings (under section 336 of the Act), Form N–336.* For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act: $1,735. There is no fee for an applicant who has filed an Application for Naturalization under sections 328 or 329 of the Act with respect to military service and whose application has been denied.

(3) *Application for Naturalization, Form N–400.* For filing an application for naturalization: $1,170. No fee is charged an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service.

(4) *Application to Preserve Residence for Naturalization Purposes, Form N–470.* For filing an application for benefits under section 316(b) or 317 of the Act: $1,585.

(5) *Application for Replacement Naturalization/Citizenship Document, Form N–565:* $545.

(i) This fee is for filing an application for:

(A) A certificate of naturalization or certificate of citizenship;

(B) A declaration of intention in place of a certificate or declaration alleged to have been lost, mutilated, or destroyed;

(C) A changed name under section 343(c) of the Act; or

(D) A special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act;

(ii) There is no fee when this application is submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate of naturalization or certificate of citizenship that contains an error.

(6) *Application for Certificate of Citizenship, Form N–600.* For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act: $1,000. There is no fee for any application filed by a member or veteran of any branch of the U.S. Armed Forces.

(7) *Application for Citizenship and Issuance of Certificate Under Section 322, Form N–600K.* For filing an application for citizenship and issuance of certificate under section 322 of the Act: $945.

(c) *G Forms, Statutory Fees, and Non-Form Fees*—(1) *Genealogy Index Search Request, Form G–1041:* $170. The fee is due regardless of the search results.

(2) *Genealogy Records Request, Form G–1041A:* $265. USCIS will refund the records request fee when it is unable to

locate any file previously identified in response to the index search request.

(3) *USCIS Immigrant Fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $190.

(4) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions: $1,500 or $750.

(5) *Fraud detection and prevention fee.* (i) For filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $500.

(ii) For filing certain H–2B petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $150.

(6) *Fraud detection and prevention fee for CNMI.* For employer petitions in CNMI as described in Public Law 115–218 and USCIS form instructions: $50.

(7) *9–11 Response and Biometric Entry-Exit Fee for H–1B Visa.* For all petitioners filing an H–1B petition who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees in the aggregate are in H–1B, L–1A or L–1B nonimmigrant status, except for petitioners filing an amended petition without an extension of stay request: $4,000. This fee will apply to petitions filed on or before September 30, 2027.

(8) *9–11 Response and Biometric Entry-Exit Fee for L–1 Visa.* For all petitioners filing an L–1 petition who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees in the aggregate are in H–1B, L–1A or L–1B nonimmigrant status, except for petitioners filing an amended petition without an extension of stay request: $4,500. This fee will apply to petitions filed on or before September 30, 2027.

(9) *Claimant under section 289 of the Act:* No fee.

(10) *Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens.* For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $10. This fee will not be refunded if the registration is not selected or is withdrawn.

(d) *Online forms.* The fee for the following forms is $10.00 lower than the fee established in paragraphs (a), (b), and (c) of this section when submitted to USCIS online and not in paper form:

(1) I–90, Application to Replace Permanent Resident Card;

(2) N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA);

(3) N–400, Application for Naturalization;

(4) N–565, Application for Replacement Naturalization/Citizenship Document;

(5) I–130/130A, Petition for Alien Relative;

(6) N–600, Application for Certificate of Citizenship;

(7) N–600K, Application for Citizenship and Issuance of Certificate Under Section 322;

(8) I–539/539A, Application To Extend/Change Nonimmigrant Status;

(9) G–1041, Genealogy Index Search Request; and

(10) G–1041A, Genealogy Records Request.

### § 106.3   Fee waivers and exemptions.

(a) *Fee waiver.* No fee relating to any benefit request submitted to USCIS may be waived unless otherwise provided in this paragraph.

(1) An alien may apply for a fee waiver if there is a statutory or regulatory provision allowing for fee waivers including as provided by section 245(l)(7) of the Act, 8 U.S.C. 1255(l)(7). Specifically, the following categories of requestors may apply for a waiver of any fees for an immigration benefit and any associated filing up to and including an application for adjustment of status:

(i) Violence Against Women Act (VAWA) self-petitioners and derivatives as defined under section 101(a)(51) and anyone otherwise self-petitioning due to battery or extreme cruelty pursuant to the procedures in section 204(a) of the Act;

(ii) T nonimmigrants;

(iii) U nonimmigrants;

(iv) Battered spouses of A, G, E–3, or H nonimmigrants;

(v) Battered spouses or children of a lawful permanent resident or U.S. citizen and derivatives as provided under section 240A(b)(2) of the Act; and

(vi) Applicants for Temporary Protected Status, including both initial applicants and re-registering TPS beneficiaries.

(2) The following categories of requestors may apply for a waiver of any fees for an immigration benefit and any associated filing up to and including an application for adjustment of status:

(i) Special Immigrant Juveniles (SIJs) who have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency at the time of filing; and

(ii) Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces.

(3) Requestors who have been approved for the immigration benefits in paragraphs (a)(1) and (2) of this section may apply for a waiver of any fees for Form N–400, Application for Naturalization, Form N–600 Application for Certificate of Citizenship, or Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322, as applicable.

(b) *Director's exception.* The Director of USCIS may authorize the waiver, in whole or in part, of a form fee required by 8 CFR 106.2 that is not otherwise waivable under this section, if the Director determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. This discretionary authority may be delegated only to the USCIS Deputy Director. The Director may not waive the requirements of paragraph (c) or (d) of this section. An applicant, petitioner, or requestor may not directly submit a request to the Director. In addition, a waiver of fees as provided in this paragraph may not be provided to a requestor who is seeking an immigration benefit for which he or she:

(1) Is subject to the affidavit of support requirements under section 213A of the Act or is already a sponsored immigrant as defined in 8 CFR 213a.1 unless the applicant is seeking a waiver of the joint filing requirement to remove conditions on his or her residence based on abuse; or

(2) Is subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

(c) *Eligibility for fee waiver.* A waiver of fees is limited to an alien with an annual gross household income at or below 125 percent of the Federal Poverty Guidelines as updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2).

(d) *Form required.* A person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form.

(e) *Exemptions.* The Director of USCIS may provide an exemption for any fee required by 8 CFR 106.2. This discretionary authority may only be delegated to the USCIS Deputy Director. The Director must determine that such action would be in the public interest, the action is consistent with the applicable law, and the exemption is related to one of the following:

(1) Asylees;

(2) Refugees;

(3) National security;

(4) Emergencies or major disasters declared in accordance with 44 CFR part 206, subpart B;

(5) An agreement between the U.S. government and another nation or nations; or

(6) USCIS error.

(f) *Documentation of gross household income.* A person submitting a request for a fee waiver must submit the following documents as evidence of annual gross household income:

(1) A transcript(s) from the United States Internal Revenue Service (IRS) of the person's IRS Form 1040, U.S. Individual Income Tax Return;

(2) If the person was not required to file a Federal income tax return, he or she must submit their most recent IRS Form W–2, Wage and Tax Statement, Form 1099G, Certain Government Payments, or Social Security Benefit Form SSA–1099, if applicable;

(3) If the person filed a Federal income tax return, and has recently changed employment or had a change in salary, the person must also submit copies of consecutive pay statements (stubs) for the most recent month or longer;

(4) If the person does not have income and has not filed income tax returns, he or she must submit documentation from the IRS that indicates that no Federal income tax transcripts and no IRS Form W–2s were found;

(5) An alien who is applying for or has been granted benefits or status as a VAWA self-petitioner or derivative or a T or U nonimmigrant, who does not have any income or cannot provide proof of income may:

(i) Describe the situation in sufficient detail as provided in the form and form instructions prescribed by DHS to substantiate that he or she has income at or below 125 percent of the Federal Poverty Guidelines as well as the inability to obtain the required documentation; and

(ii) Provide pay statements (stubs) or affidavits from religious institutions, non-profits, or other community-based organizations verifying that he or she is currently receiving some benefit or support from that entity and attesting to his or her financial situation as documentation of income, if available; and

(6) For applications related to Special Immigrant Juvenile classification, the applicant must provide the following in lieu of documentation of gross household income:

—

(i) Evidence that the applicant is approved for or filed for Special Immigrant Juvenile classification, and

(ii) Evidence that the applicant remains in out-of-home care such as foster care.

### § 106.4  Premium processing service.

(a) *General.* A person submitting a request to USCIS may request 15 business-day processing of certain employment-based immigration benefit requests.

(b) *Submitting a request.* A request must be submitted on the form prescribed by USCIS and prepared and submitted in accordance with the form instructions. If the request for premium processing is submitted together with the underlying benefit request, all required fees in the correct amount must be paid.

(c) *Fee amount.* The fee amount will be prescribed in the form instructions and:

(1) Must be paid in addition to, and in a separate remittance from, other filing fees.

(2) May be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index (CPI) since the fee was set by law at $1,000 on June 1, 2001.

(d) *15-day limitation.* USCIS will refund the premium processing service fee, but continue to process the case if:

(1) USCIS does not issue a notice of any adjudicative action by the end of the 15th business day from the date USCIS accepted a properly filed request for premium processing for an eligible employment-based immigration benefit request, including all required fees. The adjudicative action is evidenced by the notification of, but not necessarily receipt of, an approval, denial, request for evidence (RFE) or notice of intent to deny (NOID); or

(2) USCIS does not issue a notice of a subsequent adjudicative action by the end of the 15th business-day from the date USCIS received the response to an RFE or NOID. In premium processing cases where USCIS issues an RFE or NOID within 15 business days from the initial date of acceptance, a new 15-day period begins on the date that USCIS receives the response to the RFE or NOID.

(3) USCIS may retain the premium processing fee and not reach a conclusion on the request within 15 business days, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the benefit request.

(e) *Requests eligible for premium processing.* (1) USCIS will designate the categories of employment-based benefit requests that are eligible for premium processing.

(2) USCIS will announce by its official internet website, currently *http://www.uscis.gov,* those requests for which premium processing may be requested, the dates upon which such availability commences and ends, and any conditions that may apply.

### § 106.5  Authority to certify records.

The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

### § 106.6  DHS severability.

Each provision of this part is separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions will continue in effect.

## PART 204—IMMIGRANT PETITIONS

■ 11. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1641; 8 CFR part 2.

■ 12. Section 204.3 is amended:
■ a. By revising the section heading;
■ b. In paragraph (b), in the definition of ''Orphan petition'', by revising the second sentence;
■ c. By revising the fourth and fifth sentences of paragraph (d) introductory text; and
■ d. By revising paragraphs (h)(3)(i) and (ii) and (h)(7) and (13).
The revisions read as follows:

### § 204.3  Orphan cases under section 101(b)(1)(F) of the Act (non-Hague Adoption Convention cases).

\*    \*    \*    \*    \*

(b) \*  \*  \*

*Orphan petition* means \* \* \* The petition must be completed in accordance with the form's instructions and submitted with the required supporting documentation and, if there is not a pending, or currently valid and approved advanced processing application, the fee as required in 8 CFR 106.2. \* \* \*

\*    \*    \*    \*    \*

(d) \* \* \* If the prospective adoptive parents fail to file the orphan petition within the approval validity period of the advanced processing application, the advanced processing application will be deemed abandoned pursuant to paragraph (h)(7) of this section. If the prospective adoptive parents file the

orphan petition after the approval period of the advanced processing application has expired, the petition will be denied pursuant to paragraph (h)(13) of this section. \* \* \*

\*    \*    \*    \*    \*

(h) \* \* \*
(3) \* \* \*
(i) If the advanced processing application is approved:

(A) The prospective adoptive parents will be advised in writing. A notice of approval expires 15 months after the date on which USCIS received the FBI response on the applicant's, and any additional adult member of the household's, biometrics, unless approval is revoked. If USCIS received the responses on different days, the 15-month period begins on the earliest response date. The notice of approval will specify the expiration date.

(B) USCIS may extend the validity period for the approval of a Form I–600A as provided in paragraph (h)(3)(ii) of this section or if requested in accordance with 8 CFR 106.2(a)(23). During this time, the prospective adoptive parents may file an orphan petition for one orphan without fee.

(C) If the Form I–600A approval is for more than one orphan, the prospective adoptive parents may file a petition for each of the additional children, to the maximum number approved.

(D) If the orphans are birth siblings, no additional fee is required. If the orphans are not birth siblings, an additional fee is required for each orphan beyond the first orphan.

(E) It does not guarantee that the orphan petition will be approved.

(ii) In the case of an outbreak affecting a public health or other emergency:

(A) The USCIS Director or his or her designee, may extend the validity period of the approval of the advance processing application, either in an individual case or for a class of cases if the Director or designee determines that the ability of a prospective adoptive parent to timely file a petition has been adversely affected.

(B) An extension of the validity of the approval of the advance processing application may be subject to such conditions as the USCIS Director, or officer designated by the USCIS Director, may establish.

\*    \*    \*    \*    \*

(7) *Advanced processing application deemed abandoned for failure to file orphan petition within the approval validity period of the advanced processing application.* If an orphan petition is not properly filed within 15 months of the approval date of the advanced processing application:

(i) The application will be deemed abandoned;

(ii) Supporting documentation will be returned to the prospective adoptive parents, except for documentation submitted by a third party which will be returned to the third party, and documentation relating to the biometrics checks;

(iii) The director will dispose of documentation relating to biometrics checks in accordance with current policy; and

(iv) Such abandonment will be without prejudice to a new filing at any time with fee.

\*    \*    \*    \*    \*

(13) *Orphan petition denied: petitioner files orphan petition after the approval of the advanced processing application has expired.* If the petitioner files the orphan petition after the advanced processing application has expired, the petition will be denied. This action will be without prejudice to a new filing at any time with fee.

\*    \*    \*    \*    \*

■ 13. Section 204.5 is amended:
■ a. In paragraph (m)(5), in the definition of ''Petition,'' by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''; and
■ b. By revising paragraph (p)(4).
    The revision reads as follows:

### § 204.5    Petitions for employment-based immigrants.

\*    \*    \*    \*    \*

(p) \*    \*    \*

(4) *Application for employment authorization.* (i) To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must:

(A) File an application for employment authorization (Form I–765), with USCIS, in accordance with 8 CFR 274a.13(a) and the form instructions.

(B) Submit biometric information as may be provided in the applicable form instructions.

(ii) Employment authorization under this paragraph may be granted solely in 1-year increments, but not to exceed the period of the alien's authorized admission.

\*    \*    \*    \*    \*

### § 204.6    [Amended]

■ 14. Section 204.6 is amended in paragraph (m)(6)(i)(C) by removing ''8 CFR 103.7(b)(1)(i)(XX)'' and adding in its place ''8 CFR 106.2''.

### § 204.310    [Amended]

■ 15. Section 204.310 is amended in paragraph (a)(3)(i) by removing ''8 CFR

103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' and by removing and reserving paragraph (a)(3)(ii).

### § 204.311    [Amended]

■ 16. Section 204.311 is amended in paragraph (u)(4) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

■ 17. Section 204.312 is amended by revising paragraph (e)(3) to read as follows:

### § 204.312    Adjudication of the Form I–800A.

\*    \*    \*    \*    \*

(e) \*    \*    \*

(3)(i) If the 15-month validity period for a Form I–800A approval is about to expire, the applicant:

(A) May file Form I–800A Supplement 3, with the filing fee under 8 CFR 106.2, if required.

(B) May not file a Form I–800A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–800A approval, but must do so on or before the date on which the validity period expires.

(C) Is not required to pay the Form I–800A Supplement 3 filing fee for the first request to extend the approval of a Form I–800A, or to obtain a first time change of Hague Convention country during the Form I–800A approval period.

(D) Must pay the Form I–800A Supplement 3 filing fee, as specified in 8 CFR 106.2, for the second, or any subsequent, Form I–800A Supplement 3 that is filed, if the applicant files a second or subsequent Form I–800A Supplement 3 to obtain a second or subsequent extension or a second or subsequent change of Hague Convention country.

(ii) Any Form I–800A Supplement 3 that is filed to obtain an extension of the approval of a Form I–800A or a change of Hague Convention country must be accompanied by:

(A) A statement, signed by the applicant under penalty of perjury, detailing any changes to the answers given to the questions on the original Form I–800A;

(B) An updated or amended home study as required under 8 CFR 204.311(u); and

(C) A photocopy of the Form I–800A approval notice.

(iii) If USCIS continues to be satisfied that the applicant remains suitable as the adoptive parent of a Convention adoptee, USCIS will extend the approval of the Form I–800A to a date not more than 15 months after the date on which USCIS received the new biometric responses. If new responses

are received on different dates, the new 15-month period begins on the earliest response date. The new notice of approval will specify the new expiration date.

(iv) There is no limit to the number of extensions that may be requested and granted under this section, so long as each request is supported by an updated or amended home study that continues to recommend approval of the applicant for intercountry adoption and USCIS continues to find that the applicant remain suitable as the adoptive parent(s) of a Convention adoptee.

\*    \*    \*    \*    \*

### § 204.313    [Amended]

■ 18. Section 204.313 is amended in the last sentence of paragraph (a) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' and by adding the word ''birth'' before ''siblings''.

\*    \*    \*    \*    \*

## PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS

■ 19. The authority citation for part 211 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

### § 211.1    [Amended]

■ 20. Section 211.1 is amended in the second sentence in paragraph (b)(3) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

### § 211.2    [Amended]

■ 21. Section 211.2 is amended in the second sentence in paragraph (b) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 22. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

### § 212.2    [Amended]

■ 23. Section 212.2 is amended in paragraphs (b)(1), (c)(1)(ii), (d), and (g)(1) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

### § 212.3    [Amended]

■ 24. Section 212.3 is amended in paragraph (a) by removing ''8 CFR

AR2022_200527

103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

§ 212.4   [Amended]

■ 25. Section 212.4 is amended in the first sentence in paragraph (b) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

§ 212.7   [Amended]

■ 26. Section 212.7 is amended:
■ a. In paragraph (a)(1), by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'' in paragraph (a)(1); and
■ b. In paragraphs (e)(1) and (e)(5)(i), by removing ''8 CFR 103.7(b)'' and adding in its place ''8 CFR 106.2''.

§ 212.15   [Amended]

■ 27. Section 212.15 is amended in paragraph (j)(2)(ii) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

§ 212.18   [Amended]

■ 28. Section 212.18 is amended in paragraph (a)(2) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.
■ 29. Section 212.19 is amended by revising paragraphs (b)(1), (c)(1), (e), (h)(1), and (j) to read as follows:

§ 212.19   Parole for entrepreneurs.

*       *       *       *       *

(b) * * *
(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee, and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

*       *       *       *       *

(c) * * *
(1) *Filing of re-parole request form.* Before expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

*       *       *       *       *

(e) *Collection of biometric information.* An alien seeking an initial grant of parole or re-parole before October 2, 2020 will be required to submit biometric information. An alien seeking an initial grant of parole or re-parole may be required to submit biometric information.

*       *       *       *       *

(h) * * *
(1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file Form I–131, Application for Travel Document. Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

*       *       *       *       *

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

*       *       *       *       *

PART 214—NONIMMIGRANT CLASSES

■ 30. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1356, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 31. Section 214.1 is amended:
■ a. In paragraph (c)(1), by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'';
■ b. In paragraph (c)(2), by removing ''§ 103.7 of this chapter'' and adding in its place ''8 CFR 106.2'';
■ c. By revising paragraph (c)(5); and
■ d. In paragraph (j) introductory text, by removing:

■ i. ''a Form I–129'' and adding in its place ''an application or petition'' in the first sentence; and
■ ii. ''Form I–129'' and adding in its place ''application or petition'' in the second and third sentences.
The revision reads as follows:

§ 214.1   Requirements for admission, extension, and maintenance of status.

*       *       *       *       *

(c) * * *
(5) *Decision on application for extension or change of status.* Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of USCIS. The denial of an application for extension of stay may not be appealed.

*       *       *       *       *

■ 32. Section 214.2 is amended:
■ a. By revising paragraph (e)(8)(iii), the first sentence of paragraph (e)(8)(iv) introductory text, and paragraphs (e)(8)(iv)(B) and (e)(8)(v);
■ b. In paragraph (e)(20) introductory text and in two places in paragraph (e)(21)(i), by removing ''Form I–129 and E Supplement'' and adding in its place ''the form prescribed by USCIS'';
■ c. By revising paragraph (e)(23)(viii);
■ d. By removing and reserving paragraph (e)(23)(xv);
■ e. In paragraph (f)(9)(ii)(F)(*1*), by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'';
■ f. By revising paragraph (h)(2)(i)(A);
■ g. In paragraph (h)(2)(i)(B), by removing ''Form I–129'' and adding in its place ''application or petition'' wherever it appears;
■ h. In paragraph (h)(2)(i)(D), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';
■ i. By revising paragraph (h)(2)(ii);
■ j. In paragraph (h)(5)(i)(A), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';
■ k. By revising paragraph (h)(5)(i)(B);
■ l. In paragraph (h)(6)(iii)(E), by removing ''I–129'' and adding in its place ''the form prescribed by USCIS'';
■ m. In paragraph (h)(6)(vii), by removing ''Form I–129'' and adding in its place ''application or petition'' wherever it appears;
■ n. In paragraphs (h)(11)(i)(A), (h)(14), and (h)(15)(i), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';
■ o. By revising paragraph (h)(19)(i);
■ p. In paragraph (h)(19)(vi)(A), by removing ''Petition for Nonimmigrant Worker (Form I–129)'' and adding in its place ''the form prescribed by USCIS'';
■ q. In paragraph (l)(2)(i), by removing ''Form I–129, Petition for Nonimmigrant

Worker'' and adding in its place ''the form prescribed by USCIS'' in its place;

■ r. In paragraphs (l)(2)(ii), (l)(3) introductory text, and (l)(4)(iv) introductory text by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';

■ s. In paragraph (l)(5)(ii)(F), by removing ''Form I–129, Petition for Nonimmigrant Worker'' and adding in its place ''the form prescribed by USCIS'' in its place;

■ t. In paragraph (l)(14)(ii) introductory text, by removing ''Form I–129'' and adding in its place ''application or petition'' wherever it appears;

■ u. In paragraph (l)(17)(i), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'' wherever it occurs;

■ v. By revising paragraph (m)(14)(ii) introductory text;

■ w. In paragraph (o)(2)(i), by removing ''Form I–129, Petition for Nonimmigrant Worker'' and adding in its place ''the form prescribed by USCIS'' in its place;

■ x. In paragraph (o)(2)(iv)(D), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';

■ y. By revising paragraph (o)(2)(iv)(F);

■ z. In paragraph (o)(2)(iv)(G), by removing ''Form I–129'' and adding in its place ''application or petition'' wherever it appears;

■ aa. In paragraph (o)(11), by removing ''Form I–129, Petition for Nonimmigrant Worker'' and adding in its place ''the form prescribed by USCIS'' in its place;

■ bb. In paragraph (o)(12)(i), by removing ''Form I–129'' and adding in its place ''an application or petition'' in the first sentence;

■ cc. In paragraph (p)(2)(i), by removing ''Form I–129, Petition for Nonimmigrant Worker'' and adding in its place ''the form prescribed by USCIS'' in its place;

■ dd. In paragraph (p)(2)(iv)(C)(2), by removing ''Form I–129'' and adding in its place ''application or petition'' wherever it appears;

■ ee. By revising paragraph (p)(2)(iv)(F);

■ ff. In paragraph (p)(2)(iv)(H), by removing ''Form I–129 petition'' and adding in its place ''application or petition'';

■ gg. In paragraphs (p)(13) and (p)(14)(i), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';

■ hh. In paragraph (q)(3)(i), by removing ''Form I–129, Petition for Nonimmigrant Worker'' and adding in its place ''the form prescribed by USCIS'';

■ ii. In the second sentence of paragraph (q)(3)(i) wherever it appears and in paragraph (q)(4)(i), by removing ''Form I–129'' and adding in its place ''application or petition'';

■ jj. In paragraph (q)(4)(iii), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';

■ kk. In the first sentence of paragraph (q)(5)(i), by removing ''Form I–129, Petition for Nonimmigrant Worker'' and adding in its place ''the form prescribed by USCIS'';

■ ll. In the second sentence of paragraph (q)(5)(i), by removing ''Form I–129'' and adding in its place ''the form prescribed by USCIS'';

■ mm. In paragraph (q)(6), by removing ''Form I–129'' and adding in its place ''application or petition'';

■ nn. By revising paragraph (r)(3) introductory text and the definition of ''Petition'' in paragraph (r)(3);

■ oo. By revising paragraph (r)(5);

■ pp. In paragraph (r)(13), by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''; and

■ qq. By revising paragraphs (w)(5), (w)(15)(iii), and (w)(16).

The revisions read as follows:

**§ 214.2  Special requirements for admission, extension, and maintenance of status.**

\*    \*    \*    \*    \*

(e) \*  \*  \*

(8) \*  \*  \*

(iii) *Substantive changes.* Approval of USCIS must be obtained where there will be a substantive change in the terms or conditions of E status. The treaty alien must file a new application in accordance with the instructions on the form prescribed by USCIS requesting extension of stay in the United States, plus evidence of continued eligibility for E classification in the new capacity. Or the alien may obtain a visa reflecting the new terms and conditions and subsequently apply for admission at a port-of-entry. USCIS will deem there to have been a substantive change necessitating the filing of a new application where there has been a fundamental change in the employing entity's basic characteristics, such as a merger, acquisition, or sale of the division where the alien is employed.

(iv) \*  \*  \* Neither prior approval nor a new application is required if there is no substantive, or fundamental, change in the terms or conditions of the alien's employment which would affect the alien's eligibility for E classification. \*  \*  \*

\*    \*    \*    \*    \*

(B) Request a new approval notice reflecting the non-substantive change by filing an application with a description of the change, or;

\*    \*    \*    \*    \*

(v) *Advice.* To request advice from USCIS as to whether a change is

substantive, an alien may file an application with a complete description of the change. In cases involving multiple employees, an alien may request that USCIS determine if a merger or other corporate restructuring requires the filing of separate applications by filing a single application and attaching a list of the related receipt numbers for the employees involved and an explanation of the change or changes.

\*    \*    \*    \*    \*

(23) \*  \*  \*

(viii) *Information for background checks.* USCIS may require an applicant for E–2 CNMI Investor status, including but not limited to any applicant for derivative status as a spouse or child, to submit biometrics as required under 8 CFR 103.16.

\*    \*    \*    \*    \*

(h) \*  \*  \*

(2) \*  \*  \*

(i) \*  \*  \*

(A) *General.* A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions.

\*    \*    \*    \*    \*

(ii) *Multiple beneficiaries.* Up to 25 named beneficiaries may be included in an H–1C, H–2A, H–2B, or H–3 petition if the beneficiaries will be performing the same service, or receiving the same training, for the same period, and in the same location. If more than 25 named beneficiaries are being petitioned for, an additional petition is required. Petitions for H–2A and H–2B workers from countries not designated in accordance with paragraph (h)(6)(i)(E) of this section must be filed separately.

\*    \*    \*    \*    \*

(5) \*  \*  \*

(i) \*  \*  \*

(B) *Multiple beneficiaries.* The total number of beneficiaries of a petition or series of petitions based on the same temporary labor certification may not exceed the number of workers indicated on that document. A single petition can include more than one named beneficiary if the total number is 25 or less and does not exceed the number of positions indicated on the relating temporary labor certification.

\*    \*    \*    \*    \*

(19) \*  \*  \*

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a petition or application must include the additional American

Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in 8 CFR 106.2, if the petition is filed for any of the following purposes:

\* \* \* \* \*

(m) \* \* \*

(14) \* \* \*

(ii) *Application.* A M–1 student must apply for permission to accept employment for practical training on Form I–765, with fee as contained in 8 CFR part 106, accompanied by a properly endorsed Form I–20 by the designated school official for practical training. The application must be submitted before the program end date listed on the student's Form I–20 but not more than 90 days before the program end date. The designated school official must certify on Form I–538 that—

\* \* \* \* \*

(o) \* \* \*

(2) \* \* \*

(iv) \* \* \*

(F) *Multiple beneficiaries.* More than one O–2 accompanying alien may be included on a petition if they are assisting the same O–1 alien for the same events or performances, during the same period, and in the same location. Up to 25 named beneficiaries may be included per petition.

\* \* \* \* \*

(p) \* \* \*

(2) \* \* \*

(iv) \* \* \*

(F) *Multiple beneficiaries.* More than one beneficiary may be included in a P petition if they are members of a team or group, or if they will provide essential support to P–1, P–2, or P–3 beneficiaries performing in the same location and in the same occupation. Up to 25 named beneficiaries may be included per petition.

\* \* \* \* \*

(r) \* \* \*

(3) *Definitions.* As used in this section, the term:

\* \* \* \* \*

*Petition* means the form or as may be prescribed by USCIS, a supplement containing attestations required by this section, and the supporting evidence required by this part.

\* \* \* \* \*

(5) *Extension of stay or readmission.* An R–1 alien who is maintaining status or is seeking readmission and who satisfies the eligibility requirements of this section may be granted an extension of R–1 stay or readmission in R–1 status for the validity period of the petition, up to 30 months, provided the total period of time spent in R–1 status does not exceed a maximum of five years. A Petition for a Nonimmigrant Worker to request an extension of R–1 status must be filed by the employer with a supplement prescribed by USCIS containing attestations required by this section, the fee specified in 8 CFR part 106, and the supporting evidence, in accordance with the applicable form instructions.

\* \* \* \* \*

(w) \* \* \*

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education funding fee and the fraud prevention and detection fee as prescribed in the form instructions and 8 CFR part 106. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with fees with USCIS.

\* \* \* \* \*

(15) \* \* \*

(iii) If the eligible spouse and/or minor child(ren) are present in the CNMI, the spouse or child(ren) may apply for CW–2 dependent status on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status may not be approved until approval of the CW–1 petition.

(16) *Biometrics and other information.* The beneficiary of a CW–1 petition or the spouse or child applying for a grant or, extension of CW–2 status, or a change of status to CW–2 status, must submit biometric information as requested by USCIS.

\* \* \* \* \*

### §214.3   [Amended]

■ 33. Section 214.3 is amended:

■ a. In paragraph (h)(1)(i), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2"; and

■ b. In paragraph (h)(2) introductory text, by removing "8 CFR 103.7(b)(1)(ii)(B)" and adding in its place "8 CFR 103.7(d)(2)".

### §214.6   [Amended]

■ 34. Section 214.6 is amended in paragraphs (g)(1), (h)(1)(i), (h)(2), and (i)(2) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

### §214.11   [Amended]

■ 35. Section 214.11 is amended in paragraphs (d)(2)(iii) and (k)(1) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

■ 36. Section 214.14 is amended by revising paragraph (c)(1) introductory text to read as follows:

### §214.14   Alien victims of certain qualifying criminal activity.

\* \* \* \* \*

(c) \* \* \*

(1) *Filing a petition.* USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit, Form I–918, Petition for U Nonimmigrant Status, and initial evidence to USCIS in accordance with this paragraph and the instructions to Form I–918. A petitioner who received interim relief is not required to submit initial evidence with Form I–918 if he or she wishes to rely on the law enforcement certification and other evidence that was submitted with the request for interim relief.

\* \* \* \* \*

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

■ 37. The authority citation for part 216 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.

### §216.4   [Amended]

■ 38. Section 216.4 is amended in paragraph (a)(1) by removing "§ 103.7(b) of this chapter" and adding in its place "8 CFR 106.2".

### §216.5   [Amended]

■ 39. Section 216.5 is amended in paragraph (b) by removing "§ 103.7(b) of this Chapter" and adding in its place "8 CFR 106.2".

### §216.6   [Amended]

■ 40. Section 216.6 is amended in paragraph (a)(1)(i) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

## PART 217—VISA WAIVER PROGRAM

■ 41. The authority citation for part 217 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1187; 8 CFR part 2.

### §217.2   [Amended]

■ 42. Section 217.2 is amended in paragraph (c)(2) by removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 103.7(d)(4)".

## PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS

■ 43. The authority citation for part 223 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol

**46926** **Federal Register** / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

### § 223.2 [Amended]

■ 44. Section 223.2 is amended in paragraph (a) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 45. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2004 Comp., p.278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; Title VII of Public Law 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Pub. L. 112–54.

### § 235.1 [Amended]

■ 46. Section 235.1 is amended in paragraphs (g)(1)(iii) and (g)(2) by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 103.7(d)(3)''.

### § 235.7 [Amended]

■ 47. Section 235.7 is amended in paragraph (a)(4)(v) by removing ''§ 103.7(b)(1) of this chapter'' and ''§ 103.7(b)(1)'' and adding in their place ''8 CFR 103.7(d)(7)''.

### § 235.12 [Amended]

■ 48. Section 235.12 is amended in paragraph (d)(2) by removing ''8 CFR 103.7(b)(1)(ii)(M)'' and adding in its place ''8 CFR 103.7(d)(13)''.

### § 235.13 [Amended]

■ 49. Section 235.13 is amended in paragraph (c)(5) by removing ''8 CFR 103.7(b)(1)(ii)(N)'' and adding in its place ''8 CFR 103.7(d)(14)''.

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 50. The authority citation for part 236 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

### § 236.14 [Amended]

■ 51. Section 236.14 is amended in paragraph (a) by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 106.2''.

### § 236.15 [Amended]

■ 52. Section 236.15 is amended in paragraph (e) by removing ''§ 103.7(b)(1)

of this chapter'' and adding in its place ''8 CFR 106.2''.

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 53. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681); 8 CFR part 2.

■ 54. Section 240.63 is amended by revising paragraph (a) to read as follows:

### § 240.63 Application process.

(a) *Form and fees.* Except as provided in paragraph (b) of this section, the application must be made on the form prescribed by USCIS for this program and filed in accordance with the instructions for that form. An applicant who submitted to EOIR a completed Form EOIR–40, Application for Suspension of Deportation, before the effective date of the form prescribed by USCIS may apply with the Service by submitting the completed Form EOIR–40 attached to a completed first page of the application. Each application must be filed with the required fees as provided in 8 CFR 106.2.

\* \* \* \* \*

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 55. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

### § 244.6 [Amended]

■ 56. Section 244.6 is revised to read as follows:

### § 244.6 Application.

(a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific **Federal Register** notice that announces the procedures for TPS registration or re-registration and, except as otherwise provided in this section, with the appropriate fees as described in 8 CFR part 106.

(b) An applicant for TPS may also request an employment authorization document pursuant to 8 CFR 274a by filing an Application for Employment Authorization in accordance with the form instructions and in accordance with 8 CFR 106.2 and 106.3.

■ 57. Section 244.17 is amended by revising paragraph (a) to read as follows:

### § 244.17 Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated for more than one year by DHS or where a designation has been extended for a year or more. Applicants for re-registration must apply during the period provided by USCIS. Re-registration applicants do not need to pay the fee that was required for initial registration except the biometric services fee, unless that fee is waived in the applicable form instructions, and if requesting an employment authorization document, the application fee for an Application for Employment Authorization. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests that they do so.

\* \* \* \* \*

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 58. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### § 245.7 [Amended]

■ 59. Section 245.7 is amended in paragraph (a) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

### § 245.10 [Amended]

■ 60. Section 245.10 is amended in paragraph (c) introductory text by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 106.2''.

### § 245.15 [Amended]

■ 61. Section 245.15 is amended:
■ a. In paragraph (c)(2)(iv)(A), by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 106.2'';
■ b. By removing and reserving paragraph (c)(2)(iv)(B);
■ c. In paragraph (g)(1), by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2'';
■ d. In paragraph (h)(1), by removing ''§ 103.7(b)(1) of this chapter'' and adding in its place ''8 CFR 106.2'';
■ e. By removing and reserving paragraph (h)(2); and

■ f. In paragraphs (n)(1), (t)(1), and (t)(2)(i), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

§ 245.18  [Amended]

■ 62. Section 245.18 is amended in paragraphs (d)(1) and (k) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

§ 245.21  [Amended]

■ 63. Section 245.21 is amended:
■ a. In paragraph (b), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" in the first sentence and removing the second sentence; and
■ b. In paragraphs (f), (h), and (i), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

§ 245.23  [Amended]

■ 64. Section 245.23 is amended in paragraph (e)(1)(ii) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" and by removing and reserving paragraph (e)(1)(iii).

§ 245.24  [Amended]

■ 65. Section 245.24 is amended:
■ a. In paragraph (d)(2), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" and by removing and reserving paragraph (d)(3); and
■ b. In paragraphs (h)(1)(ii) and (i)(1)(iii), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" and by removing paragraph (i)(1)(iv).

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 66. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a and 1255a note.

■ 67. Section 245a.2 is amended by revising paragraph (e)(3) to read as follows:

### § 245a.2  Application for temporary residence.

\*    \*    \*    \*    \*

(e) \* \* \*

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\*    \*    \*    \*    \*

■ 68. Section 245a.3 is amended by revising paragraph (d)(3) to read as follows:

### § 245a.3  Application for adjustment from temporary to permanent resident status.

\*    \*    \*    \*    \*

(d) \* \* \*

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\*    \*    \*    \*    \*

■ 69. Section 245a.4 is amended by revising paragraph (b)(5)(iii) to read as follows:

### § 245a.4  Adjustment to lawful resident status of certain nationals of countries for which extended voluntary departure has been made available.

\*    \*    \*    \*    \*

(b) \* \* \*

(5) \* \* \*

(iii) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

\*    \*    \*    \*    \*

■ 70. Section 245a.12 is amended:
■ a. In paragraphs (b) introductory text and (c), by removing "Missouri Service Center" and adding in its place "National Benefit Center";
■ b. By revising paragraph (d) introductory text;
■ c. In paragraph (d)(1), by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2"; and
■ d. By removing and reserving paragraphs (d)(2), (4), and (6).
The revision reads as follows:

### § 245a.12  Filing and applications.

\*    \*    \*    \*    \*

(d) *Application and supporting documentation.* Each applicant for LIFE Legalization adjustment of status must submit the form prescribed by USCIS completed in accordance with the form instructions accompanied by the required evidence.

\*    \*    \*    \*    \*

§ 245a.13  [Amended]

■ 71. Section 245a.13 is amended:
■ a. In paragraphs (d)(1) and (e)(1), by removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2"; and
■ b. In paragraph (e) introductory text and (e)(1), by removing "Missouri Service Center" and adding in its place "National Benefit Center"; and

§ 245a.18  [Amended]

■ 72. Section 245a.18 is amended in paragraph (c)(1) by removing "Missouri Service Center" and adding in its place "National Benefit Center" in paragraph (c)(1).

§ 245a.19  [Amended]

■ 73. Section 245a.19 is amended in paragraph (a) by removing "Missouri

Service Center" and adding in its place "National Benefit Center".

§ 245a.20  [Amended]

■ 74. Section 245a.20 is amended in paragraph (a)(2) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

§ 245a.33  [Amended]

■ 75. Section 245a.33 is amended in paragraph (a) by removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2" and in paragraphs (a) and (b) by removing "Missouri Service Center" and adding in its place "National Benefit Center".

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 76. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

§ 248.3  [Amended]

■ 77. Section 248.3 is amended in the introductory text by removing "8 CFR 103.7(b)" and adding in its place "8 CFR 106.2" in its place and in paragraph (h) introductory text by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 78. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

§ 264.2  [Amended]

■ 79. Section 264.2 is amended in paragraphs (c)(1)(i) and (c)(2)(i) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

§ 264.5  [Amended]

■ 80. Section 264.5 is amended in paragraph (a) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

§ 264.6  [Amended]

■ 81. Section 264.6 is amended in paragraph (b) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 82. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410,

**46928**   **Federal Register** / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 83. Section 274a.12 is amended by revising paragraphs (b)(9), (13), and (14) to read as follows:

**§ 274a.12   Classes of aliens authorized to accept employment.**

\* \* \* \* \*

(b) \* \* \*

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker pursuant to sections 101(a)(15)(H)(i)(b)(1), 101(a)(15)(H)(ii)(a), 101(a)(15)(H)(ii)(b) and INA 101(a)(15)(H)(iii) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization must file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H);

\* \* \* \* \*

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), pursuant to 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new

petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), pursuant to 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

\* \* \* \* \*

**PART 286—IMMIGRATION USER FEE**

■ 84. The authority citation for part 286 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1356; Title VII of Public Law 110–229; 8 CFR part 2.

**§ 286.9   [Amended]**

■ 85. Section 286.9 is amended in paragraph (a) by removing "§ 103.7(b)(1)" and adding in its place "8 CFR 103.7(d)".

**PART 301—NATIONALS AND CITIZENS OF THE UNITED STATES AT BIRTH**

■ 86. The authority citation for part 301 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1401; 8 CFR part 2.

**§ 301.1   [Amended]**

■ 87. Section 301.1 is amended in paragraph (a)(1) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

**PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS**

■ 88. The authority citation for part 319 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1430, 1443.

**§ 319.11   [Amended]**

■ 89. Section 319.11 is amended in paragraph (a) introductory text by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

**PART 320—CHILD BORN OUTSIDE THE UNITED STATES AND RESIDING PERMANENTLY IN THE UNITED STATES; REQUIREMENTS FOR AUTOMATIC ACQUISITION OF CITIZENSHIP**

■ 90. The authority citation for part 320 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

**§ 320.5   [Amended]**

■ 91. Section 320.5 is amended in paragraphs (b) and (c) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

**PART 322—CHILD BORN OUTSIDE THE UNITED STATES; REQUIREMENTS FOR APPLICATION FOR CERTIFICATE OF CITIZENSHIP**

■ 92. The authority citation for part 322 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

**§ 322.3   [Amended]**

■ 93. Section 322.3 is amended in paragraph (a) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2" and in paragraph (b)(1) introductory text by removing "§ 103.7(b)(1) of this chapter" and adding in its place "8 CFR 106.2".

**§ 322.5   [Amended]**

■ 94. Section 322.5 is amended in paragraphs (b) and (c) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

**PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW**

■ 95. The authority citation for part 324 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1435, 1443, 1448, 1101 note.

**§ 324.2   [Amended]**

■ 96. Section 324.2 is amended in paragraph (b) by removing "8 CFR 103.7(b)(1)" and adding in its place "8 CFR 106.2".

**PART 334—APPLICATION FOR NATURALIZATION**

■ 97. The authority citation for part 334 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

## § 334.2 [Amended]

■ 98. Section 334.2 is amended in paragraph (a) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

## PART 341—CERTIFICATES OF CITIZENSHIP

■ 99. The authority citation for part 341 continues to read as follows:

**Authority:** Pub. L. 82–414, 66 Stat. 173, 238, 254, 264, as amended; 8 U.S.C. 1103, 1409(c), 1443, 1444, 1448, 1452, 1455; 8 CFR part 2.

## § 341.1 [Amended]

■ 100. Section 341.1 is amended by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

## § 341.5 [Amended]

■ 101. Section 341.5 is amended in paragraph (e) by removing ''8 CFR 103.7'' and adding in its place ''8 CFR 106.2''.

## PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS

■ 102. The authority citation for part 343a continues to read as follows:

**Authority:** 8 U.S.C. 1101 note, 1103, 1435, 1443, 1454, and 1455.

## § 343a.1 [Amended]

■ 103. Section 343a.1 is amended in paragraph (a) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR part 106''.

## PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE

■ 104. The authority citation for part 343b continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1454, 1455.

## § 343b.1 [Amended]

■ 105. Section 343b.1 is amended by removing the term ''8 CFR 103.7(b)(1)''

and adding in its place ''8 CFR 106.2'' in the first sentence.

## PART 392—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WHO DIE WHILE SERVING ON ACTIVE DUTY WITH THE UNITED STATES ARMED FORCES DURING CERTAIN PERIODS OF HOSTILITIES

■ 106. The authority citation for part 392 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440 and note, and 1440–1; 8 CFR part 2.

## § 392.4 [Amended]

■ 107. Section 392.4 is amended in paragraph (e) by removing ''8 CFR 103.7(b)(1)'' and adding in its place ''8 CFR 106.2''.

**Chad R. Mizelle,**

*Senior Official Performing the Duties of the General Counsel for DHS.*

[FR Doc. 2020–16389 Filed 7–31–20; 8:45 am]

**BILLING CODE 9111–97–P**


# Rules and Regulations

**Federal Register**

Vol. 86, No. 18

Friday, January 29, 2021

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 211, 212, 214, 216, 217, 223, 235, 236, 240, 244, 245, 245a, 248, 264, 274a, 286, 301, 319, 320, 322, 324, 334, 341, 343a, 343b, and 392**

**[CIS No. 2627–18; DHS Docket No. USCIS–2019–0010]**

**RIN 1615–AC18**

### U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notification of preliminary injunction.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS) is issuing this document to inform the public of two preliminary injunctions ordered by Federal district courts affecting the Department of Homeland Security's (the Department, or DHS) final rule entitled "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements."

**DATES:** The court orders were effective September 29, 2020 and October 8, 2020.

**FOR FURTHER INFORMATION CONTACT:** For technical questions only: Kika Scott, Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009, telephone (240) 721–3000.

**SUPPLEMENTARY INFORMATION:** On August 3, 2020, the Department published a final rule in the **Federal Register** at 85 FR 46788 entitled "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the

"Final Rule"). The Final Rule was to be effective October 2, 2020.

On August 20, 2020, the Immigrant Legal Resource Center and other plaintiffs filed a lawsuit in the U.S. District Court for the Northern District of California, *Immigration Legal Resource Center et al.,* v. *Wolf, et al.,* 20–cv–05883–JWS ("*ILRC* v. *Wolf*"), seeking a court order to prohibit the Department from implementing or enforcing the Final Rule. Plaintiffs subsequently filed a motion for a preliminary injunction and stay of the effective date of the Final Rule.

On September 3, 2020, Northwest Immigrant Rights Project (NWIRP) and other plaintiffs in *Nw. Immigrant Rts. Project, et al.,* v. *USCIS,* No. 19–cv–3283 (RDM) ("*NWIRP* v. *USCIS*"), filed a motion in the U.S. District Court for the District of Columbia requesting postponement of the effective date of the Final Rule, stay of any implementation or enforcement of the Final Rule, and for a preliminary injunction against implementation or enforcement of the Final Rule.

On September 29, 2020, the U.S. District Court for the Northern District of California, in *ILRC* v. *Wolf,* preliminarily enjoined DHS from implementing or enforcing any part of the Final Rule. *See Immigration Legal Resource Center et al.,* v. *Wolf, et al.,* No. 20–cv–05883–JWS, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020).

On October 8, 2020, the U.S. District Court for the District of Columbia granted NWIRP's motion for a preliminary injunction. *See NWIRP* v. *USCIS,* No. CV 19–3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020).

The Department is complying with the terms of these orders and is not enforcing the regulatory changes set out in the Final Rule. USCIS will continue to accept the fees that were in place prior to October 2, 2020, and follow the guidance in place prior to October 2, 2020 to adjudicate fee waiver requests as provided under the Adjudicator's Field Manual (AFM) Chapters 10.9 and 10.10.

Any further guidance and updates regarding the subject litigation will be posted on the USCIS website *https:// www.uscis.gov/news/news-releases/ uscis-response-to-preliminary-*

*injunction-of-fee-rule* on an ongoing basis.

**Tracy L. Renaud,**
*Senior Official Performing the Duties of the Director.*

[FR Doc. 2021–02044 Filed 1–28–21; 8:45 am]

**BILLING CODE 9111–97–P**

## FEDERAL HOUSING FINANCE AGENCY

**12 CFR Parts 1209, 1217, and 1250**

**RIN 2590–AB14**

### Rules of Practice and Procedure; Civil Money Penalty Inflation Adjustment

**AGENCY:** Federal Housing Finance Agency.

**ACTION:** Final rule.

**SUMMARY:** The Federal Housing Finance Agency (FHFA) is adopting this final rule amending its Rules of Practice and Procedure and other agency regulations to adjust each civil money penalty within its jurisdiction to account for inflation, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

**DATES:** *Effective* January 29, 2021, and applicable beginning January 15, 2021.

**FOR FURTHER INFORMATION CONTACT:** Frank R. Wright, Assistant General Counsel, at (202) 649–3087, *Frank.Wright@fhfa.gov* (not a toll-free number); Federal Housing Finance Agency, 400 7th Street SW, Washington, DC 20219. The telephone number for the Telecommunications Device for the Deaf is: (800) 877–8339 (TDD only).

**SUPPLEMENTARY INFORMATION:**

### I. Background

FHFA is an independent agency of the Federal government, and the financial safety and soundness regulator of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises), as well as the Federal Home Loan Banks (collectively, the Banks) and the Office of Finance under authority granted by the Federal Housing Enterprises Financial Safety and Soundness Act of

LEGAL STATUS

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

LEGAL STATUS

# U.S. Citizenship and Immigration Services Fee Schedule

A Rule by the Homeland Security Department on 10/24/2016

## DOCUMENT DETAILS

**Printed version:**
PDF (https://www.govinfo.gov/content/pkg/FR-2016-10-24/pdf/2016-25328.pdf)

**Publication Date:**
10/24/2016 (/documents/2016/10/24)

**Agency:**
Department of Homeland Security (https://www.federalregister.gov/agencies/homeland-security-department)

**Dates:**
This rule is effective December 23, 2016. Applications or petitions mailed, postmarked, or otherwise filed on or after December 23, 2016 must include the new fee.

**Effective Date:**
12/23/2016

**Document Type:**
Rule

**Document Citation:**
81 FR 73292

**Page:**
73292-73332 (41 pages)

**CFR:**
8 CFR 103
8 CFR 204
8 CFR 205

**Agency/Docket Numbers:**
CIS No. 2577-15
DHS Docket No. USCIS-2016-0001

**RIN:**
1615-AC09 (https://www.federalregister.gov/regulations/1615-AC09/u-s-citizenship-and-immigration-services-fee-schedule)

Feedback

**Document Number:**

AR2022_200536

---

**DOCUMENT DETAILS**

---

**DOCUMENT STATISTICS**

**Page views:**
106,126
as of 05/12/2021 at 10:15 am EDT

---

**DOCUMENT STATISTICS**

---

**ENHANCED CONTENT**



**Docket Number:**
USCIS-2016-0001 (https://beta.regulations.gov/docket/USCIS-2016-0001)

**Docket Name:**
U.S. Citizenship and Immigration Services Fee Schedule

**Docket RIN**
1615-AC08

**Supporting/Related Materials:**
USCIS Fee Rule Small Entity Analysis 24OCT16 (https://www.regulations.gov/document?D=USCIS-2016-0001-0467)
FY 2016/2017 Immigration Examinations Fee Account Fee Review... (https://www.regulations.gov/document?D=USCIS-2016-0001-0466)
Small Entity Analysis for the U.S. Citizenship and Immigration... (https://www.regulations.gov/document?D=USCIS-2016-0001-0464)
Form I-942, Request for Reduced Fee 5.18.2016 (https://www.regulations.gov/document?D=USCIS-2016-0001-0108)
Instructions for Form I-942, Instructions for Request for... (https://www.regulations.gov/document?D=USCIS-2016-0001-0107)
Form I-924, Application for Regional Center Designation Under... (https://www.regulations.gov/document?D=USCIS-2016-0001-0106)
Instructions for Form I-924, Application for Regional Center... (https://www.regulations.gov/document?D=USCIS-2016-0001-0105)
Form N-400, Application for Naturalization (https://www.regulations.gov/document?D=USCIS-2016-0001-0098)
Instructions for Form N-400, Application for Naturalization (https://www.regulations.gov/document?D=USCIS-2016-0001-0097)
FY 2016/2017 Immigration Examinations Fee Account Fee Review... (https://www.regulations.gov/document?D=USCIS-2016-0001-0077)
**See all 28 supporting documents (https://beta.regulations.gov/docket/USCIS-2016-0001/document?
documentTypes=Supporting%20%26%20Related%20Material)**

---

**ENHANCED CONTENT**

---

**PUBLISHED DOCUMENT**

⬚ Start Printed Page 73292

# AGENCY:

U.S. Citizenship and Immigration Services, DHS.

# ACTION:

Final rule.

# SUMMARY:

The Department of Homeland Security (DHS) is adjusting the fee schedule for immigration and
naturalization benefit requests processed by U.S. Citizenship and Immigration Services (USCIS). The fee
schedule was last adjusted on November 23, 2010. USCIS conducted a comprehensive fee review for the

fiscal year (FY) 2016/2017 biennial period and determined that current fees do not recover the full cost of services provided. DHS has determined that adjusting the fee schedule is necessary to fully recover costs and maintain adequate service. DHS published a proposed fee schedule on May 4, 2016.

Under this final rule, DHS will increase fees by a weighted average of 21 percent; establish a new fee of $3,035 covering USCIS costs related to processing the Employment Based Immigrant Visa, Fifth Preference (EB-5) Annual Certification of Regional Center, Form I-924A; establish a three-level fee for the Application for Naturalization, Form N-400; and remove regulatory provisions that prevent USCIS from rejecting an immigration or naturalization benefit request paid with a dishonored check or lacking the required biometric services fee until the remitter has been provided an opportunity to correct the deficient payment.

## DATES:

This rule is effective December 23, 2016. Applications or petitions mailed, postmarked, or otherwise filed on or after December 23, 2016 must include the new fee.

## FOR FURTHER INFORMATION CONTACT:

Joseph D. Moore, Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529-2130, telephone 202-272-1969.

## SUPPLEMENTARY INFORMATION:

### Table of Contents

I. Executive Summary

II. Background

III. Final Rule

A. Changes in the Final Rule

B. Corrections

C. Summary of Final Fees

IV. Public Comments on the Proposed Rule

A. General Comments

B. Relative Amount of Fees

1. Proposed Fees Are Too High

a. Barrier to Family Reunification

b. Impact on Low-Income Individuals; Low Volume Reallocation

2. Comments on Specific Fees and Adjustments

a. Application for Certificate of Citizenship, Forms N-600/600K

b. Adoption, Forms I-600/600A/800/800A

c. Petition for a Nonimmigrant Worker, Form I-129

d. Application To Register Permanent Residence or Adjust Status, Form I-485, and Interim Benefits

e. Application for Travel Document, Form I-131

f. Students

g. Application for Replacement Naturalization/Citizenship Certificate, Form N-565

h. Petition for Alien Relative, Form I-130

i. Application To Replace Permanent Resident Card, Form I-90

j. Genealogy, Forms G-1041/1041A

k. Petition To Remove Conditions on Residence, Form I-751

l. Petition for Alien Fiancé(e), Form I-129F

m. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360

n. Notice of Appeal or Motion, Form I-290B

o. Application for Civil Surgeon Designation, Form I-910

p. Application for Advance Permission to Enter as a Nonimmigrant, Form I-192, and Application for
   Waiver of Passport and/or Visa, Form I-193

C. Fee Waivers and Exemptions

D. Naturalization

E. Improve Service and Reduce Inefficiencies

F. Premium Processing

G. Immigrant Investors

1. Application for Regional Center Under the Immigrant Investor Program, Form I-924

2. Immigrant Petition by Alien Entrepreneur, Form I-526

3. Petition by Entrepreneur To Remove Conditions on Permanent Resident Status, Form I-829

H. Methods Used To Determine Fee Amounts

AR2022_200539

1. Recovery of Full Cost Without Appropriations

2. Exclusion of Temporary or Uncertain Costs, Items, and Programs

3. Setting Fees by Benefit Type

4. Income-Based Fee Structure

5. Reduction in USCIS Costs

I. Dishonored Payments

J. Refunds

K. Visa Allocation

L. Credit Card Payments

V. Statutory and Regulatory Reviews

A. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis

1. A Statement of the Need for, and Objectives of, the Rule

2. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial
   Regulatory Flexibility Analysis, A Statement of the Assessment of the Agency of Such Issues, and A
   Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

a. Comments on Form I-129

b. Comments on Forms I-360 and I-485

c. Comments on Forms G-1041 and G-1041A

d. Comments on Form I-924A

3. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small
   Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change
   Made to the Proposed Rule in the Final Rule as a Result of the Comments

4. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an
   Explanation of Why No Such Estimate is Available

a. Petition for a Nonimmigrant Worker, Form I-129

b. Immigrant Petition for an Alien Worker, Form I-140

c. Application for Civil Surgeon Designation, Form I-910

d. Regional Center Designation Under the Immigrant Investor Program, Form I-924 and I-924A

**AR2022_200540**

e. Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360

5. A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary For Preparation of the Report or Record

6. A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent with the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

B. Unfunded Mandates Reform Act

C. Small Business Regulatory Enforcement Fairness Act

D. Congressional Review Act

E. Executive Orders (E.O.) 12866 and 13563 (Regulatory Planning and Review)

1. Background and Purpose of the Final Rule

2. Amendments and Impacts of Regulatory Change

a. Dishonored Payments

b. Failure To Pay the Biometric Services Fees

c. Reduced Fee for Application for Naturalization

d. Refunds

F. Executive Order 13132 (/executive-order/13132) (Federalism)

G. Executive Order 12988 (/executive-order/12988) (Civil Justice Reform)

H. Family Assessment 🗋                                      🗋 Start Printed
                                                              Page 73293

I. Paperwork Reduction Act—Comments on the Proposed Information Collection Changes

1. Request for Reduced Fee, Form I-942

2. Annual Certification of Regional Center, Form I-924A

## I. Executive Summary

The Department of Homeland Security (DHS) is adjusting the fee schedule for U.S. Citizenship and Immigration Services (USCIS). USCIS conducted a comprehensive fee review for the FY 2016/2017 biennial period, refined its cost accounting process, and determined that current fees do not recover the full costs of

AR2022_200541

services provided. DHS has determined that adjusting USCIS' fee schedule is necessary to fully recover costs and maintain adequate service.

In this final rule, DHS will:

- Adjust fees by a weighted average increase of 21 percent to ensure that fees for each benefit type are adequate to cover USCIS' costs associated with processing applications and petitions, as well as providing similar benefits to asylum and refugee applicants [1] and certain other immigrants at no charge.

- Establish a new fee of $3,035 to recover the full cost of processing the Employment Based Immigrant Visa, Fifth Preference (EB-5) Annual Certification of Regional Center, Form I-924A.

- Establish a three-level fee for Application for Naturalization, Form N-400. First, DHS will increase the standard fee for Form N-400 from $595 to $640. Second, DHS will continue to charge no fee to applicants who meet the requirements of sections 328 or 329 of the Immigration and Nationality Act of 1952 (INA) with respect to military service and applicants with approved fee waivers. Third, DHS will charge a reduced fee of $320 for naturalization applicants with family income greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines.

- Remove regulatory provisions that prevent USCIS from rejecting an immigration or naturalization benefit request paid with a dishonored check or lacking the required biometric services fee until the remitter has been provided an opportunity to correct the deficient payment.

- Clarify that persons filing any benefit request may be required to appear for biometrics services or an interview and may be required to pay the biometrics services fee.

## II. Background

DHS published a notice of proposed rulemaking (NPRM) on May 4, 2016, which proposed adjusting USCIS' fee schedule by a weighted average increase of 21 percent. *See U.S. Citizenship and Immigration Services Fee Schedule; Proposed Rule,* 81 FR 26904 (/citation/81-FR-26904). This final rule establishes the first fee adjustment since 2010. It is a result of a comprehensive fee review conducted by USCIS for the FY 2016/2017 biennial period. During the fee review, USCIS determined that current fees do not recover the full costs of processing immigration benefits. This final rule reflects full cost recovery including program costs that DHS excluded in the 2010 final rule. USCIS provided the FY 2016/2017 Immigration Examinations Fee Account (IEFA) Fee Review Supporting Documentation (supporting documentation), which includes budget methodology, and regulatory flexibility analysis, in the public docket. *See http://www.regulations.gov (http://www.regulations.gov),* docket number USCIS-2016-0001.

This final rule includes the addition of fee surcharges applied to certain immigration benefits to fully recover costs related to the USCIS Refugee, Asylum, and International Operations Directorate (RAIO), the Systematic Alien Verification for Entitlements (SAVE) program (to the extent not recovered from users),[2] and the Office of Citizenship.[3] In the 2010 final rule, USCIS assumed it would continue receiving funding for these programs through congressional appropriations. *See U.S. Citizenship and Immigration Services Fee Schedule,* 75 FR 58962 (/citation/75-FR-58962), 58966 (Sept. 24, 2010). The 2010 final rule removed asylum, refugee, and military naturalization costs from the fee structure and assumed that immigration fees would not be used to recover the costs of adjudicating asylum, refugee, and military naturalization requests, as well as costs associated with the SAVE program and the Office of Citizenship. The final rule removed all of these costs from the USCIS fee structure, instead assuming that these services would be funded using appropriated funds. *See* 75 FR 58963 (/citation/75-FR-58963). That budget request was not fulfilled, and USCIS was left to fund the cost of these programs after having removed the surcharge. *See* Pub. L. 112-10 (https://api.fdsys.gov/link?collection=plaw&congress=112&lawtype=public&lawnum=10&link-type=html), sec. 1639 (Apr. 15, 2011).[4]

**AR2022_200542**

DHS issues this final rule consistent with the Immigration and Nationality Act (INA) section 286(m), 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants) and the Chief Financial Officers (CFO) Act of 1990, 31 U.S.C. 901 (https://api.fdsys.gov/link?collection=uscode&title=31&year=mostrecent&section=901&type=usc&link-type=html)-03 (requiring each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees). The NPRM provides additional information on the legal authority, non-statutory guidance, and background on the IEFA fees. *See* 81 FR 26906 (/citation/81-FR-26906).

## III. Final Rule

### A. Changes in the Final Rule

This section details the changes made in this final rule as compared to the NPRM. These changes are summarized as follows:

1. Application to Register Permanent Residence or Adjust Status, Form I-485. DHS has revised the regulatory language regarding the fee for the Application to Register Permanent Residence or Adjust Status, Form I-485, to clarify that the proposed $750 discounted fee is available for all applicants under 14 years old who submit their Form I-485 with that of a parent. These revisions accord the fee regulations with the current Form I-485 instructions and intake practices. *See* new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(U)(2); 81 FR 26919 (/citation/81-FR-26919). The section later in this preamble entitled, "Adjustment of Status, Form I-485, and Interim Benefits," provides more details about this change.⬜

⬜ Start Printed Page 73294

2. Dishonored payments. DHS has also clarified the regulations governing USCIS actions when a check used to pay the required fee is dishonored by the remitter's bank. Under this final rule, USCIS will submit all initially rejected payments to the applicant's bank a second time for it to clear or be rejected. 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii)(D). If the check is rejected again following re-submission by USCIS, it will reject the case for fee non-payment. If the case has been approved, USCIS will send a notice of intent to revoke the approval. The section later in this preamble entitled, "Dishonored Payments," provides more details about this change.

3. Application for Advance Permission to Enter as a Nonimmigrant, Form I-192, and Application for Waiver for Passport and/or Visa, Form I-193. DHS has made adjustments to the proposed fees in the final rule for the Application for Advance Permission to Enter as a Nonimmigrant, Form I-192, and the Application for Waiver for Passport and/or Visa, Form I-193. For the reasons outlined in section IV.B.2.p. of this preamble, the fees that will be charged for Forms I-192 and I-193 will remain at $585, rather than the proposed fee of $930 when such forms are submitted to and processed by the U.S. Customs and Border Protection (CBP). *See* new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(P)-(Q).

### B. Corrections

DHS inadvertently listed Application by Refugee for Waiver of Grounds of Excludability, Form I-602, in the NPRM preamble and the supporting documentation. DHS listed Form I-602 in the NPRM as part of Waiver Forms in section IV, Fee Review Methodology, at 81 FR 26916 (/citation/81-FR-26916) and tables 8 and 9 at 81 FR 26926 (/citation/81-FR-26926)-26927. USCIS referenced it on pages 24, 47, 49, and 50 of the

**AR2022_200543**

accompanying supporting documentation. The docket of this final rule includes a corrected version of the supporting documentation without references to Form I-602. Form I-602 has no fee and DHS should not have included it in these lists or tables. The NPRM did not assume any fee-paying workload for Form I-602; therefore, removing it from the fee schedule does not affect other fees. DHS continues to not charge a fee for Form I-602.

DHS also inadvertently did not include provisions for what would occur if a benefit request was approved before USCIS became aware that the fee payment was dishonored by the remitter institution. *See* proposed 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii), 103.7(a)(2); 81 FR 26936 (/citation/81-FR-26936)-26937. Specifically, DHS proposed to remove the requirement that USCIS provide notification to the requester whenever an instrument used to pay the filing fee is returned as not payable, with 14 days to cure the deficiency. However, DHS neglected to propose the necessary conforming change to 8 CFR 205.1 (/select-citation/2016/10/24/8-CFR-205.1)(a)(2), which provides that the approval of a petition or self-petition made under INA section 204 is automatically revoked if the filing fee and associated service charge are not paid within 14 days of the notification to the remitter that his or her check or other financial instrument used to pay the filing fee has been returned as not payable. The latter provision must be revised to conform it to the proposed change described previously. That oversight has been corrected in this final rule. New 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(a)(2)(iii), 205.1(a). This change is discussed in more detail in the response to the public comments regarding dishonored payments.

### C. Summary of Final Fees

The current USCIS fee schedule and the fees adopted in this final rule are summarized in Table 1. DHS bases the final fees on the FY 2016/2017 estimated cost baseline as outlined in the NPRM. The table excludes fees established and required by statute and those that DHS cannot adjust.

**AR2022_200544**

Table 1—Non-Statutory IEFA Immigration Benefit Request Fees

| Form No.[5] | Title | Current fee | Final fee |
|---|---|---|---|
| G-1041 | Genealogy Index Search Request | $20 | $65 |
| G-1041A | Genealogy Records Request (Copy from Microfilm) | 20 | 65 |
| G-1041A | Genealogy Records Request (Copy from Textual Record) | 35 | 65 |
| I-90 | Application to Replace Permanent Resident Card | 365 | 455 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 330 | 445 |
| I-129/129CW | Petition for a Nonimmigrant Worker | 325 | 460 |
| I-129F | Petition for Alien Fiancé(e) | 340 | 535 |
| I-130 | Petition for Alien Relative | 420 | 535 |
| I-131[6]/I-131A[7] | Application for Travel Document | 360 | 575 |
| I-140 | Immigrant Petition for Alien Worker | 580 | 700 |
| I-191 | Application for Advance Permission to Return to Unrelinquished Domicile | 585 | 930 |
| I-192 | Application for Advance Permission to Enter as Nonimmigrant | 585 | [8] 585/930 |
| I-193 | Application for Waiver of Passport and/or Visa | 585 | 585 |
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 585 | 930 |
| I-290B | Notice of Appeal or Motion | 630 | 675 |
| I-360 | Petition for Amerasian Widow(er) or Special Immigrant | 405 | 435 |
| I-485 | Application to Register Permanent Residence or Adjust Status | 985 | 1,140 |
| I-485 | Application to Register Permanent Residence or Adjust Status (certain applicants under the age of 14 years) | 635 | 750 |
| I-526 | Immigrant Petition by Alien Entrepreneur | 1,500 | 3,675 |
| I-539 | Application to Extend/Change Nonimmigrant Status | 290 | 370 |
| I-600/600A | Petition to Classify Orphan as an Immediate Relative/Application for Advance Petition Processing of Orphan Petition | 720 | 775 |
| I-800/800A | Petition to Classify Convention Adoptee as an Immediate Relative/Application for Determination of Suitability to Adopt a Child from a Convention Country | 720 | 775 |

AR2022_200545

| Form No.[5] | Title | Current fee | Final fee |
|---|---|---|---|
| I-698 | Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | 1,020 | 1,670 |
| I-751 | Petition to Remove Conditions on Residence | 505 | 595 |
| I-765 | Application for Employment Authorization | 380 | 410 |
| I-800A Supp. 3 | Request for Action on Approved Form I-800A | 360 | 385 |
| I-817 | Application for Family Unity Benefits | 435 | 600 |
| I-824 | Application for Action on an Approved Application or Petition | 405 | 465 |
| I-829 | Petition by Entrepreneur to Remove Conditions | 3,750 | 3,750 |
| I-910 | Application for Civil Surgeon Designation | 615 | 785 |
| I-924 [9] | Application for Regional Center Designation Under the Immigrant Investor Program | 6,230 | 17,795 |
| I-924A | Annual Certification of Regional Center | 0 | 3,035 |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | 215 | 230 |
| N-300 | Application to File Declaration of Intention | 250 | 270 |
| N-336 | Request for Hearing on a Decision in Naturalization Proceedings | 650 | 700 |
| N-400 | Application for Naturalization | 595 | 640 |
| N-470 | Application to Preserve Residence for Naturalization Purposes | 330 | 355 |
| N-565 | Application for Replacement Naturalization/Citizenship Document | 345 | 555 |
| N-600/N-600K | Application for Certification of Citizenship/Application for Citizenship and Issuance of Certificate under Section 322 | [10] 600/550 | 1,170 |
| | USCIS Immigrant Fee [11] | 165 | 220 |
| | Biometric Services Fee | 85 | 85 |

AR2022_200546

## IV. Public Comments on the Proposed Rule

DHS provided a 60-day comment period following publication of the NPRM; 436 comments were posted to *regulations.gov*. Although 475 comments were received on the docket, 38 were not posted and one was withdrawn. As noted in the proposed rule, DHS may withhold information provided in comments from public viewing if it determines that such information is offensive or may affect the privacy of an individual. 81 FR 26905 (/citation/81-FR-26905).

### A. General Comments

DHS received comments from a broad spectrum of individuals and organizations, including refugee and immigrant service and advocacy organizations, public policy groups, members of Congress, and private citizens. Some commenters wrote that they supported the fee changes while others were critical of them. Many commenters wrote that they were generally unsupportive of the weighted average increase; others commented on specific form types. Some commenters wrote about alternative methods to reduce costs and inefficiencies.

DHS also received several comments on subjects that are not related to the proposed fees and are outside the scope of the NPRM. With limited exception as explicitly stated below, DHS has not separately summarized or responded to these comments.

### B. Relative Amount of Fees

Most commenters stated opposition to the fee increases. Some commenters suggested that fee increases would reduce the number of people seeking immigration benefits. Some commenters stated that the proposed fees did not reflect the actual adjudicative workload of particular benefit types. Several commenters stated that proposed fees were too low, but the clear majority stated that the fees were too high.

Although DHS summarizes and responds to these concerns in more detail below, it emphasizes that, as an initial matter and as articulated in the NPRM, DHS needs to increase USCIS fees by a weighted average increase of 21 percent to offset growing costs and continue to provide an adequate level of service, as provided by section 286(m) of the INA, 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(m), which authorizes USCIS to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge." As reflected in this provision, some USCIS fees must exceed the cost of adjudicating the respective benefit types to cover those benefits provided without charge, such as refugee benefits, asylum benefits, and other fee-exempt, fee-waived or fee-reduced workloads. Furthermore, as explained in the NPRM, □ "DHS may reasonably adjust fees based on value judgements and public policy reasons where a rational basis for the methodology is propounded in the rulemaking." *See* 81 FR 26907 (/citation/81-FR-26907).

□ Start Printed Page 73296

An example is the policy decision to include a fee exemption for individuals who are victims of a severe form of human trafficking and who assist law enforcement in the investigation or prosecution of those acts of trafficking (who may qualify for T visas), and individuals who are victims of certain crimes and are being helpful to the investigation or prosecution of those crimes (who may qualify for U visas). The cost of processing those fee-exempt visas must be recovered through fees charged for other benefit requests. *See* INA secs. 101(a)(15)(T), (U), 214(o), (p), 8 U.S.C. 1101 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1101&type=usc&link-type=html)(a)(15)(T), (U), and

AR2022_200547

1184(o), (p); 8 CFR 214.11 (/select-citation/2016/10/24/8-CFR-214.11), 214.14, 103.7(c)(5)(iii); *Adjustment of Status to Lawful Permanent Resident for Aliens in T or U Nonimmigrant Status*, 73 FR 75540 (/citation/73-FR-75540) (Dec. 12, 2008). Such a decision would inevitably cause an unsustainable reduction in fee revenue unless DHS spread the cost of the fee exemption among other fee-paying applicants and petitioners. Accordingly, consistent with section 286(m) of the INA, 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(m), DHS sets fees for other fee-paying applicants and petitioners at a level sufficient to recover the full costs of providing all such services.

Similarly, a decision to allow fee waivers for a particular benefit request, or a decision to allow a reduced fee, will also have an impact on other fee-paying applicants and petitioners. For instance, when USCIS determines to hold a fee to a smaller percentage increase than the overall methodology suggests (in this rule, DHS uses an 8 percent weighted average increase for those benefits that it determines should be held to a smaller fee increase [12] ), there are cascading effects on other fee-paying applicants and petitioners. These fee-reduced immigration benefit requests may not recover the full cost of their associated workloads or the full cost of their respective fee waivers. The portion of costs that is not recovered is reallocated to other immigration benefit requests.

Correspondingly, when DHS sets a fee for a given benefit request at the level suggested by the USCIS fee-setting methodology, without further adjustment, the associated immigration benefit request absorbs a portion of the additional costs associated with the immigration benefit requests that are held down to the 8 percent weighted average increase. These fees recover the full cost of their respective fee waivers, plus some of the fee waiver costs for immigration benefit requests that are held down to the 8 percent weighted average increase.[13] These fees also recover a greater portion of the cost of fee-exempt services.

### 1. PROPOSED FEES ARE TOO HIGH

The largest number of commenters wrote in opposition to the overall increase in fees. Several commenters expressed concern over specific populations (such as families or potential adoptive families) that may be particularly affected by the fee increases. Some commenters believed that a steep increase in fees would result in increased illegal immigration, particularly for individuals who may not be able to afford increased costs associated with existing legal avenues. Some commenters suggested that the increase in fees could discourage certain individuals from attempting to work or ultimately seeking lawful permanent residence resident (LPR) status in the country.

As an initial matter, DHS notes that as stated in the NPRM, it attributes 17 percent of the 21 percent weighted average fee increase to the reinstatement of the surcharge needed to sustain current operating levels of RAIO, the SAVE program, and the Office of Citizenship, as well as to account for a projected loss in fee revenue resulting from a significant increase in the number of fee waivers currently received (and which is expected to continue throughout FY 2016/2017). *See* 81 FR 26911 (/citation/81-FR-26911). The remaining 4 percent is needed to recover the cost of sustaining current operating levels and to allow for limited, strategic investments necessary to ensure the agency's information technology infrastructure is strengthened. Such strengthening is needed to protect against potential cyber intrusions and to build the disaster recovery and back-up capabilities required to effectively deliver on the USCIS mission. *See* 81 FR 26910 (/citation/81-FR-26910). For comparison, the inflation from July 2010 to July 2016 was 9.5 percent. [14]

**AR2022_200548**

DHS notes that fees do not merely cover the cost of adjudication time. The fees also cover the resources required for intake of immigration benefit requests, customer support, fraud detection, background checks, and administrative requirements.[15] DHS also reiterates that any further fee adjustments would be zero-sum. Given the need to recover the full cost of the services provided, a decision reducing the fee burden on one population of beneficiaries will ultimately increase the burden on others.

## A. BARRIER TO FAMILY REUNIFICATION

A number of commenters stated that an increase in fees could potentially prevent family reunification for certain U.S. citizens and lawful permanent residents (LPRs), especially for individuals seeking to reunite with several family members. USCIS understands the importance of facilitating family reunification, as well as the advantages that LPR status and citizenship provide. DHS acknowledges that certain individuals may need to file multiple requests, and thus pay multiple fees, depending on the number of family members they seek to sponsor. Nonetheless, USCIS filing fees are necessary to provide the resources required to do the work associated with such filings. When fees do not fully recover costs, USCIS is unable to maintain sufficient capacity to process requests. Inadequate fees may cause significant delays in immigration request processing, which can result in the burden of longer separation from family members.

DHS recognizes that fees impose a burden on fee-paying applicants and beneficiaries, and it takes steps to mitigate that burden as appropriate. Specifically, after USCIS applies its standard fee-setting methodology to identify the Activity-Based Cost (ABC) [16] model output for each benefit ⬚ request, USCIS evaluates the model output and determines whether it should be adjusted. DHS is mindful that departures from the standard USCIS fee-setting methodology result in lower fees for some and higher fees for others. DHS discusses these adjustments in more detail in the remainder of this preamble, including by reference to certain family-based benefit requests, such as the Petition for Alien Relative, Form I-130.

⬚ Start Printed
Page 73297

## B. IMPACT ON LOW-INCOME INDIVIDUALS; LOW VOLUME REALLOCATION

Several commenters stated that the proposed rule would harm the ability of low-income applicants and petitioners to afford USCIS services. Some of these commenters suggested that the proposed overall fee increase would result in a reduction in overall filings from low-income applicants and petitioners. Commenters discussed the importance of maintaining an immigration system that is accessible to people at all income levels.

DHS is aware of the potential impact of fee increases on low-income individuals and is sympathetic to these concerns. As a result, DHS not only offers fee waivers, but also uses its fee-setting discretion to adjust certain immigration benefit request fees that USCIS believes may be overly burdensome on applicants, petitioners, and requestors if set at the recommended model output levels. As discussed in the proposed rule and supporting documentation, and consistent with past practice, USCIS proposed to limit fee adjustments for certain benefit requests to a set percentage increase above current fees. USCIS determined this figure by calculating the average percentage fee increase across all model outputs before cost reallocation. In this rule, that calculated figure is 8 percent. This methodology is referred to as Low Volume Reallocation.

The use of Low Volume Reallocation frequently results in lower fees for certain low-income applicants and petitioners, but always results in higher fees for other benefit requests. This is because USCIS relies almost completely on fee revenue to support its operations. DHS is therefore mindful to use low volume reallocation only where compelling circumstances counsel in favor of shifting costs from one benefit request to others.

Nonetheless, as proposed, in this final rule, DHS will continue applying Low Volume Reallocation from the 2010 final rule to the following forms:

**AR2022_200549**

- Notice of Appeal or Motion, Form I-290B
- Petition for Amerasian, Widow(er) or Special Immigrant, Form I-360
- Petition to Classify Orphan as an Immediate Relative, Form I-600, and Application for Advance Processing of an Orphan Petition, Form I-600A
- Petition to Classify Convention Adoptee as an Immediate Relative, Form I-800, and Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I-800A
- Petition for Qualifying Family Member of a U-1 Nonimmigrant Form I-929
- Application to File Declaration of Intention, Form N-300
- Request for Hearing on a Decision in Naturalization Proceedings, Form N-336
- Application to Preserve Residence for Naturalization Purposes, Form N-470

Also as proposed, DHS will apply the same calculated 8 percent weighted average increase to the following benefit types:

- Application for Provisional Unlawful Presence Waiver, Form I-601A
- Application for Employment Authorization, Form I-765
- Request for Action on Approved Form I-800A, Form I-800A Supplement 3

DHS believes that the use of Low Volume Reallocation will mitigate the potential burden of this final rule on certain low-income applicants and petitioners.[17] DHS intends to continue assessing the affordability of its fees in future fee reviews. This may result in continuing Low Volume Reallocation, otherwise reallocating certain costs, and identifying cost savings. For purposes of this final rule, however, DHS has not materially changed the proposed rule to address the commenters' stated concerns with the proposed overall fee increase.

### 2. COMMENTS ON SPECIFIC FEES AND ADJUSTMENTS

While many commenters indicated that they were opposed to the overall increase in fees, some comments focused on increases to particular forms or to specific groups of applicants, petitioners, or requestors. Those comments are addressed below.[18]

### A. APPLICATION FOR CERTIFICATE OF CITIZENSHIP, FORMS N-600/600K

In the NPRM, DHS proposed fee increases for the Application for Certificate of Citizenship, Form N-600, and the Application for Citizenship and Issuance of Certificate Under Section 322, Form N-600K. Under the proposed rule, the current $600 fee for applications filed on behalf of biological children would be increased by $570, or 95 percent, to $1,170. The proposed rule also would eliminate the current $50 discount on applications filed on behalf of adopted children, previously codified at 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(AAA), thereby effectively increasing fees for such applications by $620, or 103 percent. *Id.*

A number of commenters stated that DHS should reconsider the proposed fee increases. Some commenters requested additional information to explain the increases. Certain commenters who submitted comments through a form letter campaign stated that the proposed increases were troubling considering that USCIS had not reported a significant increase in application volume or processing times.

Some commenters stated that the proposed fee increase would result in a significant additional burden for potential adoptive families, who already invest a great deal of time and money in the adoption process. Some stated that Forms N-600 and N-600K should be free or discounted for adopted children, or alternatively

AR2022_200550

maintained at the current fee. A commenter stated that the Department of State (DOS) processes derivative citizens' requests for passports in substantially the same manner that USCIS processes Forms N-600 and N-600K, yet DOS only charges $120 for a passport book for a child younger than 16 years of age. Other commenters stated that many adopted children automatically derive U.S. citizenship from their parents when they enter the United States, while other children derive U.S. citizenship when their adoptions are completed.[19] Several commenters noted that a passport may be an effective alternative to the certificate for naturalization.

⬚

⬚ Start Printed Page 73298

As noted previously, USCIS based the proposed fee increase for the Forms N-600 and N-600K on the results of its comprehensive biennial fee review, a summary of which was available for comment in the docket accompanying the proposed rule. The biennial fee review helps ensure that fees for USCIS services cover the full cost of processing immigration benefits. In the absence of full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements.

DHS recognizes that fees impose a burden on fee-paying applicants and beneficiaries, and takes steps to mitigate that burden as appropriate. Specifically, after DHS applies the standard USCIS methodology to identify the model output for each benefit request, DHS evaluates the model output and determines whether it should be adjusted. In the NPRM, DHS proposed to limit a small number of fees to an 8 percent weighted average increase for one or more of the following three reasons: (1) DHS determined that the combined effect of cost, fee-paying volume, and methodology changes since the previous fee rule would otherwise place an inordinate fee burden on individuals requesting these types of benefits; (2) DHS determined that an adjustment was necessary to promote citizenship and immigrant integration or other policies; or (3) DHS lacked data on which to base an appropriate fee. See 81 FR 26915 (/citation/81-FR-26915). For example, DHS proposed to limit to the 8 percent weighted average increase to the Application for Naturalization and the adoption petition and application fees (explained in the sections of this preamble that discuss those requests).

DHS is mindful that departures from the standard USCIS fee methodology result in lower fees for some and higher fees for others. DHS is careful to use its fee setting discretion in a way that does not result in unnecessary or unjustifiable burdens for fee-paying applicants and petitioners. Accordingly, the proposed rule (like past fee rules) would have set most fees above cost, in adherence to the fee-setting methodology. The fee for Forms N-600 and N-600K is one of those fees.

Setting aside the effect of cost reallocation,[20] DHS attributes the proposed increase to the fee for Forms N-600 and N-600K to a significant increase in the number of fee waivers granted for such forms.[21] In the 2010 final rule, DHS assumed that every applicant would pay the fee for Forms N-600 and N-600K. However, the fee-paying volume estimate for Forms N-600 and N-600K decreased from 100 percent in FY 2010/2011 to 67 percent in FY 2016/2017 due to applicants receiving fee waivers. The standard fee-setting methodology provides that the costs of waived or exempted fees are to be recovered from fee-paying applicants submitting the same form(s) (in this case, applicants filing Forms N-600 and N-600K).[22] See 81 FR 26922 (/citation/81-FR-26922). The previous fee for Form N-600 was set under the assumption that 100 percent of filers would pay the fee; as the NPRM explained, however, a third of Form N-600 filers are receiving fee waivers. These waivers account for a large portion of the costs that must now be addressed through the proposed fee increase. In short, the Form N-600 fee in the proposed rule is the result of consistent application of USCIS's fee-setting methodology. No adjustment was made to the fee calculated under the methodology based on other policy considerations.

**AR2022_200551**

DHS is setting the fees for several other forms at a level that is less than their projected cost. If DHS similarly limited the fee for an Application for a Certificate of Citizenship, however, it would need to raise other fees to recover these expenses. USCIS estimates that each such instance would increase other fees between $5 and $210, with an average increase of $21.

With respect to comments about the potential impact of the proposed fee increase on adoptive families in particular, DHS notes that Forms N-600 and N-600K are not primarily used by adoptive families. USCIS estimates that adopted children represent less than 10 percent of the workload related to Applications for Certificate of Citizenship.[23] Although DHS could have established a separate fee for adopted children, the cost of such a departure from the standard fee-setting methodology would be borne by other fee-paying applicants and petitioners.[24] Similarly, if DHS set the fee for this benefit request at an equivalent level to the DOS passport fee, DHS would be required to substantially increase other fees to ensure full-cost recovery. DHS agrees with commenters that in many cases, a passport will serve the same purpose as a certificate of citizenship, and for a lower cost to the applicant. Finally, DHS notes that adjudicating a Form N-600 for an adopted child is similar in workload and difficulty to the adjudication of an Application for Certificate of Citizenship for a biological child. There would be no cost-related basis for establishing a separate fee for adopted children.

For the reasons stated above, DHS has not revised the proposed fee in this final rule. Under this final rule, the fee for the Application for Certificate of Citizenship, Form N-600, and the Application for Citizenship and Issuance of Certificate Under Section 322, Form N-600K, will be $1,170.

### B. ADOPTION, FORMS I-600/600A/800/800A

In the NPRM, DHS proposed to increase the fee for the (1) Petition to Classify Orphan as an Immediate Relative, Form I-600; (2) Application for Advance Processing of an Orphan Petition, Form I-600A; (3) Petition to Classify Convention Adoptee as an Immediate Relative, Form I-800; and (4) Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I-800A. The proposed increase would change the fee for each of these forms from $720 to $775. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(Y), (Z), (JJ)(2), (KK); 81 FR 26939 (/citation/81-FR-26939). DHS proposed to hold the increase for these benefit types (among others) to an 8 percent increase because the combined effect of cost, fee-paying volume, and methodology changes since the last fee rule would otherwise place an inordinate fee burden on individuals ⬚ requesting these types of benefits. For example, if DHS did not maintain the proposed fee for the Form I-600, this benefit request would have a fee of at least $2,258. DHS believes it would be contrary to the public interest to impose a fee of this amount on an estimated 15,000 potential adoptive parents each year.

⬚ Start Printed Page 73299

Some commenters wrote in opposition to the proposed fee increases associated with intercountry adoptions or stated that DHS should reconsider these fee increases. Commenters wrote that all adoption-related fees should remain at the current level, be lowered, or be waived when adopting children from foster care. Some commenters stated that these fee increases would lead to decreased intercountry adoptions. At least one commenter wrote that adoptive parents were specifically targeted by the proposed fee increases in the NPRM.

DHS greatly values its role in intercountry adoptions and places high priority on the accurate and timely processing of immigration applications and petitions that enable U.S. families to provide permanent homes for adopted children from around the world. It also recognizes that the financial costs, both foreign and domestic, involved in intercountry adoptions can have significant impacts on these families. DHS has a history of modifying policies to ease burdens associated with international adoption. Prior to 2007, USCIS

AR2022_200552

required prospective adoptive parents who had not found a suitable child for adoption within 18 months after approval of their Application for Advance Processing of Orphan Petition, Form I-600, to submit a fee with their request to extend their approval. Since 2007, USCIS has permitted adoptive parents to request one extension of their Form I-600 approval without charge, including the biometric fee. *See* 72 FR 29864 (/citation/72-FR-29864); 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(Z). Finally, DHS does not charge an additional filing fee for an adoption petition filed on behalf of the first beneficiary child or birth siblings. *See* 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(Z) and 103.7(b)(1)(i)(JJ) (*1*).

DHS also has a history of setting adoption-related fees lower than the amount suggested by the fee-setting methodology. In the 2010 fee rule, the calculated fee for adoption petitions and applications (Forms I-600/I-600A and I-800/I-800A) was $1,455, based on projected costs. *See* 75 FR 33461 (/citation/75-FR-33461); previous 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(Y), (Z), (II), (JJ). Instead of using the model output, DHS increased the fee by only $50, to $720. *See* 75 FR 58972 (/citation/75-FR-58972). As noted previously, in the FY 2016/2017 fee review, the model output for the Form I-600 was $2,258.[25] Nonetheless, DHS proposed setting fees for adoption petitions at $775. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(Y), (Z), (JJ), (2), (KK). The $1,483 difference between the model output and the final fee will be recovered from other applications, petitions, and requests. Shifting the adoption petition and application costs to other fees is consistent with past DHS efforts and is in the public interest to support parents of children adopted abroad.

DHS recognizes that fees impose a burden on individuals seeking immigration benefits, and it takes steps to mitigate that burden as appropriate. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. In this case, DHS proposed to apply the reduced (8 percent) fee increase to these benefit requests, for the reasons stated previously and consistent with DHS's practice of holding a number of benefit requests to this reduced fee increase. DHS was mindful that although this departure from the standard fee-setting methodology results in lower fees for adoptive families, it also results in higher fees for others. 81 FR 26915 (/citation/81-FR-26915). Any further departure would only heighten the effect on the rest of the fee schedule, and would not be consistent with DHS's overall fee-setting methodology. DHS is therefore finalizing the fee as proposed.

## C. PETITION FOR A NONIMMIGRANT WORKER, FORM I-129

In the NPRM, DHS proposed to increase the fee for the Petition for a Nonimmigrant Worker, Form I-129, from $325 to $460. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(I); 81 FR 26937 (/citation/81-FR-26937). The proposed fee increase was the result of the application of the standard USCIS fee-setting methodology to this benefit request.

Several commenters objected to the proposed fee increase. Most of the comments on this subject were from agricultural groups or farmers who expressed that the new fee would be too expensive for employers that employ H-2A temporary agricultural workers for seasonal labor. Other commenters objected to the impact that the proposed fee increase would have on performers in the arts. Commenters representing religious organizations also opposed the increase, stating that it would pose a burden to religious workers in small communities.

Others submitted comments about processing delays. Some commenters noted that delays in processing Forms I-129 affect the incomes of farmers and performers. Some commenters stated that DHS's proposal to increase the Form I-129 fee was undermined by USCIS' failure to process O and P visa requests within the 14

AR2022_200553

days allotted by statute for certain petitions. *See* INA sec. 214(c)(6)(D), 8 U.S.C.1184(c)(6)(D). Commenters stated that any fee increase should be accompanied by improvements in petition processing and policies, particularly as related to H-1B, L-1, O and P visas.[26]

As noted previously, DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements. Full cost recovery means not only that fee-paying applicants and petitioners must pay their proportionate share of costs, but also that at least some fee-paying applicants and petitioners must pay a share of the immigration adjudication and naturalization services that DHS provides for vulnerable populations on a fee-exempt, fee-reduced, or fee-waived basis. DHS is therefore mindful to adhere to the standard USCIS fee-setting methodology as often as possible, and to avoid overuse of DHS's discretion to eliminate or reduce fees for special groups of beneficiaries.

The proposed fee for the Form I-129 resulted from application of the standard USCIS fee-setting methodology, because DHS did not find a compelling reason to shift the burden of the Form I-129 fee increase onto other applicants. Following consideration of the public comments, DHS retains the fee level expressed in the proposed rule. It is possible that in a limited number of cases a reduced fee would be more appropriate, but in the interest of fairness to all applicants and petitioners, as well as in the interest of the administration, this final rule sets a single fee for the Form I-129 at $460, as proposed.[27]

⎙                                                   ⎙ Start Printed
Page 73300

### D. APPLICATION TO REGISTER PERMANENT RESIDENCE OR ADJUST STATUS, FORM I-485, AND INTERIM BENEFITS

In the NPRM, DHS proposed to continue offering travel document and employment authorization renewals free of charge during the pendency of an Application to Register Permanent Residence or Adjust Status, Form I-485, so long as the applicant filed the application with the appropriate fee on or after July 30, 2007. *See* 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(M) (HH); proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(M), (II); 81 FR 26937 (/citation/81-FR-26937). The associated forms are the Application for Travel Document, Form I-131, and Application for Employment Authorization, Form I-765. USCIS refers to travel document and employment authorization renewals as "interim benefits" when they are associated with a pending Form I-485. *See* 81 FR 26918 (/citation/81-FR-26918).

DHS received several comments from individuals who applied to adjust status before July 30, 2007, and who thus do not qualify for free interim benefits. These commenters stated that their Form I-485 applications have been pending since before July 30, 2007, and that because of the annual numerical visa limits established by Congress, they would likely need to request additional travel document and employment authorization renewals in the future.[28] Some commenters stated that it is unfair to charge applicants for interim benefits while they are waiting for visas to become available. Another commenter noted that USCIS has recently started requiring refugees and asylees to pay the required fee associated with the Application for Employment Authorization when concurrently filed with Form I-485. The commenter stated that USCIS had not previously required payment of a fee for such an application.

USCIS acknowledges that under current regulations and as proposed, employment-based Form I-485 applicants who filed before July 30, 2007, must continue to pay fees associated with interim benefits. Before the USCIS 2007 fee rule, DHS did not provide free interim benefits, and the Form I-485 fee was calculated without considering the potential costs of providing such benefits. *See* 75 FR 58968 (/citation/75-FR-

**AR2022_200554**

58968), 58982.[29] The 2007 final rule increased the Form I-485 fee from $325 to $905, or 178 percent, mostly due to the decision to permit interim benefits without additional fees. 72 FR 29861 (/citation/72-FR-29861). Because applicants for adjustment of status who filed before July 30, 2007, paid the lesser amount of $325 when they filed their Form I-485, and because a decision to provide free interim benefits to this population would shift additional costs to other fee-paying applicants and petitioners, DHS has decided to not provide free interim benefits for those pending applicants.

USCIS has taken other actions to alleviate the filing burden and fees on those individuals whose applications are still pending due to the lack of available visas. For example, DHS now provides Employment Authorization Documents (EADs) with 2-year validity periods, instead of previously issued 1-year periods, which effectively reduces the fee per year.[30] In addition, USCIS adopted a policy in December 2010 under which an applicant with a pending Form I-485 that was filed before August 18, 2007, may receive a combination advance parole document and EAD with a 2-year validity period. *See* Policy Memorandum, *Issuance of Advance Parole Employment Authorization Document* (Dec. 21, 2010).[31] These longer approval periods have alleviated some of the burden described by the commenters.

With regard to the comment that USCIS is requiring refugees and asylees to pay for Form I-765 when filing it concurrently with Form I-485, current regulations provide that Form I-765 has no fee if filed in conjunction with a pending or concurrently filed Form I-485 that was filed with a fee on or after July 30, 2007. *See* 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(M)(*4*). There is no fee for a refugee who is filing Form I-485. *See* 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(U)(*3*). Therefore, although USCIS has waived the Form I-765 fee for the first such application filed by a refugee, a Form I-765 filed by a refugee to renew his or her EAD requires a fee.[32] To renew interim benefits, a refugee who is filing a Form I-765 with Form I-485 must pay the Form I-765 fee or submit a Request for Fee Waiver, Form I-912. Similarly, if the refugee's employment authorization document expires before the Form I-485 is approved, he or she must file Form I-765 with a fee or request another fee waiver. Contrary to the commenter's statement, there has been no change in practice on this point.

Like almost all other applicants for adjustment of status, asylees are generally required to pay a fee for Form I-485; if they pay this fee, they receive free interim benefits as long as their Form I-485 is pending with USCIS. Asylees may request that both their Form I-485 and Form I-765 fees be waived. *See* 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(viii) & (c)(4)(iii).[33] However, if USCIS waives the fee for the initial Form I-485, subsequent Form I-765 filings (for instance, to renew or replace a lost or expired EAD) require a fee or a new fee waiver request.[34] Because fee waivers are available, because refugees and asylees are usually not subject to lengthy waiting periods associated with visa availability, and because of the importance of ensuring full-cost recovery, DHS did not find a compelling reason to shift fee burdens onto other fee-paying applicants and petitioners. Accordingly, DHS has not revised this policy in this final rule.

Finally, DHS also proposed to increase the separate Form I-485 fee that applies to a child under the age of 14 years who files a Form I-485 concurrently with the application of a parent seeking classification as an immediate relative of a U.S. citizen, a family-sponsored preference immigrant, or a family member accompanying or following to join a spouse or parent. DHS proposed a fee increase from $635 to $750, but did not propose any substantive changes to eligibility for the reduced fee. *See* 81 FR 26919 (/citation/81-FR-26919).[35] USCIS received at least one comment requesting that the proposed $750 discounted fee apply to all children under the age of 14 at any time, regardless of whether their Form I-485 ▢ was filed concurrently with the application of a parent. The commenter noted that such children, like the children who are currently eligible for the reduced Form I-485 fee, cannot work in the United States.

▢ Start Printed
Page 73301

**AR2022_200555**

DHS proposed that the discounted Form I-485 fee would only be available when the Form I-485 is filed concurrently with the application of a parent seeking classification as an immediate relative of a U.S. citizen, a family-sponsored preference immigrant, or a family member accompanying or following to join a spouse or parent. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(U)(2); 81 FR 26938 (/citation/81-FR-26938). DHS has considered the commenter's suggestion, but is unable to adopt it. USCIS does not track the completion rates (*i.e.,* adjudication times) for Form I-485 based on the age of the applicant, so the agency does not have data showing a difference in the completion rate correlated to the difference in applicant age. In addition, USCIS does not know the volume of individual Form I-485 filings by children on which to base a separate fee. To set that fee as suggested by the commenter would require deviation from the fee-setting methodology and, as stated previously in this preamble, require the costs for those applications to be shifted to other benefit requests. Therefore, DHS is not expanding the child discount to all children in this final rule.

Nevertheless, while the current and proposed provisions limited the reduced fee only to children who are derivative applicants filing the Form I-485 at the same time as their parent, USCIS has in practice extended the reduced fee provision to all immigrant relative children under the age of 14 who file the Form I-485 at the same time as their parent (*i.e.,* mailed in the same envelope), regardless of whether they are filing as a derivative or a principal applicant. Therefore, to make the regulation text consistent with the form instructions and USCIS practice, this final rule sets the fee for Form I-485 accordingly. *See* new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(U)(2).

### E. APPLICATION FOR TRAVEL DOCUMENT, FORM I-131

In the NPRM, DHS proposed to increase the fee for the Application for Travel Document, Form I-131, from $360 to $575. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(M); 81 FR 23937 (/citation/81-FR-23937). The proposed fee increase was the result of application of the standard fee-setting methodology to this benefit request.

Some commenters objected to the proposed increase. Some commenters noted that the forecasted fee-paying volume for Form I-131 has not changed significantly from the 2010 fee rule.[36] Additionally, they pointed out that the Form I-131 has one of the shortest completion rates,[37] indicating that it is not a relatively complex adjudication.[38] Some of these commenters wrote that they have a pending Form I-485 that was filed before July 30, 2007, and that they are thus ineligible for free interim benefits, including being permitted to file Form I-131 without a fee while waiting for an immigrant visa to become available. *See* previous 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(b)(1)(i)(M)(*4*). Some commenters stated that they have paid the Form I-131 fee several times while waiting for a visa to become available and that applicants from countries with long visa wait times must renew their travel documents every year, sometimes for multiple family members.[39]

As noted previously, the proposed fee increase for the Form I-131 was the result of application of the standard USCIS fee-setting methodology to this benefit request. When DHS departs from the standard USCIS fee-setting methodology to reduce fees for one group, fees for other groups (including, in this case, the fee for Form I-131) must be increased to recover full cost.

With respect to the Form I-131 in particular, the proposed fee increase was also due in part to USCIS improving its ability to fully account for the costs of this benefit request. The FY 2016/2017 fee review included more complete data on the Application for Travel Document workload than was included in the 2010 final rule. As noted in the supporting documentation, the latest fee review considered the completion rates for work performed by International Operations,[40] which adjudicates some Applications for Travel

AR2022_200556

Documents, in the overall completion rates for Applications for Travel Documents. This information was not available for the FY 2010/2011 fee review, but it was included in this review to more accurately represent the cost of adjudicating an Application for Travel Document overseas. The proposed fee increase was due in part to USCIS including costs and time from International Operations in the model output for the Applications for Travel Documents fee. Ultimately, the proposed fee for Form I-131 represents its proportion of USCIS operating costs, as dictated by the standard USCIS fee-setting methodology. If DHS held the fee for Form I-131 below the amount suggested by the FY 2016/2017 fee-setting methodology, then the additional costs would be transferred to other immigration benefit fees.

Because DHS did not find a compelling reason to transfer a portion of the Form I-131 fee increase to other applicants, DHS retains the fee proposed in the NPRM. DHS recognizes that this decision will affect different applicants differently; some applicants may file this application just once, while others may file it multiple times. But in the interest of fairness to all applicants and petitioners, as well as in the interest of sound and efficient adjudications, DHS has decided to not create additional levels of fees for the Form I-131. This final rule sets a fee of $575 for the Form I-131, with appropriate exceptions for refugee travel documents, as discussed below. Nevertheless, Form I-131 requests for parole filed on behalf of individuals outside the United States, including humanitarian parole, remain eligible for a fee waiver. 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(iv).

Finally, at least one commenter questioned why DHS did not propose a new fee for refugee travel documents. As noted in the NPRM, fees for a refugee travel document are set at a level that is consistent with U.S. obligations under Article 28 of the 1951 Convention relating to the Status of Refugees, as incorporated by reference in the 1967 Convention relating to the Status of Refugees. *See* 81 FR 26917 (/citation/81-FR-26917). The fee must remain set at an amount that is consistent with U.S. obligations under Article 28. Therefore, fees for refugee travel documents will remain the same as DOS passport book fees.[41]

⎗

⎗ Start Printed
Page 73302

### F. APPLICATION FOR EMPLOYMENT AUTHORIZATION, FORM I-765, AND STUDENTS

In the NPRM, DHS proposed to increase the fee for the Application for Employment Authorization, Form I-765, from $380 to $410. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(II); 81 FR 26938 (/citation/81-FR-26938). DHS proposed to limit the increase for these benefit types (among others) to 8 percent for humanitarian and practical reasons. Many individuals seeking immigration benefits face financial obstacles and cannot earn money through lawful employment in the United States until they receive an Employment Authorization Document (EAD). 81 FR 26916 (/citation/81-FR-26916).

At least one commenter objected to the potential effect of the proposed Form I-765 fee increase on foreign students seeking work authorization under the Optional Practical Training (OPT) program. The OPT program allows an F-1 nonimmigrant student to file a Form I-765 to request authorization to work in the United States in a position that is directly related to the F-1 student's major area of study. *See* 8 CFR 214.2 (/select-citation/2016/10/24/8-CFR-214.2)(f)(10)(ii)(C). OPT provides F-1 students with an opportunity to apply knowledge gained in the classroom to practical work experience off campus.

DHS places a high value on its role in attracting international students and scholars to the United States. Among other things, the contributions to U.S. educational institutions provided by a diverse international student body are invaluable. In recognition of these goals, USCIS devotes many resources to delivering immigration benefits to deserving students, including expending substantial resources, which DHS must recover, to adjudicate their eligibility for EADs. In addition, DHS limited the proposed EAD fee increase in a

**AR2022_200557**

manner consistent with a number of other fees. See 81 FR 26916 (/citation/81-FR-26916). Moreover, F-1 students may request fee waivers in cases in which they are unable to afford the fee. In other cases, USCIS will continue to charge the full fee based on the effort and resources expended to process this benefit. This final rule therefore sets the fee at $410, as proposed. See new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(II).

### G. APPLICATION FOR REPLACEMENT NATURALIZATION/CITIZENSHIP CERTIFICATE, FORM N-565

In the NPRM, DHS proposed to increase the fee for the Application for Replacement Naturalization/Citizenship Certificate, Form N-565, from $345 to $555, or 61 percent. The proposed fee increase was the result of application of the standard fee-setting methodology to this benefit request.

Commenters mentioned that some people could lose proof of citizenship or naturalization due to unforeseen circumstances, such as natural disasters or theft, and that a steep increase might make it more difficult for certain individuals to obtain replacement documents. Other commenters noted that citizens may need a certificate of naturalization or citizenship due to a name change. Commenters stated that the more prohibitively expensive it becomes for foreign-born U.S. citizens to replace documentation of their citizenship, the more difficult it will be for them to work, vote, or pursue other opportunities.

Commenters noted that the completion rate for Form N-565 increased significantly since the 2010 final rule. Some commenters compared the completion rate for Form N-565 to that of the Application to Replace Permanent Resident Card, Form I-90, and stated that the two adjudications should be similar. Those commenters noted that the completion rate for Form I-90 decreased since the 2010 final rule, while the Form N-565 completion rate increased by 64 percent. Some commenters stated that USCIS should further assess why the completion rate for Form N-565 increased to this degree.

DHS acknowledges that the Form N-565 adjudication time has increased over the years, and attributes this increase to the amount of research and review necessary to adjudicate these filings. Form N-565 adjudications require USCIS to fully review A-Files for security check purposes, including discovering name variations or aliases. To verify the naturalization of an applicant, USCIS officers must research all available systems. Yet many filings involve individuals who were naturalized decades ago and whose information is not contained in electronic systems, thus requiring extensive paper-based review. USCIS officers may also have to communicate with the National Archives and Records Administration or the Federal courts to obtain evidence supporting naturalization. In some cases, paper files must be transferred to a field office to conduct an interview of the applicant. Changes in name, marital status, gender, or other facts require evidentiary review to support requested changes in USCIS records. No filing fee is required in cases where the Form N-565 is filed to request correction of a certificate that contains an error, but even such filings require that USCIS fully review the relevant A-Files. DHS further notes that the processing of Form N-565 often requires the same use of time and resources by USCIS regardless of the basis for the request.

Moreover, the fee for Form I-90 differs from the fee for Form N-565 because the adjudication of the two forms differs. LPRs typically apply for new permanent resident cards every 10 years. Their information is thus generally up-to-date and readily available in an electronic system, thus eliminating the need for full A-File reviews when adjudicating Forms I-90. In addition, Form I-90 adjudication is streamlined and partially automated because the application exists in an electronic environment. Filings that involve information that is up-to-date and available in an electronic system generally require less processing time than filings that require review of physical records or multiple systems, or that require the entry of new data.

**AR2022_200558**

As noted, the proposed fee for Form N-565 resulted from application of the standard USCIS fee-setting methodology. Because DHS did not find a compelling reason to shift the burden of the Form N-565 fee increase onto other applicants, DHS retains the position expressed in the proposed rule. This final rule sets the fee for Form N-565 at $555, as proposed. Applicants who cannot pay the fee may request a fee waiver. 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(xv).

## H. PETITION FOR ALIEN RELATIVE, FORM I-130

In the NPRM, DHS proposed to increase the fee for the Petition for Alien Relative, Form I-130, from $420 to $535. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(L); 81 FR 26937 (/citation/81-FR-26937). The proposed fee increase was the result of application of the standard USCIS fee-setting methodology to this benefit request.

Several commenters stated that they generally opposed the proposed increase in the Form I-130 fee because the increase, along with other proposed increases, would result in a significant financial burden for certain individuals, especially for low-income immigrants and their families. Some commenters asserted that the proposed increase of $115 would be disproportionate to the current adjudication time of 45 minutes. Another commenter suggested that fees be higher for businesses in order to offset the cost for family-based applicants. The same commenter referenced existing additional fees for H-1B visas and asserted that DHS should increase fees for O and P visas ⬜ to offset the cost of, and reduce the fees for, family-based immigration benefit requests. One commenter noted that Form I-130 filings are not eligible for fee waivers.

⬜ Start Printed Page 73303

DHS appreciates the concerns of commenters, but reiterates that because USCIS is funded almost exclusively by fees, it sets the USCIS fee schedule based on a full cost recovery model. This means that although there is a relationship between the proposed fee and the projected adjudication time of 45 minutes, DHS cannot set fees at a level that would only recover costs for an individual adjudicator's time. In order for USCIS to continue to fulfill its mission, DHS must set fees at a level that accounts for the total resources required for intake of immigration benefit requests, customer support, fraud detection, background checks, and administration. Moreover, because DHS provides some immigration adjudication and naturalization services (including for families) on a fee-exempt, fee-reduced, or fee-waived basis, fee-paying applicants and petitioners must at times pay more than their directly attributable share of costs.

In the case of the Form I-130, the primary reason for the proposed fee increase was the increase in USCIS' cost baseline for FY 2016/2017, and specifically the need to cover the costs of certain fee-exempt services. As noted in the NPRM and in this final rule, the FY 2016/2017 fee schedule adjusts fees to recover the costs related to RAIO, the SAVE program, and the Office of Citizenship. *See* 81 FR 26910 (/citation/81-FR-26910). In the FY 2010/2011 fee review, the model output for Form I-130 was approximately $368 before cost reallocation. Cost reallocation was smaller in the FY 2010/2011 fee review because USCIS assumed that appropriations would recover surcharges related to RAIO, the SAVE program, and the Office of Citizenship. In the FY 2016/2017 fee review, the model output for Form I-130, before cost reallocation, was approximately $383.[42] As mentioned in the NPRM, in the FY 2016/2017 fee review, USCIS included RAIO, the SAVE program, and the Office of Citizenship in the cost baseline. As shown in the supporting documentation, the fee includes $152 above the model output to ensure that IEFA fees recover full cost.[43] The $152 provides revenue for services that do not otherwise generate revenue (*e.g.,* refugee, asylum, and fee-waived workloads) and for forms that are held to the 8 percent weighted average increase based on policy decisions (*e.g.,* forms N-400 and I-600/600A/800/800A).

AR2022_200559

DHS recognizes the burden that proposed fee increases impose on families and low-income individuals, and takes steps to mitigate that burden as appropriate. Specifically, after USCIS applies its standard fee-setting methodology to identify the model output for each benefit request, USCIS evaluates the model output and determines whether it should be adjusted. However, downward adjustments for some groups result in upward adjustments for other groups. There are many benefit requests that are used by families and low-income individuals, and it would be unsustainable and arguably unfair for USCIS to consistently shift the costs of all such requests to a completely unrelated subgroup of business immigration applicants and petitioners. With that context in mind, and following review of the public comments received, DHS has determined that the amount recommended under the fee-setting methodology was not inordinately high. Thus, DHS is adjusting the fee for Form I-130 in this final rule, as proposed. Moreover, as stated in the "Fee Waivers and Exemptions" section of this preamble, fee waivers are not provided for forms, such as Form I-130, that require petitioners to have the ability to support their intended beneficiary. DHS believes that this is sound overall policy, especially in light of the effects of fee waivers on the fees paid by other applicants and petitioners.

## I. APPLICATION TO REPLACE PERMANENT RESIDENT CARD, FORM I-90

In the NPRM, DHS proposed to increase the fee for the Application to Replace Permanent Resident Card, Form I-90, from $365 to $455. See proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(G); 81 FR 26937 (/citation/81-FR-26937). The proposed fee increase was the result of application of the standard USCIS fee-setting methodology to this benefit request.

A number of commenters objected to the proposed fee increase. Some commenters stated that the proposed fee was unjustified by the projected completion rate of 13 minutes. The commenters noted that although the proposed fee represents a significant increase, the projected completion rate had decreased slightly since the 2010 final rule. A commenter stated that the proposed increase would impose an unreasonable burden on many low-income applicants, especially when the reason for application may be out of their control, such as owning a prior edition of the card, expiration of the card between the individual's 14th and 16th birthday, a name change, or a change in commuter status.

Some commenters stated that USCIS guidance advises naturalization applicants to file Form I-90 if their permanent resident cards will expire within six months of the filing of their naturalization applications, and that USCIS sometimes requires naturalization applicants to file Form I-90 before completion of the Form N-400 adjudication. These commenters suggested that as a result, some applicants may file a Form I-90 and a Form N-400 in quick succession, and that DHS should reduce the combined fee burden for these two forms. The commenters suggested that DHS provide a discounted or partial fee for naturalization applicants who are required to file Form I-90.

As noted elsewhere in this preamble, because USCIS is funded almost exclusively by fees, DHS sets the USCIS fee schedule based on a full cost recovery model. This means that although there is a relationship between the proposed fee and the projected adjudication time of 13 minutes, DHS cannot set fees at a level that would only recover costs for an individual adjudicator's time. In order for USCIS to continue to fulfill its mission, DHS must set fees at a level that accounts for the total resources required for intake of immigration benefit requests, customer support, fraud detection, background checks, and administration. Moreover, because DHS provides some immigration adjudication and naturalization services on a fee-exempt, fee-reduced, or fee-waived basis, fee-paying applicants and petitioners must pay more than their directly attributable share of costs.

**AR2022_200560**

In the case of the Form I-90, the primary reason for the proposed fee increase is the increase in the USCIS cost baseline for FY 2016/2017, and specifically the need to cover the costs of certain fee-exempt services. As noted in the NPRM and this final rule, the FY 2016/2017 fee schedule recovers costs related to RAIO, the SAVE program, and the Office of Citizenship. *See* 81 FR 26910 (/citation/81-FR-26910). In the FY 2010/2011 fee review, the model output fee for Form I-90 was ☐ approximately $321 before cost reallocation. Cost reallocation was smaller in the FY 2010/2011 fee review, because USCIS assumed appropriations that would recover the costs for RAIO, the SAVE program, and the Office of Citizenship. In the FY 2016/2017 fee review, the model output fee for Form I-90 was approximately $326, also before cost reallocation.[44] But, as mentioned in the NPRM, USCIS included the above mentioned programs in cost reallocation to recover the full cost of those programs. As shown in the supporting documentation, the fee is $129 above the model output fee to ensure that IEFA fees recover full cost.[45] The $129 provides revenue for services that do not otherwise generate revenue (*e.g.,* refugee, asylum, and fee-waived workloads) and for request types that are held to the 8 percent weighted average increase based on policy decisions (*e.g.,* Forms N-400 and I-600/600A/800/800A).

☐ Start Printed
Page 73304

DHS recognizes that the proposed Form I-90 fee increase would impose an additional cost burden on filers. But the proposed fee increase results from application of the standard USCIS fee-setting methodology, and a downward adjustment favoring all Form I-90 filers, or a subgroup thereof, would result in upward adjustment of other fees. DHS has decided to impose this fee at the level dictated by the standard USCIS fee-setting methodology, as proposed. If applicants cannot afford to pay the increased Form I-90 fee, they may request a fee waiver. 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(ii).

With respect to the comments concerning naturalization applicants who are required to file a Form I-90 if their permanent resident card will expire within six months of filing the naturalization application, DHS notes that this is not a change in practice. LPRs are required to have valid, unexpired Permanent Resident Cards, Forms I-551, in their possession at all times, *see* INA sec. 264(e), 8 U.S.C. 1304 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1304&type=usc&link-type=html)(e), and DHS regulations require LPRs to file Form I-90 when those cards are set to expire in six months, *see* 8 CFR 264.5 (/select-citation/2016/10/24/8-CFR-264.5)(b)(2). For this reason, an LPR with fewer than six months remaining on his or her permanent resident card must generally file Form I-90, with fee, even if the LPR has applied for naturalization.[46] In other words, applying for naturalization does not eliminate the need to file Form I-90 when a permanent resident card is about to expire. If Form I-90 is properly filed, or if Form N-400 is filed at least six months before the expiration of the applicant's permanent resident card, the applicant can request an Alien Documentation Identification and Telecommunication (ADIT) stamp in lieu of filing for a new card.

DHS observes that a permanent resident card generally does not expire until 10 years after it is received by the LPR. For individuals who are familiar with the regulatory requirements,[47] this should be sufficient time for the applicant to take appropriate action, including renewing the card or naturalizing before the card expires.[48] Generally, LPRs become eligible to naturalize after 5 years of obtaining LPR status, *see, e.g.,* 8 CFR 316.2 (/select-citation/2016/10/24/8-CFR-316.2)(a)(3), and the average processing time for an application for naturalization is approximately 6 months. Therefore, individuals who receive LPR status have ample time during which they may save for fees, gather documents, and apply for naturalization before their permanent resident card expires. Moreover, creating a new process and discounted fee for those Form I-90 applicants who wish to naturalize would increase the administrative burden of administering both Form I-90 and Form N-400. For the reasons stated above, this final rule sets the Form I-90 fee at $455, as proposed, regardless of whether the applicant will also file Form N-400 in the near term.

**AR2022_200561**

## J. GENEALOGY, FORMS G-1041/1041A

In the NPRM, DHS proposed to increase fees for the Genealogy Index Search Request, Form G-1041, and Genealogy Records Request, Form G-1041A, from $20 or $35, depending on the format requested, to a single fee of $65. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(E)-(F); 81 FR 23967 (/citation/81-FR-23967). As noted in the NPRM, DHS based the proposed fee increase on the ABC model output fee of $46 for genealogy services, as well as an additional $19 to recover the applicable administrative costs associated with funding these services, such as the USCIS Librarian and other genealogy research and information services. 81 FR 26919 (/citation/81-FR-26919) (citing INA sec. 286(t)(1), 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(t)(1)).

Some commenters objected to the proposed fee increase. Some of these commenters compared the genealogy fees to state and local government fees for copies of vital records. Some commenters stated that the quality and efficiency of genealogy services were insufficient to justify the proposed fee increase.[49]

USCIS does not receive any appropriations for its genealogy program and thus depends on genealogy fees to cover costs, without increasing other immigration and naturalization fees to support this work. Genealogy fees have not been adjusted since USCIS created the program in 2008,[50] and such fees are currently insufficient to cover the full costs of the genealogy program. USCIS created the Genealogy Program to serve people performing genealogy research, including historical researchers, genealogists, and other members of the public, without diverting resources from the significant number of Freedom of Information Act requests to which USCIS must respond.[51] USCIS thus proposed to increase the fee to meet the full costs of the program and permit USCIS to respond to requests for such historical records and materials. Notwithstanding the fees charged by other government agencies, which likely face different operational and funding challenges, USCIS must ensure that it has sufficient funding to fulfill its mission. Following consideration of the comments on this subject, DHS has decided to set the final fee at $65, as proposed.

Start Printed Page 73305

## K. PETITION TO REMOVE CONDITIONS ON RESIDENCE, FORM I-751

In the NPRM, DHS proposed to increase the fee for the Petition to Remove Conditions on Residence, Form I-751, from $505 to $595. Proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(HH); 81 FR 23968 (/citation/81-FR-23968). The proposed fee increase was the result of application of the standard USCIS fee methodology to this benefit request.

Some commenters objected to the proposed fee increase. These commenters stated that Form I-751 is required for people who were granted conditional permanent residence through marriage, including spouses of U.S. citizens and their children, to remove the conditions on their status. The commenters asserted that the new fee is so burdensome that some applicants may miss their deadline to apply, putting those applicants at risk of losing their residency and becoming subject to removal from the United States. A commenter stated that in 2010, DHS increased the I-751 filing fee by $40. The commenter stated that to now increase it again by another $90 is unjustified, particularly when USCIS estimates that its projected workload volume for Form I-751 will decrease by 10,000 receipts from 2010/2011 levels. The commenter stated that if I-751 workloads will decrease, there is no justification for an 18 percent fee increase.

As noted previously in this preamble, because USCIS operates almost exclusively on fees, DHS sets the USCIS fee schedule based on a standard full cost recovery model. This means that DHS must account for more than just projected total receipts when setting the fee for a given benefit. For instance, DHS must

AR2022_200562

account for the likelihood of fee waivers by setting fees based on projected total *fee-paying* receipts, not just projected total receipts. And DHS must also account for the costs associated with adjudicating each benefit request. If DHS did not account for fee waivers when setting fees, or for the cost of adjudicating benefit requests, DHS would not recover sufficient revenue to cover the cost of the services that DHS provides. Moreover, because DHS provides some immigration adjudication and naturalization services on a fee-exempt, fee-reduced, or fee-waived basis, fee-paying applicants and petitioners must pay more than their directly attributable share of costs.

In addition, in the case of the Form I-751 specifically, although workload volume decreased 5.5 percent since the 2010 final rule, fee-paying volume decreased at a greater rate of 8.4 percent. Moreover, the completion rate, or the average hours per adjudication, increased 39 percent since the 2010 final rule. Given that fewer fee-paying applicants are now absorbing the increased costs associated with longer adjudications, DHS believes the proposed $90 increase since the fee was last set six years ago is reasonable. Although the proposed increase would impose an additional cost burden on filers, it results from application of the standard USCIS fee methodology. A downward adjustment in favor of Form I-751 petitioners would result in upward adjustment of other fees. Furthermore, if the petitioner cannot pay the fee, they may request that the fee be waived. *See* 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(vii). Therefore, this final rule sets the Form I-751 fee at $595, as proposed.

### L. PETITION FOR ALIEN FIANCÉ(E), FORM I-129F

In the NPRM, DHS proposed to increase the fee for the Petition for Alien Fiancé(e), Form I-129F, from to $340 to $535. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(K); 81 FR 23967 (/citation/81-FR-23967). The proposed fee increase was the result of application of the standard USCIS fee methodology to this benefit request.

Some commenters objected to the proposed fee increase, stating that it could discourage family reunification. The commenters stated that the increase would be particularly burdensome because there is no fee waiver option when filing this form.

As noted previously, DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements. Full cost recovery means not only that fee-paying applicants and petitioners must pay their proportionate share of costs, but also that at least some fee-paying applicants and petitioners must pay a share of the immigration adjudication and naturalization services that DHS provides on a fee-exempt, fee-reduced, or fee-waived basis. DHS is therefore mindful to adhere to the standard USCIS fee methodology as often as possible, and to avoid overuse of DHS's discretion to eliminate or reduce fees for special groups of beneficiaries.

The proposed fee for the Form I-129F resulted from application of the standard USCIS fee methodology. DHS values its role in assisting U.S. citizens who wish to bring a foreign national fiancé(e) to the United States to marry, and is sensitive to the extra burden that the increased filing fee may impose. But if USCIS were to waive or exempt Form I-129F fees, then other applicants, petitioners, and requestors would pay higher fees to cover the cost. Because DHS did not find a compelling reason to shift the burden of the Form I-129F fee increase onto other applicants, this final rule sets the Form I-129F fee at $535, as proposed.

**AR2022_200563**

Moreover, as a general matter, DHS does not waive fees for petitions that require the beneficiaries to demonstrate that they will be able to support themselves financially, or that require the filing of an affidavit of support. A citizen who files Form I-129F must document his or her ability to financially support his or her foreign national fiancé(e). Because a few waiver options would be inconsistent with this financial support requirement, DHS declines to allow fee waivers for this form.

## M. PETITION FOR AMERASIAN, WIDOW(ER), OR SPECIAL IMMIGRANT, FORM I-360

In the NPRM, DHS proposed to increase the fee for the Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360, from $405 to $435. Proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(T); 81 FR 23968 (/citation/81-FR-23968). DHS proposed to hold the increase for these benefit types to an 8 percent increase [52] because the combined effect of cost, fee-paying volume, and methodology changes since the last fee rule would otherwise place an inordinate fee burden on individuals requesting these types of benefits. See 81 FR 26915 (/citation/81-FR-26915).

Some commenters objected to the proposed fee increase because of its potential effect on religious workers. The commenters stated that religious workers must file additional forms and pay the required fees to obtain LPR status. The commenters noted that these workers benefit the United States by becoming integral parts of their religious ministries, participating in community outreach, and making specific connections with immigrants who speak the same language. For these reasons, the commenters requested that the agency not finalize the proposed fee increase.

Form I-360 may be used to obtain any of a large number of immigration benefits, some of which allow petitioners to file the form on a fee-exempt basis.[53] Many petitioners may ⬚ use the Form I-360 on a fee-exempt basis. For example, there is no fee for a petitioner seeking classification as an Amerasian; an individual self-petitioning as a battered or abused spouse, parent, or child of a United States citizen or LPR; a petitioner seeking Special Immigrant Juvenile status; or an Iraqi or Afghan national who worked for, or on behalf of, the U.S. Government in Iraq or Afghanistan. Previous 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(T)(1)-(4).

⬚ Start Printed Page 73306

For those petitioners who are not fee-exempt, DHS recognizes that fee increases impose a burden, and DHS takes steps to mitigate such burdens as appropriate. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality. In this case, DHS proposed to apply the reduced fee increase (8 percent) to the Form I-360, for the reasons stated previously and consistent with DHS's practice of holding a number of benefit requests to this reduced fee increase. DHS was mindful that this departure from the standard fee methodology would also result in higher fees for others. See 81 FR 26915 (/citation/81-FR-26915). Although DHS acknowledges the importance of the religious worker program to many communities, any further departure would only heighten the effect on the rest of the fee schedule, and would not be consistent with DHS's overall fee methodology. In addition, unlike many of the fee-exempt Form I-360 petitioners, religious workers fall into the category of employment-based immigrants for whom petitioners must demonstrate the ability to pay a salary. See, e.g., 8 CFR 204.5 (/select-citation/2016/10/24/8-CFR-204.5)(g)(2) (requiring a petition which requires an offer of employment to be accompanied by evidence that the prospective United States employer has the ability to pay the proffered wage). This final rule therefore sets the fee for Form I-360 at $435, as proposed.

## N. NOTICE OF APPEAL OR MOTION, FORM I-290B

AR2022_200564

DHS proposed to increase the fee for the Notice of Appeal or Motion, Form I-290B, from to $630 to $675. Proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(S); 81 FR 26938 (/citation/81-FR-26938). DHS proposed to hold the increase for these benefit types to 8 percent [54] because the combined effect of cost, fee-paying volume, and methodology changes since the last fee rule would otherwise place an inordinate fee burden on the particular individuals requesting these types of benefits. *See* 81 FR 26915 (/citation/81-FR-26915).

Some commenters objected to the proposed fee increase. Commenters stated that the resulting fee, though waivable,[55] could hinder individuals from receiving benefits for which they are eligible. The commenters noted that the time involved in submitting fee waiver requests jeopardized the chance of meeting the 30-day filing deadline for appeals. Commenters also expressed disappointment in the appeals process in general, opining that it was particularly burdensome for those attempting to rectify USCIS errors. Commenters also stated that USCIS should allow credit card payments for filing Form I-290B.

DHS appreciates the concerns of the commenters and does not intend to hinder individuals from receiving benefits for which they are eligible. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality. In this case, DHS proposed to apply the reduced fee increase (8 percent) to these benefit requests, for the reasons stated previously and consistent with DHS's practice of holding a number of benefit requests to this reduced fee increase. DHS was mindful that although this departure from the standard fee methodology would result in lower fees for Form I-290B filers, it would also results in higher fees for others. 81 FR 26915 (/citation/81-FR-26915). Any further departure would only increase the effect on the rest of the fee schedule, and would not be consistent with DHS's overall fee methodology. DHS addresses requests for service quality improvements and credit card payments later in this preamble. DHS has made no changes to the fee in this final rule as a result of these comments, and is finalizing the Form I-290B fee at $675, as proposed.

## O. APPLICATION FOR CIVIL SURGEON DESIGNATION, FORM I-910

In the NPRM, DHS proposed to increase the fee for the Application for Civil Surgeon Designation, Form I-910, from $615 to $785. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(TT); 81 FR 26939 (/citation/81-FR-26939). Form I-910 is used to request recognition of a physician as a civil surgeon for purposes of performing mandatory medical examinations on intending immigrants to determine whether they are inadmissible based on health-related grounds. *See* 8 CFR 232.2 (/select-citation/2016/10/24/8-CFR-232.2)(b). The proposed fee increase was the result of application of the standard USCIS fee methodology to this benefit request.

At least one commenter stated that the proposed increase may have a chilling effect on requests from physicians to become approved civil surgeons. The commenter suggested the possibility of employing a tiered-fee structure, in which USCIS would offer a lower application fee in exchange for a physician's commitment to discount fees for vulnerable children and youth and other indigent applicants.

As noted, the proposed fee increase for the Form I-910 was the result of application of the standard USCIS fee methodology to this benefit request. When DHS departs from the standard USCIS fee methodology to reduce fees for one group, fees for other groups increase to recover full cost. With respect to the proposal to establish a tiered fee structure for the application, implementing such fees would require eligibility and evidentiary requirements for each fee and income level established. This would add administrative complexity, and further increase costs. Additionally, USCIS would not know whether such civil surgeons

AR2022_200565

complied with their commitments to charge lower fees without regulating and monitoring those civil surgeons, and incurring the time and costs to do so. Accordingly, no changes were made in this final rule, which sets the Form I-910 fee at $785, as proposed.

### P. APPLICATION FOR ADVANCE PERMISSION TO ENTER AS A NONIMMIGRANT, FORM I-192, AND APPLICATION FOR WAIVER OF PASSPORT AND/OR VISA, FORM I-193

In the NPRM, DHS proposed to increase the fee for the Application for Advance Permission to Enter as a Nonimmigrant, Form I-192, and Application for Waiver of Passport and/or Visa, Form I-193, from $585 to $930. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(P); 81 FR 26938 (/citation/81-FR-26938). The proposed fee increase was the result of application of the standard USCIS fee methodology to this benefit request. In the FY 2016/2017 fee review, USCIS grouped these benefit requests with other similar benefit requests, specifically, Forms I-191, I-212, I-601, and I-612.

One commenter stated that for certain filers, CBP, and not USCIS, adjudicates the benefit request.[56] The commenter stated that it would be unfair to increase ⬜ the fee for Form I-192 applications adjudicated by CBP, because those adjudications do not increase USCIS costs.[57] The commenter stated that the proposed increase in the fee for Form I-192 would burden Canadian and Bermudan nonimmigrant waiver applicants in particular, because unlike other nonimmigrant waiver applicants who submit their applications at the same time as visa applications at no additional charge, Canadians and Bermudans do not require a visa to enter the United States, and thus pay the full filing fee to submit the waiver application. The commenter stated that an increase in the filing fee will hurt local economies in border towns because "every dollar spent on a waiver application is a dollar not spent on tourism or retail." The commenter did not provide further data or analysis on the potential impact of the proposed fee increase on such economies.

⬜ Start Printed
Page 73307

In response to this comment, DHS is not implementing the fee increase proposed in the NPRM with respect to those Forms I-192 filed with and processed by CBP, and all Forms I-193. CBP uses the fee revenue from these forms to defray its own costs related to such processing. The FY 2016/2017 fee review and resulting proposed fee change was based on USCIS's costs for processing inadmissibility waivers. Therefore, under this final rule, DHS adjusts only the fee for those Forms I-192 filed with and processed by USCIS. Consequently, Form I-192 will have two fees—$585 for those filed with CBP and $930 for those filed with USCIS. New 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(P). All filings of Form I-193 are processed by CBP and thus DHS will also not adjust the current $585 fee. New 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(Q).

### C. Fee Waivers and Exemptions

DHS proposed no changes to the USCIS fee waiver policies in the NPRM. DHS noted, however, that the lost revenue from fee waivers and exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 Fee Review. DHS also explained the fee waiver process. *See* 81 FR 26922 (/citation/81-FR-26922). DHS received a number of comments on its fee waiver and exemption policies. Some commenters on this subject requested that DHS permit fee waivers for additional immigration benefit requests. Others asked that DHS make more requests exempt from fee requirements.

Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee-waived or fee-exempt. *Id.*[58] While a number of commenters suggested that USCIS expand the range of applications and petitions for which USCIS would consider a fee waiver, none provided a compelling argument for why a particular form that is not eligible for fee waivers should be made eligible in this final rule.

**AR2022_200566**

For example, one commenter recommended that USCIS make fee waivers available for all applications. DHS recognizes that some applicants cannot pay filing fees, and has established a fee waiver process for certain forms and benefit types. USCIS carefully considers the merits of each fee waiver request before making a decision. Expansion of fee waiver policy to include all immigration benefit request fees would significantly increase administrative and adjudicative costs. Although DHS recognizes that filing fees impose a heavy burden on people of limited financial means, the costs of allowing fee waivers across the board would be borne by all other fee payers, because the cost of providing services with a discount or without a fee must be transferred to those who pay a full fee. Thus, USCIS takes a relatively careful position with respect to transferring costs from one applicant to another through the expansion of fee waiver eligibility.

DHS notes that, in response to stakeholder concerns about the fee waiver process and rejections of fee waiver requests, USCIS recently published a new Request for Fee Waiver, Form I-912. It revised the form to clarify the instructions, make the form less complex, and reduce the number of incomplete fee waiver requests that are ultimately rejected. In addition, because many applicants have had difficulty providing all the requested information in the spaces provided on the previous form, USCIS also included text boxes that provide space for explanations. Those boxes reduce the need for attachments, and make the form more user-friendly.

As for fee exemptions, DHS already exempts from fees those requests with compelling circumstances. These exemptions include benefit requests for a range of humanitarian and protective services, such as refugee and asylum processing, assisting victims of crime and human trafficking, and other related services. USCIS also may allow fee exemptions based on economic necessity in the event of incidents such as an earthquake, hurricane, or other natural disasters affecting localized populations by using the authority of the Director of USCIS at 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(d). DHS proposed no new exemptions in the NPRM, and knows of no compelling reason for exempting a new group of applicants, petitioners, or requestors from a fee. Therefore, DHS has added no new exemptions in this final rule.

## D. Naturalization

In the NPRM, DHS proposed to increase the fee for the Application for Naturalization, Form N-400, from $595 to $640. Proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(BBB); 81 FR 26939 (/citation/81-FR-26939). DHS proposed to hold the increase for the Form N-400 to the reduced fee increase (8 percent) [59] to support naturalization. DHS also proposed an additional fee option for those non-military naturalization applicants with family incomes greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines. Proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(BBB)(1); 81 FR 26939 (/citation/81-FR-26939). Specifically, DHS proposed that such applicants would receive a 50 percent discount, resulting in a fee of $320 for Form N-400. DHS proposed this reduced fee option to limit any potential economic disincentives that some eligible naturalization applicants may face when deciding whether or not to seek U.S. citizenship. The lower fee is intended to help ensure that those who have become eligible for naturalization are not prohibited from naturalizing due to their economic means.

Several commenters stated that the price of this benefit is already too high. Another commenter stated that the fee for Form N-400 should be increased based on the value of U.S. citizenship, not just the costs associated with adjudicating the form. And, while generally opposed to the fee increase, several commenters wrote in support of USCIS' efforts to alleviate some of the associated burdens by establishing a three-level fee for Form N-400, including a fee of $320 for certain low-income applicants who do not qualify for the existing fee waiver. The commenters stated that by doing so, USCIS will expand the pool of potential applicants.

**AR2022_200567**

DHS agrees with commenters that citizenship is a benefit that deserves special consideration and promotion. Therefore, DHS did not propose a fee ☐ that reflected all of the costs associated with the relative complexity of the adjudication. The Application for Naturalization fee has not changed in nearly a decade. Additionally, the fee established in this rule for Form N-400 is less than it would be if the 2007 fee were simply adjusted for inflation. According to the Bureau of Labor Statistics, the semiannual average inflation from July 2007 to July 2016 was 16.1 percent.[60] If adjusted only for inflation, the current $595 fee would be $690, which is $50 more than the $640 fee set by this rule. DHS has not previously adjusted Form N-400 by CPI-U inflation, but provides this as a point of comparison.

☐ Start Printed Page 73308

As for the comment requesting that the Form N-400 fee be based on the value of U.S. citizenship, doing so would require quantifying that value, which assuming it is appropriate or even possible to do precisely, would be beyond the scope established by the proposed rule. The USCIS ABC model is based on estimated operational costs, and DHS has set the fee at a level that adheres to the fee review methodology, which includes full cost recovery. *See* new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(BBB). DHS therefore sets the fee for Form N-400 at $640, as proposed.

## E. IMPROVE SERVICE AND REDUCE INEFFICIENCIES

Many of the comments received that opposed fee increases cited delays in processing times and dissatisfaction with customer service. Some of these commenters stated that they would embrace the fee increases if they resulted in faster processing and improved customer service. A few commenters asserted that if DHS implements any type of USCIS fee increase, then USCIS should guarantee that it will reduce benefit request processing times. At least one commenter recommended increasing the fees further so there would be no excuse for delays in processing. Other commenters wrote about expanding electronic filing and receipting to reduce mail handling and shipping of paper. USCIS acknowledges that since it last adjusted fees in FY 2010, the agency has experienced elevated processing times compared to the goals established in the 2007 fee rule. See 72 FR 29858 (/citation/72-FR-29858)-29859. These processing delays have contributed to case processing backlogs. This can partially be attributed to having removed the surcharge previously applied to the IEFA fee schedule to recover costs related to RAIO, the SAVE program, and the Office of Citizenship. This was done in anticipation of congressional appropriations for these programs, consistent with the President's budget requests. As the anticipated budget request was not granted, since FY 2012 USCIS has used other fee revenue to support these programs. Under this final rule, DHS will adjust USCIS fees by a total weighted average increase of 21 percent; the total 21 percent weighted average increase will be allocated as follows:

- To reinstate a surcharge in the fee schedule to sustain the current operating levels of RAIO, the SAVE program, and the Office of Citizenship (approximately 8 percent);

- To account for reduced revenue stemming from an increase in fee waivers granted since FY 2010 (approximately 9 percent); and

- To recover the costs needed to sustain current operating levels while allowing for limited, strategic investments necessary to ensure the agency's information technology infrastructure is strengthened to protect against potential cyber intrusions, and to build the necessary disaster recovery and back-up capabilities required to effectively deliver the USCIS mission (approximately 4 percent).

Through this final rule, USCIS expects to collect sufficient fee revenue to sustain current operating levels of RAIO, the SAVE program, and the Office of Citizenship. This change will allow USCIS to discontinue diverting other fee revenue to fund these programs, thereby increasing the resources available to fund additional personnel [61] needed to improve case processing, reduce backlogs, and move toward processing times that are in line with the commitments in the FY 2007 fee rule.

**AR2022_200568**

While the agency remains committed to achieving the processing goal commitments in the 2007 fee rule, it acknowledges that these goals remain ambitious. By its very nature, the fee review cycle uses historical staffing and workload information to establish future needs, and as a result, cannot identify the exact resources necessary to guarantee future processing goals. In addition, superseding priorities may arise, which could not have been known at the time fee cycle calculations were made, that may impact USCIS' ability to meet customer expectations. USCIS will need to continue addressing emergent issues and their associated costs, which may impact case processing efficiency and backlogs. Nevertheless, the agency holds the 2007 processing goals to be among its highest priorities and recommits to achieving them as quickly as possible.

In addition, USCIS is committed to providing stakeholders and customers with the information they need, when they need it. To that end, USCIS is transforming how it calculates and posts processing time information to improve the timeliness of such postings, but more importantly, to achieve greater transparency of USCIS case processing. For instance, to make current published processing time information more transparent and less complex for customers to interpret, USCIS is evaluating the feasibility of calculating processing times using data generated directly from case management systems, rather than with self-reported performance data provided by Service Centers and Field Offices. Preliminary findings suggest that USCIS will be able to publish processing times sooner and with greater transparency by showing different processing times for each office and form type. USCIS is also considering publishing processing times using a range rather than using one number or date. This approach would show that, for example, half of cases are decided in between X and Y number of months.

USCIS also expects to improve the customer experience as it continues to transition to online filing and electronic processing of immigration applications and petitions. With the new person-centric electronic case processing environment, USCIS will possess the data needed to provide near-real-time processing updates to the customer that will identify the case status and time period that has elapsed between actions for each individual case. This will allow greater transparency to the public on how long it will take to process each case as it moves from stage to stage (*e.g.,* from biometrics collection, to interview, to decision).

DHS appreciates the comments requesting expansions of electronic filing, and USCIS is actively planning the expansion of its online case management system for the submission and adjudication of immigration benefits. As of the end of FY 2016, approximately 17 percent of the agency's intake was processed through ⬚ online filing and we are striving to increase that level.

⬚ Start Printed Page 73309

In sum, DHS appreciates the commenters' concerns for timely service. USCIS continually strives to meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. Fees have not been adjusted since 2010 and that fee rule did not include the surcharge for RAIO, the SAVE program, and the Office of Citizenship, which has resulted in the reprioritization of resources to cover those program costs. This fee rule is intended to address such shortfalls and provide resources necessary to ensure adequate service. USCIS would be unable to adequately perform its mission if DHS allowed fee levels to remain insufficient while USCIS continued to develop its search for additional efficiencies.

## F. Premium Processing

Premium processing is a program by which filers may request 15-calendar-day processing of certain employment-based immigration benefit requests if they pay an extra amount. 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(RR) and (e); proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(SS); 81 FR 26939 (/citation/81-FR-26939). In 2000, Congress

**AR2022_200569**

set the premium processing fee at $1,000 and authorized USCIS to adjust the fee for inflation, as determined by the Consumer Price Index (CPI). Section 286(u) of the INA, 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(u). USCIS adjusted the premium processing fee to $1,225 by using the CPI in the 2010 final rule.[62] *See* 75 FR 58979 (/citation/75-FR-58979). DHS proposed no change to premium processing fees or regulations because forecasted premium processing revenue is sufficient to cover the projected costs of providing the premium service and other permissible infrastructure investments.

Several commenters wrote to request that USCIS expand premium processing to other forms, including family-based immigration benefit requests, naturalization, relief for victims of crimes who assist law enforcement, and forms related to the EB-5 Immigrant Investor Program. Some commenters stated that using premium processing revenue may alleviate backlogs. Other commenters stated that premium processing is essentially mandatory to ensure the timely and efficient processing of their employment-based petitions.

Assuming DHS has the general authority to offer expedited processing fees to additional forms, the timing requirements of many adjudications involve considerations that are out of USCIS' control. For example, background checks, the timing of which are not controlled by USCIS, are required for: The Application for Temporary Protected Status, Form I-821; the Application for Naturalization, Form N-400; the Application for Provisional Unlawful Presence Waiver, Form I-601A; and the Application to Register Permanent Residence or Adjust Status, Form I-485. These and many other forms are not suited for expedited processing. USCIS already seeks processing efficiencies where available and shifts workload to balance volume surges, seasonal demands, and competing priorities.

In addition, where expedited processing may be possible, it would be extraordinarily time-intensive to determine the appropriate fee amount, target adjudication timeframe, and staffing levels needed to implement a new expedited processing program. Expanding the premium processing program would require USCIS to estimate the costs of a service that does not currently exist with sufficient confidence that it can deliver the service promised and not impair service for other immigration benefit requests. Nevertheless, USCIS will continue considering additional premium processing services and its ability to improve services without creating new challenges. DHS made no changes in this final rule as a result of these comments.

## G. Immigrant Investors

In the NPRM, DHS proposed a number of changes to fees related to the Employment-Based Immigrant Visa, Fifth Preference (EB-5) "Immigrant Investor" Program.[63] Specifically, DHS proposed to increase the fee for the Application for Regional Center Under the Immigrant Investor Program, Form I-924, from $6,230 to $17,795. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(WW); 81 FR 26939 (/citation/81-FR-26939). DHS proposed to establish a new fee for the Annual Certification of Regional Center, Form I-924A, at $3,035. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(XX); 81 FR 26939 (/citation/81-FR-26939). DHS proposed to increase the fee for the Immigrant Petition by Alien Entrepreneur, Form I-526, from $1,500 to $3,675. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(W); 81 FR 26938 (/citation/81-FR-26938). Finally, DHS proposed to hold the fee for the Petition by Entrepreneur to Remove Conditions, Form I-829, at $3,750. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(PP); 81 FR 26939 (/citation/81-FR-26939). With the exception of the proposed fee for Form I-829, each proposed EB-5 fee increase was the result of application of the standard USCIS fee methodology to the applicable benefit request.

**AR2022_200570**

Several commenters objected to the proposed increases, noting that these are some of the highest proposed fee increases, while the related benefit requests have some of the longest processing times. Another commenter wrote to applaud the increase to EB-5 fees in general, but requested that USCIS conduct site visits and evaluate whether regional centers are misrepresenting themselves to investors.

As an initial matter, and as noted previously, DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements. Full cost recovery means not only that fee-paying applicants and petitioners must pay their proportionate share of costs, but also that at least some fee-paying applicants and petitioners must pay a share of the immigration adjudication and naturalization services that DHS provides on a fee-exempt, fee-reduced, or fee-waived basis. DHS is therefore mindful to adhere to the standard USCIS fee methodology as often as possible, and to avoid overuse ⎙ of DHS's discretion to eliminate or reduce fees for special groups of beneficiaries.

⎙ Start Printed
Page 73310

The proposed fees for three of the four EB-5 Program forms resulted from application of the standard USCIS fee methodology,[64] because DHS did not find a compelling reason to shift the burden of adjudicating these forms onto other applicants. In addition, the relatively high fees for these requests result in part from the high costs associated with adjudicating them. For instance, USCIS has recently implemented several changes to refine and improve the delivery, security and integrity of the EB-5 Program. USCIS established the Immigrant Investor Program Office (IPO) in Washington, DC in 2012. Since that time, IPO has regularly added staff positions to focus both on managing the program and ensuring identification of fraud, national security, or public safety concerns within the program. In addition, USCIS plans to conduct increased site visits to regional centers and associated commercial enterprises to verify information provided in regional center applications and investor petitions and to clarify its EB-5 regulations. Currently, USCIS is in the process of hiring and training additional adjudicators, economists, and support staff needed to adjudicate the benefit requests associated with the EB-5 program. Part of the increase in fees for EB-5-related adjudications will bolster the fraud detection and national security capabilities of USCIS to investigate fraud and abuse at all levels of the EB-5 process, including investigating projects that receive funds from EB-5 investors and auditing regional center annual reports to enhance compliance with the program. *See* 81 FR 26918 (/citation/81-FR-26918). Each of these factors contributed to the proposed EB-5 Program fees.

In the immediately succeeding section, as well as in the Paperwork Reduction Act section of this preamble, DHS responds to additional comments on the proposed EB-5 fees.

### 1. APPLICATION FOR REGIONAL CENTER UNDER THE IMMIGRANT INVESTOR PROGRAM, FORM I-924

In the NPRM, DHS proposed to increase the fee for the Application for Regional Center Under the Immigrant Investor Program, Form I-924, from $6,230 to $17,795. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(WW); 81 FR 26939 (/citation/81-FR-26939). The proposed fee increase was the result of application of the standard USCIS fee methodology to the benefit request.

At least one commenter wrote to oppose the proposed Form I-924 fee increase due to the possible impact on EB-5 regional centers. The commenter recommended a possible reduced fee for centers in existence for fewer than 5 years. The same commenter stated dissatisfaction with the level of customer service that USCIS has provided and suggested that USCIS create an electronic platform for EB-5 regional centers to monitor their applications and cases. Other commenters stated that the proposed fee increase were unreasonable and inflated, especially in light of long processing delays. At least one commenter stated that regional centers in

rural and high-unemployment areas are less capable of withstanding long processing delays. The same commenter stated that the proposed 286 percent fee increase for the Form I-924 should be accompanied by an assurance that processing times would be cut by 75 percent. The commenter stated that an alternative to processing time reductions would be to create a process in which regional centers would be automatically approved if USCIS does not provide a notice of action within 4 months, or if USCIS does not summarily reject a petition for which there have been prior approvals on the same project. Another commenter stated that DHS could adopt a tiered fee structure for Form I-924 based on whether the associated investment project was an actual or exemplar project. At least one commenter mentioned the potential for legislation to alter the regional center requirements.

USCIS understands the desire of EB-5 regional centers to receive prompt and courteous service, and the agency strives to provide the best level of service possible. As the program has grown and applicants and projects have become more advanced, the current fee level has proven to be inadequate to ensure that USCIS has the resources it needs. The proposed fee increase was determined using USCIS's standard fee-setting methodology, based on the number of hours required to adjudicate Form I-924. These adjudications require economists and adjudications officers to thoroughly review extensive business documents, economic impact analyses, and other project-related documents. The proposed fee increase was, in part, calculated to allow USCIS to hire additional staff to process Forms I-924 and provide better and more thorough service.

Currently, USCIS does not have the data to quantify alternative fees for regional centers in existence for fewer than 5 years. In addition, USCIS does not track Form I-924 completion rates based on whether the project involves a rural or urban area, an area of high or low employment, or an actual or exemplar project. USCIS also cannot commit to across-the-board processing time reductions as adjudications involve case-by-case review of complex applications and related supplementary information, nor can it implement a process that automatically approves a regional center without a complete adjudication. Moreover, USCIS does not prioritize Form I-924 workloads based on whether regional center projects involve a rural or urban area, or an area of high or low employment. DHS may consider exploring the feasibility of such a change in the future, but will not implement a change at this time.

With respect to the commenter that identified the possibility of legislative changes, USCIS greatly appreciates the work of stakeholders towards reauthorization of the Regional Center Program and reform of the EB-5 program more generally. USCIS is cognizant of potential legislative changes to the EB-5 program and is also aware that such changes may require adjustments to USCIS adjudication processes. In the event that legislative changes are enacted, USCIS would assess any significant changes and reassess program requirements, adjudication process, and required fees. For now, however, and for the reasons stated previously, this rule sets the Form I-924 fee at $17,795, as proposed.

## 2. IMMIGRANT PETITION BY ALIEN ENTREPRENEUR, FORM I-526

In the NPRM, DHS proposed to increase the fee for the Immigrant Petition by Alien Entrepreneur, Form I-526, from $1,500 to $3,675. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i) (W); 81 FR 26938 (/citation/81-FR-26938). The proposed fee increase was the result of application of the standard USCIS fee methodology to the benefit request.

Some commenters wrote to request additional information on the proposed fee increase. Another commenter stated that a lack of processing efficiency can cause problems for Form I-526 applicants. Specifically, the commenter stated that EB-5 project sponsors sometimes agree to put an investor's money in escrow until the Form I-526 is approved. If the form is denied, project sponsors return those funds to the investor; if approved, the project sponsor uses those funds on the project. The commenter stated that such

projects can languish when the investor's money is held in escrow for lengthy periods of ⬜ time. According to the commenter, although escrow arrangements provide substantial benefits to program integrity, they are becoming commercially untenable due to Form I-526 processing times. The commenter also asserted that projects themselves are also hurt by lengthy processing times, as projects may be well underway by the time USCIS denies the forms.

⬜ Start Printed Page 73311

USCIS has taken multiple steps towards reducing Form I-526 processing times. As previously mentioned, USCIS is in the process of hiring and training additional adjudications officers, economists, and support staff for these form types. Additionally, USCIS is working to revise the EB-5 regulations and is preparing revisions to the EB-5 Policy Manual. USCIS is also improving the forms and form instructions for the EB-5 program. The EB-5 program fee increases will further these agency efforts with the goal of improving operational efficiencies while enhancing predictability and transparency in the adjudication process. USCIS understands that long delays in Form I-526 adjudications negatively impact both immigrant investors and the projects awaiting the release of their investment funds from escrow. USCIS strives to process Form I-526 filings as soon as practicable. In addition, regarding the release of escrowed funds, USCIS permits EB-5 financing to replace interim financing where the financing to be replaced was contemplated as temporary financing that would be replaced.[65] DHS made no changes to the proposed Form I-526 fee as a result of these comments, and is finalizing the fee at $3,675, as proposed.

### 3. PETITION BY ENTREPRENEUR TO REMOVE CONDITIONS, FORM I-829

In the NPRM, DHS proposed to hold the fee for the Petition by Entrepreneur to Remove Conditions, Form I-829, at $3,750. *See* proposed 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(PP); 81 FR 26939 (/citation/81-FR-26939). While the fee model calculated a fee of $2,353, DHS proposed to maintain the current fee for such petitions. *See* 81 FR 26918 (/citation/81-FR-26918). Because of the recent and continued growth and maturation of the EB-5 Program, associated costs over the next few fiscal years are uncertain. Among other things, the final parameters of the program are still evolving, such as the number of USCIS employees and facilities necessary to carry out enhanced review of EB-5 filings, as well as site visits. This uncertainty makes it unclear whether EB-5 related fees will fully fund EB-5 program activities. DHS therefore proposed to keep the Form I-829 at the current fee, above the full cost recovery calculation, to shield USCIS against potential, but likely rising costs.[66]

At least one commenter indicated current USCIS processing times for Form I-829 extend beyond the 1-year automatic extension of the entrepreneur's conditional residence, imposing an additional burden on petitioners traveling outside of the United States. The commenter stated that delays in processing Form I-829 mean that investments must remain at risk for an extended period of time. The commenter added that USCIS could increase the efficiency of Form I-829 adjudications by consolidating the business-related portions of multiple Forms I-829 associated with a single investment project into a single adjudication. Another commenter recommended that USCIS implement electronic filing of this and other forms related to the Immigrant Investor Program to increase efficiency.

USCIS recognizes that lengthy Form I-829 processing times place a strain on EB-5 investors who are awaiting approval of their applications to adjust to LPR status. USCIS is working diligently to add staffing, and the agency plans to publish regulatory action, policy guidance, and revised forms with the goal of improving service delivery to applicants and improving the integrity of the EB-5 program. In part due to the tentative nature of these plans, DHS has no way to reliably quantify any potential cost savings that might be associated with these actions, and therefore could not propose to reduce the Form I-829 fee to account for such savings.

**AR2022_200573**

DHS appreciates the suggestions for improving EB-5 processing times. DHS clarifies that USCIS already has processes in place to streamline adjudication of the business-related portions of multiple Forms I-829 associated with a single, new investment project. Specifically, when USCIS receives a regional center-associated Form I-829 that involves a new commercial enterprise, USCIS reviews the first two petitions associated with that new commercial enterprise to determine if there are specific project-related issues that would apply to all petitioners associated with the new commercial enterprise. After completing that review, USCIS commences adjudication of all Forms I-829 associated with that new commercial enterprise filed within a given period. Similarly, when USCIS receives a regional center-associated Form I-829 that involves a previously reviewed commercial enterprise, USCIS immediately assigns that petition for adjudication. In other words, USCIS currently adjudicates Form I-829 petitions in "first in, first out" order by new commercial enterprises. USCIS constantly searches for new ways to increase efficiencies in the adjudications process, and for that reason cannot commit to a uniform queuing practice in this rule, or reduce associated fees in anticipation of heretofore unrealized savings.

USCIS does not have immediate plans to allow electronic filing for EB-5 requests, but appreciates commenters' desire to avoid voluminous paper filings. USCIS plans to allow electronic filing for EB-5 requests in the future. DHS made no changes to the proposed Form I-829 fee, or the policies regarding EB-5 adjudications, as a result of these comments. The final rule sets the Form I-829 fee at $3,750, as proposed.

## H. Methods Used To Determine Fee Amounts

As described previously and in the NPRM, the standard USCIS fee-setting methodology is intended to ensure full cost recovery for USCIS immigration adjudication and naturalization services. DHS based the proposed USCIS fees on the estimated costs of providing immigration benefit adjudication and naturalization services. In addition, to the extent possible, and with limited exception, DHS based the proposed USCIS fees on the relative identifiable costs associated with providing each particular benefit or service. This fee methodology is consistent with government-wide fee-setting guidelines outlined by OMB Circular A-25, 58 FR 38142 (July 15, 1993); [67] the principles of the Chief Financial Officers Act of 1990, 31 U.S.C. 901 (https://api.fdsys.gov/link?collection=uscode&title=31&year=mostrecent&section=901&type=usc&link-type=html)-03; and the Federal Accounting Standards Advisory Board (FASAB) guidelines.[68] Additional information about the fee methodology can be found in this preamble, the preamble for the ⬚ proposed rule, and the supporting documentation accompanying this rulemaking.[69]

⬚ Start Printed Page 73312

DHS received a number of comments regarding the methods that DHS uses to determine fee amounts. Commenters made statements about the need for full cost recovery without appropriations, the decision to exclude revenue from certain benefits in the proposed fee schedule, potential alternative fee methodologies, and the potential for cost reductions. DHS responds to these comments below.

## 1. RECOVERY OF FULL COST WITHOUT APPROPRIATIONS

Some commenters suggested that USCIS seek appropriations to reduce immigration benefit request fees. Some commenters opposing the fee increase mentioned that immigrants in the United States pay Federal income taxes, Social Security taxes, and other fees and questioned whether those are being accounted for in USCIS fee calculations. Commenters stated that appropriations could help reduce processing times or fund programs that do not recover full cost on their own, such as RAIO, the SAVE program, and the Office of Citizenship.

AR2022_200574

DHS acknowledges that immigrants pay both Social Security and various Federal taxes and fees, but the decision whether to fund USCIS services through tax revenues belongs to the U.S. Congress. And in recent years, such funding has been unavailable. As noted in the NPRM, USCIS is almost entirely funded by fees and must recover the full cost of its operations. *See* 81 FR 26905 (/citation/81-FR-26905)-26912. Fees collected from individuals and entities filing immigration benefit requests are deposited into the IEFA and used to fund the cost of immigration benefits and naturalization. *Id.* USCIS has not received any substantial appropriations since FY 2011. Similarly, USCIS received no FY 2016 discretionary appropriations for the SAVE program or the Office of Citizenship. *See* DHS Appropriations Act 2016, Public Law 114-113 (https://api.fdsys.gov/link?collection=plaw&congress=114&lawtype=public&lawnum=113&link-type=html), div. F. (Dec. 18, 2015) and 81 FR 26912 (/citation/81-FR-26912). USCIS did not receive appropriations for refugee and asylum processing or the SAVE program after FY 2011. USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113-6 (https://api.fdsys.gov/link?collection=plaw&congress=113&lawtype=public&lawnum=6&link-type=html)) and FY 2014 (Pub. L. 113-76 (https://api.fdsys.gov/link?collection=plaw&congress=113&lawtype=public&lawnum=76&link-type=html)), but the agency did not receive appropriations for that program in FY 2015 or FY 2016. The only USCIS appropriations for FY 2016 provided funding for the E-Verify employment eligibility verification program. *See* Consolidated Appropriations Act, 2016, Public Law 114-113 (https://api.fdsys.gov/link?collection=plaw&congress=114&lawtype=public&lawnum=113&link-type=html), div. F, tit. IV (Dec. 18, 2015) (DHS Appropriations Act 2016). Other than as described, USCIS receives no appropriations to offset the cost of adjudicating immigration benefit requests. *Id.* As a consequence of this funding structure, taxpayers do not bear any costs related to the IEFA and bear only a nominal burden to fund USCIS. However, in the event appropriations are provided that will materially change IEFA fees, then DHS could pursue a rulemaking to adjust fees appropriately.

Finally, one commenter questioned why SAVE fees charged to local, state, and Federal agencies do not recover the full cost of the SAVE program. USCIS collects SAVE fees from federal government agencies under the authority of the Economy Act, 31 U.S.C. 1535 (https://api.fdsys.gov/link?collection=uscode&title=31&year=mostrecent&section=1535&type=usc&link-type=html), and from state or local government agencies under the authority of the Inter-Governmental Cooperation Act, 31 U.S.C. 6501 (https://api.fdsys.gov/link?collection=uscode&title=31&year=mostrecent&section=6501&type=usc&link-type=html). SAVE fees are included in Memoranda of Agreement (MOAs) with user agencies, which are updated based on the established periods of performance. As noted in the proposed rule, SAVE fees impact the IEFA fees established in this rule only as necessary to fund the SAVE costs that remain after taking into account revenue received under the MOAs. *See* 81 FR 26911 (/citation/81-FR-26911). Fees charged to SAVE users do not cover the full cost of the SAVE program; rather, they only cover the estimated per-query cost of operating the verification system. IEFA funds are used to cover other costs of the program, especially personnel and overhead expenses. In short, then, the funding structure for SAVE is a dual one, in which some costs are covered by reimbursements, and other costs from IEFA funds. Congress has supported this funding arrangement in the past, noting ongoing budget constraints.[70] As the commenter requests, USCIS and DHS regularly examine SAVE fees, and may modify them in the future.

## 2. EXCLUSION OF TEMPORARY OR UNCERTAIN COSTS, ITEMS, AND PROGRAMS

As noted in the NPRM, DHS excluded from the fee model the costs and revenue associated with certain programs that are time-limited or that may otherwise be narrowed or terminated, including because they are predicated on guidance and not preserved in regulations or statute.[71] *See* 81 FR 26914 (/citation/81-FR-26914)-26915. This exclusion applies to the Application for TPS, Form I-821; Consideration of Deferred Action for Childhood Arrivals (DACA), Form I-821D; and Application for Suspension of Deportation or

AR2022_200575

Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105-100 (https://api.fdsys.gov/link?collection=plaw&congress=105&lawtype=public&lawnum=100&link-type=html)) (Nicaraguan Adjustment and Central American Relief Act (NACARA), Form I-881. As stated in the NPRM, DACA and TPS are both administrative exercises of discretion that may be granted on a case-by-case basis for particular periods of time. Both TPS and DACA, and the individual grants under each, are subject to intermittent renewal or extension at DHS's discretion. For NACARA, the eligible population will eventually be exhausted due to relevant eligibility requirements, including the date by which an applicant was required to have entered the United States. Given that these initiatives or programs are temporary by definition and at the discretion of DHS, USCIS excluded the associated cost and workload from the fee review and did not propose to allocate overhead and other fixed costs to these workload volumes. *See* 81 FR 26915 (/citation/81-FR-26915).

Some commenters wrote to question the rationale for excluding DACA and TPS from the fee review. Several commenters stated that it is a financial burden to have to renew DACA every 2 years and to renew TPS every 18 months. Other commenters stated that, by their own estimates, the cost of administering DACA is less than the revenue that the program generates. Some commenters stated that fee increases to Forms I-765 and I-131 would deter DACA and TPS renewals and initial applications.

Following consideration of the comments received, DHS retains its earlier position. The practice of excluding these initiatives or programs that are temporary by definition from the fee review mitigates an unnecessary revenue risk, by ensuring that USCIS ⧉ will have enough revenue to recover full cost regardless of DHS's discretionary decision to continue these initiatives. This allows DHS to maintain the integrity of its ABC model, ensure recovery of full costs, and mitigate revenue risk from unreliable sources.

⧉ Start Printed Page 73313

For these reasons, the cost of adjudicating requests associated with these policies was not considered, and this final rule excludes from the ABC model the costs and revenue associated with aforementioned policies, as proposed.

### 3. SETTING FEES BY BENEFIT TYPE

A commenter stated that IEFA fees should be based on the specific immigration benefit sought by a filer, rather than the specific form type used. The commenter noted that USCIS tracks completion rate (*i.e.,* adjudication time) by form number, and that the agency generally establishes a fee for the form type rather than the benefit being sought through the filing, even if the same form can be used to obtain different immigration benefits. For example, Form I-129 is used to request several types of nonimmigrant visa classifications, and a different fee could conceivably be calculated for each such classification.[72]

USCIS already sets some of its fees based on benefit sought, rather than form type used. For example, USCIS sets different fees for Form I-131 depending on the benefit sought, and the agency provides fee exemptions to certain filers of Form I-360. For other forms that have multiple uses, USCIS has not calculated the completion rate with enough precision to determine fees based on the benefits sought by filers of those forms. USCIS officers are required to manually report the time they spend on adjudicating forms; requiring reporting for sub-uses of those forms would divert time from processing requests. In addition, tracking whether filers are submitting the appropriate fees for the specific benefit sought would increase complexity for the agency and the public, potentially adding to processing delays. Nonetheless, DHS will continue considering this comment and may further refine its fee-setting methodology in the future to determine if different fees for the same form can be justified, as well as accurately and efficiently determined, without causing confusion and delay for adjudicators and the public. DHS made no changes in this final rule as a result of this comment.

AR2022_200576

## 4. INCOME-BASED FEE STRUCTURE

Some commenters stated that DHS should generally base fees on the filer's income level or cost of living. Although USCIS is adopting a limited income-based fee structure in the naturalization context, adjusting all fees based on income or cost of living would be administratively complex and would require even higher costs to administer. A tiered fee system would require staff dedicated to income verification and necessitate significant information system changes to accommodate multiple fee scenarios for every form. The costs and administrative burden associated with implementing such a system would require additional overall fee revenue. As a result, DHS does not support making the entire fee schedule contingent on income or cost of living and DHS has made no changes in this final rule as a result of these comments.

## 5. REDUCTION IN USCIS COSTS

A number of commenters recommended that USCIS reduce costs internally instead of raising fees to fully recover costs. For instance, some commenters stated that USCIS employees' salaries were too high. No commenters proposed a methodology that DHS could use to adjust the proposed fee schedule to account for unrealized cost reductions.

USCIS is continually exploring opportunities to increase efficiency and reduce unnecessary costs without negatively affecting the delivery of benefits. Although USCIS will continue seeking out cost reductions, and may incorporate the results of such cost reductions in future fee reviews, DHS cannot set aside the need for full cost recovery indefinitely. Accordingly, DHS made no changes in this final rule as a result of these comments.

## I. Dishonored Payments

In the NPRM, in a set of proposals separate and distinct from the proposed fee schedule, DHS proposed to eliminate three rules requiring that cases be held while deficient payments are corrected. *See* proposed 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii), 103.7(a)(2); 81 FR 26936 (/citation/81-FR-26936); *see also* previous 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii), (a)(2); 8 CFR 103.17 (/select-citation/2016/10/24/8-CFR-103.17)(b)(1). Instead, DHS proposed that if a financial instrument used to pay a fee were returned as unpayable after one re-presentment, USCIS would reject the filing and impose a standard $30 charge. The purpose of the proposed change was to reduce the USCIS administrative costs for holding and tracking immigration benefit requests when the accompanying payment has already been rejected.

DHS received several comments concerning these proposed changes. Some commenters suggested that USCIS maintain the current procedure or allow for several attempts to process a payment. These commenters noted that some payment problems are due to circumstances beyond the filer's control. These commenters stated that dishonored payments may result from errors at a USCIS Lockbox facility or a temporary disruption to a bank or Automated Clearing House (ACH) [73] network. These commenters also stated that the rejection of a benefit request can have serious repercussions for the filer. Commenters asserted that a payment failure may be especially disruptive if, for example, an underlying labor certification application for Form I-140 is about to expire, a derivative applicant is about to age out of eligibility, the priority date for an application for adjustment of status is scheduled to retrogress, or an applicant's current status will expire imminently and the pendency and approval of the application would otherwise result in an extension of status. These commenters stated that time-sensitive immigration benefit requests could be delayed by months or years because of the proposed changes. One commenter also noted that the rejected filings may require over a month to be returned to filers.

**AR2022_200577**

DHS agrees that ACH and bank network outages can sometimes result in a rejection or delay payments for a few days.[74] In the past, USCIS has addressed the possibility of ACH and network outages by arranging for the Department of the Treasury (Treasury) to automatically re-present a rejected payment twice to see if it clears on the second or third attempt before sending the filer the bill for the rejected payment.[75] Re-depositing a rejected ⎕ check, known as "re-presentment," was not required by the regulations, but USCIS arranged for Treasury to do this as a courtesy to filers.[76]

⎕ Start Printed
Page 73314

To address the concerns raised by commenters that a dishonored payment may be due to circumstances beyond the filer's control, DHS has decided to continue this practice, and to codify it (with slight revision) in this final rule. To make sure that a payment rejection is the result of insufficient funds and not due to USCIS error or network outages, USCIS (through Treasury) will re-submit rejected payment instruments to the appropriate financial institution one time. *See* new 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2) (a)(7)(ii)(D).[77] In effect, DHS will implement as a regulatory requirement the current practice under which USCIS re-presents rejected payments, but this rule will only require USCIS to re-submit the payment once, not twice. USCIS estimates that this change, based on its experience with how many days are required for financial instruments to clear, will provide a total of approximately 10 days before Treasury notifies USCIS that the payment (including re-presentment) has failed. The change codifies in regulation a practice that reduces instances in which requests are erroneously rejected because a bank erroneously rejects the relevant financial instrument.

This final rule also corrects an oversight in the NPRM related to how USCIS treats benefit requests that have already been approved when the agency learns that the financial instrument used to pay the associated fee is unpayable. Under current 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii), if USCIS has approved a benefit request before the payment has cleared, and the filer, having received notice of failed payment, fails to pay the filing fee and associated service charge within 14 days, USCIS automatically revokes the approval, or reopens and denies the request, due to improper filing. *See, e.g.,* previous 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(1) ("Each benefit request or other document must be filed with fee(s) as required by regulation."); 8 CFR 103.5 (/select-citation/2016/10/24/8-CFR-103.5)(a)(5). As a result, a filer could not retain an approved benefit if the financial instrument used to pay the fee was subsequently returned as unpayable.[78] Unfortunately, the proposed rule erroneously omitted this existing regulatory authority, *see* proposed 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii); 81 FR 26936 (/citation/81-FR-26936), and also erroneously failed to include conforming updates to a related provision, *see* previous 8 CFR 205.1 (/select-citation/2016/10/24/8-CFR-205.1)(a)(2) (providing for automatic revocation of certain petitions "[i]f the filing fee and associated service charge are not paid within 14 days of the notification to the remitter that his or her check or other financial instrument used to pay the filing fee has been returned as not payable").

As the NPRM and this rule make clear, however, the ability of USCIS to collect fees is a fundamental aspect of its ability to function. USCIS must be able to continue requiring proper fee payments as a condition of eligibility for immigration benefits. Individuals who file a benefit request with a fee payment that is dishonored should, therefore, have no expectation that they might benefit from early processing of their filing.

Given that background, the only alternative to continuing to provide for revocation would be for USCIS to hold each benefit request until the financial instrument used to pay the fee has finally cleared or been rejected. In the interest of administrative efficiency and prompt processing of benefit requests, DHS has rejected that alternative. Therefore, DHS has provided in this final rule that if a remittance in payment of any fee submitted with a request is not honored by the bank or financial institution on which it is drawn, and the

AR2022_200578

request was approved, USCIS will initiate revocation of the approval by issuing a notice of intent to revoke (NOIR). *See* new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(a)(2)(iii).[79] The applicant, petitioner or requestor will be provided an opportunity to respond to the NOIR with evidence that the payment was honored and the revocation would be in error. To assuage concerns about procedural safeguards in such a situation, USCIS has decided to provide a notice in advance of the revocation in response to public comments that stated that a mistake by USCIS or a contractor could result in a dishonored payment. The applicant, petitioner or requestor may not, however, pay the rejected fee in response to the NOIR.

DHS emphasizes that this provision applies if *any* fee submitted with a benefit request is returned as dishonored. If a benefit request requires multiple fees, all fee instruments submitted with the request must be honored by the remitting bank; if any one fee instrument is dishonored after approval of the request, USCIS will revoke the approval after notice and will retain any filing fees properly paid. For instance, for the past five fiscal years, an average of 231 petitions per year were submitted with a Request for Premium Processing Service, Form I-907, accompanied by a check that was dishonored by the remitting bank. If a benefit approved under these circumstances is not revoked, petitioners would have the perverse incentive to request premium processing services in order to receive a swift approval, knowing they would not suffer any consequences once the bank dishonors the payment submitted for premium processing.[80] If the bank dishonors the Form I-907 payment after USCIS has approved the benefit request underlying the Form I-907, USCIS may revoke the approval after notice and, in that event, would retain the filing fees for the underlying benefit.[81]

In short, USCIS is fee funded and it must be able to adjudicate requests, including those which it has committed to approve in an expedited manner, without concerns that the fee payment will be declined. Accordingly, under this final rule, USCIS will intake the benefit request, deposit the fee, and begin processing the filing. If the payment is rejected, Treasury will re-present the payment instrument on USCIS's behalf. If the payment is rejected on the second try, Treasury will notify USCIS and USCIS, solely under ⬚ its own authority, will reject the filing for fee non-payment. If the filing has been approved, USCIS will initiate revocation of the approval. *See id.* The elimination of the 14-day waiting period will reduce the need for special handling of cases involving a dishonored payment. The requirement to re-present rejected payments will address commenters' concerns about rejections that occur through no fault of the filer. And the requirement to revoke an approved request if the payment has ultimately been rejected will help ensure the integrity of the benefits adjudication system.

⬚ Start Printed
Page 73315

## J. Refunds

In the NPRM, DHS proposed a minor change in the provision regarding USCIS fee refunds. *See* proposed 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(1); 81 FR 26936 (/citation/81-FR-26936). In general, and except for a premium processing fee under 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(e)(2)(i), USCIS does not refund a fee regardless of the decision on the immigration benefit. However, USCIS will refund a fee if the agency determines that an administrative error occurred resulting in the incorrect collection of a fee. *See* 81 FR 26920 (/citation/81-FR-26920)-26921. DHS proposed to revise 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(1) to provide that fees are "generally" not refunded. This would address concerns that the current regulatory text does not explicitly permit refunds at DHS discretion. DHS currently grants such refunds because as electronic filings and associated electronic payments have increased, there has been an increase in the number of erroneous payments where refunds are appropriate.

**AR2022_200579**

Some commenters stated that they supported the regulatory change to clarify that USCIS does not generally allow refunds, but that a refund may occur as a result of administrative error or unnecessary payment. *See* 81 FR 26936 (/citation/81-FR-26936). DHS has made no change based on these comments. DHS is finalizing this provision as proposed.

## K. Visa Allocation

Some commenters wrote that they generally opposed the fee increases in the proposed rule due to long waits for immigrant visas. Although these long waits are due to visa retrogression in oversubscribed categories, some attributed it to USCIS processing inefficiencies and questioned a fee hike in the face of such delays.[82] Some commenters stated that USCIS should be able to move visa priority dates forward if fee increases are implemented.

Significant improvements have been made in the visa coordination process between DHS and the Department of State (DOS). In September 2015, DOS, in coordination with DHS, revised the procedures for determining immigrant visa availability and authorization for issuance for both employment-based and family-sponsored applicants for adjustment of status in the United States. *See* Department of State Visa Bulletin for October 2015.[83] These revisions were made to better align with DOS' immigrant visa overseas consular processing application procedures and to enhance DOS' ability to better predict overall immigrant visa demand and determine cut-off dates for visa issuance published in the Visa Bulletin. *Id.*

DHS appreciates the concerns raised by individuals who may have been affected by long visa waits and visa retrogression. However, requests to make further revisions to the visa allocation process and priority dates must be done in coordination with DOS and are outside the scope of this rulemaking.

## L. Credit Card Payments

Finally, some commenters criticized USCIS for not allowing credit card payments for additional immigration benefit requests. USCIS accepts credit card payments made in person at all domestic field offices that accept payments.[84] USCIS began allowing credit card payments for paper-filed Applications for Naturalization, Forms N-400, on September 19, 2015.[85] Currently, this is the only immigration benefit that can be paid for with a credit card when filed by mail. USCIS also accepts credit card payments for immigration benefit requests made through the electronic immigration system. DHS made no changes in this final rule as a result of these comments. Nonetheless, in the future, USCIS will allow credit cards payments for all immigration benefit request fees when they are filed at a Lockbox facility as soon as this capability can be made available.

# V. Statutory and Regulatory Reviews

## A. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis

In accordance with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601 (https://api.fdsys.gov/link? collection=uscode&title=5&year=mostrecent&section=601&type=usc&link-type=html)(6), DHS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632 (https://api.fdsys.gov/link? collection=uscode&title=15&year=mostrecent&section=632&type=usc&link-type=html)), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people). Below is a summary of the small entity analysis. A more detailed analysis is available in the rulemaking docket at *http://www.regulations.gov (http://www.regulations.gov).*

AR2022_200580

Individuals rather than entities submit the majority of immigration and naturalization benefit applications and petitions. Entities that will be affected by this rule are those that file and pay the fees for certain immigration benefit applications and petitions. There are four categories of benefits that DHS analyzed in the Initial Regulatory Flexibility Analysis (IRFA) for this rule: Petition for a Nonimmigrant Worker, Form I-129; Immigrant Petition for an Alien Worker, Form I-140; Application for Civil Surgeon Designation, Form I-910; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I-924.[86] Additionally, DHS has analyzed as part of the following Final Regulatory Flexibility Analysis (FRFA) requests related to genealogy information, Forms G-1041 and G-1041A, and the Petition for Amerasian Widow(er) or Special Immigrant, Form I-360, in response to public comment on the impact to small entities that file these forms.

Following the review of available data, DHS does not believe that the increase in fees in this final rule will have a significant economic impact on a substantial number of small entities that are filing Form I-129, Form I-140, or Form I-910. However, DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-924. DHS also does not have sufficient data on the requestors that file genealogy forms to determine whether such filings were made by entities or individuals, ▯ and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. Finally, DHS has added in this FRFA an analysis of the effects on small entities from the fee increase for Form I-360 and does not believe that the increase in fees will have a significant economic impact on these small entities. DHS is publishing this FRFA to respond to public comments, and provide further information on the likely impact of this rule on small entities.

▯ Start Printed Page 73316

### 1. A STATEMENT OF THE NEED FOR, AND OBJECTIVES OF, THE RULE

DHS issues this final rule consistent with INA section 286(m),[87] which authorizes DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and the CFO Act,[88] which requires each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees. DHS is adjusting the fee schedule for DHS immigration and naturalization benefit applications after conducting a comprehensive fee review for the FY 2016/2017 biennial period and determining that current fees do not recover the full costs of services provided. DHS has determined that adjusting the fee schedule is necessary to fully recover costs and maintain adequate service.

### 2. A STATEMENT OF THE SIGNIFICANT ISSUES RAISED BY THE PUBLIC COMMENTS IN RESPONSE TO THE INITIAL REGULATORY FLEXIBILITY ANALYSIS, A STATEMENT OF THE ASSESSMENT OF THE AGENCY OF SUCH ISSUES, AND A STATEMENT OF ANY CHANGES MADE IN THE PROPOSED RULE AS A RESULT OF SUCH COMMENTS

DHS published the NPRM along with the IRFA on May 4, 2016 (81 FR 26903 (/citation/81-FR-26903)) with the comment period ending July 6, 2016. During the 60-day comment period, DHS received 475 comments from interested individuals and organizations. DHS received several comments that directly or indirectly referred to aspects of the small entity analysis or IRFA presented with the NPRM. The comments, however, did not result in any major revisions to the small entity analysis in this final rule that are relevant to the effects on small businesses, small organizations, and small governmental jurisdictions presented in this FRFA. DHS summarizes and responds to these comments in this Final Rule.

### A. COMMENTS ON FORM I-129

**AR2022_200581**

One commenter wrote about the 42-percent increase ($135) of the fee for the Petition for a Nonimmigrant Worker, Form I-129. The commenter explained that such a significant increase in visa fees for H-2A category visas for temporary agricultural workers will negatively affect the ability of both large and small farmers to use those visas to ensure a sufficient and stable work force. Form I-129, which is used to petition for H-2A workers, is often used by a large and an increasing portion of small business employers according to this commenter. The commenter discussed the impact this 42-percent increase has on an employer hiring only one employee compared to an employer hiring 100 employees. This commenter was especially concerned with the impact of this rule on smaller farmers, many of whom petition for 1 to 5 workers, but whose farming operations could not continue without these workers. This commenter also stated that the impact of the rule on small entities was not quantitatively considered and/or disclosed.

Several other commenters wrote about the fee increase for Form I-129 and its impact on small entities in terms of small traveling musicians that cross over the border, particularly those along the United States and Canadian border. The commenters stated that these musicians routinely perform in small venues or small festivals and it currently takes about 3 separate performances to recoup the expenses of the current fee for Form I-129. The commenters stated that this increase in fees presents considerable hardship for these small performers and also compromises the ability to organize small tours that would result in break-even revenues.

Other commenters also wrote about the increase for Form I-129 and its impact on small religious orders and communities who petition for foreign-born religious workers. The commenters stated that this increase is particularly burdensome since extensions have to continually be filed for work authorizations as well. They noted that these added costs impact smaller parishes and lower-income neighborhoods disproportionately. In addition to the fee increases for Form I-129, these commenters also expressed similar concern for Forms I-360 and I-485.

DHS respectfully disagrees with the commenter who stated that the impact of the rule on small entities was not quantitatively considered and/or disclosed. DHS used recent data to examine the direct impacts to small entities for Forms I-129, I-140, I-910, and I-924. DHS prepared an IRFA that complied with the Regulatory Flexibility Act (RFA) and that was published with the NPRM. DHS also published a more comprehensive small entity analysis of the potential impact of the Form I-129 fee increase on *www.regulations.gov (http://www.regulations.gov)* in the docket for this rule along with other supporting documentation. DHS has also added an analysis of Forms G-1041, G-1041A, and I-360 in this FRFA in response to public comments.

In terms of the range for Form I-129, among the 284 small entities with reported revenue data identified in the small entity analysis, all experienced an economic impact of considerably less than 1.0 percent of revenue in the analysis, with the exception of two entities. Using the methodology described in the comprehensive small entity analysis, the greatest economic impact imposed by this fee change totaled 2.55 percent. This small entity with the highest economic impact imposed by the fee increase is in the theater companies and dinner theaters industry, which submitted 18 of the total 482,190 Form I-129 petitions in the 12-month period analyzed. The small entity with the second highest economic impact (2.05 percent) imposed by the fee increase is in the custom computer programming services industry, which submitted 50 of the total 482,190 Form I-129 petitions. DHS notes that out of the 10 small entities that face the highest economic impact due to this fee increase, a majority are in industries that are not related to musicians, farmers, or religious organizations. Table 2 shows the industry in which these top 10 impacted small entities belong, as well as the number of petitions submitted by each entity. ⬜

⬜ Start Printed Page 73317

**AR2022_200582**

Table 2—Form I-129 NAICS Industry of the Small Entities With the Highest Economic Impact
Imposed by the Fee Increase *

| NAICS Industry | Number of petitions submitted | Economic impact on entity's revenue imposed by fee increase (percent) |
|---|---:|---:|
| Theater Companies and Dinner Theaters | 18 | 2.55 |
| Custom Computer Programming Services | 50 | 2.05 |
| All Other Business Support Services | 2 | 0.90 |
| Dance Companies | 4 | 0.90 |
| Other Scientific and Technical Consulting Services | 7 | 0.53 |
| Computer Systems Design Services | 2 | 0.46 |
| All Other Business Support Services | 1 | 0.45 |
| Custom Computer Programming Services | 3 | 0.37 |
| All Other Business Support Services | 2 | 0.34 |
| All Other Business Support Services | 2 | 0.34 |

*Source: DHS, USCIS, Office of Performance and Quality.*

*\* North American Industry Classification System (NAICS).*

DHS also analyzed the 284 small entities with reported revenue data in our sample of Form I-129 petitions to see how many small entities were specifically in NAICS codes related to musicians, farmers, or religious organizations. Of these small entities, a total of 26 small entities were found in one of these related NAICS, 3 of the small entities were in the agricultural industry; 8 small entities were in the performing arts, spectator sports, and related industries; and 15 small entities were religious organizations. Looking only at this subset of 26 entities, only one small entity had an economic impact above 1 percent with one other small entity just under 1 percent, both of which were in the performing arts industries. The 24 other small entities in these categories had economic impacts that were well below 1 percent. Twelve of these small entities had an economic impact between 0.34 percent and 0.10 percent, while the remaining 12 small entities had economic impacts below 0.10 percent. Therefore, while DHS sympathizes with small farmers, small traveling musicians, and small religious entities, the evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on most of these types of entities.

**B. COMMENTS ON FORMS I-360 AND I-485**

DHS also received comments about the impact of this rule on small religious organizations who file on behalf of religious workers utilizing Forms I-485 and I-360. Form I-485, Application to Register Permanent Residence or Adjust Status, was not considered in this small entity analysis because it is submitted by individuals seeking to receive benefits, not entities. DHS selected forms that are filed by entities for the small

**AR2022_200583**

entity analysis in the NPRM. DHS recognizes, however, that entities may also file the Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360, on behalf of a religious worker and acknowledges it is appropriate to include Form I-360 in the small entity analysis for the final rule.

The fee for Form I-360 will increase from $405 to $435, a $30 (7 percent) increase. DHS was able to obtain internal data on petitioners who file Form I-360 for Special Immigrant Religious Workers provided by the Office of Performance and Quality for this final rule. There were a total of 4,399 religious foreign worker Form I-360 petitions submitted in FY 2015 by 1,890 unique entities. Of these 1,890 unique entities, approximately 96 percent were churches, mosques, synagogues, temples, or other places of worship. Due to the overwhelming number of entities that were places of worship and therefore, likely designated as non-profit organizations, DHS assumed that all 1,890 entities are small.

Of the unique entities, about 51 percent of entities had submitted just one petition in the FY 2015 (Table 3). Over 83 percent submitted only one or two petitions. At the other end of scale, only about half a percent of entities submitted more than 20 petitions. An average of 2.4 petitions per entity was submitted in FY 2015. Based on a $30 increase in fees per petition for Form I-360, the average additional cost to these entities is $72.[89]

Table 3—Form I-360 Petitions per Entity

| Petitions per entity | Entities | Percentage of total (percent) | Cumulative percentage (percent) |
|---|---|---|---|
| 1 | 959 | 50.7 | 50.7 |
| 2 | 617 | 32.6 | 83.3 |
| 3 | 91 | 4.8 | 88.2 |
| 4 | 78 | 4.1 | 92.3 |
| 5 | 21 | 1.1 | 93.4 |
| 6 to 10 | 87 | 4.6 | 98.0 |
| 11 to 20 | 30 | 1.6 | 99.6 |
| 21 to 50 | 5 | 0.3 | 99.9 |
| 51+ | 2 | 0.1 | 100.0 |
| Total | 1,890 | 100.0 | |

*Source: DHS, USCIS, Office of Performance and Quality.*

DHS also analyzed the costs imposed by this rule on the petitioning entities relative to the costs of the typical employee's salary. Guidelines suggested by the Small Business Administration (SBA) Office of Advocacy indicate that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the entities in the sector.[90] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $48,150 for clergy,[91] $45,160 for directors of religious activities and education,[92] and $35,160 for all other religious workers.[93] Based on an average of 2.4 religious workers petitioned-for per entity, the additional average annual cost will be $72 per entity.[94] Thus, the additional costs per entity imposed by this rule represent only 0.15 percent of the average salary for clergy, 0.16 percent of the average

AR2022_200584

salary for directors of religious of activities and education, and 0.20 percent of the average salary for all other religious workers. Therefore, using average annual labor cost guidelines, the additional regulatory compliance costs imposed by this rule are not significant.

## C. COMMENTS ON FORMS G-1041 AND G-1041A

Several commenters also expressed concern about the impact the proposed increase in fees related to genealogy searches would have on individual businesses. The commenters stated that such large increases in fees would be prohibitive to many individual genealogists that submit requests. Some commenters suggested that the fee increase should be phased-in over several years to help mitigate the impact of this total cost increase.

DHS appreciates the comments on the impact this fee increase will have on the individual businesses who request information from the genealogy program. The fee for Genealogy Index Search Request, Form G-1041, will increase from $20 to $65 (a 225 percent increase). The fee for Genealogy Index Search Request, Form G-1041, will increase from $20 to $65 (a 225 percent increase). Currently there are two fees for the Genealogy Records Request, Form G-1041A; the appropriate fee depends on whether the filing requests copies from microfilm (currently $20) or copies from textual records (currently $35). The new fee for Form G-1041A will increase to $65, regardless of the type of media involved. This represents a fee increase of 86 to 225 percent over current fee levels.

Based on DHS records related to the genealogy program, an average of 4,022 Index Search requests and 2,166 Records requests were made annually over the 4 calendar year span from 2012 to 2015 (Table 4). However, DHS does not have sufficient data on these requests to determine whether they were submitted by entities or individuals. Additionally, DHS cannot break out how many Genealogy Records Requests are copies from microfilm or from textual records. The case management tracking system used by DHS for these genealogy requests does not allow for requestor data to be readily pulled, nor does it allow for a break out in the Form G-1041A requests by record type.

**AR2022_200585**

Table 4—Genealogy Form Receipts

[Calendar Year]

| Form Type | 2012 | 2013 | 2014 | 2015 | Average |
|---|---|---|---|---|---|
| Genealogy Index Search Request, Form G-1041 | 3361 | 3662 | 4167 | 4897 | 4022 |
| Genealogy Records Request, Form G-1041A | 2066 | 2219 | 2036 | 2344 | 2166 |

*Source: DHS, USCIS, Immigration Records and Identity Services Directorate.*

AR2022_200586

DHS has previously determined that requests for historical records are usually made by individuals.[95] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requesters and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. Therefore, DHS does not currently have sufficient data to definitively assess the impact on small entities for these requests.

DHS has decided to recover the full cost of the genealogy program from the genealogy program fees. As previously stated in this final rule, reducing the filing fee for any one benefit request submitted to DHS simply transfers the additional cost to process this request to other immigration and naturalization filing fees. Furthermore, DHS is not able ☐ to accommodate a phased-in approach of costs over several years due to the statutory guidelines on how DHS is able to increase its fees.

☐ Start Printed
Page 73319

### D. COMMENTS ON FORM I-924A

One commenter indicated that fees for the new Form I-924A would create particular burdens on regional centers with less than 30 investors. The new fee for the annual filings of Supplement Form I-924A is $3,035.

As discussed in the small entity analysis of this final rule, while DHS cannot definitively claim that there is no significant economic impact to these small entities based on existing information at the time of this final rule, DHS would assume existing regional centers that have revenues equal to or less than $303,500 per year [96] (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA. DHS also assumes newly designated regional centers that have revenues equal to or less than $1,779,500 per year [97] could also experience a significant impact.

Searching through several public Web sites, DHS gathers that administrative fees charged to investors could range between $30,000 and $100,000 per investor.[98] DHS was able to obtain some sample data on 440 regional centers operating 5,886 projects. These 5,886 projects had a total of 54,506 investors, averaging 124 investors per regional center.[99] Assuming an average of 124 investors is a representative proxy for regional centers, and that $30,000 is the minimum administrative fee charged by regional centers, then such fees would represent approximately $3,720,000 in revenue. In that case, DHS expects that the proposed filing fee increase for Form I-924 and the creation of a new fee for Form I-924A would not cause a significant economic impact to these entities.

DHS does not currently have information on how many regional centers may have 30 or fewer investors. However, DHS expects that the fee for the annual filing of Form I-924A is greater than 1 percent of annual revenue for only those regional centers with 10 or fewer investors.[100] Regional centers with 11 or more investors are not likely to experience a significant economic impact due to this rule. While DHS cannot definitively state the number of regional centers that have fewer than 10 investors, we do not believe it is a substantial number of regional centers.

### 3. THE RESPONSE OF THE AGENCY TO ANY COMMENTS FILED BY THE CHIEF COUNSEL FOR ADVOCACY OF THE SMALL BUSINESS ADMINISTRATION IN RESPONSE TO THE PROPOSED RULE, AND A DETAILED STATEMENT OF ANY CHANGE MADE TO THE PROPOSED RULE IN THE FINAL RULE AS A RESULT OF THE COMMENTS

No comments were filed by the Chief Counsel for Advocacy of SBA.

**AR2022_200587**

**4. A DESCRIPTION OF AND AN ESTIMATE OF THE NUMBER OF SMALL ENTITIES TO WHICH THE RULE WILL APPLY OR AN EXPLANATION OF WHY NO SUCH ESTIMATE IS AVAILABLE**

Entities affected by this final rule are those that file and pay fees for certain immigration benefit applications and petitions on behalf of a foreign national. These applications include Petition for Nonimmigrant Worker, Form I-129; Immigrant Petition for Alien Worker, Form I-140; Civil Surgeon Designation, Form I-910; Application for Regional Center Designation Under the Immigrant Investor Program, Form I-924; and Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360. Annual numeric estimates of small entities affected by this fee increase total (in parentheses): Form I-129 (70,211), Form I-140 (17,812), Form I-910 (589), Form I-924 (412), and Form I-360 (1,890).

This rule applies to small entities including businesses, not-for-profit organizations, and governmental jurisdictions filing for the above benefits. Form I-129 and Form I-140 will see a number of industry clusters affected by this rule (see Appendix A of the Small Entity Analysis for a list of affected industry codes). Of the total 444 small entities in the sample for Form I-129, most entities were small businesses (401), with 41 small not-for-profit entities and only 2 small governmental jurisdictions. Similarly, of the total 393 small entities in the sample for Form I-140, most entities were small businesses (364), with 26 small not-for-profit entities and 3 small governmental jurisdictions. The fee for the Application for Civil Surgeon Designation, Form I-910, will apply to physicians requesting such designation. There were 322 small entities in the sample for Form I-910, consisting of two small governmental jurisdictions and 320 small entities that were either small businesses or small not-for-profits. DHS was unable to further break down the composition of small entities between small businesses and small not-for-profits due to difficulties in determining the structure of these small entities. The Form I-924 will apply to any entity requesting approval and designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Also captured in the dataset for Form I-924 is the Supplement Form I-924A, which regional centers must file annually to certify their continued eligibility for regional center designation. The Form I-360 will apply to any entity petitioning on behalf of a religious worker.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G-1041 and G-1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals.[101] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requesters and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those that submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. Therefore, DHS does not currently have sufficient data to definitively assess the estimate of small entities for these requests.

**A. PETITION FOR A NONIMMIGRANT WORKER, FORM I-129**

The fee for the Petition for a Nonimmigrant Worker, Form I-129, will increase from $325 to $460, a $135 (42 percent) increase. DHS used a 12-month period of data on filings of Form I-129 from September 1, 2014 to August 31, 2015, to collect internal data for each filing organization including the name, Employer Identification Number, city, state, ZIP Code, and number/type of filings. Each entity may make multiple filings; for instance, there were 482,190 Form I-129 petitions, but only 84,490 ☐ unique entities that filed those petitions. Since the filing statistics do not contain information such as the revenue of the business, DHS looked for this information by researching databases from third-party sources. DHS used the subscription-based online database from Hoover's, as well as three open-access databases from Manta, Cortera, and Guidestar, to help determine an organization's small entity status and apply SBA size standards.

☐ Start Printed Page 73320

**AR2022_200588**

DHS devised a methodology to conduct the small entity analysis based on a representative sample of the affected population for each form. To achieve a 95 percent confidence level and a 5 percent confidence interval on a population of 84,490 unique entities for Form I-129, DHS used the standard statistical formula to determine a minimum sample size of 382 entities was necessary. Based on past experience, DHS expected to find about 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS selected a sample size approximately 40 percent larger than the minimum necessary in order to allow for non-matches (filing organizations that could not be found in any of the four databases). Therefore, DHS conducted searches on 534 randomly selected entities from the population of 84,490 unique entities for Form I-129.

The 534 searches for Form I-129 resulted in 444 small entities, 287 of which were determined to be small entities based on their reported revenue or employee count and their NAICS code. Combining non-matches (130), matches missing data (27), and small entity matches (287), enables us to classify 444 of the 534 entities as small for Form I-129.

With an aggregated total of 444 out of a sample size of 534 entities searched, DHS inferred that a majority, or 83.1 percent, of the entities filing Form I-129 petitions during the period were small entities. Furthermore, 284 of the 534 entities searched were small entities with the sales revenue data needed to estimate the economic impact of the rule. Because these 284 small entities were a subset of the random sample of 534 searches, they were statistically significant in the context of this research. In order to calculate the economic impact of this rule, DHS estimated the total costs associated with the fee increase annually for each entity, divided by the annual sales revenue of that entity.[102] Based on the fee increase of $135 for Form I-129, this will amount to an average impact of 0.08 percent on all 284 small entities with reported revenue data.

In terms of range, among the 284 small entities with reported revenue data, all experienced an economic impact of considerably less than 1.0 percent in the analysis, with the exception of two entities. Using the above methodology, the greatest economic impact imposed by this fee change totaled 2.55 percent and the smallest totaled 0.0001 percent.

The evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on these entities.

## B. IMMIGRANT PETITION FOR AN ALIEN WORKER, FORM I-140

The fee for the Immigrant Petition for an Alien Worker, Form I-140, will increase from $580 to $700, a $120 (21 percent) increase. Using a 12-month period of data on filings of Form I-140 petitions from September 1, 2014 to August 31, 2015, DHS collected internal data similar to that of Form I-129. There were 101,245 Form I-140 petitions, but only 23,284 unique entities that filed those petitions. Again, DHS used the third party sources of data mentioned previously to search for revenue and employee count information.

DHS used the same methodology as with Form I-129 to conduct the small entity analysis based on a representative sample of the affected population. To achieve a 95 percent confidence level and a 5 percent confidence interval on a population of 23,284 unique entities for Form I-140, DHS used the standard statistical formula to determine that a minimum sample size of 378 entities was necessary. Again, based on past experience, DHS expected to find about 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, DHS oversampled in order to allow for non-matches (filing organizations that could not be found in any of the four databases).

**AR2022_200589**

DHS conducted searches on 514 randomly selected entities from the population of 23,284 unique entities for Form I-140. The 514 searches resulted in 430 instances where the name of the filing organization was successfully matched in the databases and 84 instances where the name of the filing organization was not found in the databases. Based on previous experience conducting regulatory flexibility analyses, DHS assumes filing organizations not found in the online databases are likely to be small entities. In order not to underestimate the number of small entities affected by this rule, DHS makes the conservative assumption to consider all of the non-matched entities as small entities for the purpose of this analysis. Among the 430 matches for Form I-140, 290 were determined to be small entities based on their reported revenue or employee count and their NAICS code. Combining non-matches (84), matches missing data (19), and small entity matches (290), enables us to classify 393 of 514 entities as small for Form I-140.

With an aggregated total of 393 out of a sample size of 514 entities searched, DHS inferred that a majority, or 76.5 percent, of the entities filing Form I-140 during the period were small entities. Furthermore, 287 of the 514 entities searched were small entities with the sales revenue data needed to estimate the economic impact of the rule. Because these 287 small entities were a subset of the random sample of 514 searches, they were statistically significant in the context of this research. Similar to the analysis involving Form I-129, DHS estimated the total costs associated with the Form I-140 fee increase annually for each entity, divided by the annual sales revenue of that entity in order to calculate the economic impact of this rule.

Among the 287 small entities with reported revenue data, all experienced an economic impact considerably less than 1.0 percent in the analysis. Using the above methodology, the greatest economic impact imposed by this fee change totaled 0.68 percent and the smallest totaled 0.000002 percent. The average impact on all 287 small entities with revenue data was 0.04 percent. The evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on these entities.

Additionally, DHS analyzed any cumulative impacts to small entities resulting from the fee increases to both Forms I-129 and I-140. DHS isolated those entities that overlapped in both samples of Forms I-129 and I-140 by Employer Identification Number (EIN). Only three entities had EINs that overlapped in both samples. Of these three entities, two of them were small entities and one was not a small entity. Only one entity submitted multiple Form I-129 petitions, while all three entities submitted multiple Form I-140 petitions. Due to little overlap in entities in the samples and the relatively minor impacts on revenue of fee increases of Forms I-129 and I-140, DHS does not expect the combined impact of these two forms to be an economically significant burden on a substantial number of small entities.

Start Printed Page 73321

## C. APPLICATION FOR CIVIL SURGEON DESIGNATION, FORM I-910

The fee for the Application for Civil Surgeon Designation, Form I-910, will increase from $615 to $785, a $170 (28 percent) increase. Using a 12-month period of August 1, 2014 to July 31, 2015, DHS collected internal data on applicants of this form. There were 719 Form I-910 applications, but only 602 unique entities that filed such applications. Again, DHS used third party sources of data mentioned previously to search for revenue and employee count information.

Using the same methodology employed with Forms I-129 and I-140, DHS conducted the small entity analysis based on a representative sample, with a 95 percent confidence level and a 5 percent confidence interval, of the population of 602 unique entities for Form I-910. DHS determined that a minimum sample size of 235 entities was necessary. DHS oversampled and conducted searches on 329 randomly selected entities for Form I-910.

**AR2022_200590**

The 329 searches for Form I-910 resulted in 252 instances in which the name of the filing organization was successfully matched in the databases and 77 instances in which the name of the filing organization was not found in the databases. DHS assumed again that filing organizations not found in the online databases are likely to be small entities, so DHS considered all of the non-matched entities as small entities for the purpose of this analysis. Among the 252 matches for Form I-910, 240 were determined to be small entities based on their reported revenue or employee count and their NAICS code. Combining non-matches (77), matches missing data (5), and small entity matches (240), DHS classified 322 of 329 entities as small for Form I-910.

With an aggregated total of 322 out of a sample size of 329 entities searched, DHS inferred that a majority, or 97.9 percent, of the entities filing Form I-910 applications were small entities. Furthermore, 238 of the 329 entities searched were small entities with the sales revenue data needed in order to estimate the economic impact of the rule. Because these 238 small entities were a subset of the random sample of 329 searches, they were statistically significant in the context of this research.

Similar to the analysis involving Forms I-129 and I-140, DHS estimated the total costs associated with the Form I-910 fee increase for each entity. Among the 238 small entities with reported revenue data, all experienced an economic impact considerably less than 1.0 percent in the analysis. The greatest economic impact imposed by this fee change totaled 0.61 percent and the smallest totaled 0.00002 percent. The average impact on all 238 small entities with revenue data was 0.09 percent. The evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on these entities.

### D. REGIONAL CENTER DESIGNATION UNDER THE IMMIGRANT INVESTOR PROGRAM, FORMS I-924 AND I-924A

Congress created the EB-5 Program in 1990 under section 203(b)(5) of the INA to stimulate the U.S. economy through job creation and capital investment by foreign investors. Foreign investors have the opportunity to obtain LPR status in the United States for themselves, their spouses, and their minor unmarried children through a certain level of capital investment and associated job creation or preservation. There are two distinct EB-5 pathways for a foreign investor to gain LPR status: The Basic Program and the Regional Center Program. Both options require a capital investment from the foreign investor in a new commercial enterprise located within the United States. The capital investment amount is generally set at $1,000,000, but may be reduced to $500,000 if the investment is made in a "Targeted Employment Area."

A regional center is an economic entity, public or private, that promotes economic growth, regional productivity, job creation, and increased domestic capital investment. Regional centers pool funds into development loans or equity for commercial and real estate development projects. As of July 15, 2016, there were 847 DHS-approved regional centers.[103] Entities seeking designation as regional centers file Form I-924 along with supporting materials. Approved regional centers are currently required to file the Supplement to Form I-924, Form I-924A, on an annual basis to demonstrate continued eligibility for regional center designation. DHS is proposing to change the name of the Form I-924A annual filing to "Annual Certification of Regional Center."

DHS is increasing the fee for the Application for Regional Center Designation Under the Immigrant Investor Program, Form I-924, from $6,230 to $17,795, an $11,565 (186 percent) increase. Additionally, DHS introduces a filing fee of $3,035 for Form I-924A. In establishing this fee, DHS is also clarifying the related regulations that provide for the annual regional center review related to Form I-924A. Currently, there is no procedure for regional centers seeking to withdraw their designation and discontinue their participation in the program. Formal termination is currently processed by DHS issuing a Notice of Intent to Terminate and a subsequent termination notice. The withdrawal procedure will allow a regional center to proactively

**AR2022_200591**

request withdrawal without the need for the more formal notices sent out by DHS. This procedure will reduce administrative costs and time for the Department, while timely clarifying status to the requesting regional center. Over a 13-month period of August 1, 2014 through August 31, 2015, DHS received a total of 412 Form I-924 applications.[104] These applications include the request for newly designated regional centers, as well as requests for continued designation for existing regional centers.

DHS was not able to determine the numbers of regional centers that are considered small entities. Regional centers are difficult to assess because there is a lack of official data on employment, income, and industry classification for these entities. Regional centers also pose a challenge for analysis as their structure is often complex and can involve many related business and financial activities not directly involved with EB-5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above market return differentials. While DHS attempted to treat the regional centers similar to the other entities in this analysis, we were not able to identify most of the entities in any of the online databases. Furthermore, while regional centers are an integral component of the EB-5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either $1 million or $500,000 per investor) that the regional center invests into a new commercial enterprise. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA.

Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue through the administrative fees charged to investors. Searching through several public Web sites, DHS gathers that administrative fees charged to investors could range between $30,000 and $100,000 per investor.[105] DHS assumes administrative fees charged to investors are $30,000 per investor for the purposes of this analysis. DHS does not know the extent to which these regional centers can pass along fee increases to individual investors. Passing along the costs from this rule could reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively state there is no significant economic impact to these small entities based on existing information, DHS assumes existing regional centers that have revenues equal to or less than $303,500 per year [106] (some of which we assume will be derived from administrative fees charged to individual investors) could experience a significant economic impact if we assume a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA. DHS also assumes newly designated regional centers that have revenues equal to or less than $1,779,500 per year [107] could also experience a significant impact.

☐ Start Printed Page 73322

DHS was able to obtain some sample data on 440 regional centers operating 5,886 projects. These 5,886 projects had a total of 54,506 investors, averaging 124 investors per regional center.[108] Assuming an average of 124 investors is a representative proxy of the regional centers, and that $30,000 is the minimum administrative fee charged by regional centers, then such fees will represent approximately $3.7 million in revenue. In that case, DHS expects that the filing fee increase for Form I-924 and the creation of a new fee for Form I-924A will not cause a significant economic impact to these entities.

## E. PETITION FOR AMERASIAN, WIDOW(ER), OR SPECIAL IMMIGRANT, FORM I-360

As previously described in this analysis, the fee for Form I-360 will increase from $405 to $435, a $30 (7 percent) increase. DHS was able to obtain internal data for FY 2015 showing 1,890 unique entities submitted 4,399 Form I-360 petitions for religious workers. Of these 1,890 unique entities, approximately 96 percent were churches, mosques, synagogues, temples, or other places of worship, and DHS thus chose to consider all 1,890 entities to be small entities. Most entities only submitted 1 or 2 petitions. As previously described,

**AR2022_200592**

DHS analysis showed that the costs per entity imposed by this rule represent only 0.15 percent of the average salary for clergy; 0.16 percent of the average salary for directors of religious of activities and education, and 0.20 percent of the average salary for all other religious workers. As all of these are under the 5 percent average annual labor cost SBA guidelines, DHS determined that the additional regulatory costs imposed by this rule are not significant.

### 5. A DESCRIPTION OF THE PROJECTED REPORTING, RECORDKEEPING AND OTHER COMPLIANCE REQUIREMENTS OF THE RULE, INCLUDING AN ESTIMATE OF THE CLASSES OF SMALL ENTITIES WHICH WILL BE SUBJECT TO THE REQUIREMENT AND THE TYPE OF PROFESSIONAL SKILLS NECESSARY FOR PREPARATION OF THE REPORT OR RECORD

This final rule imposes higher fees for filers of Forms I-129, I-140, I-910, I-924, I-924A, and I-360. The new fee structure, as it applies to the small entities outlined above, results in the following fees: Form I-129 ($460), Form I-140 ($700), Form I-910 ($785), Form I-924 ($17,795), Form I-924A ($3,035), and Form I-360 ($435). This final rule does not require any new professional skills for reporting.

### 6. A DESCRIPTION OF THE STEPS THE AGENCY HAS TAKEN TO MINIMIZE THE SIGNIFICANT ECONOMIC IMPACT ON SMALL ENTITIES CONSISTENT WITH THE STATED OBJECTIVES OF APPLICABLE STATUTES, INCLUDING A STATEMENT OF THE FACTUAL, POLICY, AND LEGAL REASONS FOR SELECTING THE ALTERNATIVE ADOPTED IN THE FINAL RULE AND WHY EACH ONE OF THE OTHER SIGNIFICANT ALTERNATIVES TO THE RULE CONSIDERED BY THE AGENCY WHICH AFFECT THE IMPACT ON SMALL ENTITIES WAS REJECTED

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees collected for other immigration benefits. Without an increase in fees, DHS will not be able to maintain the level of service for immigration and naturalization benefits that it now provides. DHS has considered the alternative of maintaining fees at the current level with reduced services and increased processing times, but has determined that this will not be in the interest of applicants and petitioners. Therefore, this alternative was rejected.

While most immigration benefit fees apply to individuals, as described previously, some also apply to small entities. DHS seeks to minimize the impact on all parties, but in particular small entities. Another alternative to the increased economic burden of the fee adjustment is to maintain fees at their current level for small entities. The strength of this alternative is that it assures that no additional fee-burden is placed on small entities; however, small entities will experience negative effects due to the service reductions that will result in the absence of the fee adjustments in this final rule.

Without the fee adjustments provided in this rule, significant operational changes to DHS would be necessary. Given current filing volume and other economic considerations, DHS requires additional revenue to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as Federal and contract staff, infrastructure spending on information technology and facilities, and training. Depending on the actual level of workload received, these operational changes would result in longer processing times, a degradation in customer service, and reduced efficiency over time. These cuts would ultimately represent an increased cost to small entities by causing delays in benefit processing and reductions in customer service.

### B. Unfunded Mandates Reform Act

**AR2022_200593**

The Unfunded Mandates Reform Act of 1995 (UMRA) requires certain actions to be taken before an agency promulgates any notice of rulemaking "that is likely to result in promulgation of any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year.[109] While this rule may result in the expenditure of more than $100 million by the private sector annually, the rulemaking is not a "Federal ☐ mandate" as defined for UMRA purposes,[110] as the payment of immigration benefit fees by individuals or other private sector entities is, to the extent it could be termed an enforceable duty, one that arises from participation in a voluntary Federal program, applying for immigration status in the United States.[111] Therefore, no actions were deemed necessary under the provisions of the UMRA.

☐ Start Printed Page 73323

## C. Small Business Regulatory Enforcement Fairness Act

This rulemaking is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rulemaking will result in an annual effect on the economy of more than $100 million (adjusted annually for inflation) in order to generate the revenue necessary to fully fund all adjudication and naturalization services. The increased costs will be recovered through the fees charged for various immigration benefit requests. As small businesses may be impacted under this regulation, DHS has prepared a RFA analysis.

## D. Congressional Review Act

The Congressional Review Act [112] requires rules to be submitted to Congress before taking effect. DHS will submit a report regarding the issuance of this final rule before its effective date, as required by 5 U.S.C. 801 (https://api.fdsys.gov/link?collection=uscode&title=5&year=mostrecent&section=801&type=usc&link-type=html) to Congress and the Comptroller General of the United States. This rule is deemed a major rule and will therefore have a 60-day delayed effective date.

## E. Executive Orders 12866 and 13563 (Regulatory Planning and Review)

### 1. BACKGROUND AND PURPOSE OF THE FINAL RULE

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (/executive-order/13563) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This final rule has been designated an "economically significant regulatory action" under section 3(f)(1) of Executive Order 12866. Accordingly, OMB has reviewed this final rule.

DHS projects an annual budget of $3.038 billion in FY 2016/2017, a $767 million (34 percent) increase over the FY 2010/FY 2011 fee review-adjusted annual budget of $2.271 billion. This final rule is estimated to provide DHS with an average of $546 million in annual fee revenue above the FY 2010/FY 2011 levels, based on a projected annual fee-paying volume of 4.9 million immigrant benefit requests and 2.6 million requests for biometric services.[113] DHS will use this increase in revenue under subsections 286(m) and (n) of the INA, 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(m) and (n), to fund the full costs of processing immigration benefit requests and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants at no charge; and the full cost of providing similar benefits to others at no charge.

**AR2022_200594**

Federal Register U.S. Citizenship and Immigration Services Fee Schedule

If DHS does not adjust the current fees to recover the full costs of processing immigration benefit requests, it will be forced to make reductions in services provided to applicants and petitioners. These will reverse the considerable progress DHS has made over the last several years to reduce the backlogs of immigration benefit filings, to increase the integrity of the immigration benefit system, and to protect national security and public safety. The revenue increase is based on DHS costs and volume projections available at the time the rule was drafted. DHS has placed in the rulemaking docket a detailed analysis that explains the basis for the annual fee increase.

DHS has included an accounting statement detailing the annualized impacts of the rule in Table 5 below. DHS makes a correction from the NPRM by adding in the opportunity costs of time for filing Form I-942 as discussed later in this analysis. Thus, DHS notes the higher cost in this final rule.

**AR2022_200595**

Table 5—Accounting Statement, FY 2016 Through FY 2017

| Category | Primary estimate | Maximum estimate |
|---|---|---|
| **Benefits:** | | |
| Un-quantified Benefits | Maintain current level of service with respect to processing times, customer service, and efficiency levels. | |
| **Costs:** | | |
| Quantified Costs | $717,724 | $717,724 |
| **Transfers:** | | |
| Annualized Monetized Transfers at 3 percent | 546,429,650 | 546,429,650 |
| Annualized Monetized Transfers at 7 percent | 546,429,650 | 546,429,650 |
| Category | Effects | Source |
| Effects on State, local, and/or tribal governments | For those state, local, and/or tribal governments that submit petitions for nonimmigrant and immigrant workers, they will face an increase in filing fees | Final Rule, Executive Order 12866/13563 Analysis. |
| Effects on small businesses | For those small businesses that submit petitions for nonimmigrant and immigrant workers, they will face an increase in filing fees | Final Rule, Executive Order 12866/13563 Analysis, Small Entity Analysis. |

AR2022_200596

☐

## 2. AMENDMENTS AND IMPACTS OF REGULATORY CHANGE

This rule is intended to adjust current fees to ensure that DHS is able to recover the full costs of the immigration services it provides and maintain adequate service.[114] In addition to increasing fees, this final rule includes the following provisions: Provisions that DHS will reject an immigration benefit request paid with a dishonored check; provisions that DHS will reject an application that does not include the required biometric services fee; the institution of a reduced fee for the Application for Naturalization, Form N-400; and provisions that DHS will provide fee refunds at its discretion.

### A. DISHONORED PAYMENTS

This final rule changes how DHS will treat a benefit request filing accompanied by fee payment (in the form of check or other financial instrument) that is subsequently returned as not payable.[115] Current regulations provide that when a check or other financial instrument used to pay a filing fee is subsequently returned as not payable, the remitter will be notified and requested to pay the filing fee and associated service charge within 14 calendar days, without extension.[116] If the benefit request is pending and these charges are not paid within 14 days, the benefit request will be rejected as improperly filed. In addition, a receipt issued by a DHS officer for any remittance will not be binding upon DHS if the remittance is found uncollectable, and legal and statutory deadlines will not be deemed to have been met if payment is not made within 10 business days after notification by DHS of the dishonored payment.[117] In accordance with these current provisions, when a payment is returned as not payable, DHS places the immigration benefit request on hold, and suspends adjudication. If payment fails, DHS assesses a $30 penalty and pursues the unpaid fee and penalty using administrative debt collection procedures.[118] If payment (the unpaid fee plus $30) is made within the allotted 14 day time period, DHS resumes processing the benefit request. If a payment is not corrected by the applicant, DHS rejects the filing for nonpayment.[119]

In this final rule, DHS is eliminating provisions that require USCIS to hold benefit request filings while deficient payments are corrected. Under the amendment, if a check or other financial instrument used to pay a filing fee is subsequently returned as not payable, DHS will now reject the filing when Treasury notifies DHS that the payment has failed; USCIS will no longer hold the filing and provide 14 days for the deficient payment to be corrected.

To ensure that a payment rejection is the result of insufficient funds and not due to ACH and bank network outages, DHS has made a minor revision to the proposed amendment in the NPRM. Under the final rule, DHS will submit all rejected payments to the applicant's bank two times (once upon original deposit and once again if the original attempt to deposit the payment is unsuccessful). Based on the typical time required for a payment instrument to clear a financial institution, this will allow approximately 5 additional days for payments to clear.[120] DHS estimates the new mandatory rejected payment re-presentment requirement will therefore provide approximately 10 days for payments to be corrected before DHS receives notification that the payment has failed and rejects the filing or imposes the $30 returned check fee.[121]

Under the new process, DHS will continue to intake benefit requests, attempt to deposit fees, and begin processing filings as soon as possible.[122] In cases where the payment is initially rejected, Treasury will re-attempt to deposit the payment. However, if the payment is rejected a second time, Treasury will notify DHS and DHS, solely under its own authority, will reject the filing for non-payment of the required fee. In such cases where the benefit request has already been approved when DHS is notified of the failed payment, DHS will send the approved applicant or petitioner a notice of intent to revoke the approval. Regardless of the disposition of the benefit request, if the payment to DHS is rejected, the remitter will be charged a $30

returned check service charge.[123] In order to estimate the number of applicants who will make a payment that is ultimately dishonored, DHS analyzed the count of all returned and subsequently corrected payments of a credit card or check from fiscal years 2012 to 2015.[124] In FY 2015, a total of 10,818 payments were returned (Table 6). Of those 10,818 returned payments, 6,399 (59.2 percent) were later corrected. The average annual number of returned payments from FY 2012 to FY 2015 was 9,781 with an annual average of 6,478 payments (66.2 percent) later corrected. Assuming all included the current service fee of $30, the resulting total annual cost to applicants for returned payments is $293,430.[125]

Table 6—Count of Returned and Corrected Credit Card/Check Payments, FY 2012-2015

| Year | Total returned payments | Total corrected payments | Percentage of corrected payments |
|---|---|---|---|
| 2015 | 10,818 | 6,399 | 59.2 |
| 2014 | 9,200 | 6,467 | 70.3 |
| 2013 | 9,785 | 6,496 | 66.4 |
| 2012 | 9,322 | 6,550 | 70.3 |
| Average | 9,781 | 6,478 | 66.2 |

*Source: Department of Homeland Security, Immigration and Customs Enforcement, Burlington Finance Center.*

As stated previously, with the implementation of this final rule, the regulations will no longer require DHS to hold benefit requests, and applicants will no longer be allowed to correct payments directly. Instead, all rejected payments will be re-presented to the relevant financial institution a second time, which will allow approximately another 5 days for it to clear.[126] DHS' current policy is to re-present a rejected payment twice to see if it clears on the second or third attempt before sending the filer the bill for the rejected payment. Under this final rule, Treasury will only re-present the payment on one occasion to save time. The average 9,781 returned payments (Table 6) will now be rejected unless the payments clear when re-presented by Treasury. This re-presentation by Treasury has no additional cost since Treasury currently includes this step in the process to deposit DHS fee payments. DHS anticipates that the prospect of rejection will encourage filers to provide the correct filing fees at the time they submit their benefit requests. However, DHS recognizes that there will continue to be filers who file benefit requests with incorrect or deficient fees.

For filers, filing fees are a required and fundamental aspect of the benefit being requested. By providing a 14-day window to correct dishonored payments, the regulation currently permits a benefit request paid with a dishonored payment instrument to secure a place in line ahead of a benefit request that was accompanied by a proper payment, including in programs that are time sensitive or involve numerically limited visas. In all cases, rejected filings may be refiled immediately with the proper payment but there are some slight differences depending on whether the submission is paper-based or electronically filed. The DHS online filing system will permit the rejected applications to remain accessible for the applicant to print and view. The original rejected electronic submission will not be available for resubmission with a new payment; however, the rejected submission may be used as a reference when a new application is being completed. In cases where the rejected submission is paper-based, the entire application/petition/request and supporting documentation are returned when rejected and can generally be refiled with the proper payment instrument.

AR2022_200598

5/12/2021 Case 1:18-cv-00068 Document 607-3 Filed on 11/03/22 in TXSD Page 458 of 504
Documents607-3 · Filed on 11/03/22 in TXSD Page
U.S. Citizenship and Immigration Services fee schedule

The changes in this final rule will provide several benefits to DHS. These changes lower DHS administrative costs for holding and tracking benefit requests during the 14-day period currently provided to correct dishonored payments. The holding and tracking of benefit requests requires physical storage space that will no longer be required with these revisions. DHS currently incurs administrative costs through tracking payments in postage costs and adjudicator time among other costs. This change in process also provides parity to those individuals who file benefit requests with the correct fees, particularly in programs that are time sensitive or involve numerically limited visas.

DHS recognizes the unique impact that these changes may have in the context of the H-1B program regulations, which make visa numbers available to petitions in the order in which the petitions are filed.[127] The H-1B regulations allow the final receipt date to be any of the first 5 business days on which petitions subject to the applicable numerical limit may be received. DHS then conducts a random selection among the petitions received during any of those 5 business days, known as the "H-1B lottery." Currently, petitions remain eligible for the H-1B lottery despite having failed payments, as long as the payments are corrected within the provided 14-day or 10-day timeframe.[128] Under the changes in this final rule, however, DHS will remove petitions from the H-1B lottery as soon as DHS receives notification of a failed payment, typically within 10 days of the receipt date. DHS does not have data at this time to estimate the impact on how many petitions may be affected by these changes. DHS is also unable to monetize the cost to the applicant of having a petition removed from selection for the H-1B lottery.

## B. FAILURE TO PAY THE BIOMETRIC SERVICES FEES

DHS is also eliminating provisions governing non-payment of the biometric services fee in this final rule. Currently, if a benefit request is received by DHS without the correct biometric services fee, DHS will notify the filer of the deficiency and take no further action on the benefit request until payment is received.[129] Failure to submit the correct biometric services fee within the time allotted in the notice will result in denial of the benefit request. If the required biometric services fee is missing, DHS suspends adjudication and places the benefit request on hold. If payment is made within the allotted time, DHS resumes processing the benefit request. If the biometric services fee is not paid, the benefit request is denied as abandoned.

Through this final rule, DHS is deleting the regulatory provisions that permitted benefit requests to be held while deficient payments are corrected. As a result of these deletions, DHS will reject a benefit request if, for instance, it is received without the correct biometric services fee, as specified in the form instructions.

In order to analyze the number of people who do not pay the correct biometric services fee, DHS updated the numbers from the NPRM with more recent data and gathered 7 months of data from DHS lockbox facilities. [130] The data covers the period from December 1, 2015 to June 30, 2016. During this 7-month period, DHS lockbox facilities accepted 2,624,825 benefit requests. Of these, a total of 6,179 (.24 percent) of filers were issued a notice alerting them that their biometric services fees were missing. Assuming this 7-month trend is typical of the number of deficient biometric services fee notices, the new provision will affect less than 1 percent of all benefit requests received at DHS lockbox facilities. As previously mentioned, rejected filings may be refiled immediately. While filers do not incur monetary costs (except for ▯ additional postage fees) associated with the rejection of a benefit request, reapplying for benefits with the correct fees requires time. Again, DHS anticipates this new provision will encourage individuals to file with the appropriate fees.

▯ Start Printed Page 73326

Additionally, this change will streamline DHS' process for handling benefit requests when biometrics services fees are not submitted when required. DHS costs are reduced by eliminating the administrative handling costs associated with holding cases while biometric services fees are collected.

**AR2022_200599**

## C. REDUCED FEE FOR APPLICATION FOR NATURALIZATION

The current fee for the Application for Naturalization, Form N-400, is $595. In most cases, applicants must also pay an $85 biometrics services fee, so the total cost for most applicants is $680. If an applicant cannot pay the fee, he or she can file a Request for Fee Waiver, Form I-912, along with their Form N-400. DHS considers anyone with a household income at or below 150 percent of the Federal Poverty Guidelines to be eligible for a fee waiver. If DHS approves an applicant's fee waiver, both the $595 Form N-400 fee and the $85 biometrics services fee, where applicable, are waived.

DHS will increase the Form N-400 fee from $595 to $640, a $45 (8 percent) increase in this final rule. The biometric services fee will remain unchanged at $85. Therefore, the new costs of Form N-400 plus the biometric services fee will total $725. DHS is introducing an additional fee option for those non-military naturalization applicants with family incomes greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines. Specifically, applicants will receive a 50 percent discount and only be required to pay a filing fee of $320 for the N-400, plus an additional $85 biometric services fee (for a total of $405). This reduced fee option is intended to limit any potential economic disincentives that some eligible naturalization applicants face when deciding whether or not to seek citizenship. The lower fee will help ensure that those who have worked hard to become eligible for naturalization are not limited by their economic means. In order to qualify for this fee, the eligible applicant will have to submit the newly created Form I-942, Request for Reduced Fee, along with their Form N-400. Form I-942 will require the names of everyone in the household and documentation of the household income to determine if the applicant's household income is greater than 150 and not more than 200 percent of the Federal Poverty Guidelines.

As described in the NPRM, DHS estimates that approximately 11 percent of all Form N-400 applicants, excluding military applicants, could qualify for the reduced fee. Given the non-military Form N-400 volume projection estimate of 821,500 annually, over the biennial period, DHS expects that 90,365 filers will be included in the population eligible for the fee reduction.[131] While these 90,365 filers represent only the current number of applicants who will be eligible for the fee reduction, DHS anticipates an increase in Form N-400 filings as a result of the changes in this final rule. DHS anticipates that the reduced fee for applicants with qualifying incomes will remove economic barriers associated with the costs of associated fees and thus encourage more eligible applicants to file their Form N-400 applications. While DHS anticipates an increase in Form N-400 filings due to this fee reduction, we cannot predict how many more eligible applicants will file their N-400 applications at this time.

DHS has factored the estimated revenue loss from this product line into its fee model, so those costs are reallocated over other fee paying benefit requests. While the costs of the reduced fee are being reallocated to other fee-paying customers, DHS believes the benefits of facilitating access to citizenship outweighs the cost reallocation impacts.

As previously mentioned, an eligible applicant will have to submit a Form I-942 along with a Form N-400 application to qualify for this reduced fee. While DHS is not imposing an additional fee for Form I-942, DHS has estimated the opportunity cost of time to applicants to complete the form. The total annual opportunity cost of time for applicants will be $717,724, if all 90,365 eligible applicants apply for the reduced fee.[132] The Federal minimum wage rate [133] of $7.25 was used as the hourly wage rate because the anticipated applicants are asserting they cannot afford to pay the full DHS fee and DHS thus assumes that such applicants earn less than average incomes. The BLS reports the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. Using these data from BLS, DHS calculated compensation-to-wage multiplier of 1.46 to estimate the full opportunity costs to applicants, including

AR2022_200600

employee wages, salaries, and the full costs of benefits, such as paid leave, insurance, and retirement.[134] To anticipate the full opportunity cost of time to applicants, we multiplied the Federal minimum wage rate by 1.46 to account for the full cost of employee benefits for a total of $10.59. The time burden estimate was developed by DHS with an average of 45 minutes (or .75 of an hour) to complete Form I-942, resulting in an opportunity cost of time per petition of $7.94.[135] This additional burden is offset by the benefits received from the $320 fee reduction.

**D. REFUNDS. DHS IS ALSO AMENDING REGULATIONS FOR FEE REFUNDS IN THIS FINAL RULE. IN GENERAL, AND EXCEPT FOR A PREMIUM PROCESSING FEE UNDER 8 CFR 103.7 (/SELECT-CITATION/2016/10/24/8-CFR-103.7)(E)(2)(I), DHS DOES NOT REFUND A FEE REGARDLESS OF THE DECISION ON THE IMMIGRATION BENEFIT REQUEST. DHS MAKES VERY RARE EXCEPTIONS WHEN DHS DETERMINES THAT AN ADMINISTRATIVE ERROR OCCURRED RESULTING IN THE INADVERTENT COLLECTION OF A FEE. DHS ERRORS MAY INCLUDE:**

- *Unnecessary filings.* Cases in which DHS (or DOS in the case of an immigration benefit request filed overseas) erroneously requests that an individual file an unnecessary form along with the associated fee; and

- *Accidental Payments.* Cases in which an individual pays a required fee more than once or otherwise pays a fee in excess of the amount due and DHS (or the DOS in the case of an immigration benefit request filed overseas) erroneously accepts the erroneous fee.

DHS is codifying the process of continuing to provide these refunds in cases involving obvious DHS error. Individuals will continue to request a refund through the current established process, which requires calling the customer service line or submitting a written request for a refund to the office having jurisdiction over the relevant immigration benefit request.

Any DHS refunds provided are generally due to obvious DHS errors resulting from electronic system behavior issues or human error. The anticipation of increased electronic filings in the future also spurs the need for this provision. Currently, DHS provides fee refunds to applicants as shown in Table 7. Over the past 3 fiscal years, DHS issued an annual average of 5,363 refunds, resulting in an average of $2.1 million refunded. This is approximately $396 per refund. These numbers and amounts of refunds do not include premium processing refunds regulated under 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(e)(2)(i). In the context of the total number of fees collected by DHS across all benefits, this average amount of refunds is still less than 1 percent of the total fees collected.

Start Printed Page 73327

Table 7—Amount and Number of Fee Refunds Provided by USCIS

| Fiscal year | Amount refunded | Number of refunds |
|---|---|---|
| 2013 | $2,674,290 | 7,405 |
| 2014 | 1,805,006 | 4,198 |
| 2015 | 1,890,638 | 4,485 |
| Average | 2,123,311 | 5,363 |

*Source: Department of Homeland Security, U.S. Immigration and Customs Enforcement, Burlington Finance Center.*

The changes in the final rule will benefit applicants who accidently submit payments twice. DHS anticipates this to be a bigger issue as more forms and associated fees begin to be collected through electronic means. Applicants will recoup any fees that were submitted erroneously due to electronic systems issues. DHS

**AR2022_200601**

benefits by having clear regulatory authority concerning the relatively few cases in which refunds are provided.

There may be some administrative costs associated with the issuance of refunds. DHS may see a potential initial increase in requests for refunds due to the visibility of this rule; however, DHS does not anticipate a sustained increase as DHS is not anticipating any changes to the conditions for issuing refunds. There may also be a potential increase in the time burden costs for DHS adjudicators to process these potential initial increases in refund requests. DHS does not have cost estimates at this time indicating the number of hours required to process and issue these refunds. There may also be some opportunity costs of time to filers who submit refund requests; however, DHS anticipates this cost is offset by the benefit gained in receiving a refund.

## F. Executive Order 13132 (/executive-order/13132) (Federalism)

This rulemaking will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, (/executive-order/13132) DHS has determined that this rulemaking does not have sufficient Federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (/executive-order/12988) (Civil Justice Reform)

This final rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (/executive-order/12988).

## H. Family Assessment

DHS has determined that this rule will not affect family well-being within the meaning of section 654 of the Treasury and General Government Appropriations Act, 1999, *Public Law 105-277 (https://api.fdsys.gov/link?collection=plaw&congress=105&lawtype=public&lawnum=277&link-type=html),* 112 Stat. 2681 (1998). By increasing immigration benefit request fees, this action will impose a slightly higher financial burden on some families that petition for family members to join them in the United States. On the other hand, the rule will provide USCIS with the funds necessary to carry out adjudication and naturalization services and provide similar services for free to disadvantaged populations, including asylees, refugees, individuals with Temporary Protected Status, and victims of human trafficking. DHS has determined that the benefits of the action justify the financial impact that it will place on some families.

## I. Paperwork Reduction Act—Comments on the Proposed Information Collection Changes

Under the Paperwork Reduction Act of 1995, all Departments are required to submit to OMB, for review and approval, any reporting and recordkeeping requirements inherent in a rule. *See* 44 U.S.C. 3507 (https://api.fdsys.gov/link?collection=uscode&title=44&year=mostrecent&section=3507&type=usc&link-type=html). This final rule requires changes to OMB control number 1615-0052, the Application for Naturalization, Form N-400, to collect information necessary to document the applicant's eligibility for the reduced fee proposed in this final rule at 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i) (AAA)(*1*); OMB control number 1615-0061, Annual Certification of Regional Center, Form I-924A, and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I-924, to add the instructions necessary to require the annual fee; and OMB control number 1615-NEW, Request for Reduced Fee, Form I-942, to document the applicant's eligibility for the reduced fee. DHS specifically requested public comments on the proposed changes to the forms and form instructions in the NPRM in accordance with 5 CFR 1320.11 (/select-citation/2016/10/24/5-CFR-1320.11)(a). OMB reviewed the request filed in

**AR2022_200602**

connection with the NPRM and also filed comments in accordance with 5 CFR 1320.11 (/select-citation/2016/10/24/5-CFR-1320.11)(c). DHS summarized the comments received from the public and responded below:

## 1. REQUEST FOR REDUCED FEE, FORM I-942

USCIS received some comments on the Request for Reduced Fee, Form I-942, which was part of the NPRM docket. USCIS proposed to require Form I-942 for an applicant to request the $320 reduced fee for the Application for Naturalization. The comments indicated that the Form I-942's sections related to preparer and interpreter certifications were unnecessarily lengthy, as was the section for signatures of additional family members. The comments stated that these sections make the form appear longer and more onerous than it needs to be. The commenters also recommended that the form be optional, similar to the optional Request for Fee Waiver, Form I-912.

USCIS designed the Request for Reduced Fee to be very similar to the Request for Fee Waiver. USCIS anticipates that preparers will benefit from having similar forms with similar formats. Additionally, USCIS does not believe that Form I-942 should be optional for reduced fee requests in the same way that Form I-912 is optional. With respect to Form I-912, USCIS recognizes that applicants may be able to address certain criteria, such as financial hardship, in a letter more ☐ easily than through a form. However, the proposed sole basis for submitting a Request for Reduced Fee is the applicant's household income level. *See* 81 FR 26916 (/citation/81-FR-26916). To qualify for the reduced fee, an applicant's household income must be greater than 150 and not more than 200 percent of the Federal Poverty Guidelines. *Id.* USCIS believes that such income information is more easily conveyed to the agency, and accessed by the agency, if it is presented in a uniform manner through a form, rather than through a letter. To provide additional flexibility to reduced fee applicants, USCIS has also decided to permit multiple family members living in the same household who are each submitting an Application for Naturalization, and who are each within the relevant income levels for the reduced fee, to jointly submit one Form I-942 with their naturalization applications.[136] USCIS determined that permitting multiple requests on one form would impose less of a burden overall than requiring multiple members of the same household to file separate reduced fee requests. As a result of these comments, DHS changed the form to permit multiple family members to file on Form I-942 with respect to multiple naturalization applications.

☐ Start Printed Page 73328

## 2. ANNUAL CERTIFICATION OF REGIONAL CENTER, FORM I-924A

At least one commenter recommended standardizing the questions for Form I-924A and indicated that the form provides little to no value to USCIS. USCIS believes the revised form and instructions better explain the annual reporting process and requirements, and provide more useful information to USCIS, than the previous version of the form. In addition, USCIS believes the revised forms address the commenter's concerns by eliminating many redundant and lengthy questions and instructions. While the form contains new questions, it is intended to result in more comprehensive reviews and to require fewer and simpler follow-up inquiries from USCIS in response to annual I-924A filings. DHS made no changes to the draft form or the proposed rule as a result of these comments. The form and fee are finalized as proposed. New CFR 204.6(m).

# List of Subjects

### 8 CFR Part 103 (/select-citation/2016/10/24/8-CFR-103)

- Administrative practice and procedures
- Authority delegations (government agencies)

AR2022_200603

- Freedom of Information
- Privacy
- Reporting and recordkeeping requirements, and Surety bonds

**8 CFR Part 204 (/select-citation/2016/10/24/8-CFR-204)**

- Administrative practice and procedure
- Immigration
- Reporting and recordkeeping requirements

**8 CFR Part 205 (/select-citation/2016/10/24/8-CFR-205)**

- Administrative practice and procedure
- Immigration

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

**1.** The authority citation for part 103 continues to read as follows:

> **Authority:** 5 U.S.C. 301 (https://api.fdsys.gov/link?collection=uscode&title=5&year=mostrecent&section=301&type=usc&link-type=html), 552, 552(a); 6 U.S.C. 112 (https://api.fdsys.gov/link?collection=uscode&title=6&year=mostrecent&section=112&type=usc&link-type=html), 8 U.S.C. 1101 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1101&type=usc&link-type=html), 1103, 1154, 1155, 1185, 1186a, 1186b, 1254a, 1304, 1324a, 1356; 31 U.S.C. 9701 (https://api.fdsys.gov/link?collection=uscode&title=31&year=mostrecent&section=9701&type=usc&link-type=html); Pub. L. 107-296 (https://api.fdsys.gov/link?collection=plaw&congress=107&lawtype=public&lawnum=296&link-type=html), 116 Stat. 2135 (6 U.S.C. 1 (https://api.fdsys.gov/link?collection=uscode&title=6&year=mostrecent&section=1&type=usc&link-type=html) *et seq.*); E.O. 12356, 47 FR 14874, 15557; 3 CFR, 1982 Comp., p. 166; 8 CFR part 2 (/select-citation/2016/10/24/8-CFR-2); Pub. L. 112-54 (https://api.fdsys.gov/link?collection=plaw&congress=112&lawtype=public&lawnum=54&link-type=html).

**2.** Section 103.2 is amended by:

**a.** Revising paragraph (a)(1);

**b.** Revising paragraph (a)(7); and

**c.** Revising paragraph (b)(9).

The revisions read as follows:

§ 103.2    **Submission and adjudication of benefit requests.**

(a) * * *

**AR2022_200604**

(1) *Preparation and submission.* Every form, benefit request, or other document must be submitted to DHS and executed in accordance with the form instructions regardless of a provision of 8 CFR chapter I to the contrary. The form's instructions are hereby incorporated into the regulations requiring its submission. Each form, benefit request, or other document must be filed with the fee(s) required by regulation. Filing fees generally are non-refundable and, except as otherwise provided in this chapter I, must be paid when the benefit request is filed.



(7) *Benefit requests submitted.* (i) USCIS will consider a benefit request received and will record the receipt date as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format.

(ii) A benefit request which is rejected will not retain a filing date. A benefit request will be rejected if it is not:

(A) Signed with valid signature;

(B) Executed;

(C) Filed in compliance with the regulations governing the filing of the specific application, petition, form, or request; and

(D) *Submitted with the correct fee(s).* If a check or other financial instrument used to pay a fee is returned as unpayable, USCIS will re-submit the payment to the remitter institution one time. If the instrument used to pay a fee is returned as unpayable a second time, the filing will be rejected and a charge will be imposed in accordance with 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(a)(2).

(iii) A rejection of a filing with USCIS may not be appealed.

(b) * * *

(9) *Appearance for interview or biometrics.* USCIS may require any applicant, petitioner, sponsor, beneficiary, or individual filing a benefit request, or any group or class of such persons submitting requests, to appear for an interview and/or biometric collection. USCIS may require the payment of the biometric services fee in 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(C) or that the individual obtain a fee waiver. Such appearance and fee may also be required by law, regulation, form instructions, or **Federal Register** notice applicable to the request type. USCIS will notify the affected person of the date, time and location of any required appearance under this paragraph. Any person required to appear under this paragraph may, before the scheduled date and time of the appearance, either:

(i) Appear before the scheduled date and time;

(ii) For good cause, request that the biometric services appointment be rescheduled; or

(iii) Withdraw the benefit request.

**AR2022_200605**

★✳          ★✳          ★✳          ★✳          ★✳

**4.** Section 103.7 is amended by revising paragraphs (a)(2) and (b)(1) to read as follows:

§ 103.7          **Fees.**

★✳          ★✳          ★✳          ★✳          ★✳

(a) * * *

(2) Remittances must be drawn on a bank or other institution located in the United States and be payable in United States currency. Remittances must be made payable in accordance with the guidance specific to the applicable U.S. Government office when submitting to a Department of Homeland Security office located outside of the United States. Remittances to the Board of Immigration Appeals must be made payable to the "United States Department of Justice," in accordance with 8 CFR 1003.8 (/select-citation/2016/10/24/8-CFR-1003.8). If a remittance in payment of a fee or any ▯ other matter is not honored by the bank or financial institution on which it is drawn:

▯ Start Printed
Page 73329

(i) A charge of $30.00 will be imposed;

(ii) The provisions of 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(iii) If the benefit request was approved, the approval may be revoked upon notice. If the approved benefit request requires multiple fees, this provision will apply if any fee submitted is not honored. Other fees that were paid for a benefit request that is revoked under this provision will be retained and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed to the USCIS Administrative Appeals Office, in accordance with 8 CFR 103.3 (/select-citation/2016/10/24/8-CFR-103.3) and the applicable form instructions.

(b) *Amounts of fees*—(1) *Established fees and charges*—(i) *USCIS fees.* A request for immigration benefits submitted to USCIS must include the required fee as established under this section. The fees established in this section are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed below. The term "form" as defined in 8 CFR part 1 (/select-citation/2016/10/24/8-CFR-1), may include a USCIS-approved electronic equivalent of such form as USCIS may provide on its official Web site at *http://www.uscis.gov (http://www.uscis.gov).*

(A) *Certification of true copies:* $2.00 per copy.

(B) *Attestation under seal:* $2.00 each.

(C) *Biometric services fee.* For capturing, storing, and using biometric information (Biometric Fee). A service fee of $85 will be charged to pay for background checks and have their biometric information captured, stored, and used for any individual who is required to submit biometric information for an application, petition, or other request for certain immigration and naturalization benefits (other than asylum or refugee status) or actions. USCIS will not charge a biometric services fee when:

**AR2022_200606**

(*1*) An applicant under 8 CFR 204.3 (/select-citation/2016/10/24/8-CFR-204.3) submits to USCIS a written request for an extension of the approval period of an Application for Advance Processing of an Orphan Petition (Application), if the request is submitted before the approval period expires and the applicant has not yet filed a Petition to Classify Orphan as an Immediate Relative (Petition) in connection with the approved Application. The applicant may submit only one extension request without having to pay an additional biometric services fee. If the extension of the approval expires before the applicant files an associated Petition, then the applicant must file either a new Application or a Petition, and pay a new filing fee and a new biometric services fee.

(*2*) The application or petition fee for the associated request has been waived under paragraph (c) of this section; or

(*3*) The associated benefit request is one of the following:

(*i*) Application for Posthumous Citizenship, Form N-644;

(*ii*) Refugee/Asylee Relative Petition, Form I-730;

(*iii*) Application for T Nonimmigrant Status, Form I-914;

(*iv*) Petition for U Nonimmigrant Status, Form I-918;

(*v*) Application for Naturalization, Form N-400, by an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service under paragraph (b)(1)(i)(WW) of this section;

(*vi*) Application to Register Permanent Residence or Adjust Status, Form I-485, from an asylee under paragraph (b)(1)(i)(U) of this section;

(*vii*) Application To Adjust Status under Section 245(i) of the Act, Supplement A to Form I-485, from an unmarried child less than 17 years of age, or when the applicant is the spouse, or the unmarried child less than 21 years of age of a legalized foreign national and who is qualified for and has applied for voluntary departure under the family unity program from an asylee under paragraph (b)(1)(i)(V) of this section; or

(*viii*) Petition for Amerasian, Widow(er), or Special Immigrant, Form I-360, meeting the requirements of paragraphs (b)(1)(i)(T)(*1*), (*2*), (*3*) or (*4*) of this section.

(D) *USCIS Immigrant Fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $220.

(E) *Request for a search of indices to historical records to be used in genealogical research,* Form G-1041: $65. The search request fee is not refundable.

(F) *Request for a copy of historical records to be used in genealogical research,* Form G-1041A: $65. USCIS will refund the records request fee only when it is unable to locate the file previously identified in response to the index search request.

**AR2022_200607**

(G) *Application to Replace Permanent Resident Card,* Form I-90. For filing an application for a Permanent Resident Card, Form I-551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name: $455.

(H) *Application for Replacement/Initial Nonimmigrant Arrival-Departure Document,* Form I-102. For filing a petition for an application for Arrival/Departure Record Form I-94, or Crewman's Landing Permit Form I-95, to replace one lost, mutilated, or destroyed: $445.

(I) *Petition for a Nonimmigrant Worker,* Form I-129. For filing a petition for a nonimmigrant worker: $460.

(J) *Petition for Nonimmigrant Worker in CNMI,* Form I-129CW. For an employer to petition on behalf of one or more beneficiaries: $460 plus a supplemental CNMI education funding fee of $150 per beneficiary per year. The CNMI education funding fee cannot be waived.

(K) *Petition for Alien Fiancé(e),* Form I-129F. For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $535; there is no fee for a K-3 spouse as designated in 8 CFR 214.1 (/select-citation/2016/10/24/8-CFR-214.1)(a)(2) who is the beneficiary of an immigrant petition filed by a United States citizen on a Petition for Alien Relative, Form I-130.

(L) *Petition for Alien Relative,* Form I-130. For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act: $535.

(M) *Application for Travel Document,* Form I-131. For filing an application for travel document:

(*1*) $135 for a Refugee Travel Document for an individual age 16 or older.

(*2*) $105 for a Refugee Travel Document for a child under the age of 16.

(*3*) $575 for advance parole and any other travel document.

(*4*) No fee if filed in conjunction with a pending or concurrently filed Form I-485 with fee that was filed on or after July 30, 2007.

(N) *Immigrant Petition for Alien Worker,* Form I-140. For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act: $700.

(O) *Application for Advance Permission to Return to Unrelinquished Domicile,* Form I-191. For filing an application for discretionary relief under section 212(c) of the Act: $930.

(P) *Application for Advance Permission to Enter as a Nonimmigrant,* Form I-192. For filing an application for discretionary relief under section 212(d)(3) of the Act, except in an emergency case or where the approval of the application is in the interest of ▯ the United States Government: $930. If filed with and processed by CBP: $585.

▯ Start Printed
Page 73330

(Q) *Application for Waiver for Passport and/or Visa,* Form I-193. For filing an application for waiver of passport and/or visa: $585.

**AR2022_200608**

(R) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal,* Form I-212. For filing an application for permission to reapply for an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense instead of deportation: $930.

(S) *Notice of Appeal or Motion,* Form I-290B. For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction: $675. The fee will be the same for appeal of a denial of a benefit request with one or multiple beneficiaries. There is no fee for an appeal or motion associated with a denial of a petition for a special immigrant visa filed by or on behalf of an individual seeking special immigrant visa or status as an Iraqi or Afghan national who was employed by or on behalf of the U.S. Government in Iraq or Afghanistan.

(T) *Petition for Amerasian, Widow(er), or Special Immigrant,* Form I-360. For filing a petition for an Amerasian, Widow(er), or Special Immigrant: $435. The following requests are exempt from this fee:

(*1*) A petition seeking classification as an Amerasian;

(*2*) A self-petition for immigrant status as a battered or abused spouse, parent, or child of a U.S. citizen or lawful permanent resident; or

(*3*) A petition for special immigrant juvenile status; or

(*4*) A petition seeking special immigrant visa or status an Iraqi or Afghan national who was employed by or on behalf of the U.S. Government in Iraq or Afghanistan.

(U) Application to Register Permanent Residence or Adjust Status, Form I-485. For filing an application for permanent resident status or creation of a record of lawful permanent residence:

(1) $1,140 for an applicant 14 years of age or older; or

(2) $750 for an applicant under the age of 14 years who submits the application concurrently with the Form I-485 of a parent.

(3) There is no fee if an applicant is filing as a refugee under section 209(a) of the Act.

(V) *Application to Adjust Status under Section 245(i) of the Act,* Supplement A to Form I-485. Supplement to Form I-485 for persons seeking to adjust status under the provisions of section 245(i) of the Act: $1,000. There is no fee when the applicant is an unmarried child less than 17 years of age, when the applicant is the spouse, or the unmarried child less than 21 years of age of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program.

(W) *Immigrant Petition by Alien Entrepreneur,* Form I-526. For filing a petition for an alien entrepreneur: $3,675.

(X) *Application To Extend/Change Nonimmigrant Status,* Form I-539. For filing an application to extend or change nonimmigrant status: $370.

(Y) *Petition to Classify Orphan as an Immediate Relative,* Form I-600. For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act. Only one fee is required when more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters: $775.

(Z) *Application for Advance Processing of Orphan Petition,* Form I-600A. For filing an application for advance processing of orphan petition. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.): $775. No fee is charged if Form I-600 has not yet been submitted in connection with an approved Form I-600A subject to the following conditions:

(*1*) The applicant requests an extension of the approval in writing and the request is received by USCIS before the expiration date of approval; and

(*2*) The applicant's home study is updated and USCIS determines that proper care will be provided to an adopted orphan.

(*3*) A no fee extension is limited to one occasion. If the Form I-600A approval extension expires before submission of an associated Form I-600, then a complete application and fee must be submitted for any subsequent application.

(AA) *Application for Waiver of Ground of Inadmissibility,* Form I-601. For filing an application for waiver of grounds of inadmissibility: $930.

(BB) *Application for Provisional Unlawful Presence Waiver,* Form I-601A. For filing an application for provisional unlawful presence waiver: $630.

(CC) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended),* Form I-612. For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act: $930.

(DD) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act,* Form I-687. For filing an application for status as a temporary resident under section 245A(a) of the Act: $1,130.

(EE) *Application for Waiver of Grounds of Inadmissibility under Sections 245A or 210 of the Immigration and Nationality Act,* Form I-690. For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $715.

(FF) *Notice of Appeal of Decision under Sections 245A or 210 of the Immigration and Nationality Act* (or a petition under section 210A of the Act), Form I-694. For appealing the denial of an application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $890.

AR2022_200610

(GG) *Application to Adjust Status from Temporary to Permanent Resident* (Under Section 245A of Pub. L. 99-603), Form I-698. For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99-603): $1,670. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

(HH) *Petition to Remove Conditions on Residence,* Form I-751. For filing a petition to remove the conditions on residence based on marriage: $595.

(II) *Application for Employment Authorization,* Form I-765. $410. No fee if filed in conjunction with a pending or concurrently filed Form I-485 with fee that was filed on or after July 30, 2007.

(JJ) *Petition to Classify Convention Adoptee as an Immediate Relative,* Form I-800.

(*1*) There is no fee for the first Form I-800 filed for a child on the basis of an approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I-800A, during the approval period.

(*2*) If more than one Form I-800 is filed during the approval period for different children, the fee is $775 for the second and each subsequent petition submitted.

(*3*) If the children are already siblings before the proposed adoption, however, only one filing fee of $775 is required, ⬜ regardless of the sequence of submission of the immigration benefit.

⬜ Start Printed Page 73331

(KK) *Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I-800A. For filing an application for determination of suitability to adopt a child from a convention country: $775.

(LL) *Request for Action on Approved Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I-800A, Supplement 3. This filing fee is not charged if Form I-800 has not been filed based on the approval of the Form I- 800A, and Form I-800A Supplement 3 is filed in order to obtain a first extension of the approval of the Form I-800A: $385.

(MM) *Application for Family Unity Benefits,* Form I-817. For filing an application for voluntary departure under the Family Unity Program: $600.

(NN) *Application for Temporary Protected Status,* Form I-821. For first time applicants: $50. There is no fee for re-registration.

(OO) *Application for Action on an Approved Application or Petition,* Form I-824. For filing for action on an approved application or petition: $465.

(PP) *Petition by Entrepreneur to Remove Conditions,* Form I-829. For filing a petition by entrepreneur to remove conditions: $3,750.

(QQ) *Application for Suspension of Deportation or Special Rule Cancellation of Removal* (Pursuant to Section 203 of Pub. L. 105-100 (https://api.fdsys.gov/link?collection=plaw&congress=105&lawtype=public&lawnum=100&link-type=html)), Form I-881:

AR2022_200611

(*1*) $285 for adjudication by DHS, except that the maximum amount payable by family members (related as husband, wife, unmarried child under 21, unmarried son, or unmarried daughter) who submit applications at the same time will be $570.

(*2*) $165 for adjudication by the Immigration Court (a single fee of $165 will be charged whenever applications are filed by two or more foreign nationals in the same proceedings).

(*3*) The $165 fee is not required if the Form I-881 is referred to the Immigration Court by DHS.

(RR) *Application for Authorization to Issue Certification for Health Care Workers,* Form I-905: $230.

(SS) *Request for Premium Processing Service,* Form I-907. $1,225. The Request for Premium Processing Service fee:

(*1*) Must be paid in addition to, and in a separate remittance from, other filing fees.

(*2*) May be adjusted annually by notice in the **Federal Register** based on inflation according to the Consumer Price Index (CPI).

(*3*) May not be waived.

(TT) *Application for Civil Surgeon Designation,* Form I-910. For filing an application for civil surgeon designation: $785. There is no fee for an application from a medical officer in the U.S. Armed Forces or civilian physician employed by the U.S. Government who examines members and veterans of the Armed Forces and their dependents at a military, Department of Veterans Affairs, or U.S. Government facility in the United States.

(UU) *Application for T Nonimmigrant Status,* Form I-914. No fee.

(VV) *Application for U Nonimmigrant Status,* Form I-918. No fee.

(WW) *Application for Regional Center Designation under the Immigrant Investor Program,* Form I-924. For filing an application for regional center designation under the Immigrant Investor Program: $17,795.

(XX) *Annual Certification of Regional Center,* Form I-924A. To provide updated information and certify that an Immigrant Investor Regional Center has maintained their eligibility: $3,035.

(YY) *Petition for Qualifying Family Member of a U-1 Nonimmigrant,* Form I-929. For U-1 principal applicant to submit for each qualifying family member who plans to seek an immigrant visa or adjustment of U status: $230.

(ZZ) *Application to File Declaration of Intention,* Form N-300. For filing an application for declaration of intention to become a U.S. citizen: $270.

(AAA) *Request for a Hearing on a Decision in Naturalization Proceedings (Under section 336 of the Act),* Form N-336. For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act: $700. There is no fee if filed on or after October 1, 2004, by an

AR2022_200612

applicant who has filed an Application for Naturalization under sections 328 or 329 of the Act with respect to military service and whose application has been denied.

(BBB) *Application for Naturalization,* Form N-400. For filing an application for naturalization: $640. Except:

(*1*) The fee for an applicant whose documented income is greater than 150 percent and not more than 200 percent of the Federal poverty level is $320.

(*2*) No fee is charged an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service.

(CCC) *Application to Preserve Residence for Naturalization Purposes,* Form N-470. For filing an application for benefits under section 316(b) or 317 of the Act: $355.

(DDD) *Application for Replacement Naturalization/Citizenship Document,* Form N-565. For filing an application for a certificate of naturalization or declaration of intention in place of a certificate or declaration alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act: $555. There is no fee when this application is submitted under 8 CFR 338.5 (/select-citation/2016/10/24/8-CFR-338.5)(a) or 343a.1 to request correction of a certificate that contains an error.

(EEE) *Application for Certificate of Citizenship,* Form N-600. For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act: $1,170. There is no fee for any application filed by a member or veteran of any branch of the United States Armed Forces.

(FFF) *Application for Citizenship and Issuance of Certificate under section 322 of the Act,* Form N-600K. For filing an application for citizenship and issuance of certificate under section 322 of the Act: $1,170.

(GGG) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H-1B petitions as described in 8 CFR 214.2 (/select-citation/2016/10/24/8-CFR-214.2)(h)(19) and USCIS form instructions: $1,500 or $750.

(HHH) *Fraud detection and prevention fee.* For filing certain H-1B and L petitions, and $150 for H-2B petitions as described in 8 CFR 214.2 (/select-citation/2016/10/24/8-CFR-214.2)(h)(19): $500.

(III) *9-11 Response and Biometric Entry-Exit Fee for H-1B Visa.* For certain petitioners who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees are in H-1B, L-1A or L-1B nonimmigrant status: $4,000. Collection of this fee is scheduled to end on September 30, 2025.

(JJJ) *9-11 Response and Biometric Entry-Exit Fee for L-1 Visa.* For certain petitioners who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees are in H-1B, L-1A or L-1B nonimmigrant status: $4,500. Collection of this fee is scheduled to end

**AR2022_200613**

on September 30, 2025.

★ ✱          ★ ✱          ★ ✱          ★ ✱          ★ ✱

**5.** Section 103.16 is amended by revising the first sentence of paragraph (a) to read as follows:

**§ 103.16**          **Collection, use and storage of biometric information.**

(a) *Use of biometric information.* An individual may be required to submit biometric information by law, regulation, **Federal Register** notice or ⬜ the form instructions applicable to the request type or if required in accordance with 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(b) (9). * * *

⬜ Start Printed Page 73332

★ ✱          ★ ✱          ★ ✱          ★ ✱          ★ ✱

**6.** Section 103.17 is amended by revising paragraph (b) to read as follows:

**§ 103.17**          **Biometric services fee.**

★ ✱          ★ ✱          ★ ✱          ★ ✱          ★ ✱

(b) *Non-payment.* If a benefit request is received by DHS without the correct biometric services fee as provided in the form instructions, DHS will reject the benefit request.

## PART 204—IMMIGRANT PETITIONS

**7.** The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1101&type=usc&link-type=html), 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1641; 8 CFR part 2 (/select-citation/2016/10/24/8-CFR-2).

**8.** Section 204.6 is amended by revising paragraph (m)(6) to read as follows:

**§ 204.6**          **Petitions for employment creation aliens.**

★ ✱          ★ ✱          ★ ✱          ★ ✱          ★ ✱

(m) * * *

(6) *Continued participation requirements for regional centers.* (i) Regional centers approved for participation in the program must:

(A) Continue to meet the requirements of section 610(a) of the Appropriations Act.

(B) Provide USCIS with updated information annually, and/or as otherwise requested by USCIS, to demonstrate that the regional center is continuing to promote economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment in the approved geographic area, using a form designated for this purpose; and

(C) Pay the fee provided by 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(XX).

(ii) USCIS will issue a notice of intent to terminate the designation of a regional center in the program if:

(A) A regional center fails to submit the information required in paragraph (m)(6)(i)(B) of this section, or pay the associated fee; or

(B) USCIS determines that the regional center no longer serves the purpose of promoting economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

(iii) A notice of intent to terminate the designation of a regional center will be sent to the regional center and set forth the reasons for termination.

(iv) The regional center will be provided 30 days from receipt of the notice of intent to terminate to rebut the ground or grounds stated in the notice of intent to terminate.

(v) USCIS will notify the regional center of the final decision. If USCIS determines that the regional center's participation in the program should be terminated, USCIS will state the reasons for termination. The regional center may appeal the final termination decision in accordance with 8 CFR 103.3 (/select-citation/2016/10/24/8-CFR-103.3).

(vi) A regional center may elect to withdraw from the program and request a termination of the regional center designation. The regional center must notify USCIS of such election in the form of a letter or as otherwise requested by USCIS. USCIS will notify the regional center of its decision regarding the withdrawal request in writing.

★✳　　　　★✳　　　　★✳　　　　★✳　　　　★✳

## PART 205—REVOCATION OF APPROVAL OF PETITIONS

**9.** The authority citation for part 205 continues to read as follows:

**Authority:** 8 U.S.C. 1101 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1101&type=usc&link-type=html), 1103, 1151, 1153, 1154, 1155, 1182, and 1186a.

**10.** Section 205.1 is amended by removing and reserving paragraph (a)(2).

§ 205.1　　　　**Automatic revocation.**

(a) * * *

(2) [Reserved]

★✳　　　　★✳　　　　★✳　　　　★✳　　　　★✳

Jeh Charles Johnson,

Secretary.

## Footnotes

*1. Although the President has announced an increase in the refugee admissions ceiling to 110,000, the final fee structure includes costs for only 100,000, which was the anticipated ceiling at the time that the fee review was conducted.*
Back to Citation

*2. The SAVE program was established in 1987 by the Immigration Reform and Control Act, Pub. L. 99-603, sec. 121(c) (Nov. 6, 1986), which required the Commissioner of the Immigration and Naturalization Service to "implement a system for the verification of immigration status . . . so that the system is available to all States by not later than October 1, 1987." SAVE uses an internet-based service to assist Federal, state, and local benefit-issuing and licensing agencies, and other governmental entities, in determining the immigration status of benefit or license applicants, so that only those applicants entitled to benefits or licenses receive them.*
Back to Citation

*3. The USCIS Office of Citizenship was established by section 451(f) of the Homeland Security Act of 2002. Pub. L. 107-296 (https://api.fdsys.gov/link?collection=plaw&congress=107&lawtype=public&lawnum=296&link-type=html), sec. 451(f) (2002). The statute tasks the office with "promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens."*
Back to Citation

*4. USCIS received $29.95 million of the requested $248 million to fund a portion of the refugee and asylum processing administered under the RAIO Directorate and military naturalization processing in Fiscal Year 2011. USCIS has not received any substantial appropriations for these programs since FY 2011. USCIS received $2.5 million for the immigrant integration grants program in FY 2014 (Pub. L. 113-76 (https://api.fdsys.gov/link?collection=plaw&congress=113&lawtype=public&lawnum=76&link-type=html)) and FY 2013 (Pub. L. 113-6 (https://api.fdsys.gov/link?collection=plaw&congress=113&lawtype=public&lawnum=6&link-type=html)). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015 or FY 2016. Similarly, USCIS received no FY 2016 discretionary appropriations for the SAVE program or for the Office of Citizenship. See DHS Appropriations Act 2016, Pub. L. 114-113 (https://api.fdsys.gov/link?collection=plaw&congress=114&lawtype=public&lawnum=113&link-type=html), div. F. (Dec. 18, 2015).*
Back to Citation

*5. Form, when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in a paper format or an electronic format as prescribed by USCIS on its official Internet Web site. The term "Form" followed by an immigration form number includes an approved electronic equivalent of such form as made available by USCIS on its official Internet Web site. See 8 CFR 1.2 (/select-citation/2016/10/24/8-CFR-1.2) and 299.1. Therefore, the word "form" is used in this final rule in both the specific and general sense.*

*6. As described in the NPRM, the United States' obligations under the 1967 Protocol relating to the Status of Refugees (incorporating by reference Article 28 of the 1951 U.N. Convention relating to the Status of Refugees) guide the Application for Travel Document fees for a Refugee Travel Document. The USCIS ABC model does not calculate these fees. See 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(M)(2) and (3).*

*7. On August 31, OMB approved Form I-131A, Application for Travel Document (Carrier Documentation). The new form will be used by Lawful Permanent Residents (LPRs) who are temporarily overseas and have lost their Permanent Resident Card or Reentry Permit, to apply for a Travel Document. See https://www.uscis.gov/i-131a (https://www.uscis.gov/i-131a).*

*8. The fee for Form I-192 will remain $585 when filed with and processed by CBP.*

*9. DHS removed the word "Pilot" from the form title. See new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(WW).*

**AR2022_200616**

10.  The current fee for applications filed on behalf of a biological child is $600. The fee for an adopted child is $550. There is no fee for any application filed by a member or veteran of any branch of the U.S. Armed Forces.

11.  DHS changed the fee name to "USCIS Immigrant Fee." See new 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(D).
Back to Citation

12.  In this rule, USCIS applies this increase to a number of benefit types, including the Application for Naturalization, Form N-400; Application for Employment Authorization, Form I-765; and adoption-related applications, Forms I-600/600A/800/800A. This smaller increase, which in this rulemaking amounts to 8 percent, is the percentage difference between the current fees and the model output before reallocation, weighted by fee-paying volume. See 81 FR 26915 (/citation/81-FR-26915).
Back to Citation

13.  See Appendix Table 4, Cost Reallocation column in the supporting documentation. These figures represent all additional costs, including the cost of forms that are held to the 8 percent weighted average increase based on policy decisions, that USCIS applies to fees to ensure full cost recovery.
Back to Citation

14.  The semiannual average consumer price index for all urban consumers (CPI-U) was 217.5 in July 2010 and 238.8 in July 2016. The change in the Index over 9 years was 21.3 or 9.5 percent. See U.S. Department of Labor, Bureau of Labor Statistics, All Urban Consumers (CPI-U) Semiannual Average tables, available at http://www.bls.gov/cpi/cpi_dr.htm (http://www.bls.gov/cpi/cpi_dr.htm). DHS has not recently adjusted IEFA fees by CPI-U inflation, but provides this figure as a point of comparison.
Back to Citation

15.  See Appendix Table 5: Activity Unit Costs by Immigration Benefit Request After Cost Reallocation of the supporting documentation. Pages 19-20 define the activities in the appendix table.
Back to Citation

16.  USCIS uses the ABC model to determine the full cost of processing immigration benefit requests and biometric services. This is the same methodology used in the last four fee reviews and the basis for the current fee structure. The ABC model is a business management tool that assigns resource costs to operational activities and then to products and/or services. These assignments provide an accurate cost assessment of each major step towards producing the individual outputs of an organization. For additional information on the ABC model, see pages 17-22 of the supporting documentation.
Back to Citation

17.  DHS has not estimated the overall effect that this final rule will have on filing volume from low-income applicants. USCIS may consider exploring options to collect and analyze this data in the future.
Back to Citation

18.  DHS addresses the comments on specific immigration benefit requests in approximate order of the number of commenters who submitted comments on that subject.
Back to Citation

19.  See U.S. Citizenship and Immigration Services, Before Your Child Immigrates to the United States (11/18/2014), available at https://www.uscis.gov/adoption/your-child-immigrates-united-states (https://www.uscis.gov/adoption/your-child-immigrates-united-states).
Back to Citation

20.  At least one commenter indicated that the RAIO surcharge seemed to be a large contributor to the increase in the proposed fee for the Form N-600. The commenter suggested that the RAIO surcharge should be redistributed to all other forms to reduce the financial burden of the proposed fee increase on

**AR2022_200617**

adoptive parents. As outlined in the NPRM, Forms N-600 and 600K are not the only forms that recover the cost of RAIO, the SAVE program, and the Office of Citizenship. USCIS currently distributes these costs to all form types not set below projected cost. See 81 FR 26915 (/citation/81-FR-26915).
Back to Citation

21.  See Appendix Table 4 of the supporting documentation.
Back to Citation

22.  When DHS holds a fee below cost, the costs that are not covered, including fee waivers, must be paid by other fee paying applicants. Specifically, other immigration benefits whose fees are not held down recover the additional cost.
Back to Citation

23.  Based on FY 2015 actual revenue data, less than 10 percent of fee-paying applicants for Forms N-600 or N-600K paid the lower fee for adopted children.
Back to Citation

24.  DHS will continue its policy of reducing fee burdens on adoptive families in other ways. For instance, DHS will continue to allow fee waivers for the Form N-600. DHS will also continue to cover costs attributable to the adjudication of adoption petitions and applications (Forms I-600/600A/800/800A) through the fees collected from other requests. This policy is described in the following section on "Adoption." Note that in the NPRM, the row for Forms I-600/600A/800/800A was labeled as "orphan petitions." The term "orphan" only applies to Forms I-600 and Form I-600A. The row includes data for all of the adoption forms. Therefore, DHS changed the label for Forms I-600/600A/800/800A from "orphan petitions" to "adoption petitions and applications" in the final rule and in several tables within the supporting documentation. The changes only affect the labels for the rows and do not represent a change in the data or calculations.
Back to Citation

25.  Model output is reflected and further explained in Appendix Table 4: Proposed Fees by Immigration Benefit Request in the supporting documentation.
Back to Citation

26.  For additional information, see the section entitled, Improve Service and Reduce Inefficiencies.
Back to Citation

27.  The Regulatory Flexibility Act discussion in the Statutory and Regulatory Requirements section addresses comments regarding the effect of the rule on small entities. As for processing delays, DHS has further addressed the operational and efficiency comments in the section of this preamble entitled, "Improve Service and Reduce Inefficiencies."
Back to Citation

28.  The U.S. Department of State (DOS) manages the allocation of visa numbers and Congress establishes the annual visa numerical limits.
Back to Citation

29.  As explained in the 2007 proposed rule, the decision to provide free interim benefits is intended to restructure certain fee arrangements that some perceived as providing disincentives for USCIS to improve efficiency in processing. See 72 FR 4894 (/citation/72-FR-4894). By bundling the Form I-485 and interim benefit costs, USCIS ensured that an applicant for adjustment of status will pay a single fee and will not pay separate fees for interim benefits, no matter how long the case remains pending. As a result, if USCIS is unable to process the base application within the established processing goals, an applicant who needs to travel or extend his or her employment authorization is not financially disadvantaged by the delay.
Back to Citation

**AR2022_200618**

*30. USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an individual's authorization to work in the United States. 8 CFR 274 (/select-citation/2016/10/24/8-CFR-274)a.12(b).*

Back to Citation

*31. See https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2011/April/issuance-advance-parole.pdf (https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2011/April/issuance-advance-parole.pdf).*

Back to Citation

*32. See Instructions for I-765, Application for Employment Authorization, available at https://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf (https://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf).*

Back to Citation

*33. Both fee waivers may be requested on one Request for Fee Waiver. See Instructions for Request for Fee Waiver at https://www.uscis.gov/sites/default/files/files/form/i-912instr.pdf (https://www.uscis.gov/sites/default/files/files/form/i-912instr.pdf).*

Back to Citation

*34. An asylee in this situation, like all individuals seeking to file a Form I-765, may still apply for a fee waiver. See 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(viii).*

Back to Citation

*35. Under the proposed rule and in this final rule, the standard fee for a Form I-485 would increase from $985 to $1,140.*

Back to Citation

*36. See 75 FR 26923 (/citation/75-FR-26923) for overall workload in table 4 and 75 FR 26924 (/citation/75-FR-26924) for fee-paying workload in table 5.*

Back to Citation

*37. USCIS completion rates are the average hours per adjudication of an immigration benefit request. Adjudication hours are divided by the number of completions for the same time period to determine an average completion rate. For additional information on completion rates, see Appendix IX—Completion Rates on page 57 of the supporting documentation.*

Back to Citation

*38. See Appendix Table 7: Completion Rates (Projected Adjudication Hours/Completions) on page 58 of the supporting documentation.*

Back to Citation

*39. Some commenters stated DHS should use a validity period of 2 years instead of 1 year when extensions of Form I-131 are approved for this population. As noted earlier in this preamble, however, USCIS may grant an applicant who has a pending Form I-485 and interim benefits, such as advance parole, an employment authorization combination document with a 2-year validity period if the immigrant visa is not currently available. Adjudicator's Field Manual ch. 55.3, par. (a)(2). These longer approval periods have alleviated some of the burden on applicants with long-pending I-485 applications.*

Back to Citation

*40. See International Operations Cost Allocation on page 26 of the supporting documentation.*

Back to Citation

*41. The Refugee Travel Document fees are the same as the sum of the U.S. passport book application fee plus the additional execution fee that the Department of State charges for first-time applicants.*

Back to Citation

AR2022_200619

*42. Projected cost refers to the model output column of Appendix Table 4: Proposed Fees by Immigration Benefit Request in the supporting documentation.*
Back to Citation

*43. The amount here is the difference between the Model Output and the final fee. Amounts shown in Appendix Table 4: Proposed Fees by Immigration Benefit Request in the supporting documentation are rounded to the nearest dollar and all IEFA fees are rounded to the nearest $5 increment. The sum of the Model Output and the Cost Reallocation columns may not equal the proposed fee because of rounding.*
Back to Citation

*44. See Appendix Table 4: Proposed Fees by Immigration Benefit Request in the supporting documentation.*
Back to Citation

*45. Amounts shown in Appendix Table 4: Proposed Fees by Immigration Benefit Request in the supporting documentation are rounded to the nearest dollar and all IEFA fees are rounded to the nearest $5 increment. The sum of the Model Output and the Cost Reallocation columns may not equal the proposed fee because of rounding.*
Back to Citation

*46. For additional information, see https://www.uscis.gov/i-90 (https://www.uscis.gov/i-90) and https://www.uscis.gov/green-card/after-green-card-granted/renew-green-card (https://www.uscis.gov/green-card/after-green-card-granted/renew-green-card).*
Back to Citation

*47. USCIS also provides educational products and resources to welcome immigrants, promote English language learning, educate on rights and responsibilities of citizenship, and prepare immigrants for naturalization and civic participation. In addition, USCIS provides grants, materials and technical assistance to organizations that prepare immigrants for citizenship. The USCIS Citizenship Resource Center helps users better understand the citizenship process and gain the necessary skills required to be successful during the naturalization interview and test. See https://www.uscis.gov/us-citizenship/ naturalization-test/applicant-performance-naturalization-test/uscis-citizenship-education-resources-and-initiatives (https://www.uscis.gov/us-citizenship/naturalization-test/applicant-performance-naturalization-test/uscis-citizenship-education-resources-and-initiatives).*
Back to Citation

*48. See https://www.uscis.gov/green-card/after-green-card-granted/renew-green-card (https://www.uscis.gov/green-card/after-green-card-granted/renew-green-card).*
Back to Citation

*49. At least one commenter questioned why USCIS proposed to collect the biometric services fee for the genealogy workload. While DHS is revising 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(b)(9) to clarify that any individual filing a benefit request, or any beneficiary of such a request, may be required to appear for biometric collection and pay the biometric services fee, DHS did not propose to and will not collect the biometric services fee for genealogy searches or document requests. See 81 FR 26917 (/citation/81-FR-26917).*
Back to Citation

*50. See 81 FR 26919 (/citation/81-FR-26919); Final Rule, Establishment of a Genealogy Program, 73 FR 28026 (/citation/73-FR-28026) (May 15, 2008).*
Back to Citation

*51. Prior to the establishment of the Genealogy Program, genealogy researchers used the Freedom of Information Act process to conduct their research.*
Back to Citation

**AR2022_200620**

52.  *The proposed increase was 7.4 percent due to rounding.*
Back to Citation

53.  *See https://www.uscis.gov/i-360 (https://www.uscis.gov/i-360).*
Back to Citation

54.  *The proposed increase was 7.1 percent due to rounding.*
Back to Citation

55.  *If the Form I-290B is being filed to appeal or reopen the denial of an immigration benefit request that is exempt or where a fee has been waived, the Form I-290B fee may also be waived by USCIS if the applicant or petitioner demonstrates that he or she is unable to pay the fee. 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(c)(3)(vi) and 103.7(c)(1)(iii). Further, there is no fee for Form I-290B when an Iraqi or Afghan national who worked for, or on behalf of, the U.S. Government in Iraq or Afghanistan appeals a denial of a petition for a special immigrant visa. 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(b)(1)(i)(S).*
Back to Citation

56.  *The commenter acknowledged that USCIS adjudicates Form I-192 for T and U nonimmigrants.*
Back to Citation

57.  *The commenter did not mention Form I-193 applications, but such applications are similarly affected by this rulemaking.*
Back to Citation

58.  *USCIS compares fee-paying receipts to the total number of receipts to determine a fee-paying percentage for each immigration benefit request. See page 16 of the supporting documentation in the rulemaking docket for an explanation of fee-paying volume and methodology.*
Back to Citation

59.  *The proposed increase was a 7.5 percent due to rounding.*
Back to Citation

60.  *The semiannual average consumer price index for all urban consumers (CPI-U) was 205.7 in July 2007 and 238.8 in July 2016. The change in the Index over 9 years was 33.1 or 16.1 percent. See U.S. Department of Labor, Bureau of Labor Statistics, All Urban Consumers (CPI-U) Semiannual Average tables, available at http://www.bls.gov/cpi/cpi_dr.htm (http://www.bls.gov/cpi/cpi_dr.htm).*
Back to Citation

61.  *For additional information on staffing, see second bullet on pg. 13, Alignment of USCIS Staffing Allocation Model with the Fee Review on pg. 26, and Appendix XIII Table 12: IEFA Positions by Office in the supporting documentation.*
Back to Citation

62.  *Premium processing fees are increased using the CPI through statutory authority. See INA sec. 286(u), 8 U.S.C. 1356 (https://api.fdsys.gov/link? collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(u).*
Back to Citation

63.  *The EB-5 program was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. The EB-5 "regional center program" was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Pub. L. 102-395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). The EB-5 immigrant classification allows qualifying individuals, and any accompanying or following to join spouses and children, to obtain lawful permanent resident (LPR) status if the qualifying individuals have invested, or are actively in the process of investing, $1 million in a new commercial enterprise. See INA sec. 203(b)(5) (A) and (C), 8 U.S.C. 1153 (https://api.fdsys.gov/link?*

**AR2022_200621**

collection=uscode&title=8&year=mostrecent&section=1153&type=usc&link-type=html)(b)(5)(A) and (C). To qualify, the individual's investment must benefit the U.S. economy and create full-time jobs for 10 or more qualifying employees. INA sec. 203(b)(5)(A)(ii), 8 U.S.C. 1153 (https://api.fdsys.gov/link? collection=uscode&title=8&year=mostrecent&section=1153&type=usc&link-type=html)(B)(5)(A)(ii). If the investment is in a Targeted Employment Area (TEA) (i.e., a rural area or an area that has unemployment of at least 150% of the national average), the required capital investment amount is $500,000 rather than $1 million. INA sec. 203(b)(5)(C)(ii), 8 U.S.C. 1153 (https://api.fdsys.gov/link? collection=uscode&title=8&year=mostrecent&section=1153&type=usc&link-type=html)(b)(5)(C)(ii); 8 CFR 204.6 (/select-citation/2016/10/24/8-CFR-204.6)(f)(2). Entrepreneurs may meet the job creation requirements through the creation of indirect jobs by making qualifying investments within a new commercial enterprise associated with a regional center approved by USCIS for participation in the regional center program. INA sec. 203(b)(5), 8 U.S.C. 1153 (https://api.fdsys.gov/link? collection=uscode&title=8&year=mostrecent&section=1153&type=usc&link-type=html)(b)(5); 8 CFR 204.6 (/select-citation/2016/10/24/8-CFR-204.6)(e) and (m)(7). For more information on the EB-5 program, see https://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-eb-5-visa (https://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-eb-5-visa).
Back to Citation

64.  The proposed fee for the Form I-829 was above the model output, as described in the proposed rule.
Back to Citation

65.  See Policy Memorandum, EB-5 Adjudications Policy (May 30, 2013) at https://www.uscis.gov/sites/ default/files/USCIS/Laws/Memoranda/2013/May/EB-5%20Adjudications%20PM%20(Approved%20as%20final%205-30-13).pdf (https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/May/EB-5%20Adjudications%20PM%20(Approved%20as%20final%205-30-13).pdf).
Back to Citation

66.  If DHS had decided to adjust the fee consistent with the adjustment that DHS made to most other fees, the proposed fee would have decreased to $3,280. The proposed fee would have been higher than the model output because of Cost Reallocation. Other fees would also have been adjusted accordingly.
Back to Citation

67.  Office of Management and Budget, Circular A-25, User Charges, available at http://www.whitehouse.gov/omb/circulars_a025/ (http://www.whitehouse.gov/omb/circulars_a025/).
Back to Citation

68.  Handbook, Version 14 (06/15), available at http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf (http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf).
Back to Citation

69.  The USCIS fee methodology is not intended to yield a profit for the agency nor the Federal Government. The sole purpose of USCIS IEFA fees is to achieve full cost recovery to allow the agency to provide an adequate level of service. USCIS filing fees are not designed to function as tariffs, to generate general revenue to support broader policy decisions, or to deter certain behavior. As previously stated in this final rule, filing fees are generally not intended to influence public policy in favor of or in opposition to immigration, support broader infrastructure, or cover costs beyond USCIS.
Back to Citation

70.  H.R. Rep. No. 112-492 (May 23, 2012).
Back to Citation

71.  As noted in the proposed rule, for the purposes of this rulemaking, DHS is including all requests funded from the IEFA in the term "benefit request" or "immigration benefit request" although the form or request may not be to request an immigration benefit. For example, DACA is solely an exercise of prosecutorial

AR2022_200622

*discretion by DHS and not an immigration benefit, and would fit under the definition of "benefit request" solely for purposes of this rule. For historic receipts and completion information, see USCIS immigration and citizenship data available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data (https://www.uscis.gov/tools/reports-studies/immigration-forms-data).*
Back to Citation

*72. Currently, the fee is the same for each Form I-129 filed. This fee has historically been calculated based on the average level of complexity for the adjudication of the form.*
Back to Citation

*73. The ACH Network is a nationwide electronic fund transfer system that provides for the inter-bank clearing of electronic credit and debit transactions and for the exchange of payment-related information among participating financial institutions.*
Back to Citation

*74. Treasury notifies USCIS of the reasons the payment was dishonored. Sometimes the reason is a lack of funds and sometimes the reason is a system outage. DHS will apply the dishonored payment provisions in this rule to all dishonored payments, regardless of the reason provided by Treasury. DHS believes that the safeguards described in the remainder of this section appropriately balance the interests of applicants and beneficiaries, on the one hand, and USCIS's interest in sound and efficient administration, on the other.*
Back to Citation

*75. USCIS implemented this internal policy in an effort to reduce the number of bad checks under the assumption that the payor may deposit funds during the intervening period and to preclude the need for USCIS to hold the bad check case while the payor has 14 days to correct it.*
Back to Citation

*76. DHS notes that the proposed rule's preamble erroneously stated that "DHS is proposing that USCIS will not begin processing the benefit request until the payment has cleared." See 81 FR 26920 (/citation/81-FR-26920). No provisions were proposed that would require USCIS to hold cases. As in the past, USCIS strives to intake and begin processing every benefit request as soon as practicable, without regard for whether or not the payment has cleared.*
Back to Citation

*77. This policy will not apply to credit card payments.*
Back to Citation

*78. In such a case, USCIS would either (1) revoke the approval automatically, (2) send a notice of intent to revoke the approval, or (3) reopen the approved case and deny it. See, e.g., 8 CFR 103.5 (/select-citation/2016/10/24/8-CFR-103.5)(a)(5) (motion by Service officer); 205.1(a)(2) (automatic revocation of immigrant petitions); 205.2 (revocation on notice); 214.2(h)(11)(iii)(A)(5), (l)(9)(iii)(A)(5), (o)(8)(iii)(A)(5), (p)(10)(iii)(A)(5), (q)(9)(iii)(D) & (r)(18)(iii)(A)(5); 274a.14(b) (revocation for erroneous approval); see also, e.g., 6 U.S.C. 112 (https://api.fdsys.gov/link?collection=uscode&title=6&year=mostrecent&section=112&type=usc&link-type=html); INA secs. 103, 204, 205, 214, 216, 216A, 244, 274A, and 286; 8 U.S.C. 1103 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1103&type=usc&link-type=html), 1154, 1155, 1184, 1186a, 1186b, 1254a, 1324a, and 1356.*
Back to Citation

*79. DHS considers an NOIR process to provide superior notice to requestors, as compared to the automatic revocation provision in previous 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii).*
Back to Citation

*80. Currently, in the case of a request for premium processing, if the Form I-907 check is returned for insufficient funds, USCIS will process the case as a regular submission and will not revoke the approval even if the Form I-907 check is never honored. Unless DHS can also revoke the underlying petition, some*

*premium processing requesters will benefit from a swift adjudication for which they have not paid.*
Back to Citation

*81.  Just as USCIS does not refund filing fees for a denied benefit, USCIS will not refund filing fees for a revoked benefit. After USCIS has fully adjudicated the request, it will have performed the same amount of work and expended the same resources for the adjudication that it would have expended if the case had been approved or denied.*
Back to Citation

*82.  Visa retrogression occurs when more people apply for a visa in a particular category or country than there are visas available for that month https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression).*
Back to Citation

*83.  Available at https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-october-2015.html (https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-october-2015.html).*
Back to Citation

*84.  See U.S. Citizenship and Immigration Services, Paying Immigration Fees (7/7/2014), available at https://www.uscis.gov/forms/paying-immigration-fees (https://www.uscis.gov/forms/paying-immigration-fees).*
Back to Citation

*85.  See USCIS to Welcome More Than 36,000 Citizens During Annual Constitution Day and Citizenship Day Celebrations (9/17/2015), available at https://www.uscis.gov/news/news-releases/uscis-welcome-more-36000-citizens-during-annual-constitution-day-and-citizenship-day-celebrations (https://www.uscis.gov/news/news-releases/uscis-welcome-more-36000-citizens-during-annual-constitution-day-and-citizenship-day-celebrations).*
Back to Citation

*86.  Also captured in the dataset for Form I-924 is the Supplement Form I-924A, which regional centers must file annually to certify their continued eligibility for regional center designation.*
Back to Citation

*87.  See 8 U.S.C. 1356 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1356&type=usc&link-type=html)(m).*
Back to Citation

*88.  See 31 U.S.C. 901 (https://api.fdsys.gov/link?collection=uscode&title=31&year=mostrecent&section=901&type=usc&link-type=html)-03.*
Back to Citation

*89.  Calculation: 2.4 average petitions per entity × $30 increase in fees = $72 average additional cost to entities.*
Back to Citation

*90.  Office of Advocacy, Small Business Administration, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act": https://www.sba.gov/sites/default/files/rfaguide_0512_0.pdf (https://www.sba.gov/sites/default/files/rfaguide_0512_0.pdf).*
Back to Citation

*91.  Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2015, "Clergy": http://www.bls.gov/oes/current/oes212011.htm (http://www.bls.gov/oes/current/oes212011.htm).*
Back to Citation

**AR2022_200624**

*92. Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2015, "Directors of Religious Activities and Education": http://www.bls.gov/oes/current/oes212021.htm (http://www.bls.gov/oes/current/oes212021.htm).*
Back to Citation

*93. Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2015, "Religious Workers, All Other": http://www.bls.gov/oes/current/oes212099.htm (http://www.bls.gov/oes/current/oes212099.htm).*
Back to Citation

*94. Calculation: 2.4 average petitions per entity × $30 new petition fee = $72 additional total cost per entity.*
Back to Citation

*95. See "Establishment of a Genealogy Program; Proposed Rule," 8 CFR 103 (/select-citation/2016/10/24/8-CFR-103), 299 (Apr. 20, 2006), available at https://www.regulations.gov/document?D=USCIS-2006-0013-0001 (https://www.regulations.gov/document?D=USCIS-2006-0013-0001).*
Back to Citation

*96. Calculation: 1 percent of $303,500 = $3,035 (the new proposed fee for Form I-924A).*
Back to Citation

*97. Calculation: 1 percent of $1,779,500 = $17,995 (the new proposed fee for Form I-924).*
Back to Citation

*98. Yen, Christine et al., "A Report on Source of Funds: Perils of the Administrative Fee." EB5 Investors Magazine (Aug. 20, 2015), available at: http://www.eb5investors.com/magazine/article/A-Report-on-Source-of-Funds (http://www.eb5investors.com/magazine/article/A-Report-on-Source-of-Funds); see also Green, Merritt. "The Costs of an EB-5 Regional Center Project Investment." (June 27, 2014), available at: http://www.generalcounsellaw.com/the-cost-of-an-eb-5-regional-center-project-investment/ (http://www.generalcounsellaw.com/the-cost-of-an-eb-5-regional-center-project-investment/).*
Back to Citation

*99. Department of Homeland Security, USCIS, Immigrant Investor Program Office.*
Back to Citation

*100. Assuming $30,000 administrative fee × 10 investors = $300,000 regional center revenue.*
Back to Citation

*101. See "Establishment of a Genealogy Program; Proposed Rule," 8 CFR 103 (/select-citation/2016/10/24/8-CFR-103), 299 (Apr. 20, 2006), available at: https://www.regulations.gov/document?D=USCIS-2006-0013-0001 (https://www.regulations.gov/document?D=USCIS-2006-0013-0001).*
Back to Citation

*102. Total Cost to Entity = (Number of Petitions × $135)/Entity Sales Revenue.*
Back to Citation

*103. USCIS Immigrant Investor Regional Centers: http://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers#table (http://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers#table).*
Back to Citation

*104. Supplemental Form I-924A (Supplement to Form I-924) is captured in this dataset.*
Back to Citation

**AR2022_200625**

*105. See Yen, Christine et al., "A Report on Source of Funds: Perils of the Administrative Fee." EB5
Investors Magazine (Aug. 20, 2015), available at: http://www.eb5investors.com/magazine/article/A-
Report-on-Source-of-Funds (http://www.eb5investors.com/magazine/article/A-Report-on-Source-of-
Funds); see also Green, Merritt. "The Costs of an EB-5 Regional Center Project Investment." (June 27,
2014), available at: http://www.generalcounsellaw.com/the-cost-of-an-eb-5-regional-center-project-
investment/ (http://www.generalcounsellaw.com/the-cost-of-an-eb-5-regional-center-project-
investment/).*
Back to Citation

*106. Calculation: 1 percent of $303,500 = $3,035 (the new fee for Form I-924A).*
Back to Citation

*107. Calculation: 1 percent of $1,779,500 = $17,995 (the new fee for Form I-924).*
Back to Citation

*108. DHS, USCIS, Immigrant Investor Program Office.*
Back to Citation

*109. See 2 U.S.C. 1532 (https://api.fdsys.gov/link?
collection=uscode&title=2&year=mostrecent&section=1532&type=usc&link-type=html)(a).*
Back to Citation

*110. See 2 U.S.C. 658 (https://api.fdsys.gov/link?
collection=uscode&title=2&year=mostrecent&section=658&type=usc&link-type=html)(6).*
Back to Citation

*111. See 2 U.S.C. 658 (https://api.fdsys.gov/link?
collection=uscode&title=2&year=mostrecent&section=658&type=usc&link-type=html)(7)(A)(ii).*
Back to Citation

*112. See 5 U.S.C. 801 (https://api.fdsys.gov/link?
collection=uscode&title=5&year=mostrecent&section=801&type=usc&link-type=html) et seq.*
Back to Citation

*113. This estimate is based on FY 2016/FY 2017 fee study volume projections.*
Back to Citation

*114. For comparison between current fees, USCIS estimates for costs of underlying services, and changes
to fees, see Appendix VI, Table 4 in the supporting documentation.*
Back to Citation

*115. USCIS will immediately reject and not accept for processing any applications and petitions submitted
with invalid payments, e.g., an unsigned check or invalid bank account on an electronic payment. The
subsequent identification as not payable will occur when an attempt is made to process the payment
through a bank, but the bank does not honor the payment (e.g., because of insufficient funds).*
Back to Citation

*116. See 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii).*
Back to Citation

*117. See 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii), 103.7(a)(2).*
Back to Citation

*118. See 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(a)(2).*
Back to Citation

*119. See 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii).*
Back to Citation

**AR2022_200626**

*120. See 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii)(D).*
Back to Citation

*121. A commenter wrote that a fee payment may be submitted even when the applicant knows the account lacks the funds to cover the payment because a document is due to expire or a deadline is approaching.*
Back to Citation

*122. USCIS will not store and hold any case. The adjudicator will intake and begin processing every benefit request as soon as practicable and will presume that all fee payments are valid. If the payment is rejected (which could take 10-days to know) and the adjudicator has not approved the request, Treasury will notify USCIS of the rejected payment, and USCIS will collect the request package and reject it. If the fees have been deposited and the benefit request has not yet been adjudicated, USCIS will process a refund. If the request is approved, USCIS may revoke after notice without a refund.*
Back to Citation

*123. See amended 8 CFR 103.7 (/select-citation/2016/10/24/8-CFR-103.7)(a)(2).*
Back to Citation

*124. Corrected payments include any payment collected by USCIS after the return of an initial payment.*
Back to Citation

*125. Calculation: 9,781 (average number of returned payments) × $30 (current service fee charge) = $293,430 (total cost for returned payments)).*
Back to Citation

*126. See 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii)(D).*
Back to Citation

*127. See 8 CFR 214.2 (/select-citation/2016/10/24/8-CFR-214.2)(h)(8)(ii)(B).*
Back to Citation

*128. See 8 CFR 103.2 (/select-citation/2016/10/24/8-CFR-103.2)(a)(7)(ii).*
Back to Citation

*129. See 8 CFR 103.17 (/select-citation/2016/10/24/8-CFR-103.17)(b)(1).*
Back to Citation

*130. While USCIS prefers to base assumptions on a longer time period (ideally 5 years), 7 months was the longest time period for which this data was available.*
Back to Citation

*131. Calculation: 821,500 * 11 percent.*
Back to Citation

*132. Total Opportunity Costs of Time to Applicants = Expected Filers (90,365) * (Full Cost of Employee Benefits ($10.59) * Time Burden (.75 hr.)).*
Back to Citation

*133. U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of July 13, 2016. See http://www.dol.gov/general/topic/wages/minimumwage (http://www.dol.gov/general/topic/wages/minimumwage).*
Back to Citation

*134. The compensation-to-wage multiplier is calculated as follows: (All Workers Total Employee Compensation per hour)/(Wages and Salaries per hour). See Economic News Release, U.S. Department of Labor, BLS, Table 1. Employer Costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (Sept. 2015), available at http://www.bls.gov/news.release/pdf/ecec.pdf (http://www.bls.gov/news.release/pdf/ecec.pdf).*

AR2022_200627

Back to Citation

*135. Calculation: $10.59 hourly wage rate * .75 hours.*

Back to Citation

*136. In such cases, each family member who is requesting a reduced fee for their Application for Naturalization must sign the Form I-942. Applicants must submit the Form I-942 in the same envelope as the naturalization applications for which they are requesting fee waivers.*

Back to Citation

[FR Doc. 2016-25328 (/a/2016-25328) Filed 10-21-16; 8:45 am]

BILLING CODE 4410-10-P

PUBLISHED DOCUMENT

AR2022_200628

**5238**   **Federal Register** / Vol. 87, No. 20 / Monday, January 31, 2022 / UA: Reg Flex Agenda

# DEPARTMENT OF HOMELAND SECURITY

**Office of the Secretary**

**6 CFR Chapters I and II**

[DHS Docket No. OGC–RP–04–001]

**Unified Agenda of Federal Regulatory and Deregulatory Actions**

**AGENCY:** Office of the Secretary, DHS.

**ACTION:** Semiannual Regulatory Agenda.

**SUMMARY:** This regulatory agenda is a semiannual summary of projected regulations, existing regulations, and completed actions of the Department of Homeland Security (DHS) and its components. This agenda provides the public with information about DHS's regulatory and deregulatory activity. DHS expects that this information will enable the public to be more aware of, and effectively participate in, the Department's regulatory and deregulatory activity. DHS invites the public to submit comments on any aspect of this agenda.

**FOR FURTHER INFORMATION CONTACT:**

**General**

Please direct general comments and inquiries on the agenda to the Regulatory Affairs Law Division, Office of the General Counsel, U.S. Department of Homeland Security, 2707 Martin Luther King Jr. Avenue SE, Mail Stop 0485, Washington, DC 20528–0485.

**Specific**

Please direct specific comments and inquiries on individual actions identified in this agenda to the individual listed in the summary portion as the point of contact for that action.

**SUPPLEMENTARY INFORMATION:** DHS provides this notice pursuant to the requirements of the Regulatory Flexibility Act (Pub. L. 96–354, Sept. 19, 1980) and Executive Order 12866 "Regulatory Planning and Review" (Sept. 30, 1993) as incorporated in Executive Order 13563 "Improving Regulation and Regulatory Review" (Jan. 18, 2011), which require the Department to publish a semiannual agenda of regulations. The regulatory agenda is a summary of existing and projected regulations as well as actions completed since the publication of the last regulatory agenda for the Department. DHS's last semiannual regulatory agenda was published online on June 11, 2021, at *http:// www.reginfo.gov/public/do/ eAgendaMain.*

Beginning in fall 2007, the internet became the basic means for disseminating the Unified Agenda. The complete Unified Agenda is available online at *www.reginfo.gov.*

The Regulatory Flexibility Act (5 U.S.C. 602) requires Federal agencies to publish their regulatory flexibility agendas in the **Federal Register**. A regulatory flexibility agenda shall contain, among other things, a brief description of the subject area of any rule which is likely to have a significant economic impact on a substantial number of small entities. DHS's printed agenda entries include regulatory actions that are in the Department's regulatory flexibility agenda. Printing of these entries is limited to fields that contain information required by the agenda provisions of the Regulatory Flexibility Act. Additional information on these entries is available in the Unified Agenda published on the internet.

The semiannual agenda of the Department conforms to the Unified Agenda format developed by the Regulatory Information Service Center.

Dated: September 10, 2021.

**Christina E. McDonald,**
*Associate General Counsel for Regulatory Affairs.*

## OFFICE OF THE SECRETARY—PRERULE STAGE

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 303 .................... | Homeland Security Acquisition Regulation: Privacy Training (HSAR Case 2015–003) ................................. | 1601–AA79 |

## OFFICE OF THE SECRETARY—FINAL RULE STAGE

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 304 .................... | Homeland Security Acquisition Regulation: Safeguarding of Controlled Unclassified Information (HSAR Case 2015–001). | 1601–AA76 |
| 305 .................... | Homeland Security Acquisition Regulation: Information Technology Security Awareness Training (HSAR Case 2015–002). | 1601–AA78 |

## OFFICE OF THE SECRETARY—LONG-TERM ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 306 .................... | Homeland Security Acquisition Regulation, Enhancement of Whistleblower Protections for Contractor Employees. | 1601–AA72 |

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES—PROPOSED RULE STAGE

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 307 .................... | U.S. Citizenship and Immigration Services Fee Schedule **(Reg Plan Seq No. 80)** ........................................ | 1615–AC68 |

References in boldface appear in The Regulatory Plan in part II of this issue of the **Federal Register**.

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES—LONG-TERM ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 308 .................... | Requirements for Filing Motions and Administrative Appeals .......................................................... | 1615–AB98 |

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES—COMPLETED ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 309 .................... | Removing H–4 Dependent Spouses From the Classes of Noncitizens Eligible for Employment Authorization. | 1615–AC15 |

## U.S. COAST GUARD—PROPOSED RULE STAGE

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 310 .................... | Claims Procedures Under the Oil Pollution Act of 1990 (USCG–2004–17697) ............................................. | 1625–AA03 |
| 311 .................... | Lifejacket Approval Harmonization ................................................................................................ | 1625–AC62 |

## U.S. COAST GUARD—LONG-TERM ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 312 .................... | Commercial Fishing Vessels—Implementation of 2010 and 2012 Legislation ................................................. | 1625–AB85 |

## U.S. COAST GUARD—COMPLETED ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 313 .................... | Financial Responsibility—Vessels; Superseded Pollution Funds (USCG–2017–0788) ................................... | 1625–AC39 |

## U.S. CUSTOMS AND BORDER PROTECTION—LONG-TERM ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 314 .................... | Importer Security Filing and Additional Carrier Requirements (**Section 610 Review**) ................................... | 1651–AA70 |
| 315 .................... | Implementation of the Guam-CNMI Visa Waiver Program (**Section 610 Review**) ........................................ | 1651–AA77 |

## TRANSPORTATION SECURITY ADMINISTRATION—COMPLETED ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 316 .................... | Security Training for Surface Transportation Employees ................................................................ | 1652–AA73 |

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT—COMPLETED ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 317 .................... | Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media. | 1653–AA78 |

## CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY—PROPOSED RULE STAGE

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 318 .................... | Ammonium Nitrate Security Program (**Reg Plan Seq No. 98**) ............................................................ | 1670–AA00 |

References in boldface appear in The Regulatory Plan in part II of this issue of the **Federal Register**.

CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY—LONG-TERM ACTIONS

| Sequence No. | Title | Regulation Identifier No. |
|---|---|---|
| 319 ................... | Chemical Facility Anti-Terrorism Standards (CFATS) ............................................................. | 1670–AA01 |

**DEPARTMENT OF HOMELAND SECURITY (DHS)**

*Office of the Secretary (OS)*

Prerule Stage

**303. Homeland Security Acquisition Regulation: Privacy Training (HSAR Case 2015–003)**

*Legal Authority:* 5 U.S.C. 301 and 302; 41 U.S.C. 1303, 1702 and 1707

*Abstract:* This Homeland Security Acquisition Regulation (HSAR) rule would require contractors to complete training that addresses the protection of privacy, in accordance with the Privacy Act of 1974, and the handling and safeguarding of Personally Identifiable Information and Sensitive Personally Identifiable Information. DHS is withdrawing this regulatory action, because privacy training is covered by the Federal Acquisition Regulation final rule titled Privacy Training (81 FR 93476, Dec. 20, 2016) and DHS FAR Class Deviation Number 17–03.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................. | 01/19/17 | 82 FR 6425 |
| NPRM Comment Period End. | 03/20/17 | |
| NPRM Comment Period Extended. | 03/20/17 | 82 FR 14341 |
| NPRM Comment Period Extended End. | 04/19/17 | |
| Notice of Withdrawal. | 11/00/21 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Candace Lightfoot, Procurement Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Acquisition Policy and Legislation, Room 3636–15, 301 7th Street SW, Washington, DC 20528, *Phone:* 202 447–0082, *Email: candace.lightfoot@hq.dhs.gov.*

Nancy Harvey, Policy Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Room 3636–15, 301 7th Street SW, Washington, DC 20528, *Phone:* 202 447–0956, *Email: nancy.harvey@hq.dhs.gov.*

*RIN:* 1601–AA79

**DEPARTMENT OF HOMELAND SECURITY (DHS)**

*Office of the Secretary (OS)*

Final Rule Stage

**304. Homeland Security Acquisition Regulation: Safeguarding of Controlled Unclassified Information (HSAR Case 2015–001)**

*Legal Authority:* 5 U.S.C. 301 to 302; 41 U.S.C. 1302, 1303 and 1707

*Abstract:* This Homeland Security Acquisition Regulation (HSAR) rule would implement security and privacy measures to ensure Controlled Unclassified Information (CUI), such as Personally Identifiable Information (PII), is adequately safeguarded by DHS contractors. Specifically, the rule would define key terms, outline security requirements and inspection provisions for contractor information technology (IT) systems that store, process or transmit CUI, institute incident notification and response procedures, and identify post-incident credit monitoring requirements.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................. | 01/19/17 | 82 FR 6429 |
| NPRM Comment Period End. | 03/20/17 | |
| NPRM Comment Period Extended. | 03/20/17 | 82 FR 14341 |
| NPRM Comment Period Extended End. | 04/19/17 | |
| Final Rule ............ | 04/00/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Shaundra Ford, Procurement Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Acquisition Policy and Legislation, 245 Murray Lane SW, Washington, DC 20528, *Phone:* 202 447–0056, *Email: shaundra.ford@hq.dhs.gov.*

Nancy Harvey, Policy Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Room 3636–15, 301 7th Street SW, Washington, DC 20528, *Phone:* 202 447–0956, *Email: nancy.harvey@hq.dhs.gov.*

*RIN:* 1601–AA76

**305. Homeland Security Acquisition Regulation: Information Technology Security Awareness Training (HSAR Case 2015–002)**

*Legal Authority:* 5 U.S.C. 301 and 302; 41 U.S.C. 1707, 1302 and 1303

*Abstract:* This Homeland Security Acquisition Regulation (HSAR) rule would standardize information technology security awareness training and DHS Rules of Behavior requirements for contractor and subcontractor employees who access DHS information systems and information resources or contractor-owned and/or operated information systems and information resources capable of collecting, processing, storing, or transmitting controlled unclassified information (CUI).

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................. | 01/19/17 | 82 FR 6446 |
| NPRM Comment Period End. | 03/20/17 | |
| NPRM Comment Period Extended. | 03/20/17 | 82 FR 14341 |
| NPRM Comment Period Extended End. | 04/19/17 | |
| Final Rule ............ | 04/00/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Shaundra Ford, Procurement Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Acquisition Policy and Legislation, 245 Murray Lane SW, Washington, DC 20528, *Phone:* 202 447–0056, *Email: shaundra.ford@hq.dhs.gov.*

Nancy Harvey, Policy Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Room 3636–15, 301 7th Street SW, Washington, DC 20528, *Phone:* 202 447–0956, *Email: nancy.harvey@hq.dhs.gov.*

*RIN:* 1601–AA78

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*Office of the Secretary (OS)*

Long-Term Actions

**306. Homeland Security Acquisition Regulation, Enhancement of Whistleblower Protections for Contractor Employees**

*Legal Authority:* Sec. 827 of the National Defense Authorization Act (NDAA) for Fiscal Year 2013, (Pub. L. 112–239, enacted January 2, 2013); 41 U.S.C. 1302(a)(2) and 1707

*Abstract:* The Department of Homeland Security (DHS) is proposing to amend its Homeland Security Acquisition Regulation (HSAR) parts 3003 and 3052 to implement section 827 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2013 (Pub. L. 112–239, enacted January 2, 2013) for the United States Coast Guard (USCG). Section 827 of the NDAA for FY 2013 established enhancements to the Whistleblower Protections for Contractor Employees for all agencies subject to section 2409 of title 10, United States Code, which includes the USCG.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................. | 11/00/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Nancy Harvey, Policy Analyst, Department of Homeland Security, Office of the Chief Procurement Officer, Room 3636–15, 301 7th Street SW, Washington, DC 20528, *Phone:* 202 447–0956, *Email:* nancy.harvey@hq.dhs.gov.

*RIN:* 1601–AA72

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Citizenship and Immigration Services (USCIS)*

Proposed Rule Stage

**307. U.S. Citizenship and Immigration Services Fee Schedule**

*Regulatory Plan:* This entry is Seq. No. 80 in part II of this issue of the **Federal Register**.

*RIN:* 1615–AC68

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Citizenship and Immigration Services (USCIS)*

Long-Term Actions

**308. Requirements for Filing Motions and Administrative Appeals**

*Legal Authority:* 5 U.S.C. 552 and 552a; 8 U.S.C. 1101, 1103 and 1304; 6 U.S.C. 112

*Abstract:* The Department of Homeland Security (DHS) is proposing this rule to improve the administration of U.S. Citizenship and Immigration Services (USCIS) appeals, motions, and certifications. The proposed changes would update and restructure the regulations in order to clarify and streamline the administrative review process, increase efficiency, and reflect the establishment of DHS and its components.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................. | 12/00/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* William K. Renwick, Jr., Branch Chief, Department of Homeland Security, U.S. Citizenship and Immigration Services, Administrative Appeals Office, 5900 Capital Gateway, Suite 4S190, Camp Springs, MD 20588–0009, *Phone:* 202 721–3000.

*RIN:* 1615–AB98

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Citizenship and Immigration Services (USCIS)*

Completed Actions

**309. Removing H–4 Dependent Spouses From the Classes of Noncitizens Eligible for Employment Authorization**

*Legal Authority:* 6 U.S.C. 112; 8 U.S.C. 1103(a), 1184(a)(1) and 1324a(H)(3)(B)

*Abstract:* On February 25, 2015, DHS published a final rule that amended DHS regulations to extend eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrant workers who are seeking employment-based lawful permanent resident (LPR) status. DHS previously indicated that it would propose to rescind or change that final rule. DHS no longer intends to issue such a proposed rule.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| Withdrawn ........... | 08/25/21 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Charles Nimick, Chief, Business and Foreign Workers Division, Office of Policy and Strategy, Department of Homeland Security, U.S. Citizenship and Immigration Services, 5900 Capital Gateway Drive, Suite 4S190, Camp Springs, MD 20588–0009, *Phone:* 240 721–3000.

*RIN:* 1615–AC15

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Coast Guard (USCG)*

Proposed Rule Stage

**310. Claims Procedures Under the Oil Pollution Act of 1990 (USCG–2004–17697)**

*Legal Authority:* 33 U.S.C. 2713 and 2714

*Abstract:* The purpose of this project is to remove superseded regulations at 33 Code of Federal Regulations (CFR) part 135, and to finalize the Oil Pollution Act of 1990 (OPA90) claims procedures at 33 CFR part 136. The OPA90 claims procedures, implementing OPA90 section 1013 (Claims Procedures) and section 1014 (Designation of Source and Advertisement), were established by an interim rule, titled ''Claims under the Oil Pollution Act of 1990'' (Interim Rule) that has not been substantively amended since it was published in 1992. This rulemaking supports the Coast Guard's strategic goal of protection of natural resources.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| Interim Final Rule | 08/12/92 | 57 FR 36314 |
| Correction ........... | 09/09/92 | 57 FR 41104 |
| Interim Final Rule Comment Period End. | 12/10/92 | |
| Notice of Inquiry .. | 11/01/11 | 76 FR 67385 |
| Notice of Inquiry Comment Period End. | 01/30/12 | |
| NPRM ................. | 09/00/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Benjamin White, Project Manager, Department of Homeland Security, U.S. Coast Guard, National Pollution Funds Center (NPFC), 2703 Martin Luther King Jr. Avenue SE, STOP 7605, Washington,

DC 20593–7605, *Phone:* 202 795–6066, *Email: benjamin.h.white@uscg.mil.*

*RIN:* 1625–AA03

### 311. Lifejacket Approval Harmonization

*Legal Authority:* 46 U.S.C. 3306(a); 46 U.S.C. 3306(b); 46 U.S.C. 4102(a); 46 U.S.C. 4102(b); 46 U.S.C. 4302(a); 46 U.S.C. 4502(a); 46 U.S.C. 4502(c)(2)(B)

*Abstract:* The Coast Guard proposes to amend the lifejacket approval requirements and follow-up program requirements by incorporating three new bi-national standards. At the same time, the Coast Guard proposes to amend lifejacket and personal flotation devices (PFDs) carriage requirements to allow for the use of equipment approved to the new standards, and to remove obsolete equipment approval requirements. The new standards are state-of-the-art and are intended to replace the legacy standards. The proposed amendments will streamline the process for approval of PFDs and allow manufacturers the opportunity to produce more innovative equipment that meets the approval requirements of both Canada and the United States, while reducing the burden for manufacturers in both the approval process and follow-up program. These proposed changes are expected to promote economic relief. The proposed rule is expected to promote economic relief by reducing the regulatory burden on PFD manufacturers by harmonizing our PFD approval standards with Canada, requiring less frequent inspections of manufacturing facilities, providing lower cost PFD user manuals, and by creating a new market in PFDs with a lower buoyancy rating.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................... | 07/00/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Jacqueline M. Yurkovich, Project Manager, Department of Homeland Security, U.S. Coast Guard, Office of Design and Engineering Standards (CG–ENG–4), 2703 Martin Luther King Jr. Avenue SE, STOP 7509, Washington, DC 20593–7509, *Phone:* 202 372–1389, *Email: jacqueline.m.yurkovich@uscg.mil.*

*RIN:* 1625–AC62

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Coast Guard (USCG)*

Long-Term Actions

### 312. Commercial Fishing Vessels—Implementation of 2010 and 2012 Legislation

*Legal Authority:* 46 U.S.C. 4502 and 5103; Pub. L. 111–281

*Abstract:* The Coast Guard proposes to implement those requirements of 2010 and 2012 legislation that pertain to uninspected commercial fishing industry vessels and that took effect upon enactment of the legislation but that, to be implemented, require amendments to Coast Guard regulations affecting those vessels. The applicability of the regulations is being changed, and new requirements are being added to safety training, equipment, vessel examinations, vessel safety standards, the documentation of maintenance, and the termination of unsafe operations. This rulemaking promotes the Coast Guard's maritime safety mission.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................... | 06/21/16 | 81 FR 40437 |
| NPRM Comment Period Extended. | 08/15/16 | 81 FR 53986 |
| NPRM Comment Period End. | 10/19/16 | |
| NPRM Comment Period Extended End. | 12/18/16 | |
| Final Rule ............ | To Be Determined | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Joseph Myers, Project Manager, Department of Homeland Security, U.S. Coast Guard, Office of Commercial Vessel Compliance (CG–CVC–3), 2703 Martin Luther King Jr. Avenue SE, STOP 7501, Washington, DC 20593–7501, *Phone:* 202 372–1249, *Email: joseph.d.myers@uscg.mil.*

*RIN:* 1625–AB85

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Coast Guard (USCG)*

Completed Actions

### 313. Financial Responsibility—Vessels; Superseded Pollution Funds (USCG–2017–0788)

*Legal Authority:* 33 U.S.C. 2704; 33 U.S.C. 2716 and 2716a; 42 U.S.C. 9607 to 9609; 6 U.S.C. 552; E.O. 12580; sec. 7(b), 3 CFR, 1987; Comp., p. 193; E.O.

12777, secs. 4 and 5, 3 CFR, 1991 Comp., p. 351, as amended by E.O. 13286, sec. 89, 3; 3 CFR, 2004 Comp., p. 166, and by E.O. 13638, sec. 1, 3 CFR, 2014 Comp., p. 227; Department of Homeland; Security Delegation Nos. 0170.1 and 5110, Revision 01

*Abstract:* The Coast Guard has proposed to amend its rule on vessel financial responsibility to include tank vessels greater than 100 gross tons, to clarify and strengthen the rule's reporting requirements, to conform its rule to current practice, and to remove two superseded regulations. This rulemaking will ensure the Coast Guard has current information when there are significant changes in a vessel's operation, ownership, or evidence of financial responsibility, and reflect current best practices in the Coast Guard's management of the Certificate of Financial Responsibility Program. This rulemaking will also promote the Coast Guard's missions of maritime stewardship, maritime security, and maritime safety.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................... | 05/13/20 | 85 FR 28802 |
| NPRM Comment Period End. | 08/11/20 | |
| Final Rule ............ | 12/01/21 | 86 FR 68123 |
| Final Action Effective. | 01/03/22 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Benjamin White, Project Manager, Department of Homeland Security, U.S. Coast Guard, National Pollution Funds Center (NPFC), 2703 Martin Luther King Jr. Avenue SE, STOP 7605, Washington, DC 20593–7605, *Phone:* 202 795–6066, *Email: benjamin.h.white@uscg.mil.*

*RIN:* 1625–AC39

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Customs and Border Protection (USCBP)*

Long-Term Actions

### 314. Importer Security Filing and Additional Carrier Requirements (Section 610 Review)

*Legal Authority:* Pub. L. 109–347, sec. 203; 5 U.S.C. 301; 19 U.S.C. 66; 19 U.S.C. 1431; 19 U.S.C. 1433 and 1434; 19 U.S.C. 1624; 19 U.S.C. 2071 (note); 46 U.S.C. 60105

*Abstract:* This final rule implements the provisions of section 203 of the Security and Accountability for Every

Port Act of 2006. On November 25, 2008, Customs and Border Protection (CBP) published an interim final rule (CBP Dec. 08–46) in the **Federal Register** (73 FR 71730), that finalized most of the provisions proposed in the Notice of Proposed Rulemaking. It requires carrier and importers to provide to CBP, via a CBP approved electronic data interchange system, certain advance information pertaining to cargo brought into the United States by vessel to enable CBP to identify high-risk shipments to prevent smuggling and ensure cargo safety and security. The interim final rule did not finalize six data elements that were identified as areas of potential concern for industry during the rulemaking process and, for which, CBP provided some type of flexibility for compliance with those data elements. CBP solicited public comment on these six data elements and also invited comments on the revised Regulatory Assessment and Final Regulatory Flexibility Analysis. (See 73 FR 71782–85 for regulatory text and 73 CFR 71733–34 for general discussion.)

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM .................. | 01/02/08 | 73 FR 90 |
| NPRM Comment Period End. | 03/03/08 | |
| NPRM Comment Period Extended. | 02/01/08 | 73 FR 6061 |
| NPRM Comment Period Extended End. | 03/18/08 | |
| Interim Final Rule | 11/25/08 | 73 FR 71730 |
| Interim Final Rule Effective. | 01/26/09 | |
| Interim Final Rule Comment Period End. | 06/01/09 | |
| Correction ............ | 07/14/09 | 74 FR 33920 |
| Correction ............ | 12/24/09 | 74 FR 68376 |
| Next Action Undetermined. | | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Brian Sale, Branch Chief, Manifest & Conveyance Security Division, Cargo & Conveyance, Office of Field Operation, Department of Homeland Security, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Washington, DC 20229, *Phone:* 202 325–3338, *Email: brian.a.sale@cbp.dhs.gov; ofo-manifestbranch@cbp.dhs.gov.*

*RIN:* 1651–AA70

**315. Implementation of the Guam-CNMI Visa Waiver Program (Section 610 Review)**

*Legal Authority:* Pub. L. 110–229, sec. 702

*Abstract:* The interim final rule amends Department of Homeland Security (DHS) regulations to implement section 702 of the Consolidated Natural Resources Act of 2008 (CNRA). This law extends the immigration laws of the United States to the Commonwealth of the Northern Mariana Islands (CNMI) and provides for a joint visa waiver program for travel to Guam and the CNMI. This rule implements section 702 of the CNRA by amending the regulations to replace the current Guam Visa Waiver Program with a new Guam-CNMI Visa Waiver Program. The amended regulations set forth the requirements for nonimmigrant visitors who seek admission for business or pleasure and solely for entry into and stay on Guam or the CNMI without a visa. This rule also establishes six ports of entry in the CNMI for purposes of administering and enforcing the Guam-CNMI Visa Waiver Program. Section 702 of the Consolidated Natural Resources Act of 2008 (CNRA), subject to a transition period, extends the immigration laws of the United States to the Commonwealth of the Northern Mariana Islands (CNMI) and provides for a visa waiver program for travel to Guam and/or the CNMI. On January 16, 2009, the Department of Homeland Security (DHS), Customs and Border Protection (CBP), issued an interim final rule in the **Federal Register** replacing the then-existing Guam Visa Waiver Program with the Guam-CNMI Visa Waiver Program and setting forth the requirements for nonimmigrant visitors seeking admission into Guam and/or the CNMI under the Guam-CNMI Visa Waiver Program. As of November 28, 2009, the Guam-CNMI Visa Waiver Program is operational. This program allows nonimmigrant visitors from eligible countries to seek admission for business or pleasure for entry into Guam and/or the CNMI without a visa for a period of authorized stay not to exceed 45 days. This rulemaking would finalize the January 2009 interim final rule.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| Interim Final Rule | 01/16/09 | 74 FR 2824 |
| Interim Final Rule Effective. | 01/16/09 | |
| Interim Final Rule Comment Period End. | 03/17/09 | |
| Technical Amendment; Change of Implementation Date. | 05/28/09 | 74 FR 25387 |
| Final Action ......... | To Be Determined | |

*Regulatory Flexibility Analysis Required:* No.

*Agency Contact:* Neyda I. Yejo, Program Manager, Electronic System for Travel Authorization, Office of Field Operations, Department of Homeland Security, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Washington, DC 20229, *Phone:* 202 344–2373, *Email: neyda.i.yejo@cbp.dhs.gov.*

*RIN:* 1651–AA77

# DEPARTMENT OF HOMELAND SECURITY (DHS)

*Transportation Security Administration (TSA)*

Completed Actions

**316. • Security Training for Surface Transportation Employees**

*Legal Authority:* 49 U.S.C. 114; Pub. L. 110–53, secs. 1405, 1408, 1501, 1512, 1517, 1534, and 1534

*Abstract:* This action was previously reported as 1652–AA55. TSA published a Security Training Final Rule on March 23, 2020. This rule required owner/operators of higher-risk freight railroad carriers, public transportation agencies (including rail mass transit and bus systems), passenger railroad carriers, and over-the-road bus companies, to provide TSA-approved security training to employees performing security-sensitive functions. On May 1, 2020, TSA delayed the effective date of the final rule to September 21, 2020, in recognition of the potential impact of the COVID–19 public health crisis and related strain on resources for owner/operators required to comply with the regulation. TSA revised all compliance dates within the rule to reflect the new effective date. On October 26, 2020, TSA extended certain compliance dates from December 21, 2020, to March 22, 2021. On May 4, 2021, TSA extended the compliance deadline for submission of the required security training program from March 22, 2021, to no later than June 21, 2021.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| Notice; Request for Comment. | 06/14/13 | 78 FR 35945 |
| Notice; Comment Period End. | 07/15/13 | |
| NPRM .................. | 12/16/16 | 81 FR 91336 |
| NPRM Comment Period End. | 03/16/17 | |
| Final Rule ............ | 03/23/20 | 85 FR 16456 |
| Final Rule Effective. | 06/22/20 | |

| Action | Date | FR Cite |
|---|---|---|
| Final Rule; Delay of Effective Date. | 05/01/20 | 85 FR 25315 |
| Final Rule ............ | 10/26/20 | 85 FR 67681 |
| Final Rule ............ | 05/04/21 | 86 FR 23629 |
| Final Rule Effective. | 06/21/21 | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Chandru (Jack) Kalro, Deputy Director, Surface Division, Department of Homeland Security, Transportation Security Administration, Policy, Plans, and Engagement, 6595 Springfield Center Drive, Springfield, VA 20598–6028, *Phone:* 571 227–1145, *Email: surfacefrontoffice@tsa.dhs.gov.*

Alex Moscoso, Chief Economist, Economic Analysis Branch—Coordination & Analysis Division, Department of Homeland Security, Transportation Security Administration, Policy, Plans, and Engagement, 6595 Springfield Center Drive, Springfield, VA 20598–6028, *Phone:* 571 227–5839, *Email: alex.moscoso@tsa.dhs.gov.*

Traci Klemm, Assistant Chief Counsel, Regulations and Security Standards, Department of Homeland Security, Transportation Security Administration, Chief Counsel's Office, 6595 Springfield Center Drive, Springfield, VA 20598–6002, *Phone:* 571 227–3596, *Email: traci.klemm@tsa.dhs.gov.*

*RIN:* 1652–AA73

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*U.S. Immigration and Customs Enforcement (USICE)*

Completed Actions

### 317. Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media

*Legal Authority:* 8 U.S.C. 1101; 8 U.S.C. 1103; 8 U.S.C. 1182 and 1184

*Abstract:* DHS originally proposed modifying the period of authorized stay for certain categories of nonimmigrants traveling to the United States by eliminating the availability of "duration of status" and by providing a maximum period of authorized stay with options for extensions for each applicable visa category. DHS has withdrawn this proposed rule.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| NPRM ................... | 09/25/20 | 85 FR 60526 |
| NPRM Comment Period End. | 10/26/20 | |
| Notice of Withdrawal. | 07/06/21 | 86 FR 35410 |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Sharon Hageman, Acting Deputy Assistant Director, Department of Homeland Security, U.S. Immigration and Customs Enforcement, 500 12th Street SW, Mail Stop 5006, Washington, DC 20536, *Phone:* 202 732–6960, *Email: ice.regulations@ice.dhs.gov.*

*RIN:* 1653–AA78

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*Cybersecurity and Infrastructure Security Agency (CISA)*

Proposed Rule Stage

### 318. Ammonium Nitrate Security Program

*Regulatory Plan:* This entry is Seq. No. 98 in part II of this issue of the **Federal Register**.

*RIN:* 1670–AA00

## DEPARTMENT OF HOMELAND SECURITY (DHS)

*Cybersecurity and Infrastructure Security Agency (CISA)*

Long-Term Actions

### 319. Chemical Facility Anti-Terrorism Standards (CFATS)

*Legal Authority:* 6 U.S.C. 621 to 629

*Abstract:* The Cybersecurity and Infrastructure Security Agency (CISA) previously invited public comment on an Advance Notice of Proposed Rulemaking (ANPRM) during August 2014 for potential revisions to the Chemical Facility Anti-Terrorism Standards (CFATS) regulations. The ANPRM provided an opportunity for the public to provide recommendations for possible program changes. In June 2020, CISA published for public comment a retrospective analysis of the CFATS program. And in January 2021, CISA invited additional public comment through an ANPRM concerning the removal of certain explosive chemicals from CFATS. CISA intends to address many of the subjects raised in both ANPRMs and the retrospective analysis in this regulatory action, including potential updates to CFATS cybersecurity requirements and Appendix A to the CFATS regulations.

*Timetable:*

| Action | Date | FR Cite |
|---|---|---|
| ANPRM ................ | 08/18/14 | 79 FR 48693 |
| ANPRM Comment Period End. | 10/17/14 | |
| ANPRM ................ | 01/06/21 | 86 FR 495 |
| Announcement of Availability; Retrospective Analysis. | 06/22/20 | 85 FR 37393 |
| Announcement of Availability; Retrospective Analysis Comment Period End. | 09/21/20 | |
| Next Action Undetermined. | | |

*Regulatory Flexibility Analysis Required:* Yes.

*Agency Contact:* Ryan Donaghy, Deputy Branch Chief for Chemical Security Policy, Rulemaking, and Engagement, Department of Homeland Security, Cybersecurity and Infrastructure Security Agency, 245 Murray Lane SW, Mail Stop 0610, Arlington, VA 20528, *Phone:* 571 532–4127, *Email: ryan.donaghy@cisa.dhs.gov.*

*RIN:* 1670–AA01

[FR Doc. 2021–27977 Filed 1–28–22; 8:45 am]

**BILLING CODE 9110–9B–P**

the public (consistent with the treatment afforded confidential business information).

*Written submissions.* Interested persons may submit written statements. Any commercial or financial information which a submitter desires the Commission to treat as confidential must be submitted on separate sheets of paper, each clearly marked "Confidential business information" at the top. All submissions requesting confiential treatment must conform with the requirements of section 201.6 of the commission's rules of practice and procedure (19 CFR 201.6). All written submissions, except for confidential business information, will be made available for inspection by interested persons. To be assured of consideration by the commission, written statements should be submitted at the earliest practicable date, but not later than may 15, 1978. All such submissions should be addressed to the Secretary, United States International Trade commission, 701 E Street NW., Washington, D.C. 20436.

*Request for a hearing.* Any interested person who believes that a public hearing should be held in connection with this investigation may, on or before February 21, 1978, submit a request in writing to the Secretary of the Commission that a public hearing be held. All such requests should state the reasons for such request and be addressed to the Secretary, United States International Trade Commission, 701 E Street NW., Washington, D.C. 20436.

By order of the commission.

Issued: January 16, 1978.

KENNETH R. MASON,
*Secretary.*

[FR Doc. 78-1551 Filed 1-18-78; 8:45 am]

---

[4410-01]

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

VOLUNTARY DEPARTURE FOR OUT-OF-STATUS NONIMMIGRANT H-1 NURSES

Many foreign nurse graduates were admitted to the United States temporarily under section 101(a)(15)(H)(i) of the Immigration and Nationality Act in order to practice their profession in this country. Their eligibility for such nonimmigrant status was based upon their being able to secure temporary licenses to work as professional nurses immediately following their entry and pending their taking and passing State examinations for permanent licensure. It has been brought to the attention of the INS that many of these nonimmigrant nurses have failed these examinations for permanent licensure have had their temporary licenses

expire, and have therefore been unable to continue working in a professional capacity. Since they were admitted to the United States solely to work as professional nurses and lacking a license are now not permitted to do so, they no longer have lawful nonimmigrant status and routinely should depart from the United States. Representations have been made, however, that these out-of-status nurses could pass the licensure examinations if given the time and opportunity to do so, free of the anxiety of being imminently required to depart. There is nothing in law or regulation that would require the grant of any further time in the United States to any of these nurses. In view of the representations made, however, and the imminence of an officially acceptable test to screen visa applicants abroad and before they are permitted to come to the United States (which it is expected will largely eliminate the problem), it has been decided to give this group of out-of-status nurses until December 31, 1978, to apply for extended voluntary departure (deferred departure) under the conditions stated below. This notice is effective immediately.

CONDITIONS FOR THE GRANT OF VOLUNTARY DEPARTURE TO THE OUT-OF-STATUS H-1 NURSE, IN ORDER TO AFFORD FURTHER OPPORTUNITY TO TAKE AND PASS THE LICENSURE EXAMINATION AS PROFESSIONAL NURSE

1. The nurse's lack of lawful immigration status shall be due only to the nurse's having changed employer without authority, or to his/her having failed the licensure examination. Refusal to take any such examination will be disqualifying for grant of extended voluntary departure.

2. The nurse must have taken the first available licensure examination after arrival in the United States, and have taken consecutively each such examination thereafter.

3. The nurse must show evidence (e.g., a cancelled check) that he/she has been registered to take the next licensure examination offered by the State.

4. A prior change of employer without INS authorization shall not disqualify the nurse from the grant of voluntary departure.

5. The nurse who meets the above conditions shall be given extended voluntary departure status in six-month increments up to a total that does not exceed three years from date of arrival in the United States.

6. The nurse already in the United States in excess of three years who meets the above conditions shall be given a further six-month period of voluntary departure for the purpose of again taking the licensure examinations.

7. During any period of authorized voluntary departure, the nurse shall

be permitted to work in a lesser capacity than professional nurse.

8. The nurse who is successful in passing the examination, and is issued a license to practice professional nursing, may upon the approval by INS of an H-1 visa petition filed by an employer, be restored to H-1 nonimmigrant status.

9. The Nation Alliance for Fair Licensure of Foreign Nurse Graduates, for the benefit of intending applicants for H-1 visas in the future, will undertake to publicize to foreign nurse graduates abroad the information that they must pass State licensure examinations in the United States, and that they may not work as professional nurses after failing such examinations.

10. The nurse already under deportation proceedings shall be eligible for extended voluntary departure as provided above, if those proceedings are based on grounds which arose solely by reason of the nurse's having changed employer without authority, or by reason of his/her previous inability to pass the licensure examination. If such nurse is successful thereafter in passing the examination and achieving licensure, the Service will move to teminate the deportation proceedings with a view to restoring him/her to lawful H-1 status as provided above.

11. The period during which the out-of-status nurse may make application for the above benefit shall expire December 31, 1978.

Dated: January 13, 1978.

LEONEL J. CASTILLO,
*Commissioner of Immigration and Naturalization.*

[FR Doc. 78-1431 Filed 1-18-78; 8:45 am]

---

[7532-01]

NATIONAL COMMISSION ON NEIGHBORHOODS

RESCHEDULED MEETING

ACTION: Rescheduling of meeting.

SUMMARY: This notice, required under the Federal Advisory Committee Act (5 U.S.C. Appendix I) reschedules a meeting announced in the FEDERAL REGISTER on January 12, 1978.

TIME AND DATE: 8 p.m. (eastern standard time) on Friday, February 3, 1978 and 4 p.m. (eastern standard time) on Saturday, February 4, 1978.

PLACE: (February 3 meeting)—Church Hall of United Evangelical Church of Christ, East Avenue at Dillon Avenue, Baltimore, Md. (February 4 meeting)—Gymnasium of Wyman Park Multipurpose Center, 501 West 30 Street, Baltimore, Md.

AGENDA: February 3 meeting—1. Consideration of staff reports. 2. Discussion of future hearings.

AR2022_200636

Dated: September 7, 1979.

**Bruce M. Kilgore,**

*Acting Regional Director, Western Region, National Park Service.*

[FR Doc. 79–28636 Filed 9–13–79; 8:45 am]

BILLING CODE 4310-70-M

## [Order No. 1]

## Administrative Officer, Fort Frederica National Monument; Delegation of Authority

**Section 1.** *Administrative Officer.* The Administrative Officer, Fort Frederica National Monument, may issue purchase orders not in excess of $5,000 for supplies, equipment, or services in conformity with applicable regulations and statutory authority and subject to the availability of appropriated funds.

[National Park Service Order No. 77 (38 FR 7478) as amended; Southeast Region Order No. 6 (42 FR 59428) published November 17, 1977]

Dated: June 7, 1977.

**Janet C. Wolf,**

*Superintendent, Fort Frederica National Monument.*

[FR Doc. 79–28630 Filed 9–13–79; 8:45 am]

BILLING CODE 4310-70-M

## [Order No. 6, Amdt. No. 1]

## Superintendents, et al., Southeast Region; Delegation of Authority

Southeast Region Order No. 6, approved August 30, 1977, and published in **Federal Register,** Vol. 42, November 17, 1977, sets forth, in Section 1, the exceptions on delegations of authority, and, in Section 2, certain limitations on redelegation of authority. This amendment revises Section 1 by adding paragraphs (o) and (p) as follows:

**Section 1.** *Superintendents.* * * * (o) Authority to execute or amend a concession contract, to approve an assignment or sale of a concession contract, and to terminate a concession contract.

(p) Authority to execute or amend a concession permit, to approve an assignment or sale of a concession permit, and to terminate a concession permit where the concession permit is over four (4) years' duration or when anticipated gross receipts in any year will exceed $90,000.

(National Park Service Order No. 77 (38 FR 7478) published March 22, 1973, as amended)

Dated: June 28, 1979.

**Joe Brown,**

*Regional Director, Southeast Region.*

[FR Doc. 79–28600 Filed 9–13–79; 8:45 am]

BILLING CODE 4310-70-M

## Fish and Wildlife Service

## Endangered Species Permit; Receipt of Application

Applicant: San Diego Zoological Garden, P.O. Box 551, San Diego, California 92112.

The applicant requests a permit to import two Chinese red dogs or dholes (*Cuon alpinus leptrus*) from the Kwangchow Zoo, Kwantung Province, Peoples Republic of China for enhancement of propagation.

Humane care and treatment during transport has been indicated by the applicant.

Documents and other information submitted with this application are available to the public during normal business hours in Room 601, 1000 N. Glebe Road, Arlington, Virginia, or by writing to the Director, U.S. Fish and Wildlife Service (WPO), Washington, D.C. 20240.

This application has been assigned file number PRT 2–4679. Interested persons may comment on this application within 30 days of the date of this publication by submitting written data, views, or arguments to the Director at the above address. Please refer to the file number when submitting comments.

Dated: September 13, 1979.

**Donald G. Donahoo,**

*Chief, Permit Branch, Federal Wildlife Permit Office, U.S. Fish and Wildlife Service.*

[FR Doc. 79–28800 Filed 9–13–79; 9:42 am]

BILLING CODE 4310-55-M

## DEPARTMENT OF JUSTICE

## Immigration and Naturalization Service

## Voluntary Departure for Out-of-Status Nonimmigrant H–1 Nurses

On January 19, 1978, the Service published a Notice in the **Federal Register** [43 FR 2776] specifying the conditions for the granting of extended voluntary departure (deferred departure) to out-of-status nonimmigrant H–1 nurses, in order to afford them further opportunity to take and pass the State licensure examinations as professional nurses. Passage of such examinations is necessary to assure that nurses admitted as H–1 nonimmigrants may continue working in a professional capacity; and when they fail the examinations, they are expected to leave the United States. Since many had failed, allegedly because they had not had adequate opportunity to prepare, they could not be employed in the professional nurse occupation for which their employers' visa petitions for them had been approved. Among the

circumstances that influenced the promulgation of this voluntary departure policy was the assurance that the National Alliance for Fair Licensure of Foreign Nurse Graduates would publicize to foreign nurses abroad the information that they had to pass licensure examinations in the United States. U.S. consular officers were to advise them similarly when they inquired concerning the issuance of visas. Most important, however, was the expected availability of a new examination to screen nurse applicants abroad, before they would be permitted entry into the United States, as to the probability of their being able to pass the State licensing examinations. There is now such an examination, administered in April and October each year, both in this country and abroad, by the Commission on Graduates of Foreign Nursing Schools (CGFNS). The Immigration and Naturalization Service is in the process of publishing regulations which will require the taking and passing of this examination as a condition to the approval of an H–1 visa petition for a foreign nurse.

The period during which applications could be made for voluntary departure (deferred departure) under the terms of the January 19, 1978 Notice expired on December 31, 1978. It has been concluded, however, that it should be reinstated and further extended to December 31, 1979 so as to make eligible to file for deferred departure those now out-of-status H–1 nurses who have entered the United States since, and previous to the regulatory requirement that would make application for the CGFNS examination mandatory. This notice is effective immediately. For clarity, the conditions for the grant of voluntary departure are restated below.

**Conditions for the Grant of Voluntary Departure to the Out-of-Status H–1 Nurse in Order To Afford Further Opportunity To Take and Pass the Licensure Examination as Professional Nurse**

1. The nurse's lack of lawful immigration status shall be due only to the nurse's having changed employer without authority, or to his/her having failed the licensure examination. Refusal to take any such examination will be disqualifying for grant of extended voluntary departure.

2. The nurse must have taken the first available licensure examination after arrival in the United States, and have taken consecutively each such examination thereafter.

3. The nurse must show evidence (e.g., a cancelled check) that he/she has been

AR2022_200637

Case 1:18-cv-00068   Document 607-3   Filed on 11/03/22 in TXSD   Page 497 of 504
Federal Register / Vol. 44, No. 180 / Friday, September 14, 1979 / Notices

53583

registered to take the next licensure examination offered by the State.

4. A prior change of employer without INS authorization shall not disqualify the nurse from the grant of voluntary departure.

5. The nurse who meets the above conditions shall be given extended voluntary departure status in six-month increments up to a total that does not exceed three years from date of arrival in the United States.

6. The nurse already in the United States in excess of three years who meets the above conditions shall be given a further six-month period of voluntary departure for the purpose of again taking the licensure examinations.

7. During any period of authorized voluntary departure, the nurse shall be permitted to work in a lesser capacity than professional nurse.

8. The nurse who is successful in passing the examination, and is issued a license to practice professional nursing, may upon the approval by INS of an H-1 visa petition filed by an employer, be restored to H-1 nonimmigrant status.

9. The National Alliance for Fair Licensure of Foreign Nurse Graduates, for the benefit of intending applicants for H-1 visas in the future, will undertake to publicize to foreign nurse graduates abroad the information that they must pass State licensure examinations in the United States, and that they may not work as professional nurses after failing such examinations.

10. The nurse already under deportation proceedings shall be eligible for extended voluntary departure as provided above, if those proceedings are based on grounds which arose solely by reason of the nurse's having changed employer without authority, or by reason of his/her previous inability to pass the licensure examination. If such nurse is successful thereafter in passing the examination and achieving licensure, the Service will move to terminate the deportation proceedings with a veiw to restoring him/her to lawful H-1 status as provided above.

11. The period during which the out-of-status nurse may make application for the above benefit shall expire December 31, 1979.

Dated: September 10, 1979.

Leonel J. Castillo,
Commissioner of Immigration and Naturalization.
[FR Doc. 79-28632 Filed 9-13-79; 8:45 am]
BILLING CODE 4410-10-M

## DEPARTMENT OF LABOR

### Bureau of Labor Statistics

[OMB No. 44R-1136]

**Manual for Developing Local Area Unemployment Statistics; Availability of Methodological Instructions for Estimating State and Local Employment and Unemployment**

**PURPOSE.** The "Manual for Developing Local Area Unemployment Statistics" is issued by the Bureau of Labor Statistics to provide consistent instructions and documentation on the preparation of State and area estimates under the cooperative Federal-State Local Area Unemployment Statistics program.

**BACKGROUND.** The Bureau of Labor Statistics is charged with the responsibility for concepts and methods by which State employment security agencies prepare State and area unemployment and employment estimates. The "Manual for Developing Local Area Unemployment Statistics" is a compendium of existing procedures and replaces but does not alter previous instructions. The manual explains the conceptual framework for the estimating procedures, specifies the exact procedures used, and discusses the theoretical and empirical basis of each procedure. The estimates thus prepared by the State employment security agencies are used as part of the allocation criteria for funds under such programs as the Comprehensive Employment and Training Act of 1973.

**EFFECTIVE DATE.** The "Manual for Developing Local Area Unemployment Statistics" shall be available as of July 31, 1979. Request for copies should be addressed to: Mr. Dudley E. Young, Assistant Commissioner, Office of Employment Structure and Trends, Bureau of Labor Statistics, Department of Labor, Room 2907, 441 G Street, N.W., Washington, D.C. 20212

Dated: Sept. 4, 1979.

Janet L. Norwood,
Commissioner of Labor Statistics.
[FR Doc. 79-28681 Filed 9-13-79; 8:45 am]
BILLING CODE 4510-24-M

### Employment and Training Administration

**Migrant and Seasonal Farmworker Programs, Potential Fiscal Year 1980 Sponsors; Reopening of Competition for the States of New Hampshire and Indiana for Fiscal Year 1980**

**AGENCY:** Employment and Training Administration, Labor.

**ACTION:** Notice.

**SUMMARY:** *Potential Sponsors.* Pursuant to 20 CFR 689.201 and 689.207, the Employment and Training Administration announces (1) the selection of potential Fiscal Year 1980 sponsors for funds under Title III, Section 303 of the Comprehensive Employment and Training Act (CETA), (2) applicants selected on a conditionally basis, (3) those applicants not selected for Fiscal Year 1980. Section 303 funding and, (4) reopening of competition for New Hampshire and Indiana.

In all cases, the Department reserves the right to cease or suspend negotiations with any organization if serious management problems have been discovered through an assessment, audit, or other investigation by the Department, including but not limited to the instances of fraud and program abuse in 20 CFR 676, Subpart E, published in the **Federal Register** on April 3, 1979. In such instances, the Department may suspend negotiations indefinitely or may declare that awarding funds to the organization is not the best interests of the government or the Section 303 program and that negotiations are therefore terminated. The procedures of 20 CFR 689.208(d) will be followed in this event.

**FURTHER INFORMATION CONTACT:** Mr. Lindsay Campbell, Acting Director, Office of Farmworker Programs, DOL/ETA, 601 D Street, N.W., Patrick Henry Building, Room 6308, Washington, D.C. 20213, phone: (202) 376-6128.

**SUPPLEMENTARY INFORMATION:** 1. Potential Sponsor designations.—The following are the applicants designated as potential sponsors to provide services to migrant and seasonal farmworkers with allocable funds authorized under CETA, Section 303 in all or part of the States indicated. Each applicant so designated as a potential sponsor will be notified in writing of the amount of funds which may be granted, the target areas to be served, the items to be negotiated, and the time and place of negotiations. These designations are being made pursuant to 20 CFR 689.201, 20 CFR 689.207, and 689.208; designation as a potential sponsor does not commit the Department of Labor to award funds to designee, only to enter into negotiations. If negotiations fail to produce an acceptable grant, the Secretary will make a resolicitation for the State or area pursuant to 20 CFR 689.208(d).

AR2022_200638

States other than Florida, California, and Arizona) (7 CFR 51.620–51.653).

Dated: September 22, 1977.

CHARLES R. BRADER,
*Deputy Director, Fruit and Vegetable Division, Agricultural Marketing Service.*

[FR Doc.77–28177 Filed 9–26–77;8:45 am]

---

**Rural Electrification Administration**

**[ 7 CFR Part 1701 ]**

**ELECTRIC PROGRAM**

**Proposed Revision of REA Bulletin on General Funds**

AGENCY: Rural Electrification Administration.

ACTION: Advance notice of proposed rule.

SUMMARY: The Rural Electrification Administration (REA) proposes to revise Bulletin 1–7, General Funds, and REA Form 740a, Review of General Funds (Electric). The circumstances that create the need for this action arise from changes in REA and supplemental lenders' loan programs and services. The intended effect of this action is to redefine general funds to include investments in borrowers' associated organizations, with the exception of certain such investments that have been deemed excludable from general funds by the Administrator, and to liberalize the application of the policy with respect to other items that may be excludable from general funds.

DATE: Public comments must be received by REA on or before October 24, 1977.

ADDRESS: Interested persons may submit written data, views, or comments to the Director, Electric Borrowers' Management Division, Room 3346, South Building, U.S. Department of Agriculture, Washington, D.C. 20250. All written submissions made pursuant to this notice will be made available for public inspection in the Office of the Director, Electric Borrowers' Management Division, during regular business hours.

FOR FURTHER INFORMATION CONTACT:

Mr. Charles R. Weaver, Director, Electric Borrowers' Management Division, Rural Electrification Administration, Room 3346, South Building, U.S. Department of Agriculture, Washington, D.C. 20250, telephone 202–447–5900.

SUPPLEMENTARY INFORMATION: Pursuant to the Rural Electrification Act, as amended (7 U.S.C. 901 et seq.), REA proposes to revise REA Bulletin 1–7 issued August 19, 1969, and to revise REA Form 740a issued June 1974. The effect of the proposed revisions would be to:

(1) Reinstate REA borrowers' investments in associated organizations as general fund items, with the exception of certain excludable such investments.

(2) Allow the exclusion of short-term loans from general funds for loan fund advance purposes, where the advance is

to be used to repay the short-term loan.

(3) Change REA's advance payment recommendation from an amount equal to two years' debt service payments to a level consistent with the borrower's cash management planning.

A copy of the proposed revision of REA Bulletin 1–7 and REA Form 740a may be secured in person or by written request from the Office of the Director, Electric Borrowers' Management Division.

NOTE.—REA has determined that this document does not involve a major action requiring preparation of an Economic Impact Statement under Executive Order 11821, as amended by Executive Order 11949, and OMB Circular A–107.

Dated: September 19, 1977.

JOSEPH VELLONE,
*Acting Administrator.*

[FR Doc.77–27007 Filed 9–26–77;8:45 am]

---

**Title 8—Aliens and Nationality**

**CHAPTER I—IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE**

**[ 8 CFR Part 108 ]**

**ASYLUM**

**Identification for Reasons of Denial; Extension of Comment Period**

AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Proposed rule, extension of period for public comments.

SUMMARY: This notice responds to a request by the Association of Immigration and Nationality Lawyers for an extension of the period for submission of written comments on the notice of proposed rulemaking amending the Service's regulations pertaining to asylum.

DATE: Comments must be received on or before November 7, 1977.

ADDRESS: Please submit written representations only to the Commissioner of Immigration and Naturalization, 425 Eye Street, NW., Washington, D.C. 20536.

FOR FURTHER INFORMATION CONTACT:

James G. Hoofnagle, Jr., Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536, Telephone 202–376–8373.

SUPPLEMENTARY INFORMATION: This notice responds to a request by the Association of Immigration and Nationality Lawyers for an extension of the period for submission of written comments on the notice of proposed rulemaking amending the Service's regulations pertaining to asylum. The notice of proposed rulemaking was published in the FEDERAL REGISTER on August 5, 1977 (42 FR 39672) and established a deadline of September 6, 1977, for the receipt of written comments. In order to afford interested parties additional time to submit comments, the deadline date for receipt of comments is hereby extended to

November 7, 1977. All relevant comments received on or before that date will be considered. Oral representations may not be presented in any manner and will not be considered.

Dated: September 21, 1977.

LEONEL J. CASTILLO,
*Commissioner of Immigration and Naturalization.*

[FR Doc.77–28055 Filed 9–26–77;8:45 am]

---

**[ 8 CFR Part 242 ]**

**VOLUNTARY DEPARTURE PRIOR TO COMMENCEMENT OF HEARING**

AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Notice of Proposed Rule Making.

SUMMARY: This is a proposed amendment to the regulations of the Immigration and Naturalization Service pertaining to authorization of voluntary departure prior to commencement of hearing. This proposed amendment, whether or not necessary, is intended to make more widely available, by setting forth in the regulations Service policy now contained in the Operations Instructions. This notice is also intended to inform the public concerning the reasons for the Service's unpublished decision in 1972 and present proposed rule to remove third preference aliens from the classes of aliens eligible for voluntary departure prior to commencement of hearing.

DATES: Representations must be received on or before October 27, 1977.

ADDRESSES: Please submit written representations in duplicate to the Commissioner of Immigration and Naturalization, Room 7100, 425 Eye Street, NW., Washington, D.C. 20536.

FOR FURTHER INFORMATION CONTACT:

James G. Hoofnagle, Jr., Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536 telephone 202–376–8373.

SUPPLEMENTARY INFORMATION:

A. GENERAL

This is a notice of proposed rule making published under section 553 of Title 5 of the United States Code (80 Stat. 383). This notice is being published in order to publish certain material regarding the authorization of voluntary departure prior to commencement of hearing now contained in the Service's Operations Instructions, in the Code of Federal Regulations for the information and guidance of the general public and all interested individuals. The second reason this notice is being published is to set forth in the FEDERAL REGISTER formal notice to the public of the Service's revocation of its unpublished former policy under which aliens with approved visa petitions for preference classification under section 203(a) (3) of the Immigration and Nationality Act (8 U.S.C.

AR2022_200639

19460

**PROPOSED RULES**

1153(a)(3)) (third preference aliens) were permitted to remain in the United States pending availability of a visa number. This policy was rescinded effective July 31, 1972 by a memorandum dated July 17, 1972 from the then Associate Commissioner, Operations to the Regional. District and Files Control Offices of the Service. However, the memorandum was not published in the FEDERAL REGISTER.

**B. BACKGROUND OF THE POLICY TOWARD THIRD PREFERENCE ALIENS**

The Service's policy of permitting certain preference aliens to remain in the United States pending availability of a visa number was first published in the operations instructions on August 1, 1956. It provided that an alien "who is the beneficiary of an approved petition according to section 203(a)(1) status but cannot obtain a visa because of quota oversubscription * * * shall be granted voluntary departure until a visa is available," provided the alien was statutorily eligible. When this operations instruction was first published, section 203(a)(1) of the Act described an alien who was "a qualified quota immigrant whose services are determined to be needed urgently in the United States because of the high education, technical training, special experience or exceptional ability of such immigrant and to be substantially beneficial prospectively to the national economy, cultural interests or welfare of the United States." The accompanying spouse and children of these immigrants were also included in the classification. The Act of October 3, 1965 (79 Stat. 911) which substantially amended the Act of 1952 placed aliens described in section 203(a)(1), in section 203(a)(3) of the amended Act. Section 203(a)(3) as amended provided that "(3) visas shall next be made available * * * to qualified immigrants who are members of the professions, or because of their exceptional ability in the sciences or arts are substantial benefits prospectively to the national economy, cultural interests or welfare of the United States." The operations instructions issued in accordance with these changes to the law were amended to change section 203(a)(1) to section 203(a)(3) to continue the extended voluntary departure privilege for those individuals described in the former section 203(a)(1).

**C. OPERATIONS INSTRUCTIONS 242.10(a)(6) IN EFFECT JULY 17, 1972**

On July 17, 1972, Service Operations Instruction 242.10(a)(6) read as follows:

* * *Voluntary departure may be granted to any alien who is statutorily eligible therefor * * * (6)(i) who is the beneficiary of an approved third-preference petition except a J nonimmigrant subject to the foreign residence requirement who has not been granted a waiver or an alien in whose case an order to show cause was issued pursuant to the third subparagraph of OI 242.1(a) or (ii) a native of an independent country or the Western Hemisphere or the Canal Zone who has the qualifications of a third-preference alien and has applied for an immigrant visa

or (iii) the beneficiary of an approved sixth-preference petition who satisfies Travel Control without another petition that he can qualify for third preference, and who cannot obtain a visa solely because a visa number is unavailable, and his child or spouse, including a spouse who is or was a J nonimmigrant and is subject to the foreign residence requirement.

**D. THE MEMORANDUM OF JULY 17, 1972**

On July 17, 1972 the Associate Commissioner, Operations issued a memorandum to all Regional Commissioners, District Directors and Files Control Offices directing that the practice of routinely permitting alien professionals and certain Western Hemisphere natives to remain in the United States pending the availability of immigrant visas be terminated effective July 31, 1972. Operations Instruction 242.10(a)(6) was thereby canceled. The Associate Commissioner cited the unfavorable effect of unlawful employment of nonresident aliens on the domestic job market and concern over this situation coupled with a recommendation that the practice be discontinued made by the House Judiciary Subcommittee dealing with immigration as his reasons for ordering termination of the policy. This memorandum was not published in the FEDERAL REGISTER. However, copies were sent to the Association of Immigration and Nationality Lawyers. The American Council of Voluntary Agencies for Foreign Service, Inc., and the National Association for Foreign Student Affairs. Also, District Directors were directed to notify all interested local organizations. Copies of Operations Instruction 242.10(a)(6) were available in the Service's public reading rooms as well, and included the operations instruction as it appeared both before and after rescission of the subject instructions.

**E. THE PARCO CASE**

On January 28, 1977, in *U.S. ex rel. Parco v. Morris*, Civil Action No. 73-2496 (U.S.D.C. E.D.Pa.) it was held that failure of the Services to publish its change of policy respecting the grant of extended voluntary departure to third preference aliens pending availability of a visa number in the FEDERAL REGISTER, was a violation of the Administrative Procedure Act and that this change in policy could not be applied against the relators to compel their departure from the United States. Although the Service might have chosen to appeal, this decision came at a time when the Service was embracing a policy of greater openness, characterized by publishing more operations instructions in the FEDERAL REGISTER as rules, and this operations instruction was deemed to be one which ought to be so published, whether or not required by law. For this reason the Service is publishing this notice of proposed rule making to place the public and interested parties on notice that it remains the policy of the Service that extended voluntary departure pending availability of a visa number is not to be routinely granted third preference aliens or the others in the classes specified in the

above quoted operations instruction which was rescinded effective July 31, 1972. Third preference aliens with a priority date earlier than the effective date of this regulation, acquired either through early approval of the petition or by timely filing of the petition for third preference status the approval of which accords the alien such a priority date, will continue to receive extended voluntary departure until visa numbers become available. Third preference aliens with priority dates later than the effective date of this regulation will not receive extended voluntary departure unless they are accorded it under some other policy expressed in the new version of 8 CFR 242.5(a)(2).

**F. RATIONALE FOR RESCISSION OF FORMER OPERATIONS INSTRUCTION 242.10(a)(6)**

The 1972 decision to terminate the policy of granting extended voluntary departure to third preference aliens pending availability of a visa number was the result of studies which had been initiated several years before the decision was made. Statistical data relating to third preference aliens who had been permitted to remain in the United States pending the availability of visa numbers was gathered and studied. This statistical data is no longer available. However, the Service learned from a study of that data that the policy of granting third preference aliens extended voluntary departure was not working out satisfactorily. For example, once it became widely known that a temporary visitor who could qualify for third preference classification could confidently expect to receive permission to remain at work in the United States until his visa became available, numbers of aliens, especially from countries with slow visa availability, obtained nonimmigrant visas by misrepresenting to the American Consul the real reason for which they were traveling to the United States. They thereby took advantage of their countrymen who had formed the intention to immigrate at about the same time, but who registered for immigrant visas in their home country and waited there. Another abuse of the privilege which appeared was that third preference immigrants who had received indefinite voluntary departure would have their spouses come to the United States, and even though the spouse's occupation was not one for which preference status could be authorized, permission to remain and work would be given to both husband and wife. Various Service officials observed and reported increasing instances of aliens coming to the United States with nonimmigrant visitors' visas who had a preconceived intent to remain, a violation of the nonimmigrant visa conditions of the Act. As a result of the abuses of the voluntary departure privilege, the numbers of aliens in the United States awaiting visas increased to the point where the policy was no longer realistic. As of May 12, 1972, there were 6,362 professionals from the Philippines in the United States awaiting visa availability.

AR2022_200640

This number was more than three times the total statutorily permitted for third preference visas from any single country. Although the reasons discussed above were not specifically set forth in the memorandum of July 17, 1972, they were considered by the Associate Commissioner, Operations when the memorandum terminating the policy was issued. His determination was the culmination of an intermittent study over several years of the defects in the voluntary departure program, which were aggravated by the decreasing availability of visa numbers, and a corresponding increase in the abuse of the procedure. The net result was that administration of the immigration laws and the economy of the nation were adversely affected. Accordingly the procedure was terminated. When the operations instructions material relating to voluntary departure prior to commencement of hearing is republished in the Code of Federal Regulations, former Operations Instruction 242.10(a) (6) as it appeared on July 17, 1972 (see Part C of this discussion) will not be included because the reasons for termination of the procedure in 1972 remain valid today.

Therefore, Operations Instruction 242.10(a)(6) will be published in the regulations in a different format. Existing Operations Instruction 242.10(a)(6) provides that "Voluntary departure may be granted to an alien who is statutorily eligible therefor * * * (6) who is admissible to the United States as an immigrant and (i) who is an immediate relative of a United States citizen or is otherwise exempt from the numerical limitation on immigrant visa issuance, or has a priority date for an immigrant visa not more than 60 days later than the date shown in the latest Visa Office Bulletin, and has applied for an immigrant visa at an American consulate which has accepted jurisdiction over the case; or (ii) who is a native of an independent country of the Western Hemisphere or the Canal Zone, has been in the United States since a date prior to January 1, 1977, and who on December 31, 1976 was and continues to be an immediate relative of a United States citizen, or the unmarried son or unmarried daughter of a United States citizen, or the spouse or unmarried son or unmarried daughter of a lawful permanent resident alien." Subparagraph (ii) was published in the Operations Instructions in anticipation of the passage of legislation which would make natives of the Western Hemisphere and the Canal Zone eligible for preference classification in the issuance of immigrant visas under the provisions of section 203(a) of the Act (8 U.S.C. 1153 (a)). Pub. L. 94–571 which became effective January 1, 1977, accomplished this objective. As a result, Western Hemisphere natives are included in the visa preference system and the special provisions of subparagraph (6) (ii) are no longer required. They can receive the same privilege under subparagraph (6) (i). Therefore, there is no need to retain Operations Instruction 242.10(a)(6)(ii)

in the proposed regulation and it will be deleted when this operations instruction is so published. The provision is also unnecessary because preference visa numbers are now generally available for natives of the Western Hemisphere.

G. PROPOSED AMENDMENTS TO REGULATIONS

In the light of the foregoing, it is proposed to amend existing 8 CFR 242.5(a) *Voluntary departure prior to commencement of hearing.* This section will be amended by the addition thereto of material presently contained in Service Operations Instruction 242.10(a) and 242.10(b) (1). There will be no change in the provisions of existing 8 CFR 242.5 (b) and (c).

Operations Instruction 242.10(a) sets forth the classes of aliens who in the absence of countervailing factors will ordinarily be granted voluntary departure prior to the commencement of hearing. Operations Instruction 242.10(b) (1) sets forth periods of time for which the voluntary departure privilege may be authorized allows referred to in Operations Instruction 242.10(a). 8 CFR 242.5(a) will be revised by redesignating existing paragraph (a) as subparagraph (a) (1) and republishing it without change. 8 CFR 242.5(a) will be further revised by the addition of new subparagraph (a) (2) pertaining to classes of aliens to whom voluntary departure prior to commencement of hearing may be authorized, and subparagraph (a) (3) setting forth the periods of time for which such voluntary departure may be authorized.

Therefore, it is proposed to amend Part 242 of Chapter I of Title 8 of the Code of Federal Regulations as set forth below:

PART 242—PROCEEDINGS TO DETERMINE DEPORTABILITY OF ALIENS IN THE UNITED STATES: APPREHENSION, CUSTODY, HEARING, AND APPEAL

In Part 242, in § 242.5(a), it is proposed to redesignate existing paragraph (a) as 8 CFR 242.5(a) (1), and republish it without change; and to add new subparagraph (a) (2) *Authorization* and (a) (3) *Periods of time.* As revised § 242.5(a) reads as follows:

§ 242.5   Voluntary departure prior to commencement of hearing.

(a) (1) *Authorized officers.* The authority contained in section 242(b) of the Act to permit aliens to depart voluntarily from the United States may be exercised by district directors, district officers who are in charge of investigations, officers in charge, and chief patrol agents.

(2) *Authorization.* Voluntary departure may be granted to any alien who is statutorily eligible therefor

(i) Who is a native of a foreign contiguous territory and not within the purview of class (vi) of this paragraph; or

(ii) Whose application for extension of stay as a nonimmigrant is being denied;

(iii) Who has voluntarily surrendered himself to the Service; or

(iv) Who presents a valid travel docu-

ment and confirmed reservation for transportation out of the United States within 30 days; or

(v) Who is an F-1, F-2, J-1, or J-2 nonimmigrant and who has lost such status solely becuse of a private bill introduced in his behalf; or

<mark>(vi) Who is (A) Admissible to the United States as an immigrant and who is an immediate relative of a United States citizen or (B) is otherwise exempt from the numerical limitation on immigrant visa issuance or (C) has a priority date for an immigrant visa not more than 60 days later than the date shown in the latest Visa Office Bulletin and has applied for an immigrant visa at an American Consulate which has accepted jurisdiction over the case or (D) who is a third preference alien with a priority date earlier than the effective date of this regulation; or

(vii) Any alien who has been granted asylum and who has not been granted parole status or stay of deportation; or

(viii) In whose case the district director has determined there are compelling factors warranting grant of voluntary departure.</mark>

(3) *Periods of time.* Except for classes (v), (vi), (vii), and (viii) of paragraph (a) (2) of this section, any grant of voluntary departure shall contain a time limitation of usually not more than 30 days, and an extension of the original voluntary departure time shall not be authorized except under meritorious circumstances. Upon failure to depart, deportation proceedings will be pursued. Class (v) may be granted voluntary departure in increments of one year conditioned upon the F-1 or J-1 alien maintaining a full course of study at an approved institution of learning, or upon abiding by the terms and conditions of the exchange program with the limitations imposed by 22 CFR 63.23. Class (vi) may be granted voluntary departure until the American counsul is ready to issue an immigrant visa and, in the discretion of the district director, may be in increments of 30 days, conditioned upon continuing availability of an immigrant visa as shown in the latest Visa Office Bulletin and upon the alien's diligent pursuit of efforts to obtain the visa. <mark>Classes (vii) and (viii) may be granted voluntary departure in increments of time, not to exceed one year, as determined by the district director to be appropriate in the case. Form I-94 issued to an alien granted voluntary departure, who is within class (v), (vi), (vii), or (viii) of paragraph (a)(1) of this section may be stamped with the legend "Employment Authorized" if the alien seeks some indication from the Service that he is entitled to be employed.</mark>

(Sec. 103; 66 Stat. 173; 8 U.S.C. 1103.)

H. REPRESENTATIONS INVITED

The Service invites submission of written data, views and arguments concerning the proposed rule. Oral representations may not be made in any manner. All relevant material received on or be-

AR2022_200641

**PROPOSED RULES**

fore the closing date for submission of representations will be considered. Representations should be submitted to the Commissioner of Immigration and Naturalization at the address indicated at the beginning of this notice.

Dated: September 21, 1977.

LEONEL J. CASTILLO,
*Commissioner of Immigration and Naturalization.*

[FR Doc.77-28056 Filed 9-26-77;8:45 am]

## DEPARTMENT OF AGRICULTURE

### Animal and Plant Health Inspection Service

**[ 9 CFR Part 113 ]**

### VIRUSES, SERUMS, TOXINS, AND ANALOGOUS PRODUCTS

#### Miscellaneous Amendments

**AGENCY:** Animal and Plant Health Inspection Service (APHIS).

**ACTION:** Proposed rule.

**SUMMARY:** This proposed amendment would provide for the use of a shorter expiration dating for Tetanus Antitoxin based upon the number of units of the antitoxin in the final container. At the present time, a 3-year dating for a serial of product having a 20 percent overage is authorized, but no provision is made for products with less than a 20 percent unit overage. This proposed amendment would provide requirements for a 1-year dating for a serial of product having more than 10 percent but less than 20 percent overage.

**DATES:** Comments must be received on or before October 27, 1977.

**ADDRESS:** Interested parties are invited to submit written data, views, or arguments regarding the proposed regulations to: Deputy Administrator, Veterinary Services, Animal and Plant Health Inspection Service, U.S. Department of Agriculture, Room 828-A, Federal Building, Hyattsville, Md. 20782.

**FOR FURTHER INFORMATION CONTACT:**

Dr. R. J. Price, 301-436-8245.

**SUPPLEMENTARY INFORMATION:** To assure an adequate number of units in all final containers of Tetanus Antitoxin throughout a dating period, the regulations require that each container of the product must contain a greater number of units of antitoxin than is indicated on the label. At the present time, the regulations provide for a dating period of 3 years if the overage is 20 percent or more, but there is no provision for a shorter period if the overage is less than 20 percent.

It is proposed that Tetanus Antitoxin containing more than 10 percent but less than 20 percent overage at the time of the potency test be released with a dating period of not more than 1 year.

Each word in the heading for § 113.251 shall be capitalized.

**§ 113.251** is amended by revising paragraph (a)(2) to read:

**§ 113.251  Tetanus Antitoxin.**

  *   *   *   *   *

(a) * * *

(2) The expiration date of Tetanus Antitoxin shall be not more than 3 years after the date of a potency test which demonstrates that the recoverable antitoxin from the final container provides at least 20 percent excess over the number of units claimed on the label or not more than 1 year after the date of a potency test which demonstrates that the recoverable antitoxin from the final container provides 10 to 19 percent excess over the number of units claimed on the label.

  *   *   *   *   *

(21 U.S.C. 151 and 154; 37 FR 28477, 28646; 38 FR 19141.)

All written submissions made pursuant to this notice will be made available for public inspection at the address listed in this document during regular hours of business (8 a.m. to 4:30 p.m., Monday to Friday, except holidays) in a manner convenient to the public business (7 CFR 12.7(b)).

Done at Washington, D.C., this 21st day of September 1977.

NOTE.—The Animal and Plant Health Inspection Service has determined that this document does not contain a major proposal requiring preparation of an Inflation Impact Statement under Executive Order 11821 and OMB Circular A-107.

PIERRE A. CHALOUX,
*Deputy Administrator,*
*Veterinary Services.*

[FR Doc.77-28018 Filed 9-26-77;8:45 am]

## CIVIL AERONAUTICS BOARD

**[ 14 CFR Parts 241, 245, 246 ]**

[EDR-331-B; Docket 31205; Dated: September 21, 1977]

### MODEL CORPORATE DISCLOSURE REGULATIONS

#### Supplemental Advance Notice of Proposed Rulemaking

**AGENCY:** Civil Aeronautics Board.

**ACTION:** Supplemental advance notice of proposed rulemaking.

**SUMMARY:** This notice extends for 9 days the filing date for comments and reply comments in a rulemaking proceeding concerning Model Corporate Disclosure Regulations developed by the Interagency Steering Committee on Uniform Corporate Reporting. The extension for the comment due date was requested by Continental Illinois Corp.

**DATES:** Comments: September 30, 1977. Reply comments: October 15, 1977.

**ADDRESSES:** Comments should be sent to: Docket 31205, Docket Section, Civil Aeronautics Board, Washington, D.C. 20428. Comments may be examined at the Docket Section, Civil Aeronautics Board, Room 711, Universal Building, 1825 Connecticut Avenue NW., Washington, D.C., as soon as they are received.

**FOR FURTHER INFORMATION CONTACT:**

Stephen Babcock, Office of the General Counsel, Civil Aeronautics Board, 1825 Connecticut Avenue NW., Washington, D.C. 20428 (202-673-5442).

**SUPPLEMENTARY INFORMATION:** By Advance Notice of Proposed Rulemaking EDR-331, 42 FR 39115, August 2, 1977, the Board gave notice that it desired to solicit public views on whether it can and should adopt the Model Corporate Disclosure Regulations developed by the Interagency Steering Committee on Uniform Corporate Reporting.

By telex received September 21, 1977, Continental Illinois Corp., (CIC) the parent of a number of firms, including Continental Illinois National Bank and Trust Co., has requested an extension of 9 days for the filing of comments and reply comments. In support, CIC advises that the additional time is required to review and coordinate information concerning the impact of the Model Regulations on its numerous subsidiaries.

Upon consideration of the foregoing, I find that good cause has been shown for the granting of the requested extension. Although the date for comments and reply comments has already been extended once (EDR-331A, 42 FR 42691, August 24, 1977), I believe that the disadvantage of an additional 9-day delay is outweighed by the desirability of obtaining the considered views of all interested members of the public, including CIC. Moreover, it does not appear that this extension will prejudice any party to the proceeding.

Accordingly, pursuant to authority delegated in section 385.20(d) of the Board's Organization Regulations (14 CFR 385.20(d)), the time for filing comments is extended to September 30, 1977, and the time for filing reply comments to October 15, 1977.

(Sec. 204(a) of the Federal Aviation Act of 1958, as amended, 72 Stat. 743, 49 U.S.C. 1324.)

STEPHEN L. BABCOCK,
*Acting Associate General Counsel,*
*Rules Division.*

[FR Doc.77-28173 Filed 9-26-77;8:45 am]

## FEDERAL TRADE COMMISSION

**[ 16 CFR Part 13 ]**

[Docket No. 9004]

### GOLD BULLION INTERNATIONAL, LTD., ET AL.

#### Consent Agreement With Analysis To Aid Public Comment

**AGENCY:** Federal Trade Commission.

**ACTION:** Provisional consent agreement.

**SUMMARY:** In settlement of alleged violations of federal law prohibiting unfair acts and practices and unfair methods of competition, this provisionally accepted consent order, among other things, would require B. H. Mayer's Kunstprageanstalt of Pforzheim, West Germany, a manufacturer of imitation

AR2022_200642

Case 1:18-cv-00068   Document 607-3   Filed on 11/03/22 in TXSD   Page 502 of 504

[3410-02]

[Plum Reg. 14, Amdt. 1]

## PART 917—FRESH PEARS, PLUMS, AND PEACHES GROWN IN CALIFORNIA

### Grade and Size Requirements

AGENCY: Agricultural Marketing Service, USDA.

ACTION: Final rule.

SUMMARY: This amendment continues through May 31, 1979, the current minimum grade and size requirements for shipments of fresh California plums. The amendment takes into consideration the marketing situation facing the California plum industry and is necessary to assure that shipments of plums will be of suitable quality and size in the interest of consumers and producers.

EFFECTIVE DATES: July 15, 1978, through May 31, 1979.

FOR FURTHER INFORMATION CONTACT:

Charles R. Brader, 202-447-6393.

SUPPLEMENTARY INFORMATION: Plum Regulation 14 was published in the FEDERAL REGISTER on May 19, 1978 (43 FR 21636). On June 1, 1978, a proposal was issued (43 FR 23724) to extend the regulatory provisions through May 31, 1979. The notice allowed interested persons until June 23, 1978, to submit written comments pertaining to the proposed amendment. No such material was submitted.

The proposal was recommended by the Plum Commodity Committee, established under the marketing agreement, as amended, and order No. 917, as amended (7 CFR Part 917). This marketing agreement and order regulates the handling of fresh pears, plums, and peaches grown in California and is effective under the applicable provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601-674).

After consideration of all relevant matter presented, including the proposals in the notice and other available information, it is hereby found that the following amendment is in accordance with this marketing agreement and order and will tend to effectuate the declared policy of the act.

It is further found that good cause exists for not postponing the effective date of this amendment until 30 days after publication in the FEDERAL REGISTER (5 U.S.C. 553) in that: (1) Shipments of plums are currently in progress and this amendment should be applicable to all shipments during the season in order to effectuate the declared policy of the act; (2) the amendment is the same as that specified in the notice to which no exceptions were

filed; (3) the regulatory provisions are the same as those currently in effect; and (4) compliance with this amendment will not require any special preparation on the part of the persons subject thereto which cannot be completed by the effective time hereof.

The provisions of §917.447 Plum Regulation 14 (43 FR 21636) are hereby amended to read as follows:

### §917.447 Plum Regulation 14.

Order. (a) During the period July 15, 1978, through May 31, 1979, no handler shall ship any lot of packages or containers of any plums, other than the varieties named in paragraph (b) hereof, unless such plums grade at least U.S. No. 1.

(b) During the period July 15, 1978, through May 31, 1979, no handler shall ship:

(1) Any lot of packages or containers of Tragedy or Kelsey plums unless such plums grade U.S. No. 1, with a total tolerance of 10 percent for defects not considered serious damage in addition to the tolerances permitted by such grade; or

(2) Any lot of packages or containers of Angeleno, Andys Pride, Autumn Queen, Bee Gee, Casselman, Empress, Fresno Rosa, Grand Rosa, Improved Late Santa Rosa, King David, Late Santa Rosa, Linda Rosa, Red Rosa, Rosa Grande, Roysum, SW-1, and Swall Rosa plums unless such plums grade U.S. No. 1, except that healed cracks emanating from the stem and which do not cause serious damage shall not be considered as a grade defect with respect to such grade; or

(3) Any lot of packages or other containers of Late Tragedy plums unless such plums grade U.S. No. 1, except that gum spots which do not cause serious damage shall not be considered as a grade defect with respect to such grade.

(c) During the period July 15, 1978, through May 31, 1979, no handler shall ship any package or other container of any variety of plums listed in column A of the following table I unless such plums are of a size that an eight-pound sample, representative of the sizes of the plums in the package or container, contains not more than the number of plums listed for the variety of column B of said table.

TABLE I

| Column A variety | Column B plums per sampler |
|---|---|
| Ace | 55 |
| Amazon | 64 |
| Andys Pride | 69 |
| Angeleno | 57 |
| Autumn Rosa | 72 |
| Beauty | 91 |
| Bee Gee | 65 |
| Burmosa | 80 |
| Casselman | 63 |

TABLE I—Continued

| Column A variety | Column B plums per sampler |
|---|---|
| Duarte | 62 |
| Durado | 91 |
| El Dorado | 68 |
| Elephant Heart | 63 |
| Empress | 57 |
| Fresno Rosa | 62 |
| Friar | 56 |
| Frontier | 61 |
| Gar-Rosa | 71 |
| Grand Rosa | 54 |
| July Santa Rosa | 69 |
| Kelsey | 47 |
| Laroda | 58 |
| Late Durate | 60 |
| Late Santa Rosa (including improved late Santa Rosa and Swall Rosa) | 64 |
| Linda Rosa | 63 |
| Mariposa | 61 |
| Midsummer | 63 |
| Nubiana | 56 |
| President | 57 |
| Queen Ann | 50 |
| Queen Rosa | 53 |
| Red Beaut | 91 |
| Red Rosa | 64 |
| Redroy | 58 |
| Rosa Ann | 69 |
| Rosa Grande | 63 |
| Roysum | 80 |
| Santa Rosa | 69 |
| Simka, Arrosa, New Yorker | 48 |
| Standard | 83 |
| Tragedy | 114 |
| Wickson | 51 |

(d) When used herein, "U.S. No. 1" and "serious damage" shall have the same meaning as set forth in the U.S. Standards for Fresh Plums and Prunes (7 CFR 51.1520-1538); and all other terms shall have the same meaning as when used in the amended marketing agreement and order.

(Secs. 1-19, 48 Stat. 31, as amended; 7 U.S.C. 601-674.)

Dated, July 5, 1978, to become effective July 15, 1978.

CHARLES R. BRADER,
*Deputy Director, Fruit and Vegetable Division, Agricultural Marketing Service.*

[FR Doc 78-18919 Filed 7-7-78; 8:45 am]

[4410-10]

### Title 8—Aliens and Nationality

## CHAPTER I—IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE

## PART 242—PROCEEDINGS TO DETERMINE DEPORTABILITY OF ALIENS IN THE UNITED STATES: APPREHENSION, CUSTODY, HEARING, AND APPEAL

### Voluntary Departure Prior to Commencement of Hearing

AGENCY: Immigration and Naturalization Service, Justice.

AR2022_200643

ACTION: Final rule.

SUMMARY: This final rule amends the regulations of the Immigration and Naturalization Service to set forth in the regulations material formerly contained in the operations instructions respecting the eligibility of certain aliens for voluntary departure prior to commencement of hearing. The amendment also provides that effective August 9, 1978, third- and sixth-preference aliens, as described in the regulation, will not be eligible for voluntary departure prior to commencement of hearing for the purpose of remaining in the United States to await the availability of a visa number. These amendments are intended to set forth the Service policy on this subject and the reasons for it, and to inform those who will be affected and members of the general public.

EFFECTIVE DATE: August 9, 1978.

FOR FURTHER INFORMATION CONTACT:

James G. Hoofnagle, Jr., Instructions Officer, Immigration and Naturalization Service, 425 I Street NW., Washington, D.C. 20536, telephone 202-376-8373.

SUPPLEMENTARY INFORMATION: On September 27, 1977, the Service published a notice of proposed rulemaking in the FEDERAL REGISTER at 42 FR 49459 in which it was proposed to amend 8 CFR 242.5(a) by setting forth regulations which would formally rescind the Service policy of granting voluntary departure prior to the commencement of hearing to aliens who were the beneficiaries of third-preference petitions but were unable to adjust their status to that of a lawful permanent resident of the United States solely because visa numbers were not immediately available to them. The period for public comment on this proposal was scheduled to expire on October 27, 1977, but was subsequently extended to December 27, 1977.

Several representations were received from individual attorneys and from the Association of Immigration and Nationality Lawyers. All of those representations have been carefully considered and as pertinent, are discussed below.

A number of the persons who commented suggested that the 30-day incremental limitations on the period of voluntary departure provided for the third-preference beneficiary was insufficient and would only inconvenience the alien and his counsel by requiring them to reapply for this benefit every 30 days, particularly since visa numbers would not become available for a long period of time. We will amend the final rule to provide that a third-preference alien who is given voluntary departure prior to commencement of

hearing under this regulation will be permitted to remain for an indefinite period of time until an immigrant visa becomes available provided the third-preference petition remains valid and the alien retains the status established in the petition. However, voluntary departure authorizations for the other groups of aliens described in subparagraph (vi) will continue to be given in 30-day increments. This is necessary not to create inconvenience for the alien and his counsel, but to enable the Service to stay on top of the case should the alien become eligible for other immigration benefits, and insure that issuance of the visa is diligently pursued so the alien's status may be adjusted as expeditiously as possible.

Another commenter suggested that there may be possible confusion caused by the transfer of operations instruction 242.10(a)(6) to the Code of Federal Regulations, since other operations instructions which refer to it were not also being published as regulations. To minimize confusion, all cross references to operations instruction 242.10(a)(6) will be amended to reflect the proper CFR citation. This same commenter also suggested that the provision under which a student would lose his status upon introduction of a private bill was not necessary because the private bill would not take that student out of nonimmigrant status. The contrary is the case. Generally, private legislation is introduced for the purpose of making an alien a permanent resident of the United States. Should a nonimmigrant student become the beneficiary of private legislation introduced for this purpose, he would be declaring his intention to remain permanently in the United States and would no longer be entitled to nonimmigrant status for that reason. Therefore, this provision of the proposed regulation is valid and appropriate.

Another commenter requested clarification of how the regulation is to be applied since the effective date of the regulation is to be used as the reckoning date to determine whether a third-preference alien is considered eligible for voluntary departure prior to the commencement of hearing. In order for a third-preference beneficiary to be eligible for voluntary departure prior to commencement of hearing under this regulation, he must have a priority date as a third-preference alien which predates the effective date of this regulation. For example, since the effective date of this regulation is August 9, 1978, a third-preference beneficiary with a priority date earlier than August 9, 1978, may apply for this privilege regardless of when the visa number actually becomes available. Conversely, an alien with a priority date later than August 9, 1978, would not be eligible to apply. It is

Service policy to permit the spouse and child(ren) of an alien beneficiary to remain in the United States unless derogatory information indicates the spouse or child(ren) should not be permitted to remain.

Finally, it was contended by some commenters that the Service should not issue the proposed regulation at all, but should continue the practice of granting beneficiaries of third-preference petitions voluntary departure pending availability of a visa number. It is argued that a third-preference alien is one who possesses a skill or profession which is in short supply in this country, and therefore, that individual should be permitted to remain here until a visa number becomes available. These commenters rely on a statement by the former Associate Commissioner for Operations in a deposition filed in litigation which led to this regulation. In that deposition he stated that the reason for the termination of the practice was the adverse effect on the American labor market. These commenters suggest that the studies which were conducted and described in our notice of proposed rulemaking, do not constitute a valid reason for the termination of the practice. This argument completely overlooks the fact that the studies were made, and abuses were found. The former Associate Commissioner for Operations subsequently stated that he agreed with the findings of those studies and with the conclusion that the defects and abuses warranted termination of the practice. Those reasons were valid justification then and are valid justification now, for promulgation of the proposed regulation formally terminating the practice.

Approval of a third-preference petition in and of itself, does not authorize an alien to remain in the United States and work. It is only an acknowledgment by the Service that the beneficiary is an alien who is admissible to the United States pursuant to section 203(a)(3) and 212(a)(14) of the act. This alien can only work in the United States lawfully by obtaining the permission of the Service to work while his section 245 application is pending. Employment undertaken without the authorization of the Service could be considered unlawful and if so, would render the alien statutorily ineligible for adjustment of status under section 245 of the act. In addition, the immigration and Nationality Act amendments of 1976 amended section 245 of the act to provide that a visa number must be immediately available at the time the section 245 application is filed. In view of this statutory provision, to permit an alien beneficiary of a third-preference petition for whom a visa number is not immediately available to remain in the United States to await availability of a visa number

AR2022_200644

would be absolutely contrary to this provision of the act. Nevertheless, as indicated above, third-preference beneficiaries whose priority date is earlier than August 9, 1978, and are otherwise admissible to the United States and retain the status established by the petition, will be permitted to remain in the United States pending availability of a visa number.

Based on our consideration of the representations received and our further study of the proposal, it has been determined that the proposal should be adopted, with the following amendments:

1. An editorial amendment will be made to subparagraph (vi) to make it clear that all aliens described in subparagraph (vi) must be admissible to the United States to qualify under this regulation.

2. Subparagraph (vi) will be expanded to include aliens who are beneficiaries of approved sixth-preference petitions who satisfy examinations without another petition that they can qualify for third-preference classification, but cannot obtain a visa because a visa number is not immediately available. To qualify they must have a priority date which is earlier than August 9, 1978.

3. Third and sixth preference aliens who qualify under this regulation will be granted voluntary departure for an indefinite period of time, up until the time a visa number becomes available.

4. The proposal will be amended editorially to provide that retention of eligibility under the regulation is conditioned upon the approved visa petition remaining valid and beneficiary's retention of the status established in the petition, for the entire period for which voluntary departure is authorized.

In the light of the foregoing, the following amendments are hereby prescribed to chapter I of title 8 of the Code of Federal Regulations:

In part 242, § 242.5(a) is amended by redesignating paragraph (a), as subparagraph (a)(1) and by adding new subparagraphs (a)(2) and (a)(3). As amended § 242.5(a) reads as follows:

§ 242.5   Voluntary departure prior to commencement of hearing.

(a)(1) *Authorized officers.* The authority contained in section 242(b) of the act to permit aliens to depart voluntarily from the United States may be exercised by district directors, district officers who are in charge of investigations, officers in charge, and chief patrol agents.

(2) *Authorization.* Voluntary departure may be granted to any alien who is statutorily eligible therefor: (i) Who is a native of a foreign contiguous territory and not within the purview of class (vi) of this paragraph; or (ii) whose application for extension of

stay as a nonimmigrant is being denied; or (iii) who has voluntarily surrendered himself to the Service; or (iv) who presents a valid travel document and confirmed reservation for transportation out of the United States within 30 days; or (v) who is an F-1, F-2, J-1, or J-2 nonimmigrant and who has lost such status solely because of a private bill introduced in his behalf; or (vi) who is admissible to the United States as an immigrant and: (A) Who is an immediate relative of a U.S. citizen, or (B) is otherwise exempt from the numerical limitation on immigrant visa issuance, or (C) has a priority date for an immigrant visa not more than 60 days later than the date shown in the latest Visa Office Bulletin and has applied for an immigrant visa at an American Consulate which has accepted jurisdiction over the case, or (D) who is a third preference alien with a priority date earlier than August 9, 1978, or (E) who is the beneficiary of an approved sixth-preference petition who satisfies Examinations without another petition that he can qualify for third preference and who cannot obtain a visa solely because a visa number is unavailable, and who has a priority date earlier than August 9, 1978; or (vii) any alien who has been granted asylum and who has not been granted parole status or a stay of deportation; or (viii) in whose case the district director has determined there are compelling factors warranting grant of voluntary departure.

(3) *Periods of time.* Except for classes (v), (vi), (vii), and (viii) of subparagraph (a)(2), any grant of voluntary departure shall contain a time limitation of usually not more than 30 days, and an extension of the original voluntary departure time shall not be authorized except under meritorious circumstances. Upon failure to depart, deportation proceedings will be pursued. Class (v) may be granted voluntary departure in increments of 1 year conditioned upon the F-1 or J-1 alien maintaining a full course of study at an approved institution of learning, or upon abiding by the terms and conditions of the exchange program within the limitations imposed by 22 CFR 63.23. Classes (vi) (A), (B), and (C) may be granted voluntary departure until the American consul is ready to issue an immigrant visa and, in the discretion of the district director, may be in increments of 30 days, conditioned upon continuing availability of an immigrant visa as shown in the latest Visa Office Bulletin and upon the alien's diligent pursuit of efforts to obtain the visa. Classes (vi) (D) and (E) may be granted voluntary departure, conditioned upon the approved third- or sixth-preference petition as appropriate, remaining valid as well as the alien's retention of the status es-

tablished in the petition, for an indefinite period until an immigrant visa is available. Classes (vii) and (viii) may be granted voluntary departure in increments of time, not to exceed 1 year, as determined by the district director to be appropriate in the case. Form I-94 issued to an alien granted voluntary departure, who is within class (v), (vi), (vii), or (viii) of subparagraph (a)(2) may be stamped with the legend "Employment Authorized" if the alien seeks some indication from the Service that he is entitled to be employed.

*       *       *       *       *

(Sec. 103; 8 U.S.C. 1103.)

Effective date: The amendments contained in this order will be effective on August 9, 1978.

Dated: July 1, 1978.

LEONEL J. CASTILLO,
*Commissioner of Immigration
and Naturalization.*

[FR Doc. 78-18906 Filed 7-7-78; 8:45 am]

[3128-01]

**Title 10—Energy**

**CHAPTER II—FEDERAL ENERGY ADMINISTRATION[1]**

**PART 205—ADMINISTRATIVE PROCEDURES AND SANCTIONS**

**1978 Interpretations of the General Counsel**

AGENCY: Department of Energy.

ACTION: Notice of interpretations.

SUMMARY: Attached are the interpretations issued by the Office of the General Counsel of the Department of Energy under 10 CFR Part 205, Subpart F, during the period June 1, 1978, through June 30, 1978.

FOR FURTHER INFORMATION CONTACT:

Diane Stubbs, Office of the General Counsel, Department of Energy, 12th and Pennsylvania Avenue NW., Room 1121, Washington, D.C. 20461, 202-566-9070.

SUPPLEMENTARY INFORMATION: Interpretations issued pursuant to 10 CFR Part 205, Subpart F, are published in the FEDERAL REGISTER in accordance with the editorial and classification criteria set forth in 42 FR 7925, February 8, 1977, as modified in 42 FR 46270, September 15, 1977.

These interpretations depend for their authority on the accuracy of the

---

[1] EDITORIAL NOTE.—Chapter II will be renamed at a future date to reflect that it contains regulations administered by the Economic Regulatory Administration of the Department of Energy.

AR2022_200645