# INTERPRETER RELEASES

**An Information Service
on Immigration, Naturalization and Related Problems**

AMERICAN COUNCIL FOR NATIONALITIES SERVICE

**20 WEST 40TH STREET, NEW YORK, N. Y. 10018**

Edith Lowenstein
    Editor

Vol. 48, No. 21
June 21, 1971

## LAWFUL WORK FOR NONIMMIGRANTS

by
Sam Bernsen, Assistant Commissioner,
Adjudications, Immigration and Naturalization Service*

There are 12 classes of nonimmigrants. Some classes have as many as 5 subdivisions and some classes include the accompanying or following to join spouses and children.

The law states that if an alien does not fit into one of the 12 nonimmigrant classes he is an immigrant.

Immigrants may work but their admission to the United States is subject to annual numerical limitations. Only certain immigrants such as immediate relatives of United States citizens are not subject to the annual limitations. Non-immigrants are subject to work restrictions but are not subject to any numerical limitations.

In a general overview of the 12 nonimmigrant classes, it is interesting to note that there is authorization for some kind of employment for all nonimmigrant classes except:

> B-2 visitors for pleasure (including F-2, H-4 and L-2 spouses and children of students, workers and trainees, and international intracompany transferees, respectively. These spouses and children are essentially visitors for pleasure who are assigned a nonimmigrant classification similar to that of the principal for ready identification and to enable them to obtain admissions and extensions for identical periods);
> 29-day transits and 10-day transits without visas (TRWOV).

---

\* Mr. Bernsen presented this discussion at the National Conference of Immigration and Nationality Lawyers on May 21, 1971, at San Juan, Puerto Rico. The statements made by him, to be fully understood, must be placed in the context of the existing regulations.

AR2022_300001

Let us look at those nonimmigrants whose work authorization is based on nonimmigrant classification alone:

### A-1, A-2 and A-3 Aliens.

These classifications are accorded to foreign government officials, their servants and members of the immediate families. The principal is expected to work in the capacity in which he is employed by his foreign government and the servant is expected to work in that capacity. The family members, however, are not authorized to engage in any employment while in A-1, A-2 or A-3 status. The family members can be authorized to work only if they change to an immigrant classification or to another nonimmigrant classification in which employment is permitted. However, if a family member works while in A-1, A-2 or A-3 status, the Service is not in a position to consider the work as a violation if the State Department continues to accept the alien as having official status. If the State Department advises the INS that the alien has lost official status for any reason, including acceptance of unauthorized employment, the alien may be subject to deportation proceedings.

### B-1 Aliens.

This is the temporary visitor for business. The alien can do certain kinds of work that is considered to come within the definition of business. Examples are the following:

> Take orders for goods manufactured abroad;
> Negotiate contracts;
> Consult business associates;
> Perform H-1 services (section 101(a)(15)(H)(i) if the alien qualifies for H-1 qualification, provided he will receive no salary or pay from a U.S. source (expense allowance permitted);
> Obtain training for which he could be classified as H-3 (section 101(a)(15)(H)(iii) provided the alien continues to be employed abroad, continues to receive his salary from abroad and is not paid a U.S. salary (expense allowance permitted);
> Perform personal services if alien is a servant accompanying or following to join a U.S. citizen who lives abroad permanently, provided the alien is employed as a servant by the U.S. citizen abroad and the U.S. citizen is visiting the U.S. temporarily;
> Compete for prize money (not salary) as a professional athlete.

### D-1 and D-2 Crewmen.

A crewman is an alien serving in good faith as such in any capacity required for normal operation and service on board a vessel or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the U.S. A crewman can work on his vessel in a U.S. port so long as the work has a direct relationship to the normal operation of the vessel. For example, a crewman may load ship's stores but he may not load cargo.

AR2022_300002

- 170

E-1 and E-2 Aliens.

E-1 classification is for a treaty trader who is defined as an alien coming
to the United States under a treaty between the U.S. and the country of the alien's
nationality solely to carry on substantial trade principally between the U.S.
and the Treaty country.

E-2 is a treaty investor who is coming to the United States under a treaty
between the U.S. and the country of the alien's nationality solely to develop and
direct the operation of an enterprise in which he has invested, or is actively in
the process of investing, substantial capital.

Spouse and children of the E-1 alien are also classified E-1. Spouse and
children of the E-2 alien are classified E-2.

A treaty trader or investor classification may be accorded to an employee
of a treaty person or organization if the employee is engaged in executive or
supervisory duties or has special qualifications. The principal alien is autho-
rized to work by virtue of his classification. The family members are not
authorized to work. However, IMS does not consider that the family member has
violated status by engaging in employment and will not require the family member's
departure if the principal alien maintains E-1 or E-2 status.

G Aliens.

This classification is for certain international organizations such as the
United Nations. G-1 is the principal resident representative of the foreign
government to the international organization. G-2 classification is for other
representatives. G-3 is for representatives of governments not recognized by
the United States or representatives of governments which are not members of the
international organization. G-4 is for employees of the international organiza-
tion. G-5 is for the servants of the foregoing. Immediate family members are
accorded the same classification as the principal. The principal alien is expected
to work by virtue of his classification. As with "A" aliens, the immediate
family members may work only if they obtain a change to immigrant classification
or to another nonimmigrant classification which permits employment. A family
member who works without permission is not considered to be in violation if the
Department of State continues to accept the family member as having official
status. If the State Department considers the alien to have lost official status
he may be subject to deportation.

H-1, H-2, H-3 and H-4 Aliens.

There are 4 categories of "H" aliens. H-1 is for persons of distinguished
merit and ability coming to the United States temporarily to perform services of
an exceptional nature requiring such distinguished merit and ability.

H-2 is for other workers coming to the United States temporarily to perform
temporary services in occupations in which there is a shortage of American workers.

The H-3 classification is for temporary trainees.

The H-4 classification is for the spouses and children accompanying or follow-
ing to join the worker or trainee.

AR2022_300003

- 171

A visa may not be issued to an "H" alien unless a petition on Form I-129B has been approved by the Service. The petition is filed, together with a fee of $25, with the District Director having jurisdiction over the place where the services will be performed or where the training will be received. If the services will be performed in more than one place, the petition may be filed with the District Director having jurisdiction over any of those places. One petition may cover any group of aliens who will be performing the same type of services or who will be receiving the same training, will be applying for visas at the same consulate, and will be working or training in the same immigration district.

The only "H" alien for whom a labor certification must be requested is the H-2 alien. The certification must be requested in the case of the H-2 alien because the statute provides that H-2 classification can be accorded only if unemployed persons capable of performing the work involved cannot be found in this country. Also, in the case of the H-2 alien the work itself must be of a temporary nature.

Before April 7, 1970 the law required that the work performed by an H-1 alien must also be temporary in nature. However, the H-1 provision was amended by the Act of April 7, 1970 so that the temporariness of the work is not relevant. All "H" aliens, however, must intend to come for a temporary period.

The question is frequently raised whether, in view of the amendment of the H-1 provision, an alien who is registered on an immigrant visa waiting list or who has been accorded third or sixth preference classification is eligible for an H-1 admission. The answer to the question is that an alien is not ineligible for an H-1 admission solely because there is an indication that he desires to immigrate to the United States. If the petitioner intends to bring the alien in temporarily, regardless of the permanency of the job itself, and if the alien intends to come to the United States temporarily, he may be admitted as an H-1 alien. A precedent decision to that effect has been published (I.D.2053). Although that decision relates to an L-1 alien, it is equally applicable to an H-1 alien.

If an alien in the United States desires to perform temporary services or training for another petitioner, a new petition on Form I-129B must be submitted. Special mention should be made of petitions for entertainers. Entertainers are frequently brought to the United States to perform in different places. The agent who files the petition for the entertainer may specify in the petition all of the places where the entertainer will perform. Upon approval of the petition the services of the entertainer are restricted to the activity, area and employer specified in the approved petition. Any engagement not specified in that petition requires a new petition. Also, a new petition is required if the entertainer's services are engaged by a new employer or by a new agent.

In these days of charity shows and talk shows, we also have a special rule for those situations. A new petition will not be required for the appearance of an alien performer on a bona fide charity show without compensation if he is already in the United States under an approved petition. Also, a petition is not required for an appearance, interview or demonstration without remuneration by any nonimmigrant who is not an entertainer by occupation.

In the event of a labor dispute involving a strike or other work stoppage in the alien's occupation at his place of employment, work permission is automatically suspended.

- 172

The H-4 spouse and children are not authorized to work. If they accept employment they are in violation of status and are subject to deportation.

I Aliens.

The "I" classification is accorded to bona fide representatives of foreign press, radio, film or other information media who seek to enter the United States to engage in such vocation and to their spouses and children accompanying or following to join them. The principal alien is expected to work as he has been accorded a visa classification for that purpose.

As in the cases of spouses and children of "A", "E" and "G" aliens, the Service is not in a position to authorize the spouse and children of an "I" alien to accept employment. If the spouse or children should accept employment they will not be deemed to have violated status and no action will be taken to require departure so long as the principal is maintaining status.

K-1 and K-2 Aliens.

A K-1 classification is accorded to a fiance(e) who is the beneficiary of an approved visa petition filed by the U.S. citizen under section 214(d) of the Act. Since a fiance(e) is actually an intending immigrant who is permitted to enter temporarily for the purpose of marriage which would qualify the alien for permanent residence, it is the Service view that acceptance of employment by a K-1 alien prior to becoming a lawful permanent resident is permitted. Similarly, the children accompanying or following to join the K-1 alien, who are accorded K-2 classification, are also permitted to work before the K-1 fiance(e) becomes a lawful permanent resident.

L-1 and L-2 Aliens.

The L-1 classification is accorded to an international intracompany transferee. The L-2 classification is accorded to the principal's spouse and children accompanying or following to join him. Before a consul may issue an L-1 visa a petition in behalf of the alien must have been approved by the Service. The L-1 alien is expected to engage in employment as the visa/issued on the basis that he was to be employed in a managerial, executive or specialized knowledge capacity. However, the spouse nor the children of the L-1 alien may accept employment in an L-2 classification.

F and J Aliens.

The "F" and "J" alien is not permitted to work solely on the basis of his classification. As was pointed out, the spouse of an F-1 student is not permitted to work under any circumstances without violating F-2 status. However, F-1 students and J-1 participants in exchange programs and the J-2 spouses of exchange program paticipants may, under certain circumstances, be permitted to work.

F-1 classification is for the nonimmigrant student coming to the United States to take a full course of study at a school approved by the Service for attenddance by nonimmigrant students. F-2 classification is accorded to the spouse and children of the student who accompany or follow to join him.

- 173

An applicant for a student visa must establish that he is financially able to pay the cost of his studies and stay in the United States. The wife and children are not authorized to engage in any employment. The student is permitted to accept on-campus employment if a U.S. resident will not be displaced. Authorization from the Service to accept such employment is not required. For off-campus employment, an F-1 student requires permission.

There are three off-campus employment situations - economic necessity, practical training and summer vacation employment. Permission to engage in employment because of economic necessity or for practical training may be granted only by the Service. Permission to accept summer employment may be granted by an authorized school official.

Economic necessity onployment for part-time may be authorized upon a showing that there has been a change in the financial situation of the student due to an unforseen change in circumstances. The application for permission to accept such employment is made on Form I-538. The application must be endorsed by a school official who certifies the student is taking a full course of study and that part-time employment will not interfere with the student's ability to carry successfully a full course of study. If the application is granted, the student may engage in part-time employment. Economic necessity employment may be granted in increments of 12 months each.

Practical training employment permission is also requested on Form I-538. An authorized school official must certify that the proposed employment is recommended for practical training of the student in his field of study and that it is believed the training will not be available in the student's country. Practical training may be authorized in increments of 6 months each not to exceed 18 months in the aggregate. The alien continues to retain his F-1 classification during the time he is authorized to engage in practical training.

Summer employment permission is handled differently from economic necessity and practical training employment. Each year, in order to determine whether summer employment should be permitted in light of current labor market conditions, the Service consults the Labor Department. After consultation the Service determines whether summer employment will be permitted. If it is permitted, all approved schools are notified. The schools are informed that responsible officials may authorize students to accept employment during the summer vacation period. The application is submitted on Form I-538 to the authorized school official. The decision on the application is made by that official who makes his decision on the basis of the following criteria:

(1) The student must be maintaining status under section 101(a)(15)(F) of the Immigration and Nationality Act,

(2) be enrolled in school for the next academic year (if it is the practice of the school to defer actual enrollment until the late summer, the student's intention and eligibility to enroll for the next academic year will suffice), and

(3) be in need of employment to supplement funds for necessary maintenance expenses.

Any permission granted a student to engage in employment is automatically suspended while a strike or other labor dispute involving a work stoppage or lay-off is in progress in his occupation at the place of employment.

- 174

J-1 and J-2 Aliens.

J-1 classification is accorded to the participant in an exchange program approved by the Department of State and the J-2 classification is accorded to the principal's spouse and children accompanying or following to join him. The J-1 alien can work only if permissible under the terms of the approved program. J-1 students may be permitted by the sponsor to accept summer employment (even if not specifically provided for in the program) and practical training. Permission to work rests with the sponsor who is responsible for assuring that the terms of the program approved by the Department of State are complied with. Requests for work permission in the case of J-1 aliens are not submitted to the Service. Under State Department regulations, 22 CFR 63.5, a school having an exchange program may authorize part-time employment during the school year for a J-1 alien student if employment is required because of urgent financial need which has arisen since the time of visa issuance and if the employment will not interfere with participating in a full course of study. The part-time employment must have the written approval of the responsible officer of the exchange program.

The J-2 spouse and children under Service regulations, 8 CFR 214.2(j), may be granted permission by the Service to accept employment in the U.S. only if such employment is for the support (including customary recreational and cultural activities and related travel) of the spouse and children. Employment permission may not be granted for the support of the principal alien. The application is made to the District Director where the alien is residing temporarily and it need not be made in writing.

AR2022_300007

# INTERPRETER

# RELEASES

**An Information Service**
**on Immigration, Naturalization and Related Problems**

AMERICAN COUNCIL FOR NATIONALITIES SERVICE

20 WEST 40TH STREET, NEW YORK, N. Y. 10018

Maurice A. Roberts
Editor

Vol. 52, No. 35
September 2, 1975

LEAVE TO LABOR*

by
Sam Bernsen
General Counsel
Immigration and Naturalization Service
U.S. Department of Justice


The question of alien employment ranges from the alien lawfully admitted as a permanent resident to the alien who is in the United States illegally, with many different situations in between.

With respect to the lawful permanent resident alien, there is very little question but that he has the right to work. He has his blue-green alien registration receipt card, Form I-151, to prove it, and there should be no problem. But there is one caution. If the alien is admitted to the United States as a lawful permanent resident on the basis of a labor certification, it should be kept in mind that he is not free to ignore the terms of the certification by promptly proceeding from the port of arrival to some other employer who has no connection with the certification. If the alien does take a job with another employer, rather than the employer who brought him to the United States, his status as a lawful permanent resident may be in jeopardy. Otherwise, it can be said that there are no restrictions on the employment of lawful permanent residents, insofar as federal immigration laws are concerned.

---

* This is the fifth of a series of presentations made on the occasion of the Annual Conference of the Association of Immigration and Nationality Lawyers in Montreal, Canada from May 28 to May 30, 1975.

We were able to transcribe this presentation and the questions and answers which followed it through the cooperation of Dan Danilov, Esq., who made available a taped recording of the session.

AR2022_300008

-292

Many, if not most, of the aliens who enter the United States as lawful permanent residents on the basis of labor certifications, come for employment as live-in maids. When the petitioner finally gets his certification for a live-in maid, and he files his sixth preference petition, we find him pounding on the door of the Service demanding prompt approval of the petition. Very shortly after the maid arrives in the United States with an immigrant visa, and quits her job, we find the petitioner again pounding on the INS' door, this time demanding prompt deportation of the maid because she left him.

I'd like to mention some interesting aspects of the problems of lawful permanent resident aliens that don't have anything to do with the immigration laws but should be of interest to practicing attorneys. The Supreme Court has held that a State cannot refuse state government employment to a lawful permanent resident alien job applicant on the ground of alienage. The same question is now before the Supreme Court with respect to lawful permanent residents who are applicants for federal government employment. In the private employment sector, the Supreme Court has held that a private employer does not violate the Civil Rights Act by hiring only United States citizens, as long as he hires them without regard to race, religion or national origin.

### Students

With respect to employment for nonimmigrants, I'd like to discuss the special rules that relate to F-1 student employment. These rules attracted a great deal of attention in the past year because INS changed its policy on student summer employment. In the spring of 1974, the Service notified school officials throughout the country that they would not be authorized to grant summer work permission to F-1 students during the summer of that year. Instead, students desiring to obtain employment would be required to make application to the Immigration Service for work permission and establish eligibility under the prescribed rules. This was not one of our most popular changes. We received about 1,000 letters of criticism, almost all from school officials, but the opposition was not unanimous -- we did get a few letters of support. The critics took their case to the Congress and succeeded in having some bills introduced that would give F-1 students blanket permission to work at any time with the approval of school officials. Favorable action has not been taken on the bills as of this time.

By way of background, INS had a summer program for student employment for almost 20 years. Annually, the Labor Department was first consulted before the program was authorized. For about the first 16 or 17 years, the Labor Department invariably said there would be no adverse impact on the domestic labor market if the alien students were allowed to work. Each of those years the Immigration Service sent a notice to school officials advising them that they could grant permission to the foreign students to work during the summer vacation period.

About three of four years ago, the job market began to tighten. The Labor Department then advised INS that it was concerned about the adverse impact of the employment of foreign students. So we thought we'd better get some broader consultation. We began to consult with the State Department. That Department looked at the problem from the foreign relations point of view and expressed a great concern about the effect that termination of the summer employment program would have on foreign relations with the countries the students came from. For several years we followed the advice of the Department of State, rather than the Labor Department, and we continued to let students work during the summer.

AR2022_300009

In the summer of 1974, we received a very strong letter from the Labor Department, with considerable statistics and data, and we received an equally strong letter from the State Department. INS had to weigh the adverse effect on foreign relations against the adverse effect on the labor market. When we considered the high unemployment among youth, which was much higher than the average unemployment, and the even higher unemployment among minority groups and veterans, we found the scales tipping in favor of not permitting the students to work during the summer. That led to our decision and its subsequent unpopularity.

Well, the seasons moved on, from the summer of '74 to the winter of '74. The Immigration Service announced in the Federal Register that it was terminating once and for all the policy of considering annually whether students would be allowed to work during the summer. The reason for the decision was that it was felt that the grant or denial of a request for student work permission should be made by an officer of the Immigration Service rather than a school official. It's important to note that this does not mean that students cannot work during the summer. It simply means that a different procedure has to be followed if the student wishes to obtain summer employment.

What is our policy on letting students work? The statute defines an F-1 student as an alien who is coming to the United States temporarily for the sole purpose of pursuing a full course of study at a school approved by the Attorney General for attendance by nonimmigrant students. The statute is completely silent on the question of student employment. In 1961 when the International Educational and Cultural Exchange Bill was under consideration by the Congress, there was a provision in that bill that would give students and their spouses blanket permission to work, without first obtaining INS approval. However, as the bill wound its way through the legislative process to enactment, the work provision for students was deleted.

Nevertheless, the Immigration Service view is that F-1 student work is not banned by the statute. The Service takes the position that if a student is to be employed on campus, no permission from the Service is needed. All we are concerned about is that a United States citizen or a United States lawful permanent resident will not be fired from a campus job to provide employment for a nonimmigrant student. But when the student intends to go out into the community to obtain employment, the Service is concerned.

There are two bases on which a student may apply to the Immigration Service for permission to work off the campus, economic necessity and practical training.

In the economic necessity situation, the student must show that the work is needed because of economic necessity arising after entry due to unforeseen circumstances. It should be remembered that the student would have been ineligible for a student visa unless he was able to establish that he could pay the expenses of his entire stay in the United States. If, after the student arrives, he is no longer able to pay his expenses because of inflation or currency restrictions, or because his parents have lost their source of income and are no longer able to support him, he is in a position to show an unforeseen change in circumstances that could support an application for work permission due to economic necessity.

The student must make an application to the District Director having jurisdiction over the area where the school is located. The application has to be endorsed by the responsible school official, who must certify that the student is

-294

taking a full course of study and that part-time employment will not interfere with his ability to successfully carry such course.

What is part-time employment?  Part-time employment means that the student may work up to 20 hours per week while school is in session.  When school is not in session, for example during the summer vacation, Christmas vacation or during the Easter recess, the student may work full-time.  When work permission is granted to an F-1 student, his Arrival-Departure Card, Form I-94 is endorsed "part-time employment authorized to (date)."  Part-time employment is granted in increments of up to one year, but not to exceed the period of the student's authorized stay in the United States.

Practical training we consider as a continuation of the student's full course of study.  The student must make an application for permission to engage in such training.  He applies to the District Director having jurisdiction over the place where the school is located.  The application must be endorsed by a school official who certifies that the employment is recommended for practical training in a field related to the student's course of study, and that the training is not believed to be available in the alien's home country.  When practical training is approved, it is granted in increments of six months, not to exceed 18 months in the aggregate.

The spouse of a student, visa symbol F-2, is not authorized to work.  For all practical purposes, she is treated as if she were here as a tourist.

### Illegal Aliens

Work permission for illegal aliens has a rather strange connotation for me. It would seem that if an alien is illegally in the United States, why should he get permission to work?  If he gets such permission, that doesn't make his illegal stay here any less illegal.  But in certain circumstances, the Service will endorse an illegal alien's I-94 (Arrival-Departure Card) with the notation, "Employment Authorized".  This notation is important to the alien.  Some employers will not hire an alien unless he is able to show some evidence of authorization to work, and the Social Security Administration will not issue a social security card without evidence of work authorization.

When does the Immigration Service endorse the I-94 of an illegal alien, "Employment Authorized"?  In general, the endorsement may be made when we do not intend or are unable to enforce the alien's departure.  The thought is that in such cases gainful employment should not be prevented and that it is reasonable to give the alien something that he can present to a prospective employer to show that he can work.

We place the work authorized notation on I-94's in several situations.  For example, we grant extended voluntary departure to a native of the Western Hemisphere who entered the United States on or before April 10, 1973 and married a lawful permanent resident alien.  In such case, it is Service policy to grant extended voluntary departure until the alien is reached on the visa waiting list, which is backed up for more than two years for the Western Hemisphere.  It's also Service policy to give extended voluntary departure to aliens in the United States who are immigrant visa applicants if they are within 60 days of being reached on the visa waiting list.

AR2022_300011

-295

In the cases of aliens who are granted extended voluntary departure after it is determined that they are eligible for asylum, we also endorse the I-94, "Employment Authorized".

The general rule is that extended voluntary departure is given in cases of compelling circumstances.  This provides the flexibility needed to administer this kind of rule, and when we grant VD under those circumstances, we endorse the I-94, "Employment Authorized".  We don't do it automatically.  The alien has to come to the Service and make a request.

Even aliens found deportable after a hearing before an Immigration Judge may request that their I-94's be stamped  "Employment Authorized".  Some examples are aliens granted suspension of deportation or a stay of deportation on the basis of persecution, under section 243(h) of the Act.  The I-94 is not stamped "Employment Authorized" when the Immigration Judge orders the alien deported with the option of leaving voluntarily prior to a specified date before the order of deportation becomes final.

In certain situations we routinely endorse the I-94, "Employment Authorized", at the time of arrival without a request.  Examples are aliens admitted as conditional entrants, and refugees who are paroled into the United States.

The endorsement is also made in the cases of certain applications pending before the Service.  If an alien has properly filed an application for adjustment of status to permanent resident under section 245, or if he's filed an application for the creation of a record of lawful entry under section 249, his Form I-94 on request will be endorsed  "Employment Authorized".  We will not make the endorsement merely on the filing or approval of a visa petition.

So much for the alien worker.


<u>Refugees</u>

I've been asked to make some remarks about the Vietnamese Refugee situation. Originally the Service was planning to parole only those Vietnamese refugees into the United States who were related to United States citizens or lawful permanent residents, or who were U.S. Government employees, or who would be in danger because of their support of the U.S. effort in Southeast Asia if they remained behind.  The plan was to screen the aliens in Vietnam, before they arrived in the United States, to be sure that they were admissible and that they met the prescribed criteria.

But events moved too swiftly, these people were evacuated in a great rush. It was not possible to screen all of them.  Many were picked up at sea.  All were initially brought to Guam or Wake Island.  Those who were brought to Guam, the vast majority, were physically within the United States as defined by the Immigration and Nationality Act.  We found ourselves in the position of having to screen aliens who were already in the United States.

In the course of the crises, we were in continuous consultation with the House and Senate Judiciary Committees.  The situation changed rapidly.  The estimates on the number of Vietnamese that would have to be paroled were revised frequently, always upward.  We now expect that the number may come to about

AR2022_300012

-296

150,000. That would be the largest number of aliens ever paroled into the United States under a refugee parole program in such a short time span.

In the course of the processing, the Vietnamese refugees will be requested to sign an affidavit that they are admissible under all provisions of the immigration laws except those relating to labor certification, public charge and immigrant visa. The affidavit includes a declaration that the refugee has not participated in any act of persecution against any person because of race, religion or political opinion. A statement concerning assets will also be required. Security checks will be completed before parole is authorized.

On arrival at the mainland the refugees will be sent to one of four military camps, Camp Pendleton, California; Eglin Air Force Base, Florida; Camp Chaffee, Arkansas; and Indiantown Gap, Pennyslvania. The aliens will have to remain in the camp until assurances concerning housing and employment or support are received.

With regard to Vietnamese refugees who are already in the United States, many as students or visitors, the Service will not require them to depart. A Vietnamese nonimmigrant student who requests permission to work because he can no longer get money from home will readily be granted such permission for part-time employment. If he wishes to work full-time, permission would also be granted, but since he could not maintain student status when working full time he would be accorded voluntary departure.

Any Vietnamese alien in the United States who believes he is eligible to apply for permanent residence may do so. If he's found eligible, the application will be approved.

On that happy note, I terminate my remarks.

\* \* \* \* \* \* \*

### QUESTIONS AND ANSWERS

Q. A number of the questions deal with the permission to work for aliens for whom I-130's have been filed but not approved. The complaint is made that in various offices there is a great time lag between filing and adjudication of the petition. The time lag results in hardship not only to the beneficiary, but also to other members of his family who would like to work. What answer do you see to that problem?

A. I wish I had a happy answer. But the Immigration Service itself is on the verge of filing a petition - a petition in bankruptcy. We are, as you've heard many, many times, badly understaffed, and badly in need of funds. The President, in his budget, has asked for some $30 million additional for the Immigration Service but we don't have those funds. We simply have to do the best we can with what we have.

Q. Could not the permission to work be granted with the filing of the petition which seems proper on its face?

AR2022_300013

-297

A.  The Service has considered that question a number of times.  The Association of Immigration and Nationality Lawyers, through its liaison committee in Washington, has submitted a request to that effect.  However, the Service feels that it should not go any further than it has.  Until we actually have received an application for permanent residence which is properly filed, the Service will not endorse "Employment Authorized" on the alien's Form I-94.  You can submit a section 245 adjustment application at the same time that you file an immediate relative petition.  Upon approval of the petition, the sec. 245 application would be considered as properly filed, and the applicant would be in a position to request that his I-94 be stamped "Employment Authorized".

Q.  Where the principal alien applies for adjustment along with his wife, and both ask for employment authorization, some District Directors have endorsed the principal alien's I-94, but have refused to grant the privilege to the spouse.  Is there any recourse from this decision?

A.  First, I'd have to say that a refusal to stamp the I-94 of the spouse is incorrect.  The recourse would be to immediately take the matter up with the District Director.  If you find difficulty there, you should go to the Regional Office.  If the problem still remains, your committee can take it up with the Central Office.

Q.  Must the person applying for practical training show that he already has a specific job, or need he come in simply with a proposal to work without having prearranged employment?

A.  For the first period of practical training, a specific job need not be shown.  However, when the alien applies for an extension of his practical training, he will have to establish that he is working in a field related to his course of studies.

Q.  You have just stated that an I-485 application may be filed with an I-130.  However, New York does not permit this procedure.  Can that be corrected?

A.  There is an express provision in the regulations which permits the I-130 visa petition, or any other visa petition, to be submitted with a sec. 245 application, and perhaps that provision of the regulations has been overlooked.  You may wish to call it to the District's attention.  I believe you'll find it in 8 C.F.R. 245.

Q.  A number of schools, such as Antioch College, have combined study and off-campus work programs as part of their education plans.  Does the policy of the Service permit this off-campus employment?

A.  Yes.  There are special situations where some schools have a practice of requiring the student to engage in off-campus work for one semester and attending school the following semester.  We recognize alternate work-study programs.  In fact, work permission is not required for students in such programs.  However, the time spent working is counted against the student's practical training period which may not exceed 18 months in the aggregate.

AR2022_300014

-298

Q. You have stated that in deciding whether to permit students to accept employment, foreign policy considerations were considered along with domestic unemployment rates. Considering those two factors, is it correct to suppose that unemployment rates for particular areas are what is relevant? Second, are the foreign policy considerations for particular countries taken into consideration? For example, it may not affect our foreign relations with Canada, especially since students from that country may have the money to support themselves without working, but this policy for Nigeria may well cut off all students from that country. I guess the question is, are discrete considerations given to particular countries, or are all unemployment rates and all foreign policies lumped together in deciding whether or not students shall be permitted to work?

A. The question was treated on a broad basis. The Service does not have the facilities to determine the job market situation in separate areas throughout the country. And the Labor Department, I suspect, is not in a position to screen applications speedily. We also are not able to determine the foreign policy impact on an individual country basis. The State Department would have to be consulted and the inevitable delay necessarily involved would not be acceptable. If the student from Nigeria, which was the example given, is unable to obtain funds from that country for one reason or another, he'd be in an excellent position to apply for regular work permission based on economic necessity. If that work permission is granted, he could work for the entire year, including the summer.

Q. May the parent of a U.S. citizen child of the Western Hemisphere be authorized to work, while he is waiting for a visa appointment in his home country?

A. He can be authorized to work only if he is within 60 days of being reached on the immigrant visa waiting list. We do not have a special rule for parents in such situations.

Q. The District Director in New York has said that if a Vietnamese student now in the United States wants employment authorization, he must either follow the usual procedures or get out of status and proceed to the Investigations Section for an interview. Isn't this unreasonable? Suppose the student wants to remain in status but wants to work for the summer. Must this student show financial necessity?

A. The student should make an application on the prescribed form, Form I-538. If he is a Vietnamese student who wants to work part-time, that application should be approved just as soon as the adjudicator looks at it and sees that the applicant is a Vietnamese student. We take judicial notice of the situation.

Q. The Immigration and Naturalization Service in Baltimore has sent letters to various employers asking them to provide the names of all aliens in their employment. Since no distinction is made between permanent residents, nonimmigrants who have permission to work, and illegal aliens, do you believe this request by the Baltimore office is proper?

AR2022_300015

-299

I would rather not pass judgment here on what the Baltimore office has done. I think when something like this comes to your attention, and you believe it is wrong, you should take the matter up with the District officials, and if necessary, with the Regional officials. Finally, your liaison committee can take it up with the Central Office if you are not satisfied with the response that you get below.

Q.   A serious student has been given INS permission to work. He makes application for an extension, but it takes four to six months for the District to adjudicate his application. What is his status vis-a-vis working and maintaining legal status during the period between the expiration of his original permission to work and the time the INS rules on his extension?

A.   I don't believe we have an express instruction or policy on that point. On the initial application for work permission, the student should not work until he receives an approval of his application. Once his application is approved and he makes a timely request for an extension of work permission, I think the Service would be reasonable and would not take any action if he continued to work while waiting for the decision on his extension application.

Q.   A man emigrates to the United States to retire, that is, not to enter the work force, but subsequently he begins to work. Does the Immigration and Naturalization Service take any action for violating his retirement status?

A.   I think we are talking about an alien who was allowed to immigrate to the United States without obtaining a labor certification because he satisfied the consular and immigration officer that he had sufficient funds to support himself without working and did not intend to work. If this was the bona fide intention of the prospective immigrant and he subsequently has a genuine, legitimate change of mind, I don't think any action would be taken by the Service.

Q.   The Hibi cases, Filipino veterans of World War II, are not given employment authorization even though they have petitions pending for naturalization, and no deportation proceedings have been filed against them. Is there any recourse which would give them permission to work?

A.   We've never considered whether we should make it a policy to allow aliens who are not lawful permanent residents to work while they are seeking a legal interpretation in the courts concerning eligibility for naturalization. The Association may wish to take that matter up with the Service.

Q.   A student applied for change of status to E-2 eighteen months ago. The application has not been adjudicated. May he work in the interim without violating his status? Also, may a business investor work while his application is pending?

A.   If a person wants to change from one nonimmigrant status to another, the statute requires that he be in lawful status. He should not engage in employment until his application for change in nonimmigrant classification has been approved.

AR2022_300016

-300

Regarding the business investor, can someone who has applied under the non-preference portion of the quota for change in status as a business investor work, presumably at something other than his business, or perhaps in his business, while the application is pending?

A. If a person works while his application for change of status to permanent resident is pending it will not have any effect on his eligibility for status under the present law. I can't tell you to tell him to go to work. I can simply point out that his status and his eligibility for adjustment would not be affected if he worked while the application is pending.

Q. Can an immigration judge grant employment authorization?

A. The immigration judge does not have authority to grant work permission to an alien. He cannot endorse an I-94, "Employment Authorized". That's the prerogative of the District Director or his designee.

Q. Where a student violates his status by working without permission, but is otherwise a bona fide student, must his departure be required without a second chance, particularly when he shows his need for work and the Central Office has advised the District Director that strict construction should give way to the exercise of discretion based on circumstances?

A. The Service has a reasonable policy toward students. When a student unwittingly engages in unauthorized employment we don't make it a practice to rush in to seize him and institute deportation proceedings. The Service will consider giving him a second chance. We may make a notation in his file.

Q. Is this a national policy or a district policy?

A. It's a policy that depends on the individual circumstances.

Q. There are no individual circumstances in Philadelphia. We've got students, some who worked 5 hours over for two weeks, and as soon as their application comes in for an extension, they are given an order to show cause. They do wait in Philadelphia until the I-538 comes in, and then they schedule the hearings.

A. When you have a problem with an individual district, where you feel the district is arbitrary and unreasonable, you can take the matter up with the Regional office, and if necessary, with the Central Office. We do not require that a student be immediately placed under expulsion proceedings when he unwittingly and innocently engages in employment.

Q. In view of the individual variations among District Directors in handling applications for permission to work or to reinstate students, is there any provision for giving a uniform system of instruction to District Directors?

A. This is an area where it's very difficult to give uniform instructions. We have let our people know that students would be treated with consideration, and I can only repeat what I said before, we do not lie in wait to ambush every student who unwittingly takes a job.

(From the audience:  Texas doesn't know it!)

AR2022_300017

-301

/Editor's Note:  The following questions asked of Mr. Bernsen were of a more general nature._7

Q.   What are the criteria in Section 13 cases?

A.   Well, section 13 is a provision of law which permits certain aliens who came into the United States as diplomats, A-1 or A-2, or as international organization aliens, G-1 or G-2, to obtain permanent residence once they are no longer in official status.  Fifty aliens a year, without regard to visa availability, may be granted permanent residence under this law.  When we receive such an application, we interview the applicant, the State Department is consulted to make security checks.  If the alien meets the statutory criteria, his application is generally approved by the District Director. The facts are then reported to the Congress.  The case has to pend in the Congress for two sessions before approval becomes final.  However, regardless of his visa classification, the applicant has to be a person of diplomatic or semi-diplomatic rank.  Chauffeurs, clerks, butlers, stenographers, typists are not eligible.

Q.   Would alien Chinese who are not Vietnamese citizens but who were brought out on the Vietnamese airlift be granted the same asylum benefits granted to the Vietnamese?

A.   The policy relates to those who are Vietnamese.  The probability is that on an individual case basis, persons of other nationalities who are closely related to Vietnamese nationals may be eligible.

Q.   These are persons who have lived in Vietnam, who are Vietnamese by place of birth under American immigration law, but are regarded by the Chinese as overseas Chinese.  In that circumstance, would they be treated by American immigration law as Vietnamese or Chinese?

A.   If they were born in Vietnam, and applied for immigrant visas, they would be chargeable to the numerical limitation for Vietnam.  The policy statements for parole of Vietnamese refugees apply only to those of Vietnamese nationality with the exceptions mentioned in my response to the previous question.

Q.   Do the broad provisions for Cambodians apply to persons who are natives of and last residents of Cambodia, but not citizens of Cambodia?

A.   The policy for the Vietnamese also applies to Cambodian refugees.

AR2022_300018



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**U.S. Citizenship
and Immigration
Services**

**November 15, 2013**                                           **PM-602-0091**

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
           Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S.
           Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on
           Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

## Purpose
This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to
ensure consistent adjudication of parole requests made on behalf of aliens who are present without
admission or parole and who are spouses, children and parents of those serving on active duty in the
U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S.
Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility
under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i).  This amendment to AFM chapter
40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

## Scope
This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS)
employees.

## Authority
INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i),
1182(d)(5)(A), 1225(a), and 1255(a), (c)

## Background
**Parole of Spouses, children and parents of Armed Forces personnel**
- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives
  to assist military members, veterans, and their families to navigate our complex immigration
  system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active
  members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready
  Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 2

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States.  We as a nation have made a commitment to our veterans, to support and care for them.  It is a commitment that begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families.  The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible."  Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States.  Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.  This latter use of parole is sometimes called "parole in place."  The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2]  That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3]  In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4]  The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States."  INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).

[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.

[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).

[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007).  The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under  INA § 236(a)(2)(B) (so-called "conditional parole"), see Matter of Castillo-Padilla, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues.  The first is a policy question:  Should parole in place be
  granted to certain family members of active duty members of the U.S. Armed Forces, individuals
  in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S.
  Armed Forces or the Selected Reserve of the Ready Reserve?  The second is a legal question: Does
  parole in place (for military family members or anyone else) affect whether an alien is inadmissible
  under INA § 212(a)(6)(A)(i)?  That provision is discussed below and is critical to determining the
  alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed
Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously
Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.
Generally, parole in place is to be granted only sparingly.  The fact that the individual is a spouse, child
or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve
of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected
Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent
a criminal conviction or other serious adverse factors, parole in place would generally be an
appropriate exercise of discretion for such an individual.  If USCIS[5] decides to grant parole in that
situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status
under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.  The first ground relates to
the alien who is "present in the United States without being admitted or paroled."  This inadmissibility
ground generally covers those who entered the United States without inspection (and are still in the
United States).  Aliens who have entered the United States without inspection, while not "arriving
aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for
admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the
United States at any time or place other than as designated by the [Secretary of Homeland Security]."
Where the first inadmissibility ground leaves off, this one picks up.  Using the present tense
("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.  As is
true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate.  In enacting the
various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority.  "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of
coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA §
212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008).  Their
decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

AR2022_300021

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense. Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended.  The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or policy reason to interpret "arrives" in that way.

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless.  One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i).  Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years.  That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole.  Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies.  An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).  The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection).  Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i).  It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  INA § 245(c)(2).  Parole does not erase any periods of prior unlawful status.  Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**
AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞     1. A new section 21.1(c) is added to read:

## 21.1  General Information About Relative Petitions

\* \* \* \* \*

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces</u>, <u>individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o  Completed Form I-131, Application for Travel Document  (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o  Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or less, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and  certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

- o Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);

- o Two identical, color, passport style photographs; and

- o Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞   2. Chapter 40.6.2(a) of the AFM is revised:

a.  By amending Chapter 40.6.2(a)(1);

b.  By deleting Chapter 40.6.2(a)(3)(ii);

c.  By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and

d.  By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

### (a) INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an
undesignated time or place.  It is not a question of *parole* curing or erasing the second
inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit
of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who
entered the United States without inspection, but subsequently receives parole, is not
inadmissible under either of the two inadmissibility grounds contained in section
212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A)
affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of
status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole
eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of
status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).
The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all
the other requirements for adjustment of status.  One of those requirements is that, except for
immediate relatives of United States citizens and certain other exempt categories listed in
INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since
entry into the United States."  Parole does not erase any periods of prior unlawful status or
any other applicable grounds of inadmissibility.  An alien who entered without inspection will
therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an
immediate relative or falls within one of the other designated exemptions.  Moreover, even an
alien who satisfies all the statutory prerequisites for adjustment of status additionally requires
the favorable exercise of discretion.

* * * * *


 (4) Exemptions and Waivers

* * * * *


 (ii) Waivers.  There are no waivers available to applicants inadmissible under INA section
212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter
40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA
section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞    3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c)** **Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate.

USCIS Response to Coronavirus (COVID-19) (https://www.uscis.gov/about-us/uscis-response-to-covid-19)

Para tener acceso a este sitio en Español, presione aquí (./historic-pt-es)

# Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year

Fiscal Year 2017 to 2022 (up to April 30, 2022)

Next Page (./historic-pt-2)

## Median Processing Times (in Months)

The number of months shown is the median. It represents the time it took to complete half of the cases in a given time period.

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|------|------------------|-----------------------------------|---------|---------|---------|---------|---------|---------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance, replacement or renewal | 6.8 | 8.0 | 7.8 | 8.3 | 5.2 | 1.1 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 4.9 | 3.9 | 3.3 | 3.9 | 4.0 | 1.9 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (Premium filed) | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (non Premium filed) | 3.4 | 3.8 | 4.7 | 2.3 | 1.8 | 3.0 |
| I-129F | Petition for Alien Fiancé(e) | All Classifications | 3.6 | 6.5 | 5.2 | 4.6 | 8.0 | 10.3 |
| I-130 | Petition for Alien Relative | Immediate Relative | 6.5 | 7.6 | 8.6 | 8.3 | 10.2 | 9.6 |
| I-131 | Application for Travel Document | Advance Parole Document | 3.0 | 3.6 | 4.5 | 4.6 | 7.7 | 7.2 |
| I-131 | Application for Travel Document | Parole in Place | 2.5 | 3.3 | 3.3 | 4.8 | 4.9 | 4.8 |

AR2022_300028

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|------------|
| I-131 | Application for Travel Document | Travel Document | 4.2 | 2.9 | 2.8 | 4.0 | 7.2 | 9.6 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (Premium filed) | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (non Premium filed) | 7.3 | 8.9 | 5.8 | 4.9 | 8.2 | 10.9 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Immigrant Petition (All Classifications) | 6.3 | 13.3 | 16.8 | 11.4 | 5.5 | 8.7 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | 5.5 | 6.2 | 6.7 | 6.9 | 12.9 | 22.9 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on refugee admission more than 1 year ago | 4.6 | 6.4 | 9.4 | 9.3 | 7.1 | 12.8 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 7.0 | 10.6 | 10.0 | 8.8 | 9.9 | 10.3 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Family-based adjustment applications | 7.9 | 10.2 | 10.9 | 9.3 | 12.9 | 10.3 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on Cuban Adjustment Act of 1966 (CAA) | 6.2 | 7.6 | 11.3 | 7.1 | 8.5 | 8.1 |
| I-485[1] | Application to Register Permanent Residence or to Adjust Status | All Other Adjustment of Status | 7.4 | 11.7 | 24.0 | 32.7 | 8.7 | 15.0 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an investor who wishes to immigrate to the United States | 16.6 | 17.9 | 19.0 | 31.1 | 32.5 | 37.7 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All Extend/Change Applications | 2.8 | 3.4 | 4.4 | 4.8 | 9.6 | 7.3 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | U.S. citizen filing to adopt an orphan | N/A | N/A | N/A | N/A | N/A | N/A |

AR2022_300029

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|---|---|---|---|---|---|---|---|---|
| I-600A | Application for Advance Processing of Orphan Petition | U.S. citizen who plans to adopt a foreign-born child | N/A | N/A | N/A | N/A | N/A | N/A |
| I-601A | Application for Provisional Unlawful Presence Waiver | Provisional Waiver of INA 212(a)(9)(B) | 4.6 | 4.5 | 8.7 | 11.2 | 17.1 | 28.1 |
| I-730 | Refugee/Asylee Relative Petition | Petition for accompanying family members of a refugee or an asylee | 7.9 | 10.1 | 12.4 | 15.2 | 20.1 | 25.2 |
| I-751 | Petition to Remove the Conditions on Residence | Removal of conditions on lawful permanent resident status (spouses and children of U.S. citizens and lawful permanent residents) | 11.8 | 15.9 | 14.9 | 13.8 | 13.6 | 17.4 |
| I-765 | Application for Employment Authorization | All other applications for employment authorization | 2.6 | 3.0 | 3.4 | 3.2 | 3.9 | 4.2 |
| I-765 | Application for Employment Authorization | Based on an approved, concurrently filed, I-821D, Consideration of Deferred Action for Childhood Arrivals (c)(33). | 1.8 | 1.2 | 1.1 | 1.1 | 1.9 | 0.5 |
| I-765 | Application for Employment Authorization | Based on a pending asylum application | 1.7 | 0.9 | 2.0 | 2.5 | 3.2 | 8.3 |
| I-765 | Application for Employment Authorization | Based on a pending I-485 adjustment application | 3.0 | 4.1 | 5.1 | 4.8 | 7.1 | 7.0 |
| I-817 | Application for Family Unity Benefits | Voluntary departure under the family unity program and LIFE Act family unity | 8.1 | 12.0 | 9.5 | 5.3 | 5.9 | 5.7 |
| I-821 | Application for Temporary Protected Status | To request or reregister for TPS | 3.4 | 2.9 | 6.4 | 2.2 | 4.1 | 8.9 |

AR2022_300030

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|------|------------------|-----------------------------------|---------|---------|---------|---------|---------|------------|
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Initial Deferred Action | 6.7 | 10.4 | 8.9 | 5.5 | 5.9 | N/A |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Renewal of Deferred Action | 1.6 | 1.2 | 1.1 | 1.1 | 1.8 | 0.5 |
| I-824 | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 3.3 | 5.9 | 7.1 | 6.0 | 4.4 | 8.4 |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Removal of conditions on lawful permanent resident status (immigrant investors) | 18.2 | 21.8 | 25.9 | 24.8 | 34.5 | 41.9 |
| I-914[2] | Application for T Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of trafficking in persons, and immediate family | 9.6 | 12.1 | 16.2 | 18.6 | 18.0 | 13.9 |
| I-918[3] | Petition for U Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of qualifying criminal activity, and their qualifying family | 31.5 | 41.8 | 48.7 | 54.3 | 53.6 | 59.8 |
| I-924 | Application For Regional Center Designation Under the Immigrant Investor Program | I-924 - Application For Regional Center Designation Under the Immigrant Investor Program | 19.5 | 19.0 | 18.8 | 19.1 | 22.1 | N/A |
| N-400 | Application for Naturalization | Application for Naturalization | 7.9 | 9.7 | 10.0 | 9.1 | 11.5 | 11.0 |
| N-565 | Application for Replacement Naturalization/Citizenship Document | U.S. citizen applying for a replacement of naturalization or citizenship certificate | 5.1 | 3.9 | 2.4 | 3.6 | 6.7 | 10.4 |

AR2022_300031

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|---|---|---|---|---|---|---|---|---|
| N-600 | Application for Certificate of Citizenship | Application for recognition of U.S. citizenship | 7.8 | 9.2 | 7.1 | 5.1 | 5.8 | 6.4 |
| N-600K | Application for Certificate of Citizenship and Issuance of Certificate Under Section 322 | Application for Citizenship and Issuance of Certificate | 5.9 | 7.6 | 6.4 | 5.7 | 9.6 | 5.5 |
| Waivers[4] | Waivers | Excluding I-601A | 9.4 | 12.8 | 10.3 | 7.3 | 7.6 | 8.9 |

Next Page (./historic-pt-2)

### Table Key:

N/A Not available.

### References:

[1] Excludes EOIR Adjustment applications.

[2] Includes I-914A, Application for Family Member of T-1 Recipient.

[3] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient.

[4] Includes the following applications filed to waive exclusionary grounds: Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[5] FY2022 uses data from October 1, 2021 to April 30, 2022.

### Note(s):

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Processing times may differ from previously published reports due to system updates and post-adjudicative outcomes.

3) Discrepancies from past historical processing time reports may exist due to differences in reporting procedures.

4) Some of the forms have been aggregated.

5) Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. Visa regressed I-485s and revoked petitions or applications are excluded. Additional information on visa retrogression can be found on our website (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression) (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression).

6) Historical processing times are not comparable to the processing times posted on the USCIS processing times webpage (https://egov.uscis.gov/processing-times/) for certain form types due to different methodologies (for example, cycle time methodology versus processing time methodology).

**AR2022_300032**

For more information, visit the Case Processing Times webpage (https://egov.uscis.gov/processing-times/more-info).

7) From FY2017 through FY2021, the processing time for the I-918/I-918A is calculated using the receipt date to waitlist determination date. Beginning in FY 2022, the processing time is calculated using the receipt date to Bona Fide Determination (BFD) review.

8) Consistent with the July 16, 2021 order (https://www.uscis.gov/DACADecisionStateofTexas) from the Southern District of Texas that prohibits DHS from granting initial DACA requests, USCIS has suspended calculations of processing times for initial DACA requests. The 5.9 months historical processing time listed for initial DACA requests was current as of June 30, 2021.

9) Statutory authorization related to the EB-5 Immigrant Investor Regional Center Program expired at midnight on June 30, 2021. For information regarding Form I-526 petition processing, and the impact of the lapse in statutory authorization related to the EB-5 Immigrant Investor Regional Center Program, please see: https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program)

10) The federal fiscal year is from October 1st through September 30th.

### Source(s):

1) Department of Homeland Security, U.S. Citizenship and Immigration Services, USCIS Electronic Immigration System (ELIS), C3 Consolidated, C4 Consolidated, INFACT, queried May 2022.

## Other case processing times resources

Reducing Processing Backlogs (./reducing-processing-backlogs)

Frequently Asked Questions About Processing Times (./processing-times-faqs)

When to expect to receive your Green Card (./expect-green-card)

Check current processing times (./home)

Processing information for the I-765 (./i765)

Affirmative Asylum Interview Scheduling (http://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-scheduling-bulletin)

Administrative Appeals Office (https://www.uscis.gov/about-us/directorates-and-program-offices/administrative-appeals-office-aao/aao-processing-times)

International Offices (./international-operations-office)

Parole Processing (https://www.uscis.gov/humanitarian/humanitarian-parole/parole-processing)

## Case management tools

AR2022_300033

Inquire about a case outside normal processing time
(https://egov.uscis.gov/e-request/displayONPTForm.do?
entryPoint=init&sroPageType=onpt)

Check your case status (https://egov.uscis.gov/casestatus/landing.do)

Update your mailing address (https://egov.uscis.gov/coa/)

Ask about missing mail (https://egov.uscis.gov/e-Request/Intro.do)

Correct a typographical error (https://egov.uscis.gov/e-
request/displayTypoForm.do?entryPoint=init&sroPageType=typoError)

Request appointment accommodations (https://egov.uscis.gov/e-
request/displayAccomForm.do?
entryPoint=init&sroPageType=accommodations)

## Feedback

**Let us know what you think about our redesigned Processing Times webpage at**
ProcessingTimesFeedback@uscis.dhs.gov
(mailto:ProcessingTimesFeedback@uscis.dhs.gov) **(Please do not submit
case-specific inquiries).**

Return to top

**Topics**
**(https://www.uscis.gov/topics)**

**Forms**
**(https://www.uscis.gov/forms)**

**Newsroom**
**(https://www.uscis.gov/newsr**

**Citizenship**
**(https://www.uscis.gov/citizenship)**

**Green Card**
**(https://www.uscis.gov/green-
card)**

**Laws**
**(https://www.uscis.gov/laws-
and-policy)**

**Tools**
**(https://www.uscis.gov/tools)**

(https://(https://(https://(https://(https://(https://

# **Contact USCIS**
# **(https://www.uscis.gov/about-**
# **us/contact-us)**

(https://www.dhs.gov)

USCIS.gov

AR2022_300034

**An official website of the U.S. Department of Homeland Security (https://www.dhs.gov)**

## National Terrorism Advisory System

About USCIS (https://www.uscis.gov/about-us)

Accessibility (https://www.uscis.gov/website-policies/accessibility)

Budget and Performance (https://www.uscis.gov/about-us/budget-planning-and-performance)

DHS Components (https://www.uscis.gov/website-policies/dhs-component-websites)

Freedom of Information Act (https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act)

No FEAR Act Data (https://www.uscis.gov/about-us/equal-employment-opportunity/equal-employment-opportunity-data-posted-pursuant-to-the-no-fear-act)

Privacy and Legal Disclaimers (https://www.uscis.gov/website-policies/privacy-and-legal-disclaimers)

Site Map (https://www.uscis.gov/sitemap)

Office of the Inspector General (https://www.oig.dhs.gov/)

The White House (https://www.whitehouse.gov/)

USA.gov (https://www.usa.gov/)

AR2022_300035

USCIS Response to Coronavirus (COVID-19) (https://www.uscis.gov/about-us/uscis-response-to-covid-19)

Para tener acceso a este sitio en Español, presione aquí (./historic-pt-es)

# Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year

## Fiscal Year 2017 to 2022 (up to May 31, 2022)

| Next Page (./historic-pt-2) |
|---|

### Median Processing Times (in Months)

The number of months shown is the median. It represents the time it took to complete half of the cases in a given time period.

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|---|---|---|---|---|---|---|---|---|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance, replacement or renewal | 6.8 | 8.0 | 7.8 | 8.3 | 5.2 | 1.1 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 4.9 | 3.9 | 3.3 | 3.9 | 4.0 | 2.6 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (Premium filed) | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (non Premium filed) | 3.4 | 3.8 | 4.7 | 2.3 | 1.8 | 3.0 |
| I-129F | Petition for Alien Fiancé(e) | All Classifications | 3.6 | 6.5 | 5.2 | 4.6 | 8.0 | 10.6 |
| I-130 | Petition for Alien Relative | Immediate Relative | 6.5 | 7.6 | 8.6 | 8.3 | 10.2 | 9.8 |
| I-131 | Application for Travel Document | Advance Parole Document | 3.0 | 3.6 | 4.5 | 4.6 | 7.7 | 7.2 |
| I-131 | Application for Travel Document | Parole in Place | 2.5 | 3.3 | 3.3 | 4.8 | 4.9 | 4.6 |

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|---|---|---|---|---|---|---|---|---|
| I-131 | Application for Travel Document | Travel Document | 4.2 | 2.9 | 2.8 | 4.0 | 7.2 | 9.8 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (Premium filed) | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.3 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (non Premium filed) | 7.3 | 8.9 | 5.8 | 4.9 | 8.2 | 10.8 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Immigrant Petition (All Classifications) | 6.3 | 13.3 | 16.8 | 11.4 | 5.5 | 8.6 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | 5.5 | 6.2 | 6.7 | 6.9 | 12.9 | 22.7 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on refugee admission more than 1 year ago | 4.6 | 6.4 | 9.4 | 9.3 | 7.1 | 13.0 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 7.0 | 10.6 | 10.0 | 8.8 | 9.9 | 10.1 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Family-based adjustment applications | 7.9 | 10.2 | 10.9 | 9.3 | 12.9 | 10.2 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on Cuban Adjustment Act of 1966 (CAA) | 6.2 | 7.6 | 11.3 | 7.1 | 8.5 | 8.0 |
| I-485[1] | Application to Register Permanent Residence or to Adjust Status | All Other Adjustment of Status | 7.4 | 11.7 | 24.0 | 32.7 | 8.7 | 14.9 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an investor who wishes to immigrate to the United States | 16.6 | 17.9 | 19.0 | 31.1 | 32.5 | 41.2 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All Extend/Change Applications | 2.8 | 3.4 | 4.4 | 4.8 | 9.6 | 7.2 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | U.S. citizen filing to adopt an orphan | N/A | N/A | N/A | N/A | N/A | N/A |

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|---------|
| I-600A | Application for Advance Processing of Orphan Petition | U.S. citizen who plans to adopt a foreign-born child | N/A | N/A | N/A | N/A | N/A | N/A |
| I-601A | Application for Provisional Unlawful Presence Waiver | Provisional Waiver of INA 212(a)(9)(B) | 4.6 | 4.5 | 8.7 | 11.2 | 17.1 | 30.0 |
| I-730 | Refugee/Asylee Relative Petition | Petition for accompanying family members of a refugee or an asylee | 7.9 | 10.1 | 12.4 | 15.2 | 20.1 | 27.3 |
| I-751 | Petition to Remove the Conditions on Residence | Removal of conditions on lawful permanent resident status (spouses and children of U.S. citizens and lawful permanent residents) | 11.8 | 15.9 | 14.9 | 13.8 | 13.6 | 17.3 |
| I-765 | Application for Employment Authorization | All other applications for employment authorization | 2.6 | 3.0 | 3.4 | 3.2 | 3.9 | 4.3 |
| I-765 | Application for Employment Authorization | Based on an approved, concurrently filed, I-821D, Consideration of Deferred Action for Childhood Arrivals (c)(33). | 1.8 | 1.2 | 1.1 | 1.1 | 1.9 | 0.5 |
| I-765 | Application for Employment Authorization | Based on a pending asylum application | 1.7 | 0.9 | 2.0 | 2.5 | 3.2 | 9.8 |
| I-765 | Application for Employment Authorization | Based on a pending I-485 adjustment application | 3.0 | 4.1 | 5.1 | 4.8 | 7.1 | 7.0 |
| I-817 | Application for Family Unity Benefits | Voluntary departure under the family unity program and LIFE Act family unity | 8.1 | 12.0 | 9.5 | 5.3 | 5.9 | 5.6 |
| I-821 | Application for Temporary Protected Status | To request or reregister for TPS | 3.4 | 2.9 | 6.4 | 2.2 | 4.1 | 9.2 |

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|---|---|---|---|---|---|---|---|---|
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Initial Deferred Action | 6.7 | 10.4 | 8.9 | 5.5 | 5.9 | N/A |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Renewal of Deferred Action | 1.6 | 1.2 | 1.1 | 1.1 | 1.8 | 0.5 |
| I-824 | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 3.3 | 5.9 | 7.1 | 6.0 | 4.4 | 9.1 |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Removal of conditions on lawful permanent resident status (immigrant investors) | 18.2 | 21.8 | 25.9 | 24.8 | 34.5 | 44.4 |
| I-914[2] | Application for T Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of trafficking in persons, and immediate family | 9.6 | 12.1 | 16.2 | 18.6 | 18.0 | 13.5 |
| I-918[3] | Petition for U Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of qualifying criminal activity, and their qualifying family | 31.5 | 41.8 | 48.7 | 54.3 | 53.6 | 59.7 |
| I-924 | Application For Regional Center Designation Under the Immigrant Investor Program | I-924 - Application For Regional Center Designation Under the Immigrant Investor Program | 19.5 | 19.0 | 18.8 | 19.1 | 22.1 | N/A |
| N-400 | Application for Naturalization | Application for Naturalization | 7.9 | 9.7 | 10.0 | 9.1 | 11.5 | 11.0 |
| N-565 | Application for Replacement Naturalization/Citizenship Document | U.S. citizen applying for a replacement of naturalization or citizenship certificate | 5.1 | 3.9 | 2.4 | 3.6 | 6.7 | 10.5 |

| Form | Form Description | Classification or Basis for Filing | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022[5] |
|---|---|---|---|---|---|---|---|---|
| **N-600** | Application for Certificate of Citizenship | Application for recognition of U.S. citizenship | 7.8 | 9.2 | 7.1 | 5.1 | 5.8 | 6.4 |
| **N-600K** | Application for Certificate of Citizenship and Issuance of Certificate Under Section 322 | Application for Citizenship and Issuance of Certificate | 5.9 | 7.6 | 6.4 | 5.7 | 9.6 | 5.7 |
| **Waivers[4]** | Waivers | Excluding I-601A | 9.4 | 12.8 | 10.3 | 7.3 | 7.6 | 8.7 |

Next Page (./historic-pt-2)

**Table Key:**

N/A Not available.

**References:**

[1] Excludes EOIR Adjustment applications.

[2] Includes I-914A, Application for Family Member of T-1 Recipient.

[3] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient.

[4] Includes the following applications filed to waive exclusionary grounds: Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[5] FY2022 uses data from October 1, 2021 to May 31, 2022.

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Processing times may differ from previously published reports due to system updates and post-adjudicative outcomes.

3) Discrepancies from past historical processing time reports may exist due to differences in reporting procedures.

4) Some of the forms have been aggregated.

5) Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. Visa regressed I-485s and revoked petitions or applications are excluded. Additional information on visa retrogression can be found on our website (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression) (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression).

6) Historical processing times are not comparable to the processing times posted on the USCIS processing times webpage (https://egov.uscis.gov/processing-times/) for certain form types due to different methodologies (for example, cycle time methodology versus processing time methodology).

For more information, visit the Case Processing Times webpage (https://egov.uscis.gov/processing-times/more-info).

7) From FY2017 through FY2021, the processing time for the I-918/I-918A is calculated using the receipt date to waitlist determination date. Beginning in FY 2022, the processing time is calculated using the receipt date to Bona Fide Determination (BFD) review.

8) Consistent with the July 16, 2021 order (https://www.uscis.gov/DACADecisionStateofTexas) from the Southern District of Texas that prohibits DHS from granting initial DACA requests, USCIS has suspended calculations of processing times for initial DACA requests. The 5.9 months historical processing time listed for initial DACA requests was current as of June 30, 2021.

9) Statutory authorization related to the EB-5 Immigrant Investor Regional Center Program expired at midnight on June 30, 2021. For information regarding Form I-526 petition processing, and the impact of the lapse in statutory authorization related to the EB-5 Immigrant Investor Regional Center Program, please see: https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program)

10) The federal fiscal year is from October 1st through September 30th.

**Source(s):**

1) Department of Homeland Security, U.S. Citizenship and Immigration Services, USCIS Electronic Immigration System (ELIS), C3 Consolidated, C4 Consolidated, INFACT, queried June 2022.

## Other case processing times resources

Reducing Processing Backlogs (./reducing-processing-backlogs)

Frequently Asked Questions About Processing Times (./processing-times-faqs)

When to expect to receive your Green Card (./expect-green-card)

Check current processing times (./home)

Processing information for the I-765 (./i765)

Affirmative Asylum Interview Scheduling (http://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-scheduling-bulletin)

Administrative Appeals Office (https://www.uscis.gov/about-us/directorates-and-program-offices/administrative-appeals-office-aao/aao-processing-times)

International Offices (./international-operations-office)

Parole Processing (https://www.uscis.gov/humanitarian/humanitarian-parole/parole-processing)

## Case management tools

Inquire about a case outside normal processing time (https://egov.uscis.gov/e-request/displayONPTForm.do?entryPoint=init&sroPageType=onpt)

Check your case status (https://egov.uscis.gov/casestatus/landing.do)

Update your mailing address (https://egov.uscis.gov/coa/)

Ask about missing mail (https://egov.uscis.gov/e-Request/Intro.do)

Correct a typographical error (https://egov.uscis.gov/e-request/displayTypoForm.do?entryPoint=init&sroPageType=typoError)

Request appointment accommodations (https://egov.uscis.gov/e-request/displayAccomForm.do?entryPoint=init&sroPageType=accommodations)

## Feedback

Let us know what you think about our redesigned Processing Times webpage at ProcessingTimesFeedback@uscis.dhs.gov (mailto:ProcessingTimesFeedback@uscis.dhs.gov)    (Please do not submit case-specific inquiries).

Return to top

**Topics (https://www.uscis.gov/topics)**

**Forms (https://www.uscis.gov/forms)**

**Newsroom (https://www.uscis.gov/newsro**

**Citizenship (https://www.uscis.gov/citizenship)**

**Green Card (https://www.uscis.gov/green-card)**

**Laws (https://www.uscis.gov/laws-and-policy)**

**Tools (https://www.uscis.gov/tools)**

(https://www.facebook.com/uscis)

## Contact USCIS (https://www.uscis.gov/about-us/contact-us)

(https://www.dhs.gov)

USCIS.gov

**An official website of the U.S. Department of Homeland Security (https://www.dhs.gov)**

About USCIS (https://www.uscis.gov/about-us)

Accessibility (https://www.uscis.gov/website-policies/accessibility)

Budget and Performance (https://www.uscis.gov/about-us/budget-planning-and-performance)

DHS Components (https://www.uscis.gov/website-policies/dhs-component-websites)

Freedom of Information Act (https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act)

No FEAR Act Data (https://www.uscis.gov/about-us/equal-employment-opportunity/equal-employment-opportunity-data-posted-pursuant-to-the-no-fear-act)

Privacy and Legal Disclaimers (https://www.uscis.gov/website-policies/privacy-and-legal-disclaimers)

Site Map (https://www.uscis.gov/sitemap)

Office of the Inspector General (https://www.oig.dhs.gov/)

The White House (https://www.whitehouse.gov/)

USA.gov (https://www.usa.gov/)

# National Terrorism Advisory System

1200

Appendix I

LEGALIZATION AND FAMILY FAIRNESS -- AN ANALYSIS

I.   GENERAL PURPOSE OF THE UNITED STATES IMMIGRATION LAWS AND THE
     IMMIGRATION REFORM AND CONTROL ACT OF 1986 (IRCA)

On November 6, 1986, President Reagan signed the Immigration Reform and
Control Act of 1986 (IRCA) into law.   This legislation, the most
comprehensive reform of our Immigration laws since 1952, makes great
strides to control illegal immigration while preserving our heritage of
legal immigration.

While the theme of this legislation is focused on gaining control of our
borders and eliminating the illegal alien problem through firm yet fair
enforcement, it also reflects the nation's concerns for aliens who have
been long-time illegal residents of the United States.

This is accomplished through a generous legalization program that is
based on the same concepts of fairness that underlie the lawful
immigration system.   Both paths offer an orderly transition to permanent
residence for those who have established their eligibility and provide an
opportunity for family members to immigrate under a process that does not
reward people who have circumvented the law by entering illegally.

Immigration by close relatives of permanent residents and citizens of the
United States forms the core of a lawful system centered on the
reunification of families; the overwhelming majority of some six hundred
thousand people who immigrate each year are such immediate family
members.   By legalizing their status, aliens who have been in this
country since 1982 gain access to our family-oriented immigration policy,
and ensure that their spouses and children may enter lawfully.

II.  CONCEPT OF LEGALIZATION UNDER IRCA

IRCA is an enforcement law; its primary purpose is to stop illegal
immigration.   The legalization program is one part of a package that
includes employer sanctions, enhanced border enforcement, the Systematic
Alien Verification for Entitlements (SAVE) program, and a provision for
removal of criminal aliens.

Legalization was the balance--a one-time program to legalize certain
aliens, even though they were illegal, and allow them to become part of
the American mainstream.   This delicate balance was achieved through a
statute that was carefully constructed to make passage of the bill
possible.   Even as crafted, legalization was still so controversial that
the margin in favor of the provision in the House of Representatives was
only seven votes.

The Congress accomplished the legalization balance by limiting the
program to aliens with substantial equities in the United States.   It did
not intend to place all illegal aliens within a legal status.  January 1,
1982, was set as the eligibility date for legalization, thus setting
forth clear boundaries for establishing ties to this country.   Those
illegal aliens who arrived in the United States after January 1, 1982,
remain illegal and are subject to deportation.

AR2022_300044

Appendix I, continued

This Congressional intent as it applies to each alien is evidence in the plain meaning of the statute. This intent is further magnified by the legislative history of the bill, including the House Report, the State Report, the Conference Report, and the Congressional floor debates (1986). There is nothing in these documents that would indicate Congress wanted to provide immigration benefits to others who didn't meet the basic criteria, including families of legalized aliens. To the contrary, the Senate Judiciary Committee stated in its report that:

> It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning right by virtue of the legalization. They will be required to "wait in line" in the same manner as immediate family members of other new resident aliens. S. Rep. No. 99-131, 99th Cong., 1 Sess. 343 (1985).

With the legislative history so clear, the authority of the Attorney General to grant resident status must extend only to aliens who qualify on the merits of their own case, and not through a broad, extralegal derivative basis.

III. **HOW LEGALIZATION HAS WORKED**

In the six months allowed to prepare for implementation of the program, the INS engaged in an unprecedented action which opened the full regulatory process to the public. Comments were solicited at the earliest stage, and the thousands of responses were carefully considered in developing the final product. Meanwhile, INS undertook an implementation effort never matched in the agency's history. By May 5, 1987, one hundred and seven (107) new offices were opened with 2,000 people hired to staff these offices; a major automated data system was developed and installed; the public information campaign was begun; and training was provided to all that were to work in the legalization program.

As of October 16, 1987, roughly 5 1/2 months after opening, we have accepted over 865,000 applications. Over 85% of these applications were filed directly with the INS, indicating that there is no "fear factor" — the alien population that has come forward exhibits trust in the Immigration Service. With this participation rate already doubling the results of all other legalization programs throughout the world in modern-day history, expectations are that 2 million illegal aliens will be processed by May 4, 1988.

IV. **HOW LEGALIZATION SUPPORTS THE DUAL THEMES OF LEGAL IMMIGRATION AND FAMILY UNIFICATION**

Through the legalization program made possible by IRCA, several million people will be able to shift from an illegal to a legal status. They will be able to come "out of the shadows", become full active participants in our society, and eventually become United States citizens. Many of these millions are in family units which have filed as a unit and have been found eligible for legalization. Many parents of United States citizen children have qualified on the merits of their own cases under IRCA.

The INS is exercising the Attorney General's discretion by allowing minor children to remain in the United States even though they do not qualify on their own, but whose parents (or single parent in the case of divorce or death of spouse) have qualified under the provisions of IRCA. The same discretion is to be exercised as well in other cases which have specific humanitarian considerations.

AR2022_300045

1202

Appendix I, continued

Many family members who would have otherwise been judged ineligible for legalization may now qualify due to recent policy decisions. Applicants who resided illegally in the United States prior to January 1, 1982, but who subsequently departed and then used legal nonimmigrant documents to re-enter the United States to resume their illegal residence, are now considered eligible for legalization benefits with the filing of a waiver to overcome the fraud at entry.

Upon being approved for permanent resident status, the legalized alien will be eligible to bring in immediate relatives under the current provisions of the Immigration and Nationality Act. Therefore, families of legalized aliens will be unified in the same manner as other immigrant families who have been waiting outside of the United States. (See the following chart for comparisons).

Legal Immigration

1. Married couple with wife in U.S. and husband in foreign country

2. Lawful resident wife files petition for husband

3. Petition approved; husband gains right to immigrate under preference system

4. Husband must wait for visa; cannot wait in U.S.

5. If husband comes to U.S. illegally, he is subject to deportation if routinely encountered

6. Husband must return to home country to obtain visa when it is available

Legalization

1. Married couple apply for legalization

2. Wife approved; husband denied

3. No effort to deport husband based on legalization application

4. Later INS contact (i.e., at place of work) could result in deportation proceedings against husband

5. Wife gains permanent resident status; files petition for husband

6. See steps 3 - 6 under Legal Immigration

V.   FAMILY FAIRNESS

Congress, as well as the INS, recognized that there is a basic issue of fairness involved in the enactment of IRCA. Fairness dictates that illegal alien family members of persons eligible for legalization not be treated more favorably than the family members of legal permanent residents who may have to wait years to come to the United States due to the backlog of a demand for visas. To grant a derivative legalization benefit to unqualified aliens who are merely related to a qualified applicant would be unfair when put in this context. Such a break from fairness and tradition would also act as a magnet for others to enter the United States in an illegal manner, marry a qualified legalization

AR2022_300046

Appendix I, continued

applicant, and attempt to gain benefits.  This would  create a second
legalization program contrary to the intent of Congress and upset the
delicate balance of IRCA.

Legalization is a unique act.  Basic equity between those legal
immigrants who patiently wait in foreign countries for legal visas and
those who entered illegally, but have contributed to America and are
being forgiven, should be maintained.  However, unqualified family
members will be in no worse a position than they were prior to the
enactment of IRCA.  In fact, as noted above, it is to the benefit of the
unqualified to have their eligible relative apply for legalization in
that it may qualify them in the future for permanent residence.

VI.   UNFOUNDED BELIEF THAT UNLESS LEGALIZATION LAW BE EXPANDED, FAMILIES WILL
      BE BROKEN UP

As previously noted, legalization allows many families to stay in this
country legally.  Without legalization, individuals who are in the United
States illegally have no right to any benefits of the immigration law and
may not petition for relatives.

To the extent that there is a family separation, the separation was
usually accomplished by the alien who left his or her family behind in
the home country to seek an illegal life in the United States.  If the
family is separated because of legalization and decides not to wait for a
legal means to bring the family unit together again in the United States,
the option is always available for the family unit to return to the home
country.

VII.  INS PROCEDURES TO HANDLE FAMILY FAIRNESS ISSUES

Under the law no information from the legalization application will be
used against any applicant or their family.  Once family members are
recorded on the application, there cannot be subsequent modifications.
Thus it is in the ineligible alien's best interest to be recorded as a
family member now.

The confidentiality factor of the application, which Congress included in
the legislation, prevents INS from taking any action as a result of
information provided in the application.  The only way family members of
a legalization applicant would come under deportation proceedings is if
they are apprehended during a routine INS operation at a workplace.

INS district directors may exercise the Attorney General's authority to
indefinitely defer deportation of anyone for specific humanitarian
reasons.  They will continue to examine any case that involves an
immediate relative of a successful legalization applicant.  The district
directors are instructed to review all evidence submitted, make a
recommended finding, and make available all such cases for review and
concurrence.  This unusual step is being taken to ensure the consistency
of decisions throughout the Service.

Guidelines for INS officials regarding the basis for issuing voluntary
departure are as follows:

1.  Voluntary departure shall generally not be granted to the ineligible
    spouses of legalized aliens whose only claim to such discretionary
    relief is by virtue of the marriage itself.  Likewise, such relief is
    not available to the ineligible parents of either legal
    applicants or United States citizen children.

AR2022_300047

1204

Appendix I, continued

2. Instead, certain compelling or humanitarian factors must exist in addition to the family relationship and hardships caused by separation.

3. In general, indefinite voluntary departure shall be granted to unmarried children under the age of eighteen (18) years who can establish that they were in an unlawful status prior to November 6, 1986. Such children should be residing with their parents and the granting of voluntary departure should be conditioned on the fact that both parents (or, in the case of a single parent household, the parent the child lives with) have achieved lawful temporary resident status.

IX.  CONCLUSION

The United States is now nearly half way through the largest program in world history to allow many illegal aliens to become legal. Legalization is a balance to enforcement efforts to deter and control illegal immigration through border enforcement, job market and entitlement enforcement to deny jobs and entitlements to illegal aliens and stronger efforts against criminal aliens. By May 1988, the United States will legalize an estimated 2 million people, five times those legalized by all other countries in the world.

Many of these 2 million being legalized are families. Additional exercise of the Attorney General's discretion by INS assures that minor children living with their parents will be covered. Spouse not directly eligible for legalization will be reviewed on a case-by-case basis and can be granted permission to remain if special humanitarian factors are present. Other ineligible spouses of legalized aliens are placed in the exact same position as spouses of legal immigrants — they can become legal residents through the petition process.

Therefore, legalization itself is the most significant effort of the Congress and the Administration to pursue the goal of U.S. immigration laws -- family unification. Out of fairness to our legal system, to legal immigrants waiting patiently in line, and to adhere to Congressional intent, there is no basis to "blanket in" all ineligible spouses. They, like all American immigrants, must follow the laws and fundamental principles of fairness.

It is extremely important, however, that persons who believe they are eligible for legalization apply because of the unique protection the law offers through the confidentiality provision. They should appear at an INS Legalization Office or pursue their case through a church or other organization (Qualified Designated Entity) whether or not other family members qualify, in order to ensure that their family situation is resolved through the lawful immigration process.

Alan C. Nelson
Commissioner
U.S. Immigration & Naturalization Service

October 21, 1987

AR2022_300048

INTERPRETER RELEASES, October 26, 1987

1200

Appendix I

LEGALIZATION AND FAMILY FAIRNESS -- AN ANALYSIS

I.  GENERAL PURPOSE OF THE UNITED STATES IMMIGRATION LAWS AND THE IMMIGRATION REFORM AND CONTROL ACT OF 1986 (IRCA)

On November 6, 1986, President Reagan signed the Immigration Reform and Control Act of 1986 (IRCA) into law.   This legislation, the most comprehensive reform of our Immigration laws since 1952, makes great strides to control illegal immigration while preserving our heritage of legal immigration.

While the theme of this legislation is focused on gaining control of our borders and eliminating the illegal alien problem through firm yet fair enforcement, it also reflects the nation's concerns for aliens who have been long-time illegal residents of the United States.

This is accomplished through a generous legalization program that is based on the same concepts of fairness that underlie the lawful immigration system.  Both paths offer an orderly transition to permanent residence for those who have established their eligibility and provide an opportunity for family members to immigrate under a process that does not reward people who have circumvented the law by entering illegally.

Immigration by close relatives of permanent residents and citizens of the United States forms the core of a lawful system centered on the reunification of families; the overwhelming majority of some six hundred thousand people who immigrate each year are such immediate family members.   By legalizing their status, aliens who have been in this country since 1982 gain access to our family-oriented immigration policy, and ensure that their spouses and children may enter lawfully.

II. CONCEPT OF LEGALIZATION UNDER IRCA

IRCA is an enforcement law; its primary purpose is to stop illegal immigration.   The legalization program is one part of a package that includes employer sanctions, enhanced border enforcement, the Systematic Alien Verification for Entitlements (SAVE) program, and a provision for removal of criminal aliens.

Legalization was the balance--a one-time program to legalize certain aliens, even though they were illegal, and allow them to become part of the American mainstream.   This delicate balance was achieved through a statute that was carefully constructed to make passage of the bill possible.  Even as crafted, legalization was still so controversial that the margin in favor of the provision in the House of Representatives was only seven votes.

The Congress accomplished the legalization balance by limiting the program to aliens with substantial equities in the United States. It did not intend to place all illegal aliens within a legal status. January 1, 1982, was set as the eligibility date for legalization, thus setting forth clear boundaries for establishing ties to this country.   Those illegal aliens who arrived in the United States after January 1, 1982, remain illegal and are subject to deportation.

AR2022_300049

Appendix I, continued

This Congressional intent as it applies to each alien is evidence in the plain meaning of the statute. This intent is further magnified by the legislative history of the bill, including the House Report, the State Report, the Conference Report, and the Congressional floor debates (1986). There is nothing in these documents that would indicate Congress wanted to provide immigration benefits to others who didn't meet the basic criteria, including families of legalized aliens. To the contrary, the Senate Judiciary Committee stated in its report that:

> It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning right by virtue of the legalization. They will be required to "wait in line" in the same manner as immediate family members of other new resident aliens. S. Rep. No. 99-131, 99th Cong., 1 Sess. 343 (1985).

With the legislative history so clear, the authority of the Attorney General to grant resident status must extend only to aliens who qualify on the merits of their own case, and not through a broad, extralegal derivative basis.

III. HOW LEGALIZATION HAS WORKED

In the six months allowed to prepare for implementation of the program, the INS engaged in an unprecedented action which opened the full regulatory process to the public. Comments were solicited at the earliest stage, and the thousands of responses were carefully considered in developing the final product. Meanwhile, INS undertook an implementation effort never matched in the agency's history. By May 5, 1987, one hundred and seven (107) new offices were opened with 2,000 people hired to staff these offices; a major automated data system was developed and installed; the public information campaign was begun; and training was provided to all that were to work in the legalization program.

As of October 16, 1987, roughly 5 1/2 months after opening, we have accepted over 865,000 applications. Over 85% of these applications were filed directly with the INS, indicating that there is no "fear factor" — the alien population that has come forward exhibits trust in the Immigration Service. With this participation rate already doubling the results of all other legalization programs throughout the world in modern-day history, expectations are that 2 million illegal aliens will be processed by May 4, 1988.

IV. HOW LEGALIZATION SUPPORTS THE DUAL THEMES OF LEGAL IMMIGRATION AND FAMILY UNIFICATION

Through the legalization program made possible by IRCA, several million people will be able to shift from an illegal to a legal status. They will be able to come "out of the shadows", become full active participants in our society, and eventually become United States citizens. Many of these millions are in family units which have filed as a unit and have been found eligible for legalization. Many parents of United States citizen children have qualified on the merits of their own cases under IRCA.

The INS is exercising the Attorney General's discretion by allowing minor children to remain in the United States even though they do not qualify on their own, but whose parents (or single parent in the case of divorce or death of spouse) have qualified under the provisions of IRCA. The same discretion is to be exercised as well in other cases which have specific humanitarian considerations.

AR2022_300050

1202

Appendix I, continued

Many family members who would have otherwise been judged ineligible for legalization may now qualify due to recent policy decisions. Applicants who resided illegally in the United States prior to January 1, 1982, but who subsequently departed and then used legal nonimmigrant documents to re-enter the United States to resume their illegal residence, are now considered eligible for legalization benefits with the filing of a waiver to overcome the fraud at entry.

Upon being approved for permanent resident status, the legalized alien will be eligible to bring in immediate relatives under the current provisions of the Immigration and Nationality Act. Therefore, families of legalized aliens will be unified in the same manner as other immigrant families who have been waiting outside of the United States. (See the following chart for comparisons).

Legal Immigration

1.  Married couple with wife in U.S. and husband in foreign country

2.  Lawful resident wife files petition for husband

3.  Petition approved; husband gains right to immigrate under preference system

4.  Husband must wait for visa; cannot wait in U.S.

5.  If husband comes to U.S. illegally, he is subject to deportation if routinely encountered

6.  Husband must return to home country to obtain visa when it is available

Legalization

1.  Married couple apply for legalization

2.  Wife approved; husband denied

3.  No effort to deport husband based on legalization application

4.  Later INS contact (i.e., at place of work) could result in deportation proceedings against husband

5.  Wife gains permanent resident status; files petition for husband

6.  See steps 3 - 6 under Legal Immigration

V.   FAMILY FAIRNESS

Congress, as well as the INS, recognized that there is a basic issue of fairness involved in the enactment of IRCA. Fairness dictates that illegal alien family members of persons eligible for legalization not be treated more favorably than the family members of legal permanent residents who may have to wait years to come to the United States due to the backlog of a demand for visas. To grant a derivative legalization benefit to unqualified aliens who are merely related to a qualified applicant would be unfair when put in this context. Such a break from fairness and tradition would also act as a magnet for others to enter the United States in an illegal manner, marry a qualified legalization

AR2022_300051

Appendix I, continued

applicant, and attempt to gain benefits.  This would  create a second
legalization program contrary to the intent of Congress and upset the
delicate balance of IRCA.

Legalization is a unique act.  Basic equity between those legal
immigrants who patiently wait in foreign countries for legal visas and
those who entered illegally, but have contributed to America and are
being forgiven, should be maintained.  However, unqualified family
members will be in no worse a position than they were prior to the
enactment of IRCA.  In fact, as noted above, it is to the benefit of the
unqualified to have their eligible relative apply for legalization in
that it may qualify them in the future for permanent residence.

VI.  UNFOUNDED BELIEF THAT UNLESS LEGALIZATION LAW BE EXPANDED, FAMILIES WILL
     BE BROKEN UP

As previously noted, legalization allows many families to stay in this
country legally.  Without legalization, individuals who are in the United
States illegally have no right to any benefits of the immigration law and
may not petition for relatives.

To the extent that there is a family separation, the separation was
usually accomplished by the alien who left his or her family behind in
the home country to seek an illegal life in the United States.  If the
family is separated because of legalization and decides not to wait for a
legal means to bring the family unit together again in the United States,
the option is always available for the family unit to return to the home
country.

VII.  INS PROCEDURES TO HANDLE FAMILY FAIRNESS ISSUES

Under the law no information from the legalization application will be
used against any applicant or their family.  Once family members are
recorded on the application, there cannot be subsequent modifications.
Thus it is in the ineligible alien's best interest to be recorded as a
family member now.

The confidentiality factor of the application, which Congress included in
the legislation, prevents INS from taking any action as a result of
information provided in the application.  The only way family members of
a legalization applicant would come under deportation proceedings is if
they are apprehended during a routine INS operation at a workplace.

INS district directors may exercise the Attorney General's authority to
indefinitely defer deportation of anyone for specific humanitarian
reasons.   They will continue to examine any case that involves an
immediate relative of a successful legalization applicant.  The district
directors are instructed to review all evidence submitted, make a
recommended finding, and make available all such cases for review and
concurrence.  This unusual step is being taken to ensure the consistency
of decisions throughout the Service.

Guidelines for INS officials regarding the basis for issuing voluntary
departure are as follows:

1.  Voluntary departure shall generally not be granted to the ineligible
    spouses of legalized aliens whose only claim to such discretionary
    relief is by virtue of the marriage itself.  Likewise, such relief is
    not available to the ineligible parents of either legal
    applicants or United States citizen children.

AR2022_300052

INTERPRETER RELEASES, October 26, 1987

1204

Appendix I, continued

2. Instead, certain compelling or humanitarian factors must exist in
addition to the family relationship and hardships caused by
separation.

3. In general, indefinite voluntary departure shall be granted to
unmarried children under the age of eighteen (18) years who can
establish that they were in an unlawful status prior to November 6,
1986. Such children should be residing with their parents and the
granting of voluntary departure should be conditioned on the fact
that both parents (or, in the case of a single parent household, the
parent the child lives with) have achieved lawful temporary resident
status.

IX.   CONCLUSION

The United States is now nearly half way through the largest program in
world history to allow many illegal aliens to become legal. Legalization
is a balance to enforcement efforts to deter and control illegal
immigration through border enforcement, job market and entitlement
enforcement to deny jobs and entitlements to illegal aliens and stronger
efforts against criminal aliens. By May 1988, the United States will
legalize an estimated 2 million people, five times those legalized by all
other countries in the world.

Many of these 2 million being legalized are families. Additional
exercise of the Attorney General's discretion by INS assures that minor
children living with their parents will be covered. Spouse not directly
eligible for legalization will be reviewed on a case-by-case basis and
can be granted permission to remain if special humanitarian factors are
present. Other ineligible spouses of legalized aliens are placed in the
exact same position as spouses of legal immigrants — they can become
legal residents through the petition process.

Therefore, legalization itself is the most significant effort of the
Congress and the Administration to pursue the goal of U.S. immigration
laws -- family unification. Out of fairness to our legal system, to
legal immigrants waiting patiently in line, and to adhere to
Congressional intent, there is no basis to "blanket in" all ineligible
spouses. They, like all American immigrants, must follow the laws and
fundamental principles of fairness.

It is extremely important, however, that persons who believe they are
eligible for legalization apply because of the unique protection the law
offers through the confidentiality provision. They should appear at an
INS Legalization Office or pursue their case through a church or other
organization (Qualified Designated Entity) whether or not other family
members qualify, in order to ensure that their family situation is
resolved through the lawful immigration process.

Alan C. Nelson
Commissioner
U.S. Immigration & Naturalization Service

October 21, 1987

AR2022_300053

**U.S. Department of Justice**
Immigration and Naturalization Service

HQADN 70/6.2

_____

*Office of the Executive Associate Commissioner*                    *4257 Street NW*
                                                                    *Washington, DC 20536*



MAY  8  2002

MEMORANDUM FOR JOHNNY N. WILLIAMS                                    ~
                    EXECUTIVE ASSOCIATE COMMISSIONER
                    OFFICE OF FIELD OPERATIONS

FROM:           Stuart Anderson /S/
                Executive Associate Commissioner
                Office of Policy and Planning


SUBJECT:        Deferred Action for Aliens with bona fide Applications for
                <u>T Nonimmigrant Status</u>

    This memorandum outlines changes in Immigration and Naturalization Service (INS)
procedures for deferred action determinations on behalf of victims of severe forms of trafficking
whose applications for T nonimmigrant status have been determined to be bona fide but are still
awaiting final adjudication by the Vermont Service Center (VSC).  It should be read as a
supplement to guidance by the Office of Programs on December 19, 2000, and
September 7, 2001, and to a memorandum dated August 30,2001, that instructed INS offices to
utilize deferred action as one means to provide possible victims the opportunity to avail
themselves of the provisions of the Victims of Trafficking and Violence Protection Act of 2000,
including applying for T or U nonimmigrant status.[1]

    Effective the date of this memorandum, the VSC is responsible for assessing deferred action
for all applicants whose applications have been determined to be bona fide. The duration of the
initial deferred action assessment shall be at the discretion of the Service Center Director but
shall not exceed 12 months.  The initial assessment may be for less than 12 months if the director
determines an application would be adjudicated within that time.  Deferred action <u>will not </u>be
considered or assessed for a T nonimmigrant status applicant if he or she is currently in

_____

1 This memorandum does not, however, after the guidance outlined in those memoranda regarding the interim
procedures to be followed while the regulations implementing the U nonimmigrant status are being promulgated.
Aliens who are identified as possibly eligible for U nonimmigrant status should not be removed from the United
States until they have had the opportunity to apply for such status.  Existing authority and mechanisms such as
parole, deferred action, and stays of removal should be used to achieve this objective.

AR2022_300054

Memorandum for Johnny N. Williams
Subject: Deferred Action for Aliens with Bona Fide Applications
          for T Nonimmigrant Status

removal proceedings unless the case has been administratively closed by the Immigration Judge
or the Board of Immigration Appeals. For purposes of this memorandum, removal proceedings
are defined as the period between the filing of the Notice to Appear with the Immigration Judge
and the issuance of the final decision.

    If a deferred action determination is made, the VSC will notify the alien to submit Form I-765,
Application for Employment Authorization. Applications for employment authorization based on
an assessment of deferred action at the VSC must be filed with the VSC.  After the initial
deferred action decision and issuance of a one-year Employment Authorization Document, the
VSC will hold those files and review each subsequent request for employment authorization and
deferred action upon receipt of each application.  Requests for extensions of employment
authorization and deferred action will be reviewed and granted in increments of twelve months.

    Field Offices (and other Service Centers) may continue to receive inquiries from T applicants
regarding determination of deferred action.  These may be initial requests or requests for an
extension of deferred action. These requests should be mailed to: **USINS- Vermont Service
Center, ATTN: Keith Canney, Box 1000, 75 Lower Weldon St., St. Albans, VT 05479-0001.**

    If you have any questions regarding this memorandum or other T nonimmigrant status issues,
please contact Laura Dawkins, Office of Adjudications at (202) 514-4754.

**U.S. Department of Homeland Security**
Citizenship and Immigration Services

---

Office of Associate Director of Operations

*425 I Street NW*
*Washington, DC 20536*

**OCT  8 2003**

MEMORANDUM FOR  DIRECTOR, VERMONT SERVICE CENTER

FROM:                          William R. Yates
                                    Associate Director of Operations

SUBJECT:                    Centralization of Interim Relief For
                                    U Nonimmigrant Status Applicants

**Background**

On October 28, 2000, Congress passed the Victims of Trafficking and Violence Protection Act (VTVPA), Pub. L. 106-386.[1]  The VTVPA created the U nonimmigrant status, a new nonimmigrant classification for victims of specific crimes. This nonimmigrant status was created to strengthen the ability of law enforcement agencies to detect, investigate and prosecute cases of domestic violence, sexual assault, trafficking of persons and other criminal activity of which aliens are victims, while offering protection to victims of such offenses.  It provides an immigration mechanism for cooperating victims to remain temporarily in the United States to assist in investigations and/or prosecutions.  It is available to victims of certain criminal activity and their families, and is limited to 10,000 principals per year.

Regulations implementing this new nonimmigrant status are currently in the clearance process.  In an effort to provide interim relief for this vulnerable population, the Office of Programs issued interim guidance in August 2001, which directed that no one who appeared to be eligible to apply for U nonimmigrant status be removed from the United States until he/she has had the opportunity to avail him/herself of the provisions of the VTVPA.  It further instructed field offices to use existing mechanisms (parole, deferred action, and stays of removal) to achieve this objective.

---

[1] The sections of the VTVPA pertaining to U nonimmigrant status are codified at sections 101(a)(15)(U), 214(o), and 245(l) of the Immigration and Nationality Act (INA).

AR2022_300056

Memorandum for Director, Vermont Service Center                    Page 2
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

Since this guidance was issued, it has become apparent that until the regulations implementing the U nonimmigrant status are published, a more unified, centralized approach is needed in the interim relief process. Many field offices have been unsure how to proceed in granting interim relief, which has resulted in inconsistent treatment of potential U nonimmigrant status applicants. It is for these reasons that the U nonimmigrant status interim relief process will be centralized at the Vermont Service Center (VSC) effective immediately.

## Centralization of Interim Relief Process

The VSC will serve as the "clearinghouse" for early-filed applications and will have jurisdiction to assess deferred action in early-filed U nonimmigrant status cases. Upon receipt of a request for interim relief, the VSC will consider the facts of each case and determine if deferred action is appropriate. Each decision should be considered individually, based on all the facts present. Upon authorizing deferred action, the center director will advise the alien, by letter, of the action taken and advise him or her of eligibility to request employment authorization. The center director will include a copy of a G-312 in the alien's A file and maintain that file for docket control.

Deferred action shall not be assessed in those cases where the applicant is clearly ineligible for U nonimmigrant status or is an aggravated felon, and those cases should be referred to the Bureau of Immigration and Customs Enforcement (ICE) for possible issuance of a Notice to Appear. If the VSC determines that the case is not suitable for deferred action, the alien should be notified of that decision by letter.

By their nature, U nonimmigrant status cases generally possess factors that warrant consideration for deferred action. In some cases, however, there may be factors present that would militate against deferred action; cases should therefore receive individual scrutiny. The VSC should maintain records of all assessments of deferred action for statistical and tracking purposes. In addition, a process for periodic review of the deferred action decisions made by the VSC is planned. Upon publication of the regulations implementing the U nonimmigrant status, the VSC will send a letter informing early filers to submit an application on the proper form, and monitor the early-filed list to determine whether those assessed deferred action have applied. The VSC will terminate deferred action and refer those who fail to apply within the timeframe established by the regulation to ICE for possible issuance of a Notice to Appear, or for removal.

## Eligibility to apply for U nonimmigrant status

Before determining whether to grant a form of interim relief, VSC personnel must first determine whether the alien adequately demonstrates that he/she may possibly be eligible to apply for U nonimmigrant status when regulations are issued. This would be demonstrated by the submission of *prima facie* evidence of each eligibility requirement. In other words, the alien must produce sufficient evidence to render reasonable a conclusion that the alien may be eligible for U nonimmigrant status when regulations are issued implementing that status. This is not a

AR2022_300057

Memorandum for Director, Vermont Service Center                    Page 3
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

determination that an alien is or is not eligible to apply, or an adjudication of the claim itself. It
is a conclusion reached by examining the documents accompanying the request for interim relief
based upon perceived eligibility.

   The four basic eligibility requirements that an alien must satisfy in order to be classified as a
principal U nonimmigrant are set out in the VTVPA. Therefore, in order to be eligible to apply
for interim relief, an alien must present evidence demonstrating that:

1.   He/she has suffered substantial physical or mental abuse as a result of having
     been a victim of certain criminal activity;

2.   He/she (or in the case of an alien child under the age of 16, the parent,
     guardian, or next friend of the alien) possesses information concerning that criminal
     activity;

3.   He/she (or in the case of an alien child under the age of 16, the parent, guardian, or next
     friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a
     Federal, State, or local law enforcement official; to a Federal, State, or local prosecutor;
     to a Federal or State judge; to the INS; or to other Federal, State, or local authorities
     investigating or prosecuting the criminal activity; and

4.   The criminal activity described violated the laws of the United States or occurred in the
     United States (including in Indian country and military installations) or the territories
     and possessions of the United States.

   The criminal activity referred to above is listed at INA § 101(a)(15)(U)(iii). It is that
involving one or more of the following or any similar activity in violation of Federal, State, or
local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive
sexual contact; prostitution; sexual exploitation female genital mutilation; being held hostage;
peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint;
false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness
tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any
of the above mentioned crimes.

   When considering whether an alien has presented sufficient evidence demonstrating he/she
may be eligible to apply for U nonimmigrant status and thus eligible to request a form of interim
relief, VSC personnel must examine each of the U nonimmigrant status eligibility requirements,
taking into consideration the guidance below.

Law enforcement certification

   The possible U nonimmigrant status applicant does not have to be identified to the VSC
through a law enforcement official. However, any request for interim relief from a possible U

Memorandum for Director, Vermont Service Center                              Page 4
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

nonimmigrant status applicant <u>must</u> be accompanied by some form of certification from a law
enforcement official attesting to the fact that the alien has been, is likely to be, or is being helpful
in the investigation or prosecution of criminal activity designated in the VTVPA.  There
currently is no official DHS-created law enforcement certification form.  Therefore, the law
enforcement official certification may be in the form of a letter, or a form created by a non-
governmental organization or an applicant's attorney or representative, and should:

- State that the person was a victim of one or more of the crimes listed in the statute;
- Identify the crime(s); and
- Verify the victim is, has been, or is likely to be helpful to the prosecution or investigation
  of the criminal activity.

   Whatever form the certification takes, it must in all cases be signed by the law enforcement
official investigating or prosecuting the criminal activity.  The certification submitted must have
been signed within six months immediately preceding the submission of the request for interim
relief.  In addition, the VTVPA does not require the U nonimmigrant status applicant to assist in
both the investigation and prosecution of the criminal activity; the assistance offered by the
possible U nonimmigrant status applicant may be in either the investigation or the prosecution,
or both.

   It is important to note that the law enforcement certification does not have to come from a
Federal law enforcement official.  Section 214(o)(1) of the INA identifies from whom a
certification may be accepted.  The certification may come from a Federal, State or local law
enforcement official, prosecutor, judge or other Federal, State, or local authority investigating the
criminal activity.  Further development of the range of criminal activity involved and the types of
certifying government officials will occur in the rulemaking process.  At this point, VSC
personnel should keep in mind that circumstances will vary from case to case, and it is better to
err on the side of caution than to remove a possible U nonimmigrant status applicant.

<u>Time element</u>

   The fact that the criminal activity occurred a number of years prior to the current request or
that the case in which the applicant is the victim is closed is not a determinative factor at this
stage.  The statute contemplates that a person may be eligible for U nonimmigrant status as a
result of having been a victim of a crime that occurred at some point in the past.  Until there are
regulations interpreting this statutory requirement, VSC personnel should not deny interim relief
based on the fact that the criminal activity at issue occurred prior to the enactment date of the
VTVPA.

<u>Level of harm</u>

   The VTVPA does not specifically reserve U nonimmigrant status solely for individuals who
have suffered the most harm.  As with any form of immigration benefit with a harm component,
there are some applicants who present cases with more harm than others.  Whether the level of
harm meets the statutory requirement of substantial physical or mental abuse will be a question

Memorandum for Director, Vermont Service Center                    Page 5
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

Bureau of Citizenship and Immigration Services (CIS) officers adjudicating the U nonimmigrant status application will decide in accordance with the regulations once they are promulgated. Therefore, for interim relief purposes, "substantial physical or mental abuse" should be broadly interpreted. Similarly, the fact that the criminal activity involved in the case was classified as a misdemeanor as opposed to a felony should not be a factor in determining eligibility for interim relief.

## Eligibility for Interim Relief

Once an individual is determined to have submitted *prima facie* evidence of his/her eligibility for U nonimmigrant status, VSC personnel must then decide whether to exercise discretion and assess deferred action. Absent adverse factors, deferred action will be assessed following established CIS guidelines. Officers should note that if the alien is in removal proceedings or has a final removal order, the VSC does not have jurisdiction to assess deferred action. The applicant shall be notified in writing if his/her submission does not establish a *prima facie* case or if deferred action cannot be assessed due to lack of jurisdiction.

It is important to note that deferred action does not confer any immigration status upon an alien. Since deferred action is not an immigration status, no alien has the right to deferred action. Deferred action does not preclude the CIS from commencing removal proceedings at any time against an alien.

## Employment Authorization

Although deferred action is not an immigration status, an alien may be granted work authorization based on deferred action in his or her case pursuant to 8 C.F.R. 274a.12(c)(14). If the alien is placed in deferred action, the VSC will notify the alien that he or she may submit an I-765, Application for Employment Authorization. After the initial deferred action decision and issuance of a one-year employment authorization document, the VSC will hold these files and review the deferred action decision upon each application for extension of work authorization.

## Derivative U Nonimmigrant Status Applicants

To avoid extreme hardship, the VTVPA authorizes CIS to provide U nonimmigrant status to the spouses, children, and, in the case of a child under the age of 16, the parents of U nonimmigrants. This would require certification by a government official that an investigation or prosecution would be harmed without the assistance of the spouse, child, or in the case of an alien child, the parent of the alien.

Family members who may be eligible to receive derivative U nonimmigrant status and who are present in the United States should not be removed, and shall be eligible for interim relief. The eligible family member(s) must demonstrate extreme hardship if removed from the United States and must also submit a certification of a government official that an investigation or prosecution would be harmed without the spouse, child, or parent of the principal. This certification must comply with the guidelines outlined in this memo.

Memorandum for Director, Vermont Service Center                                    Page 6
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

## Reporting Requirements

Deferred action is a resource utilization tool.  Therefore, the VSC should maintain statistics on deferred action cases to ensure that it is being used appropriately.  These statistics are to be maintained on a current basis so that data can be readily extracted upon request.

Statistics should be maintained in the following categories:

- number of requests in deferred action category at the beginning of the fiscal year;

- number of requests for which deferred action is assessed;

- number of requests for which deferred action is denied;

- number of requests removed from deferred action category;

- number of deferred action requests pending at the end of the fiscal year.

## Periodic Review

The VSC adjudicators assigned to the early-filed U applications should conduct interim reviews to determine whether deferred action cases should be continued or the alien removed from the deferred action category.  Reviews must determine if there is any change in the circumstances of the case.  Results of the review and a recommendation to continue or terminate deferred action would be reported to the center director via memorandum.  The center director should endorse the memorandum with his or her decision and return it for inclusion in the alien's file.

## Termination of Deferred Action

During the course of the periodic review, or at any other time if the VSC determines that circumstances of the case no longer warrant deferred action, the VSC should recommend termination.  Termination may occur for conduct that occurs after the issuance of interim relief (i.e. conviction of a violent crime), for conduct or a condition not disclosed prior to issuance of interim relief, or based on affirmative evidence that the alien unreasonably refused to provide assistance in a criminal investigation or prosecution.  The VSC should notify the alien of the decision to terminate by letter.  Such a determination is not appealable.  Upon termination of deferred action, any relating employment authorization will be revoked in accordance with the standard revocation procedures set out in 8 CFR § 274a.14(b).

## Record Keeping And Confidentiality

It is imperative that documentation be maintained on all U nonimmigrant status applicants.  As such, information about the possible applicant, including all pertinent information surrounding the applicant's circumstances, must be maintained in the alien's A-file.  If

Memorandum for Director, Vermont Service Center                                    Page 7
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

no A-file exists for the individual, one should be created.

Officers should keep in mind that section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)[3] is applicable to all U nonimmigrant status cases.  Section 384 prohibits employees from making an adverse determination of admissibility or deportability of an alien using information provided solely by:

1) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty;

2) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty;

3) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty);

4) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty; or

5) **in the case of an alien applying for status under section 101(a)(15)(U) of the INA, the perpetrator of the substantial physical or mental abuse and the criminal activity.**[4]

Section 384 of IIRIRA also prohibits employees from permitting the use by or disclosure to anyone (other than a sworn officer or employee of the Department of Homeland Security (DHS), or bureau or agency thereof, for legitimate DHS, bureau, or agency purposes) of any information that relates to an alien who has applied for U nonimmigrant status.[5]  Anyone who willfully uses, publishes, or permits such information to be disclosed in violation of IIRIRA § 384 will face disciplinary action and be subject to a civil money penalty of up to $5,000 for each such violation.[6]

When the VSC creates or encounters an A file of an applicant for interim relief based upon eligibility for U nonimmigrant status, the contents of the A file should be placed behind a colored cover sheet that sets out the disclosure parameters and penalties so that the materials are handled with appropriate care.

If you have questions regarding this memorandum or other U nonimmigrant status related issues, please contact Laura Dawkins, Office of Program and Regulation Development, by electronic mail.

---

[3] Codified at 8 U.S.C. § 1367.
[4] As amended by VTVPA § 1513(d).  For limited exceptions to this prohibition *see* IIRIRA § 384(b).
[5] *See* IIRIRA § 384(a)(2) as amended by VTVPA § 1513 (d).
[6] *Id.*

AR2022_300062



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

---

Office of the Commissioner

*425 I Street NW*
*Washington, DC 20536*

NOV 17 2000

MEMORANDUM TO REGIONAL DIRECTORS
                    DISTRICT DIRECTORS
                    CHIEF PATROL AGENTS
                    REGIONAL AND DISTRICT COUNSEL

FROM:    Doris Meissner
           Commissioner
           Immigration and Naturalization Service

SUBJECT:   <u>Exercising Prosecutorial Discretion</u>

      Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion.  This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions.  <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position.  In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

      More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers:  Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X.  This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997.  This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate.  If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

Memorandum for Regional Directors, et al.                                    Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution," [2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day.  In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others:  Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings.  INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

conduct, or one that while legal in other contexts, is not within the authority of the agency or officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive any legal requirements that apply to the action itself.  For example, an enforcement decision to focus on certain types of immigration violators for arrest and removal does not mean that the INS may arrest any person without probable cause to do so for an offense within its jurisdiction. Service officers who are in doubt whether a particular action complies with applicable constitutional, statutory, or case law requirements should consult with their supervisor and obtain advice from the district or sector counsel or representative of the Office of General Counsel to the extent necessary.

Finally, exercising prosecutorial discretion does not lessen the INS' commitment to enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations.  The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals.  These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.

It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals.  The INS has used this principle in the design and execution of its border enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.

The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution if "*no substantial Federal interest would be served by prosecution*."  This principle provides a useful frame of reference for the INS, although applying it presents challenges that differ from those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal responsibility, the option of an adequate alternative remedy under state law is not available.  In an immigration case, the interest at stake will always be Federal.  Therefore, we must place particular emphasis on the element of substantiality.  <u>How important is the Federal interest in the case, as compared to other cases and priorities</u>?  That is the overriding question, and answering it requires examining a number of factors that may differ according to the stage of the case.

Memorandum for Regional Directors, et al.                              Page 5
Subject:  Exercising Prosecutorial Discretion

As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.[3]  Except as may be provided specifically in other policy statements or directives, the responsibility for exercising prosecutorial discretion in this manner rests with the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and sound judgment.[4]  The DD or CPA should obtain legal advice from the District or Sector Counsel to the extent that such advice may be necessary and appropriate to ensure the sound and lawful exercise of discretion, particularly with respect to cases pending before the Executive Office for Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent necessary and proper, except that decisions not to place a removable alien in removal proceedings, or decisions to move to terminate a proceeding which in the opinion of the District or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs remain subject to their chains of command and may be supervised as necessary in their exercise of prosecutorial discretion.

### *Investigations*

Priorities for deploying investigative resources are discussed in other documents, such as the interior enforcement strategy, and will not be discussed in detail in this memorandum. These previously identified priorities include identifying and removing criminal and terrorist aliens, deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse, responding to community complaints about illegal immigration and building partnerships to solve local problems, and blocking and removing employers' access to undocumented workers. Even within these broad priority areas, however, the Service must make decisions about how best to expend its resources.

Managers should plan and design operations to maximize the likelihood that serious offenders will be identified.  Supervisors should ensure that front-line investigators understand that it is not mandatory to issue an NTA in every case where they have reason to believe that an alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's attention.  Operational planning for investigations should include consideration of appropriate procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light of the circumstances and interests involved.
[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not report to DDs or CPAs, or to change any INS chains of command.
[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8 CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                    Page 6
Subject:  Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial discretion.  Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS' goals, compared with other possible uses of those resources.  As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over investigations which, by their nature, will identify a broader variety of removable aliens.  Even an operation that is designed based on high-priority criteria, however, may still identify individual aliens who warrant a favorable exercise of prosecutorial discretion.[6]

   *Initiating and Pursuing Proceedings*

   Aliens who are subject to removal may come to the Service's attention in a variety of ways.  For example, some aliens are identified as a result of INS investigations, while others are identified when they apply for immigration benefits or seek admission at a port-of-entry.  While the context in which the INS encounters an alien may, as a practical matter, affect the Service's options, it does not change the underlying principle that the INS has discretion and should exercise that discretion appropriately given the circumstances of the case.

   Even when an immigration officer has reason to believe that an alien is removable and that there is sufficient evidence to obtain a final order of removal, it may be appropriate to decline to proceed with that case.  This is true even when an alien is removable based on his or her criminal history and when the alien–if served with an NTA–would be subject to mandatory detention. The INS may exercise its discretion throughout the enforcement process.  Thus, the INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to detain (for those aliens not subject to mandatory detention), whether to offer an alternative to removal such as voluntary departure or withdrawal of an application for admission, and whether to stay an order of deportation.

   The decision to exercise any of these options or other alternatives in a particular case requires an individualized determination, based on the facts and the law.  As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings.  However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the Service.  Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether the exercise of prosecutorial discretion would be appropriate in individual cases.

Memorandum for Regional Directors, et al.                                          Page 7
Subject:  Exercising Prosecutorial Discretion

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible.  Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel.  It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis.  Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion.  Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration.  However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States:  The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation.  It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court.  Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns:  Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history:  Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history.  The seriousness of any such violations should also be taken into account.

Memorandum for Regional Directors, et al.                                    Page 8
Subject:  Exercising Prosecutorial Discretion

- <u>Likelihood of ultimately removing the alien</u>:  Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- <u>Likelihood of achieving enforcement goal by other means</u>:  In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- <u>Whether the alien is eligible or is likely to become eligible for other relief</u>:  Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States.  The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- <u>Effect of action on future admissibility</u>:  The effect an action such as removal may have on an alien can vary–for example, a time-limited as opposed to an indefinite bar to future admissibility–and these effects may be considered.
- <u>Current or past cooperation with law enforcement authorities</u>:  Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- <u>Honorable U.S. military service</u>:  Military service with an honorable discharge should be considered as a favorable factor.  See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- <u>Community attention</u>:  Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS.  Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds.  Public and professional responsibility will sometimes require the choice of an unpopular course.
- <u>Resources available to the INS</u>:  As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative.  For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case.  There may be other factors, not on the list above, that are appropriate to consider.  The decision should be based on the totality of the circumstances, not on any one factor considered in isolation.  General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case.  In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer.  Choosing a course of action in difficult

Memorandum for Regional Directors, et al.                                    Page 9
Subject:  Exercising Prosecutorial Discretion

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may <u>not</u> be considered.  Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion.  For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time.  For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here.  For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit.  For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief.  Political activities may be relevant to a ground of removal on national security or terrorism grounds.  An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if appropriate, would be more useful to the INS if done sooner rather than later.  It would be improper for an officer to assume that someone else at some later time will always be able to make a more informed decision, and therefore never to consider exercising discretion.

Factors relevant to exercising prosecutorial discretion may come to the Service's attention in various ways.  For example, aliens may make requests to the INS to exercise prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as cancellation of removal that may only be available in that forum).  In either case, the INS may consider the request, but the fact that it is made should not determine the outcome, and the prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly, the fact that an alien has not requested prosecutorial discretion should not influence the analysis of the case.  Whether, and to what extent, any request should be considered is also a matter of discretion.  Although INS officers should be open to new facts and arguments, attempts to exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have been thoroughly considered and decided, or for other improper tactical reasons should be rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the close of this memorandum) this memorandum creates no right or obligation enforceable at law by any alien or any other party.

**Process for Decisions**

*Identification of Suitable Cases*

No single process of exercising discretion will fit the multiple contexts in which the need to exercise discretion may arise.  Although this guidance is designed to promote consistency in the application of the immigration laws, it is not intended to produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law.  Different offices face different conditions and have different requirements.  Service managers and supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to exercise discretion as early in process as possible once the factual record has been identified.[8]  In particular, in cases where it is clear that no statutory relief will be available at the immigration hearing and where detention will be mandatory, it best conserves the Service's resources to make a decision early.

Enforcement and benefits personnel at all levels should understand that prosecutorial discretion exists and that it is appropriate and expected that the INS will exercise this authority in appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either for or against the exercise of discretion) based upon further development of the facts.

Memorandum for Regional Directors, et al.                                    Page 11
Subject:  Exercising Prosecutorial Discretion

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the favorable exercise of discretion to their attention for appropriate resolution.  To assist in exercising their authority, DDs and CPAs may wish to convene a group to provide advice on difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial discretion.  These cases should then be reviewed at a supervisory level where a decision can be made as to whether to proceed in the ordinary course of business, to develop additional facts, or to recommend a favorable exercise of discretion.  Such triggers could include the following facts (whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly both within and between INS offices, this list of possible trigger factors for supervisory review is intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to suggest that the presence or absence of "trigger" facts should itself determine whether prosecutorial discretion should be exercised, as compared to review of all the relevant factors as discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended solely as a suggested means of facilitating identification of potential cases that may be suitable for prosecutorial review as early as possible in the process.

*Documenting Decisions*

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision should be clearly documented in the alien file, including the specific decision taken and its factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial discretion favorably, such as not placing him or her in removal proceedings or not pursuing a case.  This normally should be done by letter to the alien and/or his or her attorney of record, briefly stating the decision made and its consequences.  It is not necessary to recite the facts of the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

Memorandum for Regional Directors, et al.                                          Page 12
Subject:  Exercising Prosecutorial Discretion

will vary depending on the circumstances of the case and the action taken, it must make it clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States (unless the alien applies for and receives advance parole), immunity from future removal proceedings, or any enforceable right or benefit upon the alien. If, however, there is a potential benefit that is linked to the action (for example, the availability of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

The obligation to notify an individual is limited to situations in which a specific, identifiable decision to refrain from action is taken in a situation in which the alien normally would expect enforcement action to proceed.  For example, it is not necessary to notify aliens that the INS has refrained from focusing investigative resources on them, but a specific decision not to proceed with removal proceedings against an alien who has come into INS custody should be communicated to the alien in writing.  This guideline is not intended to replace existing standard procedures or forms for deferred action, voluntary return, voluntary departure, or other currently existing and standardized processes involving prosecutorial discretion.

### *Future Impact*

An issue of particular complexity is the future effect of prosecutorial discretion decisions in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that another office has declined, immigration violations are continuing offenses that, as a general principle of immigration law, continue to make an alien legally removable regardless of a decision not to pursue removal on a previous occasion.  An alien may come to the attention of the INS in the future through seeking admission or in other ways.  An INS office should abide by a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new facts or changed circumstances.  However, if a removal proceeding is transferred from one INS district to another, the district assuming responsibility for the case is not bound by the charging district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest that a favorable exercise of prosecutorial discretion is appropriate.

Service offices should review alien files for information on previous exercises of prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any such information into account.  In particular, the office encountering the alien must carefully assess to what extent the relevant facts and circumstances are the same or have changed either procedurally or substantively (either with respect to later developments, or more detailed knowledge of past circumstances) from the basis for the original exercise of discretion. A decision by an INS office to take enforcement action against the subject of a previous documented exercise of favorable prosecutorial discretion should be memorialized with a memorandum to the file explaining the basis for the decision, unless the charging documents on their face show a material difference in facts and circumstances (such as a different ground of deportability).

Memorandum for Regional Directors, et al.                                    Page 13
Subject:  Exercising Prosecutorial Discretion

**Legal Liability and Enforceability**

The question of liability may arise in the implementation of this memorandum.  Some
INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably,
they may become subject to suit and personal liability for the possible consequences of that
decision.  We cannot promise INS officers that they will never be sued.  However, we can assure
our employees that Federal law shields INS employees who act in reasonable reliance upon
properly promulgated agency guidance within the agency's legal authority – such as this
memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted
hereto, are intended solely for the guidance of INS personnel in performing their duties.  They
are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or
procedural, enforceable at law by any individual or other party in removal proceedings, in
litigation with the United States, or in any other form or manner.

**Training and Implementation**

Training on the implementation of this memorandum for DDs, CPAs, and Regional,
District, and Sector Counsel will be conducted at the regional level.  This training will include
discussion of accountability and periodic feedback on implementation issues.  In addition,
following these regional sessions, separate training on prosecutorial discretion will be conducted
at the district level for other staff, to be designated.  The regions will report to the Office of Field
Operations when this training has been completed.

# Memorandum



C-1588-P

| Subject Family Fairness: Guidelines For Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens | Date FEB 2 1990 |
| --- | --- |

To

From

    Regional Commissioners
        Eastern
        Northern
        Southern
        Western

        Office of the
        Commissioner

On November 13, 1987, the Service implemented guidelines on granting voluntary departure to the ineligible spouses and children of legalized aliens, the so-called "family fairness" policy.

The Service is likely to face the issue of family fairness for several more years, because of the length of time needed for newly legalized aliens to acquire lawful permanent resident status and then to wait for a visa preference number to become available for family members. Accordingly, the Service is clarifying its family fairness policy, to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens.

Effective February 14, 1990, the following policy is to be implemented by all district directors in determining the eligibility for voluntary departure of ineligible spouses and children of legalized aliens.

1.    Voluntary departure will be granted to the spouse and to unmarried children under 18 years of age, living with the legalized alien, who can establish that they have been residing in the United States since on or before November 6, 1986, if

    - the alien is admissible as an immigrant, except for documentary requirements;

    - the alien has not been convicted of a felony or three misdemeanors committed in the United States;

    - the alien has not assisted in the persecution of any person or persons on account of race, religion,

AR2022_300076

Appendix I, continued

nationality, membership in a particular social group or political opinion.

2. Voluntary departure will be granted for a one-year period to aliens who meet these requirements. Cases will be reviewed on an annual basis thereafter by district directors to determine whether extensions of voluntary departure should be issued.

- A grant of voluntary departure based on family fairness will be terminated if the legalized family member loses his or her status.

- A grant of voluntary departure based on family fairness will be terminated if the alien fails to maintain the requirements outlined in Paragraph 1.

- A grant of voluntary departure issued pursuant to this policy shall not be terminated for the sole reasons that the legalized family member has become a lawful permanent resident.

3. Documentary evidence must be submitted to establish

- the family relationship, through marriage certificates for spouses and birth or baptismal certificates for children and

- residence with the legalized alien, through a sworn affidavit, under penalty of perjury, by the legalized alien.

4. Work authorization will be granted to aliens who qualify for voluntary departure under Paragraph One and as provided in Paragraph Two.

5. In the case of a child born after November 6, 1986, no deportation proceedings shall be instituted as long as a parent maintains his or her status as a legalized alien.

The Legalization and Special Agricultural Worker Programs will eventually bring permanent lawful immigration status to nearly 3 million aliens. It is critical that the Service continue to respond to the needs of these aliens and their immediate family members in a consistent and humanitarian manner.

GENE MCNARY
Commissioner

AR2022_300077



**U.S. Department of Justice**
Immigration and Naturalization Service

HQADN 70/21.1.24-P

Office of the Executive Associate Commissioner

*425 I Street NW*
*Washington, DC 20536*

**JUN** 1 2 2002

MEMORANDUM FOR REGIONAL DIRECTORS
                            DEPUTY EXECUTIVE ASSOCIATE COMMISSIONER,
                                    IMMIGRATION SERVICES
                            GENERAL COUNSEL

FROM:        Johnny N. Williams
                    Executive Associate Commissioner
                    Office of Field Operations

SUBJECT:    Unlawful Presence

**Purpose**

This memorandum addresses issues relating to the 3- and 10-year bars to admission under section 212(a)(9)(B)(i)(I) and (II) of the Immigration and Nationality Act (Act) and the decision to designate as a period of stay authorized by the Attorney General the entire period during which an alien has been granted deferred action by the Immigration and Naturalization Service (INS). This period of stay authorized by the Attorney General covers only the period during which deferred action is in effect. It does not eliminate any unlawful presence that accrued before the alien was granted deferred action.

The decision to designate deferred action as a period of stay authorized by the Attorney General does not in any way alter the nature of deferred action or the standards for granting it. See Chapter 17.7 of the INS's Detention and Deportation Manual. Note that Chapter 17.7(a) will be amended in the second paragraph to be consistent with the policy guidance provided herein.

AR2022_300078

Memorandum for  Regional Directors, et. al                                        Page  2
Subject:  Unlawful Presence

Any adjustment of status application that is pending denial or has been denied because of unlawful presence that the alien accrued while in deferred action status may be re-evaluated in light of this policy memorandum.

This memorandum also provides clarification on the period of stay authorized by the Attorney General with respect to applicants for temporary protected status (TPS) and deferred enforced departure (DED).  These policies and procedures are effective immediately and will be included in the Adjudicator's Field Manual (AFM) in the next release of INSERTS.

For purposes of section 212(a)(9)(B)(ii) of the Act, and for no other purpose or benefit under the Act, the INS has designated the following as periods of stay authorized by the Attorney General:

- Current grants of voluntary departure;

- Current grants of deferred action in effect on or after April 1, 1997;

- Refugee status;

- Asylee status;

- Grants of withholding or deferral of removal under the United Nations Convention Against Torture;

- Legalization and special agricultural worker applications for lawful temporary residence which are pending through an administrative appeal;

- Grants of withholding or suspension of deportation,  or cancellation of removal;

- Properly filed applications for temporary and permanent residence by Cuban-Haitian entrants under section 202(b) of Pub. L. 99-603 through administrative appeal;

- Current grants of TPS and DED.  For TPS, the period of stay authorized by the Attorney General begins on the date a prima facie TPS application is filed with the Service, if that application is ultimately approved.  If the TPS application is denied, or if the TPS application does not establish the alien's prima facie eligibility, unlawful presence begins accruing on the date the previous stay

Memorandum for Regional Directors, et. al                                   Page 3
Subject: Unlawful Presence

authorized by the Attorney General expired.   For DED, the period of stay authorized by the Attorney General takes effect beginning on the date specified in the Executive Order.   When TPS or DED are no longer in effect, the accrual of unlawful presence resumes;

·      Properly filed, affirmative applications for adjustment of status under section 245 of the Act [including section 245(i)], and properly filed, affirmative registry applications under section 249 of the Act. The period of stay authorized by the Attorney General continues if the application is denied and renewed in proceedings, through review by the Board of Immigration Appeals. The alien must, however, be eligible to renew the denied application in proceedings and have a legal basis for renewing that application; and

·      Certain pending applications for extension of stay or change of status.

Please direct any further questions relating to operational issues, through supervisory channels, to Kathy Dominguez in Headquarters Office of Field Services Operations at 202-616-1050 or Danielle Lee in Headquarters Office of Service Center Operations at 202-305-8010.   Direct questions relating to policy issues, through supervisory channels, to Sophia Cox in Headquarters Office of Adjudications at 202-514-4754.

# Memorandum

87-30

| | | | |
|---|---|---|---|
| Subject | Legal Considerations On The Treatment Of Family Members Who Are Not Eligible For Legalization Decision Memo 8715 | Date | MAY 29 1987 |
| To | Alan C. Nelson Commissioner | From | Office of the General Counsel |

This responds to your request for legal guidance on how to treat families of legalized aliens.

## I. LEGAL ISSUES

1. Whether families of legalized aliens obtain any immigration benefits under IRCA?

The Immigration Reform and Control Act of 1986 (IRCA) does not cover spouses and children of legalized aliens. Only those aliens who qualify under the statutory criteria can be granted temporary resident status. The legislative history on this issue is crystal clear. In its report, the Senate Judiciary Committee stated:

> It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning rights by virtue of the legalization. They will be required to "wait in line" in the same manner as immediate family members of other new resident aliens.

S. Rep. No.99-132, 99th Cong., 1st Sess. 343 (1985).

Although Congressional intent is clear on this issue, attempts to remove spouses and children of legalized aliens may be seen as discouraging bona fide applicants from coming forward. Congress intended to encourage applicants to come forward without fear. To protect these applicants Congress authorized the Attorney General to designate qualified entities to assist applicants and also made the information submitted with the application confidential. Moreover, the removal of spouses and children would be inconsistent with the Service enforcement priorities.

71

APA202200501

3-2
(-2-82)

2. Whether the Attorney General can permit families of legalized aliens to remain in the United States?

The Attorney General has broad discretionary authority under the immigration laws. In the exercise of his prosecutorial discretion he may decide not to prosecute an alien or a class of aliens. In exercising his prosecutorial discretion, the Attorney General may consider a number of factors, including humanitarian concerns. Accordingly, the Attorney General or the Commissioner acting under his delegated authority may permit families of legalized aliens to remain in the United States either on a case-by-case basis or under a nation-wide policy.

While a decision to grant nation-wide relief to a class of illegal aliens could be subject to legal challenges, it is unlikely that a court would reverse the Attorney General's decision not to prosecute this particular class of aliens. Generally, the courts have applied a limited review standards when reviewing the Attorney General's prosecutorial discretion. Hotel and Restaurant Employees Union v. Attorney General, 804 F.2d 1256 (D.C. Cir. 1986)(Decision of the Attorney General to deny EVD to El Salvadorans was a facially legitimate exercise of the Attorney General's discretion and not subject to judicial review); Romeiro DeSilva v. Smith, 773 F.2d 1021 (9th Cir. 1985)(District court lacked jurisdiction to review district director's decision not to recommend deferred action status for alien).

## II. TYPES OF DISCRETIONARY RELIEFS
## AVAILABLE TO THE ALIENS

1. APPLICATION FOR SECOND PREFERENCE VISA PETITION

Spouses and children of legalized aliens who have obtained permanent resident status could apply for a second preference visa. As of March 1987, there was a two-year wait world-wide for second preference visas.  However, for natives of Mexico, there was a ten (10) year waiting time.

Current Service policy provides voluntary departure for aliens who have approved second preference visa petitions but only of they are within 60 days on the waiting list for second preference visas.  Therefore, aliens from Mexico would not qualify.

It will be difficult for the Service to separate the issue of IRCA spouses of Mexican permanent residents from the overall second preference relief.  Congress has in the past provided legislative relief in some similar areas.  For example, in the

- 2 -

72

1981 INA amendments, Congress permitted nonpreference immigrant
with investor status to adjust their status to permanent
residence notwithstanding the numerical limitations. Similarly,
Congress could conceivably act to clear the second preference
backlog.

## 2. PROSECUTORIAL DISCRETION

The Attorney General has the inherent power of prosecutorial
discretion. Under this power the Attorney General may abstain
from prosecuting a person or a class of persons in the interest
of "justice and humanity." The doctrine of prosecutorial
discretion applies also to the administration of the INA. "The
Attorney General has the power to defer the enforced departure of
aliens for compassionate or humanitarian reasons." OLC

The Service has acted in the past to grant relief to a class of
aliens pending enactment of remedial legislation. On April 10,
1973, the Service granted as a matter of discretion extended
voluntary departure to a class of aliens from the Western
Hemisphere on the ground that they would be eligible for relief
under pending legislation designed to eliminate geographica
distinction between immigrants.  That policy remained in effect
until January 1, 1977, when the law in question became effective.
P.L. 94-571. The Service's experience in this instance was not
entirely satisfactory.  Congress delayed legislation for several
years, and the population of aliens seeking relief built up.

In 1978, Commissioner Castillo requested a legal opinion from the
Attorney General seeking advice as to whether the Service had
authority to defer enforced departure of aliens who would benefit
from  pending legislation proposed to legalize the status of
certain aliens.  In the Attorney General's view, the
Commissioner, under his power to exercise prosecutorial
discretion could stay the enforced departure of aliens who would
be beneficiaries under the proposed legislation. To our knowledge
such prosecutorial discretion was not exercised.

In both of these circumstances when the issue of prosecutorial
discretion on a class-wide basis was considered, there was
pending legislation that would have benefitted a particular class
of aliens.  However, even absent such legislation, we believe
that the Service could provide nation-wide relief to a class of
aliens.

The Service currently exercises prosecutorial discretion on a
case-by-case basis in three principal ways:  voluntary departure,

- 3 -

73

deferred action, and de facto non-deportation.  These areas are discussed below.

3. Voluntary Departure

A deportable alien may be elegible for voluntary departure. The Service is authorized to grant voluntary departure prior to the institution of deportation proceedings. However, this grant is limited to 30 days. Extensions may be granted under meritorious circumstances. 8 CFR 242.5.  Voluntary departure may also be granted subsequent to a finding of deportability by an Immigration Judge. The Service may grant voluntary departure for a short period or for an indefinite period of time. As we indicated above, the Service did grant extended voluntary departure to a class of aliens in 1973 as a result of pending legislation.

The Service also had a policy in effect between 1956 and 1972 of granting extended voluntary departure to a nonimmigrant, physically present in the United States, who was subject to deportation but who filed a satisfactory third preference visa petition.  This meant, in effect, that no firm date to leave the U.S. was set, and the alien could await the availability of a visa while remaining in this country. Parco v. Morris, 426 F.Supp. 976, 990 (E.D. Pa. 1977).

Assuming that large numbers of family members of legalized aliens apply for voluntary departure, the Service should streamline and expand the pre-deportation voluntary departure procedures. Unless the Service is willing to deport the aliens, it makes no sense to place them in deportation proceedings. Such approach would waste valuable Service resources at a time when the Service should be concentrating on deporting criminal aliens. However, even if voluntary departure would be granted prior to institution of deportation proceedings, given the large number of aliens, the inevitable result would be increased workload which could interfere with the normal work activities at INS offices.

4. DEFERRED ACTION

For more than ten years, the Service has had an internal procedure called deferred action or non-priority. Under this informal procedure the Service may before or after a deportation proceeding decide not to prosecute the alien. The operating instructions on deferred action are set forth at O.I. 103.1(a)(ii).  Normally deferred action is granted in extreme cases involving physical and mental disabilities or because of family ties in the United States.  There is no formal application process.  However, an alien may apply to the District Director for this discretionary relief. If the District director feels

- 4 -

74

that deferred action is appropriate, the matter is referred to the Regional Commissioner who makes the final decision.

To accomodate requests for deferred actions filed by family members of legalized aliens, we would recommend that the procedure be streamlined and made more accessible.  Given the large number of aliens who may apply for this relief, perhaps it might be more appropriate that the final decision be made by the District Directors and not the Regional Commissioner.

Even if streamlined procedure were implemented to process deferred action cases, the process could still be cumbersome and would inevitably interfere with normal adjudicative functions in the district offices.

5. De facto "non-deportation"

The Service may simply decide not to place in deportation proceedings family members of legalized aliens.  While there are no written policy on this matter, this is the practice of Service officers in the field.  This practice has become inevitable as a result of the Service's enforcement priorities and limited manpower and fiscal resources.

## III.  OTHER ISSUES TO BE CONSIDERED

6. PRUCUL

A decision to defer departure of an alien or a class of aliens may render the alien(s) eligible for certain public benefits on the ground that the alien(s) would be residing in the United States under "color of law."  Eligibility of aliens for Federal benefit programs is an issue to be resolved by the Federal agencies which administer those programs, i.e. HHS, HUD, Department of Agriculture.  In our opinion, spouses and children of legalized aliens, would be eligible for SSI and Medicaid benefits if INS permits them to remain in the U.S.  However, they would not be eligible for for AFDC benefits.

7. Work Authorization

If the Service decides to grant voluntary departure or deferred action status to spouses and children of legalized aliens, we must address the issue of work authorization for these aliens. Under our current work authorization procedures these aliens

- 5 -

75

would be eligible to apply for work authorization. Absent a liberal policy of granting work authorization it is likely that aliens would challenge the decision in district courts.  This would generate a wave of litigation which the U.S. Attorneys would either be unable to defend for either lack of manpower or because of their prosecutorial priorities.  On the other hand, if the Service adopts a de facto non-deportation approach, aliens would not have a right to request work authorization unless they are either apprehended by the Service or in deportation proceedings.

## IV. SUMMARY

There are no perfect solutions to address the void left by Congress.  Clearly the Service does not have the resources to devote to prosecute and deport this class of aliens. On the other hand the Service should not take any actions that would encourage aliens to enter the country illegally.  The Service probably should not grant work authorization to a class of illegal aliens that Congress has not protected.  To do so could invite public criticism based on the possible displacement of American workers. A nation-wide policy to defer deportation of these aliens may render them eligible for PRUCUL, a consequence clearly not intended by Congress.

## V. RECOMMENDATIONS

The entire scheme of our immigration laws rests on the notion of family unification.  The preference system is largely based on reuniting family members. Moreover, when the Service adjudicates a request for a discretionary benefit, family unification is considered as a key factor.  Therefore there is support both in the law and in actual INS practice to provide relief in cases where a family may be separated because one family member is a deportable alien.

Against this background of established practice, one possible solution is to take no action against spouses and children of legalized aliens.  If an alien within this class is apprehended by the Service, the District Director would on a case-by-case basis, prior to instituting deportation proceedings, grant voluntary departure if the alien entered the United States prior to November 6, 1986.  In our view this represents a balanced approach.  The Service would not be granting a blanket amnesty to another class of aliens while at the same time the Service would continue to grant discretionary relief to aliens on the grounds of humanitarian concerns.

- 6 -

76

AR2022000586

As to the other aliens, other than spouses and children of
legalized aliens, they would be treated as we have in the past,
namely business as usual.

The Service, in the interim, could submit or support legislation
to eventually regularize the status of this class of aliens. Such
legislation could be linked to an amendment to the sunset
provision of the employer sanction legislation. Our posisition
would be that the Administration would support remedial
legislation if Congress would remove the sunset provisions for
employer sanctions.

Paul W. Schmidt
Acting General Counsel

87-0001 FIsgro

AR2022_000087

Memorandum



| **Subject:**<br>Your request for a LEGAL OPINION on issues concerning the definition of "lawfully present in the United States" | **Date:**<br><br>JAN 2 4 1997 |
|---|---|

| **To:** Robert L. Bach<br>Executive Associate Commissioner<br>for Policy and Planning | **From:** Office of the<br>General Counsel |
|---|---|

## I. QUESTIONS

1. Is the definition of "lawfully present in the United States" for purposes of section 401(b)(2) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Reconciliation Act), Pub. L. No. 104-193, 110 Stat. 2105, 2265, published as an interim rule in the Federal Register on September 6, 1996, still valid in light of the definition of "unlawfully present in the United States" contained in the new INA section 212(a)(9)(B)(ii), as added by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (1996 Act), Pub. L. 104-208, 110 Stat. 3009?

2. If the answer to question 1 is yes, which definition of "lawfully present" -- the interim rule or INA section 212(a)(9)(B)(ii) -- should be applied to the other sections of the Reconciliation Act and the 1996 Act sections that use this phrase and similar phrases?

3. For those sections of the Reconciliation Act and the 1996 Act to which the definition of the term "lawfully present in the United States" in the interim rule may be applied, may the Service amend the interim rule or must it publish a new proposed rule with an opportunity for public notice and comment?

## II. SUMMARY CONCLUSIONS

1. The definition of "lawfully present in the United States" in the interim rule published on September 6, 1996, continues to be valid after the enactment the definition of "unlawfully present in the United States" contained in the new INA section 212(a)(9)(B)(ii).

2. The definition of "lawfully present in the United States" in the interim rule published on September 6, 1996, should be applied in most cases to the other sections of the Reconciliation Act and the sections of the 1996 Act which use the phrase in reference to the eligibility of aliens for public benefits and services. The definition in INA section 212(a)(9)(B)(ii) should be applied

in most cases to the other sections of the 1996 act that use the phrase in relation to the admissibility and removal of aliens. Limited exceptions are identified below.

3. For those sections of the Reconciliation Act and the 1996 Act for which a definition of "lawfully present in the United States" must be made immediately, the Service may amend the interim rule and extend the comment period. For sections for which an immediate definition is not required, a new proposed rule will be needed. However, if the amended interim rule were not to address specified sections already in effect, but were instead framed so as to modify the existing rule to apply the definition of lawfully present to public benefits determinations generally, then the amended rule would necessarily also cover those other sections with later effective dates. It could still appropriately be promulgated as an interim rule, owing to the need to address those sections already operative.

## III. ANALYSIS

**Question 1.**

Congress has used the phrase "lawfully present in the United States" and similar phrases in a large number of provisions for different purposes in the Reconciliation Act and the 1996 Act but has failed to provide a generally applicable definition. Congress has, however, made reference to a definition of the phrase in three separate provisions. First, in INA section 212(a)(9)(B)(ii) --created by section 301(b) of the 1996 Act-- Congress precisely defined the term "unlawfully present in the United States" for purposes of the grounds of inadmissibility contained in the new paragraph (9) of INA section 212(a).

The second two references to a definition are contained in section 401(b)(2) of the Reconciliation Act and section 503 of the 1996 Act, and both concern eligibility for benefits under Title II of the Social Security Act. Rather than define the phrase "lawfully present in the United States," these sections explicitly give the Attorney General discretion to determine its meaning. In a regulation issued on September 4, 1996, the Attorney General defined "lawfully present in the United States" for section 401(b)(2).[1] 61 F.R. 47039 (September 6, 1996), 8 C.F.R. § 103.12.

The essence of the question here is whether the definition in INA section 212(a)(9)(B)(ii) supersedes the regulatory definition promulgated by the Attorney General to the extent that they are inconsistent. We must first determine the measure of inconsistency between the two definitions. The regulatory definition is clear and is limited to the following specific categories of aliens:

1) aliens lawfully admitted for permanent residence;
2) aliens inspected and admitted to the United States who have not violated the terms of their status or the status to which they have changed;
3) aliens paroled into the United States pursuant to section 212(d)(5), with the exception of persons paroled for exclusion proceedings or for prosecution;
4) aliens who are granted asylum under INA section 208;

---

[1] Although the rule was not published until September 6, 1996, it became effective on September 4, 1996, when it went on display at the Federal Register.

AR2022_300088

5) refugees admitted into the United States under INA section 207;

6) aliens whose deportation is being withheld under INA section 243(h);

7) aliens granted conditional entry pursuant to INA section 203(a)(7) as in effect prior to April 1, 1980;

8) aliens currently in temporary resident status pursuant to INA section 210 or 245A;

9) aliens currently under Temporary Protected Status (TPS) pursuant to INA section 244A;

10) Cuban-Haitian entrants, as defined in section 202(b) of Pub.L. 99-603;

11) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649;

12) aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

13) aliens currently in deferred action status pursuant to Service Operations Instructions at OI 242.1(a)(22);

14) aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status; and

15) applicants for asylum under INA section 208(a) and applicants for withholding of deportation under INA section 243(h) who have been granted employment authorization or who are under the age of 14 and had an application pending for at least 180 days.

The definition in the 1996 Act is less precise, and we will need to interpret it in order to determine whether it covers these same fifteen classes of aliens. The pertinent provision is contained in INA section 212(a)(9)(B)(ii) and reads as follows:

> CONSTRUCTION OF UNLAWFUL PRESENCE .--For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.[2]

---

[2] Sections 209(a)(9)(B)(iii) and (iv) list certain circumstances in which the time spent in the United States by a person who is otherwise unlawfully present in the United States will not be included in the calculation of the period of unlawful presence for purposes of paragraph (9) of section 212(a). The classes of aliens referred to in these clauses remain "unlawfully present" in the United States even during those periods of time which are not taken into account. The relevant clauses read as follows:

(iii) EXCEPTIONS.--

(I) MINORS.-No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).
(II) ASYLEES.-No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.
(III) FAMILY UNITY.-No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).
(IV) BATTERED WOMEN AND CHILDREN.-Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if 'violation of the terms of the alien's nonimmigrant visa' were substituted for 'unlawful entry into the United States' in subclause (III) of that paragraph.
(iv) TOLLING FOR GOOD CAUSE.-In the case of an alien who-
(I) has been lawfully admitted or paroled into the United States,
(II) has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

---

For this opinion, the most effective means of determining the difference in the meaning between "unlawfully present in the United States" for purposes of INA section 212(a)(9)(B) and "lawfully present in the United States" will be presented in the regulation is to determine whether the specific categories of aliens defined in 8 C.F.R. section 103.12 are lawfully present under the INA definition. The following aliens who are indisputably admitted or paroled are clearly lawfully present under both definitions: 1) aliens lawfully admitted for permanent residence; 2) aliens inspected and admitted to the United States who have not violated the terms of their status, 3) aliens paroled into the United States pursuant to INA section 212(d)(5); and 4) refugees admitted into the United States under INA section 207.[3]

Asylum applicants and Family Unity beneficiaries are treated somewhat differently under INA section 212(a)(9)(B)(ii) and the interim rule. Under the INA definition, all bona fide asylum applicants and Family Unity beneficiaries fall within the definition of unlawfully present, but the time they spend in the United States in these conditions is not taken into account when calculating the period of unlawful presence for determining inadmissibility. Under 8 C.F.R. section 103.12, by contrast, asylum applicants who have work authorization or who are under 14 and have had an application pending for 180 days are defined as lawfully present.

The remaining eight classes of aliens included in the regulation (as well as some not included) pose a more difficult question of interpretation. In order for the aliens in these categories to be lawfully present for purposes of section 212(a)(9)(B)(ii), they must have been admitted or paroled into the United State and have a "period of stay authorized by the Attorney General" that has not expired. Because of the drafting of the definition of "unlawfully present in the United States" and the provisions in the INA defining "admission" (INA § 101(a)(13)) and regulating the use the Attorney General's parole power (INA § 212(d)(5)), it is unclear whether persons who have entered without inspection and are later authorized to remain in the United States, such as aliens in temporary protected status, have been admitted or paroled. Therefore, it is not clear whether they are "unlawfully present in the United States" under INA section 212(a)(9)(B)(ii).

This complicated question need not be resolved in this legal opinion. It is sufficient to note that there are differences between the definition of "unlawfully present" in INA section 212(a)(9)(B)(ii) and "lawfully present" in 8 C.F.R. section 103.12. The INA definition is in some instances broader than the regulatory definition, and in others it is more narrow.

---

(III) has not been employed without authorization in the United States before or during the pendency of such application,
the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

---

[3] It should be noted that the definition in 8 C.F.R. § 103.12 is in some respects more restrictive than INA section 212(a)(9)(B)(ii). First, under the INA definition, all parolees are considered lawfully present, while under the regulation persons paroled into the United States pending removal proceedings or for criminal prosecution are not lawfully present. Also, section 212(a)(9)(B)(ii) clearly makes persons who overstay their visas unlawfully present, but does not do so for persons who violate the terms of their status in other ways. The regulation makes any alien who violates his or her status unlawfully present.

AR2022_300089

Because of these differences, we must now determine whether the Department of Justice overrides the prior regulation. The term "lawfully present in the United States" defined in 8 C.F.R. section 103.12 and the term "unlawfully present in the United States" in INA section 212(a)(9)(B)(ii) derive from separate acts of Congress. Therefore there is no legal presumption that the terms have identical meanings. As Justice O'Connor wrote,

> [i]n determining the meaning of a term in a particular statute, the meaning of the term in other statutes is at best only one factor to consider, and it may turn out to be utterly irrelevant in particular cases. Congress need not, and frequently does not, use the same term to mean precisely the same thing in two different statutes, even when the statutes are enacted at about the same time.

Securities Industries Association v. Board of Governors of the Federal Reserve System, 468 U.S. 137, 175 (1984) (O'Connor, J., dissenting); see also, United States v. Louisiana, 394 U.S. 11, 19 (1969) and Atlantic Cleaners and Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932). In fact, the plain language of section 301(b) of the 1996 Act --which creates the new INA section 212(a)(9)(B)-- and section 401(b)(2) of the Reconciliation Act (which contains the term defined in 8 C.F.R. section 103.12) indicates that Congress most likely intended for the phrase "lawfully present" to have meanings that are different for each of the two sections.

Section 401(b)(2) of the Reconciliation Act specifically states that the general restriction on the eligibility for benefits for aliens who are not qualified aliens

> [s]hall not apply to any benefit payable under title II of the Social Security Act to an alien who is *lawfully present in the United States as determined by the Attorney General . . . .*[4]

Congress thus granted the Attorney General discretion to define lawful presence for purposes of this section. On September 4, 1996, the Attorney General exercised this discretion and defined this phrase for purposes of section 401(b)(2) by promulgating 8 C.F.R. section 103.12. Congress did not pass the 1996 Act until September 30, 1996, but did not in any way indicate that it intended to revoke the discretion given to and exercised by the Attorney General under the Reconciliation Act. To the contrary, INA section 212(a)(9)(B)(ii) explicitly limits its definition of "unlawfully present" to paragraph 9 of INA section 212(a). Moreover, in section 503(a) of the 1996 Act, Congress reasserted its intention to have the Attorney General define "lawfully present" for the purposes of Title II of the Social Security Act when it repeated that the meaning of "lawfully present" shall be "determined by the Attorney General."[5] If Congress had wanted the definition in INA section 212(a)(9)(B)(ii) to apply to the restriction on benefits under the Title II of the Social Security Act, it could easily have applied that definition to section 503(a) of the 1996 Act rather than granting the Attorney General discretion to define the phrase. It is clear,

then, that Congress did not intend the term "lawfully present" to have the exact same meaning in all sections of both Acts. As a result, the definition in 8 C.F.R. section 103.12 need not be changed despite the differences between that section and INA section 212(a)(9)(B)(ii).

### Question 2.

The 1996 Act, the Reconciliation Act, and their legislative histories fail to give any guidance as to which definition of "lawfully present" should be applied to the other sections of the two Acts that do not contain a definition of the phrase. The general rule of statutory interpretation on the meaning of the same terms in the same act was succinctly stated by the Supreme Court in 1932:

> Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the Act with different intent.

Atlantic Cleaners and Dyers, Inc. v. United States, 286 U.S. at 433 (citations omitted). We can conclude with some certainty that Congress intended the definition in INA section 212(a)(9)(B)(ii) to apply to paragraph 9 of section 212(a), and that Congress gave the Attorney General discretion to establish a different definition for purposes of the restriction on granting benefits under Title II of the Social Security Act contained in sections 401(b)(2) of the Reconciliation Act and the 503(a) of the 1996 Act. As for the other sections of the two acts, we may presume that the phrase "lawfully present" has the same meaning throughout each Act unless there is reason to conclude that Congress intended them to have different meanings.[6] We consider each Act in turn.

### A. The Reconciliation Act

First, the Reconciliation Act contains the phrase "lawfully present in the United States" or similar terms in three sections. As discussed above, section 401(b)(2) of the Reconciliation Act gives the Attorney General discretion to define this phrase for that section. The definition established by the Attorney General in 8 C.F.R. section 103.12 is now the definition for that section and the only definition provided for this phrase in the Reconciliation Act. Therefore, it should be applied throughout the Reconciliation Act unless it appears that Congress intended otherwise.

Sections 404(b), (c) and (d) require respectively that, under certain conditions, States, the Commissioner of Social Security and the Secretary of Housing and Urban Development

---

[4] Throughout this opinion the phrase "lawfully present in the United States" and similar phrases in statutory quotations are italicized. These italics are not in the original texts.

[5] While Congress repeated its intention to have the Attorney General determine the meaning of "lawfully present" for the purpose of determining eligibility for Title II Social Security benefits after the publication of the interim rule containing that definition, Congress did not specifically endorse the regulatory definition nor incorporate it into the statute. Therefore, the Attorney General may modify the definition at 8 C.F.R. § 103.12 whenever she determines it to be proper.

[6] Congress has not been consistent in its use of the phrase "lawfully present." In some sections, it has used the words "lawfully present in the United States." In others it has used the words "not lawfully present in the United States." In others it has used "unlawfully present in the United States." And in still others it has used the term "unlawfully in the United States." Nothing in the statute or legislative history suggests that these slight alterations in themselves reflect a deliberate congressional decision to apply varied meanings. Our starting point for the analysis to follow is therefore the assumption that "not lawfully present in the United States," "unlawfully present in the United States," and "unlawfully in the United States" are all the opposite of "lawfully present in the United States."

AR2022_300090

furnish the Immigration and Naturalization Service with the name and address of , and other identifying information on any individual who the [State, Commissioner or Secretary] knows is *unlawfully in the United States*.

Although the phrases "unlawfully in the United States" and "lawfully present in the United States" do not contain identical words, they do ordinarily address the same operative facts. Accordingly, it is logical to assume, absent contrary indications from the language or structure of the statutes involved, that the phrases should be construed harmoniously -- the first being the opposite of the second. There is no indication from the text of these sections or the legislative history that Congress intended different meanings. No significant problems or contradictions are created if the definition in 8 C.F.R. section 103.12 is applied to section 404 of the Reconciliation Act. Therefore, any alien not belonging to one of the classes of aliens listed in 8 C.F.R. section 103.12 should be considered unlawfully in the United States for purposes of section 404.

The same cannot be said of section 411(d) of the Reconciliation Act, which provides that

a State may provide that an alien who is *not lawfully present in the United States* is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after the date of the enactment of this Act which affirmatively provides for such eligibility.

Section 411(a) states that

an alien who is not-- (1) a qualified alien (as defined in section 431), (2) a nonimmigrant under the INA, or (3) an alien who is paroled into the United States under section 212(d)(5) of such Act for less than one year, is not eligible for any State or local public benefit (as defined in subsection (c)).

A contradiction is created if we apply the definition in the regulation to section 411(d) of the Reconciliation Act. The definition of "lawfully present" in the regulation covers a broader class of aliens than those described in the numbered clauses of section 411(a). If "not lawfully present" in section 411(a) is read to mean the opposite of 8 C.F.R. section 103.12, then a gap is created so that some lawfully present aliens ineligible for benefits under 411(a) cannot be granted benefits under the exception in 411(d). For example, under the regulation, persons in temporary protected status (TPS) are lawfully present, but they are barred from state and local benefits by section 411(a). However, 411(d) only allows states to make an exception for aliens who are "not lawfully present in the United States." Thus, if the definition in the regulation were applied to section 411(d), TPS aliens would be irrevocably barred from state and local benefits. At the same time, section 411(d) would allow states to grant benefits to aliens who enter the United States without being inspected and admitted and who are in no way lawfully present. This would result in the absurdity of treating some lawfully present aliens worse than unlawfully present aliens. To avoid this irrational result, the phrase "not lawfully present in the United States" in

section 411(d) of the Reconciliation Act should be read to include all aliens not listed in the numbered clauses of section 411(a) as eligible for State and local public benefits.[7]

**B. The 1996 Act**

The 1996 Act contains the phrase "unlawfully present in the United States" or similar words in no less than eleven sections in titles III, V and VI. In title III and VI the terms are used in reference to grounds of admissibility and the removal of aliens, while in title V the terms are used in relation to eligibility for public benefits and services.[8] The references to "unlawfully present" and similar terms as grounds for inadmissibility are contained in section 301 of the 1996 Act. Section 301(b) creates new INA sections 212(a)(9)(B) and (C) which define new grounds for inadmissibility. They read:

(B). . .(i) In General.--Any alien (other than an alien lawfully admitted for permanent residence) who-- (I) was *unlawfully present in the United States* for a period of more than 180 days but less than 1 year, voluntarily departed the United States. . .prior to the commencement of proceedings under section 235(b)(1) or section 240 and again seeks admission within 3 years of the date of such alien's departure or removal or (II) has been *unlawfully present in the United States* for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible.

(ii) Construction of unlawful presence.-- For purposes of this paragraph, an alien is deemed to be *unlawfully present in the United States* if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled. . . .

(C). . .(i) In general.--Any alien who-- (I) has been *unlawfully present in the United States* for an aggregate period of more than 1 year. . .and who enters or attempts to enter the United States without being admitted is inadmissible.

---

[7] Another option would be to conclude that Congress intended the phrase "lawfully present in the United States" in the Reconciliation Act to be coextensive with the classes of aliens listed in section 411(a). In that case the definition in 8 C.F.R. § 103.12 would have to be replaced with that provided in section 411(a) of the Reconciliation Act. This interpretation, however, would have to be inconsistent with the language in section 401(b)(2) of that Act that gives the Attorney General discretion to determine which aliens are lawfully present. For that reason, we conclude that it should be rejected.

[8] Sections 301(c) and (d) use terms closely related to "unlawfully present," but they are sufficiently different from the other sections of the 1996 Act to warrant excluding them from the scope of this opinion. The new INA section 212(a)(6)(A), added by section 301(c) of the 1996 Act, creates a new ground of inadmissibility for any

alien *present in the United States without being admitted or paroled*, or who arrives in the United States at any time or place other than as designated by the Attorney General. . ..

Similarly, section 301(d) establishes a new ground of deportability codified in the new INA section 237(a)(1)(B) and provides that any alien who is *present in the United States in violation of this Act or any other law* of the United States is deportable.

7

8

AR2022_300091

There are six further references to lawful presence related to the removal of aliens in the 1996 Act. Section 303(a) of the 1996 Act establishes a new INA section 236(d)(3) which requires that upon

> the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of *aliens unlawfully present in the United States* pending criminal prosecution.

The new INA section 240(c)(2) --created in Section 304(a) of the 1996 Act-- established the burden of proof for aliens in removal proceedings. It reads as follows:

> (2) BURDEN ON ALIEN.-In the proceeding the alien has the burden of establishing-
>> (A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or
>> (B) by clear and convincing evidence, that the alien is *lawfully present in the United States* pursuant to a prior admission.
>
> In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

Section 326(a) of the 1996 Act requires the Service to operate a criminal alien identification system

> to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, *not lawfully present in the United States*, or otherwise removable.

Section 329(a) requires the Attorney General to

> conduct a project demonstrating the feasibility of identifying, from among the individuals who are incarcerated in local governmental prison facilities prior to arraignment on criminal charges, those individuals who are aliens *unlawfully present in the United States*.

In section 330 Congress

> advises the President to begin to negotiate and renegotiate, not later than 90 days after the date of enactment of this Act, bilateral prisoner transfer treaties, providing for the incarceration, in the country of the alien's nationality. . ..
> [T]he focus of negotiations for such agreements should be. . .to expedite the transfer of aliens *unlawfully in the United States* who are (or are about to be) incarcerated in United States prisons. . . .

Finally, section 334 expresses the sense of the Congress

that the mission statement of the Immigration and Naturalization Service should include a statement that it is the responsibility of the Service to detect, apprehend, and remove those aliens *unlawfully present in the United States*, particularly those aliens involved in drug trafficking or other criminal activity.

Title V of the 1996 Act uses the phrase "not lawfully present in the United States" four times in relation to aliens' eligibility for public benefits or services. Section 502 permits States to

> conduct pilot programs to determine the viability, advisability, and cost-effectiveness of the State's denying driver's licenses to aliens who are *not lawfully present in the United States*.

Section 503 amends section 202 to the Social Security Act (42 U.S.C. § 402) by adding a new subsection (y) which reads:

> [n]otwithstanding any other provision of law, no monthly benefit under this title shall be payable to any alien in the United States for any month during which such alien is *not lawfully present in the United States as determined by the Attorney General*.

Section 505 of the 1996 Act provides that

> an alien who is *not lawfully present in the United States* shall not be eligible on the basis of residence within a State. . .for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident.

Finally, section 562 of the 1996 Act makes States and their political subdivisions eligible for payment from the United States Government of the costs of providing certain emergency medical care services to "an individual who is an *alien not lawfully present in the United States*."

The working assumption that highly similar words used in the same piece of legislation should have the same meaning does not necessarily resolve the question of what definition should be given to the words "(un)lawfully present in the United States" in each of these sections of the 1996 Act. That Act clearly contemplates the possibility of at least two different definitions. The first definition is that in the new INA section 212(a)(9)(B)(ii) and it is applied by its express terms only to that section.

The second definition is that contemplated for section 503 of the 1996 Act. Congress committed the definition for that section to the discretion of the Attorney General, and, therefore, clearly anticipated that the definition could be different from that in INA section 212(a)(9)(B)(ii). Because section 503 covers benefits in the same title of the Social Security Act and effectively creates the same restriction on the receipt of those benefits as section 401(b)(2) of the Reconciliation Act, it is highly probable that Congress intended them to have the same definition

9

10

of "lawfully present in the United States." As a condition of admission, section 103.12 should be applied to section 503 of the 1996 Act.

CASE 1:18-cv-00068 Document 607-4 Filed on 11/03/22 in TXSD Page 93 of 691

Neither the 1996 Act nor its legislative history gives explicit guidance as to whether these two definitions should be applied to the other sections of the 1996 Act. As a result, we must decide whether one of them or some third definition should be used. We conclude that, with one exception dictated by the structure of the new removal provisions, a third definition is not warranted. If it can generally be presumed that the same words in an act have the same meaning, it is logical also to presume that when Congress provides for two different definitions of the same or similar words in the same act, those words in other sections of that act should be interpreted based on one of the two definitions, unless the context in which the words are used or the legislative history indicates otherwise.

The structure of the 1996 Act and the purposes of the various provisions provide the best guide for resolving the question of which definition should apply to each specific section of the Act. As indicated above, the sections in titles III and VI all relate to the admissibility and removal of aliens. In most respects, we conclude that these provisions should be applied using a single definition of the phrase in question. Congress has provided in Title III a definition in INA section 212(a)(9)(B)(ii) for certain specific removal purposes, and that definition should be applied to the sections that use the phrase in question in reference to inadmissibility and removal. With one exception, such an application leads to logical, workable results, fully consistent with Congress's evident intent for those sections of Titles III and VI.

The one exception is the new INA section 240(c)(2), setting forth the burden of proof upon an alien in removal proceedings. It must be read in conjunction with the closely related provision in INA section 240(c)(3)(A),[9] which specifies the circumstances in which the Service bears the burden of proof in such proceedings, and with INA section 101(a)(13), the new definition of "admission." Structurally, these provisions implement Congress's decision in the 1996 Act to treat entrants without inspection as applicants for admission, thus making them subject to the grounds of inadmissibility in INA section 212(a) rather than the grounds of deportability as had previously been the case.

Section 240(c)(2) essentially places an initial burden of proof upon an alien in removal proceedings. If the alien establishes a prior lawful admission (subparagraph (2)(B)), then plainly paragraph (3) comes into play; this is then "the case of an alien who has been admitted to the United States." Accordingly, the Service must thereafter carry the burden of proof to show that the alien is deportable under one of the grounds specified in INA section 237. If the alien cannot establish a prior lawful admission (even through access to government records as specified in the final sentence of section 240(c)(2)), then he or she is treated as an applicant for admission and

---

[9] INA section 240(c)(3)(A) reads as follows:

(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.-
(A) IN GENERAL.-In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

11

---

must carry the burden, specified in subparagraph (A), to establish that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212."

In short, whether the alien carries the burden of proof specified in section 240(c)(2)(B) determines whether he or she will be subject to the inadmissibility grounds of section 212 or the deportability grounds of section 237. The phrase "lawfully present in the United States pursuant to a prior admission" must therefore be read as a whole, to link in closely with the new definition of "admission" in section 101(a)(13). For these purposes, an alien is lawfully present if he or she accomplished a "lawful entry . . . into the United States after inspection and authorization by an immigration officer." Id. The word "lawfully" in section 240(c)(2)(B) connotes, as does section 101(a)(13), that the alien's latest relevant admission must be lawful -- e.g., not procured by corruption.[8] The alien's burden is simply to show that a lawful admission has occurred, if this is at issue.[10]

Plainly Congress did not intend by section 240(c)(2)(B) to shift to the alien the burden to negate removability based on some act or event that occurs after a lawful admission, such as overstaying the period of admission or committing a crime in the United States that renders the alien deportable. The responsibility to prove that such an act or event occurred remains with the Service. The intent of Congress to have the Service retain this burden of proof is clearly evidenced in the new INA section 240(c)(3), which states that the Service must prove that an alien who has been admitted is deportable. Congress's objective was to move entrants without inspection into the category of applicants for admission, not to apply the grounds of inadmissibility in section 212 to visa overstays or other possible violators of the terms of their initial lawful admission. Nothing in the legislative history suggests that Congress intended a change more substantial than this. Accordingly, an alien is "lawfully present in the United States pursuant to a prior admission" for purposes of section 240(c)(2)(B) if he or she was lawfully admitted on the last entry, even if the alien has subsequently violated the conditions of admission or stayed beyond the admission period.

A further indication that the phrase in section 240(c)(2)(B) is not meant to be governed by section 212(a)(9)(B)(ii) comes from the treatment of parolees. The latter section treats parolees as lawfully present for its purposes, meaning that parolees do not come within the 3- or 10-year disabilities it specifies, even if they have been physically present here for longer than the 180-day or 1-year periods. But section 101(a)(13)(B) provides expressly that "parolees shall not be considered to have been admitted." This specification reinforces the structural logic of Congress's new removal provisions. Arriving aliens, parolees, and entrants without inspection are all to be subject to the inadmissibility grounds of section 212 and must carry the burden of proof spelled out in section 240(c)(2)(A). Others, those who are lawfully admitted, will be removable, if at all, in accordance with the deportability grounds of section 237, and the Service must carry the burden of proof specified in section 240(c)(3).

The preceding paragraphs indicate which definitions should apply for titles III and VI of the 1996 Act, which deal generally with the admissibility and removal of aliens. The sections of title V of the 1996 Act that use the phrase "lawfully present" and similar terms have a different

---

[10] In this respect, section 240(c)(2)(B) sets forth in a more logical place in the INA a burden of proof on the alien similar to that formerly provided only in the last two sentences of INA section 291.

12

AR2022_300093

purpose, that of determining eligibility for public benefits and services. Again, there is no definitive answer as to which of the two definitions should be applied to these sections. However, logic suggests that the definition in section 503 of the 1996 Act (which should be identical 8 C.F.R. section 103.12) should be applied to these sections. First, all these sections are contained in the same title of the 1996 Act as section 503 and not in the same title as the INA section 212(a)(9) definition. Second, all these provisions have the same purpose as section 503. Finally, this definition will be applied to the provisions of the Reconciliation Act that serve to determine the eligibility of aliens for public benefits, and this interpretation would create one definition applicable to all provisions that relate to public benefits and services.

In sum, Congress clearly contemplated two different primary definitions of "unlawfully present in the United States" in the 1996 Act. The most reasonable interpretation is to apply the definition in section 212(a)(9)(B)(ii) to all the provisions in the Act which refer to the admissibility and removal of aliens -- with the above noted exception of INA section 240(c)(2) -- and apply the definition contemplated in section 503 of the 1996 Act to the provisions that deal with the eligibility of aliens for public benefits and services.

**Question 3.**

On September 6, 1996, the Attorney General published an immediately effective interim rule defining the words "lawfully present in the United States" for purposes of section 401(b)(2) of the Reconciliation Act and thereby created 8 C.F.R. section 103.12. The question here is whether the Service may add other sections of the Reconciliation Act and the 1996 Act as being covered by that definition by simply amending the interim rule or whether a separate proposed rule must be promulgated.

As a general rule when an agency of the Federal Government issues a regulation it must publish a general notice of proposed rule making and give the public an opportunity to comment on the proposed rule before it becomes effective. 5 U.S.C. § 553(b) and (c). An exception applies when the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The courts have consistently held that this good cause exception is to be read narrowly in order to avoid providing agencies with an escape clause from the requirements Congress prescribed. *See, e.g.*, U.S. v. Gardner, 767 F.2d 104 (5th Cir. 1985).

When the Service published the interim rule creating 8 C.F.R. section 103.12, it waived the notice and comment period based on the above good cause exception. The Service correctly concluded that, given the immediate effective date of section 401 of the Reconciliation Act and the adverse impact of delay on the public, it would be impracticable and contrary to the public interest to observe the usual notice and comment period. Because of the requirement to construe the good cause exception narrowly and the different effective dates of the various provisions of the Reconciliation Act and the 1996 Act to which the Service may wish to apply the regulatory definition, this same rationale will not apply to all sections of the two acts.

Those sections with immediate effective dates or effective dates that will not allow for the normal notice and comment period may be included in the section 103.12 definition by amending the interim rule and extending the comment period. The good cause exception used for the

interim rule will apply to these sections. Section 404 of the Reconciliation Act was effective immediately and can be addressed by amending the interim rule. Likewise, section 411 of the Reconciliation Act was effective immediately and Section 503 of the 1996 Act was effective on December 1, 1996. The interpretation of these sections can and should be dealt with in the amended interim rule. The sections with later effective dates are sections 502, 505 and 562 of the 1996 Act.

If the definition of lawfully present is drafted in a manner that references specific sections of each Act, then the provisions with effective dates that permit the Service to comply with the usual notice and comment period should be promulgated in a proposed rule with opportunity for notice and comment. However, if the amended interim rule discussed in the previous paragraph were not to address specified sections already in effect, but were instead framed so as to modify the existing rule to apply the definition of lawfully present to public benefits determinations generally, then the amended rule would necessarily also cover those other sections with later effective dates. It could still appropriately be promulgated as an interim rule, owing to the need to address those sections already operative.

The sections of the 1996 Act that use the term "unlawfully present in the United States" related to the admissibility and removal of aliens will not be included in the definition in 8 C.F.R. section 103.12, and thus need not be considered in connection with Question 3.

*[signature: David A. Martin]*

David A. Martin
General Counsel

AR2022_300094

# Memorandum



| Subject | Date |
|---|---|
| Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues | MAY - 6 1997 |

| To | From |
|---|---|
| Regional Directors<br>District Directors<br>Officers-in-Charge<br>Service Center Directors | Office of Programs |

This memorandum outlines changes in the handling of I-360 self-petitions for immigrant status filed by battered spouses and children of U.S. citizens and permanent residents aliens and addresses related issues.  It should be read as a supplement to the guidance issued by the Office of Programs on April 16, 1996.

## <u>Background</u>

The issue of domestic violence and its potential impact on spouses and children who would normally be entitled to immigration benefits under the I-130 petitioning process was first addressed by Congress in the Violence Against Women Act ("VAWA") which was enacted as part of the Violent Crime Control Act of 1994 ("Crime Bill").  The VAWA contains provisions to limit the ability of an abusive U.S. citizen ("USC") or lawful permanent resident ("LPR") to utilize the spouse' or child's immigration status in order to perpetuate the abuse.  The Service published an interim rule on March 26, 1996 (59 FR 13061-13079) establishing the procedures for qualified abused spouses and children to self-petition for immigrant classification using the Form I-360. This rule was accompanied by extensive field instructions in the Office of Programs' memorandum of April 16, 1996.

In the autumn of 1996, Congress enacted various new provisions relating to battered aliens, in both the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA" or "the welfare law") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" or "the immigration bill").  <u>None of these new provisions directly affect the legal standards applicable to adjudication of I-360 applications.</u> The new provisions do, however, provide additional benefits and protections for battered aliens, and have created the need for INS to restructure how we handle this category of very sensitive cases.  This memorandum outlines those changes, and instructs field offices on the handling of pending cases and new cases received.

II-30

Guidance on Battered Alien Issues
Page 2

## Centralization at the Vermont Service Center

On April 7, 1997, the Service published a notice in the Federal Register at 16607-08 establishing the Vermont Service Center as the direct mail filing location for all Forms I-360 filed by self-petitioning battered spouses and children (Attachment A). This centralization was necessitated by the new welfare provisions which make certain battered aliens -- including self-petitioners and others -- eligible for public benefits. In addition to adjudicating I-360 self-petitions, the Vermont Service Center will serve as a central "clearinghouse" for inquiries from federal, state and local benefit-granting agencies regarding pending or recently-adjudicated cases, as discussed in more detail in the Verification section, below. Finally, as an alien may be eligible for public benefits not only upon the approval of the relevant immigrant status, but also upon having filed a petition which makes a prima facie case for such status, the Vermont Service Center will also begin making prima facie determinations pursuant to an interim rule expected to be published in the Federal Register prior to June 1, 1997.

While these are sensitive cases which require special handling, the move to centralized filing is expected to have only minimal impact on caseloads in the district offices. Since the beginning of the fiscal year, according to G-22 statistics, fewer than 500 cases have been filed Servicewide. Centralization allows the Service to have a small corps of officers well-versed in the complexity and sensitivity of VAWA adjudications, and will also allow for better monitoring of the caseload and any fraud trends.

Although the direct mail notice allows self-petitioners to continue to file locally until May 7, INS field offices and the other service centers are encouraged to forward to the Vermont Service Center those I-360s for which review/adjudication has not been initiated. All I-360 self-petitions received on or after May 7 shall be forwarded to the Vermont Service Center, but the 30 day transition period requires that no office refuse to receive an I-360 submitted before June 6, 1997. Immediate relatives, who were previously able to file concurrent I-360 self-petitions and I-485 adjustment applications, should be advised to retain their I-485s pending the Vermont Service Center's adjudication of the I-360 self-petition. The battered alien I-360s are to be mailed to:

> INS Vermont Service Center
> Attn: Family Services Product Line (VAWA)
> 75 Lower Weldon Street
> St. Albans, VT  05479-0001

As inquiries from benefit-granting agencies can be expected in many cases, offices are encouraged to expedite handling of all pending cases which they do not forward to the Vermont Service Center. Nothing in this move to centralize direct mail filing changes the ability of the Vermont Service Center to transfer I-360s to district offices when an interview or investigation of suspected fraud is merited.

II-31

AR2022_300096

Guidance on Battered Alien Issues
Page 3

## Deferred Action and Employment Authorization

In the April 16 memorandum, INS offices were encouraged to utilize voluntary departure and deferred action in order to provide approved VAWA self-petitioners with employment authorization pending the availability of a visa number. Since that time, in IIRIRA, Congress has limited grants of voluntary departure to no more than 120 days, and INS regulations no longer allow for work authorization during any period of voluntary departure.

Starting June 1, when the Vermont Service Center approves a VAWA self-petition, it will then also assess, on a case-by-case basis, whether to place the alien in deferred action status pursuant to new deferred action guidelines in the Interim Enforcement Procedures (a forthcoming document which will be available on the 96Act bulletin board, as well as in printed versions). By their nature, VAWA cases generally possess factors that warrant consideration for deferred action. In an unusual case, there may be factors present that would militate against deferred action; cases should therefore receive individual scrutiny. Although the Vermont Service Center is not required to obtain Regional Director approval for deferred action, it will report all grants of deferred action to the Eastern Regional Office for statistical and tracking purposes. In addition, a process for periodic review of the deferred action decisions made by the Vermont Service Center is planned.

If the alien is placed in deferred action, the Vermont Service Center will notify the alien that he or she may submit an I-765, Application for Employment Authorization. After the initial deferred action decision and issuance of a one-year employment authorization document, the Vermont Service Center will hold these files and review the deferred action decision upon each application for extension of work authorization. When the Vermont Service Center is notified by the National Visa Center or by an INS district office that the alien is seeking a visa abroad or has filed an adjustment application, the Vermont Service Center will forward the file to the appropriate office.

In cases where the I-360 was approved prior to April 1, many aliens may have current grants of voluntary departure. Upon expiration of voluntary departure, and for other cases adjudicated before June 1, district offices are strongly encouraged to utilize deferred action to provide work authorization pending the availability of a visa. As described in more detail below, battered aliens are now eligible for certain public benefits, which are often necessary for the victim to be able to leave the abusive situation. To deny such aliens work authorization when they are able to obtain public assistance is counter to the spirit of welfare reform. Moreover, for many individuals, the ability to work is necessary in order to save the funds necessary to pay for the adjustment application and the penalty fee. As it has already been determined that these aliens face extreme hardship if returned to the home country and as removal of battered aliens is not an INS priority, the exercise of discretion to place these cases in deferred action status will almost always be appropriate.

JJ-32

Guidance on Battered Alien Issues
Page 4

## <u>Non-Disclosure Provisions and Other Limitations in IIRIRA § 384</u>

Section 384 of IIRIRA strictly prohibits the release of <u>any</u> information relating to a VAWA self-petitioner, and also precludes any INS officer from making an adverse determination of admissibility or deportability based solely on information furnished by an abusive relative. Any violation of this section can subject an INS officer to disciplinary action and a fine of up to $5,000. This provision is discussed in more detail in IIRIRA Implementation Memo #96act.036 (Attachment B).

## <u>Verification of Status for Benefit-Granting Agencies</u>

Section 501 of IIRIRA amends the welfare law to provide that certain battered aliens are "qualified aliens" for purposes of eligibility for some public benefits. This includes not only those aliens who can self-petition for immigrant status under the VAWA provisions, but also other aliens who have been abused by a member of their household. In cases other than VAWA self-petitioning cases, it is the benefit-granting agency, not the INS, which will assess the claims of abuse. Benefit providers, however, will request that INS verify the alien's status or the fact that a petition is pending on behalf of the alien. Detailed procedures for verification of these and other categories of qualified aliens under welfare law are being provided to benefit-granting agencies by the Department of Justice in a document entitled "Interim Guidance on Verification," which is expected to be published in the Federal Register later this month. An INS field directive designed for immigration status verifiers will be issued in conjunction with publication of the Interim Guidance on Verification.

Although some verification inquiries relating to battered aliens will be handled through the normal status verification channels, many of the inquiries will fall outside the type of inquiries which status verifiers typically handle. For example, because of the dynamics of abusive relationships, the abuse victim will not always have access to approval notices or other documentation relating to their cases. Moreover, because aliens can be eligible for public benefits upon filing a petition which makes a prima facie case for status, benefit providers will sometimes be seeking information on pending cases, including a determination as to whether the petition makes a prima facie case for eligibility for the status sought.

The Vermont Service Center will serve as the "clearinghouse" for these unusual types of inquiries, which will be submitted by fax using an inquiry format patterned on the sample at Attachment C. It is anticipated that the Vermont Service Center will be able to handle the vast majority of inquiries, which should pertain to cases pending there or in one of the other service centers. For those inquiries which pertain to cases pending in district offices or sub-offices, the Vermont Service Center will forward the inquiries by fax to the attention of a designated Service

II-33

Guidance on Battered Alien Issues
Page 5

Center liaison officer in each district or sub-office.   Each district and sub-office should complete
the liaison designation form at Attachment D and fax to Lisa Batey at 202/514-9262 prior to May
20 (the list of designees will be shared with INS regional offices and all four Service Centers).
The designated liaison should ensure that a response is provided to the requesting agency, with a
copy to the Vermont Service Center, within five working days.   Information on pending or
completed cases should not be given over the telephone, but rather should be sent via facsimile.

As you will note, the sample inquiry format includes a limited waiver of the non-disclosure
provisions of IIRIRA § 384.   At present, such a waiver is necessary before INS can provide any
information relating to a VAWA self-petitioner, even to another governmental entity for purposes
of determining eligibility for public benefits.   Because of IIRIRA § 642, no waiver is necessary in
other categories of cases, such as where the alien seeking benefits is the beneficiary of a spousal
I-130 petition, but has suffered abuse at the hands of another household member.   If there is any
doubt as to whether a waiver is required, the officer should seek guidance from his or her district
counsel.   If there are waiver questions which cannot be resolved locally, please contact Lisa Batey
of the Headquarters Office of Programs, at 202/514-9089.

## Providing Information on Filing of I-360 Self-Petitions

Some battered aliens who are eligible to self-petition have chosen not to do so, instead
relying upon the I-130 petition filed by their abuser.   This not only allows the abuser to continue
to control the spouse's or child's immigration status by withdrawing the petition, but also places a
battered spouse at risk should the abuser subsequently obtain a divorce before the spouse is able
to adjust status.   For these and other reasons, such as easier determinations as to welfare eligibility
and employment authorization, an immigration officer who deals with a battered alien should
inform that alien about the process for self-petitioning, despite the fact that an I-130 petition is
still pending on his or her behalf.   The Interim Guidance on Verification similarly urges benefit
agency caseworkers to give such aliens the number for the INS Forms Line [1-800-870-3676] and
for the National Domestic Violence Hotline [1-800-799-7233] for assistance in preparing self-
petitions.

## Making Prima Facie Determinations

As noted above, Section 501 of IIRIRA includes in the definition of "qualified alien" for
public benefit purposes those aliens who have filed a self-petition, or are the beneficiary of a
spousal or parental petition, which sets forth a prima facie case for immigrant status under a
variety of provisions.   Specifically, those with approved petitions or pending petitions which make
a prima facie case for status under any of the following Immigration and Nationality Act ("INA")
provisions are included:

II-34

Guidance on Battered Alien Issues
Page 6

- spouse or child of a USC under 204(a)(1)(A)(i)

- spouse, child or unmarried son or daughter of an LPR under 204(a)(1)(B)(i)

- widow(er) of a USC under 204(a)(1)(A)(ii)

- self-petitioning battered spouse or child of a USC or LPR under 204(a)(1)(A)(iii)-(iv) or 204(a)(1)(B)(ii)-(iii)

In all but the latter category, battery or abuse will not be part of the INS adjudication, but rather will be assessed by the benefit-granting agency pursuant to the Interim Guidance on Verification.

In the case of self-petitioning battered spouses and children, the Vermont Service Center will begin making prima facie determinations no later than June 1, 1997, following publication of an interim rule in the Federal Register. If the self-petition and accompanying documentation are adequate, the self-petitioner will receive a decision or a Notice of Prima Facie Determination ("NPFD") within three weeks of filing. The approval notice or NPFD may be presented to benefit granting agencies as evidence of the applicant's status as a "qualified alien". The NPFD will be valid for 150 days, to allow time for the submission of any supplemental evidence and for adjudication of the self-petition.

In those cases which are not handled by the Vermont Service Center, benefit-granting agencies will be expecting decisions or prima facie determinations within a similar three-week time frame. As the non-VAWA cases are simpler adjudications based purely on family relationship, there are no plans to define what would constitute a prima facie case. Instead, when a benefit-granting agency inquires about a pending case, INS offices should expedite the adjudication of the case in order to minimize the time during which the alien is unable to receive public assistance for which he or she may be eligible.

### Aliens Seeking Issuance of Notices to Appear

An individual may also be eligible for public benefits if he or she makes a prima facie case for cancellation of removal as a battered spouse or child under INA § 240A(b)(2). INS district offices shall promptly issue a Notice to Appear to any alien who makes a credible request to be placed in proceedings in order to raise a claim for cancellation of removal under section 240A(b)(2). District offices may want to do a search of the CLAIMS system to determine if a self-petition was filed and denied. It is important to note, however, that some individuals who are ineligible for status pursuant to the self-petitioning provisions will be eligible for cancellation (e.g., where the marriage has been terminated). Once proceedings have been initiated, the alien can contact the immigration court to seek a determination that he or she has demonstrated a prima facie case for cancellation of removal.

II-35

Guidance on Battered Alien Issues
Page 7

## <u>Other District Office Issues</u>

While centralizing I-360 adjudications was motivated in part by the goal of having a small corps of officers well-trained in domestic violence issues, district adjudications officers will still interact with self-petitioners during the adjustment process.   The nature of domestic violence and the sensitivity needed in dealing with victims are topics to which few INS officers will have had exposure.   District offices are strongly encouraged to identify two or more officers (depending upon the size of the district) to handle all adjustments following from I-360 approvals.   The designated officers should have the experience, discretion and communications skills to be able to balance sensitivity in dealing with true victims with vigilance against fraud, and would ideally also serve as the designated Service Center liaison officer described at pages 4-5, above.

Recognizing the need for more training on complex and subtle domestic violence issues, Headquarters is looking into opportunities to provide informational materials and perhaps training sessions.  In addition, a number of reputable non-profit organizations throughout the country provide training for personnel who work with domestic violence victims, and are willing to share their expertise with INS offices.  Last year, for example, training for San Francisco adjudicators was provided by representatives of the Family Violence Prevention Fund.  The training was well-received by district personnel, and was given at no cost to the district.  Managers interested in obtaining materials or in fostering contacts with local organizations which work with victims of domestic violence should contact either of the persons named below for information about organizations active in their area.

*     *     *     *     *

The Office of Field Operations concurs with this memorandum.  Addressees are strongly encouraged to distribute copies of this memorandum widely, particularly to adjudications and investigations officers.  Questions about this policy or about the interim rule published in the Federal Register may be directed to Lisa Batey, Headquarters Office of Programs, 202/514-9089, or Karen FitzGerald, Headquarters Benefits Division, at 202/305-4904.

Paul W. Virtue
for  Acting Executive Associate Commissioner

II-36

[sample only – request to be submitted on letterhead of requesting agency]

Fax Request Form – from Benefit Agency to INS

To: INS Vermont Service Center, fax 802/527-3252
    Attn: Battered Alien Review Unit          This fax consists of ____ pages.

This request is being submitted by:

Name (printed): _____          T_____

Agency name and address: _____

_____

Fax number: _____

Agency case tracking number: _____

Item 1: An alien applicant is seeking ____ benefit ____ from the agency identified above, pursuant
to recent welfare reform legislation. This applicant falls into one of two categories:

  ____ a) believes an INS Form ____, Petition for ____, was filed on the
        applicant's behalf by his ____ ____ parent, or has self-petitioned as a
        widow(er) using ____ Form ____, Petition for Amerasian, Widow or Special
        Immigrant (complete ____ Part A below);

  ____ b) has self-petitioned as a battered spouse or child using INS Form I-360, Petition for
        Amerasian, Widow, or Special Immigrant (complete ____ B, below).

Item 2: The ____ is ____ requesting that INS: (please check ____ one)
☐ Verify that the attached document is a valid copy of the I-797 approval notice, prima facie
  determination or receipt notice.
☐ Make a prima facie determination or expedited adjudication of the petition and notify the
  requesting ____.
☐ Update the status of the ____ agency's _____ (insert date) request for a prima
  facie determination or expedited adjudication. (Requesting agency should allow three
  weeks from the request for a prima facie determination or filing of a petition before
  making this request.)
☐ Determine whether the applicant has filed a petition or whether a petition has been filed on his
  or her behalf under (a) or (b), as indicated above. If so, please make a prima facie
  determination or expedited adjudication of the applicant's petition and notify the
  requesting agency of the outcome.

Date: _____          Agency Signature: _____

AR2022_300102

**PART A:** For an Applicant Who Is the Beneficiary of a Petition Filed by Spouse or Parent, or Who Has Self-Petitioned as a Widow(er)

**Step 1:** Does the alien applicant have a copy of an INS Form I-797 indicating that an I-130 was filed on his/her behalf?    [If applicant has self-petitioned as a widow(er), check "No" and proceed to Step 2.]

    Yes _____  → Attach a copy of ___ 797 to this fo___ou need not complete Step 2)

    No _____  → If the applicant ha___ ___cumentation ___ ___s documentation other than a Form I-797, pro___ to Step ___

**Step 2:** If the applicant does not have a Form I-797, p___ fill o___ following information. All blanks, except that noted "if available" must b___ ___pl___

    . Benefit Applicant's full name:

    Benefit Applicant's date of birth:

    Benefit Applicant's best guess ___ ___ ___on wa___ ___ _____ (mo/yr)

    Benefit Applicant's best gues___ ___ ___ with which INS o___ ___tion ___fil___

    Petitioner's full name:

    Petitioner is Applicant___ ___spo___ ___ ___ ___ ___self [widow(er)]   (check one)

    Petitioner is a ___ U.S. c___ or ___lawf___ ___sident ("green card holder")

    Petitioner's da___ of ___

    Petition___ AR___ ___ ___tion N___ ___ if a___:  A

    Petiti___ ___ ___dress at the ___ ___ling ___

    ___reet address, ___ ___ ___ ___de)

AR2022_300103



**PART B:** For an Applicant Who Has Self-Petitioned as a Battered Spouse or Child

**Step 1:** Attach a copy of the receipt notice or other documentation evidencing that a Form I-360 has been filed with the INS. If that documentation does not include the following information, please complete the blanks:

Applicant/self-petitioner's full name: _____

Applicant/self-petitioner's date of birth: _____

Date I-360 was filed: _____

Location (city) of INS office where filed: _____

**Step 2:** A waiver signed by the alien appears below.

This waiver authorizes release of information only for the purpose of determining eligibility for Federal, state or local public benefits. It does not authorize release of information to relatives of the alien other than any relatives other than those specified in paragraph (3), below.

(1)    My name is (print full name): _____

(2)    My date of birth is _____ 19____

(3)    I hereby waive any restriction on the release of information relating to me under section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the "Immigration Act") to the extent necessary to permit the Immigration and Naturalization Service ("INS") and/or the Executive Office for Immigration Review ("EOIR") to provide, in writing, to any federal, state, local or private benefit-granting entity seeking to verify my immigration status, the following information required to determine my eligibility for federal, state or local public benefits under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by the Immigration Act: (a) whether an application has been filed by me or on my behalf under section 204(a)(1)(A) (ii), (iii) or (iv), section 204(a)(1)(B) (ii) or (iii), section 216(c)(4)(C), section 244(a)(3) as in effect prior to April 1, 1997, or section 240A(b)(2) of the Immigration and Nationality Act, and (b) whether INS or EOIR has made a prima facie determination or final determination of my eligibility for relief under any of the above provisions, and, if so, the outcome of those determinations.

I declare, under penalty of perjury, that the foregoing is true and correct, and that I have executed this waiver knowingly and voluntarily.

Executed on (date): _____

_____
Signature of Applicant

II-39

AR2022_300104



**U.S. Department of Justice**
Immigration and Naturalization Service

HQINV 50/1

*425 I Street NW*
*Washington, DC 20536*

AUG 30 2001

MEMORANDUM FOR MICHAEL A. PEARSON
                EXECUTIVE ASSOCIATE COMMISSIONER
                OFFICE OF FIELD OPERATIONS

FROM:       Michael D. Cronin
             Acting Executive Associate Commissioner
             Office of Programs

SUBJECT:  Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy
              Memorandum #2 – "T" and "U" Nonimmigrant Visas

      The following instructions provide interim guidance to INS relating to the Victims of
Trafficking and Violence Protection Act of 2000 (VTVPA) Pub. L. No. 106-386, 114 Stat 1464,
(October 28, 2000). This memorandum establishes interim procedures to be followed while the
regulations implementing the T and U visa status are being promulgated by INS. The guidance in
this memorandum is effective immediately, and will remain in effect until regulations on T and
U visa status are in place. This guidance supercedes or augments any previous national or local
guidance on T and U visas.

## BACKGROUND

The VTVPA reflects the United States Government's strong stance against trafficking and its
intent to vigorously pursue the prosecution of traffickers and the protection of victims. It
provides access to social services and benefits for some victims, creates stronger criminal
penalties and enhanced sentencing for traffickers, and creates a new nonimmigrant classification
for victims of severe forms of trafficking ("T Visa" or "T").[1] The VTVPA also reauthorizes and
amends the Violence Against Women Act (VAWA) and adds a second new nonimmigrant
classification for victims of other specific crimes ("U Visa" or "U"). [2]

---

[1] The statutory purposes of the Trafficking Victims Protection division of the VTVPA "are to combat trafficking in
persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure
just and effective punishment of traffickers, and to protect their victims." VTVPA§102(a)
[2] The "U Visa" related statutory purpose includes the intent "to create a new nonimmigrant visa classification that
will strengthen the ability of law enforcement agencies to detect, investigate and prosecute cases of domestic
violence, sexual assault, trafficking of aliens and other crimes...committed against aliens, while offering protection
to victims of such offenses in keeping with the humanitarian interests of the United States..."
VTVPA§1513(a)(2)(A)

Memorandum to Michael A. Pearson
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas                    Page 2

## DEFINITIONS
Following are several definitions critical to the understanding of this guidance.

**Severe Forms of Trafficking in Persons** as defined by VTVPA §103(8). The term "severe forms of trafficking in persons" means-

    (A)    sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

    (B)    the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

**Certain Criminal Activity for "U Visa" Purposes** as defined by VTVPA §1513 (b)(3) refers to one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes.

**Possible Victim** is any alien who may be eligible for benefits under the "T" or "U" visa categories.

## GENERAL GUIDANCE
The VTVPA creates two new nonimmigrant classifications. These two classifications provide an immigration mechanism for cooperating victims to remain temporarily in the United States to assist in investigations and prosecutions and provide humanitarian protection to victims. The "T" classification is available to victims of severe forms of trafficking and their families and is limited to 5,000 principal aliens per year. The "U" classification is available to victims of certain criminal activity (see Definitions) and their families and is limited to 10,000 principals per year.

The "T" and "U" provisions of the VTVPA went into effect upon enactment, but regulations for implementation and for the processing of applications have not yet been finalized. In the interim, aliens who are identified as possible victims in the above categories **should not be removed from the United States until they have had the opportunity to avail themselves of the provisions of the VTVPA.** Existing authority and mechanisms such as parole, deferred action, and stays of removal will be used to achieve this objective, including continued presence for victims of severe forms of trafficking, as described in interim policy guidelines for continued presence and in the regulations implementing Section 107 (c) of the VTVPA.

AR2022_300106

Memorandum to Michael A. Pearson
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas                    Page 3

## IDENTIFICATION OF POSSIBLE VICTIMS

In the absence of governing regulations, Service personnel should ensure broad interpretation of the guidance to ensure an alien is not removed from the United States if it appears that they fit into one of these victim categories. This guidance is an interim measure aimed only at identifying possible victims who may be eligible for relief under the new nonimmigrant classifications.

Service personnel may encounter possible victims in a variety of circumstances, such as at a Port of Entry (POE), between POEs, in detention, in adjudication processes, in Immigration Court, and/or in the course of investigative activities. At times, Service personnel will be the first point of contact with the possible victim; at other times contact may be established through a prosecutor's office, through a local or federal law enforcement agency, or through an attorney. Regardless of the manner of encounter, if the individual is identified as a possible victim, Service personnel should take the necessary steps to ensure that the individual is not prematurely removed. Circumstances will vary from case to case, and INS personnel should keep in mind that it is better to err on the side of caution than to remove a possible victim to a country where he or she may be harmed by the trafficker or abuser, or by their associates.

**Possible "T" Victims:** The VTVPA specifies that four conditions must be satisfied to classify an alien as a principal "T" nonimmigrant.

1.  The alien is or has been a victim of a severe form of trafficking in persons; and

2.  The alien is physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a POE, on account of such trafficking; and

3.  The alien has complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking - or - the alien is under the age of 15; and

4.  The alien would suffer extreme hardship involving unusual and severe harm upon removal.

Additionally, to avoid extreme hardship, the Attorney General may provide "T" nonimmigrant status to the spouses, children, and, in the case of those under age 21, the parents of "T" nonimmigrants.

**Possible "U" Victims:** The VTVPA specifies that four conditions must be satisfied to classify an alien as a principal "U" nonimmigrant:

1.  The alien has suffered substantial physical or mental abuse as a result of having been a victim of the certain criminal activity (see Definitions); and

3

Memorandum to Michael A. Pearson
Re: VTVPA Policy Memorandum #2 — "T" and "U" Nonimmigrant Visas

Page 4

2. The alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning that certain criminal activity described in Definitions;

3. The alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official; to a Federal, State, or local prosecutor; to a Federal or State judge, to the Service; or to other Federal, State, or local authorities investigating or prosecuting one of the certain criminal activities described in Definitions; and

4. The criminal activity described violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States.

Additionally, to avoid extreme hardship, the Attorney General may provide "U" nonimmigrant status to the spouses, children, and, in the case of a child under the age of 16, the parents of "U" nonimmigrants. This would require certification by a government official that an investigation or prosecution would be harmed without the assistance of the spouse, the child, or in the case of an alien child, the parent of the alien. It should be noted that trafficking victims might also be eligible for "U" nonimmigrant classification.

## WORK AUTHORIZATION

Service personnel are instructed to use existing authority and mechanisms to prevent removal of possible "T" and "U" victims. These mechanisms include parole, deferred action, continuances, and stays of removal. Individuals who are identified as possible "T" or "U" victims may be granted work authorization pursuant to existing authority and utilizing existing application procedures. For instance, potential applicants that are paroled may be granted work authorization pursuant to 8 C.F.R. §274a.12(c)(11); potential applicants that are placed on deferred action may be granted work authorization pursuant to 8 C.F.R. §274a.12(c)(14); and potential applicants that are granted a stay of removal may be granted work authorization in accordance with the provisions of 8 C.F.R. §274a.12(c)(18). Governing regulations concerning continued presence for victims and other information related to this topic are also contained in the Department of Justice and Department of State interim rule published in the Federal Register on July 24, 2001 concerning the Protection and Assistance for Victims of Trafficking.

## JUVENILES

Each District has a juvenile coordinator who should be contacted regarding juvenile victims.

## RECORD KEEPING

It is imperative that documentation is maintained on possible victims. As such, information about the possible victim including all pertinent information surrounding the possible victim's circumstances must be maintained in the alien's A-file. If no A-file exists for the individual, one should be created. The use of standard sworn statements and/or applicable question and answer

4

Memorandum to Michael A. Pearson                                    Page 5
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas

forms must be maintained for the record. As evidence of contact with the possible victim, the INS investigator and/or officer will include any necessary notes and memorandum for the record.

## CONTINUED PRESENCE
Aliens who are victims of severe forms of trafficking and are potential witnesses may be eligible for a "T" nonimmigrant classification and shall be processed in accordance with the guidance contained in the policy memorandum dated August 20, 2001, entitled Interim Guidance #1 – Continued Presence. Governing regulations concerning continued presence are also contained in the Department of Justice and Department of State interim rule published in the Federal Register on July 24, 2001 concerning the Protection and Assistance for Victims of Trafficking, as 28 CFR Part 1100.35.

## LEGAL PROCEEDINGS
No alien identified as a possible victim eligible for "T" or "U" nonimmigrant classification should be removed from the United States until they have had the opportunity to avail themselves of the provisions of the VTVPA. When a possible "T" or "U" victim is encountered during the course of proceedings, the District Counsel's office should contact the District Victim-Witness Coordinator so that appropriate action can be taken in accordance with the instructions in this memo. The District Counsel's office has the discretion to seek a continuance of the proceedings or to request administrative closure or termination.

## FEDERAL OBLIGATIONS TO VICTIMS
Some of the provisions included in the VTVPA replicate INS responsibilities that are currently included in 42 U.S.C. 10606-10607 (the Victim's Rights and Restitution Act) and the *Attorney General Guidelines for Victim and Witness Assistance, 2000 edition*. This includes the referral of victims of Federal crime to medical care and assistance and the provision of reasonable protection. Victims who fall into the statutory definition of victim found in the *Attorney General Guidelines for Victim and Witness Assistance* must be afforded all the rights contained in that directive.[3] Service personnel should continue to involve the District and Sector Victim-Witness Coordinators in referring these victims for services.

This guidance is to be followed until such time as the alien's status has been confirmed, and, where the alien is an actual or possible material witness, the alien has had an opportunity to be considered for a "T" or a "U" nonimmigrant classification, as appropriate.

---

[3] For purposes of the Attorney General Guidelines for Victim and Witness Assistance, the term "victim" means a person that has suffered direct physical, emotional, or pecuniary harm as the result of a (federal) crime, including ….in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, another person or persons as listed in 42 U.S.C. 10607. The Attorney General designated District Directors and Chief Patrol Agents of the office having primary responsibility for conducting a Federal investigation as the responsible officials to identify victims of Federal crime.

AR2022_300109

Memorandum to Michael A. Pearson                                    Page 6
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely to guide INS personnel in performing their duties.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

AR2022_300110

MAY 14 1969

242.10(a)        OPERATIONS INSTRUCTIONS

to the United States as an immigrant, who has an
immigrant visa available to him because of a prior-
ity date earlier than the date in the Visa Office
Bulletin, and who has applied for an immigrant visa
at an American consulate which has accepted juris-
diction of his case; or (8) in whose case the dis-
trict director has determined there are compelling
factors warranting grant of voluntary departure.
(Revised)

In cases within the jurisdiction of investigations,
the authority of the district officer in charge of
investigations or the officer in charge under 8 CFR
242.5 to grant or revoke voluntary departure prior
to the commencement of hearing shall not be redele-
gated.  The authority of chief patrol inspectors
shall not be redelegated.

When prior approval of an application for an order
to show cause is required by OI 242.1(a), the alien
shall not be advised or notified that he must de-
part unless or until such approval has been re-
ceived.

   (b)  Periods of time.  Except for classes (5),
(6), (7), and (8) of paragraph (a), any grant of
voluntary departure shall contain a time limitation
of usually not more than 30 days, and an extension
of the original voluntary departure time shall not
be authorized except under meritorious circum-
stances.  Upon failure to depart, deportation pro-
ceedings will be pursued.  Class (5) shall be
granted voluntary departure in increments of one
year conditioned upon the F-1 or J-1 alien main-
taining a full course of study at an approved in-
stitution of learning, or upon abiding by the terms
and conditions of the exchange program within the
limitations imposed by 22 CFR 63.5(b).  Class (6)
shall be granted voluntary departure in increments
of one year until an immigrant visa is available,

AR2022_300111

FEB 26 1969

OPERATIONS INSTRUCTIONS      242.10(b)

conditioned upon continuing eligibility for section
203(a)(3) or section 203(a)(6) classification as
evidenced by the unexpired approval of the original
or subsequent petition granting such classification;
the spouse or child of such an alien shall be
granted voluntary departure to coincide with that
granted to the principal alien.  Class (7) shall be
granted voluntary departure until the American con-
sul is ready to issue an immigrant visa and may, in
the discretion of the district director, be in in-
crements of 30 days, conditioned upon continuing
availability of an immigrant visa as shown in the
latest Visa Office Bulletin and upon the alien's
diligent pursuit of efforts to obtain the visa.
Class (3) shall be granted voluntary departure in
increments of time, not to exceed one year, as de-
termined by the district director to be appropriate
in the case.  Form I-94 issued to an alien granted
voluntary departure, who is within class (5), (6),
(7), or (8) of paragraph (a) may be stamped with
the legend "EMPLOYMENT WILL NOT AFFECT IMMIGRATION
STATUS" if the alien seeks some indication from the
Service that he is entitled to be employed.

   (c)  _Selective Service_.  A male alien in classes
(5), (6), (7), and (8) of paragraph (a) who was
born on or after September 15, 1925, and is 18
years of age or over or who will become 18 during
the granted period of voluntary departure, shall be
instructed to communicate with the nearest office
of the Selective Service System for instructions
regarding registration requirements.

   (d)  _Parole authorization_.  See OI 212.5(c) for
procedure authorizing the parole of an alien in
class (6) of paragraph (a) and his spouse and chil-
dren.

   (e)  _Notification_.  The alien shall be notified
on Form I-210 (except in private bill cases or in
any other case in which voluntary departure has
been granted for more than 30 days) of the date by

Page 2867          (1-29-69)

AR2022_300112

Nov. 27, 1968

TM No. 428 continued:

OI 235.12(c) (p. 2343, amended to reflect new
stamp regarding effect of employment)

OI 238.1(c) (p. 2644, subpar. added to provide
consolidated report re TRWOV's who
failed to depart be furnished Deputy
Associate Commissioner, Travel Control,
by each region at the beginning of each
calendar year)

OI 242.10(a) (p. 2865, amended to authorize vol-
untary departure to spouse of alien
granted voluntary departure even
though spouse is subject to 2-year for-
eign-residence requirement)

OI 242.10(b) (p. 2867, amended so that spouse's or
child's grant of voluntary departure
coincides with principal alien)

OI 252.4(a) (p. 3825, 2d subpar. amended to pro-
vide disposition of photographs and
fingerprint charts relating to Soviet-
bloc crewmen)

OI 290.5(e)(3) (p. 4776.4, sentence added to
eliminate duplication of material)

INTERP 318.2(c)(1)(i), (ii), (iii) (pp. 5280.1-
.3, amended because of enactment of
Act of October 24, 1968)

INTERP 329.1(c)(1) and (8) (pp. 5529, 5534, (1)
amended and subpar. (8) deleted be-
cause of enactment of Act of October
24, 1968)

Raymond F. Farrell
Commissioner

Enclosures

- 3 -

③ 4 blank 2050

AR2022_300113

conditioned upon continuing eligibility for section
203(a)(3) or section 203(a)(6) classification as
evidenced by the unexpired approval of the original
or subsequent petition granting such classification;
the spouse or child of such an alien shall be
granted voluntary departure to coincide with that
granted to the principal alien.  Class (7) shall be
granted voluntary departure until the American con-
sul is ready to issue an immigrant visa and may, in
the discretion of the district director, be in in-
crements of 30 days, conditioned upon continuing
availability of an immigrant visa as shown in the
latest Visa Office Bulletin and upon the alien's
diligent pursuit of efforts to obtain the visa.
Class (3) shall be granted voluntary departure in
increments of time, not to exceed one year, as de-
termined by the district director to be appropriate
in the case.  Form I-94 issued to an alien granted
voluntary departure, who is within class (5), (6),
(7), or (8) of paragraph (a) may be stamped with
the legend "EMPLOYMENT WILL NOT AFFECT IMMIGRATION
STATUS" if the alien seeks some indication from the
Service that he is entitled to be employed.
(Revised)

   (c)  Selective Service.  A male alien in classes
(5), (6), (7), and (8) of paragraph (a) who was
born on or after September 15, 1925, and is 18
years of age or over or who will become 18 during
the granted period of voluntary departure, shall be
instructed to communicate with the nearest office
of the Selective Service System for instructions
regarding registration requirements.

   (d)  Parole authorization.  See OI 212.5(c) for
procedure authorizing the parole of an alien in
class (6) of paragraph (a) and his spouse and chil-
dren.

   (e)  Notification.  The alien shall be notified
on Form I-210 (except in private bill cases or in
any other case in which voluntary departure has
been granted for more than 30 days) of the date by

AR2022_300114

maintaining a full course of study at an approved
institution of learning, or upon abiding by the
terms and conditions of the exchange program within
the limitations imposed by 22 CFR 63.5(b).  Class
(6)(i) and (iii) shall be granted voluntary depar-
ture for an indefinite period until an immigrant
visa is available, conditioned upon retention of
the status established in the approved petition;
class (6)(ii) shall be granted voluntary departure
as provided for class (8).  Class (7) shall be
granted voluntary departure until the American con-
sul is ready to issue an immigrant visa and may, in
the discretion of the district director, be in in-
crements of 30 days, conditioned upon continuing
availability of an immigrant visa as shown in the
latest Visa Office Bulletin and upon the alien's
diligent pursuit of efforts to obtain the visa.
Class (8) shall be granted voluntary departure in
increments of time, not to exceed one year, as de-
termined by the district director to be appropri-
ate in the case.  Form I-94 issued to an alien
granted voluntary departure, who is within class
(5), (6), (7), or (8) of paragraph (a) may be
stamped with the legend "EMPLOYMENT AUTHORIZED" if
the alien seeks some indication from the Service
that he is entitled to be employed. (Revised)

(2)  Extension of voluntary departure time
granted by SIO or BIA.  The district director's au-
thority under 8 CFR 244.2 to extend the voluntary
departure time granted by a special inquiry officer
or the Board of Immigration Appeals generally shall
be exercised in behalf of an alien who is the par-
ent, spouse, or child of a United States citizen or
permanent resident alien if the facts in the case

AR2022_300115

(d)  <u>Notification to Selective Service</u>.  In the
case of every male alien born on or after September
15, 1925, and who has attained the age of 18, the
State Director of Selective Service shall be fur-
nished a copy of Form I-181 showing the date on
which the application was granted and the name and
address of such alien.

(e)  <u>Aliens seeking employment</u>.  Form I-94 is-
sued to a deportable alien whose departure will
not or cannot be enforced may be stamped with the
legend "EMPLOYMENT AUTHORIZED" if the alien seeks
some indication from the Service that he is en-
titled to be employed.

(f)  <u>Extension of voluntary departure time
granted by SIO or BIA</u>.  The district director's au-
thority under 8 CFR 244.2 to extend the voluntary
departure time granted by a special inquiry officer
or the Board of Immigration Appeals may be exer-
cised in behalf of an alien who is the parent,
spouse, or child of a United States citizen or per-
manent resident alien if the facts in the case war-
rant such action, or for an alien whose case falls
within the purview of OI 242.10(a)(6), (a)(7), or
(a)(8).

AR2022_300116

OPERATIONS INSTRUCTIONS

shall have each alien execute a Form SS-5, Application for Social Security Account Number. See OI 245.6(a)(4) for instructions regarding endorsement to be made on Form SS-5 (which shall be made by such employee) and disposition of that form.

(d) Form I-357. Form I-357 shall be delivered to every alien who has been granted suspension of deportation. The date of delivery of Form I-357 shall be entered in the designated space on the record copy of Form I-181.

(e) Selective Service registration notice. In the case of every male alien between the ages of 18 and 26 years, and in the case of every male alien between the ages of 18 and 35 years who has a degree in a medical, dental, or allied specialist category, execute and mail Form I-59 to the State Director of Selective Service with a copy of Form I-181 showing the date on which the application was granted.

244.3 Aliens seeking employment. Form I-94 issued to a deportable alien whose departure will not or cannot be enforced may be stamped with the legend "EMPLOYMENT AUTHORIZED" if the alien seeks some indication from the Service that he is entitled to be employed. (Redesignated; formerly OI 244.2(f))

244.4 Extension of voluntary departure time granted by SIO or BIA. The district director's authority under 8 CFR 244.2 to extend the voluntary departure time granted by a special inquiry officer or the Board of Immigration Appeals may be exercised in behalf of an alien who is the spouse or child of a United States citizen, or who is the parent of an adult United States citizen, or who is within the purview of OI 242.10(a)(6) or (8). (Redesignated; formerly OI 244.2(g))

AR2022_300117

CO 241.11-P

TO      : Commissioner

DATE: 15 JUL 1976

FROM  : Sam Bernsen
        General Counsel

SUBJECT: Legal Opinion Regarding Service Exercise of Prosecutorial Discretion

You have asked for my opinion regarding the authority of the Service to exercise prosecutorial discretion in administrative proceedings arising under the Immigration and Nationality Act. You have also asked for my opinion regarding the appropriate   time and manner for the exercise of such discretion.

Prosecutorial discretion refers to the power of a law enforcement official to decide whether or not to commence or proceed with action against a possible law violator. See generally, K. Davis, Administrative Law Treatise, 1970 Supp., §4.08, at 188. This power is not restricted to those termed prosecutors, but is also exercised by others with law enforcement functions such as police and officials of various administrative agencies. 1/    The power extends to both civil and criminal cases. 38 Op. Att'y Gen. 98, 102 (1934)

The reasons for the exercise of prosecutorial discretion are both practical and humanitarian. There simply are not enough resources to enforce all of the rules and regulations presently on the books. As a practical matter, therefore, law enforcement officials have to make policy choices as to the most effective and desirable way in which to deploy their limited resources. Thus, for example, police and prosecutors may choose to concentrate on apprehension and prosecution of perpetrators of violent crimes, while choosing not to proceed against those committing so-called "victimless crimes," such as certain consensual sex acts and possession of small amounts of marihuana. In addition, there are times when defects in the quality, quantity, or method of gathering evidence will make it difficult to prove the matter before a court.

Aside from purely practical considerations, it is also obvious that in enacting a statute the legislature cannot possibly contemplate all of the possible circumstances in which the statute may be applied. In some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose. For instance, a prosecutor may well decide not to proceed against a terminally ill individual, even in the presence of overwhelming evidence of guilt.

1/  See e.g., NLRB v. Sears. 386 U.S. 471, 187 (1967) (General Counsel of NLRB has unreviewable discretion to refuse to institute unfair labor practice complaint).



*Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan*



-2-

### General Authority of Executive Branch

The ultimate source for the exercise of prosecutorial discretion in the Federal Government is the power of the President. Under Article II, Section 1 of the Constitution, the executive power is vested in the President. Article II, Section 3, states that the President "shall take care that the laws be faithfully executed."

Most discussions of the exercise of prosecutorial discretion on the federal level center on the Attorney General, since he is the chief legal officer of the Federal Government. Nevertheless, prosecutorial discretion is also exercised by a wide variety of other government officials with law-enforcement responsibilities. 2/

The Attorney General has the authority "to determine when the United States shall sue, to decide for what it shall sue, and to be responsible that such suits shall be brought in appropriate cases." U.S. v. San Jacinto Tin Co., 125 U.S. 273, 279 (1888). The power of the Attorney General to exercise his prosecutorial discretion does not end with the entry of judgment, but also embraces execution of the judgment. U.S. v. Morris, 23 U.S. (10 Wheat.) 246 (1825); 38 Op. Att'y Gen. 98, 102 (1934).

In a 1934 opinion, Attorney General Cummings pointed to three sources for the Attorney General's exercise of prosecutorial discretion: (1) inherent authority, (2) court decisions, and (3) various statutory enactments. 38 Op. Att'y Gen. 98 (1934). 3/

The inherent authority can be traced to the common law, where a prosecuting attorney had authority to terminate a suit at any time. See Confiscation Cases, 74 U.S. (7 Wall.) 454 (1868). As Attorney General Taney stated in 2 Op. Att'y Gen. 482, 486 (1831):

> An attorney conducting a suit for a party has, in the absence of that party, a right to discontinue it whenever, in his judgment, the interest of his client requires it to be done. If he abuses this power, he is liable to the client whom he injures.... An attorney of the United States, except in so far as his power may be restrained by particular acts of Congress, has the same authority and control over the suits which he is conducting.

---

2/ Id.

3/ See also 2 Op. Att'y Gen. 482, 486 (1831); 22 Op. Att'y Gen. 491, 494 (1899); 23 Op. Att'y Gen. 507, 508-09 (1901). See generally Schwartz, Federal Criminal Jurisdiction and Prosecutors Discretion, 13 Law & Contemp. Prob. 64 (1948).

AR2022_300119

-3-

Numerous Supreme Court decisions have confirmed the power of the Attorney General to exercise his discretion in the institution, control, and settlement of suits in behalf of the United States. See e.g., Confiscation Cases, supra; U.S. v. San Jacinto Tin Co., supra; U.S. v. Throckmorton, 98 U.S. 61, 70 (1878); In re Neagle, 135 U.S. 1, 67 (1890); New York v. New Jersey, 256 U.S. 296, 308 (1921); Kern River Co. v. U.S., 257 U.S. 147, 155 (1921); Ponzi v. Fessenden, 258 U.S. 254, 262 (1922); Petite v. U.S., 361 U.S. 529 (1960). 4/

There is also a long line of lower court cases recognizing this authority. See e.g., U.S. v. Alessio, 528 F.2d 1079 (9 Cir. 1976); U.S. v. Cawley, 481 F.2d 702 (5 Cir. 1973); Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 379 (2 Cir. 1973); U.S. v. Kysar, 459 F.2d 422, 424 (10 Cir. 1972); Spillman v. U.S., 413 F.2d 527, 530 (9 Cir. 1969); Newman v. U.S., 382 F.2d 479 (D.C. Cir. 1967); U.S. v. Cox, 342 F.2d 167 (5 Cir. 1965), cert. denied, Cox v. Hauberg, 381 U.S. 935 (1965); Goldberg v. Hoffman, 225 F.2d 463 (7 Cir. 1955); District of Columbia v. Buckley, 128 F.2d 17, 20–21 (D.C. Cir. 1942); Pugach v. Klein, 193 F. Supp. 630, 635 (S.D.N.Y. 1961); U.S. v. Woody, 2 F.2d 263 (D. Mont. 1924).

A final source for the Attorney General's authority to exercise prosecutorial discretion can be found in the various statutes creating his office and conferring upon him the power to supervise and conduct the litigation and other legal affairs of the United States. 28 U.S.C. §§515-519, 547; Judiciary Act of 1789, Ch. 20, §35, 1 Stat. 92; Act of June 22, 1870, Ch. 150, 16 Stat. 162.

Most of the aforementioned federal cases dealing with prosecutorial discretion state that the power of the executive authorities is plenary and may not be reviewed by the judiciary. Nevertheless, dicta in several court decisions has indicated that selective prosecution based upon certain suspect classifications may violate the Constitution. 5/ Courts have also indicated that they will not tolerate an arbitrary exercise of prosecutorial discretion by an ad-

---

4/ See also Oyler v. Boles, 368 U.S. 448 (1962) (selective prosecution by state authorities not a violation of constitutional rights where not based upon unjustifiable standard); Linda R.S. v. Richard D., 410 U.S. 614 (1973) (private party has no standing to compel prosecution by state authorities).

5/ Oyler v. Boles, supra at note 4 (selection not based on unjustifiable standard such as race, religion, or other arbitrary classification); Nader v. Saxbe, 497 F.2d 676, 679 n. 19 (D.C. Cir. 1974) (exercise of prosecutorial discretion, like any other exercise of executive discretion, subject to statutory and constitutional limits enforceable through judicial review); U.S. v. Sacco, 428 F.2d 264, 271 (9 Cir. 1970), cert. denied, 400 U.S. 903 (1970) (selective prosecution not a constitutional violation where no allegation that it was based on constitutionally suspect classification).

-4-

ministrative agency. 6/

### Prosecutorial Discretion in Immigration Cases

It has been pointed out that prosecutorial discretion may be exercised in administrative, as well as criminal contexts. 7/ One of the earliest manifestations of prosecutorial discretion in an immigration-related field is Department of Justice Circular Letter Number 107, dated September 20, 1909, dealing with the institution of proceedings to cancel naturalization. That letter states:

> In the opinion of the department, as a general rule, good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.

This policy still governs denaturalization cases. See Interp. 340.1(f).

The Attorney General has exercised prosecutorial discretion in the immigration area in the cases of aliens deportable under §241(a)(4) of the Immigration and Nationality Act who are eligible to receive state court expungements at a future date. In a letter to the Commissioner of Immigration, dated January 17, 1961, Attorney General Rogers stated that the Service should "withhold or terminate proceedings under section 241(a)(4) of the Immigration and Nationality Act in the cases of youthful offenders who are eligible for an honorable discharge from the control of the California Youth Authority."

---

6/ Moog Industries, Inc. v. F.T.C., 355 U.S. 411 (1958) and F.T.C. v. Universal Rundle Corp., 387 U.S. 244, 251 (1967) (FTC does not have unbridled power to institute proceedings that will arbitrarily destroy one of many law violators in an industry); Lennon v. INS, 527 F.2d 187, 195 (2 Cir. 1975) (dictum) (courts will not condone selective prosecution based upon secret political grounds); Lennon v. United States, 387 F. Supp. 651, 564 (S.D.N.Y. 1975) (Government cannot institute deportation proceedings solely as penalty for exercise of constitutional rights). See also U.S. v. Berrios, 501 F.2d 1207, 1209 (2 Cir. 1974). See generally K. Davis, Administrative Law Treatise §28.16, at 982 (1958); Note, Reviewability of Prosecutorial Discretion: Failure to Prosecute, 75 Colum. L. Rev. 130 (1975).

7/ See e.g., Vaca v. Sipes, supra note 1. See also Bachowski v. Brennan, 502 F.2d 79, 87 (3 Cir. 1974), reversed on other grounds, Dunlop v. Bachowski, 421 U.S. 560 (1975), where the court stated that prosecutorial discretion could be exercised in administrative contexts, "which, like criminal prosecutions, involve the vindication of societal or governmental interest, rather than the protection of individual rights,"

AR2022_300121

-5-

Numerous administrative decisions have affirmed the power of Service officers to exercise prosecutorial discretion. For instance, in <u>Matter of Vizcarra-Delgadillo</u>, 13 I&N Dec. 51, 53 (BIA 1968), the Board of Immigration Appeals upheld the authority of the District Director to move that proceedings be terminated as improvidently begun. The Board commented on the nature of the District Director's authority:

> Those charged with responsibility for enforcing the criminal laws have prosecutive discretion in determining whether to initiate criminal prosecution in a given case. A similar discretion not to proceed in a given case must be accorded to those responsible for immigration law enforcement. And where, following the formal start of deportation proceedings, additional facts or policy considera- tions arise which lead those responsible to conclude that this is not the sort of case in which such proceedings should have been started in the first place, 8 CFR 242.7 wisely provides the mechanics for termination on the ground that the proceeding was "improvidently begun." (Footnotes omitted)

Another case, <u>Matter of Andrade</u>, I.D. 2276 (BIA 1964), dealt with a minor who had been convicted of a marihuana violation which was expunged under a state law comparable to the Federal Youth Corrections Act. An order of deportation was initially entered. Thereafter, however, in connection with a petition for certiorari filed in the United States Supreme Court, the Solicitor General urged the Service to reconsider its policy with respect to such expungements and to administratively set aside the order of deportation. In response to this suggestion, the Service moved for termination of the deportation pro- ceedings. The Board granted the Service's motion stating that, "the Service's determination not to initiate or press deportation proceedings in a given case or class of cases is a matter of prosecutorial judgment which we do not review."

Many other administrative decisions recognize and affirm the Service's power to exercise prosecutorial discretion. See e.g., <u>Matter of Geronimo</u>, 13 I&N Dec. 680 (BIA 1971); <u>Matter of Wong</u>, 13 I&N Dec. 701 (BIA 1971); <u>Matter of Gallares</u>, I.D. 2177 (BIA 1972); <u>Matter of Marced</u>, I.D. 2273 (BIA 1974), aff'd per curiam <u>Merced v. INS</u>, 514 F.2d 1070 (5 Cir. 1975); <u>Matter of Lennon</u>, I.D. 2304 (BIA 1974), rev'd on other grounds, <u>Lennon v. INS</u>, 527 F.2d 187 (2 Cir. 1975). See also <u>Matter of Anaya</u>, I.D. 2243 (BIA 1973), aff'd per curiam, <u>Anaya v. INS</u>, 500 F.2d 574 (5 Cir. 1974); <u>Matter of Felix</u>, I.D. 2149 (BIA 1972). See also Roberts, <u>The Exercise of Administrative Discretion Under the Immigration Laws</u>, 13 San Diego L. Rev. 144, 149-52 (1975).

The Service's power to exercise prosecutorial discretion is inherent in the nature of its enforcement function and does not depend upon any specific pro- vision of the Immigration and Nationality Act. The Service has nevertheless promulgated regulations and operations instructions dealing with the exercise of prosecutorial discretion.

AR2022_500122

-6-

8 CFR 242.7(a) sets forth the authority of the District Director to cancel or move for cancellation of deportation proceedings if "he is satisfied that the respondent is actually a national of the United States, or is not deportable under the immigration laws, or is deceased, or is not in the United States, or that the proceeding was improvidently begun." (underscoring supplied).

It is obvious that the "improvidently begun" ground is in addition to the "not deportable" ground and includes individuals who are deportable, but whose departure the Service, for policy or humanitarian reasons, does not choose to enforce. Operations Instruction 103.1(c)(ii) lists various factors to be considered in determining whether to place an alien in the "deferred action" (formerly "nonpriority") category, meaning that deportation proceedings will not be instituted or continued against the alien. 8/

In addition to the discretion not to institute deportation proceedings, prosecutorial discretion may be exercised in connection with various other discretionary remedies, such as voluntary departure, 9/ and stays of deportation. 10/

Courts have acknowledged that a determination whether or not to enforce a deportable alien's departure in a particular case is normally within the sound discretion of the Service officer having responsibility over the case. See e.g., Balanos v. Kiley, 509 F.2d 1023 (2 Cir. 1975); Vassiliou v. INS, 461 F.2d 1193 (10 Cir. 1972); Spata v. INS, 442 F.2d 1013 (2 Cir. 1971), cert. denied, 404 U.S. 857 (1971); Armstrong v. INS, 445 F.2d 1395 (9 Cir. 1971); Bowes v. District Director, 443 F.2d 30 (9 Cir. 1971); Manantan v. INS, 425 F.2d 693 (7 Cir. 1970); Discaya v. INS, 339 F. Supp. 1034 (N.D. Ill. 1972). See also Pignatello v. Attorney General, 350 F.2d 719, 725 (2 Cir. 1965). However, in Lennon v. U.S., 387 F. Supp. 561 (S.D.N.Y. 1975), the court indicated that a claim of selective deportation presents a proper issue for judicial review, and in Lennon v. INS, 527 F.2d 187, 195 (2 Cir. 1975), the court indicated in dictum that selective deportation based on political motives will not be tolerated. See also Lennon v. Richardson, 378 F. Supp. 39 (S.D.N.Y. 1974).

In Vergel v. INS, _____ F.2d _____, Civ. No. 75-1526 (8 Cir. June 2, 1976), the court sustained an order of deportation, but noted that there was a substantial

8/ See also Wildes, The Nonpriority Program of the Immigration and Naturalization Service - A Measure of the Attorney General's Concern for Aliens, (two parts) 53 Interpreter Releases 25, 33 (1976).

9/ 8 CFR 244.1, 244.2. See Matter of Anaya, I.D. 2243 (BIA 1973), aff'd per curiam, 500 F.2d 574 (5 Cir. 1974); Matter of Felix, I.D. 2149 (BIA 1972)

10/ 8 CFR 243.4.

-7-

basis for allowing the alien to remain in the United States in the "deferred action category" under O.I. 103.1(a)(j)(ii). The court stated that it would be "appropriate for the District Director to make further inquiry to that end," and stayed its mandate for 90 days in order to allow the District Director to consider the alien's claim.

In several other cases, courts have upheld deportation orders while suggesting that the Service might appropriately exercise prosecutorial discretion to stay execution of the orders. See e.g., U.S. v. McAlister, 395 F.2d 852 (3 Cir. 1968); 11/ Liegzi v. INS, Civ. No. 75-1393 (7 Cir. January 27, 1976), reversing 389 F. Supp. 12 (N.D. Ill. 1975); 12/ Dunn v. INS, Civ. No. 72-2186 (9 Cir. February 20, 1974), cert. denied 419 U.S. 919 (1974). 13/

### Proper Time for Exercise

Normally the appropriate time for the exercise of prosecutorial discretion is prior to the institution of proceedings. The primary reason for this is the humanitarian factor; it makes little sense to put an alien through the ordeal and expense of a deportation proceeding when his actual removal will not be sought.

In addition, there are practical considerations. Deportation proceedings tie up Government manpower and resources that could be used in performing other important functions. Given the present illegal alien problem such a use of scarce resources on aliens whom the Service does not ultimately intend to deport is indefensible. Moreover, once a final administrative order of deportation is issued, the Service cannot prevent the alien from seeking judicial review. When a case with extremely appealing factors goes to court, it may place the Service in an unfavorable light, both before the court and in the forum of public opinion.

There are some situations, however, where prosecutorial discretion is properly exercised after the institution or completion of deportation proceedings. The sympathetic or humanitarian factors may not arise or become apparent until after the case has been started. In other cases involving aliens who may have committed serious offenses but are allowed to remain on the representation that

---

11/ "Therefore, we think it would be appropriate for the Department to make further inquiry to the end that, if justified, appellant's deportation at least be stayed during his good behavior."

12/ "We agree...that this is a hardship case. Therefore the Government should afford petitioner any administrative remedy that may still be available...."

13/ "While this is a case in which the administrative discretion of the INS might have been exercised with greater compassion the scope of our review in this area is extremely narrow."

-8-

they are the sole support of United States citizen families, it may be desirable to have a final order of deportation outstanding for immediate execution in the event of any further misconduct.

### Conclusion

The power of various officers of the Executive Branch to exercise prosecutorial discretion is inherent and does not depend on express statutory authorization. Officers of the Service have been recognized as possessing such power, and provision for its exercise has been made in both the regulations and the operations instructions.

Although there is authority for the plenary nature of prosecutorial discretion, the trend, especially in administrative contexts, is towards judicial review of prosecutorial discretion to ascertain that it is not being exercised in a way that would be constitutionally suspect or grossly unfair. Consequently, the Service's attempts to set forth some standards for the exercise of prosecutorial discretion are particularly appropriate.

Finally, prosecutorial discretion may be exercised before, during, or after the completion of deportation proceedings. Normally, however, such discretion is best exercised prior to the institution of proceedings.

CC:   W/F - Opinions of the General Counsel, 1976

CC:   CO 840-F

PWS:snb

JANUARY 2021

# Population Estimates

# Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018

**BRYAN BAKER**

## INTRODUCTION

This report presents estimates of the size of the unauthorized immigrant population residing in the United States on January 1 each year from 2015 through 2018. The results are tabulated according to available demographic characteristics, including period of entry, country of origin, state of residence, age, and sex. As in previous editions, the estimates were calculated using the residual method in which the unauthorized population is the remainder (or residual) after the legally-resident, foreign-born population—naturalized citizens, lawful permanent residents (LPRs), asylees, refugees, and certain nonimmigrants—is subtracted from the total foreign-born population.[1] The legally-resident subpopulation was estimated primarily based on the Department of Homeland Security's (DHS) administrative records and modeled components of population change (such as emigration and mortality), and the total foreign-born population estimate was derived from the American Community Survey (ACS) of the U.S. Census Bureau with adjustments for undercount and the choice of reference date. The population must be estimated because there is no nationally representative survey or census that includes information on the legal status of foreign-born residents.

In summary, DHS estimates that 11.4 million unauthorized immigrants were living in the United States on January 1, 2018, roughly unchanged from 11.4 million on January 1, 2015.[2] Slightly fewer than 50 percent of the unauthorized immigrants in 2018 were from Mexico, compared to nearly 55 percent in 2015. About 15 percent entered since January of 2010 and 40 percent reside in California or Texas.

---

[1] Previous editions of this report are available at: https://www.dhs.gov/immigration-statistics. Although the method in this report is very similar to that used in earlier editions, the current report includes several minor methodological updates that are discussed in the appendix.

[2] The previous edition of this report estimated 12.0 million unauthorized immigrants as of January 2015; the updated estimate reflects minor methodological changes implemented with the current report.

## DEFINITIONS

### Legal Residents

The legally-resident, foreign-born population, as defined for these estimates, includes naturalized citizens, persons granted lawful permanent residence, persons granted asylum, persons admitted as refugees, and persons admitted as resident nonimmigrants (i.e., students and temporary workers, as opposed to tourists) who have unexpired authorized periods of admission.

### Unauthorized Immigrants

The resident unauthorized immigrant population is defined as all foreign-born non-citizens who are not legal residents as defined above. Most unauthorized immigrants either entered the United States without inspection or were admitted temporarily and remained past the date they were required to depart. Persons who are beneficiaries of Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA) or other forms of prosecutorial discretion, or who are residing in the United States while awaiting removal proceedings in immigration court are included among the estimates of the unauthorized population. Unauthorized immigrants applying for adjustment to LPR status under the Immigration and Nationality Act (INA) are considered to be part of the resident unauthorized population until they have been granted lawful permanent residence.

## METHODOLOGY OVERVIEW AND DATA

This report estimates two populations to derive the unauthorized immigrant population estimate: 1) the total foreign-born population living in the United States on January 1 of each year 2015-2018, and 2) the legally-resident, foreign-born population on the same dates. The unauthorized immigrant population estimate is the residual when the second population is subtracted from the first population.



Data on the total foreign-born population that entered during 1980−2017 by country of birth, state of residence, year of entry, age, and sex were obtained from the 2017 ACS.[3] The ACS is a nationwide sample survey that collects information from U.S. households on social, demographic, and economic characteristics, including country of birth and year of entry of the foreign-born population.[4] Foreign-born residents who entered the United States prior to 1980 are assumed to be legally resident and are therefore excluded from the estimate.[5]

Data for several subsets of the legally-resident, foreign-born population are derived from DHS and other administrative records. DHS administrative records in a U.S. Citizenship and Immigration Services (USCIS) application case tracking system include data on persons who obtained LPR status or naturalized. Department of State records include data on refugee arrivals. USCIS and the Department of Justice Executive Office for Immigration Review maintain records of persons granted asylum affirmatively or defensively. And I-94 arrival-departure records in the U.S. Customs and Border Protection

(CBP) TECS database includes data on nonimmigrant arrivals and departures. Each of these systems includes information on subjects' country of birth or nationality, state of residence, age, sex, category of admission, and year of entry.

The Department generates its estimate of the unauthorized population by subtracting the legally-resident, foreign-born population from the total foreign-born population. The demographic data in the ACS survey and administrative records allows the Department to generate estimates for the 10 leading countries of birth and states of residence and to disaggregate the estimate by age and sex.

**FINDINGS**

Figure 1 depicts the Department's estimates of unauthorized population for 2000 and annual estimates for 2005-2015. Readers should exercise caution when describing changes in these estimates over time because some year-to-year variation may reflect sampling error in the ACS and/or non-sampling error in the estimation method (see Appendix), and the Department does not have a methodology to evaluate the statistical significance of these fluctuations. Longer-term trends are also difficult to interpret because of two disjunctures in the data series: estimates for 2000-2010 are based on ACS data tied to the 2000 Census, while estimates for 2010-2018 are based on ACS data tied to the 2010 Census; and estimates for 2015-2018 incorporate minor updates to improve upon the methodology employed in previous years. For each of these break points (2010 and 2015), the figure depicts estimates generated under earlier and later data sources/assumptions.

---

[3] See Appendix 1 for more detailed information on each component of the estimation process.

[4] The Department uses the ACS to build its estimates because of its large sample size: about three million households per year, compared to about 100,000 annually for the Current Population Survey, which is the primary alternative source of national data on the foreign-born population.

[5] The vast majority of otherwise-unauthorized immigrants who entered the United States prior to 1980 and who still reside in the country likely obtained lawful status prior to 2015 under either Section 249 of the INA, which allows qualified persons who have resided continuously in the United States since prior to January 1, 1972 to apply for LPR status under the so-called registry provision, or under the Immigration Reform and Control Act (IRCA) of 1986 (Pub. L. No. 99-603, 100 Stat. 3359 (1986)), which allows qualified persons who had resided continuously in the United States since prior to January 1, 1982 to adjust to lawful status.



**Figure 1.**

**Estimated Unauthorized Immigrant Population: 2000-2018**

Millions

| Year | Value |
|------|-------|
| 2000 | 8.5 |
| 2005 | 10.5 |
| 2006 | 11.3 |
| 2007 | 11.8 |
| 2008 | 11.6 |
| 2009 | 10.8 |
| 2010 | 10.8 |
| 2010 | 11.6 |
| 2011 | 11.5 |
| 2012 | 11.4 |
| 2013 | 11.2 |
| 2014 | 11.5 |
| 2015 | 12.0 |
| 2015 | 11.4 |
| 2016 | 11.8 |
| 2017 | 11.4 |
| 2018 | 11.4 |

- Based on the 2000 Census
- Based on the 2010 Census
- Based on the 2010 Census (updated method)

Source: U.S. Department of Homeland Security.

## Period of Entry

The subset of the unauthorized population that arrived since 2010 added an average of 310,000 people each year from 2015-2018, reflecting continued illegal arrivals and non-immigrant overstays during this period (see Table 1 and Figure 2). Nonetheless, the overall size of the unauthorized population remained roughly unchanged throughout this period because new inflows since 2010 were offset by attrition due to mortality, emigration and repatriation, and changes in status in the subsets of the population arriving before 2010.[6]

---

[6]  The total estimate is roughly unchanged for 2015-2018 but includes a "spike" from 11.4 to 11.8 million in 2016. This spike is driven by a similar increase in the ACS foreign-born estimate that does not persist into 2017-2018.

**Table 1.**

### Estimated Unauthorized Immigrant Population by Period of Entry: 2015-2018

| Period of entry | 2015 | 2016 | 2017 | 2018 |
|---|---:|---:|---:|---:|
| Total . . . . . . . . . . . . . . . | 11,440,000 | 11,750,000 | 11,410,000 | 11,390,000 |
| 1980-1990 . . . . . . . . . . . . | 1,710,000 | 1,640,000 | 1,540,000 | 1,560,000 |
| 1990-1999 . . . . . . . . . . . . | 4,180,000 | 4,090,000 | 3,820,000 | 3,820,000 |
| 2000-2009 . . . . . . . . . . . . | 4,710,000 | 4,710,000 | 4,490,000 | 4,230,000 |
| 2010 or later . . . . . . . . . . . | 840,000 | 1,310,000 | 1,420,000 | 1,770,000 |

Note: Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.



**Figure 2.**

**Estimated Unauthorized Immigrant Population by Period of Entry: 2015-2018**

Millions

Source: U.S. Department of Homeland Security.

### Estimates by Country of Birth

Mexico continued to account for the largest share of the unauthorized population, with an estimated 5.42 million people from Mexico representing nearly 50 percent of the total unauthorized population in 2018 (see Table 2).[7] The next five leading countries included the three Northern Triangle countries of El Salvador (730,000 people), Guatemala (620,000), and Honduras (450,000), along with India (540,000) and the People's Republic of China (China) (410,000)—together accounting for just under an additional 25 percent of the total unauthorized population in 2018. The Philippines, Colombia, Brazil, and Venezuela rounded out the top 10 in 2018, with South Korea, Vietnam, and Ecuador falling out of the top 10 list from the previous edition of this report (Baker, 2018).[8]

While year-to-year fluctuations should be interpreted with caution, the 4-year trends in Table 2 suggest notable differences during this recent time-period among these countries. As in the previous edition of this report, the Mexican unauthorized population continued to decline, dropping by an average of 260,000 people per year in 2015-2018. The unauthorized populations from India and China increased by about 30,000 per year on average from 2015 to 2018, with this apparent growth occurring in 2015-2016. The populations from Colombia, Brazil, and Venezuela increased markedly; Colombia increased by more than 50 percent, Brazil by nearly 100 percent, and Venezuela by nearly 150 percent and the populations from the Northern Triangle countries increased by an average of 5,000-10,000 per year.[9] All of these average changes represent net amounts—meaning attrition from emigration, repatriation, and mortality—exceeded new inflows in the case of Mexicans, but new inflows exceeded attrition in the cases of the Asian, Northern Triangle, and South American countries.

---

[7] Throughout this report, percentages and percent change were calculated prior to rounding.

[8] The vast majority of the Cuban-born population living in the United States is excluded from the population estimate since most Cubans who were admitted or paroled into the United States prior to January 2017 were eligible to apply to adjust to LPR status 1 year after entry. Cubans who entered after the wet-foot/dry-foot policy was discontinued in January 2017 are included in the estimate.

[9] These data should be interpreted with some caution as DHS enforcement data suggest more modest growth during this period for Venezuela and somewhat faster growth for Northern Triangle countries (see Appendix 1).

**Table 2.**

### Estimated Unauthorized Immigrant Population by Top 10 Countries of Birth: 2015-2018

| Country of Birth | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Total . . . . . . . . . . . . . . . . . | 11,440,000 | 11,750,000 | 11,410,000 | 11,390,000 |
| Mexico . . . . . . . . . . . . . . . . | 6,200,000 | 5,970,000 | 5,860,000 | 5,420,000 |
| El Salvador . . . . . . . . . . . . . | 720,000 | 750,000 | 750,000 | 730,000 |
| Guatemala. . . . . . . . . . . . . . | 600,000 | 610,000 | 610,000 | 620,000 |
| India . . . . . . . . . . . . . . . . . . | 450,000 | 560,000 | 490,000 | 540,000 |
| Honduras. . . . . . . . . . . . . . . | 420,000 | 430,000 | 500,000 | 450,000 |
| China, People's Republic. . . . | 320,000 | 420,000 | 410,000 | 410,000 |
| Philippines. . . . . . . . . . . . . . | 350,000 | 410,000 | 300,000 | 370,000 |
| Colombia. . . . . . . . . . . . . . . | 130,000 | 140,000 | 130,000 | 210,000 |
| Brazil. . . . . . . . . . . . . . . . . . | 100,000 | 110,000 | 150,000 | 200,000 |
| Venezuela . . . . . . . . . . . . . . | 80,000 | 100,000 | 120,000 | 190,000 |
| All other countries . . . . . . . . | 2,080,000 | 2,260,000 | 2,090,000 | 2,260,000 |

Note: Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

### Estimates by State of Residence

California and Texas remained the leading states of residence of the unauthorized population in 2018, with 2.6 million and 1.9 million people respectively, 40 percent of the total number (see Table 3). The next leading states were Florida (660,000), New York (520,000), Illinois (450,000), and New Jersey (460,000). The 10 leading states represented 70 percent of the unauthorized population in 2018. The unauthorized population fell by about 100,000 (17 percent) in New York from 2015 to 2018 and grew by 110,000 (about 20 percent) in Florida.

**Table 3.**

**Estimated Unauthorized Immigrant Population by Top States of Residence: 2015-2018**

| State | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Total . . . . . . . . . . . . . . . | 11,440,000 | 11,750,000 | 11,410,000 | 11,390,000 |
| California. . . . . . . . . . . . . . | 2,760,000 | 2,860,000 | 2,790,000 | 2,610,000 |
| Texas . . . . . . . . . . . . . . . . | 1,860,000 | 1,910,000 | 1,870,000 | 1,940,000 |
| Florida. . . . . . . . . . . . . . . . | 540,000 | 610,000 | 610,000 | 660,000 |
| New York . . . . . . . . . . . . . . | 630,000 | 630,000 | 620,000 | 520,000 |
| New Jersey . . . . . . . . . . . . | 420,000 | 420,000 | 450,000 | 460,000 |
| Illinois . . . . . . . . . . . . . . . . | 440,000 | 520,000 | 440,000 | 450,000 |
| Georgia . . . . . . . . . . . . . . . | 370,000 | 400,000 | 400,000 | 380,000 |
| North Carolina . . . . . . . . . . | 370,000 | 360,000 | 320,000 | 350,000 |
| Arizona . . . . . . . . . . . . . . . | 360,000 | 330,000 | 340,000 | 330,000 |
| Washington . . . . . . . . . . . . | 260,000 | 280,000 | 280,000 | 290,000 |
| All other states . . . . . . . . . . | 3,420,000 | 3,430,000 | 3,300,000 | 3,390,000 |

Note: Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

Nearly 60 percent of unauthorized immigrants were ages 25 to 44 years in 2018 (see Figure 4 and Table 4). Males accounted for 54 percent of the population in the 18 to 34 age group, while females accounted for 59 percent of the 55 and older age groups.

### Estimates by Age and Sex



**Figure 3.**

**Estimated Unauthorized Immigrant Population by Age and Sex: 2015-2018**

Source: U.S. Department of Homeland Security.

AR2022_300130

**Table 4.**

Estimated Unauthorized Immigrant Population by Age and Sex: 2015-2018

| Age (In years) and sex | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| **Males and Females** | | | | |
| Total . . . . . . . . . . . . . . | 11,440,000 | 11,750,000 | 11,410,000 | 11,390,000 |
| Under 18. . . . . . . . . . . . | 1,130,000 | 1,040,000 | 1,080,000 | 1,120,000 |
| 18 to 24 . . . . . . . . . . . . | 1,180,000 | 1,080,000 | 960,000 | 840,000 |
| 25 to 34 . . . . . . . . . . . . | 3,500,000 | 3,400,000 | 3,130,000 | 2,940,000 |
| 35 to 44 . . . . . . . . . . . . | 3,440,000 | 3,670,000 | 3,600,000 | 3,630,000 |
| 45 to 54 . . . . . . . . . . . . | 1,620,000 | 1,800,000 | 1,900,000 | 1,990,000 |
| 55 and over . . . . . . . . . . | 560,000 | 770,000 | 750,000 | 860,000 |
| **Male** | | | | |
| Total . . . . . . . . . . . . . . | 6,020,000 | 6,140,000 | 5,930,000 | 5,850,000 |
| Under 18. . . . . . . . . . . . | 600,000 | 540,000 | 550,000 | 580,000 |
| 18 to 24 . . . . . . . . . . . . | 680,000 | 600,000 | 530,000 | 460,000 |
| 25 to 34 . . . . . . . . . . . . | 1,960,000 | 1,880,000 | 1,720,000 | 1,590,000 |
| 35 to 44 . . . . . . . . . . . . | 1,800,000 | 1,940,000 | 1,890,000 | 1,870,000 |
| 45 to 54 . . . . . . . . . . . . | 780,000 | 880,000 | 930,000 | 1,000,000 |
| 55 and over . . . . . . . . . . | 190,000 | 310,000 | 300,000 | 350,000 |
| **Female** | | | | |
| Total . . . . . . . . . . . . . . | 5,420,000 | 5,610,000 | 5,490,000 | 5,540,000 |
| Under 18. . . . . . . . . . . . | 540,000 | 500,000 | 530,000 | 540,000 |
| 18 to 24 . . . . . . . . . . . . | 490,000 | 480,000 | 430,000 | 380,000 |
| 25 to 34 . . . . . . . . . . . . | 1,540,000 | 1,520,000 | 1,410,000 | 1,350,000 |
| 35 to 44 . . . . . . . . . . . . | 1,640,000 | 1,730,000 | 1,710,000 | 1,760,000 |
| 45 to 54 . . . . . . . . . . . . | 850,000 | 930,000 | 970,000 | 990,000 |
| 55 and over . . . . . . . . . . | 370,000 | 460,000 | 440,000 | 510,000 |

Note: Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

DHS Office of Immigration Statistics

**AR2022_300131**

## ALTERNATIVE ESTIMATES

### Residual Estimates

The Pew Research Center and the Center for Migration Studies (CMS) also estimate the unauthorized immigrant population using the residual method (Passel and Cohn, 2018, Warren, 2019). The DHS, Pew, and CMS estimates are generally similar, but key differences in methodological details (e.g., assumptions about undercount and emigration) mean the estimates are not identical. Some of these methodological differences are described below:

- *Survey undercount.* The residual model estimates the total foreign-born population based on U.S. Census data, but the Census is believed to under-count the foreign-born population—and particularly the unauthorized immigrant population—at higher rates than the native-born population. The exact degree of the undercount and how it may differ with time spent in the United States and for different sub-groups is unknown and must be estimated or modeled.

- *Emigration modeling.* The residual method uses estimates of the lawful permanent resident population which are based on previous immigration inflows, adjusted for mortality and return migration (i.e., lawful immigrants who depart the United States). Mortality rates can be estimated with precision based on standard demographic tables, but similar tables do not exist for emigration rates.

- *Methods for estimating the nonimmigrant, refugee, and asylee populations.* The Office of Immigration Statistics estimates nonimmigrants, refugees, and asylees based on previous admissions data, controlling for estimated deaths and outflows. Pew and CMS identify these populations based on their expected characteristics in Census data. These methodological differences affect the estimated size of the legally-resident population and therefore have an influence on the estimated size of the unauthorized population.

- *Techniques used to control for entry-year heaping in the ACS.* Census data on the foreign-born population indicate an unexpectedly large number of immigrants who report entering the United States in 1980 (along with other round-numbered years) relative to surrounding years ("heaping" on 1980). Unauthorized immigrants who entered prior to 1980 are assumed to have legalized through the Immigration Reform and Control Act, so how analysts control for this heaping effect has an impact on the resulting population estimate.

- *Base populations used in the residual method.* The residual method used by DHS starts with all foreign-born persons and subtracts off all legally-resident, foreign-born persons. One alternative would be to start with foreign-born noncitizens and subtract off all legally-resident, foreign-born noncitizens. These different choices of starting populations can lead to different estimates due to over-reporting of citizenship in the ACS.



**Figure 4.**

**Estimated Unauthorized Immigrant Population for Mexico: 2010-2018**

**Millions**

Sources: U.S. Department of Homeland Security; Pew Research Center; Center for Migration Studies.



**Figure 5.**

**Estimated Unauthorized Immigrant Population for All Countries Other than Mexico: 2010-2018**

Millions

Sources: U.S. Department of Homeland Security; Pew Research Center; Center for Migration Studies.

Figures 4 and 5 offer additional insight into differences among the three organizations' estimates. Figure 4 depicts estimated numbers of unauthorized Mexican nationals, and Figure 5 depicts estimated numbers of non-Mexicans. As illustrated in Figure 4, all three organizations estimated the Mexican unauthorized population to have been about six to seven million in 2010, and all three series show similar declining trends through 2017. The Pew and CMS estimates were 5 to 10 percent lower than the DHS estimates each year. Figure 5 shows that estimates of the non-Mexican unauthorized immigrant population from the three organizations also fell within a similar range each year, but that DHS estimates differ from Pew and CMS in registering an upward trend from 2012 to 2016 that is less evident in or absent from the other two series.[10]

### "Inflow-Outflow" Estimates

In 2018, a team of academic researchers published a new estimate of the unauthorized population based on a different methodology (Fazel-Zarandi, Feinstein, and Kaplan 2018). Starting from an assumed 1990 baseline population of 3.5 million unauthorized immigrants, the Fazel-Zarandi et al. study combines separate estimates of population inflows (illegal entries and visa overstayers) and population outflows

(deaths, emigration, repatriations, and acquisitions of legal status) to calculate year-over-year population changes. Their analysis aggregates inflow and outflow estimates over 16 years to produce an average estimate for 2016 of 22.1 million unauthorized immigrants.[11]

Research by the Office of Immigration Statistics replicates the Fazel-Zarandi et al. methodology and assesses the possibility that the size of the unauthorized population was in the range of 16.2–29.5 million on January 1, 2017 as Fazel-Zarandi et al. conclude, rather than 11.4 million as the DHS residual model estimates. One key finding is that the difference between Fazel-Zarandi et al.'s results and DHS's residual model is entirely driven by high estimated growth in Fazel-Zarandi et al.'s model during the 1990s—yet key data required for inflow-outflow modeling are not available for those years. These data limitations, along with a number of questionable modeling assumptions, give DHS no confidence in Fazel-Zarandi et al.'s findings about population growth in 1990-2000. A forthcoming DHS whitepaper includes a preliminary inflow-outflow analysis that is similar to the Fazel-Zarandi et al. method but updates certain assumptions and makes fuller use of DHS data for 2000 − 2018; the paper finds support for the DHS estimate of about 11.4 million people as of Jan. 1, 2018 (Rosenblum, Baker, and Meeks, forthcoming).

---

[10] This increase in the non-Mexican unauthorized population from 2012 to 2016 coincides with the surge in unauthorized immigration from the Northern Triangle of Central America during this period and also reflects an increase in the 2016 ACS estimate of the Chinese and Indian populations.

[11] Fazel-Zarandi et al. assume probability distributions around each inflow and outflow component and simulate the model over a range of values; the simulation yields a range of estimated totals as of 2017 with a mean estimate 22.1 million and a 95 percent probability interval of between 16.2 and 29.5 million unauthorized immigrants.

# Appendix 1

## COMPONENT ESTIMATION DETAILS AND LIMITATIONS

### Method and Components

The unauthorized immigrant population estimate is the residual when the estimated legally-resident population is subtracted from the estimated total foreign-born population. This appendix describes the methodology and estimated populations for each component of the 2018 estimate; see Table A1 for corresponding values for 2015-2017.

This edition of this report includes updates to the methods for estimating several components of the total foreign-born and legally-resident populations to make fuller use of available data. Each of these updates and their estimated impact are identified below.

1) Total foreign-born population:

   a. **Foreign-born population in 2017, entered 1980–2017 (36.5 million)**

   The initial estimate of the total foreign-born population that entered in 1980 to 2017 was obtained from the 2017 ACS Public Use Microdata Sample (PUMS), along with data on the distribution of the foreign-born population by country of origin, state of residence, year of entry, age, and sex. A 3-year moving average was applied to PUMS data for year of entry to reduce so-called heaping effects in which ACS survey responses disproportionately focus on round numbers.

   Prior editions of this report reduced the overall PUMS estimate for the total foreign-born population to remove the Cuban-born population since all Cubans were assumed to take advantage of the Cuban Adjustment Act. Beginning with this edition of the report, the PUMS estimate was not reduced for Cubans entering in 2017 or later.

   b. **Shift in reference date to January 1, 2018 (680,000)**

   The 2017 ACS estimates of the foreign-born population are benchmarked to the middle of 2017 and therefore do not count the full population that arrived in 2017. For example, the 2017 ACS estimated about 75 percent more foreign-born persons who entered the United States in 2016 than the 2016 ACS estimated for the same entry-year cohort. Over the last three ACS vintages, this adjustment averaged 0.74. This report assumes the adjustment for 2017 entrants in the 2017 ACS will be similar and multiplies that estimate by 1.74.

   c. **Undercount of nonimmigrants in the ACS (280,000)**

   The Census is believed to undercount nonimmigrants at higher rates than the native-born population. This report assumes that the undercount rate for nonimmigrants was 10 percent—the same rate assumed in DHS estimates for 2000 and 2005–2015 (U.S. Department of Homeland Security, 2003).

   d. **Undercount of LPRs, refugees, and asylees in the ACS (610,000)**

   This report assumes the undercount rate for LPRs, refugees, and asylees in the ACS was 2.5 percent—the same rate assumed in DHS estimates for 2000 and 2005–2015 (U.S. Department of Homeland Security, 2003).

   e. **Undercount of unauthorized immigrants in the ACS (0.5 million)**

   This report assumes that the undercount rate for unauthorized immigrants in the ACS is 13 percent for those who arrived in the most recent year and declines by 7.5 percent with each year of presence.[12] This assumption is based on the model that was used for the 2000 edition of the report but represents a change from the 2005-2015 editions. In those reports, DHS assumed a flat 10 percent undercount rate (based on the overall undercount estimated in the 2000 model). The shift from the flat 10 percent assumption used in the most recent editions of this report back to the declining undercount assumption in the earlier model results in a decrease of about 700,000 in the overall unauthorized population estimate.

   f. **Total estimated foreign-born population, January 1, 2018 (38.6 million)**

   The sum of 1a. through 1e. (above) is the estimated foreign-born population on January 1, 2018 that entered the United States during the 1980–2017 period.

2) Legally-resident, foreign-born population:

   a. **LPR, refugee, and asylee flow, entered 1980–2017 (32.7 million)**

   The 1980–2017 flow was calculated separately for LPRs, refugees, and asylees using DHS administrative data (Baker, 2020). LPRs consist of two groups: new arrivals and those who have adjusted status. New arrivals include all persons with immigrant visas issued by the Department of State who were admitted at a U.S. port of entry. For new arrival LPRs, the date of entry into the United States is the same as the date of approval for LPR status. For LPRs adjusting status, year of entry was assumed to be the most recent year of entry prior to adjustment.

---

[12]  This declining model was used for the 1990-2000 estimates published in 2003. Special thanks go to Robert Warren for providing the model and parameters used for that report.

The refugee and affirmative asylee populations were estimated by matching the previous 5 years of records for refugee arrivals and persons affirmatively granted asylum to records of LPR adjustment that occurred prior to January 1, 2018. The January 1, 2018 refugee and affirmative asylum populations consist of those persons who had not adjusted to LPR status by that date. Individual, detailed records were not readily available for defensive asylees, so that population was estimated by assuming the LPR adjustment rates were the same for defensive asylees as for affirmative asylees from the same country and granted asylum in the same year. The update in this edition of the report results in a reduction of 50,000 in the combined refugee and asylee population estimates (i.e., an increase of 50,000 in the estimated number of unauthorized immigrants).

**b. Mortality of legally-resident flow, 1980–2017 (2.6 million)**

Data are not collected on the mortality of the legally-resident, foreign-born population. The LPR population was survived forward in time (from the year in which LPR status was obtained to 2018) using National Center for Health Statistics mortality rates by age and sex from 1999–2001 (Arias et al., 2008).

**c. Emigration of legally-resident flow, 1980–2017 (5.7 million)**

Emigration is a major component of immigrant population change. In the absence of data that directly measure emigration from the United States, researchers have developed indirect estimates based largely on Census data. For this report, annual emigration rates were calculated from estimates of emigration of the foreign-born population based on 1980 and 1990 Census data (Ahmed and Robinson, 1994). The emigration model is similar to that used for the DHS LPR population estimates report, except that emigration risk was suspended until after naturalization for LPRs who became citizens. Further, refugees and asylees, with little likelihood of returning to their country of origin, were assumed not to emigrate. The model assumes 3.26 percent of new LPRs emigrate in their first year, declining by 5 percent per year of residence, resulting in a total effective emigration rate of 17.5 percent for this edition of the report.

Previous editions of this report estimated mortality and emigration jointly as a single estimate of attrition. The update in this edition of the report results in slightly reduced attrition; 20,000 fewer legal residents are assumed to have died or emigrated, which translates to an increase of 20,000 in the estimated size of the legally-resident population and a decrease of 20,000 in the estimated unauthorized population.

**d. LPR, refugee, and asylee population, January 1, 2018 (24.4 million)**

Subtracting mortality (2b.) and emigration (2c.) from the LPR, refugee, and asylee flow during 1980–2017 (2a.) results in the total estimated LPR, refugee, and asylee resident population on January 1, 2018.

**e. Nonimmigrant population, January 1, 2018 (2.8 million)**

The number of nonimmigrants living in the United States on January 1, 2018 was estimated by estimating days of presence between July 1, 2014 and June 30, 2018 and dividing the result by 365 (see Baker, 2017 for a fuller discussion). The estimate was restricted to classes of admission such as students, temporary workers, and exchange visitors where the length of stay typically exceeds 2 months. The estimate does not include visitors for business or pleasure, or Mexicans admitted with a Border Crossing Card. Year of entry for the 2018 nonimmigrant population was based on the distribution of year of entry for nonimmigrants used in previous DHS estimates of unauthorized population.

**f. Estimated legally-resident, immigrant population, January 1, 2018 (27.2 million)**

Adding the population of LPRs, refugees, and asylees on January 1, 2018 (2d.) to the nonimmigrant population on the same date (2e.) results in the total estimated legally resident immigrant population in the United States on January 1, 2018.

3) Unauthorized population:

**a. Estimated unauthorized population, January 1, 2018 (11.4 million)**

Subtracting the estimated legally-resident, foreign-born immigrant population (2f.) from the total foreign-born population on January 1, 2018 (1f.) yields the estimate of the unauthorized population.

## Limitations

Annual estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for estimation described above.

- *Assumptions about undercount of the foreign-born population in the ACS.* The foreign-born—particularly unauthorized immigrants and nonimmigrants—are less likely than native-born Americans to respond to or to be included in responses to government surveys. To control for undercount of these "hard to count" populations, analysts must make assumptions about the extent of the undercount and then adjust the ACS survey estimates accordingly. The estimates are sensitive to these undercount adjustments.

- *Assumptions about rates of emigration.* The preexisting legally-resident, foreign-born population declines over time through mortality and emigration. Mortality rates can be estimated from standard demographic tables, but current, nationally representative data necessary to construct similar tables for emigration rates do not exist. The estimates are sensitive to emigration modeling assumptions.

- *Accuracy of year of entry reporting.* Census data suggest that respondents provide unreliable answers to the Census year-of-entry question ("When did this person come to live in the United States?"), with disproportionate numbers of responses "heaping" on round numbers. Errors also occur in converting DHS administrative dates for LPRs into year of entry dates.

- *Assumptions about the nonimmigrant population estimate.* The estimates are based on admission dates of nonimmigrants admitted under classes of admission associated with temporary residence and on typical visit lengths as measured by matched arrival and departure records. Thus, the estimates are sensitive to sudden changes in visit-length trends; are biased downward to the extent that some nonimmigrants adjust to immigrant status and do not ever depart the United States; and do not conform perfectly to the definition of residence in the ACS.[13]

- *Sampling error in the ACS.* The estimates of the total foreign-born population that moved to the United States in the 1980–2017 period are based on a sample and are thus subject to sampling variability. Actual year-to-year fluctuations in the population size may be larger or smaller than estimated in the ACS, particularly when the foreign-born population is subdivided by state of residence or country of origin. The estimated margin of error for the estimate of the total foreign-born population in the 2017 ACS PUMS at the 90 percent confidence level is plus or minus approximately 180,000.

- *Accuracy of state of residence for the non-naturalized legally-resident, foreign-born population.* The state of residence for the non-naturalized, legally-resident, 1980–2017 entrants is assumed to be the state of residence on the date the most recent status (e.g., refugee, LPR) was obtained; however, the accuracy of the estimates may be affected by state-to-state migration that occurred between the date of the status change and January 1, 2018.

- *Comparisons across years.* Although DHS has been producing annual estimates since 2005, comparisons across multiple years are problematic. In addition to sampling error and the uncertainty surrounding the estimates described above, the series of DHS estimates is not fully consistent. Estimates of the foreign-born population from the 2010-2017 ACS were based on the 2010 Census (adjusted for births, deaths, and migration), whereas estimates from earlier ACS editions

were based on the 2000 Census. DHS also made minor methodological updates to take fuller advantage of available data beginning with the 2015-2018 estimates. Comparisons across multiple years should be interpreted with caution.

- *Reconciling the population estimate with administrative enforcement data.* In general, it can be difficult to reconcile components of the unauthorized population estimate with information gathered from DHS administrative data on enforcement. For example, year to year variation in the residual method used in this report suggest that the total population increase from the three Northern Triangle countries averaged 20,000 to 25,000 per year in 2015-2018, but estimates based on administrative enforcement data suggest a net inflow (i.e., border apprehensions between the ports of entry, inadmissible aliens encountered at the ports minus repatriations) of 130,000 to 200,000 per year during this period. Conversely, the residual method suggests the population of Venezuelan nationals in the United States increased by about 110,000 in 2015–2018 (a nearly 150-percent increase over the period), but DHS administrative records (mainly consisting of suspected overstays by nonimmigrants in the Venezuelan case) suggest a somewhat smaller net population increase of about 75,000 people. Both findings may be partly explained by unusual ACS estimates for Northern Triangle and Venezuelan nationals during this time period. Similarly, the administrative enforcement data do not reflect the large increases in 2016 in the unauthorized populations from China or India that were estimated using the residual method.

---

[13] For example, tourists may stay in the United States for 2 months or longer and thus meet the requirement to be considered "resident" in the ACS but are not considered to be residents in the DHS estimates.

**Table A1-1.**

## Component Estimates (in thousands) of the Unauthorized Immigrant Population: 2015-2018

| 1) Foreign-born population | | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| a. | Foreign-born population, entered 1980-2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,900 | 34,990 | 35,580 | 36,480 |
| b. | Adjustment for shift in reference date from July 1, 2017 to January 1, 2018 . . . . . . . . . . . . . . | 630 | 730 | 810 | 690 |
| c. | Undercount of nonimmigrants in ACS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 | 220 | 250 | 280 |
| d. | Undercount of other legally resident immigrants (LPRs, recent refugee/asylee arrivals) in ACS . . | 560 | 580 | 600 | 610 |
| e. | Undercount of unauthorized immigrant population in ACS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 530 | 550 | 510 | 500 |
| f. | Estimated foreign-born population, January 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35,820 | 37,070 | 37,760 | 38,550 |
| **2) Legally resident population** | | | | | |
| a. | LPR, refugee, and asylee flow January 1, 1980-December 31, 2017 . . . . . . . . . . . . . . . . . . . . | 29,440 | 30,490 | 31,640 | 32,650 |
| | b.  Mortality 1980-2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,020 | 2,190 | 2,370 | 2,570 |
| | c.  Emigration 1980-2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,980 | 5,210 | 5,460 | 5,690 |
| d. | LPR, refugee, and asylee resident population, January 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . | 22,440 | 23,080 | 23,810 | 24,390 |
| e. | Nonimmigrant population on January 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,940 | 2,240 | 2,530 | 2,780 |
| f. | Estimated legally resident population, January 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,380 | 25,320 | 26,340 | 27,170 |
| **3) Unauthorized immigrant population** | | | | | |
| a. | Estimated resident unauthorized immigrant population, January 1, 2018 . . . . . . . . . . . . . . . . . | 11,440 | 11,750 | 11,410 | 11,390 |

Note: Detail may not sum to totals because of rounding.
Source: U.S. Department of Homeland Security.

DHS Office of Immigration Statistics

**AR2022_300137**

# Appendix 2

**UPDATED HISTORICAL ESTIMATES FOR JANUARY 2000 THROUGH JANUARY 2018**

**Table A2-1.**

Estimates of the Unauthorized Immigrant Population (In thousands) by Country of Birth and State of Residence: 2000 and 2005-2018

| Country | 2000 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2010* | 2011 | 2012 | 2013 | 2014 | 2015 | 2015** | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total ........ | 8,460 | 10,490 | 11,310 | 11,780 | 11,600 | 10,750 | 10,790 | 11,590 | 11,510 | 11,430 | 11,210 | 11,460 | 11,960 | 11,440 | 11,750 | 11,410 | 11,390 |
| Mexico ....... | 4,680 | 5,970 | 6,570 | 6,980 | 7,030 | 6,650 | 6,640 | 6,830 | 6,800 | 6,720 | 6,450 | 6,450 | 6,580 | 6,200 | 5,970 | 5,860 | 5,420 |
| El Salvador .... | 430 | 470 | 510 | 540 | 570 | 530 | 620 | 670 | 660 | 690 | 690 | 670 | 750 | 720 | 750 | 750 | 730 |
| Guatemala .... | 290 | 370 | 430 | 500 | 430 | 480 | 520 | 520 | 520 | 560 | 590 | 620 | 620 | 600 | 610 | 610 | 620 |
| India ......... | 120 | 280 | 210 | 220 | 160 | 200 | 200 | 270 | 240 | 260 | 320 | 390 | 470 | 450 | 560 | 490 | 540 |
| Honduras ..... | 160 | 180 | 280 | 280 | 300 | 320 | 330 | 380 | 380 | 360 | 390 | 390 | 440 | 420 | 430 | 500 | 450 |
| China ........ | 190 | 230 | 170 | 290 | 220 | 120 | 130 | 300 | 280 | 210 | 190 | 230 | 320 | 320 | 420 | 410 | 410 |
| Philippines .... | 200 | 210 | 280 | 290 | 300 | 270 | 280 | 290 | 270 | 310 | 340 | 330 | 370 | 350 | 410 | 300 | 370 |
| Colombia ..... | 100 | 110 | 140 | 130 | 130 | 100 | 110 | 120 | 130 | 130 | 160 | 130 | 140 | 130 | 140 | 130 | 210 |
| Brazil ........ | 100 | 170 | 210 | 190 | 180 | 150 | 180 | 150 | 150 | 130 | 110 | 110 | 100 | 100 | 110 | 150 | 200 |
| Venezuela ..... | *** | *** | *** | 60 | 50 | 50 | 30 | 50 | 50 | 60 | 50 | 40 | 80 | 80 | 100 | 120 | 190 |
| All ........... | 2,180 | 2,500 | 2,510 | 2,290 | 2,240 | 1,880 | 1,750 | 2,020 | 2,030 | 2,010 | 1,920 | 2,090 | 2,110 | 2,080 | 2,260 | 2,090 | 2,260 |
| **State** | 2000 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2010* | 2011 | 2012 | 2013 | 2014 | 2015 | 2015** | 2016 | 2017 | 2018 |
| Total ........ | 8,460 | 10,500 | 11,310 | 11,780 | 11,600 | 10,750 | 10,790 | 11,590 | 11,510 | 11,430 | 11,210 | 11,460 | 11,960 | 11,440 | 11,750 | 11,410 | 11,390 |
| California ..... | 2,510 | 2,770 | 2,790 | 2,840 | 2,850 | 2,600 | 2,570 | 2,910 | 2,830 | 2,820 | 2,780 | 2,730 | 2,880 | 2,760 | 2,860 | 2,790 | 2,610 |
| Texas ........ | 1,090 | 1,360 | 1,620 | 1,710 | 1,680 | 1,680 | 1,770 | 1,780 | 1,790 | 1,830 | 1,750 | 1,850 | 1,940 | 1,860 | 1,910 | 1,870 | 1,940 |
| Florida ........ | 800 | 850 | 960 | 960 | 840 | 720 | 760 | 730 | 740 | 730 | 740 | 710 | 810 | 540 | 610 | 610 | 660 |
| New York ..... | 540 | 560 | 510 | 640 | 640 | 550 | 460 | 690 | 630 | 580 | 610 | 570 | 590 | 630 | 630 | 620 | 520 |
| New Jersey ... | 350 | 380 | 420 | 470 | 400 | 360 | 370 | 440 | 420 | 430 | 410 | 450 | 440 | 420 | 420 | 450 | 460 |
| Illinois ........ | 440 | 520 | 530 | 560 | 550 | 540 | 490 | 550 | 550 | 540 | 520 | 530 | 450 | 440 | 520 | 440 | 450 |
| Georgia ....... | 220 | 470 | 490 | 490 | 460 | 480 | 460 | 430 | 440 | 400 | 390 | 410 | 390 | 370 | 400 | 400 | 380 |
| North Carolina . | 260 | 360 | 360 | 380 | 380 | 370 | 390 | 390 | 400 | 360 | 400 | 390 | 390 | 370 | 360 | 320 | 350 |
| Arizona ....... | 330 | 480 | 490 | 530 | 560 | 460 | 470 | 350 | 360 | 350 | 350 | 350 | 380 | 360 | 330 | 340 | 330 |
| Washington ... | 170 | *** | 280 | 260 | 260 | 230 | 200 | 260 | 260 | 270 | 240 | 280 | 270 | 260 | 280 | 280 | 290 |
| All ........... | 1,750 | 2,750 | 2,860 | 2,940 | 2,980 | 2,760 | 2,840 | 3,040 | 3,100 | 3,110 | 3,010 | 3,190 | 3,430 | 3,420 | 3,430 | 3,300 | 3,390 |

*Revised to be consistent with estimates derived from the 2010 Census (U.S. Census Bureau, 2011).
**Revised to show the impact of the updated methodology.
***Estimates not available.
Detail: May not sum to totals because of rounding. Estimates shown for Colombia 2000-2013, Brazil 2010-2015, and Venezuela 2007-2015 are approximations based on historical estimation and project notes.
Source: U.S. Department of Homeland Security.

13

AR2022_300138

## REFERENCES

Ahmed, Bashir and J. Gregory Robinson, 1994. "Estimates of Emigration of the Foreign-Born Population: 1980-1990," Technical Working Paper No. 9, U.S. Bureau of the Census.

Arias, Elizabeth and Lester R. Curtin, Rong Wei and Robert N. Anderson, 2008. "U.S. Decennial Life Tables for 1999-2001, United States Life Tables," National Vital Statistics Report 57 (1), National Center for Health Statistics, Centers for Disease Control, http://www.cdc.gov/nchs/data/nvsr/nvsr57/nvsr57_01.pdf

Baker, Bryan, 2019. "Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2015-2019," Office of Immigration Statistics; Office of Strategy, Policy, and Plans; U.S. Department of Homeland Security.

Baker, Bryan, 2017. "Nonimmigrants Residing in the United States: Fiscal Year 2016," Office of Immigration Statistics, Office of Policy, U.S. Department of Homeland Security.

Baker, Bryan, 2018. "Unauthorized population Residing in the United States: January 2015," Office of Immigration Statistic; Office of Strategy, Policy, and Plans.; U.S. Department of Homeland Security. https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf

Fazel-Zarandi, Mohammad M., Jonathan S. Feinstein, and Edward H. Kaplan, 2018. "The number of undocumented immigrants in the United States: Estimates based on demographic modeling with data from 1990 to 2016," PLOS One, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0201193

Passel, Jeffrey S. and D'Vera Cohn, 2018. "U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade," Pew Research Center, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf

U.S. Census Bureau, 2011. "Change in Population Controls," American Community Survey Research Note,

U.S. Department of Homeland Security, 2003. "Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000," http://www.dhs.gov/xlibrary/assets/statistics/publications/Ill_Report_1211.pdf

Warren, Robert, 2019. "US Undocumented Population Continued to Fall from 2016 to 2017 and Visa Overstays Significantly Exceeded Illegal Crossings for the Seventh Consecutive Year," Journal on Migration and Human Security, https://journals.sagepub.com/doi/pdf/10.1177/2331502419830339

AR2022_300139

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date    07/26/2022

Department of Homeland Security

U.S. Citizenship and Immigration Services

FOR CERTIFYING OFFICIAL:    Robert Dorr

FOR CLEARANCE OFFICER:    Tyrone Huff

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received

07/20/2022

ACTION REQUESTED:    Revision of a currently approved collection

TYPE OF REVIEW REQUESTED:    Emergency

ICR REFERENCE NUMBER:    202207-1615-004

AGENCY ICR TRACKING NUMBER:    I-765, I-765WS

TITLE:    Application for Employment Authorization

LIST OF INFORMATION COLLECTIONS:  See next page

OMB ACTION:  Approved without change

OMB CONTROL NUMBER:    1615-0040

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  01/31/2023                    DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 5,176,535 | 11,881,376 | 400,895,820 |
| New | 5,176,535 | 11,881,376 | 400,895,820 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 0 | 0 | 0 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:

OMB Authorizing Official:    Dominic J. Mancini

Deputy Administrator,

Office Of Information And Regulatory Affairs

AR2022_300140

| List of ICs | | | |
|---|---|---|---|
| IC Title | Form No. | Form Name | CFR Citation |
| Application for Employment Authorization (paper filing) | I-765 | Application for Employment Authorization Document | 8 CFR 274a.13 |
| Biometrics Submission | | | 8 CFR 274a.13 |
| I-765 Worksheet | I-765WS | Form I-765 Worksheet | 8 CFR 103.2 |
| Passport-Style Photographs | | | 8 CFR 274a.13 |
| I-765 Online Filing | | | 8 CFR 274a.13 |

AR2022_300141

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et at.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

**FEDERAL DEFENDANTS' REVISED RESPONSE TO
DEFENDANT-INTERVENORS' REVISED DISCOVERY REQUEST**

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

Federal Defendants served the response to Defendant-Intervenors' revised interrogatory pursuant to the Federal Rules of Civil Procedure on October 14, 2019. Federal Defendants responded to this interrogatory pursuant to the Court's June 26, 2019 Order, ECF Dkt. 412, requiring that Federal Defendants respond to Defendants-Intervenors' Interrogatory No. 13 – notwithstanding Federal Defendants' objections, and the Court's August 2, 2019 Order, ECF Dkt. 421, granting the parties' joint motion to modify the interrogatory to which Federal Defendants were ordered to respond, by reviewing a random sampling of 500 responsive records. Following discussions with counsel for Defendants-Intervenors, Federal Defendants now serve this revised response that clarifies the scope of the sample.

AR2022_300142

## RESPONSE TO DEFENDANT-INTERVENORS' REVISED INTERROGATORY

**REVISED INTERROGATORY**

Please identify the total number of requestors approved for DACA between June 2012 and June 2018:

- With an approved Form I-485 (Application to Register Permanent Residence or Adjust Status), based on 8 U.S.C. § 1255(a), and

- Who received a Class of Admission code (COA) following approval of the Form I-485 indicating they adjusted to Lawful Permanent Resident (LPR) status as an immediate relative (*i.e.,* qualified spouse, child or parent of a United States citizen), and

- With an approved Form I-131 application for an advance parole document based on the standards associated with the DACA policy where the Form I-131 was approved before the Form I-485 filing date; and

- Who was paroled into the United States by U.S. Customs and Border Protection on the basis of the DACA-based advance parole document (Form I-512L) that was issued to the DACA recipient and where such parole occurred before the Form I-485 was filed; and

- Where the DACA recipient/adjustment applicant could not have met the requirement in 8 U.S.C. § 1255(a) to have been "inspected and admitted, or paroled" but for his or her entry to the United States on the DACA-based advance parole document.

**RESPONSE**

USCIS determined from computer searches of all approved DACA requestors, that 14,600 approved requestors met the first three criteria of the interrogatory. Out of a random sampling of 500 individuals from those 14,600 requestors, 484 individuals met all the criteria in the Interrogatory. Based on the population of 14,600 requestors that met the first three criteria of the interrogatory before sampling, USCIS estimates with a +/- 1.5% margin of error, that between 13,908 and 14,358 requestors approved for DACA between June 2012 and June 2018 meet all the criteria as specified in this revised interrogatory above.

## VERIFICATION OF RESPONSE TO REVISED INTERROGATORY

I, _____Alexander King_____ , Senior Advisor, U.S. Citizenship and
Immigration Services' (USCIS) Service Center Operations (SCOPS), certify that, based on my
knowledge, information made available to me in the course of my official duties, and belief, the
foregoing response is true and correct regarding the manual review of the records related to the
five hundred (500) individuals selected for the random sample provided to SCOPS and the
conclusion that four hundred eighty-four (484) individuals in the sample met all of the terms of
the revised interrogatory approved by the Court on August 2, 2019.

DATED: October 10, 2019.

Alexander King
Senior Advisor, SCOPS, USCIS

## VERIFICATION OF RESPONSE TO REVISED INTERROGATORY

I, __Mike Hoefer__ , Chief of U.S. Citizenship and Immigration Services' (USCIS) Office of Performance and Quality (OPQ), certify that, based on my knowledge, information made available to me in the course of my official duties, and belief, the foregoing is true and correct regarding: 1) the total population of requestors that met the first three criteria of the interrogatory before sampling and 2) within the stated margin of error, the estimated number of requestors approved for DACA between June 2012 and June 2018 that met the all criteria as specified in the interrogatory.

DATED: October 10, 2019.

Michael Hoefer
Chief, OPQ, USCIS

Dated: November 8, 2019                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General
                                           Civil Division
                                           WILLIAM C. PEACHEY
                                           Director, Office of Immigration Litigation
                                           District Court Section

                                           /s/ *Jeffrey S. Robins*
                                           JEFFREY S. ROBINS
                                           Attorney-in-Charge
                                           Deputy Director
                                           U.S. Department of Justice, Civil Division
                                           Office of Immigration Litigation
                                           District Court Section
                                           P.O. Box 868, Washington, DC 20044
                                           Telephone: (202) 616-1246
                                           Facsimile: (202) 305-7000
*Attorneys for Federal Defendants*         jeffrey.robins@usdoj.gov



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2000

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 716 | 523 | 514 | 527 | 525 | 588 | 496 | 529 | 449 | 395 | 517 | 426 | 6,205 |
| Miami | 401 | 342 | 493 | 375 | 562 | 614 | 461 | 613 | 483 | 639 | 543 | 711 | 6,237 |
| New Orleans | 559 | 626 | 333 | 596 | 684 | 1,000 | 581 | 507 | 375 | 262 | 392 | 563 | 6,478 |
| Ramey | 221 | 102 | 115 | 142 | 28 | 71 | 63 | 202 | 124 | 99 | 284 | 280 | 1,731 |
| Blaine | 246 | 184 | 177 | 228 | 204 | 226 | 200 | 311 | 229 | 196 | 197 | 183 | 2,581 |
| Buffalo | 168 | 106 | 61 | 80 | 65 | 117 | 117 | 110 | 109 | 185 | 219 | 233 | 1,570 |
| Detroit | 213 | 145 | 191 | 190 | 183 | 227 | 169 | 146 | 138 | 165 | 130 | 160 | 2,057 |
| Grand Forks | 68 | 30 | 20 | 33 | 33 | 71 | 44 | 57 | 57 | 36 | 48 | 65 | 562 |
| Havre | 73 | 82 | 80 | 122 | 78 | 100 | 190 | 246 | 129 | 120 | 178 | 170 | 1,568 |
| Houlton | 51 | 37 | 32 | 25 | 42 | 25 | 30 | 30 | 25 | 45 | 105 | 42 | 489 |
| Spokane | 112 | 103 | 65 | 92 | 100 | 95 | 80 | 102 | 118 | 156 | 154 | 147 | 1,324 |
| Swanton | 153 | 111 | 125 | 97 | 87 | 108 | 132 | 118 | 140 | 370 | 374 | 142 | 1,957 |
| Big Bend (formerly Marfa) | 891 | 1,111 | 1,192 | 1,093 | 1,675 | 1,597 | 1,272 | 1,154 | 885 | 921 | 998 | 900 | 13,689 |
| Del Rio | 8,161 | 6,812 | 5,118 | 20,354 | 24,706 | 24,416 | 18,145 | 13,443 | 7,820 | 9,373 | 10,132 | 8,698 | 157,178 |
| El Centro | 13,761 | 11,035 | 8,882 | 21,924 | 31,072 | 33,301 | 26,534 | 27,460 | 20,071 | 15,820 | 15,018 | 13,248 | 238,126 |
| El Paso | 6,386 | 5,203 | 4,651 | 14,914 | 15,049 | 16,018 | 12,883 | 10,645 | 7,637 | 7,533 | 8,106 | 6,671 | 115,696 |
| Laredo | 6,962 | 6,058 | 4,477 | 13,794 | 14,745 | 15,549 | 11,174 | 9,707 | 6,436 | 6,760 | 6,971 | 6,340 | 108,973 |
| Rio Grande Valley (formerly McAllen) | 8,416 | 7,371 | 5,808 | 15,443 | 16,814 | 17,995 | 15,005 | 12,390 | 7,764 | 9,842 | 9,073 | 7,322 | 133,243 |
| San Diego | 9,046 | 7,620 | 5,978 | 15,363 | 20,204 | 18,279 | 16,751 | 16,615 | 13,186 | 10,630 | 9,356 | 8,653 | 151,681 |
| Tucson | 32,384 | 25,767 | 30,182 | 70,632 | 73,506 | 76,245 | 65,213 | 62,555 | 44,341 | 46,849 | 47,905 | 40,767 | 616,346 |
| Yuma | 5,403 | 5,219 | 4,964 | 12,462 | 13,557 | 16,663 | 13,073 | 12,327 | 6,953 | 6,228 | 6,753 | 5,145 | 108,747 |
| Coastal Border | 1,897 | 1,593 | 1,455 | 1,640 | 1,799 | 2,273 | 1,601 | 1,851 | 1,431 | 1,395 | 1,736 | 1,980 | 20,651 |
| Northern Border | 1,084 | 798 | 751 | 867 | 792 | 969 | 962 | 1,120 | 945 | 1,273 | 1,405 | 1,142 | 12,108 |
| Southwest Border | 91,410 | 76,196 | 71,252 | 185,979 | 211,328 | 220,063 | 180,050 | 166,296 | 115,093 | 113,956 | 114,312 | 97,744 | 1,643,679 |
| Monthly Total | 94,391 | 78,587 | 73,458 | 188,486 | 213,919 | 223,305 | 182,613 | 169,267 | 117,469 | 116,624 | 117,453 | 100,866 | 1,676,438 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2001

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 532 | 449 | 360 | 403 | 407 | 463 | 443 | 482 | 463 | 436 | 406 | 367 | 5,211 |
| Miami | 338 | 590 | 481 | 483 | 452 | 392 | 399 | 503 | 607 | 735 | 532 | 450 | 5,962 |
| New Orleans | 315 | 306 | 396 | 358 | 634 | 446 | 740 | 377 | 346 | 402 | 354 | 359 | 5,033 |
| Ramey | 399 | 285 | 187 | 418 | 79 | 73 | 19 | 117 | 94 | 107 | 101 | 73 | 1,952 |
| Blaine | 179 | 168 | 151 | 141 | 159 | 175 | 145 | 194 | 231 | 192 | 186 | 168 | 2,089 |
| Buffalo | 203 | 85 | 74 | 87 | 81 | 116 | 89 | 137 | 134 | 165 | 156 | 107 | 1,434 |
| Detroit | 132 | 139 | 107 | 195 | 182 | 167 | 157 | 156 | 177 | 195 | 349 | 150 | 2,106 |
| Grand Forks | 48 | 23 | 45 | 44 | 66 | 73 | 96 | 85 | 112 | 100 | 144 | 85 | 921 |
| Havre | 108 | 67 | 58 | 77 | 136 | 108 | 104 | 97 | 93 | 169 | 175 | 113 | 1,305 |
| Houlton | 40 | 37 | 30 | 54 | 27 | 30 | 24 | 31 | 33 | 153 | 182 | 44 | 685 |
| Spokane | 158 | 114 | 126 | 99 | 100 | 131 | 87 | 95 | 117 | 132 | 109 | 67 | 1,335 |
| Swanton | 126 | 120 | 75 | 101 | 73 | 95 | 109 | 139 | 168 | 543 | 715 | 199 | 2,463 |
| Big Bend (formerly Marfa) | 844 | 874 | 776 | 846 | 1,046 | 1,427 | 1,249 | 1,123 | 1,058 | 1,107 | 906 | 831 | 12,087 |
| Del Rio | 7,648 | 5,344 | 3,756 | 11,218 | 16,447 | 16,833 | 11,444 | 9,005 | 7,048 | 6,069 | 6,038 | 4,025 | 104,875 |
| El Centro | 13,712 | 9,979 | 8,299 | 18,672 | 21,412 | 21,815 | 20,699 | 17,203 | 11,385 | 11,175 | 10,965 | 7,536 | 172,852 |
| El Paso | 6,095 | 5,401 | 4,683 | 10,862 | 12,369 | 15,311 | 12,738 | 11,343 | 8,035 | 8,607 | 9,945 | 7,468 | 112,857 |
| Laredo | 5,154 | 3,652 | 2,762 | 8,228 | 10,656 | 12,604 | 9,928 | 9,216 | 6,586 | 6,475 | 7,338 | 4,469 | 87,068 |
| Rio Grande Valley (formerly McAllen) | 6,634 | 5,975 | 4,280 | 10,102 | 12,298 | 12,890 | 11,366 | 11,204 | 8,152 | 9,191 | 9,426 | 6,326 | 107,844 |
| San Diego | 8,002 | 5,556 | 5,270 | 11,558 | 12,085 | 13,510 | 12,597 | 11,270 | 8,467 | 7,580 | 8,297 | 5,883 | 110,075 |
| Tucson | 30,009 | 25,889 | 20,907 | 43,972 | 54,913 | 64,779 | 52,949 | 44,573 | 33,602 | 29,550 | 28,028 | 20,504 | 449,675 |
| Yuma | 4,534 | 5,039 | 4,348 | 9,632 | 11,003 | 11,411 | 9,843 | 7,990 | 4,798 | 3,848 | 3,705 | 2,234 | 78,385 |
| Coastal Border | 1,584 | 1,630 | 1,424 | 1,662 | 1,572 | 1,374 | 1,601 | 1,479 | 1,510 | 1,680 | 1,393 | 1,249 | 18,158 |
| Northern Border | 994 | 753 | 666 | 798 | 824 | 895 | 811 | 934 | 1,065 | 1,649 | 2,016 | 933 | 12,338 |
| Southwest Border | 82,632 | 67,709 | 55,081 | 125,090 | 152,229 | 170,580 | 142,813 | 122,927 | 89,131 | 83,602 | 84,648 | 59,276 | 1,235,718 |
| Monthly Total | 85,210 | 70,092 | 57,171 | 127,550 | 154,625 | 172,849 | 145,225 | 125,340 | 91,706 | 86,931 | 88,057 | 61,458 | 1,266,214 |

AR2022_300148



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2002

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 437 | 439 | 373 | 362 | 247 | 314 | 359 | 340 | 360 | 358 | 457 | 325 | 4,371 |
| Miami | 391 | 352 | 251 | 445 | 415 | 494 | 422 | 475 | 440 | 532 | 564 | 362 | 5,143 |
| New Orleans | 352 | 220 | 299 | 357 | 373 | 459 | 492 | 307 | 460 | 427 | 424 | 495 | 4,665 |
| Ramey | 3 | 47 | 11 | 37 | 36 | 98 | 32 | 94 | 29 | 90 | 222 | 136 | 835 |
| Blaine | 127 | 152 | 172 | 106 | 147 | 132 | 156 | 175 | 124 | 148 | 157 | 136 | 1,732 |
| Buffalo | 50 | 73 | 36 | 74 | 101 | 112 | 155 | 121 | 85 | 64 | 142 | 89 | 1,102 |
| Detroit | 135 | 106 | 98 | 99 | 135 | 107 | 137 | 132 | 106 | 173 | 133 | 150 | 1,511 |
| Grand Forks | 85 | 80 | 87 | 93 | 87 | 113 | 131 | 159 | 153 | 138 | 108 | 135 | 1,369 |
| Havre | 114 | 119 | 92 | 89 | 107 | 144 | 123 | 138 | 113 | 139 | 163 | 122 | 1,463 |
| Houlton | 27 | 31 | 24 | 43 | 40 | 35 | 31 | 36 | 28 | 42 | 59 | 36 | 432 |
| Spokane | 62 | 53 | 60 | 98 | 91 | 100 | 90 | 104 | 99 | 135 | 121 | 129 | 1,142 |
| Swanton | 82 | 73 | 76 | 71 | 58 | 104 | 100 | 125 | 210 | 293 | 387 | 157 | 1,736 |
| Big Bend (formerly Marfa) | 913 | 810 | 876 | 826 | 1,040 | 1,184 | 1,312 | 1,163 | 702 | 748 | 940 | 878 | 11,392 |
| Del Rio | 2,938 | 2,367 | 2,104 | 8,384 | 10,087 | 12,068 | 8,540 | 5,404 | 3,787 | 3,301 | 4,297 | 3,708 | 66,985 |
| El Centro | 4,069 | 3,318 | 3,720 | 9,670 | 11,118 | 15,673 | 14,274 | 11,415 | 8,870 | 7,897 | 9,557 | 8,692 | 108,273 |
| El Paso | 4,441 | 3,483 | 3,784 | 8,185 | 9,393 | 11,309 | 11,783 | 9,972 | 6,931 | 8,044 | 9,018 | 7,811 | 94,154 |
| Laredo | 3,431 | 2,949 | 2,608 | 7,711 | 10,628 | 12,270 | 10,709 | 7,861 | 6,545 | 5,830 | 6,376 | 5,177 | 82,095 |
| Rio Grande Valley (formerly McAllen) | 4,784 | 3,744 | 3,843 | 8,035 | 8,438 | 10,153 | 10,310 | 9,473 | 8,109 | 7,523 | 8,762 | 6,753 | 89,927 |
| San Diego | 4,530 | 3,178 | 3,183 | 7,716 | 9,172 | 12,832 | 11,712 | 11,222 | 9,251 | 9,340 | 10,115 | 8,430 | 100,681 |
| Tucson | 11,124 | 10,523 | 9,208 | 25,182 | 32,264 | 46,094 | 47,712 | 36,333 | 30,898 | 30,212 | 30,078 | 24,020 | 333,648 |
| Yuma | 1,582 | 2,134 | 2,175 | 4,084 | 3,584 | 5,409 | 5,569 | 4,581 | 3,562 | 3,766 | 3,414 | 2,794 | 42,654 |
| Coastal Border | 1,183 | 1,058 | 934 | 1,201 | 1,071 | 1,365 | 1,305 | 1,216 | 1,289 | 1,407 | 1,667 | 1,318 | 15,014 |
| Northern Border | 682 | 687 | 645 | 673 | 766 | 847 | 923 | 990 | 918 | 1,132 | 1,270 | 954 | 10,487 |
| Southwest Border | 37,812 | 32,506 | 31,501 | 79,793 | 95,724 | 126,992 | 121,921 | 97,424 | 78,655 | 76,661 | 82,557 | 68,263 | 929,809 |
| Monthly Total | 39,677 | 34,251 | 33,080 | 81,667 | 97,561 | 129,204 | 124,149 | 99,630 | 80,862 | 79,200 | 85,494 | 70,535 | 955,310 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2003

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 371 | 292 | 288 | 309 | 253 | 315 | 336 | 330 | 267 | 247 | 211 | 346 | 3,565 |
| Miami | 686 | 398 | 287 | 493 | 542 | 461 | 623 | 434 | 408 | 491 | 481 | 627 | 5,931 |
| New Orleans | 462 | 430 | 349 | 535 | 506 | 504 | 576 | 516 | 399 | 378 | 252 | 244 | 5,151 |
| Ramey | 198 | 316 | 121 | 201 | 32 | 36 | 46 | 231 | 81 | 21 | 172 | 233 | 1,688 |
| Blaine | 107 | 107 | 89 | 92 | 116 | 125 | 93 | 121 | 69 | 152 | 140 | 169 | 1,380 |
| Buffalo | 112 | 79 | 55 | 35 | 30 | 34 | 26 | 22 | 33 | 28 | 30 | 80 | 564 |
| Detroit | 151 | 195 | 153 | 178 | 188 | 170 | 220 | 195 | 196 | 235 | 232 | 232 | 2,345 |
| Grand Forks | 102 | 81 | 88 | 78 | 110 | 119 | 113 | 90 | 99 | 123 | 131 | 89 | 1,223 |
| Havre | 151 | 105 | 86 | 92 | 98 | 97 | 156 | 135 | 132 | 128 | 110 | 116 | 1,406 |
| Houlton | 53 | 22 | 12 | 19 | 17 | 16 | 19 | 30 | 21 | 38 | 29 | 16 | 292 |
| Spokane | 126 | 88 | 72 | 79 | 69 | 54 | 42 | 60 | 68 | 137 | 87 | 110 | 992 |
| Swanton | 107 | 80 | 80 | 101 | 113 | 121 | 101 | 156 | 337 | 352 | 235 | 172 | 1,955 |
| Big Bend (formerly Marfa) | 754 | 722 | 872 | 862 | 974 | 1,097 | 860 | 1,099 | 678 | 773 | 867 | 761 | 10,319 |
| Del Rio | 3,037 | 1,942 | 2,083 | 6,546 | 7,127 | 6,579 | 5,020 | 4,973 | 2,857 | 2,993 | 3,700 | 3,288 | 50,145 |
| El Centro | 8,399 | 6,107 | 4,572 | 12,369 | 13,293 | 11,632 | 6,116 | 6,528 | 5,791 | 6,128 | 6,076 | 5,088 | 92,099 |
| El Paso | 6,545 | 5,303 | 4,008 | 9,255 | 10,000 | 8,883 | 7,359 | 8,120 | 6,998 | 7,618 | 7,538 | 7,189 | 88,816 |
| Laredo | 4,644 | 4,157 | 3,991 | 7,444 | 7,603 | 7,803 | 5,990 | 6,683 | 5,165 | 5,570 | 6,371 | 5,100 | 70,521 |
| Rio Grande Valley (formerly McAllen) | 6,024 | 4,218 | 3,814 | 7,630 | 7,905 | 7,498 | 6,560 | 7,095 | 6,153 | 7,042 | 7,737 | 6,073 | 77,749 |
| San Diego | 7,339 | 5,379 | 4,280 | 10,177 | 10,958 | 11,158 | 9,082 | 10,680 | 9,271 | 10,207 | 11,217 | 11,767 | 111,515 |
| Tucson | 21,352 | 17,206 | 11,481 | 26,826 | 33,854 | 37,055 | 29,099 | 37,847 | 32,532 | 34,201 | 36,639 | 29,171 | 347,263 |
| Yuma | 3,698 | 2,697 | 2,723 | 5,816 | 5,155 | 6,694 | 5,273 | 5,665 | 6,085 | 4,752 | 4,341 | 3,739 | 56,638 |
| Coastal Border | 1,717 | 1,436 | 1,045 | 1,538 | 1,333 | 1,316 | 1,581 | 1,511 | 1,155 | 1,137 | 1,116 | 1,450 | 16,335 |
| Northern Border | 909 | 757 | 635 | 674 | 741 | 736 | 770 | 809 | 955 | 1,193 | 994 | 984 | 10,157 |
| Southwest Border | 61,792 | 47,731 | 37,824 | 86,925 | 96,869 | 98,399 | 75,359 | 88,690 | 75,530 | 79,284 | 84,486 | 72,176 | 905,065 |
| Monthly Total | 64,418 | 49,924 | 39,504 | 89,137 | 98,943 | 100,451 | 77,710 | 91,010 | 77,640 | 81,614 | 86,596 | 74,610 | 931,557 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2004

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 296 | 225 | 220 | 172 | 184 | 183 | 185 | 214 | 171 | 0 | 0 | 0 | 1,850 |
| Miami | 437 | 321 | 367 | 522 | 418 | 346 | 371 | 252 | 415 | 344 | 494 | 315 | 4,602 |
| New Orleans | 284 | 244 | 184 | 293 | 226 | 376 | 282 | 286 | 296 | 98 | 158 | 162 | 2,889 |
| Ramey | 213 | 247 | 332 | 166 | 188 | 31 | 178 | 87 | 99 | 74 | 165 | 33 | 1,813 |
| Blaine | 135 | 100 | 101 | 76 | 118 | 145 | 132 | 136 | 106 | 85 | 117 | 103 | 1,354 |
| Buffalo | 25 | 17 | 30 | 28 | 28 | 84 | 60 | 84 | 85 | 86 | 95 | 49 | 671 |
| Detroit | 154 | 157 | 111 | 114 | 108 | 202 | 149 | 173 | 148 | 184 | 212 | 200 | 1,912 |
| Grand Forks | 92 | 89 | 85 | 105 | 70 | 106 | 84 | 134 | 136 | 122 | 105 | 97 | 1,225 |
| Havre | 81 | 48 | 90 | 84 | 62 | 84 | 69 | 92 | 83 | 108 | 106 | 79 | 986 |
| Houlton | 27 | 19 | 17 | 38 | 17 | 15 | 17 | 22 | 17 | 32 | 24 | 18 | 263 |
| Spokane | 83 | 79 | 51 | 69 | 103 | 101 | 52 | 58 | 84 | 54 | 49 | 64 | 847 |
| Swanton | 177 | 82 | 107 | 224 | 182 | 195 | 141 | 179 | 270 | 526 | 374 | 244 | 2,701 |
| Big Bend (formerly Marfa) | 707 | 710 | 824 | 696 | 907 | 1,104 | 993 | 923 | 885 | 1,068 | 930 | 783 | 10,530 |
| Del Rio | 2,913 | 2,372 | 2,307 | 5,044 | 6,561 | 7,983 | 4,960 | 5,177 | 3,709 | 4,242 | 4,573 | 3,953 | 53,794 |
| El Centro | 5,438 | 3,799 | 2,802 | 7,826 | 8,417 | 10,761 | 8,327 | 7,616 | 5,611 | 4,581 | 5,086 | 4,203 | 74,467 |
| El Paso | 6,451 | 5,244 | 4,030 | 8,768 | 10,584 | 13,483 | 12,632 | 10,343 | 8,432 | 8,654 | 8,321 | 7,457 | 104,399 |
| Laredo | 4,479 | 4,670 | 3,571 | 6,540 | 8,057 | 9,686 | 7,069 | 7,421 | 6,149 | 5,376 | 6,570 | 5,118 | 74,706 |
| Rio Grande Valley (formerly McAllen) | 5,414 | 5,053 | 4,636 | 8,102 | 8,732 | 10,149 | 9,618 | 8,916 | 7,423 | 8,826 | 8,542 | 7,536 | 92,947 |
| San Diego | 10,426 | 7,996 | 5,849 | 13,405 | 13,252 | 17,532 | 15,962 | 14,976 | 11,548 | 9,530 | 9,716 | 8,416 | 138,608 |
| Tucson | 26,530 | 24,890 | 17,349 | 34,913 | 45,312 | 72,095 | 64,563 | 53,132 | 42,013 | 39,114 | 38,740 | 33,120 | 491,771 |
| Yuma | 3,033 | 3,160 | 2,246 | 7,227 | 8,847 | 12,188 | 11,344 | 10,222 | 8,820 | 10,774 | 10,768 | 9,431 | 98,060 |
| Coastal Border | 1,230 | 1,037 | 1,103 | 1,153 | 1,016 | 936 | 1,016 | 839 | 981 | 516 | 817 | 510 | 11,154 |
| Northern Border | 774 | 591 | 592 | 738 | 688 | 932 | 704 | 878 | 929 | 1,197 | 1,082 | 854 | 9,959 |
| Southwest Border | 65,391 | 57,894 | 43,614 | 92,521 | 110,669 | 154,981 | 135,468 | 118,726 | 94,590 | 92,165 | 93,246 | 80,017 | 1,139,282 |
| Monthly Total | 67,395 | 59,522 | 45,309 | 94,412 | 112,373 | 156,849 | 137,188 | 120,443 | 96,500 | 93,878 | 95,145 | 81,381 | 1,160,395 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2005

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 51 | 26 | 6 | 3 | 0 | 7 | 5 | 3 | 7 | 1 | 0 | 5 | 114 |
| Miami | 541 | 460 | 489 | 641 | 487 | 574 | 536 | 717 | 676 | 648 | 586 | 890 | 7,245 |
| New Orleans | 140 | 129 | 135 | 155 | 73 | 100 | 96 | 170 | 69 | 83 | 186 | 22 | 1,358 |
| Ramey | 188 | 112 | 205 | 33 | 106 | 63 | 163 | 67 | 103 | 101 | 156 | 322 | 1,619 |
| Blaine | 89 | 92 | 75 | 69 | 93 | 96 | 68 | 88 | 93 | 85 | 72 | 81 | 1,001 |
| Buffalo | 26 | 27 | 21 | 28 | 29 | 37 | 40 | 53 | 19 | 34 | 45 | 41 | 400 |
| Detroit | 200 | 176 | 133 | 164 | 205 | 193 | 132 | 113 | 122 | 107 | 132 | 116 | 1,793 |
| Grand Forks | 109 | 72 | 73 | 98 | 90 | 61 | 35 | 24 | 41 | 28 | 56 | 67 | 754 |
| Havre | 83 | 106 | 57 | 73 | 70 | 85 | 105 | 89 | 88 | 70 | 74 | 48 | 948 |
| Houlton | 17 | 47 | 31 | 27 | 26 | 6 | 19 | 10 | 11 | 18 | 8 | 13 | 233 |
| Spokane | 26 | 26 | 30 | 26 | 7 | 22 | 33 | 30 | 41 | 18 | 14 | 6 | 279 |
| Swanton | 193 | 186 | 141 | 95 | 105 | 152 | 105 | 123 | 241 | 274 | 214 | 106 | 1,935 |
| Big Bend (formerly Marfa) | 844 | 713 | 722 | 802 | 1,113 | 1,364 | 1,276 | 866 | 620 | 761 | 777 | 678 | 10,536 |
| Del Rio | 3,856 | 2,795 | 2,768 | 6,120 | 7,248 | 7,935 | 7,584 | 6,270 | 4,947 | 5,873 | 6,498 | 6,612 | 68,506 |
| El Centro | 3,723 | 2,798 | 1,772 | 4,963 | 5,926 | 6,632 | 6,010 | 5,352 | 3,829 | 3,712 | 5,047 | 5,958 | 55,722 |
| El Paso | 7,472 | 5,801 | 4,464 | 9,898 | 13,033 | 13,249 | 15,274 | 11,041 | 8,445 | 11,568 | 12,099 | 10,335 | 122,679 |
| Laredo | 4,691 | 3,997 | 3,367 | 6,331 | 7,530 | 8,112 | 9,043 | 7,569 | 5,699 | 6,623 | 6,635 | 5,749 | 75,346 |
| Rio Grande Valley (formerly McAllen) | 7,813 | 7,512 | 7,214 | 9,136 | 10,147 | 13,176 | 14,635 | 14,796 | 13,109 | 12,208 | 12,713 | 11,727 | 134,186 |
| San Diego | 6,702 | 5,428 | 4,632 | 9,390 | 10,864 | 12,750 | 16,534 | 15,114 | 10,921 | 10,010 | 11,798 | 12,761 | 126,904 |
| Tucson | 31,940 | 27,673 | 17,631 | 35,873 | 45,875 | 64,096 | 52,644 | 40,764 | 31,694 | 32,390 | 29,178 | 29,321 | 439,079 |
| Yuma | 8,872 | 8,418 | 5,836 | 10,507 | 12,039 | 15,734 | 17,062 | 14,051 | 11,522 | 11,809 | 11,988 | 10,600 | 138,438 |
| Coastal Border | 920 | 727 | 835 | 832 | 666 | 744 | 800 | 957 | 855 | 833 | 928 | 1,239 | 10,336 |
| Northern Border | 743 | 732 | 561 | 580 | 625 | 652 | 537 | 530 | 656 | 634 | 615 | 478 | 7,343 |
| Southwest Border | 75,913 | 65,135 | 48,406 | 93,020 | 113,775 | 143,048 | 140,062 | 115,823 | 90,786 | 94,954 | 96,733 | 93,741 | 1,171,396 |
| Monthly Total | 77,576 | 66,594 | 49,802 | 94,432 | 115,066 | 144,444 | 141,399 | 117,310 | 92,297 | 96,421 | 98,276 | 95,458 | 1,189,075 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2006

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 438 | 543 | 693 | 506 | 452 | 450 | 592 | 725 | 523 | 358 | 295 | 457 | 6,032 |
| New Orleans | 48 | 176 | 214 | 372 | 300 | 230 | 136 | 402 | 238 | 289 | 325 | 323 | 3,053 |
| Ramey | 184 | 119 | 174 | 60 | 208 | 136 | 127 | 149 | 112 | 46 | 85 | 36 | 1,436 |
| Blaine | 71 | 103 | 49 | 54 | 54 | 50 | 83 | 85 | 64 | 66 | 64 | 68 | 811 |
| Buffalo | 120 | 107 | 71 | 85 | 96 | 101 | 111 | 178 | 154 | 174 | 148 | 172 | 1,517 |
| Detroit | 120 | 134 | 130 | 138 | 92 | 149 | 83 | 108 | 78 | 76 | 97 | 76 | 1,281 |
| Grand Forks | 59 | 48 | 41 | 56 | 36 | 18 | 66 | 49 | 26 | 31 | 48 | 40 | 518 |
| Havre | 26 | 58 | 28 | 40 | 62 | 32 | 43 | 63 | 56 | 47 | 52 | 61 | 568 |
| Houlton | 17 | 21 | 15 | 28 | 10 | 12 | 11 | 5 | 22 | 12 | 16 | 6 | 175 |
| Spokane | 8 | 23 | 8 | 10 | 3 | 12 | 26 | 6 | 19 | 6 | 19 | 45 | 185 |
| Swanton | 107 | 98 | 89 | 96 | 75 | 87 | 83 | 121 | 155 | 352 | 201 | 80 | 1,544 |
| Big Bend (formerly Marfa) | 655 | 590 | 563 | 739 | 908 | 910 | 746 | 711 | 478 | 392 | 403 | 425 | 7,520 |
| Del Rio | 4,840 | 4,016 | 2,910 | 4,839 | 5,854 | 5,636 | 4,555 | 2,633 | 2,106 | 1,947 | 1,683 | 1,617 | 42,636 |
| El Centro | 5,072 | 3,831 | 2,998 | 5,797 | 6,399 | 9,048 | 6,847 | 6,187 | 4,112 | 3,240 | 3,705 | 4,229 | 61,465 |
| El Paso | 11,027 | 8,191 | 5,668 | 11,941 | 14,457 | 18,668 | 15,238 | 12,239 | 7,664 | 6,970 | 5,027 | 5,166 | 122,256 |
| Laredo | 5,014 | 4,323 | 3,544 | 7,415 | 9,554 | 10,179 | 8,530 | 6,866 | 4,815 | 4,667 | 5,525 | 4,408 | 74,840 |
| Rio Grande Valley (formerly McAllen) | 10,060 | 9,111 | 7,128 | 9,533 | 10,444 | 13,080 | 11,264 | 11,649 | 7,516 | 7,109 | 7,020 | 6,614 | 110,528 |
| San Diego | 10,145 | 7,730 | 6,531 | 13,959 | 17,160 | 18,361 | 14,736 | 13,888 | 10,597 | 8,683 | 10,009 | 10,305 | 142,104 |
| Tucson | 27,316 | 24,270 | 16,447 | 33,229 | 43,153 | 63,583 | 51,588 | 40,190 | 25,049 | 21,187 | 23,256 | 22,806 | 392,074 |
| Yuma | 9,428 | 8,913 | 6,884 | 13,743 | 17,117 | 21,231 | 13,034 | 11,087 | 6,029 | 5,446 | 3,123 | 2,514 | 118,549 |
| Coastal Border | 670 | 838 | 1,081 | 938 | 960 | 816 | 855 | 1,276 | 873 | 693 | 705 | 816 | 10,521 |
| Northern Border | 528 | 592 | 431 | 507 | 428 | 461 | 506 | 615 | 574 | 764 | 645 | 548 | 6,599 |
| Southwest Border | 83,557 | 70,975 | 52,673 | 101,195 | 125,046 | 160,696 | 126,538 | 105,450 | 68,366 | 59,641 | 59,751 | 58,084 | 1,071,972 |
| Monthly Total | 84,755 | 72,405 | 54,185 | 102,640 | 126,434 | 161,973 | 127,899 | 107,341 | 69,813 | 61,098 | 61,101 | 59,448 | 1,089,092 |

*Livermore Sector was closed after FY 2004

AR2022_300153



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2007

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 669 | 429 | 405 | 751 | 531 | 475 | 477 | 573 | 905 | 648 | 651 | 606 | 7,120 |
| **New Orleans** | 379 | 379 | 222 | 327 | 398 | 492 | 336 | 336 | 340 | 354 | 155 | 300 | 4,018 |
| **Ramey** | 41 | 61 | 117 | 39 | 71 | 37 | 51 | 48 | 32 | 13 | 28 | 10 | 548 |
| **Blaine** | 61 | 36 | 62 | 61 | 59 | 87 | 50 | 67 | 82 | 67 | 60 | 57 | 749 |
| **Buffalo** | 141 | 155 | 104 | 123 | 125 | 170 | 167 | 178 | 219 | 223 | 233 | 353 | 2,191 |
| **Detroit** | 106 | 99 | 83 | 77 | 56 | 83 | 85 | 76 | 51 | 52 | 66 | 68 | 902 |
| **Grand Forks** | 56 | 32 | 45 | 25 | 40 | 48 | 49 | 33 | 35 | 40 | 54 | 40 | 497 |
| **Havre** | 68 | 56 | 53 | 41 | 60 | 40 | 27 | 27 | 31 | 17 | 31 | 35 | 486 |
| **Houlton** | 7 | 7 | 4 | 6 | 12 | 2 | 3 | 6 | 5 | 22 | 6 | 15 | 95 |
| **Spokane** | 30 | 18 | 23 | 30 | 22 | 37 | 24 | 29 | 42 | 47 | 27 | 12 | 341 |
| **Swanton** | 73 | 78 | 80 | 75 | 68 | 75 | 91 | 105 | 74 | 101 | 183 | 116 | 1,119 |
| **Big Bend** *(formerly Marfa)* | 368 | 442 | 383 | 556 | 532 | 677 | 602 | 407 | 362 | 439 | 403 | 365 | 5,536 |
| **Del Rio** | 1,618 | 1,701 | 1,051 | 2,044 | 2,421 | 3,314 | 2,699 | 1,858 | 1,579 | 1,862 | 1,440 | 1,333 | 22,920 |
| **El Centro** | 4,379 | 3,667 | 3,037 | 4,983 | 5,187 | 7,198 | 6,983 | 5,747 | 3,842 | 3,835 | 3,789 | 3,236 | 55,883 |
| **El Paso** | 6,183 | 5,098 | 4,189 | 6,570 | 7,482 | 10,537 | 8,957 | 6,741 | 5,632 | 5,109 | 4,969 | 3,997 | 75,464 |
| **Laredo** | 4,286 | 3,810 | 2,890 | 4,678 | 5,855 | 7,673 | 6,428 | 4,928 | 4,595 | 4,338 | 3,858 | 3,375 | 56,714 |
| **Rio Grande Valley** *(formerly McAllen)* | 5,772 | 4,549 | 3,649 | 5,798 | 6,172 | 8,431 | 7,645 | 7,736 | 5,791 | 6,225 | 6,331 | 5,331 | 73,430 |
| **San Diego** | 9,494 | 7,764 | 6,591 | 12,489 | 12,997 | 18,044 | 17,999 | 16,136 | 13,283 | 12,941 | 13,312 | 11,410 | 152,460 |
| **Tucson** | 25,135 | 21,323 | 16,136 | 29,459 | 34,148 | 52,692 | 49,044 | 41,789 | 34,103 | 30,373 | 24,388 | 19,649 | 378,239 |
| **Yuma** | 3,478 | 3,240 | 2,601 | 5,357 | 4,474 | 5,571 | 4,108 | 3,162 | 2,151 | 1,660 | 1,305 | 885 | 37,992 |
| **Coastal Border** | 1,089 | 869 | 744 | 1,117 | 1,000 | 1,004 | 864 | 957 | 1,277 | 1,015 | 834 | 916 | 11,686 |
| **Northern Border** | 542 | 481 | 454 | 438 | 442 | 542 | 496 | 521 | 539 | 569 | 660 | 696 | 6,380 |
| **Southwest Border** | 60,713 | 51,594 | 40,527 | 71,934 | 79,268 | 114,137 | 104,465 | 88,504 | 71,338 | 66,782 | 59,795 | 49,581 | 858,638 |
| **Monthly Total** | 62,344 | 52,944 | 41,725 | 73,489 | 80,710 | 115,683 | 105,825 | 89,982 | 73,154 | 68,366 | 61,289 | 51,193 | 876,704 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2008

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 553 | 496 | 685 | 456 | 539 | 699 | 634 | 433 | 519 | 277 | 335 | 394 | 6,020 |
| New Orleans | 382 | 429 | 329 | 650 | 305 | 365 | 462 | 318 | 439 | 296 | 251 | 77 | 4,303 |
| Ramey | 90 | 40 | 20 | 52 | 12 | 55 | 48 | 33 | 53 | 28 | 50 | 91 | 572 |
| Blaine | 52 | 75 | 40 | 91 | 69 | 108 | 101 | 67 | 75 | 88 | 82 | 106 | 954 |
| Buffalo | 382 | 290 | 295 | 228 | 260 | 304 | 233 | 222 | 260 | 259 | 291 | 315 | 3,339 |
| Detroit | 100 | 63 | 68 | 79 | 71 | 95 | 64 | 113 | 83 | 73 | 84 | 68 | 961 |
| Grand Forks | 67 | 91 | 41 | 24 | 38 | 22 | 41 | 30 | 52 | 41 | 38 | 56 | 541 |
| Havre | 63 | 121 | 13 | 33 | 19 | 3 | 23 | 28 | 33 | 21 | 38 | 32 | 427 |
| Houlton | 15 | 5 | 2 | 17 | 2 | 0 | 5 | 3 | 1 | 7 | 14 | 10 | 81 |
| Spokane | 30 | 40 | 17 | 18 | 27 | 15 | 20 | 10 | 34 | 38 | 34 | 57 | 340 |
| Swanton | 106 | 126 | 64 | 74 | 85 | 87 | 72 | 92 | 148 | 195 | 159 | 74 | 1,282 |
| Big Bend (formerly Marfa) | 386 | 388 | 451 | 350 | 612 | 613 | 527 | 586 | 369 | 416 | 415 | 278 | 5,391 |
| Del Rio | 1,679 | 1,059 | 945 | 1,961 | 2,462 | 2,667 | 2,286 | 1,745 | 1,708 | 1,482 | 1,618 | 1,149 | 20,761 |
| El Centro | 3,230 | 2,412 | 2,000 | 3,839 | 4,095 | 4,604 | 5,090 | 3,860 | 3,161 | 2,726 | 2,995 | 2,949 | 40,961 |
| El Paso | 3,605 | 2,648 | 2,015 | 3,470 | 3,944 | 3,129 | 2,808 | 2,035 | 1,811 | 1,634 | 1,615 | 1,598 | 30,312 |
| Laredo | 3,825 | 2,658 | 1,969 | 3,907 | 5,001 | 5,355 | 4,904 | 3,733 | 3,432 | 3,066 | 3,310 | 2,498 | 43,658 |
| Rio Grande Valley (formerly McAllen) | 5,989 | 4,695 | 3,974 | 5,216 | 6,880 | 8,543 | 9,417 | 7,967 | 6,308 | 5,562 | 6,103 | 4,819 | 75,473 |
| San Diego | 9,801 | 9,163 | 7,773 | 12,877 | 15,091 | 18,869 | 20,569 | 16,015 | 12,395 | 13,127 | 13,734 | 12,976 | 162,390 |
| Tucson | 21,730 | 18,231 | 11,721 | 26,347 | 34,309 | 45,239 | 45,442 | 32,845 | 24,289 | 21,093 | 18,406 | 18,044 | 317,696 |
| Yuma | 1,094 | 955 | 954 | 1,061 | 1,089 | 751 | 523 | 447 | 381 | 366 | 345 | 397 | 8,363 |
| Coastal Border | 1,025 | 965 | 1,034 | 1,158 | 856 | 1,119 | 1,144 | 784 | 1,011 | 601 | 636 | 562 | 10,895 |
| Northern Border | 815 | 811 | 540 | 564 | 571 | 634 | 559 | 565 | 686 | 722 | 740 | 718 | 7,925 |
| Southwest Border | 51,339 | 42,209 | 31,802 | 59,028 | 73,483 | 89,770 | 91,566 | 69,233 | 53,854 | 49,472 | 48,541 | 44,708 | 705,005 |
| Monthly Total | 53,179 | 43,985 | 33,376 | 60,750 | 74,910 | 91,523 | 93,269 | 70,582 | 55,551 | 50,795 | 49,917 | 45,988 | 723,825 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2009

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 342 | 302 | 317 | 401 | 383 | 382 | 407 | 314 | 343 | 413 | 358 | 463 | 4,425 |
| New Orleans | 386 | 267 | 309 | 259 | 282 | 429 | 317 | 257 | 264 | 253 | 271 | 233 | 3,527 |
| Ramey | 114 | 34 | 27 | 27 | 21 | 42 | 26 | 11 | 50 | 5 | 58 | 3 | 418 |
| Blaine | 103 | 93 | 68 | 96 | 68 | 85 | 61 | 65 | 39 | 49 | 67 | 49 | 843 |
| Buffalo | 254 | 210 | 201 | 176 | 194 | 220 | 225 | 263 | 250 | 198 | 240 | 241 | 2,672 |
| Detroit | 120 | 62 | 63 | 78 | 118 | 99 | 97 | 91 | 80 | 117 | 122 | 110 | 1,157 |
| Grand Forks | 52 | 53 | 37 | 29 | 26 | 29 | 22 | 41 | 35 | 50 | 49 | 49 | 472 |
| Havre | 31 | 21 | 11 | 29 | 30 | 23 | 30 | 21 | 31 | 22 | 18 | 16 | 283 |
| Houlton | 1 | 8 | 13 | 3 | 0 | 4 | 4 | 4 | 2 | 8 | 4 | 8 | 59 |
| Spokane | 32 | 44 | 22 | 20 | 18 | 14 | 15 | 16 | 17 | 19 | 38 | 22 | 277 |
| Swanton | 65 | 80 | 106 | 36 | 77 | 71 | 74 | 111 | 99 | 125 | 104 | 95 | 1,043 |
| Big Bend (formerly Marfa) | 539 | 459 | 472 | 533 | 689 | 590 | 458 | 511 | 569 | 484 | 575 | 481 | 6,360 |
| Del Rio | 1,321 | 1,064 | 872 | 1,604 | 1,908 | 2,231 | 1,619 | 1,426 | 1,304 | 1,383 | 1,321 | 1,029 | 17,082 |
| El Centro | 2,619 | 2,176 | 1,691 | 2,969 | 2,904 | 4,141 | 3,314 | 2,955 | 2,811 | 2,449 | 2,767 | 2,725 | 33,521 |
| El Paso | 1,469 | 1,153 | 866 | 1,344 | 1,435 | 1,508 | 1,344 | 1,238 | 1,208 | 1,160 | 1,181 | 1,093 | 14,999 |
| Laredo | 2,709 | 2,465 | 1,932 | 3,970 | 3,718 | 4,538 | 4,168 | 3,722 | 3,283 | 3,512 | 3,671 | 2,881 | 40,569 |
| Rio Grande Valley (formerly McAllen) | 5,092 | 4,259 | 3,341 | 4,575 | 5,207 | 5,479 | 6,107 | 5,293 | 5,094 | 5,509 | 6,025 | 5,008 | 60,989 |
| San Diego | 10,036 | 7,954 | 6,552 | 10,246 | 11,678 | 16,472 | 12,618 | 11,000 | 10,278 | 8,655 | 6,743 | 6,489 | 118,721 |
| Tucson | 18,814 | 12,844 | 9,862 | 18,649 | 20,941 | 31,432 | 28,072 | 24,083 | 20,842 | 20,146 | 20,810 | 15,178 | 241,673 |
| Yuma | 339 | 406 | 359 | 612 | 731 | 951 | 793 | 656 | 655 | 545 | 429 | 475 | 6,951 |
| Coastal Border | 842 | 603 | 653 | 687 | 686 | 853 | 750 | 582 | 657 | 671 | 687 | 699 | 8,370 |
| Northern Border | 658 | 571 | 521 | 467 | 531 | 545 | 528 | 612 | 553 | 588 | 642 | 590 | 6,806 |
| Southwest Border | 42,938 | 32,780 | 25,947 | 44,502 | 49,211 | 67,342 | 58,493 | 50,884 | 46,044 | 43,843 | 43,522 | 35,359 | 540,865 |
| Monthly Total | 44,438 | 33,954 | 27,121 | 45,656 | 50,428 | 68,740 | 59,771 | 52,078 | 47,254 | 45,102 | 44,851 | 36,648 | 556,041 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2010

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 463 | 478 | 416 | 265 | 335 | 326 | 370 | 427 | 442 | 367 | 427 | 335 | 4,651 |
| New Orleans | 247 | 179 | 173 | 303 | 303 | 394 | 404 | 218 | 223 | 204 | 244 | 279 | 3,171 |
| Ramey | 41 | 20 | 10 | 8 | 23 | 32 | 40 | 44 | 25 | 4 | 94 | 57 | 398 |
| Blaine | 50 | 69 | 52 | 59 | 57 | 58 | 54 | 44 | 53 | 65 | 70 | 42 | 673 |
| Buffalo | 241 | 214 | 207 | 168 | 216 | 252 | 207 | 231 | 189 | 135 | 180 | 182 | 2,422 |
| Detroit | 168 | 154 | 157 | 129 | 126 | 122 | 110 | 98 | 128 | 113 | 165 | 199 | 1,669 |
| Grand Forks | 55 | 47 | 36 | 26 | 37 | 45 | 39 | 80 | 23 | 34 | 74 | 47 | 543 |
| Havre | 31 | 23 | 17 | 11 | 18 | 54 | 30 | 32 | 20 | 12 | 20 | 22 | 290 |
| Houlton | 3 | 2 | 0 | 0 | 0 | 12 | 5 | 10 | 6 | 12 | 6 | 0 | 56 |
| Spokane | 35 | 21 | 14 | 19 | 15 | 27 | 25 | 34 | 33 | 42 | 51 | 40 | 356 |
| Swanton | 71 | 101 | 68 | 58 | 128 | 132 | 97 | 136 | 124 | 233 | 197 | 77 | 1,422 |
| Big Bend (formerly Marfa) | 530 | 421 | 373 | 433 | 484 | 660 | 575 | 493 | 415 | 280 | 295 | 329 | 5,288 |
| Del Rio | 1,119 | 897 | 697 | 1,234 | 1,245 | 1,874 | 1,791 | 1,718 | 1,326 | 767 | 1,095 | 931 | 14,694 |
| El Centro | 2,589 | 2,412 | 2,196 | 2,688 | 2,836 | 4,408 | 3,419 | 3,126 | 2,440 | 2,331 | 2,075 | 2,042 | 32,562 |
| El Paso | 1,007 | 894 | 725 | 1,124 | 1,140 | 1,528 | 1,359 | 1,380 | 1,005 | 725 | 732 | 632 | 12,251 |
| Laredo | 2,613 | 2,130 | 1,802 | 2,526 | 3,173 | 4,433 | 4,528 | 3,813 | 3,475 | 1,857 | 2,819 | 2,118 | 35,287 |
| Rio Grande Valley (formerly McAllen) | 4,236 | 3,688 | 2,987 | 3,658 | 4,845 | 7,141 | 7,139 | 7,477 | 5,595 | 3,832 | 5,329 | 3,839 | 59,766 |
| San Diego | 5,017 | 4,738 | 4,636 | 6,413 | 6,982 | 9,061 | 7,115 | 5,858 | 5,092 | 5,113 | 4,528 | 4,012 | 68,565 |
| Tucson | 23,197 | 16,986 | 10,907 | 16,122 | 21,266 | 31,197 | 28,579 | 22,572 | 13,160 | 10,303 | 9,280 | 8,633 | 212,202 |
| Yuma | 582 | 649 | 711 | 586 | 819 | 1,059 | 732 | 608 | 447 | 401 | 262 | 260 | 7,116 |
| Coastal Border | 751 | 677 | 599 | 576 | 661 | 752 | 814 | 689 | 690 | 575 | 765 | 671 | 8,220 |
| Northern Border | 654 | 631 | 551 | 470 | 597 | 702 | 567 | 665 | 576 | 646 | 763 | 609 | 7,431 |
| Southwest Border | 40,890 | 32,815 | 25,034 | 34,784 | 42,790 | 61,361 | 55,237 | 47,045 | 32,955 | 25,609 | 26,415 | 22,796 | 447,731 |
| Monthly Total | 42,295 | 34,123 | 26,184 | 35,830 | 44,048 | 62,815 | 56,618 | 48,399 | 34,221 | 26,830 | 27,943 | 24,076 | 463,382 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2011

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 401 | 441 | 349 | 447 | 364 | 466 | 324 | 325 | 309 | 330 | 340 | 305 | 4,401 |
| New Orleans | 231 | 144 | 121 | 156 | 132 | 105 | 109 | 124 | 111 | 63 | 114 | 99 | 1,509 |
| Ramey | 55 | 25 | 59 | 47 | 44 | 54 | 46 | 82 | 42 | 90 | 38 | 60 | 642 |
| Blaine | 68 | 42 | 37 | 54 | 31 | 69 | 35 | 53 | 46 | 48 | 64 | 44 | 591 |
| Buffalo | 231 | 190 | 139 | 161 | 148 | 203 | 174 | 158 | 176 | 157 | 188 | 189 | 2,114 |
| Detroit | 177 | 143 | 110 | 133 | 121 | 175 | 118 | 103 | 110 | 96 | 126 | 119 | 1,531 |
| Grand Forks | 47 | 34 | 32 | 24 | 37 | 56 | 20 | 24 | 49 | 52 | 44 | 49 | 468 |
| Havre | 46 | 23 | 16 | 24 | 21 | 17 | 32 | 25 | 4 | 9 | 31 | 22 | 270 |
| Houlton | 4 | 4 | 0 | 1 | 1 | 9 | 1 | 1 | 10 | 5 | 2 | 3 | 41 |
| Spokane | 32 | 28 | 20 | 5 | 26 | 28 | 20 | 23 | 24 | 21 | 41 | 25 | 293 |
| Swanton | 78 | 74 | 37 | 67 | 67 | 50 | 53 | 53 | 50 | 121 | 110 | 55 | 815 |
| Big Bend (formerly Marfa) | 375 | 290 | 282 | 332 | 300 | 457 | 512 | 350 | 296 | 235 | 311 | 296 | 4,036 |
| Del Rio | 1,043 | 837 | 704 | 899 | 1,399 | 2,132 | 1,977 | 1,499 | 1,525 | 1,386 | 1,356 | 1,387 | 16,144 |
| El Centro | 2,201 | 1,851 | 1,734 | 2,135 | 2,569 | 3,772 | 3,563 | 3,278 | 2,904 | 2,225 | 2,074 | 1,885 | 30,191 |
| El Paso | 732 | 660 | 622 | 779 | 911 | 1,354 | 1,380 | 904 | 816 | 794 | 711 | 682 | 10,345 |
| Laredo | 2,286 | 2,174 | 1,797 | 2,285 | 2,943 | 4,686 | 3,891 | 3,168 | 3,205 | 2,913 | 3,262 | 3,443 | 36,053 |
| Rio Grande Valley (formerly McAllen) | 3,628 | 3,625 | 3,349 | 3,485 | 4,233 | 6,806 | 6,502 | 5,953 | 5,409 | 5,276 | 5,973 | 5,004 | 59,243 |
| San Diego | 4,344 | 3,480 | 3,233 | 3,379 | 3,977 | 4,811 | 4,031 | 3,474 | 3,109 | 3,016 | 2,863 | 2,730 | 42,447 |
| Tucson | 11,165 | 9,097 | 7,354 | 10,131 | 11,790 | 17,056 | 13,816 | 12,088 | 9,585 | 6,923 | 7,270 | 7,010 | 123,285 |
| Yuma | 391 | 391 | 354 | 501 | 664 | 940 | 579 | 522 | 317 | 402 | 346 | 426 | 5,833 |
| Coastal Border | 687 | 610 | 529 | 650 | 540 | 625 | 479 | 531 | 462 | 483 | 492 | 464 | 6,552 |
| Northern Border | 683 | 538 | 391 | 469 | 452 | 607 | 453 | 440 | 469 | 509 | 606 | 506 | 6,123 |
| Southwest Border | 26,165 | 22,405 | 19,429 | 23,926 | 28,786 | 42,014 | 36,251 | 31,236 | 27,166 | 23,170 | 24,166 | 22,863 | 327,577 |
| Monthly Total | 27,535 | 23,553 | 20,349 | 25,045 | 29,778 | 43,246 | 37,183 | 32,207 | 28,097 | 24,162 | 25,264 | 23,833 | 340,252 |

*Livermore Sector was closed after FY 2004

AR2022_300158



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2012

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 216 | 293 | 195 | 249 | 180 | 156 | 159 | 226 | 137 | 249 | 207 | 242 | 2,509 |
| New Orleans | 49 | 48 | 39 | 40 | 42 | 24 | 22 | 58 | 22 | 12 | 21 | 97 | 474 |
| Ramey | 72 | 100 | 41 | 51 | 50 | 68 | 41 | 39 | 123 | 41 | 33 | 43 | 702 |
| Blaine | 50 | 58 | 47 | 41 | 53 | 51 | 42 | 28 | 40 | 41 | 41 | 45 | 537 |
| Buffalo | 118 | 87 | 56 | 78 | 90 | 100 | 89 | 106 | 61 | 126 | 104 | 128 | 1,143 |
| Detroit | 127 | 109 | 57 | 62 | 67 | 95 | 111 | 67 | 82 | 67 | 55 | 51 | 950 |
| Grand Forks | 58 | 46 | 16 | 29 | 13 | 30 | 33 | 26 | 36 | 43 | 32 | 56 | 418 |
| Havre | 21 | 9 | 18 | 4 | 9 | 11 | 9 | 5 | 5 | 3 | 4 | 4 | 102 |
| Houlton | 0 | 3 | 2 | 1 | 0 | 1 | 2 | 1 | 7 | 4 | 9 | 11 | 41 |
| Spokane | 34 | 18 | 23 | 24 | 18 | 21 | 35 | 22 | 25 | 40 | 34 | 23 | 317 |
| Swanton | 40 | 43 | 43 | 26 | 51 | 48 | 47 | 52 | 103 | 120 | 69 | 60 | 702 |
| Big Bend (formerly Marfa) | 284 | 317 | 288 | 323 | 423 | 450 | 393 | 304 | 300 | 303 | 333 | 246 | 3,964 |
| Del Rio | 1,364 | 1,289 | 871 | 1,204 | 1,788 | 2,375 | 2,791 | 2,480 | 2,123 | 1,942 | 1,770 | 1,723 | 21,720 |
| El Centro | 1,946 | 1,698 | 1,401 | 1,655 | 2,041 | 2,857 | 2,805 | 2,622 | 2,107 | 1,896 | 1,411 | 1,477 | 23,916 |
| El Paso | 647 | 662 | 534 | 625 | 812 | 1,151 | 888 | 823 | 840 | 793 | 984 | 919 | 9,678 |
| Laredo | 2,835 | 2,846 | 1,853 | 3,180 | 3,855 | 5,154 | 5,100 | 4,478 | 4,019 | 3,670 | 4,306 | 3,576 | 44,872 |
| Rio Grande Valley (formerly McAllen) | 6,201 | 5,513 | 4,285 | 5,514 | 6,709 | 9,622 | 11,160 | 11,583 | 10,112 | 9,023 | 9,295 | 8,745 | 97,762 |
| San Diego | 2,439 | 2,185 | 2,136 | 2,185 | 2,439 | 3,064 | 2,879 | 2,787 | 2,170 | 2,165 | 2,020 | 1,992 | 28,461 |
| Tucson | 9,306 | 8,361 | 7,100 | 10,209 | 12,836 | 16,559 | 14,095 | 11,343 | 8,636 | 6,856 | 7,116 | 7,583 | 120,000 |
| Yuma | 590 | 497 | 515 | 819 | 676 | 986 | 517 | 546 | 362 | 330 | 332 | 330 | 6,500 |
| Coastal Border | 337 | 441 | 275 | 340 | 272 | 248 | 222 | 323 | 282 | 302 | 261 | 382 | 3,685 |
| Northern Border | 448 | 373 | 262 | 265 | 301 | 357 | 368 | 307 | 359 | 444 | 348 | 378 | 4,210 |
| Southwest Border | 25,612 | 23,368 | 18,983 | 25,714 | 31,579 | 42,218 | 40,628 | 36,966 | 30,669 | 26,978 | 27,567 | 26,591 | 356,873 |
| Monthly Total | 26,397 | 24,182 | 19,520 | 26,319 | 32,152 | 42,823 | 41,218 | 37,596 | 31,310 | 27,724 | 28,176 | 27,351 | 364,768 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2013

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 248 | 134 | 130 | 135 | 89 | 92 | 157 | 92 | 113 | 212 | 171 | 165 | 1,738 |
| New Orleans | 49 | 74 | 47 | 32 | 49 | 27 | 46 | 28 | 15 | 30 | 47 | 56 | 500 |
| Ramey | 24 | 56 | 45 | 39 | 107 | 194 | 11 | 27 | 99 | 43 | 164 | 115 | 924 |
| Blaine | 37 | 34 | 33 | 21 | 32 | 31 | 24 | 26 | 34 | 32 | 25 | 31 | 360 |
| Buffalo | 106 | 54 | 60 | 53 | 47 | 47 | 73 | 54 | 78 | 83 | 58 | 83 | 796 |
| Detroit | 65 | 58 | 64 | 58 | 44 | 50 | 49 | 43 | 42 | 67 | 59 | 51 | 650 |
| Grand Forks | 32 | 27 | 12 | 19 | 36 | 31 | 39 | 36 | 52 | 73 | 55 | 57 | 469 |
| Havre | 4 | 2 | 0 | 3 | 3 | 2 | 3 | 9 | 9 | 8 | 21 | 24 | 88 |
| Houlton | 15 | 1 | 0 | 0 | 1 | 2 | 2 | 0 | 7 | 1 | 3 | 5 | 37 |
| Spokane | 33 | 36 | 17 | 19 | 13 | 19 | 28 | 20 | 26 | 33 | 34 | 21 | 299 |
| Swanton | 35 | 21 | 29 | 17 | 41 | 50 | 53 | 57 | 42 | 72 | 48 | 66 | 531 |
| Big Bend (formerly Marfa) | 356 | 238 | 213 | 340 | 400 | 416 | 473 | 341 | 232 | 219 | 218 | 238 | 3,684 |
| Del Rio | 1,792 | 1,715 | 1,135 | 1,617 | 2,223 | 2,771 | 2,778 | 2,332 | 1,695 | 2,039 | 1,817 | 1,596 | 23,510 |
| El Centro | 1,527 | 1,408 | 1,101 | 1,103 | 1,340 | 2,098 | 1,972 | 1,513 | 1,222 | 1,035 | 1,056 | 931 | 16,306 |
| El Paso | 977 | 860 | 629 | 776 | 1,030 | 1,176 | 1,217 | 1,163 | 857 | 852 | 852 | 765 | 11,154 |
| Laredo | 3,829 | 3,537 | 2,835 | 3,280 | 4,628 | 5,903 | 5,621 | 5,338 | 4,029 | 4,212 | 3,944 | 3,593 | 50,749 |
| Rio Grande Valley (formerly McAllen) | 8,869 | 8,352 | 6,587 | 7,190 | 10,828 | 16,115 | 18,455 | 17,522 | 14,275 | 15,217 | 16,253 | 14,790 | 154,453 |
| San Diego | 1,922 | 1,924 | 1,795 | 2,150 | 2,227 | 3,062 | 2,833 | 2,854 | 2,324 | 2,313 | 2,069 | 2,023 | 27,496 |
| Tucson | 9,224 | 9,185 | 8,481 | 9,871 | 11,831 | 14,990 | 14,051 | 12,119 | 9,357 | 7,014 | 7,278 | 7,538 | 120,939 |
| Yuma | 433 | 417 | 467 | 594 | 535 | 762 | 812 | 674 | 445 | 329 | 310 | 328 | 6,106 |
| Coastal Border | 321 | 264 | 222 | 206 | 245 | 313 | 214 | 147 | 227 | 285 | 382 | 336 | 3,162 |
| Northern Border | 327 | 233 | 215 | 190 | 217 | 232 | 271 | 245 | 290 | 369 | 303 | 338 | 3,230 |
| Southwest Border | 28,929 | 27,636 | 23,243 | 26,921 | 35,042 | 47,293 | 48,212 | 43,856 | 34,436 | 33,230 | 33,797 | 31,802 | 414,397 |
| Monthly Total | 29,577 | 28,133 | 23,680 | 27,317 | 35,504 | 47,838 | 48,697 | 44,248 | 34,953 | 33,884 | 34,482 | 32,476 | 420,789 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2014

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 131 | 146 | 125 | 228 | 178 | 113 | 151 | 199 | 213 | 134 | 217 | 199 | 2,034 |
| New Orleans | 58 | 48 | 57 | 55 | 90 | 103 | 114 | 88 | 86 | 82 | 72 | 97 | 950 |
| Ramey | 133 | 120 | 48 | 79 | 39 | 79 | 38 | 86 | 133 | 77 | 73 | 53 | 958 |
| Blaine | 16 | 22 | 18 | 29 | 26 | 19 | 36 | 27 | 19 | 28 | 14 | 18 | 272 |
| Buffalo | 58 | 39 | 52 | 36 | 47 | 87 | 64 | 81 | 54 | 79 | 97 | 47 | 741 |
| Detroit | 48 | 53 | 51 | 34 | 55 | 35 | 40 | 49 | 86 | 66 | 70 | 60 | 647 |
| Grand Forks | 59 | 45 | 36 | 42 | 49 | 85 | 65 | 63 | 71 | 81 | 73 | 98 | 767 |
| Havre | 18 | 10 | 2 | 5 | 6 | 2 | 1 | 13 | 12 | 3 | 7 | 12 | 91 |
| Houlton | 3 | 4 | 2 | 3 | 3 | 1 | 2 | 13 | 1 | 4 | 8 | 1 | 45 |
| Spokane | 35 | 24 | 15 | 24 | 16 | 31 | 17 | 22 | 19 | 19 | 16 | 31 | 269 |
| Swanton | 44 | 25 | 45 | 30 | 21 | 17 | 31 | 33 | 57 | 69 | 64 | 70 | 506 |
| Big Bend (formerly Marfa) | 316 | 260 | 241 | 278 | 522 | 445 | 403 | 374 | 414 | 341 | 302 | 200 | 4,096 |
| Del Rio | 1,587 | 1,586 | 1,360 | 1,514 | 2,133 | 2,823 | 2,616 | 3,432 | 2,857 | 1,830 | 1,279 | 1,238 | 24,255 |
| El Centro | 1,193 | 1,077 | 987 | 1,126 | 1,365 | 1,502 | 1,441 | 1,353 | 1,203 | 1,250 | 1,095 | 919 | 14,511 |
| El Paso | 885 | 845 | 738 | 813 | 1,060 | 1,278 | 1,244 | 1,371 | 1,221 | 939 | 948 | 997 | 12,339 |
| Laredo | 3,638 | 3,026 | 2,567 | 2,756 | 3,838 | 5,087 | 5,117 | 4,737 | 3,946 | 3,546 | 2,960 | 2,831 | 44,049 |
| Rio Grande Valley (formerly McAllen) | 15,192 | 14,170 | 13,540 | 12,255 | 16,808 | 25,398 | 28,624 | 37,510 | 38,446 | 24,938 | 17,273 | 12,239 | 256,393 |
| San Diego | 2,218 | 2,153 | 2,091 | 2,548 | 2,469 | 3,378 | 3,035 | 2,863 | 2,438 | 2,497 | 2,132 | 2,089 | 29,911 |
| Tucson | 9,785 | 8,334 | 7,629 | 6,825 | 7,566 | 8,925 | 8,473 | 8,407 | 6,867 | 5,019 | 5,105 | 4,980 | 87,915 |
| Yuma | 498 | 445 | 375 | 553 | 642 | 760 | 549 | 636 | 470 | 348 | 294 | 332 | 5,902 |
| Coastal Border | 322 | 314 | 230 | 362 | 307 | 295 | 303 | 373 | 432 | 293 | 362 | 349 | 3,942 |
| Northern Border | 281 | 222 | 221 | 203 | 223 | 277 | 256 | 301 | 319 | 349 | 349 | 337 | 3,338 |
| Southwest Border | 35,312 | 31,896 | 29,528 | 28,668 | 36,403 | 49,596 | 51,502 | 60,683 | 57,862 | 40,708 | 31,388 | 25,825 | 479,371 |
| Monthly Total | 35,915 | 32,432 | 29,979 | 29,233 | 36,933 | 50,168 | 52,061 | 61,357 | 58,613 | 41,350 | 32,099 | 26,511 | 486,651 |

*Livermore Sector was closed after FY 2004

AR2022_300161



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2015

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 90 | 50 | 143 | 121 | 79 | 116 | 101 | 110 | 203 | 168 | 346 | 225 | 1,752 |
| New Orleans | 115 | 98 | 100 | 79 | 78 | 35 | 39 | 75 | 71 | 72 | 32 | 55 | 849 |
| Ramey | 55 | 76 | 32 | 71 | 12 | 60 | 44 | 25 | 39 | 74 | 9 | 60 | 557 |
| Blaine | 37 | 47 | 29 | 25 | 20 | 16 | 14 | 19 | 17 | 23 | 23 | 12 | 282 |
| Buffalo | 28 | 34 | 35 | 21 | 19 | 20 | 15 | 16 | 18 | 40 | 27 | 18 | 291 |
| Detroit | 75 | 68 | 109 | 42 | 33 | 30 | 44 | 36 | 72 | 32 | 54 | 40 | 637 |
| Grand Forks | 87 | 78 | 72 | 53 | 74 | 65 | 73 | 40 | 40 | 76 | 69 | 62 | 789 |
| Havre | 5 | 3 | 3 | 3 | 10 | 6 | 5 | 3 | 2 | 2 | 18 | 4 | 64 |
| Houlton | 1 | 2 | 8 | 4 | 6 | 0 | 3 | 0 | 0 | 4 | 2 | 2 | 32 |
| Spokane | 24 | 15 | 10 | 15 | 23 | 12 | 15 | 14 | 7 | 18 | 13 | 24 | 190 |
| Swanton | 26 | 23 | 25 | 6 | 19 | 27 | 14 | 16 | 35 | 39 | 68 | 43 | 341 |
| Big Bend (formerly Marfa) | 302 | 232 | 336 | 233 | 330 | 453 | 438 | 567 | 373 | 428 | 600 | 739 | 5,031 |
| Del Rio | 1,246 | 985 | 1,051 | 985 | 1,291 | 1,718 | 2,100 | 2,083 | 1,928 | 1,752 | 1,918 | 1,956 | 19,013 |
| El Centro | 894 | 842 | 980 | 902 | 991 | 1,355 | 1,244 | 1,295 | 1,063 | 1,072 | 1,058 | 1,124 | 12,820 |
| El Paso | 904 | 924 | 921 | 874 | 859 | 1,455 | 1,516 | 1,335 | 1,410 | 1,417 | 1,436 | 1,444 | 14,495 |
| Laredo | 3,276 | 2,540 | 2,367 | 2,776 | 2,864 | 3,093 | 3,497 | 3,127 | 2,958 | 3,110 | 3,072 | 3,208 | 35,888 |
| Rio Grande Valley (formerly McAllen) | 12,031 | 11,466 | 11,035 | 8,425 | 9,557 | 11,817 | 12,602 | 14,103 | 13,750 | 13,719 | 14,750 | 14,002 | 147,257 |
| San Diego | 2,133 | 1,924 | 2,280 | 2,111 | 2,466 | 2,876 | 2,284 | 2,308 | 2,081 | 1,985 | 1,883 | 1,959 | 26,290 |
| Tucson | 5,261 | 5,303 | 5,610 | 4,869 | 5,553 | 6,256 | 5,543 | 6,105 | 5,081 | 4,071 | 4,733 | 5,012 | 63,397 |
| Yuma | 403 | 425 | 439 | 339 | 465 | 768 | 526 | 653 | 659 | 834 | 789 | 842 | 7,142 |
| Coastal Border | 260 | 224 | 275 | 271 | 169 | 211 | 184 | 210 | 313 | 314 | 387 | 340 | 3,158 |
| Northern Border | 283 | 270 | 291 | 169 | 206 | 176 | 183 | 144 | 191 | 234 | 274 | 205 | 2,626 |
| Southwest Border | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 | 331,333 |
| Monthly Total | 26,993 | 25,135 | 25,585 | 21,954 | 24,751 | 30,178 | 30,117 | 31,930 | 29,807 | 28,936 | 30,900 | 30,831 | 337,117 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2016

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 271 | 206 | 337 | 207 | 181 | 310 | 331 | 266 | 232 | 286 | 274 | 304 | 3,205 |
| New Orleans | 74 | 59 | 48 | 40 | 53 | 50 | 76 | 57 | 56 | 96 | 72 | 83 | 764 |
| Ramey | 21 | 57 | 64 | 28 | 68 | 63 | 61 | 78 | 72 | 66 | 43 | 73 | 694 |
| Blaine | 27 | 28 | 13 | 13 | 21 | 33 | 19 | 20 | 17 | 28 | 30 | 22 | 271 |
| Buffalo | 15 | 4 | 7 | 22 | 14 | 17 | 29 | 21 | 15 | 37 | 27 | 18 | 226 |
| Detroit | 55 | 38 | 35 | 35 | 54 | 61 | 51 | 78 | 67 | 64 | 89 | 66 | 716 |
| Grand Forks | 40 | 40 | 25 | 48 | 26 | 49 | 35 | 34 | 34 | 66 | 62 | 46 | 505 |
| Havre | 4 | 5 | 1 | 4 | 1 | 2 | 9 | 4 | 2 | 2 | 7 | 2 | 43 |
| Houlton | 6 | 0 | 1 | 1 | 2 | 2 | 2 | 7 | 1 | 2 | 1 | 0 | 25 |
| Spokane | 4 | 16 | 9 | 4 | 6 | 11 | 18 | 56 | 20 | 19 | 20 | 23 | 206 |
| Swanton | 25 | 13 | 25 | 10 | 14 | 26 | 18 | 14 | 34 | 35 | 30 | 47 | 291 |
| Big Bend (formerly Marfa) | 735 | 637 | 690 | 388 | 458 | 616 | 739 | 491 | 292 | 344 | 326 | 650 | 6,366 |
| Del Rio | 1,873 | 1,798 | 2,185 | 1,531 | 1,780 | 2,022 | 2,224 | 2,588 | 1,918 | 1,833 | 1,445 | 1,881 | 23,078 |
| El Centro | 1,214 | 1,239 | 1,253 | 1,061 | 1,342 | 1,775 | 2,097 | 2,000 | 1,719 | 1,669 | 2,047 | 2,032 | 19,448 |
| El Paso | 1,639 | 1,679 | 2,187 | 1,148 | 1,399 | 2,158 | 2,408 | 2,481 | 2,369 | 2,503 | 2,708 | 2,955 | 25,634 |
| Laredo | 3,146 | 3,249 | 2,995 | 2,454 | 2,895 | 3,196 | 3,654 | 3,403 | 2,906 | 2,647 | 2,888 | 3,129 | 36,562 |
| Rio Grande Valley (formerly McAllen) | 15,036 | 15,297 | 17,736 | 9,398 | 9,660 | 13,325 | 16,688 | 18,291 | 15,972 | 16,519 | 19,155 | 19,753 | 186,830 |
| San Diego | 2,081 | 2,022 | 2,196 | 2,525 | 2,504 | 3,108 | 3,329 | 3,118 | 2,522 | 2,555 | 2,748 | 3,183 | 31,891 |
| Tucson | 5,899 | 5,791 | 6,263 | 4,572 | 5,245 | 6,142 | 5,784 | 6,574 | 5,427 | 4,364 | 4,303 | 4,527 | 64,891 |
| Yuma | 1,101 | 1,126 | 1,509 | 681 | 789 | 974 | 1,166 | 1,391 | 1,325 | 1,289 | 1,428 | 1,391 | 14,170 |
| Coastal Border | 366 | 322 | 449 | 275 | 302 | 423 | 468 | 401 | 360 | 448 | 389 | 460 | 4,663 |
| Northern Border | 176 | 144 | 139 | 137 | 138 | 201 | 181 | 234 | 190 | 253 | 266 | 224 | 2,283 |
| Southwest Border | 32,724 | 32,838 | 37,014 | 23,758 | 26,072 | 33,316 | 38,089 | 40,337 | 34,450 | 33,723 | 37,048 | 39,501 | 408,870 |
| Monthly Total | 33,266 | 33,304 | 37,602 | 24,170 | 26,512 | 33,940 | 38,738 | 40,972 | 35,000 | 34,424 | 37,703 | 40,185 | 415,816 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2017

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 178 | 186 | 329 | 161 | 194 | 150 | 193 | 221 | 173 | 195 | 196 | 104 | 2,280 |
| New Orleans | 76 | 98 | 81 | 121 | 94 | 88 | 50 | 105 | 57 | 52 | 74 | 24 | 920 |
| Ramey | 77 | 41 | 62 | 99 | 15 | 15 | 39 | 17 | 0 | 8 | 15 | 0 | 388 |
| Blaine | 45 | 36 | 28 | 20 | 23 | 21 | 16 | 12 | 23 | 27 | 27 | 10 | 288 |
| Buffalo | 9 | 19 | 12 | 24 | 66 | 16 | 33 | 76 | 48 | 55 | 37 | 52 | 447 |
| Detroit | 64 | 30 | 34 | 43 | 71 | 143 | 119 | 112 | 118 | 113 | 132 | 91 | 1,070 |
| Grand Forks | 19 | 25 | 23 | 40 | 48 | 56 | 57 | 44 | 42 | 51 | 58 | 33 | 496 |
| Havre | 1 | 3 | 2 | 0 | 4 | 0 | 4 | 6 | 4 | 7 | 7 | 1 | 39 |
| Houlton | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 5 | 1 | 5 | 8 | 4 | 30 |
| Spokane | 16 | 10 | 7 | 5 | 18 | 22 | 14 | 14 | 50 | 19 | 17 | 16 | 208 |
| Swanton | 10 | 22 | 25 | 19 | 43 | 43 | 25 | 41 | 51 | 63 | 73 | 34 | 449 |
| Big Bend (formerly Marfa) | 697 | 603 | 477 | 473 | 383 | 357 | 413 | 552 | 378 | 492 | 563 | 614 | 6,002 |
| Del Rio | 2,106 | 1,880 | 1,817 | 1,243 | 1,104 | 746 | 589 | 740 | 761 | 760 | 798 | 932 | 13,476 |
| El Centro | 2,441 | 1,850 | 1,870 | 1,796 | 1,196 | 871 | 849 | 1,134 | 1,280 | 1,478 | 1,880 | 1,988 | 18,633 |
| El Paso | 3,973 | 4,105 | 3,948 | 2,779 | 1,575 | 978 | 906 | 1,032 | 1,180 | 1,395 | 1,782 | 1,540 | 25,193 |
| Laredo | 3,350 | 3,194 | 2,460 | 2,265 | 1,710 | 1,256 | 1,304 | 1,722 | 1,839 | 2,120 | 2,143 | 2,097 | 25,460 |
| Rio Grande Valley (formerly McAllen) | 22,642 | 24,686 | 23,418 | 15,580 | 7,855 | 4,147 | 3,942 | 4,882 | 5,817 | 7,107 | 8,650 | 8,836 | 137,562 |
| San Diego | 2,934 | 2,947 | 3,099 | 2,927 | 1,808 | 1,356 | 1,392 | 1,724 | 1,652 | 1,764 | 2,241 | 2,242 | 26,086 |
| Tucson | 5,924 | 5,912 | 4,303 | 3,357 | 2,589 | 2,148 | 1,487 | 2,199 | 2,632 | 2,177 | 2,913 | 3,016 | 38,657 |
| Yuma | 2,117 | 2,034 | 1,859 | 1,156 | 534 | 336 | 245 | 534 | 548 | 894 | 1,318 | 1,272 | 12,847 |
| Coastal Border | 331 | 325 | 472 | 381 | 303 | 253 | 282 | 343 | 230 | 255 | 285 | 128 | 3,588 |
| Northern Border | 169 | 145 | 131 | 152 | 273 | 302 | 268 | 310 | 337 | 340 | 359 | 241 | 3,027 |
| Southwest Border | 46,184 | 47,211 | 43,251 | 31,576 | 18,754 | 12,195 | 11,127 | 14,519 | 16,087 | 18,187 | 22,288 | 22,537 | 303,916 |
| Monthly Total | 46,684 | 47,681 | 43,854 | 32,109 | 19,330 | 12,750 | 11,677 | 15,172 | 16,654 | 18,782 | 22,932 | 22,906 | 310,531 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2018

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 196 | 168 | 164 | 189 | 189 | 202 | 205 | 172 | 130 | 244 | 173 | 137 | 2,169 |
| New Orleans | 46 | 62 | 27 | 86 | 63 | 54 | 63 | 35 | 115 | 43 | 102 | 102 | 798 |
| Ramey | 7 | 17 | 14 | 77 | 18 | 21 | 9 | 36 | 5 | 20 | 53 | 3 | 280 |
| Blaine | 19 | 22 | 22 | 15 | 10 | 54 | 40 | 35 | 27 | 22 | 43 | 50 | 359 |
| Buffalo | 48 | 23 | 17 | 25 | 16 | 29 | 32 | 46 | 55 | 33 | 28 | 32 | 384 |
| Detroit | 119 | 150 | 86 | 193 | 159 | 175 | 166 | 158 | 280 | 168 | 127 | 149 | 1,930 |
| Grand Forks | 48 | 40 | 38 | 21 | 30 | 41 | 31 | 41 | 38 | 41 | 55 | 37 | 461 |
| Havre | 10 | 13 | 2 | 0 | 2 | 1 | 1 | 0 | 6 | 4 | 6 | 2 | 47 |
| Houlton | 0 | 2 | 5 | 3 | 3 | 6 | 9 | 3 | 4 | 6 | 3 | 8 | 52 |
| Spokane | 30 | 16 | 17 | 22 | 19 | 36 | 27 | 32 | 29 | 39 | 52 | 28 | 347 |
| Swanton | 28 | 29 | 32 | 30 | 47 | 66 | 36 | 66 | 105 | 92 | 67 | 138 | 736 |
| Big Bend (formerly Marfa) | 819 | 828 | 802 | 543 | 838 | 703 | 808 | 743 | 375 | 456 | 585 | 545 | 8,045 |
| Del Rio | 1,046 | 1,186 | 1,113 | 1,083 | 1,306 | 1,466 | 1,451 | 1,486 | 1,462 | 1,365 | 1,506 | 1,363 | 15,833 |
| El Centro | 2,194 | 2,123 | 2,110 | 2,052 | 1,954 | 2,697 | 2,790 | 2,683 | 2,327 | 2,531 | 2,821 | 2,948 | 29,230 |
| El Paso | 1,489 | 1,647 | 1,713 | 1,607 | 1,737 | 2,782 | 2,671 | 3,510 | 3,560 | 2,890 | 3,585 | 4,370 | 31,561 |
| Laredo | 2,451 | 2,283 | 1,982 | 2,296 | 2,671 | 3,652 | 3,370 | 3,210 | 2,586 | 2,600 | 2,785 | 2,755 | 32,641 |
| Rio Grande Valley (formerly McAllen) | 9,722 | 11,726 | 11,668 | 9,484 | 9,611 | 14,140 | 15,993 | 17,491 | 14,703 | 13,238 | 16,744 | 17,742 | 162,262 |
| San Diego | 2,377 | 2,760 | 2,764 | 3,171 | 3,107 | 4,101 | 3,644 | 3,418 | 3,014 | 3,098 | 3,507 | 3,630 | 38,591 |
| Tucson | 3,854 | 4,562 | 4,400 | 3,925 | 3,824 | 5,785 | 5,012 | 4,760 | 4,146 | 3,241 | 3,627 | 5,036 | 52,172 |
| Yuma | 1,536 | 1,970 | 2,443 | 1,814 | 1,618 | 2,064 | 2,504 | 3,038 | 1,916 | 1,880 | 2,364 | 3,097 | 26,244 |
| Coastal Border | 249 | 247 | 205 | 352 | 270 | 277 | 277 | 243 | 250 | 307 | 328 | 242 | 3,247 |
| Northern Border | 302 | 295 | 219 | 309 | 286 | 408 | 342 | 381 | 544 | 405 | 381 | 444 | 4,316 |
| Southwest Border | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 | 396,579 |
| Monthly Total | 26,039 | 29,627 | 29,419 | 26,636 | 27,222 | 38,075 | 38,862 | 40,963 | 34,883 | 32,011 | 38,233 | 42,172 | 404,142 |

*Livermore Sector was closed after FY 2004

AR2022_300165



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2019

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 201 | 136 | 149 | 172 | 111 | 184 | 191 | 163 | 140 | 165 | 179 | 100 | 1,891 |
| New Orleans | 74 | 82 | 60 | 100 | 101 | 94 | 132 | 105 | 100 | 87 | 105 | 92 | 1132 |
| Ramey | 21 | 26 | 36 | 32 | 20 | 61 | 15 | 64 | 78 | 27 | 106 | 76 | 562 |
| Blaine | 53 | 35 | 48 | 41 | 41 | 54 | 35 | 27 | 53 | 49 | 38 | 50 | 524 |
| Buffalo | 40 | 29 | 19 | 26 | 27 | 43 | 33 | 18 | 55 | 93 | 123 | 31 | 537 |
| Detroit | 188 | 107 | 119 | 107 | 115 | 118 | 102 | 114 | 95 | 79 | 80 | 98 | 1,322 |
| Grand Forks | 24 | 28 | 29 | 20 | 24 | 36 | 48 | 41 | 43 | 31 | 41 | 47 | 412 |
| Havre | 7 | 7 | 5 | 8 | 0 | 5 | 7 | 3 | 8 | 14 | 5 | 8 | 77 |
| Houlton | 2 | 3 | 2 | 0 | 0 | 4 | 1 | 0 | 4 | 19 | 8 | 9 | 52 |
| Spokane | 38 | 41 | 23 | 57 | 42 | 52 | 37 | 46 | 11 | 19 | 30 | 32 | 428 |
| Swanton | 148 | 68 | 79 | 40 | 58 | 109 | 73 | 104 | 87 | 91 | 80 | 119 | 1056 |
| Big Bend | 555 | 448 | 621 | 588 | 845 | 942 | 941 | 1557 | 628 | 799 | 922 | 791 | 9,637 |
| Del Rio | 2,002 | 2,088 | 2,024 | 2,524 | 4,013 | 5,563 | 5,848 | 8,563 | 8,085 | 6,686 | 5,297 | 4,576 | 57,269 |
| El Centro | 3,242 | 3,189 | 2,718 | 2,461 | 3,319 | 3,561 | 3,386 | 3,482 | 2,885 | 2,214 | 2,327 | 2,354 | 35,138 |
| El Paso | 7,334 | 8,867 | 9,450 | 9,137 | 14,171 | 22,224 | 27,073 | 38,637 | 18,882 | 11,594 | 8,078 | 6,696 | 182,143 |
| Laredo | 3,448 | 2,669 | 2,059 | 2,632 | 3,123 | 4,192 | 3,975 | 4,115 | 3,819 | 2,686 | 2,421 | 3,239 | 38,378 |
| Rio Grande Valley | 20,755 | 20,713 | 18,372 | 17,713 | 25,366 | 33,763 | 36,727 | 49,821 | 43,207 | 36,854 | 22,355 | 13,489 | 339,135 |
| San Diego | 4,227 | 4,577 | 5,816 | 4,122 | 5,448 | 6,881 | 6,197 | 5,882 | 4,684 | 3,458 | 3,321 | 3,436 | 58,049 |
| Tucson | 5,828 | 5,062 | 4,912 | 4,096 | 4,911 | 7,257 | 5,921 | 6,875 | 5,517 | 4,129 | 4,080 | 4,902 | 63,490 |
| Yuma | 3,614 | 4,244 | 4,779 | 4,706 | 5,687 | 8,450 | 9,205 | 13,924 | 7,195 | 3,558 | 1,883 | 1,024 | 68,269 |
| Coastal Border | 296 | 244 | 245 | 304 | 232 | 339 | 338 | 332 | 318 | 279 | 390 | 268 | 3,585 |
| Northern Border | 500 | 318 | 324 | 299 | 307 | 421 | 336 | 353 | 356 | 395 | 405 | 394 | 4,408 |
| Southwest Border | 51,005 | 51,857 | 50,751 | 47,979 | 66,883 | 92,833 | 99,273 | 132,856 | 94,902 | 71,978 | 50,684 | 40,507 | 851,508 |
| Monthly Total | 51,801 | 52,419 | 51,320 | 48,582 | 67,422 | 93,593 | 99,947 | 133,541 | 95,576 | 72,652 | 51,479 | 41,169 | 859,501 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2010

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 4 | 2 | 4 | 2 | 3 | 4 | 6 | 7 | 11 | 4 | 6 | 4 | 57 |
| New Orleans | 3 | 1 | 2 | 3 | 1 | 4 | 1 | 4 | 3 | 0 | 3 | 3 | 28 |
| Ramey | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Blaine | 2 | 1 | 0 | 1 | 3 | 1 | 0 | 0 | 0 | 4 | 2 | 0 | 14 |
| Buffalo | 6 | 1 | 5 | 2 | 4 | 7 | 3 | 6 | 5 | 0 | 4 | 3 | 46 |
| Detroit | 2 | 3 | 3 | 2 | 4 | 1 | 6 | 3 | 3 | 1 | 2 | 3 | 33 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 4 | 0 | 1 | 2 | 3 | 14 |
| Havre | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |
| Swanton | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 4 | 2 | 1 | 10 |
| Big Bend (formerly Marfa) | 16 | 8 | 9 | 18 | 22 | 22 | 27 | 25 | 13 | 8 | 11 | 18 | 197 |
| Del Rio | 80 | 80 | 54 | 87 | 106 | 129 | 114 | 123 | 75 | 40 | 58 | 68 | 1,014 |
| El Centro | 28 | 46 | 27 | 36 | 52 | 64 | 43 | 29 | 28 | 35 | 29 | 31 | 448 |
| El Paso | 83 | 77 | 64 | 105 | 102 | 118 | 111 | 78 | 90 | 56 | 76 | 51 | 1,011 |
| Laredo | 103 | 76 | 88 | 103 | 103 | 205 | 209 | 184 | 148 | 101 | 148 | 102 | 1,570 |
| Rio Grande Valley (formerly McAllen) | 346 | 257 | 235 | 273 | 409 | 580 | 537 | 646 | 531 | 340 | 474 | 349 | 4,977 |
| San Diego | 88 | 61 | 64 | 87 | 118 | 155 | 101 | 88 | 79 | 54 | 40 | 45 | 980 |
| Tucson | 767 | 546 | 433 | 571 | 752 | 1,066 | 879 | 844 | 660 | 523 | 501 | 456 | 7,998 |
| Yuma | 22 | 20 | 24 | 25 | 31 | 25 | 18 | 11 | 11 | 10 | 13 | 6 | 216 |
| Coastal Border | 11 | 3 | 6 | 5 | 4 | 8 | 7 | 11 | 14 | 4 | 9 | 7 | 89 |
| Northern Border | 10 | 7 | 8 | 5 | 11 | 12 | 11 | 15 | 9 | 10 | 14 | 10 | 122 |
| Southwest Border | 1,533 | 1,171 | 998 | 1,305 | 1,695 | 2,364 | 2,039 | 2,028 | 1,635 | 1,167 | 1,350 | 1,126 | 18,411 |
| Monthly Total | 1,554 | 1,181 | 1,012 | 1,315 | 1,710 | 2,384 | 2,057 | 2,054 | 1,658 | 1,181 | 1,373 | 1,143 | 18,622 |

AR2022_300167



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2011

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 2 | 2 | 9 | 2 | 3 | 1 | 2 | 0 | 3 | 1 | 1 | 27 |
| New Orleans | 5 | 1 | 2 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 1 | 14 |
| Ramey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Blaine | 2 | 0 | 0 | 1 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 8 |
| Buffalo | 3 | 2 | 3 | 2 | 2 | 0 | 1 | 3 | 3 | 2 | 2 | 2 | 25 |
| Detroit | 4 | 1 | 0 | 3 | 4 | 0 | 1 | 1 | 0 | 1 | 1 | 5 | 21 |
| Grand Forks | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 3 | 0 | 1 | 0 | 0 | 7 |
| Havre | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 3 |
| Swanton | 0 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 0 | 9 |
| Big Bend (formerly Marfa) | 16 | 16 | 7 | 10 | 12 | 23 | 21 | 15 | 17 | 15 | 20 | 17 | 189 |
| Del Rio | 63 | 63 | 61 | 60 | 115 | 147 | 128 | 86 | 95 | 87 | 96 | 112 | 1,113 |
| El Centro | 31 | 24 | 25 | 38 | 28 | 58 | 59 | 31 | 36 | 35 | 39 | 53 | 457 |
| El Paso | 43 | 51 | 65 | 59 | 54 | 90 | 84 | 53 | 51 | 48 | 59 | 40 | 697 |
| Laredo | 91 | 91 | 76 | 95 | 113 | 179 | 175 | 162 | 161 | 132 | 156 | 177 | 1,608 |
| Rio Grande Valley (formerly McAllen) | 297 | 315 | 338 | 268 | 387 | 586 | 589 | 500 | 459 | 514 | 514 | 469 | 5,236 |
| San Diego | 48 | 33 | 33 | 32 | 54 | 58 | 64 | 48 | 51 | 45 | 47 | 36 | 549 |
| Tucson | 496 | 486 | 394 | 482 | 525 | 777 | 587 | 514 | 430 | 365 | 419 | 403 | 5,878 |
| Yuma | 12 | 13 | 12 | 29 | 22 | 38 | 11 | 26 | 13 | 12 | 10 | 24 | 222 |
| Coastal Border | 6 | 3 | 4 | 10 | 2 | 3 | 1 | 4 | 1 | 3 | 3 | 2 | 42 |
| Northern Border | 11 | 4 | 3 | 10 | 6 | 5 | 3 | 9 | 5 | 9 | 4 | 7 | 76 |
| Southwest Border | 1,097 | 1,092 | 1,011 | 1,073 | 1,310 | 1,956 | 1,718 | 1,435 | 1,313 | 1,253 | 1,360 | 1,331 | 15,949 |
| Monthly Total | 1,114 | 1,099 | 1,018 | 1,093 | 1,318 | 1,964 | 1,722 | 1,448 | 1,319 | 1,265 | 1,367 | 1,340 | 16,067 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2012

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 3 | 2 | 0 | 1 | 2 | 1 | 0 | 2 | 2 | 3 | 0 | 2 | 18 |
| New Orleans | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 5 |
| Ramey | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 5 |
| Blaine | 0 | 0 | 1 | 2 | 0 | 3 | 0 | 0 | 1 | 1 | 1 | 3 | 12 |
| Buffalo | 0 | 3 | 1 | 1 | 2 | 0 | 2 | 1 | 0 | 6 | 0 | 2 | 18 |
| Detroit | 2 | 2 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 10 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 |
| Swanton | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 5 |
| Big Bend *(formerly Marfa)* | 9 | 20 | 18 | 22 | 17 | 20 | 20 | 11 | 4 | 15 | 10 | 2 | 168 |
| Del Rio | 103 | 94 | 88 | 77 | 120 | 182 | 217 | 179 | 168 | 137 | 128 | 125 | 1,618 |
| El Centro | 43 | 39 | 12 | 31 | 48 | 62 | 50 | 58 | 64 | 35 | 34 | 22 | 498 |
| El Paso | 39 | 41 | 36 | 46 | 57 | 81 | 49 | 59 | 55 | 77 | 73 | 46 | 659 |
| Laredo | 147 | 179 | 135 | 195 | 223 | 286 | 241 | 241 | 221 | 243 | 308 | 239 | 2,658 |
| Rio Grande Valley *(formerly McAllen)* | 596 | 573 | 448 | 541 | 742 | 1,092 | 1,233 | 1,209 | 1,025 | 1,048 | 1,228 | 1,024 | 10,759 |
| San Diego | 33 | 36 | 29 | 34 | 29 | 68 | 47 | 57 | 41 | 54 | 24 | 72 | 524 |
| Tucson | 472 | 447 | 462 | 642 | 797 | 933 | 821 | 708 | 486 | 489 | 474 | 508 | 7,239 |
| Yuma | 23 | 17 | 31 | 47 | 44 | 31 | 25 | 19 | 7 | 20 | 10 | 6 | 280 |
| Coastal Border | 4 | 2 | 0 | 2 | 3 | 1 | 0 | 4 | 3 | 3 | 1 | 5 | 28 |
| Northern Border | 2 | 5 | 3 | 5 | 3 | 4 | 5 | 2 | 2 | 9 | 3 | 7 | 50 |
| Southwest Border | 1,465 | 1,446 | 1,259 | 1,635 | 2,077 | 2,755 | 2,703 | 2,541 | 2,071 | 2,118 | 2,289 | 2,044 | 24,403 |
| Monthly Total | 1,471 | 1,453 | 1,262 | 1,642 | 2,083 | 2,760 | 2,708 | 2,547 | 2,076 | 2,130 | 2,293 | 2,056 | 24,481 |

AR2022_300169



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2013

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 7 | 2 | 0 | 1 | 1 | 0 | 1 | 2 | 3 | 0 | 9 | 2 | 28 |
| New Orleans | 2 | 1 | 0 | 3 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 11 |
| Ramey | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 5 |
| Blaine | 1 | 1 | 1 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 8 |
| Buffalo | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 5 |
| Detroit | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 6 |
| Grand Forks | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 4 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 3 |
| Swanton | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 4 |
| Big Bend (formerly Marfa) | 15 | 5 | 9 | 17 | 8 | 13 | 17 | 15 | 6 | 11 | 6 | 3 | 125 |
| Del Rio | 189 | 142 | 103 | 143 | 201 | 208 | 231 | 180 | 136 | 220 | 190 | 192 | 2,135 |
| El Centro | 35 | 45 | 27 | 24 | 33 | 61 | 41 | 38 | 38 | 31 | 23 | 38 | 434 |
| El Paso | 84 | 62 | 56 | 56 | 56 | 59 | 89 | 72 | 50 | 52 | 57 | 51 | 744 |
| Laredo | 263 | 253 | 222 | 234 | 333 | 438 | 354 | 401 | 318 | 391 | 296 | 292 | 3,795 |
| Rio Grande Valley (formerly McAllen) | 1,067 | 1,106 | 978 | 945 | 1,385 | 2,206 | 2,420 | 2,378 | 2,080 | 2,255 | 2,427 | 2,306 | 21,553 |
| San Diego | 43 | 33 | 31 | 55 | 65 | 64 | 68 | 57 | 55 | 75 | 43 | 67 | 656 |
| Tucson | 620 | 733 | 764 | 758 | 887 | 1,041 | 949 | 818 | 684 | 559 | 667 | 590 | 9,070 |
| Yuma | 17 | 13 | 28 | 28 | 18 | 30 | 37 | 26 | 17 | 13 | 9 | 11 | 247 |
| Coastal Border | 9 | 4 | 0 | 4 | 2 | 2 | 2 | 2 | 5 | 0 | 11 | 3 | 44 |
| Northern Border | 2 | 3 | 2 | 6 | 1 | 2 | 1 | 2 | 2 | 6 | 3 | 0 | 30 |
| Southwest Border | 2,333 | 2,392 | 2,218 | 2,260 | 2,986 | 4,120 | 4,206 | 3,985 | 3,384 | 3,607 | 3,718 | 3,550 | 38,759 |
| Monthly Total | 2,344 | 2,399 | 2,220 | 2,270 | 2,989 | 4,124 | 4,209 | 3,989 | 3,391 | 3,613 | 3,732 | 3,553 | 38,833 |

AR2022_300170



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2014

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 3 | 2 | 0 | 3 | 0 | 0 | 3 | 2 | 4 | 3 | 7 | 1 | 28 |
| New Orleans | 1 | 3 | 4 | 1 | 3 | 1 | 2 | 1 | 0 | 4 | 0 | 1 | 21 |
| Ramey | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 4 | 4 | 0 | 1 | 16 |
| Blaine | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Buffalo | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 1 | 0 | 0 | 1 | 7 |
| Detroit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 4 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| Swanton | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 1 | 7 |
| Big Bend *(formerly Marfa)* | 18 | 10 | 15 | 22 | 24 | 16 | 18 | 25 | 30 | 43 | 23 | 12 | 256 |
| Del Rio | 172 | 221 | 220 | 156 | 267 | 378 | 370 | 544 | 453 | 239 | 127 | 121 | 3,268 |
| El Centro | 39 | 43 | 32 | 35 | 51 | 78 | 71 | 60 | 76 | 79 | 48 | 50 | 662 |
| El Paso | 64 | 94 | 54 | 71 | 100 | 86 | 100 | 111 | 114 | 81 | 70 | 84 | 1,029 |
| Laredo | 301 | 270 | 245 | 223 | 298 | 455 | 477 | 470 | 389 | 297 | 202 | 173 | 3,800 |
| Rio Grande Valley *(formerly McAllen)* | 2,652 | 2,809 | 2,833 | 2,419 | 3,330 | 5,215 | 5,725 | 8,433 | 8,730 | 4,149 | 2,173 | 1,491 | 49,959 |
| San Diego | 45 | 61 | 48 | 81 | 64 | 126 | 106 | 100 | 98 | 89 | 57 | 79 | 954 |
| Tucson | 874 | 816 | 860 | 658 | 672 | 780 | 796 | 788 | 698 | 505 | 422 | 393 | 8,262 |
| Yuma | 16 | 20 | 20 | 41 | 39 | 42 | 38 | 47 | 32 | 17 | 16 | 23 | 351 |
| Coastal Border | 7 | 5 | 4 | 4 | 3 | 3 | 5 | 5 | 8 | 11 | 7 | 3 | 65 |
| Northern Border | 1 | 1 | 2 | 1 | 0 | 3 | 3 | 2 | 3 | 5 | 1 | 3 | 25 |
| Southwest Border | 4,181 | 4,344 | 4,327 | 3,706 | 4,845 | 7,176 | 7,701 | 10,578 | 10,620 | 5,499 | 3,138 | 2,426 | 68,541 |
| Monthly Total | 4,189 | 4,350 | 4,333 | 3,711 | 4,848 | 7,182 | 7,709 | 10,585 | 10,631 | 5,515 | 3,146 | 2,432 | 68,631 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2015

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 0 | 0 | 0 | 1 | 2 | 4 | 0 | 0 | 8 | 0 | 4 | 20 |
| New Orleans | 1 | 1 | 3 | 5 | 3 | 1 | 1 | 4 | 4 | 3 | 0 | 0 | 26 |
| Ramey | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 |
| Blaine | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Buffalo | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Detroit | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 4 |
| Grand Forks | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swanton | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Big Bend (formerly Marfa) | 13 | 24 | 21 | 25 | 59 | 52 | 50 | 100 | 66 | 110 | 136 | 183 | 839 |
| Del Rio | 120 | 94 | 101 | 99 | 129 | 163 | 248 | 254 | 270 | 236 | 309 | 262 | 2,285 |
| El Centro | 35 | 27 | 35 | 50 | 47 | 77 | 48 | 72 | 53 | 62 | 89 | 73 | 668 |
| El Paso | 80 | 83 | 101 | 86 | 83 | 103 | 187 | 155 | 174 | 206 | 196 | 208 | 1,662 |
| Laredo | 220 | 177 | 175 | 171 | 168 | 242 | 225 | 189 | 207 | 217 | 241 | 227 | 2,459 |
| Rio Grande Valley (formerly McAllen) | 1,547 | 1,672 | 1,701 | 1,123 | 1,289 | 1,744 | 1,864 | 2,299 | 2,368 | 2,629 | 2,895 | 2,733 | 23,864 |
| San Diego | 74 | 56 | 106 | 71 | 89 | 111 | 102 | 96 | 82 | 83 | 116 | 98 | 1,084 |
| Tucson | 401 | 454 | 555 | 439 | 478 | 549 | 483 | 655 | 501 | 480 | 505 | 519 | 6,019 |
| Yuma | 29 | 23 | 63 | 54 | 43 | 85 | 66 | 123 | 112 | 159 | 151 | 182 | 1,090 |
| Coastal Border | 2 | 5 | 3 | 5 | 4 | 3 | 5 | 4 | 4 | 11 | 0 | 5 | 51 |
| Northern Border | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 4 | 3 | 0 | 1 | 0 | 14 |
| Southwest Border | 2,519 | 2,610 | 2,858 | 2,118 | 2,385 | 3,126 | 3,273 | 3,943 | 3,833 | 4,182 | 4,638 | 4,485 | 39,970 |
| Monthly Total | 2,522 | 2,616 | 2,862 | 2,123 | 2,390 | 3,130 | 3,279 | 3,951 | 3,840 | 4,193 | 4,639 | 4,490 | 40,035 |

AR2022_300172



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2016

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 5 | 3 | 3 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 2 | 20 |
| New Orleans | 1 | 3 | 3 | 0 | 0 | 2 | 3 | 1 | 2 | 4 | 2 | 4 | 25 |
| Ramey | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Blaine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 3 |
| Buffalo | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Detroit | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Grand Forks | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 5 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swanton | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| Big Bend *(formerly Marfa)* | 185 | 132 | 143 | 53 | 46 | 72 | 90 | 64 | 42 | 41 | 27 | 56 | 951 |
| Del Rio | 237 | 255 | 327 | 153 | 192 | 187 | 214 | 276 | 189 | 247 | 165 | 247 | 2,689 |
| El Centro | 76 | 99 | 97 | 58 | 76 | 90 | 142 | 121 | 97 | 146 | 192 | 185 | 1,379 |
| El Paso | 239 | 329 | 457 | 155 | 206 | 274 | 300 | 290 | 331 | 374 | 431 | 499 | 3,885 |
| Laredo | 242 | 278 | 284 | 191 | 219 | 250 | 263 | 298 | 203 | 195 | 266 | 264 | 2,953 |
| Rio Grande Valley *(formerly McAllen)* | 3,011 | 3,442 | 4,074 | 1,733 | 1,659 | 2,479 | 3,288 | 3,527 | 2,971 | 3,216 | 3,768 | 3,546 | 36,714 |
| San Diego | 105 | 97 | 147 | 142 | 110 | 135 | 152 | 144 | 116 | 97 | 147 | 161 | 1,553 |
| Tucson | 618 | 660 | 762 | 438 | 438 | 549 | 495 | 574 | 518 | 416 | 402 | 432 | 6,302 |
| Yuma | 230 | 312 | 466 | 166 | 146 | 173 | 218 | 300 | 283 | 294 | 369 | 309 | 3,266 |
| Coastal Border | 2 | 10 | 6 | 3 | 0 | 4 | 3 | 2 | 5 | 4 | 3 | 6 | 48 |
| Northern Border | 0 | 1 | 4 | 0 | 0 | 0 | 1 | 1 | 0 | 2 | 5 | 3 | 17 |
| Southwest Border | 4,943 | 5,604 | 6,757 | 3,089 | 3,092 | 4,209 | 5,162 | 5,594 | 4,750 | 5,026 | 5,767 | 5,699 | 59,692 |
| Monthly Total | 4,945 | 5,615 | 6,767 | 3,092 | 3,092 | 4,213 | 5,166 | 5,597 | 4,755 | 5,032 | 5,775 | 5,708 | 59,757 |



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2017

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 1 | 3 | 2 | 4 | 2 | 3 | 0 | 3 | 4 | 13 | 6 | 1 | 42 |
| New Orleans | 0 | 1 | 4 | 4 | 5 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 22 |
| Ramey | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Blaine | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 3 | 0 | 0 | 7 |
| Buffalo | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Detroit | 1 | 0 | 0 | 0 | 3 | 0 | 2 | 0 | 1 | 1 | 2 | 1 | 11 |
| Grand Forks | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |
| Havre | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 8 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swanton | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 2 | 10 |
| Big Bend (formerly Marfa) | 86 | 74 | 63 | 63 | 23 | 29 | 51 | 80 | 73 | 87 | 83 | 99 | 811 |
| Del Rio | 222 | 208 | 243 | 147 | 88 | 60 | 47 | 67 | 66 | 52 | 75 | 74 | 1,349 |
| El Centro | 197 | 168 | 151 | 122 | 65 | 52 | 55 | 72 | 107 | 127 | 185 | 230 | 1,531 |
| El Paso | 620 | 665 | 676 | 433 | 178 | 90 | 100 | 120 | 146 | 268 | 369 | 261 | 3,926 |
| Laredo | 282 | 242 | 207 | 186 | 110 | 72 | 88 | 119 | 172 | 189 | 209 | 157 | 2,033 |
| Rio Grande Valley (formerly McAllen) | 4,082 | 4,777 | 4,718 | 2,692 | 1,081 | 508 | 447 | 669 | 957 | 1,192 | 1,294 | 1,291 | 23,708 |
| San Diego | 179 | 177 | 229 | 167 | 110 | 52 | 55 | 84 | 70 | 110 | 150 | 168 | 1,551 |
| Tucson | 580 | 528 | 453 | 327 | 196 | 149 | 119 | 171 | 237 | 234 | 317 | 348 | 3,659 |
| Yuma | 456 | 507 | 447 | 268 | 59 | 29 | 35 | 91 | 121 | 216 | 305 | 333 | 2,867 |
| Coastal Border | 1 | 4 | 6 | 8 | 7 | 3 | 5 | 7 | 4 | 13 | 6 | 1 | 65 |
| Northern Border | 2 | 1 | 1 | 2 | 5 | 3 | 2 | 4 | 2 | 12 | 5 | 7 | 46 |
| Southwest Border | 6,704 | 7,346 | 7,187 | 4,405 | 1,910 | 1,041 | 997 | 1,473 | 1,949 | 2,475 | 2,987 | 2,961 | 41,435 |
| Monthly Total | 6,707 | 7,351 | 7,194 | 4,415 | 1,922 | 1,047 | 1,004 | 1,484 | 1,955 | 2,500 | 2,998 | 2,969 | 41,546 |

AR2022_300174



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2018

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 2 | 6 | 0 | 1 | 1 | 0 | 2 | 1 | 0 | 5 | 8 | 1 | 27 |
| New Orleans | 1 | 2 | 0 | 2 | 0 | 1 | 2 | 2 | 6 | 1 | 2 | 7 | 26 |
| Ramey | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Blaine | 0 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 6 |
| Buffalo | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 5 |
| Detroit | 0 | 3 | 1 | 0 | 0 | 3 | 9 | 2 | 2 | 1 | 0 | 1 | 22 |
| Grand Forks | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| Havre | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Swanton | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 2 | 2 | 5 | 2 | 0 | 15 |
| Big Bend *(formerly Marfa)* | 126 | 148 | 140 | 66 | 76 | 56 | 64 | 152 | 22 | 27 | 70 | 42 | 989 |
| Del Rio | 96 | 108 | 91 | 90 | 98 | 104 | 106 | 169 | 136 | 96 | 117 | 86 | 1,297 |
| El Centro | 228 | 217 | 236 | 196 | 179 | 231 | 214 | 207 | 213 | 260 | 279 | 255 | 2,715 |
| El Paso | 208 | 321 | 299 | 277 | 250 | 391 | 370 | 1,025 | 837 | 422 | 528 | 533 | 5,461 |
| Laredo | 232 | 202 | 184 | 244 | 236 | 281 | 281 | 269 | 208 | 261 | 258 | 223 | 2,879 |
| Rio Grande Valley *(formerly McAllen)* | 1,406 | 1,814 | 1,902 | 1,369 | 1,386 | 1,936 | 2,152 | 2,857 | 2,570 | 1,927 | 2,237 | 2,201 | 23,757 |
| San Diego | 148 | 196 | 173 | 170 | 184 | 222 | 190 | 205 | 204 | 258 | 291 | 250 | 2,491 |
| Tucson | 389 | 528 | 498 | 392 | 367 | 518 | 462 | 411 | 418 | 329 | 311 | 400 | 5,023 |
| Yuma | 322 | 438 | 538 | 398 | 335 | 401 | 445 | 1,072 | 472 | 331 | 302 | 370 | 5,424 |
| Coastal Border | 3 | 8 | 0 | 5 | 1 | 1 | 4 | 3 | 6 | 6 | 11 | 8 | 56 |
| Northern Border | 1 | 7 | 1 | 1 | 4 | 7 | 11 | 6 | 5 | 6 | 3 | 1 | 53 |
| Southwest Border | 3,155 | 3,972 | 4,061 | 3,202 | 3,111 | 4,140 | 4,284 | 6,367 | 5,080 | 3,911 | 4,393 | 4,360 | 50,036 |
| Monthly Total | 3,159 | 3,987 | 4,062 | 3,208 | 3,116 | 4,148 | 4,299 | 6,376 | 5,091 | 3,923 | 4,407 | 4,369 | 50,145 |

AR2022_300175



# United States Border Patrol

Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions By Month - FY 2019

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 4 | 3 | 1 | 3 | 1 | 1 | 0 | 3 | 2 | 2 | 1 | 2 | 23 |
| New Orleans | 8 | 2 | 2 | 7 | 0 | 2 | 5 | 1 | 1 | 2 | 3 | 2 | 35 |
| Ramey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 5 | 1 | 0 | 9 |
| Blaine | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 6 |
| Buffalo | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 |
| Detroit | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 2 | 1 | 3 | 1 | 0 | 11 |
| Grand Forks | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 0 | 2 | 6 |
| Havre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houlton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spokane | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| Swanton | 0 | 2 | 2 | 0 | 3 | 0 | 1 | 8 | 0 | 0 | 2 | 0 | 18 |
| Big Bend (formerly Marfa) | 37 | 36 | 74 | 59 | 61 | 80 | 61 | 115 | 56 | 61 | 81 | 58 | 779 |
| Del Rio | 145 | 146 | 155 | 192 | 239 | 434 | 395 | 568 | 420 | 350 | 268 | 309 | 3,621 |
| El Centro | 256 | 273 | 212 | 236 | 336 | 299 | 255 | 242 | 174 | 107 | 148 | 150 | 2,688 |
| El Paso | 830 | 1,038 | 970 | 1,012 | 1,522 | 2,184 | 2,459 | 3,255 | 1,313 | 765 | 457 | 354 | 16,159 |
| Laredo | 266 | 180 | 148 | 191 | 249 | 301 | 258 | 265 | 196 | 140 | 137 | 190 | 2,521 |
| Rio Grande Valley (formerly McAllen) | 2,306 | 2,309 | 1,881 | 2,182 | 2,910 | 3,714 | 3,755 | 4,867 | 3,912 | 3,287 | 1,971 | 1,429 | 34,523 |
| San Diego | 227 | 310 | 355 | 283 | 383 | 428 | 367 | 307 | 200 | 154 | 162 | 159 | 3,335 |
| Tucson | 468 | 465 | 408 | 357 | 438 | 599 | 396 | 509 | 409 | 318 | 317 | 421 | 5,105 |
| Yuma | 429 | 500 | 550 | 593 | 679 | 917 | 934 | 1,347 | 692 | 372 | 181 | 95 | 7,289 |
| Coastal Border | 12 | 5 | 3 | 10 | 1 | 3 | 5 | 6 | 4 | 9 | 5 | 4 | 67 |
| Northern Border | 2 | 2 | 3 | 2 | 5 | 0 | 3 | 13 | 3 | 9 | 4 | 3 | 49 |
| Southwest Border | 4,964 | 5,257 | 4,753 | 5,105 | 6,817 | 8,956 | 8,880 | 11,475 | 7,372 | 5,554 | 3,722 | 3,165 | 76,020 |
| Monthly Total | 4,978 | 5,264 | 4,759 | 5,117 | 6,823 | 8,959 | 8,888 | 11,494 | 7,379 | 5,572 | 3,731 | 3,172 | 76,136 |

AR2022_300176

## Adjudicator's Field Manual

**NOTE: The USCIS Policy Manual is our centralized online repository for immigration policies. We are working quickly to update and move material from the Adjudicator's Field Manual to the Policy Manual. Please check that resource, along with our Policy Memoranda page, to verify information you find in the Adjudicator's Field Manual. If you have questions or concerns about any discrepancies among these resources, please contact USCISPolicyManual@uscis.dhs.gov.**

### Chapter 21 Family-based Petitions and Applications.

21.1    General Information About Relative Visa Petitions

21.2    Factors Common to the Adjudication of All Relative Petitions

21.3    Petition for a Spouse

21.4    Petition for a Child, Son, or Daughter

21.5    Petition for an Orphan

21.6    Petition for Hague Convention Adoption

21.7    Petition for an Amerasian

21.8    Petition for a Parent

21.9    Petition for a Sibling

21.10   Refugee/Asylee Relative Petition

21.11   Petition for Spouse, Child, or Parent of Certain Deceased U.S. Armed Forces Members

21.12   Process for Responding to Requests by the Department of State (DOS) to Accept a Locally Filed Form I-130, Petition for Alien Relative has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of February 1, 2020.

21.13   [Reserved]

21.14   Self-Petitions by Abused Spouses and Children

21.15   Self-Petitions by Abused Parents of U.S. Citizens

21.16   Adoption as a Basis for Immigration Benefits

**21.1 General Information About Relative Visa Petitions.**

(a) <u>Historical Information Regarding Visa Petitions</u> .

In the aftermath of World War I, Congress passed a number of laws restricting immigration to the U.S. by both numbers and qualifications. [Previously, there were restrictions barring certain types of individuals based on individual shortcomings (e.g., the Act of March 3, 1875 which barred convicts and prostitutes, and the Act of August 3, 1882, which barred criminals, paupers, and "mental and physical defectives"), and on race (i.e., the Chinese Exclusion Act of May 6, 1882).] In order to qualify for an imm igrant visa (itself a new post-WWI innovation), the alien had to fall within one of the quota categories, or be exempt therefrom. The visa petition was then created as the vehicle for establishing that an alien fell into one of the higher quota categories, or was quota-exempt.

Over the years, the definitions of the various immigrant visa categories have changed with the passage of new legislation, and the requirements have been interpreted and reinterpreted through volumes of case law. However, the need for an approved immigrant visa petition to qualify for most visa classifications has remained a basic requirement of the system of legal immigration to the United States. It is no exaggeration to say that professional adjudication of immigrant visa petitions is one of the keystone s to ensuring that the system works as intended.

(b) <u>Organization of This Chapter</u> .

Many of the basic visa petition adjudication procedures and issues are similar regardless of the form being filed or the classification being sought. Those basic procedures are discussed in **subchapter 21.2** . **Subchapters 21.3** through 21.10 are organized according to the relationship of the petitioner to the beneficiary and discuss those aspects of the adjudication procedures and issues which are unique to those particular relationships. Accordingly, it is intended that the users of this field manual review both subchapter 21.2 and the relevant individual relationship subchapter when seeking information.

(c) <u>Special Parole and Deferred Action Considerations.</u>

On November 15, 2013, USCIS, pursuant to the authority conferred upon the Secretary of Homeland Security by INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), issued a Policy Memorandum guiding the exercise of discretion with respect to applications for parole by designated family members of U.S. military personnel and veterans. On November 20, 2014, the Secretary directed USCIS to issue new policies on the use of both parole in place and deferred action for certain family members of certain military personnel, veterans, and individuals who are seeking to enlist in the U.S. military. See Secretary of Homeland Security Memorandum, "Families of U.S. Armed Forces Members and Enlistees" (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf

These new policies support the Department of Defense (DoD) in several ways, including by:

- Elaborating on general USCIS deferred action policies by identifying factors that are of particular relevance to discretionary determinations involving military personnel, veterans, and their families;

- Building on existing USCIS and DoD initiatives and policies designed to assist military members, veterans, and their families in navigating our complex immigration system;

- Facilitating military morale and readiness and supporting DoD recruitment policies by considering temporarily deferring the removal of certain military family members;

- Furthering the goal of the Military Accessions Vital to the National Interest (MAVNI) program to recruit certain foreign nationals whose skills are considered vital to the national interest and critical to military services; and

- Ensuring consistent support for our military personnel and veterans, who have served and sacrificed for our nation, and their families.

For guidance on parole in place for certain family members of military personnel and veterans, see AFM Chapter 21.1(c)(1). For guidance on deferred action for certain enlistees and certain family members of military personnel and veterans, see AFM Chapter 21.1(c)(2).


(1) <u>Special Parole Consideration for Spouses, Parents, Sons, and Daughters of Active Duty Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve, or Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve and Were Not Dishonorably Discharged.</u>

The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, USCIS grants parole in place only sparingly. The fact that the individual is a spouse, parent, son, or daughter of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve, or an individual who previously served on active duty in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve (if the former service member was not dishonorably discharged and either is living or died while the family member was residing in the United States), however, ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual. If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate. To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

- Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

- Evidence of the family relationship (this may include proof of filing a petition in certain cases – see AFM 21.1(c)(3) below);

- Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve, or an individual who (whether still living or deceased) previously served on active duty in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173) (in the case of family members of veterans (whether still

living or deceased), the service member must not have received a dishonorable discharge upon separation from the military)

- In the case of surviving family members, proof of residence in the United States at the time of the service member's death;

- Two identical, color, passport style photographs; and

- Evidence of any additional favorable discretionary factors that the requestor wishes considered.

Individuals who have obtained parole in place are eligible to apply for work authorization for the period of parole if they can demonstrate economic necessity. See 8 CFR 274a.12(c)(11), (14). See Form I-765, Application for Employment Authorization.

Parole in place may be granted only to individuals who are present without admission and are therefore applicants for admission. Individuals who were admitted to the United States but are currently present in the United States beyond their periods of authorized stay are not eligible for parole in place, as they are no longer applicants for admission.

(2) Deferred Action Consideration for Spouses, Parents, and Sons and Daughters of Active Duty Military Personnel, Individuals in the Selected Reserve of the Ready Reserve, and Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Military or the Selected Reserve of the Ready Reserve and Were Not Dishonorably Discharged; and for MAVNI and other Enlistees in the Delayed Entry Program and their Spouses, Parents, and Sons and Daughters.

(A) Deferred Action for DoD Delayed Entry Program Enlistees (Including MAVNI Recruits) and Certain Family Members.

Individuals who have no previous military experience and are seeking to enlist in the U.S. Armed Forces must sign a contract by which they enter into the Delayed Entry Program (DEP) for a maximum of 365 days while awaiting Basic Training. While in the DEP, there can be delays in starting active duty for the Active Components or initial active duty for training for the Reserve Components.

Individuals who enlist in the military through the Military Accessions Vital to the National Interest (MAVNI) program may also enter the DEP. The MAVNI program allows certain foreign nationals to enlist in the military to fill positions where there are critical shortages in health care and foreign language skills. See the DoD MAVNI program fact sheet for further details: http://www.defense.gov/news/mavni-fact-sheet.pdf.

Most MAVNI recruits are in a lawful nonimmigrant status at the time that they enlist. For example, it is common for a J-1 foreign exchange visitor or F-1 foreign student to enlist in the U.S. military through MAVNI. Through no fault of their own, MAVNI recruits in the DEP may fall out of their lawful status while waiting to enter Basic Training. This may occur, for example, in cases where an F-1 foreign student completes his or her program of study while waiting to enter Basic Training in the DEP. In the same way, the family members of such recruits often lose their lawful statuses because their statuses depend on those of the recruits. In addition, family members might lack status either because they are present without being admitted or paroled, or because they were admitted or paroled but overstayed their authorized periods of stay even before their MAVNI or other DEP family member entered the DEP.

As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence. In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative. Certain factors, however, are of particular relevance to the exercise of that discretion when deferred action requests are submitted by individuals in DEP and their family members. Particularly strong positive factors specific to such requests include, but are not limited to:

- Being a DEP enlistee, including through the MAVNI program (even if the enlistee's authorized period of stay expires while in the DEP); and

- Being the spouse, parent, son, or daughter of a MAVNI recruit or other individual in the DEP (even if present in the United States without an authorized status).

The presence of one or more of the preceding factors does not guarantee a grant of deferred action but may be considered a strong positive factor weighing in favor of granting deferred action. The ultimate decision rests on whether, based on the totality of the facts of the individual case, USCIS finds that the positive factors outweigh any negative factors that may be present.

If an individual described in either of the two bullets above is granted deferred action in the exercise of discretion, the period of deferred action should be authorized in two-year increments; USCIS may consider requests for renewal of deferred action as appropriate. If the individual withdraws from the DEP or becomes disqualified from joining the military, any period of deferred action for the family member may be terminated. See AFM Chapter 21.1(c)(2)(C) for guidance on filing requests for deferred action. See AFM Chapter 21.1(c)(1) for guidance on parole in place.


(B) <u>Deferred Action for Certain Family Members of Active Duty Members of the U.S. Military, Individuals in the Selected Reserve of the Ready Reserve, or Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Military or in the Selected Reserve of the Ready Reserve and Were Not Dishonorably Discharged</u>.


As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence. In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative. Certain factors, however, are of particular relevance to the exercise of that discretion when deferred action requests are submitted by the family members of military personnel and veterans. One particularly strong positive factor specific to such requests is that the person has been admitted and is the spouse, parent, son, or daughter of an individual who is serving, or has previously served on active duty in the U.S. military or in the Selected Reserve of the Ready Reserve (if the former service member was not dishonorably discharged and either is living or died while the family member was residing in the United States). Such an individual ordinarily fits the guidelines for parole under section 21.1(c)(1) above, except for being statutorily ineligible solely because of his or her prior admission. See INA §§ 212(d)(5)(A), 235(a)(1), 8 U.S.C. §§ 1182(d)(5)(A), 1225(a)(1). The presence of the preceding factor does not guarantee a grant of deferred action but may be considered a strong positive factor weighing in favor of granting deferred action. The ultimate decision rests on whether, based on the totality of the facts of the individual case, USCIS finds that the positive factors outweigh any negative factors that may be present. If USCIS grants deferred action in the exercise of discretion, the period of deferred action should be authorized in two-year increments; USCIS may consider requests for renewal of deferred action as appropriate.


(C) <u>Filing Request for Deferred Action</u>.

To request deferred action, one must submit the following to the director of the USCIS office with jurisdiction over the requestor's place of residence:

- Letter stating basis for the deferred action request [See AFM 21.1(c)(2)(A) and (c)(2)(B)];

- Evidence supporting a favorable exercise of discretion in the form of deferred action as elaborated in AFM 21.1(c)(2)(A) and (c)(2)(B) – (e.g., evidence of family member's current or previous military service, or alien's or family member's enlistment in the DEP; note that in the case of family members of veterans, whether still living or deceased, the service member must not have received a dishonorable discharge upon separation from the military);

- Proof of family relationship, if applying based on family relationship to military member, veteran, or enlistee (this may include proof of filing a petition in certain cases - see section below);

- In the case of surviving family members, proof of residence in the United States at the time of the service member's death;

- Proof of identity and nationality (including a birth certificate, a passport and/or identification card, driver's license, notarized affidavit(s), etc.);

- If applicable, any document the alien used to lawfully enter the United States (including, but not limited to, Form I-94, Arrival/Departure Record, passport with visa and/or admission stamp, and any other documents issued by other components of DHS or legacy INS);

- Form G-325A, Biographic Information (for Deferred Action);

- Two identical, color, passport style photographs; and

- Evidence of any additional discretionary factors that the requestor would like USCIS to consider.

Individuals who have obtained deferred action are eligible to apply for work authorization for the period of deferred action if they can demonstrate economic necessity. See 8 CFR 274a.12(c)(11), (14). See Form I-765, Application for Employment Authorization.

A requestor who has legal representation must submit a properly completed Form G-28, Notice of Entry as Attorney or Accredited Representative.


(3) Petition Filing Requirement for Certain Parole or Deferred Action Requests.

USCIS encourages applicants to continue on a path toward lawful permanent resident status whenever applicable. In cases where it is applicable, USCIS encourages the filing of a Form I-130, Petition for Alien Relative (or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant) to allow USCIS to use an established process in evaluating the bona fides of the pertinent family relationship. In some cases where subsequent parole in place or renewal of deferred action is requested, such filing may be required (see AFM 21.1(c)(3)(A) below). USCIS checks the bona fides of the qualifying family relationship in all parole in place and deferred action requests regardless of whether the Form I-130 (or Form I-360) has been filed.

In all cases where a Form I-130 or Form I-360 has been filed, USCIS may grant either parole in place, as provided in AFM 21.1(c)(1), or deferred action, as provided in AFM 21.1.(c)(2), as long as the applicant's Form I-130 (or Form I-360) is pending or approved (and still valid). Even in cases where the Form I-130 or Form I-360 is required, it does not need to be approved prior to a grant of either parole in place or

deferred action. Upon receiving the receipt notice for the Form I-130 or Form I-360, the alien may file the request for either parole in place or deferred action with the USCIS office with jurisdiction over the alien's place of residence. The request for either parole in place or deferred action must include documentation to establish an eligible family relationship. Such evidence may include a previously approved petition.

Note: Proof of filing the Form I-130 or Form I-360 is not required, even in applicable cases, for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2). See AFM 21.1(c)(3)(B).

(A) Petition Required for Request for Subsequent Parole in Place or Renewal of Deferred Action.

Active Duty military members, individuals in the Selected Reserve of the Ready Reserve, individuals who have previously served on active duty in the U.S. military or in the Selected Reserve of the Ready Reserve, and DEP enlistees, if eligible to file a Form I-130 on behalf of a family member requesting subsequent parole in place or renewal of deferred action as provided under AFM 21.1(c)(1) or (c)(2), must submit a completed Form I-130 for the family member, with fee and according to the instructions on the form, prior to filing the request for subsequent parole in place or renewal of deferred action, as applicable. (See Form I-130 instructions for more information on who may file.)

Surviving spouses, parents, sons, and daughters of deceased service members and veterans (described above) who were residing in the United States at the time of the service member's death and who are eligible to file Form I-360 on their own behalf must submit a completed Form I-360, with fee and according to the instructions on the form, prior to filing the request for subsequent parole in place or renewal of deferred action, as applicable. (See Form I-360 instructions for more information on who may file. See also the USCIS web site at: http://www.uscis.gov/military/family-based-survivor-benefits/survivor-benefits-relatives-us-citizen-military-members.)

The Form I-130 (or Form I-360) filing requirement for requests for subsequent parole in place or renewal of deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2) applies only to requests that are submitted on or after November 23, 2017 (one year after publication of memorandum updating AFM 21.1).

(B) Cases where Petition is Not Required at Any Time.

Individuals who are ineligible to file a Form I-130 or a Form I-360 are not required to do so; they may still request parole in place or deferred action, as applicable. In particular, MAVNI recruits in the DEP are not eligible to file Form I-130 and therefore not required to do so. MAVNI recruits may, however, become eligible for naturalization under INA § 329(a) upon entering active duty. Recruits typically must wait until they naturalize before filing a Form I-130 for any eligible family members.

Proof of filing the Form I-130 (or Form I-360) also is not required, even in applicable cases, for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2).

**21.2 Factors Common to the Adjudication of All Relative Visa Petitions.**

(a) <u>Filing and Receipting of Relative Petitions</u> .

(1) <u>Statutory Definitions of Relationships Covered</u> .

USCIS has the responsibility of determining if the beneficiary of a relative visa petition is eligible for the classification sought. As the adjudicating officer, you will make that determination. Therefore, you must be completely familiar with the statutory definitions of relatives as well as the applicable regulations and precedent decisions. The classes of eligible alien relatives are enumerated in sections 201(b), 203(a), 207(c)(2), and 208(b)(3) of the Act and Public Law 97-359:

(A) **Section 201(b)** of the Act covers aliens exempt from numerical limitations and includes "immediate relatives" of United States citizens:

· **Spouse** , which is not really a defined term under the Act or regulations, although **section 101(a)(35)** of the Act does exclude spouses acquired through unconsummated proxy marriages. Also, section 7 of the Defense of Marriage Act (Pub. L. 104-199) clarifies the term (see Chapter 21.3 of this field manual).

· **Child** , as that term is defined in paragraphs (A) through (E) of **section 101(b)(1)** of the Act

· **Orphan** , as that term is defined in section **101(b)(1)(F)** of the Act, who has been, or will be, adopted abroad

· **Orphan** , as that term is defined in section **101(b)(1)(F)** of the Act, who will be coming to the U.S. to be adopted in legal proceedings in this country

· **Parent** , as that term is defined in **section 101(b)(2)** of the Act

(B) **Section 203(a)** covers aliens eligible for preferential consideration based on a familial relationship to a citizen or LPR of the U.S. Unlike the immediate relative petitions, the dependents (spouse and child(ren)) of a beneficiary of a preference petition receive derivative immigrant visa classification if they are accompanying or following to join the principal beneficiary. ("Accompanying" refers to a dependent who is immigrating concurrently with, or who has an immigrant visa issued within 6 months after, the principal alien's admission or adjustment; "following to join" refers to an alien who is immigrating more than 6 months after the principal alien, but based on a relationship which existed at the time of the principal alien's immigration, provided that relationship still exists at the time of the dependent's application for admission to the United States.) The family-based preference classifications are:

·   **First preference** under section 203(a)(1) includes the unmarried sons and daughters of United States citizens;

·   **Second preference** under section 203(a)(2) includes the spouses, children, and unmarried sons and daughters of lawful permanent resident aliens;

| Note 1 |
| --- |
| If a lawful permanent resident acquired a dependent prior to such LPR's immigration or adjustment (the LPR had already married the spouse or the parent-child had been established), the dependent could qualify for a following to join visa classification and would not need a second preference petition or a second preference quota number. |

| Note 2 |
| --- |
| Frequently, the child of an LPR can qualify either as a principal beneficiary (child of LPR) based on a visa petition filed on behalf of the child; or as a derivative (child of the spouse of an LPR) through the petition filed by the LPR for the other parent. This is not always the case, since sometimes the child can only qualify as the child of the spouse, as with a stepchild of an LPR who is over 18 at the time the LPR married the child's parent. |

The derivative classification, of course, requires no separate visa petition. The decision on whether to file one visa petition (for the spouse only) or multiple visa petitions (one for spouse and one for each of the LPR's children) is up to the petitioning LPR. Either approach has advantages:

–   The advantage of filing one petition is that only one fee must be paid and only one set of supporting

documents has to be filed. This can result in considerable savings in time and money, especially if the LPR has a large, multi–child family. Furthermore, should situations change (e.g., if the principal beneficiary dies or the marriage ends in divorce) and individual petitions for the children become necessary, the new petitions will be accorded the same filing date as the original petition (see 8 CFR 204.2 (a)(4)).

–     The advantage of filing multiple petitions is that each beneficiary can act independently. If one of the children needs to immigrate before the others are ready to travel (e.g., if a daughter wants to join her LPR mother in the U.S. to begin school in the U.S. while her father remains in the home country to care for a sibling who is finishing school there), that child may do so.

| Note 3 |
| --- |
| In accordance with **Matter of Ah San** , 15 I&N Dec. 315 (BIA 1975) , non-citizen nationals of the U.S. may also file petitions pursuant to section 203(a)(2) of the Act. |

·     **Third preference** under section 203(a)(3) includes the married sons and daughters of United States citizens;

·     **Fourth preference** under section 203(a)(4) includes the brothers and sisters of United States citizens.

(C) **Section 207(c)(2)** of the Act covers the relatives of an alien admitted to the United States as a refugee and includes:

·     The **spouse of a refugee** , provided the spousal relationship existed at the time the refugee was first admitted to the United States in that status; and

·     The **child of a refugee** , provided the parent-child relationship between the refugee and the child existed at the time of the refugee's admission to the United States, or the child was in *utero* at the time of the father's admission as a refugee. **Note:** In refugee matters, to qualify as "accompanying" the derivative must be admitted within <u>four</u> months of the principal's admission (see **8 CFR 207.7(a)** and contrast with the <u>six</u> month timeframe for immigrant visa cases as discussed in paragraph 21.2(a)(1)(B) above).

(D) **Section 208(b)(3)** of the Act covers the relatives of an alien granted asylum status (an "asylee") and includes:

· The **spouse of an asylee** , provided the spousal relationship existed at the time the asylee was granted such status in the United States; and

· The **child of an asylee** , provided the parent-child relationship between the refugee and the child existed at the time of the refugee's admission to the United States, or the child was in *utero* at the time the father's asylum application was granted.

| Note |
| --- |
| Nonimmigrant relative petitions for K and V nonimmigrants are discussed in **Chapter 37** of this field manual. |

(2) <u>Petition Form</u> .

· Form I-130 (Petition for Alien Relative) is filed with USCIS by a United States citizen or lawful permanent resident on behalf of an alien relative to establish eligibility for the exemption or preference.

· Form I-360 is used to classify an alien as an Amerasian, Widow(er), or as a Special Immigrant. With regards to relatives, it includes those who are:

– The widow or widower of a U.S. citizen. The form allows such person to petition for himself or herself, and to petition for his or her child. The widow or widower of an LPR cannot self-petition. Likewise, the child of a deceased citizen cannot self-petition; the child must be included in his or her parent's widow/widower self-petition.

– A battered spouse or child of a U.S. citizen or LPR. This category also includes certain persons who would have fallen within this category, except that the marriage to the citizen or LPR was bigamous, as well as certain former battered spouses and children of citizens or LPRs.

&mdash;   An Amerasian under Publ. L. 97-359, as amended by subsequent legislation.

| Note: |
| --- |
| Form I-360 is also used for a number of other (non-relative) special immigrant classifications which are discussed in **Chapter 22** of this field manual. |

·   Form I-600 is used to petition for an orphan who has been identified.

·   Form I-600A is used to petition for an orphan if the orphan is to be named later.

·   Form I-730 is used by an alien who has been admitted as a refugee under section 207 of the Act, or granted asylee status under section 208 of the Act, to bring a spouse or child to the United States as a derivative refugee or asylee.

(3) Priority Dates .

Preference aliens need a priority date for visa issuance, and that date is generally established when the petition, filed on the alien's behalf, is properly signed by the petitioner and the fee has been collected by USCIS . The priority date is the chronological date which establishes the preference alien's place on a waiting list maintained by the Department of State for issuance of the immigrant visa. (See also **Chapter 21.1** of this field manual.)

(A) General .

The priority date, in most instances, is the date the visa petition was properly filed at a USCIS office. If the visa petition is filed at a consulate abroad, and the petitioner is under the jurisdiction of the consulate, the priority date or filing date is the date the petition was received at the consular office if the petition can be approved by the consular officer. For those cases not within the jurisdiction of the consular office, no filing date is accorded until such time as they are received by the appropriate USCIS office in the States. The filing

date should be recorded on the appropriate line on the front of the petition with an explanation for any priority date which is different from the date on which USCIS date-stamped the petition when it was originally filed by the petitioner.

(B) Petition Not Properly Filed .

If, during normal processing a delay results from deficiencies in the initial filing, the priority date will be established only when the petition is properly signed by the petitioner and the fee has been collected by USCIS . If questions arise concerning the filing of the petition which cannot be resolved through a check of the Fee Receipting System, (FARES), or other fee collection system, then the director may consider the date of receipt of the petition to be the priority date. Where a petition is returned to the petitioner because the fee has not been paid, or the petition has not been signed, the petitioner should be informed on the Form I-797 that the petition has not been properly filed and no priority date has been es tablished. If you use a later date than the initial date-stamp on the petition as the filing date, you should indicate the reason for using the later date in the Remarks Block on the petition. An example of the format which you may use in the Remarks Block follows:

Priority date not established on date filed because...

a. Fee not paid until_____.

b. Petition not signed until_____.

(4) Chapter 21.2(a)(4) replaced with Memorandum - Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children (REVISED); Effect of FY 2010 DHS Appropriations Act on eligibility to immigrate after death of visa petitioner. See **Appendix 21-7** . [Replacement and addition 12-02-2009]

(b) Adjudicative Procedures .

(1) Review of the Petition .

The basic adjudication procedures and concerns discussed in chapters 10 through 17 of this field manual apply to relative petitions. Adjudicators who are not already familiar with these matters should review those chapters before adjudicating relative petitions.

(A) <u>General</u>.

You must carefully review the answer to each question on the petition and determine if the information is relevant and correct. People preparing petitions sometimes provide incorrect, inaccurate, or misleading information, and you must detect mistakes and misinformation in order to properly adjudicate the petition. Some errors are inadvertent; others are deliberate. Examples of common problems associated with the execution and filing of petitions are:

· Failure to include the requisite fee;

· Failure to sign the petition;

· Reversal of petitioner's and beneficiary's names (the terms "petitioner" and "beneficiary" sometimes confuse people);

· Failure to answer relevant questions;

· Use of "N/A" to answer relevant questions; and,

· Erroneously listing the current date as the birth date for the petitioner or the beneficiary.

| <u>Note</u> |
|---|

You should be aware that the use of the term "N/A" is a common ploy used to try to conceal relevant information (e.g., prior marriages, children, beneficiary's status in the United States) by implying the answer is "none" without actually stating it. Therefore, "N/A" should generally not be considered an acceptable answer.

(B) Item-by-Item Review .

Special attention should be paid to the following items:

· Name . The names of the petitioner and the beneficiary are basic in establishing identity and are extremely important when trying to locate any relating USCIS records. They also provide clues concerning marriages, illegitimacy, adoption, and other issues for which a name differentiation is normal. Any substantial variation in these names, when compared with USCIS or other records, must be satisfactorily explained by the submission of additional documents, affidavits, or other appropriate means.

· Date and Place of Birth . This information is essential as it relates to the identity of the individual and is often necessary to locate any relating USCIS records. Additionally, it may determine eligibility for the benefit sought. For example, a petition filed to accord immediate relative classification to a parent or fourth preference classification to a brother or sister requires a review of the petitioner's date of birth because the petitioner must be at least 21 years of age at the time of filing. A large difference in age between the petitioner and beneficiary on a spouse petition is often the first indication you will have that the marriage may have be en contracted solely for the purpose of gaining an immigration benefit (with or without the knowledge and complicity of the petitioner). On petitions for parents, brothers, sisters, children, sons, or daughters, the petitioner's and the beneficiary's birth dates may have a definite bearing on the claimed relationship. Also, the law governing the place where and when the individual was born must be considered in determining eligibility for many benefits. Because of the variance in individual state law as well as in foreign laws, the adjudicator will, ofte ntimes, have to rely on a report from the Library of Congress (see **Chapter 14.10** of this field manual), interim decisions, General Counsel Opinions, or other resources to determine eligibility.

· Previously-Filed Visa Petitions . The answer to this question may provide you with valuable information pertinent to your case. A previously-filed petition may contain the necessary evidence or information that was missing or may indicate a lack of eligibility for the benefit sought. If the petition or other record reflects that a previous petition has been filed by the petitioner, and it is believed that the prior petition may contain evidence or information pertinent to the adjudication of the present petition, then the prior petition s hould be obtained where possible.

·   <u>Addresses</u> . The correct addresses for both the petitioner and the beneficiary are extremely important. The petitioner's address generally establishes which USCIS office has jurisdiction over the petition. The addresses are also important because the petitioner and the beneficiary may have to be contacted or interviewed. However, even if personal contact is not necessary, the petitioner will have to be notified of the decision on the petition, and the beneficiary will have to be contacted concerning the issuance of an immigrant visa or adjustment of status.

·   <u>Location of Consulate</u> . The location of the United States Embassy/Consulate where the beneficiary will apply for a visa must be shown on the petition, particularly if the beneficiary will have to apply abroad. If the beneficiary will not seek adjustment in the United States or is ineligible for section 245 benefits, the approved petition is forwarded to the National Visa Center (NVC) at:

The Department of State,

National Visa Center,

32 Rochester Ave,

Portsmouth, NH 03801-2909.

The NVC, at the appropriate time, will forward the petition to the consulate designated by the petitioner on the approved petition. If the designation is omitted by the petitioner, you will have to obtain the consular location based on the beneficiary's country of birth or country of last residence. If the consulate designated does not issue immigrant visas, you must ascertain the proper consulate before you can complete the processing of the petition. You can verify whether a consular office issues immigra nt visas from the list of visa issuing posts in the Department of State's Foreign Affairs Manual.

If the beneficiary is unable to return to the country of birth for visa issuance or if a U.S. consulate is not present in the beneficiary's country of birth, the petitioner may request that another U.S. consulate, which is designated as an immigrant visa processing post, accept jurisdiction on humanitarian grounds. This procedure is requested through the individual consulate or the Department of State. If jurisdiction is accepted by the consulate, the adjudicator should annotate the petition to that effect prior to forwarding the petition to the NVC. Under no circumstances is the adjudicator to designate or recommend that the petitioner designate a processing post other than one in the beneficiary's country of birth or country of last residence.

| Note |
|---|
| The Form I-797 (Notice of Approval) will show the petition has been sent to the NVC. The consular block on the approval notice will be left blank. |

· <u>United States Citizenship of Petitioner</u> . If the petitioner is a United States citizen, proof of citizenship must be submitted with the petition. In most cases, a birth certificate, Naturalization Certificate, Certificate of Citizenship, or U.S. passport will be submitted. **8 CFR 204.1(g)(1)(i - vi** ) stipulates the acceptable documents to be presented as evidence of U.S. citizenship. USCIS does not post-audit citizenship claims and, therefore, evidence that the petitioner is a U.S. citizen must be submitted with the petition. If the petitioner was born outside the United States and derived citizenship, but has not applied for a Certificate of Citizenship, the case should be returned to the petitioner to resolve his/her citizenship status at a district office.

**8 CFR 204.1(f)(2)** allows for the submission of legible, true copies of original documents; however, USCIS reserves the right to require submission of original documents when deemed necessary.

If it appears the petitioner may have expatriated or lost U.S. citizenship, the petition should be referred to the district office having jurisdiction. The district office is able to interview and obtain a question and answer statement or affidavit from the petitioner. Then, the case will be referred to the Citizenship section with all the supporting evidence, and with a memorandum of the conclusion that the petitioner has lost citizenship. The Citizenship section will furnish an informal opinion as to whet her the case would have been referred to Headquarters under outstanding instructions, had it arisen in the Citizenship section. If so, the case is referred to Headquarters, through the office of the regional director, and will attach its comments and recommendation. This referral is not a certification and the petitioner should not be informed of it.

· <u>Lawful Residence Status of Petitioner</u> . **8 CFR 204(g)(1)(vii)** gives the specific requirements for evidence of lawful permanent residence. Generally, the petitioner will submit a copy of his/her Form I-551. If the original is seen by the adjudicator, verify an alien's status by noting "I-551 seen" or "file seen" beside the petitioner's "A" number. Immediately return the Form I-551 to the petitioner unless the authenticity of the document is questionable.

If the petitioner does not submit Form I-551, conduct a record check in USCIS to verify status. If the relating file cannot be located or does not contain a record of admission for permanent residence, you should attempt to verify arrival pursuant to Chapter 7A of the Records Operations Handbook . If that is unsuccessful, request the alien to submit any document he or she may have which was issued or endorsed by USCIS which may bear on the claim to permanent resident status.

In doubtful cases, the petition should be sent to, and the petitioner referred to, the district office having jurisdiction. An interview should be conducted if there is a question that a document or a record relates to the petitioner.

You should accord the petitioner the benefit of any presumption of lawful admission under **8 CFR 101** to which he or she may be entitled (see **Chapter 23.4** of this field manual).

You should also determine if the petitioner's status as a lawful permanent resident has been lost. If the petitioner's file contains a signed Form I-407 (Record of Abandonment of Residence), but the petitioner contends that he or she had no intentions of abandoning U.S. residence and that the Form I-551 or other document was lifted in error, the case should be referred to the district office for interview.

In the case of a permanent resident who has not yet received Form I-551, the temporary stamp showing processing for Form I-551 is acceptable evidence of permanent residence. This stamp may be in the petitioner's passport or on Form I-181.

·   <u>Relationship</u> . Mistakes are often made on this item. Generally, the mistake consists of reversing the relationship; for example, listing the relationship as "father" when a parent is petitioning for a child. Often the intent is obvious in which case you may correct the error (making sure to initial your correction). The relationship must be established by the supporting documents and any other available evidence.

·   <u>Prior Marriages of the Petitioner and Beneficiary</u> . The response to this question is very important because it may have a definite bearing on eligibility for the benefit sought. For example, a "child" cannot be married; a "spouse" must have been legally free to marry when the current marriage was contracted; and a marriage is generally necessary for a child to be considered legitimate. The answer given on the petition may not be completely accurate; therefore, all evidence and information should be carefully reviewed to ascertain if a prior marriage, for w hich you have no evidence of termination, may have occurred. Birth certificates of the subject's children, prior INS or USCIS records, and marriage certificates are good sources of evidence of prior marriages. It is extremely important that this issue be completely resolved and documented for the record. All evidence that was necessary to establish termination of any prior marriages must be made a part of the record.

AR2022_300194

| Note |
|------|
| A son or daughter who is unmarried and under age 21 is a child. Unmarried does not mean "never married" and a previously married son or daughter under age 21 is a "child." This raises the distinct possibility that someone might engage in divorce fraud in order to qualify for an immigration benefit. As we do not recognize a marriage which is contracted solely to circumvent immigration law, we also do not recognize a divorce which is obtained solely to circumvent immigration law. |

·   <u>Marital Status of Beneficiary</u> . This question has a definite bearing on eligibility for the benefit sought. You should be careful to verify the answer from the evidence and information furnished. It is not uncommon for a petitioner filing on behalf of a son or daughter to claim the beneficiary has never been married when, in fact, the person is currently married. Some indications that a person may be married, even though the marriage is undeclared, are:

–   <u>Age</u> . Some nationalities and cultures tend to marry at a fairly young age. If the beneficiary is abnormally old to be an unmarried person in a particular country, this may indicate an undeclared marriage.

–   <u>Children</u> . If the beneficiary has children, there is a strong possibility a marriage exists or did exist. The children's birth certificates will help resolve this.

–   <u>Service Records</u> , Records, such as a visa application, Form I-213, affidavit, and previously filed application or petition, may indicate the subject's marital status.

·   <u>Petition Submitted Concurrently for Other Relatives</u> . If the petition indicates the petitioner is filing for other relatives at the same time, all the petitions should be considered simultaneously, if possible. However, remember that all petitions stand alone and each must be documented individually. Therefore, a clearly approvable petition should not be held in abeyance pending the adjudication of the other relative's questionable petition. Be aware that generally with "joint" petitions, documents pertaining to all or some of the petitions may be attached t o only one of the petitions. In such a situation, check all the petitions for documentation, as this may save the needless return of a petition. Each petition must be accompanied by the necessary supporting documents, either originals or the acceptable copies, before being approved. The supporting documents must be made part of the Service record relating to that particular case.

(C) <u>Discretionary Procedures for Petitioning Military Members and Their Dependents</u> . [Chapter added on 09-22-2009 ]

When adjudicating a standalone Form I-130 filed by a military member on behalf of his or her alien spouse or child, Service Center ISOs must follow the steps below:

·      Review every properly filed petition in chronological order by the receipt date;

·      Determine whether the petition involves an active duty military member (by checking the file for military orders) before issuing a request for evidence (RFE); and

| Note |
| --- |
| The evidence necessary for the issuance of an RFE in this situation includes but is not limited to the list of documents listed in the memo entitled *Standalone Form I-130 and Jointly Filed Form I-751 : Discretionary Procedures for Petitioning Military Members and Their Dependents, Sept.* 22, 2009. See **Appendix 21-8** . |

·      Review the evidence submitted to determine the nature of the member's deployment; the claimed bona fides of the marriage and relationship to any children involved. See memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and Their Dependents, Sept.* 22, 2009. See **Appendix 21-8**

The detailed steps that the ISO must follow are listed in **Appendix 21-9** .

(2) <u>Types of Primary Documentation</u> .

All petitions must be supported by primary evidence, if available. The standard sources of primary documents are:

(A) <u>USCIS Records</u> .

One of the most valuable, yet often overlooked, sources of information to verify a claimed relationship is the records of USCIS itself. When primary evidence such as birth certificates, marriage certificates or divorce decrees is not provided in support of a family-based petition, or where the authenticity of such documents is in question, USCIS records relating to the petitioner or other close relatives may verify or refute information claimed in the petition. Records showing acceptance in another USCIS proceeding of a claim to U.S. citizenship, marriage, birth of a child, etc. may serve to support such a claim in a later petition, or to refute a contradictory claim.

(B) <u>Federal, State and Local Records</u> .

In the United States, vital records are usually kept by State and local authorities. In some cases (e.g., where an event took place while the party in question was in the military), the vital records may be kept by a branch of the federal government.

(C) <u>Foreign Documentation</u> .

To determine if documentary evidence is available from another country, refer to the Department of State's Foreign Affairs Manual (FAM).

(3) <u>Secondary Evidence</u> .

One problem common to all categories of petitions is the unavailability or alleged unavailability of documents. You should always refer to the FAM any time a petitioner alleges that documents cannot be obtained. When the FAM shows that primary documents are generally available in the country at issue, but the petitioner claims that his or her document is unavailable, a letter from the appropriate registrar stating that the document is not available is required before USCIS will accept secondary evidence. If primary evidence is not available, and if this fact is certified by the issuing authority, secondary evidence (as described in **8 CFR 204.1** and on the I-130 instructions sheet) may be accepted. Furthermore, secondary evidence (e.g.,school records, baptismal certificates, etc.) is also used in conjunction with primary evidence that carries little probative value like a delayed birth certificate.

(A)Documents should be examined critically for alterations, authenticity, validity, and proper certification. **8 CFR 204.1(f)** ("Supporting Documentation") reads, in pertinent part:

( 1 ) Documentary evidence consists of those documents which establish the United States citizenship or lawful permanent resident status of the petitioner and the claimed relationship of the petitioner to the beneficiary.... When the FAM shows that primary documents are generally available in the country of issue but the petitioner claims that his or her document is unavailable, a letter from the appropriate registrar stating that the document is not available will be required before USCIS will accept secondary evidence.

( 2 ) Original documents or legible, true copies of original documents are acceptable. USCIS reserves the right to require submission of original documents when deemed necessary.

(B) **8 CFR 204.1(g)** lists, in detail, the requirements for primary and secondary evidence.

(4) Adequacy of Evidence .

(A) "Law of the Land" .

To evaluate the adequacy of evidence, you must be aware that the law of the state or country where the act (marriage, divorce, legitimation, or adoption) took place generally governs the validity of the relationship established or terminated. You should check the published precedent decisions if there is a question on this issue. If the precedent decisions and other available references do not resolve the issue, you should request an advisory opinion from the Library of Congress (see **Chapter 14.10** of this field manual). Your office may also have available copies of previous Library of Congress opinions for reference.

(B) Exceptions .

Although the law of the land generally governs the validity of a relationship, it does not follow that all legal relationships will confer benefits under the Act. For example, a marriage contracted solely for the purpose

of gaining immigration benefits and not intended to create a life together as man and wife, though valid in the place where contracted, is not valid for benefits under the Act, and a proxy marriage is not considered valid under the Act unless consummated. Furthermore, in some countries it m ay be possible to establish a same-sex relationship which is not in compliance with the provisions of section 7 of the Defense of Marriage Act (110 Stat 2419 amending 28 U.S.C. 115, prohibiting federal law recognition of same-sex marriages) and would therefore not be recognized for immigration purposes (see **Chapter 21.3** ).

(5) Determining the Meaning of a Document .

You must ensure that the document accepted is, in fact, what it is purported to be. A marriage license is different from a marriage certificate (the former allows the couple in question to get married in a given jurisdiction and within a given time period, the latter is evidence that the marriage has been celebrated). Likewise, often you will find that what appears to be a divorce decree is in reality a petition for divorce or a separation decree, neither of which legally terminates a marriage. Some decrees may be granted with qualification, such as a prohibition against marriage within a specific period of time, and therefore are not valid unless the qualifications are met. Others may specify that the decree will not become final until some future date or is null if the woman becomes pregnant during a specified period of time.

| **Note** |
| --- |
| Even in countries where a condition is placed on a decree, that same country might not honor the condition. For example, in Mexico divorce decrees prohibiting remarriage within a certain amount of time do not invalidate a subsequent marriage performed before time limit. When in doubt, solicit an opinion from the Library of Congress (see **Chapter 14.10** of this *field manual* ). |

(6) Documentation Already in the USCIS File .

The petitioner is required to submit all required documentation with the petition. However, in some instances, the petitioner may advise USCIS that the required document can only be located in the petitioner's file. If so, USCIS should request the file to attempt to locate the document in question.

(7) Evidence in Undocumented Cases .

Primary evidence of birth, marriage, death, divorce, and adoption is sometimes unavailable. In these cases,

affidavits by the petitioner and other persons having personal knowledge of the events that created the relationship, and other evidence such as family photographs, blood tests, signature specimen forms, and evidence of transmittal of remittances to the petitioner's family may be considered. In many countries where the lack of primary evidence is known to be a fact, you need not require a certificatio n of the non-existence of a record before you accept secondary evidence. Blood tests may be required in these cases. You should always refer to the FAM for primary document availability. The regulations at **8 CFR 204.1(g)(2)** give specifics as to what type of secondary evidence to request. See *Matter of Tanessa Amelia Pagan* , ID 3378 (BIA 1999).

Any information furnished should be carefully scrutinized for consistency with claims made in the visa petition and information contained in USCIS records, particularly with regard to names, relationships, dates and place of birth, and dates and places of marriages.

When a petitioner seeks to confer immediate relative or preference classification on the basis of an alleged relationship between an adoptive parent and an adopted child (or adopted son or daughter) and no formal adoption decree is available, or, if such a decree is submitted and its authenticity is considered suspect, the petitioner should be required to submit secondary evidence of the alleged relationship. Such secondary evidence may consist of copies of affidavits, photographs, remittances, or other evi dence of support, or letters and other documents bearing upon the validity of the adoption. Such evidence should be made part of the record of proceeding.

In **Matter of Kwan** , 14 I&N Dec. 175 (BIA 1972) , involving a visa petition on behalf of an adopted daughter, the BIA provided a useful guide to the kind of secondary evidence which should be required in an undocumented case. The following is an excerpt from that decision:

Inasmuch as most Chinese adoption cases must be decided without benefit of a recorded formal decree of adoption, it is permissible to resort to other forms of probative evidence in order to reach a decision as to the validity of the adoption.

For instance, it would be proper for the petitioner to submit affidavits executed by (1) both adoptive parents, (2) witnesses to the adoption ceremony, and (3) relatives and neighbors. The absence of such affidavits is a factor the petitioner must satisfactorily explain. Affidavits submitted should (1) state the nature of the affiant's relationship, if any, to the parties, (2) set forth the basis of the affiant's knowledge, and (3) contain a statement of the facts the affiant knows regarding the adoption, r ather than mere conclusory statements as to the existence of the adoption.

**Matter of Kwan** describes and explains the necessity of good secondary evidence. You should require similar secondary evidence; make it a part of the record of proceeding when primary evidence of birth, marriage, death or divorce is not available to establish a claimed relationship between a petitioner and beneficiary. Attach the originals or copies of secondary evidence you considered in reaching a decision to any approved petition you forward to a National Visa Center (NVC) . You should not approve the petition unless you are satisfied from the evidence submitted that the petitioner has met the burden of proof.

(8) <u>Affidavits</u> .

When considering secondary evidence, you must usually evaluate sworn affidavits to determine the validity of the relationship. Be sure that the affidavits contain all the specified elements as required by the secondary evidence regulation. You should analyze the affidavits carefully and compare them with any available information to determine if inconsistencies exist. When all the affidavits are worded the same, it indicates that the words are not necessarily those of the affiant and may cast some doubt on the affidavits' validity. When that situation arises, it is often beneficial, if possible, to have the affiant appear for a personal interview to determine what he or she personally knows about the claimed relationship and how the knowledge was acquired.

You should always try to obtain some legal or official document to corroborate affidavits. In some cases it is not possible, but usually the case will indicate something else is available, such as school records, census records, military or draft records, income statements, or social security records. Though the corroborating evidence may be nothing more than information furnished to another agency by the petitioner or beneficiary, it may establish that the relationship was claimed prior to seeking immigrat ion benefits and can be very helpful in verifying the claimed relationship.

(9) <u>Evidence of Status in the United States</u> .

(A) <u>United States Citizenship of Petitioner</u> .

When a USCIS employee has verified the petitioner's status, the notation "proof seen" will be placed beside the citizenship information on the petition and initialed. If a naturalization or citizenship certificate is presented in person, it shall be handed back to the petitioner. If a petition has been mailed in with the certificate attached, it shall be certified by the first employee reviewing the application. The certificate shall then be sent directly back to the petitioner by certified or registered mail. Form G-3 47 should be used to

obtain the naturalization file of any petitioner who is unable to furnish his certificate number and date and place of naturalization or where there is reason to suspect that the petitioner may have been expatriated.

Some petitioners who claim U.S. citizenship through birth in the U.S. are in fact aliens. The following may indicate an alien is making a false claim to U.S. citizenship:

· Delayed birth certificate;

· Delayed baptismal certificate;

· Unavailability of school records;

· No census records of the individual;

· Individual not in the military or registered for the draft;

· No baptismal certificate when of a faith normally baptized;

· No official documents (claim based solely on affidavits);

· Unable to speak English;

· Illiterate, when of an age group for which illiteracy is uncommon;

· No knowledge of area of predominant residence in the U.S.;

· No knowledge of mother, father, and/or brothers or sisters (check the number of prior births on the birth certificate);

· Siblings and/or parents born abroad;

· Claims raised abroad and only recently learned of U.S. citizenship; no satisfactory explanation for means of entry into U.S.;

· Social security card obtained late in life, or the number does not correspond to the claimed place of issuance;

This list is by no means complete, nor can each factor be applied to all cases. Many of the elements discussed can only be developed through personal interview. If the petitioner's citizenship is in question, an interview should be conducted.

(B) <u>Lawful Residence Status of Petitioner</u>.

Ideally, an LPR filing an I-130 petition will submit a photocopy of a currently valid Form I-551 to verify his or her LPR status. However, the instructions on the Form I-130 require an LPR petitioner to submit his or her original "Form I-151 or I-551" (and do not even specify that the Form I-551 must be a currently valid one). On the other hand, even in the absence of documentation, regulations at **8 CFR 103.2(b)(17)** allow for verification of claimed LPR status through USCIS records "at the discretion of the adjudicating officer." Furthermore, **section 264(e)** of the Act requires an LPR (18 years of age and over) to carry his or her Form I-551 at all times. Accordingly, the documentation submitted by the petitioner might range from an original valid Form I-551, to a photocopy of such Form I-551, to an obsolete document, to no document at all; and the action of the USCIS employee or contractor upon receiving a Form I-130 will vary according to the documentation submitted:

· If the petitioner submits an original valid Form I-551, depending on local office policy, either:

−    Make a photocopy of the Form I-551 to accompany the petition and return the original to the petitioner, or

−    Annotate the Form I-130 in block 14a "Original, valid Form I-551 seen and returned;" add the date and the appropriate identifier (e.g., your stamp number or your initials); and return the Form I-551 to the petitioner.

·    If the petitioner submits a photocopy of a valid Form I-551, no verification or annotation action is required at this point.

·    If the petitioner submits an original Form I-151, or an original but expired Form I-551, make a photocopy of the document and annotate that photocopy "Expired card seen and returned to petitioner with instructions to apply for replacement" adding the date and your identifier. Then return the card to the petitioner with a Form I-90 and an explanation that the petitioner must apply for a replacement card (see **Chapter 51** of this field manual).

·    If the petitioner submits a photocopy of a Form I-151, or of an expired Form I-551, no verification or annotation action is required at this point.

·    If the petitioner submits none of the above or no documentation at all, but claims in block 14a of the Form I-130 to be a lawful permanent resident, depending on local policy, either:

−    Annotate block 14a of the Form I-130 "No documentation submitted," adding the date and your identifier (which will require verification from USCIS records in accordance with **8 CFR 103.2(b)(17)** , as discussed above), or

−    Return the Form I-130 to the petitioner with instructions to submit the required documentation.

| **Note** |
|---|

> Regardless of the action taken at the point of receipt by the USCIS employee or contractor, the adjudicating officer has full responsibility for determining the petitioner's status and standing at the time of adjudication.

Even though the petitioner presents evidence of permanent residence and USCIS records verify the status, the adjudicating officer must determine if the petitioner is underlined entitled to the status or is deportable. A visa petition should not be approved until questions concerning the petitioner's deportability are resolved.

One of the most frequent problems in this area concerns petitioners who gained entry into the United States as children or unmarried sons or daughters, and whose pending petitions establish that they were actually married before entering the United States. These particular cases should be transferred out to the operations branch for their disposition and most likely to a district or local office for full interview and adjudication. The results could lead to prosecution of the petitioner and the possible los s of his/her lawful permanent residence status.

---

**Note**

When admitting a "marriageable age" immigrant with a "child" or "unmarried son or daughter" visa (including the "accompanying to join" child classifications), or adjusting an alien in such category, it is always a good idea to verify that the person is still unmarried and to so annotate the visa or adjustment application. This will assist in establishing that the alien committed fraud if it is later determined that he or she was already married at the time. The same pertains to derivative refugees and asyle es being admitted under the RE-3 classification or granted AS-3 classification.

---

(C) <u>Status in the United States as a Non-citizen National</u> .

An American Samoan (including a Swain's Islander), as a non-citizen national, may file a relative visa petition for a spouse, child or unmarried son or daughter under second preference (see **Matter of Ah San** , 15 I&N Dec. 315 (BIA 1975) ). A non-citizen national will generally present a Certificate of Identity showing United States nationality, a United States passport, or a birth certificate as evidence of his or her status in this country. Chapter 12.8 of the Inspector's Field Manual contains additional information on non-citizen nationals.

(D) <u>Status in the United States as a Refugee or Asylee</u> .

A refugee or asylee will generally present a copy of his or her I-94 showing that he or she has been

admitted as a refugee or granted refugee status. He or she may also present a refugee travel document (Form I-571) as evidence of his or her status. Any doubts regarding the petitioner's status in the United States should be resolved through a review of his or her A-file, and, if necessary, a personal interview.

| **Note** |
| --- |
| Remember that under **8 CFR 207.7(d)** and **8 CFR 208.20** , a Form I-730 can only be filed within the first 2 years after the refugee's <u>initial</u> admission as a refugee or the asylee's grant of asylee status (a departure and return on a refugee travel document does <u>not</u> begin a new 2-year time period). |

(10) <u>Evidence of Relationship</u> .

General information about documentation is contained in **Chapter 11** of this field manual. More specific information on the documentation required to establish a specific relationship is discussed in each of the subchapters (21.3 through 21.10) of this chapter.

(11) <u>Insufficient Documentation</u> .

If the documentation submitted by the petitioner does not adequately prove or disprove all issues involving the standing of the petitioner or the relationship between the petitioner and the beneficiary, you have 3 (or in some offices, 4) means of resolving the outstanding issues:

(A) <u>Requests for Evidence</u> .

When the USCIS determines that the evidence is not sufficient, an explanation of the deficiency will be provided and additional evidence will be requested. Service centers use Form I-797 and districts use Form I-72 to make such request. In accordance with 8 CFR 204.1(h), the petitioner will be given sixty (60) days to present additional evidence, withdraw the petition, request a decision based on the submitted evidence, or request additional time to respond. If the Director determines that the initial sixty (60) day peri od is insufficient to permit the presentation of additional documents, the Director may provide an additional sixty (60) days for the submission. The total time shall not exceed 120 days, unless unusual circumstances exist. Failure to respond to a request for additional evidence will result in a decision based on the evidence previously submitted. [ **Note:** Compare and contrast 8 CFR 204.1(h) (which allows up to two 60-day periods for response) and 8 CFR 103.2(b)(8) (which allows a single 84-day period for response). Since

there is an apparent conflict between to these two regulatory provisions, we have to give the applicant or petitioner for a benefit under 8 CFR 204 the more generous provision. Also, because 204.1(h) is specific to section 204, it has more relevance to relative visa petitions ]

When you request additional information, inform the petitioner what must be completed, corrected, or submitted. It is important that you inform the petitioner of ALL deficiencies, (remember to consider the allowable time for resubmission stipulated by **8 CFR 204.1(h)** ), so the petition is 100% complete and ready for adjudication. Returning of a petition without stipulating all the deficiencies results in additional work for USCIS because of the unnecessary additional handling prior to final decision. This results in complaints from the petitioner concerning inefficiency and delays, in Congressional interest due to the petitioner's discontent with the Service's inordinate processing time for the petition, and in a bad public image of USCIS .

A petition should not be returned, or additional information requested, if there is sufficient documentation to allow a decision to be rendered. For example, if a permanent resident alien files a petition on behalf of a brother submitting both birth certificates indicating a common father and different mothers, but fails to submit other documentation, the petition should not be returned as deficient. The evidence submitted clearly establishes the petitioner's ineligibility to file (because a LPR cannot petition for a sibling), and additional evidence will not alter the situation; therefore, the petition would be properly denied on the evidence of record rather than returned requesting additional documentation. Any evidence reques ted must be necessary and pertinent to the decision in the case.

(B) Interview .

The Service Centers are not set up to conduct interviews; however situations will arise that occasion an interview. These occasions would require a petition referral to the local office having jurisdiction over the petitioner (and/or beneficiary if in the U.S.). (The referral must include a memorandum explaining the reason for the referral and the concerns or issues which must be explored at the interview.) The local office, according to its availability, would then schedule the interview. Each Service Cent er usually has a specified policy as to how to accomplish this referral. Once a case has been referred to a local office, that office becomes the adjudicating office and has full responsibility for the petition; the petition is not to be returned to the Service Center for post-interview adjudication.

Most petitions will be completed without the need of a personal interview; however, the facts of an individual case may indicate that a personal interview is appropriate. Most interviews concern the bona fides of a marriage in spouse petition proceedings or the petitioner's status in the United States.

Usually, a written or taped record of the interview(s) is made to document the proceedings and the interview is used to render a decision.

Interviews are time-consuming and should be requested only when absolutely necessary. If conducted properly, interviews can be very beneficial in helping one reach a decision on a case.

See **Chapter 15** of this field manual for a discussion of interview techniques and procedures.

| **Note** |
|---|
| Upon completion of the interview, the adjudicating office should provide the Service Center with feedback regarding the results of the interview. This will both give the Service Center officer credit for a case well-referred and will enable the Service Center to refine its referral criteria. |

(C) <u>Investigation</u>. See **Chapter 10.5(d)** of this field manual.

(D) <u>Field Examination</u>. See **Chapter 17** of this field manual.

(c) <u>Adjudicative Issues</u>.

The adjudication of a relative petition deals with two issues: whether the petitioner has standing to file the petition and whether the beneficiary has the requisite familial relationship to qualify for the classification being sought. These determinations require an understanding of not only the immigration and nationality laws and regulations of the United States, but also of the laws of other countries and states, prior laws, genetics, domestic abuse, fraud, psychology, and a myriad of other issues and s ub-issues.

(1) <u>Burden of Proof</u>.

The adjudication of visa petitions is an administrative proceeding. In administrative proceedings, the

petitioner bears the burden of proof to establish eligibility for the benefit sought. **Matter of Brantigan** , 11 I & N Dec. 453 (BIA 1966) .

(2) <u>Review and Rebuttal Rights</u> .

The adjudicating officer must keep in mind the fact that the petitioner must be given the opportunity to inspect and rebut any adverse information used in arriving at the decision to deny or revoke a petition. The one exception pertains to material classified under E.O. 12356. In accordance with **8 CFR 103.2(b)(16)(iv)** , the petitioner must still be given a summary (authorized by a regional director) of the general nature of the information and the opportunity to rebut it if it can be done without jeopardizing the safety of the information and the source. (See **Matter of Tahsir** , 16 I&N Dec. 56 (BIA 1976) and Chapter 10.19 of this field manual.)

(3) <u>Order of Processing</u> .

Generally speaking, relative petitions should be adjudicated in the order in which they are received. However, the regulations and policies recognize that exceptions to this general rule may be made under certain circumstances (see **Chapter 10.11** of this field manual).

(4) <u>Rules of Evidence</u> .

Strict rules of evidence used in criminal proceedings do not apply in administrative proceedings. Usually, any oral or documentary evidence may be used in a visa petition proceeding.

Petitioners may submit photocopies of documents in support of the petition, but must be able to submit the original documents upon request. The original document which was photocopied must, of course, be a genuine document which was obtained from the authorized keeper of the records.

Copies of public documents, certified by the person having custody of the originals, are generally admissible. Official foreign documents should be certified by the lawful custodian and authenticated by U.S. consular officers, except in cases signatory to the Hague Convention of Legalizations. The absence of

an official record may be proved by a written statement signed by an appointed deputy that, after a diligent search, no record of entry of the event is found to exist in the records of the custodian's o ffice.

A statement that a particular record does not exist is, of course, not evidence of the veracity of the claim being presented; it merely allows you to consider other evidence. Any such claims should be carefully reviewed. For example, someone who quit high school in the 9 th grade might claim that he graduated from another high school in the same area whose records he knows to have been destroyed in a fire, so that anyone checking on the claim would be advised that the records (of the school which the person did not attend) are unavailable. The verifying inspector would not know that the records a different school (the one the person briefly attended) exist and reveal that the person did not graduate.

(5) <u>Derivative Beneficiaries</u> .

Any alien classified as an immediate relative must be the direct beneficiary of an approved petition for that classification. Therefore the child of an alien approved for immediate relative spouse classification is not eligible for derivative classification and must have a petition filed on his or her behalf.

However, the children and, in some cases, the spouse of an alien approved for family preference classification, may be included in the principal alien's preference visa petition. The derivative beneficiary will be accorded the same family preference classification and the same priority date as the principal alien.

If the derivative child of a second preference beneficiary reaches the age of 21 years prior to the issuance of a visa to the principal alien parent, a separate petition will be required for that child. The petition must be filed by the same petitioner that filed for the principal alien parent, and, if approved, would retain the original priority date. Remember, this retention of the original priority date only applies when the derivative child's principal alien parent is accorded second preference classifi cation.

When adjudicating a petition, it is important to determine if there are family members eligible to derive benefits from the petition.

If the family is in the United States and the principal alien is outside the United States, the derivative beneficiaries may be eligible for adjustment of status under section 245 of the Act once the principal alien has immigrated (provided they are not subject to the bars contained in sections 245(a) or 245(c) of the Act), and should be so notified.

(6) <u>Special Concerns about Particular Nationalities</u> .

(A) <u>Chinese Visa Petitions</u> .

Prior to 1931, the prevailing standards or guidelines for marriages, adoptions, and other civil proceedings which might be considered in connection with an I-130 were determined by Chinese Customary Rite. This was true also in Hong Kong, a British Crown Colony.

In 1931, the *Chinese Civil Code* was instituted in mainland China, codifying much of the Customary Rite and becoming the governing law of the land. Books IV and V of the Civil Code relate to family affairs and include all the regulations as to what constituted a valid marriage, divorce, or adoption.

The Chinese Civil Code remained in effect in mainland China until the Communist takeover, which started in early 1949, and was essentially completed by 1950. The Communist government evolved its own civil code, eliminating many of the discriminatory or "decadent" provisions of the Chinese Civil Code. For example, under the Communist government, adoption was permitted solely in the interest of the child, to provide the child with a home, education, and parental guidance, and was no longer permitted for the p urpose of instituting an heir to continue a family name. The stigma of illegitimacy was removed, theoretically, by eliminating any distinctions made by the law between children whose parents were married and those whose parents were not. Once paternity was established, the child was considered legitimate.

Therefore, in order for a petition filed by a petitioner from mainland China on behalf of a beneficiary fitting this scenario to be considered for approval, paternity must be shown. The regulations with reference to primary and secondary evidence would apply here also. Once the relationship has been proven, the petition will be adjudicated as any other.

After diplomatic relations were reestablished in the early 1970s, the need for documentation to support relative petitions became more urgent, and the Communist government developed a certificate of family relationship or notarial certificate. Since there was and is no uniform nationwide system of registration, the information contained in the certificates must be obtained from interviews and local records and should carry no more weight than an affidavit prepared by a witness. The BIA corroborated this vie w in **Matter of Cheung** , 17 I&N Dec. 365 (BIA 1980) which was modified by **Matter of May** ,18 I&N Dec. 381 (BIA

1983) which states that notarial certificates are issued on the basis of primary documentation submitted by the applicant or as a result of investigation by notarial office staff and **while generally reliable, are best used in conjunction with other supporting evidence.**

(B) <u>Petitions on Behalf of Aliens from Yemen</u> .

Since civil documents concerning marriage, birth, death, etc., are often issued in Yemen based solely on information furnished by an interested party, often the petitioner or beneficiary of the petition, they are usually not considered conclusive to establish claimed relationships. Both the petitioner and beneficiary should be interviewed. The consular officer will interview the beneficiary abroad; if an interview was possible and carried out by the district office, you should attach a record of the intervi ew with the petitioner to the petition when you forward it to the consul. However, you may only be able to solicit an affidavit from the petitioner responding to specific questions.

Families in Yemen are very close; therefore, your questions should include all the information you can develop concerning family members, including grandparents, aunts, uncles, nephews, nieces, and cousins. You should also ask questions concerning the home village in Yemen, about the house structure and livestock owned. Be on the look out for subtle differences in interviewees' testimony. Questions might include:

· The type of house;

· Number of rooms and location of each;

· Names and relationship of everyone living in the house and where they sleep; and

· The number of cows, donkeys, sheep, goats, and other livestock owned, if any.

The usual procedure is to request the petitioner's "A" file, and upon receipt, make a careful check of the file in reference to the claimed relationship to the beneficiary. Question the petitioner regarding any

discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled to your satisfaction.

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen. (See **Matter of Mozeb** , 15 I&N Dec. 430 (BIA 1975) .)

(d) <u>Anti-fraud Measures</u> .

Some cases contain information which should alert you that there may be a problem with the case. You should be aware of the indications of fraud or ineligibility and try to detect and deny those cases. It is important to remember that a case may be bona fide notwithstanding the fact that, on the surface, it appears fraudulent. Each case must be decided individually based on the evidence of record.

| **Note:** |
| --- |
| Remember that the statute does not provide for the use of administrative discretion in the adjudication of a relative visa petition. Furthermore, the admissibility of the beneficiary is not at issue. If the beneficiary is eligible for the benefit sought, the petition must be approved, regardless of any and all unfavorable aspects of the alien's history and character. However, if during the course of the adjudication of the visa petition you encounter grounds of inadmissibility or unfavorable discretionary f actors, you should make sure that such grounds or factors are properly documented and brought to the attention of the immigration officer considering the alien's application for adjustment of status or the consular officer considering the alien's application for an immigrant visa. |

If fraud is suspected, there are a number of methods by which you can seek to resolve the concerns, including (but not limited to):

(1) <u>Parentage Testing</u> .

(A) <u>General</u> .

Parentage testing is used to establish a claimed relationship for benefits under the Immigration and Nationality Act. Such testing may be appropriate to establish a parental relationship in support or a petition for a child, son, or daughter (Form I-130). The procedures discussed herein may also apply to establishing the biological parent of a foreign-born adopted child to support an orphan petition (Form I-600) or to establishing a parental relationship for citizenship cases (Form N-600). In addition, thes e procedures may be used to establish a parental relationship for refugee and asylum relative petitions (Form I-730).

(B) <u>Authority to Require Parentage Testing</u> .

A petitioner must establish eligibility for a requested immigration benefit. An application or petition must be filed with any initial evidence required by regulation or by the form instructions. Any evidence submitted is considered part of the relating petition or application and may establish eligibility. 8 CFR 103.2(b)(1).

In the case of a petition for a child, son, or daughter, the petitioner must provide evidence of the claimed relationship. 8 CFR 204.2(d)(2). The initial evidence for a child, son, or daughter includes a birth certificate. When a birth certificate is unavailable, the petitioner must demonstrate that it is not available and submit secondary evidence, such as a baptismal certificate, or church or school records. If the petitioner demonstrates that both initial and secondary evidence is unavailable, two or mor e affidavits may be substituted. However, the unavailability of a birth certificate creates a presumption of ineligibility for the benefit, and any alternative evidence submitted must be evaluated for its authenticity and credibility. 8 CFR 103.2(b)(2)(i) and 204.2(d)(2)(v).

A director may also require that Blood Group Antigen or Human Leukocyte Antigen (HLA) blood parentage testing be conducted on the child, son, or daughter and putative mother and father to establish eligibility for a benefit. 8 CFR 204.2(d)(2)(vi). Statistical analysis of these tests provides a likelihood of parentage. These test results will often establish or disprove the claimed parental relationship. Since blood parentage testing can be a valuable tool to verify a relationship, it may generally be requir ed when initial and secondary forms of evidence have proven insufficient to prove a claimed relationship. As a result of technological advances, field offices should be aware that Blood Group Antigen and HLA tests are no longer widely available for testing by laboratories, and are not considered to be as reliable as DNA tests.

Although a director may require blood parentage testing, he or she has no statutory or regulatory authority to require DNA testing. However, when initial and secondary forms of evidence have proven inconclusive and blood parentage testing does not clearly establish the claimed parental relationship, field offices may have no alternative to suggesting DNA testing as a means of establishing the relationship. The petitioner has the burden of proof when the evidence submitted has not satisfied his evidentiary t hreshold and

the USCIS would otherwise deny the petition without more conclusive evidence such as that which DNA testing could provide. In such cases, field offices should inform the petitioner that:

· DNA testing is absolutely voluntary;

· The costs of DNA testing and related expenses (such as doctor's fees and the cost of transmitting testing materials and blood samples) must be borne exclusively by the petitioner; and

· Submitting to DNA testing is in no way a guarantee of the approval of the petition.

Field offices should keep in mind that no parentage testing, including DNA testing, is 100 percent conclusive. **[(b)(2) or (b)(7)(E)]**

While blood testing is not and should not be a routine part of the adjudications process, it can be an extremely valuable tool in cases when it otherwise would be impossible to verify a relationship. Parentage blood tests involve laboratory procedures performed on blood samples or other genetic material obtained from the child and putative parent or parents. The statistical analysis of the blood test provides a likelihood of parentage if the putative parent is not excluded. The likelihood of parentage is gr eater with increased information. Increasing the number of genetic testing systems tested provides stronger results, while the absence of information diminishes the strength of results. Officers should be aware that parentage testing is an extremely fact-driven procedure. A laboratory may more accurately determine what tests to run based on specific facts. A more accurate answer will be provided by the laboratory if the Officer provides the laboratory with suspicions of fraud or other pertinent facts.

(C) <u>Minimum Standards</u> .

· <u>Parties tested</u> : The most accurate results are received when the alleged mother, father and child available for testing. However, testing of only the mother and child or father and child are also acceptable.

· <u>Statistical probability</u> : All tests must produce a 99.5% statistical probability for the conclusion of results to establish parentage. Laboratories can continue with a battery of tests until a 99.5% conclusion of

parentage is established. After testing the samples from all parties, laboratories will produce a conclusion of parentage which will inform field offices which tests were administered and the conclusion for the results they obtained.

·    <u>Preferred test</u> : The preferred test is the Polymerase Chain Reaction (PCR) test drawn with a buccal swab or a PCR test based on a blood sample.

Please see below for a more detailed explanation of the parentage testing process and procedures.

(D) <u>Blood Testing</u> .

Blood consists of red and white blood cells, platelets and liquid plasma. Each component of the blood contains several antigens or "markers." The blood group antigens are structures on the surface of the blood cells that help to distinguish individuals within a population. The antigens, inherited from the parents, are controlled by genes on a pair of chromosomes. Each parent contributes one of each chromosome pair carrying the genes that determine the detectable properties of an offspring's blood. The prese nce or a specific antigen indicates a particular genetic composition or marker. Conclusions in parentage blood testing are based upon the principle that the child inherits genetic markers in his or her blood from each of his or her biological parents.

(E) <u>Conventional Blood Tests</u> .

There are four basic tests used in conventional blood testing:

·    basic red cell antigens (ABO, MN, CcDEe);

·    extended red cell antigens;

·    white cell antigens (HLA); and

· red cell enzymes and serum proteins.

The laboratory begins by conducting the first test. If parentage cannot be ruled out based on the results of the first test, the laboratory will conduct the second test. The process continues until either the putative parent can be entirely excluded or a good statistical probability is established that the relationship is bona fide.

(F) <u>DNA Testing</u> .

DNA (deoxyribonucleic acid) parentage testing provides an alternative to more conventional parentage blood testing methods. DNA testing can be especially useful in countries with limited medical and transportation facilities because, unlike HLA testing, it does not require the use of live human blood cells, which must be tested within just a few days, and are sometimes difficult to obtain. DNA parentage testing can often provide conclusive results even when not all parties are available for testing.

Officers should be aware that parentage testing technology changes rapidly. Whereas HLA blood testing was widely used until 1994, it is now rarely used. Restriction Fragment Length Polymorphism (RFLP) tests which have been widely used since 1994 are now being phased out by laboratories in the U.S. The DNA test which is most recommended for use in parentage testing is the Polymerase Chain Reaction (PCR) test. Although DNA testing has traditionally been accomplished through blood testing, buccal (mouth or che ek cavity) swabs are an alternative to drawing brood for testing. Cells are drawn from the inside cheek using a long cotton swab. As opposed to blood testing, buccal swab testing does not require the assistance of a physician, and is non-invasive. Nevertheless, it is recommended that only a person specially trained to collect a tissue sampling perform the procedure in order to ensure the quantity is sufficient for testing.

(G) <u>Parentage Testing Procedures</u> . (Chapter 21.2(d)(1)(G) Revised 04/08/2005; AFM 05-10)

The American Association of Blood Banks (AABB) accredits parentage-testing laboratories for a two-year period. The current list of AABB accredited parentage testing laboratories is contained in **Appendix 21-3** of this field manual. To access this list, click on the web links listed in Appendix 21-3. Offices may accept parentage testing results only from laboratories on this list.

| **Note** |
|---|
| The accreditation standards were developed by the committee on parentage testing of the AABB under a grant from the Federal Office of Child Support Enforcement of the U.S. Department of Health and Human Services and with assistance of special consultants and representatives from the American Bar Association, American Medical Association, American Society of Clinical Pathologists, American Society for Histocompatibility and Immunogenetics and the College of American Pathologists. |

The burden of proof is on the petitioner to show that the laboratory chosen is accredited by the AABB.

When a field office requires blood testing or suggests DNA testing, it should provide the petitioner with the list of AABB accredited laboratories. Field offices should be aware that the state designations on the list are for laboratory headquarters. Many laboratories have collection sites in many different states and locations. The petitioner must select a laboratory, contact the laboratory directly, and make the necessary arrangements for conducting the tests. To ensure the integrity of the test results, all stages of parentage testing must be conducted under appropriate safeguards. These safeguards must include strict controls concerning:

· protection of the chain of custody of blood or tissue samples;

· identification of the parties to be tested, generally by photographing individuals being tested; and

· correct presentation of test results.

Communication should be directly between the laboratory and the civil surgeon or panel physician or the field office. Under no circumstances should a third party, including the individuals being tested, be permitted to carry or transport blood or tissue samples or test results. Since the applicant bears full financial responsibility for testing, USCIS has no objection to that person receiving a copy of the test results from the laboratory or panel physician. It is imperative that the same facility tests bot h the alleged child and the alleged parent(s). Where the petitioner is physically present in the U.S., a U.S.-based lab must conduct the tests and relay the results. Instructions usually require the participation of a witness, identification taken from all (adult) parties involved, and photographs taken of all parties.

(H) <u>Analysis of Test Results</u> .

In all cases of parentage testing, laboratories should provide the statistical probability for the conclusion for the results they obtain. Offices should use the following interpretations of the plausibility of parentage to analyze test results. In general, AABB standards mandate 99 percent to be the minimum requirement for the proof of parentage. However, this statement does not mean that all test results 99 percent and higher should be accepted as conclusive proof of parentage, or that all test results be low 99 percent exclude parentage. The type of parentage test performed, the genetic profile of the local population, and facts specific to the case will all affect the percentage that an office should require establishing a parental relationship. Field offices should provide laboratories with non-genetic evidence, which may affect the lab's assumptions in performing the testing, analysis of the results or the number of genetic markers tested.

| Plausibility of Parentage (Percent) | Interpretation |
| --- | --- |
| 99.80 - 99.90 | Practically Proved |
| 99.1 - 99.80 | Extremely Likely |
| 95 - 99 | Very Likely |
| 90 - 95 | Likely |
| 80 - 90 | Undecided |
| Less than 80 | Not Useful |

Please note that in societies where intra-family marriage is common, close relatives will share many genetic markers and the test results of an aunt, uncle, or grandparent of a beneficiary may appear to establish the claimed parental relationship. The statistics used in paternity testing are designed for evaluating an alleged father as compared to unrelated men. Unlike the random population where persons may share genetic markers by chance, related men will share genetic markers by descent. First degree rel atives, such as father, brother or son, will share 50% of their genetic material on average. Therefore, directors should consult with local physicians and parentage testing laboratories, and consider local fraud patterns, to determine the appropriate tests and particular test results to reliably establish the parental relationship in questionable cases. Officers should ask labs to calculate both a father-child and uncle-child or sibling relationship in these cases and should examine reports provided by the laboratory to ensure that sufficient testing was done to distinguish between family members. Officers should feel free to contact the laboratory for clarification if the lab's findings are inconclusive. Labs are able to conduct tests on additional genetic markers if necessary to resolve inconclusive cases.

(I) <u>Questions</u> .

Questions regarding the appropriate parentage test to use to establish a claimed relationship or analysis of the test results may be directed to the parentage-testing laboratory selected by the petitioner. Questions regarding this policy should be directed to the Residence and Status Branch, Adjudications Division at 202-514-4754.

(2) <u>EPIC checks</u> . See Chapter 32.6 of the Inspector's Field Manual.

(3) <u>Interview</u> . See **Chapter 15** of this field manual.

(4) <u>Investigation</u> . See **Chapter 10.5** of this field manual.

(5) <u>Field Examination</u> . See **Chapter 17** of this field manual.

(6) <u>The Immigration Marriage Fraud Amendments of 1986 (IMFA)</u> .

In 1986, Congress amended the Immigration and Nationality Act to provide that if an alien obtains lawful permanent residence based on a marriage that is less than 2 years old at the time of the alien's admission or adjustment to permanent residence, the alien's permanent residence is on a conditional basis. The "condition" is that the alien and the spouse through whom the status was obtained must file an I-751 petition to remove the conditional basis of the residence two years after the immigration or adjus tment (see **Chapter 21.3** and **Chapter 25.1** of this field manual). This requirement pertains only to those aliens who obtain status directly through the alien's marriage to the petitioner, or (in the case of a child) through the marriage of the alien's parent to the petitioner. It does not apply to other relationships, such as a derivative spouse or child of a beneficiary (e.g., a F3-2 or F3-3 immigrant). Properly used, IMFA is a powerful anti-fraud tool, since it enables USCIS to fully adjudicate a case both before the alien obtains LPR status and once again when he or she seeks removal of the conditions. The effectiveness of this second adjudication can be even further enhanced if officers adjudicating the I-130 petition or the I-485 adjustment application provide guidance (in the form of memorandum in the A-file or electronic notes once the automated support systems have such capacity) regarding items to be aware of when adjudicating the Form I-751 .

However, if improperly used, IMFA can be very ineffective. Officers adjudicating the I-130 petition must guard against the temptation to "let the I-485 and I-751 adjudicators worry about the fraud." Likewise,

officers adjudicating the I-751 petitions must guard against the temptation to say, "Well, it looked good enough to the I-130 adjudicator and the I-485 adjudicator, so it must be OK." The system only works if each officer adjudicating each step of the process takes full responsibility for detecting and deterring fraud in his or her stage of the process.

(e) <u>The Child Status Protection Act of 2002 (CSPA)</u> . (Revised AD07-04; 04-11-08)

The CSPA amended the Immigration and Nationality Act (Act) to permit an applicant for certain immigration benefits to retain classification as a child under the Act, even if he or she has reached the age of 21. The CSPA added section 201(f) for applicants seeking to qualify as Immediate Relatives and section 203(h) for applicants seeking to benefit under a preference category, including derivative beneficiaries.

(1) <u>CSPA Coverage</u>

(i) <u>Adjustment as an Immediate Relative (IR)</u> .

The CSPA amended section 201(f) of the Act to fix the age of an alien beneficiary on the occurrence of a specific event (e.g. filing a petition). If the alien beneficiary is under the age of 21 on the date of that event, the alien will not age out and continue to be eligible for permanent residence as an IR. It does not matter whether the alien reaches the age of 21 before or after the enactment date of the CSPA, when the petition was filed, or how long the alien took after petition approval to apply for pe rmanent residence provided the alien did not have a final decision prior to August 6, 2002 on an application for permanent residence based on the immigrant visa petition upon which the alien claims to be a child.

(A) <u>Petition Initially Filed as Immediate Relative (IR) Child</u> .

Chapter 21.2(e)(1)(i)(A), Petition Initially Filed as Immediate Relative (IR) Child, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(B) <u>Petition Initially Filed as Child of a Lawful Permanent Resident (LPR).</u>

If an alien is seeking to adjust status on the basis of being an immediate relative child, and the petition serving as the basis for the adjustment was first filed for classification as a family-sponsored immigrant based on the parent being a lawful permanent resident and the petition was later converted, due to the naturalization of the parent, to a petition to classify the alien as an IR, then the age of the alien on the date of the parent's naturalization is the alien's age for CSPA purposes. If the alie n was under the age of 21 on the date of the petitioning parent's naturalization, the alien will not age out.

(C) Petition Initially Filed as Married Son or Daughter of a U.S. Citizen (USC) .

If an alien is seeking to adjust as an immediate relative child, and the petition serving as the basis for such adjustment was first filed for classification as a married son or daughter of a U.S. citizen, but the petition was later converted, due to the legal termination of the alien's marriage, to a petition to classify the alien as an immediate relative, then the age of the alien on the date of the termination of the marriage is the alien's age for CSPA purposes. If the alien was under the age of 21 on t he date of the termination of the marriage, the alien will not age out.

(ii) Adjustment Under a Preference Category .

The beneficiary's CSPA age is determined using the formula below. If the petition is approved and the priority date becomes current before the alien's CSPA age reaches 21, then a one-year period begins during which the alien must apply for permanent residence in order for CSPA coverage to continue.

It does not matter if the alien aged out before or after the enactment date of the CSPA, so long as the petition is filed before the child reaches the age of 21 provided the alien did not have a final decision prior to August 6, 2002 on an application for permanent residence based on the immigrant visa petition upon which the alien claims to be a child.

(A) CSPA Age Formula .

Chapter 21.2(e)(1)(ii)(A), CSPA Age Formula, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(B) <u>Direct Beneficiaries</u> .

The number of days that a petition is pending is the number of days between the date that it is properly filed (receipt date) and the date an approval is issued on the petition, including any period of administrative review.

In the case of a petition where adjustment is sought as the child of an LPR (F2A) and it is determined that the age of the beneficiary is over the age of 21 for CSPA purposes, if the petitioner naturalizes then the petition is to be automatically converted to the appropriate first or third family preference category for that petitioner and beneficiary (so long as marriage occurred after the naturalization of the petitioner). The beneficiary will retain the priority date in this case.

(C) <u>Derivative Beneficiaries – Family and Employment-Based</u> .

Chapter 21.2(e)(1)(ii)(C), Derivative Beneficiaries – Family and Employment-Based, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(D) <u>Derivative Diversity Visa (DV) Applicants</u> .

Chapter 21.2(e)(1)(ii)(D), Derivative Diversity Visa (DV) Applicants, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(E) <u>Sought to Acquire</u> .

Chapter 21.2(e)(1)(ii)(E), Sought to Acquire, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(2) <u>CSPA Coverage for Specific Aliens Not Covered Under Previous Guidance</u>

(i) <u>Limited CSPA Coverage for K4 Aliens</u> .

The CSPA does not apply to aliens obtaining K2 or K4 nonimmigrant visas or extensions. An alien in K4 status may utilize the CSPA upon seeking adjustment of status because a K4 alien seeks to adjust as an IR on the basis of an approved Form I-130, which is filed under section 204 of the Act. This is because the USC petitioner who filed the nonimmigrant visa petition on behalf of the K3 parent must file a Form I-130 on behalf of the K4 alien before the K4 seeks to adjust status pursuant to 8 CFR 245.1(i). T his necessarily requires the existence of a parent-child relationship between the USC and the K4 alien. Accordingly, the CSPA should be applied to K4 applicants as described in paragraph 21.2(e)(1)(i).

(ii) <u>Limited CSPA Coverage Option for K2 Aliens</u> .

An alien in K2 status does not have a visa petition filed on his or her behalf under section 204. Consequently, a K2 alien cannot utilize the CSPA when seeking to adjust status. Although not required, USCIS may accept a Form I-130 filed by the USC petitioner based on a parent-child relationship between the USC petitioner and the K2 alien (e.g. where the USC petitioner has married the K1 and K2 is not yet 18 years old). This will allow an alien who once was a K2 to adjust on the basis of a petition filed und er section 204 of the Act and will allow him/her to utilize the CSPA when seeking to adjust status in some cases.

Exercising this <u>option</u> requires: (1) an existing parent-child relationship between the USC petitioner and the K2 alien, and (2) paying the requisite fees associated with Forms I-130 and I-485, Application To Register Permanent Residence or Adjust Status. This guidance does <u>not</u> create a petitionable relationship for K2s or K4s where none exists.

(iii) <u>CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and who subsequently filed an application for permanent residence that was denied solely because he or she aged out.</u>

Chapter 21.2(e)(2)(iii), CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and who subsequently filed an application for permanent residence that was denied solely because he or she aged out, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(iv) <u>CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and did not subsequently apply for permanent residence</u> .

Chapter 21.2(e)(2)(iv), CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and did not subsequently apply for permanent residence, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(3) <u>CSPA Section 6 Opting-Out Provisions</u> .

Beneficiaries of 2nd preference I-130 petitions that were automatically converted to family first preference upon the petitioning parent's naturalization may exercise the "opt-out" provision of section 6 even if the petition in question was originally filed in the F2A category but has now converted to F2B. Aliens seeking to utilize this opt-out provision should file a request in writing with the District Office having jurisdiction over the beneficiary's residence. Adjudicators do not need to determine the age of the alien when a section 6 opt-out request is received.

(4) <u>Visa Availability Date Regression</u> .

Chapter 21.2(e)(4), Visa Availability Date Regression, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(5) <u>Inapplicability of the CSPA</u> .

Chapter 21.2(e)(5), Inapplicability of the CSPA, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

| **Note:** |
|---|
| There is an **Appendix** to this chapter showing how the guidance would be applied to some specific scenarios. |

(6) <u>Priority Date Retention Requests</u> .

(A) Officers may encounter certain petitions that are eligible for assignment of an earlier priority date. The assignment of an earlier priority date is only permitted for those petitions filed by the same petitioner, on behalf of the same principal beneficiary. However, not every petition filed by the same petitioner on behalf of the same principal beneficiary will qualify. First and foremost, only approved petitions may qualify. Furthermore, those petitions which have been denied, revoked, or from which an immigrant visa has already been used do not qualify. See 8 CFR 204.2(h) .

(B) Officers may encounter adjustment of status cases involving applicants eligible to adjust status in the F2B category based on having automatically converted from a derivative in the F2A category to a principal in the F2B category (upon reaching the age of 21) whether or not the petitioner for the F2A petition filed a subsequent petition to classify the applicant as a principal under F2B. An assignment under the F2B category is permitted, and is considered to have happened automatically on the original petition, despite the fact that the applicant does not have a separate petition filed on his or her behalf to classify him or her in the F2B category. The original priority date available to the derivative beneficiary once classified pursuant to the F2A category is retained and applied to F2B classification - without need for a separate petition as previously indicated in the regulations. See 8 C.F.R. 204.2(a)(4) .

(C) If the principal beneficiary of an F2B petition (petition #2) was <u>*previously*</u> the derivative beneficiary of a petition filed pursuant to sections 203(a)(1) , (3) , (4) , or 203(b) , and the petitioner of petition #2 was not the petitioner on the previous petition (petition #1), then petition #2 is NOT entitled to the older priority date. See 8 CFR 204.1(b); 22 CFR 42.53(a). Instead, petition #2 should be assigned a priority date based on the date of filing. Send the standard notice of denial of priority date retention provided through the appropriate chain of command. Continue to otherwise adjudicate the petition on its merits in accordance with applicable law, regulations, and policies.

---

**Example 1:**  Alice is an LPR. She files a petition for her husband, Barney, for F2A classification. Their son, Charlie, is listed as a derivative. Charlie ages out. Barney adjusts status.

---

Scenario 1: Barney files a petition on behalf of Charlie for classification as an F2B. This petition cannot retain the priority date from the petition filed by Alice because it was filed by a different petitioner.

Scenario 2: Alice files a petition on behalf of Charlie for classification as an F2B. This petition can retain the priority date from the petition filed by Alice for Barney because it is the same petitioner filing on behalf of the same beneficiary.

---

<table>
<tr><td></td></tr>
</table>

---

**Example 2:**  David is a USC. He files a petition on behalf of his brother, Eric. Eric's daughter, Fanny, is listed as a derivative. Fanny ages out. Eric adjusts status.

Scenario: Eric files a petition for Fanny for classification as an F2B. This petition cannot retain the priority date from the petition filed by David because it was filed by a different petitioner.

---

(D) If an individual files an application for adjustment of status in the F2B or F1 classification based on previous F2A derivative classification, but the petitioner did not file a new (subsequent) petition on behalf of the individual, the individual may be eligible for adjustment of status if:

(i) he or she was previously the derivative beneficiary of an approvable F2A petition;

(ii) he or she qualifies as the son or daughter of the original petitioner (take particular care that step-relationships were created before the applicant turned 18); and

(iii) all other eligibility requirements are met.

---

**Example 3:**  Gregory is an LPR. He files a petition for his wife, Heather. Heather's son, Igor, is listed as a derivative beneficiary on the petition, but he ages out. Heather adjusts status.

Scenario 1: Igor was 17 years old when his mother married Gregory. He files an application for adjustment of status in the F2B category. Igor qualifies as Gregory's stepson and may use the priority date from the petition filed on behalf of his mother to adjust status.

Scenario 2: Igor was 19 years old when his mother married Gregory. He files an application for adjustment of status in the F2B category. Igor does not qualify as Gregory's stepson and is not eligible to

---

adjust status in the F2B category, so the application must be denied on the basis that there is no visa available to him because he is not eligible for an immigrant visa classification.

(E) If an application for adjustment of status is pending based on INA 245(a) or (i), and visa availability is solely contingent upon a request for priority date retention for which the applicant is not eligible, the officer must deny the application for adjustment of status. If, however, it appears that the applicant is prima facie eligible to adjust on a different visa petition or different section of law, and was so eligible at the time the applicant filed the application for adjustment of status, the officer should request additional evidence as needed, and adjudicate the application based on the alternative basis of eligibility. In such a case, if the application is ultimately denied, the adjudicator should address both the reasons for denial on the original basis, as well as the reasons for denial on the alternate basis. If the applicant was not prima facie eligible on another basis at the time the applicant filed the application for adjustment of status, the officer may not adjudicate the application on any other basis, and must deny the application based upon the original basis.

(F) Officers may encounter motions to reopen or motions to reconsider which are filed by applicants who were previously denied adjustment of status.

· If the motion is solely contingent on a request for priority date retention for which the applicant is not eligible, the officer must deny the motion.

· If the applicant demonstrates that they were, at the time of filing for adjustment of status, prima facie eligible on an alternative basis for adjustment that was not considered before denial, then the officer must reopen the application and adjudicate the application based on the alternative basis of eligibility.

| **Note** |
| --- |
| Eligibility pursuant to the alternative basis for adjustment of status must have existed at the time the underlying application for adjustment of status (not the motion) was filed. |

(f) Adam Walsh Child Protection and Safety Act of 2006, (Adam Walsh Act), Pub. L. 109-248 . [Section 21.2(f) replaced 04-28-2007; previous Sections 21.2(f)-(h) renumbered as 21.2(g)-(i)]

(1) Background .

**Title IV of the Adam Walsh Act, "Immigration Law Reforms to Prevent Sex Offenders from Abusing Children"** contains two provisions that amend the Immigration and Nationality Act (the Act).

·      **Section 402(a) of the Adam Walsh Act** amends sections **204(a)(1)(A)(i)** and **204(a)(1)(B)(i)** of the Act to prohibit U.S. citizens and lawful permanent residents who have been convicted of any "specified offense against a minor" from filing a family-based immigrant petition on behalf of any beneficiary, unless the Secretary of Homeland Security (the Secretary) determines, in his sole and unreviewable discretion, that the petitioner "poses no risk to the beneficiary."

Section 402(b) of the Adam Walsh Act amends section **101(a)(15)(K)** of the Act to bar U.S. citizens convicted of these offenses from filing nonimmigrant visa petitions to classify their fiancé(e)s, spouses, or minor children as eligible for "K" nonimmigrant status, unless the Secretary determines, in his sole and unreviewable discretion, that the petitioner poses no risk to the beneficiary.

A petitioner who has been convicted of a specified offense against a minor is not simply prohibited from filing on behalf of a minor child. The petitioner is prohibited from filing on behalf of "any" family-based beneficiary under sections 204(a)(1)(A)(i) and 204(a)(1)(B)(i) of the Act or in accordance with section 101(a)(15)(K) of the Act.

Section 401 of the Adam Walsh Act amends section **237(a)(2)(A)** of the Act by adding a new subparagraph (v). Under new section 237(a)(2)(A)(v), an alien who is convicted under new 18 USC 2250, for failing to register as a sex offender, is subject to removal as a deportable alien.

(2) <u>Statutory Definitions</u> .

(A) <u>Beneficiary</u> .

"Any beneficiary" includes a spouse, a fiancé(e), a parent, an unmarried child, an unmarried son or daughter over 21 years of age, an orphan, a married son or daughter, a brother or sister, and any derivative beneficiary permitted to apply for an immigrant visa on the basis of his or her relationship to the principal beneficiary of a family-based petition.

(B) <u>Specified Offense Against a Minor</u> .

The term "specified offense against a minor" means an offense against a minor (defined as an individual who has not attained the age of 18 years) that involves any of the following:

· An offense (unless committed by a parent or guardian) involving kidnapping;

· An offense (unless committed by a parent or guardian) involving false imprisonment;

· Solicitation to engage in sexual conduct;

· Use in a sexual performance;

· Solicitation to practice prostitution;

· Video voyeurism as described in 18 USC 1801;

· Possession, production, or distribution of child pornography;

· Criminal sexual conduct involving a minor, or the use of the Internet to facilitate or attempt such conduct; or

· Any conduct that by its nature is a sex offense against a minor.

The statutory list of criminal activity in the Adam Walsh Act that may be considered a specified offense against a minor is stated in relatively broad terms and takes into account that these offenses may be named differently in a wide variety of Federal, State and foreign criminal statutes.

With one exception, the statutory list is not composed of specific statutory violations. As defined in the relevant criminal statute, for a conviction to be deemed a specified offense against a minor, the essential elements of the crime for which the petitioner was convicted must be substantially similar to an offense defined as such in the Adam Walsh Act.

(C) <u>Poses No Risk to Beneficiary</u> .

USCIS interprets the "poses no risk to the beneficiary" provision to mean that the petitioner must pose no risk to the safety or well-being of the beneficiary, which includes the principal beneficiary and any alien derivative beneficiary.

(3) <u>Field Guidance</u> .

(A) <u>Applicability of the Adam Walsh Act</u> .

**Title IV of the Adam Walsh Act** does not include a specific effective date. For this reason, it entered into force on July 27, 2006, the date of enactment. In general, an application for benefits under the Act is adjudicated according to the facts and law as they exist on the date of decision. See **Matter of Alarcon** , 20 I&N Dec. 557 (BIA 1992).

(B) <u>Determining "Specified Offense Against a Minor</u> .

(i)    <u>Operational Procedures</u> .

On July 28, 2006, **http://www.uscis.gov/files/pressrelease/AdamWalshAct072806.pdf** USCIS field offices were directed to issue a Request for Evidence (RFE) for all police arrest records and court disposition documents and schedule the petitioner for fingerprints if the petitioner's IBIS check revealed a hit for any offense that is or potentially may be a "specified offense against a minor" as defined above.

If there is an IBIS hit or some other indication that a lawful permanent resident petitioner may have a conviction for a specified offense against a minor as defined in the Adam Walsh Act, the case must be handled in accordance with current IBIS procedures as it relates to an "egregious public safety threat."

| **Note** |
| --- |
| As defined by the Memorandum of Agreement between USCIS and United States Immigration and Customs Enforcement (ICE) on the Issuance of Notices to Appear to Aliens Encountered During an Adjudication, and accompanying policy memorandum entitled, "Disposition of Cases Involving Removable Aliens," July 11, 2006, ICE may decide to initiate removal proceedings against any lawful permanent resident who is deportable under section 237(a)(2)(A)(v) of the Act (conviction for having failed to register as a sex offende r). |

If the offense meets the definition of an egregious public safety threat, adjudication of the petition must be suspended and an appropriate referral to ICE must be completed in accordance with current "egregious public safety threat" procedures.

Otherwise, if the petition has already been approved or is currently being adjudicated and there is an IBIS hit or some other indication that the petitioner may have a conviction of a specified offense against a minor as defined in the Adam Walsh Act, the adjudicator must issue an RFE or Notice of Intent to Revoke (NOIR) for all police arrest records and court disposition documents.

If the petitioner was an "Ident" based on previous fingerprinting, the adjudicator must obtain a current rap sheet per local procedures instead of scheduling the petitioner for fingerprinting. Otherwise, the adjudicator must schedule the petitioner for fingerprinting in accordance with service center or field office procedures, which will be processed without fee.

(ii)     <u>Adjudicative Review of Evidence</u> .

If the petitioner fails to respond to the RFE or NOIR, the petition should be denied or revoked accordingly.

If the fingerprint results and the evidence submitted in response to an RFE or NOIR indicate that the petitioner was not convicted of a specified offense against a minor as defined by the Adam Walsh Act, the adjudicator should proceed with the adjudication of the petition in accordance with **8 CFR 204** and other pertinent regulations.

If, after review of the fingerprint results and the evidence submitted in response to the RFE or NOIR, the adjudicator determines that either of the following two instances exists, the adjudicator should forward the file, through appropriate supervisory channels, to local USCIS counsel for review and opinion:

·   The adjudicator is unsure whether the petitioner's conviction may be considered a specified offense against a minor, or

·   The criminal case against the petitioner is still pending or the disposition of the case is still unknown.

If, after review of the fingerprint results the evidence submitted in response to the RFE or NOIR, the adjudicator finds that the petitioner has been convicted of a specified offense against a minor as defined by the Adam Walsh Act, the adjudicator must determine whether the petitioner poses a risk to the beneficiary, as described below.

(C) <u>Determining "Poses No Risk to Beneficiary</u> ."

(i) <u>Adjudicative Review of Evidence</u> .

The critical purpose of **section 402 of the Adam Walsh Act** is to ensure that an intended alien beneficiary is not placed at risk of harm from the person seeking to facilitate the alien's immigration to the United States. USCIS, therefore, may not approve a family-based petition ( Form I-130 or I-129F ) if the petitioner has a conviction for a specified offense against a minor unless USCIS first determines that the petitioner poses no risk to the beneficiary with respect to whom a petition was filed. Under section 402 of the Adam

Walsh Act, this determination is entrusted to the discretion of the Secretary, who has the "sole and unreviewable" authority to decide whether a petitioner poses any risk to the intended beneficiary.

To avoid denial of a petition or the revocation of a prior approval, a petitioner who has been convicted of a specified offense against a minor must submit evidence of rehabilitation and any other relevant evidence that clearly demonstrates, beyond any reasonable doubt, that he or she poses no risk to the safety and well-being of his or her intended beneficiary(ies). The initially filed petition or response to an RFE or NOIR must include whatever evidence and legal argument the petitioner wants USCIS to con sider in making its risk determination. Examples of such evidence include, but are not limited to:

·   Certified records indicating successful completion of counseling or rehabilitation programs;

·   Certified evaluations conducted by licensed professionals, such as psychiatrists, clinical psychologists, or clinical social workers, which attest to the degree of a petitioner's rehabilitation or behavior modification;

·   Evidence demonstrating intervening good and exemplary service to the community or in the uniformed services;

·   Certified copies of police reports and court records relating to the offense (the court records must include the original indictment or other charging document, any superseding charging document, any pre-sentencing report, and the conviction judgment); and

·   News accounts and trial transcripts describing the nature and circumstances surrounding the petitioner's specified offense(s) against a minor and any other criminal, violent, or abusive behavior incidents, arrests, and convictions.

The determination of whether a petitioner's evidence is credible, and the weight and probative value to be given that evidence, shall be within the sole and unreviewable discretion of USCIS.

(ii) Decide .

In determining whether a petitioner poses any risk to his or her intended beneficiary, the adjudicator must consider all known factors that are relevant to determining whether the petitioner poses any risk to the safety and well-being of the beneficiary. Factors that should be considered include, but are not limited to, the following:

· The nature and severity of the petitioner's specified offense(s) against a minor, including all facts and circumstances underlying the offense(s);

· The petitioner's criminal history;

· The nature, severity, and mitigating circumstances of any arrest(s), conviction(s), or history of alcohol or substance abuse, sexual or child abuse, domestic violence, or other violent or criminal behavior that may pose a risk to the safety or well-being of the principal beneficiary or any derivative beneficiary;

· The relationship of the petitioner to the principal beneficiary and any derivative beneficiary;

· The age and, if relevant, the gender of the beneficiary;

· Whether the petitioner and beneficiary will be residing either in the same household or within close proximity to one another; and

· The degree of rehabilitation or behavior modification that may alleviate any risk posed by the petitioner to the beneficiary, evidenced by the successful completion of appropriate counseling or rehabilitation programs and the significant passage of time between incidence of violent, criminal, or abusive behavior and the submission of the petition.

Given the critical purpose of section 402 of the Adam Walsh Act, the adjudicator must automatically presume that risk exists in any case where the intended beneficiary is a child, irrespective of the nature and severity of the petitioner's specified offense and other past criminal acts and irrespective of whether the

petitioner and beneficiary will be residing either in the same household or within close proximity to one another.

The burden is upon the petitioner to rebut and overcome the presumption of risk by providing credible and persuasive evidence of rehabilitation and any other relevant evidence that proves, beyond any reasonable doubt, that he or she poses no risk to the intended child beneficiary.

In cases where none of the intended beneficiaries are children, the adjudicator must closely examine the petitioner's specified offense and other past criminal acts to determine whether the petitioner poses any risk to the safety or well-being of the adult beneficiary.

For example, past acts of spousal abuse or other acts of violence must certainly be considered. The fact that a petitioner's past criminal acts may have been perpetrated only against children or that the petitioner and beneficiary will not be residing either in the same household or within close proximity to one another may not, in and of themselves, be sufficient to convince USCIS that the petitioner poses no risk to the adult beneficiary.

The burden is upon the petitioner to prove, beyond any reasonable doubt, that he or she poses no risk to the intended adult beneficiary.

Unless the adjudicator can conclude, based on the evidence, that the petitioner poses no risk to the beneficiary, the adjudicator must deny the petition and clearly articulate the factual basis for the determination.

If the adjudicator is uncertain as to whether the petitioner poses no risk to the beneficiary, or if the adjudicator is finding it difficult to articulate the factual basis for the denial, the adjudicator should consult with his or her supervisor and/or USCIS counsel.

(iii) Headquarters Clearance of Approval Recommendations .

If the adjudicator finds that the petitioner poses no risk to the beneficiary, the adjudicator must seek the

guidance and direction of USCIS Headquarters, Regulations and Product Management Division, before approving the petition. Adjudicators are prohibited from exercising favorable discretion in such instances without the consent of USCIS Headquarters.

(D) <u>Revocation of Approved Petitions</u> .

If, at any time prior to adjustment of status or consular processing, USCIS becomes aware that the petitioner has a conviction for a specified offense against a minor, steps may be taken to revoke the approved family-based immigrant visa petition or reopen and reconsider the Form I-129F .

For immigrant visa petitions that have already been approved, **section 205** of the Act provides discretion to revoke approval for "good and sufficient cause."

For a case in which a Form I-130 has been approved, revocation of the approval under **8 CFR 205.2** would be appropriate, if the petitioner has been convicted of a specified offense against a minor and the adjudicator finds that the petitioner poses any risk to the beneficiary.

Therefore, an IBIS check on the petitioner of the family-based immigrant petition must be valid at the time the beneficiary adjusts status. If the IBIS check on the petitioner is not valid at the time of adjustment, IBIS must be re-run and any resulting hits treated in accordance with current IBIS procedures.

For Form I-129F , **8 CFR 103.5(a)(5)(ii)** provides authority to reopen and reconsider the decision on the petition. Thus, in a case in which a Form I-129F has been approved, it would be appropriate to reopen the case and deny it if the petitioner has been convicted of a specified offense against a minor and the adjudicator finds that the petitioner poses any risk to the beneficiary.

(E) <u>Administrative Appeals of Denied or Revoked Petitions</u> .

Traditionally, the denial or revocation of Form I-130 and Form I-360 (in specified cases) has been subject to appeal to the Board of Immigration Appeals (BIA). See **8 CFR 1003.1(b)(5)** .

The denial or revocation of orphan (Forms I-600 and I-600A ) and fiancé(e) cases (Form I-129F) may be appealed to the Administrative Appeals Office (AAO). As required in Chapter 10.7(b)(5) of this manual, a decision denying or revoking approval of a Form I 600 or Form I 600A must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

To aid in the proper presentation of the appealed denial or revocation, each field office must advise Headquarters of any notice of appeal filed with the BIA in any case denied or revoked under **section 402 of the Adam Walsh Act** . Section 402 of the Adam Walsh Act does not affect the AAO's jurisdiction in Form I-600, I-600A, and I-129F cases.

(F) <u>Centralization of AWA-applicable Visa Petitions (Forms I-130 and I-129F) at the Vermont Service Center</u> .

As of March 22, 2011, service center adjudication of all relative visa petitions subject to the Adam Walsh Act (AWA) is centralized at the VSC. Using the procedures set forth in this section, all other service centers will transfer Forms I-130 or I-129F in their possession to the VSC upon determining preliminarily that AWA applies.

(i) Sources of Information. An officer adjudicating a Form I-130 or Form I 129F may identify derogatory information on criminality through any of the following sources:

- Front-end search,

- Back-end referral from an adjudicator based on a hit in TECS or IBIS Manifest, or

- Non-IBIS referral from an adjudicator based on criminal documents in the file or other documents indicating criminality.

(ii) Sufficiency of Information. The following derogatory information s sufficient to determine preliminarily that AWA applies:

- An NCIC sexual offender registry hit, unless it can be conclusively demonstrated that the victim was an adult or that the charge was dismissed, withdrawn, or the prosecution entered "no prosecution [nolle prosequi]."

- A TECS hit revealing anything sexual in nature, unless it can be conclusively demonstrated that the victim was an adult or that the investigation has been closed (with no resulting arrest), dismissed, recorded as "no prosecution," or withdrawn.

- A review of NN16 / NN11 indicates any sexual offense, unless it can be conclusively demonstrated that the victim was an adult or that the charge was dismissed, recorded as "no prosecution," or withdrawn.

- A check of any system reveals derogatory information involving kidnapping or false imprisonment (unless the offense was committed by parent or guardian).

**Note:** All AWA-related files that are transferred to the VSC must contain a timely and unexpired AWA petitioner criminality-resolution memorandum. The resolution memorandum will detail all criminality issues related to the petition and indicate that a preliminary AWA determination has been made.

(iii) Cases with Scheduled Fingerprinting Appointments. Where the petitioner has a history of criminality, the petition has been transferred to the VSC after the originating service center issued a fingerprint-appointment notice, and the petitioner later fails to appear for (or seeks postponement of) the originally scheduled fingerprinting appointment, the VSC will do the following:

(a) determine whether it is necessary to reschedule the fingerprinting appointment;
(b) if so, apply its local fingerprint scheduling procedures; and
(c) determine whether the petition should undergo AWA-related review and adjudication.

(iv) Post-adjudication Transfers to the VSC. Where an originating service center or the VSC has already adjudicated the underlying petition, but where new derogatory evidence is uncovered, or where a remand from the Board of Immigration Appeals (BIA) requires that a service center review the case for possible AWA determinations, the originating service center should forward the case to the VSC for reconsideration.

**Note:** If there is a concurrently filed Form I-485 associated with the underlying petition that was to be adjudicated by the originating service center, that Form I-485 will also be adjudicated by the VSC. Additionally, if an AWA-related case is remanded by the BIA to an originating service center, the originating service center should transfer the case to the VSC for AWA-related review and adjudication. In those cases, the originating service center must also provide the petitioner with written notice of the case transfer.

(v) File Transfer. The originating service center will package and send to the VSC all files where there has been a preliminary determination that the petition warrants review as an AWA-related case. The following procedure applies:

- Create a manifest for each box detailing the file receipt and box numbers.

- Record the number of files and list the corresponding barcodes on the manifest.

- Number each box (e.g., "1 of 4") for each shipment (a copy of the manifest should be maintained by the audit team of the sending service center).

- Place a copy of the manifest in the box.

- Send an electronic copy of each manifest via email to the VSC after every shipment, detailing the contents of each shipment.

- Relocate each file to VSC in CLAIMS using "Relocated to new jurisdiction (VSC)" and "batch transfer forward" in NFTS to the VSC shipping destination.

AR2022_300239

- Affix an AWA cover sheet to each AWA-related case file being transferred to the VSC (see attached uniform AWA cover sheet). For previously batched AWA case shipments, use only one cover sheet for each batch.

- Provide written notice to each petitioner regarding the transfer of the underlying petition or application

- Forward all AWA petitions to the following VSC shipping address:

DHS-USCIS Vermont Service Center
Attn: AWA TEAM
75 Lower Welden Street
St. Albans, VT 05479-0001

(vi) Post-shipment Audit. VSC will audit each shipment of AWA files, as follows:

- The audit will consist of random checks (i.e., samples will be pulled from each box) to an AQL of 1.5 % Level II of ANSI/ASQ Z1.4 2003.*

- The audit will:

    o Verify that the files have been properly transferred forward in NFTS;

    o Verify that the files have been properly manifested;

    o Verify that the files have been properly relocated in CLAIMS "Transferred to new jurisdiction (VSC)";

    o Verify the files are I-130s and I-129Fs; and

    o Verify the I-130 and I-129F data is in CLAIMS 3.

- Once the petition is received at the VSC, all files will be routed to the designated AWA shelf in Essex "Attn: AWA BCU Team" for review and processing. Each file must be clearly marked so that BCU is aware that the petition has been identified as an AWA petition.

(vii) Jurisdiction over AWA-related Determinations. The decision to centralize the adjudication of AWA-related petitions filed does not alter the VSC's ability to refer petitions to district offices when an interview is deemed necessary or an investigation of suspected fraud is merited. In those instances, the VSC will retain exclusive authority to make all AWA-related determinations. Any case referred to a district office should be accompanied by a completed AWA-approval worksheet indicating the VSC has determined that the petitioner poses no risk to his or her intended beneficiary.

(g) Post-Adjudication Actions .

(1) <u>Decision - Approvals</u>

(A) <u>Notification</u> .

When you approve a petition, be sure to note the priority or filing date on the appropriate line, place the approval stamp in the designated block, and sign or initial it. Be sure to check the proper section of law to designate the beneficiary's immigrant classification. If you mark the wrong section of law or fail to affix the approval stamp, the consular office will return the petition to you for correction, and the processing of the beneficiary's immigrant visa will be delayed unnecessarily.

(B) <u>Form I-797</u> .

Form I-797 is used to notify the petitioner, and any recognized representative, of the approval and disposition of the petition. Any mistakes on the notice will probably be detected by the petitioner, and, in most cases, the petitioner will want a corrected notice. If the mistake is related to the beneficiary's classification or the filing date, it may even be necessary to have the petition recalled from the consular office. This is time-consuming and does not reflect favorably on USCIS .

(C) <u>Beneficiary in the United States and Eligible for Adjustment of Status.</u>

If the beneficiary is in the United States and appears eligible to adjust status pursuant to section 245, you would adjudicate the case. If approvable, note the Consulate block "Adj. case." If there is no "A" file, then you should have one created.

(D) <u>Beneficiary in the United States, But Ineligible for Adjustment of Status</u> .

If the beneficiary is in the United States, but the file indicates ineligibility for adjustment of status, forward the approved petition to the National Visa Center (NVC), with reference to the consulate abroad. It is to be noted also that all immigrant petitions designated as "homeless" petitions will be forwarded to NVC. Designation on the I-130 for a consulate other than one in the beneficiary's country of birth or country of

last residence may only be made by the petitioner. Under no circumstances shoul d an officer advise a petitioner to designate a country other than the appropriate consulate having jurisdiction.

(E) Section 243(d) Sanctions and Waivers Thereof .

Section 243(d) sanctions can be imposed against countries which fail to cooperate in the removal of their nationals who have been ordered removed from the United States. Upon being advised by the Attorney General that a particular country is not cooperating, the Secretary of State orders consular officers not to issue either immigrant visas or nonimmigrant visas, or both, to nationals of that country. (The Secretary of State may also choose to apply sanctions against only certain visa categories.) Unless su ch sanctions are waived by the consular officer on an individual case basis, an alien seeking a visa subject to the sanctions cannot be issued a visa. Unlike the former section 243(g) sanctions, which required adjudicators to annotate visa petitions when sanctions were waived, there is no action required by adjudicators to either implement or waive section 243(d) sanctions. Furthermore, even if sanctions have been imposed, they have no effect on applications (e.g., adjustment applications, change of status applications, waiver applications) handled by USCIS .

There are currently no countries subject to sanctions under section 243(d) of the Act with regard to immigrant visas.

(2) Denials .

A visa petition may not be denied as a matter of discretion or because the beneficiary is excludable. The only valid ground for denial is failure to establish the qualifying relationship as defined in the Act and interpreted through precedent decisions or because of ineligibility of the petitioner. Use Form I-292 to notify the petitioner of the decision and the right to appeal within 15 calendar days from the date of the notice (18 days if the notice is mailed). The appellate body (if any) to which the appe al is filed depends on the type of relative petition involved:

·    The appeal from a denial of a Form I-130 petition is made to the Board of Immigration Appeals (BIA) on Form EOIR-29.

·    The appeal from a denial of a Form I-360 filed by a widow(er) is made to the BIA on Form EOIR-29.

| **Note** |
|---|
| Any appeal on a case where the BIA has appellate jurisdiction must be accepted and forwarded to the BIA, even if it is not timely filed. The BIA will decide whether to consider the case. |

·   The appeal from a denial of a Form I-360 <u>filed by a battered spouse</u> is made to the Office of Administrative Appeals on Form I-290B.

·   The appeal from a denial of a Form I-600 or I-600A is made to the Office of Administrative Appeals.

·   The denial of a Form I-730 is not appealable.

Notify the petitioner in writing of the decision and the right to appeal. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(3) <u>Issuance of a Notice To Appear (NTA)</u> .

Upon completion of adjudication of a visa petition filed on behalf of an alien who is illegally in the United States, the adjudicating officer must consider whether USCIS or DHS should initiate removal proceedings through the issuance of a Notice to Appear. Generally, NTAs should be issued if the beneficiary is illegally in the United States and is not immediately eligible to apply for adjustment of status (e.g., if he or she is subject to bars to adjustment contained in sections 245(a) or 245(c) of the Act ).

Only certain officials have the regulatory authority to issue NTAs (see **8 CFR 239.1** ) and the director of each office or center determines which unit within that office or center exercises that authority. For example, in some offices, upon completion of adjudicative action, cases are referred from the Adjudications Branch to the Investigations Branch for consideration of NTA issuance; in other offices the NTA is prepared by the Adjudications Branch and signed by the ADD for Examinations or ADD for Adjudications. Follow the procedures set forth in your local office or center.

(h) <u>Revocation of Approval</u> .

The approval of a relative petition may be revoked under **section 205** of the Act and **8 CFR 205** if certain conditions arise or are discovered. Revocations can be divided into 2 areas: Automatic revocation and Revocation Upon Notice.

(1) <u>Automatic Revocation</u> .

(A) <u>Grounds for Automatic Revocation</u> .

The grounds for automatic revocation are set forth in **8 CFR 205.1(a)** . Officers should be familiar with each of the events spelled out in the regulation. Under each of these grounds, the revocation is automatic when the specified events occurs, regardless of whether USCIS is aware of its occurrence or not, and regardless of when (or even whether) USCIS provides notification of the revocation. For example, if an alien who is the beneficiary of an approved 2 nd preference visa petition as the unmarried son or daughter of a lawful permanent resident marries before immigrating to the United States or adjusting status, the petition's approval is revoked. It should be noted that although it is the event of the marriage which triggers the revocation, the revocation itself is as of the date of the petition's approval (in automatic revocation proceedings, revocation upon notice is different). Furthermore, because the petition's approval has been revoked, it does not bec ome valid again if the marriage of the beneficiary is terminated through divorce or death of the beneficiary's spouse. (However, if the marriage is annulled by a court of competent authority, the legal effect is that the marriage never occurred and therefore, neither did the revocation.)

(B) <u>Notification</u> .

Once USCIS becomes aware of the revocation, it must notify the consular post to which the petition was sent (or the National Visa Center, as appropriate) of the revocation and provide a copy of that notice to the petitioner at his or her last known address, or at the estate of the petitioner, as appropriate. As always, if a G-28 is on file indicating that the petitioner has or had legal representation in the petition process, the petitioner's copy of the notice is sent to the legal representative. Again, it is import ant to understand that under 8 CFR 205.1(a) it is the event which triggers the automatic revocation, not the notice; and that the revocation is as of the date of the petition's approval, not as of the date of the notice.

(C) <u>Discretionary Authority to Not Automatically Revoke Approval</u> .

Although revocation of approval is automatic under **8 CFR 205.1(a)(3)(i)(C)** , when the petitioner has died there are circumstances under which the Attorney General may exercise his or her discretion to not revoke the approval. Such discretionary authority is delegated to the district director or service center director who approved the petition, and may be exercised when he or she "determines that for humanitarian reasons revocation would be inappropriate."

The Affidavit of Support (AOS) requirement at section 213A of the Act rendered such "humanitarian reinstatement" moot as there was no sponsor to sign the AOS. Congress remedied this by passing the Family Sponsor Immigration Act, Pub. L. 107-150, that allows for the use of a "substitute sponsor." Now, if a visa petitioner dies after approval of the petition, but prior to the beneficiary adjusting status or immigrating to the U.S., the beneficiary may use a "substitute sponsor" on the AOS.

To request humanitarian reinstatement of a revoked petition, the beneficiary should send a written request for reinstatement to the USCIS service center or field office that approved the petition except that, if the beneficiary has properly filed an application for adjustment of status with USCIS, the written request should be submitted to the USCIS office with jurisdiction over the adjustment application. The written request must include a copy of the approval notice for the revoked petition, the death certificate of the petitioner (or other qualifying relative) and, if required by section 213A of the Act and 8 CFR part 213a, a Form I-864 from a substitute sponsor and proof of the substitute sponsor's relationship to the beneficary. If the director decides that humanitarian reinstatement is not warranted, this decision should be communicated, in writing, to the beneficiary. There is no appeal from a determination not to exercise this discretionary authority. If the director decides that humanitarian reinstatement is warranted, the beneficiary should be notified and the decision forwarded to either the Department of State (if the beneficiary is abroad) or to the USCIS officer adjudicating the beneficiary's adjustment application (if the beneficiary is present in the U.S.).

While there are no other rules or precedents on how to apply this discretionary authority, reinstatement may be appropriate when revocation is not consistent with ?the furtherance of justice,? especially in light of the goal of family unity that is the underlying premise of our nation?s immigration system.? In particular, reinstatement is generally appropriate as a matter of discretion, if section 204(l) of the Act and Chapter 10.21 of this *AFM* would support approval of the petition if it were still pending.? For cases that are not covered by section 204(l) of the Act, the reinstatement request will be addressed in light of the factors that USCIS has traditionally considered in acting on reinstatement requests, which include:

- The impact of revocation on the family unit in the United States, especially on U.S. citizen or LPR relatives or other relatives living lawfully in the United States;

- The beneficiary's advanced age or poor health;

- The beneficiary's having resided in the United States lawfully for a lengthy period;

- The beneficiary's ties to his or her home country; and

- Significant delay in processing the case after approval of the petition and after a visa number has become available, if the delay is reasonably attributable to the Government, rather than the alien.

Although family ties in the United States are a major consideration, there is no strict requirement for the alien beneficiary to show extreme hardship to the alien, or to relatives already living lawfully in the United States, in order for the approval to be reinstated.? If the alien is required to have a Form I-864 affidavit of support, however, there must be a Form I-864 from a substitute sponsor.? 8 C.F.R. ? 205.1(a)(3)(i)(C).

| Note |
|------|
| [Note removed on 12-02-2009] See Appendix 21-8. [Appendix 21-8 added on 12-02-2009] |

(D) Underline Conversion to Another Visa Classification .

Under certain circumstances, the triggering event not only makes the beneficiary ineligible for the visa classification under which the petition was originally approved, it also makes him or her eligible for a different visa classification. For example, when an unmarried son of a U.S. citizen reaches age 21, he is no longer eligible for immediate relative classification as the child of a U.S. citizen (IR-2), but the same event makes him eligible for first preference classification as the unmarried son of a U.S. citizen (F1-1). Likewise, if the unmarried adult daughter of a citizen marries, she is no longer eligible for first preference classification, but the same event makes her eligible for third prefere nce classification as the married daughter of a citizen (F3-1). Paragraphs (G) and (H) of 8 CFR 205.1(a)(3) provide that under such circumstances not only is the approval for the original classification automatically revoked, but the same petition is automatically converted to (i.e., approved for) the new classification. The priority date of the newly-converted petition is the date on which that petition was originally filed (albeit for another classification), not the date on which the conversion occurred.

Similarly, if the petitioner in a second preference case naturalizes, the petition is automatically converted to the new classification for which the beneficiary becomes eligible ["spouse of LPR" (F2-1) becomes "spouse of citizen" (IR-1); "child of LPR" (F2-2) becomes "child of citizen (IR-2)"; "unmarried son or daughter of LPR" (F2-4) becomes "unmarried son or daughter of U.S. citizen" (F1-1)].

| Note |
|------|
|  |

An alien who is eligible for F2-3 derivative classification as the child of an alien classified F2-1 is not the beneficiary of a petition filed on his or her behalf. Accordingly, upon the naturalization of the LPR who petitioned for such child's parent, there is no conversion that can occur. A new petition would have to be filed for such child. If the child qualifies for classification as the child of the newly-naturalized citizen (i.e., step-child or adopted child), that citizen may file an immediate rela tive petition. If the child does not so qualify, then his mother or father (the spouse of the newly-naturalized citizen) may file a second preference petition on the child's behalf once he or she becomes an LPR.

(E) <u>Amerasian Petitions</u> .

Special circumstances apply to the automatic revocation of Amerasian petitions which are discussed in subchapter 21.7 .

(2) <u>Revocation Upon Notice</u> .

In addition to those situations covered under the automatic revocation provisions of **8 CFR 205.1** , there are other situations where USCIS determines that the approval of a petition should be revoked for what **section 205** of the Act refers to as "good and sufficient cause." For example, if subsequent to the approval of a petition for a (natural) sibling, USCIS learned that the sibling relationship had previously been terminated by the adoption of the petitioner out of the family, there would be good and sufficient cause for revocation of approval of the petition upon notice.

(A) <u>Triggering Event</u> .

Under 8 CFR 205.2(a) USCIS can initiate revocation proceedings on a visa petition any time "the necessity of the revocation comes to the attention of the Service." While this may be the result of a particular triggering event (such as USCIS learning that the petitioner had been adopted out of the natural family unit in the example above), there does not need to be a specific "triggering event" (as with automatic revocation); instead there can be a series of events that leads to the conclusion that the petition's approval should be revoked. These events could have occurred either before or after the original approval, or some might have occurred before approval and others after.

(B) <u>Good and Sufficient Cause</u> .

The BIA has held that good and sufficient cause exists where the evidence of record at the time of issuance of the notice of intent, if unexplained and unrebutted, would warrant a denial ( *see* **Matter of Estime** , 19 I&N Dec. 450 (BIA, 1987) ).

(C) <u>Notice of Intent</u> .

When it appears that revocation upon notice is appropriate, USCIS sends the petitioner a Notice of Intent to Revoke, setting forth the reasons (the "good and sufficient causes") why revocation is appropriate. It is important that all the valid reasons for which USCIS intends to revoke the petition be spelled out in the notice, since the petition is only required to respond to, and the ultimate decision can only be based on, reasons which were specified in the notice. In addition to a specific statement of the facts and evidence underlying the proposed revocation, the notice must advise the petitioner of his or her right to review and rebut the evidence. Quite simply, the BIA has held that "a decision to revoke approval of a visa petition will not be sustained where the notice of intent was not properly issued" ( *see* **Matter of Estime** , 19 I&N Dec. 450 (BIA, 1987) ).

(D) <u>Burden of Proof</u> .

In revocation proceedings, as in all visa petition proceedings, the burden of proof rests with the petitioner. This does not change simply because USCIS is now the party proposing the action of revocation. USCIS's requirement is to set forth the good and sufficient grounds in the notice of intent (and to meet the other requirements of the notice). Once this has been done, the burden of proof is on the petitioner to establish eligibility for the benefit sought (see **Matter of Cheung** , 12 I&N Dec. 715 (BIA, 1968) .

(E) <u>Response to Notice</u> .

The petitioner should be given 30 days to respond to the notice of intent to revoke. If the petitioner requests additional time to respond, and USCIS is satisfied that he or she is not simply seeking to delay the revocation, additional time may be granted to respond to the notice. If the petitioner does not respond within the allotted time, or if the response is inadequate to meet the petitioner's burden of proof, the approval should be revoked through a formal order attached to a notice of decision (Form I-292), with appropriate appeal forms.

(F) <u>Appeal Rights</u> .

As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider. The petitioner has the same appeal rights from a decision to revoke upon notice as he or she would have from a decision to deny the petition. If a denial of the petition would be appealable to the BIA on Form EOIR 29, so is the revocation; if it would be appealable to the AAO on Form I 290B, so is the revocation. The petitioner also has a right to file a motion to reopen or reconsider the decision revoking the petition approval.

(G) <u>Date of Revocation</u> .

When a petition is revoked upon notice, the revocation is effective as of the date on which the decision becomes final.

(i) <u>Precedent Decisions</u> .

(1) <u>Relating Index Topics</u> .

The foregoing are only a few selected precedent or interim decisions particularly important to the adjudication of the particular petitions. To locate other relevant decisions refer to the index of administrative decisions under the following subtitles:

| **Adoption** | **Immediate Relatives** | **Quota Preference** |
|---|---|---|
| Annulment | Legitimation | Stepparent, question of |
| Child | Marriage | Visa, petition for |
| Divorce | Nonquota Immigration | Visa Petition, revocation of |

(2) <u>Synopses of Selected Precedent Decisions</u> .

(A) Precedent decisions of general applicability:

·   **Matter of O−** , 8 I&N Dec. 295 (BIA 959) . Admissibility of beneficiary is not relevant to decision of visa petition.

·   **Matter of C−** , 9 I&N Dec. 433 (BIA 1961) . - There is no provision for retroactive approval of a petition. Furthermore, only the petitioner (not the beneficiary) can appeal a decision on a visa petition.

·   **Matter of Brantigan** , 11 I&N Dec. 493 (BIA 1966) ; and **Matter of Phillis** , 15 I&N Dec. 385 (BIA 1975) . Burden of proof to establish eligibility for the benefit sought lies with the petitioner.

·   **Matter of Pearson** , 13 I&N Dec. 152 (BIA 1969) . Failure to prosecute is a valid ground for denial when petitioner fails to comply with a reasonable request to appear for interview.

·   **Matter of Varela** , 13 I&N Dec. 453 (BIA 1970) ; distinguished by **Matter of Pagnerre** , 13 I&N Dec. 688 (BIA 1971) . Death of the petitioner terminates relationship; this petition filed prior to the death may not be approved.

·   **Matter of Herrera** , 13 I&N Dec. 755 (BIA 1971) ; followed by **Matter of Serna** , 16 I&N Dec. 643 (BIA 1978) . A delayed birth certificate plus delayed secondary evidence does not meet the requirements of 8 CFR 204.2(a).

·   **Matter of Ah San** , 15 I&N Dec. 315 (BIA 1975) . Non-citizen nationals of the U.S. may file petitions pursuant to section 203(a)(2) of the Act.

·   **Matter of Nevarez** , 15 I&N Dec. 550 (BIA 1976) . English translations of foreign language documents are required notwithstanding the documents were entered into evidence by the Service.

· **Matter of Aviles** , 15 I&N Dec. 588 (BIA 1976) ; **Matter of Mintah** , 15 I&N Dec. 540 (BIA 1975) . Reopening visa petition proceedings on a Service motion after an appeal to the BIA has been taken is prohibited. The District Director loses jurisdiction on such cases once the appeal is filed.

· **Matter of Cintron** , 16 I&N Dec. 9 (BIA 1976) . A petition withdrawn by the petitioner may not be denied.

· **Matter of Tahsir** , 16 I&N Dec. 56 (BIA 1976) ; **Matter of Calilao** , 16 I&N Dec. 104 (BIA 1977) . A decision may not be based on adverse evidence if the petitioner is unaware of it.

· **Matter of Calilao** , 16 I&N Dec. 104 (BIA 1977) . A petition may be filed for a beneficiary who is currently an LPR under removal proceedings.

· **Matter of Serna** , 16 I&N Dec. 643 (BIA 1978) . A delayed birth certificate is given weight on a case by case basis and is not always sufficient to establish U.S. citizenship.

· **Matter of DaBaase** , 16 I&N Dec. 720 (BIA 1979) . Reopening of visa petition proceedings may not be instituted by the beneficiary; the right lies solely with the petitioner.

· **Matter of Bardouille** , 18 I&N Dec. 114 (BIA1981) . A beneficiary of a visa petitioner must be fully qualified at the time the visa petition is filed.

(B) Precedent decisions pertaining to section 204(c) of the Act:

· **Matter of F–** , 9 I&N Dec. 684 (BIA, 1962) ; Matter of Samsen, 15 I&N Dec. 28 (BIA, 1974). The decision on section 204(c) applicability must be made on all the evidence.

· **Matter of Cabeliza** , 11 I&N Dec. 812 (BIA 1966) . Section 204(c) contains no statute of limitations and applies to any subsequently filed petition.

· **Matter of Rahmati** , 16 I&N Dec. 538 (BIA 1978) . A finding that a previous marriage was non-viable does not necessarily indicate it was contracted solely for immigration purposes; therefore, such a finding does not conclusively place an alien within 204(c).

· **Matter of Agdinaoay** , 16 I&N Dec. 545 (BIA 1978) . A finding of deportability under section 241(c)(2) provides a basis for determination that section 204(c) is applicable for subsequent visa petition proceedings.

· **Matter of May** , 18 I&N Dec. 381 (BIA 1983) ; and **Matter of Chu** , 19 I&N Dec. 81 (BIA 1984) ; **Matter of Ma** , 20 I&N Dec. 394 (BIA 1991) . Certificates issued by notarial offices in the People's Republic of China shall be accepted as evidence that both the adoptive relationship was created and that the adoption was valid. However, notarial certificates shall not be regarded as conclusive proof because of the potential for fraud or error in issuance. Lack of corroborating evidence, contradicting evidence and unexplained inconsistencies are indications of possible fraud or error.

· **Matter of Villanueva** , 19 I&N Dec. 101 (BIA 1984) . Unless void on its face, a **valid** U.S. passport issued to an individual as a citizen of the U.S. is not subject to collateral attack in administrative immigration proceedings, but constitutes conclusive proof of such person's U.S. citizenship.

· **Matter of Obaigbena** , 19 I&N Dec. 533 (BIA 1988) . Where a petitioner fails to timely and substantively respond to the notice of intention to deny or to make a reasonable request for an extension, the Board will not consider any evidence first proffered on appeal as its review is limited to the record of proceeding before the district director; for further consideration, a new visa must be filed.

· **Matter of Hilaire** , 19 I&N Dec. 566 (BIA 1988) . Although a petitioner may submit certified copies of documents, the Service may still require the originals in order to determine authenticity.

(C) Precedent decisions pertaining to revocation of approval:

· **Matter of Cheung** , 12 I&N Dec. 715 (BIA, 1968) . The burden of proof in revocation proceedings rests with the petitioner.

· **Matter of Zaidan** , 19 I&N Dec. 297 (BIA 1985) . Since there is no provision for appellate review when a visa petition is automatically revoked under 8 CFR 205.1, the Board lacks jurisdiction over appeals dealing with the automatic revocation of a petition.

· **Matter of Estime** , 19 I&N Dec. 450 (BIA, 1987) . A decision that sets forth requirements for a notice of intent to revoke (see also **Matter of Arias** , 19 I&N Dec. 568 (BIA 1988) ; **Matter of Tawfik** , 20 I&N Dec. 166 (BIA 1990) ; and **Matter of Li** , 20 I&N Dec. 700 (BIA 1993) ).

· **Matter of Arias** , 19 I&N Dec. 568 (BIA 1988) . A decision to revoke approval of a visa petition can only be grounded upon, and the petitioner is only obligated to respond to, the factual allegations specified in the notice of intention to revoke.

**21.3 Petition for a Spouse.**

(a) <u>Petition By Citizen or LPR for a Spouse</u> .

In addition to the general filing and adjudication procedures and issues discussed in **Chapter 21.2** of this *field manual* , this section will discuss matters more specific to the adjudication of an I-130 petition filed by a citizen or LPR on behalf of his or her spouse.

(1) <u>Procedural Concerns Particular to Spousal Petitions</u> .

(A) <u>Concurrent Filing of I-130 and I-485</u> .

A petitioner may file a Form I-130, Petition for Alien Relative, and the beneficiary may file a Form I-485, Application to Register Permanent Residence or Adjust Status, concurrently in certain circumstances. In order to file concurrently, the Form I-130 petitioner and the Form I-485 applicant (who is also the Form I-130 beneficiary) must, at the time of filing, meet all the eligibility requirements of both forms. For example:

· If the beneficiary of the Form I-130 is subject to INA 212(e) as an exchange visitor who has neither complied with nor obtained a waiver of the 2-year foreign residency requirement, the Form I-485 cannot be filed concurrently. The Form I-130 can be filed separately.

· If the petitioner is an LPR and second preference visa numbers are not "current," i.e. available, the beneficiary cannot concurrently file Form I-485. Again, the Form I-130 would have to be filed separately.

· If the Form I-130 beneficiary entered on a K nonimmigrant visa and the Form I-130 petitioner is not the same person who filed the Form I-129F on the beneficiary's behalf, then the beneficiary is prohibited from adjusting status under INA 245(a). See INA 245(d). A Form I-130 may be filed by a different petitioner, but the beneficiary must consular process or be readmitted in a different non-immigrant classification. (Note: There are also limited exceptions available if the applicant is adjusting in the United States based on T nonimmigrant status (for victims of a severe form of trafficking in persons) or U nonimmigrant status (for victims of qualifying criminal activity).)

Family-based Form I-485s generally require the Form I-130 petitioner to be the sponsor and executor of Form I-864, Affidavit of Support under INA 213A. The Form I-864 must generally be submitted with the beneficiary's Form I-485. INA 213A.  While there is no age requirement for a petitioner filing a spousal Form I-130, a Form I-130 petitioner cannot execute a Form I-864 unless he or she is at least 18 years old. INA 213A(f)(1)(B) and (f)(5). In cases where a joint sponsor is used to meet the income requirements, the joint sponsor must also be at least 18 years of age. In cases where the petitioning spouse is deceased and a substitute sponsor is needed, the substitute sponsor that executes a Form I-864 must also be at least 18 years of age.  INA 213A(f)(1)(B) and (f)(5).

If the Form I-130 petitioner is under age 18, he/she cannot execute a Form I-864.  A joint sponsor 18 years of age or older cannot remedy an underage sponsor's ineligibility to execute a Form I-864, as the purpose of a joint sponsor is only to cure the petitioner's inability to meet the income requirements.  Therefore, if the Form I-130 petitioner cannot execute a Form I-864 due to being under the age of 18, the beneficiary will be inadmissible under INA 212(a)(4)  based on his or her failure to submit a sufficient Form I-864 as required. The beneficiary will be ineligible to file for adjustment of status based on that underlying Form I-130 until the Form I-130 petitioner turns 18.

For more information about Affidavits of Support, see AFM Chapter 20.5; or the Policy Manual Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section D, Determine Admissibility, Subsection 2, Affidavit of Support Under Section 213A of the Act (Form I-864) [7 USCIS-PM A.6(D)(2)].

(B) <u>Supporting Documents</u> .

As with other relative petitions, documentation must be submitted to establish both the standing of the petitioner (evidence of U.S. citizenship or lawful permanent residence) and validity of relationship (evidence of the lawful marriage of the petitioner and beneficiary and of the termination of any and all prior marriages of both parties). In addition, in the case of spousal petitions, the supporting documentation must include ADIT-style photographs of both the petitioner and the beneficiary. If the petitioner has failed to provide any of these documents, either:

·    Send the petitioner an RFE requesting the missing documentation; or

·    If the I-130 was filed concurrently with the beneficiary's adjustment application, require the petitioner to bring the missing documentation to the interview.

(2) <u>Adjudication Issues</u> .

In addition to the more general adjudication issues discussed in subchapter 21.2, pay particular attention to these concerns pertaining specifically to spousal visa petitions:

(A) <u>Proxy Marriages</u> .

**Section 101(a)(35)** of the Act provides that the term "spouse", "wife", or "husband" does not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present together at the ceremony, unless the marriage has been consummated afterwards. (Note: Consummation of a marriage can only occur after the ceremony, there is no such thing as "pre-consummation" of a marriage.)

(B) <u>Validity of a Marriage Celebrated in a Foreign Country</u> .

One may normally presume the validity of a marriage upon presentation of a marriage certificate, duly certified by the custodian of the official record. As a general rule, the validity of a marriage is judged by the law of the place of celebration. If the marriage is voidable but no court action to void the marriage has taken place, it will be considered valid for immigration purposes. However, if a marriage is valid in the country where celebrated but considered offensive to public policy of the United States, it will not be recognized as valid for immigration purposes. Plural marriages fall within this category.

(C) <u>Marriage Between Close Relatives</u> .

In some foreign countries, and some states in the United States, marriages between close relatives (e.g., cousins) are permitted under certain circumstances. In cases where such marriages do not offend the laws of the state where the parties reside, the marriage will be recognized for immigration purposes.

(D) <u>Marriage Involving Minor(s).</u>

There are no statutory minimum age requirements for the petitioner or beneficiary of a Form I-130 spousal petition.  In some U.S. states and in some foreign countries, marriage involving a minor is generally not allowed but may be permitted under certain circumstances, including where there is parental consent, a judicial order, emancipation of the minor, pregnancy of the minor, etc. (Note: Although the INA definition of "child" includes being under 21 years of age, in family law, a "minor" in a marriage context is generally defined as an individual under 18 years of age.)

However, a marriage involving a minor warrants special attention. Officers should evaluate all marriages involving a minor for evidence that: 1) the marriage was lawful in the place it was celebrated and on the date it was celebrated, 2) if the couple resides outside the place of celebration, the marriage is recognized as valid in the U.S. state where the couple currently resides or will presumably reside and does not violate the state of residence's public policy, and 3) the marriage is bona fide, and the minor(s) provided full, free, and informed consent to enter into the marriage.

Note: U.S. state laws vary in setting minimum age requirements to marry and exceptions that may permit minors to marry. Some U.S. states do not have an age floor below which a minor cannot marry if an exception applies. However, there may still be public policy considerations that would result in the domicile refusing to confer reciprocity to an out of state marriage involving a minor.

Note: The officer can generally rely upon a marriage certificate, court decree or parental consent as probative evidence of the minor's consent. However, if the case presents forced marriage issues, please consult with headquarters and/or your regional office through your normal supervisory chain.

(i) Legality of Marriage in the Place of Celebration.

Where the record does not establish the legality of the marriage, officers should issue an RFE for evidence that the marriage was lawful in the place where it was celebrated and on the date it was celebrated. The petitioner bears the burden of proof [See *Matter of Brantigan*, 11 I&N Dec. 493 (BIA 1966)] and must provide evidence that the minor(s) met the legal minimum age requirements in the place of celebration or that the minor(s) qualified for an exception to the general age requirements. If you have questions about the legality of a marriage involving a minor, please contact local USCIS counsel.

Note: Officers retain discretion to deny a petition without first issuing an RFE or NOID when required initial evidence was not submitted or the evidence of record fails to establish eligibility.  See AFM 10.5(a) and AFM 10.5(b).

Note: Regardless of the age of the petitioner and beneficiary at the time the I-130 petition is adjudicated, officers should ensure that any marriage that involved a minor was valid at the time it was entered into. Matter of P, 4 I&N Dec. 610 (Decided by the AG March 18, 1952).

(ii) Validity of the Marriage in Petitioner and Beneficiary's State of Residence or Presumed State of Residence and State Public Policy Considerations.

If the marriage involving a minor was lawfully entered into in the place where it was celebrated, whether domestically or overseas, but the couple now lives in or can be expected to live in a different place at the time of adjudication, officers should determine whether the marriage is or will be recognized as valid in the petitioner's current or presumed state of residence. (Note: A marriage complying with all the requirements of the state of celebration might nevertheless be deemed invalid if it is invalid under the laws of a state where one of the parties is domiciled at the time of the marriage and where both parties intend to make their home afterward, or if it violates a strong public policy of the state of domicile. See *Matter of Zappia*, 12 I. & N. Dec. 439 (BIA 1967); Matter of Da Silva, 15 I. & N. Dec. 778, 779 (BIA 1976).)


Where the beneficiary resides abroad, unless otherwise indicated or known to the officer, officers should presume that the couple will reside in the petitioner's state of residence [See *Matter of Manjoukis*, 13 I&N Dec. 705 (BIA 1971)]. The officer should consult with local USCIS counsel for assistance in determining the validity of the marriage or considering whether to issue an RFE for the petitioner to establish whether the marriage is or will be recognized as valid in the petitioner's current or presumed state of residence. For example, the petitioner may provide evidence that the state Attorney General's Office recognizes the marriage involving a minor, which was celebrated out of state. [Note: Officers retain discretion to deny the petition without first issuing an RFE or NOID when required initial evidence was not submitted or the evidence of record fails to establish eligibility.  See AFM 10.5(a) and AFM 10.5(b).]


Where it is unclear whether the marriage is or will be recognized as valid outside the place of celebration, officers should also determine whether the marriage violates the public policy of the new place of residence. A state's public policy is often reflected in specific criminal statutes that penalize undesirable or offensive conduct. Officers should look at the state's criminal statutes or consult with local counsel to determine whether the marriage is contrary to the state's public policy. A marriage involving a minor may be legal in the place of celebration but void under the state law of the minor's residence as contrary to state public policy. Conversely, state law may prohibit the marriage of a person under age 16, but may recognize as valid an out of state marriage of a resident under age 16 [See *Matter of Da Silva*, 15 I&N Dec. 778 (BIA 1976)]. The assessment as to whether a marriage violates state public policy is a case-by-case determination and involves the facts surrounding the parties, the marriage, and U.S. state law.  Officers should contact local counsel if it appears that the petitioner has not met his or her burden of establishing that the marriage would not violate the public policy of the state of residence despite being legal in the place of celebration. (Note: Some states will not recognize a marriage as valid if celebrated outside the state because the parties intended to evade the marriage restrictions in that state. These are generally referred to as 'evasion laws'.)


(iii) Bona Fides of the Marriage, Including Forced Marriage Considerations.

Officers must also consider the bona fides of the marriage and all other eligibility requirements as they evaluate a marriage involving a minor. A marriage cannot be considered bona fide if it was entered into for the sole purpose of evading U.S. immigration law. See *Matter of Laureano*, 19 I&N Dec. 1 (BIA 1983).


A marriage that was entered into without the consent of one or both parties is not considered bona fide for immigration purposes. Generally, an officer may rely upon a marriage certificate, court decree, or parental

consent as probative evidence of the minor's consent unless the case involves forced marriage indicators, such as an affidavit from the victim or a communication from Department of State (Note: Instances of forced marriage are almost always self-identified). Forced marriage is a marriage entered into without the full, free, and informed consent of one or both parties to the marriage, regardless of age. (Note: For additional information, please see the USCIS Forced Marriage webpage, at https://www.uscis.gov/humanitarian/forced-marriage.) Forced marriage should not be confused with the cultural practice of arranged marriage, where families may be involved in selecting a partner.  USCIS will consider any evidence that a forced marriage exists in its determination of whether the marriage is bona fide. If you have reason to believe that the marriage underlying an I-130 spousal petition may have been forced, please consult with headquarters and/or your regional office through your normal supervisory chain.

If the marriage involving a minor: (1) was legal in the place of celebration; (2) is recognized as valid in the couple's current or presumed state of residence and there are no state public policy concerns; (3) is bona fide and there are no indications of a forced marriage; and all other eligibility requirements have been met, then officers must approve a Form I-130 spousal petition involving the lawful marriage of a minor.

Note:  While there is no minimum age associated with being party to a Form I-130 spousal petition, any sponsor executing Form I-864 (including the Form I-130 petitioner, any joint sponsor, and/or a substitute sponsor) must be at least 18 years of age at the time the Form I-864 is executed. The Form I-864 must generally be submitted with the beneficiary's Form I-485. For more information about <u>Affidavit of Support Considerations,</u> AFM Chapter 20.5; AFM Chapter 21.3(a)(1)(A); and Policy Manual Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section D, Determine Admissibility, Subsection 2, Affidavit of Support Under Section 213A of the Act (Form I-864) [7 USCIS-PM A.6(D)(2)].

(iv)  <u>Interview Guidelines for Form I-130 Spousal Petitions Involving a Minor.</u>

USCIS has the authority to interview any petitioner or beneficiary, including a minor. *See* 8 CFR 103.2(b)(7) and 8 CFR 103.2(b)(9). While the eligibility of a spousal relationship for immigration purposes is generally assessed in person by USCIS when the alien spouse applies to adjust status or by Department of State when the alien spouse applies for an Immigrant Visa, USCIS has determined that Form I-130 spousal petitions involving a minor party warrant special consideration due to the possible vulnerabilities associated with marriage involving minor(s).

To better examine the eligibility of the spousal relationship for immigration purposes, service center officers must refer the following standalone Form I-130 spousal petitions for interview when the case appears approvable under Section D (i) − (iii):

1. All Form I-130 spousal petitions in which the petitioner or the beneficiary is less than 16 years of age; and

2. All Form I-130 spousal petitions in which the petitioner or the beneficiary is 16 or 17 years of age and there are 10 years or more difference between the ages of the spouses.

USCIS may interview either party to an I-130 spousal petition (petitioner or beneficiary), including minors and adults. The interview of the Form I-130 spousal petitioner and/or beneficiary should follow the same procedures as the interviews USCIS already conducts during the Form I-485 spousal adjustments. Generally, officers should ask the usual questions to evaluate the relationship for immigration purposes, while remaining aware of the unique nature of interviewing minors. Interviews of minors must be conducted with sensitivity and may warrant special considerations, including determining whether a trusted adult should be present and conducting additional rapport building. Interviews involving minors may require additional lines of questioning if the officer suspects the minor is a victim of forced marriage or human trafficking.

Please note, while this population warrants special consideration, spousal relationships involving a minor should not be viewed as inherently fraudulent or containing elements of forced marriage.

For further guidance on Interviewing the Petitioner or Beneficiary of a Form I-130 spousal petition, please see Section I below.

(E) <u>Fraudulent Marriage Prohibition</u> .

Section 204(c) of the Act provides that:

Notwithstanding the provisions of subsection (b) no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws[,] or (2) the Attorney General has determined that the ali en has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

If there is evidence that the beneficiary has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws, the petition must be denied. However, the evidence of the attempt or conspiracy must be contained in the alien's file. (See also **8 CFR 204.2(a)(1)(ii)** .)

| Note |
|---|
| Section 204(c) prohibits the approval of <u>any</u> petition, not just an I-130 petition. Accordingly, if an alien has attempted of conspired to enter into a fraudulent marriage, USCIS would also be barred from approving an I-140 petition filed in his or her behalf. |

(F) <u>Freedom to Marry</u> .

The parties to a marriage must be legally free to marry. Some people "marry" with a bona fide intent to have a life together as man and wife, but the marriage is not valid because one of the parties was not legally free to marry when the marriage was contracted. Although the I-130 petition asks for the names of all prior spouses, the response to the question is sometimes inaccurate. The reasons given for an inaccurate answer are numerous, but the most common reasons are:

· Desire to conceal prior marriage(s) from spouse;

· Separated for many years and unsure if legally divorced;

· Even though legally divorced, not in possession of the divorce decree and unwilling to take time to get it;

· Not divorced because divorce is not allowed in the person's country of origin (e.g., the Philippines).

(G) <u>Legal Separation vs. Divorce or Annulment</u> .

A legal separation is not proof of marital capacity. A final decree of divorce, annulment or death must be presented as proof of termination of a prior marriage. If either party's prior marriage(s) has/have been terminated by divorce or annulment, the petitioner must establish that the divorce or annulment is valid under the laws of the place where pronounced. It must then be judged by the law of the jurisdiction where the parties to the divorce were actually residing at the time of the divorce.

(H) <u>Legal Separation vs. Separate Cohabitation</u>.

You may deny the visa petition in cases where the parties entered into a valid marriage, but have since obtained a legal separation prior to the final adjudication of the visa petition. However, if the parties entered into a valid marriage, have not obtained a legal separation, but simply reside separately, the petition may not be denied merely because of such separate cohabitation. The issue of separate cohabitation is relevant, however, in determining the intent of the parties at the time of the marriage.

(I) <u>Interviewing Petitioner and Spouse</u>.

This section provides general guidance on interviewing the petitioner or beneficiary of an I-130 spousal petition. If the marriage involves a minor, the officer should follow the guidance below and the guidance provided in subsection (D)(iv), Interview Guidelines for Form I-130 Spousal Petitions Involving a Minor.

You will often have to question both the petitioner and the beneficiary to determine whether the marriage is bona fide. Remember that the issue to be resolved during the interview is the bona fides of the marriage, not its "viability" (i.e., the probability of the parties remaining married for a long time). USCIS is not in the business of determining (or even speculating about) viability. Although the petitioner and the beneficiary may not appear to have a "viable" marriage, the petition may be approved if the marriage is valid and was not entered into solely for immigration purposes.

On the other hand, a marriage which was contracted solely for immigration purposes does not confer benefits under the Act. A number of factors may raise questions about the intent of the marriage, and therefore necessitate more in depth questioning (see **Chapter 15** regarding interviewing techniques), or even a field examination (see **Chapter 17**) or an investigation (see **Chapter 10.5(d)**). Some indications that a marriage may have been contracted solely for immigration benefits include:

· Large disparity of age;

· Inability of petitioner and beneficiary to speak each other's language;

· Vast difference in cultural and ethnic background;

· Family and/or friends unaware of the marriage;

· Marriage arranged by a third party;

· Marriage contracted immediately following the beneficiary's apprehension or receipt of notification to depart the United States;

· Discrepancies in statements on questions for which a husband and wife should have common knowledge;

· No cohabitation since marriage;

· Beneficiary is a friend of the family;

· Petitioner has filed previous petitions in behalf of aliens, especially prior alien spouses.

A sham marriage has been defined by the BIA as a marriage which may comply with all the formal requirements of the law but which the parties entered into with no intent, or "good faith", to live together and which is designed solely to circumvent the immigrations laws. Sham marriages are not recognized for immigration purposes. See **Matter of Patel** , 19 I&N Dec. 774 (BIA 1988).

(J) Same Sex Marriages .

In *United States v. Windsor*, 133 S. Ct. 2675 (2013), the Supreme Court held that section 3 of the Defense of Marriage Act (DOMA) (1 U.S.C. § 7), which previously had barred recognition of same-sex marriages for Federal purposes, is unconstitutional. As a result, same-sex marriage is now a lawful basis for all immigration benefits based on marriage.

AR2022_300263

In order to be valid for immigration purposes, a same-sex marriage must meet all of the same requirements as an opposite-sex marriage. As with opposite-sex relationships, a civil union, domestic partnership, or other relationship that is not recognized as a legal marriage in the place of celebration is not considered a marriage for immigration purposes.

A same-sex marriage that is legally valid in the jurisdiction in which it was celebrated is valid for immigration purposes, regardless of whether the jurisdiction in which the parties reside recognizes same-sex marriage. See Matter of Zeleniak, 26 I. & N. Dec. 158 (BIA 2013).

(K) Transgender issues and marriage. [Revised 8/10/12; PM-602-0061.1, AD12-02]

Prior to the Supreme Court's ruling in *United States v. Windsor*, 133 S. Ct. 2675 (June 27, 2013), benefits involving the marriage of transgender individuals could be granted pursuant to the Board of Immigration Appeals decision in *Matter of Lovo-Lara*, 23 I&N Dec. 746 (BIA 2005). *Lovo-Lara* provides that benefits based upon marriage may be approved on the basis of a marriage between a transgender individual and an individual of the other gender if the Petitioner/Applicant establishes 1) the transgender individual has legally changed his or her gender and *subsequently*[1] married an individual of the other gender, 2) the marriage is recognized as a heterosexual marriage under the law where the marriage took place (*Matter of Lovo-Lara, supra*), and 3) the law where the marriage took place does not bar a marriage between a transgender individual and an individual of the other gender. *Lovo-Lara* remains binding precedent for marriages that were celebrated in a jurisdiction that does not allow same-sex marriages. However, following *Windsor*, whether a spouse is transgender has no bearing on the validity of the marriage that was celebrated in a jurisdiction that recognizes same-sex marriage.

A timely registered marriage certificate from the appropriate civil authority is prima facie evidence of the validity of a marriage. When an officer determines, based on the record or through interview or other means, that a party to a petition has changed gender, the officer must ascertain that the marriage is a valid marriage under the laws of the jurisdiction in which it was contracted.

The validity of the marriage must be established by the preponderance of the evidence. As with most administrative immigration proceedings, the petitioner bears the "preponderance of the evidence" burden. Thus, even if there is some doubt, if the petitioner submits relevant, probative, and credible evidence that leads the director to believe that the claim is "probably true" or "more likely than not," the applicant or petitioner has satisfied the standard of proof. See *United States v. Cardozo-Fonseca*, 480 U.S. 421 (1987) (defining "more likely than not" as a greater than 50 percent probability of something occurring). As such, officers should be satisfied that this burden is met if the marriage is recognized in the jurisdiction in which it was contracted. USCIS will presume the validity of the marriage involving a transgender individual in the absence of jurisdictional law and/or precedent that would place the validity of such marriage in doubt.

Only in jurisdictions where a specific law or precedent either prohibits or sets specific requirements for a legal change of gender, and does not permit same-sex marriage, is the individual required to demonstrate that he or she has met the specific requirements needed to establish the legal change of gender and the

AR2022_300264

validity of the marriage. The individual may also show, in an appropriate case, that the law barring a legal change of gender for purposes of marriage has changed and that the marriage is valid under current law, or that under the particular facts of the case and law of the jurisdiction in question, the marriage should be recognized (for example, if state law recognizes neither gender change nor same-sex marriage, then a marriage between a couple that is same-sex as a result of gender change of one of the parties may be considered lawful).

Where an individual claims to have legally changed his or her gender, USCIS will recognize that claim based upon the following documentation:

- Amended birth certificate; or

- Other official recognition of new gender, such as a passport, court order, certificate of naturalization or citizenship, or driver's license (note that some jurisdictions may have a lower threshold for issuing a driver's license than to establish a legal change of gender for purposes of the marriage laws, and USCIS would require additional evidence that the individual met the threshold for marriage, if applicable); or

- Medical certification of the change in gender from a licensed physician (a Doctor of Medicine (M.D.) or Doctor of Osteopathy (D.O.)). This is based on standards[2] and recommendations[3] of the World Professional Association for Transgender Health, who are recognized as the authority in this field by the American Medical Association.[4] Medical certification of gender transition received from a licensed physician (an M.D. or D.O.) is sufficient documentation, alone, of gender change. If the physician certifies the gender transition, USCIS will not question the certificate by asking for specific information about the individual's treatment. Additional information about medical certifications:

  o For the purposes of this chapter only an M.D. or a D.O. qualifies as a licensed physician. Officers may accept medical certifications from any number of specialties as well as from general practitioners.

  o Statements from persons who are not licensed physicians, such as psychologists, physician assistants, nurse practitioners, social workers, health practitioners, chiropractors, are not acceptable.

  o The medical certification should include the following information:

    ▪ Physician's full name;

    ▪ Medical license or certificate number;

    ▪ Issuing state, country, or other jurisdiction of medical license/certificate;

    ▪ Drug Enforcement Administration registration number assigned to the doctor or comparable foreign registration number, if applicable;

    ▪ Address and telephone number of the physician;

    ▪ Language stating that the individual has had appropriate clinical treatment for gender transition to the new gender (male or female);

    ▪ Language stating that he/she has either treated the applicant in relation to the applicant's change in gender or has reviewed and evaluated the medical history of

> the applicant in relation to the applicant's change in gender and that he/she has a doctor/patient relationship with the applicant

Sex reassignment surgery is *not* required in order for USCIS to approve a Form I-130 to establish a legal change of gender unless the law of the place of marriage clearly requires sex reassignment surgery in order to accomplish a change in legal gender and the jurisdiction does not permit same-sex marriage. The *fact* of sex reassignment surgery, however, would generally be reflected in the medical certification. USCIS will not ask for records relating to any such surgery.

These documents are listed in order of evidentiary preference. Officers must recognize, however, that the personal circumstances and jurisdictions involved in an individual's case will affect availability of specific types of documentation. As evidence of the new gender, officers should treat an amended birth certificate as carrying the same weight as USCIS would normally give to other timely registered primary evidence.

This guidance also applies to the adjudication of all immigration benefits based upon marriage, including but not limited to a Petition for Alien Fiancé(e). In the case of a proposed marriage involving a transgender individual, the petition may be approved assuming the same conditions are met for legal gender change and validity of the marriage as described above. If the record indicates the parties' specific intent to marry in a jurisdiction where the marriage would not be valid, the officer will issue an intent to deny in which the petitioner is informed that the marriage would not be valid for immigration purposes and why. USCIS will provide the petitioner the opportunity to submit evidence that USCIS's interpretation of the jurisdiction's law and/or precedent is incorrect or provide an affidavit attesting that the intended marriage will take place in a jurisdiction where the marriage will be valid for immigration purposes.

The same principles for determining the validity of a marriage involving a transgender individual for a spousal Petition for Alien Relative apply to those who may derive an immigrant or nonimmigrant benefit by virtue of a spousal relationship.

If an officer has questions about the validity of a marriage involving a transgender individual, the officer should contact local USCIS counsel.

As in all adjudications, if an officer finds significant substantive discrepancies, has reason to question the accuracy or authenticity of documents submitted, or finds other indicators of fraud, the case may be referred to FDNS in accordance with current national and local policies.

---

| |
|---|
| As in all adjudications, if an officer finds significant substantive discrepancies, has reason to question the accuracy or authenticity of documents submitted, or finds other indicators of fraud, the case may be referred to FDNS in accordance with current national and local policies. |

(L) <u>Immigration Marriage Fraud Amendments of 1986</u>.

In an effort to deter immigration-related marriage fraud, Congress passed the Marriage Fraud Amendments of 1986 on November 10, 1986. This legislation had a major effect on the adjudication of relative petitions, including:

·    In many cases, certain conditions had to be met prior to the acceptance or approval of certain petitions on behalf of spouses (see paragraphs (L) and (M).

·    Criminal penalties were added or enhanced for individuals who were convicted of having engaged in a fraudulent marriage.

·    An alien's lawful permanent residence is "conditional" if the qualifying marriage occurred less than 2 years prior to the alien's immigration or adjustment. The provision requires that a conditional resident alien seek removal of the conditional basis of the residence shortly before the second anniversary of the date on which he or she immigrated or adjusted (see **Chapter 25** regarding removal of conditions).

(M) <u>Marriage within Five Years of Obtaining LPR Status</u> .

**Section 204(a)(2)(A)** of the Act generally prohibits the approval of a visa petition filed by a lawful permanent resident for a spouse within 5 years of the date on which the petitioner became a LPR if that LPR obtained his or her residence status through a prior marriage. The LPR can overcome this prohibition if he or she establishes by clear and convincing evidence that the prior marriage was not entered into with the purpose of evading the immigration laws, or that the prior marriage ended through death. **8 CFR 204.2(a)(1)(i)** specifies the type of evidence which the petitioner must submit to meet the clear and convincing standard. If the petitioner falls within this restriction and has not submitted the requisite evidence, send him or her a letter explaining the deficiency and requesting additional evidence. If satisfactory evidence is not submitted within 60 days (or 120 days if the petitioner has requested and been granted additional time), deny the petition.

(N) <u>Marriage During Proceedings</u> .

There is a general prohibition against approval of visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Issues concerning determination of commencement and termination of proceedings and exemptions are covered in **8 CFR 245.1(c)(9)** , except that the burden in visa petition proceedings to establish eligibility for the exemption in **8 CFR 245.1(c)(9)(iii)(F)** rests with the petitioner. The petitioner can request an exemption if he or she:

(i) Is able to establish through clear and convincing evidence that:

· the marriage was entered into in good faith; and

· the marriage was not entered into for the purpose of obtaining LPR status for the beneficiary; or

(ii) The alien beneficiary has resided outside the United States for at least two years after the date of the marriage.

| **Note** |
|---|
| If the alien was deported from the United States (or was a "self- deport"), he or she may need permission to reapply before immigrating to the United States, but not before the I-130 may be approved. (See **Chapter 43** of this field manual.) |

(3) <u>Closing Action</u> . See Chapter 21.2(g) of this field manual.

(b) <u>Petition for Widow(er)</u> .

(1) <u>Background</u> .

The Immigration Act of 1990 expanded the definition of immediate relatives to include spouses of United States citizens who had been married at least two years before their spouse died. A widow(er) of a U.S. citizen may file a petition on his or her own behalf to be classified as an immediate relative under Section 201(b) of the Act. **Section 201(b)(2)(A)(i)** of the Act and **8 CFR 204.2(b)** govern the process. An alien who obtains an immigrant visa or adjustment of status through this process is not subject to the conditional resident provisions of section 216 of the Act.

(2) <u>Procedure</u> .

An eligible widow or widower may apply for immediate relative classification by filing Form I-360 concurrently with his or her adjustment application with the Service Center having jurisdiction over the petitioner's residence. If the petitioner resides outside the United States, the I-360 petition should be filed with the USCIS office or American consulate having jurisdiction over such residence.

(3) Eligibility ,

Widow(er) may be classified as an immediate relative if:

· He/she was married for at least two years to a United States citizen ( **Note:** The United States citizen must have been a U.S. citizen at the time of death, but did not have to have the status of a U.S. citizen for the entire two year period);

· The petition was filed within two years of the death of the citizen spouse or before November 29, 1992, if the citizen spouse died before November 29, 1990;

· The alien petitioner and the citizen spouse were not legally separated at the time of the U.S. citizen's death; and

· The alien spouse has not remarried.

(4) Evidence .

The petition must be accompanied by the following evidence:

· Evidence of citizenship of the United States citizen (birth certificate, certificate of naturalization, certificate of citizenship, or U.S. passport); and

·   Evidence of the relationship, which includes:

–   Marriage certificate issued by civil authorities;

–   Proof of the terminations of all prior marriages of both husband and wife (divorce or annulment decrees or death certificates of prior spouses); and

–   Death certificate of the U.S. citizen issued by civil authorities.

Primary evidence of the relationship (as listed above) is preferred. If the primary evidence is not available, secondary evidence may be considered (see **Chapter 11** of this field manual).

(5) <u>Adjudication Issues</u> .

The adjudication of an I-360 petition filed by a widow or widower is quite similar to the adjudication of an I-130 petition filed by a citizen for his or her spouse. The basic eligibility requirements are the same (status of petitioner and relationship between the petitioner and the beneficiary), and the significant concerns are the same (dissolution of any and all prior marriages, fraud, etc.). The most significant difference in the adjudication is the obvious one: the citizen cannot be questioned as to th e bona fides of the marriage. However, the burden of proof still rests with the petitioner (who in this case is also the beneficiary), and the resolution of questions regarding the bona fides of the marriage is still the petitioner's responsibility. The basic techniques for determining whether the marriage is suspect still exist: examination of the paper trail; formal interrogation of the petitioner; and field examination or investigation.

Factors which may lead you to doubt the bona fides of the marriage and to more intensively question the petitioner (or to call for a field examination or investigation) include:

·   A large age discrepancy between the petitioner and the (now) deceased citizen at the time of the marriage;

·   Ill health of the citizen at the time of the marriage, although this is obviated to some extent by the requirement that the marriage be in existence for at least 2 years before the death of the citizen;

·   Lack of common residence of the petitioner and the citizen prior to the latter's demise;

·   Lack of intermingling of financial assets and liabilities (and other resources and obligations).

(6) <u>Closing Action</u>.

(A) <u>Approval</u>.

If the petition is approved:

·   Place the examiner's approval stamp in the Action Block on the petition;

·   Sign your name;

·   Annotate the petition with the proper classification (IW1) and the consulate selected by the petitioner;

·   If the petitioner will be applying for an immigrant visa, forward the petition to the Department of State's National Visa Center;

·   If the widow(er) is in the U.S. and is eligible for adjustment of status under Section 245 of the Act, retain the approved petition and write "245 Adjust" in the Consulate box.

(B) <u>Denial</u> .

If the petition is denied, notify the widow(er) in writing of the reasons for the denial. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(7) <u>Child of Petitioning Widow(er)</u> .

A child of a petitioning widow(er) classified as an immediate relative is also eligible for classification as an immediate relative. Except as provided in section 423 of the Patriot Act (see paragraph (b)(8)), no separate petition is filed for such child. The child of the petitioning widow(er) need not be the child of the deceased citizen and could have been born either before, during, or after the marriage of the petitioner to the (now) deceased citizen. However, the child would **not** be eligible for derivative classification under the widow(er) provision if:

·   He or she has reached the age of 21;

·   He or she is married;

·   The petitioning widow(er) has remarried;

·   He or she was born after date on which the petitioning widow(er) immigrated to the U.S.

| **Note 1** |
| --- |
| When the widow/widower provisions were first incorporated into the law (1990), there was no provision for the child of such widow or widower. The provision which allows for immediate relative classification for the child was added by **section 219(b)(1)** of the Technical Corrections Act of 1994. If a |

widow(er) who immigrated under the pre-1994 version of this provision had a child who (still) qualifies under the 1994 revision, that child can immigrate under this provision, without the filing of a new petition.

**Note 2**

Although the statute is silent on whether the child must be accompanying or following to join the petitioning widow(er)/parent, **8 CFR 204.2(b)(4)** states that the child "may accompany or follow to join." Accordingly, by regulation, the child cannot be admitted or adjusted unless and until the petitioning widow(er)/parent has been admitted or adjusted.

(8) Special Provisions Added by the USA Patriot Act of 2001 .

In response to the September 11, 2001, terrorist attack on the World Trade Center and the Pentagon, Congress passed Public Law 107- 56, Act of October 26, 2001, 115 Stat. 272 (the "USA Patriot Act"). **Section 423** of that law expanded the widow(er) self-petition entitlement for widow(er)s of citizens killed as a direct result of those terrorist acts. It did so in two significant ways:

·    It provided that an otherwise qualifying widow(er) of a citizen killed in the terrorist attacks of that day may self-petition without any regard to the length of the marriage; and

·    It provided that any child of a U.S. citizen who was killed in one of the terrorist acts of September 11, 2001, may file a petition for status as an immediate relative child within two years of the death of the parent, regardless of changes in age or marital status. (In other words, he or she must have met the definition of child on September 11, 2001, but could have turned 21 and/or married after that date.) As a result of the child's ability to self-petition, the regulatory "accompanying or following to j oin" requirement that normally attaches to the child of a widow(er) (see Note 2 of paragraph (b)(6)) does not apply in the case of a child of a citizen killed as a direct result of the September 11, 2001 terrorist attack.

All other statutory requirements remain unchanged, as do all other aspects of the adjudication of the I-360 petition described in this field manual.

**Note**

> Although a child of a citizen killed as a direct result of the September 11, 2001, terrorist attacks on the World Trade Center and the Pentagon may self-petition even if he/she has married, there is no visa category for the spouse or child of such self-petitioning child. If such self-petitioning child has a spouse or child of his/her own, he/she would have to immigrate first and then file a 2 nd preference petition for such spouse or child.

(c) <u>Precedent Decisions Relating to Spouse Petitions</u> .

In addition to the decisions cited in section 21.2(h), which apply to I-130 petitions in general, the following precedents apply to petitions filed for a spouse:

·   **Matter of B–** , 5 I&N Dec. 698 (BIA 1954) . A proxy marriage must be consummated to be valid for benefits under the I&N Act.

·   **Matter of M–** , 8 I&N Dec. 217 (BIA 1958) . Where no bona fide husband-wife relationship was intended, a marriage is deemed invalid for immigration purposes regardless of whether it would be considered valid under the domestic law of the jurisdiction where it was performed.

·   **Matter of Agoudemos** , 10 I&N Dec. 444 (BIA 1964) ; **Matter of G–** , 9 I&N Dec. 89 (BIA 1960) . A marriage which is voidable but not void without any action to void the marriage is generally valid for benefits under the I&N Act.

·   **Matter of H–** , 9 I&N Dec. 640 (BIA 1962) . A polygamous marriage, though valid where contracted, is not recognized for immigration purposes.

·   **Matter of Zappia** , 12 I&N Dec. 439 (BIA 1967) . A marriage complying with all the requirements of the state of celebration might nevertheless be deemed invalid if it is invalid under the laws of the state where the parties are domiciled at the time of the marriage and where both intend to make their home afterward or if it violates a strong public policy of the state of domicile.

·   **Matter of Pearson** , 13 I&N Dec. 152 (BIA 1969) . The marriage following a divorce can only be considered valid if the divorce is considered valid under the laws of the place where the marriage was contracted.

·   **Matter of Phillis** , 15 I&N Dec. 385 (BIA 1975) . The facts of an individual case may suggest or imply that the marriage was entered into solely for the purpose of obtaining immigration benefits. The mere denial of fraud does not overcome the inference and is insufficient to sustain the petitioner's burden of proof.

·   **Matter of Weaver** , 16 I&N Dec. 730 (BIA 1979) .The validity of a divorce should be governed by the law of the state where the parties were domiciled at the time of the divorce.

·   **Matter of P−** , 4 I&N Dec. 610 (BIA 1952) . The validity of a marriage is generally governed by the law of the place where it is celebrated.

·   **Matter of Lenning** , 17 I&N Dec. 476 (BIA 1980) . A petition was properly denied where the parties entered into a formal, written separation agreement notwithstanding the fact that the marriage had not been finally dissolved by an absolute divorce decree.

·   **Matter of W−** , 8 I&N Dec. 16 (BIA 1958) . A Mexican "mail order" divorce, not ordinarily recognized as valid by California courts,.was not valid for immigration purposes, thus the applicant was not legally free to marry.

·   **Matter of Kurys** , 11 I&N Dec. 315 (BIA 1965) . A visa petition filed under compulsion of a court order by a petitioner who stated that a bona fide marital relationship did not exist and that she did not intend to live with her husband is properly denied. The petition was not filed in good faith.

·   **Matter of Arenas** , 15 I&N Dec. 174 (BIA 1975) . In determining the validity of a marriage for immigration purposes, the law of the place of celebration of the marriage will generally govern. Under Section 2.22 of the Texas Family Code, a marriage is void if either party was married and the prior marriage is not dissolved. However, the marriage becomes valid when the prior marriage is dissolved and the parties continue to reside together as husband and wife and present themselves to others as being married.

·   **Matter of DaSilva** , 15 I&N Dec.778 (BIA 1976) . A marriage between an uncle and his niece is valid

for immigration purposes for a couple who reside in New York but who marry in Georgia where marriage between and uncle and niece are legal. Since the marriage was legally contracted in Georgia and is thus not regulated by New York law nor violative of New York public policy, the marriage is recognized as valid in New York and is valid for immigration purposes.

·   **Matter of Magana** , 17 I&N Dec. 111 (BIA 1979) . Where the respondent entered the United States as the spouse of a citizen, concealing the fact of his prior marriage in Mexico, a decree from a Washington state court declaring the Mexican marriage invalid from its inception will not be given retroactive effect for immigration purposes.

·   **Matter of Laureano** , 19 I&N Dec. 1 (BIA 1983) . A marriage entered into for the primary purpose of circumventing the immigration laws, commonly referred to as fraudulent or sham marriage, is not recognized for the purpose of obtaining immigration benefits.

·   **Matter of Kumah** , 19 I&N Dec. 290 (BIA 1985) . A Ghanaian court decree of divorce is accepted as evidence that a customary divorce was validly obtained, however, it is not deemed to be conclusive proof of the facts certified therein because of the potential for fraud or error in the issuance.

·   **Matter of Zeleniak** , 26 I. & N. Dec. 158 (BIA 2013). Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7, is no longer an impediment to the recognition of lawful same-sex marriages and spouses under the Immigration and Nationality Act if the marriage is valid under the laws of the jurisdiction where it was celebrated.

**Notes:**

[1] Please consult with OCC in cases where the marriage was originally an opposite-sex marriage celebrated in a state that does not recognize same-sex marriage, and one of the spouses changed gender after the marriage.   Return

[2] Standards of Care, 7th Version (2012), World Professional Association for Transgender Health (WPATH)    Return

[3] Identity Recognition Statement (2010), World Professional Association for Transgender Health (WPATH),    Return

[4] American Medical Association. Res. 122; A-08, Removing Barriers to Care for Transgender Patients (2008)    Return

**21.4 Petition by Citizen or Lawful Permanent Resident for a Child, Son or Daughter.**

(a) <u>Eligibility Requirements</u>.

A visa petition may be filed on behalf of a child (i.e., a person meeting the definition contained in paragraphs (A) through (E) of section 101(b)(1) of the Act) by either a citizen or lawful permanent resident of the U.S. A citizen and, in certain circumstances a LPR, may file a visa petition on behalf of a son or daughter (i.e., a person who at one time was able to meet the definition of "child" as set forth in section 101(b)(1) of the Act. A citizen may also file an I-130 petition for an orphan as define d in paragraph (E) of that section, but a lawful permanent resident may not. (See **Chapter 21.5** of this field manual.)

(b) <u>Form and Filing Issues</u>.

Form I-130 is used by a citizen or lawful permanent resident to petition for his or her child, son or daughter. [It is also used by either to petition for a spouse and by a citizen to petition for a parent or sibling (see Chapter 21.3, Chapter 21.8 and Chapter 21.9).] It may be filed through a Service Center, or at a local office if filed concurrently with an adjustment application.

(c) <u>General Adjudicative Issues</u>.

Regardless of the circumstances under which an immigrant visa petition is filed on behalf of a child, son or daughter, there are four basic adjudicative issues which must be taken into consideration: the petitioner's status, the beneficiary's age, the beneficiary's marital status, and the relationship between the petitioner and the beneficiary.

| **Note** |
| --- |
| With each of these factors, the criteria must be met not just at the time of filing, but also at the time of the adjudication of the petition, in order for the petition to be approved. Furthermore, in most circumstances, the criteria must continue to be met after the petition's approval and until the beneficiary becomes an LPR; otherwise, the petition's approval may be revoked. (See **Chapter 20.3** of this field manual.) |

·   <u>Petitioner's Status</u> - The petitioner may be a citizen of the U.S. or a lawful permanent resident of the U.S. The relationships for which the petition may be filed depend on the petitioner's status (see below). The evidence which must be submitted to establish the petitioner's status as a citizen or LPR is specified in 8 CFR 204.1(g). Any doubts about the status of an LPR or naturalized citizen should be resolved through a review of the petitioner's A-file.

·   <u>Age of Beneficiary</u> - The age of the beneficiary affects the classification under which a petition may be approved. If under age 21 and unmarried, the (otherwise eligible) beneficiary is considered to be a child; if 21 or older or if married, the (otherwise eligible) beneficiary is considered a son or daughter (see below).

·   <u>Marital Status of Beneficiary</u> - One of the most frequent problems arising in this category is that a beneficiary who is reputed to be unmarried may actually be married. In the case of a petition filed by citizen, this can affect the classification under which the petition is approved; in the case of a petition filed by a LPR, it makes the difference between an approval and a denial:

| **PETITIONER** | **MARITAL STATUS & AGE OF <u>THE BENEFICIARY</u>** | **RESULT** |
|---|---|---|
| Citizen | Unmarried and under age 21 | Immediate Relative |
| Citizen | Unmarried and 21 or older | 1 st Family Preference |
| Citizen | Married (any age) | 3 rd Family Preference |
| LPR | Unmarried and under age 21 | 2a Family Preference* |
| LPR | Unmarried and 21 or older | 2b Family Preference* |
| LPR | Married (any age) | Not eligible |

| **\* Note** |
|---|
| While 2a and 2b are both 2nd preference classifications, quota numbers for the 2a sub-group (which is limited to spouses and unmarried children of LPRs) are much more readily available. |

Since a lawful permanent resident can petition on behalf of an unmarried son or daughter regardless of age, you must be satisfied that the beneficiary has either never been married or has terminated any and all prior marriages before you approve the petition. Any doubts about the beneficiary's marital status should be resolved through an interview at a local office.

·   <u>Relationship Between Petitioner and Beneficiary</u> - This is the most complex issue to the considered in the adjudication of a petition for a child, son or daughter. In examining this issue, it is important to keep in mind not only the nature of the relationship (e.g., legitimate child, illegitimate child, adopted child), but

also the point at which the relationship existed (e.g., the child's age at the time of the marriage between his or her parent and stepparent or at the time of the petitioner's acquisition of status). Each possibility is discussed separately under section (d) of this subchapter.

·   Assisted Reproductive Technology (ART) - For purposes of family based immigrant visa petitions, a gestational mother (meaning, the person who carried and gave birth to the child) has a petitionable relationship without a genetic relationship to the child, as long as she is also the legal parent at the time of birth [1] . Legal parentage is generally determined under the laws of the jurisdiction in which the child was born, but there may be circumstances in which the jurisdiction of residence or a post-partum act of legitimation serves this purpose.

(d) Adjudicative Issues Pertaining to Relationship Between Petitioner and Beneficiary.

The following list of issues provide guidance on specific familial relationships. Adjudicators should also be aware of the issues discussed in the relevant precedent decisions pertaining to petitions for a child, son or daughter (see Chapter 23.4(g)).

(1) Child Born in Wedlock (Formerly Referred to as "Legitimate Child").

See **8 CFR 204.2(d)(2)(i)** for information regarding primary evidence for a child, son or daughter born in wedlock. **(Note:** "The phrase "child, son or daughter born in wedlock" includes an individual born to a couple in a "common law" marriage, if the common law marriage is recognized by the State or foreign country in which the couple resides (see Appendix 21-1 of this field manual.)

The applicable provision depends upon whether the child is born in wedlock or out of wedlock. USCIS must determine whether a child born through ART is born in wedlock or out of wedlock and will treat a child born to a legal gestational mother in the same manner as a child born to a genetic mother when determining if the child is born in or out of wedlock.

(2) Step Child.

See **8 CFR 204.2(d)(2)(iv)** for information regarding primary evidence for a stepchild.

(A) <u>Creation of the Stepparent-Stepchild Relationship</u>.

A stepchild relationship is created whenever a parent of the child marries someone (other than the child's other parent) before the child's 18 th birthday. The relationship is created automatically as a result of the marriage, assuming that the marriage is not a sham or does not violate the Defense of Marriage Act - see *Matter of Teng* , 15 I. & N. Dec 516 (BIA 1975) and **Chapter 21.3** of this field manual.)

(B) <u>Termination of Stepparent-Stepchild Relationship</u>.

Normally, a step relationship terminates when a marriage ends, especially if it ends in divorce. See *Matter of Simicevic* , 10 I. & N. Dec. 363 (BIA 1963). However, under certain circumstances a step relationship may continue after the death of the natural parent or even after the legal separation or divorce of the stepparent and natural parent if there is an ongoing relationship between the stepparent and stepchild (see *Matter of Pagnerre* , 13 I. & N. Dec. 173 (BIA 1971), *Matter of Mowrer* , 17 I. & N. Dec. 613 (BIA 1981), and *Matter of Mourillon* , 18 I. & N. Dec. 122 (BIA 1981)). If the marriage ends in annulment, however, the step relationship is deemed to have never existed because legally the marriage never existed.

| **Note** |
|---|
| The creation of a step relationship in no way terminates the relationship between the child and his or her other natural parent (i.e., the one who did not marry the stepparent). It is neither unusual nor improper for a child who acquired LPR status through a stepparent to later petition for the other natural parent once the child naturalizes and reaches the age of 21. |

(C) <u>Petition by Wife of Natural Father</u>.

In some cases, although a natural father may be ineligible to petition for his illegitimate child, a stepparent-stepchild relationship may exist under the Act between the child and the wife of the natural father even if she has never seen or cared for the child. See *Matter of McMillan* , 17 I. & N. Dec. 605 (BIA 1981).

(3) <u>Legitimated Child</u>.

See **8 CFR 204.2(d)(2)(ii)** for information regarding primary evidence for a legitimated child or son or daughter.

Some nationalities are not concerned with the formal legalization of a relationship; therefore, a child may be raised in a household in a parent-child relationship when legally there is no relationship. A petition based on that relationship could not normally be approved.

In considering petitions for parents or children, you must take into account the laws governing the places of residence of the parents and of the child in addition to the restrictions of the Act. Some countries require formal court action to legitimate a child, while others do not. You may find a case where the father of an illegitimate child acknowledges paternity of a child, but that acknowledgment may or may not have constituted legitimation. If the petitioner fails to establish that the beneficiary has been legitimated, you should then consider whether the beneficiary may qualify as a child born out of wedlock with whom the petitioner has a bona-fide parent-child relationship (see paragraph (4)).

While legitimation has historically applied to father-child relationships, the non-genetic gestational mother of a child born through ART may be required to take action after the birth of the child to formalize the legal relationship. Whether such action is required depends on the law of the relevant jurisdiction.

(4) <u>Child Born out of Wedlock (Formerly Referred to as "Illegitimate Child")</u>.

See **8 CFR 204.2(d)(2)(iii)** for information regarding primary evidence for a child, son or daughter born out of wedlock.

(A) <u>Petition by Mother for a Child Born Out of Wedlock</u>.

The mother of an illegitimate child always qualifies as a petitioner.

(B) <u>Petition by Natural Father for a Child Born Out of Wedlock</u>.

Section 101(b)(1)(D) of the Act was amended to enable the natural father of a child born out of wedlock to petition for that child, if the father has or had a bona fide parent- child relationship with the child. A bona fide parent-child relationship is established when the father has or had evinced an active concern for the child's support, instruction and general welfare. The parent-child relationship must be established while the child is unmarried and under twenty-one (21) years of age. Benefits sought via this amendment may only be obtained on the basis of relative petitions filed on or after November 6, 1986, the effective date of the amendment. See **Matter of Atembe** , 19 I. & N. Dec. 427 (BIA 1986).

| **Note** |
| --- |
| See also **paragraph (2)(C)** of this chapter regarding a petition filed by a step-mother. |

(5) <u>Child Adopted While Under the Age of 16</u>.

See **8 CFR 204.2(d)(2)(vii)** for information regarding primary evidence for an <u>adopted</u> child or son or daughter.

(A) <u>General Provisions</u>.

Section **101(b)(1)(E)** defines an adopted alien child as "(i) a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: Provided, That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; or (ii) subject to the same proviso as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (F)(i); (II) was adopted by the adoptive parent or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child was adopted while under the age of 18 years[.]"

| **Note** (added 10-31-2008) |
| --- |

In section **101(b)(1)(E)** of the Act, "adopted while under the age of 16" means that the court or other entity must actually have entered the adoption order *before* the child's 16th birthday. An adoption order that was entered on or after the child's 16th birthday does not meet this requirement, *even if the court or other entity makes the order effective as of some date before the 16th birthday. See Matter of Cariaga*, 15 I&N Dec. 716 (BIA 1976).

This conclusion does not mean that USCIS is not recognizing the validity of the adoption, for purposes of domestic relations law or any other purpose. This conclusion only means that the parent-child relationship was not created by the age required in the statute for immigration purposes.

An order that was entered *on or after* the child's 16th birthday can support the approval of a Form I-130 *only* if that order was entered to correct an error in an order that actually was entered *before* the child's 16th birthday. For example, if a court intended to enter an adoption order but, mistakenly, entered a guardianship order, an order correcting the earlier order would support approval of a Form I-130, if all the other requirements of section 101(b)(1)(E) are met. *See Allen v. Brown*, 953 F.Supp. 199 (N.D.Ohio 1997). In these circumstances, the petitioner should present *both* the original order and the later order correcting the original order.

(B) <u>Relationship Through Adoption</u>. The regulations incorporate the definitions for both legal custody and joint residence in paragraphs (vii)(A), (vii)(B), and (vii)(C) of 8 CFR 204.2(d)(2) . You need to be aware of these regulations and their applicability. See also chapter 21.16 of this AFM for specific information about immigration benefits based on adoption.

It is important that you determine if the petitioner and beneficiary are related through adoption or if their natural relationship was severed through an adoption. Aliens who gain permanent resident status in the U.S. through adoptive parents are not eligible to pass on immigration benefits to their natural parents. Also, the beneficiary's date of birth, the date of the adoption and time spent residing with and in the legal custody of the adoptive parents are critical in establishing the validity of the relationship. See **8 CFR 204.2(d)(2)(vii)** for the evidence necessary to establish petitioner's right for the benefits sought. See also **Matter of Cuello** , 20 I. & N. Dec. 94 (BIA 1989) and **Matter of Marquez** , 20 I. & N. Dec. 160 (BIA 1990).

**<u>Note</u>**

While the petition asks the petitioner if the relationship between the petitioner and beneficiary is an adoptive relationship, in some cases you must evaluate the evidence and information presented in order to make the determination. Often, the only clue you will have to indicate a person was adopted is a birth certificate which indicates that birth occurred a number of years before it was registered but with no indication that the document is a delayed birth certificate. Most states in the U.S. do not annotate birth certificates issued for adoptive children to indicate the adoption.

(C) Primary Parental Control.

The petitioner, as adoptive parent, has the burden of proof in establishing that primary parental control has been exercised by him/her during the requisite residence period. 8 CFR 204.2(d)(2)(vii)(B) lists some types of evidence of that may be submitted to establish such parental control. Once the petitioner submits such evidence, the relationship is presumed bona fide, absent any evidence indicating otherwise. See **Matter of Cuello** , 20 I. & N. Dec. 94 (BIA 1989).

(D) Petition by Adopted Child for Natural Parent(s) Prohibited.

If a woman or couple give up a child for adoption, and that adoption meets the requirements set forth in section 101(b) of the Act, the natural parent(s) can gain no immigration benefit from that child (see **Matter of Li** , 20 I. & N. Dec. 700). Accordingly, such child is prohibited from petitioning for his or her natural parent(s), since the relationship between the child and the natural parent(s) was severed at the time of the adoption. This prohibition is in effect regardless of whether the child gains any immigration benefit through his or her adoptive parents ( *Matter of Li* overruled prior precedent decisions in this regard).

However, if the adoption in question does not meet all of the requirements of section 101(b) of the Act (e.g., if the child was over age 16 at the time of the adoption), then the relationship between the child and his or her natural parent(s) was not severed, and the child is not prohibited from petitioning for such natural parent(s).

(E) Special Provision for Sibling of Child Adopted by Same Parents.

**Pub. L. 106-139** amended the Act to provide that an adopted alien child who is under the age of eighteen may be considered a "child" as defined in the Act, if the child is adopted with or after a natural sibling who is also considered a "child" under the Act. This change in law only applies when the sibling has been or will be adopted by the same adoptive or prospective adoptive parents. The legislation addresses the two definitions of an adopted alien child under section 101(b)(1)(E) and section 101(b)(1)(F) of the Act. Section 101(b)(1)(E) defines a "child" as including "a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: Provided, That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act." Pub. L. 106-139 amends section 101(b)(1)(E) of the Act to addthat a child who is a natural sibling of an adopted child described above, and who was adopted by the adoptive parent or parents of the sibling while the child was under the age of

eighteen, is also a "child" as defined by the Act. The child must otherwise fall under the definition of a child under paragraph (E) except that the child was adopted while under the age of eighteen. The exceptions apply equally if either the adopted alien child or natural sibling has been adopted after being in the guardianship of the U.S. citizen parent(s) for more than two years as defined in paragraph (E) or falls under the definition of an orphaned child under paragraph (F). (See Chapter 21.5 of this field manual for a discussion of section 101(b)(1)(F) cases.)

**Note**

Pub. L. 106-139 also amended sections 101(c)(1) and 322(a)(4) of the Act relating to naturalization to conform with the changes explained above. It amended these sections by changing only the permitted age of adoption for the natural sibling of an adopted alien child under the Act.

(F) <u>Child from a Hague Adoption Convention Country</u>. (added 10-31-2008)

USCIS may not approve a Form I-130 that is filed by a citizen who is habitually resident in the United States on behalf of a child, son or daughter who is habitually resident in a country, other than the United States, that is a Party to the Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption ("Hague Adoption Convention"), unless the citizen completed the adoption of the child before April 1, 2008.

Adjudicators may find a list of countries that are parties to the Hague Adoption Convention at: **https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/understanding-the-hague-convention/convention-countries.html**

If the citizen adopted the child from a Hague Adoption Convention country on or after April 1, 2008, a **Form I-130** may be approved only if the citizen establishes that, at the time of the adoption:

·    EITHER the citizen was not habitually resident in the Uniteadoption under the Hague Adoption d States; OR

·    The child was not habitually resident in the other Hague Adoption Convention country.

The Hague Adoption Convention regulation, at **8 CFR 204.303** , explains when the adoptive parent and adopted child are deemed to be "habitually resident" in a particular country.

A U.S. citizen is deemed to be "habitually resident" in the United States if he or she is domiciled in the United States, that is, if he or she actually lives in the United States with the intent to maintain that residence for the indefinite future.

A U.S. citizen is also deemed to be "habitually resident" in the United States if he or she is domiciled abroad, but the U.S. citizen plans to take either of the following actions before satisfying the 2-year residence and custody requirements that would permit the child to immigrate under section **101(b)(1)(E)**:

·   establishing a domicile in the United States on or before the date of the child's admission for permanent residence (and, therefore, will be living with the child in the United States after the adoption); or

·   bringing the child to the United States temporarily to obtain the child's naturalization under **section 322** of the Act.

Thus, a U.S. citizen will be deemed to be "habitually resident" in the United States if the citizen seeks to bring the child to the United States as a direct consequence of the adoption.

A child is generally deemed to be habitually resident in a Hague Adoption Convention country if he or she is a citizen of that country. If the child is actually residing in a country other than the country of citizenship, however, the child may be deemed to be habitually resident in that other country if the Central Authority of that other Convention country, or another competent authority in either a Convention or non-Convention country determines that the child's status in that country is sufficiently st able to make it appropriate for that country to exercise jurisdiction over the adoption of the child. See the **Note** later in this AFM chapter concerning when and how this determination may be made with respect to a child who is actually residing in the United States.

Under 8 CFR 204.2(d)(2)(vii)(E) , the citizen will be deemed, for purposes of adjudicating a Form I-130, not to have been habitually resident in the United States at the time of the adoption if the citizen completes the two-year custody and joint residence requirement by living with the child outside the United States. In this situation, the adoptive parent may file a Form I-130 instead of following the Hague Adoption Convention procedures.

This rule at 8 CFR 204.2(d)(2)(vii)(E) is not the only situation in which the adoptive parent may claim not to have been habitually resident in the United States at the time of the adoption. There may be other situations in which the adoptive parent can establish the he or she was not domiciled in the United States,

and did not intend to bring the child to the United States as an immediate consequence of the adoption. If so, then the Hague Adoption Convention process would not apply.

There is no basis, however, for waiving the two-year custody and joint residence requirement for a Form I-130 case (except for certain battered children). Thus, if a citizen adoptive parent who was not habitually resident in the United States at the time of adoption, decides to move to the United States before the adoptive parent has satisfied the two-year custody and joint residence requirements, USCIS may not be able to approve a Form I-130 for the child. In this situation, it might be in the child's best interests, and might facilitate the child's immigration and naturalization,for the citizen parent to try to complete the Hague Adoption Convention process, if it becomes necessary to return to the United States before the two-year custody and joint residence requirement is met. See chapter 21.6(b) of this AFM concerning the issue of the child's having been adopted before the completion of the Hague Adoption Convention process.


Note

Under **8 CFR 204.2(d)(2)(vii)(F)** , a child who is present in the United States, but whose habitual residence was in a Hague Adoption Convention country other than the United States immediately before the child came to the United States, is still deemed to be habitually resident in the other Hague Adoption Convention country for purposes of the filing and approval of a visa petition based on the child's adoption by a citizen who is habitually resident in the United States. Thus, the adjudicator will presume that the child's adoption and immigration are governed by the Hague Adoption Convention, the Intercountry Adoption Act, and **8 CFR 204** subpart C.

Since a child described in **8 CFR 204.2(d)(2)(vii)(F)** , is still deemed to be habitually resident in the other Hague Adoption Convention country, a citizen who is habitually resident in the United States and who wants to adopt a child from a Hague Adoption Convention country must, generally, follow the Hague Adoption Convention process, even if the child is already in the United States. **8 CFR 204.309(b)(4)** specifically provides that a Form I-800A and Form I-800 can be filed, even if the child is in the United States, if the other Hague Adoption Convention country is willing to complete the Hague Adoption Convention process with respect to the child.

In most cases, adoption under the Hague Adoption Convention would be in the child'ss best interest, even if the child is present in the United States. The child may be able to immigrate and, under **section 320(a)** , acquire citizenship by automatic naturalization, as a direct result of the adoption under the Hague Adoption Convention. If the child is adopted without compliance with the Hague Adoption Convention, the parent must have legal custody of the child and live with the child for 2 years before the child can immigrate under **section 101(b)(1)(E)** .

There may be situations, however, in which the parent is not able to complete a Hague Adoption Convention adoption, because the Central Authority of the child's country has determined that, from its perspective, the Hague Adoption Convention no longer applies to the child. The purpose of 8 CFR 204.2(d)(2)(vii)(F) is to prevent the circumvention of the Hague Adoption Convention process. Thus, USCIS has determined that 8 CFR 204.2(d)(2)(vii)(F) must be read in light of the Hague Adoption Convention regulations in subpart C of 8 CFR part 204 .

If, under subpart C, there is a sufficient basis for saying that the Hague Adoption Convention and the implementing regulations no longer apply to a child who came to the United States from another Hague Adoption Convention country, then USCIS can conclude that 8 CFR 204.2(d)(2)(vii)(F) no longer applies.

AR2022_300287

The governing regulation, **8 CFR 204.303(b)** , explains when the child is habitually resident in a country other than the country of citizenship. This regulation does not explicitly apply to children in the United States, but USCIS has determined that it can be interpreted to permit a finding that a child who, under **8 CFR 204.2(d)(2)(vii)(F)** , is presumed to be habitually resident in another Hague Adoption Convention country can be found to be no longer habitually resident in that country, but to be habitually resident, now, in the United States.

USCIS will determine that **8 CFR 204.2(d)(2)(vii)(F)** no longer precludes approval of a Form I-130 if the adoption order that is submitted with the **Form I-130** expressly states that, the Central Authority of the other Hague Adoption Convention country has filed with the adoption court in the United States a written statement indicating that the Central Authority is aware of the child's presence in the United States, and of the proposed adoption, and that the Central Authority has determined that the child is not habitually resident in that country. A copy of the written statement from the Central Authority must also be submitted with the Form I-130 and the adoption order.

If the adoption order shows that the Central Authority of the other Hague Adoption Convention country had determined that the child was no longer habitually resident in that other Hague Adoption Convention country, USCIS will accept that determination and, if all the other requirements of section 101(b)(1)(E) are met, the Form I-130 could be approved.

It is preferable for the petitioner to obtain the written statement from the Central Authority of the other Hague Adoption Convention country before obtaining an adoption order in the United States. However, the written statement, even after the fact, would serve to resolve any doubt about whether adoption court had jurisdiction to act on the adoption petition at the time when the court first did so. For this reason, USCIS will also accept an amended adoption order, if the amended adoption order reflects the Central Authority's written statement. This amended order will be sufficient to establish that the child was no longer habitually resident in the other Convention country at the time of the adoption. The written statement must be included with the amended order.

Note

An LPR (unless married to a citizen) may not file a petition under 8 CFR part 204, subpart C, on behalf of a Convention adoptee. An LPR may, therefore, file a Form I-130 on behalf of a child habitually resident in a Hague Adoption Convention country. The Form I-130 cannot be approved, however, unless the two-year custody and joint residence requirements are met.

(G)   <u>Determining Habitual Residence</u> .

In cases where petitioners do not obtain a written statement from the Central Authority of the child's COO until after the adoption is finalized, petitioners must submit an amended order that contains the required language, as well as a copy of the COO's Central Authority's written statement.

However, there may be cases where the petitioner is unable to obtain a written statement regarding the child's habitual residence from the COO's Central Authority, because

- The child's COO does not issue statements concerning a child's habitual residence, as confirmed by the Department of State, *or*

- The Central Authority of the COO has informed the petitioner in writing that it will not make a determination on habitual residence upon the petitioner's request, *or*

- The Central Authority of the COO has not issued a statement of habitual residence for at least 120 days following the petitioner's request to obtain such a statement.

Note: A current list of Central Authorities for the Hague Adoption Convention can be found on the Hague Conference website: https://www.hcch.net.

In these situations, USCIS will determine that 8 CFR 204.2(d)(2)(vii)(F) does not preclude approval of a Form I-130, Petition for Alien Relative, if:

1. At the time the child entered the United States, the purpose(s) of the entry were for reasons other than adoption (*intent criteria*);

2. Prior to the U.S. domestic adoption, the child actually resided in the United States for a substantial period of time, establishing compelling ties in the United States, (*actual residence criteria*); and

3. Any adoption decree issued after February 3, 2014,[2] confirms that the COO Central Authority was notified of the adoption or amended adoption proceedings in a manner satisfactory to the court and that the COO Central Authority did not object to the proceeding with the court within 120 days after receiving notice or within a longer period of time determined by the court (*notice criteria*).

**General Notes**

- USCIS will review each Form I-130 filed under this guidance on a case-by-case basis and based on the totality of the evidence.

- Language in the adoption order alone is not sufficient to establish that the Hague Adoption Convention does not apply to a particular case. Although an adoption order issued by a court in the United States may contain language that the child was not habitually resident in the COO or that the adoption is not governed by the Hague Adoption Convention, such determinations are made solely by USCIS when adjudicating the Form I-130.

- USCIS will deny any Form I-130 petition filed for a child in the United States if the COO's Central Authority advises the U.S. government, the petitioner, or the U.S. court with jurisdiction over the adoption that it considers a child to remain habitually resident in the COO, despite the child's presence in the United States. If the Central Authority of the COO states that they consider the child to be habitually resident in the COO, the petitioner(s) must follow the DHS regulations

implementing the Hague Adoption Convention (i.e., the Form I-800A and Form I-800 Hague process).

- If USCIS approves a Form I-130 under this guidance, the child will still need to meet the requirements for adjustment of status to obtain lawful permanent resident status. Certain statutory limitations could apply. Therefore, if a child entered the United States without inspection, was admitted in certain visa categories, or is subject to other grounds of inadmissibility, the child may have to depart the United States to obtain an immigrant visa that he or she could then use to seek admission to the United States as a lawful permanent resident.

When adjudicating Form I-130 petitions based on an adoption in the United States by U.S. citizen parent(s) of a child from another Hague Adoption Convention country where the petitioner is unable to obtain a statement concerning the child's habitual residence from the Central Authority of the child's COO, USCIS will consider the following criteria:

## 1.      Intent Criteria: Entry for Purposes Other than Adoption

USCIS will review the case to determine whether the child entered the U.S. for adoption purposes.

Evidence for Intent Criteria

- Affidavit, made under penalty of perjury, from the petitioning adoptive parent(s), which should include a:

- Description of child's circumstances prior to child's entry into the United States (e.g., Where did the child live and/or go to school? Who cared for the child?  What events led to the child's travel to the United States?  Reason for the child's travel to the United States? etc.);

- List of individuals who have cared for the child since his or her entry into the United States and the relationship to the child;

- Description of any contact the adoptive parents had with the child, the child's birth parents, or any adoption or child welfare agency or nongovernmental organization (in the United States or abroad) related to the child that took place:

- Before the child came to the United States; and/or

- After the child's arrival but before a court placed the child with the petitioning adoptive parent(s); *and*

- Adoptive parents' declaration that on the date the child entered the United States, the adoptive parent(s) did not intend to adopt the child or circumvent the Hague Adoption Convention procedures.

- Evidence establishing the timeline and course of events that led to the child's availability for adoption by the adoptive parents, which may include one or more of the following:

- An order from a court with jurisdiction over the child if the order includes express findings related to the child's purpose for entering the United States, such as a finding that the child did not enter the United States for the purpose of adoption. (Note:  This information in a court order does not in itself indicate that USCIS will determine that the child is no longer habitually resident in the COO.)

Addresses where the birth parents have resided since the child's date of birth (if known), and any time periods the birth parents resided with the child.

- Any other evidence to support the statements made in the affidavit (such as informal consent documentation) or to document that the adoptive parent(s) did not intend to adopt the child when he or she entered the United States.

- Method of arrival, as indicated in visa records or other government system checks; specifically, any records related to the child's stated purpose of travel to the United States or whether the child had any intent to immigrate.

- Evidence that the child was a ward of a U.S. state or state court prior to the adoption. In such cases, the evidence should establish that the child was in state care due to the child's bona fide need for state managed care and was not abandoned in order for the petitioner to adopt the child.

- Evidence of birth parent's inability to provide proper care for the child.

- Evidence to establish one or both birth parents are deceased.

- Evidence to establish any living birth parents freely consented to the proposed adoption *or* the birth parents' parental rights were fully and properly terminated.

- Any other evidence to establish that entry into the United States was for purposes other than adoption.


The following are examples of adverse factors that may be considered in determining if the child entered the United States for the purpose of adoption.  This is a non-exhaustive list:

- A prior adoption of the child in the COO by the adoptive parent(s) in the United States. (This is a heavily weighted adverse factor.)

- Prior contact between the adoptive parent(s) and the child. (This could be an adverse factor if the contact was related to the adoption.  USCIS will consider present and prior family relationships when reviewing the intent criteria.  Prior contact between adoptive parent(s) and the child if the child is a relative may not be an adverse factor, but the case will be reviewed based on the totality of the evidence.)

- Any evidence that suggests that the entry was for the purpose of adoption.

**2.      Actual Residence Criteria:  Compelling Ties for a Substantial Period of Time**


If the child was physically present in the United States for two years or more before the adoption, USCIS will presume that a child has actually and physically resided in the United States for a substantial period of time, establishing compelling ties in the United States prior to the U.S. domestic adoption.  However, if the child has been present in the United States for less than two years, adjudicators must consider the length of time that the child has spent in the United States before the adoption and supporting evidence establishing the child's actual residence and compelling ties in the United States before the adoption.


Evidence for Actual Residence Criteria

- Depending on the child's age, documentation from the time period before the adoption may include, but is not limited to, the following:

- Evidence of ongoing medical care in the United States;

- Statement from the petitioners explaining the child's social interactions, including family and peer relationships;

- School records;

- Registration for extra-curricular activities;

- Affidavits from knowledgeable individuals (such as the child's doctor or teacher, day care provider, landlord, or neighbors) attesting to the child's actual residence in the United States; and/or

- Evidence that the child's birth parent(s), guardian, or caretaker resided in the United States.

- An order from a court with jurisdiction over the child if that order includes express findings that the child actually resided in the United States for a substantial period of time or had compelling ties in the United States before the adoption. (Note:  This information in a court order does not in itself indicate that USCIS will determine that the child is no longer habitually resident in the COO.)

- Evidence that the child was a ward of the state or court before the adoption.

If there is evidence that the child lived outside of the United States shortly before the adoption, it may be considered as an adverse factor.

**3.        Notice Criteria:  Notification from the Central Authority of the Child's Country of Origin**

The notice criteria are required in **any case** where the adoption took place <u>on or after</u> February 3, 2014.  **(Note:  USCIS will not apply the notice criteria or require an amended adoption order if the adoption occurred before February 3, 2014.  USCIS will only apply the intent and residence criteria.)**  Even if the intent criteria and actual residence criteria are met, the notice criteria must also be met in order for USCIS to make a determination that the Hague Adoption Convention does not apply.

If the petitioner cannot obtain a written statement addressing a child's habitual residence from the Central Authority of the child's COO in 120 days, the petitioner still must notify the Central Authority of the adoption in a manner satisfactory to the court.  The Central Authority then has an additional 120 days to object to the adoption.

<u>Evidence for Notice Criteria</u>

- Copy of the notice provided to the Central Authority of the child's COO informing it of the pending adoption and providing the Central Authority with 120 days to object.

- Any and all responses received from the COO Central Authority.

- If the Central Authority of the child's COO does not reply to the notice, an adoption order (or amended adoption order) containing language regarding the:

- Petitioner's request for a statement of habitual residence (if applicable).

- A written indication from the court indicating the Central Authority did not respond to the court notice, and

- Court's confirmation as noted in the court order that the court required the petitioner(s) and their representatives (if any) to provide all correspondence from the Central Authority to the court, even responses stating the child is considered habitually resident in the COO.

- Copies of the request for a statement of habitual residence (if applicable) and court notice in the language used for official proceedings in the COO. Additionally, the petitioner must submit a certified English translation of each document and proof of service in the manner specified by the court.

**Important Notes about Notice Criteria**

*Notification of the Central Authority*

- When notifying the Central Authority of the child's COO of the adoption proceedings, petitioners must follow the court's rules of procedure or the instructions in a specific order from the court. The notice must include a copy of the adoption petition or the motion for amended adoption order and must also clearly specify:

- The name of the child, together with the place and date of birth of the child and the name(s) of the birth parent(s), if known;

- The country of the child's nationality;

- The name of the agency or individual that is the Central Authority in the COO;

- The name of the adopting parents;

- The date of the child's departure from the COO, if known;

- The date of the child's arrival in the United States, if known;

- The court name and the date, time, and place of the court's hearing on the adoption petition or motion for amended adoption order.

- Additionally, the notice should indicate that the Central Authority should notify the court if the Central Authority:

- Does not intend to object, or

- Requires additional time beyond 120 days.

- The notification can take the form of a court order or another document authorized by the court. Notice by email or fax is generally not sufficient unless the court rules clearly allow email or fax notifications.

- Both the request for a statement addressing the child's habitual residence (if applicable) and the notice of the court proceeding must be provided directly to the Central Authority.

- Notice to another competent authority or an Embassy or consulate of the COO in the United States will generally not be sufficient. If a country has a different Central Authority for different parts of

the country (such as a regional or state Central Authority), the petitioner must provide the request for a statement addressing the child's habitual residence and the notice of the court proceeding to the Central Authority for the place where the child last resided in that country.

A current list of Central Authorities for the Hague Adoption Convention can be found on the Hague Conference website: https://www.hcch.net.

*Timing of Request for Statement on Habitual Residence and Timing of Notice of Adoption*

- If the Central Authority of the COO does not respond to an initial request for a statement of habitual residence within 120 days, the petitioner still must notify the Central Authority of the COO of the adoption in a manner satisfactory to the court per the notice criteria and provide an additional 120 days to object to the adoption. USCIS may deny adoption based Form I-130 petitions that do not include evidence that the petitioner cannot obtain a statement of habitual residence from the COO Central Authority or evidence that the COO Central Authority was given proper notice of the adoption.

- If permitted by the court, the petitioner can send both the request for a habitual residence statement and the notice of the court proceeding to the Central Authority at the same time.

- The petitioners do not need to give 120-day notice of the court hearing on the adoption proceeding more than once. If the Central Authority does not respond to the notice of the court hearing on the adoption proceeding within the 120-day period, there is no need to give additional notice, even if the court grants any continuances in the adoption proceedings and the adoption hearing takes place at a later date than what was stated in the notice provided to the Central Authority.

- If the Central Authority informs the court in writing that it does not consider the child to be habitually resident in that country before the expiration of the 120-day period, there is no need to delay the hearing for the 120-day period. USCIS will not apply the intent, residence, and notice criteria when adjudicating a Form I-130 if the requirements from the 2008 guidance are met.

*Amended Orders (if Applicable)*

- In cases where the petitioner does not obtain a written statement from the Central Authority of the child's COO until after the adoption is finalized, the petitioner must submit an amended order that contains the required language, as well as the Central Authority's written statement.

- For purposes of the age, custody, and joint residence requirements in INA section 101(b)(1)(E), the date of the adoption will be the date of the *original* order, not the amended order.

- If an order is amended after February 3, 2014, to meet the notice criteria, USCIS will deem the amended order not as the adoption order itself, but as a confirmation that the State court had jurisdiction to make the original order when the court did so. Therefore, notice and amended order may be issued after a child's 16th birthday as long as the original adoption order took place before the child's 16th birthday (or 18th birthday in the case of a qualifying sibling).

- USCIS may deny a Form I-130 if the adoption order submitted fails to comply with the notice criteria or does not incorporate the response from the Central Authority of the child's COO that addresses habitual residence.

- If the petitioner(s) cannot obtain an amended order within the standard Request for Evidence ("RFE") response period:

- They should submit all other requested evidence by the RFE response date, including a copy of the written notice provided to the Central Authority of the COO.

- They may request in writing that USCIS administratively close the Form I-130 petition for up to one year. This request may or may not be granted, depending on the circumstances of the case and the evidence provided.

- If the petition is administratively closed, once the petitioners obtain the amended order, they may ask USCIS to reopen the case administratively without being required to file a Form I-1290B, Notice of Appeal or Motion.

- If the petitioner does not request to reopen the case within one year, USCIS will deny the petition.

(f) <u>Final Decision</u>.

(A) <u>Denial</u>.

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner in writing of the reasons. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(B) <u>Approval</u> .

If no adverse information is developed in a case at a USCIS office, the adjudicating officer shall approve the petition and:

· Forward it, with all attachments, to the National Visa Center (NVC) so that it may be processed and then forwarded to the embassy or consulate where the beneficiary will apply for an immigrant visa if the alien is:

    –   outside the U.S., or

    –   unable or unwilling to apply for adjustment of status; or

·   Retain the approved petition in the beneficiary's file (i.e., A-file is one is pre- existing or receipt/petition file if no A-file exists) and invite him or her to apply for adjustment of status if he or she is in the U.S., and is eligible to and intending to so apply.

The adjudicating officer will also send Form I-797, Notice of Approval of Relative Immigrant Visa petition, to the petitioner.

(C) <u>Revocation Proceedings Based on Adverse Information</u> .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See **Chapter 20.3** of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition. See, generally, **8 CFR 205** and **Chapter 20.3** of this field manual regarding revocation of petitions. See also **Chapter 20.4** of this field manual regarding withdrawal of petitions.

(g) <u>Precedent Decisions</u>.

(1) <u>Precedents Pertaining to a Petition on Behalf of a Child</u>.

· *Matter of M-*, 8 I. & N. Dec. 118 (BIA 1958, Attorney General 1959); *Matter of Lee*, 11 I. & N. Dec. 911 (BIA 1966); *Matter of Cho*, 16 I. & N. Dec. 188 (BIA 1977). Residence requirement of section 101(b)(1)(E) may include residence occurring prior the formal adoption decree.

· Matter of Kirby , 13 I. & N. Dec. 173 (BIA 1969). A child adopted in accordance with requirements of section 101(b)(1)(E) of the Act is not entitled to benefits from a petition filed by the natural parents.

· **Matter of Pagnerre** , 13 I. & N. Dec. 688 (BIA 1971). A stepparent-stepchild relationship may continue after the death of the alien's natural parent terminates the marriage which created the relationship if there is a continuing parent-child relationship.

· *Matter of Stultz* , 15 I. & N. Dec. 362 (BIA 1974 and 1975; Attorney General 1975). Adulterine children, irrespective of the time of birth, should be treated like any other illegitimate children under section 101(b)(1)(B) of the Act.

· *Matter of Teng* , 15 I. & N. Dec. 516 (BIA 1975). Where there is a sham marriage and no actual familial relationship between the stepchildren are not entitled to be considered the children of the U.S. citizen.

· *Matter of Cariago* , 15 I. & N. Dec. 716 (BIA 1976). Retroactive adoption decree does not confer benefits under the Act when actual adoption did not take place prior to the limiting age.

· *Matter of Cho* , 16 I. & N. Dec. 188 (BIA 1977). "Proxy" adoption valid where contracted is generally valid for INS (now USCIS) purposes.

· *Matter of Cabucana* , 16 I. & N. Dec. 217 (BIA 1977). Jurisdiction of the person, as well as jurisdiction over the subject matter is not necessarily a prerequisite for a valid adoption. (Overrules Matter of Dela Cruz, 15 I. & N. Dec. 580 (BIA 1976).)

· *Matter of Au Yeung* , 16 I. & N. Dec. 540 (BIA 1978). An alien, who is admitted to the U.S. as an "eligible orphan" pursuant to section 101(b)(1)(F) of the Act, and is never adopted by the petitioning U.S. citizen "parent", and who leaves the U.S., is not eligible for preference status as the "son" of the petitioning U.S. citizen "parent"since the relationship never came into existence.

· *Matter of Reyes* , 17 I. & N. Dec. 512 (BIA 1980). To be "legitimated" pursuant to section 101(b)(1)(C), the legitimating act must have placed the child in all respects on the same footing as if begotten and born in wedlock.

· *Matter of Mowrer* , 17 I. & N. Dec. 613 (BIA 1981). When the marriage creating the stepparent-stepchild relationship is terminated through divorce, it must be determined whether a family relationship has continued to exist as a matter of fact between the stepparent and stepchild.

· *Matter of McMillan* , 17 I. & N. Dec. 605 (BIA 1981). Persons who become stepchildren through the marriage of a natural parent prior to their 18 th birthday fall within section 101(b)(1)(B) without further qualification (i.e., there is no need to show a close family unit).

· *Matter of Clahar* , 18 I. & N. Dec. 1 (BIA 1981). A child within the scope of the Jamaican Status of Children Act of 1976 is included within the definition of a legitimated "child" as set forth in section 101(b)(1).

· *Matter of Richard* , 18 I. & N. Dec. 208 (BIA 1982); *Matter of Mesias* , 18 I. & N. Dec. 298 (BIA 1982); *Matter of Cherismo* , 19 I. & N. Dec. 25 (BIA 1984). Under the Civil Code of Haiti, as amended by the 1959 Presidential Decree, children born out of wedlock after January 27, 1959, and acknowledged by their natural father have the same rights and obligations as legitimate children. (This precedent is country specific to Haiti.)

· *Matter of Fakalata* , 18 I. & N. Dec. 213 (BIA 1982). In order to prove that customary adoption is valid for immigration purposes, the petitioner must establish that the adoption creates a legal status or relationship which is recognized by the government of the place where it occurred as carrying with it substantial legal rights and obligations.

· *Matter of Drigo* , 18 I. & N. Dec. 223 (BIA 1982); **Matter of Atembe** , 19 I. & N. Dec. 427 (BIA 1986). The beneficiary does not qualify for immigration priority date to which the beneficiary was not entitled at the time of the filing of the visa petition. (Relates to the change in age requirement of section 101(b)(1)(E) for adopted children.)

· *Matter of Oduro* , 18 I. & N. Dec. 421 (BIA 1983). Under Massachusetts law, legitimation of a person born out of wedlock is affected only by an acknowledgment of paternity (or judicial declaration of paternity) and the marriage of his/her natural parents. The LPR petitioner's natural, acknowledged offsprings who were born out of wedlock and whose natural parents never married did not qualify as the petitioner's "legitimated children". (This precedent is specific to Massachusetts.)

· **Matter of Cardoso** , 19 I. & N. Dec. 5 (BIA 1983). Legislation passed on May 21, 1980, in the Republic of Cape Verde resulted in no distinction between legitimate and illegitimate children and all children have equal rights under this law. Consequently, a beneficiary, who is born in Cape Verde on or after October 1, 1976, is deemed the legitimate "child" of his or her natural father under section 101(b)(1)(A) of the Act, whereas a beneficiary who was under eighteen years of age on that date is deemed the legitimated "child" of his or her natural father under section 101(b)(1)(C) of the Act. (This precedent is country specific to Cape Verde.)

· **Matter of Hernandez** , 19 I. & N. Dec. 14 (BIA 1983). To qualify under section 101(b)(1)(C), a change in law making all children legitimate must occur prior to the child's 18th birthday.

· **Matter of Repuyan** , 19 I. & N. Dec. 119 (BIA 1984). Mere visit is not sufficient to fulfill two-year residence requirement under section 101(b)(1)(E).

· **Matter of Awwal** , 19 I. & N. Dec. 617 (BIA 1988). Even where there is an ongoing actual family relationship between a stepparent and a stepchild, that relationship cannot be recognized under section 101(b)(1)(B) of the Act where the marriage creating the step-relationship was a sham. *Matter of Teng* , 15 I. & N. Dec. 516 (BIA l975), clarified.

· **Matter of Vizcaino** , 19 I. & N. Dec. 644 (BIA 1988). Section 101(b)(1)(D) of the Act, as amended by P.L. 99-603, 100 Stat. 3359, is applicable to all visa petitions filed after the date that the law went into effect.

· **Matter of Pineda** , 20 I. & N. Dec. 70 (BIA 1989). Discusses the evidence relevant to establishing a bona fide parent-child relationship, requiring at minimum a showing of emotional and/or financial ties or an active concern by the father for the child's support, instruction, and general welfare for purposes of establishing eligibility under section 101(b)(1)(D) of the Act.

· **Matter of Cuello** , 20 I. & N. Dec. 94 (BIA 1989). Where an adoption has been effected, be it intra-family or otherwise, and the adopted child continues to reside in the same household with the natural parent or parents during the period in which the adoptive parent seeks to establish his or her compliance with the statutory residence requirement of section 101(b)(1)(E) of the Act, the petitioner has the burden of establishing that the adoptive parent exercised primary parental control during that period of residence. Eviden ce of parental control may take many forms, including competent objective evidence that the adoptive parent owns or maintains the property where the child resides, provides financial support and day-to-day care, and assumes responsibility for important decisions in the child's life. The evidence must clearly establish the physical living arrangements of the adopted child, adoptive parents, and the child's natural parents during the period of time in which the adoptive parent seeks to establish compliance wi th the residence requirement of the statute and, where a fraudulent or ad hoc adoption is suspected, during any period following the adoption which the adjudicating officer deems appropriate. Where a petitioner establishes compliance with the statutory requirements of section 101(b)(1)(E) of the Act, demonstrating, where necessary, primary parental control during the parties' residence with one another, the relationship will be presumed bona fide in the absence of evidence indicating otherwise.

· **Matter of Marquez** , 20 I. & N. Dec. 160 (BIA 1990). Rejects a strict statutory interpretation of section 101(b)(1)(E) of the Act, and relies instead upon the legislative history of the statute which indicates that Congress did not intend to recognize *ad hoc* adoptions designed to circumvent the immigration laws. This decision found that an adoptive relationship to be more akin to marital relationships than to step-relationships, and thus, in certain cases, the bona fides of adoptions will be determined. Visa petitions involving the specter of sham adoptions which generally arise in adoptions by a close relative where the relationship between the natural parent and the adopted child does not appear to change subsequent to the adoption will be analyzed under the standards set forth in **Matter of Cuello** , 20 I. & N. Dec. 94 (BIA 1989).

(2) <u>Precedent Decisions Pertaining to a Petition for a Son or Daughter</u> .

· *Matter of Coker* , 14 I. & N. Dec. 521 (BIA 1974). To qualify as a son or daughter for preference classification, the beneficiary of the visa petition must once have qualified as a "child" of the petitioner under section 101(b)(1) of the Act.

· *Matter of Wong* , 16 I. & N. Dec. 87 (BIA 1977). Beneficiary of a visa petition classified as an "unmarried son" or "unmarried daughter" who obtains an immigrant visa and enters the U.S. in that classification, but who at the time of entry was actually married, may be deportable notwithstanding a subsequent annulment is granted *ab initio* .


· *Matter of Aldecoaotalora* , 18 I. & N. Dec. 430 (BIA 1983). Where the beneficiary was divorced for the sole purpose of obtaining immigration benefits and continued to reside with and own property jointly with her former husband in what by all appearances is a marital relationship; such a divorce is considered a sham and is not acceptable for immigration purposes.

---

[1]But see paragraph (d)(3) describing where parentage may be recognized through legitimation where some action is taken post-birth to formalize the legal relationship. In the case of post-birth legitimation, the legal parent-child relationship relates back to the time of birth.

[2]If the petitioner was unable to obtain a statement from the Central Authority in the appropriate COO addressing the child's habitual residence, the interim PM stated the notice criteria applied to adoption decrees issued one month after the publication date – therefore, the notice criteria applies to adoptions issued on or after February 3, 2014.

**21.5 Petition for an Orphan. [Revised introductory paragraph section (d), Added new section (d)(8) AD10-47 (8/27.2010). ]**

**REFERENCES**

Immigration and Nationality Act: **101(b)(1)(E)** ; **101(b)(1)(F)** ; **101(b)(2)** ; **201(b)(2)** ; **204(d)** ; and **205**

Regulations: **8 CFR 103.2** ; **8 CFR 204.1** ; **8 CFR 204.2** ; **8 CFR 204.3** ; **8 CFR 205.1** ; and **8 CFR 205.2**

(a) <u>Background</u> .

(1)   <u>History</u>.

The first laws relating to the immigration of foreign-born orphans to the United States were temporary. The Displaced Persons Act of 1948 contained the first of these provisions. Language relating to orphans became a permanent part of the Act in 1961.

The current definition of "orphan" (with several amendments over the years) was adopted in 1965. In enacting this legislation, Congress was primarily concerned with the welfare of the children. USCIS (and its predecessor) has always attempted to provide expeditious processing of orphan petitions and has kept its documentary and regulatory requirements at a minimum.

(2)   <u>Filing Requirements</u> .

As with all family-based petitions filed with USCIS, officers should be familiar with the general filing instructions (i.e., jurisdiction, acceptable evidence, translation of foreign documents, requests for additional evidence, etc.) found at **8 CFR 103.2** . The regulations at **8 CFR 204.1** and **204.3** contain specific information concerning the proper form, place, and procedure for filing an orphan petition. These regulations also discuss eligibility requirements of petitioners and beneficiaries and provide for advance processing of orphan petitions. 8 CFR 204.1 discusses the general documentary requirements for petitions filed under **section 204** of the Act. 8 CFR 204.3 specifically discusses the evidence and information

required to be submitted in orphan cases, and discusses preliminary processing of an orphan petition which is not yet fully documented.

(3)   Forms.

- Forms

- **Form I-600A** , Application for Advance Processing of Orphan Petition, is used by the prospective adoptive parent(s) (PAP) to determine the eligibility of the PAP to adopt a child before a child is identified. The Form I-600A is also used by the PAP if the child has been identified and the PAP intends to travel abroad to adopt the child or to file a **Form I-600** , Petition to Classify Orphan as an Immediate Relative, at an overseas office while in the country of the child's habitual residence. The filing fee listed in **8 CFR 103.7** must be submitted with the Form I-600A, along with any required fingerprinting fee.

- **Form I-600** , Petition to Classify Orphan as an Immediate Relative, is used once an orphan has been identified. If the Form I-600 is filed while there is a Form I- 600A pending or within 18 months of a favorable decision on a Form I-600A, no new filing fee is required for one child, or for more than one child if they are natural siblings.

(4)   Information for USCIS Officers .

In addition to the information available to the public, officers may also avail themselves of the information provided on the intranet adjudications portal. Any more complex policy questions that are not addressed in this location should be vetted through each office's chain of command.

(b)   Adjudication of Form I-600A.

Proper adjudication of the **Form I-600A** will include a thorough review of each answer on the application, inspection of all evidence submitted with the application, and reference to the pertinent law, regulations, precedent decisions, and current policy. All processing steps in the Form I-600A Standard Operating Procedures (SOP) must be followed.

(1)   Jurisdiction and Proper Filing .

If the PAP is residing in the United States, the **Form I-600A** should be filed with the USCIS Lockbox facility or in accordance with instructions on the form. Form I-600A will then be routed to, and adjudicated at, the field office having jurisdiction over the PAP's place of residence.

PAPs residing outside the United States may file **Form I-600A** with: 1) the USCIS overseas office with jurisdiction over their residence abroad, or 2) the appropriate USCIS Lockbox for routing to the USCIS domestic office with jurisdiction over their proposed residence in the United States.

If residing temporarily in Canada, **Form I-600A** must be filed with the USCIS Lockbox facility. Form I-600A will then be routed to, and adjudicated at, the field office having jurisdiction over the PAP's proposed place of residence. The Form I-600A is not properly filed unless it has been signed by the PAP and his or her spouse (if married), and is accompanied by the correct fee.

Acknowledgement Letter: Upon receipt of the properly filed **Form I-600A** the field office must send an acknowledgment letter to the PAP and attorney or designated representative if any.

(2)    Evidence That the PAP (and Spouse, If Married) Is Prima Facie Eligible .

- The PAP must be a United States citizen. See

- The PAP must be a United States citizen. See **8 CFR 204.3(b)** .Therefore, evidence of such citizenship must be submitted with the **Form I-600A** . Such evidence consists of the PAP's birth certificate, an unexpired United States passport, or a certificate of naturalization. If such primary evidence is unavailable, secondary evidence may be considered, such as a baptismal certificate issued within two (2) months of birth or affidavits of two (2) United States citizens who have personal knowledge of the PAP's birth in the United States. See **8 CFR 204.1(g)**

- If the PAP is married, his or her spouse must be a United States citizen or be in lawful immigration status in the United States. Evidence of the spouse's citizenship or lawful immigration status must be submitted with the **Form I-600A** .

Evidence of lawful immigration status may consist of a Form I-551 (Permanent Resident Card), a foreign passport with an I-551 stamp, a foreign passport with an unexpired visa and a valid admission stamp, or a currently valid Form I-94 or other evidence of lawful status in the United States. Although lawful permanent resident (LPR) status is not required of the spouse, a review of the lawful immigration status of the spouse should be evaluated by the officer.

If the spouse does not have LPR status, the current immigration status (nonimmigrant, parole, etc.) and the reason and impact of this status on the stability of the home should be reviewed. For instance, some spouses may elect to retain nonimmigrant E status for tax purposes. Or, there may be instances where a United States citizen who ordinarily resides abroad is temporarily assigned to a job in the United States and the spouse may be eligible for a valid nonimmigrant status during the term of the United S tates citizen's temporary assignment to the "United States". The lack of LPR status of the spouse does would not preclude a favorable determination by USCIS.

- The PAP must be a United States citizen.

- If the PAP is married, proof of such marriage must be submitted. This includes evidence of the termination of all prior marriages, if applicable. Officers must be aware that PAPs who are separated are not eligible for approval of **Form I-600A** until the separation is over, either because the divorce is final, or both are adopting together, as married. There are no age restrictions on a married couple.

- If the PAP is not married, he or she must be at least 24 years of age at the time of filing, provided that he or she will be at least 25 years of age at the time of adoption and filing the Form I-600.

(3)   <u>Fingerprinting Requirements</u> .

The PAP, the PAP's spouse, and any adults 18 years of age and older residing in the PAP's residence must be fingerprinted. If the PAP is residing in the United States, USCIS will schedule the fingerprinting at an Application Support Center (ASC).

If the PAP is residing outside of the United States, fingerprints may be done at a U.S. Embassy, consulate, military installation or USCIS office. If the **Form I-600A** is ultimately denied, and the criminal record was a ground for such denial, a copy of the denial and of the record of proceeding of the Form I-600A should be made a part of the A file. All required procedures regarding fingerprints must be followed including those relating to "idents," and "unclassifiable" fingerprints.

(4)   <u>Home Study Requirements</u> .

The Intercountry Adoption Universal Accreditation Act of 2012 (UAA), effective July 14, 2014, imposes certain requirements on any case that does not meet the transition criteria outlined in UAA Section 2(c). The UAA has significant implications for Form I-600A and Form I-600 adjudications, including home study preparation and required home study elements, among others. See Chapter 21.5(e) to determine whether the UAA applies to a particular case and what to do if it does.

(A)   A valid, original home study must be submitted within one year of the filing of a **Form I-600A** . If a home study is not submitted within one year of the filing of a Form I-600A, the Form I-600A must be denied pursuant to **8 CFR 204.3(h)(5)** . This home study, or the most recent update of the home study, must be less than six (6) months old at the time of submission and must contain the original signature(s) of the home study preparer(s). The following information must be disclosed in the home study:

- The PAP must be a United States citizen.

- At least one personal interview with each prospective adoptive parent and each adult household member over the age of 18 was conducted by the home study preparer. Telephonic or video interviews are not adequate.

- If the PAP is not married, he or she must be at least 24 years of age at the time of filing, provided that he or she will be at least 25 years of age at the time of adoption and filing the Form I-600.

- At least one home visit was conducted.

- A detailed description of the living accommodations has been provided.

- An assessment of the physical, mental, and emotional capability of the applicant and his or her spouse, if married, to properly parent a child has been conducted.

- An assessment of the applicant's finances has been conducted.

- The applicant, his or her spouse, and all adults 18 years of age and older that are residing in the applicant's residence were asked whether they had any history of abuse (sexual, substance, or child), domestic violence, or any other criminal history even if it did not result in an arrest or conviction. This information must be checked against the fingerprint check. Failure to disclose an arrest, conviction, or history of substance, sexual and/or child abuse, and/or domestic violence to the agency conducting the home study and to USCIS may result in the denial of the petition or application. A new petition or application may not be submitted for reconsideration until a one year period has elapsed from this denial.

- If the state where the applicant resides has a child abuse registry, evidence that the applicant, his or her spouse, and all adult members of the applicant's household were checked against this registry must be included, and the results of the check must also be included. Failure to cooperate in having child abuse registries checked WILL result in denial of the application or petition. Any new application or petition filed within a year of such denial will also be denied.

- If the state where the applicant resides requires that the home study preparer can check a child abuse registry only with a person's consent, the applicant, his or her spouse, and all adult members of the household must give this consent so that the home study preparer can check the registry. If the state's law provides that only the subject of the child abuse registry may obtain information, then the applicant, his or her spouse, and all adult members of the household must obtain the information from the registry and present it to the home study preparer.

- If the state where the applicant resides does not have a child abuse registry, or will not release information to the home study preparer or to the applicant, his or her spouse, and all adult members of the household, this must be noted in the home study.

AR2022_300306

- The applicant, his or her spouse, and all adults 18 years of age and older that are residing in the applicant's residence were asked whether they were previously rejected as prospective adoptive parents or previously received an unfavorable home study.

- The number of orphans that the PAP may adopt must be provided in the home study.

- If there are any restrictions based on gender, age, and/or nationality of the orphan that the PAP may adopt, this must be delineated in the home study.

- If the PAP has been approved to adopt a handicapped or special needs orphan, this must be noted in the home study.

- A summary of the counseling given to the PAP(s) and of any plans for post-placement counseling is discussed in the home study.

- There is a specific approval and discussion of the reasons for approval contained in the home study.

- If the applicant is residing in the United States, evidence of the home study preparer's certification and statement of authority to conduct home studies must be included. Also, some states require a review of home studies. Evidence of this review must be submitted when necessary.

(B)     The officer who is adjudicating the **Form I–600A** must be satisfied that proper care will be provided for the orphan. Pursuant to **8 CFR 204.3(h)(2)** , if there is reason to believe that a favorable home study was based on inadequate or erroneous evaluation of all of the facts, the officer must attempt to resolve these issues with the home study preparer, the applicant(s), and the state agency that reviewed the home study (if any). Issues that may need to be addressed include, but are not limited to: criminal history; disabilities of the applicant(s); threatening/dangerous behavior when working with USCIS; and financial issues.

(C)     If the home study will be more than six (6) months old at the time of submission to USCIS, the applicant must ensure that it is updated by the home study preparer. Also, if there have been any significant changes in the applicant(s) circumstances (such as change of residence, marital status, criminal history, financial resources, and/or the addition of one or more children or other dependents to the family), the applicant must ensure that an amended home study addressing the changed circumstances is submitt ed to USCIS.

(5)     Pre-adoption Requirements .

If the **Form I-600A** indicates that the child is to be adopted or re-adopted in the United States, evidence must be submitted to establish that the pre-adoption requirements of the state of the child's intended residence, if any, have been met. If the PAP is unmarried and intends to adopt or re-adopt the child in the "United States", it must be established that adoption by an unmarried person is legal in the state of the child's intended residence.

(6)     Child from a Hague Convention Country .

The Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption ("Hague Adoption Convention") entered into force for the United States on April 1, 2008. AFM **Chapter 21.6** discusses the adjudication of cases under the Hague Adoption Convention.

The Hague Adoption Convention and the implementing regulations, 8 CFR 204.300 through 204.314, generally apply when a U.S. citizen habitually resident in the United States adopts a child habitually resident in a Hague Convention country on or after April 1. 2008. If the Convention and these regulations apply to a case, then the child may not immigrate as a "orphan" under **section 101(b)(1)(F)** of the Act.

Section 505(b) of the Intercountry Adoption Act, 8 CFR 203.3(a)(2) and **8 CFR 204.300(b)** , provide, however, that a case governed by the Hague Adoption Convention can continue as an non-Hague orphan case if the PAPs filed a **Form I-600A** or a **Form I-600** before April 1, 2008. Further, PAPs may file a Form I-600 or Form I-600A if they completed a full and final adoption of a child habitually resident in a Hague Convention country prior to April 1, 2008.

In a case in which the adoption will occur after April 1, 2008, USCIS adjudicators will interpret 8 CFR 204.300(b) to mean that a Form I-600A or Form I-600 is grandfathered as follows:

- The PAP must be a United States citizen.

- A Form I-600 is "grandfathered," and can be adjudicated after April 1, 2008, under the orphan regulations *only* if it is filed before the date on which the Form I-600A approval (including an extension of a prior approval) expires.

- A Form I-600A is "grandfathered," and can be adjudicated after April 1, 2008, under the orphan regulations *only if*:

    o the original Form I-600A was actually filed before April 1, 2008; OR

    o if a second Form I-600A was filed after April 1, 2008, but it was filed on or before the date on which the approval (including an extension of a prior approval) of a Form I-600A filed before April 1, 2008 expired, *and* a corresponding Form I-600 was not filed on the basis of the prior Form I-600A.

---

**Example**

**Form I-600A** was approved, with the approval expiring on August 1, 2008. The applicant requested and obtained a one-time extension, with the new approval period expiring February 1, 2010. In January 2010, they still have not filed a Form I-600. On February 1, 2010, they file a new Form I-600A. The "grandfathering" of the original Form I-600A will be extended to the new Form I-600A, since it was filed before the approval of the original Form I-600A expired.

---

**Example**

**Form I-600A** was approved, with the approval expiring on August 1, 2008. The applicant requested and obtained a one-time extension, with the new approval period expiring February 1, 2010. In January 2010, they still have not filed a **Form I-600** . However, they do not file a new Form I-600A until February 2, 2010. The "grandfathering" of the original Form I-600A does not extend to the new Form I-600A, since it was filed after the approval of the original Form I-600A expired.

---

**Example**

**Form I-600A** was approved, with the approval expiring on August 1, 2008. The applicant did not seek an extension. On September 1, 2008, the applicant files a new Form I-600A. This new Form I-600A is not grandfathered, since it was filed after April 1, 2008, and after the approval of the original Form I-600A expired.

---

**Example**

**Form I-600A** was approved for one child, with the approval expiring on August 1, 2008. One Form I-600 was filed on July 31, 2008. Since the Form I-600 was filed, no further extension of the Form I-600A approval is permitted. Also, since the Form I-600 was filed, a new Form I-600A for an additional child, or a reopening and re-approval for more than one child, would not be "grandfathered."

---

**Example**

**Form I-600A** was approved for two children, with the approval expiring on August 1, 2008. One **Form I-600** was filed before August 1, 2008, and the applicant requested and obtained an extension of the

approval. The extension expires February 1, 2010. The applicant then files a Form I-600 for an additional child. The Form I-600 is "grandfathered," since it is based on a "grandfathered" Form I-600A for more than one child. No additional children may be adopted from a Hague Convention country based on the Form I-600A, however. To adopt a third or subsequent child, the Hague Adoption Convention process will apply.

(7)   <u>Adjudicative Issues</u> .

The purpose of **Form I-600A** is to determine the eligibility and suitability of the prospective adoptive parent(s) to adopt. Although a favorable home study is required to establish eligibility, it is not the end of the adjudicator's review. The adjudicating officer must make an independent evaluation of the merits of the case and the home study and any other evidence the adjudicator is aware of.

(c)   <u>Post-adjudication Actions</u> .

(1)   <u>Approvals</u> .

Prepare Form I-171H (Notice of Favorable Determination Concerning Application for Advance Processing of Orphan Petition) or Form I-797 (Notice of Action, if used in your office) in all cases.

| <u>**Note**</u> |
|---|
| Remember that all security checks must be completed and current before any decision. |

(A)   If the PAP intends to travel overseas to adopt or intends to travel abroad to escort a child to be adopted in the United States and intends to file the **Form I-600** while abroad:

- The PAP must be a United States citizen.

- Forward the **Form I-600A** and the home study to the National Visa Center (NVC).

- Forward the "Visas 37" (Form I-933) (see **Appendix 21-2** ) to the NVC.

- Provide the PAP with a copy of the Form I-171H/I-797

AR2022_300310

- If the **Form I-600A** was accompanied by a **G-28** completed by an attorney or by an accredited representative or an agency that has been recognized by the Board of Immigration Appeals pursuant to **8 CFR 292.2** , provide a copy of the Form I-171H/I-797 to the attorney or representative. (see NOTE)

- Retain a copy of the Form I-171H/I-797 with the number of children approved and the date of approval, and a copy of the "Visas 37" cable (Form I-933) (see AFM **Appendix 21-2** ) and document date of mailing.

| Note |
| --- |
| To forward the approval packet to the NVC expeditiously, the PAP must provide a prepaid envelope from a courier that provides express mailing service. |

(B)      If the PAP intends to finalize the adoption in the United States or intends to file the **Form I-600** stateside after traveling abroad:

- The PAP must be a United States citizen.

- Provide the PAP with a copy of the Form I-171H/I-797.

- If the **Form I-600A** was accompanied by a **Form G-28** completed by an attorney or by an agency that has been recognized by the Board of Immigration Appeals pursuant to **8 CFR 292.2** , provide a copy of the Form I-171H/I-797 to such entity.

| Note |
| --- |
| USCIS cannot recognize a **Form G-28** from an adoption agency unless the Board of Immigration Appeals has recognized the agency as an agency authorized to represent others. In general, adoption agencies are not accredited by the Board. Information about the particulars of any case can only be given to the PAP, or to an attorney or accredited representative with a Form G-28 on file. The Privacy Act forbids disclosing information about the case to anyone else, unless the PAP has signed a written consent to the disclosure. |

- The PAP must be a United States citizen.

- Retain a copy of the Form I-171H/I-797, the **Form I-600A** , and all supporting documents in a file folder. Mark the approval date on the outside of this file folder.

(2)      <u>Extensions</u> .

If the PAP intends to extend an approved **Form I-600A** beyond the 18-month validity period, he or she may request a *one* -time, no-fee extension prior to the expiration of an approved Form I-600A.

(A)     PAP seeking a one-time, no-fee extension must submit a written request with signature stating this intent to the USCIS office that originally approved his or her Form I-600A.

(B)     The following should be submitted with a request for extension of a **Form I-600A** :

- The PAP must be a United States citizen.

- A copy of the current and valid approval notice (I-171H or I-797),

- An updated home study, as well as a copy of the original home study, and

- Request for re-fingerprinting (if necessary).

(C)     If a request for an extension is granted for **Form I-600A** , it will not expire until eighteen months from the expiration of the initial Form I-171H/I-797 – not from the date USCIS granted the extension. A request of a duplicate approval notice may be obtained by filing a **Form I-824** with fee with the USCIS office which originally granted approval.

(D)     If a request for an extension of **Form I-600A** is denied, it does not serve as a revocation or denial of the original approval notice. For this reason, the denied extension request cannot be appealed or challenged. To extend the application, the PAP has the right to file a new Form I-600A, with the required fee and documentation even if a request for extension has been denied.

(E)     If the **Form I-600A** extension is approaching expiration, the PAP must file for a "Grandfathered" I-600A **with fee** in order to maintain a valid Form I-600A approval under the Orphan process. In such cases, a "grandfathered" clause is an exception that allows an old rule (orphan regulations) to continue to apply to an existing situation, when a new rule (Hague regulations) will apply to all.

To be "Grandfathered" for Form I-600A, all of the following requirements must be met:

- The PAP must be a United States citizen.

- The original Form I-600A was filed before April 1, 2008,

- Extension of Form I-600A remains valid,

- **No** Form I-600 has been filed for authorized child(ren) (i.e. the total number of Forms I-600 have not been filed for the number of children the original Form I-600A was approved for. Any additional children, above the initial number desired, must be adopted from non-Hague countries.)

- All fees associated with a Grandfathered Form I-600A are paid and all necessary documentation submitted.

The purpose of the Grandfathered **Form I-600A** is to maintain the validity of the petition if the PAP has not completed the adoption within the validity period of the Form I-600A extension. Therefore, a Form I-600A extension must be granted before filing for a Grandfathered Form I-600A. The second "grandfathered" Form I-600A must be submitted, along with all associated fees and documentation, before the expiration of the Form I-600A extension of approval, but no earlier than 90 days prior to its expiration.

(3)    <u>Denials</u>.

If **Form I-600A** cannot be approved, the officer must explain in writing the specific reasons for denial. Remember that, pursuant to **8 CFR 103.2(b)(16)**, a notice of intent to deny is not required unless an intended denial is based upon information or evidence of which the applicant is unaware.

(4)    <u>Amendments and Changes to the Home Study after Approval</u>.

If a significant change occurs in the PAP's household, the PAP must submit an amended home study that reflects the significant change to USCIS.

Significant changes include, but are not limited to, changes in the following:

- The PAP must be a United States citizen.

- Residence of PAP;

- Marital Status;

- Criminal History, Abuse History, or other Derogatory Information;

- Financial Resources;

- Additional children, dependents, or adults residing in the household;

- Change in characteristics of the child the PAP is approved to adopt.

If the significant change (other than a change in marital status) occurs after approval of **Form I-600A** , the PAP must submit the amended home study to the USCIS office that approved the Form I-600A or extension. A written request for an updated approval notice must also be submitted. If USCIS concludes that approval of the Form I-600A remains appropriate, USCIS should send an updated Form I-171H or Form I-797 approval notice that reflects any changes.

If a separate Form I-600A was not submitted (i.e. PAP filed the Form I-600A and Form I-600 concurrently), the PAP must submit the amended home study and written request to the USCIS office that approved the Form I-600. The request cover letter must be signed by the PAP and the amended home study by the preparer.

If the significant change that occurs after approval of the Form I-600A or Form I-600 is a change in marital status, the PAP cannot submit a request for an updated approval notice. The PAP must instead submit a new Form I-600A with a new filing fee, along with the amended home study. If the PAP is newly married, the spouse must also sign the new form.

(5)   <u>Change of Country or Post Where the PAP Wishes to File **Form I-600** <u>after</u> **Form I-600A** <u>Approval</u></u> .

- The PAP must be a United States citizen.

- All requests must be submitted in writing to the field office.

- There is no limit to the number of change of country or post requests that the PAP may submit.

- There is no fee for the first change of country or post request. For any subsequent change of country request, the PAP must submit **Form I-824** , Application for Action on an Approved Application or Petition, with fee.

- The PAP may need to submit an amended home study if the recommendation for the child to be adopted was country specific.

(d)   <u>Adjudication of Form I-600</u>. Except as provided in sections (d)(8), (9) and (10), proper adjudication of the **Form I-600** will include a thorough review of each answer on the petition, inspection of all evidence submitted with the petition, and reference to the pertinent law, regulations, precedent decisions, and current policy. All processing steps in the Form I-600 Standard Operating Procedures (SOP) must be followed. As a result of the UAA, effective July 14, 2014, any case that does not meet certain criteria must also comply with the UAA, which has significant implications for Form I-600A and Form I-600 adjudications, including: home study preparation and required home study elements; the definitions

of home study preparer, applicant, and adult member of the household; duty of disclosure obligations; and identifying a primary provider. See Chapter 21.5(e) to determine whether the UAA applies to a particular case and what adjudicative steps are necessary if the UAA applies.

(1)     Jurisdiction and Proper Filing .

(A)     **Form I-600** filed domestically should be sent to the USCIS Lockbox facility in accordance with the instructions on the form; however, if a favorable determination has been made on a filed **Form I-600A**, and if the petitioner travels abroad to adopt or locate an orphan, the Form I-600 may be filed with the USCIS overseas office, the U.S. Embassy or consulate having jurisdiction over that country. The Form I-600 is not properly filed unless it has been signed by the petitioner and his or her spouse (if married).

(B)     A filing fee is not required if the **Form I-600** is filed while a **Form I-600** is pending or within eighteen (18) months of a favorable decision on a previously filed Form I-600A. In all other cases, a Form I-600 is not properly filed unless it is accompanied by the correct fee.

(C)     Petitioners may adopt more than one child, but he and/or she must file separate **Form I-600** for each additional child, to the maximum number approved on the Form **I-600A** . If the children are siblings, no additional fee is required. If the children are not siblings, the petitioner must pay the Form I-600 filing fee for each child beyond the first. An A-file must be created for each child for whom a Form I-600 is filed.

(D)     If multiple children are adopted at different times throughout the eighteen-month **Form I-600A** validity period, an amended home study addressing the addition of a child into the home and an amended Form I-600A approval notice will be required.

(E)     An A-file in the name of the child must be created if one does not exit. See the Record Operation Handbook and **Form I-600** SOP.

(F)     An acknowledgement letter must be sent to the PAP and attorney or designated representative.

(2)     Adjudicative Issues .

The purpose of the **Form I-600** is to determine whether the child the petitioner has identified qualifies as an "orphan" under **INA 101(b)(1)(F)** . Under INA 101(b)(1)(F), an orphan is a child who:

- The PAP must be a United States citizen.

- Is under the age of sixteen (16) at the time the petition is filed (or under the age of eighteen (18) if adopted or coming to be adopted by the same adoptive parent of the natural sibling who qualifies/qualified as an orphan or adopted child as defined under **INA 101(b)(1)(E)** or **(F)** while under the age of 16); and

- Has no parents because of the death or disappearance of, abandonment or desertion by, or separation or loss of both parents;

OR

- The sole or surviving parent is incapable of providing proper care and has, in writing, irrevocably released the child for emigration and adoption in accordance with the laws of the foreign-sending country.

(3)    <u>Stepparents</u> .

(A)    The situation of stepparents can present special issues. Because of **INA 101(b)(1)(B)** and **101(b)(2)** , USCIS must consider the existence of a stepparent in determining whether a minor is an orphan. Note that the special provisions set forth in this paragraph **_do not_** apply to the adjudication of **Form I-130** , but only to **Form I-600** cases.

(B)    In at least some countries and in several States a stepparent does not have any <u>legal</u> parent-child relationship to a stepchild. Thus, the stepparent may not have any right or duty to care for a minor, but also may not have any legal standing to perform any action terminating the non-existent rights and duties.

Although USCIS must take note of the existence of the stepparent, the policy is that a stepparent will not be considered a minor's parent, solely for purposes of approval or denial of an orphan petition, if the petitioner establishes that, under the law of the foreign sending country, a stepparent has no legal parent-child relationship to a stepchild. The burden of establishing that a stepparent has no legal parent-child relationship to a minor rests with the petitioner. The petitioner may not simply assert that the stepparent has no legal parental rights in relation to the child. See AFM Chapter 21.5(d)(5)(D).

Proof that the stepparent has no legal relationship to the stepchild will distinguish a pending Form **I-**

**600** case from *Matter of D-*, 8 I & N Dec. 628 (RC 1960). The case held that a minor did not qualify as an orphan because:

- her mother was not a sole parent, because she had remarried; and,

- the petitioner was not married, and under the law at the time unmarried persons could not file I-600s.

It does not appear from that decision that the petitioner raised the argument that the stepparent had no legal relationship to the minor, nor that this possibility was actually considered.

(C)     The stepparent must be considered a parent, for purposes of adjudication of a **Form I-600** , if:

(i)     The stepparent actually adopted the stepchild as specified in **section 101(b)(1)(E)** of the Act;

(ii)     Under the law of the foreign sending country, the marriage between the parent and stepparent is itself enough to create a legal parent-child relationship between the stepparent and stepchild; or

(iii)     The stepparent has obtained legal custody of the stepchild so that the stepparent does have a legal relationship to the stepchild.

(D)     If an officer determines that the intended beneficiary has a stepparent, the officer should request additional evidence from the petitioner, including:

(i)     A copy (with a certified English translation) of the relevant statutes, regulations or court judgments or other legal authority from the foreign sending country addressing whether a stepparent has a legal parent-child relationship to the stepchild; and

(ii)     A statement from the stepparent (with a certified English translation) indicating that the stepparent has neither adopted the stepchild nor obtained any other form of legal custody of the stepchild, and has no interest in doing so.

(E)     If an officer is unsure of the legal status of the relationship between a stepparent and stepchild, the officer may consult his or her district counsel, or request guidance and, if necessary, a Library of Congress opinion, through USCIS Headquarters.

(4)     Evidentiary Requirements if No Form I-600A Was Filed Previously (Combination Filing) .

While the majority of petitioners do file a **Form I-600A** prior to filing a **Form I-600** , this is not a regulatory requirement. Thus, a petitioner who files a Form I-600 without a valid Form I-600A is considered to be filing both the Form I-600 and Form I-600A concurrently. As such, in addition to the documentary requirements relating to the identified orphan discussed above, all documentation that must be submitted with a Form I-600A must also be submitted. In these cases, the Form I-600 must be filed with the USCIS Lockbox facility if PAP is residing in the United States. If residing abroad, Form I-600 must be filed with the USCIS overseas office having jurisdiction over the PAP's residence. Only USCIS has jurisdiction over a Form I-600A.

(5)     Documenting That a Child Is an Orphan under INA 101(b)(1)(F) and Conducting Form I-604 Determinations .

(A)     The Relationship between the Form I-600 and the Form I-604.

(1) *All Forms I-600 require completion of a Form I-604.*

Under U.S. Department of Homeland Security (DHS) regulations, a Form I-604, Determination on Child for Adoption, informally referred to as an "orphan determination," must be completed in every orphan case. 8 CFR 204.3(k)(1). The Form I-604 must be completed by either USCIS overseas officers or State consular officers in the child's country of origin, or the country where the adoption or grant of legal custody is completed. When it is not possible to complete the Form I-604 in the child's country of origin or the country where the adoption is completed, then officers designated by USCIS or State with jurisdiction over the specific location should complete the Form I-604. In general, if USCIS has an office in the child's country of origin and has assumed jurisdiction of Form I-604 determinations, USCIS completes the Form I-604 abroad, while State completes the Form I-604 if USCIS does not have an office in the child's country of origin. Regardless of who completes the Form I-604, its primary purpose is to verify that the child (i.e., the beneficiary) qualifies for orphan classification.

(2) *Where the Form I-600 is filed affects the timing of and who is responsible for completing the Form I-604.*

Under DHS regulations and the Form I-600 instructions, the petitioner may generally file a Form I-600 petition domestically or abroad. 8 CFR 204.3(g). There are certain countries, however, where USCIS has designated one filing location - either domestic or abroad. The current domestic filing location for the Form I-600 petition is the USCIS Dallas Lockbox, with the USCIS National Benefits Center (NBC) adjudicating the petition.

When a petitioner files a Form I-600 petition domestically, the Form I-604 determination is normally not completed until after USCIS has approved the Form I-600 petition and sent it to a Consular Post ("Post"). If USCIS has "articulable concerns" that can only be resolved through the Form I-604 determination, then the adjudicating NBC officer may request that a Form I-604 determination be completed before the final adjudication of the Form I-600 petition. 8 CFR 204.3(k)(1) . At present, generally a consular officer in the child's country of origin completes the Form I-604 determination for a domestically approved Form I-600 petition unless USCIS has assumed jurisdiction over the Form I-604 determination.[2]

When a petitioner files a Form I-600 petition abroad, the USCIS or consular officer completes the Form I-604 determination before adjudicating the Form I-600 petition and uses the information gathered during the Form I-604 determination when adjudicating the Form I-600 petition:

1.   If the petitioner filed the Form I-600 petition with a USCIS international office in the child's country or where the adoption or grant of
     legal custody is completed, the USCIS officer will complete both the Form I-604 determination and the Form I-600 adjudication.

2.   If the petitioner filed the Form I-600 petition with an embassy or consulate, then the consular officer completes the Form I-604 determination
     prior to the Form I-600 adjudication and visa screening.

*See* Chapter 21.5(d)(5)(H) "How and When to Complete Form I-604" for a breakdown of Form I-600 filing locations and who will be responsible for completing the Form I-604 determination and at what point in the process.

(3) *The Form I-600 adjudication and the Form I-604 determination are based on DHS authority.*

The adjudication of a Form I-600 and the completion of the Form I-604 determination are the exercise of the DHS Secretary's authority, delegated to USCIS. INA 103(a) and 204(b). DHS further delegated authority to consular officers under certain circumstances to approve orphan petitions and to complete Form I-604 determinations. 8 CFR 204.3(k)(2).

Under this delegated authority, a consular officer has the authority to approve, but not deny, a Form I-600 petition. In addition, while consular officers may ask petitioners for additional information, a consular officer is not authorized to issue a Request for Evidence, a Notice of Intent to Deny, or a Notice of Intent to Revoke. If the consular officer believes a Form I-600 petition filed at his or her Post is "not clearly approvable," the consular officer must refer the Form I-600 petition to USCIS. 8 CFR 204.3(k)(2). See Chapter 21.5(d)(5)(I) "How to Refer Cases to USCIS as "Not Clearly Approvable" for more on this topic.

(B) <u>The Burden and Standard of Proof in Form I-600 Orphan Adjudications</u>.

The burden and standard of proof for Form I-600 petitions differ depending on whether the petition has been previously approved by USCIS domestically or has not yet been adjudicated. Officers must understand the applicable burdens and standards of proof.

*(1) Burden and Standard of Proof to Approve Form I-600.*

The burden of proof is on the petitioner to establish eligibility for the benefit sought.[3] This determination may include questions of foreign law. When a petitioner relies on foreign law to establish eligibility for the beneficiary, the application of the foreign law is a question of fact, which must be proved by the petitioner.[4] Therefore, the burden of proof is on the petitioner to establish that the beneficiary is eligible for a Form I-600 approval.

The standard of proof for establishing eligibility is that of a "preponderance of the evidence.[5]" The petitioner meets this standard of proof if the evidence of record would permit a reasonable adjudicator to conclude that the claim that the beneficiary is an orphan is probably true.[6] If the petitioner submits relevant, probative, and credible evidence that leads the adjudicator to believe that the claim is "probably true" or "more likely than not" to be true, the petitioner satisfies the standard of proof.[7] Certainty is not required. Approval is appropriate if it is at least more likely than not that the beneficiary qualifies for classification as an orphan than that the beneficiary does not qualify. By contrast, denial is appropriate if the adjudicator can articulate "a material doubt" based on the evidence of record that leads the adjudicator to believe "that the claim is probably not true.[8]"

In applying the "preponderance of the evidence standard," an officer must consider all of the evidence and decide, based on a totality of the evidence, whether it is more likely than not that the beneficiary is eligible for orphan classification. The evidence presented in some cases may include inconsistencies, which additional explanation or evidence may or may not overcome. Minor inconsistencies or omissions that are not material to the determination of orphan status and eligibility generally, in and of themselves, do not support a denial or make an otherwise approvable Form I-600 petition not clearly approvable. However, multiple minor inconsistencies or omissions may lead to a denial or a not clearly approvable finding when looking at the evidence as a whole. Officers must determine whether gaps or inconsistencies in the record are material and whether they overcome other evidence in the record indicating the beneficiary meets the definition of an orphan. Officers should carefully weigh the evidence and may assign differing weight to evidence in the record, depending on the reliability of that evidence. See the USCIS AFM Chapter 11.1 for further discussion of the appropriate evidence to be considered in adjudications.

(2) *Burden and Standard of Proof For Revocation after Form I-600 Approval.*

If USCIS finds that there is "good and sufficient cause" for revocation after Form I-600 has been approved, USCIS may issue a Notice of Intent to Revoke (NOIR).[9] If USCIS has properly issued a NOIR, the petitioner still bears the burden of establishing that the beneficiary qualifies for the benefit sought.[10]

If the petitioner fails to overcome the grounds for revocation stated in the NOIR in his or her response to the NOIR or even if the petitioner fails to respond to the NOIR, USCIS may revoke the approval of a Form I-600, only if USCIS establishes "good and sufficient cause" for revocation. "Good and sufficient cause" for revocation must be based upon adverse information known to the petitioner, including errors of fact or law, which would have resulted in a denial had the information been known to USCIS at the time the petition was adjudicated because the petitioner would have failed to meet his or her burden of proof at that time.[11] Generally, such adverse information must be specific and material to the case and based upon detailed evidence. Concerns that are "conclusory, speculative, equivocal, and . . . irrelevant" to eligibility do not warrant revocation.[12] Instead, only factual allegations that are supported by probative evidence in the record and that call the beneficiary's eligibility into question can support revocation.[13]

(3) *Evidentiary Requirements.*

USCIS regulations and policy specify that petitioners should submit primary evidence when available. If primary evidence is not available, prospective adoptive parents must follow 8 CFR 103.2(b)(2)(i) to demonstrate its unavailability and should submit secondary evidence. Primary evidence is evidence that, on its face, proves a fact. For example, primary evidence of identity and age is a birth certificate. Likewise, primary evidence of death is a death certificate. However, not all countries have the same kind of documentary practices as the United States.

Generally, delayed birth certificates are not given the same weight as birth certificates issued at the time of birth due to the potential for fraud. See Matter of Bueno-Almonte, 21 I&N Dec. 1029, 1032-33 (BIA 1997); Matter of Ma, 20 I&N Dec. 394 (BIA 1991); and Matter of Serna, 16 I&N Dec. 643 (BIA 1978). However, in certain countries, and possibly just in particular regions within a country, children may not be issued birth certificates until they become involved in an intercountry adoption. An officer must determine the reliability of the facts contained in the delayed certificate in light of the other evidence in the record, and should not reject the delayed certificate's evidentiary value simply because it was not issued contemporaneous with the child's birth. Officers should consult the country-specific reciprocity table (accessible on www.travel.state.gov ) to determine a document's availability and reliability.

When a birth certificate is not available, a prospective adoptive parent must explain why it is not available, and provide "other proof of identity and age." 8 CFR 204.3(d)(1)(ii). This "other proof" is called secondary evidence. Secondary evidence of identity and age could include medical records, school records, church records, entry in a family Bible, orphanage intake sheets, or affidavits from individuals with first-hand knowledge of the event(s) to which they are testifying. Secondary evidence of death could include funeral details, obituaries, newspaper articles, church records, affidavits from individuals with first-hand knowledge of the event to which they are testifying. If both primary and secondary evidence are unavailable, the prospective adoptive parents must demonstrate the unavailability of the primary and secondary evidence and submit two or more affidavits that are sworn to or affirmed by persons who are not parties to the petition or application who have direct personal knowledge of the event and circumstances. See 8 CFR 103.2(b)(2)(i)-(ii).

Chapter 21.5(d)(5)(D) of this AFM explains in detail each of the distinct ways a child may meet the INA definition of an orphan and addresses what documents may constitute primary evidence under these different circumstances. For example, in a separation case (where the parents' rights are involuntarily severed or terminated for good cause), primary evidence is a decree by a court or other competent authority unconditionally divesting the parents of their parental rights. In this example, absent specific material information that the court decree is legally invalid[14] or was obtained by fraud, an officer may generally rely on such authentic decrees as evidence of a determination by a foreign government. Chapter 21.15(c) and 21.5(d)(5)(E) below provide further information on assessing adoption decrees and custody orders applicable to all the ways a child may meet the orphan definition.

While giving appropriate weight to a court decree, officers should consider all evidence when adjudicating a case. For instance, in an abandonment case (where the parents have willfully forsaken all parental rights, obligations, and claims to the child, as well as control over and possession of the child), officers should consider all evidence regarding the circumstances of the abandonment, not just the court or competent authority's decree unconditionally divesting the parents of their parental rights.[15] Officers should consider secondary evidence, such as police reports or administrative or lower court documents that led to the foreign government's decision to terminate parental rights. If the secondary evidence is materially inconsistent with the court order divesting the birth parents of their parental rights, or indicates possible fraud, officers should request more information to resolve any inconsistencies and give appropriate weight to the decree. See Chapter 21.5(d)(5)(I)-(J) for more on not clearly approvable Form I-600 petitions and consular returns of Form I-600 petitions.

AR2022_300322

In countries where officers have reason to doubt the reliability of court orders due to a lack of due process or appropriate safeguards, USCIS officers may request secondary evidence in support of the adoption decree. In these circumstances, the adoption decree may lack sufficient reliability to prove a fact, such as a fact that may establish abandonment, on its own. Primary evidence that is not reliable may be insufficient to prove a child's orphan status and therefore, secondary evidence may be considered. In addition, when officers repeatedly receive similar pieces of secondary evidence, such as multiple police reports documenting abandonment, with identical fact patterns, such evidence may raise concerns about the reports' reliability. In such an instance, officers should take additional steps to verify the authenticity of the documentation and seek assistance from USCIS headquarters as necessary. Chapter 21.5(d)(5)(F) and (H) provide additional guidance on suspicious fact patterns and documenting evidence.

***Note on Discrepancies in the Evidence Presented***: Minor inconsistencies in police reports or documentation are generally not grounds for denial, but may result in a Request .for Evidence (RFE). However, material inconsistencies or a lack of credible information to support the child's orphan status could lead to a finding that the petition should be denied. See Chapter 11.1 for more on materiality.

(C) <u>Researching Local Adoption Law, Documents, and Procedures.</u>.

When completing a Form I-604 and adjudicating a Form I-600 petition, officers should educate themselves on local adoption law, authorities, documents, and procedures. Country-specific processing information is available on www.uscis.gov. Additionally, the Department of State's adoption website at www.adoption.state.gov outlines the adoption process for most countries and its Country-Specific Reciprocity Tables (accessible on www.travel.state.gov) may also be useful when researching civil documents in certain countries.

In order to learn more about a country's adoption process, an officer should:

- Learn which government or judicial entity in the child's country of origin has authority over adoption processing. There may be multiple entities that control the process.

    o Explore whether there are any known tensions or inconsistencies among the relevant government or judicial entities.

    o Research the foreign legal process and foreign law to determine how a child becomes eligible for intercountry adoption, how the prospective adoptive parent(s) are matched with an eligible child, what fees are charged for services rendered and by whom, and the procedures to complete an adoption or custody order sufficient for intercountry adoption.

- Obtain examples of local adoption documents and signatures, as well as a list of names of government officials and judges authorized to sign adoption-related documents.

- If working in a USCIS international office, meet with adoption counterparts and consular section colleagues at regular intervals to discuss intercountry adoption trends and determine whether adoption laws and regulations have changed. Keep consular officer colleagues informed of any adoption-related issues at Post.

- If local law permits, work with consular officers to establish contact with adoption service providers (ASPs) in-country, and learn what rules and regulations govern their activities. If possible, attend meetings with consular staff, local ASPs, and intercountry adoption working groups.

- Work with consular officers to research screening processes government officials have in place to combat counterfeit/fraudulent documents and wrongdoing in the adoption system in general.

- Understand what fraud concerns exist in the child's country of origin to identify potential weaknesses in the child welfare and adoption systems. Read State Department fraud summaries, engage consular officers, and share information on adoption fraud indicators, trends, and prevailing country conditions. When possible, accompany consular staff on visits to local orphanages and conduct joint field investigations. Alert International Operations Division Headquarters (IO HQ) of any immediate, emergent issues, any potential fraud indicators, and/or suspicious fact patterns.

(D) Applying the Provisions of the Orphan Definition.

As part of the Form I-604 determination, the officer completing the form must consider the various regulatory elements of the orphan definition contained in 8 CFR 204.3 to determine whether the beneficiary qualifies for orphan classification under INA 101(b)(1)(F).

**NOTE**: Although domestic adjudication of the Form I-600 does not include the completion of the Form I-604, the three-pronged legal analysis below applies to both domestic and international Form I-600 adjudications.

Officers must analyze the three following issues:

- *Age of child*: Is the child under the age of sixteen (16) at the time the petition is filed? (Or under the age of eighteen (18) if adopted abroad or coming to the United States to be adopted by the same adoptive parent(s) of the birth sibling[16] who qualifies/qualified as an orphan or adopted child under INA 101(b)(1)(E) or (F) while under the age of 16? Or does the other exception noted under the "Age of Child" section below apply?)

- *Identity of child*: Have the prospective adoptive parent(s) presented primary evidence of the child's age and identity or, if none is available, an explanation together with secondary proof of age and identity?

- *Orphanhood*: Do <u>any</u> of the terms in the orphan definition apply such that the child would qualify as an orphan as defined in INA 101(b)(1)(F) and 8 CFR 204.3? The petitioner only needs to establish that **one** of the circumstances of the orphan definition applies in order for the child beneficiary to qualify as an orphan.

i. **Age of Child** - The child identified on the Form I-600 must be under the age of 16 at the time the petition is filed, unless one of the following exceptions applies:

- <u>Sibling exception</u>: The child identified on the Form I-600 must be under the age of 18 at the time of filing of the Form I-600 if that child's birth sibling:

    o Is or was previously classified as an orphan while under the age of 16 and is coming to the United States to be adopted by the same adoptive parent(s); or

    o Met the definition of adopted child under INA 101(b)(1)(E) and was under the age of 16 at the time of adoption by the same adoptive parent(s).

- <u>Form I-600A, Application for Advance Processing of an Orphan Petition, filed when a child is 15 years of age</u>: The DHS regulations at 8 CFR 204.3 do not directly address the relationship between the separate filing of a Form I-600A and the statutory requirement to file the "petition" while the child is under the age of 16 (or, as permitted in section 101(b)(1)(F)(ii), under the age of 18). Consistent with the regulations for Hague Adoption Convention cases, the Form I-600A filing date will be deemed to be the Form I-600 filing date if ***both*** of these requirements are met:

    o The Form I-600A was filed after the child's 15th birthday, but before the child's 16th birthday (or, if applicable, after the child's 17th birthday but before the child's 18th birthday); and

    o The Form I-600 is filed not more than 180 days after initial approval of Form I 600A.

**Age Out Note**: Even if the prospective adoptive parent has not yet completed the adoption or obtained all of the required supporting documentation, he or she MUST file Form I-600 before the child turns 16 (or 18 if the sibling exception applies) or, if Form I-600A is filed when a child is 15 years of age, no more than 180 days after the initial approval of Form I-600A so that the child does not age out.

If the child is under age 16 at the time the petitioner filed the Form I-600, meets the sibling exception, or satisfies the other exception above, the USCIS or consular officer completing the Form I-604 should check "yes" in Block 6. If the officer checks "no," he or she must explain in Block 15 why the Form I-600 petition cannot be approved and/or immigrant visa issued.

    ii.    **Identity** - As explained in Chapter 21.5(d)(5)(B) under "Evidentiary Requirements," USCIS regulations and policy specify what primary evidence petitioners should submit when available. If primary evidence is not available, petitioners must demonstrate the unavailability according to 8 CFR 103.2(b)(2)(i), and submit secondary evidence. Primary evidence of age and identity is a birth certificate. According to 8 CFR 204.3(d)(1)(ii), the prospective adoptive parent(s) must submit a copy of the child's birth certificate as supporting documentation with a Form I-600 petition, or if a birth certificate is unavailable, an explanation together with secondary proof of identity and age.

            Officers should ensure that the child's age and identity have been properly documented through primary or secondary evidence. If age and identity have been properly documented, the officer completing the Form I-604 should check the "Proof of age" and "Proof of identity" boxes in Block 10. If the officer cannot check each box in Block 10, he or she must explain in Block 15 why the Form I-600 petition cannot be approved and/or immigrant visa issued.

    iii.    **Orphanhood** - The officer must determine if the beneficiary would qualify as an orphan under any of the terms defined in INA 101(b)(1)(F) and 8 CFR 204.3. Foreign official documents and local law may use different terms from those used in INA 101(b)(1)(F) and 8 CFR 204.3, or use the same terms but with different meanings. An officer must examine the actual circumstances in each case to determine whether the child can meet the orphan definition by any of the terms defined by U.S. immigration law.

            There are two general categories of orphans:

- A child who has *no legal parents* because of the death or disappearance of, abandonment or desertion by, or separation or loss from both parents; or

- A child whose *sole or surviving parent* is incapable of providing proper care consistent with the local standards of the foreign-sending country and has, in writing, irrevocably released the child for emigration and adoption.

The officer must first determine whether the child falls into one of the two categories listed above.

If a child has no legal parents, the child is not required to have lost each parent in the same way. For example, one parent may have been separated from the child, while the other parent may have abandoned the child to an orphanage. Also, if a sole or surviving parent relinquished the child to an orphanage, this may qualify as abandonment - which does not require evidence that the sole or surviving parent is incapable of providing proper care and does not require the legitimation analysis that is required in the sole parent context as explained below. Usually, officers only need to conduct a sole or surviving parent analysis when there is: 1) a release for adoption to specific prospective adoptive parents; or, 2) when the third party providing custodial care to the child in anticipation of, or preparation for, adoption is not authorized under the laws of the foreign country to act in such a capacity, as such a release or custodial care is excluded from the abandonment definition.

Officers must also remember that a child may have more than two parents. Under INA 101(b)(2), the term "parent" includes any person who is related to a child in any of the ways specified in INA 101(b)(1). For example, a stepparent may qualify as a "parent" under the INA if the marriage creating the status of stepchild occurred before the child's 18th birthday.

In determining whether a child is an orphan, a sole or surviving parent who has married will still be considered the child's sole or surviving parent if the petitioner establishes that the sole or surviving parent's new spouse has no legal parent-child relationship to the child under the law of the foreign-sending country.[17]

To establish a legal parent-child relationship to a stepparent:

- The stepparent must have adopted the child;

- The stepparent must have obtained legal custody of the child; or

- Under the law of the foreign-sending country, the marriage between the parent and stepparent must have created a parent-child relationship between the stepparent and the child.

Under the law of some U.S. states and other countries and locations, a stepparent may adopt his or her spouse's children without terminating the legal parent-child relationship between the children and their other parent. The adoptive stepparent may then qualify as a "parent" through INA 101(b)(1)(E), as well as 101(b)(1)(B). If a child has more than two legal parents, officers must determine whether the child has lost other legal parent(s) in addition to the birth father and birth mother. If the child has stepparents, the officer should consult AFM Chapter 25.1(d)(3) ("Stepparents").

The definition of each term used to determine orphan status is described in detail below. The officer completing the Form I-604 should check the relevant box(es) in Block 9 to indicate how the child meets or does not meet the definition of an orphan. If the petitioner has established the child's orphanhood, officers should check the "Proof of orphanhood" box in Block 10. If the officer cannot check this box in Block 10, he or she must explain in Block 15 why the Form I-600 petition cannot be approved and/or immigrant visa issued.

*Abandonment*

As defined by 8 CFR 204.3, abandonment under INA 101(b)(1)(F) has a specific meaning and is the most generally applicable section of the orphan definition. The term "abandonment" as used in foreign jurisdictions may or may not correspond to the definitions of abandonment, desertion, disappearance, loss, or separation in U.S. immigration law. Officers should explore how the term "abandonment" is used in the relevant foreign jurisdiction when trying to determine "orphan status."

*"Abandonment" under U.S. immigration law means* that the parents have willfully forsaken all parental rights, obligations, and claims to the child, as well as all control over and possession of the child, without intending to transfer or without transferring these rights to any specific persons. Abandonment must include both the intention to surrender these rights and the actual act of doing so.

Essential Elements

- Willfully forsaking all parental rights, obligations, claims, control, and possession; and

- Third party authorized to provide custodial care prior to an adoption without transferring these rights to any specific person(s).

Abandonment does not include:

- A relinquishment or release by one or both parents directly to the prospective adoptive parent(s). (See "Irrevocable Release by Sole or Surviving Parent" below for a separate explanation regarding direct relinquishment by a sole or surviving parent);

- A relinquishment or release by one or both parents to an authorized third party for a specific adoption;

- A relinquishment or release by one or both parents to a third party for custodial care in anticipation of, or preparation for, adoption where the third party (such as a governmental agency, a court of competent jurisdiction, an adoption agency, or an orphanage) is *not authorized under the child welfare laws of the foreign-sending country to act in such a capacity*;

- A child who is placed with a third party that is not authorized under the child welfare laws of the foreign-sending country to accept released or relinquished children in anticipation of or preparation for adoption; or

AR2022_300328

- A child who is placed temporarily in an orphanage if the parent(s) express an intention to retrieve the child, are contributing or attempting to contribute to the support of the child, or otherwise exhibit ongoing parental interest in the child.

**NOTE:** U.S. immigration law generally considers a child who has been released unconditionally to an orphanage to be abandoned. See 8 CFR 204.3(b). However, it is not uncommon for parents in some countries to entrust their children to the care of orphanages temporarily without intending to abandon the child. In such circumstances, the parent may not have "abandoned" his or her child according to 8 CFR 204.3(b). The parent may not intend for the child to be adopted and may return to the orphanage with the expectation that his or her child will still be there. In this circumstance, the child may not qualify as "abandoned."

*Primary evidence of abandonment* is:

- A written release by the parent(s) of a child to an orphanage (or other third party authorized under the child welfare laws of the foreign-sending country to provide custodial care in anticipation of or preparation for adoption) demonstrating that the parent(s) gave up all parental rights to the child and physically gave up control/possession unconditionally to the orphanage or other third party.

  - Only parent(s) can release a child. Subsequent guardians may not do so. The guardians are not legally necessary parties in the orphan context (unlike in Hague Adoption Convention adoptions) and their action does not constitute a "release" for immigration purposes unless the guardian legally adopted the child. Therefore, children whose guardians surrender them to an orphanage may still meet the orphan definition.

  - A child can still meet the abandonment definition even if the parent(s) show an ongoing parental interest in the child or request promises of pictures, ongoing contact, or the child returning to visit at some point in the future. Often ASPs and prospective adoptive parent(s) believe in staying in touch with the birth family after adoption and make such promises to the birth parents. These promises are not legally enforceable and should not be considered as a condition of the child's release; however, such promises could be an indication that the birth parent(s) did not understand the finality of adoption and could warrant further investigation by the officer.

- A decree from a court or other competent authority that unconditionally divests the parent(s) of all parental rights or divests other individuals or entities of their legal rights over the child. Depending on local law this may be a finding of abandonment that is:

  - Made when the child is in the custody of an orphanage or orphanage-like institution,

  - Made when the child is a ward of the court, and/or

o   Incorporated into the adoption decree itself.

Officers must assess all of the evidence in the record to determine whether the child has been abandoned within the meaning of 8 CFR 204.3(b). See also Chapter 21.5(d)(5)(B) for more information on Evidentiary Requirements.

Officers will likely encounter two different scenarios that can constitute abandonment:

- Where there are known parent(s) who unconditionally surrender or release the child to an orphanage or other authorized third party; or

- Where someone found a child who was left anonymously (i.e., a "foundling" child) and the country of origin's official processes led to a termination of all parental rights.

In the first scenario, there are identifiable parent(s) who can be questioned or interviewed, if necessary, to determine if they willfully forsake all rights to the child. However, in the second scenario, reaching the same conclusion about the parent(s)' intent can be more difficult. When considering evidence of abandonment in foundling cases, officers must evaluate all available evidence and, if there are any inconstancies in the record, determine whether the inconsistencies are material and/or whether the court or local authority was aware of any potentially derogatory information. Additionally, if there are fraud indicators in the record, the officer may seek to interview individuals who have first-hand knowledge of the discovery of the abandoned child.

**Note**: While not required under the U.S. immigration law abandonment definition, if a country requires that specific steps must take place to locate the foundling child's parents, then officers must look for evidence that these steps were followed or otherwise waived by the appropriate authority. See Chapter 11.1 for more on materiality and below in Chapter 21.5(d)(5)(E) for more on the validity of court decrees.

Unlike the disappearance definition of 8 CFR 204.3(b) that is discussed below in the "Disappearance" section, a finding of abandonment does not require that a reasonable effort was made to locate the parents. For example, a child likely meets the abandonment definition in a foundling case where a police report lists the parents as unknown and says that the child was found by a bridge at night and a court decree attests to the same, without any additional information or evidence to call into question the reliability of the documentation presented (see Chapter 11.1 for more on documentary evidence).

However, if an orphanage intake form in the same case documents a known parent that was unknown to the court, this may be a material inconsistency that warrants additional investigation. In such instances, a USCIS officer could choose to issue a RFE, or a USCIS officer abroad (or consular officer, where authority has been delegated) could choose to take additional investigative steps and interview by phone or in person the officials or representatives who wrote the conflicting documents, interview the person who found the child, or interview the parent, etc.

If these additional investigative steps do not reasonably explain the inconsistency/ omission or no plausible explanation exists for the inconsistency/omission, then the adjudicating USCIS officer should issue an

additional RFE or a Notice of Intent to Deny (NOID), as appropriate. If a consular officer is responsible for adjudicating the Form I-600, the consular officer should refer the case as not clearly approvable (NCA) to the USCIS international office with jurisdiction. See Chapter 21.5(d)(5)(I) for more on NCA cases. If the Form I-600 petition was approved domestically prior to the Form I-604 determination and the inconsistency/omission is material to the child's classification as an orphan, the USCIS or consular officer who completed the Form I 604 should return the case to the USCIS office that approved the petition with a memorandum recommending revocation of the Form I-600. See Chapter 21.5(d)(5)(J) for more information about consular returns.

<u>In Summary</u>

*Abandonment includes instances where the parent(s):*

- Unconditionally relinquish or release the child to an orphanage or other authorized third party; or

- Anonymously abandoned the child and the country of origin's official processes led to a termination of all parental rights.

*Abandonment does NOT include:*

- Relinquishment or release by one or both parents directly to the prospective adoptive parent(s) for a specific adoption;

- Relinquishment or release by one or both parents to a third party for custodial care in anticipation, or preparation, for adoption where the third party is not authorized under the child welfare laws of the foreign-sending country to act in such a capacity; or

- Conditional surrender to an orphanage for temporary care or temporary periods of time.

### Death

A child whose parents are deceased and who has not acquired another parent (such as a stepparent or legal adoptive parent) as defined by the INA is considered an orphan for immigration purposes. For example, a child whose parents were killed in an accident is an orphan. That child would continue to qualify as an orphan even after a court named her grandmother as her guardian, as long as the child was not legally adopted.

***"Death" under U.S. immigration law means*** that one or both parents are legally deceased.

***Primary evidence of death*** is a death certificate in the name of the deceased parent.

- In some cases and in some countries where there is no standard death registration or where it is not customary to report deaths to a local civil registry, a death certificate may be unavailable. In

such cases, officers should consider the explanation of why such a certificate is unavailable, along with secondary evidence provided by the petitioner such as funeral details, obituaries, newspaper articles, church records, or affidavits from individuals with first-hand knowledge.

- It may also be appropriate to consider the length of time since the child's parent(s) are reported to have died, and during which time, the parent has not been seen or heard from, and it may be appropriate to consider if relatives have cared for the child since the parent(s) died. See Chapter 21.5(d)(5)(B) above for more on evidentiary requirements.

## Disappearance

*"Disappearance" under U.S. immigration law means* that the parent(s) have unaccountably or inexplicably passed out of the child's life; the parent(s)' whereabouts are unknown; there is no reasonable hope of reappearance; and there has been a reasonable effort to locate them as determined by a competent authority in accordance with the laws of the foreign-sending country.

### Essential Elements

- Parent(s) unaccountably or inexplicably passed out of child's life;

- Whereabouts unknown;

- No reasonable hope of reappearance; and

- Reasonable efforts to locate parent(s) as determined by competent authority (such as a court or governmental agency) in accordance with the laws of the foreign-sending country.

*Primary evidence of disappearance* is a decree from a court or other competent authority: 1) making the child a ward of the state because of such disappearance; and 2) unconditionally divesting the parent(s) of all parental rights over the child.

When considering whether the child's parent(s) have disappeared, officers should consider the laws of the child's country of origin and what actions competent authorities must take when a child's parent(s) have disappeared. Often, the parents are documented as unknown or as "disappeared" Just because a parent is listed as having "disappeared" does not mean that officers must apply the disappearance definition and require a showing of reasonable efforts to locate the parent(s). As previously noted, the meaning of a term in the foreign-sending country may differ from what it means under U.S. immigration law and, therefore, it is important to look at the actual facts and circumstances of the case to determine if a child meets the orphan definition.

Officers must examine the actual circumstances in each case to determine whether the particular conditions are met to find that a child is an orphan under any **one** of the ways the child can meet the definition of an orphan under the INA. It is important to remember the requirement that reasonable efforts to locate a

missing parent only applies to the disappearance definition - not to the abandonment definition in the context of foundling children. Officers may find that the child meets the definition of an orphan due to abandonment but not disappearance.

## Separation

**"Separation" under U.S. immigration law means** the involuntary severance of the child from his or her parent(s) by action of a competent authority for good cause and in accordance with the laws of the foreign-sending country. This is often called "termination of parental rights" and often occurs because of child abuse, neglect, or incompetence when a competent authority deems the parent to be "unfit." The parent(s) must have been properly notified and granted the opportunity to contest such action. The termination of all parental rights and obligations must be permanent and unconditional. See 8 CFR 204.3(b).

### Essential Elements

- Involuntary severance of the child from his or her parent(s) by competent authority for good cause and in accordance with the laws of the country;

- With proper notification and opportunity to contest; and

- Termination of parental rights must be permanent and unconditional.

**Primary evidence of separation** is a decree from a court or other competent authority unconditionally divesting the parent(s) of all parental rights over the child because of such separation.

In applying the separation definition, officers should consider the laws of the child's country of origin to determine what actions competent authorities must take to legally separate a child from his/her parents. A valid court order terminating parental rights over the objections of one or both parents is sufficient if parents received notice and an opportunity to contest such action.

## Loss

**"Loss" under U.S. immigration law means** the involuntary severance or detachment of the child from his or her parents in a permanent manner such as that caused by a natural disaster, civil unrest, or other calamitous events beyond the control of the parents, as verified by a competent authority in accordance with the laws of the foreign sending country. See 8 CFR 204.3(b).

### Essential Elements

- Involuntary severance or detachment of the child from the parent(s);

- Permanent;

- Caused by:

    o   Natural disaster;

    o   Civil unrest; or

    o   Other calamitous event beyond parents control; and

- Verified by a competent authority.

***Primary evidence of loss*** is a decree from a court or other competent authority unconditionally divesting the parent(s) of all parental rights over the child because of such loss.

Officers will very rarely encounter a "loss" situation in the field. This provision may also apply to children outside of their own country of origin, but it is unusual for a competent authority in another country to exercise jurisdiction over a child who has no legal parents due to loss if that child is outside his or her native country. Thus, beneficiaries are rarely determined to be orphans under this provision.

## Desertion

***"Desertion" under U.S. immigration law means*** that the parents have willfully forsaken the child and have refused to carry out their parental rights and obligations and that, as a result, the child has become a ward of a competent authority in accordance with the laws of the foreign-sending country. See 8 CFR 204.3(b).

### Essential Elements

- Parent(s) willfully forsaken the child;

- Refused to carry out parental rights and obligations; and

- As a result, the child has become a ward of a competent authority.

Desertion does not mean that the parents have disappeared, but rather that they refuse to carry out their parental rights and obligations towards the child. Desertion differs from abandonment in that the parents have not taken steps to divest themselves of parental duties, but the parents' inaction has caused a local authority to step in to assume custody of the child.

***Primary evidence of loss*** is a decree from a court or other competent authority making the child a ward of the state and unconditionally divesting the parent(s) of all parental rights over the child because of such desertion.

**AR2022_300334**

In applying this provision, officers should consider the laws of the foreign-sending country the child is being adopted from regarding what actions competent authorities must take to legally declare a child a ward deserted by his or her parents.

### _Irrevocable Release by Sole or Surviving Parent_

Officers must apply the sole or surviving parent definitions when there has been a direct relinquishment to the prospective adoptive parent(s) or when the third party providing custodial care to the child is not authorized to do so under the child welfare laws of the foreign-sending country. Otherwise, officers should evaluate whether the child has no legal parents in the various ways outlined above.

***Primary evidence of a sole parent or a surviving parent's release*** must be:

- In writing in a language the parent is capable of reading and signing or marking (if the parent is illiterate, an interview can establish that he or she had full knowledge of the contents of the document and understood its irrevocable nature);

- Irrevocable; and

- Without stipulations or conditions.

The release may identify the person to whom the parent is releasing the child, even if that person is a prospective adoptive parent.

***"Sole parent" under U.S. immigration law means*** the mother when it is established that the child is born out of wedlock and has not acquired a parent within the meaning of section 101(b)(2) of the Act. For a mother to qualify as a sole parent, the father of the child must be unknown, have disappeared or abandoned or deserted the child, or have, in writing, irrevocably released the child for emigration and adoption.

### _Essential Elements_

- Unmarried mother at the time of child's birth;

- Child has not been legitimated under the law of child's residence or domicile or the law of the father's residence or domicile while in the legal custody of the legitimating parent(s);

- Birth father is:

  - Unknown;

  - Known and has disappeared, abandoned, or deserted the child; or

- - Known and has, in writing, irrevocably released the child for emigration and adoption, in accordance with the laws of the foreign-sending country;

- Child has not acquired a stepparent, or the prospective adoptive parent establishes that the stepparent has no legal parent-child relationship - see Chapter 21.5(d)(3);

- Mother is incapable of providing proper care; and

- Mother, in writing, irrevocably releases child for emigration and adoption, in accordance with the laws of the foreign-sending country

Officers do not need to determine whether a child born out of wedlock is regarded as legitimate or illegitimate unless the birth father ever had sole or joint legal custody of the child[18] (i.e., if the child was legitimated while in the legal custody of the birth father).

Applying the sole parent definition can be complex, and officers generally do not need to analyze the sole parent definition unless they encounter a situation where:

- There is a direct relinquishment to the prospective adoptive parent(s) (such that the mother cannot satisfy the abandonment definition);

- The third party providing care to the child is not authorized to do so under the law of the foreign-sending country (thus the mother cannot satisfy the abandonment definition); or

- The mother can satisfy the abandonment definition, but the father cannot meet any of the definitions and thus must, in writing, irrevocably release the child for emigration and adoption.

*Primary evidence of loss* is a decree from a court or other competent authority unconditionally divesting the parent(s) of all parental rights over the child because of such loss.

Officers will very rarely encounter a "loss" situation in the field. This provision may also apply to children outside of their own country of origin, but it is unusual for a competent authority in another country to exercise jurisdiction over a child who has no legal parents due to loss if that child is outside his or her native country. Thus, beneficiaries are rarely determined to be orphans under this provision.

*"Surviving parent" under U.S. immigration law means* a child's living parent when the child's other parent is dead, and the child has not acquired another parent within the meaning of INA 101(b)(2). See also Chapter 21.5(d)(3).

Essential Elements

- One living parent;

- One deceased parent;

- Child has not acquired a stepparent or the prospective adoptive parent establishes that the stepparent has no legal parent-child relationship - see Chapter 21.5(d)(3);

- Living parent is incapable of providing proper care; and

- Living parent has, in writing, irrevocably released child for emigration and adoption in accordance with the laws of the foreign-sending country.

Primary evidence that one parent is deceased is a death certificate in the name of the deceased parent. See Chapter 21.5(d)(5)(D)(iii) ("death") for situations in which a death certificate may be unavailable and for discussion on secondary evidence of death.

*"Incapable of providing proper care"* means that a sole or surviving parent is unable to provide for the child's basic needs, consistent with the local standards of the foreign-sending country. This determination is not limited to economic or financial concerns. A parent could be unable to provide proper care due to a number of reasons, including, but not limited to: extreme poverty; medical, psychological or emotional difficulties; or long-term incarceration.
Evidence can include

- Proof of the sole or surviving parent's wages in comparison to the local area's average wages for a family of the same size.

- Medical records of the child's or sole or surviving parents' psychological or physical difficulties.

- Court records or other proof that the sole or surviving parent is incarcerated and the duration of the sentence.

- A social welfare report submitted to the adoption authority in support of an adoption that discusses the background and living situation, etc. of the child. See Matter of Rodriguez, 18 I&N Dec. 9, 11 (Reg. Comm'r 1980) (citing social welfare agency study as evidence of a sole parent's inability to provide proper care).

- Any other documentation which goes to the ability of the parent to provide proper care for the child.

(E) <u>Adoption versus legal custody</u>.

Once an officer makes a finding of proper age, identity, and orphanhood, he or she must then determine how the child will emigrate to the United States - through a full and final adoption granted by the foreign-sending country under Chapter 21.15, or through the prospective adoptive parent's legal custody of the child granted by the foreign-sending country for emigration and adoption in the United States. **Note**: Some countries will not allow a child to emigrate without a final adoption decree. Officers should consult the Department of State website at www.adoption.state.gov to determine the specific laws of the foreign-sending country.

**Full and Final Adoption Abroad –** See Chapter 21.15 of this AFM for more information on what qualifies as an "adoption" for immigration purposes.

If the petitioner adopted the child abroad, the petitioner must submit a legible, certified copy of the final adoption decree showing that he or she adopted the child and evidence that the petitioner (or spouse, if married) personally saw and observed the child before or during the adoption proceedings. If the petitioner is married, only one spouse needs to have seen and observed the child before or during the adoption proceedings. If this is the case, the child may qualify for an IR-3 visa on the basis of a valid, full and final adoption in accordance with the laws of the foreign-sending country.

<u>Essential Elements</u>

- Valid, full and final adoption that satisfies the three-prong test in Chapter 21.15:

  o   Valid under the law of the foreign-sending country;

  o   Creates a legal permanent parent-child relationship; and

  o   Terminates the prior legal parent-child relationship;

- Petitioner (and spouse, if married) adopted the child; and

- Petitioner (or spouse, if married) personally saw and observed the child before or during the adoption proceedings abroad.

If the petitioner is married and neither the petitioner nor the spouse actually saw and observed the child before or during the adoption proceedings, or only one parent adopted the child, the child will not be eligible to immigrate under INA 101(b)(1)(F) unless the parents will be able to adopt the child (or validate the foreign adoption) in the United States (although the "adoption" may be considered to have established legal custody for emigration and adoption) and have met the pre-adoption requirements of the state of the child's proposed residence. In such a case, the child may qualify for an IR-4 visa.

If the laws of the foreign-sending country allow proxy adoptions, U.S. citizen petitioners may complete an adoption abroad without ever traveling to a foreign-sending country or meeting the child prior to the child's entry into the United States. This type of adoption may be fully valid in the United States as a matter of domestic relations law, but will not make the child eligible to immigrate under INA 101(b)(1)(F) unless the parents will be able to adopt the child (or validate the foreign adoption) in the United States. In such a case, the child may qualify for an IR-4 visa.

As noted also in Chapter 21.15, guardianships, "simple adoptions," or Kafala orders in countries that follow traditional Islamic law may not qualify as full and final adoptions abroad. But because an "orphan" can be brought to the United States for adoption instead of being adopted abroad, a guardianship, Kafala order, or other custody order may be sufficient to establish that the prospective adoptive parents "have...secured custody of the child," as specified in 8 CFR 204.3(d)(1)(iv)(B)(1). If the legal custody is for emigration and adoption, in accordance with the laws of the foreign-sending country, and all other requirements are met, the evidence could support approval of the Form I-600, and the child may qualify for an IR-4 visa.

***Legal Custody for Emigration and Adoption -*** As Chapter 21.15 explains, not all countries recognize adoption or grant what can be considered full and final adoptions abroad for immigration purposes. However, legal custody decrees or guardianship orders may provide sufficient evidence that the prospective adoptive parent(s) have secured legal custody of the child for emigration and adoption. If this is the case, or if neither the petitioner nor his or her spouse (if married) personally saw and observed the child before or during the adoption proceedings, then the officer must review the evidence to determine if the petitioner (or a person or entity working on his or her behalf) secured legal custody that is sufficient for the purposes of emigration and adoption.

The petitioner must secure legal custody in accordance with the laws of the foreign-sending country. The person, organization, or competent authority that has legal custody or control over the child must irrevocably release the child for emigration and adoption. (For example, this may be evidenced by a court order or release by the previous legal custodian of the child giving the child for adoption to the named prospective adoptive parent(s) with their U.S. residence clearly incorporated into the order.) The petitioner must show evidence of compliance with all state pre-adoption requirements, if any. If state law prevents petitioners from complying with any pre-adoption requirements before the child's arrival in the United States, they must note the missing requirements and provide an explanation. In addition, if there was an adoption abroad that was not full and final for U.S. immigration purposes, and/or if the petitioner (or spouse, if married) did not personally see and observe the child before or during the adoption proceedings, then the officer should ensure that the orphan's proposed state of residence allows re-adoption or provides for judicial recognition of the adoption abroad. Children meeting these criteria may qualify for an IR-4 visa on the basis of legal custody for the purpose of emigration and adoption.

<u>Essential Elements</u>

- Adoptive parents obtain custody in accordance with the laws of the foreign-sending country;

- Child has been irrevocably released from proper person, organization, or competent authority;

- For emigration and adoption;

- Compliance with state pre-adoption requirements, if any; and

- <u>If</u> child adopted abroad and/or <u>if</u> the petitioner (or spouse, if married) did not personally see and observe the child before or during the adoption proceedings, then:

    o Evidence proposed state of residence allows re-adoption; *or*

    o Provides for judicial recognition of the adoption abroad.

***Additional considerations –*** As Chapter 21.15(c) explains, officers should generally accept the adoption decree or custody order on its face as primary evidence of a determination by a foreign court. However, officers may properly question the validity of the decree or order for various reasons, such as:

- Lack of jurisdiction by the foreign court or authority;

- Lack of parental consent to the adoption;

- No or improper notice of termination of parental rights;

- Evidence of corruption, fraud, or material misrepresentation; or

- Other credible and probative evidence to question the reliability of the documentation.

If there is reason to doubt the validity of the decree or order, then secondary evidence may be needed. See Chapter 21.5(d)(5)(B) above for additional information, including when there is a material inconsistency between adoption decree and other evidence in the record. See Chapter 11.1 for more on materiality.

(F) <u>Handling Evidence of Fraud, Child-Buying, and/or Other Non-Bona Fide Intent.</u>

The officer must determine whether there are allegations or indications of fraud, child-buying, and/or other misrepresentation or non-bona fide intent (i.e., the petitioner does not intend to form a parent-child relationship) that would prevent the specific beneficiary child from being able to immigrate under INA 101(b)(1)(F) and 8 CFR 204.3.

**Fraud –** For USCIS purposes, fraud is a willful misrepresentation or concealment of a material fact to obtain some benefit (for example, an adoption decree). To meet the requirement of materiality, evidence of fraud must be documented and generally relate to the beneficiary's eligibility as an orphan.

Documents can also be described in the context of fraud. With respect to fraud, there are generally three kinds of documents:

1. Genuine documents;

2. Counterfeit (completely fabricated) documents; and

3. Genuine documents that have been obtained through fraudulent means, falsified, or altered with fraudulent information.

As Chapter 21.5(d)(5)(C) explains, one way to identify fraud indicators in the adoption system is to obtain examples of genuine documents and a list of officials responsible for various aspects of the adoption process. If an officer sees a document that appears suspicious or is signed by an official he or she does not recognize, the officer may be able to compare it to an example and/or confirm its authenticity or inauthenticity with the issuing body. If the officer has confirmed that a suspicious document is counterfeit, or was obtained through fraudulent means, falsified, or altered with fraudulent information, the officer must clearly document the findings.

Typically, identified fraud must be case-specific. However, patterns of fraudulent behavior can call into question the credibility of evidence submitted in an individual case. The officer must specifically articulate findings of fraud and how the findings relate to the beneficiary's eligibility as an orphan. See Chapter 21.5(d)(5)(B) above for more detail on credibility and reliability

_Essential Elements_: Willful **misrepresentation** or **concealment** of a material fact to obtain an immigration benefit.

_Documenting the Evidence -_ If fraud is identified, an officer should:

- Check "Yes" in Block 12 of the Form I-604.

- Provide evidence gathered as testimony during field investigations or during interviews preferably in Q&A format or sworn statements (in the witness's own language with translation, if possible), with as much verbatim language as reasonably possible and include a detailed explanation of the fraud.

- Provide copies of any submitted documents that are determined to be fraudulent and an explanation as to why the document is deemed fraudulent. For example, indicate whether the document is counterfeit, or a genuine document that has been obtained through fraudulent means, falsified, or altered with fraudulent information. If possible, include an example of a genuine document if the document has been falsified or altered.

- Provide photographs if relevant. For example, if civil register records have been checked and they are inconsistent with the document provided by the petitioner, it is helpful to take a photograph of the civil register record, if permitted.

- In Block 15, clearly state why the evidence gathered is inconsistent with the documents provided in support of the petition. Conclude why the child is ineligible for classification as an orphan under INA 101(b)(1)(F) or 8 CFR 204.3 - specifically indicate why the above orphan definitions do not apply in light of the information documented, if applicable.

**Child-Buying -** Officers must deny a Form I-600 petition if the prospective adoptive parent(s), adoptive parent(s), or a person or entity working on their behalf gave or will give money or other consideration, either directly or indirectly, to the child's parent(s), agent(s), other individual(s), or entity as payment for the child or as an inducement to release the child. 8 CFR 204.3(i). Child-buying is also a mandatory ground for revoking an approved petition. Officers must carefully review any allegations of child-buying or other evidence that indicates child-buying took place in the case and carefully weigh the evidence available to determine whether it substantiates the charge. Child-buying does not include reasonable payment for necessary activities such as administrative, court, legal, translation, or medical services related to the adoption proceedings.

Foreign adoption services are sometimes expensive and their costs may often seem disproportionately high in comparison with other social services. Further, in many countries there may be a network of legitimate adoption facilitators, each playing a transparent role in processing an individual case and reasonably expecting to be paid for their services. Posts work closely with foreign governments to identify all costs related to intercountry adoption in particular countries. General information about adoption-related costs is posted on www.adoption.state.gov under the country-specific information.

Child-buying can be difficult to prove since payments are often explained as being related to the adoption proceedings. Unless the payments are clearly excessive and unexplainable, it can be very difficult to deny or revoke a petition on the grounds of child-buying.

In most intercountry adoption cases, the expenses incurred can be explained in terms of "reasonable payments." Even cash given directly to a birth mother may be justifiable if it relates directly to expenses such as pre-natal or neo-natal care, transportation, lodging or living expenses. Investigations of child-buying should, therefore, focus on evidence documenting the purpose and amount of payment or consideration, or an admission of conduct that qualifies as child-buying, and examine the following:

Essential Elements

- Prospective adoptive parent(s), adoptive parent(s), or someone working on their behalf gave or will give money or other consideration directly or indirectly to the child's parent(s), agent(s), other individual(s), or entity; and

- As payment for the child or as an inducement to release the child.

Does NOT Include

- Reasonable payment for necessary activities, such as administrative, court, legal, translation, or medical services related to the adoption proceedings.

- Payments that are not intended to induce the relinquishment or release of the child.

Documenting the Evidence

- Check "Yes" in Block 12 and provide a detailed description in Block 15.

- Provide evidence gathered as testimony during field investigations or during interviews preferably in Q&A format, with as much verbatim language as reasonably possible and an explanation as to how the child-buying transpired.

- Document any evidence that a relinquishing parent, a local official, or any other representative received improper payments; documentation of witness testimony should be in Q&A format. When Q&A format is not possible, an affidavit format, voluntarily signed by the affiant is acceptable.

- Include evidence of payments made or interview records that discuss who made the payment, who was paid, and for what the payment was intended.

- Explain conclusions and why the evidence makes the child ineligible for classification of an orphan under INA 101(b)(1)(F) or 8 CFR 204.3.

(G) <u>Ensuring the Child Matches the Characteristics that the Prospective Adoptive Parent(s) have been Approved to Adopt</u>.

During the Form I-600A process (or Form I-600 process, if there was no prior Form I-600A), an officer determines whether the petitioner is a suitable adoptive parent for a child with special needs. The Form I-604 determination process should identify whether the child has any significant physical or mental impairment or disability relevant to the Form I-600A approval, or any significant condition undisclosed during adjudication of the petition. Generally, officers would find this information in supporting documentation submitted with the case or information discovered during the Form I-604 determination. The officers should review the evidence to:

- Ensure that any significant or serious medical condition of the child is not excluded by special conditions established in the Form I-600A approval (i.e., Form I-600A approval states that prospective adoptive parents are only approved to adopt a healthy child); and

- Verify that any significant medical condition is known and accepted by the prospective adoptive parents (or adoptive parents if the adoption has taken place).

If officers discover that the child has a significant medical condition that the prospective adoptive parent(s) are not aware of during the Form I-604 determination, including a condition that is not grounds for exclusion under INA 212(a)(1), they must:

 Furnish the prospective and adoptive parents with all pertinent details concerning the affliction or disability. This is especially important in cases where the prospective and adoptive parents have not personally observed the child.

 Halt adjudication of the case until the petitioner submits a notarized statement indicating awareness of the child's impaired health or disability and a willingness to proceed with orphan processing. The petitioner must also submit an amended home study addressing the child's medical condition and the petitioner's preparation, willingness, and ability to provide proper care for the child to the USCIS office with jurisdiction over the petitioner's suitability determination.

A Form I-600A approval may also indicate specific restrictions on an adoption such as the child's nationality, age range or gender and if the petitioner has been approved for a special needs adoption.

**Note on Age**: The child must meet the age range listed on the Form I-600A approval at the time the referral or match was accepted by the prospective adoptive parents, or if the accepted referral or match date cannot be established, the filing date of the Form I-600 petition[19].

If a Form I-600A states that the petitioner is approved to adopt a child aged 0-4 years old, then a child who is four years old but not yet 5 would meet this age range.

If the Form I-604 determination reveals that the child does not match the characteristics that the prospective adoptive parent(s) have been approved to adopt (i.e., unknown serious medical condition, or an age or gender discrepancy), then:

- The officer should document this on the Form I-604 in Block 5 and provide a detailed description in Block 15; and

- USCIS should issue an RFE for an amended home study and any related documents.

Typically, the USCIS office that approved the Form I-600A should issue the RFE. However, if the Form I-600A approval has expired, then the USCIS office with jurisdiction over the petitioner's suitability should issue the RFE.[20]

**Note**: Officers are encouraged to communicate with the USCIS office with jurisdiction over the prospective adoptive parent(s)' suitability before physically transferring the case to the appropriate USCIS office.

(H) <u>How and When to Complete Form I-604</u>.

A Form I-604 must be completed in every orphan case to verify that the child meets the eligibility criteria to be classified as an "orphan" under INA 101(b)(1)(F) and 8 CFR 204.3.

In addition to completing the three-prong legal analysis of age, identity, and orphanhood, as explained above, officers must also determine that

- There has been a full and final adoption abroad, or legal custody for emigration and adoption;

- There is no evidence of fraud, child-buying, or other misrepresentation or non-bona fide intent;

- The child matches the characteristics that the prospective adoptive parent(s) have been approved to adopt; and

- The petitioner has identified a primary adoption service provider.

Jurisdiction - The Form I-604 determination is completed under the DHS regulations and is tied to the exercise of the DHS Secretary's authority to adjudicate immigrant visa petitions. If the petition is filed with a USCIS international office in the child's country (or the country where the adoption is completed), the adjudicating USCIS officer will complete the Form I 604 determination as part of the adjudication of the Form I-600 petition.

At present, a consular officer in the child's country of origin (or the country where the adoption is completed) completes the Form I-604 determination for a domestically filed Form I-600 petition, unless USCIS has assumed jurisdiction over the Form I-604 workload in that country. Therefore, consular officers complete Form I-604 determinations in two general scenarios:

1. (1) When adjudicating a Form I-600 that a petitioner has filed abroad in a location where USCIS does not have an office; or

2. (2) When a petitioner files Form I-600 with the NBC domestically. Typically, the consular officer will conduct the determination after the domestic USCIS office has already approved the Form I-600. However, if domestic USCIS officers have "articulable concerns," they can request that the Form I-604 determination occur prior to Form I-600 adjudication. 8 CFR 204.3(k)(1).

In certain locations, USCIS and State have implemented Pre-Adoption Immigration Review (PAIR) programs, which require the Form I-604 determination to be completed prior to the final adoption or grant of custody in the child's country of origin. See Chapter 21.5(d)(6)-(8) for more information on the PAIR process, when the Form I-604 determination occurs in the PAIR process, and who conducts the Form I-604 determination, as it is country-specific and outside the scope of this section.

See the charts below for an overview of who completes a Form I-604 determination and when it occurs in the context of the entire orphan process, depending on the Form I-600 filing location with and without Form I-600A approval:

|  | Form I-600 Filing Location | Who Completes Form I-604? |
|---|---|---|
| PAPs residing **domestically with an approved Form I-600A** | May file Form I-600 with the: <br><br> • USCIS National Benefits Center (NBC); <br><br> • U.S. Embassy or Consulate in the child's country* if USCIS is not present; or | Consular officer _unless_ USCIS has an office in the child's country and has assumed jurisdiction over the Form I-604 workload for Form I-600 petitions filed at the NBC.** |

| | • USCIS international office in the child's country, if any.* | USCIS overseas officer in the child's country. |
|---|---|---|
| **PAPs residing domestically without an approved Form I-600A** | May make a concurrent (i.e., combo) filing of Form I-600, along with Form I 600A supporting documentation only, with the NBC. | Consular officer _unless_ USCIS has an office in the child's country and has assumed jurisdiction over the Form I-604 workload for Form I-600 petitions filed at the NBC.** |
| **PAPs residing abroad with an approved Form I-600A** | May file Form I-600 with the: <br><br> • USCIS National Benefits Center (NBC); <br><br> • U.S. Embassy or Consulate in the child's country* if USCIS is not present; or | Consular officer _unless_ USCIS has an office in the child's country and has assumed jurisdiction over the Form I-604 workload for Form I-600 petitions filed at the NBC.** |
| | • USCIS international office in the child's country, if any,* or <br><br> • USCIS international office with jurisdiction over the PAP's residence. | USCIS overseas officer in the child's country. |
| **PAPs residing abroad without an approved Form I-600A** | May make a concurrent (i.e., combo) filing of Form I-600, along with Form I 600 supporting documentation and all required Form I-600A | Consular officer _unless_ USCIS has an office in the child's country and has assumed jurisdiction over the Form I-604 workload for |

| | supporting documentation (no Form I-600A), with the: <br><br> • NBC; or | Form I-600 petitions filed at the NBC.** |
|---|---|---|
| | • USCIS international office with jurisdiction over the PAP's residence. | USCIS overseas officer or consular officer in the child's country. |

*Requires physical presence at some point during the adoption or immigrant visa process, within the jurisdiction of the USCIS international office or the U.S. Embassy or Consulate designated to act on the petition.*

** USCIS assumed jurisdiction over Form I-604 processing in Haiti on September 16, 2013, and in the Republic of Korea on September 22, 2014.*

### When is the Form I-604 Completed?

| IF... | THEN... |
|---|---|
| Form I-600 is adjudicated abroad, | The Form I-604 must be completed before the petition is approved.* |
| Form I-600 is adjudicated in the United States, | The Form I-604 must be completed after the petition is approved, but before visa issuance unless: <br><br> • The domestic USCIS office requests the investigation before the adjudication of the Form I-600 due to "articulable concerns" 8 CFR 204.3(k)(1); or <br><br> • The Pre-Adoption Immigration Review (PAIR) program has been established in the child's country. |

**Guidance for Officers Completing the Form I-604 -** Form I-604 determinations are important to address any concerns regarding the child's orphanhood, the authenticity and validity of foreign government documents, or concerns about potential fraud. The in-country review of the documentation is intended to provide integrity in the orphan adjudication and to ensure that foreign documents submitted to support the Form I-600 petition are legally sufficient. In addition, officers on the ground in a country may be aware of systemic issues that could affect the validity of foreign documentation. All items on the Form I-604 must be completed according to the form instructions. Since most of the questions are self-explanatory, this guidance focuses on those items on the Form I-604 that address whether the child's situation meets the orphan definition under U.S. law.

Depending on the circumstances of the case, Form I-604 determinations should include, but are not

necessarily limited to: document checks, telephonic checks, interviews with the parent(s), and/or field investigation of material facts presented in the case. 8 CFR 204.3(k)(1). What each Form I-604 determination should encompass will depend upon the circumstances of the particular Form I-600 beneficiary and upon other relevant factors, such as country conditions and the presence or absence of any potential fraud indicators or other concerns.

While it is possible to complete many Form I-604 determinations through telephone interviews and verifications of documentation at the USCIS international office or U.S. Embassy, situations do arise when a field investigation is necessary to validate the bona fides of the case. When conducting a field investigation, officers should talk with local government officials, orphanage directors, and neighbors in a language in which they are easily conversant and comfortable using. This may require the use of locally employed staff to provide the necessary interpretation.

In a country where documentary evidence is typically considered to be reliable and no other concerns are present, a review of the documentary evidence on its face may be sufficient. If the officer is satisfied that the record is consistent, complete, and that the child qualifies to be classified as an "orphan" under U.S. immigration law, the officer should complete the Form I-604 by signing and dating the form, and checking the appropriate box to indicate the facts have been affirmed and orphan classification is appropriate.

However, if the record is materially incomplete, inconsistent, or if adverse/negative information is found, officers should fully document and explain the reasoning for their findings/determination on Form I-604, Block 15, Comments Section, or in separate attachments, if necessary, and enclose all relevant evidence. For negative Form I-604 determinations, the officer should include a memorandum providing an explanation of the determination, the identity or identities the investigator along with his or her qualifications, and a narrative summary of the findings of fact, specifically:

**1) Documenting Incomplete/Inconsistent Records**

- If the record is incomplete or inconsistent, provide an explanation of what is missing or inconsistent, why it is material to the adjudication, and its effect on the case.

- The officer may also recommend what additional evidence could overcome the deficiency or inconsistency.

**2) Documenting Adoptions That Do Not Comply with Foreign Law**

- If officers believe the adoption is not valid under the law of the country of adoption, include a copy of the country's applicable law in the case file (with an English translation, if possible) and provide an explanation of why the adoption is not valid.

- Generally, officers should accept an adoption decree as valid unless there is evidence that the court order was obtained fraudulently or was based on a misrepresentation. See Chapter 21.5(d)(5)(B) for more on Evidentiary Requirements.

**3) Documenting When a Child Does Not Meet the Definition of an Orphan**

- If the child does not meet the "orphan" definition under U.S. law, provide an explanation of which provision(s) of the orphan definition were considered, why the provision(s) were not met, and what case-specific evidence is lacking or insufficient to establish the child's orphanhood.

- Always explain conclusions, support them with factual findings, and describe the supporting evidence, explaining why the evidence makes the child ineligible for classification as an orphan under INA 101(b)(1)(F) and 8 CFR 204.3. Keep in mind that a child only needs to meet one provision of the orphan definition to be found eligible for the benefit (i.e., abandonment, death, disappearance, desertion, separation, or loss, or has a sole or surviving parent incapable of providing care).

**4) Documenting Child-Buying**

- If child-buying is suspected, provide evidence of payments made or interview records that discuss such payments, including: who made the payment, to whom, and for what reason (both stated and/or supported by the facts on the record).

- Explain the basis for the conclusion that these payments should be construed as child-buying and not as reasonable expenses for adoption-related activities.

**5) Documenting Fraud**

- If there is evidence of fraud, provide documentation and an explanation of the type of fraud, and how the evidence supports a finding of fraud. Include any and all evidence gathered during a field investigation or interviews that supports the fraud conclusion.

- Also explain why the documented fraud makes the child ineligible for orphan classification under INA 101(b)(1)(F) and 8 CFR 204.3.

- Verify all civil documents. If officers discover a counterfeit document or a genuine document that has been obtained through fraudulent means, falsified, or altered with fraudulent information, include copies and explain how they were identified as fraudulent, and include official confirmation by the issuing authority when possible.

- Also, if possible, provide an example of a genuine document for comparison. Indicate whether the falsified document is a genuine document containing false information, or if it is a counterfeit or forged document. In either case, investigate the underlying facts and explain why the falsified document makes the child ineligible for orphan classification.

**6) Documenting Civil Registry Records**

- If civil register records have been checked and they are inconsistent with the document provided by the petitioner, it is helpful to take a photograph of the civil register record, if permitted.

**7) Documenting Interviews**

- When conducting interviews, provide documentation of the date, time, location, and identity of any interviewers, interviewees, witnesses and/or translators and any other salient factors surrounding the circumstances of the interview.

- Whenever reasonable, record interviews in question and answer (Q&A) format, providing a verbatim report of the material issues.

- If an interview reveals material evidence that the child does not meet the orphan definition, consider the feasibility of obtaining a sworn statement from the interviewee.

- Include copies of Q&As and any sworn statements, and summarize the interview, identifying the relevant information and its effect on the case. Carefully document investigative interviews and statements made by interviewees in a format that may be shared with the petitioner as an exhibit to an RFE, NOID, or Denial.

- Document any refusal to sign a sworn statement.

- Be sure to explain any cultural anomalies in an interviewee's demeanor or responses that may not be readily apparent to a reader who does not have firsthand knowledge of the country.

- If an investigation reveals inconsistencies, the officer must give the interviewee an opportunity to explain the inconsistencies on the record. Confront the interviewee about the specific inconsistency in a non-adversarial manner.

- Fully explain when and where the inconsistent statements were provided and quote or accurately paraphrase the statement the affiant previously provided. Also consider including verbatim quotes from the interviewee to fully capture salient facts derived from the interview.

- If an interpreter is used, confirm while questioning the interviewee that he or she understood the interpreter and was able to communicate effectively with the interviewer. USCIS requires credible evidence documented in a format that can be shared with the petitioner, and support(s) the issuance of a RFE, NOID, NOIR, or Denial Notice (often as an exhibit).

- Talk with the birth child's parents, if known and located, and document what they believe is happening to their child. Ask whether they are aware their child is being placed for intercountry adoption and whether they understand the permanent nature of adoption. Use plain language and consider the parents' level of education when explaining the intercountry adoption process.

- Talk to the adoptive child, if appropriate. If the adoptive child appears old enough to speak for him or herself, ask the child if he or she is willing to talk with a USCIS or consular officer or local staff with no parents or ASP officials present. Ask the child what happened to the birth family and document the interview carefully, noting reactions to follow-up questions. Ask the child if he or she knows that an adoption is taking place and that he or she will be moving to the United States permanently.

- Interviews of parents, witnesses, and others should, to the extent possible, be conducted outside of the presence of local government officials or ASP representatives so the interviewees are able to speak freely.

Only check Form I-604, Block 12, in cases where there is documented evidence of fraud, child-buying, misrepresentation or non-bona fide intent to adopt the beneficiary. General suspicions of improper activity not specific to the case are not sufficient.

When completing Form I-604, Block 9, officers should review the 8 CFR 204.3 definitions of abandonment, desertion, loss, separation, disappearance, sole parent, surviving parent, and "incapable of providing proper care." Keep in mind that a child may meet the definition of an orphan under INA 101(b)(1)(F) and 8 CFR 204.3 in any one of these ways. See Chapter 21.5(d)(5)(D). The facts may indicate that a child could fall into more than one orphan category. The officer should consider all of the categories that make up the definition of orphan and indicate which applies based upon the facts presented in the case.

(I) <u>"Not Clearly Approval" (NCA) Cases vs. "Consular Returns"</u>.

In both NCA cases and consular return cases, officers have determined, based on the Form I-604 determination, that the child beneficiary does not appear to meet the U.S. immigration definition of an orphan. Both types of cases require case-specific, factual evidence. It is important that officers understand the difference between NCA cases, which involve petitions that cannot be readily approved because of insufficient evidence or identified fraud or malfeasance, and consular returns, which are based on probative evidence that the officer has determined would have supported a denial had it been known at the time of petition approval.

1.  Consular Officer Referral of Cases to USCIS as "Not Clearly Approvable" after the Completion of the Form I-604 (before final adjudication of the Form I-600).

Only consular officers refer cases as "not clearly approvable" to USCIS international offices. If a USCIS officer adjudicating a case after completing a Form I-604 determined that the petitioner did not meet his or her burden of proof then the officer would issue an RFE or NOID before making a final decision. Consular officers may not issue RFEs or NOIDs, and must therefore refer cases that are "not clearly approvable" to USCIS for further processing. A finding that a case is not clearly approvable does not necessarily mean that it should be denied. It simply means that the record, as presented, is insufficient to make a positive determination on the case.

*Jurisdiction -* Under 8 CFR 204.3(k)(2), consular officers are only authorized to approve a Form I-600 petition if:

1.  USCIS has made a favorable determination on the related Form I-600A (and it remains valid at time of Form I-600 filing);

2.  The petitioner traveled to the child's country and fell under the jurisdiction of the U.S. Embassy or consulate during the adoption process; and

3.  A consular officer finds the petition is "clearly approvable."

Consular officers must refer any Form I-600 petition that is "not clearly approvable" to the USCIS office abroad having jurisdiction over its adjudication, along with the supporting documents, the completed Form I-604, and any other relevant documentation per 8 CFR 204.3(h)(11).

*Not Clearly Approvable -* DHS regulations do not define the terms "approvable" and "not clearly approvable." However, since the petitioner must establish eligibility for the benefit sought by a "preponderance of the evidence," it follows that a Form I-600 is clearly approvable when the petitioner has met his or her burden of proving by a preponderance of the evidence that the beneficiary is eligible for classification as an orphan. Likewise, a Form I-600 is not clearly approvable when the petitioner has not

met his or her burden of proving by a preponderance of the evidence that the beneficiary is eligible for classification as an orphan, or it is unclear whether the petitioner has met this burden. If the Form I-604 determination is favorable, but there is evidence that the child may not be eligible for an IR-3 or IR-4 visa (i.e., there is a potential INA 212(a) inadmissibility issue), then the consular officer may be required to contact State's Visa Office for coordination with USCIS headquarters.

Reasons for finding that the petitioner has not met his or her burden, thus making the Form I-600 "not clearly approvable" include, but are not limited to:

- A significant change within the petitioner's household or a change in the number of children or characteristics of the child the petitioner was approved to adopt that necessitates an RFE for an amended or updated home study (e.g., if an officer discovers during the Form I-604 determination that the child has a significant medical condition for which the family has not been approved);

- Any state pre-adoption requirements have not been met for IR-4 cases;

- There is not enough information in the record to make a favorable determination;

- There is materially inconsistent or conflicting information in the record that must be reconciled; or

- There is adverse information in the record, such as evidence of fraud, child-buying, and/or fraudulent documentation, uncovered as a result of the Form I-604 determination.

Whenever a consular officer determines that the petitioner has not established by a preponderance of evidence that the beneficiary child is an orphan under U.S. immigration law, the officer should refer the case to USCIS as "not clearly approvable."

**Note:** Consular officers may contact the USCIS office that approved a family's Form I 600A through appropriate channels to discuss either of the first two bullets above before referring a case as "not clearly approvable." This may be especially important in circumstances where there is a compelling medical or humanitarian need necessitating a more expedited process.

*Process -* When referring a Form I-600 petition to USCIS as "not clearly approvable," consular officers must:

- Complete the Form I-604 determination in accordance with the guidance in the Completing Form I-604 section above;

- Complete Blocks 3 through 13 and 15 of Form I-604 and sign and date the form in the Officer Performing Inquiry Section on Page 4;

- Draft a NCA Memo in accordance with relevant State policy;

- Send the Form I-600 petition, all supporting documents, the completed Form I-604, the NCA memo, and any other related documentation to the international USCIS office having jurisdiction over the case; and

- Notify the prospective adoptive parent(s) that their case has been referred to USCIS as NCA and inform USCIS by phone or email that the case in en route.

**Note:** While 8 CFR 204.3(h)(11) does not specify exactly how consular officers must notify the prospective adoptive parent(s), it is best practice to provide such notice in writing, explaining generally why the case has been identified as NCA.

Consular officers are encouraged to contact the appropriate USCIS office abroad with any questions as to whether a petition is NCA before approving or referring a case. At any point, USCIS and consular officers may reach out and coordinate with each other to consult about a case or seek additional information. Such open lines of communication are not only encouraged, but can also save time and prevent miscommunications/ misunderstandings. Consular officers may be required to notify State's Visa Office of any discussions about specific cases.

Once USCIS receives an NCA case, a USCIS officer will review the case carefully and will interact with Post and State's Visa Office as necessary to make sure the USCIS officer fully understands the consular officer's concerns before proceeding. The USCIS office is responsible for first determining whether the available evidence is sufficient to approve the Form I-600. If the available evidence is sufficient, the officer will approve the petition and return the petition to Post for visa screening. If the evidence is insufficient, the officer may:

- Issue a RFE to the petitioner, which allows the petitioner 84 days (plus additional time for mailing, if appropriate) to gather additional evidence and provide it to USCIS;

- Issue a NOID if all required evidence is submitted but the evidence submitted does not establish eligibility or the decision will be adverse to the petitioner and is based on derogatory information considered by USCIS and of which the petitioner is unaware. Petitioner has 30 days (plus time for mailing, if appropriate) to submit evidence sufficient to overcome the grounds for a denial; or

- Issue a Denial, in rare cases where the officer determines that there is no possibility that the petitioner can rebut the reason for denial (i.e., the child was older than 16 when the Form I-600 was filed and is no longer eligible for consideration).

Any time USCIS sends an RFE or NOID, the petitioner has the opportunity to respond with additional information. The officer must then assess the totality of the evidence in the record to determine if the petitioner has met his or her burden of proving that the beneficiary child is entitled to orphan status.

If an officer has suspicions or doubts about the bona fides of a child's eligibility as an orphan, the officer must identify specific factual evidence to support any decision to deny. When the record contains factual evidence proving that it is more likely than not that the child is eligible for the benefit, an officer's suspicions alone are insufficient for a denial of the case. However, where there is specific factual evidence that raises doubts about any aspect of the petitioner's proof, an officer may reevaluate the reliability and sufficiency of the remaining evidence offered in support of the visa petition. See Matter of Ho, 19 I&N Dec. 582, 591 (BIA 1988).

As previously noted, referring a case as NCA may or may not result in a denial. An NCA case may be approved without additional evidence if USCIS determines that the petitioner has established that the child is an orphan by a preponderance of the evidence, or if a petitioner provided additional evidence that resulted in a favorable determination. Similar to cases filed with USCIS where USCIS approved the petition after issuance of an RFE, USCIS may ultimately approve NCA petitions after the petitioners provide additional information. If additional evidence is provided, the USCIS officer may consult with the Post that referred the case to verify documents or consult on country norms.

If USCIS approves a petition but the consular officer adjudicating the visa application believes that the applicant is not eligible for a visa, or discovers new evidence that the consular officer believes would support revoking the approval, according to the Department of State's Foreign Affairs Manual, Post should send an Advisory Opinion to CA/VO/L/A requesting further guidance per 9 FAM 42.43 N4.1 and N4.2. CA/VO will advise Post on next steps.

2. How to Return Already Approved Forms I-600 for Possible Revocation (Consular Returns).

Officers abroad completing a Form I-604 determination may return the approved Form I 600 petition to the USCIS adjudicating office that previously approved the Form I 600 petition with a recommendation for revocation. In the most common scenario, the consular officer receives a Form I-600 petition that has already been approved, either domestically by the USCIS National Benefits Center or by a USCIS international field office. For the Form I-600 petitions approved domestically by USCIS, the adverse information that leads to a consular return recommending that USCIS revoke approval of the petition is generally uncovered during the Form I-604 determination, which occurs after approval but before immigrant visa processing.

A Form I-600 petition must be revoked in accordance with 8 CFR 205.2 when information is discovered that would have resulted in denial had it been known at the time of adjudication. See Chapter 21.5(d)(5)(B) and 8 CFR 204.3(h)(14). USCIS can properly issue a Notice of Intent to Revoke (NOIR) a petition where there is "good and sufficient cause." A NOIR is properly issued when the evidence of record at the time of issuance, if unexplained and unrebutted, would warrant denial of the petition based upon the petitioner's failure to meet his burden of proof. See Matter of Estime, 19 I&N Dec. 450 (BIA 1987).

A Form I-600 petition must be revoked in accordance with 8 CFR 205.2 when information is discovered that would have resulted in denial had it been known at the time of adjudication. See Chapter 21.5(d)(5)(B) and 8 CFR 204.3(h)(14). USCIS can properly issue a Notice of Intent to Revoke (NOIR) a petition where there is "good and sufficient cause." A NOIR is properly issued when the evidence of record at the time of issuance, if unexplained and unrebutted, would warrant denial of the petition based upon the petitioner's failure to meet his burden of proof. See Matter of Estime, 19 I&N Dec. 450 (BIA 1987).

Doubts that do not call the beneficiary's eligibility into question, or that are not supported by probative evidence, are not sufficient. See Matter of Arias, 19 I&N Dec. at 570-71. Probative evidence is evidence which proves or helps prove a fact or issue.

**Jurisdiction -** Only USCIS officers have authority to revoke approval of Form I-600 petitions and, before doing so, must provide the petitioner with a NOIR. 8 CFR 205.2(b). Note: A NOIR is not required when the petitioner or beneficiary dies or when some other automatic ground for revocation under 8 CFR 205.1 applies. See 8 CFR 205.2(b).

**Recommendation of Revocation -** If, after receiving an approved Form I-600 from USCIS, a consular officer identifies probative evidence - either from the Form I-604 determination or that come to light prior to or during the visa process - that would have led USCIS to deny the petition had it been known at the time of adjudication, the consular officer should return the petition to the USCIS adjudicating office for possible revocation.

**Process -** When returning a Form I-600 petition to USCIS for revocation, consular officers must:

- Draft a memo recommending revocation (often referred to as a Consular Return or, Revocation Memo) in accordance with State policy.

- Explain in the Revocation Memo whether the recommendation is based on the Form I-604 determination results (which must be documented and completed in accordance with the Completing Form I-604 section above) or other probative evidence discovered prior to or during visa interview/screening which may establish good and sufficient cause to proceed with a NOIR.

- Clearly articulate in the Revocation Memo the factual basis for revocation, explaining why the information is probative and why approval would not have been proper had the information been

known at the time of adjudication. Attach as enclosures all new and relevant, case-specific evidence, including copies of any sworn statements, Q&As, or other relevant evidence such as identified patterns or trends in a particular country or region in accordance with the general principals in the Completing Form I-604 guidance above.

- Return the Form I-600 petition, completed Form I-604 and results, all supporting documentation and evidence, and the Revocation Memo to the USCIS NBC via the National Visa Center if the case was approved domestically or directly to the USCIS international office if the case was approved abroad.

- Consular officers are encouraged to notify the petitioner that the case has been returned to USCIS, and also inform USCIS by email or phone that the case is en route.

At any point, USCIS and consular officers may reach out and coordinate with each other to consult about the case or to seek additional information. Such open lines of communication are not only encouraged, but can also save time and prevent miscommunications/misunderstandings. Consular officers may be required to notify State's Visa Office of any discussions about specific cases.

Once USCIS receives a consular return case, a USCIS officer will carefully review the case and interact with Post as necessary to make sure the USCIS officer fully understands the consular officer's concerns. USCIS may then:

- Issue a NOIR, which will generally give the petitioner 30 days (plus time for mailing, if appropriate) to submit evidence sufficient to overcome the intended revocation; or

- Reaffirm the Form I-600 approval and send the case back to the appropriate Consular Section, via the National Visa Center, for visa screening.

If USCIS reaffirms a petition but the consular officer adjudicating the visa application believes that the applicant is not eligible for a visa or discovers new evidence that the consular officer believes would result in a revocation request, Post should send an Advisory Opinion to CA/VO/L/A requesting further guidance per 9 FAM 42.43 N4.1 and N4.2. State's Visa Office will advise Post on next steps.

(J) <u>How to Proceed when USCIS Completes the Form I-604</u>.

Since USCIS has reassumed responsibility for Form I-604 determinations for domestically filed petitions in some locations, USCIS international offices in those locations may also return an approved Form I-600

petition to the NBC recommending revocation. The same process outlined in section (I)(2) above applies to these returns, which are not technically "consular" returns but rather USCIS international office returns.

(6) Special Instructions for Forms I-600 Filed on Behalf of Beneficiaries in Nepal. If the USCIS National Benefits Center (NBC) receives a petition filed after August 27, 2010 on behalf of a beneficiary child residing in Nepal, it will suspend adjudication of the petition, and forward the entire record of proceedings to the National Visa Center (NVC), and notify the petitioner(s) of the transfer. The NBC will also forward any pending Form I-600 petitions filed on behalf of a child residing in Nepal to the NVC. (Note: These special instructions do not apply to a Nepalese beneficiary who is physically present outside Nepal.

The NVC will then forward a scanned copy of the Form I-600 to the U.S. Embassy, Kathmandu for immediate processing and will mail the original to post. Concurrent with this authority, petitioners adopting children exempt from the suspension will be encouraged to file the Form I-600 with U.S. Embassy, Kathmandu before traveling to, and adopting a child in, Nepal. The petitioners will be advised to send their Form I-600 and supporting documents to their local agency representatives in Nepal who will then deliver the documents to the embassy.

The U.S. Embassy, Kathmandu will send the petitioner written confirmation when it receives the Form I-600 and supporting evidence. A consular officer will review the petition and supporting evidence and conduct necessary field inquiries to determine whether the child qualifies as an orphan. If the U.S. Embasssy, Kathmandu determines that the Form I-600 is clearly approvable, it will approve the petition and proceed to issuance of the immigrant visa. If the U.S. Embassy, Kathmandu determines that the Form I-600 petition is not clearly approvable, it will forward the unadjudicated Form I-600 petition to USCIS, New Delhi office for further review and action.

(7) Special Instructions for Forms I 600 Filed on Behalf of Beneficiaries from, and physically located in, Taiwan. USCIS will accept Form I-600 petitions filed on behalf of a beneficiary child from, and physically located in, Taiwan who is not yet the subject of a final legal custody order or final adoption by U.S. citizen prospective adoptive parents residing in the United States, overseas, or who have traveled overseas to complete an adoption. (Note: These special instructions do not apply to a beneficiary child from Taiwan who is physically located outside of Taiwan.) Petitioners adopting Taiwan children from, and physically located in, Taiwan are encouraged to file the Form I 600 petition and supporting documents with the USCIS National Benefits Center (NBC) in Lees Summit, MO, through the appropriate USCIS lockbox before traveling to, and adopting a child in, Taiwan. (See www.USCIS.gov for filing instructions for the NBC.) The USCIS Bangkok Field Office and American Institute in Taiwan (AIT) will continue to accept Form I-600 petitions, but such petitions will be forwarded to the USCIS NBC for a preliminary determination. Concurrent filings of Form I-600A applications with Form I-600 petitions with a USCIS office abroad will also be forwarded to the NBC under this policy.

Petitioners should file with USCIS a completed Form I-600 together with all available documentation regarding the child's immigration eligibility that is currently required when filing a Form I-600 petition,

except the adoption decree or grant of legal custody. In addition, petitioners adopting from Taiwan should submit:

1)    Evidence of availability for intercountry adoption generated by the Taiwan island-wide database;

2)    Signed adoption agreement between birth parents and prospective adoptive parents for use in Taiwan District Family courts; and

3)    Power of attorney appointing the Taiwan ASP to represent the prospective adoptive parents.


A USCIS adjudications officer will review the petition and supporting evidence and request that AIT conduct the necessary Form I-604 investigation to determine whether the child appears to qualify as an orphan and is otherwise likely eligible to immigrate to the United States on the basis of the filed Form I-600 petition. If USCIS makes a favorable preliminary determination that the Form I-600 beneficiary appears to meet the definition of an orphan at INA 101(b)(1)(F), and otherwise appears eligible to immigrate, it will issue a PAIR letter. This preliminary eligibility determination is not a final adjudication of the Form I-600 petition, and is not binding on USCIS. USCIS will then forward the file to AIT.


After the adoption or grant of legal custody is completed the adoptive parents will submit the adoption decree or legal custody order and required identity documents for the child to AIT, which will then issue the final approval of the Form I-600, if approvable. If AIT determines that the Form I 600 petition is not clearly approvable at that time, it will return the unadjudicated Form I 600 petition to USCIS for further review and action. If USCIS needs additional information or determines that the child does not meet the definition of an orphan, USCIS will notify the prospective adoptive parents and give them an opportunity to respond.


(8)  Special Instructions for Forms I 600 Filed on Behalf of Beneficiaries from, and physically located in, Ethiopia. USCIS will accept Form I-600 petitions filed on behalf of a beneficiary child from, and physically located in, Ethiopia who is not yet the subject of a final legal custody order or final adoption by U.S. citizen prospective adoptive parents residing in the United States, overseas, or who have traveled overseas to complete an adoption. (Note: These special instructions do not apply to a beneficiary child from Ethiopia who is physically located outside of Ethiopia.) Petitioners adopting children from, and physically located in, Ethiopia are encouraged to file the Form I 600 petition and supporting documents with the USCIS National Benefits Center (NBC) in Lees Summit, MO, through the appropriate USCIS lockbox before traveling to, and adopting a child in, Ethiopia. (See www.USCIS.gov for filing instructions.) The USCIS Overseas Field Offices and U.S. Embassy in Addis Ababa, Ethiopia, as appropriate, will continue to accept Form I-600 petitions, but such petitions will be forwarded to the USCIS NBC for a preliminary determination of eligibility. Concurrent filings of Form I-600A documentation with Form I-600 petitions with a USCIS office abroad will also be forwarded to the NBC under this policy.

(e)    <u>Requirements under the Intercountry Adoption Universal Accreditation Act (UAA)</u> . Effective July 14, 2014, officers will determine whether the UAA applies to a particular Form I-600A or Form I-600 adjudication, and if it does, follow the adjudicative steps in this section. If the UAA does not apply, instead follow the adjudicative steps listed in Chapter 21.5(b)-(d) and (f).

The UAA requires that all agencies or persons providing adoption services on behalf of prospective adoptive parents in support of Form I-600A, or Form I-600, must be accredited or approved, or be a supervised or exempted provider, in accordance with the Intercountry Adoption Act of 2000 and the Department of State accreditation regulations at 22 CFR Part 96 for Hague Adoption Convention cases.

Under 22 CFR 96.2, *adoption service* means any one of the following six services:

1.  Identifying a child for adoption and arranging an adoption;

2.  Securing the necessary consent to termination of parental rights and to adoption;

3.  Performing a background study on a child or a home study on a prospective adoptive parent(s), and reporting on such a study;

4.  Making non-judicial determinations of the best interests of a child and the appropriateness of an adoptive placement for the child;

5.  Monitoring a case after a child has been placed with prospective adoptive parent(s) until final adoption; or

6.  When necessary because of a disruption before final adoption, assuming custody and providing (including facilitating the provision of) child care or any other social service pending an alternative placement.

The UAA has significant implications for orphan adjudications, including: home study preparation and required home study elements; the definitions of adult member of the household, home study preparer, suitability as adoptive parent(s), officer, adoption, and applicant; duty of disclosure obligations; and identifying a primary provider. Each of these issues is addressed in the below guidance. Please direct

questions to the Refugee, Asylum and International Operations Directorate (International Operations Division Headquarters) and Field Operations Directorate (USCIS National Benefits Center) through proper channels.

(1)    How to Determine Whether the UAA Applies .

The UAA does not apply to cases that meet certain criteria (i.e. grandfathered cases). **A case is grandfathered and the UAA does not apply if:**

1.  The prospective/adoptive parents filed Form I-600A or Form I-600, before July 13, 2013; **OR**

2.  The prospective adoptive parents submitted an application to the relevant competent authority (the application need not designate a specific child) or the prospective adoptive parents accepted a match proposed by a competent authority or appropriate entity, before July 13, 2013 (see the Department of State website and when available supplementary country-specific materials for interpretative guidance on this provision).

Officers should first determine if a case is grandfathered under option 1 above and only look to option 2 if the case cannot satisfy option 1. If it is not clear that option 2 is satisfied, officers may issue a Request for Evidence (RFE) requesting evidence that would establish that the case is grandfathered under option 2. In cases where an officer cannot determine if a case meets option 2, the officer should consult the appropriate Adoption Division country officer using AdoptionUSCA@state.gov to determine whether option 2 is satisfied. When adjudicating Form I-600A or Form I-600, if officers cannot determine whether a case is grandfathered based on the evidence in the record, officers should issue an RFE.

(2)    Adjudication of Form I-600A When the UAA Applies .

(A)    See and follow the guidance at Chapter 21.5(b)(1)-(3) for "Jurisdiction and Proper Filing," "Evidence that the PAP (and Spouse, if Married) is Prima Facie Eligible," and "Fingerprinting Requirements," respectively.

(B)    Ensuring Proper Home Study Preparation and/or Approval.

All home studies must be conducted by an individual or agency authorized under 22 CFR Part 96 to

conduct home studies for Hague Adoption Convention cases (see definition of home study preparer in 8 CFR 204.301), which includes:

- Public domestic authorities;

- Accredited agencies;

- Approved persons;

- Supervised providers; and

- Exempted providers.

The above terms are defined at 22 CFR 96.2. Note that the Hague Adoption Convention, and thus, the Department of State Regulations at 22 CFR Part 96 distinguish between an "agency" (a private non-profit organization) and a "person" (an individual or for-profit entity). (See 22 CFR 96.2 for these definitions and the Department of State website for more on this distinction).

While 22 CFR Part 96 allows approved persons to conduct home studies, it requires that an accredited agency review and approve such a home study. Thus, per 22 CFR 96.47(c), an accredited agency must review and approve any home study that was not performed by an accredited agency. This review and approval requirement, however, does not apply when the home study is prepared by a public domestic authority (see 8 CFR 204.311(t)(2)).

See the Department of State website for a list of accredited agencies and approved persons. If the home study preparer is not an accredited agency or public domestic authority, officers must ensure that the home study has been reviewed and approved by an accredited agency before its submission to USCIS. If officers do not see evidence of such review and approval, issue an RFE.

(C)    Home Study Requirements.

A valid, original home study must be submitted within one year of the filing of a Form I-600a . If a home study is not submitted within one year of the filing of a Form I-600A, the Form I-600A must be denied pursuant to 8 CFR 204.3(h)(5) . This home study, or the most recent update of the home study, must be no more than six (6) months old at the time of submission and must contain the original signature of the home study preparer.

8 CFR 204.3(e) and certain definitions in 8 CFR 204.3(b) no longer apply in orphan cases that are subject to the UAA (see 8 CFR 204.301 for the definitions of "adult member of the household," "home study

preparer," "suitability as adoptive parent(s)," "officer," "adoption," and "applicant," which includes both a married U.S. citizen and his or her spouse).

Under 8 CFR 204.311, the home study must now:

- Be tailored to the particular situation of the ***applicant*** (defined at 8 CFR 204.301 to mean the applicant *and* his or her spouse, if married). For example, an applicant who has previously adopted children will require different preparation than an applicant who has no adopted children.

- Be tailored to the specific country in which the applicant intends to seek a child for adoption. (The home study may address the applicant's suitability to adopt in more than one country, but if the home study does so, the home study must separately assess the applicant's suitability as to each specific country.)

- Identify any additional adult members of the household (defined at 8 CFR 204.301) by name, alien registration number (if the individual has one), and date of birth.

- State the number of interviews and visits, the participants, date and location of each interview and visit, and the date and location of any other contacts with the applicant and any additional adult member of the household. Under 8 CFR 204.311(g)(1), the home study preparer must conduct at least one interview in person, and at least one home visit with the applicant.

- Include at least one interview by the preparer of any additional ***adult member of the household*** and an assessment of him or her in light of the requirements of 8 CFR 204.311. According to 8 CFR 204.311(g)(2), the interview should be in person, unless the home study preparer determines that interviewing that individual in person is not reasonably feasible and explains the reason for this conclusion.

- Include the home study preparer's assessment of any potential problem areas, a copy of any outside evaluation(s), and the home study preparer's recommended restrictions, if any, on the characteristics of the child to be placed in the home. (8 CFR 204.309(a) requires denial as a consequence for a failure to disclose certain information or cooperate in completion of a home study.)

- Include the home study preparer's signature under penalty of perjury, in accordance with 8 CFR 204.311(f).

- Summarize the pre-placement preparation and training already provided to the applicant concerning the issues specified in 22 CFR 96.48(a) and (b), the plans for future preparation and training with respect to those issues, or with respect to a particular child, as specified in 22 CFR

96.48(c). (22 CFR 96.48(a) requires at least ten (10) hours of preparation and training designed to promote a successful intercountry adoption unless an exemption applies under 22 CFR 96.48(g).)

- Summarize the plans for post-placement monitoring specified in 22 CFR 96.50, in the event that the child will be adopted in the United States rather than abroad.

- Specify whether the home study preparer made any referrals as described in 8 CFR 204.311(g)(4) and include a copy of the report resulting from each referral, the home study preparer's assessment of the impact of the report on the suitability of the applicant to adopt, and the home study preparer's recommended restrictions, if any, on the characteristics of the child to be placed in the home.

- Include results of the child abuse registry checks conducted in accordance with 8 CFR 204.311(i) of every state or foreign country in which the applicant or any adult member of the household has resided since his or her 18th birthday, including that no record was found to exist, that the state or foreign country will not release information to the home study preparer or anyone in the household, or that the state or foreign country does not have a child abuse registry.

- Include each person's response to the questions regarding abuse and violence in accordance with 8 CFR 204.311(j).

- Contain an evaluation of the suitability of the home for adoptive placement of a child in light of any applicant's or additional adult member of the household's history of abuse and/or violence as an offender, whether this history is disclosed by an applicant or any additional adult member of the household or is discovered by home study preparer, regardless of the source of the home study preparer's discovery. A single incident of sexual abuse, child abuse, or family violence is sufficient to constitute a "history" of abuse and/or violence.

- Include a certified copy of the documentation showing the final disposition of each incident which resulted in arrest, indictment, conviction, and/or any other judicial or administrative action for anyone subject to the home study and a written statement submitted with the home study giving details, including any mitigating circumstances about each arrest, signed, under penalty of perjury, by the person to whom the arrest relates.

- Contain an evaluation of the suitability of the home for adoptive placement of a child in light of disclosure by an applicant, or any additional adult member of the household, of a history of substance abuse. A person has a history of substance abuse if his or her current or past use of alcohol, controlled substances, or other substances impaired or impairs his or her ability to fulfill

obligations at work, school, or home, or creates other social or interpersonal problems that may adversely affect the applicant's suitability as an adoptive parent.

- Include a general description of the information disclosed in accordance with 8 CFR 204.311(m) concerning the physical, mental, and emotional health, or behavioral issues of the applicant and of any additional adult member of the household.

- Identify the agency involved in each prior or terminated home study in accordance with 8 CFR 204.311(n), when the prior home study process began, the date the prior home study was completed, and whether the prior home study recommended for or against finding the applicant or additional adult member of the household suitable for adoption, foster care, or other custodial care of a child. If a prior home study was terminated without completion, the current home study must indicate when the prior home study began, the date of termination, and the reason for the termination.

If any of the above required home study elements are missing or deficient, issue an RFE, Notice of Intent to Deny (NOID), or denial as appropriate. See 8 CFR 204.309(a) for the home study and disclosure-related reasons necessitating a denial of Form I-600A.

The officer who is adjudicating the Form I-600A must be satisfied that proper care will be provided for the orphan. Pursuant to 8 CFR 204.3(h)(2) , if there is reason to believe that a favorable home study was based on inadequate or erroneous evaluation of all of the facts, the officer must attempt to resolve these issues with the home study preparer, the applicant, and the state agency that reviewed the home study (if any). Issues that may need to be addressed include, but are not limited to: criminal history; one or more disabilities and/or impairments of the applicant; threatening/dangerous behavior when working with USCIS; and financial issues.

If the home study will be more than six (6) months old at the time of submission to USCIS, the applicant must ensure that it is updated by the home study preparer before it is submitted to USCIS. Also, if there have been any significant changes in the applicant's circumstances (such as a change of residence, marital status, criminal history, financial resources, and/or the addition of one or more children or other dependents to the family) or changes in the characteristics of the child the applicant intends to adopt, the applicant must ensure that an amended home study addressing the changed circumstances is submitted to USCIS.

(D)   Pre-adoption Requirements.

If the Form I-600A indicates that the child is to be adopted or re-adopted in the United States, the applicant must establish that the pre-adoption requirements of the state of the child's intended residence, if any, have been met. If the applicant is unmarried and intends to adopt or re-adopt the child in the United States, it must be established that adoption by an unmarried person is legal in the state of the child's intended residence.

(E)   Form I-600A/I-600, Supplement 1, Listing of Adult Member of the Household.

Applicants are required to submit a Supplement 1 for each adult member of their household, as defined at 8 CFR 204.301. (Note: under 8 CFR 204.301, the term applicant includes the applicant, and his/her spouse, if married). If in the adjudication of Form I-600A, the officer learns about an adult member of the household for whom there is no signed Supplement 1, the officer should issue an RFE for the Supplement 1 signed by the adult member of the household. Officers should update CAMINO/ACMS, as appropriate, to indicate that USCIS has received a Supplement 1 for each adult member of the household.

(F)   See and follow the guidance at Chapter 21.5(b)(6) and (7) for a "Child from a Hague Convention Country" and "Adjudicative Issues," respectively..

(3)   Post-Form I-600A Adjudication Actions . See and follow the guidance at Chapter 21.5(c). Indicate the home study preparer and the accredited adoption agency, or primary adoption service provider (if any) in the appropriate field on the Visas 37 cable.

(4)   Adjudication of Form I-600 when the UAA Applies . Except as provided in Chapter 21.5(d)(6), (7) and (8), proper adjudication of the Form I-600 will include a thorough review of each answer on the petition, inspection of all evidence submitted with the petition, and reference to the pertinent law, regulations, precedent decisions, and current policy. All processing steps in the Form I-600 SOP must be followed.

(A) See and follow the guidance at Chapter 21.5(d)(1)-(8) regarding:

1.   "Jurisdiction and Proper Filing";

2.   "Adjudicative Issues";

3.   "Stepparents";

4.   "Evidentiary Requirements if No Form I-600A Was Filed Previously (Combination Filing)";

5.   "Documenting That A Child is an Orphan under **INA 101(b)(1)(F)** and Conducting Form I-604 Determinations";

6.   "Special Instructions for Forms I-600 Filed on Behalf of Beneficiaries in Nepal";

7.   "Special Instructions for Forms I-600 Filed on Behalf of Beneficiaries from, and physically located in Taiwan"; and

8.   "Special Instructions for Forms I-600 Filed on Behalf of Beneficiaries from, and physically located in Ethiopia"; respectively

(B) Apply the same UAA Form I-600A and Supplement 1 guidance listed at Chapter 21.5(e)(2)(B)-(E) above when adjudicating Form I-600, as appropriate.

(C) <u>Identifying a Primary Adoption Service Provider</u>.

A petitioner must identify a primary adoption service provider. Under 22 CFR Part 96, a primary provider is responsible for:

1.  Ensuring that all six adoption services defined at 22 CFR 96.2 are provided consistent with applicable laws and regulations;;

2.  Supervising and being responsible for supervised providers where used (see 22 CFR 96.14); and;

3.  Developing and implementing a service plan in accordance with 22 CFR 96.44.

Only accredited agencies or approved persons can act as primary providers. Petitioners may still act on their own behalf in their own adoption case if permitted under the laws of the state in which they reside and the laws of the country from which they seek to adopt. Although petitioners do not need accreditation or approval to act on their own behalf, their actions need to comply with applicable law, and petitioners will still need to engage an accredited agency or approved person to act as the primary provider in their case. A primary provider helps to ensure that orphan adoption services are provided with the same standards of practice and ethical conduct as Hague Adoption Convention cases. See the Department of State website for a list of accredited agencies and approved persons.

If in the adjudication of Form I-600, the officer determines that the petitioner has not sufficiently identified a primary adoption service provider, the officer may issue an RFE. (Note: Form I-600 petitions released after 03/05/13 include a field for the petitioner to list the primary adoption service provider.)

If an officer has received notice or has knowledge that the petitioner's primary adoption service provider has withdrawn from the petitioner's case, the officer should issue an RFE, requesting evidence that either: 1) the current primary adoption service provider remains so; or, 2) the petitioner has identified a new primary adoption service provider. (Note: Officers may only contact the primary provider if there is a valid Privacy Act waiver from the petitioner.)

Note: If an officer identifies a non-UAA grandfathered case with no evidence of a primary adoption service provider, but all the adoption services were provided before July 14, 2014, or the case was initiated between July 13, 2013 and July 14, 2014, please visit the USCIS adoption website to see if any supplementary information applies and if not, contact the Refugee, Asylum and International Operations Directorate (International Operations Division Headquarters) and Field Operations Directorate (USCIS National Benefits Center) through proper channels.

(D) <u>Consular Officer Referrals of Form I-600 Petitions to USCIS as "Not Clearly Approvable" or Returns of Form I-600 Petitions to USCIS Recommending Revocation</u>.

(i) Consular officer adjudicating Form I-600s

When adjudicating Form I-600 on USCIS's behalf, if a Department of State consular officer cannot determine whether the UAA applies to a case based on the evidence in the record, he or she should first attempt to see if evidence of UAA-grandfathered status exists. If the case does not appear to be grandfathered, ask that the petitioner indicate the name, address, and contact information of his or her primary adoption service provider to prevent unnecessary adjudicative delays. If the petitioner does not have a primary adoption service provider or is unable to provide this information, refer the petition as "not clearly approvable" to the USCIS international office that has jurisdiction to act on the petition, along with the supporting documents, the completed Form I-604, and any other relevant documentation per 8 CFR 204.3(h)(11).

If a petition does not appear to be UAA-grandfathered and the petitioner provides the name, address, and contact information of his or her primary adoption service provider, consular officers should not typically need to refer a petition to USCIS as "not clearly approvable." However, if there is: 1) a significant change within the petitioner's household or a change in the number of children or characteristics of the child the petitioner was approved to adopt that necessitates an RFE for an amended or updated home study or other adoption service; or, 2) the Form I-600 petition is "not clearly approvable" for another reason (UAA-related or otherwise), the officer should refer the petition as "not clearly approvable" to the USCIS international office that has jurisdiction to act on the petition, along with the supporting documents, the completed Form I-604 (with a detailed description of why the petition is "not clearly approvable"), and any other relevant documentation per 8 CFR 204.3(h)(11).

Note: Nothing prevents consular officers from contacting the USCIS office that approved a family's Form I-600A through proper channels to discuss the changes noted in (1) above before sending a case as "not clearly approvable".

Should any situation arise that has not been addressed above or if an officer identifies a non-UAA grandfathered case where all the adoption services were provided before July 14, 2014, and there is no evidence of a primary adoption service provider, please contact the Refugee, Asylum and International Operations Directorate (International Operations Division Headquarters) and Field Operations Directorate (USCIS National Benefits Center) through proper channels.

(5)    Post-Form I-600 Adjudication Actions . See and follow the guidance at Chapter 21.5(f). Indicate the primary adoption service provider in the appropriate field on the Visas 38 or Visas 39 cable as appropriate.

See and follow the guidance at Chapter 21.5(f). Indicate the primary adoption service provider in the appropriate field on the Visas 38 or Visas 39 cable as appropriate.

(f)  Post-adjudications Actions.

(1) Approvals.

Prepare Form I-171 (Notice of Approval of Relative Visa Petition) or Form I-797 (Notice of Action) in all cases.  Security checks must be current.

(A)     If petition is approved by a USCIS office in the United States:

- Forward the Form I-600 and all supporting documentation to the NVC.

- In the case of a child approved as "adopted abroad," prepare and forward the "Visas 38" to the NVC.

- In the case of a child approved as "coming to be adopted," prepare and forward the "Visas 39" to the NVC.

- Provide the petitioner with Form I-171/I-797.

- If the Form I-600 was accompanied by a Form G-28 completed by an attorney or by an accredited representative of an agency that has been recognized by the Board of Immigration Appeals pursuant to 8 CFR 292.2 , provide a copy of the Form I-171/I-797 to such entity. See note below.

- Retain a copy of the Form I-171/I-797, and a copy of the "Visas 38" or "Visas 39" cable and document the date of mailing in the A-file that was created in the child's name.

Note:
To forward the approval packet to the NVC expeditiously, the PAP must provide a prepaid envelope from a courier that provides express mailing service.


(B) If a petition is approved by a USCIS office overseas:  [Reserved for future instructions]


(2)   Denials.

If the Form I-600 cannot be approved, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing.  Pursuant to 8 CFR 103.2(b)(16) , a notice of intent to deny is not required unless the intended denial is based upon information and/or evidence of which the petitioner is unaware. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.


(3)     Revocations .

If the Department of State returns an approved Form I-600 for possible revocation following a Form I-604 determination, follow the applicable provisions of 8 CFR 205.2 regarding notice of intent to revoke, revocation. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider. Remember, however, that the return of a case by the Department of State for possible revocation is only a recommendation.


If the USCIS office that initially approved the Form I-600 believes that the information contained in the Form I-604 report does not support a revocation, the Form I-600 should be returned to the entity that recommended revocation with an explanation as to why revocation is not appropriate.


If USCIS does revoke the approval of the Form I-600, prepare and forward a "Visas 90" to the NVC. In addition, a petition may be subject to automatic revocation (without issuance of a notice of intent to

revoke) pursuant to 8 CFR 205.1 if any of the following conditions should occur prior to the visa issuance: death of the petitioner; death of the beneficiary; or withdrawal of the petition by the petitioner.

Footnotes

[1] Many questions on the Form I-604 are self-explanatory and do not require specific guidance to complete. Those questions are not specifically addressed in this PM and AFM update.

[2] USCIS assumed jurisdiction over Form I-604 processing in Haiti on September 16, 2013, and in the Republic of Korea on September 22, 2014.

[3] See Section 291 of the Act, 8 U.S.C. § 1361; Matter of Brantigan, 11 I&N Dec. 493 (BIA 1966).

[4] See Matter of Kodwo, 24 I& N Dec. 479, 482 (BIA 2008) (citing Matter of Fakalata 18 I&N Dec. 213 (BIA 1982); Matter of Annang, 14 I&N Dec. 502 (BIA 1973)).

[5] See Matter of Chawathe, 25 I&N Dec. 369, 375 (AAO 2010).

[6] See Matter of Chawathe, 25 I&N Dec. at 376; Matter of E-M-, 20 I&N Dec. 77, 80 (INS 1989).

[7] See INS v. Cardozo-Fonseca, 480 U.S. 421 (1987) (defining "more likely than not" as a greater than 50 percent probability of something occurring).

[8] See Matter of Chawathe, 25 I&N Dec. at 376.

[9] See INA § 205; 8 CFR 205.2; 8 CFR 204.3(h)(14); Matter of Estime, 19 I&N Dec. 450 (BIA 1987

[10] See Matter of Cheung, 12 I&N Dec. 715 (BIA 1968).

[11] See Matter of Estime, 19 I&N Dec. at 451.

[12] See Matter of Arias, 19 I&N Dec. 568, 570-51 (BIA 1988).

[13] See Matter of Estime, 19 I&N Dec. at 451.

[14] An order may be legally invalid if the order was issued by an entity without proper authority to issue such orders, or if the court invalidated its order.

[15] This could be an abandonment decree or be incorporated into the adoption decree itself.

[16] Although the INA uses the terms "natural" siblings and "natural" parent, USCIS uses the terms "birth" sibling and "birth" parent where possible in response to concerns raised by the adoption community. In this guidance, USCIS uses "birth" and "natural" synonymously.

[17] This means the country of the orphan's citizenship, or if he or she is not permanently residing in the

country of citizenship, the country of the orphan's habitual residence. This excludes a country to which the orphan travels temporarily, or to which he or she travels either as a prelude to, or in conjunction with, his or her adoption and/or immigration to the United States. See 8 CFR 204.3(b).

[18] See Immigration and Naturalization Service (INS) Cable HQ 204.21-P, 204.22-P, reprinted in Interpreter Releases, January 2, 1996. This INS guidance remains in effect for USCIS.

[19] See USCIS PM-602-0071.1, The Jurisdiction of Amended Home Studies and the Application of Home Study Age Restrictions for Prospective Adoptive Child(ren) in Intercountry Adoption Cases, November 5, 2012.

[20] Id.

**21.6 Petition for a Hague Convention Adoption. (added 10-31-2008)**

(a)   <u>Application of the Hague Adoption Convention</u> .

On November 16, 2007, the President, acting on the advice and consent of the Senate, ratified the Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption ("Hague Adoption Convention"). The Hague Adoption Convention entered into force for the United States on April 1, 2008. On the same day, title III of the Intercountry Adoption Act ("IAA"), **Public Law 106-279** , and the Hague Adoption Convention regulations, **8 CFR 204** , subpart C, also entered into force. Title III of the IAA, in section 302, enacted new sections **101(b)(1)(G)** and **204(d)(2)** of the Immigration and Nationality Act ("Act"), which govern the immigration of an alien child who is habitually resident in a country that is a party to the Hague Adoption Convention and who seeks to immigrate based on the child's adoption by a United States citizen habitually resident in the United States.

The Hague Adoption Convention, sections **101(b)(1)(G)** and **204(d)(2)** of the Act, and the Hague Adoption Convention regulations apply to any case in which a citizen who is habitually resident in the United States seeks to accord immediate relative status upon a child who is habitually resident in a Hague Adoption Convention country other than the United States based on an adoption occurring on or after April 1, 2008.

See Chapter 21.16 of this AFM, for information on what qualifies as an "adoption" for immigration purposes. As noted in that chapter, guardianships, "simple adoptions," or Kafala adoptions in countries that follow traditional Islamic law might not qualify. But because a Hague Convention adoptee can be brought to the United States for adoption, instead of being adopted abroad, a guardianship, Kafala order, or other custody order might qualify as a "decree or administrative order…giving custody of the child," 8 CFR 204.313(h)(1)(ii)(A). The document giving legal custody must be valid under the law of the country in which it was obtained. Depending on the governing law, the custody document may be either a court order or an administrative act. Provided the legal custody is for purposes of emigration and adoption, in accordance with the laws of the foreign-sending country, and all other requirements are met, the evidence could support approval of the Form I-800 as an IH-4, rather than an IH-3 case.

Adjudicators may find a list of countries that are parties to the Hague Adoption Convention at:

**https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/understanding-the-hague-convention/convention-countries.html**

If an adopted child is from a Hague Adoption Convention country, the citizen adoptive parent may not file a **Form I-130** (under section **101(b)(1)(E)** ) or a **Form I-600** (under section **101(b)(1)(F)** ), unless the citizen adoptive parent establishes that the child's adoption and immigration are not governed by the Hague Adoption Convention.

The child's adoption and immigration are not governed by the Hague Adoption Convention if the citizen adoptive parent completed the adoption before April 1, 2008.

If, by contrast, the parents acquired custody of the child for purposes of emigration and adoption before April 1, 2008, but did not actually complete the adoption before April 1, 2008, the adoption of the child on or after April 1, 2008, is governed by the Hague Adoption Convention.

For a case involving the adoption, on or after April 1, 2008, of a child habitually resident in a Hague Adoption Convention, the child's adoption and immigration are not governed by the Hague Adoption Convention and the implementing statute and regulations if the citizen parent filed a Form I-600A (whose period of approval or extension has not expired) or Form I-600 before April 1, 2008. Rather, these cases will proceed as orphan cases under section **101(b)(1)(F)** of the Act.

For a **Form I-130** case under section **101(b)(1)(E)** of the Act, involving an adoption occurring on or after April 1, 2008, the child's adoption and immigration are not governed by the Hague Adoption Convention and the implementing statute and regulations if the citizen parent establishes that, at the time of the adoption,

·   EITHER the citizen was not habitually resident in the United States; OR

·   The child was not habitually resident in the other Hague Adoption Convention country.

(b)    Determining "Habitual Residence ."

The Hague Adoption Convention regulation, at **8 CFR 204.303** , gives the principles for determining the whether the adoptive parent and adopted child are deemed to be "habitually resident" in a particular country.

(1)   Principles for Determination .

(A)   A U.S. citizen is deemed to be "habitually resident" in the United States if he or she is domiciled in the United States, that is, if he or she actually has a *legal* residence in the United States with the intent to maintain that residence for the indefinite future, even if he or she is living temporarily abroad.

(B)   A U.S. citizen is also deemed to be "habitually resident" in the United States if he or she is domiciled abroad, but the U.S. citizen plans to take either of the following actions before satisfying the 2-year residence and custody requirements that would permit the child to immigrate under section **101(b)(1)(E)** :

·   establishing a domicile in the United States on or before the date of the child's admission for permanent residence (and, therefore, will be living with the child in the ''United States'' after the adoption); or

·   bringing the child to the United States temporarily to obtain the child's naturalization under **section 322** of the Act;

Thus, a U.S. citizen will be deemed to be "habitually resident" in the United States if the citizen seeks to bring the child to the United States as a direct consequence of the adoption.

(2)   A child is generally deemed to be habitually resident in a Hague Adoption Convention country if he or she is a citizen of that country. If the child is actually residing in a country other than the country of citizenship, however, the child may be deemed to be habitually resident in that other country if the Central Authority of that other Convention country, or another competent authority in either a Convention or non-Convention country determines that the child's status in that country is sufficiently st able to make it appropriate for that country to exercise jurisdiction over the adoption of the child.

AR2022_300375

(c)   Order entered before the filing of Form I-800.

(1)   General .

Articles 4, 5 and 17 of the Hague Adoption Convention contemplate that a Hague Convention adoption will not occur before the completion of the Hague Convention adoption process. The receiving country must first determine, *before a placement is made,* that the prospective adoptive parents are suitable for intercountry adoption. The sending country must then determine, *before a placement is made,* that the child is eligible for intercountry adoption. Finally, the receiving country must determine, *before the adoption order is obtained,* that the child will be eligible to immigrate to the receiving country.

Because of these Hague Adoption Convention requirements, **8 CFR 204.309(b)(1)** provides that a Form I-800 must be denied if the adoptive parents adopted the child, or obtained custody for purposes of adoption, before USCIS has granted provisional approval of the **Form I-800** .

In fact, **8 CFR 204.309(b)(1)** requires that the adoptive parents must show that a premature order was voided, vacated, annulled or otherwise terminated, in order to file a Form I-800. The Form I-800 may be provisionally approved, if the adoption or custody order has been terminated before the filing of the Form I-800. Final approval of the Form I-800 could then be granted if a new adoption or custody order is granted *after* the first was voided, vacated, annulled or otherwise terminated, *and* after USCIS has provisionally approved the Form I-800.

| **Note** |
|---|
| Because **8 CFR 204.309(b)(1)** was not in effect before April 1, 2008, the need to void, vacate, annul or otherwise terminate a custody order that pre-dates provisional approval of a **Form I-800** *does not* apply to a custody order that was entered before April 1, 2008. 8 CFR 204.309(b)(1) does, however, apply to an adoption order that was entered before provisional approval of the Form I-800, even if there was a custody order entered before April 1, 2008. |

(2)   Satisfying the requirement of 204.309(b)(1) where legal custody for purposes of adoption or the adoption order were obtained on or after April 1, 2008 but before provisional approval of Form I-800.

Some countries may not have readily available mechanisms for voiding, vacating, annulling or otherwise terminating a premature adoption or custody order. If the petitioner adopted the child before the provisional approval of the **Form I-800** , the adjudicator should send a request for evidence ("RFE") asking the petitioner for one or the other of the following items of evidence:

| **First option** |
| --- |
| An order from a competent authority voiding, vacating, annulling, or otherwise terminating the adoption or custody order OR |

| **Second option** |
| --- |
| Two separate statements, as follows: |
| ·   A statement from the petitioner, signed under penalty of perjury under United States law, explaining why, despite the clearly stated requirement in 8 CFR 204.309(b)(2) and the warnings on the Instructions for Form I-800A and Form I-800, the petitioner obtained the adoption or custody order before obtaining provisional approval of a Form I-800; AND, |
| ·   A statement from the Central Authority indicating that, under the law of that country, the petitioner is not able to obtain an order voiding, vacating, annulling or otherwise terminating the adoption or custody order. |

The RFE should also request a copy of the law governing the voiding, vacating, annulling or termination of adoptions, as well as a certified English translation of that law.

If the petitioner takes the first option, and submits an order voiding, vacating, annulling or otherwise terminating the adoption or custody order, the adjudicator may grant provisional approval of the **Form I-800** , if it is otherwise approvable.

If the petitioner takes the second option, and the response to the RFE establishes that the petitioner is not able, under the law of the country of the child's habitual residence, to obtain an order voiding, vacating, annulling, or terminating an adoption or grant of custody that occurred after April 1, 2008, and before the provisional approval of a **Form I-800** , USCIS will adjudicate the Form I-800 in light of the fact that the adoption or custody order appears to have been obtained without compliance with the Hague Adoption Convention requirements and related U.S. laws and regulations, including section 301(b) of the IAA.

Section 301(b) of the IAA provides that it is the Secretary of State's certification under section **204(d)(2)** of the Act that establishes, conclusively, that a Hague Convention adoption or custody order is entitled to recognition in the United States as a valid adoption. This certificate under section 204(d)(2) of the Act will not have been issued at the provisional approval stage. Thus, at the provision approval stage, the validity of the adoption or custody order, under United States law, will not yet have been conclusively established. USCIS may, therefore, deem the "voiding" requirement in **8 CFR 204.309(b)(1)** to be satisfied, solely for purposes of *provisional* approval.

In the case of a petitioner who takes the second option, even if the evidence does show that the adoption or custody order cannot be voided, vacated, annulled or otherwise terminated, the Form I-800 will be denied under **8 CFR 204.309(b)(1)** if the evidence of record establishes that the petitioner knowingly obtained the adoption or custody order before filing the Form I-800 with the specific intent of circumventing the requirements of the Convention, the IAA, and the implementing regulations.

If the Form I-800 is provisionally approved, the petitioners may then apply for an immigrant visa for the child under 22 CFR 42.24, and the immigration process for the child can go forward. If, in the course of this process, the Department of State issues the section **204(d)(2)** certification, this certification will establish substantial compliance with the Hague Convention and the IAA, and that the adoption or custody order is entitled to recognition in the United States as a valid adoption or custody order. USCIS (or the Department of State, on behalf of USCIS) may then grant final approval of the Form I-800.

(d) <u>Home studies – checking abuse registries</u> .

Under **8 CFR 204.311** (i), the home study preparer must check "available child abuse registries in any State or foreign country," if the prospective adoptive parents or an additional adult member of the household has resided in that State or foreign country after his or her 18th birthday.

To aid adjudicators, USCIS has sought to determine which countries, other than the United States, maintain "child abuse registries" in the sense intended in the regulation. As this information becomes available with respect to a particular country, USCIS will make the information available to adjudicators.

Until such time as USCIS is able to verify that a particular country does have such a child abuse registry, USCIS will find that a home study complies with this requirement in 8 CFR 204.311(i) if the home study preparer states in the home study that the home study preparer has consulted the Central Authority of the foreign country (if the Hague Convention Adoption applicant was living abroad in a Hague Adoption

Convention country) or other competent authority (for the Hague Convention Adoption applicant was living abroad in a country that is not a Hague Adoption Convention country) and has determined, based on this consultation, that the foreign country does not have a child abuse registry.

(e)      Affidavit of Support .

With respect to the affidavit of support, the Hague Adoption Convention rule amended **8 CFR 213a.2** to take account of a child immigrating to the United States as a Convention adoptee. As with "orphans" under section **101(b)(1)(F)** of the Act, no Form I-864, *Affidavit of Support Under* Section **213A** *of the Act*, is needed for a Convention adoptee who has been adopted abroad, and who will acquire citizenship through automatic naturalization under section **320(a)** of the Act upon admission for permanent residence.

For a Convention adoptee who will be adopted in the United States, rather than abroad, the child will not become a citizen by automatic naturalization under section 320(a) until the adoption is completed in the United States. If the child will be adopted in the United States, a Form I-864 may be needed unless the child is otherwise exempt. For example, if the adoptive parents, between them, have a total of 40 quarters of work under the Social Security Act, they may be eligible to file Form I-864W, *Intending Immigrant's Affidavit of Support Exemption*, instead of Form I-864.

(f)      Application for Citizenship .

With respect to naturalization under section **322** of the Act, the Hague Adoption Convention rule amended 8 CFR 322.3(b)(1)(xii) to facilitate the naturalization of a Convention adoptee under section 322. As with other children of U.S. citizens, this procedure is available in the case of a child from a Convention country who is adopted by a U.S. citizen parent who does not intend to take up residence in the United States subsequent to the adoption.

A U.S. citizen domiciled outside the United States may facilitate the child's naturalization under section **322** by bringing the child to the United States after adoption and before the child's 18th birthday. The U.S. citizen would still follow the Hague Adoption Convention procedures by filing Form I-800A and then **Form I-800** unless the U.S. citizen has already fulfilled the two-year joint residence and legal custody requirement for purposes of INA section **101(b)(1)(E)** .

Once **Form I-800** is provisionally approved, the U.S. citizen adoptive parent will be invited by USCIS to

file **Form N-600K** on behalf of his/her prospective adoptive child. Once Form N-600K has been reviewed and eligibility to receive a certificate has been preliminarily determined, an interview will be pre-arranged and a notice indicating the date, time and place of the interview will be issued to the prospective adoptive parent.

| **Note:** |
| --- |
| The U.S. citizen parent will have to demonstrate that he/she has the required five years of residence in the United States, or if the parent does not meet the residency requirements, that the parent's U.S. citizen parent (grandparent) has the required five years of residence in the United States. |

Upon receipt of a Form N-600K interview notice and adoption decree and approval of Form I-800, the U.S. Consulate/Embassy will issue a B-2 visa to the child for the purposes of attending the required interview in the United States. At the time of the interview, the U.S. citizen adoptive parent will need to provide evidence of the Form I-800 final approval, the adoption decree, as well as all other documents previously submitted for the child with Form I-800. USCIS is developing Instructions for submitting and processing Form N-600K.

**21.7 Petition for an Amerasian.**

REFERENCES

Law: Sections 204(f) and 205 of the Immigration and Nationality Act: Pub. L. 97-359.

Regulations: 8 CFR 204.4; 8 CFR 205

(a) General .

On October 22, 1982, Pub. L. 97-359 was enacted for humanitarian reasons. As a result of this legislation, a new section 204(g), later redesignated as section 204(f), was added to the Immigration and Nationality Act. Under this section of law, a petition for immediate relative, first family-based preference, or third family-based preference classification may be filed on behalf of an alien born in Korea, Vietnam, Laos, Kampuchea, or Thailand after December 31, 1950, and before October 22, 1982, who was fath ered by a U.S. citizen.

In every case, a guarantee of financial responsibility must be signed by a U.S. citizen or lawful permanent resident sponsor at least 21 years of age. The sponsor must agree to support the beneficiary for 5 years or until the beneficiary becomes 21 years of age, whichever period of time is longer. In the case of an alien under 18 years of age, the alien's placement must be arranged by an appropriate agency, and the sponsor must agree to file a petition with the appropriate court within 30 days of the benefi ciary's arrival in the U.S. to be awarded legal custody of the beneficiary. The guarantee of financial responsibility and intent to petition for legal custody may be enforced by the Attorney General in a civil suit.

(b) Forms .

You should become familiar with the following forms used in these cases and any instructions on them:

· I-360     Petition for Amerasian, Widow or Special Immigrant.

· I-361     Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97-359 Amerasian.

· I-362     Report on Public Law 97-359 Amerasian Interview / Investigation.

· I-363     Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97-359 Amerasian.

· I-365     Notice of Completion of Preliminary Processing of Petition for Public Law 97-359 Amerasian.

· I-367     Public Law 97-359 Amerasian Worksheet. ( **Note:** This worksheet is a simple, step-by-step processing guide. Since Pub. L. 97-359 Amerasian petitions are rarely filed in DHS offices other than in certain locations such as Seoul, Korea, it is particularly useful as an aid to adjudicators unfamiliar with the provisions of Pub. L. 97-359.)

(c) Filing Requirements .

(1) Petitioner .

| **Note:** |
| --- |
| (Unlike most other visa petition situations, an alien beneficiary may file on his or her own behalf.) The petition may be filed by: |

· Any person who is 18 years of age or older (regardless of nationality, status in the U.S., or lack of such status);

·   Any emancipated minor (regardless of nationality, status in the U.S., or lack of such status); or

·   Any U.S. corporation.

(2) <u>Location</u> .

If the alien is in the U.S., the petition must be filed at the Service Center having jurisdiction over the alien's location in the U.S. If the alien is outside the U.S., the petition may be filed:

·   At the overseas DHS office having jurisdiction over the alien's residence;

·   At the U.S. embassy or consulate having jurisdiction over the alien's residence <u>if there is no overseas DHS office having jurisdiction</u> ; or

·   At the USCIS office within the U.S. having jurisdiction over the place where the alien will live.

(3) <u>Supporting Documents</u> .

The petition must be supported by documentation as specified in the instructions on the Form I-360.

(d) <u>Adjudication</u> .

(1) <u>Expeditious Processing</u> .

To the extent possible, adjudicating officers are to expedite the processing of Form I-360 petitions for Pub. L. 97-359 Amerasians for humanitarian reasons.

(2) <u>Two Stage Processing</u> .

Amerasian petitions are usually adjudicated in two stages:

· During the first stage, a determination is made as to whether there is reason to believe that the beneficiary was fathered by a U.S. citizen.

· During the second stage, a determination is made regarding the other requirements.

The two-stage adjudication permits completion of the part of the petition on the beneficiary first so that the sponsor does not need to complete the more complex procedures relating to second stage issues unless the beneficiary is found tentatively qualified for the benefit sought. Those second stage procedures and issues include:

· Sponsorship;

· Placement and legal custody in the case of a beneficiary under 18 years of age;

· A fingerprint check of the sponsor to determine whether he or she is of good moral character;

· An interview of the beneficiary; and

· An overseas investigation to confirm that the beneficiary is eligible for the benefit sought, when necessary.

Upon submission of a Form I-360 for preliminary processing as provided in 8 CFR 204.1(f)(1)(i), the adjudicating officer shall determine whether there is reason to believe the beneficiary was fathered by a U.S. citizen. If the preliminary processing is completed in a satisfactory manner and the fingerprint check of the sponsor is not yet completed or has not disclosed any adverse information which may result in denial of the petition, the officer shall send the petitioner Form I-365, Notice of Completion of Preliminary Processing of Petition for Public Law 97-359 Amerasian, accompanied by a blank Form I-361, Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97-359 Amerasian. If the sponsor's fingerprints on Form FD-258 have not already been obtained, the sponsor must be given an ASC appointment (see Chapter 16 of this field manual).

Upon submission of all further documents required for final processing in response to the Form I-365, the officer shall determine whether the beneficiary qualifies for benefits under section 204(f) of the Act. In the event that the petitioner does not file all required documents within one year of the date of Form I-365, the petitioner must be advised in writing that the petition is considered abandoned.

| **Note** |
| --- |
| If the petitioner submits Form I-360 with all documentary evidence required by paragraphs (1)(i) and (1)(ii) of 8 CFR 204.2(f), the adjudicating officer shall consider all evidence in the case without using the two-stage processing described in 8 CFR 204.4 (d). |

(3) Evidence .

(A) General .

There is no hard and fast rule as to what evidence, or how much evidence, must be submitted in support of a Pub. L. 97-359 Amerasian petition. The petition quite simply must be supported by enough evidence to prove to the satisfaction of the district director that "there is reason to believe" that the beneficiary was fathered by a U.S. citizen as required by the statute. In exceptional circumstances, the putative father and the beneficiary may be asked to submit DNA tests (see Chapter 21.2 of this field man ual).

(B) Certifications from Agencies and Foundations .

Certification from agencies and foundations are to be considered on a case by case basis. A district director may, in his or her discretion, accept these certifications as all or part of the evidence if these certifications are convincing, without requesting overseas investigations. On the other hand, a district director may request an investigation if he or she deems it to be warranted.

(4) Fingerprint Checks .

See Chapter 16 of this field manual.

(5) Interview and Overseas Investigation .

(A) General .

The purpose of the interview, and, when necessary, the overseas investigation, is to confirm that there is reason to believe that the beneficiary was fathered by a U.S. citizen and that the beneficiary was born in Korea, Vietnam, Laos, Kampuchea, or Thailand after December 31, 1950 and before October 22, 1982. Form I-362 is used to report the results of the interview, and, if necessary, the overseas investigation.

The interview and, if necessary, overseas investigation, should explore a number of issues:

·    One of the factors to be considered at the interview is the beneficiary's physical appearance. If the beneficiary's mother or legal guardian is available, the interviewing officer should also interview the mother or guardian. There may be applicants who have a legitimate claim to eligibility but whose physical appearance or documentation are less convincing than in other cases. In these cases, an overseas investigation may be conducted in addition to the interview.

· Another factor to consider when making a determination as to whether there is reason to believe that the beneficiary was fathered by a U.S. citizen is whether the father has contributed to the beneficiary's support. However, since many fathers may not have contributed support, it is not a requirement.

· As part of an overseas investigation, the immigration or consular officer should consult with government officials and officials of private voluntary agencies in the country of the child's birth, if possible.

If the overseas investigation is conducted at a DHS office, the immigration officer may wish to consult with:

· The American consular officer located in the same city;

· A military officer who might have access to personnel records which could be of value (e.g., an officer from the defense attache's office), or

· U.S. citizen civilians (such as missionaries) who have long experience and contacts in the area and might have access to local records.

If the overseas investigation is being conducted at an American consulate or embassy, the consular officer may likewise wish to consult with a U.S. military officer or U.S. citizen civilians.

Where it is impossible to conduct an overseas investigation, the immigration or consular officer must, in every case, determine whether or not the beneficiary is eligible for the benefit sought based upon the interview with the beneficiary. Depending on the circumstances in the country where the beneficiary is residing, the officer shall interview the beneficiary to the extent possible using the best method available.

(B) <u>Beneficiary in the U.S.</u>

If the beneficiary is residing in the U.S., the adjudicating officer shall question the beneficiary at the time of the adjustment of status interview concerning the beneficiary's eligibility for the benefit sought. The officer shall complete as many items of Form I-362 as possible.

If an overseas investigation is necessary, the adjudicating officer shall send Form I-362 to the overseas DHS office having jurisdiction over the beneficiary's place of birth with copies of the petition and all supporting documents.

(C) <u>Petition Filed at Overseas DHS Office</u> .

If the petition is filed at an overseas DHS office and if the beneficiary is available for an interview, the adjudicating officer shall question the beneficiary concerning his or her eligibility for the benefit sought prior to approval of the petition. If an overseas investigation is necessary, the DHS office shall conduct the investigation prior to approval of the petition whether or not an interview is conducted prior to approval of the petition.

If the petition is approved, the adjudicating officer shall forward the original petition to the designated American consulate or embassy. A copy of Form I-360 and a copy of Form I-361 are to be retained in the beneficiary's file. The petition must be accompanied by:

·   The original Form I-361;

·   Form I-362; and

·   All documentary evidence submitted in support of the petition.

(D) <u>Interview at Consulate or Embassy</u> .

If an interview has not yet been conducted with the beneficiary, the consular officer shall question the beneficiary during the processing of the visa application concerning the beneficiary's eligibility for the benefit sought.

(E) Petition Filed at Stateside Office in the Case of Beneficiary Overseas .

When a petition is filed at a stateside office in the case of beneficiary overseas, if the adjudicating officer is unable to determine whether there is reason to believe the beneficiary was fathered by a U.S. citizen without an interview of the beneficiary and an overseas investigation, that officer may request an interview and investigation prior to approval of the petition. The request for interview and investigation should be made to the overseas DHS office having jurisdiction over the beneficiary's plac e of residence. Form I-362 and copies of the petition and all supporting documents must accompany the request.

(6) Financial Issues .

(A) Poverty Guidelines .

For the official poverty guidelines refer to on Form I-361, Affidavit of Financial Support and Intent to Petition for Legal Custody for Pub. L. 97-359 Amerasian, see Appendix 10-3 of this field manual.

(B) Enforcement of Affidavit of Financial Support and Intent to Petition of Legal Custody .

When a Form I-363, Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Pub. L. 97-359 Amerasian, is filed at a USCIS office, the Examinations Section may request an investigation, if necessary, to verify the facts. That section will then forward the request to the regional counsel. The regional counsel will review the request. If the request is valid, it shall be forwarded to the appropriate U.S. Attorney for institution of an enforcement action.

(C) Derivative Beneficiaries of Petitions Approved for 1 st or 3 rd Family-Based Preference Classification .

In considering an application for adjustment of status or an application for an immigrant visa for the derivative beneficiary of a petition to accord a Pub. L. 97-359 Amerasian first or fourth preference classification, the immigration or consular officer must determine whether or not the applicant is likely to become a public charge. It making this determination, the officer must consider whether the principal beneficiary's sponsor or another individual will support the derivative beneficiary. The sponsor is not required by the statute to support the derivative beneficiary.

(7) Final Decision .

(A) Denial .

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(B) Approval .

If no adverse information is developed in a case at a USCIS office, the adjudicating officer shall approve the petition and:

· Forward it, with all attachments, to the National Visa Center (NVC) so that it may be processed and then forwarded to the embassy or consulate where the beneficiary will apply for an immigrant visa if the alien is outside the U.S. or is unable or unwilling to apply for adjustment of status; or

· Retain the approved petition in the beneficiary's file (i.e., A-file is one is pre- existing or receipt/petition file if no A-file exists) and invite him or her to apply for adjustment of status if he or she is in the U.S., and is eligible to and intending to so apply.

The adjudicating officer will also send Form I-797, Notice of Approval of Relative Immigrant Visa petition,

to the petitioner. If no adverse information is developed in a case at a consulate the embassy, the consular officer will proceed with the processing of the visa application.

(C) <u>Revocation Proceedings Based on Adverse Information</u> .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See Chapter 20.3 of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition.

(e) <u>Precedent Decisions</u> .

To date, no precedent decisions have been published with regard to Amerasian visa petitions.

**21.8 Petition for a Parent.**

(a) <u>Eligibility Requirements</u> .

(1) <u>Status</u> .

Only a citizen of the U.S. may file a visa petition for a parent. A petition filed by a LPR must be denied.

(2) <u>Age</u> .

The petitioner must be at least 21 years old at the time of filing.

(3) <u>Relationship</u> .

In order for the beneficiary to be considered the parent of the petitioner:

·    The petitioner must have once qualified as the child of the beneficiary under one or more of the definitions contained in section 101(b)(1) of the Act; and

·    The relationship must continue to exist, even though the petitioner is over age 21 and, therefor, no longer a child. If the relationship has been terminated (as would happen in the case of a stepparent-stepchild relationship if marriage between the stepparent and natural parent were to be terminated by divorce or annulment, or would happen in the case of any other parent-child relationship if the child were to be given up for adoption), the beneficiary would no longer be eligible for classification as a par ent, even though the petitioner had once been considered to be the beneficiary's child.

The requirements for establishing the parent-child relationship are the same as with petitions for children,

except that the roles of the petitioner and the beneficiary are reversed (see **Chapter 21.4** of this field manual).

(b) <u>Filing Requirements</u> .

In accordance with the instructions on the form, the petitioner must file an I-130 petition, with fee and all supporting documents, with:

·   the appropriate Service Center, or

·   the local office having jurisdiction over the beneficiary's location in the U.S., if the beneficiary is filing a concurrent Form I-485.

(c) <u>Adjudication</u> .

(1) <u>Evidence to Support a Petition for a Parent</u> .

In addition to evidence of U.S. citizenship as listed in paragraphs (i) through (vi) of **8 CFR 204.1 (g)** , the petitioner must also provide evidence of the claimed relationship. See the references below:

·   **8 CFR 204.2 (f) (2) (i)** – Primary evidence if the petitioner is a <u>legitimate</u> son or daughter of the beneficiary;

·   **8 CFR 204.2 (f) (2) (ii)** – Primary evidence if the petitioner is a <u>legitimated</u> son or daughter of the beneficiary;

· **8 CFR 204.2(f)(2)(iii)** – Primary evidence if the petitioner is an <u>illegitimate</u> son or daughter of the beneficiary; and

· **8 CFR 204.2(f)(2)(iv)** – Primary evidence if the petitioner is the <u>adopted</u> son or daughter of the beneficiary.

If primary evidence is not available, secondary evidence may be submitted by the petitioner and considered by the adjudicator. See **8 CFR 204.1(g)(2)** and **8 CFR 204.2(d)(v)** and **Chapter 11.1** of this field manual.

(2) <u>Petitions for More than Two Parents</u>.

There is no limitation on the number of parents for whom a single petitioner may file visa petitions. For example, if the (alien) natural parents of the petitioner divorced and both remarried other aliens prior to the petitioner's 18 th birthday, the petitioner could file petitions for his natural mother, his natural father, his stepmother and his stepfather.

(3) <u>Fraud</u>.

While not as common as marriage fraud, parent-child fraud is a serious problem. The same techniques used to detect and deter fraud in petitions filed for children (e.g., DNA tests) apply to petitions filed for parents. See **Chapter 21.2** of this field manual.

(4) <u>Final Decision</u>.

(A) <u>Approval</u>.

If no adverse information is developed in a case at a USCIS office, the adjudicating officer shall approve the petition and:

· Forward it, with all attachments, to the National Visa Center (NVC) so that it may be processed and then forwarded to the embassy or consulate where the beneficiary will apply for an immigrant visa if the alien is outside the U.S. or is unable or unwilling to apply for adjustment of status; or

· Retain the approved petition in the beneficiary's file (i.e., A-file is one is pre- existing or receipt/petition file if no A-file exists) and invite him or her to apply for adjustment of status if he or she is in the U.S., and is eligible to and intending to so apply.

The adjudicating officer will also send Form I-797, Notice of Approval of Relative Immigrant Visa petition, to the petitioner. If no adverse information is developed in a case at a consulate or the embassy, the consular officer will proceed with the processing of the visa application.

(B) Denial . If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(C) Revocation Proceedings Based on Adverse Information .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See Chapter 20.3 of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition.

(5) Derivative Beneficiaries .

There are no provisions in the law for issuance of a visa to a dependent spouse or child of a parent of U.S. citizen. If the person in question qualifies as a (step)parent or sibling of the citizen, then that citizen can file a separate petition on his or her behalf. If the person in question does not so qualify, (e.g., if the person in question married the petitioner's parent subsequent to the petitioner's 18 th birthday) the parent of the citizen could file a second preference petition on his or her behalf, provided all other requirements are met. This may involve considerable delay between the immigration of the petitioner's parent and the person in question, since the process would require (1) the immigration of the parent, (2) the filing and adjudication of an I-130 petition by the newly-immigrated parent, (3) the availability of a second preference visa number, and (4) all necessary steps and checks in the vi sa issuance process.

(d) Precedent Decisions .

In addition to the following precedent decisions pertaining to visa petitions filed on behalf of parents, the adjudicator should also be familiar with precedents pertaining to visa petitions filed on behalf of children (see **Chapter 21.3** ):

·   *Matter of Hassan* , 16 I. & N. Dec. 16 (BIA, 1976) − In order for a son or daughter to confer immediate relative status upon a parent, the petitioner must be a U.S. citizen, at least 21 years of age, and must have once qualified as the "child" of the beneficiary as defined in 101(b) of the Act.

·   *Matter of Fong* , 17 I. & N. Dec. 212 (BIA, 1980) − The fact that a petitioner has already successfully petitioned for a natural parent does not preclude approval of a visa petition filed on behalf of a stepparent in the absence of a statutory bar such as that existing in section 101(b)(1)(E) of the Act with respect to the natural parents of an adopted child.

·   **Matter of Li** , 20 I. & N. Dec. 700 (BIA, 1993) - An adopted child may not confer immigration benefits upon a natural parent without regard to whether the adopted child has been accorded or could be accorded immigration benefits by virtue of his or her adoptive status. An adopted child may not confer immigration benefits upon his or her natural sibling, because their common natural parent no longer has the status of parent of the adopted child for immigration purposes.

**21.9 Petition for a Sibling.**

(a) <u>Establishing the Standing of the Petitioner</u> .

Only a U.S. citizen who is 21 years of age or older may file a petition for a brother or sister for classification under section 203(a)(4).

(b) <u>Establishing a Qualifying Relationship</u> .

It must be established that the petitioner and beneficiary are or once were "children of a common parent" within the meaning of section **101(b)(1)** and **(2)** of the Act. A consanguineous (i.e., blood) relationship between the petitioner and the beneficiary is not required (see *Matter of Hueng* , 15 I. & N. Dec. 145 and *Matter of Garner* , 15 I. & N. Dec. 215). The parent-child relationships can be established through any of the means recognized in the definition of child contained in section 101(b)(1) of the Act (i.e., through birth, through adoption, or through a marriage creating a steprelationship). As in the case of a stepparent-stepchild relationship, a stepsibling relationship is normally dissolved should the marriage of the parent and stepparent end in divorce or annulment (see the discussion under **Chapter 21.4** ). It may help, therefore, to look upon the adjudication of a petition for a sibling as being more of an adjudication of two separate relationships: the relationship between the petitioner and his/her parent, and the relationship between the beneficiary and that same parent. An example may help to illustrate this point:

John Smith married Mary Jones. At the time of the marriage, John Smith had a 19 year old son, Fred, and Mary Jones had a 17 year old daughter, Betty and a 22 year old son, Steve. Fred was the legitimate offspring of John's prior marriage, and Betty and Steve were the legitimate offspring of Mary's prior marriage, both prior marriages having been legally dissolved. Of the 5, only Fred is a citizen of the U.S., the rest being neither citizens nor LPRs. Because Fred was over age 18 at the time of the marriage, he is not considered to be Mary's stepson under immigration law; likewise, Steve is not considered to be Fred's stepson. Betty, on the other hand, became John's stepdaughter because she was under age 18. Under immigration law:

·   Fred and Betty are children of John and are therefore siblings through John only, but not through Mary.

·   Betty and Steve, being the children of Mary and her first husband, are siblings through both of their blood parents.

· Fred is not Mary's son and Steve is not John's son, so (not having a common parent) they are not siblings at all.

If Fred is a citizen, he may file a petition for his sister Betty once he turns 21. He may not file a petition for Steve. Of course, if Betty immigrates to the U.S. and later naturalizes, she may then file a petition for her brother Steve.

(c) <u>Adjudication</u> .

(1) <u>Evidence</u>.

(A) TThe documentation required to establish a sibling relationship varies and depends entirely on the common parent(s) through whom the relationship occurs. Therefore, officers should carefully review the supporting documents to ensure that both the petitioner and beneficiary have a parent-child relationship with the claimed common parent(s), as defined at INA 101 (b)(1)-(2). The following sections of the regulations discuss the primary or secondary evidence necessary to support a petition for a sibling, depending on the nature of the sibling relationship:

· **8 CFR 204.2(g)(2)(i)** – primary evidence, if the siblings share a common mother or are the legitimate children of a common father;

· **8 CFR 204.2(g)(2)(ii)** – primary evidence, if either or both siblings are legitimated;

· **8 CFR 204.2(g)(2)(iii)** – primary evidence, if either sibling is illegitimate;

· **8 CFR 204.2(g)(2)(iv)** – primary evidence for stepsiblings; and

· **8 CFR 204.2(d)(2)(v)** and **(iv)** – secondary evidence of parent-child relationships.

(B) <u>DNA Evidence</u>. When USCIS determines that primary evidence is unavailable or unreliable, it may suggest and accept DNA test results as evidence of a full-sibling relationship (where siblings share two biological parents) or a half-sibling relationship (where siblings share one biological parent). Test results should be evaluated for probative value according to the guidance contained in the chart below. Please note that there are currently no regulations requiring a petitioner or beneficiary to submit DNA test results.

**Overview of Guidance for Sibling DNA Test Results**

| DNA Test Result | Full–Sibling Interpretation | Half–Sibling Interpretation |
| --- | --- | --- |
| **90% or higher**[1] | **Relationship Supported** – Probative evidence that the claimed relationship exists. | **Relationship Supported** – Probative evidence that the claimed relationship exists. |
| **9% to 89%**[2] | **Inconclusive Result** – By itself, the test result is not sufficient to establish the claimed relationship without additional affirmation from an AABB-accredited lab.[3] | **Inconclusive Result** – By itself, the test result is not sufficient to establish the claimed relationship without additional affirmation from an AABB-accredited lab.[4] |
| **Below 9%**[5] | **Relationship Not Supported** – Probative evidence that the claimed relationship does not exist. | **Inconclusive result** – By itself, the test result is not sufficient to establish the claimed relationship without additional affirmation from an AABB-accredited lab. [6]<br><br>In contrast to full-sibling results, this result for half-siblings does not necessarily mean the claimed relationship does not exist. |

**Full- and Half-Sibling Test Results Demonstrating 90 Percent Probability or Higher are Probative Evidence of the Claimed Relationship**

Adjudicators must consider DNA test results reflecting 90 percent probability or higher to be probative evidence of a full- or half-sibling relationship. When an officer determines that primary evidence is unavailable or unreliable, the officer may consider DNA test results reflecting 90 percent probability or higher as sufficient to establish the claimed relationship and forego securing additional evidence. However, petitioners are generally expected to submit other available evidence of the claimed sibling relationship (such as primary evidence, secondary evidence, affidavits, or an explanation as to why it is not possible to submit additional evidence) and evidence of legitimation or a bona fide father-child relationship, if necessary. Generally, a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) will not be required for additional explanation or evidence of the relationship when the record contains a probative DNA test

result.  Where evidence is submitted in addition to DNA test results, adjudicators must consider all evidence in the totality of the circumstances. While a DNA test result may indicate that a relationship is supported, any other evidence to the contrary must also be considered.

**Full-Sibling Test Results Between 9 and 89 Percent Probability are Inconclusive Evidence of the Claimed Relationship**

USCIS considers DNA results reflecting less than 90 percent, but greater than or equal to 9 percent probability, to be inconclusive evidence of a full-sibling relationship. A valid full-sibling relationship may exist, even when a DNA test result reflects less than 90 percent probability.  However, due to the significant variation between inconclusive results, officers should not consider inconclusive results to either support or weaken the case for the existence of the claimed relationship, unless the results include independent clarification from the AABB-accredited lab that demonstrates to the officer that the claimed relationship is more likely than not to exist. For example, comparisons of the test results of the petitioner and beneficiary against the test results of other relatives may lead the lab to indicate that the claimed relationship exists, even if the test results of the petitioner and beneficiary do not reach 90 percent.[7] Where a result is inconclusive, an officer must continue to evaluate the remaining evidence in the totality of the circumstances to determine whether the claimed relationship is more likely than not to exist.

**Full-Sibling Test Results Below 9 Percent Probability Demonstrate that the Claimed Relationship Does Not Exist**

USCIS considers DNA results for full-siblings reflecting less than 9 percent probability to be exclusionary, or as evidence that the claimed full-sibling relationship does not exist. Where DNA test results do not support the existence of a full-sibling relationship, the officer must continue to review other evidence of the claimed relationship. In some rare cases, the remaining evidence may be sufficient to establish a half-sibling or step-sibling relationship.

**Half-Sibling Test Results Below 90 Percent Probability are Inconclusive Evidence of the Claimed Relationship**

Due to the considerable variations in DNA test results for valid half-sibling relationships, USCIS considers half-sibling test results reflecting less than 90 percent probability to be inconclusive for immigration purposes. While an inconclusive result does not necessarily indicate that the claimed relationship does not exist, officers should not consider inconclusive results for half-siblings to either support or weaken the case for the existence of the claimed relationship, unless the results include independent clarification from the AABB-accredited lab, and they demonstrate to the officer that the claimed relationship is more likely than not to exist.[8] Where a result is inconclusive, an officer must continue to evaluate the remaining evidence in the totality of the circumstances. Unlike full-sibling test results, a half-sibling test result below 9 percent does not rule out the possibility that the claimed half-sibling relationship exists.

**Encouraging Testing Against Additional Family Members**

Direct sibling-to-sibling testing is normally performed when it is not possible to test against the common parent(s). Some labs have reported that, when a DNA test is conducted for immigration purposes, the lab may incorrectly believe that it can only test the individuals named on the petition. However, where the

claimed sibling relationship is valid, testing against additional family members improves the likelihood of test results, and thereby reduces the need to issue additional RFEs, NOIDs, or denials. The AABB standards encourage accredited labs to recommend testing against additional relatives, as appropriate.

Including additional family members, particularly first-degree relatives, such as parents and other siblings, or second-degree relatives, such as aunts, uncles, and cousins, in the testing may produce more conclusive results. Therefore, when an RFE or NOID includes a suggestion to undergo voluntary DNA testing, officers should suggest that the petitioner include additional relatives, particularly the shared parent(s), if possible.

### Significance of Type of Relationship Test Conducted

The type of test conducted by the lab may also impact the ultimate result.  For example, when half-siblings explicitly request a half-sibling test rather than a full-sibling test, they will receive a stronger test result.  Conversely, when half-siblings incorrectly request a full-sibling test, they will receive skewed results. The lab may guide a customer as to which test may be appropriate after reviewing initial results. The AABB-accredited lab has sole discretion to set the parameters of the test that will be conducted.

### Loci Tested in Sibling Relationships

USCIS guidance for test results that fall below 90 percent is based upon testing at 20 loci. A locus (or loci, in plural) is a genetic marker which indicates a specific location on the DNA strand. Test results that fall below 90 percent probability have the strongest conclusions if they show 20 loci were tested. Each lab report indicates by name which loci have been tested and, thereby, displays the number of loci tested.

In January 2018, the AABB Relationship Testing Subcommittee revised its standards to require accredited labs to test at least 20 loci for full- and half-sibling relationships where results appear lower than 90 percent (inconclusive or exclusionary). Results that measure at or above 90 percent will not be subject to a minimal loci requirement.

Where DNA testing was conducted after January 1, 2018, (the effective date of the 13th edition of the AABB standards) officers will not need to verify the number of loci tested. However, when evaluating a result that was conducted before January 1, 2018, officers will need to verify the number of loci tested, if a result falls below 90 percent probability.

In general, the officer must advise the petitioner, in writing, of the option to request that the AABB-accredited lab test to 20 loci and/or test against additional relatives to improve the accuracy of results when:

- The result falls below 90 percent probability and fewer than 20 loci were tested;

- The claimed relationship has not otherwise been established by a preponderance of the evidence; and

- The petitioner was not previously advised that results will have the strongest probability if tested to 20 loci.

**Parent–Child Test Results**

USCIS policy on parentage testing remains unchanged.  Parent-child DNA test results between one or both claimed siblings and the claimed common parent will be considered according to current policy relating to DNA testing for parent-child relationships.[9]

**Step-Sibling Relationships**

When DNA test results do not establish the validity of the claimed relationship, but other evidence appears to support a step-sibling relationship, the officer may continue to review the relationship as a step-sibling relationship, if appropriate. For example, if a petitioner submits DNA test results that exclude the possibility of a biological relationship, but the file contains evidence, such as marriage certificates or birth certificates, that indicate the existence of a step-sibling relationship, the adjudicator may evaluate the relationship as a step-sibling relationship.

(2) Fraud .

Eligibility for relative classification as a brother or sister depends upon the petitioner establishing that both petitioner and beneficiary were "children" of a common parent. This relationship is usually established through the submission of the birth certificates of the petitioner and beneficiary, as well as evidence of the relationship between their parents, where appropriate. Some indications that a birth certificate attempting to establish a sibling relationship may be fraudulent include:

· A delayed birth certificate for either the petitioner or the beneficiary might indicate an attempt to document a relationship that does not exist. (Or it might not, since there are also legitimate reasons for obtaining a delayed birth certificate.)

· Birth certificates from countries that are experiencing economic problems or political turmoil should be given special attention. The incentive to leave those countries is great and that fact sometimes causes petitioners who would otherwise obey the law to submit fraudulent documents in support of petitions on behalf of aliens from those countries.

· Some countries change governments frequently. One indication that a birth certificate may be fraudulent is an issuance date that is prior to or after the government of a country came into or went out of

existence. Officers should be familiar enough with the political backgrounds of the countries so that they are able to detect this type of fraud.

While not as common as marriage fraud, sibling fraud is a potential problem. The same techniques used to detect and deter fraud in petitions filed for children (e.g., DNA tests) apply to petitions filed for parents. See **Chapter 21.2** of this field manual.

(4) <u>Final Decision</u> .

(A) <u>Approval</u> .

If no adverse information is developed in a case at a USCIS office, the adjudicating officer shall approve the petition and:

·   Forward it, with all attachments, to the National Visa Center (NVC) so that it may be processed and then forwarded to the embassy or consulate where the beneficiary will apply for an immigrant visa if the alien is outside the U.S. or is unable or unwilling to apply for adjustment of status; or

·   Retain the approved petition in the beneficiary's file (i.e., A-file is one is pre- existing or receipt/petition file if no A-file exists) and invite him or her to apply for adjustment of status if he or she is in the U.S., and is eligible to and intending to so apply.

The adjudicating officer will also send Form I-797, Notice of Approval of Relative Immigrant Visa petition, to the petitioner. If no adverse information is developed in a case at a consulate or the embassy, the consular officer will proceed with the processing of the visa application.

(B) <u>Denial</u> .

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the

petition and notify the petitioner of the reasons in writing. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(C) Revocation Proceedings Based on Adverse Information .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See **Chapter 20.3** of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition.

(d) Precedent Decisions .

In addition to the following decisions, adjudicating officers should be aware of precedents pertaining to visa petitions for parents (see **Chapter 21.8** of this field manual) and those pertaining to spousal visa petitions (see **Chapter 21.3** of this field manual).

·   **Matter of Van Pamelen** , 12 I. & N. Dec.11 (BIA, 1966) – Acknowledgment , but not legitimation, by natural father did not give petitioner standing to petition for sibling through the common father. ( **Note:** This case was decided before the amendments to section 101(b)(1)(E) of the Act allowing a parent-child relationship with the father if the child was born out of wedlock.)

·   **Matter of Mahal** , 12 I. & N. Dec. 409 (BIA, 1967) – Citizen may petition for a sibling born to a common father and different mother where father was married to both mothers in a polygamous relationship if polygamy is legal in the country of the parents marriages and residence. ( **Note:** This case

was decided before the amendments to section 101(b)(1)(E) of the Act allowing a parent-child relationship with the father if the child was born out of wedlock.)

· **Matter of Wong-Setoo** , 12 I. & N. Dec.484 (BIA, 1967) – Petition for a blood niece as a sibling is denied where petitioner's parents "adopted" the beneficiary (their own granddaughter) in China, since adoption of a grandchild is illegal in China.

· **Matter of Campbell** , 13 I. & N. Dec. 552 (BIA, 1970) – This decision was overruled by Matter of Heung (see below).

· *Matter of Butterfly* , 14 I. & N. Dec. 460 (BIA, 1973) – Citizen may not petition for sibling adopted by petitioner's mother where the adoption did not meet the provisions of section 101(b)(1) of the Act in that the beneficiary was over 18 at the time of the adoption.

· **Matter of Kim** , 14 I. & N. Dec. 561 (BIA, 1974) – Citizen cannot petition for sibling who is the child of the same father and the father's concubine if sibling was never legitimated. (This case was specific to Korea and was overruled in part by *Matter of Lee* , 16 I. & N. Dec. 305 (BIA 1977).)

· **Matter of Heung** , 15 I. & N. Dec.145 (BIA, 1974) – Citizen may petition for stepsibling ( *Matter of Campbell* overruled).

· **Matter of Garner** , 15 I. & N. Dec. 215 (BIA, 1975) – While the term "sister" is not defined in the Act, petitioner must establish that he/she and sibling once qualified as the children of a common parent as provided in sections 101(b)(1) and (2) of the Act.

· **Matter of Kwong** , 15 I. & N. Dec. 312 (BIA, 1975) – Citizen cannot petition for sibling who was born to father's concubine in Hong Kong if the concubine did not occupy the status of a *tsip* . Such status requires concubine to enter the household of the man and his principal wife and to accept position subordinate to the principal wife. which did not occur in this case.

· **Matter of Mourillon,** 18 I. & N. Dec. 122 (BIA 1981). In order to qualify as stepsiblings, either (1) the

marriage which created the step-relationships must continue to exist, or (2) where parties to that marriage have legally separated or the marriage also terminated by death or divorce, a family relationship must continue to exist as a matter of fact between the "stepsiblings".

·   **Matter of Li** , 20 I. & N. Dec. 700 (BIA, 1993) - An adopted child may not confer immigration benefits upon a natural parent without regard to whether the adopted child has been accorded or could be accorded immigration benefits by virtue of his or her adoptive status. An adopted child may not confer immigration benefits upon his or her natural sibling, because their common natural parent no longer has the status of parent of the adopted child for immigration purposes.

Footnotes

[1] This does not require testing to 20 loci.

[2] This assumes testing to 20 loci. This row includes results between 89 and 89.99 percent.

[3] For further discussion of the additional affirmation from an AABB-accredited lab, see *Full-Sibling Test Results Between 9 and 89 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed below.

[4] For further discussion of the additional affirmation from an AABB-accredited lab, see *Half-Sibling Test Results Below 90 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed below.

[5] This assumes testing to 20 loci.

[6] For further discussion of the additional affirmation from an AABB-accredited lab, see *Half-Sibling Test Results Below 90 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed below.

[7] In one case, a lab was able to test the petitioner against the beneficiary and also test the petitioner and beneficiary separately against a third sibling. The test results indicated a 44.99 percent probability between the petitioner tested against the beneficiary, a 99.99 percent probability between the petitioner tested against the third sibling, and a 99.96 percent probability between the beneficiary tested against the third sibling.  In evaluating these results, the lab director concluded the following: "Results such as those obtained when testing (the petitioner) against (the beneficiary) can occur even if they are truly full siblings because there is no obligate sharing of alleles in siblings like there is in a parent/child relationship…Using the basic rules of logic, there is a very strong indication that all three are full siblings. Additionally, there are no genetic loci at which four alleles would occur. If it were true that some loci displayed five or six alleles, there would have to be more than two total parents for the three tested alleged siblings. Since this is not true and the indicated Siblingship Indexes were obtained, I feel that the data indicate strongly that all three individuals share the same parents."

[8] For further discussion of the additional affirmation from an AABB-accredited lab, see *Full-Sibling Test Results Between 9 and 89 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed above.

[9] The relationship between each sibling and the claimed common parent must be individually established.  When one sibling's relationship to the common parent is established through primary and/or secondary evidence already contained in the record, the petitioner may only need to submit additional evidence of the claimed relationship between the other sibling and the common parent.  *See* Aytes, Michael,

PM, *Genetic Relationship Testing; Suggesting DNA Tests, Revisions to the Adjudicator's Field Manual (AFM) Chapter 21 (AFM Update AD07-25)*, March 19, 2008  (http://www.uscis.gov/files/pressrelease/genetic_testing.pdf) for additional information on the use of DNA testing to establish a parent-child relationship.

**21.10 Refugee / Asylee Relative Petitions.**

(a) <u>Background</u> .

**Section 207(c)(2)** of the Act entitles a qualifying spouse or child of a refugee to be admitted as a refugee if accompanying or following to join the refugee. **Section 208(b)(3)** of the Act entitles a qualifying spouse or child of an asylee to be granted asylum status if accompanying or following to join the asylee.

(b) <u>Eligibility Requirements</u> .

A Form I-730 ("Refugee/Asylee Relative Petition") may be filed on behalf of either a spouse or a child (i.e., a person meeting the definition contained in paragraphs (A) through (E) of section 101(b)(1) of the Act) by an alien who has been admitted to the United States as a refugee or has been granted asylee status in the United States. A separate Form I-730 must be filed for each beneficiary.

(c) <u>Form and Filing Issues</u> .

Form I-730 must be filed with the Nebraska Service Center.

By regulation, the Form I-730 must be filed within two years of the date on which the refugee petitioner arrived in the United States or was granted asylum status, with the following exceptions:

· If the alien acquired his or her status on or prior to February 27, 1998, the petition could have been filed at any time prior to February 28, 2000.

· If USCIS determines that valid humanitarian reasons exist for extending the filing deadline, it may do so. (There is no set limit on the length of extension which may be granted.)

| Note |
|------|
| If more than 2 years have passed since the refugee arrived in the U.S. or asylum status was granted, and neither of the exceptions applies, the petitioner's only option is to wait until he or she becomes a lawful permanent resident and then file a Form I-130, Petition for Alien Relative. |

(d) <u>General Adjudication Issues</u>.

·  <u>Petitioner's Status</u> - A petitioner must be either a refugee or an asylee in the U.S. when the Form I-730 is filed. If, pursuant to section **209(a)** or section **209(b)** of the Act, he or she adjusts status to that of lawful permanent resident before the petition is approved, the petition may still be approved and the beneficiary may receive derivative status (provided all other requirements are met).

·  <u>Age of (Child) Beneficiary</u> - For asylum and refugee applications pending on or filed after August 6, 2002, whether or not a son or daughter may continue to be classified as a child is based on the age of the derivative at the time the refugee or asylee application is filed. As long as the child was under 21 on the date of filing the asylum or refugee application, he or she will continue to be classified as a child for purposes of adjudicating the refugee or asylum application, This provision continues to protect the beneficiary afte r the approval of the Form I-730, through the admission process, and (in the case of a dependent asylee) the section 209(b) adjustment process. (Section 209(a), under which a refugee or derivative refugee "adjusts" to permanent resident status, does not require that a derivative refugee have continued to qualify as the child of a refugee, so aging out is not an issue.) See **section 207(c)(2)(B)** and **section 208(b)(3)(B)** of the Act. These special provisions do not apply to beneficiaries who had aged out prior to the filing of an I-730 petition on their behalf or whose I-730 petition had been denied prior to August 6, 2002.

·  <u>Marital Status of Beneficiary</u> - A child must be unmarried in order to qualify as a beneficiary of an I-730 petition.

·  <u>Time at Which Relationship Was Created</u> - Generally, in order to qualify as a spouse or child of a refugee or asylee for Form I-730 purposes, the relationship must have existed at the time the petitioner/parent acquired refugee or asylee status (except for in *utero* children, see below). Relationships created after that date do not qualify <u>for Form I-730 petition purposes</u>, although the refugee or asylee may be eligible to file a second preference petition for the same individual once that refugee or asylee adjusts to LPR status.

Unlike other classifications, the regulations at 8 CFR 207.7 and 8 CFR 208.21 governing following to join dependents of refugees and asylees allow a child to qualify even if the child was not born until after the petitioner acquired refugee or asylee status, provided such child was in utero (i.e., had been conceived) prior to the date on which the petitioner acquired such status. Accordingly, an I-730 petition may be approved for a child who was born within approximately 9 months after the date on which the petitioner acquired status, so long as the beneficiary falls within one of the definitions of child set forth in section 101(b)(1) of the Act.

| **Note** |
|---|
| A child might qualify as the child of the principal refugee or asylee even if the petitioner is not the birth father or birth mother as a matter of fact. For example, the petitioner may have been married to the child's mother when the child was born, but may also have been in the United States continuously since prior to the earliest possible date of the child's conception. First, the law of the place of birth of the child may conclusively establish that the mother's husband is the legal birth father. Second, even if the law does not establish a legal parental relationship, when a child is born as the legal child of only one partner of a married couple, the child is considered the "step-child" of the other partner for immigration purposes. See _Matter of Stultz_, 15 I&N Dec. 362 (AG 1975). Because the child qualifies as the petitioner's "step-child" under INA 101(b)(1)(B), you do not need to decide if the child is the petitioner's child under INA 101(b)(1)(A), (C), or (D). |

· Relationship Between the Petitioner and the Beneficiary - With the exception of the issues covered in the preceding bullets, the same relationship issues that pertain to an I-130 petition for a spouse or child pertain to an I-730 petition for the same relationship. Accordingly, in adjudicating an I-730 petition, the adjudicator should be aware of, and follow, the relating guidance set forth in Chapter 21.2, Chapter 21.3 and Chapter 21.4 of this field manual.

· For Adopted Child(ren- Effects of the Adoption - An adopted child, as defined in INA 101(b)(1)(E), can be the beneficiary of a Form I-730. See chapter 21.16 of this AFM for information on what qualifies as an "adoption" for immigration purposes.

(e) Final Decision .

(1) Approval .

If no adverse information is developed in a case at a USCIS office, the adjudicating officer shall approve the petition and either:

·    Send the approved Form I-730 to the National Visa Center, which will in turn forward it to the appropriate overseas post. (See Chapter 16.2(d) and Chapter 16.3(b) of the *Inspector's Field Manual* for information regarding admission of derivative refugees and asylees at ports-of-entry); or

·    Retain the approved petition in the beneficiary's file (i.e., A-file is one is pre- existing or receipt/petition file if no A-file exists) and invite him or her to apply for derivative refugee/asylee status if he or she is in the U.S.

| **Note** |
|---|
| Previously, a Visas Ninety-Two (in the case of a derivative asylee) or Visas Ninety-Three (in the case of a derivative refugee) cable would have been sent to the appropriate U.S. embassy or consulate. Although the practice of sending a cable has been discontinued, I-730 petition approvals are still known as "Visas 92" and "Visas 93" cases. |

(2) <u>Denial</u> .

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing. There is no appeal from the denial of an I 730 petition. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about the opportunity to file a motion to reopen or reconsider.

(3) <u>Reopening Proceedings Based on Adverse Information</u> .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the Nebraska Service Center with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the Nebraska Service Center receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to reopen the decision to approve the petition. The petitioner is to be given the choice of withdrawi ng the petition or having a determination of eligibility made in reopened proceedings. There is no appeal from the revocation

of a Form I-730. After the new decision has been made, the Nebraska Service Center will notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the reopened petition is not withdrawn or denied, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary is being processed for Form I-730 benefits. If the adverse information was developed at an overseas DHS office or a consular post, a memorandum explaining the reasons for not reopening and denying the petition must be attached to the re-affirmed petition.

(e) <u>Precedent Decisions</u> .

To date, there have been no precedent decisions relating to Refugee/Asylee Relative Petitions.

**21.11 Petition for Spouse, Child, or Parent of Certain Deceased U.S. Armed Forces Members [Chapter added 04-03-2006; AD05-34]**

(a) <u>General Eligibility: Immediate Relative Benefits under Section 1703 of Public Law 108-136</u> .

(See **Appendix 21-4** for relevant section of Public Law 108-136.)

Section 1703(a) of Public Law 108-136 provides that a surviving alien spouse, child, or parent of a U.S. citizen may be classified as an immediate relative if the U.S. citizen:

- served honorably in an active duty status in the military, air, or naval forces of the United States; and

- died as a result of injury or disease incurred in or aggravated by combat.

Similarly, sections **1703(c) and (d) of Public Law 108-136** provide that a surviving alien spouse, child, or parent of a lawful permanent resident (LPR) may be classified as an immediate relative if the LPR:

- served honorably in an active duty status in the military, air, or naval forces of the United States;

- died as a result of injury or disease in or aggravated by combat; and

- has been granted posthumous citizenship under section **329A** of the Act.

The adjudicator may treat such surviving alien spouse, child, or parent as an immediate relative (IR) for purposes of sections **201(b)(2)(A)(i)** , **204(a)(1)(A)(ii)** , and **245** of the Act if the surviving family member satisfies the other applicable requirements of section **1703 of Public Law 108-136** and is otherwise eligible for the immigration benefit(s) sought.

(1) <u>Spouse, Child, or Parent of United States Citizen Member of the Armed Forces</u>

Section 1703(a) provides that a surviving alien spouse, child, or parent of a United States citizen member of the Armed Forces can remain classified as an immediate relative under certain circumstances.

    (A) <u>Spouse or Child</u>

(i)    <u>The alien spouse or child must file</u> **Form I-360.** In cases where the qualifying U.S. citizen died on or after November 24, 2003, the alien spouse or child may file **Form I-360** with fee within 2 years of the qualifying U.S. citizen's death. In cases where the qualifying U.S. citizen died on or after September 11, 1999, but prior to November 24, 2003, the alien spouse or child must have filed the **Form I-360** on or before November 24, 2005.

(ii)    <u>Special Consideration for the Spouse</u> . The alien spouse must have been the spouse of the U.S. citizen at the time of the U.S. citizen's death and cannot have been legally separated from the U.S. citizen at that time. Unlike other provisions of the Act, there is no requirement that the marriage must have existed for a specific length of time. The spouse will cease to qualify as an immediate relative if he or she remarries prior to obtaining lawful permanent residence based on his or her relationship to the deceased U.S. citizen.

(iii)    <u>Special Consideration for the Child</u> . The alien child will remain classifiable as an immediate relative even if he or she marries or turns 21 years of age.

(B) Parent

(i)    The alien parent must file **Form I-360** . In cases where the qualifying U.S. citizen died on or after November 24, 2003, the alien parent may file **Form I-360** with fee within 2 years of the qualifying U.S. citizen's death. In cases where the qualifying U.S. citizen died on or after September 11, 1999, but prior to November 24, 2003, the alien parent must have filed the **Form I-360** on or before November 24, 2005.

(ii)    Special Consideration for the Parent . The alien parent will remain classifiable as an immediate relative irrespective of the U.S. citizen's age at the time of the U.S. citizen's death. The standard requirement that a U.S. citizen must be over the age of 21 in order to petition for his or her parents does not apply.

(2) Spouse, Child, or Parent of Lawful Permanent Resident (LPR) Member of Armed Forces

Section **1703(c) and (d) of Public Law 108-136** provide that a surviving alien spouse, child, or parent of an LPR member of the armed forces may be classified as an immediate relative under certain circumstances.

(A) Spouse or Child

The alien spouse or child must either:

(i)    be the beneficiary of an approved **Form I-130** filed by the deceased LPR under section **203(a)(2)** of the Act as a spouse or child of a lawful permanent resident or

(ii)    self-petition by filing a **Form I-360** to obtain an immediate relative classification within 2 years of the qualifying LPRs posthumous naturalization.

(B) Parent . The alien parent must file **Form I-360** to obtain an immediate relative classification within 2 years of the deceased LPRs posthumous naturalization.

(C) Eligibility for Interim Relief and Benefits . If present in the United States, the alien spouse, child, or parent is eligible for deferred action, an Employment Authorization Document (EAD), and/or advance parole, as necessary. The office with jurisdiction over the **Form I-360** may grant such benefits.

(b) USCIS Interpretation of "Died as a result of…Combat"

Consistent with the statutory definition of "combat-related disability" as well as United States Department of Defense (DOD), United States Veterans Affairs (VA), and United States Coast Guard (USCG) standards used to make combat-related disability determinations, the adjudicator is directed to interpret "died as a result of injury or disease incurred in or aggravated by combat" to mean:

(1) The death is attributable to an injury or disease for which the member was awarded the Purple Heart; or

(2) The death resulted from an injury or disease that was incurred or aggravated:

(A) as a direct result of armed conflict;

(B) while engaged in hazardous service;

(C) in the performance of duty under conditions simulating war; or

(D) through an instrumentality of war.

To determine if a death related to a particular incident is combat-related, the adjudicator should consult the guidelines that are currently used by DOD, as in the following:

(1) Purple Heart

"Death attributable to an injury or disease for which the service member was awarded the Purple Heart" means that the service member received a Purple Heart for such injury or disease and also died as a result of such injury or disease. Generally, the death is associated with an incident involving armed conflict.

(2)(A) Direct Result of Armed Conflict

"Death resulting from an injury or disease that was incurred or aggravated as a direct result of armed conflict" means that the service member's injury or disease was sustained or further exacerbated in armed hostilities and such injury or disease resulted in the service member's death. Armed conflict includes war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerilla action, riot, or any other action in which service members are engaged with a hostile or belligerent nation, faction, force, or terrorists. Armed conflict may also include incidents involving a service member while interned as a prisoner of war, while detained against the service member's will in custody of a hostile or belligerent force, or while escaping or attempting to escape from such confinement, prisoner of war, or detained status. Evidence simply demonstrating that the service member's death occurring during a period of war, in an area of armed conflict, or while the service member participated in combat operations is insufficient to show that the service member's death directly resulted from armed conflict.

(2)(B) While Engaged in Hazardous Service

"Death resulting from an injury or disease that was incurred or aggravated while engaged in hazardous service" means that the service member died from an injury or disease that was the direct result of actions taken in the performance of such service. Hazardous service includes, but is not limited to, aerial flight, parachute duty, demolition duty, experimental stress duty, and diving duty. Hazardous service does not include travel to and from hazardous service duty or actions incidental to a normal duty status.

(2)(C) In the Performance of Duty Under Conditions Simulating War

"Death resulting from an injury or disease that was incurred or aggravated in the performance of duty under conditions simulating war" means that a service member's participation in a combat simulation activity caused or exacerbated an injury or disease, which resulted in the service member's death. The performance of duty under conditions simulating war includes participation in military training, such as war games, practice alerts, tactical exercises, airborne operations, leadership reaction courses, grenade and live fire weapons practice, bayonet training, hand-to-hand combat training, repelling, and negotiation of combat confidence and obstacle courses. Incurring or aggravating an injury or disease during military training without participation in combat simulation activity, however, is not considered combat-related. Consequently, the performance of duty under conditions simulating war does not include physical training activities, such as calisthenics and jogging or formation running and supervised sport activities.

(2)(D) <u>Instrumentality of War</u>

"Death resulting from an injury or disease that was incurred or aggravated through an instrumentality of war" means that the instrumentality of war caused the service member's injury or disease, which resulted in the service member's death. Sustaining or aggravating an injury or disease during an actual period of war, however, is not required. An instrumentality of war is a vehicle, vessel, or device designated primarily for Military Service and intended for use in Military Service at the time the service member's injury or disease was incurred or aggravated. An instrumentality of war may also include an instrumentality that is not designated primarily for Military Service if use of, or occurrence involving, such instrumentality subjects the service member to a hazard or risk peculiar to Military Service. Therefore, a determination that a service member's death resulted from an instrumentality of war may include instances where the death occurred in any period of service as a result of such diverse causes as: wounds caused by a military weapon; accidents involving a military combat vehicle; or injury or sickness caused by fumes, gases, or explosion of military ordinance, vehicles, or material.

(c) <u>Evaluation of Evidence Addressing "Died as a Result of…Combat"</u>

It is the responsibility of the surviving alien spouse, child, or parent of the deceased service member to prove that the service member "died as a result of injury or disease incurred in or aggravated by combat." The adjudicator should make reasonable efforts to verify whether the service member died of a combat-related injury or disease by contacting the appropriate DOD, VA, or USCG office when necessary. The adjudicator should exercise normal judgment and discretion when reviewing evidence submitted to establish that the service member's death was combat-related and when determining whether the service member "died as a result of injury or disease incurred in or aggravated by combat."

(1) <u>Evidence</u> .

Evidence should include, but is not limited to, the following:

(A) The service member's death certificate, if such certificate indicates that the service member's death was attributable to a combat-related injury or disease;

(B) Purple Heart certificate, other combat decoration, or DOD or USCG service records showing the award of a Purple Heart or combat decoration and, if available, accompanying citations explaining that the service member's death was attributable to an injury or disease for which the service member was awarded the Purple Heart or other combat decoration;

(C) DOD or USCG forms, service records, service medical records, reports, or casualty notification telegrams indicating that the service member's death was the result of an injury or disease that qualified the service member or the service member's family for a Combat-Related Special Compensation (CRSC) benefit or demonstrating a causal relationship between an injury or disease that resulted in the service member's death and a combat-related incident or activity;

(D) VA administrative, adjudicative, medical, or clinical records or reports showing that the service member's death was the result of an injury or disease that qualified the service member or the service member's family for a Combat-Related Special Compensation (CRSC) benefit or demonstrating a causal

relationship between an injury or disease that resulted in the service member's death and a combat-related incident or activity; and/or

(E) Other credible documentation that is not issued or endorsed by DOD, VA, or USCG but sufficiently proves that the service member's death resulted from an injury or disease incurred in or aggravated by a combat-related incident or activity.

Evidence demonstrating that DOD, VA, or USCG has determined that the service member's death was combat-related or qualified for a CRSC benefit clearly meets the "died as a result of injury or disease incurred in or aggravated by combat" provision.

(2) Consultation with DOD, VA, and/or USCG

The adjudicator should consult with the appropriate office within DOD, VA, and/or USCG under the following conditions:

(A) The adjudicator cannot determine eligibility, because the submitted DOD, VA, and/or USCG-issued and endorsed documents are inconclusive.

(B) The evidence has not been issued and endorsed by DOD, VA, or USCG, and the evidence is inconsistent with the circumstances, conditions, and/or hardships of the service member's active duty status assignments and responsibilities or is otherwise unsatisfactory.

**Appendix 21-5** contains a list of DOD, VA, and USCG offices that serve as points-of-contact. If more detailed information for DOD, VA, or USCG points-of-contact is needed, the adjudicator should contact the California Service Center, Posthumous Citizenship for Military Casualties and Derivative Citizenship Team, at the following email address: CSCN644.REF9@dhs.gov .

(d) Jurisdiction and Filing Instructions .

(1) **Form I-360** and **Form I-485** Jurisdiction . An alien in the United States who qualifies for benefits under section **1703** as an immediate relative and who needs to file **Form I-360** may file **Form I-360** alone or concurrently with **Form I-485** . Both the California Service Center (CSC) and the USCIS district office that has jurisdiction over the alien's place of residence for family-based petitions and applications may accept a stand-alone **Form I-360** or **Form I-360** concurrently filed with **Form I-485** . However, if the alien is currently residing outside of the United States, he or she needs to file only **Form I-360** with the USCIS overseas office having jurisdiction over the alien's place of residence or with the appropriate Consular Section of the U.S. Embassy. If the **Form I-360** is approved overseas, the alien will be issued an immigrant visa.

(2) **Form I-130** and **Form I-485** Jurisdiction . An alien spouse or child residing in the United States who qualifies for benefits under section **1703(c)** as an immediate relative and who is the beneficiary of a qualifying approved **Form I-130** may file for adjustment of status. The alien should file **Form I-485** with the USCIS office that has jurisdiction over the alien's place of residence for family-based applications for adjustment of status.

(3) <u>Filing</u> **Form I-360** . The alien should check box "K" in Part 2 and write "PUBLIC LAW 108-136" in the space provided. The alien should submit the following with **Form I-360** :

(A) Proof of the alien's identity, such as a passport or foreign birth certificate with English translation.

(B) Evidence showing that the alien was the bona fide spouse, child, or parent of the deceased U.S. citizen or LPR member of the U.S. Armed Forces, such as a birth certificate or marriage certificate. A surviving spouse should submit proof of termination of any prior marriages for both the surviving spouse and the deceased service member. The surviving spouse should also submit documentation showing that the marriage was entered in good faith, such as holding joint accounts and property leases, filing joint income tax returns, and/or testimonials by credible witnesses/acquaintances regarding the spousal relationship.

(C) A copy of the deceased service member's death certificate.

(D) Documentation showing that the deceased member of the U.S. Armed Forces was a U.S. citizen or was granted citizenship, such as a birth certificate, naturalization certificate, certificate of citizenship, or posthumous naturalization certificate (N-645).

(E) Certified proof issued by the appropriate military department showing that the deceased member of the U.S. Armed Forces served honorably in an active duty status in the military, air, or naval forces of the United States.

(F) Evidence demonstrating that the deceased member of the U.S. Armed Forces died as a result of injury or disease incurred in or aggravated by combat. See section s (b) and (c) of this subchapter.

(4) <u>Approved</u> **Form I-130** . If the alien's qualifying **Form I-130** has been approved and the alien has not yet established eligibility under section **1703(c) or (d) of Public Law 108-136** , the alien should submit the evidence and documentation noted in (d)(3) of t his subchapter when filing **Form I-485** in the United States or when applying for an immigrant visa prior to entry into the United States. The adjudicator handling the approved **Form I-130** should write "PUBLIC LAW 108-136" in the "Remarks" section of the form.

(5) <u>Filing</u> **Form I-485** . Refer to instructions in **Chapter 23.5(d)(2)** .

**21.12 Process for Responding to Requests by the Department of State (DOS) to Accept a Locally Filed Form I-130, Petition for Alien Relative has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of February 1, 2020.**

**21.13 Reserved**

AR2022_300420

## 21.14 Self-Petitions by Abused Spouses and Children

(a) <u>Background</u>. Otherwise eligible sons and daughters of United States citizens and lawful permanent residents have found themselves precluded from filing a VAWA self-petition because they attained age 21 before the petition could be filed. The inability to file the self-petition before attaining age 21 may have been due to various reasons, including the nature of the abuse or the time period during which the abuse took place. Section 805(c) of VAWA 2005 amends section 204(a)(1)(D) of the Act by adding a new paragraph (v) which permits the late-filing of a VAWA self-petition in certain instances.

(b) <u>Reserved</u>.

(c) <u>Adjudicative Issues</u>.

(1) <u>Late Petition Permitted for Eligible Sons and Daughters as Children</u>.

(A) <u>Background</u>. Otherwise eligible sons and daughters of United States citizens and lawful permanent residents have found themselves precluded from filing a VAWA self-petition because they attained age 21 before the petition could be filed. The inability to file the self-petition before attaining age 21 may have been due to various reasons, including the nature of the abuse or the time period during which the abuse took place. Section 805(c) of VAWA 2005 amends section 204(a)(1)(D) of the Act by adding a new paragraph (v) which permits the late-filing of a VAWA self-petition in certain instances.

(B) <u>Eligibility Qualifications for Filing Late Petitions</u>.

(i) <u>Self-petitioner Qualified Before Attaining Age 21</u>. The self-petitioner must have been qualified to file the self-petition on the day before the individual attained age 21. This means that all qualifying factors must have been in place on that date. For instance, if the"qualifying" abuse took place only after the individual attained age 21, the individual would not have been qualified to file the self-petition as of the day before he or she attained age 21.

(ii) <u>Qualifying Abuse Must Be One Central Reason for Delay in Filing</u>. Section 204(a)(1)(D)(v) of the Act

requires the qualifying abuse to be "one central reason" for the self-petitioner's delay in filing. For these purposes, one central reason is one that is caused by or incident to the battery or extreme cruelty to which the self-petitioner was subjected. The battery or extreme cruelty is not required to be the sole reason for the delay in filing, but to be considered central, the nexus between the battery or extreme cruelty and the filing delay must be more than tangential.

An example of a qualifying reason would be that the abuse took place so near in time to the self-petitioner attaining age 21 that there was insufficient time to timely file. Another example would be that the abuse was so traumatic that the self-petitioner was mentally or physically incapable of filing in a timely manner. Although not limited to the foregoing examples, the abuse must be identifiable as one central reason for the delay. The adjudicating officer will evaluate each claim on a case-by-case basis taking into account the totality of circumstance leading to the delay in filing and the full history of battery or extreme cruelty in the case. The credibility and probative value of the evidence provided by the self-petitioner is a determination left to the discretion of the adjudicating officer.

(iii) <u>Self-petition Must Be Filed Prior to Attaining Age 25</u>. Pursuant to 204(a)(1)(D)(v) of the Act, the self-petitioner over age 21 must file Form I 360 with all accompanying documentation before the self-petitioner attains age 25.

(iv) <u>Self-petitioner Must Be Unmarried.</u> Paragraph (v) of 204(a)(1)(D) provides for the late-filing of a self-petition that would have otherwise been filed pursuant to 204(a)(1)(A)(iv) or 204(a)(1)(B)(iii) of the Act. Therefore, the adjudication of late-filed self-petitions filed under 204(a)(1)(D)(v) will be treated as though filed under either 204(a)(1)(A)(iv) or 204(a)(1)(B)(iii) of the Act.

Self-petitioners seeking classification under 204(a)(1)(D)(v) must be unmarried at the time of filing. Accordingly, self-petitioners who were unmarried at the time of filing, but acquire a husband or wife during the pendency of the self-petition, and remain married at the time of the adjudication of the self-petition are ineligible.

(C) <u>Filing Requirements</u>. The late-filing self-petitioner must file a Form I 360, Petition for Amerasian, Widow(er), or Special Immigrant, along with relevant, credible evidence establishing eligibility and that the battering or extreme cruelty was one central reason for the delay in filing.

(D) <u>Consideration of Evidence</u>. The adjudicating officer must consider any credible evidence that establishes the qualifying abuse was one central reason for the delay in filing. The self-petitioner should submit that evidence with the petition. If the evidence is absent from the submission, it may be requested. The self-petitioner may be requested to submit a statement explaining how submitted evidence establishes the required nexus.

(E) <u>Approval</u>. If the self-petitioner will apply for adjustment of status under section 245 of the Act, the

approved petition will be retained by USCIS. If the self-petitioner will apply for an immigrant visa abroad, USCIS will forward the self-petition to the Department of State's National Visa Center (8 CFR 204.2(e)(3)(i)).

(F) <u>Denial</u>.

(i) <u>Late-filing After Age 21</u>. The adjudicating officer must deny a self-petition filed after the self-petitioner attains age 21 and before the self-petitioner attains age 25 that is not supported by credible evidence establishing the qualifying abuse was one central reason for the delay in filing. The denial should address the insufficiency in the evidence and all other eligibility deficiencies in the record.

(ii) <u>Late-filing and Marital Status</u>. The adjudicating officer must deny a self-petition filed by a married self-petitioner seeking classification under 204(a)(1)(D)(v). The adjudicating officer must also deny a self-petition filed by an unmarried self-petitioner seeking classification under 204(a)(1)(D)(v) who, after filing and during the pendency of the self-petition, acquired a husband or wife. However, an unmarried self-petitioner who sought classification under 204(a)(1)(D)(v), acquired a husband or wife after the filing of the self-petition, but whose marital relationship was legally terminated prior to a final decision by USCIS may remain eligible. Any credible evidence offered to demonstrate the legal termination of such a marriage will be considered.

(G) <u>Classification</u>. A self-petitioner petitioning for eligibility under sub-paragraph (v) of section 204(a)(1)(D) of the Act shall be treated as if the self-petition had been filed on the day before the self-petitioner attained age 21. When a self-petition is approved, however, a self-petitioner?s continued eligibility and subsequent classification for visa issuance or adjustment of status shall be governed by section 201(f) of the Act or paragraph (i) of section 204(a)(1)(D) of the Act, whichever is appropriate.

(d) <u>Abused Adopted Child</u>.

(1) <u>Removal of 2-Year Legal Custody and 2-Year Residency Requirement</u>. Generally, for an adoption to be the basis for granting immigration benefits, evidence of the following is needed to establish an adopted child's eligibility under INA sections 201(b)(2)(A)(i) or 203(a)(2)(A):

- A legal adoption took place:

    o Prior to the child reaching the age of 16; or

- o Prior to the child reaching the age of 18, if the child is the birth sibling of another child who was under 16 at the time he or she was adopted by the same adoptive parent;

- The adoptive parent(s) had two years of legal custody of the child; and

- The adoptive parent(s) had two years of residence with the child.

However, section 805(d) of VAWA 2005 amended the definition of adopted child in INA section 101(b)(1)(E)(i). This change in the law removed the two-year legal custody and the two-year residency requirement for adopted children who were battered or subjected to extreme cruelty by their adoptive parent(s) or household family members.

(2) <u>Applicability of 101(b)(1)(E)(i)</u>. The amendment to 101(b)(1)(E) is applicable to any child who is the beneficiary of a Form I-130, Petition for Alien Relative, and to the self-petitioning child filing a VAWA-based Form I-360, Petition for Amerasian, Widow(er) or Special Immigrant.

A self-petitioning child, who is related to his or her abusive parent through adoption, will not need to establish the two-year legal custody and two-year residency requirements with the adoptive parent if the self-petitioning child can demonstrate that he or she was battered or subjected to extreme cruelty by the adoptive parent or a member of the adoptive parent's family residing in the same household.

(3) <u>Eligibility Requirements</u>.

(A) <u>Self-Petitioning Child of Abusive USCs and LPRs (Generally)</u>. INA section 204 allows for children of abusive U.S. citizens and lawful permanent residents to self-petition for classification as lawful permanent residents. The child self-petitioner is required to provide evidence that he or she:

- Is the child of a U.S. citizen or lawful permanent resident or was the child of a U.S. citizen or lawful permanent resident who within the past 2 years lost or renounced citizenship or lawful permanent resident status due to an incident of domestic violence;

- Is eligible to be classified under INA section 201(b)(2)(A)(i) or 203(a)(2)(A);

- Resides or has resided with the abusive U.S. citizen or abusive lawful permanent resident parent;

- Has been battered by or has been the subject of extreme cruelty perpetrated by the U.S. citizen or lawful permanent resident parent; and

- Is a person of good moral character, if age 14 or older.

(B) <u>Self-Petitioning Adopted Child of Abusive USCs and LPRs</u>. The VAWA 2005 amendments to the definition of an adopted child (i.e., the removal of the two-year custody and two-year residency requirements for abused adopted children) do not remove the need for adopted children to establish all other requirements for self-petitioning children under INA section 204. The self-petitioning adopted child is required to provide evidence demonstrating that he or she:

- Was legally adopted by a U.S. citizen or lawful permanent resident:

    o Before attaining age 16; or

    o Before attaining age 18 if the child is the birth sibling of another child who was under 16 at the time he or she was adopted by the same adoptive parent;

- Was in the legal custody of the adoptive parent(s) for at least 2 years; or

    o Was battered by or subjected to extreme cruelty perpetrated by the U.S. citizen parent or lawful permanent resident parent or a member of the U.S. citizen's or lawful permanent resident's family residing in the same household;

- Resided with adoptive parent(s) for at least 2 years; or

    o Was battered by or subjected to extreme cruelty perpetrated by the U.S. citizen parent or lawful permanent resident parent or a member of the U.S. citizen's or lawful permanent resident's family residing in the same household;

- Resided for some period with the abusive U.S. citizen or abusive lawful permanent resident;

- Was battered by or subjected to extreme cruelty perpetrated by the U.S. citizen parent or lawful permanent resident parent; and

- Is a person of good moral character, if age 14 or older.

(4) <u>Filing from Outside the United States</u>. There is no statutory requirement that a self-petitioning adopted child be living in the United States at the time the self-petition is filed. The filing requirements found in INA sections 204(a)(1)(A)(v) and 204(a)(1)(B)(iv) relating to a self-petitioning spouse, intended spouse, or child living abroad of a U.S. citizen or lawful permanent resident shall be applicable to self-petitions filed by an abused adopted child. A self-petitioning adopted child living abroad at the time of filing the self-petition may file Form I-360 if:

- Abuser is an employee of the U.S. government,

- Abuser is a member of the uniformed services, or

- Self-petitioning child was subjected to battery or extreme cruelty in the United States.

(5) <u>Late-filing After Age 21</u>. The provisions of INA section 204(a)(1)(D)(v) which provide continued eligibility to file as a self-petitioning child after attaining age 21 until age 25, if the abuse was one central reason for the delay in filing, shall be applicable to self-petitions filed by an abused adopted child. For

guidance relating to the late-filing provisions, please see the September 6, 2011 memorandum entitled: Continued Eligibility to File for Child VAWA Self-Petitioners After Attaining Age 21; Revisions to Adjudicator's Field Manual (AFM) Chapter 21.14 (AFM Update AD07-02), PM-602-0048.

(6) Evidence.

(A) Standard of Proof. The standard of proof applied in the adjudication of a self-petition filed by an abused adopted child is "preponderance of the evidence." This evidentiary standard is met if the self-petitioning child submits sufficient evidence to establish that the facts of the case are more likely true than not true.

(B) Evidentiary Requirements for a Self-Petitioning Abused, Adopted Child.

(i) Evidence to establish the self-petitioning child qualifies as the adopted child of a U.S. citizen or lawful permanent resident must include:

- Evidence of adoption. Such evidence may include a copy of the legal adoption decree, issued by the appropriate civil authority, or other relevant credible evidence of the self-petitioning child's legal relationship to the abuser, and should be submitted with the Form I-360. If a copy of the legal adoption decree is unavailable, the self-petitioning adopted child should provide any other credible evidence to demonstrate that a legal adoption took place.

- Evidence to show 2 years of legal custody and 2 years of residence with the adoptive parent or evidence of being subjected to battery or extreme cruelty perpetrated by the U.S. citizen or lawful permanent resident parent or perpetrated by a member of that parent's family residing in the same household.

- Evidence of the abuser's U.S. citizenship or lawful permanent resident status, such as a birth certificate or green card.

(ii) Evidence of the period of shared residence with the abusive parent may include, but is not limited to the following:

- Employment records, school records, hospital or medical records, rental records;

- Insurance policies; or

- Affidavits or any other type of relevant credible evidence of residency.

(iii) Evidence that the child was battered or subjected to extreme cruelty perpetrated by the U.S. citizen or lawful permanent resident parent may include, but is not limited to, the following:

- Reports and affidavits from: police, judges, court officials, medical personnel, counselors, social workers, or other social service agency personnel, or school officials;

- Evidence that the child was placed in a shelter for the abused or in foster care or state custody as a result of removal from a home due to abuse;

- Photographs of injuries accompanied by affidavits from witnesses, if possible;

- A statement from the child or other competent individual describing the battery or extreme cruelty in the child's relationship with the adoptive parent; or

- Similar evidence showing the abusive parent perpetrated such acts against another immediate family member in the household to which the child was a witness or was adversely impacted by the behavior.

(iv) Evidence of good moral character if the adopted child is age 14 or older. A good moral character determination will be made on a case-by-case basis, taking into account the provisions of INA section 101(f) and the general standards of the community. Evidence of good moral character may include, but is not limited to the following:

- The self-petitioner's affidavit of good moral character, accompanied by a local police clearance or a state-issued criminal background check from each locality or state in the United States in which the self-petitioner has resided for six or more months during the three year period immediately preceding the filing of the self-petition.

  - Self-petitioners who lived outside of the United States should submit similar clearances or background checks issued by the appropriate authority in the foreign country in which he or she resided for six or more months during the three year period immediately preceding the filing of the self-petition.

- If the types of clearances listed above are not available, the self-petitioner may include an explanation and submit any other credible and relevant evidence with his or her affidavit.

(C) Consideration of Evidence. Officers will consider all relevant, credible evidence when making a determination regarding claims to all eligibility requirements. The determination of what evidence is credible and the weight to be given that evidence is within the sole discretion of USCIS. If an abused adopted child is unable to submit primary evidence of the abusive parent's status, USCIS will search electronic systems to verify the abuser's status from information submitted with the self-petition. Other USCIS records may be reviewed at the discretion of the adjudicating officer. See 8 CFR 103.2(b)(17)(ii).

(e)-(p)   Reserved.

(q)   <u>Citizenship or Immigration Status of the Abuser</u>. A self-petitioning spouse or child must demonstrate that his or her abusive spouse or parent is or was a U.S. Citizen (USC) or Lawful Permanent Resident (LPR).

(1)   <u>Evidence</u>. A self-petition filed by a battered spouse or child must be accompanied by evidence of citizenship of the U.S. citizen or evidence of the immigration status of the lawful permanent resident abuser. Self-petitioners are encouraged to submit primary evidence whenever possible, although adjudicators should consider any relevant credible evidence. **8 CFR 204.2(c)(2)(i)** .

A self-petition filed by a battered spouse or child must be accompanied by evidence of citizenship of the U.S. citizen or evidence of the immigration status of the lawful permanent resident abuser. Self-petitioners are encouraged to submit primary evidence whenever possible, although adjudicators should consider any relevant credible evidence. **8 CFR 204.2(c)(2)(i)** .

However, the determination of what evidence is credible, and the weight to be given to that evidence, is left to the discretion of the adjudicating officer. **Section 204(a)(1)(J)** of the INA. USClS regulations at **8 CFR 204.1(g)**

Self-petitioners can submit evidence of a spousal relationship to a USC or LPR. The evidence allowed under **8 CFR 204.1(g)(1)** will also be allowed for self-petitioners. Primary evidence of the abuser's U.S. citizenship or lawful permanent residence includes:

·   A birth certificate issued by a civil authority that shows the abuser's birth in the United States;

·   The abuser's unexpired U.S. passport issued initially for a full ten-year period to a citizen of the United States;

·   The abuser's expired U.S. passport issued initially for a full five-year period to a citizen of the United States who was under the age of 18 at the time of issuance;

· A statement executed by a U.S. consular officer certifying the abuser to be a U.S. citizen and the bearer of a currently valid U.S. passport;

· The abuser's Certificate of Naturalization or Certificate of Citizenship;

· Department of State Form FS-240, Report of Birth Abroad of a Citizen of the United States, relating to the abuser;

· The abuser's Form I-551 Alien Registration Receipt Card, or other proof given by USCIS as evidence of lawful permanent residence.

Pursuant to the instructions section of the **Form I-360** , Petition for Amerasian, Widow(er) or Special Immigrant, photocopies of the above documents may be accepted as primary evidence.

If primary evidence is unavailable, the self-petitioner must present secondary evidence. Any evidence submitted as secondary evidence should be evaluated for authenticity and credibility. USCIS regulations at **8 CFR 204.1(g)(2)** provide detailed information concerning secondary supporting documentation of a spousal relationship to a USC or LPR.

If a self-petitioner is unable to present primary evidence or secondary evidence of the abuser's status, the officer will attempt to electronically verify the abuser's citizenship or immigration status from information contained in DHS computerized records. Other DHS records may also be reviewed at the discretion of the adjudicating officer.

Nevertheless, it is ultimately the self-petitioner's burden to establish the abuser's U.S. citizenship or immigration status. If USCIS is unable to identify a record as relating to an abuser or the record does not establish the abuser's immigration or citizenship status, the self-petition will be adjudicated based on the information submitted by the self-petitioner. See **8 CFR 204.1(g)(3)** .

(2)     <u>Loss of Immigration Status</u> .

On October 28, 2000, the Battered Immigrant Women Protection Act of 2000 (BIWPA), **Pub. L. 106-386** , was enacted. The BIWPA amended some of the self-petitioning provisions, including those relating to status of the abuser. Prior to the enactment of the BIWPA, an alien was ineligible to file a self-petition as a battered spouse or child of a USC or LPR if the USC or LPR spouse or parent lost his or her status prior to the date the self-petition was properly filed or approved.

The BIWPA, amended the Act to preserve self-petitioning eligibility for spouses and children of abusive USCs or LPRs if the spouse or child can demonstrate that the abusive USC or LPR lost his or her status during the two-year period immediately preceding the filing of the self-petition for a reason that was "related to" or "due to" an incident of domestic violence. This change applies to all self-petitioners, including those who file under sections **204(a)(1)(A)(v)** or **204(a)(1)(B)(iv)** as self-petitioners living abroad. This determination is based on the fact that sections 204(a)(1)(A)(v) and 204(a)(1)(B)(iv) of the Act state that the claimant must be "eligible to file a petition" under section **204(a)(1)(A)(iii)** or **(iv)** of the Act or section **204(a)(1)(B)(ii)** or **(iii)** of the Act, respectively.

(A)    Loss of Status Due to Death of the Abusive USC Spouse or Parent .

The spouse or child of a U.S. citizen who died within the two years immediately preceding the filing of the self-petition may benefit from the self-petitioning provisions.
Section **204(a)(1)(A)(iii)(II)(aa)(CC)(aaa)** and **204(a)(1)(A)(iv)** of the INA. However, this provision is only applicable to spouses or children of U.S. citizens.

(B)    Loss of Status Prior to Filing or Approval of the **Form I-360** .

The spouse or child of a USC or LPR who lost USC or LPR status may benefit from the self-petitioning provisions provided the loss of status occurred within the two years immediately preceding the filing of the self-petition, and the loss of status was related to or due to an incident of domestic violence. In other words, if the self-petitioner can demonstrate that the abuser's loss of status was related to or due to an incident of domestic violence, and the self-petitioner files his or her self-petition wit hin two years of the loss of status, that self-petition should not be denied on the grounds the abuser is not a USC or LPR. **Sections**
**204(a)(1)(A)(iii)(II)(CC)(bbb)** and **(iv)** ; **204(a)(1)(A)(iii)(II)(aa)(CC)(aaa)** and **(iii)** of the INA. Whether the abuser's loss of status is "related to" or "due to" an incident of domestic violence is a matter of evidentiary proof. In order for an act or conviction to be considered sufficiently related to or due to an incident of domestic violence, the evidence must establish:

· The circumstances surrounding the loss of status;

· The requisite causal relationship between the loss of status and the incident of domestic violence; and

· The loss of status occurred within the two-year period immediately preceding the filing of the self-petition.

When determining whether the alleged abusive spouse's loss of status is related to or due to an incident of domestic violence, the adjudicating officer should consider the full history of the domestic violence in the case. The credibility and probative value of the evidence submitted by the self-petitioner is a determination left to the discretion of the adjudicating officer.

(C)     Loss of Status after Filing or Approval of the **Form I-360** .

Loss of USC status by denaturalization, renunciation or other means, death of a USC abuser, divorce from a USC abuser, or changes to a USC abuser's citizenship status after the filing of the self-petition shall not adversely affect the approval of the self-petition, nor shall it affect the ability of an approved self-petitioner to adjust status to that of an LPR. Similarly, divorce from an LPR or loss of LPR status by an LPR abuser after the filing of the self-petition shall not adversely affect the approva l of the self-petition, nor shall it affect the ability of an approved self-petitioner to adjust status to that of an LPR.
Sections **204(a)(1)(A)(vi)** and **204(a)(1)(B)(v)(I)** of the INA.

(D)     Effective Date .

The provisions of the affecting this eligibility requirement apply to all self-petitions pending on or filed on or after October 28, 2000.

## 21.15 Self Petitions by Parents of U.S. Citizens

(a) <u>Background</u>. Title IV of the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103-322 (Crime Act), enacted September 13, 1994, contains the Violence Against Women Act of 1994 (VAWA). VAWA amended section 204 of the Act, permitting certain spouses and children of U.S. citizens and lawful permanent residents who were subjected to battery or extreme cruelty to self-petition for immigrant classification. Although the title of VAWA reflects the fact that many abuse victims are women, battered spouses and children of either sex can benefit from these provisions. The immigration provisions of VAWA were expanded by the Battered Immigrant Women Protection Act (BIWPA), enacted as Title V of Pub. L. 106-386, on October 28, 2000. The Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), Tit. VIII, Pub. L. No. 109-162, which became effective January 5, 2006, further expanded the immigration provisions of VAWA. Section 816 of VAWA 2005 added paragraph (vii) to section 204(a)(1)(A) of the Act which provides certain parents who were subjected to battery or extreme cruelty by their U.S. citizen sons or daughters the ability to file a self-petition.

(b) <u>Eligibility Requirements</u>. The self-petitioning parent must demonstrate that he or she:

- Possesses the requisite qualifying relationship to the U.S. citizen son or daughter. The following relationships qualify:

    o   The parent of a U.S. citizen son or daughter who is at least 21 years of age when the self-petition is filed; or

    o   The parent of a former U.S. citizen son or daughter who lost or renounced citizenship within the two years prior to filing the self-petition as a result of an incident of domestic violence. At the time of the loss of status, the son or daughter must have been at least 21 years of age; or

    o   The parent of a U.S. citizen son or daughter who was at least 21 years of age and who died within two years prior to filing the self-petition;

**Note**: In order for a son or daughter to confer immediate relative status upon a parent, the petitioner must be a U.S. citizen, at least 21 years of age, and must have qualified as the "child" of the beneficiary as defined in 101(b) of the Act. *Matter of Hassan*, 16 I&N Dec. 16 (BIA 1976). A child is defined as "an unmarried person under twenty-one years of age" in 101(b) of the Act. 101(b)(1)(B) of the Act further defines child to include a "stepchild…provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred." Adopted children are also included in the definition of child in sections 101(b)(1)(E), (F), and (G) of the Act.

The stepparent of an abusive U.S. citizen son or daughter may file a VAWA self-petition provided that: (1) the abusive U.S. citizen son or daughter had not reached the age of eighteen years at the time the marriage creating the step-relationship occurred; (2) the step-relationship existed, by law, at the time of the abuse; and (3) the step-relationship existed by law, or as a matter of fact, at the time of filing the VAWA self-petition. If at the time of filing, the step-relationship had been terminated due to death of the natural parent, legal separation, or divorce, the self-petitioning stepparent will remain eligible to file provided that as a matter of fact, the step-relationship was ongoing. *Matter of Mowrer*, 17 I&N Dec. 613, 615 (BIA 1981). The relationship need not continue after filing.

- Is a person of good moral character

- Is otherwise eligible as an immediate relative parent as described in section 201(b)(2)(A)(i) of the Act;

- Resides with or has previously resided with the abusive U.S. citizen son or daughter; and

- Has been subjected to battery or extreme cruelty by the U.S. citizen son or daughter.

(c) Filing Requirements.

- Generally. An eligible self-petitioning parent must submit a properly competed Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360), to the Vermont Service Center (VSC) with supporting evidence as described in this section. No fee is required for the Form I-360 filed by a self-petitioning parent.

- Primary Evidence. Self-petitioners should submit primary evidence whenever possible, although adjudicators must consider all relevant credible evidence. The determination of what evidence is credible, and the weight to be given to that evidence, is left to the discretion of the adjudicator in accordance with the guidance provided in this section.

A self-petition filed under section 204(a)(1)(A)(vii) of the Act must include the following:

- Evidence of the abuser's U.S. citizenship;

- Evidence of the parental relationship as described in 8 CFR 204.2(f)(2);

- Evidence of the stepchild relationship as described in 8 CFR 204.2(d)(2)(iv); or

**Note:** In the case of a self-petitioning stepparent, evidence supporting the relationship as defined at 101(b)(1)(B) of the Act, and other relevant evidence of the parental step-relationship will be considered. Examples include but are not limited to: marriage certificate of self-petitioner and natural parent of the abusive stepson or stepdaughter showing that the marriage occurred before the U.S. citizen abuser's 18th birthday, other legal or court documents supporting the same, birth certificates, affidavits, or other evidence.

- Evidence of the adoptive relationship as described in 8 CFR 204.2(d)(2)(vii);

**Note:** A self-petitioning parent, filing based on abuse perpetrated by an adopted U.S. citizen son or daughter, must provide evidence demonstrating that the relationship was created when the U.S. citizen son or daughter was under the age of sixteen and the additional requirements of 101(b)(1)(E), (F), or (G). Evidence of a qualifying adoptive relationship includes a copy of the adoption decree issued by a civil authority. Other relevant evidence of a qualifying adoptive relationship will be considered.

- Evidence the self-petitioner resides or has resided with the abusive U.S. citizen son or daughter. Examples include but are not limited to: employment records, school records, utility receipts, medical records, police reports, leases, mortgages, or affidavits;

- Evidence of the battery or extreme cruelty. Examples include, but are not limited to: police reports, court records, medical records, or reports from social services agencies. If there is a protective order in place, a copy should be submitted; and

- Evidence of good moral character of the self-petitioner. Such evidence should be in the form of an affidavit and should be supported by a local police clearance, state issued criminal background check or similar report from each locality or state in which the self-petitioner has resided for at least six months during the three years prior to filing the self-petition.

- Secondary Evidence. Section 204(a)(1)(J) of the Act was not specifically amended to encompass consideration of secondary evidence submitted by self-petitioning abused parents. The discussion of evidence found at 8 CFR 204.1(f)(1) and (3) regarding self-petitions filed under section 204(a)(1)(A)(iii) of the Act shall be applicable to self-petitions filed by abused parents of U.S. citizen sons or daughters. Agency records relating to the abusive son or daughter may also be used to verify his or her citizenship status.

- Filing from Outside the United States. There is no statutory requirement that a self-petitioning parent be living in the United States at the time the self-petition is filed. The filing requirements found at 204(a)(1)(A)(v) of the Act relating to a self-petitioning spouse, intended spouse, or child living abroad of a U.S. citizen shall be applicable to self-petitions filed by an abused parent of a U.S. citizen son or daughter. For these reasons, self-petitioners filing from abroad must file with the VSC and be in compliance with 204(a)(1)(A)(v) of the Act. The self-petitioner should submit primary evidence whenever possible, although the adjudicator must consider all relevant credible evidence. The determination of what evidence is credible, and the weight to be given to that evidence, is left to the discretion of the adjudicator and in accordance with the guidance provided in this section.

(d) Adjudication.

- Authority. Authority to adjudicate self-petitions filed pursuant to section 204(a)(1)(A)(vii) of the Act rests solely with the VSC. VAWA self-petitions filed elsewhere should be promptly transferred to VSC.

- Prima Facie Eligibility. USCIS will withhold issuance of prima facie determinations for self-petitioning parents, until such time as they are recognized as "qualified aliens" by the Personal Responsibility and Work Opportunity and Reconciliation Act of 1996 (PRWORA).

- Review and Consideration of Documentary Evidence. The primary evidence to establish the relationship between the abuser and the self-petitioner and to establish the abuser's United States citizenship submitted with Form I-360 by an abused parent is the same as that which is generally submitted by self-petitioning spouses and children pursuant to section 8 CFR 204.2(c)(2)(i)-(v) and (vii) and 204.2(e)(2)(i)- (v)). However, in view of the circumstances surrounding a self-petition, primary documentation may not be readily available. Adjudicators must consider whatever evidence is available, using agency records and secondary evidence when submitted in lieu of primary documents. Before sending an RFE in such cases, consider the totality of circumstances in the case and, if the RFE is needed, suggest appropriate forms of secondary evidence which might be appropriate to the case.

- Other Considerations. There are several other important considerations for the adjudicator processing a self-petition by an abused parent that are similar to those encountered during the adjudication of self-petitions filed by abused spouses and children. These are discussed fully in 8 CFR 204.2(c) and (e) (with the specific exclusion of 8 CFR 204.2(c)(1)(i)(G), 8 CFR 204.2(c)(1)(viii), 8 CFR 204.2(e)(1)(i)(G), and 8 CFR 204.2(e)(1)(viii)). General adjudicative issues relating to the parent-child relationship are applicable to parental self-petitions.

- Loss of Citizenship Status or Death of Abusive Son or Daughter. Eligibility to petition for classification as a parent who has been battered or subjected to extreme cruelty by a U.S. citizen son or daughter will be preserved if, within the 2 years immediately preceding the filing of the self-petition, the U.S. citizen son or daughter loses or renounces citizenship relating to an incident of domestic violence or dies. In cases where the abusive U.S. citizen son or daughter has lost his or her status, adjudicators should follow the guidance found in AFM chapter 21.14(q) relating to the

method by which a self-petitioning spouse or child may establish that an abuser's loss of status is related to an incident of domestic violence. The evidentiary requirements applicable to self-petitioning spouses and children in cases where there has been a loss of status shall be the same for self-petitioning parents.

A parent whose eligibility is thus preserved will be eligible for issuance of a visa or adjustment of status pursuant to section 201(b)(2)(A)(i) of the Act as though the abusive son or daughter were still a United States citizen at the time of visa issuance or adjustment of status.

- Derivative Beneficiaries. Self-petitioning parents are not eligible to confer derivative benefits. Self-petitioning parents may not include a derivative beneficiary in the self-petition. Including a derivative on a self-petition filed by a self-petitioning parent will not result in the denial of the self-petition; however the derivative is not eligible and will not receive any benefit as such.

- Closing Actions. See AFM 21.2(f). An appeal from the denial of an I-360 petition filed by an abused parent may be filed on Form I-290B with the Administrative Appeals Office.

1. e) Employment Authorization.

- Eligibility. All self-petitioners (including self-petitioning parents) with approved self-petitions are eligible for work authorization. An Employment Authorization Document (EAD) may be issued upon approval of the Form I-765. Those self-petitioners who are living outside the United States will not be issued an EAD.

- New Code. A new code, (c)(31), has been provided for work authorization for the beneficiary of an approved VAWA self-petition.

- Filing Requirements. A self-petitioner desiring an EAD must file Form I-765, Application for Employment Authorization, with the Vermont Service Center (VSC).

- Adjudication.

- Authority. Authority to adjudicate applications for employment authorization pursuant to section 204(a)(1)(K) of the Act is limited to the VSC. Applications filed elsewhere should be promptly transferred to the VSC.

- Review and Consideration of Documentary Evidence. The adjudicating officer must ensure that the following criteria are met when adjudicating the Form I-765:

- Proper fee or waiver thereof and application is signed;

- Required photos and signature are present;

- Applicant is residing in the United States;

- Applicant has an approved VAWA self-petition;

- Applicant does not currently hold a valid EAD under another provision of 8 CFR 274a.12; and

- Applicant has not adjusted status.

- Closing Action. If found to meet the criteria, the application will be approved for employment pursuant to 8 CFR 274a.12(c)(31). There is no appeal from the denial of Form I-765, Application for Employment Authorization.

(f) Deferred Action. Although no longer necessary for providing employment authorization to a VAWA self-petitioner with an approved petition, consideration of placing a self-petitioner in deferred action will continue to be a part of the adjudication process.

(g) Precedent Decisions. There are no precedent decisions relating to this specific class of I-360 self-petition. However, precedent decisions listed in AFM 21.8(d) relating to petitions filed for a parent are generally applicable to this class of case.

(h)-(y) Reserved.

(z)    Revocation of VAWA-based Forms I-360.

(1) Field Request for Review of an Approved VAWA-based Form I-360. If an officer in the field receives new information that was not available to the VSC at the time of the approval of a VAWA self-petition, and that new information leads the officer to reasonably believe that a VAWA self-petition should be revoked, the officer must write a memorandum to his or her Supervisory Immigration Service Officer (SISO) explaining why the VAWA self-petition should be reviewed for possible revocation. The memorandum must state what the new information is and how USCIS obtained it.

(2) Supervisory Review and Return to VSC. If, upon review of an officer's memorandum of explanation, the SISO concurs in the officer's assessment, the SISO must sign the memorandum and forward it, with the file in question, to the VSC to the attention of the VAWA unit. A VSC VAWA unit supervisor will review the memorandum of explanation and the relating file and make a recommendation either to initiate revocation proceedings or to reaffirm the self-petition. If the VSC supervisor concurs with a recommendation to reaffirm the self-petition, he or she must write a memorandum explaining why the self-petition was not revoked. This memorandum will be returned to the field with the file. In all such situations, the VSC is expected to complete its review process on an expedited basis. Self-petitions being returned to the VSC from a field office, or from the VSC to a field office, must in all cases be accompanied by a memorandum signed by the appropriate supervisor.

(3) Reminder of Special Provisions Relating to VAWA Cases. Officers should keep in mind that **section 384** of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (8 U.S.C. Section 1367) prohibits DHS employees from making an adverse determination of admissibility or deportability of an alien using information provided solely by:

- A spouse or parent who has battered the alien or subjected the alien to extreme cruelty;

- A member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty;

- A spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty); or

- A member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty. (See IIRIRA Section 384(a)(1). For limited exceptions to this prohibition, see IIRIRA Section 384(b).)

Any adverse information received by USCIS from a self-petitioner's U.S. citizen or lawful permanent resident spouse or parent, or from relatives of that spouse or parent, must be independently corroborated by an unrelated source before USCIS may take adverse action based on that information. (See Virtue, INS

Office of Programs, "Non-Disclosure and Other Prohibitions Relating to Battered Aliens: IIRIRA Section 384," (May 5, 1997).)

Section 384 of IIRIRA also prohibits DHS employees from permitting the use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information that relates to an alien who is the beneficiary of a VAWA-based self-petition. (See IIRIRA Section 384(a)(2).) Anyone who willfully uses, publishes, or permits such information to be disclosed in violation of IIRIRA Section 384 will face disciplinary action and be subject to a civil money penalty of up to $5,000 for each such violation. (See IIRIRA Section 384(c).)

The provisions of the affecting this eligibility requirement apply to all self-petitions pending on or filed on or after October 28, 2000.

**21.16 Adoption as a Basis for Immigration Benefits.**

(a) <u>General</u>. If the requirements of INA section 101(b)(1)(E) have been met, a person adopted while under the age of 16 (or, in certain cases, under the age of 18) is the child, adult son or adult daughter of the adopting parent(s) – not the birth parent(s) – for immigration purposes. Similarly, the adopted person is the sibling of the adoptive parent's other legal children, but not of the birth parent's children. See *Matter of Li*, 20 I&N Dec. 700 (BIA 1993). The adoptive parent-child relationship is valid for all relevant immigration requests under the INA, including, but not limited to:

- Form I-130 (whether filed for a child, adult son or daughter, or sibling);

- Form I-730;

- Form N-600;

- Form N-600K; or

- A claim to eligibility for an immigrant visa as a derivative under INA section 203(d).

The validity of an adoption is relevant to adjudication of both the Form I-600 (orphan petition) and the Form I-800 (Hague Adoption Convention petition). Although both orphans and Hague Convention adoptees often come to the United States after they are adopted overseas, both INA sections 101(b)(1)(F) and (G) allow children to come to the United States before they are actually adopted. **Chapters 21.5** and **21.6** of this AFM state that an adoption that does not actually qualify as an adoption for immigration purposes may nonetheless establish guardianship for emigration and adoption under the laws of the sending country. Such guardianship may support approval of a Form I-600 or Form I-800 for a child coming to the United States to be adopted, provided all other requirements are met.

(b) <u>Validity and essential legal elements of an adoption</u>. Though the INA does not define "adopted" or "adoption," BIA precedent establishes that an adoption must create "a legal status comparable to that of a natural legitimate child" between the adopted and the adopter. *Matter of Mozeb*, 15 I&N Dec. 430 (BIA 1975). Thus, it does not matter what name anyone gives to a claimed adoption. For immigration purposes, what matters is whether or not the order that is claimed to be an adoption meets these essential legal elements:

- It is valid under the law of the country or place granting the order; *and*

- It creates a legal permanent parent-child relationship between a child and someone who is not already the child's legal parent; *and*

- It terminates the legal parent-child relationship with the prior legal parent(s).

Note, however, that the law in some jurisdictions allows a step-parent to adopt the children of his or her spouse, if the legal parent-child relationship with the other legal/biological parent has been terminated by death or legal action. In this situation, it is enough to meet the third essential element of "adoption" for the parent-child relationship to be terminated as to the prior parent who is not the spouse of the adopting step-parent. The continuing legal parent-child relationship between the child and the adopting step-parent's spouse does not preclude recognition of the adoption. The legal custody and joint residence requirements of INA section 101(b)(1)(E), however, must be met by the adoptive step-parent before the individual can be considered the adopting step-parent's child under section 101(b)(1)(E).

A step-parent does not actually need to adopt his or her step-child in order for a Form I-130 or Form I-730 to be approved. If the parent and step-parent married before the child's 18th birthday, the step-parent/step-child relationship can be a basis for approving a Form I-130 or a Form I-730. See INA section 101(b)(1)(B). An adoption that meets the age, custody and residence requirements of INA section 101(b)(1)(E) would be needed, however, before the individual could be the adopting step-parent's "child" for purposes of naturalization under INA section 320 or INA section 322.

The mere fact of ongoing contact with the birth parents (as in "open adoptions") does not mean that the legal parent-child relationship with the prior legal parent(s) was not terminated. The adoptive parents, rather than the prior parents, must be exercising full parental authority over the child as a result of the adoption.

(c) <u>Determining the validity and effect of a foreign "adoption"</u>. The law of the country of adoption determines the validity of the adoption. See **_Matter of T-_**, 6 I&N Dec. 634 (1955). Generally speaking, you should accept the adoption decree at face value. The validity of the adoption under the relevant law does not establish, however, that the child was adopted "while under the age of sixteen" (or 18, as appropriate) for purposes of INA section 101(b)(1)(E). To meet the age requirement, the court or administrative body must have actually granted the adoption before the adoptee's 16th (or 18th) birthday. See **_Matter of Cariaga_**, 15 I&N Dec. 716 (BIA 1976); cf. *Mathews v. USCIS*, 2012 WL 555665 (11th Cir. 2012). District court decisions refusing to defer to *Matter of Cariaga* are not binding precedents. *Matter of K- S-*, 20 I&N Dec. 715 (BIA 1992). USCIS adjudicators are legally obligated to follow *Matter of Cariaga*. 8 CFR 1003.1(g).

You may properly question the validity of the adoption; moreover, if there is credible and probative evidence that:

- The adoption was flawed in its execution, such as when the court (or other official body) granting the adoption appears to have lacked jurisdiction over the adoption, or when the prior parents did not consent to the adoption or were not given proper notice of the termination of parental rights; or

- The adoption was granted due to official corruption or the use of fraud or material misrepresentation.

Not recognizing an adoption in one of these situations may be consistent with legal principles generally observed by courts in the United States with respect to foreign country judgments. See Restatement (Third) Foreign Relations Law of the United States sections 482(2)(a), (b) and (c). If there is credible and probative evidence that the adoption may be invalid for one of these reasons, the burden will fall on the petitioner to establish that the adoption is still valid under the foreign law.

You must consult closely with USCIS counsel, through appropriate channels, before deciding not to recognize a foreign adoption that appears on its face to be valid.

- <u>Adoption as judicial or administrative act</u>. One issue clearly governed by foreign law is what official act constitutes an adoption in another country. In many countries, as in the United States, adoption is a judicial process. Thus, the evidence of the adoption is a court order. In other countries, adoption is an administrative, not a judicial, process. For example, in South Korea, adoption is accomplished by adding the adopted child to one's Family Registry. See **_Matter of Cho_**, 16 I&N Dec. 188 (BIA 1977). In 2003, Cambodia informed other countries through a diplomatic note that Cambodian courts do not have jurisdiction to grant adoption to non-Cambodians. Cambodian adoptions are completed through an administrative process. Finally, as noted in paragraph (c)(4) of this chapter, in some countries, a legal adoption can be accomplished according to legal custom, without a court or administrative order.

- *Whether adoption actually exists in a given country*. Another issue governed by the foreign law is whether or not a legal parent-child relationship can be created by adoption.

- In countries that follow traditional Islamic law, "adoption" in the sense required for immigration purposes does not exist. See, *Matter of Mozeb*, supra; and **Matter of Ashree, Ahmed and Ahmed**, 14 I&N Dec. 305 (BIA 1973). Therefore, a Kafala order issued by a country *that follows traditional Islamic law* will not qualify as an adoption.

- In some multi-ethnic or multi-religious countries, the personal status laws for each ethnic or religious group governs adoptions. In such countries, different bodies of law govern adoption for different children, even within the same neighborhood. An adoption valid for immigration purposes may not be available for a Muslim child under Islamic family law, but may be available for the child next door under Jewish or Christian family law.

- India is an example of a country with complex multiple adoption laws. Traditionally, under the 1956 Hindu Adoption and Maintenance Act, adoption by adoption deed is available in India (other than in the state of Jammu and Kashmir) only to Hindus, Buddhists, Jains, and Sikhs, and others subject to Hindu family law or custom. For others, the 1890 Guardians and Wards Act apply (other than in Jammu and Kashmir). But the Guardians and Wards Act does not provide for adoption for those not subject to Hindu family law or custom, only guardianship. Thus, a court order under the Guardians and Wards Act is not valid as an adoption for immigration purposes. Effective August 22, 2006, however, India amended the Juvenile Justice Act of 2000. Adoptions under the Juvenile Justice Act permanently separate children from their prior parents and make them the "legitimate child" of the adoptive parents. Courts in India now have authority to grant adoption for any child who has been "abandoned" "orphaned" or "surrendered." The Juvenile Justice Act is now effective throughout India, except for Jammu and Kashmir. In light of these amendments, if a court in India (other than a court in Jammu and Kashmir), on or after August 22, 2006, grants an adoption *under the Juvenile Justice Act*, USCIS accepts the adoption as valid, regardless of the religion of the adoptive parents or of the child.

Note that to be valid for immigration purposes, the adoption must be:

- For children found to be abandoned, orphaned or surrendered;

- Made by a court acting under the Juvenile Justice Act, as amended;

- After August 22, 2006; and

- Not in the state of Jammu and Kashmir

The amended Juvenile Justice Act did not repeal either the Hindu Adoption and Maintenance Act or the Guardians and Wards Act.  Adoption by adoption deed under the Hindu Adoption and Maintenance Act is still limited to individuals governed by Hindu law or custom. An order under the Guardians and Wards Act is still guardianship, not adoption.

Also, the 1956 Hindu Adoption and Maintenance Act, the 1890 Guardians and Wards Act, and the Juvenile Justice Act are not in force in the State of Jammu and Kashmir.  Jammu and Kashmir has its own family laws. As noted in chapter 1.5(e), a person seeking a benefit based on an adoption in Jammu and Kashmir must show that it is valid for immigration purposes.

- *Simple adoption*. Some countries have a type of adoption commonly called "simple adoption," in addition to another type that may be called "full" or "plenary" or "perfect" adoption. Whether "simple adoption" is valid for immigration purposes depends on the foreign law. For example,

in *Matter of Kong*, 15 I&N Dec. 224 (BIA 1975), and 14 I&N Dec. 649 (BIA 1974) and *Matter of Chang*, 14 I&N Dec. 720 (BIA 1974) the BIA held that "Appatitha," a form of simple adoption in Burma, did not create a legal parent/child relationship. However, if a simple adoption does create a permanent legal parent/child relationship, it might be valid for immigration purposes (if it otherwise satisfies the three essential elements noted in chapter 21.15(b)). *Matter of Chin*, 12 I&N Dec. 240 (BIA 1967).

The French Civil Code is one example of simple adoption. It states that simple adoption gives the adoptive parent "all the rights of parental authority." Thus, although the child may still have some inheritance rights through the family of origin, the child is, legally, the child of the adoptive parents not the birth parents. Similarly, in Guinea (Conakry), simple adoption gives the adoptive parent(s) all parental authority over the child. Guinea (Conakry) *Code L'Enfant*, art. 123.

Even if a "simple adoption" might be more easily terminated than a "full" adoption, that alone does not mean the simple adoption does not create a "permanent" relationship. For example, article 359 of the French Civil Code says plenary adoption is "irrevocable," while article 370 allows for revocation of simple adoption. But simple adoption can only be revoked "[w]here serious reasons so justify." Even the legal parent-child relationship created by birth can be terminated for serious reasons. Moreover, the adoptive parent cannot seek revocation of simple adoption unless the adoptee is over 15 years old. Similarly, in Guinea (Conakry), simple adoption can only be terminated for "grave reasons," and the parent cannot request termination while the child is under 13 years old. Guinea (Conakry) *Code L'Enfant*, art. 129. These are examples of simple adoptions that can be deemed "permanent," since they cannot be terminated by the adoptive parent while the child is still very young, or simply at the adoptive parent's request.

To summarize, a USCIS adjudicator can find that a "simple adoption" is valid for immigration purposes if the simple adoption meets the three essential elements noted in **Chapter 21.15(b)**:

- It creates a legal permanent parent-child relationship between a child and someone who is not already the child's legal parent; *and*

  - The parent-child relationship cannot be terminated for other than "serious" or "grave" reasons; *and*

- It terminates the legal parent-child relationship with the prior legal parent; *and*

- It does the above, under the law of the country (or political subdivision) granting the simple adoption.

- <u>Customary adoption</u>. As noted, the law of the place of adoption governs the validity of an adoption. In some countries, "customary" adoption may exist instead of, or in addition to, adoption through a judicial or administrative procedure. If a customary adoption terminates the legal parent-child relationship with the prior parents, and creates a legal parent-child relationship with the adoptive parent under local law, then that customary adoption is valid for immigration purposes. See *Matter of Lee*, 16 I&N Dec. 511 (BIA 1978). As with any other case involving questions of foreign law, the petitioner must show that the foreign law actually creates a valid adoption for immigration purposes. See *Matter of Annang*, 14 I&N Dec. 502 (BIA 1973). As the Board has recognized with respect to customary divorce, see *Matter of Kodwo*, 24 I&N Dec. 479 (BIA 2008), the petitioner would need to establish that the customary adoption:

- Creates a legal permanent parent-child relationship between a child and someone who is not already the child's legal parent; *and*

- Terminates the legal parent-child relationship with the prior legal parent; *and*

- Complies with the requirements of the relevant customary law and is legally recognized in the country or place the adoption occurs.

- <u>Hague Adoption Convention adoptions not involving the United States</u>. Many countries other than the United States are parties to the Hague Adoption Convention. An adjudicator may encounter a request for an immigration benefit in which it is claimed that an individual habitually resident in one Hague Adoption Convention country, other than the United States, adopted a child habitually resident in another Hague Adoption Convention country, other than the United States. If properly certified as specified in Article 23 of the Hague Adoption Convention, the claimed adoption would be entitled to recognition by the United States.

But whether this adoption would form the basis for immigration benefits under United States law is determined solely as provided for in the immigration laws of the United States. Thus, for purposes of a Form I-130, I-730, N-600, N-600K, or an "accompanying for following to join" claim, the adoption would support approval only if the adoption met the age, custody and residence requirements of INA section 101(b)(1)(E).

Similarly, a Form I-800 could be approved only if the Secretary of State certified under INA section 204(d)(2) that the adoption complied with the Hague Adoption Convention.

(d) <u>Effect of legal termination of an adoption</u>. As with the adoption itself, local foreign law governs the validity of a termination of an adoption. However, even if a termination is legally valid, it will not adversely impact any immigration benefits already granted while an adoption was in effect. See *Matter of Xiu Hong Li*, 21 I&N Dec. 13 (BIA 1995). Moreover, termination of an adoption does not necessarily mean that the legal parent-child relationship has actually been restored with the birth parent(s). As the Board noted in *Xiu Hong* Li, "We do not assume that natural relationships are automatically reestablished solely by virtue of the fact that an adoption has been lawfully terminated." See *Matter of Xiu Hong Li* at 18. Therefore, even if no immigration benefits flowed from the adoption, the evidence must show that the legal relationship to the prior parent(s) is re-established according to law in order for that relationship to form the basis for granting a benefit under the INA.

(e) <u>Getting evidence about the foreign adoption law</u>. In proceedings under the INA, foreign law is a question of fact to be proved by evidence. See *Matter of Annang*, 14 I&N Dec. 502 (BIA 1973). If the evidence of record does not clearly show that an adoption creates a permanent legal parent-child relationship, the USCIS officer will issue a request for evidence (RFE) asking for a copy of the relevant laws, with properly certified English translations. The officer can also request information, or a formal opinion, about the foreign law, from the Library of Congress, through appropriate channels.

Information about the Library of Congress is on USCIS Connect. Work within your office's local policy and guidelines to request an opinion from the Library of Congress.

The Department of State has information on adoptions and country-specific information on their **adoptions** webpage and their . An adjudicator can also request assistance, through appropriate USCIS and National Visa Center channels, and from U.S. consular posts or USCIS field offices abroad.

Another resource for information is the **CIA World Factbook**.

Before denying a petition or application based on information about the other country's adoption law that the petitioner or applicant may not be aware of, the officer will provide the petitioner or applicant with notice and an opportunity to respond, as specified in 8 CFR 103.2(b)(16).

**Appendix 21-1 List of States Recognizing Common Law Marriages and their Requirements.**

BASIC CRITERIA : Merely living together is NOT enough to validate a common law marriage. The four basic requirements for a valid common law marriage are:

· The parties must live together.

· The parties must present themselves to others as a married couple. Some ways of doing this are by using the same last name, referring to one another as husband or wife, and filing a joint tax return.

· Although not defined, the parties must have been together for a significant period of time.

· The parties must intend to be married.

JURISDICTION : There are a limited number of states which currently have statutory provisions allowing for common law marriages. (However, under Article IV, Section 1 of the Constitution, every state is required to recognize as valid a common-law marriage that was "celebrated" in another state.) The following states, sometimes with restrictions, recognize common law marriages performed by parties living together within their jurisdiction and meeting certain other criteria:

· Alabama     The requirements for a common-law marriage are: (1) capacity; (2) an agreement to be husband and wife; and (3) consummation of the marital relationship

· Colorado     A common-law marriage may be established by proving cohabitation and a reputation of being married

· Georgia     Recognized only if performed by January 1, 1997

· Idaho     Recognized only if performed by January 1, 1996

· Iowa     The requirements for a common-law marriage are: (1) intent and agreement to be married; (2) continuous cohabitation; and (3) public declarations that the parties are husband and wife.

· Kansas     For a man and woman to form a common-law marriage, they must: (1) have the mental capacity to marry; (2) agree to be married at the present time; and (3) represent to the public that they are married.

· Montana     The requirements for a common-law marriage are: (1) capacity to consent to the marriage; (2) an agreement to be married; (3) cohabitation; and (4) a reputation of being married.

· New Hampshire     Common law marriages are recognized only at death and only for probate purposes. (N.H. RSA. 457:39)

· Ohio     Recognized only if performed by October 10, 1991

· Oklahoma     To establish a common-law marriage, a man and woman must (1) be competent; (2) agree to enter into a marriage relationship; and (3) cohabit

· Pennsylvania     A common-law marriage may be established if a man and woman exchange words that indicate that they intend to be married at the present time

· Rhode Island     The requirements for a common-law marriage are: (1) serious intent to be married and (2) conduct that leads to a reasonable belief in the community that the man and woman are married

· South Carolina     A common-law marriage is established if a man and woman intend for others to believe they are married

· Texas     A man and woman who want to establish a common-law marriage must sign a form provided by the county clerk. Or, they must (1) agree to be married, (2) cohabit, and (3) represent to others that they are married

· Utah     For a common-law marriage, a man and woman must (1) be capable of giving consent and getting married; (2) cohabit; and (3) have a reputation of being husband and wife

· Washington, D.C.     The requirements for a common-law marriage are: (1) an express, present intent to be married and (2) cohabitation.

(Added AD01-16)

**Appendix 21-2 Orphan Case Related Cables to Consulates.**

*Note: This appendix relates solely to orphan cases. For information on cables to consulates in general, see Appendix 10-4 of this field manual.*

**VISAS 37:** USCIS prepares a "Visas 37" cable once a favorable determination concerning an application for advance processing of an orphan petition (Form I-600A) for the prospective petitioner has been made. This cable will include, in this order:

- The name and address of the prospective adoptive parent (and spouse, if any);

- Phone number (including area code);

- Adjudicating USCIS office;

- Fee receipt number;

- Date of completion of advance processing application;

- Whether Form M-349 was sent to the petitioner;

- Number of orphans for whom prospective parent can give proper care;

- Whether the home study contains a favorable recommendation that the petitioner may adopt a child with disabilities ("yes", "no", or "not addressed");

- Whether ALL preadoption requirements of the child's proposed state of residence have been met ("yes", "no", "not applicable at the time this cable is drafted since both petitioner (and spouse, if any) plan to see the child prior to or during the adoption abroad", or "state has no preadoption requirements");

- If answer to (9) is "no", the remaining preadoption requirement(s) to be met before the orphan petition can be approved for a child for issuance of an IR-4 visa; or, if the answer to (9) is "not applicable etc.", cable will list the preadoption requirements to be met in case the petitioner (and/or spouse, if any) fail to see the child prior to or during the adoption; or, if the answer to (9) is "yes" or "state has no requirements", cable will state "not applicable";

- Petitioner's foreign address, if known (if unknown, cable will so state).

EXAMPLES :

VISAS THIRTY-SEVEN; JOHN AND JANE DOE, 2063 ORCHARD AVENUE, OAKLAND, CA 94577; (415) 555-4008; SAN FRANCISCO, 54789; OCTOBER 14, 1991;YES; ONE; YES; STATE HAS NO PREADOPTION REQUIREMENTS; NOT APPLICABLE, UNKNOWN.

VISAS THIRTY-SEVEN; JOHN AND JANE DOE, 2063 ORCHARD AVENUE, OAKLAND, CA 94577; (415) 555-7777; SAN FRANCISCO, 54618; OCTOBER 14, 1991;YES; ONE; NOT ADDRESSED; NO (LIST OF PREADOPTION REQUIREMENTS THAT REMAIN TO BE MET); UNKNOWN.

**VISAS 38:** USCIS prepares a "Visas 38" cable once it has approved a Form I-600 for the named alien as an orphan adopted by the named U.S. citizen petitioner (and spouse, if any) with the assistance of the named overseas social agency, contingent upon the consular officer's completing Form I-604 (overseas investigation). The cable will list, in this order:

- The orphan's name;

- Adjudicating USCIS office;

- Orphan's date and place of birth;

- Name and address of interested overseas social agency or name and address of person taking care of orphan;

- USCIS file number (or, if none, fee receipt number);

- Filing date of the petition;

- Name and U.S. address of petitioner (and spouse, if any);

- Phone number of petitioner (including area code);

- Name and address of interested stateside social agency (if different from the one overseas); and

- The foreign address of the petitioner, if known.

EXAMPLE :

VISAS THIRTY-EIGHT; JANE DOE AKA KIM; WASHINGTON, D.C.; BORN JUNE 18, 1991, SEOUL, KOREA; HOLT CHILDREN SERVICES, 147 SEJON-RO, SEOUL; A23 456 789; OCTOBER 12, 1991; JOHN AND HARRY DOE, 1929 15TH STREET NW, WASHINGTON, D.C. 20007; (202) 555-1907; HOLT ADOPTION PROGRAM, WASHINGTON, D.C. 20037

**VISAS 39:** USCIS prepares a "Visas 39" cable once it has approved a Form I-600 for the named alien as an orphan <u>to be adopted</u> by the named U.S. citizen petitioner (and spouse, if any) with the assistance of the named overseas social agency, contingent upon the consular officer's completion of Form I-604 (overseas investigation). The message will include, in this order:

- The orphan's name;

- USCIS adjudicating office;

- Orphan's date and place of birth;

- Name and address of interested overseas social agency or name and address of person caring for orphan;

- USCIS file number (or, if none, fee receipt number);

- Filing date of petition;

- Name and address of the petitioner (and spouse, if any);

- Phone number of petitioner (including area code);

- Name and address of the interested stateside social agency if different from the one overseas; and

- The foreign address of the petitioner, if known.

<u>EXAMPLE</u> :

VISAS THIRTY-NINE; JANE DOE; PORTLAND; BORN FEBRUARY 18, 1991, BANGKOK, THAILAND; C/O SUE DOE, 82 NHUT AVE., BANGKOK, THAILAND; A23 456 789; SEPTEMBER 2, 1991; JOHN AND JANE DOE, 11115 UNION STREET, BALTIMORE, MD 32209; (301) 555-8782; U.S. CATHOLIC CONFERENCE, 3000 MASSACHUSETTS AVENUE, NW, WASHINGTON, D.C. 20007.

**VISAS 90:** USCIS prepares a "Visas 90" cable once it has revoked the approval of a petition referred from the Department of State. The message will include, in this order:

- The type of petition;

- Date of approval;

- Visa classification;

- Adjudicating USCIS office;

- USCIS file number (if any) or fee receipt number;

- Name(s) of alien(s), date(s) and place(s) of birth;

- Address(es) of beneficiary(ies); and

- Petitioner's name.

<u>EXAMPLE</u> :

VISAS NINETY IMMEDIATE RELATIVE ORPHAN; MARCH 7, 1992; IR-3; SAN FRANCISCO DISTRICT

OFFICE; A23 456 789; JOHN DOE, MAY 1, 1993, SEOUL, KOREA; 147 SEJON-RO, SEOUL, KOREA; BOB AND JANE DOE.

**Appendix 21-2e The Child Status Protection Act of 2002 (CSPA) (Revised AD07-04; 04-11-08)**

The following examples reflect how the guidance would be applied to some specific scenarios.

A.   Form I-129F was approved and the K1 entered the country with a K2 who was then 17. The marriage between the K1 and USC petitioner occurred within 90 days and before the child's 18th birthday. The USC petitioner then files an I-130 on behalf of the K2 when the K2 is 20 years old. Consequently the K2 would be treated as if he or she is an immediate relative for CSPA purposes and his or her eligibility for permanent residence would be 20, the beneficiary's age on the date the form I-130 was filed on his or her behalf. See **Chapter 21.2(e)(1)(i)** .

B.   An immigrant visa petition was filed when the beneficiary was under the age of 21 and approved before August 6, 2002. After August 6, 2002, the beneficiary filed Form I-485 within one year of visa availability. USCIS determined that the CSPA did not apply because no petition or application was pending on the August 6, 2002, and the alien received a denial solely because he or she aged out. Based on this new CSPA guidance, the applicant may be eligible for CSPA benefits. The alien may file a new application for adjustment of status today. USCIS will adjudicate the current Form I-485 as if it had been filed within one year of visa availability. See **Chapter 21.2(e)(2)(iii)** .

C.   An immigrant visa petition was filed when the beneficiary was under the age of 21 and subsequently approved. The beneficiary did not file Form I-485 within one year of visa availability because previous USCIS guidance indicated that they would not benefit from the CSPA. Based on this new CSPA guidance, the applicant may be eligible for CSPA benefits. The alien may file a Form I-485, and USCIS will adjudicate the Form I-485 as if it had been filed within one year of visa availability. See **Chapter 21.2(e)(2)(iii)** , a nd **(iv)** .

D.   An immigrant visa petition (either a Form I-130 or a Form I-140) was filed in 2000 when the derivative beneficiary was 20. When the petition was filed, the priority date for the principal's classification was current. The visa petition was not approved until 2007, and a Form I-485 was filed one month after approval. The derivative beneficiary's "age" for CSPA purposes would be 20 (the beneficiary was 27 when the I-485 was filed, but the visa petition was pending for 7 years). This derivative beneficiary can benefit from the CSPA since he or she applied for permanent residence within one year of visa number availability. The visa availability date in this example is the immigration petition approval date. Thus, this derivative beneficiary would be able to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(C)** .

E.     An immigrant visa petition (either a Form I-130 or a Form I-140) was filed in 2000 when the derivative beneficiary was 20. The visa petition is approved exactly one year later in 2001. A visa becomes available exactly 5 years later in 2005 and the principal files an I-485 immediately. The application is approved in 2007 and the beneficiary applies for adjustment of status one month after approval of the principal's application. The derivative beneficiary's "age" for CSPA purposes would be 24 (the beneficiary is 25 in 2005 when the visa became available, but the visa petition was pending for 1 year). Not only would this derivative beneficiary be considered over the age of 21, this beneficiary could not benefit from the provisions of the CSPA because he or she did not file a Form I-485 within one year of the principal's visa becoming available. Thus, t his derivative beneficiary would be unable to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(C)** .

F.     An immigrant visa petition (either Form I-130 or Form I-140) was filed and denied in 2000 when the derivative beneficiary was 20. The petitioner filed a timely appeal with the AAO/BIA which, in 2006, sustained the appeal, remanded the matter, and directed the petition approved (on grounds other than the new availability of the CSPA). On the date of approval, visas are available for the principal's classification. The principal and derivative beneficiaries each file a Form I-485 six months later. The derivat ive beneficiary's "age" for CSPA purposes would be 20 (the beneficiary is 27 in 2007, but the Form I-140 was pending for 7 years). Thus this beneficiary would be eligible to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(C)** .

G.     An immigrant visa petition (either Form I-130 or a Form I-140) was filed and denied in 2000 when the beneficiary was 20. The petitioner filed a timely motion to reopen, and, in 2007, the motion to reopen is granted (on grounds other than the new availability of the CSPA). The petition is then approved and a visa is available to the beneficiary on the date of approval, and the alien files a Form I-485 nine months later. The beneficiary's "age" for CSPA purposes would be 20 (the beneficiary is 27 today, but t he Form I-130 was pending for 7 years). Thus, this beneficiary would be eligible to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(B)** .

**Appendix 21-3 American Association Of Blood Banks.**

( Revised 04/08/2005; *AFM 05-10*)

Editor's Note: The following information was obtained from:

American Association of Blood Banks
8101 Glenbrook Road
Bethesda, MD 20814-2749

| Phone | (301) 907-6977 |
|---|---|
| FAX | (301) 907-6895 |
| Website | www.aabb.org |
| Email | aabb@aabb.org |

Part A: Accredited Parentage Testing Laboratories. A current list of the AABB accredited parentage testing laboratories can be viewed
at: http://www.aabb.org/About_the_AABB/Stds_and_Accred/aboutptlabs.htm . You must access the AABB website set forth above to obtain current laboratory information. The USCIS office is no longer providing a paper list of the AABB facilities due to the transient nature of this information.

Please be advised that the AABB website lists only the headquarters or primary location for each AABB laboratory. In fact, many of the laboratories listed have multi-state and/or multi-site locations despite being listed under only one state. Therefore, it is necessary to go to the selected laboratory's website to identify all locations and contact information for that particular laboratory.

**April 2005**

**Fact Sheet**

American Association of Blood Banks ("AABB")Accredited Parentage Testing Laboratories

Parentage testing, or what is also referred to as blood testing or DNA testing, must be conducted by an American Association of Blood Banks ("AABB") accredited laboratory.

A current list of the AABB accredited parentage testing laboratories can be viewed
at: **http://www.aabb.org/About_the_AABB/Stds_and_Accred/aboutptlabs.htm** . You must access the AABB website set forth above to obtain current laboratory information. The USCIS office is no longer providing a paper list of the AABB facilities due to the transient nature of this information.

Please be advised that the AABB website lists only the headquarters or primary location for each AABB laboratory. In fact, many of the laboratories listed have multi-state and/or multi-site locations despite being listed under only one state. Therefore, it is necessary to go to your selected laboratory's website to identify all locations and contact information for that particular laboratory.

Any questions regarding the actual parentage testing procedures or test results should be directed to the AABB parentage testing laboratory selected.

**PART B:** GENERAL POLICIES

| ITEM | ISSUE | YES | NO | N/A |
|------|-------|-----|----|----|
| 1.100 | PERSONNEL | | | |
| 1.101 | Is the laboratory under the direction of an individual(s) with a doctoral degree who is/are qualified by advanced training and/or experience in parentage testing | | | |
| 1.102 | Is there evidence that the director(s) is/are spending adequate amounts of time as DIRECTOR | | | |
| 1.103 | Is there evidence of personal review of the cases by a director | | | |
| 1.104 | Are there clear-cut assignments of responsibility for: | | | |
| 1.105 | Day-to-day performance of specific tests | | | |
| 1.106 | Scheduling of tests | | | |
| 1.107 | Implementation of quality control | | | |
| 1.108 | Maintenance of laboratory records | | | |
| 1.109 | Review of laboratory performance | | | |
| 1.110 | Delegation of responsibility in director's absence | | | |
| 1.111 | Is there evidence of interaction between the director and staff | | | |
| 1.112 | If not, comment | | | |

**REFERENCE**

PI.110      The laboratory shall be under the direction of an individual/individuals with a doctoral degree who is/are qualified by advanced training and/or experience in parentage testing.

PI.130      A qualified individual must be available to act as an expert witness in the event that legal testimony related to the test results is required.

**EXPLANATION**

The director of a parentage testing laboratory is the most important component of that laboratory. The director provides expertise and ensures that the technical staff are competent to perform their duties. It is the director's responsibility to establish and review policies and procedures that ensure accurate test results. In addition, the laboratory director usually serves as the expert witness and as such must be familiar with all aspects of paternity testing and be able to interpret results for individu als unfamiliar with medical technology and terminology.

The director must have a doctoral degree in an area such as medicine, genetics, biology, or other related fields. The director should be able to demonstrate experience and expertise in those methods the laboratory employs for paternity testing (HLA, red cell antigen tests, enzymes and proteins, DNA). In some larger laboratories, expertise in a given area (such as DNA testing) may be provided by another individual. The laboratory director, however, must still be conversant with all areas of testing and is re sponsible for the results of testing performed in all areas. It is essential that a laboratory director have adequate experience to detect possible errors in test performance or in the interpretation of test results. Adequate experience is difficult to quantify. It cannot be measured necessarily by years of experience or number of cases reviewed, nor can it be assumed based upon education or coursework. Adequate experience can only be demonstrated in the way that the individual directs his or her laboratory , through the care given to case review, through response to errors or problems, through the procedures and protocols established for the performance of the testing, through interactions with the staff, and through demonstration of adequate understanding of the genetics and statistics that form the foundation of the science of parentage testing. Failure of a director to adequately demonstrate sufficient experience and general competence to the satisfaction of the inspector may result in a deficiency.

**1.113** Personal review of all cases by a director is required, as this individual is responsible for all results generated by the laboratory, This shall be documented by having the director sign all reports. In addition, the director and/or his/her designee must review and sign or initial important worksheets, autoradiograms, and other pertinent test results. The director shall also review the laboratory's procedures manual and indicate that review by initialing and dating the document. And, there should be eviden ce that the director reviews results of external (and internal if appropriate) proficiency tests. Corrective action, where appropriate, must be documented.

Some large laboratories may find it necessary or practical to have multiple directors. Thus, there may be several individuals who sign paternity test reports. However, each individual in that laboratory who reviews and signs those reports must meet the qualifications of a paternity laboratory director outlined above. In addition, there must still be one individual who has the overall responsibility for the paternity testing laboratory. Any change in director(s) must be reported to the AABB within 30 days.

**AR2022_300455**

Authority for the technical and clerical aspects of the laboratory functions may be delegated. In some institutions the director may arrange for consultative services to augment existing services or for the purpose of dealing with problems requiring special expertise.

The director is also responsible for the development, implementation, and review of the quality assurance (QA) program of the laboratory. The QA program developed and administered by the Director must include procedures for training staff and reviewing their competency periodically. In addition, policies for quality control of reagents and the periodic maintenance of equipment must be a part of the QA plan. The QA plan must also define acceptable limits for all equipment and reagents and must indicate the c ourse of action when these limits are not achieved.

Records must be maintained for at least 5 years unless local law requires a longer retention time. All paternity files are to be considered confidential and stored with security.

### 1.211 B **EXPLANATION**

The laboratory shall have a quality plan in place that describes how the facility plans to develop their quality program, including a time line.

In the future, the laboratory will be required to have a quality program m place that monitors performance to ensure that predetermined quality criteria are met and that laboratory improvement is a management goal. Responsibility for the ongoing implementation of the quality program may be assigned to a designated individual(s), but is ultimately the responsibility of the laboratory director. The quality program must address the items found in the Quality System Essentials (Association Bulletin 97-4).

|  | 10 ESSENTIAL |
| --- | --- |
| Organization | A table of organization or description of organization is to be included in this section in which lines of responsibility are clearly shown. The individual(s) responsible for the quality program is named here. The goals of the organization and a quality statement should be defined and written. |
|  |  |
| Personnel | Job descriptions that define educational and experience requirements, duties and responsibilities, and lines of authority are to be included in this section. A description of the training program for new hires and documentation of appropriate training prior to on-line responsibility are also kept here as well as documents of periodic evaluations and competency for each staff member. |
|  |  |

AR2022_300456

| | |
|---|---|
| Equipment | Each item of equipment must be listed with a unique inventory number. Records of calibration, schedules of periodic maintenance with dates of activity, and repairs are to be kept in this section. |
| | |
| Supplier Issues | A list of suppliers/vendors of all scientific items and services is maintained. The list should document the names of the vendors with addresses, phone and FAX numbers, and what items/services are provided by each vendor. |
| | |
| Process Control | This section contains a description of all the various quality control procedures in place with a calendar schedule of set intervals for checks. A policy should be established to follow when established limits are exceeded. It should also list the various proficiency tests used in the laboratory and what action is taken if a nonconsensual result is reported. Separate notebooks should be used to store the actual quality control data and the proficiency testing records. |
| | |
| Documents and Records | A model format for writing a standard operating procedure (SOP) should display the various sections of the procedure in a set order. There should also be a description of how SOPs are changed and how data entries in records are to be changed when appropriate. The length of time for the retention of records should be established as well as security for any offsite storage. |
| | |
| Incidents, Errors and Accidents | A process must be in place to investigate errors, accidents, and credible complaints. Clients whose challenges about test results appear to have merit must be offered a repeat test at no charge by the laboratory, or, if the client chooses, in another laboratory accredited by the /LA.BB. The director should advise the client to prepare a written appeal to the Parentage Testing Program Unit if the client and director disagree on the merit of the challenge. Errors must be investigated to determine root cause a nd appropriate action must be taken. Documentation must be kept on errors and accidents regarding discovery, root cause analysis, and corrective action taken. |
| | |
| Assessments Process | There must be a schedule for internal assessments. The director and the responsible head of the quality program (if not the director) shall establish specific items for periodic review. Appropriate assessments might include test result discrepancies, completeness of records, sigma and delta calculations in RFLP analysis, paternity index and power of exclusion (PE) consistency checks, etc. The director and the responsible head of the quality program (if not the director) should set Improvement goals with timetables for process improvement activities. Appropriate study areas might include DNA extraction yields, background noise on autorads, number (%) of redraws, etc. |
| | |

AR2022_300457

| Facilities and Safety | There shall be a description of the safety training program for the staff and records of periodic participation by each staff member must be kept. |
|---|---|
|  |  |

AR2022_300458

**Appendix 21-4 Public Law 108-136 (National Defense Authorization Act for Fiscal Year 2004), Sec. 1701. Requirements for Naturalization through Service in the Armed Forces of the United States has been superseded by USCIS Policy Manual, Volume 12: Citizenship and Naturalization as of January 22, 2013.**

**Appendix 21-5 U.S. Department of Defense, U.S. Department of Veterans Affairs, and U.S. Coast Guard Points-of-Contact for Public Law 108-136 (National Defense Authorization Act for Fiscal Year 2004) has been superseded by USCIS Policy Manual, Volume 12: Citizenship and Naturalization as of January 22, 2013.**

**Appendix 21-6 Adam Walsh Child Protection and Safety Act of 2006**

[Appendix added 02-08-2007]

TITLE IV--IMMIGRATION LAW REFORMS TO PREVENT SEX OFFENDERS FROM ABUSING CHILDREN

SEC. 401. FAILURE TO REGISTER A DEPORTABLE OFFENSE.

Section 237(a)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(2)(A)) is amended--

(1) by redesignating clause (v) as clause (vi); and

(2) by inserting after clause (iv) the following new clause:

"(v) Failure to register as a sex offender.--

Any alien who is convicted under section 2250 of title 18, United States Code, is deportable."

SEC. 402. BARRING CONVICTED SEX OFFENDERS FROM HAVING FAMILY-BASED PETITIONS APPROVED.

(a) Immigrant Family Members.--Section 204(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)), is amended--

(1) in subparagraph (A)(i), by striking "Any" and inserting "Except as provided in clause (viii), any";

(2) in subparagraph (A), by inserting after clause (vii) the following:

"(viii)(I) Clause (i) shall not apply to a citizen of the United States who has been convicted of a specified offense against a minor, unless the Secretary of Homeland Security, in the Secretary's sole and unreviewable discretion, determines that the citizen poses no risk to the alien with respect to whom a petition described in clause (i) is filed.

"(II) For purposes of subclause (I), the term 'specified offense against a minor' is defined as in section 111 of the Adam Walsh Child Protection and Safety Act of 2006."; and

(3) in subparagraph (B)(i)--

(A) by striking "(B)(i) Any alien" and inserting the following: "(B)(i)(I) Except as provided in subclause (II), any alien"; and

(B) by adding at the end the following:

"(I) Subclause (I) shall not apply in the case of an alien lawfully admitted for permanent residence who has been convicted of a specified offense against a minor (as defined in subparagraph (A)(viii)(II)), unless the Secretary of Homeland Security, in the Secretary's sole and unreviewable discretion, determines that such person poses no risk to the alien with respect to whom a petition described in subclause (I) is filed.".

(b) Nonimmigrants.--Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)), is amended by inserting "(other than a citizen described in section 204(a)(1)(A)(viii)(I)" after "citizen of the United States" each place that phrase appears.

**Appendix 21-7 Legislation Affecting Certain Surviving Spouses and Visa Petitioners [Appendix added on 12-02-2009]**

U.S. Department of Homeland Security
20 Massachusetts Ave., NW
Washington, DC 20529

**U.S. Citizenship
and Immigration
Services**

HQDOMO 70/6.1.1-P
70/6.1.3-P
*AFM* Update AD10-09

# Interoffice Memorandum

To:        Executive Leadership

From:    Donald Neufeld /s/
            Acting Associate Director
            Domestic Operations Directorate

            Lori Scialabba /s/ Joanna Ruppel for
            Associate Director
            Refugee, Asylum, and International Operations Directorate

            Pearl Chang /s/
            Acting Chief
            Office of Policy and Strategy

Date:     December 2, 2009

SUBJECT:        Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and
                      their Children (REVISED)

                      Effect of FY2010 DHS Appropriations Act on eligibility to immigrate after death
                      of visa petitioner

                      Revisions to Adjudicator's Field Manual (AFM) Chapter(s) 21.2(a)(4) and
                      (h)(1)(C)
                      (AFM Update AD10-09)

## I. Purpose

This memorandum supersedes an earlier memorandum on this subject, dated November 13,
2009, and provides updated guidance to U.S. Citizenship and Immigration Services (USCIS)
field offices and service centers regarding the processing of Forms I-130, petitions for alien
relative, and I-485, application to register permanent residence or adjust status, filed by surviving
spouses of deceased U.S. citizens and the qualifying children of the surviving spouses.  This new
guidance is based on the enactment of section 568(c) of the Department of Homeland Security
Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009), which provides

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 2

relief for these aliens.  Section 568(c) entered into force on October 28, 2009, the date of
enactment.

Sections 568(d) and (e) of the FY2010 DHS Appropriations Act, which provide relief for aliens
who are surviving beneficiaries of certain pending or approved petitions filed by certain
qualifying categories of noncitizens, will be addressed in a separate memorandum.

## II.  Background

### A.   Prior Policy and Related Litigation

For many years, U.S. immigration policy has been that a Form I-130 could not be approved if the
petitioner died while the Form I-130 was pending.  *See Matter of Sano,* 19 I&N Dec. 299 (BIA
1985); *Matter of Varela,* 13 I&N Dec. 453 (BIA 1970).  As far back as 1938, our immigration
regulations have provided for the revocation of the approval of a visa petition upon the
petitioner's death.  More recently, the regulations, while maintaining that general policy, have
provided for discretion, for "humanitarian reasons," to reinstate the approval.  8 C.F.R. §
205.1(a)(3)(i)(C)(2).  Also, since 2006, 8 C.F.R. § 204.2(i)(1)(iv) and 205.1(a)(3)(i)(C)(1) have
provided that the automatic revocation provision does not apply to a spousal immediate relative
visa petition, if the deceased petitioner and the alien widow(er) had been married at least two
years when the petitioner died.

Over the past several years, widow(er)s of citizens who had died before the second anniversary
of the underlying marriages have challenged this long-standing policy as being inconsistent with
the statute.  The federal courts of appeals have split on the legal issue.  *Compare Robinson v.
Napolitano,* 554 F.3d 358 (3d Cir. 2009) (sustaining agency view that petitioner's death while
a Form I-130 is pending ends the beneficiary's eligibility); *petition for cert. filed,* No. 09- 94 (U.S.
filed July 23, 2009), *with Taing v. Napolitano,* 567 F.3d 19 (1st Cir. 2009) (holding agency
policy violative of statute); *Lockhart v. Napolitano,* 561 F.3d 611 (6th Cir. 2009) (same); *and
Freeman v. Gonzales,* 444 F.3d 1031 (9th Cir. 2006) (same).  The issue has engendered much
litigation before the federal district courts in recent months, with most courts ruling against the
agency.  Among the unfavorable decisions is the class action ruling in *Hootkins v. Napolitano,*
___ F. Supp. 2d ___, 2009 WL 2222839 (C.D. Cal. Apr. 28, 2009), which is on appeal to the
Ninth Circuit Court of Appeals.  Other cases are pending in district courts throughout the United
States.

### B.  Section 568(c) of FY2010 DHS Appropriations Act

Congress, however, recently acted to resolve the issue.  On October 28, 2009, the President
signed into law the FY2010 DHS Appropriations Act.  Section 568(c) of the new law amends the
second sentence in section 201(b)(2)(A)(i) of the INA so that, for a widow(er) of a citizen to
qualify as an immediate relative, it is no longer necessary for the couple to have been married at
least two years when the citizen died.  The second sentence of section 201(b)(2)(A)(i) now reads,

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 3

> In the case of an alien who was the spouse of a citizen of the United States and
> was not legally separated from the citizen at the time of the citizen's death, the
> alien (and each child of the alien) shall be considered, for purposes of this
> subsection, to remain an immediate relative after the date of the citizen's death
> but only if the spouse files a petition under [section 204(a)(1)(A)(ii) of the INA]
> within 2 years after such date and only until the date the spouse remarries.

When a widow(er) qualifies as an immediate relative under the second sentence in section
201(b)(2)(A)(i) of the INA, his or her children, as defined in sections 101(b)(1) and 201(f) of the
INA, also qualify.  The amendment made by section 568(c) applies equally to aliens abroad who
are seeking immigrant visas and aliens in the United States who are seeking adjustment of status.
The amendment applies to any alien whose spouse died before October 28, 2009, and who had a
Form I-130 pending on October 28, 2009.  If no Form I-130 was pending, then an alien whose
U.S. citizen spouse died before October 28, 2009, and before the second anniversary of their
marriage, may file a visa petition under section 204(a)(1)(A)(ii) of the INA so long as (a) the
alien has not remarried, and (b) the petition is filed no later than October 28, 2011.

Section 568(c) relates only to the impact of the citizen's death on the alien's eligibility for
classification as an immediate relative.  All other requirements for approval of a visa petition
remain in force.  In particular, the alien must still establish that he or she was the citizen's legal
spouse, and that the marriage was a bona fide marriage and not an arrangement solely to confer
immigration benefits on the alien.  If the alien was in removal proceedings at the time of the
marriage, the "clear and convincing evidence" standard in section 245(e)(3) of the INA will still
apply to the adjudication of the visa petition.  If the necessary visa petition is approved, the alien
may then seek an immigrant visa or adjustment of status.  The alien must still establish that he or
she is admissible as an immigrant and, in an adjustment case, that he or she meets all other
adjustment eligibility requirements and merits a favorable exercise of discretion.

In light of this new legislation, the policy guidance stated in the November 8, 2007,
memorandum entitled "Effect of Form I-130 Petitioner's Death on Authority to Approve the
Form I-130" (*AFM* Update AD08-04) is obsolete.  This memorandum amends the Adjudicator's
Field Manual to remove the material added in that earlier memorandum.

## III. Policy Guidance and AFM Update

### *AFM* Update

1. Chapter 21.2 of the *AFM* entitled "Factors Common to the Adjudication of All Relative Visa
   Petitions" is amended by

   a.  Removing chapter 21.2(a)(4)
   b.  Removing the **Note** at the end of chapter 21.2(h)(1)(C).

AR2022_300466

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 4

## A. **Widow(er)s with pending cases**

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act makes the amendment to the second sentence in INA section 201(b)(2)(A)(i) applicable to any visa petition or adjustment application "pending on or after the date of enactment." As noted, the date of enactment is October 28, 2009.

### 1. *Reopening of pending Form I-130 cases*

For purposes of this amendment, a Form I-130 will be deemed "pending" on October 28 2009, if the deceased citizen had filed a Form I-130 on or before that date but:

- USCIS has not adjudicated the Form I-130;

- USCIS denied the Form I-130, but USCIS granted a motion to reopen or reconsider, so that the Form I-130 is, again, pending;

- USCIS denied the Form I-130, but has not yet ruled on a motion to reopen or reconsider;

- USCIS denied the Form I-130, but the alien's appeal from that decision is pending before the Board of Immigration Appeals (BIA) or the period for appeal of the adverse USCIS decision to the BIA had not yet expired; or

- The USCIS or BIA decision denying the Form I-130 is the subject of pending litigation before a federal court (including cases in which the district court issued a decision before October 28, 2009, but the appeals period established by law had not yet expired).

Under 8 C.F.R. § 204.2(i), a citizen's spousal Form I-130 is automatically converted to a widow(er)'s Form I-360 if, on the date of the citizen's death, the beneficiary qualifies as a widow(er) under the second sentence in section 201(b)(2)(A)(i). Under section 568(c) of the FY2010 DHS Appropriations Act, these aliens now qualify under the second sentence. Thus, any Form I-130 that is "pending" as described in the preceding paragraph will be deemed to be, and adjudicated as, a widow(er)'s Form I-360.

In any Form I-130 case in which a motion to reopen or for reconsideration was filed, but not acted on, USCIS will grant the motion and make a new decision in light of section 568(c) of the FY2010 DHS Appropriations Act.

Any Form I-130 that is the subject of litigation in any federal court on the issue of the effect of the petitioner's death is, as of the date of this memorandum, reopened for a new decision in light of section 568(c) of the FY2010 DHS Appropriations Act. The beneficiary need not file a separate motion. Nor does it matter, for purposes of reopening the Form I-130, whether the beneficiary is currently in the United States or abroad. If the decision denying or terminating action on the Form I-130 was pending in any court on October 28, 2009, the decision is now

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 5

reopened.  USCIS will therefore make a new decision in light of section 568(c) of the FY2010
DHS Appropriations Act.

Cases challenging the denial of a spousal immediate relative Form I-130 based on the
petitioner's death have been filed in district courts throughout the United States.  USCIS officers
must consult with the appropriate regional or service center counsel to identify those cases that
are the subject of litigation that was pending on October 28, 2009.  Once a case is identified as
subject to reopening under this memorandum, the USCIS officer will notify the alien in writing
that the Form I-130 is reopened in light of section 568(c) of the FY2010 DHS Appropriations
Act, and will be readjudicated as a Form I-360.

If it is determined that a Form I-130 had been filed but was not "pending" on October 28, 2009,
because a USCIS decision denying the Form I-130 had become final before October 28, 2009
(and no administrative appeal or civil action challenging the denial was pending on October 28,
2009), please refer to part III(B) of this memorandum.

> 2.     *Reopening of pending Form I-485 cases*

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act also makes the amendment
applicable to any Form I-485 that was pending on the date of enactment.  A Form I-485 is
deemed "pending" on the date of enactment if it was filed before the deceased citizen's death
but:

- USCIS has not adjudicated the Form I-485

- USCIS denied the Form I-485, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-485 is, again, pending

- USCIS denied the Form I-485, but has not yet ruled on a motion to reopen or reconsider;

- The Form I-485 is the subject of litigation before a federal court (including cases in
  which the district court issued a decision before October 28, 2009, but the appeals period
  established by law had not yet expired).

With this guidance memo, USCIS also reopens, without the need for a formal motion, any Form
I-485 that is the subject of litigation on this issue in any federal court, if USCIS still has
jurisdiction to act on the Form I-485.  As with the reopening of the related Form I-130, the
USCIS officer will notify the applicant in writing that the Form I-485 is reopened in light of
section 568(c) of the FY2010 DHS Appropriations Act.

In the case of a widow(er) who entered the United States as a K-1 nonimmigrant, and filed a
Form I-485 after marrying the deceased citizen who had filed the Form I-129F, ordinarily there
will not be a Form I-130.  If the Form I-485 is still "pending" as described in this memo, and
USCIS still has jurisdiction to act on it, the Form I-485 will also be reopened for a new decision
in light of section 568(c) of the FY2010 DHS Appropriations Act, without the need for a formal

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 6

motion.  Since no Form I-130 is required for a K-1 nonimmigrant to seek adjustment after
marrying the K petitioner within the period specified by statute, the K-1 nonimmigrant will also
be deemed the beneficiary of a Form I-360 if the K-1 nonimmigrant now qualifies as a
widow(er).  The K-1 nonimmigrant still may not adjust on any basis other than the K-1
nonimmigrant's having married the citizen petitioner who filed the Form I-129F.

Some aliens may have been placed into removal proceeding after USCIS denied their Forms I-
485.  Except for "arriving aliens," this factor would mean that USCIS no longer has jurisdiction
to adjudicate the Form I-485.  8 C.F.R. § 245.2(a)(1) and 1245.2(a)(1).  USCIS would have
jurisdiction to adjudicate the Form I-485 only if the Executive Office for Immigration Review
(EOIR) terminated the removal proceeding.  Whether to support or oppose terminating a removal
proceeding is a matter for U.S. Immigration and Customs Enforcement to decide, not USCIS.  If
a USCIS office reopens a Form I-130 involving an alien in removal proceedings, the USCIS
office must, through the appropriate USCIS counsel, advise the local counsel for U.S.
Immigration and Customs Enforcement.

Some aliens whose citizen spouses had died may have left the United States voluntarily, without
obtaining a grant of advance parole.  Others may have left after obtaining advance parole, but
may have remained abroad after expiration of the Form I-512.  Under 8 C.F.R. §
245.2(a)(ii)(4)(B), these aliens have abandoned their adjustment applications.  Also abandoned is
the adjustment application of an alien who left as the result of removal proceedings.  8 C.F.R. §
245.2(a)(4)(ii)(A).  In these situations, a Form I-485 will not be deemed "pending" for purposes
of section 568(c)(2)(A).  However, where section 568(c) applies to the approved Form I-130, and
the Form I-130 has been approved as a Form I-360, the alien approved on that I-360 who has left
the United States may apply for an immigrant visa abroad.

3.    *Petition already approved before death*

If a widow(er) is the beneficiary of a Form I-130 that was approved before the citizen
petitioner's death, it is not necessary for the widow(er) to request humanitarian reinstatement of
the approval.  Under 8 C.F.R. § 204.2(i)(1)(iv), the approved Form I-130 is automatically
converted to an approved Form I-360.  Any children of the widow(er) will also be eligible to
seek an immigrant visa or adjustment of status based on the converted petition.

There may be some cases in which a spousal immediate relative Form I-130 was approved, but
the approval was revoked automatically under 8 C.F.R. 205.1(a)(3)(i)(C) upon the citizen
petitioner's death.  If the alien is now eligible for classification as the widow(er) of a citizen
under section 568(c)(2)(A) of the  FY2010 DHS Appropriations Act , the approval will be
deemed to have been reinstated, effective October 28, 2009.  No separate request for
reinstatement is necessary.  Under 8 C.F.R. § 204.2(i)(1)(iv), the Form I-130 will be deemed to
be an approved Form I-360.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 7

### 4.    *Admissibility issues*

Whether an alien is actually admissible is not germane in adjudicating a Form I-130.  *Matter of O-*, 8 I&N Dec. 295 (BIA 1959).  The only issue resolved by enactment of section 568(c) of the FY2010 DHS Appropriations Act is that the death of the citizen spouse, by itself, does not make the widow(er) ineligible for immediate relative classification. Thus, the alien must still be admissible as an immigrant to obtain adjustment of status or an immigrant visa.

For those aliens, however, who had pending Form I-130 cases, and who now can benefit from section 568(c) of the FY2010 DHS Appropriations Act, two inadmissibility grounds warrant special consideration.  The first is section 212(a)(9)(B)(i) of the Act, under which an alien is inadmissible if the alien seeks admission within a specified period after the alien leaves the United States, if the alien has accrued a lengthy period of unlawful presence.  The second is section 212(a)(9)(A), under which an alien who has been removed (or who left the United States while under a final administrative order of removal) must obtain consent to reapply, if the alien seeks admission within the period set in section 212(a)(9)(A).

It is important to note that the special provisions in this memorandum relating to INA section 212(a)(9)(A) and (B) apply only to an alien who was the beneficiary of a Form I-130 that was filed by a now-deceased spouse petitioner, and that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act.  The purpose of these special provisions is simply to minimize the adverse effect on these aliens of the disputed, and now resolved, issue of the impact of the death of the petitioning spouse on the alien's eligibility.

### a.  Unlawful presence

By specifying, in section 568(c)(2)(A) of the FY2010 DHS Appropriations Act, that the amendment should apply to pending cases, Congress indicated its desire to resolve these cases fully.  For this reason, for purposes of INA section 212(a)(9)(B)(i), if an alien remained in the United States while awaiting the outcome of Form I-130 that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act, the alien will be deemed *not* to have accrued any unlawful presence.  This protection applies even if the alien was not actually in a lawful status while the now-converted Form I-360 was pending.

An alien who had a Form I-130 pending on October 28, 2009, but who is present in the United States without a lawful admission or parole generally cannot obtain adjustment under INA section 245(a).  Rather, the alien must generally seek adjustment under INA section 245(i).  But this relief is not available to an alien who did not have a petition or labor certification filed before April 30, 2001.  Thus, even if the Form I-130 can now be approved as a Form I-360, the alien may need to leave the United States to obtain an immigrant visa.  But since, under this guidance memorandum, the alien will be deemed *not* to have accrued any unlawful presence, he or she will not be inadmissible under INA section 212(a)(9)(B)(i).

Again, these special provisions relating to the accrual of unlawful presence apply only to an alien who is the beneficiary of a spousal immediate relative Form I-130 that was pending on October

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 8

28, 2009, and that is now approved under section 568(c)(2)(A) of the FY2010 DHS
Appropriations Act and 8 C.F.R. § 204.2(i)(1)(iv) as a widow(er)'s Form I-360:  the widow(er)
and his or her accompanying child(ren).  Ordinarily, the pendency of a visa petition, itself, does
not prevent accrual of unlawful presence.  A pending adjustment application, by contrast, does
prevent accrual of unlawful presence.  *Adjudicator's Field Manual* chapter 40.9(b)(3)(A).  Most
aliens who have been in litigation because the death of a spouse led to denial of the Form I-130
are probably already protected from unlawful presence under the ordinary provisions in the
AFM.  This broader protection against unlawful presence, for this narrow class of cases, is
designed to maximize the ability of those aliens whose specific situations gave rise to the new
legislation to fully benefit from it.

<h4 align="center">b.  Consent to reapply for admission after removal</h4>

These protections against accrual of unlawful presence apply even if the alien was actually
removed from the United States under a removal order.  Still, because the alien was removed
under a valid order, the alien is inadmissible under INA section 212(a)(9)(A)(i) or (ii).  USCIS,
however, has discretion under section 212(a)(9)(A)(iii) to consent to the alien's re-application for
admission.  USCIS should generally exercise discretion favorably and grant an application for
consent to reapply under section 212(a)(9)(A)(iii), if:

- The Form I-130 that had been filed by the alien's spouse has now been approved as a
Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act;

- The alien is otherwise admissible, and

- The alien's case does not present significant adverse factors beyond the removal itself.

A USCIS adjudicator will not deny a Form I-212 filed by an alien whose case was in litigation
on October 28, 2009, and whose Form I-130 has been approved as a Form I-360 under section
568(c)(2)(A) of the FY2010 DHS Appropriations Act without consulting USCIS Headquarters
through appropriate channels.

<h4 align="center">5.  *Remarriage*</h4>

Any immediate relative Form I-130 that was filed on behalf of the spouse of a U.S. citizen, and
that was pending on October 28, 2009, is no longer a spousal immediate relative Form I-130.
By operation of 8 C.F.R. § 204.2(i)(1)(iv), what was filed as a spousal immediate relative Form
I-130 is now a widow(er)'s Form I-360.  The converted Form I-360 may be approved only if the
beneficiary, who is now also deemed to be the petitioner, qualifies as the widow(er) of a citizen,
as described in INA section 201(b)(2)(A)(i).  Eligibility for classification as an immediate
relative continues "only until the date the spouse remarries."

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 9

### 6. *Ninth Circuit cases*

In acting on the guidance in this memorandum, USCIS adjudicators must keep in mind that the
*Hootkins* case was certified as a class action. Thus, an individual need not be a *named* Plaintiff
in *Hootkins* in order for his or her Form I-130 and Form I-485 to be reopened under this
memorandum. If an individual has not already been identified as a member of the *Hootkins*
class, that individual may make a written request to have his or her Form I-130 and Form I-485
reopened and readjudicated. The purpose of the written request is simply to *identify* the case as a
*Hootkins* case. The individual is not required to pay the filing fee for a motion to reopen. The
case will be considered a *Hootkins* class member case if the case was denied on or after August
30, 2001,[1] and:

- either the citizen spouse petitioner or the alien spouse beneficiary lived in the Ninth
  Circuit when the citizen spouse died; or

- a USCIS office in the Ninth Circuit made the prior decision on the Form I-130 or Form I-
  485.

### B.  Widow(er)s without pending cases

The alien widow(er) of a citizen who died before October 28, 2009, but who did not have a Form
I-130 pending on that date, may now file a Form I-360, provided that he or she does so no later
than October 28, 2011, and has not remarried. FY2010 DHS Appropriations Act § 568(c)(2)(B).
Section 568(c)(2)(B) applies if the citizen spouse did not file a Form I-130 on the alien spouse's
behalf before dying. But it also applies if there was a Form I-130 filed, but the decision denying
the Form I-130 had become administratively final before October 28, 2009, because the decision
was not the subject of any type of administrative or judicial review that was pending on October
28, 2009. Note that section 568(c)(2)(B)(i) says the Form I-360 must be filed "not later than the
date that is 2 years after the date of the enactment." Thus, a Form I-360 that is filed *on* October
28, 2011, will still be timely. A Form I-360 filed on or after October 29, 2011, will be untimely.

For any case in which a citizen dies on or after October 28, 2009, the alien widow(er) must file
the Form I-360 within 2 years of the citizen's death.

### C.    Children of widow(er)s

The child of a widow(er) whose Form I-360 is approved may, as specified in the second sentence
of INA section 201(b)(2)(A)(i) and in INA section 204(a)(1)(A)(ii), be included in the
widow(er)'s petition. Whether an individual qualifies as the widow(er)'s "child" is determined
according to INA sections 101(b)(1) and 201(f).

---

[1] Any case denied before August 30, 2001, is time-barred under 28 U.S.C. § 2401(a). But even if a Ninth Circuit
case is not considered "pending" because of *Hootkins*, the alien may still be eligible to immigrate as the widow(er)
of a citizen, if the alien has not remarried and files the Form I-360 no later than October 28, 2011.

AR2022_300472

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 10

In a case in which the deceased citizen had filed a Form I-130 for his or her spouse, and the
Form I-130 can now be adjudicated as a Form I-360 widow(er)'s petition, the child(ren) of the
widow(er) will be deemed to be included in the converted Form I-360.  Thus, it will not be
necessary to act on any separate Form(s) I-130 that the deceased citizen may have filed for the
widow(er)'s children.  And the child(ren) of the widow(er) will be deemed included in the
converted Form I-360 even if the deceased citizen had not filed any Form(s) I-130 for the
child(ren).

Note that, in light of INA section 201(f), whether an individual qualifies as the "child" of a
widow(er) depends on the individual's age when the visa petition was filed.  For those cases that
were pending on October 28, 2009, the Form I-360 filing date is deemed to be the date on which
the deceased citizen filed the prior Form I-130.  If a widow(er) has an unmarried son or daughter
who was under 21 when the deceased citizen filed the Form I-130, that individual will still be
deemed to be under 21 for purposes of the widow(er)'s now-converted Form I-360.

### D.  Affidavits of support

Under section 212(a)(4)(C)(i)(I) of the INA, a Form I-864 (Affidavit of Support under Section
213A of the Act) is *not* required in the case of the widow(er) of a citizen and the widow(er)'s
accompanying children.[2]

### E.  Conversion of deferred action applications filed under prior guidance

While remedial legislation was pending in Congress, the Secretary of Homeland Security
directed the use of deferred action relief to allow widow(er)s of citizen whose cases may have
been affected by the legislation to remain in the United States.  In the September 4, 2009
Memorandum, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their
Children," USCIS designated the Form I-360 as the form an individual would use to request
deferred action under the Secretary's policy.

Now that Congress has enacted the legislation, any Form I-360 that had been filed to obtain
deferred action relief, and that has not yet been adjudicated as a deferred action request, will now
be considered to be, and adjudicated as, a widow(er)'s visa petition under 8 C.F.R. § 204.2(b).  If
the Form I-360 has already been approved as a deferred action request, it will be reopened and
adjudicated as a visa petition under 8 C.F.R. § 204.2(b).  It is not necessary for the alien to file a
formal motion, nor to pay a new Form I-360 filing fee.  Additionally, any prior grant of deferred
action relief need not be rescinded and should remain undisturbed.

---

[2] There may be an individual case in which, regardless of the Form I-864 issue, the factors specified in INA section
212(a)(4)(B) and the standard public charge guidance, as published at 64 Fed. Reg. 28689 (1999), will support a
finding that a widow(er) is inadmissible as an alien likely to become a public charge.  Even in this case, a Form I-
864 is not required.  Rather, since the statute does not specifically require the Form I-864, the Form I-134 can be
used instead.  8 C.F.R. § 213a.5.  It is important to note that, on a Form I-134, the sponsor does not have to meet the
requirements in INA section 213A(f), and so does *not* need to be someone who could have been a "substitute
sponsor" in a case in which a Form I-864 actually is required.

AR2022_300473

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 11

Under the deferred action guidance, an alien could file a Form I-765, application for employment authorization, only if the deferred action request had been granted.  Now that a Form I-360 that was filed to request deferred action is deemed to be a widow(er)'s visa petition, the alien can, if otherwise eligible, file a Form I-485 even before the approval of the Form I-360.  8 C.F.R § 245.2(a)(2)(i)(B).  Filing the Form I-485 permits the alien to file a Form I-765.  8 C.F.R. § 274a.12(c)(9).

## F.  Implementation

Section 568(c) of the FY2010 DHS Appropriations Act became effective on October 28, 2009, the date of enactment.  USCIS offices and centers, therefore, are to begin implementing the instructions established in this memorandum immediately.  USCIS adjudicators should note that Congress clearly intended to benefit the aliens affected by these provisions.

**_AFM_ Transmittal Memorandum Revisions.  The _AFM_ Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:**

| AD 10-09 [Date of Signature] | **Chapter 21.2** | This memorandum removes chapter 21.2(a)(4) and the **Note** at the end of chapter 21.2(h)(1)(C) to reflect enactment of section 568(c) of Public Law 111-83. |
| --- | --- | --- |

## H.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.  For cases adjudicated overseas, questions should be directed to the International Operations Division, Programs Branch.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**Distribution**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

**Appendix 21-8 Memorandum – Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and Their Dependents [Appendix added 09-22-2009]**



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations*
Washington, DC  20529-2110

**U.S. Citizenship
and Immigration
Services**

SEP **2 2 2009**

Memorandum

HQ 70/6.1.8
HQ 70/6.1.1
AD 09-47

TO:     Service Center Directors

FROM:    Barbara Velarde
          Chief, Service Center Operations

SUBJECT:  Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for
             Petitioning Military Members and their Dependents

             Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and
             Appendix 21-7 (AFM Update AD09-47)

## 1. Purpose

This memorandum provides policy guidance to service centers adjudicating a standalone Form I-130, *Petition for Alien Relative*,[1] or jointly filed Form I-751, *Petition to Remove Conditions on Residence*,[2] filed by a military member on behalf of his or her alien spouse or child. For purposes of this memo, military member is defined as any United States citizen (USC) or lawful permanent resident (LPR) active duty member of any branch of the U.S. Armed Forces who is currently deployed.[3] This includes activated reservists and mobilized National Guardsmen.

The guidance in this memorandum supersedes the Memorandum: *Guidance on the Processing of Form I-751, Petition to Remove Conditions on Residence, Filed by Conditional Permanent Residents Overseas on Official Military or Government Orders,* dated June 2, 2006.

## 2. Background

When a petitioner files a standalone Form I-130 or jointly filed Form I-751, he or she must provide specific information to establish the bona fides of the relationship between the petitioner and his or her spouse or child. When a military member is the petitioner, service center Immigration Service Officers (ISOs) may use this guidance to determine what types of specific documents military

---

[1] Standalone I-130s do not include I-130s filed concurrently with Form I-485, *Application to Register Permanent Residence or to Adjust Status*.
[2] This memorandum only applies to Form I-130 or Form I-751 filed by a military member. It does not restrict nor expand the interview waiver criteria for other petitioners.
[3] This includes, but is not limited to, Permanent Change of Station (PCS) orders or Deployment Orders issued to the military member for a permanent tour of duty.

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

members may be able to provide to establish bona fides of the marriage. This guidance will also enable service centers to adjudicate most cases involving military members without having to relocate them to a field office for interview.

### 3. Guidance

### Evidence pertaining to military members

USCIS service centers reviewing a standalone Form I-130 or jointly filed Form I-751 will evaluate every properly filed petition in chronological order by the receipt date.

The ISO will review the file for the following:

- Evidence that the petition involves an active duty military member;

- Evidence establishing that the active duty military member is deployed;

- Evidence of the claimed relationship:

  o  If the military member is filing the petition on behalf of an alien spouse, evidence establishing a bona fide marriage between the alien and the military member; and

  o  If the military member is filing the petition on behalf of an alien child, evidence establishing a parent-child relationship between the child and the military member.

Military-specific evidence can be deemed as strong evidence towards the bona fides of the marriage.. Such evidence may include but is not limited to the following.

- All pages of the service member's Form DD-1172, "Application for Uniformed Services Identification Card DEERS Enrollment," naming dependents

- Dependent's Military Identification and Privilege Card

- Form DD-1278, "Certificate of Overseas Assignment to Support Application to File Petition for Naturalization"

- Copy of Permanent Change of Station (PCS) orders issued to the service member for permanent tour of duty overseas that specifically name the spouse or child

- Designation of the beneficiary on the military members' Group Life Insurance (SGLI) policy

- Evidence of a Family Service Members' Group Life Insurance (FSGLI) policy

- Evidence of the military member's health insurance policy on behalf of dependent

2

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

- Documentation showing that the spouse and/or child resides in military base/post housing

- Powers of Attorney life insurance designation (general or specific)

- Military TRICARE medical ID card for usage of military medical facilities

- Leave and Earnings Statement showing: Family Separation Allowance or allotments to dependents

- Living will and/or last will and testament

- Pre-authorization for emergency financial assistance

- A copy of the service member's Record of Emergency Data

## Adjudicative actions for I-130 and I-751 petitions filed by military members

If the I-130 or I-751[4] petition is approvable, the ISO will approve the petition and follow the normal post-adjudication process.

If the ISO cannot approve the petition, and the petition cannot be statutorily denied (for example, because it was based on a non-qualifying relationship), the ISO will send the military member a Request for Evidence (RFE). The ISO will do the following:

(a) Issue the RFE to the military member's last known (physical or APO/FPO) address.

(b) If the service center receives a response to the RFE, the ISO will continue the adjudication process.

(c) If there is no response to the RFE within the appropriate RFE response period (12 weeks), or the RFE is returned as undeliverable, the ISO will place the petition on hold for up to 18 months.

(d) If 18 months have passed since the service center placed the case on hold, the ISO will deny the petition if the petitioner is no longer in the military; otherwise, the ISO will administratively close the petition. Upon request, the petitioner may, at any time, request to reopen/reactivate the petition at no charge to the petitioner.

---

[4] If there is evidence that a conditional permanent resident (CPR) spouse or child has filed an N-400 application, the ISO will not adjudicate any I-751 filed to remove the conditions on that spouse's or child's status. Instead, the ISO will transfer the I-751, and the N-400 if accompanying the I-751, to the appropriate field office for adjudication. For additional guidance, please refer to the memorandum, *Conditional Permanent Residents and Naturalization under Section 319(b) of the Act Revisions to Adjudicator's Field Manual (AFM), Chapters 25 (AFM Update AD09-28)*, dated August 4, 2009. See also AFM chapter 25.1 (k)(2)(d). If there is no N-400 application, the ISO will proceed with adjudication of the I-751 petition.

AR2022_300478

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

If the service center receives a response from the petitioner, the ISO will do the following:

a) If the petition is approvable, the ISO will approve the petition and continue with the normal post-adjudication process.

b) If the evidence submitted is insufficient to support approval, the ISO will place the petition on an overseas hold until the military member returns to the U.S.

c) If the military member notifies USCIS of his or her return,[5] the ISO will take the case off hold and relocate it to the appropriate field office.  See AFM chapter 21.2 (b)(1).

d) If 18 months have passed since the service center placed the case on overseas hold, and the military member has not notified USCIS of return to the U.S., the ISO will administratively close the petition.  The ISO must notify the petitioner that the case is being administratively closed because USCIS must conduct an interview to proceed with a decision.  The notice should advise the petitioner that he or she may, at any time after returning to the U.S., request to reopen/reactivate the petition at no charge to the petitioner.

**4. Adjudicator's Field Manual Update:**

**The AFM is revised to add Chapters 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7.**

**21.2 <u>Factors Common to the Adjudication of All Relative Visa Petitions.</u>**

\*   \*   \*

(b) <u>Adjudicative Procedures</u>.

\*   \*   \*

   (1) <u>Review of the Petition</u>.

\*   \*   \*

   (C) <u>Discretionary Procedures for Petitioning Military Members and Their Dependents</u>. [Chapter added on (date memo signed)]

When adjudicating a standalone Form I-130 filed by a military member on behalf of his or her alien spouse or child, service center ISOs must follow the steps below:

- Review every properly filed petition in chronological order by the receipt date;

---

[5] Notification of return may occur via an AR-11 change of address or direct correspondence.

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

- Determine whether the petition involves an active duty military member (by checking the file for military orders) before issuing a request for evidence (RFE);

> **Note**
> The evidence necessary for the issuance of an RFE in this situation includes but is not limited to the list of documents listed in the memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents. See Appendix 21-7;*

- Review the evidence submitted to determine the nature of the member's deployment; the claimed bona fides of the marriage and relationship to any children involved. See memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents. See Appendix 21-7;*

The detailed steps that the ISO must follow are listed in Appendix 21-7

## 25.1  Immigration Marriage Fraud Amendments of 1986.

\* \* \*

### (c)  Filing of Removal of Conditions.

\* \* \*

#### (3)  Discretionary Procedures for Petitioning Military Members and Their Dependents.  [Chapter added on (date memo signed)]

When adjudicating a Form I-751 filed by a military member on behalf of his or her alien spouse or child, service center ISOs must follow the steps below:

- Review every properly filed petition in chronological order by the receipt date;

- Determine whether the petition involves an active duty military member (by checking the file for military orders) before issuing a request for evidence (RFE);

> **Note**
> The evidence necessary for the issuance of an RFE in this situation includes but is not limited to the list of documents listed in the memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents. See Appendix 21-7;*

5

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

- Review the evidence submitted to determine the nature of the member's deployment; the claimed bona fides of the marriage and relationship to any children involved.  See memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents.  See Appendix 21-7;*

| If | And the ISO believes | Then |
|----|----------------------|------|
| The evidence to support the standalone I-130 is received and all items provided are sufficient | that the I-130 petition is approvable | the ISO will approve standalone Form I-130 and continue the normal post adjudication process |
| The evidence to support the I-751 is received and all items provided are sufficient | that the I-751 petition is approvable | the ISO will approved the Form I-751 and continue the normal post adjudication process.  If there are any interfiled or concurrently filed N-400 applications, the ISO must refer to the 319(b) memorandum for further guidance. |

6

AR2022_300481

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

## Appendix 21-7    Form I-130 and Form I-751 Adjudication Steps for USCIS Service Center Immigration Services Officers (ISOs)   Appendix added [date memo signed]; AD09-47]

| If | Then |
|---|---|
| The ISO cannot approve the petition and the petition cannot be statutorily denied (e.g., the petition is based on a non-qualifying relationship) | The ISO will send the military member an RFE for additional documentation to establish claimed relationships or to address other deficiencies to the military member's last known (physical or APO/FPO) address. |
| The service center receives a response to the RFE | The ISO will continue the adjudication and post adjudication  processes. |
| The RFE response is still insufficient the ISO will | The ISO will place  the petition on an overseas hold until the military member returns to the U.S. |
| There is no response to the RFE within the appropriate RFE response period (12 weeks) | The ISO will place the petition on hold for up to 18 months. |
| The response to the RFE is returned as undeliverable the ISO will | The ISO will place the petition on hold for up to 18 months. |
| Eighteen (18) months have passed since the service center placed the petition on hold | The ISO will either:  (a) deny the petition if the petitioner is no longer in the military  Or  (b)  administratively close the petition if the petitioner is still in the military. |
| The petition is denied | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |
| The petition is administratively close | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |

7

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

**4. *AFM* Transmittal Memoranda Revisions.** The *AFM* Transmittal Memoranda button is revised by adding new entry, in numerical order, to read:

| AD09-47 [dated memo signed] | Chapters: <br>• **21.2(b)(1)(C)(2)** <br>• **25.1(c)(3)** <br>**Appendix 21-7** | The AFM is updated to add Chapter 21.2(b)(1)(C) and Appendix 21-7. The chapter and appendix set forth adjudicative procedure that Immigration Services Officers must follow when adjudicating standalone Forms I-130. <br><br> The AFM is updated to add Chapter 25.1(c )(3), "Discretionary Procedures for Military Members and their Dependents. |

**5. Use**

This memorandum is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**6. Contact Information**

Questions regarding the operational guidance in this memorandum may be directed through appropriate channels to Felicia Cameron, Program Manager in Service Center Operations Division or Heather Evelyn, Program Manager in Service Center Operations Division.

AR2022_300483

Department of Homeland Security
U.S. Citizenship and Immigration Services

# G-1056, USCIS
# Internal Clearance Routing Sheet

| | | | |
|---|---|---|---|
| **Originating Office:** | Office of Service Center Operations | **Originating Official:** | Bryan Christian |
| **Contact Officer:** | Felicia Cameron | **Contact Number:** | 202-272-8169 |
| **Date:** | 08/04/2009 | **Suspense Date:** | 08/12/2009 |
| **Subject:** | Military Members on the MFAS Terminate Report | | |

**EXECUTIVE SUMMARY:**

This memorandum provides guidance to the Service Centers on how to handle military I-751 cases:

•This memorandum provides policy guidance to Service Centers when requesting military-specific documentation through the issuance of a Request for Evidence (RFE) for certain deployed United States citizen (USC) or lawful permanent resident (LPR) military members filing Form I-130, Petition for Alien Relative, and filing Form I-751, Petition to Remove Conditions on Residence.

## FINAL PUBLICATION AND DISSEMINATION (CHECK APPROPRIATE BOX):

- [ ] Unrestricted Dissemination
  - [ ] Press needed
  - [ ] USCIS.gov posting
  - [ ] All outlets
  - *All web publishing requires completion of Form G-1019*
- [x] Internal Dissemination Only
  - [x] Leadership Alert
  - [x] USCIS Daily News
  - [x] Intranet Posting
- [ ] Restricted Dissemination- explanation attached

## ROUTING AND CLEARANCE (CHECK ONE BOX FOR EACH OFFICE):

| USCIS Office | CNC | FYI | N/A | USCIS Office | CNC | FYI | N/A | USCIS Office | CNC | FYI | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | Communication | | | | Ombudsman Liaison | | | |
| Administrative Appeals | | | | Congressional Relations | | | | Policy & Strategy | | | |
| Chief Financial Officer | | | | Domestic Operations | | | | Refugee, Asylum, International | | | |
| Chief Counsel | x | | | Human Capital | | | | Security | | | |
| Chief Information Officer | | | | National Security and Records Verification | | | | Transformation | | | |
| Citizenship | | | | Field Operations | | | | Regulatory Management Division | | | |

Reviewer Signature (or Designate) _(signature)_ assoc. Couse / Date: 09/03/09

Office: _Office of the Chief Counsel_    GLD

Check one:

- [ ] Concur
- [ ] Concur w/edits
- [ ] Non-Concur (attach explanation)
- [ ] *If notes are attached, check this box*

## OFFICE OF THE DIRECTOR

| Office | Signature | Action | | | Date |
|---|---|---|---|---|---|
| | | C | NC | N/A | |
| Executive Secretariat | | | | | |
| Chief of Staff | | | | | |
| Deputy Director | | | | | |
| Director | | | | | |

Form G-1056 (Rev. 06/08/06)

Department of Homeland Security
U.S. Citizenship and Immigration Services

**G-1056, USCIS**
**Internal Clearance Routing Sheet**

| Originating Office: | Office of Service Center Operations | Originating Official: | Bryan Christian |
|---|---|---|---|
| Contact Officer: | Felicia Cameron | Contact Number: | 202-272-8169 |
| Date: | 08/04/2009 | Suspense Date: | 08/12/2009 |
| Subject: | Military Members on the MFAS Terminate Report | | |

**EXECUTIVE SUMMARY:**

This memorandum provides guidance to the Service Centers on how to handle military I-751 cases:

•This memorandum provides policy guidance to Service Centers when requesting military-specific documentation through the issuance of a Request for Evidence (RFE) for certain deployed United States citizen (USC) or lawful permanent resident (LPR) military members filing Form I-130, Petition for Alien Relative, and filing Form I-751, Petition to Remove Conditions on Residence.

**FINAL PUBLICATION AND DISSEMINATION (CHECK APPROPRIATE BOX):**

| | | |
|---|---|---|
| ☐ Unrestricted Dissemination | ☒ Internal Dissemination Only | ☐ Restricted Dissemination- explanation attached |
| ☐ Press needed | ☒ Leadership Alert | |
| ☐ USCIS.gov posting | ☒ USCIS Daily News | |
| ☐ All outlets | ☒ Intranet Posting | |
| *All web publishing requires completion of Form G-1019* | | |

**ROUTING AND CLEARANCE (CHECK ONE BOX FOR EACH OFFICE):**

| USCIS Office | C/NC | FYI | N/A | USCIS Office | C/NC | FYI | N/A | USCIS Office | C/NC | FYI | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | Communication | | | | Ombudsman Liaison | | | |
| Administrative Appeals | | | | Congressional Relations | | | | Policy & Strategy | | | |
| Chief Financial Officer | | | | Domestic Operations | | | | Refugee, Asylum, International | | | |
| Chief Counsel | | | | Human Capital | | | | Security | | | |
| Chief Information Officer | | | | National Security and Records Verification | | | | Transformation | | | |
| Citizenship | | | | Field Operations | × | | | Regulatory Management Division | | | |
| | | | | | | | | | | | |

Reviewer Signature (or Designate) _Gary Nourzat J Bulger_   Date: _9 Sept 2009_

Office: _DOMO / OFO_

Check one:

☒ Concur      ☐ Concur w/edits      ☐ Non-Concur (attach explanation)

☐ *If notes are attached, check this box*

**OFFICE OF THE DIRECTOR**

| Office | Signature | Action | | | Date |
|---|---|---|---|---|---|
| | | C | NC | N/A | |
| Executive Secretariat | | | | | |
| Chief of Staff | | | | | |
| Deputy Director | | | | | |
| Director | | | | | |

Form G-1056 (Rev. 06/08/06)

AR2022_300485

Department of Homeland Security
U.S. Citizenship and Immigration Services

**G-1056, USCIS**
**Internal Clearance Routing Sheet**

| | | | |
|---|---|---|---|
| **Originating Office:** | Office of Service Center Operations | **Originating Official:** | Bryan Christian |
| **Contact Officer:** | Felicia Cameron | **Contact Number:** | 202-272-8169 |
| **Date:** | 08/04/2009 | **Suspense Date:** | 08/12/2009 |
| **Subject:** | Military Members on the MFAS Terminate Report | | |

**EXECUTIVE SUMMARY:**

This memorandum provides guidance to the Service Centers on how to handle military I-751 cases:

• This memorandum provides policy guidance to Service Centers when requesting military-specific documentation through the issuance of a Request for Evidence (RFE) for certain deployed United States citizen (USC) or lawful permanent resident (LPR) military members filing Form I-130, Petition for Alien Relative, and filing Form I-751, Petition to Remove Conditions on Residence.

**FINAL PUBLICATION AND DISSEMINATION (CHECK APPROPRIATE BOX):**

| | | |
|---|---|---|
| ☐ Unrestricted Dissemination | ☒ **Internal Dissemination Only** | ☐ Restricted Dissemination- explanation attached |
| ☐ Press needed | ☒ Leadership Alert | |
| ☐ USCIS.gov posting | ☒ USCIS Daily News | |
| ☐ All outlets | ☒ Intranet Posting | |
| *All web publishing requires completion of Form G-1019* | | |

**ROUTING AND CLEARANCE (CHECK ONE BOX FOR EACH OFFICE):**

| USCIS Office | C/NC | FYI | N/A | USCIS Office | C/NC | FYI | N/A | USCIS Office | C/NC | FYI | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | Communication | | | | Ombudsman Liaison | | | |
| Administrative Appeals | | | | Congressional Relations | | | | Policy & Strategy | | | |
| Chief Financial Officer | | | | Domestic Operations | | | | Refugee, Asylum, International | | | |
| Chief Counsel | | | | Human Capital | | | | Security | | | |
| Chief Information Officer | | | | National Security and Records Verification | | | | Transformation | | | |
| Citizenship | | | | Field Operations | | | | Regulatory Management Division | | | |
| | | | | Service Center Operations | ✗ | | | | | | |

Reviewer Signature (or Designate) _____  Date: _____

Office: _____

Check one:

☐ Concur  ☐ Concur w/edits  ☐ Non-Concur (attach explanation)

☐ *If notes are attached, check this box*

**OFFICE OF THE DIRECTOR**

| Office | Signature | Action | | | Date |
|---|---|---|---|---|---|
| | | C | NC | N/A | |
| Executive Secretariat | | | | | |
| Chief of Staff | | | | | |
| Deputy Director | | | | | |
| Director | | | | | |

Form G-1056 (Rev. 06/08/06)

AR2022_300486

**Appendix 21-9 Form I-130 and Form I-751 Adjudication Steps for USCIS Service Center Immigration Services Officers (ISOs) [Appendix added 09-22-2009]**

| If | Then |
|---|---|
| The ISO cannot approve the petition and the petition cannot be statutorily denied, e.g., the petition is based on a non-qualifying relationship | The ISO will send the military member an RFE for additional documentation to establish claimed relationships or to address other deficiencies to the military member's last known (physical or APO/FPO) address. |
| The Service Center receives a response to the RFE | The ISO will continue the adjudication and post adjudication processes. |
| The RFE response is still insufficient the ISO will | The ISO will place the petition on an overseas hold until the military member returns to the country-regionplaceU.S. |
| There is no response to the RFE within the appropriate RFE response period (12 weeks) | The ISO will place the petition on hold for up to 18 months. |
| The response to the RFE is returned as undeliverable the ISO will | The ISO will place the petition on hold for up to 18 months. |
| Eighteen (18) months have passed since the Service Center placed the petition on hold | The ISO will either: (a) Deny the petition if the petitioner is no longer in the military Or (b) Administratively close the petition if the petitioner is still in the military. |
| The petition is denied | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |
| The petition is administratively closed | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |

**Appendix 21-10 Memorandum – Processing N-400s Filed Under INA 328 and 329 When Applicant Fails to Responds to a Request for Evidence has been superseded by USCIS Policy Manual, Volume 12: Citizenship and Naturalization as of January 22, 2013.**

## Adjudicator's Field Manual

**NOTE: The USCIS Policy Manual is our centralized online repository for immigration policies. We are working quickly to update and move material from the Adjudicator's Field Manual to the Policy Manual. Please check that resource, along with our Policy Memoranda page, to verify information you find in the Adjudicator's Field Manual. If you have questions or concerns about any discrepancies among these resources, please contact PolicyFeedback@uscis.dhs.gov.**

### Chapter 40 Grounds of Inadmissibility under Section 212(a) of the Immigration and Nationality Act

40.1    Health Related Grounds of Inadmissibility and Medical Examination, has been superseded by USCIS Policy Manual, Volume 8, Part B: Health-Related Grounds of Inadmissibility as of January 28, 2014.

40.2    Section 212(a)(2) of the Act - Criminal and Related Grounds [Reserved]

40.3    Section 212(a)(3) of the Act - Security and Related Grounds [Reserved]

40.4    Section 212(a)(4) of the Act - Public Charge [Reserved], has been superseded by USCIS Policy Manual, Volume 8: Admissibility as of February 24, 2020.

40.5    Section 212(a)(5) of the Act - Labor Certification and Qualifications for Certain Immigrants [Reserved]

40.6    Section 212(a)(6) of the Act - Illegal Entrants and Immigration Violators

40.6.2(c)(1)    Section 212(a)(6)(C)(i) of the Act: Fraud or Misrepresentation, has been superseded by USCIS Policy Manual, Volume 8: Admissibility and Volume 9: Waivers as of March 25, 2014.

40.6.2(c)(2)    Section 212(a)(6)(C)(ii)(I) of the Act: Falsely Claiming Citizenship, has been superseded by USCIS Policy Manual, Volume 8: Admissibility as of December 14, 2016.

40.7    Section 212(a)(7) of the Act - Documentation Requirements [Reserved]

40.8    Section 212(a)(8) of the Act - Ineligible for Citizenship [Reserved]

40.9    Section 212(a)(9) of the Act - Aliens Unlawfully Present after Previous Immigration Violations [Chapter 40.9 Added 05-06-2009]

40.9.1    Inadmissibility Based on Prior Removal (Section 212(a)(9)(A) of the Act) or Based on Unlawful Return after Prior Removal (Section 212(a)(9)(C)(i)(II) of the Act) [Reserved]

40.9.2    Inadmissibility Based on Prior Unlawful Presence (Sections 212(a)(9)(B) and (C)(i)(I) of the Act)

40.10   Section 212(a)(10) of the Act - Miscellaneous [Reserved]

**40.1 Health Related Grounds of Inadmissibility and Medical Examination, has been superseded by USCIS Policy Manual, Volume 8, Part B: Health–Related Grounds of Inadmissibility, as of January 28, 2014.**

**40.2 Section 212(a)(2) of the Act – Criminal and Related Grounds [Reserved]**

AR2022_300491

**40.3 Section 212(a)(3) of the Act – Security and Related Grounds [Reserved]**

AR2022_300492

**40.4 Section 212(a)(4) of the Act – Public Charge [Reserved], has been superseded by USCIS Policy Manual, Volume 8: Admissibility as of February 24, 2020.**

**40.5 Section 212(a)(5) of the Act – Labor Certification and Qualifications for Certain Immigrants [Reserved]**

**40.6 Section 212(a)(6) of the Act – Illegal Entrants and Immigration Violators [Chapter Added 03-03-2009]**

| 40.6.1 | Introduction and Overview |
|---|---|
| 40.6.1(a) | General |
| 40.6.1(b) | Inapplicability of Section 212(a)(6) of the Act to Registry Applicants under Section 249 of the Act (Except Section 212(a)(6)(E) of the Act |
| 40.6.1(c) | Overview of Available Waivers |
| 40.6.2 | Individual Grounds of Inadmissibility Under Section 212(a)(6) of the Act |
| 40.6.2(a) | Section 212(a)(6)(A) of the Act: Aliens Present Without Admission or Parole |
| 40.6.2(b) | Section 212(a)(6)(B) of the Act: Failure to Attend Removal Proceeding |
| 40.6.2(c) | Section 212(a)(6)(C) of the Act: Misrepresentation and False Claim to U.S. Citizenship has been superseded in its entirety. |

Chapter 40.6.2(c)(1), Section 212(a)(6)(C)(i) of the Act: Fraud or Misrepresentation, has been superseded by USCIS Policy Manual, Volume 8: Admissibility and Volume 9: Waivers as of March 25, 2014.

Chapter 40.6.2(c)(2), Section 212(a)(6)(C)(ii)(I) of the Act: Falsely Claiming Citizenship, has been superseded by USCIS Policy Manual, Volume 8: Admissibility as of December 14, 2016.

| | |
|---|---|
| **40.6.2(d)** | **Section 212(a)(6)(D) of the Act: Stowaways** |
| **40.6.2(e)** | **Section 212(a)(6)(E)(i) of the Act: Smugglers** |
| **40.6.2(f)** | **Section 212(a)(6)(F)(i) of the Act: Subject of Civil Penalty** |
| **40.6.2(g)** | **Section 212(a)(6)(G) of the Act: Student Visa Abusers** |

40.6.1 Introduction and Overview

(a) General.

Any alien who is subject to one or more of the grounds of inadmissibility under **section 212(a)(6)** of the Act is ineligible to receive a visa or to be admitted to the United States.

**Section 212(a)(6)** of the Act covers the following grounds of inadmissibility:

· **Section 212(a)(6)(A)** of the Act – Aliens present without admission or parole

· **Section 212(a)(6)(B)** of the Act – Failure to attend removal proceeding

- **Section 212(a)(6)(C)** of the Act – Misrepresentation

- **Section 212(a)(6)(D)** of the Act – Stowaways

- **Section 212(a)(6)(E)** of the Act – Smugglers

- **Section 212(a)(6)(F)** of the Act – Subject of civil penalty

- **Section 212(a)(6)(G)** of the Act – Student visa abusers

The grounds of inadmissibility may apply when determining eligibility for benefits such as adjustment of status to lawful permanent resident status, adjustment to temporary resident status, change of nonimmigrant status, extension of nonimmigrant stay, or when applying for an immigrant or nonimmigrant visa abroad with the U.S. Department of State.

Inadmissibility under **section 212(a)(6)** of the Act may also impact the exercise of discretion for non-status conferring benefits, such as parole under **section 212(d)(5)** of the Act.

(b) Inapplicability of **section 212(a)(6)** of the Act to Registry Applicants under **Section 249** of the Act (Except **Section 212(a)(6)(E)** of the Act).

Inadmissibility under section **212(a)(6)** of the Act (other than **Section 212(a)(6)(E)** of the Act) does not make an alien ineligible for Registry under **Section 249** of the Act. No separate waiver is required for the alien to apply for and obtain Registry because the statute itself makes inadmissibility under **ection 212(a)(6)** of the Act irrelevant to the alien's eligibility.

Note, however, that an alien who is inadmissible under **Section 212(a)(6)(E)** of the Act (relating to alien smugglers) is ineligible for Registry.

(c) <u>Overview of Available Waivers</u> .

(For a more detailed analysis of available waivers for a particular ground of inadmissibility, the adjudicator should refer to **section 40.6.2** of this *A*FM chapter.)

(1) <u>Nonimmigrants in General</u> .

**Section 212(d)(3)** of the Act pr ovides broad discretion to admit aliens as nonimmigrants who are inadmissible under most provisions of section 212(a) of the Act, including under section 212(a)(6) of the Act. As a practical matter, relief under section 212(d)(3) of the Act generally would not be of any benefit to an alien, who is inadmissible under section 212(a)(6)(A)(i) of the Act. *See A*FM **chapter 40.6.2(a)** .

| **Note** |
| --- |
| Depending on the particular nonimmigrant category, individuals inadmissible under section 212(a) of the Act, including section 212(a)(6) of the Act, may obtain a waiver of inadmissibility under additional provisions of **section 212** of the Act. For example, S nonimmigrant applicants may seek a waiver under **section 212(d)(1)** or **section 212(d)(3)** of the Act. If such an individual applies for adjustment of status after having been granted a waiver under **section 212(d)(1)** or **(3)** of the Act, as outlined in **section 245(j)** of the Act a nd **8 CFR 245.11** , the alien does not need to apply for a waiver again. Check the particular nonimmigrant category in **8 CFR 214** to determine additional waiver provisions. |

AR2022_300498

(2) <u>Immigrants</u> .

See **chapter 40.6.2** of the *AF*M chapter that discusses the individual grounds of inadmissibility under section 212(a)(6) of the Act, and waivers that may be available to immigrants who are inadmissible under that section.

(3) <u>Asylees and Refugees Seeking Adjustment of Status</u> .

Section 212(a)(6) grounds of inadmissibility can be waived for Asylees and Refugees seeking adjustment of status pursuant to **section 209(c)** of the Act. Th ey may apply for a waiver by filing Form I-602, Applica tion by Refugee For Waiver of Grounds of Excludability.

Under current USCIS policy, however, an adjudicator has discretion to grant the waiver without requiring the filing of Form I-602 , as specified at *AF*M **chapter 41.6(b)(1)** .

Normally, waiver applications for refugees are handled overseas before a person is approved for refugee classification. *See* **8 CFR 207.3** . However, if a ground of inadmissibility arose after the alien's approval for refugee classification, or if the ground was not known to the officer who approved the waiver, a waiver may be sought and adjudicated as part of the refugee adjustment process. *See AF*M **chapter 23.6** (Asylee and Refugee Adjustment).

(4) <u>Continued Availability of Section 212(c) of the Act for Certain Aliens</u> .

Former section 212(c) of the Act provided broad discretion to waive most grounds of inadmissibility for aliens who had already been lawfully admitted for permanent residence, and who had been domiciled in the United States for at least seven (7) years, but who had become subject to removal.

Congress repealed this provision, and the repeal took effect on April 1, 1997. In *I.N.S. v. St. Cyr* , 533 U.S. 289 (2001), however, the Supreme Court held that this repeal did not preclude certain aliens who, <u>before</u> April 1, 1997, had become subject to removal based on certain criminal convictions, from applying for relief und er **section 212(c)** of the Act.

Relief under section **212(c)** of the Act is not available to any alien who incurred inadmissibility under any provision of section **212(a)(6)** of the Act, i f the conduct that makes the alien inadmissible occurred <u>on or after</u> April 1, 1997.

An adjudicator may encounter a case in which an alien applies for relief under former section 212(c) ( Form I-191 , Application for Advance Permission to Return to Unrelinquished Domicile) to obtain a waiver for conduct occurring before April 1, 1997, that renders the alien inadmissible under some provision of section **212(a)(6)** of the Act.

Unless the alien is also inadmissible on the basis of a criminal conviction that was entered before April 1, 1997, it is not clear whether the alien can claim the benefit of former section 212(c) of the Act. The adjudicator should consult with the appropriate regional or service center counsel concerning the availability of relief under former section 212(c) of the Act in these cases.

(5) Legalization Applicants under **Section 245A** , Legalization Applicants under **Section 1104** of the Legal Immigration Family Equity (LIFE) Act, PL 106-553, and **the LIFE Act Amendments, PL 106-554** (December 21, 2000) (Including CSS/LULAC, Zambrano Class Settlements) and subsequent Class Settlements relati ng to **Section 245A** .

**Section 212(a)(6)** grounds of inadmissibility may be waived by filing Form I-690 , Application for Waiver of Grounds of Inadmissibility under Sections 245A or 210 of the Immigration and Nationality Act. The waiver may be granted in the discretion of the Secretary of Homeland Security (Secretary), if granting the waiver will serve humanitarian purposes, or assure family unity, or if the waiver is in the public interest. *See* **8 CFR 245a.2(k)(2)** , **8 CFR 245a.3(g)(2)** , and **8 CFR 245a.18(c)** .

(6) Special Agricultural Worker (SAW) Applicants .

**Section 212(a)(6)** grounds of inadmissibility may be waived pursuant to **section 210(c)(2)(B)(i)** of the Act and **8 CFR 210.3(e)** , by filing Form I-690 , Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act. *See* **8 CFR 210.3(e)(2)** . The waiver may be granted in the discretion of the Secretary, if granting the waiver will serve humanitarian purposes, assure family unity, or if granting the waiver is in the public interest. *See id.*

(7) Applicants for Temporary Protected Status (TPS) Pursuant to **Section 244** of the Act .

TPS applicants may apply for a waiver of inadmissibility under **section 212(a)(6)** of the Act. Th e waiver may be granted in the exercise of discretion, if the Secretary of Homeland Security determines that granting the waiver will serve humanitarian purposes, or assure family unity, or if granting the waiver would be in the public interest. The application is filed on Form I-601 , Application for Waiver of Grounds of Inadmissibility. *See* **8 CFR 244.3(b)** .

While section **244(c)(2)(A)(ii)** of the Act ind icates that the Secretary or Attorney General (AG) may waive certain **secti** ons of 212(a) of the Act, **section 244(a)(5)** of the Act indicates that an alien cannot be denied TPS on account of his or her immigration status. Therefore, USCIS deems **section 212(a)(6)(A)** of th e Act to be inapplicable to TPS applicants; if an individual is inadmissible under section 212(a)(6)(A) of the Act, he or she is not required to file a waiver application.

40.6.2 Individual Grounds of Inadmissibility Under Section 212(a)(6) of the Act

(a) INA Section 212(a)(6)(A): Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place.

(1) <u>General</u> . INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled." This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]." Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.* An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of parole curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground. Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2) . As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2) , the person has to have "maintain[ed] continuously a lawful status since entry into the United States." Parole does not erase any periods of prior unlawful status or any other applicable grounds of

inadmissibility. An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

---

**Example:**

---

Alien A arrives in the United States at the port of entry at Sweet Grass, Montana. He is denied admission and detained. He escapes from detention, however, and makes his way into the interior of the United States. He is *not* inadmissible under the second part of Section 212(a)(6)(A)(i) of the Act, since he arrived through an open port of entry. However, he is inadmissible under the first part of section 212(a)(6)(A)(i) of the Act because he is present in the United States without having been admitted or paroled.

---

**Example:**

---

Alien B arrives in the United States by crossing the border undetected 25 miles east of the port of entry at Sweet Grass, Montana. Alien B is inadmissible under *both* parts of Section 212(a)(6)(A)(i) of the Act, since Alien B arrived other than at a port of entry and is present in the United States without having been admitted or paroled.

---

**Example**

---

Alien C arrives in the United States by crossing the border undetected 25 miles east of the port of entry at Sweet Grass, Montana. Some time after the alien's arrival, a Customs and Border Protection (CBP) officer takes Alien C into custody.

Because of the specific facts of this case, DHS determines as a matter of discretion that urgent humanitarian reasons justify Alien C's parole into the United States under **section 212(d)(5)(A)** of the Act. Once paroled, Alien C is *no longer* inadmissible under the *first* part of **Section 212(a)(6)(A)(i)** of the Act because the alien has been paroled under **section 212(d)(5)(A)** of the Act. However, Alien C remains inadmissible under the *second* part of section 212(a)(6)(A)(i) of the Act since he or she had arrived other than at a port of entry.

**Example:**

Alien D arrives in the United States by crossing the border undetected 25 miles east of the port of entry at Sweet Grass, Montana. Some time after his or her arrival, a CBP officer takes custody of Alien C and places him/her in removal proceedings.

DHS determines that Alien D may be released from custody on posting a bond pursuant to section 236 of the Act (conditional parole). Alien D seeks a bond hearing before the immigration judge, who reduces the amount of the required bond. Alien D remains inadmissible under *both prongs* of **Section 212(a)(6)(A)(i)** of the Act.

Release under conditional parole pursuant to section 236 of the Act *is not* parole. See (2)(ii) below for an explanation why conditional parole under **section 236** of the Act is not equivalent to a parole under **section 212(d)(5)** of the Act . Thus, even after Alien D's release, it remains the case that Alien D arrived at a place other than an open port of entry and that Alien D has not been admitted or paroled.

(2) <u>Definitions</u> .

(i) <u>Admission</u> .

**Section 101(a)(13)(A)** of the Act defines "admission" and "admitted" as "the lawful entry of the

alien into the United States after inspection and authorization by an immigration officer." The provision also makes clear that "parole" is not admission.

Before April 1, 1997, an alien who made an "entry without inspection" into the United States was a deportable alien under former section 241(a)(1)(B) of the Act. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) **(Division C of PL 104-208** (September 30, 1996)) amended **Section 101(a)(13)(A)** of the Act by removing the definition of the term "entry" and replacing it with a definition of the terms "admission" and "admitted."

IIRIRA provided, in **section 235(a)** of the Act , that an alien who is present without admission is deemed an applicant for admission, and thus is subject to removal as an inadmissible, not a deportable, alien. IIRIRA also added **section 212(a)(6)(A)(i)** of the Act , which provides the relevant inadmissibility ground.

(ii) <u>Parole</u> .

Parole is the discretionary decision, under **section 212(d)(5)(A)** of the Act , to permit an inadmissible alien to leave the inspection facility free of official custody, so that, although the alien is not admitted, the alien is permitted to be in the United States. By statutory definition, parole is not admission. *See* **section 101(a)(13)(B)** of the Act . An alien, who has been paroled under section 212(d)(5)(A) of the Act "[is] still in theory of law at the boundary line and [has] gained no foothold in the United States." *Leng May Ma v. Barber* , 357 U.S. 185, 188-189 (1958), *quoting Kaplan v. Tod* , 267 U.S. 228 (1925).

Parole may be granted for "urgent humanitarian reasons" (humanitarian parole) or for "significant public benefit." Deferred inspection, **8 CFR 235.2** , and advance parole, **8 CFR 212.5(f)** , are types of parole, as are individual port of entry paroles and paroles authorized while the person is overseas. For purposes of **section 212(a)(6)(A)(i)** of the Act, the reason for the grant of parole is irrelevant. For more information on parole pursuant to **section 212(d)(5)(A)** of the Act , see *AFM* **chapter 54** .

> **Note:**
>
> Only parole under **section 212(d)(5)(A)** of the Act qualifies as parole for purposes of section 212(a)(6)(A)(i) of the Act. In an April 1999 Memorandum, and an August 1998 legal opinion (Legal Opinion No. 98-10, August 21, 1998), legacy INS suggested that a release pursuant to **section 236** of the Act (conditional parole) could also be considered parole for purposes of adjustment of status under t he Cuban Adjustment Act (CAA).

The Board of Immigration Appeals (BIA) has rejected this interpretation in at least one unpublished decision. *See Matter of Ortega-Cervantes,* 2005 WL 649116 (BIA, January 6, 2005). The Ninth Circuit confirmed the BIA's decision and held that release under section 236 of the Act is not parole for purposes of adjustment of status. *See* Ortega-Cervantes v. Gonzales, 501 F.3d 1111, 1120 (9th Cir. 2007).

DHS, moreover, no longer adheres to the 1998 INS opinion's indication that release under **section 236** of the Act is the same as parole under **section 212(d)(5)(A)** of the Act .

DHS/Office of General Counsel (OGC) reconsidered that aspect of the 1999 memorandum, and the related 1998 legal opinion. On September 28, 2007, DHS/OGC issued a memorandum stating that release under section 236 of the Act is not deemed to be a form of parole under section 212(d)(5)(A) of the Act. *See* September 28, 2007, Office of the General Counsel of the Department of Homeland Security, *Clarification of the Relation Between Release Under Section 236 and Parole Under Section 212(d)(5) of the Immigration and Nationality Act* .

Adjudicators, therefore, may not find that release under section 236 of the Act qualifies as parole under section 212(d)(5) of the Act.

(3) <u>Applicability</u> .

(i) <u>After April 1, 1997</u> .

The effective date for **section 212(a)(6)(A)** of the Act was April 1, 1997. **Section 212(a)(6)(A)** of the Act does not apply to applications for admission or adjustment of status adjudicated by an immigration judge in deportation or exclusion proceedings commenced <u>prior</u> to April 1, 1997.

(ii) <u>Only Applies to Individuals Present in the United States</u>.

**Section 212(a)(6)(A)(i)** of the Act only applies to individuals who are present in the United States in violation of section 212(a)(6)(A)(i) of the Act. Inadmissibility does not continue after the alien has departed the United States. Therefore, section 212(a)(6)(A)(i) of the Act does not apply to individuals who apply for a visa; however, these individuals may be inadmissible under **sections 212(a)(9)(B)** or **(C)(i)(I)** of the Act.

| **Note:** |
| --- |
| If an alien is granted TPS, he or she is in lawful status for adjustment of status purposes pursuant to **section 244(f)** of the Act. However, despite **section 244(f)** of the Act, the requirements of **section 245(a)** of the Act still apply at the time of adjustment of status. *See* Virtue, General Counsel Opinion, No. 91-27, March 4, 1991. Section 244(f)(4) of the Act does not make lawful the alien's unlawful entry or presence in the United States prior to granting TPS. *See id*. |

For example, an alien who is granted TPS after having entered without being admitted or paroled, will be inadmissible pursuant to section 212(a)(6)(A)(i) of the Act at the time of adjustment of status despite the wording of section 244(f) of the Act.

(4) <u>Exemptions and Waivers</u>.

(i) <u>Exemptions</u> .

In addition to the special waivers mentioned in section 1(b) or 1(c) of this *AFM* chapter, inadmissibility under **Section 212(a)(6)(A)(i)** of the Act does not make an alien inadmissible for the following benefits (by virtue of the statutory provisions governing these benefits):

· Adjustment of status pursuant to **section 245(i)** of the Act ;

· Adjustment of status under **section 245(a)** of the Act, if the applicant is an approved VAWA self-petitioner or the child(ren) of an approved VAWA self-petitioner (see *AFM chapter* 23.5(k));

· Adjustment of status pursuant to **section 245(h)** of the Act ;

· Adjustment of status under **section 902 of the Haitian Refugee Immigration Fairness Act (HRIFA)** ;

· Adjustment of status under **section 202(b) of the Nicaraguan Adjustment And Central American Relief Act (NACARA);**

· Adjustment of status under **section 249** of the Act (Registry);

· Family Unity under **section 301 of the Immigration Act of 1990 (IMMACT)** ;

· Legalization under **section 245A** , and CSS, LULAC or other section 245A Class Settlements;

· Change of status to V nonimmigrant status ( **section 214(q)** of the Act and **8 CFR 214.15** );

· Temporary Protected Status under the interpretation of **section 244(a)(5)** of the Act ;

· Asylum ( **Sections 208(a)(1)** and **(2)** and **208(b)(2)** of the Act ; **8 CFR 208.13(c)** ).

(ii) <u>Waivers</u> .

There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c). As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

(5) <u>Citing References and Additional Materials</u> .

· March 31, 1997, Office of Programs memorandum - *Implementation of section 212(a)(6)(A) and 212(a)(9) grounds of inadmissibility*

· May 1, 1997, Office of Examinations memorandum − *Processing of section 245(i) adjustment applications on or after the October 1, 1997 sunset date; Clarification regarding the applicability of certain new grounds of inadmissibility to 245(i) applications*

· April 19, 1999, Commissioner's memo − *Eligibility for permanent residence under the Cuban Adjustment Act despite having arrived at a place other than a designated port of entry*

· October 31, 2005, Domestic Operations memorandum – *Re: Waivers under Section 209(c) of the Immigration and Nationality Act (AFM* Update 05-33)

· April 11, 2008, Domestic Operations memorandum – *Adjustment of status for VAWA self-petitioner who is present without inspection ( AFM* Update 08-16)

(b) Section 212(a)(6)(B) of the Act: Failure to Attend Removal Proceeding

(1) <u>General</u> .

Any alien who, without reasonable cause, fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability, and who seeks admission to the United States within five (5) years of such alien's subsequent departure or removal is inadmissible.

(2) <u>Applicability</u> .

(i) <u>Effective on or after April 1, 1997</u> .

**Section 212(a)(6)(B)** of the Act does not apply to an alien placed in deportation or exclusion proceedings before April 1, 1997, even if the alien's hearing was held after April 1, 1997. The provision applies *only* to individuals who are placed in removal proceedings beginning April 1, 1997.

An alien who failed to attend an exclusion proceeding under former section 236 of the Act, or a

deportation proceeding under former section 242 of the Act is, therefore, not inadmissible under **Section 212(a)(6)(B)** of the Act.

(ii) <u>Only Applicable to Aliens Who Departed or Who Were Removed</u> .

Since the ground of inadmissibility applies to aliens, who "seek admission to the United States within five (5) years of such alien's <u>subsequent departure or removal</u> …," only those aliens, who actually departed or were removed from the United States after failing to attend or to remain in attendance at their removal proceedings are inadmissible. Aliens, who remained in the United States after failing to attend their hearing, <u>are not</u> inadmissible under this provision.

(iii) <u>Only Applies to Aliens Seeking Admission During the Five (5)-Year Bar</u> .

This ground of inadmissibility does not apply to aliens who seek admission to the United States more than five (5) years after their departure or removal from the United States.

(iv) <u>Notice Requirement</u> .

In order to be inadmissible under **Section 212(a)(6)(B)** of the Act, the alien must actually have been in removal proceedings under **section 240** of the Act . A section 240 removal proceeding is initiated by the filing of the Notice to Appear (NTA), **Form I-862** , with the immigration court. See **8 CFR 1003.14(a)** . Even if the alien was *served* with the Notice to Appear, the alien will not be inadmissible under section 212(a)(6)(B) of the Act unless the NTA was actually filed with the immigration court.

Also, even if the NTA has been filed, an alien cannot be found to have "failed to appear" unless the alien had notice of the proceeding and of the obligation to appear. If the record shows that the alien had actual notice of the date and time of the removal hearing, and that the alien failed to appear, these facts would generally be sufficient to show the alien's inadmissibility. *See* **Matter of G- Y- R-, 23 I&N Dec. 181 (BIA 2001)** .

The alien may also be inadmissible if the alien had adequate *constructive* notice. An alien is on constructive notice if he or she is deemed to have been on notice because the notice of hearing was sent to the alien at the address that the alien provided as required by **section 239(a)(1)(F)** of the Act . *See id.*

In short, the alien will be found inadmissible under **Section 212(a)(6)(B)** of the Act only if the alien failed to appear after there was notice that would be sufficient to support the entry of an in absentia removal order. This notice requirement does not mean that the alien can be found inadmissible *only* if there is an in absentia removal order. Even if the immigration judge did not enter such an order, the alien is inadmissible if the alien failed to appear after receiving proper notice of the proceedings.

(v) Effect of an In Absentia Order .

An alien who failed to attend or remain in attendance at a removal may have received an in absentia order of removal under **section 240(b)(5)** of the Act . As noted, an alien who fails to appear after proper notice, may be inadmissible under **Section 212(a)(6)(B)** of the Act even if the immigration judge did not enter an in absentia order.

If the immigration judge *did* enter an in absentia order, that order will generally be sufficient to establish that the alien had sufficient notice of the proceeding and that the alien can be found to have failed to attend the proceeding. Thus, an alien's departure after entry of an in absentia removal order will generally establish that the alien is inadmissible under section 212(a)(6)(B) of the Act.

If the alien departs while an in absentia order is in effect, the alien may also be inadmissible under section **212(a)(9)(A)** of the Act.

(3) Exceptions and Waivers .

(i) " Reasonable Cause" Exception .

In addition to the general exceptions to inadmissibility noted in **40.6.1(b)** or **40.6.1(c)** of this *AFM* chapter, an alien who establishes that there was a "reasonable cause" for failing to attend his or her removal proceeding is not inadmissible under **Section 212(a)(6)(B)** of the Act.

"Reasonable cause" is defined neither in the statute nor in regulations; however, case law has provided some guidance on what constitutes "reasonable cause." In general, "reasonable cause" is something that is not within the reasonable control of the alien. *See* case law summary in section **40.6.2(b)(4)** of this *AFM* chapter.

It may also be helpful to compare the alien's circumstances to the higher standard of "exceptional circumstances" required for the rescission of a removal order, as defined in **section 240(e)** of the Act .

However, the standard of "exceptional circumstances" is a standard more stringent than the "reasonable cause" standard. In order to justify rescission of a removal order, an alien must establish that "exceptional circumstances" prevented his or her attendance at the removal proceeding.

Section 240(e) of the Act defines exceptional circumstances as circumstances beyond the control of the alien, such as: (1) battery or extreme cruelty to the alien or any child or parent of the alien; (2) serious illness of the alien; or (3) serious illness or death of the alien's spouse, child, or parent.

Whether the alien can meet the burden of proving "reasonable cause" for failure to attend the removal proceeding is determined by the officer adjudicating an application for an immigrant or nonimmigrant visa, for admission to the United States, for adjustment of status, change of status, or extension of stay, or any other benefit under the immigration laws.

The officer determines the issue based on evidence that the alien presents in support of the pending application; **no separate application (such as a** Form I-601 **) is needed.** In all cases, the burden of proving that the person had reasonable cause not to attend the removal proceedings rests with the alien.

(ii) <u>Waivers</u> .

There are no waivers available for this ground of inadmissibility, other than the exceptions or waivers described in **40.6.1(b)** or **40.6.1(c)** of this *AFM* chapter.

(4) <u>Citing References and Additional Materials</u> .

·      March 31, 1997 , Office of Programs memorandum – *Additional Guidance for Implementing* **Sections 212(a)(6)** *and* **212(a)(9)** *of the Immigration and Nationality Act (Act). See* **Appendix 40-1**

·      <u>Some Case Law Addressing "Reasonable Cause":</u>

*Hernandez-Vivas v.* I.N.S., 23 F.3d 1557, 1560 (9 th Cir. 1994) – The filing of a motion to change venue does not establish reasonable cause for failure to appear at the removal hearing. Cases related to *Hernandez-Vivas* :

*Wijeratne v.* I.N.S. , 961 F.2d 1344, 1346-47 (7 th Cir. 1992) – The fact that the alien had moved after proceedings were commenced did not provide for reasonable cause to justify the alien's failure to appear at the removal hearing.

*Wellington v.* I.N.S. , 108 F.3d 631, 635 (5 th Cir. 1997) – The error of an applicant's counsel in

misplacing the hearing notice does not constitute "reasonable cause" for the applicant's failure to appear.

**Matter of Cruz-Garcia** , 22 I&N Dec. 1155, 1159 (BIA 1999) – An alien who asserted for the first time on appeal that her failure to appear at a deportation hearing was the result of ineffective assistance of counsel, but who failed to comply with the requirements for such a claim, has not shown "reasonable cause" that warrants reopening of the proceedings.

**Matter of N–B–** , 22 I&N Dec. 590, 593 (BIA 1999) – Reasonable cause" is a standard less stringent than the one of "exceptional circumstances;" the alien had provided sufficient and credible evidence that supported the applicant's contention that she was suffering from a serious illness, which necessitated surgeries later on.

**Matter of S–A–** , 21 I&N Dec. 1050, 1051 (BIA 1997) – An applicant's general assertion that he was prevented from reaching his hearing on time because of heavy traffic does not constitute reasonable cause that would warrant reopening of his in absentia exclusion proceedings.

**Matter of Patel,** 19 I&N Dec. 260, 262 (BIA 1985) – Filing a request for a continuance is not a reasonable cause for the alien's failure to appear.

**Matter of Ruiz** , 20 I&N Dec. 91, 93 (BIA 1989) – Illness, properly documented by a physician's letter, was a valid excuse for the failure to appear.

(c) Section 212(a)(6)(C) of the Act: Misrepresentation and False Claim to U.S. Citizenship.

Chapter 40.6.2(c), Section 212(a)(6)(C) of the Act: Misrepresentation and False Claim to U.S. Citizenship, has been superseded in its entirety.

Chapter 40.6.2(c)(1), Section 212(a)(6)(C)(i) of the Act: Fraud or Misrepresentation, has been superseded by USCIS Policy Manual, Volume 8: Admissibility and Volume 9: Waivers as of March 25, 2014.

Chapter 40.6.2(c)(2), Section 212(a)(6)(C)(ii)(I) of the Act: Falsely Claiming Citizenship, has been superseded by USCIS Policy Manual, Volume 8: Admissibility as of December 14, 2016.

(d) Section 212(a)(6)(D) of the Act: Stowaways.

(1) <u>General</u> .

An alien who is a stowaway is inadmissible under section 212(a)(6)(D) of the Act.

(2) <u>Definition of Stowaway.</u>

**Section 101(a)(49)** of the Act defines stowaways as "any alien who obtains transportation without the consent of the owner, charterer, master, or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft." A passenger who boards with a valid ticket is not to be considered a stowaway.

(3) <u>Applicability</u> .

(i) <u>A Stowaway Is Not An Applicant for Admission</u> .

Pursuant to **section 235(a)(2)** of the Act , a stowaway is not an applicant for admission and may not be admitted to the United States.

A stowaway shall be ordered removed upon inspection by an immigration officer. If during this inspection, the alien indicates that he or she intends to apply for asylum, the inspector should refer the alien for a credible fear interview.

A stowaway may only apply for asylum if the stowaway is found to have a credible fear during this interview. In no case may a stowaway be considered an applicant for admission or be eligible for a hearing under **section 240** of the Act (Removal proceedings).

(ii) <u>Ineligible to Adjust Status under **Section 245** or **Section 245(i)** of the Act or to Change Status under **Section 248** of the Act</u> .

As a practical matter, this ground of inadmissibility usually applies to aliens who are encountered at the time of an attempted entry into the United States. However, this ground of inadmissibility also applies to an alien who traveled to the United States as a stowaway, entered the United States, and is attempting to adjust status to lawful permanent residence or to change status while in the United States.

Section 245(i) of the Act provides authority to grant adjustment to certain aliens who are not eligible for adjustment of status because they are unable to meet the requirements of **section 245(a)** of the Act or are subject to the bars of **section 245(c)** of the Act .

Namely, certain eligible aliens, despite having entered without inspection (under **section 212(a)(6)(A)(i)** of the Act ) or despite ineligibility according to the grounds listed in section 245(c) of the Act, may apply for adjustment of status under section 245(i) of the Act.

Nothing in **section 245(c)** of the Act , however, applies specifically to stowaways, and stowaways, as noted, are inadmissible under **section 212(a)(6)(D)** of the Act . Thus, a stowaway is not eligible for adjustment under section 245(i) of the Act.

(iii) <u>Ineligible for Removal Proceedings under</u> **section 240** of the Act .

Even if the alien has been found to have a credible fear after the credible fear interview and is allowed to file an application for asylum, the stowaway is ineligible for proceedings under section 240 of the Act.

(4) <u>Waivers And Exceptions</u> .

(i) <u>Exceptions</u> .

In addition to the general exceptions noted in **section 40.6.1(b)** of this *A*FM chapter , a stowaway may:

·    be paroled into the United States pursuant to **section 212(d)(5)** of the Act for various purposes, including for the alien to apply for asylum;

·    seek adjustment of status under **section 245(h)** of the Act .

(ii) <u>Exception for Returning Legal Permanent Residents</u> .

The only exception to the summary removal provision of stowaways is the provision providing relief to lawful permanent residents returning from a brief, temporary absence. *See* section 101(a)(13)(C) of the Act.

(iii) <u>Waivers</u> .

Other than the ones noted in **40.6.1(c)** of this *A*FM chapter, there is no waiver available.

(e) Section 212(a)(6)(E)(i) of the Act: Smugglers.

(1) <u>General</u> .

Any alien, who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of the law, is inadmissible.

(2) <u>Definitions</u> .

(i) <u>Knowingly</u> .

For **section 212(a)(6)(E)(i)** of the Act to apply, the alien must "knowingly" encourage, induce, or assist an illegal alien to enter the United States.

The term "knowingly" means that the alien must be aware of facts sufficient that a reasonable person in the same circumstances would conclude that his or her encouragement, inducement, or assistance could result in the illegal entry of the alien into the United States.

Furthermore, the smuggler must encourage, induce, or assist with the intent that the alien achieve the illegal entry. The mistaken belief that the alien was entitled to enter legally can be a defense to inadmissibility for suspected smugglers.

**Example:**

In *Tapucu v. Gonzales*, 399 F.3d 736 (6th Cir. 2005), the alien drove his friends from Canada to the United States. He knew that one (1) of them was not a U.S. citizen or national, and that this friend had been living in the United States illegally. However, at the time of the trip, the alien believed that the friend's pending adjustment of status application made it lawful for the friend to return to the United States. The court held that he did not knowingly assist the friend to reenter illegally.

**Example:**

In *Altamirano v. Gonzales*, 427 F.3d 586 (9th Cir. 2005), the applicant was a guest rider in a car. During the ride, she knew that someone was hiding in the trunk. The court found that, even though the individual had knowledge of the presence of the illegal alien, she was not inadmissible under **section 212(a)(6)(E)** of the Act because she herself did not perform any affirmative act to aid or abet the alien smuggling.

(ii) <u>Encourage, Induce, Assist, Abet, or Aid</u>.

Any affirmative action that leads an applicant to enter the United States illegally can be classified as "encourage, induce, assist, abet, or aid."

**Example 1:**

Offering a job to an alien under circumstances that make clear that the alien will have to enter illegally to accept the job offer;

**Example 2:**

Physically transporting or bringing the alien across the border; or

**Example 3:**

Making a false written or oral statement on behalf of another alien at the time of entry;

**Example 4:**

Filing an immigrant or nonimmigrant visa petition for an alien, knowing that the alien does not have the necessary qualifying relationship to the individual (for a family-based petition) or (for an employment-based petition) that the petition does not rest on a bona fide job offer, investment plan, or other set of circumstances that qualifies the alien for the immigrant or nonimmigrant classification that is sought.

(iii) <u>With Regard to a Visa Application</u> .

As noted in the discussion of **section 212(a)(6)(C)(i)** of the Act, an alien who gave a materially false statement in support of another alien's application for an immigration benefit would not incur inadmissibility under section 212(a)(6)(C) of the Act.

A materially false statement in support of another alien's application could, however, make the alien inadmissible under **section 212(a)(6)(E)** of the Act for having knowingly "assisted, abetted, or aided" the other alien's unlawful entry.

(iv) <u>An Alien</u> .

The person whom the alleged smuggler "encouraged, induced, assisted, abetted or aided" must have been an alien at the time of the smuggling. That is, the person must not have been a citizen or a non-citizen U.S. national.

(v) <u>Enter or Try to Enter . . . in Violation of Law</u> .

An alien may be inadmissible under **section 212(a)(6)(E)** of the Act as a result of "encourag[ing], induc[ing], assist[ing], abet[ing] or aid[ing]" another alien's entry into the United States without inspection at a port-of-entry or by "encourag[ing], induc[ing], assist[ing], abet[ing] or aid[ing]" the other alien in obtaining admission or parole at a port-of-entry by fraud.

(3) <u>Applicability</u> .

(i) <u>Inadmissible Even for Smuggling Close Family Members</u> .

Under the pre-1990 version of 212(a)(6)(E)(i) of the Act, an alien was not inadmissible, if he or she smuggled close family members based on a motive of close affection and not for financial gain. This version was eliminated with the passing of the **Immigration Act of 1990 (IMMACT 90)** . Under current **section 212(a)(6)(E)** of the Act , an alien will be inadmissible even if an alien assists or causes close family members to enter the United States illegally and regardless of his or her motivation. However, to alleviate some of the harshness of the provision, a waiver is available under **section 212(d)(11)** of the Act . See 40.6.2(e)(4) of this *AFM* chapter below.

(ii) <u>Motives of the Smuggler Are Irrelevant</u> .

Under **section 212(a)(6)(E)(i)** of the Act , it is irrelevant what motives caused the smuggler to induce, encourage, assist, abet, or aid the alien.

(iii) <u>"Gain" Is No Longer Required</u> .

Under former section 212(a)(31) of the Act, alien smuggling made an alien inadmissible only if the smuggling was done "for gain." *See* section 212(a)(31) of the Act (1988) or Title 8, United States Code (U.S.C.), 1182(a)(31) (1988). "Gain" is no longer an element under current section 212(a)(6)(E) of the Act.

(4) <u>Waivers and Exceptions</u> .

(i) Statutory Exception In **Section 212(a)(6)(E)(ii)** of the Act for Family Reunification (Family Unity).

In addition to the waivers mentioned in **40.6.1(c)** or **40.6.2(e)(4)(ii)** of this *A*FM chapter, section 212(a)(6)(E)(ii) of the Act states that an alien who has engaged in alien smuggling is not inadmissible under section 212(a)(6)(E) of the Act, if the alien is a "Family Unity" immigrant under **section 301(b)(1) of IMMACT 90** , and the alien:

·   was physically present in the United States on May 5, 1988; and

·   seeks admission as an immediate relative or as a second family-based preference immigrant (including under **sections 112** or **301(a)** of IMMACT 90); and

·    has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of the law; and

·    the smuggling occurred *before* May 5, 1988.

(ii) <u>Waivers</u> .

In addition to the waivers described above in **section 40.6.1(c)** of this *AFM* chapter , **section 212(a)(6)(E)(iii)** of the Act allows individuals applying for a visa to apply also for a waiver of this ground of inadmissibility pursuant to **section 212(d)(11)** of the Act .

To be eligible for this waiver, the alien must establish that:

·    He or she is a lawful permanent resident who temporarily proceeded abroad voluntarily, who is not under an order of removal, and who is otherwise admissible as a returning resident pursuant to **section 212(d)(11)** of the Act ; <u>or</u>

·    He or she is seeking admission (or adjustment of status) as an immediate relative, or as a first, second, or third family-based preference immigrant; <u>and</u>

·    He or she encouraged, induced, assisted, abetted, or aided the unlawful entry only of an individual who *at the time of such action* was the alien's spouse, parent, son, or daughter, and the alien has not encouraged, induced, assisted, abetted, or aided the unlawful entry of any other individual.

The application is filed on Form I-601 , Application for Waiver of Grounds of Inadmissibility. This

waiver may be granted in the discretion of the Secretary of Homeland Security to assure family unity, or when it is otherwise in the public interest.

(5) Reference .

U.S. Department of State, 9 Foreign Affairs Manual ( *FAM* ) 40.65 "Smugglers" and 40.65 Notes

(f) Section 212(a)(6)(F)(i) of the Act: Subject of Civil Penalty.

(1) General .

An alien who is the subject of a final order imposing a civil penalty for violation of **section 274C** of the Act , is inadmissible under **section 212(a)(6)(F)(i)** of the Act .

(2) Definitions .

(i) Final Order .

What constitutes a "final order" under **section 274C** of the Act depends on how a violation of section 274C of the Act was adjudicated.

When the Department of Homeland Security (DHS) issues a notice of intent to fine under section 274C of the Act, the person has sixty (60) days to request a hearing before an administrative law judge. If the person does not request a hearing, the DHS decision to impose a civil penalty under section 274C is the final order. *See* **8 CFR 270.2(g)** and **(h)** .

If the person does make a timely request for a hearing before an administrative law judge, the administrative law judge's order imposing a fine is the final order unless the Chief Administrative Hearing Officer of the Executive Office for Immigration Review modifies or vacates the order, or unless the case is referred to or accepted for review by the Attorney General. *See* **section 274C(d)(4)** of the Act , **8 CFR 270.2(f)** an d 28 CFR 68.

(ii) **section 274C** of the Act .

Section 274C of the Act makes it unlawful for a person or entity to knowingly:

(A) forge, counterfeit, alter, or falsely make any document;

(B) use, attempt to use, possess, obtain, accept, or receive any forged, counterfeit, altered, or falsely made document;

(C) use, or attempt to use any document lawfully issued to a person other than the possessor (including a deceased individual); for the purpose of or in order to satisfy any requirements of the Act. *See* **section 274C(a)(1)** through (3) of the Act.

It is also unlawful to knowingly accept or receive any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of complying with **section 274A(b)** of the Act or obtaining a benefit under the Act. *See* **section 274C(a)(4)** of the Act .

**Section 274C(a)(5)** of the Act prohibits the preparation, filing, or assistance to another in preparing or filing any application for benefits under the Act, or any document required under the Act, or any document submitted in connection with such application or document, with knowledge or in reckless disregard of the fact that such application or document was falsely made

or, in whole or in part, does not related to the person on whose behalf it was or is being submitted.

Finally, **section 274C(a)(6)** of the Act makes it unlawful for a person or an entity to knowingly present before boarding a common carrier for purposes of coming to the United States a document, which relates to the alien's eligibility to enter the United States, and to fail to present such document to an immigration officer upon arrival at the United States port of entry.

(3) <u>Applicability</u> .

(i) <u>Effective Date</u> .

**Section 212(a)(6)(F)** of the Act became effective on June 1, 1991; an alien subject to a final order imposing civil penalties under **section 274C** of the Act on or after that date is ineligible for adjustment and was subject to exclusion (pre-1996), or removal proceedings (post-1996).

(ii) <u>Effect of Administrative Appeal or Judicial Review</u> .

If DHS issues a final order because the person did not request a hearing, the DHS order is final and is not subject to any administrative or judicial review. *See* **section 274C(d)(2)(B)** of the Act .

If the person does request a hearing, the administrative law judge's decision is the final decision unless the case is before the Chief Administrative Hearing Officer or the Attorney General for review. See **section 274C(d)(4)** of the Act.

If the person files a timely petition for review of a final order with the appropriate court of appeals, the order is not deemed final while the petition for review remains pending. *See* **section 274C(d)(5)** of the Act .

(iii) <u>Other Inadmissibility Grounds May Be Applicable</u>.

Check whether other grounds of inadmissibility under **section 212** of the Act exist. It is possible that an alien who is subject to a civil penalty under **section 274C** of the Act , may be subject to other grounds of inadmissibility, such as **section 212(a)(6)(C)** [Misrepresentation] or **212(a)(6)(E)** [Smugglers] of the Act. If the alien was also convicted in a criminal proceeding, the conviction could make the alien inadmissible under **section 212(a)(2)** of the Act .

(iv) <u>Effect of a Waiver under</u> **Section 212(i)** of the Act .

The Board of Immigration Appeals (BIA) held that if an alien is in removal proceedings, a waiver under section 212(i) of the Act may not be used to waive **section 212(a)(6)(F)** for document fraud in violation of **section 274C** of the Act . *See Matter of Lazarte-Valverde* , 21 I&N Dec. 214 (BIA 1996).

In *Matter of Lazarte-Valverde*, the BIA rejected the position stated in General Counsel Opinion 93-33, issued by the General Counsel of the former INS in 1993. USCIS adjudicators are bound by the BIA's decision, and must not follow the General Counsel Opinion 93-33. *See* **8 CFR 1003.1(g)** (Board precedents bind USCIS officers).

(4) <u>Exceptions and Waivers</u> .

(i) <u>Nonimmigrants</u> .

After a final order is entered pursuant to **section 274C** of the Act , a nonimmigrant seeking entry may be eligible to apply for advance permission to enter the United States as a nonimmigrant despite the inadmissibility, pursuant to **section 212(d)(3)** of the Act . The application is filed on Form I-192 , Application for Advance Permission to Enter as a Nonimmigrant.

(ii) <u>Waiver for Immigrants and Adjustment of Status Applicants under</u> **Section 212(d)(12)** <u>of the Act</u> .

The Secretary of Homeland Security may, in his or her discretion and for humanitarian purposes or to assure family unity, waive the application of **section 212(a)(6)(F)(i)** of the Act in the case of an alien, who:

(A) Is:

·   already lawfully admitted for permanent residence, and who temporarily proceeded abroad voluntarily and not under an order of deportation or removal, and who is otherwise admissible to the United States as a returning resident under **section 211(b)** of the Act ; <u>or</u>

·   seeking admission or adjustment of status as an immediate relative or as a family-based preference immigrant; <u>and</u>

(B) Has not been the subject of any prior civil money penalty under **section 274C** of the Act ; <u>and</u>

(C) Committed the offense that resulted in the civil money penalty solely to assist, aid, or support the alien's spouse or child (and not another individual).

The relationship to the supported individual had to exist at the time of the fraud, not only at the time of the waiver application. The waiver application must be filed on Form I-601 , Application for Waiver of Grounds of Inadmissibility. Also, there is no judicial review of a decision denying this waiver.

| **Note:** |
|---|
| The legislative history of a prior version of the bill that became IIRIRA suggests that this waiver is also available to employment-based immigrants. *See* H. Conf. Rep. 104-828 at 227 (1996). |

This report, however, directly contradicts the actual terms of the statute on this point. The report cannot be relied on to grant a waiver to someone who is not eligible for it under the terms of the statute. Thus, an alien who is not *already* a lawful permanent resident (LPR) may seek the waiver under **section 212(d)(12)** of the Act only if the alien is seeking to immigrate as an immediate relative or as a family-based immigrant.

(iii) <u>No Other Waivers or Exceptions Available</u> .

Other than stated in this section or **section 40.6.1(b)** or **40.6.1(c)** of this AFM chapter , there is no other waiver or exception available to an alien who is inadmissible under **section 212(a)(6)(F)** of the Act.

Also, as noted, the conduct that made the person subject to the civil penalty under section 212(a)(6)(F) of the Act may also make the alien inadmissible under other provisions of the Act. Just as a waiver under **section 212(i)** of the Act does not waive section 212(a)(6)(F) of the Act, *see Matter of Lazarte-Valverde, supra* , a waiver under **section 212(d)(12)** of the Act would not relieve the alien of inadmissibility under some other ground. The alien would have to apply for each separate waiver for each relevant ground of inadmissibility.

(5) <u>References and Other Materials</u> .

·    U.S Department of State's 9 Foreign Affairs Manual ( *FAM* ) 40.66 "Subject of Civil Penalty" and 40.66 Notes

·   *Matter of Lazarte-Valverde* , 21 I&N Dec. 214 (BIA 1996)

(g) Section 212(a)(6)(G) of the Act: Student Visa Abusers.

(1) <u>General</u> .

An alien who obtains the status of nonimmigrant under **section 101(a)(15)(F)(i)** of the Act as a student, and who violates a term or condition of such status under section 214(l) of the Act [now **section 214(m)** of the Act ] is inadmissible until the alien has been outside the United States for a continuous period of five (5) years after the date of the violation.

**Section 212(a)(6)(G)** of the Act refers to the violation of conditions of admission as imposed under **section 214(l)** of the Act . Section 212(a)(6)(G) of the Act, and the related section 214(l) of the Act, were enacted by section 625 of IIRIRA, PL 104-208 . Section 671(a)(3)(A) of the same law, however, had redesignated section 214(k) of the Act, as added by PL 103-416, to be section 214(l) of the Act.

There was already a section 214(k) of the Act when PL 103-416 was enacted. Its enactment resulted in two (2) sections 214(k) of the Act. Once PL 104-208 was enacted, there were now *two* (2) sections 214(l) of the Act. The version of section 214(l) of the Act referred to in section 212(a)(6)(G) of the Act was subsequently redesignated as section 214(m) of the Act by section 107(e)(2) of the Victims of Trafficking and Violence Protection Act of 2000, PL 106-386 (October 28, 2000). **section 214(m)** of the Act **, therefore, is the provision that relates to Section 212(a)(6)(G)** of the Act **.**

**Section 214(m)(1)** of the Act specifies that an alien may not be accorded F-1 student nonimmigrant status to study at a <u>public</u> elementary school or in a <u>publicly</u> funded adult education program. Study at a <u>public</u> secondary school is allowed as long as the aggregate period of study does not exceed twelve (12) months and the alien has reimbursed the local educational agency for the full, unsubsidized per capita cost of his or her education at the school.

**Section 214(m)(2)** of the Act states:

An alien, who obtains the status of nonimmigrant under clause (i) or (iii) of **section 101(a)(15)(F)** in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such a status, and the alien's visa under section 101(a)(15)(F) of the Act shall be void, if

·    the alien terminates or abandons such course of study at such a school; AND

·    undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of section 214(m)(1)(B) of the Act are met).

Therefore, in order to be deemed a student visa abuser under **Section 212(a)(6)(G)** of the Act for being in violation of section 214(m)(2) of the Act, both conditions (1 and 2) must be fulfilled. The alien cannot be held to be a student visa abuser for being in violation of section 214(m)(2) of the Act, if only one condition is met. *see* below, **section (g)(3)** of this update .

However, because of the wording of section 212(a)(6)(G) of the Act [which refers to 214(m) of the Act in its entirety), the individual may be deemed to be a student visa abuser for being in violation of **section 214(m)(1)** of the Act .

(2) <u>Definitions</u> .

The terms used in **section 214(m)** of the Act are defined as follows:

<u>Abandon</u> : To desert, surrender, forsake, or cede. To relinquish or give up with intent of never

again resuming one's right or interest. To give up or to cease to use. To give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert. It includes the intention, and also the external act by which it is carried into effect. *See Lee v. Mukasey*, 527 F.3d 1103 (10th Cir. 2008) ; *referring to* Black's Law Dictionary (6th ed., 1990).

Public Elementary School : Kindergarten through eighth (8th) grades.

Public Secondary School : Ninth (9th) through twelfth (12th) grades (also known as "high school").

Publicly-Funded Adult Education Programs : Publicly funded adult education programs means education, training, English-as-Second-Language (ELS) or other intensive English programs operated by, through, or for a local public school district, system, agency, or authority, regardless of whether such program charges fees or tuition.

Terminate : To put to an end; to bring to an end; to end or to conclude. *See* Black's Law Dictionary (8th ed. 2004).

(3) Applicability .

Only Applicable to Individuals Seeking F-1 Nonimmigrant Student Status after November 30, 1996 .

**Section 212(a)(6)(G)** of the Act only applies to aliens seeking F-1 status after November 30, 1996, or aliens, whose status was extended on or after that date. It does not apply to aliens attending public schools or programs while in other nonimmigrant status (e.g. F-2, E, H-4, J, or B-2), or to individuals out-of-status or with no status at all.

<u>Conduct That Violates</u> **Section 214(m)** of the Act . An alien admitted as an F-1 nonimmigrant student on or after November 30, 1996, violates section 214(m) of the Act, and is inadmissible under section 212(a)(6)(G) of the Act, if the alien:

·   attends a public elementary school for any length of time; or

·   attends a public secondary school for more than twelve (12) months, in the aggregate (even if the student pays the full unsubsidized per capita cost); or

·   attends a public secondary school without paying the full unsubsidized per capita cost (even if the alien attends for less than twelve (12) months, in the aggregate); or

·   attends a publicly funded adult education program for any length of time; or

·   abandons or terminates enrollment in an approved school and attends a public elementary school, a publicly funded adult education program, or a publicly funded adult education language training program, or a public secondary school, in violation of the requirements of section 214(m)(1) of the Act.

| **Note:** |
|---|
| *See* **AFM 40.6.2(g)(2)** (iv) concerning the impact of the closure of a school. |

These prohibitions do not apply to post-secondary schools such as public community or junior colleges, which receive public funds but charge full non-resident tuition to foreign students.

(iii) <u>Burden of Proof</u> .

The alien bears the responsibility of documenting that a school is not considered to be a public school. The school is responsible for determining what amount constitutes the "unsubsidized per capita cost of education," and the school's estimate of its per student expenditure of public revenues (federal, state, and local). The later figure is not necessarily the school's nonresident tuition rate.

(iv) <u>Effect of Closure of a School</u> .

In *Lee v. Mukasey* , 527 F.3d 1103, 1107 (10th Cir. 2008), the U.S. Court of Appeals for the Tenth Circuit held that an alien who quit attending his or her approved school, and enrolled in a different school in violation of **section 214(m)** of the Act was not inadmissible under **section 212(a)(6)(G)** of the Act . The basis for the Court's conclusion is that the reason the alien had left the approved school was that it had closed.

USCIS has decided to follow the *Lee* decision nationwide. An alien will not be found inadmissible under section 212(a)(6)(G) of the Act and under section 214(m) of the Act, solely because he or she is no longer at the school for reasons that can be attributed to th e school only (such as a school's permanent closing).

However, a lthough ceasing to attend the approved school because it has closed will not make the alien inadmissible under section 212(a)(6)(G) of the Act, this fact does not mean that the alien is still in a lawful nonimmigrant status. This nonimmigrant status will have ended, and the alien will be subject to removal under **section 237(a)(1)** of the Act , unless the alien transfers to another approved school.

The student and the new school will still have to comply with the requirements imposed by **sections 101(a)(15)(F)** and 214(m)(1) of the Act, as well as **8 CFR 214.2(f)** , in order for the alien to maintain valid nonimmigrant status. *See Matter of Yazdani* , 17 I&N Dec. 626 (BIA 1981)(An alien who, without first securing the Service's permission, transfers to a school other than that which she was authorized, is in breach of the condition of the student's status). The alien student may be subject to **section 245(c)(2)** of the Act or any other provisions imposing adverse consequences on aliens who are unlawfully present in the United States.

In relat ion to the grant of reinstatement or a student's transfer request under **8 CFR 214.2(f)(8)** and **8 CFR 214.2(f)(16)** , the adjudicator should consider every relevant circumstance. If the adjudicator encounters difficulties, the adjudicator should contact his or her supervisor or local counsel.

An alien whose enrollment at an approved school ends because the school has closed will also be in an unlawful status for purposes of **sections 245(c)(2)** , **(7)** and **(8)** of the Act. Thus, even if the alien is *not* inadmissible under section 212(a)(6)(G) of the Act, the alien may be precluded from adjustment of status.

The decision to remain in the United States cannot be excused as a violation "through no fault of one's own" because, although the alien may not have had control over the closure of the school, the alien would also have the option of complying with the law, either by transferring to a school that the alien is permitted to attend under section 214(m) of the Act, or by leaving the United States.

Leaving the United States and returning does not cure one's adjustment ineligibility under section 245(c)(2) of the Act. *See* **8 CFR 245.1(d)(3)** .

(v) Individuals to Whom Section 212(a)(6)(G) of the Act Does Not Apply .

**Section 212(a)(6)(G)** of the Act does not apply to the following individuals:

·    Aliens who remained outside the United States for a continuous period of five (5) years after having violated the terms and conditions of section 214(m) of the Act;

·    Aliens studying in pubic schools, who are in J-1, J-2, E, F-2, L-2, or H-4 nonimmigrant status;

·    Aliens, who are studying at public schools illegally, such as B-2 nonimmigrants or aliens who are unlawfully in the United States;

·    Aliens who violate the terms and conditions of their F-1 nonimmigrant student status in other ways, such as non-attendance at their approved school, working without authorization, or not maintaining a full-course of study.

(4) Exceptions and Available Waivers .

Other than the general exceptions and waivers to inadmissibility noted in sections **40.6.1(b)** and **40.6.1(c)** of this chapter , there are no exceptions or waivers to inadmissibility for aliens who are student visa abusers.

(5) References .

·    74 No. 5 Interpreter Releases 227 (February 3, 1997), *INS provides Interim Guidance on New Public School Provisions for F-1 Students* (complete reproduction of INS HQ Cable text sent to all Field offices on January 27, 1997 (File HQ 50/5.12/96ACT.011)] (Note: The text of this cable is not available on USCIS' website.)

·    U.S. Department of State's 9 Foreign Affairs Manual (*FAM*) 40.67 "Student Visa Abusers" and 40.67 Notes

**40.7 Section 212(a)(7) of the Act – Documentation Requirements [Reserved]**

AR2022_300537

**40.8 Section 212(a)(8) of the Act – Ineligible for Citizenship [Reserved]**

**40.9 Section 212(a)(9) of the Act – Aliens Unlawfully Present after Previous Immigration Violations [Chapter 40.9 added May 6, 2009]**

**Section 212(a)(9)** of the Act renders certain aliens inadmissible based on prior violations of U.S. immigration law. Section 212(a)(9) of the Act has three major subsections.

Under **section 212(a)(9)(A)** of the Act, an alien, who was deported, excluded or removed under any provision of law, is inadmissible if the alien seeks admission to the United States during the period specified in section 212(a)(9)(A) of the Act, unless the alien obtains consent to reapply for admission during this period.

Under **section 212(a)(9)(B)** of the Act, an alien is inadmissible if the alien has accrued a specified period of unlawful presence, leaves the United States after accruing the unlawful presence, and then seeks admission during the period specified in (either 3 years or 10 years after the departure, depending on the **section 212(a)(9)(B)(i)** duration of the accrued unlawful presence).

Under **section 212(a)(9)(C)(i)** of the Act, an alien is inadmissible if the alien enters or attempts to enter the United States without admission after having been removed or after having accrued more than one year (in the aggregate) of unlawful presence.

**AFM Chapter 40.9.2** provides an overview of USCIS' policy concerning the accrual of unlawful presence and the resulting inadmissibility under **section 212(a)(9)(B)** or **section 212(a)(9)(C)(i)(I)** of the Act.

40.9.1 Inadmissibility Based on Prior Removal (Section 212(a)(9)(A) of the Act) or Based on Unlawful Return after Prior Removal (Section 212(a)(9)(C)(i)(II) of the Act)

[Reserved]

40.9.2 Inadmissibility Based on Prior Unlawful Presence (Sections 212(a)(9)(B) and (C)(i)(I) of the Act)

ALERT: On Feb. 6, 2020, the U.S. District Court for the Middle District of North Carolina issued a nationwide injunction enjoining USCIS from enforcing the Aug. 9, 2018, policy memorandum titled, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." USCIS will continue to apply the prior policy guidance found in AFM Chapter 40.9.2, issued on May 6, 2009: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(b)(i) and 212(a)(9)(c)(i)(I) of the Act.

Table of Contents: Chapter 40.9.2

**(a) Overview**

**(1) Outline of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act**

**(2) Distinction Between "Unlawful Status" and "Unlawful Presence"**

**(3) Definition of Unlawful Presence and Explanation of Related Terms**

**(4) General Considerations when Counting Unlawful Presence Time under Sections 212(a)(9)(B) and 212(a)(9)(C)(i)(I) of the Act**

**(5) Triggering the Bar by Departing the United States**

**(6) Triggering the 3-Year and the 10-Year Bar but not the Permanent Bar When Departing with Advance Parole or with a Refugee Travel Document**

**(7) Multiple Grounds of Inadmissibility and the Relationship Between Sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act**

**(8) Benefits That May Be Available Despite Inadmissibility under Section 212(a)(9)(B)(i)(I), (B)(i)(II), or (C)(i)(I) of the Act**

**(9) Effective Date of Sections 212(a)(9)(B) and (C)(i)(I) of the Act**

**(b) Determining When an Alien Accrues Unlawful Presence**

**(1) Aliens Present in Lawful Status or as Parolees**

    (A)  Lawful Permanent Residents (LPRs)

    (B)  Lawful Temporary Residents (Section 245A(b) of the Act and 8 CFR 245a)

    (C)  Conditional Permanent Residents under Sections 216 and 216A of the Act

    (D)  Aliens Granted Cancellation of Removal or Suspension of Deportation

    (E)  Lawful Nonimmigrants

        (i)  Nonimmigrants Admitted until a Specific Date (Date Certain)

        (ii)  Nonimmigrants Admitted for Duration of Status (D/S)

        (iii)  Non-controlled Nonimmigrants (e.g. Canadian B-1/B-2)

    (F)  Other Types of Lawful Status

        (i)  Aliens in Refugee Status

        (ii)  Aliens Granted Asylum

        (iii)  Aliens Granted Temporary Protected Status (TPS) pursuant to Section 244 of the Act

    (G)  Aliens Present as Parolees

**(2) Aliens Present in Unlawful Status Who Do Not Accrue Unlawful Presence by Statute for Purposes of Section 212(a)(9)(B) of the Act (Statutory Exceptions)**

    (A)  Minors Who Are under 18 Years of Age

    (B)  Aliens with Pending Asylum Applications (Including Children Aging Out and Dependents of Asylum Applicants)

    (C)  Aliens Physically Present in the United States with pending Forms I-730

    (D)  Beneficiary of Family Unity Protection (FUP) Granted pursuant to Section 301 of the Immigration Act of 1990; 8 CFR 236.15

    (E)  Certain Battered Spouses, Parents, and Children

    (F)  Victims of Severe Form of Trafficking in Persons

    (G)  Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS] ("Tolling")

**(3) Aliens Present in Unlawful Status Who Do Not Accrue Unlawful Presence By Virtue of USCIS Policy for Purposes of Sections 212(a)(9)(B) and (C)(i)(I) of the Act**

(A) Aliens with Properly Filed Pending Applications for Adjustment of Status or Registry (Sections 209, 245, 245(i), and 249 of the Act, Sections 202 of Public Law 99-603 Cuban Haitian Adjustment, Section 202(b) of the Nicaraguan Adjustment and Central American Relief Act (NACARA), section 902 of the Haitian Refugee Immigration Fairness Act of 1998 (HRIFA))

(B) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS)("Tolling")

(C) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS) Who Depart the United States During the Pendency

(D) Nonimmigrants - Effect of a Decision on the Request for Extension of Status (EOS) or Change of Status (COS) on Unlawful Presence

  (i) Approved Requests

  (ii) Denials Based on Frivolous Filings or Unauthorized Employment

  (iii) Denials of Untimely Applications

  (iv) Denials for Cause of Timely Filed, Non-Frivolous Applications for EOS or COS

  (v) Motion to Reopen/Reconsider

  (vi) Appeal to the Administrative Appeals Office (AAO) of the Underlying Petition Upon Which an EOS or COS Is Based

  (vii) Nonimmigrants - Multiple Requests for EOS or COS ("Bridge Filings") and Its Effect on Unlawful Presence

(E) Aliens with Pending Legalization Applications, Special Agricultural Worker Applications, and LIFE Legalization Applications

(F) Aliens granted Family Unity Program Benefits under Section 1504 of the LIFE Act Amendments of 2000

(G) Aliens with Pending Applications for Temporary Protected Status (TPS) pursuant to Section 244 of the Act

(H) Aliens Granted Voluntary Departure pursuant to Section 240B of the Act

(I) Aliens Granted Stay of Removal

(J) Aliens Granted Deferred Action

(K) Aliens Granted Withholding of Removal under Section 241(b)(3) of the Act or Withholding of Deportation under Former Section 243 of the Act

(L) Aliens Granted Withholding of Removal or Deferral of Removal under the United Nations Convention Against Torture Pursuant to 8 CFR 208.16 and 8 CFR 208.17

(M) Aliens Granted Deferred Enforced Departure (OED)

(N) Aliens Granted Satisfactory Departure under 8 CFR 217.3

**(4) Effect of the Protection from the Accrual of Unlawful Presence on Previously Accrued Unlawful Presence: Protection from the Accrual of Unlawful Presence Does Not Cure Previously Accrued Unlawful Presence**

**(5) Effect of Removal Proceedings on Unlawful Presence**

**(6) Effect of an Order of Supervision pursuant to 8 CFR 241.5 on Unlawful Presence**

**(c) Relief from Inadmissibility under Section 212(a)(9)(B)(i)(I) and (II), and Section 212(a)(9)(C)(i)(I) of the Act**

**(1) Waiver of the 3-Year Bar or the 10-Year Bar under Section 212(a)(9)(B)(i) of the Act**

    (A) Nonimmigrants

    (B) Immigrants and Adjustment of Status Applicants Who Are the Spouses, Sons, or Daughters of U.S. Citizens or LPRs, and Fiance(e) of U.S. Citizens

    (C) Asylees and Refugees Applying for Adjustment of Status

    (D) TPS Applicants

    (E) Legalization under the CSS LULAC and NWRIP Class Settlement Agreements, and Legalization Applicants pursuant to 8 CFR 245a.2(k) and 8 CFR 245a.18

**(2) Waiver of the Permanent Bar under Section 212(a)(9)(C)(i)(I) of the Act**

    (A) HRIFA and NACARA Applicants

    (B) Legalization, SAW, LIFE Act Legalization, and Legalization Class Settlement Agreement Applicants

    (C) TPS Applicants

    (D) Certain Battered Spouses, Parents, and Children

    (E) Asylee and Refugee Adjustment Applicants under Section 209(c) of the Act

Adjudicator's Guidance: Chapter 40.9.2

(a) <u>General Overview</u>

If an alien, other than an alien lawfully admitted for permanent residence, accrues unlawful presence in the United States, he or she may be inadmissible pursuant to **section 212(a)(9)(B)(i)** (Three-year and Ten-year bars) or **212(a)(9)(C)(i)(I)** of the Act (Permanent bar).

(1) <u>Outline of Section 212(a)(9)(B)(i) and Section 212(a)(9)(C)(i)(I) of the Act</u>

(A) <u>Section 212(a)(9)(B)(i) of the Act - The 3-Year and the 10-Year Bars</u> . **section 212(a)(9)(B)(i)** is broken into two (2) sub-groups:

· <u>Section 212(a)(9)(B)(i)(I) of the Act (3-year bar)</u>

This provision renders inadmissible for three (3) years those aliens, who were unlawfully present for more than 180 days but less than one (1) year, and who departed from the United States voluntarily prior to the initiation of removal proceedings.

· <u>Section 212(a)(9)(B)(i)(II) of the Act (10-year bar)</u>

This provision renders inadmissible an alien, who was unlawfully present for one (1) year or more, and who seeks again admission within ten (10) years of the date of the alien's departure or removal from the United States.

Both bars can be waived pursuant to **section 212(a)(9)(B)(v)** of the Act.

(B) <u>Section 212(a)(9)(C)(i)(I) of the Act - The Permanent Bar</u>

This provision renders an individual inadmissible, if he or she has been unlawfully present in the United States for an aggregate period of more than one (1) year, and who enters or attempts to reenter the United States without being admitted.

An alien, who is inadmissible under **section 212(a)(9)(C)(i)(I)** of the Act is permanently inadmissible; however, after having been outside the United States for at least ten (10) years, he or she may seek consent to reapply for admission pursuant to **section 212(a)(9)(C)(ii)** of the Act and **8 CFR 212.2** . A waiver is also available for certain Violence Against Women Act (VAWA) self-petitioners under **section 212(a)(9)(C)(iii)** of the Act.

The 10-year absence requirement does not apply to a VAWA self-petitioner who is seeking a waiver under **section 212(a)(9)(C)(iii)** of the Act, rather than seeking consent to reapply under **section 212(a)(9)(C)(ii)** of the Act.

A DHS regulation at **8 CFR 212.2** addresses the filing and adjudication of an application for consent to reapply (filed on **Form I-212** ). As stated by the Board of Immigration Appeals (BIA) in *Matter of Torres-Garcia*, 23 I&N Dec. 866 (BIA 2006), however, the consent to reapply regulation at 8 CFR 212.2 predates the enactment of **section 212(a)(9)(C)** of the Act and the related consent to reapply provision in **section 212(a)(9)(A)(iii)** of the Act.

Thus, although the *filing procedures* in **8 CFR 212.2** are still in effect, the substantive requirements of **section**

**212(a)(9)** of the Act govern during the adjudication of **Form I-212** , Application for Permission to Reapply for Admission into the United States After Deportation and Removal.

A USCIS adjudicator must consider the specific requirements of **section 212(a)(9)(C)(ii)** of the Act when adjudicating **Form I-212** that is filed by an alien who is inadmissible under **section 212(a)(9)(C)(i)** of the Act. That is, because of the 10-year absence requirement for consent to reapply, **section 212(a)(9)(C)(i)(I)** of the Act is a permanent bar for which neither the retroactive nor the prospective grant of consent to reapply is possible.

The regulatory language at **8 CFR 212.2(i)** and **(j)** is not applicable, *see Torres-Garcia* , at 875, and the alien has to be physically outside the United States for a period of at least ten years since his or her last departure before being eligible to be granted consent to reapply. *See id* ., at 876.

Finally, the regulatory language referring to the 5-year and the 20-year limitation on consent to reapply does not apply to **section 212(a)(9)(C)** of the Act; these limitations refer to former **sections 212(a)(6)(A)** and **(B)** , the predecessors of current **section 212(a)(9)(A)** of the Act. *See id* . at 874 (for a historical analysis).

Also, an adjudicator should pay special attention to the possibility that an alien who is inadmissible under **section 212(a)(9)(C)(i)(II)** of the Act (because the alien entered or attempted to enter without admission after having been removed) may be subject to the reinstatement provision of **section 241(a)(5)** of the Act (reinstatement of removal orders).

(2) <u>Distinction Between "Unlawful Status" and "Unlawful Presence "</u>

To understand the operation of **sections 212(a)(9)(B)** and **212(a)(9)(C)(i)(I)** of the Act, it is important to comprehend the difference between being in an unlawful immigration status and the accrual of unlawful presence ("period of stay not authorized"). Although these concepts are related (one must be present in an unlawful status in order to accrue unlawful presence), they are not the same.

As discussed in **chapters 40.9.2(b)(2)** and **40.9.2(b)(3)** of the *AFM* , there are situations in which an alien who is present in an unlawful status nevertheless does not accrue unlawful presence. As a matter of prosecutorial discretion, DHS may permit an alien who is present in the United States unlawfully, but who has pending an application that stops the accrual of unlawful presence, to remain in the United States while that application is pending. In this sense, the alien's remaining can be said to be "authorized." However, the fact that the alien does not accrue unlawfu l presence does *not* mean that the alien's presence in the United States is actually lawful.

| **Example 1** |
| --- |
| An alien is admitted as a nonimmigrant, with a **Form I-94** that expires on January 1, 2009. The alien remains in the United States after the Form I-94 expires. The alien's status becomes unlawful, and she |

begins to accrue unlawful presence, on January 2, 2009. On May 10, 2009, the alien properly files an application for adjustment of status.

The filing of the adjustment application stops the accrual of unlawful presence. But it does not "restore" the alien to a substantively lawful immigration status. She is still amenable to removal as a deportable alien under **section 237(a)(1)(C)** of the Act because she has remained after the expiration of her nonimmigrant admission.

**Example 2**

An alien is admitted as a nonimmigrant, with a **Form I-94** that expires on January 1, 2009. On October 5, 2008, he properly files an application for adjustment of status. He does not, however, file any application to extend his nonimmigrant stay, which expires on January 1, 2009. The adjustment of status application is still pending on January 2, 2009.

On January 2, 2009, he becomes subject to removal as a deportable alien under **section 237(a)(1)(C)** of the Act because he has remained after the expiration of his nonimmigrant admission. For purposes of future inadmissibility, however, the pending adjustment application protects him from the accrual of unlawful presence.

The application of **section 245(k)** of the Act is a good example of the importance of clearly distinguishing unlawful *status* from the accrual of unlawful presence. Guidance concerning section 245(k) may be found in **chapter 23.5(d)** of the *AFM* . If the requirements of section 245(k) are met, this provision relieves certain employment-based immigrants of ineligibility under section 245(c)(2), (c)(7) or (c)(8) of the Act for adjustment of status.

For example, an alien who failed to maintain a lawful status after any entry is, ordinarily, ineligible for adjustment of status under **section 245(c)(2)** of the Act. Departure from the United States and return does, ordinarily, not relieve the alien of this provision. **8 CFR 245.1(d)(3)** .

For an alien who is eligible for the benefit of **section 245(k)** of the Act, however, only a failure to maintain status since the last *lawful admission* is considered in determining whether the alien is subject to **section 245(c)(2)** , **(c)(7)** or **(c)(8)** of the Act. AFM Chapter 23.5(d)(4). Unless the alien, since the last lawful admission failed to maintain lawful status for at least 181 days, section 245(k) of the Act relieves the alien of ineligibility under section 245(c)(2), (c)(7) or (c)(8) of the Act.

As stated in **chapters 40.9.2(b)(2)** and **40.9.2(b)(3)** of the *AFM* , some aliens who are actually present in an unlawful *status* , are, nevertheless, protected from accruing unlawful presence. But if their unlawful status continues for more than 180 days, in the aggregate, they would be ineligible for the benefit of **section 245(k)** of the Act, *even if they have accrued no unlawful presence for purposes of* **section 212(a)(9)(B)** of the Act.

**Example 3**

An alien is admitted for "duration of status" as an F-1 nonimmigrant student. One year later, the alien drops out of school, and remains in the United States for one year after dropping out.

The alien's status became unlawful when she dropped out of school. Neither USCIS nor an IJ ever makes a finding that the alien was out of status; therefore, she never accrues any unlawful presence for purposes of **section 212(a)(9)(B )** of the Act. **AFM Chapter 40.9.2(b)(1)(E)(ii)** .

The alien eventually leaves the United States and returns lawfully as a nonimmigrant. While in nonimmigrant status, a Form I-140 is approved and the alien applies for adjustment of status. Because the alien failed to maintain a lawful status for more than 180 days during her prior sojourn, she is ineligible for adjustment under **section 245(c)(2)** of the Act, and **section 245(k)** of the Act does not relieve her of this ineligibility.

Under **section 245(k)** of the Act, the alien is still eligible for adjustment, since the prior failure to maintain status does not apply to make the alien ineligible under **section 245(c)** of the Act. Also, the alien did not accrue unlawful *presence* despite the prior unlawful *status*, and so the alien is not inadmissible under **section 212(a)(9)(B)** of the Act.

**Example 4**

The alien is admitted as a lawful nonimmigrant, and, while still in status, applies for adjustment of status on the basis of an approved Form I-140. While the Form I-485 is pending, the alien's employment authorization documentation (EAD) expires, and the alien fails to apply for a new EAD. Nevertheless, the alien continues to work after the EAD expires. The period of unauthorized employment exceeds 180 days.

The alien would not be inadmissible under **section 212(a)(9)(B)** of the Act, since the pendency of the **Form I-485** stopped the accrual of unlawful presence. Also, there has been no "departure" to trigger section 212(a)(9)(B) of the Act. **Section 245(k)** of the Act does not relieve the alien of ineligibility under **section 245(c)(2)** of the Act since the alien engaged in unauthorized employment for more than 180 days.

An alien who is present in a lawful status will not accrue unlawful presence as long as that lawful status is maintained.

(3) Definition of Unlawful Presence and Explanation of Related Terms

(A) Unlawful Presence

**Section 212(a)(9)(B)(ii)** of the Act defines "unlawful presence" for purposes of **sections 212(a)(9)(B)(i)** and **212(a)(9)(C)(i)(I)** of the Act to mean that an alien is deemed to be unlawfully present in the United States, if the alien is:

·   present after the expiration of the period of stay authorized by the Secretary of Homeland Security; or

· present without being admitted or paroled.

(B) Period of Stay Authorized (Authorized Stay)

When nonimmigrants are admitted into the United States, the period of stay authorized is generally noted on **Form I-94** , Admission/Departure Record. Additionally, by policy, USCIS has designated other statuses - including some that are not actually lawful - as "periods of stay authorized." see the more detailed analysis in AFM **chapters 40.9.2(b)** and **40.9.2(c)** .

(C) Admission

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (Div. C of Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act of 1997, **PL 104-208** (September 30, 1996)) amended **section 101(a)(13)** of the Act by removing the definition of the term "entry," and by replacing it with a definition of the terms "admission" and "admitted."

**Section 101(a)(13)(A)** of the Act now defines "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *See* section 101(a)(13)(A) of the Act.

**Section 101(a)(13)(B)** of the Act furthermore clarifies that parole is not admission, and that an alien crewman, who is permitted to land temporarily in the United States, shall not be considered to have been admitted. *See* section 101(a)(13)(B) of the Act.

(D) Parole

Parole is the discretionary decision, under **section 212(d)(5)(A)** of the Act, to permit an inadmissible alien to leave the inspection facility free of official custody, so that, although the alien is not admitted, the alien is permitted to be physically present in the United States.

By statutory definition, parole is not admission. *See* **section 101(a)(13)(B)** of the Act. An alien, who has been paroled under **section 212(d)(5)(A)** of the Act "[is] still in theory of law at the boundary line and [has] gained no foothold in the United States." *Leng May Ma v. Barber* , 357 U.S. 185, 188-189 (1958), *quoting Kaplan v. Tod* , 267 U.S. 228 (1925).

Parole may be granted on a case-by-case basis for urgent humanitarian reasons (humanitarian parole) or for significant public benefit. *See* **section 212(d)(5)(A)** of the Act and **8 CFR 212.5** .

Deferred inspection and advance parole are parole, as are individual port of entry paroles and paroles

authorized while a person is overseas. **Section 212(a)(9)(B)(ii)** of the Act makes clear that an alien, who has been paroled, does not accrue unlawful presence as long as the parole lasts.

For purposes of unlawful presence, the reason for the grant of parole is irrelevant. For more information on parole pursuant to **section 212(d)(5)** of the Act, *see AFM* **chapter 54** .

Only parole under **section 212(d)(5)(A)** of the Act qualifies as parole for purposes of **section 212(a)(9)** of the Act. In an April 1999 memorandum and an August 1998 legal opinion (Legal Opinion No. 98-10, August 21, 1998), former INS suggested that a release under **section 236** of the Act (conditional parole) could also be considered "parole" for purposes of adjustment of status under the Cuban Adjustment Act .

The Board of Immigration Appeals (BIA) has rejected this interpretation in at least one unpublished decision. *See Matter of Ortega-Cervantes,* 2005 WL 649116 (BIA, January 6, 2005). The Ninth Circuit confirmed the BIA's decision and held that release under **section 236** of the Act was not "parole" for purposes of adjustment of status. *See Ortega-Cervantes v. Gonzales* , 501 F.3d 1111 (9th Cir. 2007).

DHS/Office of the General Counsel reconsidered that aspect of the 1999 memorandum, and the related 1998 legal opinion. On September 28, 2007, it issued a memorandum stating that release under **section 236** of the Act is not deemed to be a form of parole under **section 212(d)(5)** of the Act. *See* September 28, 2007 Memorandum, Office of the General Counsel of the Department of Homeland Security, *Clarification of the Relation Between Release Under Section 236 and Parole Under Section 212(d)(5) of the Immigration and Nationality Act* .

As of the release of this *AFM* chapter, the Ninth Circuit is the only circuit that has decided this issue, although several circuits have cases outstanding. If the adjudicator encounters the issue, he or she is advised to inquire with the USCIS Office of the Chief Counsel (Adjudications Law Division) about the status of any pending litigation or further developments.

(4) General Considerations when Counting Unlawful Presence Time Under Sections 212(a)(9)(B) and 212(a)(9)(C)(i)(I) of the Act

(A) Unlawful Presence for Purposes of the 3-Year and 10-Year Bars Is Not Counted in the Aggregate

**Section 212(a)(9)(B)(i)** of the Act only applies to an alien, who has accrued the required amount of unlawful presence during any single stay in the United States; the length of the alien's accrued unlawful presence is not calculated by combining periods of unlawful presence accrued during multiple unlawful stays in the United States.

If, during any single stay, an alien has more than one (1) period during which the alien accrues unlawful presence, the length of each period of unlawful presence is added together to determine the total period of unlawful presence time accrued during that single stay.

**Reminder**

The statutory provisions of the 3-year and the 10-year bars became effective on or after April 1, 1997. An alien, who was unlawfully present in the United States prior to April 1, 1997, started to accrue unlawful presence on April 1, 1997, if he or she remained present in the United States at that time. An alien, who was unlawfully present in the United States prior to April 1, 1997, but departed prior to April 1, 1997, did not accrue any unlawful presence for purposes of **section 212(a)(9)(B)** of the Act.

**Example 1**

An alien's status becomes unlawful, and the alien begins to accrue unlawful presence on April 1, 2004. On September 1, 2004 (150 days after April 1, 2004), the alien files an adjustment of status application. The alien does not accrue unlawful presence while the adjustment application is pending. *See AFM* **chapter 40.9.2(b)(3)(A)** .

The adjustment application is denied on October 15, 2006 (administratively final decision). After the denial, the alien continues to remain in the United States unlawfully; the accrual of unlawful presence resumes on October 16, 2006, a day after the application is denied.

The alien leaves the United States on January 1, 2007. At that time, the individual had accrued unlawful presence from April 1, 2004 to September 1, 2004, and again from October 16, 2006 to January 1, 2007. The total period of unlawful presence time accrued during this single unlawful stay exceeds 180 days.

By departing the United States on January 1, 2007, the alien triggered the three-year bar and is inadmissible under **section 212(a)(9)(B)(i)(I)** of the Act.

**Example 2**

An alien's status becomes unlawful, and the alien begins to accrue unlawful presence on April 1, 2004. On September 1, 2004, the alien leaves the United States. The alien returns unlawfully on October 15, 2006. He departs the United States again on January 1, 2007.

Although the alien has been unlawfully present in the United States for more than 180 days in the aggregate, the unlawful presence was accrued during two (2) separate stays in the United States; during each of these stays, the alien accrued less than 180 days of unlawful presence. Thus, the alien is not inadmissible under **section 212(a)(9)(B)(i)(I)** of the Act.

(B) Unlawful Presence for Purposes of the Permanent Bar Is Counted in the Aggregate

Under **section 212(a)(9)(C)(i)(I)** of the Act, the alien's unlawful presence is counted in the aggregate, i.e. the total amount of unlawful presence time is determined by adding together all periods of time during which an alien was unlawfully present in the United States on or after April 1, 1997.

Therefore, if an alien accrues a total of more than one (1) year of unlawful presence time, whether accrued during a single stay or during multiple stays , departs the United States, and subsequently reenters or attempts to reenter without admission, he or she is subject to the permanent bar of **section 212(a)(9)(C)(i)(I)** of the Act.

| Example |
| --- |
| An alien enters the United States unlawfully on April 1, 2004, and leaves on September 1, 2004. The alien has accrued about 150 days of unlawful presence at this time. She reenters the United States unlawfully on January 1, 2005 and stays until November 1, 2005. This time, the alien has accrued 300 days of unlawful presence. |
| Although neither period of unlawful presence exceeds one (1) year, the aggregate period of unlawful presence does exceed one (1) year by totaling 450 days of unlawful presence, which the alien accrued during both stays. If the alien ever returns or attempts to return to the United States without being admitted, he or she will be inadmissible under **section 212(a)(9)(C)(i)(I)** of the Act. |

(C) Specific Requirements for Inadmissibility under Section 212(a)(9)(B)(i)(I) of the Act (The 3-Year Bar)

For the three-year bar to apply, the individual must have accrued at least 180 days but less than one (1) year of unlawful presence, and thereafter, must have departed voluntarily prior to the commencement of removal proceedings. Any period of unlawful presence accrued prior to April 1, 1997, does not count for purposes of **section 212(a)(9)(B)(i)(I)** of the Act.

The alien does not need a formal grant of voluntary departure by DHS for his or her departure to be considered voluntary. However, if DHS grants voluntary departure, the departure is still voluntary because removal proceedings have not yet commenced.

The statutory language of **section 212(a)(9)(B)(i)(I)** of the Act specifically requires that the alien must have departed the United States prior to the commencement of removal proceedings. Removal proceedings commence with the filing of the Notice to Appear (NTA) with the immigration court following service of the NTA on the alien. *See* **8 CFR 1003.14** .

An alien, who departs the United States after the NTA has been filed with the immigration court, therefore, is not subject to the three-year bar according to the statutory language.

To avoid future inadmissibility, however, the alien must leave before he or she has accrued more than one year of unlawful presence, and becomes inadmissible under **section 212(a)(9)(B)(i)(II)** of the Act, rather than **section 212(a)(9)(A)(i)(I)** of the Act. This provision provides the alien with an incentive to end his or her unlawful presence by leaving the United States, rather that contesting removal.

The burden is on the applicant to establish that the NTA had already been filed by the time the applicant had departed. The record of proceedings before the immigration court will generally indicate when the NTA was actually filed, and the filing date shown in the court's record will be controlling.

Even if the applicant is not subject to the three-year or the ten-year bar, there may be other grounds of inadmissibility that apply based on the fact that the removal proceedings were initiated and the alien departed the United States during the proceedings. For example, a conviction that made the alien subject to removal as a deportable alien may also make the alien inadmissible.

(D) Specific Requirements for Inadmissibility under Section 212(a)(9)(B)(i)(II) of the Act (The 10-Year Bar)

An alien, who voluntarily departs the United States or who was removed from the United States after having been unlawfully present for more than one (1) year, triggers the 10-year bar to admission under **section 212(a)(9)(B)(i)(II)** of the Act. Any period of unlawful presence accrued prior to April 1, 1997 does not count for purposes of section 212(a)(9)(B)(i)(II) of the Act.

Unlike the 3-year bar, the 10-year bar applies even if the alien leaves after removal proceedings have commenced; the individual will be inadmissible, even if he or she leaves after the NTA has been filed with the immigration court. Moreover, filing the NTA does not stop the accrual of unlawful presence. **8 CFR 239.3** .

(E) Specific Requirements for Inadmissibility under Section 212(a)(9)(C)(i)(I) of the Act (The Permanent Bar)

(i) General Requirements

To be permanently inadmissible under **section 212(a)(9)(C)(i)(I)** of the Act, an alien must have accrued more than one (1) year of unlawful presence in the aggregate, must have left the United States thereafter, and must then have entered or attempted to reenter the United States without being admitted. Any unlawful presence accrued prior to April 1, 1997, or any unlawful entry or attempted reentry into the United States prior to April 1, 1997, does not count for purposes of inadmissibility under section 212(a)(9)(C)(i)(I) of the Act.

(ii) Special Note on the Effect of An Alien's Entry on Parole After Having Accrued More Than One (1) Year Of Unlawful Presence

Is an alien, who had accrued more than one (1) year of unlawful presence, and who is paroled into the United States but not admitted, subject to **section 212(a)(9)(C)(i)(I)** of the Act?

An alien's inadmissibility under section 212(a)(9)(C)(i)(I) of the Act is fixed at the time of the alien's unlawful entry or attempted reentry.

An alien who had accrued more than one (1) year of unlawful presence, and who has *never* returned or attempted to return without admission after that unlawful presence, and who is paroled into the United States pursuant to **section 212(d)(5)** of the Act, but not admitted, is not subject to inadmissibility under **section 212(a)(9)(C)(i)(I)** of the Act.

It is the Department of Homeland Security's (DHS) policy that for purposes of section 212(a)(9)(C)(i)(I) inadmissibility, an alien's parole is <u>not</u> deemed to be an "entry or attempted reentry without being admitted," even though parole is not considered admission. *See* **section 101(a)(13)(B)** and **section 212(d)(5)(A)** of the Act.

This conclusion reflects the legal principle that, although a parolee is actually allowed to physically enter the United States, a parolee is deemed to be at a port of entry, pending a final decision on whether to admit the alien or not. *See Leng May Ma v. Barber* , 357 U.S. 185, 188-189 (1958), *quoting Kaplan v.Tod* , 267 U.S. 228 (1925).

As noted, however, an alien's inadmissibility for returning unlawfully after accruing sufficient unlawful presence is fixed at the time of the alien's unlawful return or attempt to return. Paroling an alien who is already inadmissible does not relieve the alien of inadmissibility.

For example, if an alien who is already present in the United States without being admitted because he or she entered without inspection, and who, in the past, had accumulated unlawful presence in excess of one (1) year, is taken into custody, and then later paroled pursuant to **section 212(d)(5)** of the Act, the alien's parole would not relieve the alien of inadmissibility under **section 212(a)(9)(C)(i)** of the Act.

For a more detailed explanation and examples, see **AFM Chapter 40.9.2(a)(6)(B)** .

(5) <u>Triggering the Bar by Departing the United States</u>

An alien must leave the United States after accruing more than 180 days or one (1) year of unlawful presence in order to trigger the 3-year or 10-year bar to admission under **section 212(a)(9)(B)** of the Act. This includes departures made while traveling after having approved advance parole or with a valid refugee travel document. *See* **AFM Chapter 40.9.2(a)(6)** .

| |
|---|
| **Note:** |
| By granting advance parole or a refugee travel document, USCIS does not authorize the alien's departure from the United States; it merely provides a means for the alien to return to the United States, regardless of admissibility. Therefore, even if the alien has an advance parole document, the alien's actual departure from the United States will still trigger the bar to inadmissibility under **section 212(a)(9)(B)** of the Act. |

**Section 212(a)(9)(C)(i)(I)** of the Act does not explicitly mention "departure" as a prerequisite for the bar to apply. However, according to the wording of the statute, an alien with the requisite period of unlawful presence must "enter or attempt to enter without admission" in order to incur inadmissibility.

Thus, the alien cannot violate the provision unless the alien leaves the United States and then returns or attempts to return. *See Matter of Rodarte-Roman* , 23 I&N Dec. 905 (BIA 2006) (Departure triggers the bars; the IJ erred when denying adjustment of status because of the individual's accrual of unlawful presence in excess of one (1) year without departure).

(6) Triggering the 3-Year and the 10-Year Bars But Not the Permanent Bar When Departing with Advance Parole or with a Refugee Travel Document

(A) Travel on Advance Parole Issued to Applicants for Adjustment of Status on **Form I-512 ,** Authorization For Parole Of An Alien Into The United States, pursuant to **8 CFR 212.5(f)** and **8 CFR 245.2(a)(4)**

An alien with a pending adjustment of status application, who has accrued more than 180 days of unlawful presence time, will trigger the bars to admission, if he or she travels outside the United States subsequent to the issuance of an advance parole document.

When the alien presents the advance parole document at a port of entry, he or she may be permitted to return to the United States as a parolee because aliens who request parole into the United States are not required to establish admissibility under **section 212(a)** of the Act.

However, the fact that the alien is permitted to return to the United States as a parolee does not confer a waiver of inadmissibility under **section 212(a)(9)(B)(i)(I)** and **(II)** of the Act. Consequently, a waiver under **section 212(a)(9)(B)(v)** of the Act would be required when determining the alien's eligibility to adjust status to lawful permanent residence.

(B) A Special Note on the Effect on Section 212(a)(9)(C) of the Act of an Alien's Entry on Parole After Having Accrued More Than One (1) Year Of Unlawful Presence

Parole is not admission. *See* **section 101(a)(13)(B)** of the Act. An individual is subject to **section 212(a)(9)(C)(i)(I)** of the Act, if he or she has accrued more than one (1) year of unlawful presence in the United States during a single stay or during multiple stays, who departs, and subsequently enters or attempts to reenter "without being admitted."

The statutory language omits the word "parole" and makes it unclear whether an alien, who enters on parole, triggers the bar to inadmissibility under **section 212(a)(9)(C)** of the Act.

Therefore, if an alien is paroled into the United States pursuant to **section 212(d)(5)(A)** of the Act after

having accrued more than one (1) year of unlawful presence, is he or she inadmissible under **section 212(a)(9)(C)(i)(I)** of the Act because the alien was not "admitted"? The answer is "no" for the following reason:

An alien's inadmissibility pursuant to section 212(a)(9)(C)(i)(I) of the Act is fixed as of the date of the alien's entry or attempted reentry without being admitted.

If an alien, who has accrued unlawful presence in excess of one (1) year, came to a port of entry and applied for admission to the United States or asked to be paroled into the United States, the alien will not be deemed to have attempted to enter the United States without "being admitted," if DHS actually paroles the alien.

The significant point is that the alien will have arrived at a port of entry and presented himself or herself for inspection. If the alien is paroled, the alien will continue to be considered an applicant for admission, and so cannot be said to have entered or attempted to enter without admission.

Thus, if DHS paroles the alien under **section 212(d)(5)** of the Act, the alien's departure and subsequent return as a parolee does not trigger the **section 212(a)(9)(C)(i)(I)** -bar for purposes of a subsequent admissibility determination by DHS (such as at the time of the adjustment of status adjudication).

This conclusion reflects the legal principle that, although a parolee is actually allowed to physically enter the United States, a parolee is deemed to be at a port of entry, pending a final decision on whether to admit the alien or not. *See Leng May Ma v. Barber* , 357 U.S. 185, 188-189 (1958), *quoting Kaplan v. Tod* , 267 U.S. 228 (1925).

| **Example:** |
|---|
| As an example, assume the following: |
| ·    An alien enters the United States on a B visa: |
| ·    The status expires on January 1, 2000. |
| ·    On January 2, 2000, the individual commences to accrue unlawful presence as having overstayed his or her period of admission. |
| ·    The alien applies for adjustment of status on January 1, 2005. |
| The individual is in authorized stay during the pendency of the adjustment of status application and does not accrue unlawful presence. See **AFM chapter 40.9.2(b)(3)(A)** . |
| Based on the pending adjustment application, the alien applies for advance parole ( **Form I-131** ) which is approved. The alien then leaves the United States on April 1, 2005; at this time, the alien has triggered |

the 10-year bar to admission to the United States because the alien had accrued unlawful presence in excess of one (1) year (from January 2, 2000, to January 1, 2005).

On April 15, 2005, the alien returns to the United States through a port of entry, presents his advance parole document, and is paroled into the United States. The alien will not be considered to have triggered inadmissibility under **section 212(a)(9)(C)(i)(I)** of the Act.

Because the alien is currently a parolee, the alien is deemed to still be at the port of entry. At the time of the adjudication of the adjustment of status application, the alien's request for admission (through the adjustment of status application) will be decided.

Thus, the individual is a parolee, he or she is not deemed to have "entered or attempted to reenter without being admitted."

**Note:**

The alien still may be inadmissible under **section 212(a)(9)(B)** of the Act at the time of the adjustment of status application.

By contrast, the parole of an alien after the alien had already become inadmissible under **section 212(a)(9)(C)(i)** would not relieve the alien of inadmissibility under section 212(a)(9)(C)(i) of the Act.

**Example**

As an example, assume the following: An alien enters the United States on a B visa. The status expires on January 1, 2000. On January 1, 2000, the alien commences to accrue unlawful presence for having overstayed his or her period of admission.

The alien applies for adjustment of status on January 1, 2005. The alien departs the United States and returns illegally by crossing the border 30 miles west of the nearest port of entry on April 15, 2005.

The alien is now inadmissible under **section 212(a)(9)(C)(i)(I)** of the Act. (An additional consequence, unrelated to the illegal entry, is that the alien also abandoned his or her adjustment application).

Even if the alien were later taken into custody and paroled under **section 212(d)(5)** of the Act, or were to *later* travel and return on a grant of advance parole, the alien would remain inadmissible under section 212(a)(9)(C)(i)(I) of the Act since the alien did, in fact, enter without admission after having accrued the requisite period of unlawful presence.

The instructions to **Form I-131**, Application for Travel Document, and **Form I-485**, Application to Register Permanent Residence or Adjust Status, as well as the standard **Form I-512**, Authorization for Parole of an Alien into the United States, include language warning the alien that traveling abroad and returning to the United States by using Form I-512 may make the alien inadmissible under **section 212(a)(9)(B)** of the Act.

(C) <u>Travel on a Valid Refugee Travel Document Issued pursuant to Section 208(c)(1)(C) of the Act and 8 CFR 223</u>

An asylee who had accrued more than 180 days of unlawful presence time prior to having filed the bona fide asylum application, will trigger the bar to admission, if he or she departs the United States while traveling on a valid refugee travel document. When the asylee presents the travel document at a port of entry, he or she can be permitted to reenter the United States to resume status as an asylee; however, the asylee will be inadmissible when he or she applies to adjust status to lawful permanent reside nt, and a waiver would be required at that time.

(7) <u>Multiple Grounds of Inadmissibility and the Relationship Between Sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act</u>

**Sections 212(a)(9)(B)(i)(I)** , **(B)(i)(II)** , and **(C)(i)(I)** of the Act establish different grounds of inadmissibility based on prior unlawful presence. Whether a specific ground applies to an alien depends on an analysis of the facts of the person's case in light of that specific ground.

It is possible that the alien's immigration history makes the alien inadmissible under *both* **section 212(a)(9)(B)** of the Act and section 212(a)(9)(C)(i)(I) of the Act.

| **Example:** |
| --- |
| An alien with more than one (1) year of unlawful presence leaves the United States, thus triggering the 10-year bar to admissibility under section 212(a)(9)(B)(i)(II) of the Act. |
| Three (3) years after the alien's last departure, the alien returns to the United States and enters illegally, thus without having been admitted. The alien is now inadmissible under sections 212(a)(9)(B)(i)(II) and 212(a)(9)(C)(i)(I) of the Act. |

Also, an alien with sufficient unlawful presence who is removed from the United States, may be inadmissible under section 212(a)(9)(A), as well as section 212(a)(9)(B)(i)(II) and/or section 212(a)(9)(C)(i) of the Act depending on the circumstances of the individual case.

(8) <u>Benefits That May Be Available Despite Inadmissibility under Section 212(a)(9)(B)(i)(I), (B)(i)(II), or (C)(i)(I) of the Act</u>

**AFM Chapter 40.9.2(c)** specifies forms of relief from inadmissibility under **Sections 212(a)(9)(B)(i)(I)** , **(B)(i)(II)** , and **(C)(i)(I)** of the Act ("Waivers"). Even without a grant of a waiver, aliens who are subject to these grounds of inadmissibility, may still obtain certain benefits as outlined below in **AFM Chapters 40.9.2(b)(2)** and **40.9.2(b)(3)** , if otherwise eligible.

(A) Under Section 212(a)(9)(B)(i)(I) or (II) of the Act . An alien, who is inadmissible under **section 212(a)(9)(B)(i)** of the Act may apply for and receive, if eligible, a grant of:

· Registry under **section 249** of the Act;

· Adjustment of status under section 202 of NACARA;

· Adjustment of status under section 902 of HRIFA ;

· Adjustment of status under section **245(h)(2)(A)** of the Act;

· Change to V nonimmigrant status under **8 CFR 214.15** (but the alien may need a waiver to obtain adjustment of status to LPR after having acquired V nonimmigrant status);

· LPR status pursuant to the LIFE Legalization Provision: A Legalization applicant under section 1104 of the LIFE Act may travel with authorization during the pendency of the application without triggering inadmissibility under **section 212(a)(9)(B)** of the Act. *See* **8 CFR 245a.13(e)(5)** .

(B) Under Section 212(a)(9)(C)(i)(I) of the Act

An alien who is inadmissible under section 212(a)(9)(C)(i)(I) of the Act may apply for and receive, if eligible, a grant of registry under **section 249** of the Act.

(C) Special Concerns Regarding Section 245(i) − Applications

The USCIS position is that inadmissibility under **section 212(a)(9)(B)** or **(C)** of the Act makes an alien ineligible for adjustment of status under section 245 of the Act, regardless of whether the alien applies under **section 245(a)** or **section 245(i)** of the Act.

The BIA has endorsed this view. In *Matter of Briones* , 24 I&N Dec. 355 (BIA 2007), the Board held that an alien who is inadmissible under section 212(a)(9)(C)(i)(I) of the Act is not eligible for adjustment under section 245(i) of the Act. An alien who is inadmissible under section 212(a)(9)(B) of the Act is also ineligible for section 245(i) adjustment. *Matter of Lemus* , 24 I&N Dec. 373 (BIA 2007).

USCIS adjudicators will follow *Matter of Briones* and *Matter of Lemus* in all cases, regardless of the decisions of the Ninth Circuit in *Acosta v. Gonzales,* 439 F.3d 550 (9th Cir. 2006) or of the Tenth Circuit in *Padilla-Caldera v. Gonzales,* 453 F.3d 1237 (10th Cir. 2005). Following these Board cases, rather than *Acosta* and *Padilla-Caldera* , will allow the Board to reexamine the continued validity of these court decisions.

USCIS adjudicators should also be aware that the Ninth Circuit has held that the Board's decision in *Matter of Torres-Garcia*, 23 I&N Dec. 866 (BIA 2006) is entitled to judicial deference, and that the decision in *Perez-Gonzales v. Ashcroft*, 379 F.3d 783 (9th Cir. 2004), is no longer good law. *Gonzales v. Department of Homeland Security*, 508 F.3d 1227 (9th Cir. 2007).

(9)   Effective Date of Sections 212(a)(9)(B) and (C)(i)(I) of the Act

(A)  Effective Date

Only periods of unlawful presence spent in the United States after the April 1, 1997, effective date of the **Illegal Immigration Reform and Immigrant Responsibility Act of 1996** (Div. C of Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act of 1997, PL 104-208 (September 30, 1996))(IIRIRA), count towards unlawful presence for purposes of **section 212(a)(9)(B)** and **(C)(i)(I)** of the Act.

For purposes of section 212(a)(9)(C)(i)(I) of the Act, one (1) full year of unlawful presence must have accrued. Therefore, the earliest an individual could have been subjected to this ground of inadmissibility was April 2, 1998.

(B)  The Child Status Protection Act and Its Influence on Unlawful Presence

On August 6, 2002, the **Child Status Protection Act** (CSPA) (PL 107-208, August 6, 2002) was enacted to provide relief to certain children, who "aged-out" during the processing of certain applications.

The CSPA applies to derivative children of asylum and refugee applicants, children of United States citizens, children of Lawful Permanent Residents (LPRs), and derivative beneficiaries of family-based, employment-based, and diversity visas.

The CSPA changes how a child's age should be calculated for purposes of eligibility for certain immigration benefits; it does not change the definition of "child" pursuant to **section 101(b)(1)** of the Act.

The CSPA was effective on August 6, 2002. In general, its provisions are not retroactive: Any qualified petition or application that was pending on the effective date is subject to the provisions of the CSPA. For detailed information, consult the policy memorandum, Domestic Operations, April 30, 2008, Revised Guidance for the Child Status Protection Act (AD07-04), or **AFM Chapter 21.2(e)** .

Calculation of Unlawful Presence, if the CSPA Is Applicable : Any derivative beneficiary child who is in a "period of stay authorized" because of a pending application or petition, does not accrue unlawful presence merely because of his or her "aging-out," if the requirements and conditions of the CSPA are met. For more information about the applicability of the CSPA, *see* *AFM* sections describing individual types of immigration benefits and **Chapter 21.2(e)** .

The CSPA applies only to those benefits expressly specified by the statute. Nothing in the CSPA provides protection for nonimmigrant visa holders (such as K or V nonimmigrants), or to NACARA, HRIFA, Family Unity, Cuban Adjustment Act, and Special Immigrant Juvenile Applicants, and/or derivatives.

However, there may be limited coverage for K-2 and K-4 individuals. *See* **Chapter 21.2(e)** . This list is not exhaustive.

(b) Determining When an Alien Accrues Unlawful Presence

(1) Aliens Present in Lawful Status or as Parolees

An alien does not accrue unlawful presence, if he or she is present in the United States under a period of stay authorized by the Secretary of Homeland Security, or if he or she has been inspected and paroled into the United States and the parole is still in effect.

An alien who is present in the United States without inspection accrues unlawful presence from the date of the unlawful arrival, unless the alien is protected from the accrual of unlawful presence as described in this *AFM* chapter.

| **Note:** |
| --- |
| An alien, who arrived at a port of entry and obtained permission to come into the United States by making a knowingly false claim to be a citizen, is present in the United States without having been inspected and admitted. *See Matter of S--*, 9 I&N Dec. 599 (BIA 1962). |

(A) Lawful Permanent Residents (LPRs )

An alien lawfully admitted for permanent residence will not accrue unlawful presence unless the alien becomes subject to an administratively final order of removal by the IJ or the BIA (which means that during the course of proceedings, the alien was found to have lost his or her LPR status), or if he or she is otherwise protected from the accrual of unlawful presence. Unlawful presence will start to accrue the day after the order becomes administratively final, and not on the date of the event that made t he alien subject to removal.

(B) Lawful Temporary Residents (Section 245A(b) of the Act and 8 CFR 245a)

A lawful temporary resident must file an application to adjust from temporary to permanent resident status before the beginning of the 43 third month from the date he or she was granted lawful temporary resident status. *See* **8 CFR 245a.3(a)(2)** .

However, unlike conditional permanent residents, the status of a lawful temporary resident does not

automatically terminate, if the alien fails to file a timely application, and DHS needs to advise the alien of its intent to terminate his or her Temporary Residence Status. *See* **section 245A(b)(2)** of the Act, and **8 CFR 245a.2(u)(2)** .

The same procedures apply, if the alien's status is terminated for the reasons specified in section 245A(b)(2) of the Act. Lawful Temporary Resident status also terminates upon the entry of a final order of deportation, exclusion, or removal. *See* 8 CFR 245.2(u)(2).

If DHS advises the alien of its intent to terminate lawful temporary resident status, the alien continues to be a lawful temporary resident and does not accrue unlawful presence until a notice of termination is issued.

If the termination is appealed, the period of authorized stay continues through the administrative appeals process. The termination of an alien's lawful temporary resident status cannot be reviewed in removal proceedings before an immigration judge. The alien would accrue unlawful presence time during removal proceedings or while a petition for review is pending in Federal court.

(C) Conditional Permanent Residents under Sections 216 and 216A of the Act

(i) Termination upon the Entry of an Administratively Final Order of Removal

As is the case with other LPRs, an alien lawfully admitted for permanent residence on a conditional basis under **section 216** or **216A** of the Act begins to accrue unlawful presence upon the entry of an administratively final order of removal.

A conditional LPR will also accrue unlawful presence before the entry of an administratively final removal order, if USCIS terminates the alien's conditional LPR status, as described below.

(ii) Automatic Termination

Pursuant to **section 216** or **216A** of the Act, an alien, who was granted conditional permanent resident status must properly file a petition to remove the conditions placed on his or her status within the 90-day period immediately preceding the second anniversary of the date on which lawful permanent resident status on a conditional basis was granted. *See* **Sections 216(c)(1)** and **216A(c)(1)** of the Act.

The petition is filed on **Form I-751** , Petition to Remove Conditions of Residence, or on **Form I-829** , Petition by Entrepreneur to Remove Conditions. *See* **8 CFR 216.4** and **8 CFR 216.6** .

Failure to do so results in the automatic termination of conditional resident status and the initiation of removal proceedings at the expiration of the 90-day period, unless the parties can establish good cause for failure to file the petition. *See* **section 216(c)(2)** and **8 CFR 216.4(a)(6)** ; **section 216A(c)(2)** and **8 CFR 216.6(a)(5)** ; section **216(c)(4)** and **8 CFR 216.5** .

The alien begins to accrue unlawful presence as of the date of the second anniversary of the alien's lawful admission for permanent residence. *See id* . Also, failure to appear for the personal interview that may be required by USCIS in relation to the Form I-751 or I-829 petition results in the automatic termination of the conditional legal permanent resident status, unless the parties establish good cause for the failure to appear. *See* **section 216(c)(2)(A)** of the Act and **8 CFR 216.4(b)(3)** ; **section 216A(c)(2)(A)** of the Act and **8 CFR 216.6(b)(3)** .

(iii) <u>Late Filings of the Petition to Remove the Conditional Basis Of LPR Status by the Alien</u>

Current regulations at **8 CFR 216.4(a)(6)** and **8 CFR 216.6(a)(5)** allow a conditional resident to submit a late filing to USCIS, if jurisdiction has not yet vested with the immigration judge, and if certain requirements are met. If the late filed petition is accepted and approved, no unlawful presence time will be deemed to have accrued.

If jurisdiction has already vested with the immigration judge, the judge may terminate removal proceedings upon joint motion by the alien and DHS. Consequently, if a late filing is accepted and approved while the alien is in proceedings, the alien will not accrue unlawful presence time.

If, however, the late filing is rejected, the alien begins to accrue unlawful presence time on the date his or her status as a conditional resident automatically terminated.

(iv) <u>Termination on Notice</u>

If DHS advises the alien of its intent to terminate conditional permanent resident status, the alien continues to be a conditional permanent resident and does not accrue unlawful presence until a notice of termination is issued.

The alien begins to accrue unlawful presence on the day after the notice of termination is issued, unless the alien seeks review of the termination in removal proceedings. *See* **8 CFR 216.3**.

(v) <u>Review in Removal Proceedings</u>

If the alien seeks review of the termination in removal proceedings, DHS bears the burden of proving that the termination was proper. Thus, the alien will be deemed not to accrue unlawful presence unless the immigration judge affirms the termination. *See* **8 CFR 216.3**.

If the immigration judge affirms the termination, the alien will begin to accrue unlawful presence on the day after the immigration judge's removal order becomes administratively final.

(D) <u>Aliens Granted Cancellation of Removal or Suspension of Deportation</u>

**Section 240A** of the Act provides for two (2) different types of cancellation of removal:

· Cancellation of removal for an alien who has been admitted for permanent residence, **section 240A(a)** of the Act, and

· Cancellation of removal and adjustment of status for certain aliens who have been present in the United States for a period of not less than ten (10) years, **section 240A(b)** of the Act.

Therefore, the effect of a grant of cancellation of removal on the accrual of unlawful presence (or of suspension of deportation under former section 244 of the Act) depends on the alien's status immediately before relief was granted, and as outlined below:

· If an alien who has already acquired LPR status becomes subject to removal but applies for and receives a grant of cancellation of removal under section 240A(a) of the Act, or a grant of suspension of deportation under former section 244 of the Act, the alien retains his or her LPR status. No period of unlawful presence will have accrued because the grant of cancellation or suspension prevents the loss of LPR status.

· If an alien who is not already an LPR obtains a grant of cancellation of removal under **section 240A(b)** of the Act, or a grant of suspension of deportation under former section 244 of the Act, the alien becomes an alien lawfully admitted for permanent residence as of the date of the final decision granting relief.

As such, the alien will no longer accrue unlawful presence after cancellation of removal or suspension of deportation is granted. Moreover, given the special nature of these forms of relief, any unlawful presence that may have accrued before the grant of cancellation of removal or suspension of deportation will be eliminated for purposes of any future application for admission.

| **Example** |
| --- |
| An alien had accrued ten (10) years of unlawful presence in the United States, and is subsequently granted cancellation of removal. The alien is now an LPR. If, after becoming an LPR, the alien travels abroad and returns to the United States through a port of entry, none of the pre-grant unlawful presence will be considered in determining the alien's admissibility. **Section 212(a)(9)(B)(i)** of the Act does not apply to LPRs. |

(E) <u>Lawful Nonimmigrants</u>

The period of authorized stay for a nonimmigrant may end on a specific date or may continue for "duration of status (D/S)." Under current USCIS policy, nonimmigrants begin to accrue unlawful presence as follows:

(i) <u>Nonimmigrants Admitted until a Specific Date (Date Certain)</u>

Nonimmigrants admitted until a specific date will generally begin to accrue unlawful presence the day following the date the authorized period of admission expires, as noted on **Form I-94** , Arrival/Departure Record.

If USCIS finds, during the adjudication of a request for immigration benefit, that the alien has violated his or her nonimmigrant status, unlawful presence will begin to accrue either the day after Form I-94 expires or the day after USCIS denies the request, whichever is earlier.

If an immigration judge makes a determination of nonimmigrant status violation in exclusion, deportation or removal proceedings, unlawful presence begins to accrue the day after the immigration judge's order or the day after the Form I-94 expired, whichever is earlier.

It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated. Removal proceedings have no impact on whether an individual is accruing unlawful presence. *See* **8 CFR 239.3** .

| **Example:** |
| --- |
| An individual is admitted in H-1B status until September 20, 2007, as evidenced on Form I-94, Arrival/Departure Record. On January 1, 2007, an NTA is issued and the individual is placed in removal proceedings. The individual will not start to accrue unlawful presence unless the immigration judge holds that the alien had violated his or her nonimmigrant status, or until his or her Form I-94 expires, whichever is earlier. |

(ii) <u>Nonimmigrants Admitted for Duration of Status (D/S).</u> If USCIS finds a nonimmigrant status violation while adjudicating a request for an immigration benefit, unlawful presence will begin to accrue on the day after the request is denied. If an immigration judge makes a determination of nonimmigrant status violation in exclusion, deportation, or removal proceedings, unlawful presence begins to accrue the day after the immigration judge's order. It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated. *See* 8 CFR 239.3.

 (iii) <u>Non-Controlled Nonimmigrants (for example, Canadian B-1/B-2)</u>

Nonimmigrants, who are not issued a **Form I-94**, Arrival/Departure Record, are treated as nonimmigrants admitted for D/S S (as addressed in Chapter 40.9.2(b)(1)(E)(ii)) for purposes of determining unlawful presence.

(F) Other Types of Lawful Status

(i) <u>Aliens in Refugee Status</u>

In general, the period of authorized stay begins on the date the alien is admitted to the United States in refugee status. If refugee status is terminated, unlawful presence will start to accrue the day after the refugee status is terminated.

If the individual is a derivative refugee, either by accompanying or by following to join the principal, the alien will commence to accrue unlawful presence as follows:

·    If the derivative refugee is outside the United States: The period of stay authorized begins on the date the alien either enters as an accompanying or following-to-join refugee pursuant to **section 207(c)(2)** of the Act and **8 CFR 207.7** .

·    If the derivative refugee is inside the United States: The accrual of unlawful presence ceases when USCIS accepts the filing of a bona fide Form I-730 , Asylee/Refugee Relative Petition, on the individual's behalf. USCIS interprets the language of **section 212(a)(9)(B)(iii)(II)** of the Act to apply to refugees and asylees alike.

Therefore, once the bona fide **Form I-730** petition is filed on behalf of the individual, the individual will be protected from the accrual of unlawful presence.

No period of time during which the bona fide petition is pending shall be taken into account in determining the period of unlawful presence. If the petition is subsequently denied, the individual will again begin to accrue unlawful presence, if the individual has previously accrued unlawful presence.

·    Because filing a Form I-730 stops the accrual of unlawful presence, but does not cure any unlawful presence that has already accrued, an individual who departs the United States during the pendency of the petition, with or without advance parole, will trigger the 3-year or the 10-year bar.

In this case and because an individual seeking refugee status has to be admissible as an immigrant pursuant to section 207 of the Act, the individual will be required to file Form I-602, Application by Refugee For Waiver of Grounds of Excludability, to overcome the bars to admissibility before the Asylee/Refugee Relative Petition can be approved.

If the alien is not permitted to reenter the United States, the individual will have to seek the waiver through the U.S. consulate where the approved I-730 is processed .

(ii) <u>Aliens Granted Asylum</u>

The period of authorized stay begins on the date the alien files a bona fide application for asylum. *See* **section 212(a)(9)(B)(iii)(II)** of the Act; *see also* **AFM Chapter 40.9.2(b)(2)(B)** of this chapter.

This includes aliens, who entered the United States illegally but who were subsequently granted asylum. If asylum status is terminated, unlawful presence starts to accrue the day after the date of termination. A grant of asylum does not eliminate any prior periods of unlawful presence.

An individual who is included in the principal's asylum application, Form I-589 , as a derivative beneficiary is in a period of stay authorized as of the date the principal applicant is in a period of stay authorized (unless he or she works without authorization or it is deemed that the application for the derivative individual is not bona fide).

However, if it is determined that the asylum application is not bona fide for reasons other than the ones to be attributed to the derivative beneficiary, the individual is in a period of stay authorized until the determination is made that the application by the principal was not bona fide.

Also, if the principal works without authorization, the derivative beneficiary only commences to accrue unlawful presence at the time the determination is made that the principal had worked without authorization.

Finally, a derivative beneficiary, who is physically present in the United States, but who was not included on the asylum application, is protected from the accrual of unlawful presence once the qualifying asylee files an Asylee/Refugee Relative Petition on behalf of the individual.

DHS interprets the language of **section 212(a)(9)(B)(iii)(II)** of the Act to apply to all applicants for asylum, including derivative beneficiaries, who obtain their status through an Asylee/Refugee Relative Petition.

(iii) <u>Aliens Granted Temporary Protected Status (TPS) pursuant to Section 244 of the Act</u>

If an alien's TPS application has been granted, the alien is deemed to be in lawful nonimmigrant status for the duration of the grant. *See* **section 244(f)** of the Act; also s ee AFM **Chapter 40.9.2(b)(3)(G)** for the effect of a violation of TPS status on the accrual of unlawful presence, and for the effect of a pending TPS application on the accrual of unlawful presence.

If an alien is granted TPS, he or she is, while the grant is in effect, deemed to be in lawful nonimmigrant status for purposes of adjustment of status and change of status according to section 244(f) of the Act.

A grant of TPS does not, however, cure any unlawful presence that may have accrued before the grant of TPS. If the alien was present without inspection and admission or parole, the alien remains an alien who has not been inspected and admitted or paroled, despite the grant of TPS. *See* INS General Counsel Opinion, 91-27, March 4, 1991.

Therefore, if before TPS is granted, the applicant had previously accrued unlawful presence sufficient to trigger the bars, and the applicant travels outside the United States after having obtained advance parole, his or her departure triggers the bars for purposes of an adjustment of change of status application; that is, the individual may be ineligible to adjust despite the wording of **section 244(f)** of the Act, and depending on the basis upon which the alien seeks adjustment.

Also, if a waiver was granted for inadmissibility under **section 212(a)(9)(B)** or **(C)** of the Act for purposes of the TPS application, the alien is still inadmissible for purposes of adjustment of status because the standard of the waiver granted for TPS status is different than the one granted in relation to an immigrant benefits application (although both are filed on **Form I-601** , Application for Waiver of Grounds of Inadmissibility).

(G) <u>Aliens Present as Parolees</u> .

**Section 212(a)(9)(B)(ii)** of the Act makes clear that an alien, who has been paroled, does not accrue unlawful presence as long as the parole lasts.

For purposes of the accrual of unlawful presence, the specific type of parole and the reasons for the grant of parole do not matter; however, conditional parole pursuant to **section 236** of the Act cannot be considered parole for purposes of **section 212(a)(9)(B)(ii)** of the Act. *See* AFM chapter 40.9.1(a)(3)(D).

An alien, who has been paroled into the United States does, however, begin to accrue unlawful presence as follows:

When a parolee remains in the United States beyond the period of parole authorization, unlawful presence begins to accrue the day following the expiration of the parole authorization.

| **Example:** |
| --- |
| The alien's parole expires January 1, 2007, and the alien does not depart. January 2, 2007 will be the alien's first day of unlawful presence. |

If the parole authorization is revoked or terminated prior to its expiration date, unlawful presence begins to accrue the day after the revocation or termination.

An alien paroled for the purpose of removal proceedings will begin to accrue unlawful presence the day after the date the removal order becomes administratively final, or unless the alien is otherwise protected from the accrual of unlawful presence.

(2) <u>Aliens Present in Unlawful Status Who Do not Accrue Unlawful Presence by Statute for Purposes of Section 212(a)(9)(B) of the Act (Statutory Exceptions)</u>

As noted in **AFM Chapter 40.9.2(a)(2)** , an alien must be in the United States in an unlawful status in order to accrue unlawful presence; however, there are some situations in which unlawful presence does not accrue despite unlawful status.

The alien may be protected from accruing unlawful presence by **section 212(a)(9)(B)** of the Act itself, or by USCIS policy. **AFM Chapter 40.9.2(b)(2)** deals with individuals, who are actually in unlawful status but who, by statute, do not accrue unlawful presence for purposes of section 212(a)(9)(B) of the Act.

The exceptions listed in AFM Chapter 40.9.2(b)(2) apply *only* to grounds of inadmissibility listed in section 212(a)(9)(B) of the Act, and *do not* apply for purposes of inadmissibility under **section 212(a)(9)(C)** of the Act.

There are two reasons for this conclusion:

·       The terms of **sections 212(a)(9)(B)(iii)** and **(iv)** of the Act refer *only* to specific subsections of **section 212(a)(9)(B)(i)** of the Act; and

·       Inadmissibility under **section 212(a)(9)(C)(i)(I)** of the Act rests on a more serious immigration violation than simple unlawful presence: To be inadmissible under section 212(a)(9)(C)(i)(I) of the Act, the alien must not only have accrued sufficient unlawful presence but also returned or attempted to return to the United States without admission.

Since the precise language of sections 212(a)(9)(B)(iii) and (iv) of the Act clearly make them apply only to inadmissibility under **section 212(a)(9)(B)** of the Act and not to inadmissibility under section 212(a)(9)(C)(i)(I) of the Act, and because violations of section 212(a)(9)(C)(i)(I) of the Act are more culpable than mere unlawful presence, USCIS has concluded that these statutory exceptions do not apply to section 212(a)(9)(C)(i)(I) cases. *See* June 17, 1997, Office of Programs memorandum – *Additional Guidance for Implementing Sections 212(a)(6) and 212(a)(9) of the Immigration and Nationality Act (Act)* ; *see also* **AFM Chapter 40.9.2(b)(3)** below for the same remark.

(A) <u>Minors Who Are under 18 Years of Age</u>

An alien whose unlawful status begins before his or her 18th birthday does not begin to accrue unlawful presence for purposes of **section 212(a)(9)(B)** of the Act until the day after his or her 18th birthday pursuant to **section 212(a)(9)(B)(iii)(I)** of the Act.

(B) <u>Aliens with Pending Asylum Applications (Including Children Aging Out and Dependents of Asylum Applicants)</u>

(i) <u>Principal Applicant</u>

An alien, whose bona fide application for asylum is pending, is in an authorized period of stay and does not accrue unlawful presence for purposes of **section 212(a)(9)(B)** of the Act unless the alien is employed without authorization while the application is pending. *See* **section 212(a)(9)(B)(iii)(II)** of the Act. It does not matter whether the application is or was filed affirmatively or defensively.

DHS has interpreted the phrase "bona fide asylum application" to mean a properly filed asylum application that has a reasonably arguable basis in fact or law, and is not frivolous. If this is the case, unlawful presence does not accrue while the application is pending unless the alien engages in unauthorized employment. DHS considers the application for asylum to be pending during any administrative or judicial review (including review in Federal court).

A denial of an asylum claim is not determinative of whether the claim was bona fide for purposes of section 212(a)(9)(B)(iii)(II) of the Act. Similarly, the abandonment of an application for asylum does not mean that the application was not bona fide.

The Asylum Division within the Refugee, Asylum, and International Operations Directorate at USCIS HQ can provide guidance regarding whether a filing of an asylum application can be deemed "bona fide" based on the specific facts of the case and should be contacted, if there are any questions as to the determination.

(ii) <u>Dependents in General</u>

An individual who is included in the principal's asylum application (Form I-589) as a derivative beneficiary is in a period of stay authorized as of the date the principal applicant is in a period of stay authorized (unless he or she works without authorization or it is deemed that the application for the derivative individual is not bona fide).

However, if it is determined that the asylum application is not bona fide for reasons other than the ones to be attributed to the dependent, the individual is in a period of stay authorized, for example until the determination is made that the application was not bona fide.

Also, if the principal works without authorization, the derivative beneficiary only commences to accrue unlawful presence at the time the determination is made that the principal had worked without authorization.

A dependent's asylum case is no longer considered pending if the principal asylum applicant notifies USCIS that the dependent is no longer part of the principal's application, or if USCIS determines that the dependent relationship no longer exists (for example because of divorce, or if the individual is no longer considered a "child").

In such cases, USCIS will remove the individual from the pending asylum application; the individual must file his or her own asylum application as a principal applicant within a reasonable amount of time.

The individual will commence to accrue unlawful presence from the time USCIS has removed the dependent from the principal's application. Individuals, who do file a bona fide application within a reasonable period of time, will be deemed to have a pending application and they do not accrue unlawful presence from the time the new bona fide application is pending.

Finally, a derivative beneficiary, who is physically present in the United States but who was not included on the asylum application, is in a period of stay authorized at the time the qualifying asylee files an Asylee/Refugee Relative Petition on behalf of the individual. DHS interprets the language of **section 212(a)(9)(B)(iii)(II)** of the Act to apply to all applicants for asylum, including derivative beneficiaries who obtain their status through an Asylee/Refugee Relative petition.

Adjudicators should keep in mind that if the principal asylum applicant's dependent is not yet 18 years old, then the dependent will be protected from accrual of unlawful presence under **section 212(a)(9)(B)(iii)(I)** of the Act.

(iii)  Children Who Age Out and The Child Status Protection Act (CSPA)

The CSPA amended **section 208(b)(3)(B)** of the Act to allow continued classification as a child for an unmarried son or daughter, who was under 21 years of age on the date the parent filed for asylum, provided that the son or daughter turned 21 years of age while the application remained pending.

Therefore, if the requirements of the CSPA are met (the alien is present in the United States, named in the asylum application of his or her parent, and the application was pending on or after August 6, 2002) the individual may continue to be classified as a "child" and can be considered to have a pending application. Thus, unlawful presence does not accrue in such cases.

| **Example:** |
|---|
| Form I-589, Application for Asylum and for Withholding of Removal, was filed on February 7, 2000, listing a 20-year old derivative son in the United States. The son turned 21 on October 1, 2000. The application remained pending through August 6, 2002, and continues to be pending. For purposes of the asylum application, the son continues to be a "child" because the application was filed prior to his 21 st birthday. The son will not start to accrue unlawful presence until and unless the application is denied. |

(C)  Aliens Physically Present in the United States with pending Forms I-730

Accrual of unlawful presence stops upon the filing of a bona fide Form I-730 , Asylee/Refugee Relative Petition. USCIS interprets the language of section **212(a)(9)(B)(iii)(II)** of the Act to apply to refugees and

asylees alike. Therefore, once the bona fide petition is properly filed on behalf of the individual, the individual will no longer accrue unlawful presence.

If the alien was already accruing unlawful presence when the Form I-730 was filed, and the Form I-730 is subsequently denied, the individual will again begin to accrue unlawful presence on the day after the denial of the petition.

If, at the time of the filing of the Form I-730, the alien was protected from the accrual of unlawful presence (for example, was in lawful status or had another application pending), but the other basis for protection expired while the Form I-730 was pending, then the alien will begin to accrue unlawful presence on the day after the denial of the Form I-730.

No period during which the bona fide Form I-730 was pending will be counted in determining the accrual of unlawful presence. Since the filing of a Form I-730 does not cure any unlawful presence that has already accrued, if the individual departs during the pendency of the petition, the individual will trigger the 3-year and the 10-year bar, if, prior to the filing of the petition, the individual has already accrued sufficient unlawful presence.

Because a refugee has to be admissible as an immigrant pursuant to **section 207** of the Act, the individual, upon his return to the United States, will be required to file Form I-602 , Application By Refugee For Wavier of Grounds of Excludability, to overcome the bars to admissibility before Form I-730 can be granted to confer derivative refugee status. If the alien departs without advance parole, the individual will have to seek the waiver through the U.S. consulate where the approved Asylee/Refugee Relative Petition will be processed.

(D) Beneficiary of Family Unity Protection (FUP) Granted pursuant to Section 301 of the Immigration Act of 1990; **8 CFR 236.15**

No period of time in which an alien is a beneficiary of FUP shall be taken into account in determining the period of unlawful presence in the United States, for purposes of **section 212(a)(9)(B)** of the Act. If the FUP application ( Form I-817 ) is approved, the accrual of unlawful presence will be deemed to have stopped as of the date of the filing of Form I-817, Application for Family Unity Benefits, and will continue through the period the alien retains FUP protection. The grant of FUP protection does not, however, erase prior unlawful presence.

The filing of Form I-817, by itself, does not stop the accrual of unlawful presence. If the Form I-817 is denied, the individual will continue to accrue unlawful presence as if no Form I-817 had been filed.

Section **212(a)(9)(B)(iii)(II)** of the Act, by its terms, applies only to Family Unity Program benefits under section 301 of the Immigration Act of 1990. Congress provided similar benefits under section 1504 of the LIFE Act Amendments of 2000. As a matter of policy, US CIS treats section 1504 FUP cases the same as

section 301 FUP cases, for purposes of the accrual of unlawful presence. See **AFM chapter 40.9.2(b)(3)(F)** .


(E) <u>Certain Battered Spouses, Parents, and Children</u>


An approved Violence Against Women Act of 1994 (VAWA) self-petitioner and his or her child(ren) can claim an exception from inadmissibility under **section 212(a)(9)(B)(i)** of the Act, if he or she can establish a substantial connection between the abuse suffered, the unlawful presence, and his or her departure from the United States.


He or she may claim this exception by submitting evidence of such substantial connection with his or her adjustment application. If the exception is granted, the individual is deemed to not be inadmissible under section 212(a)(9)(B)(i) of the Act for purposes of future immigration benefits. This exception does not apply to inadmissibility under **section 212(a)(9)(C)(i)** of the Act, which has its own VAWA waiver in **section 212(a)(9)(C)(iii)** of the Act.


(F) <u>Victims of Severe Form of Trafficking in Persons</u>


**Section 212(a)(9)(B)(i)** of the Act does not apply to certain victims of severe forms of trafficking. *See* **section 212(a)(9)(B)(iii)(V)** of the Act.


Similar to the battered spouses, a victim of a severe form of trafficking in persons may claim an exception to inadmissibility under section 212(a)(9)(B)(i) of the Act, if he or she can demonstrate that the severe form of trafficking (as that term is defined in section 7102 of Title 22 U.S.C.) was at least one central reason for the alien's unlawful presence in the United States.


An individual can claim the exception by submitting evidence of the central reason with **Form I-914** , Application for T Nonimmigrant Status, or, at the time of the adjustment, when filing **Form I-485** , Application to Register Permanent Residence or Adjust Status. *See* **8 CFR 214.11** ; **8 CFR 245.23** . If the exception is granted by USCIS, the individual will be deemed to have never accrued any unlawful presence for purposes of the current nonimmigrant benefits application or any future benefits application.


If the exception is not granted, the individual may apply for a discretionary waiver of the ground of inadmissibility. If seeking T nonimmigrant status, the alien would apply under **section 212(d)(3)(A)** or 212(d)(13) of the Act by filing **Form I-192** , Advance Permission to Enter as Nonimmigrant. *See* **8 CFR 212.16** . If the alien is already a T nonimmigrant, and is seeking adjustment of status, the alien would file Form I-601, Application for Waiver Grounds of Inadmissibility. *See* **8 CFR 212.18** .


(G) <u>Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS) ("Tolling")</u>


Pursuant to **section 212(a)(9)(B)(iv)** of the Act, a nonimmigrant, who has filed a timely request for

extension of nonimmigrant status (EOS) or change of nonimmigrant status (COS), is protected from accruing unlawful presence during the pendency of the application for up to 120 days (the accrual of unlawful presence is "tolled"). Section 212(a)(9)(B)(iv) of the Act is only applicable to the three-year bar of **section 212(a)(9)(B)(i)(I)** of the Act, and is also referred to as the "tolling-provision." However, unlawful presence for purposes of the 3-year bar will only be tolled, if:

· the alien has been lawfully admitted or paroled into the United States, and

· the application for EOS or COS is timely filed, and not frivolous, and

· the alien does not engage and/or has not been engaging in unauthorized employment. *See* section 212(a)(9)(B)(iv) of the Act.

By policy, USCIS has extended the 120-day statutory tolling period to cover the entire period during which an application for EOS or COS is pending; this extension is valid for the 3-year and the 10-year bars.

For a more detailed description of this extension and guidance concerning whether unlawful presence accrues after the 120-day period specified by the statute. *See* **AFM Chapter 40.9.2(b)(3)(C)** .

(3) Aliens Present in Unlawful Status Who Do not Accrue Unlawful Presence by Virtue of USCIS Policy for Purposes of Sections 212(a)(9)(B) and (C)(i)(I) of the Act

As noted in **AFM Chapter 40.9.2(a)(2)** , there are some circumstances in which an alien whose status is actually unlawful is, nevertheless, protected from the accrual of unlawful presence.

As a matter of policy, USCIS has determined that an alien whose status is actually unlawful does not accrue unlawful presence in the situations described in this subsection.

These exceptions are based on policy, unlike the statutory exceptions listed in **sections 212(a)(9)(B)(iii)** and **(iv)** of the Act that were discussed in **AFM Chapter 40.9.2(b)(2)** . It is USCIS' policy that these exceptions apply to unlawful presence accrued for purposes of **sections 212(a)(9)(B)** and (C)(i)(I) of the Act unless otherwise noted in this section.

(A) Aliens with Properly Filed Pending Applications for Adjustment of Status or Registry **( Sections 209 , 245** , and **245(i)** of the Act, **sections 202** of Public Law 99-603 (Cuban-Haitian Adjustment), section 202(b) of NACARA, section 902 of HRIFA, and aliens with properly filed, pending Registry applications under section 249 of the Act)

Accrual of unlawful presence stops on the date the application is properly filed pursuant to **8 CFR 103** and the regulatory filing requirements governing the particular type of benefit sought.

Note that, if the application is properly filed according to the regulatory requirements, the applicant will

not accrue unlawful presence, even if it is ultimately determined that the applicant was not eligible for the benefit in the first place. The accrual of unlawful presence is tolled until the application is denied.

| **Example:** |
|---|
| An alien, who has been unlawfully in the United States for 90 days, and who had worked without authorization during the 90 days, applies for adjustment of status based on an approved Form I-130, Petition for Alien Relative. |
| The application for adjustment of status is properly filed, that is, the application is fully executed, signed, and the applicant pays the proper fee. *See* **8 CFR 103.2(a)(7)** . Also, with the application package, the alien provides a copy of **Form I-797** , Notice of Approval for the Alien Relative Petition, and a copy of the newest Visa Bulletin, demonstrating that a visa number is immediately available in his or her preference category. *See* **8 CFR 245.2** . |
| Therefore, USCIS accepts the application and stamps it as received and properly filed as of January 1, 2007. What is not readily apparent from the initial review of the application is that the alien had previously worked without authorization, and therefore, he or she is not eligible to apply for adjustment of status pursuant to section 245(c) of the Act. |
| However, because the application was accepted by USCIS as (technically) properly filed, the applicant is now in authorized stay and does not accrue any unlawful presence during the pendency of the properly filed application for adjustment of status. |
| At the time of the interview, on April 1, 2007, the applicant's adjustment of status application is denied based on **section 245(c)** of the Act, for having been employed without authorization. |
| On April 2, 2007, the alien's accrual of unlawful presence resumes because he or she no longer has a pending application for adjustment of status. The alien departs the United States on May 1, 2007, after having secured an immigrant visa interview at the US Embassy/consular section in his or her home country. |
| In assessing the alien's inadmissibility under **section 212(a)(9)** of the Act, the consular officer will count the alien's 90 days of unlawful presence that accrued prior to the filing of the adjustment of status application, and the 30 days of unlawful presence that accrued after the adjustment of status application was denied. |
| However, the consular officer will not count the time period during which the adjustment of status application was pending because the individual was in a period of stay authorized and did not accrue unlawful presence during the pendency of the adjustment application. |

In total, the alien had accrued 120 days of unlawful presence in the United States; the alien is not i nadmissible under **section 212(a)(9)(B)** of the Act.

Except in the case of a NACARA or HRIFA application, the application must have been filed affirmatively (with USCIS) rather than defensively (before the immigration judge as a form of relief from removal) for it to toll the accrual of unlawful presence; that is, an alien, who files an application for adjustment of status

after being served with a Notice to Appear (NTA) in removal proceedings, is not protected from the accrual of unlawful presence.

Accrual of unlawful presence resumes the day after the application is denied. However, if the application that was filed with USCIS is denied, and the alien has a legal basis upon which to renew the application in proceedings before an immigration judge, the protection against the accrual of unlawful presence will continue through the administrative appeal. *See* for example for adjustment of status applications under **section 245** of the Act: **8 CFR 245.2(a)(5)(ii)** and **8 CFR 1245.2(a)(5)(ii)** .

(B) <u>Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS)("Tolling")</u>

As noted in **AFM chapter 40.9.2(b)(2)(G)** , by statute, an alien does not accrue unlawful presence for up to 120 days while a non-frivolous EOS or COS application is pending, provided that the alien does not work and/or has not worked unlawfully. This is referred to as "tolling:" while the application is pending after having been properly filed, the alien will not accrue unlawful presence. The above described statutory exception applies to **section 212(a)(9)(B)(i)(I)** of the Act; it does not apply to section **212(a)(9)(B)(i)(II)** or **(C)(i)(I)** of the Act.

However, according to USCIS policy, an alien does not accrue unlawful presence (the accrual of unlawful presence is tolled), and is considered in a period of stay authorized for purposes of sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act during the entire period a properly filed EOS or COS application is pending, if the EOS or COS application meets the following requirements:

· the non-frivolous request for EOS or COS was filed timely. To be considered timely, the application must have been filed with USCIS, i.e. be physically received (unless specified otherwise, such as mailing or posting date) before the previously authorized stay expired. *See* **8 CFR 103.2(a)(7)** ; **8 CFR 214.1(c)(4)** ; **8 CFR 248.1(b)** . An untimely request may be excused in USCIS' discretion pursuant to 8 CFR 214.1(c)(4) and 8 CFR 248.1(b); <u>and</u>

· the alien did not work without authorization before the application for EOS or COS was filed or while the application is pending; <u>and</u>

· the alien has not failed to maintain his or her status prior to the filing of the request for EOS or COS.

If these requirements are met, the period of authorized stay covers the 120-day tolling period described in **section 212(a)(9)(B)(iv)** of the Act and extends to the date a decision is issued on the request for EOS or COS.

A request for EOS or COS may be filed on **Form I-539** , Application to Extend/Change Nonimmigrant Status, or may be included in the filing of **Form I-129** , Petition for a Nonimmigrant Worker. S *ee* Section **AFM chapter 40.9.2(b)(2)(G)** for a detailed description of the statutory tolling provision

under section 212(a)(9)(B)(iv) of the Act, covering *only* inadmissibility under **section 212(a)(9)(B)(i)(I) of the Act** .

(C) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS) Who Depart the United States During the Pendency

Departure from the United States while a request for EOS or COS is pending, does not subject an alien to the 3-year, 10-year, or permanent bar, if he or she departs after the expiration of **Form I-94** , Arrival/Departure Record unless the application was frivolous, untimely, or the individual had worked without authorization.

D/S nonimmigrants, who depart the United States while an application for COS or EOS is pending, generally do not trigger the 3-year, 10-year, or permanent bar under **sections 212(a)(9)(B)(i)** or **212(a)(9)(C)(i)(I)** of the Act.

· Evidentiary Considerations

If the applicant subsequently applies for a nonimmigrant visa abroad, the individual has to establish to the satisfaction of the consular officer that the application was timely filed and not frivolous.

The requirement that the application was timely may be established through the submission of evidence of the date the previously authorized stay expired, together with a copy of a dated filing receipt, a canceled check payable to USCIS for the EOS or COS application, or other credible evidence of a timely filing.

· Determination by a Consular Officer that the Application Was Non-Frivolous

To be considered non-frivolous, the application must have an arguable basis in law and fact, and must not have been filed for an improper purpose (such as to prolong one's stay to pursue activities inconsistent with one's status).

In determining whether an EOS or COS application was non-frivolous, DOS has instructed consular posts that it is not necessary to make a determination that USCIS would have ultimately ruled in favor of the alien. *See* 9 Foreign Affairs Manual ( *FAM* ) 40.92 Notes, Note 5c.

(D) Nonimmigrants - Effect of a Decision on the Request for Extension of Status (EOS) or Change of Status (COS) on Unlawful Presence

The following information pertains to applications requesting EOS or COS, or petitions that include requests for EOS or COS.

(i) Approved Requests

If a request for EOS or COS is approved, the alien will be granted a new period of authorized stay, retroactive to the date the previous period of authorized stay expired. This applies to aliens admitted until a specific date and aliens admitted for D/S.

(ii) Denials Based on Frivolous Filings or Unauthorized Employment

If a request for EOS or COS is denied because it was frivolous or because the alien engaged in unauthorized employment, any and all time after the expiration date marked on Form I-94, Arrival/Departure Record, will be considered unlawful presence time, if the alien was admitted until a specific date. However, if the alien was admitted for D/S, unlawful presence begins to accrue on the date the request is denied.

(iii) Denials of Untimely Applications

If a request for EOS or COS is denied because it was not timely filed, unlawful presence begins to accrue on the date Form I-94 expired. If, however, the alien was admitted for D/S, unlawful presence begins to accrue the day after the request is denied.

(iv) Denials for Cause of Timely Filed, Non-Frivolous Applications for EOS or COS

If a timely filed, non-frivolous request for EOS or COS is denied for cause, unlawful presence begins to accrue the day after the request is denied.

(v) Motion to Reopen/Reconsider

The filing of a motion to reopen or reconsider does not stop the accrual of unlawful presence. *See* **8 CFR 103.5(a)(iv)** (Effect of motion or subsequent application or petition).

However, if the motion is successful and the benefit granted, the grant is effective retroactively. The alien will be deemed to not have accrued unlawful presence.

If DHS reopens proceedings, but ultimately denies the petition or application again, the petition or application will be considered to have been pending since the initial filing date.

Thus, unlawful presence will accrue as specified in **AFM Chapters 40.9.2(b)(3)(D)(ii)** , **(iii)** or **(iv)** above. In the case of a timely, non-frivolous application, unlawful

presence will accrue from the date of the last denial of the petition or application, not from the earlier, reopened decision.

(vi) Appeal to the Administrative Appeals Office (AAO) of the Underlying Petition Upon Which an EOS or COS Is Based

If an individual applies for an EOS or COS as part of a **Form I-129** , Petition for Nonimmigrant Worker, the adjudicator has to adjudicate two requests: The petition seeking a particular classification, and the request for an EOS or COS.

The denial of an EOS or COS cannot be appealed. *See* **8 CFR 214.1(c)(5)** and **8 CFR 248.3(g)** .

However, the denial of the underlying petition for the status classification can, in general, be appealed. The filing of an appeal to the AAO for the denial of the underlying petition, however, has no influence on the accrual of unlawful presence.

Unlawful presence starts to accrue on the day of the denial of the request for EOS or COS regardless of whether the applicant or the petitioner appeals the denial of the petition to the AAO.

However, if the denial of the underlying petition is reversed on appeal, and the EOS or COS subsequently granted, the individual is not deemed to have accrued any unlawful presence between the denial of the petition and request for EOS or COS, and the subsequent grant of the EOS or COS.

(vii) Nonimmigrants - Multiple Requests for EOS Or COS ("Bridge Filings") and Its Effect on Unlawful Presence

The terms "authorized status" (authorized period of admission or lawful status) and "period of stay authorized by the Secretary of Homeland Security" are not interchangeable. They do not carry the same legal implications. *See* **AFM Chapter 40.9.2(a)(2)** . An alien may be in a period of stay authorized by the Secretary of Homeland Security but not in an authorized status.

An alien whose authorized status expires while a timely filed request for EOS or COS is pending, is in a period of stay authorized by the Secretary of Homeland Security. The alien does not accrue unlawful presence as long as the timely filed request is pending.

However, the filing of a request for EOS or COS does not put an individual into valid and authorized nonimmigrant status, i.e. he or she is not in authorized status. Therefore, if an individual has filed an initial application for EOS or COS and subsequently files additional (untimely) requests for EOS or COS, the subsequently filed request will not stop the individual from accruing unlawful presence, if the initial request is denied.

(E) Aliens with Pending Legalization Applications, Special Agricultural Worker (SAW) Applications, and LIFE Legalization Applications

An alien who properly filed an application under **section 245A** of the Act (including an applicant for Legalization under any Legalization-related Class Settlement Agreements), **section 210** of the Act, or section 1104 of the LIFE Act, is in a period of authorized stay as long as the application remains pending. Accrual of unlawful presence stops on the date the application is filed and resumes the day after the application is denied.

However, if the denial is appealed, the period of authorized stay continues through the administrative appeals process. Denied applications cannot be renewed before an immigration judge. Therefore, the period of authorized stay does not continue through removal proceedings or while a petition for review is pending in Federal court.

(F) Aliens granted Family Unity Program Benefits under section 1504 of the LIFE Act Amendments of 2000

**Section 212(a)(9)(B)(iii)(III)** of the Act, by its terms, applies only to Family Unity Program (FUP) benefits under **section 301 of the Immigration Act of 1990** . Congress provided similar benefits under section 1504 of the LIFE Act Amendments of 2000. As a matter of policy, USCIS treats section 1504 FUP cases the same as section 301 FUP cases, for purposes of the accrual of unlawful presence.

As with section 301 FUP cases, if the Form I-817 is approved, then the alien will be deemed not to accrue unlawful presence from the Form I-817 filing date throughout the period of the FUP grant.

A grant of FUP benefits under section 1504 does not, however, erase any unlawful presence accrued before the grant of FUP benefits under section 1504 of the LIFE Act Amendments of 2000.

Also, as with section 301 FUP cases, the filing of Form I-817 , by itself, does not stop the accrual of unlawful presence. If the Form I-817 is denied, the individual will continue to accrue unlawful presence as if no Form I-817 had been filed.

(G) Aliens with Pending Applications for Temporary Protected Status (TPS) pursuant to **Section 244** of the Act

The period of authorized stay begins on the date a prima facie application for TPS is filed, provided the application is ultimately approved. If the application is approved, the period of authorized stay continues until TPS status is terminated.

If the application is denied, or if prima facie eligibility is not established, unlawful presence accrues as of the date the alien's previous period of authorized stay expired. The application for TPS can be renewed in removal proceedings pursuant to **8 CFR 244.11** and **8 CFR 1244.11** , and the period of authorized stay continues through removal proceedings.

(H) <u>Aliens Granted Voluntary Departure pursuant to Section 240B of the Act</u>

Voluntary departure is a discretionary relief that allows certain favored aliens to leave the country willingly. Voluntary departure can either be granted by DHS, by the immigration judge, or the Board of Immigration Appeals (BIA). The length of the voluntary departure period that can be granted depends on the stages of proceedings the alien is in.

If the alien is not in removal proceedings, DHS can grant voluntary departure for up to 120 days. *See* **section 240B(a)** and **8 CFR 240.25** . The denial of voluntary departure at this stage, cannot be appealed; however, the denial is without prejudice to the alien for a later application of voluntary departure in removal proceedings. See **8 CFR 240.25(e).**

If the alien is in removal proceedings but these proceedings are not yet completed, or if the alien's proceedings are at the conclusion, the immigration judge or the judge at the BIA, may grant voluntary departure. *See* **section 240B(a)** or **(b)** of the Act; **8 CFR 1240.26** . If the IJ denies voluntary departure, the denial can be appealed to the BIA . **8 CFR 1240.26(g)** . The time period granted can be up to 120 days if granted prior to completion, or up to 60 days if granted at the conclusion of proceedings. See **8 CFR 1240.26(e)** .

Under certain circumstances, the voluntary departure period can be extended, or voluntary departure reinstated. Voluntary departure is always granted in lieu of removal proceedings or a final order of removal. Therefore, if an alien timely departs according to the voluntary departure period, the alien is not subject to a final order of removal.

However, if the alien fails to depart, and there was an alternate order of removal, the alternate order will be become effective upon the alien's failure to depart. *See* **8 CFR 1240.26(d)** .

On December 18, 2008, the Department of Justice amended the voluntary departure rule; the changes became effective on January 20, 2009 and apply prospectively only. 73 FR 76927 (December 18, 2008).

The new rules clarified the relationship between voluntary departure and the filing of a motion to reopen/reconsider or petition for review. It also clarified the impact of the failure to post bond on voluntary departure and the alternate order of removal.

| **General Rule for the Accrual of Unlawful Presence in Connection With A Grant of Voluntary Departure** |
| --- |
| Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure. |

(i) <u>Voluntary Departure Granted by DHS pursuant to 8 CFR 240.25 (Including Extension of Voluntary Departure)</u>

If DHS grants voluntary departure before initiation of removal proceedings, time spent in voluntary departure does not add to an alien's unlawful presence. A grant of voluntary departure prior to the initiation of removal proceedings may not exceed 120 days. *See* **section 240B(a)(2)** of the Act. Pursuant to **8 CFR 240.25**, voluntary departure may be extended at the discretion of the Field Office Director, except that the total period allowed, including any extensions, may not exceed the 120-day limit. Courts may not extend voluntary departure but they may reinstate voluntary departure.

(ii) <u>Voluntary Departure Granted Pursuant to Section 240B of the Act after the Initiation of Removal Proceedings</u>

If a person is granted voluntary departure after commencement of removal proceedings, unlawful presence ceases to accrue with the grant, and resumes after the expiration of the voluntary departure period. Voluntary departure after the initiation of removal proceedings is governed by **section 240B(b)** of the Act and **8 CFR 1240.26**.

If the immigration judge grants voluntary departure, the alien is not subject to the 3-year bar because of the wording of **section 212(a)(9)(B)(i)(I)** of the Act. However, the fact that proceedings commenced does not stop the accrual of unlawful presence time for purposes of the 10-year and the permanent bar. *See* **8 CFR 239.3**.

(iii) <u>Reversal of a Denial of Voluntary Departure</u>

If the denial of voluntary departure by the Immigration Judge is reversed on appeal by the BIA, the time from the denial to the reversal will be considered authorized stay in the United States

| **Remember** |
| --- |
| A denial of voluntary departure by USCIS cannot be appealed. |

(iv) <u>Reinstatement of Voluntary Departure by the Board Of Immigration Appeals (BIA) or the Immigration Judge</u>

An immigration judge or the BIA may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure, and if reopening was granted prior to the expiration of the original period of voluntary departure. *See* **8 CFR 1240.26(h)**.

In no event can the reinstatement of voluntary departure result in a total period of time, including any reinstatement, exceeding the 60 or the 120 days of voluntary departure stated in **section 240B** of the Act.

If voluntary departure is reinstated by the BIA or by the immigration judge, the time from the expiration of the grant of voluntary departure to the grant of reinstatement is not considered authorized stay.

However, the time of the reinstated voluntary departure to the ending period of this voluntary departure, is considered authorized stay. Reinstatement of voluntary departure is regulated at **8 CFR 1240.26(h)** .

(v) <u>Effect of a Petition for Review</u>

In a case involving a grant of voluntary departure before January 20, 2009, if a Federal court with jurisdiction to review the removal order stays the running of the voluntary departure period while the case is pending, the alien will continue to be considered to be under a grant of voluntary departure and will not accrue unlawful presence.

For any EOIR grant of voluntary departure on or after January 20, 2009, however, the filing of a petition for review terminates a grant of voluntary departure and makes the alternate removal order immediately effective. **8 CFR 1240.26(i)** .

If the alien files a petition for review, therefore, the alien will no longer be protected from the accrual of unlawful presence based on the voluntary departure grant. If the alien remains in the United States while the petition is pending, the accrual of unlawful presence will begin the day after the petition for review is filed.

This regulation, however, gives the alien 30 days after filing the petition for review in order to leave the United States voluntarily. If the alien leaves within this 30-day period, the alien will continue to be protected from the accrual of unlawful presence up to the date of the alien's actual departure.

(vi) <u>Voluntary Departure and the Filing of A Motion to Reopen To the Board of Immigration Appeals (BIA)</u>

A motion to reopen is a form of procedural relief that asks the BIA to change its decision in light of newly discovered evidence or a change in circumstances since the hearing. *See Dada v. Mukasey* , 128 S.Ct. 2307, 2315 (2008). In general, a motion to reopen has to be filed within 90 days. *See* **section 240(c)(7)** of the Act.

Therefore, an alien granted voluntary departure for a period of up to 60 days is either faced with the choice of departing according to the voluntary departure order, or to make use of his or her statutory right to file the motion to reopen and to await the result of the adjudication of the motion.

In 2008, the Supreme Court addressed the issue and held that to safeguard the right to pursue a motion to

reopen for voluntary departure recipients, the alien must be permitted to withdraw, unilaterally and without regards to the underlying merits of the motion to reopen, a voluntary departure request before expiration of the departure period. *See Dada v. Mukasey*, 128 S.Ct. 2307, 2320 (2008). As a result, the alien has the option either to abide by the terms and receive the agreed upon benefits of voluntary departure; or, alternatively, to forego those benefits and remain in the United States to pursue an administrative motion.

Therefore, if an alien was initially granted voluntary departure by the immigration judge or the Board of Immigration Appeals before January 20, 2009, but the alien later requests withdrawal of the voluntary departure order, the alien will commence to accrue unlawful presence at the time of the administratively final order of removal unless the alien is otherwise protected from the accrual of unlawful presence (such as the grant of a stay of removal by the BIA).

The motion to reopen does not toll voluntary departure. If the alien requests a withdrawal of the voluntary departure order, the alien will accrue unlawful presence as if voluntary departure had never been granted even if the request for withdrawal is made, for example, on the last day of the voluntary departure period.

The *Dada* decision does not apply, however, to any EOIR grant of voluntary departure that is made on or after January 20, 2009. Under **8 CFR 1240.26(b)(3)(iii)**, filing a motion to reopen or reconsider during the voluntary departure period automatically terminates the grant of voluntary departure, and makes the alternative removal order effective immediately.

Thus, for a grant of voluntary departure on or after January 20, 2009, the alien will no longer be protected from the accrual of unlawful presence beginning the day after the date the alien files a motion to reopen or to reconsider.

(I) <u>Aliens Granted Stay of Removal</u>

A stay of removal is an administrative or judicial remedy of temporary relief from removal. The grant of a stay of removal can be automatic or discretionary. *See* **sections 240(b)(5)** and **241(c)(2)** of the Act; **8 CFR 241.6**, **8 CFR 1241.6**, **8 CFR 1003.6**, and **8 CFR 1003.23(b)(1)(v)**. During a grant of stay of removal, DHS is prevented from executing any outstanding order of removal, deportation, or exclusion. Therefore, an alien granted stay of removal does not accrue unlawful presence during the period of the grant of stay of removal. A stay of removal does not erase any previously accrued unlawful presence.

If an individual is ordered removed in absentia pursuant to **section 240(b)(5)(A)** of the Act, and he or she challenges the order in a motion to rescind the in absentia order pursuant to **section 240(b)(5)(C)** of the Act, the alien's removal order will be stayed automatically until the motion is decided. *See* **section 240(b)(5)(C)** of the Act.

The order will be stayed through a possible appeal to the Board of Immigration Appeals (BIA) or Federal court. *See Matter of Rivera-Claros*, 21 I&N Dec. 232 (BIA 1996). For purposes of **section 212(a)(9)(B)** and **(C)(i)(I)** of the Act, an individual, who filed a motion to rescind an in absentia order of removal pursuant to **section 240(b)(5)(C)** of the Act, will not accrue unlawful presence during the pendency of the motion, including any stages of appeal before the BIA or Federal court.

(J) <u>Aliens Granted Deferred Action</u>

A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority. Deferred action is, in no way, an entitlement, and does not make the alien's status lawful.

Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws. There is no specific authority for deferred action codified in law or regulation although certain types of benefits refer to a grant of deferred action. For more information on Deferred Action, *see* Detention and Removal Operations Policy and Procedure Manual (DROPPM), Chapter 20.8.

Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.

(K) <u>Aliens Granted Withholding of Removal under</u> **Section 241(b)(3)** <u>of the Act or Deportation under Former Section 243 of the Act</u>

Accrual of unlawful presence stops on the date that withholding is granted and continuous through the period of the grant.

(L) <u>Aliens Granted Withholding of Removal or Deferral of Removal under the United Nations Convention Against Torture Pursuant to</u> **8 CFR 208.16** <u>and</u> **8 CFR 208.17**

Accrual of unlawful presence stops on the date that withholding or deferral is granted and continuous through the period of the grant.

(M) <u>Aliens Granted Deferred Enforced Departure (DED)</u>

The period of authorized stay begins on the date specified in the Executive Order or other Presidential directive and ends when DED is no longer in effect.

(N) <u>Aliens Granted Satisfactory Departure under 8 CFR 217.3</u>

Under **8 CFR 217.3(a)** , a Visa Waiver Program (VWP) alien, who obtains a grant of satisfactory departure from U.S. Immigration and Customs Enforcement, and who leaves during the satisfactory departure period, is deemed to not have violated his or her VWP admission. Thus, unlawful presence will not accrue during the satisfactory departure period, if the alien departs as required.

If the alien remains in the United States after the expiration of the grant of satisfactory departure, unlawful presence will begin to accrue the day after the satisfactory departure period expires unless some other provision or policy determination protects the person from accrual of unlawful presence. *See* section (b) of this *AFM* chapter.

**(4)** Effect of the Protection from the Accrual of Unlawful Presence on Previously Accrued Unlawful Presence: Protection from the Accrual of Unlawful Presence Does Not Cure Previously Accrued Unlawful Presence

Unless stated otherwise, protection from the accrual of unlawful presence under any section of this *AFM* chapter does *not* cure any unlawful presence that the alien may have already accrued before the alien came to be protected.

| **Example:** |
|---|
| An alien accrues 181 days of unlawful presence. He or she then applies for adjustment of status. Although the alien had accrued 181 days of unlawful presence before he or she applied for adjustment of status, the alien stops to accrue unlawful presence once the adjustment of status application is properly filed. |
| However, the already accrued unlawful presence of 181 days continues to apply to the alien. If the alien departs after having obtained a grant of advance parole, the individual will be subject to the 3-year bar under **section 212(a)(9)(B)(i)(I)** of the Act. |

**(5)** Effect of Removal Proceedings on Unlawful Presence

**(A)** Initiation of Removal Proceedings

The initiation of removal proceeding has no effect, neither to the alien's benefit nor to the alien's detriment, on the accrual of unlawful presence. *See* **8 CFR 239.3** . If the alien is already accruing unlawful presence when removal proceedings are initiated, the alien will continue to accrue unlawful presence unless the alien is protected from the accrual of unlawful presence (as described in these *AFM* chapters).

If the alien is not accruing unlawful presence when removal proceedings begin, the alien will continue to be protected from the accrual of unlawful presence until the immigration judge determines that the individual has violated his or her status, or until **Form I-94** , Arrival/Departure Record expires, whichever is earlier (and regardless of whether the decision is subsequently appealed).

**Example 1:**

An alien, who is present without inspection, is placed in proceedings. The alien was already accruing unlawful presence when placed in proceedings, and will continue to do so while in proceedings unless a provision described in this A FM chapter stops the accrual of unlawful presence.

**Example 2:**

An alien, admitted as an LPR, is placed in removal proceedings because of a criminal conviction. As an LPR, the alien does not accrue unlawful presence. The alien will not begin to do so unless the alien becomes subject to a final order of removal, that is, when LPR status is terminated.

**Example 3:**

An alien, admitted as a nonimmigrant for duration of status, is placed in removal proceedings. The alien does not accrue unlawful presence while the proceedings are pending. If the immigration judge rules in the alien's favor on the removal charge, no unlawful presence applies to the alien. If the immigration judge sustains the removal charge, unlawful presence begins to accrue the day after the immigration judge's decision becomes administratively final.

**Example 4:**

An alien is admitted as a nonimmigrant until January 10, 2011. On March 15, 2009, DHS places the alien in removal proceedings, claiming that the alien had violated a condition of admission. On May 1, 2010, the immigration judge sustains the removal charge, and the alien appeals. The Board of Immigration Appeals affirms the decision. Once the removal order becomes administratively final, the alien will accrue unlawful presence from May 2, 2010, the day after the immigration judge's order.

**Example 5:**

An alien is admitted as a nonimmigrant until January 10, 2011. On March 15, 2009, DHS places the alien in removal proceedings, claiming that the alien had violated a condition of admission. On May 1, 2010, the immigration judge rules in the alien's favor and dismisses the removal charge. The alien will not be deemed to have accrued any unlawful presence.

**Example 6:**

An alien in unlawful status properly files with USCIS an adjustment of status application. USCIS denies the application and places the alien in proceedings. The alien renews the application before the Immigration Judge. Because the alien is renewing an affirmative application that had stopped the accrual

of unlawful presence, the alien does not accrue unlawful presence while the adjustment application is pending before the IJ.

**Example 7:**

An alien whose nonimmigrant admission ended on November 6, 2008, is placed in removal proceedings. On February 6, 2009, the alien files an adjustment application with the immigration judge. The alien had never filed with USCIS. Because the application is not the "renewal" of an affirmative application, filing the application with the immigration judge does not stop the accrual of unlawful presence.

**Example 8:**

Same facts as in Example 7, except that the alien's application is under NACARA or HRIFA. In this situation, filing the application *does* stop the accrual of unlawful presence.

**Example 9:**

An alien is admitted as a nonimmigrant until January 10, 2011. On March 15, 2009, DHS places the alien in removal proceedings, claiming that the alien had violated a condition of admission. Removal proceedings are still pending on January 11, 2011. Regardless of the outcome of the proceedings, the alien will accrue unlawful presence the day after the I-94 expires, that is, on January 11, 2011.

The result in Example 9 above is consistent with *Matter of Halabi*, 15 I&N Dec.105 (BIA 1974), where the Board of Immigration Appeals (BIA) held that the expiration of the alien's authorized period of stay rendered the alien subject to removal without the need to resolve the original charge listed in the Notice to Appear (in *Halabi* , the individual was originally charged with having violated his status).

The BIA indicated that being able to charge the alien as a visa overstay from the date the alien's period of authorized stay expired, although while in removal proceedings, did not "punish" the alien for contesting the original removal charge. *See Halabi* , at 106; *see also Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999) (Removal of an alien, who has remained longer than authorized, is not punishment but simply a matter of the alien's "being held to the terms under which he was admitted."); cf. *Westover v. Reno*, 202 F.3d 475 (1 st Cir. 2000) (dicta), and *Halabi* at 107-08 (Roberts, Board Chair, dissenting).

The alien may avoid any accrual of unlawful presence, for example, by offering to settle the removal proceeding by agreeing to leave the United States no later than the date his or her status expires in return for dismissal of the charge of having violated his or her status before that date. *See* **8 CFR 239.2(a)(4)** (notice to appear may be cancelled, if alien has left the United States).

Leaving at the expiration of the period of authorized stay and the resulting dismissal of removal

proceedings would also avoid the risk of a ruling against the alien on the original charge of having violated his or her status before it expired.

(B) Effect of Filing an Appeal or Petition for Review on Unlawful Presence

As noted, the initiation of removal proceedings does not affect the accrual of unlawful presence. *See* **8 CFR 239.3** . Thus, the fact that an alien or DHS files an appeal to the Board of Immigration Appeals (BIA) or seeks judicial review of a removal order or the relief granted, does *not* affect the alien's position in relation to the accrual of unlawful presence.

If the Board or a Federal court vacates the removal order, however, the alien will not be deemed to have accrued unlawful presence solely on the basis of the vacated removal order. If the Board or the Federal court affirms the removal order, the alien will be deemed to have accrued unlawful presence from the date of the immigration judge's order, unless the alien was already accruing unlawful presence on that date.

(6) Effect of an Order of Supervision pursuant to 8 CFR 241.5 on Unlawful Presence

Unless protected by some other provision included in this *AFM* chapter, an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision under **8 CFR 241.5.**

(c) Relief from Inadmissibility under Section 212(a)(9)(B)(i)(I) and (II), and Section 212(a)(9)(C)(i)(I) of the Act

(1) Waiver of the 3-Year Bar or the 10-Year Bar under Section 212(a)(9)(B)(i) of the Act

(A) Nonimmigrants

If a nonimmigrant is inadmissible, the nonimmigrant may apply for advance permission to enter as a nonimmigrant despite his or her inadmissibility pursuant to **section 212(d)(3)** of the Act, which is granted in the discretion of the Secretary of Homeland Security. If the alien is an applicant for a nonimmigrant visa at the American consulate, the alien will have to apply for this type of temporary permission through the consulate.

The application is adjudicated by the United States Customs and Border Protection (CBP), Admissibility Review Office (ARO) pursuant to section **212(d)(3)(A)(i)** of the Act. If the alien is an applicant at the U.S. border for admission because he or she is not required to apply for a visa (other than visa waiver applicants), the application is filed with a CBP designated port of entry or designated Preclearance office. See section **212(d)(3)(A)(ii)** and **8 CFR 212.4.**

If the nonimmigrant status applicant is an applicant for T or U visa status, the applicant has to file **Form I-192** with USCIS at the Vermont Service Center (VSC).

(B) Immigrants and Adjustment of Status Applicants Who Are the Spouses,Sons, or Daughters of U.S. Citizens or LPRs, and Fiancé(e)s of U.S. Citizens

DHS has discretion to waive an alien's inadmissibility under **section 212(a)(9)(B)** of the Act if the alien is applying for an immigrant visa or adjustment of status and the alien is the spouse, son, or daughter of a U.S. citizen or LPR, or the fiancé(e) of a U.S. citizen (in relation to a K-1/K-2 visa).

The alien must establish that denying the alien's admission to the United States, or removing the alien from the United States would result in extreme hardship to the alien's U.S. citizen or LPR spouse, parent, or the K visa petitioner. *See* section **212(a)(9)(B)(v)** of the Act; *see* **8 CFR 212.7(a)** .

The application is filed on Form I-601 , Application for Waiver of Grounds of Inadmissibility, with the respective fee as stated in **8 CFR 103.7(b)** . There is no judicial review available, if the waiver is denied but the denial can be appealed to the Administrative Appeals Office of USCIS pursuant to **8 CFR 103** .

If the alien seeks a waiver in relation to an application for a K-1 or K-2 visa, approval of the waiver is conditioned on the K-1's marrying the citizen who filed the K nonimmigrant visa petition within the statutory time of three (3) months from the day of the K-1 nonimmigrant's admission.

The reason for this condition is that, at the time of the issuance of the K-1 or K-2 nonimmigrant visa, the K-1 and K-2 nonimmigrants are not yet legally related to the petitioner in the manner required by **section 212(a)(9)(B)(v)** of the Act. If the K-1 nonimmigrant does not marry the petitioner, and the K-1 and K-2 nonimmigrants do not acquire LPR status on that basis, USCIS may ultimately deny the Form I-601 .

There is no waiver available to an alien parent if only his or her U.S. citizen or LPR child experiences extreme hardship on account of the mother's or father's removal.

(C) Asylees and Refugees Seeking Adjustment of Status

**Section 212(a)(9)(B)** grounds of inadmissibility can be waived for Asylees and Refugees seeking adjustment of status pursuant to **section 209(c)** of the Act. Such aliens must file **Form I-602, Application by Refugee For Waiver of Grounds of Excludability.** Under current USCIS policy, it is within the adjudicator's discretion to determine whether the waiver can be granted without requiring the filing of Form I-602. *See* **AFM chapter 41.6** ; October 31, 2005, Domestic Operations memorandum – *Re: Waiver under Section 209(c) of the Immigration and Nationality Act (AFM* Update 05-33 ).

Normally, waiver applications for refugees are handled overseas before a person is approved for refugee classification. *See* **8 CFR 207.3(b)** . However, if a ground of inadmissibility arose after the alien's approval for refugee classification, or if the ground was not known to the officer who made such approval, the

waiver may be sought and adjudicated as part of the refugee adjustment process. *See* **AFM Chapter 23.6** (Asylee and Refugee Adjustment).

(D) <u>TPS Applicants</u>

Section **212(a)(9)(B)** of the Act may be waived for humanitarian purposes, to assure family unity, or when it would be in the public interest to grant the waiver. The waiver is filed on Form I-601, Application for Waiver of Grounds of Inadmissibility. *See* **section 244** of the Act; **8 CFR 244.3** .

Granting a waiver to a TPS applicant for purposes of the TPS application does not waive any grounds of inadmissibility in connection with a subsequent application for adjustment of status, although both are filed on **Form I-601** . This is because the standard for adjustment of status applicants to have a ground of inadmissibility waived is generally an "extreme hardship"- standard for **section 212(a)(9)(B)** of the Act (3-year and 10-year bars), and not the lesser standard for TPS, i.e. the standard that the waiver may be granted for "humanitarian purposes, to assure family unity, or public interest."

Therefore, if an adjustment of status applicant, who was previously granted TPS status, presents an approved **Form I-601** to the adjudicator, the adjudicator should not accept this approved Form I-601 as evidence that the alien is not inadmissible under section **212(a)(9)(B)** of the Act for purposes of the adjustment of status application. Rather, the adjudicator should direct the applicant to file a new Form I-601 to overcome the specific grounds of inadmissibility for adjustment of status purposes.

(E) <u>Legalization under **Section 245A** of the Act and Any Legalization-related Class Settlement Agreements, and Legalization Applicants pursuant to **8 CFR 245a.2(k)** and **8 CFR 245a.18**</u>

The waiver can be granted for humanitarian purposes, to ensure family unity, or when the granting of such a waiver is otherwise in the public interest. The waiver is filed on **Form I-690** , Application for Waiver of Grounds of Inadmissibility pursuant to **Section 245A** or **Section 210** of the Immigration and Naturalization Act.

(2) <u>Waiver of the Permanent Bar under Section 212(a)(9)(C)(i)(I) of the Act</u>

Generally, there is no "waiver" of inadmissibility under **section 212(a)(9)(C)(i)(I)** of the Act. Rather, an alien who is inadmissible under **section 212(a)(9)(C)(i)** of the Act must, generally, obtain consent to reapply for admission under **section 212(a)(9)(C)(ii)** of the Act. *See* **AFM chapter 43** concerning Consent to Reapply, which is sought by filing Form I-212 , Application for Permission to Reapply for Admission into the United States after Deportation or Removal.

As stated by the Board of Immigration Appeals (BIA) in *Matter of Torres-Garcia,* 23 I&N Dec. 866 (BIA 2006), the consent to reapply regulation at **8 CFR 212.2** predates the enactment of **section 212(a)(9)(C)** of the Act and the related consent to reapply provision in **section 212(a)(9)(A)(iii)** of the Act.

Thus, although the *filing procedures* in **8 CFR 212.2** are still in effect, the substantive requirements of the provisions in **section 212(a)(9)** of the Act govern during the adjudication of **Form I-212**, Application for Permission to Reapply for Admission into the United States After Deportation and Removal; a USCIS adjudicator must consider the specific requirements of section **212(a)(9)(C)(ii)** of the Act when adjudicating Form I-212.

A Form I-212 cannot be approved for an alien who is inadmissible under section **212(a)(9)(C)(i)** of the Act unless the alien has been abroad for at least 10 years. *Matter of Torres-Garcia, supra*. This rule applies in the 9 th Circuit as well as in other circuits. *Gonzales v. Department of Homeland Security*, 508 F.3d 1227 (9 th Cir. 2007).

There are, however, some waivers that are also available to certain categories of aliens, who are inadmissible under section **212(a)(9)(C)(i)(I)** of the Act. If an alien is eligible for one of these waivers, and the waiver is granted, it is not necessary for the alien to obtain approval of a Form I-212 .

(A) HRIFA and NACARA Applicants

A waiver can be granted at the discretion of USCIS. The waiver is sought by filing Form I-601, Application for Waiver of Grounds of Inadmissibility. *See* **8 CFR 245.13(c)(2)** and **8 CFR 245.15(e)(3)** . However, the standard that applies to the adjudication is the same standard as if the alien had filed **Form I-212** , Application for Permission to Reapply for Admission into the United States after Deportation or Removal.

*See* February 14, 2001 Office of Field Operations Memorandum, *Changes to Section 202 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), and the Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), based Upon the Provisions of and Amendments to the Legal Immigration Family Equity Act* (LIFE).

(B) Legalization, SAW, LIFE Act Legalization, and Legalization Class Settlement Agreement Applicants

A waiver can be granted to such an applicant, if the applicant establishes that a waiver should be granted based on humanitarian reasons, to ensure family unity, or because granting the waiver would be in the public interest. The waiver is filed on Form I-690 , Application for Waiver of Grounds of Excludability under **section 245A** or **section 210** of the Act. *See* **8 CFR 210.3(e)** , **8 CFR 245a.2(k)** , and **8 CFR 245a.18(c)** .

(C) TPS Applicants

TPS applicants may obtain waivers for certain grounds of inadmissibility, including inadmissibility under **section 212(a)(9)(C)** of the Act. *See* **section 244(c)(2)** of the Act. The permanent bar may be waived for humanitarian purposes, to assure family unity, or when the granting of the waiver is in the public interest. *See* **8 CFR 244.3** . The waiver is filed on **Form I-601** , Application for Waiver of Grounds of Inadmissibility. *See id* .

Granting a waiver to an applicant for purposes of the TPS application does not waive any grounds of inadmissibility in connection with a subsequent application for adjustment of status, although both are filed on **Form I-601** . This is because the standard for adjustment of status applicants to have waived inadmissibility is different from the one used for TPS applicants.

In order to overcome the permanent bar to admissibility under section **212(a)(9)(C)(i)(I)** of the Act, an applicant for an immigrant visa has to file **Form I-212** , Application for Permission to Reapply for Admission into the United States after Deportation or Removal, rather than **Form I-601** , and no earlier than ten (10) years after the alien's last departure. *See* **section 212(a)(9)(C)(ii)** of the Act.

Therefore, if an adjustment of status applicant, who was previously granted TPS status, presents an approved **Form I-601** to the adjudicator, the adjudicator should not accept this approved Form I-601 as evidence that the person is not inadmissible under section **212(a)(9)(C)(i)(I)** of the Act for purposes of the adjustment of status application.

Any **Form I-212** that is filed by a TPS applicant would be adjudicated according to same principles that apply generally to aliens who are inadmissible under section **212(a)(9)(C)(i)(I)** of the Act, including the requirement that the alien may not obtain consent to reapply under **section 212(a)(9)(C)(ii)** unless the alien satisfies the 10-year absence requirement in the statute.

(D) <u>Certain Battered Spouses, Parents, and Children</u>

An approved VAWA self-petitioner and his or her child(ren) can apply for a waiver from inadmissibility under **section 212(a)(9)(C)(i)** of the Act, if he or she can establish a "connection" between the abuse suffered, the unlawful presence and departure, or his or her removal, and the alien's subsequent unlawful entry/entries or attempted reentry/reentries. *See* **section 212(a)(9)(C)(iii)** of the Act.

The waiver is filed on **Form I-601** , Application for Waiver of Grounds of Inadmissibility, with fee. If the waiver is granted, the ground of inadmissibility and any relating unlawful presence is deemed to be erased for purposes of any future immigration benefits applications.

(E) <u>Asylee and Refugee Adjustment Applicants under Section 209(c) of the Act</u>

Asylee and Refugee applicants for adjustment of status may obtain a waiver of inadmissibility in lieu of consent to reapply. The waiver is filed on **<u>Form I-602</u>** , Application by Refugee for Waiver of Grounds of Excludability. *See* **8 CFR 209.1** and **8 CFR 209.2(b)** ; see also **AFM chapter 41.6** .

Under current USCIS policy, it is within the adjudicator's discretion to determine whether the waiver can be granted without requiring the filing of **Form I-602** . See **AFM chapter 41.6** ; October 31, 2005, Domestic Operations memorandum – *Re: Waiver under Section 209(c) of the Immigration and Nationality Act* (*AFM* Update 05-33 ).

Normally, waiver applications for refugees are handled overseas before a person is approved for refugee classification. *See* **8 CFR 207.3** . However, if a ground of inadmissibility arose after the alien's approval for refugee classification, or if the ground was not known to the officer who made such approval, the waiver may be sought and adjudicated as part of the refugee adjustment process. *See* **AFM chapter 23.6** (Asylee and Refugee Adjustment).

Note that the 10-year waiting period normally imposed on applicants for consent to reapply under this ground of inadmissibility ( *see* **section 212(a)(9)(C)(ii)** of the Act) does not apply to refugee and asylee adjustment applicants.

(F) <u>Nonimmigrants</u>

An alien who is inadmissible under section **212(a)(9)(C)(i)(I)** may, as a matter of discretion, be admitted as a nonimmigrant under **section 212(d)(3)** of the Act.

The alien may make the application when applying for the nonimmigrant visa with the Department of State or, if eligible, file **Form I-192** to seek this benefit. Obtaining relief under **section 212(d)(3)** does not relieve the alien of the need to obtain consent to reapply under **section 212(a)(9)(C)(ii)** of the Act if the alien seeks to acquire permanent residence.

**40.10 Section 212(a)(10) of the Act – Miscellaneous [Reserved]**

AR2022_300594

**Appendix 40-1 Additional Guidance for Implementing Sections 212(a)(6) and 212(a)(9) of the Immigration and Nationality Act (Act) [Appendix added 03-03-2009]**

96act.026
HQIRT 50/5.12

| Subject | Implementation of section 212(a)(6)(A) and 212(a)(9) grounds of inadmissibility | Date | MAR 3 1 1997 |
|---------|---------|---------|---------|

| To | Management Team | From | Office of Programs |
|----|----------------|------|-------------------|
| | Regional Directors | | (HQPGM) |
| | District Directors (Including Foreign) | | |
| | Chief Patrol Agents | | |
| | Officers in Charge (Including Foreign) | | |
| | Chief, ODETF, Glynco, GA | | |
| | Chief Patrol Agent, BPA, Glynco, GA | | |
| | Asylum Office Directors | | |
| | Service Center Directors | | |
| | Regional Counsel | | |
| | District Counsel | | |

This memorandum provides interim guidelines to the field for implementing the new grounds of inadmissibility found in sections 212(a)(6)(A) and 212(a)(9) of the Immigration and Nationality Act ("the Act"), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). The effective date for each of these sections is April 1, 1997. Sections 212(a)(6)(A) and 212(a)(9) do not apply to applications for admission or adjustment of status adjudicated by an immigration judge in deportation or exclusion proceedings commenced prior to April 1, 1997. Except as otherwise required by law, these grounds of inadmissibility apply at the time of any other administrative determination regarding admissibility, including but not limited to the issuance of a visa, inspection of an alien at a port of entry, disposition of an application for admission by an inspector or an immigration judge or adjudication of an application for adjustment of status. Further guidance will be released and proposed regulations published in the Federal Register at a later date.

This memorandum is divided into sections addressing the general implementation of the sections of law, the manner in which time "unlawfully present" in the United States is measured and the effect of these grounds of inadmissibility on applications for adjustment of status. A chart is also attached to assist with determinations about whether aliens are subject to the 212(a)(9) grounds of inadmissibility.

I.      General Implementation Issues

As a preliminary matter it is noted that the section 212(a)(6)(A) ground of inadmissibility applies to any alien present in the United States without having been admitted or paroled but the

212(a)(6) grounds of inadmissibility only apply to aliens who have previously physically departed the United States and are now either seeking admission or have entered or attempted to enter the United States without being inspected. Therefore, section 212(a)(6)(A) does not apply to visa applicants outside of the United States, but section 212(a)(9)(B) does apply to visa applicants outside of the United States who previously did accrue sufficient unlawful presence in the United States. Likewise, section 212(a)(9) does not apply to aliens seeking adjustment of status in the United States who have not previously departed the United States. Aliens will not be able to avoid the consequences of unlawful presence by claiming that their re-entry after their previous physical departure was brief, casual and innocent.

Section 212(a)(6)(A) of the Act provides that "an alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." Written into the section is an exception for battered spouses and children. The battered spouse exception will be applied to both women and men.

Section 212(a)(9)(A)(i) of the Act provides that aliens who have been ordered removed from the United States through expedited removal proceedings or removal proceedings initiated on the alien's arrival in the United States and who have actually been removed (or departed after such an order) are inadmissible for 5 years. Section 212(a)(9)(A)(ii) of the Act provides that aliens who have been otherwise ordered removed, ordered deported under sections 242 or 217 of the Act or ordered excluded under section 236 of the Act and who have actually been removed (or departed after such an order) are inadmissible for 10 years. Aliens who have been removed more than once are inadmissible for 20 years and aliens who have been convicted of aggravated felonies are permanently inadmissible. The provision holding aliens inadmissible for 10 years after the issuance of an exclusion or deportation order applies to such orders rendered both before and after April 1, 1997. In this context, it should be noted that pursuant to section 101(a)(13)(C) of the Act, permanent residents often are not regarded as seeking admission upon return to the United States. The statute does include an exception to the 212(a)(9)(A) ground of inadmissibility for those who have, prior to their return to the United States, obtained consent from the Attorney General to reapply for admission. The Service is considering a regulation or policy that would grant this exception to aliens excluded or deported prior to April 1, 1997, who had either been subsequently lawfully admitted to the United States or granted an immigrant or nonimmigrant visa prior to the effective date of the new, lengthier prohibitions against readmission. In the interim, applicants who have already remained outside of the United States for the one or five years required under pre-IIRIRA law, in the absence of other adverse discretionary factors, should be granted advance consent to reapply for admission. Those who have been convicted of an aggravated felony are eligible to apply to the Attorney General for consent to reapply for admission but remain subject to all other applicable grounds of inadmissibility. All requests for such a waiver should be filed on Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal.

Pursuant to section 212(a)(9)(B)(i)(I) of the Act; aliens "unlawfully present" in the United States for more than 180 days but less than one year who subsequently depart the United

States voluntarily prior to the initiation of removal proceedings under section 235(b)(1) or section 240 are inadmissible for a period of 3 years. For purposes of this section, "voluntarily departed" includes any departure by an alien from the United States prior to the initiation of removal proceedings, whether or not pursuant to an order of voluntary departure issued by the Service. Pursuant to section 212(a)(9)(B)(i)(II) of the Act, those aliens "unlawfully present" in the United States for one year or more, who depart or are removed and then seek admission are inadmissible for 10 years. The Attorney General may waive inadmissibility under section 212(a)(9)(B) in the case of an immigrant who can show that refusal of admission would result in extreme hardship to the alien's spouse or parent who is a citizen or lawful permanent resident. The Service will retain authority to grant the extreme hardship waiver in consular cases (with no administrative appeal available); however, those seeking admission at a Port-of-Entry who seek such a waiver will be referred to an immigration judge (with administrative appeal to the Board of Immigration Appeals, as part of an appeal of a removal order). Form I-724, Application to Waive Inadmissibility Grounds and Permission to Reapply is being designed to accommodate this provision.

Pursuant to section 212(a)(9)(C) of the Act, aliens who were unlawfully present in the United States for an aggregate period of more than one year and subsequently departed or who were previously ordered removed (and actually left the United States) and have subsequently either entered the United States without inspection or sought to enter the United States without inspection are permanently inadmissible. The statute makes an exception for aliens who seek admission more than 10 years after their last departure who have obtained advance consent from the Attorney General to reapply for admission. This ground of inadmissibility applies only to aliens who have attempted to re-enter or actually have re-entered the United States without being inspected and admitted or paroled.

## II. Measuring Time "Unlawfully Present"

When determining whether sections 212(a)(9)(B) & (C) of the Act are applicable in a particular case, Service officers will be required to determine the length of time that an alien spent "unlawfully present" in the United States prior to their initial departure. A number of factors are relevant to this calculation.

### When is an alien unlawfully present?

The first question in every case will be whether an alien has been previously "unlawfully present" in the United States. By statute, "an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." See Section 212(a)(9)(B)(ii) of the Act. The Service interprets time "unlawfully present" to include any time spent in the United States by aliens after they have violated the terms and conditions of any form of non-immigrant status, because time spent in violation of status is not authorized.

For purposes of section 212(a)(9)(B), time in "unlawful presence" begins to accrue on April 1, 1997. For example, although an alien may have been in ~~AR20220005083~~ illegally for

one year prior to April 1, 1997, as of April 2, 1997, the same alien has accrued only one day of "unlawful presence" for purposes of section 212(a)(9)(B). For purposes of section 212(a)(9)(C), time in "unlawful presence" may accrue prior to April 1, 1997. Thus, the same alien who would only have one day of unlawful presence for purposes of section 212(a)(9)(B) on April 2, 1997, would have one year and one day of "unlawful presence" for purposes of section 212(a)(9)(C). In addition, when measuring time spent "unlawfully present" in the United States, the time is measured cumulatively for purposes of section 212(a)(9)(C), but not for purposes of section 212(a)(9)(B). For example, an alien who was "unlawfully present" in the United States for 5 months, departed the United States, returned, and was "unlawfully present" for 2 more months would have accrued 7 months of "unlawful presence" for purposes of section 212(a)(9)(C), but not for purposes of section 212(a)(9)(B).

Unlawful presence may be triggered either by overstaying the time authorized or by entering into an activity that violates the terms or conditions of status. For example, an alien present on a visitor visa begins to accrue unlawful presence on the day that he or she enters into unauthorized employment. Unlawful presence is also triggered by the commission of a criminal offense that renders an alien inadmissible or removable.

**When does an alien stop being unlawfully present?**

Once an alien goes out of status, he or she is "unlawfully present" until the Service restores status or he or she leaves the United States. Service policy governing restoration of status will be disseminated under separate cover.

Section 212(a)(9)(B)(iii) enumerates instances in which an alien does not accrue "unlawful presence" for purposes of section 212(a)(9)(B):

1. Time in which an alien is under 18 years of age
2. Time during which an alien has a bona fide application for asylum pending (unless the alien was employed without authorization at any time during the period that the application was pending)
3. Time during which an alien is a beneficiary of family unity protection
4. For those admitted or paroled -- time during the pendency of a non-frivolous application for change or extension of status (up to a maximum of 120 days)
5. Those who qualify as a battered spouse or child as provided in section 212(a)(9)(B)(iii)(IV) of the Act.

These exceptions are not applicable when considering "unlawful presence" for purposes of section 212(a)(9)(C).

The exception for up to 120 days during the pendency of an application for change or extension of status only applies when the application is submitted prior to the expiration of status by a person who has been lawfully admitted or paroled into the United States, and includes not only time during the pendency of an application for "change or extension" of status but also time during applications for "adjustment" of status.                AR2022_300599

"An alien who is unlawfully present" continues to accrue time as such while in removal proceedings. See 8 CFR section 239.3. Likewise, the grant of voluntary departure by the Service or an immigration judge will not stop the running of time "unlawfully present." However, time in certain forms of Attorney General "sanctioned" status will not count in measuring time unlawfully present. By proposed regulation, this will include refugees admitted under section 207 of the Act, aliens granted asylum under section 208 of the Act and aliens granted cancellation pending adjustment of status. The proposed regulation addressing these groups will be specific in nature and not leave "sanctioned" status open to broader interpretation. Aliens with pending change or extension of status applications after the 120-day period and aliens present but not yet removed after a final removal order will not be considered to be in a period of stay "authorized by the Attorney General."

## III.   Impact of these Grounds of Inadmissibility on Applications for Adjustment of Status

Aliens inadmissible pursuant to 212(a)(6)(A) of the Act are eligible to apply for adjustment of status under section 245(i) of the Act. However, aliens inadmissible pursuant to section 212(a)(9) of the Act are ineligible for adjustment of status under section 245 of the Act, subject to the waiver and exception provisions of those grounds of inadmissibility.

Paul W. Virtue
Acting Executive Associate Commissioner

Attachment

cc:   Official File Copy
      Department of State (Attn: Stephen Fischel)

AR2022_300600

# HOW LONG IS AN ALIEN INADMISSIBLE PURSUANT TO SECTION 212(A)(9) OF THE ACT AFTER BEING PREVIOUSLY UNLAWFULLY PRESENT IN THE UNITED STATES?

**Three factors to consider in every case where an alien may be inadmissible pursuant to section 212(a)(9) of the Act:**

1. Means of current application for admission
2. Means of prior departure
3. Length of time unlawfully present before prior departure

| Current Application: | Means of Prior Departure: | Time Spent Previously Unlawfully Present in the United States: | | | |
|---|---|---|---|---|---|
| | | 0-180 Days | 181-364 Days | 365 Days | 366 + Days |
| Seeking Visa, Admission, Adjustment | Any Kind of Voluntary Departure Prior to Proceedings: | Not Applicable | 3 Yrs 212(a)(9)(B)(i)(I) | 10 Yrs 212(a)(9)(B)(i)(II) | 10 Yrs 212(a)(9)(B)(i)(II) |
| | Voluntary Departure in Proceedings: | Not Applicable | Not Applicable | 10 Yrs 212(a)(9)(B)(i)(II) | 10 Yrs 212(a)(9)(B)(i)(II) |
| | Removed or Departed After Ordered Removed in 238(b)(1) Proceedings: | 5 Yrs 212(a)(9)(A)(i) | 5 Yrs 212(a)(9)(A)(i) | 10 Yrs 212(a)(9)(B)(i)(II) | 10 Yrs 212(a)(9)(B)(i)(II) |
| | Removed or Departed After Ordered Removed in 240 Proceedings as an Arriving Alien: | 5 Yrs 212(a)(9)(A)(i) | 5 Yrs 212(a)(9)(A)(i) | 10 Yrs 212(a)(9)(B)(i)(II) | 10 Yrs 212(a)(9)(B)(i)(II) |
| | Removed or Departed After Ordered Removed/Deported/Excluded Other Than Above: | 10 Yrs 212(a)(9)(A)(ii) | 10 Yrs 212(a)(9)(A)(ii) | 10 Yrs 212(a)(9)(A)(ii) & (B)(i)(II) | 10 Yrs 212(a)(9)(A)(ii) & (B)(i)(II) |
| | Removed or Departed After Ordered Removed/Excluded/Deported Twice: | 20 Yrs 212(a)(9)(A)(ii) | 20 Yrs 212(a)(9)(A)(ii) | 20 Yrs 212(a)(9)(A)(ii) & 10 Yrs 212(a)(9)(B)(i)(II) | 20 Yrs 212(a)(9)(A)(ii) & 10 Yrs 212(a)(9)(B)(i)(II) |
| | Removed or Departed After Ordered Removed/Excluded/Deported and Aggravated Felony: | Permanent 212(a)(9)(A)(ii) | Permanent 212(a)(9)(A)(ii) | Permanent 212(a)(9)(A)(ii) | Permanent 212(a)(9)(A)(ii) |
| In Proceedings or Seeking Adjustment | Ordered Removed/Excluded/Deported and Attempted to or did Re-Enter EWI: | Permanent 212(a)(9)(C) | Permanent 212(a)(9)(C) | Permanent 212(a)(9)(C) | Permanent 212(a)(9)(C) |
| (EWI of Attempted EWI alone) | Any Voluntary Departure Prior to Proceedings and Attempted to or did Re-Enter EWI: | Not Applicable | 3 Yrs 212(a)(9)(B)(i)(I) | 10 Yrs 212(a)(9)(C)(i)(I) & Permanent 212(a)(9)(C) | 10 Yrs 212(a)(9)(C)(i)(I) & Permanent 212(a)(9)(C) |
| | Voluntary Departure in Proceedings and Attempted to or did Re-Enter EWI: | Not Applicable | Not Applicable | 10 Yrs 212(a)(9)(B)(i)(II) | 10 Yrs 212(a)(9)(C)(i)(I) & Permanent 212(a)(9)(C) |

**Waivers available for selected grounds of inadmissibility:**

212(a)(9)(A): Advance consent of Attorney General
212(a)(9)(B): Extreme hardship waiver (extreme hardship to LPR or citizen spouse or parent)
212(a)(9)(C): Advance consent of Attorney General more than 10 years after last departure

**For purposes of section 212(a)(9)(B), time in the following status does not count as time unlawfully present:**

1. Time while alien is under 18 years of age
2. Time while alien has bona fide asylum application pending
3. Time while a beneficiary of family unity
4. Those who qualify for the battered spouse or child exception found in section 212(a)(9)(A)(iii) of the Act.
5. Up to 120 days while nonfrivolous application for extension/change/adjustment of status pending if filed by lawfully admitted/paroled alien prior to expiration of status

AR20__601

**Appendix 40-2 New Waiver Provisions, INA 212(i), has been superseded by USCIS Policy Manual, Volume 9: Waivers as of March 25, 2014**

AR2022_300602

**Appendix 40-3 Memorandum – Changes to Vaccination Requirements for Adjustment of Status and Form I-693 has been superseded by USCIS Policy Manual, Volume 8, Part B: Health-Related Grounds of Inadmissibility as of January 28, 2014.**

USCIS Response to Coronavirus (COVID-19)


**U.S. Citizenship and Immigration Services**

Home > Working in the United States > Information for Employers and Employees > Automatic Employment Authorization Document (EAD) Extension

# Automatic Employment Authorization Document (EAD) Extension

This page is also available in Arabic, Chinese, French, Haitian Creole, Portuguese, and Russian.

> **ⓘ Alert:** Between May 4, 2022, and June 2, 2022, some Forms I-797C, Notice of Action, issued to communicate receipt of Form I-765, Application for Employment Authorization, included outdated language relating to a 180-day automatic extension for certain categories of renewal applicants, instead of language relating to the current 540-day automatic extension provided by the temporary final rule effective May 4, 2022 (Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicant (87 FR 26614)). Corrected notices were printed for affected applications. Unfortunately, the corrected notices did not include Notice Date, Received Date, or Date of Birth. Affected applicants should expect to receive an updated receipt by the third week of July.

Certain renewal applicants who have filed Form I-765, Application for Employment Authorization, qualify for an automatic extension of their expiring employment authorization and/or EADs while their application is pending. You qualify for this extension if you:

- Properly filed Form I-765 for a renewal of your employment authorization and/or EAD before your current EAD expired, and
- Are otherwise eligible for a renewal, which means that:
  - Your renewal application is under a category that is eligible for an automatic extension (see the list of categories below); and
  - The Category on your current EAD matches the "Class Requested" listed on your Form I-797C Notice of Action, Receipt Notice. (Note: If you are a Temporary Protected Status (TPS) beneficiary or pending applicant, your EAD and this Notice must contain either the A12 or C19 category, but the categories do not need to match each other. In addition, for H-4, E, and L-2 dependent spouses, an unexpired Form I-94 indicating H-4, E, or L-2 nonimmigrant status (including E-1S, E-2S, E-3S, and L-2S class of admission codes) must accompany Form I-797C when presenting proof of employment authorization to an employer for Form I-9, Employment Eligibility Verification, purposes).

**AR2022_300604**

**Automatic Extension Time Period—Temporary Increase to up to 540 Days**

Normally, DHS regulations provide for an automatic extension period of up to 180 days from the expiration date stated on the EAD. However, DHS has published a temporary final rule increasing the extension period. Effective May 4, 2022, DHS is temporarily increasing the extension period and providing up to 360 days of additional automatic extension time, for a total of up to 540 days, to eligible renewal applicants. The automatic extension time is counted from the expiration date of the employment authorization and/or EAD. This temporary increase is available to eligible renewal applicants with pending applications if you filed your Form I-765 renewal application either:

- Before May 4, 2022, and your 180-day automatic extension has since expired;
- Before May 4, 2022, and your 180-day automatic extension has not yet expired; or
- Between May 4, 2022 and Oct. 26, 2023, inclusive of these dates.

If you file your Form I-765 renewal application after Oct. 26, 2023, the normal 180-day automatic extension period will apply.

**Proof of an Automatic Extension**

The automatic extension period, including the temporary increase to the extension period, is provided to certain renewal applicants to help prevent gaps in employment authorization and documentation.

If you file a Form I-765 renewal application on or after May 4, 2022, USCIS will send you a Form I-797C Notice of Action receipt notice that has information regarding the up to 540-day automatic extension. If you are eligible for the automatic extension, this receipt notice, together with your expired EAD (and your unexpired Form I-94, if you are an H-4, E, or L-2 dependent spouse, including E-1S, E-2S, E-3S and L-2S class of admission codes) will serve as acceptable proof of employment authorization and/or EAD validity during the up to 540-day automatic extension period.

If you filed a Form I-765 renewal application before May 4, 2022, you should have received a Form I-797C Notice of Action receipt notice that describes the automatic extension period of up to 180 days. You will not receive a new I-797C receipt notice reflecting the increased employment authorization and/or EAD automatic extension period. However, Form I-797C receipt notices that refer to an up to 180-day automatic extension will still meet the regulatory requirements for completing Form I-9, including if your 180-day automatic extension expired prior to May 4, 2022.

To present acceptable proof of the automatic extension of employment authorization and/or EAD validity, you can show your Form I-797C receipt notice that refers to the 180-day extension, along with your qualifying EAD (and also your unexpired Form I-94, if you are an H-4, E, or L-2 dependent spouse, including E-1S, E-2S, E-3S and L-2S class of admission codes). This document combination is sufficient proof of an up to 540-day automatic extension, counting from the expiration date on your current EAD.

If you are a renewal applicant and your 180-day automatic extension expired before May 4, 2022, you can still receive the benefit of the temporary increase of the automatic extension period. Your employment authorization and/or EAD validity will automatically resume beginning on May 4, 2022, for any time remaining within the up to 540-day automatic extension period. To calculate whether there is any automatic extension time remaining, count 540 days from the expiration date stated on the front of the EAD, or use this calculator. (If you are an H-4, E, or L-2 dependent spouse, including E-1S, E-2S, E-3S and L-2S class of admission codes, count up to either 540 days or the expiration date on Form I-94, whichever is earlier.) Employers should complete Form I-9 using the same guidance applicable to those when present a

AR2022_300605

Form I-797C Notice of Action receipt notice indicating that the Form I-765 renewal application was filed before May 4, 2022, and that states the normal 180-day automatic extension period.

An individual's automatic extension period may terminate prior to the maximum period (either 540 or 180 days) either automatically when USCIS issues a denial of the applicant's Form I-765 renewal application or upon notice.

For guidance on completing [Form I-9](#) covering automatic extensions and proof of employment authorization for hiring, rehiring, and reverification, as well as all other Form I-9-related guidance, visit [I-9 Central](#).

**Categories Eligible for Automatic Extensions**

The following employment eligible categories are eligible for an automatic extension:

| The eligibility category you listed on your Form I-765 renewal application | Description |
| --- | --- |
| (a)(3) | Refugee |
| (a)(5) | Asylee |
| (a)(7) | N-8 or N-9 |
| (a)(8) | Citizen of Micronesia, Marshall Islands, or Palau |
| (a)(10) | Withholding of Deportation or Removal Granted |
| (a)(12) | Temporary Protected Status (TPS) Granted |
| (a)(17) | Spouse of principal E nonimmigrant with an unexpired I-94 showing E (including E-1S, E-2S and E-3S) nonimmigrant status* |
| (a)(18) | Spouse of principal L-1 Nonimmigrant with an unexpired I-94 showing L-2 (including L-2S) nonimmigrant status* |
| (c)(8) | Asylum Application Pending |

**AR2022_300606**

| The eligibility category you listed on your Form I-765 renewal application | Description |
|---|---|
| (c)(9) | Pending Adjustment of Status under Section 245 of the Act |
| (c)(10) | Suspension of Deportation Applicants (filed before April 1, 1997) Cancellation of Removal Applicants Special Rule Cancellation of Removal Applicants Under NACARA |
| (c)(16) | Creation of Record (Adjustment Based on Continuous Residence Since January 1, 1972) |
| (c)(19) | Pending initial application for TPS where USCIS determines applicant is *prima facie* eligible for TPS and can receive an EAD as a "temporary treatment benefit". |
| (c)(20) | Section 210 Legalization (pending I-700) |
| (c)(22) | Section 245A Legalization (pending I-687) |
| (c)(24) | LIFE Legalization |
| (c)(26) | Spouses of certain H-1B principal nonimmigrants with an unexpired I-94 showing H-4 nonimmigrant status |
| (c)(31) | VAWA Self-Petitioners |

* For more information on the options available to demonstrate employment authorization for E spouses and L spouses, see E-1 Treaty Traders page (Family of E-1 Treaty Traders and Employees section), E-2 Treaty Investors page (Family of E-2 Treaty Investors and Employees section), E-3 Certain Specialty Occupation Professions from Australia page (Family of E-3 Nonimmigrant Workers section), L-1A Intracompany Transferee Executive or Manager page (Family of L-1 Workers section), or L-1B Intracompany Transferee Specialized Knowledge page (Family of L-1 Workers section).

NOTE: Individuals with a TPS-based EAD may receive an automatic extension of their EAD:

- Through publication of a Federal Register notice extending the TPS designation of the individual's country, if the Federal Register notice also authorizes an automatic extension of covered individuals' existing EADs; or

AR2022_300607

- Through this automatic extension.

NOTE: F-1 students who have a pending STEM optional practical training (OPT) extension application are **not** eligible for the temporary increase of the automatic extension period under the temporary final rule published on May 4, 2022. That temporary increase of the automatic extension period under 8 CFR 274a.13(d) only applies to the categories listed in the chart above.

If you file your STEM OPT extension application on time and your OPT period expires while your extension application is pending, we will automatically extend your employment authorization for 180 days. This automatic 180-day extension ceases once USCIS adjudicates your STEM OPT extension application.

Additional information on filing a STEM OPT extension application is available on the Optional Practical Training Extension for STEM Students (STEM OPT) page.

Last Reviewed/Updated: 07/22/2022

AR2022_300608



Home > Humanitarian > Consideration of Deferred Action for Childhood Arrivals (DACA) > Frequently Asked Questions

# Frequently Asked Questions

ⓘ **ALERT:** DACA Decision in State of Texas, et al., v. United States of America, et al., 1:18-CV-00068, (S.D. Texas July 16, 2021) ("Texas II")

See more ⌄

ⓘ **ALERT:** In compliance with an order of a United States District Court, and effective Dec. 7, 2020, U.S. Citizenship and Immigration Services (USCIS) is:

See more ⌄

If you have questions about the DACA Decision in **State of Texas, et al., v. United States of America, et al., 1:18-CV-00068, (S.D. Texas July 16, 2021) ("Texas II")** or want to learn more, visit our Additional Information re: July 16, 2021 DACA Texas II decision page.

⤢ Close All   ⤢ Open All

| General | ⌄ |
|---|---|

| Initials | ⌄ |
|---|---|

| Renewals | ⌄ |
|---|---|

| Advance Parole | ⌄ |
|---|---|

| Employers | ⌄ |
|---|---|

**AR2022_300609**

↗ Close All   ↗ Open All

### *DHS DACA FAQs*

- **DACA Process**
- **What is Deferred Action for Childhood Arrivals?**
- **General Information for All Requestors**
- **Background Checks**
- **After USCIS Makes a Decision**
- **Initial Requests for DACA**
- **Renewal of DACA**
- **Travel**
- **Criminal Convictions**
- **Miscellaneous**

# I. General Information for All Requestors

## A. What is Deferred Action for Childhood Arrivals?

As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on low priority cases, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of two years, subject to renewal for a period of two years, and may be eligible for employment authorization.

You may request consideration of DACA if you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012, meaning that:

- You never had a lawful immigration status on or before June 15, 2012*, or

- Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

AR2022_300610

7. Have not been convicted of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

\* Please review DACA FAQ 18 if you are currently in a lawful immigration status.

**Individuals can call U.S. Citizenship and Immigration Services (USCIS) at 800-375-5283 with questions or to request more information on DACA.** Those with pending requests can also use a number of online self-help tools which include the ability to check case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or non-delivery of a card or document.

**Q1: What is deferred action?**
A1: Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon **unlawful presence**, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer **lawful status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time, at the agency's discretion.

**Q2: What is DACA?**
A2: On June 15, 2012, the secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of two years, subject to renewal, and would then be eligible for work authorization.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the DACA guidelines.

**Q3: Is there any difference between "deferred action" and DACA under this process?**
A3: DACA is one form of deferred action. The relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

**Q4: If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?**
A4: Yes. Under existing regulations, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

**Q5: If my case is deferred, am I in lawful status for the period of deferral?**
A5: No. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful

AR2022_300611

immigration status, your period of stay is authorized by the Department of Homeland Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. **Individuals granted deferred action are not precluded by federal law from establishing domicile in the U.S.**

Apart from the immigration laws, "lawful presence," "lawful status" and similar terms are used in various other federal and state laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.

**Q6: Can I renew my period of deferred action and employment authorization under DACA?**
A6: Yes. You may request consideration for a renewal of your DACA. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another two years, and if you demonstrate an economic necessity for employment, you may receive employment authorization throughout that period.

Return to top.

# B. DACA Process

**Q7: How do I request consideration of DACA?**
A7: To request consideration of DACA (either as an initial request or to request a renewal), you must submit Form I-821D, Consideration of Deferred Action for Childhood Arrivals to USCIS. Please visit uscis.gov/i-821d before you begin the process to make sure you are using the most current version of the form available. This form must be completed, properly signed and accompanied by a Form I-765, Application for Employment Authorization, and a Form I-765WS, Worksheet (PDF, 242.84 KB), establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the accompanying filing fees for that form, please see the Form I-821D page for more information), USCIS will not consider your request for deferred action. Please read the form instructions to ensure that you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

You must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions at www.uscis.gov/i-821d. After your Form I-821D, Form I-765, and Form I-765 Worksheet have been received, USCIS will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings).

If it is determined that the request is complete, USCIS will send you a receipt notice. USCIS will then send you an appointment notice to visit an Application Support Center (ASC) for biometric services, if an appointment is required. Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing of your request for consideration of deferred action, or may result in a denial of your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a Form G-1145, E-Notification of Application/Petition Acceptance.

Each request for consideration of DACA will be reviewed on an individual, case-by-case basis. USCIS may request more information or evidence from you, or request that you appear at a USCIS office. USCIS will notify you of its determination in writing.

**AR2022_300612**

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS through this process. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their ICE case officer or follow directions at ICE's website at www.ice.gov/daca. This website also contains further information.

**Q8: Can I obtain a fee waiver or fee exemption for this process?**
A8: There are no fee waivers available for employment authorization applications connected to DACA. There are very limited fee exemptions available. Requests for fee exemptions must be filed and favorably adjudicated before an individual files his/her request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, homeless, in foster care or under 18 years of age and otherwise lacking any parental or other familial support and your income is less than 150% of the U.S. poverty level; or

- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or

- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

You can find additional information on our Fee Exemption Guidance Web page. Your request must be submitted and decided before you submit a request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must provide documentary evidence to demonstrate that you meet any of the above conditions at the time that you make the request. For evidence, USCIS will:

- Accept affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support.

- Accept copies of tax returns, bank statement, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level.

- Accept copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least $**10,000**.

- Address factual questions through Requests for Evidence (RFEs).

**Q9: If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), will they be placed into removal proceedings?**
A9: DACA is intended, in part, to allow CBP and ICE to focus on priority cases. Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact your case officer or the ICE Detention Reporting and Information Line at 1-888-351-4024 (staffed 8 a.m. – 8 p.m., Monday – Friday); or email ERO.INFO@ice.dhs.gov.

AR2022_300613

**Q10: Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**

A10: This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention).

**Q11: If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**

A11: No. If you are not in removal proceedings but believe that you meet the guidelines, you should submit your DACA request to USCIS under the process outlined below.

**Q12: Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**

A12: No. If you are currently in immigration detention, you may not request consideration of DACA from USCIS. If you think you may meet the guidelines of this process, you should identify yourself to your ICE case officer or follow procedures on ICE's website at www.ice.gov/daca, which also contains further information.

**Q13: If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what steps should I take to seek review of my case before removal?**

A13: If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact your case officer or the ICE Detention Reporting and Information Line at 1-888-351-4024 (staffed 8 a.m. – 8 p.m., Monday – Friday); or email ERO.INFO@ice.dhs.gov.

**Q14: What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**

A14: If you meet the guidelines and have been served a detainer, you should immediately contact the ICE Detention Reporting and Information Line at 1-888-351-4024 (staffed 8 a.m. – 8 p.m., Monday – Friday); or email ERO.INFO@ice.dhs.gov.

**Q15: If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated as part of the case-by-case review process, can I be considered for deferred action under this process?**

A15: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**Q16: If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**

A16: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**Q17: If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**

A17: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

**Q18: Can I request consideration of DACA under this process if I am currently in a nonimmigrant status (e.g. F-1, E-2, H-4) or have Temporary Protected Status (TPS)?**

A18: No. You can only request consideration of DACA under this process if you currently have no immigration status and were not in any lawful status on June 15, 2012.

**Q19: Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?**

A19: Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in the 2011 USCIS Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil or criminal matter.

**Q20: If my case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?**

A20: If your case is referred to ICE for purposes of immigration enforcement or you receive an NTA, information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians. However, that information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

**Q21: Will USCIS verify documents or statements that I provide in support of a request for DACA?**

A21: USCIS has the authority to verify documents, facts, and statements that are provided in support of requests for DACA. USCIS may contact education institutions, other government agencies, employers, or other entities in order to verify information.

Return to top.

# C. Background Checks

**Q22: Will USCIS conduct a background check when reviewing my request for consideration of DACA?**
A22: Yes. You must undergo biographic and biometric background checks before USCIS will consider your DACA request.

**Q23: What do background checks involve?**
A23: Background checks involve checking biographic and biometric information provided by the

AR2022_300615

individuals against a variety of databases maintained by DHS and other federal government agencies.

**Q24: What steps will USCIS and ICE take if I engage in fraud through the new process?**
A24: If you knowingly make a misrepresentation, or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, you will be treated as an immigration enforcement priority to the fullest extent permitted by law, and be subject to criminal prosecution and/or removal from the United States.

Return to top.

# D. After USCIS Makes a Decision

**Q25: Can I appeal USCIS' determination?**
A25: No. You cannot file a motion to reopen or reconsider and cannot appeal the decision if USCIS denies your request for consideration of DACA.

You may request a review of your I-821D denial by contacting the USCIS Contact Center at 800-375-5283 Monday to Friday, 8 a.m. to 8 p.m. Eastern. For people who are deaf, hard of hearing or have a speech disability: TTY 800-767-1833. You can have a Service Request created if you believe that you actually did meet all of the DACA guidelines and you believe that your request was denied because USCIS:

- Denied the request based on abandonment, when you actually responded to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) within the prescribed time;

- Mailed the RFE or NOID to the wrong address although you had changed your address online at www.uscis.gov **or** with a customer service representative on the phone and submitted a Form AR-11, Change of Address, before USCIS issued the RFE or NOID.

  - To ensure the address is updated on a pending case as quickly as possible, we recommend that customers submit a change of address request at www.uscis.gov/addresschange.  Please note that only an online change of address or a Form AR-11 submission will satisfy the legal requirements for notifying the agency of an address change. Therefore, if you called a customer service representative to change your address, please be sure you have also submitted your address change online or with a Form AR-11.

- Denied the request on the grounds that you did not come to the United States prior to your 16th birthday, but the evidence submitted at the time of filing shows that you did arrive before reaching that age.

- Denied the request on the grounds that you were under age 15 at the time of filing but not in removal proceedings, while the evidence submitted at the time of filing show that you indeed were in removal proceedings when the request was filed;

- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted at the time of filing shows that you were under the age of 31 as of June 15, 2012;

- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence submitted at the time of filing shows that you indeed were in an unlawful immigration status on that date;

- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted at the time of filing shows that you were, in fact, present;

AR2022_300616

- Denied the request due to your failure to appear at a USCIS Application Support Center (ASC) to have your biometrics collected, when you in fact either did appear at a USCIS ASC to have this done or requested prior to the scheduled date of your biometrics appointment to have the appointment rescheduled; or

- Denied the request because you did not pay the filing fees for Form I-765, Application for Employment Authorization, when you actually did pay these fees

**Q26: If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?**
A26: If you have submitted a request for consideration of DACA and USCIS decides not to defer action in your case, USCIS will apply its 2011 policy guidance governing the referral of cases to ICE and the issuance of Notices to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more detailed information on the applicable NTA policy, visit www.uscis.gov/NTA. If after a review of the totality of circumstances USCIS determines to defer action in your case, USCIS will likewise exercise its discretion and will not issue you an NTA.

**Q27: Can my deferred action under the DACA process be terminated before it expires?**
A27: Yes. DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.

Return to top.

# II. Initial Requests for DACA

**Q28: What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?**
A28: Under the secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012*;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

* Please review DACA FAQ 18 if you currently in a lawful immigration status.

**AR2022_300617**

**Q29: How old must I be in order to be considered for deferred action under this process?**
A29:

- If you have never been in removal proceedings, or your proceedings have been terminated before your request for consideration of DACA, you must be at least 15 years of age or older at the time of filing and meet the other guidelines.

- If you are in removal proceedings, have a final removal order, or have a voluntary departure order, and are not in immigration detention, you can request consideration of DACA even if you are under the age of 15 at the time of filing and meet the other guidelines.

- In all instances, you must have been under the age of 31 as of June 15, 2012, to be considered for DACA.

**Q30: I first came to the United States before I turned 16 years old and have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under this process?**
A30: Yes, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process.

**Q31: To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?**
A31: To meet the continuous residence guideline, you must submit documentation that shows you have been living in the United States from June 15, 2007, up until the time of your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation as to certain periods may raise doubts as to your continued residence if, for example, the gaps are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

Affidavits may be submitted to explain a gap in the documentation demonstrating that you meet the five-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit two or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period as to which there is a gap in the documentation. Affidavits may only be used to explain gaps in your continuous residence; they cannot be used as evidence that you meet the entire five-year continuous residence requirement.

**Q32: Does "currently in school" refer to the date on which the request for consideration of deferred action is filed?**

**AR2022_300618**

A32: To be considered "currently in school" under the guidelines, you must be enrolled in school on the date you submit a request for consideration of deferred action under this process.

**Q33: Who is considered to be "currently in school" under the guidelines?**
A33: To be considered "currently in school" under the guidelines, you must be enrolled in:

- a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements;

- an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or

- an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other state-authorized exam (e.g., HiSet or TASC) in the United States.

Such education, literacy, career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under state law, or in passing a GED exam or other state-authorized exam in the United States, include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations. Programs funded by other sources may qualify if they are programs of demonstrated effectiveness.

In assessing whether such programs not funded in whole or in part by federal, state, county or municipal grants or administered by non-profit organizations are of demonstrated effectiveness, USCIS will consider the duration of the program's existence; the program's track record in assisting students in obtaining a regular high school diploma or its recognized equivalent, in passing a GED or other state-authorized exam (e.g., HiSet or TASC), or in placing students in postsecondary education, job training, or employment; and other indicators of the program's overall quality. For individuals seeking to demonstrate that they are "currently in school" through enrollment in such a program, the burden is on the requestor to show the program's demonstrated effectiveness.

**Q34: How do I establish that I am currently in school?**
A34: Documentation sufficient for you to demonstrate that you are currently in school may include, but is not limited to:

- evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school; alternative program, or homeschool program that meets state requirements; or

- evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:

  - has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and

  - is funded, in whole or in part, by federal, state, county or municipal grants or is administered by non-profit organizations, or if funded by other sources, is a program of demonstrated effectiveness; or

AR2022_300619

Case 1:18-cv-00068   Document 607-4   Filed on 11/03/22 in TXSD   Page 620 of 691

- evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under state law (such as by passing a GED exam or other such state-authorized exam [for example, HiSet or TASC]), and that the program is funded in whole or in part by federal, state, county or municipal grants or is administered by non-profit organizations or if funded by other sources, is of demonstrated effectiveness.

Such evidence of enrollment may include: acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports which may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant.

**Q35: What documentation may be sufficient to demonstrate that I have graduated from high school?**
A35: Documentation sufficient for you to demonstrate that you have graduated from high school may include, but is not limited to, a high school diploma from a public or private high school or secondary school, a certificate of completion, a certificate of attendance, or an alternate award from a public or private high school or secondary school, or a recognized equivalent of a high school diploma under state law, or a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC) in the United States.

**Q36: What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC)?**
A36: Documentation may include, but is not limited to, evidence that you have passed a GED exam, or other state-authorized exam (e.g., HiSet or TASC), and, as a result, have received the recognized equivalent of a regular high school diploma under state law.

**Q37: If I am enrolled in a literacy or career training program, can I meet the guidelines?**
A37: Yes, in certain circumstances. You may meet the guidelines if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations, or if funded by other sources, are programs of demonstrated effectiveness.

**Q38: If I am enrolled in an English as a Second Language (ESL) program, can I meet the guidelines?**
A38: Yes, in certain circumstances. Enrollment in an ESL program may be used to meet the guidelines if the ESL program is funded in whole or in part by federal, state, county or municipal grants, or administered by non-profit organizations, or if funded by other sources is a program of demonstrated effectiveness. You must submit direct documentary evidence that the program is funded in whole or part by federal, state, county or municipal grants, administered by a non-profit organization, or of demonstrated effectiveness.

**Q39: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines?**
A39: No. Evidence not listed in Chart #1 will not be accepted to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another state-authorized exam (e.g., HiSet or TASC). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines.

**Q40: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain initial guidelines?**
A40: Evidence other than those documents listed in Chart #1 may be used to establish the following

**AR2022_300620**

guidelines and factual showings if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You satisfy the continuous residence requirement, as long as you present direct evidence of your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and

- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof of any of the following guidelines to demonstrate that you:

- Were under the age of 31 on June 15, 2012; and

- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to satisfy the guideline. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which, under the facts presented, may give rise to an inference of your presence on June 15, 2012 as well. However, evidence other than that listed in Chart #1 will not be accepted to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

Chart #1 provides examples of documentation you may submit to demonstrate you meet the initial guidelines for consideration of deferred action under this process. Please see the instructions of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
|---|---|
| Proof of identity | <ul><li>Passport or national identity document from your country of origin</li><li>Birth certificate with photo identification</li><li>School or military ID with photo</li><li>Any U.S. government immigration or other document bearing your name and photo</li></ul> |

AR2022_300621

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
| --- | --- |
| Proof you came to U.S. before your 16th birthday | • Passport with admission stamp<br>• Form I-94/I-95/I-94W<br>• School records from the U.S. schools you have attended<br>• Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)<br>• Travel records<br>• Hospital or medical records<br>• Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of immigration status | • Form I-94/I-95/I-94W with authorized stay expiration date<br>• Final order of exclusion, deportation, or removal issued as of June 15, 2012<br>• A charging document placing you into removal proceedings |
| Proof of presence in U.S. on June 15, 2012 | • Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• School records (letters, report cards, etc.)<br>• Military records (Form DD-214 or NGB Form 22)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Passport entries<br>• Birth certificates of children born in the U.S. |

**AR2022_300622**

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
|---|---|
| Proof you continuously resided in U.S. since June 15, 2007 | • Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of your education status at the time of requesting consideration of DACA | • School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current educational or grade level<br>• U.S. high school diploma, certificate of completion, or other alternate award<br>• High school equivalency diploma or certificate recognized under state law<br>• Evidence that you passed a state-authorized exam, including the GED or other state-authorized exam (for example, HiSet or TASC) in the United States |
| Proof you are an honorably discharged veteran of the U.S. Armed Forces or the U.S. Coast Guard | • Form DD-214, Certificate of Release or Discharge from Active Duty<br>• NGB Form 22, National Guard Report of Separation and Record of Service<br>• Military personnel records<br>• Military health records |

**Q41: May I file affidavits as proof that I meet the initial guidelines for consideration of DACA?**
A41: Affidavits generally will not be sufficient on their own to demonstrate that you meet the guidelines for USCIS to consider you for DACA. However, affidavits may be used to support meeting the following guidelines only if the documentary evidence available to you is insufficient or lacking:

- Demonstrating that you meet the five-year continuous residence requirement; and
- Establishing that departures during the required period of continuous residence were brief, casual and innocent.

If you submit affidavits related to the above criteria, you must submit two or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. Should USCIS determine that the affidavits are insufficient to overcome the unavailability or the lack of documentary evidence with respect to either of these guidelines, it will issue a Request for Evidence, indicating that further evidence must be submitted to demonstrate that you meet these guidelines.

**AR2022_300623**

Frequently Asked Questions | USCIS

USCIS will not accept affidavits as proof of satisfying the following guidelines:

- You are currently in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other state-authorized exam [for example, HiSet or TASC]), or are an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You were under the age of 31 on June 15, 2012; and

- Your criminal history, if applicable.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, USCIS will issue a Request for Evidence, indicating that you have not demonstrated that you meet these guidelines and that you must do so in order to demonstrate that you meet that guideline.

**Q42: Will I be considered to be in unlawful status if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?**
A42: Yes. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

**Q43: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?**
A43: No, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

**Q44: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of my dependent nonimmigrant status as of June 15, 2012.  May I be considered for deferred action under this process?**
A44: Yes.  For purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if you were admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of your dependent nonimmigrant status, on or before June 15, 2012, (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under this process.

**Q45: I was admitted for "duration of status" but my status in SEVIS is listed as terminated on or before June 15, 2012. May I be considered for deferred action under this process?**
A45: Yes. For the purposes of satisfying the ""had no lawful status on June 15, 2012," guideline alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for deferred action under this process.

**Q46: I am a Canadian citizen who was inspected by CBP but was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**
A46: In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of six months. For that reason, unless there is evidence, including verifiable evidence

provided by the individual, that he or she was specifically advised that his or her admission would be for a different length of time, the Department of Homeland Security (DHS) will consider for DACA purposes only, that the noncitizen was lawfully admitted for a period of six months. Therefore, if DHS is able to verify from its records that your last non-controlled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012 and you may be considered for deferred action under this process.

**Q47: I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**
A47: Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided an I-94 was admitted for the longest period legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued an I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

**Q48: Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?**
A48: You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18 while your request is pending with USCIS. If action on your case is deferred, you will not accrue unlawful presence during the period of deferred action. However, having action deferred on your case will not excuse previously accrued unlawful presence.

Return to top.

# III. Renewal of DACA

**Q49: When should I file my renewal request with U.S. Citizenship and Immigration Services (USCIS)?**
A49: USCIS strongly encourages you to submit your Deferred Action for Childhood Arrivals (DACA) renewal request between 150 days and 120 days before the expiration date located on your current Form I-797 DACA approval notice and Employment Authorization Document (EAD). Filing during this window will minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request.

USCIS' current goal is to process DACA renewal requests within 120 days. You may submit an inquiry about the status of your renewal request after it has been pending more than 105 days. To submit an inquiry online, please visit egov.uscis.gov/e-request.

- **Please Note:** Factors that may affect the timely processing of your DACA renewal request include, but are not limited to:

  - Failure to appear at an Application Support Center (ASC) for a scheduled biometrics appointment to obtain fingerprints and photographs. No-shows or rescheduling appointments will require additional processing time.

  - Issues of national security, criminality or public safety discovered during the background check process that require further vetting.

**AR2022_300625**

- Issues of travel abroad that need additional evidence/clarification.
- Name/date of birth discrepancies that may require additional evidence/clarification.
- The renewal submission was incomplete or contained evidence that suggests a requestor may not satisfy the DACA renewal guidelines and USCIS must send a request for additional evidence or explanation

**Q50: Can I file a renewal request outside the recommended filing period of 150 days to 120 days before my current DACA expires?**

A50: USCIS strongly encourages you to file your renewal request within the recommended 150-120 day filing period to minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request. Requests received earlier than 150 days in advance will be accepted; however, this could result in an overlap between your current DACA and your renewal. This means your renewal period may extend for less than a full two years from the date that your current DACA period expires.

If you file after the recommended filing period (meaning less than 120 days before your current period of DACA expires), there is an increased possibility that your current period of DACA and employment authorization will expire before you receive a decision on your renewal request. If you file after your most recent DACA period expired, but within one year of its expiration, you may submit a request to renew your DACA. If you are filing beyond one year after your most recent period of DACA expired, you may still request DACA by submitting a new initial request.

**Q51: How will USCIS evaluate my request for renewal of DACA:**

A51: You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:

- Did not depart the United States on or after Aug. 15, 2012, without advance parole;
- Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and
- Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

**Q52 Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?**

A52: Yes, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new employment authorization document from USCIS.

**Q53. Do I need to provide additional documents when I request renewal of deferred action under DACA?**

A53. No, unless you have *new* documents pertaining to removal proceedings or criminal history that you

AR2022_300626

have not already submitted to USCIS in a previously approved DACA request. USCIS, however, reserves the authority to request at its discretion additional documents, information or statements relating to a DACA renewal request determination.

CAUTION: If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

**Q54.  If I am no longer in school, can I still request to renew my DACA?**
A54.  Yes. Neither Form I-821D nor the instructions ask renewal requestors for information about continued school enrollment or graduation. The instructions for renewal requests specify that you may be considered for DACA renewal if you met the guidelines for consideration of initial DACA, including the educational guidelines and:

1. Did not depart the United States on or after Aug. 15, 2012, without advance parole;

2. Have continuously resided in the United States, up to the present time, since you submitted your most recent request for DACA that was approved; and

3. Have not been convicted of a felony, a significant misdemeanor or three or more misdemeanors, and are not a threat to national security or public safety.

**Q55.  If I initially received DACA and was under the age of 31 on June 15, 2012, but have since become 31 or older, can I still request a DACA renewal?**
A55. Yes. You may request consideration for a renewal of DACA as long as you were under the age of 31 as of June 15, 2012.


# IV. Travel

**Q56: May I travel outside of the United States before I submit an initial Deferred Action for Childhood Arrivals (DACA) request or while my initial DACA request remains pending with the Department of Homeland Security (DHS)?**
A56: Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence and you will not be considered for deferred action under this process. Any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, will be assessed by USCIS to determine whether the travel qualifies as brief, casual and innocent. (See Chart #2.)

CAUTION: You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences.

**Q57: If my case is deferred under DACA, will I be able to travel outside of the United States?**
A57: Not automatically. If USCIS has decided to defer action in your case and you want to travel outside the United States, you must apply for advance parole by filing a Form I-131, Application for Travel Document and paying the applicable fee. USCIS will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, USCIS will only grant advance parole if your travel abroad will be in furtherance of:

- humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;

AR2022_300627

- educational purposes, such as semester-abroad programs and academic research, or;
- employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

You may not apply for advance parole unless and until USCIS defers action in your case under the consideration of DACA. You cannot apply for advance parole at the same time as you submit your request for consideration of DACA. All advance parole requests will be considered on a case-by-case basis.

If USCIS has deferred action in your case under the DACA process after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

**CAUTION:** However, for those individuals who have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the Executive Office for Immigration Review (EOIR) and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, your departure may result in your being considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact U.S. Immigration and Customs Enforcement (ICE) through the local ICE Office of the Chief Counsel with jurisdiction over your case.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Q58: Do brief departures from the United States interrupt the continuous residence requirement?**
A58: A brief, casual and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States, your absence will be considered brief, casual and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;

2. The absence was not because of an order of exclusion, deportation or removal;

3. The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation or removal proceedings; and

4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file Form I-131, Application for Travel Document, to request advance parole to travel outside of the United States.

CAUTION: If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Travel Guidelines (Chart #2)**

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|

**AR2022_300628**

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after June 15, 2007, but before Aug. 15, 2012 | Brief, casual and innocent | No |
| | For an extended time<br><br>Because of an order of exclusion, deportation, voluntary departure, or removal<br><br>To participate in criminal activity | Yes |
| On or after Aug. 15, 2012, and before you have requested deferred action | Any | Yes. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case and you cannot travel until you receive advance parole.<br><br>In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| On or after Aug. 15, 2012, and after you have requested deferred action | Any | |

AR2022_300629

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after Aug. 15, 2012 and after receiving DACA | Any | It depends. If you travel after receiving advance parole, the travel will not interrupt your continuous residence. However, if you travel *without* receiving advance parole, the travel *will* interrupt your continuous residence. |

**Q59: May I file a request for advance parole concurrently with my DACA package?**
A59: Concurrent filing of advance parole is not an option at this time.

**Q60: Will USCIS expedite the processing of a DACA I-131 advance parole application?**
A60: No. As a general matter of course, expedite requests will not be granted, because USCIS will make every effort to process the advance parole request quickly; however, if you are experiencing an extremely urgent situation, you may request an emergency advance parole appointment at your local field office by contacting the USCIS Contact Center. You should bring the following items to your appointment:

- A completed and signed Form I-131, Application for Travel Document;
- The correct Form I-131 filing fee;
- Evidence to support the emergency request (e.g. medical documentation, death certificate, etc.); and
- Two passport-style photos.

Return to top.

# V. Criminal Convictions

**Q61: If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?**
A61: No. If you have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, you will not be considered for Deferred Action for Childhood Arrivals (DACA) except where the Department of Homeland Security (DHS) determines there are exceptional circumstances.

**Q62: What offenses qualify as a felony?**
A62: A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

**Q63: What offenses constitute a significant misdemeanor?**
A63: For the purposes of this process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the

AR2022_300630

influence; or,

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less.

**Q64: What offenses constitute a non-significant misdemeanor?**
A64: For purposes of this process, a non-significant misdemeanor is any misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

**Q65: If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the "three or more non-significant misdemeanors" making me unable to receive consideration for an exercise of prosecutorial discretion under this new process?**
A65: A minor traffic offense will not be considered a misdemeanor for purposes of this process. However, your entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, you warrant an exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a significant misdemeanor regardless of the sentence imposed.

**Q66: What qualifies as a national security or public safety threat?**
A66: If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion except where DHS determines there are exceptional circumstances. Indicators that you pose such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**AR2022_300631**

**Q67: Will offenses criminalized as felonies or misdemeanors by state immigration laws be considered felonies or misdemeanors for purpose of this process?**

A67: No. Immigration-related offenses characterized as felonies or misdemeanors by state immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action under this process.

**Q68: Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?**

A68: Expunged convictions and juvenile convictions will not automatically disqualify you. Your request will be assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted. If you were a juvenile, but tried and convicted as an adult, you will be treated as an adult for purposes of the DACA process.

Return to top.

# VI. Miscellaneous

**Q69: Does deferred action provide me with a path to permanent resident status or citizenship?**

A69: No. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

**Q70: Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?**

A70: This process is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from U.S. Citizenship and Immigration Services (USCIS) or U.S. Immigration and Customs Enforcement (ICE) in certain circumstances, consistent with longstanding practice.

**Q71: How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may warrant an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?**

A71: If USCIS determines that you do not satisfy the guidelines or otherwise determines you do not warrant an exercise of prosecutorial discretion, then it will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion.

**Q72: How should I fill out question 9 on Form I-765, Application for Employment Authorization?**

A72. When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

**Q73: Will there be supervisory review of decisions by USCIS under this process?**

A73: Yes. USCIS has implemented a successful supervisory review process to ensure a consistent process for considering requests for DACA.

**Q74: Will USCIS personnel responsible for reviewing requests for DACA receive special training?**

A74: Yes. USCIS personnel responsible for considering requests for consideration of DACA have received special training.

**AR2022_300632**

**Q75: Must attorneys and accredited representatives who provide pro bono services to deferred action requestors at group assistance events file a Form G-28 with USCIS?**

A75: Under 8 C.F.R. §§ 292.3 and 1003.102, practitioners are required to file a Notice of Entry of Appearance as Attorney or Accredited Representative when they engage in practice in immigration matters before DHS, either in person or through the preparation or filing of any brief, application, petition, or other document. Under these rules, a practitioner who consistently violates the requirement to file a Form G-28 may be subject to disciplinary sanctions; however on Feb. 28, 2011, USCIS issued a statement indicating that it does not intend to initiate disciplinary proceedings against practitioners (attorneys and accredited representatives) based solely on the failure to submit a Notice of Entry of Appearance as Attorney or Accredited Representative (Form G-28) in relation to pro bono services provided at group assistance events. DHS is in the process of issuing a final rule at which time this matter will be reevaluated.

**Q76: When must an individual sign a Form I-821D as a preparer?**

A76: Anytime someone other than the requestor prepares or helps fill out the Form I-821D, that individual must complete Part 5 of the form.

**Q77: If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?**

A77: You may, as you determine appropriate, provide individuals requesting DACA with documentation which verifies their employment. This information will not be shared with ICE for civil immigration enforcement purposes under section 274A of the Immigration and Nationality Act (relating to unlawful employment) unless there is evidence of egregious violations of criminal statutes or widespread abuses.

**Q78: Can I request consideration for deferred action under this process if I live in the Commonwealth of the Northern Mariana Islands (CNMI)?**

A78: Yes, in certain circumstances. The CNMI is part of the United States for immigration purposes and is not excluded from this process. However, because of the specific guidelines for consideration of DACA, individuals who have been residents of the CNMI are in most cases unlikely to qualify for the program. You must, among other things, have come to the United States before your 16th birthday and have resided continuously in the United States since June 15, 2007.

Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on Nov. 28, 2009. Therefore entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of the DACA process.

USCIS has used parole authority in a variety of situations in the CNMI to address particular humanitarian needs on a case-by-case basis since Nov. 28, 2009. If you live in the CNMI and believe that you meet the guidelines for consideration of deferred action under this process, except that your entry and/or residence to the CNMI took place entirely or in part before Nov. 28, 2009, USCIS is willing to consider your situation on a case-by-case basis for a grant of parole. If this situation applies to you, you should make an appointment through INFOPASS with the USCIS ASC in Saipan to discuss your case with an immigration officer.

**Q79: Someone told me if I pay them a fee, they can expedite my DACA request. Is this true?**

A79: No. There is no expedited processing for deferred action. Dishonest practitioners may promise to provide you with faster services if you pay them a fee. These people are trying to scam you and take your money. Visit our Avoid Scams page to learn how you can protect yourself from immigration scams.

**AR2022_300633**

Make sure you seek information about requests for consideration of DACA from official government sources such as USCIS or the DHS. If you are seeking legal advice, visit our Find Legal Services page to learn how to choose a licensed attorney or accredited representative.

**Q80: Am I required to register with the Selective Service?**
A80:  Most male persons residing in the U.S., who are ages 18 through 25, are required to register with Selective Service. Please see link for more information. [Selective Service].

**Q81: How can I tell if an employer is discriminating against me because I am a DACA recipient?**
A81: An employer may be engaging in discrimination if the employer:

- Demands that an employee show specific documents or asks for more or different documents than are required to complete Form I-9, Employment Eligibility Verification, or create an E-Verify case; or

- Rejects documents from the Lists of Acceptable Documents that reasonably appear to be genuine and relate to the employee, including a work authorization document because it has a future expiration date or because of an employee's prior unauthorized status.

The Civil Rights Division of the U.S. Department of Justice has an office dedicated to ensuring that employers do not discriminate against individuals who are permitted to work in the U.S. These include DACA recipients who have been granted work authorization. If you think your employer may be discriminating against you, contact the Immigrant and Employee Rights Section (IER) at 1-800-255-7688 (TDD for the deaf and hard of hearing: 1-800-237-2515).

For more information about unfair employment practices against DACA recipients, please read IER's factsheet in English (PDF) or Spanish (PDF).

For additional resources and information about workers' rights, visit www.justice.gov/crt/worker-information.

Return to top.

Last Reviewed/Updated:  08/31/2021

AR2022_300634

# February 2021 Volumes Projection Committee Meetings – FY 2022-2028 Volumes

*February 8-11, 2021*

## Summary

From February 8-11, 2021, the Volume Projection Committee (VPC) met to discuss preliminary workload volume projections for FY 2022-2028. As discussed in the FY 2019 meeting, these forecasts include additional fiscal years in a move towards long term planning. The VPC continued its approach, instituted in April 2013, of holding separate meetings for Field Operations Directorate (FOD) and Service Center Operations Directorate (SCOPS) to focus primarily on the volumes processed by their respective directorate. We held a separate meeting with both FOD and SCOPS to discuss the benefits and applications that are processed by each directorate and a combined meeting for those forms that are processed by both directorates. The Committee also held separate meetings for Asylum and the International and Refugee Affairs Division (IRAD) workloads.

The Office of Performance and Quality (OPQ) prepared preliminary workload volume projections for FY 2022-2028 time periods using SAS and historical System of Record (and in some instances PRT) receipt data (e.g. CLAIMS3) through October 2020, depending on the form type. OPQ provided graphs that illustrated volume trends and discussed key assumptions by form type. The Office of the Chief Financial Officer (OCFO) distributed the volume projections from OPQ in advance of the meeting via email.  These projections are the preliminary forecasts for FY 2022-2028. The VPC will revisit the FY 2022 workload volume projections in June 2021.

- Overall notes:
    - The previous fee rule is enjoined. We may do two or three fee rules by FY 2028. We do not think one will happen until FY 2022. Over the long term, we do not think fee rules will significantly affect the volumes that we are forecasting today.
    - We no longer anticipate significant fee waiver changes as part of a fee rule.
    - OCFO and OPQ are not interested in revisiting the FY 2021 forecasts. The frontlog means that we do not know precisely how many receipts we have received since approximately November 2020. Our revenue is close to the current forecast, but we do not have the budget to change the staffing levels for this year.
    - The Lockbox is trying to reduce the frontlog by working 6 days a week, moving work between filing locations, and other collaborative efforts with JP Morgan.

## Meeting #1: FOD

| Offices Represented |
| --- |
| Field Operations Directorate HQ |
| Investor Program Office |
| National Benefits Center |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| Office of Intake and Document Production |
| Office of Policy and Strategy |
| Office of Security and Integrity |
| Administrative Appeals Office |

## Volume Projection by Immigration Benefit

OPQ discussed assumptions they made regarding COVID-19, new and ongoing policy initiatives, and regulatory efforts.

### I-485 Application to Register Permanent Residence or Adjust Status

- Current Issues and Trends:
  - Family:
    - There has been an increase to the Chicago Lockbox frontlog, which could mean an increase in I-485 family filing. Perhaps people are more inclined to bring family members to the U.S. in the current political environment. There could be pent-up demand from the last few years. Bringing family members over is somewhat discretionary. We may have a better idea if this is an ongoing trend when we meet to finalize the FY 2022 forecast.
  - Cuban: The model uses I-765 C11 Cuban receipts as a leading indicator. No objection to OPQ forecasts.
- Volume Decision:
  - The VPC agreed to keep the OPQ forecasts for Family and Cuban volumes.
    - Family:
      - FY 2022: 324,000
      - FY 2023: 325,000
      - FY 2024-2028: 326,000
    - Cuban:
      - FY 2022-2028: 11,700

### N-400 Application for Naturalization - Regular

- Current Issues and Trends:
  - OPQ continues to leverage survival analysis to include individual microdata and assume that the behavior of people who naturalized before accurately represents the behavior of people who will naturalize in the future.
  - OPQ uses multiple factors to determine the likelihood of naturalization. For example, whether they are eligible to apply, length of time as an LPR, country of origin, visa type, and age.

- o The people in the survival analysis have never applied for naturalization. Refiles by LPRs who have previously filed their first N-400 are modeled separately.
- o OPQ pointed out that forecasting this way has an advantage over aggregated time series forecasts by making it possible to adjust the models at the person level. This sort of model does a better job of responding to spikes in applications by estimating how many people may apply than a simple trend analysis, which would respond to a recent spike in applications by simply carrying it forward.
- o The survival analysis does not capture the effects of extraordinary factors that drive surges in applications, such as presidential elections. We could adjust the outyear forecast for the next election, if necessary. Sometimes the VPC increased election years by 15%. This would make the FY 2024 and 2028 forecasts 950,000 approximately. Often the people that apply have tried unsuccessfully to naturalize before. This means that we may not need to reduce outyears to offset an increase. We will have more data by the next meeting.
- Volume Decision:
  - o The VPC agreed to the OPQ forecasts, except for FY 2024 and 2028, which would be election years.
    - ▪ FY 2022: 836,000
    - ▪ FY 2023: 825,000
    - ▪ FY 2024: 950,000
    - ▪ FY 2025-2027: 825,000
    - ▪ FY 2028: 950,000

### N-400 Application for Naturalization - Military
- Current Issues and Trends:
  - o There has been talk of DOD opening the gates to allow more people to apply for this form. The previous administration prevented people from applying, but the current administration may remove those barriers. There may be pent up demand.
  - o Numbers are so small that it is okay to go with OPQ forecasts.
- Volume Decision:
  - o The VPC agreed to use 10,000 for all years.

### N-600 Application for Certification of Citizenship
- Current Issues and Trends:
  - o None
- Volume Decision: The Committee agreed to use the OPQ forecast in each year.
  - o FY 2022: 56,100
  - o FY 2023: 55,100
  - o FY 2024: 54,500
  - o FY 2025: 54,300
  - o FY 2026: 54,100
    - ▪ FY 2027 – FY 2028: 54,000

## N-600K Application for Citizenship and Issuance of Certificate
- Current Issues and Trends:
  - No anticipated changes in behavior.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts.
    - FY 2022: 3,710
    - FY 2023: 3,800
    - FY 2024: 3,810
    - FY 2025: 3,810
    - FY 2026: 3,810
    - FY 2027: 3,810
    - FY 2028: 3,810

## I-600/600A Orphan Petitions
- Current Issues and Trends:
  - Used PRT data. No real seasonality. Any statistical model would bring the forecast down to zero because of the year over year decline.
  - NBC was comfortable with the OPQ forecasts. People cannot travel right now to pursue international adoptions.
  - OPQ used historical proportions of the I-600A to forecast I-600A Updates and I-600A Extensions. At the next meeting, we could look at older data to see what a return to normal might mean to the forecast.
  - The I-600A Supplement 3, which will be created by the Fee Rule, was forecast using the historical ratio of I-800 Supplement 3 to I-800As to determine the number of I-600A Supplement 3s as a proportion of I-600A receipts for the forecast. We anticipate it will be part of the next fee rule because it is apolitical and received 100% positive comments in the previous NPRM.
- Volume Decision:
  - I-600: The VPC agreed to use the OPQ forecast of 194 for all years.
  - I-600A: The VPC agreed to use the OPQ forecast of 192 for all years.
  - I-600A Update: The VPC agreed to use the OPQ forecast of 296 for all years.
  - I-600A Extension: The VPC agreed to use the OPQ forecast of 232 for all years.
  - I-600A Supplement 3: O filings in FY 2022 and120 starting in FY 2023 and continuing through FY 2028.

## I-800/800A Orphan Petitions
- Current Issues and Trends:
  - Same as Non-Hague Convention adoption.
- Volume Decision:
  - I-800: The VPC agreed to use the OPQ forecast of 576 for all years.
  - I-800A: The VPC agreed to use the OPQ forecast of 468 for all years.
  - I-800A Supplement 3: The VPC agreed to use the OPQ forecast of 508 for all years.

## I-131 Parole in Place
- Current Issues and Trends:

- o No objection to OPQ forecasts.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecasts from FY 2022-2028.
    - ▪ FY 2022: 7,880
    - ▪ FY 2023: 7,940
    - ▪ FY 2024: 7,970
    - ▪ FY 2025: 7,980
    - ▪ FY 2026: 7,990
    - ▪ FY 2027: 7,990
    - ▪ FY 2028: 8,000

## I-910 Civil Surgeon Request

- Current Issues and Trends:
  - o OPQ is waiting to see how the civil surgeon rule fits on the priority list for the new administration. We can adjust the forecast when we have more information.
  - o A future rule might make changes such as require renewal every three years and require all current civil surgeons to re-register within a given amount of time.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecast of 497 for all years.

## N-336 Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA)

- Current Issues and Trends:
  - o The Committee discussed the possibility that current high naturalization volumes could lead to an increase in this workload but agreed to use the OPQ forecast.
- Volume Decision:
  - o No objections to OPQ forecast of 5,050 per year for all years.

## IPO EB-5 Workloads

- Overall:
  - o Legislative authority for the regional center program will expire on June 30th unless Congress acts on it. We will know more when we meet in June.

### I-526 Immigrant Petition by Alien Entrepreneur

- Current Issues and Trends:
  - o Center:
    - ▪ IPO argued for increasing this forecast to 2,000. OPQ and OCFO agreed to compromise and use a 1,000 forecast for each year.
    - ▪ It is interesting to see how drastically this volume decreased immediately after the effective date of the EB-5 rule that changed the investment thresholds. Demand has not yet recovered.
  - o Non-Center: direct correlation to I-526 Center.

- In OPQ forecast, this volume was about 10% of the I-526 center workload. OPQ recommended using the same predicted ratio on the new Center volume of 1,000.
- Volume Decision: The VPC agreed to revised forecasts of the following volumes:
  o I-526 Center: 1,000 for all years.
  o I-526 Non-Center: 100 in all years.

### *I-829 Petition by Entrepreneur to Remove Conditions*
- Current Issues and Trends:
  o Despite current low I-526 volumes, the Committee expects to USCIS to continue to use all available EB-5 visas and therefore have typical levels of I-829 filings.
- Volume Decision:
  o The VPC agreed to use the OPQ forecasts.
    - FY 2021: 2,790
    - FY 2022: 2,810
    - FY 2023: 3,150
    - FY 2024: 3,150
    - FY 2025: 3,140
    - FY 2026: 3,140
    - FY 2027: 3,130
    - FY 2028: 3,130

### *I-924 and I-924A Application for Regional Center Under the Immigrant Investor Pilot Program*
- Current Issues and Trends:
  o Initial:
    - Legislative authority for the regional center program will expire on June 30th unless Congress acts on it. We will know more when we meet in June.
  o Amendments:
    - Currently about 4 a month. Very small volume now.
    - OPQ projections of 42 for FY 2021-2027.
  o I-924A:
    - IPO: Supplement is an annual submission for each existing regional center.
    - OPQ accounted for the current number of regional centers, typical approvals of new centers, and a standard rate of discontinued centers.
- Volume Decision:
  o I-924 Initial: The VPC agreed to use the OPQ forecasts of 7 for FY 2022-2028.
  o I-924 Amendment: The VPC agreed to use the OPQ forecast of 18 for FY 2022-2028.
  o I-924A: The VPC agreed to use the OPQ forecasts.
    - FY 2022: 631
    - FY 2023: 596
    - FY 2024: 564
    - FY 2025: 533

- FY 2026: 504
- FY 2027: 476
- FY 2028: 450

## Action Items

- Brief FOD on the survival analysis for the N-400 forecast.

## Meeting #2: Asylum

| Offices Represented |
|---|
| Asylum |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| RAIO |
| Office of Policy and Strategy |
| Office of Security and Integrity |

## Volume Projection by Immigration Benefit

### I-589 Application for Asylum and Withholding of Removal

- Current Issues and Trends:
  - As shown on the OPQ dashboard, the VPC overestimated I-589 receipts for the last several years. Actual receipts were lower than VPC forecast from FY 2018- FY 2020.
  - The return to Last-In-First-Out (LIFO) processing at the end of January 2018 resulted in a sustained decrease in asylum filings. The OPQ model assumed that LIFO would continue. Because of the pandemic affecting interviews, we may not suspend LIFO. Instead, we may slow down processing affirmative asylum.
  - OPQ admits the initial forecast of 45,600 might be low. Receipts were broadly down throughout April-September last year. The forecast just carries recent trends forward. We have not seen receipts that low since before FY 2014.
  - Asylum thinks they're seeing about 1,000 more a month or 20% more and have seen significant increases since November.
  - The spike in August was probably people trying to beat the fee rule. Surprisingly receipts stayed higher in historically low months, like January.
  - Other recent changes may not have driven changes in receipts. Asylum does not think the community is that responsive to small changes in nuance of I-589 workload.
  - Refugee workload is a priority for the new administration. It may divert resources from Asylum. A diversion of resource may lead to an inability to maintain LIFO processing and subsequently induce filings.
  - TPS for Venezuelans was discussed, but the Committee agreed that any effect on asylum volumes is likely to be relatively small.

- o Asylum is comfortable with a forecast like 80,000. The VPC agreed to use slightly higher amounts in the near-term and discounting years farther away
- Volume Decision:
  - o The VPC agreed to use 85,000 for each year from FY 2022-2024 and 70,000 for FY 2025 – FY 2028.

## I-867 Credible Fear

- Current Issues and Trends:
  - o The model added more weight to recent data points, which were relatively low.
  - o Travel to the border is suspended right now because of COVID-19. Asylum does not expect that to change in the next few months, but it may change closer to FY 2021 Q4.
  - o COVID-19 may remain a problem in detention facilities. However, if people are fleeing their country because of the pandemic, then it may drive them to the U.S.
  - o Going forward, Asylum expects affirmative asylum, credible fear, and reasonable fear to proceed and programs the previous administration started (MPP, ACA) will end. It might make sense to add MPP and ACA volumes to credible fear. The staff time for credible fear, MPP, and ACA workloads are all similar. There could be pent up demand because of COVID-19 and a return to normal.
  - o Asylum does not know how much the change in Mexican law that allows them to detain children will affect workload going forward.
  - o In FY 2016, receipts were over 90,000. The group agreed to assume 90,000 going forward. Percentage changes to credible fear has been comparable to I-589 since 2016.
- Volume Decision:
  - o The Committee agreed to use a forecast of 90,000 for each year FY 2022 through FY 2028.

## Reasonable Fear

- Current Issues and Trends:
  - o The growth in reasonable fear claims has been steady. This data series is not volatile, unlike credible fear and I-589s.
  - o The OPQ forecasts assume receipts will increase up to pre-pandemic figures.
- Volume Decision:
  - o The VPC agreed to use the OPQ projections for all years.
    - FY 2022: 13,500
    - FY 2023: 14,200
    - FY 2024-2028: 14,400

## Migrant Protection Protocols (MPP)

- Current Issues and Trends:
  - o COVID-19 killed MPP and ACA even before the election. The Trump administration used health care law (Title 42 of the U.S. Code) to stop asylum.
  - o Based on information from State, we should zero these out going forward. The credible fear forecast could cover these.

- o The Biden administration is actively pursuing the removal of MPP. If this occurs, the workload will be diverted to credible fear.
- Volume Decision:
  - o The VPC agreed to remove all forecasts and reduce estimates to 0 for all years.

### Asylum Cooperative Agreements (ACA)
- Current Issues and Trends:
  - o ACA will be treated similarly to MMP. The workload is expected to divert to credible fear.
- Volume Decision:
  - o The VPC agreed to remove all forecasts and reduce estimates to 0 for all years.

### I-881 NACARA
- Current Issues and Trends:
  - o Filing patterns have not changed considerably since the fee rule NPRM announced a higher proposed fee. With the final fee rule now enjoined, there are no expected shifts in receipts.
- Volume Decision:
  - o The VPC agreed to 300 a year from FY 2022 to 2028.

## Meeting #3: International and Refugee Affairs Division

| Offices Represented |
| --- |
| International and Refugee Affairs Division |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| RAIO |

## Volume Projection by Immigration Benefit

USCIS closed most USCIS offices abroad. USCIS currently has seven international offices:

1. Mexico City, Mexico;
2. Guatemala City, Guatemala;
3. San Salvador, El Salvador;
4. Beijing, China;
5. Guangzhou, China;
6. Nairobi, Kenya; and
7. New Delhi, India.

Based on feedback from International and Refugee Affairs Division (IRAD), we moved workloads to SCOPS/FOD or eliminated form lines from the RAIO forecasts. The remaining forms on the spreadsheet are those we assume will remain with the division.

### I-131 (IO) - Refugee Travel Document
- Current Issues and Trends:
  - OPQ used a 24-month annualization for the forecast.
  - These adjudications are handled domestically.
- Volume Decision:
  - The VPC agreed to use 40 for FY 2022-2028.

### I-131 Application for Travel Document - Humanitarian Parole
- Current Issues and Trends:
  - This workload will remain in IRAD.
- Volume Decision:
  - The VPC agreed to use 1,840 for all years.

### I-290B Notice of Appeal or Motion
- Current Issues and Trends:
  - None.
- Volume Decision:
  - The VPC agreed to use 31, the OPQ forecast, in all years.

### I-590 Registration for Classification as Refugee (IO) including Requests for Review
- Current Issues and Trends:

- o Refugee workload is a priority for the new administration so the initial OPQ forecast of 179 might be low.
- o Because of the time required to ramp up refugee processing, the Committee expect that volumes will remain low in FY 2022 before growing for FY 2023 and beyond.
- Volume Decision:  VPC agreed to use 800 in FY 2022 and 2,000 in FY 2023 – FY 2028
  - o FY 2022: 800
  - o FY 2023 – FY 2028: 2,000

### I-602 Application by Refugee for Waiver of Grounds of Excludability
- Current Issues and Trends:
  - o We should expect an increase over receipts in recent years because refugee processing is a priority once again.
- Volume Decision: VPC agreed to use 300 for all years.

### I-730 (IO)
- Current Issues and Trends:
  - o IRAD will process this work at all of its remaining locations.
  - o IRAD indicated that OPQ should straight-line forecast using 2019 historical volumes for 6 of the 7 remaining international offices. However, the I-730 workload at Nairobi will be more than in the past because IRAD is completing the Department of State's backlogged cases from Burundi, Uganda, and Kenya.
  - o We kept open the international offices that had large filing to join workloads.
- Volume Decision:
  - o The VPC agreed to use 3,000 for all years.

### Overseas Verifications
- Current Issues and Trends:
  - o Mexico City and some of the other remaining offices will continue to work on these. This is a new priority for IRAD. They recommended using data for the remaining 7 offices to calculate a new forecast.
  - o The OPQ forecast includes offices that closed. IRAD believes at the next meeting, we should only include the offices that remain open. State will perform work the work where we are not present.
  - o We continue to do this work even with offices closed to the public. Travel is not always required. Some are phone calls.
  - o This is a function of overall workload and fraud investigations. It is not something people apply for with a form.
- Volume Decision:
  - o The VPC agreed to use the 500 for all years.


### Action Items
- OPQ will create a new SAM using IRAD forecasts in case we want to request appropriations to process refugee workload.
- There will likely be several additional workloads that will need to be included in the future, including refugee status terminations/revocations, Haitian Family Reunification

Parole (HFRP), Cuban Family Reunification Parole (CFRP), and the Central American Minors (CAM) program.

AR2022_300646

## Meeting #4: SCOPS

| Offices Represented |
| --- |
| Service Center Operations HQ |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| Office of Policy and Strategy |
| Office of Security and Integrity |
| Immigration Records and Identity Services |

## Volume Projection by Immigration Benefit

### I-90 Application to Replace Permanent Resident Card - Replacement
- Current Issues and Trends:
  - It has not recovered from its historical need. It could be that people are less likely to lose their card or replace it if they are not traveling or applying for other benefit types.
  - The forecast uses ELIS data.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast of 145,000 for all years.

### I-90 Application to Replace Permanent Resident Card - Renewal
- Current Issues and Trends:
  - Stable series. Recovered from a slight drop. Forecast increases slightly year over year.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast for all years.
    - FY 2022: 603,000
    - FY 2023: 608,000
    - FY 2024: 614,000
    - FY 2025: 619,000
    - FY 2026: 624,000
    - FY 2027: 630,000
    - FY 2028: 635,000

### I-129 Petition for a Nonimmigrant Worker (Non-Premium)
- Current Issues and Trends:
  - OPQ provided detailed forecasts that align with the different fee levels in the proposed fee rule.
  - I-129 H-1B:
    - The forecast that OPQ presented is the sum of 4 (four) separate forecasts (cap initials, non-cap initials, amendments, and extensions).
    - H-1B pre-registration was new last year. SCOPS received some positive feedback on it.

- COVID may have depressed filings. On the other hand, companies that were well off before the pandemic may still petition for workers.
- The receipts did not materialize until close to the 90-day deadline after pre-registration period. We do not know if this was a result of the new system or a symptom of the pandemic.
- We may not need to accept 110,000 this year due to higher approval rates following policy changes. We might only need to accept 90,000 to hit the cap. The VPC agreed we should reduce the forecast by 20,000 as a result.
- We also expect fewer people to renew or adjust status, which would further reduce the forecast. The VPC agreed to reduce the OPQ forecast by 17,000 for a total reduction of 37,000 from the OPQ forecast. The forecast is 370,000 for all years.

o I-129 H-2B Named:
  - The OPQ forecast accounted for the proposed limit of 25 named beneficiaries per petition that was  part of the previous fee rule. We expect to propose this change in a new NPRM and to affect FY 2023 and beyond. OCFO hopes to have a new fee structure in place by FY 2023.
  - OPQ assumes that petitioners will continue to behave the same way that they did before. If they petitioned for 26 – 50 named workers before, then we assume that they will file 2 (two) petitions when this change may become effective in FY 2021. Similarly, if they petitioned for 51 – 75 named workers we assume 3 (three) petitions, 76 – 100 we assume 4 (four) petitions, and more than 100 we assume 5 (five) petitions.
  - There is no plan for a supplemental cap, but SCOPS wanted everyone to be aware it could happen.
  - The group agreed to the OPQ forecast.

o I-129 H-2B Unnamed:
  - Petitions with only unnamed beneficiaries would not be limited in the proposed fee structure.
  - There is no cap on workers per petition. The initial OPQ forecast sees a continuing increase in the outyears.
  - The group agreed to the OPQ forecast.

o I-129 H-2A Named:
  - The same logic and forecast as used in I-129 H-2B Named.
  - When there is a big spike, like a March 2019, OPQ accounts for it in the model to stabilize the forecast.

o I-129 H-2A Unnamed
  - Most of these petitions are unnamed. Steady upward trend, despite the pandemic. FY 2020 receipts are higher than last year but maybe not as high as they might have been without the pandemic. Travel restrictions or State not issuing visa might have depressed growth.
  - The group agreed to use the OPQ forecast of 13,200 for FY 2022 and add 1,000 year over year for each afterward. For example, the forecast in FY 2023 is 14,200.

o I-129L:

- This includes blanket petitions. Initials dropped and extensions and amendments increased, possibly as a result of travel restrictions during COVID-19. COVID-19 data was part of the forecast. The forecast is lower than historical actuals. The group agreed to 42,000, which is closer to our previous forecast and historical levels, for all years of the forecast.
  - o I-1290:
    - This is also a multi-beneficiary form, so the 25 named beneficiary limit would affect it. OPQ may not have included that in their forecast.
    - This may not recover as quickly as other volumes because entertainers may need time to prepare. We agreed that FY 2022 may be lower than historic levels.
    - We lowered the forecast for FY 2022 to 22,00 but otherwise used the OPQ forecast.
  - o I-129 All Other
    - This grouping includes 2 separate forms I-129MISC and I-129E&TN. Both will have the same fee. Most of these filings will be I-129MISC.
    - P visas will not have a separate proposed fee in the fee rule. It is part of the "all other" category that also includes E, TN, H3, and others. It will be subject to the 25-beneficiary limit like other I-129 subgroups.
    - The Committee agreed to use the OPQ forecasts.
- Volume Decision:
  - o I-129 Total: The VPC agreed to use the forecasts shown in the table below.

*Table 1: I-129 Non-Premium Forecasts*

| Immigration Benefit | FY 2022 Projection | FY 2023 Projection | FY 2024 Projection | FY 2025 Projection | FY 2026 Projection | FY 2027 Projection | FY 2028 Projection |
|---|---|---|---|---|---|---|---|
| I-129 H-1B | 370,000 | 370,000 | 370,000 | 370,000 | 370,000 | 370,000 | 370,000 |
| I-129 H-2B Named | 2,390 | 2,690 | 2,690 | 2,690 | 2,690 | 2,690 | 2,690 |
| I-129 H-2B Unnamed | 3,790 | 3,780 | 3,780 | 3,780 | 3,770 | 3,770 | 3,770 |
| I-129 H-2A Named | 4,410 | 5,950 | 6,060 | 6,150 | 6,210 | 6,260 | 6,290 |
| I-129 H-2A Unnamed | 13,200 | 14,200 | 15,200 | 16,200 | 17,200 | 18,200 | 19,200 |
| I-129 L | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 |
| I-129 O | 22,000 | 30,800 | 31,700 | 32,500 | 33,300 | 34,100 | 34,900 |
| I-129 All Other | 41,200 | 41,300 | 41,300 | 41,300 | 41,300 | 41,300 | 41,300 |

### I-129 Petition for a Nonimmigrant Worker (Premium)

- Current Issues and Trends:
  - o This one line is the sum of all the eligible types.
  - o There is now more than one premium processing fee. In the future, OCFO would like volume forecasts for each of the different premium fees.
  - o Last year might be an outlier. There was a suspension last year during the initial cap filing period.
  - o Typically, there is less premium workload when processing times are relatively fast. November, December, and January had very low premium receipts. The

OPQ forecast stopped with October receipts. As such, it does not include those low months.
- o We hoped to expand premium processing to other visa types, but OCC decided that would require changes to our regulations in most cases, except E3, a very small volume.
- Volume Decision:
  - o The VPC agreed to use 300,000 for FY 2022-2028.

### I-131 Application for Travel Document (DACA)
- Current Issues and Trends:
  - o The Trump administration tried to end DACA, but it will continue now. The initial 40,000 forecast is just a back of the envelope calculation and SME estimate.
  - o Historically it was around 21,000 during the Obama administration. It started to drop off during his term.
  - o The group agreed to meet in the middle of 20,000 and 40,000 to hedge our bets on 30,000.
- Volume Decision: 30,000 for all years.

### I-539 Application to Extend/Change Nonimmigrant Status
- Current Issues and Trends:
  - o The duration of status rule will not happen now.
  - o No objection to the OPQ forecast.
- Volume Decision:
  - o The VPC agreed to use the following forecasts:
    - FY 2022: 267,000
    - FY 2023: 246,000
    - FY 2024: 228,000
    - FY 2025: 212,000
    - FY 2026: 203,000
    - FY 2027-2028: 202,000

### I-140 Immigrant Petition for Alien Worker
- Current Issues and Trends:
  - o The OPQ forecast was an aggregate of four separate forecasts.
  - o The frontlog makes our actual receipts since October 2020 unclear.
  - o As discussed last year, there will be surplus family-based visas this year which will mean additional employment-based visas this year. It could mean as many as 200,000 additional visas in FY 2022. This would move the filing dates for employment-based visas. A lot of that surplus may go to I-140s that are already adjudicated but did not have a visa available at the time. However, there may be some enthusiasm that leads to increased filing.

- o We do not think the annual limit will be higher in FY 2023 and later years. State expects to be back to normal in FY 2023 according to OP&S. State does not think they will need to do anything to drive demand.
  - o Premium processing was suspended several times in 2020, so the initial OPQ forecast may be low.
- Volume Decision:
  - o I-140 Total: The VPC agreed to 140,000 for FY 2022 and 131,000 for FY 2023-2028.
  - o I-140 Premium: the VPC agreed to use 79,000 for the forecast in FY 2022 and the OPQ forecasts for all subsequent years.
    - ▪ FY 2022: 79,000
    - ▪ FY 2023: 74,100
    - ▪ FY 2024: 74,200
    - ▪ FY 2025: 74,200
    - ▪ FY 2026-FY 2028: 74,300

## DACA

### I-821D Deferred Action for Childhood Arrivals
- Current Issues and Trends:
  - o Because of the Supreme Court decision, USCIS started to accept initial requests again. We only started to receive initial requests again in December. People may age into the program for a few more years.
  - o Eventually, this population could be exhausted because eligible individuals must have arrived in the US by a certain date.
- Volume Decision: the VPC agreed to use the OPQ forecasts for FY 2022-2028.
  - o I-821D Initial
    - ▪ FY 2022: 40,000
    - ▪ FY 2023: 30,000
    - ▪ FY 2024-2028: 0
  - o I-821D Renewal
    - ▪ FY 2022: 270,000
    - ▪ FY 2023: 419,000
    - ▪ FY 2024: 270,000
    - ▪ FY 2025: 378,000
    - ▪ FY 2026: 228,000
    - ▪ FY 2027: 320,000
    - ▪ FY 2028: 194,000

### I-765 Application for Employment Authorization - DACA
- Current Issues and Trends:
  - o This forecast has a one-to-one relationship with the I-821D, with a slight plus-up for replacements.
  - o It uses a predictor for expiring DACA EADs.
  - o There is an 85% renewal rate

- Volume Decision:
  - The VPC agreed to use the OPQ forecasts for FY 2022-202w8.
    - FY 2022: 313,000
    - FY 2023: 453,000
    - FY 2024: 230,000
    - FY 2025: 381,000
    - FY 2026: 230,000
    - FY 2027: 323,000
    - FY 2028: 196,000

## TPS

### I-821 Application for Temporary Protected Status

- Current Issues and Trends:
  - The OPQ forecast assumes that there will be re-registrations for nationals of El Salvador, Sudan, Nicaragua, Haiti, Honduras, and Nepal in FY 2022 and subsequent 18-month cycles.
  - The Committee confirmed the TPS for Venezuela is imminent, indicating that the initial receipts would arrive in FY 2021 and renewals would likely begin in late FY 2022.
- Volume Decision:

  - The VPC agreed to use the OPQ projections for FY 2022-2028 plus an additional 275,000 for Venezuela in FY 2021 with a 96 percent renewal rate.
    - FY 2022: 277,000
    - FY 2023: 363,000
    - FY 2024: 258,000
    - FY 2025: 259,000
    - FY 2026: 335,000
    - FY 2027: 237,000
    - FY 2028: 87,000

### I-765 Application for Employment Authorization - TPS

- Current Issues and Trends:
  - See I-821
  - OPQ, SCOPS and OCFO are discussing whether this forecast should be reduced/adjusted to account for the fact that many Venezuelans who will qualify for TPS already have pending asylum claims and C8 EADs.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts for all years.
    - FY 2022: 274,000
    - FY 2023: 275,000
    - FY 2024: 174,00
    - FY 2025: 257,000
    - FY 2026: 254,000

- ▪ FY 2027: 161,000
- ▪ FY 2028: 86,000

### I-765 Application for Employment Authorization

- Current Issues and Trends:
  - Initials:
    - ▪ The OPQ C8 forecasts for both initials and renewals represent the status quo.
    - ▪ Litigation blocked various DHS and DOJ attempts to change the asylum system. Biden immigration policies will be a return to the previous status quo.
  - Renewals:
    - ▪ The renewal would be two years after the initial. The renewal rate is 82% so it should be even less than the initials.
  - Student initials:
    - ▪ None.
- Volume Decisions:
  - C8 Initials: the VPC agreed to use the OPQ forecast of 218,000 for all years
  - C8 Renewals: use the OPQ forecast for all years except FY 2023
    - ▪ FY 2022: 274,000
    - ▪ FY 2023: 214,000
    - ▪ FY 2024: 311,000
    - ▪ FY 2025: 201,000
    - ▪ FY 2026: 303,000
    - ▪ FY 2027: 263,000
    - ▪ FY 2028: 238,000
  - Student Initial: the VPC agreed to the OPQ forecasts for all years
    - ▪ FY 2022-2024: 133,000
    - ▪ FY 2025-FY 2027: 134,000
    - ▪ FY 2028: 135,000

### I-601A Provisional Unlawful Presence Waiver

- Current Issues and Trends:
  - A possible rule to amend this program is dead. As such, there is no longer a policy reason to intervene in the OPQ forecast. The group agreed to use the OPQ forecast.
- Volume Decision:
  - The VPC agreed use the OPQ forecast of 47,200 for FY 2022-2028.

### U Visas

### Waiver Form I-192 Application for Advance Permission to Enter as a Nonimmigrant

- Current Issues and Trends:

- - There was a proportionate relationship with I-918 in the past. However, with the change in fee waiver policy for this form, that relationship is no longer consistent. This may return to normal in the future.
- Volume Decision:
  - The VPC agreed to use 31,300 as the projection for all years.

### I-918 and I-918A Petition for U Nonimmigrant Status

- Current Issues and Trends:
  - The I-918A forecast is a proportion of the I-918 forecast.
  - There is a statutory cap of 10K visas that can be issued. However, there is no limit to applications.
  - We changed the rejection criteria so that we were rejecting most petitions temporarily. We do not believe this reflects any change in the underlying demand.
- Volume Decision:
  - I-918: The VPC agreed to use the OPQ forecasts of 26,200 in FY 2022 and 26,400 for FY 2023-2028.
  - I-918A: The VPC agreed to use the OPQ forecasts for in all years.
    - FY 2022: 18,300
    - FY 2023: 18,400
    - FY 2024- FY 2028: 18,500

### I-929 Petition for a Qualifying Family Member of a U-1 Nonimmigrant

- Current Issues and Trends:
  - The OPQ forecast is flat.
  - No issues with the OPQ forecast.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts of 784 for FY 2022-2028.

### I-914 and I-914A Application for T Nonimmigrant Status

- Current Issues and Trends:
  - The I-914A forecast is 90% of the I-914 forecast.
  - No issues with the OPQ forecast.
- Volume Decision:
  - I-914: The VPC agreed to use the OPQ forecasts of 1,190 in all years.
  - I-914A: The VPC agreed to use the OPQ forecasts of 1,020 in all years.

### I-129F Petition for Alien Fiancé(e)

- Current Issues and Trends:
  - Stable series. The OPQ forecasts suggest a rebound in FY 2022 and slightly lower levels for years beyond.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts of 51,100 in FY 2022 and 48,700 in FY 2023-FY 2028

### N-565 Application for Replacement Naturalization/Citizenship Document
- Current Issues and Trends:
  - None.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast for all years.
    - FY 2022: 27,300
    - FY 2023: 27,000
    - FY 2024: 26,800
    - FY 2025: 26,600
    - FY 2026: 26,500
    - FY 2027: 26,400
    - FY 2028: 26,300

## Action Items
- None


## Meetings #5: FOD and SCOPS

| Offices Represented |
| --- |
| Field Operations Directorate HQ |
| Office of the Chief Financial Officer |
| Office of Performance and Quality |
| Office of Policy and Strategy |
| Service Center Operations HQ |
| Administrative Appeals Office |
| Office of Intake and Document Production |


## Volume Projection by Immigration Benefit

### I-130 Petition for Alien Relative - Preference
- Current Issues and Trends:
  - OPQ forecasted this form as an aggregate of subgroup forecasts. There are separate models for F1, F2A, F2B, F3, and F4. Each model best represents the behavior of the subgroup.
  - Not all family-based visas were issued in FY 2020 and the same will be true for FY 2021. F2A went current last year, which lead to a small monthly spike. It more recently dipped. State is processing only limited numbers of visas abroad currently.
- Volume Decision
  - The VPC agreed to use the OPQ forecast of 224,,000 for all years.

**I-130 Petition for Alien Relative - Immediate Relative**
- Current Issues and Trends:
  - The current forecast is an aggregate of three subgroup forecasts: spouse, parent, and minor child.
  - It's possible that spouses might lag because the pandemic affected in-person activities like dating and travel. We also saw a dip in sponsoring of parents during the Trump administration. That workload could increase as political rhetoric around immigration changed. Changes in behavior like this are hard to model.
  - The FY 2022 forecast seems high considering FY 2019 and 2020 receipts. They approach the highs of FY 2016 through 2018. There was a small spike around the original implementation date for the fee rule before it was enjoined.
  - SCOPS pointed out that the frontlog might be affecting our counts, essentially understating recent receipts.
  - The group agreed to compromise and use 575,000 for all years instead of the OPQ forecast of 593,000.
- Volume Decision
  - The VPC agreed to use 575,000 for all years.

**I-131 Application for Travel Document**
- Current Issues and Trends:
  - I-131 Reentry Permit:
    - People cannot travel now, but there may be some future demand.
    - These are still historically low forecasts, but receipt receipts are low. We may see an increase in future years, but a substantial increase in FY 2022. It may be slow to respond.
  - I-131 Refugee Travel Document:
    - Refugees are a small part of this population, as it is primarily used by asylees, so an increase in refugee admissions will not have a significant affect.  It will take time to ramp up refugee processing.
  - I-131 Advance Parole:
    - The Committee discussed increasing the volume because the Committee expects I-485 employment filing volumes to remain high in FY 2021. There will be additional visas next year. Employment filers file I-131 at very high rates, so 40K was added to the FY21 forecast. OPQ recommends adding 15,000 more. The question is how long to expect additional employment visas to continue.
    - Adding Venezuela as a TPS country could increase filings.
    - As processing times continue to grow, people will need to renew their interim benefits. Renewals will continue to be important until processing times improve. Backlogs and difficulty scheduling interviews and ASC appointments may have lingering effects.
- Volume Decision:
  - I-131 Reentry Permit: The VPC agreed to use the OPQ forecast for FY 2023-2028.
    - FY 2022: 50,000
    - FY 2023-2028: 61,900

- o I-131 Refugee Travel Document: The VPC agreed to use the OPQ forecast  in all years.
  - FY 2022: 26,700
  - FY 2023: 26,500
  - FY 2024-2028: 26,600
- o I-131 Advance Parole: The VPC agreed to use the 450,00 for FY 2020 and the OPQ forecast for the following years.
  - FY 2022: 450,000
  - FY 2023-2028: 425,000

**I-485 Application to Register Permanent Residence or Adjust Status - Other**
- Current Issues and Trends:
  - o Employment:
    - Highly likely that family visas will not be fully used this year, so will be rolled over for next year to the employment category (FY 2022). We are probably going to end the year with a high inventory, around 160,000.
    - We assume DOS will use 12,000 employment.
    - Heavily affected by frontlog. It will continue to be hard to interview people and get cases in adjudicators hands this year. We are assuming that as many as 65,000 I-485s are in the frontlog now.
    - We will know more in June.
  - o Other:
    - None.
  - o Asylee:
    - We do not know if this workload will more back to SCOPS or if FOD will continue to work it. SCOPS is only working on a backlog of cases they already had as of September 2020.
    - The forecast uses predictors: affirmative and defensive asylum approvals by EOIR and USCIS I-589 approvals. The OPQ graphs show the predictor, actuals, and forecast.
  - o Refugee:
    - Uses refugee approvals as a predictor. This year we might admit 20-35K even though the target is 65K. Our capacity to interview will be a problem.
    - The administration has indicated that the refugee admissions ceiling and target for FY 2022 will be 125,000, indicating high volumes of processing in future years.
    - Refugees can apply a year after admission.
- Volume Decision:
  - o Employment:
    - FY 2022: 140,000
    - FY 2023-2028: 125,000
  - o Other: The VPC agreed to use the OPQ forecasts for all years.
    - FY 2022: 32,200
    - FY 2023: 31,600
    - FY 2024-2028: 31,500

- o Asylee: The VPC agreed to use the OPQ forecasts for FY 2022-2028.
    - FY 2022: 46,300
    - FY 2023: 46,700
    - FY 2024: 47,500
    - FY 2025: 48,200
    - FY 2026: 49,000
    - FY 2027: 49,800
    - FY 2028: 50,500
- o Refugee: The VPC agreed to use the OPQ forecast.
    - FY 2022: 25,000
    - FY 2023: 80,000
    - FY 2024: 110,000
    - FY 2025 – FY 2028: 75,000

## I-751 Petition to Remove the Conditions of Residence

- Current Issues and Trends:
    - o OPQ uses a predictor of LPRs granted conditional residence 2 years earlier to forecast this volume. However, the predictor is dependent on USCIS and State capacity to process other workloads.
    - o There may be a decrease in future filing because State is  issuing very few visas abroad right now.
    - o If a couple is married for two years, then the residence of the spouse is no longer conditional. We determine if there are conditions based on the wedding date and adjudication/admission date, not the filing date. As such, increased processing times may result in fewer persons being given conditional residence, and thus a lower I-751 figure in the future.
    - o  The FY 2022 forecast is solid because of the predictor. However, we can expect something lower than the forecast for a few years after.
- Volume Decision
    - o The VPC agreed to use the OPQ forecasts for FY 2021 and FY 2025-2027 but revised the other forecasts because of changes to visa processing in FY 2020.
        - FY 2022: 106,000
        - FY 2023: 150,000
        - FY 2024: 150,000
        - FY 2025: 176,000
        - FY 2026: 176,000
        - FY 2027: 176,000
        - FY 2028: 176,000

## I-765 Application for Employment Authorization - Non-TPS, Non-DACA

- Current Issues and Trends:
    - o This is the combination of different forecasts for the various I-765 subtypes.
    - o Asylee (C8) renewal applicants were forecasted separately with a predictor and discussed at the SCOPS meeting.
    - o AOS Renewal:

- There is a mix for 1 and 2-year EADs now. The [current policy manual](#) says everyone gets a 1-year EAD. USCIS may want to change it to prevent large volumes of free work associated with renewals and the visa bulletin surge of EB I-485s. OPQ can use the Valid to Date for the forecasts, but future mix is not the same as the historic mix, then that may not be reliable.
  - In the past, if a visa retrogresses, then the applicant got a 2-year EAD. If the priority date is current, then they got a 1-year EAD.
- All Other: Grab bag of all non-student, non-asylum applicant, and non-adjustment EAD types.
- Volume Decision:
  - The VPC agreed to use the following forecasts:
  - AOS Initials:
    - FY 2022: 460,000
    - FY 2023-2028: 445,000
  - AOS Renewals:
    - FY 2022: 275,000
    - FY 2023-2028: 200,000
  - All Other: OPQ forecast for all years
    - FY 2022: 464,000
    - FY 2023: 470,000
    - FY 2024-2028: 471,000

## I-360 Petition for Amerasian, Widow(er), or Special Immigrant

- Current Issues and Trends:
  - Special Immigrant: recent spike. State is held to a timeline because of a court order.
- Volume Decision: the VPC agreed to the OPQ projections as follows:
  - Widow(er): The VPC agreed to use the OPQ forecasts of 696 for all years.
  - Abusee: The VPC agreed to use the OPQ forecast for all years.
    - FY 2022: 20,100
    - FY 2023-2028: 20,600
  - Special Immigrant: The VPC agreed to use the OPQ forecast of 3,620 for FY 2022-2028.
  - Special Immigrant Juvenile: The VPC agreed to use the OPQ forecast of 19,700 for FY 2022-2028.

## I-290B Notice of Appeal or Motion

- Current Issues and Trends:
  - This is a combination of appeals and motions to reopen/reconsider.
  - There were several Trump administration policies that lead to increased denials and appeals. Higher approval rates mean fewer appeals and motions to reopen. In the SCOPS meeting, we forecasted a lower H-1B number in anticipation of higher approval rates. In recent years, most of the appeals were related to I-129 denials.
- Volume Decision
  - The VPC agreed to use the OPQ forecast of for all years.

- ▪ FY 2022: 32,900
- ▪ FY 2023 – FY 2028: 33,100

### Waiver Forms (I-191, I-193, I-212, I-601, I-612)

- Current Issues and Trends:
  - ○ None.
  - ○ The Committee acknowledged that the forecast for the I-612 reflects the combined volume of work performed on behalf of the Department of State as well as cases directly received by USCIS.
- Volume Decision
  - ○ I-191: The Committee agreed to use the OPQ forecast of 144 in all years.
  - ○ I-193: The Committee agreed to use the OPQ projection of 56 in all years.
  - ○ I-212: The Committee agreed to use the OPQ forecasts of 7,450 for all years.
  - ○ I-601: The Committee agreed to use the OPQ forecasts of 19,300 for all years.
  - ○ I-612: The Committee agreed to use the OPQ forecasts of 7,220 for all years

### I-102 Replacement/Initial Nonimmigrant Arrival/Departure Record

- Current Issues and Trends:
  - ○ USCIS issues initial I-94s for certain H-1Bs.
- Volume Decision:
  - ○ The VPC agreed to use the OPQ forecasts for all years :
    - ▪ FY 2022: 3,800
    - ▪ FY 2023: 3,710
    - ▪ FY 2024: 3,650
    - ▪ FY 2025: 3,610
    - ▪ FY 2026: 3,580
    - ▪ FY 2027: 3,550
    - ▪ FY 2028: 3,530

### I-824 Application for Action on an Approved Application or Petition

- Current Issues and Trends:
  - ○ None.
- Volume Decision:
  - ○ The VPC agreed to use the OPQ forecasts for FY 2022-2028.
    - ▪ FY 2022: 10,300
    - ▪ FY 2023: 10,100
    - ▪ FY 2024: 9,870
    - ▪ FY 2025: 9,670
    - ▪ FY 2026: 9,480
    - ▪ FY 2027: 9,280
    - ▪ FY 2028: 9,080

### I-817 Application for Family Unity Benefits

- Current Issues and Trends:
  - ○ None.
- Volume Decision:

- o The VPC agreed to use the OPQ forecast of 448 for all years.

**I-730 Refugee/Asylee Relative Petition**
- Current Issues and Trends:
  - o A mix of asylees and refugees use this form. Refugees are often admitted as family units, so asylees make up a larger portion of it. The Biden administration is making asylum and refugee admissions a priority so we might want to increase the forecast.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecast for FY 2022 and increase the forecast in later years.
    - ▪ FY 2022: 17,200
    - ▪ FY 2023-2028: 20,000

**Action Items**
- None.

# January 2020 Volumes Projection Committee Meetings – FY 2021-2027 Volumes

*January 27-30, 2020*

## Summary

From January 27-30, 2020, the Volume Projection Committee (VPC) met to discuss preliminary workload volume projections for FY 2021-2027. As discussed in the FY 2019 meeting, these forecasts include additional fiscal years in a move towards long term planning. The VPC continued its approach, instituted in April 2013, of holding separate meetings for Field Operations Directorate (FOD) and Service Center Operations Directorate (SCOPS) to focus primarily on the volumes processed by their respective directorate. We held a separate meeting with both FOD and SCOPS to discuss the benefits and applications that are processed by each directorate and a combined meeting for those forms that are processed by both directorates. The Committee also held separate meetings for Asylum and the International and Refugee Affairs Division (IRAD) workloads.

The Office of Performance and Quality (OPQ) prepared preliminary workload volume projections for FY 2021-2027 time periods using SAS and historical System of Record (and in some instances PRT) receipt data (e.g. CLAIMS3) through September, October, or November 2019, depending on the form type. OPQ provided graphs that illustrated volume trends and discussed key assumptions by form type. The Office of the Chief Financial Officer (OCFO) distributed the volume projections from OPQ in advance of the meeting via email.  Those projections were the initial forecasts for FY 2021-2027. The VPC will revisit the FY 2021 workload volume projections in June 2020.

## OPQ Assumptions

OPQ incorporated the following assumptions into the forecasts presented to the Committee:

### General

**Seven-year forecasts:** This year, the VPC will discuss seven years of forecasts, FY 2021-FY 2027. This longer outlook will benefit the FY 2022-2023 Fee Rule and the Strategic Facilities Plan. Most forecasts represent the model with the best statistical fit to the end of the seven-year period, but some forecasts were capped and straight-lined in order to remain within a reasonable range.

AR2022_300662

## RAIO Assumptions

**Last-In/First-Out (LIFO):** The Form I-589 forecast is naïve, meaning that if LIFO percentages are expected to change significantly, the VPC should adjust the forecast.

**Migrant Protection Protocols (MPP) and Asylum Cooperative Agreements (ACA):** With these programs being new, the VPC will rely on Asylum's SME volume estimates for the seven-year period.

**IO Office Closures:** Based on feedback from International and Refugee Affairs Division (IRAD), we moved workloads to SCOPS/FOD or eliminated form lines from the RAIO forecasts. The remaining forms on the spreadsheet are those we assume will remain with the division.

## Domestic Assumptions

**Fee Rule:** The latest timeline indicates that the upcoming fee rule will be effective in Q1 of FY 2021. Previous forecasts assumed the new fees would be effective in FY 2020.
- Several proposed fees for major form types are less than the current fee. For example, Forms, I-90, I-140, and N-600/N-600K. For these forms, we may see a pause in applications between the NPRM and final rule implementation, but OPQ did not include it in the forecasts.
- The NPRM proposes to remove standardized fee waivers except where required by statute. For example, T and U visa petitioners would still be eligible for a fee waiver under the proposal. If finalized, then this will likely change long-term filing patterns of heavily fee-waived forms such as the N-400 and N-600.
- The NPRM proposes to no longer bundle free I-765s and I-131s with a fee-paying I-485. If finalized, each application will require a separate fee, unless some other fee exemption applies. Due to this changes, OPQ made the following interventions in the forecasts:
  - I-130 Immediate Relative (IR): OPQ added an additional 24,000 to the forecast for FY 2021, mirroring a corresponding increase in the I-485 Family
  - I-131 Advance Parole (AP): OPQ added an additional 24,000 to the forecast for FY 2021, mirroring the I-485 Family; additionally, OPQ subtracted 160,000 from the FY 2022-2027 forecast, assuming that filing behavior for I-131 will revert to that from before bundling was introduced in 2007.
  - I-485 Family: OPQ added an additional 24,000 to the forecast for FY 2021, due to the unbundling effect of the fee rule. This figure was modelled on the FY 2017 fee rule volume increase.
  - I-765 Adjustment of Status (AOS): OPQ added an additional 24,000 to the forecast for FY 2021, mirroring the I-485 Family; additionally, OPQ subtracted 80,000 from the FY 2022-2027 forecast, assuming that filing behavior for I-765 will revert to that from before the bundling was introduced in 2007.

- Most I-129 proposed fees are higher than current fees. OPQ assumes demand for the I-129 is inelastic, so the only changes modelled were the increased volume of H-2As and H-2Bs, given that a maximum of 25 named beneficiaries will be allowed per form.
- N-400: OPQ made a best estimate forecast, based in large part on the 2007 fee rule volumes, tempered by the fact that we have received higher-than-expected volumes over the last several years.

**Other I-765 Assumptions**
- **Asylee (C8) I-765s:** The forecasts for both initials and renewals represent the status quo and do not take into account new regulations or policy changes regarding eligibility or validity periods.
- **DACA:** Methodology for the I-821D and I-765 DACA assume that the current parameters of the DACA program will continue indefinitely. As such, we only include DACA *renewals* in the forecasts, which include a minimal amount of initials. We assume no I-131D receipts.
- **H4 Rescission (I-765 Other):** we assumed that the H4 EAD rescission rule will be final by the end of FY 2021. As such, the FY 2022-2027 forecasts exclude H4 I-765 receipts.
- **TPS:** Methodology for the I-821 and I-765 TPS assume that there will be no future re-registrations for nationals of El Salvador, Sudan, Nicaragua, Haiti, Honduras, and Nepal.

**Duration of Status:** Based on the latest version of the draft rule, extensive communication with OP&S, and analysis of SEVIS data, 225,000 additional I-539s were included annually beginning in January 2021. The vast majority of this volume would be OPT and STEM OPT extensions.

**I-131A Boarding Letters:** We assume that this form, which was previously handled by IO, transferred to SCOPS.

**I-600/I-600A:** OPQ added overseas volumes that were handled by IO to the FOD volumes.

**I-601A Rule:** OPQ subtracted approximately 7,000 receipts from the annual forecasts for FY 2021-2027 to account for the upcoming rule.

**IO Office Closures/I-130 IR:** OPQ added stand-alone I-130 IR petitions that IO handled abroad (approximately 7K) to the Domestic line. We assume SCOPS will handle the workload.

**Public Charge:** No changes have been made to any forecasts in response to the Public Charge Rule, as both the implementation date and likely effect are unknown.

## Meeting #1: Asylum

| Offices Represented |
| --- |
| Asylum |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| RAIO |
| Service Center Operations (SCOPS) |
| Office of Policy and Strategy |

## Volume Projection by Immigration Benefit

### I-589 Application for Asylum and Withholding of Removal

- Current Issues and Trends:
    - The return to Last-In-First-Out (LIFO) processing at the end of January 2018 resulted in a sustained decrease in asylum filings. The OPQ model assumed that LIFO would continue.
    - Asylum is not keeping up with receipts in every office. In some places the backlog is growing, despite LIFO. This is true for Miami, Arlington, and Houston.
    - Affirmative asylum is unlikely to be a priority with the continuation and expansion of programs like the Migrant Protection Protocols (MPP) and Asylum Cooperative Agreements (ACA).
    - Asylum highlighted significant issues with delays in the entry of receipt data by SCOPS. Of the 17,000 asylum cases filed in FY 2020 Q1, only 60% were data entered within 21 days of receipt. These delays can cause issues with the historical information used to generate the forecasts.
    - The committee agreed to raise the forecast above the OPQ projection level because of the data issues identified in the series used to forecast receipts.
- Volume Decision:
    - The VPC agreed to use 95,000 for each year from FY 2021-2027.

### I-867 Credible Fear

- Current Issues and Trends:
    - Credible fear cases take priority over affirmative asylum. USCIS may have to pull more people off of affirmative asylum in order to adjudicate credible fear cases in 6 days.
    - Right now, some individuals claiming fear of return to their countries, are released by ICE and CBP with a Notice to Appear (NTA), but without a credible fear hearing because ICE does not have the physical capacity to detain everyone apprehended near the border who expresses a fear of return. ICE may increase their detention capacity, which may bring more people into the credible fear process. We can add more interview rooms. Additionally, if asylum is directed to reduce credible fear processing times to 6 days (from current time of 17 days), ICE will be able to cycle more individuals through their detention facilities, further increasing the credible fear workload.

- Volume Decision:
  - The Committee agreed to use a forecast of 95,000 for each year FY 2021 through FY27.

## Reasonable Fear
- Current Issues and Trends:
  - The growth in reasonable fear claims has been steady. This data series is not volatile, unlike credible fear and I-589s.
- Volume Decision:
  - The VPC agreed to use the OPQ projections for each year from FY 2021 to FY 2027.
    - FY 2021: 14,800
    - FY 2022: 15,800
    - FY 2023: 16,800
    - FY 2024: 17,800
    - FY 2025: 18,800
    - FY 2026: 19,800
    - FY 2027: 20,800

## Migrant Protection Protocols (MPP)
- Current Issues and Trends:
  - MPP expanded to approximately 20K cases in FY 2020 and is active in multiple different locations.
  - Asylum believes they are on pace to complete 30K MPP screenings in FY2020.
  - This workload forecast represents a count of interviews, not a count of unique individuals screened.
- Volume Decision:
  - The VPC agreed to use 30,000 for all years FY21 through FY27.

## Asylum Cooperative Agreements (ACA)
- Current Issues and Trends:
  - The data is really complicated. Asylum systems were not set-up for it, so the first determination is recorded as a credible fear screening and the second determination is recorded as a reasonable fear screening.
  - January 2020 is the first month with regular data from the Guatemala agreement. Asylum received 383 screenings. There is also an agreement with Honduras that will expand the number of screenings to be completed.
  - There are limiting factors like detention space, ICE flight capacity, and the ability of the receiving countries to accommodate arrivals.
- Volume Decision:
  - The VPC agreed to 10,000 a year from FY 2021 to 2027.

## Meeting #2: SCOPS

| Offices Represented |
| --- |
| Service Center Operations HQ |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| Office of Policy and Strategy |

## Volume Projection by Immigration Benefit

### I-90 Application to Replace Permanent Resident Card - Replacement
- Current Issues and Trends:
  - None.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast of 152,000 from FY 2020-2027.

### I-90 Application to Replace Permanent Resident Card - Renewal
- Current Issues and Trends:
  - Around 1.1M people get green cards every year. Old forecasts used a predictor. OPQ no longer does that.
  - OPQ will examine adjusting this forecast to account for the people who naturalize.
  - The naive model does trend up, possibly because of dips in the data from 10 years ago.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts for FY 2021 to 2027.
    - FY 2021: 574,000
    - FY 2022: 590,000
    - FY 2023: 607,000
    - FY 2024: 624,000
    - FY 2025: 641,000
    - FY 2026: 658,000
    - FY 2027: 674,000

### I-129 Petition for a Nonimmigrant Worker (Premium)
- Current Issues and Trends:
  - This has been trending up for years, possibly as a result of the backlog and long non-premium processing times.
  - The initial premium processing forecast included a 12 month period with a partial premium processing suspension.
  - By June 2020, OPQ will have a clean data set where there was not a premium processing suspension in the last 12 months.
- Volume Decision:
  - The VPC agreed to use 357,000 for FY 2021-2027.

## I-129 Petition for a Nonimmigrant Worker (Non-Premium)

- Current Issues and Trends:
  - OPQ provided detailed forecasts that align with the different fee levels in the proposed fee rule.
  - I-129 H-1B:
    - The forecast that OPQ presented is the sum of 4 (four) separate forecasts (cap initials, non-cap initials, amendments, and extensions).
  - I-129 H-2B Named:
    - The OPQ forecast accounted for the proposed limit of 25 named beneficiaries per petition that will be a part of the fee rule. OPQ assumes that petitioners will continue to behave the same way that they did before. If they petitioned for 26 named workers before, then we assume that they will file 2 (two) petitions when this change may become effective in FY 2021.
  - I-129 H-2B Unnamed:
    - Petitions with only unnamed beneficiaries would not be limited in the proposed fee structure.
  - I-129 H-2A Named:
    - The same logic and forecast as used in I-129 H-2B Named.
    - While H-2As are not eligible for premium processing, a policy memo requires a 15-day turn-around.
    - The forecast seems to double the current receipts. As such, the group decided to use 4,400 for each year.
    - SCOPS will follow-up with California Service Center. If the workload is increasing that much, then it may be an operational issue because of the short deadline. Additionally, it seems that H-2A with named workers may be cannibalizing some of the H-2A unnamed worker volume.
  - I-129 H-2A Unnamed:
    - Most of these petitions are unnamed.
  - I-129L:
    - This includes blanket petitions.
    - The group decided to use 36,000 across all of the years
  - I-129O: No issues.
  - I-129 All Other
    - P visas will not have a separate proposed fee in the fee rule. It is part of the "all other" category that also includes E, TN, H3, and others. It will be subject to the 25 beneficiary limit like other I-129 subgroups.
- Volume Decision:
  - I-129 Total: The VPC agreed to use the forecasts shown in the table below.

*Table 1: I-129 Non-Premium Forecasts*

| Immigration Benefit | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection |
|---|---|---|---|---|---|---|---|
| I-129 H-1B | 432,000 | 432,000 | 432,000 | 432,000 | 432,000 | 432,000 | 432,000 |
| I-129 H-2B Named | 2,730 | 2,730 | 2,730 | 2,740 | 2,740 | 2,740 | 2,750 |

| Immigration Benefit | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection | VPC January Projection |
|---|---|---|---|---|---|---|---|
| I-129 H-2B Unnamed | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 |
| I-129 H-2A Named | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 |
| I-129 H-2A Unnamed | 11,200 | 11,200 | 11,200 | 11,200 | 11,200 | 11,200 | 11,200 |
| I-129 L | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| I-129 O | 28,700 | 28,600 | 29,200 | 29,300 | 29,800 | 30,000 | 30,400 |
| I-129 All Other | 42,800 | 42,800 | 42,800 | 42,800 | 42,800 | 42,800 | 42,800 |
| Subtotal | 561,590 | 561,490 | 562,090 | 562,200 | 562,700 | 562,900 | 563,310 |

## I-140 Immigrant Petition for Alien Worker

- Current Issues and Trends:
  - The OPQ forecast was an aggregate of four separate forecasts.
  - Filing an I-140 may be a way for current H-1B holders to extend their nonimmigrant stay and get an EAD.
- Volume Decision:
  - I-140 Total: The VPC agreed to the OPQ forecasts for FY 2021-2027.
    - FY 2021: 150,000
    - FY 2022: 155,000
    - FY 2023-2027: 160,000
  - I-140 Premium: the VPC agreed to use for the OPQ forecasts for FY 2021-2027.
    - FY 2021: 74,600
    - FY 2022: 78,700
    - FY 2023: 83,100
    - FY 2024: 84,800
    - FY 2025: 86,400
    - FY 2026: 87,900
    - FY 2027: 89,300

## I-485 Application to Register Permanent Residence or Adjust Status

- Current Issues and Trends:
  - Asylee: Asylum expects to struggle to devote more resources to affirmative asylum cases, but current resources devoted to I-589 on the part of USCIS and EOIR are expected to continue.
  - Refugee: It is a structural model based on 91.4% of refugees filing for adjustment of status within one year of being eligible. OPQ will review the predictor series it used and get back to the committee.
- Volume Decision:
  - Asylee: The VPC agreed to use the OPQ forecasts for FY 2021-2027.
    - FY 2021: 40,000
    - FY 2022: 39,400
    - FY 2023: 38,900
    - FY 2024: 38,600
    - FY 2025: 38,300

- ▪ FY 2026: 38,100
- ▪ FY 2027: 37,900
- o Refugee: The VPC agreed to wait for OPQ to review its predictor series before adopting a forecast. After the meeting, SCOPS, OPQ, and OCFO agreed to use a forecast of 25,000 in all years.

## I-539 Application to Extend/Change Nonimmigrant Status

- Current Issues and Trends:
  - o Based on the latest version of the Duration of Status rule, extensive communication with OP&S, and analysis of SEVIS data, 225,000 additional I-539s were included annually beginning in January 2021. The vast majority of this volume would be OPT and STEM OPT extensions.
  - o OP&S mentioned that the timeline could be expedited even further, putting the policy into effect for the entirety of FY21.
  - o OPQ used multiple assumption regarding the implementation of the duration of status rule, including assuming that most individuals on non-OPT F visas would go through CBP rather than file with USCIS. In contrast, OPT filers would continue to file with USCIS because they are simultaneously requesting an EAD.
  - o OPQ will try to develop a more comprehensive SEVIS data set to evaluate the lifecycle of filers who proceed from bachelors through advanced degrees.
- Volume Decision:
  - o The VPC agreed to use the following forecasts:
    - ▪ FY 2021: 454,000
    - ▪ FY 2022: 454,000
    - ▪ FY 2023: 456,000
    - ▪ FY 2024: 458,000
    - ▪ FY 2025: 460,000
    - ▪ FY 2026: 462,000
    - ▪ FY 2027: 463,000


## U Visas

### Waiver Form I-192 Application for Advance Permission to Enter as a Nonimmigrant

- Current Issues and Trends:
  - o This mirrors the decrease in I-918 receipts. SCOPS suspects this slight decline will continue for the foreseeable future because of changes to fee waiver policy.
  - o Many potential actions related to I-918 policy, including potential litigation, may affect future receipt levels.
- Volume Decision:
  - o The VPC agreed to use the OPQ projections for FY 2021-2027.
    - ▪ FY 2021: 21,300
    - ▪ FY 2022: 20,600
    - ▪ FY 2023: 20,400
    - ▪ FY 2024-2027: 20,300

### I-918 and I-918A Petition for U Nonimmigrant Status

- Current Issues and Trends:
  - The I-918A forecast is a proportion of the I-918 forecast.
  - There is a statutory cap of 10K visas. However, there is no limit to applications that will remain in queue.
  - This has been trending down. SCOPS suspects this slight decline will continue for the foreseeable future.
  - Many potential actions related to I-918 policy, including potential litigation that may require USCIS to devote more resources to wait-listing I-918 applications, may affect future receipt levels.
- Volume Decision:
  - I-918: The VPC agreed to use the OPQ forecasts of 23,400 for FY 2021-2027.
  - I-918A: The VPC agreed to use the OPQ forecasts of 15,200 in FY 2021 and 14,600 in subsequent years

### I-929 Petition for a Qualifying Family Member of a U-1 Nonimmigrant

- Current Issues and Trends:
  - The OPQ forecast is flat. SCOPS believes I-918 workload will continue to decrease slightly.
  - There will be a substantial fee increase if the proposed fees are finalized.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts of 1,090 in FY 2021-2027.

## DACA

### I-821D Deferred Action for Childhood Arrivals

- Current Issues and Trends:
  - The renewals for this population continue as expected. The Committee assumed that this will continue through FY 2021.
  - The group decided to use the OPQ forecasts while waiting on a Supreme Court decision.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts for FY 2021-2027.
    - FY 2021: 340,000
    - FY 2022: 316,000
    - FY 2023: 310,000
    - FY 2024: 288,000
    - FY 2025: 283,000
    - FY 2026: 263,000
    - FY 2027: 258,000

### I-765 Application for Employment Authorization - DACA

- Current Issues and Trends:

- o This forecast has a one-to-one relationship with the I-821D, with a slight plus-up for replacements
- Volume Decision:
  - o The VPC agreed to use the OPQ forecasts for FY 2021-2027.
    - FY 2021: 344,000
    - FY 2022: 320,000
    - FY 2023: 314,000
    - FY 2024: 292,000
    - FY 2025: 286,000
    - FY 2026: 266,000
    - FY 2027: 261,000

## TPS

### I-765 Application for Employment Authorization - TPS

- Current Issues and Trends:
  - o The Committee assumed that none of the countries subject to the TPS injunction will have a re-registration period in FY21-FY27.
  - o The remaining countries subject to TPS are South Sudan, Yemen, Somalia, and Syria.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecasts for FY21-FY 27.
    - FY 2021: 3,040
    - FY 2022: 2,320
    - FY 2023: 4,820
    - FY 2024: 2,690
    - FY 2025: 2,220
    - FY 2026: 4,390
    - FY 2027: 1,530

### I-821 Application for Temporary Protected Status

- Current Issues and Trends:
  - o See I-765 TPS.
- Volume Decision:
  - o The VPC agreed to use the OPQ projections for FY 2021-2027.
    - FY 2021: 3,040
    - FY 2022: 2,320
    - FY 2023: 4,820
    - FY 2024: 2,690
    - FY 2025: 2,220
    - FY 2026: 4,390
    - FY 2027: 1,530

## I-765 Application for Employment Authorization

- Current Issues and Trends:

- o The C8 forecasts for both initials and renewals represent the status quo and do not take into account new regulations or policy changes regarding eligibility or validity periods.
- The three categories discussed at the SCOPS only meeting included C8 Initials, C8 Renewals, and Student Initials. Volume Decision:
  - o The VPC agreed to use the OPQ forecasts for FY21-FY27 for all of the categories.
  - o C8 Initials: 214,000 each year FY21-FY27
  - o C8 Renewals:
    - FY 2021: 345,000
    - FY 2022: 306,000
    - FY 2023: 329,000
    - FY 2024: 322,000
    - FY 2025-FY 2027: 324,000
  - o Student Initial:
    - FY 2021: 146,000
    - FY 2022: 142,000
    - FY 2023: 138,000
    - FY 2024: 133,000
    - FY 2025: 129,000
    - FY 2026: 124,000
    - FY 2027: 120,000

### I-129F Petition for Alien Fiancé(e)

- Current Issues and Trends:
  - o Stable series. The OPQ forecast is in line with the annualizations.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecasts for FY21-FY27.
    - FY 2021: 48,400
    - FY 2022: 48,500
    - FY 2023: 48,500
    - FY 2024: 48,600
    - FY 2025: 48,700
    - FY 2026: 48,800
    - FY 2027: 48,900

### I-131A Boarding Letters

- Current Issues and Trends:
  - o International Operations (IO) used to do this workload when USCIS had a presence overseas. Department of State does the work (and charges USCIS for it under the Economy Act) where we do not have an overseas presence. With many USCIS IO offices closes, this work would either move to Department of State or to a domestic USCIS office.
- Volume Decision:
  - o The VPC agreed to use the OPQ projection of 4,150 in FY 2021-2027. During the IRAD meeting, it was determined that SCOPS would only handle the not clearly

approvable cases from DOS, so the VPC will not forecast this workload for SCOPS in the future.

### I-914 and I-914A Application for T Nonimmigrant Status

- Current Issues and Trends:
  - o The I-914A forecast is 90% of the I-914 forecast.
- Volume Decision:
  - o I-914: The VPC agreed to use the OPQ forecasts of 1,240 in all years.
  - o I-914A: The VPC agreed to use the OPQ forecasts of 1,030 in all years.

### N-565 Application for Replacement Naturalization/Citizenship Document

- Current Issues and Trends:
  - o None.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecasts for FY 2021-2027.
    - ▪ FY 2021: 24,300
    - ▪ FY 2022: 23,800
    - ▪ FY 2023: 23,300
    - ▪ FY 2024: 22,800
    - ▪ FY 2025: 22,300
    - ▪ FY 2026: 21,800
    - ▪ FY 2027: 21,300

### Action Items

- H-2A named/unnamed follow-up from SCOPS
- I-485 refugee predictor follow-up from OPQ
- OCFO follow-up with IRAD on I-131A future processing.
- OPQ will provide monthly premium processing forecasts by subtype to SCOPS.

## Meeting #3: FOD

| Offices Represented |
| --- |
| Field Operations Directorate HQ |
| Investor Program Office |
| National Benefits Center |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| Office of Intake and Document Production |
| Office of Policy and Strategy |
| Service Center Operations HQ |

## Volume Projection by Immigration Benefit

OPQ discussed numerous assumptions it made regarding the fee rule, new and ongoing policy initiatives, and regulatory efforts.

### I-131 Parole in Place

- Current Issues and Trends:
  - System of record data are now being used because OPQ believes it is more accurate than the PRT data that the previous forecast used.
  - The naive forecast from OPQ is higher than the previous forecast because they resolved an issue with the source data that they used with the June 2019 forecasts for FY 2020-2021.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts from FY 2021-2027.
    - FY 2021: 6,250
    - FY 2022: 6,090
    - FY 2023: 5,920
    - FY 2024: 5,760
    - FY 2025: 5,590
    - FY 2026: 5,420
    - FY 2027: 5,260

### I-485 Application to Register Permanent Residence or Adjust Status

- Current Issues and Trends:
  - <u>Overall</u>:
    - The NPRM proposes to no longer bundle free I-765s and I-131s with a fee-paying I-485. If finalized, each application will require a separate fee, unless some other fee exemption applies. Due to this changes, OPQ made a number of interventions in the forecasts:
    - No separate forecast of I-944 filings associated with the forthcoming public charge rule was completed. The workload effects of this additional filing will be captured in the completion rates associated I-485s.
  - <u>Employment</u>:
    - There is a lot of monthly volatility, but the forecast expects the annual result will be near the employment visa cap. State and USCIS share a pool of around 140K employment-based visas. The cap changes a little year by year because of unused family-based visas that get added into the employment based pool.
    - Reverted back to the PRT data because there were issues with the system of record data. The system of record data is showing only 102K receipts at the end of FY 2019 due to an issue with disappearing history action codes (HACs). The Office of the Chief Data Officer is working to resolve the data issue in the system of record data.
  - <u>Family</u>:
    - OPQ added an additional 24,000 to the forecast for FY 2021, due to the unbundling effect of the fee rule. This figure was modelled on the FY 2017 fee rule volume increase.

- ▪ The OPQ forecast does not include any possible effect of the public charge rule. The group did not know how this change may affect receipts. The group decided to accept the OPQ forecast as a preliminary forecast. The VPC can revisit it in the June 2020 meeting.
  - o <u>Cuban</u>: The C11 predictor demonstrated one odd spike in September 2019. The June forecast may be lower.
- ▪ Volume Decision:
  - o The VPC agreed to keep the OPQ forecasts for all of the volumes.
    - ▪ Employment:
      - • FY 2021: 123,000
      - • FY 2022: 124,000
      - • FY 2023: 125,000
      - • FY 2024: 127,000
      - • FY 2025: 128,000
      - • FY 2026: 129,000
      - • FY 2027: 131,000.
    - ▪ Family: 382,000 in FY 2021 and 358,000 in FY 2022-2027.
    - ▪ Cuban:
      - • FY 2021: 19,400
      - • FY 2022: 18,500
      - • FY 2023: 17,700
      - • FY 2024: 16,900
      - • FY 2025: 16,000
      - • FY 2026: 15,200
      - • FY 2027: 14,400.

### N-400 Application for Naturalization - Regular

- • Current Issues and Trends:
  - o OPQ made a best estimate forecast, based in large part on the 2007 fee rule volumes, tempered by the fact that we have received higher-than-expected volumes over the last several years.
  - o OPQ pointed out that forecasting via survival analysis has an advantage over aggregated time series forecasts by making it possible to adjust the models at the person level. It had been working well up to January 2019. However, survival analysis is not helpful right now considering the following factors: a potential fee rule with a large increase, the elimination of fee waivers, immigration groups pushing for naturalization, and an election year.
  - o We expect receipts in FY 2022 to be much lower because many members of the eligible population will apply in FY 2021 to utilize fee waivers, the lower fee, and to participate in the national elections, and some applicants will not be able to afford the proposed $1,170 fee without a fee waiver.
  - o The group agreed on a preliminary forecast of 800,000 for all years.
- • Volume Decision:
  - o The VPC agreed to 800,000 from FY 2021-2027.

**N-400 Application for Naturalization - Military**
- Current Issues and Trends:
  - FOD continues to believe that there is pent up demand within the military population.
  - FOD may begin to take over some military naturalizations abroad, which IO has traditionally completed; however, those receipts were not explicitly considered here.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast for all of the years.
    - FY 2021: 6,300
    - FY 2022: 6,950
    - FY 2023: 7,020
    - FY 2024: 7,050
    - FY 2025: 6,950
    - FY 2026: 7,060
    - FY 2027: 7,060

**N-600 Application for Certification of Citizenship**
- Current Issues and Trends:
  - The overall workload volumes and fee-paying percentages for this form did not change substantially after the last fee increase. However, after the fee change in FY 2021, volumes could drop if current fee-waived populations decide to file for a passport instead.
  - It was discussed that passport applications and the N-600 are not necessarily perfect substitutes, so a population that needs this form is likely to remain.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast of 61,900 in FY 2021 but chose a forecast of 53,000 in FY 2022-2027 because it is closer to historical levels.

**N-600K Application for Citizenship and Issuance of Certificate**
- Current Issues and Trends:
  - None.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast of 5,190 in FY 2021 and 4,200 in FY 2022 and beyond, which is closer to historical levels.

**IPO EB-5 Workloads**

***I-526 Immigrant Petition by Alien Entrepreneur***
- Current Issues and Trends:
  - Despite the fall in receipts observed in FY 2019, receipts have increased before the implementation of the EB-5 modernization rule. Receipts seem to have remained elevated even after the new rule came into effect.
  - The announcement that IPO will prioritize the adjudication of case for which visas are immediately available may spur demand from countries other than

those that are currently subject to priority dates in the visa bulletin (i.e.
countries other than China, India, and Vietnam).
- Volume Decision: The VPC agreed to the OPQ forecasts of the following volumes:
  - I-526 Center: 6,120 in for FY 2021 through FY 2027.
  - I-526 Non-Center: 139 in all years.

### *I-829 Petition by Entrepreneur to Remove Conditions*
- Current Issues and Trends:
  - The committee discussed the fact that investors and their families may all file
    jointly on a single petition or may file individual petitions to remove conditions.
    FOD suggested that the committee could investigate changes in the ratio of
    principal investors to beneficiaries on I-526 to determine if the current model
    predictor remains valid.
  - OPQ can explore changing the predictor for future meetings, but the forecast is
    close to historical receipts.
- Volume Decision:
  - The VPC agreed on the OPQ forecasts for FY 2021-2027.
    - FY 2021: 3,270
    - FY 2022: 3,040
    - FY 2023: 3,180
    - FY 2024: 3,310
    - FY 2025: 3,440
    - FY 2026: 3,560
    - FY 2027: 3,690

### *I-924 and I-924A Application for Regional Center Under the Immigrant Investor Pilot Program*
- Current Issues and Trends:
  - Initial:
    - The OPQ forecast seemed high. The group chose to use FY 2019 receipts as
      the forecast for future years.
  - Amendments:
    - None.
  - I-924A:
    - None.
- Volume Decision:
  - I-924 Initial: The VPC agreed to use the FY 2019 receipts of 76 in FY 2021-2027.
  - I-924 Amendment: The VPC agreed to use the OPQ forecast of 72 in FY 2021-
    2027.
  - I-924A: The VPC agreed to use the OPQ forecast of 809 for FY 2021 and 833 for
    FY 2022-2027.

### I-600/600A Orphan Petitions
- Current Issues and Trends:
  - NBC was comfortable with the OPQ forecasts.
  - OPQ used historical proportions of the I-600A to forecast I-600A Updates and I-
    600A Extensions.

- o The I-600A Supplement 3, which will be created by the Fee Rule anticipated in Q1 of FY 2021, was not forecasted before the meeting. The group agreed to use the historical ratio of I-800 Supplement 3 to I-800As to determine the number of I-600A Supplement 3s as a proportion of I-600A receipts for the forecast.
- Volume Decision:
  - o I-600: The VPC agreed to use the OPQ recommendation of the 12-month annualization of 757 receipts for all years.
  - o I-600A:  The VPC agreed to use 827 in FY 2021-2027.
  - o I-600A Update: The VPC agreed to use 184 in FY 2021 and 138 in FY 2022-2027.
  - o I-600A Extension: The VPC agreed to use 29 in FY 2021 and 18 in FY 2022-2027.
  - o I-600A Supplement 3: The calculation method agreed upon by the committee produces a forecast of 542 filings each year from FY 2021 through FY 2027.

### I-800/800A Orphan Petitions
- Current Issues and Trends:
  - o None.
- Volume Decision:
  - o I-800: The VPC agreed to use the OPQ forecast of 1,930 for all years FY 2021 through FY 2027.
  - o I-800A: The VPC agreed to use the OPQ forecast of 1,800 for all years FY 2021 through FY 2027.
  - o I-800A Supplement 3: The VPC agreed to use the OPQ forecast of 1,180 for all years FY 2021 through FY 2027.

### I-910 Civil Surgeon Request
- Current Issues and Trends:
  - o USCIS is considering a proposal to require re-certifications. USCIS is drafting the NPRM. A final rule will not be effective before the end FY 2020.
  - o Another final rule that would require Form N-648 to be certified by Civil Surgeons, might increase this form's receipts.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecast of 505 for all years FY 2021 through FY 2027.

### N-470 Application to Preserve Residence for Naturalization Purposes
- Current Issues and Trends:
  - o None.
- Volume Decision:
  - o The VPC agreed to use the OPQ forecasts of 156 for all years FY 2021 through FY 2027.

## Meeting #4: International Operations

| Offices Represented |
| --- |
| International Operations |
| Office of Performance and Quality |
| Office of the Chief Financial Officer |
| RAIO |
| Office of Intake and Document Production |

## Volume Projection by Immigration Benefit

USCIS leadership plans to close most USCIS offices abroad. The current plan is to keep seven offices open:

1. Mexico City, Mexico;
2. Guatemala City, Guatemala;
3. San Salvador, El Salvador;
4. Beijing, China;
5. Guangzhou, China;
6. Nairobi, Kenya; and
7. New Delhi, India.

Based on feedback from International and Refugee Affairs Division (IRAD), we moved workloads to SCOPS/FOD or eliminated form lines from the RAIO forecasts. The remaining forms on the spreadsheet are those we assume will remain with the division.

### I-131 Refugee Travel Document
- Current Issues and Trends:
    - IRAD works on travel documents when someone leaves the country before they get a travel document.
    - The OPQ forecast is only an annualization.
- Volume Decision:
    - The VPC agreed to use the OPQ forecast of 66 for FY 2020-2027.

### I-131 Application for Travel Document - Humanitarian Parole - Humanitarian Affairs Branch
- Current Issues and Trends:
    - This workload will remain in IRAD.
    - IRAD informed the committee of a legal settlement that will enable 3,000 – 3,600 individuals who were previously cleared for the Central American Minors program to be paroled into the country. IO is performing this work currently. These individuals will be paroled for a period of 3 years and will need to apply for re-parole upon the end of that period.
    - The committee agreed to increase the projections for FY2023 and FY 2024 to reflect an anticipated wave of re-parole requests.
- Volume Decision:

- o The VPC agreed to the following forecasts:
  - ▪ FY 2021: 1,900
  - ▪ FY 2022: 1,900
  - ▪ FY 2023: 3,000
  - ▪ FY 2024: 3,000
  - ▪ FY 2025: 1,900
  - ▪ FY 2026: 1,900
  - ▪ FY 2027: 1,900

### I-290B Notice of Appeal or Motion
- Current Issues and Trends:
  - o This will remain in IRAD.
- Volume Decision:
  - o The VPC agreed to use 16 receipts in all years.

### I-590 Registration for Classification as Refugee (IO) including Requests for Review
- Current Issues and Trends:
  - o This will be integrated across all of IRAD, so it will no longer be captured via this meaning. It will be determined solely as a result of the overall refugee admissions ceiling.
  - o IO expects requests for review to continue at roughly the current workload level because IRAD's efforts to work through its discretionary review backlog may offset the effects of lower initial interview numbers.
- Volume Decision:
  - o N/A

### I-602 Application by Refugee for Waiver of Grounds of Excludability
- Current Issues and Trends:
  - o This work is completed at IRAD HQ.
- Volume Decision:
  - o N/A

### I-730 (IO)
- Current Issues and Trends:
  - o IRAD will process this work at all of its remaining locations.
  - o IRAD indicated that OPQ should a straight-line forecast using historical volumes for 6 of the 7 remaining international offices. However, the I-730 workload at Nairobi will be more than in the past because IRAD is completing the Department of State's backlogged cases from Burundi, Uganda, and Kenya. .
- Volume Decision:
  - o The VPC did not agree on a forecast at the meeting.

### Overseas Verifications
- Current Issues and Trends:

- Mexico City and some of the other remaining offices will continue to work on these. This is a new priority for IRAD. They recommended using data for the remaining 7 offices to calculate a new forecast.
  - IRAD suggested increasing the past work by existing offices by 15%
- Volume Decision:
  - The VPC agreed to determine a new forecast based on IRAD's recommendation.

## Meetings #5: FOD and SCOPS

| Offices Represented |
| --- |
| Field Operations Directorate HQ |
| Office of the Chief Financial Officer |
| Office of Performance and Quality |
| Office of Policy and Strategy |
| Service Center Operations HQ |
| Administrative Appeals Office |
| Office of Intake and Document Production |

## Volume Projection by Immigration Benefit

### I-130 Petition for Alien Relative - Preference

- Current Issues and Trends:
  - OPQ forecasted this form as an aggregate of subgroup forecasts. There are separate models for F1, F2A, F2B, F3, and F4. Each model best represents the behavior of the subgroup.
  - LPR spouses, LPR unmarried children, and USC siblings have shown volume decreases, while all other series are stable.
  - Overall, there is a decrease in applicants sponsoring relatives, since October 2016. OPQ noted, for preference cases, the effects are most pronounced in the 4th preference adult siblings of U.S. citizens.
  - The fact that visas are immediately available for the F-2A preference may produce additional receipts, but the effect is anticipated only in FY20. The committee acknowledges the high likelihood that this preference will become retrogress, possibly resulting in lower receipts in FY21.
  - SCOPS anticipates completing the adjudication of all existing paper F-2A applications by March-April 2020. Additional applications in the future will be in ELIS, significantly improving efficiency and communication with the Department of State.
- Volume Decision
  - The VPC agreed to use the OPQ forecasts in FY 2021-2027.
    - FY 2021: 249,000
    - FY 2022: 245,000
    - FY 2023: 240,000

- FY 2024: 236,000
- FY 2025: 232,000
- FY 2026: 228,000
- FY 2027: 224,000

### I-130 Petition for Alien Relative - Immediate Relative

- Current Issues and Trends:
  - As mentioned in the OPQ assumptions, we added an additional 24,000 to the forecast for FY 2021, mirroring a corresponding increase in the I-485 Family.
  - OPQ believes this spike may be motivated by an attempt to get free interim benefit before the fee rule eliminating debundling.
- The current forecast is an aggregate of three subgroup forecasts— spouse, parent, and minor child.Volume Decision
  - The VPC agreed to use 7,000 less than the OPQ projections.
    - FY 2021: 626,000
    - FY 2022: 602,000
    - FY 2023: 602,000
    - FY 2024: 603,000
    - FY 2025: 603,000
    - FY 2026: 604,000
    - FY 2027: 604,000

### I-131 Application for Travel Document

- Current Issues and Trends:
  - I-131 Reentry Permit:
    - The group agreed that the OPQ forecast in the out-years seemed high so they agreed to limit the forecast to 75,000 from FY 2024 onwards.
  - I-131 Refugee Travel Document:
    - This forecast now separates Reentry Permits and Refugee Travel Documents. This change was a suggestion of the VPC in the past and will be used to improve the revenue forecast.
    - Refugees are a small part of this population, as it is primarily used by asylees, so a decrease in refugee admissions will not have a significant affect. Additionally, the lower level of refugee admissions has been consistent for the last two years.
  - I-131 Advance Parole
    - OPQ added an additional 24,000 to the forecast for FY 2021, mirroring the I-485 Family; additionally, OPQ subtracted 160,000 from the FY 2022-2027 forecast, assuming that filing behavior for I-131 will revert to that from before bundling was introduced in 2007.
    - SCOPS thought that people with an employment based pending I-485 may still pay the fee.
- Volume Decision:
  - I-131 Reentry Permit: The VPC agreed to use the OPQ forecasts through FY 2023 and 75,000 per year after that.
    - FY 2021: 68,800

- ▪ FY 2022: 71,900
- ▪ FY 2023: 74,400
- ▪ FY 2024: 75,000
- ▪ FY 2025: 75,000
- ▪ FY 2026: 75,000
- ▪ FY 2027: 75,000
- o I-131 Refugee Travel Document: The VPC agreed to use the 12 month annualization of 27,000 in all years.
- o I-131 Advance Parole: The VPC agreed to use the OPQ forecasts for all years.
  - ▪ FY 2021: 388,000
  - ▪ FY 2022: 204,000
  - ▪ FY 2023: 204,000
  - ▪ FY 2024: 204,000
  - ▪ FY 2025: 204,000
  - ▪ FY 2026: 204,000
  - ▪ FY 2027: 204,000

**I-485 Application to Register Permanent Residence or Adjust Status Other**
- Current Issues and Trends:
  - o None.
- Volume Decision:
  - o Other: The VPC agreed to use the OPQ forecasts for all years.
    - ▪ FY 2021: 23,600
    - ▪ FY 2022: 25,000
    - ▪ FY 2023: 26,400
    - ▪ FY 2024: 27,800
    - ▪ FY 2025: 29,200
    - ▪ FY 2026: 30,600
    - ▪ FY 2027: 32,000

**I-601A Provisional Unlawful Presence Waiver**
- Current Issues and Trends:
  - o USCIS intends to issue a final rule in September restricting who is eligible to file this form.
  - o SCOPS handled these waivers and they will be moved to the SCOPS meeting in the future. SCOPS expects the backlog of these applications to grow.
- Volume Decision:
  - o The VPC agreed use the OPQ forecast of 46,300 for FY 2021-2027.

**Waiver Forms (I-191, I-193 I-212, I-601, I-612)**
- Current Issues and Trends:
  - o Form I-212 has seen a steady increase in receipts for the last 5 years. The group discussed whether the steady increase in the forecast makes sense operationally. The group decided to use a 10K ceiling in some of the future years.

- o The Committee acknowledged that the forecast for the I-612 reflects the combined volume of work performed on behalf of the Department of State as well as cases directly received by USCIS.
- Volume Decision
  - o I-191: The Committee agreed to use the OPQ forecast of 116 in all years.
  - o I-193: The Committee agreed to use the OPQ projection of 70 in all years.
  - o I-212: The Committee agreed to use the OPQ forecasts for FY 2021-2022 until using a 10,000 ceiling for FY 2023-2027.
    - ▪ FY 2021: 9,120
    - ▪ FY 2022: 9,890
    - ▪ FY 2023-2027: 10,000
  - o I-601: The Committee agreed to use the OPQ forecasts for FY 2021-2027.
    - ▪ FY 2021: 20,200
    - ▪ FY 2022: 19,500
    - ▪ FY 2023: 18,800
    - ▪ FY 2024: 18,100
    - ▪ FY 2025: 17,400
    - ▪ FY 2026: 16,700
    - ▪ FY 2027: 16,000
  - o I-612: The Committee agreed to use the OPQ forecasts for FY 2021-2027
    - ▪ FY 2021: 7,750
    - ▪ FY 2022: 7,880
    - ▪ FY 2023: 8,010
    - ▪ FY 2024: 8,140
    - ▪ FY 2025: 8,270
    - ▪ FY 2026: 8,400
    - ▪ FY 2027: 8,530

### I-751 Petition to Remove the Conditions of Residence

- Current Issues and Trends:
  - o OPQ uses a predictor of LPRs granted conditional residence 2 years earlier to forecast this volume.
  - o A fee rule may affect filing by introducing a spike in IR spousal filings immediately before the fee rule. This populations would likely need to start filing to remove conditions on their residence starting in FY 2024.
- Volume Decision
  - o The VPC agreed to use the OPQ forecasts for FY 2021-2023 and FY 2025-2027 but added 15,000 to the forecast for FY 2024.
    - ▪ FY 2021: 175,000
    - ▪ FY 2022: 171,000
    - ▪ FY 2023: 169,000
    - ▪ FY 2024: 182,000
    - ▪ FY 2025: 165,000
    - ▪ FY 2026: 163,000
    - ▪ FY 2027: 162,000

**I-765 Application for Employment Authorization - Non-TPS, Non-DACA**
- Current Issues and Trends:
  - This is the combination of different forecasts for the various I-765 subtypes.
  - As mentioned in the OPQ assumptions, OPQ made an intervention to the forecast because of a proposal in the fee rule NPRM. OPQ added an additional 24,000 to the forecast for FY 2021, mirroring the I-485 Family; additionally, OPQ subtracted 80,000 from the FY 2022-2027 forecast, assuming that filing behavior for I-765 will revert to that from before the bundling was introduced in 2007.
  - For the third time, Asylee (C8) renewal applicants were forecasted separately with a predictor. SCOPS confirmed the quality of the predictor in the January 2019 meeting. While there appears to be a larger gap between the predictor and forecast farther in the future, it is probably because the percentage relationship remains relatively constant but receipts are at an elevated level. The forecasts for both initials and renewals represent the status quo and do not take into account new regulations or policy changes regarding eligibility or validity periods.
  - Also, OPQ assumed that the H4 EAD rescission rule will be final by the end of FY 2021. As such, the FY 2022-2027 forecasts exclude H4 I-765 receipts.
  - AOS Renewal: despite debundling, there are many reasons besides employment for people to apply for an EAD. For example, some people use it to get a social security number or driver's license. As such, the group decided to limit the decrease in some future fiscal years.
- Volume Decision:
  - The VPC agreed to use the following forecasts for FY 2021-2027
  - AOS Initials:
    - FY 2021: 475,000
    - FY 2022: 371,000
    - FY 2023: 371,000
    - FY 2024: 371,000
    - FY 2025: 371,000
    - FY 2026: 371,000
    - FY 2027: 371,000
  - AOS Renewals:
    - FY 2021: 136,000
    - FY 2022: 128,000
    - FY 2023: 128,000
    - FY 2024: 128,000
    - FY 2025: 128,000
    - FY 2026: 128,000
    - FY 2027: 128,000
  - All Other:
    - FY 2021: 383,000
    - FY 2022: 385,000
    - FY 2023: 389,000
    - FY 2024: 392,000
    - FY 2025: 395,000

- FY 2026: 398,000
- FY 2027: 401,000

## I-102 Replacement/Initial Nonimmigrant Arrival/Departure Record

- Current Issues and Trends:
  - USCIS issues initial I-94s for certain H-1Bs.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts for FY 2021-2027
    - FY 2021: 5,580
    - FY 2022: 5,690
    - FY 2023: 5,770
    - FY 2024: 5,820
    - FY 2025: 5,850
    - FY 2026: 5,880
    - FY 2027: 5,890

## I-290B Notice of Appeal or Motion

- Current Issues and Trends:
  - This is a combination of appeals and motions to reopen/reconsider. It makes sense to see an increase in both because of our increase in denials for other benefits.
- Volume Decision
  - The VPC agreed to use the OPQ forecasts for FY 2021 through FY 2027-.
    - FY 2021: 41,200
    - FY 2022: 41,300
    - FY 2023: 42,600
    - FY 2024: 41,800
    - FY 2025: 39,500
    - FY 2026: 39,700
    - FY 2027: 39,800

## I-360 Petition for Amerasian, Widow(er), or Special Immigrant

- Current Issues and Trends:
  - Special Immigrant Juveniles volumes have flattened. Potential applicants may be discouraged by the final action date restrictions imposed by the visa bulletin.
- Volume Decision: the VPC agreed to the OPQ projections as follows:
  - Widow(er): The VPC agreed to use the OPQ forecast of 894 for all years.
  - Abusee: The VPC agreed to use the OPQ forecast 18,800 for all years.
  - Special Immigrant: The VPC agreed to use the OPQ forecast for FY 2021-2027.
    - FY 2021: 5,000
    - FY 2022: 4,960
    - FY 2023: 4,910
    - FY 2024: 4,870
    - FY 2025: 4,820
    - FY 2026: 4,770
    - FY 2027: 4,730

- Special Immigrant Juvenile: The VPC agreed to use the OPQ forecast of 22,800 for FY 2021-2027.

### I-730 Refugee/Asylee Relative Petition

- Current Issues and Trends:
  - Naive model seems reasonable.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast for all years.
    - FY 2021: 17,800
    - FY 2022: 18,100
    - FY 2023: 18,200
    - FY 2024-2027: 18,300

### I-817 Application for Family Unity Benefits

- Current Issues and Trends:
  - None.
- Volume Decision:
  - The VPC agreed to use the OPQ forecast for all years.
    - FY 2021: 451
    - FY 2022: 402
    - FY 2023: 361
    - FY 2024: 326
    - FY 2025: 297
    - FY 2026: 271
    - FY 2027: 250

### I-824 Application for Action on an Approved Application or Petition

- Current Issues and Trends:
  - None.
- Volume Decision:
  - The VPC agreed to use the OPQ forecasts for FY 2021-2027.
    - FY 2021: 10,300
    - FY 2022: 10,000
    - FY 2023: 9,800
    - FY 2024: 9,570
    - FY 2025: 9,350
    - FY 2026: 9,120
    - FY 2027: 8,900

### Action Items

- The group discussed changing the format of the meetings. For example, one meeting could discuss I-485 and all related benefit requests (I-130, I-131, I-751, I-765, etc.). However, the group did not make a decision. If anyone has a proposal to change the format, feel free to email it to the group.
- Everyone found the new dashboards that OPQ created very helpful.

**Count of Active DACA Recipients**
**By Month of Current DACA Expiration**
**As of Dec. 31, 2020**

**U.S. Citizenship**
**and Immigration**
**Services**

| Month of Current DACA Expiration | Active DACA Recipients (Rounded) |
|---|---|
| Dec-20 | D |
| Jan-21 | 13,540 |
| Feb-21 | 19,600 |
| Mar-21 | 27,850 |
| Apr-21 | 35,540 |
| May-21 | 29,830 |
| Jun-21 | 27,150 |
| Jul-21 | 36,550 |
| Aug-21 | 29,760 |
| Sep-21 | 36,050 |
| Oct-21 | 30,580 |
| Nov-21 | 17,640 |
| Dec-21 | 22,310 |
| Jan-22 | 23,040 |
| Feb-22 | 22,770 |
| Mar-22 | 18,830 |
| Apr-22 | 35,080 |
| May-22 | 42,340 |
| Jun-22 | 36,900 |
| Jul-22 | 16,630 |
| Aug-22 | 2,840 |
| Sep-22 | 21,480 |
| Oct-22 | 24,190 |
| Nov-22 | 20,180 |
| Dec-22 | 45,730 |
| **Grand Total** | **636,390** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

3) This report reflects the number of individuals with DACA expiration on or after Dec. 31, 2020 as of Dec. 31, 2020.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.

5) Totals may not sum due to rounding.

6) Counts less than 10 are notated with the letter "D".

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS & C3 Consolidated, queried 01/2021, TRK 6801.

Count of Active DACA Recipients
By Country of Birth
As of Dec. 31, 2020



U.S. Citizenship
and Immigration
Services

| Country of Birth | Count (rounded) | Country of Birth | Count (rounded) |
|---|---|---|---|
| Grand Total | 636,390 | Germany | 170 |
| Mexico | 512,660 | Zambia | 170 |
| El Salvador | 24,590 | Thailand | 170 |
| Guatemala | 16,700 | South Africa | 160 |
| Honduras | 15,310 | Saudi Arabia | 160 |
| Peru | 6,090 | Egypt | 150 |
| Korea, South | 6,030 | Armenia | 150 |
| Brazil | 4,950 | United Arab Emirates | 140 |
| Ecuador | 4,670 | Hong Kong | 140 |
| Colombia | 4,120 | Haiti | 140 |
| Argentina | 3,280 | Malaysia | 140 |
| Philippines | 3,190 | France | 140 |
| Jamaica | 2,200 | Ukraine | 130 |
| India | 2,150 | Lithuania | 130 |
| Venezuela | 2,060 | Russia | 120 |
| Dominican Republic | 1,940 | Senegal | 120 |
| Uruguay | 1,660 | Guinea | 110 |
| Trinidad and Tobago | 1,450 | Cameroon | 110 |
| Bolivia | 1,400 | Sri Lanka | 110 |
| Costa Rica | 1,290 | Zimbabwe | 110 |
| Nicaragua | 1,260 | Côte D'Ivoire | 110 |
| Chile | 1,180 | Japan | 110 |
| Poland | 1,130 | Grenada | 100 |
| Pakistan | 1,110 | Morocco | 100 |
| Nigeria | 890 | Gambia, The | 100 |
| Guyana | 820 | Saint Vincent and the Grenadines | 100 |
| Belize | 680 | Liberia | 100 |
| Indonesia | 630 | Greece | 90 |
| Canada | 630 | Suriname | 90 |
| Kenya | 580 | Romania | 90 |
| China | 570 | Lebanon | 90 |
| Bangladesh | 430 | Sierra Leone | 90 |
| United Kingdom | 420 | Spain | 90 |
| Portugal | 420 | Barbados | 80 |
| Mongolia | 420 | Fiji | 80 |
| Ghana | 400 | Dominica | 70 |
| Panama | 360 | Czech Republic | 70 |
| Italy | 300 | Malawi | 70 |
| Israel | 280 | Hungary | 70 |
| Bahamas, The | 260 | Macedonia | 70 |
| Albania | 220 | Tanzania | 70 |
| Taiwan | 210 | New Zealand | 60 |
| Saint Lucia | 200 | Uganda | 60 |
| Jordan | 190 | Antigua and Barbuda | 60 |

Count of Active DACA Recipients
By Country of Birth
As of Dec. 31, 2020



**U.S. Citizenship and Immigration Services**

| Country of Birth | Count (rounded) | Country of Birth | Count (rounded) |
|---|---|---|---|
| Turkey | 190 | Bulgaria | 60 |
| Paraguay | 180 | Iran | 50 |
| Vietnam | 50 | Libya | 10 |
| Kuwait | 50 | Afghanistan | D |
| Nepal | 50 | Denmark | D |
| Cabo Verde | 50 | Montserrat | D |
| Tonga | 50 | Iraq | D |
| Australia | 50 | Latvia | D |
| Montenegro | 50 | Namibia | D |
| Netherlands | 50 | Slovenia | D |
| Angola | 40 | Somalia | D |
| Democratic Republic of Congo | 40 | French Guiana | D |
| Mali | 40 | Kyrgyzstan | D |
| Cambodia | 40 | Moldova | D |
| Singapore | 40 | Central African Republic | D |
| Qatar | 30 | Cyprus | D |
| Virgin Islands, British | 30 | Lesotho | D |
| Slovakia | 30 | Madagascar | D |
| Ethiopia | 30 | Norway | D |
| Uzbekistan | 30 | Aruba | D |
| Sweden | 30 | Guadeloupe | D |
| Turks and Caicos Islands | 30 | Macau | D |
| Saint Kitts and Nevis | 30 | Mauritania | D |
| Serbia | 30 | Mauritius | D |
| Yemen | 30 | Bosnia and Herzegovina | D |
| Togo | 30 | Brunei | D |
| Bahrain | 20 | Chad | D |
| Belgium | 20 | Luxembourg | D |
| Estonia | 20 | Rwanda | D |
| Netherlands Antilles | 20 | Bhutan | D |
| Samoa | 20 | Martinique | D |
| Gabon | 20 | Sudan | D |
| Austria | 20 | Tuvalu | D |
| Yugoslavia | 20 | Equatorial Guinea | D |
| Botswana | 20 | Guinea-Bissau | D |
| Ireland | 20 | Marshall Islands | D |
| Congo | 20 | Micronesia, Federated States of | D |
| Western Samoa | 20 | Mozambique | D |
| Bermuda | 20 | Palau | D |
| Syria | 20 | Papua New Guinea | D |
| Cayman Islands | 20 | Tunisia | D |
| Algeria | 10 | Turkmenistan | D |
| Kosovo | 10 | Zaire | D |
| Switzerland | 10 | Anguilla | D |

AR2022_300691