3. Evidence establishing that you have a residence abroad that you have no intention of abandoning.

**B. B-1 Nonimmigrant Domestic Servant of a U.S. Citizen--(c)(17)(ii).** File Form I-765 with:

1. Evidence from your employer that he or she is a U.S. citizen; and

2. Evidence that your employer has a permanent home abroad or is stationed outside the United States and is temporarily visiting the United States or the citizen's current assignment in the United States will not be longer than four years; and

3. Evidence that he or she has employed you as a domestic servant abroad for at least six months prior to your admission to the United States.

**C. B-1 Nonimmigrant Employed by a Foreign Airline--(c)(17)(iii).** File Form I-765 with a letter from the airline fully describing your duties and stating that your position would entitle you to E nonimmigrant status except for the fact that you are not a national of the same country as the airline or because there is no treaty of commerce and navigation in effect between the United States and that country.

**D. Spouse of an E-1/E-2 Treaty Trader or Investor--(a)(17).** File Form I-765 with evidence of your lawful status and evidence you are a **spouse** of a principal E-1/E-2, such as your Form I-94. (Other relatives or dependents of E-1/E-2 aliens who are in E status are not eligible for employment authorization and may not file under this category.)

**E. Spouse of an L-1 Intracompany Transferee-- (a)(18).** File Form I-765 with evidence of your lawful status and evidence you are a **spouse** of a principal L-1, such as your Form I-94. (Other relatives or dependents of L-1 aliens who are in L status are not eligible for employment authorization and may not file under this category.)

**F. Spouse of an E-2 CNMI Investor--(c)(12).** File Form I-765 with evidence of your lawful status and evidence you are a **spouse** of a principal E-2 CNMI Investor, and a copy of the principal E-2 CNMI Investors long-term business certificate or Foreign Investment Certificate. (Please note that spouse of a principal E-2 CNMI Investor who obtained status on the basis of a Foreign Retiree Investment Certification is not eligible for employment authorization and may not file under this category.)

**6. Family-Based Nonimmigrant Categories**

**A. K-1 Nonimmigrant Fiance(e) of U.S. Citizen or K-2 Dependent--(a)(6).** File Form I-765 if you are

filing within 90 days from the date of entry. This EAD cannot be renewed. Any EAD application other than for a replacement must be based on your pending application for adjustment under (c)(9).

**B. K-3 Nonimmigrant Spouse of U.S. Citizen or K-4 Dependent--(a)(9).** File Form I-765 along with evidence of your admission such as copies of your Form I-94, passport, and K visa.

**C. Family Unity Program--(a)(13).** If you are filing for initial or extension Family Unity benefits, complete and submit Form I-817, Application for Voluntary Departure Under the Family Unity Program according to the filing instructions on Form I-817. An EAD will be issued if your Form I-817 is approved; you do not need to submit Form I-765.

If your non-expired Family Unity EAD is lost or stolen, file Form I-765 with proper fee(s), along with a copy of your approval notice for Family Unity benefits, to request a replacement.

**D. LIFE Family Unity--(a)(14).** If you are applying for initial employment authorization under Family Unity provisions of section 1504 of the LIFE Act Amendments, or an extension of such authorization, you should not use this form. Obtain and complete Form I-817, Application for Family Unity Benefits. If you are applying for a replacement EAD that was issued under LIFE Act Amendments Family Unity provisions, file Form I-765 with the required evidence listed in the "Required Document" section of these instructions.

**E. V-1, V-2, or V-3 Nonimmigrant--(a)(15).** If you have been inspected and admitted to the United States with a valid V visa, file this application along with evidence of your admission, such as copies of your Form I-94, passport, and K visa. If you have been granted V status while in the United States, file this application along with evidence of your V status, such as an approval notice. If you are in the United States but you have not yet filed an application for V status, you may file this application at the same time as you file your application for V status. USCIS will adjudicate this application after adjudicating your application for V status.

**7. EAD Applicants Who Have Filed for Adjustment of Status**

**A. Adjustment Applicant--(c)(9).** File Form I-765 with a copy of the receipt notice or other evidence that your Form I-485, Application for Permanent Residence or Adjust Status, is pending. You may file Form I-765 together with your Form I-485.

**B. Adjustment Applicant Based on Continuous Residence Since January 1, 1972--(c)(16).** File Form I-765 with your Form I-485, Application for Permanent Residence; a copy of your receipt notice; or other evidence that the Form I-485 is pending.

**C. Renewal EAD for National Interest Waiver Physicians:** If you are filing for a renewal EAD based on your pending adjustment status and an approved National Interest Waiver Physician petition, you must also include evidence of your meaningful progress toward completing the national interest waiver obligation. Such evidence includes documentation of employment in any period during the previous 12 months (e.g., copies of W-2 forms). If you did not work as a national interest waiver physician during any period of the previous 12 months, you must explain and provide a statement of future intent to work in the national interest waiver employment.

**8. Other Categories**

**A. N-8 or N-9 Nonimmigrant--(a)(7).** File Form I-765 with the required evidence listed in the "Required Document" section of these instructions.

**B. Granted Withholding of Deportation or Removal (a)(10).** File Form I-765 with a copy of the Immigration Judge's order. It is not necessary to apply for a new EAD until 90 days before the expiration of your current EAD.

**C. Applicant for Suspension of Deportation--(c)(10).** File Form I-765 with evidence that your Form I-881, Application for Suspension of Deportation, or EOIR-40, is pending.

**D. Paroled in the Public Interest--(c)(11).** File Form I-765 if you were paroled into the United States for emergent reasons or reasons strictly in the public interest.

**E. Deferred Action--(c)(14).** File Form I-765 with a copy of the order, notice, or document placing you in deferred action and evidence establishing economic necessity for an EAD.

**F. Final Order of Deportation--(c)(18).** File Form I-765 with a copy of the order of supervision and a request for employment authorization that may be based on but not limited to the following:

  **1.** Existence of a dependent spouse and/or children in the United States who rely on you for support;

  **2.** Existence of economic necessity to be employed; and

  **3.** Anticipated length of time before you can be removed from the United States.

**G. LIFE Legalization Applicant--(c)(24).** We encourage you to file File Form I-765 together with your Form I-485, Application to Register Permanent Residence or Adjust Status, to facilitate processing. However, you may file Form I-765 at a later date with evidence that you were a CSS, LULAC, or Zambrano class member applicant before October 1, 2000, and with a copy of the receipt notice or other evidence that your Form I-485 is pending.

**H. T-1 Nonimmigrant--(a)(16).** If you are applying for initial employment authorization as a T-1 nonimmigrant, file Form I-765 only if you did not request an employment authorization document when you applied for T nonimmigrant status. If you have been granted T nonimmigrant status and this is a request for a renewal or replacement of an employment authorization document, file Form I-765 along with evidence of your T nonimmigrant status, such as an approval notice.

**I. T-2, T-3, or T-4 Nonimmigrant--(c)(25).** File Form I-765 with a copy of your T-1 (principal alien's) approval notice and proof of your relationship to the T-1 principal.

**J. U-1 Nonimmigrant--(a)(19).** If you are applying for initial employment authorization as a U-1 nonimmigrant, file Form I-765 only if you did not request an employment authorization document when you applied for U nonimmigrant status. If you have been granted U nonimmigrant status and this is a request for a renewal or replacement of an employment authorization document, file Form I-765 along with evidence of your U nonimmigrant status, such as an approval notice.

**K. U-2, U-3, U-4, or U-5--(a)(20).** If you obtained U nonimmigrant status while in the United States, you must submit a copy of the approval notice for your U nonimmigrant status. If you were admitted to the United States as a U nonimmigrant, you must submit a copy of your passport with your U nonimmigrant visa.

**L. VAWA Self-Petitioners--(C)(31).** If you are the principal beneficiary or qualified child of an approved VAWA self-petition, you are eligible for work authorization. File Form I-765 with evidence of your status, such as a copy of Form I-360 approved notice. Additionally, you may concurrently file Form I-765 with your initial VAWA self-petition.

## Required Documentation

**All** applications must be filed with the documents required below in addition to the particular evidence required for the category listed in "Who May File This Form I-765?" with fee, if required.

If you are required to show economic necessity for your category, submit a list of your assets, income, and expenses.

Assemble the documents in the following order:

1. Your application with the filing fee. See **"What Is the Filing Fee?"** for details.

2. If you are mailing your application to USCIS, you must also submit:

   A. A copy of Form I-94, Arrival-Departure Record (front and back), if available. If you are filing Form I-765 under the (c) (9) category, Form I-94 is not required.

   B. A copy of your last EAD (front and back). If no prior EAD has been issued, you must submit a copy of a Federal Government-issued identity document, such as a passport showing your picture, name, and date of birth; a birth certificate with photo ID; a visa issued by a foreign consulate; or a national ID document with photo and/or fingerprint. The identity document photocopy must clearly show the facial features of the applicant and the biographical information.

   C. You **must** submit two identical color photographs of yourself taken within 30 days of filing your application. The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

   The passport-style photos must be 2" by 2". The photos must be in color with full face, frontal view on a white to off-white background. Head height should measure 1" to 1 3/8" from top to bottom of chin, and eye height is between 1 1/8" to 1 3/8" from bottom of photo. Your head must be bare unless you are wearing a headdress as required by a religious order of which you are a member. Using pencil or felt pen, lightly print your name and Alien Receipt Number on the back of the photo.

### Special Filing Instructions for Those With Pending Asylum Applications ((c)(8))

**Asylum Applicant (with a pending asylum application) who filed for asylum on or after January 4, 1995.** You must wait at least 150 days following the filling of your asylum claim before you are eligible to apply for an EAD.

Any delay in processing the asylum application that is caused by you, including unexcused failure to appear for fingerprinting and other biometric capture, will not be counted as part of that 150 days. If you fail to appear for your asylum interview or for a hearing before an immigration judge, you will be ineligible for an EAD. If you have received a recommended approval for a grant of asylum, you do not need to wait the 150 days and may apply for an EAD immediately upon receipt of your recommended approval. If you file Form I-765 early, it will be denied. File Form I-765 with:

1. A copy of the USCIS acknowledgement mailer which was mailed to you; or

2. Other evidence that your Form I-589 was filed with USCIS; or

3. Evidence that your Form I-589 was filed with an Immigration Judge at the Executive Office for Immigration Review (EOIR); or

4. Evidence that your asylum application remains under administrative or judicial review.

**Asylum applicant (with a pending asylum application) who filed for asylum and for withholding of deportation prior to January 4, 1995, and is *NOT* in exclusion or deportation proceedings.**

You may file Form I-765 at any time; however, it will only be granted if USCIS finds that your asylum application is not frivolous. File Form I-765 with:

1. A complete copy of your previously filed Form I-589;

2. A copy of your USCIS receipt notice; or

3. A copy of the USCIS acknowledgement mailer; or

4. Evidence that your Form I-589 was filed with EOIR; or

5. Evidence that your asylum application remains under administrative or judicial review; or

6. A copy of the USCIS acknowledgement mailer.

**Asylum applicant (with a pending asylum application) who filed an initial request for asylum prior to January 4, 1995, and is IN exclusion or deportation proceedings.** If you filed your Request for Asylum and Withholding of Deportation (Form I-589) prior to January 4, 1995, and you are IN exclusion or deportation proceedings, file your EAD application with:

1. A date-stamped copy of your previously filed Form I-589; or

2. A copy of Form I-221, Order to Show Cause and Notice of Hearing, or Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge; or

AR2022_300894

**3.** A copy of EOIR-26, Notice of Appeal, date stamped by the Office of the Immigration Judge; or

**4.** A date-stamped copy of a petition for judicial review or for *habeas corpus* issued to the asylum applicant; or

**5.** Other evidence that you filed an asylum application with EOIR.

**Asylum application under the ABC Settlement Agreement--(c)(8).** If you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement, American Baptist Churches v. Thornburgh , 760 F. Supp. 976 (N.D. Cal. 1991), follow the instructions contained in this section when filing your Form I-765.

You must have an asylum application (Form I-589) on file either with USCIS or with an Immigration Judge in order to receive work authorization. Therefore, submit evidence that you have previously filed an asylum application when you submit Form I-765. You are not required to submit this evidence when you apply, but it will help USCIS process your request efficiently.

If you are renewing or replacing your EAD, you must pay the filing fee.

Mark your application as follows:

**1.** Write "ABC" in the top right corner of your EAD application. You must identify yourself as an ABC class member if you are applying for an EAD under the ABC settlement agreement.

**2.** Write "(c)(8)" in **Section 16** of the application.

You are entitled to an EAD without regard to the merits of your asylum claim. Your application for an EAD will be decided within 60 days if: (1) you pay the filing fee, (2) you have a complete pending asylum application on file, and (3) write "ABC" in the top right corner of your EAD application. If you do not pay the filing fee for an initial EAD request, your request may be denied if USCIS finds that your asylum application is frivolous. However, if you cannot pay the filing fee for an EAD, you may qualify for a fee waiver under 8 CFR 103.7(c).

**Special Filing Instructions for Spouses of E-2 CNMI Investors ((c)(12)).**

Spouses of certain principal E-2 CNMI Investors (E-2C) are eligible to seek employment in the CNMI. An EAD issued under this category is only valid for employment in the Commonwealth of Northern Mariana Islands (the CNMI).

To determine if you are eligible for an EAD under this section, you must determine what type of investor certificate was issued by the CNMI to your spouse, the principal E-2 CNMI Investor. If your spouse was issued either a Long-Term Business Certificate or Foreign Investment Certificate, you may be eligible for an EAD under this category. If your

spouse, the principal E-2 CNMI Investor, was issued a Foreign Retiree Investment Certification, you are not eligible to receive an EAD under this category.

File Form I-765 with:

**1.** Documentation, such as a marriage certificate establishing a legal marriage between you and the principal E-2C. Additionally, documentation such as divorce or death certificates establishing the termination of any prior marriages of you and your spouse.

**2.** Documentation establishing that you reside in the Commonwealth of the Northern Mariana Islands.

**3.** Documentation establishing that you have obtained E-2C status as a dependent.

**4.** Evidence that your spouse has obtained E-2C status.

**5.** A copy of your spouse's CNMI issued Long-Term Business Certificate or Foreign Investment Certificate.

## What Is the Filing Fee?

**The filing fee for Form I-765 is $380.**

**Exceptions:**

**Initial EAD:** If this is your initial application and you are applying under one of the following categories, a filing fee is **not** required:

**1.** (a)(3) Refugee;

**2.** (a)(4) Paroled as Refugee;

**3.** (a)(5) Asylee;

**4.** (a)(7) N-8 or N-9 nonimmigrant;

**5.** (a)(8) Citizen of Micronesia, Marshall Islands, or Palau;

**6.** (a)(10) Granted Withholding of Deportation;

**7.** (a)(16) Victim of Severe Form of Trafficking (T-1);

**8.** (a)(19) U-1 Nonimmigrant;

**9.** (c)(1), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel; or

**10.** (c)(8) Applicant for asylum. (An applicant filing under the special ABC procedures must pay the fee.)

**11.** (c)(31) VAWA Self-Petitioner.

AR2022_300895

**Renewal EAD:** If this is a renewal application and you are applying under one of the following categories, a filing fee is **not** required:

1. (a)(8) Citizen of Micronesia, Marshall Islands, or Palau;

2. (a)(10) Granted Withholding of Deportation;

3. (c)(l), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel;

4. (c)(9) or (c)(16) Adjustment applicant who applied after July 30, 2007.

**Replacement EAD:** If this is your replacement application, and you are applying under one of the following categories, a filing fee is **not** required:

1. (c)(l), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel.

**NOTE:** If you are requesting a replacement EAD under the (c)(9) or (c)(16) Adjustment applicant who applied after July 30, 2007, then the full filing fee will be required; however, no biometrics fee is required.

**Incorrect Card:** No fee is required if you are filing only because the card issued to you was incorrect due to a USCIS administrative error. However, if the error was not caused by USCIS, both application and biometrics fees are required.

You may be eligible for a fee waiver under 8 CFR 103.7(c).

Use the following guidelines when you prepare your check or money order for the Form I-765 fee:

1. The check or money order must be drawn on a bank or other financial institution located in the United States and must be payable in U.S. currency; and

2. Make the check or money order payable to **U.S. Department of Homeland Security**, unless:

   A. If you live in Guam, make it payable to **Treasurer, Guam**.

   B. If you live in the U.S. Virgin Islands, make it payable to **Commissioner of Finance of the Virgin Islands**.

**NOTE:** If you filed Form I-485, Application to Register Permanent Residence or Adjust Status, as of July 30, 2007, no fee is required to also file a request for employment authorization on Form I-765. You may file the I-765 concurrently with your I-485, or you may submit the I-765 at a later date. If you file Form I-765 separately, you must also submit a copy of your Form I-797C, Notice of Action, receipt as evidence of the filing of Form I-485 as of July 30, 2007.

**NOTE:** Spell out U.S. Department of Homeland Security; do not use the initials "USDHS" or "DHS."

**Notice to Those Making Payment by Check.** If you send us a check, it will be converted into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually take 24 hours and will be shown on your regular account statement.

You will not receive your original check back. We will destroy your original check, but we will keep a copy of it. If the EFT cannot be processed for technical reasons, you authorize us to process the copy in place of your original check. If the EFT cannot be completed because of insufficient funds, we may try to make the transfer up to two times.

**How to Check If the Fees Are Correct**

The form fee on this form is current as of the edition date appearing in the lower right corner of this page. However, because USCIS fees change periodically, you can verify if the fees are correct by following one of the steps below:

1. Visit our Web site at **www.uscis.gov**, select "Check Filing Fee," and check the appropriate fee;

2. Review the Fee Schedule included in your form package, if you called us to request the form; or

3. Telephone our National Customer Service Center at **1-800-375-5283** and ask for the fee information.

## Where to File?

**E-Filing Form I-765:** Certain Form I-765 filings may be electronically filed (e-filed) with USCIS. View our Web site at **www.uscis.gov** for a list of who is eligible to e-file this form and instructions.

**Paper Filing of Form I-765:**

Please note that the filing locations for the paper version of this form are subject to change. Read the instructions carefully to determine where you must send your paper application.

**Replacement EAD with an error that is the fault of USCIS**

If you are completing a Form I-765 for replacement of an EAD that contains an error caused by USCIS, you must submit this form, accompanied by the card containing the error to the Service Center or National Benefit Center that approved your last employment authorization request. Please do not submit these applications to a Lockbox facility.

**If your response to Question 16 is (a)(11), Deferred Enforced Departure (DED),** mail your application according to the most recent Federal Register notice for your particular country's DED order. Please also check the most recent Federal Register notice regarding DED for your country for additional EAD filing instructions that may apply in your case.

**File at the USCIS Vermont Service Center if your response to Question 16 is:**

**(a)(16),** T-1 nonimmigrant victim of trafficking, or

**(a)(19)** U-1 nonimmigrant, or

**(a)(20),** U-2, U-3, U-4, or U-5 nonimmigrant immediate family member of a U-1 victim of criminal activity, or

**(c)(9),** an alien with a pending or approved VAWA self-petition and you have a pending Form I-485 that was filed with the Vermont Service Center based on this petition.

**(c)(9),** a T or U nonimmigrant and you have a pending Form I-485 that was filed with the Vermont Service Center based on this status.

**(c)(14),** an alien who has been granted deferred action as a surviving spouse or qualified child, or based on an approved Form I-360 filed for a battered or abused spouse or child, or

**(c)(25),** T-2, T-3, T-4, or T-5 nonimmigrant, immediate family member of a T-1 victim of severe form of trafficking in persons.

**USCIS Vermont Service Center**

USCIS
Vermont Service Center
Attn: I-765
75 Lower Welden St.
St. Albans, VT  05479-0001

If your response to **Question 16** is:

(a)(12) or (c)(19) and you have already filed Form I-821, Application for Temporary Protected Status (TPS), you **must** include a copy of Form I-797C Notice of Action, showing that your initial Form I-821 was accepted or approved. File your Form I-765 according to the instructions in the Federal Register Notice for your particular country's TPS designation.

(a)(12) or (c)(19) and you are initially filing or reregistering for TPS you **must** file Form I-765 with Form I-821 according to the instructions in the Federal Register Notice for your particular country's TPS designation.  This includes an application for a lost, stolen, or mutilated EAD.

File at the USCIS Chicago Lockbox facility if your response to **Question 16 is**:

**(a)(10),** an alien granted withholding of deportation or removal; or

**(c)(9) AND** you filed your Form I-485 with the USCIS Chicago Lockbox facility, and your Receipt Number begins with "**MSC.**"  You must include a copy of the I-797C, Notice of Action, which shows your Form I-485 was accepted; or

**(c)(10) AND** you are **not** eligible to apply for NACARA 203 relief with USCIS, but you are eligible for other deportation or removal relief; or

**(c)(11),** an alien paroled into the United States temporarily for emergency reasons, or reasons deemed strictly in the public interest; or

**(c)(14),** an alien who has been granted deferred action, with the exception of those categories filed at the USCIS Vermont Service Center; or

**(c)(16),** an alien who has filed an application for creation of record of lawful admission for permanent residence; or

**(c)(18),** an alien against whom a final order of deportation or removal exists and who is released on an order of supervision.

**Mail to the address below:**

**USCIS Chicago Lockbox**

For U.S. Postal Service:

USCIS
P.O. Box 805887
Chicago, IL 60680-4120

For Express mail and courier deliveries:

USCIS
Attn: FBAS
131 South Dearborn-3rd Floor
Chicago, IL 60603-5517

If your response to **Question 16** is:

**(a)(14)**, an alien granted family unity benefits under Section 1504 of the LIFE Act, or

**(a)(15)**, any alien in V nonimmigrant status, or

**(c) (22)**, if you have a pending I-687 (Legalization application) or if you filed a completed Legalization application pursuant to Section 245A of the Act (and Section 245(a) 8 Code of Federal Regulations), or

**(c)(24)**, an alien who has filed for adjustment of status under Section 1104 of the LIFE Act.

**Mail to the address below:**

**USCIS Chicago Lockbox**

For U.S. Postal Service:

USCIS
P.O. Box 7219
Chicago, IL 60680-7219

For Express Mail and courier service:

USCIS
Attn: VKL
131 South Dearborn- 3rd Floor
Chicago, IL 60603-7219

If your response to **Question 16** is:

**(c)(1)**, alien spouse or unmarried dependent child, son, or daughter of a foreign government official,

**(c)(4)**, eligible dependent of a G-1, G-3, or G-4 non-immigrant, or

**(c)(7)**, Dependent of a NATO 1 through NATO 7

Submit your application through your principal's sponsoring organization and your application will be reviewed and forwarded by DOS, USUN, or NATO/SACLANT to the Nebraska Service Center following certification of your eligibility for an employment authorization document.

**If your response to Question 16 is (c)(12), Spouse of an E-2 CNMI Investor,**

**For U.S. Postal Service, mail your application to:**

USCIS
California Service Center
ATTN: E-2C I-765
P.O. Box 10698
Laguna Niguel, CA 92607-1098

For Express mail and courier deliveries, mail your application to:

USCIS
California Service Center
ATTN: E-2C I-765
24000 Avila Road
2d Floor Room 2312
Laguna Niguel, CA 92677

**For all other Form I-765s, file at the USCIS Phoenix or Dallas Lockbox facilities based on where you live.** See chart below.

**NOTE:** If you are filing Form I-765 together with Form I-485, mail your applications to the address you will use to file the Form I-485.

If you are filing Form I-765 alone because you have already filed Form I-485 and it is **pending**, file your application at the USCIS Phoenix or Dallas Lockbox facilities based on where you live. You **must** include a copy of the I-797C, Notice of Action showing that your application was accepted.

**USCIS Phoenix or Dallas Lockbox**

| If you live in : | File your application at: |
|---|---|
| Alaska, Arizona, California, Colorado, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, North Dakota, Ohio, Oregon, South Dakota, Utah, Washington, Wisconsin, Wyoming, or Commonwealth of the Northern Mariana Islands | **USCIS Phoenix Lockbox** <br> For U.S. Postal Service (USPS) deliveries: <br> USCIS <br> PO Box 21281 <br> Phoenix, AZ 85036 <br><br> For Express mail and courier service deliveries: <br><br> USCIS <br> Attn: AOS <br> 1820 E. Skyharbor Circle S <br> Suite 100 <br> Phoenix, AZ 85034 |
| Alabama, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Oklahoma, Tennessee, Texas, Vermont, Virginia, U.S. Virgin Islands, or West Virginia | **USCIS Dallas Lockbox** <br> For U.S. Postal Service (USPS) Deliveries: <br> USCIS <br> PO Box 660867 <br> Dallas, TX 75266 <br><br> For Express mail and courier service deliveries: <br> USCIS <br> Attn: AOS <br> 2501 S. State Hwy. 121, Business Suite 400 <br> Lewisville, TX 75067 |

AR2022_300898

### E-Notification

If you are filing your Form I-765 at one of the USCIS Lockbox facilities, you may elect to receive an email and/or text message notifying you that your application has been accepted. You must complete Form G-1145, E-Notification of Application/Petition Acceptance, and clip it to the first page of your application. To download a copy of Form G-1145, including the instructions, click on the link www. uscis.gov "FORMS."

If your response to **Question 16** is **(c)(8)** under the special ABC filing instructions, and you are filing your Form I-589, Application for Asylum, and this application together, mail your applications to the filing location identified in the Form I-589 instructions.

Otherwise, all other **(c)(8)** related applications will be filed at the USCIS Phoenix or Dallas Lockbox facility based on where you live.  See filing chart.

### Questions Regarding Form I-765

For additional information about Form I-765, including how to file your application or filing locations not mentioned, call the USCIS National Customer Service Center at 1-800-375-5283 or visit our Web site at www.uscis.gov.

## Processing  Information

**Any Form I-765 that is not signed or accompanied by the correct fee will be rejected with a notice that Form I-765 is deficient.** You may correct the deficiency and resubmit Form I-765.  An application or petition is not considered properly filed until accepted by USCIS.

### Initial processing

Once Form I-765 has been accepted, it will be checked for completeness, including submission of the required initial evidence.  If you do not completely fill out the form, or file it without required initial evidence, you will not establish a basis for eligibility, and we may deny your Form I-765.

### Requests for more information or interview

We may request more information or evidence, or we may request that you appear at a USCIS office for an interview. We may also request that you submit the originals of any copy.  We will return these originals when they are no longer required.

### Interim EAD

If you have not received a decision within 90 days of receipt by USCIS of a properly filed EAD application or within 30 days of a properly filed initial EAD application based on an asylum application filed on or after January 4, 1995, you may request interim work authorization by calling the USCIS National Customer Service Center at **1-800-375-5283** or by appearing in person at your local USCIS Field Office by making an InfoPass appointment. For further processing at a USCIS Field Office, you must bring proof of identity and any notices that you have received from USCIS in connection with your application for employment authorization.

### Approval

If approved, your EAD will either be mailed to you or you may be required to visit your local USCIS office to pick it up.

### Denial

If your application cannot be granted, you will receive a written notice explaining the basis of your denial.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-765, we will deny your Form I-765 and may deny any other immigration benefit.

In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## USCIS Forms and Information

To order USCIS forms, call our toll-free number at **1-800-870-3676.** You can also get USCIS forms and information on immigration laws, regulations, and procedures by telephoning our National Customer Service Center at **1-800-375-5283** or visiting our Internet Web site at **www.uscis.gov**.

As an alternative to waiting in line for assistance at your local USCIS office, you can now schedule an appointment through our Internet-based system, **InfoPass**. To access the system, visit our Web site. Use the **InfoPass** appointment scheduler and follow the screen prompts to set up your appointment. **InfoPass** generates an electronic appointment notice that appears on the screen.

## Privacy Act Notice

We ask for the information on this form, and associated evidence, to determine if you have established eligibility for the immigration benefit for which you are filing. Our legal right to ask for this information can be found in the Immigration and Nationality Act, as amended. We may provide this information to other government agencies. Failure to provide this information, and any requested evidence, may delay a final decision or result  in denial of your Form.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The public reporting burden for this collection of information is estimated at 3 hours and 25 minutes per response, including the time for reviewing instructions and completing and submitting the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Regulatory Products Division, Office of the Executive Secretariat, 20 Massachusetts Avenue, N.W., Washington, DC 20529-2020. OMB No. 1615-0040. This form expires September 30, 2011. **Do not mail your application to this address.**

Interim Enforcement Procedures

# INTERIM ENFORCEMENT PROCEDURES
## June 5, 1997
## Standard Operating Procedures for Enforcement Officers:
## Arrest, Detention, Processing and Removal

### DESTROY ALL VERSIONS PRIOR TO 6/5/97

A Processing Guide for implementation of  amendments to the Immigration and Nationality Act (Act) enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, **Public Law 104-208** (IIRIRA). This document is intended for use by INS officers in combination with the interim final rule covering major portions of Title III of IIRIRA. Nothing in this document shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

This document is one of three major procedures documents issued by the Service for use by its officers engaged in activities described in Title III of IIRIRA. The other documents are: Chapter 7 of the Asylum Pre-Screening Officers Procedures Manual and several chapters of the **Inspector's Field Manual**, notably **Chapters 17.2** (Withdrawal of Application for Admission), **17.6** (Preparing Removal or Prosecution Hearing) and 17.15 (Expedited Removal).

Double Click

**Interim Enforcement Procedures**

**VIII.**   Post-Hearing Processing

      A.      Voluntary Departure under Section 240B of the Act
      B.      Detention
      C.      Issuance of a Warrant of Removal
      D.      Travel Arrangements and Obtaining Documents
      E.      Penalties for Failure to Cooperate in Obtaining a Travel Document
      F.      Sanctions Against Countries that Fail to Accept Their Nationals
      G.      Execution of Warrants and Warning of Penalties for Reentry
      H.      Closing Actions

**IX.**   Reinstatement of Final Orders

      A.      Applicability
      B.      Procedure
      C.      Aliens Expressing a Fear of Persecution or Torture
      D.      Criminal Prosecution
      E.      Execution of a Reinstated Final Order
      F.      Case Tracking using the Deportable Alien Control System (DACS)

**X.**   Deferred Action

      A.      General
      B.      Factors to Be Considered
      C.      Procedures
      D.      Employment Authorization
      E.      Reporting Requirements

**XI.**   Stays of Removal

      A.      General
      B.      Deportable Aliens Ordered Removed
      C.      Inadmissible Arriving Aliens Ordered Removed
      D.      Judicial Review and Stays of Removal

**Attachment  1 :  Encounter by Arresting Officer**

**Click "Backtrack" to return to the previous screen**

**Interim Enforcement Procedures**

## I.   **General Description of IIRIRA Provisions.**

**Public Law 104-208**, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) makes sweeping changes to procedures for treatment by the Immigration and Naturalization Service of aliens present in the United States in apparent violation of the immigration laws. It does so by making several major changes to the Immigration and Nationality Act:

- The IIRIRA directs that persons entering without inspection are subject to removal as inadmissible, rather than deportable aliens.

- The IIRIRA provides a new form of removal proceedings, expedited removal, for persons inadmissible under section **212(a)(6)(C)** or **212(a)(7)** of the Act. This expedited process is administered entirely by Service officers, rather than the immigration judges who handle other removal matters. The IIRIRA provides that the Attorney General may apply this expedited removal process both to arriving aliens and to aliens who entered without inspection and who have been physically present in the United States for less than 2 years.   Initially, this provision is being applied only to arriving aliens, the regulations provide that the Commissioner may expand the use of expedited removal at any time, to any class of aliens described here, through publication of a notice in the Federal Register.

- The IIRIRA consolidates former exclusion and deportation proceedings into a single "removal proceeding" initiated by service of a Notice to Appear, replacing the former Order to Show Cause and Notice of Hearing used to institute deportation and exclusion hearings.

- The IIRIRA revises and the policies and procedures governing the arrest, detention and removal of aliens illegally present in the U.S.

Implementation of IIRIRA changes the removal process in several ways, both complicating the decisions to be made by Enforcement personnel and streamlining the overall process in many instances.  Under prior law, Enforcement officers needed only to determine whether an alien was, at the time of encounter, in a lawful status and whether he or she was eligible for and willing to accept a voluntary departure in lieu of a formal deportation proceeding. All formal proceedings were initiated by issuing an Order to Show Cause. Deportability was formally established in proceedings before an immigration judge and various forms of relief were applied for and adjudicated in the course of the proceeding. As of April 1, 1997, INS Enforcement personnel are required to conduct all related activities using the new statute and regulations, according to the procedures described below.

## II.    Preliminary Assessment of Aliens Prior to Arrest.

### A.    Pre-Arrest Assessment.

When a stop is made, there are several preliminary steps which must be taken by the Service officer in order to determine how to proceed.

1.    <u>Decide if there is there reasonable suspicion to question the individual</u>. Reasonable suspicion depends on the situation at the time of encounter. Most often, reasonable suspicion is obvious: an alien observed illegally entering the U.S. or tracked from the  immediate border. Routine questioning at a checkpoint or during a workplace enforcement action will also lead to articulable facts upon which to engage in more formal, detailed questioning.  In situations where lawful residents and visitors mix freely \with illegal aliens, determining where there is reasonable suspicion may be more problematic. If reasonable suspicion does not exist, questioning may be continued if it is consensual and the subject remains free to leave at any point.

2.    <u>Decide if the facts surrounding the encounter might support criminal prosecution</u>,  such as alien smuggling, drug smuggling, etc.  If a criminal arrest is being made, provide  the subject with the required Miranda warnings before continuing questioning. Follow established local procedures for prosecution, if appropriate.

3.    <u>Determine alienage</u>. If the individual is a U.S. citizen, he or she must be released unless you are an officer authorized to make an arrest pursuant to section **287(a)(5)** of  the Act or State law and you  identify a prosecutable offense. Remember that the required  burden of proof differs, depending upon the situation. Burden of proof is discussed later  in this section.

4.    <u>Determine if the alien entered legally</u>.  Check documents and Service records  systems to verify any claimed lawful entry, unless the illegal entry was actually observed.  If the alien is a lawful permanent resident, the issue of whether the individual is an  applicant for admission becomes  somewhat more complex. Section **101(a)(13)(C)** of the  Act provides that a lawful permanent resident is not considered to be seeking admission  (and, therefore, not subject to grounds of inadmissibility) unless he or she has done any  of the following:

    - abandoned or relinquished LPR status.

    - been absent from the U.S. for a continuous period of more than 180 days

    - engaged in illegal activity after having departed the United States

    - has departed the United States while under removal proceedings         or extradition   proceedings

    - committed an offense identified in section **212(a)(2)**, unless granted relief under section   **212(h)** or **240A(a)** since such offense.

    - has entered or is attempting to enter without inspection

5.    <u>Role of the examining officer</u>.  Once a determination has been made by the  arresting officer that an alien is subject to removal, and obtaining an arrest warrant is not  feasible, the alien must be questioned to determine whether the arrested alien has a right  to enter or remain in the U.S. This function is performed by an examining officer, most  often a different officer from the one making the initial apprehension. The examining  officer must review all facts in the case and decide if there are sufficient grounds and evidence  to support a charge of inadmissibility or deportability (removability), considering the burdens of proof discussed below.

6.    <u>Expedited removal</u>. Although not  operational  at  the  present  time,  if  expedited removal is extended to EWI aliens in the future, you must determine if the alien, at the time of

apprehension, has been physically present in the United States continuously for less than 2 years.

The flow charts **(Attachment 1)** depict how the apprehension process (Encounter), the regular removal process (Deportable Alien Processing), and the expedited removal (Expedited Removal Process under IIRIRA) processes operate. The following narrative describes each of the major alternative procedures engaged in by enforcement personnel. Certain less frequently encountered procedures (e.g. section **235(c)** and section 503 proceedings) are not described here, but are discussed in detail in the Inspector's Field Manual and other IIRIRA materials. Details of asylum-related processing under IIRIRA provisions are described in Chapter 7 of the Asylum Pre-Screening Officers Procedures Manual.

## B.    Burden of Proof.

Although all immigration judge proceedings to determine inadmissibility or deportability are conducted under section **240** of the Act, the relative burdens of proof vary depending on the alien's status:

€      An "arriving alien" encountered at a port of entry, paroled upon arrival, or interdicted  at sea and brought into the United States must prove **clearly and beyond a doubt** that  he or she is entitled to be admitted into the United States and is not inadmissible under section **212** of the Act.

€      For an EWI alien, the Service bears the burden of establishing alienage.  Once alienage  has been established, the burden shifts to the alien. The alien must demonstrate by **clear  and convincing evidence** that he or she was lawfully admitted or, in the alternative, prove **clearly and beyond a doubt** that he or she is entitled to admission and is not inadmissible as charged.

€      For an alien charged with deportability (under section **237**), the Service must **prove by  clear and convincing evidence** that the alien is deportable.

## C.    Advisals of Rights; Right to Communicate with Consular Official.

1.    <u>General</u>.   Every apprehended alien must be given a notice of rights. The Service presently uses a variety of forms for this purpose, as a result of adverse decisions in  certain court cases. At present, El Salvadorans are give a Notice of Rights on Form I-848, juveniles are given Form I-770, which is a simplified version, and all others are  given Form **I-826**. These forms are available in English and Spanish, as appropriate.  Before continuing the processing of an apprehended alien, make sure he or she has and  understands these rights and is provided with a copy of the appropriate form.

Each of the rights forms contains a section which records the decision by the apprehended alien to accept voluntary departure and immediate return, under appropriate safeguards,  in lieu of formal removal proceedings. A discussion is contained in section III concerning criteria used by the processing officer to determine whether the alien will be permitted  to voluntarily return. Although the form is provided in both English and Spanish, it is  critical that the processing officer takes precautions to ensure the alien is completely aware of the availability of the hearing process.

2.    <u>Rights Notices for Aliens Not Entitled to Removal Proceedings under Section 240</u>.  There are several categories of aliens not entitled to a section **240** hearing but who may  request asylum, specifically:

- crewmembers,
- VWPP applicants and VWPP overstays or status violators,
- stowaways,
- S-nonimmigrant visa holders
- aliens under a section 235(c) order and
- claimants to LPR, asylee or refugee status ordered removed under section 235(b)(1)

(expedited order).

A more detailed discussion of thes categories is contained in Section E below. There is no separate rights form for use in such cases, since such aliens, by virtue of their status, do not have the same rights provided by the Act to others. Unless such an alien expresses a fear of persecution or fear of return to his or her home country, removal may be ordered (frequently at carrier expense) by the district director, without recourse to the Immigration Court. If an asylum claim is asserted, the applicant has limited rights which are contained in the Notice of Referral to Immigration Judge, Form **I-863**, which is served on the applicant and the immigration court. The form includes several check-blocks explaining the alien's rights in each situation.

For aliens ordered removed under section **235(b)(1)**, [block 1 on Form I-863] and for stowaways who have been interviewed by an asylum officer and found not to have a credible fear of persecution [block 2 on Form I-863], check off the second block in the Notice to Applicant section which states:

> You may consult with a person or persons of your own choosing prior to your appearance in Immigration Court. Such consultation is at no expense to the government and may not unreasonably delay the process.

For aliens requesting a determination pursuant to section 208.2(b) [block 3 on Form I-863], check off the first block in the Notice to Applicant section which states:

> You may be represented in this proceeding, at no expense to the government, by an attorney or other individual authorized and qualified to represent persons before an Immigration Court. If you wish to be so represented, your attorney or representative should appear with you at this hearing. In the event of your release from custody, you must immediately report any change of your address to the Immigration Court on Form EOIR-33, which is provided with this notice. If you fail to appear for a scheduled hearing, a decision may be rendered in your absence.

An alien who has been ordered removed by an immigration officer pursuant to section 235(b)(1), who claims to be a lawful permanent resident, asylee or refugee, may have the claim to such status reviewed by an immigration judge, pursuant to **8 CFR 235.4**(b)(5)(iv) [block 4 on Form I-863]. In such cases, no formal notice of rights is required.

In addition to the classes of aliens enumerated above, any alien previously excluded, deported or removed who is apprehended after having unlawfully reentered the United States is subject to reinstatement of the prior order, without referral to an immigration judge, as discussed in **Section IX** of these interim procedures.

3.    Contact with Consular Officials. In addition to these rights, an alien who is being detained must be notified that he or she may communicate with a consular official in accordance with **8 CFR 236.1(e)**. If an alien is a national of one of the countries listed in that regulation, a consular official of that country must be notified, even if the alien specifically requests that no notification be made. Do not reveal to any consular official the fact that an alien may have requested asylum.

## D.    Inadmissible or Deportable?

Prior to April 1, 1997, aliens apprehended were generally placed in deportation proceedings, regardless of whether they were status violators such as overstays, or EWI cases. IIRIRA revised the Act, providing that aliens present without inspection and admission are considered applicants for admission, and are charged with one or more grounds of inadmissibility (section 212 of the Act). These EWI aliens bear a significantly greater burden of proof in removal proceedings than aliens who have been admitted (but overstayed or violated status), and are charged with deportability (section 237 of the Act).

Regardless of whether the apprehended alien is being charged under section 212 or section 237, the

processing options for every alien entitled to a removal hearing are the same: institution of removal proceedings under section 240 of the Act (by issuance of a Notice to Appear, **Form I-862**) or, in appropriate cases, voluntary departure. Arriving aliens may not be given voluntary departure, but may be given an opportunity to withdraw their application for admission and depart immediately (in custody). The specific details for handling each option are discussed below or (for processing withdrawals) in the **Inspector's Field Manual, Chapter 17.2**. **Although the statute provides another option, expedited removal, for aliens physically present in the U.S. for less than 2 years, the Service has elected at this time not to exercise this option. Expedited removal will be used solely for arriving aliens, unless the Attorney General determines that expansion of the program is necessary**. Procedures for expedited removal of arriving aliens are discussed in **section VI** and in the **Inspector's Field Manual, Chapter 17.15**.

**E.**     **Aliens Not Eligible for Removal Proceedings.**

In certain cases, apprehended aliens are not entitled to formal removal proceedings under section 240 of the Act. Once you determine that an alien who is apprehended falls within one of these classes, the procedures for removal become greatly simplified. The specific classes of aliens included in this group, and the procedures to be followed are described below. If an alien in any of these categories requests asylum, they must be referred to an immigration judge for a hearing limited **solely** to the issue of asylum or withholding of removal. In the case of a stowaway, the alien must be given a "credible fear" determination prior to referral to an immigration judge. Referral to an immigration judge is accomplished through use of the Notice of Referral to Immigration Judge, Form I-863. Under no circumstances should a Notice to Appear, Form I-862, be issued in such cases.

    1.     <u>Crewmembers</u>.   Crewmembers apprehended for violation of status fall into several categories. An overstay crewmember is one whose vessel or aircraft has departed but who has not been paid off or discharged with Service permission. Another type of violation involves a crewmember whose ship is still in port but who has engaged in activities inconsistent with the terms of his or her landing permit. A third type of violation involves a crewmember who was refused a landing permit or whose landing permit was revoked, but who left the vessel without Service permission. Regardless of the type of violation, such crewmembers are not entitled to any hearing before an immigration judge, except for the purpose of resolving an asylum claim.

    Absent an asylum claim, a crewmember whose vessel remains in the U.S. may be issued a Notice of Revocation, **Form I-99**, and returned to the vessel for removal in accordance with procedures described in the **Inspector's Field Manual, Chapter 23.10**. If the vessel or aircraft has departed the U.S. an alien crewmember may be ordered removed by issuing a Notice to Detain, Remove or Present Alien, Form I-259, to the transportation line or agency representing the transportation line on which the alien served. In addition, if removal occurs within 5 years of the crewmember's landing in the U.S., the carrier is liable for the costs of removal. When carrier liability exists, complete and serve a Notice to Transportation Line Regarding Alien Removal Expenses, **Form I-288**. Expenses billable to a carrier may be tracked and recorded on a Record of Expenses Billable to Transportation Company, **Form I-380**.

    An **exception** to the preceding discussion exists for crewmembers who landed prior to April 1, 1997. Such crewmember who is apprehended in violation of status and whose vessel has departed must be placed into removal proceedings under section 240 of the Act unless he or she is willing to depart voluntarily. Procedures for assessing carrier liability remain the same.

    Refer to **8 CFR 252.2**.

    2.     <u>Visa Waiver Pilot Program Admissions</u>.   An alien admitted under the Visa Waiver Pilot Program (**section 217** of the Act) who violates his or her status or stays beyond the 90-day admission period permitted by the statute is not eligible for a hearing, except in cases involving an asylum claim. If there is no asylum claim or if asylum is denied, such alien is to be given a letter from the district director having jurisdiction over his or her residence. This letter should advise the alien of the determination concerning the violation and order removal from the U.S.

AR2022_300906

Serve Forms I-259 and I-288 on the carrier which  brought the alien into the U.S. Procedures for removal of VWPP refusal cases are  described in **Chapter 15.7 of the Inspector's Field Manual.**

3.    <u>Stowaways</u>.  A stowaway, whether or not landed, is not entitled to a removal  hearing. Unless such case involves an asylum claim, the alien may be ordered removed  by serving Forms I-259 and I-288 on the affected carrier.  See **8 CFR 235.1(d)(4)** and  **8 CFR 241.11**. Handling of asylum claims by stowaways are discussed further in the  Inspector's Field Manual, Chapter 23.18.

4.    <u>S-Nonimmigrant Visa Holders</u>.  See **8 CFR 236.4**.

**F.    <u>Criminal Prosecution</u>.**

Options for criminal prosecution which existed prior to April 1, 1997, remain in effect. In many cases, the monetary penalties imposed for immigration-related violations were increased by IIRIRA. In addition several new penalties were added. Commonly applied criminal penalties and the statutory reference for the penalty are listed in the table below.

| Statutory Reference | Description of Violation | |
|---|---|---|
| 8 U.S.C. 1306 | Counterfeit INS documents | |
| 8 U.S.C. 1253 & **274D** INA | Failure to depart under a removal order: Failure to assist in obtaining travel document | §§ 243 |
| 18 U.S.C. 758 | High speed flight from INS checkpoint. | |
| 8 U.S.C. 1324 § 274 INA | Alien Smuggling | |
| 18 U.S.C. 1028(b), 18 U.S.C. 1425-1427, 1541-1544, 1546(a) 8 U.S.C. 1001 | Photo substitution: counterfeit Visa & other docs | |
| 18 U.S.C. 506 | Counterfeit agency seals | |
| 18 U.S.C. 982(a) | Criminal forfeiture for passport and visa related offenses | |
| 8 U.S.C. 1324C § **274C** INA | Failure to disclose role as prepare of INS documents. | |
| 18 U.S.C. 1015 18 U.S.C. 911 | False claim to U.S.C. | |
| 18 U.S.C. 611 | Voting by alien in federal election | |

Local policies and procedures govern which types of cases are appropriate for prosecution in each jurisdiction and the actual case referral paperwork requirements, depending on the requirements of local courts and U.S. Attorneys.

**G.    <u>Civil Penalties for Illegal Entry</u>.**

Section 105 of IIRIRA provides for new civil penalties for illegal entry by amending **section 275** of the Act.  Regulations and procedures for implementation of this section have not yet been prepared. Accordingly, no penalties under this section will be assessed until further notice.

**Interim Enforcement Procedures**

## H.   **Detainers**.

A detainer is a notice to another law enforcement entity or penal facility that the Service has an interest in the subject of such detainer for the purpose of enforcement of provisions of the Act. Detainers may be used when the Service becomes aware that another agency has an alien in custody, either for completion of a sentence or on an interim basis. A detainer serves as a request for the custodial agency to notify the Service in advance of an alien's release, in order for the Service to arrange to efficiently assume custody. A detainer may also serve as a request to hold an alien for a brief period until the Service can arrange to assume custody of an alien whom the custodial agency no longer intends to detain. Section **287(d)** of the Act requires the Service to take custody of aliens released by other Federal, state or local officials as soon as possible.

1.   Issuance Procedures.  Detainers are issued using an Immigration Detainer - Notice of Action, Form I-247. Authority to issue detainers is contained in **8 CFR 287.7** and **8 CFR 236.1(a)**. Detainers may be completed manually on pre-printed forms or called up  from various Service form filler applications, such as the INS Form Filler, FIMS or  ENFORCE. Completion of the form requires the following:

€   Complete all data blocks, including the Service office address and "Attention" line, if the return is expected to be directed to a particular section, unit, or officer.

€   Check one of the four action blocks following the data blocks, indicating the type of Service action pending in the case.

€   Check one or more blocks in the request section and include the contact officer's name, phone and fax numbers, if needed.

€   An authorized officer (8 CFR 287.7(b)) must sign the detainer.

Upon completion, file one copy of the detainer in the alien's "A" file and either mail or  transmit by fax machine a copy to the detaining agency or institution. Follow local  procedures for call-ups to ensure response to the detainer is received. File a copy of the receipted detainer in the "A" file upon return by the custodial agent.

2.   Cancellation.  Form I-247 may be used to cancel a detainer, as well as to issue one. Complete all data blocks and check the appropriate block on the form.

## I.    **Waivers of Inadmissibility and Admission**.

Aliens who enter without inspection are generally inadmissible under section **212(a)(7)(A)(i)(I)** of the Act (if proceedings commenced prior to April 1, 1997, deportable under section **237(a)(1)(B)**)). In rare cases, an alien who are present without inspection (EWI) could be eligible for a waiver, such as a lawful permanent resident who is not in possession of Form I-551 because he lost it or left it at home. Such alien could be considered for a waiver of immigrant documents under section **211(b)** of the Act. Cases that require adjudication of a waiver application and collection of a fee, should be referred for completion to the nearest port-of-entry or district office. The referral will be accomplished by completing **Forms I-213**, G-56 and an I-94 Parole. Form G-56 will be completed in triplicate, original to alien, copy to district and a copy to sector files.

### III.     Voluntary Departure Under Section 240B of the Act Prior to or During Hearings.

#### A.     Determining When to Permit Voluntary Departure.

Once you have made the preliminary assessment of an apprehended alien, there are other determinations you must make before instituting proceedings. As discussed above in section I, IIRIRA amended the Act to provide that aliens present without inspection are deemed applicants for admission. Regardless of when an alien physically came into the United States, most aliens(except those discussed in Section II-E) present in the U.S. who have not been inspected and admitted or paroled are amenable to removal proceedings under section **240** of the Act based on inadmissibility under section **212** of the Act. You should familiarize yourself with the discussion in section I above and with the grounds of inadmissibility contained in section 212 of the Act. With limited exceptions described in section II E, other apprehended aliens (e.g., overstays, status violators) are subject to removal proceedings based on deportability under section **237** of the Act.

#### B.     Voluntary Departure (VD/VR) or Removal Proceedings?

Prior to IIRIRA, the vast majority of apprehensions by Service Enforcement personnel resulted in the alien accepting either voluntary departure or a "voluntary return" to his or her home country, in lieu of formal deportation. Similarly, a large segment of the aliens found inadmissible at a port-of-entry by Inspections personnel were permitted to withdraw their applications for admission, rather than facing an immigration judge in exclusion proceedings. These programs significantly reduce processing time for Service personnel and promote efficient use of agency resources while at the same time benefiting the subject alien who avoids the potential penalty attached to formal removal proceedings.

The voluntary departure option (and withdrawal) is still available after April 1, 1997. The criteria for permitting a voluntary departure for both EWI and non-EWI cases in lieu of a removal hearing (pursuant to section 240 of the Act) are severely limited. Section **240B(a)(1)** of the Act precludes voluntary departure for aliens who are aggravated felons or terrorists.

**Note:** An alien who previously was granted voluntary departure after being found inadmissible (in removal proceedings) under section 212(a)(6)(A), a.k.a. EWI, is ineligible for a new grant of voluntary departure [see section **240B(c)** of the Act] regardless of whether the alien departed during the voluntary departure period or after the alternate order became effective (self-deportation). In such cases, however, section **241(a)(5)** permitting reinstatement of the prior removal order, will often be applicable, eliminating the need to institute a new removal proceeding or to permit voluntary departure. [See discussion in **Section X**.]

Service officers must weigh favorable and unfavorable factors in each case before deciding to offer the option of voluntary departure to eligible aliens. Among the factors to be considered are:

€     does the alien applicant have prior entries without inspection or other immigration violations?

€     facts surrounding the apprehension, such as resisting arrest, or failing to cooperate with the arresting officers indicating a need for more stringent enforcement action?

€     age, infirmity, or other considerations which weigh in favor of less stringent enforcement?

€     indications that the alien may be engaged in other illegal activities?

€     local or national policy or operational considerations indicating a need for stricterenforcement policies at a particular location or during a particular time period?

The processing officer ultimately must make a determination whether to offer the alien an opportunity to return voluntarily in lieu of removal proceedings. Once a decision is made to permit voluntary departure, and the alien has elected to waive his or her right to a hearing, follow the procedures described in

section **IV** to complete processing.

## C.    Changes to VD Resulting from the IIRIRA.

The IIRIRA and the implementing regulations significantly change the length of the departure period, and conditions under which, voluntary departure may be authorized. They also specify by whom and when voluntary departure may be granted.

Prior to April 1, 1997, voluntary departure was often viewed as being one or more potentially lengthy periods of time which allowed the alien to remain in the United States. The IIRIRA makes clear that voluntary departure is intended only as a relatively short period of time to depart. It does this in several ways:

- Voluntary departure is divided into two distinct categories.  Voluntary departure prior to the completion of removal proceedings is granted pursuant to section **240B(a)** of the Act. Voluntary departure after completion of a removal proceeding is granted pursuant to 240B(b).

    - Prior to initiation of proceedings, INS may grant voluntary departure. Such voluntary departure is limited to a maximum of 120 days. Extensions of voluntary departure may not be granted beyond an aggregate of 120 days  for any reason.  The Service may set additional conditions in such cases, including posting of bond, delivery of a travel document or other such requirement which is reasonably related to assuring the Service of an  alien's actual intention to depart as agreed.  [see **8 CFR 240.25**]

    - Once removal proceedings have commenced, but prior to completion of the hearing, voluntary departure can be requested by the alien from the Service or  from the Immigration Court.  In a joint motion, proceedings may be terminated  or a request may be made to the immigration judge to consider voluntary  departure under **8 CFR 240.26**. The same limits and conditions apply.

    - An immigration judge may, without the consent of the Service, grant voluntary departure after the proceedings have commenced (charging document served on the court) and until 30 days after the master calendar hearing. This voluntary departure requires a concession of removability, waiver of all appeals and no request for any other relief.

    - After the thirtieth day beyond the master calendar hearing, an immigration judge may not grant such voluntary departure without the consent of the Service.

    - Once the hearing is concluded, voluntary departure is granted pursuant to section 240B(b) of the Act, and is even more severely limited than earlier voluntary departure.  The judge may grant such voluntary departure only to an alien who has been present in the U.S. for more than one year. Posting of a bond is  mandatory and other conditions and restrictions apply. [see section VII A]

- The new section 240B(d) of the INA precludes an alien who was previously granted  voluntary departure and did not depart from receiving additional grants of voluntary  departure for 10 years and makes the alien subject to civil penalties. It is most important  that arresting officers understand and communicate to aliens being granted voluntary  departure that failure to depart under the terms given will not only result in the alien being placed in removal proceedings, but will also preclude him or her from receiving  any grant of voluntary departure for a period of 10 years, including voluntary departure from the immigration judge at the end of the removal proceedings. Additionally, failure  to adhere to the terms of voluntary departure will render the alien ineligible for various  forms of relief including benefits under sections 245, 248 and 249 of the Act. Such  advisory is required by statute and is incorporated into the **Form I-210**, Notice of Action--Voluntary Departure. **It is essential that no voluntary departure period be  granted without issuance of Form I-210 (Rev 4/1/97) and that the affected alien be  made aware of and agree to the terms of such a grant**.

- It limits the total, aggregate period for voluntary departure which may be granted to 120 days. Normally, voluntary departure would be granted in a single increment of up to 120 days, not to exceed the time necessary to conclude departure arrangements. If an alien is granted less than 120 days initially, he or she may be granted an additional increment(s), provided the total amount of time granted does not exceed 120 days.

  **Note on Transition Cases:** For cases involving aliens granted voluntary departure prior to the effective date of this provision of IIRIRA (April 1, 1997), different rules apply. If an alien was granted voluntary departure during the course of and in connection with a deportation proceeding (typically, with an alternate order of deportation), the former rules for voluntary departure, including extensions by the district director, continue to apply. For persons who were granted voluntary departure before April 1, 1997 prior to or in lieu of deportation proceedings, a single extension of voluntary departure, not to exceed 120 days, is permitted. However, in considering extensions voluntary departure where the aggregate of the initial period and the extended period would exceed 120 days, the deciding official must consider the overall intent of IIRIRA in curbing protracted periods of voluntary departure. Such extensions of voluntary departure should be granted only in extraordinary circumstances.

- It limits voluntary departure which may be granted at the conclusion of hearing to a maximum of 60 days, and places a number of restrictions on such voluntary departure [see section VIIIA].

Additionally, the IIRIRA implementing regulations eliminated the availability of employment authorization documentation for persons granted voluntary departure. Effective April 1, 1997, no person granted voluntary departure may apply for or be granted work authorization, nor may any previous grant of employment authorization based upon having been granted voluntary departure be extended. (In the first example given above, the alien being granted the 30-day extension on May 1 would not be authorized to accept employment and could neither apply for nor be issued a work authorization document to cover that period.)

**D.    Authority to grant Voluntary Departure.**

The implementing regulations specify when the Service (i.e., district directors, assistant district directors for investigations, assistant district directors for examinations, officers in charge, chief patrol agents, service center directors and assistant center directors for examinations) may grant voluntary departure, when an immigration judge (or the Board of Immigration Appeals) may grant voluntary departure, and when the Service and EOIR can jointly grant voluntary departure. This time line explains these time periods:

**Time period or event**

| Authority | From prior to arrest up to filing of Notice to Appear (NTA) | From filing of NTA up to 30 days after master calendar | From 30 days after master calendar up to IJ's order | As part of IJ's order | After issuance of IJ's order (Extension of voluntary departure) |
|---|---|---|---|---|---|
| Service | YES | NO | NO | NO | YES |
| IJ or BIA | NO | YES | NO | YES | NO |
| Joint authority | NO | YES | YES | NO | NO |

**E.    Factors to be considered in granting voluntary departure.**

1.    <u>Advantages</u>.  Significant advantages remain to allowing an alien to depart voluntarily, provided the alien does actually depart. The costs to the government in terms of work force expenditures, detention space, transportation costs and other key areas are greatly reduced.

The alien receives the distinct advantages of not being ordered deported,  and either not being barred from applying for admission at a later date or being barred  for a lesser time. In no case should an officer state or even imply in any case that there  is an advantage to the alien in departing voluntarily. The officer must simply provide the  information so the alien may make his or her decision to accept voluntary departure or  to appear before an immigration judge.

2.     <u>Disadvantages</u>.  As stated above, an alien who has been granted voluntary  departure and who fails to depart is subject to a civil penalty of up to $5,000 and is  barred from receiving any additional voluntary departure for 10 years and from any relief  from deportation under sections **240A**, **240B**, **245**, **248** and **249** of the Act. Accordingly,  the alien who accepts voluntary departure and fails to depart automatically waives any eligibility for voluntary departure at the end of a hearing should he or she be placed in  removal proceedings.

3.     <u>Statutory prohibitions</u>.  Under no circumstances may an officer grant voluntary  departure to an alien who is prohibited by statute or regulations from receiving it. Those  aliens statutorily barred include:

€      Aliens who are deportable under section **237(a)(2)(A)(iii)** or section **237(a)(4)(B)** of the Act;

€      Aliens who had previously been granted voluntary departure after having been found inadmissible under section **212(a)(6)(A)** of the Act;

€      Aliens who have already received the maximum amount of time allowed (120 days prior to the conclusion of a removal hearing or 60 days at the end of one); and

€      Aliens classified as arriving aliens.

4.     <u>Likelihood of departing</u>.  The officer must be satisfied tha here is a reasonable likelihood that the alien will comply with the conditions set in his or her case and depart from the United States. The availability of the means of departure (financial and otherwise), the alien's immigration history, the alien's willingness to cooperate and other factors particular to thecase should be taken into account.

5.     <u>Bond prior to completion of removal proceedings</u>.  The Service may condition it's approval of voluntary departure on the posting of a bond to ensure departure, pursuant to section **240B(a)(3)** of the Act. However, the posting of a bond does not overcome the statutory ineligibility of an alien for voluntary departure, nor does it turn a bad risk into a good one. In most cases an alien who is determined not to depart will not change his or her mind because a bond has been posted. A bond requirement should be set high enough to provide the extra incentive needed for an alien who is a reasonable risk of complying with the voluntary departure conditions, but not so high as to prevent the obligor from posting it.

**Note:** After conclusion of proceedings, bond is **mandatory** if the alien is to be permitted to depart voluntarily, pursuant to section **240B(b)(3)**.

6.     <u>Other conditions</u>.  In accordance with local policy, the Service can place other conditions on the alien's receiving voluntary departure, provided those additional conditions are both reasonable and contribute to the likelihood of the alien's departure. Such conditions might include the presentation of a valid passport and confirmed transportation tickets for departure.

7.     <u>Bars to re-admission</u>.  The 180-day and 1-year time periods specified in section **212(a)(9)(B)** begin on the first day the alien is in the U.S. illegally, either by entering  illegally, by violating status, or by remaining longer than authorized, and extend until the alien departs. These time periods include **all** the time after April 1, 1997, during which the alien is in the United States illegally (i.e., both the time before the alien is granted voluntary departure and the time between the granting of VD and the alien's actual departure). It must be noted that there are certain exceptions in section 212(a)(9)(B) which preclude counting as illegal presence:

- any time during which the alien is under the age of 18 years old
- any time during which the alien has an asylum application pending (unless the alien worked without authorization during such time)
- any time during which the alien is the beneficiary of family unity protection in accordance with IMMACT section 301 (although a family unity beneficiary is  granted VD under the provisions of IMMACT section 301, he or she is **not**  granted VD under section **240B**)
- up to the first 120 days of any time during which the alien had been lawfully admitted or paroled **and** the alien had filed a timely, non-frivolous application for extension of stay or change of status **and** the alien was not employed in the United States without authorization, or
- any time in the case of certain battered women and children.
- any other time during which the alien is considered present pursuant to the authorization of the Attorney General.

In granting voluntary departure which would result in the alien being illegally in the U.S. for more than 180 days, or more than 1 year, officers should ensure that the alien is aware of the advantages of departing before the relevant time period has tolled.  Time prior to April 1, 1997, is not included in this calculation.

8.      <u>Voluntary departure with safeguards</u>. The Service may choose to allow the aliento leave under voluntary departure without safeguards, voluntary departure with safeguards, or it may place the alien in removal proceedings. The distinctions between the first two options may appear minor, but can actually be significant.

If the alien is granted voluntary departure with safeguards, he or she must depart  immediately and under the direct observation of the Service. The alien is not permitted to be out of Service custody. An alien granted voluntary departure without safeguards is normally released from Service custody and is generally at liberty until the required departure date, provided he or she complies with the conditions established when VD is granted.

On the other hand, an alien who has previously been granted voluntary departure by an immigration judge but failed to depart within the conditions specified is precluded from being granted voluntary departure for 10 years thereafter. Such failure to comply will result in an alternate order of removal taking effect. If the alien has not already departed under such alternate order, that alternate order should be executed.  If the alien has departed under such alternate order, he or she has deported himself or herself, and the previous order may be reinstated in accordance with section **241(a)(5)** of the Act if the alien reenters (see Section IX of these interim procedures).

9.      <u>Voluntary departure vs. deferred action</u>.  Voluntary departure can no longer be used to permit an alien to remain in the United States for extended periods of time. In extreme and exceptional circumstances, if a case of an illegal alien is so meritorious that the Service concludes that it would not be appropriate to proceed with removal action, the Service may choose to place the alien in a deferred action category (see Section **X**). Deferred action is not a "right" nor is there any procedure whereby it can be formally requested. It is a matter of prosecutorial discretion, and must be carefully guarded against abuse.

10.      <u>Voluntary departure under section 240B of the Act vs. voluntary departure under section 301 of IMMACT (Family Unity)</u>.  Although as an enforcement officer it is unlikely that you will be involved in issuing benefits under the family unity program, it is quite possible that you will encounter aliens who have been granted such benefits. Accordingly, it is important that you understand the differences between voluntary departure under section 240B of the Act and voluntary departure granted through the family unity program under section 301 of IMMACT and 8 CFR 236 subpart B. Voluntary departure under the family unity program:

- is separate and apart from voluntary departure under section 240B,
- is only available to a qualifying spouse or unmarried child of a  legalized alien (as defined

in **8CFR 236.11**),

- is usually granted in increments of 2 years and may be extended an indefinite number of times,
- is not subject to the restrictions contained in section 240B,
- does not count toward the maximum time limits of 120 days before          or during hearings, or 60 days after hearings, and
- is (normally) granted through an application filed through one of the service centers.

## F.    Procedures and Forms.

Except when **Form I-826** is being used for an alien departing immediately in Service custody, any decision to permit or refuse voluntary departure, including a decision to grant or deny any extension of voluntary departure previously granted, shall be made on **Form I-210**, Notice of Action--Voluntary Departure. It is important that this form be used in all cases because it contains information about the penalty provisions of section 240B(d) of the Act which the Service is required to provide to the alien.

The Form I-210 contains seven check blocks:

- The first block should be checked only when an initial grant of voluntary departure is given to an alien who had been admitted as a nonimmigrant and subsequently violated his or her nonimmigrant status.

- The second block should be checked in all other cases where an initial period of voluntary departure is being granted.

- The third block should be checked when a request for an extension of voluntary departure is either approved or denied. If the request is denied, the voluntary departure date which was previously authorized is written in the second sentence, even if that date has already passed.

- The fourth block is checked if the alien has already received the maximum amount of voluntary departure allowed by law. If this blocked is checked, the third block should also be checked, with the application "denied" and no additional time being granted for departure.

- The fifth block is checked if the alien is ineligible for voluntary departure under section **240B(d)** as someone who was previously granted voluntary departure and failed to depart. This section does not apply where an alien has filed a bona fide, timely application for an extension of voluntary departure. If this blocked is checked, the third block should also be checked, with the application "denied" and no additional time being granted for departure.

- The sixth block is checked if the alien was previously permitted to depart voluntarily after having been formally found inadmissible **by an immigration judge** under section **212(a)(6)(C)** of the Act (present without admission or parole, more commonly known as EWI). If this blocked is checked, the third block should also be checked, with the application "denied" and no additional time being granted for departure.

- The seventh block is checked whenever the Service requires prior notification of the alien's departure arrangements. This would normally occur only when the alien is under docket control, but is not being detailed and removed in Service custody. This block should be checked in combination with one or more of the other blocks, as appropriate.

Once the Form I-210 has been completed, deliver the original to the alien and place a copy in the alien's file. If the alien has an attorney or other authorized representative, a copy shall be provided to that attorney or representative. If appropriate, either place the alien under docket control or update the existing docket. Cancel the alien's nonimmigrant visa pursuant to 22 CFR 41.122(h)(5), if appropriate. Ordinarily, the nonimmigrant visa should be canceled if an alien is apprehended in violation of his or her

**Interim Enforcement Procedures**

status.

AR2022_300915

## IV.    Detention and Bond Determinations.

In cases where removal proceedings are being initiated, a decision relating to arrest and detention must be made. A Warrant of Arrest should not be issued unless the issuing officer has reason to believe that the alien is likely to abscond, will be a threat to public safety or national security, or where mandatory detention rules apply. In issuing a Warrant of Arrest, the issuing officer shall, among other factors, take into consideration the respondent's close family ties; age; fixed address; prior immigration or any law violations; employment history; financial condition; previous attempts to escape or abscond; and other facts which give reason to believe the respondent will not appear but will evade immigration process. **Form I-265** (Notice to Appear, Bond, and Custody Processing Sheet) should be completed in each case in which a Warrant of Arrest is issued, in order to provide a record that uniform criteria were applied in making custody determination.

### A.    Rules of detention.

1.    <u>General</u>.  Whenever any regulation or statute provides that certain requirements must be met for an alien to be released from custody, the alien must establish to the satisfaction of the authorized officer that he or she meets those requirements. When any available information indicates that an alien is statutorily ineligible for release and must be detained, when the alien's release would represent a danger to persons or property, or when an alien's lack of funds or fixed address and other factors support a finding that he or she is likely to abscond, the alien may be detained in a Service approved facility.  The burden is on the alien to show that he or she meets the criteria for release. The Service does not have to show that the alien is a threat or is not likely to appear.

2.    <u>Aliens served with Notice to Appear and detained in Service custody</u>.  A recommendation shall be made by the investigating officer, simultaneously with the Notice to Appear, Bond, and Custody Processing Sheet, that a Warrant of Arrest be issued on Form I-200 for an alien who will be detained in Service custody. If it is not feasible to do so in person, the recommendation may be made telephonically. Only those officers specified in **8 CFR 287.5(e)(2)** may issue a Notice to Appear and a Warrant of Arrest pursuant to a telephonic request. The copy of these documents which is intended for service upon the alien shall be prepared in the name of the authorized officer. The original shall be signed by the authorized officer. These documents shall be noted with the exact time of issuance and shall be served within 24 hours of issuance. A Notice of  Custody Determination, Form I-286 is used to notify an alien of conditions of custody and any redetermination of custody conditions. Form I-286 is not used at ports-of-entry for arriving aliens.

An alien who is released from custody pending a decision in removal proceedings may **not** be granted employment authorization unless the alien would otherwise have been eligible for the employment authorization. [see section **236(a)(3)** of the Act.]

3.    <u>Initiating Removal Proceedings against an alien detained in a correctional institution</u>. When removal proceedings are initiated against an alien detained in a correctional institution, a Notice to Appear will be issued using **Form I-862**. Form I-200 should be prepared simultaneously with Form I-862 and signed by an authorized official if it is anticipated that the alien will be taken into custody by the Service when released from the correctional institution. Form I-200 will be served upon the alien by an immigration officer when the alien is released from confinement by the correctional institution and taken into custody by the Service. A detainer on **Form I-247** is frequently used in such cases (See Section II H of these interim procedures).

4.    <u>Bond Redetermination</u>.  When, prior to conclusion of a removal proceeding, an eligible alien requests a determination by an immigration judge concerning custody, detention, or bond, the district director shall promptly transmit to the immigration judge Form I-286; the record file; information as to whether detention is mandatory, a detailed statement why the alien should be detained or bond not reduced, and any other relevant information. Copies of anything the Service wishes to present to the Immigration Court must be filed with the Court by Service

counsel and served on the alien.

**B.** **Rules for specific cases**.

1.   Detention prior to completion of proceedings of aliens not subject to the Transition Period Custody Rules. (TPCR).  An alien described in section **236(a)** of the Act on a warrant may be released from custody on bond, an Order of Release on Recognizance, Form I-220A, with such conditions as the district director or the district director's designated representative may establish. If a bond is required the amount can be no less than $1500.00.

2.   Detention prior to completion of removal proceedings of aliens subject to the TPCR.  The TPCR went into effect on October 9, 1996, and will remain in effect until October 9, 1997 or 1998, depending on whether the Commissioner notifies Congress that the Service lacks sufficient detention facilities and personnel to implement the mandatory detention provisions of the IIRIRA.

The TPCR applies to aliens inadmissible under section **212(a)(2)**, section **212(a)(3)(B)** or deportable under section **237(a)(2)(A)(ii)**, **(iii)**, **(B)**,**(C)**, **(D)**, or section **237(a)(4)(B)**. Note: the TPCR references section 241 of the Act, but that section was redesignated as section 237, effective April 1, 1997.

The TPCR provides that the Service must take all aliens described above into custody but allows the Service to consider release of two classes of aliens. [see section **303(b)**(3)(B) of the Act.] An alien who was lawfully admitted may be considered for release if the alien is not at threat to persons or property and is likely to report for proceedings as required.  The determination regarding whether an alien is threat to the community is a separate determination which precedes consideration of the alien's flight risk. An alien who was not lawfully admitted but cannot be removed because the designated country will not accept the alien can be considered for release if the alien is not a threat to persons or property and is likely to appear for any scheduled proceedings.

3.   Detention prior to completion of removal proceedings after termination of Transition Period Custody Rules. After the expiration of the TPCR, an alien described in section **236(c)** of the Act can only be released during proceedings if the release is necessary for the protection of the alien pursuant to 18 U.S.C. 3521.

**C.** **Special detention cases**.

1.   Juveniles. Aliens who are defined as juveniles should only be placed in a Service approved juvenile facility or with an appropriate responsible agency or institution, recognized or licensed to accommodate juveniles by the laws of that State. [see **8 CFR 236.3**.] Children of tender years who are too young to be placed in a juvenile facility or youth hall should be placed with local youth/child services, or with relatives or friends. In those extreme cases where it is impossible to accommodate a child of  tender years accompanied by an adult, consideration should be given to releasing the accompanying adult to a responsible agency, relative, or friend. Extenuating circumstances requiring a deviation from this policy must be cleared through the appropriate Juvenile Coordinator.

2.   Non removable. An alien who may not be removed must nonetheless be detained during proceedings and during the removal period. If after the expiration of the removal period, it is determined that the alien may not be removed, the alien may be released on an order of supervision, Form **I-220B**.

3.   Protective custody. The Service may provide, pending determination of deportability, protective custody to a consenting alien who is or may be subject to involuntary repatriation or to any form of coercion which could inhibit the free exercise of will in deciding whether to depart from the United States. This authority is exercised as an incident of the Service's authority to detain deportable aliens if failure to detain would result in harm to the national interest. Protective custody shall be provided

**Interim Enforcement Procedures**

hereunder to consenting aliens only upon the authorization of the Executive Associate Commissioner for Programs, upon the request of the Department of State or, if the circumstances require immediate Service action, without such a request. The Executive Associate Commissioner for Programs shall immediately notify the Executive Associate Commissioner for Field Operations of approval of any request for protective custody.  The Associate Commissioner for Field Operations shall arrange with appropriate personnel in the field for such protective custody to be provided.

**INSERTS**

**AR2022_300918**

## V.    Processing Removal Hearings.

### A.    General.

Upon arresting an alien a determination must be made as to what section of the Act will that alien be charged with, either **Section 212(a)** of the Act or **Section 237** of the Act. Aliens who have entered the United States without inspection (as well as arriving aliens, not further discussed here) are charged under section 212 of the Act, not section 237. Although there are two different Sections that may be used in charging an alien who is put in removal proceedings, the necessary paperwork is the same.

### B.    Case Preparation.

There are a number of steps to be taken to refer a case for a removal hearing or prosecution. Complete and accurate case preparation is extremely important. Prepare cases for prosecution according to guidelines set by the local U.S. Attorney. The following steps must be taken in each case referred to an immigration judge for a Removal Hearing.

1.    Search for existing Service records in CIS and other appropriate automated systems. If an "A" file exists, create a temporary file. If a file does not exist, follow local district or sector procedures for creating an "A" file.

2.    Complete Form I-213 and electronic processing, (IDENT) as applicable.

3.    Complete Form I-826 (Rev.4/1/97).

4.    Complete the applicable sections of Form I-214.

5.    Photograph and fingerprint the alien on FD-249 fingerprint cards (two sets) and on the R-84. Be sure to properly code the fingerprint cards with the proper United States Code citation, since the FBI will not clear cards without such codes. Following are examples of codes that may be used:

| | | |
|---|---|---|
| 8 U.S.C. 1306 | Counterfeit INS documents, such as | alien registration |
| 8 U.S.C. 1324 | Alien Smuggling | |
| 8 U.S.C. 1325 | Illegal Entry | |
| 8 U.S.C. 1326 | Reentry after Deport | |
| 18 U.S.C. 911 | False claims to U.S.citizenship | |
| | (imposters, photo substitution of U.S.passport) 18 U.S.C.1001 | |
| | Other (fraudulent documents, imposter, no documents). | |

6.    If the alien is to be detained, Form I-43 must be completed.  Every arrested alien who is to be placed in detention or granted immediate voluntary departure under safeguard shall be required to fill out and sign Form I-43 when he claims he has money due him or personal property in the United States not in his immediate possession. It is the responsibility of the arresting officer to insure that the alien is afforded a reasonable opportunity to collect money due to him or to dispose of such personal property. If an employer refuses to pay wages due or to arrange for payment, the nearest consul representing the alien's country shall be notified. Facts of the case, including the consul's name, address, and date of notification shall be included on the form. When the alien has no monies due and no property, Form I-213 shall be checked "None claimed" in the appropriate block and the alien requested to initial the notation, unless he or she was apprehended at the time of entry.  Consult **8 CFR 236.1(e)** to ensure that, if required, the appropriate consular official is immediately notified of the alien's detention, even if the alien requests that this not be done. Complete local procedures for authorization and arrangement of detention, if appropriate.

7.    If available, review the A file to ensure that necessary court records or other evidence needed for the hearing are available.

AR2022_300919

Interim Enforcement Procedures

Requirements for proving convictions are contained in section **240(c)(3)(B)** of the Act.

**C.    Preparing a Notice to Appear.**

1.    The investigating officer shall simultaneously make a recommendation to the authorizing official, using a Notice to Appear, Bond, and Custody Processing Sheet (**Form I-265**), that:

€    a Warrant of Arrest (**Form I-200**) be issued for an alien who will be detained in Service custody, or

€    an Order of Release on Recognizance (**Form I-220A**) be issued for an alien who will be released.

If it is not feasible to do so in person, the recommendation may be made telephonically. Only those officers specified in **8 CFR 287.5 (e)(2)** may issue a Notice to Appear and Warrant of Arrest pursuant to a telephonic request. The copy of these documents which is intended for service upon the alien shall be prepared in the name of the authorizing official. The original shall be signed by the authorizing official.

2.    Prepare an original and two copies of **Form I-862**, Notice to Appear. If the alien is being held in Service custody, indicate that fact and location of the facility where the alien is detained in the address block. If the alien is not being held in Service custody, enter the complete address and phone number where the alien can be reached and provide the alien with Form EOIR-33 to report any change of address. If the aliens's mailing address is different than the physical address, include both. Check the appropriate block to indicate if the alien is an arriving alien as defined by **8 CFR 1.1(q)**, an alien present without inspection, or a deportable alien (overstay or status violator). Check off  any other appropriate boxes on the form immediately following the "provisions of law" section.  The Notice to Appear must ordinarily include the time and place of the hearing. Obtain a date and time for the hearing using the EOIR ANSIR system, or following established local procedures. In unusual situations when a hearing date and time cannot be obtained, such as when there is a computer system outage, indicate " to be set" in the appropriate data field.  No hearing date may be scheduled earlier than ten days from the date of service of the Notice (to allow sufficient time to obtain counsel and prepare for the hearing), but the form includes a waiver which the alien may execute in order to obtain an earlier hearing date. Fill in the appropriate address and room number for the Immigration Court where the alien is to appear. On the reverse of the I-862 is critical information concerning representation, conduct of removal proceedings and the consequences of failure to appear at the scheduled hearing. These should be specifically identified to the alien.

Whenever possible, use the standardized text provided in the appendix to these procedures to complete the allegations and provisions of law sections of the Notice to Appear. The standard text includes specific language to be used for arriving aliens, aliens who entered without inspection and aliens who made a lawful entry but are now in violation of that status (those charged under any provision of section 237), as well as standard text for allegations and citations of law for each provision of section 212 and 237. If the space on the Notice to Appear for stating the facts or charges is inadequate, use a blank sheet as a continuation page and indicate in both the allegations section and provisions of law section "See attached continuation sheet." Many Service offices use form-filler software to generate the Notices. Such software may include an option to select from the standard text contained in Appendix V, requiring only the addition of facts specific to the case.

3.    Provide the alien with a current list of organizations and programs prescribed in **8 CFR 292** which provide free legal services.

4.    If the Notice to Appear has been telephonically authorized and the authorizing official is not readily available to sign the original, the officer serving the Notice must sign the name and title of the "Issuing Officer" by -------- then sign his or her own name on both copies. The serving

officer will complete the "date, city and state" blanks on all three forms.

5.      If the alien wants a prompt hearing, prior to the ten day waiting period, have the alien sign the section titled "Request for Prompt Hearing". The officer must date and sign this section if that is the choice of the alien. Any motions or other written requests, including requests for adjournment, filed by the alien or his counsel prior to the scheduled date of the hearing before the immigration judge and any documents reflecting the action taken thereon by the Service shall be made available to the immigration judge at the time of hearing.

6.      The Notice to Appear must be served on the alien within 24 hours of issuance in any instance where the Service proposes to set bond or retain the alien in custody. The original and a copy will be placed in the "A" File. The alien will be served one of the copies and must sign the original and the copy that are placed in the file, unless service is by mail.  If the Service file contains evidence of counsel (Form G-28), he or she must also be sent a copy of the Notice. The officer completing service must execute the Certificate of Service block.

## D.   **Special Instructions.**

1.      <u>Aliens previously granted voluntary departure</u>.  If an alien has been Granted voluntary departure previously by the Service and failed to depart within the time specified, the Notice to Appear should contain a factual allegation stating when the alien  was granted voluntary departure and for what period of time, and that the alien did not depart within that time. In cases where an alien has been granted voluntary departure by an immigration judge and failed to depart, the appropriate action against the alien will usually be either a reinstatement of the prior order under section **241(a)(5)** of the Act or execution of the outstanding order.

2.      <u>Certain permanent residents where families are present</u>.  When a Notice to Appear is being issued in the case of an alien who was admitted as a permanent resident, and whose deportability is based on inadmissibility at the time of admission for obtaining that visa by fraud or misrepresentation, Notices to Appear should also be issued against any spouse or minor children who obtained their status as a dependent.

3.      <u>Certain permanent residents who have made multiple entries</u>.  In the case of a permanent resident whose deportability is based on inadmissibility at the time of original admission or entry or for subsequent conduct, the original entry or admission, and no other, shall be alleged in the Notice to Appear. Dates other than the original entry shall not be used unless the later date is essential to the proceeding and that later admission followed an absence that was "meaningfully interruptive" of the aliens permanent residence under <u>Rosenberg v. Fleuti</u>, 374 U.S. 449 (1963) or the alien was "seeking admission" within the meaning of section **101(a)(13)(C)** of the Act.

4.      <u>Expunged convictions</u>.  It has been the Service's policy to defer the institution of deportation proceedings in the case of aliens who are eligible to have a criminal conviction expunged under State law. If a conviction has been expunged the Board of Immigration Appeals has stated that the conviction may not support an order of deportation. See Matter of Ibarra-Obando, 12 I & N Dec. 576 (BIA 1966; A.G. 1967); **Matter of G-**, 9 I & N Dec. 159 (BIA 1960; A.G. 1961), and cases cited therein. However, an exception to this rule exists for expunged drug convictions. The Attorney General has ruled that an alien convicted of a drug offense will be subject to deportation even if the conviction has been expunged. See Matter of A-F-, 8 I & N Dec. 429 (BIA, A.G.1959). In the case of an alien who may avail himself or herself of a state expungement procedure upon fulfilling the conditions of probation, commencement of removal proceedings should be deferred during the period of probation and during the pendency of any proceeedings to obtain expungement. The alien shall be advised of this fact. If the alien's probation is revoked, or if an expungement is refused, or if the alien does not obtain an expungement within a reasonable period of time after discharge from probation, the district director may institute removal proceedings.

5.      <u>Deportability based on inadmissibilty at admission on public health grounds</u>.  An

application for a Notice to Appear alleging deportabilty based on inadmissibility at entry under section 212(a)(1) of the Act shall be supported, if possible, by a certificate from a United States Public Health Service doctor based upon a personal examination of the alien.

6.      <u>Alien's entry or admission affected by false claim to United States citizenship</u>.  In cases where an alien's etry or admission was obtained by a false claim to United States citizenship, the "no immigrant visa" charge should generally be used.

7.      <u>Aliens admitted as nonimmigrants</u>.  As a general rule, a "no immigrant visa" charge shall not be used in the case of an alien admitted as a nonimmigrant. when appropriate, a "remained longer" or other charge based on violation of nonimmigrant status shall be used.

8.      <u>Current or former members of Armed forces</u>.   A Notice to Appear shall not be issued against any current or former member of the armed forces without prior approval from the regional director. Also, such an alien must also be advised, prior to the issuance of the Notice to Appear, of any discretionary relief which may be available.

9.      <u>Processing diplomats</u>.  Before a Notice to Appear may be issued against an alien who may have diplomatic status, the officer must contact the State Department to ensure that diplomatic status no longer exists and that there is no diplomatic immunity from legal process. The State Department should be contacted by completely filling out Form I-88,  which may be sent by facsimile or the information and response may be transacted by phone.

**E.    Cancellation of Proceedings**

1.      Prior to actual commencement of a removal hearing before an immigration judge, Service counsel, if he or she believes that the facts warrant, may prepare an appropriate recommendation (memorandum) to the district director that the proceedings be canceled; that voluntary departure be granted or extended to a specified date for the purpose of actual departure; that the alien be released from custody and the conditions of release; that the case be considered by the district director under section 245, 248, or 249 or other provision of law; that such other action be taken as appears appropriate. When such action is initiated because of a request from the alien or counsel for the alien, the alien must be advised of the district director's determination.

2.      After actual commencement of the hearing the trial attorney, in behalf of the district director, may prepare and submit to the immigration judge a motion as may be appropriate for the proper disposition of the case.

## VI.   Expedited Removal

### A.   General.

Section **235(b)(1)** of the amended Act contains provisions to allow immigration officers to order removed certain aliens who are found to be inadmissible under section **212(a)(6)(C)** or **212(a)(7)** of the Act. These sections of 212(a) include aliens who attempt entry by fraud or misrepresentation or without proper documents. An alien ordered removed under the expedited removal provisions is not entitled to further hearing or review, unless the alien indicates an intention to apply for asylum or a fear of persecution.

Section **235(b)(1)(A)(iii)** permits the Attorney General to apply the expedited removal provisions to aliens in the United States who have not been admitted or paroled, and who have not affirmatively shown, to the satisfaction of the immigration officer, that they have been continuously physically present in the United States for the 2-year period immediately preceding the date of determination of inadmissibility. Although these provisions will not initially be applied to aliens who entered without inspection, the regulations provide that the Commissioner may elect to apply the expedited removal provisions at any time, to any aliens specified in this section, by publication of a notice in the Federal Register. All enforcement officers need a basic working knowledge of the expedited removal provisions so that they may be immediately implemented in the event the Commissioner determines a need to apply the expedited removal process to aliens who entered without inspection.

The expedited removal provisions apply only to aliens inadmissible under sections 212(a)(6)(C) and (7). If the Service wishes to lodge any charge of inadmissibility other than section 212(a)(6)(C) or 212(a)(7), expedited removal is **not** appropriate. A section 240 removal proceeding before an immigration judge must be initiated in order to remove on other grounds. The Service may not opt to place any alien subject only to expedited removal into section 240 proceedings, unless additional charges are being lodged. There will be very few instances where it will be advantageous to the Service to lodge additional charges and institute section 240 removal proceedings if an expedited removal proceeding can be concluded. Even in cases where an alien is inadmissible able due to a criminal ground, an expedited removal will normally be the preferred option. As with any other apprehension, the Service has the option of allowing the alien to voluntarily depart the United States rather than institute removal proceedings.

During an inspection, the burden of proof lies with the alien to establish admissibility. However, any charge of inadmissibility, whether in referring to a hearing before an immigration judge or entering an order of expedited removal, must be fully justified by the facts or evidence in the case. Refer to **Section II B** for additional discussion of burdens of proof.

It is important that officers handling expedited removals have a thorough understanding of the relevant grounds of inadmissibility:

### B.   Section 212(a)(6)(C) - Fraud and Misrepresentation.

1.   Definitions.

€   Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or otherbenefit provided under this Act is inadmissible.

€   Falsely Claiming Citizenship - Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this Act (including section **274A**) or any other Federal or State law is inadmissible.

An alien who is determined to be inadmissible for fraud or misrepresentation is barred forever from the United States, with few waivers available. Any one or several of the following points

should be considered in determining if an alien has committed fraud or misrepresentation.

2.  <u>Sustaining a fraud or misrepresentation charge</u>.

€   To support a charge of having procured a document by fraud or misrepresentation, the document must have been procured from a government official based on fraud or misrepresentation, not from a counterfeiter, and any misrepresentation must have been practiced on a U.S. Government official.

€   The procurement by fraud must relate to a person who has done so to obtain his or her own admission, not someone else's.

€   The fraud or misrepresentation must be material, i.e., the alien is inadmissible on the true facts, or the misrepresentation tends to shut off a relevant line of inquiry that might have resulted in a determination of inadmissibility.

€   In general, an alien should not be charged with misrepresentation if            he or she makes a timely retraction of a simple, oral   misrepresentation, in most cases at the first opportunity.

€   Silence or failure to volunteer information does not in itself constitute a misrepresentation.

A couple of examples may be helpful in distinguishing when a fraud charge may be sustained:

•   A college age individual states that he is a student at the local college and that his passport and all immigration paperwork are with the foreign student advisor. Having doubts, you ask him to explain the process through which he originally obtained his student visa. He realizes that he cannot "bluff his way past you", and immediately concedes that he is not a student and that he in fact EWI'd two days ago.  The alien is inadmissible under section **212(a)(7)**, but cannot be held inadmissible under section **212(a)(6)(C)**, as he made a timely retraction.

•   A college age student presents a counterfeit passport, visa, I-94 and student ID from the local college. Having doubts about the alien and the documents, you contact the foreign student advisor, who informs you that the school has no record of the individual. Confronted with the facts, the alien finally admits that he EWI'd and has never attended the college. The alien is inadmissible under both sections 212(a)(6)(C) and 212(a)(7).

**C.   <u>Section 212(a)(7) - Documentary Deficiencies</u>.**

1.  <u>Immigrants</u>.  Section 212(a)(7)(A) of the Act provides:

(i) In General - any immigrant at the time of application for admission - (I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act, and valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under **section 211(a)** of the Act, or (II) whose visa has been issued without compliance with the provisions of **section 203** of the Act.

Section 212(a)(7)(A)(i)(I) includes aliens with expired documents or with an immigrant visa with a classification to which the alien is not entitled. It is most commonly used as the charge lodged against mala fide nonimmigrants, since every alien is presumed to be an immigrant until he establishes that he is properly classifiable in a specific nonimmigrant category. If the alien is not then in possession of a valid immigrant visa, the alien is considered an immigrant without proper documents and therefore inadmissible. Aliens who entered without inspection may be inadmissible under this section. Those with fraudulent documents may also be inadmissible under section **212(a)(6)(C)(i)**.

2.  <u>Nonimmigrants</u>.  Section **212(a)(7)(B)** of the Act provides:

(i) In General - Any nonimmigrant who - (I) is not in possession of a passport valid for a minimum of 6 months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or (II) is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission.

Section **212(a)(7)(B)** includes aliens who are not in possession of a valid passport and visa or border crossing card. This is used when the only problem is an expired passport or inappropriate visa, not when the alien is simply not entitled to any nonimmigrant classification.

## D.   Processing an Expedited Removal Case.

Completing an expedited removal case requires consistency, thoroughness and attention to detail.  The Service must maintain accurate and complete records of all expedited removal cases, and most of all, exercise extreme caution to ensure a proper decision in every instance in order to avoid attempts at litigation and possibly even further legislation curtailing the agency's newly-acquired authority in such cases. As when referring an inadmissible alien for a removal hearing before an immigration judge, it is important that a complete, accurate record of inadmissibility be created, and that any expedited removal be justifiable and non-arbitrary.

The following steps must be taken in each case in which an order of expedited removal is entered against an alien:

1.      Clearly explain to the alien, in a language he or she understands, the serious nature and impact of the expedited removal process. Read the statement of rights and consequences contained on Form I-867AB, Record of Sworn Statement in Proceedings under section **235(b)(1)** of the Act, to the alien. Explain that you will be taking a statement from him or her, and that any information given or discovered will be used in making a decision on the case and may result in his or her prompt removal.  Advise the alien that if he or she is found to be inadmissible and a decision is made to order the alien removed, he or she will be immediately removed from the United States. Explain that there is no appeal to this decision and that this will be his or her only opportunity to provide any information or state any fear of return or removal that he or she may have.

2.      Complete Form I-213, preprinted or electronic versions, as applicable.

3.      You must use Form I-867AB to take a complete sworn statement from the alien concerning all pertinent facts. The information discussed in paragraph (1) above is printed on the form and should be carefully explained to the alien. If the case did not initially appear to involve inadmissibility and removal under the expedited removal proceedings, and the sworn statement was begun using other Service forms, you must immediately advise the alien of the rights and warnings on Form I-867A once you determine that the alien is subject to expedited removal. The sworn statement will usually be done in  question and answer format, but a narrative format may be used in simple, straightforward cases not involving potentially sensitive or contentious issues. The sworn statement should cover several general areas of inquiry:

€       Identity - including true name, aliases, date and place of birth and other biographical data.

€       Alienage - determine citizenship, nationality, residence. Cover any possible claim to U.S. citizenship through parents.

€       Inadmissibility - questions should cover the alien's reason for coming to the United States, information about the specific facts of the case and the specific suspected grounds of inadmissibility.

€       Impact of removal -once inadmissibility under section 212(a)(6)(C) or (7) is decided, and you intend to issue an expedited removal order, clearly advise the alien of impact and consequences of inadmissibility and ask if he or she understands.

You must use Form I-867B as the jurat. Be sure to obtain responses from the alien regarding the closing questions contained on the form. If the alien in any way indicates a fear of removal or return, follow the procedures in part C. of this section. Collect any additional evidence relevant to the case which is discovered during the inspection proce

4.      Prepare three copies of Form **I-860**, Notice and Order of Expedited Removal. Check the box for the appropriate ground(s) of inadmissibility under which the alien is being charged, and insert a narrative description of each charge. Read and explain the charges to the alien in the alien's native language or in a language the alien can understand. An interpreter may be required to ensure that the alien understands the allegations and the removal order. Interpreters should not be used if they are employees of the government of the alien's home country, such as an employee of a government-owned airline, except for the most routine questioning. Never use an employee of a foreign government if there is any possibility of sensitive areas (e.g., persecution or torture) being discussed. After all statements are taken and other paperwork is complete, present it to the appropriate supervisor (not to be delegated below the second line supervisor) or person acting in that capacity, for review and approval. If the appropriate supervisor is not present at that location, the supervisory review and  approval may be obtained telephonically, by fax, or by other means. Print the name and title of the supervisor approving the order. The expedited removal order is signed by the preparing officer, unless the alien expresses a fear of return, but does not pass the credible fear threshold before an asylum officer. In such case, the asylum officer signs the removal order.

5.      Photograph and fingerprint the alien on FD-249 fingerprint cards (two sets). Be sure to properly code the fingerprint cards with the proper United States Code citation, since the FBI will not clear cards without such codes. Following are examples of some of the common citations that may be used:

|  |  |
|---|---|
| 18 U.S.C. 1544 | Photo substitutions |
| 18 U.S.C. 1546 | Counterfeit immigrant visa |
| 18 U.S.C. 1306 | Counterfeit INS documents, such as alien  registration |
| 18 U.S.C. 911 | False claims to U.S. citizenship (imposters,                photo substitution of U.S. passport) |
| 18 U.S.C. 1001 | Other (fraudulent documents, general false statements, imposter, etc.) |

6.      In cases involving fraudulent documents, if the sworn statement includes an admission of the fraud, no forensic analysis may be required. Due to the expedited nature of the removal process, actual forensic examination of the document by the Forensic Document Laboratory (FDL) may not be feasible. Offices with photo phones or other communications devices for transmitting quality images should use that technology whenever possible.

7.      Search for existing Service records in CIS and other appropriate automated systems. If an "A" file exists, create a temporary file and request the permanent file through local procedures. After the file is received, update it with all relevant documents completed or collected during the expedited removal process and forward to the proper Files Control Office according to local procedures. If a file does not exist, follow local district or sector procedures for creating an "A" file

8.      Consult **8 CFR 236.1(e)** to ensure that, if required, the appropriate consular official is immediately notified of the alien's detention, even if the alien requests that this <u>not</u> be done. Notify the alien that he or she may communicate with a consular official. Document the file that such advisal was given.

9.      Complete local procedures for authorization and arrange for detention, if appropriate.

10.     Most aliens processed under the expedited removal provisions should be removed promptly; however, some aliens, such as those who claim asylum or LPR status, may be detained pending a decision on their claim.

11.     When the expedited removal order is ready for execution, serve the original I-860 on the alien. Place a copy of the form in the "A" file. The third copy may be retained at the office or station.

12.     If the alien is in possession of a visa or consular-issued border crossing card, cancel the visa or border crossing card and complete **Form I-275**, Withdrawal of Application for Admission/Consular Notification. Check the box "Ordered removed (inadmissible) by INS - Section **235(b)(1)**". In the reasons block, you may note "See attached I-213" or "See attached sworn statement". Note the passport with the file number and action taken, for example: "Removed 12/1/97 SDC/Section 212(a)(6)(C)(i)". Forward a copy of the removal order, sworn statement, and I-213 with the I-275 to the Department of State.

13.     Serve **Form I-296**, Notice to Alien Ordered Removed. You must check the appropriate box to indicate the period during which the alien must obtain permission to reenter: 5 years for the first removal under section 235(b)(1); 20 years in the case of a second or subsequent removal; at any time if the alien has been convicted of an aggravated felony (even though the alien is not being charged as an aggravated felon in this proceeding). At the time of actual removal, a photograph and a pressed print of the alien's right index finger should be placed on a copy of the I-296, the alien should sign the form, and the particulars of the departure entered on the form for retention in the file.

14.     Arrange for removal according to local procedures.

15.     Arrange for entry of the record into NAILS and DACS, according to local procedures.

**E.      Expedited Removal Cases Involving a Claim to U.S. Citizenship, Lawful Permanent Resident, Refugee, or Asylee Status.**

1.     <u>General</u>.  Cases in which an alien who is subject to expedited removal claims to be a U.S. citizen, claims to have been lawfully admitted for permanent residence, to have been admitted as a refugee under **section 207**, or to have been granted asylum under **section 208**, should be handled very cautiously to ensure that the rights of the individual are fully protected. The expedited removal authority provided by IIRIRA is a powerful tool and there are significant interests at issue where such a claim is made . You should  be extremely aware of those interests when you are using this tool. There are grave consequences (for the person involved, for the Service, and for the individual officer) involved in incorrectly processing a bona fide citizen, LPR, refugee or asylee for removal. Although the statute and regulations provide certain procedural protections to minimize the risk of such consequences, you  should never process a case for expedited removal which you would not feel satisfied processing for an immigration judge hearing.

If the alien falsely (or apparently falsely) claims to be a citizen, lawful permanent resident, refugee, or asylee, and is not in possession of documents to prove the claim, make every effort to verify the alien's claim prior to proceeding with the case. This can be accomplished through a thorough check of the Service data systems, manual request to the Records Division, careful questioning of the alien, or review of Service issued and other documentation presented. Use whatever means at your disposal to verify or refute a claim to U.S. citizenship, including verification of birth records with state authorities, etc.

2.     <u>Verifiable Claim</u>.  Although section **101(a)(13)** defines admission and provides that certain lawful permanent residents are not considered to be seeking admission, a lawful permanent resident who is attempting entry at a time or place other than as designated by immigration officers or who has not been inspected and admitted by an immigration officer is

considered to be seeking admission. If the claim is verified and the alien appears to be admissible except for lack of the required documents, you may consider a waiver under section 211(b) of the Act for a lawful permanent resident, or you may consider accepting an application for a refugee travel document in accordance with **8 CFR 223.2(d)**(2)(ii) for a refugee or asylee. Refer to **Chapters 13.2** and 17.5 of the Inspectors Field Manual for a discussion of this and other options for admitting returning residents. It is highly unlikely such a situation will arise except at a port of entry.

If the claim is verified, but a waiver is not available or is not clearly warranted, such as when fraud was committed in obtaining status, when the alien has repeatedly violated the immigration laws, or in cases where the alien appears to have abandoned his or her residence, you should initiate removal proceedings under section 240 of the Act, charging the alien as an inadmissible alien. Follow procedures in **Section V.**

3.    <u>No Verifiable Claim</u>.   If no record of the alien's citizenship, lawful admission for permanent residence, admission as a refugee, or grant of asylee status can be found after a reasonably diligent search, advise the alien that you are placing him or her under oath, or take a declaration as permitted in 28 U.S.C. 1746, and warn the alien of the penalties for perjury. Section 1746 of the Title 28 United States Code reads as follows:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath
> required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him as true under penalty of perjury, and dated, in substantially the following form:

> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

The penalties for perjury contained in 18 U.S.C. 1621 (Perjury generally) provide for fine and imprisonment of not more than five years, or both. The penalties for perjury contained in 18 U.S.C. 1546 (Fraud and misuse of visas, permits, and other documents) provide for fine and imprisonment of not more than 10 years, or both.

If practicable, require the alien to write the statement in his or her own handwriting and in his or her native language. If the alien declares under oath, pursuant to the advice above, that he or she is a citizen, lawful permanent resident, refugee, or asylee, order the alien removed on Form I-860 under section **235(b)(1)(A)** of the Act and refer to the immigration judge for review of the order, using Form I-863. If the alien declines to make a written statement under oath, conclude the expedited removal as you would in the case of any nonimmigrant.

Complete Form I-860 after completing all procedures in this chapter. Serve the Form I-860 on the alien. Use Form I-863, checking Box #4, to refer the removal order to the immigration judge for review. If the immigration judge determines that the individual is not a citizen and has never been admitted as a lawful permanent resident, refugee, or asylee, the expedited removal order will be affirmed and the alien removed. There is no appeal from the decision of the immigration judge. If the judge determines that the individual is a citizen, or an alien who was once admitted as a lawful permanent resident, refugee, or asylee, and that status has not been terminated, the

judge will vacate the expedited removal order and the Service may initiate removal proceedings under section 240, if the individual is not a citizen and such removal proceedings are appropriate.

**F.    Asylum Claims in Expedited Removal and Stowaway Cases.**

1.    General.  In a situation involving a subject who may be amenable to expedited removal, you may well encounter an alien who has a fear of returning to his or her homeland. You may also encounter an alien who is attempting to enter, or has entered, the United States as a stowaway and who also has indicated such fear. Although stowaways are not subject to the normal expedited removal provisions of section **235(b)(1)** and can be removed without a formal order of removal, the law provides review procedures to be followed in dealing with both stowaways who claim asylum or a fear of persecution and aliens who are subject to expedited removal through the "credible fear determination process" set forth in section **235(b)(1)(B)** of the Act. It is of vital importance that if an alien has such fear, he or she be referred to a Service asylum officer for the proper determination.

The first point to keep in mind is that there are no "magic words" which the alien must say in order to trigger the process. An alien might say "I want asylum", or he might say "I'm afraid to go home" or anything else which indicates that he might have a fear of persecution. For that matter, the alien might not say anything at all, but his non-verbal actions or body language might indicate a fear of return. It is important that you remain alert for, and aware of, any such indications.  While it is helpful if you are aware of countries where persecution is more likely to take place, you can never discount the possibility of an alien from any country in the world having a fear of return. The United States is bound by both the Protocol on Refugees and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and, except under extraordinary circumstances, may not return an alien to a country where he or she may face torture or persecution.

The alien may convey fear of violence or harm, a need for protection, an indication of harm to, or disappearance of, relatives or associates, or dangerous conditions in his or her country. Even disputes of a personal nature sometimes may relate to asylum, such as domestic violence, sexual or child abuse, child custody problems, coercive marriage or family planning practices, or forced female genital mutilation. All officers shouldrecognize that sometimes unusual cases have been found eligible for asylum that may not have initially appeared to relate to the five grounds contained in the definition of refugee, such as AIDS victims who face government persecution, land or money disputes with wealthy persons or persons in power, whistle blowers, witnesses to crimes and even organized crime connections.

Do not attempt to evaluate the credibility or probability of the alien's claim. Under the law that task can only be performed by a qualified asylum officer.  If the alien first makes and then retracts a statement indicating a fear of persecution, such retraction should be fully documented in the alien's sworn statement (Form I-867A&B). If the asylum officer has already been advised of the case, the arresting officer (or detaining officer) should obtain telephonic concurrence of the retraction from the asylum officer. The arresting or detaining officer can then proceed with the alien's removal as discussed in subsection A.

Normally, an arriving alien desiring a credible fear interview must be placed in a detention facility (see below) for at least 48 hours before being interviewed by an asylum officer. The alien may elect, however, to waive that 48-hour requirement and request that the interview be arranged as soon as possible.

2.    Arresting Officer Procedures.   As the arresting officer you are responsible for establishing that the alien is either a stowaway or is inadmissible under either section **212(a)(6)(C)** or **212(a)(7)** of the Act in an expedited removal case, as appropriate. You must fully document the inadmissibility aspect of the case against the alien, leaving only the credible fear determination to the asylum officer. If the asylum officer finds the alien does not have a credible fear of persecution, that officer will not look into the issue of the alien's inadmissibility, but will

INSERTS

AR2022_300929

simply endorse the I-860 previously prepared. You should:

- Prepare the case as you would any other expedited removal case (completing the Forms **I-213**, **I-867A** & **B**, **I-860**, taking the alien's photograph and fingerprints, etc.) as set forth in section VII A above, but you should neither sign the bottom part of the I-860 nor serve the I-860 on the alien. Do not complete Form I-860 for stowaways; clearly indicate on the I-213 and I-867A&B that the alien arrived as a stowaway.

- Provide the alien with the standard notification regarding the credible fear process, Form **M-444** and advise him or her of the right to consult with a person or person of his or her choosing prior to the credible fear interview, at no expense to the Government.

- Contact the asylum officer once the case has been established, informing him or her of the alien's name, languages spoken, place of detention, and any other pertinent information. (The asylum officer is responsible for setting time and date of interview and for arranging for an interpreter).

- Place alien in detention as soon as possible once his or her inadmissibility has been established and all of the required paperwork has been completed.

3.    Detaining Officer Procedures.  As with any other alien being detained, the detention must be in a location which meets Service guidelines (i.e., a Service facility or other approved facility). In addition to the normal detention responsibilities, the Service official in charge of the alien's detention is responsible for:

- Notifying all appropriate persons within his or her chain of command of the alien's detention

- Verifying that arresting officer has contacted an asylum officer

- Ensuring that appropriate facilities, including a private interview room and normal office equipment, are available for the asylum officer to conduct credible fear interview.

4.    Post-credible fear determination procedures.   Upon completion of the credible fear interview, the asylum officer will make a recommendation regarding possible release of  any alien who is found to have a credible fear of persecution. However, unless required for medical reasons or for a legitimate law enforcement necessity, a stowaway or an alien in expedited removal proceedings who does not pass credible fear will not be released from custody. Upon receipt of the asylum officer's recommendation, and taking into  account all other relevant factors, the district director will decide whether to release the  alien. Only the district director may make a decision on releasing a stowaway or an alien  in the expedited removal process who passes credible fear, taking into account the recommendation of the asylum officer and all other relevant factors.

If the asylum officer finds credible fear, he or she will make a recommendation to the district director regarding the continued detention of the alien, or possible release in the event there is some urgent reason for such release. The asylum officer then prepares and serves Form **I-862**, Notice to Appear, and refers the matter to the immigration judge for a hearing under section **240** of the Act.

If the asylum officer does not find credible fear, he or she will complete the lower portion of Form I-860 previously prepared by the arresting officer. The asylum officer will offer the alien an opportunity to seek review of that finding before an immigration judge. If the alien does not seek such review, the order is executed immediately.  If the alien is a stowaway, no removal order is necessary. The officer in charge of the alien's detention will then effect the alien's removal, completing Form **I-296**. If the alien seeks review, the asylum officer prepares Form **I-863**, Notice of Referral to Immigration Judge. The alien's custody situation is unchanged, regardless of the results of the credible fear determination.

**Interim Enforcement Procedures**

If the immigration judge concurs in the asylum officer's decision, the alien will be removed as indicated above. If the judge overturns the asylum officer's decision in the case of an alien in expedited removal proceedings, the alien will be allowed to file an asylum application in proceedings before the immigration judge. If the alien is in expedited removal proceedings, those proceedings will be canceled and the alien will be placed in regular removal proceedings under section 240 of the Act (see **section V**). The charging document placing the alien in such proceedings, Form I-862, Notice to Appear, will be prepared and served by a district official, in accordance will local procedures. If the alien is a stowaway, the alien will be placed in "asylum only" proceedings under **8 CFR 208.2(b)(1)** for which no new charging document need be prepared (see section **II E** of these interim procedures).

AR2022_300931

**Interim Enforcement Procedures**

**VII.    Parole. [reserved]**

AR2022_300932

**Interim Enforcement Procedures**

## VIII.   Post-Hearing Processing.

### A.   Voluntary Departure under Section 240B of the Act.

During the course of, or at the conclusion of, a removal hearing under section 240 of the Act, an alien may be granted voluntary departure. If granted during proceedings, the alien may receive up to 120 days of voluntary departure from either the immigration judge or the Service (or both), and there may or may not be conditions which he or she must meet in order to be released from custody. If granted at the end of proceedings (i.e., as part of the immigration judge's removal order) the maximum amount which he or she may receive is 60 days and there will definitely be conditions which he or she must meet.

1.   Conditions.  Whenever voluntary departure is granted at the conclusion of a hearing, the immigration judge must require that a bond of at least $500 be posted in the alien's behalf to ensure that he or she departs from the U.S. Such bond must be posted within 5 days of the judge's order, and the Service may, at its discretion, hold the alien in custody until the bond is posted. If the bond is not posted within the 5-day period, the voluntary departure order is automatically vacated and an alternate order of removal will take effect on the sixth day. If the alien is detained, it is the responsibility of the officer in charge of the alien's detention to verify that the required bond has been  properly posted before releasing the alien from custody. Conversely, if the bond is not posted by the fifth day, that officer is responsible for ensuring the alien is taken back into custody (if previously released) and removed from the United States.

Other conditions may be placed on the order of voluntary departure by the authorizing official (e.g., presentation of confirmed reservations for departure) which will require verification of compliance by a Service officer before the alien is released from custody or allowed to remain at large.

2.   Extension of VD.   If the alien has been granted less than the maximum amount of voluntary departure (120 days prior to the conclusion of the hearing or 60 days as part of the judge's order), the Service may (without consultation with or any other involvement of the Immigration Court) grant an extension of voluntary departure up to the maximum allowed provided the alien establishes a need for such extension and the Service is satisfied that the alien does in fact intend to depart. The Service may place any reasonable conditions on the granting of such extension of voluntary departure, including the presentation of documents and the posting of a bond (or higher bond) to ensure departure. Because of the serious consequences of failure to adhere to the terms ofvoluntary departure, Service offices should establish procedures to ensure that extension requests are adjudicated as soon as possible after receipt. Note: An alien who files a timely application for an extension of voluntary departure, still risks incurring the penalties for violating the terms of the initial grant in the event such extension is denied and he or she has remained beyond the term of the original VD period. The mere filing of an extension request does not absolve the alien from imposition of penalties during the pendency of such request.

### B.   Detention.

1.   Detention during the 90-day removal period.   Once a removal order against any alien becomes final as described in **8 CFR 241.1**, the Service must take the alien into custody for removal. If the alien was previously released, on an Order of Release on Recognizance (Form I-220A), the order will be canceled by completing the bottom section of the form. If the alien was released on bond, the bond shall be canceled if the obligor complied with the conditions of the bond or breached if the obligor did not comply.  In general the removal period is 90 days but the period is suspended if the alien wilfully fails or refuses to make timely application for documents necessary for the alien's removal or conspires or acts to prevent his or her removal. The Service may  detain beyond the 90-day period if the alien is inadmissible under section 212, removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) or is determined to be a risk to the community or unlikely to comply with the order of removal.

**AR2022_300933**

2.    <u>Release on Order of Supervision after the 90 day removal period</u>.  When the removal period has expired and a warrant of deportation is outstanding, the case shall be evaluated and release on an order of supervision may be considered. If the alien demonstrates to the satisfaction of an officer authorized by **8 CFR 241.5**, that the alien is not a threat to property or persons and is likely to comply with the order of removal, the alien shall be served with Form **I-220B**. The conditions of release shall be explained to the alien and the alien must acknowledge the conditions. The conditions may include the posting of bond to ensure that the alien reports as required.

Although an authorized officer may released an alien on an order of supervision, the officer may not grant employment authorization unless he or she determines that the alien cannot be removed because no country will accept the alien or the alien's removal is impractical or contrary to the public interest.

Every released alien who has a criminal or subversive background shall report at least once a month. Any other alien under supervision shall be required to report at least once annually, or as often as the authorized officer deems necessary. Every report does not have to be in person, but each alien under supervision shall be required to report at least once a year in person. Each time an alien reports, he or she shall be questioned concerning compliance with the terms of his supervision. Each case will be evaluated at least once annually, to determine if the alien is eligible for administrative relief or if  deportation could or should be effected.

If evidence of a willful violation of the conditions of supervision is obtained from the statement or from a subsequent investigation, the case shall be presented for prosecution, in accordance with section 243(b) of the Act.

**C.**    <u>**Issuance of a Warrant of Removal**</u>.

A Warrant of Removal on Form I-205 (Rev. 4/1/97) shall be issued by a district director immediately when a final order or deportation or removal, as defined in 8 CFR 241.1, becomes effective. Responsibility for the costs of removal will be established based on section 241 of the Act and noted on Form I-205. The warrant will cite only the section of law under which the alien has been ordered removed and the appropriate block will be checked to indicate whether the final order was issued by an immigration judge, a district director or chief patrol agent, or a U.S. district court judge or magistrate. Once a warrant is issued it remains valid until executed or canceled.

If after the expiration of the voluntary departure time granted in connection with the alternate order of deportation or removal entered by an immigration judge or the BIA the alien presents a valid travel document and a confirmed reservation for transportation, a nunc pro tunc extension of the expired voluntary departure time may be granted. Voluntary departure cannot be granted in this manner if the voluntary departure period would extend beyond the statutory maximum. The warrant of removal shall then be endorsed "CANCELED" and a memorandum covering the action taken shall be placed in the alien's file with a copy of the letter granting the extension of voluntary departure time. The provisions of this subparagraph ordinarily shall not be applicable to an alien who has been granted the maximum 60-day period of voluntary departure.

**D.**    <u>**Travel Arrangements and Obtaining Documents**</u>.

1.    <u>General</u>.  Except for a limited class of aliens deported to a contiguous territory, removal cannot be effected until travel documentation has been obtained. Application for the document shall be made following issuance of the Notice to Appear for aliens who are detained at Service expense, or who will shortly be released from a penal institution upon completion of sentence, or who are otherwise considered high priority. In other cases application shall be made after the issuance of a warrant of removal, unless an  application for stay has been filed or is anticipated and prima facie eligibility is established or there is good reason to believe that an alien granted an alternate order of  deportation will fail to depart voluntarily as required. Consideration should

routinely be given to requiring the alien to produce a travel document, or at least demonstrate an effort to obtain such document, as a condition of voluntary departure. The burden should be placed on the alien to produce a travel document wherever possible, since it is generally simpler and more cost effective for the alien to obtain his or her own document than for the Service to become directly involved. The Service may induce cooperation in several ways. The Service may hold such document for verification and copy it for later use [see **8 CFR 240.25(b)** and **8 CFR 240.26(c)(2)**] An alien may also be subject to penalties under section 274D of the Act if he or she fails to cooperate in obtaining such travel document. **Note:** Penalties under sections 274D and 240B(d) may not be assessed until such time as Service regulations are developed and implemented.

If an alien designates a country other than Canada to which he or she prefers to be deported and it appears that such country is unlikely to receive him, a request on Form **I-241** for a travel document shall nevertheless be made to the authorities of the country designated; however, a simultaneous application for a travel document shall be made to the authorities of the country to which he is likely to be deported if refused by the country of his choice.

Field officers may make application directly to the issuing foreign consulate. If such a consulate is located within one hundred miles, each detained alien whose travel documentation is expected to prove difficult to obtain shall be escorted to the consulate for consular interview.

When documentation is refused or unduly delayed, a request for assistance shall be addressed to the Assistant Commissioner for Detention and Deportation. A request for assistance shall be accompanied by the following, in triplicate: summary of the facts, including the deportation charges; **Form I-217**; any available birth, baptismal, or foreign military record; signed photograph; copy of any travel document; copy of the warrant of removal; and copy of letter refusing issuance of travel document for removal or copies of correspondence if there is undue delay.

A request for assistance should also be sent to the INS Representative, INTERPOL - U.S. National Central Bureau, U.S. Department of Justice, Alien/Fugitive Unit, Bicentennial Building, Suite 600, 600 E Street N.W., Washington, D.C. 20530, telephone (202) 616-7289 or 7276. Include copies of the material that had been previously presented to the Consul including I-217, I-213, immigration judge's order, fingerprints, and any other identifying documentation that will assist in establishing the nationality of the alien.

In cases where departure is being enforced, passports in Service possession need not be returned. The passport is the property of the issuing government and not the alien. However, in cases where administrative relief is pending and no final order has been entered, or if entered, enforced departure is not contemplated, the passport may be returned at the discretion of the district director.

2.      Removals to Canada. Any request for Canadian consent to deport an alien to Canada when required by the Reciprocal Arrangement shall be submitted to the Service Liaison Officer at Ottawa on Form I-270, in triplicate with Form I-217, who will transmit them to the appropriate Canadian immigration official and take any necessary steps to expedite decision. When an alien does not appear to be returnable to Canada under the Reciprocal Arrangement, but has designated Canada as the country to which he wishes to be deported, Form I-217, in triplicate, shall be submitted with Form **I-270** to the Liaison Officer for presentation. Unused letters for consent shall be returned to the Service Liaison Officer in Ottawa with information as to why they were not used. When the alien is a member of the Canadian Armed Forces, a copy of the request shall be sent to the Military Attache, c/o Embassy of Canada, 501 Pennsylvania Av., NW, Washington, DC 20008. Existing procedures used to effect return to Canada when letters of consent are not required shall not be disturbed. Any Canadian deportee requesting transportation and subsistence to a place other than to the closest Canadian port shall execute the reverse of Form I-270.

When an unescorted deportee in the United States is placed aboard a vessel or aircraft which

will enter Canada en route to a third country, the port authorities at the first Canadian port shall be notified prior to the entry. If the first Canadian port is unknown, the Service Liaison Officer in Ottawa shall be informed expeditiously to enable him or her to alert the appropriate Canadian authority.

The Service Liaison Officer in Ottawa may be able to obtain documents and information to assist in identifying and obtaining travel documents on crewmen of any nationality who deserted in Canada from the centralized Canadian records in Ottawa.

3.    Transfer of deportees.  A deportee shall not be transferred to a port for deportation until advice has been received that arrangements have been completed for the deportee's transportation and, if required, custodial care and attention en route to and at final destination. Executed Form I-216, Record of Person and Property Transferred, shall accompany the deportee. If the deportee is an afflicted alien, Form I-141, Medical Certificate together with a clinical history, shall be attached to Form I-216. When an unescorted deportee is being transferred, the documents accompanying his shall be enclosed in a document envelope, Form I-164.

4.    Advance notice to Department of State and Service officers abroad.   When an alien of the subversive, criminal, immoral, or narcotic classes is about to be deported, or an alien is to be escorted the Service must provide pertinent background information, to the Department of State, Diplomatic Security for routing to the host country.

5.    Notice to transportation lines.   When an alien is deportable at the expense of a transportation line, it should be served immediately with Form I-288. If the transportation line responds and indicates that it will furnish transportation, notification shall be made on Form I-288 when the alien is completely ready for deportation.  If personal care and attendance is required, the notice shall be revised accordingly and supplemented with information that the expense incident to employing a suitable person to accompany the alien to his final destination shall be defrayed in the same manner as the expense of his deportation. Form **I-380**, Record of Expenses Billable to Transportation Company, is used to maintain an accurate record of all expenses incurred by the Service which are billable to a carrier.

**E.    Penalties for failure to cooperate in obtaining a travel document.**

If an alien fails to cooperate in obtaining a travel document, the alien should be advised of possible administrative sanctions and criminal penalties. The 90-day removal period is held in abeyance while the alien does not cooperate and delaying tactics will not result in release of the alien on an order of supervision after 90 days. The alien may also be subject to criminal prosecution. [Reserved: regulations for implementation of section 274D of the Act are under development.]

**F.    Sanctions against countries that fail to accept their nationals.**

If travel document requests are denied or acceptance of aliens is unduly delayed by a country of which an alien is a national, citizen, subject, or resident, officers should use the case comments screen in DACS to document efforts made to obtain travel documents. If the officer believes that the action of the country is arbitrary and part of a pattern to refuse to issue or honor travel documents, a request shall be made, through the appropriate regional director, to the Assistant Commissioner for Detention and Deportation to invoke the sanctions of section 243(d) of the Act. Prepare such request in memorandum format, providing details of the incident or incidents provoking the request. Include the specific names, dates and consular contacts, as well as other facts specific to the case.

**G.    Execution of warrant and warning of penalties for reentry.**

1.    Warning of penalties for entry, attempted entry, or being found in the United States after being deported or removed.   Prior to execution of the warrant of removal, an alien being removed must be notified of the administrative sanction and criminal penalties involved if the alien enters, attempts to enter or is found in the United States without having obtained

AR2022_300936

permission to reapply for admission. The officer preparing the warning on Form I-294, must check the series of boxes that apply in the alien's particular case. The alien must be served with a copy of the warning and a copy is retained for the Service"A" file.

2. <u>Execution</u>. At the time of the alien's physical removal, the officer effecting the removal must complete the reverse side of the I-205. The officer must fill in the information relating to the alien and removal, and obtain a classifiable rolled print of the alien's right index finger on the reverse of the warrant. If a classifiable print of the right index finger cannot be obtained, a print of another finger may be used and must be identified. The alien and the officer taking the print must sign in the spaces provided.

**H.   <u>Closing Actions</u>.**

1. <u>Lookout notices</u> - Once the warrant of removal has been executed, the case must be closed in the Deportable Alien Control System (DACS). An interface between DACS and National Automated Immigration Lookout System (NAILS) will cause a lookout to be posed within 24 hours of the DACS case closure.

2. <u>Notification of final disposition</u> - The final disposition of each case shall be reported to the Identification Division, FBI. If the final disposition is not available when the fingerprint card is submitted, FBI Form R-84 shall be prepared and forwarded with the case. Notification, which shall be prepared after receipt of verification of departure or endorsed warrant of removal, is the responsibility of the district holding the file, even though the alien may have departed or been deported through a district other than the district of origin. When the FBI number is unknown, furnish date of birth, sex, and fingerprint classification if known, as quoted by the FBI on Form 1-A. Final disposition shall be shown as follows: "Deported." "Departed voluntarily," "Status adjusted to lawful permanent resident," "Notice to Appear canceled," "Proceedings terminated by IJ (BIA)," Alienage not established," "Released as U.S. citizen (lawful resident alien), " "Alien died," followed in each instance by the date of occurrence. If the alien was deported or departed voluntarily to Mexico, add after the date, in appropriate cases, or "via airlift to Mexico." "Departed voluntarily" includes the case of an alien who departed from the United States before the expiration of the voluntary departure time granted in connection with an alternate order of removal.

**AR2022_300937**

## IX.      Reinstatement of Final Orders

### A.      Applicability.

Section **241(a)(5)** of the Act provides that the Attorney General will reinstate (without referral to an immigration court) a final order against an alien who illegally reentered the United States after being deported, excluded, or removed from the United States under a final order, or who departed voluntarily while under a final order of deportation, exclusion, or removal ("self deports"), regardless of the date that the previous order was entered. Thus, an alien who was deported five years ago, but who illegally reentered the United States today, is subject to reinstatement of the final order. It is not limited to orders of removal entered after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the law which created section 241(a)(5) of the Act.

Reinstatement is <u>not</u> applicable, however, to an alien who was granted voluntary departure by an immigration judge and left the United States in compliance with the terms of that grant. In such instances, the alien was not subject to a final order of deportation or removal.

Reinstatement does not preclude the Service from pursuing criminal prosecution in accordance with local procedures and guidelines.

Much like expedited removal under section 235(b)(1) of the Act, reinstatement of removal is a significant expansion in authority for immigration officers to remove aliens from the United States without referral to an immigration judge. It is particularly important in this context to ensure that officers follow all of the applicable procedures, that officers ensure that aliens understand the reinstatement process, and that officers carefully evaluate all available evidence before determining that an alien was previously removed and illegally reentered the United States.

### B.      Procedure.

1.      <u>Required Elements</u>.  Before reinstating a prior order, the officer processing the case must determine:

a.      <u>That the alien believed to have reentered illegally was previously excluded, deported, or removed from the United States</u>.  Included in this class of aliens are those who voluntarily departed the United States while subject to a final order of exclusion, deportation, or removal ("self deports"). An alien who complied with the terms of a voluntary departure order is not subject to reinstatement. If, however, the alien stayed beyond the period authorized for voluntary departure, or left of his or her own volition while a final order was outstanding (i.e., the alien "self-deported"), the alien is subject to reinstatement.

The processing officer must obtain the alien's A-file or copies of the documents contained therein to verify that the alien was subject to a final order and that the previous order was executed. In uncontested cases, suitable database printouts to document these facts will suffice.

b.      <u>That the alien believed to have reentered illegally is the same alien as the one previously removed</u>.  If, in questioning an alien, he or she admits to being previously excluded, deported or removed, or to having self-deported by leaving after the expiration of a voluntary departure period with an alternate order, the Form I-213 and the sworn statement must so indicate. If a record check or fingerprint hit reveals such prior adverse action, that information must be included  in the Service file.  The alien should be questioned and confronted with any  relevant adverse information from the A-file, record check or fingerprint hit, and such information must be included in the I-213 and sworn statement, if applicable.

If the alien disputes the fact that he or she was previously removed, a comparison  of the

alien's fingerprints with those in the A-file documenting the previous removal must be completed to document positively the alien's identity. The fingerprint comparison must be completed by a locally available expert or by the Forensic Document Laboratory via Photophone.

c. <u>That the alien did in fact illegally reenter the United States</u>. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

In any case in which the officer is not able to satisfactorily establish the preceding facts, the previous order cannot be reinstated, and the alien must be processed for removal through other applicable procedures, such as administrative removal under section 238 of the Act, or removal proceedings before an immigration judge under section 240 of the Act.

2. <u>Record of sworn statement</u>. In all cases in which an order may be reinstated, the officer must create a record of sworn statement. The record of sworn statement will document admissions, if any, relevant to determining whether the alien is subject to reinstatement, and whether the alien expressed a fear of persecution or torture if returned on the reinstated order.

In addition to covering the normal elements (identity, alienage, and the required elements listed in items B.1. through B.3), the sworn statement must include the following question and the alien's response thereto: "Do you have any fear of persecution or torture should you be removed from the United States?".

If the alien refuses to provide a sworn statement, the record should so indicate. An alien's refusal to execute a sworn statement does not preclude the Service from reinstating prior order, provided that the record establishes that all of the required elements discussed in Section B.1. have been satisfied. If the alien refuses to give a sworn statement, the processing officer must record whateverinformation the alien orally provided that relates to reinstatement of the order or to any claim of possible persecution.

3. <u>Form I-871 and notification to the alien</u>. Once the processing officer is satisfied that the alien has been clearly identified and is subject to the reinstatement provision (and the sworn statement has been taken), the officer shall prepare Form I-871, Notice of Intent/Decision to Reinstate Prior Order. The processing officer completes and signs the top portion of the form, provides a copy to the alien and retains a copy for the file. The officer must read, or have read, the notice to the alien in a language the alien understands. The alien signs the second box of the file copy and indicates whether he or she intends to rebut the officer's determination. In the event that the alien declines to sign the form, the officer shall note the block that a copy of the form was provided, but that the alien declined to acknowledge receipt or provide any response. If the alien provides a response, the officer shall review the information provided and promptly determine whether reevaluation of the decision or further investigation is warranted. If not, or if no additional information is provided, the officer shall proceed with reinstatement based on the information already available.

4. <u>Reinstatement of a Final Order</u>. If, after considering the alien's response, the processing officer is satisfied that the alien's prior order should be reinstated, the processing officer presents the Form I-871 and all relevant evidence to a deciding officer for review and signature at the bottom of the form. A deciding officer is any officer authorized to issue a Notice to Appear, listed in **8 CFR. § 239.1**.

After the deciding officer signs the Form I-871 reinstating the prior order, the Service shall issue a new Warrant of Removal, Form I-205, in accordance with **8 CFR 241.2**. The officer should indicate on the I-205, in the section reserved for provisions of law, that removal is pursuant to section 241(a)(5) of the Act as amended by IIRIRA.

AR2022_300939

**C.**   **Aliens expressing a fear of persecution or torture.**

If the alien expresses a fear of persecution or torture, the alien must be referred to an asylum officer to determine whether the alien is eligible for withholding of removal under section 241(b)(3) or a stay of removal in accordance with the procedures applicable to claims under Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (the Torture Convention). In referring the alien to the asylum officer, the processing officer should also provide the alien with Form I-589 and the appropriate list of providers of free legal services. The fact that an alien will be referred to an asylum officer does not preclude the completion of the reinstatement order. If the alien is subject to reinstatement of the prior order, the reinstatement processing should be finished before forwarding the case to an asylum officer. If an asylum officer determines that the alien must be granted withholding of removal or a stay under the Torture Convention, the reinstated order may only be executed if the alien is accepted by, and is being removed to, a country where he or she will not face persecution or torture.

**D.**   **Criminal Prosecution.**

Reinstatement processing must be completed before referring an alien for criminal prosecution. Aliens whose reinstatement processing is completed prior to criminal prosecution will be removed more quickly after any criminal sentence is served. The processing officer must lodge a detainer (Form I-247) and note on the document that a final order has been entered.

**E.**   **Execution of Reinstated Final Order.**

At the time of removal, the officer executing the reinstated final order must photograph the alien and obtain a classifiable rolled print of the alien's right index finger on the I-205. If a classifiable print of the right index finger cannot be obtained, a print of another finger may be used and must be identified. The alien and the officer taking the print must sign in the spaces provided.

Once the final order has been executed, it must be attached to a copy of the previously executed documents which establish the prior departure, exclusion, deportation, or removal. The officer executing the reinstated order must also serve the alien with a notice of penalties on Form **I-294**. The penalty period commences on the date the reinstated order is executed. Since this is his or her second (or subsequent) removal, the alien is subject to the 20 year bar; unless the alien is also an aggravated felon, in which case the lifetime bar applies. (Note that the alien being removed need not have been found deportable as an aggravated felon for the lifetime bar to apply, only to have been convicted of an aggravated felony.) The officer should route the I-205 and a copy of the I-294 to the A-file. A comparison of the photographs and fingerprints between the original I-205 and the second I-205 executed at the time of reinstatement may prove essential in the event the reinstatement order is questioned at a later date.

**F.**   **Case Tracking Using the Deportable Alien Control System (DACS).**

As with all removal cases, the progress and completion of these cases must be monitored by use of DACS. The basic instructions for how to enter and close cases in DACS that are contained in the latest version of the DACS Manual are still valid except for the certain additional and changed codes. Use the final charge from the order that is being reinstated on the alien as the initial and final charge codes. Place these cases in CASE CAT=16, use DECISION CODE=6 to indicate that the previous final order has been reinstated and, once they are removed again, close the case using DEPART-CLEARED-STAT=6 (if the order being reinstated was an order of deportation or removal based on deportability) or 8 (if the order being reinstated was an order of exclusion or removal based on inadmissibility).

Interim Enforcement Procedures

## X.    Deferred Action

### A.    General.

A Service director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice to give some cases lower priority and in no way an entitlement, in appropriate cases. The deferred action category recognizes that the Service has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws. In making deferred action determinations, the factors listed in paragraph B, among others, should be considered.

Deferred action does not confer any immigration status upon an alien, nor is it in any way a reflection of an alien's immigration status. It does not affect periods of unlawful presence as defined in section **212(a)(9)** of the Act, and does not alter the status of any alien who is present in the United States without being inspected and admitted. Under no circumstances does deferred action operate to cure any defect in status under any section of the Act for any purpose. Since deferred action is not an immigration status, no alien has the right to deferred action. It is used solely in the discretion of the Service and confers no protection or benefit upon an alien. Deferred action does not preclude the Service from commencing removal proceedings at any time against an alien. Any request by an alien (or another party on behalf of such alien) for deferred action should be considered in the same manner as other correspondence. The writer should be advised that he or she may not apply for deferred action, but that the Service will review the facts presented and consider deferred action as well as any other appropriate course of action.

### B.    Factors to be Considered.

The following factors, among others, should be considered as part of a deferred action determination:

(1) the likelihood of ultimately removing the alien, including:

- likelihood that the alien will depart without formal proceedings (e.g., minor child who will accompany deportable parents);

- age or physical condition affecting ability to travel;

- the likelihood that another country will accept the alien;

- the likelihood that the alien will be able to qualify for some form of relief which would prevent or indefinitely delay removal;

(2) the presence of sympathetic factors which, because of a desire on the part of administrative or judicial authorities to reach a favorable decision, could result in adistortion of the law with unfavorable implications for future cases;

(3) whether or not the individual is a member of a class of deportable aliens whose removal has been given a high enforcement priority (e.g., dangerous criminals, alien smugglers, drug traffickers, terrorists, war criminals, habitual immigration violators).

(4) whether the alien's continued presence in the U.S. is desired by local, state, or federal law enforcement authorities for purposes of ongoing criminal or civil investigation or prosecution.

### C.    Procedures.

(1) District directors.  If the district director recommends that removal action in an alien's case be deferred, the director shall advise the regional director of such recommendation using a Deferred Action Case Summary, Form G-312. The district director shall sign the recommendation and shall explain the basis for his or her recommendation. The regional director shall consider the recommendation and

determine whether further action on the alien's case should be deferred. Upon receipt of notification of deferral by the regional director, the district director shall notify the applicant, by letter, of the action taken and advise the alien that he or she may apply for employment authorization in accordance with **8 CFR 274a.12(c)(14)**. A decision not to defer action in such a case need not be separately communicated to the alien.

(2)     Center directors.  In limited circumstances, Eastern Service Center Director may defer action on removal of an alien. Upon approval of an I-360 petition by a battered or abused spouse or child in his or her own behalf, the director shall separately consider the particular facts of each case and determine if deferred action is appropriate. Although the approval of such a petition will weigh in favor of deferred action, each decision must be considered individually, based on all the facts present and the factors discussed above. Upon deferral of action, the center director shall advise the alien, by letter, of the action taken and advise him or her of eligibility to request employment authorization. A decision not to defer action in such a case need not be separately communicated to the alien.

The center director shall provide the Eastern Regional Director with notification of the action taken, using Form G-312, with sufficient information for compilation of the report specified in paragraph E. Upon deferral of removal action, the center director shall include a copy of the G-312 in the alien's A file and forward the file to the local Service office having jurisdiction over the alien's residence for docket control.

## D.     Employment Authorization.

Although deferred action is not an immigration status, an alien may be granted work authorization based on deferred action in his or her case, pursuant to **8 CFR 274a.12(c)(14)**.

## E.     Reporting Requirements.

Deferred action is a resource utilization tool. Therefore, regional directors shall maintain statistics on deferred action cases to ensure that it is being used appropriately. These statistics are to be maintained on a current basis so that data can be readily extracted upon request.

Statistics should be maintained, by office, in the following categories:

(1) number of cases in deferred action category at the beginning of the fiscal year;

(2) number of recommendations received fiscal year to date;

(3) number of recommendations approved;

(4) number of recommendations denied;

(5) number of cases removed from deferred action category;

(6) number of deferred action cases pending at the end of the fiscal year.

Interim or biennial reviews should be conducted by both district and regional directors to determine whether deferred action cases should be continued or removed from the deferred action category. Regions should compare statistics among its districts to ensure consistent application of this highly sensitive program.

## XI.    Stays of Removal.

### A.    General.

A stay of removal, like deferred action, reflects an administrative decision by the Service or a reviewing body that removal against an alien should not proceed. Unlike deferred action, a stay of removal is granted after the completion of a removal hearing when the only remaining step in a case is the physical removal of the alien.

An alien ordered removed may apply for a stay of removal on **Form I-246**, Stay of Removal. **8 CFR 241.6** governs administrative stays of removal. Service officers should be familiar with this regulation.

### B.    Deportable Aliens Ordered Removed.

When there are compelling humanitarian factors, a district director may grant a stay of removal for such period of time as he or she deems necessary. A stay of removal under this paragraph may be granted by a district director upon his or her own initiative without application being made by the alien. The detention rules found at 8 CFR 241 should be applied to a deportable alien granted a stay of removal.

### C.    Inadmissible Arriving Aliens Ordered Removed.

Section **241(c)(2)** of the Act allows the Attorney General to stay the removal of an alien arriving at a port of entry ordered removed under either section **235(a)(1)** or **235(c)** (expedited removal), or section 240 (ordinary removal resulting in a finding of inadmissibility).

A stay of removal under this section requires a determination either that immediate removal is not practicable or proper or that the alien is needed to testify in the prosecution of another person in a criminal trial.

Aliens granted a stay because their removal is impracticable or improper must be detained. Aliens who are granted a stay to testify in a criminal prosecution, however, may be released if certain conditions are met. The alien must post bond of at least $500, must agree to appear when required to testify and for removal, and must agree to any other conditions prescribed by the Attorney General.

### D.    Judicial Review and Stays of Removal.

The filing or intention to file a petition seeking review in Federal court or an action in which the order of removal would be reviewed does not operate as an automatic stay. The reviewing court must affirmatively order a stay of removal in such a situation. See **8 CFR 241.3.** Similarly, the filing of a motion to reopen or motion to reconsider before the Immigration Court or BIA does not operate as an automatic stay of removal, unless the removal order was issued in absentia. See **8 CFR 3.23(b)(1)(v)**. Under **8 CFR 3.6**, however, the filing of an appeal of a decision by the Immigration Court will operate as an automatic stay. This applies to appeals of all decisions by the Immigration Court. The exception is an appeal of a denial of a motion to reconsider or denial of a request for a stay of removal. Furthermore, the district director may, in his or her discretion, remove an alien who has filed an untimely appeal, unless the court, an immigration judge, or the BIA has affirmatively stayed removal.

AR2022_300943

Interim Enforcement Procedures

## Attachment 1 - Encounter By Arresting Officer

Attachment 1 Pg. 1 of 2
Attachment 1 Pg. 2 of 2

ATTACHMENT 1

# ENCOUNTER BY ARRESTING OFFICER



Page 1

AR2022_300945

# REMOVABLE ALIEN PROCESSING BY EXAMINING OFFICER



Page 2

AR2022_300946

## INTERIM RELIEF FOR CERTAIN FOREIGN ACADEMIC STUDENTS ADVERSELY AFFECTED BY HURRICANE KATRINA
## Frequently Asked Questions (FAQ)

On November 25, 2005. U.S. Citizenship and Immigration Services (USCIS) published a Federal Register Notice (Notice), which temporarily suspended the applicability of certain requirements related to on-campus and off-campus employment for a specifically designated group of F-1 students. This temporary relief enables qualified F-1 students, who were adversely affected by Hurricane Katrina, to work additional hours on-campus, or work off-campus if employment authorization is granted.  F-1 students who are granted employment authorization pursuant to the Notice may likewise reduce their course load for the duration of their employment authorization to the minimum course load requirement set forth in the Notice.

Since the Notice does not cover Katrina-impacted foreign academic students who have failed to maintain their F-1 status, such persons, and their F-2 dependents, may request a grant of deferred action and short-term employment authorization based on economic necessity.

**Q.  Why is USCIS taking this action?**

**A.**  Hurricane Katrina caused severe loss of life and extensive property damage, and disrupted normal activities, in the states of Alabama, Louisiana, and Mississippi.  As a result of this catastrophic natural disaster, many of the approximately 5,500 F-1 students, who were enrolled in DHS-approved academic institutions located in the areas adversely affected by Hurricane Katrina, have been suffering severe economic hardship and have been experiencing difficulty in satisfying the normal regulatory requirements for maintaining valid F-1 status, which include the pursuit of a "full course of study."  See 8 CFR 214.2(f)(6).  USCIS is taking action to provide temporary relief to these F-1 students.

**Q.  For whom specifically is USCIS taking this action?**

**A.**  The interim relief covered in this FAQ was developed specifically for F-1 students who: (1) on August 29, 2005, were lawfully present in the United States in F-1 status and were enrolled in a DHS-approved institution located in an area adversely affected by Hurricane Katrina; and (2) are experiencing severe economic hardship as direct result of Hurricane Katrina.  Hereinafter, this group will be referred to as *"Affected F-1 Students."*

**Q.  Which DHS-approved academic institutions have been deemed to be located in the areas adversely affected by Hurricane Katrina?**

**A.**  Following is a list of the specific campuses of DHS-approved academic institutions that have been deemed to be located in the areas adversely affected by Hurricane Katrina.

AR2022_300947

| SCHOOL NAME | CAMPUS NAME | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| Archdiocese of New Orleans | Academy of the Sacred Heart | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Christian Brothers School | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | Henriette DeLille | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Holy Cross | New Orleans | LA | 70117 |
| Archdiocese of New Orleans | Holy Ghost | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Holy Name of Jesus | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | Holy Rosary Academy | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | House of the Holy Family | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Immaculate Heart of Mary | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Marian Central Catholic Middle School | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | Our Lady of Lourdes | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Resurrection of Our Lord | New Orleans | LA | 70127 |
| Archdiocese of New Orleans | St. Alphonsus | New Orleans | LA | 70130 |
| Archdiocese of New Orleans | St. Anthony of Padua | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | St. Benedict the Moor | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | St. David | New Orleans | LA | 70117 |
| Archdiocese of New Orleans | St. Dominic | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | St. Frances Xavier Cabrini | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Joan of Arc | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | St. Joseph Central Catholic Elementary | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Leo the Great | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | St. Mary of the Angels | New Orleans | LA | 70117 |
| Archdiocese of New Orleans | St. Paul the Apostle | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | St. Pius X | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | St. Raymond | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Stephen | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Stuart Hall School for Boys | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | Ursuline Academy | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | All Saints | New Orleans | LA | 70114 |
| Archdiocese of New Orleans | Holy Name of Mary | New Orleans | LA | 70114 |
| Archdiocese of New Orleans | Our Lady of Divine Providence | Metairie | LA | 70003 |
| Archdiocese of New Orleans | Our Lady of Perpetual Help | Kenner | LA | 70062 |
| Archdiocese of New Orleans | St. Angela Merici | Metairie | LA | 70002 |
| Archdiocese of New Orleans | St. Benilde | Metairie | LA | 70001 |
| Archdiocese of New Orleans | St. Catherine of Siena | Metairie | LA | 70005 |
| Archdiocese of New Orleans | St. Christopher | Metairie | LA | 70001 |
| Archdiocese of New Orleans | St. Clement of Rome | Metairie | LA | 70002 |
| Archdiocese of New Orleans | St. Edward the Confessor | Metairie | LA | 70001 |
| Archdiocese of New Orleans | St. Elizabeth Ann Seton | Kenner | LA | 70065 |
| Archdiocese of New Orleans | St. Francis Xavier | Metairie | LA | 70005 |
| Archdiocese of New Orleans | St. Louis King of France | Metairie | LA | 70005 |
| Archdiocese of New Orleans | St. Mary Magdalen | Metairie | LA | 70003 |
| Archdiocese of New Orleans | St. Matthew the Apostle | River Ridge | LA | 70123 |

2

| | | | | |
|---|---|---|---|---|
| Archdiocese of New Orleans | St. Philip Neri | Metairie | LA | 70003 |
| Archdiocese of New Orleans | St. Rita | Harahan | LA | 70123 |
| Archdiocese of New Orleans | Immaculate Conception | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Our Lady of Prompt Succor | Westwego | LA | 70094 |
| Archdiocese of New Orleans | St. Anthony | Gretna | LA | 70053 |
| Archdiocese of New Orleans | St. Cletus | Gretna | LA | 70053 |
| Archdiocese of New Orleans | St. Joseph the Worker | Marrero | LA | 70072 |
| Archdiocese of New Orleans | St. Rosalie | Harvey | LA | 70058 |
| Archdiocese of New Orleans | Visitation of Our Lady | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Our Lady of Perpetual Help | Belle Chasse | LA | 70037 |
| Archdiocese of New Orleans | Our Lady of Prompt Succor | Chalmette | LA | 70043 |
| Archdiocese of New Orleans | St. Louise DeMarillac | Arabi | LA | 70032 |
| Archdiocese of New Orleans | St. Mark | Chalmette | LA | 70043 |
| Archdiocese of New Orleans | St. Robert Bellarmine | Arabi | LA | 70032 |
| Archdiocese of New Orleans | Sacred Heart of Jesus | Norco | LA | 70079 |
| Archdiocese of New Orleans | St. Charles Borromeo | Destrehan | LA | 70047 |
| Archdiocese of New Orleans | Ascension of Our Lord | LaPlace | LA | 70068 |
| Archdiocese of New Orleans | Our Lady of Grace | Reserve | LA | 70084 |
| Archdiocese of New Orleans | St. Joan of Arc | LaPlace | LA | 70068 |
| Archdiocese of New Orleans | St. Peter | Reserve | LA | 70084 |
| Archdiocese of New Orleans | Mary, Queen of Peace | Mandeville | LA | 70471 |
| Archdiocese of New Orleans | Our Lady of Lourdes | Slidell | LA | 70458 |
| Archdiocese of New Orleans | St. Margaret Mary | Slidell | LA | 70458 |
| Archdiocese of New Orleans | St. Peter | Covington | LA | 70433 |
| Archdiocese of New Orleans | Annunciation | Bogalusa | LA | 70427 |
| Archdiocese of New Orleans | Brother Martin | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | Cabrini | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | DeLaSalle | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Jesuit | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | Mount Carmel Academy | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | Redeemer-Seton | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Augustine | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | St. Gerard Majella Alternative School | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Mary's Academy | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Xavier University Prep | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Archbishop Chapelle | Metairie | LA | 70003 |
| Archdiocese of New Orleans | Archbishop Rummel | Metairie | LA | 70001 |
| Archdiocese of New Orleans | Archbishop Blenk | Gretna | LA | 70053 |
| Archdiocese of New Orleans | Archbishop Shaw | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Immaculata | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Archbishop Hannan | Meraux | LA | 70075 |
| Archdiocese of New Orleans | St. Charles Catholic | LaPlace | LA | 70068 |
| Archdiocese of New Orleans | Pope John Paul II | Slidell | LA | 70461 |
| Archdiocese of New Orleans | The Saint Paul's School | Covington | LA | 70433 |
| Archdiocese of New Orleans | St. Scholastica Academy | Covington | LA | 70433 |

3

AR2022_300949

| | | | | |
|---|---|---|---|---|
| Bass Memorial Academy | Bass Memorial Academy | Lumberton | MS | 39455 |
| Delgado Community College | Delgado Community College | New Orleans | LA | 70119 |
| Dillard University | Dillard University | New Orleans | LA | 70122 |
| East Central Community College | East Central Community College | Decatur | MS | 39327 |
| East Mississippi Community College | Scooba Campus | Scooba | MS | 39358 |
| Ecole Classique | Ecole Classique | New Orleans | LA | 70112 |
| English Language Center | University of South Alabama | Mobile | AL | 36688 |
| Faulkner State Community College | Faulkner State Community College | Bay Minette | AL | 36507 |
| Faulkner University | Faulkner University at Mobile | Mobile | AL | 36609 |
| John Curtis Christian School | John Curtis Christian School | River Ridge | LA | 70123 |
| Kaplan Test Prep, a division of Kaplan, Inc. | Kaplan Test Prep - New Orleans, LA | New Orleans | LA | 70118 |
| Louisiana State University Health Sciences Center | Louisiana State University Health Sciences Center | New Orleans | LA | 70006 |
| Loyola University New Orleans | Loyola University New Orleans | New Orleans | LA | 70118 |
| Lutheran High School | Lutheran High School | Metairie | LA | 70002 |
| Meridian Community College | Meridian Community College | Meridian | MS | 39307 |
| Metairie Park Country Day School | Metairie Park Country Day School | Metairie | LA | 70005 |
| Mississippi Gulf Coast Community College | Perkinston Campus | Perkinston | MS | 39573 |
| Mississippi Gulf Coast Community College | Jefferson Davis Campus | Gulfport | MS | 39507 |
| Mississippi Gulf Coast Community College | Jackson County Campus | Gautier | MS | 39553 |
| Mobile County Public Schools | Division Of Student Support Services | Mobile | AL | 36602 |
| Mobile County Public Schools | Baker High | Mobile | AL | 36608 |
| Mobile County Public Schools | Blount High | Prichard | AL | 36610 |
| Mobile County Public Schools | Bryant High | Irvington | AL | 36544 |
| Mobile County Public Schools | Citronelle High | Citronelle | AL | 36522 |
| Mobile County Public Schools | Davidson High | Mobile | AL | 36609 |
| Mobile County Public Schools | Montgomery High | Semmes | AL | 36575 |
| Mobile County Public Schools | Murphy High | Mobile | AL | 36606 |
| Mobile County Public Schools | Rain High | Mobile | AL | 36605 |
| Mobile County Public Schools | Satsuma High | Satsuma | AL | 36572 |
| Mobile County Public Schools | Shaw High | Mobile | AL | 36608 |
| Mobile County Public Schools | Theodore High | Theodore | AL | 36582 |
| Mobile County Public Schools | Vigor High | Prichard | AL | 36610 |
| Mobile County Public Schools | Williamson High | Mobile | AL | 36605 |
| Modern Languages Institute | Modern Languages Institute | New Orleans | LA | 70130 |
| New Orleans Baptist Theological Seminary | New Orleans Baptist Theological Seminary | New Orleans | LA | 70126 |
| Nicholls State University | Nicholls State University | Thibodaux | LA | 70301 |
| Notre Dame Seminary | Notre Dame Seminary | New Orleans | LA | 70118 |
| Nunez Community College | Nunez Community College | Chalmette | LA | 70043 |
| Our Lady Holy Cross College | Our Lady Holy Cross College | New Orleans | LA | 70131 |
| Picayune School District | Picayune Memorial High School | Picayune | MS | 39466 |
| Remington College | Remington College | Metairie | LA | 70005 |
| Reserve Christian School | Reserve Christian School | Reserve | LA | 70084 |
| Ridgewood Preparatory School | Ridgewood Preparatory School | Metairie | LA | 70001 |
| Riverside Academy Corporation | Riverside Academy | Reserve | LA | 70084 |

4

AR2022_300950

| Saint Joseph Seminary College | St. Benedict | St. Benedict | LA | 70457 |
|---|---|---|---|---|
| School of Urban Missions | New Orleans School of Urban Missions | Gretna | LA | 70053 |
| Southeastern Baptist College | Southeastern Baptist College | Laurel | MS | 39440 |
| Southeastern Louisiana University | Southeastern Louisiana University | Hammond | LA | 70402 |
| Southern University at New Orleans | Southern University at New Orleans | New Orleans | LA | 70126 |
| Spring Hill College | Spring Hill College | Mobile | AL | 36608 |
| St. Paul's Episcopal School | St. Paul's Episcopal School | Mobile | AL | 36608 |
| St. Stanislaus College Prep | St. Stanislaus College Prep | Bay St. Louis | MS | 39520 |
| St. Stanislaus College Prep | Mercy Cross High School | Biloxi | MS | 39530 |
| St. Stanislaus College Prep | St. John High School | Gulfport | MS | 39501 |
| St. Stanislaus College Prep | Resurrection Catholic School | Pascagoula | MS | 39567 |
| St. Stanislaus College Prep | Nativity, B. V. M. | Biloxi | MS | 39530 |
| St. Stanislaus College Prep | Sacred Heart | Hattiesburg | MS | 39401 |
| The University of Southern Mississippi | Hattiesburg Campus | Hattiesburg | MS | 39406 |
| The University of Southern Mississippi | English Language Institute | Hattiesburg | MS | 39406 |
| Top Garden School | Top Garden School | Irvington | AL | 36544 |
| Tulane University | Tulane University | New Orleans | LA | 70118 |
| United States Sports Academy | United States Sports Academy | Daphne | AL | 36526 |
| University of Mobile | University of Mobile | Mobile | AL | 36613 |
| University of New Orleans | University of New Orleans | New Orleans | LA | 70148 |
| University of New Orleans | UNO Intensive English Language Program | New Orleans | LA | 70148 |
| University of South Alabama | University of South Alabama | Mobile | AL | 36688 |
| William Carey College | William Carey College | Hattiesburg | MS | 39401 |
| Xavier University of Louisiana | Xavier University of Louisiana | New Orleans | LA | 70125 |

**Q.  Will *Affected F-1 Students* who have since transferred to other DHS-approved institutions still qualify for the interim relief discussed in this FAQ?**

**A.**  *Affected F-1 Students*, who have since transferred to another DHS-approved institution, but who otherwise satisfy the eligibility criteria listed above in this FAQ under the section *"For whom specifically is DHS taking this action,"* remain eligible for the interim relief discussed in this FAQ.

**Q.  Which *Affected F-1 Students* are covered by the Notice and what relief is available to these students?**

**A.**  To be covered by the Notice, an *Affected F-1 Student* must be maintaining valid F-1 status, which includes pursuing a full course of study.  *Affected F-1 Students* covered by the Notice may obtain short-term employment authorization for off-campus employment or additional hours of on-campus employment.  Furthermore, *Affected F-1 Students* who are granted employment authorization pursuant to the Notice may consequently reduce their course load to no less than the minimum course load requirement set forth in the Notice for the duration of their employment authorization.

AR2022_300951

F-2 dependents (spouse or minor children) of *Affected F-1 Students* who are covered by the Notice would be considered, if otherwise eligible, to be maintaining valid F-2 status, provided the *Affected F-1 Student* continues to maintain valid F-1 status.  F-2 dependents of *Affected F-1 Students* covered by the Notice, however, are not authorized to engage in employment in the United States, irrespective of whether the *Affected F-1 Student* has been granted employment authorization.

**Q.   How do *Affected F-1 Students* covered by the Notice apply for on-campus employment authorization pursuant to the Notice?**

**A.**   *Affected F-1 Students* covered by the Notice, who wish to pursue more than 20 hours per week of on-campus employment pursuant to the Notice, must obtain permission from their current Designated School Official (DSO).  Complete instructions can be found in the Notice under the section entitled, *"How may F-1 students covered by this Notice obtain employment authorization pursuant to this Notice?"*

**Q.   How do *Affected F-1 Students* covered by the Notice apply for off-campus employment authorization pursuant to the Notice?**

**A.**   *Affected F-1 Students* covered by the Notice, who wish to obtain off-campus employment authorization pursuant to the Notice, must file a complete Form I-765, Application for Employment Authorization, with required supporting documentation and prescribed fee, with the USCIS Texas Service Center at:

> U.S. Citizenship and Immigration Services
> Texas Service Center
> P.O. Box 853062
> Mesquite, TX  75815-3062

The front of the envelope, on the bottom right-hand side, should include the following notation: "HURRICANE KATRINA SPECIAL STUDENT RELIEF."  Complete instructions can be found in the Notice under the section entitled, *"How may F-1 students covered by this Notice obtain employment authorization pursuant to this Notice?"*

**Q.   What is the minimum course load requirement set forth in the Notice for *Affected F-1 Students* who are granted employment authorization pursuant to the Notice?**

**A.**   *Affected F-1 Students* engaged in undergraduate studies and who are granted employment authorization pursuant to the Notice must remain registered for a minimum of six (6) semester/quarter hours of instruction per academic term.  *Affected F-1 Students* engaged in graduate studies and who are granted employment authorization pursuant to the Notice must remain registered for a minimum of three (3) semester/quarter hours of instruction per academic term.

AR2022_300952

**Q.  How is off-campus employment authorization granted pursuant to the Notice different from off-campus employment authorization granted pursuant to the existing provision [See 8 CFR 214.2(f)(9)(ii)]?**

**A.**  One key difference between off-campus employment authorization provided by the Notice and off-campus employment authorization under the existing provision is that *Affected F-1 Students* who are granted employment authorization pursuant to the Notice may reduce their course load for the duration of their employment authorization.

**Q.  What relief is available to *Affected F-1 Students* not covered by the Notice?**

**A.**  *Affected F-1 Students* not covered by the Notice may request deferred action and employment authorization based on economic necessity.  A grant of deferred action in this context means that, during the period that the grant of deferred action remains in effect, DHS will not seek the removal of the *Affected F-1 Student* (or his or her F-2 dependents) based on the fact that the *Affected F-1 Student's* failure to maintain status is directly due to Hurricane Katrina.  A grant of deferred action, however, does not provide an alien any legal immigration status in the United States.  *Affected F-1 Students* who are granted deferred action are eligible to apply for short-term employment authorization, provided they demonstrate economic necessity.

F-2 dependents of *Affected F-1 Students* who are granted deferred action would also be eligible for deferred action for the period granted to the *Affected F-1 Student*.  Although F-2 dependents are not authorized to engage in employment in the United States, F-2 dependents who are granted deferred action are eligible to apply for short-term employment authorization, provided they likewise demonstrate economic necessity.

**Q.  Will *Affected F-1 Students* not covered by the Notice who are granted deferred action be required to file for reinstatement?**

**A.**  Yes.  Since deferred action does not confer any lawful status on an alien, *Affected F-1 Students* who were granted deferred action must apply and be approved for reinstatement in order to resume their F-1 status.  See 8 CFR 214.2(f)(16).  F-2 dependents, who were granted deferred action, are not required to apply for reinstatement, but would be considered, if otherwise eligible, to be maintaining valid F-2 status, provided the *Affected F-1 Student* is approved for reinstatement to valid F-1 status.

**Q.  How may *Affected F-1 Students* not covered by the Notice and their F-2 dependents (spouse and minor children) request deferred action and employment authorization based on economic necessity?**

**A.**  *Affected F-1 Students* not covered by the Notice and their F-2 dependents (spouse and minor children) may individually request deferred action by submitting a letter requesting consideration.  The letter must contain the name and the SEVIS ID number of the applicant, and a written affidavit or unsworn declaration confirming that the applicant meets the eligibility criteria listed above in this FAQ under the section *"For whom*

AR2022_300953

*specifically is DHS taking this action."*  Since individuals who are granted deferred action are eligible to apply for employment authorization, *Affected F-1 Students* and their F-2 dependents who are applying for deferred action, may apply concurrently for employment authorization by filing a Form I-765, Application for Employment Authorization, with required supporting documentation and prescribed fee.  Both letter requesting deferred action and the completed Form I-765 should be mailed to the USCIS Texas Service Center at:

> U.S. Citizenship and Immigration Services
> Texas Service Center
> P.O. Box 853062
> Mesquite, TX  75815-3062

The front of the envelope, on the bottom right-hand side, should include the following notation: "HURRICANE KATRINA SPECIAL STUDENT RELIEF."

**Q.  How may *Affected F-1 Students* request a waiver of the Form I-765 filing fee?**

**A.**  An *Affected F-1 Student* who is unable to pay the prescribed Form I-765 filing fee should include with the application package a written affidavit or unsworn declaration, requesting a fee waiver and explaining the reasons why s/he is unable to pay the prescribed fee.

**Q.  How long will the interim relief discussed in this FAQ remain in effect?**

**A.**  The interim relief discussed in this FAQ will remain in effect until February 1, 2006.  Following February 1, 2006, *Affected F-1 Students* will again be subject to the normal regulatory requirements, including those related to employment authorization and maintenance of a full course of study.  DHS will continue to monitor the adverse impact of Hurricane Katrina in the affected areas to determine if modification of the interim relief is warranted and will announce any such modifications in the *Federal Register*.

**Q.  Is there a cut-off date for filing for the interim relief discussed in this FAQ?**

**A.**  No.  USCIS has not established a cut-off date for filing for the interim relief discussed in this FAQ.  However, any benefits granted pursuant to the interim relief discussed herein will expire no later than February 1, 2006.  While USCIS will exercise its best efforts to process such applications in as prompt a manner as possible, *Affected F-1 Students* (and their F-2 dependents) applying for such benefits should bear in mind this expiration date when submitting their application packages.

**Q.  Are *Affected F-1 Students* (both those covered by the Notice and those who are not) required to report their current address to DHS?**

**A.**  Yes. All aliens who are required to be registered with DHS also are required to inform DHS of their current address.  F-1 students (and their F-2 dependents) are among

AR2022_300954

the aliens who are required to be registered.  Section 265 of the INA requires aliens to report a change of address within 10 days of such change.  If the alien fails to comply with the change of address requirements, s/he may be removable under Section 237(a)(3)(A) of the INA and subject to criminal or monetary penalties under Section 266(b) of the INA.  Under 8 CFR 214.2(f)(17), F-1 students can satisfy this requirement by providing notice of a change of address within 10 days to their DSO, provided the DSO enters this information in SEVIS within 21 days of notification by the student.  F-1 students who are subject to NSEERS must provide required updated information, including any change of address, pursuant to the terms of that program.  See 8 CFR 264.1(f).

**Q.  Where are the cited Forms and additional information available?**

**A.**  Individuals may obtain the cited Forms from the USCIS website at http://uscis.gov/ or by contacting the USCIS Forms Line at 1-800-870-3676.  Additional information is through the USCIS National Customer Service Center at 1-800-375-5283.

See the November 25, 2005 Press Release

Rev: November 25, 2005

Back to USCIS.gov

AR2022_300955

        MO

## DACA FAQ's

| | |
|---|---|
| Title | Crimes Involving Domestic Violence |
| Question | **Does a conviction for a misdemeanor that is not specifically a crime of domestic violence, but involves domestic violence constitute a significant misdemeanor for DACA purposes?** |
| Answer | **Yes. Officers should treat any misdemeanor offense where the underlying facts involve domestic violence as a significant misdemeanor for DACA purposes.** |
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Criminality Issues |

Created at 12/4/2014 9:49 AM  by ▭
Last modified at 12/4/2014 9:49 AM  by ▭

Close

**Version: 2021_02_05_15_38**
**ECN Governance | SharePoint Training**
**Terms of Use | Accessibility | USCIS Public Website**

**Web Support**
**888-220-5228 | Submit EZ ticket**
**USCIS ECN Feedback**

**AR2022_300956**

1/1

📖     ⚠️     ⚙️     ⓘ     MO

## DACA FAQ's

| | |
|---|---|
| Title | Offenses of Driving After Consuming Alcohol |
| Question | **Is an offense of driving after consuming alcohol always considered a significant misdemeanor for DACA purposes?** |

Answer

No; a criminal offense of driving after consuming alcohol is only a significant misdemeanor for DACA purposes if it is a misdemeanor as defined by federal law (i.e. maximum term of imprisonment authorized is more than 5 days but less than 1 year), and the statute requires, for a finding of guilt, that either:

1. The person was intoxicated, impaired or under the influence; or
2. The person has a certain level of blood alcohol concentration (BAC), other than a negligible amount that can be measured (such as .01%).

Examples of alcohol-related driving offenses that are not significant misdemeanors for DACA purposes include, but are not limited to:

- Wisconsin offense for Operating While Under the Influence (§346.63(1)(a)) – not a significant misdemeanor because it carries no prison sentence and therefore does not meet the definition of a misdemeanor under federal law.
- California offense for Reckless Driving Involving Alcohol (§23103.5) – not a significant misdemeanor because it requires neither a particular BAC level nor intoxication/impairment. Instead, the statute defines the offense as driving where alcohol is involved.

If a DACA requestor has been convicted of an offense of driving after consuming alcohol, but it is not considered a significant misdemeanor for DACA purposes, follow the guidance in Chapter 8, Section G of the DACA SOP – although the conviction alone is not automatically disqualifying, consider the entire record, including all issues of criminality, when determining whether prosecutorial discretion should be exercised.

Please consult with your local counsel if you are unsure whether an alcohol-related driving offense is considered a significant misdemeanor for DACA purposes.

| | |
|---|---|
| Associated Form | |
| DACA Category | Guidelines |
| Sub-Category | Criminality Issues |

AR2022_300957

Created at 4/11/2013 8:06 AM  by ▮▮▮▮▮▮
Last modified at 4/11/2013 8:06 AM  by ▮▮▮▮▮▮▮▮▮

Close

**Version: 2021_02_05_15_38**
**ECN Governance | SharePoint Training**
**Terms of Use | Accessibility | USCIS Public Website**

**Web Support**
**888-220-5228 | Submit EZ ticket**
**USCIS ECN Feedback**

**U.S. Department of Homeland Security**
20 Massachusetts Ave., NW
Washington, DC 20529



**U.S. Citizenship
and Immigration
Services**

# Interoffice Memorandum

To:    Field Leadership

From:  Donald Neufeld /s/
       Acting Associate Director
       Domestic Operations Directorate

From:  Lori Scialabba /s/
       Associate Director
       Refugee, Asylum and International Operations Directorate

From:  Pearl Chang /s/
       Acting Chief
       Office of Policy and Strategy

Date:  May 6, 2009

Re:    Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections
       212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act

       Revision to and Re-designation of *Adjudicator's Field Manual* (*AFM*) Chapter 30.1(d) as
       Chapter 40.9 (*AFM* Update AD 08-03)

## 1. Purpose

Chapter 30.1(d) of the *Adjudicator's Field Manual* consolidates USCIS guidance to adjudicators
for determining when an alien accrues unlawful presence, for purposes of inadmissibility under
section 212(a)(9)(B) or (C) of the Immigration and Nationality Act. This memorandum re-
designates Chapter 30.1(d) of the *AFM* as chapter 40.9 of the *AFM*. This memorandum also
revises newly re-designated Chapter 40.9 to clarify the available guidance, and to incorporate
into Chapter 40.9 prior guidance that was issued after adoption of former Chapter 30.1(d) but not
incorporated into former Chapter 30.1(d).

USCIS intends *AFM* Chapter 40.9 to provide comprehensive guidance to adjudicators
concerning the accrual of unlawful presence and the resulting inadmissibility. Since Chapter
40.9 provides comprehensive guidance, the following prior memoranda are rescinded in their
entirety:

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 2

| Date | Subject |
|---|---|
| September 19, 1997 | Section 212(a)(9)(B) Relating to Unlawful Presence |
| March 3, 2000 | Period of stay authorized by the Attorney General after 120-day tolling period for purposes of section 212(a)(9)(B) of the Immigration and Nationality Act (the Act) (AD 00-07) |
| June 12, 2002 | Unlawful Presence |
| April 2, 2003 | Guidance on Interpretation of "Period of Stay Authorized by the Attorney General" in Determining "Unlawful Presence" under Section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (Act) |

Also, the following memoranda are rescinded, insofar as they dealt with inadmissibility under section 212(a)(9)(B) or (C) of the Act.

| Date | Subject |
|---|---|
| March 31, 1997 | Implementation of section 212(a)(6)(A) and 212(9) grounds of Inadmissibility |
| June 17, 1997 | Additional Guidance for Implementing Sections 212(a)(6) and 212(a)(9) of the Immigration and Nationality Act (Act) |

Also rescinded is any other USCIS memorandum (or legacy INS memorandum) that addresses inadmissibility under section 212(a)(9)(B) or (C) of the Act, to the extent that any other such memorandum is inconsistent with *AFM* Chapter 40.9.

## 2. **Background**

The three- and ten-year bars to admissibility of section 212(a)(9)(B)(i) of the Act and the permanent bar to admissibility of section 212(a)(9)(C)(i)(I) of the Act were added by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Div. C of PL 104-208 (September 30, 1996)) (IIRIRA).  The amendments enacting sections 212(a)(9)(B) and (C) became effective on April 1, 1997.

Section 212(a)(9)(B)(i)(I) of the Act renders inadmissible those aliens who were unlawfully present for more than 180 days but less than one (1) year, who voluntarily departed the United States prior to the initiation of removal proceedings and who seek admission within three (3) years of the date of such departure or removal from the United States. Section 212(a)(9)(B)(i)(II) of the Act renders inadmissible those aliens unlawfully present for one (1) year or more, and who seek admission within ten (10) years of the date of the alien's departure or removal from the United States. Finally, section 212(a)(9)(C)(i)(I) of the Act renders inadmissible any alien who

AR2022_300960

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 3

has been unlawfully present in the United States for an aggregate period of more than one (1) year, and who enters or attempts to reenter the United States without being admitted.

Section 212(a)(9)(B)(ii) of the Act specifies that "unlawful presence" can accrue during any period in which an alien, other than a Legal Permanent Resident, is present in the United States without having been admitted or paroled, or after the expiration of the period of stay authorized by the Secretary of Homeland Security. As discussed in *AFM* Chapter 40.9.2, there are other situations in which an alien who is actually in an unlawful immigration status is, nevertheless, protected from the accrual of unlawful presence.

Over the last ten (10) years, the determination of what constitutes "unlawful presence" has been the subject of various interpretations, in part because of legislation amending the rights of aliens seeking immigration benefits. Legacy Immigration and Naturalization Service (INS) and the United States Citizenship and Immigration Services (USCIS) have issued several memoranda on this issue; however, sometimes, the *AFM* was not updated. Therefore, this revised and re-designated section 40.9.2 in the *AFM* consolidates the information contained in these memoranda and updates the *AFM*.

In general, the consequences of accruing unlawful presence depend on the immigration status of an individual, the particular type of benefit or relief sought, and whether the denial of the benefit is subject to administrative and judicial review. The details are set forth in the field guidance below.

### 3. Field Guidance and *AFM* Update

The adjudicator is directed to comply with the guidance provided in the *AFM* as amended by this memorandum. Additionally, overseas adjudication officers can also find guidance on this issue, tailored to the overseas context, in the International Operations "Procedures for Adjudication of Form I-601 for Overseas Adjudication Officers" dated July 30, 2008 or subsequent revisions.

The *AFM* is updated as follows:

1.   Chapter 30.1(d) of the *AFM* entitled "Unlawful Presence Under Section 212(a)(9) of the Act" is re-designated as Chapter 40.9 and
2.   Chapter 40.9 and is amended as follows:

## 40.9 Aliens Previously Removed and Unlawfully Present (Section 212(a)(9) of the Act)

Section 212(a)(9) of the Act renders certain aliens inadmissible based on prior violations of U.S. immigration law. Section 212(a)(9) of the Act has three major subsections.

Under Section 212(a)(9)(A) of the Act, an alien, who was deported, excluded or removed under any provision of law, is inadmissible if the alien seeks admission to the

AR2022_300961

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 4

United States during the period specified in section 212(a)(9)(A) of the Act, unless the alien obtains consent to reapply for admission during this period.

Under section 212(a)(9)(B) of the Act, an alien is inadmissible if the alien has accrued a specified period of unlawful presence, leaves the United States after accruing the unlawful presence, and then seeks admission during the period specified in section 212(a)(9)(B)(i) (either 3 years or 10 years after the departure, depending on the duration of the accrued unlawful presence).

Under Section 212(a)(9)(C)(i) of the Act, an alien is inadmissible if the alien enters or attempts to enter the United States without admission after having been removed or after having accrued more than one year (in the aggregate) of unlawful presence.

*AFM* Chapter 40.9.2 provides an overview of USCIS' policy concerning the accrual of unlawful presence and the resulting inadmissibility under section 212(a)(9)(B) or section 212(a)(9)(C)(i)(I) of the Act.

**40.9.1 Inadmissibility Based on Prior Removal (Section 212(a)(9)(A) of the Act) or Based on Unlawful Return after Prior Removal (Section 212(a)(9)(C)(i)(II) of the Act)) [Reserved]**

**40.9.2 Inadmissibility Based on Prior Unlawful Presence (Sections 212(a)(9)(B) and (C)(i)(I) of the Act)**

**Table of Contents**
**(a) General Overview**
**(1) Outline of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act**
**(2) Distinction Between "Unlawful Status" and "Unlawful Presence"**
**(3) Definition of Unlawful Presence and Explanation of Related Terms**
    (A) Unlawful Presence
    (B) Period of Stay Authorized (Authorized Stay)
    (C) Admission
    (D) Parole
**(4) General Considerations when Counting Unlawful Presence Time under Sections 212(a)(9)(B) and 212(a)(9)(C)(i)(I) of the Act**
    (A) Unlawful Presence for Purposes of the 3-Year and 10-Year Bars Is Not Counted in the Aggregate
    (B) Unlawful Presence for Purposes of the Permanent Bar Is Counted in the Aggregate
    (C) Specific Requirements for Inadmissibility under Section 212(a)(9)(B)(i)(I) of the Act (The 3-Year Bar)

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 5

(D) Specific Requirements for Inadmissibility under Section 212(a)(9)(B)(i)(II) of the Act (The 10-Year Bar)

(E) Specific Requirements for Inadmissibility under Section 212(a)(9)(C)(i)(I) of the Act (The Permanent Bar)

(i) General Requirements

(ii) Special Note on the Effects of an Alien's Entry on Parole After Having Accrued More Than One (1) Year of Unlawful Presence

**(5) Triggering the Bar by Departing the United States**

**(6) Triggering the 3-Year and the 10-Year Bar but not the Permanent Bar When Departing with Advance Parole or with a Refugee Travel Document**

(A) Travel on Advance Parole Issued to Applicants for Adjustment of Status on Form I-512, Authorization for Parole of An Alien Into The United States, pursuant to 8 CFR 212.5(f) and 8 CFR 245.2(a)(4)

(B) Special Note on the Effect of an Alien's Entry on Parole after Having Accrued More Than One (1) Year of Unlawful Presence

(C) Travel on a Valid Refugee Travel Document Issued pursuant to Section 208(c)(1)(C) of the Act and 8 CFR 223.2

**(7) Multiple Grounds of Inadmissibility and the Relationship Between Sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act**

**(8) Benefits That May Be Available Despite Inadmissibility under Section 212(a)(9)(B)(i)(I), (B)(i)(II), or (C)(i)(I) of the Act**

**(9) Effective Date of Sections 212(a)(9)(B) and (C)(i)(I) of the Act**

(A) Effective Date

(B) The Child Status Protection Act and Its Influence on Unlawful Presence

**(b) <u>Determining When an Alien Accrues Unlawful Presence</u>**

**(1) Aliens Present in Lawful Status or as Parolees**

(A) Lawful Permanent Residents (LPRs)

(B) Lawful Temporary Residents (Section 245A(b) of the Act and 8 CFR 245a)

(C) Conditional Permanent Residents under Sections 216 and 216A of the Act

(D) Aliens Granted Cancellation of Removal or Suspension of Deportation

(E) Lawful Nonimmigrants

(i) Nonimmigrants Admitted until a Specific Date (Date Certain)

(ii) Nonimmigrants Admitted for Duration of Status (D/S)

(iii) Non-controlled Nonimmigrants (e.g. Canadian B-1/B-2)

(F) Other Types of Lawful Status

(i) Aliens in Refugee Status

(ii) Aliens Granted Asylum

(iii) Aliens Granted Temporary Protected Status (TPS) pursuant to Section 244 of the Act

AR2022_300963

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 6

(G) Aliens Present as Parolees

**(2) Aliens Present in Unlawful Status Who Do Not Accrue Unlawful Presence by Statute for Purposes of Section 212(a)(9)(B) of the Act (Statutory Exceptions**)

(A) Minors Who Are under 18 Years of Age

(B) Aliens with Pending Asylum Applications (Including Children Aging Out and Dependents of Asylum Applicants)

(C) Aliens Physically Present in the United States with pending Forms I-730

(D) Beneficiary of Family Unity Protection (FUP) Granted pursuant to Section 301 of the Immigration Act of 1990; 8 CFR 236.15

(E) Certain Battered Spouses, Parents, and Children

(F) Victims of Severe Form of Trafficking in Persons

(G) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status [COS] ("Tolling")

**(3) Aliens Present in Unlawful Status Who Do Not Accrue Unlawful Presence By Virtue of USCIS Policy for Purposes of Sections 212(a)(9)(B) and (C)(i)(I) of the Act**

(A) Aliens with Properly Filed Pending Applications for Adjustment of Status or Registry (Sections 209, 245, 245(i), and 249 of the Act, Sections 202 of Public Law 99-603 Cuban Haitian Adjustment, Section 202(b) of the Nicaraguan Adjustment and Central American Relief Act (NACARA), section 902 of the Haitian Refugee Immigration Fairness Act of 1998 (HRIFA))

(B) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS)("Tolling")

(C) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS) Who Depart the United States During the Pendency

(D) Nonimmigrants – Effect of a Decision on the Request for Extension of Status (EOS) or Change of Status (COS) on Unlawful Presence

(i) Approved Requests

(ii) Denials Based on Frivolous Filings or Unauthorized Employment

(iii) Denials of Untimely Applications

(iv) Denials for Cause of Timely Filed, Non-Frivolous Applications for EOS or COS

(v) Motion to Reopen/Reconsider

(vi) Appeal to the Administrative Appeals Office (AAO) of the Underlying Petition Upon Which an EOS or COS Is Based

(vii) Nonimmigrants – Multiple Requests for EOS or COS ("Bridge Filings") and Its Effect on Unlawful Presence

(E) Aliens with Pending Legalization Applications, Special Agricultural Worker Applications, and LIFE Legalization Applications

(F)  Aliens granted Family Unity Program Benefits under Section 1504 of the LIFE Act Amendments of 2000

AR2022_300964

(G) Aliens with Pending Applications for Temporary Protected Status (TPS) pursuant to Section 244 of the Act

(H) Aliens Granted Voluntary Departure pursuant to Section 240B of the Act

(I) Aliens Granted Stay of Removal

(J) Aliens Granted Deferred Action

(K) Aliens Granted Withholding of Removal under Section 241(b)(3) of the Act or Withholding of Deportation under Former Section 243 of the Act

(L) Aliens Granted Withholding of Removal or Deferral of Removal under the United Nations Convention Against Torture Pursuant to 8 CFR 208.16 and 8 CFR 208.17

(M) Aliens Granted Deferred Enforced Departure (DED)

(N) Aliens Granted Satisfactory Departure under 8 CFR 217.3

**(4) Effect of the Protection from the Accrual of Unlawful Presence on Previously Accrued Unlawful Presence: Protection from the Accrual of Unlawful Presence Does Not Cure Previously Accrued Unlawful Presence**

**(5) Effect of Removal Proceedings on Unlawful Presence**

(A) Initiation of Removal Proceedings

(B) Effect of Filing an Appeal or Petition for Review on Unlawful Presence

**(6) Effect of an Order of Supervision pursuant to 8 CFR 241.5 on Unlawful Presence**


**(c) Relief from Inadmissibility under Section 212(a)(9)(B)(i)(I) and (II), and Section 212(a)(9)(C)(i)(I) of the Act**

**(1) Waiver of the 3-Year Bar or the 10-Year Bar under Section 212(a)(9)(B)(i) of the Act**

(A) Nonimmigrants

(B) Immigrants and Adjustment of Status Applicants Who Are the Spouses, Sons, or Daughters of U.S. Citizens or LPRs, and Fiancé(e) of U.S. Citizens

(C) Asylees and Refugees Applying for Adjustment of Status

(D) TPS Applicants

(E) Legalization under the CSS LULAC and NWRIP Class Settlement Agreements, and Legalization Applicants pursuant to 8 CFR 245a.2(k) and 8 CFR 245a.18

**(2) Wavier of the Permanent Bar under Section 212(a)(9)(C)(i)(I) of the Act**

(A) HRIFA and NACARA Applicants

(B) Legalization, SAW, LIFE Act Legalization, and Legalization Class Settlement Agreement Applicants

(C) TPS Applicants

(D) Certain Battered Spouses, Parents, and Children

(E) Asylee and Refugee Adjustment Applicants under Section 209(c) of the Act

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 8

## (a) General Overview

If an alien, other than an alien lawfully admitted for permanent residence, accrues unlawful presence in the United States, he or she may be inadmissible pursuant to section 212(a)(9)(B)(i)(Three-year and Ten-year bars) or 212(a)(9)(C)(i)(I) of the Act (Permanent bar).

## (1) Outline of Section 212(a)(9)(B)(i) and Section 212(a)(9)(C)(i)(I) of the Act

### (A) Section 212(a)(9)(B)(i) of the Act - The 3-Year and the 10-Year Bars. Section 212(a)(9)(B)(i) is broken into two (2) sub-groups:

- Section 212(a)(9)(B)(i)(I) of the Act (3-year bar). This provision renders inadmissible for three (3) years those aliens, who were unlawfully present for more than 180 days but less than one (1) year, and who departed from the United States voluntarily prior to the initiation of removal proceedings.
- Section 212(a)(9)(B)(i)(II) of the Act (10-year bar). This provision renders inadmissible an alien, who was unlawfully present for one (1) year or more, and who seeks again admission within ten (10) years of the date of the alien's departure or removal from the United States.

Both bars can be waived pursuant to section 212(a)(9)(B)(v) of the Act.

### (B) Section 212(a)(9)(C)(i)(I) of the Act - The Permanent Bar. This provision renders an individual inadmissible, if he or she has been unlawfully present in the United States for an aggregate period of more than one (1) year, and who enters or attempts to reenter the United States without being admitted. An alien, who is inadmissible under section 212(a)(9)(C)(i)(I) of the Act is permanently inadmissible; however, after having been outside the United States for at least ten (10) years, he or she may seek consent to reapply for admission pursuant to section 212(a)(9)(C)(ii) of the Act and 8 CFR 212.2. A waiver is also available for certain Violence Against Women Act (VAWA) self-petitioners under section 212(a)(9)(C)(iii) of the Act. The 10-year absence requirement does not apply to a VAWA self-petitioner who is seeking a waiver under section 212(a)(9)(C)(iii) of the Act, rather than seeking consent to reapply under section 212(a)(9)(C)(ii) of the Act.

A DHS regulation at 8 CFR 212.2 addresses the filing and adjudication of an application for consent to reapply (filed on Form I-212).  As stated by the Board of Immigration Appeals (BIA) in *Matter of Torres-Garcia,* 23 I&N Dec. 866 (BIA 2006), however, the consent to reapply regulation at 8 CFR 212.2 predates the enactment of section 212(a)(9)(C) of the Act and the related consent to reapply provision in section 212(a)(9)(A)(iii) of the Act. Thus, although the *filing procedures* in 8 CFR 212.2 are still in effect, the substantive requirements of section 212(a)(9) of the Act govern during the adjudication of Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation and Removal. A USCIS adjudicator must consider the specific requirements of section 212(a)(9)(C)(ii) of the Act when adjudicating Form I-212

AR2022_300966

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 9

that is filed by an alien who is inadmissible under section 212(a)(9)(C)(i) of the Act. That is, because of the 10-year absence requirement for consent to reapply, section 212(a)(9)(C)(i)(I) of the Act is a permanent bar for which neither the retroactive nor the prospective grant of consent to reapply is possible. The regulatory language at 8 CFR 212.2(i) and (j) is not applicable, *see Torres-Garcia*, at 875, and the alien has to be physically outside the United States for a period of at least ten years since his or her last departure before being eligible to be granted consent to reapply. *See id.*, at 876. Finally, the regulatory language referring to the 5-year and the 20-year limitation on consent to reapply does not apply to section 212(a)(9)(C) of the Act; these limitations refer to former sections 212(a)(6)(A) and (B), the predecessors of current section 212(a)(9)(A) of the Act. *See id.* at 874 (for a historical analysis).

Also, an adjudicator should pay special attention to the possibility that an alien who is inadmissible under section 212(a)(9)(C)(i)(II) of the Act (because the alien entered or attempted to enter without admission after having been removed) may be subject to the reinstatement provision of section 241(a)(5) of the Act (reinstatement of removal orders).

(2) **Distinction Between "Unlawful Status" and "Unlawful Presence"**
To understand the operation of sections 212(a)(9)(B) and 212(a)(9)(C)(i)(I) of the Act, it is important to comprehend the difference between being in an unlawful immigration status and the accrual of unlawful presence ("period of stay not authorized"). Although these concepts are related (one must be present in an unlawful status in order to accrue unlawful presence), they are not the same.

As discussed in chapters 40.9.2(b)(2) and (3), there are situations in which an alien who is present in an unlawful status nevertheless does not accrue unlawful presence. As a matter of prosecutorial discretion, DHS may permit an alien who is present in the United States unlawfully, but who has pending an application that stops the accrual of unlawful presence, to remain in the United States while that application is pending. In this sense, the alien's remaining can be said to be "authorized." However, the fact that the alien does not accrue unlawful presence does *not* mean that the alien's presence in the United States is actually lawful.

> **Example 1:** An alien is admitted as a nonimmigrant, with a Form I-94 that expires on January 1, 2009. The alien remains in the United States after the Form I-94 expires. The alien's status becomes unlawful, and she begins to accrue unlawful presence, on January 2, 2009. On May 10, 2009, the alien properly files an application for adjustment of status. The filing of the adjustment application stops the accrual of unlawful presence. But it does not "restore" the alien to a substantively lawful immigration status. She is still amenable to removal as a deportable alien under section 237(a)(1)(C) of the Act because she has remained after the expiration of her nonimmigrant admission.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 10

**Example 2:**  An alien is admitted as a nonimmigrant, with a Form I-94 that expires on January 1, 2009.  On October 5, 2008, he properly files an application for adjustment of status.  He does not, however, file any application to extend his nonimmigrant stay, which expires on January 1, 2009.  The adjustment of status application is still pending on January 2, 2009.  On January 2, 2009, he becomes subject to removal as a deportable alien under section 237(a)(1)(C) of the Act because he has remained after the expiration of his nonimmigrant admission.  For purposes of future inadmissibility, however, the pending adjustment application protects him from the accrual of unlawful presence.

The application of section 245(k) of the Act is a good example of the importance of clearly distinguishing unlawful *status* from the accrual of unlawful presence.  Guidance concerning section 245(k) may be found in chapter 23.5(d) of the *AFM*.  If the requirements of section 245(k) are met, this provision relieves certain employment-based immigrants of ineligibility under section 245(c)(2), (c)(7) or (c)(8) of the Act for adjustment of status.  For example, an alien who failed to maintain a lawful status after any entry is, ordinarily, ineligible for adjustment of status under section 245(c)(2) of the Act.  Departure from the United States and return does, ordinarily, not relieve the alien of this provision.  8 CFR 245.1(d)(3). For an alien who is eligible for the benefit of section 245(k) of the Act, however, only a failure to maintain status since the *last lawful admission* is considered in determining whether the alien is subject to section 245(c)(2), (c)(7) or (c)(8) of the Act. AFM Chapter 23.5(d)(4). Unless the alien, since the last lawful admission failed to maintain lawful status for at least 181 days, section 245(k) of the Act relieves the alien of ineligibility under section 245(c)(2), (c)(7) or (c)(8) of the Act.

As stated in chapters 40.9.2(b)(2) and (3), some aliens who are actually present in an unlawful *status*, are, nevertheless, protected from accruing unlawful presence.  But if their unlawful status continues for more than 180 days, in the aggregate, they would be ineligible for the benefit of section 245(k) of the Act, *even if they have accrued no unlawful presence for purposes of section 212(a)(9)(B)* of the Act.

**Example 3:**  An alien is admitted for "duration of status" as an F-1 nonimmigrant student.  One year later, the alien drops out of school, and remains in the United States for one year after dropping out.  The alien's status became unlawful when she dropped out of school.  Neither USCIS nor an IJ ever makes a finding that the alien was out of status; therefore, she never accrues any unlawful presence for purposes of section 212(a)(9)(B) of the Act. Chapter 40.9.2(b)(1)(E)(ii). The alien eventually leaves the United States and returns lawfully as a nonimmigrant.  While in nonimmigrant status, a Form I-140 is approved and the alien applies for adjustment of status.  Because the alien failed to maintain a lawful status for more than 180 days during her prior sojourn, she is ineligible for adjustment under section 245(c)(2) of the Act, and section 245(k) of the Act does not relieve her of this ineligibility.  Under section 245(k) of the Act, the alien is still eligible for adjustment, since the prior failure to maintain status does not apply to make the alien ineligible under section 245(c) of the Act. Also, the alien did not accrue

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 11

unlawful *presence* despite the prior unlawful *status,* and so the alien is not inadmissible under section 212(a)(9)(B) of the Act.

**Example 4:**  The alien is admitted as a lawful nonimmigrant, and, while still in status, applies for adjustment of status on the basis of an approved I-140. While the Form I-485 is pending, the alien's EAD expires, and the alien fails to apply for a new EAD. Nevertheless, the alien continues to work after the EAD expires. The period of unauthorized employment exceeds 180 days. The alien would not be inadmissible under section 212(a)(9)(B) of the Act, since the pendency of the I-485  stopped the accrual of unlawful presence. Also, there has been no "departure" to trigger section 212(a)(9)(B) of the Act. Section 245(k) of the Act does not relieve the alien of ineligibility under section 245(c)(2) of the Act since the alien engaged in unauthorized employment for more than 180 days..

An alien who is present in a lawful status will not accrue unlawful presence as long as that lawful status is maintained.

### (3) <u>Definition of Unlawful Presence and Explanation of Related Terms</u>

(A) <u>Unlawful Presence</u>.  Section 212(a)(9)(B)(ii) of the Act defines "unlawful presence" for purposes of sections 212(a)(9)(B)(i) <u>and</u> 212(a)(9)(C)(i)(I) of the Act to mean that an alien is deemed to be unlawfully present in the United States, if the alien is:

* present after the expiration of the period of stay authorized by the Secretary of Homeland Security; or
* present without being admitted or paroled.

(B) <u>Period of Stay Authorized (Authorized Stay)</u>.  When nonimmigrants are admitted into the United States, the period of stay authorized is generally noted on Form I-94, Admission/Departure Record. Additionally, by policy, USCIS has designated other statuses - including some that are not actually lawful - as "periods of stay authorized." Please see the more detailed analysis in sections (b) and (c), below.

(C) <u>Admission</u>.  The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (Div. C of Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act of 1997, PL 104-208 (September 30, 1996)) amended section 101(a)(13) of the Act by removing the definition of the term "entry," and by replacing it with a definition of the terms "admission" and "admitted."  Section 101(a)(13)(A) of the Act now defines "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *See* section 101(a)(13)(A) of the Act. Section 101(a)(13)(B) of the Act furthermore clarifies that parole is not admission, and that an alien crewman, who is permitted to land temporarily in the United States, shall not be considered to have been admitted. *See* section 101(a)(13)(B) of the Act.

AR2022_300969

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 12

(D) **Parole**.  Parole is the discretionary decision, under section 212(d)(5)(A) of the Act, to permit an inadmissible alien to leave the inspection facility free of official custody, so that, although the alien is not admitted, the alien is permitted to be physically present in the United States.  By statutory definition, parole is not admission. *See* section 101(a)(13)(B) of the Act. An alien, who has been paroled under section 212(d)(5)(A) of the Act "[is] still in theory of law at the boundary line and [has] gained no foothold in the United States." *Leng May Ma v. Barber*, 357 U.S. 185, 188-189 (1958), *quoting Kaplan v. Tod*, 267 U.S. 228 (1925).

Parole may be granted on a case-by-case basis for urgent humanitarian reasons (humanitarian parole) or for significant public benefit. *See* section 212(d)(5)(A) of the Act and 8 CFR 212.5. Deferred inspection and advance parole are parole, as are individual port of entry paroles and paroles authorized while a person is overseas. Section 212(a)(9)(B)(ii) of the Act makes clear that an alien, who has been paroled, does not accrue unlawful presence as long as the parole lasts. For purposes of unlawful presence, the reason for the grant of parole is irrelevant. For more information on parole pursuant to section 212(d)(5) of the Act, *see* chapter 54 of the *AFM*.

Only parole under section 212(d)(5)(A) of the Act qualifies as parole for purposes of section 212(a)(9) of the Act. In an April 1999 memorandum and an August 1998 legal opinion (Legal Opinion No. 98-10, August 21, 1998), former INS suggested that a release under section 236 of the Act (conditional parole) could also be considered "parole" for purposes of adjustment of status under the Cuban Adjustment Act. The Board of Immigration Appeals (BIA) has rejected this interpretation in at least one unpublished decision. *See Matter of Ortega-Cervantes,* 2005 WL 649116 (BIA, January 6, 2005). The Ninth Circuit confirmed the BIA's decision and held that release under section 236 of the Act was not "parole" for purposes of adjustment of status. *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111 (9th Cir. 2007). DHS/Office of the General Counsel reconsidered that aspect of the 1999 memorandum, and the related 1998 legal opinion. On September 28, 2007, it issued a memorandum stating that release under section 236 of the Act is not deemed to be a form of parole under section 212(d)(5) of the Act. *See* September 28, 2007 Memorandum, Office of the General Counsel of the Department of Homeland Security, *Clarification of the Relation Between Release Under Section 236 and Parole Under Section 212(d)(5) of the Immigration and Nationality Act*. As of the release of this *AFM* chapter, the Ninth Circuit is the only circuit that has decided this issue, although several circuits have cases outstanding. If the adjudicator encounters the issue, he or she is advised to inquire with the USCIS Office of the Chief Counsel (Adjudications Law Division) about the status of any pending litigation or further developments.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 13

### (4) General Considerations when Counting Unlawful Presence Time Under Sections 212(a)(9)(B) and 212(a)(9)(C)(i)(I) of the Act

### (A) Unlawful Presence for Purposes of the 3-Year and 10-Year Bars Is Not Counted in the Aggregate. Section 212(a)(9)(B)(i) of the Act only applies to an alien, who has accrued the required amount of unlawful presence during <u>any single</u> stay in the United States; the length of the alien's accrued unlawful presence is not calculated by combining periods of unlawful presence accrued during multiple unlawful stays in the United States. If, during any single stay, an alien has more than one (1) period during which the alien accrues unlawful presence, the length of each period of unlawful presence is added together to determine the total period of unlawful presence time accrued during that single stay.

Reminder: The statutory provisions of the 3-year and the 10-year bars became effective on or after April 1, 1997. An alien, who was unlawfully present in the United States prior to April 1, 1997, started to accrue unlawful presence on April 1, 1997, if he or she remained present in the United States at that time. An alien, who was unlawfully present in the United States prior to April 1, 1997, but departed prior to April 1, 1997, did not accrue any unlawful presence for purposes of section 212(a)(9)(B) of the Act.

**Example 1:** An alien's status becomes unlawful, and the alien begins to accrue unlawful presence on April 1, 2004. On September 1, 2004 (150 days after April 1, 2004), the alien files an adjustment of status application. The alien does not accrue unlawful presence while the adjustment application is pending. *See* section (b)(3)(A) of this *AFM* chapter. The adjustment application is denied on October 15, 2006 (administratively final decision). After the denial, the alien continues to remain in the United States unlawfully; the accrual of unlawful presence resumes on October 16, 2006, a day after the application is denied. The alien leaves the United States on January 1, 2007. At that time, the individual had accrued unlawful presence from April 1, 2004 to September 1, 2004, and again from October 16, 2006 to January 1, 2007. The total period of unlawful presence time accrued during this single unlawful stay exceeds 180 days. By departing the United States on January 1, 2007, the alien triggered the three-year bar and is inadmissible under section 212(a)(9)(B)(i)(I) of the Act.

**Example 2:** An alien's status becomes unlawful, and the alien begins to accrue unlawful presence on April 1, 2004. On September 1, 2004, the alien leaves the United States. The alien returns unlawfully on October 15, 2006. He departs the United States again on January 1, 2007. Although the alien has been unlawfully present in the United States for more than 180 days in the aggregate, the unlawful presence was accrued during two (2) separate stays in the United States; during each of these stays, the alien accrued less than 180 days of unlawful presence. Thus, the alien is not inadmissible under section 212(a)(9)(B)(i)(I) of the Act.

AR2022_300971

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 14

**(B) Unlawful Presence for Purposes of the Permanent Bar Is Counted in the Aggregate**.  Under section 212(a)(9)(C)(i)(I) of the Act, the alien's unlawful presence is counted in the aggregate, i.e. the total amount of unlawful presence time is determined by adding together all periods of time during which an alien was unlawfully present in the United States on or after April 1, 1997. Therefore, if an alien accrues a total of more than one (1) year of unlawful presence time, whether accrued during a single stay or during multiple stays, departs the United States, and subsequently reenters or attempts to reenter without admission, he or she is subject to the permanent bar of section 212(a)(9)(C)(i)(I) of the Act.

> **Example**: An alien enters the United States unlawfully on April 1, 2004, and leaves on September 1, 2004.  The alien has accrued about 150 days of unlawful presence at this time. She reenters the United States unlawfully on January 1, 2005 and stays until November 1, 2005.  This time, the alien has accrued 300 days of unlawful presence. Although neither period of unlawful presence exceeds one (1) year, the aggregate period of unlawful presence does exceed one (1) year by totaling 450 days of unlawful presence, which the alien accrued during both stays. If the alien ever returns or attempts to return to the United States without being admitted, he or she will be inadmissible under section 212(a)(9)(C)(i)(I) of the Act.

**(C) Specific Requirements for Inadmissibility under Section 212(a)(9)(B)(i)(I) of the Act (The 3-Year Bar)**.  For the three-year bar to apply, the individual must have accrued at least 180 days but less than one (1) year of unlawful presence, and thereafter, must have departed voluntarily prior to the commencement of removal proceedings. Any period of unlawful presence accrued prior to April 1, 1997, does not count for purposes of section 212(a)(9)(B)(i)(I) of the Act.

The alien does not need a formal grant of voluntary departure by DHS for his or her departure to be considered voluntary. However, if DHS grants voluntary departure, the departure is still voluntary because removal proceedings have not yet commenced.

The statutory language of section 212(a)(9)(B)(i)(I) of the Act specifically requires that the alien must have departed the United States prior to the commencement of removal proceedings. Removal proceedings commence with the filing of the Notice to Appear (NTA) with the immigration court following service of the NTA on the alien. *See* 8 CFR 1003.14. An alien, who departs the United States after the NTA has been filed with the immigration court, therefore, is not subject to the three-year bar according to the statutory language. To avoid future inadmissibility, however, the alien must leave before he or she has accrued more than one year of unlawful presence, and becomes inadmissible under section 212(a)(9)(B)(i)(II) of the Act, rather than section 212(a)(9)(A)(i)(I) of the Act.  This provision provides the alien with an incentive to end his or her unlawful presence by leaving the United States, rather that contesting removal.

AR2022_300972

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 15

The burden is on the applicant to establish that the NTA had already been filed by the time the applicant had departed.  The record of proceedings before the immigration court will generally indicate when the NTA was actually filed, and the filing date shown in the court's record will be controlling.

Even if the applicant is not subject to the three-year or the ten-year bar, there may be other grounds of inadmissibility that apply based on the fact that the removal proceedings were initiated and the alien departed the United States during the proceedings. For example, a conviction that made the alien subject to removal as a deportable alien may also make the alien inadmissible.

(D) **Specific Requirements for Inadmissibility under Section 212(a)(9)(B)(i)(II) of the Act (The 10-Year Bar)**.  An alien, who voluntarily departs the United States or who was removed from the United States after having been unlawfully present for more than one (1) year, triggers the 10-year bar to admission under section 212(a)(9)(B)(i)(II) of the Act. Any period of unlawful presence accrued prior to April 1, 1997 does not count for purposes of section 212(a)(9)(B)(i)(II) of the Act.

Unlike the 3-year bar, the 10-year bar applies even if the alien leaves after removal proceedings have commenced; the individual will be inadmissible, even if he or she leaves after the NTA has been filed with the immigration court.  Moreover, filing the NTA does not stop the accrual of unlawful presence.  8 CFR 239.3.

(E) **Specific Requirements for Inadmissibility under Section 212(a)(9)(C)(i)(I) of the Act (The Permanent Bar)**

(i) General Requirements. To be permanently inadmissible under section 212(a)(9)(C)(i)(I) of the Act, an alien must have accrued more than one (1) year of unlawful presence in the aggregate, must have left the United States thereafter, and must then have entered or attempted to reenter the United States without being admitted. Any unlawful presence accrued prior to April 1, 1997, or any unlawful entry or attempted reentry into the United States prior to April 1, 1997, does not count for purposes of inadmissibility under section 212(a)(9)(C)(i)(I) of the Act.

(ii) Special Note On the Effect of An Alien's Entry on Parole After Having Accrued More Than One (1) Year Of Unlawful Presence

Is an alien, who had accrued more than one (1) year of unlawful presence, and who is paroled into the United States but not admitted, subject to section 212(a)(9)(C)(i)(I) of the Act?

An alien's inadmissibility under section 212(a)(9)(C)(i)(I) of the Act is fixed at the time of the alien's unlawful entry or attempted reentry.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 16

An alien who had accrued more than one (1) year of unlawful presence, and who has *never* returned or attempted to return without admission after that unlawful presence, and who is paroled into the United States pursuant to section 212(d)(5) of the Act, but not admitted, is not subject to inadmissibility under section 212(a)(9)(C)(i)(I) of the Act. It is the Department of Homeland Security's (DHS) policy that for purposes of section 212(a)(9)(C)(i)(I) inadmissibility, an alien's parole is not deemed to be an "entry or attempted reentry without being admitted," even though parole is not considered admission. *See* section 101(a)(13)(B) and section 212(d)(5)(A) of the Act. This conclusion reflects the legal principle that, although a parolee is actually allowed to physically enter the United States, a parolee is deemed to be at a port of entry, pending a final decision on whether to admit the alien or not. *See Leng May Ma v. Barber*, 357 U.S. 185, 188-189 (1958), *quoting Kaplan v. Tod*, 267 U.S. 228 (1925).

As noted, however, an alien's inadmissibility for returning unlawfully after accruing sufficient unlawful presence is fixed at the time of the alien's unlawful return or attempt to return.  Paroling an alien who is already inadmissible does not relieve the alien of inadmissibility.  For example, if an alien who is already present in the United States without being admitted because he or she entered without inspection, and who, in the past, had accumulated unlawful presence in excess of one (1) year, is taken into custody, and then later paroled pursuant to section 212(d)(5) of the Act, the alien's parole would not relieve the alien of inadmissibility under section 212(a)(9)(C)(i) of the Act.

For a more detailed explanation and examples, please see (a)(6)(B) of this subsection, below.

## (5) **Triggering the Bar by Departing the United States**

An alien must leave the United States after accruing more than 180 days or one (1) year of unlawful presence in order to trigger the 3-year or 10-year bar to admission under section 212(a)(9)(B) of the Act. This includes departures made while traveling after having approved advance parole or with a valid refugee travel document. *See* section (a)(6) of this chapter.

Note: By granting advance parole or a refugee travel document, USCIS does not authorize the alien's departure from the United States; it merely provides a means for the alien to return to the United States, regardless of admissibility. Therefore, even if the alien has an advance parole document, the alien's actual departure from the United States will still trigger the bar to inadmissibility under section 212(a)(9)(B) of the Act.

Section 212(a)(9)(C)(i)(I) of the Act does not explicitly mention "departure" as a prerequisite for the bar to apply. However, according to the wording of the statute, an alien with the requisite period of unlawful presence must "enter or attempt to enter without admission" in order to incur inadmissibility.  Thus, the alien cannot violate the provision unless the alien leaves the United States and then returns or attempts to

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 17

return.  *See Matter of Rodarte-Roman*, 23 I&N Dec. 905 (BIA 2006)(Departure triggers the bars; the IJ erred when denying adjustment of status because of the individual's accrual of unlawful presence in excess of one (1) year without departure.).

## (6) **Triggering the 3-Year and the 10-Year Bars But Not the Permanent Bar When Departing with Advance Parole or with a Refugee Travel Document**

(A) **Travel on Advance Parole Issued to Applicants for Adjustment of Status on Form I-512, Authorization For Parole Of An Alien Into The United States, pursuant to 8 CFR 212.5(f) and 8 CFR 245.2(a)(4)**.  An alien with a pending adjustment of status application, who has accrued more than 180 days of unlawful presence time, will trigger the bars to admission, if he or she travels outside the United States subsequent to the issuance of an advance parole document.  When the alien presents the advance parole document at a port of entry, he or she may be permitted to return to the United States as a parolee because aliens who request parole into the United States are not required to establish admissibility under section 212(a) of the Act.  However, the fact that the alien is permitted to return to the United States as a parolee does not confer a waiver of inadmissibility under section 212(a)(9)(B)(i)(I) and (II) of the Act. Consequently, a waiver under section 212(a)(9)(B)(v) of the Act would be required when determining the alien's eligibility to adjust status to lawful permanent residence.

(B) **A Special Note on the Effect on Section 212(a)(9)(C) of the Act of an Alien's Entry on Parole After Having Accrued More Than One (1) Year Of Unlawful Presence**.  Parole is not admission. *See* section 101(a)(13)(B) of the Act. An individual is subject to section 212(a)(9)(C)(i)(I) of the Act, if he or she has accrued more than one (1) year of unlawful presence in the United States during a single stay or during multiple stays, who departs, and subsequently enters or attempts to reenter "without being admitted." The statutory language omits the word "parole" and makes it unclear whether an alien, who enters on parole, triggers the bar to inadmissibility under section 212(a)(9)(C) of the Act.  Therefore, if an alien is paroled into the United States pursuant to section 212(d)(5)(A) of the Act after having accrued more than one (1) year of unlawful presence, is he or she inadmissible under section 212(a)(9)(C)(i)(I) of the Act because the alien was not "admitted"? The answer is "no" for the following reason:

An alien's inadmissibility pursuant to section 212(a)(9)(C)(i)(I) of the Act is fixed as of the date of the alien's entry or attempted reentry without being admitted. If an alien, who has accrued unlawful presence in excess of one (1) year, came to a port of entry and applied for admission to the United States or asked to be paroled into the United States, the alien will not be deemed to have attempted to enter the United States without "being admitted," if DHS actually paroles the alien. The significant point is that the alien will have arrived at a port of entry and presented himself or herself for inspection.  If the alien is paroled, the alien will continue to be considered an applicant for admission, and so cannot be said to have entered or attempted to enter without admission.  Thus, if DHS paroles the alien under section 212(d)(5) of the Act, the alien's departure and subsequent return as a parolee does not trigger the section 212(a)(9)(C)(i)(I)-bar for

AR2022_300975

purposes of a subsequent admissibility determination by DHS (such as at the time of the adjustment of status adjudication). This conclusion reflects the legal principle that, although a parolee is actually allowed to physically enter the United States, a parolee is deemed to be at a port of entry, pending a final decision on whether to admit the alien or not. *See Leng May Ma v. Barber*, 357 U.S. 185, 188-189 (1958), *quoting Kaplan v. Tod*, 267 U.S. 228 (1925).

> **Example**: An alien enters the United States on a B visa. The status expires on January 1, 2000. On January 2, 2000, the individual commences to accrue unlawful presence as having overstayed his or her period of admission The alien applies for adjustment of status on January 1, 2005. The individual is in authorized stay during the pendency of the adjustment of status application and does not accrue unlawful presence. *See* section (b)(3)(A) of this *AFM* chapter. Based on the pending adjustment application, the alien applies for advance parole (Form I-131), which is approved. The alien then leaves the United States on April 1, 2005; at this time, the alien has triggered the 10-year bar to admission to the United States because the alien had accrued unlawful presence in excess of one (1) year (from January 2, 2000, to January 1, 2005). On April 15, 2005, the alien returns to the United States through a port of entry, presents his advance parole document, and is paroled into the United States. The alien will not be considered to have triggered inadmissibility under section 212(a)(9)(C)(i)(I) of the Act. Because the alien is currently a parolee, the alien is deemed to still be at the port of entry. At the time of the adjudication of the adjustment of status application, the alien's request for admission (through the adjustment of status application) will be decided. Thus, the individual is a parolee, he or she is not deemed to have "entered or attempted to reenter without being admitted." (Note: The alien still may be inadmissible under section 212(a)(9)(B) of the Act at the time of the adjustment of status application.)

By contrast, the parole of an alien after the alien had already become inadmissible under section 212(a)(9)(C)(i) would not relieve the alien of inadmissibility under section 212(a)(9)(C)(i) of the Act.

> **Example**: An alien enters the United States on a B visa. The status expires on January 1, 2000. On January 1, 2000, the alien commences to accrue unlawful presence for having overstayed his or her period of admission. The alien applies for adjustment of status on January 1, 2005. The alien departs the United States and returns illegally by crossing the border 30 miles west of the nearest port of entry on April 15, 2005. The alien is now inadmissible under section 212(a)(9)(C)(i)(I) of the Act. (An additional consequence, unrelated to the illegal entry, is that the alien also abandoned his or her adjustment application). Even if the alien were later taken into custody and paroled under section 212(d)(5) of the Act, or were to *later* travel and return on a grant of advance parole, the alien would remain inadmissible under section 212(a)(9)(C)(i)(I) of the Act since the

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 19

alien did, in fact, enter without admission after having accrued the requisite period of unlawful presence.

The instructions to Form I-131, Application for Travel Document, and Form I-485, Application to Register Permanent Residence or Adjust Status, as well as the standard Form I-512, Authorization for Parole of an Alien into the United States, include language warning the alien that traveling abroad and returning to the United States by using Form I-512 may make the alien inadmissible under section 212(a)(9)(B) of the Act.

**(C) Travel on a Valid Refugee Travel Document Issued pursuant to Section 208(c)(1)(C) of the Act and 8 CFR 223**. An asylee who had accrued more than 180 days of unlawful presence time prior to having filed the bona fide asylum application, will trigger the bar to admission, if he or she departs the United States while traveling on a valid refugee travel document. When the asylee presents the travel document at a port of entry, he or she can be permitted to reenter the United States to resume status as an asylee; however, the asylee will be inadmissible when he or she applies to adjust status to lawful permanent resident, and a waiver would be required at that time.

**(7) Multiple Grounds of Inadmissibility and the Relationship Between Sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act**
Sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act establish different grounds of inadmissibility based on prior unlawful presence. Whether a specific ground applies to an alien depends on an analysis of the facts of the person's case in light of that specific ground.

It is possible that the alien's immigration history makes the alien inadmissible under *both* section 212(a)(9)(B) of the Act and section 212(a)(9)(C)(i)(I) of the Act.

> **Example**: An alien with more than one (1) year of unlawful presence leaves the United States, thus triggering the 10-year bar to admissibility under section 212(a)(9)(B)(i)(II) of the Act. Three (3) years after the alien's last departure, the alien returns to the United States and enters illegally, thus without having been admitted. The alien is now inadmissible under sections 212(a)(9)(B)(i)(II) and 212(a)(9)(C)(i)(I) of the Act.

Also, an alien with sufficient unlawful presence who is removed from the United States, may be inadmissible under section 212(a)(9)(A), as well as section 212(a)(9)(B)(i)(II) and/or section 212(a)(9)(C)(i) of the Act depending on the circumstances of the individual case.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 20

## (8) **Benefits That May Be Available Despite Inadmissibility under Section 212(a)(9)(B)(i)(I), (B)(i)(II), or (C)(i)(I) of the Act**

Section (c) of this chapter specifies forms of relief from inadmissibility under sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act ("Waivers").  Even without a grant of a waiver, aliens who are subject to these grounds of inadmissibility, may still obtain certain benefits as outlined below in (b)(2) and (b)(3), if otherwise eligible.

(A) **Under Section 212(a)(9)(B)(i)(I) or (II) of the Act**. An alien, who is inadmissible under section 212(a)(9)(B)(i) of the Act may apply for and receive, if eligible, a grant of:

- Registry under section 249 of the Act;
- Adjustment of status under section 202 of NACARA;
- Adjustment of status under section 902 of HRIFA;
- Adjustment of status under section 245(h)(2)(A) of the Act;
- Change to V nonimmigrant status under 8 CFR 214.15 (but the alien may need a waiver to obtain adjustment of status to LPR after having acquired V nonimmigrant status);
- LPR status pursuant to the LIFE Legalization Provision: A Legalization applicant under section 1104 of the LIFE Act may travel with authorization during the pendency of the application without triggering inadmissibility under section 212(a)(9)(B) of the Act. *See* 8 CFR 245a.13(e)(5).

(B) **Under Section 212(a)(9)(C)(i)(I) of the Act**.  An alien who is inadmissible under section 212(a)(9)(C)(i)(I) of the Act may apply for and receive, if eligible, a grant of:

- Registry under section 249 of the Act.

(C) **Special Concerns Regarding Section 245(i) - Applications**.  The USCIS position is that inadmissibility under section 212(a)(9)(B) or (C) of the Act makes an alien ineligible for adjustment of status under section 245 of the Act, regardless of whether the alien applies under section 245(a) or section 245(i) of the Act.  The BIA has endorsed this view.  In *Matter of Briones*, 24 I&N Dec. 355 (BIA 2007), the Board held that an alien who is inadmissible under section 212(a)(9)(C)(i)(I) of the Act is not eligible for adjustment under section 245(i) of the Act.  An alien who is inadmissible under section 212(a)(9)(B) of the Act is also ineligible for section 245(i) adjustment.  *Matter of Lemus*, 24 I&N Dec. 373 (BIA 2007).

USCIS adjudicators will follow *Matter of Briones* and *Matter of Lemus* in all cases, regardless of the decisions of the 9th Circuit in *Acosta v. Gonzales*, 439 F.3d 550 (9th Cir. 2006) or of the 10th Circuit in *Padilla-Caldera v. Gonzales*, 453 F.3d 1237 (10th Cir. 2005).  Following these Board cases, rather than *Acosta* and *Padilla-Caldera*, will allow the Board to reexamine the continued validity of these court decisions.

USCIS adjudicators should also be aware that the 9th Circuit has held that the Board's decision in *Matter of Torres-Garcia,* 23 I&N Dec. 866 (BIA 2006) is entitled to judicial

AR2022_300978

deference, and that the decision in *Perez-Gonzales v. Ashcroft,* 379 F.3d 783 (9th Cir. 2004), is no longer good law. *Gonzales v. Department of Homeland Security,* 508 F.3d 1227 (9th Cir. 2007).

## (9) **Effective Date of Sections 212(a)(9)(B) and (C)(i)(I) of the Act**

(A) **Effective Date**. Only periods of unlawful presence spent in the United States after the April 1, 1997, effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Div. C of Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act of 1997, PL 104-208 (September 30, 1996))(IIRIRA), count towards unlawful presence for purposes of section 212(a)(9)(B) and (C)(i)(I) of the Act.

For purposes of section 212(a)(9)(C)(i)(I) of the Act, one (1) full year of unlawful presence must have accrued. Therefore, the earliest an individual could have been subjected to this ground of inadmissibility was April 2, 1998.

(B) **The Child Status Protection Act and Its Influence on Unlawful Presence**. On August 6, 2002, the Child Status Protection Act (CSPA) (PL 107-208, August 6, 2002) was enacted to provide relief to certain children, who "aged-out" during the processing of certain applications. The CSPA applies to derivative children of asylum and refugee applicants, children of United States citizens, children of Lawful Permanent Residents (LPRs), and derivative beneficiaries of family-based, employment-based, and diversity visas. The CSPA changes how a child's age should be calculated for purposes of eligibility for certain immigration benefits; it does not change the definition of "child" pursuant to section 101(b)(1) of the Act.

The CSPA was effective on August 6, 2002. In general, its provisions are not retroactive: Any qualified petition or application that was pending on the effective date is subject to the provisions of the CSPA. For detailed information, please consult the policy memorandum, Domestic Operations, April 30, 2008, Revised Guidance for the Child Status Protection Act (AD07-04), or AFM Chapter 21.2(e).

Calculation of Unlawful Presence, if the CSPA Is Applicable: Any derivative beneficiary child who is in a "period of stay authorized" because of a pending application or petition, does not accrue unlawful presence merely because of his or her "aging-out," if the requirements and conditions of the CSPA are met. For more information about the applicability of the CSPA, *see AFM* sections describing individual types of immigration benefits and Chapter 21.2(e).

The CSPA applies only to those benefits expressly specified by the statute. Nothing in the CSPA provides protection for nonimmigrant visa holders (such as K or V nonimmigrants), or to NACARA, HRIFA, Family Unity, Cuban Adjustment Act, and Special Immigrant Juvenile Applicants, and/or derivatives. However, there may be

limited coverage for K-2 and K-4 individuals. *See* Chapter 21.2(e). This list is not exhaustive.

## (b) Determining When an Alien Accrues Unlawful Presence

### (1) Aliens Present in Lawful Status or as Parolees
An alien does not accrue unlawful presence, if he or she is present in the United States under a period of stay authorized by the Secretary of Homeland Security, or if he or she has been inspected and paroled into the United States and the parole is still in effect.

An alien who is present in the United States without inspection accrues unlawful presence from the date of the unlawful arrival, unless the alien is protected from the accrual of unlawful presence as described in this *AFM* chapter. Note that an alien, who arrived at a port of entry and obtained permission to come into the United States by making a knowingly false claim to be a citizen, is present in the United States without having been inspected and admitted. *See Matter of S--,* 9 I&N Dec. 599 (BIA 1962).

### (A) Lawful Permanent Residents (LPRs).
An alien lawfully admitted for permanent residence will not accrue unlawful presence unless the alien becomes subject to an administratively final order of removal  by the IJ or the BIA (which means that during the course of proceedings, the alien was found to have lost his or her LPR status), or if he or she is otherwise protected from the accrual of unlawful presence. Unlawful presence will start to accrue the day after the order becomes administratively final, and not on the date of the event that made the alien subject to removal.

### (B) Lawful Temporary Residents (Section 245A(b) of the Act and 8 CFR 245a).
A lawful temporary resident must file an application to adjust from temporary to permanent resident status before the beginning of the 43rd month from the date he or she was granted lawful temporary resident status. *See* 8 CFR 245a.3(a)(2). However, unlike conditional permanent residents, the status of a lawful temporary resident does not automatically terminate, if the alien fails to file a timely application, and the DHS needs to advise the alien of its intent to terminate his or her Temporary Residence Status. *See* section 245A(b)(2) of the Act, and 8 CFR 245a.2(u)(2). The same procedures apply, if the alien's status is terminated for the reasons specified in section 245A(b)(2) of the Act. Lawful Temporary Resident status also terminates upon the entry of a final order of deportation, exclusion, or removal. *See* 8 CFR 245.2(u)(2).

If the DHS advises the alien of its intent to terminate lawful temporary resident status, the alien continues to be a lawful temporary resident and does not accrue unlawful presence until a notice of termination is issued. If the termination is appealed, the period of authorized stay continues through the administrative appeals process. The termination of an alien's lawful temporary resident status cannot be reviewed in removal proceedings before an immigration judge. The alien would accrue unlawful presence

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 23

time during removal proceedings or while a petition for review is pending in Federal court.

## (C) Conditional Permanent Residents under Sections 216 and 216A of the Act

(i) Termination upon the Entry of an Administratively Final Order of Removal. As is the case with other LPRs, an alien lawfully admitted for permanent residence on a conditional basis under section 216 or 216A of the Act begins to accrue unlawful presence upon the entry of an administratively final order of removal. A conditional LPR will also accrue unlawful presence before the entry of an administratively final removal order, if USCIS terminates the alien's conditional LPR status, as described below.

(ii) Automatic Termination. Pursuant to section 216 or section 216A of the Act, an alien, who was granted conditional permanent resident status must properly file a petition to remove the conditions placed on his or her status within the 90-day period immediately preceding the second anniversary of the date on which lawful permanent resident status on a conditional basis was granted. *See* Sections 216(c)(1) and 216A(c)(1) of the Act. The petition is filed on Form I-751, Petition to Remove Conditions of Residence, or on Form I-829, Petition by Entrepreneur to Remove Conditions. *See* 8 CFR 216.4 and 8 CFR 216.6. Failure to do so results in the automatic termination of conditional resident status and the initiation of removal proceedings at the expiration of the 90-day period, unless the parties can establish good cause for failure to file the petition. *See* section 216(c)(2) and 8 CFR 216.4(a)(6); section 216A(c)(2) and 8 CFR 216.6(a)(5); section 216(c)(4) and 8 CFR 216.5. The alien begins to accrue unlawful presence as of the date of the second anniversary of the alien's lawful admission for permanent residence. *See id*. Also, failure to appear for the personal interview that may be required by USCIS in relation to the I-751 or I-829 petition results in the automatic termination of the conditional legal permanent resident status, unless the parties establish good cause for the failure to appear. *See* section 216(c)(2)(A) of the Act and 8 CFR 216.4(b)(3); section 216A(c)(2)(A) of the Act and 8 CFR 216.6(b)(3).

(iii) Late Filings of the Petition to Remove the Conditional Basis Of LPR Status by the Alien. Current regulations at 8 CFR 216.4(a)(6) and 8 CFR 216.6(a)(5) allow a conditional resident to submit a late filing to USCIS, if jurisdiction has not yet vested with the immigration judge, and if certain requirements are met. If the late filed petition is accepted and approved, no unlawful presence time will be deemed to have accrued. If jurisdiction has already vested with the immigration judge, the judge may terminate removal proceedings upon joint motion by the alien and DHS. Consequently, if a late filing is accepted and approved while the alien is in proceedings, the alien will not accrue unlawful presence time. If, however, the late filing is rejected, the alien begins to accrue unlawful presence time on the date his or her status as a conditional resident automatically terminated.

AR2022_300981

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 24

(iv) <u>Termination on Notice</u>. If the DHS advises the alien of its intent to terminate conditional permanent resident status, the alien continues to be a conditional permanent resident and does not accrue unlawful presence until a notice of termination is issued. The alien begins to accrue unlawful presence on the day after the notice of termination is issued, unless the alien seeks review of the termination in removal proceedings. *See* 8 CFR 216.3.

(v) <u>Review in Removal Proceedings</u>. If the alien seeks review of the termination in removal proceedings, DHS bears the burden of proving that the termination was proper. Thus, the alien will be deemed not to accrue unlawful presence unless the immigration judge affirms the termination.  *See* 8 CFR 216.3.  If the immigration judge affirms the termination, the alien will begin to accrue unlawful presence on the day after the immigration judge's removal order becomes administratively final.

(D) **Aliens Granted Cancellation of Removal or Suspension of Deportation**.
Section 240A of the Act provides for two (2) different types of cancellation of removal: cancellation of removal for an alien who has been admitted for permanent residence (section 240A(a) of the Act), and cancellation of removal and adjustment of status for certain aliens who have been present in the United States for a period of not less than ten (10) years (section 240A(b) of the Act). Therefore, the effect of a grant of cancellation of removal on the accrual of unlawful presence (or of suspension of deportation under former section 244 of the Act) depends on the alien's status immediately before relief was granted, and as outlined below:

- If an alien who has already acquired LPR status becomes subject to removal but applies for and receives a grant of cancellation of removal under section 240A(a) of the Act, or a grant of suspension of deportation under former section 244 of the Act, the alien retains his or her LPR status. No period of unlawful presence will have accrued because the grant of cancellation or suspension prevents the loss of LPR status.

- If an alien who is not already an LPR obtains a grant of cancellation of removal under section 240A(b) of the Act, or a grant of suspension of deportation under former section 244 of the Act, the alien becomes an alien lawfully admitted for permanent residence as of the date of the final decision granting relief. As such, the alien will no longer accrue unlawful presence after cancellation of removal or suspension of deportation is granted. Moreover, given the special nature of these forms of relief, any unlawful presence that may have accrued before the grant of cancellation of removal or suspension of deportation will be eliminated for purposes of any future application for admission.

    **Example**: An alien had accrued ten (10) years of unlawful presence in the United States, and is subsequently granted cancellation of removal. The

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 25

alien is now an LPR. If, after becoming an LPR, the alien travels abroad and returns to the United States through a port of entry, none of the pre-grant unlawful presence will be considered in determining the alien's admissibility. Section 212(a)(9)(B)(i) of the Act does not apply to LPRs.

(E) **Lawful Nonimmigrants**.  The period of authorized stay for a nonimmigrant may end on a specific date or may continue for "duration of status (D/S)." Under current USCIS policy, nonimmigrants begin to accrue unlawful presence as follows:

(i) Nonimmigrants Admitted until a Specific Date (Date Certain). Nonimmigrants admitted until a specific date will generally begin to accrue unlawful presence the day following the date the authorized period of admission expires, as noted on Form I-94, Arrival/Departure Record. If USCIS finds, during the adjudication of a request for immigration benefit, that the alien has violated his or her nonimmigrant status, unlawful presence will begin to accrue either the day after Form I-94 expires or the day after USCIS denies the request, whichever is earlier. If an immigration judge makes a determination of nonimmigrant status violation in exclusion, deportation or removal proceedings, unlawful presence begins to accrue the day after the immigration judge's order or the day after the Form I-94 expired, whichever is earlier. It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated. Removal proceedings have no impact on whether an individual is accruing unlawful presence. *See* 8 CFR 239.3.

> **Example**: An individual is admitted in H-1B status until September 20, 2007, as evidenced on Form I-94, Arrival/Departure Record. On January 1, 2007, an NTA is issued and the individual is placed in removal proceedings. The individual will not start to accrue unlawful presence unless the immigration judge holds that the alien had violated his or her nonimmigrant status, or until his or her Form I-94 expires, whichever is earlier.

(ii) Nonimmigrants Admitted for Duration of Status (D/S). If USCIS finds a nonimmigrant status violation while adjudicating a request for an immigration benefit, unlawful presence will begin to accrue on the day after the request is denied. If an immigration judge makes a determination of nonimmigrant status violation in exclusion, deportation, or removal proceedings, unlawful presence begins to accrue the day after the immigration judge's order. It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated. *See* 8 CFR 239.3.

(iii) Non-controlled Nonimmigrants (e.g. Canadian B-1/B-2). Nonimmigrants, who are not issued a Form I-94, Arrival/Departure Record, are treated as nonimmigrants admitted for D/S for purposes of determining unlawful presence.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 26

## (F)  **Other Types of Lawful Status**

(i) Aliens in Refugee Status. In general, the period of authorized stay begins on the date the alien is admitted to the United States in refugee status. If refugee status is terminated, unlawful presence will start to accrue the day after the refugee status is terminated.

If the individual is a derivative refugee, either by accompanying or by following to join the principal, the alien will commence to accrue unlawful presence as follows:

 - If the derivative refugee is outside the United States: The period of stay authorized begins on the date the alien either enters as an accompanying  or following-to-join refugee pursuant to section 207(c)(2) of the Act and 8 CFR 207.7.

 - If the derivative refugee is inside the United States: The accrual of unlawful presence ceases when USCIS accepts the filing of a bona fide Asylee/Refugee Relative Petition (Form I-730) on the individual's behalf. USCIS interprets the language of section 212(a)(9)(B)(iii)(II) of the Act to apply to refugees and asylees alike. Therefore, once the bona fide Form I-730 petition is filed on behalf of the individual, the individual will be protected from the accrual of unlawful presence. No period of time during which the bona fide petition is pending shall be taken into account in determining the period of unlawful presence. If the petition is subsequently denied, the individual will again begin to accrue unlawful presence, if the individual has previously accrued unlawful presence.

 - Because filing a Form I-730 stops the accrual of unlawful presence, but does not cure any unlawful presence that has already accrued, an individual who departs the United States during the pendency of the petition, with or without advance parole,  will trigger the 3-year or the 10-year bar. In this case and because an individual seeking refugee status has to be admissible as an immigrant pursuant to section 207 of the Act, the individual will be required to file Form I-602, Application by Refugee For Waiver of Grounds of Excludability, to overcome the bars to admissibility before the Asylee/Refugee Relative Petition can be approved. If the alien is not permitted to reenter the United States, the individual will have to seek the waiver through the U.S. consulate where the approved I-730 is processed.

(ii) Aliens Granted Asylum. The period of authorized stay begins on the date the alien files a bona fide application for asylum. *See* section 212(a)(9)(B)(iii)(II) of the Act; *see also* section (b)(2)(B) of this chapter. This includes aliens, who entered the United States illegally but who were subsequently granted asylum. If asylum status is terminated, unlawful presence starts to accrue the day after the date of termination. A grant of asylum does not eliminate any prior periods of unlawful presence.

An individual who is included in the principal's asylum application (Form I-589) as a derivative beneficiary is in a period of stay authorized as of the date the principal

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 27

applicant is in a period of stay authorized (unless he or she works without authorization or it is deemed that the application for the derivative individual is not bona fide). However, if it is determined that the asylum application is not bona fide for reasons other than the ones to be attributed to the derivative beneficiary, the individual is in a period of stay authorized until the determination is made that the application by the principal was not bona fide. Also, if the principal works without authorization, the derivative beneficiary only commences to accrue unlawful presence at the time the determination is made that the principal had worked without authorization.

Finally, a derivative beneficiary, who is physically present in the United States, but who was not included on the asylum application, is protected from the accrual of unlawful presence once the qualifying asylee files an Asylee/Refugee Relative Petition on behalf of the individual. DHS interprets the language of section 212(a)(9)(B)(iii)(II) of the Act to apply to all applicants for asylum, including derivative beneficiaries, who obtain their status through an Asylee/Refugee Relative Petition.

(iii) <u>Aliens Granted Temporary Protected Status (TPS) pursuant to Section 244 of the Act.</u> If an alien's TPS application has been granted, the alien is deemed to be in lawful nonimmigrant status for the duration of the grant. *See* section 244(f) of the Act. Please *see* (b)(3)(G) of this section of this *AFM* chapter for the effect of a violation of TPS status on the accrual of unlawful presence, and for the effect of a pending TPS application on the accrual of unlawful presence.

If an alien is granted TPS, he or she is, while the grant is in effect, deemed to be in lawful nonimmigrant status for purposes of adjustment of status and change of status according to section 244(f) of the Act.

A grant of TPS does not, however, cure any unlawful presence that may have accrued before the grant of TPS. If the alien was present without inspection and admission or parole, the alien remains an alien who has not been inspected and admitted or paroled, despite the grant of TPS. *See* INS General Counsel Opinion, 91-27, March 4, 1991. Therefore, if before TPS is granted, the applicant had previously accrued unlawful presence sufficient to trigger the bars, and the applicant travels outside the United States after having obtained advance parole, his or her departure triggers the bars for purposes of an adjustment of change of status application; that is, the individual may be ineligible to adjust despite the wording of section 244(f) of the Act, and depending on the basis upon which the alien seeks adjustment. Also, if a waiver was granted for inadmissibility under section 212(a)(9)(B) or (C) of the Act for purposes of the TPS application, the alien is still inadmissible for purposes of adjustment of status because the standard of the waiver granted for TPS status is different than the one granted in relation to an immigrant benefits application (although both are filed on Form I-601, Application for Waiver of Grounds of Inadmissibility).

(G) **Aliens Present as Parolees**. Section 212(a)(9)(B)(ii) of the Act makes clear that an alien, who has been paroled, does not accrue unlawful presence as long as the parole lasts. For purposes of the accrual of unlawful presence, the specific type of parole and the reasons for the grant of parole do not matter; however, conditional parole pursuant to section 236 of the Act cannot be considered parole for purposes of section 212(a)(9)(B)(ii) of the Act. *See* section 40.9.1(a)(3)(D) of this *AFM* chapter.

An alien, who has been paroled into the United States does, however, begin to accrue unlawful presence as follows:

When a parolee remains in the United States beyond the period of parole authorization, unlawful presence begins to accrue the day following the expiration of the parole authorization.

> **Example**: The alien's parole expires January 1, 2007, and the alien does not depart. January 2, 2007 will be the alien's first day of unlawful presence.

If the parole authorization is revoked or terminated prior to its expiration date, unlawful presence begins to accrue the day after the revocation or termination.

An alien paroled for the purpose of removal proceedings will begin to accrue unlawful presence the day after the date the removal order becomes administratively final, or unless the alien is otherwise protected from the accrual of unlawful presence.

## (2) **Aliens Present in Unlawful Status Who Do not Accrue Unlawful Presence by Statute for Purposes of Section 212(a)(9)(B) of the Act (Statutory Exceptions)**

As noted in section (a)(2) of this *AFM* chapter, an alien must be in the United States in an unlawful status in order to accrue unlawful presence; however, there are some situations in which unlawful presence does not accrue despite unlawful status. The alien may be protected from accruing unlawful presence by section 212(a)(9)(B) of the Act itself, or by USCIS policy. This section (b)(2) deals with individuals, who are actually in unlawful status but who, by statute, do not accrue unlawful presence for purposes of section 212(a)(9)(B) of the Act.

The exceptions listed in this section (b)(2) apply *only* to grounds of inadmissibility listed in section 212(a)(9)(B) of the Act, and *do not* apply for purposes of inadmissibility under section 212(a)(9)(C) of the Act. There are two reasons for this conclusion: 1) The terms of sections 212(a)(9)(B)(iii) and (iv) of the Act refer *only* to specific subsections of section 212(a)(9)(B)(i) of the Act; and 2) Inadmissibility under section 212(a)(9)(C)(i)(I) of the Act rests on a more serious immigration violation than simple unlawful presence: To be inadmissible under section 212(a)(9)(C)(i)(I) of the Act, the alien must not only have accrued sufficient unlawful presence but also returned or attempted to return to

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 29

the United States without admission. Since the precise language of sections 212(a)(9)(B)(iii) and (iv) of the Act clearly make them apply only to inadmissibility under section 212(a)(9)(B) of the Act and not to inadmissibility under section 212(a)(9)(C)(i)(I) of the Act, and because violations of section 212(a)(9)(C)(i)(I) of the Act are more culpable than mere unlawful presence, USCIS has concluded that these statutory exceptions do not apply to section 212(a)(9)(C)(i)(I) cases. *See* June 17, 1997, Office of Programs memorandum – *Additional Guidance for Implementing Sections 212(a)(6) and 212(a)(9) of the Immigration and Nationality Act (Act)*; *see also* Section (b)(3) below for the same remark.

(A) **Minors Who Are under 18 Years of Age**. An alien whose unlawful status begins before his or her 18th birthday does not begin to accrue unlawful presence for purposes of section 212(a)(9)(B) of the Act until the day after his or her 18th birthday pursuant to section 212(a)(9)(B)(iii)(I) of the Act.

(B) **Aliens with Pending Asylum Applications (Including Children Aging Out and Dependents of Asylum Applicants)**

(i) Principal Applicant. An alien, whose bona fide application for asylum is pending, is in an authorized period of stay and does not accrue unlawful presence for purposes of section 212(a)(9)(B) of the Act unless the alien is employed without authorization while the application is pending. *See* section 212(a)(9)(B)(iii)(II) of the Act. It does not matter whether the application is or was filed affirmatively or defensively.

DHS has interpreted the phrase "bona fide asylum application" to mean a properly filed asylum application that has a reasonably arguable basis in fact or law, and is not frivolous. If this is the case, unlawful presence does not accrue while the application is pending unless the alien engages in unauthorized employment. DHS considers the application for asylum to be pending during any administrative or judicial review (including review in Federal court).

A denial of an asylum claim is not determinative of whether the claim was bona fide for purposes of section 212(a)(9)(B)(iii)(II) of the Act. Similarly, the abandonment of an application for asylum does not mean that the application was not bona fide. The Asylum Division within the Refugee, Asylum, and International Operations Directorate at USCIS' HQ can provide guidance regarding whether a filing of an asylum application can be deemed "bona fide" based on the specific facts of the case and should be contacted, if there are any questions as to the determination.

(ii) Dependents in General.
An individual who is included in the principal's asylum application (Form I-589) as a derivative beneficiary is in a period of stay authorized as of the date the principal applicant is in a period of stay authorized (unless he or she works without authorization or it is deemed that the application for the derivative individual is not bona fide).

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 30

However, if it is determined that the asylum application is not bona fide for reasons other than the ones to be attributed to the dependent, the individual is in a period of stay authorized, for example until the determination is made that the application was not bona fide. Also, if the principal works without authorization, the derivative beneficiary only commences to accrue unlawful presence at the time the determination is made that the principal had worked without authorization.

A dependent's asylum case is no longer considered pending if the principal asylum applicant notifies USCIS that the dependent is no longer part of the principal's application, or if USCIS determines that the dependent relationship no longer exists (for example because of divorce, or if the individual is no longer considered a "child"). In such cases, USCIS will remove the individual from the pending asylum application; the individual must file his or her own asylum application as a principal applicant within a reasonable amount of time. The individual will commence to accrue unlawful presence from the time USCIS has removed the dependent from the principal's application. Individuals, who do file a bona fide application within a reasonable period of time, will be deemed to have a pending application and they do not accrue unlawful presence from the time the new bona fide application is pending.

Finally, a derivative beneficiary, who is physically present in the United States but who was not included on the asylum application, is in a period of stay authorized at the time the qualifying asylee files an Asylee/Refugee Relative Petition on behalf of the individual. DHS interprets the language of section 212(a)(9)(B)(iii)(II) of the Act to apply to all applicants for asylum, including derivative beneficiaries who obtain their status through an Asylee/Refugee Relative petition.

Adjudicators should keep in mind that if the principal asylum applicant's dependent is not yet 18 years old, then the dependent will be protected from accrual of unlawful presence under section 212(a)(9)(B)(iii)(I) of the Act.

 (iii) Children Who Age Out and The Child Status Protection Act (CSPA). The CSPA amended section 208(b)(3)(B) of the Act to allow continued classification as a child for an unmarried son or daughter, who was under 21 years of age on the date the parent filed for asylum, provided that the son or daughter turned 21 years of age while the application remained pending. Therefore, if the requirements of the CSPA are met (the alien is present in the United States, named in the asylum application of his or her parent, and the application was pending on or after August 6, 2002) the individual may continue to be classified as a "child" and can be considered to have a pending application. Thus, unlawful presence does not accrue in such cases.

**Example**: Form I-589, Application for Asylum and for Withholding of Removal, was filed on February 7, 2000, listing a 20-year old derivative son in the United States. The son turned 21 on October 1, 2000. The application remained pending through August 6, 2002, and continues to be pending. For purposes of the asylum application, the son

continues to be a "child" because the application was filed prior to his 21st birthday. The son will not start to accrue unlawful presence until and unless the application is denied.

## (C) **Aliens Physically Present in the United States with pending Forms I-730**

Accrual of unlawful presence stops upon the filing of a bona fide Asylee/Refugee Relative Petition (Form I-730). USCIS interprets the language of section 212(a)(9)(B)(iii)(II) of the Act to apply to refugees and asylees alike. Therefore, once the bona fide petition is properly filed on behalf of the individual, the individual will no longer accrue unlawful presence.

If the alien was already accruing unlawful presence when the Form I-730 was filed, and the Form I-730 is subsequently denied, the individual will again begin to accrue unlawful presence on the day after the denial of the petition. If, at the time of the filing of the Form I-730, the alien was protected from the accrual of unlawful presence (for example, was in lawful status or had another application pending), but the other basis for protection expired while the Form I-730 was pending, then the alien will begin to accrue unlawful presence on the day after the denial of the Form I-730.

No period during which the bona fide Form I-730 was pending will be counted in determining the accrual of unlawful presence. Since the filing of a Form I-730 does not cure any unlawful presence that has already accrued, if the individual departs during the pendency of the petition, the individual will trigger the 3-year and the 10-year bar, if, prior to the filing of the petition, the individual has already accrued sufficient unlawful presence. Because a refugee has to be admissible as an immigrant pursuant to section 207 of the Act, the individual, upon his return to the United States, will be required to file Form I-602, Application By Refugee For Wavier of Grounds of Excludability, to overcome the bars to admissibility before Form I-730 can be granted to confer derivative refugee status. If the alien departs without advance parole, the individual will have to seek the waiver through the U.S. consulate where the approved Asylee/Refugee Relative Petition will be processed.

## (D) **Beneficiary of Family Unity Protection (FUP) Granted pursuant to Section 301 of the Immigration Act of 1990; 8 CFR 236.15**. No period of time in which an alien is a beneficiary of FUP shall be taken into account in determining the period of unlawful presence in the United States, for purposes of section 212(a)(9)(B) of the Act. If the FUP application (Form I-817) is approved, the accrual of unlawful presence will be deemed to have stopped as of the date of the filing of Form I-817, Application for Family Unity Benefits, and will continue through the period the alien retains FUP protection. The grant of FUP protection does not, however, erase prior unlawful presence.

The filing of Form I-817, by itself, does not stop the accrual of unlawful presence. If the Form I-817 is denied, the individual will continue to accrue unlawful presence as if no Form I-817 had been filed.

AR2022_300989

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 32

Section 212(a)(9)(B)(iii)(III) of the Act, by its terms, applies only to Family Unity Program benefits under section 301 of the Immigration Act of 1990. Congress provided similar benefits under section 1504 of the LIFE Act Amendments of 2000. As a matter of policy, USCIS treats section 1504 FUP cases the same as section 301 FUP cases, for purposes of the accrual of unlawful presence. See *AFM* chapter 40.9.2(b)(3)(F), below.

(E) <u>**Certain Battered Spouses, Parents, and Children**</u>. An approved VAWA self-petitioner and his or her child(ren) can claim an exception from inadmissibility under section 212(a)(9)(B)(i) of the Act, if he or she can establish a substantial connection between the abuse suffered, the unlawful presence, and his or her departure from the United States. He or she claims this exception by submitting evidence of such substantial connection with his or her adjustment application. If the exception is granted, the individual is deemed to not be inadmissible under section 212(a)(9)(B)(i) of the Act for purposes of future immigration benefits. This exception does not apply to inadmissibility under section 212(a)(9)(C)(i) of the Act, which has its own VAWA waiver in section 212(a)(9)(C)(iii) of the Act.

(F) <u>**Victims of Severe Form of Trafficking in Persons**</u>. Section 212(a)(9)(B)(i) of the Act does not apply to certain victims of severe forms of trafficking. *See* section 212(a)(9)(B)(iii)(V) of the Act. Similar to the battered spouses, a victim of a severe form of trafficking in persons may claim an exception to inadmissibility under section 212(a)(9)(B)(i) of the Act, if he or she can demonstrate that the severe form of trafficking (as that term is defined in section 7102 of Title 22 U.S.C.) was at least one central reason for the alien's unlawful presence in the United States. An individual can claim the exception by submitting evidence of the central reason with Form I-914, Application for T Nonimmigrant Status, or, at the time of the adjustment, when filing Form I-485, Application to Register Permanent Residence or Adjust Status. 8 CFR 214.11; 8 CFR 245.23 If the exception is granted by USCIS, the individual will be deemed to have never accrued any unlawful presence for purposes of the current nonimmigrant benefits application or any future benefits application.

If the exception is not granted, the individual may apply for a discretionary waiver of the ground of inadmissibility. If seeking T nonimmigrant status, the alien would apply under section 212(d)(3)(A) or 212(d)(13) of the Act by filing Form I-192, Advance Permission to Enter as Nonimmigrant. See 8 CFR 212.16. If the alien is already a T nonimmigrant, and is seeking adjustment of status, the alien would file Form I-601, Application for Waiver Grounds of Inadmissibility. See 8 CFR 212.18.

(G) <u>**Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS)("Tolling")**</u>. Pursuant to section 212(a)(9)(B)(iv) of the Act, a nonimmigrant, who has filed a timely request for extension of nonimmigrant status (EOS) or change of nonimmigrant status (COS), is protected from accruing unlawful presence during the pendency of the application for up to 120 days (the accrual of unlawful presence is "tolled"). Section 212(a)(9)(B)(iv) of the Act is only applicable to the three-year bar of section 212(a)(9)(B)(i)(I) of the Act, and is also referred to as the

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 33

"tolling-provision." However, unlawful presence for purposes of the 3-year bar will only be tolled, if

      1) the alien has been lawfully admitted or paroled into the United States, and

      2) the application for EOS or COS is timely filed, and not frivolous, and

      3) the alien does not engage and/or has not been engaging in unauthorized employment. *See* section 212(a)(9)(B)(iv) of the Act.

By policy, USCIS has extended the 120-day statutory tolling period to cover the entire period during which an application for EOS or COS is pending; this extension is valid for the 3-year and the 10-year bars. For a more detailed description of this extension and guidance concerning whether unlawful presence accrues after the 120-day period specified by the statute, please *see* section 3(C) below.

### (3) **Aliens Present in Unlawful Status Who Do not Accrue Unlawful Presence by Virtue of USCIS Policy for Purposes of Sections 212(a)(9)(B) and (C)(i)(I) of the Act**

As noted in section (a)(2) of this *AFM* chapter, there are some circumstances in which an alien whose status is actually unlawful is, nevertheless, protected from the accrual of unlawful presence.  As a matter of policy, USCIS has determined that an alien whose status is actually unlawful does not accrue unlawful presence in the situations described in this subsection. These exceptions are based on policy, unlike the statutory exceptions listed in sections 212(a)(9)(B)(iii) and (iv) of the Act that were discussed in section (b)(2) of this *AFM* chapter. It is USCIS' policy that these exceptions apply to unlawful presence accrued for purposes of sections 212(a)(9)(B) and (C)(i)(I) of the Act unless otherwise noted in this section.

### (A) **Aliens with Properly Filed Pending Applications for Adjustment of Status or Registry (Sections 209, 245, and 245(i) of the Act, sections 202 of Public Law 99-603 (Cuban-Haitian Adjustment), section 202(b) of NACARA, section 902 of HRIFA, and aliens with properly filed, pending Registry applications under section 249 of the Act)**.  Accrual of unlawful presence stops on the date the application is properly filed pursuant to 8 CFR 103 and the regulatory filing requirements governing the particular type of benefit sought. Note that, if the application is properly filed according to the regulatory requirements, the applicant will not accrue unlawful presence, even if it is ultimately determined that the applicant was not eligible for the benefit in the first place. The accrual of unlawful presence is tolled until the application is denied.

      **Example**: An alien, who has been unlawfully in the United States for 90 days, and who had worked without authorization during the 90 days, applies for adjustment of status based on an approved I-130, Petition for Alien Relative. The

application for adjustment of status is properly filed, that is, the application is fully executed, signed, and the applicant pays the proper fee. *See* 8 CFR 103.2(a)(7). Also, with the application package, the alien provides a copy of Form I-797, Notice of Approval for the Alien Relative Petition, and a copy of the newest Visa Bulletin, demonstrating that a visa number is immediately available in his or her preference category. *See* 8 CFR 245.2. Therefore, USCIS accepts the application and stamps it as received and properly filed as of January 1, 2007. What is not readily apparent from the initial review of the application is that the alien had previously worked without authorization, and therefore, he or she is not eligible to apply for adjustment of status pursuant to section 245(c) of the Act. However, because the application was accepted by USCIS as (technically) properly filed, the applicant is now in authorized stay and does not accrue any unlawful presence during the pendency of the properly filed application for adjustment of status.

At the time of the interview, on April 1, 2007, the applicant's adjustment of status application is denied based on section 245(c) of the Act, for having been employed without authorization. On April 2, 2007, the alien's accrual of unlawful presence resumes because he or she no longer has a pending application for adjustment of status. The alien departs the United States on May 1, 2007, after having secured an immigrant visa interview at the US Embassy/consular section in his or her home country. In assessing the alien's inadmissibility under section 212(a)(9) of the Act, the consular officer will count the alien's 90 days of unlawful presence that accrued prior to the filing of the adjustment of status application, and the 30 days of unlawful presence that accrued after the adjustment of status application was denied. However, the consular officer will not count the time period during which the adjustment of status application was pending because the individual was in a period of stay authorized and did not accrue unlawful presence during the pendency of the adjustment application. In total, the alien had accrued 120 days of unlawful presence in the United States; the alien is not inadmissible under section 212(a)(9)(B) of the Act.

Except in the case of a NACARA or HRIFA application, the application must have been filed affirmatively (with USCIS) rather than defensively (before the immigration judge as a form of relief from removal) for it to toll the accrual of unlawful presence; that is, an alien, who files an application for adjustment of status after being served with a Notice to Appear (NTA) in removal proceedings, is not protected from the accrual of unlawful presence. Accrual of unlawful presence resumes the day after the application is denied. However, if the application that was filed with USCIS is denied, and the alien has a legal basis upon which to renew the application in proceedings before an immigration judge, the protection against the accrual of unlawful presence will continue through the administrative appeal. *See* for example for adjustment of status applications under section 245 of the Act: 8 CFR 245.2(a)(5)(ii) and 8 CFR 1245.2(a)(5)(ii).

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 35

**(B) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS)("Tolling")**. As noted in 40.9.2(b)(2)(G) of this AFM chapter, by statute, an alien does not accrue unlawful presence for up to 120 days while a non-frivolous EOS or COS application is pending, provided that the alien does not work and/or has not worked unlawfully. This is referred to as "tolling:" while the application is pending after having been properly filed, the alien will not accrue unlawful presence. The above described statutory exception applies to section 212(a)(9)(B)(i)(I) of the Act; it does not apply to section 212(a)(9)(B)(i)(II) or (C)(i)(I) of the Act.

However, according to USCIS policy, an alien does not accrue unlawful presence (the accrual of unlawful presence is tolled), and is considered in a period of stay authorized for purposes of sections 212(a)(9)(B)(i)(I), (B)(i)(II), and (C)(i)(I) of the Act during the entire period a properly filed EOS or COS application is pending, if the EOS or COS application meets the following requirements:

- the non-frivolous request for EOS or COS was filed timely. To be considered timely, the application must have been filed with USCIS, i.e. be physically received (unless specified otherwise, such as mailing or posting date) before the previously authorized stay expired. *See* 8 CFR 103.2(a)(7); 8 CFR 214.1(c)(4); 8 CFR 248.1(b). An untimely request may be excused in USCIS' discretion pursuant to 8 CFR 214.1(c)(4) and 8 CFR 248.1(b);  and
- the alien did not work without authorization before the application for EOS or COS was filed or while the application is pending; and
- the alien has not failed to maintain his or her status prior to the filing of the request for EOS or COS.

  If these requirements are met, the period of authorized stay covers the 120-day tolling period described in section 212(a)(9)(B)(iv) of the Act and extends to the date a decision is issued on the request for EOS or COS.

  A request for EOS or COS may be filed on Form I-539, Application to Extend/Change Nonimmigrant Status, or may be included in the filing of Form I-129, Petition for a Nonimmigrant Worker.

Please *see* Section 40.9.2(b)(2)(G) of this *AFM* chapter for a detailed description of the statutory tolling provision under section 212(a)(9)(B)(iv) of the Act, covering *only* inadmissibility under section 212(a)(9)(B)(i)(I) of the Act.

**(C) Nonimmigrants with Pending Requests for Extension of Status (EOS) or Change of Status (COS) Who Depart the United States During the Pendency**. Departure from the United States while a request for EOS or COS is pending, does not subject an alien to the 3-year, 10-year, or permanent bar, if he or she departs after the expiration of Form I-94, Arrival/Departure Record unless the application was frivolous,

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 36

untimely, or the individual had worked without authorization. D/S nonimmigrants, who depart the United States while an application for COS or EOS is pending, generally do not trigger the 3-year, 10-year, or permanent bar under sections 212(a)(9)(B)(i) or 212(a)(9)(C)(i)(I) of the Act.

- Evidentiary Considerations: If the applicant subsequently applies for a nonimmigrant visa abroad, the individual has to establish to the satisfaction of the consular officer that the application was timely filed and not frivolous. The requirement that the application was timely may be established through the submission of evidence of the date the previously authorized stay expired, together with a copy of a dated filing receipt, a canceled check payable to USCIS for the EOS or COS application, or other credible evidence of a timely filing.

- Determination by a Consular Officer that the Application Was Non-Frivolous: To be considered non-frivolous, the application must have an arguable basis in law and fact, and must not have been filed for an improper purpose (such as to prolong one's stay to pursue activities inconsistent with one's status). In determining whether an EOS or COS application was non-frivolous, DOS has instructed consular posts that it is not necessary to make a determination that USCIS would have ultimately ruled in favor of the alien. *See* 9 Foreign Affairs Manual (*FAM*) 40.92 Notes, Note 5c.

**(D) Nonimmigrants - Effect of a Decision on the Request for Extension of Status (EOS) or Change of Status (COS) on Unlawful Presence**.  The following information pertains to applications requesting EOS or COS, or petitions that include requests for EOS or COS.

(i) Approved Requests. If a request for EOS or COS is approved, the alien will be granted a new period of authorized stay, retroactive to the date the previous period of authorized stay expired. This applies to aliens admitted until a specific date and aliens admitted for D/S.

(ii) Denials Based on Frivolous Filings or Unauthorized Employment. If a request for EOS or COS is denied because it was frivolous or because the alien engaged in unauthorized employment, any and all time after the expiration date marked on Form I-94, Arrival/Departure Record, will be considered unlawful presence time, if the alien was admitted until a specific date. However, if the alien was admitted for D/S, unlawful presence begins to accrue on the date the request is denied.

(iii) Denials of Untimely Applications. If a request for EOS or COS is denied because it was not timely filed, unlawful presence begins to accrue on the date Form I-94 expired. If, however, the alien was admitted for D/S, unlawful presence begins to accrue the day after the request is denied.

(iv) <u>Denials for Cause of Timely Filed, Non-Frivolous Applications for EOS or COS</u>. If a timely filed, non-frivolous request for EOS or COS is denied for cause, unlawful presence begins to accrue the day after the request is denied.

(v) <u>Motion to Reopen/Reconsider</u>. The filing of a motion to reopen or reconsider does not stop the accrual of unlawful presence. *See* 8 CFR 103.5(a)(iv) (Effect of motion or subsequent application or petition). However, if the motion is successful and the benefit granted, the grant is effective retroactively. The alien will be deemed to not have accrued unlawful presence. If DHS reopens proceedings, but ultimately denies the petition or application again, the petition or application will be considered to have been pending since the initial filing date. Thus, unlawful presence will accrue as specified in paragraphs (ii), (iii) or (iv). In the case of a timely, non-frivolous application, unlawful presence will accrue from the date of the last denial of the petition or application, not from the earlier, reopened decision.

(vi) <u>Appeal to the Administrative Appeals Office (AAO) of the Underlying Petition Upon Which an EOS or COS Is Based</u>. If an individual applies for an EOS or COS as part of an I-129, Petition for Nonimmigrant Worker, the adjudicator has to adjudicate two requests: The petition seeking a particular classification, and the request for an EOS or COS.

The denial of an EOS or COS cannot be appealed. *See* 8 CFR 214.1(c)(5) and 248.3(g). However, the denial of the underlying petition for the status classification can, in general, be appealed. The filing of an appeal to the AAO for the denial of the underlying petition, however, has no influence on the accrual of unlawful presence. Unlawful presence starts to accrue on the day of the denial of the request for EOS or COS regardless of whether the applicant or the petitioner appeals the denial of the petition to the AAO. However, if the denial of the underlying petition is reversed on appeal, and the EOS or COS subsequently granted, the individual is not deemed to have accrued any unlawful presence between the denial of the petition and request for EOS or COS, and the subsequent grant of the EOS or COS.

(vii) <u>Nonimmigrants - Multiple Requests for EOS Or COS ("Bridge Filings") and Its Effect on Unlawful Presence</u>.  The terms "authorized status" (authorized period of admission or lawful status) and "period of stay authorized by the Secretary of Homeland Security" are not interchangeable. They do not carry the same legal implications. *See* Section (a)(2) of this *AFM* chapter. An alien may be in a period of stay authorized by the Secretary of Homeland Security but not in an authorized status.

An alien whose authorized status expires while a timely filed request for EOS or COS is pending, is in a period of stay authorized by the Secretary of Homeland Security. The alien does not accrue unlawful presence as long as the timely filed request is pending. However, the filing of a request for EOS or COS does not put an individual into valid

and authorized nonimmigrant status, i.e. he or she is not in authorized status. Therefore, if an individual has filed an initial application for EOS or COS and subsequently files additional (untimely) requests for EOS or COS, the subsequently filed request will not stop the individual from accruing unlawful presence, if the initial request is denied.

(E) **Aliens with Pending Legalization Applications, Special Agricultural Worker (SAW) Applications, and LIFE Legalization Applications**.  An alien who properly filed an application under section 245A of the Act (including an applicant for Legalization under any Legalization-related Class Settlement Agreements), section 210 of the Act, or section 1104 of the LIFE Act, is in a period of authorized stay as long as the application remains pending. Accrual of unlawful presence stops on the date the application is filed and resumes the day after the application is denied. However, if the denial is appealed, the period of authorized stay continues through the administrative appeals process. Denied applications cannot be renewed before an immigration judge. Therefore, the period of authorized stay does not continue through removal proceedings or while a petition for review is pending in Federal court.

(F) **Aliens granted Family Unity Program Benefits under section 1504 of the LIFE Act Amendments of 2000**
Section 212(a)(9)(B)(III)(iii) of the Act, by its terms, applies only to Family Unity Program (FUP) benefits under section 301 of the Immigration Act of 1990.  Congress provided similar benefits under section 1504 of the LIFE Act Amendments of 2000.  As a matter of policy, USCIS treats section 1504 FUP cases the same as section 301 FUP cases, for purposes of the accrual of unlawful presence.

As with section 301 FUP cases, if the Form I-817 is approved, then the alien will be deemed not to accrue unlawful presence from the Form I-817 filing date throughout the period of the FUP grant.

A grant of FUP benefits under section 1504 does not, however, erase any unlawful presence accrued before the grant of FUP benefits under section 1504 of the LIFE Act Amendments of 2000.

Also, as with section 301 FUP cases, the filing of Form I-817, by itself, does not stop the accrual of unlawful presence.  If the Form I-817 is denied, the individual will continue to accrue unlawful presence as if no Form I-817 had been filed.

(G) **Aliens with Pending Applications for Temporary Protected Status (TPS) pursuant to Section 244 of the Act**. The period of authorized stay begins on the date a prima facie application for TPS is filed, provided the application is ultimately approved. If the application is approved, the period of authorized stay continues until TPS status is terminated. If the application is denied, or if prima facie eligibility is not established, unlawful presence accrues as of the date the alien's previous period of authorized stay

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 39

expired. The application for TPS can be renewed in removal proceedings pursuant to 8 CFR 244.11 and 8 CFR 1244.11, and the period of authorized stay continues through removal proceedings.

## (H) **Aliens Granted Voluntary Departure pursuant to Section 240B of the Act**

Voluntary departure is a discretionary relief that allows certain favored aliens to leave the country willingly. Voluntary departure can either be granted by DHS, by the immigration judge, or the Board of Immigration Appeals (BIA). The length of the voluntary departure period that can be granted depends on the stages of proceedings the alien is in. If the alien is not in removal proceedings, DHS can grant voluntary departure for up to 120 days. *See* section 240B(a) and 8 CFR 240.25. The denial of voluntary departure at this stage, cannot be appealed; however, the denial is without prejudice to the alien for a later application of voluntary departure in removal proceedings. See 8 CFR 240.25(e).

If the alien is in removal proceedings but these proceedings are not yet completed, or if the alien's proceedings are at the conclusion, the immigration judge or the judge at the BIA, may grant voluntary departure. *See* section 240B(a) or (b) of the Act; 8 CFR 1240.26. If the IJ denies voluntary departure, the denial can be appealed to the BIA. 8 CFR 1240.26(g). The time period granted can be up to 120 days if granted prior to completion, or up to 60 days if granted at the conclusion of proceedings. See 8 CFR 1240.26(e). Under certain circumstances, the voluntary departure period can be extended, or voluntary departure reinstated.  Voluntary departure is always granted in lieu of removal proceedings or a final order of removal. Therefore, if an alien timely departs according to the voluntary departure period, the alien is not subject to a final order of removal. However, if the alien fails to depart, and there was an alternate order of removal, the alternate order will be become effective upon the alien's failure to depart. *See* 8 CFR 1240.26(d).

On December 18, 2008, the Department of Justice amended the voluntary departure rule; the changes became effective on January 20, 2009 and apply prospectively only. 73 FR 76927 (December 18, 2008). The new rules clarified the relationship between voluntary departure and the filing of a motion to reopen/reconsider or petition for review. It also clarified the impact of the failure to post bond on voluntary departure and the alternate order of removal.

**General Rule for the Accrual of Unlawful Presence in Connection With A Grant of Voluntary Departure**: Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure.

(i) Voluntary Departure Granted by DHS pursuant to 8 CFR 240.25 (Including Extension of Voluntary Departure). If DHS grants voluntary departure before initiation of removal

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 40

proceedings, time spent in voluntary departure does not add to an alien's unlawful presence. A grant of voluntary departure prior to the initiation of removal proceedings may not exceed 120 days. *See* section 240B(a)(2) of the Act. Pursuant to 8 CFR 240.25, voluntary departure may be extended at the discretion of the Field Office Director, except that the total period allowed, including any extensions, may not exceed the 120-day limit. Courts may not extend voluntary departure but they may reinstate voluntary departure.

(ii) <u>Voluntary Departure Granted Pursuant to Section 240B of the Act after the Initiation of Removal Proceedings</u>. If a person is granted voluntary departure after commencement of removal proceedings, unlawful presence ceases to accrue with the grant, and resumes after the expiration of the voluntary departure period. Voluntary departure after the initiation of removal proceedings is governed by section 240B(b) of the Act and 8 CFR 1240.26.

If the immigration judge grants voluntary departure, the alien is not subject to the 3-year bar because of the wording of section 212(a)(9)(B)(i)(I) of the Act. However, the fact that proceedings commenced does not stop the accrual of unlawful presence time for purposes of the 10-year and the permanent bar. *See* 8 CFR 239.3.

(iii) <u>Reversal of a Denial of Voluntary Departure</u>. If the denial of voluntary departure by the Immigration Judge is reversed on appeal by the BIA, the time from the denial to the reversal will be considered authorized stay in the United States (Remember: A denial of voluntary departure by USCIS cannot be appealed.)

(iv) <u>Reinstatement of Voluntary Departure by the Board Of Immigration Appeals (BIA) or the Immigration Judge</u>. An immigration judge or the BIA may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure, and if reopening was granted prior to the expiration of the original period of voluntary departure. *See* 8 CFR 1240.26(h). In no event can the reinstatement of voluntary departure result in a total period of time, including any reinstatement, exceeding the 60 or the 120 days of voluntary departure stated in section 240B of the Act. If voluntary departure is reinstated by the BIA or by the immigration judge, the time from the expiration of the grant of voluntary departure to the grant of reinstatement is not considered authorized stay. However, the time of the reinstated voluntary departure to the ending period of this voluntary departure, is considered authorized stay. Reinstatement of voluntary departure is regulated at 8 CFR 1240.26(h).

(v) <u>Effect of a Petition for Review</u>. In a case involving a grant of voluntary departure before January 20, 2009, if a Federal court with jurisdiction to review the removal order stays the running of the voluntary departure period while the case is pending, the alien will continue to be considered to be under a grant of voluntary departure and will not accrue unlawful presence.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 41

For any EOIR grant of voluntary departure on or after January 20, 2009, however, the filing of a petition for review terminates a grant of voluntary departure and makes the alternate removal order immediately effective.  8 CFR 1240.26(i).  If the alien files a petition for review, therefore, the alien will no longer be protected from the accrual of unlawful presence based on the voluntary departure grant.  If the alien remains in the United States while the petition is pending, the accrual of unlawful presence will begin the day after the petition for review is filed.  This regulation, however, gives the alien 30 days after filing the petition for review in order to leave the United States voluntarily.  If the alien leaves within this 30-day period, the alien will continue to be protected from the accrual of unlawful presence up to the date of the alien's actual departure.

(vi) Voluntary Departure and the Filing of A Motion to Reopen To the Board of Immigration Appeals (BIA)
A motion to reopen is a form of procedural relief that asks the BIA to change its decision in light of newly discovered evidence or a change in circumstances since the hearing. *See Dada v. Mukasey*, 128 S.Ct. 2307, 2315 (2008). In general, a motion to reopen has to be filed within 90 days. *See* 240(c)(7) of the Act. Therefore, an alien granted voluntary departure for a period of up to 60 days is either faced with the choice of departing according to the voluntary departure order, or to make use of his or her statutory right to file the motion to reopen and to await the result of the adjudication of the motion.

In 2008, the Supreme Court addressed the issue and held that to safeguard the right to pursue a motion to reopen for voluntary departure recipients, the alien must be permitted to withdraw, unilaterally and without regards to the underlying merits of the motion to reopen, a voluntary departure request before expiration of the departure period. *See Dada v. Mukasey*, 128 S.Ct. 2307, 2320 (2008). As a result, the alien has the option either to abide by the terms and receive the agreed upon benefits of voluntary departure; or, alternatively, to forego those benefits and remain in the United States to pursue an administrative motion.

Therefore, if an alien was initially granted voluntary departure by the immigration judge or the Board of Immigration Appeals before January 20, 2009, but the alien later requests withdrawal of the voluntary departure order, the alien will commence to accrue unlawful presence at the time of the administratively final order of removal unless the alien is otherwise protected from the accrual of unlawful presence (such as the grant of a stay of removal by the BIA). The motion to reopen does not toll voluntary departure. If the alien requests a withdrawal of the voluntary departure order, the alien will accrue unlawful presence as if voluntary departure had never been granted even if the request for withdrawal is made, for example, on the last day of the voluntary departure period.

The *Dada* decision does not apply, however, to any EOIR grant of voluntary departure that is made on or after January 20, 2009.  Under 8 CFR 1240.26(b)(3)(iii), filing a

motion to reopen or reconsider during the voluntary departure period automatically terminates the grant of voluntary departure, and makes the alternative removal order effective immediately.  Thus, for a grant of voluntary departure on or after January 20, 2009, the alien will no longer be protected from the accrual of unlawful presence beginning the day after the date the alien files a motion to reopen or to reconsider.

(I) **Aliens Granted Stay of Removal**.  A stay of removal is an administrative or judicial remedy of temporary relief from removal. The grant of a stay of removal can be automatic or discretionary. *See* sections 240(b)(5) and 241(c)(2) of the Act; 8 CFR 241.6, 8 CFR 1241.6, 8 CFR 1003.6, and 8 CFR 1003.23(b)(1)(v). During a grant of stay of removal, DHS is prevented from executing any outstanding order of removal, deportation, or exclusion. Therefore, an alien granted stay of removal does not accrue unlawful presence during the period of the grant of stay of removal. A stay of removal does not erase any previously accrued unlawful presence.

If an individual is ordered removed in absentia pursuant to section 240(b)(5)(A) of the Act, and he or she challenges the order in a motion to rescind the in absentia order pursuant to section 240(b)(5)(C) of the Act, the alien's removal order will be stayed automatically until the motion is decided. *See* section 240(b)(5)(C) of the Act. The order will be stayed through a possible appeal to the Board of Immigration Appeals (BIA) or Federal court. *See Matter of Rivera-Claros*, 21 I&N Dec. 232 (BIA 1996). For purposes of section 212(a)(9)(B) and (C)(i)(I) of the Act, an individual, who filed a motion to rescind an in absentia order of removal pursuant to section 240(b)(5)(C) of the Act, will not accrue unlawful presence during the pendency of the motion, including any stages of appeal before the BIA or Federal court.

(J) **Aliens Granted Deferred Action**. A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority.  Deferred action is, in no way, an entitlement, and does not make the alien's status lawful. Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws. There is no specific authority for deferred action codified in law or regulation although certain types of benefits refer to a grant of deferred action.  For more information on Deferred Action, please *see* Detention and Removal Operations Policy and Procedure Manual (DROPPM), Chapter 20.8.

Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.

(K) **Aliens Granted Withholding of Removal under Section 241(b)(3) of the Act or Deportation under Former Section 243 of the Act**. Accrual of unlawful presence

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 43

stops on the date that withholding is granted and continuous through the period of the grant.

**(L) Aliens Granted Withholding of Removal or Deferral of Removal under the United Nations Convention Against Torture Pursuant to 8 CFR 208.16 and 8 CFR 208.17**.  Accrual of unlawful presence stops on the date that withholding or deferral is granted and continuous through the period of the grant.

**(M) Aliens Granted Deferred Enforced Departure (DED)**. The period of authorized stay begins on the date specified in the Executive Order or other Presidential directive and ends when DED is no longer in effect.

**(N) Aliens Granted Satisfactory Departure under 8 CFR 217.3**. Under 8 CFR 217.3(a), a Visa Waiver Program (VWP) alien, who obtains a grant of satisfactory departure from U.S. Immigration and Customs Enforcement, and who leaves during the satisfactory departure period, is deemed to not have violated his or her VWP admission. Thus, unlawful presence will not accrue during the satisfactory departure period, if the alien departs as required. If the alien remains in the United States after the expiration of the grant of satisfactory departure, unlawful presence will begin to accrue the day after the satisfactory departure period expires unless some other provision or policy determination protects the person from accrual of unlawful presence. *See* section (b) of this *AFM* chapter.

**(4) Effect of the Protection from the Accrual of Unlawful Presence on Previously Accrued Unlawful Presence: Protection from the Accrual of Unlawful Presence Does Not Cure Previously Accrued Unlawful Presence**
Unless stated otherwise, protection from the accrual of unlawful presence under any section of this *AFM* chapter does *not* cure any unlawful presence that the alien may have already accrued before the alien came to be protected.

> **Example**: An alien accrues 181 days of unlawful presence. He or she then applies for adjustment of status. Although the alien had accrued 181 days of unlawful presence before he or she applied for adjustment of status, the alien stops to accrue unlawful presence once the adjustment of status application is properly filed. However, the already accrued unlawful presence of 181 days continues to apply to the alien. If the alien departs after having obtained a grant of advance parole, the individual will be subject to the 3-year bar under section 212(a)(9)(B)(i)(I) of the Act.

**(5) Effect of Removal Proceedings on Unlawful Presence**

**(A) Initiation of Removal Proceedings**. The initiation of removal proceeding has no effect, neither to the alien's benefit nor to the alien's detriment, on the accrual of unlawful presence. *See* 8 CFR 239.3. If the alien is already accruing unlawful presence

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 44

when removal proceedings are initiated, the alien will continue to accrue unlawful presence unless the alien is protected from the accrual of unlawful presence (as described in these *AFM* chapters). If the alien is not accruing unlawful presence when removal proceedings begin, the alien will continue to be protected from the accrual of unlawful presence until the immigration judge determines that the individual has violated his or her status, or until Form I-94, Arrival/Departure Record expires, whichever is earlier (and regardless of whether the decision is subsequently appealed).

> **Example 1**: An alien, who is present without inspection, is placed in proceedings. The alien was already accruing unlawful presence when placed in proceedings, and will continue to do so while in proceedings unless a provision described in this A*FM* chapter stops the accrual of unlawful presence.

> **Example 2**: An alien, admitted as an LPR, is placed in removal proceedings because of a criminal conviction. As an LPR, the alien does not accrue unlawful presence. The alien will not begin to do so unless the alien becomes subject to a final order of removal, that is, when LPR status is terminated.

> **Example 3**: An alien, admitted as a nonimmigrant for duration of status, is placed in removal proceedings. The alien does not accrue unlawful presence while the proceedings are pending. If the immigration judge rules in the alien's favor on the removal charge, no unlawful presence applies to the alien. If the immigration judge sustains the removal charge, unlawful presence begins to accrue the day after the immigration judge's decision becomes administratively final.

> **Example 4**: An alien is admitted as a nonimmigrant until January 10, 2011. On March 15, 2009, DHS places the alien in removal proceedings, claiming that the alien had violated a condition of admission. On May 1, 2010, the immigration judge sustains the removal charge, and the alien appeals. The Board of Immigration Appeals affirms the decision. Once the removal order becomes administratively final, the alien will accrue unlawful presence from May 2, 2010, the day after the immigration judge's order.

> **Example 5**: An alien is admitted as a nonimmigrant until January 10, 2011. On March 15, 2009, DHS places the alien in removal proceedings, claiming that the alien had violated a condition of admission. On May 1, 2010, the immigration judge rules in the alien's favor and dismisses the removal charge. The alien will not be deemed to have accrued any unlawful presence.

> **Example 6**: An alien in unlawful status properly files with USCIS an adjustment of status application. USCIS denies the application and places the alien in proceedings. The alien renews the application before the Immigration Judge. Because the alien is renewing an affirmative application that had stopped the

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 45

accrual of unlawful presence, the alien does not accrue unlawful presence while the adjustment application is pending before the IJ.

**Example 7**:  An alien whose nonimmigrant admission ended on November 6, 2008, is placed in removal proceedings.  On February 6, 2009, the alien files an adjustment application with the immigration judge.  The alien had never filed with USCIS.  Because the application is not the "renewal" of an affirmative application, filing the application with the immigration judge does not stop the accrual of unlawful presence.

**Example 8**:  Same facts as in Example 7, except that the alien's application is under NACARA or HRIFA.  In this situation, filing the application *does* stop the accrual of unlawful presence.

**Example 9**: An alien is admitted as a nonimmigrant until January 10, 2011. On March 15, 2009, DHS places the alien in removal proceedings, claiming that the alien had violated a condition of admission. Removal proceedings are still pending on January 11, 2011. Regardless of the outcome of the proceedings, the alien will accrue unlawful presence the day after the I-94 expires, that is, on January 11, 2011.

The result in Example 9 is consistent with *Matter of Halabi,* 15 I&N Dec.105 (BIA 1974), where the Board of Immigration Appeals (BIA) held that the expiration of the alien's authorized period of stay rendered the alien subject to removal without the need to resolve the original charge listed in the Notice to Appear (in *Halabi*, the individual was originally charged with having violated his status). The BIA indicated that being able to charge the alien as a visa overstay from the date the alien's period of authorized stay expired, although while in removal proceedings, did not "punish" the alien for contesting the original removal charge.  *See Halabi*, at 106; *see also Reno v. American-Arab Anti-Discrimination Committee,* 525 U.S. 471, 491 (1999) (Removal of an alien, who has remained longer than authorized, is not punishment but simply a matter of the alien's "being held to the terms under which he was admitted."); *cf. Westover v. Reno,* 202 F.3d 475 (1st Cir. 2000) (dicta), and *Halabi* at 107-08 (Roberts, Board Chair, dissenting). The alien may avoid any accrual of unlawful presence, for example, by offering to settle the removal proceeding by agreeing to leave the United States no later than the date his or her status expires in return for dismissal of the charge of having violated his or her status before that date. *See* 8 CFR 239.2(a)(4) (notice to appear may be cancelled, if alien has left the United States). Leaving at the expiration of the period of authorized stay and the resulting dismissal of removal proceedings would also avoid the risk of a ruling against the alien on the original charge of having violated his or her status before it expired.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 46

(B) **Effect of Filing an Appeal or Petition for Review on Unlawful Presence**. As noted, the initiation of removal proceedings does not affect the accrual of unlawful presence. *See* 8 CFR 239.3. Thus, the fact that an alien or DHS files an appeal to the Board of Immigration Appeals (BIA) or seeks judicial review of a removal order or the relief granted, does *not* affect the alien's position in relation to the accrual of unlawful presence. If the Board or a Federal court vacates the removal order, however, the alien will not be deemed to have accrued unlawful presence solely on the basis of the vacated removal order. If the Board or the Federal court affirms the removal order, the alien will be deemed to have accrued unlawful presence from the date of the immigration judge's order, unless the alien was already accruing unlawful presence on that date.

(6) **Effect of an Order of Supervision pursuant to 8 CFR 241.5 on Unlawful Presence**
Unless protected by some other provision included in this *AFM* chapter, an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision under 8 CFR 241.5.

**(c) Relief from Inadmissibility under Section 212(a)(9)(B)(i)(I) and (II), and Section 212(a)(9)(C)(i)(I) of the Act**

(1) **Waiver of the 3-Year Bar or the 10-Year Bar under Section 212(a)(9)(B)(i) of the Act**

(A) **Nonimmigrants**. If a nonimmigrant is inadmissible, the nonimmigrant may apply for advance permission to enter as a nonimmigrant despite his or her inadmissibility pursuant to section 212(d)(3) of the Act, which is granted in the discretion of the Secretary of Homeland Security. If the alien is an applicant for a nonimmigrant visa at the American consulate, the alien will have to apply for this type of temporary permission through the consulate. The application is adjudicated by the United States Customs and Border Protection (CBP), Admissibility Review Office (ARO) pursuant to section 212(d)(3)(A)(i) of the Act. If the alien is an applicant at the U.S. border for admission because he or she is not required to apply for a visa (other than visa waiver applicants), the application is filed with a CBP designated port of entry or designated Preclearance office. See section 212(d)(3)(A)(ii) and 8 CFR 212.4.

If the nonimmigrant status applicant is an applicant for T or U visa status, the applicant has to file Form I-192 with USCIS at the Vermont Service Center (VSC).

(B) **Immigrants and Adjustment of Status Applicants Who Are the Spouses, Sons, or Daughters of U.S. Citizens or LPRs, and Fiancé(e)s of U.S. Citizens**. DHS has discretion to waive an alien's inadmissibility under section 212(a)(9)(B) of the Act if the alien is applying for an immigrant visa or adjustment of status and the alien is the spouse, son, or daughter of a U.S. citizen or LPR, or the fiancé(e) of a U.S. citizen (in

AR2022_301004

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 47

relation to a K-1/K-2 visa). The alien must establish that denying the alien's admission to the United States, or removing the alien from the United States would result in extreme hardship to the alien's U.S. citizen or LPR spouse, parent, or the K visa petitioner. *See* section 212(a)(9)(B)(v) of the Act; *see* 8 CFR 212.7(a). The application is filed on Form I-601, Application for Waiver of Grounds of Inadmissibility, with the respective fee as stated in 8 CFR 103.7(b). There is no judicial review available, if the waiver is denied but the denial can be appealed to the Administrative Appeals Office of USCIS pursuant to 8 CFR 103.

If the alien seeks a waiver in relation to an application for a K-1 or K-2 visa, approval of the waiver is conditioned on the K-1's marrying the citizen who filed the K nonimmigrant visa petition within the statutory time of three (3) months from the day of the K-1 nonimmigrant's admission. The reason for this condition is that, at the time of the issuance of the K-1 or K-2 nonimmigrant visa, the K-1 and K-2 nonimmigrants are not yet legally related to the petitioner in the manner required by section 212(a)(9)(B)(v) of the Act. If the K-1 nonimmigrant does not marry the petitioner, and the K-1 and K-2 nonimmigrants do not acquire LPR status on that basis, USCIS may ultimately deny the Form I-601.

There is no waiver available to an alien parent if only his or her U.S. citizen or LPR child experiences extreme hardship on account of the mother's or father's removal.

(C) **Asylees and Refugees Seeking Adjustment of Status**. Section 212(a)(9)(B) grounds of inadmissibility can be waived for Asylees and Refugees seeking adjustment of status pursuant to section 209(c) of the Act. Such aliens must file Form I-602, Application by Refugee For Waiver of Grounds of Excludability. Under current USCIS policy, it is within the adjudicator's discretion to determine whether the waiver can be granted without requiring the filing of Form I-602. *See AFM* chapter 41.6; October 31, 2005, Domestic Operations memorandum – *Re: Waiver under Section 209(c) of the Immigration and Nationality Act (AFM* Update 05-33*).*

Normally, waiver applications for refugees are handled overseas before a person is approved for refugee classification. *See* 8 CFR 207.3(b). However, if a ground of inadmissibility arose after the alien's approval for refugee classification, or if the ground was not known to the officer who made such approval, the waiver may be sought and adjudicated as part of the refugee adjustment process. *See AFM* Chapter 23.6 (Asylee and Refugee Adjustment).

(D) **TPS Applicants**. Section 212(a)(9)(B) of the Act may be waived for humanitarian purposes, to assure family unity, or when it would be in the public interest to grant the waiver. The waiver is filed on Form I-601, Application for Waiver of Grounds of Inadmissibility. *See* section 244 of the Act; 8 CFR 244.3.

AR2022_301005

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 48

Granting a waiver to a TPS applicant for purposes of the TPS application does not waive any grounds of inadmissibility in connection with a subsequent application for adjustment of status, although both are filed on Form I-601. This is because the standard for adjustment of status applicants to have a ground of inadmissibility waived is generally an "extreme hardship"- standard for section 212(a)(9)(B) of the Act (3-year and 10-year bars), and not the lesser standard for TPS, i.e. the standard that the waiver may be granted for "humanitarian purposes, to assure family unity, or public interest."

Therefore, if an adjustment of status applicant, who was previously granted TPS status, presents an approved Form I-601 to the adjudicator, the adjudicator should not accept this approved Form I-601 as evidence that the alien is not inadmissible under section 212(a)(9)(B) of the Act for purposes of the adjustment of status application.  Rather, the adjudicator should direct the applicant to file a new Form I-601 to overcome the specific grounds of inadmissibility for adjustment of status purposes.

(E) **Legalization under Section 245A of the Act and Any Legalization-related Class Settlement Agreements, and Legalization Applicants pursuant to 8 CFR 245a.2(k) and 8 CFR 245a.18**. The waiver can be granted for humanitarian purposes, to ensure family unity, or when the granting of such a waiver is otherwise in the public interest. The waiver is filed on Form I-690, Application for Waiver of Grounds of Inadmissibility pursuant to Section 245A or 210 of the Immigration and Naturalization Act.

(2) **Waiver of the Permanent Bar under Section 212(a)(9)(C)(i)(I) of the Act**
Generally, there is no "waiver" of inadmissibility under section 212(a)(9)(C)(i)(I) of the Act.  Rather, an alien who is inadmissible under section 212(a)(9)(C)(i) of the Act must, generally, obtain consent to reapply for admission under section 212(a)(9)(C)(ii) of the Act. *See AFM* chapter 43 concerning Consent to Reapply, which is sought by filing Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal.

As stated by the Board of Immigration Appeals (BIA) in *Matter of Torres-Garcia,* 23 I&N Dec. 866 (BIA 2006), the consent to reapply regulation at 8 CFR 212.2 predates the enactment of section 212(a)(9)(C) of the Act and the related consent to reapply provision in section 212(a)(9)(A)(iii) of the Act. Thus, although the *filing procedures* in 8 CFR 212.2 are still in effect, the substantive requirements of the provisions in section 212(a)(9) of the Act govern during the adjudication of Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation and Removal; a USCIS adjudicator must consider the specific requirements of section 212(a)(9)(C)(ii) of the Act when adjudicating Form I-212. A Form I-212 cannot be approved for an alien who is inadmissible under section 212(a)(9)(C)(i) of the Act unless the alien has been abroad for at least 10 years.  *Matter of Torres-Garcia, supra*.  This rule applies in the 9th Circuit as well as in other circuits.  *Gonzales v. Department of Homeland Security,* 508 F.3d 1227 (9th Cir. 2007).

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 49

There are, however, some waivers that are also available to certain categories of aliens, who are inadmissible under section 212(a)(9)(C)(i)(I) of the Act.  If an alien is eligible for one of these waivers, and the waiver is granted, it is not necessary for the alien to obtain approval of a Form I-212.

(A) **HRIFA and NACARA Applicants**. A waiver can be granted at the discretion of USCIS. The waiver is sought by filing Form I-601, Application for Waiver of Grounds of Inadmissibility. *See* 8 CFR 245.13(c)(2) and 8 CFR 245.15(e)(3). However, the standard that applies to the adjudication is the same standard as if the alien had filed Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal. *See* February 14, 2001 Office of Field Operations Memorandum, *Changes to Section 202 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), and the Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), based Upon the Provisions of and Amendments to the Legal Immigration Family Equity Act (LIFE).*

(B) **Legalization, SAW, LIFE Act Legalization, and Legalization Class Settlement Agreement Applicants**. A waiver can be granted to such an applicant, if the applicant establishes that a waiver should be granted based on humanitarian reasons, to ensure family unity, or because granting the waiver would be in the public interest. The waiver is filed on Form I-690, Application for Waiver of Grounds of Excludability under Section 245A or 210 of the Act. *See* 8 CFR 210.3(e), 8 CFR 245a.2(k), and 8 CFR 245a.18(c).

(C) **TPS Applicants**. TPS applicants may obtain waivers for certain grounds of inadmissibility, including inadmissibility under section 212(a)(9)(C) of the Act. *See* section 244(c)(2) of the Act. The permanent bar may be waived for humanitarian purposes, to assure family unity, or when the granting of the waiver is in the public interest. *See* 8 CFR 244.3. The waiver is filed on Form I-601, Application for Waiver of Grounds of Inadmissibility. *See id.*

Granting a waiver to an applicant for purposes of the TPS application does not waive any grounds of inadmissibility in connection with a subsequent application for adjustment of status, although both are filed on Form I-601. This is because the standard for adjustment of status applicants to have waived inadmissibility is different from the one used for TPS applicants. In order to overcome the permanent bar to admissibility under section 212(a)(9)(C)(i)(I) of the Act, an applicant for an immigrant visa has to file Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal, rather than Form I-601, and no earlier than ten (10) years after the alien's last departure. *See* section 212(a)(9)(C)(ii) of the Act.

Therefore, if an adjustment of status applicant, who was previously granted TPS status, presents an approved Form I-601 to the adjudicator, the adjudicator should not accept this approved Form I-601 as evidence that the person is not inadmissible under section 212(a)(9)(C)(i)(I) of the Act for purposes of the adjustment of status application.  Any

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 50

Form I-212 that is filed by a TPS applicant would be adjudicated according to same principles that apply generally to aliens who are inadmissible under section 212(a)(9)(C)(i)(I) of the Act, including the requirement that the alien may not obtain consent to reapply under section 212(a)(9)(C)(ii) unless the alien satisfies the 10-year absence requirement in the statute.

(D) **Certain Battered Spouses, Parents, and Children**. An approved VAWA self-petitioner and his or her child(ren) can apply for a waiver from inadmissibility under section 212(a)(9)(C)(i) of the Act, if he or she can establish a "connection" between the abuse suffered, the unlawful presence and departure, or his or her removal, and the alien's subsequent unlawful entry/entries or attempted reentry/reentries. *See* section 212(a)(9)(C)(iii) of the Act. The waiver is filed on Form I-601, Application for Waiver of Grounds of Inadmissibility, with fee. If the waiver is granted, the ground of inadmissibility and any relating unlawful presence is deemed to be erased for purposes of any future immigration benefits applications.

(E) **Asylee and Refugee Adjustment Applicants under Section 209(c) of the Act**. Asylee and Refugee applicants for adjustment of status may obtain a waiver of inadmissibility in lieu of consent to reapply. The waiver is filed on Form I-602, Application by Refugee for Waiver of Grounds of Excludability. *See* 8 CFR 209.1 and 8 CFR 209.2(b); see also AFM chapter 41.6. Under current USCIS policy, it is within the adjudicator's discretion to determine whether the waiver can be granted without requiring the filing of Form I-602. See *AFM* chapter 41.6; October 31, 2005, Domestic Operations memorandum – *Re: Waiver under Section 209(c) of the Immigration and Nationality Act (AFM* Update 05-33).

Normally, waiver applications for refugees are handled overseas before a person is approved for refugee classification. *See* 8 CFR 207.3. However, if a ground of inadmissibility arose after the alien's approval for refugee classification, or if the ground was not known to the officer who made such approval, the waiver may be sought and adjudicated as part of the refugee adjustment process. *See AFM* chapter 23.6 (Asylee and Refugee Adjustment).

Note that the 10-year waiting period normally imposed on applicants for consent to reapply under this ground of inadmissibility (*see* section 212(a)(9)(C)(ii) of the Act) does not apply to refugee and asylee adjustment applicants.

(F) **Nonimmigrants.** An alien who is inadmissible under section 212(a)(9)(C)(i)(I) may, as a matter of discretion, be admitted as a nonimmigrant under section 212(d)(3) of the Act. The alien may make the application when applying for the nonimmigrant visa with the Department of State or, if eligible, file Form I-192 to seek this benefit. Obtaining relief under section 212(d)(3) does not relieve the alien of the need to obtain consent to reapply under section 212(a)(9)(C)(ii) of the Act if the alien seeks to acquire permanent residence.

Unlawful Presence, sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (*AFM* Update AD 08-03)
HQDOMO 70/21.1
Page 51

| AD 08-03 [Date signed] | Chapter 40.9.2 | This memorandum eliminates chapter 30.1(d) of the *Adjudicator's Field Manual* (*AFM*), and redesignates the section as chapter 40.9.2 |
|---|---|---|

## 4. <u>Use</u>

This memorandum is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

## 5. <u>Contact Information</u>

Operational questions regarding this memorandum may be directed to Roselyn Brown-Frei, Office of Policy and Strategy. Inquiries should be vetted through appropriate supervisory channels.

<u>**Distribution List**</u>:   Regional Office Directors
District Office Directors (Including Overseas District Office Directors)
Service Center Directors
Asylum Office Directors
Field Office Directors



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations (MS-2110)*
Washington, DC  20529

**U.S. Citizenship and Immigration Services**

June 15, 2009

# Memorandum

TO:       Field Leadership

FROM:     Donald Neufeld
          Acting Associate Director, Office of Domestic Operations

SUBJECT:  Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children

## I. Purpose

This memorandum provides guidance to U.S. Citizenship and Immigration Services (USCIS) field offices and service centers regarding the processing of surviving spouses of deceased U.S. citizens and qualifying children of the surviving spouses.  It affords a new process by which they may apply for deferred action.  This policy guidance will be in effect until further notice and may be revised as needed.

## II. Background

Section 205.1(a)(3)(i)(C) of title 8 of the Code of Federal Regulations (8 CFR) requires that the approval of  Form I-130, *Petition for Alien Relative*, be automatically revoked upon the death of the petitioner if the beneficiary[1] has not adjusted status in the United States or been inspected and admitted as an immigrant.  In such instances, the beneficiary may request a reinstatement of the approval and USCIS, in its discretion, may grant such a request for humanitarian reasons.  8 CFR 205.1(a)(3)(i)(C)(2).

However, no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death and (1) the immigrant petition filed by the citizen on behalf of the surviving spouse has not been adjudicated by USCIS at the time of the citizen's death, or (2) no petition was filed by the citizen before the citizen's death.  This issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in the U.S. Congress (bills S. 815 and H.R. 1870).

---

[1] Depending on context, the term beneficiary in this guidance may include both actual and potential beneficiaries of Forms I-130 filed on their behalf.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 2

## III. Policy Guidance

This policy guidance covers only (1) surviving spouses of U.S. citizens who died before the second anniversary of the marriage, who have not remarried and were not legally separated from the citizen spouse at the time of the citizen's death, and who are residing in the United States,[2] and (2) such surviving spouses' qualifying children.  For purposes of this policy guidance, "qualifying children" are any children of the surviving spouse of the deceased U.S. citizen who remain unmarried and under 21 years of age (age determinations for beneficiaries of Forms I-130 should be made as provided in section 201(f) of the INA).

This guidance applies to the aforementioned beneficiaries without regard to their manner of entry into the United States.  Such surviving spouses are covered without restrictions on how long the U.S. citizen spouse has been deceased as long as the surviving spouse has not remarried.[3]

This guidance does not cover surviving spouses or qualifying children of deceased U.S. citizens who are residing outside the United States or surviving spouses and children of a lawful permanent resident or other non-U.S. citizen.  This guidance also does not cover surviving spouses or qualifying children of deceased U.S. citizens if the surviving spouse remarried at any time after the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).  This guidance does not cover any beneficiary who was legally separated from his or her U.S. citizen spouse at the time of the citizen's death, or such beneficiary's children.

Since current section 201(b)(2)(A)(i) of the Immigration and Nationality Act (INA) treats covered widow(er)s of U.S. citizens and their children as immediate relatives based upon a self-petition, they are not covered by this guidance.  They may file a Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, in accordance with the instructions on the Form.

In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens, USCIS is instituting the following policy guidance, which is effective immediately and until further notice.

## A. <u>Form I-130 Approved Prior to the Death of the U.S. Citizen Spouse (Petitioner)</u>

Upon the death of the U.S. citizen petitioner, the approved Form I-130 is automatically revoked pursuant to 8 CFR 205.1(a)(3)(i)(C).  The beneficiary, however, may request reinstatement of the revoked petition pursuant to 8 CFR 205.1(a)(3)(i)(C)(2).  USCIS may then exercise discretion and grant the reinstatement after considering the facts and humanitarian considerations of the particular

---

[2] Section III(A) of this memorandum, however, regarding humanitarian reinstatement, shall apply to surviving spouses outside the United States.

[3] This guidance is also applicable to a beneficiary who entered the United States on a K-1 Nonimmigrant Visa and married a U.S. citizen other than the U.S. citizen petitioner who filed the I-129F.  If the U.S. citizen spouse died before the second anniversary of the marriage, the widow(er) is eligible for deferred action or humanitarian reinstatement as described herein.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 3

case. If the request for humanitarian reinstatement is approved, the beneficiary may proceed to the adjustment of status or consular processing stage.

This memorandum does not alter the process for reviewing a Form I-130 returned to USCIS by a U.S. Consular Officer overseas when the beneficiary is seeking a humanitarian reinstatement. If USCIS reinstates the Form I-130 returned by the consular officer, the I-130 should be forwarded to the National Visa Center to allow the beneficiary to resume consular processing. Section III(A) of this guidance, relating to humanitarian reinstatement, applies to beneficiaries who are within or outside the United States.

If a beneficiary covered by this guidance requests humanitarian reinstatement, adjudicators should presume that humanitarian reasons support a grant of the request. Absent extraordinary factors or a failure to meet the regulatory requirements of 8 CFR 205.1(a)(3)(i)(C)(2), adjudicators should favorably exercise discretion accordingly. If the request for reinstatement cannot be granted for any reason other than confirmed or suspected fraud or issues of criminality or national security, the beneficiary should be informed that he or she may request deferred action in the manner described in III(E) below.

In a case governed by First, Sixth or Ninth Circuit law, officers should consult with local USCIS counsel before treating an approved spousal immediate relative petition as "revoked" under 8 CFR 205.1(a)(3)(i)(C). Courts in those jurisdictions have held that the visa petitioner's death does *not* end a surviving spouse's eligibility for classification as an immediate relative. Taing v. Napolitano, ____ F.3d ____, 2009 WL 1395836 (1st Cir. 2009); Lockhart v. Napolitano, 561 F.3d 611 (6th Cir. 2009); Freeman v. Gonzales, 444 F.3d 1031 (9th Cir. 2006).

**B.** **Form I-130 Pending at the Time of Death of the U.S. Citizen Spouse (Petitioner) – Married Less than 2 Years at Time of Death**

Once USCIS has received a copy of the U.S. citizen petitioner's death certificate, the pending, stand-alone Form I-130 should be held in abeyance at the pending location. Petitions may be transferred to the Vermont Service Center to be consolidated with the A-file housing a deferred action request, if such a request is made by the beneficiary (see further guidance below).

Any concurrently filed Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form I-130, should be held in abeyance at the National Benefits Center until further guidance. The beneficiary will remain eligible to receive the interim benefits of advance parole and employment authorization on the basis of the pending adjustment of status application.

If a Form I-485 was not concurrently filed, the beneficiary should be informed that he or she may request deferred action in the manner described in section III(E) below.

Note: In instances where the beneficiary and deceased U.S. citizen petitioner were married for at least two years at the time of the petitioner's death, the Form I-130 should be denied under existing

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 4

procedures.  Instructions should be provided to the beneficiary regarding the availability of the Form I-360 as a special immigrant widow/widower.  Any associated Form I-485 should also be denied.

**C.**  **Form I-130 Denied (Prior to the Issuance of this Guidance) due to the Death of the U.S. Citizen Spouse (Petitioner)**

A beneficiary who is the surviving spouse of a U.S. citizen petitioner and whose petition was denied by USCIS (1) due to the death of the U.S. citizen petitioner, and (2) prior to the issuance of this guidance, may request deferred action in the manner described in section III(E) below.

**D.**  **Form I-130 Not Filed Prior to the Death of the U.S. Citizen Spouse**

A beneficiary who was legally married to a now deceased U.S. citizen at the time of the U.S. citizen's death, but for whom no Form I-130 was filed, may request deferred action in the manner described in section III(E) below.

If the beneficiary was not legally married to, or was legally separated from, the deceased U.S. citizen at the time of the U.S. citizen's death, a qualifying relationship does not exist.  The beneficiary is therefore not eligible to submit Form I-360 based on the specific policy guidance set forth in section III(E) below.

**E.**  **Required Documentation for Requests for Deferred Action**

Beneficiaries may request deferred action by submitting the following:

1) A Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, with the appropriate, nonwaivable filing fee (currently $375), completed in the format explained below; and
2) All of the documents requested in the Form I-360 filing instructions for widow/widowers.

The beneficiary of the Form I-360 must check box "**m.  Other, explain:**" in Part 2 of the petition and cite the basis for eligibility as "**Deferred Action -- Surviving spouse of a deceased U.S. citizen, married less than 2 years**."  The Form I-360 must be submitted to the Vermont Service Center for deferred action consideration.  Note that while USCIS is utilizing Form I-360 for these deferred action requests, such filings are NOT immigrant self-petitions under current law.  They should be adjudicated as requests for deferred action only.  In addition to the Part 2 information described above, the applicant must complete Parts 1, 3, 4, 7, 9, 10 and 11 of the Form I-360.

**F.**  **Decision on Requests for Deferred Action**

Requests for deferred action based on the specific policy guidance set forth in this memorandum may only be considered for:  1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and 2) their qualifying children who are residing in the United States.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 5

The following persons are ineligible for deferred action: 1) beneficiaries whose visa petition was denied or revoked for any reason other than or in addition to the death of the petitioning U.S. citizen spouse; 2) widow(er)s who have remarried or were legally separated from the U.S. citizen spouse at the time of the U.S. citizen's death; and 3) beneficiaries with other serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons.   A grant of deferred action is a discretionary action on the part of USCIS.  It is intended that this discretion should be liberally applied to provide a humanitarian benefit to eligible beneficiaries.  However, deferred action may be denied for serious adverse factors, whether or not such factors are specifically identified in this guidance.

Requests for deferred action based on the specific policy guidance set forth in this memorandum will not be considered for beneficiaries who: 1) are surviving spouses or qualifying children of non-U.S. citizens; 2) are residing outside the United States; 3) meet the conditional marriage period set forth in INA 201(b)(2)(A)(i); or 4) have remarried subsequent to the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).

Once a decision on the request for deferred action has been made, the decision must be communicated to the beneficiary via a decision letter.  If the request has been granted, the deferred action grant letter must state that the beneficiary is eligible to file Form I-765, *Application for Employment Authorization*.  If the request has been denied, the deferred action denial letter must cite the reasons for the denial.  A decision on a request for deferred action falls within the discretion of the Secretary.  A denial of a request for deferred action is not subject to administrative appeal or judicial review, see INA § 242(a)(2)(B), and (g).

## G.  Validity Period for Deferred Action

The validity period of deferred action based on the policy guidance set forth in this memorandum is two (2) years from the date of grant of the Form I-360 request for deferred action.

## H.  Eligibility for Employment Authorization

The appropriate classification for Form I-765 filed on the basis of a deferred action grant is (C)(14) pursuant to 8 CFR 274a.12(c)(14).  Beneficiaries may submit Form I-765, with the appropriate filing fee (currently $340), using this classification at any time after the grant (but prior to the expiration) of deferred action.  However, they must demonstrate an economic necessity.  The validity period for an employment authorization document (EAD) under the classification (C)(14), based on the specific policy guidance set forth in this memorandum is two (2) years, not to exceed the expiration date of the grant of deferred action.

All requests for employment authorization based on the policy guidance set forth in this memorandum must contain the appropriate required supporting documentation.  Applicants must follow currently established filing procedures for the Form I-765 in accordance with the instructions on the form.  Fee waiver of the Form I-765 fee is available on a case-by-case basis for substantiated inability to pay as provided in 8 CFR 103.7(c)(1).

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 6

A beneficiary whose Form I-485 is being held in abeyance may also file a Form I-765, with the appropriate filing fee.  The appropriate classification for employment authorization filed on such a basis is (C)(9) pursuant to 8 CFR 274a.12(c)(9).  Evidence of an economic necessity is not required if using this classification.  A beneficiary whose application is being held in abeyance may have been issued an employment authorization document valid for one year under category (C)(9).  When such an applicant files a Form I-765 for renewal of his or her EAD under the classification (C)(9), based on the specific policy guidance set forth in this memorandum, the validity period will be **two (2) years**.  An applicant with a valid EAD under the classification (C)(9) may file for renewal no more than 90 days prior to the expiration date of the valid document.  The employment authorization may then be granted for two (2) years based on the specific policy guidance set forth in this memorandum.

### I.  Effect of Grant of Deferred Action

The grant of deferred action by USCIS does not confer or alter any immigration status.  It does not convey or imply any waivers of inadmissibility that may exist, regardless of whether that inadmissibility is known to DHS or other agencies at the time of the request for deferred action.  A grant of deferred action also does not eliminate any period of prior unlawful presence.  However, periods of time in deferred action do not count as unlawful presence for the purposes of sections 212(a)(9)(B) and (C) of the INA.  Any period of time in deferred action qualifies as a period of stay authorized by the Secretary of Homeland Security for those purposes.

### J.  Eligibility for Advance Parole

Beneficiaries granted deferred action based on the policy guidance set forth in this memorandum or whose applications for adjustment of status are being held in abeyance may request advance parole.  Such request may be made by filing Form I-131, *Application for Travel Document*, in accordance with the Form I-131 instructions and with the appropriate fee.  Note, however, that departure from the United States and return, even under a grant of advance parole, may adversely affect eligibility for adjustment of status of aliens with past periods of unlawful presence.

### K.  Implementation

USCIS offices and centers are to begin implementing the instructions established in this memorandum immediately.

### L.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 7

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**<u>Distribution</u>**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

AR2022_301016

U.S. Department of Homeland Security
20 Massachusetts Ave., NW
Washington. DC 20529



**U.S. Citizenship
and Immigration
Services**

HQDOMO 70/6.1.1-P
70/6.1.3-P
*AFM* Update AD10-09

# Interoffice Memorandum

To:     Executive Leadership

From:   Donald Neufeld
        Acting Associate Director
        Domestic Operations Directorate

        Lori Scialabba
        Associate Director
        Refugee, Asylum, and International Operations Directorate

        Pearl Chang
        Acting Chief
        Office of Policy and Strategy

Date:   DEC - 2 2009

SUBJECT:    Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and
            their Children (REVISED)

            Effect of FY2010 DHS Appropriations Act on eligibility to immigrate after death
            of visa petitioner

            Revisions to Adjudicator's Field Manual (AFM) Chapter(s) 21.2(a)(4) and
            (h)(1)(C)
            (AFM Update AD10-09)

## I. Purpose

This memorandum supersedes an earlier memorandum on this subject, dated November 13,
2009, and provides updated guidance to U.S. Citizenship and Immigration Services (USCIS)
field offices and service centers regarding the processing of Forms I-130, petitions for alien
relative, and I-485, application to register permanent residence or adjust status, filed by surviving
spouses of deceased U.S. citizens and the qualifying children of the surviving spouses.  This new
guidance is based on the enactment of section 568(c) of the Department of Homeland Security
Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009), which provides

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 2

relief for these aliens.  Section 568(c) entered into force on October 28, 2009, the date of
enactment.

Sections 568(d) and (e) of the FY2010 DHS Appropriations Act, which provide relief for aliens
who are surviving beneficiaries of certain pending or approved petitions filed by certain
qualifying categories of noncitizens, will be addressed in a separate memorandum.

## II.  Background

### A.  Prior Policy and Related Litigation

For many years, U.S. immigration policy has been that a Form I-130 could not be approved if the
petitioner died while the Form I-130 was pending.  *See Matter of Sano,* 19 I&N Dec. 299 (BIA
1985); *Matter of Varela,* 13 I&N Dec. 453 (BIA 1970).  As far back as 1938, our immigration
regulations have provided for the revocation of the approval of a visa petition upon the
petitioner's death.  More recently, the regulations, while maintaining that general policy, have
provided for discretion, for "humanitarian reasons," to reinstate the approval.  8 C.F.R. §
205.1(a)(3)(i)(C)(2).  Also, since 2006, 8 C.F.R. § 204.2(i)(1)(iv) and 205.1(a)(3)(i)(C)(1) have
provided that the automatic revocation provision does not apply to a spousal immediate relative
visa petition, if the deceased petitioner and the alien widow(er) had been married at least two
years when the petitioner died.

Over the past several years, widow(er)s of citizens who had died before the second anniversary
of the underlying marriages have challenged this long-standing policy as being inconsistent with
the statute.  The federal courts of appeals have split on the legal issue.  *Compare Robinson v.
Napolitano,* 554 F.3d 358 (3d Cir. 2009) (sustaining agency view that petitioner's death while a
Form I-130 is pending ends the beneficiary's eligibility); *petition for cert. filed,* No. 09- 94 (U.S.
filed July 23, 2009), *with Taing v. Napolitano,* 567 F.3d 19 (1st Cir. 2009) (holding agency
policy violative of statute); *Lockhart v. Napolitano,* 561 F.3d 611 (6th Cir. 2009) (same); *and
Freeman v. Gonzales,* 444 F.3d 1031 (9th Cir. 2006) (same).  The issue has engendered much
litigation before the federal district courts in recent months, with most courts ruling against the
agency.  Among the unfavorable decisions is the class action ruling in *Hootkins v. Napolitano,*
___ F. Supp. 2d ___, 2009 WL 2222839 (C.D. Cal. Apr. 28, 2009), which is on appeal to the
Ninth Circuit Court of Appeals.  Other cases are pending in district courts throughout the United
States.

### B.  Section 568(c) of FY2010 DHS Appropriations Act

Congress, however, recently acted to resolve the issue.  On October 28, 2009, the President
signed into law the FY2010 DHS Appropriations Act.  Section 568(c) of the new law amends the
second sentence in section 201(b)(2)(A)(i) of the INA so that, for a widow(er) of a citizen to
qualify as an immediate relative, it is no longer necessary for the couple to have been married at
least two years when the citizen died.  The second sentence of section 201(b)(2)(A)(i) now reads,

AR2022_301018

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 3

> In the case of an alien who was the spouse of a citizen of the United States and
> was not legally separated from the citizen at the time of the citizen's death, the
> alien (and each child of the alien) shall be considered, for purposes of this
> subsection, to remain an immediate relative after the date of the citizen's death
> but only if the spouse files a petition under [section 204(a)(1)(A)(ii) of the INA]
> within 2 years after such date and only until the date the spouse remarries.

When a widow(er) qualifies as an immediate relative under the second sentence in section
201(b)(2)(A)(i) of the INA, his or her children, as defined in sections 101(b)(1) and 201(f) of the
INA, also qualify.  The amendment made by section 568(c) applies equally to aliens abroad who
are seeking immigrant visas and aliens in the United States who are seeking adjustment of status.
The amendment applies to any alien whose spouse died before October 28, 2009, and who had a
Form I-130 pending on October 28, 2009.  If no Form I-130 was pending, then an alien whose
U.S. citizen spouse died before October 28, 2009, and before the second anniversary of their
marriage, may file a visa petition under section 204(a)(1)(A)(ii) of the INA so long as (a) the
alien has not remarried, and (b) the petition is filed no later than October 28, 2011.

Section 568(c) relates only to the impact of the citizen's death on the alien's eligibility for
classification as an immediate relative.  All other requirements for approval of a visa petition
remain in force.  In particular, the alien must still establish that he or she was the citizen's legal
spouse, and that the marriage was a bona fide marriage and not an arrangement solely to confer
immigration benefits on the alien.  If the alien was in removal proceedings at the time of the
marriage, the "clear and convincing evidence" standard in section 245(e)(3) of the INA will still
apply to the adjudication of the visa petition.  If the necessary visa petition is approved, the alien
may then seek an immigrant visa or adjustment of status.  The alien must still establish that he or
she is admissible as an immigrant and, in an adjustment case, that he or she meets all other
adjustment eligibility requirements and merits a favorable exercise of discretion.

In light of this new legislation, the policy guidance stated in the November 8, 2007,
memorandum entitled "Effect of Form I-130 Petitioner's Death on Authority to Approve the
Form I-130" (*AFM* Update AD08-04) is obsolete.  This memorandum amends the Adjudicator's
Field Manual to remove the material added in that earlier memorandum.

## III. Policy Guidance and AFM Update

### *AFM* Update

1. Chapter 21.2 of the *AFM* entitled "Factors Common to the Adjudication of All Relative Visa
   Petitions" is amended by

   a. Removing chapter 21.2(a)(4)
   b. Removing the **Note** at the end of chapter 21.2(h)(1)(C).

AR2022_301019

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 4

## A. **Widow(er)s with pending cases**

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act makes the amendment to the
second sentence in INA section 201(b)(2)(A)(i) applicable to any visa petition or adjustment
application "pending on or after the date of enactment." As noted, the date of enactment is
October 28, 2009.

### 1. *Reopening of pending Form I-130 cases*

For purposes of this amendment, a Form I-130 will be deemed "pending" on October 28 2009, if
the deceased citizen had filed a Form I-130 on or before that date but:

- USCIS has not adjudicated the Form I-130;

- USCIS denied the Form I-130, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-130 is, again, pending;

- USCIS denied the Form I-130, but has not yet ruled on a motion to reopen or reconsider;

- USCIS denied the Form I-130, but the alien's appeal from that decision is pending before
  the Board of Immigration Appeals (BIA) or the period for appeal of the adverse USCIS
  decision to the BIA had not yet expired; or

- The USCIS or BIA decision denying the Form I-130 is the subject of pending litigation
  before a federal court (including cases in which the district court issued a decision before
  October 28, 2009, but the appeals period established by law had not yet expired).

Under 8 C.F.R. § 204.2(i), a citizen's spousal Form I-130 is automatically converted to a
widow(er)'s Form I-360 if, on the date of the citizen's death, the beneficiary qualifies as a
widow(er) under the second sentence in section 201(b)(2)(A)(i). Under section 568(c) of the
FY2010 DHS Appropriations Act, these aliens now qualify under the second sentence. Thus,
any Form I-130 that is "pending" as described in the preceding paragraph will be deemed to be,
and adjudicated as, a widow(er)'s Form I-360.

In any Form I-130 case in which a motion to reopen or for reconsideration was filed, but not
acted on, USCIS will grant the motion and make a new decision in light of section 568(c) of the
FY2010 DHS Appropriations Act.

Any Form I-130 that is the subject of litigation in any federal court on the issue of the effect of
the petitioner's death is, as of the date of this memorandum, reopened for a new decision in light
of section 568(c) of the FY2010 DHS Appropriations Act. The beneficiary need not file a
separate motion. Nor does it matter, for purposes of reopening the Form I-130, whether the
beneficiary is currently in the United States or abroad. If the decision denying or terminating
action on the Form I-130 was pending in any court on October 28, 2009, the decision is now

AR2022_301020

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 5

reopened. USCIS will therefore make a new decision in light of section 568(c) of the FY2010
DHS Appropriations Act.

Cases challenging the denial of a spousal immediate relative Form I-130 based on the
petitioner's death have been filed in district courts throughout the United States. USCIS officers
must consult with the appropriate regional or service center counsel to identify those cases that
are the subject of litigation that was pending on October 28, 2009. Once a case is identified as
subject to reopening under this memorandum, the USCIS officer will notify the alien in writing
that the Form I-130 is reopened in light of section 568(c) of the FY2010 DHS Appropriations
Act, and will be readjudicated as a Form I-360.

If it is determined that a Form I-130 had been filed but was not "pending" on October 28, 2009,
because a USCIS decision denying the Form I-130 had become final before October 28, 2009
(and no administrative appeal or civil action challenging the denial was pending on October 28,
2009), please refer to part III(B) of this memorandum.

> ### 2.    *Reopening of pending Form I-485 cases*

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act also makes the amendment
applicable to any Form I-485 that was pending on the date of enactment. A Form I-485 is
deemed "pending" on the date of enactment if it was filed before the deceased citizen's death
but:

- USCIS has not adjudicated the Form I-485

- USCIS denied the Form I-485, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-485 is, again, pending

- USCIS denied the Form I-485, but has not yet ruled on a motion to reopen or reconsider;

- The Form I-485 is the subject of litigation before a federal court (including cases in
  which the district court issued a decision before October 28, 2009, but the appeals period
  established by law had not yet expired).

With this guidance memo, USCIS also reopens, without the need for a formal motion, any Form
I-485 that is the subject of litigation on this issue in any federal court, if USCIS still has
jurisdiction to act on the Form I-485. As with the reopening of the related Form I-130, the
USCIS officer will notify the applicant in writing that the Form I-485 is reopened in light of
section 568(c) of the FY2010 DHS Appropriations Act.

In the case of a widow(er) who entered the United States as a K-1 nonimmigrant, and filed a
Form I-485 after marrying the deceased citizen who had filed the Form I-129F, ordinarily there
will not be a Form I-130. If the Form I-485 is still "pending" as described in this memo, and
USCIS still has jurisdiction to act on it, the Form I-485 will also be reopened for a new decision
in light of section 568(c) of the FY2010 DHS Appropriations Act, without the need for a formal

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 6

motion.  Since no Form I-130 is required for a K-1 nonimmigrant to seek adjustment after
marrying the K petitioner within the period specified by statute, the K-1 nonimmigrant will also
be deemed the beneficiary of a Form I-360 if the K-1 nonimmigrant now qualifies as a
widow(er).  The K-1 nonimmigrant still may not adjust on any basis other than the K-1
nonimmigrant's having married the citizen petitioner who filed the Form I-129F.

Some aliens may have been placed into removal proceeding after USCIS denied their Forms I-
485.  Except for "arriving aliens," this factor would mean that USCIS no longer has jurisdiction
to adjudicate the Form I-485.  8 C.F.R. § 245.2(a)(1) and 1245.2(a)(1).  USCIS would have
jurisdiction to adjudicate the Form I-485 only if the Executive Office for Immigration Review
(EOIR) terminated the removal proceeding.  Whether to support or oppose terminating a removal
proceeding is a matter for U.S. Immigration and Customs Enforcement to decide, not USCIS.  If
a USCIS office reopens a Form I-130 involving an alien in removal proceedings, the USCIS
office must, through the appropriate USCIS counsel, advise the local counsel for U.S.
Immigration and Customs Enforcement.

Some aliens whose citizen spouses had died may have left the United States voluntarily, without
obtaining a grant of advance parole.  Others may have left after obtaining advance parole, but
may have remained abroad after expiration of the Form I-512.  Under 8 C.F.R. §
245.2(a)(ii)(4)(B), these aliens have abandoned their adjustment applications.  Also abandoned is
the adjustment application of an alien who left as the result of removal proceedings.  8 C.F.R. §
245.2(a)(4)(ii)(A).  In these situations, a Form I-485 will not be deemed "pending" for purposes
of section 568(c)(2)(A).  However, where section 568(c) applies to the approved Form I-130, and
the Form I-130 has been approved as a Form I-360, the alien approved on that I-360 who has left
the United States may apply for an immigrant visa abroad.

3.    *Petition already approved before death*

If a widow(er) is the beneficiary of a Form I-130 that was approved before the citizen
petitioner's death, it is not necessary for the widow(er) to request humanitarian reinstatement of
the approval.  Under 8 C.F.R. § 204.2(i)(1)(iv), the approved Form I-130 is automatically
converted to an approved Form I-360.  Any children of the widow(er) will also be eligible to
seek an immigrant visa or adjustment of status based on the converted petition.

There may be some cases in which a spousal immediate relative Form I-130 was approved, but
the approval was revoked automatically under 8 C.F.R. 205.1(a)(3)(i)(C) upon the citizen
petitioner's death.  If the alien is now eligible for classification as the widow(er) of a citizen
under section 568(c)(2)(A) of the  FY2010 DHS Appropriations Act , the approval will be
deemed to have been reinstated, effective October 28, 2009.  No separate request for
reinstatement is necessary.  Under 8 C.F.R. § 204.2(i)(1)(iv), the Form I-130 will be deemed to
be an approved Form I-360.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 7

### 4. Admissibility issues

Whether an alien is actually admissible is not germane in adjudicating a Form I-130. *Matter of O-*, 8 I&N Dec. 295 (BIA 1959). The only issue resolved by enactment of section 568(c) of the FY2010 DHS Appropriations Act is that the death of the citizen spouse, by itself, does not make the widow(er) ineligible for immediate relative classification. Thus, the alien must still be admissible as an immigrant to obtain adjustment of status or an immigrant visa.

For those aliens, however, who had pending Form I-130 cases, and who now can benefit from section 568(c) of the FY2010 DHS Appropriations Act, two inadmissibility grounds warrant special consideration. The first is section 212(a)(9)(B)(i) of the Act, under which an alien is inadmissible if the alien seeks admission within a specified period after the alien leaves the United States, if the alien has accrued a lengthy period of unlawful presence. The second is section 212(a)(9)(A), under which an alien who has been removed (or who left the United States while under a final administrative order of removal) must obtain consent to reapply, if the alien seeks admission within the period set in section 212(a)(9)(A).

It is important to note that the special provisions in this memorandum relating to INA section 212(a)(9)(A) and (B) apply only to an alien who was the beneficiary of a Form I-130 that was filed by a now-deceased spouse petitioner, and that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act. The purpose of these special provisions is simply to minimize the adverse effect on these aliens of the disputed, and now resolved, issue of the impact of the death of the petitioning spouse on the alien's eligibility.

### a. Unlawful presence

By specifying, in section 568(c)(2)(A) of the FY2010 DHS Appropriations Act, that the amendment should apply to pending cases, Congress indicated its desire to resolve these cases fully. For this reason, for purposes of INA section 212(a)(9)(B)(i), if an alien remained in the United States while awaiting the outcome of Form I-130 that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act, the alien will be deemed *not* to have accrued any unlawful presence. This protection applies even if the alien was not actually in a lawful status while the now-converted Form I-360 was pending.

An alien who had a Form I-130 pending on October 28, 2009, but who is present in the United States without a lawful admission or parole generally cannot obtain adjustment under INA section 245(a). Rather, the alien must generally seek adjustment under INA section 245(i). But this relief is not available to an alien who did not have a petition or labor certification filed before April 30, 2001. Thus, even if the Form I-130 can now be approved as a Form I-360, the alien may need to leave the United States to obtain an immigrant visa. But since, under this guidance memorandum, the alien will be deemed *not* to have accrued any unlawful presence, he or she will not be inadmissible under INA section 212(a)(9)(B)(i).

Again, these special provisions relating to the accrual of unlawful presence apply only to an alien who is the beneficiary of a spousal immediate relative Form I-130 that was pending on October

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 8

28, 2009, and that is now approved under section 568(c)(2)(A) of the FY2010 DHS
Appropriations Act and 8 C.F.R. § 204.2(i)(1)(iv) as a widow(er)'s Form I-360: the widow(er)
and his or her accompanying child(ren).  Ordinarily, the pendency of a visa petition, itself, does
not prevent accrual of unlawful presence.  A pending adjustment application, by contrast, does
prevent accrual of unlawful presence.  *Adjudicator's Field Manual* chapter 40.9(b)(3)(A).  Most
aliens who have been in litigation because the death of a spouse led to denial of the Form I-130
are probably already protected from unlawful presence under the ordinary provisions in the
AFM.  This broader protection against unlawful presence, for this narrow class of cases, is
designed to maximize the ability of those aliens whose specific situations gave rise to the new
legislation to fully benefit from it.

> b.  Consent to reapply for admission after removal

These protections against accrual of unlawful presence apply even if the alien was actually
removed from the United States under a removal order.  Still, because the alien was removed
under a valid order, the alien is inadmissible under INA section 212(a)(9)(A)(i) or (ii).  USCIS,
however, has discretion under section 212(a)(9)(A)(iii) to consent to the alien's re-application for
admission.  USCIS should generally exercise discretion favorably and grant an application for
consent to reapply under section 212(a)(9)(A)(iii), if:

- The Form I-130 that had been filed by the alien's spouse has now been approved as a
  Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act;

- The alien is otherwise admissible, and

- The alien's case does not present significant adverse factors beyond the removal itself.

A USCIS adjudicator will not deny a Form I-212 filed by an alien whose case was in litigation
on October 28, 2009, and whose Form I-130 has been approved as a Form I-360 under section
568(c)(2)(A) of the FY2010 DHS Appropriations Act without consulting USCIS Headquarters
through appropriate channels.

> 5.  *Remarriage*

Any immediate relative Form I-130 that was filed on behalf of the spouse of a U.S. citizen, and
that was pending on October 28, 2009, is no longer a spousal immediate relative Form I-130.
By operation of 8 C.F.R. § 204.2(i)(1)(iv), what was filed as a spousal immediate relative Form
I-130 is now a widow(er)'s Form I-360.  The converted Form I-360 may be approved only if the
beneficiary, who is now also deemed to be the petitioner, qualifies as the widow(er) of a citizen,
as described in INA section 201(b)(2)(A)(i).  Eligibility for classification as an immediate
relative continues "only until the date the spouse remarries."

AR2022_301024

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 9

### 6. *Ninth Circuit cases*

In acting on the guidance in this memorandum, USCIS adjudicators must keep in mind that the *Hootkins* case was certified as a class action. Thus, an individual need not be a *named* Plaintiff in *Hootkins* in order for his or her Form I-130 and Form I-485 to be reopened under this memorandum. If an individual has not already been identified as a member of the *Hootkins* class, that individual may make a written request to have his or her Form I-130 and Form I-485 reopened and readjudicated. The purpose of the written request is simply to *identify* the case as a *Hootkins* case. The individual is not required to pay the filing fee for a motion to reopen. The case will be considered a *Hootkins* class member case if the case was denied on or after August 30, 2001,[1] and:

- either the citizen spouse petitioner or the alien spouse beneficiary lived in the Ninth Circuit when the citizen spouse died; or

- a USCIS office in the Ninth Circuit made the prior decision on the Form I-130 or Form I-485.

### B.  Widow(er)s without pending cases

The alien widow(er) of a citizen who died before October 28, 2009, but who did not have a Form I-130 pending on that date, may now file a Form I-360, provided that he or she does so no later than October 28, 2011, and has not remarried. FY2010 DHS Appropriations Act § 568(c)(2)(B). Section 568(c)(2)(B) applies if the citizen spouse did not file a Form I-130 on the alien spouse's behalf before dying. But it also applies if there was a Form I-130 filed, but the decision denying the Form I-130 had become administratively final before October 28, 2009, because the decision was not the subject of any type of administrative or judicial review that was pending on October 28, 2009. Note that section 568(c)(2)(B)(i) says the Form I-360 must be filed "not later than the date that is 2 years after the date of the enactment." Thus, a Form I-360 that is filed *on* October 28, 2011, will still be timely. A Form I-360 filed on or after October 29, 2011, will be untimely.

For any case in which a citizen dies on or after October 28, 2009, the alien widow(er) must file the Form I-360 within 2 years of the citizen's death.

### C.     Children of widow(er)s

The child of a widow(er) whose Form I-360 is approved may, as specified in the second sentence of INA section 201(b)(2)(A)(i) and in INA section 204(a)(1)(A)(ii), be included in the widow(er)'s petition. Whether an individual qualifies as the widow(er)'s "child" is determined according to INA sections 101(b)(1) and 201(f).

---

[1] Any case denied before August 30, 2001, is time-barred under 28 U.S.C. § 2401(a). But even if a Ninth Circuit case is not considered "pending" because of *Hootkins*, the alien may still be eligible to immigrate as the widow(er) of a citizen, if the alien has not remarried and files the Form I-360 no later than October 28, 2011.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 10

In a case in which the deceased citizen had filed a Form I-130 for his or her spouse, and the
Form I-130 can now be adjudicated as a Form I-360 widow(er)'s petition, the child(ren) of the
widow(er) will be deemed to be included in the converted Form I-360.  Thus, it will not be
necessary to act on any separate Form(s) I-130 that the deceased citizen may have filed for the
widow(er)'s children.  And the child(ren) of the widow(er) will be deemed included in the
converted Form I-360 even if the deceased citizen had not filed any Form(s) I-130 for the
child(ren).

Note that, in light of INA section 201(f), whether an individual qualifies as the "child" of a
widow(er) depends on the individual's age when the visa petition was filed.  For those cases that
were pending on October 28, 2009, the Form I-360 filing date is deemed to be the date on which
the deceased citizen filed the prior Form I-130.  If a widow(er) has an unmarried son or daughter
who was under 21 when the deceased citizen filed the Form I-130, that individual will still be
deemed to be under 21 for purposes of the widow(er)'s now-converted Form I-360.

### D.  Affidavits of support

Under section 212(a)(4)(C)(i)(I) of the INA, a Form I-864 (Affidavit of Support under Section
213A of the Act) is *not* required in the case of the widow(er) of a citizen and the widow(er)'s
accompanying children.[2]

### E.  Conversion of deferred action applications filed under prior guidance

While remedial legislation was pending in Congress, the Secretary of Homeland Security
directed the use of deferred action relief to allow widow(er)s of citizen whose cases may have
been affected by the legislation to remain in the United States.  In the September 4, 2009
Memorandum, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their
Children," USCIS designated the Form I-360 as the form an individual would use to request
deferred action under the Secretary's policy.

Now that Congress has enacted the legislation, any Form I-360 that had been filed to obtain
deferred action relief, and that has not yet been adjudicated as a deferred action request, will now
be considered to be, and adjudicated as, a widow(er)'s visa petition under 8 C.F.R. § 204.2(b).  If
the Form I-360 has already been approved as a deferred action request, it will be reopened and
adjudicated as a visa petition under 8 C.F.R. § 204.2(b).  It is not necessary for the alien to file a
formal motion, nor to pay a new Form I-360 filing fee.  Additionally, any prior grant of deferred
action relief need not be rescinded and should remain undisturbed.

---

[2] There may be an individual case in which, regardless of the Form I-864 issue, the factors specified in INA section
212(a)(4)(B) and the standard public charge guidance, as published at 64 Fed. Reg. 28689 (1999), will support a
finding that a widow(er) is inadmissible as an alien likely to become a public charge.  Even in this case, a Form I-
864 is not required.  Rather, since the statute does not specifically require the Form I-864, the Form I-134 can be
used instead.  8 C.F.R. § 213a.5.  It is important to note that, on a Form I-134, the sponsor does not have to meet the
requirements in INA section 213A(f), and so does *not* need to be someone who could have been a "substitute
sponsor" in a case in which a Form I-864 actually is required.

AR2022_301026

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 11

Under the deferred action guidance, an alien could file a Form I-765, application for employment authorization, only if the deferred action request had been granted. Now that a Form I-360 that was filed to request deferred action is deemed to be a widow(er)'s visa petition, the alien can, if otherwise eligible, file a Form I-485 even before the approval of the Form I-360. 8 C.F.R § 245.2(a)(2)(i)(B). Filing the Form I-485 permits the alien to file a Form I-765. 8 C.F.R. § 274a.12(c)(9).

### F. Implementation

Section 568(c) of the FY2010 DHS Appropriations Act became effective on October 28, 2009, the date of enactment. USCIS offices and centers, therefore, are to begin implementing the instructions established in this memorandum immediately. USCIS adjudicators should note that Congress clearly intended to benefit the aliens affected by these provisions.

*AFM* **Transmittal Memorandum Revisions. The** *AFM* **Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:**

| AD 10-09<br><br>[Date of Signature] | **Chapter 21.2** | This memorandum removes chapter 21.2(a)(4) and the **Note** at the end of chapter 21.2(h)(1)(C) to reflect enactment of section 568(c) of Public Law 111-83. |
| --- | --- | --- |

### H. Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels. For cases adjudicated overseas, questions should be directed to the International Operations Division, Programs Branch.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**Distribution**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
Director
U.S. Citizenship and Immigration Services

Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

FROM:   Jeh Charles Johnson
Secretary

SUBJECT:   **Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.* The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

AR2022_301028

www.dhs.gov

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3]  Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See*, Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization")*; INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action")*; REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status")*; National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization")*.

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

AR2022_301029

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

## A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years. On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.** DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today. The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981). That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**. The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014. Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants.  USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.**  In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B.      Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above.  Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants.  Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

the Immigration and Nationality Act.[4]  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations.  ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.  The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights.  It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.  This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

5

AR2022_301032



**Instructions for Application for Employment Authorization**

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-765**
OMB No. 1615-0040
Expires 07/31/2022

---

## What Is the Purpose of Form I-765?

Certain foreign nationals who are in the United States may file Form I-765, Application for Employment Authorization, to request employment authorization and an Employment Authorization Document (EAD). Other foreign nationals whose immigration status authorizes them to work in the United States without restrictions may also use Form I-765 to apply to U.S. Citizenship and Immigration Services (USCIS) for an EAD that shows such authorization. Review the **Who May File Form I-765** section of these Instructions to determine whether you should use Form I-765.

Foreign nationals may also apply for a Social Security number and card on Form I-765 following the guidelines in the **Specific Instructions** section of these Instructions, **Part 2. Information About You, Item Numbers 13.a. - 17.b.**

If you are a lawful permanent resident, a conditional permanent resident, or a nonimmigrant only authorized for employment with a specific employer under 8 CFR 274a.12(b), do **not** use Form I-765.

**Definitions**

**Employment Authorization Document (EAD):** The EAD is the card (also known as Form I-688A, Form I-688B, Form I-766, or any successor document) issued as evidence that the holder is authorized to work in the United States.

**Initial EAD:** An EAD issued to an eligible applicant for the first time under a specific eligibility category.

**Renewal EAD:** An EAD issued to an eligible applicant after the expiration of a previous EAD issued under the same category.

**Replacement EAD:** An EAD issued to an eligible applicant when the previously issued EAD was lost, stolen, damaged, or contains errors, such as a misspelled name.

**NOTE:** For more information regarding employment authorization documents, visit **www.uscis.gov/greencard/employment-authorization-document**.

---

## Who May File Form I-765?

You may file Form I-765 if you fall within one of the eligibility categories below. For some categories, employment authorization is granted with your underlying immigration status (called "incident to status" employment authorization). For example, asylees and refugees have employment authorization as soon as they obtain such status. In these cases, your EAD is issued upon approval of your Form I-765, and the EAD is evidence of your employment authorization. For other categories such as parolees or individuals with deferred action, USCIS must first approve your Form I-765 before you are eligible to accept employment in the United States. Once your Form I-765 is approved, USCIS will issue your EAD. You must type or print your eligibility category in **Part 2.**, **Item Number 27.**, on Form I-765. Enter only one category number on the application. For example, if you are a refugee applying for an EAD, type or print "(a)(3)" in **Item Number 27.**

**Please note that a person with a pending application for an immigration benefit or request might have a different category number than the person who was already granted the benefit or request. For example certain pending asylum applicants are category "(c)(8)," but a person already granted asylum is category "(a)(5)."**

---

AR2022_301033

**Asylee/Refugee Categories (and their Spouses and Children)**

1. **Refugee--(a)(3).**  If an initial Form I-765 was not already prepared for you before your arrival as a refugee in the United States, or if you are requesting to renew your EAD, file Form I-765 with a copy of one of the following:  your stamped Form I-94, Arrival-Departure Record; your Final Notice of Eligibility for Resettlement (approval letter); or your Form I-797 Notice approving your derivative refugee status based on a Form I-730, Refugee/Asylee Relative Petition (if approved while in the United States).

   **NOTE:**  If you were admitted as a refugee and have applied under the Immigration and Nationality Act (INA) section 209 to adjust to lawful permanent resident status using Form I-485, Application to Register Permanent Residence or Adjust Status, file Form I-765 under category (a)(3) as a refugee.  Do not file Form I-765 under eligibility category (c)(9) as an INA section 245 adjustment applicant.

2. **Paroled as a Refugee--(a)(4).**  File Form I-765 with a copy of your Form I-94, passport, or travel document. Commonwealth of the Northern Mariana Islands (CNMI), and other humanitarian or significant public benefit parolees (such as Cuban Family and Haitian Family Reunification Parole programs), should file under the category (c)(11), not as a refugee under (a)(4).

3. **Asylee (Granted Asylum)--(a)(5).**  File Form I-765 with a copy of one of the following:  your stamped Form I-94 indicating asylee status; a USCIS Asylum approval letter; an order granting asylum signed by an Executive Office for Immigration Review (EOIR) immigration judge (IJ); or a Form I-797 Notice approving your derivative asylee status based on a Form I-730 (if approved while in the United States).

   **NOTE:**  If you are an asylee and have applied under INA section 209 to adjust to lawful permanent resident status using Form I-485, file Form I-765 under category (a)(5) as an asylee.  Do not file Form I-765 under eligibility category (c)(9) as an INA section 245 adjustment applicant.

4. **Granted Withholding of Deportation or Removal--(a)(10).**  File Form I-765 with a copy of the EOIR IJ's signed order granting withholding of deportation or removal.

5. **Pending Asylum and Withholding of Removal Applicants and Applicants for Asylum under the ABC Settlement Agreement--(c)(8).**  If you have a pending Form I-589, Application for Asylum and for Withholding of Removal, refer to the Instructions below.

**Special Filing Instructions for Those With Pending Asylum Applications--(c)(8)**

**Applicants requesting employment authorization under (c)(8) must:**

1. Wait 365 calendar days from the date you properly file and USCIS or the Immigration Court accepts your asylum application before you file your application for employment authorization;

2. Appear for your asylum biometric services appointment;

3. Appear for your interview with a USCIS asylum officer, or your hearing before an Immigration Judge (IJ), if requested or scheduled; and

4. Appear for your biometric services appointment for your application for employment authorization.

For further information see 8 CFR sections 208.7, 208.9, and 208.10.

**Special information about biometric services fee and appointments.**  All applicants for initial and renewal EADs under the (c)(8) eligibility category must submit biometrics at a scheduled biometric services appointment and pay the biometric services fee.  If you fail to appear for your biometric services appointment, you may be ineligible for employment authorization.

AR2022_301034

**Special information about the one-year deadline to file for asylum.**  If you file your asylum application on or after August 25, 2020 and file it more than one year after your most recent arrival in the United States, you will not be granted employment authorization under this eligibility category **unless and until** a USCIS asylum officer or an Immigration Judge determines that you meet an exception for late filing, as provided in section 208(a)(2)(D) of the Immigration and Nationality Act (INA).  This one-year filing deadline does not apply to an alien who is an unaccompanied alien child, as defined by section 462(g) of the Homeland Security Act of 2002, 6 U.S.C. 279(g), INA section 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E).

**Special information about lawful entry into the United States through a port of entry.**  Eligibility for an EAD under category (c)(8) requires that your last entry into the United States was lawful.  If you entered or attempted to enter the United States unlawfully on or after August 25, 2020, you are ineligible for employment authorization based on a pending asylum application, unless you demonstrate that: (1) you presented yourself to the Secretary of Homeland Security or his or her delegate within 48 hours of your arrival; (2) you indicated a fear of persecution or torture or an intent to apply for asylum; and (3) you establish good cause for failing to enter lawfully through a port of entry.  USCIS will determine whether you meet the exception to the illegal entry bar based on your responses to **Item Numbers 30.b. - 30.g.** of Form I-765.

**Special information about arrests, charges, and convictions.**  You cannot receive employment authorization under this eligibility category if:

- You have been convicted at any time in the United States or abroad of any aggravated felony as described in section 101(a)(43) of the Act;

- You have been convicted on or after August 25, 2020 of a particularly serious crime in the United States;

- You have been convicted on or after August 25, 2020 of any serious non-political crime outside the United States;

- There are serious reasons for believing that you on or after August 25, 2020 have committed a serious non-political crime outside the United States; or

- You are subject to a mandatory denial of your asylum application based on the criminal grounds described in 8 CFR 208.13(c)(6).

**Special information about the impact of applicant-caused delays.**  Any delays you have caused in the adjudication of your asylum application that are still in effect at the time your initial application for employment authorization is filed will result in USCIS denying your application for employment authorization.

Examples of applicant-caused delays include, but are not limited to:

1. A request to amend or supplement an asylum application that causes a delay in its adjudication or in proceedings as described in 8 CFR section 208.4(c);

2. Failure to appear to receive and acknowledge receipt of the decision as specified in 8 CFR section 208.9(d);

3. A request for extension to submit additional evidence fewer than 14 days before the interview date as described in 8 CFR section 208.9(e);

4. Failure to appear for an asylum interview or biometric services appointment, unless excused by USCIS as described in 8 CFR section 208.10(b)(1) for the failure to appear;

5. A request to reschedule an interview for a later date;

6. A request to transfer a case to a new asylum office or interview location, including when the transfer is based on a new address;

7. A request to provide additional evidence after interview;

8. Failure to provide a competent interpreter at interview; and

9. Failure to comply with any other request needed to determine asylum eligibility.

AR2022_301035

**Special Information About Availability of (c)(8) Employment Authorization During the Asylum Process.**  If you are granted employment authorization while your asylum application is pending with USCIS or the Immigration Court, you may seek renewal of your EAD as long as the asylum application remains pending (unless your EAD is revoked or terminated).

If you have an EAD based on a pending asylum application and your asylum application is denied by the Immigration Court, your EAD will automatically terminate after 30 days unless you file a timely appeal with the Board of Immigration Appeals (BIA).  If you file a timely appeal with the BIA, your current employment authorization will continue while your asylum application is on review at the BIA (unless revoked or terminated).  There is no need to file another Form I-765, unless your EAD is about to expire or will expire during the time your case is on appeal.  If the BIA affirms the denial of your asylum application, your employment authorization terminates automatically on the date of the BIA's denial.

**NOTE:**  Employment authorization **is not permitted during any period of judicial review of EOIR's decision on your asylum application**.  However, if a federal court remands your asylum case back to the BIA, you may reapply for employment authorization once your case is again pending with the BIA.

**Additional Evidence requirements for category (c)(8) applicants:**

If you are a category (c)(8) applicant who has met the requisite 365 calendar-day waiting period to file Form I-765, you may file your application with the following evidence, where applicable.

1.  If you filed your Form I-589 with USCIS, a copy of the following:  the USCIS Acknowledgement of Receipt that was mailed to you and your USCIS Asylum Interview Notice (scheduling, re-scheduling, or cancelling your asylum interview); your Form I-797C Notice (ASC appointment notice) (for the biometrics appointment for your Form I-589); or other evidence that you filed your Form I-589 with USCIS.

2.  If you lodged or filed your Form I-589 with the Executive Office for Immigration Review (EOIR), a copy of acknowledgement of receipt of your application or other available evidence.

3.  If you were granted employment authorization under the (c)(8) category and an Immigration Judge (IJ) subsequently denied your asylum application, and you are now seeking renewal of your EAD, evidence that you timely appealed the EOIR IJ's decision on your Form I-589 to the BIA and the appeal remains pending.

4.  If the BIA remanded your Form I-589 to an EOIR IJ for further adjudication of your underlying asylum claim:

    **A.**  A copy of the BIA decision and order remanding your case to the EOIR IJ; and

    **B.**  Evidence that your asylum claim remains under review by the EOIR IJ.

5.  If a federal court remanded your asylum claim to the BIA for further action and your claim is still pending with the BIA, you must submit a copy of the Federal Court's remand order.

6.  **Evidence of Arrests and Convictions.**  You must submit certified police and court records for any criminal charges, arrests, or convictions you may have.

    **A.**  If you were **EVER** arrested or detained by a law enforcement officer for **any** reason in any country, including the United States, and no criminal charges were filed, you must submit:

    **(1)**  An original or certified copy of the complete arrest report; and

    **(2)**  Either an official statement by the arresting or detaining agency or prosecutor's office **OR** an applicable court order that indicates the final disposition of your arrest or detention;

    **B.**  If you were **EVER** charged for any reason (even if you were not arrested) in **any** country, including the United States, you must submit:

    **(1)**  An original or certified copy of the complete arrest report; and

    **(2)**  Certified copies of **BOTH** the indictment, information, or other formal charging document **AND** the final disposition of each charge (for example, a dismissal order or acquittal order);

**C.** If you were **EVER** convicted or placed in an alternative sentencing or rehabilitative program (such as probation, drug treatment, deferred adjudication, or community service program) in **any** country, including the United States, you must submit:

    **(1)** An original or certified copy of the complete arrest report;

    **(2)** Certified copies of the following: the indictment, information, or other formal charging document; any plea agreement, whether in the form of a court filing or recording in a hearing transcript; and the final disposition for each incident (for example, conviction record, deferred adjudication order, probation order); and

    **(3)** Either an original or certified copy of your probation or parole record showing that you completed the mandated sentence, conditions set for the deferred adjudication, or rehabilitative program OR documentation showing that you completed the alternative sentencing or rehabilitative program; or

**D.** If you **EVER** had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record in **any** country, you must submit:

    **(1)** An original or certified copy of the complete arrest report; the indictment, information, or other formal charging document; any plea agreement, whether in the form of a court filing or recording in a hearing transcript; and the final disposition for each incident (for example, conviction record, deferred adjudication order, probation order); and

    **(2)** A certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction.

You must disclose all arrests and charges, even if the arrest occurred when you were a minor.  An adjudication of juvenile delinquency is not a "conviction" under U.S. immigration law, but a juvenile can be charged as an adult for an offense committed while a juvenile.  If you were convicted as an adult, there is a conviction, regardless of whether you were tried before a criminal court or a juvenile court.  An adjudication of juvenile delinquency could also be relevant to the exercise of discretion.  If you claim that an arrest resulted in adjudication of delinquency, and not in a conviction, you must submit a copy of the court document that establishes this fact.

In general, you do **not** need to submit documentation relating to traffic fines and incidents that did not involve an actual physical arrest if the penalty was only a fine of less than **$500** or points on your driver's license.  However, you must submit such documentation if the traffic incident resulted in criminal charges or involved alcohol, drugs, or injury to a person or property.

If you are not able to obtain certified copies of any court disposition relating to **Items A. - D.**, please submit:

**1.** An explanation of why the documents are not available, including (if possible) a certificate from the custodian of the documents explaining why the documents are not available;

**2.** Any secondary evidence that shows the disposition of the case; or

**3.** If secondary evidence is also not available, one or more written statements, signed under penalty of perjury under 28 U.S.C. section 1746, by someone who has personal knowledge of the disposition.

**Asylum and Withholding of Deportation Applicants (with a pending Form I-589) Who Filed Before January 4, 1995**

You may file Form I-765 at any time; however, we will only grant your employment authorization if we find that your asylum application is not frivolous.  File Form I-765 with a copy of the following documents, where applicable:

**1.** Your date-stamped previously filed Form I-589;

**2.** If you filed your Form I-589 with the former Immigration and Naturalization Service (INS), an INS Acknowledgement of Receipt;

**3.** A USCIS Asylum Interview Notice (scheduling, re-scheduling, or cancelling your asylum interview);

**4.** Form I-797 Notice, Fingerprint Notification (for a fingerprint appointment for your Form I-589);

5. If you filed your Form I-589 in exclusion or deportation proceedings, evidence that your Form I-589 was filed with EOIR;

6. If you are currently in exclusion or deportation proceedings, a copy of Form I-221, Order to Show Cause and Notice of Hearing, or Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge; or

7. Evidence that your Form I-589 remains under administrative or judicial review.

**Asylum application under the ABC Settlement Agreement--(c)(8).**  If you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement, *American Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991), you are entitled to an EAD under the ABC settlement agreement.  Follow the instructions contained in this section when filing your Form I-765.

You must have filed your asylum application (Form I-589) with us (the former INS or USCIS) or with an EOIR IJ to receive an EAD.  Therefore, submit evidence that you have previously filed a complete asylum application when you submit Form I-765.  You are not required to submit this evidence when you apply, but it will help us process your request more efficiently.

If you are requesting an EAD under this category, you must pay the filing fee.  Mark your application as follows:

1. Type or print "ABC" in the top right corner of your EAD application.  You must identify yourself as an ABC class member if you are applying for an EAD under the ABC settlement agreement.

2. Type or print "(c)(8)" in **Part 2.**, **Item Number 27.**, of the application.

3. Select the box in **Part 3.**, **Item Number 6.**, of this application.

You are entitled to an EAD without regard to the merits of your asylum claim.

Your Form I-765 will be decided within 60 days if:

1. You pay the applicable filing fee and biometric services fee, or you apply for and USCIS approves a waiver of either fee;

2. You have a complete pending asylum application on file; and

3. You correctly mark your application as described above.

**Nationality Categories**

1. **Citizen of Micronesia, the Marshall Islands, or Palau--(a)(8).**  File Form I-765 with evidence you were admitted to the United States as a citizen of the Federated States of Micronesia (CFA/FSM), the Marshall Islands (CFA/MIS), or Palau under agreements between the United States and the former trust territories.

2. **Deferred Enforced Departure (DED)--(a)(11).**  File Form I-765 with evidence of your identity and nationality.  If you are without nationality, submit evidence of your residence in the last country in which you habitually resided.  You should also state your basis for claiming that you are covered by DED and provide evidence (if available) for your claim.

3. **Temporary Protected Status (TPS)--(a)(12) and (c)(19).**  File Form I-765 with your Form I-821, Application for Temporary Protected Status, or evidence that we accepted or approved your initial Form I-821.  Include evidence of your nationality and identity as required by the Form I-821 Instructions.  If an EOIR IJ or the Board of Immigration Appeals (BIA) granted TPS, and you are requesting your first EAD or are re-registering for the first time, you must submit a copy of the EOIR IJ or BIA order that granted TPS with your Form I-765 (such as a copy of your Form I-821 that the EOIR IJ or BIA approved).  You must also follow the instructions for filing your application as described in the most recent TPS Federal Register notice regarding a TPS designation, re-designation, or extension for your country.  Please check the USCIS website at **www.uscis.gov/tps** for procedures to register or re-register for TPS, including obtaining an EAD, if your country has been designated for TPS.

If your non-expired TPS EAD is lost, stolen, or damaged, file Form I-765 with required fees to request a replacement. Include a copy of your approval notice for TPS (if you have been approved) or a copy of your previous Form I-797 Notice for Form I-821 if your TPS application is still pending.

**A. Category (a)(12) EAD:** We may issue you a category (a)(12) EAD if your TPS application was approved, you requested an EAD, and you were not previously issued a category (c)(19) EAD that runs through the current TPS designation, re-designation, or extension period for your country.

**Re-registration for TPS:** File your Form I-765, Form I-821, and a letter indicating that this application is for TPS re-registration. Include a copy (front and back) of your last available TPS document (for example, an EAD, Form I-94, passport, or travel document, or a Form I-797 Notice).

**NOTE:** To re-register for TPS, you must file Form I-821; however, you do not need to file Form I-765 if you do not want an EAD.

**B. Category (c)(19) EAD:** A category (c)(19) EAD is a temporary benefit under TPS under 8 CFR Part 244. We may issue you a category (c)(19) EAD if you have a pending Form I-821, and you are *prima facie* eligible for TPS.

**4. Nicaraguan Adjustment and Central American Relief Act (NACARA) Section 203 Applicants Who Are Eligible to Apply for NACARA Relief With USCIS--(c)(10).** See the Instructions to Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA)), to determine if you are eligible to apply for NACARA 203 relief.

If you are eligible to apply for NACARA 203 relief with USCIS, you may file Form I-765 together with your Form I-881. See our website at **www.uscis.gov/I-881** for the most current information on where to file Form I-881. If you are eligible to file Form I-881 with EOIR, or if you have already filed Form I-881 with USCIS or EOIR, see the **Where to File** section of these Instructions.

If you are filing for an EAD related to your NACARA application, you may be eligible for a fee waiver under 8 CFR 103.7(c)(3)(xi).

**5. Dependent of TECRO E-1 Nonimmigrant--(c)(2).** File Form I-765 with the required certification from the American Institute in Taiwan if you are the spouse or unmarried dependent son or daughter of an E-1 employee of the Taipei Economic and Cultural Representative Office.

**Foreign Students Categories**

**1. F-1 Student Seeking Optional Practical Training (OPT) in a Position Directly Related to Major Area of Study**

**NOTE:** If you are an F-1 student filing for initial or extension of OPT, please note that your OPT and your employment authorization will be automatically terminated if you change educational program levels or transfer to another school. Working in the United States without authorization may result in your removal from the United States or denial of re-entry. Consult your Designated School Official (DSO) for additional details.

**A. Pre-Completion OPT--(c)(3)(A).** File Form I-765 up to 90 days before being enrolled for one full academic year, provided that the period of employment will not start before you have completed one full academic year. The one full academic year need not necessarily have been completed while you were in F-1 status; if you completed the one-year requirement while in another valid nonimmigrant status and you are now in valid F-1 status, you are eligible to apply for OPT. Include evidence of having been lawfully enrolled on a full-time basis for one full academic year at a college, university, conservatory, or seminary approved by the U.S. Immigration and Customs Enforcement (ICE) Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students. Also, include all previously used Student and Exchange Visitor Information System (SEVIS) numbers and evidence of any previously authorized curricular practical training (CPT) or OPT and academic level at which each was authorized. You must include a Certificate of Eligibility of Nonimmigrant (F-1) Student Status (Form I-20) endorsed by the DSO before filing Form I-765.

**B. Post-Completion OPT--(c)(3)(B).** File Form I-765 up to 90 days before, but no later than 60 days after, your program end date. Use **Part 6. Additional Information** to provide all previously used SEVIS numbers and evidence of any previously authorized CPT or OPT and the academic level at which it was authorized.

**NOTE:** You **must** file your Form I-765 within 30 days of the date that your DSO enters the recommendation for OPT into your SEVIS record. If you fail to do so, we will deny your OPT request.

**C. 24-Month Extension for STEM Students (Students With a Degree in Science, Technology, Engineering, or Mathematics)--(c)(3)(C).** File Form I-765 up to 90 days before the expiration of your current OPT, if you are requesting a 24-month STEM extension. Include evidence the degree that is the basis for the STEM OPT extension is in one of the degree programs currently listed on the STEM Designated Degree Program List. Additionally, submit the employer's name as listed in E-Verify, along with the E-Verify Company Identification Number, or a valid E-Verify Client Company Identification Number for the employer with whom you are seeking the 24-month STEM OPT extension. You must provide this information in **Part 2., Item Numbers 28.a. - 28.c.,** of Form I-765. You must include a copy of the Form I-20 endorsed by the DSO within 60 days before filing Form I-765.

**NOTE:** If you are applying for a STEM OPT extension based on a previously earned STEM degree, you must also include a copy of your prior STEM degree and evidence that the institution is currently accredited by the U.S. Department of Education and certified by the SEVP.

**D. F-1 Student Offered Off-Campus Employment Under the Sponsorship of a Qualifying International Organization--(c)(3)(ii).** File Form I-765 with the international organization's letter of certification that the proposed employment is within the scope of its sponsorship and a copy of the Form I-20 with the employment page completed by the DSO certifying eligibility for employment.

**E. F-1 Student Seeking Off-Campus Employment Due to Severe Economic Hardship--(c)(3)(iii).** File Form I-765 with a copy of the Form I-20 that includes the employment page completed by the DSO certifying eligibility for off-campus employment due to severe economic hardship caused by unforeseen circumstances beyond your control. Include evidence that:

**(1)** You have been in F-1 status for one full academic year;

**(2)** You are in good standing as a student;

**(3)** You are carrying a full course of study;

**(4)** Acceptance of employment will not interfere with your carrying a full course of study;

**(5)** The employment is necessary to avoid severe economic hardship due to unforeseen circumstances beyond your control; and

**(6)** On-campus employment is unavailable or is not sufficient to meet the needs that have arisen due to the unforeseen circumstances.

**F. J-2 Spouse or Minor Child of an Exchange Visitor--(c)(5).** File Form I-765 with a copy of Form DS-2019, evidence the J-1 principal foreign national is currently maintaining status, and evidence any income from this employment authorization will not be used to support the J-1 principal foreign national. Also, provide evidence you are currently maintaining status and include evidence of all previously authorized periods of J-2 employment.

**G. M-1 Student Seeking Post-Completion OPT After Completing Studies--(c)(6).** File Form I-765 with a copy of the Form I-20 endorsed by the DSO certifying eligibility for employment together with Form I-539, Application to Change/Extend Nonimmigrant Status, if applicable, completed according to the Form I-539 Instructions. We must receive the completed forms before, but not more than 90 days before, your program end date. If applicable, your Form I-539 must request an extension of stay that covers the requested period of post-completion OPT and a 30-day departure period.

**NOTE:** You may request one month of OPT for every four months of full-time study you have completed as an M-1 student.

**Categories for Eligible Dependents of Employees of Diplomatic Missions, International Organizations, or NATO**

1. **Dependent of A-1 or A-2 Foreign Government Officials--(c)(1).** Submit Form I-765 with Form I-566, Interagency Record of Request-A, G, or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G, or NATO Status, Dependent Employment Authorization, through your diplomatic mission to the Department of State (DOS).  DOS will forward all favorably endorsed applications directly to USCIS for adjudication.

2. **Dependent of G-1, G-3, or G-4 Nonimmigrant--(c)(4).**  Submit Form I-765 together with Form I-566 through your international organization to DOS.  The United Nations (UN) and UN missions located in New York City should submit such applications to the U.S. Mission to the UN (USUN).  DOS or USUN will forward all favorably endorsed applications directly to USCIS for adjudication.

3. **Dependent of NATO-1 Through NATO-6--(c)(7).**  If you are a dependent of a North Atlantic Treaty Organization (NATO) nonimmigrant who is stationed at Supreme Allied Command Transformation (SACT), NATO/HQ, submit Form I-765 with Form I-566 to:

   **USLO to NATO/HQ SACT**
   **7857 Blandy Road, Suite 200**
   **Norfolk, VA 23551-2491**

   If you are a dependent of a NATO nonimmigrant who is stationed outside of NATO/HQ SACT, submit Form I-765 with Form I-566 to the Defense Attaché's Office at the embassy of the NATO member that employs the foreign national.  For more details on NATO member embassy contacts and on documents required, visit the DOS website **www.state.gov/ofm** under the topic "Dependent Work Authorization."

   If you have questions regarding the process or document requirements, email **OFM-EAD@state.gov**.

**Employment-Based Nonimmigrant Categories**

1. **B-1 Nonimmigrant Who Is the Personal or Domestic Servant of a Nonimmigrant Employer--(c)(17)(i).**  File Form I-765 with:

   **A.** Evidence of your lawful B nonimmigrant status (for example, your Form I-94, passport, or other travel document);

   **B.** Evidence that your employer is a B, E, F, H, I, J, L, M, O, P, Q, or TN nonimmigrant;

   **C.** Evidence you worked for the employer for at least one year before the employer entered the United States, or your employer regularly employs personal and domestic servants and has done so for a period of years before coming to the United States;

   **D.** Evidence you have either worked for this employer as a personal or domestic servant for at least one year, or evidence you have at least one year of experience as a personal or domestic servant; and

   **E.** Evidence establishing you have a residence abroad that you have no intention of abandoning.

2. **B-1 Nonimmigrant Domestic Servant of a U.S. Citizen--(c)(17)(ii).**  File Form I-765 with:

   **A.** Evidence of your lawful B nonimmigrant status (for example, your Form I-94, passport, or other travel document);

   **B.** Evidence that your employer is a U.S. citizen;

   **C.** Evidence that your employer has a permanent home abroad or is stationed outside the United States and is temporarily visiting the United States, OR evidence that your employer's current assignment in the United States will not be longer than four years; and

   **D.** Evidence that your employer has employed you as a domestic servant abroad for at least six months before your admission to the United States.

3. **B-1 Nonimmigrant Employed by a Foreign Airline--(c)(17)(iii).**  File Form I-765 with:

**AR2022_301041**

  **A.** Evidence of your lawful B nonimmigrant status (for example, your Form I-94, passport, or other travel document); and

  **B.** A letter from the airline fully describing your duties and stating your position would entitle you to E nonimmigrant status except for the fact that you are not a national of the same country as the airline, or because there is no treaty of commerce and navigation in effect between the United States and that country.

**4.** **Spouse of an E-1 Treaty Trader, E-2 Treaty Investor, or E-3 Specialty Occupation Professional from Australia--(a)(17).** File Form I-765 with:

  **A.** Evidence of your lawful E nonimmigrant status (for example, your Form I-94, passport, or other travel document); and

  **B.** Evidence of your spouse's lawful E nonimmigrant status (for example, a copy of your spouse's Form I-94, passport, or other travel document) and your marriage certificate.

  **NOTE:** Other relatives or dependents of E nonimmigrants in E status are not eligible for employment authorization and cannot file under this category.

**5.** **Spouse of an L-1 Intracompany Transferee--(a)(18).** File Form I-765 with:

  **A.** Evidence of your lawful L nonimmigrant status (for example, your Form I-94, passport, or other travel document); and

  **B.** Evidence of your spouse's lawful L nonimmigrant status (for example, a copy of your spouse's Form I-94, passport, or other travel document) and your marriage certificate.

  **NOTE:** Other relatives or dependents of L nonimmigrants in L status are not eligible for employment authorization and cannot file under this category.

**6.** **Spouse of an E-2 Commonwealth of Northern Mariana Islands (CNMI) Investor--(c)(12).** File Form I-765 with the required evidence listed under **Special Filing Instructions for Spouses of E-2 CNMI Investors** in the **Required Documentation** section of these Instructions.

Spouses of certain principal E-2 CNMI investors (E-2C) are eligible to seek employment in the CNMI. An EAD issued under this category is only valid for employment in the CNMI.

To determine if you are eligible for an EAD under this section, you must determine what type of investor certificate was issued by the CNMI to your spouse, the principal E-2 CNMI investor. If your spouse was issued either a Long-Term Business Certificate or Foreign Investment Certificate, you may be eligible for an EAD under this category. If your spouse was issued a Foreign Retiree Investment Certification, you are not eligible to receive an EAD under this category.

File Form I-765 with:

  **A.** Documentation (such as a marriage certificate) establishing a legal marriage;

  **B.** Documentation (such as divorce or death certificates) establishing the termination of any prior marriages of you and your spouse (if applicable);

  **C.** Documentation establishing that you reside in the CNMI;

  **D.** Documentation establishing that your spouse has obtained E-2C status;

  **E.** Documentation establishing that you have obtained E-2C status as a dependent; and

  **F.** A copy of your spouse's CNMI issued Long-Term Business Certificate or Foreign Investment Certificate.

**NOTE:** If you are the spouse of a principal E-2 CNMI investor who obtained status on the basis of a Foreign Retiree Investment Certification, you are not eligible for employment authorization and cannot file under this category.

7. **Spouse of an H-1B Nonimmigrant--(c)(26).** File Form I-765 along with documentation of your current H-4 admission or extension of stay. You must also submit documentation establishing either your spouse is the beneficiary of an approved Form I-140, Immigrant Petition for Alien Worker, or your spouse received H-1B status based on the American Competitiveness in the Twenty-First Century Act (AC21) sections 106(a) and (b). For your convenience, you may file Form I-765 with Form I-539. However, we will not process your Form I-765 (except filing fees), until after we have adjudicated your Form I-539. You may also file Form I-765 at the same time as your Form I-539 and your H1-B spouse's Form I-129, Petition for a Nonimmigrant Worker. Please see the USCIS website at **www.uscis.gov/I-765** for the most current information on where to file this benefit request.

   A. **Proof of Your Status.** Submit a copy of your current Form I-797 Notice for Form I-539, or Form I-94 showing your admission as an H-4 nonimmigrant or your most recent approved extension of stay; and

   B. **Proof of Relationship to the Principal H-1B.** Submit a copy of your marriage certificate. If you cannot submit a copy of your current Form I-797 Notice, Form I-94, or marriage certificate, we will consider secondary evidence of your relationship.

   C. **Basis for Work Authorization.** Acceptable documentation includes:

   (1) **Approved Form I-140.** Submit evidence the H-1B principal is the beneficiary of an approved Form I-140. You may show this by submitting a copy of your spouse's Form I-797 Notice for Form I-140; or

   (2) **H-1B Principal Received AC21 106(a) and (b) Extension.** Submit evidence that your spouse has been admitted or granted an extension of stay under AC21 sections 106(a) and (b). You may show this by submitting copies of your spouse's passports, prior Form I-94s, and current and prior Form I-797 Notices for Form I-129. In addition, submit evidence to establish one of the following bases for the H-1B extension of stay.

      (a) **Based on Filing of a Permanent Labor Certification Application.** Submit evidence your spouse is the beneficiary of a Permanent Labor Certification Application that was filed at least 365 days prior to the date the period of admission authorized under AC21 sections 106(a) and (b) took effect. You may show this by submitting a print out from the Department of Labor's (DOL) website or other correspondence from DOL showing the status of your spouse's Permanent Labor Certification Application. If DOL certified the Permanent Labor Certification, you must also submit a copy of Form I-797 Notice for Form I-140 establishing the Form I-140 was filed within 180 days of DOL certifying the Permanent Labor Certification; or

      (b) **Based on a Pending Form I-140.** If the preference category sought for the principal H-1B spouse does not require a Permanent Labor Certification Application with DOL, submit evidence your spouse's Form I-140 was filed at least 365 days prior to the date the period of admission authorized under AC21 sections 106(a) and (b) took effect. You may show this by submitting a copy of the Form I-797 Notice for Form I-140.

      (c) **Secondary Evidence.** If you do not have the evidence listed in **Items (a) or (b)** above, you may ask us to consider secondary evidence in support of your application for employment authorization as an H-4 spouse. For example, in establishing the Basis for Employment Authorization as described in **Items (1)** and **(2)**, you may submit the receipt number of your spouse's most current Form I-129 extension of stay or Form I-140 approved on your spouse's behalf.

      Failure to provide the evidence listed above or secondary evidence may result in the delay or denial of your Form I-765. For additional information on secondary evidence, see **Evidence** in the **General Instructions** section of these Instructions.

8. **Principal Beneficiary of an Approved Employment-Based Immigrant Petition Facing Compelling Circumstances--(c)(35).** File Form I-765 with documents showing that you are eligible for an initial grant or a renewal of employment authorization under the (c)(35) eligibility category.

AR2022_301043

**A. Initial Application:**  If this is your first application for compelling circumstances employment authorization under the (c)(35) eligibility category, **and** an immigrant visa number is not yet available to you, you may be eligible if:

**(1)**  You have NOT filed Form I-485;

**(2)**  You have a Form I-140 approved on your behalf;

**(3)**  You are in the United States in a valid E-3, H-1B, H-1B1, O-1, or L-1 nonimmigrant status; and

**(4)**  You face compelling circumstances.

**See Item C. Supporting Evidence by Principal below for more information regarding what documents to submit with your application, including additional requirements where you have been convicted of certain crimes.**

**B. Renewal Application:**  If you already have employment authorization under the (c)(35) eligibility category, you may be eligible for renewal if:

**(1)**  You have a Form I-140 approved on your behalf;

**(2)**  You face compelling circumstances **and** an immigrant visa is not authorized for issuance based on your priority date according to the relevant Final Action Date in the Department of State Visa Bulletin in effect on the date the application for a renewal of employment authorization is filed; **OR**

The difference between your priority date and the Final Action Date for your preference category and country of chargeability is one year or less according to the Department of State Visa Bulletin in effect on the date your renewal application is filed.  This means that your priority date cannot be more than one year earlier or one year later than the Department of State cut-off date in the Visa Bulletin applicable to your preference category and country of chargeability in effect on the date your renewal application is filed.  If this is the basis for your renewal application, you are not required to show compelling circumstances; **AND**

**(3)**  You file your renewal application on Form I-765 with USCIS before your current employment authorization expires.  You are not required to be in a valid nonimmigrant status when you file your renewal application.

**See Item C. Supporting Evidence by Principal below for more information regarding what documents to submit with your application, including additional requirements where you have been convicted of certain crimes.**

**C. Supporting Evidence by Principal**

**(1)  Proof You Are in the United States in E-3, H-1B, H-1B1, O-1, or L-1 Nonimmigrant Status.**  For initial applications, submit a copy of your Arrival-Departure Record (Form I-94) showing your admission as an E-3, H-1B, H-1B1, O-1, or L-1 nonimmigrant, or a copy of your current Form I-797 Notice for Form I-129.

**(2)  Proof of Your Approved Form I-140.**  For initial and renewal applications, submit a copy of a Form I-797 Notice for Form I-140 showing the Immigrant Petition has been approved on your behalf.

**(3)  Evidence You Are Facing Compelling Circumstances While You Wait for Your Immigrant Visa to Become Available.**  For initial and, if applicable, renewal applications based on compelling circumstances, USCIS will review the documents you provide to determine, in its discretion, whether you have established compelling circumstances.  USCIS makes this discretionary determination on a case-by-case basis according to the documents submitted and the totality of the record.  You should submit any credible evidence you believe supports your claim of compelling circumstances.

**(4)  Secondary Evidence.**  If you do not have the evidence listed in **Items (1)** or **(2)** above, you may ask us to consider secondary evidence in support of your application for employment authorization.  For additional information on secondary evidence, see **Evidence** in the **General Instructions** section of these Instructions.

AR2022_301044

**(5) Proof of Arrests and Conviction.** For initial and renewal applications, you must submit documentation of any arrests and/or convictions. If you were ever convicted of a felony or two or more misdemeanors, you cannot be granted employment authorization under this eligibility category. USCIS will make the determination as to whether your crimes fall into either of these categories. You must, however, provide information and any supporting documentation on all crimes which you were convicted of so USCIS can make an appropriate decision. Provide certified copies of all arrest reports, court dispositions, sentencing documents, and any other relevant documents.

**NOTE:** USCIS may, in its discretion, deny your application if you have been arrested and/or convicted of any crime.

**D. Traffic Violations and Arrests**

Do not select the "Yes" box for **Part 2.**, **Item Number 31.b.**, on the application or submit documentation if you only have had minor traffic violations. Minor traffic violations do NOT include violations that are alcohol- or drug-related. If you were **ARRESTED** for any traffic offense, select the "Yes" box for **Item Number 31.b.** on the application and provide arrest and disposition documentation so USCIS can properly assess whether your arrest and/or conviction may impact your employment authorization eligibility.

**NOTE: Provide the conviction and disposition documentation even if your records were sealed, expunged, or otherwise cleared.** You must provide the documentation even if anyone, including a judge, law enforcement officer, or attorney told you that you no longer have a record or that you do not have to disclose the information.

Failure to provide the evidence listed above or secondary evidence may result in the delay or denial of your application for employment authorization.

**9. Spouse or Unmarried Child of a Principal Beneficiary of an Approved Employment-Based Immigrant Petition--(c)(36).** File Form I-765 along with supporting documentation for an initial grant or a renewal of employment authorization under the (c)(36) eligibility category. You may file your application **WITH** your spouse's or parent's application under (c)(35). You may file your application while your spouse's or parent's application under (c)(35) is **PENDING** or **AFTER** your spouse's or parent's application has been approved by USCIS. If filing with your spouse's or parent's application, USCIS will not adjudicate your Form I-765 until after USCIS has adjudicated your spouse's or parent's Form I-765 first.

**A. Initial Application:** If this is your first application for employment authorization under the (c)(36) eligibility category, you may be eligible if:

**(1)** You are the spouse or unmarried child of an individual who is filing or who has been approved for compelling circumstances employment authorization under (c)(35) (See **Proof of Relationship to the Principal Beneficiary of the Approved Form I-140** section below);

**(2)** Your spouse's or parent's application for compelling circumstances employment authorization under (c)(35) has been approved or is pending with USCIS (not required if you are filing your application at the same time as your spouse's or parent's application under (c)(35)); and

**(3)** You were in a valid nonimmigrant status when your spouse or parent applies for initial employment authorization under the (c)(35) eligibility category.

See **Item C. Supporting Evidence by Spouse or Unmarried Child below for more information regarding what documents to submit with your application, including additional requirements if you have been arrested or convicted.**

**B. Renewal Application:** You may be eligible to renew your application under the (c)(36) eligibility category if:

**(1)** You file Form I-765 before your current employment authorization expires;

**(2)** You are the spouse or unmarried child of an individual who is filing or who has been approved for compelling circumstances employment authorization under (c)(35) (See **Proof of Relationship to the Principal Beneficiary of the Approved Form I-140** below); and

AR2022_301045

**(3)** Your spouse's or parent's application for compelling circumstances employment authorization under (c)(35) has been approved or is pending with USCIS (not required if you are filing your application at the same time as your spouse's or parent's renewal application under (c)(35)).

You are not required to be in a valid nonimmigrant status when you file your renewal application.

**See Item C. Supporting Evidence by Spouse or Unmarried Child below for more information regarding what documents to submit with your application, including additional requirements if you have been arrested or convicted.**

**C. Supporting Evidence by Spouse or Unmarried Child**

**(1) Proof of Your Nonimmigrant Status.** For initial applications only, submit a copy of your Arrival-Departure Record (Form I-94) showing your admission as a nonimmigrant, a copy of your current Form I-797 Notice for Form I-129, or a copy of your current Form I-797 Notice for Form I-539.

**(2) Proof of Relationship to the Principal Beneficiary of the Approved Form I-140.** For initial and renewal applications, if you are applying as the spouse of a principal beneficiary of an approved Form I-140, submit a copy of the marriage certificate and if applicable, copies of documents showing the legal termination of all other marriages by you or your spouse. If you are applying as the child of a principal beneficiary of an approved Form I-140, submit a copy of your birth certificate or other documents to demonstrate you qualify as the principal beneficiary's child. If you cannot submit a copy of your marriage certificate or birth certificate, USCIS will consider secondary evidence.

**(3) Proof the Spouse or Parent Principal Beneficiary was Granted or has Applied for Employment Authorization Under Eligibility Category (c)(35).** For initial and renewal applications, if you submit your Form I-765 after your spouse or parent receives employment authorization under eligibility category (c)(35), submit a copy of your spouse's or parent's employment authorization document or submit a copy of your spouse's or parent's Form I-797 Notice for Form I-765.

If your spouse's or parent's application under (c)(35) is **pending** when you file your Form I-765, submit a copy of your spouse's or parent's Form I-797 Notice for the pending Form I-765. USCIS will not adjudicate your Form I-765 until USCIS has adjudicated your spouse's or parent's Form I-765.

**(4) Secondary Evidence.** If you do not have the evidence listed in **Items (1)**, **(2)**, or **(3)** above, you may ask us to consider secondary evidence in support of your application for employment authorization. For additional information on secondary evidence, see **Evidence** in the **General Instructions** section of these Instructions.

**(5) Proof of Arrests and Convictions.** For initial and renewal applications, you must submit documentation of any arrests and/or convictions. If you were ever convicted of a felony or two or more misdemeanors committed, you cannot be granted employment authorization under this eligibility category. USCIS will make the determination as to whether your crimes fall into either of these categories. You must, however, provide information and any supporting documentation on all crimes which you were convicted of so USCIS can make an appropriate decision. Provide certified copies of all arrest reports, court dispositions, sentencing documents, and any other relevant documents.

**NOTE:** USCIS may, in its discretion, deny your application if you have been arrested and/or convicted of any crime.

**D. Traffic Violations and Arrests**

Do not select the "Yes" box for **Part 2.**, **Item Number 31.b.**, on the application or submit documentation if you only have had minor traffic violations. Minor traffic violations do NOT include violations that are alcohol- or drug-related. If you were **ARRESTED** for any traffic offense, select the "Yes" box for **Item Number 31.b.** on the application and provide arrest and disposition documentation so USCIS can properly assess whether your arrest and/or conviction may impact your employment authorization eligibility.

AR2022_301046

**NOTE:  Provide the conviction and disposition documentation even if your records were sealed, expunged, or otherwise cleared.**  You must provide the documentation even if anyone, including a judge, law enforcement officer, or attorney, told you that you no longer have a record or that you do not have to disclose the information.

Failure to provide the evidence listed above or secondary evidence may result in the delay or denial of your application for employment authorization.

**Department of State Visa Bulletin**.  USCIS will adjudicate all applications for initial or renewal employment authorization according to the Visa Bulletin in effect on the date the application is filed.  To see the current Visa Bulletin, please go to **https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html** and click the link to the Visa Bulletin.

**Priority Dates.**  For more information about priority dates, please visit our Visa Availability and Priority Date website at **www.uscis.gov**.

**Filing Location.**  Please see the USCIS website at **www.uscis.gov/i-765** for the most current information on where to file your application for initial or renewal employment authorization under the (c)(35) or (c)(36) eligibility categories.

## Family-Based Nonimmigrant Categories

1. **K-1 Nonimmigrant Fiancé(e) of U.S. Citizen or K-2 Dependent--(a)(6).**  File Form I-765 along with evidence of your admission (for example, copies of your Form I-94, passport, or other travel document) and your K visa.  You are only authorized to work under this category during your 90 days in K-1 or K-2 status.  You cannot renew this EAD.  If you submit subsequent EAD applications, other than for replacement of a lost, stolen, or damaged card or a card that contains incorrect data, you must apply on a different basis.  If you have a pending application for adjustment of status, you should file under category (c)(9).

2. **K-3 Nonimmigrant Spouse of U.S. Citizen or K-4 Dependent--(a)(9).**  File Form I-765 along with evidence of your admission (for example, copies of your Form I-94, passport, or other travel document) and your K visa.

3. **Family Unity Program--(a)(13).**  If you are filing for initial or extension of family unity benefits, complete and submit Form I-817, Application for Family Unity benefits, according to the filing instructions on Form I-817.  We will issue an EAD if we approve your Form I-817.  No Form I-765 is necessary, unless you are filing for replacement of a non-expired lost, stolen, damaged, or incorrect card.

4. **LIFE Family Unity--(a)(14).**  If you are applying for initial employment authorization under section 1504 of the LIFE Act Amendments, complete and submit Form I-817.  We will issue an EAD if we approve your Form I-817; no Form I-765 is necessary unless you are filing for replacement of a non-expired lost, stolen, damaged, or incorrect card.

5. **V-1, V-2, or V-3 Nonimmigrant--(a)(15).**  If you were granted V status or an extension of V status while in the United States, file Form I-765 with evidence of your V status (for example, an approval notice, your Form I-94, passport, or other travel document).  If you are in the United States but you have not yet filed an application for V status, you may file Form I-765 at the same time as you file your application for V status.  We will adjudicate this application after adjudicating your application for V status.

## Adjustment of Status Categories

1. **Adjustment Applicant under Section 245--(c)(9).**  File Form I-765 together with Form I-485, Application to Register Permanent Residence or Adjust Status, or if filing separately, submit a copy of your I-485 receipt notice or other evidence that your Form I-485 is pending.

   **NOTE:**  If you are an asylee or refugee and have applied to adjust to lawful permanent resident status on Form I-485, file Form I-765 under category (a)(5) as an asylee or (a)(3) as a refugee.  Do not file under eligibility category (c)(9).  You will need to pay the filing fee or obtain a fee waiver for Form I-765 if your Form I-485 is still pending with USCIS and this is not your first EAD as a refugee or asylee and you did not pay the Form I-485 filing fee for any reason.

AR2022_301047

2. **Registry Applicant Based on Continuous Residence Since January 1, 1972--(c)(16).** File Form I-765 together with your Form I-485 or, if filing separately, submit a copy of your Form I-485 receipt notice or other evidence that your Form I-485 is pending.

3. **Renewal EAD for National Interest Waiver Physicians:** If you are requesting a renewal EAD based on your pending adjustment of status application and an approved National Interest Waiver Physician petition, you must also include evidence of your meaningful progress toward completing the National Interest Waiver obligation (for example, documentation of employment in any period during the previous year, such as copies of W-2 forms). If you did not work as a National Interest Waiver Physician during any period of the previous year, you must explain why and provide a statement of future intent to work as a physician in a qualifying location.

**Other Categories**

1. **Legalization Temporary Resident Pursuant to INA Sections 245A or 210--(a)(2).** File Form I-765 with a copy of your approval notice for Form I-687, Application for Status as a Temporary Resident Under Section 245A of the INA, or other evidence that your Form I-687 is approved; OR File Form I-765 with a copy of your approval notice for Form I-700, Application for Status as a Special Agricultural Worker, or other evidence that your Form I-700 is approved.

2. **N-8 or N-9 Nonimmigrant--(a)(7).** File Form I-765 with evidence of your lawful N nonimmigrant status (for example, your Form I-94, passport, or other travel document).

3. **Applicant for Cancellation of Removal--(c)(10).** File Form I-765 with evidence one of the following forms is pending with EOIR: EOIR-42A or EOIR-42B.

4. **Applicant for Legalization Pursuant to INA Section 210--(c)(20).** File Form I-765 with a copy of your receipt notice for Form I-700, Application for Status as a Temporary Resident Under Section 210 of the INA, or other evidence that your Form I-700 is pending.

5. **Applicant for Legalization Pursuant to INA Section 245A--(c)(22).** File Form I-765 with a copy of your receipt notice for Form I-687, Application for Status as a Temporary Resident Under Section 245A of the INA, or Form I-698, Application to Adjust Status from Temporary to Permanent Resident Under Section 245A of the INA, or other evidence that your Form I-687 or I-698 is pending.

6. **Parole--(c)(11).** File Form I-765 with a copy of your Form I-94, passport, or other travel document showing you were paroled into the United States for urgent humanitarian reasons or reasons of significant public benefit pursuant to INA 212(d)(5) (such as Cuban Family and Haitian Family Reunification Parole programs).

   **NOTE:** If you were paroled into the United States after having established a credible fear of persecution or torture pursuant to INA 235(b)(1)(A), you **are not eligible** for either an initial or renewal EAD under the (c)(11) eligibility category. You must wait 365 calendar days from the date you properly file and USCIS or the Immigration Court accepts your asylum application before you can request employment authorization under the (c)(8) eligibility category.

7. **Deferred Action--(c)(14).** File Form I-765 with a copy of the order, notice, or other document reflecting the grant of deferred action and proof that you have an economic necessity to work. We will consider whether you have an economic necessity to work by reviewing your current annual income, your current annual expenses, and the total current value of your assets. Provide this financial information on Form I-765WS, Form I-765 Worksheet. If you would like to provide an explanation, complete **Part 3. Explanation** of the worksheet. Supporting evidence is not required, but USCIS will accept and review any documentation that you submit. You do not need to include other household members' financial information to establish your own economic necessity.

8. **Consideration of Deferred Action for Childhood Arrivals--(c)(33).**

   A. You must file Form I-765 with Form I-821D, Consideration of Deferred Action for Childhood Arrivals, if you meet the guidelines described in the Form I-821D Instructions. Enter (c)(33) in **Part 2.**, **Item Number 27.**, as the eligibility category under which you are applying.

**AR2022_301048**

**(1)** You must file Form I-765 Worksheet to demonstrate that you have an economic necessity to work.  We will consider whether you have an economic necessity to work by reviewing your current annual income, your current annual expenses, and the total current value of your assets.  Provide this financial information on Form I-765WS.  If you would like to provide an explanation, complete **Part 3. Explanation** of the worksheet.  Supporting evidence is not required, but USCIS will accept and review any documentation that you submit.  You do not need to include other household members' financial information to establish your own economic necessity.

**(2)** The filing fee for Form I-765 is based on the Consideration of Deferred Action for Childhood Arrivals category and the associated biometric services fee **cannot** be waived.  However, we may waive the collection of certain biometrics.

9. **Final Order of Deportation or Removal, including Deferral of Removal under the Convention Against Torture--(c)(18).**  File Form I-765 with a copy of the EOIR IJ's Order of Removal and Form I-220B, Order of Supervision (if any).  Additional factors that may be considered include, but are not limited to, the following:

   **A.** Existence of a dependent spouse and/or children in the United States who rely on you for support;

   **B.** Existence of economic necessity to be employed; and

   **C.** Anticipated length of time before you can be removed from the United States.

10. **LIFE Legalization Applicant--(c)(24).**  File Form I-765 with evidence that you were a Catholic Social Services (CSS), League of United Latin American Citizens (LULAC), or Zambrano class member applicant before October 1, 2000 and a copy of the Form I-797 Notice or other evidence that your Form I-485 is pending.

11. **T-1 Nonimmigrant--(a)(16).**  If you are filing Form I-914, Application for T Nonimmigrant Status, and request an EAD as part of that application, you do not need to file Form I-765.  If you are currently in T-1 nonimmigrant status and did not request an EAD when you filed your Form I-914, you may file Form I-765 to request an EAD.  If you were granted T-1 nonimmigrant status and want to request a replacement of an EAD, file Form I-765 along with evidence of your T-1 nonimmigrant status (for example, an approval notice).

    If you have filed Form I-539 to extend your T-1 nonimmigrant status, you may file Form I-765 to request a renewal of your EAD, along with evidence of your T nonimmigrant status (for example, an approval notice).  You may file Form I-765 together with Form I-539 or after we approve your Form I-539.  If you file Form I-765 after we approve your Form I-539, submit a copy of your I-539 approval notice.

12. **T-2, T-3, T-4, T-5, or T-6 Nonimmigrant--(c)(25).**  File Form I-765 along with proof of your derivative T nonimmigrant status.  If you obtained derivative T nonimmigrant status while in the United States, you must submit a copy of the approval notice for your T nonimmigrant status.  If you were admitted to the United States as a T nonimmigrant, you must submit a copy of your passport with your T nonimmigrant visa.  If you were granted derivative T nonimmigrant status and want to request replacement of an EAD, file Form I-765 along with evidence of your derivative T nonimmigrant status (for example, an approval notice).

    If you (or the T-1 principal foreign national) filed Form I-539 to extend your T-2, T-3, T-4, T-5, or T-6 nonimmigrant status in conjunction with an extension of the principal T-1 nonimmigrant's status, you may file Form I-765 to request an initial or renewal EAD, along with evidence of your nonimmigrant status (for example, an approval notice or copy of your passport with your T nonimmigrant visa).  You may also file Form I-765 together with Form I-539 or after we approve your Form I-539.  If you file Form I-765 after we approve your Form I-539, submit a copy of your Form I-539 approval notice.

    **NOTE:**  Derivative family members of T-1 nonimmigrants living outside the United States are not eligible to receive an EAD until they lawfully enter the United States.  If you are a derivative family member who is outside the United States, do not file Form I-765.

13. **T Nonimmigrant Adjustment of Status--(c)(9).**  If you filed Form I-485 to adjust your status from a T-1, T-2, T-3, T-4, T-5, or T-6 nonimmigrant to a lawful permanent resident, you may file Form I-765 together with Form I-485 if you are seeking an EAD.  You should also include evidence of your T nonimmigrant status (for example, an approval notice or copy of your passport with your T nonimmigrant visa).  If you file Form I-765 after filing Form I-485, submit a copy of your Form I-485 receipt notice.  While your Form I-485 is pending, we will extend T nonimmigrant status until a decision is made on your Form I-485.

14. **U-1 Nonimmigrant--(a)(19).**  If you are currently residing in the United States and your Form I-918, Petition for U Nonimmigrant Status, is approved, you will receive employment authorization incident to status and USCIS will send you an EAD as evidence of that authorization.  You do not need to file Form I-765.  If you resided outside the United States when your Form I-918 was approved, you must file Form I-765 with USCIS when you enter the United States.  You must submit a copy of your passport with your U nonimmigrant visa.

If we granted your U nonimmigrant status and you want to request a replacement of an EAD, file Form I-765 along with evidence of your U nonimmigrant status (for example, an approval notice).

If you have filed Form I-539 to extend your U-1 nonimmigrant status, you may file Form I-765 to request a renewal of your EAD, along with evidence of your U-1 nonimmigrant status (for example, an approval notice).  You may file Form I-765 together with Form I-539, or after we approve your Form I-539.  If you file Form I-765 after we approve your Form I-539, submit a copy of your I-539 approval notice.

**NOTE:**  U-1 nonimmigrants living outside the United States are not eligible to receive an EAD until they lawfully enter the United States.  If you have an approved Form I-918 but are outside the United States, do not file Form I-765 until you have entered the United States.

**NOTE:**  If the statutory cap is reached within a fiscal year and USCIS uses the waiting list process described at 8 CFR 214.14(d)(2), U-1 petitioners for U nonimmigrant status in the United States can file Form I-765 to apply for an EAD based on deferred action ((c)(14)).  An application for employment authorization based on deferred action can only be approved after DHS has issued deferred action in your case, regardless of when Form I-765 is filed.

15. **U-2, U-3, U-4, or U-5--(a)(20).**  You may file Form I-765 at the same time as Form 918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient, or you may file Form I-765 at a later time.  If USCIS has granted you derivative U nonimmigrant status, file Form I-765 along with proof of your derivative U nonimmigrant status.  If you obtained derivative U nonimmigrant status while in the United States, you must submit a copy of the approval notice for that status.  If you were admitted to the United States as a U nonimmigrant, you must submit a copy of your passport with your U nonimmigrant visa.

If you (or the principal U-1 nonimmigrant) filed Form I-539 to extend your U-2, U-3, U-4, or U-5 nonimmigrant status, you may file Form I-765 to request an initial or renewal EAD, along with evidence of your nonimmigrant status (for example, an approval notice or copy of your passport with your U nonimmigrant visa).  You may file Form I-765 together with Form I-539 or after we approve your Form I-539.  If you file Form I-765 after we approve your Form I-539, submit a copy of your Form I-539 approval notice.

**NOTE:**  Derivative family members of U-1 nonimmigrants living outside the United States are not eligible to receive an EAD until they lawfully enter the United States.  If you are a derivative family member who is outside the United States, do not file Form I-765.

**NOTE:**  If the statutory cap is reached within a fiscal year and USCIS uses the waiting list process described at 8 CFR 214.14(d)(2), derivative family members of U-1 petitioners for U nonimmigrant status in the United States can file Form I-765 to apply for an EAD based on deferred action ((c)(14)).  An application for employment authorization based on deferred action can only be approved after DHS has issued deferred action in your case, regardless of when Form I-765 is filed.

AR2022_301050

16. **U Nonimmigrant Adjustment of Status--(c)(9).**  If you filed Form I-485 to adjust your status from a U-1, U-2, U-3, U-4 or U-5 Nonimmigrant to a lawful permanent resident, you may file Form I-765 along with Form I-485 if you are seeking an EAD.  You should also include evidence of your U nonimmigrant status (for example, an approval notice or copy of your passport with your U nonimmigrant visa).  If you file Form I-765 after filing your Form I-485, submit a copy of your Form I-485 receipt notice.  While your Form I-485 is pending, we will extend your U nonimmigrant status until we make a decision on your Form I-485.

17. **VAWA Self-Petitioners--(c)(31).**  If you are the principal beneficiary or derivative child of an approved VAWA self-petition, you are eligible for work authorization.  If you are filing a Form I-360 VAWA self-petition, and request an initial EAD as the principal beneficiary of the self-petition, you do not need to file Form I-765.  Principal beneficiaries of an approved VAWA self-petition seeking a renewal or replacement EAD and derivative children seeking an EAD must use Form I-765.  File Form I-765 with evidence of the principal beneficiary's approved Form I-360 VAWA self-petition (for example, a copy of the VAWA self-petition approval notice).

18. **A-3 or G-5 Nonimmigrant--(c)(14).**  If you have filed a pending civil action against your employer because your employer violated the terms of your employment contract or conditions of your employment, you may file Form I-765 to request deferred action and receive work authorization.  File Form I-765 with a copy of the civil complaint filed in court and proof of lawful admission into the United States in A-3 or G-5 status (for example, a copy of your passport with your A-3 or G-5 nonimmigrant visa).  If you are requesting renewal after your initial employment authorization is granted, file Form I-765 with evidence that the civil case is still pending (for example, a recent court docket update).

19. **Applicant for Commonwealth of the Northern Mariana Islands (CNMI) Long-Term Resident Status-- (c)(37).**  You must file Form I-765 together with your Form I-955, Application for CNMI Long-Term Resident Status.  If you do not submit your Form I-765 with all applicable fees together with your Form I-955, the entire submission will be rejected.  A fee waiver is not available.  If your Form I-955 is approved, you will receive an employment authorization document as evidence of your CNMI Long-Term Resident Status and evidence that you are authorized for employment in the CNMI incident to status.

---

## General Instructions

USCIS provides forms free of charge through the USCIS website.  To view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

**Signature.**  Each application must be properly signed and filed.  For all signatures on this application, USCIS will not accept a stamped or typewritten name in place of a signature.  If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf.  A legal guardian may also sign for a mentally incompetent person.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of the original, handwritten signature valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten, ink signature.

**Filing Fee.**  Each application must be accompanied by the appropriate filing fee.  (See the **What Is the Filing Fee** section of these Instructions.)

**Evidence.**  At the time of filing, you must submit all evidence and supporting documents listed in these Instructions.  If you do not have and cannot get a required document, you must demonstrate this and provide secondary evidence.  If secondary evidence does not exist or is unavailable, you must demonstrate both the unavailability of the required document and the relevant secondary evidence and submit two or more sworn affidavits by people not named on this application who have direct knowledge of the event and circumstances.

**Biometric Services Appointment.** USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition. After USCIS receives your application and ensures it is complete, we will inform you in writing if you need to attend a biometric services appointment. If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1. You provided or authorized all information in the application;

2. You reviewed and understood all of the information contained in, and submitted with, your application; and

3. All of this information was complete, true, and correct at the time of filing.

If you fail to attend your biometric services appointment, USCIS may deny your application.

**Copies.** You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document. USCIS may request an original document at the time of filing or at any time during processing of an application or petition. If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**NOTE:** If you submit original documents when not required or requested by USCIS, **your original documents may be immediately destroyed after we receive them.**

**Translations.** If you submit a document with information in a foreign language, you must also submit a full English translation. The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English. The certification must include the translator's signature. DHS recommends the certification contain the translator's printed name, the signature date, and the translator's contact information.

**How To Fill Out Form I-765**

1. Type or print legibly in black ink.

2. If you need extra space to complete any item within this application, use the space provided in **Part 6. Additional Information** or attach a separate sheet of paper. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately. If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed. If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

---

| Specific Instructions |
|---|

**Part 1. Reason for Applying.**

You must select one **Item Number** that best describes your reason for applying:

AR2022_301052

**Item Number 1.a.**  Initial permission to accept employment.

**Item Number 1.b.**  Replacement of a lost, stolen, or damaged EAD, or correction of your EAD not due to USCIS error.

**NOTE:**  Replacement (correction) of an employment authorization document due to USCIS error does not require a new Form I-765 and filing fee.  Refer to **Replacement for Card Error** in the **What Is the Filing Fee** section of these Instructions for further details.

**Item Number 1.c.  Renewal of your permission to accept employment.**  If you select **Item Number 1.c.**, attach a copy of your previous EAD.

**Part 2.  Information About You**

**Item Numbers 1.a. - 1.c.  Your Full Legal Name.**  Provide your full legal name as shown on your birth certificate or legal change of name document in the spaces provided.

**Item Numbers 2.a. - 4.c.  Other Names Used.**  Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

**Item Numbers 5.a. - 5.f.  Your U.S. Mailing Address.**  You must provide a valid mailing address in the United States. You may list a valid U.S. residence, APO, or commercial address.  You may also list a U.S. Post Office address (PO Box) if that is how you receive your mail.  If your mail is sent to someone other than yourself, please include an "In Care Of Name" as part of your mailing address.  If your U.S. mailing address is in a U.S. territory and it contains an urbanization name, list the urbanization name in the "In Care Of Name" space provided.  We will send your EAD to this address.  Do not use the attorney's or other legal representative's address.

**NOTE:**  If you have a pending or approved Form I-360 VAWA self-petition, Form I-914, Application for T Nonimmigrant Status, or Form I-918, Petition for U Nonimmigrant Status, and do not feel safe receiving correspondence regarding this application at your residential address, provide a safe mailing address.  You may provide a post office box (PO Box) or the address of a friend, your attorney, a community-based organization that is helping you, or any other address where you can safely and punctually receive mail.  If an alternate or safe mailing address is not provided, USCIS may use the address of your attorney or preparer, if any.  If your safe mailing address is not the same as the address where you currently reside, provide your U.S. physical address in **Item Numbers 6.a. - 6.e.**

**Item Numbers 6. - 7.e.  U.S. Physical Address.**  Type or print your physical address in the spaces provided.

**Item Number 8.  Alien Registration Number (A-Number)** (if any)**.**  An Alien Registration Number, otherwise known as an "A-Number," is typically issued to people who apply for, or are granted, certain immigration benefits.  In addition to USCIS; ICE, U.S. Customs and Border Protection (CBP), EOIR, and the DOS may also issue an A-Number to certain foreign nationals.  If you were issued an A-Number, type or print it in the spaces provided.  If you are renewing your EAD, this number may be listed as the USCIS Number on the front of the card.  If you have more than one A-Number, use the space provided in **Part 6. Additional Information** to provide the information.  If you do not have an A-Number or if you cannot remember it, leave this space blank.

**Item Number 9.  USCIS Online Account Number** (if any)**.**  If you have previously filed an application or petition using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number you were issued by the system.  You can find your USCIS Online Account Number by logging in to your account and going to the profile page.  If you previously filed certain applications or petitions on a paper form through a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number.  You may find your USCIS Online Account Number at the top of the notice.  The USCIS Online Account Number is not the same as an A-Number.  If you were issued a USCIS Online Account Number, enter it in the space provided.

**Item Number 10.  Gender.**  Select the box that indicates whether you are male or female.

AR2022_301053

**Item Number 11.  Marital Status.**  Select the box that describes the marital status you have on the date you file Form I-765.

**Item Numbers 12.  Previous Application for Employment Authorization from USCIS.**  If you have applied for employment authorization in the past, select "Yes" for **Item Number 12.**  Provide copies of your previous EADs, if available.

**Item Numbers 13.a. - 17.b.  Questions regarding Social Security Number (SSN).  Item Number 13.a.** asks you if the Social Security Administration (SSA) has ever officially issued you a Social Security card.  If the SSA ever issued a Social Security card to you in your name or a previously used name such as your maiden name, then you must enter the SSN from your card in **Item Number 13.b.**

If your request for employment authorization is approved, the SSA may assign you an SSN and issue you a Social Security card, or issue you a replacement card.  If you want the SSA to assign you a Social Security number and issue you a Social Security card, or issue you a new or replacement Social Security card, then answer "Yes" to both **Item Number 14.** and **Item Number 15.**  You must also provide your father's and mother's family and given names at birth in **Item Numbers 16.a. - 17.b.**  SSA will use **Item Numbers 16.a. -17.b.** in issuing you a Social Security card.

You are not required to request an SSN using this application.  Completing **Item Numbers 14. - 17.b.** is optional.  However, you must have an SSN properly assigned in your name to work in the United States.

**NOTE:**  If your employer uses E-Verify to confirm new employees' eligibility to legally work in the United States, the information you provide on Form I-9, Employment Eligibility Verification, will be compared to data in SSA and DHS databases.  Employees must have an SSN in order for E-Verify to confirm their eligibility to legally work in the United States.

**Item Number 18.a. - 18.b.  Country or Countries of Citizenship or Nationality.**  Type or print the name of the country or countries where you are currently a citizen or national.

1.  If you are stateless, type or print the name of the country where you were last a citizen or national.

2.  If you are a citizen or national of more than one country, type or print the name of the foreign country that issued your last passport.

**Item Numbers 19.a. - 19.c.  Place of Birth.**  Enter the name of the city, town, or village; state or province; and country where you were born.  Type or print the name of the country as it was named when you were born, even if the country's name has changed or the country no longer exists.

**Item Number 20.  Date of Birth.**  Enter your date of birth in mm/dd/yyyy format in the space provided.  For example, type or print October 5, 1967 as 10/05/1967.

**Item Numbers 21.a. - 21.e  Form I-94 Arrival-Departure Record.**  If CBP or USCIS issued you a Form I-94, Arrival-Departure Record, provide your Form I-94 number.  The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

**NOTE:**  If you were admitted to the United States by CBP at an airport or seaport after April 30, 2013, CBP may have issued you an electronic Form I-94 instead of a paper Form I-94.  You may visit the CBP website at **www.cbp.gov/i94** to obtain a paper version of an electronic Form I-94.  CBP does not charge a fee for this service.  Some travelers admitted to the United States at a land border, airport, or seaport, after April 30, 2013, with a passport or travel document, who were issued a paper Form I-94 by CBP, may also be able to obtain a replacement Form I-94 from the CBP website without charge.  If your Form I-94 cannot be obtained from the CBP website, it may be obtained by filing Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Record, with USCIS.  USCIS **does** charge a fee for this service.

**Passport and Travel Document Numbers.**  If you used a passport or travel document to travel to the United States, enter either the passport or travel document information in the appropriate space on the application, even if the passport or travel document is currently expired.

AR2022_301054

**Item Number 22.  Date of Your Last Arrival Into the United States, On or About.**  Provide the date on which you last entered the United States in mm/dd/yyyy format.

**Item Number 23.  Place of Your Last Arrival Into the United States.**  Provide the location where you last entered the United States.

**Item Number 24.  Immigration Status at Your Last Arrival.**  Provide the letter and number that correlates with your status when you last entered the United States.  For example, if you last entered the United States as a **temporary visitor for pleasure, B-2**, type or print "B-2 visitor" in the space provided.

**Item Number 25.  Your Current Immigration Status or Category.**  Provide your current immigration status.  For example, if your current status is **student academic**, **F-1**, type or print "F-1 student" in the space provided.

**Item Number 26.  Student and Exchange Visitor Information System (SEVIS) Number** (if any)**.**  If you were issued a SEVIS number, enter it in the space provided.

**Item Number 27.  Eligibility Category.**  Refer to the list of the eligibility categories in the **Who May File Form I-765** section of these Instructions.  Find your eligibility category, and enter it in the space provided.

**Item Numbers 28.a. - 28.c.  (c)(3)(C) STEM OPT Eligibility Category.**  If you entered eligibility category **(c)(3)(C)** in **Item Number 27.**, provide your degree level and major (for example, Bachelor's degree in English), your employer's name as listed in E-Verify, your employer's E-Verify Company Identification Number, or a valid E-Verify Client Company Identification Number in the spaces provided.

**Item Number 29.  (c)(26) Eligibility Category.**  If you entered eligibility category (c)(26) in **Item Number 27.**, provide the receipt number of your spouse's most recent Form I-797 Notice for Form I-129, Petition for a Nonimmigrant Worker, in the space provided.

**Item Number 30.  (c)(8) Eligibility Category.**  If you entered the eligibility category (c)(8) in **Item Number 27.**, provide an answer to the questions:

**Item Number 30.a.**  "Have you have **EVER** been arrested for and/or convicted of any crime?"  If you answered "Yes" to **Item Number 30.a.**, refer to **Special Filing Instructions for Those With Pending Asylum Applications (c)(8) in the Required Documentation** section of the Instructions for information about providing court dispositions.

**Item Number 30.b.  Lawful Entry.**  Select "Yes" if you entered the United States lawfully through a port of entry.  You **must** provide evidence of your lawful entry such as a Form I-94 or passport with entry stamp.

Select "No" if you **did not** enter the United States lawfully through a port of entry.  Complete **Item Numbers 30.c.** and **30.d. - 30.g.**

**NOTE:**  Your eligibility for an EAD under category (c)(8) requires that, after August 25, 2020 any entry into the United States was lawful and through a port of entry.  However, in limited circumstances, you may qualify for an exception to this requirement under 8 CFR 208.7(a)(1)(iii)(F).  In order for USCIS to determine whether you qualify for an exception, you must complete **Item Numbers 30.c.** and **30.d. - 30.g.**

**Item Number 30.c.  Presenting yourself to the Department of Homeland Security.**  Select "Yes" if you presented yourself to an officer or agent from the Department of Homeland Security (DHS) within 48 hours of your unlawful entry into the United States **and** expressed an intention to apply for asylum or expressed a fear of persecution or torture.  Presenting yourself to DHS includes presenting yourself to an officer or an agent from:  U.S. Customs and Border Protection, U.S. Border Patrol, U.S. Immigration and Customs Enforcement, U.S. Coast Guard, or U.S. Citizenship and Immigration Services.

Select "No" if you did not present yourself to an officer or agent from DHS within 48 hours of your unlawful entry into the United States **and** express an intention to apply for asylum or express a fear of persecution or torture.

**Item Number 30.d.  Date you presented yourself to DHS.**  Provide the date that you presented yourself to DHS.

**AR2022_301055**

**Item Number 30.e.  Location where you presented yourself to DHS.**  Provide the location where you presented yourself to DHS.

**Item Number 30.f.  Country of claimed persecution.**  Provide the name of the country from which you fear persecution or torture.

**Item Number 30.g.  Explanation of why you did not enter the United States lawfully through a port of entry.**  You must show good cause for failing to enter the United States lawfully at a port of entry.  See 8 CFR 208.7(a)(1)(iii)(F).  Examples of good cause include, but are not limited to, needing immediate medical attention or fleeing imminent serious harm.  Examples that do not constitute good cause include, but are not limited to, evasion of U.S. immigration officers, circumvention of the orderly processing of asylum seekers at a U.S. port of entry, or convenience.

**Item Number 31.a. - 31.b.  (c)(35) and (c)(36) Eligibility Category.**  If you entered the eligibility category **(c)(35)** or **(c)(36)** in **Item Number 27.**, please provide the receipt number of your Form I-797 Notice for Form I-140 or the receipt number of your spouse's or parent's Form I-797 Notice for Form I-140.  Provide an answer to the question "Have you **EVER** been arrested for and/or convicted of any crime?"

**NOTE:**  If you answered "Yes" to **Item Number 31.b.**, refer to **Employment-Based Nonimmigrant Categories**, **Items 8. - 9.** in the **Who May File Form I-765** section of the Instructions for information about providing court dispositions.

**Part 3.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature**

**Item Numbers 1.a. - 7.b.**  Select the appropriate box to indicate whether you read this application yourself or whether you had an interpreter assist you.  If someone assisted you in completing the application, select the box indicating that you used a preparer.  Further, you must sign and date your application and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every application **MUST** contain the signature of the applicant (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**Part 4.  Interpreter's Contact Information, Certification, and Signature**

**Item Numbers 1.a. - 7.b.**  If you used anyone as an interpreter to read the Instructions and questions on this application to you in a language in which you are fluent, the interpreter must fill out this section; provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the application.

**Part 5.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant**

**Item Numbers 1.a. - 8.b.**  This section must contain the signature of the person who completed your application, if other than you, the applicant.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 4.** and **Part 5.**  If the person who completed this application is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this application **MUST** sign and date the application.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your application is an attorney or accredited representative, he or she may also need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your application.

AR2022_301056

## Part 6. Additional Information

**Item Numbers 1.a. - 7.d.**  If you need extra space to provide any additional information within this application, use the space provided in **Part 6. Additional Information**.  If you need more space than what is provided in **Part 6.**, you may make copies of **Part 6.** to complete and file with your application, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

> **We recommend that you print or save a copy of your completed application to review in the future and for your records.**

## Required Documentation

You must submit all evidence requested in these Instructions with your application.  If you fail to submit required evidence, USCIS may reject or deny your application for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

You must file all applications with the documents required below, the particular evidence required for each category listed in the **Who May File Form I-765** section of these Instructions, and the appropriate filing fee, if required.

If you are required to show economic necessity for your category, submit a list of your assets, income, and expenses.  Provide this financial information on Form I-765WS, Form I-765 Worksheet.  If you would like to provide an explanation, complete **Part 3. Explanation** of the worksheet.

Assemble the documents in the following order.

1.  The appropriate filing fee, if applicable.  See the **What Is the Filing Fee** section of these Instructions for details.

2.  Your properly signed application.

3.  You must submit the following documents.

   **A.**  A copy of at least one of the following documents:  Form I-94, Arrival-Departure Record (front and back), a printout of your electronic Form I-94 from **www.cbp.gov/i94**, passport, or other travel document.  If you are filing Form I-765 under the (c)(9) category, copies of any of the above are not required.

   **B.**  A copy of your last EAD (front and back).  If you were not previously issued an EAD, you must submit a copy of a government-issued identity document (such as a passport) showing your picture, name, and date of birth; a birth certificate with photo ID; a visa issued by a foreign consulate; or a national ID document with photo and/or fingerprint.  The identity document photocopy must clearly show your facial features and contain your biographical information.

   **NOTE:**  If you are filing under the (c)(33) category, you are not required to submit additional documentation beyond what you submit with Form I-821D under **2. What documents do you need to provide to prove identity** in the **Evidence for Initial Requests Only** section of the Form I-821D Instructions.

   **C.**  Photographs

   You **must** submit two identical color passport-style photographs of yourself taken recently.  The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

The two identical passport-style photos must be 2 by 2 inches.  The photos must be in color with a full face, frontal view, on a white to off-white background.  Head height should measure 1 to 1 3/8 inches from the top of your hair to the bottom of your chin, and eye height is between 1 1/8 to 1 3/8 inches from the top of your eyes to the bottom of photo.  Your head must be bare unless you are wearing headwear as required by a religious denomination of which you are a member.  Using a pencil or felt pen, lightly print your name and A-Number (if any) on the back of the photo.

## What Is the Filing Fee?

The filing fee for Form I-765 is **$410**.

**NOTE:**  The filing fee is not refundable, regardless of any action USCIS takes on this application.  **DO NOT MAIL CASH.**  You must submit all fees in the exact amounts.

**Special Instructions for TPS Applicants.**  If you are requesting an EAD as an initial TPS applicant, you must pay the Form I-765 filing fee, unless you are under 14 years of age or over 65 years of age.  If you are a TPS beneficiary requesting an EAD when filing for TPS re-registration, you must pay the Form I-765 filing fee, regardless of your age.

**Special Instructions for Those With Pending Asylum Applications--(c)(8).**  All applicants for an initial or renewal EAD under the (c)(8) eligibility category must submit biometrics and pay the **$85** biometric services fee.  If you fail to appear for your biometric services appointment, you may be ineligible for employment authorization.

**Special Instructions for Deferred Action for Childhood Arrivals--(c)(33).**  All requestors under this category must pay the biometric services fee of **$85**.  The biometric services fee and the filing fee for this application cannot be waived.

**Special Instructions for Beneficiaries of an Approved Employment-Based Immigrant Petition--(c)(35) and Spouses or Children of a Principal Beneficiary of an Approved Immigrant Petition--(c)(36).**  All applicants under these categories must submit biometrics.  An additional biometric services fee of **$85** is required for applicants 14 to 79 years of age, unless waived.

**Special Instructions for Applicants for Commonwealth of the Northern Mariana Islands (CNMI) Long-Term Resident Status--(c)(37).**  All applicants under this category must pay the biometric services fee of $85. The biometric services fee and the filing fee for the I-765 application cannot be waived.

**Exceptions**

**Initial EAD.**  If this is your initial application and you are applying under one of the following categories, a filing fee is **not** required for:

1. (a)(3) Refugee;

2. (a)(4) Paroled as Refugee;

3. (a)(5) Asylee;

4. (a)(7) N-8 or N-9 nonimmigrant;

5. (a)(8) Citizen of Micronesia, Marshall Islands, or Palau;

6. (a)(10) Granted Withholding of Deportation;

7. (a)(16) Victim of Severe Form of Trafficking (T-1 Nonimmigrant);

8. (a)(12) or (c)(19) Temporary Protected Status if you are filing an initial TPS application and you are under 14 years of age or over 65 years of age.  All applicants for TPS re-registration who want an EAD must pay the filing fee, unless granted a fee waiver;

9. (a)(19) Victim of Qualifying Criminal Activity (U-1 Nonimmigrant);

10. (c)(1), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel;

AR2022_301058

**11.** (c)(8) Applicant for Asylum and Withholding of Deportation and Removal (an applicant filing under the special ABC procedures must pay the filing fee);

**12.** (c)(9) or (c)(16) Any current Adjustment of Status or Registry applicant who filed Form I-485 on or after July 30, 2007, and paid the appropriate Form I-485 filing fee.  If you file Form I-765 separately from your Form I-485, you must also submit a copy of your Form I-797C Notice for Form I-485, as evidence of filing Form I-485 on or after July 30, 2007, and payment of the appropriate filing fee.  If you did not pay the appropriate Form I-485 filing fee because your filing fee was waived or you are exempt from paying it, you must pay the Form I-765 filing fee or request that the filing fee be waived; and

**13.** (c)(31) VAWA Self-Petitioner.

**Renewal EAD.**  If this is a renewal application and you are applying under one of the following categories, a filing fee is **not** required for:

**1.** (a)(8) Citizen of Micronesia, Marshall Islands, or Palau;

**2.** (a)(10) Granted Withholding of Deportation;

**3.** (c)(l), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel; and

**4.** (c)(9) or (c)(16) Any current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and paid the appropriate Form I-485 filing fee.  If you file Form I-765 separately from your Form I-485, you must also submit a copy of your Form I-797C Notice for Form I-485, as evidence of filing Form I-485 on or after July 30, 2007, and payment of the appropriate form filing fee.  If you did not pay the appropriate Form I-485 filing fee because your filing fee was waived or you are exempt from paying it, you must pay the Form I-765 filing fee or request that the filing fee be waived.

**Replacement for Lost, Stolen, or Damaged EAD.**  If you are requesting a replacement EAD because your previously issued card was lost, stolen, or damaged, but has not expired, you must pay the filing fee unless you have filed for adjustment of status on or after July 30, 2007 and paid the Form I-485 filing fee.  If you did not pay the Form I-485 filing fee because your filing fee was waived or you are exempt from paying it, you must pay the Form I-765 filing fee or request that the filing fee be waived.  See Form I-912 at **www.uscis.gov/i-912**.

### Replacement for Card Error

**1.** If the card we issued to you contains incorrect information that is not attributed to our error, you must submit a new Form I-765 and filing fee, unless you have a pending Form I-485 and paid the Form I-485 filing fee.  If you did not pay the appropriate Form I-485 filing fee because your filing fee was waived or you are exempt from paying it, you must pay the Form I-765 filing fee or request that the filing fee be waived.  You must include the card containing the error when you submit the new Form I-765.

**2.** If the card we issued to you contains incorrect information that is attributed to our error, you do not need to file a new Form I-765 and filing fee.  Instead, you must submit a letter explaining the error, along with the card containing the error to the service center or National Benefits Center that approved your last Form I-765.

### Payments by Check or Money Order

**Use the following guidelines when you prepare your check or money order for the Form I-765 filing fee:**

**1.** The check or money order must be drawn on a bank or other financial institution located in the United States and must be payable in U.S. currency; **and**

**2.** Make the check or money order payable to **U.S. Department of Homeland Security.**

**NOTE:**  Spell out U.S. Department of Homeland Security; do not use the initials "USDHS" or "DHS."

**AR2022_301059**

**NOTE:** If you filed Form I-485 on or after July 30, 2007, and you paid the appropriate Form I-485 filing fee, no filing fee is required to request employment authorization on Form I-765. You may file Form I-765 with Form I-485, or you may submit Form I-765 at a later date. If you file Form I-765 separately, you must also submit a copy of your Form I-797C Notice as evidence of filing Form I-485 on or after July 30, 2007 and paying the filing fee.

If you did not pay the appropriate Form I-485 filing fee because your filing fee was waived or you are exempt from paying it, you must pay the Form I-765 filing fee or request that the filing fee be waived.

**Notice to Those Paying by Check.** If you send USCIS a check, we will convert it into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually take 24 hours and your bank will show it on your regular account statement.

You will not receive your original check back. We will destroy your original check, but will keep a copy of it. If USCIS cannot process the EFT for technical reasons, you authorize us to process the copy in place of your original check. If your check is returned as unpayable, we will re-submit the payment to the financial institution one time. If the check is returned as unpayable a second time, we will reject your application and charge you a returned check fee.

**Payments by Credit Card**

If you are filing your form at a USCIS Lockbox facility, you can pay your filing fee and biometric services fee (if applicable) using a credit card. Please see Form G-1450, Authorization for Credit Card Transactions, at **www.uscis.gov/G-1450** for more information.

**How To Check If the Fees Are Correct**

Form I-765's filing fee is current as of the edition date in the lower left corner of this page. However, because USCIS fees change periodically, you can verify that the fee is correct by following one of the steps below.

1. Visit the USCIS website at **www.uscis.gov**, select "FORMS," and check the appropriate fee; or

2. Call the USCIS National Customer Service Center at **1-800-375-5283** and ask for fee information. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Fee Waiver**

You may be eligible for a fee waiver under 8 CFR 103.7(c). If you believe you are eligible for a fee waiver, complete Form I-912, Request for Fee Waiver (or a written request), and submit it and any required evidence of your inability to pay the filing fee with this application. You can review the fee waiver guidance at **www.uscis.gov/feewaiver**.

| Where to File? |
|---|

Please see our website at **www.uscis.gov/I-765** or call our National Customer Service Center at **1-800-375-5283** for the most current information about where to file this application. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

AR2022_301060

If you are requesting an EAD as an initial TPS applicant or a TPS beneficiary, see the Form I-821 Instructions and the most recent Federal Register notice regarding a TPS designation, re-designation, or extension for your country for additional guidance and filing location. You can find information on countries designated for TPS on our website at **www.uscis.gov/tps**.

---

## Address Change

An applicant who is not a U.S. citizen must notify USCIS of his or her new address within 10 days of moving from his or her previous residence. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

---

## Processing  Information

You must have a United States address to file this application.

**Initial processing.** Once USCIS accepts your application, we will check it for completeness. If you do not completely fill out this application, you will not establish a basis for your eligibility and USCIS may reject or deny your application.

**Requests for More Information.** USCIS may request that you provide more information or evidence to support your application. We may also request that you provide the originals of any copies you submit. If we request an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.** We may request that you appear at a USCIS office for an interview based on your application. At the time of any interview or other appearance at a USCIS office, we may require that you provide your biometrics to verify your identity and/or update background and security checks.

**Decision.** The decision on Form I-765 involves a determination of whether you have established eligibility for the immigration benefit you are seeking. USCIS will notify you of the decision in writing.

**Approval.** If your application is approved, we will either mail your EAD to you or we may require you to visit your local USCIS office to pick it up.

**Denial.** If USCIS cannot approve your application, you will receive a written notice explaining the basis of your denial.

AR2022_301061

## USCIS Forms and Information

To ensure you are using the latest version of this application, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Make an Appointment" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-765, we will deny your Form I-765 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## SSA Privacy Act Statement

Sections 205(c) and 702 of the Social Security Act authorizes SSA to collect information to assign you an SSN and issue a Social Security card.  The information you furnish on this application is voluntary.  However, failure to provide the requested information may prevent SSA from issuing you an SSN and Social Security card.  SSA will maintain the information used to assign you an SSN and issue you a Social Security card in SSA's system of records [Master Files of Social Security Number (SSN) Holders and SSN Applications, 60-0058].  Complete lists of approved routine uses for the information used to assign you an SSN and issue you a Social Security card are available in the System of Records Notice 60-0058, available at **www.ssa.gov**.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this application, and the associated evidence, is collected under the Immigration and Nationality Act, 8 U.S.C. § 1324a; 8 CFR 274a.12, and 8CFR 274a.13.

**PURPOSE:**  The primary purpose for providing the requested information on this application is to determine eligibility for certain aliens who are temporarily in the United States requesting an Employment Authorization Document.  DHS uses the information you provide to grant or deny the benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number, and any requested evidence may delay a final decision or result in a rejection or denial of your application.

**ROUTINE USES:**  DHS may, where allowable under relevant confidentiality provisions, share the information you provide on this application and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses, as described in the associated published system of records notices [DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records; DHS/USCIS-007 Benefits Information System; DHS/USCIS-010 Asylum Information and Pre-Screening System of Records; DHS/USCIS-017 Refugee Case Processing and Security Screening Information System of Records; and DHS/ USCIS-018 Immigration Biometric and Background Check (IBBC) System of Records], and the published privacy impact assessments [DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System (Claims 3) and Associated Systems; DHS/USCIS/PIA-027 USCIS Asylum Division; DHS/USCIS/PIA-056 USCIS Electronic Immigration System (USCIS ELIS); and DHS/USCIS/PIA-068 Refugee Case Processing and Security Vetting], which can be found at **www.dhs.gov/privacy**.  DHS may also share this information as appropriate for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 4 hours and 45 minutes per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.  The collection of biometrics is estimated to require 1 hour and 10 minutes.  The public reporting burden for the collection of information for Form I-765WS is estimated at 30 minutes per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0040.  **Do not mail your completed Form I-765 to this address.**



# Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative

**Department of Homeland Security**

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 05/31/2021

---

## What Is the Purpose of Form G-28?

This form is used to establish the eligibility of an attorney or accredited representative to represent a client (applicant, petitioner, requestor, beneficiary or derivative, or respondent) in an immigration matter before U.S. Department of Homeland Security (DHS). An attorney or accredited representative appearing before DHS must file Form G-28 in each case. U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) will only recognize a properly completed Form G-28 that was signed by the attorney or accredited representative and the client.

USCIS, CBP, and ICE will recognize Form G-28 until the conclusion of the matter for which it is entered, unless otherwise notified. You must file a new Form G-28 with the Administrative Appeals Office if you are filing Form I-290B, Notice of Appeal or Motion.

**NOTE:** For matters before the Board of Immigration Appeals (BIA), use Form EOIR-27 instead of Form G-28.

---

## Who May Use Form G-28?

### Attorneys and Accredited Representatives

This form is used only by attorneys and accredited representatives as defined in 8 CFR parts 1.2 and 1292.

If you are an attorney or accredited representative appearing in person at a DHS office for a limited purpose, such as appearing for an interview, and at the request of an attorney or accredited representative who previously filed Form G-28 in the same case, you must complete and submit Form G-28 in person at a DHS office.

**NOTE:** The original attorney or accredited representative of record will remain the attorney or accredited representative of record in this situation. Any notices and communications USICS sends following the interview will continue to be sent to the original attorney or accredited representative of record.

In accordance with 8 CFR 292.4(a), when you act in a representative capacity, your personal appearance or signature will constitute a representation under 8 CFR parts 103.2(a)(3) and 292.1(a)(1) or part 1292 that you are authorized and qualified to represent the individual or entity. DHS may require further proof of authority to act in a representative capacity.

### Law Students and Law Graduates

A law student or law graduate who is working under the direct supervision of an attorney or accredited representative under 8 CFR 292.1(a)(2) must complete **Part 2.**, **Item Numbers 4.a.** and **4.b.,** on the same Form G-28 filed by the supervising attorney or accredited representative. The law student or law graduate must sign the same Form G-28 in **Part 5.**, **Item Numbers 2.a - 2.b.** DHS may require law students and law graduates verify they are eligible under 8 CFR 292.1(a)(2). The appearance of a law student or law graduate requires the permission of the DHS official before whom he or she wishes to appear. The DHS official may require the law student or law graduate be accompanied by the supervising attorney or accredited representative.

### Foreign Attorneys

Attorneys not licensed to practice law in the United States must use Form G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States. Such attorneys may only represent individuals in matters filed and adjudicated in DHS offices outside the United States. DHS has sole discretion to permit such representation.

---

**Other Representatives**

Individuals seeking to appear as reputable individuals may not use Form G-28.  They must obtain permission from DHS to appear on behalf of an applicant, petitioner, requestor, beneficiary or derivative, or respondent.  DHS will require the individual establishes he or she meets the definition of a reputable individual at 8 CFR 292.1(a)(3).

## General Instructions

USCIS provides forms free of charge through the USCIS website.  In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have Internet access, you may call the USCIS National Customer Service Center at **1-800-375-5283** and ask that we mail a form to you.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Signature.**  Each Form G-28 must be properly signed and filed.  For all signatures on this form, USCIS will not accept a stamped or typewritten name in place of a signature.

**Validity of Signatures.**  For Form G-28, USCIS will consider a photocopied, faxed, or scanned copy of the original handwritten signature valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten, ink signature.

### How To Fill Out Form G-28

1. Type or print legibly in black ink.

2. If you need extra space to complete any item within this form, use the space provided in **Part 6. Additional Information** or attach a separate sheet of paper.  Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately.

## Specific Instructions

**Part 1.  Information About Attorney or Accredited Representative**

**Item Number 1.  USCIS Online Account Number** (if any)**.**  If you (the attorney or accredited representative) have previously filed an application or petition using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number you were issued by the system.  You can find your USCIS Online Account Number by logging in to your account and going to the profile page.  If you previously filed certain applications or petitions on a paper form through a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number.  You may find your USCIS Online Account Number at the top of the notice.  The USCIS Online Account Number is not the same as an Alien Registration Number (A-Number).  If you were issued a USCIS Online Account Number, enter it in the space provided.

**Item Numbers 2.a. - 7.  Attorney or Accredited Representative Information.**  Provide the full name, mailing address, and contact information of the attorney or accredited representative

AR2022_301065

**Part 2.  Eligibility Information for Attorney or Accredited Representative**

**Item Numbers 1.a. - 1.d.  Eligibility Information.**  If you are an attorney admitted to practice in the United States, as defined in 8 CFR 1.2, you must select **Item Number 1.a.** and provide the required information regarding the licensing authority for all states, possessions, territories, commonwealths, or the District of Columbia, where you are admitted.  Attorneys must provide the bar numbers, if applicable, for all jurisdictions in which they are admitted to practice in **Item Number 1.b.**  If you are subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting you in the practice of law, you must select **Item Number 1.c.** and disclose this information using the space provided in **Part 6. Additional Information**.  Attorneys are required to notify DHS of convictions or discipline under 8 CFR 292.3.  You must also provide the name of your law firm or organization, if applicable, in **Item Number 1.d.**  If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

**Item Numbers 2.a. - 2.c.  Eligibility Information.**  If you are an accredited representative of a recognized organization, as defined in 8 CFR part 1292, you must select **Item Number 2.a.** and provide the name of the organization recognized by the Department of Justice under 8 CFR part 1292 and the date of your accreditation in **Item Numbers 2.b - 2.c.**

**NOTE:**  We will reject any Form G-28 submitted without the required information in **Part 2.**, **Item Numbers 1.a. - 1.d.** or **2.a. - 2.c.**

**Item Number 3.  Eligibility Information.**  Only complete this item if you are not the attorney or accredited representative of record, but are standing in for that person for a limited purpose.  You must select the box and provide the name of the attorney or accredited representative of record in this matter.  **You must submit a Form G-28 filed under these circumstances in person at a DHS office.  A separate Form G-28 must be filed by each attorney or accredited representative who appears in the matter.**

**Item Numbers 4.a. - 4.b.  Eligibility Information.**  If you are a law student or law graduate not yet admitted to the bar, you must select **Item Number 4.a.**, enter the information in **Item Number 4.b.**, **and** sign and date in **Part 5.**, **Item Numbers 2.a. - 2.b.**, of the same Form G-28 filed by the supervising attorney or accredited representative.  The appearance of law students and law graduates is subject to the requirements of 8 CFR 292.1(a)(2).

**Part 3.  Notice of Appearance as Attorney or Accredited Representative**

**Item Numbers 1.a. - 3.b.  Appearance before USCIS, ICE, or CBP.**  Select **only one** box to indicate the DHS agency where the matter is pending.  If you select the box for USCIS, list the form numbers filed with Form G-28 or the specific matter in which the appearance is entered.  If you select the box for CBP or ICE, list the specific matter in which the appearance is entered.

**Item Number 4.  Receipt Number.**  Provide the Receipt Number for the application or petition pending with USCIS, if any.

**Item Number 5.  Client Type.**  Select **only one** box to indicate your appearance for the client.

**Item Numbers 6.a. - 7.b.  Information About Client.**  Provide the full name of the client.  If the client is an entity, provide the name of the entity and the title of the entity's authorized signatory.

**Item Number 8.  Client's USCIS Online Account Number** (if any)**.**  If the client has previously filed an application or petition using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number he or she was issued by the system.  The client can find the USCIS Online Account Number by logging in to his or her account and going to the profile page.  If the client previously filed certain applications or petitions on a paper form through a USCIS Lockbox facility, he or she may have received a USCIS Online Account Access Notice issuing a USCIS Online Account Number.  He or she may find the USCIS Online Account Number at the top of the notice.  The USCIS Online Account Number is not the same as an A-Number.  If the client was issued a USCIS Online Account Number, enter it in the space provided.

**Item Number 9.  Client's Alien Registration Number (A-Number)** (if any)**.**  Provide the Alien Registration Number (A-Number) for the client, if any.

AR2022_301066

**Item Numbers 10. - 12.  Client's Contact Information.**  Provide the daytime telephone number, the mobile telephone number, and the email address for the client, if any.

**Item Numbers 13.a. - 13.h.  Mailing Address of Client.**  Provide the mailing address of the client.  **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

## Part 4.  Client's Consent to Representation and Signature

The client's signature on this form confirms consent to representation and the release of information to the attorney or accredited representative.

**Item Numbers 1.a. - 1.c.  Options Regarding Receipt of USCIS Notices and Documents.**  The client must select **Item Numbers 1.a. - 1.c.** if he or she wants USCIS to send original notices and/or secure identity documents to the attorney or accredited representative of record.  When **Item Numbers 1.a.** and **1.b.** are selected, original notices and secure identity documents will be sent to the attorney or accredited representative of record and copies will be sent to the client.  If the client wants to receive notices containing Form I-94, Arrival-Departure Record, rather than having USCIS send these notices to the attorney or accredited representative of record, **Item Number 1.c.** must be selected.

**NOTE:  USCIS will not mail secure identity documents to a private, commercial, or business address in a foreign country.**  USCIS, however, will mail secure identity documents to a **U.S. business address** of an attorney admitted to practice law outside of the United States or to a designated Army/Air Post Office (APO), Fleet Post Office (FPO), or Diplomatic Post Office (DPO) address.  USCIS will mail notices and other correspondence to a foreign address.

**Item Numbers 2.a. - 2.b.  Signature of Client or Authorized Signatory for an Entity.**  The client **must sign and date the form in black ink.**  If the client is under 14 years of age, a parent or legal guardian may sign Form G-28 on his or her behalf.  A legal guardian may also sign for a mentally incompetent person.

## Part 5.  Signature of Attorney or Accredited Representative

**Item Numbers 1.a. - 2.b.  Signature of Attorney or Accredited Representative.**  The attorney or accredited representative and, if applicable, law student or law graduate must sign and date the form in black ink.

## Part 6.  Additional Information

**Item Numbers 1.a. - 6.d.**  If you need extra space to provide any additional information within this form, use the space provided in **Part 6. Additional Information**.  For example, if you need more space to provide your U.S. business address for purposes of receiving secure identity documents for your client (if your client has consented to your receipt of such documents in **Part 4.**)  If you need more space than what is provided in **Part 6.**, you may make copies of **Part 6.** to complete and file with your form, or attach a separate sheet of paper.  Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

> **We recommend that you print or save a copy of your completed Form G-28
> to review in the future and for your records.**

### Warning

Individuals appearing as attorneys or accredited representatives (including law students and law graduates permitted to appear under 8 CFR 292.1(a)(2)) are subject to the rules of Professional Conduct for Practitioners found in 8 CFR 292.3.

AR2022_301067

## Freedom of Information/Privacy Act Requests

You may not use this form to request records under the Freedom of Information Act or the Privacy Act, Title 5 U.S.C. sections 552 and 552a.  You may find the procedures for requesting such records in 6 CFR 5 and at **www.uscis.gov**.

## USCIS Privacy Notice

**AUTHORITIES:**  The information requested on this form is collected pursuant to 8 CFR 292.4(a).

**PURPOSE:**  The primary purpose for providing the requested information on this form is to establish your eligibility to appear and act on behalf of a client.  The information you provide will be used to designate you as an attorney or accredited representative.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information may prevent your ability to represent an individual or entity.

**ROUTINE USES:**  The information will be used by and disclosed to DHS personnel and contractors or other agents who need the information to perform associated administrative functions.  Additionally, DHS may share the information with other Federal, state, local government agencies, and authorized organizations in accordance with approved routine uses, as described in the associated published system of records notices [DHS/USCIS-001 - Alien File and National File Tracking System, DHS/USCIS-007 - Benefits Information System, DHS/USCIS-010 - Asylum Information and Pre-Screening, DHS/USCIS-005 Inter-Country Adoptions Security, DHS/USCIS-006 Fraud Detection and National Security Records, and DHS/USCIS-017 Refugee Case Processing and Security] as described in the published privacy impact assessments [DHS/USCIS/PIA-015 Computer Linked Application Information Management (CLAIMS 4) Update, DHS/USCIS/PIA-016 Computer Linked Application Information Management (CLAIMS 3), and Associated Systems, DHS/USCIS/PIA-056 ELIS, DHS/USCIS/PIA-027(c)-USCIS Asylum Division, DHS/USCIS/PIA-003(b) Integrated Digitization Document Management Program, DHS/USCIS/PIA-007(b) Domestically Filed Intercountry Adoptions and Petitions, DHS/USCIS/PIA-013(a) Fraud Detection and National Security Data System, and DHS/USCIS/PIA-051 Case and Activity Management for International Operations] which can be found at **www.dhs.gov/privacy**.  The information may also be made available, as appropriate for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 50 minutes per response, including the time for reviewing instructions and completing and submitting the form.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0105.  **Do not mail your completed Form G-28 to this address.**

AR2022_301068



# Instructions for Consideration of Deferred Action
## for Childhood Arrivals

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 03/31/2023

---

## What is the Purpose of this Form?

An individual may file Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to request that U.S. Citizenship and Immigration Services (USCIS) exercise prosecutorial discretion in his or her favor under the Deferred Action for Childhood Arrivals (DACA) process, including consideration for Renewal of deferred action. USCIS considers deferring action (including Renewal of deferred action) on a case-by-case basis, based on the guidelines in the **What is a Childhood Arrival for Purposes of This Form** section of these instructions. Deferred action is a discretionary determination to defer removal of an individual as an act of prosecutorial discretion. Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral. See the Secretary of Homeland Security's memorandum issued on June 15, 2012 (Secretary's memorandum), upon which the DACA process is based, at **www.uscis.gov/childhoodarrivals**.

## When Should I Use Form I-821D?

Use this form to request consideration of Initial DACA or Renewal of DACA. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. All individuals filing Form I-821D, whether for an Initial or a Renewal of deferred action, must also file Form I-765, Application for Employment Authorization, and Form I-765 Worksheet, Form I-765WS. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more information.

**CAUTION:** If you file this request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. **USCIS encourages renewal requestors to file as early in the 150-day period as possible - ideally, at least 120 days prior to the DACA expiration date.**

**NOTE:** If you have received DACA and you are filing within one year after your last period of deferred action expired, please follow the instructions provided below for renewal requestors.

**NOTE:** If U.S. Immigration and Customs Enforcement (ICE) initially deferred action in your case and you are seeking a Renewal, you must file Form I-821D and select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to ALL subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

If you are currently in immigration detention, you may not request consideration of DACA or Renewal of DACA from USCIS. If you think you meet the guidelines of this process, you should identify yourself to your deportation officer.

## What is a Childhood Arrival for Purposes of This Form?

An individual may be considered for Initial DACA if he or she:

1. Was under 31 years of age as of June 15, 2012;

2. Came to the United States before reaching his or her 16th birthday;

3. Has continuously resided in the United States since June 15, 2007, up to the present time;

---

4.  Was present in the United States on June 15, 2012 and at the time of making his or her request for consideration of deferred action with USCIS;

5.  Had no lawful status on June 15, 2012;

    **NOTE:** No lawful status on June 15, 2012 means that:

    **A.** You never had a lawful immigration status on or before June 15, 2012; or

    **B.** Any lawful immigration status or parole that you obtained prior to June 15, 2012 had expired as of June 15, 2012.

6.  Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general educational development (GED) certificate, or is an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard; and

7.  Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

An individual may be considered for **Renewal** of DACA if he or she met the guidelines for consideration of Initial DACA (see above) AND he or she:

1.  Did not depart the United States on or after August 15, 2012 without advance parole;

2.  Has continuously resided in the United States since he or she submitted his or her most recent request for DACA that was approved up to the present time; and

3.  Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

---

## Who May File Form I-821D?

1.  **Childhood Arrivals Who Have Never Been in Removal Proceedings.** If you have never been in removal proceedings, submit this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

2.  **Childhood Arrivals Whose Removal Proceedings Were Terminated.** If you were in removal proceedings which have been terminated by the immigration judge prior to this request, you may use this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

3.  **Childhood Arrivals In Removal Proceedings, With a Final Removal Order, or With Voluntary Departure.** If you are in removal proceedings, have a final order of removal, exclusion, or deportation issued in any other context, have a voluntary departure order, or if your proceedings have been administratively closed, you may use this form to request that USCIS consider deferring action in your case, even if you are under 15 years of age at the time of filing. For the purpose of this form, "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997, an Immigration and Nationality Act (INA) section 240 removal proceeding, expedited removal, reinstatement of a final order of exclusion, deportation, or removal, an INA section 217 removal after admission under the Visa Waiver Program, removal as a criminal alien under INA section 238, or any other kind of removal proceeding under U.S. immigration law in any other context (e.g., at the border or within the United States by an immigration agent).

4.  **Childhood Arrivals Whose Case Was Deferred and Who Are Seeking Renewal of DACA.** If USCIS or ICE deferred action in your case under DACA, you may use this form to request consideration of Renewal of DACA from USCIS.

---

AR2022_301070

## General Instructions

USCIS provides forms free of charge through the USCIS website. In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which can be downloaded for free at **http://get.adobe.com/reader/**.

Each request must be properly signed and accompanied by Form I-765 with fees and Form I-765WS. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment. A photocopy of a signed request or typewritten name in place of a signature is not acceptable. This request is not considered properly filed until accepted by USCIS.

**Evidence.** You must submit all required evidence and supporting documentation with your request at the time of filing. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more details.

You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

**Biometric Services Appointment.** Individuals requesting DACA must provide fingerprints, photographs, and signatures (biometrics). You may receive a notice scheduling you to appear at an Application Support Center (ASC) for biometrics collection. Failure to comply with the notice may result in the denial of your deferred action request. USCIS may, in its discretion, waive the collection of certain biometrics.

**Copies.** You may submit a legible photocopy of any document, unless you are specifically required to file an original document with this request. Original documents submitted when not required may remain a part of the record, and USCIS will not automatically return them to you.

**Translations.** Any document you submit to USCIS that contains a foreign language must have a full English translation. The translator must certify that the English translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.

An example of a certification would read, "I [typed name], certify that I am fluent (conversant) in the English and [insert other language] languages, and that the above/attached document is an accurate translation of the document attached entitled [name of document]." The certification should also include the date, the translator's signature and typed name, and the translator's address.

**Advance Parole.** If you wish to file a request for Advance Parole, please follow the instructions for filing Form I-131, Application for Travel Document. You can get the most current information on how to apply for advance parole by visiting the USCIS website at **www.uscis.gov/i-131** or calling the National Customer Service Line at **1-800-375-5283** or **1-800-767-1833** (TTY for the hearing impaired). Customer service officers are available Monday - Friday from 8 a.m. - 6 p.m. in each U.S. time zone.

**Travel Warning.** On or after August 15, 2012, if you travel outside of the United States before USCIS has determined whether to defer action in your case, you will not be considered for deferred action. Even after USCIS has deferred action in your case under DACA, you should not travel outside the United States unless you have been issued an Advance Parole Document by USCIS. Deferred action will terminate automatically if you travel outside the United States without obtaining an Advance Parole Document from USCIS. In addition, leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

AR2022_301071

**How To Fill Out Form I-821D**

1. This form consists of eight parts. Requestors for Initial DACA and those requestors seeking Renewal of DACA should fill out most parts. However, only requestors for Initial DACA should complete **Part 3.** See below for greater detail.

   **Part 1. Information About You.** All requestors must complete this part.

   **Part 2. Residence and Travel Information.** All requestors must complete this part. Please be aware that Initial requestors must provide more extensive information than Renewal requestors.

   **Part 3. For Initial Requests Only.** Renewal requestors should skip this part.

   **Part 4. Criminal, National Security, and Public Safety Information.** All requestors must complete this part.

   **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** All requestors must complete this part.

   **Part 6. Contact Information, Certification, and Signature of the Interpreter.** Any requestor using an interpreter must complete this part.

   **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor.** If you had someone else prepare your request, he or she must complete this part.

   **Part 8. Additional Information.** Any requestor may complete this part if additional space is needed.

2. Further Information on filling out Form I-821D:

   **A.** Type or print legibly in black ink.

   **B.** If you need extra space to complete any item within this request, use **Part 8. Additional Information** and make additional copies of this sheet as needed. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

   **C.** Answer all questions fully and accurately. If an item is not applicable or the answer is "none," type or print "N/A," unless otherwise directed.

   **D.** All dates must be entered as mm/dd/yyyy. You may provide approximate dates if you do not know the exact date. Do not leave a date response blank.

   **E.** **Processing Information.** You must provide the biometrics information requested in **Part 1.**, **Item Numbers 15. - 20.** Providing this information as part of your request may reduce the time you spend at your USCIS ASC appointment.

   **F.** **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** Select the box that indicates whether someone interpreted this form for you. If applicable, the attorney, accredited representative, or other individual who helped prepare this form for you must complete **Part 7.** and sign and date the form. Every request must contain the requestor's original signature. A photocopy of a signed request or a typewritten name in place of a signature is **not** acceptable. Sign and date the form and provide your daytime telephone number, mobile telephone number, and email address. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment.

   **G.** **Part 6. Contact Information, Certification, and Signature of the Interpreter.** If you used an interpreter to read the instructions and complete the questions on this form, the interpreter must fill out **Part 6.** The interpreter must provide his or her full name, the name of his or her business or organization, an address, a daytime telephone number, and an email address. He or she must also sign and date the form.

**H. Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other Than the Requestor.** If the person who completed this request, is someone other than the person named in **Part 1.**, he or she must complete this section of the request, provide his or her name, the address of his or her business or organization (if any), and his or her contact information. If the person completing this request is an attorney or accredited representative, he or she must submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with this request. Further, the attorney or accredited representative, and anyone who assisted in preparing your request, must sign and date the request. This section of the request **MUST** contain the original signature of the attorney or accredited representative, and anyone who assisted in preparing your request. A typewritten name in place of a signature is not acceptable.

## Evidence for Initial Requests Only

**NOTE:** If you are submitting an **Initial Request** for consideration of DACA to USCIS, you will need to submit documents showing how you believe you have satisfied each DACA guideline.

1. What documents should you submit with your Form I-821D?

    **A.** You do not need to submit original documents unless USCIS requests them.

    **B.** Evidence and supporting documents that you file with your Form I-821D should show that you are at least 15 years of age at the time of filing, if required (see the **Who May File Form I-821D** section of these instructions for more information), and that you meet all of the following:

    **(1)** Were born after June 15, 1981 (i.e., You were not age 31 or older on June 15, 2012);

    **(2)** Arrived in the United States before 16 years of age;

    **(3)** Have continuously resided in the United States since June 15, 2007, up to the present time;

    **(4)** Were present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

    **(5)** Had no lawful status on June 15, 2012; and

    **(6)** Are currently in school, graduated or received a certificate of completion from high school, obtained a GED certificate or other equivalent state-authorized exam in the United States, or that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard.

2. What documents do you need to provide to prove identity?

    Submit copies of any of the following:

    **A.** Passport;

    **B.** Birth certificate accompanied by photo identification;

    **C.** Any national identity document from your country of origin bearing your photo and/or fingerprint;

    **D.** Any U.S. government immigration or other document bearing your name and photograph (e.g., EADs, visas, driver's licenses, non-driver cards);

    **E.** Any school-issued form of identification with photo;

    **F.** Military identification document with photo;

    **G.** State-issued photo ID showing date of birth; or

    **H.** Any other document with photo that you believe is relevant.

    **NOTE:** Expired documents are acceptable.

AR2022_301073

**3. What documents may show that you came to the United States before your 16th birthday?**

Submit copies of any of the following documents:

**A.** Passport with an admission stamp indicating when you entered the United States;

**B.** Form I-94, I-94W, or I-95 Arrival-Departure Record;

**C.** Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);

**D.** Travel records, such as transportation tickets showing your dates of travel to the United States;

**E.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**F.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**G.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding); or

**H.** Any other document that you believe is relevant.

**4. If you left the United States for some period of time before your 16th birthday and returned on or after your 16th birthday to begin your current period of continuous residence, what documents may show that you established residence before your 16th birthday?**

Submit copies of any of the following documents:

**A.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**C.** Documents evidencing that you were physically present in the United States for multiple years prior to your 16th birthday; or

**D.** Any other relevant document.

**5. What documents may show that you continuously resided in the United States since June 15, 2007, up to the present date?**

Submit copies of any relevant documents such as:

**A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

**C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

---

AR2022_301074

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**6. Do brief departures interrupt continuous residence?**

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States for any period of time, your absence will be considered brief, casual, and innocent, if it was on or after June 15, 2007, and before August 15, 2012, and:

**A.** The absence was short and reasonably calculated to accomplish the purpose for the absence;

**B.** The absence was not because of an order of exclusion, deportation, or removal;

**C.** The absence was not because of an order of voluntary departure or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

**D.** The purpose of the absence and/or your actions while outside of the United States were not contrary to law.

**In Part 3. Arrival/Residence Information,** list all your absences from the United States since June 15, 2007. Include information about all your departure and return dates, and the reason for your departures. Documents you can submit that may show your absence was brief, casual, and innocent include, but are not limited to:

**A.** Plane or other transportation tickets or itinerary showing the travel dates;

**B.** Passport entries;

**C.** Hotel receipts showing the dates you were abroad;

**D.** Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);

**E.** Copy of Advance Parole Document issued by USCIS; and

**F.** Any other evidence that could support a brief, casual, and innocent absence.

**7. What documents may demonstrate that you were present in the United States on June 15, 2012?**

Submit copies of any relevant documents such as:

**A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

**C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**8. What documents may show you had no lawful status on June 15, 2012?**  (Submit documents if you were admitted or paroled, or otherwise obtained a lawful immigration status, on or before June 15, 2012, or you were or are in removal proceedings.)

Submit copies of any of the following documents:

**A.** Form I-94, I-94W, or I-95 Arrival/Departure Record showing the date your authorized stay expired;

**B.** If you have a final order of exclusion, deportation, or removal issued as of June 15, 2012, submit a copy of that order and related charging documents, if available;

**C.** An INS or DHS charging document placing you into removal proceedings, if available; or

**D.** Any other document that you believe is relevant to show that on June 15, 2012, you had no lawful status.

**9. What documents may demonstrate that you:  a) are currently in school in the United States at the time of filing; b) have graduated or received a certificate of completion or a certificate of attendance from a U.S. high school, a U.S. public or private college or university, including community college; or c) have obtained a GED certificate or other equivalent state-authorized exam in the United States?** (If applicable)

USCIS recognizes that schools, educational programs, school districts, and state education agencies around the country issue educational records in a variety of formats.  USCIS does not require educational records to be presented in any particular format.

**A.** To be considered "currently in school," you are to demonstrate that you are currently enrolled in one of the following:

    **(1)** A U.S. public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home school program meeting state requirements;

    **(2)** An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in post-secondary education, job training, or employment, and where you are working toward such placement, and that the program:

        **(a)** Is administered by a non-profit entity; or

        **(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

        **(c)** Is of demonstrated effectiveness;

**(3)** An education program in the U.S. assisting students in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other equivalent state-authorized exam, and that the program:

**(a)** Is administered by a non-profit entity; or

**(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

**(c)** Is of demonstrated effectiveness;

**(4)** A U.S. public or private college or university including community college.

Evidence of enrollment may include, but is not limited to: school registration cards, acceptance or other letters demonstrating enrollment or attendance, current transcripts, report cards, progress reports, or other documents issued by a school district, state education agency, school, or program.  These documents should show your name; the name of the school district, or state educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your current educational or grade level.

If you have been accepted for enrollment and your classes have not yet begun, you may submit an acceptance letter with evidence that you have registered for classes or any other relevant evidence showing you have committed to starting classes on a certain date, including, for example, a copy of your tuition bill, your class schedule, or your Individualized Educational Program.

If you are enrolled in an educational, literacy, or career training program (including vocational training or an ESL course), evidence that the program is funded in whole or in part by Federal, state, local, or municipal funds includes a letter or other documentation from an authorized representative of the program that includes information such as: your name and date of enrollment, the duration of the program and expected completion date, the program's source of public funding, and the program's authorized representative's contact information.

If you are enrolled in an education, literacy, or career training program that is not publicly funded, evidence that the program is of demonstrated effectiveness may include information from an authorized school representative relating to: the duration of the program's existence; the program's track record in placing students in employment, job training, or post-secondary education; receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or any other information indicating the program's overall quality.

**B.** Evidence to show that you meet the educational guideline because you have "graduated from school" or "obtained a GED certificate" or other equivalent state-authorized exam in the United States includes, but is not limited to:

**(1)** A high school diploma from a U.S. public or private high school or secondary school;

**(2)** A recognized equivalent of a U.S. high school diploma under state law, including a GED certificate or other equivalent state-authorized exam, a certificate of completion, or a certificate of attendance;

**(3)** A transcript that identifies the date of graduation or program completion;

**(4)** An enrollment history that shows the date of graduation or program completion;

**(5)** A degree from a public or private college or university or a community college; or

**(6)** An alternate award from a U.S. public or private high school or secondary school.

These documents should show your name; the name of the U.S. school district, educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your date of graduation or completion.

**10. What documents may demonstrate that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?** (If applicable)

Submit copies of the following documents:

**A.** Form DD-214, Certificate of Release or Discharge from Active Duty;

**B.** NGB Form 22, National Guard Report of Separation and Record of Service;

AR2022_301077

**C.** Military personnel records;

**D.** Military health records; or

**E.** Any other relevant document.

**11.** **What additional documents should you submit if you are currently or have been in removal proceedings?**

Submit a copy of the removal order, any document issued by the immigration judge, or the final decision of the Board of Immigration Appeals (BIA), if available.  If you have not been in removal proceedings, this question does not apply to you.

**12.** **What evidence should I submit to demonstrate my criminal history?**

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you.  If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

**A.** If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable court order confirming that no charges were filed for each arrest.  If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**B.** If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order).  If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**C.** If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

**(1)** An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

**(2)** An original statement from the court that no record exists of your arrest or conviction.

If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**NOTE:  You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol - or drug-related.**

---

### Evidence for Renewal Requests Only

**NOTE:**  If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

If you are seeking a **Renewal** of DACA, respond to all questions, except where the section or question indicates "For Initial Requests Only."

If you are currently in exclusion, deportation, or removal proceedings, see **Item Number 11.** (above) for additional guidance.

If you have any criminal history, see **Item Number 12.** (above) for additional guidance.

AR2022_301078

With your Renewal request, you only need to submit any new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS. If USCIS needs more documentation from you, USCIS will send a Request for Evidence to you explaining the needed information. However, you should submit new documents if any of the following situations apply to you:

1. You are currently in exclusion, deportation, or removal proceedings (please note, you do not need to submit these documents if your case was administratively closed); or

2. You have been charged with, or convicted of, a felony or misdemeanor (please note, you do not need to submit these documents if you already submitted them with a previous DACA request).

**NOTE:** You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

If ICE initially deferred action in your case and you are seeking a Renewal, you must select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to **ALL** subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

**NOTE:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol-or drug- related.

---

## Additional Information Relevant to ALL Requests for DACA

1. **What other factors will USCIS consider when making a determination on deferred action?**

   USCIS will also conduct a background check. USCIS may consider deferring action in your case even if you have been arrested or detained by any law enforcement officer and charges were filed, or if charges were filed against you without an arrest. USCIS will evaluate the totality of the circumstances in reaching a decision on deferred action.

   In accordance with the Secretary's memorandum, if USCIS determines that you have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or that you otherwise pose a threat to national security or public safety, USCIS is unlikely to defer action in your case. See the Frequently Asked Questions at www.uscis.gov/childhoodarrivals.

   Even if you satisfy the threshold criteria for consideration of DACA, USCIS may deny your request if it determines, in its unreviewable discretion, that an exercise of prosecutorial discretion is not warranted in your case.

2. **What else should you submit with Form I-821D?**

   USCIS will not consider deferring action in your case unless your Form I-821D is accompanied by Form I-765, with fees, and Form I-765WS. If you do not include Form I-765 with all applicable fees with your Form I-821D, your entire submission will be rejected.

   **Optional E-Notification of Request Acceptance.** You may submit Form G-1145, Notification of Application/ Petition Acceptance, an optional form, which will notify you electronically when USCIS accepts your request for DACA.

---

## What is the Filing Fee?

There is no filing fee for Form I-821D. However, you must submit both filing and biometric services fees with Form I-765. Read Form I-765 filing instructions for complete information at www.uscis.gov/I-765.

---

## Where to File?

Please see our USCIS website at **www.uscis.gov/I-821D** or call the USCIS National Customer Service Center at **1-800-375-5283** for the most current information about where to file this form. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Changes

You must inform USCIS if you change your address. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address request to USCIS Lockbox facilities because these facilities do not process change of address requests.

## Processing Information

**Initial Processing.** Once your request has been received by USCIS, USCIS will check the request for completeness. If you do not completely fill out the form, USCIS may deny or reject your request.

**Requests for More Information, Including Biometrics or Interview.** We may request more information or evidence, or we may request that you appear at a USCIS office for an interview. We may also request that you provide the originals of any copies you submit. We will return these originals when they are no longer needed.

If the same documents are required for both Form I-821D and Form I-765 that are filed together, the documents only have to be submitted once.

At the time of any interview or other appearance at a USCIS office, USCIS may require that you provide biometric information (e.g., photograph, fingerprints, signature) to verify your identity and update your background information.

**Decision.** USCIS will review your request to determine whether the exercise of prosecutorial discretion is appropriate in your case. Each case will be considered on an individual, case-by-case basis. Even if you satisfy the threshold criteria for consideration of DACA, USCIS may determine, in its unreviewable discretion, that deferred action is not warranted in your case. You will be notified of the decision in writing. There is no motion to reopen/reconsider the decision and there is no right to appeal.

## USCIS Forms and Information

To ensure you are using the latest version of this request, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information. If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**. The USCIS Contact Center provides information in English and Spanish. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**. Select "Tools," then under "Self Service Tools," select "Appointments" and follow the screen prompts to set up your appointment. Once you finish scheduling an appointment, the system will generate an appointment notice for you.

AR2022_301080

## Penalties

If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001.  In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this form, and the associated evidence, is collected under the Immigration and Nationality Act, section 101, et seq.

**PURPOSE:**  The primary purpose for providing the requested information on this form is to determine if you should be considered for deferred action as a childhood arrival.  The information you provide will be used in making a decision whether to defer removal action in your case as an exercise of prosecutorial discretion.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your form.

**ROUTINE USES:**  The information you provide on this form may be shared with other Federal, state, local, and foreign government agencies and authorized organizations following approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System] and the published privacy impact assessments [DHS/USCIS/PIA-003(a) Integrated Digitization Document Management Program (IDDMP), DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, and DHS/USCIS/PIA-056 USCIS Electronic Immigration System] which can be found at **www.dhs.gov/privacy**].

**OTHER DISCLOSURE INFORMATION:**  Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' 2011 Notice to Appear guidance (**www.uscis.gov/NTA**).  The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.  The above information sharing clause covers family members and guardians, in addition to the requestor.

This policy is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid OMB control number.  The public reporting burden for this collection of information is estimated at 3 hours per response, including the time for reviewing instructions and completing and submitting the form.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0124. **Do not mail your completed Form I-821D to this address.**

AR2022_301081

**Reminder**

### *For Initial and Renewal Request*

☐ Did you submit Form I-765 along with the filing and biometric services fees ($495) required for the application or employment authorization, and did you also submit a completed Form I-765WS?

☐ Did you answer every relevant **Item Number**?

☐ Did you provide an original, handwritten signature and date your request?

☐ Did you submit the necessary documents? For Initial requests, did you submit documents to meet each guideline? For Renewal requests, see the section titled Evidence for Renewal Requests Only.

☐ If you were issued a final order of exclusion, deportation, or removal, did you include a copy of that final order (if available and if you had not already submitted it to USCIS)?

☐ If your exclusion, deportation, or removal proceedings were terminated by an immigration judge, did you include a copy of the immigration judge's termination order (if available and if you had not already submitted it to USCIS)?

☐ If you have ever been arrested for, charged with, or convicted of any felony or misdemeanor in the United States or any crime in any country other than the United States, did you submit an original, official, or court-certified document that shows your complete arrest record and final disposition for each incident (if available and if you had not already submitted it to USCIS)?

### *For Initial Requests Only*

☐ Did you submit evidence to show that you came to the United States while under 16 years of age?

☐ Did you submit evidence to prove your identity, date of initial entry, and continuous residence from June 15, 2007 (or earlier) up to the present time?

☐ Did you submit evidence that you are currently in school, have a GED certificate, have graduated or received a certificate of completion from high school, or are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?

☐ Did you provide evidence showing that you had no lawful status as of June 15, 2012?

AR2022_301082

# Consideration of Deferred Action
## for Childhood Arrivals

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 03/31/2023

| For USCIS Use Only | A- | Receipt | | Action Block |
|---|---|---|---|---|
| | **Case ID:** | | | |
| | ☐ Requestor interviewed on | | | |

| Returned: / / | Received: / / | **Remarks** | |
|---|---|---|---|
| Resubmitted: / / | Sent: / / | | |
| Relocated | | | |

| **To Be Completed by an Attorney or Accredited Representative, if any.** | ☐ Select this box if Form G-28 is attached to represent the requestor. | Attorney State Bar Number *(if any)*: |
|---|---|---|

▶ **START HERE** - Type or print in black ink. Read Form I-821D Instructions for information on how to complete this form.

## Part 1. Information About You *(For Initial and Renewal Requests)*

I am not in immigration detention *and* I have included Form I-765, Application for Employment Authorization, and Form I-765WS, Form I-765 Worksheet; and

I am requesting:

**1.** ☐ **Initial Request** - Consideration of Deferred Action for Childhood Arrivals

*OR*

**2.** ☐ **Renewal Request** - Consideration of Deferred Action for Childhood Arrivals

*AND*

For this Renewal request, my most recent period of Deferred Action for Childhood Arrivals expires on

*(mm/dd/yyyy)* ▶ [_____]

### Full Legal Name

**3.a.** Family Name *(Last Name)* [_____]

**3.b.** Given Name *(First Name)* [_____]

**3.c.** Middle Name [_____]

### U.S. Mailing Address *(Enter the same address on Form I-765)*

**4.a.** In Care Of Name *(if applicable)* [_____]

**4.b.** Street Number and Name [_____]

**4.c.** Apt. ☐ Ste. ☐ Flr. ☐ [_____]

**4.d.** City or Town [_____]

**4.e.** State [____] **4.f.** ZIP Code [_____]

## Removal Proceedings Information

**5.** Are you **NOW** or have you **EVER** been in removal proceedings, or do you have a removal order issued in any other context *(for example, at the border or within the United States by an immigration agent)*?

☐ Yes   ☐ No

**NOTE:** The term "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997; an Immigration and Nationality Act (INA) section 240 removal proceeding; expedited removal; reinstatement of a final order of exclusion, deportation, or removal; an INA section 217 removal after admission under the Visa Waiver Program; or removal as a criminal alien under INA section 238.

If you answered "Yes" to **Item Number 5.**, you must select a box below indicating your current status or outcome of your removal proceedings.

Status or outcome:

**5.a.** ☐ Currently in Proceedings *(Active)*

**5.b.** ☐ Currently in Proceedings *(Administratively Closed)*

**5.c.** ☐ Terminated

**5.d.** ☐ Subject to a Final Order

**5.e.** ☐ Other. Explain in **Part 8. Additional Information.**

**5.f.** Most Recent Date of Proceedings
*(mm/dd/yyyy)* ▶ [_____]

**5.g.** Location of Proceedings [_____]

AR2022_301083

## Part 1. Information About You *(For Initial and Renewal Requests) (continued)*

### Other Information

**6.** Alien Registration Number (A-Number) *(if any)*

▶ A-

**7.** U.S. Social Security Number *(if any)*

▶

**8.** Date of Birth *(mm/dd/yyyy)* ▶

**9.** Gender ☐ Male ☐ Female

**10.a.** City/Town/Village of Birth

**10.b.** Country of Birth

**11.** Current Country of Residence

**12.** Country of Citizenship or Nationality

**13.** Marital Status
☐ Married ☐ Widowed ☐ Single ☐ Divorced

### Other Names Used *(If Applicable)*

If you need additional space, use **Part 8. Additional Information.**

**14.a.** Family Name *(Last Name)*

**14.b.** Given Name *(First Name)*

**14.c.** Middle Name

### Processing Information

**15.** Ethnicity *(Select only one box)*
☐ Hispanic or Latino
☐ Not Hispanic or Latino

**16.** Race *(Select all applicable boxes)*
☐ White
☐ Asian
☐ Black or African American
☐ American Indian or Alaska Native
☐ Native Hawaiian or Other Pacific Islander

**17.** Height  Feet ☐  Inches ☐

**18.** Weight  Pounds ☐ ☐ ☐

**19.** Eye Color *(Select only one box)*
☐ Black ☐ Blue ☐ Brown
☐ Gray ☐ Green ☐ Hazel
☐ Maroon ☐ Pink ☐ Unknown/Other

**20.** Hair Color *(Select only one box)*
☐ Bald (No hair) ☐ Black ☐ Blond
☐ Brown ☐ Gray ☐ Red
☐ Sandy ☐ White ☐ Unknown/Other

## Part 2. Residence and Travel Information *(For Initial and Renewal Requests)*

**1.** I have been continuously residing in the U.S. since at least June 15, 2007, up to the present time. ☐ Yes ☐ No

**NOTE:** If you departed the United States for some period of time before your 16th birthday and returned to the United States on or after your 16th birthday to begin your current period of continuous residence, and if this is an initial request, submit evidence that you established residence in the United States prior to 16 years of age as set forth in the instructions to this form.

**For Initial Requests:** List your current address and, to the best of your knowledge, the addresses where you resided since the date of your initial entry into the United States to present.

**For Renewal Requests:** List only the addresses where you resided since you submitted your last Form I-821D that was approved.

If you require additional space, use **Part 8. Additional Information.**

## Part 2.  Residence and Travel Information *(For Initial and Renewal Requests) (continued)*

### Present Address

**2.a.** Dates at this residence *(mm/dd/yyyy)*

From ▶ [                ]   To ▶ [ **Present** ]

**2.b.** Street Number and Name [                ]

**2.c.** Apt. ☐  Ste. ☐  Flr. ☐ [                ]

**2.d.** City or Town [                ]

**2.e.** State [        ]   **2.f.** ZIP Code [            ]

### Address 1

**3.a.** Dates at this residence *(mm/dd/yyyy)*

From ▶ [                ]   To ▶ [                ]

**3.b.** Street Number and Name [                ]

**3.c.** Apt. ☐  Ste. ☐  Flr. ☐ [                ]

**3.d.** City or Town [                ]

**3.e.** State [        ]   **3.f.** ZIP Code [            ]

### Address 2

**4.a.** Dates at this residence *(mm/dd/yyyy)*

From ▶ [                ]   To ▶ [                ]

**4.b.** Street Number and Name [                ]

**4.c.** Apt. ☐  Ste. ☐  Flr. ☐ [                ]

**4.d.** City or Town [                ]

**4.e.** State [        ]   **4.f.** ZIP Code [            ]

### Address 3

**5.a.** Dates at this residence *(mm/dd/yyyy)*

From ▶ [                ]   To ▶ [                ]

**5.b.** Street Number and Name [                ]

**5.c.** Apt. ☐  Ste. ☐  Flr. ☐ [                ]

**5.d.** City or Town [                ]

**5.e.** State [        ]   **5.f.** ZIP Code [            ]

## *Travel Information*

**For Initial Requests:**  List all of your absences from the United States since June 15, 2007.

**For Renewal Requests:**  List only your absences from the United States since you submitted your last Form I-821D that was approved.

If you require additional space, use **Part 8. Additional Information.**

### Departure 1

**6.a.** Departure Date  *(mm/dd/yyyy)* ▶ [            ]

**6.b.** Return Date  *(mm/dd/yyyy)* ▶ [            ]

**6.c.** Reason for Departure

[                ]

### Departure 2

**7.a.** Departure Date  *(mm/dd/yyyy)* ▶ [            ]

**7.b.** Return Date  *(mm/dd/yyyy)* ▶ [            ]

**7.c.** Reason for Departure

[                ]

**8.** Have you left the United States without advance parole on or after August 15, 2012?   ☐ Yes   ☐ No

**9.a.** What country issued your last passport?

[                ]

**9.b.** Passport Number

[                ]

**9.c.** Passport Expiration Date

*(mm/dd/yyyy)* ▶ [            ]

**10.** Border Crossing Card Number (*if any*)

[                ]

## Part 3.  For Initial Requests Only

**1.** I initially arrived and established residence in the U.S. prior to 16 years of age.   ☐ Yes   ☐ No

**2.** Date of *Initial* Entry into the United States *(on or about)*

*(mm/dd/yyyy)* ▶ [            ]

**3.** Place of *Initial* Entry into the United States

[                ]

## Part 3. For Initial Requests Only *(continued)*

**4.** Immigration Status on June 15, 2012 *(e.g., No Lawful Status, Status Expired, Parole Expired)*

**5.a.** Were you **EVER** issued an Arrival-Departure Record (Form I-94, I-94W, or I-95)?  ☐ Yes  ☐ No

**5.b.** If you answered "Yes" to **Item Number 5.a.**, provide your Form I-94, I-94W, or I-95 number *(if available)*.

▶

**5.c.** If you answered "Yes" to **Item Number 5.a.**, provide the date your authorized stay expired, as shown on Form I-94, I-94W, or I-95 *(if available)*.

*(mm/dd/yyyy)* ▶

### Education Information

**6.** Indicate how you meet the education guideline *(e.g., Graduated from high school, Received a general educational development (GED) certificate or equivalent state-authorized exam, Currently in school)*

**7.** Name, City, and State of School Currently Attending or Where Education Received

**8.** Date of Graduation *(e.g., Receipt of a Certificate of Completion, GED certificate, other equivalent state-authorized exam)* or, if currently in school, date of last attendance. *(mm/dd/yyyy)* ▶

### Military Service Information

**9.** Were you a member of the U.S. Armed Forces or U.S. Coast Guard?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 9.**, you must provide responses to **Item Numbers 9.a. - 9.d.**

**9.a.** Military Branch

**9.b.** Service Start Date *(mm/dd/yyyy)* ▶

**9.c.** Discharge Date   *(mm/dd/yyyy)* ▶

**9.d.** Type of Discharge

## Part 4. Criminal, National Security, and Public Safety Information *(For Initial and Renewal Requests)*

If any of the following questions apply to you, use **Part 8. Additional Information** to describe the circumstances and include a full explanation.

**1.** Have you **EVER** been arrested for, charged with, or convicted of a felony or misdemeanor, *including incidents handled in juvenile court*, in the United States?  *Do not include minor traffic violations unless they were alcohol- or drug-related.*  ☐ Yes  ☐ No

**If you answered "Yes," you must include a certified court disposition, arrest record, charging document, sentencing record, etc., for each arrest, unless disclosure is prohibited under state law.**

**2.** Have you **EVER** been arrested for, charged with, or convicted of a crime in any country other than the United States?  ☐ Yes  ☐ No

**If you answered "Yes," you must include a certified court disposition, arrest record, charging document, sentencing record, etc., for each arrest.**

**3.** Have you **EVER** engaged in, do you continue to engage in, or plan to engage in terrorist activities?  ☐ Yes  ☐ No

**4.** Are you **NOW** or have you **EVER** been a member of a gang?  ☐ Yes  ☐ No

**5.** Have you **EVER** engaged in, ordered, incited, assisted, or otherwise participated in any of the following:

**5.a.** Acts involving torture, genocide, or human trafficking?  ☐ Yes  ☐ No

**5.b.** Killing any person?  ☐ Yes  ☐ No

**5.c.** Severely injuring any person?  ☐ Yes  ☐ No

**5.d.** Any kind of sexual contact or relations with any person who was being forced or threatened?  ☐ Yes  ☐ No

**6.** Have you EVER recruited, enlisted, conscripted, or used any person to serve in or help an armed force or group while such person was under age 15?  ☐ Yes  ☐ No

**7.** Have you EVER used any person under age 15 to take part in hostilities, or to help or provide services to people in combat?  ☐ Yes  ☐ No

## Part 5.  Statement, Certification, Signature, and Contact Information of the Requestor *(For Initial and Renewal Requests)*

**NOTE:**  Select the box for either **Item Number 1.a.** or **1.b.**

**1.a.**  ☐  I can read and understand English, and have read and understand each and every question and instruction on this form, as well as my answer to each question.

**1.b.**  ☐  The interpreter named in **Part 6.** has read to me each and every question and instruction on this form, as well as my answer to each question, in

[                    ], a language in which I am fluent.  I understand each and every question and instruction on this form as translated to me by my interpreter, and have provided true and correct responses in the language indicated above.

### *Requestor's Certification*

I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and that copies of documents submitted are exact photocopies of unaltered original documents.  I understand that I may be required to submit original documents to U.S. Citizenship and Immigration Services (USCIS) at a later date.  I also understand that knowingly and willfully providing materially false information on this form is a federal felony punishable by a fine, imprisonment up to 5 years, or both, under 18 U.S.C. section 1001.  Furthermore, I authorize the release of any information from my records that USCIS may need to reach a determination on my deferred action request.

**2.a.**  Requestor's Signature

➡ [                    ]

**2.b.**  Date of Signature  *(mm/dd/yyyy)* ▶ [          ]

### *Requestor's Contact Information*

**3.**  Requestor's Daytime Telephone Number

[                    ]

**4.**  Requestor's Mobile Telephone Number

[                    ]

**5.**  Requestor's Email Address

[                    ]

## Part 6.  Contact Information, Certification, and Signature of the Interpreter *(For Initial and Renewal Requests)*

### *Interpreter's Full Name*

Provide the following information concerning the interpreter:

**1.a.**  Interpreter's Family Name *(Last Name)*

[                    ]

**1.b.**  Interpreter's Given Name *(First Name)*

[                    ]

**2.**  Interpreter's Business or Organization Name *(if any)*

[                    ]

### *Interpreter's Mailing Address*

**3.a.**  Street Number and Name  [                    ]

**3.b.**  Apt. ☐  Ste. ☐  Flr. ☐  [                    ]

**3.c.**  City or Town  [                    ]

**3.d.**  State  [          ]   **3.e.**  ZIP Code  [          ]

**3.f.**  Province  [                    ]

**3.g.**  Postal Code  [                    ]

**3.h.**  Country

[                    ]

### *Interpreter's Contact Information*

**4.**  Interpreter's Daytime Telephone Number

[                    ]

**5.**  Interpreter's Email Address

[                    ]

**Part 6.  Contact Information, Certification, and Signature of the Interpreter** *(For Initial and Renewal Requests) (continued)*

### *Interpreter's Certification*

**I certify that:**

I am fluent in English and [_____] which is the same language provided in **Part 5., Item Number 1.b.**;

I have read to this requestor each and every question and instruction on this form, as well as the answer to each question, in the language provided in **Part 5., Item Number 1.b.**; and

The requestor has informed me that he or she understands each and every instruction and question on the form, as well as the answer to each question.

**6.a.**  Interpreter's Signature

**6.b.**  Date of Signature  *(mm/dd/yyyy)* ▶

---

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor** *(For Initial and Renewal Requests)*

### *Preparer's Full Name*

Provide the following information concerning the preparer:

**1.a.**  Preparer's Family Name *(Last Name)*

**1.b.**  Preparer's Given Name *(First Name)*

**2.**  Preparer's Business or Organization Name

### *Preparer's Mailing Address*

**3.a.**  Street Number and Name

**3.b.**  Apt. ☐  Ste. ☐  Flr. ☐ [_____]

**3.c.**  City or Town

**3.d.**  State [____]  **3.e.**  ZIP Code [_____]

**3.f.**  Province

**3.g.**  Postal Code

**3.h.**  Country

### *Preparer's Contact Information*

**4.**  Preparer's Daytime Telephone Number

**5.**  Preparer's Fax Number

**6.**  Preparer's Email Address

### *Preparer's Declaration*

I declare that I prepared this Form I-821D at the requestor's behest, and it is based on all the information of which I have knowledge.

**7.a.**  Preparer's Signature

**7.b.**  Date of Signature  *(mm/dd/yyyy)* ▶

**NOTE:**  If you need extra space to complete any item within this request, see the next page for **Part 8. Additional Information.**

## Part 8.  Additional Information *(For Initial and Renewal Requests)*

If you need extra space to complete any item within this request, use the space below.  You may also make copies of this page to complete and file with this request.  Include your name and A-Number *(if any)* at the top of each sheet of paper; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

### Full Legal Name

**1.a.**  Family Name *(Last Name)*

**1.b.**  Given Name *(First Name)*

**1.c.**  Middle Name

**2.**  A-Number *(if any)*

▶ **A-**

**3.a.**  Page Number

**3.b.**  Part Number

**3.c.**  Item Number

**3.d.**

**4.a.**  Page Number

**4.b.**  Part Number

**4.c.**  Item Number

**4.d.**

**5.a.**  Page Number

**5.b.**  Part Number

**5.c.**  Item Number

**5.d.**

AR2022_301089



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**U.S. Citizenship and Immigration Services**

November 7, 2011                                             PM-602-0050

# Policy Memorandum

SUBJECT:   Revised Guidance for the Referral of Cases and Issuance of Notices to Appear
(NTAs) in Cases Involving Inadmissible and Removable Aliens

**Purpose**
This Policy Memorandum (PM) establishes new USCIS guidelines for referring cases and
issuing Notices to Appear (NTAs) in a manner that promotes the sound use of the resources of
the Department of Homeland Security and the Department of Justice to enhance national
security, public safety, and the integrity of the immigration system.  This PM supersedes Policy
Memorandum No. 110, *Disposition of Cases Involving Removable Aliens*, dated July 11, 2006.

**Scope**
This PM applies to and is binding on all USCIS employees unless otherwise specifically
provided in this PM.

**Authority**
Immigration and Nationality Act (INA) sections 101(a)(43), 103(a), 239, 240 and 318; Title 8,
Code of Federal Regulations (8 CFR) parts/sections 2.1, 103, 204, 207.9, 208, 216.3(a),
216.6(a)(5), 236.14(c), and 239; Adjudicator's Field Manual Chapter 10.11(a).

**Background**
U.S. Citizenship and Immigration Services (USCIS) has authority, under the immigration laws,
*see, e.g.,* INA §§ 103(a), 239; 8 CFR §§ 2.1, 239.1, to issue Form I-862, Notice to Appear, to
initiate removal proceedings.[1]  U.S. Immigration and Customs Enforcement (ICE) and U.S.
Customs and Border Protection (CBP) also have authority to issue NTAs.  Accordingly, USCIS
must ensure that its issuance of NTAs fits within and supports the Government's overall removal
priorities, while also ensuring that its NTA policies promote national security and the integrity of
the nation's immigration system.

To those ends, this PM identifies the circumstances under which USCIS will issue an NTA, or
will refer the case to ICE for NTA issuance, in order to effectively handle cases that involve
public safety threats, criminals, and aliens engaged in fraud.

---

[1] *Delegation by the Secretary of the Department of Homeland Security to the Bureau of Citizenship and Immigration
Services,* Delegation Number 0150.1; Paragraph 2(N).  However, international District Directors and officers are not
authorized to issue NTAs.

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 2

**Policy**

I.   <u>National Security Cases</u>

This PM does not affect the handling of cases involving national security concerns.[2]
Guidance from the Fraud Detection and National Security Directorate (FDNS)[3] will continue
to govern the definition of these cases and the procedures for resolution and NTA issuance.

II.   National Security Required by Statute or Regulation

USCIS will issue an NTA in the following circumstances:[4]

A.   Termination of Conditional Permanent Resident Status and Denials of Form I-751,
     Petition to Remove the Conditions of Residence (8 CFR 216.3, 216.4, 216.5)[5]
B.   Denials of Form I-829, Petition by Entrepreneur to Remove Conditions (8 CFR 216.6)
C.   Termination of refugee status by the District Director (8 CFR 207.9)
D.   Denials of NACARA 202 and HRIFA adjustments
     1.   NACARA 202 adjustment denials (8 CFR 245.13(m));
     2.   HRIFA adjustment denials (8 CFR 245.15(r)(2)(i)).
E.   Asylum[6], NACARA 203, and Credible Fear cases:[7]
     1.   Asylum referrals (8 CFR 208.14(c)(1));
     2.   Termination of asylum or termination of withholding of removal or deportation
          (8 CFR 208.24(e));[8]
     3.   Positive credible fear findings (8 CFR 208.30(f));
     4.   NACARA 203 cases where suspension of deportation or cancellation of removal
          is not granted, and the applicant does not have asylum status, or lawful immigrant
          or non-immigrant status (8 CFR 240.70(d)).

This PM does not apply to, or change, NTA or notification procedures for Temporary
Protected Status cases.[9]   Further, Form I-360, Petition for Amerasian, Widow(er), or Special
Immigrant, processed under the Violence Against Women Act (VAWA), should continue to

---

[2] National Security Cases include cases involving Terrorist Related Grounds of Inadmissibility (TRIG) pursuant to
sections 212(a)(3)(B) and 212(a)(3)(F) of the INA.
[3] See, e.g., *Policy for Vetting and Adjudicating Cases with National Security Concerns* (April 11, 2008).
[4] If any Form I-751 or I-829 cases are also Egregious Public Safety cases, they will be referred to ICE in accordance
with Section IV.A.1 of this PM.
[5] See the October 9, 2009 internal memo, *Adjudication of Form I-751, Petition to Remove Conditions on Residence
Where the CPR Has a Final Order of Removal, Is in Removal Proceedings, or Has Filed an Unexcused Untimely
Petition or Multiple Petitions.*  See also the April 3, 2009 memo, *I-751 Filed Prior to Termination of Marriage.*
[6] USCIS may issue an NTA when an asylum applicant withdraws his or her asylum application.
[7] This memo does not apply to the Asylum Division's issuance of Form I-863, Notice of Referral to Immigration
Judge, to certain stowaways, crewmembers, and VWP individuals who are requesting asylum or withholding of
removal; reasonable fear screenings and negative credible fear screenings.
[8] See also section 208(c)(3) of the INA describing removal when asylum is terminated.
[9] See the September 12, 2003 internal memo, *Service Center Issuance of Notice to Appear (Form I-862).*

AR2022_301091

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases Involving Inadmissible and Removable Aliens
Page 3

be processed under existing protocols.  If the VAWA applicant's Form I-485 is denied, this memorandum is applicable in terms of NTA issuance.[10]

III. <u>Fraud Cases with a Statement of Findings Substantiating Fraud</u>

To protect the integrity of the immigration system and address fraud, USCIS will issue NTAs when a Statement of Findings (SOF) substantiating fraud is part of the record.[11]  An NTA will be issued upon final adjudicative action on the petition and/or application or other appropriate eligibility determination.[12]  NTAs will be issued even if the petition and/or application is denied for a ground other than fraud, such as lack of prosecution or abandonment, is terminated based on a withdrawal by the petitioner/applicant, or where an approval is revoked, so long as an SOF substantiating fraud is in the record.

The NTA should include the charge of fraud or misrepresentation, if possible.  The appropriate charge(s) will be determined on a case-by-case basis.  Consultation with local USCIS counsel to determine the appropriate charge(s) is recommended.

IV. <u>Cases to be Referred to ICE for a Decision on NTA Issuance</u>

A. Criminal Cases:  Criminal aliens are a top immigration enforcement priority for the government.  The following guidance recognizes the prioritization and requires USCIS to refer criminals to ICE for action or issue an NTA in accordance with this PM.

1. Egregious Public Safety (EPS) Cases

USCIS will refer all EPS cases, including cases with pending N-400s, to ICE prior to adjudicating the case even if USCIS can deny the petition and/or application on its merits.  An EPS case is defined by USCIS and ICE as a case where information indicates the alien is under investigation for, has been arrested for (without disposition), or has been convicted of, any of the following:
a. Murder, rape, or sexual abuse of a minor as defined in section 101(a)(43)(A) of the INA.
b. Illicit trafficking in firearms or destructive devices as defined in section 101(a)(43)(C) of the INA.
c. Offenses relating to explosive materials or firearms as defined in section 101(a)(43)(E) of the INA.

---

[10] When making determinations, employees must keep in mind USCIS's obligations under 8 USC § 1367, which prohibits the release of any information, outside of DHS, relating to aliens who are seeking or have been approved for immigration benefit(s) under the provisions for battered spouses, children, and parents in the Violence Against Women Act.

[11] Alternatively, ICE will determine whether to issue the NTA if a criminal investigation is conducted, fraud is found, and the investigation results in criminal prosecution.

[12] This includes, but is not limited to, aliens that were granted asylum status by USCIS, adjusted to Lawful Permanent Resident status, presented fraud indicators, were subject to the Post Adjustment Eligibility Review (PAER) process in an Asylum Office, and met the PAER criteria for NTA issuance.

AR2022_301092

d. Crimes of violence for which the term of imprisonment imposed, or where the penalty for a pending case, is at least one year as defined in section 101(a)(43)(F) of the INA.

e. An offense relating to the demand for, or receipt of, ransom as defined in section 101(a)(43)(H) of the INA.

f. An offense relating to child pornography as defined in section 101(a)(43)(I) of the INA.

g. An offense relating to peonage, slavery, involuntary servitude, and trafficking in persons as defined in section 101(a)(43)(K)(iii) of the INA.

h. An offense relating to alien smuggling as described in section 101(a)(43)(N) of the INA

i. Human Rights Violators, known or suspected street gang members, or Interpol hits.

j. Re-entry after an order of exclusion, deportation or removal subsequent to conviction for a felony where a Form I-212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal, has not been approved.

All EPS cases must be referred to ICE using the procedures outlined below. The case will be referred as soon as it is identified. ICE will have an opportunity to decide if, when, and how to issue an NTA and/or detain the alien. USCIS will not issue an NTA in these cases if ICE declines to issue an NTA. If some other basis unrelated to the EPS concern becomes apparent during the course of adjudication, an NTA may be issued in accordance with this memo.

<u>Referral Process</u>

This referral process is utilized in order to give ICE the opportunity to determine the appropriate course of action before USCIS adjudicates the case. A decision to issue an NTA may directly affect the processing of the pending petition and/or application. Upon issuing the Referral to Immigration and Customs Enforcement (RTI), USCIS will suspend adjudication for 60 days, or until ICE provides notification of its action on the case, whichever is earlier.

In response to the RTI –

1. ICE may issue an NTA. ICE's issuance of an NTA allows USCIS to proceed with adjudication (unless jurisdiction transfers to EOIR or the pending application is an N-400), taking into account the basis for the NTA.

2. If ICE does not issue an NTA or otherwise provide notification of its action on the case within 60 days of the RTI, USCIS may resume its adjudication of the case, taking into account the referral grounds.

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases Involving Inadmissible and Removable Aliens
Page 5

    a. If the case is approvable, USCIS will consult with ICE prior to adjudication.

    b. Once adjudicated, regardless of the decision, USCIS will notify ICE of the result by sending a copy of the original RTI to ICE with a cover memorandum advising of the outcome of the case.

EPS cases referred to ICE prior to adjudication should be called up and reviewed no later than 60 days after referral.  Normally, the case should be adjudicated by USCIS.  However, USCIS retains discretion to place the case on hold for more than 60 days if ICE requests additional time to conduct an investigation.[13]

<u>Office-Specific Processes</u>

1. Cases to be adjudicated by Service Centers and the National Benefits Center.  Adjudication will be suspended and the case will immediately be sent to the appropriate Service Center Background Check Unit (BCU).  The BCU will refer the case to the ICE Benefit Fraud Unit (BFU) via an RTI.  A hard copy of the RTI will be placed in the A-file and/or receipt file.  The BCU will retain the file unless ICE requests it or the 60 days expire.

2. Cases to be adjudicated by Field Offices.  The Immigration Services Officer (ISO) will suspend adjudication and the case will immediately be referred to the local ICE Special Agent in Charge (SAC) via an RTI.  A hard copy of the RTI will be placed in the A-file and/or receipt file.  A copy of the RTI must also be sent to the ICE BFU.  USCIS will retain the file unless ICE requests the file for their review.

An RTI should include any relevant attachments that USCIS has at the time, such as a copy of the RAP sheet and a copy of the petition and/or application.

2. Non-Egregious Public Safety Criminal Cases

If it appears that the alien is inadmissible or removable for a criminal offense not included on the EPS list, USCIS will complete the adjudication and then refer the case to ICE. This section applies to N-400 cases if the N-400 has been denied on good moral character (GMC) grounds based on the criminal offense.[14]  ICE will decide if, and how, it will institute removal proceedings and whether or not it will detain the alien.  USCIS will not issue an NTA if ICE declines to issue an NTA.

---

[13]  Pursuant to 8 CFR 274a.13(d), USCIS must complete processing of an Employment Authorization Document (EAD) within 90 days or issue an interim EAD card valid up to 240 days.  Officers should be mindful of this regulatory timeframe when cases with a pending Form I-765, Application for Employment Authorization, are referred to ICE.

[14]  See Section V of this memo addressing N-400 cases.

AR2022_301094

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases Involving Inadmissible and Removable Aliens
Page 6

If some other basis unrelated to the criminal offense becomes apparent upon return of the case to USCIS, an NTA may be issued in accordance with this memo.

Referral Process

The referral process is used to allow ICE to make a determination whether to issue an NTA, based on the totality of circumstances and its priorities. ICE will determine the appropriate grounds for removal if an NTA is issued.

Once adjudication is complete, USCIS will send an RTI to ICE. USCIS will concurrently transmit a copy of the RTI to ICE Headquarters (HQ) Enforcement and Removal Operations (ERO) Criminal Alien Division for statistical monitoring purposes. If there is any confusion or uncertainty about classifying a case as egregious versus non-egregious, the USCIS ISO should refer the matter as an EPS case using the process described above.

The accompanying A-file will be referred to ICE with the RTI, if the file is in the possession of the referring USCIS office or center. If the file is not at the referring USCIS office or center, the RTI should include any relevant attachments that USCIS has, such as a copy of the RAP sheet and a copy of the petition and/or application. Where USCIS obtained certified conviction records through normal processing of the case, USCIS will include the records with the RTI, but it will not hold the RTI on a completed case solely to obtain disposition records. Instead ICE will decide whether, and how, it will obtain such records as part of its decision to issue an NTA.

Office-Specific Processes

1. Cases adjudicated by Service Centers and the National Benefits Center. Once adjudication is completed, if the alien is removable on a criminal charge, regardless of the reason for the denial, the file will be referred to the BCU. The BCU will refer the case, along with the A-file and/or receipt file, to the appropriate ERO Field Office Director (FOD) via an RTI.

2. Cases adjudicated by Field Offices. Once adjudication is completed, if the alien is removable on a criminal charge, regardless of the reason for the denial, USCIS will prepare an RTI and refer the case, along with the A-file and/or receipt file, to the local ERO FOD.

B. National Security Entry Exit Registration System (NSEERS) Violator Cases

USCIS will refer all cases in which an application is denied based on an NSEERS violation to ICE for possible NTA issuance.

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 7

V. Cases Involving Form N-400, Application for Naturalization

The following guidance applies to the issuance of NTAs in cases in which applicants for
naturalization are removable.  There are two primary situations in which NTAs may be
issued in connection with a filed Form N-400.  If the N-400 case involves fraud (documented
in the SOF) the procedures found in this section must be followed, rather than the procedures
found in Section III (Fraud Cases with a Statement of Findings Substantiating Fraud).
However, the below guidance does not apply to EPS cases.  EPS cases must be referred in
accordance with Section IV.A.1 (Egregious Public Safety Cases) of this memo.
Additionally, the below guidance does not apply to non-EPS criminal cases when the N-400
can be denied on GMC grounds based on the criminal act.  These cases must be denied and
referred in accordance with Section IV.A.2 (Non-Egregious Public Safety Criminal Cases).

A. The first situation occurs when the applicant may be eligible to naturalize but is also
   deportable under section 237 of the INA.  Examples include applicants convicted of
   aggravated felonies prior to November 29, 1990, or applicants convicted of deportable
   offenses after obtaining Lawful Permanent Resident (LPR) status that do not fall within
   the GMC period.  The ISO should:

   1. Make a written recommendation on the issuance of an NTA through a review of
      the totality of the circumstances to include factors such as: severity of crime, time
      since crime committed, other criminal conduct, reformation, immigration history
      including method of entry, length of presence in the U.S., and prior immigration
      violations, and contributions to society to include the pursuit of education and
      military service.[15]

   2. Once the ISO has made a recommendation on whether or not to issue an NTA, the
      case should be forwarded to the N-400 NTA Review Panel (Review Panel), along
      with the written recommendation.  A Review Panel must be formed in each Field
      Office and include a local Supervisory Immigration Services Officer (SISO), a
      local USCIS Office of Chief Counsel attorney, and a district representative.  An
      attorney from ICE's local Office of Chief Counsel will be invited to participate
      and will have an advisory role on the panel.  The Review Panel will make the
      final determination on NTA issuance.  If consensus cannot be reached by the
      Review Panel, the case will be elevated to the District Director, through the
      district representative, for a final decision.

   3. If the Review Panel decides to issue an NTA, place the N-400 on hold until
      removal proceedings have concluded.  Once proceedings have concluded, or if the
      Review Panel declines to issue an NTA, adjudicate the case appropriately.

---

[15] Additional factors to be taken under consideration can be found in the June 17, 2011 ICE memo, *Exercising
Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the
Apprehension, Detention, and Removal of Aliens.*

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 8

B. The second situation occurs when it is determined that the applicant was inadmissible at
the time of adjustment or admission to the United States, thus deportable under section
237 of the INA and not eligible for naturalization under section 318 of the INA.[16]  The
ISO should:

1. Make a written recommendation on the issuance of an NTA through a review of
the totality of the circumstances to include factors such as: willfulness of actions,
fraud factors, length of LPR status, criminal history, and officer error at time of
adjustment.

2. Once the ISO has made a recommendation on the issuance of the NTA, the case
should be forwarded to the Review Panel (see Section V.A.2), along with the
written recommendation.  The Review Panel will make the final determination on
NTA issuance.  If consensus cannot be reached by the Review Panel, the case will
be elevated to the District Director, through the district representative, for a final
decision.

3. If the Review Panel decides to issue an NTA, place the N-400 on hold until
removal proceedings have concluded.  Once removal proceedings have
concluded, adjudicate the case appropriately.  If the Review Panel declines to
issue an NTA, deny the case under section 318 of the INA.

VI.  <u>Other Cases</u>

A. An alien may request NTA issuance to renew an application for adjustment or in certain
cases with a denied N-400.  The request must be made in writing.[17]

B. An asylum applicant issued an NTA may request NTA issuance for family members not
included on the asylum application as dependents for family unification purposes.  The
request must be made in writing.[18]

VII.  <u>Exceptions</u>

Exceptions to the guidance in this PM require concurrence from Regional or Center
Directors, who will consult with ICE before issuing an NTA.

---

[16] In the Third Circuit *only* (Pennsylvania, New Jersey, Delaware, and the U.S. Virgin Islands)*,* based on the holding
in *Garcia v. Att'y Gen.*, 553 F.3d 724 (3d Cir. 2009), if the alien has been an LPR for at least five years, the alien
cannot be placed in removal proceedings for fraud or willful misrepresentation of a material fact at time of
adjustment, if USCIS could have learned of the fraud or misrepresentation through reasonable diligence before the
five year rescission period expired.  Please consult with USCIS counsel if there are questions regarding the
applicability of this precedent.
[17] USCIS retains discretion to deny a request.  USCIS should consider ICE actions and determinations when making
an NTA issuance decision under this section.
[18] USCIS retains discretion to deny a request.

**AR2022_301097**

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 9

VIII.  Coordination with ICE

According to the June 2011 ICE memo regarding the exercise of prosecutorial discretion
consistent with priorities,[19] USCIS will receive notice before an ICE attorney exercises
prosecutorial discretion and dismisses, suspends, or closes a case.  The local N-400 NTA
Review Panel will work with ICE to come to a resolution if USCIS does not agree with
ICE's use of prosecutorial discretion in a particular case.  If concurrence cannot be reached,
the case should be elevated to the USCIS Office of Chief Counsel in headquarters.

**Implementation**
Each field office must form an N-400 NTA Review Panel and create a process to complete RTIs
and refer EPS and non-EPS criminal cases to ICE.  A written list enumerating the members of
the Review Panel and a document outlining the process of referral must be sent to the appropriate
district office within 30 days of the issuance of this memorandum.

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their
official duties.  It is not intended to, does not, and may not be relied upon to create any right or
benefit, substantive or procedural, enforceable at law, or by any individual or other party in
removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions or suggestions regarding this PM should be addressed through appropriate channels to
the Field Operations Directorate, Service Center Operations Directorate, or the Refugee,
Asylum, and International Operations Directorate.

---

[19] *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency
for the Apprehension, Detention, and Removal of Aliens*, signed June 17, 2011.



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20529

July 1, 2022                                                                                            PM-602-0188

# Policy Memorandum

**SUBJECT:**   Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries

## Purpose

U.S. Citizenship and Immigration Services (USCIS) rescinds its designation[1] of the decision of the Administrative Appeals Office (AAO) in *Matter of Z-R-Z-C-*[2] as an Adopted Decision and updates its interpretation of the effects of authorized travel by Temporary Protected Status (TPS) beneficiaries, in accordance with the reasoning contained in this memorandum. This memorandum supersedes the prior USCIS Policy Manual content incorporating *Matter of Z-R-Z-C-*[3] regarding the treatment of a TPS beneficiary's return after authorized travel abroad under the provisions of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (MTINA), § 304(c), Pub. L. 102-232, 105 Stat. 1733, 1749 (Dec. 12, 1991) (8 U.S.C. § 1254a note).

## Scope

Based on developments in legal precedent, recent guidance from the DHS Office of the General Counsel (DHS OGC),[4] and further evaluation of current and past policy, USCIS hereby updates its interpretation of MTINA and related guidance as follows:

- USCIS will no longer use the advance parole mechanism to authorize travel for TPS beneficiaries, but will instead provide a new TPS travel authorization document. This document will serve as evidence of the prior consent for travel contemplated in INA 244(f)(3) and serve as evidence that the bearer may be inspected and admitted into TPS pursuant to MTINA if all other requirements are met.[5]

---

[1] *See Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO Aug. 20, 2020). PM-602-0179, issued August 20, 2020.
[2] *See Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO Aug. 20, 2020).
[3] *See* Policy Alert - Temporary Protected Status and Eligibility for Adjustment of Status under Section 245(a) of the Immigration and Nationality Act, https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20201006-TPSAndAOS.pdf.
[4] DHS Office of the General Counsel, *Immigration Consequences of Authorized Travel and Return to the United States of Individuals Holding Temporary Protected Status*, issued April 6, 2022 (DHS OGC memorandum) (attached).
[5] The new TPS travel document will be available to noncitizens who are in valid TPS, as provided in INA 244(f)(3). Those who seek travel authorization based on pending initial applications for TPS may continue to apply under the advance parole procedures.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 2

- TPS beneficiaries whom DHS has inspected and admitted into TPS under MTINA, subsequent to that inspection and admission, will have been "inspected and admitted" and are "present in the United States pursuant to a lawful admission," including for purposes of adjustment of status under INA 245. This is true even if the TPS beneficiary was present without admission or parole when initially granted TPS.

In adjudicating an application for adjustment of status, or any other benefit request where relevant, USCIS will consider whether to apply this guidance to travel undertaken by the applicant before the issuance of this memorandum. This consideration will include a case-by-case review of any reliance on the prior policy, applicable law, as well as any other factors relevant to the application of this guidance to prior travel. Additionally, to be eligible for consideration under this guidance, past travel must meet each of the following requirements:

- The noncitizen obtained prior authorization to travel abroad temporarily on the basis of being a TPS beneficiary;[6]

- The noncitizen's TPS was not withdrawn or the designation for their foreign state (or part of a foreign state) was not terminated or did not expire during their travel;[7]

- The noncitizen returned to the United States in accordance with the authorization to travel; and

- Upon return, the noncitizen was inspected by the former Immigration and Naturalization Service (INS) or DHS at a designated port of entry and paroled or otherwise permitted to pass into the territorial boundaries of the United States in accordance with the TPS-based travel authorization.

This guidance does not apply to travel undertaken by noncitizens whose TPS was not valid for the duration of travel, who traveled without obtaining advance authorization under INA 244(f)(3), who did not return in accordance with prior authorization under INA 244(f)(3), who were not inspected at a designated port of entry, who were found to be inadmissible on the grounds specified in INA 244(c)(2)(A)(iii) when returning from authorized travel, or who were paroled or permitted to enter the United States on a basis other than the TPS-based travel authorization.[8]

USCIS recognizes that the regulation implementing travel authorization for TPS beneficiaries continues to refer to the advance parole provisions.[9] Until the regulation is amended in accordance with MTINA as described in this memorandum, and corresponding changes are made to related

---

[6] TPS beneficiaries are noncitizens granted TPS in accordance with INA 244(a)(1)(A).
[7] *See* INA 244(c)(3) and INA 244(b)(3)
[8] These TPS beneficiaries do not meet the requirements specified in section 304(c) of MTINA.
[9] *See* 8 CFR 244.15 ("Permission to travel may be granted by the director pursuant to the Service's advance parole provisions.").

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 3

forms and other documentation,[10] USCIS will consider the reference to advance parole in 8 CFR 244.15 to encompass any advance discretionary authorization to travel under INA 244(f)(3).[11]

## Background

TPS, which was created by Congress in 1990,[12] is available to qualifying noncitizens present in the United States who are nationals of a foreign state or any part of such foreign state (or individuals having no nationality who last habitually resided there) designated for TPS by the Secretary of Homeland Security (formerly the Attorney General).[13] TPS designations are discretionary, but the Secretary must first find that country conditions meet the statutory criteria, including that the designation is based on an ongoing armed conflict, an environmental disaster, or "extraordinary and temporary conditions."[14]

Noncitizens who meet the statutory criteria may be granted TPS regardless of their immigration status—even while in removal proceedings or after having been ordered removed—and regardless of their manner of entry.[15] Among other criteria, a noncitizen must be "admissible as an immigrant" in order to be eligible for TPS, though certain inadmissibility grounds do not apply to TPS applicants and waivers are available for some other grounds.[16]

For the duration of their TPS, beneficiaries are protected from being removed by DHS and are authorized to work in the United States.[17] They are also eligible to travel abroad with DHS's prior consent.[18]

Shortly after the enactment of IMMACT90, the former INS issued regulations implementing TPS.[19] The rules, in part, specified that permission to travel would be issued under INS's advance parole processes.[20] A subsequent opinion from the INS Office of the General Counsel explained the consequences of travel under a grant of advance parole, including that any TPS beneficiary who

---

[10] Related forms and documentation include the Form I-821, Application for Temporary Protected Status and its instructions and Form I-131, Application for Travel Document and its instructions. As previously stated, USCIS will create and issue a new TPS travel document as evidence of TPS-authorized travel and cease to issue the Form I-512/I-512L, Authorization for Parole of an Alien into the United States, to TPS beneficiaries.

[11] *See* OGC memorandum p. 28, explaining that 8 CFR 244.15 was abrogated by the MTINA travel provision.

[12] *See* Section 302 of the Immigration Act of 1990 (IMMACT90), Pub. L. No. 101-649 (Nov. 29, 1990).

[13] *See* INA 244(a).

[14] *See* INA 244(b).

[15] *See* INA 244(c)(1)-(2).

[16] By statute, INA 212(a)(5) (labor certification requirements) and INA 212(a)(7)(A) (documentation requirements for immigrants) do not apply to TPS applications. Also by statute, waivers are available for all other grounds of inadmissibility except INA 212(a)(2)(A) and (B) (convictions of certain crimes or multiple criminal convictions), INA 212(a)(2)(C) (controlled substance traffickers, unless related to a single offense of simple possession of 30 grams or less of marijuana), and INA 212(a)(3)(A), (B), (C), and (E) (relating to national security, terrorist activities, foreign policy, or participation in Nazi persecutions, genocide, torture, or extrajudicial killings). *See* INA 244(c)(1)(A)(iii), (c)(2)(A).

[17] *See* INA 244(a)(1)

[18] *See* INA 244(f)(3).

[19] *See* 56 Fed. Reg. 618-01 (Jan. 7, 1991) (interim rule); 56 Fed. Reg. 23491-02 (May 22, 1991) (final rule).

[20] *See* 56 Fed. Reg. at 622 (TPS interim rule); 56 Fed. Reg. at 23,498 (TPS final rule).

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 4

returns from such authorized travel would be subject to exclusion proceedings, and not deportation proceedings, upon termination of the individual's TPS.[21] Recognizing that multiple avenues of relief, such as suspension of deportation, would be unavailable to TPS beneficiaries in exclusion proceedings, the Acting INS General Counsel advised that the advance parole document issued to TPS recipients include a warning about this consequence of travel.[22]

In order to allow TPS beneficiaries to travel abroad without altering their immigration status and eligibility for relief from deportation, Congress enacted section 304(c) of MTINA, which provides that a TPS beneficiary "whom the Attorney General authorizes to travel abroad temporarily and who returns to the United States in accordance with such authorization" shall "be inspected and admitted in the *same immigration status* the alien had at the time of departure," unless the noncitizen is inadmissible under specified grounds.[23]

However, the TPS travel regulation (now located at 8 CFR 244.15)[24] has not been substantively updated since it was initially issued prior to MTINA's enactment. Despite MTINA's requirement of inspection and admission and INS General Counsel's 1992 opinion advising against the practice of continuing to facilitate authorized travel for TPS beneficiaries through advance parole, the regulation and USCIS practice remained unchanged in this regard until now.[25] From 1991 to the present, TPS beneficiaries seeking authorization to travel abroad have done so by filing the Form I-131, Application for Travel Document, and requesting advance parole. If approved, they were issued Form I-512 or I-512L, Authorization for Parole of an Alien into the United States, as evidence of their travel authorization. Upon returning from abroad, they were inspected and, if eligible, paroled into the United States.

This use of advance parole had consequences for TPS beneficiaries seeking to adjust status under INA 245(a), which requires a noncitizen to have been inspected and admitted or paroled into the United States. Many INS and USCIS offices considered TPS beneficiaries who were paroled after authorized travel abroad to have met this requirement; consequently, some TPS beneficiaries who had initially entered the United States without inspection and admission or parole were able to overcome ineligibility under INA 245(a) by traveling abroad and returning with an advance parole document.[26]

The USCIS Policy Manual affirmed this interpretation with the publication of Volume 7, Part B on February 25, 2016, stating that a TPS beneficiary who was inspected and permitted to enter—

---

[21] *See* Immigration and Naturalization Service (INS) General Counsel Opinion No. 91-44; *see also Matter of G-A-C-*, 22 I&N Dec. 83, 89 (BIA 1998) (holding that, under pre-IIRIRA law, a noncitizen granted advance parole and paroled into the United States upon return from travel abroad was properly placed in exclusion proceedings when parole was revoked); *Matter of Torres*, 19 I&N Dec. 371, 373-76 (BIA 1986) (same).

[22] *See* INS General Counsel Opinion No. 91-44.

[23] *See* Section 304(c) of MTINA (limiting inspection and admission in the same immigration status held at the time of departure to those TPS beneficiaries who are not subject to certain criminal, national security, and related grounds of inadmissibility as described in INA 244(c)(2)(A)(iii) (emphasis added)).

[24] The provision originally was located at 8 CFR 240.15 (1990).

[25] *See* INS General Counsel Opinion No. 92-10.

[26] USCIS acknowledges that prior to and even after the publication of Volume 7, Part B, of the USCIS Policy Manual on February 25, 2016, there were some discrepancies of practice between USCIS offices.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 5

whether admitted or paroled—after traveling abroad with TPS-related advance parole documentation met the inspected and admitted or inspected and paroled requirement for purposes of adjustment eligibility.[27]

This interpretation remained in place until August 20, 2020, when USCIS departed from this position and designated the AAO's *Matter of Z-R-Z-C-* as an adopted decision.[28]

*Matter of Z-R-Z-C-* held that DHS's and INS's past treatment of TPS beneficiaries who were paroled upon returning from travel authorized under INA 244(f)(3) as parolees for purposes of eligibility for adjustment of status under INA 245(a) was contrary to the language of MTINA, as such individuals should not be considered to have been paroled.[29] The decision also held that being "inspected and admitted" after TPS-authorized travel does not constitute being inspected and admitted for purposes of adjustment of status under INA 245(a).[30]

*Matter of Z-R-Z-C-* relied heavily on MTINA's instruction that TPS beneficiaries be admitted in the "same immigration status the alien had at the time of departure," particularly focusing on the phrase "same immigration status." The decision interpreted that phrase to encompass the entirety of a noncitizen's circumstances under the immigration laws, explaining that "MTINA travel authorization is a unique form of travel authorization and operates as a legal fiction that restores the alien to the *status quo ante* as if the alien had never left the United States."[31] Consequently, the decision reasoned, TPS recipients who return from authorized travel abroad cannot be treated as "paroled" for purposes of adjustment, as they had not been in parole status prior to departing.

For similar reasons, *Matter of Z-R-Z-C-* determined that MTINA's instruction that TPS beneficiaries who travel with advance permission be "inspected and admitted" upon their return (if they are not subject to specified grounds of inadmissibility) does not result in an inspection and admission for purposes of adjustment eligibility.[32] Since the grant of TPS is not itself an "admission," to admit returning TPS beneficiaries who had been present without admission or parole before traveling would be to place them in a different—and improved—immigration posture than they held before they departed.[33] This result, the decision asserted, contradicts MTINA's intention and therefore the phrase must be assigned a different meaning.

Acknowledging the significant change in *Matter of Z-R-Z-C-*'s reading of MTINA, USCIS limited its application in order to "minimize adverse impacts" on TPS recipients who may have reasonably relied on the previous treatment of travel with advance parole.[34] Accordingly, USCIS applied the new guidance only to those who traveled and returned to the United States after *Matter of*

---

[27] *See* General Adjustment of Status Policies and Section 245(a) of the Immigration and Nationality Act, PA-2016-001, issued February 25, 2016.
[28] *See Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO Aug. 20, 2020). PM-602-0179, issued August 20, 2020.
[29] *Id*. at 8-9.
[30] *Id*. at 6.
[31] *Id*.
[32] *Id*.
[33] *Id*.; *see also Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021).
[34] *See Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO Aug. 20, 2020). PM-602-0179, issued August 20, 2020.

AR2022_301103

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 6

*Z-R-Z-C-*'s adoption.[35] USCIS subsequently updated the USCIS Policy Manual to incorporate *Matter of Z-R-Z-C-*'s reasoning into determinations of eligibility for adjustment of status.[36]

When *Matter of Z-R-Z-C-* was adopted, the issue of whether a grant of TPS was an admission for purposes of adjustment under INA 245 was the subject of nationwide litigation that had resulted in a split within the U.S. Circuit Courts of Appeals. The split was resolved on June 7, 2021, when the Supreme Court held in *Sanchez v. Mayorkas* that a grant of TPS is not an admission.[37] The Court noted that "[l]awful status and admission . . . are distinct concepts in immigration law: Establishing one does not necessarily establish the other."[38]

The Court, however, acknowledged but expressly did not reach the separate issue of whether a TPS beneficiary "paroled" into the country following authorized travel abroad should be treated as having been "paroled" for purposes of adjustment under INA 245(a).[39] Nonetheless, the Court's focus on the text of the applicable statutory provisions and its characterization of TPS as a "kind of lawful status" emphasizes shortcomings in the reasoning contained in *Matter of Z-R-Z-C-* and earlier policies for implementing MTINA.

USCIS has since reevaluated the reasoning articulated in *Matter of Z-R-Z-C-*, both on its own merits and in light of the Supreme Court's decision in *Sanchez* and a recent decision by the U.S. Court of Appeals for the Fifth Circuit in *Duarte v. Mayorkas*, which held that MTINA does not permit the use of parole for TPS beneficiaries who travel with prior authorization under INA 244(f)(3).[40] Rather, the court in *Duarte* concluded that MTINA mandates that authorized TPS travelers be inspected and admitted upon their return and treated as having been inspected and admitted in future adjudications.[41] Additionally, at USCIS' request, DHS OGC recently completed a review of MTINA and *Matter of Z-R-Z-C-*, as well as *Sanchez* and *Duarte*, and concluded that the plain meaning of section 304 of MTINA, and, in any event, the best interpretation of that provision, is that the term "inspected and admitted" be assigned its ordinary meaning in immigration law.

As a result, USCIS is persuaded that an interpretation different from that expressed in *Matter of Z-R-Z-C-*, detailed below, more accurately implements MTINA's provisions and best supports USCIS' policy objectives. In short, USCIS has concluded that:

- TPS beneficiaries who are inspected and allowed to lawfully pass through a port of entry under the TPS-specific standards established by MTINA and INA 244 should be inspected and admitted into Temporary Protected Status.

---

[35] *Id*.
[36] *See* Policy Alert - Temporary Protected Status and Eligibility for Adjustment of Status under Section 245(a) of the Immigration and Nationality Act, https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20201006-TPSAndAOS.pdf.
[37] *Sanchez*, 141 S. Ct. at 1812.
[38] *Id*.
[39] *Id*. at 1813 n.4 ("The Government notes that Sanchez was treated as 'paroled' when he returned from an authorized trip abroad after obtaining TPS. . . . We express no view on whether a parole of the kind Sanchez received enables a TPS recipient to become an LPR absent any other bar in [INA 245].").
[40] *Duarte v. Mayorkas*, 27 F.4th 1044 (5th Cir. 2022).
[41] *Id*. at 1058.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 7

- Inspection and admission under MTINA satisfies the "inspected and admitted" requirement for eligibility for adjustment of status under INA 245(a) and the "lawful admission" requirement for the exceptions of INA 245(k).

- For cases in the Fifth Circuit, USCIS must treat qualifying prior travel as inspection and admission pursuant to *Duarte v. Mayorkas*. Elsewhere, USCIS should, where needed and on a case-by-case basis, determine whether a noncitizen who was paroled or otherwise permitted to enter after TPS-authorized travel under prior guidance should be treated as inspected and admitted for purposes of a given adjudication.

**Discussion**

In the course of reevaluating *Matter of Z-R-Z-C-*, USCIS requested advice from DHS OGC on the following questions:

- What is the best reading of MTINA's requirement that TPS beneficiaries who have traveled overseas with prior authorization be "inspected and admitted" into the United States upon their return "in the same immigration status [they] had at the time of departure?"

- What effect does such authorized travel and return have on eligibility for adjustment of status under INA 245?[42]

DHS OGC responded to USCIS' request with its memorandum, *Immigration Consequences of Authorized Travel and Return to the United States of Individuals Holding Temporary Protected Status* (DHS OGC memorandum) (attached), which it also shared with U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).

In the memorandum, DHS OGC reviewed the statutory and regulatory framework for TPS and MTINA; prior actions taken by INS and by USCIS to interpret and implement these provisions, including the designation of *Matter of Z-R-Z-C-* as an adopted decision; and recent developments in case law addressing whether, or when, a TPS beneficiary is "admitted."

After analyzing the statutory text and history of TPS and MTINA, relevant case law, and the historical meaning attributed to the phrase "inspected and admitted," DHS OGC concluded that the terms used in section 304 of MTINA should be interpreted in accordance with their ordinary meaning in immigration law and that such interpretation was consistent with legislative intent. DHS OGC summarized its response to USCIS' question as follows:

- The MTINA travel-and-return provision is best understood as providing that TPS beneficiaries with advance authorization to travel who present at a port of entry must be inspected and, so long as they are otherwise admissible under the TPS-specific standards established by MTINA and INA 244, admitted into Temporary Protected Status. USCIS is

---

[42] DHS OGC memorandum p. 2.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 8

therefore well within its authority to rescind *Matter of Z-R-Z-C-* and give the phrase "inspected and admitted" the same meaning it holds—and has long held—elsewhere in the INA. Indeed, USCIS would be assuming a stronger legal posture by doing so. The Department should not authorize such travel via advance parole procedures, nor should such TPS travelers be paroled upon their return.

- The phrase "inspected and admitted" in MTINA is best understood as satisfying the "inspected and admitted" eligibility requirement for adjustment of status under INA 245(a) and (k).[43]

The DHS OGC memorandum fully states DHS's legal position and complete analysis of these issues. Below, USCIS has summarized its understanding of DHS OGC's analysis in order to provide context for the policy decisions within this memorandum.

1. MTINA is Best Understood as Requiring Inspection and Admission into TPS[44]

DHS OGC concluded that by using "inspected and admitted" in MTINA, Congress strongly indicated its intent that the authorized reentry of TPS beneficiaries effectuates an "admission," as that term had long been understood and defined in case law: an immigration officer's authorization of a noncitizen to lawfully pass through a U.S. port of entry following inspection and a determination of admissibility.[45]

Consequently, USCIS' use of advance parole for TPS travel authorization was inconsistent with MTINA, as the INA specifies that noncitizens who are paroled into the United States "shall not be considered to have been admitted."[46] Further, DHS OGC concluded that "the same immigration status [a TPS beneficiary] had at the time of departure" on authorized travel is best understood to refer to "Temporary Protected Status," and upon returning, the beneficiary, if eligible, must be admitted into that "same immigration status."[47]

In further support of this reading, DHS OGC referenced the *Sanchez* Court's recognition of TPS as a lawful status and noted that, although the Court was not addressing whether TPS was a status into which one could be admitted following authorized travel, two types of status that it examined in its decision—U nonimmigrant status and asylum status—were forms of lawful status whose conferral does not necessarily result in an admission but also statuses into which noncitizens nevertheless may be admitted after inspection at a port of entry.[48]

---

[43] DHS OGC memorandum p. 2.

[44] *See* DHS OGC memorandum p. 15.

[45] *See* DHS OGC memorandum p. 15.

[46] *See* INA 101(a)(13)(B); *see also* INA 212(d)(5)(A) ("parole of [an] alien shall not be regarded as an admission of the alien"). *See generally* DHS OGC memorandum p. 16.

[47] *See* DHS OGC memorandum p. 18.

[48] *See* DHS OGC memorandum p. 19. Noncitizens may be admitted into U nonimmigrant status if their petition is approved while they are overseas. *See* 8 CFR 214.14(c)(5)(i)(B) and (f). Asylees who are authorized to travel abroad under INA 208(c)(1)(C) are inspected and admitted upon their return, even if they had initially entered the United States without inspection or parole. See Memorandum from Bo Cooper, General Counsel, INS, *Readmission of Asylees and*

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 9

These arguments, as laid out in the DHS OGC memorandum, persuade us that TPS beneficiaries should be inspected and admitted into TPS after an authorized trip abroad pursuant to MTINA and INA 244(f)(3).

2.   TPS Beneficiaries Who Are Inspected and Admitted after Authorized Travel Satisfy the "Inspected and Admitted" Requirement for Adjustment of Status under INA 245

Upon examining the statutory histories of the TPS program and MTINA and considering Congress's choice to borrow the well-understood term of art "inspected and admitted" from the adjustment of status provisions, DHS OGC found it reasonable to assume that Congress was aware that travel under MTINA would result in previously ineligible noncitizens being able to meet the INA 245(a) requirement of inspection and admission and parole.[49]

In consideration of DHS OGC's conclusion that Congress intended to use the phrase "inspected and admitted" in MTINA as it was ordinarily used elsewhere in immigration law, USCIS has concluded that it will consider inspection and admission under MTINA to satisfy the requirement of inspection and admission for INA 245 and in other relevant contexts, including the "lawful admission" requirement of INA 245(k). USCIS agrees that this policy best reflects MTINA's language and intent and promotes consistency in the language of inspection and admission across the immigration laws.

3.   Applying this Straightforward Interpretation of MTINA Best Serves USCIS' Policy Goals

In considering the issues raised subsequent to USCIS' adoption of *Matter of Z-R-Z-C-*, as well as the recent Fifth Circuit decision in *Duarte* and DHS OGC's legal opinion referenced above, USCIS has examined several policy options to determine what would most effectively advance the agency's policy objectives while recognizing any legitimate reliance interests implicated in any changes to the agency's application of MTINA. Those objectives include administering immigration laws clearly, lawfully, and consistent with Congress's intent; ensuring equitable treatment of noncitizens under the immigration laws; applying a uniform policy throughout the United States; promoting family unity; and reducing barriers and promoting access to the legal immigration system.

As a preliminary matter, USCIS' options are constrained, at least in part, by the Fifth Circuit's ruling in *Duarte*. USCIS may either adopt that court's holding nationwide to ensure a consistent position for all TPS travelers, or adopt one of several options that would result in inconsistent application of the law across jurisdictions.

First, USCIS considered adopting *Duarte* in the Fifth Circuit, but leaving the designation of *Matter of Z-R-Z-C-* in place and maintaining its holdings as USCIS policy in all other jurisdictions. This

---

*Refugees Without Travel Documents*, General Counsel Opinion 99-6 (citing 8 CFR 223.3(d)(2)(i)) ("An arriving alien who presents a valid refugee travel document may be admitted to the United States and resume his or her status as a refugee or asylee.").
[49] DHS OGC memorandum pp. 21-23.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 10

option would have provided some measure of continuity with the policy changes made in 2020 and would be consistent with the agency's position in litigation. However, in finding that "MTINA mandated that [the plaintiffs in *Duarte*] be 'admitted'—not paroled—upon their return from their travel abroad," and that the plaintiffs therefore "were admitted and not paroled into the country," the Fifth Circuit indicated that any past returning TPS beneficiary be treated as having been admitted, regardless of whether USCIS had determined otherwise or whether they were in fact paroled by CBP.[50]

Consequently, TPS beneficiaries whose cases arise under the Fifth Circuit's jurisdiction would be subject to a different analysis than similarly situated TPS beneficiaries whose cases arise elsewhere if USCIS were to continue applying *Matter of Z-R-Z-C-*, preventing equitable treatment of noncitizens and application of a uniform policy throughout the country. Further, the interpretation in *Matter of Z-R-Z-C-* strains the ordinary meaning of the statutory text concerning inspection and admission, which places a continuing legal burden on USCIS. The presence of pending lawsuits in multiple states poses the risk of different rulings in different jurisdictions and, consequently, interpretations and policy that vary across the country.

USCIS also considered withdrawing *Matter of Z-R-Z-C-* and returning to the earlier policy in which TPS beneficiaries traveled with an advance parole document, were paroled upon return, and were therefore considered to meet the INA 245(a) "inspected and admitted or paroled" requirement on the basis of parole. However, this approach is contrary to the holding in *Duarte*, and in addition to the problems caused by a jurisdictional split as discussed above, INS General Counsel advised against a policy that such individuals be considered paroled when MTINA was enacted, and DHS OGC has similarly advised against such a policy. It would also be contrary to MTINA's language of admission and would result in TPS beneficiaries being placed in a different immigration status—that of a parolee—in further contravention of MTINA.

When assessing the option adopted in this memorandum, the possibility that TPS beneficiaries who had been present without admission or parole could become "inspected and admitted" by traveling abroad with prior authorization drew concern that such an outcome would be in tension with the general understanding that TPS is not intended to confer advantages other than the protection from removal specified in the statute. However, as OGC noted in their memorandum, prior to MTINA Congress specified that Salvadoran TPS holders could travel using advance parole, thereby creating just such mechanism through which TPS beneficiaries who had not previously been admitted or paroled could, in fact, meet the requirement at INA 245(a).[51] To the extent that such a tension does in fact exist, we reiterate that it is reasonable to assume that Congress was aware of the outcome of this language, and therefore any apparent tension does not outweigh our conclusion that the best reading of MTINA's text should be adopted.

Further, we no longer believe that this perceived tension is necessarily, or best, resolved by continuing to apply a policy premised on disregarding the well-established meaning of the term "inspected and admitted" and the ordinary understanding of the phrase "into the same immigration

---

[50] *See Duarte*, 27 F.4th at 1060-61.
[51] DHS OGC memorandum pp. 21-22.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 11

status" and instead assigning these phrases a different meaning for MTINA purposes than elsewhere in the INA. By contrast, reading the "same immigration status" to refer to TPS gives effect to the text of MTINA and is consistent with the ordinary understanding of inspection and admission into a particular lawful status under the immigration laws (e.g., nonimmigrant status).

Moreover, the analysis outlined in this memorandum and detailed by the DHS OGC persuades us that this position is better positioned to withstand legal challenges—and already has support in the Fifth Circuit's decision in *Duarte*—thereby promoting uniform policy nationwide and conserving USCIS resources by avoiding further litigation.

We acknowledge that allowing certain TPS beneficiaries to meet the "inspected and admitted or paroled" requirement of INA 245(a) (as was generally the case prior to the adoption of *Matter of Z-R-Z-C-*) and the "lawful admission" requirement of INA 245(k) after returning from authorized travel will result in some previously ineligible noncitizens becoming eligible for adjustment of status. Critically, though, this change does not, in itself, create a direct pathway to lawful permanent resident status. Those who benefit from this new policy must still satisfy all other requirements for adjustment of status, including having an immigrant visa immediately available and being admissible to the United States for permanent residence, and they must also merit a favorable exercise of discretion.[52] The adjustment of status bars of INA 245(c) also apply. The change effected by this memorandum, however, advances USCIS' goals of promoting access to legal immigration and promoting family unity in addition to aligning our policy with the clearest reading of the statutory text.

In deciding to rescind its designation of *Matter of Z-R-Z-C-* as an Adopted Decision, USCIS has also considered whether there are legitimate reliance interests implicated by the rescission.[53] Those potential reliance interests, detailed below, relate to whether a noncitizen is subject to inadmissibility or deportability grounds of removal, where jurisdiction over an application for adjustment of status lies, whether TPS-authorized travel may result in a noncitizen's inadmissibility on other grounds, whether a TPS beneficiary may lose access to certain public benefits, and how the agency's workload may be impacted.[54] As discussed further below, after considering these reliance interests and the effects of this policy change on both the agency and noncitizens who travelled with authorization based on TPS, USCIS has decided to rescind its adoption of *Matter of Z-R-Z-C-* and will no longer use advance parole to implement INA 244(f)(3).

---

[52] Under MTINA, TPS beneficiaries returning from authorized travel are assessed for inadmissibility only under the grounds specified in INA 244(c)(2)(A)(iii). Thus, they may be admitted into the United States in TPS even if they are inadmissible on other grounds. The fact of a TPS beneficiary's admission under MTINA has no bearing on the beneficiary's inadmissibility on other grounds.

[53] *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

[54] In addition to the interests described below, USCIS considered but deemed negligible any reliance interests of third parties, such as states, that may be affected by this change. The manner in which TPS beneficiaries are authorized to travel and the effects of such travel have no reasonable connection to any interests third parties may assert, such as any costs to states due to the presence of additional noncitizens in their territory. TPS beneficiaries already cannot be removed by DHS, they may work, and there is no definite terminus to their status so USCIS does not expect that this policy will change the population of noncitizens in the United States. And as noted above, inspection and admission does not, by itself, create any pathways to lawful permanent residence.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 12

For example, unadmitted TPS beneficiaries who were amenable to removal proceedings based on certain inadmissibility grounds under INA 212 prior to their authorized travel outside the United States will no longer be subject to removal based on those inadmissibility grounds after being inspected and admitted into TPS upon their return. As admitted noncitizens, they will instead be subject to deportability grounds under INA 237. In some cases, TPS beneficiaries who were amenable to inadmissibility charges under INA 212 may not fall within a ground of deportability under INA 237 and would not be amenable to removal proceedings unless they later become deportable under one of the INA 237 grounds. Conversely, some TPS beneficiaries who did not fall within a ground of inadmissibility may be subject to deportability under INA 237. USCIS defers to other DHS components on the effect of DHS OGC's legal determination on removal proceedings, and USCIS officers should follow agency guidance if issuing Notices to Appear under these legal determinations.

In some cases, applying this guidance retroactively to TPS beneficiaries who were paroled upon returning from authorized travel may shift jurisdiction over certain adjustment of status adjudications from USCIS to the Executive Office for Immigration Review (EOIR). Before the adoption of *Matter of Z-R-Z-C-*, TPS beneficiaries who were paroled upon return were treated as "arriving aliens" on the basis of that parole, regardless of whether they had met the definition of an arriving alien before their travel.[55] Consequently, USCIS had jurisdiction over their applications for adjustment of status in most cases if they were later placed in removal proceedings.[56]

After *Matter of Z-R-Z-C-* was adopted, reentry after TPS-authorized travel was not treated as a parole for purposes of adjustment of status, even though USCIS continued to use advance parole as the mechanism for authorizing travel. Consequently, if a noncitizen was placed into proceedings after TPS-authorized travel, USCIS would only have jurisdiction over the adjustment application if the noncitizen had been an "arriving alien" when departing on authorized travel.[57]

Under this new guidance, TPS beneficiaries whom USCIS considers to have been admitted into the United States under MTINA will no longer be "arriving aliens," and USCIS would not have jurisdiction over applications for adjustment of status for those placed into proceedings after TPS-authorized travel, regardless of whether they were "arriving aliens" when they departed. Those applicants will need to apply for adjustment of status with EOIR or seek to have their removal proceedings terminated in order to apply with USCIS.[58]

Nonetheless, for the reasons described in this policy memorandum, USCIS has determined that the interpretation of MTINA explained in this guidance has the strongest legal foundation and will best promote access to legal immigration and family unity. USCIS is adopting this guidance in recognition that the benefits outweigh the costs related to any shifts in jurisdiction.

---

[55] *See* 8 CFR 1.2 (defining "arriving alien").
[56] *See* 8 CFR 245.2(a)(1); *see also* 8 CFR 1245.2(a)(1)(ii) (specifying the circumstances in which EOIR, and not USCIS, would have jurisdiction over an arriving alien's application for adjustment of status).
[57] *See Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO Aug. 20, 2020), PM-602-0179, p. 9, issued August 20, 2020.
[58] *See* 8 CFR 1245.1(i).

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 13

The rescission could result in an increase in certain types of adjudications and form submissions, such as Form I-485, Application to Register Permanent Residence or Adjust Status, or the Form I-131, Application for Travel Document. This could impact backlogs and wait times for adjudication of the impacted forms. However, upon submission of these forms, applicants must pay the applicable filing fees (unless provided a fee waiver), which provide operational resources to supplement workforces to process the increased volume of forms. Therefore, considering the limited reliance interests implicated by this policy change and the positive impact the change will have on important agency policy objectives, the benefits of rescinding the adoption of *Matter of Z-R-Z-C-* justify the related costs to the agency.

Rescinding the policy in *Matter of Z-R-Z-C-* may adversely affect TPS beneficiaries who relied on *Matter of Z-R-Z-C-* to avoid inadmissibility under INA 212(a)(6)(B) or (a)(9)(A)(ii) that would have otherwise resulted from their departure from and again seeking admission to the United States. Under INA 212(a)(6)(B), a noncitizen is inadmissible if they again seek admission to the United States within 5 years of departure after failing or refusing to attend or remain in attendance at removal proceedings without reasonable cause. Under INA 212(a)(9)(A)(ii), a noncitizen is inadmissible if they seek admission within a specified period after departing the United States while under an outstanding order of removal. If TPS beneficiaries who meet the other criteria for inadmissibility under these grounds travel with authorization and subsequently present themselves for inspection and admission into TPS under MTINA, they will thereby trigger inadmissibility.[59] Although such inadmissibility would not prevent them from admission into TPS under MTINA, it could lead to ineligibility for adjustment of status or other immigration benefits.[60] Because *Matter of Z-R-Z-C-* held that TPS beneficiaries returning from authorized travel must be treated as if they had never left, TPS-authorized travel would not have resulted in inadmissibility under these grounds. While this is a worse outcome for those individuals affected by this change, USCIS has assessed this impact against both mitigating and countervailing considerations, beginning with the limited size of the affected population: *Matter of Z-R-Z-C-* was USCIS' policy for less than 2 years and applied only prospectively, and those who traveled under the policy in effect before its adoption would also have become inadmissible when they presented themselves for inspection and were paroled into the United States if they met the other criteria for inadmissibility under these

---

[59] Inadmissibility under both of these grounds requires either departure or removal, and therefore may be triggered in circumstances where a noncitizen departs the United States under an order of removal, even if the departure did not execute the order. *See* INA 212(a)6)(B) and (9)(A)(ii). USCIS will continue to apply the holding of *Matter of Arrabally and Yerabelly*, 25 I&N Dec. 771 (BIA 2012)—that a noncitizen who leaves the United States temporarily pursuant to a grant of advance parole does not make a departure from the United States within the meaning of INA 212(a)(9)(B)(ii)—to authorized travel under MTINA followed by admission to the United States into TPS, as the Board's reasoning remains equally applicable. Therefore, this change will not adversely affect individuals with respect to reliance upon *Matter of Arrabally*.

[60] *See* INA 245(a)(2) (requiring that an applicant for adjustment of status be admissible to the United States).

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 14

grounds.[61] Additionally, noncitizens may seek relief from INA 212(a)(9)(A)(ii) inadmissibility by obtaining consent to reapply for admission.[62]

With respect to eligibility for public benefits, noncitizens paroled into the United States for more than one year are "qualified aliens" for the purpose of eligibility for Federal public benefits.[63] Noncitizens paroled for less than one year may be eligible for certain State and local public benefits.[64] In addition, Cuban and Haitian entrants, as defined in section 501(e) of the Refugee Education Assistance Act of 1980 (REAA), are qualified aliens.[65] Cuban and Haitian entrants are not subject to some limitations on eligibility for certain Federal public benefits applicable to other qualified aliens.[66] The definition of Cuban and Haitian entrant under the REAA includes, among other things, Cuban and Haitian nationals who have been paroled into the United States regardless of current status, and Cuban and Haitian nationals currently paroled.[67] A grant of TPS does not render a noncitizen a qualified alien, or a Cuban and Haitian entrant. Admitting noncitizens in the future into TPS rather than paroling them may therefore have some effect on their eligibility for certain public benefits. With respect to USCIS deeming an applicant for adjustment of status or other immigration benefit to have been previously admitted rather than paroled, we emphasize that this determination is limited to adjudication of the immigration benefit request before USCIS and is not intended to affect the decisions of other agencies, including regarding whether a noncitizen is a qualified alien or a Cuban and Haitian entrant. Again, in general, this deeming would take place with respect to an applicant voluntarily seeking an immigration status, such as lawful permanent residence, to which it is relevant.

USCIS has also considered whether and to what extent this interpretation of MTINA should be applied to past travel by TPS beneficiaries that was authorized under the auspices of parole. For cases arising in the Fifth Circuit, *Duarte* indicates that past paroles are to be treated as inspection and admission, regardless of the procedure used when TPS beneficiaries were permitted to reenter the United States and regardless of the status listed on their travel documentation.[68] In other jurisdictions, to the extent that USCIS must determine whether to consider a prior entry an admission or parole, it will consider, on a case-by-case basis for individual adjudications, whether retroactive application of this policy is appropriate. In most cases, whether the prior entry is treated as an admission or a parole will not affect the outcome of the adjudication, particularly in the

---

[61] Under INA 212(d)(5)(A), DHS has the authority to parole a noncitizen who is "applying for admission," and when the parole ends, the noncitizen is treated "in the same manner as that of any other applicant for admission to the United States."

[62] Inadmissibility under INA 212(a)(9)(A)(ii) does not apply to a noncitizen who obtains DHS's consent to reapply for admission before the noncitizen's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory. INA 212(a)(9)(A)(iii). Consent to reapply may be requested in accordance with 8 CFR 212.2.

[63] 8 U.S.C. §§ 1611(a), 1641(b)(4).

[64] 8 U.S.C. § 1621(a)(3).

[65] 8 U.S.C. § 1641(b)(7).

[66] *See, e.g.*, 8 U.S.C. § 1612(b)(2).

[67] 8 U.S.C. § 1522 note.

[68] *See Duarte*, 27 F.4th at 1061 (concluding that "USCIS was … not authorized to grant the Appellants the advance parole that the 512L form it issued them purported to allow" and that as a result they "were admitted and not paroled into the country").

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 15

context of adjustment of status under INA 245(a).[69] If the distinction between admission and parole is not dispositive, then no retroactivity determination need be made.

In circumstances where the distinction between admission and parole is dispositive, USCIS will determine whether to consider a prior return from TPS-authorized travel as an admission. USCIS recognizes that this type of retroactivity in adjudications is generally disfavored where affected parties have relied on a past interpretation in such a way that they would be harmed by the change. Consequently, when determining whether to apply this guidance retroactively to a case, USCIS will apply *Retail Wholesale and Department Store Union AFL-CIO v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972)—known as the *Montgomery Ward* test in the Ninth Circuit[70]—as adopted by the Board of Immigration Appeals in *Matter of Cordero-Garcia*, 27 I&N Dec. 652, 657 (BIA 2019).[71] The five-factor test formulated by the D.C. Circuit entails the following considerations:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.[72]

If a particular noncitizen who relied on either *Matter of Z-R-Z-C-* or DHS's prior use of advance parole to implement TPS travel would be negatively affected or otherwise burdened by retroactive application of this new policy, USCIS will weigh any such harm against the other factors in the *Retail Union* test on a case-by-case basis. If there was no such detrimental reliance or burden, or if the harm in a particular case is outweighed by other factors in favor of retroactive application, then officers may deem a prior parole an admission for purposes of the adjudication before them. In general, when USCIS determines that an applicant is eligible for adjustment of status but for having been paroled rather than admitted under MTINA, and the applicant merits adjustment in the exercise of discretion, it would be appropriate on a case-by-case basis to deem the prior parole to be an admission.

---

[69] USCIS recognizes that a smaller subset of adjustment cases will turn on the distinction between admission and parole, namely employment-based adjustment of status applications by noncitizens seeking an exception to the bars to adjustment in INA 245(c)(2), (7), and (8). The exception at INA 245(k) requires, in part, that the applicant be present in the United States "pursuant to a lawful admission." In such cases, USCIS will conduct the individualized assessment, described above, in determining whether to apply this guidance to past travel.

[70] *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322 (9th Cir. 1982).

[71] USCIS expects that under this test, retroactive application of the policy will be appropriate in many cases where the question of parole or admission is relevant. Further guidance on how the *Retail Union* test may be applied to individual applications for adjustment of status can be found in the USCIS Policy Manual, Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements, Section A, "Inspected and Admitted" or "Inspected and Paroled," Subsection 2, Admission [7 USCIS-PM B.2(A)(2)].

[72] *See Retail Wholesale*, 466 F.2d at 390.

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 16

**Conclusion**

USCIS rescinds its August 2020 designation of the AAO's decision in *Matter of Z-R-Z-C-* as an Adopted Decision. USCIS will no longer use advance parole when authorizing TPS travel under MTINA. TPS beneficiaries who are inspected and admitted by CBP will be treated as such in USCIS adjudications. Where appropriate, USCIS will also consider TPS beneficiaries who were paroled under prior guidance to have been inspected and admitted into Temporary Protected Status, including for purposes of the "inspected and admitted" requirement for adjustment of status under INA 245(a) and the "lawful admission" requirement for INA 245(k), even if the beneficiary was present without admission or parole when initially granted TPS. USCIS recognizes this interpretation of MTINA and related guidance relating to adjustment of status effectively reverses the position it took with the adoption of *Matter of Z-R-Z-C-*.

In considering this rescission, USCIS determined that assigning the terms in section 304 of MTINA their ordinary meanings, as described in the DHS OGC memorandum, would most effectively advance the agency's policy objectives. This rescission will result in the clear and lawful administration of the immigration laws consistent with Congress's intent as expressed in the text of MTINA, thereby ensuring equitable treatment of noncitizens under the immigration laws and the application of a uniform policy throughout the United States. This policy position does not, in itself, create a direct pathway to lawful permanent resident status. However, it promotes family unity and removes barriers, thereby promoting access, to the legal immigration system by allowing certain TPS beneficiaries to satisfy the "inspected and admitted or paroled" requirement of INA 245(a) and the "lawful admission" requirement of INA 245(k) after a return from authorized travel. As the analysis in this memorandum demonstrates, USCIS believes the reading of MTINA adopted in this memorandum is both permissible and the best interpretation of the statutory text.

**Policy**

Effective immediately, USCIS rescinds its adoption of *Matter of Z-R-Z-C-*. The guidance in this memorandum supersedes prior guidance.

**Changes to Policy Manual**

The following section of the USCIS Policy Manual will be updated in accordance with the agency's clarified interpretation of the MTINA travel provisions, as explained in this memorandum.

Affected Section: Volume 7 > Part B > Chapter 2 > Section A, Eligibility Requirements

Affected Section: Volume 12 > Part D > Chapter 2 > Section C, Effect of Change in Law

**Citation**

Volume 7: Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements [7 USCIS-PM B.2].

PM-602-0188: Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries
Page: 17

Volume 12: Citizenship and Naturalization, Part D, General Naturalization Requirements, Chapter 2, Lawful Permanent Resident Admission for Naturalization, Section C, Effect of Change in Law [12 USCIS-PM D.2(C)].

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate directorate channels.

**Attachment**

DHS Office of the General Counsel, *Immigration Consequences of Authorized Travel and Return to the United States of Individuals Holding Temporary Protected Status*, issued April 6, 2022.

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

**Office of the General Counsel**
**U.S. Department of Homeland Security**
Washington, DC 20528



April 6, 2022

**MEMORANDUM**

TO:       Ur Mendoza Jaddou
             Director
             U.S. Citizenship and Immigration Services

FROM:     Jonathan E. Meyer
             General Counsel    JONATHAN E MEYER  Digitally signed by JONATHAN E MEYER
                                              Date: 2022.04.06 19:57:31 -04'00'
             Department of Homeland Security

CC:       Chris Magnus
             Commissioner
             U.S. Customs and Border Protection

             Tae D. Johnson
             Acting Director
             U.S. Immigration and Customs Enforcement

SUBJECT:  *Immigration Consequences of Authorized Travel and Return to the United States*
                *by Individuals Holding Temporary Protected Status*

## I.  PURPOSE

      U.S. Citizenship and Immigration Services (USCIS) has requested guidance[1] on the best interpretation of a provision of the Miscellaneous and Technical Immigration and Nationality Amendments of 1991 (MTINA). This provision calls for noncitizens with Temporary Protected Status (TPS)[2] who have traveled overseas with advance authorization to be "inspected and admitted" into the United States upon their return "in the same immigration status [they] had at the time of departure."[3]

---

[1] A copy of this memorandum is being shared with U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) because of the cross-component interests in the subject matter and the implications of any policy change on such components. In developing this memorandum, the Office of the General Counsel consulted with component counsel from USCIS, ICE, and CBP.

[2] *See* Immigration and Nationality Act (INA) § 244; 8 C.F.R. pts. 244, 1244.

[3] Pub. L. No. 102-232, § 304(c), 105 Stat. 1733, 1749.

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

For nearly thirty years, the Department of Homeland Security (DHS) and its predecessors used its advance parole authority to implement this provision.  This position contravened the advice of the General Counsel of the Immigration and Naturalization Service (INS), as stated in a 1992 opinion.[4]

In 2020, USCIS adopted, as binding policy guidance, a decision issued by its Administrative Appeals Office (AAO), known as *Matter of Z-R-Z-C-*.[5] This decision held that, under MTINA, such individuals should be treated not as "paroled" within the meaning of INA 245(a) for purposes of adjustment of status, but rather as if they had never left the country. Following the Supreme Court's decision in *Sanchez v. Mayorkas* and in connection with multiple pending lawsuits, USCIS is reconsidering the approach taken in *Matter of Z-R-Z-C-* and has sought advice from the Office of the General Counsel (OGC) on the best interpretation of the relevant statutory provision.

## II.     QUESTIONS PRESENTED

a. What is the best reading of MTINA's requirement that TPS holders who have traveled overseas with the Government's permission be "inspected and admitted" into the United States upon their return "in the same immigration status [they] had at the time of departure?"

b. What effect does such authorized travel and return have on eligibility for adjustment of status under section 245 of the Immigration and Nationality Act (INA)?

## III.     SUMMARY CONCLUSIONS

a. The MTINA travel-and-return provision is best understood as providing that TPS holders with advance authorization to travel who present at a port of entry must be inspected and, so long as they are otherwise admissible under the TPS-specific standards established by MTINA and INA § 244, admitted into Temporary Protected Status.  USCIS is therefore well within its authority to rescind *Matter of Z-R-Z-C-* and give the phrase "inspected and admitted" the same meaning it holds—and has long held—elsewhere in the INA.  Indeed, USCIS would be assuming a stronger legal posture by doing so, and would be coming into compliance with legal advice issued by the INS General Counsel 30 years ago.  The Department should not authorize such travel via advance parole procedures, nor should such TPS travelers be paroled upon their return.

b. The phrase "inspected and admitted" in MTINA is best understood as satisfying the "inspected and admitted" eligibility requirement for adjustment of status under INA § 245(a) and (k).

---

[4] Memorandum from Grover J. Rees III, General Counsel, INS, *Legal Opinion: Travel Authorization for Aliens Granted TPS*, Genco Op. No. 92-10, 1992 WL 1369349 (Feb. 27, 1992) (1992 Genco Op.).

[5] *Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO 2020).

AR2022_301117

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

## IV.   BACKGROUND

### A.  Statutory & Regulatory Framework

We begin with a brief discussion of the history and context of the statutes at issue, in particular the MTINA travel provision, and the related regulatory history.

#### 1.   Creation of TPS in the Immigration Act of 1990

Congress created the TPS program in Title III of the Immigration Act of 1990 (IMMACT90),[6] placing the TPS provisions in what is now section 244 of the INA.[7]  TPS provides temporary protection from removal as well as employment authorization to certain noncitizens present in the United States who are nationals of a country (or stateless individuals who last habitually resided there) designated for TPS by the Secretary of Homeland Security (formerly the Attorney General).[8]  TPS designations are discretionary, but the Secretary must first find that country conditions meet detailed statutory criteria based on ongoing armed conflict, certain natural disasters, or other extraordinary and temporary conditions.[9]

Eligible noncitizens may be granted TPS, irrespective of their current immigration status or manner of entry, so long as they meet the statutory TPS criteria.[10]  IMMACT90 also provided that TPS recipients "may travel abroad with the prior consent of the [Secretary]," and that "for purposes of adjustment of status under section 245 and change of status under section 248, [a TPS holder] shall be considered as being in, and maintaining, lawful status as a nonimmigrant."[11]

In addition to creating a process for the Secretary to designate countries for TPS as he deems appropriate, Congress in IMMACT90 explicitly designated TPS for El Salvador for a period of roughly nineteen months.[12]  Congress also specified that Salvadorans granted TPS under this statutory designation could be provided "advance parole" to travel abroad in cases of "emergency and extenuating circumstances beyond the control" of the noncitizen.[13]

Finally, section 301 of IMMACT90 created a time-limited program known as the Family Unity Program (FUP), which—similar to TPS—provided protection from removal for covered individuals.  The FUP provided a temporary stay of deportation and employment authorization to qualifying noncitizens with close family ties to certain categories of legalized noncitizens.[14]

---

[6] Pub. L. No. 101-649, § 302, 104 Stat. 4978.

[7] INA § 244.  The TPS provisions originally were located in section 244A of the INA.

[8] INA § 244(a).  TPS designations last from six to eighteen months, at which point the Secretary determines whether the conditions underlying the designation continue to be met, and either extends or terminates the designation, as appropriate.  Where warranted, TPS extensions must be at least 6 months, but they can be 12 or 18 months in the Secretary's discretion.  INA § 244(b)(3).  Eligible noncitizens must register for TPS in order to benefit from a designation.  INA § 244(c)(1)(A)(iv).

[9] INA § 244(b).

[10] INA § 244(c)(1), (2).

[11] INA § 244(f)(3), (4).

[12] IMMACT90 § 303(a).

[13] *Id.* § 303(c)(4).

[14] *See* 8 C.F.R. §§ 236.10-236.18 (implementing regulations for FUP).

AR2022_301118

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

Shortly after the enactment of IMMACT90, INS issued regulations for implementing TPS and FUP.[15]  Among other things, the rules specified that permission to travel would be issued under INS's advance parole processes, using Form I-131, Application for Travel Document.[16]

The immigration consequences of travel and return of TPS recipients received a great deal of attention in the ensuing months.  During a nine-month period from May 1991 to February 1992, the INS General Counsel's Office issued no fewer than four opinions on this subject.  On May 13, 1991, the Acting INS General Counsel issued an opinion advising that, consistent with the state of immigration law at the time,[17] a Salvadoran TPS recipient (as well as any other TPS recipient) who traveled abroad pursuant to a grant of advance parole would be subject to exclusion proceedings, not deportation proceedings, upon return to the United States and termination of the individual's TPS.[18]  That was so regardless of whether they had previously been admitted to the United States (e.g., as a nonimmigrant) or otherwise effected an entry (e.g., entered without inspection).[19]  The Acting General Counsel noted that, "in contrast to deportation proceedings, exclusion proceedings do not provide avenues of relief such as voluntary departure, suspension of deportation, or designation of country of choice for deportation" and that, consequently "[f]ederal courts ha[d] not approved INS' placing an alien in exclusion proceedings after advance parole, without providing the alien with sufficient notice of the loss of entitlement to deportation proceedings at the time the alien was granted advance parole by the Service."[20]  Accordingly, the Acting General Counsel advised that "INS employees should be instructed to indicate on the [Form] I-512 [advance parole document] that the alien will be placed in exclusion proceedings and will not benefit from any relief available in deportation proceedings."[21]  On May 22, 1991, the INS issued a cable on travel abroad by TPS

---

[15] Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (interim rule); Temporary Protected Status, 56 Fed. Reg. 23,491-02 (May 22, 1991) (final rule); Applicant Processing for Family Unity Benefits, 56 Fed. Reg. 42,948 (Aug. 30, 1991) (proposed rule).

[16] See 56 Fed. Reg. at 622 (TPS interim rule) ("Permission to travel may be granted by the district director.  Such permission to travel shall be requested pursuant to the Service's advance parole provisions contained in [8 C.F.R.] § 212.5(e) . . . . There is no appeal from a denial of advance parole."); 56 Fed. Reg. at 23,498 (TPS final rule) (adding "pursuant to the Service's advance parole provisions" after interim rule's provision that "[p]ermission to travel may be granted by the district director" and deleting the provision citing 8 C.F.R. § 212.5(e)); 56 Fed. Reg. at 42951 (FUP NPRM) ("An alien whose application for family unity is granted who desires to travel outside the United States and return must make application for advance parole to the district director having jurisdiction over the applicant's residence. Form I-512 (Authorization for Parole of an Alien into the United States) will be issued to an alien whose application is granted.  The authority to grant an application for advance parole for an alien granted family unity benefits rests solely with the district director.  An alien who is granted advance parole will be subject to exclusion proceedings upon termination of the parole status.").

[17] Congress amended the INA significantly in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546.  See infra pp. 7-8 & notes 39, 41.

[18] Memorandum from Paul W. Virtue, Acting General Counsel, INS, Proceedings Applicable to Salvadoran TPS Aliens After Advance Parole, Genco Op. No. 91-44, 1991 WL 1185155, at *1 (May 13, 1991); see also Matter of G-A-C-, 22 I&N Dec. 83, 89 (BIA 1998) (holding that, under pre-IIRIRA law, a noncitizen granted advance parole and paroled into the United States upon return from travel abroad was properly placed in exclusion proceedings when parole revoked); Matter of Torres, 19 I&N Dec. 371, 373-76 (BIA 1986) (same).

[19] See id.  The same would be true of FUP beneficiaries.

[20] Id. at *2 (citing Joshi v. Dist. Dir., INS, 720 F.2d 799 (4th Cir. 1983) and Patel v. Landon, 739 F.2d 1455 (9th Cir. 1984)).

[21] Id.

AR2022_301119

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

recipients instructing that the remarks block on the Form I-512 should include such a travel warning.[22]

In a subsequent June 17, 1991 memorandum, the Acting INS General Counsel advised that the INS could grant advance parole to a TPS recipient who was subject to pending deportation proceedings.[23]   The opinion further explained, however, that the INS should move to dismiss the deportation proceedings "in those cases in which an alien who is in deportation proceedings travels abroad under advance parole after having been granted TPS."[24]   "As noted," the opinion continued, "these aliens will be subject to exclusion, rather than deportation, proceedings following their return under the advance parole."[25]

### 2.   Enactment of MTINA

On December 12, 1991, one year after the enactment of IMMACT90, Congress passed follow-up legislation known as the Miscellaneous and Technical Immigration and Nationality Amendments of 1991 (MTINA).[26]   Section 304 of MTINA provides that TPS recipients who travel overseas temporarily with advance authorization, as well as traveling noncitizens benefiting from the FUP, "shall be inspected and admitted in the same immigration status the alien had at the time of departure"[27] if they were not excludable under certain exclusion grounds—now inadmissibility grounds—that render noncitizens ineligible for TPS or FUP without waiver.[28]

By requiring in MTINA that TPS recipients returning to the United States after authorized travel be "inspected and admitted," Congress deviated from its approach one year earlier when it specified that Salvadoran TPS recipients be permitted to travel on advance parole.[29]   At the time MTINA was enacted, the phrase "shall be inspected and admitted" was well understood in immigration law.[30]   The phrase mirrors the terminology of former section 235(a) of the INA, which designated INS immigration officers as responsible for conducting the "inspection" of noncitizens "seeking admission or readmission," and granted them various

---

[22] *INS Instructs on Travel Abroad by TPS Aliens*, 68 No. 22 Interpreter Releases 712 (June 17, 1991) ("The remarks block [on the Form I-512] should also state '[U]pon return to the United States, if otherwise eligible, you will be paroled into the United States.  You will not be considered to have made an entry and may be subject to exclusion proceedings.  Therefore you may not be entitled to the discretionary relief available to aliens in deportation proceedings.'").

[23] Memorandum from Paul W. Virtue, Acting General Counsel, INS, *Your June 3, 1991, Memorandum: Advance[ ] Parole for TPS Eligible Aliens in Deportation Proceedings*, Genco Op. No. 91-49, 1991 WL 1185160, at *1 (June 17, 1991).

[24] *Id.* at *2.

[25] *Id.*

[26] Pub. L. No. 102-232, 105 Stat. 1733.

[27] MTINA § 304(c)(1)(A).

[28] MTINA § 304(c)(1)(A)(i)-(ii).  With respect to TPS recipients, the applicable inadmissibility grounds are now described in INA § 244(c)(2)(A)(iii) (formerly INA § 244A(c)(2)(A)(iii) (1990)).  Those provisions are as follows: (1) INA § 212(a)(2)(A)(i), (2)(B), and (2)(C) (relating to certain criminal offenses); (2) INA § 212(a)(3)(A), (3)(B), and (3)(C) (relating to certain security, terrorism, and related grounds); and (3) INA § 212(a)(3)(E) (relating to Nazi persecution, genocide, torture, and extrajudicial killings).  *See* INA § 244(c)(2)(A)(iii).

[29] *Compare* MTINA § 304(c)(1)(A) *with* IMMACT90 § 303(c)(4).

[30] We were unable to locate any legislative history that specifically concerned the travel provision in MTINA § 304.

AR2022_301120

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

authorities for doing so.  Likewise, implementing regulations at 8 C.F.R. part 235, titled "Inspection of Persons Applying for Admission" used the same terminology.[31]

Congress's use of the phrase "inspected and admitted" also aligns with the longstanding threshold eligibility requirement for adjustment of status to that of a lawful permanent resident (LPR) under section 245(a) of the INA that the noncitizen have been "inspected and admitted or paroled into the United States."[32]  Since 1952, the INA has supplied a mechanism for certain noncitizens who were admitted to the United States to adjust their immigration status to that of an LPR without having to travel overseas for consular processing.[33]  In particular, the phrase "inspected and admitted or paroled" has been present in INA § 245(a) since 1960.[34]

The MTINA travel provision appears to have been aimed at remedying the adverse consequences of the use of advance parole and parole for TPS and FUP recipients granted authorization to travel.  Those adverse consequences were of obvious significance to the INS and stakeholders at the time, as reflected in the questions posed in 1991 to the INS General Counsel and the opinions he issued.[35]  As the Board of Immigration Appeals (BIA or Board) later observed in a different context, advance parole "is tied to section 212(d)(5)(A) parole authority because neither the Attorney General, nor the [INS] district director as her delegatee, has authority under law to *admit* an alien into this country unless the law authorizes such admission."[36]  The Board further explained that, in contrast to the circumstances at issue in that case, Congress in the MTINA travel provision expressly provided such authority to admit an

---

[31] INA § 235(a) (1990); 8 C.F.R. pt. 235 (1990).

[32] INA § 245(a).  Section 245(a) provides, "The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed."  In addition, subject to certain exceptions, a noncitizen is ineligible for adjustment of status if the individual "is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States" or has engaged in "unauthorized employment" since entry into the United States.  INA § 245(c)(2).

[33] Pub. L. No. 82-414, § 245, 66 Stat. 163, 217.

[34] *See* Pub. L. No. 86-648, § 10, 74 Stat. 504, 505 (1960).  Adjustment eligibility originally was limited to noncitizens who had been "lawfully admitted to the United States as a bona fide nonimmigrant."  Pub. L. No. 82-414, § 245(a); *see also* Immigrant Status–Adjustment Under Immigration and Nationality Act, 41 U.S. Op. Atty. Gen. 433, 440 (Nov. 20, 1959) (describing 1958 amendments to INA § 245(a)).

[35] *See also Matter of Singh*, 21 I&N Dec. 427, 440 (BIA 1996) (Rosenberg, Bd. Member, dissenting) (observing that the MTINA travel provision was enacted "[i]n response to expressions of concern that family unity and TPS status recipients who obtained advance parole as then construed by the [INS] could forfeit their right to apply for other forms of relief such as suspension of deportation"); *Applicant Processing for Family Unity Benefits*, 57 Fed. Reg. 6457-01, 6460 (Feb. 25, 1992) (noting "several" comments received on NPRM between August 30, 1991 and September 30, 1991, just prior to MTINA's enactment, "express[ing] concern over such possible consequences of advance parole as exclusion and loss of the possibility of future suspension of deportation, and urg[ing] the [INS] to change its position on this matter," and further noting that MTINA addressed the advance parole policy that was of such significant concern to commenters).

[36] *Matter of G-A-C-*, 22 I&N Dec. at 88.

AR2022_301121

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

otherwise inadmissible noncitizen, further distinguishing the travel-and-return authority under MTINA from the Department's parole authorities.[37]

When IMMACT90 and MTINA were enacted, an "admission" was understood to "occur . . . when an authorized employee of the Service communicates in a tangible manner to an applicant for admission his determination that the applicant has established that he is not inadmissible under the immigration laws."[38]  However, prior to enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA),[39] the separate concept of "entry"—which could be accomplished with inspection and admission *or* surreptitiously—provided the legal threshold for distinguishing which noncitizens were subject to exclusion versus deportation proceedings.[40]  Thus, a noncitizen could effectuate an entry without inspection and admission, and thereby be subject to deportation proceedings, benefitting from the attendant rights and relief options not enjoyed in exclusion proceedings.[41]  For example, in deportation proceedings, the noncitizen could have applied for voluntary departure or suspension of deportation, which were forms of discretionary relief that were unavailable in exclusion proceedings.  In deportation proceedings, the INS had the burden of demonstrating deportability by clear, unequivocal, and convincing evidence, and the noncitizen could be released on bond or recognizance and could challenge a deportation order directly to a court of appeals; in exclusion proceedings, the noncitizen had the burden of demonstrating that he or she was not excludable,

---

[37] *Id.* at 88 n.4.

[38] *Matter of Patel*, 20 I&N Dec. 368, 372 (BIA 1991) (quoting *Matter of V-Q-*, 9 I&N Dec. 78 (BIA 1960)); *see also Matter of Areguillin*, 17 I&N Dec. 308, 310 n.6 (BIA 1980) (internal citation omitted) ("'Admission' occurs when the inspecting officer communicates to the applicant that he has determined that the applicant is not inadmissible. That communication has taken place when the inspector permits the applicant to pass through the port of entry.").

[39] In IIRIRA, Congress eliminated separate exclusion and deportation proceedings, establishing a single removal proceeding under section 240 of the INA.  Pub. L. No. 104-208, Div. C., §§ 301-309, 110 Stat. 3009-575-627.  The INA now distinguishes applicants for admission, who are subject to the grounds of inadmissibility described in section 212(a), and admitted noncitizens, who are subject to the grounds of deportability in section 237(a).  In general, applicants for admission, like former "excludable" noncitizens, face certain disadvantages in relation to admitted noncitizens, such as having to bear the burden of demonstrating they are "clearly and beyond doubt entitled to be admitted," INA § 240(c)(2)(A), and being subject to more expansive grounds for removability.  *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) ("IIRIRA established 'admission' as the key concept in immigration law and defines the term as 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.' (quoting INA § 101(a)(13)(A) and citing *Vartelas v. Holder*, 566 U.S. 257, 262 (2012))."

[40] *See, e.g.*, *Matter of Pierre*, 14 I&N Dec. 467, 468 (BIA 1973) (internal citations omitted) ("An 'entry' involves (1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer; or (3) actual and intentional evasion of inspection at the nearest inspection point; coupled with (4) freedom from restraint.").

[41] *See, e.g.*, *id.* at 470-71 (noncitizens who did not "enter" the United States were properly placed in exclusion proceedings and therefore ineligible to pursue claims of persecution under former section 243(h) of the INA); *Matter of Ching & Chen*, 19 I&N Dec. 203, 204-06 (BIA 1984) (noncitizens who were refused admission and subsequently escaped from carrier custody while awaiting removal "entered" the United States and were subject only to deportation proceedings); *see also Landon v. Plasencia*, 459 U.S. 21, 25-27 (1982) (distinguishing exclusion proceedings from deportation proceedings); *Navarro-Aispura v. INS*, 53 F.3d 233, 235 (9th Cir. 1995) ("There is . . . no question that deportation proceedings afford greater procedural and substantive rights to an alien than do exclusion proceedings."); *Matter of Rosas-Ramirez*, 22 I&N Dec. 616, 620 (BIA 1999) (explaining that prior to the enactment of IIRIRA in 1996, persons without an "entry" into the United States were charged as excludable, while those who had made an "entry" were deportable); INA § 212(a) (1988) (former grounds for exclusion); *id.* § 241(a) (1988) (former grounds for deportation).

AR2022_301122

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

could only be released through discretionary parole, and could challenge an exclusion order only through *habeas corpus* proceedings in district court.[42]

As section 212(d)(5)(A) of the INA continues to provide today, the parole of a noncitizen into the United States is not, and has never been, considered an admission or, in pre-IIRIRA parlance, an "entry."[43]  Instead, "through a legal fiction," noncitizens granted parole are considered to "remain[ ] for immigration purposes at the border."[44]  Prior to IIRIRA, this meant they were subject to exclusion proceedings; under IIRIRA, noncitizen applicants for admission granted parole continue to be applicants for admission subject to the grounds of inadmissibility.[45]  Accordingly, if a noncitizen who had effected an entry into the United States—and thus could only be deported through deportation proceedings—later traveled with advance parole, the noncitizen would be paroled into the United States upon return.  As a consequence, as the INS Office of the General Counsel advised in 1991, were the INS subsequently to pursue deportation of that individual, the individual would be amenable to exclusion proceedings, rather than deportation proceedings, having forfeited significant substantive and procedural rights by virtue of the authorized travel.[46]

## B.  Agency Actions in Response to the MTINA Travel Provision

Notwithstanding the MTINA travel provision, the TPS travel regulation (now located at 8 C.F.R. § 244.15)[47] continued—and still continues—to require that individuals request travel authorization through advance parole procedures, which results in them being paroled back into the United States at the time of return.  That is so despite a legal opinion from the INS General Counsel advising against the use of advance parole for TPS travel authorization after MTINA, discussed *infra*.

---

[42] *Plasencia,* 459 U.S. at 25-27; *Ramirez-Durazo v. INS*, 794 F.2d 491, 496-97 & n.2 (9th Cir. 1986).

[43] *See* INA § 212(d)(5)(A) (providing that "parole of [an] alien shall not be regarded as an admission of the alien") (1988); *Leng May Ma v. Barber*, 357 U.S. 185, 187-89 (1958); *Geach v. Chertoff*, 444 F.3d 940, 943-45 (8th Cir. 2006); *see also Mojica v. Reno*, 970 F. Supp. 130, 141 (E.D.N.Y. 1997) ("Parole is a mechanism permitting the INS to allow an alien to remain free within the borders of the United States without 'admitting' the alien into this country.  It is based on a fiction whereby, although free to move about within the United States, the alien remains 'at the threshold of admission.'  *See* 8 C.F.R. § 235.3(c)."), *appeal dismissed sub nom.*, *Yesil v. Reno*, 175 F.3d 287 (2d Cir. 1999); *see also* INA § 101(a)(13)(B) (2020) ("An alien who is paroled under section 212(d)(5) . . . shall not be considered to have been admitted.").

[44] *Singh v. Gonzales*, 499 F.3d 969, 976 n.9 (9th Cir. 2007) (quoting *Henderson v. INS*, 157 F.3d 106, 111 n.5 (2d Cir. 1998)).

[45] *See, e.g.*, *Leng May Ma*, 357 U.S. at 186; *Geach*, 444 F.3d at 943-45; *Patel v. McElroy*, 143 F.3d 56, 59 (2d Cir. 1998); *Matter of Torres*, 19 I&N Dec. at 373-76; *see also* 8 C.F.R. §§ 1.2, 1001.1(q) (current regulations defining "arriving alien" as including parolees).

[46] *See, e.g.*, *G-A-C-*, 22 I&N Dec. at 86-92; *Matter of Torres*, 19 I&N Dec. at 373-76; *see also* 8 C.F.R. § 245.2(a)(3) (1986) (providing that if an applicant for adjustment of status travels and returns via advance parole and parole, and her application "is subsequently denied, the applicant will be subject to the exclusion provisions of . . . of the Act" and that "[n]o alien granted advance parole and inspected upon return shall be entitled to a deportation hearing").

[47] The provision originally was located at 8 C.F.R. § 240.15 (1990).

AR2022_301123

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

*FUP Rulemaking*

Following the passage of MTINA, however, the INS did engage in further FUP rulemaking on the issue of travel authorization.[48]  The FUP travel regulation is located at 8 C.F.R. § 236.16.  Like the TPS travel regulation, the INS proposed a rule prior to the enactment of MTINA that would have required FUP beneficiaries seeking to travel to request advance parole and generally be paroled upon return.[49]  In the FUP interim rule issued after MTINA's enactment, however, the INS responded to commenters who had expressed concern "over such possible consequences of advance parole as exclusion and loss of the possibility of future suspension of deportation":

> Section 304 of [MTINA] modifies this policy.  Pursuant to this provision, an alien in the program who leaves the United States with advance authorization, and who is not excludable on a ground referred to in section 301(a)(1) of the Immigration Act of 1990 when he or she returns, shall be inspected and admitted in the same immigration condition the alien had at the time of departure.  Thus the alien will continue to be ineligible to adjust status under section 245 of the Immigration and Nationality Act, since voluntary departure is not a "status" under the Act.  The alien will obtain authorization using the advance parole mechanism, form I-131, Application for Travel Document.  Upon his or her return to the U.S., however, the alien will not be paroled, but instead will be reinstated to voluntary departure under the Family Unity Program.[50]

Accordingly, the interim rule removed the proposed rule's references to advance parole:

> An alien granted family unity benefits who intends to travel outside the United States and then return must apply for advance authorization using Form I-131, Application for Travel Document.  The authority to grant an application for advance authorization for an alien granted family unity benefits rests solely with the district director.  An alien who is granted advance authorization and returns to the United States in accordance with such authorization, and who is found not to be excludable on a ground of exclusion referred to in section 301(a)(1) of the Immigration Act of 1990, shall be inspected and admitted in the same immigration condition the alien had at the time of departure for the remainder of the two-year period granted under the Family Unity Program.[51]

The INS revisited this issue again in issuing the final rule in 1995.[52]  Specifically, in the final rule, the INS replaced the interim rule's use of the word "condition" with "status":

> To avoid an appearance that the Service is not following the statute, the word "status" will be used in the final rule.  If the person was in status at the time of departure, the alien will be placed in status upon return to the United States.  Conversely, if the person was out of status upon departure, the alien will be out of

---

[48] Applicant Processing for Family Unity Benefits, 57 Fed. Reg. 6457 (Feb. 25, 1992) (interim rule).

[49] 56 Fed. Reg. at 42,951; *see supra* note 15.

[50] 57 Fed. Reg. at 6460.

[51] *Id.* at 6461.

[52] Applicant Processing for Family Unity Benefits, 60 Fed. Reg. 66,062 (Dec. 21, 1995) (final rule).

AR2022_301124

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

status upon his or her return. Thus, existing sections of the Act, such as section 245, are unaffected by section 301 of IMMACT 90. If an alien was ineligible to adjust status upon departure, the alien will be ineligible to adjust status upon return.[53]

The remaining substance of the FUP travel regulation was functionally unchanged, and notwithstanding this regulatory change, FUP beneficiaries continued to be paroled back into the United States following their authorized travel rather than inspected and admitted.[54]

*1992 INS General Counsel Opinion Advises Against Use of Parole*

In 1992, the INS General Counsel issued a brief opinion on the proper mechanism for implementing MTINA's travel provisions, concluding that because Congress chose not to use the term "parole," and instructed that TPS recipients traveling with the permission of the INS "shall be inspected and admitted in the same immigration status the alien had at the time of departure," it did not intend that the INS should implement this provision through the advance parole mechanism.[55] Instead, the General Counsel advised, the noncitizen "must be given the same status and the same incidents of status as those possessed before departure" and noted that such authorized travel would not interrupt accumulation of continuous physical presence for purposes of the suspension of deportation statute in place at the time, as advance parole would have.[56] The INS General Counsel concluded that individuals with TPS or FUP benefits who have traveled under the auspices of MTINA should not be considered parolees, that unlike individuals who have traveled on advance parole they have not abandoned any rights to deportation proceedings, and that the INS should revise Form I-131, Application for Travel Document, to make clear that travel pursuant to MTINA is separate from the existing advance parole process.[57] However, the 1992 General Counsel opinion did not expressly address what "status" travelers should be inspected and admitted into if they originally entered without inspection and had no lawful status beyond the grant of TPS, or whether TPS itself can be considered a status. In fact, the opinion was ambiguous with respect to its understanding of the phrase "shall be . . . admitted in the same immigration status," though noting that for TPS and FUP travelers who were already in parole status prior to their departure, it meant that they should be *paroled* upon their return.[58]

*The INS's Nonadherence to Its General Counsel's Opinion*

The INS, however, did not adhere to its General Counsel's advice that the mechanism for authorizing the travel and return of TPS travelers should no longer be the advance parole process. For 30 years, the text of the relevant regulation (8 C.F.R. § 244.15) has not been changed to remove the requirement that such travel be facilitated through the use of advance parole, and individuals with TPS who wish to travel outside of the United States have done so by

---

[53] *Id.* at 66,066.

[54] *See* Form I-817, Instructions for Application for Family Unity Benefits, at 1 ("If you are granted Family Unity benefits under either IMMACT 90 or the LIFE Act and you intend to travel outside the United States temporarily, you must apply for advance parole authorization by completing Form I-131, Application for Travel Document. Advance parole allows you to request parole into the United States when you return.").

[55] 1992 Genco Op.

[56] *Id.*

[57] *Id.*; *see also Matter of Singh,* 21 I&N Dec. at 440-41.

[58] 1992 Genco Op. at 1.

AR2022_301125

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

applying for advance parole via Form I-131.  They have been provided a parole document indicating that they had been granted advance parole, and then upon arrival at a port of entry were considered for parole and provided a stamp in their passport or travel document indicating that they had been paroled into the United States.  For much of this period, in many INS and USCIS offices, such individuals were also considered to have been paroled for purposes of eligibility for adjustment of status under INA § 245(a), and as a result TPS recipients who had initially entered the United States without inspection could meet one eligibility requirement for adjustment of status by applying for permission to travel abroad and being paroled upon their return.

### C.  USCIS's 2020 Adoption of *Matter of Z-R-Z-C-* (USCIS AAO 2020)

After almost 30 years without changes in the law or its interpretation, on August 20, 2020, the AAO issued *Matter of Z-R-Z-C-*, a non-precedential decision that USCIS immediately "adopted" as a nationwide policy in its Policy Manual.[59]  These actions significantly changed the agency's position on the effect of authorized travel and return by TPS recipients.[60]  The AAO held that despite DHS's and INS's inconsistent history of treating such travelers as parolees for purposes of eligibility for adjustment of status when they return to the United States, that treatment was contrary to the language of MTINA and such individuals should *not* be considered to have been paroled.[61]  In seeming contradiction of the language of MTINA, the AAO also opined that being "inspected and admitted" into the United States after such travel does not constitute being inspected and admitted for purposes of adjustment of status under INA § 245(a).[62]

In reaching its conclusion with respect to parole, the AAO relied heavily on MTINA's instruction that FUP and TPS beneficiaries be admitted in the "same immigration status the alien had at the time of departure."  Reading the phrase "same immigration status" to refer broadly to all attendant circumstances of the noncitizen's relationship to the immigration laws, the AAO found that the "MTINA travel authorization is a unique form of travel authorization and operates as a legal fiction that restores the alien to the *status quo ante* as if the alien had never left the

---

[59] The agency had no written operational guidance on the issue until 2016 when, without analyzing the impact of MTINA, it added a Policy Manual entry relying specifically on other applications of factual parole on applications of adjustment. USCIS Policy Manual Vol. 7: Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements, Section A.5, Temporary Protected Status [7 USCIS-PM B.3(A.5)] ("For purposes of adjustment eligibility, it does not matter whether the TPS beneficiary was admitted or paroled.  In either situation, once the alien is inspected at a port of entry and permitted to enter to the United States, the alien meets the inspected and admitted or inspected and paroled requirement.").  In 2020, the AAO described the 2016 Policy Manual entry as a misapplication of MTINA, and the agency adopted *Matter of Z-R-Z-C-*'s reasoning and changed the Policy Manual.

[60] *See supra* note 5.  USCIS AAO decisions may only be formally published as precedents if they are approved by the DHS General Counsel and referred by him or her, as the Secretary's designee, to the Attorney General for review for lawfulness and publication in the Immigration and Nationality Decision (I.&N. Dec.) volumes.  *See* 8 C.F.R. §§ 103.3(c), 1003.1(g)(2), (i).  That process was not followed for *Matter of Z-R-Z-C-*, whose holding was instead incorporated into USCIS policy guidance via a memorandum from the USCIS Director.  Thus, if the choice is made to rescind *Matter of Z-R-Z-C-*, USCIS could do so by rescinding the policy guidance and replacing it through the same process, or the Department could follow the process for making a new, precedential decision. Other options may be available as well.

[61] *Matter of Z-R-Z-C-* at 8-9.

[62] *Id.* at 6.

AR2022_301126

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

United States."[63]  As a result, the AAO concluded that MTINA does not allow a TPS recipient who returns from travel abroad based on an approved advance parole application to be treated as "paroled" for purposes of eligibility for adjustment of status.

Next, the AAO considered MTINA's instruction that TPS beneficiaries who travel with advance permission be "inspected and admitted" upon their return, so long as they are not subject to specified grounds of exclusion.[64]  Noting that a grant of TPS itself is not an "admission" to the United States,[65] and that MTINA-based travel was intended to place TPS recipients in the same position they had prior to their departure, the AAO concluded that MTINA's use of "the phrase 'inspected and admitted' . . . cannot be interpreted to put TPS recipients in a better position than they had been upon their physical departure from the United States . . . ."[66]  Therefore, the AAO held that just as the "parole" granted to TPS recipients could not be treated as a parole for purposes of adjustment of status, neither could the "inspection and admission" contemplated by MTINA constitute an "inspection and admission" for purposes of adjustment of status.[67]

*Matter of Z-R-Z-C-* itself—and USCIS's decision to adopt the AAO's holding as policy—constituted a new agency position that closed off an avenue that generally had existed for decades for certain TPS recipients to potentially adjust status.  Recognizing that TPS recipients who already had traveled and returned on advance parole had reasonably relied on the agency's longstanding prior practice, USCIS determined that the adopted decision would not be applied retroactively.[68]

### D.  The Supreme Court's 2021 Decision in *Sanchez v. Mayorkas*

At the time the AAO decided *Matter of Z-R-Z-C-*, the issue of whether a grant of TPS constitutes an "admission" for purposes of adjustment-of-status eligibility was the subject of litigation nationwide.  The question centered on the unique TPS provision at section 244(f)(4) stating that during a period in which a noncitizen is granted TPS, the noncitizen, for purposes of adjustment or change of status under sections 245 and 248 of the INA, respectively, "shall be considered as being in, and maintaining, lawful status as a nonimmigrant."  The AAO took the position that section 244(f)(4) should not be construed as meaning that a grant of TPS constitutes an admission,[69] a position the Board later adopted.[70]  Three courts of appeals agreed.[71]  However, several federal appeals courts interpreted section 244(f)(4) as meaning that a grant of TPS not only deems TPS recipients to be *in* a lawful nonimmigrant status for purposes of

---

[63] *Id.* at 6.

[64] *Id.* at 6.

[65] *See Matter of H-G-G-*, 27 I&N Dec. 617, 641 (AAO 2019); *see also* discussion of *Sanchez v. Mayorkas infra*.

[66] *Matter of Z-R-Z-C-* at 6.

[67] *Id.* at 6.

[68] *Id.* at 9.

[69] *Matter of H-G-G-*, 27 I&N Dec. at 641.

[70] *Matter of Padilla Rodriguez*, 28 I&N Dec. 164 (BIA 2020)

[71] *Sanchez v. Sec'y, U.S. Dep't of Homeland Sec.*, 967 F.3d 242 (3d Cir. 2020); *Solorzano v. Mayorkas*, 987 F.3d 392 (5th Cir. 2021); *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1265 (11th Cir. 2011) (per curiam).

AR2022_301127

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

adjustment and change of status eligibility but also to have been *admitted* into a lawful nonimmigrant status for such purposes.[72]

On June 7, 2021, the Supreme Court resolved the circuit split, holding that a grant of TPS is not an admission.[73]   The Court noted that "[l]awful status and admission . . . are distinct concepts in immigration law: Establishing one does not necessarily establish the other."[74]   The Court additionally explained that a noncitizen can be admitted but not in lawful status (e.g., a noncitizen who overstays their authorized period of admission in nonimmigrant status ("visa overstay")) or in lawful status but not admitted (e.g., an asylee).[75]   The Court analogized a grant of TPS to the latter situation:

> The TPS statute permits [a TPS recipient] to remain in the country; and it deems him in nonimmigrant status for purposes of applying to become an LPR.  But the statute does not constructively "admit" a TPS recipient—that is, "consider[]" him as having entered the country "after inspection and authorization."  § 1254a(f)(4); § 1101(a)(13)(A).  And because a grant of TPS does not come with a ticket of admission, it does not eliminate the disqualifying effect of an unlawful entry.[76]

The Court rejected the petitioner's call to "view the TPS provision's conferral of nonimmigrant status as also a conferral of admission."[77]   In doing so, the Court pointed to two situations where nonimmigrant status does not presuppose an admission: crewmen, and U visa recipients.[78]   Thus, "when Congress does not speak in that manner—when it confers status, but says nothing about admission, for purposes of [INA § 245]—we have no basis for ruling an unlawful entrant eligible to become an LPR."[79]   The Court, however, expressly did not reach the separate issue of whether a TPS recipient "paroled" into the country following authorized travel abroad should be treated as having been "paroled" for purposes of adjustment under INA § 245(a).[80]

### E.  Pending Litigation

While not directly relevant to the analysis in this memorandum, there are a number of cases pending against USCIS and the Department that relate to one or more aspects of the effect of travel and return on TPS recipients and their applications for adjustment of status.  While the Department considers its legal options and policy preferences going forward, USCIS has put a hold on adjudicating adjustment of status applications where the sole basis for denying such an application would be the Policy Manual guidance adopting the holding of *Matter of Z-R-Z-C-*.  A

---

[72] *Flores v. USCIS*, 718 F.3d 548, 554 (6th Cir. 2013); *Velasquez v. Barr*, 979 F.3d 572, 581 (8th Cir. 2020), *vacated and remanded*, 142 S. Ct. 420 (2021); *Ramirez v. Brown*, 852 F.3d 954, 964 (9th Cir. 2017); *see Matter of Padilla Rodriguez*, 28 I&N Dec. at 167-68 (discussing circuit split); *see also Sanchez*, 141 S. Ct. at 1812 n.3 (same).

[73] *Sanchez*, 141 S. Ct. at 1812.

[74] *Id*.

[75] *Id.*

[76] *Id.* at 1813-14.

[77] *Id.* at 1814.

[78] *Id.*

[79] *Id.* at 1815.

[80] *Id.* at 1813 n.4 ("The Government notes that Sanchez was treated as 'paroled' when he returned from an authorized trip abroad after obtaining TPS . . . .  We express no view on whether a parole of the kind Sanchez received enables a TPS recipient to become an LPR absent any other bar in [INA § 245].").

AR2022_301128

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

putative class action lawsuit with three plaintiffs, *Gomez v. Jaddou*, directly challenging the agency's Policy Manual adoption of the holding in *Matter of Z-R-Z-C-* was recently filed in the U.S. District Court for the Southern District of New York.[81]   In addition, there are a handful of ongoing district court cases by individual litigants in which the Government has sought extensions, one of which remains stayed and two of which were dismissed without prejudice to their renewal while the AAO considers the cases.[82]   There is also pending litigation concerning whether TPS holders who entered without inspection and have final orders of removal have executed those final removal orders when traveling with an advance parole document evidencing authorization to travel under INA § 244(f)(3), which affects whether the Department of Justice Executive Office for Immigration Review (EOIR) or USCIS has jurisdiction over their applications for adjustment of status.[83]

## DISCUSSION

In our view, MTINA's statutory text and the relevant provisions in the INA are best understood as requiring that TPS recipients returning from authorized travel, and not subject to certain statutory inadmissibility grounds,[84] should be inspected and admitted into temporary protected status, the "same immigration status [they] had at the time of departure."[85]   Though contrary to the practice of the Department and its predecessors since MTINA's enactment, this construction hews far more closely to the statutory text and the apparent intention of Congress than any possible alternative constructions, including that such individuals be paroled or somehow "restored" to the *status quo ante*.[86]   It also concurs with the 1992 INS General Counsel opinion on this subject.

---

[81] Compl., No. 21-cv-9203 (S.D.N.Y. filed Nov. 8, 2021).

[82] *See Quintanilla v. Wolf*, No. 20 C 4944 (N.D. Ill. Sept. 20, 2021) (dismissing case without prejudice while AAO considers administrative appeal); *Amaya v. Cioppa*, No. 20-CV-4616 (E.D.N.Y. filed Sept. 29, 2020) (dismissing case without prejudice while AAO considers administrative appeal); *Bhujel v. Nielsen*, No. 1:18-cv-12644-LTS (D. Mass. filed Dec. 27, 2018) (currently stayed with joint status reports due every 60 days pending the government's evaluation of the policy position discussed here).

[83] *See, e.g.*, *Cent. Am. Res. Ctr. v. Cuccinelli*, No. 20-cv-02363-RBW (D.D.C. filed Aug. 26, 2020) (challenging Dec. 20, 2019 Policy Alert issued by USCIS instructing adjudicators that TPS travelers do not execute prior removal orders when re-entering the U.S. after travel abroad, and therefore USCIS does not have jurisdiction over their adjustment of status applications).  In general, "arriving aliens," as defined in 8 C.F.R. §§ 1.2 and 1001.1(q), must apply for adjustment of status before USCIS, regardless of whether they are in removal proceedings before EOIR. *See* 8 C.F.R. §§ 245.2(a)(1), 1245.2(a); 71 Fed. Reg. 27,585 (2006).  With the exception of "arriving aliens," noncitizens who are in removal proceedings must apply for adjustment before EOIR, whereas noncitizens who are not in removal proceedings file their adjustment applications with USCIS.  *See id.*; *see also Brito v. Mukasey*, 521 F.3d 160, 164-66 (2d Cir. 2008) (describing regulatory history).

[84] As noted above, MTINA was enacted prior to IIRIRA and therefore refers to grounds of exclusion rather than grounds of inadmissibility.  However, rather than list the specific grounds of exclusion that Congress intended legacy INS to apply to TPS travelers, it instead cited INA § 244A.  *See* Pub. L. No. 102-232, § 304(c)(1)(A)(ii), 105 Stat. 1733, 1749.  Section 308(g)(1) of IIRIRA provides that all statutory references to 244A are deemed to refer to 244, which in turn was updated to reference specific grounds of inadmissibility at INA § 212(a).  *See* 8 U.S.C. § 1254a note, INA § 244(c)(2)(A)(iii); *see also* 8 C.F.R. § 244.3(c) (specifying non-waivable grounds of inadmissibility for purposes of TPS eligibility).  Thus, in light of IIRIRA's general change of terminology, the Department would apply the relevant inadmissibility grounds to TPS travelers seeking admission under MTINA.

[85] Pub. L. No. 102-232, § 304(c)(1)(A), 105 Stat. 1733, 1749.

[86] Although the focus of this memorandum is on TPS recipients, our conclusions apply equally to the application of the MTINA travel provision to FUP recipients.

AR2022_301129

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

### A.  The Language of MTINA Explicitly Requires Inspection and Admission

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."[87]  "The plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but also by] the specific context in which that language is used, and the broader context of the statute as a whole."[88]  Accordingly, "we must . . .  interpret the relevant words in a statute not in a vacuum, but with reference to the statutory . . . history and purpose."[89]  If the "statute is silent or ambiguous with respect to the specific issue," the agency is delegated the authority to provide its own interpretation so long as it is "based on a permissible construction of the statute."[90]  To merit deference, however, the agency's interpretation must be reasonable and consistent "with the design and structure of the statute as a whole."[91]

As discussed above, in 1991 (and today), the terms "admission" and "admitted" generally encompassed the authorization by an immigration officer for a noncitizen to lawfully pass through a U.S. port of entry following inspection and a determination of admissibility.[92]  And the phrase "inspected and admitted" mirrors the language used in section 245(a) as a threshold eligibility requirement for adjustment of status.[93]  We must "assume that when a statute uses . . . a term [of art], Congress intended it to have its established meaning,"[94] as informed by well-established administrative interpretation of that term.[95]

As the U.S. Court of Appeals for the Fifth Circuit recently held, the INA's parole authority in this context is irreconcilable with Congress's use of the phrase "inspected and

---

[87] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997) ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.").

[88] *Id.* at 341; *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("Even under *Chevron*'s deferential framework, agencies must operate within the bounds of reasonable interpretation.  And reasonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole.") (citations and quotation marks omitted).

[89] *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quotation marks omitted).

[90] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if agency's reading differs from what the court believes is the best statutory interpretation.") (citing *Chevron*, 467 U.S. at 843-44).

[91] *Utility Air*, 573 U.S. at 321.

[92] *See supra* p. 7, note 38.

[93] *Matter of Z-R-Z-C-* fails to adequately address why these terms and phrases should be assigned a different meaning for MTINA purposes or reasonably explain why they should be read differently in MTINA than elsewhere in the INA.

[94] *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).

[95] *See Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) ("It is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." (quotation marks omitted)); *see also Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (quotation marks omitted)); *Medina Tovar v. Zuchowski*, 982 F.3d 631, 636 (9th Cir. 2020) (same – including settled administrative interpretations of a term or phrase, especially a term of art).

AR2022_301130

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

admitted" in MTINA.[96]  Sections 101(a)(13)(B) and 212(d)(5)(A) of the INA make clear—as did section 212(d)(5) when IMMACT90 and MTINA were enacted—that noncitizens who are paroled into the country "shall not be considered to have been admitted."  Congress's choice in MTINA to use the well-understood term of art, "inspected and admitted"—particularly after having used "advance parole" just one year earlier to authorize the travel of Salvadoran TPS recipients in IMMACT90—indicates that travel abroad and reentry under MTINA was intended to effectuate an admission and thereby align with the requirement of INA § 245(a).  Indeed, absent a compelling reason to depart from the canons of statutory construction,  "when Congress uses the same language in two statutes having similar purposes . . . , it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."[97]  As the Supreme Court instructed recently in *Niz-Chavez v. Garland*, "When called on to resolve a dispute over a statute's meaning, [we] normally seek[] to afford the law's terms their ordinary meaning at the time Congress adopted them" and to "exhaust all the textual and structural clues bearing on that meaning."[98]

Moreover, the phrase "the same immigration status" should be construed in context, i.e., in relation to the preceding phrase "shall be inspected and admitted in."  Even if it is possible that Congress intended "immigration status" to mean more generally the individual's immigration posture, including that of a noncitizen present without inspection and admission, we do not ordinarily understand immigration law as providing for inspection and admission into such an amorphous posture.  Instead, noncitizens typically are admitted into specific lawful statuses under the immigration laws (e.g., nonimmigrant status, refugee status).[99]

---

[96] *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022) ("First, because an alien that is paroled into the country is explicitly not considered 'admitted,' paroling TPS beneficiaries into the country is contrary to MTINA's mandate that such travelers 'shall be inspected and admitted.'").  The *Duarte* Court did not reach the question of what "status" such noncitizens should be admitted into, but we believe the court's reasoning and holdings support the view expressed here, and that our further conclusion that they are to be admitted into TPS itself is consistent with its analysis.

[97] *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005); *see also Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (quoting *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012)); *Desert Palace Inc. v. Costa*, 539 U.S. 90, 101 (2003) ("Absent some congressional indication to the contrary, we decline to give the same term in the same Act a different meaning . . . .").

[98] 141 S. Ct. 1474, 1480 (2021).

[99] In a different context, the Courts of Appeals for the Fifth and Ninth Circuits have noted that Black's Law Dictionary defines "status" more broadly, namely "[a] person's legal condition, whether personal or proprietary; the sum total of a person's legal rights, duties, liabilities, and other legal relations, or any particular group of them separately considered," and as a result found that the phrase "admitted in any status" in section 240B(a) of the INA is not limited to admission into a legal status, but rather it "encompasses all states or conditions, of whatever kind, that an alien may possess under the immigration laws." *Tula Rubio v. Lynch*, 787 F.3d 288, 293 (5th Cir. 2015); *accord Saldivar v. Sessions*, 877 F. 3d 812, 814-19 (9th Cir. 2017); *Status*, *Black's Law Dictionary* (11th ed. 2019). The Board disagrees with that interpretation. *Matter of Castillo-Angulo*, 27 I&N Dec. 194, 200 (BIA 2018) ("We also disagree with the view of the Fifth and Ninth Circuits that an alien can be admitted in an unlawful status. *See Saldivar*, 877 F.3d at 816; *Tula-Rubio*, 787 F.3d at 293‒94 & n.5. When an alien seeks admission at the border, an immigration official admits the alien only upon a determination that he or she is lawfully entitled to enter the United States. *See* section 212(a)(7) of the Act, . . . (rendering inadmissible those aliens who are not in possession of valid entry documents at the time they seek admission); . . . Because it is precisely the nature of the alien's status that determines whether he or she is entitled to admission, we cannot agree with the conclusion of the Fifth and Ninth

AR2022_301131

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

It is particularly notable here that MTINA's direction that TPS recipients be inspected and admitted after such authorized travel, subject only to specific grounds of excludability listed in INA § 244(c)(2)(A)(iii), and not subject to the general inadmissibility grounds listed in INA § 212, indicates that Congress intended to establish for this class of individuals a distinct form of inspection that would ultimately result in a grant of admission into temporary protected status.[100] That Congress in MTINA made the grounds for ineligibility for admission in TPS upon return identical to the unwaivable inadmissibility grounds for TPS itself makes a good deal of sense.[101] A current TPS holder who has been authorized to travel has already been deemed by USCIS (or an immigration judge or the BIA if the applicant is in removal proceedings) to merit TPS following consideration of those inadmissibility grounds that Congress chose to make applicable and, where necessary, pursuant to waivers of any additional and applicable inadmissibility grounds for which Congress made waivers available. As a result, there is little value in having CBP effectively re-adjudicate those judgments where the relevant determination already has been made by Congress and USCIS (or the immigration judge or BIA) in granting TPS in the first instance.[102]

## B. The "Status" Referred to in MTINA for Returning TPS Travelers is Best Understood as Temporary Protected Status

Notwithstanding our concerns with *Matter of Z-R-Z-C-*'s construction of MTINA, an unresolved question is which immigration status a returning TPS or FUP recipient should be

---

Circuits that an alien can be 'admitted in' a status that would not entitle him or her to admission."). Additionally, in those cases, the courts were considering whether a noncitizen who was "waved through" a port of entry by an immigration officer was "admitted in any status" for purposes of eligibility for cancellation of removal under section 240B(a). Even accepting *arguendo* that this broader conception of "status" should be transplanted to MTINA's use of "same immigration status," these Fifth and Ninth Circuit decisions would appear to support the view that returning TPS recipients nevertheless are to be considered "inspected and admitted" for purposes of section 245(a) and other immigration purposes.

[100] Although the legislative history does not illuminate Congress's intent in passing this provision of MTINA (see *supra* note 30), we do know that it specifically moved away from the parole framework that was causing deleterious effects on certain TPS holders from El Salvador. It is reasonable to infer that Congress used the "inspected and admitted" term of art in an attempt to provide TPS and FUP travelers with access to deportation proceedings under the pre-IIRIRA construct. *See supra* pp. 5-8, note 30. Indeed, if Congress intended the INS to continue using parole, it would not have needed to include this section of MTINA, as that was the agency's practice at the time of passage.

Additionally, this situation is not unlike that of asylees and refugees who are returning from temporary travel abroad with a refugee travel document, who are subject only to a limited list of inadmissibility grounds. *See* Memorandum from Bo Cooper, General Counsel, INS, *Readmission of Asylees and Refugees Without Travel Documents*, Genco Op. No. 99-6, 2001 WL 1047688, at *1 (1999) ("An asylee or refugee returning with a valid refugee travel document must be examined as to his or her admissibility. 8 C.F.R. § 223.3(d)(2)(1). We believe that in the case of asylees, however, this requirement only applies to those grounds of inadmissibility that would also constitute grounds for termination of asylum under 8 C.F.R. § 208.23.").

[101] *See* MTINA § 304(c)(1)(A)(ii); *see also* INA § 244(c)(2)(A)(iii); 8 C.F.R. § 244.3(c).

[102] Of course, were CBP to become aware of new information indicating that an unwaivable TPS inadmissibility ground may exist, denying admission pursuant to MTINA would be appropriate. If CBP becomes aware that an individual has, since being granted TPS, accrued derogatory information that would call into question whether TPS should be maintained, that can be addressed post-admission through revocation efforts, when a person seeks extension of their TPS, and/or should the person seek to adjust their status and have to establish that they are admissible. The mere fact of being inspected and admitted into TPS will not immunize the individual from the consequences of disqualifying post-TPS conduct.

AR2022_301132

admitted into upon return, especially if they had initially entered the United States without inspection.  USCIS has posited that MTINA's language—"shall be inspected and admitted in the same immigration status the alien had at the time of departure"—requires that returning TPS recipients be "admitted," as that term was defined by case law[103] and now in section 101(a)(13)(A) of the INA, in the status of Temporary Protected Status, which is the status they held "at the time of departure."  We agree that that is the plain meaning of the provision or, in any event, certainly the best reading.[104]

1. The Statutory Language Supports Treating TPS as a Status

By its own choice of words, Congress has indicated that Temporary Protected *Status* is, in fact, a lawful immigration status,[105] and is therefore the "status" referred to in MTINA.[106] Indeed, the MTINA provision requiring inspection and admission "in the same immigration status the alien had at the time of departure" applies to noncitizens "provided temporary protected status under . . . the Immigration and Nationality Act, including aliens provided *such status* under section 303 of the Immigration Act of 1990."[107]  Such a reading is faithful to the text of the statute, and as such should be the starting point in any textual analysis.[108]  Even if the concept of "status" may encompass more than one of the enumerated legal immigration statuses available under the INA, a more natural reading of MTINA is that Congress was referring to admission back in TPS or FUP and that it intended that such inspection and admission would meet the requirements of INA § 245(a).[109]

Importantly, other forms of "status" distinct from the immigrant and nonimmigrant categories support treating TPS as a status into which a noncitizen can be admitted following authorized travel abroad *even if* the noncitizen's original receipt of that status did not constitute an admission.  To begin, the Board has acknowledged that FUP—which was created in the same

---

[103] *See supra* note 38.

[104] We recognize that the Government recently took the position in litigation that TPS is *not* a status in which noncitizens can be admitted upon return under MTINA.  *See* Brief for Appellants at 6 n.2, *Duarte v. Mayorkas*, No. 27 F.4th 1044 (5th Cir. 2022).  However, for the reasons discussed in this paper and bolstered by the Fifth Circuit's recent decision in that case, OGC has reconsidered that position and believes that TPS recipients can be admitted into temporary protected status when returning from travel pursuant to MTINA.  *See Duarte*, 27 F.4th at 1058-61.

[105] *See, e.g.*, *Michel v. Mayorkas*, No. 4:20-cv-10885-IT, 2021 WL 797810, at *6 (D. Mass. Mar. 2, 2021) (unpublished) (observing that TPS "is an immigration status, albeit a temporary one" and that, given MTINA's travel provision, "Michel's 'immigration status' when she left for her travel was [TPS], she held the same status upon her return").

[106] Likewise, Congress may well have considered a grant of FUP to constitute an immigration status, such that the more general reference to "the same immigration status" in MTINA was meant to refer to either TPS or FUP, depending upon which benefit had been conferred.

[107] MTINA § 304(c) (emphasis added).

[108] *See Niz-Chavez*, 141 S. Ct. at 1486 ("Our only job today is to give the law's terms their ordinary meaning . . . ."); *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ."); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (quotation marks and citations omitted)).

[109] We have not been asked to address whether a TPS recipient who held a lawful nonimmigrant status prior to departing must or should be admitted in that nonimmigrant status, as opposed to temporary protected status.  *See* INA § 244(a)(5) (clarifying that noncitizens may not be required to relinquish their nonimmigrant status upon being granted TPS).

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

statute as TPS and addressed in tandem with it in MTINA[110]—is an immigration "status," while recognizing that a grant of FUP benefits is not an "admission."[111]  Notably, the Board has contrasted the general principle that a grant of FUP benefits is not an admission with the admission-based language in the FUP travel regulations.[112]

In addition, the Supreme Court in *Sanchez* drew a direct parallel between an individual who received TPS after entering the country without inspection and one who received asylum after similarly entering without inspection.  The Court explained that "a foreign national can be in a lawful status but not be admitted," and observed that just as an individual who entered the country without inspection can receive the lawful status of being an asylee without being admitted, an individual can "receive[] a different kind of lawful status"—i.e., temporary protected status—without being admitted.[113]  Notably, when asylees travel abroad with the Department's permission,[114] upon return they are inspected and admitted into their asylee status,[115] notwithstanding the fact that a grant of asylum itself is not an admission.[116]  An INS General Counsel opinion on asylee travel abroad underscores that "a refugee or asylee returning from travel abroad with a refugee travel document is readmitted as a refugee or asylee, not as a newly admitted parolee or with some other immigrant status."[117]

---

[110] *See supra* pp. 3-6.

[111] *Fajardo Espinoza*, 26 I&N Dec. at 605; *accord Matter of Reza-Murillo*, 25 I&N Dec. 296, 297 (BIA 2010); *see also Matter of Rotimi*, 24 I&N Dec. 567, 576-77 (BIA 2008) ("Ordinarily, we would expect the privilege of residing in this country to be reflected in a recognized status such as that of nonimmigrant, refugee, or asylee, each of which is set out in the statute.  The unique nature of the Family Unity Program may qualify as well, given its statutory foundation in section 301 of the Immigration Act of 1990, and its expectation of long-term presence and ultimate regularization of status.").

[112] *See Reza-Murillo*, 25 I&N Dec. at 299 (quoting 8 C.F.R. § 236.16); *see also G-A-C-*, 22 I&N Dec. at 88 & note 4 (noting admission-based language in MTINA travel provision).

[113] *Sanchez*, 141 S. Ct. at 1813.

[114] *See* INA § 208(c)(1)(C).

[115] 8 C.F.R. §§ 223.1(b) ("Except as provided in § 223.3(d)(2)(i), a person who holds refugee status pursuant to section 207 of the Act, or asylum status pursuant to section 208 of the Act, must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document."); 223.3(d)(2)(i) ("Inspection and immigration status. Upon arrival in the United States, an alien who presents a valid unexpired refugee travel document, or who has been allowed to file an application for a refugee travel document and this application has been approved under the procedure set forth in § 223.2(b)(2)(ii), shall be examined as to his or her admissibility under the Act. An alien shall be accorded the immigration status endorsed in his or her refugee travel document, or (in the case of an alien discussed in § 223.2(b)(2)(ii)) which will be endorsed in such document, unless he or she is no longer eligible for that status, or he or she applies for and is found eligible for some other immigration status."); *see* USCIS, *Questions and Answers: Asylum Eligibility and Applications*, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/asylum-frequently-asked-questions/questions-and-answers-asylum-eligibility-and-applications (last updated Sept. 16, 2021) ("A refugee travel document may be used for temporary travel abroad and is required for readmission to the United States as an asylee."); *see also* Form I-131 Instructions at 1 ("A Department of Homeland Security (DHS) officer at the U.S. port-of-entry will determine your admissibility when you present your travel document.").

[116] *Matter of V-X-*, 26 I&N Dec. 147, 150-52 (BIA 2013).

[117] Memorandum from Bo Cooper, General Counsel, INS, *Readmission of Asylees and Refugees Without Travel Documents*, Genco Op.  INS Genco Op. No. 99-6, 2001 WL 1047688, at *6; *see also id.* at *1 (citing 8 C.F.R. § 223.3(d)(2)(i)) ("An arriving alien who presents a valid refugee travel document may be admitted to the United States and resume his or her status as a refugee or asylee.").

AR2022_301134

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

*Sanchez* provides still more support for construing MTINA to allow "inspection and admission" in temporary protected status.  As discussed above, the Court held that "the conferral of TPS does not make an unlawful entrant (like Sanchez) eligible under [INA § 245] for adjustment to LPR status," emphasizing that "[l]awful status and admission . . . are distinct concepts in immigration law."[118]  The Court's reasoning, however, focused on whether a grant of TPS (or of a nonimmigrant status) by itself necessarily constitutes an admission, not whether TPS was a status into which one could be admitted following authorized travel.  The Court cited two examples of nonimmigrant statuses that may be granted without lawful admission.[119]  One of these examples—U nonimmigrant status—is particularly instructive for our purposes.  The Court noted that individuals may be granted U nonimmigrant status from within the United States, without effecting an admission, but they may also be admitted into U nonimmigrant status if their petition is approved while overseas.[120]  Taken together, these examples provide strong evidence that although a grant of TPS status is not in and of itself an admission, neither must it prevent a TPS recipient from being admitted in TPS after an authorized trip abroad.[121]

It is true that the framework presented by this interpretation could be seen as being in tension with the general understanding that TPS was not meant to improve recipients' immigration standing in the United States, but rather to ensure that they were not disadvantaged by the circumstances surrounding the designation.[122]  It could be deemed arbitrary to advantage a certain class of TPS recipients simply by virtue of their return from authorized travel abroad if MTINA is believed to have been motivated by a desire to strictly maintain the status quo.  As the AAO observed in *Matter of Z-R-Z-C-*, admitting or paroling returning TPS recipients may well result in improving their immigration posture—especially those who had previously entered the United States without inspection—simply by virtue of their authorized departure and return, so long as they meet all other requirements for adjustment of status.  Yet, ascribing to Congress the narrow intention of merely preserving the status quo in MTINA when it used language well understood in immigration law at the time to have greater effect seems to disregard the statutory text itself.[123]  That is perhaps why it was the uninterrupted (though not entirely consistent)

---

[118] *Sanchez*, 141 S. Ct. at 1812-13.

[119] *Id.* at 1813-15.

[120] *Id.* at 1814.

[121] One aspect of the 1992 Genco Opinion does give us pause.  The concluding paragraph states, "Pursuant to the above technical amendments, TPS (and family unity) aliens granted authorization 'to travel' must be readmitted to the United States in the same immigration status they had at the time of departure. They should not be given advance parole, or be paroled upon return, *unless they are already in parole status.*" (Emphasis added.)  The final sentence could be read as implying that because parolees cannot be admitted, they should not be admitted notwithstanding the MTINA directive.  We do not believe that the one-sentence reference to parolees compels a particular interpretation of MTINA and, in any event, the DHS General Counsel may issue opinions that supersede INS General Counsel opinions in whole or in part, as has been done on occasion, and chooses to do so here.

[122] *See H-G-G-*, 27 I&N Dec. at 627 ("The plain language of the statute does not reflect any intent to confer advantages to those persons without lawful status beyond providing temporary protection from removal; instead, it is clear that Congress sought an orderly departure regime.").

[123] In terms of adjustment-of-status eligibility, switching from parole to admission under MTINA would provide the further benefit of allowing certain individuals to qualify for adjustment under section 245(k) of the INA, which is a special provision for certain employment-based immigrant visa beneficiaries and requires physical presence in the United States "pursuant to a lawful admission."  *See Sanchez*, 141 S. Ct. at 1811 n.1.

AR2022_301135

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

practice of INS and this Department for thirty years to permit adjustment of status following return on parole until *Matter of Z-R-Z-C-* was issued and adopted only one year ago.

Moreover, it bears recalling that any international travel by a TPS holder occurs only with the express permission of the Secretary. Thus, to the extent there is concern about individual TPS holders inappropriately seeking to advance their immigration situation by engaging in overseas travel, the statutory framework does not explicitly forbid it; rather, it vests in the Secretary the means to prevent it, should the Secretary so choose.

2. The Legislative Intent Supports Treating TPS as a Status

There is good reason to believe that the text of the MTINA travel provision is a straightforward expression of legislative intent. Two forms of permission to come into the United States lawfully were available at the time of MTINA: admission and parole. Congress in MTINA elected not to parole these individuals. Admission was the obvious alternative. If Congress did not intend an actual admission, it could have used different terminology such as "shall be restored" or "shall resume" rather than a well-known term of art from the adjustment of status statute.[124] We should not attribute to Congress the incongruous intent to use the technical term "admission" to mean something other than its ordinary understanding in immigration law.[125]

Having just created the TPS and FUP statuses—and designated El Salvador for TPS—the year before, and having referenced that El Salvador designation in MTINA, we must assume that Congress was aware that a significant portion of individuals covered by the MTINA travel provisions had originally entered the country without inspection prior to receiving TPS or benefits under the FUP.[126] Moreover, having statutorily authorized Salvadoran TPS holders—including those who previously entered without inspection—to receive advance parole, it is reasonable to assume that Congress supported (or at least accepted) the idea that travel-and-return by such TPS holders could satisfy the "inspected and admitted or paroled" requirement for purposes of adjustment of status and allow some such individuals to adjust status if they were otherwise eligible to do so. It is certainly true that if Congress intended to create a pathway to adjustment of status for this population, it could have done so more explicitly.[127] But Congress's

---

[124] *Cf., e.g.*, INA § 223(b) ("resume the status existing at the time of his departure for such visit [abroad]"). *See generally Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) (observing that had Congress intended a different policy, "it could easily have chosen language directed to that end" as it had done in other INA provisions).

[125] *See, e.g., Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) (observing that "interpretations that would attribute different meanings to the same phrase" should be "avoid[ed]" (quotation marks omitted)); *see also supra* notes 107 & 109.

[126] *See* IMMACT90 § 303; MTINA § 304(c)(2)(B).

[127] Congress did specifically address pathways to adjustment of status in the TPS statute, but not in relation to the travel provisions of MTINA. Section 244(f)(4) states that for purposes of change of status and adjustment of status, a TPS recipient "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." Congress also limited its ability to pass future legislation that "provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving temporary protected status under this section," requiring that any such bills must pass with a supermajority of sixty Senators. INA § 244(h). That provision is of little relevance to the question at issue here, or specifically to the passage of MTINA, because the interpretation of MTINA's travel-and-return provision proposed in this memorandum would not by itself provide for adjustment of status to lawful permanent residence to TPS recipients. Rather, were the Department to adopt this interpretation, for a TPS recipient to adjust

AR2022_301136

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

awareness that many FUP and Salvadoran TPS recipients likely entered without inspection supports the argument that increased access to adjustment of status was an intended result based on the choice in MTINA to mimic the language of INA § 245(a) as discussed *supra*.  This is particularly true in light of the fact that Congress in MTINA departed from its explicit reference in IMMACT90 to "advance parole" specifically for Salvadoran TPS holders in favor of "inspected and admitted" for the full FUP and TPS populations only one year later.[128]

Congress has maintained the same "inspected and admitted or paroled" language since 1960 and was clearly aware of that language when it crafted the text of the MTINA travel provision.[129]  We should not assume that Congress had the peculiar intent of assigning to the phrase "inspected and admitted" in MTINA a meaning distinct from the identical text in INA § 245(a) that it mirrors.[130]

One additional consequence of giving the words used by Congress their ordinary and well-understood meaning is that unadmitted TPS recipients who were previously subject to removal proceedings based on certain grounds of inadmissibility under section 212 and who traveled with advance authorization, would no longer be subject to those inadmissibility charges after admission into TPS upon return.  As admitted noncitizens, they instead would be subject only to the grounds of deportability under INA § 237.[131]  For noncitizens who are deportable under section 237, DHS could lodge new removal charges and allegations.[132]  However,

---

status following inspection and admission they would additionally have to have a lawful basis on which to adjust status, such as a certain type of familial relationship or employment offer, and meet a number of other criteria.  This interpretation would allow certain TPS recipients to remove one barrier to adjustment of status, but it does not "provide" lawful permanent residence to anyone.

[128] *See supra* pp. 5-8 and notes 13 & 14.

[129] *See supra* pp. 15-17 and note 34.

[130] Even if there were reason to believe Congress was unaware of the consequences of choosing to use the term "inspected and admitted" in MTINA, "the fact that Congress may not have foreseen all the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning."  *Union Bank v. Wolas*, 502 U.S. 151, 157-58 (1991); *see also Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might accord with good policy." (quotation marks omitted)); *cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (observing that courts should be "unwilling[ ] to soften the import of Congress's chosen words even if we believe the words lead to a harsh outcome" and that "[t]here is a basic difference between filling a gap left by Congress's silence and rewriting rules that Congress has affirmatively and specifically enacted" (quotation marks omitted)); *id.* at 542 ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred result." (quotation marks omitted)).  The Supreme Court has "long rejected" the casting aside of the common meaning of statutory terms as understood at the time of enactment on the ground that "a new application [of those terms has] emerge[d] that is both unexpected and important."  *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1750 (2020); *see also id.* ("One could easily contend that legislators only intended expected applications or that a statute's purpose is limited to achieving applications foreseen at the time of enactment. However framed, th[at] logic impermissibly seeks to displace the plain meaning of the law in favor of something lying beyond it.").

[131] Of course, noncitizens cannot be removed while in TPS, and the grounds for withdrawing an individual's TPS would often also trigger new section 237 deportability grounds.  *See* 8 C.F.R. § 244.14.

[132] *See* 8 C.F.R. § 1240.10(e) ("At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing."); *accord* 8 C.F.R. § 1003.30.  A noncitizen in removal proceedings who travels abroad and returns to the United States may be subject to different charges in those removal proceedings, but that does not compel the termination of

AR2022_301137

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

noncitizens with TPS who are not deportable under section 237—for instance, those whose only prior inadmissibility had been under INA § 212(a)(6)(A)(i) for being present without admission or parole—would no longer be amenable to removal proceedings until their TPS is withdrawn or they remain in the country without authorization following the termination of their TPS designation, in which case INA § 237(a)(1)(B) (present in violation of law) or other similar deportability grounds would generally apply.[133]

For the reasons discussed above, it appears that Congress was aware of these potential implications, and the Executive Branch's role is to implement the law as written.  Moreover, this reading would not be contrary to the holding in *Sanchez* and would improve upon the AAO's effort in *Matter of Z-R-Z-C-* to move away from the use of parole in this arena, which OGC has long found to be contrary to the text and intent of MTINA.  This reading would represent a significant departure from how the Department currently treats the effects of travel and return on TPS holders and long-established procedures for facilitating travel authorization and return.  It would, however, be consistent with the overlapping statutory provisions that govern grants of TPS, authorized travel for TPS recipients, and adjustment of status, and it would create a consistent, comprehensive framework for reconciling these disparate provisions.[134]

## B.  The AAO's Reading of MTINA in *Matter of Z-R-Z-C-* is Flawed

In light of the above, it seems clear that the AAO erred in *Matter of Z-R-Z-C-*, when it determined that the language "shall be inspected and admitted in the same immigration status the alien had at the time of departure" means that (1) DHS would not actually "admit" the returning TPS traveler as that term was understood at the time of MTINA's enactment in 1991 or as now

---

proceedings.  *See Matter of Brown*, 18 I&N Dec. 324, 325 (BIA 1982) (a noncitizen "cannot compel the termination of deportation proceedings which have been commenced against him merely by effecting a departure and reentry").

[133] In fact, the INS General Counsel recommended a similar action for returning TPS recipients in the May 1991 opinion described *supra* note 18.  *Cf. Matter of Arrabally and Yerrabelly*, 25 I&N Dec. 771, 780 (BIA 2012) ("[I]t is well settled that an alien who leaves the United States and returns under a grant of advance parole is subject to the grounds of inadmissibility once parole is terminated, even if he had been 'deportable' rather than 'inadmissible' before the trip's commencement.").

[134] There has been some discussion of a third alternative, where noncitizens who held lawful immigration status at the time of their departure (e.g., nonimmigrants) would be readmitted into that status, while individuals who had entered without inspection, or whose prior status had expired, would be paroled.  This would still allow such individuals to meet the requirements of INA § 245(a), although it would not provide protection from the limitations of § 245(c) and (k) regarding unlawful presence and employment.  Because such a "hybrid" model relies in part on parole, we believe it is irreconcilable with MTINA, particularly after Congress in that Act seemingly moved away from the advance parole construct used just one year earlier for Salvadoran nationals granted TPS pursuant to the designation contained in IMMACT90.  Moreover, it conflicts with the plain meaning of the term "Temporary Protected Status" by refusing to treat TPS as a lawful immigration status itself.  Finally, such an approach would frustrate the intent of the provision at the time of enactment to spare TPS travelers—both admitted nonimmigrants and those who effected an entry without inspection—the adverse immigration consequences of parole, *i.e.*, forfeiting the procedural safeguards and forms of relief available only in deportation proceedings.  *See, e.g.*, *United States v. Bryant*, 996 F.3d 1243, 1256 (11th Cir. 2021) ("As between two competing interpretations, we must favor the 'textually permissible interpretation that furthers rather than obstructs' the statute's purposes." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 4, at 63 (2012)).  It is therefore difficult to find support for this alternative interpretation in the text and context of MTINA.  This approach is potentially distinguishable from the reliance on parole that preceded *Matter of Z-R-Z-C-* because it is limited to those without a lawful "status" to return to as envisioned by the MTINA drafters, which may put it on a stronger footing.  However, for the reasons described above—and consistent with the advice provided by the INS General Counsel in in 1992—OGC advises against any option that relies on DHS's parole authority in this context.

AR2022_301138

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

defined in section 101(a)(13)(A) of the INA ("the lawful entry of the alien into the United States after inspection and authorization by an immigration officer"), and (2) "status" should be interpreted to mean the TPS recipient's former "temporary status (including all of the incidents attached to that status, e.g., a TPS recipient present in the United States without inspection and admission or inspection and parole)."[135]  The AAO reasoned that Congress intended that the TPS traveler be restored to the immigration posture that they held prior to departure rather than be admitted.  According to the AAO, "MTINA travel authorization is a unique form of travel authorization and operates as a legal fiction that restores the alien to the *status quo ante* as if the alien had never left the United States."  Under that approach, the AAO observed, the TPS traveler would be in no better and no worse a situation.[136]  However, the AAO analysis fails to adequately assign to the terms of the provision their ordinary meanings, especially as they were well understood in immigration law and by Congress at the time of MTINA's enactment.

The atextual interpretation of "inspected and admitted" in *Matter of Z-R-Z-C-* is also in tension with the Board's understanding of the MTINA travel provision.  In *Matter of G-A-C-*, the Board held that an asylum applicant who left the United States after having been granted advance parole and who, upon his return, was paroled into this country under section 212(d)(5)(A) was properly placed in exclusion proceedings following the INS's denial of his asylum application.[137]  The Board distinguished Ninth Circuit case law in which the court had expressed concern that noncitizens who otherwise would be afforded the greater rights and relief available in deportation proceedings would have to forfeit those benefits by traveling with advance parole and being paroled upon return.[138]

The Board underscored in *Matter of G-A-C-* that advance parole necessarily "is tied to section 212(d)(5)(A) parole authority because neither the Attorney General, nor the [INS] district director as her delegatee, has authority under law to *admit* an alien into this country unless the law authorizes such admission" and that "[a]bsent readmission, as opposed to parole . . . , the applicant would have no right under the [INA] to have his status tested in deportation proceedings."[139]  By contrast, the Board observed, Congress had expressly provided in the MTINA travel-and-return provision the authority to admit otherwise excludable or inadmissible TPS and FUP recipients who traveled with advance authorization into the United States.[140]

In *Matter of Z-R-Z-C-*, the AAO seemingly explains its decision to treat "inspected and admitted" in a way that diverges from the rest of immigration law by observing that "[a] given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different ways of implementation."[141]  The AAO's justification for disregarding the common meaning of "inspected and admitted" appears to be that the MTINA

---

[135] *Matter of Z-R-Z-C-* at 6.  According to the AAO, "'Immigration status' in this context includes being subject to a final order of deportation, exclusion, or removal."  *Id.* at *6 n.8.

[136] This is very similar to the approach taken in the FUP regulations, although the *Matter of Z-R-Z-C-* opinion does not address the FUP. *See supra* pp. 8-10.

[137] *Matter of G-A-C-*, 22 I&N Dec. at 88-91.

[138] *See id.* at 89-91 (considering *Navarro-Aispura v. INS*, 53 F.3d 233 (9th Cir. 1995), and *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996)).

[139] *Id.* at 88.

[140] *Id.* at 88 n.4.

[141] *Id.* at 7 (citing *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)).

AR2022_301139

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

travel provision "is a specific provision applying to a very specific situation" that should not be controlled by the section 101(a)(13)(A) definition (which was enacted several years after MTINA) or the ordinary usage of those well-understood terms in immigration law even at the time of MTINA's enactment.[142]  We find the AAO's justification to be quite strained given the long history and understanding of the phrase as a term of art regarding the adjustment of status eligibility criteria, as well as the text, context, purpose, and history of the MTINA travel provision.[143]

The AAO places considerable emphasis on MTINA's specific instruction that the TPS recipients be admitted "in the same immigration status [they] had at the time of departure."[144] The AAO reads that phrase as meaning that the individual is to be restored to the same "status" they had prior to departure, as if the individual "never left the United States" and their "immigration status never changed at all."[145]  Accordingly, by the AAO's reasoning, a TPS recipient who had entered the United States without inspection and admission (or parole) would be restored to the "status" of an inadmissible TPS recipient without any other immigration status.

But, here again, the AAO seems to stray from the more natural meaning of a term (*i.e.*, "same immigration status").  Although not defined in the INA, the Board has held that "status" is a term of art "denot[ing] someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant."[146]  *Matter of Z-R-Z-C-* does not address Congress's decision to call TPS a "status" or consider why for this population the "immigration status the alien held before departure" is something other than "temporary protected status."  The opinion notes that under *Matter of H-G-G-* (and now *Sanchez*), a grant of TPS itself is not an "admission" under the INA and concludes that "the inspection and admission required under [MTINA] is for the sole purpose of returning the TPS recipient to his or her temporary status (including all of the incidents attached to that status, *e.g.*, a TPS recipient present in the United States without inspection and admission or inspection and parole)."[147]  The AAO did not, however, consider whether, by referring specifically to inspection and admission, Congress intended for a noncitizen with TPS who is returning from authorized travel to be admitted into TPS, which the Supreme Court subsequently recognized in *Sanchez* is an immigration "status," even if the initial grant of TPS does not itself constitute an admission.[148]

The AAO in *Matter of Z-R-Z-C-* also sought to rely on two contemporaneous INS General Counsel opinions, but those opinions do not appear to offer much support for the AAO's reading.  In a 1993 opinion, the Acting INS General Counsel advised that a TPS recipient who is in deportation proceedings and who travels with advance INS authorization "will upon return to

---

[142] *Matter of Z-R-Z-C-* at 7 (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)).

[143] *See Abramski*, 573 U.S. at 179 ("[W]e must . . .  interpret the relevant words in a statute not in a vacuum, but with reference to the statutory . . . history and purpose." (quotation marks omitted)); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning . . . of certain words or phrases may only become evident when placed in context.").

[144] *See id.*

[145] *Id.*

[146] *Matter of Blancas-Lara*, 23 I&N Dec. 458, 460 (BIA 2002).

[147] *Matter of Z-R-Z-C-* at 6.

[148] 141 S. Ct. at 1812; *see also Matter of Fajardo Espinoza*, 26 I&N Dec. 603, 605 (BIA 2015) ("We do not dispute that an alien who was granted FUP benefits has a 'status' for immigration purposes.").

AR2022_301140

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

the United States remain subject to deportation for the same reasons as existed prior to his or her departure" and that "[t]he deportation proceedings could go forward on the basis of the order to show cause issued prior to the alien's departure."[149]  The AAO maintained in *Matter of Z-R-Z-C-* that the 1993 opinion supported its view that travel and return should not affect the individual's immigration posture, but the opinion offers no support for such a broad statement.  The focus of the 1993 opinion was TPS recipients who were in *deportation* proceedings, i.e., persons who had already been admitted or effected an entry.  Accordingly, "admitting" them upon return would be of no consequence to the status of their *deportation* proceedings.[150]

The AAO also sought to draw support from the 1992 INS General Counsel opinion, discussed earlier in this memorandum, advising that, following MTINA, TPS and FUP travel no longer should be processed via advance parole and parole.  The AAO noted that the INS General Counsel had "concluded that TPS recipients 'must be given the *same status and the same incidents of status as those possessed before departure*, if they are inspected and admitted' and that "'[d]eportation rights cannot be extinguished by the travel authorization provisions.'"[151]  We believe that the AAO misread the 1992 opinion, which supports the view that returning TPS travelers be admitted upon return and therefore not be subject to exclusion proceedings.

Indeed, the AAO's decision in *Z-R-Z-C-* runs in tension with another INS General Counsel opinion issued in 1993.[152]  In that opinion, the INS General Counsel advised that a Chinese national seeking to establish eligibility for adjustment of status consistent with the Chinese Student Protection Act of 1992 (CSPA) who had entered without inspection and then traveled with advance parole could meet the "inspected and admitted or paroled" requirement of INA § 245(a) because they would be paroled upon return.[153]  The General Counsel clarified, however, that "[o]ut of status [Chinese] nationals cannot be inspected and admitted, since they are not 'clearly and beyond a doubt entitled to land.'"  "Unlike [noncitizens] in TPS," the General Counsel noted, citing MTINA, "there is no statute which would permit the Service to 'admit' these out of status [Chinese] nationals."[154]  The General Counsel also recognized that MTINA "altered" the basis of a 1991 opinion in which the INS General Counsel concluded that because TPS travelers are paroled upon return, they meet section 245(a)'s "inspected and admitted or paroled" requirement, explaining that "[a] TPS [recipient] who travels abroad is now, generally, not paroled upon return but 'inspected and admitted in the same immigration status the alien had at the time of departure,'" even if they had initially entered without inspection.[155]  Accordingly, the General Counsel well understood MTINA as providing for the

---

[149] Memorandum from Paul W. Virtue, Acting General Counsel, INS, *Your CO 1810.6-C Memorandum of September 15, 1992: Travel Permission for Temporary Protected Status (TPS) Registrants*, Genco Op. 93-51, 1993 WL 1503998 (Aug. 4, 1993).

[150] By contrast, were a TPS recipient who was the subject of ongoing *exclusion* proceedings to travel and be "admitted" upon return under MTINA, the INS likely would have had to move to terminate the exclusion proceedings and commence deportation proceedings.

[151] *Matter of Z-R-Z-C-* at 8 (quoting 1992 Genco Op. 92-10 at 1) (emphasis added in *Matter of Z-R-Z-C-*).

[152] Memorandum from Paul W. Virtue, Acting General Counsel, INS, Genco Op. No. 93-56, *Your HQ 245-C Request for Legal Opinion Regarding Eligibility for Adjustment of Status under CSPA of Person Who Entered Without Inspection* (Aug. 10, 1993).

[153] *Id.* at 4.

[154] *Id.*

[155] *Id.* at 3.

AR2022_301141

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

inspection and *admission* of TPS recipients who had initially entered without inspection and now were returning from authorized travel abroad and that such inspection and admission satisfied section 245(a).

Of course, satisfying section 245(a)'s inspection and admission or parole requirement does not mean that the individual will be eligible for adjustment of status. Section 245 imposes several other eligibility requirements. The applicant, for example, must demonstrate that they have an immigrant visa immediately available to them and that they are admissible to the United States. That they were admitted into TPS upon return from authorized TPS travel does not eliminate or waive section 245's admissibility requirement.

## C.   Use of Parole Procedures for TPS Travelers is Contrary to MTINA

Although we have serious concerns about the legal viability of the holding in *Matter of Z-R-Z-C-*, we find merit in the AAO's view that MTINA is best understood as precluding the continued use of DHS's parole authority and procedures as the mechanism to allow TPS travelers to re-enter the United States. For the reasons explained above,[156] we agree that despite the long history of using parole to facilitate travel for TPS recipients, that practice is difficult to reconcile with MTINA.[157]

The Policy Memorandum that accompanied the *Matter of Z-R-Z-C-* decision correctly noted that individuals who had traveled in the past with the understanding that they would be paroled back into the United States, with attendant consequences for eligibility for adjustment of status, had engendered significant reliance interests in the previous policy, and made the decision's holding only applicable to trips abroad that took place after its adoption.[158] However, nothing in the opinion or subsequent DHS policies altered the process going forward for TPS recipients seeking to travel overseas, meaning that even now they apply for and receive an advance parole document using Form I-131 and are treated as parolees when they arrive at a port of entry. *Matter of Z-R-Z-C-* instructs USCIS, when adjudicating applications for adjustment of status, to deem such noncitizens as not having been paroled into the country despite the fact that they applied for advance parole before travel and were, in fact, paroled in by CBP upon return. That approach is not only legally suspect but also confusing and counterintuitive. It is not logical to simply say that the Department is no longer treating these travelers as parolees for one

---

[156] *See* pp. 15-17, note 121 supra.

[157] The canon of congressional acquiescence or ratification, which the Supreme Court has employed only in limited circumstances and only "with extreme care," is of little assistance here. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001). Although Congress did amend section 304(c) of MTINA in IIRIRA, it did so only by making minor conforming updates to the statutory citations to the newly designated TPS and cancellation-of-removal provisions. *See* IIRIRA § 308(g)(1), (8)(A)(ii), (8)(C); *see also Pub. Citizen, Inc. v. U.S. Dep't of Health and Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003) (contrasting *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) ("[W]hen Congress has not comprehensively revised a statutory scheme but has made only isolated amendments, ... [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the [agency's] statutory interpretation." (quotation marks omitted)), and *Barnhart v. Walton,* 535 U.S. 212, 220 (2002) (according weight where "Congress has frequently amended or reenacted *the relevant provisions* without change" (emphasis added))). Moreover, there is no evidence that Congress was familiar with the administrative practice at the time, let alone that it endorsed in any way the former INS's continued use of parole in lieu of admission. *See Pub. Citizen*, 332 F.3d at 669.

[158] USCIS Policy Memorandum PM-602-0179 (Aug. 20, 2020).

AR2022_301142

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

purpose while continuing to call them parolees and to use the same forms, terminology, and processes at ports of entry.

As noted previously, the existing TPS travel regulation at 8 C.F.R. § 244.15 continues to refer to advance parole as the required means of requesting and granting permission to travel.[159] That regulation was promulgated prior to the passage of MTINA and has not been amended to conform with MTINA.  Although agencies generally are bound by their own regulations,[160] this regulation was abrogated by the MTINA travel provision.[161]  It is well settled that a statute overrides a preexisting regulation when the "regulation conflicts with [the] subsequently enacted statute."[162]  "Even a regulation that is not 'technically inconsistent with the statutory language' is invalid 'when that regulation is fundamentally at odds with the manifest congressional design.'"[163]  That said, regardless of whether the agency elects to retain the *Matter of Z-R-Z-C-* policy, DHS should make clarifying and conforming amendments to section 244.15.[164]  In the meantime, the regulation's references to advance parole may reasonably be construed to encompass any other advance, discretionary travel authorization, which presumably also will be included in a modified version of the Form I-131 and its instructions or a new TPS-specific variation of that form.

## V.   CONCLUSION

A careful review of relevant statutes, legislative history, case law, context, and past practice indicates that inspecting and admitting eligible travelers into TPS is the correct and, in any event, best available reading of the statutory provisions that address authorized travel by TPS recipients.  Although the traditional approach to TPS travel, utilizing DHS's parole authorities, was generally accepted for thirty years, it was implemented against the advice of counsel and is very likely not a permissible reading of the statute.  The interpretation set forth in *Matter of Z-R-Z-C-* and adopted as USCIS policy likewise appears contrary to the text of MTINA and INA § 245 given the well-understood meaning of "inspected and admitted" and immigration "status" at the time of MTINA's enactment, and as such is highly likely to be rejected by reviewing courts as impermissible or unreasonable.

We recognize that the legal advice provided in this memorandum likely raises significant policy and operational considerations, including whether relevant regulations and policy guidance should be revised and whether a new interpretation could or should be implemented retroactively (which we do not address here).  Whatever approach is chosen, any significant change in policy regarding the effects of travel under MTINA would need to be explicitly and

---

[159] There is a cognate EOIR regulation at 8 C.F.R. § 1244.15, but EOIR has no role in considering requests for advance permission to travel.

[160] *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-68 (1954).

[161] *See Duarte*, 27 F.4th at 1060 n.13 ("Parole has a specific meaning within the statutory framework governing immigration, *see* 8 U.S.C. § 1182(d)(5)(A), and applying that meaning in the context of TPS beneficiaries returning from travel abroad is squarely contrary to MTINA's requirement that such aliens be 'admitted in the same immigration status' they held prior to departure.  Thus, to the extent promulgated regulations call for or authorize paroling returning TPS beneficiaries into the country, those regulations are invalid.").

[162] *Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002).

[163] *United States v. Kahn*, 5 F.4th 167, 174-75 (3d Cir. 2021) (quoting *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982)).

[164] We similarly recommend this course of action with respect to the FUP travel regulation at 8 C.F.R. § 236.16.

AR2022_301143

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT / DELIBERATIVE & PREDECISIONAL

sufficiently justified as agency action.  The APA and subsequent case law require that the Department carefully consider all "important aspect[s] of the problem."[165]  This can include the advantages and disadvantages of the proposed change, including the policy implications and effects on TPS recipients who may have relied on the previous interpretations, as well as the legal arguments described above.[166]  OGC stands by to assist with these and any other legal questions that may arise as the Department considers these important questions.

---

[165] *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[166] *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

AR2022_301144

USCIS Response to Coronavirus (COVID-19)



U.S. Citizenship
and Immigration
Services

 USCIS Only Internal Version

Home > Policy Manual > Volume 3 - Humanitarian Protection and Parole > Part D - Violence Against Women Act > Chapter 5 - Adjudication

# Chapter 5 - Adjudication

**Guidance**

Resources (13)

Appendices (0)

Updates (2)

History (0)

## A. Prima Facie Review

After receipting a self-petition, USCIS first determines whether the evidence submitted establishes a prima facie ("at first look") case.[1] Self-petitioning spouses and children and any listed derivative beneficiaries may be considered "qualified aliens" eligible for certain public benefits if they can establish a prima facie case for immigrant classification or have an approved self-petition.[2]

USCIS does not make a prima facie determination for self-petitions filed from outside the United States. Self-petitioners who are outside the United States are not eligible for U.S. public benefits. Note that although USCIS issues prima facie determinations for self-petitioning parents of U.S. citizens, they are not included in the definition of "qualified aliens" in statute and are, therefore, ineligible for public benefits as "qualified aliens."[3]

## 1. Establishing a Prima Facie Case

To establish a prima facie case, the self-petitioner must submit a completed Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360) and evidence to support each of the eligibility requirements for the self-petition.[4] The self-petitioner must merely address each of the eligibility requirements but need not prove eligibility in order to establish a prima facie case.[5]

If USCIS determines that a self-petitioner has demonstrated prima facie eligibility, USCIS issues a Notice of Prima Facie Case (NPFC) to the self-petitioner.[6] The decision to issue an NPFC rests solely with USCIS.[7]

If USCIS determines that the self-petitioner did not establish a prima facie case upon initial review, officers may, in their discretion, issue a Request For Evidence (RFE) seeking additional evidence. If additional evidence is submitted and the self-petitioner establishes a prima facie case upon second review, USCIS issues an NPFC.

Regardless of whether a self-petitioner establishes a prima facie case and receives an NPFC or not, USCIS may discover additional deficiencies while adjudicating the self-petition. For such cases, USCIS may issue an RFE and will consider RFE responses solely to adjudicate the self-petition.[8]

Note that the NPFC does not confer immigration status or a benefit, and a self-petitioner may not apply solely for an NPFC. USCIS' decision to issue or not issue an NPFC is not a consideration in the adjudication of the underlying self-petition, and a prima facie determination, whether favorable or adverse, is not a final adjudication of the self-petition.

A favorable NPFC does not mean the self-petitioner has established eligibility for the underlying self-petition, and additional evidence may be required to establish such eligibility after a favorable NPFC has been issued.[9]

## 2. Validity Period and Renewals

Self-petitioners may use the NPFC as evidence to establish their eligibility for certain public benefits and are eligible to renew their NPFC, as needed, until USCIS completes adjudication of the self-petition.[10] NPFCs are initially valid for 1 year. If USCIS has not made a decision on the self-petition by the time the NPFC expires, USCIS automatically sends a renewed NPFC within 60 days of the expiration date.

The NPFC is renewed for 180 days and continues to be renewed for 180-day periods until USCIS adjudicates the self-petition. If the Form I-360 is denied, USCIS does not re-issue or extend the NPFC. Filing an appeal of Form I-360 does not extend the validity of an existing NPFC.

# B. Review of Evidence

## 1. Standard of Proof

The standard of proof refers to the quality and weight of the evidence required to prove a fact. The standard of proof to establish eligibility for a self-petition is preponderance of the evidence.[11] Establishing eligibility by a preponderance of the evidence means that it is more likely than not that the self-petitioner qualifies for the benefit. This is a lower standard of proof than both the "clear and convincing" and "beyond a reasonable doubt" standards of proof. The burden is on self-petitioners to demonstrate their eligibility for the self-petition by a preponderance of the evidence.[12]

## 2. Any Credible Evidence Provision

Generally, petitioners are required to submit primary or secondary evidence with a family-based immigrant visa petition.[13] Although Violence Against Women Act (VAWA) self-petitioners are encouraged to submit primary or secondary evidence whenever possible, an officer must consider any credible evidence a self-petitioner submits to establish eligibility.[14] The determination of what evidence is credible and the weight to be given to the evidence is within the sole discretion of USCIS.[15]

For VAWA self-petitioners, the abusive family member may control access to or destroy necessary documents in furtherance of the abuse, which may prevent the applicant from being able to submit specific documentation. Other self-petitioners may have fled the abusive situation without taking important documents with them.

Congress created the "any credible evidence" standard for VAWA filings in recognition of these evidentiary challenges. Officers should be aware of and consider these issues when evaluating the evidence.

*Weighing and Determining the Credibility of Evidence*

A self-petition may not be denied for failure to submit a particular piece of evidence.[16] An officer may only deny a self-petition on evidentiary grounds if the evidence that was submitted is not credible or otherwise fails to establish eligibility. Officers may not require that the self-petitioner demonstrate the unavailability of primary evidence or a specific document. An explanation from the self-petitioner, however, regarding the unavailability of such documents may assist officers in adjudicating the case.

Officers determine what evidence is credible on a case-by-case basis. Often, evidence that is credible in one setting will not be so in another. Officers should consider whether the evidence may be credible or not on either an internal or external basis.

For example, evidence that is inconsistent with the other elements of the self-petition is likely not internally credible; and evidence that does not conform to external facts, such as information contained in USCIS electronic databases, is likely not credible on an external basis. Officers should carefully review evidence in both these regards before making a credibility determination. The determination of what is credible will often also be a function of other elements in the case.

For example, if USCIS finds a self-petitioner's testimony in an affidavit to be inconsistent internally or inconsistent with other evidence, officers could determine in their discretion that the evidentiary value of that affidavit may be diminished. However, officers could determine in their discretion that minor inconsistencies regarding information that is not material to the self-petitioner's eligibility would not likely diminish the evidentiary value of the self-petitioner's affidavit.

Some general principles are applicable in making a credibility determination. Officers generally should give more weight to primary evidence and evidence provided in court documents, medical reports, police reports, and other official documents.[17] Self-petitioners who submit affidavits are encouraged, but not required, to provide affidavits from more than one person. Any form of documentary evidence may be submitted, and the absence of a particular form or piece of evidence is not grounds for denial of the self-petition.

USCIS may issue a Request for Evidence (RFE) or a Notice of Intent to Deny (NOID) to notify self-petitioners of deficiencies in the self-petition and to allow them an opportunity to respond before issuing a final decision.[18]

# C. Decision

## 1. Discretion

The decision to approve or deny a self-petition is not discretionary.[19] If USCIS determines that the nonciticen meets all the eligibility requirements for the self-petition, USCIS approves the self-petition. If

AR2022_301147

derogatory information unrelated to eligibility for the self-petition is discovered, the officer may forward the information to an investigation unit for appropriate action. Unless the derogatory information relates to eligibility for the self-petition, however, such information cannot serve as the basis for a denial.

## 2. Approvals

If USCIS determines that the facts and information provided with the Form I-360 demonstrate eligibility by a preponderance of the evidence, USCIS approves the self-petition.

Self-petitioning spouses, children, and parents of abusive U.S. citizens are considered immediate relatives and make seek adjustment of status or an immigrant visa immediately after approval of the self-petition, as a visa is immediately available for this category of family-based immigrants.[20] Immediate relatives in the United States also have the option to file an application for adjustment of status concurrently with the self-petition, as the visa is immediately available after the petition is approved.[21]

Self-petitioning spouses and children of abusive LPRs receive a visa number from a family-based preference category when the self-petition is approved and may file an application for adjustment of status or seek an immigrant visa when a visa is available.[22] If a self-petitioner seeks an immigrant visa from outside the United States, USCIS forwards the self-petition to the National Visa Center.[23]

Note that an approved self-petition does not confer immigration status to self-petitioners and their derivative beneficiaries. An approved self-petition provides immigrant classification so that the self-petitioner and any derivative beneficiaries have a basis upon which they may be eligible to apply for lawful permanent resident status.

*Employment Authorization*

Approved self-petitioners and their derivative beneficiaries are eligible for employment authorization.[24] USCIS may issue an employment authorization document (EAD) to principal self-petitioners upon approval if they requested an EAD on Form I-360.[25]

Derivative beneficiaries may apply for an EAD by submitting an Application for Employment Authorization (Form I-765) and supporting documentation of the principal's approved self-petition and of the qualifying derivative relationship. Persons eligible for employment authorization based on an approved self-petition receive an EAD with a (c)(31) employment authorization code.

Approved principal self-petitioners and derivative beneficiaries must file Form I-765 when renewing their VAWA-based employment authorization.[26] Principal self-petitioners and derivatives who are living outside of the United States are not eligible to receive an EAD.

*Deferred Action*

Approved self-petitioners and their derivative beneficiaries may be considered for deferred action on a case-by-case basis.[27] Derivative beneficiaries requesting deferred action must include a copy of the self-petitioner's approval notice and evidence of the qualifying derivative relationship with the request.

AR2022_301148

[Redaction - Start]

When a VAWA self-petition is approved, the self-petitioner may be placed in deferred action. This is a case-by-case determination and deferred action is not considered or assessed for any self-petitioner under the following circumstances:

- Where there is no approved self-petition;

- The self-petitioner is not currently present in the United States;

- The self-petitioner has adjusted status or entered the United States with an immigrant visa; or

- The self-petitioner is currently in removal proceedings (See 8 CFR 245.1(c)(8), which defines who is considered currently in removal proceedings).

USCIS generally may extend deferred action to principal beneficiaries of a self-petition when approving the petition as long as none of the factors listed above are present.

Derivative beneficiaries who are residing in the United States, however, must affirmatively request deferred action in writing from the service center after USCIS approves the self-petition. Requests should include a copy of the self-petitioner's approval notice and evidence of the qualifying derivative relationship.

USCIS notifies self-petitioners and derivative beneficiaries in writing if they are granted deferred action. Deferred action determinations are initially valid for 15 months. USCIS reviews requests for extensions of deferred action on a case-by-case basis and grants extensions in increments of 12 months.

[Redaction - End]

## 3. Denials

If USCIS finds that the facts and information provided with the Form I-360 do not demonstrate eligibility by a preponderance of the evidence, then USCIS denies the self-petition. USCIS notifies the self-petitioner of the denial in writing and provides the reason(s) for the denial and the right to appeal the decision.[28] A denial of a self-petition does not prevent the self-petitioner from filing another self-petition.

AR2022_301149

[Redaction - Start]

Self-petitioners are protected by 8 U.S.C. 1367 and their record in the USCIS Central Index System 2 (CIS2) displays a warning banner to indicate that these confidentiality protections apply. Officers must treat self-petitioners with a warning banner as protected under the statute.

The warning banner remains on a self-petitioner's record even if their Form I-360 has been denied. If officers believe that the confidentiality protections should be terminated for a self-petitioner and would like to request removal of the warning banner, they may send an email to 1367Confidentiality@uscis.dhs.gov requesting termination of the confidentiality protections and removal of the warning banner. The email should include any related A-Numbers, receipt numbers, denial notices for all 8 U.S.C. 1367 generating cases, and specific details regarding why the officer believes the protections no longer apply.

On a case-by-case basis, USCIS in its discretion may remove the warning banner after denial and all opportunities for appeal of the denial have been exhausted. In general, denial or revocation of approval alone is not a basis for the banner's removal.

Upon request for removal, USCIS evaluates whether the protections under 8 U.S.C. 1367 continues to apply to a self-petitioner whose Form I-360 has been denied and all opportunities for appeal have been exhausted. Officers should refer to the internal policy memorandum, Identification and Disclosure of Section 1367 Information, PM-602-0136, August 25, 2016 (PDF), for general guidance on requests for removal of the warning banner.

[Redaction - End]

## D. Special Considerations for Self-Petitions Filed Subsequent to Family-Based Immigrant Petition and Adjustment Application

Self-petitioners may have previously been the beneficiary of a Petition for Alien Relative (Form I-130) and filed an Application to Register Permanent Residence or Adjust Status (Form I-485) before filing the self-petition. If the Form I-485 is pending, self-petitioners may notify USCIS either verbally in person or in writing by mail to the local USCIS field office that they filed a self-petition, and request that USCIS hold adjudication of the Form I-485 until the Form I-360 is adjudicated and change the underlying basis of the pending Form I-485 to the self-petition.

If a person intends to file a self-petition, they may notify USCIS either verbally in person or in writing by mail to the local USCIS field office of their intention to file the Form I-360 and request that USCIS hold the adjudication of the Form I-485. The written notification should contain the person's name and A-Number, and a safe address where USCIS can contact them. The person has 30 days from the day USCIS receives notification of the request to file the Form I-360. If the self-petitioner does not file a self-petition within 30 days of the request, USCIS continues adjudication of the Form I-485 based on the Form I-130. Officers may check USCIS electronic systems to confirm that a self-petition was filed.

When a person notifies USCIS that they intend to file a self-petition or have already filed a self-petition, DHS considers the confidentiality protections at 8 U.S.C. 1367(a)(1) to apply to the self-petitioner.[29] However, if the person does not file a self-petition, USCIS concludes they do not want to be treated as a

AR2022_301150

VAWA self-petitioner and the protections of 8 U.S.C. 1367 will not apply to the adjudication of any forms. [30]

[Redaction - Start]

Once the confidentiality protections apply, USCIS does not make an adverse determination against a protected person using information provided solely by a prohibited source, such as the qualifying abusive relative and their relatives. See 8 U.S.C. 1367(a)(1). USCIS also may not permit the use by or disclosure to anyone of any information that relates to a self-petitioner and any included beneficiaries, subject to certain exceptions. See 8 U.S.C. 1367(a)(2). Officers must be mindful of these protections when taking any actions on a Form I-130 and a Form I-485 once a Form I-360 has been filed or a person notifies USCIS of an intent to file a Form I-360.

Officers should review the internal policy memorandum, "Identification and Disclosure of Section 1367 Information," PM-602-0136, issued August 25. 2016 (PDF), and the DHS Directive, "Implementation of Section 1367 Information Provisions," Instruction Number: 002-02-001, issued November 1, 2013 (PDF), for detailed information on the confidentiality protections to prevent any unintentional violations.

Officers should be aware that victims of abuse may not want USCIS to continue adjudicating a Form I-485 because they may have safety concerns, such as not wanting to attend an interview with the abusive relative who filed the Form I-130. The abusive petitioning relative may also be threatening to withdraw the Form I-130 or provide false information to USCIS to keep control over the self-petitioner.

While the abusive petitioner may withdraw the Form I-130, officers should be aware of these dynamics of abuse when taking any action on a Form I-130 or a Form I-485. If there are safety or related concerns with moving forward with the adjudication of a Form I-130 or a Form I-485, USCIS has discretion to hold the forms in abeyance until the Form I-360 is adjudicated.

As victims of abuse, self-petitioners seeking to adjust status based on an approved self-petition are also eligible for certain exemptions and waivers that are not available if they were adjusting status based on a Form I-130.[31]

Officers must consider all of these factors when considering requests from self-petitioners regarding the Form I-485 when they notify USCIS of the intention to file a self-petition or the filing of a self-petition.

[Redaction - End]

## Footnotes

[^ 1] See 8 CFR 204.2(e)(6).

[^ 2] See the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193 (PDF), 110 Stat. 2105 (August 22, 1996) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208 (PDF), 110 Stat. 3009 (September 30, 1996), which restricted eligibility for public assistance to "qualified aliens."

[^ 3] See Pub. L. 104-193 (PDF), 110 Stat. 2105 (August 22, 1996).

[^ 4] See 8 CFR 204.2(c)(6)(ii). See 8 CFR 204.2(e)(6)(ii). For more information, see Chapter 2, Eligibility Requirements and Evidence [3 USCIS-PM D.2].

**AR2022_301151**

[^ 5] See 8 CFR 204.2(c)(6)(ii). See 8 CFR 204.2(e)(6)(ii).

[^ 6] See 8 CFR 204.2(c)(6)(iii). See 8 CFR 204.2(e)(6)(iii).

[^ 7] See 62 FR 60769, 60770 (PDF) (November 13, 1997).

[^ 8] See 8 CFR 103.2(b)(8).

[^ 9] See 8 CFR 204.2(c)(6)(ii). See 8 CFR 204.2(e)(6)(ii).

[^ 10] See 8 CFR 204.2(c)(6)(iii). See 8 CFR 204.2(e)(6)(iii).

[^ 11] See *Matter of Chawathe* (PDF), 25 I&N Dec. 369 (AAO 2010); *Matter of Martinez* (PDF), 21 I&N Dec. 1035, 1036 (BIA 1997); and *Matter of Soo Hoo* (PDF), 11 I&N Dec 151 (BIA 1965). Note that in certain circumstances, the self-petitioner may be required to satisfy a higher standard of proof. See Chapter 3, Effect of Certain Life Events, Section B, Self-Petitioner's Marriage or Remarriage [3 USCIS-PM D.3(B)].

[^ 12] See INA 291. See *Matter of Brantigan* (PDF), 11 I&N Dec. 493 (BIA 1966).

[^ 13] See 8 CFR 204.1(f).

[^ 14] See INA 204(a)(1)(J). See 8 CFR 204.2(c)(2)(i). See 8 CFR 204.2(e)(2)(i). See 61 FR 13061 (PDF) (March 26, 1996).

[^ 15] See INA 204(a)(1)(J). See 8 CFR 204.2(c)(2)(i). See 8 CFR 103.2(b)(2)(iii). See 8 CFR 204.2(e)(2)(i). See 61 FR 13061 (PDF) (March 26, 1996).

[^ 16] See INA 204(a)(1)(J). See 8 CFR 204.2(c)(2)(i). See 8 CFR 204.2(e)(2)(i). See 61 FR 13061 (PDF) (March 26, 1996).

[^ 17] See 61 FR 13061, 13068 (PDF) (March 26, 1996).

[^ 18] See 8 CFR 103.2(b)(8).

[^ 19] See INA 204(b).

[^ 20] See INA 201(b). See INA 245(a). See 8 CFR 245.2(a)(2)(i). See 8 CFR 245.1(g).

[^ 21] See 8 CFR 245.2(a)(2)(i)(B) and (C).

[^ 22] See INA 203(a). See INA 245(a). See 8 CFR 245.2(a)(2)(i). See 8 CFR 245.1(g). Visa availability depends on several factors, including the self-petitioner's immigrant classification. Information on visa availability and priority dates is available at the Adjustment of Status Filing Charts from the Visa Bulletin web page. For more information, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 3, Filing Instructions, Section B, Definition of Properly Filed, Subsection 4, Visa Availability Requirement [7 USCIS-PM A.3(B)(4)] and Chapter 6, Adjudicative Review, Section C, Verify Visa Availability [7 USCIS-PM A.6(C)].

[^ 23] See 8 CFR 204.2(c)(3)(i). See 8 CFR 204.2(e)(3)(i).

[^ 24] See INA 204(a)(1)(K). See INA 204(a)(1)(D)(i)(II). See INA 204(a)(1)(D)(i)(IV).

[^ 25] See INA 204(a)(1)(K). See the Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360).

AR2022_301152

[^ 26] For additional information on VAWA-based employment authorization, see Instructions for Form I-360 and the Application for Employment Authorization (Form I-765).

[^ 27] See INA 103(a). See INA 204(a)(1)(D)(i)(II). See INA 204(a)(1)(D)(i)(IV). See *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Note that deferred action does not permit a person to re-enter the United States lawfully without prior approval if the person were to depart the country.

[^ 28] See 8 CFR 204.2(c)(3)(ii). See 8 CFR 204.2(e)(3)(ii). See 8 CFR 103.3(a).

[^ 29] See 8 U.S.C. 1367. See DHS Directive, "Implementation of Section 1367 Information Provisions," Instruction Number: 002-02-001, issued November 1, 2013 (PDF). For more information, see Volume 1, General Policies and Procedures, Part A, Public Services, Chapter 7, Privacy and Confidentiality, Section E, VAWA, T, and U Cases [1 USCIS-PM A.7(E)].

[^ 30] See 8 U.S.C. 1367(a)(1).

[Redaction - Start] [^ 31] See INA 245(a). See INA 212(a). [Redaction - End]

Current as of July 01, 2022

AR2022_301153



Privacy Impact Assessment
for the

# Integrated Digitization Document Management Program (IDDMP)

DHS/USCIS/PIA-003(a)

**September 24, 2013**

**Contact Point**
**Donald Hawkins**
**Privacy Officer**
**United States Citizenship and Immigration Services**
**(202) 272-8030**

**Reviewing Official**
**Jonathan R. Cantor**
**Acting Chief Privacy Officer**
**Department of Homeland Security**
**(202) 343-1717**

**AR2022_301154**

## Abstract

The United States Citizenship and Immigration Services (USCIS) is republishing the previously published Privacy Impact Assessment (PIA) for the Integrated Digitization Document Management Program (IDDMP).  IDDMP is the process of digitizing paper-based case files (A-Files and Receipt Files) and storing them in the Enterprise Document Management System (EDMS).  EDMS enables the A-File to be shared more efficiently within the Department of Homeland Security (DHS) and with external agencies.  USCIS is updating and reissuing this PIA to discuss in greater detail the IDDMP process in which information is ingested into EDMS.

## Overview

The United States Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS), is responsible for administering and processing applications for all immigrant and nonimmigrant benefits. To support immigration benefit operations, USCIS assembles a paper-based file, known as an Alien-File (A-File), which contains official immigration records of aliens or persons who are not citizens or nationals of the United States (U.S.)  This function was previously the responsibility of the legacy Immigration and Naturalization Service (INS), which began issuing each alien an Alien Registration number (A-Number) in 1940, and on April 1, 1944, began using this number to create individual A-Files.  A-Files contain all records of any active case of an alien not yet naturalized, including records created as he or she passes through the U.S. immigration and inspection process and, when applicable, records related to any law enforcement action against or involving the alien.

Since the formation of DHS in 2003, the U.S. immigration system has been managed by the following DHS components: 1) USCIS, which performs the immigration benefit adjudication process; 2) Customs and Border Protection (CBP), which performs the border enforcement and inspection processes; and 3) Immigration and Customs Enforcement (ICE), which performs the investigatory, deportation, and immigration court functions.  Although USCIS is the custodian of the A-File, all three components create and use A-Files in the course of performing their mission requirements.

In addition to the management of A-Files by the DHS tri-components, the U.S. Department of State (DoS) also plays an important role in providing necessary immigration information to certain A-Files.  DoS issues immigrant visas to individuals wishing to live permanently in the U.S.[1]  In general, to apply for an immigrant visa, a foreign citizen must be sponsored by a U.S. citizen relative, U.S. Legal Permanent Resident (LPR), or by a prospective employer, and must be the beneficiary of an approved USCIS petition.  Once USCIS approves the petition, it assigns the immigrant visa petition a Priority Date and sends the petition to the DoS National Visa Center (NVC).  DoS NVC then manages the case and provides further instructions to the applicants, and collects and reviews required documents and evidence.

After DoS processes the visa, the visa recipient must indicate that he or she intends to adjust his or her status with USCIS.  If he or she would like to pursue becoming an LPR, DoS sends USCIS all of

---

[1] A citizen of a foreign country who seeks to enter the U.S. generally must first obtain a U.S. visa, which is placed in the traveler's passport, a travel document issued by the traveler's country of citizenship.

AR2022_301155



the applicant information it collected as part of the visa process to be included in the A-File.[2] USCIS uses this information to determine if the applicant is eligible to adjust to a permanent resident.

Paper A-Files are currently under the control of the USCIS National Records Center (NRC) and the National Archives and Records Administration's (NARA) Kansas City Federal Record Center (KCFRC). However, USCIS, CBP, and ICE employees, who are stationed both domestically and internationally, require access to the A-File regularly to assist in adjudicating benefits, investigating immigration violations, and enforcing border protections. Because the A-File is inherently paper-based, sharing the physical file is expensive, prone to handling errors, and difficult to share within and across DHS components.

USCIS developed the Integrated Digitization Document Management Program (IDDMP) to manage the digitization of files and to provide electronic access to case files, including A-Files and Receipt Files, using the Enterprise Document Management System (EDMS).[3] IDDMP manages the process of scanning case files, which occurs at numerous capture facilities and including (1) Scan on Demand (SODA) at the NRC; (2) the USCIS Lockboxes; (3) the Records Digitization Facility (RDF); and (4) DoS. These capture facilities scan relevant case files and ingest them into EDMS through system interfaces. IDDMP also covers EDMS's ability to store, update, and access the electronic case file. Once scanned, the electronic version of the file becomes the official A-File and can be accessed by the tri-components using EDMS.

**Enterprise Document Management System (EDMS)**

EDMS is a web-based system that allows authorized users to view and search electronic copies of the paper-based case files: A-Files and Receipt Files. The tri-components require access to the information contained in these case files to learn the status of individuals, including permanent residents, naturalized citizens, border crossers, apprehended aliens, legalized aliens, aliens issued employment authorization, and other individuals of interest in order to successfully complete their job functions. EDMS permits quick and simultaneous access to case files 24 hours a day, 7 days a week.

Prior to the implementation of EDMS, USCIS manually provided case files to the tri-components in need of the file. If one of the tri-components requested a file, USCIS NRC staff queried the National File Tracking System (NFTS)[4] or the Central Index System (CIS)[5] for the physical location of the A-file, and would mail, fax, or email the case file to the requestor. Because this is a labor-intensive and time consuming process, USCIS sought out a more efficient means of sharing the file.

To alleviate this problem, USCIS developed EDMS to facilitate efficient information sharing. Tri-components requiring access to case files can now access the electronic file directly through EDMS,

---

[2] DoS may send the application, Affidavit of Support forms from sponsors, supplementary evidence, adjudicator notes, and any other information collected as part of the visa issuing process.

[3] EDMS also contains Receipt Files, which are files of immigrant and nonimmigrant benefit applications that USCIS receives. While the Receipt Files and supporting documentation are eventually consolidated into an A-File, EDMS allows users to view the immigrant and nonimmigrant applications electronically before receiving the official paper-based application. This allows USCIS adjudicators to begin processing cases in a quick and efficient manner.

[4] For a comprehensive explanation of NFTS, please refer to the DHS/USCIS/NFTS-032 PIA at www.dhs.gov/privacy.

[5] For a comprehensive explanation of CIS, please refer to the DHS/USCIS/CIS-009 PIA at www.dhs.gov/privacy.

AR2022_301156



which eliminates the paper-based process and reliance on physical case files. Additionally, the digitization of these files reduces the time for delivery from days to seconds and allows for multiple people to view the information at the same time.

There are two separate search functions in EDMS that users can search to locate either an A-File or Receipt File. Users can search EDMS to locate A-files and Receipt files using specific search criteria that allow the users to view the images in electronic format. Users can search A-Files in EDMS by either populating the A-Number, First Name, Middle Name, Last Name, Aliases, Date of Birth (DOB), Country of Birth (COB), Sex, Federal Employer Identification Number (FEIN), and Company Name fields. Users can search Receipt files in the same manner by using the Receipt Number that is assigned to the specific application, First Name, Last Name, A-Number, DOB, Accept/Reject Status, and/or Form Type.

The search capabilities within EDMS allow users to discover information that is buried deep within the physical A-File in a reduced time period through the use of metadata. Metadata are "tags" embedded into each document within the electronic case file for indexing and searching the digitized files. Metadata saved with every digitized A-File includes:

- First Name
- Last Name
- A-Number
- DOB
- COB
- Receipt Number

Although users cannot modify the digitized images within the file, EDMS enables users to locate information within the case file, add comments, modify documents contained within an A-File (dependent on a user role), and add additional documents to the file, through a process known as interfiling.

Furthermore, there are three digitization notification interfaces that allow EDMS to update the location in each system. EDMS provides real-time reporting via the EDMS web portal and deployed web services to track the status and errors related to ingestion. This ensures that the information in EDMS is accurate, complete, and up-to-date.

While only the tri-components have direct access to EDMS, contents in the digitized A-File are authorized to be shared with various external agencies pursuant to the routine uses outlined in the Alien File, Index, and National File Tracking System of Records Notice (SORN).[6] For example, when there is a valid business need, the A-File can be provided to federal, state, tribal, local, or foreign government agencies or organizations, or international organizations, responsible for providing benefits, investigating or prosecuting violations of civil or criminal laws, or protecting our national security.

---

[6] The DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records Notice (June 13, 2011, 76 FR 34233) is available at www.dhs.gov/privacy.



**Case File Digitization Processes**

IDDMP manages the scanning, receiving, storing, updating, and accessing of digital case files into EDMS. There are four processes that allow case files to be digitized and ingested into EDMS through system interfaces, including: (1) SODA; (2) the USCIS Lockbox; (3) the RDF; and (4) DoS. Tri-component employees can request that case files be digitized directly within EDMS or, if applicable, by contacting the capture facility in which the file is located. Once the employee sends the digitization request through EDMS, EDMS will locate the facility that maintains the file to begin the digitization processes. Each capture facility has an interface with EDMS to complete the automated ingestion of information into EDMS.

<u>Scan on Demand (SODA)</u>

SODA refers to the process of digitizing a paper-based A-file and making it available electronically upon receiving a request from a tri-component. The need to digitize an A-file is typically triggered by a submission by a tri-component that needs information contained in the file to assist in adjudicating a benefit application, initiating an enforcement action, or responding to a Freedom of Information Act (FOIA) or Privacy Act (PA) request. After USCIS receives a request, a USCIS NRC or NARA KCFRC employee will physically pull the requested paper files, digitize them, and make them available for the tri-components electronically in EDMS.

USCIS performs SODA for files located at the NRC or the NARA KCFRC. The NRC is the agency's primary record keeping facility that houses millions of immigration records in A-Files. NARA maintains USCIS records deposited with the National Archives of the United States at the NARA KCFRC.

The SODA digitization process involves three fundamental steps: (1) requesting a physical record; (2) producing the digitized records; and (3) delivering the digitized record.

*Step 1: Requesting a record:*

The requesting tri-component will submit a request for a file to be digitized within EDMS or by contacting the USCIS NRC Information Liaison Division (ILD) by email or phone; a person from the requesting component will generally provide the NRC with an A-Number or other identifying combination of personally identifiable information (PII), such as a name, country of birth, and date of birth of the individual whose A-file it wants digitized. ILD staff will log the request, including the A-Number and the requesting component personnel's contact information, into the SODA database.

ILD staff then use NFTS or CIS, the systems that track the location of A-files, to locate the physical paper A-file and include the location of the file in the SODA database. Once the ILD employee inputs the request into the SODA database, it is sent to another NRC employee for manual retrieval of the file.



*Step 2: Producing the digitized record:*

Once the A-file is located, the NRC staff will physically pull the file from the facility and convert the paper A-File into an electronic record.[7]  NRC ILD staff use a scanner to scan files and then convert them to a format compatible with EDMS.  NRC Quality Assurance (QA) staff reviews the digitized files to ensure they are identical and consistent with the paper file.

After the QA review, NRC staff uploads the scanned A-files into the capture facility to notify EDMS that the files are available. Once the notification has been received, EDMS retrieves the files via web services through the ingestion process. Once the NRC ingests the file into EDMS, all files are deleted from the scanner.

*Step 3: Delivery of the digitized record:*

Requests for files to be digitized are generally responded to within 15 days, depending on where the file is located. Once USCIS digitizes the file, it becomes the official immigration record.[8] Once EDMS ingests the A-File, it is searchable by the tri-component requester and any EDMS user.

The SODA database, which does not have a direct connection to EDMS, facilitates the digitization process, tracks pending requests, and compiles weekly, monthly, and yearly statistics related to the SODA process and administrative and system errors.  NRC employees also use the database to manually record errors found during the government QA process and to track the correction of those errors.

<u>USCIS Lockbox</u>

In addition to A-Files, digitized Receipt Files from the USCIS Lockbox facility (Lockbox) that are scanned for initial intake processing are also ingested into EDMS.[9] Upon completion of a USCIS benefit application, USCIS instructs applicants to mail the form and any accompanying documentation to the appropriate Lockbox facility, which is found on the USCIS website and appropriate form.  The Lockbox manages the intake of USCIS applications, petitions, and requests and the collection of associated fees submitted directly by mail. It provides the mechanisms to capture information electronically from USCIS applications, petitions, and requests; to deposit associated fees; to forward the

---

[7] In some cases, the requestor will only need one piece of information located in the A-File. If this is the case, ILD will pull that piece of information from the file and send only that information to the requestor by an encrypted email or secure fax.

[8] The electronic copy will become the official record pursuant to USCIS policy "Use of Digitized A-Files," dated March 28, 2008.

[9] The Lockbox facilities are operated by a financial agent authorized by the Department of Treasury. The financial agent is also responsible for preparing the files in accordance with USCIS guidance and sending the files to the next processing site. The financial agent does not approve or deny petitions/applications/requests received. USCIS has a business arrangement with the Department of the Treasury to allow Bank One, N.A. to serve as the USCIS financial agent. Bank One, N.A. provides USCIS lockbox imaging, check collection, and initial processing services. For more information regarding the Lockbox services provided by the Department of Treasury and appropriate financial agents, please see the Department of Treasury Electronic Check Processing PIA, available at http://www.fms.treas.gov/pia/ECP_PIA.pdf and the accompanying system of records notice, Treasury/FMS.017 - Collections Records -Treasury/Financial Management Service, May 15, 2009 (74 FR 23019) available at http://www.treasury.gov/FOIA/Pages/fmspa.aspx.



information to USCIS systems via an interface; and to generate receipt and rejection notices to individuals.

The Lockbox personnel review newly received filings to ensure they are properly filed. The Lockbox verifies the completion of the following items: basic biographical information, signature on the form, jurisdiction of the submitted form, correct fee, and basic eligibility of the individual. Once Lockbox personnel review the filings for accuracy, they convert the applications to electronic images called Receipt Files and upload them into EDMS.

The digitized Receipt Files are not considered the official USCIS record of the Receipt File and displays a watermark stating "COPY" on the electronic copy of the receipt file. The paper file remains the official record for the Agency. However, the Receipt Files are converted into an electronic format to research customer inquiries regarding accepted and rejected applications processed by the Lockbox, and to begin initial application review before the hardcopy is received from the Service Center.

The Lockbox provides document scanning and metadata capture to integrate with EDMS. Once the Receipt file is ingested into EDMS, it is searchable by any EDMS user. The Lockbox is searchable by receipt number because those temporary records are not yet A-Files. The Receipt File is eventually added to the A-file. A-Files in EDMS are searchable by A-Number, Name, Date of Birth, and Country of Birth. Once an A-number is assigned and the file is ingested into EDMS, the file become searchable by A-number and by the other metadata elements listed above.

Records Digitization Facility (RDF)

RDF provides physical and electronic records management, document scanning, metadata capture, and creation of information to integrate A-File images into EDMS. RDF is dedicated to providing its customers with timely access to complete and accurate information contained in the USCIS digitized files. Oversight of the RDF falls within the purview of the USCIS Headquarters Records Division, Program Management Office. The RDF process of ingesting files into EDMS is similar to SODA, except the files are not ingested upon request. Instead, the RDF is a multi-year plan to digitize approximately 1 million files per year and more than 70 million paper files over the course of several years. RDF staff use a scanner to scan files and then convert them to a format compatible with EDMS. RDF QA staff review the digitized files to ensure they are identical and consistent with the paper file.

After the QA review, RDF staff upload the scanned A-files into the capture facility to notify EDMS that the files are available. EDMS then retrieves the files via web services through the ingestion process once the notification has been received. Once the RDF ingests the file into EDMS, all files are deleted from the capture facility.

DoS Immigrant Visa Files

Previously, DoS shared this information with USCIS by sending USCIS the hardcopy forms and supplementary evidence. USCIS then stored this information in the applicant's paper A-File. As previously described, the sharing of paper-based A-Files is a labor-intensive and timely process. Digitizing files and storing them in a centralized system alleviates this process and allows USCIS to share information more efficiently.



DoS has agreed to create an electronic file of all the files sent back to USCIS, for eventual ingestion into EDMS.  DoS has provided a server to USCIS containing a backlog of image files from USCIS applications and supporting materials of individuals on the DoS waiting list for a visa. Depending on the type of visa an individual is applying for, (e.g., immediate relative/family based, employment based and/or special immigrant) there may be a numerical limit of visas granted each year, and wait times may be involved. Wait times can vary, are dependent on the applicant's country of citizenship, and can be very lengthy. Visa processing will not occur until the NVC contacts the applicant and tells him or her that the wait time is complete.

Once DoS approves the applicant's visa and the applicant determines he or she would like to adjust his or her status with USCIS, USCIS will assign the individual an A-number. At this point, USCIS will retrieve the applicant's information from the server and ingest the information into EDMS. No information will be ingested into EDMS until the applicant is assigned an A-number. If the visa is denied, or the applicant does not contact USCIS to adjust his or her status, the information will remain on the server. The information contained on the servers cannot be retrieved or accessed by anyone other than the server administrators. Once the individual is assigned an A-Number and his or her information is put into EDMS, the information will be accessible by all EDMS users.

The above section describes all of the processes for ways in which information can be ingested into EDMS for efficient sharing throughout the DHS tri-components.  USCIS is republishing this PIA because the previous PIA did not distinguish the different processes and sources for how information is ingested into EDMS.  By reissuing the PIA, we hope to fully address the privacy issues associated with IDDMP and show each piece of the process. If additional process or users of EDMS are added in the future, USCIS will update this PIA.

## Section 1.0 Authorities and Other Requirements

### 1.1    What specific legal authorities and/or agreements permit and define the collection of information by the project in question?

The specific legal authority for this collection of information is Section 290(a) of the Immigration and Nationality Act. Additionally, per Office of Management and Budget (OMB) Memorandum M-12-18, "Managing Government Records Directive," by 2019, all permanent electronic records in Federal agencies will be managed electronically to the fullest extent possible for eventual transfer and accessioning by NARA in an electronic format.[10]

### 1.2    What Privacy Act System of Records Notice(s) (SORN(s)) apply to the information?

The SORN that covers this collection of information is the Alien File, Index, and National File Tracking SORN, June 13, 2011, 76 FR 34233.

---

[10] The OMB Directive can be found at www.whitehouse.gov/omb.



### 1.3 Has a system security plan been completed for the information system(s) supporting the project?

EDMS was approved for operation on July 30, 2012, for a period of 18 months. The Authority to Operate (ATO) is set to expire on January 31, 2014. The EDMS Security Plan was completed in March 2012.

### 1.4 Does a records retention schedule approved by the National Archives and Records Administration (NARA) exist?

NARA approved the EDMS N1-566-08-17 retention schedule. Additionally, the files sent to USCIS by DoS are covered by the N1-566-12-03 retention schedule. USCIS retains A-Files and Receipt Files in accordance with N1-566-08-11 and N1-85-96-01, respectively. N1-GRS-95-2 item 1c, governs the SODA Database, which allows records to be deleted/destroyed when no longer needed for administrative, legal, audit, or other operational purposes.

### 1.5 If the information is covered by the Paperwork Reduction Act (PRA), provide the OMB Control number and the agency number for the collection. If there are multiple forms, include a list in an appendix.

IDDMP does not collect information directly from an individual and there are no forms associated with this collection. The IDDMP maintains data from USCIS applications and petitions that are covered by the PRA.

## Section 2.0 Characterization of the Information

The following questions are intended to define the scope of the information requested and/or collected, as well as reasons for its collection.

### 2.1 Identify the information the project collects, uses, disseminates, or maintains.

#### A-File

IDDMP does not collect information not already collected through an existing process. IDDMP digitizes hard copy A-Files so they may be shared more efficiently throughout DHS in support of benefit application, enforcement action, or receipt of a FOIA/PA request.

The A-File contains information including, but not limited to:

- First, Middle, and Last Name;
- Alias(es);
- Sex;
- Address;
- Telephone Number;



- Social Security Number (SSN);

- A-Number;

- Passport Number;

- DOB;

- COB;

- Country of Citizenship (COC);

- Vital documents (e.g., birth certificates, passports, marriage certificates);

- Biometric information (e.g., photographs, fingerprints);

- Enforcement supporting documents (e.g., rap sheets); and

- Other documents (e.g., naturalization certificates; tax returns; labor certifications; correspondence; court dispositions; interview notes).

A-Files sometimes contain media that cannot be scanned, such as videotapes, audiotapes, and CDs. The contents of such media will not be included in the digitized A-File, but the digitized A-File will note its presence in the physical file.

### Receipt File

The digitized Receipt File contains but is not limited to:

- First and Last Name;

- Alias(es);

- Sex;

- Address;

- Telephone Number;

- SSN;

- A-Number;

- Passport Number;

- DOB;

- COB;

- COC; and

- Any other information collected on the associated form.

### SODA Database

The SODA database collects and stores the following information:



- Employee/Requestor Name;
- ILD Employee User ID;
- Name of requesting agency;
- A-Number; and
- File location.

The metadata saved in EDMS with every digitized A-File includes:

- A-Number;
- First Name;
- Last Name;
- DOB;
- COB; and
- Receipt Number.

## 2.2    What are the sources of the information and how is the information collected for the project?

IDDMP does not collect data directly from an individual.  The information contained in EDMS is generally collected from an individual or representative seeking an immigration benefit or has some encounter with the U.S. immigration system. The employee data contained in the SODA database is collected directly from the DHS employee requesting the information.

## 2.3    Does the project use information from commercial sources or publicly available data?  If so, explain why and how this information is used.

IDDMP does not collect information from commercial or publicly available data sources.

## 2.4    Discuss how accuracy of the data is ensured.

The accuracy of the data in EDMS is dependent upon the accuracy of the information in the paper A-File and/or Receipt File.  USCIS collects information contained in these files directly from the individual or his or her representative. The A-File may also contain information that was input into the file from tri-components or DoS during the course of providing benefits, investigating or prosecuting violations, or protecting our nation.

Additionally, QA personnel perform extensive quality monitoring and assurance reviews throughout the digitization process to ensure that the paper case files are scanned into legible and accurately identified digitized files.  Pages are checked to ensure that they are fully rendered; properly aligned and ordered; free of distortions; and named correctly. Metadata entered at scanning operations undergoes similarly rigid quality control checks.  QA personnel will identify, review, correct, and log inaccuracies to prevent recurrence.



### 2.5   Privacy Impact Analysis: Related to Characterization of the Information

**Privacy Risk**: The information contained in the case file may be inaccurate or incomplete.

**Mitigation**: The digitized file in EDMS may not include all material that exists for the paper case files. If there is material within the A-File that cannot be digitized, i.e., video tapes, USCIS employees will annotate in EDMS that one or more of documents in the original could not be scanned. USCIS creates Temporary Files (T-File) to store permanent documents, when the original A-file is not available. USCIS employees conduct searches in NFTS to determine if there are existing T-Files available. Lastly, if errors are found in a digitized case file, the facility that digitized the file receives notice and the facility employees review the electronic and physical file to correct the error. Furthermore, QA personnel perform quality monitoring and assurance reviews throughout the digitization process and can identify, review, correct, and log inaccuracies to prevent recurrence.

## Section 3.0 Uses of the Information

The following questions require a clear description of the project's use of information.

### 3.1   Describe how and why the project uses the information.

The uses of the information contained in EDMS are the same as the uses for the paper A-file and Receipt File. The information is used for immigration benefits processing, law enforcement, and protection of national security. Specific uses of these case files are to:

- Confirm identity using dates of birth, photos, or other biographic or biometric information;
- Confirm relationships using information found in birth, marriage, divorce, and/or adoption certificates;
- Confirm law enforcement actions using investigation reports, rap sheets, etc.;
- Confirm previous immigration benefit processing, including both approvals and denials; and
- Research customer inquiries and begin initial application review.

Storing case file information electronically in EDMS allows DHS, in the standard course of its immigration-related business to: access the files more rapidly and efficiently, concurrently and collaboratively use the files, and mitigate the risk of losing the paper-based files. EDMS eliminates the inefficiencies associated with paper records, such as slow, resource-intensive shipping, high risk of loss, and deterioration over time.

### 3.2   Does the project use technology to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly? If so, state how DHS plans to use such results.

IDDMP does not use technology to conduct electronic search, queries, or analyses to discover or locate a predictive pattern or an anomaly.



### 3.3 Are there other components with assigned roles and responsibilities within the system?

The A-File, on paper or as digitized as part of IDDMP, is the record that contains all transactions involving an individual as he or she passes through the U.S. immigration and inspection process, and chronicles interactions with the U.S. Government.  These functions have been divided among USCIS, CBP, and ICE.  Although USCIS is the custodian of the A-File, all three components create and use A-Files.

Once an A-File is digitized, information is accessible by all three components so that they may perform their respective mission requirements. Information contained within the A-File may also be shared with other components within DHS responsible for law enforcement activities and protection of national security.  In addition, access may be granted to the DHS Office of the Inspector General, primarily for the purpose of conducting internal investigations and evaluations of DHS employees conduct in the performance of their duties. Information is also shared in order to support associated management reporting, planning and analysis, or other administrative uses that require access to the information contained in the A-File.

### 3.4 <u>Privacy Impact Analysis</u>: Related to the Uses of Information

<u>Privacy Risk</u>:  Individuals who have legitimate access to PII could exceed their authority and use the data for unofficial purposes.

<u>Mitigation</u>:  USCIS strictly manages access controls and policies; auditing; and other physical, technical, and administrative controls.  USCIS limits the use and access of all data to purposes for which it was collected.  Only employees who need access to the A-File to perform their official duties are granted access to EDMS. System users must complete mandatory Computer Security Awareness training, Privacy training, and EDMS training. USCIS employees who take requests to digitize case files and who digitize the files themselves have additional training on the process. All contractors must sign non-disclosure agreements. Data must always be securely transferred. For example, if EDMS data is transferred on portable media or via email to authorized DHS employees, National Institute of Standards and Technology (NIST)-approved encryption is used to ensure that data is not tampered with en route and to prevent unauthorized personnel from viewing it.

## Section 4.0 Notice

The following questions seek information about the project's notice to the individual about the information collected, the right to consent to uses of said information, and the right to decline to provide information.

### 4.1 How does the project provide individuals notice prior to the collection of information? If notice is not provided, explain why not.

IDDMP does not collect information directly from an individual. Instead, it scans paper-based information originally provided to DHS by an applicant and stores the digitized A-Files in EDMS.  All individuals applying for a benefit are presented with a Privacy Act Statement that informs the individuals of the purpose and authority for collection, routine uses of the information, and if the submission of



information is voluntary or mandatory.  Individuals also receive general notice through the publication of this PIA and the Alien File, Index, and National File Tracking System of Records Notice (SORN), June 13, 2011, 76 FR 34233.

### 4.2    What opportunities are available for individuals to consent to uses, decline to provide information, or opt out of the project?

IDDMP does not collect information directly from an individual.  Information is collected by various means and stored in EDMS as a digitized version of the paper A-File.  Applicants who seek USCIS benefits receive a Privacy Act Statement, which details the authority and uses of information. When submitting the application, the applicant certifies and authorizes the release of any information to appropriate agencies in accordance with the approved Routine Uses outlined in the applicable SORN. USCIS informs the applicant at the point of data collection (generally on the form itself) that it is within his or her rights to decline to provide the required information; however, it will result in the denial of the benefit request.

### 4.3    <u>Privacy Impact Analysis</u>: Related to Notice

<u>**Privacy Risk**</u>:  There is a risk of insufficient notice describing the purpose, use, and effects on the requestor for failing to provide information.

<u>**Mitigation**</u>: USCIS mitigates this risk by providing notice to the individual prior to the collection of information through the inclusion of a Privacy Act Statement on each form, the publication of this PIA, and other relevant PIAs such as NFTS and CIS, on www.dhs.gov/privacy, and the publication of the A-File SORN in the Federal Register.

## Section 5.0 Data Retention by the project

The following questions are intended to outline how long the project retains the information after the initial collection.

### 5.1    Explain how long and for what reason the information is retained.

The A-File is the record that contains all transactions involving an individual as he or she passes through the U.S. immigration and inspection process.  A-File records are permanent records in both electronic and paper form. USCIS transfers A-Files to the custody of NARA 100 years after the individual's date of birth.[11] When USCIS digitizes a paper A-File, the digitized A-File maintained in EDMS becomes the official record and maintains the same retention schedule as the original paper A-File. Once USCIS digitizes the files, it sends the paper-based files to NARA or the KCFRC.

Contrary to the digitized A-File, digitized Receipt Files are copies and not the official Agency record of the Receipt File. The paper file remains as the official record for the Agency.

### 5.2    <u>Privacy Impact Analysis</u>: Related to Retention

<u>**Privacy Risk**</u>: There is a risk that USCIS may retain information longer than is necessary to approve or deny the benefit sought.

---

[11] Newly-eligible files are transferred to the KCFRC every five years.



**Mitigation**: USCIS retains data beyond the approval or denial of a benefit in order to ensure the information is available for several purposes, including future immigration status verification, evaluating subsequent benefits sought by an applicant, and for litigation. The digitized A-File serve the same purpose as the paper-based A-File, which NARA has determined to be of permanent historical value. When information is no longer necessary, USCIS retires the records according to the retention schedules listed in section 1.4 of this PIA.

# Section 6.0 Information Sharing

The following questions are intended to describe the scope of the project information sharing external to the Department. External sharing encompasses sharing with other federal, state and local government, and private sector entities.

### 6.1 Is information shared outside of DHS as part of the normal agency operations? If so, identify the organization(s) and how the information is accessed and how it is to be used.

Upon request, copies of a digitized A-File or certain documents within an A-File can be made available to external agencies that do not currently have access to EDMS but have a valid need for the immigration record. Encrypted PDF images from EDMS can be exported to CD for distribution through postal mail or, alternatively, digitized A-File documents can be compressed and sent via e-mail as an encrypted attachment. In special circumstances, such as national security events, the original physical A-File might be requested. If the need for the original physical A-File is valid, the paper file will be pulled from retired status and sent to the requesting agency. The digitized version of the A-File will no longer be available in EDMS in such instances.

Information in the digitized A-File may be shared with external organizations for the purpose of providing benefits, law enforcement, or other uses consistent with the routine uses described in Alien File, Index, and National File Tracking System of SORN, June 13, 2011, 76 FR 34233. Furthermore, information may be shared with Department of Justice to assist in the development of agency's legal and/or policy position and Department of State in processing of petitions or applications for benefit under the Immigration Nationality Act. If external agencies receive direct access to EDMS in the future, USCIS will update this PIA.

### 6.2 Describe how the external sharing noted in 6.1 is compatible with the SORN noted in 1.2.

USCIS only shares information outside of DHS as permitted under the Routine Uses outlined in the Alien File, Index, and National File Tracking System of SORN, June 13, 2011, 76 FR 34233 SORN.

### 6.3 Does the project place limitations on re-dissemination?

Prior to disclosing any information to an external agency, DHS must have a Memorandum of Understanding (MOU) in place with the partner agency fully outlining responsibilities of the parties, security standards, and limits of use of the information, including re-dissemination. Methods and controls over dissemination of information are coordinated between DHS the partner agency, prior to information sharing. Depending on the context of other sharing, DHS may place additional controls on the re-



dissemination of the information.

### 6.4 Describe how the project maintains a record of any disclosures outside of the Department.

Pursuant to 5 U.S.C. 552a(b) of the Privacy Act, all or a portion of the records or information contained in this system may be disclosed outside DHS as a routine use pursuant to 5 U.S.C. 552a(b)(3).

For any external sharing, USCIS requires a representative from the outside agency to establish, in writing, what specific information it needs about particular individuals and ensures that it is consistent with the Routine Uses listed in the SORN. This is process is begins when the requesting agency completes the G-658 *Record of Information Disclosure (Privacy Act)*. This form is used to record the reason for each disclosure and is maintained in the Subject's A-File or maintained in such a way that it can be easily retrieved when requested.

### 6.5 <u>Privacy Impact Analysis</u>: Related to Information Sharing

**Privacy Risk**: There is a privacy risk that USCIS may share data outside of DHS for purposes that are not in accordance with the stated purpose and use of the original collection.

**Mitigation**: USCIS is careful to only share data with external agencies that have a need-to-know and will use the information in a way that is compatible with the original purpose for collection described in the A-File SORN. All external sharing arrangements are reviewed prior to the sharing of information to ensure such uses are consistent with existing published routine uses in the applicable SORNs and/or performed with the consent of the individual whose information is being shared. The Privacy Act Statement included on USCIS Forms notifies the individual that USCIS may provide information from the form to other government agencies. As required by DHS procedures and policies, all current external sharing arrangements are consistent with the original purpose for which the information was collected.

## Section 7.0 Redress

The following questions seek information about processes in place for individuals to seek redress, which may include access to records about themselves, ensuring the accuracy of the information collected about them, and/or filing complaints.

### 7.1 What are the procedures that allow individuals to access their information?

An individual may gain access to his or her USCIS records by filing a FOIA/PA request. Any individual seeking access to his or her USCIS record may submit the aforementioned requests to following address:

National Records Center

Freedom of Information Act/Privacy Act Program

P. O. Box 648010

Lee's Summit, MO 64064-8010



The information requested may, however, be exempt from disclosure under the Privacy Act because sometimes files contain law enforcement sensitive information and the release of could possibly compromise ongoing criminal investigations. Further information for Privacy Act and FOIA requests for USCIS records can also be found at http://www.uscis.gov.

### 7.2    What procedures are in place to allow the subject individual to correct inaccurate or erroneous information?

USCIS treats all requests for amendment of information in a system of records as Privacy Act amendment requests. Individuals may direct all requests to contest or amend information to the FOIA/PA Office at USCIS at the address listed above. They must state clearly and concisely in the redress request the information being contested, the reason for contesting it, and the proposed amendment thereof.

### 7.3    How does the project notify individuals about the procedures for correcting their information?

The procedures for individuals to amend their information are outlined in this PIA and Alien File, Index, and National File Tracking SORN, June 13, 2011, 76 FR 34233.

### 7.4    <u>Privacy Impact Analysis</u>: Related to Redress

<u>Privacy Risk</u>: There is a privacy risk that an individual's opportunity for redress may be limited by a Privacy Act exemption.

<u>Mitigation</u>:  Individuals are given numerous opportunities during and after the completion of the application process to correct information they have provided and to respond to information received from other sources.

## Section 8.0 Auditing and Accountability

The following questions are intended to describe technical and policy based safeguards and security measures.

### 8.1    How does the project ensure that the information is used in accordance with stated practices in this PIA?

DHS security specifications require USCIS to maintain audit logs that document the activity of each user in order to reduce the possibility of misuse and inappropriate dissemination of information. In accordance with DHS security guidelines, USCIS systems use auditing capabilities that log user activity. All user actions are tracked via audit logs to identify audit information by user identification, network terminal identification, date, time, and data accessed. All USCIS systems employ auditing measures and technical safeguards to prevent the misuse of data. USCIS systems have internal audits separate from the domain security audits; therefore, a double layer of audit trails exists. Furthermore, each employee is required to undergo annual security awareness training that addresses his or her duties and responsibilities to protect the data.



### 8.2 Describe what privacy training is provided to users either generally or specifically relevant to the project.

USCIS provides annual privacy and security awareness training to all employees and contractors. The Culture of Privacy Awareness training addresses appropriate privacy concerns, including Privacy Act obligations. The Computer Security Awareness training examines appropriate technical, physical, personnel, and administrative controls that safeguard information. Lastly, all users are required to complete EDMS training prior to being granted access to the system.

### 8.3 What procedures are in place to determine which users may access the information and how does the project determine who has access?

EDMS has three types of users: general users, records administrators, and system administrators. The permissions available at each level are outlined below. The user's type will be identified at login, authenticated through the DHS Active Directory instance, and the user will be assigned the correct access rights.

- General users have the ability to perform A-Number, metadata, and full-text searches, and view documents.
- Records administrators have the ability to view the documents for A-Files, can edit the metadata for A-Files and their associated documents, and view reports on auditing and ingestion.
- System administrators have the ability to view the metadata and documents for A-Files and can delete them.

| Functions | General Users | Records Admin | System Admin |
|---|---|---|---|
| Logging In | X | X | X |
| A-Number / Account / Receipt File Number Search | X | X | X |
| Expanded Search | X | X | X |
| Search Results | X | X | X |
| Search within an A-File | X | X | X |
| View/Print A-File Documents (Watermarked) | X | X | X |
| View A-File Documents (Non-Watermarked) | | X | X |
| Print A-File Documents (Non-Watermarked) | | X | X |
| View/Print Account Documents (Non- watermarked) | X | X | X |
| Export A-Files | | X | X |
| Create Certified Printed copy of an A-File | | X | X |
| Edit Comments | | | X |

AR2022_301171



| | | | |
|---|---|---|---|
| Delete Comments | | | X |
| Delete Documents | | | X |
| Delete A-Files | | | X |
| Edit Receipt File Retention Period (Apply/Remove Hold) | | X | X |
| Add descriptive text to A-File documents | X | X | X |

USCIS deploys role-based access controls and enforces a separation of duties throughout the lifecycle of the electronic A-File. Access is limited to only those persons who have a need-to-know in order to perform their duties. This need-to-know is determined by the respective responsibilities of the employee.

### 8.4 How does the project review and approve information sharing agreements, MOUs, new uses of the information, new access to the system by organizations within DHS and outside?

USCIS has formal review and approval process in place for new sharing agreements. Any new use of information and/or new access requests for USCIS systems must go through the USCIS change control process and must be approved by the proper authorities prior to sharing information within and outside of DHS.

## Responsible Officials

Donald K. Hawkins
Privacy Officer
U.S. Citizenship and Immigration Services

## Approval Signature

Original signed copy on file with the DHS Privacy Office

_____

Jonathan R. Cantor
Acting Chief Privacy Officer
Department of Homeland Security



Privacy Impact Assessment
for the

# USCIS Electronic Immigration System (USCIS ELIS)

**DHS/USCIS/PIA-056**

**May 17, 2016**

**<u>Contact Point</u>**
**Donald Hawkins**
**Privacy Officer**
**United States Citizenship and Immigration Services**
**(202) 272-8000**

**<u>Reviewing Official</u>**
**Karen L. Neuman**
**Chief Privacy Officer**
**Department of Homeland Security**
**(202) 343-1717**

AR2022_301173



## Abstract

The Department of Homeland Security (DHS) United States Citizenship and Immigration Services (USCIS) operates the USCIS Electronic Immigration System (USCIS ELIS). USCIS ELIS is an electronic case management system that allows USCIS to process certain immigration benefit requests. USCIS conducted this PIA to evaluate the privacy impacts of converting legacy, paper-based processes to an electronic system. This PIA replaces all previously-issued USCIS ELIS PIAs, which are: DHS/USCIS/PIA-039 *Transformation*, DHS/USCIS/PIA-041 *ELIS-1 Temporary Accounts and Draft Benefit Requests*, DHS/USCIS/PIA-042 *ELIS-2 Account and Case Management*, DHS/USCIS/PIA-043 *ELIS-3 Automated Background Functions*, and DHS-USCIS-PIA-056 *USCIS ELIS: Form I-90*. As USCIS ELIS expands to additional immigration benefit types, USCIS will update the Appendix to this PIA.

## Overview

USCIS is the Component within DHS that oversees lawful visits and immigration to the United States. This includes receiving and adjudicating a wide variety of immigration and non-immigration benefits and requests (hereafter referred to as immigration benefits). Historically, USCIS has relied on manual, paper processes to perform this function. USCIS ELIS is a centralized, web-based system designed to transform USCIS business operations from a "transaction-centric" model to a "person-centric" model using unique customer accounts. USCIS is expanding its use of USCIS ELIS over the next several years by expanding the immigration benefit types that USCIS ELIS will process in an incremental fashion. As new immigration benefit types are made available in USCIS ELIS, all benefit requests within that immigration benefit type will be processed in USCIS ELIS, including paper and electronic filings.[1]

**Background and "Legacy USCIS ELIS"**

USCIS ELIS originally launched in the spring of 2012. USCIS is conducting this PIA to describe a new iteration of the existing USCIS ELIS system. The current USCIS ELIS system, now known as the "Legacy USCIS ELIS" system, is no longer accepting documents and will be decommissioned. The two systems are completely separate, including separate login accounts for customers and employees and a different user interface. However, the new system does follow the same general purpose and data collection process as the previously-used system. Each system accepts different immigration benefit types,[2] which limits the number of customers who have reason to access both systems.

---

[1] Except for certain low-volume special circumstances that will not be processed in ELIS.
[2] Legacy USCIS ELIS processed the electronic Form I-539, Application to Extend Stay/Change Status as a Nonimmigrant; electronic Form I-526, Immigrant Petition by Alien Entrepreneur; a Document Library (for EB-5 petitions associated with Regional Centers); and the ability to pay the $165 USCIS Immigrant Fee.

**AR2022_301174**



The primary users of USCIS ELIS are USCIS adjudicators processing benefit requests. USCIS ELIS also interfaces with other IT systems that conduct other functions, such as customer service and fraud detection, without subsuming or replacing those functions. Unlike Legacy USCIS ELIS, USCIS ELIS does not attempt to conduct advanced link-analysis for fraud or national security purposes.[3] Instead, it interfaces directly with other USCIS systems that are operated specifically for those purposes. Therefore, with the publication of this PIA, USCIS is retiring the previous USCIS ELIS PIAs.

### System Description

*Paper Intake*

Historically, USCIS has required applicants, petitioners, or benefit requestors submit hard-copy, paper submissions of immigration applications, petitions, or benefit requests to one of its "Lockbox" facilities. Lockbox facilities are operated by U.S. Department of Treasury financial agents on behalf of USCIS to receive paper requests, process payments, and forward the requests to USCIS Service Centers in paper and electronic format for further processing. As USCIS ELIS expands to new immigration benefit types, the applicable Lockbox facility will adjust its legacy delivery process to transmit filings to USCIS ELIS rather than to the legacy system (usually CLAIMS 3 or CLAIMS 4). It will transmit the data to USCIS ELIS as well as scanned images of the paper filings to ELIS electronic storage.

The Lockbox will continue to follow existing USCIS guidance to prepare submitted paper filings. If the paper filing pertains to an individual with a paper Alien File (A-File),[4] then the paper will be delivered to that file. If it pertains to a customer without a paper A-File (primarily nonimmigrants), then the paper will be transferred to a Receipt File and delivered to the relevant USCIS office for temporary retention. This temporary retention is governed by the applicable National Archives and Records Administration (NARA)-approved retention schedule. As USCIS expands its use of electronic records, USCIS intends to reduce its storage of paper records when NARA-approved electronic equivalents exist. All changes to retention of records are coordinated with NARA, published in the *Federal Register*, and communicated to the USCIS customer in the instructions of each immigration form.

Once information from the paper filing is accepted in USCIS ELIS, the system sends the customer a "USCIS Account Acceptance Notice" via U.S. Postal Service mail. This notice contains instructions for creating a USCIS Online Account and a passcode for linking the account with the USCIS ELIS case. If the customer opts not to activate his or her USCIS Online Account, the passcode expires in 30 days as a security measure. The customer, however, may later contact USCIS customer service to request that a new letter with a new activation passcode be sent. Customers who file paper applications, petitions, or requests that are receipted into USCIS ELIS

---

[3] DHS/USCIS/PIA-043, *ELIS-3 Automated Background Functions* (May 16, 2012), *available at* http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_elis_3_automatedbackgroundfunctions.pdf.
[4] 78 FR 69864 (Nov. 21, 2013).



will have the opportunity to log in to their USCIS ELIS account to check the status of their application, petition, or request; obtain copies of documents associated with the filing; and respond electronically to requests for additional information, such as Requests for Evidence (RFEs), if they create online accounts. Customers who opt not to activate their online accounts can continue to use the existing paper process and USCIS will continue to send notices via hard copy mail.

*Electronic Intake*

Customers may also file benefit requests with USCIS electronically. Customers who choose to file electronically must first create a USCIS Online Account by providing a person-specific, unique email address. USCIS sends a confirmation email to the provided address to confirm accuracy. The email address is then stored as the customer's username. Next, the customer creates a strong password. To establish two-factor authentication, a personal identification number (PIN) is required in addition to the password. The customer must choose whether to receive the one-time PIN either by mobile phone via short message service (SMS), or as a message delivered by email. If the customer chooses SMS, the system prompts him or her to provide the mobile number and carrier. Passwords are never sent or reset via email.

The customer also provides answers to security questions that he or she will answer to reset the account password in the future. The security questions are "fill-in-the-blank" questions that the customer provides the answer to at account set-up. USCIS provides the customer with a drop-down menu of standard questions, and the customer chooses which ones to use as his or her security questions.[5] USCIS will not use the answers to these questions for purposes other than assisting with password resets (*e.g.*, the answers would not be available to adjudicators for an immigration benefit purpose or fraud investigators in the event of a fraud investigation). These answers are stored by USCIS within the system, but like passwords, are not visible however via the user interface used by USCIS adjudicators, clerks, and similar users. The answers could be visible to customer helpdesk personnel who assist users in resetting their passwords and encountering problems using the system.

Once the online account is set-up, the customer can begin drafting his or her electronic request in the online filing system. The user interface collects the same information as is collected via the corresponding existing paper form, although questions dynamically expand or become disabled as the customer progresses through the request. In other words, a customer's answer to one question may prevent a series of additional questions from being necessary. Those would not be fillable because they would not be applicable to that customer. This enables the customer to respond only to applicable questions. Although USCIS ELIS initially saves draft data; the customer may edit, delete, or update information when it is in draft state and the system does not keep copies of these previous iterations.

---

[5] For example, the applicant may choose, *What is your favorite type of candy?* as a security question.



The electronic format also provides some advantages to the user, such as a validation of mailing address against U.S. Postal Service (USPS) known addresses. The user has the option to use a corrected address, validated by the USPS Address Standardization Web Tool,[6] to prevent address formatting confusion or typographical errors. When the customer enters his or her mailing address, the system bounces the address entered against addresses recognized by USPS. If the USPS tool does not recognize the address, the system will display a pop-up window informing the customer that the address was not found. The pop-up window will also offer an alternative recognized address that the USPS tool provides as a close match. If there is no close match, the USPS tool provides an alternative address as a suggestion. The customer is given the option to accept the suggested address or ignore the suggestion and use the address he or she originally typed. The customer may return to the address fields at any time, which will trigger a re-validation by the USPS service.

Based on the answers the customer provides, ELIS prompts the customer to upload evidence. For example, if the customer requests a replacement Permanent Resident Card because of a legal name change through marriage, the system will prompt the customer to upload evidence of the legal name change, such as a marriage certificate. Customers upload evidence by scanning documents and attaching the scanned images to the USCIS ELIS electronic request.

Once the customer completes the request and uploads necessary evidence, USCIS ELIS requires the customer to electronically sign (e-sign) the request and pay the applicable fee. The customer can review the information he or she is about to submit, and then e-sign by entering his or her name. Payment is made using the U.S. Department of Treasury's Pay.Gov service.[7] USCIS does not collect the fee directly. Rather, the Pay.Gov interface is imbedded within the USCIS Online Account user interface, and Pay.Gov collects payment information—either credit card, debit card, or Automated Clearing House (ACH) debit from a personal bank account. Once Pay.Gov validates the payment information, applicants are routed back to USCIS ELIS and the USCIS Online Account confirms to the customer that he or she successfully submitted the request. USCIS will mail a receipt notice (if applicable) to the customer's physical address and make it available electronically via a new interface called the USCIS Online Account.

*Intake with Attorney or Accredited Representative*

Attorneys and non-attorney representatives accredited by the Board of Immigration Appeals (BIA) (hereafter referred to as Representatives) may also create a USCIS Online Account to use USCIS ELIS. These accounts require limited biographic data about the Representative (based on the USCIS Form G-28, *Notice of Appearance as Attorney or Accredited Representative*) and allow the Representative to draft electronic requests on behalf of his or her clients;

---

[6] Via this service, USPS does not ingest or store the address provided by USCIS ELIS.
[7] U.S. Department of Treasury *Financial Management Services Pay.Gov Privacy Impact Assessment 2.0* (July 1, 2011), *available at*, http://fms.treas.gov/pia/paygov_pia%20.pdf.



electronically transfer draft requests for client review and e-signature; and receive updates about those requests as they are processed by USCIS.

Customers give a Representative permission to represent them on a particular request via Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative*, filed concurrently with that request. If a paper filing for a USCIS ELIS immigration benefit type is submitted with a Form G-28, the Lockbox will transmit the information to USCIS ELIS, which will search to identify whether that Representative already has a USCIS Representative account in the system. If a Representative account already exists, the new filing is linked to the existing account. However, if a Representative account does not yet exist, USCIS ELIS will create a USCIS Online Account for the Representative. Like customers, Representatives are sent a hardcopy "USCIS Account Acceptance Notice" via USPS. This letter contains instructions on activating the account as well as a passcode for linking the new account with the client immigration request in USCIS ELIS.

Representatives may also electronically file requests in USCIS ELIS. To successfully submit a represented filing in USCIS ELIS, both the Representative and the Representative's client (who is the USCIS customer) must have their own, independent USCIS Online Account. The Representative uses his or her account to draft a request for his or her client, and upon completion, submits it for the client's review. When the Representative submits the draft benefit request for client review, the Representative provides USCIS ELIS with the client's email address. USCIS ELIS then presents the Representative with a passcode that is provided in-person to his or her client. The client must provide the passcode in order to access to the draft request when he or she next logs in to the system. USCIS ELIS sends the client an email indicating the pending draft in his or her existing account, and upon login, the customer is directed to input the passcode in order to view the draft. USCIS ELIS gives the client access to the draft case filed by the Representative if both the email address connected to the client's account and the passcode entered by the client match the client email address and the passcode associated with the filing submitted via the Representative's account. The client has read-only access to the Representative's draft. The client is able to reject the draft, which sends it back to the Representative, or accept the draft and e-sign it together with the electronic Form G-28. If the client rejects the draft, the Representative may overwrite the previous draft. The customer, however, will need a new passcode in order to access the revised document. USCIS ELIS does not store previous drafts. Once the client reviews the request, he or she accepts and e-signs. It is then electronically returned to the Representative, who will also e-sign, pay filing fees, and submit the request to USCIS. Thereafter, the Representative will have access to the same request information and status updates related to the request that the client does.

*Remote Identity Proofing*

USCIS requires in-person identity verification for many of its immigration benefits, either by requiring customers to appear in-person to submit biometrics, to be interviewed in-person by



an adjudicator, or both. However, there will be some USCIS Online Account holders who never appear in-person, and require remote identity proofing to assure USCIS that the account holder is who he or she purports to be. Those requiring remote identity proofing include customers making requests that do not include in-person appearances for adjudication, and also other users such as Representatives, who do not appear in person.

USCIS will provide remote identity proofing for those users who require it using two methods. The first method will use a third-party remote identity proofing service that uses an individual's commercial and financial data to verify identity using an "out of wallet" quiz. These services are standard across public and private sector online interfaces and are designed to conform to applicable Government-wide standards on identity proofing of federal systems. USCIS ELIS will use those services as described in the DHS E-Authentication System of Records Notice.[8]

Those existing services, however, are largely unable to identity-proof individuals who have not lived or conducted business in the United States, which is a large portion of USCIS customers. For those customers, USCIS has designed Identity Proofing as a Service (IDPaaS.) IDPaaS will use data on file within USCIS legacy systems or data collected by the Department of State abroad to verify that the USCIS Online Account holder is the customer he or she claims to be. IDPaaS will present a quiz to the account-holder based on the data in a fashion similar to commercial "out-of-wallet" quizzes.

The questions presented to each account-holder are dynamically generated based on the best information USCIS has about the individual, as well as the most diverse set of questions available. This data originally comes from information the Department of State collected in-person when issuing a visa, information U.S. Custom and Border Protection (CBP) collects in-person upon entry at the border, and information USCIS has from the customer based on previous immigration benefit requests, as consolidated by USCIS in its major immigration systems.[9] In designing the questionnaire, USCIS looked at the breadth of data and categorized it into several domains based on the type of information, such as travel, contact information, etc. The questionnaire is designed to dynamically ask the customer questions from different domains to ensure the customer is showing knowledge of a wide breadth of data about him- or herself, and also data that would not be known by a different person. IDPaaS may allow customers more than one attempt to pass the questionnaire, but only if the system has enough reliable data in enough domains about that individual. Questions are in multiple-choice format, and include a "none of the above" option where appropriate.

Customers who are required to use IDPaaS are provided notice explaining what identity proofing is and what to expect before launching into the process. If customers are unable to pass the IDPaaS questionnaire, they are presented with instructions on how to proceed, which may be by contacting Customer Service or appearing in-person. Once the customer passes the identity

---

[8] DHS/ALL-037 E-Authentication System of Records, 79 FR 46857 (Aug. 11, 2014).
[9] 78 FR 20673 (Apr. 5, 2013), 78 FR 69864 (Nov. 21, 2013).



proofing quiz, USCIS ELIS retains the fact that the customer has been identity-proofed and does not require the customer to repeat the process for subsequent immigration benefit requests.

As IDPaaS is incrementally deployed, USCIS will maintain an internal governance board[10] to review the efficacy of the system, approve new questions and methods of verifying identity, and evolve the questionnaires as appropriate for each new use case. IDPaaS will only be used internally within USCIS. Data from sources will be shared as it resides in other systems.

**System Process**

*Automated System Checks*

Upon receipt of a request, the first data element USCIS ELIS validates is the customer's Alien Registration Number (A-Number), if applicable. When customers list an A-Number on a benefit request, USCIS ELIS runs an automated comparison of the claimed A-Number against the USCIS legacy Central Index System (CIS)[11] to verify that: the A-Number exists and is valid and matches the name and identifying information provided by the customer. If the system cannot automatically verify this information, USCIS ELIS moves the customer's request into an electronic work queue where it will be researched and resolved by a USCIS employee or contractor before proceeding to adjudication.

During the A-Number validation, USCIS also runs a criminal and national security background check against the CBP TECS system.[12] If this check identifies potential criminal or national security issues, it is referred to another electronic workflow queue for resolution. USCIS must take measures to address or resolve the presented issues before adjudicating the benefit request, which may include a referral to the USCIS Fraud Detection and National Security (FDNS) Directorate.

After the A-Number is validated, USCIS ELIS interfaces with the National Appointment Scheduling Service (NASS)[13] to schedule an Application Support Center (ASC) appointment for the customer if required for the particular request. During an ASC appointment, USCIS is able to verify identity in-person by collecting biometrics. NASS generates an appointment notice that USCIS mails to the customer. USCIS ELIS holds the customer's request pending completion of the ASC appointment, if required.

---

[10] Members include designees from USCIS Office of Privacy, Office of Chief Counsel, and Office of the Chief Information Security Officer, among others.
[11] DHS/USCIS/PIA-009 Central Index System PIA (June 22, 2007), *available at*, http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_cis.pdf.
[12] DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing PIA (December 22, 2010), *available at*, http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbp_tecs.pdf.
[13] Privacy Impact Assessment pending publication to http://www.dhs.gov/uscis-pias-and-sorns.



### Adjudicating the Application

The customer's case advances once the USCIS Customer Profile Management System (CPMS)[14] sends notification that the customer has submitted his or her biometrics at the ASC, if required. If biometrics are not required, the case advances to the adjudication step immediately following A-Number validation and resolution of any background check results.

USCIS ELIS automatically places the application in an adjudicator work queue after A-Number validation, completion of the TECS background check, and return of the background and security check results through the legacy USCIS Benefits Biometric Support System (BBSS)[15] have occurred. The USCIS adjudicator evaluates all data—the information submitted by the customer along with the results of the background and security checks—according to existing standard operating procedures (SOP) that apply to the legacy paper process.

To assist the adjudicator in verifying information submitted by the customer, ELIS aggregates and displays information pulled from other USCIS systems via the Person-Centric Query System (PCQS).[16] This information includes other names, dates of birth, contact information, and other A-Numbers that may also be associated with the customer. Following existing SOPs, the adjudicator is able to identify which data is correct or relevant, and make updates to the system to record the correct data about a customer. The system documents all updates made to data about the customer. The adjudicator then renders a decision, and may electronically submit the decision to his or her supervisor for review.

Once the decision is final, USCIS ELIS uses automated interfaces with existing USCIS IT systems to send approval or denial notices along with the proof of benefit (such as a Lawful Permanent Resident card), as applicable. When a proof of benefit must be produced, and it requires a photograph, the adjudicator is able to obtain the customer's facial photograph, fingerprint, and signature via an interface with CPMS solely for proof of benefit production purposes. The facial photograph and other biometric elements are temporarily displayed in USCIS ELIS and can be adjusted to improve image quality for printing. USCIS ELIS allows the user to zoom, pan, lighten, or darken the photo for card production, and then certify for printing. Upon successful card printing, the facial photograph is automatically deleted from USCIS ELIS and the final adjusted image is stored as part of the printed card record in CPMS.

### System Privacy Impacts

Overall, USCIS ELIS offers USCIS customers several advantages with respect to data privacy protections. Once logged into their account, USCIS customers are able to enter their information directly into the system or correct data as applicable. In contrast, the paper-based

---

[14] *Id.*

[15] DHS/USCIS/PIA-033 Immigration Benefit Background Check System PIA (November 5, 2010) *available at*, http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_ibbcs.pdf.

[16] DHS/USCIS/PIA-010 Person-Centric Query System (PCQS) PIA (June 22, 2007), *available at,* http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_pcq.pdf.



legacy process requires contractors to manually key-in data from paper filings. Allowing customers to enter or correct their information directly reduces the risk for typographical errors and generally improves the accuracy, timeliness, and completeness of submitted information. USCIS ELIS customers who have activated their USCIS Online Accounts also enjoy improved transparency regarding the status of their requests and better access to their data, because that data is available instantly once they are logged into their account. Although USCIS ELIS initially saves draft data; the customer may edit, delete, or update information when it is in draft state and the system does not keep copies of these previous iterations. This preserves the same confidentiality for an electronic customer as a paper-filer. IDPaaS allows USCIS ELIS to ensure many customers online are who they claim to be. There is a risk that some legitimate customers may be unable to pass the IDPaaS quiz, and there is a risk that an individual with access to a customer's files could illegitimately pass. USCIS will actively mitigate this risk by monitoring the performance of the system and assisting with customer help requests, and adjust for needed changes accordingly. Customers with online accounts also may receive requests for additional information and other communications more quickly, as information and notices are made available electronically in the account. This method of communication is faster than sending customers paper notices via USPS mail. While faster, use of email and the internet creates other risks. Customers may face some increased data security risk by virtue of submitting data via the Internet. To mitigate this risk, USCIS ELIS employs several layered IT security and data quality measures, such as establishing a secure encrypted connection when a customer is entering sensitive personally identifiable information (PII) and requiring strong two-factor authentication.

## Section 1.0 Authorities and Other Requirements

### 1.1    What specific legal authorities and/or agreements permit and define the collection of information by the project in question?

The primary legal authority supporting the collection of the information provided to USCIS is 8 U.S.C. § 1101 *et seq*. Specifically, 8 U.S.C. § 1360 requires a central file of information for the security and enforcement agencies of the Government of the United States that contains the names of all aliens admitted or denied admission to the United States and such other relevant information as required to aid in the proper enforcement of this chapter. The Homeland Security Act of 2002[17] and the Immigration Nationality Act (INA)[18] charge the Secretary of Homeland Security with administration and enforcement of the immigration and naturalization laws. The Secretary of Homeland Security has delegated duties to USCIS pursuant to DHS Management Directive MD 0150.1. DHS also has promulgated regulations that permit the collection and

---

[17] Pub. L. No.107-296, 116 Stat. 2135 (2002), 6 U.S.C. § 112.
[18] 8 U.S.C. § 1101 (2004) *et seq*.



processing of applications, petitions, and requests online entitled, "Immigration Benefits Business Transformation, Increment I;[19]" and "Immigration Benefits Business Transformation, Increment I; Correction.[20]"

The Government Paperwork Elimination Act (GPEA)[21] provides that, when possible, federal agencies should use electronic forms, electronic filing, and electronic submissions to conduct agency business with the public. GPEA establishes the criteria and guidelines for the use of electronic signatures. Executive Order 13571[22] requires federal agencies to develop plans to streamline delivery of services and improve customer service by exploring lower-cost, self-service options accessed by the Internet or mobile phone, and improved processes that deliver services faster and more responsively, reducing the overall need for customer inquiries and complaints.

### 1.2 What Privacy Act System of Records Notice(s) (SORN(s)) apply to the information?

The following SORNs cover USCIS ELIS:

- DHS/USCIS-007 Benefits Information System;[23]
- DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records,[24] and
- DHS/ALL-037 E-Authentication Records System of Records.[25]

### 1.3 Has a system security plan been completed for the information system(s) supporting the project?

Yes. USCIS ELIS has been granted an Authority to Operate (ATO), which is continually being monitored under the USCIS Ongoing Authorization process. USCIS ELIS data also includes data from the USCIS Identity and Credentialing Account Management system (ICAM) and the USCIS Online Account system, also under USCIS Ongoing Authorization.

### 1.4 Does a records retention schedule approved by the National Archives and Records Administration (NARA) exist?

Yes: N1-566-11-02, (October 17, 2011) and N1-566-12-05, (April 17, 2013) cover USCIS ELIS accounts. Each immigration benefit type processed by USCIS ELIS has an additional existing retention schedule, which USCIS ELIS applies to each particular case.

---

[19] 76 FR 53764 (Aug. 29, 2011).
[20] 76 FR 73475, (Nov. 29, 2011).
[21] 44 U.S.C. § 3504 (2004).
[22] 75 FR 24339 (Apr. 27, 2011).
[23] 78 FR 20673 (Apr. 5, 2013).
[24] 78 FR 69864 (Nov. 21, 2013).
[25] 73 FR 56596 (Sept. 29, 2008).



**1.5    If the information is covered by the Paperwork Reduction Act (PRA), provide the OMB Control number and the agency number for the collection. If there are multiple forms, include a list in an appendix.**

The OMB Control number for online account setup is 1615-0122 (there is no corresponding agency number.) Each form processed by USCIS ELIS has an existing OMB control number that covers the USCIS ELIS collection. An updated list is available in Appendix A of this document.

# Section 2.0 Characterization of the Information

The following questions are intended to define the scope of the information requested and/or collected, as well as reasons for its collection.

**2.1    Identify the information the project collects, uses, disseminates, or maintains.**

USCIS ELIS collects:

- Account setup and login information including: email address, password, security questions, mobile phone number, and mobile phone carrier;

- Information that is required to adjudicate the request: This will vary for each immigration benefit type. A full account of what data is requested for each immigration benefit type can be viewed by referencing the paper forms associated with each immigration benefit type in Appendix A;

- E-signature: check-box attestation, the customer's name, Internet Protocol (IP) address from which the filing is submitted, and time/date stamp;

- Background and security check information about the customer as described below, whether the result relates to the individual, and if applicable, memoranda from adjudicators resolving the results; and

- Temporarily stores biometric images to allow proper formatting for printing.

**2.2    What are the sources of the information and how is the information collected for the project?**

The majority of information in USCIS ELIS is obtained directly from the customer or his or her Representative. Additionally, USCIS collects data from CBP TECS and USCIS BBSS in order to conduct background and security checks. USCIS ELIS also receives information from the



Department of State (DoS) Consolidated Consular Database (CCD)[26] for Immigrant Visa data when applicable. CCD data is transmitted via PCQS and its data is necessary for USCIS because CCD contains immigrant and non-immigrant visa data. USCIS employees and contractors using the system may generate data, such as notices, internal case processing notes, and decisions.

### 2.3 Does the project use information from commercial sources or publicly available data? If so, explain why and how this information is used.

No.

### 2.4 Discuss how accuracy of the data is ensured.

USCIS ELIS ensures data accuracy because the system uses data entered directly by the individual customers whenever possible. Requests filed using the USCIS Online Accounts are completed directly by the individual customers. Customers are able to overwrite and correct any information in their applications up to the point that they sign and submit the application. After it has been submitted, the customer may login to his or her account and automatically make changes that have no substantive bearing on the adjudication, such as updating an email address or other contact information. When inputting data from a paper filing, the Lockbox facilities employ quality control measures, including levels of review to prevent keying errors. In the event of an error, the customer is able to correct certain data using existing legacy correction processes, such as contacting USCIS Customer Service.

Select data submitted by the individual customers are run through the A-Number validation process to promote data integrity between USCIS ELIS and legacy USCIS systems such as the Central Index System (CIS). USCIS ELIS also enables the adjudicator to check biographical data entered by the customer (*e.g.*, name, date of birth, place of birth, gender) against data from CIS to assist the adjudicator in identifying inaccurate data supplied by the customer (or correct inaccurate data on file in legacy systems.) Finally, USCIS automatically submits data to other federal systems such as CBP TECS and USCIS BBSS to verify identity and conduct background and security checks.

### 2.5 Privacy Impact Analysis: Related to Characterization of the Information

**Privacy Risk:** Because USCIS ELIS houses multiple benefit requests that each require different information, there is a risk that customers could submit more information than necessary.

**Mitigation:** USCIS ELIS mitigates this risk in two main ways. First, the system only collects information pertaining to one request at a time, so that the customer cannot be prompted

---

[26] Department of State Consolidated Consular Database Privacy Impact Assessment (Dec. 11, 2008), *available at* http://www.state.gov/documents/organizaiton/93772.pdf.



to enter information unless it pertains to the specific benefit request on which the customer is working. Second, the user interface dynamically greys out fields that the customer should not fill out based on answers to other questions. For example, when a paper form would instruct the customer to skip a section of the form based on her answer, USCIS ELIS would "grey out" or disable the inapplicable section and present the customer only relevant sections and questions. It is possible for customers to upload more evidence than necessary because they are allowed to submit "unsolicited evidence" at any point until adjudication. This is a valuable feature to allow customers the opportunity to provide information initially forgotten or submitted incorrectly, which partially mitigates the risk that customers may opt to provide too much information. This risk cannot be fully mitigated because of the "unsolicited evidence" option.

**Privacy Risk:** Because USCIS ELIS automatically saves draft applications, there is a risk that adjudicators could later see draft information that the customer deleted or corrected before submitting his or her electronic request. This could negatively affect USCIS ELIS customers because they would not receive the same confidentiality online they receive via the paper process.

**Mitigation:** Although USCIS ELIS initially saves draft data; the customer may edit, delete, or update information when it is in draft state and the system does not keep copies of these previous iterations. When the customer submits his or her electronic request, USCIS ELIS only stores the final, signed version. Any previous version, including uploaded evidence that the customer removed before finalizing, is permanently deleted. USCIS adjudicators only receive the information that was e-signed and submitted. Similarly, if the customer begins drafting a request but never submits it (by e-signing and paying), then USCIS ELIS automatically deletes the data after 30 days, per the approved retention schedule. If the customer later files another benefit request, the adjudicator has no indication of a previous draft.

## Section 3.0 Uses of the Information

The following questions require a clear description of the project's use of information.

### 3.1    Describe how and why the project uses the information.

USCIS collects only the minimum information necessary to fulfill the following purposes:

*(1) Establish a secure online account through which to submit an application*

Information collected includes email address (used to contact customer and also as username), password (used to authenticate the user), mobile phone number for sending one-time PIN to be used as a second-factor in authenticating, and answers to security questions for future password resets;



*(2) Verify the identity of the requester*

Information collected may include A-Number, name, date of birth, place of birth, Social Security number, and other information such as date and class of admission into the United States, and mother's and father's names. These data are used to locate the customer in legacy systems;

*(3) Facilitate criminal and national security background checks*

Information collected includes name, date of birth, and country of birth for use by CBP TECS and USCIS BBSS in running background checks; physical description (eye color, hair color, height, and weight) required by BBSS; mailing address to provide to USCIS NASS for biometric appointment scheduling; and results of criminal and national security background checks from CBP TECS and USCIS BBSS for referral to FDNS as needed;

*(4) Justify eligibility for benefit requested*

Information collected includes the information collected on the applicable request along with documentation to support the request. The adjudicator uses all of this to follow existing SOPs on adjudicating the particular request; and

*(5) Authorize card production*

Information collected includes internal system indicators that record that every step of the adjudication process was followed, the adjudicator's decision and supervisory review, and the temporary storage of the applicable biometric images to allow for proper formatting. This also includes information from Pay.gov confirming that the customer paid the applicable fee and e-signature information to record that the customer attests that the information he or she put forth in the application is true.

### 3.2 Does the project use technology to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly? If so, state how DHS plans to use such results.

No.

### 3.3 Are there other components with assigned roles and responsibilities within the system?

USCIS ELIS allows read-only roles for Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP), both within DHS because of their shared immigration missions. Also, USCIS ELIS does share read-only information with the USCIS Enterprise Service Bus (ESB),[27] which may share information from USCIS ELIS with other Components via PCQS.

---

[27] DHS/USCIS/PIA-010 Person-Centric Query System (PCQS) PIA (June 22, 2007), *available at,* http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_pcq.pdf.



The majority of PCQS users are internal to USCIS. However, PCQS does grant user access to Department of State (DoS) users who have an official need for read-only access to USCIS customer data. Like CBP and ICE, DoS has a shared mission with USCIS because of its visa-issuing authority, which is part of the immigration process for many USCIS customers.

### 3.4   Privacy Impact Analysis: Related to the Uses of Information

**Privacy Risk:** There is a risk that increased availability of information that previously was only visible to one employee at a time (because it was in a paper file) could result in new, unauthorized uses of the information.

**Mitigation:** This risk is partially mitigated. USCIS will mitigate this risk three ways. First, all users of USCIS ELIS must receive role-based system training, which explains the purpose of the data and includes reminders about proper PII handling. Second, the system tracks all access and edits to customer PII, and stores that activity in back-end audit logs available to the USCIS Office of Security Investigations (OSI) for monitoring and action. Finally, USCIS ELIS employs a provisioning process that verifies every user requesting access to the system has a valid need to view data in the system.

**Privacy Risk:** By retaining data in an active, online platform, USCIS ELIS poses a risk of unauthorized exposure because the system could be attacked by an external entity.

**Mitigation:** USCIS recognizes that retaining data online makes that data potentially more available to compromise. As a result, USCIS is building into its retention schedules a timeframe after which data may be retained offline by the agency but not available online with public access. This will allow the agency to preserve records that should be maintained for their historical value but adds some security from unauthorized access of outdated accounts. This risk is also mitigated by IT security measures such as encryption of the data in transit and at risk and requiring secure, two-factor authentication for login.

## Section 4.0 Notice

The following questions seek information about the project's notice to the individual about the information collected, the right to consent to uses of said information, and the right to decline to provide information.

### 4.1   How does the project provide individuals notice prior to the collection of information? If notice is not provided, explain why not.

USCIS provides online customers with a Privacy Act statement addressing the collection of their information for the creation of an online account before any information is input by the customer. USCIS also provides a Privacy Act statement covering the particular application, petition, or request at the time of that collection. USCIS ELIS additionally sends paper and



electronic notices pertaining to the customer's request throughout the adjudication process and via this PIA. Further, USCIS provides the appropriate OMB control number and Paperwork Reduction Act Statement for each individual form type available to a customer via the USCIS Online Account prior to any data being input by the customer.

Finally, customers who are required to use IDPaaS are provided notice explaining what identity proofing is and what to expect before launching into the process. If customers are unable to pass the IDPaaS questionnaire, they are presented with instructions on how to proceed, which may be by contacting Customer Service or appearing in-person.

### 4.2     What opportunities are available for individuals to consent to uses, decline to provide information, or opt out of the project?

Once USCIS ELIS incorporates a particular immigration benefit type, all requests received for that benefit type will be processed in USCIS ELIS. While customers cannot opt to have their request processed according to a legacy process or system, they may opt to file via paper rather than electronically. If the customer opts not to provide answers to some of the information requested, the system will generally allow the customer to proceed with the request. The request, however, may take longer to adjudicate because the adjudicator may need to request the information the customer declined to submit with his or her application. If the customer declines to provide the requested information, the adjudicator may consider the request to be abandoned and deny the request or consider it abandoned.

### 4.3     <u>Privacy Impact Analysis</u>: Related to Notice

**<u>Privacy Risk:</u>** There is a risk that someone other than the USCIS customer will use the system to fraudulently obtain an immigration benefit, which could expose the legitimate customer to identity theft. This could occur without the customer knowing.

**<u>Mitigation:</u>** In order to mitigate the risk of identity theft or fraud, USCIS has existing processes that require most customers requesting an immigration benefit to provide their biometrics at an ASC, which allows for in-person identity verification. USCIS ELIS leverages this in-person identity-proofing to ensure the individual who created the online account is who he or she claims to be. For those processes that do not include an in-person identity verification, USCIS directs users to a remote identity proofing solution to confirm the user's identity according to applicable government-wide standards.



## Section 5.0 Data Retention by the project

The following questions are intended to outline how long the project retains the information after the initial collection.

### 5.1    Explain how long and for what reason the information is retained.

USCIS has drafted a series of retention schedules to cover different types of data in USCIS ELIS. Currently, two of those schedules have been finalized and signed by the Archivist. The remaining schedules are being actively worked with NARA.

The majority of customer data in USCIS ELIS is not yet covered by a finalized retention schedule, but is pending review at the National Archives. USCIS expects NARA to approve permanent retention for USCIS ELIS customer data because it replaces data that would have been in the Alien File (A-File) if filed via paper. Data includes individual customer account data of immigrants, as well as the case data pertaining to their requests. The A-file is permanently retained for historical purposes.

The approved retention schedules are as follows:

1.  **ELECTRONIC IMMIGRATION SYSTEM (USCIS ELIS) ABANDONED DRAFT ACCOUNT AND/OR DRAFT BENEFIT REQUEST DATA, N1-566-11-02, (October 17, 2011):** This schedule covers customer accounts and draft applications that customers do not submit to USCIS within a 30-day period. The schedule dictates that the data must be permanently deleted 30 days after creation of the account or initiation of a draft application.

2.  **USCIS ELECTRONIC IMMIGRATION SYSTEM (USCIS ELIS) TEMPORARY ACCOUNTS, N1-566-12-05, (April 17, 2013):** Covers internal user accounts for USCIS employees; such accounts will be deleted/destroyed 6 years after the account is terminated or when no longer needed for investigative or security purposes, whichever is later.

### 5.2    Privacy Impact Analysis: Related to Retention

There is no privacy risk to retention because USCIS records are retained permanently for their historical value, such as genealogical research, similar to the A-File.

## Section 6.0 Information Sharing

The following questions are intended to describe the scope of the project information sharing external to the Department. External sharing encompasses sharing with other federal, state and local governments, and private sector entities.

### 6.1    Is information shared outside of DHS as part of the normal agency operations? If so, identify the organization(s) and how the



**information is accessed and how it is to be used.**

USCIS ELIS information is shared outside of USCIS in a read-only state over the ESB and may be viewable by DoS via PCQS. Also, USCIS ELIS feeds data to USCIS BBSS for background checks, and BBSS uses that data as part of the record that is forwarded to the Federal Bureau of Investigations (FBI) to conduct its criminal and national security checks.[28]

### 6.2 Describe how the external sharing noted in 6.1 is compatible with the SORN noted in 1.2.

Sharing USCIS ELIS data via PCQS to DoS is compatible with the purpose of the system because the DoS mission, like USCIS, includes ensuring lawful visits and immigration to the United States as dictated by the INA. This sharing is covered by the Routine Use "I" of the DHS/USCIS-007 SORN,[29] which states that data may be shared with, "…the Department of State for the purpose of assisting in the processing of petitions or applications for benefits under the Immigration and Nationality Act, and all other immigration and nationality laws including treaties and reciprocal agreements." Sharing with the FBI is covered by Routine Use "J" of the DHS/USCIS-007 SORN,[30] which states that data may be shared with "…appropriate Federal… law enforcement… agencies… during a proceeding within the purview of the immigration and nationality laws, when DHS deems that such disclosure is necessary to carry out its functions and statutory mandates to elicit information required by DHS to carry out its functions and statutory mandates."

### 6.3 Does the project place limitations on re-dissemination?

USCIS ELIS does not share any data that would not be allowed to be re-disseminated, and does allow for re-dissemination of information only once it becomes part of the sharing partners' systems of records.

### 6.4 Describe how the project maintains a record of any disclosures outside of the Department.

BBSS and PCQS each automatically log external disclosures of information, as described in those systems' respective PIAs.[31] If external sharing is authorized, the USCIS employee who disclosed the information must record the disclosure. The employee records this by typing a note with the data shared, purpose, and date into the free-text comment field of the system.

---

[28] All DHS PIAs and SORNs are available on www.dhs.gov/privacy. Please consult the PCQS and Background Check Service SORNs for specific information about when information is shared, for what purposes, and with whom.

[29] 73 FR 56596

[30] *Id.*

[31] All DHS PIAs and SORNs are available on www.dhs.gov/privacy. Please consult the PCQS and BCS PIAs for specific information about how external disclosures are recorded.



### 6.5    Privacy Impact Analysis: Related to Information Sharing

**Privacy Risk:** There is a risk that data-sharing governance and record keeping designed for legacy paper processes, such as paper mechanisms for logging records of disclosure and physical restrictions on paper file sharing, might not translate to the electronic environment.

**Mitigation:** USCIS is mitigating this risk by working cooperatively with NARA and its records office to address recordkeeping changes as new benefit types are incorporated into the system. Updates are regularly briefed out to the highest level of the USCIS ELIS governance boards, which include USCIS Privacy. To date, recordkeeping issues have not arisen but a continuous review process continues. As the system is expanded to cover a larger percentage of overall customers, USCIS will increase data sharing incrementally so that processes for governance and recordkeeping can be adjusted on a specific basis and documented more formally. Significant updates will be referenced as appropriate in either an updated PIA or an appendix to this PIA.

## Section 7.0 Redress

The following questions seek information about processes in place for individuals to seek redress which may include access to records about themselves, ensuring the accuracy of the information collected about them, and/or filing complaints.

### 7.1    What are the procedures that allow individuals to access their information?

USCIS ELIS provides USCIS customers the opportunity to access their information online by logging in to their account. The information they access includes a copy of the application they submitted, any notices or notifications generated by USCIS, and information about the status of their application. Certain information generated by USCIS as part of a criminal or security check is not automatically accessible by the customer. This information is exempt from access under 5 U.S.C. § 552a(k)(2) of the Privacy Act.[32]

An individual may also gain access to his or her USCIS records by filing a Privacy Act or Freedom of Information Act (FOIA) request. If an individual would like to file a Privacy Act or FOIA request to view his or her USCIS record the request can be mailed to the following address:

National Records Center
Freedom of Information Act/Privacy Act Program
P. O. Box 648010
Lee's Summit, MO 64064-8010

---

[32] 76 FR 70638 (Nov. 15, 2011).

**AR2022_301192**



The information requested may, however, be exempt from access under the Privacy Act because records related to fraud, with respect to an individual, may sometimes contain law enforcement sensitive information. The release of law enforcement sensitive information could possibly compromise ongoing criminal investigations. Further information for Privacy Act and FOIA requests for USCIS records can also be found at http://www.uscis.gov.

### 7.2   What procedures are in place to allow the subject individual to correct inaccurate or erroneous information?

USCIS ELIS allows a customer to overwrite and correct any information in his or her application up to the point that he or she e-signs and submits the application. After it has been submitted, the customer may log in to his or her account and automatically make changes that have no substantive bearing on the adjudication, such as change in email address or contact information. If the customer wants to correct inaccurate information while the benefit is being adjudicated, he or she may submit the request in writing and upload the request into USCIS ELIS as unsolicited evidence or by mail. It is the adjudicator's decision to incorporate that corrected information, depending on the timing and validity of the information. For corrections after the application has been adjudicated, the customer would use the existing correction processes employed by USCIS, depending on the type and context of the correction requested.

### 7.3   How does the project notify individuals about the procedures for correcting their information?

USCIS ELIS makes multiple notifications to the customer throughout his or her use of the system, indicating to the customer when the case is in draft, how to update contact information, and several other methods of correction. Additionally, USCIS ELIS will publish online Frequently Asked Questions that address when and how to make corrections. Finally, USCIS has a Customer Contact Center contact listed to which customers are directed if they have questions. Customers who fail to identity proof using IDPaaS will be given specific instructions on how to proceed, which may be by contacting Customer Service or appearing in-person.

### 7.4   <u>Privacy Impact Analysis</u>: Related to Redress

**Privacy Risk:** There is a risk that the customer may be unable to correct certain data, such as name and date of birth, after the application is submitted.

**Mitigation:** Making changes to certain essential information such as name or date of birth would require a new criminal and security check, as well as a new attestation of the accuracy of the data submitted. Therefore, the system cannot allow the customer to automatically update this important information once the adjudication process has started. USCIS does mitigate this risk by allowing the adjudicator to consider written requests to change this information, or an in-person appointment, at his or her discretion within established SOPs. The risk that a customer is unable



to correct an error he or she generated is mitigated by the USCIS data quality and integrity procedures within the adjudication process.

**Privacy Risk:** There is a risk that customers may be unable to access, correct, or amend their records because the systems used for criminal and national security background checks are exempt from the Privacy Act.

**Mitigation:** Due to the sensitive nature of criminal and national security background checks, customers are not provided with direct access to such records. For many lines of business, the customer has a formal appeals process through legacy processes for challenging decisions that they believe to be unfair or based on incorrect information.

## Section 8.0 Auditing and Accountability

The following questions are intended to describe technical and policy based safeguards and security measures.

### 8.1 How does the project ensure that the information is used in accordance with stated practices in this PIA?

USCIS ELIS has a sophisticated role-based user access for operational users as well as read-only users. These include roles that separate duties for operators to ensure appropriate oversight of the adjudication, as well as two levels of read-only roles to protect more sensitive data about a customer from being accessible to internal users who only have a need for some of their data. Additionally, USCIS ELIS captures all user activity, including information changed as well as viewed, in audit logs, which are reviewed by USCIS OSI.

### 8.2 Describe what privacy training is provided to users either generally or specifically relevant to the project.

USCIS trains each USCIS ELIS user on proper handling of PII as well as appropriate use of data according to each role. Additionally, all USCIS employees receive privacy and security training annually.

### 8.3 What procedures are in place to determine which users may access the information and how does the project determine who has access?

USCIS ELIS has several levels of operator roles as well as two levels of read-only roles. The operator roles are only available to individuals trained and currently occupying specific jobs within USCIS, and their supervisors are required to certify that their official duties align with the role before it is granted to those individuals. Likewise, USCIS will default to assigning the lower-



level of read-only to users requesting that access, unless they certify with supervisor confirmation that they need to know certain sensitive data about customers as part of their routine official duties.

### 8.4 How does the project review and approve information sharing agreements, MOUs, new uses of the information, new access to the system by organizations within DHS and outside?

USCIS ELIS data would be subject to the USCIS formal review process for any data sharing agreements. That process includes, at a minimum, review by the Privacy Office, Counsel, and program officials entrusted with security of the data.

## Responsible Officials

Donald Hawkins
Privacy Officer, U.S. Citizenship and Immigration Services
Department of Homeland Security

## Approval Signature

Original, signed copy on file with the DHS Privacy Office.

_____

Karen L. Neuman
Chief Privacy Officer
Department of Homeland Security



# Appendix A

**Immigration Benefit Types Processed in USCIS ELIS**

| Name of Immigration Benefit Type | Associated Forms and/or Collections | Paper Filings | Online Filings |
|---|---|---|---|
| Replacement of Permanent Resident Card | I-90, G-28 | X | X |
| Deferred Action for Childhood Arrivals | I-821D, I-765, I-765WS, G-28 | X | |
| USCIS Immigrant Fee | OMB Control Number 1615-0122 (not a form), DoS Immigrant Visa Packet (includes data from DS-260 and I-864) | | X |
| Application for Naturalization | N-400, G-28, I-942 | X | X |
| Temporary Protected Status | I-821, I-765, I-131, G-28 | X | |
| Application for Permission to Re-apply for Admission into the U.S. After Deportation or Removal | I-212 | X | X |
| Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) | N-336 | X | X |
| Application for Replacement Naturalization/Citizenship Document | N-565 | X | X |

**Homeland Security**

# APPENDIX B

**Mobile Application and Device Use During USCIS-Conducted In-Person Interviews**

*May 11, 2016*

**Summary:**

As part of an immigration request, USCIS adjudicators may interview a customer if required to complete the adjudication. During in-person interviews for cases in USCIS ELIS only, USCIS adjudicators may use a mobile device equipped with a mobile application developed by and available only to USCIS. At the time of such interaction, USCIS adjudicators may corroborate information declared by the customer on a USCIS-issued form (*e.g.*, spelling of a name), collect new information (*e.g.*, signature), and collect and verify responses provided by the individual at the time of the in-person interaction. The customer will have access to the original submission when they establish a USCIS online account. The mobile device may also be used to capture and record the officer's and applicant's required signatures.

The mobile device will be physically connected to and communicate directly to USCIS ELIS through a USCIS computer. All data, including any personally identifiable information (PII), will be transmitted through a secured encryption method to ensure that the data is protected.

**Data Elements:**

The mobile device and application will not store any collected or presented information, but will serve as a screen of USCIS ELIS information through which the individual:

- Review biographical information;

- Review and verify any changes to information on the submitted USCIS form;

- Provide responses to any questions related to the in-person interview;

- Provide signature when required; and

- Certify that any revisions or changes to the information on the USCIS form are true and correct.

The USCIS adjudicator will follow current processes to verify identity of individuals at an in-person interview or examination.

**Population:**

Any individual participating in an in-person interaction, such as an interview, with USCIS for which the form being reviewed is in USCIS ELIS.

**Privacy Risk:** There is risk that individuals do not receive notice prior to USCIS collection of information via the mobile application.

AR2022_301197



**Mitigation:** USCIS is not collecting information through a mobile device or application. USCIS is using this technology to facilitate the interview process by verifying a customer's submission to USCIS and changes made during the interview. This technology only presents to the customer the information already collected by USCIS directly from the customer. The customer will have notice of their information submitted into USCIS ELIS when they create a USCIS online account and opt to access the original submission to USCIS.

**Privacy Risk:** There is risk that information collected by the mobile application will not be submitted securely back to USCIS ELIS.

**Mitigation:** USCIS developed the mobile application to serve as screens for individuals at an in-person interview or examination and is used for USCIS internal use only. It will not be available in any commercial mobile device application store. The application will not cache or store any PII on the device. The mobile application will serve as a conduit for USCIS ELIS, and allow customers to review information and responses to questions contained in previously submitted USCIS applications, petitions, or request forms. This mobile application will transmit the information through a low-level Transmission Control Protocol/Internet Protocol (TCP/IP) over a Universal Serial Bus (USB) protocol to a "local host" (i.e., USCIS ELIS communication software installed on the adjudicator's computer). Removing the mobile device from a computer or connecting to any computer other than the designated USCIS computer will make the mobile application inoperable.

All communication functions, to include global positioning system (GPS) and cellular that are not needed for the USCIS mobile application to function, are disabled from the mobile device. Hardware functions that are not required for using the USCIS mobile application, such as the application marketplace, are also disabled. The mobile device will run in single application or a remote kiosk mode that will prevent USCIS adjudicators or customers from going to the device home page or successfully accessing other functions. USCIS-internal Wi-Fi connection may be temporarily enabled for finite periods of time only to update the mobile application. Designated administrators will be able to access device settings and perform updates using a key or passcode.

**AR2022_301198**



Privacy Impact Assessment Update
for the

# Computer Linked Application Information Management System (CLAIMS 3) and Associated Systems

### DHS/USCIS/PIA-016(a)

### March 25, 2016

**<u>Contact Point</u>**
**Donald K. Hawkins**
**Privacy Officer**
**U.S. Citizenship and Immigration Services**
**(202) 272-8030**

**<u>Reviewing Official</u>**
**Karen L. Neuman**
**Chief Privacy Officer**
**Department of Homeland Security**
**(202) 343-1717**

AR2022_301199



## Abstract

U.S. Citizenship and Immigration Services (USCIS) oversees lawful immigration to the United States and is responsible for processing petitions, applications, and other requests for immigration benefits. USCIS uses the Computer Linked Application Information Management System (CLAIMS 3) and associated systems to manage the adjudication process for most domestically-filed, paper-based, immigration benefit filings with the exception of naturalization, intercountry adoption, and certain requests for asylum and refugee status. USCIS is updating this Privacy Impact Assessment (PIA) to evaluate the privacy risks and mitigations associated with the collection, use, and maintenance of personally identifiable information (PII) provided by individuals seeking requested immigration related benefits.

## Overview

U.S. Citizenship and Immigration Services (USCIS) receives and adjudicates petitions, applications, and other requests (hereinafter referred to as "benefit requests") for many United States immigration benefits. This PIA covers the adjudication process and USCIS case management systems for most domestically-filed, paper-based, immigration benefit filings with the exception of naturalization, intercountry adoption, and certain requests[1] for asylum and refugee status. USCIS uses different data systems to capture and store information provided by benefit requestors, including the Computer Linked Application Information Management System (CLAIMS 3), the Interim Case Management System (ICMS), and Marriage Fraud Amendment System (MFAS), collectively referred to as "CLAIMS 3 and associated systems."

USCIS processes different benefit requests using different case management systems, sub-systems, tracking tools, and data aggregation tools for reporting. This process creates duplicate records and data integrity concerns. USCIS is slowly transitioning benefit request processing to the USCIS Electronic Immigration System (USCIS ELIS), which will alleviate some of these data integrity and data minimization risks.

At a very high level, CLAIMS 3 and associated systems are old, legacy, mainframe systems that do not have the capability to interface in real-time with other systems or to generate reports, metrics, or aggregated statistics. But CLAIMS 3 still serves as the authoritative source case management system for certain benefit requests because so many other tools and systems point to it.

---

[1] The "certain requests" for refugee and asylum benefits include the "follow to join" petition (Form I-730). "Follow to join" is an option offered to family members of the principal beneficiaries of approved asylum and refugee status. Immediate family members (spouses and children under the age of 21) may qualify for derivative status. An individual who entered the United States and was granted asylum/refugee status within the past two years may petition to have his or her spouse and/or unmarried children "follow-to-join" him or her in the United Sates and obtain derivative status. The derivatives may be in the United States or outside the United States.



Data from CLAIMS 3 is replicated across many systems and tools within USCIS due to the technical limitations of CLAIMS 3 itself. Therefore, this PIA focuses on documenting all of the tools and interfaces that rely on CLAIMS 3. As detailed throughout this PIA, this business process has generated data integrity and data minimization concerns.

The three case management systems used to track and process paper-based benefit request forms other than naturalization, intercountry adoption, and certain asylum and refugee benefits include:

- **CLAIMS 3** is the case management system that supports and maintains officer casework documentation and tracking for most benefit requests. CLAIMS 3 functionalities include tracking the adjudication performed by USCIS personnel, archiving, card production, case history, case transfer, on-demand reports, electronic file tracking, image capture, production statistics, and status update and electronic ingestion of benefit request form data captured through the Lockbox.[2]

- **ICMS** is a web-based front-end to CLAIMS 3. ICMS can be used to review, modify, and track the adjudication performed by USCIS personnel of benefit request forms.

- **Marriage Fraud Amendment System (MFAS)** is a legacy mainframe case tracking system designed to supplement the adjudication of petitions covered by the Immigration Marriage Fraud Act of 1986 (IMFA).[3] Contrary to the name of the system, MFAS supports and maintains casework for petitions for Legal Permanent Residency by aliens who have previously been granted Conditional Permanent Residency under the terms of the IMFA, including entrepreneurs. MFAS facilitates the adjudication and notification process for this program.

When a petition to remove the terms of conditional permanent residency is received, USCIS accepts the fee and issues a receipt in CLAIMS 3, which then interfaces with MFAS to update the case with the information that a petition has been received. When a final decision on the case is made in MFAS and a notice is issued, the CLAIMS 3 history data for the case is updated to reflect the decision. Once the case has been receipted in CLAIMS 3 and MFAS has been updated with the receipt information, the case is locked in CLAIMS 3 and can be updated only in MFAS.

---

[2] In general, a Lockbox is a post office box used by USCIS to accelerate the collection of receivables. The USCIS Lockbox is used to accept applications and petitions by electronically capturing data and images from benefit request forms and by performing fee receipting and fee deposit. *See* DHS/USCIS/PIA-061 USCIS Benefit Intake and Receipt Intake, *available at* www.dhs.gov/privacy.

[3] *See* Public Law 99-639, which was passed in order to deter immigration-related marriage fraud. Its major provision stipulates that aliens deriving their immigrant status based on a marriage of less than two years are conditional immigrants. To remove their conditional status, the immigrants must apply at an USCIS Office during the 90-day period before their second-year anniversary of receiving conditional status. If the aliens cannot show that the marriage through which the status was obtained was and is a valid one, their conditional immigrant status may be terminated and they may become deportable.

**AR2022_301201**



All information maintained by CLAIMS 3 and associated systems is also replicated in the Enterprise Citizenship and Immigrations Services Centralized Operational Repository (eCISCOR) for reporting, statistical analysis, and adjudicatory purposes[4] that CLAIMS 3 and associated systems are unable to perform.

Using a data repository such as eCISCOR protects CLAIMS 3 and associated systems from undue resource strain. eCISCOR transfers data from nearly all USCIS live transactional systems. Due to the age of many legacy USCIS live transactional systems, and the high volume of cases they process, USCIS requires eCISCOR (and other backend storage systems) to reduce the labor and system strain involved in accessing, reporting, and sharing information between USCIS systems.

*Preliminary Review of Application:*

As described in the Benefit Request Intake Process PIA, when a benefit requestor,[5] accredited representative,[6] or legal representative[7] (hereafter collectively referred to as legal representative) submits a form to USCIS, USCIS preliminarily reviews the form for completeness.[8] As part of the preliminary review, USCIS assigns the benefit requestor or beneficiary[9] an Alien Number (A-Number)[10] or matches the request with an existing A-Number (if applicable),[11] assigns the application a Receipt Number,[12] and forwards the benefit request form, to be consolidated in the Alien File (A-File)[13] or Receipt File,[14] to the appropriate USCIS office for adjudication.

---

[4] *See* DHS/USCIS/PIA-023(a) Enterprise Citizenship and Immigrations Services Centralized Operational Repository (eCISCOR), *available at* www.dhs.gov/privacy.

[5] Individuals who have filed for immigration benefits for themselves are collectively referred to as benefit requestors.

[6] A person who is approved by the Board of Immigration Appeals (the Board) to represent aliens before the Immigration Courts, the BIA and USCIS. He or she must work for a specific nonprofit, religious, charitable, social service, or similar organization. The organization must be authorized by the Board to represent aliens.

[7] An attorney or a BIA-accredited representative can represent a benefit requestor before USCIS, as a legal representative with an approved G-28, Notice of Entry of Appearance as Attorney or Accredited Representative on file.

[8] *See* DHS/USCIS/PIA-061 Benefit Request Intake Process PIA (March 16, 2016), *available at* www.dhs.gov/privacy.

[9] An alien who is sponsored by a relative or a business, or has self-petitioned for an immigration benefit.

[10] The Alien Number is a unique seven-, eight- or nine-digit number assigned to a noncitizen at the time his or her A-File is created.

[11] As a general matter, USCIS does not create an Alien Number on a native born U.S Citizen. However, in the event that a person (native born or naturalized) decides that he or she does not want to be a U.S. citizen, he or she may formally renounce his or her citizenship through Department of State (DOS). DOS sends a Certificate of Loss of Nationality to USCIS to be filed in an A-File for this purpose. In such circumstance an A-File will be created.

[12] The receipt number is a unique 13-character identifier that USCIS provides for each application or petition it receives. The agency uses it to identify and track its cases. The receipt number consists of three letters-for example, EAC, WAC, LIN, SRC, NBC, MSC, YSC, AAO, or IOE-and 10 numbers.

[13] An A-File is a paper or electronic-based file that contains official immigration records of aliens or persons who are not citizens or nationals of the United States, as well as U.S. born citizens involved in certain immigration crimes. A-Files contain all records pertaining to naturalized citizens and any active case of an alien not yet naturalized, including records created as he or she passes through the U.S. immigration and inspection process and, when applicable, records related to any law enforcement action against or involving the alien.

[14] Receipt Files are files of immigrant and nonimmigrant benefit filings that USCIS receives. While the Receipt Files and



CLAIMS 3 manages many types of benefit request forms, each with its own unique eligibility requirements and required data elements.[15] USCIS personnel review the benefit request package (to include the form and supplemental evidence) and enter relevant and necessary information from the benefit request form into CLAIMS 3, including the A-Number. CLAIMS 3 is configured to collect certain data elements based on the benefit being sought for adjudicative tracking and case management purposes.

When a new case is created in CLAIMS 3, the system electronically sends A-Numbers to the Central Index System (CIS) to either create a record or update an existing record.[16] The purpose of CIS is to provide a searchable central index of A-Files and to support the location and transfer of A-Files among DHS personnel and offices as needed in support of immigration benefits and enforcement actions. CIS helps ascertain an individual's current immigration status and prior status. CIS returns information associated with the A-Number, including name, date of birth, and country of birth for verification purposes. CLAIMS 3 also interfaces with the National File Tracking System (NFTS), which is an automated file-tracking system used to maintain an accurate file inventory and track the physical location of files (i.e., A-Files and Receipt Files), to share file location information about newly receipted applications, and to electronically input the A-Number, Receipt Number, and File Control Office (FCO) to the NFTS.[17]

When a user requires the A-File, the user goes to CIS and requests the file. CIS has a direct interface with NFTS, and receives the following information from it on the applicant: full name, the primary tracking number A-Number) and date of birth. NFTS maintains this information in order to control the inventory of all files, query the file location, manage the request and transfer of files between offices and to/from the FCOs, provide reports to support management and cleanup efforts, and gather statistical information to improve the records processes. NFTS does not store a digitized copy or the entire content of the immigration files. When the FCO receives the request for the A-File, the A-number and the person's full name and date of birth are printed on the pull ticket so that the FCO can verify the correct A-File is being pulled. When a user requires any file other than the A-File, he or she must go into NFTS directly and using the primary tracker number, submit a request for the File. The pull ticket only has the primary tracker number and no other information.

---

supporting documentation are eventually consolidated into an A-File, Receipt Files allows USCIS adjudicators to begin processing cases in a quick and efficient manner.

[15] *See* Appendix A for a full list of benefit request forms processed by CLAIMS 3.

[16] *See* DHS/USCIS/PIA-009 Central Index System (CIS), *available at* www.dhs.gov/privacy.

[17] *See* DHS/USCIS/PIA-032 NFTS, *available at* www.dhs.gov/privacy.



*Case Processing*

Each USCIS regional field office is responsible for reviewing benefit request forms under its jurisdiction and may identify cases ready for adjudicative review either manually or electronically. Each Service Center has developed tools and methods that use CLAIMS 3 data to separately manage and prioritize cases. See Appendix B for a complete description of these tools and methods.

As noted above, USCIS uses CLAIMS 3, which contains information provided by the individual on the benefit request form, to process and adjudicate benefit request forms. Information from the benefit request forms may vary depending on the benefit request sought by the individual. Additionally, USCIS records adjudicative steps that have been completed in CLAIMS 3, such as appointments to submit biometrics, other benefit request receipts pending with USCIS, the issuance of a notice, and a flag indicating suspected fraudulent activity or referral to Fraud Detection and National Security (FDNS) Directorate.

USCIS personnel review all case-related information provided by the benefit requestor or his or her representative, including supplementary evidence and review the A-File (if available) to verify the identity and benefit eligibility of the benefit requestor. In limited circumstances, USCIS may use other systems to automate the case processing and adjudication for certain benefit requests (based on the service center location or form type). The system evaluates each case to determine if it meets all eligibility criteria.[18] Cases that meet the criteria are batched for quality review by USCIS personnel prior to noting approval in CLAIMS 3. Cases that do not meet the eligibility criteria are batched for manual officer adjudication. See Appendix C for a complete description of the systems used to support automated adjudication.

*A-File Review, if applicable*

USCIS personnel may retrieve and review an individual's physical or electronic A-File (via the Enterprise Document Management System (EDMS)) when adjudicating a benefit request form.[19] USCIS

---

[18] USCIS uses CasePro (*See* DHS/USCIS/PIA-040 CasePro *available at* www.dhs.gov/privacy) and System Electronic Registration Approval (SERA) (*See* DHS/USCIS/PIA-058 SERA, *available at* www.dhs.gov/privacy.) to automate the processing of Temporary Protected Status (SERA Only), Deferred Action for Childhood Arrivals (DACA), and Deferred Enforced Departure (DED) filings. Benefit requestors submit these filings within a select and short filing period.

During the filing period, the Vermont Service Center (VSC) or California Service Center (CSC) may experience a significant increase of filings causing processing delays. The manual adjudication of these benefits are time-consuming, and limited the number of cases an adjudicator is able to complete on a daily basis. Through automated processing, both CasePro and SERA streamline the adjudication process for the aforementioned filings and significantly reducing the case processing times.

[19] EDMS is a web-based system that allows authorized users to view and search electronic copies of the paper-based case files.
Prior to the implementation of EDMS, USCIS manually provided case files to the USCIS, ICE, or CBP in need of the file. USCIS developed EDMS to facilitate efficient information sharing. *See* DHS/USCIS/PIA-003(a) Integrated Digitization Document Management Program (IDDMP), *available at* www.dhs.gov/privacy.



personnel may consolidate the form, supporting documentation, and any other case information into the individual's A-File. USCIS personnel may also use the A-File to determine if the benefit requestor or beneficiary has had prior involvement with USCIS or any other DHS Components, such as U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) which also contribute to and manage A-File content.[20] This review may provide information relevant to establishing eligibility for the immigration benefit being sought.

***Supporting Documentation and Notices***

USCIS requires supporting documentation (submitted by the requestor) as initial evidence of a benefit requestor's identification and eligibility for a benefit. Examples of supporting documentation include: copies of civil documents such as birth, marriage, or adoption certificates; divorce decrees; affidavits of financial support; criminal records; and school records. Certain forms require individuals to provide credible evidence establishing a relationship between the benefit requestor and beneficiary.[21]

If a benefit requestor or beneficiary fails to submit evidence or provides insufficient evidence to establish eligibility, USCIS will use the information stored in CLAIMS 3 to issue a Request for Evidence (RFE)[22] or Notice of Intent to Deny (NOID)[23] for continued processing. USCIS personnel use a correspondence generator tool to create and store most correspondence, including RFEs and NOIDs. These correspondence generator tools create RFEs and NOIDs using pre-defined templates and standard text.[24] In order to generate notices, USCIS personnel manually enter data into the correspondence generator tool or the tool receives information directly from CLAIMS 3 or eCISCOR. USCIS sends the notices directly to the benefit requestor and/or her or his representative with instructions on how to respond. If a Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative*, is on file with USCIS, then USCIS sends copies of the notices to legal representatives. If the benefit requestor

---

[20] When a foreign citizen enters the United States legally or illegally, USCIS, ICE, or CBP assigns the individual an A-number. In the event that an individual was inadvertently issued more than one A-Number, USCIS lists all A-Numbers in his or her CIS record. USCIS consolidates all A-Numbers in CIS by identifying primary and secondary A-Numbers. A primary A-Number is the number currently assigned to the surviving physical paper file and it the first number listed in CIS. Secondary A-Numbers are those that been consolidated into the primary A-Number, and are listed below the primary number.

[21] For example, Form I-730. Certain petitions allow individuals to petition on behalf of family members (children and spouses). To prove a child-parent relationship, a birth certificate maybe required. Evidence of any legal change must also be submitted if the names on the birth certificate do not match the names on the petition.

[22] USCIS uses an RFE when an application lacks required documentation or the adjudicator needs additional evidence to determine an applicant's eligibility for the benefit sought. The request will indicate what evidence or information USCIS needs to fully evaluate the application or petition under review.

[23] A NOID is a formal statement from USCIS that it has determined that the applicant is ineligible for the immigrant benefit requested. The issuance of a NOID is required when derogatory information is uncovered during the course of the adjudication that is not known to the individual, according to 8 CFR § 103.2(b)(16). However, USCIS will grant the applicant an opportunity to overcome this determination and demonstrate that he or she is eligible.

[24] *See* the forthcoming USCIS Benefit Decision and Output PIA for more information, *available at* www.dhs.gov/privacy.



or legal representative does not respond to the RFE or NOID by the required date set by USCIS, USCIS may deny the benefit request.[25]

### Screening (Background, Identity, and Security Checks)

All individuals submitting benefit requests are subject to background, identity, and security checks to ensure eligibility for the requested benefit and to ensure that they do not pose a threat to public safety or to the national security of the United States.[26] USCIS conducts background, identity, and security checks as part of case processing. USCIS requires benefit requestors and beneficiaries for certain immigration benefits to submit their biometrics along with biographic information provided in the benefit request to USCIS for background, identity, and security checks.

Once USCIS receives the completed benefit request form, USCIS schedules individuals to be fingerprinted and have their photograph taken at an Application Support Center (ASC). USCIS uses the National Appointment Scheduling System (NASS) to schedule appointments for fingerprinting at an ASC. USCIS personnel may schedule appointments automatically or manually.[27] NASS automatically generates appointments on a weekly basis through an interconnection with CLAIMS 3. USCIS personnel may manually expedite the process by requesting an appointment for certain benefit requestors directly in NASS.

USCIS collects biometric data at an authorized biometric capture site, including USCIS offices and ASC. At the biometric collection site, USCIS electronically captures the benefit requestor's fingerprints and related biographic data required to verify the individual's identity and to ensure that the correct biographic information is associated with the captured biometrics. Biometric data is captured in Customer Profile Management System (CPMS), which is the centralized source of biometric images used for USCIS benefit card and document production.[28] Biometric and biographic data are also sent from the respective USCIS case management system to the print production systems, where a card is produced. For CLAIMS 3, an individual's photograph, signature, and fingerprints are digitally sent to and stored in the Biometric Retrieval Utility (BRU), which is a subsystem of CLAIMS 3, and is used for card production purposes.

USCIS manually enters background and security check results into CLAIMS 3 with the exception of the results of Federal Bureau of Investigation (FBI) fingerprint checks.[29] This information includes:

---

[25] Generally, the standard maximum response time is 12 weeks (84 days). Adjudicators, in their discretion, may reduce the standard response time only after obtaining supervisory concurrence. This discretion may be used on a case-by-case basis when warranted by circumstances as determined by the adjudicators and the supervisor.

[26] *See* DHS/USCIS/PIA-033 Immigration Benefits Background Check Systems (IBBCS) and DHS/USCIS/PIA-060 Customer Profile Management System, *available at* www.dhs.gov/privacy.

[27] *See* DHS/USCIS/PIA-057 NASS, *available at* www.dhs.gov/privacy.

[28] *See* DHS/USCIS/PIA-060 Customer Profile Management Service *available at* www.dhs.gov/privacy.

[29] USCIS conducts both biometric and biographic background, identity, and security checks by querying a number of USCIS, DHS, and other U.S. Government systems. These checks allow USCIS to determine if the individual is who he or



the source and date of the background check, the return of any unclassified derogatory results and whether the results were resolved, and the expiration date of the results. All background, identity, and security check results are either initiated through manual or electronic processes outside of CLAIMS 3.[30] A summary of the background, identity, and security check may also be printed and stored in an A-File, but is not stored in CLAIMS 3.

Information from benefit request forms maintained in CLAIMS 3 may also be referred to the FDNS Directorate, through manual or automated referral processes for screening and for investigation of fraud, public safety, and/or national security concerns. The DHS/USCIS/PIA-013-01 FDNS and DHS/USCIS/PIA-013 FDNS-DS PIAs provide an in-depth discussion of the FDNS Directorate and automated screening evaluating the privacy risks and mitigation strategies built into each process.[31]

*Interview*

USCIS conducts interviews for certain benefit requests as part of the benefit adjudication process. A benefit requestor or beneficiary may be required to appear for an interview at a domestic Field Office. Adjustment of Status (AOS) Scheduler, a CLAIMS 3 subsystem, is used to schedule interview appointments, to track the date and status of interview appointments, and to generate interview notices.[32] AOS Scheduler stores the date, time, location, status of interview, and notice sent date. USCIS personnel mail the Interview Notice to the benefit requestor and, if applicable, his or her legal representative. Interview information is also added to the A-File, as required by case adjudication Standard Operating Procedures (SOPs).

All individuals who arrive at a USCIS Field Office for an interview are biometrically verified via photographs and two fingerprints (2-print) verification. USCIS uses a verification tool called Identity Verification Tool (IVT).[33] IVT allows USCIS Field Offices to compare an individual's biometric (fingerprint and photograph) and biographic information to information previously captured at an ASC, ensuring that the person who appeared at the ASC is the same person appearing at the USCIS Field Office.

---

she purports to be, as well as whether there are any criminal or national security-related issues associated with the benefit requestor or beneficiary that may adversely affect his or her eligibility for the requested immigration benefits.

[30] FD-258 MF, a CLAIMS 3 subsystem, maintains information on individual applicants' fingerprint status. Each record contains applicant information that was sent to the FBI, such as name, date of birth, and other biographical data, as well as date fingerprinted and date sent to FBI. The records also contain other information received from the FBI such as FBI process date and FBI search results.

[31] *See* DHS/USCIS/PIA-013-01 Fraud Detection and National Security Directorate (FDNS) and DHS/USCIS/PIA-013 Fraud Detection and National Security Data System (FDNS-DS), *available at* www.dhs.gov/privacy.

[32] In the future, USCIS plans to update NASS to schedule interviews for CLAIMS 3. NASS is currently limited to scheduling appointments for biometric appointments and the system is being developed in phases to ensure the system sufficiently works. USCIS plans to expand NASS to schedule interview and other appointments until then legacy AOS is used.

[33] *See* DHS/USCIS/PIA-060 Customer Profile Management System, *available at* www.dhs.gov/privacy.



During the course of the interview, USCIS Field Officers may use web cameras to digitally record immigration interviews.[34] The recordings are temporarily recorded on a workstation and then converted onto an encrypted digital optical disc storage (i.e., DVD). Once copied, the recordings are permanently erased from the workstation. The digital disc with recorded immigration interviews is then stored in the related A-File.

**_Decision Case Action_**

After all the steps discussed above are complete, USCIS personnel make a final determination on the benefit request. USCIS personnel may grant, deny, or revoke an immigration benefit. USCIS personnel may also allow the benefit requestor or beneficiary to withdraw his or her request for the benefit. In certain circumstances, a benefit request may also be administratively closed. Case decision actions are tracked and recorded in CLAIMS 3.

Following an adjudication decision, USCIS uses various tools to generate correspondence and print documents. This process is further detailed in the forthcoming USCIS Benefit Decision and Output PIA.[35]

### _Post-Decision Reporting_

USCIS uses the information contained in CLAIMS 3 to generate a number of statistical reports to measure and evaluate workload for proper resource allocation. CLAIMS 3 interfaces with the Standard Management Analysis and Reporting Tool (SMART) (which pulls information from eCISCOR[36]) to create customizable reports for a variety of purposes.[37] SMART uses CLAIMS 3 data to generate reports to identify pending cases and to measure productivity trends and average processing times. USCIS also generates granular level reports to identify types, number, and status of cases located in a particular office or assigned to a particular USCIS staff member, which allows supervisors to identify the oldest cases in queue for processing.

---

[34] 8 C.F.R. § 335.2 (c) states that USCIS officer's conducting an examination of the applicant for naturalization may have a videotaped transcript of the interview made, and the applicant and the Agency shall have the right to present such documentary evidence as may be required for a full and true disclosure of the facts. The recordings provide a complete record of the proceedings, which, in certain instances, may lead to enhanced detection of fraud and national security issues.

[35] _See_ the forthcoming USCIS Benefit Decision and Output PIA, _available at_ www.dhs.gov/privacy.

[36] _See_ DHS/USCIS/PIA-023(a) eCISCOR, _available at_ www.dhs.gov/privacy.

[37] _See_ DHS/USCIS/PIA-050 Standard Management Analysis Reporting Tool (SMART), _available at_ www.dhs.gov/privacy.

AR2022_301208



## Section 1.0 Authorities and Other Requirements

### 1.1 What specific legal authorities and/or agreements permit and define the collection of information by the project in question?

Section 103 of the Immigration and Nationality Act (INA) provides the legal authority for this system.[38]

### 1.2 What Privacy Act System of Records Notice(s) (SORN(s)) apply to the information?

The following SORNs cover the collection, maintenance, and use of the information contained in CLAIMS 3 and associated systems:

- Alien File, Index, and National File Tracking System[39] covers the collection, use, and maintenance of applications and supplemental evidence, in addition to other information related to the individual as he or she passes through the immigration process;
- Background Check Service[40] covers background checks and their results; and
- Benefits Information System[41] covers the collection and use of immigrant and non-immigrant benefit applications, decisional data, and associated fees for adjudication.

### 1.3 Has a system security plan been completed for the information system(s) supporting the project?

CLAIMS 3, includes the Mainframe, Local Application Network (LAN), ICMS, and MFAS. The CLAIMS 3 LAN, including ICMS and MFAS as subsystems and CLAIMS 3 Mainframe (MF) Security Plans were completed on September 3, 2015 and October 14, 2015, respectively. The CLAIMS 3 LAN and MF Authority to Operate (ATO) are pending the publication of this PIA. CLAIMS 3 LAN and MF will enter into the Ongoing Authorization program, upon completion of this PIA. Ongoing Authorization requires CLAIMS 3 LAN and MF to be reviewed on a monthly basis and to maintain its security posture in order to retain its ATO.

All minor subsystems for CLAIMS 3 and associated systems are listed in Appendix D.

---

[38] 8 U.S.C. § 1103.
[39] DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, 78 FR 69864 (Nov. 21, 2013).
[40] DHS/USCIS-002 Background Check Service, 72 FR 31082 (June 5, 2007).
[41] DHS/USCIS-007 Benefits Information System, 73 FR 56596 (Sept. 29, 2008).

**AR2022_301209**



### 1.4   Does a records retention schedule approved by the National Archives and Records Administration (NARA) exist?

USCIS is working with NARA to update and consolidate the current retention schedules N1-563-04-03 and N1-566-08-12. Under the proposed update to retention schedules for CLAIMS 3, the system will delete and destroy records from 15 to 50 years from the date of the last completed action. This expanded retention schedule allows USCIS to address any follow-up inquiries or requests related to the application, including inquiries related to law enforcement, public safety, national security, and Freedom of Information Act and Privacy Act (FOIA/PA) matters.

### 1.5   If the information is covered by the Paperwork Reduction Act (PRA), provide the OMB Control number and the agency number for the collection. If there are multiple forms, include a list in an appendix.

Yes. Information collected through this process is covered by the PRA. A list of the immigration forms processed in CLAIMS 3, along with the OMB Control Numbers is available in Appendix A.

## Section 2.0 Characterization of the Information

The following questions are intended to define the scope of the information requested and/or collected, as well as reasons for its collection.

### 2.1   Identify the information the project collects, uses, disseminates, or maintains.

CLAIMS 3 and associated systems maintain information from in-process and adjudicated benefit requests. The information extracted from benefit request forms varies and not all forms collect the same information. Information in CLAIMS 3 and its associated systems may include the following data elements:

**Names:** first name, last name, middle name, and any aliases of the benefit requestor, beneficiary, or family members. USCIS also collects names from sponsors, preparers, attorneys, and designated representatives.

**Immigration Status:** e.g., Lawful Permanent Resident, U.S. citizen, or parolee, relating to the benefit requestor, beneficiary, family member and sponsor.

**Travel Information:** Immigration status upon entry into the United States, days spent outside the United States, dates of entry, port of entry,[42] immigration status expiration dates, and destination in the United States.

---

[42] Travel information is collected from the benefit request form, not from a system-to-system interface with CBP.

**AR2022_301210**



**Marital Status and History:** USCIS collects information regarding current and former marital status (i.e., the marital status of the benefit requestor or beneficiary, the dates of and place of marriages or terminations, and the reason for termination).

**Addresses:** Benefit requestors, beneficiaries, family members, sponsors, attorneys, and representatives. For certain benefits, a benefit requestor or beneficiary can provide both a home address and a safe address.[43]

**Telephone and Facsimile Numbers:** Benefit requestors, beneficiaries, family members, sponsors, household members, attorneys, and representatives.

**E-mail Addresses:** Benefit requestors, beneficiaries, family members, attorneys, and representatives.

**Dates of Birth and Age:** Benefit requestors, beneficiaries, sponsors, and family members.

**Unique Identifying Numbers:** USCIS collects A-Numbers, Social Security numbers (SSN), USCIS ELIS account numbers, receipt numbers, and other identifying numbers of benefit requestors, beneficiaries, family members, and sponsors.

**Citizenship/Nationality:** USCIS collects information on the benefit requestor, beneficiary, or family member's country of citizenship or nationality, and country of birth.

**Travel Information:** USCIS collects information on the benefit requestor, beneficiary, or family member's port of entry, arrival and departure dates, passport number, passport place of issue, passport issue date, passport expiration date, travel document number, travel document country of issue, and travel document expiration date.

**Gender:** Benefit requestors, beneficiaries, and family members.

**Personal Characteristics:** Benefit requestor or beneficiary's hair color, eye color, height, weight, race, and ethnicity.

**Information about the attorney, representative, preparer or interpreter:** Full name, business or organization, mailing address, e-mail address, phone number, fax number, signature, language spoken, relationship to the benefit requestor or beneficiary (if applicable). USCIS also collects Attorney Bar Number or equivalent, Bar Membership, Accreditation Date, Board of Immigration Appeals Representative Accreditation Expiration Date, and Law Practice Restriction Explanation.

**Biometrics:** Benefit requestor or beneficiary's biometric images such as press-print, photograph, details about those images (e.g., capture date), and signature of benefit requestor, beneficiary, interpreter, and representative.

---

[43] Benefit requestors may use an alternative mailing address, a "safe address," on their benefit requests. USCIS will use this safe address as the mailing address for all correspondence regarding the victim's immigration relief. Using a safe address protects the victim's privacy and maintains confidentiality.