

**Card Data:** Includes details about cards issued for approved applications such as card serial number, RFID data associated with the Employment Authorization Document and the Permanent Resident Card, production site, production status, and time/date stamp of cards.

**Tax and Financial Information:** USCIS collects tax identification numbers, and financial information (check information, bank account numbers, credit card numbers (the last four digits only) and other tax and financial information information).

**Results of Background Identity and Security Checks:** Date of the background check, whether the check returned any derogatory results, whether those results were resolved, and expiration date of the results.

**Certifying Agency Information (if applicable):**[44] Information collected about the certifying agency includes agency name, certifying official name, title of certifying official, address, phone, fax, agency type, case status, agency category, case number, FBI Number, or State Identification (SID) Number.

**Medical Information:** USCIS collects medical information to establish that an applicant is not inadmissible to the United States on public health grounds, as well as in support of a request for an accommodation during an interview. Such information may indicate alcoholism, declaration of incompetence, or family medical history.

**Employment Information:** USCIS collects employment information (place and address of employment/occupation, type of work, employer name, length of employment, spouse's employment) in CLAIMS 3 to determine the benefit requestor and beneficiary's eligibility.

**Military and Selective Service Information:** USCIS collects information evidencing Selective Service registration and military service (e.g., Selective Service number, date of registration, application for military exemption, military branch, willingness to bear arms for the United States of America) in CLAIMS 3 to verify that the benefit requestor or beneficiary has registered with Selective Service as required by law.

**Information Regarding Organization Membership or Affiliation:** USCIS collects information regarding an applicant's organization memberships and affiliations (organizations, associations, clubs, foundations, parties, societies, or similar groups; communist party membership; totalitarian party membership; terrorist organization membership) in CLAIMS 3 to determine whether

---

[44] For certain immigration benefits, individuals are required to work with an agency who certifies that the individual "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of the criminal activity. Certifying agencies include federal, state, or local law enforcement agencies, prosecutors, judges, or other authority that investigates or prosecutes criminal activity. Other agencies such as child protective services, the Equal Employment Opportunity Commission, and the Department of Labor also qualify as certifying agencies since they have criminal investigative jurisdiction within their respective areas of expertise. *See* 8 CFR § 214.14(a)(2).

AR2022_301212



the applicant poses a security threat to the United States or individuals or has participated in activities that may disqualify him or her for a requested benefit.

**Criminal History or Involvement and Moral Character Issues:**[45] USCIS collects information regarding an applicant's criminal history, involvement in criminal activities, and information regarding moral character in CLAIMS 3 to assess whether the applicant meets the standards contained in the INA.

**Case Processing Information:** USCIS records case processing information such as date USCIS received or filed benefit requests; benefit request status; location of record; other control number when applicable; fee receipt data; status of USCIS appointments and interviews; date of issuance of a notice, and whether the benefit request form was referred to FDNS for review.

**Final Decision:** Includes a notice to the benefit requestors, beneficiary, and/or the representative on record, approval/denial code, etc.

Many USCIS forms require the submission of supplemental forms to establish eligibility for the benefit. Examples of supplemental evidence may include, but is not limited to, marriage certificates, birth certificates, tax records, court records, appeals and motions, personal narratives, and affidavits and sworn statements (of benefit requestors and qualifying witnesses) including details of victimization, criminal records, and terrorist engagement. The supplemental information is stored in the A-File.

### 2.2    What are the sources of the information and how is the information collected for the project?

Information within CLAIMS 3 is derived from the following sources: (1) benefit requestors, beneficiaries, accredited representatives, form preparers, and/or interpreters, (2) internal DHS systems, and (3) external systems.

Most of the information in CLAIMS 3 is derived from the data provided by the benefit requestor or beneficiary on the completed immigration form and documentation in support of his or her benefit request. CLAIMS 3 either automatically receives benefit request form information from an interconnected system or USCIS staff manually enter information submitted on the USCIS form into CLAIMS 3. Most background check results are also manually entered into CLAIMS 3. Certain background check results are uploaded into CLAIMS 3 in a semi-automated batch process. Please see the Appendices for a full list of immigration forms and background checks tracked in CLAIMS 3.

***USCIS Systems***

- CIS sends A-Number verification.

---

[45] *See* INA §101(f), § 316(e), and 8 CFR § 316.10

- Fingerprint Processing Mainframe (FD-258 MF), a module of CLAIMS 3 MF, sends fingerprint and name check results to CLAIMS 3.[46]

- MFAS, a module of CLAIMS 3, sends Conditional Permanent Residency approval to CLAIMS 3.

- Private Attorney Maintenance System (PAMS), a module of Refugee, Asylum, and Parole System (RAPS), sends attorney data confirmation to CLAIMS 3.

- RAPS, sends applicant address changes and employment authorization to CLAIMS 3.[47]

- CPMS sends name, receipt number, date of birth, A-Number, and SSN, if applicable.

- Integrated Card Production System sends the status of card production to CLAIMS 3.[48]

- NFTS sends file location to CLAIMS 3.

### DHS Systems

- ICE Student and Exchange Visitor Information System (SEVIS) sends SEVIS processing status from SEVIS to CLAIMS 3.[49]

### External Systems

- FBI/Central Records System and Universal Index sends name check results to FD-258, which then automatically sends information to CLAIMS 3.[50]

- Department of Labor/Permanent Labor Certification (PERM) and iCERT provides CLAIMS 3 information regarding permanent and temporary labor certifications and non-immigrant labor condition applications submitted by employers for Department of Labor approval.

---

[46] FD-258 MF is a module of the USCIS MF application CLAIMS 3 MF. FD-258 MF maintains information on individual applicants' fingerprint status. FD-258 MF contains applicant information that was sent to the FBI, such as Name, Birth Date, and other biographical data, as well as Date Fingerprinted and Date Sent to FBI. It also contains other information received from the FBI such as FBI Process Date and FBI Search Result. *See* DHS/USCIS/PIA-033 Immigration Benefits Background Check Systems (IBBCS), *available at* www.dhs.gov/privacy.
[47] *See* DHS/USCIS/PIA-027(b) Refugees, Asylum, and Parole System (RAPS) and the Asylum Pre-Screening System (APSS) Update, *available at* www.dhs.gov/privacy.
[48] ICPS prepares, manages, and processes benefit card order requests from internal and external interfacing systems. *See* forthcoming Benefit Decision and Output PIA, *available at* www.dhs.gov/privacy.
[49] SEVIS is an ICE Internet-based application for electronically tracking and reporting on foreign students, Exchange Visitors (EV), and their dependents in the United States. SEVIS enables schools and program sponsors to transmit data electronically to the DHS and the Department of State (DOS) throughout a students or EV's program in the United States. *See* DHS/ICE/PIA-001(a) Student and Exchange Visitor Information System II (SEVIS), *available at* www.dhs.gov/privacy.
[50] DOJ/FBI-002 Central Records System, 66 FR 29994 (June 4, 2001).

AR2022_301214



### 2.3    Does the project use information from commercial sources or publicly available data? If so, explain why and how this information is used.

No.

### 2.4    Discuss how accuracy of the data is ensured.

USCIS collects information primarily from the benefit requestor or beneficiary or his or her representative. CLAIMS 3 also receives information from USCIS, DHS, and external government systems. CLAIMS 3 helps validate data entry through program coding to mitigate or prevent inconsistencies in applicant data and in decision processing entries (e.g., the system rejects 00/00/00 birthdates).

Data is entered into CLAIMS 3 automatically and manually. Almost all information is input into CLAIMS 3 automatically except:

- USCIS staff may manually enter information submitted on a USCIS benefit request form into CLAIMS 3 (during the initial intake process); and

- USCIS manually enters background and security check results into CLAIMS 3 with the exception of the results of FBI fingerprint checks.

For manually entered data, all USCIS data entry personnel are provided with the opportunity to review and edit information prior to and after its submission. USCIS personnel verify the accuracy by comparing information provided by the individual with information contained in the individual's A-File and from federal law enforcement systems. USCIS also verifies data accuracy with the benefit requestor or beneficiary during the interview process. USCIS personnel can correct and edit inaccuracies at any stage of the process.

### 2.5    <u>Privacy Impact Analysis</u>: Related to Characterization of the Information

**Privacy Risk:** There is a risk of inaccurate data due to manual data entry throughout the adjudication process.

**Mitigation:** USCIS partially mitigates this risk through training, supervisor reviews, and ongoing quality assurance reviews. To establish and maintain quality and consistency in processing benefit request forms, all supervisors must ensure that all employees under their supervision involved in the processing of benefit request forms, including the Quality Assurance Reviewer, have been trained on these procedures. USCIS personnel and contractors who process benefit request forms are required to be recertified every two years by receiving on-the-job training.[51]

---

[51] All immigration officers are required to take BASIC training, where human factors are involved, and demonstrates



USCIS requires supervisory reviews to be conducted by a Supervisory Immigration Services Officer (SISO), or by an Immigration Services Officer II or higher who possesses sufficient technical skills and significant experience in the adjudication of benefit request forms and was not involved in the adjudication of the case. USCIS policy requires the reviewing officer to attend and complete all required trainings.

The SISO either concurs with the officer's recommendation or notes the reason(s) for non-concurrence within the Adjudication Processing Worksheet, and returns the file to the adjudicating officer for appropriate action.

During the Quality Assurance Reviews, individual case files are randomly selected and reviewed by a team of experienced adjudicators. Reviewers use a checklist to assess and record the quality of each case.

USCIS is working to automate the process and remove the opportunity for human error. In addition, CLAIMS 3 and its associated systems ensure data accuracy through program coding to mitigate or prevent inconsistencies in data and in decision processing entries by employee training. Finally during the interview, the benefit requestor or beneficiary is able to confirm data and update information as necessary.

**Privacy Risk:** There is a risk of over-collection of information for making a benefit determination.

**Mitigation:** The USCIS Office of Privacy reviews each immigration form during the form development process and/or promulgation process to ensure that only the minimum amount of information is collected to determine benefit eligibility. Furthermore, all data elements collected are negotiated with and approved by OMB during PRA collection review.

USCIS designed CLAIMS 3 specifically to collect and store only the information that is necessary to adjudicate the benefit request forms processed by USCIS. USCIS requires the information collected and stored in CLAIMS 3 to establish the identity of the benefit requestor or beneficiary and to process the benefit request to determine benefit eligibility.

**Privacy Risk:** There is a risk that information in CLAIMS 3 is replicated and shared via eCISCOR and therefore may be inaccurate.

**Mitigation:** This risk cannot be mitigated. USCIS uses eCISCOR to share CLAIMS 3 information more efficiently with other USCIS systems for interoperability purposes. If constant queries were performed against CLAIMS 3, which is a live transaction system designed to perform real-time daily tasks for USCIS customers, the primary source system functionality would significantly decrease.

---

unsurpassable standards of professionalism and ethical conduct. The BASIC curriculum covers public service, immigration law, customer service, fraud and national security, and other topics to ready new immigration officers for the task of ensuring the right benefit to the right person at the right time.



The CLAIMS 3 system lag would cause considerable mission disruption. Therefore, USCIS relies on the eCISCOR system to perform queries. To mitigate the risk of inaccurate data within eCISCOR, eCISCOR refreshes from CLAIMS 3 and other source systems on a daily basis (generally overnight). A daily refresh is the most frequent timeframe for refresh that USCIS can implement without impacting the functionality of the live transaction source systems.

## Section 3.0 Uses of the Information

*The following questions require a clear description of the project's use of information.*

### 3.1   Describe how and why the project uses the information.

USCIS uses CLAIMS 3 and its associated systems to support and manage the administration and adjudication of certain benefit requests. Specific uses of CLAIMS 3 and the information it contains include:

- Identify missing information and make requests for additional information;
- Provide a repository of data to assist with future immigration benefit requests;
- Schedule interview and biometrics appointments;
- Facilitate and maintain security screening check results to determine suitability for immigration benefits using criminal, immigration, or terrorism-related history;
- Generate and issue notices;
- Provide data necessary to assist in the determination of immigration and employment status to support the Verification Program;
- Manage adjudicative workflow;
- Share information with internal and external partners for mission-related activities; and,
- Generate reports.

### 3.2   Does the project use technology to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly? If so, state how DHS plans to use such results.

No.

### 3.3   Are there other components with assigned roles and responsibilities within the system?

Yes. DHS Components have read-only access to CLAIMS 3 to perform mission requirements.



CBP uses CLAIMS 3 border enforcement purposes. ICE uses CLAIMS 3 for immigration investigation purposes. Intelligence and Analysis (I&A) analysts may access CLAIMS 3 for national security purposes. The Citizenship and Immigration Services Ombudsman's Office uses CLAIMS 3 for its USCIS oversight responsibilities.

### 3.4 <u>Privacy Impact Analysis</u>: Related to the Uses of Information

**Privacy Risk:** There is a risk that authorized users could use the data for purposes inconsistent with the original collection.

**Mitigation:** To ensure the information is used consistently with the purposes of the original collection, USCIS administrators monitor internal and external user logs to ensure users are only accessing information related to their job functions. Prior to accessing CLAIMS 3, each user must sign a user access agreement that outlines the appropriate rules of behavior tailored to CLAIMS 3. USCIS implements disciplinary rules as a means to govern the use of the system. USCIS reminds employees accessing the system that the system may be monitored for improper use and illicit activity, and the penalties for non-compliance, through a warning banner that reiterates the appropriate uses of the system. All user actions are tracked via audit logs to identify audit information by user identification, network terminal identification, date, time, and data accessed. This acts as a deterrent to unauthorized activity. Additionally, all USCIS employees are required to complete role-based and adjudicator training prior to accessing CLAIMS 3.

**Privacy Risk:** There is a risk that unauthorized users may gain access to CLAIMS 3.

**Mitigation:** All records are protected from unauthorized access through appropriate administrative, physical, and technical safeguards such as restricting access to authorized personnel who have a need-to-know. CLAIMS 3 is a web-based application that is only available through the DHS USCIS network. Access to CLAIMS 3 is granted to only a limited number of users for mission-related purposes. Access is granted based on the user's job function (i.e., receipting, clerk, adjudicator) and physical location (i.e., Vermont, Texas, Nebraska, California, Virginia, or field offices). CLAIMS 3 users must have access to the USCIS network and have USCIS credentials.

Authorized employees must use their issued credentials, also known as PIV cards, to access CLAIMS 3. Employees, who do not require access to CLAIMS 3, will not be able to access CLAIMS 3 with their PIV card. Access to the system via PIV card is consistent with the National Institute of Standards and Technology 800-63 Level 4-assurance of the user's identity.[52] Finally, USCIS deploys user logs to ensure users are only accessing information related to their job functions.

---

[52] *See* NIST Special Publication (SP) 800-63-2, Electronic Authentication Guideline, dated August 2013, *available at* http://csrc.nist.gov/publications/nistpubs/800-63-1/SP-800-63-1.pdf.



## Section 4.0 Notice

The following questions seek information about the project's notice to the individual about the information collected, the right to consent to uses of said information, and the right to decline to provide information.

### 4.1 How does the project provide individuals notice prior to the collection of information? If notice is not provided, explain why not.

Each benefit request form contains a Privacy Act Statement that provides notice to individuals about the collection, USCIS's authority to collect information, the purposes of data collection, routine uses of the information, and the consequences of declining to provide the requested information to USCIS. The forms also contain a provision by which an applicant authorizes USCIS to release any information received from the benefit requestor or beneficiary as needed to determine eligibility for benefits. Additionally, individuals receive general notice through this PIA, DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking SORN, DHS/USCIS-002 Background Check Service SORN, and the DHS/USCIS-007 Benefits Information System SORN.

### 4.2 What opportunities are available for individuals to consent to uses, decline to provide information, or opt out of the project?

By submitting benefit request forms to USCIS, applicants have consented to USCIS use of the information submitted for adjudication purposes. Applicants who apply for USCIS benefits have an opportunity and ability to decline to provide information. USCIS benefit applications require the applicant to provide biographic and/or biometric information. This information is critical in making an informed adjudication decision to grant or deny a USCIS benefit. Failure to submit such information may prohibit USCIS from processing and properly adjudicating the application and thus precludes the applicant from receiving the benefit.

### 4.3 <u>Privacy Impact Analysis</u>: Related to Notice

There is no privacy risk associated with notice because all information is provided voluntarily and USCIS provides notice to individuals through a Privacy Act Statement, this PIA, and the associated SORNs.

## Section 5.0 Data Retention by the project

The following questions are intended to outline how long the project retains the information after the initial collection.

### 5.1 Explain how long and for what reason the information is retained.

USCIS is working with NARA to update and consolidate the current retention schedules: N1-563-04-03 and N1-566-08-12. Under the proposed update retention schedule for CLAIMS 3, the system



will retain records 50 years from the date of the last completed action. This retention schedule allows USCIS to address any follow-up inquiries or requests related to the application, including inquiries related to security and FOIA/PA matters.

### 5.2    Privacy Impact Analysis: Related to Retention

**Privacy Risk:** USCIS's extension of the retention period from 15 years to 50 years creates a risk of retaining the data for longer than necessary, which may lead to stale or inaccurate data.

**Mitigation:** USCIS retains CLAIMS 3 data to maintain a complete and accurate history of an individual's immigration interaction with USCIS for future benefit requests. This expanded retention schedule allows USCIS to address any follow-up inquiries or requests related to the application, including inquiries related to law enforcement, public safety, national security, and to FOIA/PA matters. Expanding the records retentions schedule allows for USCIS to provide as much information as permitted to the individual regarding his or her immigration history.

The purpose of maintaining the information in CLAIMS 3 for such a long retention period is to provide a complete history of an individual's immigration benefit history with USCIS. USCIS continues to update CLAIMS 3 as individuals continue to file immigration benefits with the agency – ensuring that the information is accurate and complete while maintaining a historical record of interactions with USCIS and benefit status changes.

## Section 6.0 Information Sharing

The following questions are intended to describe the scope of the project information sharing external to the Department. External sharing encompasses sharing with other federal, state and local government, and private sector entities.

### 6.1    Is information shared outside of DHS as part of the normal agency operations? If so, identify the organization(s) and how the information is accessed and how it is to be used.

USCIS shares information from CLAIMS 3 with other federal agencies for the purpose of processing applications or petitions for benefits under the INA. USCIS may also share information with federal, state, local, and foreign government agencies and authorized organizations in accordance with approved routine uses, as described in the associated published system of records notices.

***Department of State (DOS)***

USCIS and DOS are partners in the processing of immigration benefit cases.[53] DOS has read-only access to a subset of CLAIMS 3 data. Access to CLAIMS 3 provides DOS consular officers with

---

[53] *Memorandum of Agreement between the Department of State and the Department of Homeland Security regarding the*



information on USCIS adjudications of benefits and other decisions relating to non-immigrant and immigrant visas and naturalization cases. This includes data on pending benefit request forms, as well as historical information. This data sharing arrangement allows USCIS and DHS to increase processing efficiency and maintain a comprehensive picture of a benefit requestors' status from visa application to naturalization. It will reduce the likelihood that an individual or group might obtain an immigration benefit under the INA through fraud or error.

### *Department of Labor (DOL)*

USCIS is responsible for determining if a foreign national sought by an employer to work on a temporary or permanent basis in the United States has the necessary qualifications and meets the requirements for the immigration classification. For most employment-based categories (non-immigrant and immigrant) there is a labor component that must be satisfied by employers before they may hire a foreign worker.[54] DOL is responsible for enforcement of labor certification violations and violations of U.S. labor laws. DOL has the ability to sanction employers that fail to comply with those laws and DHS has the authority to bar employers form seeking to bring additional foreign laborers to the United States if they have been found to be violators by DOL. To determine employer violations, DOL reviews what employers are actually doing once the foreign worker is employed versus what they promised to do/or claimed they did at the certification/petition stage.

USCIS provides DOL access to the Person Centric Query System (PCQS)[55] to view, on a read-only basis, data drawn from CLAIMS 3 that contain employment-based non-immigrant and immigrant petition data and DOL will provide USCIS data from its Permanent Labor Certification (PERM) system and iCERT system from the permanent and temporary labor certifications and non-immigrant labor condition applications submitted by employers for DOL approval.

### *Selective Service System (SSS)*

The SSS is an independent federal agency that is responsible for ensuring emergency military manpower needs pursuant to the Military Selective Service Act.[56] USCIS provides immigrant adjustment of status and visa information on aliens subject to military conscription to SSS. SSS does not have a direct access with the CLAIMS 3 system. On a monthly basis, CLAIMS 3 provides SSS with a manually-

---

*sharing of visa and passport records and immigration and naturalization and citizenship records, signed November 18, 2008.*

[54] This is done through filing of a labor certification (nonimmigrant and immigrant petitions) or a labor condition application (LCA) (nonimmigrant) with DOL. Before employers can import foreign labor they must agree to comply with certain U.S. laws re: paying the prevailing wage, complying with required working conditions, testing the labor market for U.S. workers, etc.

[55] *See* DHS/USCIS/PIA-010 - Person Centric Query Service, *available at www.dhs.gov/privacy.*

[56] 50 U.S.C. App. 451 *et seq.*

**AR2022_301221**



extracted file of adjustment of status and immigrant visa information for eligible aliens. This file is sent via encrypted email from USCIS to SSS. No data is sent from the SSS to USCIS/CLAIMS 3.

### Social Security Administration (SSA)

USCIS, DOS, and the SSA currently have a Memorandum of Understanding (MOU) in place that covers the process in which SSA works with USCIS to issue SSNs and Social Security cards for immigrants through a process called Enumeration at Entry (EAE).[57] As part of the DOS immigrant visa application process, immigrants outside the United States have the option to apply for an SSN card at the same time they apply for an immigrant visa. Once DOS approves their visa application and DHS admits them into the United States for permanent residence, SSA automatically issues the SSN card. USCIS electronically transmits to SSA enumeration data for resident aliens with employment authorization who request a SSN or replacement Social Security card. This process will allow USCIS benefit seekers to request a SSN or replacement card as part of the USCIS benefit process.

## 6.2 Describe how the external sharing noted in 6.1 is compatible with the SORN noted in 1.2.

### DOS

Sharing USCIS data with DOS is compatible with the purpose of the system because the DOS mission, like USCIS, includes ensuring lawful visits and immigration to the United States as dictated by the INA. Routine Use I of the BIS SORN permits USCIS to share information with the DOS for the purpose of assisting in the processing of benefit requests under the INA, and all other immigration and nationality laws including treaties and reciprocal agreements.

### DOL

Sharing USCIS data with DOL is compatible with the purpose of the system because the respective missions are responsible for administering and enforcing the INA and other relevant immigration laws. Routine Use X of the BIS SORN permits USCIS to share information with the DOL of enforcing labor certification violations and violations of U.S. labor laws.

### SSS

Sharing USCIS data with SSS is compatible with the purpose of the system because Section 453(a) of the Military Selective Service Act requires every male citizen of the United States, and every other male person residing in the United States, who is between the ages of 18 and 26, to present his self for and submit to registration. Routine Use Q of the BIS SORN permits USCIS to share information

---

[57] *Memorandum of Understanding between Social Security Administration and Immigration and Naturalization Service* (MOU), dated December 18, 2000. The party noted as the Immigration and Naturalization Service is now known as U.S. Citizenship and Immigration Services (USCIS). Provisions included in and addressed by the MOU are still applicable today.

**AR2022_301222**



with SSS to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.

*SSA*

Sharing USCIS data with SSA is compatible with the purpose of the system because Sections 205(b)(2) of the Social Security Act, as amended, authorizes SSA to issue a Social Security card to aliens at the time of their lawful admission to the United States. Routine Use R of the BIS SORN permits USCIS to share information with the SSA for the purpose of issuing a Social Security number and card to an alien who has made a request for a Social Security number as part of the immigration process and in accordance with any related agreements in effect between the SSA, the DHS and the DOL entered into pursuant to 20 CFR 422.103(b)(3); 422.103(c); and 422.106(a), or other relevant laws and regulations.

### 6.3    Does the project place limitations on re-dissemination?

Yes. DHS or USCIS enters into Memoranda of Understanding/Agreement (MOU/A) with external organizations prior to the systematic sharing of information. When sharing information with parties outside of DHS, the same specifications related to security and safeguarding of privacy-sensitive information that are in place for USCIS and DHS are applied to the outside entity. The agreements between DHS and external entities (e.g., DOL, DOS, SSS, and SSA) fully outline responsibilities of the parties, security standards, and limits of use of the information, including re-dissemination, prior to information sharing. Access to records is governed by need-to-know criteria that demand the receiving entity demonstrate the mission-related need for the data before access is granted. In the terms of a negotiated agreement or the language of an authorization providing information to an external agency, USCIS includes justification for collecting the data, and an acknowledgement that the receiving agency will not share the information without USCIS or DHS's permission, as applicable.

### 6.4    Describe how the project maintains a record of any disclosures outside of the Department.

USCIS keeps an electronic record of all CLAIMS 3 records sent to non-DHS partners. Furthermore, USCIS updates individual CLAIMS 3 case records to reflect that a specific check has been completed.

### 6.5    Privacy Impact Analysis: Related to Information Sharing

**Privacy Risk:** There is a risk that data shared by USCIS with external partners will be used beyond the original purpose of collection (immigration benefits).

**Mitigation:** USCIS is careful to share data with external agencies that have a need to know and put the information to a use that is compatible with USCIS SORNs. USCIS documents these safeguards in MOU/MOA with the external partners. All prospective information handlers must be authorized to



access the information. This mitigates the risk of unauthorized disclosure by requiring a trained employee with access to the information to review the information before sharing the information with an external agency.

**Privacy Risk:** There is a risk that USCIS may disclose protected information inconsistent with the confidentiality requirements of 8 U.S.C. § 1367.

**Mitigation:** DHS employees are aware of the importance of safeguarding information protected by 8 U.S.C. § 1367. In addition, DHS issued a new Management Directive and Instruction to remind all DHS officers and employees they are generally prohibited from permitting use by or disclosure to anyone other than a sworn officer or employee of DHS, the DOS, or the Department of Justice (DOJ) of any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits.[58]

Prior to disclosing any information USCIS employees are required to verify the status of an individual. USCIS enhanced the Central Index System to tag records relating to a protected individual and that specific procedures regarding the disclosure and use apply to users accessing the information. CIS includes an alert message to indicate that an individual is protected by 8 U.S.C. § 1367. The message reads: *8 USC 1367 Protected Information–Disclosure and Use Restrictions Apply.* The statutory confidentiality protections at 8 U.S.C. § 1367 generally prohibit the disclosure or use of any information about applicants for, and beneficiaries of, certain victim-based immigration benefits, including T nonimmigrant status, U nonimmigrant status, or relief under the Violence Against Women Act (VAWA). Applicants for, and beneficiaries of, these benefits are those people who have been victimized by others, including human traffickers, criminal gangs, or abusive spouses. Beneficiaries may also include qualifying family members (derivatives) of the victim.

The law requires that USCIS protect information about principal applicants and their derivatives from disclosure in order to avoid endangering the victims by providing their victimizers any personal information about them. These confidentiality protections generally continue indefinitely; they may terminate only when the application for relief is denied and all opportunities for appeal of the denial have been exhausted. Any record in CIS that displays this banner must be handled as Section 1367 Information in accordance with USCIS policy

# Section 7.0 Redress

The following questions seek information about processes in place for individuals to seek redress which may include access to records about themselves, ensuring the accuracy of the information collected about them, and/or filing complaints.

---

[58] DHS Management Directive 002-02 *Implementation of Section 1367 Information Provisions* (November 1, 2013) and corresponding Instruction 002-02-001.



### 7.1    What are the procedures that allow individuals to access their information?

An individual may gain access to his or her USCIS records by filing a FOIA/PA request. If an individual would like to file a FOIA/PA request to view his or her USCIS record, he or she may mail the request to the following address:

National Records Center
Freedom of Information Act (FOIA)/Privacy Act Program
P.O. Box 648010
Lee's Summit, MO 64064-8010

Further information about FOIA/PA requests for USCIS records is available at http://www.uscis.gov.

### 7.2    What procedures are in place to allow the subject individual to correct inaccurate or erroneous information?

Individuals should submit requests to contest or amend information as discussed in Section 7.1. The requestor should clearly and concisely state the information being contested, the reason for contesting or amending it, and the proposed amendment. The requestor should also clearly mark the envelope, "Privacy Act Amendment Request." The record must be identified in the same manner as described for making a request for access.

### 7.3    How does the project notify individuals about the procedures for correcting their information?

USCIS notifies individuals of the procedures for correcting their information in this PIA, Privacy Act Statements, and the USCIS website. Specifically, the SORNs set forth in Section 1.2 provide individuals with guidance regarding the procedures for correcting information. The Privacy Act Statements, including notice of an individual's right to correct information, are also contained on the instructions to immigration forms published by USCIS.

### 7.4    <u>Privacy Impact Analysis</u>: Related to Redress

There is no risk associated with redress in relation to CLAIMS 3. USCIS provides individuals with access to his or her records in CLAIMS 3 when requested through a FOIA/PA request. The information requested may be exempt from disclosure under the Privacy Act because information contained within CLAIMS 3 may contain law enforcement sensitive information, the release of which could possibly compromise ongoing criminal investigations.

## Section 8.0 Auditing and Accountability

The following questions are intended to describe technical and policy based safeguards and security measures.

AR2022_301225



### 8.1 How does the project ensure that the information is used in accordance with stated practices in this PIA?

USCIS ensures that practices stated in this PIA comply with internal USCIS policies, including the USCIS privacy policies, SOPs, information sharing agreements, orientation and training, rules of behavior, and auditing and accountability.

CLAIMS 3 has an audit trail capability to monitor user activities and generate alerts for unauthorized access attempts. The general audit log and the security log allow the Global Administrator to select event type, such as access or logon, and the data displayed includes timestamp, name, IP, transaction, and site. The other log is the auto lock log and the display for it shows the employee's name, last login, auto lock date with time, reinstate date with time, username, and site. This auditing is a strong influence for users to use CLAIMS 3 appropriately.

### 8.2 Describe what privacy training is provided to users either generally or specifically relevant to the project.

USCIS employees and contractors are required to complete annual Privacy and Computer Security Awareness Training to ensure their understanding of proper handling and securing of PII. Privacy training addresses appropriate privacy concerns, including Privacy Act obligations (e.g., SORNs, Privacy Act Statements). The Computer Security Awareness Training examines appropriate technical, physical, and administrative control measures. Leadership at each USCIS office is responsible for ensuring that all federal employees and contractors receive the required annual Computer Security Awareness Training and Privacy training.

### 8.3 What procedures are in place to determine which users may access the information and how does the project determine who has access?

USCIS deploys user role-based access controls and enforces a separation of duties to limit access to only those individuals who have a need-to-know in order to perform their duties. Each operational role is mapped to the set of system authorizations required to support the intended duties of the role. The mapping of roles to associated authorizations enhances adherence to the principle of least privilege. Authorized users are broken into specific classes with specific access rights. This need-to-know is determined by the respective responsibilities of the employee. These are enforced through DHS and USCIS access request forms and procedures.

### 8.4 How does the project review and approve information sharing agreements, MOUs, new uses of the information, new access to the system by organizations within DHS and outside?

USCIS has a formal review and approval process in place for new sharing agreements. Any new use of information or new access requests for the system must go through the USCIS Change Control



Process and must be approved by the proper authorities of this process, such as the USCIS Privacy Officer, Chief of Information Security Officer, Office of Chief Counsel, and the respective Program Office.

## Responsible Officials

Donald K. Hawkins
Privacy Officer
U.S. Citizenship and Immigration Services
Department of Homeland Security

## Approval Signature

Original signed copy on file with the DHS Privacy Office.

—————————————————————

Karen L. Neuman
Chief Privacy Officer
Department of Homeland Security



# Appendix A

## USCIS Immigration Forms and Associated OMB Control Numbers processed in CLAIMS 3

| Form Name and Number | OMB Control Number | Paper Filing | Electronic Filing |
|---|---|---|---|
| EOIR-26, Notice of Appeal from Decision of Immigration Judge | 1125-0002 | X | |
| EOIR-29, Notice of Appeal from Decision of District Director | 1125-0010 | X | |
| I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 1615-0079 | X | |
| I-129, Petition for Nonimmigrant Worker | 1615-0009 | X | |
| I-129B, Petition for Nonimmigrant Worker | 1615-0009 | X | |
| I-129BF, Petition for Nonimmigrant Worker: FTA | 1615-0009 | X | |
| I-129CW, Petition for CNMI-Only Nonimmigrant Transition Worker | 1615-0111 | X | |
| I-129F, Petition for Alien Fiancé(e) | 1615-0001 | X | |
| I-129H, Petition for Nonimmigrant Worker: H-1, H-2, or H-3 | 1615-0009 | X | |
| I-129HF, Petition for Nonimmigrant Worker: H-1, H-2, or H-3 - FTA | 1615-0009 | X | |
| I-129L, Petition to Employ Intra-Company Transferee | 1615-0009 | X | |
| I-129LF, Petition to Employ Intra-Company Transferee FTA | 1615-0009 | X | |
| I-129S, Nonimmigrant Petition Based on Blanket L Petition | 1615-0010 | X | |
| I-130, Petition for Alien Relative | 1615-0012 | X | |
| I-130O, Immigrant Petition for Relative | 1615-0012 | X | |



| | | | |
|---|---|---|---|
| I-130S, Visa Petition for Spouse | 1615-0012 | X | |
| I-131 , Application for Travel Document | 1615-0013 | X | |
| I-131B, Effective Date for I131 Advanced Parole Approvals Sent to ICPS | 1615-0013 | X | |
| I-140, Immigrant Petition for Alien Workers | 1615-0015 | X | |
| I-191, Application for Advance Permission to Return to Unrelinquished Domicile | 1615-0016 | X | |
| I-192, Application for Advance Permission to Enter as Nonimmigrant | 1615-0017 | X | |
| I-193, Application for waiver of Passport and/or Visa | 1651-0107 | X | |
| I-212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal | 1615-0018 | X | |
| I-246, Application for Stay of Deportation | 1653-0021 | X | |
| I-290A, Appeal, Motion to Reopen or Reconsider | 1615-0095 | X | |
| I-290AA, Notice of Appeal to the Board of Immigration Appeals | 1615-0095 | X | |
| I-290AP, Notice of Appeal to the Board of Immigration Appeals | 1615-0095 | X | |
| I-290B, Notice of Appeal to the Administration | 1615-0095 | X | |
| I-290C, Certified Appeal, Motion to Reopen or Reconsider | 1615-0095 | X | |
| I-290M, Motion to Reopen or Reconsider | 1615-0095 | X | |
| I-352, Immigration Bond | 1653-0022 | X | |
| I-360, Petition for Amerasian, Widower or Special Immigrant | 1615-0020 | X | |
| I-407, Record of Abandonment of Lawful | 1615-0130 | X | |

**AR2022_301229**



**Privacy Impact Assessment Update**
DHS/PIA/USCIS-016(a) CLAIMS 3
Page 31

| Permanent Resident Status | | | |
|---|---|---|---|
| I-485, Application to Register Permanent Residence or Adjust Status and Supplement A to Form I-485 | 1615-0023 | X | |
| I-485 Supplement A, Adjustment of Status Under Section 245(i) | 1615-0023 | X | |
| I-485 Supplement B, NACARA Supplement to Form I-485 Instructions | 1115-0221 | X | |
| I-485C, HRIFA Supplement to Form I-485 | 1615-0024 | X | |
| I-485 Supplement E, Instructions for I-485, Supplement E | 1615-0023 | X | |
| I-515, Deficiency Notice to Arriving F-1, M-1, or J-1 | 1615-0003 | X | |
| I-526, Immigrant Petition by Alien Entrepreneur | 1615-0026 | X | |
| I-526O, Request Determination that Prospective Immigrant Is an Investor | 1615-0026 | X | |
| I-539, Application to Extend/Change Nonimmigrant Status | 1615-0003 | X | X |
| I-539O, Application to Extend Temporary Stay | 1615-0003 | X | X |
| I-539PP, Premium Processing | 1615-0003 | X | X |
| I-566, Inter-Agency Record of Individual requesting Change/Adj. To or from A or G Status | 1615-0027 | X | |
| I-600, Petition to Classify Orphan as an Immediate Relative | 1615-0028 | X | |
| I-600A, Application for Advance Processing of Orphan Petition | 1615-0028 | X | |
| I-601, Application for Waiver of Grounds of Inadmissibility | 1615-0029 | X | |
| I-601A, Application for Provisional | 1615-0123 | X | |

**Homeland Security**

| | | | |
|---|---|---|---|
| **Unlawful Presence Waiver** | | | |
| **I-612, Application for Waiver of Foreign Residence Requirement of Sec. 212(e) of the INA** | 1615-0030 | X | |
| **I-643, HHS Statistical Data for Refugee/Asylee Adjusting Status** | 16150070 | X | |
| **I-687, Application for Status as a Temporary Resident under Sec. 245A of the INA** | 1615-0090 | X | |
| **I-690, Application for Waiver of Grounds of Inadmissibility** | 1615-0032 | X | |
| **I-694, Notice of Appeal of Decision** | 1615-0034 | X | |
| **I-695, Application for Replacement of Form I-688a or I-688** | 1615-0034 | X | |
| **I-698, Application to Adjust Status from Temporary to Permanent Resident** | 1615-0035 | X | |
| **I-730, Refugee/Asylee Relative Petition** | 1615-0037 | X | |
| **I-751, Petition to Remove Conditions on Residence** | 1615-0038 | X | |
| **I-765, I-765WS, Application for Employment Authorization** | 1615-0040 | X | |
| **I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse** | 1615-0040 | X | |
| **I-817, Application for Family Unity** | 1615-0005 | X | |
| **I-821, Application for Temporary Protected Status** | 1615-0043 | X | |
| **I-821D, Consideration of Deferred Action for Childhood Arrivals** | 1615-0124 | X | |
| **I-824, Application for Action on an Approved Application or Petition** | 1615-0044 | X | |
| **I-829, Petition by Entrepreneur to Remove** | 1615-0045 | X | |



| Conditions | | | |
|---|---|---|---|
| I-864, Affidavit of Support under Section 213A of the Act and Notification of Reimbursement of Means-Tested Benefits | 1615-0075 | X | |
| I-864A, Contract between Sponsor and Household Member | 1615-0075 | X | |
| I-864EZ, Affidavit of Support Under Section 213A of the Act | 1615-0075 | X | |
| I-864W, Intending Immigrant's Affidavit of Support Exemption | 1615-0075 | X | |
| I-865, Sponsor's Notice of Change of Address | 1615-0076 | X | |
| I-905, Application for Authorization to Issue Certification for Health Care Workers | | X | |
| I-907, Request for Premium Processing Service | 1615-0048 | X | |
| I-912, Request for Fee Waiver | 1615-0116 | X | |
| I-914, Application for T Nonimmigrant Status; Application for Immediate Family Member of T-1 Recipient; and Declaration of Law Enforcement Officer for Victim of Trafficking in Persons | 1615-0099 | X | |
| Form I-914, Supplement A, Application for Immediate Family Member of T-1 Recipient | 1615-0099 | X | |
| Form I-914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons | 1615-0099 | X | |
| I-918, Application for U Nonimmigrant Status Application for U Nonimmigrant Status; Application for Immediate Family Member of U-1 Recipient; and U Nonimmigrant Status Certification | 1615-0104 | X | |
| Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient | 1615-0104 | X | |

**AR2022_301232**



| | | | |
|---|---|---|---|
| **Form I-918, Supplement B, U Nonimmigrant Status Certification** | 1615-0104 | X | |
| **I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant** | 1615-0106 | X | |
| **N-470,* Application to Preserve Residence for Naturalization** | 1615-0056 | X | |
| **N-644,* Application for Posthumous Citizenship** | 1615-0059 | X | |

**Homeland Security**

# Appendix B
## Tools and methods used to prioritize cases

USCIS offices use various tools and methods to prioritize cases for review. This includes:

### *California Service Center (CSC)*

- The Center Activity Tracking System (CATS) is used to report on the activities and productivity of the CSC. The system operates by allowing employees to track their work activities and production over the course of a day.
  - The Premium Processing Alert (PP Alert) provides a reminder email to the adjudicator assigned to a file as well as his or her supervisor. Noting that the premium processing files are to be adjudicated in 15 days or less, an email alert is sent to the officer and supervisor starting on the 10th day and continues until the file has a final adjudicative decision. The application provides the receipt number, officer assigned, officer's supervisor, NFTS location, and telephone number.

### *Texas Service Center*

- The Correspondence Handling and Management Planning System (CHAMPS) uses CLAIMS 3 data extracts to manage and monitor case workloads. CHAMPS provides reporting capabilities to identify 'ready to work' cases and to track cases throughout the adjudication process.[59]

### *Vermont Service Center*

- In order to track pending cases, a designated VSC employee runs a query of CLAIMS 3 replicated data from the VSC servers to identify cases that are 15 days old and notifies the adjudicator assigned to the case.

### *Nebraska Service Center*

- Using SMART, adjudicators pull information from CLAIMS 3 to identify what cases are still pending on "X" day and then locates the file using NFTS.
- A large portion of cases adjudicated at the NSC are Employment-Based Filings. To efficiently manage Employment-Based Filings the NSC created a locally – developed application, known as the EB Database. The EB Database is used daily by the NSC to identify and efficiently account for principal applicants and their dependent family members. These Employment-Based Filing applicants must be processed for security checks and prepared for adjudication in a timely manner.

---

[59] *See* DHS/USCIS/PIA-012 - Correspondence Handling and Management Planning System (CHAMPS), *available at* www.dhs.gov/privacy.



The EB Database also tracks cases that cannot be adjudicated to completion due to unavailability of visas from the Department of State, and must be pre-adjudicated and held until a visa becomes available.



## Appendix C
### Systems used to support automated adjudication

These systems include, but are not limited to:

- System Electronic Registration Approval (SERA), used by the CSC, to electronically organize and review incoming Temporary Protected Status (TPS) re-registration filings. SERA access TPS re-registration cases from CLAIMS 3, validates each application, and categorizes cases for automatic approval or manual adjudication.[60]

- Center Adjudication System Electronic Processing (CasePro), used by the Vermont Service Center, which electronically organizes and reviews incoming TPS, Deferred Enforced Departure (DED), and Deferred Action for Childhood Arrivals (DACA) filings, identifies approvable cases, automates the adjudication of some cases which meet filing requirements, and routes filings requiring additional review to the manual resolution process.[61]

These electronic case management systems either retrieve data directly from CLAIMS 3 or eCISCOR.

---

[60] *See* DHS/USCIS/PIA-058 System Electronic Registration Approval (SERA), *available at* www.dhs.gov/privacy.
[61] *See* DHS/USCIS/PIA-040 Center Adjudication System Electronic Processing (CasePro) *available at* www.dhs.gov/privacy.



# Appendix D

## CLAIMS 3 Sub-Systems and Minor Applications

| Application Name | Function | Type of Information | Location | PIA |
|---|---|---|---|---|
| Adjustment of Status (AOS) Scheduler | The AOS Scheduler provides a means of managing client interviews and appointments for CLAIMS 3. It has two distinct functions that are supported by a User and a Processor Version. The User Version is used to schedule and de-schedule interviews at the workstation. The Processor Version generates a text file to upload the appointment status to CLAIMS 3. | Schedules | NBC | CLAIMS 3 |
| Automated Premium Processing LAN e-mail System (APPLES) | APPLES is used to create and send e-mail notices to petitioners. It relies on Premium Processing information in CLAIMS 3 LAN System. Three types of notices are created and sent: a receipt notice, an approval notice, and a reminder notice. | Notices (receipt, approval, and reminder) | CSC, NSC, TSC and VSC | Benefit Decision Output |
| Biometric Retrieval Utility (BRU) Gateway | The BRU Gateway passes biometric data from Customer Profile Management System (CPMS) to CLAIMS 3. The biometric data is intended for users to perform benefits administrative tasks and functions. | Host interface | CSC, NBC, NSC, TSC and VSC | Benefit Decision Output |
| Customer Relationship Information System Interface (CRIS - Interface) | CRIS Interface extracts status updates from CLAIMS 3 database. | Case Status updates and associated time stamps | CSC, NBC, NSC, TSC and VSC. | Customer Relationship Interface System |
| Travel Document Printing System (TDPS) | This subsystem provides for the management and printing of travel-related documents. Three standard USCIS workstations and four printers are provided. There are six roles for processing travel documents: Quality Assurance Analyst, Printer Operators, Destroyer, Destruction Verifier, | Travel-related documents | NSC | Benefit Decision Output |

**AR2022_301237**

**Homeland Security**

| | | | | |
|---|---|---|---|---|
| | Supervisor, and Administrator. | | | |
| Enterprise Print Manager Service (EPMS) | EPMS supports notice/document production, by producing physical documents, i.e., Cards, Travel Documents or Correspondence. EPMS servers use Windows' built-in service Task Scheduler to create a task to run a PowerShell script to restart the EPMS agents at midnight each day to retrieve messages for processing. EPMS uses the Service Account and allow Windows Credential Manager to store the users password encrypted. | Cards and Travel-related documents | Data Center One (DC-1) | Benefit Decision Output |
| Interim Case Management Solution (ICMS) | ICMS supports an interim process for adjudication, building a custom Web-based interface to CLAIMS 3 via the USCIS Intranet to update cases with information from the adjudication decision. | Adjudications information, including final approval or denial information, for family-based adjustment of status applications. | National Benefits Center (NBC) only | CLAIMS 3 |

AR2022_301238

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009



March 7, 2022                                                                 PA-2022-10

# Policy Alert

SUBJECT:   Special Immigrant Juvenile Classification and Deferred Action

**Purpose**

U.S. Citizenship and Immigration Services (USCIS) is updating the USCIS Policy Manual to consider deferred action (and related employment authorization) for noncitizens classified as Special Immigrant Juveniles (SIJs) who are ineligible to apply for adjustment of status to lawful permanent resident (LPR) status solely due to visa unavailability.

**Background**

The SIJ classification is available to noncitizen children subject to state juvenile court proceedings related to abuse, neglect, abandonment, or a similar basis under state law.[1] SIJ classification does not render a noncitizen lawfully present, does not confer lawful status, and does not result in eligibility to apply for employment authorization. A noncitizen classified as an SIJ, however, may seek to adjust status to that of an LPR based on the SIJ classification if the noncitizen meets certain requirements. One of the requirements is that an immigrant visa number be immediately available at the time of filing the adjustment application.[2]

Due to ongoing visa number unavailability, the protection that Congress intended to afford SIJs through adjustment of status is often delayed for years, leaving this especially vulnerable population in limbo. Therefore, USCIS is updating its policy guidance to provide that USCIS will consider granting deferred action on a case-by-case basis to noncitizens classified as SIJs who are ineligible to apply for adjustment of status solely due to unavailable immigrant visa numbers.

Congress likely did not envision that SIJ petitioners would have to wait years before a visa became available, since for many years after implementation of the program, SIJs did have visas immediately available. Deferred action and related employment authorization will help to protect SIJs who cannot apply for adjustment of status solely because they are waiting for a visa number to become available. This process furthers congressional intent to provide humanitarian protection for abused, neglected, or abandoned noncitizen children for whom a juvenile court has determined that it is in their best interest to remain in the United States.[3]

---

[1] See INA 101(a)(27)(J). See 8 CFR 204.11.
[2] See INA 245(a), (h). See 8 CFR 245.2(a)(2)(i)(A).
[3] See INA 101(a)(27)(J).

PA-2022-10: Special Immigrant Juvenile Classification and Deferred Action
Page: 2

This update, contained in Volume 6 of the Policy Manual, is effective May 6, 2022 and applies to eligible noncitizens classified as SIJs before, on, or after that date based on an approved Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360). This guidance is controlling and supersedes any prior guidance on the topic.

**Policy Highlights**

- Provides that USCIS automatically conduct deferred action determinations for noncitizens with SIJ classification who cannot apply for adjustment of status solely because an immigrant visa number is not immediately available. Noncitizens with SIJ classification are not required to submit a separate request for deferred action, and a separate request will not be accepted.

- Explains that USCIS considers deferred action on a case-by-case basis to determine whether the noncitizen with SIJ classification warrants a favorable exercise of discretion.

- Provides that a grant of deferred action to a noncitizen with SIJ classification is for a period of 4 years.

- Explains that a noncitizen with SIJ classification who has been granted deferred action by USCIS may apply for, and be granted, employment authorization for the period of deferred action, by filing an Application for Employment Authorization (Form I-765), indicating category (c)(14).

**Citation**

Volume 6: Immigrants, Part J, Special Immigrant Juveniles, Chapter 4, Adjudication [6 USCIS-PM J.4].

*__Additional Background__*

Noncitizens without lawful status who have an approved SIJ petition remain subject to removal and do not have the ability to obtain employment authorization until they can apply to adjust status, unless they are otherwise in a category that authorizes them to apply for employment authorization, including deferred action. SIJs who are granted deferred action would be eligible to apply for employment authorization under 8 CFR 274a.12(c)(14).

Employment authorization will provide invaluable assistance to these vulnerable noncitizens who are children or young adults, and have limited financial support systems in the United States, especially as they age out of care, while they await an immigrant visa number.

In general, SIJs are unlikely to be enforcement priorities as evidenced by the broad waivers of inadmissibility Congress established,[4] as well as ICE Directive 11005.3: Using a Victim-Centered Approach with Noncitizen Crime Victims, which states that absent exceptional circumstances, ICE

---

[4] See INA 245(h)(2). See 8 CFR 245.1(e)(3).

PA-2022-10: Special Immigrant Juvenile Classification and Deferred Action
Page: 3

defers enforcement actions against SIJs until they adjust status to that of an LPR.[5] Therefore, the granting of deferred action[6] to SIJs further conserves DHS resources by focusing on the enforcement of higher priority cases, such as noncitizens who pose a threat to national security, public safety, and border security.

USCIS will not publish Federal Register notices requesting public comment because public notice is not required for internal policy clarifications. This policy update is based on our interpretation of the applicable terms in the Code of Federal Regulations and the Immigration and Nationality Act .

In addition to the above considerations, USCIS has analyzed this policy for any reliance interests that may have accrued to any regulated parties or the affected public. USCIS does not think there are any parties who will have taken actions or expended resources in reliance on USCIS not providing deferred action and employment authorization to noncitizens classified as SIJs who are ineligible to apply for adjustment of status to LPR. Approved SIJs already reside in the United States and are unlikely to be enforcement priorities.

Exercising our discretion to grant deferred action and possibly authorizing employment provides significant benefits to the U.S. labor pool and the economy in general compared to delaying such status. To the extent that this policy will result in any increased expenditures by any state for schools, services, or driver's licenses, USCIS anticipates such costs will be exceeded by the benefits to those states from the person being employed and contributing to the economy.

Conversely, USCIS believes that approved SIJ petitioners have a reliance interest in being provided with employment authorization consistent with the congressional intent in creating the SIJ program to protect vulnerable children by providing them with a pathway to LPR status, without having to wait years before a visa is available. Accordingly, USCIS has decided that any reliance interest that an affected party may have for maintaining the status quo is outweighed by the need for and benefits of this policy change.

---

[5] The directive states, "absent exceptional circumstances, ICE will exercise discretion to defer decisions on civil immigration enforcement action against the applicant or petitioner (primary and derivative) until USCIS makes a final determination on the pending victim-based immigration benefit application(s) or petition(s), including adjustment of status for noncitizens with approved Special Immigrant Juvenile status." See ICE Directive 11005.3: Using a Victim-Centered Approach with Noncitizen Crime Victims, Section 2.1.

[6] As in all deferred action determinations, USCIS considers on a case-by-case basis, based on the totality of the evidence, whether the person warrants a favorable exercise of discretion.

Case 1:18-cv-00068 Document 608-3 Filed on 11/03/22 in TXSD Page 31 of 379

USCIS Response to Coronavirus (COVID-19)



# USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders

Release Date : 03/29/2022

**WASHINGTON**— Today, U.S. Citizenship and Immigration Services is announcing a trio of efforts to increase efficiency and reduce burdens to the overall legal immigration system. USCIS will set new agency-wide backlog reduction goals, expand premium processing to additional form types, and work to improve timely access to employment authorization documents. Due to the COVID-19 pandemic and resource constraints resulting from the prior administration, USCIS inherited a significant number of pending cases and increased processing times. Through today's actions by the Biden administration, USCIS is acting to reduce these caseloads and processing times, while also ensuring that fair and efficient services are available to applicants and petitioners.

"USCIS remains committed to delivering timely and fair decisions to all we serve," said USCIS Director Ur M. Jaddou. "Every application we adjudicate represents the hopes and dreams of immigrants and their families, as well as their critical immediate needs such as financial stability and humanitarian protection."

**Reducing Processing Backlogs**

To reduce the agency's pending caseload, USCIS is establishing new internal cycle time goals this month. These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and applicants and petitioners will receive decisions on their cases more quickly. USCIS will increase capacity, improve technology, and expand staffing to achieve these new goals by the end of FY 2023.

The agency's publicly posted processing times show the average amount of time it took USCIS to process a particular form – from when the agency received the application until a decision was made on the case. Internally, USCIS monitors the number of pending cases in the agency's workload through a metric called "cycle times." A cycle time measures how many months' worth of pending cases for a particular form are awaiting a decision. As an internal management metric, cycle times are generally comparable to the agency's publicly posted median processing times. Cycle times are what the operational divisions of USCIS use to gauge how much progress the agency is, or is not, making on reducing our backlog and overall case processing times.

**AR2022_301242**

7/6/22, 3:33 PM    USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders | U…

Case 1:18-cv-00068 Document 608-2 Filed on 11/03/22 in TXSD Page 32 of 379

## NEW CYCLE TIME GOALS

| 2 WEEKS | 6 MONTHS | |
|---|---|---|
| I-129 Premium | N-400 | I-526 |
| I-140 Premium | N-600 | I-600 |
| **2 MONTHS** | N-600K | I-600A |
| I-129 Non-Premium | I-485 | I-730 |
| **3 MONTHS** | I-140 Non-Premium | I-800 |
| I-765 | I-130 Immediate Relative | I-800A |
| I-131 Advance Parole | I-129F Fiancé(e) | I-90 |
| I-539 | I-290B | I-821D Renewals |
| I-824 | I-360 | |
| | I-102 | |

**Expanding Premium Processing**

Today the Department of Homeland Security (DHS) announced a final rule that aligns premium processing regulations with the Emergency Stopgap USCIS Stabilization Act. The rule codifies premium processing fees and adjudication timeframes provided by Congress.

Premium processing is an expedited adjudication service now available only to petitioners filing a Form I-129, Petition for a Nonimmigrant Worker, and to certain employment-based immigrant visa petitioners filing a Form I-140, Immigrant Petition for Alien Workers. This final rule expands the categories of forms ultimately eligible for premium processing services, including Form I-539, Application to Extend/Change Nonimmigrant Status; Form I-765, Application for Employment Authorization; and additional classifications under Form I-140.

USCIS intends to begin implementing, through a phased approach, premium processing availability of Form I-539, Form I-765 and Form I-140 in fiscal year 2022. USCIS will also adhere to the congressional requirement that the expansion of premium processing must not cause an increase in processing times for regular immigration benefit requests.

USCIS plans to begin this phased implementation process by expanding premium processing eligibility to Form I-140 filers requesting EB-1 immigrant classification as a multinational executive or manager, or EB-2 immigrant classification as a member of professions with advanced degrees or exceptional ability seeking a national interest waiver.

**Improving Access to Employment Authorization Documents**

USCIS continues to make progress toward a temporary final rule currently named "Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicants."

AR2022_301243

In recent months, USCIS has begin streamlining many EAD processes, including extending validity periods for certain EADs and providing expedited work authorization renewals for healthcare and childcare workers. The temporary final rule aims to build on this progress and to ensure certain individuals will not lose their work authorization status while their applications are pending.

A full list of prior actions USCIS has taken to reduce processing times and the agency's pending caseload is available on our website.

Last Reviewed/Updated: 03/29/2022

AR2022_301244

**USCIS Response to Coronavirus (COVID-19)**


**U.S. Citizenship and Immigration Services**

Home > Newsroom > All News > News Releases > USCIS Announces Online Filing for DACA Renewal Forms

# USCIS Announces Online Filing for DACA Renewal Forms

Release Date : 04/12/2022

**WASHINGTON**— U.S. Citizenship and Immigration Services announced today that individuals who previously received deferred action under Deferred Action for Childhood Arrivals (DACA) may now file Form I-821D, Consideration of Deferred Action for Childhood Arrivals, online.

"The expansion of online filing is a priority for USCIS as we make our operations more efficient and effective for the agency and our stakeholders, applicants, petitioners and requestors," said USCIS Director Ur M. Jaddou. "The option to file DACA renewal requests online is part of USCIS' ongoing move to minimize reliance on paper records and further transition to an electronic environment."

At this time, the option to file online is only available for individuals who have previously been granted DACA. Such individuals must also file Form I-765, Application for Employment Authorization, which is available for online filing, as well as the Form I-765 Worksheet, which is required as evidence in support of the filing for DACA.

During fiscal year (FY) 2021, USCIS received more than 8.8 million requests for immigration benefits and other requests, including 438,950 Form I-821D DACA requests. Since launching online filing in 2017, the overall number of forms filed online has increased significantly. In FY 2021, approximately 1,210,700 applications, petitions and requests were filed online, a 2.3% increase from the 1,184,000 filed in FY 2020.

To file Form I-821D and Form I-765 online, a DACA requestor must first create a USCIS online account, which provides a convenient and secure method to submit forms, pay fees and track the status of any pending USCIS immigration request throughout the adjudication process. There is no cost to set up an account, which offers a variety of features, including the ability to communicate with USCIS through a secure inbox and respond online to Requests for Evidence.

With the addition of online filing for Form I-821D, individuals can now file 13 USCIS forms online, which can all be found on the Forms Available to File Online page. USCIS continues to accept the latest paper versions of all forms by mail.

Consistent with a court order issued in *State of Texas, et al., v. United States of America, et al.,* 1:18-CV-00068 (S.D. Tex. July 16, 2021), the Department of Homeland Security continues to accept the filing of both initial and renewal DACA requests, as well as accompanying requests for employment authorization.

AR2022_301245

However, under the July 16, 2021, order issued by the U.S. District Court for the Southern District of Texas, DHS is prohibited from granting initial DACA requests.

For more information on USCIS and its programs, please visit uscis.gov or follow us on Twitter ⊠, Instagram ⊠, YouTube ⊠, Facebook ⊠ and LinkedIn ⊠.

Last Reviewed/Updated: 04/12/2022

AR2022_301246

## USCIS Responses to the Congressional Research Service

**Question 1**: What is the cost of DACA?

**USCIS Response**:

There is no fee for filing the form I-821D, Consideration of Deferred Action for Childhood Arrivals. As noted on page 11 of the form instructions, there is no filing fee, but the alien must submit the I-821D with a request for Employment Authorization (form I-765) and biometric services. The I-765 fee is currently $410 and the biometric services fee is $85. Thus, the I-821D is filed with the I-765 and the biometrics request, and the total fee is $495 ($410 + $85).

USCIS generally uses a full cost recovery model to set its immigration adjudication fees, so fixed overhead costs are spread among all adjudication and naturalization service fees. However, since DACA requests were not included in the full cost recovery model for the I-765, the I-765 overhead cost allocation is spread among fewer requests, and the I-765 fee would be less than it is today if the DACA requests had been included in this overhead allocation. For more information on the cost recovery model see the fee rule in the October 24, 2016, Federal Register notice at 81 Fed. Reg. 73292. DACA is one of few exceptions to the general rule of cost recovery. Benefit types that currently have no fee and whose costs are spread across all other adjudication and naturalization service fees include refugee and asylum applicants, applications filed by victims of a severe form of trafficking in persons, victims of criminal activity, and applicants filing under the Violence Against Women Act.

Through its current draft FY 2019 – FY 2020 Immigration Examinations Fee Account (IEFA) biennial fee review process, USCIS has determined that the cost of processing initial DACA requests under Form I-821D is $446 and the cost to process DACA renewals is $216. Thus, the estimated cost to USCIS to adjudicate the two requests is their respective cost multiplied by the volume adjudicated. In 2017, USCIS adjudicated 56,506 initial DACA requests, so the total cost for 2017 is estimated at $25.2 million. USCIS adjudicated 419,071 renewals in 2017, for a total estimated cost of $90.5 million.

2016 initial I-821D adjudications: 64,105

2016 renewal I-821D adjudications: 148,860

2015 initial I-821D adjudications: 109,702

2015 renewal I-821D adjudications: 421,617

**Question 2:** Where does the funding for DACA come from? I understand that the fees charged to applicants for employment authorization and biometric services help fund the program, but it is not clear to me whether they cover the entire cost.

**USCIS Response:** All USCIS fees are pooled in the IEFA. Funding for DACA is taken from the IEFA. Since all fees are pooled, no direct correlation can be made between IEFA money used to fund DACA and fees collected from specific form types that are deposited in the IEFA.

It is nevertheless important to note that the fee for the Form I-765 applicable at the time DACA was established was set at the $380 level to account for:

(1) the costs of adjudicating an application for employment authorization and creating an Employment Authorization Document ($338); and

(2) an additional $42 to reflect:

(a) the reallocation of $9 to the I-765 to keep the naturalization application (N-400) fee the same as was set in the FY 2008/2009 fee rule; and

(b) the addition of $33 to pay for other policy decisions, such as the cost of fee waivers and exemptions, workload that does not generate revenue, and policy decisions to hold certain immigration fees lower than the total cost identified by the cost management model.[1]

The $85 fee for biometrics collection (which was not increased in 2016) is set at a level to cover only the cost of collecting biometrics and contains no extra amounts, as with the EAD application fee.[2]

---

[1] See Questions for the Record, Oversight of U.S. Citizenship and Immigration Services: Ensuring Agency Priorities Comply with the Law, Senate Judiciary Committee, Subcommittee on Immigration and the National Interest, Response to Question #34 (March 3, 2015), available at https://www.judiciary.senate.gov/imo/media/doc/Moore-Neufeld-Renaud%20Responses.pdf.
[2] Id.

AR2022_301248



# CBP Enforcement Statistics Fiscal Year 2022

U.S. Customs and Border Protection is the nation's largest federal law enforcement agency charged with securing the nation's borders and facilitating international travel and trade. Our top priority is to keep terrorists and their weapons from entering the United States.

At the nation's more than 300 ports of entry, CBP officers have a complex mission with broad law enforcement authorities tied to screening all foreign visitors, returning American citizens and imported cargo that enters the U.S. Along the nation's borders, the United States Border Patrol and Air and Marine Operations are the uniformed law enforcement arms of CBP responsible for securing U.S. borders between ports of entry.

Visit CBP's Southwest Border Migration page for demographic information regarding apprehensions and inadmissibles on the southwest border and the Assaults and Use of Force page for data on assaults on agents and officers, and uses of force by CBP personnel.

## Total CBP Enforcement Actions

Numbers below reflect Fiscal Year (FY) 2017 - FY 2022.

*Fiscal Year 2022 runs October 01, 2021 - September 30, 2022.*

|  | FY17 | FY18 | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|---|---|
| **Office of Field Operations (OFO) Total Encounters[1]** | 216,370 | 281,881 | 288,523 | 241,786 | 294,352 | 308,868 |
| **U.S. Border Patrol Total Encounters[2]** | 310,531 | 404,142 | 859,501 | 405,036 | 1,662,167 | 1,444,886 |
| **Total Enforcement Actions** | 526,901 | 683,178 | 1,148,024 | 646,822 | 1,956,519 | 1,753,754 |

[1] Beginning in March FY20,  OFO Encounters statistics include both Title 8  Inadmissibles and Title 42 Expulsions. To learn more, visit: Title-8-and-Title-42-Statistics. Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

[2] Beginning in March FY20,  USBP Encounters statistics include both Title 8  Apprehensions and Title 42 Expulsions. To learn more, visit: Title-8-and-Title-42-Statistics. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

**AR2022_301249**

# Search and Rescue Efforts

CBP agents frequently conduct life saving efforts, while carrying out their respective missions Numbers below reflect Fiscal Year (FY) 2019 - FY 2022.

*Fiscal Year 2022 runs October 01, 2021   September 30, 2022*

|  | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|
| **U.S. Border Patrol - Southwest Border Only** | 4,920 | 5,071 | 12,833 | 14,278 |
| **Air and Marine Operations   Nationwide** | 377 | 184 | 423 | 259 |

Arre t  of Individual  with Criminal Conviction  or Tho e Wanted by Law Enforcement

**Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement**

Numbers below reflect FY 2017 - FY 2022.

*Fiscal Year 2022 runs October 01, 2021 - September 30, 2022.*

|  | FY17 | FY18 | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|---|---|
| **Office of Field Operations** |  |  |  |  |  |  |
| **Criminal Noncitizens Encountered**[3] | 10,596 | 11,623 | 12,705 | 7,009 | 6,567 | 10,659 |
| **NCIC**[4] **Arrests** | 7,656 | 5,929 | 8,546 | 7,108 | 8,979 | 6,557 |
| **U.S. Border Patrol** |  |  |  |  |  |  |
| **Criminal Noncitizens Encountered**[3] | 8,531 | 6,698 | 4,269 | 2,438 | 10,763 | 7,253 |
| **Criminal Noncitizens with Outstanding Wants or Warrants** | 2,675 | 1,550 | 4,153 | 2,054 | 1,904 | 604 |

[3]Criminal noncitizens refers to noncitizens who have been convicted of crime, whether in the United States or abroad, so long as the conviction is for conduct which is deemed criminal by the United States. Criminal noncitizens encountered at ports of entry are inadmissible, absent extenuating circumstances, and represent a subset of total OFO inadmissibles. U.S. Border Patrol arrests of criminal noncitizens are a subset of total apprehensions. **See U.S. Border Patrol Criminal Noncitizen Statistics for a breakdown of criminal noncitizen stats by type of conviction.**

[4]NCIC (National Crime Information Center) arrests refers to the number of CBP arrests of individuals, including U.S. citizens, who are wanted by other law enforcement agencies.

AR2022_301250

Agriculture Enforcement

Fiscal Year 2022 Quarter 1 Agriculture Inspections Contaminated Products



## Previous Reports

Fiscal Year 2021 Quarter 4 Agriculture Inspections Contaminated Products

Fiscal Year 2021 Quarter 3 Agriculture Inspections Contaminated Products

Fiscal Year 2021 Quarter 2 Agriculture Inspections Contaminated Products

Fiscal Year 2021 Quarter 1 Agriculture Inspections Contaminated Products

Border Searches of Electronic Devices

**AR2022_301251**

In addition to longstanding federal court precedent recognizing the constitutional authority of the U.S. Government to conduct border searches, numerous federal statutes and regulations also authorize CBP to inspect and examine all individuals and merchandise entering or departing the United States, including all types of personal property, such as electronic devices.  See, for example, 8 U.S.C. §§ 1225, 1357 and 19 U.S.C. §§ 482, 507, 1461, 1496, 1499, 1581, 1582. CBP established strict guidelines for conducting border searches of electronic devices in its January 2018 Directive on Border Searches of Electronic Devices.

Border searches of electronic devices have helped detect evidence relating to terrorist activity and other national security matters, child pornography, drug smuggling, human smuggling, bulk cash smuggling, human trafficking, export control violations, intellectual property rights violations and visa fraud. In Fiscal Year 2020, CBP processed more than 238 million travelers at U.S. ports of entry. During that same period of time, CBP conducted 32,038 border searches of electronic devices, representing less than .014 percent of arriving international travelers.

# International Travelers Processed with Electronic Device Search

| Month | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY2022YTD |
|-------|---------|---------|---------|---------|-----------|
| October | 2,539 | 3,026 | 3,959 | 2,969 | 3,275 |
| November | 2,446 | 2,962 | 3,805 | 2,909 | 2,993 |
| December | 2,509 | 3,365 | 3,966 | 2,760 | 3,898 |
| January | 3,090 | 3,765 | 4,450 | 3,014 | 3,650 |
| February | 2,512 | 3,096 | 3,702 | 2,829 | 4,153 |
| March | 2,921 | 3,526 | 2,514 | 3,445 | 5,003 |
| April | 2,701 | 3,218 | 451 | 3,139 | 4,162 |
| May | 2,764 | 3,138 | 616 | 3,323 | 4,144 |
| June | 2,606 | 3,480 | 1,149 | 3,150 | |
| July | 2,798 | 3,458 | 2,047 | 3,244 | |
| August | 3,320 | 4,085 | 2,614 | 3,425 | |
| September | 3,090 | 3,794 | 2,765 | 3,243 | |
| Total | 33,296 | 40,913 | 32,038 | 37,450 | 31,278 |

Currency Seizures

OFO and USBP Currency Seizures Dashboard
Explore Office of Field Operations (OFO) and U.S. Border Patrol (USBP) currency seizures  by Fiscal Year.

**AR2022_301252**



**Monthly U.S. Border Patrol Nationwide Checkpoint Currency Seizures**

Numbers below reflect FY 2018 - FY 2022.

*Fiscal Year 2022 runs October 01, 2021 - September 30, 2022.*

|  | FY18 | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|---|
| **October** | $35,829 | $49,247 | $33,558 | $196,378 | $60,687 |
| **November** | $26,285 | $51,269 | $114,297 | $17,528 | $11,683 |
| **December** | $2,822 | $63,697 | $156,961 | $66,907 | $5,118 |
| **January** | $203,213 | $59,857 | $52,649 | $192,116 | $178,971 |
| **February** | $117,933 | $103,982 | $84,475 | $263,892 | $17,826 |
| **March** | $157,669 | $1 0,924 | $36,301 | $135,123 | $22,114 |
| **April** | $17,913 | $15,016 | $49,559 | $64,933 | $42,254 |
| **May** | $256,033 | $129,766 | $691,640 | $29,188 | $39,835 |
| **June** | $31,494 | $1 9,732 | $511,781 | $18,626 |  |
| **July** | $14,339 | $86,696 | $159,504 | $73,779 |  |
| **August** | $169,592 | $141,475 | $275,751 | $331,791 |  |
| **September** | $80,358 | $33,487 | $124,274 | $39,257 |  |
| **Total** | $1,113,480 | $965,148 | $2,290,750 | $1,429,519 | $378,488 |

Drug Seizures



OFO and USBP Drug Seizures Dashboard
Explore Office of Field Operations (OFO) and U.S. Border Patrol (USBP) drug seizures by weight and count of drug seizure events by Fiscal Year.

**AR2022_301253**

**Monthly U.S. Border Patrol Nationwide Checkpoint Drug Seizures**

Numbers below reflect FY 2022.

*Fiscal Year 2022 runs October 01, 2021- September 30, 2022.*

|  | Marijuana | Cocaine | Heroin | Methamphetamine | Fentanyl | Other |
|---|---|---|---|---|---|---|
| **October** | 376 | 220 | 0 | 290 | 73 | 3 |
| **November** | 191 | 73 | 0 | 581 | 34 | 3 |
| **December** | 128 | 102 | 66 | 559 | 26 | 4 |
| **January** | 360 | 39 | 0 | 457 | 65 | 56 |
| **February** | 786 | 90 | 2 | 268 | 12 | 27 |
| **March** | 58 | 50 | 2 | 224 | 13 | 4 |
| **April** | 275 | 186 | 14 | 479 | 174 | 19 |
| **May** | 197 | 105 | 0 | 307 | 8 | 3 |
| **June** |  |  |  |  |  |  |
| **July** |  |  |  |  |  |  |
| **August** |  |  |  |  |  |  |
| **September** |  |  |  |  |  |  |

*weights are in pounds (lb)

**See Air and Marine Operations Statistics for a breakdown of enforcement actions with non-CBP agencies.**

Intellectual Property Rights (IPR) Seizures



Intellectual Property Rights Seizures Dashboard
Explore the Office of Trade's IPR seizures by Fiscal Year.

Gang Affiliated Enforcement

**U.S. Border Patrol Nationwide Apprehensions by Gang Affiliation**

Numbers below reflect FY2015 - FY2022.

*Fiscal Year 20212 runs October 01, 2021 - September 30, 2022.*

| Gang Affiliation | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|---|---|---|---|
| **107th St** | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| **18th Street** | 84 | 47 | 61 | 145 | 168 | 36 | 28 | 72 |

AR2022_301254

| Gang Affiliation | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|---|---|---|---|
| Angelino Heights Sureno 13 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Bandidos | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Barrio Azteca | 6 | 0 | 3 | 4 | 0 | 1 | 1 | 1 |
| Barrio Van Nuys | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Border Brothers | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Brown Pride | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chirizos | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Folk Nation | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hard Times 13 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hells Angels | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Hermanos Pistoleros Latinos (HPL) | 2 | 18 | 3 | 2 | 2 | 2 | 1 | 1 |
| Latin Kings | 16 | 0 | 6 | 7 | 24 | 4 | 6 | 7 |
| Locos Surenos Trece | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| Los Traviosos | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Los Zetas | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| MS-13 | 335 | 253 | 228 | 413 | 464 | 72 | 113 | 175 |
| Mac 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Mara 18 | 0 | 0 | 0 | 1 | 2 | 1 | 1 | 0 |
| Mara-R | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Maravilla Salva Trucha | 0 | 1 | 0 | 2 | 0 | 1 | 0 | 0 |
| Market Street | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Mexican Mafia | 4 | 6 | 4 | 3 | 7 | 2 | 5 | 3 |
| Mexicles | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mexikanemi | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| Nortenos | 14 | 5 | 6 | 5 | 6 | 1 | 5 | 1 |
| Other | 154 | 136 | 90 | 82 | 110 | 75 | 53 | 63 |
| Outlaws | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pacific Street Gang | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Paisas | 73 | 119 | 53 | 62 | 90 | 93 | 79 | 93 |
| Partido Revolucionario Mexican (PRM) | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |

AR2022_301255

| Gang Affiliation | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22YTD |
|---|---|---|---|---|---|---|---|---|
| Playboys | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| San Fernando Valley Gang | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| South Los Angeles | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Southwest Cholos | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Surenos (sur-13) | 140 | 90 | 66 | 66 | 70 | 66 | 46 | 34 |
| Tango Blast | 14 | 16 | 8 | 8 | 20 | 7 | 7 | 5 |
| Texas Syndicate | 0 | 3 | 1 | 1 | 3 | 0 | 1 | 2 |
| Top Six | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Tortilla Flats | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Vallucos | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Vilanos-13 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| West Park | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Westside | | | | | 1 | 0 | 0 | 0 |
| Zetas | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Total | 844 | 702 | 536 | 808 | 976 | 363 | 348 | 459 |

Terrorist Screening Dataset Encounters

*This table provides a summary of OFO encounters of all persons at ports of entry with records within the TSDS at the time of their encounter.*

| | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 Oct-May |
|---|---|---|---|---|---|---|
| **Office of Field Operations TSDS Encounters at Land Border Ports of Entry of All Nationalities\*** | | | | | | |
| Southwest Border | 116 | 155 | 280 | 72 | 103 | 50 |
| Northern Border | 217 | 196 | 258 | 124 | 54 | 142 |
| Total | 333 | 351 | 538 | 196 | 157 | 192 |
| **U.S. Border Patrol TSDS Encounters Between Ports of Entry of Non-U.S. Citizens** | | | | | | |
| Southwest Border | 2 | 6 | 0 | 3 | 15 | 50 |
| Northern Border | 0 | 0 | 3 | 0 | 1 | 0 |
| Total | 2 | 6 | 3 | 3 | 16 | 50 |

AR2022_301256

| | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 Oct-May |
|---|---|---|---|---|---|---|
| **Percentage of Total USBP Encounters** | 0.0007% | 0.0015% | 0.0004% | 0.0007% | 0.0010% | 0.0035% |

*This table provides a summary of USBP encounters of non-U.S. citizens with records within the TSDS at the time of their encounter between U.S. ports of entry.*

The Terrorist Screening Dataset (TSDS) – also known as the "watchlist" – is the U.S. government's database that contains sensitive information on terrorist identities. The TSDS originated as the consolidated terrorist watchlist to house information on known or suspected terrorists (KSTs) but has evolved over the last decade to include additional individuals who represent a potential threat to the United States, including known affiliates of watchlisted individuals.

Encounters of watchlisted individuals at our borders are very uncommon, underscoring the critical work CBP Agents and Officers carry out every day on the frontlines. DHS works tirelessly to secure our borders through a combination of highly trained personnel, ground and aerial monitoring systems, and robust intelligence and information sharing networks.

TSDS watchlisted non-citizens encountered by the CBP Office of Field Operations at land ports of entry prior to entry into the United States may be denied admission to our country upon presentation, barring justification for their arrest under CBP policy. TSDS watchlisted individuals encountered by the U.S. Border Patrol (USBP) after entering the country without inspection may be detained and removed, to the extent possible under CBP policy, or turned over to another government agency for subsequent detention or law enforcement action, as appropriate.

*POE totals may include multiple encounters of the same individual.

U.S. Border Patrol Recidivism Rates

Recidivism percentages are updated at the end of each fiscal year.

| | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY 20 | FY21 |
|---|---|---|---|---|---|---|---|
| **Recidivism[5]** | 14% | 12% | 10% | 11% | 7% | 26% | 27% |

[5]Recidivism refers to percentage of individuals apprehended more than one time by the Border Patrol within a fiscal year. Beginning in March FY20, USBP encounters statistics and recidivism calculations include both Title 8 Apprehensions and Title 42 Expulsions. To learn more, visit: Title-8-and-Title-42-Statistics. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

Tags:
Statistics

**Source URL:** *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics*

AR2022_301257

1300 Pennsylvania Avenue NW
Washington, DC 20229

July 29, 2021

 **U.S. Customs and Border Protection**

MEMORANDUM FOR: Rodney S. Scott
Chief
United States Border Patrol

THROUGH: Michael W. Banks
Acting Deputy Chief
United States Border Patrol

FROM: Jose L. Trejo
Assistant Chief
United States Border Patrol

SUBJECT: Deferred Action for Childhood Arrivals

I am currently an Assistant Chief with the U.S. Border Patrol, which is a position at Headquarters in Washington, D.C. I have been a border patrol agent for 19 years. During my career, I have conducted checkpoint operations, line-watch operations, and other enforcement operations along the Southern Border. I am familiar with how agents in the field process both noncitizens who have Deferred Action for Childhood Arrivals (DACA) and undocumented noncitizens.

Based on my knowledge and experience and on a case-by-case basis, it typically takes only a few minutes to determine that further questioning and/or an enforcement action is not necessary where the individual has DACA and the accompanying Employment Authorization Document (EAD Card). If that individual did not produce an EAD card signifying their DACA status, that would very likely result in further questioning, or if at an immigration checkpoint, a referral to secondary inspection to validate the individual's immigration status. This additional questioning and/or secondary inspection referral can take thirty minutes to two hours to resolve, though the exact amount of time varies on a case-by-case basis.

Staff may direct questions to the Immigration, Prosecutions, and Custody Operations Unit at ImmigrationProsecutions&CustodyOPS@cbp.dhs.gov.



**U.S. Department of Homeland Security**

# 2022 Priorities

The Department of Homeland Secur ty (DHS) was establ shed  n the wake of the September 11th attacks w th the core respons b l ty to keep our nat on safe.  Over the past 19 years, DHS has evolved  nto the th rd largest Cab net agency w th over 250,000 ded cated profess onals carry ng out our m ss on through more than 20 component agenc es.

Every day, DHS interacts with the public more than any other Federal agency – on land, at sea, in the air, and in cyberspace.

Bu ld ng on a year of progress  n 2021 (/ ews/2022/02/04/202   s o g yea  p og ess depa    e   o e a d secu  y) and seek ng to strengthen and enhance the Department's capab l t es  n key areas, Secretary of Homeland Secur ty Alejandro N. Mayorkas has developed twelve pr or t es to gu de DHS's strateg c focus throughout the balance of 2022, and beyond.  As we approach the Department's 20th ann versary next year, these cross funct onal pr or t es, wh ch complement  nd v dual off ce and agency goals, w ll mean ngfully advance our cr t cal m ss on.

### Organizational Advancement

1. **Increase our effectiveness** through transformat onal, cross cutt ng  n t at ves: Strengthen our workforce, enhance our  nc dent management capab l t es, bolster our operat onal management, and better  ntegrate the work of our component agenc es and personnel so that we are draw ng on our best resources to prepare for and respond to complex and dynam c events
2. **Champion our workforce and a culture of excellence**  nternally and externally: Enhance employee engagement, bu ld and ma nta n a culture of recogn t on, and champ on the successes of our ded cated workforce
3. **Increase openness and accountability:** Bu ld and ma nta n trust w th the commun t es we serve through  mproved data transparency, robust external commun cat on, and strengthened overs ght and d sc pl nary systems
4. **Advance Diversity, Equity, Inclusion, and Accessibility (DEIA)**  n our workforce and **protect the privacy, civil rights, civil liberties, and human rights** of the commun t es we serve: Ensure our Department reflects the d vers ty of the commun t es we serve and ensure that our programs, pol c es, and operat ons  mprove equ ty and protect pr vacy, c v l r ghts, and c v l l bert es
5. **Innovate and harness technology** to advance m ss on del very: Adopt  nnovat ve approaches to opt m ze our operat ons and m ss on full llment and  mprove the customer exper ence
6. **Maximize our international impact** and strength: Leverage our  nternat onal footpr nt and relat onsh ps to advance homeland secur ty object ves, and un fy and fort fy Department efforts to counter threats from Ch na

### Mission-Specific Advancement

7. **Combat all forms of terrorism and targeted violence:** Counter all forms of terror sm,  nclud ng through enhanc ng domest c and  nternat onal  nformat on shar ng, empower ng commun t es, strengthen ng screen ng and vett ng, and address ng new and emerg ng threats such as unmanned aer al veh cles
8. **Increase cybersecurity** of our nat on s networks and cr t cal  nfrastructure,  nclud ng elect on  nfrastructure: Lead federal efforts to  ncrease nat onw de res l ence across the publ c and pr vate sectors, and cont nue play ng a lead role  n respond ng to major cybersecur ty  nc dents
9. **Secure our borders and modernize ports of entry:** Harness technology at and between ports of entry,  mprove  ntell gence and  nformat on capab l t es, and g ve our ded cated workforce the tools they need to secure our nat on's borders,  nclud ng  nterd ct ng  rregular m grat on and  ll c t flows of drugs, weapons, and other contraband
10. **Build a fair, orderly, and humane immigration system:** Develop and  mplement reg onal m grat on solut ons, lawful pathways as alternat ves to  rregular m grat on, and enhanced pol c es and processes to exped t ously and fa rly adm n ster our nat on's laws and uphold our values as a nat on of  mm grants

**AR2022_301259**

11. **Ready the nation to respond to and recover from disasters and combat the climate crisis:** Increase our investments in community resilience and adaptation and improve our disaster readiness capabilities

12. **Combat human trafficking, labor exploitation, and child exploitation:** Apply our resources and personnel to identify and protect victims, bring perpetrators to justice, and prevent the entry into the U.S. of products made with forced labor

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)      SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

PRIORITY (/KEYWORDS/PRIORITY)      SECRETARY ALEJANDRO MAYORKAS (/KEYWORDS/SECRETARY-ALEJANDRO-MAYORKAS)
STRATEGIC PLANNING (/KEYWORDS/STRATEGIC-PLANNING)

Last Updated: 03/17/2022

**AR2022_301260**

**Department of Homeland Security**
**Delegation Number: 0150.1**
**Issue Date: 06/05/2003**

# DELEGATION TO THE BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

## I. Purpose

This delegation vests in the Bureau of Citizenship and Immigration Services (BCIS) and through its highest ranking official to regional directors, asylum directors, district directors, service center directors, adjudication officers, asylum officers, immigration information officers, and other officers or employees of the BCIS the authorities described herein in order to accomplish the mission of the BCIS. This delegation is made through, and the exercise of any authorities therein is subject to the authority, direction, and control of, the Deputy Secretary of the Department of Homeland Security.

## II. Delegations

Pursuant to the authority vested in the Secretary of Homeland Security by law, including the Homeland Security Act of 2002, I hereby delegate to the Bureau of Citizenship and Immigration Services:

A. Authority to establish policies for performing such functions as are transferred to the Director by section 451 of the Homeland Security Act of 2002 (Act) or otherwise vested in the Bureau by law.

B. Authority to oversee the administration of such policies.

C. Responsibility for advising the Deputy Secretary with respect to any policy or operation of the BCIS that may affect the Bureau of Customs and Border Protection (BCBP) or the Bureau of Immigration and Customs Enforcement (BICE) of the Department, including potentially conflicting policies or operations.

D. Authority to establish national immigration services policies and priorities.

E. Authority to meet regularly with the Citizenship and Immigration Services Ombudsman ("the Ombudsman") described in section 452 of Act and to establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress pursuant to section 451(a)(3)(F) of the Act.

1

F.      Authority to design and implement in consultation with the Chief Human Capital Officer the managerial rotation program described in section 451(a)(4) of the Homeland Security Act of 2002.

G.      Authority to implement pilot initiatives for backlog elimination as described in section 451(a)(5) of the Homeland Security Act of 2002, including the authority to increase personnel, transfer personnel to focus on areas with the largest potential for backlog, and streamline paperwork.

H.      Authority under section 103(a)(1) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. §1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

I.      Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

J.      Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262-266 of the INA, 8 U.S.C. §§1302-06.

K.      Authority, in consultation with the legislative affairs function of the Department of Homeland Security, to prepare reports on private bills pertaining to immigration matters under 28 C.F.R. §0.105(h).

L.      Authority to certify official Department of Homeland Security records relating to immigration matters.

M.      Authority to maintain such files and records systems as are necessary to carry out the functions of the BCIS.

N.      Authority to place aliens in removal proceeding by issuance of a Notice to Appear, and to cancel such Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

O.      Authority to parole an applicant for admission into the United States under section 212(d)(5) of the INA, 8 U.S.C. §1182(d)(5), and to issue advance parole documentation.

P.      Authority to grant voluntary departure under section 240B of the INA, 8 U.S.C. §1229c, and deferred action.

Q.      Authority to approve bonds issued pursuant to the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

2

Delegation # 0150.1
AR2022_301262

R.      Authority to grant employment authorization under sections 214(a) or 274A(h)(3) of the INA (8 U.S.C. §§1184(a) and 1324A(h)(3)), 8 C.F.R. §274a.13, or other applicable law.

S.      Authority to interrogate aliens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph aliens under sections 287(a), (b), and (f) of the INA, 8 U.S.C. §1357 and under section 235(d) of the INA, 8 U.S.C. §1225(d).

T.      Authority under the immigration laws, including but not limited to sections 207 and 208 of the INA (8 U.S.C. §1157 and §1158), to grant asylum and refugee status (and terminate such status), adjust status of refugees and asylees, make credible fear determinations, and approve withholding of removal under the Convention Against Torture.

U.      Authority to exercise appellate jurisdiction over the matters described in 8 C.F.R. §103.1(f)(3)(E)(iii) (as in effect on February 28, 2003).

V.      Authority under the immigration laws, including but not limited to sections 310 and 341 of the INA (8 U.S.C. §1421 and §1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of aliens.

W.      Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. §1154 and §1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of the EOIR.

X.      Authority to invalidate labor certifications under 8 C.F.R §214.2, 20 C.F.R. §655.209 and §656.30.

Y.      Authority to approve participation as a Regional Center and to terminate such participation under 8 C.F.R.§204.6(m) and to take other actions to administer the Immigrant Investor (EB-5) Program.

Delegation # 0150.1
AR2022_301263

Z.     Authority under the immigration laws to extend and change nonimmigrant status and to adjust the status of aliens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of aliens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

AA.     Authority to approve or deny, or withdraw approval of petitions for schools seeking approval for attendance by nonimmigrant students under 8 C.F.R. §214.3.

BB.     Authority under the immigration laws to accept, process and adjudicate any application for any immigration benefit or service not exclusively under the jurisdiction of the EOIR, ICE or CBP, including but not limited to the authority to approve, deny, transfer, revoke, rescind, or certify all existing and future immigration, naturalization and citizenship benefits.

CC.     Authority to station officers and employees of the BCIS in foreign countries as provided by section 103(a)(7) of the INA, 8 U.S.C. §1103(a)(7), and other applicable law, and to perform such other activities with respect to the international operations of the Department of Homeland Security as I may direct.

DD.     Authority to perform other functions or duties as I may direct.

The authority delegated herein may be exercised by the director, his deputy, or the highest ranking official in the Bureau.  In exercising the authority delegated herein, the BCIS shall be governed by the Homeland Security Act of 2002; all applicable federal laws, rules and regulations; and the policies, procedures, direction, authority and control of the Secretary, the Deputy Secretary, the Under Secretary for Management, or other officer authorized by the Secretary to prescribe such policies and procedures or exercise such authority, direction and control.  Nothing herein shall be construed to limit or detract from the authority of the Secretary under section 102(a)(2) and (3) of the Homeland Security Act and other applicable law.

# III.   Reservations

The above delegations of authority to the BCIS in no way limit the functions, rights, privileges, powers, and duties vested in the Commissioner of CBP or in the Assistant Secretary for ICE by law, including authority provided by the above listed statutes or any delegation from the Secretary of Homeland Security.

The BCIS is directed to coordinate, to the extent necessary and appropriate, his exercise of the authorities under this delegation with other officials to whom I have delegated authorities that complement, relate to, involve, or are concurrent with the authorities in this delegation.  Specific reference in this delegation to coordination or consultation with other officials as to certain matters is not meant to limit the responsibility of the BCIS to coordinate or consult in other matters when appropriate.  Delegation of an authority to the BCIS shall not be construed to mean that the authority may be exclusively exercised by the Director; in particular, reference is made to delegations of authority to the Commissioner of CBP and to the Assistant Secretary for ICE that are with respect to many authorities parallel to, concurrent with, or overlapping with this delegation.

Unless specifically provided therein, nothing in this delegation authorizes the BCIS to enforce immigration laws by inspection of aliens or vehicles, issuance or execution of warrants, detention or release of aliens on bond, removal of aliens from the United States, issuance of stays of removal, reinstatement of removal orders, or any other enforcement authority exclusively delegated to the Commissioner of CBP or the Assistant Secretary for ICE.

Nothing is this delegation is intended to grant or provide authority or jurisdiction over any determination or matter within the sole authority of the Executive Office for Immigration Review of the Department of Justice.

# IV.   Re-delegations

Unless otherwise proscribed by statute, Executive Order, or the terms of this delegation, the powers, authorities, responsibilities, and functions of the BCIS may be re-delegated in writing by the Director or the highest ranking official to appropriate subordinate officials of the BCIS, and may be successively re-delegated to other officers or employees of the BCIS qualified to exercise the authority.  The Director or the highest ranking official also may re-delegate the authority contained in this delegation to the Commissioner of CBP or to Assistant Secretary for ICE, with their consent.

Officers and employees of the former Immigration and Naturalization Service (INS), including but not limited to the Examinations (Adjudications), Citizenship and International Affairs (including asylum and refugee) Programs of the former INS will, following their transfer to the BCIS, continue to exercise their authorities and responsibilities as they existed on February 28, 2003, unless modified or revoked by the BCIS or other authorized official.  Asylum officers continue to be delegated responsibilities as described in 8 C.F.R. §103.1(g)(3)(ii) (as in effect on February 28, 2003) unless modified or revoked by the BCIS or other authorized official.

Delegation # 0150.1
AR2022_301265

# V.   Authorities

Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 §§ 101, 102, 403, 441, 1502, 1706 (2002); 5 U.S.C. § 301; Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101 et seq.; the "immigration laws," as defined by section 101(a)(17) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101(a)(17).

# VI.   Credentials

Any badge, credential, seal, stamp or other such item or document that is valid at 11:59 p.m. on February 28, 2003, and that identifies an officer or employee of the INS, who is transferred to the BCIS, shall continue in effect as a badge, credential or other documentation identifying an officer or employee of the BCIS until its expiration, revocation, withdrawal, or replacement, whichever comes first.  The BCIS may authorize replacement, renewal, or new issuance of badges, credentials, seals, stamps or other such items or documents to BCIS officers or employees using Immigration and Naturalization Service identity and forms until BCIS forms are available.

# VII.  Office of Primary Interest

The Bureau of Citizenship and Immigration Services is the office with primary interest in this delegation.

# VIII. Cancellation

Delegation Number 0150 is rescinded.

# IX.   Effective Date and Time

This delegation of authority shall take effect at 12:00 midnight, March 1, 2003.


_Tom Ridge_

Secretary of Homeland Security

6

**Department of Homeland Security**
**DHS Directives System**
**Directive Number: 023-01**
**Revision Number  01**
**Issue Date: 10/31/2014**

# IMPLEMENTATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT

# I.  Purpose

The purpose of this Directive is to establish Department of Homeland Security (DHS) policy for implementing the requirements of the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA.  Instruction Manual 023-01-001-01 (Instruction Manual) provides the procedures for implementing this Directive.  This Directive and the Instruction Manual adopt and supplement the CEQ regulations and are to be used in conjunction with those regulations.  Together, this Directive and the Instruction Manual help ensure the integration of environmental stewardship into DHS decision making as required by NEPA.

# II.  Scope

A.      Policy and procedures in this Directive and the Instruction Manual apply to all DHS Components, direct appropriate compliance with NEPA, and are to be used in the planning and implementation of DHS programs, projects, and other activities as described in 40 CFR 1508.18 (herein after collectively referred to as "action").  DHS actions include, but are not limited to, the following: mission and operations planning; promulgation of regulations; acquisitions and procurements; asset and facility management; research and development; issuance of permits; and grants and other forms of federal assistance.

B.      This Directive and the Instruction Manual provide for a flexible framework for implementing NEPA in DHS.  To implement NEPA within their respective organizations to fit their unique missions, needs, and capabilities, Components have the option of developing Supplemental Instructions and of obtaining a delegation of authority to approve NEPA documents.

# III.   Authorities

A. 42 United States Code [U.S.C.] 4321-4335 (The National Environmental Policy Act of 1969);

B. 40 Code of Federal Regulations [CFR] Parts 1500-1508 (The Council on Environmental Quality Regulations for Implementing the Procedural Provisions of NEPA);

C. 6 U.S.C. Section 112 ("Secretary, functions");

D. 6 U.S.C. Subchapter VII ("Management");

E. DHS Delegation 00002, Delegation to the Under Secretary for Management;

F. DHS Delegation 00500, Delegation for Administrative Services;

G. DHS Delegation 00501, Delegation for Environmental Management, Energy Management, and Environmental Planning and Historic Preservation.

# IV.   Responsibilities

A. The Departmental Chief Readiness Support Officer (CRSO) in the Management Directorate:

1. Exercises DHS-wide authority and responsibility for various management functions, including environmental programs and among which is the implementation of NEPA; and

2. Provides guidance, direction, and oversight to the Director of Sustainability and Environmental Programs (SEP).

B. The Director of SEP:

1. Develops policy and guidance and establishes standardized requirements and processes for implementing NEPA across DHS;

2. Serves, unless otherwise delegated, as the single point of contact for DHS on NEPA and NEPA related-matters in interactions with CEQ, the Office of Management and Budget (OMB), the Advisory Council on Historic Preservation (ACHP), and other federal agency headquarters;

Directive 023-01
Revision #01
**AR2022_301268**

3. Approves Components' Supplemental Instructions for implementing NEPA within their respective organizations;

4. Approves Components' requests for a delegation of authority to approve NEPA documents; and

5. Approves NEPA documents, when such approval is required, unless otherwise delegated.

C. The Office of General Counsel:

1. Provides, upon request, legal advice to leadership and management regarding DHS compliance with NEPA;

2. Advises Proponents, in consultation with the respective Environmental Planning Program Manager (EPPM), as to whether a proposed action constitutes a major federal action to which NEPA applies;

3. Provides, upon request, review of NEPA documents for legal sufficiency; and

4. Coordinates DHS legal position with the Department of Justice, as appropriate, in the event of litigation.

D. Heads of Components:

1. Integrate the requirements of this Directive and the Instruction Manual into their respective mission activities, including providing for adequate staff and funding;

2. Ensure that any commitments made in NEPA decision documents are implemented as agreed upon and are monitored for effectiveness;

3. Have the option to develop Supplemental Instructions for approval by the Director of SEP;

4. Have the option to request a delegation of authority from the Director of SEP to approve NEPA documents in their respective component;

5. Implement approved Supplemental Instructions;

6.      Designate an EPPM with the authority to oversee the implementation of this Directive and the Instruction Manual, to be the primary point of contact for SEP regarding NEPA matters, and to receive any delegation of authority upon the Director of SEP's approval of Component Supplemental Instructions; and

7.      Provide NEPA documents to the Director of SEP for approval, when such approval is required, unless otherwise delegated.

# V.    Policy and Procedures

A.      It is DHS policy to comply with NEPA.  Environmental stewardship and DHS missions are compatible and complementary.  NEPA requires federal agencies to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.  Integrating the environmental planning requirements of NEPA with the planning and implementation of DHS actions helps to achieve environmental sustainability goals.

B.      Compliance with NEPA does not alleviate the need to comply with numerous other laws, regulations, Executive Orders, and other requirements established for the protection and stewardship of the human environment. However, the process of complying with NEPA can provide a framework to achieve compliance with many of these other requirements.  To the fullest extent possible, DHS integrates the NEPA process with compliance activities for these other requirements.

C.      Within Components, the Proponent of a proposed action is responsible for ensuring that the NEPA analysis and appropriate documentation is completed before a decision is made and with sufficient time to have a practical influence on the decision making process.

D.      DHS establishes and implements cost effective approaches for achieving NEPA compliance that are integrated into DHS missions and activities.

E.      DHS makes proposals for substantive revision to this Directive or the Instruction Manual available for review by CEQ and the public, as required by 40 CFR 1507.3.

F.      Procedures for implementing this Directive and definitions of terms are found in the Instruction Manual.

Directive 023-01
Revision #01
**AR2022_301270**

# VI.  Questions

Address any questions or concerns regarding this Directive and the Instruction Manual to the Departmental CRSO through the Director of SEP.

_____          _____
                Chris Cummiskey                              Date
    Acting Under Secretary for Management

Directive 023-01
Revision #01
AR2022_301271



# DHS EFFORTS TO COMBAT HUMAN TRAFFICKING

Combating human trafficking is a top priority for the U.S. Department of Homeland Security (DHS). Human trafficking involves the use of force, fraud, or coercion to obtain some type of labor or commercial sex act. Every year, nearly 25 million men, women, and children are trafficked worldwide – including here in the United States. DHS is a federal leader in this fight and works with partners at every level to prevent this heinous crime, identify and protect victims, and bring perpetrators to justice.

The DHS Center for Countering Human Trafficking (CCHT) integrates the efforts of 16 Agencies and Offices within DHS that carry out our anti-trafficking mission. These efforts range from criminal investigations, victim assistance, and combating forced labor in exports destined for the United States to external outreach and public education, intelligence, and training. Under the leadership of Secretary Mayorkas, DHS is incorporating a victim-centered approach into every facet of the counter-human trafficking mission.

**DHS Fiscal Year 2021 Counter-Human Trafficking Highlights:**

- DHS established the Center for Countering Human Trafficking (CCHT) to coordinate and integrate the Department's many counter-trafficking efforts.

- U.S. Customs and Border Protection (CBP) detained 1,469 shipments and seized 57 shipments containing nearly $500 million in merchandise linked to forced labor abroad, a nearly 900 percent increase from under $50 million in detained and seized goods in Fiscal Year 2020. CBP issued seven significant Withhold Release Orders (WROs) and two forced labor Findings to prevent merchandise produced with forced labor abroad from being imported into the United States.

- CBP modified three WROs and a Finding after foreign producers subject to these orders and findings took corrective actions to remediate forced labor conditions, improving the lives of thousands of workers. This included improvements in living and working conditions and repayment of unjust recruitment fees of over $30 million paid by workers.

- Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) made 2,360 human trafficking arrests and provided support to 728 victims. HSI human trafficking investigations led to 349 convictions of perpetrators.

- ICE Enforcement and Removal Operations (ERO) now has human trafficking points of contact in every office and has collaborated with the DHS Blue Campaign on posters and materials to distribute.

- The Federal Law Enforcement Training Centers (FLETC) trained more than 3,300 federal law enforcement officers on the indicators of human trafficking, how to respond, and how to support victims.

- U.S. Citizenship and Immigration Services (USCIS) released the first-ever T Visa Resource Guide for law enforcement and certifying agencies, and approved 829 T visas for victims of trafficking and 622 T visas for their qualifying family members.

- The DHS Blue Campaign, the Department's national human trafficking public awareness initiative, delivered 68 presentations to over 4,500 federal agencies, non-governmental organizations, law enforcement agencies, congressional offices, and members of the public to enable them to recognize the indicators of human trafficking and properly respond to potential trafficking cases. To raise awareness about human trafficking and how to respond, the Blue Campaign also developed three new trainings for youth program professionals, front-line convenience store employees, and campus law enforcement, and created two animated videos for youth and the trucking industry.

- The Blue Lightning Initiative, an element of Blue Campaign led by CBP and the Department of Transportation (DOT), attracted 29 new partners. The Initiative trains aviation personnel to identify potential traffickers and human trafficking victims, and to report their suspicions to federal law enforcement.

## HOW DHS COUNTERS HUMAN TRAFFICKING

### Victim Protection and Assistance

- USCIS and ICE HSI provide short-term and long-term immigration protections to eligible victims.

- The ICE HSI Victim Assistance Program informs victims of their rights and connects victims with organizations that provide direct services to support victims and their families. This support helps to protect and stabilize victims, and in turn enables them to pursue justice by actively participating in the investigation and prosecution of the crimes committed against them.

### Investigations and Enforcement

- ICE HSI investigates sex trafficking and forced labor, including forced labor in the U.S. supply chain, arrests perpetrators, and supports prosecutions.

- ICE ERO removes convicted human traffickers from the country.

- The DHS Science and Technology Directorate (S&T) develops and deploys leading-edge tools and technology to help identify victims and bring perpetrators to justice, including facial recognition technology to help identify child victims of exploitation, data analytics software to help law enforcement better understand signs of criminal activity that could indicate trafficking, and rapid DNA testing technology.

- CBP investigates allegations of forced labor in the U.S. supply chain and detains or seizes goods when information indicates that merchandise imported into the United States was produced with forced labor.

AR2022_301272

- U.S. Coast Guard conducts enforcement operations to deter and counter human trafficking at sea. The Coast Guard also collaborates with interagency and international partners to promote identification and protection of victims and address all forms of labor exploitation on vessels.

- DHS leads the interagency Forced Labor Enforcement Task Force (FLETF), which monitors U.S. enforcement of the prohibition on importing goods produced with forced labor. The broad federal collaboration within the Task Force ensures the U.S. Government can effectively enforce relevant laws and combat forced labor globally.

### Identification and Screening

- DHS employees are trained to identify and screen for suspected human trafficking victims and perpetrators on land, at sea, or in the air through CBP, USCIS, ICE, the U.S. Coast Guard, the Federal Emergency Management Agency (FEMA), U.S. Secret Service (USSS), and the Transportation Security Administration (TSA).

### Public Engagement, Awareness, Training and Outreach

- The Blue Campaign educates the public, non-governmental organizations, and industry and law enforcement partners about human trafficking and how to report suspected cases of trafficking. The Blue Campaign also develops trainings and materials to increase detection and reporting of human trafficking, and to identify victims.

- FEMA, through the DHS Center for Faith-Based and Neighborhood Partnerships, supports the development of anti-trafficking awareness materials and provides informational outreach to faith and community partners for the Blue Campaign.

- FLETC trains federal, state, local, tribal, territorial, and international law enforcement so they have the tools and expertise to recognize and respond to human trafficking.

- As part of the Blue Campaign, DHS, through CBP, partners with the Department of Transportation to lead the Blue Lightning Initiative (BLI). This initiative trains aviation industry personnel to identify potential traffickers and human trafficking victims, and to report their suspicions to federal law enforcement.

- USSS provides educational training on preventing and responding to child sex trafficking to schools, parents, and other community partners as part of its Childhood Smart Program.

## CASE SPOTLIGHTS

### HSI Baltimore Helps Secure Conviction for Sex Trafficker, Supports Victims

*In November 2021, a non-citizen illegally present in the U.S. was convicted of sex trafficking and drug distribution charges, following a nearly three-year investigation by HSI Baltimore and the Baltimore County Police Department (BCPD). Based on information from an informant, HSI and BCPD conducted surveillance, interviewed witnesses and victims, and executed search warrants for the suspect's social media platforms. Eight victims were identified, though evidence was presented at trial that indicated the convicted trafficker forced more than 25 individuals, including minors, into commercial sex work. An HSI Victim Advocate continues to help the identified victims and their families with stabilization and rehabilitation services.*

### HSI Leads Investigation Resulting in 54-Count Indictment for Human Smuggling and Labor Trafficking

*In November 2018, investigators from HSI, along with federal interagency partners, began a multi-year investigation into a largescale human smuggling and labor trafficking operation carried out by the Patricio transnational criminal organization. As part of this operation, Mexican and Central American workers were smuggled into the United States and subjected to brutal working conditions on South Georgia farms. Known as Operation Blooming Onion, the multi-agency effort led by HSI resulted in a 54-count indictment in November 2021 against two dozen defendants for their roles in labor exploitation and visa fraud. The conspirators had required the workers to pay unlawful fees for transportation, food, and housing while illegally withholding their travel and identification documents, forcing the workers to perform demanding labor for little or no pay, housing them in crowded, unsanitary, and degrading living conditions, and threatening them with deportation and violence. The conspirators are alleged to have reaped more than $200 million from the illegal scheme.*



## WHAT YOU CAN DO

- Report suspected human trafficking to DHS law enforcement by calling the HSI Tip Line at 1-866-347-2423.

- Get help from the National Human Trafficking Hotline by calling 1-888-373-7888 or texting HELP or INFO to 233733 (BEFREE).

- If you have information on goods produced with forced labor destined for the United States, provide it to CBP at https://eallegations.cbp.gov/s/ and info@ccht.dhs.gov.

- Raise awareness of human trafficking in your community using DHS Blue Campaign resources on DHS.gov/BlueCampaign.

- Visit the DHS Center for Countering Human Trafficking to learn more about our Department-wide efforts to combat human trafficking.

- Follow DHS Blue Campaign on Facebook, Instagram and Twitter: @DHSBlueCampaign.

- Read the DHS Strategy to Combat Human Trafficking, the Importation of Goods Produced with Forced Labor, and Child Sexual Exploitation.

- Read the White House National Action Plan to Combat Human Trafficking.

AR2022_301273

# Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)



**DEPARTMENT OF HOMELAND SECURITY**

**OFFICE OF THE CHIEF READINESS SUPPORT OFFICER**

_____          11/6/2014
Jeffery Orner                            Date
Chief Readiness Support Officer

AR2022_301274

# Issue Date:

## Table of Contents

I.   List of Acronyms ..............................................................................................I-1

II.  Definitions .....................................................................................................II-1

III.  Introduction ..................................................................................................III-1

IV.  Managing NEPA Implementation...................................................................IV-1

   A.  Decision-Making and Integration of NEPA with DHS Missions.........................IV-1

   B.  Primary Point of Contact within Components ...................................................IV-2

   C.  Activities Requiring Notification to SEP .............................................................IV-2

   D.  Collaboration ...................................................................................................IV-4

   E.  Dispute Resolution .........................................................................................IV-4

   F.  EP&HP Decision Support System (EP&HP DSS) ..........................................IV-5

   G.  Public Involvement .........................................................................................IV-6

   H.  Use of Contractors.......................................................................................IV-11

   I.  Performance Metrics and Reporting Requirements.......................................IV-11

   J.  Review of Other Agency NEPA Documents .................................................IV-11

   K.  Component Supplemental Instructions and Delegation of Authority..............IV-12

   L.  Administrative Record Requirements ...........................................................IV-16

V.  Procedures for Implementing NEPA .................................................................V-1

   A.  Overview of NEPA Requirements......................................................................V-1

   B.  Categorical Exclusions and Extraordinary Circumstances ...............................V-3

   C.  Environmental Assessments ...........................................................................V-8

   D.  Environmental Impact Statements.................................................................V-13

   E.  Mitigation and Monitoring ..............................................................................V-18

   F.  Cooperating and Joint Lead Agency Relationships .......................................V-20

   G.  NEPA Analysis and Writing ...........................................................................V-21

VI.  Emergency Actions.......................................................................................VI-1

   A.  Secure Lives and Protect Property ................................................................VI-1

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301275

B.   Determine Applicability of NEPA ........................................................................VI-1

C.   Notification to SEP....................................................................................VI-1

D.   Determine Level of NEPA Evaluation ..............................................................VI-1

VII.   Review of Applications from Persons or Organizations Outside of DHS .........VII-1

Appendix A.   DHS List of Categorical Exclusions .....................................................A-1

Appendix B.   List of Environmental Planning Requirements other than NEPA.........B-1

Appendix C.   Record of Environmental Consideration (REC) Template for
Categorically Excluded Actions ......................................................................... C-1

ii

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301276

## I.  List of Acronyms

| Acronym | Term |
|---|---|
| CATEX | Categorical Exclusion |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| DEIS | Draft Environmental Impact Statement |
| DHS | Department of Homeland Security |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| EP&HP | Environmental Planning and Historic Preservation |
| EP&HP DSS | EP&HP Decision Support System |
| EPPM | Environmental Planning Program Manager |
| FEIS | Final Environmental Impact Statement |
| FOIA | Freedom of Information Act |
| FONSI | Findings of No Significant Impact |
| FR | Federal Register |
| HQ | Headquarters |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NOA | Notice of Availability |
| NOI | Notice of Intent |
| OCRSO | Office of the Chief Readiness Support Officer |
| OGC | Office of the General Counsel |
| OPA | Office of Public Affairs |
| PEA | Programmatic Environmental Assessment |

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301277

| Acronym | Term |
|---------|------|
| PEIS | Programmatic Environmental Impact Statement |
| REC | Record of Environmental Consideration |
| ROD | Record of Decision |
| SEA | Supplemental Environmental Assessment |
| SEIS | Supplemental Environmental Impact Statement |
| SEP | Sustainability and Environmental Programs |
| U.S. | United States |
| U.S.C. | United States Code |

I-2

AR2022_301278

## II.  Definitions

All definitions contained in the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act (NEPA) (40 Code of Federal Regulations [CFR] Parts 1500-1508) apply to this Instruction Manual.  Definitions from the CEQ regulations of some of the terms and phrases that are more commonly used in this Instruction Manual are provided below for ease of reference.  Additional terms and phrases not defined in the CEQ regulations are defined below.

*__Action__*: A plan, project, program, policy, rule, regulation, procedure, or legislative proposal, as discussed at 40 C.F.R. §1508.18, subject to DHS's control and responsibility.  Projects include actions approved by permit or other regulatory decision as well as Federally-assisted activities (e.g., grants).

*__Best Management Practices__*: Generally accepted and applied measures or practices to lessen the adverse effects of actions on the human environment (e.g., control stormwater flowing through a construction site to reduce impacts to water quality).

*__Categorical Exclusion (CATEX)__*: As defined in 40 C.F.R. §1508.4, activities that do not need to undergo detailed environmental analysis in an EA or EIS because the activities have been determined to normally not have the potential, individually or cumulatively, to have a significant effect on the human environment.  Agencies can define categories of such activities as a way to reduce unnecessary paperwork and delay.  CATEXs are defined by, and are unique to, each Federal agency; at DHS they may be established for the Department as a whole or for an individual Component.  At DHS, certain CATEXs (see Appendix A, Table 1) are denoted with an asterisk and require preparation of a Record of Environmental Consideration (REC); an asterisk denotes classes of actions that have a higher possibility of involving extraordinary circumstances.

*__Component__*: As defined in DHS Directive 252-01, Organization of the Department of Homeland Security, any organization which reports directly to the Office of the Secretary of DHS when approved as such by the Secretary.  This is inclusive of both Operational Components and Support (also known as Headquarters) Components.  For purposes of this Instruction, the Office of the Secretary also constitutes a Component. The list of major Components making up DHS is available on the DHS website at https://www.dhs.gov/department-components.

*__Component Supplemental Instructions__*: A written policy-type document that describes how a Component implements the requirements of DHS Directive 023-01, and this Instruction Manual within their respective organization.  Criteria for Component Supplemental Instructions are provided in Section IV, Part K.

*__Cooperating Agency__*: As defined in 40 C.F.R. §1508.5, any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any

AR2022_301279

environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment.  A state or local agency of similar qualifications or a Tribe may by agreement with the lead agency also become a Cooperating Agency. Participation of Cooperating Agencies is not limited to the preparation of Environmental Impact Statements; it may also be appropriate for Cooperating Agencies to participate in the preparation of Environmental Assessments.

***Council on Environmental Quality (CEQ)***: Title II of NEPA established a council in the Executive Office of the President to oversee implementation of the Act.  The Council is appointed by the President with the advice and consent of the Senate.  The President designates the Chairman.  CEQ's responsibilities include appraising Federal Government programs and activities in light of the policy set forth in Title I of NEPA and formulating and recommending national policies to promote improvement of the quality of the environment.

***Cumulative Impact***: As defined in 40 C.F.R. §1508.7, the impact on the environment which results from the incremental impact of an action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

***Decision-Maker***: See Proponent.

***Department***: The Department of Homeland Security, which, unless otherwise specified includes all components thereof.

***Effects***: As defined in 40 C.F.R. §1508.8, effects of proposed actions includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.  Effects may also include those resulting from actions which may have both beneficial and detrimental effects.  "Effects" and "impacts" as used in the CEQ regulations and this Instruction Manual are synonymous.

***Effects of National Concern***: Effects that because of the high quality or function of the affected resource or because of the wide geographic range of effects (e.g. climate change) could create concern beyond the locale or region of a proposed action, as well as effects that may occur in multiple geographic regions of the U.S. from a program of proposed actions.

***Emergency***: A natural or man-made disaster or other phenomenon of an exceptional, inevitable, and irresistible character demanding immediate action for the protection of human life, public safety, public health, or the environment, and avoidance of significant loss of property if it relates to one of the other factors.  This includes but is not limited to

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301280

situations triggering emergency and major disaster declarations by the President under the Stafford Act.  See also 40 C.F.R. §1506.11.

***Emergency Action***: Any action needed to respond to or control the immediate impacts of an emergency.  This definition does not include long-term recovery actions.

***Environmental Assessment (EA)***: As defined in 40 C.F.R. §1508.9, a concise public document for which a Federal agency is responsible that serves to: briefly provide sufficient evidence and analysis for determining whether to prepare an Environmental Impact Statement or a Finding of No Significant Impact, aid an agency's compliance with NEPA when no Environmental Impact Statement is necessary, and facilitate preparation of an Environmental Impact Statement when one is necessary.

***Environmental Impact Evaluation***: The process of determining the level of significance of a potential impact on the human environment.  It includes all of the necessary studies, consultation, and public involvement needed to analyze the potential for environmental impact of a proposed action, assign a value to the level of impact (e.g. minor, moderate, or major), consider mitigation, and determine the level of significance; whether significant or not.  An environmental impact evaluation results in either the application of a Categorical Exclusion or documentation in the form of a final Environmental Assessment and Finding of No Significant Impact or a final Environmental Impact Statement.  An environmental impact evaluation is a necessary and major part of the NEPA process (defined in 40 C.F.R. §1508.21) but normally not fully inclusive of the NEPA process.  "Environmental impact evaluation" and "environmental analysis" as used in this Instruction Manual are synonymous.

***Environmental Impact Statement (EIS)***: As defined in 40 C.F.R. §1508.11, a detailed written statement as required by section 102(2)(C) of NEPA.

***Environmental Planning & Historic Preservation Decision Support System (EP&HP DSS)***: An automated system to standardize and improve the efficiency and effectiveness of NEPA analyses of proposed actions within DHS.  The EP&HP DSS is owned and operated by OCRSO-SEP for Department-wide utilization.

***Environmental Planning Program Manager (EPPM)***: As designated in a Component's approved Supplemental Instructions, the primary point of contact in a Component who is responsible for coordination with SEP on NEPA matters and who has the authority to oversee the implementation of DHS Directive 023-01 and this Instruction Manual in their respective organization.  For Components that do not have an EPPM, Director SEP serves as their EPPM.

***Environmentally Sensitive Area***: An area designated by law, regulation, or executive order that merits special protection or stewardship because of its value as a natural, historic, or cultural resource.  Examples include, but are not limited to: (1) proposed or designated critical habitat for threatened or endangered species; (2) properties listed or eligible for listing on the National Register of Historic Places; and (3) areas having special designation or recognition such as prime or unique agricultural lands, coastal

II-3

Instruction Manual # 023-01-001-01

Revision # 01

zones, designated wilderness or wilderness study areas, wild and scenic rivers, 100 year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, essential fish habitat, etc.

**_Extraordinary Circumstances_**:  When evaluating whether or not to apply a CATEX to a proposed action, these are circumstances associated with the proposed action that might give rise to significant environmental effects requiring further analysis and documentation in an EA or EIS.

**_Finding of No Significant Impact (FONSI)_**: As defined in 40 C.F.R. §1508.13, a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (40 C.F.R. §1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

**_Human Environment_**: As defined in 40 C.F.R. §1508.14, the natural and physical environment and the relationship of people with that environment.

**_Impacts_**: See effects.

**_Indian Tribe or Native American Tribe or Tribe_**: Any Indian tribe, band, nation, pueblo, or other organized group or community, including any Alaska native entity, which is Federally-recognized by the Secretary of the Interior through listing by the Bureau of Indian Affairs.

**_Jurisdiction by Law_**: As defined in 40 C.F.R. §1508.15, an agency's authority to approve, veto, or finance all or part of a proposal.

**_Lead Agency_**: As defined in 40 C.F.R. §1508.16, the agency or agencies preparing or having taken primary responsibility for preparing an EA or EIS.

**_Major Federal Action_**: As defined in 40 C.F.R. §1508.18, actions with effects that may be major and which are potentially subject to Federal control and responsibility.  Major reinforces but does not have a meaning independent of significantly (40 C.F.R. §1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.  See 40 C.F.R. §1508.18 for the full definition.

**_Mitigation_**: An action or series of actions, which may be ongoing and sustained, to reduce the probability of, or lessen the impact of an adverse effect on the quality of the human environment.  The following examples of ways to mitigate impacts to the human environment are provided in 40 C.F.R. §1508.20: (a) avoiding the impact altogether by not taking a certain action or parts of an action; (b) minimizing impacts by limiting the degree or magnitude of the action and its implementation; (c) rectifying the impact by repairing, rehabilitating, or restoring the affected environment; (d) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; (e) compensating for the impact by replacing or providing substitute

resources or environments.  Mitigation may also include the utilization of best management practices and adaptive management approaches.

***National Environmental Policy Act (NEPA)***: Public Law 91-190, as amended, declares a national policy which encourages productive and enjoyable harmony between humans and the environment.  NEPA requires Federal officials to consider environmental values alongside technical and economic considerations in their decision-making.

***NEPA document***: A DHS REC, EA, SEA, PEA, FONSI, NOA, NOI, EIS, SEIS, PEIS, Legislative EIS, ROD, or any other document prepared pursuant to a requirement of NEPA, the CEQ Regulations, DHS Directive 023-01, or this Instruction Manual. This includes environmental documents as defined in 40 C.F.R. §1508.10.

***NEPA process***: The effort required to systematically address the environmental stewardship and compliance requirements set forth in NEPA during program and project planning, development, and design; and prior to execution of a proposed action for the purpose of protecting, sustaining, or restoring the quality of the human environment. This process consists wholly or in part of scoping, development, and consideration of the proposed action and alternatives, environmental impact evaluation, consideration of mitigation and monitoring its success, consultation, and public involvement.  This includes the NEPA Process as defined in 40 C.F.R. §1508.21.

***Notice of Availability (NOA)***: A formal notice published in the Federal Register announcing the issuance and public availability of a draft or final EIS and ROD.  The EPA published NOA is the official public notification of an EIS.

***Notice of Intent***: As defined in 40 C.F.R. §1508.22, a notice that an environmental impact statement will be prepared and considered.

***Office of the Chief Readiness Support Officer (OCRSO)***: Office that supports the Departmental CRSO, which is organizationally located in the Management Directorate at DHS Headquarters (HQ), as defined in DHS Directive 0100, Organization of the Office of the Under Secretary for Management, and DHS Directive 0004, Administrative Services Line of Business Integration and Management, and any successions to these Directives.

***Office of the General Counsel (OGC)***: Office that supports the General Counsel (defined in DHS Directive 252-01), who is the chief legal officer and the final legal authority within DHS, and has the authority to participate in and decide any legal matter within DHS (except for matters within the scope of the Inspector General's authorities). OGC includes DHS Headquarters attorneys together with the attorneys in all Component legal offices, whether denominated Office of Chief Counsel, Office of Principal Legal Advisor, Office of the Judge Advocate General or otherwise.

***Proponent***: A DHS Federal employee who is the identified program or project manager for a proposed action that is subject to NEPA review.  The Proponent is also the

AR2022_301283

decision-maker for the proposed action.  The Proponent is responsible for defining the reason why a proposed action is needed, and has the immediate authority to decide a course of action or has the authority to recommend a course of action, from among options, to the next higher organizational level (e.g., district to region, region to headquarters) for approval.  The Proponent also normally has authority to establish the total estimate of resource requirements for the proposed action or, in the execution phase, has the authority to direct the use of resources.  The Proponent does not have to personally perform the environmental impact evaluation or have NEPA expertise, but is responsible for ensuring NEPA compliance before committing DHS to a particular course of action; this includes responsibility (with support from their respective EPPM) for the completion of any appropriate NEPA documentation.

***Record of Decision (ROD)***: The concise public record described in 40 C.F.R. §1505.2 that is prepared to conclude the process of preparing an Environmental Impact Statement.  A ROD (or Notice of its Availability) is published in the Federal Register.  The ROD need not be a unique or separate document, when a formal public record of a decision is otherwise issued, as long as the formal public record meets the requirements of 40 C.F.R. §1505.2.  For example, grant award documents or permits may suffice for a ROD if they meet the requirements of 40 C.F.R. §1505.2.

***Record of Environmental Consideration (REC)***: An internal DHS administrative document that records the application of a DHS CATEX (Appendix A, Table 1) to a specific proposal.  A REC is required for the application of any CATEX identified with an asterisk in Appendix A, Table 1 of this Instruction Manual.  RECs are normally prepared and maintained electronically in the EP&HP DSS.

***Secretary***: The Secretary of the Department of Homeland Security.

***Significantly***: As used in the NEPA process, an evaluation of significance requires consideration of both context and intensity.  Context means that the significance of an action must be analyzed in several contexts such as society as a whole, the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action.  Intensity refers to the severity of impact.  See 40 C.F.R. §1508.27 for the full definition.

***Special expertise***: As defined in 40 C.F.R. §1508.26, an agency's statutory responsibility, mission, or related program experience.

***Sustainability and Environmental Programs (SEP)***: A program management area organizationally located in OCRSO, Management Directorate, DHS Headquarters.  SEP is responsible for oversight of the implementation of NEPA across DHS.

II-6

AR2022_301284

## III.  Introduction

This Department of Homeland Security (DHS) "Instruction Manual on Implementation of the National Environmental Policy Act (NEPA) (Instruction 023-01-001-01)," together with DHS Directive 023-01, "Implementation of the National Environmental Policy Act," (hereafter Instruction Manual and Directive) establish the policy and procedures DHS follows to comply with the National Environmental Policy Act of 1969 (NEPA) (42 United States Code [U.S.C.] 4321 et seq.) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 C.F.R. Parts 1500-1508). This Instruction Manual serves as the DHS implementing procedures for NEPA (as required by 40 C.F.R. Parts 1505.1 and 1507.3) which supplement the CEQ regulations and therefore must be read in conjunction with them.  The Directive and this Instruction Manual are available on the DHS website at www.dhs.gov/nepa.  The NEPA statute and the CEQ regulations are available at https://ceq.doe.gov/index.html.

NEPA is the basic charter and foundation for stewardship of environmental resources in the United States.  To implement the policies set forth in NEPA, Congress prescribed a procedure commonly referred to as the "NEPA process" for Federal agencies to follow.  The NEPA process is a planning and decision-making tool that helps Federal agency decision-makers systematically identify and evaluate the potential environmental impacts of proposed actions prior to making decisions.  The NEPA process encourages public involvement in decisions that would affect the quality of the human environment and includes the identification and evaluation of reasonable alternatives to proposed actions that would avoid or minimize adverse environmental impacts.

Generally, NEPA applies to Federal actions that affect the human environment.  Within DHS,  NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, executed by DHS under the direction of Congress, or proposed by persons or organizations outside of DHS that require approval, funding, a license, or a permit from DHS.

The requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS.  Within Components, proponents of programs, projects, and activities implement the requirements of the Directive and this Instruction Manual in consultation with their respective Environmental Planning Program Manager (EPPM) (for a definition of EPPM, see Section II and Section IV, Part K) and Office of General Counsel (OGC), and the Director of Sustainability and Environmental Programs (SEP) when appropriate.

References to government organizations or regulations in this Instruction Manual include their succeeding organizations and requirements.

III-1

AR2022_301285

## IV. Managing NEPA Implementation

### A. Decision-Making and Integration of NEPA with DHS Missions

DHS follows the Directive and this Instruction Manual to ensure that decisions are made in accordance with the policies and procedures of NEPA. DHS integrates the NEPA process with other planning efforts at the earliest possible stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made. Within Components, Proponents ensure that the appropriate NEPA analysis and documentation is completed before a decision is made that irretrievably commits resources or limits the choice of reasonable alternatives to satisfy an objective, fix a problem, address a weakness, or develop a program. DHS also integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment, and follows CEQ guidance on such integration. These other requirements include, but are not limited to, those listed in Appendix B. However, compliance with other requirements for the stewardship and protection of the human environment does not relieve DHS from completing the NEPA process and complying with NEPA; conversely, compliance with NEPA does not relieve DHS from complying with these other requirements.

Because of the diversity of DHS, it is not feasible to describe in this Instruction Manual the decision-making process for every DHS program. Proposals and actions may be initiated at any level of the DHS organization. Similarly, review and approval authority may be exercised at various levels depending on the nature of the action, source of funding, statutory authority, etc. In their respective decision-making processes, Components:

(1) Consider all relevant NEPA documents in evaluating proposals for action;

(2) Make relevant NEPA documents, comments, and responses part of the record in formal rulemaking or adjudicatory proceedings;

(3) As a proposal for action is being developed, ensure that relevant NEPA documents, comments, and responses accompany the proposal through the appropriate formal project approval and decision-making processes to ensure that the NEPA analysis is considered in making a decision; and

(4) As a proposal for action is being developed, ensure that the range of reasonable business and operational alternatives being considered are appropriately analyzed under NEPA and, when evaluating a proposal for action, that only those alternatives discussed in the relevant NEPA documents are considered in the evaluation, unless the environmental documents are appropriately supplemented to examine a newly developed alternative.

IV-1

AR2022_301286

## B.   Primary Point of Contact within Components

Each Component provides to Director SEP the name of a primary point of contact for coordination of NEPA matters.  For Components that seek a delegation of authority as described in Section IV, Part K, this point of contact is referred to as the EPPM.

## C.   Activities Requiring Notification to SEP

Components notify SEP in writing, unless otherwise specified, of NEPA activities that meet any of criteria listed below.  This notification is made at the earliest possible stage to allow for substantive involvement from SEP and, where applicable, approval by Director SEP.

(1)   NEPA activities for actions that are likely to receive high-level executive branch and/or national attention, including those that are likely to require the attention of either the Deputy Secretary or the Secretary.  This includes situations where a Component intends to communicate with another Federal agency regarding the NEPA activities.  SEP provides written notification to Components on its level of involvement within five (5) working days of notification, or as soon as possible for emergency actions.

(2)   Emergency actions that would have significant environmental effects. Components notify SEP as soon as possible by any practical means, and SEP consults with CEQ as soon as possible to develop alternative arrangements for completing an Environmental Impact Statement (EIS). Also see Section VI.

(3)   Emergency actions where there is the potential for significant environmental effects or where the effects are unknown and there is not sufficient time to prepare an Environmental Assessment (EA). Components notify SEP as soon as possible by any practical means, and SEP coordinates with CEQ as soon as possible regarding an alternative approach to completing an EA.  Also see Section VI.

(4)   NEPA disputes that cannot be resolved at the Component level.  See the dispute resolution process in Section IV, Part E.

(5)   Requests for DHS review and comment on NEPA documents originating from other agencies when the receiving Component has a mission-related interest in the proposal, so that SEP can coordinate the request among Components to determine whether others have a mission-related interest and need to be involved in preparing the comment.  SEP acknowledges receipt and begins coordination with Components within five (5) working

IV-2

days of notification, or as soon as possible for emergency actions.  If more than one Component has a mission-related interest in the proposal, SEP normally prepares a single departmental response with input from the interested Components.  If only one Component has a mission-related interest in the proposal, SEP normally tells the respective Component to respond directly to the requesting agency.  Also see Section IV, Part J.

(6)   Where a Component is the lead or joint-lead, the following are reviewed by SEP prior to public disclosure: all Notices of Intent (NOIs) to prepare an EIS and all associated draft, final, and supplemental EISs (SEISs), all Notices of Availability (NOAs), and all proposed notices for EAs to be published in the Federal Register.  SEP provides written comments to the Component within ten (10) working days of notification for EISs and five (5) working days of notification for NOIs, NOAs, and Federal Register notices for EAs.  Also see Section V, Parts C and D.

(7)   When a Component has information to be posted on the DHS NEPA webpage.  The information is provided to SEP for posting on the DHS NEPA webpage a minimum of seven (7) calendar days in advance of the date the Component seeks to make the information publicly available. Also see Section IV, Part G (2).

(8)   New or revised Component Supplemental Instructions, including Component requests for a delegation of authority to approve NEPA documents.  SEP reviews and approves new or substantively revised Component Supplemental Instructions following the process described in Section IV, Part K (2).  Components provide SEP with copies of non-substantive changes to existing approved Supplemental Instructions, but no formal approval by SEP is required.

(9)   All NEPA documents that require approval by Director SEP, unless otherwise delegated (see Section IV, Part K (3)).  SEP provides written comments to Components within ten (10) working days of notification for EAs and EISs and five (5) working days of notification for Records of Environmental Consideration (RECs).

(10)  Component proposals for changes to categorical exclusions (CATEXs), including a supporting Administrative Record for a new or substantively revised CATEX.  For substantive revisions to, deletions of, or establishment of new CATEXs, SEP reviews and provides written comments to Components within ten (10) working days or begins coordination with CEQ, as appropriate.  For non-substantive changes to CATEXs, SEP appropriately revises Appendix A, Table 1.  Also see Section V, Part B (3).

IV-3

(11) Existence of circumstances that may substantially impair a Component's ability to fulfill substantive requirements of the Directive and Instruction Manual, and Component Supplemental Instructions, if they exist (e.g., the departure of the Component's EPPM or a significant proportion of staff who perform environmental planning activities).  Also see Section IV, Part K (3).

(12) Existence of a pattern of non-compliance in the Component with substantive requirements of the Directive and Instruction Manual, and Component Supplemental Instructions, if they exist.  Also see Section IV, Part K (3).

## D.   Collaboration

Collaboration among DHS personnel regarding common NEPA issues helps promote effective and efficient environmental planning and NEPA compliance and fosters the growth of environmental planning expertise across DHS.  To that end, SEP is responsible for facilitating collaborative efforts across DHS to promote effective implementation of NEPA.  SEP uses various communication methods, including email distribution lists, committees, and work groups with Component representation.  Through these channels,  issues are surfaced, expertise from across DHS is used to develop solutions, and members are kept apprised of and given the opportunity to provide input into current NEPA initiatives – both those developed by DHS and those originating from outside DHS, such as from regulatory and oversight agencies (e.g., CEQ).  The Environmental Planning and Historic Preservation  Decision Support System (EP&HP DSS) (see Section IV, Part F) is also used for sharing knowledge and best practices across DHS.

Components coordinate among themselves to resolve project-specific issues, with conflicts resolved through the dispute resolution process described in Section IV, Part E.  Components raise common issues to SEP for a determination as to whether a DHS-wide solution is needed.

## E.   Dispute Resolution

During the NEPA process, DHS and another Federal agency or Tribal, State or local government or the public may not agree on significant issues or aspects of the NEPA review process or the proposed action.  In addition, disputes may arise within DHS on aspects of the NEPA process or the proposed action.  When a significant dispute arises, Components keep a record of the positions and interests, as well as the eventual resolution of the dispute.

It is DHS policy to seek resolution of NEPA disputes at the lowest organizational level possible and to follow established organizational lines of authority for elevating and resolving the dispute.  If a NEPA dispute cannot be resolved at the Component level, the Component requests the involvement of Director SEP for resolution.

IV-4

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301289

When the issue(s) of conflict are beyond the authority of Director SEP to resolve, the dispute is elevated to higher levels of DHS for resolution, following established organizational lines of authority.

If an external dispute arises in the context of a memorandum of understanding or similar interagency agreement which includes a dispute resolution provision, the terms of that dispute resolution provision are ordinarily followed.  The CEQ regulations provide a formal Referral Process that may be used for referring interagency disagreements to CEQ regarding proposed actions considered in an EIS that might cause unsatisfactory environmental effects (see 40 C.F.R. §1504). The CEQ Referral Process is only used after there have been concerted but unsuccessful attempts to resolve the differences between DHS and another Federal agency, including elevation of the dispute to Director SEP.  When the CEQ referral process is used, the Component prepares the referral package according to the requirements in 40 C.F.R. §1504.3 and submits the package to Director SEP, and Director SEP submits the referral to CEQ.  Alternative Dispute Resolution, using the Institute for Environmental Conflict Resolution (see http://www.ecr.gov/) or another mediation service, is another option that may be used for resolving interagency disputes.  Additional information on environmental collaboration and conflict resolution is provided in the CEQ and OMB Memorandum on Environmental Collaboration and Conflict Resolution, 7 September 2012 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html).

## F.   EP&HP Decision Support System (EP&HP DSS)

The EP&HP DSS is an automated system designed to standardize and improve the efficiency and effectiveness of DHS reviews of proposed actions for compliance with NEPA requirements.  The system is available to anyone with access to the DHS network.  Questions on the review screens in the EP&HP DSS help users determine whether a proposed action may impact the quality of the human environment.  This enables users to ensure that the appropriate level of NEPA documentation is prepared.  The EP&HP DSS also enables knowledge sharing across DHS regarding environmental planning activities and requirements, is a repository for DHS NEPA documents, and is used to gather information necessary for meeting internal and external EP&HP reporting requirements, including NEPA reporting requirements.  Reference to the EP&HP DSS in this Instruction Manual includes Version 2.0 and future versions of the system and any successors.

The EP&HP DSS is used for the following:

(1)   To record the application of any CATEX listed in Appendix A, Table 1 that is denoted with an asterisk;

(2)   To maintain electronic versions of final NEPA documents, such as: RECs, EAs, EISs, Findings of No Significant Impact (FONSIs), and Records of Decision (RODs), as well as associated documents, including but not

limited to Memoranda of Agreement, Programmatic Agreements, and Biological Assessments; and

(3)   As determined by Components in their Supplemental Instructions.

In instances when the EP&HP DSS is not available (e.g., if the server is down), Components manually prepare a REC, using the template provided in Appendix C. Components may propose modifications to this template in their Supplemental Instructions, provided that the Component-specific template remains compatible with the EP&HP DSS.  Components include in their Supplemental Instructions the REC template to be used to prepare a REC when the EP&HP DSS is not available. When the EP&HP DSS becomes available, Components upload the manually-completed REC (in PDF format) into the system; no additional review conducted in the EP&HP DSS is necessary.

Additional information and requirements on use of the system, such as user roles and workflow, is provided online within the EP&HP DSS.


## G.   Public Involvement

Open communication, consistent with other Federal requirements, is DHS policy. Intergovernmental collaboration and public involvement improve the effectiveness of DHS missions and activities, as well as build trust between DHS and the communities it serves.  In addition, collaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making.  At DHS, public involvement is used in the NEPA process to help define the scope of issues and level of analysis.

During the NEPA process, information and documents are made available to the public in conformance with CEQ regulations at 40 C.F.R. §1506.6.  Public involvement starts early and continues throughout the NEPA process.  Components schedule sufficient time and make diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions before decisions are made.  Components make information on NEPA activities available to the public through a variety of notification methods including, but not limited to, the Federal Register, newspaper notices, website postings, and other media as appropriate.  Specifically for a draft or final EIS, a "Notice of Availability" (NOA) is published in the Federal Register (see Section V, Part D (8)).

In general, collaboration and public involvement in NEPA activities include the following three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the

identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments.

**(1)   Public Involvement Requirements**

When DHS is the lead agency for a proposed action, DHS is responsible for the nature and extent of the public involvement effort.  Public involvement efforts are tailored to the nature of the proposed action, the environmental impact issues of concern, and the characteristics of the individuals and communities to be reached.

Special outreach efforts to reach affected minority populations and low-income populations are appropriate to ensure consideration of environmental justice pursuant to Executive Order (EO) 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (http://www.gpo.gov/fdsys/pkg/FR-1994-02-16/html/94-3685.htm), the CEQ guidance for consideration of environmental justice under NEPA dated December 10, 1997, and the DHS Environmental Justice Strategy (http://www.dhs.gov/dhs-environmental-justice-strategy).  Translation of NEPA documents is also appropriate to reach communities of limited-English speakers.

Coordination with affected Tribes and Native Hawaiian organizations is another requirement that can be met in conjunction with NEPA public involvement activities.  Executive Order 13175, Consultation and Coordination with Indian Tribal Governments (http://www.gpo.gov/fdsys/pkg/FR-2000-11-09/pdf/00-29003.pdf), directs all Federal departments to "strengthen the United States government-to-government relationships with Indian tribes and establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications…"

Components consider the following factors to determine the appropriate nature and extent of public involvement efforts for proposed actions:

(a)   The size and type of the proposed action.

(b)   Whether the proposed action is of international, national, regional, or local interest.

(c)   The potential environmental impacts of the proposed action.

(d)   Extent of previous environmental analysis for the proposed action and/or the geographical location where the action would occur.

(e)   Extent of anticipated controversy over the potential environmental effects of the proposed action, based on DHS experience with similar proposed actions.

IV-7

(f)   Urgency of the proposed action.

(g)   National security classification of the proposed action.

(h)   The presence of Tribal, minority, or low-income populations that may be impacted by the proposed action.

(i)   Other laws and requirements to protect the environment that may require public review; for example, a determination of conformity with a state air quality implementation plan may require public review.

**(2)   DHS NEPA webpage**

SEP maintains a DHS NEPA webpage at http://www.dhs.gov/nepa, in accordance with DHS Office of Public Affairs (OPA) requirements, as the central location for web posting of DHS NEPA documents.  Components may either provide SEP with electronic files that meet OPA requirements for posting to the DHS NEPA webpage or with links to their respective Component webpages where NEPA documents are posted, if the Component maintains such a webpage.  Where a Component uses websites of other Federal agencies to post its NEPA documents, links to those webpages are either provided to SEP for inclusion on the DHS NEPA webpage or the Component includes the links on its own NEPA webpage.  SEP submits all content for inclusion on the DHS NEPA webpage to OPA for approval.  SEP manages web content  in accordance with the guidelines established by OPA at http://dhsconnect.dhs.gov/org/comp/opa/web/ Pages/default.aspx and the Office of Management and Budget's (OMB) Policies for Federal Agency Public Websites (OMB M-05-04) (http://www.whitehouse.gov/sites/default/files/omb/ memoranda/ fy2005/m05-04.pdf).

Components that wish to develop and maintain their own webpages for posting NEPA content coordinate with their respective OPA, or equivalent.  Components provide the web address for their NEPA pages to SEP, and SEP creates a hyperlink from the DHS NEPA webpage to the Component's webpage.

Components that wish to link to NEPA documents posted on websites outside the Federal government domain (.gov), including contractor websites, seek their respective OPA approval.  OPA determines on a case-by-case basis whether or not is it allowable to link to a contractor-maintained website.

All EISs and RODs are either posted directly on or linked from the DHS NEPA webpage.  In addition, all EAs and FONSIs for proposed actions determined to have effects of national concern are either posted directly on or linked from the DHS NEPA webpage.  Use of the DHS NEPA webpage is optional for posting EAs and FONSIs for proposed actions with effects of regional or local concern, as long as another form of public notice is provided.  Where a Component is a

joint lead agency, the joint lead agencies determine the appropriate host in the Federal government domain (.gov). The DHS NEPA webpage is not presently intended to be used for the deliberative exchange of information or comments that may be necessary in the development of NEPA documents; however, uses of the webpage may change as OPA allows.

For content submitted to SEP for posting on the DHS NEPA webpage, the following requirements apply:

(a) Documents meet OPA web publishing guidance and standards, DHS branding requirements, and Section 508 of the Rehabilitation Act requirements.

(b) Documents are in .pdf format, inclusive of figures, appendices, and documents or hyperlinks incorporated by reference.

(c) If applicable, Components include a point of contact, start and end dates of the public comment period, and information on where interested persons may submit comments.

(d) Components provide content to SEP a minimum of seven (7) calendar days in advance of the date they seek to make the information publicly available. For NEPA documents related to emergency actions, or in other time-sensitive situations as appropriate, SEP requests that OPA expedite the approval and posting of web content.

**(3)    Federal NEPA Contact**

CEQ maintains a list of Federal NEPA contacts on its website at https://ceq.doe.gov/CEQPublic/ViewFedContacts.aspx. The Department's Federal NEPA contact is the Director SEP or his/her designee. Persons interested in the Department's NEPA activities may contact SEP by email at SEP-EPHP@hq.dhs.gov. This contact information is also available on the DHS NEPA webpage at www.dhs.gov/nepa.

**(4)   Information Protected from Public Disclosure**

There is no national security or homeland security exemption from complying with NEPA. However, information used in a NEPA analysis is subject to compliance with other laws, including the Freedom of Information Act (FOIA) (5 U.S.C. sec. 552). FOIA encourages Government accountability through transparency. It provides that any person has a right, enforceable in court, to obtain access to Federal agency records, except to the extent that such records (or portions thereof) are protected from public disclosure by a FOIA exemption; these exemptions are designed to strike a "workable balance" between what citizens need to know and the Government's need to protect certain information. Information on FOIA, including the exemptions, is available

<div align="center">IV-9</div>

at http://www.foia.gov, and the Department's FOIA policy is provided in Directive 0460.1, Freedom of Information Act Compliance.  DHS will not provide information to the public through the NEPA process that DHS otherwise would not publicly disclose under FOIA.  During the NEPA process, DHS will not publically disclose information that may be sensitive for Native Americans or that may reveal the locations of archeological sites, when such information is not otherwise publicly available.

The fact that a proposed action itself or the environmental analysis for a proposed action contains information protected from public disclosure by a FOIA exemption does not relieve DHS of the requirement to assess and document the environmental effects of the proposed action as required by NEPA.  If the existence of a proposed action cannot be made public by reason of any FOIA exception, then the environmental analysis also cannot be made public.  In some circumstances the environmental analysis may not be subject to judicial review; nevertheless, an environmental analysis is required.

If the existence of a proposed action can be made public, but the environmental analysis would have to contain information that cannot be made public, then DHS segregates or redacts any information that is protected from public disclosure into an appendix sent to appropriately cleared reviewers and decision-makers, and allows public review of the rest of the document (see 40 C.F.R. §1507.3(c)).  If segregation or redaction would leave essentially meaningless material, DHS may withhold the entire document from the public.  However, DHS may share such protected NEPA documents with appropriately cleared officials in other agencies such as CEQ and EPA.  In doing so, it is important to recognize and prepare for the situation that other agencies may not interpret FOIA in the same way that DHS does and may release material that DHS would not release, except that which is properly classified for the exception in subsection 552(b)(1).

If the existence of a proposed action must be protected from public disclosure or portions of an environmental analysis must be protected from public disclosure, Components consult with their respective EPPM and OGC at the earliest possible time to ensure that NEPA compliance efforts align with the project schedule to the extent practicable.  To identify DHS and other Federal agency personnel, as well as Tribal, State, and local personnel, that have the appropriate clearance for reviewing classified information during a NEPA process for a proposed DHS action, Components consult with their respective Chief Security Officer and OGC, and follow DHS policy that addresses access to classified information, such as Instruction 121-01-001, Administrative Security Program, and Instruction 121-01-007, Personnel Suitability and Security Program.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301295

CEQ's 2009 FOIA Handbook (http://www.whitehouse.gov/sites/default/files/microsites/ceq/foia_handbook_2-27-12.pdf) provides additional guidance on the appropriate treatment of information that is protected from public disclosure.

## H.   Use of Contractors

NEPA decision-making is an inherently governmental function. DHS frequently uses contractors to perform activities during the NEPA process, such as developing documents, conducting analyses, and soliciting and collecting public comments. DHS may also allow its Federal assistance and permit applicants to use contractors to perform NEPA activities.  However, DHS remains fully responsible for NEPA activities performed by contractors, and only a DHS employee can sign or otherwise approve NEPA documents prepared for proposed DHS actions.

In addition, the presence of contractor names and logos in documents prepared for DHS, including NEPA documents, should be minimized or avoided, unless otherwise specified in the terms of a particular contract.  Proprietary information used by contractors in performance of NEPA activities is subject to public disclosure and should be avoided.  If proprietary information must be included in a NEPA document, the proprietary information is not normally presented in the main body of the document, but is segregated in an appendix where its distribution may be more carefully controlled.

## I.   Performance Metrics and Reporting Requirements

Performance metrics are important indicators of compliance with NEPA requirements and of implementation of the Directive and Instruction Manual throughout DHS.  In addition, DHS responds to Congressional and Federal interagency NEPA reporting requirements (e.g., the annual CEQ Cooperating Agencies Report).  SEP issues data calls to Components, when necessary, to obtain the information required by these external reporting requirements and ensures a consolidated response from DHS.  SEP also uses the EP&HP DSS to obtain information on NEPA performance.

In addition, internal NEPA performance metrics, such as those on the DHS Office of the Chief Readiness Support Officer (OCRSO) Scorecard, are established by SEP with participation of Components through committees and work groups. Components complete and submit their NEPA performance information to Director SEP in accordance with established requirements and timeframes.  Responses to such reporting requirements are evaluated by SEP.

## J.   Review of Other Agency NEPA Documents

Components, when requested, review and comment on NEPA documents provided by non-DHS agencies (Federal, Tribal, State, or local) when the proposed action may impact DHS missions, operations, or facilities, or when DHS has subject matter

IV-11

expertise or legal authorities relevant to the proposed action.  When such requests are received, Components provide written notification to SEP prior to issuing any comments to the requesting agency.

Comments are confined to matters within the jurisdiction or expertise of DHS. These include, but are not limited to, homeland security, immigration, other law enforcement missions, and emergency management.  Components normally do not comment on aspects of a NEPA document provided by a non-DHS agency other than what is needed to appropriately reflect DHS authorities or mission interests.

Components notify SEP of requests for comment on NEPA documents from non-DHS agencies that meet the criteria in Section IV, Part C.

Generally, DHS does not provide formal written comments for the public record.  DHS communicates its interests to other Federal agencies using methods determined on a case-by-case basis that are appropriate for the nature and level of DHS interest in another agency's NEPA activity.  If needed, Components follow the dispute resolution process described in Section IV, Part E.

### K.   Component Supplemental Instructions and Delegation of Authority

Unless otherwise delegated, Director SEP approves NEPA documents prepared for proposed DHS actions.  For any Component which does not have approved Supplemental Instructions and a delegation of authority as described below, Director SEP serves as the EPPM for that Component; Director SEP meets the EPPM criteria specified herein.

The most efficient and effective implementation of NEPA occurs when it is integrated early with other aspects of the planning, review, and development of DHS activities.  This can best be achieved at the lowest appropriate level of the organization where these processes occur.  Director SEP may delegate to Components the authority to approve NEPA documents to ensure the most efficient and effective NEPA compliance.  Component requests for a delegation of authority and Supplemental Instructions may be evaluated concurrently or separately by SEP depending on a Component's needs.  However, in order for a Component to receive a delegation of authority, a Supplemental Instruction approved by Director SEP is required.

### (1)   Component Supplemental Instructions

Components have the option of developing Supplemental Instructions for implementing NEPA within their respective organizations to fit their unique missions and needs.  A Supplemental Instruction describes a Component's administrative processes for implementing the Directive and Instruction Manual. For Components that choose to develop Supplemental Instructions, the required criteria and content are provided below.  Where these criteria are met through other existing policy or requirement documents, the Component may

IV-12

provide a brief explanation of the relevance of the existing document(s) and provide a reference in its Supplemental Instruction.  A Supplemental Instruction:

(a)   Describes the manner in which the Directive and Instruction Manual are to be implemented, including at what organizational level(s) NEPA activities and approvals occur within the Component.

(b)   Describes the internal processing requirements for the preparation and approval of NEPA documents within the Component, including the processes for quality assurance.

(c)   Describes how the Component creates a record demonstrating that the Federal employee with decision-making authority for the proposed action (normally the Proponent) has considered the potential environmental impacts of the proposed action in the process of making their decision (this may be accomplished by a signature block) in order to fulfill the requirements of NEPA.

(d)   Identifies a position in the Component with the authority to oversee the implementation of the Directive and Instruction Manual, to act as the EPPM, and to serve as the primary point of contact for coordination with SEP on NEPA matters.  The EPPM or his/her staff must have an appropriate level of expertise necessary to provide technical assistance for NEPA compliance to the range of programs, offices, and activities in the Component.  Additional criteria for the EPPM are as follows:

  i.   Be in an appropriate position in the organization and have the technical authority to speak on NEPA matters on behalf of the Component;

  ii.   Be in an appropriate position to oversee the implementation of the Directive and Instruction Manual in the Component; and

  iii.   Have visibility on the planning, development, and implementation of actions in the Component that may require NEPA compliance.

(e)   Includes procedures for re-delegation of authority within the Component for approving NEPA documents, as appropriate.  Re-delegation procedures include requirements for:

  i.   Quality assurance for the work products;

  ii.   A process to grant the re-delegation and criteria to achieve the re-delegation;

IV-13

    iii.  The identification of NEPA activities that call for the attention and approval of higher levels of the Component's organization, including the Component's management level, as well as SEP; and

    iv.  A process and criteria for suspension or revocation of the re-delegated authority.

(f)  Identifies NEPA activities that call for the attention and approval of higher levels of the Component's organization, as well as SEP.

(g)  Describes how the EP&HP DSS is used within the Component (e.g., the assignment of roles and reviewers and establishing workflow).

(h)  Describes the process for monitoring and assessing compliance with the Directive and Instruction Manual, including reporting of NEPA performance to Director SEP.

(i)  Describes the process for seeking resolution of NEPA-related disputes within the Component.  For NEPA disputes that cannot be resolved at the Component level, provide for a process for elevating the dispute to Director SEP.

(j)  If applicable, describes processes or requirements for the review of applications from persons or organizations seeking DHS approval of their proposed activities (e.g., Federal assistance, permits, and licenses) for ensuring NEPA compliance.

(k)  In addition to the required content specified in (a) through (j) above, Components can include any additional information in their Supplemental Instructions they deem necessary for implementing NEPA within their organizations, including other areas identified in this Instruction Manual.  However, Components propose new or substantively revised CATEXs separately from their Supplemental Instructions.  CATEXs proposals are processed separately by SEP because of the CEQ review and public notification requirements (see Section V, Part B (3)).

**(2)  Component Supplemental Instructions Review and Approval Process**

The following is the process for SEP's review and approval of Component Supplemental Instructions:

(a)  Components submit to SEP draft Supplemental Instructions that meet the required content and criteria described above and that have been approved by the Component's appropriate approving official.

(b)  Upon receipt of a Component's draft Supplemental Instruction, SEP completes its initial review and provides comments back to the Component within 15 working days.  Issues that cannot be resolved

between SEP and the Component within 10 working days thereafter are elevated to the respective CRSOs (or equivalent) for resolution.  If necessary, issues are further elevated to higher levels of DHS for resolution, following established organizational lines of authority.

(c)   If SEP determines that a Component's draft Supplemental Instruction contains information requiring CEQ and public review, SEP coordinates these efforts.

(d)   Director SEP notifies Components in writing when Supplemental Instructions have been approved.  This written notification will include a delegation of authority, if a Component is seeking a delegation of authority in conjunction with its Supplemental Instruction.

(e)   Components review their approved Component Supplemental Instructions and revise or update them as necessary, but at a minimum, whenever the Directive and Instruction Manual are revised.

**(3)   Delegation of Authority**

Components that wish to obtain a delegation of authority for approving NEPA documents submit a written request, accompanied by their proposed or approved Component Supplemental Instructions, to Director SEP.  In order for a Component to receive such a delegation, a Supplemental Instruction approved by Director SEP is required.

(a)   Components request the level(s) of NEPA documentation (i.e., REC, EA, and/or EIS) for which they are seeking a delegation of authority. Director SEP remains the approval authority for any level(s) of NEPA documentation that are not included in the delegation.

(b)   Approved delegations are in writing from Director SEP to the Component's EPPM.  The EPPM can re-delegate his/her authority in accordance with the procedures established in their respective Component Supplemental Instruction.

(c)   Components may request approval from Director SEP for substantive revisions to their Component Supplemental Instructions without seeking a new delegation of authority.  However, to approve additional levels of NEPA documentation, Components request a new delegation of authority, with appropriately revised Component Supplemental Instructions.

(d)   Director SEP may revoke a Component's delegation of authority upon finding a pattern of non-compliance with substantive requirements of the Directive and Instruction Manual, which may include repeated failure to follow the respective approved Component Supplemental Instruction.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301300

(e)   Director SEP may temporarily suspend a Component's delegation of authority for less significant reasons than those in paragraph (d) above that have an impact on the ability of the Component to effectively implement the substantive requirements of the Directive and Instruction Manual (e.g., the departure of qualified staff from the organization).

(f)   A Component whose delegation of authority has been suspended or revoked must remedy the issue(s) of concern, demonstrate that it meets the requirements of Section IV, Part K, and make a written request to Director SEP to have its delegation of authority reinstated. Issues related to a suspension or revocation of a delegation of authority that cannot be resolved between SEP and a Component are elevated to higher levels of DHS for resolution, following established organizational lines of authority.

A Component may request an interim delegation of authority in situations where it has drafted its Supplemental Instruction but its respective directives approval process is not completed.  Director SEP will grant an interim delegation of authority for up to six months if a Component provides a draft of its Supplemental Instruction that satisfactorily addresses the required criteria and content described above and that has, at a minimum, been entered into the Component's formal clearance process.  Written requests for extensions of this interim delegation of authority will be granted by Director SEP, with evidence that the Component is proceeding in good faith to complete its respective directives approval process.

## L.   Administrative Record Requirements

In complying with NEPA, government decision-makers cannot be arbitrary and capricious in their decisions.  The Administrative Procedure Act (APA) provides the framework for judicial oversight of executive branch decision-making.  The APA provides that a court will "review the whole record or those parts of it cited by a party…"  Therefore, the administrative record is a compilation of all documents and materials that were examined in the NEPA process (even if examined and then not used) by a Federal agency decision-maker at the time their final decision on a proposed action was made; this includes documents and materials that support a contrary decision.  It is important to note that information that is restricted from public disclosure under FOIA, but is examined in the NEPA process, may be appropriately a part of the administrative record.  The completeness of the administrative record is crucial in litigation because the court needs to be able to see, from only those things included in the record, a rational process through which the agency came to its decision as reflected in the ROD.  The court does not have to agree with the agency's decision, but it must find a rational basis in the record for that decision.  If the court is not able to make this finding, the court will normally require that the

IV-16

project be put on hold and the NEPA process redone, often under a very tight court directed time frame.

An administrative record includes public draft and final NEPA documents (see Section II for definition); communications with and comments from Federal, Tribal, State, and local agencies, Federal assistance applicants, and the public; and DHS responses to those comments. Materials such as data, reports, studies, computer modeling, maps, photographs, etc., considered by agency staff and found relevant to the decision (these can be especially broad with regard to the choice of alternatives and which alternatives were ruled out and which were considered for NEPA analysis) are also part of the record, whether or not they support the decision made in NEPA documents and whether or not they are generally available to the public. Internal memoranda regarding issues related to a NEPA analysis that were prepared prior to the Proponent's decision on a proposed action are also part of the record. Draft documents that merely clean up typographical errors do not need to be retained, but care must be taken to ensure that no documents which are necessary to the judicial review process are destroyed.  Each document is subject to a legal relevance test and, while Components compile a thorough administrative record, Components obtain the advice of OGC regarding whether or not to leave something out of the administrative record.

Once an agency decision has been made, the "deliberative, pre-decisional" basis for keeping certain internal agency documents which are part of the administrative record protected from public release under FOIA disappears and these documents may, and generally do, become publically releasable.  However, if there is another basis on which to prevent their release, they will remain entitled to protection from release, even though they are part of the record (see Section IV, Part G (3)). Components engage OGC in making decisions about what is releasable and what is protected under FOIA.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301302

# V.  Procedures for Implementing NEPA

## A.    Overview of NEPA Requirements

The NEPA process helps DHS decision-makers systematically identify and evaluate the potential environmental effects of proposed actions and make informed decisions. Therefore, the NEPA process must be completed before DHS makes a final decision on a proposed action.

NEPA applies to the majority of DHS actions.  If there is any doubt as to the applicability of NEPA, the Component, working with or through its respective EPPM, consults OGC to determine whether NEPA applies to a proposed action.  Examples of situations in which NEPA is not triggered are very few and include cases of statutory exemption, executive branch waiver of compliance when such waiver authority has been granted by Congress and properly exercised, or when the action does not constitute a major Federal action significantly affecting the quality of the human environment as that term has been interpreted in regulations and court decisions.

When NEPA applies to a proposed action, one of three levels of evaluation (CATEX, EA, or EIS) is necessary.  These levels correspond to the increasing potential for proposed actions to have significant environmental effects.  NEPA documents such as EAs and EISs are not merely a summary of an environmental impact evaluation; they are also a way to communicate that information to DHS decision-makers and the public in an easily understandable form.  The EPPM advises the respective Component on the appropriate level of NEPA analysis and documentation for proposed actions.

Evaluation and documentation requirements under NEPA are summarized in Figure 1 and described below:

(1)    Components determine, in consultation with OGC and their respective EPPM, the appropriate analytical approach, including whether NEPA applies.  Where NEPA does not apply, Components document the determination for future reference, ensure appropriate compliance with other requirements for stewardship and protection of the human environment, and proceed with the proposed action.

(2)    If the proposed action is an emergency, Components follow the emergency provisions in Section VI.

(3)    For all other proposed actions to which NEPA applies, Components review the list of DHS CATEXs (Appendix A, Table 1) and follow the CATEX application procedures in Section V, Part B to determine if one may apply.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301303

(4)   If the proposed action cannot be categorically excluded, Components normally begin the process to prepare an EA, following the EA procedures in Section V, Part C and associated CEQ guidance and requirements for EAs.  However, in some circumstances it is appropriate to begin the process to prepare an EIS instead of an EA, as explained later in this Instruction.  The EA process ends with either a FONSI or NOI to prepare an EIS.  If the EA process is concluded by a FONSI, the action may proceed.

(5)   If the proposed action clearly would have significant environmental impacts which cannot be mitigated to level of insignificance, or the EA process for the proposed action could not be concluded by a FONSI, Components prepare an EIS.  Components follow CEQ requirements and the EIS procedures in Section V, Part D for preparing an EIS.  The EIS process ends with a ROD.  Until the Component issues its ROD, no action on the proposal can be taken that would have an adverse environmental impact or limit the choice of reasonable alternatives (40 C.F.R. §1506.1(a)).  Once a ROD is issued, the action may proceed.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301304

**Figure 1 - NEPA Flow Chart**



V-3

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301305

**B.   Categorical Exclusions and Extraordinary Circumstances**

**(1)   DHS Categorical Exclusions**

The CEQ regulations (40 C.F.R. §1508.4) enable Federal agencies to establish categories of actions that, based on experience, do not individually or cumulatively have a significant impact on the quality of the human environment and, therefore, do not require an EA or EIS.  CATEXs enable DHS to avoid unnecessary efforts, paperwork, and delays and concentrate on those proposed actions having real potential for environmental impact.  Components may otherwise decide to prepare an EA for any action at any time to assist in planning and decision-making (see 40 C.F.R. §1501.3 and §1508.9).

DHS CATEXs are specific to DHS as a whole, or to individual Components when so specified.  DHS may not apply a CATEX established by another Federal agency to a proposed DHS action.  However, DHS may justify its application of a DHS CATEX to a proposed DHS action when another Federal agency has applied a similar CATEX of its own to a similar activity.

DHS CATEXs are divided into the following functional groupings of DHS mission activities:

    (a)   Administrative and Regulatory Activities.

    (b)   Operational Activities.

    (c)   Real Estate and Personal Property Management Activities.

    (d)   Repair and Maintenance Activities.

    (e)   Construction, Installation, and Demolition Activities.

    (f)   Hazardous/Radioactive Materials Management and Operations.

    (g)   Training and Exercises.

    (h)   Federal Assistance Activities.

    (i)   Component-Specific Categorical Exclusions.

**(2)   Applying Categorical Exclusions**

DHS's list of CATEXs is provided in Appendix A, Table 1.  When considering application of a CATEX to a proposed action, Components determine if there are any extraordinary circumstances present that may cause significant impacts preventing the application of the CATEX.  For a proposed action to be categorically excluded, it must satisfy all three conditions described below.  If the proposed action does not clearly meet all three conditions, the Component prepares an EA or EIS according to CEQ requirements and following the procedures provided in Section V, Parts C and D, respectively.  Certain categories of proposed actions included in the CATEX list have a greater

AR2022_301306

potential to involve extraordinary circumstances and require the preparation of a REC to document the NEPA analysis, as described in Section V, Part B (4). A CATEX cannot be used for an action with significant impacts on the quality of the human environment, regardless of whether the impacts are beneficial or adverse.  A CATEX may be applied to an entire program of DHS activities, if appropriate.  Application of a CATEX to a proposed action presumes review and compliance under other relevant environmental planning and historic preservation laws, regulations, and Executive Orders (e.g., National Historic Preservation Act, Endangered Species Act) has occurred, and that a higher level of NEPA analysis is not warranted as a result of any identified impacts to resources protected under those other requirements.

Components consider the following when determining whether or not a proposed action is covered by a CATEX:

(a) **Clearly fits the category described in the CATEX**.  The entire action clearly fits within one or more of the CATEXs in Appendix A, Table 1. Note that certain CATEXs are restricted to use by a single DHS Component.  Where a CATEX is restricted for use to a particular DHS Component, no other Component may apply that CATEX to its proposed actions.

(b) **Is not a piece of a larger action**.  It is not appropriate to segment a proposed action or connected actions by division into smaller parts in order to avoid a more extensive evaluation of the potential for environmental impacts under NEPA.  For purposes of NEPA, actions must be considered in the same review if the actions are connected. Examples include actions that trigger or force other actions; and when one action depends on another (e.g., when one action is an interdependent part of a larger action, or when one action cannot proceed unless another action is taken).

(c) **No extraordinary circumstances exist**.  The presence of one or more extraordinary circumstances precludes the application of a CATEX to a proposed action when the circumstance would have significant environmental impacts (i.e., EIS required), or presents the potential for significant environmental impacts (i.e., EA required), or that potential cannot be readily determined (i.e., EA required).  A determination of whether an action that is normally excluded requires additional evaluation because of extraordinary circumstances focuses on the action's potential effects and considers the environmental significance of those effects in terms of both context (i.e., local, state, regional, Tribal, national, or international) and intensity.  Components consider whether the proposed action involves one or more of the following extraordinary circumstances:

V-5

i. A potentially significant effect on public health or safety.

ii. A potentially significant effect on species or habitats protected by the ESA, Marine Mammal Protection Act, Migratory Bird Treaty Act, Magnuson-Stevens Fishery Conservation and Management Act, or other law protecting a species or habitat.

iii. A potentially significant effect on historic properties (e.g., districts, sites, buildings, structures, or objects) that are listed in or eligible for listing in the National Register of Historic Places, affects traditional cultural properties or sacred sites, or leads to the loss or destruction of a significant scientific, cultural, or historical resource.

iv. A potentially significant effect on an environmentally sensitive area.

v. A potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment.  Some examples of other requirements to consider are: a local noise control ordinance; the requirement to conform to an applicable State Implementation Plan for air quality standards; Federal, Tribal, State, or local requirements to control hazardous or toxic substances; and environmental permits.

vi. An effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks.  This also includes effects that may result from the use of new technology or unproven technology.  Controversy over, including public opposition to, a proposed action absent any demonstrable potential for significant environmental impacts does not itself constitute an extraordinary circumstance.

vii. Extent to which a precedent is established for future actions with significant effects.

viii. Significantly greater scope or size than normally experienced for this particular category of action.

ix. Potential for significant degradation of already existing poor environmental conditions.  Also, initiation of a potentially significant environmental degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

x. Whether the action is related to other actions with individually insignificant, but cumulatively significant impacts.

**(3)   Establishment, Revision, and Deletion of Categorical Exclusions**

V-6

Components forward proposals to substantively revise or establish new CATEXs (together with justification) to Director SEP for approval. Proposals to substantively revise or establish new CATEXs require an Administrative Record that meets CEQ standards and are subject to both CEQ review and public comment. SEP reviews such proposals to determine whether the CATEX is appropriate for inclusion in the DHS-wide list or a Component-specific list. SEP revises Appendix A, Table 1 to include approved new or substantially revised CATEXs. In addition, Components notify SEP of non-substantive revisions to or deletions of Component-specific CATEXs so that SEP can amend the table accordingly.

All CATEXs and the list of extraordinary circumstances in this Instruction Manual are reviewed by SEP in consultation with Component EPPMs at least every seven years to ensure they are still appropriate, and to identify any changes that may be needed in light of additional experience gained in applying the CATEXs to proposed DHS actions. A complete review is conducted in conjunction with any major revision to the Directive and Instruction Manual or when seven years have passed since the last major revision.

**(4)   Record of Environmental Consideration**

The application of a CATEX to a proposed action means that the proposed action is appropriately included in a category of actions that DHS has determined do not individually or cumulatively have a significant impact on the human environment and therefore neither the preparation of an EA or EIS is required. Certain CATEXs, identified by an asterisk in Appendix A, Table 1, include classes of actions that have a higher possibility of involving extraordinary circumstances that may preclude the use of a CATEX. A REC is required whenever a CATEX denoted by an asterisk is applied in order to document that potential impacts to the human environment have been appropriately considered and the determination that the proposed action is either appropriately categorically excluded or must be analyzed further through an EA or EIS process. In addition, there may be instances where a Component chooses to prepare a REC when it is not otherwise required.

RECs are normally prepared and maintained electronically in the EP&HP DSS. Completion of a REC involves a review and approval process to ensure the appropriate consideration of extraordinary circumstances, the quality of the NEPA analysis, and that the decision-maker has considered the impact of the proposal on the human environment, as required by NEPA, before making a decision. Director SEP signs all RECs as the approver of the NEPA analysis, unless otherwise delegated.

Component Supplemental Instructions may contain additional information on the administrative procedures and requirements to prepare a REC.

AR2022_301309

### C. Environmental Assessments

#### (1) Purpose

An EA is a concise public document prepared for proposed actions that have the potential for significant impacts on the quality of the human environment (40 C.F.R. §1508.9). The EA process concludes with a Component's determination on the environmental impacts of the proposed action. A finding of no significant impact (FONSI) document is prepared if the Component concludes that the proposed action would not have significant environmental impacts. Components ensure FONSIs are publically available. Additional information and guidance can be found in the CEQ regulations and guidance, such as CEQ's Memorandum for Heads of Federal Departments and Agencies: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act, 6 March, 2012 (http://ceq.hss.doe.gov/ceq_regulations/ guidance.html).

If during the preparation of an EA a Component determines that significant impacts would result from implementation of the proposed action, an EIS is required.

#### (2) When to Prepare an EA

A Component prepares an EA under the following circumstances:

(a) When a proposed action is not in a category of actions described in an available DHS CATEX and there is not enough information to determine that the proposed action will have significant environmental impacts requiring an EIS. In this situation, an EA process is used to determine, through environmental impact evaluation and opportunity for public involvement, if the impacts on the quality of the human environment would be significant or not.

(b) For a proposed action that is included in a category of actions described in a DHS CATEX but extraordinary circumstances present the potential for significant environmental impacts and therefore preclude application of the CATEX, and there is not enough information to determine that the proposed action will have significant environmental impacts requiring an EIS.

(c) A Component can decide to prepare an EA as a best practice planning tool to inform decision-makers on the environmental impacts of its actions.

(d) Other situations conforming to the above circumstances, as described in Component Supplemental Instructions.

**(3)   Actions Normally Requiring an EA or Programmatic EA**

Examples of activities for which a Component normally prepares an EA or a Programmatic EA include but are not limited to the following:

(a)   Proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas.

(b)   Projects impacting wetlands or waters of the U.S. that do not meet the criteria of the U.S. Army Corps of Engineers Nationwide Permit Program.

(c)   New or revised regulations for activities that have the potential to significantly affect environmentally sensitive areas.

(d)   Security measures that involve permanent closure or limitation of access to any area that was previously open to public use (e.g., roads and recreational areas) where there is a potential for significant environmental impacts.

(e)   New law enforcement field operations for which the environmental impacts are unknown, for which or any potential significant environmental impacts could be mitigated to the level that they are no longer significant, or for which the potential for significant environmental controversy is likely.

**(4)   Programmatic EAs**

A Component may prepare a Programmatic EA (PEA) for a broad Federal action, such as a program, plan, or actions of a similar type or at multiple locations, following the criteria above for when to prepare an EA.  A site- or activity-specific EA can be tiered from the PEA or a Supplemental EA (SEA) can be prepared and incorporate by reference the environmental impact evaluation contained in the PEA.  In some cases a PEA is specific enough or contains sufficient information to require no or very little additional evaluation. The application of a DHS CATEX to a proposed action, following the procedures in Section V, Part B (2), can also be based upon the evaluation contained in a PEA.

**(5)   Supplemental EAs**

A Component may prepare an SEA at any time for a proposed action for which:

(a) A NEPA analysis was previously completed;

V-9

(b) A  NEPA analysis is ongoing when there are substantial changes to the proposal that are relevant to environmental concerns; or

(c) If there are new circumstances or information relevant to environmental concerns and bearing on the proposal or its impacts.

An SEA only needs to focus on the issues that triggered the additional environmental impact evaluation, and the original analysis can be incorporated by reference in the SEA.  If a final EA is supplemented after a FONSI has been completed, the Component completes a new FONSI.

Components have discretion regarding the type and level of public involvement in SEAs, using the factors listed in Section IV, Part G (1).

In cases where an action has not yet been implemented within one (1) budget cycle not to exceed three (3) years from the date of the FONSI, the Component considers whether the analysis in the EA remains valid for the current state of the proposed activity and whether a supplement is needed before proceeding with the action.

## (6)  Adoption

Reliance on or adoption of an existing EA improves efficiency in the NEPA process and avoids unnecessary use of time and resources.

Within DHS, any Component may use another Component's EA without a formal adoption process, provided it fully covers the scope of the Component's proposed action and alternatives and the environmental impacts.  When relying on another Component's final EA and FONSI, the Component internally documents such reliance.  When relying on another Component's draft EA or portion thereof, the Component completes its own final EA and FONSI.

A Component may adopt another Federal agency's draft or final EA or portion thereof, provided it fully covers the scope of the Component's proposed action and alternatives and environmental impacts (see 40 C.F.R. §1506.3).  When adopting another Federal agency's draft or final EA or portion thereof, Components consider the factors in Section IV, Part G (1) to determine the appropriate additional public involvement needed.

When participating as a cooperating agency, Components may adopt the EA or portion thereof of a lead agency when, after an independent review of the document, the Component concludes that its comments and suggestions have been satisfied and the analysis includes the appropriate scope and level of environmental impact evaluation for the Component's proposed action and alternatives (see 40 C.F.R § 1506.3 (c)).

When adopting another Federal agency's final EA or portion thereof, the Component issues a FONSI acknowledging the adoption of the work of the

other Federal agency.  When adopting another Federal agency's draft EA or portion thereof, the Component completes a final EA and FONSI.

## (7)   Public Involvement Process Involving an EA

The CEQ regulations and this Instruction Manual require public involvement in the NEPA process for proposed DHS actions.  Public involvement requirements may be met during scoping at the start of an evaluation and/or by distributing a draft EA and draft FONSI for public review.

Where a diligent effort has been used to seek out and involve the public in the drafting of an EA and no significant impacts (including potential for an impact on the quality of the human environment that is highly controversial) have been identified, a Component can complete an EA and FONSI without circulating a draft document for public review.  A diligent effort includes consideration of the extent of other related public involvement efforts, as well as consideration of the factors in Section IV, Part G (1).  A public notice of the FONSI is made available to interested parties (see 40 C.F.R. §1506.6 for methods of providing public notice).  After the notice of the FONSI, the Component can take immediate action, unless there is another environmental planning requirement that requires a waiting period before an action can proceed.

When an EA has been drafted without opportunity for public involvement or when public input received during EA development indicates the need for further public review of the environmental impact evaluation, Components normally, absent exigent circumstances, make the draft EA available to the public for review and comment for a minimum of 30 calendar days.  If public comments reveal the potential for significant impact to the human environment, the Component determines whether it is appropriate to complete a FONSI, revise or supplement the EA, or prepare an EIS.  If the Component decides a FONSI is appropriate, it modifies the EA to reflect the consideration of any public comments as appropriate, completes the FONSI, and makes the FONSI available to the public.  A synopsis of the public comments received and how the Component addressed those comments, rather than a response to each individual comment, is normally prepared, and may be included as an appendix in the final EA.  After the FONSI is made publicly available, the Component can take immediate action, unless there is another environmental planning requirement that requires a waiting period before an action can proceed.

If a proposed action is unprecedented or one that normally requires an EIS or is closely similar to one that normally requires an EIS (see Section V, Part D (3)), the Component should, whenever practicable, provide an opportunity for public involvement in the drafting of the EA and makes the draft EA and draft FONSI available for public review, as described in 40 C.F.R. §1501.4(e) (2).

V-11

For proposed actions with environmental effects of national concern (see Section II for definition), Components publish a public notice in the Federal Register as required by 40 C.F.R. §1506.6, and submit to SEP draft and final EAs and FONSIs, or a hyperlink to the documents posted on a Component webpage, for posting on the DHS NEPA webpage, in accordance with Section IV, Part G (2).

**(8)   Minimum Required Content for an EA**

The minimum required content for an EA is outlined below.

(a)   Title page;

(b)   Purpose and need;

(c)   Description of the proposed action and alternatives, including a description of alternatives considered but rejected;

(d)   Description of the affected environment and environmental consequences, including conclusions regarding the significance of environmental impacts for the proposed action and alternatives and a consideration of cumulative impacts;

(e)   Description of proposed mitigation and monitoring, if applicable;

(f)   List of preparers;

(g)   List of agencies and persons consulted or contacted; and

(h)   References, if appropriate.

**(9)   Finding of No Significant Impact**

A Component's final determination on the environmental impacts of a proposed action is required upon the completion of an EA.  An EA process concludes with a FONSI when (1) the evaluation of the impacts of the proposed action on the human environment indicates that the environmental effects would not be significant, or (2) the Component commits to including measures in the proposed action that mitigate impacts to a level of insignificance (see Section V, Part E).  A FONSI is a separate document from an EA, but may be integrated into any other appropriate decision-making document that can be made publicly available, provided it includes the minimum content requirements in Section V, Part C (10).

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301314

**(10)  Minimum Required Content for a FONSI**

A FONSI document is either attached to the EA or incorporates the EA by reference and consists of the following:

(a)  The name and a brief description of the proposed action and alternatives.

(b)  A summary of the results of the environmental impact evaluation.

(c)  Identification of any mitigation commitments (including monitoring) that will be implemented as part of the proposed action and reduce otherwise significant impacts.

(d)  A statement that the proposed action will not have a significant impact on the quality of the human environment.

(e)  A statement of the final agency decision. The analysis that resulted in a FONSI must encompass this final decision.

(f)  The date of issuance and a signature block for the staff member from the Component who has decision-making authority regarding the proposed action in order to demonstrate fulfillment of the NEPA requirement to consider the potential for impact to the human environment in the decision-making process.

(g)  In Components that have not received a delegation of authority (See Section IV, Part K), a signature block for Director SEP.

(h)  Normally be no more than five pages in length, and incorporate commitments as attachments if necessary, to avoid creating a lengthier FONSI document.

**D.  Environmental Impact Statements**

**(1)  Purpose**

An EIS is prepared for major Federal actions significantly affecting the quality of the human environment (see 40 C.F.R. §1502).  Preparation of an EIS involves a more formal process to work collaboratively with other Federal, Tribal, State, local, and non-Federal interested parties, and provides a more formal opportunity for the public to understand the potential environmental impacts and to influence a Federal agency's decision.  The environmental impact evaluation documented in an EIS may be more extensive than that in an EA to appropriately reflect an evaluation of significant impacts to the quality of the human environment.  Detailed information on the requirements for an EIS is found in the CEQ regulations and guidance, such as CEQ's Memorandum for Heads of Federal Departments and Agencies: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National

V-13

Environmental Policy Act, 6 March, 2012 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html).  No alternative, in whole or in part, that is the subject of an EIS process will be taken that would limit the choice of reasonable alternatives, involve a conflict in the use of available resources, or have an adverse environmental impact until the ROD has been made publically available.  A ROD (or Notice of its Availability) is published in the Federal Register.

**(2)   When to Prepare an EIS**

A Component prepares an EIS when its proposed action and/or any reasonable alternative(s) would have significant environmental effects.  This includes actions where an EA concluded that there would be significant impacts, and therefore preparation of an EIS was necessary.  However, a Component has the option to prepare an EIS when there is good reason to do so for any activity at any time.

**(3)   Actions Normally Requiring an EIS, Programmatic EIS, or Legislative EIS**

Examples of activities for which a Component normally prepares an EIS, a Programmatic EIS, or a Legislative EIS include but are not limited to the following:

(a)   Activities where the effects on the human environment are likely to be highly controversial in terms of environmental impacts or involve unique or unknown environmental risks.

(b)   Construction projects that would have a significant effect on environmentally sensitive areas.

(c)   Major Federal actions occurring in the U.S. known to cause a significant environmental effect on the global commons, as this term is defined in E.O. 12114, "Environmental Effects Abroad of Major Federal Actions."

(d)   Change in area, scope, type, and/or tempo of operations that would result in significant environmental effects.

(e)   When an action is required by statute or treaty to develop an EIS.

**(4)   Programmatic EIS**

A Component may prepare a Programmatic EIS (PEIS) on a broad Federal action, such as a program, plan, or actions of a similar type or at multiple

AR2022_301316

locations, for which only very general environmental information is known.  A site-specific EIS or EA can be tiered from the PEIS and incorporate by reference the environmental impact evaluation contained in the PEIS.

**(5)   Legislative EIS**

A Legislative EIS is prepared and circulated for any non-budgetary legislative proposal initiated by DHS without request for drafting assistance by any member of the legislative branch that would have significant impacts on the natural and human environment (40 C.F.R. §1506.8).

**(6)   Supplemental EIS**

A Component may prepare a supplemental EIS (SEIS) if there are substantial changes to the proposal that are relevant to environmental concerns or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposal or its impacts (40 C.F.R. §1502.9(c)(1)). A Component may also supplement a draft EIS (DEIS) or Final EIS (FEIS) at any time to further the evaluation presented in the original EIS.

Components prepare, circulate, and file a supplement to a DEIS or FEIS in the same manner as any other DEIS or FEIS, except that scoping is optional for an SEIS (40 C.F.R. §1502.9(c)(4)).  Public notice methods are chosen that are appropriate for reaching persons who may be interested in or affected by the proposal.  If an FEIS is supplemented after a ROD has been completed, the Component completes a new ROD and publishes it (or a Notice of its Availability) in the Federal Register.

In cases where an action has not yet been implemented within one (1) budget cycle not to exceed three (3) years from the date of the ROD, the Component considers whether the analysis in the EIS remains valid for the current state of the proposed activity and whether a supplement is needed before proceeding with the action.

**(7)   Adoption**

Reliance on or adoption of an existing EIS improves efficiency in the NEPA process and avoids unnecessary use of time and resources.

Within DHS, any Component may use another Component's EIS without a formal adoption process, provided it fully covers the scope of the Component's proposed action and alternatives and the environmental impacts.  When relying on another Component's final EIS, the Component completes its own ROD and publishes it (or a Notice of its Availability) in the Federal Register.  When relying on another Component's draft EIS or portion thereof, the Component completes its own final EIS which is filed with EPA, completes its own ROD, and publishes the ROD (or Notice of its Availability) in the Federal Register.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301317

A Component may adopt another Federal agency's existing draft or final EIS or portion thereof, provided it fully covers the scope of the Component's proposed action and alternatives and environmental impacts (see 40 C.F.R. §1506.3). When adopting another Federal agency's draft or final EIS or portion thereof, Components consider the factors in Section IV, Part G (1) to determine the appropriate additional public involvement needed.

If the actions covered by the other Federal agency's EIS and the Component's proposed action are substantially the same, the Component normally recirculates the document as a final (i.e., files it with the EPA and makes it available to agencies and the public), and includes a statement describing its respective proposed action and acknowledging the adoption of the EIS (see 40 C.F.R. §1506.3 (b)).  The Component completes its own ROD and publishes a NOA in the Federal Register.

When participating as a cooperating agency, a Component may adopt the lead agency's EIS or portion thereof without recirculation when, after its independent review of the document, the Component concludes that its comments have been satisfied and the analysis includes the appropriate scope and level of environmental impact evaluation for the Component's proposed action and alternatives (see 40 C.F.R. §1506.3 (c)).  When adopting the lead Federal agency's final EIS or portion thereof, the Component completes its own ROD acknowledging the adoption of the work of the other Federal agency and publishes a NOA in the Federal Register.  When adopting the lead Federal agency's draft EIS or portion thereof, the Component completes its own final EIS and ROD.

### (8)   Approval and Filing of an EIS

In accordance with a memorandum of agreement (MOA) between CEQ and EPA, EPA is responsible for the receipt and filing of EISs prepared by Federal agencies.  Every week in the Federal Register, EPA publishes NOAs for all EISs filed during the previous week.  DHS follows the steps for preparation and filing of an EIS as prescribed in the CEQ regulations (40 C.F.R. §1506.9 and 1506.10) and additional information provided in CEQ and EPA guidance (see EPA's Amended EIS Filing System Guidance, published in the Federal Register on January 11, 2011).  Components also follow the requirements in Section IV, Part C regarding when to notify SEP and Section IV, Part G (1) regarding public involvement.  The EPA published NOA is the official public notification of an EIS.  Components may publish their own NOA to provide more information to the public, although it is not required.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301318

**(9)   Minimum Required Content for an EIS**

The CEQ regulations at 40 C.F.R. §1502.10 provide an example format for an EIS, and 40 C.F.R. §1508.25 describes the scope, i.e., the range of actions, alternatives, and impacts to be considered in an EIS.  There is no standard DHS format and Components can vary from the CEQ example, with compelling reason.  The appropriate structure for an EIS is one that facilitates communication of the environmental impact evaluation and results in a manner that is concise, efficient, and most easily understood by Proponents and the general public.  For example, sections on Affected Environment and Environmental Consequences are often combined to produce a document that is shorter in length and easier to read and understand.

The level of public involvement in the development of an EIS is determined through consideration of the factors in Section IV, Part G (1).  The length of an EIS varies based on project type, project size, and potential environmental concerns.

The CEQ standard format for an EIS is outlined below.

  (a)   Cover sheet;

  (b)   Summary;

  (c)   Table of Contents;

  (d)   Purpose of and need for the action;

  (e)   Alternatives considered, including proposed action and no-action alternative;

  (f)   Affected environment (baseline conditions) that may be impacted;

  (g)   Environmental and socioeconomic consequences;

  (h)   List of preparers;

  (i)   Distribution list;

  (j)   Index; and

  (k)   Appendices (as appropriate).

A Component's use of errata sheets attached to a DEIS in-lieu of a traditional FEIS is allowed under 40 C.F.R. §1503.4(c)).  Use of an errata sheet is appropriate when comments received on a DEIS are minor, and the Component's responses to those comments are limited to factual corrections or explanations of why the comments do not warrant further response.  When applying this provision, the errata sheets and the information required in an FEIS (described below) are attached to the DEIS and the document is filed with EPA and provided to the public following the CEQ requirements for an FEIS.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301319

When using errata sheets, they include at minimum the following information:

(a) A list of the factual corrections made to the DEIS with references to the relevant page numbers in the DEIS;

(b) A synopsis of the comments received on the DEIS and an explanation of why the comments do not warrant further response in the FEIS, citing the sources, authorities, or reasons that support the Component's position;

(c) If appropriate, an indication of the specific circumstances that would trigger reappraisal or further response, particularly information that could lead to a re-evaluation or an SEIS;

(d) Identification of the preferred alternative and a discussion of the reasons why it was selected;

(e) List of commitments for mitigation measures for the preferred alternative; and

(f) A copy or summary of comments received on the DEIS and responses, including any coordination activities since the DEIS.

**(10)  Record of Decision**

When a Component decides whether or not to take action on a proposal covered by an EIS, a decision document known as a ROD is prepared.  The content requirements for a ROD are found in 40 C.F.R. §1505.2.  A ROD is a separate document from the EIS, and may be integrated into any other appropriate decision-making document that can be made publicly available provided that the content requirements are met.

A ROD is made publicly available by publishing it (or a Notice of its Availability) in the Federal Register (unless there are issues meeting one or more of the exemptions from information disclosure under FOIA), and presents all the factors an agency considered when it reached its decision on whether to, and if so how to, proceed with the proposed action.  The ROD identifies mitigation measures (if any) which were important in supporting DHS decision-making, such as those measures which reduce otherwise significant impacts.

The Component submits the ROD or the hyperlink to the ROD on its own webpage to SEP for posting on the DHS NEPA webpage, in accordance with Section IV, Part G (2).

**E.   Mitigation and Monitoring**

Measures that reduce otherwise anticipated adverse impacts of a proposed action on the quality of the human environment are called mitigation measures.  When a Component commits to mitigation measures to reduce or eliminate potential

V-18

adverse effects of an action, it is essential that the Component implements the measures and monitors their effectiveness.  Components commit to appropriate, practical, and implementable mitigation measures identified in a FONSI or ROD that they have sufficient legal authority to implement or impose on applicants.  Mitigation measures are practical and implementable, i.e., those that are reasonably expected to achieve their intended purpose.  Implementable mitigation measures require not only that the Component have the appropriate legal authority, but also that it can reasonably foresee the availability of resources for performing the mitigation.  Where the mitigation is being imposed on an applicant for DHS funding or approval to perform their proposed action, Components make the mitigation a condition of DHS approval of the applications from persons or organizations external to DHS (40 C.F.R. §1505.3).

Prior to commencement of or during implementation of an action, if a mitigation measure that a Component committed to cannot be implemented or conditions have changed such that the mitigation measure may no longer be appropriate, the Component determines if other practical mitigation measures can be implemented or are necessary, in coordination with Federal, Tribal, State, or local government agencies as appropriate.  If the conclusion of the NEPA analysis was predicated in whole or in part on the mitigation in question, the Component considers whether the NEPA decision can be sustained without the identified mitigation.  The Component then considers whether the NEPA document needs to be revised to reflect the new circumstances.  If it does, the Component provides appropriate public notice of the revision.  After that, the action may proceed.

Components monitor implemented actions for effectiveness of mitigation, following the guidance in CEQ's Memorandum for Heads of Federal Departments and Agencies: Appropriate Use of Mitigation and Monitoring and Appropriate Use of Mitigated Findings of No Significant Impact, 14 January, 2011 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html).  Components also respond to inquiries from the public or other agencies regarding the status of mitigation measures and the results of monitoring.  If post-action monitoring finds that mitigation has been ineffective in mitigating the adverse impacts of the action, Components consult promptly with OGC and their respective EPPM to determine the necessary course of action, and follow Section IV, Part C for circumstances requiring notification to SEP.

Adequately documenting and monitoring mitigation advances NEPA's purpose of informed and transparent environmental decision-making.  Failure to implement, document, and/or monitor mitigation may undermine the integrity of the NEPA analysis, and may compromise the adequacy of the NEPA compliance effort.  Therefore, once a Component has committed to mitigation measures, all decisions to modify or suspend those measures are made in consultation with OGC and the Component's respective EPPM.

### F.   Cooperating and Joint Lead Agency Relationships

The CEQ regulations (40 C.F.R. §1501.6) emphasize agency cooperation in the NEPA process.  Sometimes, a proposed DHS action may impact or be impacted by the missions and activities of other agencies.  In such situations, it may be necessary to establish a lead and cooperating agency relationship or a joint-lead agency relationship to minimize or avoid duplicative, redundant NEPA compliance efforts.  Establishing this type of relationship may be appropriate when another Federal agency, Tribe, State, or local agency with a comparable NEPA requirement either proposes or is involved in the same action, or is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity (40 C.F.R. §1501.5).  An interagency MOA is normally executed to identify the lead and cooperating agencies and to document their roles and responsibilities, establish timelines and milestones, etc.  However exigencies may dictate another form of documenting the relationship, such as an exchange of written correspondence.  Components follow the CEQ regulations and guidance on cooperating agencies in its Memorandum to Heads of Federal Agencies: Reporting Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, 23 December 2004, and Memorandum for Heads of Federal Agencies: Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, 30 January 2002 (http://ceq.hss.doe.gov/ceq_regulations/ guidance.html).

The benefits of cooperating agency participation in the preparation of NEPA documents include: 1) disclosing relevant information early in the NEPA process; 2) applying available expertise and staff support; 3) avoiding duplication with other Federal, Tribal, State, and local requirements; 4) establishing a mechanism for addressing intergovernmental issues; 5) fostering intra- and intergovernmental trust; and 6) enhancing agencies' ability to adopt environmental documents.

When a Component is a lead agency, it may invite other appropriate Federal agencies with jurisdiction by law (such as regulatory jurisdiction, authority to manage land or water where the Component proposes to locate an action, or related mission authorities, among other things) to be a cooperating agency in the Component's NEPA effort.  In addition, a Component may invite other Federal agencies with special expertise on a particular environmental issue to be a cooperating agency.  A Component may also invite Tribes and non-Federal agencies to be a cooperating or joint lead agency in order to eliminate duplication with Tribal, State, and local requirements that are comparable to NEPA.

A Component may become a cooperating agency in another Federal agency's NEPA effort at the request of that agency when the Component has jurisdiction by law over an aspect of the other federal agency's proposed activity that requires action or approval by the Component.  A Component may also become a cooperating agency in another Federal agency's NEPA effort at the request of that

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301322

agency when the Component has special expertise by virtue of its statutory responsibility, mission, or related program experience that is relevant to the other Federal agency's proposal.  A Component may also request a lead Federal agency to designate it as a cooperating agency.

If another agency requests that a Component be a cooperating agency in its NEPA effort and the Component declines to accept cooperating agency status, the Component responds to the requesting agency and provides a copy of its response to Director SEP and CEQ (40 C.F.R. §1501.6 (c)).  The denial is not subject to oversight by Director SEP and is not subject to review under the Administrative Procedure Act, 5 U.S.C. 701 et seq.  Director SEP reviews the request to determine whether another Component needs to consider cooperating agency status.

Components that prepare EAs and EISs annually report information on cooperating agency status to SEP for consolidated DHS reporting to CEQ.

## G.   NEPA Analysis and Writing

Components emphasize quality analysis and documentation of potential environmental effects for reasonable alternatives that are economically and technically feasible and that meet mission needs, and of strategies to mitigate significant adverse effects.  In order to improve quality, reduce paperwork, and control the length of NEPA documents, Components closely follow the requirements of 40 C.F.R. §1500.4 and the guidance issued by CEQ in its Memorandum for Heads of Federal Departments and Agencies: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act, 6 March 2012 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html).

The appropriate structure and format for an EA or EIS is one that facilitates written communication of the environmental impact evaluation and results in a manner that is concise, efficient, and most easily understood by the Proponent and the general public.  The depth and scope of analysis and resulting volume of documentation in a NEPA process are to be relevant and proportionate to the complexity of the project and level of anticipated environmental effects.  The depth and scope of the analysis is normally informed by the level of anticipated environmental effects.  The objective in preparing an EA or EIS is to communicate quality analysis to support DHS decisions, not the production of lengthy documents.

The main body of an EA or an EIS is normally a presentation designed for the general public that is written in plain language (40 C.F.R. §1502.8).  It generally summarizes the environmental impact evaluation for the relevant scope of issues and the development of appropriate mitigation strategies, with sufficient detail to meet CEQ requirements.  Related and background information is included in appendices.  The summary required for an EIS (40 C.F.R. §1502.12) and optional for an EA presents the results of the environmental impact evaluation, stressing the

major conclusions, areas of controversy, and the issues to be resolved, but is not a summary of the document.

The following are normally taken into consideration when approving a NEPA document prepared for proposed DHS actions:  the scope, depth, and pertinence of the analysis relevant to the proposed action, alternatives, and anticipated environmental impacts; the scientific integrity of the analysis; conformance to requirements of CEQ and this Instruction Manual; and the general presentation and readability of the information.

V-22

AR2022_301324

# VI. Emergency Actions

DHS missions include ensuring resiliency to disasters and effective emergency response.  Examples of emergencies that may require immediate DHS action include responses to hurricanes, earthquakes, pandemics, nuclear strike, imminent threat of terrorist activity, or release or imminent release of oil, hazardous, biological, or radiological substances.  These incidents require DHS action to defend and protect public health and safety and/or to ensure continuity of government operations as soon as possible.

As DHS develops its response to situations involving immediate threats to human health or safety, or immediate threats to valuable natural resources, it considers whether there is sufficient time to follow the procedures established in the CEQ regulations, as further explained in CEQ's  Memorandum for Heads of Federal Departments and Agencies: Emergencies and the National Environmental Policy Act, 12 May, 2010 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html), and this Instruction Manual.

The following four phases apply when performing NEPA activities during an emergency. Components follow these general provisions for emergency actions in consultation with their respective EPPM and OGC, and SEP when appropriate, and in accordance with their Supplemental Instructions if emergency procedures are specified therein.

## A.   Secure Lives and Protect Property

Do not delay immediate actions needed to secure lives and safety of employees and citizens, or to protect property.  The Component considers the probable environmental consequences of proposed DHS actions and minimizes environmental damage to the maximum degree practical, consistent with protecting human life, property, and national security.

## B.   Determine Applicability of NEPA

Components determine, upon the advice and counsel of OGC, if NEPA applies to the emergency action (see Section V, Part A).

## C.   Notification to SEP

Components follow the criteria in Section IV, Part C, for when to notify or seek approval from Director SEP for NEPA activities during an emergency.

## D.   Determine Level of NEPA Evaluation

When NEPA applies to a proposed DHS emergency action, Components determine the appropriate level of NEPA evaluation using the following criteria:

> (1)   If the proposed emergency action qualifies for a CATEX and no
>         extraordinary circumstances exist that would preclude the use of the

VI-1

Instruction Manual # 023-01-001-01

Revision # 01

CATEX, follow the procedures in Section V, Part B for completing a CATEX review.

(2) If the proposed emergency action does not qualify for a CATEX, consideration of the potential for environmental effects must be documented in the form of either an EA or EIS.

(a) Consider if the proposed emergency action is covered by an existing final EA and FONSI or EIS and ROD prepared by any DHS Component.  If an existing final DHS EA and FONSI or EIS and ROD fully cover both the scope of the proposed activities and the environmental impacts and the environmental impact evaluation remains current, no further evaluation under NEPA is necessary. However, it is appropriate to internally record the use of another DHS Component's NEPA Document.

(b) If paragraph (a) above is not applicable, determine if the proposed emergency action is covered by an existing EA or EIS of another Federal agency.  If an existing EA or EIS of another Federal agency fully covers both the scope of the proposed activities and the environmental impacts and the environmental impact evaluation remains current, then the Component may adopt the document. Adopting an existing analysis may require the Component to provide the opportunity for public comment.  The Component prepares a separate FONSI or ROD for the proposed emergency when adopting an existing analysis.

(c) If paragraphs (a) and (b) above are not applicable, determine if an existing EA or EIS from another DHS Component or an EA or EIS adopted from another Federal agency can be supplemented to address the proposed emergency action.  Supplementing an existing analysis may require the Component to provide the opportunity for public comment.  The Component prepares a separate FONSI or ROD for the proposed emergency when supplementing an existing analysis.

(d) If paragraphs (a) through (c) above are not applicable and the expected environmental impacts are not considered to be significant, determine if sufficient time exists before starting the emergency action to complete a new EA.

i. When sufficient time exists, it is most appropriate for the Component to prepare a focused and concise EA, including consideration of the public involvement factors presented in Section IV, Part G (1).  The EA may incorporate by reference any existing relevant non-Federal environmental impact evaluation, such as one prepared pursuant to a state agency's environmental planning

VI-2

requirement.  If the new EA supports a conclusion that the proposed emergency action will not have significant environmental effects, a FONSI is prepared and made available to interested parties.

ii.  If sufficient time does not exist to complete an EA before starting the proposed emergency action, and the expected environmental impacts are not considered to be significant, the Component consults with Director SEP to develop an alternative approach to completing an EA that meets the requirements of the CEQ regulations and this Instruction Manual.  To the maximum extent practicable, such approaches ensure public notification and involvement and focus on minimizing the adverse environmental consequences of the proposed emergency action.  SEP informs CEQ of these alternatives to the preparation of an EA at the earliest opportunity.

(e)  If, at any time during the emergency, including during preparation of an EA, the Component determines that the emergency action appears to be a major Federal action significantly affecting the quality of the human environment, the Component seeks the involvement of SEP. When another EIS is not available to adopt or supplement, or insufficient time is available to adopt or supplement an existing EIS, SEP notifies CEQ regarding the emergency and seeks alternative arrangements to comply with NEPA in accordance with 40 C.F.R. §1506.11.  Alternative arrangements apply only to actions needed to control the immediate impacts of the emergency to prevent further harm to life or improved property.  Other actions remain subject to NEPA analysis.  Factors to address when crafting alternative arrangements include:

i.  Nature and scope of the emergency;

ii.  Actions needed to control the immediate impacts of the emergency;

iii.  The potential adverse effects;

iv.  Aspects of the NEPA process that can be followed and add value to the decision-making process (such as coordination with resource and regulatory agencies and the public);

v.  Duration of the emergency; and

vi.  Potential adverse impact mitigation measures.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301327

## VII. Review of Applications from Persons or Organizations Outside of DHS

Components that process applications for permits, licenses (other than those for use of real property), Federal assistance (e.g., grants), or other forms of DHS funding or approval have a responsibility to integrate NEPA requirements early in the application process.  In this context, an Applicant is a person or organization outside of DHS that seeks funding, or a permit, license, or other form of approval from DHS in order to carry out its desired action.  Components consider the environmental effects of the Applicant's proposed action when deciding whether or not to provide funding, issue a permit or license, or otherwise approve an Applicant's proposal.  Completion of the NEPA process occurs before making a decision to approve an Applicant's proposal.

Unless otherwise specified in law or regulation, Components that administer Federal assistance, permitting, licensing, or similar types of programs incorporate the applicable provisions below into their respective review and approval processes for applications under those programs.  Components that regularly administer such programs describe in their Supplemental Instructions how these provisions are normally addressed.  Components that do not regularly administer such programs may nevertheless elect to develop Supplemental Instructions (or to amend existing Supplemental Instructions) if they wish to seek delegation of NEPA authority for such programs.  Where NEPA-related program-specific guidance, policy, etc., already exists, Components include an explanation of the relevant information and reference the document(s) in their Supplemental Instructions.

A.  Coordination between the Component and the Applicant as early as possible so that the Applicant is aware of its responsibilities, if any, to assist the Component in fulfilling the NEPA process.  This includes notification to the Applicant of the kinds of analyses or information that the Component requires the Applicant to provide or prepare, if any, that are deemed necessary and appropriate for an environmental impact evaluation.  The Component establishes an internal process to ensure completion of an independent and objective evaluation of any such information provided by the Applicant.  This may include notifying the Applicant of its role, if any, in supporting coordination and consultation efforts, scoping, and other public involvement activities, and its role, if any, in activities necessary to eliminate duplication with Tribal, State, local, or other Federal requirements.

B.  Consideration of whether the Applicant's proposed action is a connected action (see 40 C.F.R. §1508.25) or, if the applicant is a non-Federal entity, is a piece of a larger action whereby the Component's involvement would federalize the entire action.

C.  The process to identify and evaluate options to resolve potentially significant environmental impacts, including the Applicant's role in coordination and

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301328

consultation activities, if any.  This includes development of measures to mitigate adverse impacts, if necessary.

D.   Notification to the Applicant of how the costs of NEPA activities (e.g., preparation of an EA; mitigation measures) are to be paid for.

E.   Notification to the Applicant of its responsibilities regarding emergency actions, if relevant.

F.   Notification to the Component if the Applicant changes the scope of the proposed action.  Scope changes require an evaluation by DHS to determine if the previous NEPA analysis is still relevant or if additional analysis is necessary.

G.   Ensuring that required NEPA documents are completed prior to the Component's decision on the application or, in the case of certain Federal assistance programs, prior to the Component's approval for the applicant to draw funds to execute its proposed action.

H.   Notification to the Applicant when the Component may deny an application if the proposed action's impacts, cost of the environmental impact evaluation, or costs of mitigation measures substantially outweigh the proposed action's costs or monetary and non-monetary benefits.

I.   Ensuring mitigation committed to as part of the NEPA process, including appropriate monitoring of the implementation and success of the mitigation, is incorporated as conditions in the appropriate formal approval document that is issued to the Applicant by the Component.

J.   Notification to the Applicant when the Component may deny an application, revoke an approval (e.g., de-obligate or recoup grant funding), or take other enforcement action if the Applicant does not comply with NEPA requirements or conditions of NEPA approval, or implements the proposed action prior to completion of the NEPA process.

K.   Identification of decision points for when the NEPA analysis and approval occurs in the Component's overall application review and approval/award process.

L.   Making contact information publically available for the DHS office and/or staff responsible for administering the Federal assistance, permitting, licensing, or similar type of program.

M.   When actions are planned by non-Federal entities before DHS gets involved but DHS involvement is reasonably foreseeable, the following provisions also apply:

    1) Ensure information and staff are available to advise potential applicants;

    2) Consult early with Tribes, State and local agencies, and the public; and

<div align="center">VII-2</div>

3) Commence the NEPA process at the earliest possible time.

When a new Federal assistance, permitting, licensing, or similar type of program is created in DHS, the relevant Component, including the relevant individual program office(s), consults with its respective EPPM and OGC to determine the applicability of NEPA requirements under that new program.  In some cases, the responsibility to administer the program may be transferred from one DHS Component to another DHS Component or from DHS to another Federal agency.  In such situations, the parties may execute an agreement to ensure that NEPA requirements are met.

VII-3

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301330

# DHS List of Categorical Exclusions

## Table 1 - List of DHS Categorical Exclusions[1]

| |
|---|
| **Note regarding the following table:** CATEX A8, CATEXs C6 through C10, and all the CATEXs in Sections M and N are new CATEXs. All others are existing CATEXs that DHS is retaining. |
| The CATEXs in Sections A through G and the CATEXs in Section N are available for use across the entire Department. The CATEXs in Sections H through M are available for use by only the Component specified in the section heading. |
| **\*** Denotes classes of actions that have a higher possibility of involving extraordinary circumstances. A REC will be prepared to document consideration of extraordinary circumstances whenever a CATEX that is identified by an asterisk is used. |
| **ADMINISTRATIVE AND REGULATORY ACTIVITIES** |
| **A1** Personnel, fiscal, management, and administrative activities, such as recruiting, processing, paying, recordkeeping, resource management, budgeting, personnel actions, and travel. |
| **A2** Reductions, realignments, or relocation of personnel that do not result in exceeding the infrastructure capacity or changing the use of space.  An example of a substantial change in use of the supporting infrastructure would be an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate such an increase. |
| **A3** Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:<br><br>(a) Those of a strictly administrative or procedural nature;<br><br>(b) Those that implement, without substantive change, statutory or regulatory requirements; |

---

[1] Includes administrative revision published in the Federal Register on October 13, 2017. Environmental Planning and Historic Preservation Program, 82 F.R. 47761 (Oct. 13, 2017).

A-1

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301331

(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

(d) Those that interpret or amend an existing regulation without changing its environmental effect;

(e) Technical guidance on safety and security matters; or

(f) Guidance for the preparation of security plans.

**A4** Information gathering, data analysis and processing, information dissemination, review, interpretation, and development of documents.  If any of these activities result in proposals for further action, those proposals must be covered by an appropriate CATEX.  Examples include but are not limited to:

(a) Document mailings, publication and distribution, training and information programs, historical and cultural demonstrations, and public affairs actions.

(b) Studies, reports, proposals, analyses, literature reviews; computer modeling; and non-intrusive intelligence gathering activities.

**A5** Awarding of contracts for technical support services, ongoing management and operation of government facilities, and professional services that do not involve unresolved conflicts concerning alternative uses of available resources.

**A6** Procurement of non-hazardous goods and services, and storage, recycling, and disposal of non-hazardous materials and wastes, that complies with applicable requirements and is in support of routine administrative, operational, or maintenance activities.  Storage activities must occur on previously disturbed land or in existing facilities.  Examples include but are not limited to:

(a) Office supplies,

(b) Equipment,

(c) Mobile assets,

(d) Utility services,

(e) Chemicals and low level radio nuclides for laboratory use,

(f) Deployable emergency response supplies and equipment, and

(g) Waste disposal and contracts for waste disposal in established permitted landfills and facilities.

A-2

**A7** The commitment of resources, personnel, and funding to conduct audits, surveys, and data collection of a minimally intrusive nature.  If any of these commitments result in proposals for further action, those proposals must be covered by an appropriate CATEX.  Examples include, but are not limited to:

(a) Activities designed to support the improvement or upgrade management of natural resources, such as surveys for threatened and endangered species, wildlife and wildlife habitat, historic properties, and archeological sites; wetland delineations; timber stand examination; minimal water, air, waste, material and soil sampling; audits, photography, and interpretation.

(b) Minimally-intrusive geological, geophysical, and geo-technical activities, including mapping and engineering surveys.

(c) Conducting Facility Audits, Environmental Site Assessments and Environmental Baseline Surveys, and

(d) Vulnerability, risk, and structural integrity assessments of infrastructure.

**A8 [new]** Review of and comment on documents that did not originate in DHS.

## OPERATIONAL ACTIVITIES

**B1** Research, development, testing, and evaluation activities, or laboratory operations conducted within existing enclosed facilities consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, and local requirements to protect the environment when it will result in no, or *de minimus* change in the use of the facility.  If the operation will substantially increase the extent of potential environmental impacts or is controversial, an EA (and possibly an EIS) is required.

**B2** Transportation of personnel, detainees, equipment, and evidentiary materials in wheeled vehicles over existing roads or jeep trails established by Federal, Tribal, State, or local governments, including access to permanent and temporary observation posts.

**B3** Proposed activities and operations to be conducted in an existing structure that would be compatible with and similar in scope to its ongoing functional uses and would be consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, or local requirements to protect the environment.

A-3

**B4** Provision of on-site technical assistance to non-DHS organizations to prepare plans, studies, or evaluations.  Examples include, but are not limited to:

   (a) General technical assistance to assist with development and enhancement of Weapons of Mass Destruction (WMD) response plans, exercise scenario development and evaluation, facilitation of working groups, etc.

   (b) State strategy technical assistance to assist States in completing needs and threat assessments and in developing their domestic preparedness strategy.

**B5** Support for or participation in community projects that do not involve significant physical alteration of the environment.  Examples include, but are not limited to:

   (a) Earth Day activities,

   (b) Adopting schools,

   (c) Cleanup of rivers and parkways, and

   (d) Repair and alteration of housing.

**B6** Approval of recreational or public activities or events at a location typically used for that type and scope (size and intensity) of activity that would not involve significant physical alteration of the environment.  Examples include, but are not limited to:

   (a) Picnics,

   (b) Encampments, and

   (c) Interpretive programs for historic and cultural resources, such as programs in conjunction with State and Tribal Historic Preservation Officers, or with local historic preservation or re-enactment groups.

**B7** Initial assignment or realignment of mobile assets, including vehicles, vessels and aircraft, to existing operational facilities that have the capacity to accommodate such assets or where supporting infrastructure changes will be minor in nature to perform as new homeports or for repair and overhaul.

**\*B8** Acquisition, installation, maintenance, operation, or evaluation of security equipment to screen for or detect dangerous or illegal individuals or materials at existing facilities and the eventual removal and disposal of that equipment

A-4

in compliance with applicable requirements to protect the environment. Examples of the equipment include, but are not limited to:

(a) Low-level x-ray devices,

(b) Cameras and biometric devices,

(c) Passive inspection devices,

(d) Detection or security systems for explosive, biological, or chemical substances, and

(e) Access controls, screening devices, and traffic management systems.

**\*B9** Acquisition, installation, operation, or evaluation of physical security devices, or controls to enhance the physical security of existing critical assets and the eventual removal and disposal of that equipment in compliance with applicable requirements to protect the environment.  Examples include, but are not limited to:

(a) Motion detection systems,

(b) Use of temporary barriers, fences, and jersey walls on or adjacent to existing facilities or on land that has already been disturbed or built upon,

(c) Impact resistant doors and gates,

(d) X-ray units,

(e) Remote video surveillance systems,

(f)  Diver/swimmer detection systems, except sonar,

(g) Blast/shock impact-resistant systems for land based and waterfront facilities,

(h) Column and surface wraps, and

(i)  Breakage/shatter-resistant glass.

**B10** Identifications, inspections, surveys, or sampling, testing, seizures, quarantines, removals, sanitization, and monitoring of imported products that cause little or no physical alteration of the environment.  This CATEX would primarily encompass a variety of daily activities performed at the borders and ports of entry by various elements of the Customs and Border Protection and Transportation Security Administration.

**B11** Routine monitoring and surveillance activities that support law enforcement or homeland security and defense operations, such as patrols, investigations, and intelligence gathering, but not including any construction

A-5

activities (construction activities are addressed in Subsection E of these CATEX). This CATEX would primarily encompass a variety of daily activities performed by the Components of U.S. Coast Guard, Immigration and Customs Enforcement, Customs and Border Protection, Transportation Security Administration, and the U.S. Secret Service.

**REAL ESTATE ACTIVITIES**

**C1** Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property.

**C2** Lease extensions, renewals, or succeeding leases where there is no change in the facility's use and all environmental operating permits have been acquired and are current.

**C3** Reassignment of real property, including related personal property within the Department (e.g., from one Departmental element to another) that does not result in a change in the functional use of the property.

**C4** Transfer of administrative control over real property, including related personal property, between another Federal agency and the Department that does not result in a change in the functional use of the property.

**C5** Determination that real property is excess to the needs of the Department and, in the case of acquired real property, the subsequent reporting of such determination to the General Services Administration or, in the case of lands withdrawn or otherwise reserved from the public domain, the subsequent filing of a notice of intent to relinquish with the Bureau of Land Management, Department of Interior.

**\*C6** Congressionally-mandated conveyance of DHS controlled real property to a non-Federal entity.

**\*C7 [new]** The initial lease of, or grant of an easement interest in, DHS-controlled real property to a non-Federal entity or the amendment, renewal, or termination of such lease or easement interest where the proposed type and intensity of real property use is similar to existing uses.

**\*C8 [new]** The grant of a license to a non-Federal entity to perform specified acts upon DHS-controlled real property or the amendment, renewal, or

A-6

termination of such license where the proposed  type and intensity of real property use is similar to existing uses.

**C9 [new]** Allowing another Federal agency to use DHS-controlled real property under a permit, use agreement, or similar arrangement or the amendment, renewal, or termination of such permit or agreement where the proposed type and intensity of real property use is similar to existing uses.

**C10 [new]** Real property inspections to ensure compliance with deed or easement restrictions.

**REPAIR AND MAINTENANCE ACTIVITIES**

**D1** Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (e.g. realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an EA or EIS for the installation).

**D2** Routine upgrade, repair, maintenance, or replacement of equipment and vehicles, such as aircraft, vessels, or airfield equipment that does not result in a change in the functional use of the property.

**D3** Repair and maintenance of Department-managed buildings, roads, airfields, grounds, equipment, and other facilities which do not result in a change in functional use or an impact on a historically significant element or setting (e.g. replacing a roof, painting a building, resurfacing a road or runway, pest control activities, restoration of trails and firebreaks, culvert maintenance, grounds maintenance, existing security systems, and maintenance of waterfront facilities that does not require individual regulatory permits).

**\*D4** Reconstruction and/or repair by replacement of existing utilities or surveillance systems in an existing right-of-way or easement, upon agreement with the owner of the relevant property interest.

**\*D5** Maintenance dredging activities within waterways, floodplains, and wetlands where no new depths are required, applicable permits are secured, and associated debris disposal is done at an approved disposal site.  This CATEX encompasses activities required for the maintenance of waterfront

A-7

facilities managed primarily within the U.S. Coast Guard and Customs and Border Protection.

**D6** Maintenance of aquatic and riparian habitat in streams and ponds, using native materials or best natural resource management practices.  Examples include, but are not limited to:

(a) Installing or repairing gabions with stone from a nearby source,

(b) Adding brush for fish habitat,

(c) Stabilizing stream banks through bioengineering techniques, and

(d) Removing and controlling exotic vegetation, not including the use of herbicides or non-native biological controls.

This CATEX would primarily involve property management activities at larger properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

**CONSTRUCTION, INSTALLATION, AND DEMOLITION ACTIVITIES**

**E1** Construction, installation, operation, maintenance, and removal of utility and communication systems (such as mobile antennas, data processing cable, and similar electronic equipment) that use existing rights-of-way, easements, utility distribution systems, and/or facilities.  This is limited to activities with towers where the resulting total height does not exceed 200 feet and where the FCC would not require an EA or EIS for the acquisition, installation, operation or maintenance.

**\*E2** New construction upon or improvement of land where all of the following conditions are met:

(a) The structure and proposed use are compatible with applicable Federal, Tribal, State, and local planning and zoning standards and consistent with Federally-approved State coastal management programs,

(b) The site is in a developed area and/or a previously-disturbed site,

(c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area,

(d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and,

A-8

(e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.).

**\*E3** Acquisition, installation, operation, and maintenance of equipment, devices, and/or controls necessary to mitigate effects of the Department's missions on health and the environment, including the execution of appropriate real estate agreements. Examples include but are not limited to:

(a) Pollution prevention and pollution control equipment required to meet applicable Federal, Tribal, State, or local requirements,

(b) Noise abatement measures, including construction of noise barriers, installation of noise control materials, or planting native trees and/or native vegetation for use as a noise abatement measure, and,

(c) Devices to protect human or animal life, such as raptor electrocution prevention devices, fencing to restrict wildlife movement on to airfields, fencing and grating to prevent accidental entry to hazardous or restricted areas, and rescue beacons to protect human life.

**\*E4** Removal or demolition, along with subsequent disposal of debris to permitted or authorized off-site locations, of non-historic buildings, structures, other improvements, and/or equipment in compliance with applicable environmental and safety requirements.

**E5** Natural resource management activities on Department-managed property to aid in the maintenance or restoration of native flora and fauna, including site preparation, landscaping, and control of non-indigenous species.  This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

**E6** Reconstruction of roads on Departmental facilities, where runoff, erosion, and sedimentation issues are mitigated through implementation of best management practices. This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

**E7** Construction of physical fitness and training trails for non-motorized use on Department facilities in areas that are not environmentally sensitive, where run-off, erosion, and sedimentation are mitigated through implementation of best management practices.  This CATEX would encompass property management activities primarily at properties within the

A-9

U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

**\*E8** Construction of aquatic and riparian habitat in streams and ponds on Department-managed land, using native materials or best natural resource management practices.  Examples include, but are not limited to:

    (a) Installing or repairing gabions with stone from a nearby source,

    (b) Adding brush for fish habitat,

    (c) Stabilizing stream banks through bioengineering techniques, and,

    (d) Removing and controlling exotic vegetation, not including the use of herbicides or non-native biological controls.

This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

## HAZARDOUS/RADIOACTIVE MATERIALS MANAGEMENT AND OPERATIONS

**F1** Routine procurement, transportation, distribution, use, and storage of hazardous materials that comply with all applicable requirements, such as Occupational Safety and Health Act (OSHA) and National Fire Protection Association (NFPA).

**F2** Reuse, recycling, and disposal of solid, medical, radiological, and hazardous waste generated incidental to Department activities that comply with applicable requirements such as Resource Conservation and Recovery Act (RCRA), Occupational Safety and Health Act (OSHA), and State hazardous waste management practices.  Examples include but are not limited to:

    (a) Appropriate treatment and disposal of medical waste conducted in accordance with all Federal, Tribal, State, and local laws and regulations,

    (b) Temporary storage and disposal of solid waste, conducted in accordance with all Federal, Tribal, State, and local laws and regulations,

    (c) Disposal of radiological waste through manufacturer return and recycling programs, and

    (d) Hazardous waste minimization activities.

A-10

**F3** Use (that may include the processes of installation, maintenance, non-destructive testing, and calibration), transport, and storage of hand-held, mobile or stationary instruments, containing sealed radiological and radioactive materials, to screen for or detect dangerous or illegal individuals or materials in compliance with commercial manufacturers' specifications, as well as applicable Federal requirements to protect the human environment. Examples of such instruments include but are not limited to:

(a) Gauging devices, tracers, and other analytical instruments,

(b) Instruments used in industrial radiography,

(c) Systems used in medical and veterinary practices; and

(d) Nuclear Regulatory Commission (NRC) approved, sealed, small source radiation devices for scanning vehicles and packages where radiation exposure to employees or the public does not exceed 0.1 rem per year and where systems are maintained within the NRC license parameters at existing facilities.

## TRAINING AND EXERCISES

**G1** Training of homeland security personnel, including international, Tribal, State, and local agency representatives using existing facilities where the training occurs in accordance with applicable permits and other requirements for the protection of the environment.  This exclusion does not apply to training that involves the use of live chemical, biological, or radiological agents except when conducted at a location designed and constructed to contain the materials used for that training.  Examples include but are not limited to:

(a) Administrative or classroom training,

(b) Tactical training, including but not limited to training in explosives and incendiary devices, arson investigation and firefighting, and emergency preparedness and response,

(c) Vehicle and small boat operation training,

(d) Small arms and less-than-lethal weapons training,

(e) Security specialties and terrorist response training,

(f) Crowd control training, including gas range training,

(g) Enforcement response, self-defense, and interdiction techniques training, and

(h) Techniques for use in fingerprinting and drug analysis.

A-11

**G2**  Projects, grants, cooperative agreements, contracts, or activities to design, develop, and conduct national, State, local, or international exercises to test the readiness of the nation to prevent or respond to a terrorist attack or a natural or manmade disaster and where conducted in accordance with existing facility or land use designations.  This exclusion does not apply to exercises that involve the use of chemical, biological, radiological, nuclear, or explosive agents/devices (other than small devices such as practice grenades/flash bang devices used to simulate an attack during exercise play).

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE TRANSPORTATION SECURITY ADMINISTRATION (TSA)**

**H1** Approval or disapproval of security plans required under legislative or regulatory mandates unless such plans would have a significant effect on the environment.

**H2** Issuance or revocation of certificates or other approvals, including but not limited to:

>   (a) Airmen certificates,

>   (b) Security procedures at general aviation airports, and

>   (c) Airport security plans.

**[Section I of this table has been deleted; CATEX I1 is now K3]**

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE FEDERAL LAW ENFORCEMENT TRAINING CENTER (FLETC)**

**\*J1** Prescribed burning, wildlife habitat improvement thinning, and brush removal for southern yellow pine at the FLETC facility in Glynco, Georgia. No more than 200 acres will be treated in any single year. These activities may include up to 0.5 mile of low-standard, temporary road construction to support these operations.

**J2** Harvest of live trees on Federal Law Enforcement Training Center facilities not to exceed 70 acres, requiring no more than ½ mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples include but are not limited to:

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301342

(a) Removal of individual trees for saw logs, specialty products, or fuel wood, and

(b) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

**J3** Salvage of dead and/or dying trees on Federal Law Enforcement Training Center facilities not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include but are not limited to:

(a) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees,

(b) Harvest of fire damaged trees, and

(c) Harvest of insect or disease damaged trees.

**UNIQUE CATEGORICAL EXCLUSIONS FOR CUSTOMS AND BORDER PROTECTION (CBP)**

**K1** Road dragging of existing roads and trails established by Federal, Tribal, State, or local governments to maintain a clearly delineated right-of-way, to provide evidence of foot traffic and that will not expand the width, length, or footprint of the road or trail.

**K2** Repair and maintenance of existing border fences that do not involve expansion in width or length of the project, and will not encroach on adjacent habitat.

**\*K3 [formerly I1]**  A portable or relocatable facility or structure used to collect traveler data at or adjacent to an existing port of entry where the placement or use of the facility does not significantly disturb land, air, or water resources and does not individually or cumulatively have a significant environmental effect.  The building footprint of the facility must be less than 5,000 square feet and the facility or structure must not foreclose future land use alternatives.

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE U.S. COAST GUARD (USCG)**

**\*L1** Personnel and other administrative actions associated with consolidations, reorganizations, or reductions in force resulting from

A-13

identified inefficiencies, reduced personnel or funding levels, skill imbalances, or other similar causes.

**L2** Routine procurement activities and actions for goods and services, including office supplies, equipment, mobile assets, and utility services for routine administration, operation, and maintenance.

**L3** Routine personnel, fiscal, and administrative activities, actions, procedures, and policies which clearly do not have any environmental impacts, such as military and civilian personnel recruiting, processing, paying, and record keeping.

**L4** Review of documents, such as studies, reports, and analyses, prepared for legislative proposals that did not originate in DHS and that relate to matters that are not the primary responsibility of the USCG.

**L5** Preparation of guidance documents that implement, without substantive change, the applicable Commandant Instruction or other Federal agency regulations, procedures, manuals, and other guidance documents.

**L6** Approval of recreational activities or events (such as a Coast Guard Unit picnic) at a location developed or created for that type of activity.

**\*L7** The initial lease of, or grant of, an easement interest in, Coast Guard-controlled real property to a non-Federal party or the amendment, renewal, or termination of such lease or easement interest where the reasonably foreseeable real property use will not change significantly and is similar to existing uses.

**\*L8** The grant of a license to a non-Federal party to perform specified acts upon Coast Guard-controlled real property or the amendment, renewal, or termination of such license where the proposed real property use is similar to existing uses.

**\*L9** Allowing another Federal agency to use Coast Guard-controlled real property under a permit, use agreement, or similar arrangement or the amendment, renewal, or termination of such permit or agreement where the real property use is similar to existing uses.

**\*L10** The lease of a Coast Guard controlled historic lighthouse property to a non-Federal party as outlined in the Programmatic Memorandum of Agreement between the Coast Guard, Advisory Council on Historic

A-14

Instruction Manual # 023-01-001-01

Revision # 01

Preservation, and the National Conference of State Historic Preservation Officers.

**\*L11** Acquisition of real property (including fee simple estates, leaseholds, and easements) improved or unimproved, and related personal property from a non-Federal party by purchase, lease, donation, or exchange where the proposed real property use is similar to existing uses for the foreseeable future (acquisition through condemnation not covered).

**\*L12** Acquisition of real property and related personal property through transfer of administrative control from another DHS component or another Federal agency to the Coast Guard where title to the property remains with the United States including transfers made pursuant to the defense Base Closure and Realignment Act of 1990, Pub. L. 101-510, as amended, (10 U.S.C. 2687 note) and where the proposed Coast Guard real property uses is similar to existing uses.

**\*L13** Coast Guard use of real property under the administrative control of another DHS component or another Federal agency through a permit, use agreement, or similar arrangement where the proposed real property use is similar to existing uses.

**\*L14** Coast Guard new construction upon, or improvement of, land where all of the following conditions are met :

    (a) The structure and proposed use are substantially in compliance with prevailing local planning and zoning standards.

    (b) The site is on heavily developed property and/or located on a previously disturbed site in a developed area.

    (c) The proposed use will not substantially increase the number of motor vehicles at the facility.

    (d) The site and scale of construction are consistent with those of existing, adjacent, or nearby buildings.

**L15** Real property inspections for compliance with deed or easement restrictions.

**\*L16** Transfer of administrative control over real property from the Coast Guard to another DHS component or another Federal agency (title to the property remains with the United States) that results in no immediate change in use of the property.

A-15

**\*L17** Determination by the Coast Guard that real property is excess to its needs, pursuant to the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.), and the subsequent reporting of such determination to the Administrator of the General Services Administration or the subsequent filing of a notice of intent to relinquish lands withdrawn or reserved from the public domain with the Bureau of Land Management, Department of Interior, in accordance with 43 CFR part 2370.

**\*L18** Congressionally mandated conveyance of Coast Guard controlled real property to another Federal agency or non-Federal entity.

**L19** Relocation of Coast Guard personnel into existing Federally owned or leased space where use does not change substantially and any attendant modifications to the facility would be minor.

**\*L20** Decisions to temporarily or permanently decommission, disestablish, or close Coast Guard shore facilities including any follow-on connected protection and maintenance needed to maintain the property until it is no longer under Coast Guard control.

**\*L21** Demolition of buildings, structures, or fixtures and disposal of subsequent building, structure, or fixture waste materials.

**\*L22** Determination by the Coast Guard that Coast Guard controlled personal property, including vessels and aircraft, is "excess property", as that term is defined in the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 472(e)), and any subsequent transfer of such property to another Federal agency's administrative control or conveyance of the United States' title in such property to a non-Federal entity.

**L23** Decisions to decommission or temporarily discontinue use of equipment;

> **\*L23(a)** Decisions to decommission or temporarily discontinue use of vessels and aircraft. This does not preclude the need to review decommissioning under section 106 of the National Historic Preservation Act.

> **L23(b)** Decisions to decommission or temporarily discontinue use of equipment, not including vessels or aircraft. This does not preclude the need to review decommissioning under section 106 of the National Historic Preservation Act.

**\*L24** Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in functional use

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301346

of the real property (e.g. realigning interior spaces of an existing building, extending an existing roadway in a developed area a short distance, installing a small antenna on an already existing antenna tower, adding a small storage shed to an existing building, etc.).

**\*L25** Installation of devices to protect human or animal life, such as raptor electrocution prevention devices, fencing to restrict wildlife movement on to airfields, and fencing and grating to prevent accidental entry to hazardous areas.

**\*L26** Maintenance dredging and debris disposal where no new depths are required, applicable permits are secured, and disposal will be at an existing approved disposal site.

**L27** Routine repair, renovation, and maintenance actions on aircraft and vessels.

**L28** Routine repair and maintenance of buildings, roads, airfields, grounds, equipment, and other facilities which do not result in a change in functional use, or an impact on a historically significant element or setting.

**L29** Routine repair and maintenance to waterfront facilities, including mooring piles, fixed floating piers, existing piers, and unburied power cables.

**\*L30** Minor renovations and additions to waterfront facilities, including mooring piles, fixed floating piers, existing piers, and unburied power cables, which do not require special, site-specific regulatory permits.

**L31** Routine grounds maintenance and activities at units and facilities. Examples include localized pest management actions and actions to maintain improved grounds (such as landscaping, lawn care and minor erosion control measures) that are conducted in accordance with applicable Federal, state, and local directives.

**\*L32** Defense preparedness training and exercises conducted on Coast Guard controlled property that do not involve undeveloped property or increased noise levels over adjacent property and that involve a limited number of personnel, such as exercises involving primarily electronic simulation or command post personnel.

**L33** Defense preparedness training and exercises conducted on other than USCG property, where the lead agency or department is not USCG or DHS

A-17

and the lead agency or department has completed its NEPA analysis and documentation requirements.

**L34** Simulated exercises, including tactical and logistical exercises that involve small numbers of personnel.

**L35** Training of an administrative or classroom nature.

**\*L36** Realignment or initial homeporting of mobile assets, including vessels and aircraft, to existing operational facilities that have the capacity to accommodate such assets or where supporting infrastructure changes will be minor in nature to perform as new homeports or for repair and overhaul. Note. If the realignment or homeporting would result in more than a one for one replacement of assets at an existing facility, then the checklist required for this CE must specifically address whether such an increase in assets could trigger the potential for significant impacts to protected species or habitats before use of the CE can be approved.

**L37** Operations to carry out maritime safety, maritime law enforcement, search and rescue, domestic ice breaking, and oil or hazardous substance removal programs.

**L38** Actions performed as a part of USCG operations and the Aids to Navigation Program to carry out statutory authority in the area of establishment of floating and minor fixed aids to navigation, except electronic sound signals.

**L39** USCG participation in disaster relief efforts under the guidance or leadership of another Federal agency that has taken responsibility for NEPA compliance.

**L40** Routine movement of personnel and equipment, and the routine movement, handling, and distribution of non-hazardous and hazardous materials and wastes in accordance with applicable regulations.

**\*L41** Contracts for activities conducted at established laboratories and facilities, to include contractor-operated laboratories and facilities, on USCG-owned property where all airborne emissions, waterborne effluents, external radiation levels, outdoor noise, and solid and bulk waste disposal practices are in compliance with existing applicable Federal, state, and local laws and regulations.

**L42** Environmental site characterization studies and environmental monitoring including: Siting, constructing, operating, and dismantling or

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301348

closing of characterization and monitoring devices. Such activities include but are not limited to the following:

(a) Conducting geological, geophysical, geochemical, and engineering surveys and mapping, including the establishment of survey marks.

(b) Installing and operating field instruments, such as stream-gauging stations or flow-measuring devices, telemetry systems, geochemical monitoring tools, and geophysical exploration tools.

(c) Drilling wells for sampling or monitoring of groundwater, well logging, and installation of water-level recording devices in wells.

(d) Conducting aquifer response testing.

(e) Installing and operating ambient air monitoring equipment.

(f)  Sampling and characterizing water, soil, rock, or contaminants.

(g) Sampling and characterizing water effluents, air emissions, or solid waste streams.

(h) Sampling flora or fauna.

(i) Conducting archeological, historic, and cultural resource identification and evaluation studies in compliance with 36 CFR part 800 and 43 CFR part 7.

(j) Gathering data and information and conducting studies that involve no physical change to the environment. Examples include topographic surveys, bird counts, wetland mapping, and other inventories.

---

**L43** Natural and cultural resource management and research activities that are in accordance with inter-agency agreements and which are designed to improve or upgrade the USCG's ability to manage those resources.

---

**L44** Planning and technical studies which do not contain recommendations for authorization or funding for future construction, but may recommend further study. This includes engineering efforts or environmental studies undertaken to define the elements of a proposal or alternatives sufficiently so that the environmental effects may be assessed and does not exclude consideration of environmental matters in the studies.

---

**L45** Modification or replacement of an existing bridge on essentially the same alignment or location. Excluded are bridges providing access to undeveloped barrier islands and beaches.

---

**L46** Construction of pipeline bridges for transporting potable water.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301349

**L47** Construction of pedestrian, bicycle, or equestrian bridges and stream gauging cableways used to transport people.

**L48** Temporary replacement of a bridge immediately after a natural disaster or a catastrophic failure for reasons of public safety, health, or welfare.

**L49** Promulgation of operating regulations or procedures for drawbridges.

**L50** Identification of advance approval waterways under 33 CFR 115.70.

**L51** Any Bridge Program action which is classified as a CE by another Federal agency acting as lead agency for such an action.

**L52** Regulations concerning vessel operation safety standards (e.g., regulations requiring: certain boaters to use approved equipment which is required to be installed such as an ignition cut-off switch, or carried on board, such as personal flotation devices (PFDS), and/or stricter blood alcohol concentration (BAC) standards for recreational boaters, etc.), equipment approval, and/or equipment carriage requirements (e.g. personal flotation devices (PFDs) and visual distress signals (VDS's)).

**\*L53** Congressionally mandated regulations designed to improve or protect the environment (e.g., regulations implementing the requirements of the Oil Pollution Act of 1990, such as those requiring vessels to have the capability to transmit and receive on radio channels that would allow them to receive critical safety and navigation warnings in U.S. waters, regulations to increase civil penalties against persons responsible for the discharge of oil or hazardous substances into U.S. waters, etc.).

**\*L54** Regulations which are editorial or procedural, such as those updating addresses or establishing application procedures.

**\*L55** Regulations concerning internal agency functions or organization or personnel administration, such as funding, establishing Captain of the Port boundaries, or delegating authority.

**\*L56** Regulations concerning the training, qualifying, licensing, and disciplining of maritime personnel.

**\*L57** Regulations concerning manning, documentation, admeasurement, inspection, and equipping of vessels.

**\*L58** Regulations concerning equipment approval and carriage requirements.

A-20

**L59** Regulations for Special Anchorage Areas or anchorage grounds:
  **\*L59(a)** Regulations establishing or increasing the size of Special Anchorage Areas or anchorage grounds.

  **L59(b)** Regulations disestablishing or reducing the size of Special Anchorage Areas or anchorage grounds.

**L60** Regulations for Regulated Navigation Areas and security or safety zones:
  **\*L60(a)** Regulations establishing or increasing the size of Regulated Navigation Areas and security or safety zones.

  **L60(b)** Regulations for actions that disestablish or reduce the size of the area or zone.

  **L60(c)** Regulations for temporary areas and zones that are established to deal with emergency situations and that are less than one week in duration.

  **\*L60(d)** Regulations for temporary areas and zones that are established to deal with emergency situations and that are one week or longer in duration REC will be prepared and submitted after issuance or publication.

**L61** Special local regulations issued in conjunction with a regatta or marine parade; provided that, if a permit is required, the environmental analysis conducted for the permit included an analysis of the impact of the regulations.

**\*L62** Regulations in aid of navigation, such as those concerning rules of the road, International Regulations for the Prevention of Collisions at Sea (COLREGS), bridge-to-bridge communications, vessel traffic services, and marking of navigation systems.

**L63** Approvals of regatta and marine parade event permits for the following events:

  **L63(a)** Events that are not located in, proximate to, or above an area designated environmentally sensitive by an environmental agency of the Federal, state, or local government.  For example, environmentally sensitive areas may include such areas as critical habitats or migration routes for endangered or threatened species or important fish or shellfish nursery areas.

  **\*L63(b)** Events that are located in, proximate to, or above an area

A-21

designated as environmentally sensitive by an environmental agency of the Federal, state, or local government and for which the USCG determines, based on consultation with the Governmental agency, that the event will not significantly affect the environmentally sensitive area.

**\*L64** Disposal of real property (including facilities) by the USCG where the reasonably foreseeable use will not change significantly or where the reasonably foreseeable use is similar to existing surrounding properties (e.g. commercial store in a commercial strip, warehouse in an urban complex, office building in downtown area, row house or vacant lot in an urban area).

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA)**

***Note:*** *All categories of actions in Section M below are new CATEXs. These CATEXs will be available for use only by FEMA.*

**M1** The following activities in support of FEMA's administration of the National Flood Insurance Program (NFIP):

**M1(a)** Review of information, provision of technical assistance, and classification for individual communities under the Community Rating System (CRS);

**M1(b)** Approvals and issuance of Letters of Map Change, including Agency comments;

**\*M1(c)** Creation of new flood zones, except establishing new flood zones for areas protected by structural flood control structures or systems or dams;

**M1(d)** Revisions to Standard Flood Insurance Policy and Group Flood Insurance Policy;

**M1(e)** Actions associated with inspections and monitoring, and enforcement of Federal, State, Tribal, or local floodplain management codes, standards, or regulations;

**\*M1(f)** Development and adoption of CRS activities; and

**M1(g)** Revisions to flood insurance rates and premium schedules.

**M2** Transportation and prepositioning of assets in preparation for national emergencies and disasters.

A-22

| |
|---|
| **M3** Urban Search and Rescue (USR) activities, including deployment of USR teams. |
| **M4** Emergency Communications (Stafford Act §418) |
| **M5** Emergency Public Transportation (Stafford Act §419) |
| **M6** Lease of pre-existing structures and facilities for disaster operations (e.g. Joint Field Offices, Area Field Offices, Disaster Recovery Centers) located out of floodplains, historic properties, or contaminated sites. |
| **\*M7** Lease of pre-existing structures and facilities for disaster operations (e.g., Joint Field Offices, Area Field Offices, Disaster Recovery Centers) located within floodplains, historic properties, or contaminated sites. |
| **\*M8** Development of temporary shelter or housing for first responders and Federal disaster personnel involving less than 10 acres of ground disturbance in previously developed or disturbed areas and that follow best management practices for pollution control. |
| **\*M9** Storage of assets immediately after a disaster, including development of temporary staging areas involving less than 10 acres of ground disturbance in previously developed or disturbed areas and that follow best management practices for pollution control. |
| **M10** Activation of response and recovery frameworks and operations (e.g. National Response Framework, National Disaster Recovery Framework, National Response Coordination Center, Regional Response Coordination Center, Emergency Response Teams, Incident Management Assistance Teams, Emergency Support Functions, Recovery Support Functions). |
| **M11** Information and data gathering and reporting in support of emergency and disaster response and recovery activities, including ground and aerial reconnaissance and structure inspection. |
| **M12** Development of plans by FEMA for the purpose of preparing for disasters, recovering from disasters, and identifying opportunities for mitigating the effects of future disasters; and the issuance of national frameworks, doctrines, guidance, standard operating procedures, and handbooks for the coordination of Federal, State, local, and private disaster response, recovery, and hazard mitigation. This CATEX is not applicable to subsequent decisions on specific situations or projects that are reasonably foreseeable in order to implement the plan. |

A-23

**\*M13** Construction or installation of structures, facilities, or equipment for the purpose of ensuring the continuity of operations during incidents such as emergencies, disasters, flooding, and power outages involving less than one acre of ground disturbance. Examples include the installation of generators, installation of storage tanks of up to 10,000 gallons, installation of pumps, construction of structures to house emergency equipment, and utility line installation. This CATEX covers associated ground disturbing activities, such as trenching, excavation, and vegetation removal of less than one acre, as well as modification of existing structures.

**FEDERAL ASSISTANCE ACTIVITIES**

***Note:*** *All categories of actions in Section N below are new CATEXs. These CATEXs will be available for use by any DHS Component providing Federal assistance, e.g., grants.*

**N1 Administrative Actions Associated with Grants Management**. Actions related to grant administration performed at any stage during the grants lifecycle, such as the development and issuance of grant guidance; announcements of availability of funds; project reviews for program eligibility; provision of technical assistance; conducting inspections, financial audits, and monitoring activities; development of information technology systems for grants management; grant close-out activities; and actions taken in situations where a grantee or subgrantee is in non-conformance with grant program requirements, such as disallowances, recoupment of funds, and debarment.

**\*N2 Federal Assistance for Facility Repair**. Federal assistance for the repair of structures and facilities in a manner that conforms to pre-existing design, function, location, and land use.  This CATEX does not apply to work within or affecting the following: streams; stream banks; seaward of the limit of moderate wave action (LiMWA) (a line mapped to delineate the inland extent of wave heights of 1.5 feet); or the V zone (areas expected to be affected by wave impact of 3 feet or more in height, in a 100-year flood event) if the LiMWA has not been identified. This CATEX covers the temporary staging and use of equipment and vehicles to carry out the proposed repair actions as long as best management practices are put in place to control noise, water, and air pollution.

**\*N3 Federal Assistance for Property Acquisition and Demolition**. Federal assistance for the acquisition of properties and the associated demolition and removal when the acquisition is from a willing seller, the assistance is solely for the purposes of financial compensation for the acquisition, and the land is deed restricted to open space, recreational,

wildlife habitat, or wetland uses in perpetuity. The CATEX does not apply to subsurface uses of acquired properties, or acquired properties with encumbrances or easements authorizing current or future subsurface uses that are not allowable and compatible with open space.  This CATEX covers actions associated with the determination of program eligibility. This CATEX does not cover Federal assistance actions that involve acquisition for the purpose of construction or development at a site in the acquired property. The use of eminent domain is explicitly excluded from the CATEX.

**\*N4 Federal Assistance for Actions Involving Stream Work and Modification and Floodways**. Federal assistance for repair and restoration actions, hazard mitigation actions other than flood control, or the new construction of facilities that are functionally dependent or facilitate open space use, when the actions are within or affect regulatory floodways, streams, and stream banks and  that

(a) Involve ground disturbance of less than ½ acre,

(b) Involve stream bank work or alteration of less than 300 linear feet,

(c) Do not involve hardening or armoring of the stream banks unless the project uses stream or stream bank bioengineering techniques and improve fish passage or habitat,

(d) Do not result in adverse flood risk effects to downstream communities,

(e) Do not result in any increase of flood levels within the community during the occurrence of the base flood discharge if the action takes place within the regulatory floodway, and

(f) Where the effect of the proposed project when combined with other existing or reasonably foreseeable development will not increase water surface elevation of the base flood more than one foot at any point within the community if the action takes place in a floodplain with no regulatory floodway.

**\*N5 Federal Assistance for Actions in Coastal Areas Subject to Moderate Wave Action or V Zones**. Federal assistance for repair, hazard mitigation, new construction, or restoration actions of less than one-half acre within the following areas: areas seaward of the limit of moderate wave action (LiMWA) (a line mapped to delineate the inland extent of wave heights of 1.5 feet) during the base flood (an area that has at least a one-percent chance of being flooded in any given year); or areas within the V zone (a coastal area where there is a velocity hazard due to wave action) if the LiMWA has not been established. The actions must meet the following criteria:

A-25

AR2022_301355

(a) They are consistent with the State or Tribe enforceable policies of approved coastal management programs,

(b) They are not within or affect a Coastal Barrier Resource System unit,

(c) They do not result in man-made alterations of sand dunes,

(d) They do not result in the permanent removal of vegetation (including mangrove stands, wetlands, and dune vegetation), and

(e) Applicable Federal requirements and local codes and standards are followed.

If the actions involve substantial improvement or new construction of structures, the following criteria also apply:

1. The structure must be elevated upon open works (e.g. piles and columns), as opposed to fill, in a manner that the bottom lowest horizontal structural member is at or above the base flood level,
2. The foundation must be anchored to resist flotation, collapse, and lateral movement due to the effects of wind and water loads, and
3. The siting of the project must conforms to applicable State, Tribe, or local setback requirements.

Examples of activities covered by this CATEX include but are not limited to: the repair and elevation of structures; repair and new construction of jetties and groins; the repair, hazard mitigation, and new construction of functionally dependent facilities such as piers, marinas, boat ramps, bathrooms, and port facility structures; and beach restoration projects except projects that result in the man-made alteration of dunes and wetlands such as beach nourishment projects.

**\*N6 Federal Assistance for Relocation/Realignment of Structures and Facilities**. Federal assistance for the relocation of structures and facilities, including the realignment of linear facilities that are part of a bigger system, when they do not involve ground disturbance of more than one acre. This category does not apply to the following: actions that involve hardening or armoring of stream banks, unless they use stream or stream bank bioengineering techniques; realignment actions affecting a regulatory floodway if they result in any increase in flood levels during the base flood discharge; or actions occurring seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified).

**\*N7 Federal Assistance for Structure and Facility Upgrades**. Federal assistance for the reconstruction, elevation, retrofitting, upgrading to current codes and standards, and improvements of pre-existing facilities in existing

A-26

developed areas with substantially completed infrastructure, when the immediate project area has already been disturbed, and when those actions do not alter basic functions, do not exceed capacity of other system components, or modify intended land use. This category does not include actions within or affecting streams or stream banks or actions seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified).

**\*N8 Federal Assistance for New Construction Activities of Less Than One Acre in Undisturbed or Undeveloped Areas**. Federal assistance for new construction and associated site preparation activities in undisturbed or undeveloped areas when the activities comprise less than one acre and follow best management practices to control noise, water, and air pollution. This category does not apply to new construction in undisturbed or undeveloped floodplains, wetlands, or seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified). This CATEX covers the range of activities typically necessary for new construction, including field work (e.g. borings, site inspection) and temporary staging and use of construction equipment and vehicles.

**\*N9 Federal Assistance for Flood Hazard Reduction Actions**. Federal assistance for drainage, berm, water crossing, and detention, retention, or sediment pond projects which have the primary purpose of addressing flood hazards and:

(a) Do not affect more than 25 acres,

(b) Do not result in adverse flood risk effects to downstream communities,

(c) Do not result in any increase of flood levels within the community during the occurrence of the base flood discharge if the action takes place within the regulatory floodway, and

(d) Where the effect of the proposed project when combined with other existing or reasonably foreseeable development will not increase water surface elevation of the base flood more than one foot at any point within the community if the action takes place in a floodplain with no regulatory floodway.

This CATEX covers minor flood control actions as identified in Sections 1366 and 1361 of the National Flood Insurance Act (NFIA). Actions that are not covered in Sections 1366 and 1361 of the NFIA, such as dikes, levees, seawalls, groins, and jetties, are excluded from this CATEX.

A-27

AR2022_301357

**\*N10 Federal Assistance for Communication Towers of Less than 400 Feet**. Federal assistance for the construction of communication towers when all of the following are met:

(a) The total height is less than 400 feet above ground level,

(b) The tower construction project has been reviewed by the Federal Communications Commission (FCC) and has been documented as meeting FCC environmental planning and historic preservation procedures,

(c) The project is located farther than 660 feet from a Bald Eagle's nest or 0.6 mile from a Golden Eagle nest,

(d) The tower is not located on ridgelines or in coastal zones, bird staging areas, colonial nesting sites, 100- or 500-year floodplains, or wetlands, and

(e) The lighting scheme meets all applicable US Fish and Wildlife Service guidelines for reducing potential impacts to night-migrating birds.

This CATEX covers associated activities such as installation of fuel storage tanks, equipment buildings, security fencing and lighting, and access roads, and land disturbance activities typically associated with construction such as clearing, fill, and grading.

**\*N11 Federal Assistance for Wildfire Hazard Mitigation Actions**. Federal assistance for wildfire hazard mitigation actions involving the creation of defensible space or hazardous fuel reduction for up to 100 feet from at-risk structures including selective removal of vegetation less than 12 inches in diameter at breast height through thinning, pruning, limbing, sawing, or brush cutting and removal of downed, dead, or dry vegetation material as part of the overall action.

Vegetation removal is limited to 100 acres inclusive of vegetation removal due to other reasonably foreseeable private and public connected actions. Actions must follow appropriate best management practices.

**\*N12** Federal assistance for planting of indigenous vegetation.

**N13** Provision of the Following Forms of Federal Assistance Under the Stafford Act:

(a) Unemployment Assistance (§410);

(b) Individuals and Households Programs (§408), except for grants that will be used for restoring, repairing or building private bridges, or purchasing mobile homes or other readily fabricated dwellings;

A-28

(c) Food Coupons and Distribution (§412);

(d) Food Commodities (§413);

(e) Legal Services (§415);

(f) Crisis Counseling Assistance and Training (§416);

(g) Community Disaster Loans (§417);

(h) Emergency Communications (§418);

(i) Emergency Public Transportation (§419);

(j) Fire Management Assistance (§420)

**N14** Federal assistance for Urban Search and Rescue (USR) activities, including deployment of USR teams.

**\*N15 Federal Assistance for Disaster Temporary Individual Housing in Private and Commercial Sites**. Federally funded action or federal assistance for the development, installation and/or removal of individual housing units in pre-existing private or commercial sites that are not located on contaminated sites for individual temporary housing units.

**\*N16 Federal Assistance for Disaster Temporary Group Housing of Less than Five (5) Acres**. Federal assistance for the placement of disaster temporary group housing, including associated temporary facilities and the tie-in or installation of necessary utilities to service the housing units (such as electricity, potable water, and wastewater infrastructure), that involves less than five (5) acres of ground disturbance on sites that are zoned for housing and that follow best management practices for pollution control.  This CATEX also covers the conversion of such temporary housing to permanent housing when these criteria are met.

**N17 Federal Assistance for Development of Plans in Support of Response, Recovery, and Hazard Mitigation Activities**. Federal assistance for the development of plans for the purpose of preparing for disasters, recovering from disasters, and identifying opportunities for mitigating the effects of future disasters. This includes but is not limited to State, Tribal, and local hazard mitigation plans, debris management plans, long-term recovery plans, and disaster housing plans. This CATEX is not applicable to plans associated with specific projects that are reasonably foreseeable to occur and that are not otherwise covered by another CATEX.

**\*N18 Federal Assistance for Construction or Installation of Structures, Facilities, or Equipment to Ensure Continuity of Operations**. Federal

A-29

assistance for the construction or installation of measures for the purpose of ensuring the continuity of operations during incidents such as emergencies, disasters, flooding, and power outages involving less than one acre of ground disturbance. Examples include the installation of generators, installation of storage tanks of up to 10,000 gallons, installation of pumps, construction of structures to house emergency equipment, and utility line installation. This CATEX covers associated ground disturbing activities, such as trenching, excavation, and vegetation removal of less than one acre, as well as modification of existing structures.

**\*N19 Federal Assistance for Clean-up and Other Actions to Restore Environmental Resources**.  Federal assistance for clean-up and other actions to restore environmental resources to pre-existing conditions when resource contamination or damage results from a disaster event and when the clean- up and associated actions are not exempt from NEPA. Examples include the clean-up of underground storage tank releases and above ground releases that affect nearby water bodies or wetlands.

A-30

# Appendix B.  List of Environmental Planning Requirements other than NEPA

DHS integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment.  These other environmental planning requirements include, but are not limited to, the following:

A.   Clean Air Act (16 U.S.C. §470 et seq.).

B.   Clean Water Act 33 (U.S.C. §1251 et seq.).

C.   Coastal Barrier Resources Act (16 U.S.C. §3501 et seq.).

D.   Coastal Zone Management Act (16 U.S.C. §1451 et seq.).

E.   Endangered Species Act (16 U.S.C. §1531 et seq.).

F.   Farmland Protection Policy Act (7 U.S.C. §4201 et seq.).

G.   Marine Mammal Protection Act (16 U.S.C. §1361 et seq.).

H.   Migratory Bird Treaty Act (16 U.S.C. §703-712).

I.   National Historic Preservation Act (16 U.S.C. §470 et seq.).

J.   National Marine Sanctuaries Act (16 U.S.C. §1431 et seq.).

K.   Executive Order 11988, Floodplain Management, dated May 24, 1977.

L.   Executive Order 11990, Protection of Wetlands, dated May 24, 1977.

M.   Executive Order 12114, Environmental Effects Abroad of Major Federal Actions, dated January 4, 1979.

N.   Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, dated February 11, 1994.

O.   Executive Order 13423, Strengthening Federal Environmental, Energy, and Transportation Management, dated January 24, 2007.

P.   Executive Order 13514, Federal Leadership in Environmental, Energy, and Economic Performance, dated October 5, 2009.

Instruction Manual # 023-01-001-01

Revision # 01

AR2022_301361

# Appendix C.  Record of Environmental Consideration (REC) Template for Categorically Excluded Actions

| INTRODUCTION |
|---|
| The purpose of this Record of Environmental Consideration (REC) is to provide a record that the potential for impacts to the quality of the human environment has been considered in the decision to implement the Proposed Action described below, in accordance with the National Environmental Policy Act of 1969 (NEPA) and DHS Directive 023-01 and Instruction Manual 023-01-001-01 on implementation of NEPA.  DHS integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment, as reflected in Section II (8) of this REC.  Signature of the DHS Proponent on this REC demonstrates that they have considered the potential for impacts to the human environment in their decision to implement the Proposed Action as required by NEPA, and are committing to any conditions listed in Section IV of this REC that may be required for implementation of the project. |
| Instructions:  Information to complete this form is needed from both the proponent office and environmental planning specialists.  The environmental impact evaluation documented in this REC must include the full life-cycle of the Proposed Action, to the extent that the stages of that life-cycle are reasonably foreseeable and sufficiently developed to make an environmental analysis possible at this time.  Any connected or related activities that are needed for the Proposed Action to be effective, or that need this Proposed Action to be effective, must also be included in the environmental impact evaluation. Provide quantitative information where appropriate; discuss alternatives, if appropriate; and attach relevant supporting documents (e.g., maps, photographs, correspondence, reports, etc.).  When completed, the form is to be signed by the Preparer, the Environmental Approver, and the Action Proponent.  The completed REC becomes a part of the administrative record for the Proposed Action. |
| SECTION I – Description of Proposed Action |
| 1.  Name of Component and Program/Office Authorizing the Proposed Action: |
| 2.  Title of Proposed Action: |
| 3.  Identifying Number of Proposed Action (if available): |
| 4.  Estimated Start Date and Useful Life of Proposed Action: |
| 5.  Location of Proposed Action (e.g., Nationwide, Regional, Site-Specific. If site-specific, provide City, County, State, and street address and/or latitude-longitude coordinates): |
| 6.  Description of Proposed Action, including its purpose and need and any related or connected actions.  You may include as attachments maps, photographs, diagrams, or other information that may assist with the description. |
| SECTION II – Analysis of Extraordinary Circumstances |
| 7.  ☐  Proposed Action is not a piece of a larger action<br><br>☐  Proposed Action is a piece of a larger action<br><br>Remarks: |

C-1

8. For A through K, check the appropriate box and provide an explanation when appropriate. Include a summary of any coordination or consultation that occurred with a resource or regulatory agency, if relevant.

☐ Yes   ☐ No   A.  Will the Proposed Action have a potentially significant effect on public health or safety?

Remarks:

☐ Yes   ☐ No   B. Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act?

Remarks:

☐ Yes   ☐ No   C. Will the Proposed Action have a potentially significant effect on a district, highway, structure, or object that is listed or eligible for listing on the National Register of Historic Places (NRHP)? Will the Proposed Action have a potentially significant effect on a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource?

Remarks:

☐ Yes   ☐ No   D.  Will the Proposed Action have a potentially significant effect on an environmentally sensitive area?

Remarks:

☐ Yes   ☐ No   E.  Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment?

Remarks:

☐ Yes   ☐ No   F.   Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks?

Remarks:

☐ Yes   ☐ No   G. Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity?

Remarks:

☐ Yes   ☐ No   H.   Will the Proposed Action establish a precedent for future actions that have significant effects?

Remarks:

C-2

| ☐ Yes | ☐ No | I.   Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? |
|---|---|---|

Remarks:

| ☐ Yes | ☐ No | J.   Does the Proposed Action have the potential to result in significant degradation of existing poor environmental conditions?  Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not significantly modified from their natural condition? |
|---|---|---|

Remarks:

| ☐ Yes | ☐ No | K.  Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts? |
|---|---|---|

Remarks:

**SECTION III  –  Categorical Exclusion (CATEX) Determination**

9. If one or more DHS CATEX applies to the proposed action, indicate which DHS CATEX(s) applies (see Appendix A, Table 1, DHS Instruction Manual 023-01-001-01 for the list of DHS CATEXs).  The entire proposed action must clearly fit within one or more DHS CATEX(s).  Note: The presence of an extraordinary circumstance (Section II above) precludes the application of a CATEX when the circumstance would have significant environmental impacts (i.e., Environmental Impact Statement required), or presents the potential for significant environmental impacts (i.e., Environmental Assessment (EA) required), or that potential cannot be readily determined without further analysis (i.e., EA required).

**SECTION IV  –  Conditions**

10.  The following conditions are required to implement the Proposed Action:

- Any change to the Proposed Action requires re-evaluation for compliance with NEPA before the action can proceed.

- This review addresses NEPA and requirements under other environmental planning requirements that are integrated into the NEPA process.  This review may identify the need for additional Federal, State, and/or local permits, approvals, etc. required for the Proposed Action.  However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate Federal, State, and/or local permits, approvals, etc. have been obtained.

- [Add action-specific conditions as necessary, e.g.: If ground disturbing activities occur during action implementation, the Proponent will monitor ground disturbance and if any potential archeological resources or human remains are discovered, will immediately cease work in that area and notify _____.]

C-3

| SECTION V – Signatures | | |
|---|---|---|
| **11a. Preparer of this REC** | | |
| Name, Office, and Title: | Signature: | Date: |
| **11b. Environmental Approver of this REC** | | |
| Name, Office, and Title: | Signature: | Date: |
| **11c. Office of General Counsel Reviewer of this REC (if required by Component)** | | |
| Name, Office, and Title: | Signature: | Date: |
| **11d.  Action Proponent** | | |
| Name, Office, and Title: | Signature: | Date: |

C-4



U.S. Department of Homeland Security

# Immigration Options for Victims of Crimes

Many immigrants are fearful of admitting that they have been a victim of a crime in part because they believe they will be removed (deported) from the United States if they report the crime. U.S. law provides several protections for legal and undocumented immigrants who have been victims of a crime. There are specific protections for victims of domestic violence, victims of certain crimes, and victims of human trafficking (/topic/human-trafficking) .

- Immigration Options for Victims of Crimes (https://www.dhs.gov/xlibrary/assets/ht_uscis_immigration_options.pdf) (PDF - 2 pages, 296 KB)
- Opciones de Inmigración para las Víctimas de Delitos (https://www.dhs.gov/xlibrary/assets/ht_uscis_immigration_remedies-spanish.pdf) (PDF, 2 pages - 258 KB)
- 犯罪受害者的移民選擇 執法單位、醫療單位和其他各方 須知 (https://www.uscis.gov/USCIS/Humanitarian/Victims%20of%20Human%20Trafficking%20and%20Other%20Crimes/Immigration-%20Options-Victims-Crimes-Chinese.pdf) [Chinese] (PDF, 2 pages - 465 KB)
- Варианты иммиграции для жертв преступлений (https://www.uscis.gov/USCIS/Humanitarian/Victims%20of%20Human%20Trafficking%20and%20Other%20Crimes/Immigration-%20Options-Victims-Crimes-Russian.pdf) [Russian] (PDF, 2 pages - 328 KB)

**Violence Against Women Act (VAWA)**

### VAWA Self–Petitioners

Some immigrants may be afraid to report acts of domestic violence to the police or to seek other forms of assistance. Such fear causes many immigrants to remain in abusive relationships.

Victims of domestic violence who are the child, parent, or current/former spouse of a United States citizen or a permanent resident (green card holder) and are abused by the citizen or permanent resident may be eligible to apply for a green card themselves without needing the abuser to file for immigration benefits on their behalf. This provision of the law was created under the VAWA.

### Victims must establish that they:

- Have or had a qualifying relationship with the abuser spouse, or, are the parent or child of the abuser,
- Reside or resided with the abuser,
- Have good moral character, and
- Have been victims of battery or extreme cruelty.

VAWA provisions apply equally to men and women. Victims of domestic violence, whether a spouse, child, or parent of the abuser, may self-petition by filing Form I-360, Petition for Widow(er)s, Amerasians, and Special Immigrants (https://www.uscis.gov/i-360) .

**U Nonimmigrant Status**

U nonimmigrant status (or U visa) offers immigration protection for victims and is also a tool for law enforcement. To obtain U status, the victim must obtain a certification from law enforcement, however, law enforcement officials should note that providing a certification does not grant a benefit—only U.S. Citizenship and Immigration Services (USCIS) has the authority to grant or deny this benefit.

### Victims are not required to be in legal immigration status, but they must:

- Be a victim of qualifying criminal activity and have suffered substantial physical or mental abuse as a result of the crime,
- Possess credible and reliable information about the qualifying criminal activity,
- Be, have been, or are likely to be helpful to the investigation and/or prosecution of that qualifying criminal activity, and

AR2022_301366

- Be a victim of criminal activity that violated a U.S. law.

## Victims of the following crimes may be eligible for a U nonimmigrant visa:

- Abduction
- Abusive Sexual Contact
- Blackmail
- Domestic Violence
- Extortion
- False Imprisonment
- Female Genital Mutilation
- Perjury
- Felonious Assault
- Hostage Taken
- Incest
- Peonage
- Involuntary Servitude
- Kidnapping
- Manslaughter
- Rape
- Murder
- Obstruction of Justice
- Witness Tampering
- Prostitution
- Sexual Assault
- Slave Trade
- Torture
- Trafficking
- Sexual Exploitation
- Unlawful Criminal Restraint
- Other Related Crimes

To apply for U nonimmigrant status, the victim must file Form I-918, Petition for U Nonimmigrant Status (https://www.uscis.gov/i-918). Law enforcement official must certify Form I-918, Supplement B. Qualifying family members may also be eligible to apply for benefits.

## T Nonimmigrant Status

Trafficking in persons—also known as "human trafficking"—is a form of modern-day slavery. Traffickers prey on many types of people, often including individuals who are poor, unemployed, underemployed, or who lack the safety and protection of strong social networks. Victims are often lured under the false pretenses of good jobs and better lives, and then forced to work under brutal and inhumane conditions. Many believe that human trafficking is a problem that only occurs in other countries—but human trafficking also happens in the United States.

The T nonimmigrant status (or T visa) provides immigration protection to victims of severe forms of trafficking in persons who assist law enforcement in the investigation and prosecution of human trafficking cases.

## Victims are not required to be in legal immigration status, but they must:

- Be a victim of a severe form of trafficking in persons,
- Be physically present in the United States on account of the trafficking,
- Comply with any reasonable requests for assistance in the investigation or prosecution (or be under the age of 18), and
- Suffer extreme hardship involving unusual and severe harm if removed from the United States.

To apply for a T nonimmigrant status, applicants must file Form I-914, Application for T Nonimmigrant Status (https://www.uscis.gov/i-914). Qualifying family members may also be eligible to apply for benefits.

Many immigrants are fearful of admitting that they have been a victim of a crime in part because they believe they will be removed (deported) from the United States if they report the crime. Officials such as police officers, healthcare providers, judges, and prosecutors are often the first to see the signs of violence and are therefore in a unique position to provide information and assistance to those who have been victims. This brochure is designed to assist front-line workers in this endeavor.

U.S. law provides several protections for legal and undocumented immigrants who have been victims of a crime. Often victims are unaware of such protections, thus frontline workers serve as a critical link for immigrant victims. There are specific protections for victims of domestic violence, victims of certain crimes, and victims of human trafficking.

All agencies within the Department of Homeland Security, including USCIS, are legally prohibited from disclosing that a victim has applied for VAWA, T, or U immigration benefits.

## Contact

For law enforcement officials and representatives of record:
**Call USCIS:** 802-527-4888 (/immigration-options-victims-crimes#)_(/immigration-options-victims-crimes#)

For all others:
**Call USCIS:** 800-375-5283 (/immigration-options-victims-crimes#)_(/immigration-options-victims-crimes#)

## Topics

HUMAN TRAFFICKING (/TOPICS/HUMAN-TRAFFICKING)

## Keywords

IMMIGRATION (/KEYWORDS/IMMIGRATION)

Last Updated: 01/30/2022

**AR2022_301368**

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

November 20, 2014

MEMORANDUM FOR:  Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

Leon Rodriguez
Director
U.S. Citizenship and Immigration Services

Alan D. Bersin
Acting Assistant Secretary for Policy

FROM:  Jeh Charles Johnson
Secretary

SUBJECT:  **Policies for the Apprehension, Detention and Removal of Undocumented Immigrants**

This memorandum reflects new policies for the apprehension, detention, and removal of aliens in this country. This memorandum should be considered Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). This memorandum should inform enforcement and removal activity, detention decisions, budget requests and execution, and strategic planning.

In general, our enforcement and removal policies should continue to prioritize threats to national security, public safety, and border security. The intent of this new policy is to provide clearer and more effective guidance in the pursuit of those priorities. To promote public confidence in our enforcement activities, I am also directing herein greater transparency in the annual reporting of our removal statistics, to include data that tracks the priorities outlined below.

The Department of Homeland Security (DHS) and its immigration components-CBP, ICE, and USCIS-are responsible for enforcing the nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities. DHS's enforcement priorities are, have been, and will continue to be national security, border security, and public safety. DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.

In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case. While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases. Thus, DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process-from the earliest investigative stage to enforcing final orders of removal-subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.

Except as noted below, the following memoranda are hereby rescinded and superseded: John Morton, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens,* March 2, 2011; John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens,* June 17, 2011; Peter Vincent, *Case-by-Case Review of Incoming and Certain Pending Cases,* November 17, 2011; *Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems,* December 21, 2012; *National Fugitive Operations Program: Priorities, Goals, and Expectations,* December 8, 2009.

2

AR2022_301370

## A. Civil Immigration Enforcement Priorities

The following shall constitute the Department's civil immigration enforcement priorities:

### Priority 1 (threats to national security, border security, and public safety)

Aliens described in this priority represent the highest priority to which enforcement resources should be directed:

(a) aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

(b) aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;

(c) aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 52 l(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;

(d) aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and

(e) aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* at the time of the conviction.

The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

### Priority 2 (misdemeanants and new immigration violators)

Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:

(a) aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element

3

was the alien's immigration status, provided the offenses arise out of three separate incidents;

(b)   aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence;[1] sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);

(c)   aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; and

(d)   aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

These aliens should be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or users Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority.

**Priority 3 (other immigration violations)**

Priority 3 aliens are those who have been issued a final order of removal[2] on or after January 1, 2014. Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly to aliens in this priority. Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

---

[1] In evaluating whether the offense is a significant misdemeanor involving ..domestic violence," careful consideration should be given to whether the convicted alien was also the <u>victim</u> of domestic violence; if so, this should be a mitigating factor. *See generally,* John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs,* June 17, 2011.

[2] For present purposes, "final order" is defined as it is in 8 C.F.R. § 1241.1.

AR2022_301372

**B.   Apprehension, Detention, and Removal of Other Aliens Unlawfully in the   United States**

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein. However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified. Immigration officers and attorneys may pursue removal of an alien not identified as a priority herein, provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest.

**C.   Detention**

As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law. Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest. To detain aliens in those categories who are not subject to mandatory detention, DHS officers or special agents must obtain approval from the ICE Field Office Director. If an alien falls within the above categories and is subject to mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.

**D.   Exercising Prosecutorial Discretion**

Section A, above, requires DHS personnel to exercise discretion based on individual circumstances. As noted above, aliens in Priority 1 must be prioritized for removal unless they qualify for asylum or other form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Likewise, aliens in Priority 2 should be removed unless they qualify for asylum or other forms of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Similarly, aliens in Priority 3 should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the

5

integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

In making such judgments, DHS personnel should consider factors such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative. These factors are not intended to be dispositive nor is this list intended to be exhaustive. Decisions should be based on the totality of the circumstances.

## E.     Implementation

The revised guidance shall be effective on January 5, 2015. Implementing training and guidance will be provided to the workforce prior to the effective date. The revised guidance in this memorandum applies only to aliens encountered or apprehended on or after the effective date, and aliens detained, in removal proceedings, or subject to removal orders who have not been removed from the United States as of the effective date. Nothing in this guidance is intended to modify USCIS Notice to Appear policies, which remain in force and effect to the extent they are not inconsistent with this memorandum.

## F.     Data

By this memorandum I am directing the Office of Immigration Statistics to create the capability to collect, maintain, and report to the Secretary data reflecting the numbers of those apprehended, removed, returned, or otherwise repatriated by any component of DHS and to report that data in accordance with the priorities set forth above. I direct CBP, ICE, and USCIS to cooperate in this effort. I intend for this data to be part of the package of data released by DHS to the public annually.

## G.     No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

AR2022_301374

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

June 15, 2017

MEMORANDUM FOR:   Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Joseph B. Maher
Acting General Counsel

Michael T. Dougherty
Assistant Secretary for Border, Immigration, and Trade Policy

FROM:              John F. Kelly

SUBJECT:           Rescission of November 20, 2014 Memorandum Providing for
Deferred Action for Parents of Americans and Lawful Permanent
Residents ("DAPA")

On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued an implementing memorandum, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

AR2022_301375

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2]. After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3] The June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident." This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria:  (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate." The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson. Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time. I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

AR2022_301376

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3

**Rescission of November 20, 2014 DAPA Memorandum**

     I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities. After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

AR2022_301377

On June 10, 2022, the U.S. District Court for the Southern District of Texas issued a final judgment vacating Secretary Mayorkas's September 30, 2021 memorandum, _Guidelines for the Enforcement of Civil Immigration Law_ (Mayorkas Memorandum). Accordingly, until further notice, ICE will not apply or rely upon the Mayorkas Memorandum in any manner.



_Secretary_

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

September 30, 2021

MEMORANDUM TO:    Tae D. Johnson
                 Acting Director
                 U.S. Immigration and Customs Enforcement

CC:              Troy Miller
                 Acting Commissioner
                 U.S. Customs and Border Protection

                 Ur Jaddou
                 Director
                 U.S. Citizenship and Immigration Services

                 Robert Silvers
                 Under Secretary
                 Office of Strategy, Policy, and Plans

                 Katherine Culliton-González
                 Officer for Civil Rights and Civil Liberties
                 Office for Civil Rights and Civil Liberties

                 Lynn Parker Dupree
                 Chief Privacy Officer
                 Privacy Office

FROM:            Alejandro N. Mayorkas
                 Secretary

SUBJECT:         Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our frontline personnel for the candor and openness of the engagements we have had to help shape this guidance. Thank you especially for dedicating yourselves – all your talent and energy – to the noble law enforcement profession. In executing our solemn responsibility to enforce immigration

1

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation. Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition. The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States. We do not have the resources to apprehend and seek the removal of every one of these noncitizens. Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years. They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways. Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them. We will use our discretion and focus our enforcement resources in a more targeted way. Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being. We do not lessen our commitment to enforce immigration law to the best of our ability. This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have.  We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A.  Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B.  Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories.  It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action.  Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action. Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

3

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

4

AR2022_301381

### III.  Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV.  Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities.  Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices.  A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V.  The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

5

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

### A. Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

### B. Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

### C. Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

### D. Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

## VI. Implementation of the Guidance

This guidance will become effective in sixty (60) days, on November 29, 2021. Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

6

AR2022_301383

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively.  Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide.  Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

### VII.  Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

AR2022_301384



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:    Mark Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Matthew Albence
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

Joseph Edlow
Deputy Director of Policy
U.S. Citizenship and Immigration Services

FROM:    Chad F. Wolf
Acting Secretary

SUBJECT:    **Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Ever since, the policy has been subject to substantial controversy. In recent years, Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined that the 2017 and 2018 memoranda had not complied with certain requirements for doing so. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA in light of the Supreme Court's decision. For the reasons outlined below, pending my full reconsideration of the DACA policy, I direct DHS personnel to take all appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy.  The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria.  The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal.  Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization.  The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so.  The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA.  The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect.  In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA).  In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote.  On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well.  The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy.  On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy.  The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

AR2022_301386

Litigation challenging the Duke Memorandum promptly ensued.  As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia.  The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy.  The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects.  Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated.  See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589.  The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus.  Slip op. at 9.  But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy."  Id. at 11.  Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA.  Id.  And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."  Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem.  In making that determination, the Court declined to consider the Nielsen Memorandum.  Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action."  Id. at 14.  As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26.  The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew."  Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York.  Id.

AR2022_301387

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies. Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy. To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy. More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission. At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration. Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission. Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:** There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy. And yet, although various proposals have been advanced to do that, Congress has so far declined to take action. Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest. As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure. For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship. Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy. In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement. I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them. DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws. I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children. It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain. Of course, the DACA policy would not apply to children who are sent or brought to this country today. But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward. By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**: In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified. In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim. First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted. Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances. Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS. As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

AR2022_301389

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients.  They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients.  They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide.  And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy.  And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please.  In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist.  Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole.  Accordingly, that has been the status quo for more than two years.  It makes sense to continue that approach while I reconsider whether to rescind or revise the policy.  If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time.  And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year.  Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it.  And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal.  They will merely have to seek renewal on an annual, rather than biannual, basis.  In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis.  Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period.  But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS.  DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration.  In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency.  Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes.  Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1]  Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps.  I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty.  Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis.  Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period.  Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1]     Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied.  Many were rejected, while some were accepted and receipted.  To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

AR2022_301391

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.

* * * * *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS. Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

June 15, 2012

MEMORANDUM FOR: David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM: Janet Napolitano
Secretary of Homeland Security

SUBJECT: Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

February 20, 2017

MEMORANDUM FOR:        Kevin McAleenan
                       Acting Commissioner
                       U.S. Customs and Border Protection

                       Thomas D. Homan
                       Acting Director
                       U.S. Immigration and Customs Enforcement

                       Lori Scialabba
                       Acting Director
                       U.S. Citizenship and Immigration Services

                       Joseph B. Maher
                       Acting General Counsel

                       Dimple Shah
                       Acting Assistant Secretary for International Affairs

                       Chip Fulghum
                       Acting Undersecretary for Management

FROM:                  John Kelly
                       Secretary

SUBJECT:               **Enforcement of the Immigration Laws to Serve the National Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

AR2022_301397

**B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States**

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

AR2022_301398

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

AR2022_301399

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

5

AR2022_301400

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## H.  Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

## I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

AR2022_301401



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

September 18, 2019

MEMORANDUM FOR:    Kenneth T. Cuccinelli II
                                Acting Director
                                U.S. Citizenship and Immigration Services

FROM:                     Kevin K. McAleenan
                     Acting Secretary

SUBJECT:            Discretionary Use of Deferred Action by USCIS

---

## Purpose

The purpose of this memorandum is to provide direction regarding the discretionary use of deferred action by United States Citizenship and Immigration Services (USCIS).

## Background

Deferred action "is a practice in which the Secretary exercise[s] enforcement discretion to notify an alien of the agency's decision to forbear from seeking the alien's removal for a designated period."[1] In 2003, the Secretary of Homeland Security delegated to the Director of USCIS the authority to grant deferred action.  Since then, that authority has been used on a case-by-case basis, although it has been used on a categorical basis for specific populations, as in the cases of Deferred Action for Childhood Arrivals and deferred action for certain military members and their families.[2]

I understand that, beginning on or about August 8, 2019, USCIS issued approximately 400 letters ("denial letters") to aliens informing them that their requests for deferred action had been denied on the basis that USCIS "no longer consider[s] deferred action requests, except those made according to the U.S. Department of Homeland Security (DHS) policies for certain military members, enlistees, and their families."  The denial letters advised recipients that if they were in the United States contrary to law, and they did not depart the United States, a Notice to Appear may be issued.[3]

---

[1] *DHS v. Regents of the Univ. of Cal.*, No. 18-587, Br. for Pets. (Aug. 19, 2019) (citing *Reno v. Am.-Arab Anti-Discrimination Comm*, 525 U.S. 471, 484 (1999)).

[2] Unlike the deferred action at issue, military deferred action was the result of several memoranda issued in 2013, 2014, and 2016, as well as a form change and Policy Memorandum cleared by the Office of Management and Budget in 2017.

[3] The issuance of denial letters did not affect deferred action requests processed at USCIS service centers pursuant to an applicable statute, regulation, or court order (such as Violence Against Women Act deferred action and deferred action related to the waiting list for U nonimmigrant status).  The use of deferred action in such instances shall continue to be carried out in accordance with the applicable authority.

Discretionary Use of Deferred Action by USCIS
Page 2

On September 2, 2019, USCIS announced that all requests for non-military deferred action pending on August 7, 2019, would be re-opened and considered.[4]  As of September 13, 2019, letters advising that cases were reopened have been sent to all aliens who received a denial letter as described above.

I am committed to restoring integrity to the immigration system, particularly in areas of law that have been improperly interpreted in the past.  However, given the complexities and wide range of circumstances to which the law must be applied, it is also necessary and proper to maintain executive branch discretion—particularly where such discretion is appropriately and fairly exercised on a case-by-case basis.

## Directives

In light of the foregoing, I hereby direct the following:

1.  The Acting Director of USCIS shall ensure that, effective immediately, USCIS resumes its consideration of non-military deferred action requests on a discretionary, case-by-case basis, except as otherwise required by an applicable statute, regulation, or court order.

2.  When implementing the above directive, the Acting Director of USCIS shall ensure that the procedure for considering and responding to deferred action requests is consistent throughout USCIS and that discretionary, case-by-case deferred action is granted only based on compelling facts and circumstances.

3.  The Acting Director of USCIS shall, 30 days after the date of this memorandum, transmit to me an update regarding the implementation of the above directives, and, 180 days after the date of this memorandum, a report containing both a further status update and recommendations for strengthening the deferred action process.

---

[4] USCIS, DHS, *USCIS Re-Opens Previously Pending Deferral Requests*, Sept. 2, 2019, https://www.uscis.gov/news/alerts/uscis-re-opens-previously-pending-deferral-requests.

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

June 22, 2018

MEMORANDUM FROM SECRETARY KIRSTJEN M. NIELSEN

On September 5, 2017, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke memorandum") rescinding the enforcement policy known as Deferred Action for Childhood Arrivals (DACA). Acting Secretary Duke concluded that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation [over the enforcement policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)], and the September 4, 2017 letter from the Attorney General [concerning DACA], it is clear that the June 15, 2012 DACA program should be terminated." Accordingly, "in the exercise of [her] authority in establishing national immigration policies and priorities," she "rescind[ed] the June 15, 2012 memorandum," subject to certain exceptions.

On April 24, 2018, the U.S. District Court for the District of Columbia held that the Duke memorandum was subject to judicial review under the Administrative Procedure Act and that it provided insufficient justification for rescinding the DACA policy. The court vacated the Duke memorandum and remanded to the Department of Homeland Security (DHS). The court issued a 90-day stay of vacatur, however, to afford DHS an opportunity to provide further explanation for rescinding the DACA policy.

Because the D.C. district court has requested further explanation, I am providing such explanation here. Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb the Duke memorandum's rescission of the DACA policy, and it is my understanding that the Department of Justice will continue to seek appellate review of preliminary injunctions that restrict DHS from implementing the Duke memorandum and rescinding the DACA policy. This explanation reflects my understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound.

The Secretary of Homeland Security is vested with authority over "the administration and enforcement" of the immigration laws, 8 U.S.C. § 1103(a)(1), including the discretion to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The DACA policy of deferred action was cast as an exercise of enforcement discretion to forbear from removing a certain class of aliens who are subject to removal under law. DHS also had concluded that under pre-existing statutory and regulatory provisions a grant of deferred action would trigger certain collateral benefits for such aliens, such as eligibility for employment authorization. In considering how DHS's discretion to establish enforcement policies and priorities should be exercised, the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons.

First, as the Attorney General concluded, the DACA policy was contrary to law. The Fifth Circuit ruled that DAPA should be enjoined on a nationwide basis on the ground, among other things, that it likely was contrary to the statutory scheme of the Immigration and Nationality Act (INA). As the Fifth Circuit held, "the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas v. United States*, 809 F.3d 134, 186 n.202 (5th Cir. 2015). An equally divided Supreme Court affirmed that decision. In light of those decisions and other factors, Secretary Kelly rescinded the DAPA policy in June 2017. Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful.

The memorandum announcing the DAPA policy both expanded the DACA policy by loosening the age and residency criteria and adopted a similar deferred action policy for parents of U.S. citizens and lawful permanent residents. The Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status (which not all of them had). Rather, it turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme. The Attorney General concluded that the DACA policy has the same statutory defects that the Fifth Circuit identified with DAPA—a determination and ruling by the Attorney General that, in any event, I am bound by pursuant to 8 U.S.C. § 1103(a)(1).

Second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality. A central aspect of the exercise of a discretionary enforcement policy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy. Like Acting Secretary Duke, I lack sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not.

There are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable. Those reasons include the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work.   The fact that some courts have recently held or suggested that the DACA policy is legal does not change my view that the DACA policy's legality is too questionable to warrant continuing the policy, especially in light of the Attorney General's contrary determination and ruling about the DACA policy and the contrary implication of the decisions of the Fifth Circuit Court of Appeals and the Supreme Court invalidating the DAPA policy.

Third, regardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. To start, DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.

2

AR2022_301405

Accordingly, I agree with Acting Secretary Duke and the Attorney General that if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively.

In addition, DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis. While the DACA policy on its face did allow for individual considerations, a categorical deferred-action policy, at the very least, tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case. Without the DACA policy, DHS may consider deferred action on a case-by-case basis, consistent with the INA. Moreover, considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens. All of those considerations lead me to conclude that Acting Secretary Duke's decision to rescind the DACA policy was, and remains, sound as a matter of both legal judgment and enforcement policy discretion.

I do not come to these conclusions lightly. I am keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives. Nevertheless, in considering DHS enforcement policy, I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above. That is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options. In contrast, the DACA policy was announced as a temporary stopgap measure, not a permanent fix; it was expressly limited to two-year renewal periods, it expressly conferred no substantive rights, and it was revocable at any time. In my judgment, neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class overcomes the legal and institutional concerns with sanctioning the continued presence of hundreds of thousands of aliens who are illegally present in violation of the laws passed by Congress, a status that the DACA non-enforcement policy did not change. And in all events, the rescission of the DACA policy does not preclude the exercise of deferred action in individual cases if circumstances warrant.

For these reasons, in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy.

Kirstjen M. Nielsen
Secretary

3

AR2022_301406



**Homeland Security**

U.S. Department of Homeland Security

---

## Archived Content

In an effort to keep DHS.gov current, the arch ve conta ns outdated nformat on that may not reflect current pol cy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Act ng D rector
U.S. C t zensh p and Imm grat on Serv ces

Thomas D. Homan
Act ng D rector
U.S. Imm grat on and Customs Enforcement

Kev n K. McAleenan
Act ng Comm ss oner
U.S. Customs and Border Protect on

Joseph B. Maher
Act ng General Counsel

Ambassador James D. Nealon
Ass stant Secretary, Internat onal Engagement

Jul e M. K rchner
C t zensh p and Imm grat on Serv ces Ombudsman

**FROM:**

Ela ne C. Duke
Act ng Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

Th s memorandum resc nds the June 15, 2012 memorandum ent tled Exerc s ng Prosecutor al D scret on w th Respect to Ind v duals Who Came to the Un ted States as Ch ldren," wh ch establ shed the program known as Deferred Act on for Ch ldhood Arr vals ( DACA"). For the reasons and n the manner outl ned below, Department of Homeland Secur ty personnel shall take all appropr ate act ons to execute a w nd down of the program, cons stent w th the parameters establ shed n th s memorandum.

## Background

The Department of Homeland Secur ty establ shed DACA through the ssuance of a memorandum on June 15, 2012. The program purported to use deferred act on — an act of prosecutor al d scret on meant to be appl ed only on an nd v dual zed case by case bas s — to confer certa n benef ts to llegal al ens that Congress had not otherw se acted to prov de by law. 1] (# ft ) Spec f cally, DACA prov ded certa n llegal al ens who entered the Un ted States before the age of s xteen a per od of deferred act on and el g b l ty to request employment author zat on.

AR2022_301407

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things – such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization on from two years to three – the November 20, 2014 memorandum directed USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion on through the use of deferred action, on a case by case basis," to certain aliens who have a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty six states led by Texas challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide. 2](# ft 2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction. 3](# ft 3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization on." According to the court, DAPA is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary, 4](# ft 4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice and comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4 4). 5](# ft 5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implement ng memorandum, stating the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA, 6](# ft 6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA. 7](# ft 7)

On June 15, 2017, after consulting with the Attorney General, and considering the likel hood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end date, after Congress repeatedly rejection of proposed legislation that would have accomplished a similar result. Such an open ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind down the program in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it's clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

AR2022_301408

Recognizing the complex tes associated with winding down the program, the Department will provide a limited window in which tw ll adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate on an individual, case by case basis properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate on an individual, case by case basis properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I 131 applications for advance parole under standards associated with the DACA program, although tw ll generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will of course retain the authority t has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will of course retain the authority to revoke or terminate an advance parole document at any t me.
- Will administratively close all pending Form I 131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise ts of d scretionary authority to terminate or deny deferred action at any t me when immigration officials determine termination or denial of deferred action is appropriate.

This document s not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party n any administrative, c v l, or cr m nal matter. L kew se, no l m tat ons are placed by th s gu dance on the otherwise lawful enforcement or l t gat on prerogatives of DHS.

---

[1] (# ft e 1) Sign f cantly, wh le the DACA denial notice indicates the decision to deny is made n the unreviewable discretion of USCIS, USCIS has not been able to dent fy specific cases where an applicant appeared to sat sfy the programmatic categorical criteria as outlined n the June 15, 2012 memorandum, but st ll had h s or her applicat on denied based solely upon discretion.

[2] (# ft e 2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (# ft e 3) *Texas v. United States*, 809 F.3d 134 (5th C r. 2015).

[4] (# ft e 4) *Id.*

[5] (# ft e 5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per cur am).

[6] (# ft e 6) Memorandum from Janet Napol tano, Secretary, DHS to Dav d Agu lar, Act ng Comm'r, CBP, et al., Exerc s ng Prosecutor al D scret on w th Respect to Ind v duals Who Came to the Un ted States as Ch ldren" (June 15, 2012).

[7] (# ft e 7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodr guez, D r., USCIS, et al., Exerc s ng Prosecutor al D scret on w th Respect to Ind v duals Who Came to the Un ted States as Ch ldren and w th Respect to Certa n Ind v duals Whose Parents are U.S. C t zens or Permanent Res dents" (Nov. 20, 2014).

## Topics

BORDER SECUR TY (/TO CS/BORD R-S CUR TY)

## Keywords

DEFERRED ACT ON FOR CH LDHOOD ARR VALS (DACA) (/K YWORDS/D RR D-ACT ON-CH DHOOD-ARR VA S-DACA)

Last Updated: 09/23/2019

**AR2022_301409**



*Secretary*
**U.S. Department of Homeland Security**
**Washington, DC 20528**

January 20, 2021

MEMORANDUM FOR:     Troy Miller
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Tae Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Tracey Renaud
Senior Official Performing the Duties of the Director
U.S. Citizenship and Immigration Services

CC:                 Karen Olick
Chief of Staff

FROM:               David Pekoske
Acting Secretary

SUBJECT:            **Review of and Interim Revision to Civil Immigration
Enforcement and Removal Policies and Priorities**

---

This memorandum directs Department of Homeland Security components to conduct a review of policies and practices concerning immigration enforcement. It also sets interim policies during the course of that review, including a 100-day pause on certain removals to enable focusing the Department's resources where they are most needed. The United States faces significant operational challenges at the southwest border as it is confronting the most serious global public health crisis in a century. In light of those unique circumstances, the Department must surge resources to the border in order to ensure safe, legal and orderly processing, to rebuild fair and effective asylum procedures that respect human rights and due process, to adopt appropriate public health guidelines and protocols, and to prioritize responding to threats to national security, public safety, and border security.

This memorandum should be considered Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).

### A.   Comprehensive Review of Enforcement Policies and Priorities

The Chief of Staff shall coordinate a Department-wide review of policies and practices concerning immigration enforcement.  Pursuant to the review, each component shall develop recommendations to address aspects of immigration enforcement, including policies for prioritizing the use of enforcement personnel, detention space, and removal assets; policies governing the exercise of prosecutorial discretion; policies governing detention; and policies regarding interaction with state and local law enforcement.  These recommendations shall ensure that the Department carries out our duties to enforce the law and serve the Department's mission in line with our values.  The Chief of Staff shall provide recommendations for the issuance of revised policies at any point during this review and no later than 100 days from the date of this memo.

The memoranda in the attached appendix are hereby rescinded and superseded.

### B.   Interim Civil Enforcement Guidelines

Due to limited resources, DHS cannot respond to all immigration violations or remove all persons unlawfully in the United States.  Rather, DHS must implement civil immigration enforcement based on sensible priorities and changing circumstances.  DHS's civil immigration enforcement priorities are protecting national security, border security, and public safety.  The review directed in section A will enable the development, issuance, and implementation of detailed revised enforcement priorities.  In the interim and pending completion of that review, the Department's priorities shall be:

1. **National security.**  Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
2. **Border security.**  Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.
3. **Public safety.**  Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

These priorities shall apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole.  In

2

addition, all enforcement and detention decisions shall be guided by DHS's ability to conduct operations and maintain custody consistent with applicable COVID-19 protocols.

While resources should be allocated to the priorities enumerated above, nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein.  In order to ensure appropriate allocation of resources and exercise of prosecutorial discretion, the Acting Director of ICE shall issue operational guidance on the implementation of these priorities.  This guidance shall contain a protocol for the Acting Secretary to conduct a periodic review of enforcement actions to ensure consistency with the priorities set forth in this memorandum.  This guidance shall also include a process for the Director of ICE to review and approve of any civil immigration enforcement actions against individuals outside of federal, state or local prisons or jails.

These interim enforcement priorities shall go into effect on February 1, 2021 and remain in effect until superseded by revised priorities developed in connection with the review directed in section A.

### C.  Immediate 100-Day Pause on Removals

In light of the unique circumstances described above, DHS's limited resources must be prioritized to: (1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact.  In addition, we must ensure that our removal resources are directed to the Department's highest enforcement priorities.  Accordingly, and pending the completion of the review set forth in section A, I am directing an immediate pause on removals of any noncitizen[1] with a final order of removal (except as noted below) for 100 days to go into effect as soon as practical and no later than January 22, 2021.

The pause on removals applies to any noncitizen present in the United States when this directive takes effect with a final order of removal except one who:

1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
2. Was not physically present in the United States before November 1, 2020; or
3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver

---

[1] "Noncitizen" as used in this memorandum does not include noncitizen nationals of the United States.

AR2022_301412

and has been given a meaningful opportunity to access counsel prior to signing the waiver;[2] or

4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

No later than February 1, 2021, the Acting Director of ICE shall issue written instructions with additional operational guidance on the further implementation of this removal pause. The guidance shall include a process for individualized review and consideration of the appropriate disposition for individuals who have been ordered removed for 90 days or more, to the extent necessary to implement this pause.  The process shall provide for assessments of alternatives to removal including, but not limited to, staying or reopening cases, alternative forms of detention, custodial detention, whether to grant temporary deferred action, or other appropriate action.

### D. No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[2] A voluntary waiver encompasses noncitizens who stipulate to removal as part of a criminal disposition.

AR2022_301413

## APPENDIX

Department of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest,* Memorandum of February 20, 2017.

U.S. Immigration and Customs Enforcement, *Implementing the President's Border Security and Interior Immigration Enforcement Policies*, Memorandum of February 20, 2017.

U.S. Immigration and Customs Enforcement, *Guidance to OPLA Attorneys Regarding the Implementation of the President's Executive Orders and the Secretary's Directives on Immigration Enforcement*, Memorandum of August 15, 2017.

US Citizenship and Immigration Services, *Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens,* Policy Memorandum of June 28, 2018.  (US Citizenship and Immigration Services should revert to the preexisting guidance in Policy Memorandum 602-0050, US Citizenship and Immigration Services, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, Policy Memorandum of Nov. 7, 2011.)

US Citizenship and Immigration Services, *Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) When Processing a Case Involving Information Submitted by a Deferred Action for Childhood Arrivals (DACA) Requestor in Connection with a DACA Request or a DACA-Related Benefit Request (Past or Pending) or Pursuing Termination of DACA,* Policy Memorandum of June 28, 2018.

U.S. Customs and Border Protection, *Executive Orders 13767 and 13768 and the Secretary's Implementation Directions of February 17, 2017*, Memorandum of February 21, 2017.



**U.S. Department of Homeland Security**

# Secretary Mayorkas Announces New Immigration Enforcement Priorities

**Release Date:** September 30, 2021

*Guidelines focus on national security, public safety, and border security; emphasize prosecutorial discretion*

WASHINGTON    Today, Secretary of Homeland Secur ty Alejandro N. Mayorkas announced new *Guidelines for the Enforcement of Civil Immigration Law (  ps://www. ce.gov/doc b/ ews/gu de   es  v       g a o  aw.pd )* to better focus the Department's resources on the apprehens on and removal of nonc t zens who are a threat to our nat onal secur ty, publ c safety, and border secur ty and advance the nterests of just ce by ensur ng a case by case assessment of whether an nd v dual poses a threat. In the last s x months, Secretary Mayorkas held mult ple engagements w th the U.S. Imm grat on and Customs Enforcement (ICE) workforce and leadersh p across the country, as well as w th a range of stakeholders nclud ng law enforcement, c v c, and commun ty leaders to nform the new gu dance.

 For the f rst t me, our gu del nes w ll, n the pursu t of publ c safety, requ re an assessment of the nd v dual and take nto account the total ty of the facts and c rcumstances," sa d Secretary Mayorkas. In exerc s ng th s d scret on, we are gu ded by the knowledge that there are nd v duals n our country who have been here for generat ons and contr buted to our country's well be ng, nclud ng those who have been on the frontl ne n the battle aga nst COVID, lead congregat ons of fa th, and teach our ch ldren. As we str ve to prov de them w th a path to status, we w ll not work n confl ct by spend ng resources seek ng to remove those who do not pose a threat and, n fact, make our Nat on stronger."

Enforcement pr or t es for apprehens on and removal rema n focused on nonc t zens who are a threat to our nat onal secur ty, publ c safety, and border secur ty. But the gu del nes are a break from a categor cal approach to enforcement. They requ re an assessment of the nd v dual and the total ty of the facts and c rcumstances to ensure resources are focused most effect vely on those who pose a threat.

There s also recogn t on that the major ty of the more than 11 m ll on undocumented or otherw se removable nonc t zens n the Un ted States have been contr but ng members of our commun t es across the country for years. The fact an nd v dual s a removable nonc t zen w ll not alone be the bas s of an enforcement act on aga nst them.  The Department's personnel are to use the r d scret on and focus the Department's enforcement resources n a more targeted way.

 I am grateful to the ICE personnel for the r candor and openness n our d scuss ons about the r cr t cal law enforcement m ss on," cont nued Mayorkas.   The new gu del nes w ll enable our Department to most effect vely accompl sh our law enforcement m ss on and, at the same t me, advance our country's well be ng by recogn z ng the nvaluable contr but ons of m ll ons of nd v duals who are part of the fabr c of our commun t es.  The gu del nes w ll help us exerc se our prosecutor al d scret on to ach eve just ce."

The mm grat on enforcement gu del nes requ re the protect on of c v l r ghts and c v l l bert es. A nonc t zen's race, rel g on, gender, sexual or entat on or gender dent ty, nat onal or g n, pol t cal assoc at ons, or exerc se of F rst Amendment r ghts cannot be factors n dec d ng to take enforcement act on. For the f rst t me, they expl c tly guard aga nst the use of mm grat on enforcement as a tool of retal at on for a nonc t zen's assert on of legal r ghts, such as the r ght to exerc se workplace or tenant r ghts. The gu del nes make clear that mm grat on enforcement author ty shall not be used as an nstrument of unscrupulous employers seek ng to explo t the r employees' mm grat on status.

Cont nuous tra n ng, a process to rev ew the r effect ve mplementat on, extens ve data collect on, and a case rev ew process w ll all be requ red.

The new gu del nes replace the nter m pr or t es ssued by ICE Act ng D rector Tae Johnson n February and become effect ve November 29, 2021. Secretary Mayorkas s expected to ssue add t onal mm grat on related pol cy memos n the com ng weeks.

## Keywords

SECRETARY ALEJANDRO MAYORKAS (/K_YWORDS/S_CR TARY-A  JANDRO-MAYORKAS)

Last Updated: 09/30/2021

AR2022_301415



🇺🇸 An official website of the United States government
<u>Here's how you know</u>



**The .gov means it's official.**
Federal government websites often end in .gov or .mil. Before sharing sensitive information, make sure you're on a federal government site.

**The site is secure.**
The **https://** ensures that you are connecting to the official website and that any information you provide is encrypted and transmitted securely.

<u>View the latest ICE guidance on COVID-19</u>

## ICE Check-in

Get information about how to check in with your local ICE Office <u>here</u>.

Reportándose con ICE: Obtenga información sobre cómo reportarse a su oficina local de ICE <u>aquí</u>.

🌐 <u>View in other languages</u>



U.S. Immigration
and Customs
Enforcement

Call <u>1-866-DHS-2-ICE</u>
Report Crime

# Contact ICE About an Immigration/Detention Case

U.S. Immigration and Customs Enforcement (ICE) Office of Enforcement and Removal Operations (ERO) is dedicated to providing open lines of communication for individuals, or their representatives, regarding individual immigration cases and to report any issues in custody.

In support of the agency's mission, ERO is committed to transparency, collaboration, and resolving concerns with our stakeholders  These stakeholders include individuals detained in ICE custody, the public, non governmental organizations, faith based organizations, academic institutions, attorneys, and advocacy groups.

**AR2022_301416**

Below are two ways you can contact ICE to report information or request an additional review of your case.

## ICE ERO DETENTION REPORTING AND INFORMATION LINE

The ICE ERO Detention Reporting and Information Line is a toll-free service that provides a direct channel for agency stakeholders to communicate with ERO to answer questions and resolve concerns. Stakeholders may reach the ICE ERO Detention Reporting and Information Line by dialing **1-888-351-4024**. Live, trained operators are available Monday through Friday (excluding holidays) from **8 a.m. to 8 p.m.** (Eastern Time) to respond to inquiries from those in ICE detention and from community members. Language assistance, including Spanish operators, is also available.

Call center representative will answer calls and assist with resolution on subjects such as:

- Incidents of sexual or physical assault or abuse;
- Serious or unresolved problems in detention;
- Reports of victims of human trafficking and other crimes;
- Reports on individuals with serious mental disorders or conditions;
- Separation of minor child or other dependent and other parental related issues;
- Inquiries from the general public, law enforcement officials, and others;
- Assistance with legal access issues when your local ERO field office is unable to assist;
- Requests for basic case information; and
- Reports that someone in detention has a serious mental disorder or condition.

## REQUEST A CASE REVIEW FROM YOUR LOCAL ICE FIELD OFFICE OR ERO SENIOR REVIEWING OFFICIAL

If a noncitizen or their representative believes they should not be subject to enforcement, they

AR2022_301417

are encouraged to first contact their local ERO field office to request a case review.

<div style="border:1px solid #000;">🌐 <strong>CONTACT INFORMATION FOR LOCAL ERO FIELD OFFICES</strong></div>

After contacting your local ERO field office, individuals may also initiate the ICE Case Review (ICR) process by emailing the ERO Senior Reviewing Official to request a case review. *Note: submitting a request to the ERO Senior Reviewing Official without first requesting a review by the local ERO field office may delay a response.* The ERO Senior Reviewing Official will coordinate all requests received with the local ERO field office to determine what, if any, discretion will be exercised.

<div style="border:1px solid #000;">✉ <strong>SUBMIT AN ICR PROCESS REQUEST</strong></div>

Cases involving individuals detained in ICE custody or pending imminent removal will be prioritized, and response times for resolution will vary.

Please include in an ICR process request the individual's A number, other identifying information, a telephone number, and a valid email.

In order to provide information to someone other than the subject of the request, ICE requires a complete Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or ICE Form 60-001, Privacy Waiver Authorizing Disclosure to a Third Party.

<div style="border:1px solid #000;">📄 <strong>ICE FORM 60-001</strong></div>

Updated: 06/24/2022

---

## ADDRESS   —

📍 500 12th St SW
   Washington  DC 20536

📱 Report Crimes: Call 1 866 DHS 2 ICE

---

## RELATED INFORMATION   —

AR2022_301418

Enforcement and Removal Operations

Contact ERO Field Offices

Línea de Información y Denuncias de los Centros de Detención

## RELATED DOCUMENTS ——

📄 Detention Reporting and Information Line Flyer

📄 Folleto sobre la Línea de Información y Denuncias de los Centros de Detención

## CONNECT WITH #ICE ——

𝐟   Facebook

🐦   Twitter

▶️   YouTube

📷   Instagram

  Flickr

in   LinkedIn

🔗   RSS

## INFORMATION LIBRARY ——

Detention Policies

Facility Inspections

Fact Sheets

Federal Register Notices

Forms

Freedom of Information Act

Legal Notices

Metrics

Speeches & Testimonies

Statements

Statistics

AR2022_301419

## PARTNERS ▬

DHS

USCIS

TSA

FEMA

USSS

CISA

CBP

USCG

FLETC

Accessibility

Accountability

Archive

Data

Intellectual Property Policy

No Fear Act

OIG

Privacy Policies

Site Map

Site Policies & Plugins

Web Content Inventory

7/12/22, 4:05 PM Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (D...

Case 1:18-cv-00068 Document 608-2 Filed on 11/03/22 in TXSD Page 210 of 379

 An official website of the United States government
<u>Here's how you know</u>

 **The .gov means it's official.**
Federal government websites often end in .gov or .mil. Before
sharing sensitive information, make sure you're on a federal
government site.

 **The site is secure.**
The **https://** ensures that you are connecting to the official
website and that any information you provide is encrypted and
transmitted securely.

<u>View the latest ICE guidance on COVID-19</u>

## ICE Check-in

Get information about how to check in with your local ICE Office <u>here</u>.

Reportándose con ICE: Obtenga información sobre cómo reportarse a su oficina local de ICE <u>aquí</u>.

🌐 <u>View in other languages</u>

 **U.S. Immigration
and Customs
Enforcement**

Call **<u>1-866-DHS-2-ICE</u>**
Report Crime

# Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)

**Important information about DACA requests:** Consistent with <u>DACA Decision in State of Texas, et al., v. United States of America, et al. 1:18-CV-00068, (S.D. Texas July 16, 2021) ("Texas II") (PDF, 401.59 KB)</u>, DHS will continue to accept the filing of both initial and renewal DACA requests, as well as accompanying requests for employment authorization. However, pursuant to the July 16, 2021 order from the Southern District of Texas, DHS is prohibited from granting initial DACA requests and accompanying requests for employment authorization. Also consistent with that order, DHS will continue to grant or deny renewal DACA requests, according to existing policy.

For more information, visit <u>Consideration of Deferred Action for Childhood Arrivals (DACA)</u>.

On July 16, 2021, the U.S. District Court for the Southern District of Texas held that the DACA policy "is illegal." The Court granted summary judgment on plaintiffs' Administrative Procedure Act (APA) claims; vacated the June 15, 2012 DACA memorandum issued by former Secretary of Homeland Security Napolitano; remanded the memorandum to DHS for further consideration; and issued a permanent injunction prohibiting the government's continued administration of DACA and the reimplementation of DACA without compliance with the APA. The Court, however, temporarily stayed its order vacating the DACA memorandum and its injunction with regard to individuals who obtained DACA on or before July 16, 2021, including those with renewal requests.

# Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?

This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who are in removal proceedings, with a final order, or with a voluntary departure order. All deferred action decisions will be made by U.S. Citizenship and Immigration Services (USCIS).

# If you are currently in immigration detention

If you are currently in immigration detention and believe you meet the guidelines for Deferred Action for Childhood Arrivals (DACA) or Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), you must:

- Identify yourself to your case officer explaining you believe you are DACA/DAPA eligible. Your case officer will review your case along with the local Office of the Principal Legal Advisor. If you appear to meet the DACA/DAPA requirements, you may be released on an alternative form of supervision to allow you to pursue your case with USCIS.
  - If your case officer is unavailable, you can contact the ICE Detention Reporting and Information Line at 1 888 351 4024 (staffed 8 a.m.  8 p.m., Monday  Friday); or submit an email to ERO.INFO@ice.dhs.gov and the appropriate action will be taken in a timely manner.

# If you are not in immigration detention

If you are not in immigration detention and want to affirmatively request consideration of deferred action for childhood arrivals, you must submit your request to USCIS  not ICE  pursuant to these procedures established by USCIS.

**AR2022_301422**

7/12/22, 4:05 PM   Consideration of Deferred Action for Childhood Arrivals and Detained Recent Border Crossings of Texas Permanent Residents (D…

Case 1:18-cv-00068   Document 608-2   Filed on 11/03/22 in TXSD   Page 212 of 379

Updated: 03/17/2022

FREQUENTLY ASKED QUESTIONS                                                        ▬

Deferred Action Process for Young People Who Are Low Enforcement Priorities

DACA Preguntas más Frecuentes (En Español)

📄 DACA 常见问题 (中文版)

RELATED INFORMATION                                                               ▬

Acción Diferida para los Llegados en la Infancia (DACA en Español)

Enforcement and Removal Operations

Law Enforcement Assistance Corner

Toolkit for Prosecutors

RELATED DOCUMENTS                                                                 ▬

📄 Consideration of Deferred Action for Childhood Arrivals (flyer)
📄 ICE Director Memo about Individuals Who Entered the United States as Children
📄 DHS Secretary Memo on Individuals Who Came to the United States as Children
📄 How Do I Request Consideration of Deferred Action for Childhood Arrivals Brochure
📄 Enforcement Actions at or Focused on Sensitive Locations
📄 Transforming the Immigration Enforcement System
📄 Notice: Potential Availability of Deferred Action

CONNECT WITH #ICE                                                                 ▬

📘 Facebook

🐦 Twitter

▶️ YouTube

📷 Instagram

◼️ Flickr

in LinkedIn

🔊 RSS

**AR2022_301423**

## INFORMATION LIBRARY ▬

Detention Policies

Facility Inspections

Fact Sheets

Federal Register Notices

Forms

Freedom of Information Act

Legal Notices

Metrics

Speeches & Testimonies

Statements

Statistics

## PARTNERS ▬

DHS

USCIS

TSA

FEMA

USSS

CISA

CBP

USCG

FLETC

Accessibility

Accountability

Archive

Data

Intellectual Property Policy

No Fear Act

**AR2022_301424**

OIG

Privacy Policies

Site Map

Site Policies & Plugins

Web Content Inventory

AR2022_301425



# Fiscal Year 2016 ICE Enforcement and Removal Operations Report

## *Overview*

This report summarizes U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO) Fiscal Year (FY) 2016 removal activities. ICE shares responsibility for enforcing the nation's immigration laws with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). In executing its enforcement duties, ERO focuses on two core missions: 1) the identification and apprehension of criminal aliens and other priority aliens located in the United States; and 2) the detention and removal of aliens arrested in the interior of the United States as well as those interdicted by CBP at the nation's borders. ICE is committed to smart immigration enforcement, preventing terrorism, and combatting the illegal movement of people and goods.

This report analyzes ICE ERO's FY 2016 removal statistics to demonstrate the impact of the Department of Homeland Security's (DHS) enforcement priorities. In executing its responsibilities, ICE has continued prioritizing its limited resources on the identification and removal of threats to national security, border security, and public safety, as outlined in Secretary of Homeland Security Jeh Johnson's November 20, 2014 memorandum entitled *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*.

The nature and scope of ICE's civil immigration enforcement is impacted by a number of factors, including: 1) the level of cooperation from state and local law enforcement partners; 2) the level of illegal immigration; and 3) changing migrant demographics.

DHS's clearer and more refined Civil Immigration Enforcement Priorities,[1] which ICE began implementing in FY 2015, place increased emphasis and focus on the removal of convicted felons and other public safety threats over non-criminals. ICE continued the implementation of these priorities with steady success during FY 2016. The implementation of the Priority Enforcement Program (PEP) further builds on the prioritization for removal of convicted criminals with the support of state and local jurisdictions. PEP became fully operational in July 2015, and, since that time, ICE has engaged in extensive efforts to encourage state and local law enforcement partners to collaborate with ICE to ensure the transfer and removal of serious public safety threats.

---

[1] See Appendix C for a detailed description of Civil Immigration Enforcement Priorities and sub-priorities.

AR2022_301426

ICE conducted more removals in FY 2016 than in FY 2015 due to a combination of increased state and local cooperation through PEP and increased border interdictions by CBP. As detailed below, ICE's targeted focus on the most significant threats to national security, public safety, and border security has meant that criminals and other priorities account for a high share of removals.[2] In fact, 99.3 percent of aliens ICE removed in FY 2016 clearly met DHS' enforcement priorities. ICE also continues to focus on criminal aliens, as 58 percent of overall ICE removals, including 92 percent of ICE removals initiated in the interior of the country, were of convicted criminals. At the same time, 95 percent of *non-criminal* removals were apprehended at or near the border or ports of entry. As ICE continued its implementation of the Department's enforcement priorities during FY 2016 and state and local cooperation increased, ICE saw continued progress in ensuring its resources are appropriately focused on keeping the nation safe and secure.

### Total ICE Removals

ICE removed a total of 240,255 aliens in FY 2016, a two percent increase over FY 2015, but a 24 percent decrease from FY 2014. The following sections of this report identify a number of factors that have contributed to the decrease in removals from previous years.

*Figure 1*



*Note:* ICE removals include removals and returns where aliens were turned over to ICE for removal efforts.

---

[2] See Appendix B for key terms and definitions.

AR2022_301427

## *Impact of Civil Immigration Enforcement Priorities*

FY 2016 marked continued progress in ICE's implementation of revised Department-wide immigration enforcement priorities, as directed by Secretary Johnson in his November 20, 2014, memorandum, *Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* known as the Civil Immigration Enforcement Priorities (CIEP). The priorities have intensified ICE's focus on removing aliens convicted of serious crimes, public safety and national security threats, and recent border entrants.

More specifically, DHS's priorities establish three civil immigration enforcement categories, in descending order of priority. These priorities are: 1) national security threats, convicted felons or "aggravated felons," criminal gang participants, and illegal entrants apprehended at the border; 2) individuals convicted of significant or multiple misdemeanors, or individuals apprehended in the U.S. interior who unlawfully entered or reentered this country and have not been continuously and physically present in the United States since January 1, 2014, or individuals who have significantly abused the visa or visa waiver programs; and 3) individuals who have failed to abide by a final order of removal issued on or after January 1, 2014. ICE may also include individuals not falling within the aforementioned categories if their removal would serve an important federal interest.

Since these priorities went into effect during FY 2015, FY 2016 was the first full year of implementation. ICE's FY 2016 removal statistics in Table 1 below, broken out by CIEP Priority Status, demonstrate continued strong alignment to these revised priorities. In FY 2016, 99.3 percent of total ICE removals were individuals who were clearly a CIEP priority, and 83.7 percent were Priority 1 aliens.

*Table 1*

| FY 2016 ICE Removals by CIEP Priority | | |
|---|---|---|
| **CIEP Priority** | **ICE Removals** | **% of ICE Removals** |
| **Priority 1** | 201,020 | 83.7% |
| **Priority 2** | 31,936 | 13.3% |
| **Priority 3** | 4,952 | 2.1% |
| **Federal Interest** | 558 | 0.2% |
| ***Total with CIEP Priority*** | *238,466* | *99.3%* |
| **Unknown Priority** | 1,789 | 0.7% |
| **Total** | **240,255** | **100%** |

This alignment with the CIEP Priorities, shown in Figure 2, exemplifies ICE's continued focus on targeted enforcement during FY 2016.

*Figure 2*

3



## *Focus on Convicted Criminal Aliens*

ICE has continued to focus on identifying, arresting, and removing convicted criminals in prisons and jails, and through at-large arrests in the interior, as demonstrated by its removal statistics.[3] In FY 2016, ICE sustained the quality of its removals from previous years by continuing to focus on serious public safety and national security threats. Of all ICE removals, 138,669, or 58 percent, were convicted criminals. This proportion is up from 31 percent in FY 2008 (see Figure 3). And 77.6 percent of removals of convicted criminals were ICE's highest priority, CIEP Priority 1.

*Figure 3*

---

[3]ICE's interior operations were complicated by the ruling of the Ninth Circuit Court of Appeals in *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013).  Under *Rodriguez*, individuals who previously would have been detained without bond may seek release on bonds from immigration judges. Their cases are then transferred from the relatively expedited detained court docket to the slower non-detained court docket, thereby decreasing the number of overall removals in a given year.  This *Rodriguez* decision applies throughout the Ninth Circuit, the federal court jurisdiction with the largest number of individuals in removal proceedings

4



AR2022_301430

## *Non-Criminal Removals*

The great majority (95 percent) of ICE removals of non-criminal immigration violators were individuals encountered by CBP agents and officers at or near the border or ports of entry. Significantly, 99 percent (100,475 out of 101,586) of ICE's non-criminal removals clearly met one of DHS' enforcement priorities, a further improvement from already high levels in FY 2015 (see Figure 4).

*Figure 4*



## *Interior Removals*

In addition to the high overall percentage of ICE removals that were of convicted criminals, ERO's interior enforcement activities have led to a sharp increase since 2011 in the percentage of ICE's interior removals (i.e., individuals apprehended by ICE officers and agents in the interior) that were of convicted criminals. As shown in Figure 5, this percentage continues to trend upward, from 67 percent in FY 2011 to 92 percent (60,318 out of 65,332) in FY 2016. Border removals in this figure include aliens apprehended at the border by the U.S. Border Patrol (USBP) and subsequently repatriated by ERO.

6

7

*Figure 5*



*Figure 6*



8

AR2022_301433

ICE conducted 65,332 interior removals in FY 2016, with 98.3 percent of them clearly falling into one of the CIEP priorities, as shown in Figure 6. This figure represents an increase of 5 percentage points over the proportion of interior removals that were CIEP priories in FY 2015.

## Cooperation from State and Local Law Enforcement Partners

The enactment of numerous state statutes and local ordinances reducing and/or preventing cooperation with ICE, in addition to federal court decisions which created liability concerns for cooperating law enforcement agencies, led an increasing number of jurisdictions to decline to honor immigration detainers before implementation of PEP in July 2015. Despite improvement following PEP implementation, ERO documented a total of 21,205 declined detainers in 567 counties in 48 states including the District of Columbia between January 1, 2014, and September 30, 2016.  Declined detainers result in convicted criminals being released back into U.S. communities with the potential to re-offend, notwithstanding ICE's requests for transfer of those individuals.  Moreover, these releases constrain ICE's civil immigration enforcement efforts because they required ICE to expend additional resources to locate and arrest convicted criminals who were at-large rather than transferred directly from jails into ICE custody, drawing resources away from other ICE enforcement efforts.

In July 2015, following implementation of PEP, ICE began using revised forms, the I-247D detainer form and the I-247N, a request for notification form. In addition to the I-247D and I-247N, in late 2015 ICE began using the I-247X immigration detainer form, which applies to non-PEP priority subcategories, and which ICE may use to seek custody transfers from cooperative jurisdictions. Each of the 24 ICE Field Office Directors whose areas of responsibility includes at least one location that does not honor detainers are in ongoing discussions with their law enforcement partners in order to tailor PEP in each location to best meet the needs of their communities.

Additionally, to facilitate state and local cooperation, Secretary Johnson, then-Deputy Secretary Mayorkas, and Director Saldaña met with elected and law enforcement officials in some of the nation's largest jurisdictions. DHS and ICE officials also regularly engage with senior law enforcement officials from across the nation through various associations and task forces. This robust engagement is producing results. Counties like Los Angeles, Alameda, Fresno, San Mateo, Sonoma, and Monterey in California and Miami-Dade in Florida are now working with ICE through PEP. Today, many law enforcement agencies, including previously uncooperative jurisdictions, are now cooperating with ICE through PEP as ICE Field Office Directors continue to strengthen and improve relationships with their local law enforcement partners.

As a result of ICE's efforts, declined detainers have dropped significantly over the past fiscal year. In FY 2016, ERO documented a 77 percent drop in declined requests for transfer (from 8,542 in FY 2015 to 1,970 in FY 2016) as well as a 29 percent drop in the number of counties declining detainers (395 counties in FY 2015, versus 279 counties in FY 2016). ERO attributes this improvement to increased local law enforcement agency cooperation as a result of PEP, and more selective and targeted issuance of detainers that align more closely to prioritized populations.

AR2022_301434

## *Increased Illegal Migration and CBP Apprehensions*

ICE supports border security efforts by detaining and removing certain individuals interdicted by CBP at the border and elsewhere. Historically, a large share of ICE's removals have been based on CBP's border apprehensions. In FY 2016, the Border Patrol apprehended 415,816 people, an increase of 23 percent from FY 2015 as shown in Figure 7. This in turn resulted in an increase in overall FY 2016 ICE intakes based upon those CBP apprehensions, rising 26 percent from 193,951 intakes in FY 2015 to 244,510 intakes in FY 2016.

*Figure 7*



*Source: USBP apprehension data as provided by USBP; figures may not match USBP year-end statistics.*

## *Changing Migrant Demographics*

Changing migrant demographics also continued to impact ICE removal operations in FY 2016, as illegal entries by Mexicans continued to decrease while those by Central Americans continued to increase. More time, personnel resources, and funding are required to complete the removal process for nationals from Central America and other non-contiguous countries as compared to Mexican nationals apprehended at the border. These costs have increased because removals of non-Mexican nationals require ICE to use additional detention capacity, more time and effort to secure travel documents from the host country, and to arrange air transportation to remove the individual to the home country.

Additionally, many Central American nationals are asserting claims of credible or reasonable fear of persecution. A total of 101,639 aliens made defensive asylum claims in FY 2016, up from fewer than 60,000 in each of the previous two fiscal years. Asylum cases require additional adjudication, and therefore, take longer to process and consume more ERO resources than certain other cases on ICE's docket.

10

## *Removals Overview*

- ICE conducted 240,255 removals.
- ICE conducted 65,332 removals of individuals apprehended by ICE officers (i.e., interior removals) (Figure 5).
  - 60,318 (92 percent) of all *interior removals* were previously convicted of a crime.
- ICE conducted 174,923 removals of individuals apprehended at or near the border or ports of entry.[4]
- 58 percent of all ICE removals, or 138,669, were previously convicted of a crime.
  - ICE conducted 60,318 interior criminal removals.
  - ICE removed 78,351 criminals apprehended at or near the border or ports of entry.
- 99.3 percent of all ICE FY 2016 removals, or 238,466, met one or more of ICE's stated civil immigration enforcement priorities.[5]
- Of the 101,586 aliens removed who had no criminal conviction, 95 percent, or 96,572, were apprehended at or near the border or ports of entry.[6]
- The leading countries of origin for removals were Mexico, Guatemala, Honduras, and El Salvador.
- 2,057 aliens removed by ICE were classified as suspected or confirmed gang members.

## *Removed Population by Citizenship*

In FY 2016, ICE removed individuals from 185 countries, the top ten of which are provided in Table 3.[7] Mexico continued to be the leading country of origin for those removed, followed by Guatemala, Honduras and El Salvador.

---

[4] Approximately 94 percent of these individuals were apprehended by U.S. Border Patrol agents and then processed, detained, and removed by ICE. The remaining individuals were apprehended by CBP officers at ports of entry.
[5] As defined in the March 2011 ICE Memorandum: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens.
[6] ICE defines criminality via a recorded criminal conviction obtained by ICE officers and agents from certified criminal history repositories. The individuals described above include recent border crossers, fugitives from the immigration courts, and repeat immigration violators.
[7] Details for removals by country of citizenship are provided in Appendix D.

11

*Table 2*

| FY 2016 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **Total** | **% of Total** |
| Mexico | 149,821 | 62.4% |
| Guatemala | 33,940 | 14.1% |
| Honduras | 21,994 | 9.2% |
| El Salvador | 20,538 | 8.5% |
| Dominican Republic | 1,981 | 0.8% |
| Colombia | 1,156 | 0.5% |
| Ecuador | 1,099 | 0.5% |
| Brazil | 1,095 | 0.5% |
| Nicaragua | 795 | 0.3% |
| Jamaica | 787 | 0.3% |
| Other | 7,049 | 2.9% |
| **Total** | **240,255** | 100.0% |

## Conclusion

Over the course of FY 2016, ICE has continued to improve its ability to target individuals who threaten public safety, national security, and border security as demonstrated by the fact that 99.3 percent of individuals that ICE removed met ICE's civil immigration enforcement priorities. This represents an increase from FY 2015. As ICE's enforcement operations continue to align with the Department's civil enforcement priorities, and state and local cooperation increases, ICE expects continued progress in ensuring its resources are appropriately focused in keeping the nation safe and secure.

AR2022_301437

## *Appendix A: Methodology*

**Data Source:**

Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

**Data Run Dates:**

FY 2016: IIDSv1.22.1 run date 10/04/2016; ENFORCE Integrated Database (EID) as of 10/02/2016
FY 2015: IIDSv1.19 run date 10/04/2015; ENFORCE Integrated Database (EID) as of 10/02/2015
FY 2014: IIDS v1.16 run date 10/05/2014; EID as of 10/03/2014
FY 2013: IIDS v1.14 run date 10/06/2013; EID as of 10/04/2013
FY 2012: IIDS v1.12 run date 10/07/2012; EID as of 10/05/2012
FY 2011: IIDS run date 10/07/2011; EID as of 10/05/2011
FY 2010: IIDS run date 10/05/2010; EID as of 10/03/2010
FY 2009: Removals and Returns are an adjusted historical number of an IIDS run date of 8/16/2010 (EID as of 8/14/10) and will remain static.

**Removals**

Removals include removals and returns where aliens were turned over to ICE for removal efforts. Removals data are historical and remain static. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control.

In FY 2009, ICE began to "lock" removal statistics on October 5 at the end of each fiscal year, and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. FY 2012 removals, excluding FY 2011 "lag," were 402,919. FY 2013 removals, excluding FY 2012 "lag," were 363,144. FY 2014 removals, excluding FY 2013 "lag," were 311,111. FY 2015 removals, excluding FY 2014 "lag," were 231,250. FY 2016 removals, excluding FY 2015 "lag," were 235,524.

Any voluntary return on or after June 1, 2013 without an ICE intake case will not be recorded as an ICE removal.

ERO Removals include aliens processed for Expedited Removal (ER) and turned over to ERO for detention. Aliens processed for ER and not detained by ERO are primarily processed by Border Patrol. CBP should be contacted for those statistics.

FY 2012 – FY 2013 Removals include ATEP removals.

**Criminality**

Criminality is determined by the existence of a criminal conviction.

13

## *Appendix B: Key Terms and Definitions*

**Key Term Definitions**

**Arrest:** An arrest, also called an apprehension, is defined as the "act of detaining an individual by legal authority based on an alleged violation of the law."

**Border Removal**: An individual removed by ICE who is apprehended by a CBP officer or agent while attempting to illicitly enter the United States at or between the ports of entry. These individuals are also referred to as recent border crossers.

**Convicted Criminal:** An individual convicted in the United States for one or more criminal offenses. This does not include civil traffic offenses.

**Immigration Fugitives**: An individual who has failed to leave the United States based on a final order of removal, deportation, or exclusion, or has failed to report to ICE after receiving notice to do so.

**Intake:** An intake is the first book-in into an ICE detention facility associated with a unique detention stay. This does not include transfers between ICE facilities.

**Interior Removal**: An individual removed by ICE who is identified or apprehended in the United States by an ICE officer or agent. This category excludes those apprehended at the immediate border while attempting to unlawfully enter the United States.

**Other Removable Alien**: An individual who is not a confirmed convicted criminal, recent border crosser or other ICE civil enforcement priority category. This category may include individuals removed on national security grounds or for general immigration violations.

**Previously Removed Alien**: An individual previously removed or returned who has re-entered the country illegally.

**Reinstatement of prior Removal Order**: The removal of an alien based on the reinstatement of a prior removal order, where the alien departed the United States under an order of removal and illegally reentered the United States (INA § 241(a)(5)). The alien may be removed without a hearing before an immigration court.

**Removal**: The compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal. An individual who is removed may have administrative or criminal consequences placed on subsequent reentry because of the removal. ICE removals include removals and returns where aliens were turned over to ICE for removal efforts.

**Return**: The confirmed movement of a potentially inadmissible or deportable alien out of the United States not based on an order of removal, but through either voluntary departure, voluntary return, or withdrawal under docket control.

14

## *Appendix C: FY 2015 Civil Immigration Enforcement Priorities*

- Priorities and Sub-Priorities reflect Secretary of Homeland Security Jeh Johnson's Memorandum on November 20, 2014, effective January 5, 2015 titled *Polices for the Apprehension, Detention and Removal of Undocumented Immigrants*. The priorities are as follows:

*Priority 1 (threats to national security, border security, and public safely)*
- o P1a: aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;
- o P1b: aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;
- o P1c: aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;
- o P1d: aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and
- o P1e: aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the Immigration and Nationality *Act* at the time of the conviction.

*Priority 2 (misdemeanants and new immigration violators)*
- o P2a: aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element was the alien's immigration status, provided the offenses arise out of three separate incidents;
- o P2b: aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence; 1 sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);
- o P2c: aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; andP1d: aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.
- o P2d: aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

*Priority 3 (other immigration violations)*
- o P3: aliens are those who have been issued a final order of removal on or after January 1, 2014. Aliens described in this priority, which are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal.

*PB: aliens of Federal Interest (Field Office Director's approval required).*

15

## *Appendix D: FY 2016 ICE Removals by Country of Citizenship*

| FY 2016 ICE Removals by Country of Citizenship | |
|---|---|
| **Country of Citizenship** | **Total** |
| Mexico | 149,821 |
| Guatemala | 33,940 |
| Honduras | 21,994 |
| El Salvador | 20,538 |
| Dominican Republic | 1,981 |
| Colombia | 1,156 |
| Ecuador | 1,099 |
| Brazil | 1,095 |
| Nicaragua | 795 |
| Jamaica | 787 |
| Canada | 417 |
| Peru | 406 |
| China, People's Republic of | 398 |
| India | 353 |
| Haiti | 310 |
| Nigeria | 242 |
| Somalia | 198 |
| Philippines | 183 |
| Venezuela | 182 |
| Romania | 176 |
| United Kingdom | 160 |
| Costa Rica | 157 |
| Bangladesh | 128 |
| Trinidad and Tobago | 128 |
| Belize | 120 |
| Poland | 115 |
| Saudi Arabia | 106 |
| Spain | 101 |
| Bahamas | 99 |
| Ghana | 94 |
| Russia | 94 |

16

| FY 2016 ICE Removals by Country of Citizenship | |
|---|---|
| **Country of Citizenship** | **Total** |
| Guyana | 93 |
| Pakistan | 79 |
| Jordan | 78 |
| South Korea | 77 |
| Argentina | 76 |
| Chile | 75 |
| Cambodia | 74 |
| Germany | 72 |
| Ukraine | 69 |
| Cuba | 64 |
| Panama | 64 |
| Kenya | 63 |
| Micronesia, Federated States of | 63 |
| France | 59 |
| Bolivia | 56 |
| Italy | 55 |
| Israel | 53 |
| Turkey | 50 |
| Bosnia-Herzegovina | 49 |
| Iraq | 48 |
| Korea | 46 |
| Egypt | 44 |
| Portugal | 44 |
| Ethiopia | 37 |
| Lebanon | 36 |
| Marshall Islands | 35 |
| Sri Lanka | 35 |
| Vietnam | 35 |
| Albania | 32 |
| Indonesia | 31 |
| Hungary | 30 |
| Cameroon | 29 |
| Liberia | 27 |
| Ireland | 26 |

17

AR2022_301442

| FY 2016 ICE Removals by Country of Citizenship | |
|---|---|
| **Country of Citizenship** | **Total** |
| Nepal | 25 |
| Netherlands | 25 |
| Taiwan | 25 |
| Australia | 24 |
| Georgia | 22 |
| Morocco | 22 |
| Thailand | 22 |
| Tonga | 22 |
| Uruguay | 22 |
| Armenia | 21 |
| Japan | 21 |
| Senegal | 21 |
| Czech Republic | 19 |
| Kazakhstan | 19 |
| Sierra Leone | 18 |
| South Africa | 18 |
| Sweden | 18 |
| Bulgaria | 17 |
| Lithuania | 17 |
| Democratic Republic of the Congo | 16 |
| Guinea | 16 |
| Iran | 16 |
| Ivory Coast | 16 |
| New Zealand | 16 |
| Serbia | 16 |
| Tanzania | 16 |
| Greece | 15 |
| Moldova | 15 |
| St. Lucia | 15 |
| Unknown | 15 |
| Uzbekistan | 15 |
| Afghanistan | 14 |
| Antigua-Barbuda | 14 |
| Barbados | 14 |

18

AR2022_301443

| FY 2016 ICE Removals by Country of Citizenship ||
| Country of Citizenship | Total |
| --- | --- |
| Kosovo | 14 |
| Eritrea | 13 |
| Kuwait | 13 |
| St. Vincent-Grenadines | 13 |
| Algeria | 12 |
| Fiji | 12 |
| Malaysia | 12 |
| Cape Verde | 11 |
| Switzerland | 11 |
| Dominica | 10 |
| Grenada | 10 |
| Kyrgyzstan | 10 |
| Mauritania | 10 |
| Palau | 10 |
| Estonia | 9 |
| Slovakia | 9 |
| St. Kitts-Nevis | 9 |
| Syria | 9 |
| Tunisia | 9 |
| Austria | 8 |
| Belarus | 8 |
| Burkina Faso | 8 |
| Latvia | 8 |
| Paraguay | 8 |
| Tajikistan | 8 |
| Yemen | 8 |
| Zambia | 8 |
| Belgium | 7 |
| Croatia | 7 |
| Macedonia | 7 |
| Mali | 7 |
| Singapore | 7 |
| Angola | 6 |
| Mongolia | 6 |

19

AR2022_301444

| FY 2016 ICE Removals by Country of Citizenship ||
| Country of Citizenship | Total |
|---|---|
| Norway | 6 |
| Uganda | 6 |
| Yugoslavia | 6 |
| Zimbabwe | 6 |
| British Virgin Islands | 5 |
| Equatorial Guinea | 5 |
| Hong Kong | 5 |
| Montenegro | 5 |
| Turkmenistan | 5 |
| Denmark | 4 |
| Malawi | 4 |
| Rwanda | 4 |
| Togo | 4 |
| Turks and Caicos Islands | 4 |
| Burma | 3 |
| Burundi | 3 |
| Chad | 3 |
| Czechoslovakia | 3 |
| Libya | 3 |
| Samoa | 3 |
| Sudan | 3 |
| Congo | 2 |
| Finland | 2 |
| Gabon | 2 |
| Gambia | 2 |
| Guinea-Bissau | 2 |
| Iceland | 2 |
| Montserrat | 2 |
| Namibia | 2 |
| Niger | 2 |
| Oman | 2 |
| Qatar | 2 |
| Suriname | 2 |
| Anguilla | 1 |

20

AR2022_301445

| FY 2016 ICE Removals by Country of Citizenship | |
|---|---|
| **Country of Citizenship** | **Total** |
| Azerbaijan | 1 |
| Benin | 1 |
| Bermuda | 1 |
| Botswana | 1 |
| Cayman Islands | 1 |
| Cyprus | 1 |
| Djibouti | 1 |
| Guadeloupe | 1 |
| Lesotho | 1 |
| Macau | 1 |
| Madagascar | 1 |
| Mauritius | 1 |
| Papua New Guinea | 1 |
| Serbia and Montenegro | 1 |
| Seychelles | 1 |
| Slovenia | 1 |
| South Sudan | 1 |
| Swaziland | 1 |
| United Arab Emirates | 1 |
| **Total** | **240,255** |

21

AR2022_301446



# Fiscal Year 2017 ICE Enforcement and Removal Operations Report

**Overview**

This report summarizes U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) activities in Fiscal Year (FY) 2017. ERO identifies, arrests, and removes aliens who present a danger to national security or a threat to public safety, or who otherwise undermine border control and the integrity of the U.S. immigration system. ICE shares responsibility for administering and enforcing the nation's immigration laws with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services.

On January 25, 2017, the President Donald J. Trump issued Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States* (EO), which set forth the Administration's immigration enforcement and removal priorities. The Department of Homeland Security's (DHS) February 20, 2017 memorandum, *Enforcement of the Immigration Laws to Serve the National Interest* (implementation memorandum) provided direction for the implementation of the policies set forth in the EO. The EO and implementation memorandum expanded ICE's enforcement focus to include removable aliens who (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Department has directed that classes or categories of removable aliens are no longer exempted from potential enforcement.

The EO and implementation memorandum highlight the critical importance of interior enforcement in protecting national security and public safety and upholding the rule of law. This report presents and analyzes ICE ERO's FY2017 year-end statistics and illustrates how ICE ERO successfully fulfilled its mission in furthering the policies set forth in the EO and implementation memorandum.

**FY2017 Enforcement and Removal Statistics**

As directed in the EO and implementation memorandum, ICE no longer exempts classes or categories of removable aliens from potential enforcement. This policy change is reflected in ERO's FY2017 enforcement statistics, which show increases in the following enforcement actions: (1) ICE ERO administrative arrests; (2) book-ins of aliens to ICE detention facilities resulting from ICE arrests; and (3) ICE ERO removals of aliens as a result of ICE's interior enforcement. The trend of increased enforcement actions began shortly after the change in administration on January 20, 2017, and this date is used throughout the report for the purposes of data reporting. In each of the aforementioned areas, there was a net increase over the prior fiscal year.

AR2022_301447

**ICE ERO Administrative Arrests**

An administrative arrest is the arrest of an alien for a civil violation of the immigration laws, which is subsequently adjudicated by an immigration judge or through other administrative processes. With 143,470 administrative arrests in FY2017, ICE ERO recorded its greatest number of administrative arrests as compared with the past three fiscal years.[1] There were 33,366 more administrative arrests in FY2017 than in FY2016, representing a 30 percent increase, as seen in Figure 1.

**Figure 1. FY2015 – FY2017 ERO Administrative Arrests**



Administrative arrests began to increase after January 25, 2017, when the EO was issued, as shown in Figure 2. The analysis of administrative arrests conducted per week shows an elevated level of enforcement as compared with FY2016, beginning just after the new Administration took office during FY2017. This illustrates ERO's prompt response to the direction set forth by the EO.

**Figure 2. FY2016 and FY2017 ERO Administrative Arrests per week Comparison**



The increase in ERO administrative arrests following the EO accounts for the increase in total ERO FY2017 arrests. Figure 3 shows the total ERO arrests from the start of the new Administration to the end of FY2017 compared to the same timeframe in FY2016; the number of administrative arrests rose from 77,806 to 110,568, a 42 percent increase. In fact, ERO arrested more aliens in FY2017 over this period than in all of FY2016. According to ICE's system of record, of the 110,568 ERO administrative arrests

---

[1] ERO administrative arrests include all ERO programs. All statistics are attributed to the current program of the processing officer of an enforcement action.

AR2022_301448

from January 20 to September 30, 2017, 92 percent had a criminal conviction, a pending criminal charge, were an ICE fugitive, or were processed with a reinstated final order.[2]

**Figure 3. FY2016 and FY2017 ERO Administrative Arrests from January 20 to End of FY**



*Administrative Arrests of Criminal vs. Non-Criminal Aliens*

An administrative arrest of a criminal alien is the arrest of an alien with a known criminal conviction. ICE remains committed to targeting such aliens for arrest and removal. ERO arrested 105,736 criminal aliens in FY2017, resulting in a 12 percent (10,985) increase over FY2016, as seen in Figure 4.

**Figure 4. FY2015 – FY2017 ERO Administrative Arrests of Criminal Aliens**

Table 1 provides a breakdown of total administrative arrests for FY2017, by those with known criminal convictions, those without a known conviction and with criminal charges pending final disposition, and those without a known criminal conviction or pending charges. An alien with both criminal convictions and pending criminal charges is only counted in the criminal conviction category. The vast majority of ERO's arrests were of convicted criminals or aliens with criminal charges. A relatively small percentage (11 percent) of the arrested alien population had no known criminal convictions or charges. These results clearly reflect ERO's success in expanding its efforts to address all illegal aliens encountered in the course

---

[2] ICE ERO defines "fugitive" as any alien who has failed to depart the United States following the issuance of a final order of removal, deportation or exclusion, or who has failed to report to ICE after receiving notice to do so.

3

of its operations, while still prioritizing its enforcement resources on those who pose a known threat to national security and public safety.

Table 2 shows the criminal background of arrested aliens and includes criminal charges and convictions in ICE's system of record for those administratively arrested in FY2017. Only criminal charge categories with at least 1,000 total convictions and charges are included in this table. Because this was a new area of focus and a new measure in FY2017, comparison to previous fiscal years is not possible at this time.

**Table 1. FY2017 ERO Administrative Arrests by Criminality**

| ERO Administrative Arrests by Criminality | | |
|---|---|---|
| **Criminality** | **Arrests** | **% of Total** |
| Criminal Convictions | 105,736 | 73.7% |
| Pending Criminal Charges | 22,256 | 15.5% |
| No Known Criminal Charges or Convictions | 15,478 | 10.8% |
| Total Arrests | 143,470 | 100.0% |

**Table 2. FY2017 Total ERO Administrative Arrests Criminal Charges and Convictions[3]**

| Criminal Charge Category | Criminal Charges | Criminal Convictions | Total |
|---|---|---|---|
| Traffic Offenses - DUI | 20,562 | 59,985 | 80,547 |
| Dangerous Drugs | 19,065 | 57,438 | 76,503 |
| Immigration | 10,389 | 52,128 | 62,517 |
| Traffic Offenses | 24,438 | 43,908 | 68,346 |
| Assault | 16,535 | 31,919 | 48,454 |
| Larceny | 4,438 | 15,918 | 20,356 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 9,623 | 11,655 | 21,278 |
| General Crimes | 6,623 | 10,702 | 17,325 |
| Burglary | 2,574 | 10,262 | 12,836 |
| Obstructing the Police | 4,640 | 9,976 | 14,616 |
| Fraudulent Activities | 3,476 | 8,922 | 12,398 |
| Weapon Offenses | 2,913 | 8,260 | 11,173 |
| Public Peace | 3,592 | 7,336 | 10,928 |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,631 | 5,033 | 6,664 |
| Invasion of Privacy | 1,904 | 4,830 | 6,734 |
| Stolen Vehicle | 1,496 | 4,678 | 6,174 |
| Robbery | 1,020 | 4,595 | 5,615 |
| Family Offenses | 1,985 | 3,934 | 5,919 |
| Forgery | 1,442 | 3,768 | 5,210 |
| Sexual Assault | 1,413 | 3,705 | 5,118 |
| Stolen Property | 1,168 | 3,176 | 4,344 |
| Damage Property | 1,421 | 2,681 | 4,102 |
| Flight / Escape | 937 | 2,319 | 3,256 |
| Liquor | 1,675 | 2,313 | 3,988 |
| Health / Safety | 539 | 1,548 | 2,087 |
| Homicide | 355 | 1,531 | 1,886 |
| Kidnapping | 710 | 1,317 | 2,027 |
| Commercialized Sexual Offenses | 577 | 995 | 1,572 |
| Threat | 495 | 847 | 1,342 |

---

[3] The criminality displayed includes all criminal charges and convictions for FY2017 ERO administrative arrests entered into ICE's system of record at the time of the data run. An alien may have more than one criminal charge or criminal conviction in a fiscal year, and all relevant charges and convictions for each arrest are included. As such, the total number of criminal charges and convictions is greater than the total number of aliens administratively arrested.

AR2022_301450

*Notes:* Immigration crimes include "illegal entry," "illegal reentry," "false claim to U.S. citizenship," and "alien smuggling." "Obstructing Judiciary& Congress& Legislature& Etc." refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear.  "General Crimes" include the following National Crime Information Center (NCIC) charges: Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

Administrative arrests of non-criminals (i.e., those aliens without a criminal conviction on record at the time of arrest) comprised 26 percent of total ICE ERO administrative arrests in FY2017. Table 3 shows a breakdown of non-criminal arrests with and without criminal charges. A total of 59 percent of non-criminal arrests during FY2017 had unresolved criminal charges at the time of their arrest. Table 4 illustrates that the percentage of non-criminal arrests with unresolved charges was higher (62 percent) in the time period after the EO was issued. Of non-criminal aliens arrested in FY2017, 57 percent were processed with a notice to appear, and 23 percent were ICE fugitives or subjects who had been previously removed and served an order of reinstatement.

**Table 3. FY2017 ERO Administrative Non-Criminal Arrests by Arrest Type**

| ERO Administrative Arrest Type | FY2017 | % of Non-Criminal Arrests |
|---|---|---|
| **Total Non-Criminal Arrests** | **37,734** | **100.0%** |
| **Criminal Charges/No Conviction Data Available** | **22,256** | **59.0%** |
| *Notice to Appear* | *13,860* | *36.7%* |
| *Fugitives* | *1,808* | *4.8%* |
| *Reinstatement* | *2,994* | *7.9%* |
| *Other* | *3,594* | *9.5%* |
| **No Criminal Arrests/Charges** | **15,478** | **41.0%** |
| *Notice to Appear* | *7,643* | *20.3%* |
| *Fugitives* | *2,350* | *6.2%* |
| *Reinstatement* | *1,695* | *4.5%* |
| *Other* | *3,790* | *10.0%* |

**Table 4. FY2017 ERO Administrative Non-Criminal Arrests by Arrest Type from January 20, 2017 to End of FY**

| ERO Administrative Arrest Type | FY2017 01/20/17 - 09/30/17 | % of Non-Criminal Arrests |
|---|---|---|
| **Total Non-Criminal Arrests** | **31,888** | **100.0%** |
| **Criminal Charges/No Conviction Data Available** | **19,757** | **62.0%** |
| *Notice to Appear* | *12,622* | *39.6%* |
| *Fugitives* | *1,585* | *5.0%* |
| *Reinstatement* | *2,572* | *8.1%* |
| *Other* | *2,978* | *9.3%* |
| **No Criminal Arrests/Charges** | **12,131** | **38.0%** |
| *Notice to Appear* | *5,927* | *18.6%* |
| *Fugitives* | *2,072* | *6.5%* |
| *Reinstatement* | *1,440* | *4.5%* |
| *Other* | *2,692* | *8.4%* |

*At-Large Arrests*

5

AR2022_301451

An ERO at-large arrest is conducted in the community, as opposed to in a custodial setting such as a prison or jail.[4] The total number of at-large arrests increased after the EO was issued, particularly in those areas that do not honor ICE detainers or limit or restrict ICE's access to their jail population. Figure 5 shows that total at-large arrests in FY2017 increased to 40,066 from 30,348 in FY2016. Figure 6 shows the increase in at-large arrests in the time period after January 20 for both FY2016 and FY2017. In this time frame, ICE ERO conducted 31,663 at-large arrests in FY2017 as compared to 22,094 in FY2016.

**Figure 5. FY2015 – FY2017 ERO At-Large Administrative Arrests**



---

[4] ERO administrative arrests reported as "at-large" include records from all ERO Programs with Arrest Methods of Located, Non-Custodial Arrest, or Probation and Parole.

AR2022_301452

**Figure 6. FY2016 and FY2017 ERO Administrative At-Large Arrests, from January 20 to End of FY**



**Table 5. FY2016 and FY2017 ERO Administrative At-Large Arrests by Criminality**

| FY2016-2017 ERO At Large Administrative Arrests by Criminality | | |
|---|---|---|
| Criminality | FY2016 | FY2017 |
| Convicted Criminal | 24,850 | 26,466 |
| Non-Criminal Immigration Violators | 5,498 | 13,600 |
| Total | 30,348 | 40,066 |

### Detainers

A detainer is a request that the receiving law enforcement agency both notify DHS as early as practicable, at least 48 hours, if possible, before a removable alien is released from criminal custody, and also maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise have been released to allow DHS to assume custody for removal purposes. ICE issues detainers to federal, state, and local law enforcement agencies only after establishing probable cause to believe that the subject is an alien who is removable from the United States and to provide notice of ICE's intent to assume custody of a subject detained in that law enforcement agency's custody. The detainer facilitates the custodial transfer of an alien to ICE from another law enforcement agency. This process helps avoid the potential risk of danger to ICE officers and to the general public by allowing arrests to be made in a controlled, custodial setting as opposed to at-large arrests in the community.

The cooperation ICE receives from other law enforcement agencies is critical to its ability to identify and arrest aliens who pose a risk to public safety or national security. While some jurisdictions do not cooperate with ICE as a matter of policy, others agree that increasing cooperation is beneficial, but decline to do so based upon litigation concerns. Although not legally required, as a matter of policy, all detainers issued by ICE must be accompanied by either:  (1) a properly completed Form I-200 (Warrant

7

for Arrest of Alien) signed by a legally authorized immigration officer; or (2) a properly completed Form I-205 (Warrant of Removal/Deportation) signed by a legally authorized immigration officer. These forms help to mitigate future litigation risk and will further ICE's efforts to ensure that our law enforcement partners can honor detainers.

*Issued Detainers*

The number of detainers issued by ERO officers substantially increased following the EO. Figure 8 shows that ERO issued 112,493 detainers in the time period beginning with the new Administration, as opposed to 62,192 during the same time period from the previous fiscal year, an 81 percent increase. Figure 7 shows the number of detainers issued over the past three fiscal years. In FY2017, ERO issued 142,356 detainers, up 65 percent from 86,026 in FY2016, which demonstrates ERO's commitment to taking enforcement action on all illegal aliens it encounters, as directed by the EO. The rise in detainers issued shows a more active approach to interior enforcement, particularly for those aliens involved in criminal activity, despite continued opposition from some state and local jurisdictions.

**Figure 7. FY2015 – FY2017 ERO Detainers Issued**



8

**Figure 8. FY2016 and FY2017 ERO Detainers Issued from January 20 to End of FY**



*Declined Detainers*

ICE records a detainer as declined when a law enforcement agency fails to maintain custody of an alien for up to 48 hours, as requested on Form I-247A (Immigration Detainer – Notice of Action), and instead releases the alien into the community. ERO is working to ensure that these aliens, many of whom may reoffend, are not released from custody. For example, in a new approach, DHS and ICE, in coordination with the Department of Justice, have taken actions to support our state and local partners when they face legal challenges for lawfully cooperating with ICE detainers, including by filing statements of interest and amicus briefs before the courts.

In FY2017, law enforcement agencies declined 8,170 ERO detainers, as compared with 3,623 in FY2016, as seen in Table 5. This is the greatest number of declined detainers over the last three fiscal years. Despite intensified efforts to locate and arrest these aliens—many of whom are convicted criminals— ERO was only able to arrest 6 percent of them in FY17.  While this is a 67 percent increase over FY2016, this further illustrates the public safety threat posed by those sanctuary jurisdictions that refuse to cooperate with ICE's enforcement efforts, as 7,710 illegal and criminal aliens remain at-large as a direct result of these policies.

**Table 5. FY2015 – FY2017 Declined Detainers and Subsequent ERO Administrative Arrests**

| Time Frame | Declined Detainers | Individuals with a Declined Detainer and a Later Arrest |
|---|---|---|
| FY 2015 | 7,369 | 1,045 |
| FY 2016 | 3,623 | 275 |
| FY 2017 | 8,170 | 460 |
| Between 1/20/2016 and 9/30/2016 | 2,267 | 181 |
| Between 1/20/2017 and 9/30/2017 | 7,232 | 376 |

9

**Initial Book-ins to ICE Custody**

An initial book-in is the first book-in to an ICE detention facility to begin a new detention stay. This population includes aliens initially arrested by CBP and transferred to ICE for removal. While *overall* ICE initial book-ins declined in FY2017, the proportion of those book-ins resulting from ICE's interior enforcement efforts increased in FY2017, as seen in Figure 9. ICE book-ins since the new Administration were 42 percent higher in FY2017 than during the same time period in FY2016, rising from 75,946 to 108,077, as seen in Figure 10.

**Figure 9. FY2015 - FY2017 Initial Book-ins from ICE Interior Programs**



**Figure 10. FY2016 and FY2017 Initial Book-ins from ICE Interior Programs for January 20 to End of FY**



Figure 11 shows the number of book-ins resulting from interior and border enforcement efforts across the past three fiscal years.[5] Border enforcement book-ins dropped 25 percent in FY2017 compared to FY2016, while book-ins from ICE arrests increased 29 percent over that time.

---

[5] Border enforcement efforts represent records that were processed by Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea.

AR2022_301456

**Figure 11. FY2015 – FY2017 Initial Book-ins to ICE Detention by Arresting Agency**



## Removals

A removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal.[6] Similar to the trends of ERO administrative arrests and book-ins, removals tied to ICE arrests increased during FY2017, especially from the start of the new Administration. Figure 12 shows a 37 percent increase in removals tied to interior ERO arrests when comparing January 20, 2016 through end of FY2016 with the same time period in FY2017.

**Figure 12. FY2016 and FY2017 ICE Interior Removals for January 20 to End of FY**



---

[6] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VR after June 1st, 2013 and not detained by ICE are primarily processed by the U.S. Border Patrol. CBP should be contacted for those statistics.

11

AR2022_301457

Figure 13 shows the removals over the past three fiscal years as a result of an ICE arrest. While total removals declined from 240,255 in FY2016 to 226,119 in FY2017, the proportion resulting from ICE arrests increased from 65,332, or 27 percent of total removals in FY2016 to 81,603, or 36 percent of total removals in FY2017. Despite the 6 percent decline in overall removals as shown in Figure 14, ICE removed 25 percent more aliens arrested during interior enforcement activities in FY2017 compared to the previous year. This surge in interior removals nearly offset the 17 percent decline in border removals, which mirrored the trend of fewer book-ins of border apprehensions.

The decrease in ICE's overall removal numbers from FY2016 to FY2017 was primarily due to the decline in border apprehensions in 2017. Many fewer aliens were apprehended at the border in FY2017 than in FY2016—possibly reflecting an increased deterrent effect from ICE's stronger interior enforcement efforts. The drop in border apprehensions contributed to a decrease in total ICE-ERO removal numbers, as the majority of aliens arriving at the border are processed under the provisions of expedited removal and are removed quickly, while aliens arrested in the interior are more likely to have protracted immigration proceedings and appeals, which delays the issuance of an executable final order of removal. These cases also frequently require a more complex and lengthy process to obtain travel documents, further delaying the process.

**Figure 13. FY2015 – FY2017 ICE Interior Removals**



**Figure 14. FY2015 – FY2017 ICE Removals**



12

Figure 15 provides a summary of ICE-ERO removals for the past three fiscal years, broken down by interior versus border arrests, as well as criminals versus non-criminals. The drop in border apprehensions offers important public safety benefits, as there was a 24 percent (18,511) decrease in criminal border removals from FY2016 to FY2017. At the same time, the renewed commitment to interior enforcement resulted in a 10 percent increase in ICE criminal removals from FY2016 to FY2017, with 53 percent of criminal removals resulting from ICE interior arrests.

**Figure 15. FY2015 – FY2017 Interior vs. Border Program Removals by Criminality**



**Conclusion**

The FY2017 statistics clearly demonstrate ICE's continued commitment to identifying, arresting, and removing aliens who are in violation of U.S. law, particularly those posing a public safety or national security threat, while restoring fidelity to the rule of law. In FY2017, ICE ERO conducted 143,470 overall administrative arrests, which is the highest number of administrative arrests over the past three fiscal years. Of these arrests, 92 percent had a criminal conviction, a pending criminal charge, were an ICE fugitive or were processed with a reinstated final order. In FY2017, ICE conducted 226,119 removals. While this is a slight overall decrease from the prior fiscal year, the proportion of removals resulting from ICE arrests increased from 65,332, or 27 percent of total removals in FY2016 to 81,603, or 36 percent of total removals, in FY2017. These results clearly demonstrate profound, positive impact of the EO. The 17 percent decrease in border removals shows the deterrent effect of strong interior enforcement, while the increase in interior removals restores the integrity of our nation's immigration system and enhances the safety and security of the United States.

13

*Appendix A: Methodology*

**Data Source:**
Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

**Data Run Dates:**
FY2017: IIDSv1.28 run date 10/09/2017; ENFORCE Integrated Database (EID) as of 10/07/2017
FY2016: IIDSv1.22.1 run date 10/04/2016; ENFORCE Integrated Database (EID) as of 10/02/2016
FY2015: IIDSv1.19 run date 10/04/2015; ENFORCE Integrated Database (EID) as of 10/02/2015

**Removals**

ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ICE for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY2009, ICE began to "lock" removal statistics on October 5 at the end of each fiscal year, and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. FY2016 removals, excluding FY2015 "lag," were 235,524. The number of removals in FY2017, excluding the "lag" from FY2016, was 220,649.

ICE Removals include aliens processed for Expedited Removal (ER) and turned over to ERO for detention. Aliens processed for ER and not detained by ERO are primarily processed by Border Patrol. CBP should be contacted for those statistics.

**Criminality**
Criminality is determined by the existence of a criminal conviction in the ICE system of record.

14

*Appendix B: FY2016 and FY2017 Removals by Country of Citizenship*[7]

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Mexico | 149,821 | 128,765 |
| Guatemala | 33,940 | 33,570 |
| Honduras | 21,994 | 22,381 |
| El Salvador | 20,538 | 18,838 |
| Haiti | 310 | 5,578 |
| Dominican Republic | 1,981 | 1,986 |
| Brazil | 1,095 | 1,413 |
| Ecuador | 1,099 | 1,152 |
| Colombia | 1,156 | 1,082 |
| Nicaragua | 795 | 832 |
| Jamaica | 787 | 782 |
| China, People's Republic Of | 398 | 525 |
| Somalia | 198 | 521 |
| India | 353 | 460 |
| Peru | 406 | 458 |
| Canada | 417 | 353 |
| Nigeria | 242 | 312 |
| Ghana | 94 | 305 |
| Romania | 176 | 292 |
| Venezuela | 182 | 248 |
| Bangladesh | 128 | 203 |
| Senegal | 21 | 197 |
| Philippines | 183 | 182 |
| Pakistan | 79 | 177 |
| Spain | 101 | 172 |
| Cuba | 64 | 160 |
| Costa Rica | 157 | 151 |
| United Kingdom | 160 | 151 |
| Saudi Arabia | 106 | 139 |
| Guyana | 93 | 137 |
| Chile | 75 | 129 |
| Trinidad and Tobago | 128 | 128 |
| Russia | 94 | 127 |
| Poland | 115 | 120 |
| Italy | 55 | 117 |
| Hungary | 30 | 116 |
| South Korea | 77 | 113 |
| Micronesia, Federated States Of | 63 | 110 |
| Liberia | 27 | 107 |
| Kenya | 63 | 103 |
| Argentina | 76 | 102 |
| Jordan | 78 | 98 |
| Bahamas | 99 | 95 |
| Turkey | 50 | 93 |
| Guinea | 16 | 88 |
| Ukraine | 69 | 86 |
| Belize | 120 | 82 |
| France | 59 | 82 |
| Israel | 53 | 81 |
| Bolivia | 56 | 76 |
| Germany | 72 | 75 |

[7] Country of citizenship is reported as it appears in ICE's system of record at the time data is pulled, but may be updated as additional information is discovered or verified.

AR2022_301461

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Vietnam | 35 | 71 |
| Panama | 64 | 69 |
| Indonesia | 31 | 68 |
| Morocco | 22 | 67 |
| Portugal | 44 | 65 |
| Iraq | 48 | 61 |
| Cameroon | 29 | 58 |
| Egypt | 44 | 57 |
| Gambia | 2 | 56 |
| Albania | 32 | 55 |
| Afghanistan | 14 | 48 |
| Bosnia-Herzegovina | 49 | 47 |
| Ethiopia | 37 | 46 |
| Nepal | 25 | 45 |
| Korea | 46 | 44 |
| Sierra Leone | 18 | 44 |
| Eritrea | 13 | 41 |
| Sri Lanka | 35 | 41 |
| Netherlands | 25 | 40 |
| Uruguay | 22 | 38 |
| Lebanon | 36 | 35 |
| Democratic Republic of the Congo | 16 | 34 |
| Ireland | 26 | 34 |
| Mali | 7 | 34 |
| Moldova | 15 | 34 |
| Thailand | 22 | 33 |
| Burkina Faso | 8 | 31 |
| Czech Republic | 19 | 30 |
| Cambodia | 74 | 29 |
| Cape Verde | 11 | 29 |
| Algeria | 12 | 28 |
| Taiwan | 25 | 28 |
| Uzbekistan | 15 | 28 |
| Bulgaria | 17 | 26 |
| Lithuania | 17 | 26 |
| Unknown | 15 | 26 |
| Armenia | 21 | 24 |
| Mongolia | 6 | 23 |
| South Africa | 18 | 23 |
| St. Lucia | 15 | 23 |
| Australia | 24 | 22 |
| Georgia | 22 | 22 |
| Iran | 16 | 22 |
| Marshall Islands | 35 | 22 |
| Greece | 15 | 20 |
| Niger | 2 | 20 |
| Slovakia | 9 | 20 |
| Antigua-Barbuda | 14 | 19 |
| Barbados | 14 | 19 |
| Latvia | 8 | 19 |
| Sudan | 3 | 19 |
| Sweden | 18 | 19 |
| Togo | 4 | 19 |
| Serbia | 16 | 18 |
| Kyrgyzstan | 10 | 17 |
| New Zealand | 16 | 16 |
| St. Kitts-Nevis | 9 | 16 |
| Grenada | 10 | 15 |

AR2022_301462

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Palau | 10 | 15 |
| Kazakhstan | 19 | 14 |
| Fiji | 12 | 13 |
| Ivory Coast | 16 | 13 |
| Japan | 21 | 13 |
| Samoa | 3 | 13 |
| Tanzania | 16 | 13 |
| Tonga | 22 | 13 |
| Estonia | 9 | 12 |
| Kuwait | 13 | 12 |
| Zimbabwe | 6 | 12 |
| Uganda | 6 | 11 |
| Belarus | 8 | 10 |
| Burma | 3 | 10 |
| Dominica | 10 | 10 |
| Kosovo | 14 | 10 |
| Macedonia | 7 | 10 |
| Rwanda | 4 | 10 |
| St. Vincent-Grenadines | 13 | 10 |
| Yemen | 8 | 10 |
| Zambia | 8 | 10 |
| Belgium | 7 | 9 |
| Hong Kong | 5 | 9 |
| Libya | 3 | 9 |
| Montenegro | 5 | 9 |
| Tajikistan | 8 | 9 |
| Turkmenistan | 5 | 9 |
| Azerbaijan | 1 | 8 |
| Benin | 1 | 8 |
| Malaysia | 12 | 8 |
| Mauritania | 10 | 8 |
| Angola | 6 | 7 |
| Austria | 8 | 7 |
| Chad | 3 | 7 |
| Suriname | 2 | 7 |
| Tunisia | 9 | 7 |
| Burundi | 3 | 6 |
| Czechoslovakia | 3 | 6 |
| Congo | 2 | 5 |
| Croatia | 7 | 5 |
| Denmark | 4 | 5 |
| Laos | 0 | 5 |
| Paraguay | 8 | 5 |
| Switzerland | 11 | 5 |
| Guinea-Bissau | 2 | 4 |
| Malawi | 4 | 4 |
| Norway | 6 | 4 |
| Qatar | 2 | 4 |
| Singapore | 7 | 4 |
| Turks and Caicos Islands | 4 | 4 |
| Yugoslavia | 6 | 4 |
| Bermuda | 1 | 3 |
| Botswana | 1 | 3 |
| British Virgin Islands | 5 | 3 |
| Finland | 2 | 3 |
| Gabon | 2 | 3 |
| Oman | 2 | 3 |
| United Arab Emirates | 1 | 3 |

17

AR2022_301463

| FY2016 and FY2017 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2016** | **FY2017** |
| Cayman Islands | 1 | 2 |
| Equatorial Guinea | 5 | 2 |
| Mozambique | 0 | 2 |
| Netherlands Antilles | 0 | 2 |
| Serbia and Montenegro | 1 | 2 |
| South Sudan | 1 | 2 |
| Syria | 9 | 2 |
| Andorra | 0 | 1 |
| Aruba | 0 | 1 |
| Bahrain | 0 | 1 |
| Central African Republic | 0 | 1 |
| Cyprus | 1 | 1 |
| Djibouti | 1 | 1 |
| French Guiana | 0 | 1 |
| Iceland | 2 | 1 |
| Luxembourg | 0 | 1 |
| Madagascar | 1 | 1 |
| Mauritius | 1 | 1 |
| Namibia | 2 | 1 |
| Papua New Guinea | 1 | 1 |
| San Marino | 0 | 1 |
| Slovenia | 1 | 1 |
| Swaziland | 1 | 1 |
| Anguilla | 1 | 0 |
| Guadeloupe | 1 | 0 |
| Lesotho | 1 | 0 |
| Macau | 1 | 0 |
| Montserrat | 2 | 0 |
| Seychelles | 1 | 0 |
| **Total** | **240,255** | **226,119** |

18

AR2022_301464



# Fiscal Year 2018 ICE Enforcement and Removal Operations Report

**Overview**

This report summarizes U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) activities in Fiscal Year (FY) 2018. ERO identifies, arrests, and removes aliens who present a danger to national security or a threat to public safety, or who otherwise undermine border control and the integrity of the U.S. immigration system. ICE shares responsibility for administering and enforcing the nation's immigration laws with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services.

During FY2018, ICE ERO continued its focus on priorities laid out by two primary directives issued in 2017. On January 25, 2017, President Donald J. Trump issued Executive Order 13768, *Enhancing Public Safety in the Interior of the United States* (EO), which set forth the Administration's immigration enforcement and removal priorities. Subsequently, the Department of Homeland Security's (DHS) February 20, 2017 implementation memorandum, *Enforcement of the Immigration Laws to Serve the National Interest* provided further direction for the implementation of the policies set forth in the EO. Together, the EO and implementation memorandum expanded ICE's enforcement focus to include removable aliens who (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Department continued to operate under the directive that classes or categories of removable aliens are not exempt from potential enforcement.

ICE ERO continued efforts under the direction of the 2017 EO and implementation memorandum by placing a significant emphasis on interior enforcement by protecting national security and public safety and upholding the rule of law. This report represents an analysis of ICE ERO's FY2018 year-end statistics and illustrates how ICE ERO successfully fulfilled its mission while furthering the aforementioned policies.

**FY2018 Enforcement and Removal Statistics**

As directed in the EO and implementation memorandum, ICE does not exempt classes or categories of removable aliens from potential enforcement. This policy directive is reflected in ERO's FY2018 enforcement statistics, which show consistent increases from previous fiscal years in the following enforcement metrics: (1) ICE ERO overall administrative arrests; (2) an accompanying rise in overall ICE removals tied to interior enforcement efforts; (3) ICE removals of criminal aliens from interior enforcement; (4) ICE removals of suspected gang members and known or suspected terrorists; (5) positive

1

AR2022_301465

impact on ICE removals from policy initiatives including visa sanctions and diplomatic relations; (6) ICE ERO total book-ins and criminal alien book-ins; and (7) ICE ERO Detainers.

**ICE ERO Administrative Arrests**

An administrative arrest is the arrest of an alien for a civil violation of U.S. immigration laws, which is subsequently adjudicated by an immigration judge or through other administrative processes. With 158,581 administrative arrests in FY2018, ICE ERO recorded the greatest number of administrative arrests[1] as compared to the two previous fiscal years (depicted below in Figure 1), and the highest number since FY2014. ICE ERO made 15,111 more administrative arrests in FY2018 than in FY2017, representing an 11 percent increase, and a continued upward trend after FY2017's 30 percent increase over FY2016.

**Figure 1. FY2016 – FY2018 ERO Administrative Arrests**



*Administrative Arrests of Immigration Violators by Criminality*

ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to the safety and security of the United States. By far, the largest percentage of aliens arrested by ICE are convicted criminals[2] (66 percent), followed by immigration violators with pending criminal charges[3] at the time of their arrest (21 percent). In FY2018, ERO arrested 138,117 aliens with criminal histories (convicted criminal and pending criminal charges) for an increase of 10,125 aliens over FY2017. This continued the growth seen in FY2017 when ERO arrested 26,974 more aliens with criminal histories than in FY2016 for a 27 percent gain. While the arrests of convicted criminals remained relatively level from FY 2017 to FY2018 at 105,736 and 105,140 respectively, administrative arrests with pending criminal charges increased by 48 percent. This continues the upward trend seen in FY2017, where arrests with pending charges increased by 255 percent over FY2016. Figure 2 provides a breakdown of FY2016, FY2017, and FY2018 administrative arrests by criminality.

---

[1] ERO administrative arrests include all ERO programs. All statistics are attributed to the current program of the processing officer of an enforcement action.

[2] Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.

[3] Immigration violators with pending criminal charges entered into ICE system of record at the time of the enforcement action.

2

**Figure 2. FY2016 – FY2018 ERO Administrative Arrests by Criminality**



Below, Table 1 tallies all pending criminal charges and convictions by category for those aliens administratively arrested in FY2018 and lists those categories with at least 1,000 combined charges and convictions present in this population. These figures are representative of the criminal history as it is entered in the ICE system of record for individuals administratively arrested. Each administrative arrest may represent multiple criminal charges and convictions, as many of the aliens arrested by ERO are recidivist criminals.

3

**Table 1. FY2018 Criminal Charges and Convictions for ERO Administrative Arrests**

| Criminal Charge Category | Criminal Charges | Criminal Convictions | Total Offenses |
|---|---|---|---|
| Traffic Offenses - DUI | 26,100 | 54,630 | 80,730 |
| Dangerous Drugs | 21,476 | 55,109 | 76,585 |
| Traffic Offenses | 30,594 | 45,610 | 76,204 |
| Immigration | 11,917 | 51,249 | 63,166 |
| Assault | 20,766 | 29,987 | 50,753 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 11,189 | 11,863 | 23,052 |
| Larceny | 5,295 | 15,045 | 20,340 |
| General Crimes | 8,415 | 10,973 | 19,388 |
| Obstructing the Police | 5,754 | 10,155 | 15,909 |
| Fraudulent Activities | 4,201 | 8,661 | 12,862 |
| Burglary | 2,829 | 9,834 | 12,663 |
| Weapon Offenses | 3,672 | 8,094 | 11,766 |
| Public Peace | 4,029 | 7,236 | 11,265 |
| Invasion of Privacy | 2,255 | 5,090 | 7,345 |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,913 | 4,975 | 6,888 |
| Stolen Vehicle | 1,693 | 4,568 | 6,261 |
| Family Offenses | 2,465 | 3,526 | 5,991 |
| Robbery | 1,139 | 4,423 | 5,562 |
| Sexual Assault | 1,610 | 3,740 | 5,350 |
| Forgery | 1,632 | 3,526 | 5,158 |
| Damage Property | 1,872 | 2,597 | 4,469 |
| Stolen Property | 1,335 | 3,127 | 4,462 |
| Liquor | 1,995 | 2,290 | 4,285 |
| Flight / Escape | 1,090 | 2,264 | 3,354 |
| Kidnapping | 791 | 1,294 | 2,085 |
| Homicide | 387 | 1,641 | 2,028 |
| Health / Safety | 522 | 1,242 | 1,764 |
| Commercialized Sexual Offenses | 729 | 1,010 | 1,739 |
| Threat | 583 | 791 | 1,374 |

_**Notes:**_ Immigration crimes include "illegal entry," "illegal reentry," "false claim to U.S. citizenship," and "alien smuggling." "Obstructing Judiciary& Congress& Legislature& Etc.," refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear. "General Crimes" include the following National Crime Information Center (NCIC) charges: Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

AR2022_301468

As a result of ERO's enhanced enforcement efforts directed at restoring the integrity of the immigration system, the percentage of administrative arrests of other immigration violators[4] increased from FY2017 (11 percent) to FY2018 (13 percent). Of this population of immigration violators arrested in FY2018, Table 2 shows that 57 percent were processed with a notice to appear[5] while 23 percent were ICE fugitives[6] or subjects who had been previously removed, illegally re-entered the country (a federal felony under 8 U.S.C § 1326) and served an order of reinstatement.[7] Both the number of fugitive and illegal re-entry arrests continued a three-year trend by increasing 19 percent and 9 percent, respectively, in FY2018.

**Table 2. FY2016 – FY2018 ERO Administrative Arrests of Other Immigration Violators by Arrest Type[8]**

| ERO Administrative Arrest Type | FY2016 | | FY2017 | | FY2018 | |
|---|---|---|---|---|---|---|
| | Arrests | Percentage | Arrests | Percentage | Arrests | Percentage |
| Other Immigration Violators | 9,086 | 100% | 15,478 | 100% | 20,464 | 100% |
| Notice to Appear | 3,390 | 37% | 7,642 | 49% | 11,570 | 57% |
| Fugitives | 1,605 | 18% | 2,350 | 15% | 2,791 | 14% |
| Reinstatement | 758 | 8% | 1,695 | 11% | 1,846 | 9% |
| Other | 3,333 | 37% | 3,791 | 24% | 4,257 | 21% |

*At-Large Arrests*

An ERO at-large arrest is conducted in the community, as opposed to a custodial setting such as a prison or jail.[9] While at-large arrests remained consistent, with a 1 percent overall increase from 40,066 in FY2017 to 40,536 in FY2018 (Figure 3), at-large arrests levels remain significantly higher compared to the 30,348 from FY2016. At-large arrests of convicted criminal aliens decreased by 13 percent in FY2018 as shown in Figure 4. However, this group still constitutes the largest proportion of at-large apprehensions (57 percent). Increases year-over-year in at-large arrests of aliens with pending criminal charges (35 percent) and other immigration violators (25 percent) offset the decrease in arrests of convicted criminals. The increased enforcement of these populations without criminal convictions add to the increases seen in FY2017 for pending criminal charges (213 percent) and other immigration violators (122 percent). Again, this demonstrates ERO's commitment to removing criminal aliens and public safety threats, while still faithfully enforcing the law against all immigration violators.

---

[4] "Other Immigration Violators" are immigration violators without any known criminal convictions or pending charges entered into ICE system of record at the time of the enforcement action.

[5] A Notice to Appear (Form I-862) is the charging document that initiates removal proceedings. Charging documents inform aliens of the charges and allegations being lodged against them by ICE.

[6] A fugitive is any alien who has failed to leave the United States following the issuance of a final order of removal, deportation, or exclusion.

[7] Section 241(a)(5) of the Immigration and Nationality Act (INA) provides that DHS may reinstate (without referral to an immigration court) a final order against an alien who illegally reenters the United States after being deported, excluded, or removed from the United States under a final order.

[8] "Other" types of arrests of Other Immigration Violators include, but are not limited to, arrests for Expedited Removal, Visa Waiver Program Removal, Administrative Removal, and Voluntary Departure/Removal.

[9] ERO administrative arrests reported as "at-large" include records from all ERO Programs with Arrest Methods of Located, Non-Custodial Arrest, or Probation and Parole.

AR2022_301469



**Figure 3. FY2016 – FY2018 At-Large Administrative Arrests**



**Figure 4. FY2016 – FY2018 At-Large Administrative Arrests by Criminality**

*Rise in ICE Removals through enhanced Interior Enforcement*

The apprehension and removal of immigration violators is central to ICE's mission to enforce U.S. immigration laws. In addition to the 11 percent increase in ERO administrative arrests from FY2017 to FY2018, ERO also made significant strides in removing aliens arrested in the interior of the country (Figure 5). Such removals stem from an ICE arrest and is the ultimate goal of the agency's interior immigration enforcement efforts. Interior ICE removals continued to increase in FY2018, as ICE removed 13,757 more aliens in this category than it did in FY2017, a 17 percent increase (Figure 5). The increases in both ERO administrative arrests and removals based on these interior arrests demonstrate the significant successes ICE achieved during FY2018, as well as the increased efficacy with which the agency carried out its mission.

6

**Figure 5. FY2016 – FY2018 Interior ICE Removals**



*Criminal Arrests and Prosecutions*

While ICE ERO showed significant gains in all meaningful enforcement metrics, perhaps none are more impressive nor have made more of an impact on public safety than its prosecutorial efforts. In conjunction with the United States Attorney's Office, ERO enforces violations of criminal immigration law through the effective prosecution of criminal offenders.

In FY2018, ERO's efforts resulted in the prosecutions of offenses which include, but are not limited to: 8 U.S.C § 1325, Illegal Entry into the United States; 8 U.S.C § 1326, Illegal Re-Entry of Removed Alien; 18 U.S.C § 1546, Fraud and Misuse of Visas, Permits and Other Documents; 18 U.S.C § 111, Assaulting and/or Resisting an Officer; and 18 U.S.C § 922(g)(5), Felon in Possession of a Firearm.

In FY2017, ERO made 5,790 criminal arrests resulting in 4,212 indictments or Bills of Information and 3,445 convictions. While these FY2017 numbers showed moderate increases over FY2016 in criminal arrests and indictments or Bills of Information, in FY2018 ERO made 7,449 criminal arrests resulting in 7,326 indictments or Bills of Information and 7,197 convictions. This surge in enforcement efforts directed at criminal aliens and repeat offenders reflects a 29 percent increase in criminal arrests, a 74 percent increase in indictments or Bills of Information, and a 109 percent increase in criminal convictions to reverse a downturn from FY2017 (Figure 6).

**Figure 6. FY2016 – FY2018 Prosecution Statistics**

7



## Initial Book-ins to ICE Custody

An initial book-in is the first book-in to an ICE detention facility to begin a new detention stay. This population includes aliens initially apprehended by CBP who are transferred to ICE for detention and removal. As seen in Figure 7, while overall ICE initial book-ins went down in FY2017 (323,591) compared to FY2016 (352,882), total book-ins increased in FY2018 to 396,448, illustrating the ongoing surge in illegal border crossings.

Figure 7 shows the number of book-ins resulting from ICE and CBP enforcement efforts for FY2016, FY2017, and FY2018.[10] Notably, book-ins from CBP increased 32 percent in FY2018 to 242,778, while book-ins from ICE arrests continued an upward trend from FY2017's 29 percent increase with an additional increase of 10 percent in FY2018.

**Figure 7. FY2016 – FY2018 Initial Book-ins to ICE Detention by Arresting Agency**



---

[10] CBP enforcement efforts represent records that were processed by Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea.

8

**Detainers**

A detainer is a request to the receiving law enforcement agency to both notify DHS as early as practicable before a removable alien is released from criminal custody, and to maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise have been released to allow DHS to assume custody for removal purposes. ICE issues detainers to federal, state, and local law enforcement agencies only after establishing probable cause that the subject is an alien who is removable from the United States and to provide notice of ICE's intent to assume custody of a subject detained in that law enforcement agency's custody. The detainer facilitates the custodial transfer of an alien to ICE from another law enforcement agency. This process may reduce potential risks to ICE officers and to the general public by allowing arrests to be made in a controlled, custodial setting as opposed to at-large arrests in the community.

The cooperation ICE receives from other law enforcement agencies is critical to its ability to identify and arrest aliens who pose a risk to public safety or national security. Some jurisdictions do not cooperate with ICE as a matter of state or local law, executive order, judicial rulings, or policy. All detainers issued by ICE are accompanied by either: (1) a properly completed Form I-200 (Warrant for Arrest of Alien) signed by a legally authorized immigration officer; or (2) a properly completed Form I-205 (Warrant of Removal/Deportation) signed by a legally authorized immigration officer, both of which include a determination of probable cause of removability.

*Issued Detainers*

In FY2018, ERO issued 177,147 detainers – an increase of 24 percent from the 142,356 detainers issued in FY2017 (Figure 8). This number demonstrates the large volume of illegal aliens involved in criminal activity and the public safety risk posed by these aliens, as well as ERO's commitment to taking enforcement action against all illegal aliens it encounters. The rise in detainers issued continues the trend from FY2017's 65 percent growth over FY2016 and shows a consistent focus on interior enforcement, particularly for those aliens involved in criminal activity, despite continued opposition and lack of cooperation from uncooperative jurisdictions.



**Figure 8. FY2016 – FY2018 ERO Detainers Issued**

9

**ICE Removals**

Integral to the integrity of the nation's lawful immigration system is the removal of immigration violators who are illegally present in the country and have received a final order of removal.[11] A removal is defined as the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on such an order.[12] ICE removals include both aliens arrested by ICE and aliens who were apprehended by CBP and turned over to ICE for repatriation efforts. In FY2018, ICE saw a significant increase in both overall removals as well as removals where ICE was the initial arresting agency.

Figure 9 displays total ICE removals for FY2016, FY2017, and FY2018 and highlights the 13 percent increase from 226,119 to 256,085 in FY2018. After a drop in FY2017 overall removals stemming from historic lows in border crossings, ICE removals rebounded in FY2018, with the previously identified 17 percent increase stemming from both strengthened ICE interior enforcement efforts as well as an 11 percent increase in removals of border apprehensions.

Figure 10 breaks down ICE removals by arresting agency, which demonstrates a 46 percent increase from FY2016 to FY2018 (from 65,332 to 95,360) in removals tied to ICE arrests.

**Figure 9. FY2016 – FY2018 ICE Removals**



---

[11] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VRs after June 1st, 2013 and not detained by ICE are primarily processed by the U.S. Border Patrol. CBP should be contacted for those statistics.
[12] Ibid.

10

AR2022_301474

**Figure 10. FY2016 – FY2018 ICE Removals by Arresting Agency**



Figure 11 shows the breakdown of ICE removals based on criminal history. ICE removals of convicted criminals followed overall removal trends with a small decrease from 138,669 in FY2016 to 127,699 in FY2017, while rising to 145,262 in FY2018, a 14 percent increase. Over this same period, ICE removals of aliens with pending criminal charges has steadily increased from 12,163 in FY2016 to 16,374 in FY2017 for a 35 percent increase and to 22,796 in FY2018 for another 39 percent increase over the previous year.

**Figure 11. FY2016 – FY2018 ICE Removals by Criminality**



*ICE Removals to Ensure National Security and Public Safety*

ICE removals of known or suspected gang members and known or suspected terrorists (KST) are instrumental to ICE's national security and public safety missions, and the agency directs significant resources to identify, locate, arrest, and remove these aliens.

ICE identifies gang members and KSTs by checking an alien's background in federal law enforcement databases, interviews with the aliens, and information received from law enforcement partners. This information is flagged accordingly in ICE's enforcement systems. These populations are not mutually exclusive, as an alien may be flagged as both a known or suspected gang member, and a KST. As seen in Figure 12, ICE removals of known and suspected gang members increased by 162 percent in FY2017,

11

more than doubling from the previous year. These critical removals increased again in FY2018, rising by 9 percent from FY2017. ICE's KST removals also rose significantly between FY2016 and FY2017 (Figure 13), increasing by 67 percent, while removals of aliens in this group were relatively level in FY2018, with ICE conducting 42 removals compared to 45 in FY2017.

**Figure 12. FY2016 – FY2018 ICE Removals of Known or Suspected Gang Members**



**Figure 13. FY2016 – FY2018 ICE Removals of Known or Suspected Terrorists**



*Removals of USBP Family Unit and Unaccompanied Alien Children Apprehensions*

Since the initial surge at the Southwest border SWB) in FY2014, there has been a significant increase in the arrival of both family units (FMUAs) and unaccompanied alien children (UACs). In FY2018, approximately 50,000 UACs and 107,000 aliens processed as FMUAs were apprehended at the SWB by the U.S. Border Patrol (USBP). These numbers represent a marked increase from FY2017, when approximately 41,000 UACs and 75,000 FMUA were apprehended by USBP. While USBP routinely turns FMUA apprehensions over to ICE for removal proceedings, ICE is severely limited by various laws and judicial actions from detaining family units through the completion of removal proceedings. For UAC apprehensions, DHS is responsible for the transfer of custody to the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances. HHS is similarly limited in their ability to detain UACs through the pendency of their removal proceedings. When these UACs are released by

12

HHS, or FMUA are released from DHS custody, they are placed onto the non-detained docket, which currently has more than 2,641,589 cases and results in decisions not being rendered for many years. Further, even when removal orders are issued, very few aliens from the non-detained docket comply with these orders and instead join an ever-growing list of 565,892 fugitive aliens.

In FY2018, ICE removed 2,711 aliens identified as FMUAs from USBP apprehension data. As seen in Figure 14, this number is up from 2,326 removals of FMUAs in FY2017, resulting in a 17 percent increase. This maintains the upward trend from FY2017, where ICE removals of this population increased by 35 percent over FY2016 (1,728). ICE similarly identifies UACs based on USBP apprehensions, and in FY2018 ICE removed 5,571 UACs, a 55 percent increase over the 3,598 UACs removed in FY2017 (Figure 15). FY2017 similarly showed an increase in UAC removals when ICE removed 41 percent more UACs compared to FY2016's 2,545. Most of the remaining population of UAC and FMUA who have been apprehended, remain in the country awaiting completion of their removal proceedings or defying removal orders.

**Figure 14. FY2016 – FY2018 ICE Removals of USBP-Identified Family Unit Apprehensions**



**Figure 15. FY2016 – FY2018 ICE Removals of USBP-Identified UAC Apprehensions**



13

*Effects of Visa Sanctions and Diplomatic Relations*

On September 13, 2017, DHS announced the implementation of visa sanctions[13] on Cambodia, Eritrea, Guinea, and Sierra Leone due to a lack of historical cooperation from these countries with regard to accepting their nationals who have been ordered removed. In coordination with the U.S. Department of State (DoS), consular officers in these countries were ordered to implement visa restrictions on specific categories of visa applicants. The categories were determined on a country-by-country basis. If the impacted countries did not respond appropriately, the scope of the sanctions could be expanded to include more visa applicant categories. The result of these sanctions can be seen in the ICE removals statistics for these countries in Table 3. All the countries with newly-issued visa sanctions have greater removals in FY2018 than in FY2017. In addition to visa sanctions, DHS and DoS have coordinated to improve diplomatic relations with Cuba, resulting in a 189 percent increase of Cuban national removals from FY2017 to FY2018.  ICE continues to work with DHS and DoS to invoke visa sanctions where appropriate for the purpose of fostering better cooperation with foreign countries in the context of removals.

**Table 3. FY2017 – FY2018 ICE Removals from Visa Sanction Countries and Cuba**

| Country of Citizenship | FY2017 | FY2018 | % Change |
|---|---|---|---|
| CAMBODIA | 29 | 110 | 279% |
| CUBA | 160 | 463 | 189% |
| ERITREA | 41 | 62 | 51% |
| GUINEA | 88 | 219 | 149% |
| SIERRA LEONE | 44 | 79 | 80% |
| **Total** | **362** | **933** | **158%** |

**Conclusion**

As the agency primarily responsible for immigration enforcement efforts in the interior of the United States, ICE plays a critical role in fulfilling the requirements laid out in The President's EO and DHS' subsequent implementation memorandum. The statistics in this report illustrate ICE's commitment to these policies and success in implementing them during FY2018.

ICE ERO's FY2018 statistics demonstrate the agency's strengthened interior enforcement measures and show significant success in identifying, arresting, and removing aliens who are in violation of U.S. law, particularly those who pose a public safety or national security threat. This was accomplished despite limited resources and an increasingly challenging operational environment.

In FY2018, ICE ERO conducted 158,581 overall administrative arrests, 15,111 more than in FY2017, while it conducted 256,085 removals – the highest level since FY2014, resulting in a more than 10 percent increase in overall arrests and removals. ICE continues to prioritize its limited resources on public safety threats and immigration violators, as reflected by the fact that, like in FY2017, 9 out of 10 ERO administrative arrests had either a criminal conviction(s), pending charge(s), were an ICE fugitive, or illegally reentered the country after previously being removed. These results clearly demonstrate that the increased enforcement productivity in FY2017 has maintained an upward trend, and that ICE's efforts to

---

[13] Section 243(d) of the INA states that, upon notification from the Secretary of Homeland Security, the Secretary of State shall direct consular officers to stop issuing visas to immigrants, nonimmigrants, or both, from countries that unreasonably delay or fail entirely to repatriate their nationals.

AR2022_301478

restore integrity to our nation's immigration system and enhance the safety and security of the United States have continued to yield positive results.

15

*Appendix A: Methodology*

## Data Source:
Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

## Data Run Dates:
FY2018: IIDS v.1.34 run date 10/08/2018; ENFORCE Integrated Database (EID) as of 10/06/2018
FY2017: IIDS v.1.28 run date 10/09/2017; ENFORCE Integrated Database (EID) as of 10/07/2017
FY2016: IIDS v.1.22.1 run date 10/04/2016; ENFORCE Integrated Database (EID) as of 10/02/2016

## Removals
ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ICE for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY2009, ICE began to "lock" removal statistics on October 5 at the end of each fiscal year, and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. FY2016 removals, excluding FY2015 "lag," were 235,524. The number of removals in FY2017, excluding the "lag" from FY2016, was 220,649. The number of removals in FY2018, excluding the "lag" from FY2017, was 252,405.

16

*Appendix B: FY2017 and FY2018 Removals by Country of Citizenship[14]*

| FY2017 and FY2018 ICE Removals by Country of Citizenship | | |
|---|---|---|
| Country of Citizenship | FY2017 | FY2018 |
| MEXICO | 128,765 | 141,045 |
| GUATEMALA | 33,570 | 50,390 |
| HONDURAS | 22,381 | 28,894 |
| EL SALVADOR | 18,838 | 15,445 |
| DOMINICAN REPUBLIC | 1,986 | 1,769 |
| BRAZIL | 1,413 | 1,691 |
| ECUADOR | 1,152 | 1,264 |
| COLOMBIA | 1,082 | 1,162 |
| HAITI | 5,578 | 934 |
| NICARAGUA | 832 | 879 |
| JAMAICA | 782 | 792 |
| CHINA, PEOPLES REPUBLIC OF | 525 | 726 |
| INDIA | 460 | 611 |
| PERU | 458 | 581 |
| CUBA | 160 | 463 |
| ROMANIA | 292 | 403 |
| NIGERIA | 312 | 369 |
| CANADA | 353 | 342 |
| VENEZUELA | 248 | 336 |
| GHANA | 305 | 243 |
| PAKISTAN | 177 | 235 |
| SOMALIA | 521 | 229 |
| GUINEA | 88 | 219 |
| PHILIPPINES | 182 | 217 |
| SPAIN | 172 | 209 |
| UNITED KINGDOM | 151 | 209 |
| CHILE | 129 | 166 |
| COSTA RICA | 151 | 162 |
| BANGLADESH | 203 | 147 |
| GUYANA | 137 | 142 |
| KENYA | 103 | 140 |
| SAUDI ARABIA | 139 | 135 |
| ITALY | 117 | 125 |
| SENEGAL | 197 | 125 |

---

[14] Country of citizenship is reported as it appears in ICE's system of record at the time data is pulled but may be updated as additional information is discovered or verified.

AR2022_301481

| FY2017 and FY2018 ICE Removals by Country of Citizenship | | |
|---|---|---|
| Country of Citizenship | FY2017 | FY2018 |
| POLAND | 120 | 123 |
| SOUTH KOREA | 113 | 122 |
| VIETNAM | 71 | 122 |
| ARGENTINA | 102 | 121 |
| LIBERIA | 107 | 113 |
| GAMBIA | 56 | 111 |
| CAMBODIA | 29 | 110 |
| INDONESIA | 68 | 110 |
| RUSSIA | 127 | 107 |
| UKRAINE | 86 | 105 |
| TRINIDAD AND TOBAGO | 128 | 104 |
| BAHAMAS | 95 | 101 |
| MICRONESIA, FEDERATED STATES OF | 110 | 99 |
| ALBANIA | 55 | 98 |
| MAURITANIA | 8 | 98 |
| PORTUGAL | 65 | 96 |
| JORDAN | 98 | 94 |
| ISRAEL | 81 | 93 |
| BELIZE | 82 | 91 |
| EGYPT | 57 | 85 |
| FRANCE | 82 | 85 |
| TURKEY | 93 | 85 |
| IVORY COAST | 13 | 82 |
| BOLIVIA | 76 | 81 |
| HUNGARY | 116 | 81 |
| DEM REP OF THE CONGO | 34 | 79 |
| SIERRA LEONE | 44 | 79 |
| CAMEROON | 58 | 72 |
| GERMANY | 75 | 72 |
| CAPE VERDE | 29 | 68 |
| MALI | 34 | 63 |
| ERITREA | 41 | 62 |
| SOUTH SUDAN | 2 | 61 |
| PANAMA | 69 | 59 |
| MOROCCO | 67 | 58 |
| THAILAND | 33 | 55 |
| LEBANON | 35 | 51 |
| LITHUANIA | 26 | 49 |

AR2022_301482

| FY2017 and FY2018 ICE Removals by Country of Citizenship | | |
|---|---|---|
| Country of Citizenship | FY2017 | FY2018 |
| IRAQ | 61 | 48 |
| BOSNIA-HERZEGOVINA | 47 | 47 |
| CZECH REPUBLIC | 30 | 47 |
| IRELAND | 34 | 47 |
| URUGUAY | 38 | 47 |
| NEPAL | 45 | 45 |
| SOUTH AFRICA | 23 | 42 |
| SUDAN | 19 | 42 |
| UNKNOWN | 26 | 42 |
| UZBEKISTAN | 28 | 41 |
| BURMA | 10 | 40 |
| NETHERLANDS | 40 | 40 |
| AUSTRALIA | 22 | 39 |
| MOLDOVA | 34 | 38 |
| ETHIOPIA | 46 | 36 |
| SRI LANKA | 41 | 36 |
| BURKINA FASO | 31 | 35 |
| MARSHALL ISLANDS | 22 | 35 |
| SLOVAKIA | 20 | 35 |
| BULGARIA | 26 | 34 |
| ANGOLA | 7 | 32 |
| KOREA | 44 | 32 |
| AFGHANISTAN | 48 | 30 |
| KAZAKHSTAN | 14 | 30 |
| SAMOA | 13 | 30 |
| SERBIA | 18 | 30 |
| JAPAN | 13 | 28 |
| MONGOLIA | 23 | 28 |
| ST. LUCIA | 23 | 28 |
| ARMENIA | 24 | 27 |
| TAIWAN | 28 | 27 |
| ANTIGUA-BARBUDA | 19 | 24 |
| NEW ZEALAND | 16 | 24 |
| TOGO | 19 | 24 |
| YEMEN | 10 | 24 |
| GREECE | 20 | 22 |
| IRAN | 22 | 22 |
| FIJI | 13 | 21 |

19

| FY2017 and FY2018 ICE Removals by Country of Citizenship | | |
|---|---|---|
| Country of Citizenship | FY2017 | FY2018 |
| TONGA | 13 | 21 |
| GEORGIA | 22 | 20 |
| DOMINICA | 10 | 19 |
| SURINAME | 7 | 19 |
| SWEDEN | 19 | 19 |
| TANZANIA | 13 | 19 |
| ZIMBABWE | 12 | 19 |
| CONGO | 5 | 18 |
| MACEDONIA | 10 | 18 |
| MONTENEGRO | 9 | 18 |
| ALGERIA | 28 | 17 |
| BARBADOS | 19 | 17 |
| BELGIUM | 9 | 17 |
| LATVIA | 19 | 17 |
| TUNISIA | 7 | 16 |
| HONG KONG | 9 | 15 |
| KYRGYZSTAN | 17 | 15 |
| ST. KITTS-NEVIS | 16 | 15 |
| AZERBAIJAN | 8 | 14 |
| BURUNDI | 6 | 14 |
| KOSOVO | 10 | 14 |
| CHAD | 7 | 13 |
| ESTONIA | 12 | 13 |
| ST. VINCENT-GRENADINES | 10 | 13 |
| UGANDA | 11 | 13 |
| CROATIA | 5 | 12 |
| ZAMBIA | 10 | 12 |
| KUWAIT | 12 | 11 |
| MALAYSIA | 8 | 11 |
| BELARUS | 10 | 10 |
| BENIN | 8 | 10 |
| GRENADA | 15 | 9 |
| PALAU | 15 | 9 |
| LAOS | 5 | 8 |
| LIBYA | 9 | 8 |
| TAJIKISTAN | 9 | 8 |
| AUSTRIA | 7 | 7 |
| NORWAY | 4 | 7 |

20

AR2022_301484

| FY2017 and FY2018 ICE Removals by Country of Citizenship | | |
|---|---|---|
| Country of Citizenship | FY2017 | FY2018 |
| SYRIA | 2 | 7 |
| GABON | 3 | 6 |
| PARAGUAY | 5 | 6 |
| SINGAPORE | 4 | 6 |
| BERMUDA | 3 | 5 |
| EQUATORIAL GUINEA | 2 | 5 |
| GUINEA-BISSAU | 4 | 5 |
| NIGER | 20 | 5 |
| YUGOSLAVIA | 4 | 5 |
| CZECHOSLOVAKIA | 6 | 4 |
| SWITZERLAND | 5 | 4 |
| TURKS AND CAICOS ISLANDS | 4 | 4 |
| CYPRUS | 1 | 3 |
| DJIBOUTI | 1 | 3 |
| FINLAND | 3 | 3 |
| MALAWI | 4 | 3 |
| CENTRAL AFRICAN REPUBLIC | 1 | 2 |
| DENMARK | 5 | 2 |
| ICELAND | 1 | 2 |
| NAMIBIA | 1 | 2 |
| NETHERLANDS ANTILLES | 2 | 2 |
| QATAR | 4 | 2 |
| RWANDA | 10 | 2 |
| SERBIA AND MONTENEGRO | 2 | 2 |
| TURKMENISTAN | 9 | 2 |
| UNITED ARAB EMIRATES | 3 | 2 |
| ARUBA | 1 | 1 |
| BAHRAIN | 1 | 1 |
| BHUTAN | 0 | 1 |
| BOTSWANA | 3 | 1 |
| BRITISH VIRGIN ISLANDS | 3 | 1 |
| GUADELOUPE | 0 | 1 |
| LESOTHO | 0 | 1 |
| MACAU | 0 | 1 |
| MADAGASCAR | 1 | 1 |
| MALDIVES | 0 | 1 |
| MONTSERRAT | 0 | 1 |
| PAPUA NEW GUINEA | 1 | 1 |

AR2022_301485

| FY2017 and FY2018 ICE Removals by Country of Citizenship | | |
|---|---|---|
| **Country of Citizenship** | **FY2017** | **FY2018** |
| SLOVENIA | 1 | 1 |
| ANDORRA | 1 | 0 |
| CAYMAN ISLANDS | 2 | 0 |
| FRENCH GUIANA | 1 | 0 |
| LUXEMBOURG | 1 | 0 |
| MAURITIUS | 1 | 0 |
| MOZAMBIQUE | 2 | 0 |
| OMAN | 3 | 0 |
| SAN MARINO | 1 | 0 |
| SWAZILAND | 1 | 0 |
| **Total** | **226,119** | **256,085** |

22

**AR2022_301486**



ENFORCEMENT AND REMOVAL OPERATIONS

# U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report



U.S. Immigration
and Customs
Enforcement

AR2022_301487

## Table of Contents

Overview ............................................................................................................................. 3

ICE Custody and Case Management ................................................................................. 4

    *Initial Book-Ins Resulting from CBP Apprehensions Increased* ................................ 4

    *Average Daily Population Resulting from CBP Apprehensions Increased* ................ 5

    *Currently Detained Population Shifted due to CBP Apprehensions* ........................... 6

    *Average Length of Stay in ICE Custody Declined* ..................................................... 8

    *Use of Family Residential Centers Decreased* .......................................................... 8

    *ICE's Non-Detained National Docket Continued to Grow* ...................................... 10

    *Alternatives to Detention Expanded* ....................................................................... 11

ERO Administrative Arrests ........................................................................................... 11

    *Administrative Arrests Declined but Focused on Criminals* .................................... 12

    *ERO Continued to Pursue Criminal Arrests and Prosecutions* ............................... 15

ICE Detainers .................................................................................................................. 16

ICE Removals .................................................................................................................. 18

    *Removals with CBP as the Arresting Agency Increased* .......................................... 19

    *Removals of USBP-Identified Family Unit and Unaccompanied Alien Children Apprehensions Continued to Increase* ...................................................................... 20

    *Removals of Criminals Remained a Priority* ........................................................... 21

Conclusion ....................................................................................................................... 25

Appendix .......................................................................................................................... 26

    *Appendix A: Methodology* ....................................................................................... 26

    *Appendix B: Removals by Country of Citizenship* .................................................. 27

2

## Overview

This report summarizes U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) activities during Fiscal Year (FY) 2019[1] and highlights the impact of changing migration patterns on the agency's operations.

ICE shares responsibility for administering and enforcing the nation's immigration laws with Department of Homeland Security (DHS) component agencies, including U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services. ICE ERO is responsible for the identification, arrest, and removal of aliens who present a danger to national security or a threat to public safety, or who otherwise undermine border control and the integrity of the U.S. immigration system. As a result, ICE ERO's main areas of focus are interior enforcement operations, management of the agency's detained population nationwide, and removal of aliens who have received a final order.

While ERO's targeted immigration enforcement operations focus on the interior of the country, changes in migration flows at the Southwest Border directly impact nearly every area of the agency's operations, including interior enforcement, detention capacity, transportation, removals, personnel, and overall expenditures. Despite some decrease in apprehensions toward the end of the fiscal year, CBP has continued to apprehend record numbers of migrants, particularly family units and Unaccompanied Alien Children (UAC), along the Southwest Border, and DHS and its component agencies continue to experience the ramifications of this unprecedented migration across operational areas.

According to CBP data, during FY 2019, the number of individuals apprehended or found inadmissible nationwide totaled 1,148,024, an increase of 68 percent over the previous fiscal year. The vast majority of this activity occurred along the Southwest Border, where the U.S. Border Patrol (USBP) apprehended 851,508 aliens, an increase of 115 percent over the previous year, and a higher number than any of the previous ten fiscal years. Among those apprehended were 473,682 family unit members, representing the highest number for any year on record and 342 percent higher than the previous year's record of 107,212. Overall, family unit members and UAC accounted for 64.5 percent of all individuals apprehended by the USBP at the Southwest Border during FY 2019, demonstrating both the magnitude and the changing demographics that have fueled a border security and humanitarian crisis and have compromised ICE's ability to conduct enforcement in the interior.

This sustained increase in migration has stretched resources across the U.S. government, requiring ERO to redirect its enforcement personnel and detention capacity to support border enforcement efforts as well as a significantly increased detained population. This has negatively impacted the number of ERO's interior arrests, as well as the percentage of removals stemming from such arrests, and has also changed the overall composition of ICE's detained population. Because much of ERO's limited detention capacity has been dedicated to housing aliens arrested by CBP, many of whom are subject to mandatory detention under U.S. immigration laws regardless of criminality, the increase in border apprehensions has resulted in a lower overall percentage of ICE detainees who have a criminal history (the vast majority of those arrested by

---

[1] FY 2019 indicates October 1, 2018 through September 30, 2019.

3

ERO in the interior have criminal convictions or pending criminal charges, while those arrested by CBP at the border often do not have any known criminal history).

In addition, the situation at the Southwest Border has also driven a significant increase in the number of non-detained cases[2] ERO manages nationwide, which surpassed 3.2 million cases in FY 2019, after steadily increasing from 2.6 million cases in FY 2018 and 2.4 million cases in FY 2017. With 5,300[3] law enforcement officers across 24 field offices, ERO does not have sufficient resources to effectively manage the sustained increase in non-detained cases.

This report presents ERO's FY 2019 year-end statistics in the following areas: 1) ICE Custody and Case Management, 2) ERO Administrative Arrests, 3) ICE Detainers, and 4) ICE Removals.

**ICE Custody and Case Management**

ERO detains individuals to ensure their presence for immigration proceedings and to secure their departure from the United States once they become subject to an executable final order of removal. Detention is an important and necessary part of immigration enforcement, and in FY 2019, 85 percent of those removed by ERO had spent time in ICE detention prior to their departure from the country. Because ERO's limited detention beds account for only a small fraction of those who are amenable to removal, the agency's detention resources are primarily focused on individuals who represent a threat to public safety, for whom detention is mandatory by law, or who may be a flight risk.

In addition, ERO manages a non-detained docket of more than 3.2 million cases, which includes aliens in all stages of the immigration process across the country. During FY 2019, ICE's detained and non-detained dockets both increased significantly, which was overwhelmingly due to the historic levels of CBP apprehensions at the Southwest Border.

*Initial Book-Ins Resulting from CBP Apprehensions Increased*

Typically, when an alien is apprehended by CBP, he or she is transferred to ICE custody pending removal proceedings. An initial book-in to an ICE detention facility is defined as the first time an alien enters ICE custody for a detention stay and does not include transfers between facilities. In FY 2019, ERO experienced an increase in overall book-ins resulting from CBP activity at the border. During this time period, 73 percent of all initial book-ins to ICE custody resulted from CBP apprehensions, while overall initial book-ins to ICE custody increased 29 percent compared to FY 2018 and 58 percent compared to FY 2017.

---

[2] Non-detained cases consist of active removal cases for aliens not in ICE Custody.
[3] ERO estimates that as of the end of FY 2019, there were approximately 5,300 Deportation Officers in its 24 field offices, excluding supervisory and headquarters personnel.

AR2022_301490

**Figure 1: FY 2017 – FY 2019 Initial Book-Ins by Arresting Agency**



*Average Daily Population Resulting from CBP Apprehensions Increased*

ERO's Average Daily Population (ADP) measures the number of individuals in ICE custody on an average day during the fiscal year. ERO's ADP reached 50,165 in FY 2019, an increase of 19 percent compared to FY 2018. Like ERO's initial book-ins, the increase in overall ADP was driven by the increased CBP activity at the border, with CBP apprehensions accounting for 60 percent of those in custody, and ERO administrative arrests in the interior accounting for only 40 percent.

**Figure 2: FY 2018 – FY 2019 Average Daily Population by Arresting Agency**



5

*Currently Detained Population Shifted due to CBP Apprehensions*

ERO provides a range of comprehensive services to ensure the welfare of all those in its custody, including medical, dental, and mental healthcare, access to legal and educational resources, and recreational opportunities. It utilizes a nationwide network of detention facilities, including five ICE-owned, contractor operated Service Processing Centers, eight privately owned and/or operated Contract Detention Facilities, 12 Intergovernmental Service Agreement (IGSA) facilities which are dedicated to detaining ICE detainees, and approximately 200 shared-use IGSAs. Through a robust inspections program, the agency ensures detention facilities utilized to detain ICE detainees do so in accordance with ICE national detention standards, which are typically much more rigorous than those that apply to other detained populations and conform to or exceed American Correctional Association guidance.

ICE's currently detained population represents a small fraction of the overall number of removal cases it manages nationwide, and the agency prioritizes its detention resources to focus on public safety and national security threats, flight risks, and those who are subject by law to mandatory detention. Since many recent border entrants are subject to mandatory detention under the Immigration and Nationality Act (INA), increased CBP apprehensions have caused a major shift in the composition of the detained population. At the end of FY 2019, 63 percent of the detained population was initially apprehended by CBP, an increase from 52 percent at the end of FY 2018 and 40 percent at the end of FY 2017.

This shift has forced ERO to balance its public safety mission in the interior with support for CBP operations at the Southwest Border, and ERO's corresponding adjustment of resources has come at a significant cost to other operational areas. As the detained population has grown, ERO officers have had to be redeployed across the country to assist with detained docket management. These temporary deployments and reassignments have come at a significant cost to ERO's interior enforcement and public safety efforts.

6

**Figure 3: End of FY 2019 ICE National Docket Snapshot**



**Figure 4: End of FY 2019 Currently Detained Population Snapshot by Arresting Agency**



**Figure 5: FY 2017- FY 2019 Currently Detained Population Snapshots by Arresting Agency**



7

*Average Length of Stay in ICE Custody Declined*

The average length of stay (ALOS) represents the average amount of time an alien was detained while in ICE custody. ICE's ALOS has been trending downward since FY 2017, which is primarily due to changes in the composition of the detained population.

In FY 2019, ICE's ALOS for its detained population was 34.3 days, which decreased from 39.4 days in FY 2018 and 43.7 days in FY 2017. The primary drivers for this decrease in ALOS were a greater percentage of CBP cases and a smaller percentage of criminal aliens as a result (CBP apprehensions typically have shorter stays in detention while criminal cases tend to have longer stays), more family unit cases (which are usually booked in and out of custody quickly due to the *Flores Settlement Agreement* (FSA)[4]), and the need to prioritize extremely limited detention resources (including through the release of aliens not subject to mandatory detention, or who do not appear to pose a public safety threat or flight risk).

**Figure 6: FY 2017 – FY 2019 Average Length of Stay in ICE Custody**



*Use of Family Residential Centers Decreased*

While CBP apprehensions at the Southwest Border have increased overall in recent years, the composition of those apprehended has also changed. DHS and its component agencies have seen a significant increase in families and UAC, predominantly from El Salvador, Guatemala, and Honduras (collectively known as the Northern Triangle countries), either being apprehended along the Southwest Border or who are determined to be inadmissible upon presenting themselves at ports of entry. While for many years the majority of those apprehended along the

---

[4] Based upon a ruling by the U.S. Court of Appeals for the Ninth Circuit that the FSA applies to all alien minors detained in DHS custody, including *accompanied* minors, *Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016), such alien minors must be released or transferred to a "licensed program" "as expeditiously as possible[.]" pursuant to paragraph 12 of the FSA. In the context of expedited removal and reinstatement of removal, the U.S. District Court for the Central District of California noted that "if 20 days is as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear" that may fall within the standard. *Flores v. Lynch*, 212 F. Supp.3d 907, 914 (C.D. Cal. 2015).

8

Southwest Border were adult males from Mexico, the composition of arrivals has changed dramatically. In FY 2019, USBP apprehensions of family units at the Southwest Border increased more than 340 percent compared to FY 2018.

In FY 2019,[5] there were over 470,000 USBP apprehensions of members of family units and 37,906 initial book-ins to ICE's three Family Residential Centers[6], while ICE directly released approximately 200,000 family unit members from its custody[7] as a result of the high volume of CBP apprehensions during this time period. Due to the humanitarian crisis caused by the record number of family unit members arriving at the border, CBP was also forced to conduct direct releases of thousands of members of this population who were never turned over to ICE and are not represented in ICE's release data as a result.

Pursuant to the FSA and subsequent court interpretations, pre-final order children accompanied by their parents generally cannot be held in immigration detention for more than 20 days. As a result, few migrant families spend time in detention and most of those that do are quickly released into the interior of the United States where they may wait years for their court cases to conclude. As a result, very few members of this population have been removed from the country, even after receiving a final order of removal from a Department of Justice Executive Office for Immigration Review immigration judge (**Figure 15**).

**Figure 7: FY 2017 – FY 2019 Initial Book-Ins to ICE Family Residential Centers**



---

[5] "Southwest Border Migration 2019," https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

[6] ICE Family Residential Centers include Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center.

[7] ICE began manually tracking the number of family unit members released from its custody on December 21, 2018. Between December 2018 and September 30, 2019, ICE released approximately 200,000 family unit members across its four Field Offices covering the Southwest Border. Most of these aliens were apprehended by the USBP, subsequently transferred to ICE custody, and released into the interior of the country shortly thereafter.

9

AR2022_301495

*ICE's Non-Detained National Docket Continued to Grow*

ERO manages active removal cases via the ICE National Docket. The national docket includes all aliens in removal proceedings and encompasses both the smaller detained docket and the much larger non-detained docket. Cases on the non-detained docket include aliens who are both pre- and post-final order, and who have been released on parole, bond, an order of recognizance, an order of supervision, or who are from countries where ERO is in the process of obtaining the necessary travel documents for repatriation.[8]

In FY 2019, the number of aliens on ICE's non-detained docket continued to increase, surpassing 3.2 million cases for the first time, up from 2.6 million cases at the end of FY 2018 and 2.4 million at the end of FY 2017. Like other increases in agency statistics this fiscal year, Southwest Border activity – including more than 470,000 USBP apprehensions of family units – accounted for nearly all of the growth on the non-detained docket.

As the ICE National Docket has continued to grow over the last several years, the number of fugitive aliens[9] on the non-detained docket has continued to grow as well. At the end of FY 2019, the number of fugitives stood at 595,430, an increase from 565,892 in FY 2018 and 540,836 in FY 2017. The continued growth of the fugitive backlog is a direct result of the pressures placed on the immigration system by the crisis at the Southwest Border, as well as the fact that ICE's Fugitive Operations resources have remained static for many years in the absence of additional appropriations.

**Figure 8: Non-Detained National Docket Cases at End of Fiscal Year**



---

[8] While most countries cooperate with ICE's requests to issue travel documents to their citizens who have been ordered removed by an immigration judge, a small number of countries fail to honor such requests or take a longer time to do so, which adds to removal timelines and results in aliens from these countries spending more time on the non-detained docket (and for those who are on the detained docket, more time in detention).

[9] An ICE fugitive is defined as an alien who has failed to leave the United States based upon a final order of removal, deportation or exclusion, or who has failed to report to ICE after receiving notice to do so.

10

AR2022_301496

*Alternatives to Detention Expanded*

ICE's Alternatives to Detention (ATD) program uses technology and case management to monitor aliens' court appearances and compliance with release conditions while their removal proceedings are pending on the non-detained immigration court docket. ATD is not a substitute for detention, but instead complements immigration enforcement efforts by offering increased supervision for a small subset of eligible aliens who are not currently in ICE detention.

ATD may serve as an appropriate additional layer of supervision for an alien who is released from detention pursuant to an Order of Recognizance, an Order of Supervision (for aliens already subject to final removal orders), a grant of parole, or a bond. Adults age 18 and over may be eligible for participation in ATD but must be thoroughly vetted by ERO officers, who review an alien's criminal, immigration, and supervision history, family and/or community ties, status as a caregiver or provider, and humanitarian or medical considerations when making enrollment determinations in order to determine whether a candidate is likely to comply with the terms of the program.

While ERO has expanded its use of ATD from approximately 23,000 participants in FY 2014 to 96,000 as of the end of FY 2019, this expansion has come with a number of challenges, including high levels of absconders among recently enrolled family units. In FY 2019, the absconder rate[10] for family units was 26.9 percent, more than double the 12.3 percent absconder rate for non-family unit participants, demonstrating the growing challenges such enrollments create for immigration enforcement.

Thus, while ATD can complement other immigration enforcement efforts when used appropriately on a vetted and monitored population of participants, the program was not designed to facilitate ERO's mission of removing aliens with final orders. Additionally, ERO lacks sufficient resources to keep all current participants enrolled through the pendency of their proceedings, or to locate and arrest the significant number of participants who abscond, problems which will only be exacerbated by enrolling greater numbers of participants without the addition of enforcement resources. While ERO has continued to expand the use of ATD to monitor the non-detained population in FY 2019, the program will need to be further resourced in order to appropriately monitor participants, including through the addition of officers who can locate, arrest, and remove those who fail to adhere to conditions of enrollment. Finally, while additional resources would improve the efficacy of ATD at current levels of enrollment, ERO notes that the program is not a viable solution for addressing the magnitude of cases on the non-detained docket, which surpassed 3.2 million in FY 2019.

## ERO Administrative Arrests

ERO primarily arrests aliens for civil violations of U.S. immigration law. In furtherance of this mission, it conducts enforcement actions based on intelligence-driven leads in communities

---

[10] Absconder Rate = Count of Absconders/Count of Overall Terminations. ICE calculates the percentage of absconders by looking at the overall number of aliens who concluded the ATD program in a given time period ("overall terminations"), and the number of those terminations which occurred due to a participant absconding.

AR2022_301497

nationwide (at-large arrests) and works with jails to identify aliens who are amenable to removal and who have been arrested by state or local authorities for criminal activity (custodial arrests).

In FY 2019, ERO's overall administrative arrests decreased by 10 percent over the last fiscal year, while administrative arrests of convicted criminals decreased by 12 percent, and at-large arrests decreased by 12 percent. As with other enforcement activity in FY 2019, this was significantly impacted by the reallocation of resources in response to the crisis at the border. These resources included approximately 350 ERO officers who were reassigned in support of Southwest Border operations. Thus, while ERO continues to conduct enforcement in the interior of the United States, in light of its limited resources and the sheer volume of aliens attempting to enter the country, the agency has had to balance its support for border security with its interior public safety mission.

*Administrative Arrests Declined but Focused on Criminals*

While ERO administrative arrests, including arrests of criminals, have declined overall since FY 2018, ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to the safety and security of the United States. As a result, the majority of aliens arrested by ERO are convicted criminals, followed by those with pending criminal charges at the time of arrest. In FY 2019, 86 percent of ERO's administrative arrests consisted of aliens with criminal convictions or pending criminal charges.[11]

ERO continues to carry out its public safety mission with limited resources, and as a result, many of the criminal aliens it arrests have extensive criminal histories with multiple convictions or pending charges. Of the 123,128 ERO administrative arrests in FY 2019 with criminal convictions or pending criminal charges, the criminal history for this group represented 489,063 total criminal convictions and pending charges as of the date of arrest, which equates to an average of four criminal arrests/convictions per alien, highlighting the recidivist nature of the aliens that ICE arrests.

---

[11] ICE defines immigration violators' criminality in the following manner: Convicted Criminal: Immigration Violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action; Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action; Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into ICE system of record at the time of the enforcement action.

12

AR2022_301498

**Figure 9: FY 2017 – FY 2019 ERO Administrative Arrests by Criminality**



**Figure 10: FY 2017 – FY 2019 At-Large Administrative Arrests by Criminality**



13

**Table 1: FY 2017 – FY 2019 ERO Administrative Arrests of Other Immigration Violators**[12]

| ERO Administrative Arrest Type | FY2017 | | FY2018 | | FY2019 | |
|---|---|---|---|---|---|---|
| | Arrests | Percentage | Arrests | Percentage | Arrests | Percentage |
| **Other Immigration Violators** | **15,478** | **100%** | **20,464** | **100%** | **19,971** | **100%** |
| Notice to Appear | 7,642 | 49% | 11,570 | 57% | 11,272 | 56% |
| Fugitives | 2,350 | 15% | 2,791 | 14% | 2,560 | 13% |
| Reinstatement | 1,695 | 11% | 1,846 | 9% | 1,981 | 10% |
| Other | 3,791 | 24% | 4,257 | 21% | 4,158 | 21% |

**Table 2: FY 2019 Criminal Charges and Convictions for ERO Administrative Arrests**[13, 14]

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Traffic Offenses - DUI | 25,417 | 49,106 | 74,523 |
| Traffic Offenses | 28,519 | 39,717 | 68,236 |
| Dangerous Drugs | 20,277 | 47,453 | 67,730 |
| Immigration | 10,769 | 46,888 | 57,657 |
| Assault | 19,648 | 26,156 | 45,804 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 10,442 | 10,287 | 20,729 |
| General Crimes | 8,114 | 9,891 | 18,005 |
| Larceny | 4,599 | 12,456 | 17,055 |
| Obstructing the Police | 5,641 | 8,776 | 14,417 |
| Fraudulent Activities | 4,145 | 7,875 | 12,020 |
| Burglary | 2,565 | 7,757 | 10,322 |
| Weapon Offenses | 3,281 | 6,997 | 10,278 |
| Public Peace | 3,605 | 5,838 | 9,443 |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,992 | 4,658 | 6,650 |
| Invasion of Privacy | 2,078 | 4,233 | 6,311 |
| Family Offenses | 2,296 | 3,139 | 5,435 |
| Stolen Vehicle | 1,568 | 3,686 | 5,254 |
| Sexual Assault | 1,654 | 3,407 | 5,061 |
| Robbery | 1,155 | 3,581 | 4,736 |
| Forgery | 1,549 | 2,979 | 4,528 |
| Damage Property | 1,653 | 2,245 | 3,898 |

[12] "Other" types of arrests of Other Immigration Violators include, but are not limited to, arrests for Expedited Removal, Visa Waiver Program Removal, Administrative Removal, and Voluntary Departure/Removal.

[13] The specific criminal charges and convictions represent the criminal history as entered in the ICE system of record based on the FBI's National Crime Information Center (NCIC) offense codes. Each alien may have multiple criminal convictions or charges at the time of their administrative arrest, and Table 2 lists categories which accounted for at least 1,000 combined charges and convictions among those who were administratively arrested by ERO in FY 2019.

[14] Notes: "Traffic Offenses" include (besides Traffic Offenses – DUI which is listed separately) Hit and Run, Transport Dangerous Material, and Traffic Offense (describe offense). "Immigration" offenses include Illegal Entry, Illegal Reentry, False Claim to U.S. Citizenship, and Alien Smuggling. "Obstructing Judiciary, Congress, Legislature, Etc.," refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear. "General Crimes" include Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

14

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Liquor | 1,991 | 1,799 | 3,790 |
| Stolen Property | 1,181 | 2,562 | 3,743 |
| Flight / Escape | 1,171 | 2,012 | 3,183 |
| Homicide | 374 | 1,549 | 1,923 |
| Kidnapping | 723 | 1,110 | 1,833 |
| Health / Safety | 481 | 1,012 | 1,493 |
| Commercialized Sexual Offenses | 605 | 743 | 1,348 |
| Threat | 534 | 658 | 1,192 |

*ERO Continued to Pursue Criminal Arrests and Prosecutions*

ICE is committed to protecting the safety and security of the homeland and adhering to the President's June 20, 2018 Executive Order 13841, *Affording Congress the Opportunity to Address Family Separation*, which directs the Executive Branch to continue to rigorously enforce immigration laws and to prosecute illegal border entrants. When compared to FY 2018, ERO notes a slight drop in overall criminal arrests, which aligns with the 10 percent decrease in administrative arrests as well as other decreases in enforcement activity during the year. However, enforcement efforts still resulted in a significant number of criminal arrests and prosecutions.

In FY 2019, ERO enforcement activities resulted in 6,739 criminal arrests (10 percent drop from FY 2018), 6,802 Indictments/Bills of Information (a seven percent drop from FY 2018), and 7,142 Convictions (a less than one percent drop from FY 2018). These efforts resulted in the prosecutions of offenses which include, but are not limited to: 8 U.S.C. § 1253, Penalties Related to Removal, U.S.C § 1325, Illegal Entry into the United States; 8 U.S.C § 1326, Illegal Re-Entry of Removed Alien; 18 U.S.C. § 1361, Destruction of Government Property, 18 U.S.C § 1546, Fraud and Misuse of Visas, Permits and Other Documents; 18 U.S.C § 111, Assaulting and/or Resisting an Officer; and 18 U.S.C § 922(g)(5), Felon in Possession of a Firearm.

AR2022_301501

**Figure 11: FY 2017 – FY 2019 Prosecution Statistics**



## ICE Detainers

A detainer is a request from ICE to local law enforcement agencies to notify DHS as early as practicable before a removable alien is released from local custody. Detainers request that local law enforcement agencies maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise be released, to allow DHS to assume custody for removal purposes in accordance with federal law. ICE also serves a warrant of removal or warrant of arrest at the time the detainer is lodged with the receiving law enforcement agency in accordance with existing legal requirements[15] and a formal ICE policy directive issued in 2017.[16]

Detainers reduce potential risks to ERO officers and the general public by allowing arrests to be made in secure custodial settings as opposed to at-large in communities, conserve scarce government resources, and allow ERO to assume custody of criminal aliens before they have an opportunity to reoffend. In FY 2019, ERO issued 165,487 detainers; the aliens who were the subjects of these detainers had criminal histories[17] including, but not limited to, the following crimes: more than 56,000 assaults, 14,500 sex crimes, 5,000 robberies, 2,500 homicides, and 2,500 kidnappings.

---

[15] Federal law vests authority in immigration officers – rather than federal judges – to issue warrants for violations of civil immigration law provisions. *See* INA § 287, 8 U.S.C. § 1357. As a result, no judge in the United States has the authority to issue a warrant for a civil immigration violation.

[16] ICE Policy Directive No. 10074.2, *Issuance of Detainers by ICE Immigration Officers* (Mar. 24, 2017), *available at*: https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

[17] "Criminal history" includes all criminal convictions and pending charges associated with the group of aliens who were the subjects of detainers in FY 2019. Criminal charges may be added or dropped at any point and convictions may be overturned, so this data is a snapshot in time but is representative of the serious criminal histories and corresponding public safety risk associated with this group of individuals.

16

AR2022_301502

Detainers are one of the most critical public safety tools ERO officers have at their disposal. However, in recent years, the agency has experienced an increase in the number of jurisdictions that do not cooperate with its enforcement efforts or who do not honor detainers. While ERO has limited visibility into whether a detainer has been honored unless an alien is subsequently rearrested, a number of aliens who have been released under these circumstances have gone on to commit additional crimes that could have been prevented if ERO had been able to assume custody in accordance with federal immigration laws. As a result, ICE uses its unique law enforcement authorities to help prevent such crimes from occurring, and continues to seek ways to maintain and strengthen its state and local partnerships nationwide in furtherance of its national security and public safety mission.

ICE detainers issued in FY 2019 decreased slightly (by seven percent) from those issued in FY 2018. Like other decreases in interior enforcement activity, this was impacted by the diversion of resources to the Southwest Border as well as limited detention space. However, ICE has also experienced an increase in the number of jurisdictions that do not cooperate with its enforcement efforts nationwide, and estimates that limited visibility into the actions of state and local law enforcement in non-cooperating jurisdictions has also impacted the number of detainers issued.

**Figure 12: FY 2017 – FY 2019 ICE Detainers Issued**



One of the biggest impediments to ERO's public safety efforts during FY 2019 was the lack of cooperation from an increasing number of jurisdictions nationwide. However, in keeping with its goal to build cooperative, respective relationships with law enforcement partners and guarantee public safety, ICE continued to collaborate with its law enforcement partners to help ensure – to the greatest extent possible – that removable aliens who may pose a safety threat are not released into the community. In furtherance of this mission, ERO has continued to operate its 287(g) Jail

17

Enforcement Model (JEM) Program,[18] a valuable force multiplier which enhances community safety by allowing ICE to partner with state and local law enforcement agencies to identify and remove criminal aliens and immigration law violators before they are released. At end of FY 2019, ICE had 77 signed and operational Memorandums of Agreement (MOAs) nationwide.

Additionally, ICE launched the 287(g) Warrant Service Officer (WSO) Program in May 2019 to provide an opportunity for jurisdictions that seek to cooperate with enforcement efforts but who are precluded from honoring ICE detainers as a matter of local policy or state law. While WSO officers can serve and execute administrative warrants on designated aliens in their jails under the terms of the MOA, unlike the traditional 287(g) JEM Program, WSO officers do not interview individuals regarding alienage and removability, and do not process aliens who are in the United States in violation of immigration law. By the end of FY 2019, approximately 40 jurisdictions had expressed interest, with 42 subsequently signing MOAs with ICE during the first month of FY 2020. ICE is currently pursuing additional agreements nationwide.

## ICE Removals

An ICE removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States.[19] ICE removals include both aliens arrested by ERO in the interior of the country and aliens who were apprehended by CBP and turned over to ERO for removal efforts. While ICE's overall removals increased slightly from FY 2018 to FY 2019, the portion of removals resulting from CBP apprehensions increased significantly during this time period.

Detention remains a necessary tool for facilitating the repatriation of those who have received a final order of removal, and 85 percent of those removed by ICE in FY 2019 had spent time in ICE detention prior to repatriation to their home country. In FY 2019, there were 226,400 removals with detention involved, a slight increase from 209,928 such removals in FY 2018, demonstrating the continued importance of detention for the removal process.

---

[18] Section 287(g) of the INA authorizes ICE to delegate the limited authority to state and local law enforcement officers to enforce federal immigration law under a signed memorandum of agreement.

[19] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens who have received a final order of removal, as well as those who have been processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VRs after June 1st, 2013 and not detained by ICE are primarily processed by the USBP. CBP should be contacted for those statistics.

18



Figure 13: FY 2017 – FY 2019 ICE Removals

*Removals with CBP as the Arresting Agency Increased*

During FY 2019, a much greater percentage of ICE's removals stemmed from an initial apprehension by CBP (68 percent) rather than an arrest by ICE (32 percent). In comparison, during FY 2018, removals stemming from a CBP apprehension accounted for 63 percent and removals stemming from an ICE arrest accounted for 37 percent. This is consistent with other shifts in ICE workload resulting from the crisis at the Southwest Border during FY 2019.



Figure 14: FY 2017 – FY 2019 ICE Removals by Arresting Agency

19

*Removals of USBP-Identified Family Unit and Unaccompanied Alien Children Apprehensions Continued to Increase*

Since the initial surge at the Southwest Border in FY 2014, there has been a continued increase in the arrival of both family units and UAC. In FY 2019, there were approximately 76,000 UAC and 470,000 family unit members apprehended by USBP at the Southwest Border, a 52 percent increase for UAC and a 341 percent increase for family unit members from the previous fiscal year.

While USBP routinely turns apprehended family unit members over to ERO for removal proceedings, judicial interpretations of the *FSA* and other adverse court rulings impose practical limitations on ICE's ability to detain family units through the completion of removal proceedings, making removal of members of this population extremely challenging. At the peak of CBP's apprehensions in May 2019, the USBP apprehended nearly 85,000 family units in a single month,[20] forcing both CBP and ICE to directly release members of this population into the United States.

DHS is responsible for transferring apprehended UAC to the custody to the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances, and the agency's primary role consists of transporting UAC from CBP to HHS custody. Like DHS, HHS is similarly limited in their ability to detain this population through the pendency of removal proceedings, so few UAC are ultimately removed.

In FY 2019, ERO conducted a number of targeted enforcement efforts in the interior of the country, including Operation Border Resolve, in order to uphold the integrity of the U.S. immigration system by locating, arresting, and removing members of the family unit and UAC populations with final orders of removal. As a result, during the fiscal year ERO removed 5,702 aliens identified as family unit members based on USBP apprehension data from the initial surge in FY 2014 through the end of FY 2019, as well as 6,351 UAC.[21] While this represents a 110 percent increase in removals of family unit members and a 14 percent increase in removals of UAC from FY 2018 to FY 2019, it remains a small fraction of overall apprehensions for these populations.

During FY 2017, FY 2018, and FY 2019 as a whole, the USBP apprehended 656,516 family unit members and 167,491 UAC, while in the same time period, ICE removed 10,739 family unit members and 15,520 UAC – a 1.6 percent and 9.2 percent removal rate, respectively.[22] These low removals of family unit members and UAC are a result of the significant challenges ICE faces when enforcing final orders issued for members of these populations. In addition to the sheer volume of arrivals and limited government resources, a growing immigration court case backlog, high numbers of absconders among family units, and judicial and legislative

---

[20] "Southwest Border Migration 2019," https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.
[21] ICE notes that this analysis is based on cross-referencing data with another agency, and that these figures are accurate to the best of its knowledge based on currently available information.
[22] ICE removals of family unit members and UAC include all those identified as members of these populations by the USBP; some of the removals that occurred during the past three years may correspond to aliens who were apprehended prior to this time period.

AR2022_301506

constraints[23] also contribute to extremely low numbers of removals and corresponding strain across the U.S. immigration system.

**Figure 15: FY 2017 – FY 2019 ICE Removals of USBP-Identified Family Unit Apprehensions (FMUA) and USBP-Identified Unaccompanied Children Apprehensions (UAC)**



*Removals of Criminals Remained a Priority*

ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to the safety and security of the United States. Despite shifts in the composition of the detained population, including an increase in removals of "other immigration violators" resulting from CBP apprehensions, ICE removals of aliens with criminal convictions and pending criminal charges continued to increase in FY 2019.

Interior removals are those initially arrested by ICE who were subsequently removed by ERO. In FY 2019, the overwhelming majority (91 percent) had criminal convictions or pending criminal charges at the time of arrest, demonstrating ICE's continued efforts to prioritize public safety in the interior despite resource constraints.

---

[23] By creating barriers to the removal of minors and family unit members, the *FSA* and the Trafficking Victims Protection Reauthorization Act in its current form are exploited by transnational criminal organizations and human smugglers, and create legal loopholes that incentivize a high volume of illegal immigration among family units and UAC.

21

**Figure 16: FY 2017 – FY 2019 ICE Removals by Criminality**



**Figure 17: FY 2017 – FY 2019 ICE Interior Removals by Criminality**



ICE removals of known or suspected gang members and known or suspected terrorists (KSTs) are instrumental to ICE's national security and public safety mission. ICE identifies gang members and KSTs by checking an alien's background in federal law enforcement databases, conducting interviews with aliens, and reviewing information received from its law enforcement partners, which is flagged accordingly in ERO's system of record. In FY 2019, ICE removed 5,497 known or suspected gang members, a slight decrease from FY 2018 that aligns with other decreases in interior enforcement. However, ICE's KST removals increased from 42 to 58.

22



**Figure 18: FY 2017 – FY 2019 ICE Removals of Known or Suspected Gang Members**



**Figure 19: FY 2017 – FY 2019 ICE Removals of Known or Suspected Terrorists**

Examples of KSTs and suspected gang members removed by ERO in FY 2019 include the following:

- **Ali Caby, aka "Alex Caby"**, a 41-year-old Iranian national, was removed to Bulgaria on March 21, 2019. Caby ran the Bulgaria office of AW-Tronics, a Miami export company that shipped and exported various aircraft parts and equipment to Syrian Arab Airlines. Ali Caby supervised and encouraged subordinate employees of AW-Tronics in the willful exportation of the parts and equipment to SDN Syrian Air, whose activities have assisted the Syrian government's violent crackdown on its people. Syrian Air is an OFAC-designated entity for transporting weapons and ammunition to Syria in conjunction with Hizballah, a terrorist organization, and the Iranian Revolutionary Guard Corps.

  On December 19, 2017, Caby was convicted in U.S. District Court for the Southern District of Florida of conspiracy to violate the International Emergency Economic Powers Act for illegally exporting aviation parts and equipment to Syria without obtaining a license or authorization, following an investigation by ICE Homeland Security Investigations (HSI), the Federal Bureau of Investigation (FBI), the Department of Commerce, the Defense Criminal Investigative Service, CBP, and the South Florida Joint Terrorism Task Force, and sentenced to 24 months in prison, followed by two years of supervised release. On Jan. 15, 2019, an immigration judge ordered Caby removed

23

from the United States to Bulgaria, where Caby had legal permanent residency, or Iran as an alternative, and ERO subsequently removed him from the country.[24]

- **Carlos Alfredo Luna-Guebara**, a 26-year-old national of El Salvador, was removed to El Salvador on May 15, 2019. Luna-Guebara was a wanted fugitive in his native country for aggravated homicide, conspiracy to commit homicide, and terrorist organization membership, and Salvadoran officials indicated to ERO that he is a documented active member of the 18th Street criminal gang.

  Luna-Guebara previously entered the United States on an unknown date and at an unknown location without admission or parole by an immigration officer, and was subsequently arrested on local charges in Pennsylvania. He was ordered removed by an immigration judge on April 8, 2019, and ERO subsequently removed him from the country and turned him over to Salvadoran officials without incident.[25]

- **Yassin Muhiddin Aref**, a 38-year-old Iraqi national, was removed to Iraq on June 10, 2019. In the summer of 2003, the FBI began investigating Aref after they received information indicating he had possible ties to terrorist organizations. His name and telephone number were found in three different suspected Ansar-al-Islam camps in Iraq, and telephone records for his telephone in Albany, New York, reflected 14 calls to the Syrian office of the Islamic Movement in Kurdistan. The FBI subsequently arrested him for conspiring to conceal the proceeds of the sale of a surface-to-air-missile he believed was unlawfully imported into the United States, knowing it would be sold to foreign terrorist group Jaish-E-Mohammed.

  On March 8, 2007, Aref was convicted in U.S. District Court for the Northern District of New York and sentenced to 180 months imprisonment on seven counts relating to material support of terrorism and weapons of mass destruction, including conspiracy to use, attempt to use, or conspire to use, a weapon of mass destruction against any person within the United States, in violation of 18 USC § 2339A; and conspiracy to provide material support and resources to a Foreign Terrorist Organization, in violation of 18 USC § 2239B. He was ordered removed by an immigration judge on October 9, 2018, and ERO subsequently removed him from the country.[26]

- **Houcine Ghoul**, a 45-year-old Tunisian national, was removed to Tunisia on June 19, 2019. Ghoul previously entered the United States on a tourist visa in 2001, overstayed his visa, and subsequently obtained status as a legal permanent resident through a sham marriage to a U.S. citizen, who he later divorced.

  The investigation into Ghoul's conduct began in April 2014 when Ghoul posted a photo online that explicitly displayed support for the Islamic State of Iraq and al-Sham (ISIS), a

---

[24] "ICE removes Iranian man convicted of violating the International Emergency Economic Powers Act," https://www.ice.gov/news/releases/ice-removes-iranian-man-convicted-violating-international-emergency-economic-powers.
[25] "ICE removes Mara 18th Street Gang member to El Salvador," https://www.ice.gov/news/releases/ice-removes-mara-18th-street-gang-member-el-salvador.
[26] "ICE removes Iraqi man convicted of terrorism related charges," https://www.ice.gov/news/releases/ice-removes-iraqi-man-convicted-terrorism-related-charges.

24

designated foreign terrorist organization. This photo displayed an individual holding a sign with the Arabic phrase, "The victory of the Islamic State in Iraq and Syria," and then below in English, "ISIS," and "N. Carolina, USA," the state where Ghoul was then residing. The photo later appeared in an online propaganda video posted by others to display worldwide support for ISIS, along with a self-description within the account, describing Ghoul as "Extremist, terrorist, tough, brain-washed, radical, I love explosions, booby trapping, beheading the enemy, and am among the supporters of establishing the religion with the sword."

In August 2018, Ghoul was sentenced to 24 months in prison, followed by deportation, for attempted unlawful procurement of naturalization and making false statements on his tax return, following an investigation conducted by ICE HSI, the FBI and the Internal Revenue Service. ERO lodged a detainer on Ghoul, and upon his release from Bureau of Prisons custody, removed him from the country.[27]


## Conclusion

As the agency primarily responsible for immigration enforcement efforts in the interior of the United States, ICE plays a critical role in the national security and public safety of this country by upholding America's immigration laws as set by Congress. During FY 2019, ICE operations were significantly impacted by the surge at the Southwest Border, including extremely high numbers of aliens turned over from CBP to ERO for detention and removal, many of them subject to mandatory detention, and record numbers of family units and UAC – the vast majority of whom remain on ICE's continually growing non-detained docket of more than 3.2 million cases. This high volume of migration, including unprecedented numbers of family unit and UAC arrivals, stretched both ERO resources and those of the entire U.S. government to the breaking point, and created a severe humanitarian crisis and border security crisis that continues to cripple the immigration system.

In FY 2019, record migration at the Southwest Border took up limited ICE detention resources, drove increases in the agency's ADP and decreases in its interior arrests (including arrests of criminals), and forced ICE to balance its critical public safety mission in the interior with its support for DHS efforts to secure the border. While CBP apprehensions decreased somewhat toward the end of FY 2019 from their peak during the months of May, June, and July, sustained high levels of migration over the course of several years have severely taxed ERO's ability to execute key aspects of its mission. ICE projects that until fundamental changes are made to the immigration enforcement process – including legislation that addresses current legal loopholes that incentivize high levels of illegal migration – the crisis situation at the border will continue, and the hundreds of thousands of cases that began during FY 2019 will continue to impact the entire immigration system for many years to come.

---

[27] "Tunisian national with terrorist ties removed from US," https://www.ice.gov/news/releases/tunisian-national-terrorist-ties-removed-us.

25

**Appendix**

*Appendix A: Methodology*

**Data Source:**

Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

**Data Run Dates:**

FY2019: IIDS v.1.3.4 run date 10/06/2019; ENFORCE Integrated Database (EID) as of 10/04/2019

FY2018: IIDS v.1.34 run date 10/08/2018; ENFORCE Integrated Database (EID) as of 10/06/2018

FY2017: IIDS v.1.28 run date 10/09/2017; ENFORCE Integrated Database (EID) as of 10/07/2017

**Removals**

ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ERO for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY 2009, ERO began to "lock" removal statistics on October 5 at the end of each fiscal year and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. The number of removals in FY 2017, excluding the "lag" from FY 2016, was 220,649. The number of removals in FY 2018, excluding the "lag" from FY 2017, was 252,405. The number of removals in FY 2019, excluding the "lag" from FY 2018, was 262,591.

26

*Appendix B: Removals by Country of Citizenship*

**Table 3: FY 2018 – FY 2019 ICE Removals by Country of Citizenship[2829]**

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| Total | 256,085 | 267,258 |
| AFGHANISTAN | 30 | 36 |
| ALBANIA | 98 | 80 |
| ALGERIA | 17 | 20 |
| ANDORRA | 0 | 0 |
| ANGOLA | 32 | 40 |
| ANGUILLA | 0 | 2 |
| ANTIGUA-BARBUDA | 24 | 12 |
| ARGENTINA | 121 | 130 |
| ARMENIA | 27 | 48 |
| ARUBA | 1 | 1 |
| AUSTRALIA | 39 | 40 |
| AUSTRIA | 7 | 8 |
| AZERBAIJAN | 14 | 10 |
| BAHAMAS | 101 | 109 |
| BAHRAIN | 1 | 2 |
| BANGLADESH | 147 | 159 |
| BARBADOS | 17 | 29 |
| BELARUS | 10 | 18 |
| BELGIUM | 17 | 7 |
| BELIZE | 91 | 90 |
| BENIN | 10 | 9 |
| BERMUDA | 5 | 2 |
| BHUTAN | 1 | 1 |
| BOLIVIA | 81 | 64 |
| BOSNIA-HERZEGOVINA | 47 | 36 |
| BOTSWANA | 1 | 3 |
| BRAZIL | 1,691 | 1,770 |
| BRITISH VIRGIN ISLANDS | 1 | 4 |
| BRUNEI | 0 | 0 |
| BULGARIA | 34 | 21 |
| BURKINA FASO | 35 | 20 |
| BURMA | 40 | 29 |
| BURUNDI | 14 | 5 |
| CAMBODIA | 110 | 80 |
| CAMEROON | 72 | 76 |

---

[28] Country of citizenship is reported as it appears in ICE's system of record at the time the data is pulled but may be updated as additional information is discovered or verified.

[29] For FY 2019, the Swaziland country of citizenship has been changed to Eswatini and Macedonia has been changed to North Macedonia to reflect these countries' name changes. Countries of citizenship for FY 2018 remain unchanged.

AR2022_301513

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| CANADA | 342 | 318 |
| CAPE VERDE | 68 | 50 |
| CAYMAN ISLANDS | 0 | 3 |
| CENTRAL AFRICAN REPUBLIC | 2 | 7 |
| CHAD | 13 | 3 |
| CHILE | 166 | 253 |
| CHINA, PEOPLES REPUBLIC OF | 726 | 637 |
| CHRISTMAS ISLAND | 0 | 0 |
| COLOMBIA | 1,162 | 1,158 |
| COMOROS | 0 | 0 |
| CONGO | 18 | 15 |
| COSTA RICA | 162 | 176 |
| CROATIA | 12 | 9 |
| CUBA | 463 | 1,179 |
| CYPRUS | 3 | 1 |
| CZECH REPUBLIC | 47 | 56 |
| CZECHOSLOVAKIA | 4 | 2 |
| DEM REP OF THE CONGO | 79 | 81 |
| DENMARK | 2 | 5 |
| DJIBOUTI | 3 | 3 |
| DOMINICA | 19 | 16 |
| DOMINICAN REPUBLIC | 1,769 | 2,186 |
| EAST TIMOR | 0 | 0 |
| ECUADOR | 1,264 | 2,253 |
| EGYPT | 85 | 57 |
| EL SALVADOR | 15,445 | 18,981 |
| EQUATORIAL GUINEA | 5 | 5 |
| ERITREA | 62 | 49 |
| ESTONIA | 13 | 9 |
| ESWATINI | 0 | 1 |
| ETHIOPIA | 36 | 32 |
| FIJI | 21 | 11 |
| FINLAND | 3 | 3 |
| FRANCE | 85 | 78 |
| FRENCH GUIANA | 0 | 2 |
| FRENCH POLYNESIA | 0 | 2 |
| GABON | 6 | 8 |
| GAMBIA | 111 | 124 |
| GEORGIA | 20 | 38 |
| GERMANY | 72 | 77 |
| GHANA | 243 | 203 |
| GREECE | 22 | 32 |
| GRENADA | 9 | 13 |
| GUADELOUPE | 1 | 1 |

28

AR2022_301514

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| GUATEMALA | 50,390 | 54,919 |
| GUINEA | 219 | 102 |
| GUINEA-BISSAU | 5 | 4 |
| GUYANA | 142 | 125 |
| HAITI | 934 | 690 |
| HONDURAS | 28,894 | 41,800 |
| HONG KONG | 15 | 7 |
| HUNGARY | 81 | 71 |
| ICELAND | 2 | 0 |
| INDIA | 611 | 1,616 |
| INDONESIA | 110 | 77 |
| IRAN | 22 | 21 |
| IRAQ | 48 | 84 |
| IRELAND | 47 | 33 |
| ISRAEL | 93 | 89 |
| ITALY | 125 | 140 |
| IVORY COAST | 82 | 39 |
| JAMAICA | 792 | 751 |
| JAPAN | 28 | 21 |
| JORDAN | 94 | 106 |
| KAZAKHSTAN | 30 | 26 |
| KENYA | 140 | 122 |
| KIRIBATI | 0 | 0 |
| KOREA | 32 | 59 |
| KOSOVO | 14 | 15 |
| KUWAIT | 11 | 21 |
| KYRGYZSTAN | 15 | 19 |
| LAOS | 8 | 5 |
| LATVIA | 17 | 15 |
| LEBANON | 51 | 48 |
| LESOTHO | 1 | 0 |
| LIBERIA | 113 | 108 |
| LIBYA | 8 | 6 |
| LIECHTENSTEIN | 0 | 0 |
| LITHUANIA | 49 | 37 |
| LUXEMBOURG | 0 | 0 |
| MACAU | 1 | 2 |
| MACEDONIA | 18 | 0 |
| MADAGASCAR | 1 | 0 |
| MALAWI | 3 | 1 |
| MALAYSIA | 11 | 9 |
| MALDIVES | 1 | 0 |
| MALI | 63 | 52 |
| MALTA | 0 | 1 |

29

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| MARSHALL ISLANDS | 35 | 32 |
| MARTINIQUE | 0 | 0 |
| MAURITANIA | 98 | 41 |
| MAURITIUS | 0 | 1 |
| MEXICO | 141,045 | 127,492 |
| MICRONESIA, FEDERATED STATES OF | 99 | 91 |
| MOLDOVA | 38 | 28 |
| MONACO | 0 | 0 |
| MONGOLIA | 28 | 19 |
| MONTENEGRO | 18 | 23 |
| MONTSERRAT | 1 | 1 |
| MOROCCO | 58 | 33 |
| MOZAMBIQUE | 0 | 3 |
| NAMIBIA | 2 | 0 |
| NAURU | 0 | 0 |
| NEPAL | 45 | 162 |
| NETHERLANDS | 40 | 40 |
| NETHERLANDS ANTILLES | 2 | 6 |
| NEW CALEDONIA | 0 | 0 |
| NEW ZEALAND | 24 | 22 |
| NICARAGUA | 879 | 2,240 |
| NIGER | 5 | 13 |
| NIGERIA | 369 | 286 |
| NORTH KOREA | 0 | 0 |
| NORTH MACEDONIA | 0 | 15 |
| NORWAY | 7 | 9 |
| OMAN | 0 | 0 |
| PAKISTAN | 235 | 202 |
| PALAU | 9 | 10 |
| PALESTINE | 0 | 0 |
| PANAMA | 59 | 55 |
| PAPUA NEW GUINEA | 1 | 2 |
| PARAGUAY | 6 | 7 |
| PERU | 581 | 571 |
| PHILIPPINES | 217 | 176 |
| PITCAIRN ISLANDS | 0 | 0 |
| POLAND | 123 | 135 |
| PORTUGAL | 96 | 101 |
| QATAR | 2 | 3 |
| REUNION | 0 | 0 |
| ROMANIA | 403 | 400 |
| RUSSIA | 107 | 153 |
| RWANDA | 2 | 12 |
| SAMOA | 30 | 17 |

AR2022_301516

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| SAN MARINO | 0 | 0 |
| SAO TOME AND PRINCIPE | 0 | 0 |
| SAUDI ARABIA | 135 | 79 |
| SENEGAL | 125 | 55 |
| SERBIA | 30 | 31 |
| SERBIA AND MONTENEGRO | 2 | 2 |
| SEYCHELLES | 0 | 1 |
| SIERRA LEONE | 79 | 86 |
| SINGAPORE | 6 | 3 |
| SLOVAKIA | 35 | 22 |
| SLOVENIA | 1 | 1 |
| SOLOMON ISLANDS | 0 | 0 |
| SOMALIA | 229 | 151 |
| SOUTH AFRICA | 42 | 39 |
| SOUTH KOREA | 122 | 127 |
| SOUTH SUDAN | 61 | 65 |
| SPAIN | 209 | 259 |
| SRI LANKA | 36 | 112 |
| ST. HELENA | 0 | 0 |
| ST. KITTS-NEVIS | 15 | 11 |
| ST. LUCIA | 28 | 22 |
| ST. PIERRE AND MIQUELON | 0 | 0 |
| ST. VINCENT-GRENADINES | 13 | 19 |
| STATELESS | 0 | 0 |
| SUDAN | 42 | 18 |
| SURINAME | 19 | 12 |
| SWAZILAND | 0 | 0 |
| SWEDEN | 19 | 21 |
| SWITZERLAND | 4 | 6 |
| SYRIA | 7 | 9 |
| TAIWAN | 27 | 51 |
| TAJIKISTAN | 8 | 4 |
| TANZANIA | 19 | 25 |
| THAILAND | 55 | 46 |
| TOGO | 24 | 16 |
| TONGA | 21 | 10 |
| TRINIDAD AND TOBAGO | 104 | 106 |
| TUNISIA | 16 | 20 |
| TURKEY | 85 | 113 |
| TURKMENISTAN | 2 | 4 |
| TURKS AND CAICOS ISLANDS | 4 | 3 |
| TUVALU | 0 | 0 |
| UGANDA | 13 | 22 |
| UKRAINE | 105 | 125 |

AR2022_301517

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| UNITED ARAB EMIRATES | 2 | 3 |
| UNITED KINGDOM | 209 | 198 |
| UNKNOWN | 42 | 46 |
| URUGUAY | 47 | 51 |
| UZBEKISTAN | 41 | 45 |
| VANUATU | 0 | 0 |
| VENEZUELA | 336 | 327 |
| VIETNAM | 122 | 80 |
| YEMEN | 24 | 46 |
| YUGOSLAVIA | 5 | 3 |
| ZAMBIA | 12 | 7 |
| ZIMBABWE | 19 | 16 |

32

AR2022_301518



ENFORCEMENT AND REMOVAL OPERATIONS

# U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report



U.S. Immigration and Customs Enforcement

# Table of Contents

Executive Summary ................................................................................................................ 3
ICE Custody and Case Management ....................................................................................... 5
    *ICE Initial Book-Ins from CBP Apprehensions* ................................................... 6
    *ICE Average Daily Population* ............................................................................. 7
    *Detained Population* ............................................................................................. 9
    *Average Length of Stay* ........................................................................................ 10
    *ICE Non-Detained National Docket* .................................................................... 11
    *Alternatives to Detention* ..................................................................................... 12
ERO Administrative Arrests ................................................................................................... 12
Criminal Arrests and Prosecutions ......................................................................................... 16
ICE Detainers ......................................................................................................................... 17
ICE Removals ......................................................................................................................... 18
    *Title 42 Expulsions* ............................................................................................. 20
    *Removals of USBP Apprehended Family Units and Unaccompanied Alien Children* ......... 20
    *Removals by Criminality* ..................................................................................... 23
Conclusion ............................................................................................................................. 25
Appendix ................................................................................................................................ 26
    *Appendix A: Methodology* .................................................................................. 26
    *Appendix B: Removals by Country of Citizenship* ............................................. 26

AR2022_301520

**Executive Summary**

U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) shares responsibility for administering and enforcing the nation's immigration laws with ICE Homeland Security Investigations (HSI), as well as other Department of Homeland Security (DHS) component agencies, including U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE ERO is responsible for protecting the homeland through the arrest, detention, and removal of aliens who undermine public safety or the integrity of United States immigration laws, and its main areas of focus are interior enforcement operations, management of the agency's detained population nationwide, and repatriation of aliens who have received a final order of removal.

During Fiscal Year (FY) 2020,[1] ICE ERO faced an unprecedented challenge in the form of the coronavirus disease 2019 (COVID-19) global pandemic. Like nearly every agency in the United States Government, ICE ERO experienced impacts to its workforce and daily operations as a result, and made significant changes to ensure the safety of both detainees and personnel in order to meet or exceed Centers for Disease Control and Prevention (CDC) guidance.[2] Pandemic safety measures, along with extremely low numbers of CBP apprehensions along the Southwest Border due to the use of 42 U.S.C. §§ 265 and 268 authority,[3] have resulted in temporary decreases in many of ICE ERO's traditional metrics. However, the agency has continued to carry out its public safety mission while refocusing many of its efforts on ensuring health and safety during the pandemic.

This report presents ICE ERO's FY 2020 year-end statistics in the following areas: Custody and Case Management, Administrative and Criminal Arrests, ICE Detainers, and Removals. While many of these metrics have fallen by a third or more since FY 2019, ICE notes that these decreases are the result of temporary conditions during a global pandemic, and projects that conditions may shift rapidly once conditions resolve. As a result, while these metrics provide a snapshot in time, they do not reflect post-pandemic operational conditions or resource requirements.

- ***Custody and Case Management:*** During the COVID-19 pandemic, ICE ERO decreased its detained population to allow for social distancing, temporarily adjusted its enforcement posture to narrowly focus on criminal aliens and public safety threats, and received far fewer intakes from CBP. While ICE ERO's detained population generally averages around 45,000 and peaked at 55,000 during the 2019 border surge, it fell to approximately 20,000 by the end of FY 2020.

  However, detention remained necessary for some aliens, and it continued to be the primary pathway by which ICE ERO was able to effectuate removals. Throughout the

---

[1] FY 2020 indicates October 1, 2019 through September 30, 2020.
[2] The CDC remains the authoritative information source on how to reduce exposure to and the spread of COVID-19.
[3] This use of title 42 U.S.C. §§ 265 and 268 authority allows the expulsion of aliens from the United States to prevent the introduction of COVID-19 into the country.

AR2022_301521

pandemic, ICE ERO has taken multiple steps ensure safety in its detention facilities, including the development and implementation of comprehensive protocols in accordance with CDC guidance, reduction of the detained population, and the continual expansion of COVID-19 testing capabilities. As of the end of FY 2020, ICE ERO had tested more than 40,000 detainees.

Additionally, beyond managing ICE's detained population, ICE ERO also manages non-detained cases. In FY 2020, the number of aliens on ICE ERO's non-detained national docket remained consistent with FY 2019 at 3.26 million cases. ICE's Alternatives to Detention (ATD) program, which has expanded dramatically in recent years, remained relatively constant during FY 2020, with 90,000 aliens enrolled in the program at the end of the year. However, ATD experienced an increase in absconder rates among both single adult enrollees and family units, and the overall absconder rate of 33 percent in FY 2020 demonstrated the continuing challenges associated with the growth of this program in recent years.

- ***Administrative and Criminal Arrests:*** Due to the COVID-19 pandemic, in March 2020, ICE ERO temporarily adjusted its enforcement posture to narrowly focus enforcement efforts on public safety risks and individuals subject to mandatory detention based on criminal grounds. In FY 2020 ICE ERO conducted 103,603 administrative arrests, a 28 percent decline from FY 2019, and 90 percent of those arrested had criminal convictions or pending criminal charges at the time of arrest.

  In addition to arresting aliens for administrative violations of the immigration laws, ICE ERO also conducts criminal arrests and assists with pursuing prosecutions related to such criminal activity. In FY 2020, ICE ERO enforcement activities resulted in 4,360 criminal arrests, 4,479 criminal charges, and 5,397 convictions.

- ***ICE Detainers:*** In FY 2020, ICE ERO issued 122,233 detainers, a 26 percent decline from FY 2019. This was likely impacted by decreased numbers of individuals in state and local custody nationwide, ICE's own temporary reduction in enforcement activity early in the pandemic, an increasing number of jurisdictions that do not cooperate with immigration enforcement activities, and court rulings limiting ICE's ability to lodge detainers.

- ***Removals:*** ICE ERO conducted 185,884 removals during FY 2020, a 30 percent decrease from FY 2019. This decrease primarily resulted from a sharp decline in CBP apprehensions at the Southwest Border due to the use of authority under 42 U.S.C. §§ 265 and 268 to expel aliens from the United States to prevent the introduction of COVID-19, though it was also impacted by a decline in ICE ERO interior arrests. The vast majority of ICE ERO's interior removals – 92 percent – had criminal convictions or pending criminal charges, demonstrating ICE ERO's commitment to removing those who pose the greatest risk to the safety and security of the United States. Additionally, despite the overall decrease in removals, ICE ERO assisted CBP with 17,000 air charter

4

expulsions under Title 42, and also saw increases in removals to several countries that were previously uncooperative with removal efforts.

## ICE Custody and Case Management

ICE custody and case management operations are integral to effectuating removals. ICE ERO detains individuals to ensure their presence for immigration proceedings and to secure their departure from the United States once they become subject to an executable final order of removal. While operations have changed due to COVID-19, detention remained necessary for some aliens, and it continued to be the primary pathway by which ICE ERO was able to effectuate removals. For example, in FY 2020, 82 percent of those removed spent time in ICE detention prior to their departure from the country.

The health and safety of both detainees and personnel is of paramount importance, especially during a global pandemic, and ICE ERO has taken a number of steps to ensure safety and allow for social distancing, including a temporary reduction in the detained population. ICE began developing and implementing comprehensive protocols in accordance with CDC guidance on January 22, 2020, and contributed to the development of the CDC's *Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities*[4] by sharing expertise related to ICE ERO's handling of infectious diseases in a custodial environment. Guidance provided by the CDC rapidly evolved as epidemiologists and public health experts learned more about COVID-19. As a result, ICE ERO medical and operational personnel monitor and review this guidance daily, and continually update applicable policies and procedures.

On March 27, 2020, ICE ERO issued a memorandum to all Detention Wardens and Superintendents entitled, *Memorandum on COVID-19 Action Plan, Revision 1.*[5] The measures in the memorandum were developed to reduce exposure to COVID-19, protect the detained population, and optimize employee health and availability for duty. Subsequently, on April 10, 2020, ICE ERO released the COVID-19 *Pandemic Response Requirements* (PRR),[6] a guidance document developed in consultation with the CDC that builds upon previously issued guidance, and sets forth specific requirements that must be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities. ICE ERO subsequently released updated versions of the PRR on June 22, July 28, September 4, and October 27, and continues to monitor evolving conditions and court rulings.

In March 2020, ICE ERO convened a working group of medical professionals, disease control specialists, detention experts, and field operators to identify enhanced steps to minimize the

---

[4] Centers of Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Oct. 15, 2020).
[5] Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, 2020)
[6] *Pandemic Response Requirements* (PRR), https://www.ice.gov/coronavirus/prr (last visited Oct. 27, 2020).

AR2022_301523

spread of COVID-19, which recommended that all facilities make efforts to reduce the population at detention facilities to 75 percent of capacity or less to allow for increased social distancing opportunities. ICE ERO asked local jails to meet this target as quickly as possible and also set a target of 70 percent of population capacity for ICE dedicated facilities, exceeding the CDC and working group recommendations of 75 percent.

Like many federal, state, and local agencies and facilities across the country, ICE has been impacted by nationwide COVID-19 testing shortages. However, in addition to decreasing detention facility capacity, ICE ERO has been evaluating its testing processes and increasing these capabilities throughout the pandemic. This has included gains in testing upon intake, saturation testing (one-time testing of an entire population at a location to detect potential asymptomatic positive cases), and implementation of testing protocols for transfers and removals. As of the end of FY 2020, seventy-four facilities were testing all new intakes, and ICE ERO has continued to expand saturation testing at multiple sites across the country. From the initial test in February 2020 through the end of FY 2020, more than 42,000 detainees had been tested for COVID-19, and the agency continues to publish the latest data on testing at ice.gov/coronavirus.

As a result of the extensive pandemic mitigation measures ICE has implemented, as well as a sharp decrease in arrivals at the Southwest Border, initial book-ins to ICE custody as well as the overall Average Daily Population (ADP) in ICE custody decreased significantly in FY 2020. However, the non-detained docket,  which contains more than 3.26 million cases of aliens in all stages of the immigration process across the country, has remained consistent throughout FY 2020 as the pandemic slowed the previously growing national docket.

*ICE Initial Book-Ins from CBP Apprehensions*

When an alien is apprehended by CBP, he or she may be returned immediately by CBP or transferred to ICE custody pending removal proceedings or execution of a removal order. An initial book-in to an ICE detention facility is defined as the first time an alien enters ICE custody for a detention stay and does not include transfers between facilities. In FY 2020, ICE ERO experienced a decline in overall book-ins from CBP largely due to border closures and fewer apprehensions at the border throughout the global pandemic, as well as CBP's use of Title 42 authority. During FY 2020, initial book-ins to ICE custody from CBP declined by 78 percent over FY 2019.

Overall, there were 182,869 initial book-ins to ICE custody in FY 2020 resulting from both CBP and ICE ERO arrests. These began to decline sharply in April 2020, coinciding with changes resulting from the global pandemic. Forty-five percent of initial book-ins were turned over from CBP in FY 2020, compared to 73 percent in FY 2019.

6

**Figure 1: FY 2018 – FY 2020 ICE Initial Book-Ins by Arresting Agency**



**Figure 2: FY 2019 – FY 2020 ICE Initial Book-Ins by Arresting Agency and Month**



*ICE Average Daily Population*

ICE ERO's ADP measures the number of individuals in ICE custody on an average day during the fiscal year. In FY 2020, the ADP was 33,724, a decline of 33 percent compared to FY 2019. Like ICE ERO's initial book-ins, the decrease in ADP in FY 2020 was driven by a reduction in

7

AR2022_301525

CBP apprehensions turned over to ICE for detention and removal, as well as necessary mitigation measures due to COVID-19.

**Figure 3: FY 2018 – FY 2020 Average Daily Population by Arresting Agency**



**Figure 4: FY 2019 – FY 2020 Average Daily Population by Arresting Agency and Month**

8

*Detained Population*

ICE ERO detains individuals to secure their presence for immigration proceedings and removal from the United States, with detention resources focused on those who represent a danger to persons or property, for whom detention is mandatory by law,[7] or who may be a flight risk.

While ICE ERO has temporarily drawn down its detained population to 75 percent or less in line with CDC and working group guidance, it has continued to detain a relatively small number of aliens during the pandemic. In general, ICE's detained population of between 20,000 and 50,000 represents a small fraction of the overall number of removal cases it manages nationwide, which stood at more than 3.26 million at the end of FY 2020.

From March 1 through August 1, 2020, ICE's detained population decreased by 44 percent, and by the end of FY 2020 the detained population stood at just 19,068 - 63 percent less than at the end of FY 2019. The majority of those detained were subject to mandatory detention (63 percent) and of the remaining 37 percent who were not subject to mandatory detention, 71 percent had criminal convictions and/or pending criminal charges.

These significant decreases came as direct result of COVID-19 mitigation efforts, as well as extremely low numbers of arrivals at the Southwest Border during the pandemic. However, DHS and its component agencies have handled multiple historic migration surges at the Southwest Border since 2014, with ICE's detained population peaking at more than 55,000 during the summer of 2019. Because COVID-19 has severely impacted the global economy, once pandemic conditions begin to resolve within the United States, ICE anticipates that migration may meet or surpass pre-pandemic levels, and the agency will require adequate resources to address such a shift.

---

[7] Under the Immigration and Nationality Act (INA), ICE may not release any alien subject to mandatory detention unless ordered to do so by a judge, and these provisions have been upheld by the Supreme Court.

9

**Figure 5: FY 2018 – FY 2020 Currently Detained Population Snapshots by Arresting Agency**



*Average Length of Stay (ALOS)*

The average length of stay (ALOS) represents the average amount of time an alien is detained in ICE custody. While ICE ERO's ALOS has been decreasing for several years, in FY 2020, the downward trend reversed for an overall ALOS of 63.5 days.

Although the average length of stay remained relatively stable from October 2019 until March 2020, it increased significantly in April 2020, the first full month of the COVID-19 pandemic. The pandemic has resulted in a number of factors which have significantly changed the removal landscape, including closure of the Southwest Border, courts not operating normally and processing times increasing significantly, limited availability of commercial flights, CDC recommendations for 14-day cohorting to reduce the spread of illness in detention, and foreign governments which have denied or delayed the return of their nationals. As a result, while ALOS is complex, ICE's analysis shows that pandemic-related factors played a major role in this increase.

10

AR2022_301528

**Figure 7: FY 2018 – FY 2020 Average Length of Stay by Arresting Agency**



*ICE Non-Detained National Docket*

ICE ERO manages cases amenable to removal going through the immigration process via the ICE Non-detained National Docket. The national docket includes all aliens in removal proceedings and encompasses both the smaller detained docket and the much larger non-detained docket. Cases on the non-detained docket include aliens who are both pre- and post-final order, and who have been released on parole, bond, an Order of Recognizance, or an Order of Supervision. In FY 2020, the number of aliens on ICE's non-detained national docket remained consistent with FY 2019 at 3.26 million cases.

**Figure 8: End of FY 2020 ICE National Docket Snapshot**



11

*Alternatives to Detention*

ICE ERO's ATD program uses technology and case management to monitor aliens' court appearances and compliance with release conditions while their removal proceedings are pending on the non-detained immigration court docket. ATD is not a substitute for detention, but instead complements immigration enforcement efforts by offering increased supervision for a subset of eligible aliens who are not currently detained.

ATD may serve as an appropriate additional layer of supervision for an alien who is released from detention pursuant to an Order of Recognizance, an Order of Supervision (for aliens already subject to final removal orders), a grant of parole, or a bond. Adults age 18 and over may be eligible for participation in ATD but must be thoroughly vetted by ERO officers, who review an alien's criminal, immigration, and supervision history, family and/or community ties, status as a caregiver or provider, and humanitarian or medical considerations when making enrollment determinations in order to determine whether a candidate is likely to comply with the terms of the program. ICE ERO typically utilizes ATD to encourage compliance for aliens who may be a flight risk but either lack a criminal history or the criminal history is minor or non-violent. ICE ERO strongly recommends against the use of ATD to monitor those who have been accused of serious and violent criminal activity, as it does nothing to prevent such an individual from reoffending or to protect the initial victim.[8]

While ICE ERO has expanded its use of ATD from approximately 23,000 participants in FY 2014 to 90,000 as of the end of FY 2020, this expansion has come with a number of challenges, including increasing levels of absconders among both single adult enrollees as well as family units. Between FY 2019 and FY 2020, the absconder rate[9] for family units increased from 26.9 percent to 39 percent, while the absconder rate among single adults increased from 12.3 percent to 21 percent. Overall, FY 2020 saw a 33 percent absconder rate for ATD participants, demonstrating the growing challenges that large numbers of ATD enrollments create for immigration enforcement.

Additionally, there are currently over 3.26 million cases assigned to the non-detained docket. With approximately 5,300 ERO officers across 24 field offices, ICE ERO's ability to closely monitor the majority of cases on its non-detained docket and to provide robust case management for this segment of the population is extremely limited. On average, participants currently spend between 14 and 18 months enrolled in the program before they are removed or terminated from the program to make room for new participants who have recently entered the United States and/or those who are being released from ICE custody.

---

[8] *See Matter of Urena*, 25 I&N Dec. 140 (BIA 2009) (holding that aliens posing a danger to the United States should be detained without bond pending their removal proceedings, as conditions of release only mitigate the risk of flight).

[9] Absconder Rate = Count of Absconders/Count of Overall Terminations. ICE calculates the percentage of absconders by looking at the overall number of aliens who concluded the ATD program in a given time period ("overall terminations"), and the number of those terminations which occurred due to a participant absconding.

AR2022_301530

Ultimately, because ICE ERO lacks sufficient resources to keep all current participants enrolled through the pendency of their removal proceedings, or to locate and arrest the significant number of participants who abscond, current problems with the ATD program will only be exacerbated by enrolling greater numbers of participants without the addition of appropriate case management and enforcement resources. While ICE ERO has continued to expand the use of ATD to monitor the non-detained population in FY 2020, particularly in light of the pandemic, the program will need to be further resourced in order to appropriately monitor participants, including through the addition of officers who can locate, arrest, and remove those who fail to adhere to conditions of enrollment.

**ERO Administrative Arrests**

ICE ERO arrests aliens for administrative violations of United States immigration law. ICE ERO conducts enforcement actions based on intelligence-driven leads in communities nationwide (at-large arrests) and also works with prisons and jails to identify aliens who are amenable to removal and who have been arrested by state or local authorities for criminal activity (custodial arrests).

Due to the COVID-19 pandemic, in March 2020 ICE ERO temporarily adjusted its enforcement posture to narrowly focus enforcement efforts on public safety risks and individuals subject to mandatory detention based on criminal grounds. ERO officers have continued to undertake enforcement actions during the pandemic and have implemented procedures to effectively perform their duties in light of COVID-19. However, ICE enforcement activities, including ERO administrative arrests, slowed sharply for several months during the spring and summer, contributing to a lower number of arrests overall during the fiscal year. There were 103,603 ERO administrative arrests in FY 2020, a 28 percent decline from FY 2019, with similar declines in both at-large and custodial arrests.

While ICE ERO administrative arrests have declined since FY 2019, ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to public safety and security threats to the United States. As a result, the majority of aliens arrested by ICE ERO are convicted criminals, followed by those with pending criminal charges at the time of arrest. In FY 2020, 90 percent of ICE ERO's administrative arrests were for aliens with criminal convictions or pending criminal charges while the remaining 10 percent were other immigration violators.[10] Many of those arrested have extensive criminal histories with multiple criminal convictions or pending charges, and the agency continued to carry out its key public safety mission during the pandemic by locating and arresting such aliens. Of the 93,061 ERO administrative arrests with criminal convictions or pending criminal charges in FY 2020, the criminal history for this group

---

[10] ICE defines immigration violators' criminality in the following manner: Convicted Criminal: Immigration Violators with a criminal conviction entered into the ICE system of record at the time of the enforcement action; Pending Criminal Charges: Immigration Violators with pending criminal charges entered into the ICE system of record at the time of the enforcement action; Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into the ICE system of record at the time of the enforcement action.

13

AR2022_301531

included more than 374,000 total criminal convictions and pending charges as of the date of arrest – an average of four per alien.

**Figure 9: FY 2018 – FY 2020 ERO Administrative Arrests by Criminality**



**Figure 10: FY 2019 – FY 2020 ERO Administrative Arrests by Month**



14

**AR2022_301532**

### Figure 11: FY 2018 – FY 2020 At-Large Arrests by Criminality



### Table 1: FY 2020 Criminal Charges and Convictions for ERO Administrative Arrests[11, 12]

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Traffic Offenses – DUI | 20,091 | 35,716 | 55,807 |
| Dangerous Drugs | 15,265 | 36,647 | 51,912 |
| Traffic Offenses | 19,910 | 29,009 | 48,919 |
| Immigration | 7,637 | 40,921 | 48,558 |
| Assault | 17,232 | 20,015 | 37,247 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 7,310 | 6,949 | 14,259 |
| General Crimes | 5,895 | 7,166 | 13,061 |
| Larceny | 3,459 | 8,847 | 12,306 |
| Obstructing the Police | 4,386 | 6,815 | 11,201 |
| Fraudulent Activities | 2,977 | 5,888 | 8,865 |

[11] The specific criminal charges and convictions represent the criminal history as entered in the ICE system of record based on the FBI's National Crime Information Center (NCIC) offense codes. Each alien may have multiple criminal convictions or charges at the time of their administrative arrest, and Table 1 lists categories which accounted for at least 1,000 combined charges and convictions among those who were administratively arrested by ERO in FY 2020.

[12] Notes: "Traffic Offenses" include (besides Traffic Offenses – DUI which is listed separately) Hit and Run, Transport Dangerous Material, and Traffic Offense. "Immigration" offenses include Illegal Entry, Illegal Reentry, False Claim to U.S. Citizenship, and Alien Smuggling. "Obstructing Judiciary, Congress, Legislature, Etc.," refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear. "General Crimes" include Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

15

AR2022_301533

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Burglary | 1,988 | 6,149 | 8,137 |
| Weapon Offenses | 2,688 | 5,426 | 8,114 |
| Public Peace | 2,695 | 4,114 | 6,809 |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,733 | 4,184 | 5,917 |
| Sexual Assault | 1,334 | 3,051 | 4,385 |
| Invasion of Privacy | 1,512 | 2,817 | 4,329 |
| Family Offenses | 1,880 | 2,336 | 4,216 |
| Robbery | 883 | 2,933 | 3,816 |
| Stolen Vehicle | 1,104 | 2,697 | 3,801 |
| Forgery | 1,095 | 2,240 | 3,335 |
| Damage Property | 1,434 | 1,652 | 3,086 |
| Liquor | 1,602 | 1,424 | 3,026 |
| Flight / Escape | 1,010 | 1,647 | 2,657 |
| Stolen Property | 808 | 1,674 | 2,482 |
| Homicide | 369 | 1,468 | 1,837 |
| Kidnapping | 736 | 901 | 1,637 |
| Health / Safety | 398 | 659 | 1,057 |

**Criminal Arrests and Prosecutions**

In addition to arresting aliens for administrative violations of immigration law, ICE ERO also conducts criminal arrests and assists with pursuing prosecutions related to such criminal activity. In FY 2020, ERO enforcement activities resulted in 4,360 criminal arrests (a 35 percent decline from FY 2019), 4,479 charges (a 34 percent decline from FY 2019), and 5,397 convictions (a 24 percent decline from FY 2019). These efforts resulted in the prosecutions of offenses which include, but are not limited to: 8 U.S.C. § 1253, Penalties Related to Removal, U.S.C § 1325, Illegal Entry into the United States; 8 U.S.C § 1326, Illegal Re-Entry of Removed Alien; 18 U.S.C. § 1361, Destruction of Government Property, 18 U.S.C § 1546, Fraud and Misuse of Visas, Permits and Other Documents; 18 U.S.C § 111, Assaulting and/or Resisting an Officer; and 18 U.S.C § 922(g)(5), Felon in Possession of a Firearm.

16



Figure 12: FY 2018 – FY 2020 Prosecution Statistics

## ICE Detainers

A detainer is a request from ICE to local law enforcement agencies to notify DHS as early as practicable before a removable alien is released from local custody. Detainers also request that local law enforcement agencies maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise be released, which allows DHS to assume custody for removal purposes in accordance with federal law.

Detainers reduce potential risks to ERO officers, removable aliens, and the general public by allowing arrests to be made in secure custodial settings as opposed to at-large in communities. The use of detainers also conserves scarce government resources and allows ICE ERO to assume custody of criminal aliens before they have an opportunity to reoffend. In FY 2020, ICE ERO issued 122,233 detainers, and the aliens who were the subjects of these detainers had criminal histories[13] including, but not limited to, the following crimes: more than 1,900 homicide-related offenses, 1,900 kidnappings, 3,600 robberies, 42,800 assaults, and 11,900 sex crimes.

Similar to other decreases in interior enforcement activity due to COVID-19, the number of detainers issued in FY 2020 declined by 26 percent. Reduced detained populations in state and local jails, along ICE ERO's own temporary reduction in enforcement activity early in the pandemic, likely contributed to this decrease. However, ICE also continues to encounter jurisdictions that do not cooperate with its enforcement efforts and estimates that limited visibility into state and local law enforcement activities in non-cooperating jurisdictions also

---

[13] "Criminal history" includes all criminal convictions and pending charges associated with the group of aliens who were the subjects of detainers in FY 2020. Criminal charges may be added or dropped at any point and convictions may be overturned, so this data is a snapshot in time but is representative of the serious criminal histories and corresponding public safety risk associated with this group of individuals.

17

impacted the number of detainers issued. Additionally, the court's ruling in *Gonzalez v. U.S. Immigr. and Customs Enf't*, 416 F. Supp. 3d 995 (C.D. Cal. 2019), which limited the agency's ability to lodge biometric detainers, may have further contributed to reduced activity in this area.

**Figure 13: FY 2018 – FY 2020 ICE ERO Detainers Issued**



## ICE Removals

An ICE removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States.[14] ICE removals include both aliens arrested by ICE ERO in the interior of the country and aliens who are apprehended by CBP and subsequently turned over to ICE ERO for removal. While ICE removal operations continued throughout FY 2020, the overall removal number decreased due to 1) much lower numbers of aliens arriving at the Southwest Border, 2) CBP's use of Title 42 authority, 3) a temporary decrease in ICE ERO enforcement actions within the interior of the country, 4) precautions taken by ICE ERO to help ensure the safety of those being removed, as well as staff and contractors, 5) restrictions on air travel, and 6) the reluctance of a number of countries to accept the return of their nationals early on in the pandemic. In FY 2020, ICE ERO conducted 185,884 removals, a 30 percent decrease over FY 2019. However, ICE ERO noted significant increases in removals to countries that were previously non-cooperative, including Bangladesh, Cuba, Haiti, and India, a direct result of engagement efforts by ICE and the Department of State (**Appendix B**).

---

[14] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens who have received a final order of removal, as well as those who have been processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VRs after June 1st, 2013 and not detained by ICE are primarily processed by the USBP. CBP should be contacted for those statistics.

18

During the pandemic, ICE ERO has taken significant steps toward safeguarding aliens with final orders of removal and does not remove any detainee who is confirmed or suspected of having COVID-19. Medical checks occur at several stages in custody, and if an individual exhibits symptom of respiratory disease, he or she is referred to a medical provider and segregated from others. Additionally, while the CDC recommends a temperature threshold of 100.4 degrees, out of an abundance of caution ICE ERO has lowered this threshold even further, to 99 degrees. Temperature checks are performed no more than 12 hours before a detainee's departure, and anyone recording a temperature of 99 degrees or higher or exhibiting symptoms of a health condition that is potentially contagious to other detainees, staff, or third parties is denied boarding and referred for further screening and evaluation. All detainees must wear a mask prior to arrival at the flight line, and ICE ERO also conducts COVID-19 testing prior to removal where deemed warranted/practicable and by specific bilateral arrangement with a given nation's government.



**Figure 14: FY 2018 – FY 2020 ICE Removals**

AR2022_301537

**Figure 15: FY 2018 – FY 2020 ICE Removals by Arresting Agency**



**Figure 16: FY 2018 – FY 2020 ICE Removals by Arresting Agency and Month**



*Title 42 Expulsions*

In addition to the removal of aliens represented in Figures 14, 15, and 16, during FY 2020, ICE ERO also assisted CBP with a subset of Title 42 expulsions. While individuals returned to their last transit point or countries of origin under Title 42 authority represent CBP "expulsions" rather than ICE removals, ICE plays a supporting role in this process.

20

During the COVID-19 pandemic, the CDC determined the potential introduction and spread of the virus in CBP stations and facilities presented a serious danger to migrants, CBP's frontline agents and officers, and the general populace. As a result, the U.S. Department of Health and Human Services issued an order pursuant to its authority under 42 U.S.C. §§ 265 and 268, which directs that DHS assist it in preventing the introduction into the United States persons who create a serious danger of introducing communicable diseases. On March 21, the CDC issued an order under Title 42 for assistance by DHS customs officers. Under this authority, illegal border crossers may be expeditiously returned to their country of last transit – Canada or Mexico – or, when such a return is not possible, to their country of origin. While both CBP and ICE are tasked with supporting the CDC in the application of Title 42, CBP determines which aliens are subject to Title 42 expulsions, while ERO's role is limited to obtaining a foreign government's authorization to receive Title 42 expulsions, as well as coordinating such expulsions. In FY 2020, from March 23 to September 30, ICE ERO assisted with more than 17,000 air charter expulsions under Title 42.

*Removals of USBP Apprehended Family Units and Unaccompanied Alien Children*

Since the initial surge at the Southwest Border in FY 2014 and through the start of FY 2020, the United States border experienced a sustained increase in arrivals of both family unit members and Unaccompanied Alien Children (UAC). The large number of arrivals placed a strain on DHS resources at the border, as well as United States Government resources in the interior of the country. During FY 2018, FY 2019, and FY 2020 as a whole, the U.S. Border Patrol (USBP) apprehended 601,534 family unit members and 148,012 UAC, while ICE ERO removed only 22,912 family unit members and 15,978 UAC during the same time period – a 3.8 percent and 10.8 percent removal rate, respectively.[15] Although apprehensions at the Southwest Border decreased during the COVID-19 pandemic, ICE anticipates a renewed increase in border arrivals once pandemic conditions in the United States subside, which may pose significant resource and policy challenges for the United States Government and DHS agencies.

In FY 2020 ICE ERO removed 14,499 aliens identified as family unit members based on USBP apprehension data from the initial surge in FY 2014 through FY 2020. Although these removals represent only a small percentage of overall family unit apprehensions, they increased by 154 percent from FY 2019, primarily as a result of the Electronic Nationality Verification (ENV) Program, which began in July 2019 and reduces time spent in detention by returning nationals of participating countries (currently El Salvador, Guatemala, and Honduras) in an expeditious manner by verifying nationality electronically. However, ICE notes that more than 13,000 of the family unit removals in FY 2020 (90 percent) occurred between October 2019 and March 2020, and the onset of the COVID-19 pandemic resulted in a sharp decrease.

---

[15] ICE ERO removals of family unit members and UAC include all those identified as members of these populations by the USBP; some of the removals that occurred during this three-year time period may correspond to aliens who were apprehended prior to this time period.

21

In FY 2020 ICE ERO also removed 4,056 UAC who were identified as UAC from FY 2009 through FY 2020 based on USBP data.[16] The removals of UAC declined 36 percent from FY 2019.

**Figure 17: FY 2018 – FY 2020 ICE Removals of USBP-Identified Family Unit Apprehensions**



**Figure 18: FY 2018 – FY 2020 ICE Removals of Unaccompanied Alien Children**



---

[16] Removal counts are based on UAC designation at the time of initial book-in, and subjects may no longer be under the age of 18 at the time of removal.

22

*Removals by Criminality*

During FY 2020, ICE ERO maintained its commitment to removing those aliens posing the greatest risk to the safety and security of the United States. The vast majority of removals in FY 2020 were of aliens with a criminal history. For FY 2020 interior removals, meaning those who were initially arrested by ICE ERO (not CBP), 92 percent had criminal convictions or pending criminal charges.

**Figure 19: FY 2018 – FY 2020 ICE Removals by Criminality**



**Figure 20: FY 2018 – FY 2020 ICE Interior Removals by Criminality**



23

ICE ERO removals of known or suspected gang members and known or suspected terrorists (KSTs) are instrumental to the agency's national security and public safety mission. ICE ERO identifies gang members and KSTs by checking an alien's background in federal law enforcement databases, conducting interviews with aliens, and reviewing information received from its law enforcement partners, which is noted accordingly in the agency's system of record. In FY 2020, ICE ERO removed 4,276 known or suspected gang members and 31 known or suspected terrorists.

**Figure 21: FY 2018 – FY 2020 ICE Removals of Known or Suspected Gang Members**



**Figure 22: FY 2018 – FY 2020 ICE Removals of Known or Suspected Terrorists**



24

**Conclusion**

As the agency primarily responsible for immigration enforcement efforts in the interior of the United States, ICE ERO plays a critical role in upholding the immigration laws set by the United States Congress, as well as helping ensure public safety and the integrity of the immigration system. Like many other agencies, ICE ERO was significantly impacted by the COVID-19 pandemic, with effects on its workforce, its enforcement operations, and the detained population. Despite the pandemic, however, key front-line law enforcement operations such as arrests of aliens who represent a threat to public safety or border security, management of the detained population, and removals of those who have received a final order have continued to the extent possible. As of the close of FY 2020, ICE ERO personnel continue to monitor and adapt to operational conditions resulting from the pandemic, and the agency continues to prepare for a shift in operational posture once current conditions resolve.

AR2022_301543

**Appendix**
*Appendix A: Methodology*

<u>Data Source</u>
Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

<u>Data Run Dates</u>
FY2020: IIDS v.1.34 run date 10/04/2020; ENFORCE Integrated Database (EID) as of 10/02/2020
FY2019: IIDS v.1.34 run date 10/06/2019; ENFORCE Integrated Database (EID) as of 10/04/2019
FY2018: IIDS v.1.34 run date 10/08/2018; ENFORCE Integrated Database (EID) as of 10/06/2018

<u>Removals</u>
ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ERO for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY 2009, ERO began to "lock" removal statistics on October 5 at the end of each fiscal year and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. The number of removals in FY 2017, excluding the "lag" from FY 2016, was 220,649. The number of removals in FY 2018, excluding the "lag" from FY 2017, was 252,405. The number of removals in FY 2019, excluding the "lag" from FY 2018, was 262,591. The number of removals in FY 2020, excluding the "lag" from FY 2019, was 177,516.

*Appendix B: Removals by Country of Citizenship*

**Table X: FY 2018 – FY 2020 ICE Removals by Country of Citizenship[17]**

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| Total | 256,085 | 267,258 | 185,884 |
| AFGHANISTAN | 30 | 36 | 25 |
| ALBANIA | 98 | 80 | 53 |
| ALGERIA | 17 | 20 | 5 |

[17] Country of citizenship is reported as it appears in ICE's system of record at the time the data is pulled but may be updated as additional information is discovered or verified.

26

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| ANDORRA | 0 | 0 | 1 |
| ANGOLA | 32 | 40 | 43 |
| ANGUILLA | 0 | 2 | 0 |
| ANTIGUA-BARBUDA | 24 | 12 | 6 |
| ARGENTINA | 121 | 130 | 87 |
| ARMENIA | 27 | 48 | 31 |
| ARUBA | 1 | 1 | 0 |
| AUSTRALIA | 39 | 40 | 39 |
| AUSTRIA | 7 | 8 | 6 |
| AZERBAIJAN | 14 | 10 | 9 |
| BAHAMAS | 101 | 109 | 76 |
| BAHRAIN | 1 | 2 | 0 |
| BANGLADESH | 147 | 159 | 305 |
| BARBADOS | 17 | 29 | 6 |
| BELARUS | 10 | 18 | 11 |
| BELGIUM | 17 | 7 | 10 |
| BELIZE | 91 | 90 | 78 |
| BENIN | 10 | 9 | 5 |
| BERMUDA | 5 | 2 | 1 |
| BHUTAN | 1 | 1 | 0 |
| BOLIVIA | 81 | 64 | 49 |
| BOSNIA-HERZEGOVINA | 47 | 36 | 27 |
| BOTSWANA | 1 | 3 | 2 |
| BRAZIL | 1,691 | 1,770 | 1,902 |
| BRITISH VIRGIN ISLANDS | 1 | 4 | 5 |
| BRUNEI | 0 | 0 | 0 |
| BULGARIA | 34 | 21 | 21 |
| BURKINA FASO | 35 | 20 | 4 |
| BURMA | 40 | 29 | 26 |
| BURUNDI | 14 | 5 | 10 |
| CAMBODIA | 110 | 80 | 32 |
| CAMEROON | 72 | 76 | 54 |
| CANADA | 342 | 318 | 320 |
| CAPE VERDE | 68 | 50 | 15 |
| CAYMAN ISLANDS | 0 | 3 | 1 |
| CENTRAL AFRICAN REPUBLIC | 2 | 7 | 1 |
| CHAD | 13 | 3 | 1 |

27

AR2022_301545

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| CHILE | 166 | 253 | 351 |
| CHINA, PEOPLES REPUBLIC OF | 726 | 637 | 337 |
| CHRISTMAS ISLAND | 0 | 0 | 0 |
| COLOMBIA | 1,162 | 1,158 | 931 |
| COMOROS | 0 | 0 | 0 |
| CONGO | 18 | 15 | 12 |
| COSTA RICA | 162 | 176 | 130 |
| CROATIA | 12 | 9 | 4 |
| CUBA | 463 | 1,179 | 1,583 |
| CYPRUS | 3 | 1 | 2 |
| CZECH REPUBLIC | 47 | 56 | 22 |
| CZECHOSLOVAKIA | 4 | 2 | 1 |
| DEM REP OF THE CONGO | 79 | 81 | 96 |
| DENMARK | 2 | 5 | 12 |
| DJIBOUTI | 3 | 3 | 0 |
| DOMINICA | 19 | 16 | 13 |
| DOMINICAN REPUBLIC | 1,769 | 2,186 | 1,835 |
| EAST TIMOR | 0 | 0 | 0 |
| ECUADOR | 1,264 | 2,253 | 2,951 |
| EGYPT | 85 | 57 | 78 |
| EL SALVADOR | 15,445 | 18,981 | 12,590 |
| EQUATORIAL GUINEA | 5 | 5 | 7 |
| ERITREA | 62 | 49 | 37 |
| ESTONIA | 13 | 9 | 6 |
| ESWATINI | 0 | 1 | 0 |
| ETHIOPIA | 36 | 32 | 43 |
| FIJI | 21 | 11 | 9 |
| FINLAND | 3 | 3 | 4 |
| FRANCE | 85 | 78 | 83 |
| FRENCH GUIANA | 0 | 2 | 0 |
| FRENCH POLYNESIA | 0 | 2 | 0 |
| GABON | 6 | 8 | 4 |
| GAMBIA | 111 | 124 | 45 |
| GEORGIA | 20 | 38 | 44 |
| GERMANY | 72 | 77 | 63 |
| GHANA | 243 | 203 | 121 |
| GREECE | 22 | 32 | 17 |

28

AR2022_301546

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---:|---:|---:|
| GRENADA | 9 | 13 | 6 |
| GUADELOUPE | 1 | 1 | 1 |
| GUATEMALA | 50,390 | 54,919 | 29,790 |
| GUINEA | 219 | 102 | 44 |
| GUINEA-BISSAU | 5 | 4 | 0 |
| GUYANA | 142 | 125 | 84 |
| HAITI | 934 | 690 | 895 |
| HONDURAS | 28,894 | 41,800 | 21,139 |
| HONG KONG | 15 | 7 | 3 |
| HUNGARY | 81 | 71 | 44 |
| ICELAND | 2 | 0 | 1 |
| INDIA | 611 | 1,616 | 2,312 |
| INDONESIA | 110 | 77 | 62 |
| IRAN | 22 | 21 | 16 |
| IRAQ | 48 | 84 | 32 |
| IRELAND | 47 | 33 | 19 |
| ISRAEL | 93 | 89 | 52 |
| ITALY | 125 | 140 | 139 |
| IVORY COAST | 82 | 39 | 41 |
| JAMAICA | 792 | 751 | 523 |
| JAPAN | 28 | 21 | 27 |
| JORDAN | 94 | 106 | 70 |
| KAZAKHSTAN | 30 | 26 | 25 |
| KENYA | 140 | 122 | 85 |
| KIRIBATI | 0 | 0 | 0 |
| KOREA | 32 | 59 | 23 |
| KOSOVO | 14 | 15 | 13 |
| KUWAIT | 11 | 21 | 14 |
| KYRGYZSTAN | 15 | 19 | 3 |
| LAOS | 8 | 5 | 11 |
| LATVIA | 17 | 15 | 19 |
| LEBANON | 51 | 48 | 41 |
| LESOTHO | 1 | 0 | 0 |
| LIBERIA | 113 | 108 | 112 |
| LIBYA | 8 | 6 | 4 |
| LIECHTENSTEIN | 0 | 0 | 0 |
| LITHUANIA | 49 | 37 | 22 |
| LUXEMBOURG | 0 | 0 | 1 |

29

AR2022_301547

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| MACAU | 1 | 2 | 1 |
| MACEDONIA | 18 | 0 | 0 |
| MADAGASCAR | 1 | 0 | 0 |
| MALAWI | 3 | 1 | 2 |
| MALAYSIA | 11 | 9 | 11 |
| MALDIVES | 1 | 0 | 0 |
| MALI | 63 | 52 | 15 |
| MALTA | 0 | 1 | 1 |
| MARSHALL ISLANDS | 35 | 32 | 16 |
| MARTINIQUE | 0 | 0 | 0 |
| MAURITANIA | 98 | 41 | 25 |
| MAURITIUS | 0 | 1 | 0 |
| MEXICO | 141,045 | 127,492 | 100,388 |
| MICRONESIA, FEDERATED STATES OF | 99 | 91 | 24 |
| MOLDOVA | 38 | 28 | 17 |
| MONACO | 0 | 0 | 0 |
| MONGOLIA | 28 | 19 | 19 |
| MONTENEGRO | 18 | 23 | 7 |
| MONTSERRAT | 1 | 1 | 0 |
| MOROCCO | 58 | 33 | 27 |
| MOZAMBIQUE | 0 | 3 | 2 |
| NAMIBIA | 2 | 0 | 0 |
| NAURU | 0 | 0 | 1 |
| NEPAL | 45 | 162 | 97 |
| NETHERLANDS | 40 | 40 | 31 |
| NETHERLANDS ANTILLES | 2 | 6 | 4 |
| NEW CALEDONIA | 0 | 0 | 0 |
| NEW ZEALAND | 24 | 22 | 13 |
| NICARAGUA | 879 | 2,240 | 1,416 |
| NIGER | 5 | 13 | 5 |
| NIGERIA | 369 | 286 | 199 |
| NORTH KOREA | 0 | 0 | 0 |
| NORTH MACEDONIA | 0 | 15 | 10 |
| NORWAY | 7 | 9 | 11 |
| OMAN | 0 | 0 | 2 |
| PAKISTAN | 235 | 202 | 207 |

AR2022_301548

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| PALAU | 9 | 10 | 4 |
| PALESTINE | 0 | 0 | 0 |
| PANAMA | 59 | 55 | 36 |
| PAPUA NEW GUINEA | 1 | 2 | 1 |
| PARAGUAY | 6 | 7 | 9 |
| PERU | 581 | 571 | 353 |
| PHILIPPINES | 217 | 176 | 120 |
| PITCAIRN ISLANDS | 0 | 0 | 0 |
| POLAND | 123 | 135 | 102 |
| PORTUGAL | 96 | 101 | 47 |
| QATAR | 2 | 3 | 1 |
| REUNION | 0 | 0 | 0 |
| ROMANIA | 403 | 400 | 263 |
| RUSSIA | 107 | 153 | 108 |
| RWANDA | 2 | 12 | 8 |
| SAMOA | 30 | 17 | 4 |
| SAN MARINO | 0 | 0 | 0 |
| SAO TOME AND PRINCIPE | 0 | 0 | 0 |
| SAUDI ARABIA | 135 | 79 | 60 |
| SENEGAL | 125 | 55 | 52 |
| SERBIA | 30 | 31 | 16 |
| SERBIA AND MONTENEGRO | 2 | 2 | 1 |
| SEYCHELLES | 0 | 1 | 1 |
| SIERRA LEONE | 79 | 86 | 23 |
| SINGAPORE | 6 | 3 | 5 |
| SLOVAKIA | 35 | 22 | 12 |
| SLOVENIA | 1 | 1 | 2 |
| SOLOMON ISLANDS | 0 | 0 | 0 |
| SOMALIA | 229 | 151 | 112 |
| SOUTH AFRICA | 42 | 39 | 31 |
| SOUTH KOREA | 122 | 127 | 129 |
| SOUTH SUDAN | 61 | 65 | 41 |
| SPAIN | 209 | 259 | 235 |
| SRI LANKA | 36 | 112 | 119 |
| ST. HELENA | 0 | 0 | 0 |
| ST. KITTS-NEVIS | 15 | 11 | 3 |
| ST. LUCIA | 28 | 22 | 10 |

31

AR2022_301549

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| ST. PIERRE AND MIQUELON | 0 | 0 | 0 |
| ST. VINCENT-GRENADINES | 13 | 19 | 8 |
| STATELESS | 0 | 0 | 0 |
| SUDAN | 42 | 18 | 17 |
| SURINAME | 19 | 12 | 1 |
| SWAZILAND | 0 | 0 | 0 |
| SWEDEN | 19 | 21 | 9 |
| SWITZERLAND | 4 | 6 | 10 |
| SYRIA | 7 | 9 | 2 |
| TAIWAN | 27 | 51 | 42 |
| TAJIKISTAN | 8 | 4 | 4 |
| TANZANIA | 19 | 25 | 13 |
| THAILAND | 55 | 46 | 25 |
| TOGO | 24 | 16 | 14 |
| TONGA | 21 | 10 | 10 |
| TRINIDAD AND TOBAGO | 104 | 106 | 73 |
| TUNISIA | 16 | 20 | 6 |
| TURKEY | 85 | 113 | 77 |
| TURKMENISTAN | 2 | 4 | 0 |
| TURKS AND CAICOS ISLANDS | 4 | 3 | 3 |
| TUVALU | 0 | 0 | 0 |
| UGANDA | 13 | 22 | 21 |
| UKRAINE | 105 | 125 | 106 |
| UNITED ARAB EMIRATES | 2 | 3 | 3 |
| UNITED KINGDOM | 209 | 198 | 173 |
| UNKNOWN | 42 | 46 | 30 |
| URUGUAY | 47 | 51 | 28 |
| UZBEKISTAN | 41 | 45 | 49 |
| VANUATU | 0 | 0 | 0 |
| VENEZUELA | 336 | 327 | 193 |
| VIETNAM | 122 | 80 | 93 |
| YEMEN | 24 | 46 | 14 |
| YUGOSLAVIA | 5 | 3 | 6 |
| ZAMBIA | 12 | 7 | 8 |
| ZIMBABWE | 19 | 16 | 16 |

AR2022_301550

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# APPLICATION FOR A STAY OF DEPORTATION OR REMOVAL

*A decision in a stay of deportation or removal application is within the sole discretion of the Secretary of Homeland Security or his or her designee, including the Field Office Director. You may not appeal his or her decision.*

## 1. Who may file this application?

Anyone ordered deported or removed from the United States may apply for a stay of deportation or removal under 8 C.F.R. 241.6. Fill out a separate application with required documentation (see item 3) for each family member and others who will also seek a stay of deportation or removal.

## 2. Where should I submit this application?

Submit this application in person* to your local Enforcement and Removal Operations (ERO) Field Office. You can locate your nearest ERO Field Office at: http://www.ice.gov/contact/ero/index.htm

- **If you are detained,** file this application with the ERO Field Office that has jurisdiction over your custody.
- **If you are not detained,** file this application with the ERO Field Office closest to your residence. *If you have a problem delivering the application in person, contact your local ERO Field Office to see if delivery would be permitted by general mail or another delivery service.*

## 3. What identity documents do you require from me?

Provide documentation from category A, B, or C below. All documents submitted will be retained by ERO pending final disposition in your case.

(A) **Original passport** - Valid for 6 months past the time period being requested **OR**

(B) **Copy of passport** - Valid for 6 months past the time period being requested **AND** a copy of birth certificate or other identity documents **OR**

(C) **If you have no valid passport** - If your country of citizenship requires a passport for entry and you do not have a valid passport or a passport that is valid for 6 months past the time period you requested, you must provide proof that you applied for a passport or similar travel document. A copy of your application, proof of fee being paid and a copy of all documentation you submitted is required. If you receive a response that your application has been received, include a copy of that correspondence.

## 4. What evidence or documentation should I submit with this application?

- **Medical** - If the basis of your request is due to a medical condition, you must obtain documentation from your doctor regarding your medical condition, treatment, prognosis, and any assistance you need relating to your condition
- **Arrests** - Submit police reports and disposition of all arrests
- **Convictions** – Submit judgment, conviction and sentencing documents for all convictions
- **Summary** - Submit your reasons why you are requesting a stay of deportation or removal. Provide any additional documentation or evidence that would support your basis for a stay.

## 5. What fees should I submit with this application?

The fee for processing this application is $155.00. Include the fee with the application. There is no refund, regardless of the action taken. Payments must be made out to, "Department of Homeland Security" or "Immigration and Customs Enforcement". **Accepted methods of payment:** *U.S. Cash, Money Order, or Cashier's Check.*

## 6. Why could ICE reject this application?

- Incorrect fee (erroneous fee amounts will not be refunded)
- Application filed at incorrect ERO Field Office
- Multiple applicants listed on same application
- Failure to sign your application
- Failure to submit application in person
- Failure to submit required identity documents. (see item 3)
- Incorrect home (physical) address listed on application
- You are currently categorized as an ICE fugitive or you have made other attempts to hinder your deportation or removal
- When applicable, failure to completely and clearly fill out the section listed as, "Information if form prepared by other than applicant"

## 7. Why could ICE deny this application?

- Failure to submit medical documentation that supports your reason for this request, if applicable
- Failure to submit your statement or summary that explains why you submitted this request
- Record of criminal activity
- Threat to self or others
- Inaccurate, incomplete or untruthful information
- Not currently under a final order of deportation or removal
- Discretion of the Field Office Director or designee

## 8. What will happen when I submit this application?

- You may be fingerprinted (if 14 years or older)
- You may be photographed
- Your criminal history (if any) will be reviewed
- Your information will be entered into Department of Homeland Security databases.

## 9. What if this application is approved?

- You will be issued an Order of Supervision (OSUP) and be required to comply with the conditions listed in the OSUP
- You may have other conditions to comply with set by the Field Office Director or designee
- You may be required to post an OSUP bond (minimum bond amount: $1,500.00)

## 10. Why could ICE revoke my stay of deportation or removal after it is approved?

- Arrest by any law enforcement officer
- Conviction of any crime(s)
- A violation of the OSUP
- A violation of the terms of an OSUP bond
- For any reason(s) at the discretion of the Field Office Director or designee

## 11. What can happen if I submit false information?

All statements made in response to questions in this application are declared to be true and correct under penalty of perjury pursuant to 18 U.S.C. 1546. The knowing placement of false information on the application may subject you, or the preparer of the application, to criminal penalties under 18 U.S.C. 1546, and you and the preparer to civil and criminal penalties pursuant to the Immigration and Nationality Act 274C and 8 U.S.C. 1324c.

**AR2022_301551**

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# APPLICATION FOR A STAY OF DEPORTATION OR REMOVAL

## PRIVACY NOTICE

**Authority:** The collection of this information is authorized by 8 U.S.C. § 1231 and 8 CFR § 241.6.

**Purpose:** The information requested is being collected to enable U.S. Immigration and Customs Enforcement (ICE) to determine your eligibility under the Immigration and Nationality Act for a stay of deportation or removal from the United States.

**Agency Disclosure of Information:** For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the DHS/USCIS-ICE-CBP-001 Alien File (A-File), Index, and National File Tracking Systems of Records Notice (SORN), which can be viewed at **www.dhs.gov/privacy**.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within the U.S. Department of Homeland Security (DHS), as well as federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for collection, enforcement, investigatory, litigation, or other purposes.

**Providing Information to DHS:** Furnishing this information is voluntary. However, requests for stays of deportation or removal will not be considered unless this form is completed.

## PUBLIC REPORTING BURDEN

U.S. Immigration and Customs Enforcement is collecting this  information as a part of its agency mission under the Department of Homeland Security. The estimated average time to review the instructions, search existing data sources, gather and maintain the data needed and completing and reviewing this collection of information is 30 minutes (0.50 hours) per response. Responses to this collection of information are voluntary for anyone ordered deported or removed from the United States. An agency may not conduct or sponsor, and a person is not required to respond to, an information collection unless it displays a currently valid OMB Control Number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Office of the Chief Information Officer/Forms Management Officer
U.S. Immigration and Customs Enforcement 500 12th Street, SW,
Washington, DC 20536-5202
**(Do not mail your completed application to this address.)**

**NOTICE - A pending application does not preclude the execution of a final order of deportation or removal. The Field Office Director may at his or her discretion revoke the approval of this application and execute the order of removal at a date and time of his or her choosing. No advance notice is required for the execution of a final order of removal.  Additionally, provision of false information could result in the denial of your application.**

ICE Form I-246 (11/20)

AR2022_301552

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

OMB No. 1653-0021
Expires: 10/31/2023

## APPLICATION FOR A STAY OF DEPORTATION OR REMOVAL

### Action Block - For ICE Use Only

Fee/Date Stamp

☐ **GRANTED** ☐ One Year ☐ Six Months ☐ Three Months ☐ Other: _____
☐ **DENIED** ☐ Denial letter attached.
☐ **REJECTED** ☐ Incorrect Fee ☐ Application was not submitted in person ☐ Other: _____

☐ Additional information attached.

Date: _____ Decision made by: _____
*(Printed Name/Title)*

Deciding Official Signature
*(Sign in ink):* _____ Office: _____

| A-File Number: | Date: | If you are currently detained by ICE, provide the name of the detention facility: |
|---|---|---|

| Last Name: | First Name: | Middle Name: |
|---|---|---|

| Address (*Number and Street*): | Country of Citizenship: | Passport No: | Expiration Date: |
|---|---|---|---|

Apartment Number:

Length of stay requested:
☐ One year ☐ Six months ☐ Three months ☐ Other:

| Town/City: | State: | Zip Code: |
|---|---|---|

Arrested by police or other law enforcement agency (other than for immigration reasons) ☐ Yes - Documents attached ☐ No

| Telephone Number: | Cell Telephone Number: |
|---|---|

### REASON(S) FOR REQUESTING A STAY OF DEPORTATION OR REMOVAL:

### EVIDENCE SUBMITTED (attached):

☐ Medical ☐ Brief ☐ Other *(specify)*: _____

I certify under penalty of perjury that the information provided and contained herein is true and correct to the best of my knowledge and belief:

_____ _____
*(Printed Name)* *(Signature) (Sign in ink)*

### INFORMATION IF FORM PREPARED BY OTHER THAN APPLICANT:

I declare under penalty of law that this document was prepared by me at the request of the applicant and is based on all information of which I have knowledge. I understand that providing false information on behalf of the applicant could result in criminal prosecution and, upon conviction, a fine or imprisonment or both.

_____ _____
*(Printed Name)* *(Signature) (Sign in ink)*

_____ _____ _____ _____ _____
*(Telephone Number)* *(Street Address)* *(City)* *(State)* *(Zip Code)*

ICE Form I-246 (11/20)

**AR2022_301553**





# ICE Annual Report
## Fiscal Year 2020

December 23, 2020



U.S. Immigration and Customs Enforcement

AR2022_301554

## A Message from the Senior Official Performing the Duties of the Director



I am pleased to present the following "ICE Annual Report" for Fiscal Year (FY) 2020.

Despite a year of unprecedented challenges, including the 2019 novel coronavirus disease (COVID-19) pandemic and civil unrest, the steadfast men and women representing the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) continued their congressionally mandated mission to promote homeland security and public safety through the criminal and civil enforcement of federal laws. The following report is a tribute to the efforts, resilience and effectiveness of the ICE workforce.

In FY 2020, ICE reevaluated its physical, office footprint. Where possible, ICE rapidly and successfully pivoted from a predominantly in-person, paper-based workforce to a digital, telework environment. However, as a law enforcement agency, not every ICE employee could shift to remote work. Dedicated ICE employees continued to appear in-person, regardless of personal risk, to properly and safely carry out operations.

No matter where ICE employees work, they got the job done. ICE's Enforcement and Removal Operations conducted 103,603 administrative arrests, approximately 90% involving aliens with criminal convictions or pending criminal charges. Homeland Security Investigations launched Operation Stolen Promise to combat criminals exploiting the pandemic for illegal financial gain, resulting in 132 criminal arrests and $18.8 million in disrupted transactions and recovered funds. In addition, the Office of the Principal Legal Advisor litigated hundreds of COVID-19 related habeas corpus petitions filed across the country and Management and Administration worked tirelessly to enhance telework and video teleconferencing capabilities, along with increasing network connectivity, for an ICE workforce of 21,000 strong.

Finally, I would be remiss not to highlight the measures taken by ICE to engage with the U.S. Department of State to bring home U.S. citizens and legal permanent residents stranded abroad due to the COVID-19 pandemic. Thanks to ICE's continued operational efforts, this exceptional workforce secured 1,057 homebound flights on the return leg of removal flights via ICE Air Operations.

I offer my sincere appreciation for the integrity, professionalism and compassion with which this workforce dutifully fulfills its public service.

Sincerely,

**Tony H. Pham**
Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement



# U.S. Immigration and Customs Enforcement

# FY 2020 Annual Report

## Table of Contents

A Message from the Senior Official Performing the Duties of the Director ...................2

Enforcement and Removal Operations ..........................................................................4

    ICE Health Service Corps ........................................................................................6

Homeland Security Investigations.................................................................................8

Management and Administration................................................................................ 11

Office of Partnership and Engagement ..................................................................... 12

Office of Professional Responsibility.......................................................................... 16

Office of the Principal Legal Advisor ......................................................................... 18

# Enforcement and Removal Operations



## Mission

ICE Enforcement and Removal Operation's (ERO) mission is to protect the homeland through the arrest and removal of aliens who undermine the safety of U.S. communities and the integrity of U.S. immigration laws. This mission remains consistent and is carried out through the arrest and removal of aliens who undermine the safety of our communities and the integrity of our immigration laws.

During FY 2020, the COVID-19 pandemic has affected nearly every facet of ERO operations. However, despite the pandemic, ERO has been able to continue to fulfill its mission and operations with the utmost professionalism.

## Effectuating Removals

In FY 2020, ICE removed **185,884** aliens.

- **118,949**, or **64%**, had criminal convictions or pending criminal charges.
  - Overall, in FY 2020, there were a total of **399,235** criminal convictions and pending charges against those aliens removed by ICE.
- **4,276** were known or suspected gang members.
- **31** were known or suspected terrorists.
- **14,499** were family units.
- **4,056** were unaccompanied alien children (UAC).
- The ERO Removal Division's ICE Air Charter Operations coordinated a record-breaking **76** Special High-Risk Charters[1] to 61 countries, **six** of which were new countries it had not previously visited: Jordan, Albania, Bulgaria, Turkey, Romania and Mongolia, effectuating **3,278** removals. This is a **160%** increase in total removals via Special High-Risk Charter flights compared to FY 2019.

## High-Profile Removals

In FY 2020, ERO officers removed more than **350**[2] high-profile removal[3] cases from the United States.

- Specifically, on September 23, 2020, ERO officers removed Saudin Agani, a citizen of Bosnia and Herzegovina, via an ICE Air Operations charter flight without incident who provided material support to a terrorist organization and was the relative of the suspect who attacked two New York City police officers in 2020.

---

[1] Special High-Risk Charter flights are scheduled to countries or regions on an as-needed basis to remove aliens who fail to comply with removal efforts, aliens with serious medical conditions and other high-profile removals with final orders of removal.

[2] ICE notes that the High-Profile Removals are maintained through a manual count from the field offices and are not tracked in ICE's system of record.

[3] High-Profile Removals are removals that garner congressional, media or foreign government interest. The objective of the High-Profile Removal (HPR) Program is to provide ERO leadership with visibility.

# Enforcement and Removal Operations

## 287(g) Program

The 287(g) Program serves as a force multiplier for ICE at the state and local level and is one of ICE's top partnership initiatives. Participation by law enforcement agencies (LEAs) is voluntary and requires execution of a memorandum of agreement (MOA)[4] between ICE and the partnering LEAs.

ICE has significantly improved public safety through increased 287(g) partnerships. At the close of FY 2020, ICE had **150** signed MOAs with partnering LEAs.

## Conducting Arrests

ICE officers have continued to undertake enforcement actions and have implemented procedures to effectively perform their duties in spite of the COVID-19 pandemic.

In FY 2020, ICE placed **122,233** immigration detainers and conducted **103,603** administrative arrests.

- ICE arrested **4,067** known or suspected gang members, including **675** from MS-13.
- ICE arrested **34** known or suspected terrorists.
- ICE conducted **23,932** at-large arrests.
- Overall, in FY 2020, approximately **90%** of those aliens arrested by ICE had criminal convictions and/or pending charges.

## FY 2020 Operations

**Operation Cross Check XI:**

In September 2020, ICE announced the results of enforcement actions targeting removable aliens who had been arrested, or had pending charges or convictions, for crimes involving victims.

- Data captured between July 13 to September 19, 2020, shows that ICE officers arrested more than **2,700** at-large individuals living illegally in the United States, or who were removable due to their criminal histories.
- About **85%** of those arrested by ICE on immigration charges had criminal convictions or pending criminal charges.
- Of the arrests conducted during Operation Cross Check XI, there were more than **5,800** criminal convictions and more than **3,200** pending charges associated with those arrests. The aliens who were the subjects of these arrests had criminal histories including, but not limited to, the following charges and convictions: more than **1,500** assaults, more than **340** sex crimes, nearly **200** weapon offenses, more than **50** robberies and **31** homicide offenses.

## Returning Citizens Impacted by COVID-19 to the United States

The unprecedented global challenge resulting from the COVID-19 pandemic affected a great number of Americans abroad. Many Americans found themselves stranded outside of the United States with very limited options available to return. ICE, working with the U.S. Department of State, has flown home a total of **1,057** U.S. citizens and lawful permanent residents (LPRs) on the return leg of removal flights via ICE Air Operations. U.S. citizens and LPRs occupied the available seats on flights to the United States.

---

[4] The MOA sets forth the scope of the authority, training requirements, and the terms of ICE supervision. It also requires partnering LEAs to follow DHS and ICE policies when its designated immigration officers perform delegated immigration law enforcement functions.

# ICE HEALTH SERVICE CORPS

## ICE Detainee Health Care

The ICE Health Service Corps (IHSC) is committed to providing the safe delivery of high-quality health care to those in ICE custody, and strives to be the best health care delivery system in detention and correctional health care.

## About ICE Health Service Corps

IHSC is a component within ERO and the only entity within ICE responsible for providing direct health care to detainees. IHSC is a high-performing, results-producing workforce made up of a multi-sector, multidisciplinary staff of approximately **1,700** authorized positions that include U.S. Public Health Service (PHS) Commissioned Corps officers, federal General Schedule (GS) civil servants, and contract health professionals. IHSC administers a detention health system that provides direct health care through ICE-owned facilities; oversees care for ICE detainees housed in contracted facilities; reimburses for off-site health care services detainees receive while in ICE and U.S. Customs and Border Protection (CBP) custody; and supports special operations missions.

## FY 2020 Detainee Health Care at a Glance

- ICE managed the care and custody of detainees from more than **180** countries.
- ICE provided comprehensive medical, dental and public health services to all those in its custody.
- In FY 2020, ICE executed a budget exceeding **$315 million** on medical, dental and public health services to detainees.
- In FY 2020, IHSC administered a health system that delivered health care to approximately **99,670** detainees at **20** facilities nationwide and oversaw health care for more than **169,000** additional detainees housed in **148** non-IHSC-staffed facilities nationwide, to include:
  - **99,219** intake screenings.
  - **3,048** emergency room visits.
  - **15,571** dental visits.
  - **19,367** urgent care visits.
  - **123,936** sick calls.
  - **68,985** mental health interventions.
  - **270,222** prescriptions filled.
  - **52,278** physical exams.
- ICE published its first annual health services report detailing the health care system and services provided in FY 2020[5].

## ICE Prevention and Mitigation Strategies to Combat COVID-19 in Detention Facilities

- IHSC medical and operational personnel monitor and review the Center for Disease Control and Prevention's (CDC) guidance daily, continue to incorporate CDC guidance into its existing infectious disease monitoring and management protocols and issue guidance to IHSC staff and ICE detention contractors.
- ERO released and continues to update the *COVID-19 Pandemic Response Requirements* (PRR)[6], a guidance document developed in consultation with the CDC that builds upon previously issued guidance to ensure that ICE detainees are appropriately housed and that available mitigation measures are implemented.

[5] https://www.ice.gov/doclib/coronavirus/detaineeHealthCareOverview.pdf
[6] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf

## ICE Health Service Corps

- In March 2020, ICE convened a working group of medical professionals, disease control specialists, detention experts and field operators to identify enhanced steps to minimize the spread of COVID-19.
  - As a result of the working group, ERO asked local jails to meet a target of **75%** of population capacity as quickly as possible. ICE set a target of **70%** of population capacity for its dedicated facilities, exceeding CDC guidelines of **75%**.
- Comprehensive protocols remain in place for the protection of staff and detainees in accordance with CDC guidance.
- Despite nationwide testing shortages, ICE has continued to evaluate its testing process and increase its testing capabilities since the COVID-19 pandemic began.
- **74** facilities are currently testing all new admissions.
- ICE has also begun to expand saturation testing[7] at its sites across the country.
- From the initial test in February 2020 through the end of FY 2020, ICE tested more than **42,000** detainees for COVID-19 and administered **52,278** physical exams[8].

---

[7] Saturation testing refers to one-time testing of an entire population at a location to detect potential asymptomatic cases.
[8] https://www.ice.gov/coronavirus

# Homeland Security Investigations



## Mission

Homeland Security Investigations (HSI) investigates, disrupts, dismantles terrorist, transnational and other criminal organizations that threaten or seek to exploit the customs and immigration laws of the United States.

## About

HSI is the principal investigative arm of DHS, responsible for investigating transnational crime and threats, specifically those criminal organizations that exploit the global infrastructure through which international trade, travel and finance move.

## FY 2020 at a Glance

Despite the extraordinarily challenging conditions resulting from the COVID-19 pandemic, HSI remained true to its core mission of protecting the homeland from transnational crime and threats. In FY 2020, HSI achieved the following statistical accomplishments:

- Arrested **31,915** criminal violators.
- Seized more than **1.4 million pounds** of narcotics, including **6,105 pounds** of fentanyl, a **65%** increase from FY 2019.
- Seized **$1.8 billion** in criminally derived proceeds and assets.
- Confiscated **6,688** weapons.
- Conducted **3,671** gang-related criminal arrests.
- Identified and rescued **1,012** victims of child exploitation and **418** victims of human trafficking.
- Disrupted and dismantled countless transnational criminal organizations.

HSI continued to lead the fight against America's ongoing opioid epidemic and maintained efforts to take dangerous narcotics and deadly weapons off our streets and violent gang members out of our communities. HSI prioritized crimes of victimization by investigating and arresting those exploiting children and arresting those involved in human trafficking, as well as rescuing victims. HSI sustained its efforts to protect the integrity of our financial and trade systems, investigating international money laundering, intellectual property theft, and financial fraud and seizing illicit proceeds and assets from criminals seeking to profit from their crimes. HSI enforced sanctions against China, Iran, Russia and North Korea, and prevented the illegal export of sensitive technology and weapons intended for our adversaries. HSI continued to combat terrorism and mitigate other significant national security threats and remained committed to using cutting-edge investigative techniques and tactics to infiltrate and take down notorious dark net marketplaces that traffic weapons and narcotics, launder money and finance terrorism. These efforts helped secure our borders, protected national security and ensured the safety of our communities and citizens.

## Homeland Security Investigations

### 2020 Programmatic Highlights

- **Operation Stolen Promise:** HSI launched Operation Stolen Promise in April 2020 to protect the homeland from the increasing and evolving threat posed by COVID-19 related fraud and criminal activity. Operation Stolen Promise combines HSI's expertise in global trade, financial, cyber-crime and intelligence-driven investigations to combat financial fraud schemes, the importation of prohibited pharmaceuticals and medical supplies, websites defrauding consumers and other COVID-19 criminal activity that compromises legitimate trade or financial systems that endanger the public.

  - **1,396** COVID-19 related seizures.
  - **132** criminal arrests.
  - **$18,805,833** disrupted transactions and recovered funds.

- **Operation Silent Night:** HSI's Operation Silent Night is a global operation targeting the smuggling of firearm silencers into the United States from China. The operation is led by the National Targeting Center – Investigations, and targets the manufacturer, supply chain and end users of this contraband. HSI's efforts on this operation help to keep dangerous weapons parts out of the hands of criminal organizations and off our streets.

  - **25,492** firearm silencers seized.
  - **2,305** firearms seized.
  - **99** criminal arrests.

- **Operation Legend:** In FY 2020, HSI was a key contributor to the U.S. Department of Justice (DOJ)-led initiative to combat violent crime in U.S. cities. HSI's participation in this operation in the cities of Chicago, St. Louis, Memphis, Albuquerque and Detroit resulted in **429** criminal arrests, including: **264** gang members, **47** search warrants; the seizure of nearly **1,200 pounds** of illegal drugs, **215** firearms and more than **$512 million** in illicit proceeds.

### Overall Successes

- **Innovation Lab**

  In September 2020, the HSI Innovation Lab officially launched. The lab utilizes cutting edge technology and innovation to promote data driven decision-making and analysis in law enforcement operations. The lab employs a field-first approach to design and development, aiming to provide solutions for capability gaps identified in the field and by HSI leadership. The lab will continue to drive ingenuity and creativity within HSI for years to come.

- **Center for Countering Human Trafficking**

  Although officially launched by DHS in October 2020, the DHS Center for Countering Human Trafficking (CCHT) began operating in FY 2020. The CCHT, led by HSI, aims to capitalize on HSI's operational expertise in human trafficking and forced labor fraud investigations, while utilizing a whole-of-government approach to combating these crimes. The CCHT will enhance investigative coordination, increase public outreach awareness and effectiveness, support victim assistance programs, provide specialized training and increase partnerships with key stakeholders.

# HSI PROGRAMMATIC HIGHLIGHTS AND OVERALL SUCCESSES FY2020

**OPERATION STOLEN PROMISE**

**OPERATION SILENT NIGHT**

**OPERATION LEGEND**

**INNOVATION LAB**





INNOVATION LAB

**HSI-LED CENTER FOR COUNTERING HUMAN TRAFFICKING**



# HSI STRATEGIC MISSION PRIORITIES FY2020

## Protect National Security

Leverage HSI's unique and wide ranging authorities to target the people, money, and materials that support terrorist activities.

Support the global counter-terrorism mission through continued participation in the FBI's Joint Terrorism Task Forces (JTTFs).



**87%**
OF JTTF DISRUPTIONS OF TERRORIST ACTIVITY IN THE U.S. WERE ACHIEVED WITH SIGNIFICANT HSI INVOLVEMENT

Deploy the internationally focused Visa Security Program, Biometric Identification Transnational Migration Alert Program (BITMAP), and Human Rights Target Tracking Team to prevent the travel to the U.S. of known or suspected terrorists, transnational criminals, human rights violators, and other high risk visa applicants.



**7,709**
VISA APPLICATIONS REFUSED BASED ON TERRORIST CONNECTIONS OR DEROGATORY INFORMATION

Utilize HSI's exclusive authorities and capabilities to counter foreign intelligence and non-traditional collection threats.

## Ensure Public Safety

Foster a collaborative environment with federal, state, local, and international partners to ensure the safety and well-being of our communities and address the threats posed by the opioid crisis, narcotics trafficking networks, and violent gangs operating across the country.

Utilize HSI's 74 Border Enforcement Security Task Forces (BEST) across the U.S. to counter narcotics smuggling by TCOs that illicitly introduce and distribute fentanyl, heroin, other dangerous opioids, synthetic drugs, methamphetamine and cocaine into and throughout the United States.



**6,105 lbs.**
FENTANYL SEIZED

Identify, infiltrate, disrupt, and dismantle MS-13 and other transnational criminal gangs and deny gang leadership access to illicit funds used to fuel violence in Central America and the United States.

**3,671**
TRANSNATIONAL GANGS CRIMINAL ARRESTS
INCLUDES 337 MS 13 CRIMINAL ARRESTS

## Prevent Crimes of Exploitation & Victimization

Protect the public from crimes of victimization by embracing partnerships; increasing outreach; and strategically targeting and investigating criminal organizations and financial structures that facilitate human trafficking, child exploitation, forced labor, and financial scams affecting vulnerable populations.

**1,012**
CHILD EXPLOITATION VICTIMS RESCUED OR IDENTIFIED

Protect children from exploitation by predators involved in the production, distribution, and possession of child pornography and travel in foreign commerce to engage in illicit sexual conduct with minors.

Lead the government's investigative efforts to combat human trafficking of victims into commercial sex or forced labor.



**418**
VICTIMS OF HUMAN TRAFFICKING IDENTIFIED AND/OR ASSISTED

## Optimize Global Trade Investigations

Uphold fairness in international commerce by protecting intellectual property, combating trade fraud, and preventing the illicit proliferation of sensitive U.S. technology and weapons.

**341 MILLION**
SEIZED COUNTERFEIT AND ILLICIT GOODS

Through the ICE-led IPR Center, spearhead the U.S. government's response to investigating and preventing intellectual property rights violations, digital piracy, illicit trade, and customs fraud.



**1,641**
COUNTER-PROLIFERATION RELATED SEIZURES

Conduct international counter-proliferation investigations to prevent the illicit procurement and export of sensitive U.S. technology and weapons and sanctions evasion by U.S. adversaries.

## Enhance Interior Enforcement

Maintain the integrity of U.S. borders by combating transnational criminal organizations that enable and profit from illegal immigration fraud and smuggling schemes.



**3,712**
HUMAN SMUGGLING CRIMINAL ARRESTS

Detect, disrupt, and dismantle networks that facilitate the illegal movement of people into the United States contrary to immigration laws.

Conduct worksite enforcement investigations to promote lawful employment in U.S. industry and prevent financial gain from illicit immigration labor practices.

Utilized 36 Document and Benefit Fraud Task Forces nationwide to combat identity theft and document and benefit fraud activities.



**1,334**
IDENTITY AND BENEFIT FRAUD CRIMINAL ARRESTS

**31,915** HSI CRIMINAL ARRESTS

---

**Focus on Financial and Cyber Enabled Crime**   Proactively launch and pursue financial and cyber angles across HSI's investigative disciplines.

**$1.8 BILLION**

Identify and seize illicit proceeds of crime and target criminal networks and third-party facilitators that launder and hide illegal financial gains.

Deter the ability of transnational criminal organizations to use cyber capabilities to further their criminal enterprises and activities.



CURRENCY AND ASSETS SEIZED

*FISCAL YEAR 2020

AR2022_301563

# Management and Administration

## Mission

Management and Administration (M&A) empowers the ICE mission through a diverse workforce dedicated to a culture of customer service and exemplary management operations.

## About

M&A oversees ICE's budget, expenditures, accounting and finance, procurement, human resources and personnel, workforce recruitment, equal employment opportunity, information technology systems, facilities, property and equipment needs. In addition, M&A identifies and tracks the agency's performance measurements.

## Office of the Executive Associate Director's COVID-19 Response

M&A stood up and chaired the COVID-19 ICE Reconstitution Working Group (RWG) comprised of key senior members from every major ICE program. The RWG led ICE-wide efforts to create and publish the formal ICE Reconstitution Plan in accordance with CDC and DHS guidelines for its **697** domestic office locations. The RWG ensured clear and timely communications to the entire workforce as guidance and procedures were fluidly updated by the CDC and DHS.

## Manpower Metrics

- In FY 2020, ICE realized a net gain of employees, which significantly exceeds net gains in previous years, and achieved an agency position fill rate of **96%**.
- In FY 2020, ICE hired a total of **568** "New to ICE" veterans.
- As of FY 2020, **32%** of the ICE workforce (approximately **6,725**) is comprised of veterans.

## Budget and Procurement

- Successfully executed the largest budget in ICE history at **$8.03 billion** and obligated **99.86%** of ICE expiring funding.
- Successfully awarded more than **7,000** contract actions valued at **$3.5 billion**, saving the agency millions of dollars through negotiations and competition and meeting or exceeding nearly every contracting organizational performance metric.

## Information Technology

- To support full teleworking capabilities during COVID-19, the Office of the Chief Information Officer (OCIO) enhanced communication and collaboration tools and improved user mobility. This included providing secure collaboration tools and videoconferencing (VTC) capabilities that have been widely adopted across the ICE workforce as the "new normal," as well as collaborating with DHS to provide network connectivity for around **15,000** ICE employees working from home, while implementing secure and higher performing alternate connection methods for email and VTC.

## Strategic Planning and Policy

Led a working group with representatives from each ICE Directorate to develop *ICE's Strategic Plan for Fiscal Years 2021–2025*. The strategic plan includes new mission and vision statements, and identifies goals that will drive the agency's decision-making process for the next four years.

- Published **two** regulatory actions (Surety Bond Final Rule and Duration of Status Notice of Proposed Rulemaking), in addition to working with other DHS components in the development of various other component and DHS rulemakings that will have a substantial impact on ICE, including the DOJ and DHS joint Global Asylum regulation and the U.S. Citizenship and Immigration Services (USCIS) Biometrics regulation.

# Office of Partnership and Engagement

## Mission

The Office of Partnership and Engagement (OPE) coordinates outreach efforts with the public, key stakeholders and ICE leadership to increase local and national awareness of ICE's mission, while building relationships and fostering trust in our communities.

## About

OPE, headquartered in Washington, D.C., has two distinct offices: the Community Engagement Office and the Victims Of Immigration Crime Engagement (VOICE) Office.

## Community Engagement Office

The Community Engagement Office has a cadre of 25 community relations officers (CROs) in field offices across the United States who serve as liaisons to the public, key stakeholders and ICE leadership. CROs are co-located throughout the country at the field offices for the HSI Special Agent in Charge (SAC) or ERO Field Office Director (FOD).



Field Community Relations Officers (CROs)

# Office of Partnership and Engagement

OPE is one of three external-facing agencies for ICE that works closely with ICE's Office of Public Affairs (OPA) and ICE's Office of Congressional Relations (OCR). While OPA and OCR are responsible for engagement with media and congressional offices, respectively, OPE and its personnel are responsible for engagement with all other stakeholders including:

- Non-governmental organizations.
- Academia.
- State and local elected officials.
- Law enforcement agencies.
- Faith-based groups.
- The public.
- Victims of crime with a nexus to immigration.

As noted in Table 1 below, ICE CROs have handled more than **20,000** inquiries from various groups and individuals in FY 2020.



Table 1. Stakeholder engagements by stakeholder type

# Office of Partnership and Engagement

Most of the inquiries or requests for engagement from stakeholders involve ERO policies and practices as noted in Table 2 below.



Table 2. Engagement by component topic event

## Office of Partnership and Engagement

### Victims Of Immigration Crime Engagement (VOICE) Office

Executive Order (EO) 13768, *Enhancing Public Safety in the Interior of the United States*, directed ICE to establish the VOICE Office to acknowledge and serve the needs of crime victims and their families who have been impacted by crimes committed by removable criminal aliens. With the creation of the office, victims of crimes committed by individuals with a nexus to immigration now have a government resource that can provide timely information on their cases. The VOICE Office works to ensure victims and their families have access to immigration-related information regarding their offenders, as releasable by law and policy. The VOICE Office may be reached via a toll-free hotline (1-855-48-VOICE or 1-855-488-6423), which is staffed with operators who triage calls to ensure victims receive the support they need.

The VOICE Office is supported by victim liaisons, CROs and the VOICE's call center staff. The VOICE Office provides the following support to victims:

- Releasable alien immigration case information.
- The opportunity to provide a victim impact statement.
- Victim social services referrals.
- Automated immigration custody information through the DHS-Victim Information and Notification Exchange (DHS-VINE).

In FY 2020, ICE's VOICE hotline received approximately **700** calls from victims requesting assistance. The chart below shows the type of assistance requested.



Types of requests to VOICE line FY 2020

- General questions
- VINE assistance
- Requesting victim information
- Requesting case status

### OPE COVID-19 Related Support in FY 2020

During the pandemic, the skills and experience of OPE personnel flexed to answer questions from a variety of stakeholders about ICE's response to COVID-19. In addition to the routine requests for information from stakeholders or victims, OPE made notable contributions to assist ICE in its engagement efforts with external audiences to help educate the public about ICE's safety and security efforts during the COVID-19 pandemic.

# Office of Professional Responsibility

## Mission

The ICE Office of Professional Responsibility (OPR) is responsible for upholding ICE's professional standards through a multi-disciplinary approach of security, inspections and investigations. OPR promotes organizational integrity by vigilantly managing ICE's security programs, conducting independent reviews of ICE programs and operations, and by impartially investigating allegations of serious employee and contractor misconduct and internal and external threats against ICE personnel and facilities.

OPR provides ICE senior leadership with an independent assessment of agency compliance with the requirements of applicable statues, regulations, policies, procedures and detention standards. OPR's role in safeguarding the organization ensures that ICE's workforce remains focused on promoting homeland security and public safety.

## OPR Security (SEC) Division

SEC is responsible for the protection and security of ICE employees, information and facilities. This includes both pre-employment suitability, continuous evaluation and background investigations for ICE employees and contractors, as well as physical security plans and protecting national security information.

## Key SEC Accomplishments and Statistics

- **Enhanced Efficiencies in Personnel Security Process:** In collaboration with the ICE Human Resources Operation Center and industry partners, the ICE Personnel Security Unit (PSU) developed two vital initiatives to enhance communication by providing real-time security determination reports; thus, eliminating email notifications.
- **Secondary Intrusion Detection System Communications:** The ICE Security Management Operations Unit (SMOU) upgraded the agency's Primary Intrusion Detection Systems for all accredited and operational Sensitive Compartmented Information (SCI) level sites nationwide to provide uninterrupted backup security monitoring in the event of a communications failure between ICE sites and the Federal Protective Service. These measures enhanced security at the agency's most sensitive sites and saved more than **$380,000**.
- PSU adjudicated **25,074** background investigations and suitability/security clearance determinations (workload increase of 6.5% from FY 2019), processed **78.6%** of all non-actionable entry-on-duty determinations within **10** days of receiving a complete and accurate security packet and conducted **145** polygraph examinations of entry-level law enforcement officers.
- SMOU managed more than **30** SCI facility projects, in operation or at various levels of construction or accreditation, to further enhance the agency's security posture, and supported and oversaw **18,143** clearance holders worldwide, including more than **3,500** ICE personnel with SCI access.

## OPR Inspections and Detention Oversight (IDO) Division

IDO is responsible for conducting and overseeing inspections, audits and reviews of each ICE component, program and office, both domestically and internationally. During the COVID-19 pandemic, many of IDO's compliance inspections were conducted virtually to accommodate CDC guidelines on travel and distancing practices.

## Key IDO Accomplishments and Statistics

- Conducted **120** compliance inspections at detention facilities, which represents a 150% increase in the number of compliance inspections conduced across ICE's detention portfolio from FY 2019. **Thirty-four** inspections were conducted at facilities governed by the ICE National Detention Standards (NDS) 2000; 20 with the NDS 2019; 13 with the Performance-Based National Detention Standards (PBNDS) 2008; 49 with the PBNDS 2011; and, four at facilities governed by the Family Residential Standards.

ual Report

# Office of Professional Responsibility

- Facilitated the completion of **19** Prison Rape Elimination Act (PREA)[9] audits at ICE detention facilities to ensure ICE's continued compliance with the requirements of the DHS Standards to Prevent, Detect and Respond to Sexual Abuse and Assault in Confinement Facilities.

- Conducted **16** financial audits of investigative programs to assess the state of performance of ICE's Certified Undercover Operations program.

- Conducted **51** inspections and focus reviews of ICE's 287(g) Jail Enforcement Model programs.

- Conducted **53** on-site field office inspections and completed the bi-annual Self-Inspections of three major ICE programs—HSI Domestic Operations, OPLA and OPR, including all field and HQ offices—to provide leadership with greater information regarding best practices and opportunities to improve the execution of their respective missions.

## OPR Investigations (INV) Division

INV is responsible for enforcing ICE's integrity program by investigating allegations of criminal and serious misconduct by ICE employees and contractors. This can include the investigation of detainee assault allegations and detainee escapes, the review of critical incidents and the assessment of excessive use of force allegations. INV also investigates bribe attempts by civilians, external threats against ICE senior leadership and other relevant matters. In addition, INV maintains oversight of the Management Inquiry and Giglio/Henthorn programs.

## Key INV Accomplishments and Statistics

- **Review of the Management Inquiry (MI) Program:** In consultation with ICE stakeholders, INV completed a review of the MI program, identifying several recommendations to further strengthen the program. Upon implementation, these improvements will: enhance current case assignment procedures; establish clear guidelines for processing, handling, and completing MIs; update existing training and provide consistent guidance to improve investigative processes; and ensure a robust internal review process contributing to greater program efficiency.

- Criminal investigations involving non-ICE employees (e.g. detainee, civilian) resulted in **22** criminal arrests, **18** indictments, and **five** convictions, while internal investigations resulted in **two** criminal arrests, **two** indictments and **three** convictions.

- Reviewed **2,080** potential threats against ICE facilities and/or personnel; **461** of those external threats required action.

The combined accomplishments of OPR's Security, Inspections and Investigations programs demonstrate ICE's commitment to the highest standards of service, integrity and accountability.

---

[9] "Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities" (DHS Prison Rape Elimination Act [PREA]) www.ice.gov/prea

# Office of the Principal Legal Advisor

## Mission

The Office of the Principal Legal Advisor (OPLA) is the largest legal program in DHS, providing legal advice and counsel to ICE to ensure its officers, agents and employees can accomplish their mission within the bounds of its legal authorities. In addition, OPLA serves as the exclusive representative of DHS in immigration proceedings before the DOJ Executive Office for Immigration Review (EOIR). In that capacity, OPLA is responsible for prosecuting thousands of charging documents issued annually by ICE, USCIS and CBP.

## Representing the Agency

During FY 2020, OPLA leveraged its personnel and technology resources to ably and adeptly represent the agency before EOIR. OPLA attorneys attended **775,202** hearings, obtained **157,433** removal orders (including **23,750** for criminal aliens) and handled an EOIR total case docket of more than **1,250,000** cases. OPLA also represented the agency before EOIR's Board of Immigration Appeals (BIA), filing **814** appellate briefs in FY 2020.

In addition to practicing before EOIR, OPLA represented the agency in other administrative matters involving **514** appeals under the Freedom of Information Act (FOIA), **seven** appeals and motions related to the Student and Exchange Visitor Program (SEVP), **203** received claims and **230** adjudicated claims under the Federal Tort Claims Act, **56** appeals to the Merit Systems Protection Board and **204** cases before the Equal Employment Opportunity Commission.

OPLA attorneys also handled an unprecedented federal litigation docket, assisting the DOJ in representing the agency before the federal courts. This included **1,571** petitions for writ of habeas corpus, **145** litigation matters under FOIA, **1,775** criminal cases accepted by the DOJ for prosecution, and **19** employment-related litigation matters.

For the past three years, ICE faced a surge in federal class action litigation. This increase in litigation—both initiated against ICE and filed affirmatively by DOJ challenging state laws encroaching on ICE's federal authorities—has required OPLA headquarters (HQ) to review millions of documents in dozens of federal cases through its e-discovery platform, Relativity. When deadlines imposed by federal district courts have overwhelmed allocated OPLA resources and contractors, attorneys from across HQ and OPLA field locations have been assigned to assist in order to timely comply with the court-imposed discovery deadlines, diverting them from other priority assignments.

Similar discovery challenges arise with the cases handled by OPLA in support of ICE's FOIA Office and DOJ in coordinating the agency's response to FOIA litigation. Government Information Law Division (GILD) attorneys also adjudicate FOIA appeals and are responsible for working with the ICE FOIA Office to review their work at the administrative level and act as counsel on the appeals. Moreover, GILD attorneys handle third-party requests or subpoenas for agency documents, which entails reviewing the requested documents, and redacting these documents to preserve privileges, among other responsibilities.

In this unprecedented year, OPLA also implemented new strategies to litigate the significant number of COVID-19 related habeas corpus petitions filed across the country by realigning its existing federal litigation practices and utilizing both field and HQ resources.

## Providing Expert Counseling and Client Services

OPLA continues to provide legal advice to its clients at HQ and field locations throughout the country. These efforts enable our clients to carry out their official duties in a lawful and ethical manner and promote accountability. In FY 2020, OPLA attorneys provided expert legal advice on a variety of subjects, including suspensions and debarments (S&D), revenue recovery and ethics. The S&D Program saw an increase from last fiscal year of **143%** in proposed debarments and a **229%** increase in debarments. OPLA attorneys further advised on detention matters, including

## Office of the Principal Legal Advisor

related to hunger strikes, medical issues and segregation, as well as matters involving national security and human rights violator investigations, removal proceedings and in support of criminal prosecutions.

The COVID-19 pandemic has resulted in the need for significant legal advice and guidance by OPLA on a range of novel issues. For instance, OPLA provided integral legal support and guidance for the development of ERO's *COVID-19 Pandemic Response Requirements*, which serves as a comprehensive collection of best practices and requirements for immigration detention operations during the pandemic. OPLA reviewed COVID-19 related federal regulations and advised ERO and HSI as to their authorities with regard to a range of issues, including enforcement and fiscal law matters. To illustrate, OPLA facilitated the return, on ICE Air, of more than **1,000** U.S. citizens stranded abroad because of COVID-19. OPLA also provided a significant amount of employment law advice related to COVID-19, including the authority and requirements surrounding hazardous duty pay and potential implications of putative class litigation against the federal government demanding pay enhancements for federal employees who may be exposed to the disease.

### Preparing the Workforce

OPLA continued to coordinate additional attorney training opportunities during the COVID-19 pandemic. OPLA also expanded its usual monthly training initiative, launching daily no-cost virtual training sessions available to all OPLA attorneys and employees to reinforce their understanding of the statutes, regulations and processes impacting their daily responsibilities and execution of OPLA's mission.

### Leveraging Resources to Meet Our Challenges and Plan for the Future

OPLA faces unprecedented staffing shortages as a result of EOIR's surging appropriations and record-breaking hiring that dramatically increased the number of immigration judges (IJs). Prior to EOIR's postponement of the non-detained docket, OPLA field attorneys already grappled with allocating time between client services; court preparation; in-court litigation; drafting motions, replies, and briefs to EOIR; and appellate advocacy. Moving forward, when EOIR reopens the non-detained docket and returns to its regular, post-COVID-19 scheduling practices, the demand for field attorneys to cover court will surpass OPLA's available resources. In addition, OPLA has invested considerable resources in support of its appellate advocacy, preparing full BIA briefs to oppose legally deficient IJ orders and ensure adequate review of such briefs. To continue the mission-critical task of appellate advocacy, OPLA launched an appeal streamlining pilot program designed to avoid the full appellate briefing process in certain cases that address a clear error of law.

The COVID-19 pandemic necessitated OPLA's implementation of various transition strategies to further its complex mission, while also ensuring the safety and health of over **1,600** OPLA employees across the country. To this end, OPLA immediately implemented expanded telework at all its offices. It also worked closely with EOIR to use technological solutions to continue litigating removal proceedings. In a matter of weeks, OPLA and EOIR transitioned from an extensive, paper-based immigration court system, to a fully electronic process. Moreover, OPLA worked with EOIR to utilize available attorneys and IJs from the postponed non-detained docket, to complete additional detained cases through VTC equipment available in ICE detention facilities.

At the same time, OPLA leveraged its personnel, who would otherwise have been appearing before EOIR to litigate non-detained immigration court cases, to address ICE's enormous civil discovery burdens stemming from an array of litigation against the agency. As of September 30, 2020, and since maximum telework was authorized, OPLA attorneys and contractors have reviewed **1,878,153** documents, ranging from email messages to ICE policy directives, successfully completing several previously lagging discovery projects.







# ICE Annual Report
## Fiscal Year 2021
March 11, 2022



U.S. Immigration and Customs Enforcement

AR2022_301573

# Message from the Acting Director

I am pleased to present the following report, "ICE Fiscal Year 2021 Annual Report" for FY 2021.

Throughout FY 2021, ICE focused on its core missions: disrupting and dismantling transnational criminal organizations; arresting and removing threats to national security, public safety, and border security; representing the Department of Homeland Security (DHS) in immigration court; and supporting Southwest Border operations that are fair, orderly, and humane. ICE has carried out these missions, achieving notable operational successes and much-needed reforms amid a global pandemic and shifting, dynamic threats to the homeland.

While maintaining mission focus, ICE also undertook key policy and operational changes. Of singular importance, ICE's Office of Enforcement and Removal Operations (ERO) rebalanced its approach to civil immigration enforcement following a series of memoranda dated January 20, 2021, February 18, 2021, and September 30, 2021. Together, these memoranda refocused the agency's civil immigration enforcement efforts on the greatest threats to national security, public safety, and border security, while empowering career law enforcement officials in the field to make discretionary decisions about which noncitizens to arrest, detain, and remove. On May 27, 2021, the Office of the Principal Legal Advisor (OPLA) followed suit, providing specific instructions to attorneys on how to align their advocacy with the direction provided to them by DHS and the ICE Director.

As detailed in this report, ICE's more focused approach yielded measurable success. In FY 2021, ERO conducted administrative arrests of 74,082 noncitizens, including 12,025 arrests of individuals convicted of an aggravated felony—nearly double the 6,815 arrests during the prior fiscal year. Although ICE was called on to provide significant levels of support to its partners in U.S. Customs and Border Protection (CBP) as detailed later in this report, the agency still increased its volume of at-large arrests by 9 percent, from 23,932 in FY 2020 to 25,993 in FY 2021, reflecting renewed focus by ICE to protect all people by identifying and targeting the most serious threats residing in our communities that threaten America's national security and public safety. A portion of these at-large arrests occurred under the Sex Offender Arrest Removal (SOAR) enforcement initiative, a targeted operation resulting in the arrest of 495 noncitizen sex offenders (compared to 194 over the same period in FY 2020) from 54 different countries—80 percent of whom had victimized children. Like ICE's broader rebalancing of interior enforcement priorities to focus on national security, public safety, and border security, Operation SOAR demonstrates how smart, targeted enforcement can make a real difference to the communities ICE serves.

While ICE's arrest statistics paint a picture of broad operational success, one case in particular underlines the importance of our ongoing efforts. On February 21, 2021, ICE removed a 95-year-old former Nazi concentration camp guard to Germany, likely one of the last fugitive Nazis who will be tracked down and removed from the United States. In 1945, Friedrich Karl Berger, a German citizen,

2

participated in Nazi-sponsored persecution while serving as an armed guard of concentration camp prisoners in the Neuengamme Concentration Camp system. A testament to collaboration among ERO, Homeland Security Investigations (HSI) and OPLA, Berger's arrest and removal demonstrates our country's and our agency's tireless pursuit of justice against those who violate fundamental human rights and who undermine human dignity itself.

FY 2021 also saw additional reforms to ICE's detention network. On May 20, 2021, in response to a memorandum from Secretary Alejandro Mayorkas, ICE ended its relationship with two detention centers: the C. Carlos Carreiro Detention Center in Dartmouth, Massachusetts, and the Irwin County Detention Center in Ocilla, Georgia. Motivated by operational and other considerations, the withdrawal of ICE detainees from these facilities reinforced DHS and ICE leadership's commitment to ensure that individuals in civil immigration are treated humanely and that detention conditions are appropriate. Meanwhile in FY 2021, ICE shifted its operations away from the detention of families while adapting new and existing detention capacity to address an influx along the Southwest Border. Most notably, ICE no longer conducts long-term detention of families at its facilities, while adapting existing (e.g., Karnes and South Texas Residential Centers) and new (Moshannon Valley Correctional Center) facilities for single adult detention purposes. ICE continues to inspect individual detention centers to ensure appropriate conditions through the work of ERO, the Office of Professional Responsibility (OPR), and in collaboration with other oversight bodies within DHS.

In FY 2021, HSI initiated significant criminal investigations to disrupt and dismantle criminal organizations, safeguard the homeland, and vindicate the rights of vulnerable victims. Chief among these efforts was Operation Stolen Promise. HSI continued its work to combat fraud associated with COVID-19, seizing 2,672 counterfeit personal protective equipment; counterfeit and fraudulent COVID-19 test kits, medical treatments, therapeutics, and prevention items; and fraudulent web domains associated with COVID-19 fraud. In connection with these efforts, HSI seized over $58 million in illicit proceeds and disrupted or recovered over $18 million in funds associated with fraudulent transactions.

While protecting Americans from pandemic-related fraud at home, HSI also cast its investigative net internationally, assisting in countless arrests and disruptions of narcotics, human trafficking, and weapons proliferation schemes. Of note, HSI continued to target the illicit financing of the Islamic Revolutionary Guards Corps (IRGC) and Quds Force (QF), significantly disrupting IRGC-QF revenue from sale of Iranian crude oil. In total, HSI seized a total of 2.6 million barrels of IRGC-QF fuel and crude oil and $64 million in U.S. currency, leading to the indictment of two Iranian officials. In addition, HSI special agents opened the U.S. government's first investigation into the assassination of Haitian President Jovenel Moïse. To date, with the FBI's assistance, HSI enabled the Department of Justice (DOJ) to obtain charges against two conspirators in that offense. These cases mark HSI as the U.S.'s preeminent investigative arm working overseas, with many successes yet to come in the new fiscal year.

3

Meanwhile, HSI's Human Exploitation Rescue Operative (HERO) child rescue program inducted a record 23 military veterans. The graduates of the 11th HERO class will assist HSI special agents in seeking out, identifying, and rescuing child victims of sexual exploitation held captive by their abusers. The HERO program allows those who have already given so much to our country to continue their service by protecting those who need it most.

ICE has no greater resource than its dedicated workforce, and ICE's Office of Management and Administration (M&A) has provided the backbone for ICE to remain strong through its recruitment and retention of talented law enforcement and other personnel. Thanks to M&A's work, ICE ended FY 2021 with a total workforce of 20,796 employees, resulting in a high agency onboard fill rate of 94 percent, ensuring all of ICE's operational components remain adequately staffed to fulfill ICE's critical national security and public safety mission. M&A further assisted ICE's border security and interior enforcement efforts by innovating and improving a series of technological tools, including the Case Acceptance System, which streamlined the transfer of noncitizens from CBP to ICE along the Southwest Border; the Field Office Appointment Scheduler, which helps to ensure noncitizens appear at ICE offices as required; and the Activity Analysis Reporting Tool (AART), which for the first time provided DHS leaders with a comprehensive weekly report of enforcement actions taking place nationwide.

Through key policy initiatives, ICE made significant changes to policies governing interior enforcement practices, including arrests, detention, and removal. These changes were first informed by interim enforcement guidelines, then followed in November with final enforcement guidelines issued by Secretary Mayorkas. These guidelines develop clear priorities for enforcement, but also provide flexibility for ICE officers to weigh aggravating and mitigating factors and make individualized enforcement decisions.

ICE also issued important policies related to encounters, treatment, and enforcement against pregnant, postpartum, or nursing individuals. A second important policy takes a victim centered approach to inform enforcement actions involving noncitizens who are victims of crime and have applied for immigration benefits on such grounds. Additionally on the policy front, ICE worked diligently to implement DHS guidance on the limitations for enforcement actions at protected areas, including at mental health-care facilities, schools, playgrounds, social services providers, and disaster relief and emergency response as well as specific DHS guidance related at arrests at or near courthouses

This Annual Report represents an important change. For the first time, ICE is releasing a unified report encompassing not just the noble work of its law enforcement components but of its entire workforce, including OPLA, M&A, OPR, and the Office of Diversity and Civil Rights. Accordingly, this report reflects a more complete picture of ICE's accomplishments.

4

Each of these developments allowed ICE to maintain its critical law enforcement operations while striving toward continual improvement. Based on the success of FY 2021, I have every confidence ICE will continue to maintain its mission focus and achieve operational successes, while ushering in fresh organizational changes in the coming fiscal year.

<div style="text-align:center">

Sincerely,


Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

</div>

5



## U.S. Immigration and Customs Enforcement

# FY 2021 Annual Report

# Table of Contents

A Message from the Acting Director ..............................2

Enforcement and Removal Operations ........................7

Homeland Security Investigations ...............................14

Office of the Principal Legal Advisor ..........................21

Management and Administration ...............................23

Office of Professional Responsibility ..........................28

Office of Diversity and Civil Rights .............................31

AR2022_301578



**Enforcement and Removal Operations**

## Mission

ERO's mission is to protect the homeland through the arrest and removal of noncitizens who pose a threat to national security, public safety, and border security. ERO's main areas of focus are interior enforcement operations, management of the agency's detained and non-detained populations, and removal of individuals who have received a final order of removal.

## FY 2021 In Review

During FY 2021, ERO continued to face unprecedented challenges resulting from the ongoing COVID-19 pandemic, as well as increases in migration along the Southwest Border. Despite these challenges, ERO undertook a series of significant changes to its policies and operations. Through a series of Department and agency memoranda, ERO has rebalanced its interior enforcement priorities designed to focus its limited law enforcement resources on the greatest threats to national security, public safety, and border security. Together, the new enforcement guidance memoranda have empowered career law enforcement officers in the field to exercise their prosecutorial discretion to determine whom to arrest, detain, and remove. This approach, emphasizing prioritization and guided discretion, has yielded significant public safety benefits, as our interior enforcement statistics show. In the coming fiscal year, ERO will continue to train its workforce on this approach with a goal of further enhancing its enforcement efforts.

7

In response to migration along the Southwest Border, ICE leveraged technology to make its operations more nimble and more responsive to operational conditions. Among other things, the agency innovated the Case Acceptance System, the Field Office Appointment Scheduler (FOAS), the Compliance Assistant Reporting Tool (CART), and the Activity Analysis Reporting Tool (AART). In addition, ERO opened a new field office in Texas, splitting the new Harlingen area of responsibility (AOR) from the San Antonio AOR while redirecting significant resources to support CBP operations across the Southwest Border.

## Civil Immigration Enforcement

On January 20, 2021, President Joseph R. Biden, Jr. issued Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*. As a result of the Executive Order, DHS established interim civil immigration enforcement priorities for those noncitizens encountered by its component agencies, specifically ICE and CBP. Subsequently, on that same day, former Acting Secretary David Pekoske released a memorandum to DHS personnel entitled, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities*. This memorandum established interim civil immigration priorities for the Department.

In accordance with the Executive Order and the DHS memorandum, on February 18, 2021, Acting ICE Director Tae Johnson then issued interim enforcement and removal guidance entitled, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities*. This interim guidance directed ICE officers and agents to focus ICE's limited civil immigration enforcement and removal resources on cases presumed to be national security, public safety, and border security priorities, and applied to all civil immigration enforcement and removal actions.

On September 30, 2021, Secretary Mayorkas announced new *Guidelines for the Enforcement of Civil Immigration Law* to focus the Department's resources on the apprehension and removal of noncitizens who are a threat to our national security, public safety, and border security and advance the interests of justice by ensuring a case-by-case assessment of whether an individual poses a threat. The guidelines are a break from a categorical approach to enforcement. Instead, these guidelines ensure a thorough and case-by-case assessment of whether enforcement action is warranted and appropriate, thus allowing ERO to focus its limited resources on cases of greatest importance to the national interest and public safety.

This focused approach has yielded measurable successes:
- In FY 2021, ERO conducted a total of 74,082 administrative arrests of noncitizens:
  - ERO arrested 12,025 individuals with aggravated felony convictions—nearly double the 6,815 arrested the previous fiscal year.
    - Since February, ICE arrested an average of 1,034 aggravated felons per month, 51 percent more than during CY 2017 – 2020 and 53 percent more than during CY 2016.
  - Approximately 49 percent of all arrests were of convicted criminals.
  - Of the 74,082 total administrative arrests in FY 2021, 45,755 took place on or after

8

February 18, 2021, and were classified under the appropriate interim civil immigration enforcement priorities (one of the three established priorities of national security, public safety, or border security; or as another public safety priority).
Of these 45,755 arrests:

- Overall, approximately 49 percent were convicted criminals.
- Approximately 55 percent of those arrested were classified as threats to border security.
  - A total of 32 percent of arrests in this period were of people initially apprehended by USBP and issued notices to report (NTRs) to ICE. These arrests reflect a new form of collaboration between ICE and CBP to utilize interior enforcement resources to better manage border encounters.
- Just over 20 percent represented threats to public safety as defined in the February 18 memorandum, in most cases due to an aggravated felony conviction.
  - Excluding NTR arrests, serious criminals (i.e., aggravated felons and felons) accounted for 43 percent of ICE arrests since February, compared to 28 percent during CY 2017 – 2020 and 36 percent during CY 2016.
- The remainder represented other national security or public safety threats.
  - At-large arrests rose by 9 percent, from 23,932 at-large arrests in FY 2020 to 25,993 in FY 2021, reflecting renewed focus by ICE to protect all people by identifying and targeting the most serious threats residing in our communities that threaten America's national security and public safety.
    - A subset of the at-large arrests resulted from the 90-day Sex Offender Arrest Removal (SOAR) enforcement initiative, a targeted intelligence-driven operation that resulted in the arrests of 495 noncitizen sex offenders (compared to 194 over the same period in FY 2020) from 54 different countries. Of particular note, 80 percent of those noncitizens had victimized children.
  - Offenses associated with noncitizens arrested in FY 2021 included 1,506 homicide-related offenses, 3,415 sexual assaults, 19,549 assaults, 2,717 robberies, and 1,063 kidnappings.

- In FY 2021, ICE removed 59,011 noncitizens:
  - Of the 59,011 total removals of noncitizens that took place during FY 2021, 28,677 were removed on or after February 18, 2021, when ICE began to track the interim civil immigration enforcement priorities.
    - Just over two thirds of this group of removals were classified as threats to either border security or to public safety, with the two categories comparably sized.
    - The remainder represented other national security priorities or public safety threats.
  - The percentage of convicted criminal removals increased from 56 percent of ICE removals in FY 2020 to 66 percent of ICE removals in FY 2021.
  - 2,718 of those removed were known or suspected gang members.
  - Another 34 were designated as known or suspected terrorists.

9

- Since February:
  - ICE removed an average of 937 aggravated felons per month – the highest level ever recorded since ICE began collecting detailed criminality data.[1]
  - Monthly removals of aggravated felons were up 48 percent over the monthly average during CY 2017 – 2020 (633 removals of aggravated felons per month) and up 40 percent over the monthly average during CY 2016 (668 removals of aggravated felons per month).
  - Twenty-six percent of ICE removals were of aggravated felons, compared to 3 percent during CY 2017 – 2020 and 3 percent during CY 2016.
  - Forty-six percent of ICE removals were of serious criminals (persons convicted of felonies or aggravated felonies), compared to 18 percent during CY 2017 – 2020 and 17 percent during CY 2016.

## Increasing Efficiency

During FY 2021, ERO continued to pursue programs to increase the organization's efficiency, as well as to provide improved processes for both its employees and for those it encounters. Thanks to strong collaboration with M&A, and in particular the Office of the Chief Information Officer, ICE achieved significant improvements, including the following:

- The **Field Office Appointment Scheduler (FOAS)** is an appointment scheduling tool designed to help facilitate the coordination of individuals and family units released from CBP custody without issuance of charging documents. ICE also developed the ICE Appointment Scheduler – a public facing version of FOAS – to allow noncitizens the ability to directly schedule and manage their appointments. In FY 2021, more than 37,000 appointments were scheduled for more than 97,000 noncitizen family members using FOAS and the ICE Appointment scheduler.
- The **Compliance Assistant Reporting Tool (CART)** was deployed to four additional offices and redeployed and expanded at the new location of the Washington Field Office. In addition, 10 offices initiated preparatory steps to enable CART at their locations. CART is a self-service, systems-integrated kiosk designed to automate the reporting process for noncitizens on the non-detained docket - more than 875 noncitizens were enrolled to use the tool.
- The **Case Acceptance System (CAS)** is a web-based application that allows immigration enforcement agencies to submit requests for immigration case jurisdictional transfer to ERO. In the past, each transfer was initiated by scanning and emailing documents in addition to making several phone calls. With CAS, however, ERO electronically reviews subject data and charging documents from a shared system to determine the legal sufficiency of a case prior to transfer. Once ICE completes the legal review and makes the custody determination, the decision is sent back to the requestor through CAS, allowing jurisdictional transfer to be completed in minutes instead of hours. CAS was first piloted in the El Paso Field Office during FY 2021, and usage will be expanded to all Southwest Border areas of operations in FY 2022.

---

[1] ICE began collecting detailed criminal arrest data in January 2015, but data collection was not standardized and considered reliable until the end of calendar year 2015.

10

## ERO Support for CBP at the Southwest Border

During FY 2021, DHS saw a significant increase in the number of migrants arriving at the Southwest Border. To aid CBP operations, and in support of the greater homeland security enterprise, ERO redirected personnel and resources to the Southwest Border.

During the summer and into the fall of 2021, ERO had up to 1,000 of its 6,228 officers supporting Southwest Border efforts, roughly one-sixth of the operational workforce. This included 300-350 officers temporarily deployed to assist the U.S. Border Patrol; 200-300 temporarily deployed to the Del Rio Sector; and another 360 collaterally working on processing Notices to Report for new arrivals — representing nearly 14 percent of the workforce.

ERO, alongside its CBP partners, participated in the Movement Coordination Cell (MCC), which was created to facilitate communication and operations between government agencies in charge of managing the flow of migrants at the border.

In concert with EOIR, ERO created a Dedicated Docket (DD) program for certain family units assigned to 11 common destination cities to allow for timely hearings without the traditional delays in scheduling due to court backlogs.

## Title 42 Expulsions

In response to the COVID-19 pandemic, on March 21, 2020, the Department of Health and Human Services Centers for Disease Control and Prevention (CDC) issued an order pursuant to its authority under Title 42 of U.S.C. §§ 265 and 268 and requested DHS assistance in preventing certain noncitizens creating a serious danger of introducing COVID-19 from entering the United States. Border crossers who were returned to their last transit point or countries of origin under Title 42 authority represent CBP "expulsions" rather than ICE removals.

- During FY 2021, ERO played a crucial supporting role in this process, assisting with 36,654 air charter expulsions under Title 42 over the course of the year.

## Detention and Alternatives to Detention

Although funded to maintain 34,000 detention beds, only approximately 75 percent of bedspace was available for use due principally to COVID-19 protocols that require social distancing, as well as the isolation and quarantine of arriving noncitizens.

Against the backdrop of COVID-19, ERO undertook initial reforms to the detention network. On May 20, 2021, in response to a memorandum from Secretary Mayorkas, ICE ended its relationship with two detention centers: the C. Carlos Carreiro Detention Center in Dartmouth, Massachusetts, and the Irwin

11

County Detention Center in Ocilla, Georgia. Motivated by operational and other considerations, the withdrawal of ICE detainees from these facilities reinforced DHS and ICE leadership's commitment not to tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention.

As part of a set of nimble operational changes to address an influx of migrants along the Southwest Border, in FY 2021 ICE shifted its operations away from the detention of families while adapting new and existing detention capacity to address an influx along the Southwest Border. Most notably, ICE no longer supports long-term detention of families at its facilities, while adapting existing (e.g., Karnes and South Texas Residential Centers) and new (Moshannon Valley Correctional Center) facilities for single adult detention purposes. Meanwhile, ICE's Alternatives to Detention (ATD) program leverages technology, case management, and other tools to manage a noncitizen's compliance with release conditions while they are on ICE's non-detained docket. The program incorporates supervision and case management for individuals who are not detained while they are in immigration proceedings. Within FY 2021, ICE's ATD program served more than 175,000 participants, compared to approximately 120,000 participants in FY 2020. In FY 2021, 85 percent of participants were compliant with the program, an improvement from 67 percent in FY 2020.[2]

## FY 2021 Detainee Health Care

Providing healthcare to the detained population is a key component of ERO's work. The ICE Health Service Corps (IHSC), a component within ERO, is committed to providing the safe delivery of high-quality health care to those in ICE custody and strives to be the best health care delivery system in detention and correctional health care. IHSC is made up of a multi-sector, multidisciplinary staff of approximately 1,700 authorized positions that include U.S. Public Health Service (PHS) Commissioned Corps officers, federal General Schedule (GS) civil servants, and contract health professionals, and administers a detention health system that provides direct health care through ICE-owned facilities; oversees care for ICE detainees housed in contracted facilities; reimburses for off-site health care services detainees receive while in ICE and CBP custody; and supports special operations missions. In FY 2021:

- ERO managed the care and custody of detainees from more than 180 countries.
- IHSC personnel provided comprehensive medical, mental health, dental, and public health services to all those in ICE custody.
  - ICE executed a budget exceeding $316 million on medical, mental health, dental, and public health services to detainees.
- IHSC administered a health system that delivered health care to approximately 88,000 detainees at 21 facilities nationwide and oversaw health care for more than 169,000 additional detainees housed in 150 non-IHSC- staffed facilities nationwide, to include:

---

[2] Program compliance figures are defined as non-absconder program outcomes (e.g., departure verified, no longer required to participate) as a share of all program outcomes. These data do not account for the [85,370] and [132,764] additional people who were in compliance and still actively enrolled in the ATD program at the end of fiscal years 2020 and 2021, respectively.

12

- o 88,430 intake screenings,
- o 13,622 emergency room visits,
- o 8,497 dental visits,
- o 12,041 urgent care visits,
- o 78,202 sick calls, and
- o 46,496 mental health interventions.

## ICE Prevention and Mitigation Strategies to Combat COVID-19 in Detention Facilities

Throughout FY 2021, IHSC medical and operational personnel continued to monitor the CDC's guidance daily, incorporating it into ICE's existing infectious disease monitoring and management protocols and issuing guidance to IHSC staff and ICE detention contractors. As part of ICE's efforts to protect the public and its detained population against COVID-19, in FY 2021 IHSC administered a total of 184,779 COVID-19 tests as part of the standard operating procedure requirements for the pandemic response. In FY 2021, IHSC administered 33,909 COVID-19 vaccine shots.

13



# Homeland Security Investigations

## Mission

Homeland Security Investigations (HSI) investigates, disrupts, and dismantles terrorist, transnational, and other criminal organizations that threaten or seek to exploit the customs and immigration laws of the United States.

## FY 2021 In Review

HSI has broad legal authority to conduct federal criminal investigations into the illegal cross-border movement of people, goods, money, technology, and other contraband into, out of, and throughout the United States. HSI uses these authorities to investigate a wide array of transnational crime and violations of customs and immigration laws, including money laundering; financial fraud and scams; cybercrime; intellectual property theft and trade fraud; narcotics smuggling; transnational gang activity; child exploitation; human smuggling and trafficking; illegal exports of controlled technology and weapons; identity and benefit fraud; human rights violations and war crimes; and terrorism and national security threats.

In collaboration with its strategic partners in the United States and abroad, HSI special agents gather evidence to identify and build criminal cases against transnational criminal organizations (TCOs), terrorist networks and facilitators, and other criminal elements that threaten the homeland. HSI works with prosecutors to indict and arrest violators, execute search warrants, seize criminally derived money and assets, and take other actions designed to disrupt and dismantle criminal organizations operating around

14

AR2022_301586

the world. These efforts protect U.S. national, border, and economic security and ensure the safety of the public and our communities.

HSI's workforce consists of approximately 10,000 employees, including special agents, criminal analysts, mission support personnel, and contract staff assigned to more than 220 cities across the United States and 86 locations around the world.

Most of HSI's more than 6,800 special agents are assigned to an HSI Special Agent in Charge office or sub-office in 253 locations across the nation. HSI's domestic footprint includes more than 980 criminal analysts and is supplemented by almost 3,700 task force officers representing key strategic federal, state, and local law enforcement partners in the fight to combat TCOs. HSI's international footprint is DHS's largest investigative presence abroad, anchored by special agents assigned to U.S. embassies, consulates, and Department of Defense (DOD) combatant commands around the globe. With 86 offices in 54 countries, HSI has one of the largest international footprints in U.S. law enforcement.

In FY 2021, HSI arrested 34,974 criminals; seized more than 2.45 million pounds of narcotics; identified and/or rescued 1,177 victims of child exploitation; assisted 728 victims of human trafficking; and disrupted and dismantled countless TCOs. Additionally, HSI seized more than $973 million in criminally derived currency and assets, dealing a significant blow to the TCO operations seeking to profit from their crimes.

## FY 2021 Programmatic Highlights

**Operation Silent Night:** Keeping dangerous weapon components off the streets.
HSI Operation Silent Night is a global operation targeting the smuggling of firearm silencers into the United States from China. The operation is led by the HSI National Targeting Center-Investigations, and targets the manufacturer, supply chain, and end users of these illegal weapon component. HSI's efforts on this operation help to keep dangerous weapon components out of the hands of criminal organizations and off our streets.
- 42,888 firearm silencers seized
- 4,868 firearms seized
- 204 criminals arrested

**Operation Cyber Centurion:** Preventing cyber-attacks before they occur.
HSI launched Operation Cyber Centurion in 2021 to identify and disrupt cyber-attacks before they occur. By leveraging advanced cyber intrusion tools and specially trained personnel, HSI proactively detects vulnerabilities in stakeholder critical infrastructure and coordinates with the effected entity, so they remediate gaps before an adversary strikes. Through Operation Cyber Centurion, HSI disrupts those seeking to exploit the internet to subvert U.S. laws and threaten U.S. economic integrity, national security, and public safety.
- 221 vulnerabilities detected in critical infrastructure, including:
  - 50 vulnerabilities in the government facilities sector
  - 19 vulnerabilities in the emergency services sector
  - 9 vulnerabilities in the defense industrial sector

15

**Operation Hydra:** Interdicting and investigating illicit supply chains and the smuggling of precursor chemicals.

Through Operation Hydra, HSI targets the supply chains responsible for foreign origin shipments of precursor chemicals used in the illicit production of fentanyl and methamphetamine destined for the United States. By blending interagency collaboration, industry partnerships, and computer-based tools, Operation Hydra processes and derives meaning from large volumes of data to identify Chinese precursor chemical suppliers and Mexican procurers. Operation Hydra uses this information to target and seize precursor chemicals before they are converted into the synthetic drugs fueling overdose deaths.

- 43 interdictions of chemicals used in the production of methamphetamine and fentanyl
- 1,318,190 pounds of chemicals seized

**Operation Stolen Promise 2.0:** Identifying and stemming the flow of counterfeit COVID-19 pharmaceuticals.

During FY 2021, HSI launched Operation Stolen Promise 2.0 to combat the production, sale, and distribution of counterfeit COVID-19 vaccines, therapeutics, and treatments. Operation Stolen Promise combines HSI's expertise in global trade, financial, cyber-crime, and intelligence-driven investigations to protect the health and safety of the general public and deter activities that may compromise legitimate trade or financial systems. The operation has yielded significant results since its inception.

- More than 139 criminal investigations initiated
- More than 100 seizures of fraudulent or illicit COVID-19 vaccines or therapeutics
- More than $5,000,000 seized in criminal proceeds

**Counter-Islamic Revolutionary Guard Corps Operations:** Targeting and disrupting illicit funding of foreign terrorist organizations.

In FY 2020, HSI began targeting the illicit funding of the Iranian designated terrorist organizations Islamic Revolutionary Guards Corps (IRGC) and Quds Force (QF). By combining its broad investigative authorities and expertise in counter-proliferation, sanctions, and financial investigations, HSI significantly disrupted IRGC-QF funding through the sale of Iranian crude oil. These efforts highlight the impact HSI continues to have in enforcing international sanctions and preventing our adversaries from funding criminal and terrorist activities around the world.

- 2.6 million barrels of IRGC-QF fuel and crude oil seized
- $64 million in U.S. currency seized
- Indictment of two Iranian nationals

**The Human Exploitation Rescue Operative – Child Rescue Corps program (HERO Corps)**

HSI's workforce is supplemented by the Human Exploitation Rescue Operative (HERO) Corps initiative, which is an example of an innovative partnership between government agencies, DOD partners, and non-governmental agencies to support wounded warriors' transition to civilian life. HERO Corps graduates assist HSI in crucial efforts to combat the sexual exploitation of children and identify and rescue victims of sexual abuse. During FY 2021, 23 veterans of the U.S. armed forces trained in the program. They graduated in November 2021 and were placed into domestic HSI offices.

16

## FY2021 Homeland Security Investigations Statistics

| General Enforcement Statistics | |
| --- | --- |
| **FY 2021 Total** | |
| Criminal Arrests | 34,974 |
| Indictments | 18,309 |
| Convictions | 11,301 |
| Admin Arrests | 7,828 |
| Cases Initiated | 38,253 |
| Currency and Assets Seized | $973,716,813 |
| Virtual Assets (Cryptocurrency) Seized | $97,618,063 |
| Bulk Cash Seized | $278,540,230 |
| Weapons Seized | 9,502 |

| Counter-Proliferation | |
| --- | --- |
| **FY 2021 Total** | |
| Cases Initiated | 1,434 |
| Criminal Arrests | 682 |
| Indictments | 504 |
| Convictions | 264 |
| Number of Seizures for Violations of Various U.S. Export Laws & Regulations | 1,184 |

| Child Exploitation | |
| --- | --- |
| **FY 2021 Total** | |
| Cases Initiated | 5,393 |
| Criminal Arrests | 3,776 |
| Indictments | 2,275 |
| Convictions | 1,511 |
| Children Identified and/or Rescued | 1,177 |

| Financial Crimes | |
| --- | --- |
| **FY 2021 Total** | |
| Cases Initiated | 4,861 |
| Criminal Arrests | 2,198 |
| Indictments | 1,417 |
| Convictions | 738 |
| Currency and Assets Seized – Financial Investigations | $550,876,903 |
| Victims of Financial Crime Assisted | 353 |

17

| Transnational Gangs | |
|---|---|
| **FY 2021 Total** | |
| Cases Initiated | 843 |
| Criminal Arrests | 3,574 |
| Indictments | 1,831 |
| Convictions | 872 |
| Admin Arrests | 162 |
| MS-13 Related Criminal Arrests | 340 |
| MS-13 Related Admin Arrests | 32 |
| Weapons Seized - Gang Investigations | 1,246 |

| Intellectual Property Theft and Commercial Fraud | |
|---|---|
| **FY 2021 Total** | |
| Cases Initiated | 1,122 |
| Criminal Arrests | 388 |
| Indictments | 155 |
| Convictions | 100 |
| Seizure Incidents | 2,651 |
| MSRP of IP Theft/Comm Fraud Seizures | $822,303,098 |

| Securing the Homeland | |
|---|---|
| **FY 2021 Total** | |
| Investigations Initiated Through Participation in Joint Terrorism Task Forces | 628 |
| Visa Applications Screened | 1,005,408 |
| Visas Recommended for Refusal Based on Terrorist Connections or Derogatory Information | 4,824 |
| Academic Institutions Reviewed for Noncompliance Issues | 1,252 |
| Overstay Priority Leads Referred for Possible Law Enforcement Action | 2,378 |
| Lookouts Placed on Known or Suspected Human Rights Violators (HRV) | 724 |
| HRV Preventions (Visa Denials/No Boards/Waivers) | 21 |

18