CONGRESS.GOV

# S.Amdt.894 to S.1394

100th Congress (1987-1988)

**Amends Bill:** S.1394 — Foreign Relations Authorization Act, Fiscal Year 1988
**Sponsor:** Sen. Chafee, John H. [R-RI] (Submitted 10/07/1987, Proposed 10/07/1987)
**Latest Action:** 10/07/1987 Motion to table SP 894 agreed to in Senate by Yea-Nay Vote. 55-45. Record Vote No: 311.

Purpose Text (1) **Actions (2)** Cosponsors (11)

Sort by Newest to Oldest

| Date | All Actions |
| --- | --- |
| 10/07/1987 | Motion to table SP 894 agreed to in Senate by Yea-Nay Vote. 55-45. Record Vote No: 311. |
| 10/07/1987 | Proposed by Senator Chafee. To amend the Immigration and Nationality Act to waive the continuous residence requirement under the legalization program for spouses and children of qualified legalized aliens. |

AR2022_400001

# BATTERED IMMIGRANT WOMEN PROTECTION ACT OF 1999

## HEARING

BEFORE THE

SUBCOMMITTEE ON IMMIGRATION AND CLAIMS

OF THE

COMMITTEE ON THE JUDICIARY
HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTH CONGRESS

SECOND SESSION

ON

**H.R. 3083**

JULY 20, 2000

**Serial No. 116**

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

66-253 WASHINGTON : 2000

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402

H521-14

AR2022_400002

## COMMITTEE ON THE JUDICIARY

HENRY J. HYDE, Illinois, *Chairman*

F. JAMES SENSENBRENNER, JR., Wisconsin
BILL McCOLLUM, Florida
GEORGE W. GEKAS, Pennsylvania
HOWARD COBLE, North Carolina
LAMAR S. SMITH, Texas
ELTON GALLEGLY, California
CHARLES T. CANADY, Florida
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
BOB BARR, Georgia
WILLIAM L. JENKINS, Tennessee
ASA HUTCHINSON, Arkansas
EDWARD A. PEASE, Indiana
CHRIS CANNON, Utah
JAMES E. ROGAN, California
LINDSEY O. GRAHAM, South Carolina
MARY BONO, California
SPENCER BACHUS, Alabama
JOE SCARBOROUGH, Florida
DAVID VITTER, Louisiana

JOHN CONYERS, JR., Michigan
BARNEY FRANK, Massachusetts
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
STEVEN R. ROTHMAN, New Jersey
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York

THOMAS E. MOONEY, SR., *General Counsel-Chief of Staff*
JULIAN EPSTEIN, *Minority Chief Counsel and Staff Director*

---

### SUBCOMMITTEE ON IMMIGRATION AND CLAIMS

LAMAR S. SMITH, Texas, *Chairman*

BILL McCOLLUM, Florida
ELTON GALLEGLY, California
EDWARD A. PEASE, Indiana
CHRIS CANNON, Utah
CHARLES T. CANADY, Florida
BOB GOODLATTE, Virginia
JOE SCARBOROUGH, Florida

SHEILA JACKSON LEE, Texas
HOWARD L. BERMAN, California
ZOE LOFGREN, California
BARNEY FRANK, Massachusetts
MARTIN T. MEEHAN, Massachusetts

GEORGE FISHMAN, *Chief Counsel*
JIM WILON, *Counsel*
LORA RIES, *Counsel*
CINDY BLACKSTON, *Professional Staff*
LEON BUCK, *Minority Counsel*

# CONTENTS

## HEARING DATE

Page

July 20, 2000 .......... 1

## TEXT OF BILL

H.R. 3083 .......... 1

## OPENING STATEMENT

Smith, Hon. Lamar S., a Representative in Congress From the State of Texas, and chairman, Subcommittee on Immigration and Claims .......... 1

## WITNESSES

Austin, Dwayne "Duke," former INS Senior Spokesman .......... 45
Buchanan, Bree, director, public policy, Texas Council on Family Violence .......... 68
Rishty, Jacqueline, staff attorney, Catholic Charities .......... 49
Orloff, Leslye, director, Immigrant Women Program, NOW Legal Defense and Education Fund .......... 57
Ortiz, Maria, Shelter for Abused Women .......... 65
Schakowsky, Hon. Janice, a Representative in Congress From the State of Illinois .......... 30
Strack, Barbara, Acting Executive Associate Commissioner for Policy and Planning, Immigration and Naturalization Service .......... 38

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Austin, Dwayne "Duke", former INS Senior Spokesman: Prepared statement .. 47
Buchanan, Bree, director, public policy, Texas Council on Family Violence: Prepared statement .......... 70
Jackson Lee, Hon. Sheila, a Representative in Congress From the State of Texas: Prepared statement .......... 29
Rishty, Jacqueline, staff attorney, Catholic Charities: Prepared statement .......... 51
Orloff, Leslye, director, Immigrant Women Program. NOW Legal Defense and Education Fund: Prepared statement .......... 59
Ortiz, Maria, Shelter for Abused Women: Prepared statement .......... 66
Schakowsky, Hon. Janice, a Representative in Congress From the State of Illinois: Prepared statement .......... 33
Smith, Hon. Lamar S., a Representative in Congress From the State of Texas, and chairman, Subcommittee on Immigration and Claims: Prepared statement .......... 25
Strack, Barbara, Acting Executive Associate Commissioner for Policy and Planning, Immigration and Naturalization Service: Prepared statement .......... 40

## APPENDIX

Material submitted for the record .......... 81

# BATTERED IMMIGRANT WOMEN PROTECTION ACT OF 1999

**THURSDAY, JULY 20, 2000**

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON IMMIGRATION AND CLAIMS,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to call, at 10:05 a.m., in Room 2226, Rayburn House Office Building, Hon. Lamar Smith [chairman of the subcommittee] presiding.

Present: Representatives Lamar Smith, Sheila Jackson Lee, and John Conyers, Jr. (ex officio).

Staff present: George Fishman, chief counsel; Lora Ries, counsel; Kelly Dixon, clerk; Leon Buck, minority counsel; and Nolan Rappaport, minority counsel.

## OPENING STATEMENT OF CHAIRMAN SMITH

Mr. SMITH. The Subcommittee on Immigration and Claims will come to order.

Today we are conducting a legislative hearing on H.R. 3083 , the Battered Immigrant Women Protection Act of 1999. Let me make a couple of announcements before we begin with our first witness, and that is to say that we are expecting votes at 11:30 this morning. So in an effort not to have to ask our third panel of expert witnesses to come back after lunch, we are going to be trying to move through the hearing so that we can finish by 11:30 in fairness to the witnesses and in fairness to those who are interested in the particular subject.

[The bill, H.R. 3083, follows:]

106TH CONGRESS
1ST SESSION

# H. R. 3083

To amend the Immigration and Nationality Act to provide protection for battered immigrant women, and for other purposes.

IN THE HOUSE OF REPRESENTATIVES

OCTOBER 14, 1999

Ms. SCHAKOWSKY (for herself, Ms. JACKSON LEE of Texas, Mrs. MORELLA, Mr. CAPUANO, Mr. MEEKS of New York, Mr. MCGOVERN, Mr. BERMAN, Mr. WAXMAN, Mr. SANDERS, Mr. WEINER, Mr. HINCHEY, Mr. FROST, Mr. FARR of California, Mr. STUPAK, Mr. LEACH, Ms. BERKLEY, Ms. WOOLSEY, Mr. ABERCROMBIE, Ms. EDDIE BERNICE JOHNSON of Texas, Mr. WYNN, Mrs. MALONEY of New York, Ms. NORTON, Mrs. MINK of Hawaii, Ms. SLAUGHTER, Ms. MILLENDER-MCDONALD, Mrs. CAPPS, Ms. LEE, Mr. TOWNS, Ms. BROWN of Florida, Mrs. LOWEY, Mr. GREEN of Texas,

Mr. McNULTY, Mr. GEORGE MILLER of California, Mr. CROWLEY, Ms. MCKINNEY, Mr. CONYERS, Mrs. MEEK of Florida, Mr. KIND, and Ms. DELAURO) introduced the following bill; which was referred to the Committee on the Judiciary, and in addition to the Committees on Ways and Means, Banking and Financial Services, Education and the Workforce, Agriculture, and Armed Services, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

---

# A BILL

To amend the Immigration and Nationality Act to provide protection for battered immigrant women, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Battered Immigrant Women Protection Act of 1999".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Findings and purposes.
Sec. 3. Restoring immigration protections under the Violence Against Women Act of 1994 (VAWA).
Sec. 4. Remedying problems with implementation of the immigration provisions of VAWA.
Sec. 5. Waivers and exceptions to inadmissibility for otherwise qualified battered immigrants.
Sec. 6. Calculation of physical presence in VAWA cancellation of removal and suspension of deportation.
Sec. 7. Improved access to VAWA immigration protections for battered immigrant women.
Sec. 8. Improved access to VAWA cancellation of removal.
Sec. 9. Good moral character determinations.
Sec. 10. Economic Security Act for Battered Immigrant Women.
Sec. 11. Access to legal representation and services for battered immigrants.
Sec. 12. Violence Against Women Act training for INS officers, immigration judges, and civil and criminal court justice system personnel.
Sec. 13. Protection for certain victims of crimes against women.
Sec. 14. Access to Cuban adjustment for battered immigrant spouses and children.
Sec. 15. Access to the Nicaraguan and Central American Relief Act for battered spouses and children.
Sec. 16. Access to the Haitian Refugee Immigration Fairness Act of 1998 for battered spouses and children.

**SEC. 2. FINDINGS AND PURPOSES.**

(a) FINDINGS.—Congress finds that—

(1) the goal of the immigration protections for battered immigrants included in the Violence Against Women Act of 1994 was to remove immigration laws as a barrier that kept battered immigrant women and children locked in abusive relationships;

(2) providing battered immigrant women and children who were experiencing domestic violence at home with protection against deportation allows them to obtain protection orders against their abusers and frees them to cooperate with law enforcement and prosecutors in criminal cases brought against their abusers and the abusers of their children; and

(3) there are several groups of battered immigrant women and children who do not have access to the immigration protections of the Violence Against Women Act of 1994 which means that their abusers are virtually immune from prosecution because their victims can be deported and the Immigration and Naturalization Service cannot offer them protection no matter how compelling their case under existing law.

(b) PURPOSES.—The purposes of this Act are—

(1) to promote criminal prosecutions of all persons who commit acts of battery or extreme cruelty against immigrant women and children;

(2) to offer protection against domestic violence occurring in family and intimate relationships that are covered in State and tribal protection orders, domestic violence, and family law statutes; and

(3) to correct erosions of the Violence Against Women Act of 1994 immigration protections that occurred as a result of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and the Balanced Budget Act of 1997.

**SEC. 3. RESTORING IMMIGRATION PROTECTIONS UNDER THE VIOLENCE AGAINST WOMEN ACT OF 1994 (VAWA).**

(a) REMOVING BARRIERS TO ADJUSTMENT OF STATUS FOR VICTIMS OF DOMESTIC VIOLENCE.—

(1) IMMIGRATION AMENDMENTS.—Section 245 of the Immigration and Nationality Act (8 U.S.C. 1255) is amended—

(A) in subsection (a), by inserting "or the status of any other alien having an approved petition for classification under subparagraph (A)(iii), (A)(iv), (A)(v), (A)(vi), (B)(ii), (B)(iii), or (B)(iv) of section 204(a)(1) or" after "into the United States"; and

(B) in subsection (c), by striking "Subsection (a) shall not be applicable to" and inserting the following: "Other than an alien who has an approved petition for classification under subparagraph (A)(iii), (A)(iv), (A)(v), (A)(vi), (B)(ii), (B)(iii), or (B)(iv) of section 204(a)(1), subsection (a) shall not be applicable to".

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall apply to applications for adjustment of status pending on, or made on or after, January 14, 1998.

(b) REMOVING BARRIERS TO CANCELLATION OF REMOVAL AND SUSPENSION OF DEPORTATION FOR VICTIMS OF DOMESTIC VIOLENCE.—

(1) NOT TREATING SERVICE OF NOTICE AS TERMINATING CONTINUOUS PERIOD.—

(A) IN GENERAL.—Section 240A(d)(1) of such Act (8 U.S.C. 1229b(d)(1)) is amended by striking "when the alien is served a notice to appear under section 239(a) or" and inserting "(A) except in the case of an alien who applies for cancellation of removal under subsection (b)(2), when the alien is served a notice to appear under section 239(a) or (B)".

(B) EFFECTIVE DATE.—The amendment made by subparagraph (A) shall take effect as if included in the enactment of section 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104-208, 110 Stat. 587).

(2) EXEMPTION FROM ANNUAL LIMITATION ON CANCELLATION OF REMOVAL FOR BATTERED SPOUSE OR CHILD.—

(A) IN GENERAL.—Section 240A(e)(3) of the Immigration and Nationality Act (8 U.S.C. 1229b(e)(3)) is amended by adding at the end the following:

"(C) Aliens in removal proceedings who applied for cancellation of removal under subsection (b)(2).".

(B) EFFECTIVE DATE.—The amendment made by subparagraph (A) shall take effect as if included in the enactment of section 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208, 110 Stat. 587).

(3) MODIFICATION OF CERTAIN TRANSITION RULES FOR BATTERED SPOUSE OR CHILD.—

(A) IN GENERAL.—Subparagraph (C) of section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note), as amended by section 203(a) of Public Law 105–100, is amended—

(i) in the heading by inserting "AND FOR BATTERED SPOUSES AND CHILDREN" after "FROM DEPORTATION"; and

(ii) in clause (i)—

(I) by striking, "or" at the end of subclause (IV);

(II) by striking the period at the end of subclause (V) and inserting "; or", and

(III) by adding at the end the following new subclause:

"(VI) is an alien who was issued an order to show cause or was in deportation proceedings before April 1, 1997, and who applied for suspension of deportation under section 244(a)(3) of the Immigration and Nationality Act (as in effect before the date of the enactment of this Act).".

(B) EFFECTIVE DATE.—The amendments made by subparagraph (A) shall take effect as if included in the enactment of section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note).

(c) ELIMINATING TIME LIMITATIONS ON MOTIONS TO REOPEN REMOVAL AND DEPORTATION PROCEEDINGS FOR VICTIMS OF DOMESTIC VIOLENCE.—

(1) REMOVAL PROCEEDINGS.—

(A) IN GENERAL.—Section 240(c)(6)(C) of the Immigration and Nationality Act (8 U.S.C. 1229a(c)(6)(C)) is amended by adding at the end the following:

"(iv) SPECIAL RULE FOR BATTERED SPOUSES AND CHILDREN.—There is no time limit on the filing of a motion to reopen, and the deadline specified in subsection (b)(5)(C) for filing such a motion does not apply—

"(I) if the basis for the motion is to apply for relief under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A), clause (ii), (iii), or (iv) of section 204(a)(1)(B), or section 240A(b)(2); and

"(II) if the motion is accompanied by a cancellation of removal application to be filed with the Attorney General or by a copy of the self-petition that has been or will be filed with the Immigration and Naturalization Service upon the granting of the motion to reopen.".

(B) EFFECTIVE DATE.—The amendment made by subparagraph (A) shall take effect as if included in the enactment of section 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

(2) DEPORTATION PROCEEDINGS.—

(A) IN GENERAL.—Notwithstanding any limitation imposed by law on motions to reopen or rescind deportation proceedings under the Immigration and Nationality Act (as in effect before the title III–A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note)), there is no time limit on the filing of a motion to reopen such proceedings, and the deadline specified in section 242B(c)(3) of the Immigration and Nationality Act (as so in effect) (8 U.S.C. 1252b(c)(3)) does not apply—

(i) if the basis of the motion is to apply for relief under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)), clause (ii), (iii), or (iv) of section 204(a)(1)(B) of such Act (8 U.S.C. 1154(a)(1)(B)), or section 244(a)(3) of such Act (as so in effect) (8 U.S.C. 1254(a)(3)); and

(ii) if the motion is accompanied by a suspension of deportation application to be filed with the Attorney General or by a copy of the self-petition that will be filed with the Immigration and Naturalization Service upon the granting of the motion to reopen.

(B) APPLICABILITY.—Subparagraph (A) shall apply to motions filed by aliens who—

(i) are, or were, in deportation proceedings under the Immigration and Nationality Act (as in effect before the title III–A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note)); and

(ii) have become eligible to apply for relief under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)), clause (ii), (iii), or (iv) of section 204(a)(1)(B) of such Act (8 U.S.C. 1154(a)(1)(B)), or section 244(a)(3) of such Act (as in effect before the title III–A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note)) as a result of the amendments made by—

(I) subtitle G of title IV of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 1953 et seq.); or

(II) this Act.

**SEC. 4. REMEDYING PROBLEMS WITH IMPLEMENTATION OF THE IMMIGRATION PROVISIONS OF VAWA.**

(a) EFFECT OF CHANGES IN ABUSERS' CITIZENSHIP STATUS ON SELF-PETITION.—

(1) RECLASSIFICATION.—Section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)), as amended by paragraphs (4), (5), and (6) of section 7(c), is amended by adding after clause (vii) the following new clause:

"(viii) For the purposes of any petition filed under clause (iii), (iv), (v), or (vi), denaturalization, loss or renunciation of citizenship, death of the abuser, or changes to the abuser's citizenship status after filing of the petition shall not adversely affect the approval of the petition and, for approved petitions, shall not preclude the classification of the eligible self-petitioning spouse, child, or son or daughter as an immediate relative or affect the alien's ability to adjust status under subsections (a) and (c) of section 245 or obtain status as a lawful permanent resident based on the approved self-petition under such clauses.".

(2) LOSS OF STATUS.—Section 204(a)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(B)), as amended by paragraphs (4) and (5) of section 7(d), is amended by adding after clause (v) the following new clause:

"(vi)(I) For the purposes of petitions filed or approved under clause (ii), (iii), or (iv), loss of lawful permanent resident status by a spouse or parent or death of a spouse or parent who was a lawful permanent resident after the filing of a petition under that clause shall not adversely affect approval of the petition, and, for an approved petition, shall not affect the alien's ability to adjust status under sections 245(a) and 245(c) or obtain status as a lawful permanent resident based on the approved self-petition under such clause (ii), (iii), or (iv).

"(II) Upon the lawful permanent resident spouse or parent becoming a United States citizen through naturalization, acquisition of citizenship, or other means, any petition filed with the Immigration and Naturalization Service and pending or approved under clause (ii), (iii), or (iv) on behalf of an alien who has been battered or subjected to extreme cruelty shall be deemed reclassified as a petition filed under subparagraph (A) even if the acquisition of citizenship occurs after divorce or termination of parental rights.".

(3) DEFINITION OF IMMEDIATE RELATIVE.—Section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1154(b)(2)(A)(i)) is amended by adding at the end the following new sentence: "For purposes of this clause, an alien who has filed a petition under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) remains an immediate relative in the event that the United States citizen spouse, parent, son, or daughter loses United States citizenship or dies after the filing of the petition.".

(b) EXEMPTION FOR BATTERED IMMIGRANT WOMEN WHO ENTERED THE UNITED STATES ON FIANCÉ VISAS FROM CONDITIONAL RESIDENCY STATUS REQUIREMENT.—Section 245(d) of the Immigration and Nationality Act (8 U.S.C. 1255(d)) is amended by adding at the end the following: "This subsection shall not apply to aliens who seek adjustment of status on the basis of an approved self-petition for classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or classification under clause (ii), (iii), or (iv) of section 204(a)(1)(B).".

(c) REDUCING AN ABUSER'S CONTROL OVER A BATTERED IMMIGRANT'S IMMIGRATION CASE.—Section 205 of the Immigration and Nationality Act (8 U.S.C. 1155) is amended by adding at the end the following: "Whenever a beneficiary of a petition filed under section 204 provides the Attorney General with credible evidence of battery or extreme cruelty as described in section 216(c)(4)(C), 204(a)(1)(A), or 204(a)(1)(B), the Attorney General shall adjudicate the petition filed under section 204 notwithstanding—

"(1) the withdrawal by the petitioner of the petition;

"(2) the failure of the petitioner to appear at the interview;

"(3) the failure of the petitioner to file an affidavit of support; or

"(4) a prior revocation or denial based on withdrawal of, or failure to prosecute, the petition or any other determination based on the petitioner's actions that could result or have resulted in the denial or revocation of the petition (but for this section).".

(d) REQUIRING PROSECUTOR COOPERATION WITH BATTERED IMMIGRANT VAWA APPLICANTS.—Section 2101(c) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796hh(c)) is amended—

(1) by striking "and" at the end of paragraph (4);

(2) by striking the period at the end of paragraph (4) and inserting "; and"; and

(3) by adding at the end the following:

"(5) certify that their laws, policies, and practices do not discourage or prohibit prosecutors and law enforcement officers from granting access to information about the citizenship or lawful permanent residency status of a domestic violence perpetrator to the victim, the child, son, or daughter or their advocate so long as release of the information does not jeopardize ongoing prosecution of the abuser.".

(e) ALLOWING REMARRIAGE OF BATTERED IMMIGRANTS.—Section 204(h) of the Immigration and Nationality Act (8 U.S.C. 1154(h)) is amended by adding at the end the

end the following new sentence: "Remarriage of an alien whose petition was approved under subsection (a)(1)(B)(ii) or (a)(1)(A)(iii) or marriage of an alien described in subsection (a)(1)(A)(iv), (a)(1)(A)(vi), (a)(1)(B)(iii), or (a)(1)(B)(iv) shall not be the basis for revocation under section 205.".

**SEC. 5. WAIVERS AND EXCEPTIONS TO INADMISSIBILITY FOR OTHERWISE QUALIFIED BATTERED IMMIGRANTS.**

(a) DISCRETIONARY WAIVERS FOR CERTAIN INADMISSIBILITY AND REMOVAL GROUNDS.—

(1) INADMISSIBILITY GROUNDS.—Section 212 of the Immigration and Nationality Act (8 U.S.C. 1182) is amended by adding at the end the following:

"(r) DISCRETIONARY WAIVER AUTHORITY.—The Attorney General, in the Attorney General's discretion, may waive any provision of this section (other than paragraphs (3), (10)(A), (10)(D), and (10)(E) of subsection (a)) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the alien demonstrates a connection between the crime or disqualifying act and battery or extreme cruelty for any alien who qualifies for—

"(1) classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or classification under clause (ii), (iii), or (iv) of section 204(a)(1)(B); or

"(2) relief under section 240A(b)(2) or under section 244(a)(3) (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).".

(2) REMOVAL GROUNDS.—Section 237 of the Immigration and Nationality Act (8 U.S.C. 1227) is amended by adding at the end the following:

"(d) DISCRETIONARY WAIVER AUTHORITY.—The Attorney General, in the discretion of the Attorney General, may waive any provision of this section (other than subsections (a)(2)(D)(i), (a)(4), or (a)(5)) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest in the case of an alien who demonstrates a connection between the crime or disqualifying act and battery or extreme cruelty for any alien who qualifies for—

"(1) classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or classification under clause (ii), (iii), or (iv) of section 204(a)(1)(B); or

"(2) relief under section 240A(b)(2) or under section 244(a)(3) (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).".

(b) OFFERING EQUAL ACCESS TO VAWA IMMIGRATION PROTECTIONS FOR ALL QUALIFIED BATTERED IMMIGRANT SELF-PETITIONERS.—

(1) ELIMINATING CONNECTION BETWEEN BATTERY AND UNLAWFUL ENTRY.—Section 212(a)(6)(A)(ii) of the Immigration and Nationality Act (8 U.S.C. 1182) is amended—

(A) by amending subclause (I) to read as follows:

"(I) the alien qualifies for classification under subparagraph (A)(iii), (A)(iv), (A)(v), (A)(vi), (B)(ii), (B)(iii), or (B)(iv) of section 204(a)(1), and";

(B) by striking ", and" in subclause (II) and inserting a period; and

(C) by striking subclause (III).

(2) BATTERED IMMIGRANT EXCEPTION.—Section 212(a)(9)(A)(iii) of such Act (8 U.S.C. 1182(a)(9)(A)(iii)) is amended by adding at the end the following: "Clauses (i) and (ii) also shall not apply to aliens to whom the Attorney General has granted classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or classification under clause (ii), (iii), or (iv) of section 204(a)(1)(B).".

(3) ELIMINATING CONNECTION BETWEEN BATTERY AND VIOLATION OF THE TERMS OF AN IMMIGRANT VISA.—Section 212(a)(9)(B)(iii)(IV) of such Act (8 U.S.C. 1182(a)(9)(B)(iii)(IV)) is amended by striking "who would be described in paragraph (6)(A)(ii)" and all that follows and inserting "who is described in paragraph (6)(A)(ii).".

(4) BATTERED IMMIGRANT EXCEPTION.—Section 212(a)(9)(C)(ii) of such Act (8 U.S.C. 1182(a)(9)(C)(ii)) is amended by adding at the end the following: "Clause (i) shall also not apply to aliens to whom the Attorney General has granted classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or classification under clause (ii), (iii), or (iv) of section 204(a)(1)(B).".

(5) WAIVER OF CERTAIN REMOVAL GROUNDS.—Section 237 of the Immigration and Nationality Act (8 U.S.C. 1227), as amended by subsection (a)(2), is further amended by adding at the end the following:

"(e) WAIVER FOR VICTIMS OF DOMESTIC VIOLENCE.—The Attorney General is not limited by the criminal court record and may waive the application of subsections (a)(2)(E)(i), (a)(2)(E)(ii), (a)(2)(A)(i), and (a)(2)(A)(iii) in the case of an alien who has

been battered or subjected to extreme cruelty and who is not and was not the primary perpetrator of violence in the relationship—

"(1) upon determination that—

"(A) the alien was acting in self-defense;

"(B) the alien was found to have violated a protection order intended to protect the alien; or

"(C) the alien committed, was arrested for, was convicted of, or pled guilty to committing a crime where there was a connection between the crime and having been battered or subjected to extreme cruelty; or

"(2) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.".

(6) MISREPRESENTATION WAIVERS FOR BATTERED SPOUSES OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS.—

(A) WAIVER OF INADMISSIBILITY.—Section 212(i)(1) of the Immigration and Nationality Act (8 U.S.C. 1182(i)(1)) is amended by inserting before the period at the end the following: "or, in the case of an alien granted classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or clause (ii), (iii), or (iv) of section 204(a)(1)(B), or who qualifies for relief under section 240A(b)(2) or under section 244(a)(3) (as in effect before the date of enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996), the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident or qualified alien parent, child, son, or daughter".

(B) WAIVER OF DEPORTABILITY.—Section 237(a)(1)(H) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(1)(H)) is amended—

(i) in clause (i), by inserting "(I)" after "(i)";

(ii) by redesignating clause (ii) as subclause (II); and

(iii) by inserting after clause (i) the following new clause:

"(ii) is an alien who qualifies for classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or clause (ii), (iii), or (iv) of section 204(a)(1)(B), or who qualifies for relief under section 240A(b)(2) or under section 244(a)(3) (as in effect before the date of enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).".

**SEC. 6. CALCULATION OF PHYSICAL PRESENCE IN VAWA CANCELLATION OF REMOVAL AND SUSPENSION OF DEPORTATION.**

(a) CANCELLATION OF REMOVAL PROCEEDINGS.—Section 240A(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1229b(d)(2)) is amended by adding at the end the following: "In the case of an alien applying for cancellation of removal under subsection (b)(2), the Attorney General may waive the provisions of this subsection for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, if the alien demonstrates that the absences were connected to the battery or extreme cruelty forming the basis of the application for cancellation of removal under such subsection.".

(b) SUSPENSION OF DEPORTATION PROCEEDINGS.—With respect to applications filed under section 244(a)(3) of the Immigration and Nationality Act (as in effect before the title III–A effective date, as defined in section 309(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104-208; 110 Stat. 3009–625)) (8 U.S.C. 1254(a)(3)), the Attorney General may waive the physical presence requirement for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the alien demonstrates that the absences were connected to the battery or extreme cruelty forming the basis of the application for suspension of deportation.

**SEC. 7. IMPROVED ACCESS TO VAWA IMMIGRATION PROTECTIONS FOR BATTERED IMMIGRANT WOMEN.**

(a) INTENDED SPOUSE DEFINED.—Section 101(a) of the Immigration and Nationality Act (8 U.S.C. 1101(a)) is amended by adding at the end the following new paragraph:

"(50) The term 'intended spouse' means any alien who meets the criteria set forth in section 204(j)(1)(B) or 204(k)(1)(B).".

(b) ENSURING PROTECTION FOR ABUSED CHILDREN AND CHILDREN OF BATTERED IMMIGRANTS.—Section 101(b) of the Immigration and Nationality Act (8 U.S.C. 1101(b)) is amended—

(1) in paragraph (1), by striking "The term" and inserting "Subject to paragraph (6), the term", and

(2) by adding at the end the following new paragraph:

"(6) For the purposes of clauses (iii) and (iv) of section 204(a)(1)(A), clauses (ii) and (iii) of section 204(a)(1)(B), section 240A(b)(2), and section 244(a)(3) (as in effect before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996) and for the purposes of attaining lawful permanent residency under those sections either under section 245 or by obtaining an immigrant visa under section 203, an individual who turns 21 years old remains a child under paragraph (1) if, on the date a petition or application was filed by the individual or their parent under any of these sections the individual—
    "(A) met the definition of child in one of subparagraphs (A) through (F) of paragraph (1); and
    "(B) was under the age of 21 on the date the application or petition was filed.".

(c) IMMEDIATE RELATIVE STATUS FOR SELF-PETITIONERS MARRIED TO U.S. CITIZENS.—
    (1) SELF-PETITIONING SPOUSES.—
        (A) BATTERY OR CRUELTY TO ALIEN OR ALIEN'S CHILD.—Section 204(a)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)(iii)) is amended to read as follows:
"(iii) An alien who is described in subsection (j) may file a petition with the Attorney General under this clause for classification of the alien (and any child of the alien as defined in paragraph (1) or (6) of section 101(b) if the alien demonstrates to the Attorney General that—
    "(I) the marriage or the intent to marry the United States citizen was entered into in good faith by the alien; and
    "(II) during the marriage or relationship intended by the alien to be legally a marriage, the alien or a child of the alien has been battered or has been the subject of extreme cruelty perpetrated by the alien's spouse or intended spouse.".
        (B) DESCRIPTION OF PROTECTED SPOUSE OR INTENDED SPOUSE.—Section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) is amended by adding at the end the following:
"(j) DESCRIPTION OF PROTECTED SPOUSE OR INTENDED SPOUSE.—For purposes of subsection (a)(1)(A)(iii), an alien described in this subsection is an alien—
    "(1)(A) who is the spouse of a citizen of the United States; or
    "(B)(i) who believed that he or she had married a citizen of the United States and with whom a marriage ceremony was actually performed; and
    "(ii) who otherwise meets any applicable requirements under this Act to establish the existence of and bona fides of a marriage, but whose marriage is not legitimate solely because of the bigamy of such citizen of the United States; or
    "(C) who was a bona fide spouse of a United States citizen within the past two years and whose spouse died within the past two years, or whose spouse lost immigration status within the past two years due to an incident of domestic violence, or who demonstrates a connection between the legal termination of the marriage within the past two years and battering or extreme cruelty by the United States citizen spouse;
    "(2) who is a person of good moral character;
    "(3) who is eligible to be classified as an immediate relative under section 201(b)(2)(A)(i) or who would have been so classified but for the bigamy of the citizen of the United States that the alien intended to marry; and
    "(4) who has resided with the alien's spouse or intended spouse.".
    (2) GUARANTEEING ACCESS TO VAWA RELIEF FOR BATTERED IMMIGRANTS BROUGHT INTO THE UNITED STATES ON FIANCÉ VISAS.—Section 204(a)(1)(C) of the Immigration and Nationality Act, as inserted by subsection (d)(6), is amended by adding at the end the following new clause:
"(iii) For aliens who entered the country on fiancé visas, failure to marry the sponsor or failure to marry the sponsor within 90 days as required under section 101(a)(15)(K) shall not bar access to relief under clause (iii), (iv), (v), or (vi) of subsection (a)(1)(A), under clause (ii), (iii), or (iv) of subsection (a)(1)(B), under section 240A(b)(2), or under section 244(a)(3) (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996) to aliens who otherwise qualify.".
    (3) SELF-PETITIONING CHILDREN.—Section 204(a)(1)(A)(iv) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)(iv)) is amended to read as follows:
"(iv) An alien who is the child of a citizen of the United States (as defined in paragraph (1) or (6) of section 101(b)) or who was a child of United States citizen parent who died within the past two years or lost immigration status due to an incident of domestic violence within the past two years, and who is a person of good

moral character, who is eligible to be classified as an immediate relative under section 201(b)(2)(A)(i), and who resides or has resided in the past with the citizen parent may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien) under such section if the alien demonstrates to the Attorney General that the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's citizen parent. For purposes of this clause, residence includes any period of visitation.".

(4) SELF-PETITIONING PARENTS.—Section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)) is amended by adding after clause (iv) the following new clause:

"(v) An alien who is the parent of a citizen of the United States or who was a parent of United States citizen who died within the past two years or lost immigration status due to an incident of domestic violence within the past two years, and who is a person of good moral character, who is eligible to be classified as an immediate relative under section 201(b)(2)(A)(i), and who has resided with the citizen daughter or son may file a petition with the Attorney General under this subparagraph for classification of the alien under such section if the alien demonstrates to the Attorney General that the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's citizen son or daughter.".

(5) SELF-PETITIONING SON OR DAUGHTER.—Section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)), as amended by paragraph (4), is amended by adding after clause (v) the following new clause:

"(vi) An alien who is the son or daughter of a citizen of the United States or who was the son or daughter of United States citizen parent who died within the past two years or lost immigration status due to an incident of domestic violence within the past two years, and who is a person of good moral character, who is eligible for classification by reason of a relationship described in paragraph (1) of section 203(a), and who resides or has resided in the past with the citizen parent may file a petition with the Attorney General under this clause for classification of the alien (and any child of the alien) under such section if the alien demonstrates to the Attorney General that the alien has been battered by, or has been the subject of extreme cruelty perpetrated by, the alien's citizen parent and 1 or more incidents of battery or extreme cruelty occurred before the son or daughter reached the age of 21. For purposes of this clause, residence includes any period of visitation.".

(6) FILING OF PETITIONS.—Section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154 (a)(1)(A)(iv)), as amended by paragraphs (4) and (5), is amended by adding after clause (vi) the following new clause:

"(vii) An alien who is the spouse, intended spouse, child, parent, son, or daughter of a United States citizen living abroad and who is eligible to file a petition under clause (iii), (iv), (v), or (vi) shall file such petition with the Attorney General under the procedures that apply to self-petitioners under such clauses.".

(d) SECOND PREFERENCE IMMIGRATION STATUS FOR SELF-PETITIONERS MARRIED TO LAWFUL PERMANENT RESIDENTS.—

(1) SELF-PETITIONING SPOUSES.—Section 204(a)(1)(B)(ii) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(B)(ii)) is amended to read as follows:

"(ii) An alien who is described in subsection (k) may file a petition with the Attorney General under this clause for classification of the alien (and any child of the alien as defined in paragraph (1) or (6) of section 101(b)) if such a child has not been classified under clause (iii) of section 203(a)(2)(A) and if the alien demonstrates to the Attorney General that—

"(I) the marriage or the intent to marry the lawful permanent resident was entered into in good faith by the alien; and

"(II) during the marriage or relationship intended by the alien to be legally a marriage, the alien or a child of the alien has been battered or has been the subject of extreme cruelty perpetrated by the alien's spouse or intended spouse.".

(2) DESCRIPTION OF PROTECTED SPOUSE OR INTENDED SPOUSE.—Section 204 of the Immigration and Nationality Act (8 U.S.C. 1154), as amended by subsection (c)(1)(B), is further amended by adding at the end the following:

"(k) DESCRIPTION OF PROTECTED SPOUSE OR INTENDED SPOUSE.—For purposes of subsection (a)(1)(B)(ii), an alien described in this subsection is an alien—

"(1)(A) who is the spouse of a lawful permanent resident of the United States; or

"(B)(i) who believed that he or she had married a lawful permanent resident of the United States and with whom a marriage ceremony was actually performed; and

"(ii) who otherwise meets any applicable requirements under this Act to establish the existence of and bona fides of a marriage, but whose marriage is not

legitimate solely because of the bigamy of such lawful permanent resident of the United States; or

"(iii) who was a bona fide spouse of a lawful permanent resident within the past two years and whose spouse died within the past two years, or whose spouse lost status within the past two years due to an incident of domestic violence, or who demonstrates a connection between the legal termination of the marriage within the past two years and battering or extreme cruelty by the United States citizen spouse;

"(2) who is a person of good moral character;

"(3) who is eligible to be classified as a spouse of an alien lawfully admitted for permanent residence under section 203(a)(2)(A) or who would have been so classified but for the bigamy of the lawful permanent resident of the United States that the alien intended to marry; and

"(4) who has resided in the United States with the alien's spouse or intended spouse.".

(3) SELF-PETITIONING CHILDREN.—Section 204(a)(1)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(B)(iii)) is amended to read as follows:

"(iii) An alien who is the child of an alien lawfully admitted for permanent residence as defined in paragraph (1) or (6) of section 101(b) or who was a child of a lawful permanent resident parent who died within the past two years or lost immigration status due to an incident of domestic violence within the past two years, and who is a person of good moral character, who is eligible for classification under section 203(a)(2)(A), and who resides or has resided in the past with the alien's permanent resident alien parent may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien) under such section if the alien demonstrates to the Attorney General that the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's permanent resident parent. For purposes of this clause, residence includes any period of visitation.".

(4) SELF-PETITIONING SON OR DAUGHTER.—Section 204(a)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(B)), as amended by section 4(a)(2), is further amended by adding at the end the following:

"(iv) An alien who is the son or daughter of an alien lawfully admitted for permanent residence or who was a son or daughter of a lawful permanent resident parent who died within the past two years or lost immigration status due to an incident of domestic violence within the past two years and who is a person of good moral character, who is eligible for classification by reason of a relationship described in paragraph (2) of section 203(a), and who resides or has resided in the past with the alien's legal permanent resident parent may file a petition with the Attorney General under this clause for classification of the alien (and any child of the alien) under such section if the alien demonstrates to the Attorney General that the alien has been battered by, or has been the subject of extreme cruelty perpetrated by, the alien's legal permanent resident parent and 1 or more incidents of battery or extreme cruelty occurred before the son or daughter reached the age of 21. For purposes of this clause, residence includes any period of visitation.".

(5) FILING OF PETITIONS.—Section 204(a)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(B)), as amended by paragraph (4), is further amended by adding after clause (iv) the following new clause:

"(v) An alien who is the spouse, intended spouse, child, son, or daughter of a lawful permanent resident living abroad is eligible to file a petition under clause (ii), (iii), or (iv) shall file such petition with the Attorney General under the procedures that apply to self-petitioners under such clauses.".

(6) TREATMENT OF PETITIONS INCLUDING DERIVATIVE CHILDREN TURNING 21 YEARS OF AGE.—Section 204(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)) is amended—

(A) by redesignating subparagraphs (C) through (H) as subparagraphs (D) through (I), respectively; and

(B) by inserting after subparagraph (B) the following:

"(C)(i)(I) Any derivative child who attains 21 years of age and who is included in a petition described in clause (ii) that was filed or approved before the date on which the child attained 21 years of age shall be considered (if no visa has been issued to the child by such date) a petitioner for preference status under paragraph (1), (2), or (3) of section 203(a), whichever paragraph is applicable, with the same priority date as that assigned to the petition in any petition described in clause (ii).

"(II) Any individual described in subclause (I) and any derivative child of a petition described in clause (ii) is eligible for deferred action and work authorization.

"(ii) The petition referred to in clause (i) is a petition filed by an alien under subparagraph (A)(iii), (A)(iv), (A)(vi), (B)(ii), (B)(iii), or (B)(iv) in which the child is included as a derivative.".

(e) ACCESS TO NATURALIZATION FOR DIVORCED VICTIMS OF ABUSE.—Section 319(a) of the Immigration and Nationality Act (8 U.S.C. 1430(a)) is amended—

(1) by inserting ", and any person who obtained status as a lawful permanent resident by reason of his or her status as a spouse or child of a United States citizen who battered him or her or subjected him or her to extreme cruelty," after "United States" the first place it appears; and

(2) by inserting "(except in the case of a person who has been battered or subjected to extreme cruelty by a United States citizen spouse or parent)" after "has been living in marital union with the citizen spouse".

**SEC. 8. IMPROVED ACCESS TO VAWA CANCELLATION OF REMOVAL.**

(a) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—Section 240A(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1229b(b)(2)) is amended to read as follows:

"(2) SPECIAL RULE FOR BATTERED SPOUSE, PARENT, CHILD, SON, OR DAUGHTER.—

"(A) IN GENERAL.—The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien demonstrates that—

"(i)(I) the alien has been battered or subjected to extreme cruelty in the United States by a spouse, parent, son, or daughter who is or was a United States citizen (or is the parent of a child of a United States citizen and the child has been battered or subjected to extreme cruelty in the United States by such citizen parent);

"(II) the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a lawful permanent resident (or is the parent of a child of an alien who is or was a lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such permanent resident parent), or

"(III) the alien has been battered or subjected to extreme cruelty by a United States citizen or lawful permanent resident whom the alien intended to marry, but whose marriage is not legitimate because of that United States citizen's or lawful permanent resident's bigamy;

"(ii) the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application (and the issuance of a charging document for removal proceedings shall not toll the 3-year period of continuous physical presence in the United States);

"(iii) the alien has been a person of good moral character during such period;

"(iv) the alien is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraphs (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony, unless the Attorney General waives application of this clause pursuant to section 237(d) or for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest; and

"(v) the removal would result in extreme hardship to the alien, the alien's child, or the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General. For aliens who entered the country on fiancé visas, failure to marry the sponsor, or failure to marry the sponsor within 90 days as required under section 101(a)(15)(K), shall not bar access to relief under this paragraph to aliens who otherwise qualify.

"(B) INCLUSION OF OTHER ALIENS IN CANCELLATION OF REMOVAL APPLICATIONS.—An alien applying for relief under this paragraph may include—

"(i) the alien's children, sons, or daughters in the alien's application and, if the alien is found eligible for cancellation, the Attorney General may adjust the status of the alien's children, sons, daughters; or

"(ii) the alien's parent or child in the alien child's (as defined in paragraph (1) or (6) of section 101(b)) application in the case of an application filed by an alien who was abused by a citizen or lawful perma-

nent resident parent and, if the alien child is found eligible for cancellation, the Attorney General may adjust the status of the alien child applicant and the alien child's parent and child.

"(C) INCLUSION OF OTHER ALIENS IN SUSPENSION OF DEPORTATION APPLICATIONS.—An alien applying for relief under section 244(a)(3) (as in effect before the date of the enactment of Illegal Immigration Reform and Immigrant Responsibility Act of 1996) may include—

"(i) the alien's children, sons, or daughters in the alien's application and, if the alien is found eligible for suspension, the Attorney General may adjust the status of the alien's children, sons, or daughters; or

"(ii) the alien's parent or child in the alien child's (as defined in paragraph (1) or (6) of section 101(b)) application in the case of an application filed by an alien who was abused by a citizen or lawful permanent resident parent and, if the alien child is found eligible for suspension, the Attorney General may adjust the status of the alien child applicant and the alien child's parent and child.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the enactment of section 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 110 Stat. 587).

(c) TREATMENT OF FAMILY MEMBERS.—

(1) IN GENERAL.—Section 203(d) of the Immigration and Nationality Act (8 U.S.C. 1153(d)) is amended—

(A) by inserting "(1)" before "A spouse or child"; and

(B) by adding at the end the following:

"(2) A spouse, parent, or child as defined in paragraph (1) or (6) of section 101(b) if not otherwise entitled to an immigrant status and immediate issuance of a visa shall be entitled to attain lawful permanent resident status if their spouse, parent, or child was granted such status pursuant to section 240A(b)(2) or section 244(a)(3) (as in effect before the date of the enactment of Illegal Immigration Reform and Immigrant Responsibility Act of 1996) by accompanying or following to join the spouse, child, or parent.".

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall take effect as if included in the enactment of subtitle G of title IV of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 1953 et seq.).

**SEC. 9. GOOD MORAL CHARACTER DETERMINATIONS.**

(a) DETERMINATIONS OF GOOD MORAL CHARACTER FOR SELF-PETITIONING IMMEDIATE RELATIVES.—Section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)), as amended by sections 7(c) and 4(a)(1), is further amended by adding after clause (viii) at the end the following new clause:

"(ix) For the purposes of making good moral character determinations under this subparagraph, the Attorney General is not limited by the criminal court record and may make a finding of good moral character notwithstanding the existence of a disqualifying act or criminal conviction in the case of an alien who otherwise qualifies for relief under clause (iii), (iv), (v), or (vi), but who committed, was arrested for, has been convicted of, or who pled guilty to—

"(I) violating a court order issued to protect the alien;

"(II) prostitution if the alien was forced into prostitution by an abuser;

"(III) a domestic violence-related crime, if the Attorney General determines that the alien acted in self-defense; or

"(IV) a crime where there was a connection between the commission of the crime and having been battered or subjected to extreme cruelty.".

(b) DETERMINATIONS OF GOOD MORAL CHARACTER FOR SELF-PETITIONERS SEEKING SECOND PREFERENCE IMMIGRATION STATUS.—Section 204(a)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(B)), as amended by sections 7(d) and 4(a)(2), is further amended by adding after clause (vi) the following new clause:

"(vii) For the purposes of making good moral character determinations under this subparagraph, the Attorney General is not limited by the criminal court record and may make a finding of good moral character notwithstanding the existence of a disqualifying act or criminal conviction in the case of an alien who otherwise qualifies for relief under clause (ii), (iii), or (iv), but who committed, was arrested for, has been convicted of, or who pled guilty to—

"(I) violating a court order issued to protect the alien;

"(II) prostitution if the alien was forced into prostitution by an abuser;

"(III) a domestic violence-related crime, if the Attorney General determines that the alien acted in self-defense; or

"(IV) a crime where there was a connection between the commission of the crime and having been battered or subjected to extreme cruelty.".

(c) DETERMINATIONS OF GOOD MORAL CHARACTER IN VAWA CANCELLATION OF REMOVAL PROCEEDINGS.—Section 240A(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1229b(b)(2)), as amended by section 8(a), is further amended by adding at the end the following new subparagraph:

"(D) GOOD MORAL CHARACTER DETERMINATIONS.—For the purposes of making good moral character determinations under this subsection, the Attorney General is not limited by the criminal court record and may make a finding of good moral character notwithstanding the existence of a disqualifying act or criminal conviction in the case of an alien who has been battered or subjected to extreme cruelty but who committed, was arrested for, has been convicted of, or who pled guilty to—

"(i) violating a court order is sued to protect the alien;

"(ii) prostitution if the alien was forced into prostitution by an abuser;

"(iii) a domestic violence-related crime if the Attorney General determines that the alien acted in self-defense; or

"(iv) committing a crime where there was a connection between the commission of the crime and having been battered or subjected to extreme cruelty.".

(d) DETERMINATIONS UNDER SUSPENSION OF DEPORTATION.—For the purposes of making good moral character determinations under section 244(a)(3) of the Immigration and Nationality Act (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996) (8 U.S.C. 1254(a)(3)), the Attorney General is not limited by the criminal court record and may make a finding of good moral character notwithstanding the existence of a disqualifying act or criminal conviction in the case of an alien who has been battered or subjected to extreme cruelty but who committed, was arrested for, has been convicted of, or who pled guilty to—

(1) violating a court order issued to protect the alien;

(2) prostitution if the alien was forced into prostitution by an abuser;

(3) a domestic violence-related crime if the Attorney General determines that the alien acted in self-defense; or

(4) committing a crime where there was a connection between the commission of the crime and having been battered or subjected to extreme cruelty.

**SEC. 10. ECONOMIC SECURITY ACT FOR BATTERED IMMIGRANT WOMEN.**

(a) NONAPPLICABILITY OF SPECIAL RULES RELATING TO THE TREATMENT OF NON-213A ALIENS.—Section 408(f)(6) of the Social Security Act (42 U.S.C. 608(f)(6)) is amended—

(1) in subparagraph (B), by striking "or" at the end;

(2) in subparagraph (C), by striking the period and inserting "; or"; and

(3) by adding at the end the following:

"(D) described in section 421(f) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631(f)) but for the fact that the individual is a non-213A alien.".

(b) PUBLIC CHARGE.—Section 212(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(4)) is amended by adding at the end the following new subparagraph:

"(E) EXCEPTION.—The following aliens are not subject to public charge determinations under this paragraph:

"(i) An alien who qualifies for classification as a spouse, parent, child, son, or daughter of a United States citizen or lawful permanent resident under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) or clause (ii), (iii), or (iv) of section 204(a)(1)(B).

"(ii) An alien who qualifies for classification under clause (i) or (ii) of section 204(a)(1)(A) or section 204(a)(1)(B)(i) and who presents credible evidence of having been battered or subjected to extreme cruelty by their United States citizen or lawful permanent resident spouse, parent, son, or daughter. In the case of alien sons or daughters, one or more incidents of battering or extreme cruelty must have occurred before the alien turned 21 years of age. This clause shall apply whether or not an affidavit of support has been filed on the alien's behalf.

"(iii) An alien who qualifies for status as a spouse, parent, child, son, or daughter of a United States citizen or lawful permanent resident, or as a parent of a child of a United States citizen or lawful permanent resident, pursuant to section 240A(b)(2) or section 244(a)(3) (as

in effect before the date of enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).

"(iv) Any child (as defined in paragraph (1) or (6) of section 101(b)) included in the application of an alien described in clause (i), (ii), or (iii).".

(c) WAIVER OF FILING FEES.—

(1) PETITIONS FOR CLASSIFICATION.—Section 204(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)), as amended by section 7(c), is further amended by adding at the end the following new subparagraph:

"(I) No fee shall be charged for the filing or processing of any application under clause (iii), (iv), (v), or (vi) of subparagraph (A) or clause (ii), (iii), or (iv) of subparagraph (B), or the first application for work authorization filed by an applicant under such a clause.".

(2) CANCELLATIONS OF REMOVAL.—Section 240A(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1229b), as amended by section 9(c), is amended by adding at the end the following new subparagraph:

"(E) PROHIBITION OF CHARGING FEES.—No fee shall be charged for the filing or processing of any application under this paragraph or the first application for work authorization filed by applicants under this paragraph.".

(3) SUSPENSION OF DEPORTATION.—No fee shall be charged for the filing or processing of any application under section 244(a)(3) of the Immigration and Nationality Act (as in effect before the date of enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996) (8 U.S.C. 1254(a)(3)), or the first application for work authorization filed by applicants under such section.

(d) ACCESS TO FOOD STAMPS AND SSI FOR QUALIFIED BATTERED ALIENS.—Section 402(a)(2) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1612(a)(2)) is amended by adding at the end the following:

"(L) EXCEPTION FOR CERTAIN BATTERED ALIENS.—With respect to eligibility for benefits for the specified Federal program (as defined in paragraph (3)), paragraph (1) shall not apply to any individual described in section 431(c).".

(e) EXEMPTION FROM 5-YEAR BAN.—Section 403(b) of the Personal Responsibility and Work Opportunity Act of 1996 (8 U.S.C. 1613(b)) is amended by adding at the end the following:

"(3) BATTERED IMMIGRANTS.—An alien described in section 431(c).".

(f) ACCESS TO HOUSING FOR BATTERED WOMEN AND QUALIFIED IMMIGRANTS.—(1) Section 214 of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a) is amended—

(A) in subsection (a), in the matter before paragraph (1), by striking "a resident of the United States and is";

(B) in paragraphs (1) through (6) of subsection (a), by inserting "a resident of the United States and is" before "an alien" each place it appears;

(C) in subsection (a)(5), by striking "or" at the end;

(D) in subsection (a)(6), by striking the period and inserting "; or";

(E) by adding at the end of subsection (a) the following new paragraph:

"(7) a qualified alien as described in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641).";

(F) in subsection (b)(2), by adding at the end the following: "Proration shall not apply in the case of a qualified alien as described in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641).";

(G) in subsection (c)(1)(A), by adding at the end the following: "Proration shall not apply in the case of a qualified alien as described in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641).";

(H) in subsection (c)(1)(A), by striking "paragraphs (1) through (6)" and inserting "paragraphs (1) through (7)";

(I) in subsection (c)(2)(A), by inserting "(other than a qualified alien as described in section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641(c)))" after "any alien"; and

(J) in subsection (d)(1)(B), by inserting before the period ", including a qualified alien as described in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641)".

(2) Section 401 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1611) is amended by adding at the end the following new subsection:

"(d) ACCESS TO SHELTER AND SERVICES FOR BATTERED IMMIGRANTS.—Notwithstanding any other provision of law, no private, government, or nonprofit organization providing shelter or services to battered women, abused children, or providing any other services listed in subsection (b) that receives any Federal funds shall deny, restrict, or condition assistance to any applicant based on alienage.".

(g) CLARIFYING WELFARE REPORTING REQUIREMENTS FOR BENEFIT APPLICANTS.—The Social Security Act (42 U.S.C. 301 et seq.) is amended—

(1) in section 411(a)(1) (42 U.S.C. 611(a)(1)), by adding at the end the following new subparagraph:

"(C) INFORMATION ON IMMIGRATION STATUS.—Collection of information about, and inquiries into, the immigration status of an individual who is a parent applying on behalf of his or her child who is a United States citizen or a qualified alien (as defined in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) for assistance under the State program funded under this part, shall not be made if the individual is not applying for benefits for themselves, whether or not the individual is determined, under Federal or State law, to be part of a family unit receiving assistance under that program."; and

(2) in section 1631(e)(9) (42 U.S.C. 1383(e)(9)), by adding at the end the following: "Collection of information about, and inquiries into, the immigration status of an individual who is a parent applying on behalf of his or her child who is a United States citizen or a qualified alien (as defined in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) for benefits under this title (or for benefits supplemented by a State with an agreement under section 1616), shall not be made if the individual is not applying for benefits for themselves, whether or not the individual is determined, under Federal or State law, to be part of a family unit receiving such benefits.".

(h) CONFORMING DEFINITION OF "FAMILY" USED IN LAWS GRANTING WELFARE ACCESS FOR BATTERED IMMIGRANTS TO STATE FAMILY LAW.—Section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641(c)) is amended—

(1) in paragraph (1)(A), by striking "by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to, or acquiesced in, such battery or cruelty," and inserting "by a spouse or parent, or by any individual having a relationship with the alien covered by the civil or criminal domestic violence statutes of the State or Indian country where the alien resides, or the State or Indian country in which the alien, the alien's child, or the alien child's parents received a protection order, or by any individual against whom the alien could obtain a protection order,"; and

(2) in paragraph (2)(A), by striking "by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty," and inserting "by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by any person having a relationship with the alien covered by the civil or criminal domestic violence statutes of the State or Indian country where the alien resides, or the State or Indian country in which the alien, the alien's child or the alien child's parent received a protection order, or by any individual against whom the alien could obtain a protection order,".

(i) EXPANSION OF DEFINITION OF BATTERED IMMIGRANTS.—

(1) IN GENERAL.—Section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641(c)) is amended—

(A) in paragraphs (1)(A), (2)(A), and (3)(A) by inserting "or the benefits to be provided would alleviate the harm from such battery or cruelty or would enable the alien to avoid such battery or cruelty in the future" before the semicolon; and

(B) in the matter following paragraph (3), by inserting "and for determining whether the benefits to be provided under a specific Federal, State, or local program would alleviate the harm from such battery or extreme cruelty or would enable the alien to avoid such battery or extreme cruelty in the future" before the period.

(2) CONFORMING AMENDMENT REGARDING SPONSOR DEEMING.—Section 421(f) of such Act (8 U.S.C. 1631(f)(1)) is amended—

(A) in subparagraph (A), by inserting "or would alleviate the harm from such battery or extreme cruelty, or would enable the alien to avoid such battery or extreme cruelty in the future" before the semicolon; and

(B) in subparagraph (B), by inserting "or would alleviate the harm from such battery or extreme cruelty, or would enable the alien to avoid such battery or extreme cruelty in the future" before the period.

(j) ENSURING THAT BATTERED IMMIGRANTS HAVE ACCESS TO FOOD STAMPS AND SSI.—

(1) QUALIFYING QUARTERS.—Section 435(2) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1645(2)) is amended by striking "and the alien remains married to such spouse or such spouse is deceased" and inserting "if such spouse is deceased or if the alien remains married to such spouse (except that qualified aliens covered by section 431(c) may continue after divorce to count the qualifying quarters worked by their spouse during the marriage)".

(2) FOOD STAMPS ACCESS FOR BATTERED IMMIGRANT QUALIFIED ALIENS AND THEIR CHILDREN.—Section 7 of the Food Stamp Act of 1977 (7 U.S.C. 2016) is amended by adding at the end the following:

"(k) BATTERED IMMIGRANT QUALIFIED ALIEN ELIGIBILITY FOR FOOD STAMPS.—Qualified alien battered immigrants under section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and their children are eligible to receive food stamps.".

(k) TECHNICAL CORRECTIONS TO QUALIFIED ALIEN DEFINITION FOR BATTERED IMMIGRANTS.—Section 431(c)(1)(B) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641(c)(1)(B)) is amended—

(1) in clause (i), by striking "clause (ii), (iii), or (iv)" and inserting "clause (ii), (iii), (iv), (v), or (vi)";

(2) in clause (ii), by striking "clause (ii) or (iii)" and inserting "clause (i), (ii), (iii), or (iv)"; and

(3) by amending clause (iii) to read as follows:

"(iii) suspension of deportation under section 244(a)(3) of the Immigration and Nationality Act (as in effect before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).".

**SEC. 11. ACCESS TO LEGAL REPRESENTATION AND SERVICES FOR BATTERED IMMIGRANTS.**

(a) CONSTRUCTION.—Section 502 of the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1998 (Public Law 105–119; 111 Stat. 2511) is amended by adding at the end the following:

"(c) CONSTRUCTION.—This section shall not be construed to prohibit a recipient from—

"(1) using funds derived from a source other than the Legal Services Corporation to provide related legal assistance (as that term is defined in subsection (b)(2)) to any alien who has been battered or subjected to extreme cruelty by a person with whom the alien has a relationship covered by the domestic violence laws of the State in which the alien resides or in which an incidence of violence occurred;

"(2) using Legal Services Corporation funds to provide related legal assistance to any alien who has been battered or subjected to extreme cruelty who qualifies for classification under clause (iii), (iv), (v), or (vi) of section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)), clause (ii), (iii), or (iv) of section 204(a)(1)(B) of such Act (8 U.S.C. 1154(a)(1)(B)), or subsection (b)(2) of section 240A of such Act (8 U.S.C. 1229b) or section 244(a)(3) of the Immigration and Nationality Act (as in effect before the title III–A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note).".

(b) LAW ENFORCEMENT AND PROSECUTION GRANTS.—

(1) Section 2001(b)(5) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796bb(b)(5)) is amended—

(A) by striking "to racial, cultural, ethnic, and language minorities" and inserting "to underserved populations"; and

(B) by inserting "providing immigration assistance to victims of domestic violence," after "protection orders are granted,".

(2) Section 2002 of such Act (42 U.S.C. 3796gg) is amended—

(A) in subsection (h)(1), by inserting before the period the following: ", the demographics of underserved populations in the State and details about the percentage of funding that went to serve which underserved populations, the programs that received such funding, and the involvement of programs serving underserved populations in the development of the State plan under subsection (c)(2)";

(B) in subsection (d)(1)(D), by striking "age, marital status, disability, race, ethnicity and language background" and inserting "marital status and characteristics of any underserved populations";

(C) in subsection (d)—

(i) by striking "and" at the end of paragraph (2),

(ii) by striking the period at the end of paragraph (3) and inserting "; and", and

(iii) by adding at the end the following:

"(4) in the case of a State, Indian tribal government, or unit of local governments applying as subgrantee for a grant under this section, a certification that its laws or official policies comply with each of the provisions of section 2101(c). The requirements of paragraph (4) do not apply to a nonprofit, nongovernmental entity that is applying for grants under this section."; and

(D) by adding at the end the following new subsection:

"(i) REPORT ON SERVICES FOR UNDERSERVED POPULATIONS.—The Violence Against Women Grants Office in the Department of Justice shall submit to Congress, not later than 1 year after the date of the enactment of this subsection, a report that contains the following information:

"(1) The quantity and percentage of funding awarded to serve underserved populations by each State under each of the following:

"(A) Grants to combat violent crimes against women under section 2001.

"(B) Grants to encourage arrest under section 2101.

"(C) Rural domestic violence and child abuse enforcement assistance grants under section 40295(a)(2) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322, 42 U.S.C. 13971(a)(2)).

"(D) Civil legal assistance grants under title I of the Department of Justice Appropriations Act, 1999.

"(E) Campus domestic violence grants under section 826 of the Higher Education Amendment Act of 1998 (Public Law 105–244; 20 U.S.C. 1152).

"(2) The percentage of each underserved population in the demographic make up of each State compared to the amount of funding aimed at addressing the needs of that underserved population.

"(3) The extent to which grants to provide services to underserved populations are awarded to programs with experience and history working with underserved populations of battered women or sexual assault victims, to programs that have bilingual or bicultural staff, and to collaborations between domestic violence or sexual assault programs and programs experienced in serving particular underserved populations and to other grantees.

"(4) The extent to which nonprofit, nongovernmental victim service organizations with experience serving various underserved populations of battered women and sexual assault or stalking victims were consulted in the development of the State plan under section 2001(c)(2), the application under section section 2102(a)(4), or the community cooperation referred to in section 40295(a)(3) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322, 42 U.S.C. 13971(a)(3)).".

(3) Section 2003(7) of such Act (42 U.S.C. 3796gg–2(7)) is amended to read as follows:

"(7) the term 'underserved populations' includes populations underserved because of race, ethnicity, age, disability, sexual orientation, religion, alienage status, geographic location (including rural isolation), language barriers, and any other populations determined to be underserved in the State planning process; and".

(4) Section 2004(b)(3) of such Act (42 U.S.C. 3796gg–3(b)(3)) is amended by striking all that follows "relationship of victim to the offender" and inserting "and the membership of persons served in any underserved populations; and".

(c) GRANTS TO ENCOURAGE ARRESTS.—

(1) Section 2101 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796hh) is amended—

(A) in subsection (b)(5), by inserting before the period the following: ", including strengthening legal advocacy for domestic violence victims in immigration cases";

(B) in subsection (c)—

(i) by striking "and" at the end of paragraph (3);

(ii) by striking the period at the end of paragraph (4) and inserting a semicolon; and

(iii) by adding at the end the following new paragraphs:

"(5) certify that their laws, policies, and practices require issuance of protection orders that are jurisdictionally sound and that all protection orders are issued after a finding, after an admission by the abuser, or based on the facts in the victim's petition that are uncontested by the abuser; and

"(6) certify that their laws, policies, and practices—

"(A) keep locational information and services provided to victims of domestic violence confidential and comply with all State and Federal laws and rules of professional practice regarding confidentiality;

"(B) guarantee that information is not released to any person without the express permission of the abuse victim, except when such information is required for a legitimate law enforcement purpose unrelated to the victim's abuser; and

"(C) assure that locational information about a victim or the services obtained by a victim are not considered a matter of public record."; and

(C) by adding at the end the following new subsection:

"(d) ADDITIONAL PROVISIONS.—(1) The requirements of subsection (c) do not apply to nonprofit, nongovernmental entities applying for grants under this section.

"(2) All grantees and subgrantees of grants in effect on the date of the enactment of this subsection or submitting new applications for funding after such date that are States, Indian tribal governments, or units of local government shall submit a certification by the chief executive officer of the State, tribal government, or local government entity that the conditions of subsections (c)(5) and (c)(6) are met (or will be met) not later than the date on which the next session of the State or Indian tribal legislature ends, but in no case later than 2 years after such date of enactment.

"(3) Failure by a grantee to comply with the certifications contained in paragraphs (1) thorough (6) of subsection (c) may result in suspension or revocation of funding. Once a grantee or subgrantee has been notified that its funding will be revoked, they shall be granted 6 months to bring their laws, policies, or practices into compliance before the revocation takes effect. Any funds that are not distributed to grantees or are removed from grantees under this paragraph shall be distributed to other eligible entities within the State. For grants under section 2002, the funds are to be redistributed first to entities within the same formula category and then, if there are no eligible entities within the same formula category, to other eligible entities without regard to the formula.".

(2) Section 2103 of such Act (42 U.S.C. 3796hh-2) is amended by adding at the end the following: "Each report shall include information about the demographics of underserved populations in the State and details about the percentage of funding that went to serve which underserved populations, the programs that received such funding, and the involvement of programs serving underserved populations in the community participation described in section 2102(a)(4).".

(d) RURAL DOMESTIC VIOLENCE AND CHILD ABUSE ENFORCEMENT GRANTS.—Section 40295 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103-322, 108 Stat. 1953, 42 U.S.C. 13971(aa)(2)) is amended—

(1) by amending subsection (a)(2) to read as follows:

"(2) to provide treatment, counseling, and legal assistance to victims of domestic violence and child abuse, including assistance to victims in immigration matters; and"; and

(2) by adding at the end the following new subsections:

"(d) APPLICATION REQUIREMENTS.—States, Indian tribal governments, and units of local government applying for grants under this section must certify that their laws, policies, and practices comply with each of the provisions of section 2101(c) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796hh(c)).

"(e) GRANTEE REPORTING.—Upon completion of the grant period under this part, a State or Indian tribal grantee shall file a performance report with the Attorney General. The report shall explain the activities carried out and shall evaluate the effectiveness of projects developed with the funds provided under the grant. The report shall include information about the demographics of underserved populations in the State and details about the percentage of funding that went to serve which underserved populations, the programs that received such funding, and the involvement of programs serving underserved populations in the community cooperation in subsection (a)(3).",

(e) FAMILY VIOLENCE PREVENTION AND SERVICES ACT.—

(1) Section 303(a)(2)(C) of the Family Violence Prevention and Services Act (42 U.S.C. 10402(c)(2)(C)) is amended by striking "populations underserved because of ethnic, racial, cultural, language diversity or geographic isolation" and inserting "populations underserved because of race, ethnicity, age, disability,

sexual orientation, religion, alienage status, geographic location (including rural isolation), language barriers, and any other populations determined to be underserved".

(2) Section 311(a)(4) of such Act (42 U.S.C. 10410(a)(4)) is amended by striking "underserved racial, ethnic or language-minority populations" and inserting "underserved populations as the term is used in section 303(a)(2)(C)".

(3) Section 303(a)(4) of such Act (42 U.S.C. 10402(a)(4)) is amended by inserting after the first sentence the following: "This performance report shall include information about the demographics of underserved populations in the State and details about the percentage of funding that went to serve which underserved populations, the programs that received such funding, and the involvement of programs serving underserved populations in the procedures described in subsection (a)(2)(C).".

(4) Section 303 of such Act (42 U.S.C. 10402) is further amended by adding at the end the following new subsection:

"(g) The Secretary shall submit to Congress, not later than 1 year after the date of the enactment of this subsection, a report that contains the following information:

"(1) The quantity and percentage of funding awarded to serve underserved populations by each State under programs funded under this Act.

"(2) The percentage of each underserved population in the demographic make up of each State compared to the amount of funding aimed at addressing the needs of that underserved population.

"(3) The extent to which grants to provide services to underserved populations are awarded to programs with experience and history working with underserved populations of battered women or sexual assault victims, to programs that have bilingual or bicultural staff, and to collaborations between domestic violence or sexual assault programs and programs experienced in serving particular underserved populations and to other grantees.

"(4) The extent to which nonprofit, nongovernmental victim service organizations with experience serving various underserved populations of battered women and sexual assault or stalking victims were involved in the procedures described in subsection (a)(2)(C).".

(f) CIVIL LEGAL ASSISTANCE.—Title I of the Department of Justice Appropriations Act, 1999 (contained within the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999 (Public Law 105–277)) is amended, under the heading of "Office of Justice Programs, State and Local Law Enforcement Assistance", by striking the period at the end and inserting the following: ", of which $206,750,000 shall be available for Grants To Combat Violence Against Women, to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(18) of said Act, including $23,000,000 which shall be used exclusively for the purpose of strengthening civil legal assistance programs for victims of domestic violence. Civil legal assistance under this heading includes (but is not limited to) legal assistance to victims of domestic violence, stalking or sexual assault in divorce, custody, child support, protection orders, immigration, public benefits, housing, consumer law and any other legal matter that will further the health, safety, and economic well-being of victims of domestic violence, stalking, or sexual assault.".

(g) CAMPUS DOMESTIC VIOLENCE GRANTS.—Section 826 of the Higher Education Amendments of 1998 (Public Law 105–244; 20 U.S.C. 1152) is amended—

(1) in subsection (b)(5), by inserting before the period at the end the following: ", including legal assistance to victims in civil, criminal, administrative, immigration, or disciplinary matters"; and

(2) in subsection (c)(2)(C), by striking "and number of students" and inserting "number of students, and services being offered to various underserved populations (as such term is defined in section 2003(7) of the Omnibus Crime Control and Safe Streets Act of 1968);".

(h) STATE JUSTICE INSTITUTE GRANTS.—Section 206(c) of the State Justice Institute Act of 1984 (42 U.S.C. 10705(c)) is amended—

(1) by redesignating paragraph (15) as paragraph (16); and

(2) by inserting after paragraph (14) the following new paragraph:

"(15) to support studies and investigate and carry out research on issues of battering and extreme cruelty against non-citizens, including the ramifications of the immigration provisions of the Violence Against Women Act of 1994 and subsequent immigration law reforms on the ability of victims to access civil, family, and criminal courts and the immigration consequences of civil, family, and criminal court actions; and".

**SEC. 12. VIOLENCE AGAINST WOMEN ACT TRAINING FOR INS OFFICERS, IMMIGRATION JUDGES, AND CIVIL AND CRIMINAL COURT JUSTICE SYSTEM PERSONNEL.**

(a) VIOLENCE AGAINST WOMEN.—

(1) MILITARY TRAINING CONCERNING DOMESTIC VIOLENCE.—The Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.) is amended by inserting after section 2006 (42 U.S.C. 3796gg–5) the following new section:

**"SEC. 2007. MILITARY TRAINING CONCERNING DOMESTIC VIOLENCE.**

"Each branch of the United States military is required to train its supervisory military officers on domestic violence, the dynamics of domestic violence in military families, the types of protection available for battered immigrant women and children abused by their United States citizen or lawful permanent resident spouse or parent under the Violence Against Women Act of 1994, and the problems of domestic violence in families in which a United States citizen or lawful permanent resident member of the military is married to a non-United States citizen.".

(2) INS TRAINING.—Section 2001 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3795gg) is amended—

(A) in subsection (a), by inserting "the Immigration and Naturalization Service and the Executive Office of Immigration Review," after "Indian tribal governments,";

(B) in subsection (b)(1), by inserting ", immigration and asylum officers, immigration judges," after "law enforcement officers"; and

(C) in subsection (b)—

(i) by striking "and" at the end of paragraph (6),

(ii) by striking the period at the end of paragraph (7) and inserting "; and", and

(iii) by adding at the end the following new paragraph:

"(8) training justice system personnel on the immigration provisions of the Violence Against Women Act of 1994 and their ramifications for victims of domestic violence appearing in civil and criminal court proceedings and potential immigration consequences for the perpetrators of domestic violence.".

(b) EFFECT ON OTHER GOALS.—Section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)) is amended by adding at the end the following:

"(11) Congress finds that public policy favors encouraging the prosecution of criminals; and therefore, nothing in this section may be construed to discourage crime victims, including domestic violence victims, from cooperating with law enforcement officials and prosecutors, including reporting of crimes committed against them to police, from cooperating in criminal prosecutions, or from seeking from courts protection orders or other legal relief available under State or Federal laws needed to protect crime victims from ongoing violence.".

(c) REPORT.—Not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and House of Representatives on—

(1) the number of and processing times for petitions under clauses (iii) and (iv) of section 204(a)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)) and under clauses (ii) and (iii) of section 204(a)(1)(B) of such Act (8 U.S.C. 1154(a)(1)(B)) at district offices of the Immigration and Naturalization Service and at the regional office of the Service in St. Albans, Vermont;

(2) the policy and procedures of the Immigration and Naturalization Service by which an alien who has been battered or subjected to extreme cruelty who is eligible for suspension of deportation or cancellation of removal can place such alien in deportation or removal proceedings so that such alien may apply for suspension of deportation or cancellation of removal, the number of requests filed at each district office under this policy, and the number of these requests granted, reported separately for each district; and

(3) the average length of time at each Immigration and Naturalization office between the date that an alien who has been subject to battering or extreme cruelty eligible for suspension of deportation or cancellation of removal requests to be placed in deportation or removal proceedings and the date that immigrant appears before an immigration judge to file an application for suspension of deportation or cancellation of removal.

**SEC. 13. PROTECTION FOR CERTAIN CRIME VICTIMS INCLUDING CRIMES AGAINST WOMEN.**

(a) FINDINGS AND PURPOSE.—

(1) FINDINGS.—

(A) Trafficking of humans, particularly women and children, is denounced by the international community as an egregious human rights violation perpetuated increasing by organized and sophisticated criminal enterprises.

(B) Trafficking to place persons in forced labor, servitude, or in slavery-like conditions has been identified as a multinational crime problem of growing severity with increasing ties to internal organized crime. Traffickers recruit and transport persons, especially women and children, to the United States in order to exploit them under horrific conditions through the use of force, violence, debt bondage, or other coercive tactics.

(C) Similarly, immigrant women and children are often targeted to be victims of crimes committed against them in the United States, including rape, torture, incest, battery or extreme cruelty, sexual assault, female genital mutilation, forced prostitution, being held hostage or other violent crimes. All women and children who are victims of trafficking, domestic violence, sexual assault, being held hostage, and other human rights violations committed against them in the United States must be able to report these crimes to law enforcement and fully participate in the criminal prosecution of their abusers.

(2) PURPOSE.—

(A) The purpose of this section is to create a new nonimmigrant visa classification that will strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of trafficking of aliens, while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States.

(B) Creating a new nonimmigrant visa classification will facilitate the reporting of violations to law enforcement officials by exploited aliens who are not in a lawful immigration status. It also gives law enforcement officials a means to regularize the status of cooperating individuals during investigations, prosecutions, and civil law enforcement proceedings. By providing temporary legal status to aliens who have been severely victimized by trafficking or similar egregious offenses, it also reflects the humanitarian interests of the United States.

(C) Finally, this section gives the Attorney General discretion to convert such nonimmigrants to permanent resident status when it is justified on humanitarian grounds, to assure family unity, or when it is otherwise in the public interest.

(b) ESTABLISHMENT OF HUMANITARIAN/MATERIAL WITNESS NONIMMIGRANT CLASSIFICATION.—Section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)) is amended—

(1) by striking "or" at the end of subparagraph (R);

(2) by striking the period at the end of subparagraph (S) and inserting "; or"; and

(3) by adding at the end the following new subparagraph:

"(T) subject to section 214(m), an alien (and the spouse, children, and parents of the alien if accompanying or following to join the alien) who files an application for status under this subparagraph, if the Attorney General determines that—

"(i) the alien possesses material information concerning criminal or other unlawful activity;

"(ii) the alien is willing to supply or has supplied such information to Federal or State law enforcement officials or a Federal or State administrative agency investigating or bringing an enforcement action;

"(iii) the alien would be helpful, were the alien to remain in the United States, to a Federal or State investigation or prosecution of criminal or other unlawful activity; and

"(iv) the alien (or a child of the alien) has suffered substantial physical or mental abuse as a result of the criminal or other unlawful activity.".

(c) CONDITIONS FOR ADMISSION.—

(1) NUMERICAL LIMITATIONS, PERIOD OF ADMISSION, ETC.—Section 214 of such Act (8 U.S.C. 1184) is amended by adding at the end the following new subsection:

"(m)(1) The number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(T) in any fiscal year may not exceed 2,000.

"(2) The period of admission of an alien as such a nonimmigrant may not exceed 3 years and such period may not be extended.

"(3) As a condition for the admission (or the provision of status), and continued stay in lawful status, of an alien as such a nonimmigrant, the alien—

"(A) may not be convicted of any criminal offense punishable by a term of imprisonment of 1 year or more after the date of such admission (or obtaining such status); and

"(B) shall abide by any other condition, limitation, or restriction imposed by the Attorney General.

"(4) The provisions of section 204(a)(1)(H) shall apply to applications to obtain nonimmigrant status under section 101(a)(15)(T). Credible evidence to meet the conditions described in clauses (i), (ii), or (iii) of section 101(a)(15)(T) may include certification from a Federal or State law enforcement officer or prosecutor or a Federal or State official responsible for bringing enforcement actions that the alien is willing to cooperate or has cooperated in a criminal or civil court action or investigation or Federal or State administrative agency enforcement action or investigation.".

(2) PROHIBITION OF CHANGE OF NONIMMIGRANT CLASSIFICATION.—Section 248(1) of such Act (8 U.S.C. 1258(1)) is amended by striking "or (S)" and inserting "(S), or (T)".

(d) ADJUSTMENT TO PERMANENT RESIDENT STATUS.—

(1) IN GENERAL.—Section 245 of such Act (8 U.S.C. 1255) is amended by adding at the end the following new subsection:

"(l)(1) The Attorney General may adjust the status of an alien admitted into the United States (or otherwise provided nonimmigrant status) under section 101(a)(15)(T) (and a spouse, child, or parents admitted under such section) to that of an alien lawfully admitted for permanent residence if—

"(A) in the opinion of the Attorney General, the alien's continued presence in the United States is justified on humanitarian grounds, to assure family unity, or is otherwise in the public interest; and

"(B) the alien is not described in subparagraph (A)(i)(I), (A)(ii), (A)(iii), (C), or (E) of section 212(a)(3).

"(2) Upon the approval of adjustment of status under paragraph (1), the Attorney General shall record the alien's lawful admission for permanent residence as of the date of such approval and the Secretary of State shall reduce by one the number of visas authorized to be issued under sections 201(d) and 203(b)(4) for the fiscal year then current.".

(2) EXCLUSIVE MEANS OF ADJUSTMENT.—Section 245(c)(5) of such Act (8 U.S.C. 1255(c)(5)) is amended by striking "sections 101(a)(15)(S)," and inserting "subparagraph (S) or (T) of section 101(a)(15)".

**SEC. 14. ACCESS TO CUBAN ADJUSTMENT FOR BATTERED IMMIGRANT SPOUSES AND CHILDREN.**

(a) IN GENERAL.—The last sentence of the first section of Public Law 89–732 (November 2, 1966; 8 U.S.C. 1255 note) is amended by striking the period at the end the following: ", except that such spouse or child who has been battered or subjected to extreme cruelty may adjust to permanent resident status under this Act without demonstrating that he or she is residing with the Cuban spouse or parent in the United States. In acting on applications under this section with respect to spouses or children who have been battered or subjected to extreme cruelty, the Attorney General shall apply the provisions of section 204(a)(1)(H) of the Immigration and Nationality Act.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as if included in subtitle G of title IV of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 1953 et seq.).

**SEC. 15. ACCESS TO THE NICARAGUAN AND CENTRAL AMERICAN RELIEF ACT FOR BATTERED SPOUSES AND CHILDREN.**

Section 309(c)(5)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended by section 203(a)(1) of the Nicaraguan Adjustment and Central American Relief Act (title II of Public Law 105–100, 111 Stat. 2196) is amended—

(1) by striking "or " at the end of subclause (IV);

(2) by striking the period at the end of subclause (V) and inserting a semicolon; and

(3) by adding at the end the following:

"(VI) is, at the time of filing of an application under subclause (I), (II), (V), or (VI) of this clause, the spouse or child (as defined in paragraph (1) or (6) of section 101(b) of the Immigration and Nationality Act, 8 U.S.C. 1101(b)) of an individual described in subclause (I), (II) or (V) of this clause and the spouse, child, or child of the spouse has been battered or subjected to extreme cruelty by the individual described in subclause (I), (II), or (V); or

"(VII) is, at the time of filing of an application under subclause (I), (II), (V), or (VII) of this clause, the unmarried son or daughter of an individual described in subclause (I), (II) or (V) of this clause who has been battered or subjected to extreme cruelty by the par-

ent described in subclause (I), (II), or (V) and, in the case of a son or daughter who is 21 years of age or older at the time the decision is rendered to suspend the deportation or cancel the removal of the son or daughter, the son or daughter must have entered the United States on or before October 1, 1990.

In acting on a petition filed under subclause (VI) or (VII), the provisions set forth in section 204(a)(1)(H) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(H)) shall apply."

**SEC. 16. ACCESS TO THE HAITIAN REFUGEE IMMIGRATION FAIRNESS ACT OF 1998 FOR BATTERED SPOUSES AND CHILDREN.**

Section 902(d)(1) of the Haitian Refugee Immigration Fairness Act of 1998 (title IX of the Treasury and General Government Appropriations Act, 1999, contained in Public Law 105–277) is amended—

(1) by amending subparagraph (B) to read as follows:

"(B)(i)(I) the alien is the spouse, child, or unmarried son or daughter, of an alien whose status is adjusted to that of an alien lawfully admitted for permanent residence under subsection (a), or (II) at the time of filing of the application for adjustment of status under subsection (a) or this subsection the alien is the spouse, child, or unmarried son or daughter of an alien whose status is adjusted to that of an alien lawfully admitted for permanent residence under subsection (a) and the spouse, child, son, daughter or child of the spouse has been battered or subjected to extreme cruelty by the individual described in subsection (a); and

"(ii) in the case of such an unmarried son or daughter, the son or daughter shall be required to establish that he or she has been physically present in the United States for a continuous period beginning not later than December 31, 1995, and ending not earlier than the date the application for such adjustment is filed;"; and

(2) by adding after and below subparagraph (D) the following:

"In acting on an application filed under this section for an individual described in subparagraph (B)(i)(II), the provisions set forth in section 204(a)(1)(H) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(H)) shall apply."

○

Mr. SMITH. We will have our opening statements to start with, and then we will start immediately with our first witness.

I recognize myself for purposes of an opening statement, and before I do that, I do want to recognize the presence of the ranking member of the full Judiciary Committee, John Conyers of Michigan, and he will have some comments in a minute as well.

Domestic abuse is a major and disturbing problem in this country and throughout the world. When the abused is an alien, the problem becomes even more complex. The purposes of today's hearing is to examine H.R. 3083, the Battered Immigrant Women's Protection Act. Currently, at least 11 forms of immigration relief exist for battered aliens in the Immigration and Nationality Act. These forms of relief address many of the concerns raised in the bill.

For instance, spouses and children of abusive spouses and parents may self-petition for a visa so they do not need to rely on the abusive spouse or parent to petition for a visa on their behalf. An abused alien may apply for a waiver from filing a joint petition with her abusive spouse to remove her conditional resident status.

Battered illegal aliens also can apply for suspension of deportation and cancellation of removal by showing that they have continuous physical presence in the U.S. for 3 years instead of the usual 7 or 10. The 1996 act also gave battered illegal aliens waivers of inadmissibility for entering the U.S. without inspection and for

being illegally present in the U.S. if they can show a connection between the immigration violation and the battery or abuse.

The 1996 act exempted battered aliens from the requirement that their spouse file an affidavit of support which is used to overcome the public charge ground of inadmissibility. The 1996 act also amended the Personal Responsibility and Work Opportunity Reconciliation Act so that battered aliens can qualify for Federal benefits such as Head Start, educational assistance programs, and child nutritional programs.

The bill we are considering today, H.R. 3083, gives aliens who have been battered additional forms of immigration relief. Supporters of the bill say that legal protections for battered aliens need to be restored and expanded so they can flee violent homes, obtain court protection, and cooperate in the criminal prosecution of their abusers without fear of deportation.

However, many of the benefits created in this bill do not require battered aliens to cooperate with law enforcement officers to enable them to investigate or prosecute the aliens' abusers. This is contrary apparently to the alleged purpose of the bill. The bill permits a self-petitioning spouse and child of a U.S. citizen to remain as an immediate relative, even if the abusive U.S. citizen loses citizenship or dies after a petition is filed.

Some provisions in the bill raise concerns. The bill restores section 245(i) which rewarded illegal aliens and which Congress wisely repealed several years ago.

The bill also deletes the time-stop rule for battered aliens. This could lead to dilatory tactics in court for up to 3 years, after which an alien becomes eligible for cancellation of removal. The bill also waives several grounds of inadmissibility and deportability. These grounds are unrelated to battery or cruelty and should not be waived. The waivers do not further the stated purpose of this bill.

For example, the bill deletes the 3-and 10-year bars of inadmissibility if an alien has been unlawfully present in the U.S. and has been battered. With this provision, a claim of battery becomes a trump card to deportation for almost any illegal alien. The bill contains waivers for many crimes, including aggravated felonies, if the alien can show the crime was related to being abused. The question arises, should criminal and illegal aliens receive the relief simply because they claim to have been abused? This could open up our immigration system to widespread fraud as criminal and illegal aliens learn that the way to defeat our immigration laws is simply to claim to be battered.

The bill removes the requirement that a battered alien live with the abuser in the U.S. This grants self-petitioning relief to battered aliens living abroad. But perhaps this, as several other points that I mentioned, was unintended. It also deletes the good moral character and extreme hardship requirements for the self-petitioner.

H.R. 3083 extends self-petitioning to battered aliens who file within 2 years of divorce or whose U.S. citizen spouse died. If the spouse is deceased-or divorced, the alien, of course, is no longer in the abusive circumstances that gave rise to the visa.

So the stated purpose of the bill to allow women to flee violent homes is not achieved by this provision. In short, the bill aims to achieve worthy goals but can be improved, and I hope the sponsors

of the bill will consider the changes that I have suggested in my opening statement.

That concludes my opening statement and I will now yield to the ranking member, Mr. Conyers, for his opening statement as well.

[The prepared statement of Mr. Smith follows:]

PREPARED STATEMENT OF HON. LAMAR S. SMITH, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF TEXAS

Domestic abuse is a major and disturbing problem in this country and throughout the world. When the abused is an alien, the problem becomes more complex. The purpose of today's hearing is to examine H.R. 3083, the "Battered Immigrant Women's Protection Act."

Currently, at least 11 forms of immigration relief exist for battered aliens in the Immigration and Nationality Act. These forms of relief address many of the concerns raised by the bill.

For instance, spouses and children of abusive spouses and parents may self-petition for a visa so they do not need to rely on the abusive spouse or parent to petition for a visa on their behalf. An abused alien may apply for a waiver from filing a joint petition with her abusive spouse to remove her conditional resident status.

Battered illegal aliens also can apply for suspension of deportation and cancellation of removal by showing they have had continuous physical presence in the U.S. for 3 years, instead of the usual 7 or 10 years. The 1996 act also gave battered illegal aliens waivers of inadmissibility for entering the U.S. without inspection and for being unlawfully present in the U.S. if they can show a connection between the immigration violation and the battery or abuse.

The 1996 act exempted battered aliens from the requirement that their spouse file an affidavit of support, which is used to overcome the public charge ground of inadmissibility. The 1996 act also amended the Personal Responsibility and Work Opportunity Reconciliation Act so that battered aliens can qualify for federal benefits such as Head Start, educational assistance programs, and child nutritional programs.

The bill we are considering today, H.R. 3083, gives aliens who claim to have been battered additional forms of immigration relief. Supporters of the bill say that legal protections for battered aliens need to be restored and expanded so that they can flee violent homes, obtain court protection, and cooperate in the criminal prosecution of their abusers, without fear of deportation. However, most of the benefits created in this bill do not require battered aliens to cooperate with law enforcement officers to enable them to investigate or prosecute the aliens' abusers. This is contrary to the alleged purpose of the bill.

The bill permits a self-petitioning spouse and child of a U.S. citizen to remain as immediate relatives, even if the abusive U.S. citizen loses citizenship or dies after a petition is filed.

It exempts abused spouses from the conditional residency status requirement after obtaining a fiance visa if the alien seeks adjustment of status based on an approved battered self-petition visa. It also permits divorced abused aliens to naturalize in 3 years, as if no divorce occurred, instead of 5 years.

Some provisions in the bill raise concerns. The bill restores section 245(i). Section 245(i) rewarded illegal aliens and Congress wisely repealed it several years ago.

The bill also deletes the time-stop rule for battered aliens. This could lead to dilatory tactics in court for up to 3 years, after which an alien becomes eligible for cancellation of removal.

The bill also waives several grounds of inadmissibility and deportability. These grounds are unrelated to battery or cruelty and should not be waived. The waivers do not further the stated purpose of this bill.

For example, the bill deletes the 3 and 10-year bars of inadmissibility if an alien has been unlawfully present in the U.S. and has been battered. With this provision, a claim of battery becomes a trump card to deportation for almost any illegal alien.

The bill contains waivers for many crimes, including aggravated felonies, if the alien can show the crime was related to being abused. Should criminal and illegal aliens receive this relief simply because they claim to have been abused? This could open up our immigration system to widespread fraud as criminal and illegal aliens learn that the way to defeat our immigration laws is to claim to be battered?

The bill removes the requirement that a battered alien live with the abuser in the U.S. This grants self-petitioning relief to battered aliens living abroad. Perhaps this was unintended. It also deletes the good moral character and extreme hardship requirements for the self-petitioner.

H.R. 3083 extends self-petitioning to battered aliens who file within 2 years of divorce or whose U.S. citizen spouse died. If the spouse is deceased or divorced, the alien of course is no longer in the abusive circumstances that give rise to the visa. So the stated purpose of the bill—to allow women to flee violent homes—is not achieved by this provision.

In short, the bill aims to achieve worthy goals but can be improved. I hope the sponsors of the bill will consider the changes I've suggested.

Mr. CONYERS. Thank you, Chairman Smith, and Ranking Member Jackson Lee.

I begin by welcoming Congresswoman Schakowsky to our hearing. She has done a very important thing by putting together this measure. I am proud to be on it.

I want to thank the chairman of the subcommittee for holding the hearing. I think this is a very important avenue for examining these issues that are before us here.

Now, prior to the enactment of the Violence Against Women Act in 1994, the immigration laws permitted abusive husbands to have too much control over the immigration status of their family members. Battered immigrant women and children were not able to appeal to law enforcement agencies and courts for protection because they simply feared being reported to the INS and deported.

The immigration provisions contained in VAWA, 1994, helped to remedy this situation. Among other things, it permitted battered immigrants to file an application for immigration relief without cooperation of the abusive spouse or parent. But despite the successes of VAWA, intervening legislative changes enacted mostly by the majority have severely undermined protections for battered immigrants.

For example, by making domestic violence a deportable crime, an unintended effect of the 1996 immigration law is that a spouse's VAWA petition for immigration relief becomes void when her husband is deported. This creates a perverse incentive for a battered immigrant spouse to tolerate the abuse rather than report it.

The 1996 law also harmed battered immigrants by capping the number of cancellation of deportation grants and increasing the evidentiary requirement needed to show a relationship between abuse and unlawful entry.

In addition, in 1998, the majority eliminated the benefits of section 245(i) of the immigration law for immigrants seeking permanent residency status. What it means then is that battered immigrant women and children with approved VAWA petitions are forced to leave the United States to obtain their green cards. Traveling outside the United States, of course, deprives these immigrants of the protection provided by the courts, custody decrees and law enforcement. Once abroad, the battered immigrant is, of course, vulnerable to stalking and retaliatory attacks by the abuser.

So we, on our side of the aisle, have expressed concern about these and other problems facing battered immigrants for the last two Congresses. I have introduced bills with Congresswoman Morella, Congresswoman Schakowsky, and Congresswoman Jackson Lee, that would address these problems facing battered immigrants. I believe we should have considered these changes as part of our violence against women reauthorization in the Full Commit-

tee last month. We attempted to do so, but were refused again by the majority to allow this, promising us this hearing instead.

And so it is now incumbent upon us, and the chairman hopefully, to move the legislation as rapidly as we can so that we can get the bill to the President's desk before adjournment.

By the way, I do want to say a word about the ranking member of this subcommittee, Ms. Jackson Lee, who has worked tirelessly in the whole area of immigration issues, and in no area has she worked with more vigor than on the question of battered women immigrants. And I wanted to congratulate her in that regard. I thank you, Chairman Smith.

Mr. SMITH. Thank you, Mr. Conyers.

The ranking member of the subcommittee, the Congresswoman from Texas, Ms. Jackson Lee, is recognized for her opening statement.

Ms. JACKSON LEE. Thank you very much, Mr. Chairman. Let me add my applause and appreciation for you agreeing to hold this hearing, and to the ranking member of the full Judiciary Committee, allow me to thank him for his constant persistence on issues of justice and fairness, and to thank him for joining with other colleagues in the effort to have this issue in conjunction with the Violence Against Women Act. That effort was valiant and we appreciated it greatly.

I just came upstairs from presiding over a group of Americans dealing with education and children's issues, the Yale University Child Study Center. And when I mentioned why I had to depart, in order for them to understand this issue, I talked about how America has addressed the question of violence against women. We have the Violence Against Women Act. We understand that it was important as a Nation to stand up against domestic violence and domestic abuse. And I simply had to raise the question that immigrant women do not have the is same protections and they immediately understood the purpose and the importance of why we are here today.

The bill that we are examining today, H.R. 3083, the Battered Immigrant Women Protection Act of 1999, will provide much-needed access to battered immigrant victims of domestic violence. Congresswoman Schakowsky has been a valiant light in ensuring that this matter has been brought before the United States Congress, and I am delighted to join her on this legislation. We thank you for your work.

In evaluating provisions of H.R. 3083, we should be mindful that but for the failure of citizens or permanent resident abusers to submit immigration petitions for their immigrant spouses and children, the beneficiaries of the battered immigrant provision would already have lawful immigration status through a family-based visa petition. A citizen or permanent resident batterer also manipulates such misconceptions by convincing his victim that he will prevail in court because he is a male and he has more money, some of that from the cultural history of these particular immigrants.

Moreover, a batterer often uses his immigration status against his victim as a tool of control threatening to report her to the INS or refusing to withdraw immigration petitions that would grant her status.

The Congress addressed this vexing issue in the bipartisan 1994 Violence Against Women Act. This legislation created a mechanism that enables immigrant victims of domestic violence to gain permanent residence in the United States without the knowledge or participation of their abusive citizen or permanent resident spouse. The 1994 VAWA bill requires the victim to be married to a citizen or permanent resident and prove battery or extreme cruelty by the abuser.

The spirit and intent of the 1994 law was to allow immigrants to safely escape the violence and bring their abusers to justice. However, as those who might oppose this bill ask, why do we need this bill? I can say that unfortunately, our job as lawmakers is not yet done. Our intent in 1994 was to provide battered immigrants with a meaningful access to lawful immigration status, thus allowing them to safely leave their abusers. Nevertheless, we are still finding groups of immigrants who are trapped in abusive relationships despite the access to such lawful status.

Why do we need this bill? We need this bill because H.R. 3083 would provide VAWA relief to abused children who subsequently turn 21, as long as they can demonstrate that one or more incidents of battery or extreme cruelty occurred before they turned 21. Of note, battered immigrants living abroad currently have no access to VAWA immigration relief. The abused children of spouses married to members of the U.S. Armed Forces and U.S. Government employees living abroad are trapped overseas, unable to escape and seek assistance. Filing a family-based visa petition at an American consulate is permissible, while filing a VAWA self-petition is not.

In addition, divorced battered immigrants do not have access to VAWA immigration relief. There are many savvy abusers who know that if they divorce their abused spouse, they will cut off their victim's access to VAWA relief.

H.R. 3083 allows battered immigrants to file such relief of self-petitions if it is filed within 2 years of divorce. Why do we need this bill? Because far too often the pleas for help of these innocent victims are not heard because of language or cultural barriers. They do not know where to turn. Moreover, many victims remain silent because of threat of deportation looms over them and their children and they may be separated from their children. As a result, immigrant women are caught in an intersection of immigration, family and welfare laws that does not positively reflect on their needs or life experiences, leaving them vulnerable to exploitation with few options to redress their situations.

There are real human illustrations as to why we need this bill. Carla, a Guatemalan woman has lived with her boyfriend, a legal permanent resident, for 5 years. When she asks him about getting married, she can apply for her own legal residency, he beats her and accuses her of only wanting to be with him so that she had get her immigration status recognized.

Tai Lin, a Chinese woman has difficulty finding support to escape her abusive husband. She lost her factory job because she has no work permit. The immigrant service agency she approached encourages her stay with her husband and advised her to try her best to cope with her difficult situation. Can you imagine staying with

an abuser who might cost you your life? Moreover, because she speaks Cantonese, the battered women's shelter she calls cannot communicate with her.

And Leticia, an undocumented, Filipino woman who went to a civil court and obtained a restraining order against her violent husband. When her husband comes to her house violating the restraining order, he calls the police. Her husband flees before the police arrive. The officer who responds makes a report and then asks her for her green card.

These are real life stories that impact women and children and they have no place to go. A battered woman who is not a legal resident, whose immigration status depends completely on her partner, is often isolated by unique cultural dynamics which may prevent her from leaving her husband or seeking asylum.

For instance, a battered immigrant woman may not understand that she is entitled to personally tell her story in court, or further, that a judge may believe her. Based on her experience in her native country, she may believe that only those who are wealthy or have ties to the government will prevail in court.

Finally, if anyone ever asks why we need this bill, it is because H.R. 3083, the Battered Immigrant Women Protection Act of 1999, will improve the lives of human beings, of women of children together collectively.

Mr. Chairman, I have heard your assessment of the legislation. What I believe we will find out today as we listen to these very, very strong stories and testimony of the need of this bill is that we will find a way to move this legislative initiative along, and we will work in a bipartisan way to get a bill that will help save lives. With that, Mr. Chairman, I thank you.

Mr. SMITH. Thank you, Ms. Jackson Lee.

[The prepared statement of Ms. Jackson Lee follows:]

PREPARED STATEMENT OF HON. SHEILA JACKSON LEE, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF TEXAS

Thank-you Mr. Chairman for agreeing to hold this very important hearing on a subject matter that impacts so many people. The bill that we are examining today, the H.R. 3083, The Battered Immigrant Act of 1999, would provide much needed access to battered immigrant victims of domestic violence.

In evaluating provisions of H.R. 3083, we should be mindful that but for the failure of citizens or permanent resident abusers to submit immigration petitions for their immigrant spouses and children, the beneficiaries of the Battered Immigrant provisions would already have lawful immigration status through a family- based visa petition.

A citizen or permanent resident batterer often manipulates such misconceptions by convincing his victim that he will prevail in court because he is a male and he has more money. Moreover, a batterer often uses his immigration status against his victim as a tool of control, threatening to report her to INS or refusing or withdrawing immigration petitions that would grant her status.

The Congress addressed this vexing issue in the bipartisan 1994 Violence Against Women Act. This legislation created a mechanism that enables immigrant victims of domestic violence to gain permanent residence in the U.S. without the knowledge or participation of their abusive citizen or permanent resident spouses.

The 1994 VAWA requires the victim to be married to a citizen or permanent resident and prove battery or extreme cruelty by the abuser. The spirit and intent of the 1994 law was to allow immigrants to safely escape the violence and bring their abusers to justice. However, as are those who might oppose this bill ask, "Why do we need this bill? I can say that unfortunately, our job, as lawmakers, is not yet done. Our intent in 1994 was to provide battered immigrants with meaningful access to lawful immigration status, thus allowing them to safely leave their abusers.

Nevertheless, we are still finding groups of battered immigrants who are trapped in abusive relationships despite the access to such lawful status. WHY DO WE NEED THIS BILL?

We need this bill because H.R. 3083 would provide VAWA relief to abused children who subsequently turn 21 as long as they can demonstrate that one or more incidents of battery or extreme cruelty occurred before they turned 21.

Of note, battered immigrants living abroad currently have no access to VAWA immigration relief. Abused children of spouses married to members of the U.S. Armed forces and U.S. government employees living abroad are trapped overseas unable to escape and seek assistance. Filing a family-based visa petition at an American consulate is permissible, while filing VAWA self-petitions are not.

In addition, divorced battered immigrants do not have access to VAWA immigration relief. There are many "savvy" abusers who know that if they divorce their abused spouse they will cut off their victim's access to VAWA relief. H.R 3083 allows battered immigrants to file VAWA self-petitions if it is filed within two years of divorce. WHY DO WE NEED THIS BILL?

We need this bill because far too often, the pleas for help by these immigrant victims are not heard because of language or cultural barriers. Moreover, many victims remain silent because the threat of deportation looms over them and their children. As a result, immigrant women are caught in an intersection of immigration, family, and welfare laws that do not reflect their needs and life experiences, leaving them vulnerable to exploitation with few options for redress. There are real human illustrations as to why we need this bill.

Carla, a Guatemalan woman, has lived with her boyfriend, a legal permanent resident for five years. When she asks him about getting married so she can apply for her own legal residency, he beats her and accuses her of only wanting to be with him so she can get her immigration status recognized.

And Tai Lin, a Chinese woman, has difficulty finding support to escape her abusive husband. She lost her factory job because she has no work permit. The immigrant service agency she approached encourages her to stay with her husband and advised her to try her best to cope with her difficult situation. Moreover, because she speaks Cantonese, the battered women's shelter she calls cannot communicate with her.

And Leticia, an undocumented Filipina woman, who went to civil court and obtained a restraining order against her violent husband. When her husband comes to her house violating the restraining order, she calls the police. Her husband flees before the police arrived. The officer who responds makes a report and then asks her for her "green card."

Such compelling real-life stories illustrate the unique array of legal, economic, and social problems battered immigrant women face today.

A battered woman, who is not a legal resident, or whose immigration status depends completely on her partner, is often isolated by unique cultural dynamics which may prevent her from leaving her husband or seeking assistance from the American legal system.

For instance, a battered immigrant woman may not understand that she is entitled to personally tell her story in court, or further, that a judge will believe her. Based on her experience in her native country, she may believe that only those who are wealthy or have ties to the government will prevail in court.

Finally, if anyone ever asks why we need this bill . . . it is because H.R. 3083, The Battered Immigrant Act of 1999, will improve the lives of battered immigrants and send them on a path to rebuilding their lives and the lives of their children.

WE NEED THIS BILL.

Thank-You Mr. Chairman.

Mr. SMITH. We will now go to our first witness and welcome our colleague from Illinois, Congresswoman Jan Schakowsky. And we look forward to your testimony if you will please proceed.

## STATEMENT OF HON. JANICE SCHAKOWSKY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ILLINOIS

Ms. SCHAKOWSKY. Thank you so much. Mr. Chairman. I really want to express my appreciation to you for scheduling this hearing, to the ranking member of the full committee, Mr. Speaker, Conyers, the ranking member of this committee, Ms. Jackson Lee, who is a cosponsor of this legislation, and members of the subcommit-

tee. I appreciate the opportunity to address the desperate needs of battered immigrant women and their families. I appreciate your interest in exploring the complex issues facing battered immigrant women and your commitment to work toward solutions that would allow battered immigrants to escape the violence and to provide a safe future for themselves and their children.

I wanted to give a special thanks to Congresswoman Morella and Congresswoman Jackson Lee for their leadership on this bipartisan bill, and Mrs. Morella for her years of outstanding leadership on the Violence Against Women Act on which this legislation builds. I know that she has submitted written testimony on this legislation.

I am grateful to the 103 cosponsors of this bill. And to Senators Abraham and Kennedy who have a companion measure in the Senate as part of the VAWA bill.

I represent a very, very diverse district. A human tapestry that serves as gateway to America for immigrants from all parts of the globe. Every day these hardworking immigrants are embracing the challenges of their adopted Nation and contributing to the vibrancy of our community. But as in every community there exists the tragedy of domestic violence. While the victims of abuse are, by definition, in a traumatic situation, immigrant women who must rely on their abusers to avoid deportation are even in worse trouble.

H.R. 3083, the Battered Immigrant Women Protection Act, is intended to assist these victims. It seeks to strengthen and expand access to a variety of legal protections for battered immigrants so that they may flee violent homes, obtain court protection, cooperate in the criminal prosecution of their abusers, and take control of their lives without fear of deportation.

Let me emphasize first what this bill will not do. It will not open the floodgates to undocumented or unwanted immigrants. According to experts, this bill will increase the number of VAWA filings and approvals by at most 10 percent. Last year that would have amounted to 190 additional approvals. It is important to understand that almost all of the individuals who benefit from this bill would, but for the abuse, have access to legal immigration status. Let me say that again. Nearly all beneficiaries of this bill are currently eligible through traditional family-based immigration policy to legalize their immigration status. It is only when they flee their abusers that their status is in jeopardy.

What the Battered Immigrant Women Protection Act does do is continue the work that began with the passage of the first VAWA Act in 1994, allowing battered immigrant women to escape domestic violence by addressing negative incentives that trap them in violent relationships.

Specifically, H.R. 3083 addresses five areas of concern in current immigration law: It re-defines who is eligible for protection under VAWA; addresses implementation problems in VAWA 94; continues the commitment that you, Chairman Smith, put further in 1996 by assuring that battered immigrants have access to the economic safety net crucial to their ability to escape their abusers; provides INS and law enforcement officers with the necessary training and tools to ensure that abusers are prosecuted; and makes technical corrections that remove ambiguities in the current law.

This is a complex issue, and as a non-lawyer, I found it easiest to understand through examples. Let me share just a couple. I will try and do that before my time runs out. H.R. 3083 ends an unintended incentive for victims to stay with their abusers. Under current immigration laws, abusers who are convicted of domestic violence crimes may be stripped of their legal immigration status and deported from the United States, a policy which I strongly support. And, in fact, the first purpose listed on page 3 of the bill is to promote criminal prosecutions of all persons who commit acts of battery or extreme cruelty.

Because victims must be married to their abusive U.S. citizen or legal permanent resident spouse at the time they file their VAWA application, it creates a perverse incentive for the battered immigrant to tolerate the abuse rather than report it. This bill allows the battered immigrant access to permanent immigration status and to fully cooperate with the criminal prosecution of her abuser, even if her abuser is deported. For example, Marta was stabbed by her permanent resident spouse, who was subsequently arrested for the crime of domestic violence. Marta wanted to cooperate in the criminal prosecution of her spouse, but was afraid since her immigration status was dependent on her husband maintaining his legal immigration status. This decision proved deadly as Marta was killed later by her husband.

May I continue?

Mr. SMITH. Please continue.

Ms. SCHAKOWSKY. Thank you. H.R. 3083 extends access to divorced victims of domestic abuse. Under current immigration laws, the abused immigrant spouse must be married to the U.S. citizen or permanent resident. Savvy abusers often sprint to the courthouse for a quick divorce because they know this will cut off her access to immigration relief. This bill allows battered immigrants who are divorced from their abusers to file their applications for immigrant status within 2 years of the divorce, death, or loss of citizenship of the abuser.

Example: Mona, who is from Poland, married a U.S. citizen. She was severely abused during the first years of her marriage. She fled to a shelter and immediately her spouse sought a divorce to effectively cut her off from any permanent resident status. Mona will not have access to immigration status if she had not submitted her application prior to the final divorce.

Let me give you one more. H.R. 3083 extends access to abused sons and daughter over the age of 21. Under current immigration laws, only spouses or minor children of U.S. citizens or residents have access to permanent immigration status. Abused sons or daughters over 21 have no access to permanent immigration status, even though they have suffered years of domestic—it could even be sexual abuse perpetrated by their citizen or resident parent. This bill contains provisions that extend immigration relief to individuals over 21 who can demonstrate that battery or extreme cruelty had occurred during their childhood prior to turning 21 years old.

Sandra is the 22-year-old daughter of a U.S. citizen. At 10 years old, she came with her mother when her mother married the U.S. citizen. She was sexually abused for 8 years by her mother's husband. This abuser never filed immigration status for Sandra.

Under current laws, Sandra now has no access to legal immigration relief.

Let me conclude with this. With the passage of the Violence Against Women Act, Congress sent a clear message to this Nation that violence against women is not just wrong, it is a crime. Prior to 1994, abusive citizens and permanent residents had total control over their spouse's immigration status. As a result, battered immigrant women and children were forced to remain in abusive relationships. By passing this Act, the committee has an opportunity to build on our strong record of opposing all violence against women by keeping victims safe and holding abusers accountable.

My bill, I feel, balances the INS's need to maintain the integrity of our immigration system with the delicate special needs of battered immigrant women and their families. It provides them with a legal way to escape the abuse and end the cycle of violence without the fear of deportation or being separated from their children.

And finally, Mr. Chairman, I would like to ask to include as part of my written testimony a list of the more than 200 organizations around this country that support this bill and a letter from leading domestic violence advocates who support H.R. 3083.

Mr. SMITH. Without objection, that list will be made a part of the record as will some testimony that I have, as well as anything that the ranking member wants to include as well.

Congresswoman Schakowsky, thank you for your testimony.

[The prepared statement of Ms. Schakowsky follows:]

PREPARED STATEMENT OF HON. JANICE SCHAKOWSKY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ILLINOIS

I would like to thank Chairman Hyde, Chairman Smith, Congresswoman Jackson Lee and members of the Subcommittee for holding this hearing and allowing me the opportunity to address the desperate needs of battered immigrant women and their families. I appreciate your interest in exploring the complex issues facing battered immigrant women and your commitment to working towards solutions that will allow battered immigrants to escape the violence and to provide a safe future for themselves and their children. I would also like to acknowledge and thank Congresswomen Morella and Jackson Lee for their leadership on this bipartisan bill, and Mrs. Morella for her years of outstanding leadership on the Violence Against Women Act (VAWA), on which this legislation builds.

I represent the 9th Congressional District in Illinois, a Chicago and suburban district that is a human tapestry and serves as a gateway to America for immigrants from all parts of the globe. Every day these hardworking immigrants are embracing the challenges of their adopted nation and contributing to the vibrancy of our community.

But, as in every community, there exists the tragedy of domestic violence. While the victims of abuse are by definition in a traumatic situation, the immigrant victim who must rely on her abuser to avoid deportation is in even worse trouble. H.R. 3083, the Battered Immigrant Women Protection Act, is intended to assist these victims. It seeks to strengthen and expand access to a variety of legal protections for battered immigrants so they may flee violent homes, obtain court protection, cooperate in the criminal prosecution of their abusers and take control of their lives without fear of deportation.

Let me begin by emphasizing what my bill will NOT do: It will NOT open the floodgates to undocumented or unwanted immigrants. According to experts, this bill will increase the number of VAWA filings and approvals by at most 10 percent. Last year that would have amounted to 190 additional approvals. It is important to understand that almost all of the individuals who would benefit from this bill would, but for the abuse, have access to legal immigration status. Let me say that again: Nearly all potential beneficiaries of this bill would be eligible, through traditional family based immigration policy, to legalize their immigration status.

As it stands now, under immigration law, a spouse who is married to a U.S. citizen or legal permanent resident must wait either two or five years before filing a

joint petition to legalize his or her immigration status. If an immigrant spouse leaves a violent home to escape abuse, that person must self-petition for legal immigration status (relief provided under VAWA) and must also meet a litany of very high evidentiary standards in order to obtain legal status.

These barriers are so daunting that many immigrant spouses who suffer from domestic violence choose to stay with their abuser, hoping to live out the years it will take before they are eligible to file a joint petition. This is particularly true when they have no access to attorneys or advocates, a situation that often occurs for people who are isolated in their communities because of language barriers or threats by their abusive spouse. Sadly, many immigrant spouses find their gamble never pays off because their abuser refuses to file a joint petition, using his or her power to maintain their spouse' undocumented status as leverage to keep the spouse from leaving.

In essence, what our immigration policy is saying to abused spouses is, "put up with the abuse, risk your life and the lives of your children, and maybe you'll get legal immigration status." I do not believe this is the message we wish to convey to immigrants. I believe the disparity in our message unfairly burdens VAWA applicants and undermines VAWA's original intent to protect battered immigrant women.

The Battered Immigrant Women Protection Act continues the work that began with the passage of the first Violence Against Women Act in 1994, allowing battered immigrant women to escape domestic abuse by addressing adverse incentives that trap them in violent relationships.

Specifically, H.R. 3083 addresses five areas of concern in current immigration law. It redefines who is eligible for protection under VAWA; addresses implementation problems in VAWA '94; continues the commitment Chairman Smith put forth in 1996 by ensuring that battered immigrants have access to the economic safety net crucial to their ability to escape their abusers; provides INS and law enforcement officers with the necessary training and tools to ensure that abusers are prosecuted; and makes technical corrections that remove ambiguities in current law.

This is a complex issue, which I found easiest to understand through examples. Let me share a few.

- *H.R. 3083 ends an unintended incentive for victims to stay with their abusers.* Under current immigration laws, abusers who are convicted of domestic violence crimes may be deported from the U.S. One unintended effect is that the battered immigrant loses his/her access to permanent immigration status once the abusive spouse is deported for a crime of domestic violence. This situation creates a perverse incentive for the battered immigrant to tolerate the abuse rather than report it. This bill allows the battered immigrant to access permanent immigration status and to fully cooperate with the criminal prosecution of her abuser even if her abuser is deported.

  *Example: Marta was stabbed by her permanent resident spouse. He was arrested. Marta would like to cooperate in the criminal prosecution of her spouse, but is afraid since her immigration status is dependent on her husband's. He is subsequently convicted of a crime of domestic violence. INS is now initiating deportation proceedings against her spouse. Marta loses her access to permanent immigration status if her immigration application is not approved before his deportation.*

- *H.R. 3083 extends access to divorced victims of domestic abuse.* Under current immigration laws, the abused immigrant spouse must be married to the U.S. citizen or permanent resident. Savvy abusers often sprint to the courthouse for a quick divorce because they know this will cut off her access to immigration relief. This bill allows battered immigrants who are divorced from their abusers to file their applications for immigration status within 2 years of the divorce, death or loss of citizenship of the abuser.

  *Example: Mona, who is from Poland, married a U.S. citizen. She was severely abused during the first years of her marriage. She fled to a shelter and immediately her spouse sought a divorce to effectively cut her off from any permanent immigration status. Mona will not have access to permanent immigration status if she had not submitted her application prior to the final divorce.*

- *H.R. 3083 allows VAWA self-petitioners to adjust their status in the U.S.* Under current immigration laws, abused immigrants are forced to leave the U.S. to obtain their lawful permanent residence. Traveling outside the U.S. deprives these women of the protection provided by courts, legislation, cus-

tody decrees, and law enforcement. This bill allows women to safely obtain permanent immigration status in the U.S.

*Example: Marie is originally from Haiti. She married a permanent resident when she came to the U.S. He burnt her with cigarettes, hit her, and threw objects at her throughout their marriage. She filed a protection order against him ensuring her safety within U.S. borders. Marie is in the final stages of obtaining her green card. Under current law, she must travel back to Haiti to complete the filing process. She fears that her husband will follow her to Haiti and she will not have the safety of her protection order or receive the same police protection as in the U.S.*

- *H.R. 3083 extends access to elder immigrants who are victims of domestic abuse.* Under current law, the abused immigrant parent of a U.S. citizen or legal permanent resident has no access to immigration relief without the cooperation of the abusive adult son or daughter. This bill allows the battered immigrant parent to file their own application for immigration relief.

*Example: Alejandro, a 71-year-old native and citizen of Peru, came to the United State on a tourist visa to visit with his daughter, Rosa, a naturalized U.S. citizen. Once he arrived, Alejandro suffered severe abuse at the hands of his daughter and her U.S. citizen husband. Alejandro's daughter and husband cut off his ability to contact the police and report the abuse. Alejandro's tourist visa eventually expired, and therefore, his status changed from non-immigrant to illegal. Under current law, Alejandro has no access to immigration relief.*

- *H.R. 3083 extends access to abused sons and daughters over age 21.* Under current immigration laws, only spouses or minor children of U.S. citizens or residents have access to permanent immigration status. Abused sons or daughters over 21 years old have no access to permanent immigration status even though they have suffered years of domestic or sexual abuse perpetrated by their citizen or resident parent. This bill contains provisions that extend immigration relief to individuals over 21 who can demonstrate that battery or extreme cruelty had occurred during their childhood prior to turning 21 years old.

*Example: Sandra is the 22-year-old daughter of a U.S. citizen. At 10 years old, she came with her mother when her mother married the U.S. citizen. She was sexually abused for 8 years by her mother's husband. This abuser has never filed immigration status for Sandra. Under current laws, Sandra has no access to legal immigration relief.*

- *H.R. 3083 extends access to battered immigrant spouses who unknowingly marry bigamists.* Under current law, the abused immigrant spouse of a U.S. citizen or legal permanent resident has no access to legal immigration status if his/her spouse is proven to be a bigamist. This bill allows spouses who entered their marriage in good faith, but unknowingly married a bigamist, to file their own application for immigration status.

*Example: Catherine, a native and citizen of Ireland, came to the United States on a student visa, but remained after the visa had expired. In the meantime, while living in New York, she met and fell in love with James, a U.S. citizen. Within a year of meeting each other, the two were married. Shortly after marriage, however, the relationship became extremely abusive. While otherwise eligible for VAWA relief, Catherine found out that James's "ex-wife" was really still his wife. He had not obtained a proper divorce in the state of California, and therefore remained legally married to his first wife, and engaged in a bigamist relationship with Catherine. Consequently, because Catherine is, technically, the wife of a bigamist, she is not eligible for VAWA relief.*

Domestic violence is an economic and heath crisis for this nation. It harms not only men and women, but also the lives of children who witness violence in their homes or experience violence themselves. Every 15 seconds, someone in our country is battered. Every day, four women die in this country as a result of domestic violence. That's over 1,400 women a year. In addition, at least 170,000 violent incidents are serious enough to require hospitalization, emergency room care or a doctor's at-

tention. Every incident of domestic violence should be of concern to us. Every person—woman, man or child—should feel safe at home and in their neighborhoods.

But there are some victims, namely immigrant women and their children, who face additional obstacles to breaking free from the violence. In addition to having an abuser who uses their immigration status as a tool to control and coerce, the barriers of a different language and culture often lead to isolation and compound the ability of battered immigrants to seek traditional domestic violence and support services.

With the passage of the Violence Against Women Act, Congress sent a clear message to this nation that violence against women is not just wrong, it's a crime. Prior to 1994, abusive citizens and permanent residents had total control over their spouse's immigration status. As a result, battered immigrant women and children were forced to remain in abusive relationships.

That is why VAWA '94 was an important first step. It included provisions to protect battered immigrant women and children. Among them, battered immigrants were allowed to file their own applications for immigration relief without the cooperation of their abusive spouse. The intent of these protections was that no one should be forced to choose between deportation and abuse. But, despite some successes of the immigration provisions of VAWA '94, subsequent legislation and the complexities of immigration law continue to place barriers in the way of the very people who need relief the most.

By passing the Battered Immigrant Women Protection Act, this Committee has the opportunity to build on our strong record of opposing all violence against women, keeping victims safe and holding abusers accountable. My bill balances the INS' need to maintain the integrity of our immigration system with the delicate special needs of battered immigrant women and their families. It provides them with a legal way to escape the abuse and end the cycle of violence without the fear of deportation or being separated from their children. Thank you.

Mr. SMITH. I have one quick question for you and then we will recognize others.

How many aliens do you estimate need the benefits that you have in your bill?

Ms. SCHAKOWSKY. The experts that I consulted thought that it might increase approvals under VAWA by about 10 percent. If we look at last year's approvals, 1900 such applications were approved. And so I used the number 190, a couple of hundred.

Mr. SMITH. You mentioned that in your testimony. So that would take it to a little over 2,000, perhaps, total individuals who would benefit?

Ms. SCHAKOWSKY. That is the number that we are looking at, yes.

Mr. SMITH. I recognize the ranking member for her questions.

Ms. JACKSON LEE. First of all, thank you very much for your testimony. We were glad to reach this point.

Two questions I have. One, what in your view, from the experts that you have consulted with, is the importance of the provision dealing with children over 21? What is the crux of why that is so vital?

And then lastly, a question we have all heard of some of the delays with the INS. In fact we have had hearings in your own city. How would this specific legislation help to channel faster these applicants for these particular documents?

Ms. SCHAKOWSKY. Okay. I think all of us who have had any experience with the issue of child abuse know that sometimes those issues do not come to the fore until an adult has gotten themselves together and are able to come forward with the abusive situation and to make the charges.

This would say that adults who for years may have been subjected to this kind of abuse, and whose abusive parent never sought

legal status for that child, would be able to use the fact of that abuse as a way to stay in this country. And let's understand that often we are talking about individuals who have been here for decades, who have been here legally because they have been associated with that abuser and now simply hope to not be deprived of their residency here, their legal status here because of abuse. That would be so cruel, I would think, and would be an exception that we could make that would not count a lot of people, but those who are desperately in need.

The Vermont center that handles these questions of VAWA applications has a great deal of expertise in moving along these petitions. And so it seems to me that we would be able to address fairly rapidly the needs of this small but needy group of victims and provide them the status that they deserve.

Ms. JACKSON LEE. Thank you very much. I think the reason for this legislation is to solve it and to move the process along quickly. Thank you.

Mr. SMITH. Thank you, Ms. Jackson Lee. The gentleman from Michigan, Mr. Conyers, is recognized.

Mr. CONYERS. Ms. Schakowsky's testimony was so penetrating that I do not have a single question for you.

Ms. SCHAKOWSKY. Thank you very much.

Mr. CONYERS. It was excellent. A good beginning. Could I announce, though, that I am introducing a comprehensive immigration bill that will include NACARA, late amnesty and other corrections, including this part of your idea of battered immigrant women which is so good. And I am going to do that on Tuesday, so I wanted to alert you about that. And by the way, Ms. Jackson Lee is also an original cosponsor on this bill. I presume you are, too.

Ms. SCHAKOWSKY. I appreciate that.

Mr. CONYERS. But at any rate, we are still staying on this case, because unless you review legislation, you find a lot of loopholes. If everything that it meant and said was being done, we wouldn't have much to do around here. The Constitution would be taking care of everything. Thirteenth, 14th, 15th amendment, what do you need civil rights laws and voters rights acts and affirmative action for? But you do and you have to stay on the case, and that is what I like about this work you are doing. And I thank you.

Mr. SMITH. Thank you, Mr. Conyers. Congresswoman Schakowsky, before you leave, your response to some comments by Congresswoman Jackson Lee reminded me of a question that I do want to ask you before you go. That is, as I understand that under your bill, if you had someone in the country who was an illegal alien and suppose she was 35 years old. 15 years ago she had been subject to abuse and had been battered by a spouse. Under your bill, that individual would be allowed to self-petition and stay in the United States, even though it had been 15 years since the incident and she had been in the country illegally for 15 years? Is that the case? I can ask the INS the question.

Ms. SCHAKOWSKY. If she were still married to him, then it would be. If they had been divorced or separated long ago? Then the answer is no, that spouse would not. She has 2 years from the time of the divorce, death or deportation to make that claim.

Mr. SMITH. Okay. And I have some other technical questions, I will wait and ask the INS.

Ms. SCHAKOWSKY. And I wanted to just end with my commitment, Mr. Chairman, to work with all members of this committee, and particularly with you in the hopes that we can come to a resolution that would expand the opportunities for victims.

Mr. SMITH. I know you heard my suggestions in my opening statement. If you will take a look at those maybe we can all sit down and visit about that. Thank you, and thank you for your testimony.

We will go to our second panel and welcome Barbara Strack, Acting Executive Associate Commissioner for Policy and Planning, Immigration and Naturalization Service.

Ms. Strack, if you will proceed when you are ready.

**STATEMENT OF BARBARA STRACK, ACTING EXECUTIVE ASSOCIATE COMMISSIONER FOR POLICY AND PLANNING, IMMIGRATION AND NATURALIZATION SERVICE**

Ms. STRACK. Thank you. Good morning Mr. Chairman and members of the subcommittee. Thank you for inviting the Immigration and Naturalization Service to appear tc comment on H.R. 3083, the Battered Immigrant Women Protection Act of 1999. My name is Barbara Strack, and I am the acting executive associate commissioner for the Office of Policy and Planning at INS.

I would like to summarize my written statement and request that it be submitted for the record. Let me begin by addressing the impact that the immigration provisions of the Violence Against Women Act, commonly known as VAWA, have had. It has helped thousands of immigrant spouses and children of U.S. citizens and lawful permanent residents who are victims of domestic violence. We know that fear of deportation or removal means that abused family members are less likely to report domestic violence or to leave an abusive household because an abusive spouse or parent has a powerful weapon by controlling the immigration process. VAWA allows qualified individuals to self-petition and allows those who self-petition to keep an earlier priority date if there has already been a petition filed by the batterer.

Since the publication of the interim regulation in March 1996, INS has received more than 11,000 applications for self-petitions and has approved over 6,500.

This number does not include children of self-petitioners who derive immigration status through a parent's self-petition. While the majority of the applications have been from women, the service has also approved self-petitions filed by men and by children.

The success of this program in providing vital immigration relief to battered immigrants is due, in large part, to the centralization of the process at our Vermont Service Center. These applications receive special handling from the mailroom and data entry through the adjudications process. They are assigned to the VAWA unit in Vermont, which is a special team consisting of special adjudicators who have received extensive training to ensure that they understand the dynamics of domestic violence. The Service has worked closely with many organizations that provide assistance to victims of domestic violence, and their expertise has been invaluable in es-

tablishing a program that is truly working to help victims of domestic violence find safety and independence.

While the current law and regulations have been extremely effective, our experience in implementing VAWA has revealed gaps in the law that we believe are unintended but that prevent many battered immigrants with approved self-petitions from completing the process and becoming lawful permanent residents.

I am here today to express INS support for specific provisions of H.R. 3083 that would eliminate these gaps. The INS believes that such improvements to VAWA are consistent with its purpose of giving battered aliens the same immigration opportunity as similarly-situated aliens who have not been battered.

One of the most important issues is how the sunset of section 245(i) limits the ability of battered immigrants to become lawful permanent residents. Specifically, many self-petitioners whose petitions have been approved find themselves either statutorily ineligible for adjustment of status in the United States, or forced to leave the country to obtain an immigrant visa after having accrued lengthy periods of "unlawful presence" in the United States. Many of them will be ineligible for readmission for 3 or 10 years. These battered immigrants also risk exposing themselves to the very hardship and danger documented in the self-petition. Section 3 of the bill would improve this situation by ensuring that battered immigrants with approved self-petitions could remain in the United States to seek adjustment of status.

Another gap is that the current immigration law establishes waivers of certain grounds of inadmissibility only for spouses or children who benefit from a relative petition filed by a U.S. citizen or LPR spouse. These waivers are not available to most self-petitioning battered immigrants. INS supports those portions of section 5 of the bill that would create a more flexible humanitarian waiver that would be helpful to many self petitioning immigrants.

I highlighted several sections of H.R. 3083 that we consider very helpful. I would also like to draw the subcommittee's attention to certain parts of the bill that concern us. I would stress that we are still reviewing the bill and may have additional comments at a later date.

First, we are concerned that H.R. 3083 proposes to change current eligibility requirements by making this relief available to individuals who live outside the United States and have never resided in the United States with the abusive spouse or parent.

Another provision of the bill that deserves careful scrutiny is section 7. This section would amend the INA to permit individuals who enter the United States with a nonimmigrant fiance visa to apply for benefits that are currently reserved for the battered spouse or child of a U.S. citizen or lawful permanent resident. A fiance visa is temporary, valid for only 90 days. A person who fails to enter into marriage during this period should be treated like other temporary nonimmigrants and should not stay in the United States indefinitely.

We address several other concerns we have with the bill in my written statement.

Finally, INS would like to reiterate the administration's support for establishing a new nonimmigrant visa category, the T-visa,

which will facilitate enforcement of trafficking laws while protecting the victims of such offenses.

In closing, let me emphasize INS's support for the underlying goals of H.R. 3083 and for many provisions of the bill. We would welcome the opportunity to work further with the sponsors and with the subcommittee on this important legislation. That concludes my testimony. Once again, thank you and I would be happy to answer your questions.

Mr. SMITH. Thank you.

[The prepared statement of Ms. Strack follows:]

PREPARED STATEMENT OF BARBARA STRACK, ACTING EXECUTIVE ASSOCIATE COMMISSIONER FOR POLICY AND PLANNING, IMMIGRATION AND NATURALIZATION SERVICE

Mr. Chairman and Members of the Subcommittee, thank you for inviting the Immigration and Naturalization Service to appear before you to comment on HR 3083, the Battered Immigrant Women Protection Act of 1999. My name is Barbara Strack, and I am the Acting Executive Associate Commissioner for the Office of Policy and Planning at the Immigration and Naturalization Service (INS).

Let me begin by describing the impact that the immigration provisions of the Violence Against Women Act of 1994—commonly known as have had. It has helped thousands of spouses and children of U.S. citizens and lawful permanent residents (LPR) who are victims of domestic violence but who are not themselves U.S. citizens or LPRs. We know that fear of deportation or removal from the United States means abused family members are less likely to report domestic violence or to leave an abusive household. An abusive spouse or parent has a powerful weapon by controlling the immigration application process. This can be misused in many ways: threatening to report a family member to the INS, making false promises to file a petition some time in the future, withdrawing a petition that has already been filed, withholding important documentation, or refusing to appear for the scheduled interview with INS. VAWA allows qualified individuals to self-petition and—under the INS interim rule—allows those who self-petition to keep the earlier priority date if there has already been a petition filed by the batterer on the victim's behalf. This takes away one of the tools that a batterer could otherwise use to control the victim of abuse.

Since the publication of the interim regulation in March 1996, INS has received more than 11,000 self-petitions, and has approved over 6,500. This number does not include the children of self-petitioners who derive immigration status through a parent's self-petition. While the majority of the applicants are women. the Service has also approved self-petitions filed by battered men and children.

The success of this program in providing vital immigration relief to battered immigrants is due in large part to the centralization of the adjudication process at the Vermont Service Center in St. Albans, Vermont. The centralization of this process at the Vermont Service Center is particularly appropriate for this type of small volume, complex adjudication. At the Service Center we have established a streamlined procedure for careful and sensitive processing of these self-petitions. Realizing the urgent need and unique circumstances of these individuals, the applications receive special handling from the mailroom and data entry to the adjudication process. For example, they are pre-screened to ensure that the Service uses a safe address for any correspondence with the self-petitioner.

The self-petitions are then assigned to the VAWA unit. This is a special team consisting of experienced adjudicators who have received extensive training to ensure they understand the dynamics of domestic violence and its impact on issues such as whether victims report these crimes to the police or victims' need for access to public benefits to escape the abuse. Most importantly, the training focuses on how batterers use their authority over victims' immigration status to control victims and prevent them from seeking assistance from the criminal justice system. The Service has worked closely with many of the organizations that provide assistance nationwide to victims of domestic violence. Their expertise has been invaluable in establishing a program that is truly working to help victims of domestic violence find safety and independence.

While the current law and regulations have been extremely effective, our experience in implementing VAWA over several years has revealed the existence of gaps in VAWA that we believe are unintended, but that prevent many battered immigrants with approved self-petitions from completing the process by applying for adjustment of status or an immigrant visa. I am here today to express INS support

for specific provisions of HR 3083 which would eliminate those gaps, ensuring that qualified battered immigrants are able to complete the immigration process that leads to lawful permanent residence. The INS believes that such improvements to VAWA are consistent with its purpose of giving battered aliens the same immigration opportunities as similarly situated aliens who have not been battered.

One of the most important issues is how the sunset of Section 245(i) of the Immigration and Nationality Act (INA) limits the ability of battered immigrants to become lawful permanent residents. Specifically, many self-petitioners whose petitions have been approved find themselves either statutorily ineligible for adjustment of status in the United States, or forced to leave the country to obtain an immigrant visa after having accrued lengthy periods of "unlawful presence" in the U.S. Because of that time accrued in unlawful status, many of them will be ineligible for admission for three or ten years, under one of the provisions added to the INA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. These battered immigrants also risk exposing themselves to the very hardship and danger documented in the self-petition. Section 3 of HR 3083 would improve this situation by ensuring that battered immigrants with approved self- petitions could remain in the United States to seek adjustment of status.

Another gap is that current immigration law establishes waivers of certain grounds of inadmissibility only for spouses or children who benefit from a relative petition filed by a U.S. citizen or LPR spouse. These waivers are not available to most self-petitioning battered immigrants, either because the spousal relationship no longer exists, or because a substantial connection cannot be established between the battery and the entry into the United States. INS supports those portions of Section 5 of HR 3083 because it grants a more flexible waiver based on humanitarian considerations that address the special circumstances of a self- petitioning battered immigrant.

HR 3083 is a wide-ranging bill that expands immigration benefits and alters the application of the INA in significant ways, and I've highlighted several sections that we consider very helpful. INS would also like to draw the Subcommittee's attention to certain parts of the bill that concern us. I should stress that we are continuing to review the bill and may have additional comments at a later date. We look forward to working with you in this regard.

We are concerned that HR 3083 proposes to change the current eligibility requirements by making this relief available to individuals who live outside the United States or have never resided in the United States with the abusive spouse or parent, by eliminating the requirement that the self-petitioner be *physically present in the United States* at the time of filing, or have *resided in the United States* with the abusive spouse. Although INS does consider spouses or children of U.S. citizens or LPRs who are serving in the military or work on behalf of the United States Government outside the U.S. to be in the United States for the purpose of filing a self-petition, legislation clarifying this eligibility would be helpful.

Another significant proposed change in HR 3083 that deserves careful scrutiny is Section 7. This section would amend the INA to permit individuals who enter the United States with a non-immigrant visa as a fiance to be eligible to apply for benefits that are currently reserved for the battered spouse or child of a U.S. citizen or LPR. A fiance(e) visa is temporary, valid only for 90 days. A person who fails to enter into marriage with the U.S. citizen after entering the United States on a short-term nonimmigrant fiance(e) visa should be treated just like any other nonimmigrant when the rationale for temporary admission no longer applies and should not stay in the United States indefinitely.

Additionally, the INS recommends striking Section 7(e), Access to Naturalization for Divorced Victims of Abuse. Under current law, most immigrants must wait 5 years to naturalize, but spouses in intact marriages to United States citizens are eligible for citizenship after only 3 years. Section 7(e) would allow *self-petitioners* to naturalize after 3 years instead of the usual 5, but would leave the usual 5-year rule in place for abused spouses who leave their abusive relationship *after* obtaining LPR status, giving self-petitioners more favorable treatment than these other abused immigrant spouses.

Finally, INS wants to reiterate the Administration's support for establishing a new, non-immigrant visa category (T-visa) which will facilitate enforcement of trafficking laws while protecting the victims of such offenses.

I want to reiterate INS' support for the underlying goals of HR 3083 and for many provisions of the bill. We would welcome the opportunity to work with the sponsors of HR 3083 and with the Subcommittee to craft meaningful legislation that fills in the unintended gaps of VAWA and helps immigrants who are victims of domestic violence.

This concludes my testimony before the Subcommittee. Once again, thank you for the opportunity to share the views of the Immigration and Naturalization Service on this important bill. I would be happy to answer your questions.

Mr. SMITH. I have a few questions and as you just heard, we have a vote, and this is not an expected vote. It is not the vote I thought we would have at 11:30, so what we will do is break and return for half an hour before we have another vote.

The first question is what is your view, and you just mentioned it a while ago, of removing the 90-day time limit to file motions to reopen? Do you think that is one of the concerns you have about the bill or not?

Ms. STRACK. The Department of Justice has not taken a position on that, and that is something we would like to look at further. In general, having some finality is helpful to us. However, we would be willing to look at this special population to examine whether there are some special circumstances that would warrant an exception in these cases.

Mr. SMITH. So no position or you have concerns about it? We were told one thing last week, and I am wondering if you are going to contradict what we were told last week.

Ms. STRACK. I think it is fair to say that the Department of Justice has some concerns.

Mr. SMITH. Okay. And I will leave it up to you all to work out that arrangement. This is a question that goes to the heart of a lot of what we are trying to do today. In the 1996 bill, we had waivers of inadmissibility for battered aliens. That was an attempt to recognize the problem, and to at least take some initial steps to try to rectify it. Yet this administration still has not issued regulations in that 3½ year period since we allowed for those waivers.

What good reason do we have for the administration not issuing regulations to help these battered spouses?

Ms. STRACK. Well, we have issued regulations with respect to battered immigrants. There is an——

Mr. SMITH. But not in respect to the waivers of inadmissibility from the 1996 act for battered spouses.

Ms. STRACK. That is correct. That is part of a larger regulation, 212(a), which is not——

Mr. SMITH. If the administration cares about battered immigrant spouses, why have they not issued regulations in 3½ years?

Ms. STRACK. We do care about battered immigrant spouses. Those regulations are part of a larger regulation, and it is the difficulty of covering so many issues in a single regulation that has delayed the issuance of the regulations. But if I could address what we have learned during this period of time through looking at the 11,000 applications we have, we now know things about this population that we did not know before. And we can look at some of these things on the face of it, and see that there are some problems with applying the law as it exist.

Mr. SMITH. Okay. Let me go on. How many battered aliens have actually been removed to your knowledge? Been deported?

Ms. STRACK. The information I believe that we provided to you in the letter, and if you will give me a moment, I can find that—we do not have statistics on having removed aliens who were recipients of approved self-petitions.

Mr. SMITH. To your knowledge, none have been deported so far?

Ms. STRACK. None to my knowledge.

[A more detailed answer was submitted after the hearing and follows.]

*Clarification of response to Mr. Smith's question regarding deportation of "battered aliens"*

The Chairman asked how many "battered aliens" have been removed by INS, but Strack responded in terms of *approved self-petitioners*. The information below clarifies this exchange.

No battered alien who has filed a self petition (Form I–360) and those whose application has bee approved by INS has been deported. Approved self-petitioners are placed in deferred action status, which reflects INS's decision not to pursue removal proceedings against them. However, INS does not have statistic reflecting whether other battered aliens—*i.e.*, those who are not eligible for relief under VAWA or who are eligible but have not applied—may have been deported.

Approved VAWA petitions for the last 3 years:

| 1997 | 1998 | 1999 | 2000 (year-to-date) |
|---|---|---|---|
| 1,210 | 1,677 | 1,921 | 1,768 |

Mr. SMITH. Ms. Jackson Lee.

Ms. JACKSON LEE. Thank you very much, and thank you for your testimony this morning. Let me quickly go—you mentioned, I believe, in your INS statement or your statement regarding the INS, that the INS has approved more than 6,500 VAWA petitions since that publication of interim regulations in March of 1996. What have you done over the last 3 years?

Ms. STRACK. The 11,000 is the cumulative total since that date. It is 11,000 filings and 6,500 cumulative approvals to date.

Ms. JACKSON LEE. So how many in the last 3 years, which would take us back to 1997?

Ms. STRACK. The individual annual tot .ls for 1997, 1998, 1999, and year to date, 2000, the filings are 11,756, and the approvals are 6,576.

Ms. JACKSON LEE. I will get that back from you in writing if you can break that down by year, and specifically the last 3 years.

[The information referred to follows:]



TOTAL I-360 PETITIONS
FY 1997 - FY 2000(THRU JUNE)

Ms. JACKSON LEE. Let me ask, what do you do to identify fraudulent applications?

Ms. STRACK. There are three major schemes, three major mechanisms through which we identify fraudulent applications. The first is looking at the application itself for internal consistency. And that sometimes will contain evidence that is inconsistent, which may be an indicator of fraud. The other thing that we have learned, there are a surprising number of these cases where, in fact, a family preference petition had previously been filed for the same person who is now a self-petitioner. We are finding that in many instances, the self-petition is not the applicant's first effort to contact the Immigration Service. That again gives us a basis for comparison and looking back and trying to identify if there is any fraud in the case.

The third way that we approach fraud is really by having a small, dedicated unit at the Vermont Service Center. These are highly trained people. They review a number of cases. They are available to speak with one another and compare notes on cases, and this allows them to identify duplicate use of documents—patterns, essentially—that could indicate fraud. That would enable them to either request additional information or, in some instances, to refer the case to a district office for further investigation.

Ms. JACKSON LEE. Thank you. I will explore further with you in writing. Thank you very much.

Mr. SMITH. Thank you.

Mr. Conyers?

Mr. CONYERS. Thank you very much for your testimony. I want to say that you are a breath of fresh air from the kind of INS people that have come over here to testify before. I mean, INS needs

more attention than almost any other part of the Department of Justice, except for prisons and corrections. And so I am excited and encouraged by your testimony that we can work something out.

Now, the main question hanging over the Schakowsky bill is simply this: Is this going to open the door for everybody to make excuses that my spouse battered me and beat me up and so now I want to become a citizen? That is the main problem here.

How can you allay the nervous nellies in the Congress that might be worried about such a prospect?

Ms. STRACK. To some extent, I think in terms of what is the scope of the problem of domestic violence, some of the other witnesses who are coming later may be better equipped than the Immigration Service to tell you what the rest of the problem is. What I can talk about is the cases that we have seen so far, 6,500 that we have approved. These are approved self-petitions, which means that we have found it is a valid marriage. We have found that the person has good moral character, a finding of battery or extreme cruelty and a finding that there would be extreme hardship if the person was removed. But this is a two-step process, and that is just the first step, having an approved petition.

The next step is being able to apply for adjustment of status which means actually getting your green card. What we have seen, looking at the kinds of people so far in those approved cases, we think there are many obstacles that will prevent them from being able to get their green card in step 2, and those are the issues that I highlighted here today, things that will keep those people with approved self-petitions from actually perfecting the process and actually getting their green card at the end of the road.

Mr. CONYERS. So you do not see the floodgates opening up, so to speak?

Ms. STRACK. We have no reason to think that they would.

Mr. CONYERS. Well, I want to thank you very much. And I thank you, Mr. Chairman.

Mr. SMITH. Thank you, Mr. Conyers.

Thank you, Ms. Strack, for your testimony. We will stand in recess for about 15 minutes, and then we will begin with the third panel when we return.

[Recess.]

Mr. SMITH. The Subcommittee on Immigration and Claims will reconvene, and let me introduce our witnesses in this third and last panel. They are Dwayne "Duke" Austin, former INS Senior Spokesman; Jacqueline Rishty, staff attorney, Catholic Charities; Leslye Orloff, director, Immigrant Women Program, NOW Legal Defense and Education Fund; and Maria Ortiz, Shelter for Abused Women; and Bree Buchanan, director of public policy, Texas Council on Family Violence.

We welcome you all and we will begin with Mr. Austin.

## STATEMENT OF DWAYNE "DUKE" AUSTIN, FORMER INS SENIOR SPOKESMAN

Mr. AUSTIN. Thank you, Mr. Chairman and other members of the committee who are not present, for inviting me here and giving me this opportunity to testify on this important piece of legislation.

Any professional public affairs practitioner would tell you that it is unwise, if not foolhardy, to come in here and testify against a bill entitled Protection of Battered Women. However, the bill is unnecessary. As you have already stated, there are numerous avenues of relief for battered women in the Immigration and Nationality Act, not the least of which is the 1996 act, which you mentioned regulations have still not be published yet.

Many of the provisions of the legislation do not address the core issue of abuse, but only grant benefits to an alien who may have been abused in the distant past.

The bill is a collage of exceptions of existing immigration law, and the bill will be an instrument of fraud. The effect of the law will be to burden the INS with another impossible task of adjudicating applications with a minimum amount of information.

It sets the standard that a self-initiated affidavit is credible evidence that abuse has occurred, that an alien in a remote corner of the world can submit an application for benefits with an affidavit as the sole standard of proof. It permits an alien to apply even after the abuser is dead and buried, even years after.

It permits the adjudicator to totally disregard criminal violations and convictions which would deem the alien inadmissible under all other provisions of the Immigration and Nationality Act and ineligible for benefits. It permits an alien visiting a parent for one day inside or outside the United States to file applications on some real or perceived abuse. It removes all the filing deadlines and permits previously denied applications to be refiled and resubmitted, which will increase the INS backlog, something I know that concerns all Members of Congress. Fees would be waived so the INS would have to deal with increased caseload without additional resources, which will mean lengthening delays in the adjudications of all types of applications.

There are many other exceptions to the basic Immigration and Nationality Act which will only apply to these applicants. Resurrection of the 245(i) exception, as you mentioned, deleting all age and residency provisions of the Immigration and Nationality Act, ignoring prior misrepresentations to the INS and even ignoring prior deportations from the United States.

It even provides for the use of taxpayer dollars to obtain legal counsel in immigration hearings affiliated with this bill. That is a new precedent, something that has never happened before.

The net effect of this legislation would be to burden the INS with another impossible task of becoming Solomon, judging applications in Vermont dealing with possible abuses in some remote corner of the world with only a self-initiated affidavit. The adjudicator will be faced with two choices: One, to hold the application and attempt to obtain additional information from some source of which I am unaware, which will result in increased delays and more backlogs, or the adjudicator can rubber stamp the applications based solely on the affidavit without any additional information, which is a recipe for fraud.

In conclusion, the bill as currently constructed is unnecessary, a collage of exceptions, inconsistent with current immigration law, will cause unforeseen burdens on the INS and become an instru-

ment for fraud and does very little to address the core issue of abuse.

Asking the INS to get a hold on and implement this bill in a fair and uniform manner consistent with the overall philosophy of our immigration laws is impossible. You might just as well try to handcuff an octopus.

Thank you.

[The prepared statement of Mr. Austin follows:]

PREPARED STATEMENT OF DWAYNE "DUKE" AUSTIN, FORMER INS SENIOR SPOKESMAN

INTRODUCTION

Mr. Chairman, Madam Ranking Minority Member and members of the Subcommittee, I am Duke Austin, a retired career employee of the Immigration and Naturalization Service. Since my retirement in 1995, I have continued to follow closely enforcement and policy issues related to immigration.

I accepted to share with you my concerns about provisions in H.R.3083 because I am convinced that, if enacted, this bill would have long-term harmful effects for our country. My concern is not with the concept of offering protection to aliens against physical or psychological abuse. That is an objective that I endorse. However, H.R.3083 goes far beyond that objective. It also misses an important point. If spousal abuse is going to be diminished, it must be faced squarely and the perpetrators must be seen to pay a penalty for their actions. When it is widely understood that spousal abuse will cost the perpetrators heavily, including loss of immigration status in this country, there will be a much greater deterrence against future spousal abuse.

This bill takes the approach that spousal abuse is a no-fault offense and does not require the abuse to be investigated and punished. Instead, it encourages those who are abused to opt out of the abusive relationship by granting them immigration status to which they otherwise may not be entitled. In this process, a vast loophole of potential fraud and abuse is opened for illegal immigrants who seek to obtain legal residence.

There are three main questions which should be focused on in considering this legislation. Is the legislation necessary? If there is a need, does the legislation meet that need? If the legislation is needed and offers appropriate remedies, does it go beyond that objective and create new problems?

My review of this bill has led me to the conclusion that by and large it is not needed. Secondly, even if it were needed, the approach taken in this bill would not achieve the long-tem objective of confronting and discouraging spousal abuse. Finally, this bill contains a Pandora's Box of unrelated measures that will be inimical to immigration law enforcement if adopted. I will explain each of these conclusions briefly.

H.R.3083 IS NOT NEEDED

There is no doubt that immigrant women, especially illegal alien women are vulnerable to spousal abuse. Part of the problem is that they and the person to whom they are married or in a relationship with are from societies in which spousal abuse is tolerated or not considered abuse. Another problem is distrust of police and limitations on effectively using legal protections that are available because of language or cultural barriers. To attempt to address this issue, a series of laws have been adopted, beginning in 1990. The process of becoming or remaining a legal resident in the United States that depends on a family relationship has been altered to permit the victim of spousal abuse to terminate the relationship without losing the opportunity to remain in the United States legally.

Those measures were designed to remove the power of the abusive spouse to threaten loss of immigration status as a means to subjugate the spouse. We are told now that those provisions are not adequate, because they are not sufficiently understood or sufficiently automatic to end the problem. However, there will continue to be a problem as long as there is a constant flow of newcomers who are unfamiliar with U.S. laws and who are especially vulnerable because they are in the country illegally.

The Violence Against Women Act of 1994 (VAWA) expanded the scope of protections. Self-petitioning was provided for spouses and children of U.S. citizens and legal permanent residents (LPRs). Relief was provided against deportation of illegal aliens who were battered spouses. Other provisions of VAWA that were specifically

designed to address the special legal situation of illegal immigrants are not yet fully in effect because the INS has not yet issued regulations to facilitate their implementation. It makes little sense to be adopting new regulations when existing ones that are already on the books lie dormant.

Other issues addressed in H.R.3038 as problem areas are not real problems. For example, the provisions protecting children against losing immigration benefits by aging out of their status as a child, have been addressed by INS policy decisions. Similarly, in practice, the INS is so overwhelmed with the volume of aliens currently in the country and the scope of the services required by legal immigrants and the law enforcement challenge presented by the enormous and growing number of illegal immigrants, that no effort is expended on identifying abused spouse illegal immigrants for deportation.

Thus, a realistic appraisal of the current situation is that adequate protections exist in the law and in INS procedures and practice to protect abused spouses and their children.

THE APPROACH TAKEN IN THIS BILL WOULD NOT ACHIEVE THE LONG–TERM OBJECTIVE OF CONFRONTING AND DISCOURAGING SPOUSAL ABUSE

Even if the protections referred to above did not exist and needed to be enacted, the approach taken in this bill is off target. Our legal system is predicated on deterrence by exposing illegal activity and punishing it. A demonstration effect of the consequences for law breaking is fundamental to effective disincentives. That is not the approach taken by this bill.

There are no provisions in this bill that require abused spouses or their children to take legal action against their abuser. On the other hand, there are provisions that discourage resort to criminal or civil law by an abused woman. In those cases where the abuser is an immigrant, legal or illegal, the law provides that the person is no longer welcome in our society and should be removed. That is a tangible consequence, which if more often practiced and better understood would constitute a major protection to vulnerable women. This legislation does not pursue that objective, and, in fact, discourages it by treating spousal abuse as a no-fault offense.

UNRELATED MEASURES INIMICAL TO IMMIGRATION LAW ENFORCEMENT

Our country currently is confronting a massive problem of illegal entry, alien smuggling, visa overstays and attendant problems of demands for uncompensated emergency medical services, incarceration expenses, schools crowded with non-English speaking children, over-taxed social service programs, and uninsured motorists to identify only some of the issues that were addressed by the U.S. Commission on Immigration Reform and have been the subject of legal reform efforts by this Committee.

I trust that your approach to this legislation will include a critical focus on how it will further or hinder efforts to restore control over our nation's borders. It is my understanding that the vast majority of the aliens for whom the VAWA protections were adopted are illegal aliens. While spousal abuse should not be condoned in any situation, we should not allow our concerns about the victims of past abuse to override our insistence on respect for our immigration law once the threat of on-going abuse has been removed.

My approach to this issue was best summarized by the honorable Barbara Jordan, Chairman of the U.S. Commission on Immigration Reform, when she testified before this Subcommittee on February 24, 1995. She reminded us that a fundamental component of our immigration policy must be that ". . . *those who should not be here will be required to leave.*" She underscored that point when she added ". . . *for the system to be credible, people actually have to be deported at the end of the process.*"

The approach in H.R.3038 runs counter to that fundamental principal. Instead, the legislation prevents actions designed to remove persons who are in illegal status or have committed acts that should lead to their removal. It also confers legal resident status on illegal aliens who have been abused, even though that status is unnecessary to their further protection against abuse. The legislation is designed as if its primary objective were achieving legal residence status for illegal aliens, bypassing all of the provisions in the law that would deny that recourse.

The problem with that approach is not just that it undermines respect for our immigration law, but that it opens up numerous broad loopholes in the immigration law that will invite abuse by illegal aliens and alien smugglers in seeking a new route to undermine our system of legal immigration.

There are so many of these loopholes, that I will not try to identify all of them, and I know that your staff has a better capability to do so than I can offer. Nevertheless, let me offer a few examples of my concerns.

The evidentiary standards provided for in this bill submission of an affidavit is so amorphous that it is virtually impossible to administer by the INS and, therefore, becomes an attractive opportunity for fraud.

Retroactivity provisions incorporated in the bill open an enormous body of litigation that will further undermine current enforcement capabilities.

Time-clock provisions are introduced in the bill that will allow illegal aliens to continue to accrue residence status in this country (albeit illegal residence) as part of a process to gain status for claiming an immigration benefit. This will have the perverse effect of encouraging legal delaying tactics to take advantage of the ticking clock.

Removal of the filing deadlines and permitting previously denied applications to be refilled will increase INS backlogs. Fees would be waived by the bill, so the INS would have to address the workload increase without any additional resources.

The bill resuscitates Section 245(i) in the INA. This is a provision that was removed from the law because of objections to the idea of allowing illegal aliens to become legal residents without leaving the country for U.S. Conuslar screening. The bill attempts to recreate this provision as a backdoor route to permanent residence.

An entirely new term in federal law, "intended spouse," not only undermines the marriage relationship as a provision in immigration law for derivative immigration status, but it also invites abuse. If an illegal alien marries an already married U.S. citizen, the alien can gain legal residence status by alleging that she did not know she had entered a bigamous relationship. It is easy to see how tempting this would become as a way to gain legal residence, especially if there was no adversarial requirement that the alien take legal action against the bigamist.

The bill also provides an array of relief for persons who seek VAWA benefits that are not available to other immigrants. These include aging-out benefits that are not even available to children of asylum beneficiaries. They also include welfare benefits. It is easy to see how these benefits would attract fraud.

Other collateral provisions open doors to persons who have never set foot in the United States to self-petition for admission and legal residence on the basis of an abusive relationship that occurred abroad. The irony of this provision is that it would allow an abused spouse the opportunity to follow to join the abuser in the United States. If the objective of the drafters of this bill were truly to protect the spouse against future abuse, they would never have included such a provision.

The bill goes far beyond offering protections to spouses against ongoing abuse. It furnishes them fast-track ability to gain legal residence and to confer immigration benefits on other family members. The bill vastly increases the population of potential VAWA alien beneficiaries to include parents and adult children and their offspring.

CONCLUSION

Although I have been able to touch only briefly on some of my major concerns with H.R.3038, I trust that you will understand the problems that would arise if it were to be adopted in its current form. In fact, my conclusion is that the bill contains so many undesirable problem areas, that it would be extremely harmful for the nation in the long-term if it were adopted.

Please keep in mind that my opposition to this bill is not because I am unsympathetic to the problem of spousal abuse. However, the fact is that substantial protections for aliens against spousal abuse already exist in the law and in practice. Even more fundamental, in my view, is that this bill is not designed to achieve the long-term objective of confronting and discouraging spousal abuse.

Thank you for the opportunity to testify, and I welcome the opportunity to answer any questions that you may have.

Mr. SMITH. Thank you, Mr. Austin.

Ms. Rishty.

## STATEMENT OF JACQUELINE RISHTY, STAFF ATTORNEY, CATHOLIC CHARITIES

Ms. RISHTY. Thank you. My name is Jacqueline Rishty, and I am a Senior Attorney with Catholic Charities Immigration Services in Maryland. I am pleased to testify today on behalf of Catholic Charities USA.

Catholic Charities USA is the Nation's largest social service provider. Our 1400 local agencies provide a wide range of human serv-

ices. Many of Catholic Charities USA's local agencies, including my own, assist battered immigrant women and see the problems these women face every day.

In my own experiences I have already helped women seek and obtain permanent resident status through the VAWA provision. These women have transformed from women who were afraid, who lacked confidence, who were unable to talk to anyone about their situation, to fear having to be deported from the United States. They transformed into people who were confident, who are working now, who are successfully contributing to our great country of the United States.

While Catholic Charities USA and our local agencies are strong supporters of marriage and family, the Catholic Church does not counsel victims of domestic violence to remain in abusive situations. Battered women should not have to choose between remaining in a violent marriage to a citizen or permanent resident who can provide them legal immigration status or leaving that relationship and risking deportation.

We applaud the work of Chairman Smith and Ranking Member Jackson Lee in calling this hearing, and we support H.R. 3083 in its entirety because it would correct many of the grievous injustices in the immigration system that presently bar some battered immigrant women from the relief granted them in 1994 by the Violence Against Women Act.

Rather than focus on the specific legal aspects behind each issue, I would like to use my time today to focus on the individuals who would benefit from H.R. 3083. I would ask that my longer statement which addresses each of these specific issues to be entered into the record.

The adjustment of status provisions in H.R. 3083 would greatly assist battered immigrants who seek to adjust their status in the United States but who are in some cases forced to return to their country of origin to obtain a green card. H.R. 3083 would do this by allowing victims of abuse to now adjust their status in the United States.

This will make a real difference in these women's lives. In one case of a woman that was represented by Catholic Charities in Florida, she told Catholic Charities about an incident that occurred after she separated from her abusive husband. She had obtained a protection order in the United States but said that her husband came to see her despite the order. At the time, her husband said that if she did not comply with his request for oral sex, he was going to call the immigration office and have her self-petition canceled. He also threatened that he had what he needed to beat her and that if she returned to Mexico he would send someone to kill her and her two sons. The woman obviously fears returning to Mexico but under the current provisions she is unable to adjust in the United States. The proposed legislation would help this woman.

Many of Catholic Charities' local agencies have directly seen the impact of the abuser's power related to a battered immigrant's legal status. Clients in Arizona, Virginia, Florida and all throughout the country have said that their husbands threatened instituting deportation proceedings against them if they come forward about the abuse. Enactment of H.R. 3083 will be critical in sever-

ing some of the control abusive U.S. Citizen or lawful permanent resident spouses and parents currently exert over the lives and immigration status of their spouses and children.

H.R. 3083 would also allow battered immigrant women to obtain waivers of some of the bars on inadmissibility and grounds for removal if the circumstances from which the bars arise are related to the abuse or would cause extreme hardship to the battered immigrant's children. An example is a Filipino immigrant who is a client of Catholic Charities in Hawaii. She suffered ongoing physical and verbal abuse by her husband. Twice when she and her husband had a fight, her husband, who was a lawyer, made it appear to the police that the woman abused him and showed the police bruises and scratches on his arm which he in fact willingly inflicted on himself. After both incidents, the woman was arrested and put in jail. If the woman had been convicted or accepted a plea agreement, she could have then faced deportation.

In another case a battered immigrant shoplifted baby food to feed her starving children when she escaped from the abuser. Even if she received no jail term but a one-year suspended sentence for a $15 crime, this woman will currently face deportation.

These harsh consequences on battered immigrants should be remedied by allowing the INS and the immigration judges to waive inadmissibility and deportation grounds in cases of battered immigrants where the crime or inadmissible act was connected to the abuse.

Catholic Charities USA commends this subcommittee for holding this hearing to address the needs of battered women. We believe the protections in H.R. 3083 represent justice and compassion for battered immigrant women while maintaining the essential principles of our immigration system.

[The prepared statement of Ms. Rishty follows:]

PREPARED STATEMENT OF JACQUELINE RISHTY, STAFF ATTORNEY, CATHOLIC CHARITIES

SUMMARY

Catholic Charities USA is the nation's largest social serv    provider. Our 1400 local agencies provide a wide range of human services. Man    f Catholic Charities USA's local agencies assist battered immigrant women and see the problems these women face every day. While Catholic Charities USA and our local agencies are strong supporters of marriage and family, the Catholic Church does not counsel victims of domestic violence to remain in abusive situations. We strongly urge the Committee to support H.R. 3083 to ensure protection of the rights of battered immigrant women.

We fully support H.R 3083 in its entirety but would like to highlight five issues:

- *Adjustment of Status*—H.R. 3083 would allow battered immigrant women who obtain an approved self-petition to also obtain a green card without leaving the U.S. This would allow a battered immigrant woman to maintain the protections of the U.S. judicial system while proceeding through adjustment of status proceedings.

- *Self-Petitions*—H.R. 3083 would allow battered immigrant women to self-petitioner for legal status even if their abusers divorce them, die, or are deported. Catholic Charities USA also supports H.R. 3083's provision to allow women and children to file self-petitions and adjust their status to legal permanent residents while remaining in the U.S.

- *Cancellation of Removal*—H.R. 3083 would consider a battered immigrant's total physical time in the U.S. when evaluating her access to cancellation of removal proceedings. In addition, we support the elimination of the cap on the

number of green cards available under cancellation of removal proceedings for battered immigrants.

- *Waivers of Inadmissibility and Bars on Re-entry*—H.R. 3083 would provide battered immigrant women meaningful access to waivers of inadmissibility and bars on reentry. We support the provisions in H.R. 3083 which waive inadmissibility and deportability requirements for battered immigrant women if the abuse was the reason for the battered immigrant woman's action. Further, we support the provisions which provide meaningful exceptions by allowing battered immigrant women to demonstrate extreme hardship to their children if not allowed to remain or enter the U.S.
- *Access to Legal Services*—H.R. 3083 would allow battered immigrant women to obtain legal assistance in VAWA immigration cases from organizations funded by VAWA grants or through the National Legal Services Corporation. H.R. 3083 would allow legal services organizations to provide legal services, with non-federal funds, to anyone covered by a State's civil protection order statute.

STATEMENT

*Introduction*

My name is Jacqueline Rishty and I am a senior attorney with Catholic Charities Immigration Legal Services in Maryland. I am pleased to testify today on behalf of Catholic Charities USA.

Catholic Charities USA is the nation's largest social service provider. Our 1400 local agencies provide a wide range of human services. Many of Catholic Charities USA's local agencies assist battered immigrant women and see the problems these women face every day. Many of these women are placed in the untenable situation of choosing to remain in a violent relationship to protect their immigration status, or leaving the relationship and having to leave the United States as well.

While Catholic Charities USA and our local agencies are strong supporters of marriage and family, the Catholic Church does not counsel victims of domestic violence to remain in abusive situations. Battered women should not have to choose between remaining in a violent marriage to a citizen or lawful permanent resident who could provide them legal immigration status, or leaving that abusive relationship and risk deportation. Thus, we strongly urge the Committee to support H.R. 3083 to ensure protection of the rights of battered immigrant women. Our local agencies, who see the problems these women face every day, have conveyed to us how important this bill is.

We applaud the work of Chairman Smith and Ranking Member Jackson Lee in convening this hearing. We believe H.R 3083 would correct many of the grievous injustices in the immigration system that bar battered immigrant women from the relief granted them in 1994 by the Violence Against Women Act (VAWA).

*1. Adjustment of Status*

Under prior section 245(i) of the Immigration and Nationality Act, a battered immigrant woman who was not a legal permanent resident could adjust her status to legal permanent resident and obtain a green card without leaving the United States. She could file a self-petition and if INS granted it, she would be automatically granted a green card. Since expiration of section 245(i), immigrant women who are married to U.S. citizens or lawful permanent residents may still file self-petitions to change their status to that of lawful permanent residents. But if an immigrant is "out-of-status" (e.g. overstaying a visa) for more than six months, even if the Immigration and Naturalization Service (INS) approves their self-petitions, they must *leave* the U.S. and *return* to their country of origin to obtain their green cards (unless they are a spouse or child of a U.S. citizen).

The expiration of this provision has created danger and extreme hardship for many battered immigrant women and children. These women lose the protection provided by civil protection orders when they travel abroad to obtain their green cards, even though their abusers can freely travel to follow them. Many of these women are forced to leave their children behind with caretakers who may not be able to adequately protect the children from the abuser. Requiring the battered immigrant to leave the country also provides the abuser leverage to convince a court that the battered immigrant has abandoned the children and that custody should be awarded to him. Moreover, if an untrained consular official chooses not to honor the INS' approval of the self-petition, and instead denies a battered immigrant woman a green card, she has no venue for appealing and can not return to the U.S. and her children.

Faced with such choices, many battered immigrant women may choose to *stay with their abusers to protect their children rather than seek a green card* and leave the country. These women make that choice despite the fact that obtaining a green card, and, later, citizenship, could allow them and their children to escape ongoing violence.

For example, a Mexican client of Catholic Charities in Florida told a caseworker about an incident after she separated from her husband because he beat her. She obtained a protection order but said her husband came to see her despite the order. At that time, her husband said that if she did not comply with his requests for oral sex, he was going to call the immigration office and have her application for legal status canceled. He also threatened that he had what he needed to "beat the crap" out of her and that if she returned to Mexico he would send someone to kill her and her two sons. The woman feared returning to Mexico because the court system does not offer the same protections as in the U.S. and her husband's entire family lives in Mexico. She had to choose between continuing with her application for legal status, which would require her to go to Mexico to obtain a green card, and withdrawing her application because of fear of retribution.

Catholic Charities USA thus supports H.R. 3083's provision to allow women and children to file self-petitions and adjust their status to legal permanent residents while remaining in the U.S. This was the approach originally contemplated when VAWA became law in 1994, and would be restored by H.R. 3083.

*2. Self-Petitions and Changes to the Immigration Status of the Abuser*

*a. Continuation of Self-Petitions*

Catholic Charities USA also supports the provisions in H.R. 3083 which would allow a battered immigrant woman's self-petition to be filed and continue even if the abuser's immigration status changes or the abuser divorces the self-petitioner.

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress made domestic violence a deportable crime. If a battered immigrant woman brings charges of abuse against her legal permanent resident spouse, the spouse may thus be subject to deportation. However, if the spouse is deported before the battered immigrant *learns* about self-petitioning, has filed the self-petition and has had the self-petition approved by INS, the battered immigrant woman's self-petition becomes void because her ability to obtain relief is directly linked to her abuser's immigration status.

Given the structure of current law, abusers have the upper hand in a relationship in which the battered immigrant woman is dependent on the abuser for her legal status in the U.S. Many battered immigrant women delay or choose not to report abuse because they do not want to jeopardize their self-petitions.

In addition, under current law, self-petitions are only available to battered immigrant women who are still married to their abusers at the time of filing. Abusers can thus leverage current law to continue their abusive relationships. This rule is particularly problematic. For example, an abuser who knows his spouse fears deportation proceedings may threaten divorce as a means of forcing the battered immigrant woman to stay in the abusive relationship or may institute divorce proceedings to cut off the battered immigrant woman's ability to self-petition. In addition, an abuser who is not a U.S. citizen may taunt his spouse that she can not call the police during or after physical abuse because the abuser's arrest and conviction can lead to his deportation and jeopardize her immigration status. To sever some of the control U.S. citizen and lawful permanent resident spouses and parents continue to exert over the lives and immigration status of their spouses and children even after VAWA, battered immigrant women need to have the ability to file a VAWA self- petition, for at least a limited time, following divorce, the abuser's loss of status or death.

These are not speculative concerns. Many of Catholic Charities' local agencies have directly seen the impact of the abuser's power in these situations. One client of Catholic Charities in Arizona said that her husband routinely reminded her that she had to accept whatever he did because her legal status was dependent on him. Another client, a Russian mail-order bride who received assistance from Catholic Charities in Virginia, said her husband constantly threatened her because she did not have a green card and he could institute deportation proceedings against her. Another Russian client in Florida said her husband threatened deportation if she did not do as he said.

We therefore strongly support H.R. 3083's provision to allow the self-petition to be evaluated regardless of the abuser's immigration status. H.R. 3083 would allow a battered immigrant woman up to two years to file a self-petition after the death, deportation or loss of citizenship of her abuser. H.R 3083 would also allow a self-petition to remain valid even if her spouse is deported due to domestic violence.

These provisions would not be anomalous in immigration law. An example of an analogous provision is section 204(a)(1)(A)(ii) of the INA which provides widows two years from the time of their spouse's death to file a self-petition. We believe that battered immigrant women should have a similar time frame if their spouse divorces them, dies, or is deported.

*b. Extreme Hardship*

Under current law, for a self-petition to adjust status to be approved, a battered immigrant woman must not only demonstrate a valid marriage to a legal permanent resident or citizen, good moral character, and evidence of battering or extreme cruelty but also demonstrate that denial of the petition would cause "extreme hardship" to herself or her children if the self-petition is denied and she would have to leave the U.S.

We have discovered that, in practice, this additional requirement creates a high burden of proof which is often unsurmountable without legal assistance. For many battered immigrant women such legal assistance is unavailable or unaffordable. The extreme hardship requirement results in the denial of self-petitions for many battered immigrants who file pro se applications with INS and who can prove the other requirements of a self-petition to INS' satisfaction—a valid marriage to a U.S. citizen or lawful permanent resident; battering or extreme cruelty existed in the marriage; and good moral character. Proving all of this evidence in a self-petition should be deemed sufficient. The safety of battered immigrant women and their children, and the ability to prosecute abusers for criminal acts committed against battered immigrant women and/or their children, will be enhanced with elimination of the extreme hardship requirement.

*3. Cancellation of Removal*

*a. Calculation of Time in the U.S.*

Catholic Cha ities USA supports changing the accrual method of counting the time a battered immigrant woman is in the United States from current law to the provision originally included in the Violence Against Women Act of 1994.

In addition to offering battered immigrant women and children the protection of self-petitioning, VAWA also provided battered immigrants who had been physically present in the United States for longer than 3 years with a defense against deportation or removal—regardless of whether the battered immigrant woman had filed a self-petition. This provision provided a much needed remedy for battered immigrants whose husbands divorced them before they could file their self-petition or whose husbands placed them in deportation proceedings. In addition, it assisted many mothers who sought to remain in the U.S. to protect their children from an abusive father or step-father. If the mothers were deported, the children may have had to continue residing with their abusive father or step-father.

Under VAWA, this option was available to any woman who had been residing in the U.S. for at least three years, regardless of whether INS had instituted deportation proceedings. The woman would still have to demonstrate "good moral character." prove that she has been subjected to battering or extreme cruelty by her U.S. citiz[illegible] or lawful permanent resident spouse or former spouse, and prove that deportation would cause extreme hardship to herself or her children.

IIRIRA, however, amended the law to provide that once INS begins deportation proceedings, the accumulation of the 3 years necessary to verify cancellation of removal *stops*. This has removed the effectiveness of the provision for many battered immigrant women. Since an abuser may turn his spouse in to INS for deportation or threaten harm if she attends the deportation hearing, the battered immigrant woman may be unable to defend against the deportation action. This is even more egregious when an abuser does not allow a battered immigrant access to her mail so she never receives notice that she is subject to a deportation hearing. Since the abusers can initiate deportation proceedings, they may purposely start proceedings right before a battered immigrant meets the three year requirement, thus foreclosing her access to cancellation of removal proceedings.

We support the provision originally included in VAWA, and now included in H.R. 3083, which specified the method of counting a battered immigrant's time in the U.S. for purposes of cancellation of removal. That original provision does not stop the clock when deportation proceedings are initiated but rather counts the total time a battered immigrant is physically present in the U.S. For example, assume a battered immigrant woman has resided in the U.S. for 2½ years. Her spouse then notifies INS of his spouse's unlawful presence in the U.S. (which was related to the abuse because he refused to allow her to reapply for a visa) and INS undertakes deportation proceedings. If the deportation proceedings take eight months (not unusual for INS proceedings), current law would not allow the battered immigrant

woman to apply for cancellation of removal even though her total time in the U.S. is over three years (2½ years prior to initiation of proceedings + 8 months after initiation = 3 years, 2 months). The original provision in VAWA would allow her access to cancellation of removal because her *total* time in the U.S. is over 3 years. This approach was crafted with the goal of offering protection to a broader group of battered immigrants.

In addition, the original provision furthers the aims of the criminal justice system. In some situations, abusers institute deportation proceedings against battered immigrants to prevent their participation in criminal proceedings. The provision was based on an understanding that for every battered immigrant who could not attain relief under cancellation of removal, there often was a U.S. citizen or lawful permanent resident abuser who could not be effectively prosecuted for abuse inflicted on the battered immigrant. Restoring the calculation of the three year time period to physical presence would allow battered immigrant women to access cancellation of removal procedures as intended by VAWA.

*b. Removing the Cap on Green Cards Issued through Cancellation of Removal*

IIRIRA also placed a cap on the number of cancellation of removal procedures INS could approve—whether for VAWA or non-VAWA cases. The current limit is 4,000. We believe battered immigrant women should have access to cancellation of removal proceedings without a cap and without a link to non-VAWA cases.

Under IIRIRA, "suspensions of deportation" became "cancellation of removal." There was a yearly cap of 4,000 on the number of suspensions of deportation and cancellations of removal INS could grant. Under NACARA (the Nicaraguan and Central American Relief Act), Congress exempted VAWA suspension of deportation applicants from the 4,000 cap. (This exemption applied to any VAWA applicant who had received notice from INS of the initiation of deportation proceedings before April 1, 1997.) The provisions in H.R. 3083 would lift the cap on cancellations of removal, providing the same exemption as Congress enacted in NACARA.

*4. Waivers of Inadmissability and Bars on Re-Entry For Otherwise VAWA Eligible Battered Immigrants*

Catholic Charities USA also supports developing a meaningful waiver of certain inadmissibility and deportation grounds for battered immigrant women who can demonstrate that a connection exists between their inadmissibility or deportability grounds and the abuse they have suffered.

With the passage of IIRIRA, Congress imposed a variety of new inadmissability and deportability grounds that reduced the access battered immigrants previously had to VAWA's protections. These included:

- *a bar to re-entry* for applicants who were lawfully admitted to the U.S. but "out-of-status" for more than six months (3 year bar) or more than one year (ten year bar)—even if the applicant could demonstrate extreme hardship to a child;
- *a bar to re-entry* for applicants who entered the United States illegally on more than one occasion—even if a battered immigrant's departure or reentry to the U.S, was related to the abuse;
- *a bar to re-entry* for applicants who had been previously deported from the United States—even if the deportation, the reentry and/or the attempt to re-enter the United States was connected to the abuse;
- deeming applicants *inadmissible* when they have been convicted of certain crimes—even if a battered immigrant woman acted in self- defense, under duress from the abuser, or when the crime they plead guilty to was connected to the abuse or being able to survive the abuse;
- *deporting victims* of domestic violence who were arrested for, plead guilty to or were convicted—even if, as noted above, they acted in self- defense, under duress or if they were wrongly convicted of violation of a protection order issued to protect them.
- deeming applicants *inadmissible* if they use fraud or willful misrepresentation of a material fact to obtain admission into the United States—even if the misrepresentation was connected to the abuse or being able to survive the abuse.

*a. Bars on Reentry*

In IIRIRA, Congress enacted a number of new bars on reentry. Any immigrant who entered the U.S. illegally is inadmissible. Immigrants who remain in the U.S. "out-of-status" (e.g. with an expired visa) for more than six months have to leave

the U.S. to apply to become legal permanent residents (unless they are a spouse or child of a U.S. citizen).

The situations that cause a battered immigrant woman to be subject to a bar on reentry vary. Some battered immigrant women, especially those who live near the Mexican or Canadian borders, often leave the U.S. either because their abusers force them to leave or they flee to escape abuse and/or heal from injuries. The abuser may stalk or threaten the battered immigrant and force her to re-enter the U.S. In some of these instances, the battered immigrant may have been previously deported and either her deportation, her attempt to reenter, or her application to reenter may have been related to the abuse. In these situations, the battered immigrant women will not be able to reenter directly as a result of the abuse inflicted by their U.S. citizen and lawful permanent resident spouses. Battered immigrant women and children should not be subject to these bars since the effect of doing so is to let the abusers of immigrant spouses go free.

One specific provision of IIRIRA imposes a three year bar on reentry for any immigrant who has been out-of-status for more than six months, and a ten year bar on reentry for anyone out-of-status for more than one year. A waiver to this inadmissibility does exist. To be eligible for the exemption, however, an individual must show extreme hardship to the citizen or legal permanent resident spouse or parent of the applicant. For example, if an individual is subject to the 3 year bar (because she was out-of-status for more than six months and not married to a U.S. citizen) but demonstrates that her *spouse* has a severe disability and would be unable to take care of his needs without assistance from the spouse, INS could determine the spouse is eligible for an exemption based on extreme hardship. But if a battered immigrant woman demonstrated that her citizen *children* would be subject to extreme hardship if she were not allowed to return because they would have to remain with their abusive father, she would not be eligible since the exception is limited to extreme hardship to her spouse or parent.

Catholic Charities USA supports the provisions in H.R. 3083 which would allow the Attorney General to waive the bar for humanitarian purposes, to assure family unity, or if there is a connection between the grounds for inadmissibility and the abuse.

*b. Bars Related to Misrepresentation*

The issue of an exemption that does not provide practical relief also exists with misrepresentation. Under current law, a battered immigrant woman may only receive a waiver of inadmissibility for misrepresentation if the legal permanent resident or citizen spouse of the immigrant subject to the bar would suffer extreme hardship. As stated above, it would be unlikely that a battered immigrant would choose to demonstrate extreme hardship to her abuser since that would presumably require her to return to the abuser to mitigate his extreme hardship.

Current law does not allow consideration of whether the bar might cause extreme hardship to the battered immigrant or her children (who often are U.S. citizens and remain in the U.S.). Battered immigrants should be afforded the same access to waivers as they would have had if their spouse was not an abuser.

We support the provisions in H.R. 3083 which would allow battered immigrant women to obtain a waiver for misrepresentation by demonstrating extreme hardship to their citizen or legal permanent resident child or parent.

*c. Waiver of Deportation for Criminal Convictions*

Finally, IIRIRA imposed many changes in admissibility and deportation grounds that have significantly heightened danger for battered immigrant women. Some battered immigrant women become involved as defendants in criminal prosecutions. This happens for a number of reasons. In many instances their inability to speak English fluently can result in their arrests for domestic violence either together with or instead of the abuser because police officials do not obtain an interpreter and listen to only the spouse's version of the incident. One example involves a Filipino immigrant, a client of Catholic Charities in Hawaii. The woman's husband verbally and physically abused her. Twice when she and her husband had a fight, her husband, a lawyer, made it appear to the police that the woman abused him and showed the police bruises and scratches on his arm which he, in fact, willingly inflicted on himself. After both incidents, the woman was arrested and put in jail. The husband ultimately dropped the charges and the woman eventually separated from him.

But if the woman had been convicted, or accepted a plea agreement, she could have then faced deportation. Battered immigrants who are arrested often accept plea offers instead of contesting the case because judges and lawyers do not understand or inform them of the immigration consequences of such pleas. The battered

immigrant woman's primary focus is often to do what she can to be released from jail because there is no safe person to care for her children. In another case, a battered immigrant shoplifted baby food to feed her starving children once she escaped from her abuser. Even if she received no jail time but a one year suspended sentence for a $15 crime, she could face deportation. Under current law, battered immigrant self-petitioners and all battered non-citizens could be placed in deportation proceedings with no possible remedy. These harsh consequences on battered immigrants should be remedied by allowing the INS and immigration judges to waive inadmissibility and deportation grounds in cases of battered immigrants where the crime or inadmissable act was connected to the abuse.

*d. Conclusion*

The rules on inadmissibility and deportability which were enacted in IIRIRA should not preclude a battered immigrant woman from residing in the United States or shutting her and her children off from all access to legal remedies, including protection for herself and her children through the courts, custody decrees, and law enforcement. Depending on her country of origin, she may not have judicial protection and may herself be placed in danger either from the abuser or others who believe her allegations of abuse bring disgrace on her and/or her family. VAWA eligible battered immigrants abused by citizens and lawful permanent residents need and deserve our protection. Waivers should be available for acts that are connected to the history of abuse or their attempts to end the abuse and similarly battered non- citizens should be able to obtain waivers of deportation grounds.

We support the provisions in H.R. 3083 which waive inadmissibility and deportability requirements for battered immigrant women if the abuse was the reason for the battered immigrant woman's action. Further, we support the provisions which provide meaningful exceptions by allowing battered immigrant women to demonstrate extreme hardship to their children if not allowed to remain or enter the U.S.

*5. Access to Legal Services*

The legislation increases access to funding for legal service organizations representing battered immigrants. For example, H.R. 3083 clarifies that VAWA civil legal assistance funds can be used to increase direct legal services to immigrant battered women, including in VAWA immigration cases. It would also allow legal services organizations to provide legal assistance to battered immigrant women in VAWA immigration cases.

Battered women often need access to legal services to obtain legal relief to help them halt the abuse and create a new home for their children apart from the abuser. This legal assistance most often includes seeking a protection order, custody order, child support, assistance in immigration matters or sometimes help obtaining legal separation or a divorce. Under current law, organizations funded through the Legal Services Corporation may provide services to immigrants with non-federal funds only in very limited circumstances. These circumstances exist, however, only when the person committing the domestic violence is a spouse or parent. H.R. 3083 expands these circumstances to include any individual in a relationship accorded redress under a State protection order statute.

*6. Conclusion*

Catholic Charities USA commends this subcommittee for convening this hearing to address the needs of battered immigrant women. We believe protections in H.R. 3083 would represent justice and compassion for battered immigrant women while maintaining the essential principles of our immigration system. We urge you to act expeditiously on H.R 3083 to address the issues that I have highlighted and other issues that interfere with the ability of battered immigrant women and children to obtain protection from ongoing abuse and undermine our ability to hold abusers accountable. We look forward to working with you to ensure these provisions become law in the remaining days of this Congress.

Mr. SMITH. Thank you.
Ms. Orloff.

**STATEMENT OF LESLYE ORLOFF, DIRECTOR, IMMIGRANT WOMEN PROGRAM, NOW LEGAL DEFENSE AND EDUCATION FUND**

Ms. ORLOFF. Thank you, Chairman Smith. I am Leslye Orloff, Director of the Immigrant Women Program at NOW Legal Defense

and Education Fund and Cofounder and Codirector of the National Network on Behalf of Battered Immigrant Women. The Network I am also representing here today is made up of over 400 groups from across the country that provide direct services to battered women. I am an attorney with 17 years of experience representing battered immigrant women in family court cases and advocating for improvements in local and Federal laws that help battered immigrant women and children.

I am going to summarize my statement here and ask that it be accepted for the record. Before I begin, I want to warmly thank Congresswomen Schakowsky, Jackson Lee and Morella for their leadership in introducing this bill; Congressman Conyers for his leadership on the Violence Against Women Act; I want to recognize Congressman McCollum's work in 1994 in including battered immigrant children in the original VAWA; and Chairman Smith and the members of the subcommittee for inviting me to testify today.

Lastly, I would like to acknowledge the work of Senators Abraham and Kennedy in sponsoring parallel legislation in the Senate.

I am going to focus first on some statistics that I think are important to keep in mind. Research indicates that between 34 and 49.8 percent of immigrant women in this country experience domestic violence in their lifetimes. When you only look at those women who are married, the abuse rate jumps to 59.5 percent. Among battered immigrant women married to U.S. citizens and lawful permanent residents, 72.3 percent never file papers on their behalf, and of the percentage who do file, most of them wait over 4 years before filing, clearly using the abuse as a tool to perpetrate domestic violence. Another fact that research shows us is that where there is immigration-related abuse in the relationship, it usually coexists with physical and emotional abuse and appears to be a predictor of the lethality of abuse in those relationships.

The other point that I think is important to recognize is that there is a 70 percent overlap between domestic violence and child abuse, and so not acting, as this bill does, to stop domestic violence on behalf of immigrant women has the effect of perpetrating child abuse against their children.

Congress understood this in 1994 when they passed the Violence Against Women Act which was a valiant effort to try to keep immigrant women from being trapped in abusive relationships. And one of the major problems that was happening is that battered immigrant women, when they cannot get out of abusive relationships, cannot call the police, cannot get help, is that their abusers essentially are immune from prosecution and the criminal process cannot reach them.

There was a case in New York in which a battered immigrant woman was attacked with a machete in front of a nunnery. The victim wanted to prosecute, but could not because her abusive husband would have her deported because he controlled her immigration status. We need that to be able to stop.

In 1994 we passed Violence Against Women Act. In 1996, Chairman Smith took a leadership role in ensuring that that act was preserved as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and extending welfare benefits to battered immigrants.

The problem is that, as Barbara Strack stated earlier, there have been a lot of problems with implementation of VAWA that we did not recognize in the beginning. These are problems that this bill is intended to fix.

The overall goals of this legislation are to restore access to VAWA, and VAWA's protective provisions for battered immigrants, where those provisions were unintentionally weakened by subsequent legislation, particularly in 1996. To correct omissions, like the people that were left out, including the adult incest victims that Congresswoman Schakowsky was talking about. Also to correct unforeseen implementation problems. Examples include children who age out of the process. They are included when their mother files a self-petition but they turn 21 before they can get their green cards. In another example, if the abuser loses his status while her case is pending because he is deported because of a domestic violence offense, she loses access to VAWA.

The bill also removes legal impediments that provide a perverse incentive for battered immigrant woman to choose to stay with their abusers, even though they qualify for VAWA, rather than seeking help. Some of those incentives include the extreme hardship requirement, public charge, the fact that she has to wait for 5 years to naturalize instead of 3, and the fact that her kids are not included in cancellation proceedings and given protection there.

And, finally, it offers improvements to cover some groups that were left out in the beginning. These improvements include better access to legal services for battered immigrants. Legal services attorneys are the best prepared attorneys in the country to help in domestic violence cases and no woman should be turned away from getting a protection order because of her immigration status.

In conclusion I would like to say that there is a grave need for action this year. Every day that we wait, there are battered immigrant women and there are abused immigrant children or U.S. citizen children who grow up witnessing this abuse. These children are learning that domestic violence is okay and are learning to perpetrate it as adults. This is something we have to stop.

We need reforms to ensure that kids can be protected, that women can flee violent homes where their immigration status is used to hold them hostage, so that they can be free to work with police and cooperate in prosecutions so that their abusers can be brought to justice. And in the end, this legislation will help create safe and secure, violence-free homes where abused battered immigrant women can raise their children in peace and help their children address the aftermaths of abuse.

Thank you.

[The prepared statement of Ms. Orloff follows:]

PREPARED STATEMENT OF LESLYE ORLOFF, DIRECTOR, IMMIGRANT WOMEN PROGRAM, NOW LEGAL DEFENSE AND EDUCATION FUND

*Introduction*

Mr. Chairman, Members of the Subcommittee, my name is Leslye Orloff and I am the Director of the Immigrant Women Program at NOW Legal Defense and Education Fund. NOW Legal Defense and Education Fund is a leading national, non-profit civil rights organization with a 30 year history of defining and defending women's rights. We provide a broad range of legal and educational services aimed at eliminating sex-based discrimination and securing equal rights for all women focusing on issues of domestic violence, child care, employment, immigration, repro-

ductive rights, and economic justice. NOW Legal Defense and Education Fund's Immigrant Women Program co-chairs the National Network on Behalf of Battered Immigrant Women[1], a broad-based national coalition of more than four hundred member organizations and individuals that work to improve protections for and provide services to immigrant victims of domestic violence. We appreciate the opportunity to submit this testimony in support of H.R. 3083, the Battered Immigrant Women's Protection Act of 1999, legislation that will enhance protections for one of the most marginalized groups in the United States: immigrant victims of domestic violence.

Before I begin, I want to thank Chairman Smith and the Members of the Subcommittee for inviting me to testify today. I am especially grateful to Congresswomen Schakowsky, Jackson Lee, and Morella for sponsoring H.R. 3083 and for spearheading this bipartisan effort to protect battered immigrant women and children. A special thanks to Ranking Member Sheila Jackson Lee for her leadership and to Congressman McCollum for his commitment to these issues. Lastly, I would like to acknowledge Senators Abraham and Kennedy for sponsoring Title V of S. 2787 the Violence Against Women Act, the Senate counterpart to H.R. 3083, which is also devoted to ending violence against immigrant women and children.

*Domestic Violence, Power, and Control Against Immigrants*

Domestic violence is a societal problem of epidemic proportions. Experts estimate that two to four million American women are battered every year,[2] and that between 3.3 and 10 million children witness violence in their homes.[3] As information about the extent and impact of domestic violence emerges, it has been identified as a criminal justice issue, a public health crisis, and a costly drain on economic productivity.[4] Domestic violence crosses ethnic, racial, age, national origin, religious, gender, geographical and socioeconomic lines.[5] However, immigrants have been particularly vulnerable to becoming victims of domestic violence. Research has found that 34–49.8% of immigrant women experience domestic violence over the course of their lifetimes.[6] Immigrant married women experience higher levels of domestic violence (59.5%)[7] and research has found that over 50% of immigrant women surveyed were still living with their abusers.[8]

Victims of domestic violence are particularly vulnerable because they face even greater obstacles in their efforts to escape violent relationships.[9] Language, culture and immigration status often block victims from access to information about legal remedies, and complicate their efforts to obtain the relief needed to end the violence.[10] As is the case with all victims of domestic violence, battered immigrants experience physical violence, coercion, threats, intimidation, isolation, destruction of important documents or possessions, and emotional, sexual or economic abuse.[11]

---

[1] The National Network on Behalf of Battered Immigrant Women is co-chaired by NOW Legal Defense and Education Fund, The Family Violence Prevention Fund, and the National Immigration Project of the National Lawyer's Guild.

[2] *Criminal Vicitmization in the United States: 1990–1997 Trends*. Bureau of Justice Statistics. Washington, DC: U.S. Department of Justice, December 1997, pp.57–58.

[3] Howard A. Davidson. *The Impact of Domestic Violence on Children; A Report to the President of the American Bar Association*. ABA. 1 (1994).

[4] *See e.g.*, Ted Miller et al. National Institute of Justice. US Dept of Justice. *Victim Costs and Consequences: A New Look*. 18–19 (1996) ( Finding that domestic violence costs $67 billion a year in property damage, medical costs, mental health care, police and fire services, victim services, and lost worker productivity).

[5] David M. Zlotnik. *Empowering the Battered Woman: The Use of Criminal Contempt Sanctions to Enforce Civil Protection Orders*. 56 Ohio St.L.J. 1153, 1162–63, 1215 (1995).

[6] Rodriquez, R. (1995 May/June), Evaluation of the MCN Domestic Violence Assessment Form and Pilot Prevalence Study. *The Clinical Supplement of the Migrant Clinicians Network*, 1–2.

[7] Mary Ann Dutton, Leslye E. Orloff, and Giselle Aguilar Hass, Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Latinas: Lega l and Policy Implications. Georgetown Journal on Poverty Law & Policy, Volume VII, Number 2, Summer 2000. Page

[8] Coalition for Immigrant and Refugee Rights and Service(CIRRS). (1990). *A needs assessment of undocumented women*. Author; San Francisco. and Mary an Dutton, et. al. Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Latinas: Legal and Policy implications. Georgetown Journal on Poverty Law & Policy, Volume VII, Number 2, 13 (Summer 2000).

[9] Mary Ann Dutton, et. al., Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Latinas: Lega l and Policy Implications. Georgetown Journal on Poverty Law & Policy, Volume VII, Number 2, 38 (Summer 2000). Language barriers (29.7%), lack of knowldege about formal services available to help battered immigrants (23%) and fear, particularly immigrant consequences (27%) appear to pose significant barriers to battered immigrant Latinas' access to institutionally based legal, social and health services.

[10] Id. at 36

[11] *See* Power and Control Wheel Produced by the Domestic Abuse Intervention Project, Duluth, MN.

Cases of battered immigrants are ultimately complicated by their abuser's use of immigration status as a tool of control. Immigration-related abuse is a critical way in which batterers of immigrant women exert power and control to dominate and isolate their abused family members. Research indicates that immigration-related abuse most often co-exists with or appears to be a predictor of physical and/or sexual violence.[12]

*The 1994 VAWA Immigration Provisions Congressional Intent*

In 1994, Congress enacted the Violence Against Women Act (VAWA) in an effort to deter and punish violence crimes against women.[13] Acknowledging the complexity of hardships facing battered immigrants, VAWA contained immigration provisions that would protect battered immigrants.[14] Prior to this enactment, the citizen or lawful permanent resident spouse had full control over the legal status of their immigrant spouse. Because abusers often use immigration status as a form of control, many battered immigrants who could have been granted legal immigration status if their abusive spouse chose to file a visa application with the Immigration and Naturalization Service were left without legal immigration status in the U.S. Research has found that in abusive relationships, 72.3% of citizen and legal permanent resident spouses never filed immigration papers for their immigrant wives.[15]

Subtitle D of the Act recognized the importance of extending all VAWA protections to battered immigrant women and children, whose immigration status remained uncertain in the hands of savvy U.S. citizen and lawful permanent resident abusers. When enacting Subtitle D of the Act, Congress recognized that many immigrant women live trapped and isolated in violent homes, afraid to turn to anyone for help. They fear both continued abuse if they stay with their batterers and deportation if they attempt to leave.[16] "This fear of deportation paralyzed immigrant victims and prevented them from calling the police for help, from cooperating with prosecutors bringing criminal cases against their abusers and from seeking protection orders.[17] Consequently, Congress enacted the self-petitioning provisions in Subtitle D of the Act Ato permit self-petitioning for battered immigrant women to prevent the citizen or legal resident spouse from using the petitioning process as a means to control or abuse an alien spouse."[18]

By allowing for self-petitioning and by assuring that all the other provisions of the Act applied to battered immigrants, Congress envisioned several overall benefits: removing the abuser's control over the victim's immigration status,[19] encouraging reporting of the abuse without the risk of deportation,[20] and facilitating prosecution of abusers, by making law enforcement officials more receptive to complaints of domestic violence and thereby eliminating a class of abusers immune from criminal prosecution.[21]

The goal of H.R. 3083 is identical to that of VAWA's immigration provisions--to free abused immigrant spouses to cooperate in their abuser's prosecution and to obtain justice system protection for themselves and their children. The amendments proposed in H.R. 3083 will improve access to the criminal justice system for battered immigrants abused by citizens or other persons lawfully permitted to reside in the United States, will remove legal impediments that continue to encourage battered immigrants to choose to remain with their abuser and will correct omissions and implementation problems that prevent the prosecution of batterers who abuse immigrant family members.

*Legal Impediments That Trap Battered Immigrants in Violent Relationships*

NOW Legal Defense and Education Fund's Immigrant Women Program and the National Network on Behalf of Battered Immigrant Women receive over 2,000 calls a year from advocates and attorneys trying to help women and children who have been victims of domestic violence. Although over 5200 battered immigrants have received help under VAWA, we are finding that several categories of immigrants battered by citizen and lawful permanent resident spouses and parents cannot attain

---

[12] See Mary Ann Dutton, et. al. Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered . ımigrant Latinas: Lega l and Policy Implications. Georgetown Journal on Poverty Law & Policy, Volume VII, Number 2, 6–7( Summer 2000).

[13] House Report No. 395, 103*rd* Cong., 1st Sess. (1993) 25.

[14] Id.

[15] See Mary Ann Dutton, et. al., Characteristics of Help-Seeking Behaviors, Resources and Service Need of Battered Immigrant Latina's: Legal and Policy Implications at 15.

[16] *House Report No. 395, 103rd Cong., 1st Sess (1993)* 26–27.

[17] Id. at 26.

[18] Id. at 37.

[19] Id. at 37.

[20] Id. at 38 (discussed in the context of child abuse).

[21] Id. at 25, 27.

VAWA protections either because of omissions in the original legislation or because of implementation problems.[22] The following are some examples of the access problems advocates report:

*Vanna* is a Cambodian wife of a member of the U.S. military who is currently stationed abroad in a country that is not her homeland. During her abusive marriage she has lived with her citizen husband in the U.S. and in various countries in which he has been stationed. Her relationship has been plagued with sexual abuse with her husband forcing Vanna to engage in sexual behaviors that made her feel demeaned and humiliated. His physical and sexual abuse has included threats to kill Vanna in which he told her that he could make her death look like an accident. Her husband also restricts the amount of food she is allowed to eat and where she was allowed to go. He threatens her with withdrawing the immigration papers he filed for her and telling her that she would be deported back to Cambodia where she would probably be killed. She feels trapped and isolated on the military base. Vanna wants to return to the U.S., but she does not qualify for VAWA self-petitioning because she lives abroad. H.R. 3083 would help Vanna by allowing abused spouses and children of U.S. citizens and lawful permanent residents to file for VAWA protection whether or not they were residing in the United States.

*Sara* is the 21-year old Panamanian daughter of an abusive lawful permanent resident. She has been sexually abused by her father since she was in junior high school. Her father brought her mother and Sara into the U.S. without visas when she was twelve years old. Her father has never filed a family-based petition for his wife nor Sara. By the time she finally found the courage to disclose the sexual abuse to her mother, who had also been abused by her father Sara was already 21 and it was too late for Sara to receive protection under VAWA. She is afraid to report the incest to authorities because she has no immigration status and fears being deported to her home country where she knows no one. As a result her father goes unpunished and Sara struggles to overcome the effects of the abuse. H.R. 3083 would allow Sara to file for relief under VAWA.

*Lupe* was born in El Salvador. She came to the U.S. at age five and grew up in the United States where she met and married her lawful permanent resident spouse. Shortly after the marriage her husband began closely monitoring her every move. When Lupe was pregnant with their first child Lupe fled to her parents house. Her husband followed her and ordered her to get into his car. When she refused he dragged her by the hair into the passenger's seat. Her pregnant belly got stuck between the seats and she could not move. When her mother and brother tried to help, he threw her mother to the ground and sped off with Lupe. He drove her to his apartment and locked her inside. After the baby was born, he began raping Lupe and threatening that if she didn't comply, she would never see the baby again. When she found him abusing the baby, locking him in a closet to punish him for crying, and crushing his favorite toys underfoot, Lupe fled back to her parents' house. After a restraining order was issued, he again abducted her and threatened to drown her. Following this incident Lupe retained an attorney and filed a self-petition that has been approved. Lupe fears having to return to El Salvador to obtain her lawful permanent residency. Her husband continues to stalk her and has many family members there. Lupe does not speak Spanish and her protection order, which granted her custody, cannot be enforced if she leaves the United States. Leaving the country to obtain permanent residency is too dangerous for her. H.R. 3083 would allow Lupe to safely apply for adjustment of status in the United States.

*H.R. 3083: Restoring Access, Addressing Omissions, and Correcting Unintended Effects and Implementation Problems of VAWA 1994*

H.R. 3083 continues Congress's commitment to the plight of battered immigrants and the work that began with the passage of VAWA 1994 to help battered immigrant women secure lawful immigration status and legal protection so they may flee violent homes, cooperate in the criminal prosecution of their abusers, and take control of their lives without fearing deportation. The specific purposes behind H.R. 3083 are tri-fold. First, the bill restores access to VAWA relief that was weakened by subsequent legislation. Second, H.R. 3083 offers access to lawful permanent residence status to victims who were inadvertently omitted under VAWA 1994. Finally, the bill corrects unintended effects and implementation problems of VAWA 1994

[22] Immigration and Naturalization Service, November 1999.

that were not anticipated when the bill was enacted. Some of the highlights of H.R. 3083's provisions include:

*Restoring Access to VAWA*

*Adjustment of Status:* Changes to immigration laws that occurred after VAWA became law in 1994 now force many battered immigrant women and children with approved VAWA self-petitions to choose between remaining without access to lawful permanent residency status and being required to leave the United States to obtain their lawful permanent residency. This is true despite the fact that the INS has already determined that they will suffer extreme hardship if returned to their home country. Further, the law makes no exceptions for battered immigrants who have proven that returning home will jeopardize their safety, undermine the treatment they rely on to overcome the abuse or interfere with custody decrees crafted to protect children from the harmful effects of domestic violence. H.R. 3083 allows battered immigrants with approved self-petitions to adjust their status to lawful permanent resident while remaining safely in the United States.

*Addressing Omissions in VAWA 1994*

*Children Who Age-Out:* The fact that domestic violence often spreads from the battered spouse as the target of the violence to abuse of the children has been well documented.[23] Battered immigrant women fleeing abusive relationships must be able to protect to their children. VAWA allows battered immigrants to include their undocumented children who are under 21 years old at the time of filing. Currently, even if a child is under 21 when the self- petition is filed, they must remain under 21 until they can obtain lawful permanent residency status based on the approved VAWA self-petition. Since the waiting time between filing of the self-petition and obtaining lawful permanent residency can range from 6 months to almost 5 years, many children who were to be offered protection by including them in their mother's petition Aage out by turning 21. The effect of this gap in the legislation is to force battered immigrants with older children to remain with their abusers as the only hope that her older children will benefit from a petition that their abusive spouse can file for the child even if the child turns 21. In order to assure that children over 21 have access to VAWA provisions, H.R. 3083 allows derivative children who are under 21 when the self-petition is filed, to continue to be included in their parent's petition until they can obtain their permanent residence status.

*Deleting the Residence in the U.S. Requirement:* Battered immigrants married to either citizens or permanent residents living outside the U.S. have no access to VAWA immigration relief. Current VAWA provisions state that an applicant must reside within the territory of the U.S. to file a self-petition. There is not a residency requirement in regular family-based visa petitions. A citizen or legal permanent resident spouse living abroad can file a visa petition on behalf of their immigrant spouse at the American Consulate. Battered immigrants need the same access to immigration benefits they would have if their spouse was not abusive. H.R. 3083 allows abused spouses and children of citizens and permanent residents to file for VAWA protection without regard to where they currently reside, this removes an incentive for abused immigrant spouses and children to remain with their abusers. Because of the transient nature of the military (military members move twice as often as the civilian workforce), military spouses are particularly affected by this provision. This is important because the frequency of abuse in military families is proportionally much greater and more severe than in civilian families.[24]

*Effect of Changes in the Abuser's Immigration Status:* Conviction of a domestic violence crime is a removable offense. One unintended effect is that the battered immigrant's pending VAWA self-petition becomes void when her husband is deported. This creates a perverse incentive for the battered immigrant to tolerate the abuse rather than report it or to not cooperate in his prosecution. H.R. 3083 allows battered immigrants to file a VAWA self-petition that would remain valid even if the batterer is.

*Unintended Effects and VAWA Implementation Problems*

*Deleting Extreme Hardship:* VAWA self-petitioning applicants would normally be beneficiaries of regular family-based petitions, but for the actions of the abusive spouse or parent. To win approval of a family-based visa petition the parties must prove that they have a valid marriage or parent/child relationship. In addition to this proof, VAWA self-petitioners must prove that they have been victims of battery

---

[23] See Hughes, HM et al (1989). Witnessing spouse abuse and experiencing physical abuse: "A double whammy," Journal of Family Violence, 4, 197–209.

[24] The Miles Foundation, *"Domestic Violence in the Military Facts and Statistics* "(visited June 7,2000) *<http: / /pages.cthome.net / milesfdn>.*

or extreme cruelty at the hands of their citizen or resident spouse or parent and that they are persons of good moral character. Once the self-petitioner has proved all of these facts, they must additionally prove that their deportation would cause extreme hardship to themselves or their children. Extreme hardship is a difficult evidentiary test that battered immigrants who file applications with INS without the assistance of an attorney find almost impossible to meet. The extreme hardship requirement has resulted in INS denials of self-petitions of many unrepresented battered immigrants are of good moral character, who present compelling evidence of abuse and whom INS believes are in good faith valid marriages. This result is contrary to VAWA's goal of providing relief to battered immigrants; with the end result of abusers continuing to go unprosecuted. INS' reviewed VAWA cases and found that in no instance did they find credible evidence of marriage fraud and credible evidence of domestic violence in the same case.[25] VAWA's evidentiary requirements are ,even without extreme hardship, much higher than the proof requirements in all other family based visa cases. H.R. 3083 deletes the extreme hardship requirement recognizing that it poses a difficult, unnecessary hurdle that deprives many needy victims of VAWA's protections and allows their abusers to go free.

*Public Charge:* In legislation crafted by Chairman Smith, Congress provided battered immigrants who were eligible under VAWA or who were the beneficiaries of petitions filed by their spouses or parents, access to the public benefits safety net. Under current immigration laws, however, immigrants who use those benefits may be deemed public charges and denied lawful permanent residency. H.R. 3083 creates an exception to the public charge ground of inadmissibility for battered immigrants who need access to benefits in order to flee their abusers and survive economically.

*Discretionary Process to Reinstate a Revocation:* As the protections offered battered immigrants through VAWA become more well known in immigrant communities, the National Network on Behalf of Battered Immigrant Women has been receiving increased reports of abusers seeking to revoke approved family-based visa petition and have their spouses placed in removal proceedings. H.R. 3083 would prevent an approved petition from being revoked and would allow INS to reinstate a revoked family-based visa petition when INS received credible evidence that the citizen or lawful permanent resident spouse or parent has perpetrated battery or extreme cruelty. Further, the H.R. 3083 provisions will require that once the INS or the immigration judge determines that the spouse or parent is an abuser, they must act to undo any harm that has occurred as a result of the abusers withdrawal or revocation of the petition or his report that initiated removal proceedings. For example, if an abuser revoked a petition and convinced INS to place his abused immigrant wife in removal proceedings, INS would be explicitly authorized to close those proceedings and to allow the victim to self-petition under VAWA.

*Access to Legal Services:* Battered immigrants are far more successful in their applications for VAWA self-petitions when they are represented by lawyers who have received domestic violence training. Legal Services Corporation (LSC) funded programs provide the vast majority of legal services to battered women in the country. Recognizing this fact, in 1997 Congress amended legal services appropriations legislation to allow lawyers working for LSC-funded programs to represent battered immigrant women, a variety of domestic violence related matters, without regard to their immigration status in so long as those services are funded with non-LCS dollars. The legislation, however, used the INS definition of family relationships (spouses and children) rather than each states' own domestic violence definition. This had the effect of cutting off access to legal services for many battered immigrants who would be protected if the state definition had been used B including immigrant women battered by their citizen boyfriends. H.R. 3038 will make an important technical correction to fix this problem.

*Recommendations and Conclusion*

On behalf of NOW Legal Defense and Education Fund and the National Network on Behalf of Battered Immigrant Women, thank you for the opportunity to present this testimony in support of the Battered Immigrant Women's Protection Act of 1999. The Act will go far toward furthering the original purpose of VAWA's immigration provisions—freeing battered immigrant women abused by citizen and lawful permanent resident spouses or parents to report the abuse to police, to seek help and to prosecute their abusers for the multiple crimes they commit against family members. We have learned much over the six years, since VAWA's enactment, about instances in which the original legislation works effectively and when it does not.

---

[25] Immigration and Naturalization Service, International Matchmaking Organizations: A Report to Congress, March 4, 1999, 5 <*http://www.ins.usdoj.gov/graphics/aboutins/repstudies/Mobrept.htm*>.

H.R. 3083 is designed to correct unforseen problems in the legislation and erosions in access to VAWA that have prevented many of the needy domestic violence victims VAWA sought to protect from seeking help. Helping battered immigrant women escape abuse and bring their abusers to justice will reduce domestic violence in our communities and will ensure that the citizen children of immigrant parents have the same opportunity to live lives free of domestic violence that VAWA sought to provide to all domestic violence victims.

Mr. SMITH. Thank you.
Ms. Ortiz.

**STATEMENT OF MARIA ORTIZ, SHELTER FOR ABUSED WOMEN**

Ms. ORTIZ. Good morning, Chairman Smith, members of the subcommittee. Thank you for the opportunity to speak to you today on behalf of battered immigrant women.

My special thanks to Ms. Sheila Jackson Lee and Ms. Schakowsky for cosponsoring this bill.

My name is Maria de la Luz Teresa Mendoza V. Ortiz. I am employed for the Shelter for Abused Women in Collier County and work in the outreach office in Immokalee. Today I come before you wearing several hats. I am a survivor of domestic violence, a licensed clinical social worker, a bilingual counselor for battered immigrant women.

In our rural office in Immokalee we have served over 1,000 battered women. About 40 percent of our clients are immigrants. As a survivor, I know firsthand the fear and pain of living in an abusive situation. I am a fifth generation Mexican-American from San Antonio, Texas. I can identify with the culture, religious, economic and emotional barriers that victims of domestic violence experience.

However, the immigrant women have special issues. They suffer even more fears, more threats, intimidation and isolation than their American sisters.

I would like to tell you about Juana. Juana is a 20-year-old Mexican married female with three children. She had her first child when she was 14. Her husband, a lawful permanent resident, had been arrested several times for domestic violence and had been divorced. She was not aware of this. When she married him, she did not know the particulars of his first case.

One day he slapped her and pulled her hair. In the morning, he said I am going to go out and get drunk and when I come back I am going to kill you, and he even showed her the knife that he was going to use. She was very afraid. She had never called 911. Once when he beat her up and threw her out of the house and locked the door behind her two days before Christmas she went to the neighbor for help. The neighbor called the police. The police came and a very nice Spanish-speaking victim advocate responded in understanding—that was very understanding and helpful to Juana. This gave Juana courage to continue and find out what else she could do.

Juana lived for 7 years in an abusive relationship. She is hiding now somewhere in this country. Her husband kept his immigration status from her, kept the power and control over her and she was not able to do anything about it until someone who knew about VAWA and knew about the benefits that she could get from this

bill. She was able to file an injunction. She was able to get some benefits for herself.

When her husband was arrested for the last time, he was in jail, he even in jail continued to batter her and threaten her. He had the water, the lights, the cable and the telephone disconnected all on the same day. She came to our office in tears. What can I do? We have no lights. We have no electricity. We have no water. We scrambled to contact community agencies for deposits to turn on at least the water and the electricity within 24 hours.

Juana says her husband receives three different bank statements but she has no idea how much money he makes or what he has. She was referred to Florida Immigration Advocacy Center to file a self-petition. She now has employment and is supporting her three children, but she has not been able to come up with the thousand dollars she needs to finish her application. She does not want child support from him because she is afraid for him to find out where she is working.

He has told her before, if she ever leaves the children with anybody, the Department of Children and Family would take them from her and she would not be able to see them. For a long time, she believed his lies and she was terrified of losing her children.

Her story is one of thousands of women who seek protection from this Congress today. Having legal status is paramount to battered immigrant women. It is threshold to eliminating barriers that keep her in fear and in the shadows. The monies that are available through H.R. 3083 will allow that other service providers will help immigrant women eliminate barriers for women like VAWA. It will also insure that women like Juana have more access to more advocates like myself. Thank you.

[The prepared statement of Ms. Ortiz follows:]

PREPARED STATEMENT OF MARIA ORTIZ, SHELTER FOR ABUSED WOMEN

Good Morning, Mr. Smith, and members of this Subcommittee. Thank you for the opportunity to speak to you today on behalf of battered immigrant women. My special thanks to Shelia Jackson Lee who is co-sponsoring this bill. My name is Maria de la Luz V. Ortiz. I am employed by The Shelter for Abused Women of Collier County, the only certified domestic violence center in Collier County Florida. I currently work in the Shelter's Immokalee Outreach Office in Immokalee, Florida. Today I come before you wearing many different hats; I am a survivor of domestic violence, a licensed clinical social worker, and a bi-lingual counselor to battered immigrant women. In the past year, our rural Immokalee office has serviced over 1,000 battered women. About 40% of our clients are immigrants.

As a survivor, I know first hand the fears and pain of living in an abusive relationship. Daily I hear battered women share their personal experiences. I am a 5th generation Mexican-American from San Antonio, Texas. I can identify with the cultural, religious, economic, and emotional barriers that victims of domestic violence experience. Who can I tell? Where can I go for help? Who can I trust? How can I make it on my own? It is such a personal problem. Questions such as these are perpetually swirling around a victims head.

This morning, however, I would like to address the special issues of battered immigrant women. They suffer even more fear, threats, intimidation and isolation than their American sisters. They are the ones who really tug at my heart strings. I want to tell you about Juana. I wish she were here today, but she is still hiding. She left her abusive husband for the fifth time in October, 1998. Juana was one of my first clients. She had been admitted to The Shelter the week before I began working for SAWCC. Juana is a 20 year old Mexican, married female with three children, ages 5, 4 and 3. Her husband, a Lawful Permanent Resident, had been arrested for the second time for Battery, DV. The day before, he had slapped her and pulled her hair. In the morning, he told her he was tried of her and was going out to drink. He said he was going to kill her when he returned and even showed

her which knife he was going to use. When he left again, she called the Collier County Sheriff's Office to speak to the victim advocate she had befriended and he was arrested. Juana had never dialed 911; she was too scared. Things would only get worse, she thought. A neighbor called once when her husband threw her outside their home two days before Christmas and locked the door behind her. She went to the neighbor for help. The Spanish-speaking victim advocate that responded was understanding and helpful to Juana. It was to her that Juana turned to about three years ago to begin knocking down the barriers that kept her from accessing services. But, let me go back in time for a more complete picture of Juana.

Juana's mother died two weeks after her birth and her father remarried within a year. Juana always felt like an outsider in the family. When she was 13, her step mother pushed her to seek work in the United States. A recently divorced son, Juan, of a family friend was visiting and needed a caregiver /housekeeper to help him with his three sons, ages 7, 6 and 4. Juana did not know he had been arrested three times for domestic violence and his wife had finally left and divorced him. Juana did not even like him. He was 33 years old. But she hoped for a happier, more peaceful life away from her wicked step-mother, and besides, her father approved of the move, so she came with Juan to Florida.

Juana was happy for about one month. Then she realized that she had been tricked, Juan demanded sex from her also. Away from family, she was at his mercy. He beat and raped her almost daily. Being pregnant did not stop the abuse. She did not know about pre-natal care during her first pregnancy. Their first daughter was born when she was 14. By the time she was 18 years old, she had three children. They were married in the fall of 1992. About that same time, Juan found his ex-wife and would bring her to their trailer and have sex with her in their bedroom while Juana took care of the six children in the living room, her three children and his three boys from his first wife. Somehow, Juana had managed to work up a little courage and protested. She knew a neighbor who had left an abusive husband. She was going to leave him, she told him for the first time. He threaten to kill her, cut her up and feed her to the alligators. Without a body, he would say, he could not be convicted of her murder. Fear is the number one reason for staying. She stayed for seven years.

Juana filed an Injunction for Protection while he was in jail. From jail, he called her father in California and he threaten him and her to make her drop the charges against him. He said he had not done anything wrong. She was just making up stories because she probably had a boy friend and wanted him out of the picture. At he hearing, he brought his parents and three children to support him, as he claimed he was a victim. He controlled everything they had. From jail, he had the water, lights, cable, and telephone disconnected all on the same day. Juana came to the office in tears. She did not have any money for the connection fees. We scrambled to contacted community agencies for deposits to turn on the electricity and water within twenty four hours.

Juana said her husband received three different bank statements but she does not have any idea how much money he makes or has.

Juana was referred to Florida Immigrant Advocacy Center to file a Self-Petition. She has Employment Authorization now and is working to support her three children. He will stop at nothing to locate her. Living and working in a rural community has advantages and disadvantages. Twice he has come to our office and my home to ask for her address. He said that he had received a letter from her father and needed to send it to her immediately. We neither confirm or deny and contact with our clients. She is afraid of filing for child support because he could locate her. During his two week vacation time last year, he visited her sister in Georgia to obtain Juana's current address. After the first of several visits, Juana's sister begged her to return to Juan. "He cried all night for you. He sounds so sad. You should go back to him, Juana. He is your husband," her sister told her. Since Juana dare not even tell her own sister her true address, he was unsuccessful and returned to Florida. Twice she has moved because she has seen neighbors or his friends in town.

He constantly reminded her that he had legal status and she did not. She did not have any rights in this country. He would see to it that she never saw her children again, if she even thought about leaving him. No one would want her. He really made her feel extremely self-conscience; she was terrified of him. He did not need any weapons to control her, one look would do it. When they were out in public, she had to keep her head and eyes down, least some male see her. He would not allow her to learn English or to work. He told her that if she left the children with someone the Department of Children and Families would take them from her because she could not take care of them. For a very long time she believed him and was terrified at the thought of losing her children.

Her story is one of thousands who seek protection from this Congress today. Having legal status is paramount for battered immigrant women. It is threshold to eliminating the barriers that keep her in fear and in the shadows. Bill H.R. 3083 provides for the various pots of money that is available through VAWA to all service providers will help to eliminate the barriers for women like Juana. Passage of this bill will ensure that women like Juana have more excess to more advocates like me.

I have enclosed a drawing by Juana which best expresses her situation as a battered

Translation:
I am sick
I am scared
I am alone
My heart is crying,
it is alone,
it is dead
I feel that I am alone
in the world
in the town
in the country

Mr. SMITH. Thank you Mrs. Ortiz.
Ms. Buchanan.

## STATEMENT OF BREE BUCHANAN, DIRECTOR OF PUBLIC POLICY, TEXAS COUNCIL ON FAMILY VIOLENCE

Ms. BUCHANAN. Good morning. I am Bree Buchanan, the Public Policy Director for the Texas Council on Family Violence. We are one of the oldest and largest domestic violence coalitions in the country and home of the National Domestic Violence Hotline. As the Domestic Violence Coalition of the state, we have certainly been able to learn a lot about the challenges that battered immigrant women face. In preparation for this hearing today I called around the State and spoke with those who provide direct services to those women every day and I asked them "what would you like me to convey to this committee?" I would like to highlight just a few of those things today and would refer you to my written statement and ask that that be incorporated into the record.

First, they had asked me to tell you that changes to the batterer's immigration status should not penalize the victim and her children. Right now if she calls the police, which we want her to do, she may be arrested, convicted and deported and then she— which means that she will lose her ability to self-petition. As a result we hear over and over again that women are simply too fearful to contact the police and too fearful to cooperate with prosecution if he is charged.

Second, INS should have the discretion, and I underline the word "discretion," to waive the good moral character requirement. In Texas right now we have a huge problem with what is called dual arrest. That means along with the batterer the woman is arrested for any acts of self-defense. And, unfortunately all too often, because they do not speak the language, they do not understand our legal system, they want to avoid potential jail time and the loss of their children, they will accept a plea bargain for probation, not realizing what it will later do to their immigration case. INS should be able to review the circumstances surrounding these arrests and then have the discretion to not always automatically deny the woman relief.

Third, battered immigrant women must have access to civil legal representation. Most of these women cannot find anyone to help them. Right now in Texas there are very few who are providing services to these women, and those who are doing the work are absolutely overwhelmed. In the Valley, for instance, there is a staff person who circuit rides between Brownsville, Harlingen, and McAllen and currently has a caseload of 165 cases. At the program in Austin that works with these women they serve 16 counties and the woman there told me that it is not uncommon for them to get desperate calls for help from as far away as Amarillo. And if you have ever been to Texas, Austin is a long way from Amarillo.

And finally, those working with battered immigrant women really must have training about VAWA and about the dynamics of domestic violence. We hear that local INS officers are still not familiar with the provisions of VAWA of 1994. We hear about police asking battered immigrant women what their immigration status is when these women have actually gotten the courage to call the police for intervention. We can have the best laws in the world, and I generally think that we do, but it is not going to make any difference if those who are charged with the enforcement and administration of those laws do not know about those laws.

In talking about these issues, I certainly do not want to give the impression that they are the only important provisions of H.R. 3083. Everyone I talked to in Texas about this legislation was so enthusiastic about it and excited about how it can help the women that they work with, and wanted me to convey to the committee how vital it is that this legislation be passed and how necessary this legislation is.

Finally, one advocate in El Paso had asked me will you please tell the committee something. Please tell them to think about the children involved in these cases. We talk about the battered woman a lot and we need to do that. We talk about the batterer a lot, and we have to do that. But we also have to talk about the children in these cases, the children who are often U.S. citizens.

If the batterer has her completely isolated and too terrified to call the police, the abuse is going to go on uninterrupted and the children in these situations are going to continue suffering the effects of violence. If she does involve the police and he is deported and she is deported because she can no longer adjust her status, what happens to the children? They are taken away from probably the only home they have ever known, from their school, their support systems, and for so many who are U.S. citizens they are denied the wonderful things that this country has to offer and to which they are entitled.

So in closing, just on behalf of the folks back in Texas I would ask this committee when they are considering this legislation to please think about how the children in these homes are affected.

I do want to thank everyone on the committee as well as Congresswoman Schakowsky. I want to say special thanks to my fellow Texans, to Ranking Member Congresswoman Jackson Lee for sponsoring this legislation, as well as to Chairman Smith for holding this hearing. Thank you very much.

[The prepared statement of Ms. Buchanan follows:]

PREPARED STATEMENT OF BREE BUCHANAN, DIRECTOR OF PUBLIC POLICY, TEXAS COUNCIL ON FAMILY VIOLENCE

PRIORITIES FOR BATTERED IMMIGRANT WOMEN IN TEXAS

*Importance of the Battered Immigrant Women Protection Act, H.R. 3083*

Since passage of the Violence Against Women Act in 1994, the domestic violence community has gained invaluable experience working with battered immigrant women. While witnessing many successes, we have also learned the limitations in the original VAWA. Six years later, we now have the expertise to identify these limitations and recommend improvements that will better protect these vulnerable women and their children.

The Battered Immigrant Women Protection Act incorporates the lessons learned and recommendations made by advocates working on behalf of battered immigrant women and builds on the protections incorporated in the original VAWA. If enacted, this vital legislation will complete a statutory system that will:

- maximize the ability of these victims to escape the violence in their homes,
- enhance prosecution of violent offenders, and
- reduce the effects of violence on the innocent children in these homes.

The provisions contained in H.R. 3083 will advance these important public policies and enhance protection of battered immigrant women who are a particularly vulnerable population of victims of domestic violence.

*Battered immigrant women and their children are more vulnerable to domestic violence*

Immigrant women face a type of violence and control beyond what U.S. citizen victims of domestic violence face because their abusers have additional tools for exerting control and intimidation. Some common tactics used include:

- Deterring battered immigrant women from contacting law enforcement or cooperating with prosecutors, by threatening to withdraw support of their petition for residency status, or may threaten that they "will get them deported."
- Abusers give misinformation to the women about laws in this country to control her through fear. For example, an abuser will tell his wife that, because he helped her get a green card, he can have it taken away.
- In many cases, the abuser speaks better English than the woman and may take advantage of her inability to communicate. For example, he may be able to talk his way out of being arrested when police come to the scene of domestic violence incident.
- Abusers may also take advantage of language, and cultural barriers by isolating her from the community in which they live. Such isolation makes separa-

tion from the abuser extremely difficult for the woman and, at the same time, easier for him to continue his control and intimidation of her.

Very often, and perhaps most frightening for a battered immigrant woman, the abuser uses threats directed at the children to maintain con rol and prevent her from leaving or from contacting the police. He may threaten to ıbduct the children from the United States. Using deportation proceedings to take away custody of their children is another threat frequently used.

*Issues facing battered immigrant women in Texas*

In preparation for this hearing, the Texas Council on Family Violence contacted service providers in Texas working on behalf of immigrant battered women and asked them to identify the most critical problems addressed by the Battered Immigrant Women Protection Act. While passage of H.R. 3083 in its entirety to fully protect battered immigrant women, this statement will focus on areas identified by service providers in Texas as the highest priorities.

*1. Changes in the abuser's immigration status due to deportation or death should not penalize the victim and her children*

Because the abuser's deportation will deny a battered immigrant woman the right to self-petition, current immigration law actually discourages her from reporting violence and from cooperating with prosecution of these offenses. Advocates working with battered immigrant women report that these women often fail to seek police intervention or any other help because they know that if a conviction results in his deportation, she will not be eligible to adjust her status. Even if law enforcement intervenes and charges are filed, victims are often too fearful to cooperate with prosecution. In the event the abuser is deported due to his criminal behavior, the battered woman may also face deportation and be forced to take her children—often U.S. citizens—with her. Ultimately, she and the children are punished for his bad acts.

Advocates also report situations where the battered immigrant woman is denied relief because her abuser died. In one case, the drug addicted husband died from a cocaine overdose. Because of this, she became ineligible to self-petition.

*2. Divorce should not terminate the victim's right to self-petition*

Terminating the right to self-petition upon divorce essentially serves as a deterrent to severing relations with the abuser by the victim. Rather than promoting the battered woman's attempts to free herself from violence, current law actually encourages her to remain in a dangerous situation as long as the immigration proceedings remain pending.

Current law poses an especially difficult problem in Texas where a divorce may be finalized only sixty days after filing. Because preparing the self-petition and gathering supporting documentation will almost always require considerable more time, the abuser can use finalization of the divorce proceedings as a tool to manipulate the victim. He can also this to his advantage to gain an upper hand in negotiations regarding property division or children in the divorce.

*3. Demonstration of "Extreme Hardship" impedes protection of the victim and should be eliminated*

Lawyers and other service providers assisting immigrant battered women report that proving "extreme hardship" is extremely daunting. The burden is even greater if the woman is facing return to a developed country. They report that INS focuses on country conditions and may deny relief for women who are facing return to countries such as Canada or England, even in cases with very compelling stories of domestic violence.

For women attempting to file their self-petition pro se or who are working with a lay advocate, this requirement presents an almost impossible hurdle because they lack access to resources needed to research and prove hardship.

Ultimately, the requirement to prove extreme hardship is simply a barrier erected to deny women, who are otherwise eligible, the relief to which they are entitled under VAWA. It runs counter to the intent of VAWA and results in the deportation of women the law was designed to protect. Proving domestic violence should be the only "extreme hardship" a battered immigrant woman should be required to prove.

*4. Training is critical to implementation of VAWA and H.R. 3083*

INS officers in Texas, as well as judges, lawyers, law enforcement, are profoundly unaware of VAWA's immigration provisions. Immigration service providers report that local INS officers often lack knowledge regarding VAWA and routinely ask about what the law provides. Implementation of a law is impossible if individuals charged with its enforcement and administration are unaware of its existence. To

ensure that Congress' intentions regarding VAWA and, if enacted, the Battered Immigrant Women Protection Act, are carried out, training must be a high priority.

Additionally, those officials interacting with battered immigrant women and abusers must be knowledgeable regarding the dynamics of domestic violence. Lacking this information, officials are subject to manipulation by abusers and may actually become unwitting parties to the abuser's manipulation of the victim. They may also engage in actions that discourage reporting of violence or cooperation with prosecution by the victim. Because the dynamics of domestic violence can be so complex, all officials working with victims and abusers must be educated if laws are to be carried out and further harm to the victim is to be avoided.

*5. Battered immigrant women must have access to civil legal assistance*

Representation in civil matters is a critical unmet need for all low-income battered women in Texas. Because of the highly complex nature of immigration matters, battered immigrant women have an even greater need for legal representation. Unfortunately, affordable legal services are virtually nonexistent. Those few programs that do exist are overrun with requests for assistance, often receiving desperate calls for help from victims living hundreds of miles away. The private bar, lacking knowledge about the complex issues involved in family violence as well as immigration, is unwilling to fill this void through *pro bono* services.

Without access to civil legal assistance, battered immigrant women are effectively denied access to the legal remedies afforded them in VAWA. Tragically, innocent—often U.S. citizen—children of the victim are also denied legal protections to which they are entitled.

*6. Discretionary waivers of good moral character should be permitted*

Dual arrest of both the abuser and victim is a problem occurring in Texas with an alarming frequency. All too often, if the victim takes any action to defend herself, she is arrested along with the batterer. In situations where the victim is an immigrant with poor English skills who cannot explain the circumstances to law enforcement, this occurrence is even more prevalent. Battered immigrant women lack knowledge of the American legal system and access to resources to adequately defend themselves against the charges. All too often, battered women in this situation simply accept a plea bargain (often for deferred adjudication or probation) to avoid trial, potential jail time and the loss of their children. A conviction for this "family violence assault" is now considered evidence that she is not of good moral character and can result in denial of her request for relief.

Immigration officials should have the discretion to take into consideration circumstances surrounding the conviction, such as when the victim is not the primary aggressor but has been convicted for acts of self-defense or for violation of a protective order intended to protect the victim.

*H.R. 3083 should be passed out of subcommittee favorably and in its entirety*

The "Battered Immigrant Women Protection Act of 1999" will go far towards remedying these concerns identified as high priorities by service providers in Texas. Passage of this vital legislation is necessary to protect battered immigrant women who are extremely vulnerable to abuse and manipulation.

H.R. 3083 will also advance basic public policy considerations on which safe and healthy communities are based. If battered immigrant women are too fearful to report the abuse, enforcement of the law is hindered. If cooperating with prosecution results in her deportation, she is not likely to assist the state in securing a conviction. If immigration laws effectively discourage intervention, children will continue to suffer the effects of exposure to domestic violence.

Passage of H.R. 3083 in its entirety will maximize the ability of battered immigrant women to escape the violence in their homes, enhance prosecution of abusers and reduce the effects of violence on the innocent children in these homes.

On behalf of immigrant battered women and their children in Texas, the Texas Council on Family Violence strongly encourages this subcommittee to pass H.R. 3083 out of committee favorably and in its entirety.

Mr. SMITH. Thank you, Ms. Buchanan. Let me begin with my questions and the first one I would like to address to you, Mr. Austin.

It is this: You mentioned it in your opening statement but I would like for to you elaborate on the concern you have about fraud. And I know we heard the INS say they wanted to address

it, but would you elaborate on your concerns about abuse and fraud?

Mr. AUSTIN. Thank you, sir. Yes, first of all, I would say that I don't believe there has ever been an immigration law passed that wasn't subject to some fraud. If there has been one I am unaware of it that did not have some level of fraud. But there are just two provisions in the law that strike me as potential fraud avenues.

One is the new category of intended spouses. I believe it will be possible now for women to marry someone who is already married with that knowledge beforehand, pay them money, and then claim they have married a bigamist. And I think that is going to be a very difficult one that INS is going to have to handle.

Secondarily, I think another avenue of fraud is one that you touched on earlier; that is, children who have been abused. Although there is a 2-year limitation on spouses who have been abused, that they must file within 2 years, there is no such limitation in the statute on children. So we could visualize a case of somebody who was abused at age 7 or 8 and applying for relief from this benefit at age 35. And I don't know how the INS would go back and reconstruct that record of potential abuse 20 years ago. So I think those are just a couple. But there are numerous others that I visualize.

Mr. SMITH. Thank you, Mr. Austin.

Mrs. Rishty, I wanted to ask you a quick question. Are you aware of any cases that exist where a battered alien has left the United States, gone back to their home country to get a visa, and then been followed by an abusive spouse and battered again?

Ms. RISHTY. Fortunately, in the cases that we have dealt with so far the women were not required to go back because those women were wives of U.S. citizens and they had entered the United States legally, so they were able to benefit from 245(a) and adjust here in the United States.

Mr. SMITH. We do not know of any cases that are addressed in that situation?

Ms. RISHTY. I'm sorry?

Mr. SMITH. Do you know of any examples?

Ms. RISHTY. Where women have gone back?

Mr. SMITH. Correct.

Ms. RISHTY. What I was saying was that we haven't had the experience of women going back. But we have had the experience of women discussing with us what is going to happen when they go back and they have been able to present documentation showing that family members were going to persecute them if they go back. In a lot of these countries——

Mr. SMITH. I understand the specter of fear. I just wondered if we had any actual cases. And not that we know of and hopefully we won't.

Ms. Orloff, a quick question for you. Do you not think the bill could be improved if we required cooperation with law enforcement officials to go after the abusers?

Ms. ORLOFF. One of the problems with that approach is that if you look at FBI statistics it is very clear that the risk of violence goes up upon separation and particularly when there is involvement with the criminal justice system or a divorce pending.

And so lots of times you have women who may want to cooperate but are legitimately terrified that if in fact they cooperate with law enforcement they will get killed. And so I don't think it would be wise to have any piece of legislation that requires such cooperation, and, in fact, original VAWA did not for that reason.

Mr. SMITH. If you do not require the cooperation, you are unlikely to get it. My point is if you wanted to carve out an exception, perhaps the example that you gave, that would be fine. But I have a major disagreement with the bill if it is not going to require cooperation with law enforcement officials to try to stop the abuse from occurring. Otherwise the abuse may occur with another spouse and you are not really going to the core problem in my judgment.

Let me ask you one more question. In your prepared statement you said research has found that 44 to 49 percent of immigrant women experience domestic violence over the course of their lifetimes. How does that compare to nonimmigrant women?

Ms. ORLOFF. It is about 10 percent higher.

Mr. SMITH. Why is that?

Ms. ORLOFF. Because of the abuser's control over her immigration status. Research indicates that control over immigration status, intimidation, isolation with language, cultural barriers, all accentuate the ability to abuse.

Mr. SMITH. Right. If it is 34, close to 50 percent of immigrant women experience domestic violence, is it likely that somewhere near that number will also get relief under this bill?

Ms. ORLOFF. No, because not all are married to U.S. citizens or lawful permanent residents. Second, a lot of women put up with abuse for a very long time before leaving or look for other remedies for the problem.

Mr. SMITH. Then you therefore agree with the universe that we are talking about, which is 10 percent more than under current law?

Ms. ORLOFF. I would agree that is true because the enhancements in terms of new people eligible, there is not that many people in each category, although each category is very compelling on its facts, particularly when talking about incest victims.

Mr. SMITH. Thank you. The gentlewoman from Houston is recognized for her questions.

Ms. JACKSON LEE. Thank you, Mr. Chairman. I am delighted to have the opportunity to hear these witnesses with their different perspectives. And Ms. Buchanan, let me welcome you as a fellow Texan. We appreciate your work, as we do the other witnesses who are here in their different capacities, whether we agree or disagree.

I would like to start with Mr. Austin. Generally just pose the question, what is your assessment of the performance and work of the INS?

Mr. AUSTIN. Boy, that is a big question. I have often said that the INS could be given the national defense budget and it would absorb that without dramatically changing the current situation.

Ms. JACKSON LEE. You think they are efficient and effective?

Mr. AUSTIN. I think they are well meaning and dedicated. Do I think they are efficient and effective? In some categories I do; in some I do not.

Ms. JACKSON LEE. And your position on this legislation, if you were to say it in just a few words, would be what?

Mr. AUSTIN. My position would be, Congresswoman, one, that there is not a need for it, that most of the cases that were described here would have already benefited under current law, and, two, that it draws a distinction between these applicants over all other types of applicants within the immigration law. It ignores provisions of the law which says that you are ineligible for certain benefits and it just draws one exception after another exception after another. Criminal convictions, misrepresentations to the INS, prior deportations, et cetera, et cetera, et cetera, that is unfortunate.

Ms. JACKSON LEE. Do you think it is open to fraud?

Mr. AUSTIN. Oh, yes, I don't think there is any question, I don't think there is any question there will be fraud.

Ms. JACKSON LEE. Huge fraud? A great deal of fraud?

Mr. AUSTIN. I don't think it would be a great deal of fraud in the potential of fraud within INS, because this would be, as related here, not a significant number of applications or a huge number of applications when we look at the INS backlog and what they are dealing with, which we are all too familiar with. But would there be a percentage of fraud applications if this bill was passed? Would it increase the fraud? Yes, I believe it would.

Ms. JACKSON LEE. And you understand that your present representative of the INS disagreed in her testimony in the question posed by Mr. Conyers, who said whether or not there would be a great fear of fraud, and she very clearly said "no" on the record. And she is presently with the INS. So I think there is a difference of opinion and I just wanted to note that.

I want to pose some other questions, and just to acknowledge the fact I think there are numbers that will be impacted by this legislation that we cannot even assess. It is hard to be able to give reasonable assessment of who is being abused because now these women are frightened. We are trying to cure a terrible loophole, which I think if it is the responsibility of the INS to be proposing or supporting the, if you will, compliance with our laws, then they also have to be an agency that recognizes that immigrants are here because of the policies that we have in the United States.

I do want to note, Mr. Chairman, for the record that I am very pleased that these courageous women were able to be here. I believe Mrs. Brhane Abrhame from Ethiopia is here, who suffered tragically 6 years of abuse, but has great peace now that she was able to get her status through VAWA, and I am delighted that you were able to come, along with Francisca Salamanca, if I have that correct, from El Salvador, 11 years of abuse, who is courageously here this morning. And I hope that we will be able to chat with them, Mr. Chairman.

But let me finish with Mr. Austin and just indicate that I have pause and concern, and the chairman knows I always do, with some of the principles that have been enunciated by the organization that you are an advisory member of, and we do have freedom of association. But I believe it is of importance for me to just raise this issue in a statement that you made.

The issue was a ruling by Judge Sterling Johnson about detained Haitians. He said in his decision lambasting the government, which is us, "Some are pregnant mothers, others are children. Simply put, they are merely the unfortunate victims of a fatal disease." they happen to have been infected with HIV/AIDS. And Johnson, who conducted a 2-week trial in New York in March, said he was particularly disturbed that witness Dwayne Austin, an official of the United States Immigration and Naturalization Service, was quoted in an interview saying of the detained, "They're going to die anyway, aren't they?" .

My only concern about your testimony here about opposing this legislation, I would like to be able to fix it and take your considerations into account. But what was behind that comment and how am I to be able to justify my consideration of your comments and criticisms with what I think is clearly an anti-immigrant bias?

Mr. AUSTIN. I would agree with you if you took that statement on its face basis. The explanation for that statement is very easy. That was taken completely out of context. And let me—I had to testify in that trial. I was subpoenaed and went up and the court record demonstrates clearly what I said. And I had a witness, in fact, to my response. When I was asked by the reporter, a Mr. Cobb from the Miami Associated Bureau, what are you going to do, leave them here to die in the HIV camp on Guantanamo? I said I wish to God that bringing them to the United States would change that eventuality. And in fact I believe if the United States Government had that possibility, that they would not hesitate to bring them to the United States. But bringing them to the United States is not going to change that eventuality at all. They are getting the same treatment there they would get in the United States. Whether we bring them or not, they are going to die. That was the total statement.

That reporter chose to take it completely out of context and put it in the report. I got hate mail from as far as China for that response. When I went to the court proceedings in New York, I stated it just as I have stated it now. There was no rebuttal to that, and the judge ignored it in his final decision. And I was told by lawyers out of the Justice Department that that borders on judicial malfeasance.

Ms. JACKSON LEE. I appreciate your explanation, and if you have the transcript that you would like to submit to the record, I would ask the chairman to allow to you do so because I think it is an important clarification.

Working for the INS—and I thank the chairman for his indulgence, I will be completed in just a moment—do you view yourself as having an anti-immigrant bias?

Mr. AUSTIN. No, I do not.

Ms. JACKSON LEE. So if we can prove to you as we listen to—I assume the chairman will allow me another round as well so that we can ask some of the more detailed questions—but if we can prove to you the need and we take into consideration some of the aspects of the chairman's comments, my comments on the legislation, that is why these hearings are being held, I would venture to say that you would comply with the laws of the land or you would seek to have the INS comply with the laws of the land, which

would include the protection of battered immigrant women through this legislation.

Mr. AUSTIN. There is no question but I believe that there is current legislation that addresses that issue. I think this goes beyond that a little bit, and I think it opens up some avenues that other aliens do not have available to them. And I am not sure that that exception is a wise one.

Ms. JACKSON LEE. If we solve that problem of your thinking that that is the case, then you would be willing to look at this as viable and needed legislation? If we could solve your—answer your concern as to whether or not it is needed, there is enough documentation to say that but we need to convince you, if we do that I assume you would follow and believe that that law should be implemented?

Mr. AUSTIN. I would have to see what the final result of the law would be and would have to analyze that. But may I add one other point? You do not really believe that a Federal agency would let a senior spokesman continue in his position if he was so calloused as the response which was reported in The New York Times or anywhere else, "Why bring them here? They are going to die anyway"?

Mr. SMITH. Mr. Austin, sounds like you would be a good witness for media bias as well.

Ms. JACKSON LEE. Let me just indicate that the Nation and its Federal officials, all of us, are enormously diverse. We do not hold a litmus test to those who are hired by government agencies as to their particular political positions. So I would say to you that yes, they probably would inasmuch as that would not be grounds because of the freedom of speech. My job here this morning is to determine the objectivity of your testimony, and I appreciate you saying that. I will not ask for an explanation because I am sure you have a long one, but you were cited another time in The Washington Post, May 26, 1991, "If we had a way to send the Cubans back, believe me we would." I know there is an explanation and I will give you a chance, but I have already heard that you do not have that bias and we will be able to work together.

Mr. Chairman, I yield back the time that I may still have and look forward to another opportunity. I thank the chairman very much.

Mr. SMITH. Let me interject a couple of things. First of all, without objection we will make a part of the record anything that you would like to submit, Mr. Austin, as well as the more complete opening statements of the witnesses, as well as additional testimony that we have in hand.

And Ms. Jackson Lee, why don't you go on and proceed with any additional questions that you might have. I think we are going to need to break in a minute.

Ms. JACKSON LEE. Thank you very much. Ms. Buchanan, I was very fascinated that you took the time to do a survey. And the real crux of this, and I think the Congresswoman from Illinois was very on point in her very effective testimony in laying out the parameters of this legislation. But we need to get to the bottom line, and that is why this legislation is needed.

In your own experience in the interviewing that you took time to do, which I really appreciated, can you just succinctly, short of the two ladies who are sitting on the front row, who I am sure

would be eloquent in expressing what it was like to experience 6 years of abuse with no help whatsoever or 11 years of abuse, can you narrow down for us what the crux of the need is, please?

Ms. BUCHANAN. I can talk to you about that from my experience with the National Domestic Violence Hotline, which we run. And we hear from women so often, battered immigrant women who are caught in this relationship and that at this point in their experience they are still too terrified even to access any of the benefits of VAWA. They are in the relationship, they are absolutely terrified to contact the police. They are continually threatened with deportation. They are threatened if they call the police that the batterer will have them deported; That if they do anything, he will have her deported and take away her children.

I can give you one quick example from the hotline. There was a Spanish-speaking woman who called, she was married to an American citizen and he had been beating her for years. She finally left the home but the batterer would not allow her to take the young son away with her. He refused to let her see the child, and then he began threatening that he had a lawyer and if she did not sign custody of the child over to him he would call immigration and have her deported.

I think those are the kinds of stories that we hear over and over again at the hotline and that women are experiencing. And this legislation will protect these women and their ability to actually go forward and call the police and seek intervention in these cases.

Ms. JACKSON LEE. Thank you very much. And I need to pose this question to you, Ms. Orloff, and thank you very much, as I thank all the witnesses for their leadership. Let's get to the crux of it. Why are the procedures of VAWA not sufficient to address this issue? And as you explain that, tell me what is wrong for the immigrant women to leave the country and then apply back for a green card, and as well, how they would use the 245(i). I will repeat them, but the crux really is why not the procedures that are presently utilized with VAWA?

Ms. ORLOFF. First of all, let me start with the whole issue of adjustment of status. When VAWA originally passed 245(i) was in place and battered immigrants could get their green cards in the U.S.; 245(i) ended. And I need to correct some misinformation from other witnesses on the record. We are not restoring 245(i) here. All we are doing is saying that battered immigrants, like the spouses of citizens who are battered immigrants, can get their green cards in this country through 245(a) and (c). We are not touching anything else. It is really important to make that distinction.

The reason for this change is that these are women, the vast majority of whom already have exemption from 3- and 10-year bars, so making them leave the country is just an exercise in futility that puts them in a position of danger with no purpose.

Ms. JACKSON LEE. I think you answered leaving the country, what is wrong with leaving the country and having them apply for the green card?

Ms. ORLOFF. It is a variety of things. One, if they have a protection order, the moment they step over the border into Mexico or go to leave the United States that protection order stops helping them. We know from farm worker families, particularly in Texas,

sometimes he will drag her over the border, beat her up there and bring her back because he knows if he beats her in Mexico he cannot be held accountable. That is what we want to stop. Many of these guys are stalkers. We have a book, I think we submitted it with our testimony, which contains stories from all over the country, virtually every State, of battered immigrants who are at risk because of the fact that they have to leave the country to get their green cards.

As to some of the other issues, I think one of the other reasons we need this legislation is there were changes to the immigration laws that I really believe inadvertently harm battered immigrants. We heard a lot of questions about waivers. Prior to the 1996 act, the Immigration Act, battered immigrants had more access to VAWA protection than they do today. If the ultimate goal is to be able, as Chairman Smith said, to prosecute these abusers, every time you cut off all relief to a battered immigrant married to a U.S. citizen—I think about the nuns and watching the machete incident—there is a citizen that can get away with it. If we really want these guys to be prosecuted, we have to be able to allow their spouses and children to come forward and testify. And without immigration relief, that will never happen.

We are not creating new whole categories here. What we are doing is fixing the problems that we did not anticipate in the first place.

Ms. JACKSON LEE. The red light is on. Let me, Mr. Chairman, thank Jackie Rishty for her great testimony, and the commitment of Catholic Charities, and finish with Mario Ortiz, just because you suffered in isolation as a battered spouse and an immigrant. And I think the key element here is whether we are creating more individuals on public assistance and what it is like to be isolated.

You are now—forgive me if it sounds in any way patronizing, but it is not—gainfully employed. You have regained your dignity. Explain how this legislation ties into that and to refute the fear that all we are doing is bringing in more people to be on public assistance.

Ms. ORTIZ. I need to make a correction, Ms. Jackson Lee. Did I understand you to say that I am an immigrant? I am not.

Ms. JACKSON LEE. Oh, I did not know that.

Ms. ORTIZ. But in my past experience with domestic violence, and my husband and I are still married—and my dad—I want to explain to this committee how difficult it is for someone, even a U.S. citizen, to put up with domestic violence. How fearful, how intimidating, how my self-esteem was very low. And I did not feel like doing anything. I used to be terrified of my husband. I would iron his clothes and everything and put everything in order because I was afraid things may not be exactly like he wanted it. And most of the women that I see in my office now tell me stories that I remember myself feeling.

However, immigrant women have even more issues at stake besides all those fears that I had. I am not afraid of INS. I am not—I speak English, too. So I am not afraid to be able to access the services that are available to me, to be able to work, to be able to go to school and get a higher education. All of those things are

available to me. They are not available to battered immigrant women.

Mr. SMITH. Thank you, Ms. Jackson Lee, for all of your good questions, and thank you all as witnesses for testifying today. It was all very helpful. We appreciate your being here. And also before we conclude, let me thank Lora Ries, our Immigration Counsel, for arranging and putting on this helpful and informative hearing as well.

Ms. JACKSON LEE. May I thank Mr. Leon Buck, and thank the witnesses very much.

[Whereupon, at 12:08 p.m., the subcommittee was adjourned.]

# APPENDIX

---

## MATERIAL SUBMITTED FOR THE HEARING RECORD

NOW LEGAL DEFENSE AND EDUCATION FUND,
IMMIGRANT WOMEN PROGRAM,
*Washington, DC, March 9, 2000.*

DEAR MEMBERS OF CONGRESS: As members and supporters of the the National Task Force to End Violence Against Women, we are writing to request your support and sponsorship of the Battered Immigrant Women Protection Act of 1999, (H.R. 3083) which was introduced mid-October. This bill sponsored by Reps. Schakowsky (D-IL), Morella (R-MD) and Jackson Lee (D–TX) restores and expands critical legal protections for battered immigrants and their children.

On January 31, 2000, all of the national domestic violence organizations met in Washington, D.C. to forge a consensus on issues that are of the utmost priority to the thousands of battered women's advocates, shelters and state domestic violence coalitions across the nation. These national organizations included: NOW Legal Defense and Education Fund, National Coalition Against Domestic Violence, National Network to End Domestic Violence, Family Violence Prevention Fund, Texas Council on Family Violence , National Domestic Violence Hotline, and the Pennsylvania Coalition Against Domestic Violence. Our collective conclusion was that, in addition to the Re-authorization of the 1994 Violence Against Women Act, the Battered Immigrant Women Protection Act, transitional housing, civil legal assistance, and VAWA's full faith and credit provisions, are our five highest priorities for passage this session.

Across the country, organizations have been experiencing increased calls for help from battered immigrant women and abused immigrant children who desperately need the legislative reforms that are included in the Battered Immigrant Women Protection Act of 1999. Several of the changes to immigration laws that have occurred since 1994 have heightened the danger for battered immigrants abused by their U.S. citizen and lawful permanent resident spouses. The Violence Against Women Act's immigration protections have been undermined and we need to restore them.

The original goal of VAWA's immigration provisions was to encourage battered immigrants abused by U.S. citizen and lawful permanent resident family members to call the police for help; to cooperate in their abuser's prosecution; to obtain protection, and to successfully remove their children from abusive homes. Intervening changes in the law have lessened the accomplishment of VAWA's protective and criminal justice goals. This critical piece of legislation would go far to remedy these problems and offer enhanced protection to battered immigrant women and children who - without your support - would remain at the mercy of abusive citizen and lawful permanent resident spouses and parents. This bill will improve protection for at-risk children of battered immigrant women and for teenage children who have been victims of incest and sexual assault perpetrated by the U.S. citizen and lawful permanent resident fathers and step-fathers. This bill grants these groups improved access to VAWA's immigration protections.

In light of the increased work many organizations have been doing on domestic violence in the military, we are also very pleased that this bill extends VAWA protection to spouses and children of U.S. military members and government personnel residing abroad.

Your immediate support will ensure that the health, welfare and lives of battered immigrant women across the country are not further endangered. On behalf of each of our programs and the thousands of domestic violence organizations and service providers we represent and the battered immigrant women and children who you

will help, we thank you in advance for your sponsorship of the Battered Immigrant Women's Protection Act of 2000.

To join the growing list of co-sponsors of H.R. 3083, please contact Kim Muzeroll in Rep. Schakowsky's office at (202) 225–2111. A summary of H.R. 3083 is available from the NOW Legal Defense and Education Fund's Immigrant Women Program by calling (202) 546–1100. We look forward to continuing to work with you on this important bi-partisan response to the needs of battered immigrants and their families.

Sincerely,

LESLYE ORLOFF, *Senior Staff Attorney and Director, Immigrant Women Program, NOW Legal Defense and Education Fund.*

JULEY FULCHER, *Director, Public Policy Office, National Coalition Against Domestic Violence.*

BREE BUCHANNAN, *Director of Public Policy, Texas Council on Family Violence and the National Domestic Violence Hotline.*

---

*Washington, DC, July 13, 2000.*

ORGANIZATIONS SUPPORTING THE BATTERED IMMIGRANT WOMEN PROTECTION ACT OF 1999 (H.R. 3083)

*National Organizations*

American College of Nurse-Midwives
American Immigration Lawyers Association
American Medical Student Association
American Medical Women's Association
American Psychological Association
Asia Pacific Center for Justice and Peace
Asian and Pacific Islander American Health Forum
Center for Constitutional Rights
Center for Women Policy Studies
Church Women United
Equality NOW
Equal Rights Advocates
The Feminist Majority—The National Center for Women and Policing
Family Violence Prevention Fund
McAuley Institute
Mexican American Legal Defense and Eduacation Fund (MALDEF)
Na' Amat—USA
National Association for the Advancement of Colored People (NAACP)
National Black Women's Health Project
National Center on Poverty Network
National Coalition Against Domestic Violence
National Council of Catholic Women
National Council of Jewish Women
National Gay and Lesbian Task Force
National Immigration Forum
National Immigration Law Center
National Immigration Project of the National Lawyer's Guild
National Latina Institute for Reproductive Health
National Latino Alliance for the Elimination of Domestic Violence
National Network on Behalf of Battered Immigrant Women
National Organization for Victim Assistance
National Organization for Women
National Organization for Women Legal Defense and Education Fund (NOW LDEF)
National Sexual Violence Resource Center

National Task Force to End Violence Against Women
National Women's Health Network
National Women's Law Center
National Women's Party—Washington, D.C.
Network, A National Catholic Social Justice Lobby
North American Council for Muslim Women
Union of American Hebrew Congregations
Women's Division—United Methodist Church
Women's Institute for Freedom of the Press
YWCA of the U.S.A.

*Organizations*

Access Immigration Services—San Diego, CA
Acercamiento Hispano / Hispanic Outreach—Columbia, SC
ACTION OHIO—Coalition for Battered Women—Columbus, OH
Albuquerque Border City Project—Albuquerque, NM
Alliance Against Family Violence and Sexual Assault—Bakersfield, CA
Alliance for Children and Families—Washington, D.C.
Apna Ghar—Chicago, IL
Arab Community Center for Economic and Social Services (ACCESS)—Rochester, MI
Asian American Family Counseling Center—Houston, TX
Asian and Pacific Islander Women and Family Safety Center—Seattle, WA
Asian Law Alliance—San Jose, CA
Asian Pacific American Legal Center—Los Angeles, CA
Asian/Pacific Islander Domestic Violence Resource Project—Washington, D.C.
Asian Human Services—Chicago, IL
Asian Women's Shelter—San Francisco, CA
Atlanta Women's Foundation—Atlanta, GA
Ayuda Inc.—Washington, D.C.
Casa de Proyecto Libertad—Harlingen, TX
Catholic Charities—Council Bluffs, IN
Center for Women and Families—Louisville, KY
Center for Legal and Social Justice at St. Mary's University School of Law—San Antonio, TX
Central American Resource Center—Los Angeles, CA
Centro Legal—St. Paul, MN
Chicago Foundation for Women—Chicago, IL
Chicago Metropolitan Battered Women's Network—Chicago, IL
Chicago Abused Women Coalition—Chicago, IL
Children and Families of Iowa, Family Violence Center—Des Moines, IA
Coalition for Humane Immigrant Rights of Los Angeles—Los Angeles, CA
Coalition of Asian Social Work Students—Univ. of MI School of Soc. Work—Ann Arbor, MI
Countering Domestic Violence / Neville House—Bloomington, IL
Crisis Center Foundation—Jacksonville, IL
Crisis Intervention and Advocacy Center—Adel, IA
De Colores Domestic Violence Shelter—Chicanos Por la Causa—Phoenix, AZ
Diocesan Migrant and Refugee Services, Inc.—El Paso, TX
Domestic Violence Intervention Program—Iowa City, IA
Domestic and Sexual Abuse Resource Center—Decorah, IA
El Buen Samaritano Episcopal Mission—Austin, TX
Family Shelter Service—Chicago, IL
Family Rescue—Chicago, IL
Family Crisis Center—Brentwood, MD
Family Violence Clinic—State Univ. of NY at Buffalo School of Law, Getzville, NY

Family Resources—Violence Intervention Counseling Services—Davenport, IA
Family Violence Network—Lake Elmo, MN
Family Violence Outreach Clinic—Widener University School of Law—Wilmington, DE
Fort Bend County Women's Center Inc.—Richmond, TX
Friends of Battered Women and their Children—Chicago, IL
Georgia Commission on Family Violence—Atlanta, GA
Governing Board of the Sisters of St. Francis—Dubuque, IA
Grace Smith House—Poughkeepsie, NY
H.O.P.E. of Rochelle—Rochelle, IL
Hadassah—New York, NY
Hamdard Center for Health and Human Services—Chicago, IL
Heartland Alliance for Human Needs and Human Rights—Chicago, IL
Hidalgo County Family Violence Task Force—Edinburg, TX
Illinois Center for Violence Prevention—Chicago, IL
Illinois Coalition for Immigrant and Refugee Rights—Chicago, IL
Immigration Project—Granite City, IL
Immigration Services—Catholic Social Services—Atlanta, GA
International Advocacy Center for Women, P.C.—Ann Arbor, MI
Japanese American Services of the East Bay—Berkeley, CA
Japanese American Service Committee—Chicago, IL
Korean American Women in Need—Chicago, IL
La Casa de las Madres—San Francisco, CA
Lake County Crisis Center—Lakeview, OR
Legal Services for Prisoners with Children—San Francisco, CA
Life Span Center for Legal Services and Advocacy—Chicago, IL
Men Stopping Violence—Atlanta, GA
Mid-Minnesota Legal Assistance / Western MN Legal Services—Willmar, MN
Midwest Immigrant and Human Rights Center—Chicago, IL
Migrant Clinicians Network, Inc.—Austin, TX
Minnesota Coalition for Battered Women—St. Paul, IL
Mujeres Latinas en Accion—Chicago, IL
Multicultural Therapeutic Intervention Services Inc.—Washington, DC
Mutual Ground, Inc.- Chicago, IL
National Lawyer's Guild—Hawaii Chapter—Honolulu, HI
Neopolitan Lighthouse-Domestic Violence Program—Chicago, IL
New York Task Force on Immigrant Health—New York, NY
New York Association for New Americans—New York, NY
Newcomers Center—Chicago, IL
Nihonmachi Legal Outreach—San Francisco, CA
North Dakota Council on Abused Women's Services—Bismarck, ND
Northern Manhattan Coalition for Immigrant Rights—New York, NY
Northwest Immigrants Rights Project—Granger, WA
Northwest Immigrants Rights Project—Seattle, WA
Ohio Domestic Violence Network—Columbus, OH
Pacific Regional Psychological Associates- PARPA—Hilo, HI
Polish American Association—Chicago, IL
Project COPE—Children and Families of Iowa—Creston, IA
Public Law Center—Santa Ana, CA
RAKSHA—Atlanta, GA
RESPOND Inc.—Somerville, MA
SAFE NEST—Temporary Assistance for Domestic Crisis—Las Vegas, NV
San Luis Valley Christian Community Services Immigrant Assistance—Alamosa, CO
San Francisco District Attorney's Office—San Francisco, CA

Sanctuary for Families—Center for Battered Women's Legal Services—New York, NY
Sarah's Inn—Oak Park, IL
Sistering Women & Children Out of Viol. Task Force—Sisters of St. Francis—Dubuque, IA
South Asian Network—Artesia, CA
St. Cloud State University Women's Center—St. Cloud, MN
St. Lukes / Roosevelt Hospital Center's Crime Victims Treatment Center—New York, NY
Tahirih Justice Center—Falls Church, VA
Tahoe Women's Services—Incline Village, NV
Texas Association Against Sexual Assault—Austin, TX
The Women's Center, Inc.—Carbondale, IL
The Women's Office, Sisters of Charity, BVM—Chicago, IL
The Women's Center of Monmouth County Inc.—Hazlet, NJ
The Rape Crisis Center—San Antonio, TX
The Haven of Religious Community Services—Clearwater, FL
Travelers & Immigrants Aid—Chicago, IL
Tri-State Coalition Against Domestic and Sexual Abuse—Keokuk, IA
Tu Casa, Inc.—Alamosa, CO
Turning Point—Knoxville, IA
Unidos Against Domestic Violence—Fond du Lac, WI
University of Hawaii President's Commission on the Status of Women—Lihue, HI
University Family Practice Center at Vailsburg—Newark, NJ
Visitation House—San Antonio, TX
Volunteer Counseling Service—Community Change Project—New York, NY
Whatcom Crisis Services—Bellingham, WA
Women In Need, Inc.—Chambersburg, PA
Women Empowered Against Violence (WEAVE)—Washington, DC
YWCA Crisis Center—Enid, OK
YWCA of North Orange County—Fullerton, CA
YWCA of Boulder County—Boulder, CO
YWCA of Bucks County—Trevose, PA
YWCA of McKeesport—McKeesport, PA
YWCA of Greater Miami—Miami, Florida
YWCA of Greater Des Moines—Des Moines, IA
YWCA of Wichita—Wichita, KS
YWCA of Northwest LA—Shieveport, LA
YWCA of Metropolitan Chicago—Chicago, IL
YWCA of Monterey County—Monterey, CA
YWCA of Meadville, PA—Meadville, PA
YWCA of Plainfield/North Plainfield—Plainfield, NJ
YWCA of Dayton—Dayton, OH
YWCA of Butler—Butler, PA
YWCA of Sauk Valley—Sterling, IL
YWCA of Greater Los Angeles—Los Angeles, CA
YWCA of Grand Rapids—Grand Rapids, MI
YWCA of Troy-Cohoes—Troy, NY
YWCA of Santa Monica—Santa Monica, CA
YWCA of Oklahoma City—Oklahoma City, OK
YWCA of Rockford—Rockford, IL

*State Coalitions*

Alabama Coalition Against Domestic Violence
Arizona Coalition Against Domestic Violence
Florida Coalition Against Domestic Violence

Georgia Coalition Against Domestic Violence
Hawaii Coalition Against Domestic Violence
Iowa Coalition Against Domestic Violence
Kansas Coalition Against Sexual and Domestic Violence
Maine Coalition Against Domestic Violence
New Hampshire Coalition Against Domestic and Sexual Violence
New York State Coalition Against Domestic Violence
North Carolina Coalition Against Domestic Violence
Pennsylvania Coalition Against Rape
Rhode Island Coalition Against Domestic Violence
Wisconsin Coalition Against Domestic Violence

---

PREPARED STATEMENT OF DAN STEIN, EXECUTIVE DIRECTOR, FEDERATION FOR AMERICAN IMMIGRATION REFORM

INTRODUCTION

Surely no one would oppose a bill designed to protect immigrant women against physical or mental abuse if it were designed to have only that consequence and did not appear to open up broad avenues of undesirable unintended consequences. Unfortunately, H.R.3083 suffers from both of those problems. In fact, the bill has so many unfortunate side effects that it should not be passed in its current form.

We are taught from a young age not to look a gift horse in the mouth. It is considered ungracious. We also learn at a somewhat later age that the Trojans made a fatal mistake because they failed to look a gift horse in the mouth. Heeding the latter lesson, we at the Federation for American Immigration Reform have taken a close look at H.R.3083. What we have found is that within the shell of this proposed legislation are many dangerous provisions which, if enacted into law, would damage the enforceability of the nation's immigration law.

Protections for vulnerable populations are noble. Few would disagree that illegal aliens are a vulnerable population. The authors of this legislation are so focused on the issue of protection that they ignore the consequence of the illegal status. Illegal immigration is so massive a problem at present that we believe that any measure, such as this bill, that encourages or even rewards illegal immigration should be avoided if at all possible. On the other hand, we would support workable provisions that are designed to prevent the loss of immigration benefits for a legal immigrant whose family relationship has been terminated as a result of spousal abuse.

The argument might be made that the problem of violence against immigrant women is so serious a social problem that we should overlook some possible unintended consequences. In other words, avoid throwing the baby out with the bathwater. That is a misleading argument. The protections against spousal abuse adopted in 1994 will be continued by adoption of H.R.1248, a bill that does not contain the destructive consequences of H.R. 3083.

*H.R. 3083 contains more than three dozen substantive amendments that repeal or weaken provisions of the Immigration and Nationality Act (INA), the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA), and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). The bill would eliminate or weaken every statutory standard applicable to petitions for adjustment of status to legal permanent residence where the petitioner invokes Violence Against Women Act (VAWA) provisions. Every cancellation of removal requirement for VAWA beneficiaries and an expanded class of derivative relatives would be repealed or weakened.*

Before entering a detailed discussion of the bill's provisions, four examples of the pitfalls included in the bill will demonstrate the nature of our concerns.

- The bill would create a new INA category of "intended spouse" (Section 7(c)(1)). This is a term that exists nowhere else in federal law. The adoption of this provision would serve as a wedge for undermining the institution of marriage as well as opening a loophole so wide that it could be used for litigating a panoply of perhaps unintended issues such as same sex relationships. The bill would disadvantage law-abiding traditional immigrant families, reward fraudulent behavior, and attack privacy protections for American citizens at the expense of privileged treatment for inter alia illegal immigrants.

- Another provision would open the door to persons who have never set foot in this country to self-petition to enter the country for permanent residence on the basis of a VAWA assertion that they had been abused by a U.S. citizen or resident (Section 7(c)(1)). In other words it would allow the alien to "rejoin" in the United States a person who is resident abroad, or if that person has returned to the United States, to rejoin the abuser.
- The bill removes most of the adversarial nature of legal proceedings that allow an accused person to defend himself. The adversarial proceedings that are removed by the bill would serve to expose the possible use of the bill for fraudulent application for immigration benefits. It may be argued that the accused abuser does not need the opportunity to defend himself against the abuse charges, because under the bill, he does not face any legal repercussions as a result of the accusation. That argument identifies another major flaw in this bill; acts of abuse that are serious enough to justify VAWA protections are actions that should result, if proven, in legal repercussions against the abuser. If the abuser is an alien the actions should lead to his removal.
- Other provisions in the bill would establish new substantive and procedural legal preferences favoring VAWA beneficiaries—including illegal aliens—over all other non-citizens. Included among these are a backdoor reestablishment of INA Section 245(i) which allows illegal aliens to obtain legal residence without leaving the country. Many of the provisions include retroactivity features that would reopen years of immigration litigation, compounding current backlog problems.

These are only four examples of a long list of serious flaws embedded in H.R. 3083. The cumulative harmful effect of the bill, if adopted, would not, however, be confined to such provisions. A broader concern is that evidentiary standards in this bill are set so low that the bill's provisions would become a super-highway for fraudulent claims to immigration benefits. The minimal standards would seriously impede any effort by the INS to investigate, expose and prevent fraud, whether by individuals or by racketeers.

The immigration and other benefits provided by this bill are so 'big-hearted' that they may be seen by some illegal aliens as outweighing the threat of detection for fraudulent allegations of abuse. Rather than protecting them from abuse, it seems possible that the bill will encourage immigrants to feign abuse in order to be able to qualify for benefits that include not only preferential status for legal residence but also welfare eligibility.

H.R.3083 is reminiscent of the most unsuccessful provisions of the Illegal Immigration Control Act of 1986. The IRCA provision for employer sanctions was designed to deter illegal immigration by denying jobs to illegal entrants and visa overstayers. The 1986 amnesty was accepted as a necessary evil to facilitate the implementation of the new illegal immigration deterrence provisions. Despite the good intentions, the country ended up with the worst features of the amnesty—including rampant fraud—without the benefits of the deterrence, because the sanctions system was established without the necessary immigration status verification provisions needed to make it effective. In practice, rather than deterring illegal immigration, IRCA now stands as a landmark pointing to an increase in illegal immigration.

Like IRCA, H.R.3083 is portrayed as offering a benefit to society in exchange for overlooking illegal alien status. The bill also includes an amnesty feature. But, by not addressing the fundamental problem, i.e., discouraging violence against women by identifying and punishing the abuser, the bill will instead result in a one-way street of benefits for illegal aliens without the benefits to the country by removing persons whose presence is undesirable. In addition, H.R.3083 will open new avenues for bypassing our system of legal immigration.

DETAILED PROVISIONS

A full analysis of the potential harm embedded in H.R.3083 requires an itemized discussion of the bill's provisions and how they relate to the current legal protections that are already provided. In addition not all of the deleterious effects of the proposed provisions are obvious on the surface, so it is necessary to speculate how the provisions might work in practice if adopted rather than accept them at their face value.

Our comments are arranged in seven sections as outlined below:

1. Expansion of the existing VAWA self-petitioning criteria;
2. Expansion of cancellation of removal provisions for VAWA beneficiaries;
3. Restoration of welfare benefits for VAWA beneficiaries

4. Weakening of immigration law enforcement;
5. Restriction of state and local enforcement against illegal aliens;
6. Establishment of new preferences for VAWA beneficiaries;
7. New "amnesties" for Cuban, Central American and Haitian VAWA beneficiaries.

*1. Expansion of the existing VAWA self-petitioning criteria*

H.R. 3083 would eliminate or erode every statutory standard applicable to petitions for adjustment of status to legal permanent resident where the petitioner is a VAWA beneficiary, including: Those standards include the requirement for a bona fide marriage, proof of good moral character, meeting the extreme hardship criteria, status derivation based on the U.S. residence of the petitioner, or the traditional parent-child relationship. All of these standards disappear in the proposed legislation, if battery or extreme cruelty is alleged and the low evidentiary standards of act are met. A fast-track naturalization benefit unavailable to other immigrants is provided for VAWA aliens.

H.R. 3083 creates new institutional benefits for unmarried non-citizens that are unavailable to married non-citizens. The effect is that married aliens are placed in a disadvantage. All of the benefits and purported "protections" in the bill require that the spouses, children and even the elderly parents separate permanently and then formally denounce their U.S. citizen or legal permanent resident (LPR) spouse or parent.

The federal benefits from asserting abusive treatment include legalization and access to welfare under a faster and more expansive procedure than offered to any other class of non-citizens. The accuser receives these benefits without any reciprocal responsibility to cooperate with the INS or local law enforcement to punish or deport the purportedly abusive father or husband. The absence of provisions to link the immigration benefits for the VAWA petitioner with sanctions against the "abusers" under immigration law suggest that H.R. 3083 was never intended to serve as a deterrent to future abuse in immigrant communities.

Rather than focusing public opinion against spousal abuse, the ironical effect of H.R. 3083 is more likely to be to create a focus by alien smugglers on how the bill's provisions can be exploited to facilitate the lucrativeness of their smuggling operations. This assessment is based on experience with the coaching by Chinese "snakehead" smugglers of their illegal alien clients to claim asylum under the Chinese family planning provision added in 1996 by Section 601 of IIRAIRA. The likelihood is that VAWA relief provisions will be rapidly exploited by organized crime and immigrant advocacy organizations with the concomitant effect that physical and mental abuse (or at least allegations of such treatment) will increase, and patterns of dependence, poverty and social dysfunction will blossom in immigrant communities.

Section 4(e) would allow a VAWA self-petitioning spouse to remarry before obtaining LPR status, revoking current regulation 8 CFR 204.29(c)(1)(ii). *Thereby an illegal alien would be able to enter into a sham marriage or intimate relationship with a U.S. citizen or LPR, provoke or simply allege abuse, divorce or separate from that person and marry a fellow illegal alien and be able to not only gain LPR status but also confer a derivative immigration benefit on the new spouse.*

Section 7(a) would create the new INA category of "intended spouse." This would be an entirely new status in federal law. This new status is defined in a way to cover aliens who may once have had a derivative immigration status based on a relationship with a citizen or LPR, but who has lost that status by death, divorce or legal provision and they assert that lost immigration status involved domestic violence. *The implication of this provision is that an illegal alien who terminates a marriage or relationship with a U.S. citizen or LPR by killing him does not lose a derivative immigration benefit if there is some evidence of abuse. In theory, the alien could gain a benefit by murder that was withheld by the murder victim while alive. Thus, the alien would be able to gain legal residence by an act that constitutes a basis for termination of legal residence.*

Section 7(c)(1) allows "intended spouse's" to self-petition for VAWA benefits. It also removes the current requirement that they reside in the U.S. As previously noted, *"intended spouse" is a provision that does not exist elsewhere in federal law, and, if enacted, would establish an entirely new alternative to marriage as a standard for judging what constitutes a family relationship.*

INA Section 204(a) which establishes the basis for self petitioning for immediate relative and spousal second preference status, currently provides that the petitioning alien must reside in the United States. By removing that requirement, *an en-*

*tirely new population of aliens would become eligible to obtain preferential immigration status.*

The range of aliens who are made eligible to self-petition is widely expanded by including, in addition to spouses, children and adult sons and daughters of citizens (Sections 7(c)(6) and 7(d)(5)).

Section 7 also removes the current requirement that a VAWA illegal alien self-petitioner prove "extreme hardship" to family members if they were to be sent home. *This provision would give privileged status to illegal aliens who invoke the VAWA provisions over all other applicants for withholding of removal.*

Another provision in current law—that self-petitioners be legally married to the abuser at the time the petition—is removed by the bill (Sections 7(c)(1)(B) and 7(d)(1–2)). If adopted, the alien would become able to self-petition up to two years after a divorce from, or death of, or loss of legal immigration status of the abusive US citizen or LPR. *This provision expands the scope of the VAWA statute as a defensive claim against deportation. In a similar vein to the counsel given thousands of illegal aliens that they may escape or delay deportation if they can show a well-founded fear of persecution if deported, a new standard of relief from abuse may arise as a defensive measure. The difference is that the "well-founded" test will be replaced by a much lower standard of evidence.*

The Immigration Marriage Fraud Act would be weakened by the bill. The IMFA provides that women sponsored by citizens or LPRs for fiance (K) visas must marry within 90 days. This was adopted to prevent the fiance visa from being used for fraudulent entry. The bill undermines that anti-fraud measure by providing that the marriage requirement may be waived for aliens who self-petition for VAWA adjustment of status (Section 7(c)(2)).

The requirement that fiances and their children remain in conditional resident status for two years before becoming LPRs—in order to deter the practice of marriages of convenience as a way to gain immigration benefits—is also eliminated by Section 4(b). By asserting abuse by the fiance, the alien is able to bypass the waiting period and apply for an immediate waiver to adjust to permanent status. *Elimination of the requirement for the putative fiance to document the basis for a battered spouse waiver will inhibit investigation of marriage fraud.*

Adult sons and daughters (aged 21 or older) of a VAWA petitioner are made eligible for immigration preference as a "child"—currently unavailable under INA § 101(b)—if they or their mother claim abuse occurred before they turned 21 (Section 7(b)). Thus, *aliens who are ineligible under current law for either an immediate relative visa or a second preference visa reserved for children, become eligible for that status by asserting abuse of the parent or abuse of themself.* These adult "children" can include their own children (i.e. the abusive parent's grandchildren) on their petition. They would not need to have lived with the abusive parent, but simply have spent a "period of visitation," (Sections 7(c)(3) and (d)(3)). *With no time limits on petitioning, this provision invites fraudulent applications.*

The bill provides alien parents who are abused by U.S. citizen children with the same immigration benefits as "intended spouses" (Section 7(c)(4))

*2. Expansion of Cancellation of Removal (COR) Provisions for VAWA Beneficiaries:*

H.R. 3083 provides VAWA beneficiaries with a way around virtually every current COR requirement including:

- documentation of extreme cruelty,
- continuous presence,
- good moral character,
- inadmissibility on criminal grounds,
- the extreme hardship rule,
- the annual cap on petitions, and
- the even the deadline for filing petitions.

Cancellation of removal (COR) was intended to provide discretionary relief for a very small number of aliens deportable for violations of immigration law or minor criminal convictions—capped at 4,000 per year—if their removal would cause "extreme hardship" to relatives in the U.S.

Section 3(b)(2) would remove the numerical restriction on COR cases by exempting VAWA COR applicants from the ceiling. *The consequence, in combination with other H.R. 3083 provisions creating VAWA loopholes throughout the immigration law, will be a dramatic increase in illegal alien applicants for COR and suspension of deportation status.*

Current INA 240A(b)(2)—a special VAWA provision, adopted in 1996—reduces the 7-year continuous residence standard to a 3-year continuous (unlawful) physical

presence. But the clock stops on accrual of that residence when the INS serves a Notice to Appear (NTA) on the alien. Under H.R. 3083 (Sections 3(b)(1) & (b)(3)) COR applicants who have been placed in deportation proceedings would *continue to accrue* time towards the 3-year requirement. Section 3(b)(1) would repeal the so-called "stop-time" rule, which cuts off the accrual of "continuous presence" once the INS issues an NTA. *Retroactivity of the provision back to the enactment date of IIRAIRA would affect all current cases and encourage new and reopened ones.*

Another provision (Sections 6(a) and 6(b)) would allow the INS to weaken the continuous presence/residence requirements even further by creating a waiver of continuous presence for "humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the alien demonstrates that the absences were connected to the battery or extreme cruelty forming the basis" for the COR or suspension of deportation applicants. *This broad discretionary standard for waiving the requirement is an open invitation to abuse.*

Eligibility for COR that is now limited to battered spouses and children would be greatly expanded in scope by Section 8. It would expand the "special rule" for eligibility for COR (and adjustment of status) in INA 204(b)(2) to the son or daughter of a US citizen, or an "intended spouse" of a bigamous US citizen or LPR.

Section 8(a) would also exempt VAWA COR applicants from the termination of accrual time towards the 3-year continuous residence requirement, although it refers to the NTA as a "charging document" *Considering the routine grant of continuances by immigration judges, and the statutory rights of the alien to file a motion to reconsider and a motion to reopen under 240(c), or a petition for review of removal under 242, H.R. 3083 makes it much easier for a VAWA applicant to qualify for COR within a period of time significantly shorter than three years.*

Section 8(a) is would allow the Attorney General to waive ineligibility for COR to benefit a wide range of criminals and undesirables, including aggravated felons, inadmissible criminals under INA 212(a)(2), and aliens who are deportable for major crimes or marriage fraud under INA 237(a). *Because the waiver provision invokes vague humanitarian, family unity, or public interest grounds for the proposed waiver of inadmissibility in Section 5(a), but without the restrictions on waivers in INA 212(a)(3) or 237(a)(4), the waiver authority appears to extend COR benefits even to aliens excludable on security risk and terrorist grounds.*

*Section 8(b) would make the revised special COR rules retroactive to April 1, 1997, facilitating motions to reopen removal or deportation proceedings.*

Section 8(c) retroactively permits VAWA suspension of deportation applicants to adjust the status of illegal children, spouses, adult sons and daughters, and parents (of child applicants).

*3. Elimination of Welfare Reform for VAWA Beneficiaries*

Welfare reform measures adopted in 1996 (PRWORA) would be restored for a greatly expanded class of VAWA beneficiaries. H.R. 3083 would grant subsidized legal assistance not available to most citizens and legal permanent residents. *The provisions create what amounts in practice to a preferential treatment to illegal immigrant spouses and children from tenuous or broken homes, and would reward fraudulent behavior.*

The bill exempts immediate relatives, second preference derivative immigrants, battered self- petitioners, COR and suspension of preference deportation applicants, plus derivative spouses, children, from public charge determinations (Section 10(b)). Proposed INA § 212(a)(4)(E)(ii) is particularly pernicious because it would expand the waiver to cover any person eligible to petition for classification as a family preference immigrant under INA 203(a) "who has been battered or subjected to extreme cruelty," plus "any derivatives or immediate relative children" of these persons. As written, *the provision drops the requirements that the alien be of "good moral character" and that the petitioner show "extreme hardship." This exemption would in practice benefit a much larger group than just the INA 204(a) battered aliens.*

Sections 10(d), 10(e), and 10(f) contain several related provision that would eliminate restrictions on the use by VAWA aliens of food stamps and SSI, on federal housing assistance or access to federally-funded services or shelter "provided to battered women or abused children," and exempts them from the 5 year ban on receipt by immigrants of public benefits. Sections 11(a) and 11(f) make the same class eligible for free legal assistance funded by the Legal Services Corporation. *This provision would overturn a present prohibition against LSC-funded attorneys representing illegal aliens.*

Section 10(h) would expand the term "family" in the definition of "qualified alien" eligible for public benefits and welfare from spouse, parent, and child to "any individual having a relationship with the alien covered by the civil or criminal domestic violence statutes in the State . . . in which the alien could obtain a protective

order." *Such a "covered relationship" could include remote relations, informal relations, same-sex relations, cohabiting relations, extended customary or tribal relations, lodgers, etc., depending on the jurisdiction. The uniform federal standard would be eliminated.*

Section 10(i) would also expand the definition of "qualified alien" eligible for federal, state, or local welfare to include any VAWA alien for whom welfare benefits "would alleviate the harm from such battery or cruelty or enable the alien to avoid [it] in the future." It would also add similar language to expand the grounds for exemption from the PRWORA sponsorship income deeming rule. VAWA applicants would also become eligible from PRWORA deeming requirements for purposes of suspension of deportation. A married VAWA beneficiary would become allowed to divorce her spouse and still qualify for SSI and food stamps using the spouses' qualifying "quarters" of work (Section 10(j)).

*4. Weakened Federal Enforcement of Illegal Immigration Laws*

H.R. 3083 would create a broad (and easily abused) waiver of INA provisions defining the classes of both inadmissible and removable aliens (Section 5). Waivers could be granted at the Attorney General's discretion for "humanitarian purposes, to assure family unity, or when it is otherwise in the public interest."*The very broad scope of the proposed waiver would cover "any provision" of INA 212 or 237*, keeping absolute bars only for terrorists, national security threats, polygamists, international child abductors (domestic kidnapers would apparently be eligible for the waiver), and wealthy Americans who renounced citizenship to avoid taxation. *Inadmissibility standards that could be waived would include health-related grounds; public charge grounds; labor certification qualifications; restrictions on illegal immigrants, parole violators, previously removed aliens, unlawful voters, uncertified physicians and unqualified foreign health care workers; standards for granting H1–B visas; and standards for computing prevailing wage levels.*

Even exclusion on criminal grounds and for obtaining a visa by fraud or falsely claiming citizenship could be waived by the INS if the crime was committed by a VAWA petitioner and the alien could "demonstrate a connection between the crime or disqualifying act and battery or extreme cruelty" (Section 5(a)(1)). *A "connection" is a very vague legal standard, which could cover numerous factual circumstances.* Section 5 also would make eligibility for waiver relief retroactive to April 1, 1997. *These provisions invite extensive litigation relating to pending or closed removal cases.*

Grounds for removal under INA 237 that could be waived for VAWA beneficiaries under Section 5(a)(2) include alien smuggling, marriage fraud, multiple criminal convictions, aggravated felonies, high speed flight, controlled substances laws, firearms offenses, illegal voting, smuggling for immoral purposes, *domestic violence* and *child abuse.*

The new language would form a much weaker standard than the current waiver provision in 212(h), which is limited to simple possession of 30 grams or less of marijuana, and only if exclusion would result in extreme hardship to the alien's US citizen or LPR immediate family members. A restrictive interpretation of the text would limit the waiver to battered class petitioners, but rules of statutory interpretation would favor a more expansive interpretation.

Under current law, aliens convicted of crimes of domestic violence, stalking, child abuse and violations of protective orders are deportable. Section 5(b)(5) would allow the Attorney General to waive deportability for any alien convicted of these crimes, regardless of membership in the class of battered petitioners, for "humanitarian reasons," or alternatively if the alien committed the crime in self-defense or under duress, or was not the "principal or primary perpetrator of violence in the relationship."

The bill would allow the Attorney General to disregard criminal court records and declare VAWA aliens to be of good moral character—and thus eligible for classification or relief—if the petitioner was convicted of any crime where the alien could claim "a connection between the crime and having been battered. *This makes no sense if the alien is no longer in the abusive relationship, and therefore no longer in need of protection.*

Current law exempts battered spouses and children who have entered the U.S. unlawfully from inadmissibility or removal if they can show a "substantial connection" between the battery and their illegal entry into the U.S. Section 5(b)(1) would eliminate illegal entry as a bar to admissibility or a waiver or removal for any VAW petitioner, by deleting the "substantial connection" clause entirely. *A claim of abuse would become an "open ticket" to LPR status for illegal aliens.*

Aliens who procure a visa or admission into the U.S. by fraud or misrepresentation are excludable under current law, although the rule can be waived at the dis-

cretion of the Attorney General if exclusion would result in extreme hardship to the citizen/LPR spouse or parent. Rhe bill would expand eligibility for the waiver to include parents, children, and adult sons and daughters of VAWA beneficiaries (Section 5(b)(6)(A)). Similar changes are made to waivers of deportability provisions.

*The Immigration Marriage Fraud Act is weakened by the bill* (Section 7(c)(2)) Aliens who enter the U.S. on fiance (K) visas and fail to marry within the statutory 90 days could apply for COR or suspension of deportation or self-petition to adjust status, even if they subsequently marry a third party.

*5. New Restrictions on Local and State Enforcement of Illegal Immigration Laws:*

PRWORA mandated new regulations requiring verification of proof of citizenship status by Federal agencies and states administering federally-funded programs. H.R. 3083 would prohibit state agencies that administer federal welfare programs from inquiring or collecting information about the immigration status of an alien applying for welfare benefits on behalf of a U.S. citizen or qualified alien (Section 10(g)(1)). Another Section 10 provision would bar reports of illegal aliens to the INS by the Social Security Administration, or state agencies with which it has cooperative agreements.

Section 12(b) modifies Section 133 of IIRAIRA to require that, as a matter of public policy, no cooperative agreement with local law enforcement agencies may "discourage crime victims, including victims of domestic violence," from cooperating with police and prosecutors. This appears to preclude any agreement that would allow local law enforcement to detain, or inform the INS of, illegal aliens who were "crime victims," broadly defined.

*6. New Legal Preferences Favoring VAWA Beneficiaries:*

Section 3(a) reopens the 245(i) adjustment of status loophole for "battered" illegal alien self-petitioners and their derivative relatives so that they can legalize their status to permanent resident without leaving the country. This loophole was closed on January 14, 1998.

Section 3(c) eliminates the 90 and 180-day deadlines for filing motions to reopen or rescind removal or deportation proceedings or orders imposed by IIRAIRA. This could allow large numbers of illegals to re-adjudicate their cases with no showing of changed circumstances, and benefit from the concomitant delays.

Section 4(a) would allow a VAWA self-petitioner to derivatively maintain the permanent resident or citizenship status of the abuser accused in the petition at the time of filing, regardless of the death or any negative change whatsoever in the status of the accused, except that if the change in the abuser's status is positive, the VAWA applicant's status will also be upgraded automatically.

Sections 4(c) creates a legal presumption against a U.S. citizen or LPR against whom "credible evidence" has been provided in a VAWA self-petition that requires the INS to grant a petition "notwithstanding" [any] "determination based on the petitioners actions that could result—in denial or revocation of the petition." In other words, as long as battery is alleged under this very low evidentiary standard, the citizen or LPR is stripped of the ability to oppose the proceeding.

Section 4(c) would create a preferential exemption in the Privacy Act to allow alien immediate relatives access to confidential INS files for "immigration relief or other domestic violence-related court or administrative remedies."

However, files of illegal aliens who had submitted "evidence" of battered or extreme cruelty status would be exempt from disclosure. Moreover, Section 4(d) would add a statutory requirement that state and local law enforcement agencies and prosecutors certify that their "laws, policies, and practices do not discourage or prohibit" access to information by a VAWA beneficiary regarding the immigration status of an accused abuser, while maintaining Privacy Act protections for the illegal VAWA beneficiaries.

Section 13 would create a new "T" visa category for aliens "who have suffered substantial physical or mental abuse as a result of . . . criminal or other unlawful activity." Although there is a provision for supplying information to law enforcement officials, *this is an even looser requirement than the "credible evidence of battery or extreme cruelty" standard to be used for other VAWA beneficiaries. The bill is similar to, but with much weaker program controls, than H.R. 3244.*

*7. New "Amnesties" for VAWA Beneficiaries from Cuba, Central America, and Haiti:*

Section 14(a) exempts a "battered" child or spouse of a Cuban applicant for LPR status under the preferential rules of the Cuban Adjustment Act from the requirement that the spouse or child reside with the applicant in the United States.

Sections 15 and 16 extend eligibility for relief for derivative aliens who were at the time of application the spouse, child or unmarried son or daughter of a Central

American, Cuban, and Haitian who has adjusted status under NACARA or HRIFA, if the derivative alien was battered or subject to extreme cruelty.

*Other Harmful Provisions*

Sections 14, 15 and 16 all require the INS to accept "any credible evidence" in processing applications from VAWA applicants, a very low evidentiary standard that will encourage and abet fraud and abuse in these amnesty programs.

The current requirement that self-petitioners must be legally married to the abuser at the time the petition is filed is replaced with a provision that allows filing of a self-petition up to two years *after* a divorce from, or death of, or loss of legal immigration status of the abusive US citizen or LPR.

The bill weakens the Immigration Marriage Fraud Act by allowing women who enter the U.S. on fiance (K) visas sponsored by citizens or LPRs and who fail to marry within the statutory 90 days to self-petition for VAWA adjustment of status, even if they subsequently marry a third party (Section 7(c)(2)). The current anti-fraud requirement that fiances and their children remain in conditional status for two years and then file a battered spouse waiver to adjust to permanent status is eliminated by Section 4(b). *Elimination of the requirement for the putative fiance to document a battered spouse waiver will inhibit investigation of marriage fraud.*

The categories of aliens who gain immigration benefits under this bill are greatly expanded beyond the provisions in current law. Those who will gain access to LPR status include aliens 21 or older for whom a VAWA petition was filed—either directly as an abused child, or as a derivative child of a battered spouse—before the child turned 21.

These adults who are treated as children are provided self-petitioning rights on a similar basis to "intended spouses," as long as they have spent at least "any period of visitation" with the abusive citizen parent. These "children" can include their own children (i.e. the abusive parent's grandchildren) on their petition. Another provision in Section 7 would allow adult sons and daughters of U.S. citizens and LPRs to self-petition for adjustment of status if at least one incident of battery occurred before the petitioner was 21. *With no time limits on petitioning, this provision invites fraudulent applications.*

In addition to the adult "children," Section 7 also extends VAWA self-petitioning to alien parents who have been abused by U.S. citizen children on the same basis as "intended spouses." No evidence has been introduced that establishes a need for these protections, and they simply open up new avenues of immigration to the United States for persons who would otherwise be ineligible for visa.

*Conclusion*

Mr. Chairman, the above lengthy listing of serious problems that would be created by H.R.3083 is not exhaustive. The bill contains so many new features with far-reaching implications that it would be difficult to unravel all of them in my testimony. Nevertheless, the above survey should serve to indicate the gravity of the implications that would be unleashed if this legislation were enacted.

The American public demands increased respect for the nation's immigration laws and a reduction in today's mass immigration. This bill would weaken those laws, further overburden the enforcement and adjudications capability of the INS, increase the ease of fraudulent access to residence in this country by illegal aliens, and increase the number of people able to immigrate to this country by backdoor provisions.

We trust that this Subcommittee will withhold its approval of this bill and use its expertise to eliminate any of these harmful provisions if they should be introduced elsewhere.

---

[NOTE: Statistical information provided to Chairman Smith by the Executive Office for Immigration Review is on file with the Judiciary Committee's Subcommittee on Immigration and Claims.]

[NOTE: Statistical information provided to Chairman Smith by the Immigration and Naturalization Service is on file with the Judiciary Committee's Subcommittee on Immigration and Claims.]

○



AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

IIB

117TH CONGRESS
1ST SESSION

# H. R. 6

IN THE SENATE OF THE UNITED STATES

MARCH 22, 2021
Received; read twice and referred to the Committee on the Judiciary

# AN ACT

To authorize the cancellation of removal and adjustment of status of certain aliens, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 99 of 513

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the ‘‘American Dream and Promise Act of 2021’’.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—DREAM ACT OF 2021

Sec. 101. Short title.
Sec. 102. Permanent resident status on a conditional basis for certain long-term residents who entered the united states as children.
Sec. 103. Terms of permanent resident status on a conditional basis.
Sec. 104. Removal of conditional basis of permanent resident status.
Sec. 105. Restoration of State option to determine residency for purposes of higher education benefits.

TITLE II—AMERICAN PROMISE ACT OF 2021

Sec. 201. Short title.
Sec. 202. Adjustment of status for certain nationals of certain countries designated for temporary protected status or deferred enforced departure.
Sec. 203. Clarification.

TITLE III—GENERAL PROVISIONS

Sec. 301. Definitions.
Sec. 302. Submission of biometric and biographic data; background checks.
Sec. 303. Limitation on removal; application and fee exemption; and other conditions on eligible individuals.
Sec. 304. Determination of continuous presence and residence.
Sec. 305. Exemption from numerical limitations.
Sec. 306. Availability of administrative and judicial review.
Sec. 307. Documentation requirements.
Sec. 308. Rule making.
Sec. 309. Confidentiality of information.
Sec. 310. Grant program to assist eligible applicants.
Sec. 311. Provisions affecting eligibility for adjustment of status.
Sec. 312. Supplementary surcharge for appointed counsel.
Sec. 313. Annual report on provisional denial authority.

# TITLE I—DREAM ACT OF 2021

**SEC. 101. SHORT TITLE.**

This title may be cited as the ‘‘Dream Act of 2021’’.

AR2022_400099

**SEC. 102. PERMANENT RESIDENT STATUS ON A CONDITIONAL BASIS FOR CERTAIN LONG-TERM RESIDENTS WHO ENTERED THE UNITED STATES AS CHILDREN.**

(a) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of law, and except as provided in section 104(c)(2), an alien shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence under this section, to have obtained such status on a conditional basis subject to the provisions of this title.

(b) REQUIREMENTS.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary or the Attorney General shall adjust to the status of an alien lawfully admitted for permanent residence on a conditional basis, or without the conditional basis as provided in section 104(c)(2), an alien who is inadmissible or deportable from the United States, is subject to a grant of Deferred Enforced Departure, has temporary protected status under section 244 of the Immigration and Nationality Act (8 U.S.C. 1254a), or is the son or daughter of an alien admitted as a nonimmigrant under subparagraphs (E)(i), (E)(ii), (H)(i)(b), or (L) of section 101(a)(15) of such Act (8 U.S.C. 1101(a)(15)) if—

(A) the alien has been continuously physically present in the United States since January 1, 2021;

(B) the alien was 18 years of age or younger on the date on which the alien entered the United States and has continuously resided in the United States since such entry;

(C) the alien—

(i) subject to paragraph (2), is not inadmissible under paragraph (1), (6)(E), (6)(G), (8), or (10) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a));

(ii) has not ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(iii) is not barred from adjustment of status under this title based on the criminal and national security grounds described under subsection (c), subject to the provisions of such subsection; and

(D) the alien—

(i) has been admitted to an institution of higher education;

(ii) has been admitted to an area career and technical education school at the postsecondary level;

(iii) in the United States, has obtained—

(I) a high school diploma or a commensurate alternative award from a public or private high school;

(II) a General Education Development credential, a high school equivalency diploma recognized under State law, or another similar State-authorized credential;

(III) a credential or certificate from an area career and technical education school at the secondary level; or

(IV) a recognized postsecondary credential; or

(iv) is enrolled in secondary school or in an education program assisting students in—

(I) obtaining a high school diploma or its recognized equivalent under State law;

(II) passing the General Education Development test, a high school equivalence diploma examination, or other similar State-authorized exam;

(III) obtaining a certificate or credential from an area career and technical education school providing education at the secondary level; or

(IV) obtaining a recognized postsecondary credential.

(2) WAIVER OF GROUNDS OF INADMISSIBILITY.—With respect to any benefit under this title, and in addition to the waivers under subsection (c)(2), the Secretary may waive the grounds of inadmissibility under paragraph (1), (6)(E), (6)(G), or (10)(D) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a)) for humanitarian purposes, for family unity, or because the waiver is otherwise in the public interest.

(3) APPLICATION FEE.—

(A) IN GENERAL.—The Secretary may, subject to an exemption under section 303(c),

require an alien applying under this section to pay a reasonable fee that is commensurate with the cost of processing the application but does not exceed $495.00.

(B) SPECIAL PROCEDURES FOR APPLICANTS WITH DACA.—The Secretary shall establish a streamlined procedure for aliens who have been granted DACA and who meet the requirements for renewal (under the terms of the program in effect on January 1, 2017) to apply for adjustment of status to that of an alien lawfully admitted for permanent residence on a conditional basis under this section, or without the conditional basis as provided in section 104(c)(2). Such procedure shall not include a requirement that the applicant pay a fee, except that the Secretary may require an applicant who meets the requirements for lawful permanent residence without the conditional basis under section 104(c)(2) to pay a fee that is commensurate with the cost of processing the application, subject to the exemption under section 303(c).

(4) BACKGROUND CHECKS.—The Secretary may not grant an alien permanent resident status on

a conditional basis under this section until the requirements of section 302 are satisfied.

(5) MILITARY SELECTIVE SERVICE.—An alien applying for permanent resident status on a conditional basis under this section, or without the conditional basis as provided in section 104(c)(2), shall establish that the alien has registered under the Military Selective Service Act (50 U.S.C. 3801 et seq.), if the alien is subject to registration under such Act.

(c) CRIMINAL AND NATIONAL SECURITY BARS.—

(1) GROUNDS OF INELIGIBILITY.—Except as provided in paragraph (2), an alien is ineligible for adjustment of status under this title (whether on a conditional basis or without the conditional basis as provided in section 104(c)(2)) if any of the following apply:

(A) The alien is inadmissible under paragraph (2) or (3) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a)).

(B) Excluding any offense under State law for which an essential element is the alien's immigration status, and any minor traffic offense, the alien has been convicted of—

(i) any felony offense;

(ii) three or more misdemeanor offenses (excluding simple possession of cannabis or cannabis-related paraphernalia, any offense involving cannabis or cannabis-related paraphernalia which is no longer prosecutable in the State in which the conviction was entered, and any offense involving civil disobedience without violence) not occurring on the same date, and not arising out of the same act, omission, or scheme of misconduct; or

(iii) a misdemeanor offense of domestic violence, unless the alien demonstrates that such crime is related to the alien having been—

(I) a victim of domestic violence, sexual assault, stalking, child abuse or neglect, abuse or neglect in later life, or human trafficking;

(II) battered or subjected to extreme cruelty; or

(III) a victim of criminal activity described in section 101(a)(15)(U)(iii) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(U)(iii)).

(2) WAIVERS FOR CERTAIN MISDEMEANORS.—For humanitarian purposes, family unity, or if otherwise in the public interest, the Secretary may—

(A) waive the grounds of inadmissibility under subparagraphs (A), (C), and (D) of section 212(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(2)), unless the conviction forming the basis for inadmissibility would otherwise render the alien ineligible under paragraph (1)(B) (subject to subparagraph (B)); and

(B) for purposes of clauses (ii) and (iii) of paragraph (1)(B), waive consideration of—

(i) one misdemeanor offense if the alien has not been convicted of any offense in the 5-year period preceding the date on which the alien applies for adjustment of status under this title; or

(ii) up to two misdemeanor offenses if the alien has not been convicted of any offense in the 10-year period preceding the date on which the alien applies for adjustment of status under this title.

(3) AUTHORITY TO CONDUCT SECONDARY REVIEW.—

(A) IN GENERAL.—Notwithstanding an alien's eligibility for adjustment of status under this title, and subject to the procedures described in this paragraph, the Secretary may, as a matter of non-delegable discretion, provisionally deny an application for adjustment of status (whether on a conditional basis or without the conditional basis as provided in section 104(c)(2)) if the Secretary, based on clear and convincing evidence, which shall include credible law enforcement information, determines that the alien is described in subparagraph (B) or (D).

(B) PUBLIC SAFETY.—An alien is described in this subparagraph if—

(i) excluding simple possession of cannabis or cannabis-related paraphernalia, any offense involving cannabis or cannabis-related paraphernalia which is no longer prosecutable in the State in which the conviction was entered, any offense under State law for which an essential element is the alien's immigration status, any offense involving civil disobedience without vio-

lence, and any minor traffic offense, the alien—

(I) has been convicted of a misdemeanor offense punishable by a term of imprisonment of more than 30 days; or

(II) has been adjudicated delinquent in a State or local juvenile court proceeding that resulted in a disposition ordering placement in a secure facility; and

(ii) the alien poses a significant and continuing threat to public safety related to such conviction or adjudication.

(C) PUBLIC SAFETY DETERMINATION.—For purposes of subparagraph (B)(ii), the Secretary shall consider the recency of the conviction or adjudication; the length of any imposed sentence or placement; the nature and seriousness of the conviction or adjudication, including whether the elements of the offense include the unlawful possession or use of a deadly weapon to commit an offense or other conduct intended to cause serious bodily injury; and any miti-

gating factors pertaining to the alien's role in the commission of the offense.

(D) GANG PARTICIPATION.—An alien is described in this subparagraph if the alien has, within the 5 years immediately preceding the date of the application, knowingly, willfully, and voluntarily participated in offenses committed by a criminal street gang (as described in subsections (a) and (c) of section 521 of title 18, United States Code) with the intent to promote or further the commission of such offenses.

(E) EVIDENTIARY LIMITATION.—For purposes of subparagraph (D), allegations of gang membership obtained from a State or Federal in-house or local database, or a network of databases used for the purpose of recording and sharing activities of alleged gang members across law enforcement agencies, shall not establish the participation described in such paragraph.

(F) NOTICE.—

(i) IN GENERAL.—Prior to rendering a discretionary decision under this paragraph, the Secretary shall provide written notice of the intent to provisionally deny

the application to the alien (or the alien's counsel of record, if any) by certified mail and, if an electronic mail address is provided, by electronic mail (or other form of electronic communication). Such notice shall—

(I) articulate with specificity all grounds for the preliminary determination, including the evidence relied upon to support the determination; and

(II) provide the alien with not less than 90 days to respond.

(ii) SECOND NOTICE.—Not more than 30 days after the issuance of the notice under clause (i), the Secretary shall provide a second written notice that meets the requirements of such clause.

(iii) NOTICE NOT RECEIVED.—Notwithstanding any other provision of law, if an applicant provides good cause for not contesting a provisional denial under this paragraph, including a failure to receive notice as required under this subparagraph, the Secretary shall, upon a motion

filed by the alien, reopen an application for adjustment of status under this title and allow the applicant an opportunity to respond, consistent with clause (i)(II).

(G) JUDICIAL REVIEW OF A PROVISIONAL DENIAL.—

(i) IN GENERAL.—Notwithstanding any other provision of law, if, after notice and the opportunity to respond under subparagraph (F), the Secretary provisionally denies an application for adjustment of status under this Act, the alien shall have 60 days from the date of the Secretary's determination to seek review of such determination in an appropriate United States district court.

(ii) SCOPE OF REVIEW AND DECISION.—Notwithstanding any other provision of law, review under paragraph (1) shall be de novo and based solely on the administrative record, except that the applicant shall be given the opportunity to supplement the administrative record and the Secretary shall be given the opportunity to rebut the evidence and arguments

raised in such submission. Upon issuing its decision, the court shall remand the matter, with appropriate instructions, to the Department of Homeland Security to render a final decision on the application.

(iii) APPOINTED COUNSEL.—Notwithstanding any other provision of law, an applicant seeking judicial review under clause (i) shall be represented by counsel. Upon the request of the applicant, counsel shall be appointed for the applicant, in accordance with procedures to be established by the Attorney General within 90 days of the date of the enactment of this Act, and shall be funded in accordance with fees collected and deposited in the Immigration Counsel Account under section 312.

(4) DEFINITIONS.—For purposes of this subsection—

(A) the term "felony offense" means an offense under Federal or State law that is punishable by a maximum term of imprisonment of more than 1 year;

(B) the term "misdemeanor offense" means an offense under Federal or State law

that is punishable by a term of imprisonment of more than 5 days but not more than 1 year; and

(C) the term ''crime of domestic violence'' means any offense that has as an element the use, attempted use, or threatened use of physical force against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian Tribal government, or unit of local government.

(d) LIMITATION ON REMOVAL OF CERTAIN ALIEN MINORS.—An alien who is 18 years of age or younger and meets the requirements under subparagraphs (A), (B), and (C) of subsection (b)(1) shall be provided a reasonable opportunity to meet the educational requirements under

subparagraph (D) of such subsection. The Attorney General or the Secretary may not commence or continue with removal proceedings against such an alien.

(e) WITHDRAWAL OF APPLICATION.—The Secretary shall, upon receipt of a request to withdraw an application for adjustment of status under this section, cease processing of the application, and close the case. Withdrawal of the application under this subsection shall not prejudice any future application filed by the applicant for any immigration benefit under this title or under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

**SEC. 103. TERMS OF PERMANENT RESIDENT STATUS ON A CONDITIONAL BASIS.**

(a) PERIOD OF STATUS.—Permanent resident status on a conditional basis is—

(1) valid for a period of 10 years, unless such period is extended by the Secretary; and

(2) subject to revocation under subsection (c).

(b) NOTICE OF REQUIREMENTS.—At the time an alien obtains permanent resident status on a conditional basis, the Secretary shall provide notice to the alien regarding the provisions of this title and the requirements to have the conditional basis of such status removed.

(c) REVOCATION OF STATUS.—The Secretary may revoke the permanent resident status on a conditional basis of an alien only if the Secretary—

(1) determines that the alien ceases to meet the requirements under section 102(b)(1)(C); and

(2) prior to the revocation, provides the alien—

(A) notice of the proposed revocation; and

(B) the opportunity for a hearing to provide evidence that the alien meets such requirements or otherwise to contest the proposed revocation.

(d) RETURN TO PREVIOUS IMMIGRATION STATUS.—An alien whose permanent resident status on a conditional basis expires under subsection (a)(1) or is revoked under subsection (c), shall return to the immigration status that the alien had immediately before receiving permanent resident status on a conditional basis.

**SEC. 104. REMOVAL OF CONDITIONAL BASIS OF PERMANENT RESIDENT STATUS.**

(a) ELIGIBILITY FOR REMOVAL OF CONDITIONAL BASIS.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall remove the conditional basis of an alien's permanent resident status granted under

this title and grant the alien status as an alien lawfully admitted for permanent residence if the alien—

(A) is described in section 102(b)(1)(C);

(B) has not abandoned the alien's residence in the United States during the period in which the alien has permanent resident status on a conditional basis; and

(C)(i) has obtained a degree from an institution of higher education, or has completed at least 2 years, in good standing, of a program in the United States leading to a bachelor's degree or higher degree or a recognized postsecondary credential from an area career and technical education school providing education at the postsecondary level;

(ii) has served in the Uniformed Services for at least 2 years and, if discharged, received an honorable discharge; or

(iii) demonstrates earned income for periods totaling at least 3 years and at least 75 percent of the time that the alien has had a valid employment authorization, except that, in the case of an alien who was enrolled in an institution of higher education, an area career and technical education school to obtain a rec-

ognized postsecondary credential, or an education program described in section 102(b)(1)(D)(iii), the Secretary shall reduce such total 3-year requirement by the total of such periods of enrollment.

(2) HARDSHIP EXCEPTION.—The Secretary shall remove the conditional basis of an alien's permanent resident status and grant the alien status as an alien lawfully admitted for permanent residence if the alien—

(A) satisfies the requirements under subparagraphs (A) and (B) of paragraph (1);

(B) demonstrates compelling circumstances for the inability to satisfy the requirements under subparagraph (C) of such paragraph; and

(C) demonstrates that—

(i) the alien has a disability;

(ii) the alien is a full-time caregiver; or

(iii) the removal of the alien from the United States would result in hardship to the alien or the alien's spouse, parent, or child who is a national of the United States or is lawfully admitted for permanent residence.

(3) CITIZENSHIP REQUIREMENT.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the conditional basis of an alien's permanent resident status granted under this title may not be removed unless the alien demonstrates that the alien satisfies the requirements under section 312(a) of the Immigration and Nationality Act (8 U.S.C. 1423(a)).

(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien who is unable to meet the requirements under such section 312(a) due to disability.

(4) APPLICATION FEE.—The Secretary may, subject to an exemption under section 303(c), require aliens applying for removal of the conditional basis of an alien's permanent resident status under this section to pay a reasonable fee that is commensurate with the cost of processing the application.

(5) BACKGROUND CHECKS.—The Secretary may not remove the conditional basis of an alien's permanent resident status until the requirements of section 302 are satisfied.

(b) TREATMENT FOR PURPOSES OF NATURALIZATION.—

(1) IN GENERAL.—For purposes of title III of the Immigration and Nationality Act (8 U.S.C. 1401 et seq.), an alien granted permanent resident status on a conditional basis shall be considered to have been admitted to the United States, and be present in the United States, as an alien lawfully admitted for permanent residence.

(2) LIMITATION ON APPLICATION FOR NATURALIZATION.—An alien may not apply for naturalization while the alien is in permanent resident status on a conditional basis.

(c) TIMING OF APPROVAL OF LAWFUL PERMANENT RESIDENT STATUS.—

(1) IN GENERAL.—An alien granted permanent resident status on a conditional basis under this title may apply to have such conditional basis removed at any time after such alien has met the eligibility requirements set forth in subsection (a).

(2) APPROVAL WITH REGARD TO INITIAL APPLICATIONS.—

(A) IN GENERAL.—Notwithstanding any other provision of law, the Secretary or the Attorney General shall adjust to the status of an alien lawfully admitted for permanent resident

status without conditional basis, any alien who—

(i) demonstrates eligibility for lawful permanent residence status on a conditional basis under section 102(b); and

(ii) subject to the exceptions described in subsections (a)(2) and (a)(3)(B) of this section, already has fulfilled the requirements of paragraphs (1) and (3) of subsection (a) of this section at the time such alien first submits an application for benefits under this title.

(B) BACKGROUND CHECKS.—Subsection (a)(5) shall apply to an alien seeking lawful permanent resident status without conditional basis in an initial application in the same manner as it applies to an alien seeking removal of the conditional basis of an alien's permanent resident status. Section 102(b)(4) shall not be construed to require the Secretary to conduct more than one identical security or law enforcement background check on such an alien.

(C) APPLICATION FEES.—In the case of an alien seeking lawful permanent resident status without conditional basis in an initial applica-

tion, the alien shall pay the fee required under subsection (a)(4), subject to the exemption allowed under section 303(c), but shall not be required to pay the application fee under section 102(b)(3).

**SEC. 105. RESTORATION OF STATE OPTION TO DETERMINE RESIDENCY FOR PURPOSES OF HIGHER EDUCATION BENEFITS.**

(a) IN GENERAL.—Section 505 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1623) is repealed.

(b) EFFECTIVE DATE.—The repeal under subsection (a) shall take effect as if included in the original enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 110 Stat. 3009–546).

# TITLE II—AMERICAN PROMISE ACT OF 2021

**SEC. 201. SHORT TITLE.**

This title may be cited as the ''American Promise Act of 2021''.

**SEC. 202. ADJUSTMENT OF STATUS FOR CERTAIN NATIONALS OF CERTAIN COUNTRIES DESIGNATED FOR TEMPORARY PROTECTED STATUS OR DEFERRED ENFORCED DEPARTURE.**

(a) IN GENERAL.—Notwithstanding any other provision of law, the Secretary or the Attorney General shall adjust to the status of an alien lawfully admitted for permanent residence, an alien described in subsection (b) if the alien—

(1) applies for such adjustment, including submitting any required documents under section 307, not later than 3 years after the date of the enactment of this Act;

(2) has been continuously physically present in the United States for a period of not less than 3 years; and

(3) subject to subsection (c), is not inadmissible under paragraph (1), (2), (3), (6)(D), (6)(E), (6)(F), (6)(G), (8), or (10) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a)).

(b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—An alien shall be eligible for adjustment of status under this section if the alien is an individual—

(1) who—

(A) is a national of a foreign state (or part thereof) (or in the case of an alien having no nationality, is a person who last habitually resided in such state) with a designation under subsection (b) of section 244 of the Immigration and Nationality Act (8 U.S.C. 1254a(b)) on January 1, 2017, who had or was otherwise eligible for temporary protected status on such date notwithstanding subsections (c)(1)(A)(iv) and (c)(3)(C) of such section; and

(B) has not engaged in conduct since such date that would render the alien ineligible for temporary protected status under section 244(c)(2) of the Immigration and Nationality Act (8 U.S.C. 1245a(c)(2)); or

(2) who was eligible for Deferred Enforced Departure as of January 20, 2021 and has not engaged in conduct since that date that would render the alien ineligible for Deferred Enforced Departure.

(c) WAIVER OF GROUNDS OF INADMISSIBILITY.—

(1) IN GENERAL.—Except as provided in paragraph (2), with respect to any benefit under this title, and in addition to any waivers that are otherwise available, the Secretary may waive the grounds of inadmissibility under paragraph (1), subpara-

graphs (A), (C), and (D) of paragraph (2), subparagraphs (D) through (G) of paragraph (6), or paragraph (10)(D) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a)) for humanitarian purposes, for family unity, or because the waiver is otherwise in the public interest.

(2) EXCEPTION.—The Secretary may not waive a ground described in paragraph (1) if such inadmissibility is based on a conviction or convictions, and such conviction or convictions would otherwise render the alien ineligible under section 244(c)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1254a(c)(2)(B)).

(d) APPLICATION.—

(1) FEE.—The Secretary shall, subject to an exemption under section 303(c), require an alien applying for adjustment of status under this section to pay a reasonable fee that is commensurate with the cost of processing the application, but does not exceed $1,140.

(2) BACKGROUND CHECKS.—The Secretary may not grant an alien permanent resident status on a conditional basis under this section until the requirements of section 302 are satisfied.

(3) WITHDRAWAL OF APPLICATION.—The Secretary of Homeland Security shall, upon receipt of a request to withdraw an application for adjustment of status under this section, cease processing of the application and close the case. Withdrawal of the application under this subsection shall not prejudice any future application filed by the applicant for any immigration benefit under this title or under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

**SEC. 203. CLARIFICATION.**

Section 244(f)(4) of the Immigration and Nationality Act (8 U.S.C. 1254a(f)(4)) is amended by inserting after ''considered'' the following: ''as having been inspected and admitted into the United States, and''.

# TITLE III—GENERAL PROVISIONS

**SEC. 301. DEFINITIONS.**

(a) IN GENERAL.—In this Act:

(1) IN GENERAL.—Except as otherwise specifically provided, any term used in this Act that is used in the immigration laws shall have the meaning given such term in the immigration laws.

(2) APPROPRIATE UNITED STATES DISTRICT COURT.—The term ''appropriate United States dis-

trict court'' means the United States District Court for the District of Columbia or the United States district court with jurisdiction over the alien's principal place of residence.

(3) AREA CAREER AND TECHNICAL EDUCATION SCHOOL.—The term ''area career and technical education school'' has the meaning given such term in section 3 of the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2302).

(4) DACA.—The term ''DACA'' means deferred action granted to an alien pursuant to the Deferred Action for Childhood Arrivals policy announced by the Secretary of Homeland Security on June 15, 2012.

(5) DISABILITY.—The term ''disability'' has the meaning given such term in section 3(1) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102(1)).

(6) FEDERAL POVERTY LINE.—The term ''Federal poverty line'' has the meaning given such term in section 213A(h) of the Immigration and Nationality Act (8 U.S.C. 1183a).

(7) HIGH SCHOOL; SECONDARY SCHOOL.—The terms ''high school'' and ''secondary school'' have the meanings given such terms in section 8101 of

the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801).

(8) IMMIGRATION LAWS.—The term "immigration laws" has the meaning given such term in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17)).

(9) INSTITUTION OF HIGHER EDUCATION.—The term "institution of higher education"—

(A) except as provided in subparagraph (B), has the meaning given such term in section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002); and

(B) does not include an institution of higher education outside of the United States.

(10) RECOGNIZED POSTSECONDARY CREDENTIAL.—The term "recognized postsecondary credential" has the meaning given such term in section 3 of the Workforce Innovation and Opportunity Act (29 U.S.C. 3102).

(11) SECRETARY.—Except as otherwise specifically provided, the term "Secretary" means the Secretary of Homeland Security.

(12) UNIFORMED SERVICES.—The term "Uniformed Services" has the meaning given the term

"uniformed services" in section 101(a) of title 10, United States Code.

(b) TREATMENT OF EXPUNGED CONVICTIONS.—For purposes of adjustment of status under this Act, the terms "convicted" and "conviction", as used in this Act and in sections 212 and 244 of the Immigration and Nationality Act (8 U.S.C. 1182, 1254a), do not include a judgment that has been expunged or set aside, that resulted in a rehabilitative disposition, or the equivalent.

**SEC. 302. SUBMISSION OF BIOMETRIC AND BIOGRAPHIC DATA; BACKGROUND CHECKS.**

(a) SUBMISSION OF BIOMETRIC AND BIOGRAPHIC DATA.—The Secretary may not grant an alien adjustment of status under this Act, on either a conditional or permanent basis, unless the alien submits biometric and biographic data, in accordance with procedures established by the Secretary. The Secretary shall provide an alternative procedure for aliens who are unable to provide such biometric or biographic data because of a physical impairment.

(b) BACKGROUND CHECKS.—The Secretary shall use biometric, biographic, and other data that the Secretary determines appropriate to conduct security and law enforcement background checks and to determine whether there is any criminal, national security, or other factor

that would render the alien ineligible for adjustment of status under this Act, on either a conditional or permanent basis. The status of an alien may not be adjusted, on either a conditional or permanent basis, unless security and law enforcement background checks are completed to the satisfaction of the Secretary.

**SEC. 303. LIMITATION ON REMOVAL; APPLICATION AND FEE EXEMPTION; AND OTHER CONDITIONS ON ELIGIBLE INDIVIDUALS.**

(a) LIMITATION ON REMOVAL.—An alien who appears to be prima facie eligible for relief under this Act shall be given a reasonable opportunity to apply for such relief and may not be removed until, subject to section 306(c)(2), a final decision establishing ineligibility for relief is rendered.

(b) APPLICATION.—An alien present in the United States who has been ordered removed or has been permitted to depart voluntarily from the United States may, notwithstanding such order or permission to depart, apply for adjustment of status under this Act. Such alien shall not be required to file a separate motion to reopen, reconsider, or vacate the order of removal. If the Secretary approves the application, the Secretary shall cancel the order of removal. If the Secretary renders a final administrative decision to deny the application, the order of removal or

permission to depart shall be effective and enforceable to the same extent as if the application had not been made, only after all available administrative and judicial remedies have been exhausted.

(c) FEE EXEMPTION.—An applicant may be exempted from paying an application fee required under this Act if the applicant—

(1) is 18 years of age or younger;

(2) received total income, during the 12-month period immediately preceding the date on which the applicant files an application under this Act, that is less than 150 percent of the Federal poverty line;

(3) is in foster care or otherwise lacks any parental or other familial support; or

(4) cannot care for himself or herself because of a serious, chronic disability.

(d) ADVANCE PAROLE.—During the period beginning on the date on which an alien applies for adjustment of status under this Act and ending on the date on which the Secretary makes a final decision regarding such application, the alien shall be eligible to apply for advance parole. Section 101(g) of the Immigration and Nationality Act (8 U.S.C. 1101(g)) shall not apply to an alien granted advance parole under this Act.

(e) EMPLOYMENT.—An alien whose removal is stayed pursuant to this Act, who may not be placed in removal proceedings pursuant to this Act, or who has pending an application under this Act, shall, upon application to the Secretary, be granted an employment authorization document.

**SEC. 304. DETERMINATION OF CONTINUOUS PRESENCE AND RESIDENCE.**

(a) EFFECT OF NOTICE TO APPEAR.—Any period of continuous physical presence or continuous residence in the United States of an alien who applies for permanent resident status under this Act (whether on a conditional basis or without the conditional basis as provided in section 104(c)(2)) shall not terminate when the alien is served a notice to appear under section 239(a) of the Immigration and Nationality Act (8 U.S.C. 1229(a)).

(b) TREATMENT OF CERTAIN BREAKS IN PRESENCE OR RESIDENCE.—

(1) IN GENERAL.—Except as provided in paragraphs (2) and (3), an alien shall be considered to have failed to maintain—

(A) continuous physical presence in the United States under this Act if the alien has departed from the United States for any period

exceeding 90 days or for any periods, in the aggregate, exceeding 180 days; and

(B) continuous residence in the United States under this Act if the alien has departed from the United States for any period exceeding 180 days, unless the alien establishes to the satisfaction of the Secretary of Homeland Security that the alien did not in fact abandon residence in the United States during such period.

(2) EXTENSIONS FOR EXTENUATING CIRCUMSTANCES.—The Secretary may extend the time periods described in paragraph (1) for an alien who demonstrates that the failure to timely return to the United States was due to extenuating circumstances beyond the alien's control, including—

(A) the serious illness of the alien;

(B) death or serious illness of a parent, grandparent, sibling, or child of the alien;

(C) processing delays associated with the application process for a visa or other travel document; or

(D) restrictions on international travel due to the public health emergency declared by the Secretary of Health and Human Services under

section 319 of the Public Health Service Act (42 U.S.C. 247d) with respect to COVID–19.

(3) TRAVEL AUTHORIZED BY THE SECRETARY.—Any period of travel outside of the United States by an alien that was authorized by the Secretary may not be counted toward any period of departure from the United States under paragraph (1).

(c) WAIVER OF PHYSICAL PRESENCE.—With respect to aliens who were removed or departed the United States on or after January 20, 2017, and who were continuously physically present in the United States for at least 4 years prior to such removal or departure, the Secretary may, as a matter of discretion, waive the physical presence requirement under section 102(b)(1)(A) or section 202(a)(2) for humanitarian purposes, for family unity, or because a waiver is otherwise in the public interest. The Secretary, in consultation with the Secretary of State, shall establish a procedure for such aliens to apply for relief under section 102 or 202 from outside the United States if they would have been eligible for relief under such section, but for their removal or departure.

**SEC. 305. EXEMPTION FROM NUMERICAL LIMITATIONS.**

Nothing in this Act or in any other law may be construed to apply a numerical limitation on the number of

aliens who may be granted permanent resident status under this Act (whether on a conditional basis, or without the conditional basis as provided in section 104(c)(2)).

**SEC. 306. AVAILABILITY OF ADMINISTRATIVE AND JUDICIAL REVIEW.**

(a) ADMINISTRATIVE REVIEW.—Not later than 30 days after the date of the enactment of this Act, the Secretary shall provide to aliens who have applied for adjustment of status under this Act a process by which an applicant may seek administrative appellate review of a denial of an application for adjustment of status, or a revocation of such status.

(b) JUDICIAL REVIEW.—Except as provided in subsection (c), and notwithstanding any other provision of law, an alien may seek judicial review of a denial of an application for adjustment of status, or a revocation of such status, under this Act in an appropriate United States district court.

(c) STAY OF REMOVAL.—

(1) IN GENERAL.—Except as provided in paragraph (2), an alien seeking administrative or judicial review under this Act may not be removed from the United States until a final decision is rendered establishing that the alien is ineligible for adjustment of status under this Act.

(2) EXCEPTION.—The Secretary may remove an alien described in paragraph (1) pending judicial review if such removal is based on criminal or national security grounds described in this Act. Such removal shall not affect the alien's right to judicial review under this Act. The Secretary shall promptly return a removed alien if a decision to deny an application for adjustment of status under this Act, or to revoke such status, is reversed.

**SEC. 307. DOCUMENTATION REQUIREMENTS.**

(a) DOCUMENTS ESTABLISHING IDENTITY.—An alien's application for permanent resident status under this Act (whether on a conditional basis, or without the conditional basis as provided in section 104(c)(2)) may include, as evidence of identity, the following:

(1) A passport or national identity document from the alien's country of origin that includes the alien's name and the alien's photograph or fingerprint.

(2) The alien's birth certificate and an identity card that includes the alien's name and photograph.

(3) A school identification card that includes the alien's name and photograph, and school records showing the alien's name and that the alien is or was enrolled at the school.

(4) A Uniformed Services identification card issued by the Department of Defense.

(5) Any immigration or other document issued by the United States Government bearing the alien's name and photograph.

(6) A State-issued identification card bearing the alien's name and photograph.

(7) Any other evidence determined to be credible by the Secretary.

(b) DOCUMENTS ESTABLISHING ENTRY, CONTINUOUS PHYSICAL PRESENCE, LACK OF ABANDONMENT OF RESIDENCE.—To establish that an alien was 18 years of age or younger on the date on which the alien entered the United States, and has continuously resided in the United States since such entry, as required under section 102(b)(1)(B), that an alien has been continuously physically present in the United States, as required under section 102(b)(1)(A) or 202(a)(2), or that an alien has not abandoned residence in the United States, as required under section 104(a)(1)(B), the alien may submit the following forms of evidence:

(1) Passport entries, including admission stamps on the alien's passport.

(2) Any document from the Department of Justice or the Department of Homeland Security noting the alien's date of entry into the United States.

(3) Records from any educational institution the alien has attended in the United States.

(4) Employment records of the alien that include the employer's name and contact information, or other records demonstrating earned income.

(5) Records of service from the Uniformed Services.

(6) Official records from a religious entity confirming the alien's participation in a religious ceremony.

(7) A birth certificate for a child who was born in the United States.

(8) Hospital or medical records showing medical treatment or hospitalization, the name of the medical facility or physician, and the date of the treatment or hospitalization.

(9) Automobile license receipts or registration.

(10) Deeds, mortgages, or rental agreement contracts.

(11) Rent receipts or utility bills bearing the alien's name or the name of an immediate family member of the alien, and the alien's address.

(12) Tax receipts.

(13) Insurance policies.

(14) Remittance records, including copies of money order receipts sent in or out of the country.

(15) Travel records.

(16) Dated bank transactions.

(17) Two or more sworn affidavits from individuals who are not related to the alien who have direct knowledge of the alien's continuous physical presence in the United States, that contain—

(A) the name, address, and telephone number of the affiant; and

(B) the nature and duration of the relationship between the affiant and the alien.

(18) Any other evidence determined to be credible by the Secretary.

(c) DOCUMENTS ESTABLISHING ADMISSION TO AN INSTITUTION OF HIGHER EDUCATION.—To establish that an alien has been admitted to an institution of higher education, the alien may submit to the Secretary a document from the institution of higher education certifying that the alien—

(1) has been admitted to the institution; or

(2) is currently enrolled in the institution as a student.

(d) DOCUMENTS ESTABLISHING RECEIPT OF A DEGREE FROM AN INSTITUTION OF HIGHER EDUCATION.—To establish that an alien has acquired a degree from an institution of higher education in the United States, the alien may submit to the Secretary a diploma or other document from the institution stating that the alien has received such a degree.

(e) DOCUMENTS ESTABLISHING RECEIPT OF A HIGH SCHOOL DIPLOMA, GENERAL EDUCATIONAL DEVELOPMENT CREDENTIAL, OR A RECOGNIZED EQUIVALENT.—To establish that in the United States an alien has earned a high school diploma or a commensurate alternative award from a public or private high school, has obtained the General Education Development credential, or otherwise has satisfied section 102(b)(1)(D)(iii), the alien may submit to the Secretary the following:

(1) A high school diploma, certificate of completion, or other alternate award.

(2) A high school equivalency diploma or certificate recognized under State law.

(3) Evidence that the alien passed a State-authorized exam, including the General Education Development test, in the United States.

(4) Evidence that the alien successfully completed an area career and technical education pro-

gram, such as a certification, certificate, or similar alternate award.

(5) Evidence that the alien obtained a recognized postsecondary credential.

(6) Any other evidence determined to be credible by the Secretary.

(f) DOCUMENTS ESTABLISHING ENROLLMENT IN AN EDUCATIONAL PROGRAM.—To establish that an alien is enrolled in any school or education program described in section 102(b)(1)(D)(iv) or 104(a)(1)(C), the alien may submit school records from the United States school that the alien is currently attending that include—

(1) the name of the school; and

(2) the alien's name, periods of attendance, and current grade or educational level.

(g) DOCUMENTS ESTABLISHING EXEMPTION FROM APPLICATION FEES.—To establish that an alien is exempt from an application fee under this Act, the alien may submit to the Secretary the following relevant documents:

(1) DOCUMENTS TO ESTABLISH AGE.—To establish that an alien meets an age requirement, the alien may provide proof of identity, as described in subsection (a), that establishes that the alien is 18 years of age or younger.

(2) DOCUMENTS TO ESTABLISH INCOME.—To establish the alien's income, the alien may provide—

(A) employment records or other records of earned income, including records that have been maintained by the Social Security Administration, the Internal Revenue Service, or any other Federal, State, or local government agency;

(B) bank records; or

(C) at least two sworn affidavits from individuals who are not related to the alien and who have direct knowledge of the alien's work and income that contain—

(i) the name, address, and telephone number of the affiant; and

(ii) the nature and duration of the relationship between the affiant and the alien.

(3) DOCUMENTS TO ESTABLISH FOSTER CARE, LACK OF FAMILIAL SUPPORT, OR SERIOUS, CHRONIC DISABILITY.—To establish that the alien is in foster care, lacks parental or familial support, or has a serious, chronic disability, the alien may provide at least two sworn affidavits from individuals who are not related to the alien and who have direct knowledge of the circumstances that contain—

(A) a statement that the alien is in foster care, otherwise lacks any parental or other familiar support, or has a serious, chronic disability, as appropriate;

(B) the name, address, and telephone number of the affiant; and

(C) the nature and duration of the relationship between the affiant and the alien.

(h) DOCUMENTS ESTABLISHING QUALIFICATION FOR HARDSHIP EXEMPTION.—To establish that an alien satisfies one of the criteria for the hardship exemption set forth in section 104(a)(2)(C), the alien may submit to the Secretary at least two sworn affidavits from individuals who are not related to the alien and who have direct knowledge of the circumstances that warrant the exemption, that contain—

(1) the name, address, and telephone number of the affiant; and

(2) the nature and duration of the relationship between the affiant and the alien.

(i) DOCUMENTS ESTABLISHING SERVICE IN THE UNIFORMED SERVICES.—To establish that an alien has served in the Uniformed Services for at least 2 years and, if discharged, received an honorable discharge, the alien may submit to the Secretary—

(1) a Department of Defense form DD–214;

(2) a National Guard Report of Separation and Record of Service form 22;

(3) personnel records for such service from the appropriate Uniformed Service; or

(4) health records from the appropriate Uniformed Service.

(j) DOCUMENTS ESTABLISHING EARNED INCOME.—

(1) IN GENERAL.—An alien may satisfy the earned income requirement under section 104(a)(1)(C)(iii) by submitting records that—

(A) establish compliance with such requirement; and

(B) have been maintained by the Social Security Administration, the Internal Revenue Service, or any other Federal, State, or local government agency.

(2) OTHER DOCUMENTS.—An alien who is unable to submit the records described in paragraph (1) may satisfy the earned income requirement by submitting at least two types of reliable documents that provide evidence of employment or other forms of earned income, including—

(A) bank records;

(B) business records;

(C) employer or contractor records;

(D) records of a labor union, day labor center, or organization that assists workers in employment;

(E) sworn affidavits from individuals who are not related to the alien and who have direct knowledge of the alien's work, that contain—

(i) the name, address, and telephone number of the affiant; and

(ii) the nature and duration of the relationship between the affiant and the alien;

(F) remittance records; or

(G) any other evidence determined to be credible by the Secretary.

(k) AUTHORITY TO PROHIBIT USE OF CERTAIN DOCUMENTS.—If the Secretary determines, after publication in the Federal Register and an opportunity for public comment, that any document or class of documents does not reliably establish identity or that permanent resident status under this Act (whether on a conditional basis, or without the conditional basis as provided in section 104(c)(2)) is being obtained fraudulently to an unacceptable degree, the Secretary may prohibit or restrict the use of such document or class of documents.

**SEC. 308. RULE MAKING.**

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary shall publish in the Federal Register interim final rules implementing this Act, which shall allow eligible individuals to immediately apply for relief under this Act. Notwithstanding section 553 of title 5, United States Code, the regulation shall be effective, on an interim basis, immediately upon publication, but may be subject to change and revision after public notice and opportunity for a period of public comment. The Secretary shall finalize such rules not later than 180 days after the date of publication.

(b) PAPERWORK REDUCTION ACT.—The requirements under chapter 35 of title 44, United States Code, (commonly known as the ''Paperwork Reduction Act'') shall not apply to any action to implement this Act.

**SEC. 309. CONFIDENTIALITY OF INFORMATION.**

(a) IN GENERAL.—The Secretary may not disclose or use information (including information provided during administrative or judicial review) provided in applications filed under this Act or in requests for DACA for the purpose of immigration enforcement.

(b) REFERRALS PROHIBITED.—The Secretary, based solely on information provided in an application for adjustment of status under this Act (including information provided during administrative or judicial review) or an appli-

cation for DACA, may not refer an applicant to U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, or any designee of either such entity.

(c) LIMITED EXCEPTION.—Notwithstanding subsections (a) and (b), information provided in an application for adjustment of status under this Act may be shared with Federal security and law enforcement agencies—

(1) for assistance in the consideration of an application for adjustment of status under this Act;

(2) to identify or prevent fraudulent claims;

(3) for national security purposes; or

(4) for the investigation or prosecution of any felony offense not related to immigration status.

(d) PENALTY.—Any person who knowingly uses, publishes, or permits information to be examined in violation of this section shall be fined not more than $10,000.

**SEC. 310. GRANT PROGRAM TO ASSIST ELIGIBLE APPLICANTS.**

(a) ESTABLISHMENT.—The Secretary shall establish, within U.S. Citizenship and Immigration Services, a program to award grants, on a competitive basis, to eligible nonprofit organizations that will use the funding to assist eligible applicants under this Act by providing them with the services described in subsection (b).

(b) USE OF FUNDS.—Grant funds awarded under this section shall be used for the design and implementation of programs that provide—

(1) information to the public regarding the eligibility and benefits of permanent resident status under this Act (whether on a conditional basis, or without the conditional basis as provided in section 104(c)(2)), particularly to individuals potentially eligible for such status;

(2) assistance, within the scope of authorized practice of immigration law, to individuals submitting applications for adjustment of status under this Act (whether on a conditional basis, or without the conditional basis as provided in section 104(c)(2)), including—

(A) screening prospective applicants to assess their eligibility for such status;

(B) completing applications and petitions, including providing assistance in obtaining the requisite documents and supporting evidence; and

(C) providing any other assistance that the Secretary or grantee considers useful or necessary to apply for adjustment of status under this Act (whether on a conditional basis, or

without the conditional basis as provided in section 104(c)(2)); and

(3) assistance, within the scope of authorized practice of immigration law, and instruction, to individuals—

(A) on the rights and responsibilities of United States citizenship;

(B) in civics and English as a second language;

(C) in preparation for the General Education Development test; and

(D) in applying for adjustment of status and United States citizenship.

(c) AUTHORIZATION OF APPROPRIATIONS.—

(1) AMOUNTS AUTHORIZED.—There are authorized to be appropriated such sums as may be necessary for each of the fiscal years 2022 through 2032 to carry out this section.

(2) AVAILABILITY.—Any amounts appropriated pursuant to paragraph (1) shall remain available until expended.

**SEC. 311. PROVISIONS AFFECTING ELIGIBILITY FOR ADJUSTMENT OF STATUS.**

An alien's eligibility to be lawfully admitted for permanent residence under this Act (whether on a conditional

basis, or without the conditional basis as provided in section 104(c)(2)) shall not preclude the alien from seeking any status under any other provision of law for which the alien may otherwise be eligible.

**SEC. 312. SUPPLEMENTARY SURCHARGE FOR APPOINTED COUNSEL.**

(a) IN GENERAL.—Except as provided in section 302 and in cases where the applicant is exempt from paying a fee under section 303(c), in any case in which a fee is charged pursuant to this Act, an additional surcharge of $25 shall be imposed and collected for the purpose of providing appointed counsel to applicants seeking judicial review of the Secretary's decision to provisionally deny an application under this Act.

(b) IMMIGRATION COUNSEL ACCOUNT.—There is established in the general fund of the Treasury a separate account which shall be known as the ''Immigration Counsel Account''. Fees collected under subsection (a) shall be deposited into the Immigration Counsel Account and shall remain available until expended for purposes of providing appointed counsel as required under this Act.

(c) REPORT.—At the end of each 2-year period, beginning with the establishment of this account, the Secretary of Homeland Security shall submit a report to the Congress concerning the status of the account, including

any balances therein, and recommend any adjustment in the prescribed fee that may be required to ensure that the receipts collected from the fee charged for the succeeding two years equal, as closely as possible, the cost of providing appointed counsel as required under this Act.

**SEC. 313. ANNUAL REPORT ON PROVISIONAL DENIAL AUTHORITY.**

Not later than 1 year after the date of the enactment of this Act, and annually thereafter, the Secretary of Homeland Security shall submit to the Congress a report detailing the number of applicants that receive—

(1) a provisional denial under this Act;

(2) a final denial under this Act without seeking judicial review;

(3) a final denial under this Act after seeking judicial review; and

(4) an approval under this Act after seeking judicial review.

Passed the House of Representatives March 18, 2021.

Attest: CHERYL L. JOHNSON,

*Clerk.*



# Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions

**Andorra Bruno**

Specialist in Immigration Policy

September 6, 2017

**Congressional Research Service**

7-5700

www.crs.gov

R44764

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

On September 5, 2017, Attorney General Jeff Sessions announced that the Deferred Action for Childhood Arrivals (DACA) policy, an Obama Administration initiative, was being rescinded. A related memorandum released by the Department of Homeland Security (DHS) that same day rescinded the 2012 memorandum that established DACA and described how DHS would "execute a wind-down of the program." According to the September 2017 memorandum, DHS will continue to adjudicate certain DACA requests and will not terminate previously issued grants of deferred action or employment authorization "solely based on the directives in this memorandum."

DACA was established in June 2012, when DHS announced that certain individuals without a lawful immigration status who were brought to the United States as children and met other criteria would be considered for temporary relief from removal. To request DACA (initial or renewal), an individual has to file specified forms with DHS's U.S. Citizenship and Immigration Services (USCIS) and pay associated fees. USCIS's decision on an initial DACA request or a renewal request is discretionary. DACA recipients are not granted a lawful immigration status and are not put on a pathway to a lawful immigration status. They are, however, considered to be lawfully present in the United States during the period of deferred action.

Cumulatively, through March 31, 2017, USCIS approved 787,580 initial DACA requests and 799,077 renewal requests. The overall approval rates for DACA requests accepted and decided by March 31, 2017, were approximately 92% for initial requests and 99% for renewals.

To date, Congress has considered, but never enacted, legislation on the DACA initiative. Several bills introduced in the 115th Congress would provide different forms of immigration protection to unauthorized childhood arrivals who satisfy specified eligibility criteria. Some of these bills would provide temporary protection from removal and employment authorization to eligible individuals, while other measures would establish pathways for eligible individuals to become U.S. lawful permanent residents (LPRs).

This report provides answers to frequently asked questions about the DACA initiative.

# Contents

Introduction ... 1
How was DACA established? ... 1
What are the eligibility requirements for consideration of DACA? ... 2
What forms and other materials must an individual have filed to request consideration of DACA? ... 2
Was there a fee to request consideration of DACA? ... 2
Are DACA applicants subject to background checks? ... 3
Is the information provided by DACA applicants protected? ... 3
If an individual satisfies the eligibility requirements, is DACA automatically granted? ... 3
Can an individual who has never requested consideration of DACA still do so, or has the period for filing initial DACA requests closed? ... 3
Are DACA recipients legally allowed to work? ... 3
Are DACA recipients allowed to travel outside the United States? ... 4
Are DACA recipients eligible for federal public benefits? ... 4
Are DACA recipients granted lawful immigration status? ... 4
Can an individual's deferred action under DACA be terminated before the end of the two-year DACA grant period? ... 4
What requirements must a DACA recipient meet in order to be considered for renewal of DACA? ... 4
What forms and other materials does an applicant for DACA renewal have to file? ... 5
Is there a fee for DACA renewal requests? ... 5
Is approval of a DACA renewal request automatic? ... 5
If a DACA recipient's request for renewal is approved, is the individual granted legal immigration status? ... 5
Would a person who loses DACA be forced to leave the United States? ... 6
How many DACA requests have been approved to date? ... 6
What are the DACA approval and denial rates? ... 6
Has Congress enacted any legislation on DACA? ... 6
Have any bills been introduced in the 115th Congress related to DACA? ... 6
Have past Congresses taken action on the DREAM Act? ... 7

## Contacts

Author Contact Information ... 7

# Introduction

On September 5, 2017, Attorney General Jeff Sessions announced that Deferred Action for Childhood Arrivals (DACA), an Obama Administration initiative, was being rescinded. A related memorandum[1] released by the Department of Homeland Security (DHS) that same day rescinded the 2012 memorandum[2] that established the DACA process. DACA was created to provide temporary relief from removal from the United States for individuals without a lawful immigration status who were brought to the United States as children and met other criteria.[3] Under the DACA process, both initial grants of deferred action and renewals are issued for a period of two years.

In addition to rescinding the 2012 DACA memorandum, the September 2017 memorandum states that DHS will "execute a wind-down" of DACA, during which it will "adjudicate certain requests for DACA and associated applications meeting certain parameters." These requests include initial and renewal requests for DACA accepted by DHS by September 5, 2017, and renewal requests from current DACA beneficiaries whose benefits will expire between September 5, 2017, and March 5, 2018, and whose renewal requests are accepted by DHS by October 5, 2017. The memorandum also states that DHS will not terminate previously issued grants of deferred action or employment authorization "solely based on the directives in this memorandum."

To provide context for the Trump Administration's rescission of DACA and possible congressional action, this report addresses frequently asked questions about the DACA initiative.

# How was DACA established?

The DACA initiative was announced by former DHS Secretary Janet Napolitano in a June 15, 2012, DHS memorandum entitled, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." The DACA initiative was not established by executive order.

[1] U.S. Department of Homeland Security, Memorandum to James W. McCament, Acting Director, U.S. Citizenship and Immigration Services, Thomas D. Homan, Acting Director, U.S. Immigration and Customs Enforcement, Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection, Joseph B. Maher, Acting General Counsel, Ambassador James D. Nealon, Assistant Secretary, International Engagement, Julie M. Kirchner, Citizenship and Immigration Services Ombudsman, from Elaine C. Duke, Acting Secretary of Homeland Security, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," September 5, 2017, https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[2] U.S. Department of Homeland Security, Memorandum to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Services, John Morton, Director, U.S. Immigration and Customs Enforcement, from Janet Napolitano, Secretary of Homeland Security, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[3] DACA is a form of deferred action. U.S. Citizenship and Immigration Services (USCIS) describes deferred action as "a use of prosecutorial discretion to defer removal action against an individual for a certain period of time." U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca.

## What are the eligibility requirements for consideration of DACA?

The eligibility criteria are

- under age 16 at the time of entry into the United States;
- under age 31 on June 15, 2012;
- continuous residence in the United States for at least five years before June 15, 2012 (that is, since June 15, 2007);
- physical presence in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;
- not in lawful immigration status on June 15, 2012;
- not convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and not otherwise a threat to national security or public safety; and
- in school, graduated from high school or obtained general education development certificate, or honorably discharged from the U.S. Armed Forces or the Coast Guard.

In addition, an individual must be at least age 15 to request DACA, unless he or she is in removal proceedings or has a final removal order or voluntary departure order.

## What forms and other materials must an individual have filed to request consideration of DACA?

An individual must have filed the following three forms with DHS's U.S. Citizenship and Immigration Services (USCIS):

- Form I-821D, Consideration of Deferred Action for Childhood Arrivals
- Form I-765, Application for Employment Authorization
- Form I-765WS, Worksheet

The individual also should have submitted evidence that he or she met the DACA eligibility requirements (see "What are the eligibility requirements for consideration of DACA?").

## Was there a fee to request consideration of DACA?

Yes. The fees, which most recently totaled $495, consisted of a Form I-765 filing fee of $410 and biometric services fee of $85.

There were limited fee exemptions available. An individual must have requested and received a fee exemption before submitting a DACA request without a fee.

## Are DACA applicants subject to background checks?

Yes. The biographic and biometric information submitted by applicants is checked against databases maintained by DHS and other federal agencies.

## Is the information provided by DACA applicants protected?

According to DHS, information provided in a DACA request generally "will not be proactively provided to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety" or meets certain criteria.[4] At the same time, DHS maintains the following:

> This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## If an individual satisfies the eligibility requirements, is DACA automatically granted?

No. USCIS's decision on a DACA request is discretionary.

## Can an individual who has never requested consideration of DACA still do so, or has the period for filing initial DACA requests closed?

The period has closed. USCIS stopped accepting initial DACA requests as of September 5, 2017. However, the agency will reportedly adjudicate initial requests for DACA accepted by that date.

## Are DACA recipients legally allowed to work?

Individuals granted deferred action may receive work authorization if they can demonstrate an economic necessity for employment.

[4] U.S. Department of Homeland Security, Frequently Asked Questions: Rescission Of Deferred Action For Childhood Arrivals (DACA), September 5, 2017, answer to Q8, https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca (hereinafter cited as DHS, 2017 DACA FAQs). ICE is DHS's Immigration and Customs Enforcement; CBP is DHS's Customs and Border Protection.

## Are DACA recipients allowed to travel outside the United States?

Previously, an individual granted deferred action under DACA who wanted to travel outside the United States could apply to USCIS for advance parole. Advance parole is permission for a foreign national to re-enter the United States after temporarily traveling abroad.[5] USCIS, however, is no longer approving advance parole requests associated with DACA. At the same time, the September 2017 DHS memorandum stated that DHS "will generally honor the validity period for previously approved applications for advance parole."

## Are DACA recipients eligible for federal public benefits?

DACA recipients, like other foreign nationals without lawful immigration status, are barred from receiving federal public benefits with the exception of certain forms of short-term, emergency assistance.[6]

## Are DACA recipients granted lawful immigration status?

No. DACA recipients are not granted a lawful immigration status and are not put on a pathway to a lawful immigration status. During the period of deferred action, however, the DACA recipient is in a period of stay authorized by DHS.

## Can an individual's deferred action under DACA be terminated before the end of the two-year DACA grant period?

Presumably, yes. According to DHS, the agency "will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."[7]

## What requirements must a DACA recipient meet in order to be considered for renewal of DACA?

The DACA recipient must satisfy the following criteria:

---

[5] Advance parole, however, does not guarantee re-entry into the United States; foreign nationals are subject to inspection at U.S. ports of entry and may be denied entry.

[6] See CRS Report RL33809, *Noncitizen Eligibility for Federal Public Assistance: Policy Overview*.

[7] DHS, 2017 DACA FAQs, answer to Q9.

- the individual did not depart from the United States on or after August 15, 2012, without first obtaining advance parole (see "Are DACA recipients allowed to travel outside the United States?");
- the individual has continuously resided in the United States since submitting his or her latest approved DACA request; and
- the individual has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and is not a threat to national security or public safety.

According to DHS, it will accept renewal requests from eligible DACA recipients until October 5, 2017 (see "Introduction").

## What forms and other materials does an applicant for DACA renewal have to file?

To request a renewal of deferred action under DACA, an individual must file the following three forms with DHS/USCIS:

- Form I-821D, Consideration of Deferred Action for Childhood Arrivals
- Form I-765, Application for Employment Authorization
- Form I-765WS, Worksheet

The forms are available on the USCIS website, http://www.uscis.gov.

An individual requesting a DACA renewal does not have to submit any documents that he or she previously provided to USCIS in connection with an approved DACA request. However, the individual does have to submit any new documents related to removal proceedings or criminal history. USCIS will request additional documentation from the individual, if needed.

## Is there a fee for DACA renewal requests?

There is a total fee of $495, consisting of a Form I-765 filing fee of $410 and biometric services fee of $85.

## Is approval of a DACA renewal request automatic?

No. The decision on a request to renew DACA is discretionary, as it is on an initial DACA request.

## If a DACA recipient's request for renewal is approved, is the individual granted legal immigration status?

No. An individual granted deferred action (an initial grant or a renewal) is not given a lawful immigration status and is not put on a pathway to a lawful immigration status (see "Are DACA recipients granted lawful immigration status?").

## Would a person who loses DACA be forced to leave the United States?

An individual who loses DACA would no longer have the protection from removal that DACA provides. Whether or not the U.S. government would take steps to remove that individual from the country is a separate issue.

## How many DACA requests have been approved to date?

As of March 31, 2017, a total of 787,580 initial DACA requests and 799,077 renewal requests had been approved.[8]

## What are the DACA approval and denial rates?

Of all the initial DACA requests accepted by USCIS for consideration and decided by March 31, 2017, approximately 92% were approved and 8% were denied, terminated, or withdrawn. For renewal requests accepted and decided by March 31, 2017, the approval rate was approximately 99% and the denial/termination/withdrawal rate was 1%.[9]

## Has Congress enacted any legislation on DACA?

No legislation on DACA has been enacted. During the 113th Congress, however, the House of Representatives passed a bill (H.R. 5272) to prohibit using federal funds to process DACA applications. That bill read, in part:

> No agency or instrumentality of the Federal Government may use Federal funding or resources after July 30, 2014—
>
> (1) to consider or adjudicate any new or previously denied application of any alien requesting consideration of deferred action for childhood arrivals, as authorized by Executive memorandum dated June 15, 2012 and effective on August 15, 2012 (or by any other succeeding Executive memorandum or policy authorizing a similar program).... [10]

## Have any bills been introduced in the 115th Congress related to DACA?

Several bills have been introduced in the 115th Congress to provide different forms of immigration protection to unauthorized childhood arrivals who satisfy specified eligibility criteria. Some of these bills, including the Bar Removal of Individuals who Dream and Grow our

---

[8] USCIS DACA statistics are available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals. Grants of deferred action under DACA are for two years. The same individual may renew multiple times.

[9] USCIS DACA statistics.

[10] See archived CRS Report R43320, *Immigration Legislation and Issues in the 113th Congress*.

Economy (BRIDGE) Act (S. 128/H.R. 496) and the Securing Active and Fair Enforcement (SAFE) Act (S. 127), would provide temporary protection from removal and employment authorization to eligible individuals. Other measures, including the Encourage New Legalized Immigrants to Start Training (ENLIST) Act (H.R. 60), the Recognizing America's Children Act (H.R. 1468), the American Hope Act of 2017 (H.R. 3591), and the Dream Act of 2017 (S. 1615/H.R. 3440), would establish pathways for eligible individuals to become U.S. lawful permanent residents (LPRs). (These measures bear similarities to Development, Relief, and Education for Alien Minors (DREAM) Act bills introduced in past Congresses.)

# Have past Congresses taken action on the DREAM Act?

Legislation known as the Development, Relief, and Education for Alien Minors (DREAM) Act was introduced in past Congresses. This legislation sought to establish a process for eligible unauthorized individuals who entered the United States as children to obtain LPR status. DREAM Act provisions were introduced both as stand-alone bills and as parts of larger immigration reform bills. Although DREAM Act legislation has never been enacted, some measures have seen legislative action. For example, in the 111th Congress, the House approved DREAM Act language as part of an unrelated bill, the Removal Clarification Act of 2010 (H.R. 5281).[11] In the 113th Congress, the Senate passed the Border Security, Economic Opportunity, and Immigration Modernization Act (S. 744), which incorporated DREAM Act language in its legalization provisions.[12]

## Author Contact Information

Andorra Bruno
Specialist in Immigration Policy
abruno@crs.loc.gov, 7-7865

[11] The Senate, however, failed to invoke cloture on a motion to agree to the House-passed DREAM Act amendment, and the bill died at the end of the Congress. See archived CRS Report R40848, *Immigration Legislation and Issues in the 111th Congress*.

[12] S. 744, as passed by the Senate in the 113th Congress, would have established a general legalization program for unauthorized aliens in the United States, with a special "DREAM Act" pathway to LPR status for certain aliens who entered the country as children. The House did not consider S. 744. See archived CRS Report R43320, *Immigration Legislation and Issues in the 113th Congress*.



# An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others

**Ben Harrington**
Legislative Attorney

April 10, 2018

**Congressional Research Service**
7-5700
www.crs.gov
R45158

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

Since at least the 1970s, immigration authorities in the United States have sometimes exercised their discretion to grant temporary reprieves from removal to non-U.S. nationals (aliens) present in the United States in violation of the Immigration and Nationality Act (INA). Well-known types of reprieves include deferred action, Deferred Action for Childhood Arrivals (DACA), and Temporary Protected Status (TPS). The authority to grant some types of discretionary reprieves from removal, including TPS, comes directly from the INA. The authority to grant other types of reprieves generally arises from the Department of Homeland Security's (DHS's) enforcement discretion—that is, its discretion to determine the best manner for enforcing the immigration laws, including by prioritizing some removal cases over others.

The primary benefit that a reprieve offers to an unlawfully present alien is an assurance that he or she does not face imminent removal. Reprieves also generally confer other benefits, including eligibility for employment authorization and nonaccrual of unlawful presence for purposes of the three- and ten-year bars on admission to the United States under the INA. Reprieves do not confer "lawful immigration status," in the narrow sense that reprieve recipients typically remain removable under the INA's grounds of inadmissibility or deportability (although they may have defenses to removal, including a statutory defense in the case of TPS) and in the more general sense that recipients do not enjoy most of the statutorily fixed protections that come with lawful permanent resident (LPR), refugee, asylee, and nonimmigrant status. The availability and duration of reprieves often turn upon executive policies, and accordingly reprieves do not offer steadfast protection from removal or reliable access to other benefits.

Categories of reprieves premised upon executive enforcement discretion include the following:

- ***Deferred Action.*** The generic term that DHS uses for a decision not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.

- ***DACA.*** A large-scale, programmatic type of deferred action available since 2012 for a subset of aliens who arrived in the United States as children.

- ***Deferred Enforced Departure (DED).*** A reprieve premised on the President's exercise of foreign policy powers to protect nationals of countries experiencing war or instability.

- ***Extended Voluntary Departure (EVD).*** An earlier version of DED little used since 1990.

Reprieves granted pursuant to statutory authority include the following:

- ***TPS Relief.*** A form of temporary protection from removal for aliens from countries that DHS designates as unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.

- ***Parole.*** A statutory power that authorizes DHS to grant entry (but not admission) to inadmissible aliens on a case-by-case basis.

Immigration authorities may grant other reprieves in connection with removal proceedings:

- ***Administrative Closure.*** A decision to discontinue temporarily a removal proceeding.

- ***Voluntary Departure***. A brief reprieve that allows an alien to depart the United States at his own expense in lieu of removal proceedings or enforcement of a removal order.

- ***Stay of Removal, Order of Supervision.*** Mechanisms often used together that allow DHS or an immigration judge to postpone enforcement of a removal order.

# Contents

Introduction ..... 1
Sources of Executive Authority to Grant Discretionary Reprieves from Removal ..... 4
Nature of Protections for Recipients: In General ..... 8
Glossary of Discretionary Reprieves ..... 11
Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers ..... 12
Generally Available Reprieves Granted Pursuant to Statutory Authority ..... 15
Reprieves Granted Exclusively in Connection with the Removal Process ..... 18

## Contacts

Author Contact Information ..... 20

# Introduction

The Immigration and Nationality Act (INA) establishes a system of rules as to which non-U.S. nationals (aliens) may enter the United States and under what conditions.[1] It sets forth, for instance, three primary categories—family-based, employment-based, and diversity-based—through which an alien may qualify for an immigrant visa and thereby seek admission to the United States as a lawful permanent resident (LPR).[2] The INA also establishes requirements for the admission of refugees,[3] and delineates the categories of aliens who may be admitted temporarily as nonimmigrants for particular purposes such as study, tourism, or temporary work.[4]

Those aliens who enter or remain in the country in violation of the INA's restrictions generally are subject to removal based on their presence within the United States alone.[5] As a consequence, the Department of Homeland Security (DHS)—the federal agency primarily responsible for enforcing the INA—has a statutory basis to seek the removal of such aliens even if they have not committed crimes or violated other INA provisions.[6] According to recent estimates, there are currently between ten and twelve million aliens in the United States whose presence violates the INA.[7] They arrive in two ways primarily: (1) surreptitiously, by crossing the border without inspection; or (2) on a temporary nonimmigrant visa (e.g., on a B-1/B-2 tourist visa,[8] which typically allows them to remain for six months), which they then overstay.[9] DHS has estimated in

---

1 8 U.S.C. §§ 1101, *et seq*.

2 *See* 8 U.S.C. § 1151(a) (setting forth the three categories of immigrant visa eligibility). For an overview of immigrant visa categories and application procedure, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*, by William A. Kandel.

3 8 U.S.C. § 1157; *see generally* CRS Report RL31269, *Refugee Admissions and Resettlement Policy*, by Andorra Bruno.

4 8 U.S.C. § 1101(a)(15); *see generally* CRS Report R45040, *Nonimmigrant (Temporary) Admissions to the United States: Policy and Trends*, by Jill H. Wilson.

5 *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *id*. § 1229a(e)(2)(B) (defining inadmissible aliens who have not been admitted to the United States as "removable"); *id*. § 1227(a)(1)(B)(rendering any alien "who is present in the United States in violation of this chapter or any other law of the United States" deportable and thus subject to removal); *id*. § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, DAVID WEISSBRODT & LAURA DANIELSON, IMMIGRATION LAW AND PROCEDURE 349 (6th ed. 2011) ("Non-citizens who are present in the U.S. in violation of the INA or any other law of the U.S. are removable . . . as are those who fail to maintain the nonimmigrant . . . status in which they were admitted.").

6 *See*, *e.g.*, Mondragón v. Holder, 706 F.3d 535, 541 (4th Cir. 2013) ("It is uncontroverted that Mondragón entered the United States illegally and is therefore removable."); Ghaffar v. Mukasey, 551 F.3d 651, 653 (7th Cir. 2008) (denying petition for review of final order of removal based on overstay of nonimmigrant visa).

7 Ctr. for Migration Studies, *The US Undocumented Population Fell Sharply During the Obama Era: Estimates for 2016* (Feb. 22, 2018) (estimating 10.8 million in 2016), http://cmsny.org/publications/warren-undocumented-2016/; Dep't of Homeland Sec. Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014* (July 2017) (estimating 12.1 million in 2014), http://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20in%20the%20US%20January%202014_1.pdf; Pew Research Center, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009* (Sept. 20, 2016) (estimating 11.1 million in 2014), http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/.

8 *See generally* 9 Foreign Affairs Manual (FAM) 402.2.

9 *See* Office of Immigration Statistics, *supra* note 7, at 1; David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167, 171 (2012) ("[E]ntrants without inspection (EWIs, in immigration-speak) probably constitute the stereotypical 'illegal alien' in the public mind, but by commonly accepted estimates they make up only fifty to sixty-seven percent of the unlawfully (continued...)

the past that its resources allow it to remove a maximum of 400,000 aliens per year who are present in violation of the INA.[10]

For reasons that may range from administrative convenience to humanitarian concerns, immigration authorities sometimes decide not to seek the removal of unlawfully present aliens[11]—either during a specified timeframe or indefinitely—and communicate that decision to the affected aliens.[12] Well-known examples of such decisions include grants of deferred action,[13] protections granted under the Deferred Action for Childhood Arrivals (DACA) initiative,[14] and Temporary Protected Status (TPS).[15] The former two types of reprieves confer assurances from DHS, premised on its enforcement discretion, that the agency will not seek an alien's removal, often during a defined time period.[16] The latter, TPS, is a statutory mechanism that allows immigration authorities to grant temporary protection from removal to aliens from countries experiencing upheaval or instability.[17]

This report refers to executive decisions not to seek removal as "discretionary reprieves from removal" because their effective period generally depends on the duration of the Executive's inclination not to seek removal and because the reprieves (unlike statutory legalization

(...continued)

present population. The rest entered through normal nonimmigrant channels (primarily on a student, tourist, or business visa), were admitted after inspection at the border, and then overstayed or otherwise violated the conditions of their temporary admission.").

[10] *See* Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014) ("DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year."); Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. PA. L. REV. 1753, 1759 (2016) (describing the "gap between the INA's putative scope and its enforceable scope").

[11] The INA defines unlawful presence as follows: "[A]n alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the [Secretary of Homeland Security] or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

[12] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, and at the time [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *see also* Arizona v. United States, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

[13] *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing deferred action).

[14] Memorandum from Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012) [hereinafter DHS DACA Memo]; *see* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing DACA).

[15] 8 U.S.C. § 1254a. TPS and some other reprieve programs may also provide relief to nonimmigrants and other aliens present pursuant to a statutory immigration status. *See, e.g.*, *id*. § 1254a(c) (requiring aliens to have been physically present since a date specified by DHS in order to qualify for TPS, but not excluding lawfully present aliens from eligibility). This report focuses on the use of discretionary reprieves to regulate the population of aliens present in violation of the INA.

[16] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action and DACA).

[17] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

mechanisms such as cancellation of removal,[18] registry,[19] or asylum[20]) do not confer LPR status or create a direct avenue to that status.[21] (However, in some jurisdictions, TPS may facilitate adjustment to LPR status for aliens who otherwise qualify for immigrant visas in a family-based, employment-based, or diversity-based category.)[22] Discretionary reprieves from removal do not, in other words, offer steadfast protection from removal,[23] although they typically confer eligibility for work authorization, among other benefits.[24] A burgeoning body of legal scholarship about discretionary reprieves has coined an array of terms for the peculiar sort of relief that they provide, including "quasi-legal status,"[25] "liminal"[26] or "twilight" status,[27] and the "status of nonstatus."[28] In recent decades, discretionary reprieves have grown in prevalence and become an increasingly significant aspect of the federal government's regulation of the unlawfully present population.[29] The prevalence of discretionary reprieves may well decline in the near term,

---

[18] 8 U.S.C. § 1229b(b) (authorizing the cancellation of removal and adjustment of status for certain nonpermanent residents).

[19] *Id*. § 1259 (authorizing the conferral of a record of admission for permanent residence in the case of certain aliens who entered the United States prior to January 1, 1972).

[20] *Id*. § 1158.

[21] *See* Arpaio v. Obama, 797 F.3d 11, 17 (D.C. Cir. 2015) ("[D]eferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'") (quoting DHS DACA Memo, *supra* note 14, at 3); Texas v. United States, 809 F.3d 134, 148 (5th Cir. 2015) ("'Lawful presence' [obtained through deferred action] is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences."); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018) ("By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States.").

[22] *See* 8 U.S.C. § 1254a(f)(4) (providing that aliens granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjustment of status eligibility); *infra* note 141 (citing cases on adjustment of status eligibility for TPS recipients).

[23] *See Arpaio*, 797 F.3d at 17; *Texas*, 809 F.3d at 148. TPS provides perhaps the most rigid protection against removal of any discretionary reprieve. *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[24] *See* 8 C.F.R. § 274a.12(c) (establishing categories of aliens eligible to apply for employment authorization).

[25] *See, e.g.*, Ingrid V. Eagly, *Criminal Justice for Noncitizens: An Analysis of Variation in Local Enforcement*, 88 N.Y.U. L. REV. 1126, 1217 (2013); Hiroshi Motomura, *What Is "Comprehensive Immigration Reform"? Taking the Long View*, 63 ARK. L. REV. 225, 226 (2010).

[26] Jennifer M. Chacon, *Producing Liminal Legality*, 92 DENV. UNIV. L. REV. 709, 713 (2015).

[27] David A. Martin, *Twilight Statuses: A Closer Examination of the Unauthorized Population*, 2 MIGRATION POLICY INST. 1, 7-8 (June 2005).

[28] *See* Geoffrey Heeren, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115 (2015).

[29] *See id*. at 1120 ("[I]n recent years, the United States has expanded the number of persons placed in nonstatus."). Two events, in particular, did much to increase the number of aliens receiving discretionary reprieves: the enactment of the TPS statute in 1990 and the implementation of the DACA program in 2012. *See* CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues*, by Jill H. Wilson, at 11 (calculating that 436,866 people held TPS as of October 12, 2017); CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno, at 6 ("As of March 31, 2017, a total of 787,580 initial DACA requests and 799,077 renewal requests had been approved."); *see also* U.S. Citizenship and Immigration Servs., *Number of Approved Employment Authorization Documents, by Classification and Basis for Eligibility, Oct. 1, 2012 – June 29, 2017* (2017) (providing statistics for employment authorization documents approved for recipients of deferred action, DACA, parole, and other types of discretionary reprieves), http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/eads-by-basis-for-eligibility.pdf [hereinafter USCIS EAD Data]. The Obama Administration's proposed Deferred Action for Parents of Americans (DAPA) initiative, which federal courts enjoined before implementation, had the potential to make approximately four million unlawfully present aliens eligible for discretionary reprieves. *See* Texas v. United States, 809 F.3d 134, 148 (5th Cir. (continued...)

however, as a result of changes in executive policy concerning DACA, TPS, and Deferred Enforced Departure (DED).[30]

This report provides an overview of discretionary reprieves from removal. It discusses the primary sources of authority on which discretionary reprieves are premised and describes, in general, the nature of the protections that they confer. The report concludes with a glossary of the principal types of discretionary reprieves.

# Sources of Executive Authority to Grant Discretionary Reprieves from Removal

The Executive's power to grant most of the existing forms of discretionary reprieves—including deferred action, DACA, and DED, among others—is typically attributed to its enforcement discretion: that is, its authority to determine the best method for enforcing federal immigration law.[31] This enforcement discretion includes the authority to prioritize some cases over others to conserve resources or avoid unjust results.[32] Criminal prosecutors in the United States possess a similar type of discretion.[33] They need not prosecute every crime of which they become aware, and their ability to set prosecution priorities that maximize the impact of their limited resources is considered fundamental to the American criminal justice system.[34] Drawing from this criminal law tradition, courts, immigration officials, and commentators often call the Executive's authority

(...continued)

2015) (affirming injunction against DAPA and observing that of "the approximately 11.3 million illegal aliens in the United States, 4.3 million would be eligible for [reprieves] pursuant to DAPA."), *aff'd by an equally divided Court,*— U.S.—, 136 S. Ct. 2271, 2272 (2016); Arpaio v. Obama, 797 F.3d 11, 18 n.1 (D.C. Cir. 2015) (similar estimate); *cf.* Randy Capps et. al., *Deferred Action For Unauthorized Immigrant Parents*, MIGRATION POLICY INST. 3 (Feb. 2016) (estimating that DAPA could have potentially reached "as many as 3.6 million unauthorized immigrants"), https://www.migrationpolicy.org/research/deferred-action-unauthorized-immigrant-parents-analysis-dapas-potential-effects-families.

[30] *See* CRS Legal Sidebar LSB10052, *UPDATE: The End of the Deferred Action for Childhood Arrivals Program: Some Immediate Takeaways*, by Hillel R. Smith; CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[31] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999); *Arpaio*, 797 F.3d at 16 ("The Secretary of Homeland Security is charged with the administration and enforcement of the immigration laws. With enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)) (some internal quotation marks and citations omitted).

[32] Arizona v. United States, 567 U.S. 387, 396 (2012); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84.

[33] *See* United States v. Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); CRS Report R43708, *The Take Care Clause and Executive Discretion in the Enforcement of Law*, by Todd Garvey, at 11 ("The judicial branch has traditionally accorded federal prosecutors 'broad' latitude in making a range of investigatory and prosecutorial determinations, including when, against whom, and whether to prosecute particular criminal violations of federal law.").

[34] *See* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 682 (2014) ("With limited resources and broad charging options, federal prosecutors must choose how to allocate investigative and prosecutorial resources; they must prioritize some offenses at the expense of others."); *cf.* LUIGI FERRAJOLI, LAW AND REASON 574 (1989) (categorizing prosecutorial discretion as an attribute of the Anglo-American system of accusatorial criminal justice that belongs to its historical tradition but not its theoretical framework, and noting that prosecutorial discretion does not form part of the civil law tradition).

to decline to seek removal of some unlawfully present aliens "prosecutorial discretion,"[35] even though removal proceedings are civil rather than criminal in nature.[36]

Enforcement discretion in the immigration context has unique attributes that distinguish it from prosecutorial discretion in the criminal context. The INA puts no general statute of limitations on removal.[37] Thus, the Executive's decision not to seek removal of an alien lacks the definitive quality of many decisions not to prosecute crimes, which become irreversible if an applicable statute of limitations expires.[38] Aliens present in violation of the INA remain removable indefinitely (unless they otherwise acquire a legal status), so an assurance that the Executive will not seek their removal at a particular juncture does not redress their long-term situation.[39] Further, perhaps as a consequence of this reality, a discretionary reprieve from removal differs from a decision not to prosecute a crime in that a discretionary reprieve from removal often carries a fixed term, which can typically be renewed.[40] DACA, for instance, carries a two-year renewable term.[41]

Over time, the Executive has employed its enforcement discretion to grant various types of reprieves under inconstant terminology. In 1974, John Lennon famously pursued a type of

[35] *See, e.g.*, Shoba Shivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243 (2010); DHS DACA Memo, *supra* note 14, at 1.

[36] *Arizona*, 567 U.S. at 396 (2012) ("Removal is a civil, not criminal, matter."); *cf*. Maureen A. Sweeney, *Fact or Fiction: The Legal Construction of Immigration Removal for Crimes*, 27 YALE J. ON REG. 47, 49 (2010) ("[C]ourts have consistently held that removal is not punishment for crime but is instead a remedial civil sanction and a collateral, rather than direct, consequence of a conviction. This theoretical characterization of removal developed many decades ago in the context of the very different immigration law that existed then. It no longer corresponds in any meaningful way to the realities of immigration law and enforcement . . . .").

[37] *See* Adams v. Holder, 692 F.3d 91, 104 (2d Cir. 2012) ("[T]he INA . . . specifically imposes no time limitations on removal proceedings."); Asika v. Ashcroft, 362 F.3d 264, 269 (4th Cir. 2004) ("[T]he provisions of the [INA] that govern deportation [do not] refer . . . to any time limitation on deportation at all."). Some grounds of deportation, however, apply only to conduct that occurs within a certain time after entry. *See* 8 U.S.C. § 1227(a)(1)(E)(i) ("Any alien who (prior to the date of entry, at the time of any entry, or *within 5 years of the date of any entry*) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.") (emphasis added); *id*. § 1227(a)(5) ("Any alien who, *within five years after the date of entry*, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.") (emphasis added); WEISSBRODT & DANIELSON, *supra* note 5, at 279-80 ("[N]on-citizens who become dependent on government benefits are removable only if they become a public charge within five years of entry . . . . Because there is no general statute of limitations, however, ICE can remove [such non-citizens] . . . *at any time*—even if [they] cease[] to be a public charge.") (emphasis in original). Also, one INA provision imposes a limitations period on actions to *rescind* a person's LPR status if he obtained it through adjustment despite being ineligible, 8 U.S.C. § 1256(a), but every federal appellate court to consider the issue, except one, has held that that limitations period does not apply to removal proceedings. *See Adams*, 692 F.3d at 101-02, 102 n.6 (collecting cases and explaining that only the Third Circuit "has applied § 1256(a)'s five-year limitations period to removal proceedings based on alleged fraudulent procurement of adjustment of status").

[38] *See* United States v. Marion, 404 U.S. 307, 322 (1971) ("[Criminal] statutes [of limitation] . . . 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.' These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.") (quoting Public Schools v. Walker, 9 Wall. 282, 288 (1870)).

[39] *See* 8 U.S.C. § 1182(a)(6)(A)(i); *id*. § 1227(a)(1)(B); Andrew Tae-Hyun Kim, *Deportation Deadline*, 95 WASH. U.L. REV. 531, 550 (2017) (noting the lack of any limitations period in the INA and explaining that because "deferred action is not an affirmative grant of relief from removal . . . a change in administrative policy or priorities could change what was once a low-priority case to a high-priority one. All this heightens the level of uncertainty for undocumented immigrants.").

[40] *See, e.g.*, DHS DACA Memo, *supra* note 14, at 2 (authorizing "deferring action for a period of two years" for qualified aliens).

[41] *Id*.

reprieve called "nonpriority status," which his lawyer accused the Immigration and Naturalization Service (INS)[42] of keeping secret.[43] Soon thereafter, the INS adopted the term "deferred action,"[44] which DHS continues to use today for a reprieve from removal granted under its general enforcement discretion.[45] Immigration authorities have also, however, granted reprieves under the labels "Extended Voluntary Departure" (EVD), DED, and DACA.[46] In some instances, such as DACA, these labels denote a particular reprieve type's focus on a discrete group.[47] In other instances, such as with EVD and DED, the bureaucratic terminology seems to supply multiple labels for the same type of reprieve.[48] The criteria for granting the reprieves (other than the statutorily authorized reprieves discussed below) are generally set forth in agency manuals and policy memoranda,[49] although for some reprieve types it can be difficult to locate a controlling document.[50] Federal statute does not set the criteria for reprieves grounded in enforcement discretion; nor does a particular law supply explicit authorization for the Executive to grant such reprieves,[51] although scattered provisions of the INA reference deferred action and describe narrow categories of aliens as eligible to receive it.[52] In recent years, questions have arisen as to

[42] The INS was the agency with primary responsibility for enforcing the INA until March 1, 2003, when it ceased to exist and most of its functions were transferred to DHS under the Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135. *See* Nijar v. Holder, 689 F.3d 1077, 1078-79 (9th Cir. 2012).

[43] Heeren, *supra* note 28, at 1134; Wadhia, *supra* note 35, at 246-47.

[44] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

[45] *See* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

[46] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion."

[47] *See* DHS DACA Memo, *supra* note 14, at 2 (describing the DACA initiative as premised on "the exercise of [] prosecutorial discretion . . . [for] certain young people who were brought to this country as children and know only this country as home").

[48] *See* U.S. IMMIGRATION AND NATURALIZATION SERVS, ADJUDICATOR'S FIELD MANUAL, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .") [hereinafter USCIS AFM].

[49] *See, e.g., id.*; IMMIGRATION AND CUSTOMS ENFORCEMENT, DETENTION AND REMOVAL OPERATIONS POLICY AND PROCEDURE MANUAL, ch. 20.8 (concerning deferred action), https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf [hereinafter DROPPM].

[50] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action); Heeren, *supra* note 28, at 1134 (contending that the controlling legal authority for discretionary reprieves "is tenuous and sometimes even secret . . . DHS will fill in requirements, if at all, using regulations or more commonly with non-binding policy guidance or memoranda").

[51] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) (quoting treatise for the proposition that deferred action is a "commendable exercise in administrative discretion [] developed without express statutory authorization"); Texas v. United States, 809 F.3d 134, 167 (5th Cir. 2015) (same); *see also* Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015) ("With [DHS's] enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)).

[52] *See* 8 USC § 1227(d)(2) (providing that the denial of an administrative stay of removal to applicants for T or U nonimmigrant status "shall not preclude the alien from applying for . . . deferred action"); REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (emphasis added) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for driver's licenses). At least two statutory provisions go so far as to state that specific groups of aliens are "eligible" for deferred action. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain self-petitioners for LPR status under the Violence Against Women Act are "eligible for deferred action and work authorization"); National Defense Authorization Act of 2004, P.L. 108-136, Div. A, Title VII, § 1703(c), 117 Stat. 1693 (codified at 8 U.S.C. § 1151 NOTE) (providing that the spouses and children of certain deceased U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); *see also* Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 413 (E.D.N.Y. 2018) (reasoning that "Congress has repeatedly ratified immigration officials' practice of according (continued...)

whether the Executive may lawfully use its enforcement discretion to provide reprieves in a programmatic fashion for large populations of aliens that meet specific criteria, instead of granting reprieves on a purely case-by-case basis.[53] The Supreme Court has yet to decide this issue.[54]

Although most types of discretionary reprieves from removal are grounded entirely in enforcement discretion, a few types have a statutory footing. First, the INA expressly gives DHS authority to grant immigration parole on a case-by-case basis to certain aliens,[55] providing legal permission for their physical presence in the United States without granting them admission (thereby leaving them "at the boundary line" of the United States for most immigration purposes).[56] DHS interprets its parole authority to encompass two types of discretionary grants of parole with implications for aliens whose presence violates the INA: parole-in-place and advance parole.[57] Second, the INA gives DHS authority to grant TPS relief to nationals from designated countries,[58] which resembles a discretionary reprieve in many respects but confers more rigid protection from removal than most reprieves because the bases for terminating TPS are statutorily limited.[59] Although TPS eligibility is not limited to unlawfully present aliens,[60] TPS may be particularly consequential for aliens who otherwise lack a legal foothold to remain in the United States.[61] Finally, the INA gives DHS and immigration courts authority to grant some types of discretionary reprieves in conjunction with the removal process, including voluntary departure,[62] stays of removal,[63] and orders of supervision.[64] (Other types of reprieves granted during removal proceedings, such as administrative closure, have a basis only in principles of executive discretion and docket management.)[65]

---

(...continued)

deferred action to certain aliens without lawful immigration status").

[53] *See* Texas v. United States, 809 F.3d 134, 179-82 (5th Cir. 2015) (reasoning that the Deferred Action for Parents of Americans (DAPA) reprieve program was "manifestly contrary to the INA" because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present . . . [and] [e]ntirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA")."), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016); *contra Batalla Vidal*, 279 F. Supp. 3d at 422 ("The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action.").

[54] *See* United States v. Texas, 136 S. Ct. 2271 (2016) (Mem.).

[55] 8 U.S.C. § 1182(d)(5).

[56] Leng May Ma v. Barber, 357 U.S. 185, 189 (1958).

[57] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole-in-place and advance parole).

[58] 8 U.S.C. § 1254a.

[59] *Id*. § 1254(c)(3); *see infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[60] *See* 8 U.S.C. § 1254(c)(1) (setting forth TPS eligibility standards).

[61] *See, e.g.*, Ramirez v. Brown, 852 F.3d 954, 958 (9th Cir. 2017) (concerning adjustment of status ramifications of a grant of TPS to an alien who entered without inspection).

[62] 8 U.S.C. § 1229c.

[63] *Id*. § 1229a(b)(5)(C); *id*. § 1231(c)(2).

[64] 8 U.S.C. § 1231(a)(3); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing voluntary departure, stays of removal, and orders of supervision).

[65] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing administrative closure).

## Nature of Protections for Recipients: In General

The principal benefit of a discretionary reprieve is the temporary assurance it provides to an unlawfully present alien that he or she does not face imminent removal, even though his or her presence in the United States violates the INA.[66] The nature of the Executive's ability to retract this assurance—and the resulting reliability of the assurance to the alien—varies by reprieve type. A grant of TPS to an individual alien, due to the applicable statutory parameters, is relatively difficult for DHS to withdraw during the grant's validity period.[67] In contrast, DHS asserts that it may terminate a grant of deferred action or DACA at its discretion,[68] although the Administrative Procedure Act and constitutional principles may require DHS to have an adequate justification for doing so.[69] No type of reprieve offers a bulwark against removal as rigid as the statutorily authorized presence that comes with LPR, refugee, and asylee status, whose holders can be removed only if they acquired their status unlawfully (e.g., through fraud) or if they engage in specified forms of misconduct.[70] Aliens present in violation of the INA who receive discretionary reprieves remain technically removable under the inadmissibility or deportability grounds of the INA, and, except in the case of TPS recipients, do not have a statutory defense against removal based on the reprieve itself.[71]

Discretionary reprieves also typically carry advantages beyond protection from removal, including eligibility to seek an employment authorization document (EAD) from DHS that allows aliens to work legally in the United States.[72] Perhaps most significantly, under DHS regulations, recipients of most types of reprieves are not considered "unlawfully present" within the United

---

[66] *See Reno*, 525 U.S. at 484.

[67] *See* 8 U.S.C. § 1254a(c)(3) (enumerating three bases for withdrawal of TPS); *infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[68] DROPPM, *supra* note 49, ch. 20.8(f) (concerning deferred action termination); U.S. Citizenship & Immigration Servs., *DHS DACA FAQs*, at Q27 (Apr. 25, 2017) ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."), https://www.uscis.gov/archive/frequently-asked-questions [hereinafter DHS DACA FAQs].

[69] *See infra* note 119 (collecting precedents concerning potential limitations on termination of individual DACA grants and rescission of the DACA program).

[70] *See* 8 U.S.C. § 1227 (enumerating specific grounds of deportability for admitted aliens, including certain criminal convictions); *id.* § 1158(c)(2) (governing termination of asylum); *cf.* Amanda Frost, *Independence and Immigration*, 89 S. CAL. L. REV. 485, 503 (2016) ("Congress has expanded the grounds on which even longtime lawful permanent residents can be deported. Today, even longtime lawful permanent residents can be deported for fairly minor criminal offenses . . . ."). Nonimmigrant aliens do not enjoy a level of protection from removal commensurate with LPRs, asylees, and refugees, because the Department of State has discretion to revoke a nonimmigrant visa "at any time," 8 U.S.C. § 1201(i), and revocation renders the visa holder removable. 8 U.S.C. § 1227(a)(1)(B) (providing for the removal of any alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)"); *see* Texas v. United States, 809 F.3d 134, 167 n.102 (5th Cir. 2015); Mier-Fiorito v. Mukasey, 282 Fed. Appx. 536, 538 (9th Cir. 2008) (unpublished) (holding that revocation of alien's nonimmigrant visa rendered him deportable).

[71] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *Id*. § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, Amanda Frost, *Cooperative Enforcement in Immigration Law*, 103 IOWA L. REV. 1, 51 n.78 (2017) ("[D]eferred action does not provide any defense to removal and the executive has absolute discretion to revoke deferred action unilaterally . . . .") (internal quotation marks and citation omitted); *cf.* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (reasoning that DACA was "*specifically designed* for persons without lawful immigration status" but that DHS must supply a non-arbitrary or capricious reason for terminating a DACA grant).

[72] *See* 8 C.F.R. § 274a.12(c); *see also* REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for federal recognition of state-issued driver's licenses and other identification documents).

States.[73] This is because DHS has "authorized" the aliens' presence by granting them reprieves.[74] As a consequence, time spent in the United States on deferred action, TPS, and most other types of reprieves does not count toward the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission set forth in INA § 212(a)(9)(B)(i) (although a reprieve does not cure, for purposes of the bars, any unlawful presence already accumulated).[75] A discretionary reprieve may also trigger eligibility for certain benefits or programs for which "lawful presence" is a qualifying criterion, such as in-state university tuition under certain state laws.[76] More generally, even though state governments typically have broad discretion to deny state benefits to unlawfully present aliens, that discretion might be more limited in the event that such aliens are granted a discretionary reprieve from removal by the federal government.[77]

It is often said that discretionary reprieves do not confer lawful immigration status.[78] But "lawful immigration status" is an imprecise term. The INA uses variations of it in some places[79] but does not define it.[80] Although a determination that an alien lacks "lawful immigration status" triggers consequences under some INA provisions—most notably, a potential bar to adjustment of status[81]—it does little to describe the alien's legal condition in a formal sense. According to DHS

---

[73] Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (en banc); Texas v. United States, 809 F.3d 134, 147-48 (5th Cir. 2015) (explaining that deferred action recipients are "lawfully present" based on agency memoranda); *see also* 8 C.F.R. § 1.3(a)(4) (defining recipients of several types of reprieves as "lawfully present in the United States" for purposes of applying for social security benefits).

[74] *Arizona Dream Act Coal.*, 855 F.3d at 974.

[75] USCIS AFM, *supra* note 48, ch. 40.9(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence."). Aliens who are unlawfully present for more than 180 days but less than one year are, following departure from the country, barred from admission for three years. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I). Aliens unlawfully present for more than a year are subject to a ten-year bar on admission to the United States following departure or removal from the country. *Id*. § 1182(a)(9)(B)(i)(II).

[76] *See, e.g.*, 8 U.S.C. § 1623 (prohibiting states from providing any "postsecondary education benefit" on the basis of state residency to aliens who are "not lawfully present," unless the same benefit is made available to U.S. citizens without regard to residency). Some have argued that a discretionary reprieve recipient's lack of unlawful presence does not mean that he or she possesses lawful presence for purposes of other statutes. *Arizona Dream Act Coal.*, 855 F.3d at 960 n.3 (Kozinski, J., dissent from denial of rehearing en banc) ("Even if it were true that an immigrant was 'unlawfully present' if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be 'lawfully present' if he didn't stay beyond such a period. In formal logic, the inverse of a conditional cannot be inferred from the conditional.").

[77] *See Arizona Dream Act Coal.*, 855 F.3d at 963 (rejecting as preempted by federal law a state policy that deemed individuals with employment authorization through DED and deferred action to be unlawfully present and denied them state-issued driver's licenses on that basis).

[78] *See* USCIS, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, http://www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca ("Deferred action does not provide lawful status."); United States v. Arrieta, 862 F.3d 512, 516 (5th Cir. 2017) (holding that DACA recipients lack "lawful status").

[79] *E.g.*, 8 U.S.C. § 1254a(f)(4) (providing that a TPS recipient "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for adjustment of status purposes); *id*. § 1644 ("[N]o State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

[80] Gazeli v. Sessions, 856 F.3d 1101, 1105 (6th Cir. 2017) ("[T]he INA does not define 'lawful immigration status' . . . ."); *see also* Tula Rubio v. Lynch, 787 F.3d 288, 293 (5th Cir. 2015) ("Although the word 'status' is not defined in the INA, its general meaning is '[a] person's legal condition.'") (quoting BLACK'S LAW DICTIONARY 1542 (10th ed. 2014)).

[81] *See* 8 U.S.C. § 1255(c)(2) (rendering some aliens who "fail to maintain continuously a lawful status" ineligible for adjustment of status).

regulations, TPS holders do not have "lawful status,"[82] even though they have a statutory protection against removal.[83] Nonimmigrants, however, indisputably possess lawful status,[84] but it can be revoked more easily than TPS.[85] Similarly, under the DHS definition, parole is a lawful status,[86] even though it, too, can be terminated at DHS's discretion.[87] Perhaps the only concrete legal meaning that can be attributed to the term "lawful immigration status" is that aliens who lack it—including those unlawfully present aliens who are granted discretionary reprieves—are removable under the inadmissibility or deportability grounds of the INA.[88]

When understood as a general concept rather than a formal legal term, however, "lawful immigration status" usefully describes the bundle of statutorily defined privileges and protections that come with the major statuses set forth in the INA (LPR, asylee, refugee, and nonimmigrant status).[89] To say that unlawfully present aliens who receive discretionary reprieves do not have lawful immigration status means, generally speaking, that they lack most such privileges and protections or possess them only as a matter of executive grace.[90] For example, aliens who receive discretionary reprieves generally cannot work legally unless DHS, in its discretion, authorizes them to do so (unlike LPRs, refugees, asylees, and some nonimmigrants);[91] they have no statutorily established prospects of remaining permanently in the United States (unlike LPRs, asylees, and refugees);[92] they are generally subject to removal by virtue of their presence within the United States alone (unlike all aliens with LPR, refugee, asylee, and unexpired nonimmigrant status);[93] they have no legal basis to facilitate the admission of immediate relatives into the United States (unlike LPRs, refugees and asylees in some circumstances, and some

[82] *See* 8 C.F.R. § 1245.1(d)(1) (omitting TPS from definition of "lawful immigration status"); Dep't of Homeland Security Office of Immigration Statistics, *supra* note 7, at 1 (classifying TPS holders as "unauthorized immigrants"); *see also* Heeren, *supra* note 28, at 1141 ("TPS meets most of the characteristics for nonstatus, although it is a close call."); *but cf.* United States v. Orellana, 405 F.3d 360, 370-71(5th Cir. 2005) (disagreeing with agency interpretations and holding that a TPS recipient is not an alien "illegally or unlawfully in the United States" for purposes of a statute criminalizing firearm possession by such aliens).

[83] *See* 8 U.S.C. § 1254a(c)(3).

[84] *See* 8 C.F.R. § 1245.1(d)(1)(ii).

[85] *See supra* note 70.

[86] 8 C.F.R. § 1245.1(d)(1)(v).

[87] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole).

[88] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility); *id*. § 1227(a)(1)(C) (deportability); *see* Judulang v. Holder, 565 U.S. 42, 46 (2011) ("[T]he immigration laws provide two separate lists of substantive grounds, principally involving criminal offenses, for [removal]. One list specifies what kinds of crime render an alien excludable (or in the term the statute now uses, 'inadmissible'), while another—sometimes overlapping and sometimes divergent—list specifies what kinds of crime render an alien deportable from the country.") (citations omitted); *see also, e.g.*, Matter of Ventura, 25 I. & N. Dec. 391, 392 (BIA 2010) ("[A] grant of TPS does not affect an alien's admissibility or inadmissibility for purposes of the Immigration and Nationality Act generally.").

[89] *See* Heeren, *supra* note 28, at 1122-24 (citing dictionaries for the proposition that "status" denotes "high standing" and explaining the statutory benefits of LPR, refugee, asylee, and nonimmigrant status).

[90] *Id*. at 1129-30; *see* Matter of Blancas–Lara, 23 I. & N. Dec. 458, 460 (B.I.A.2002) ("'Status' is a term of art . . . [that] denotes someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant.").

[91] 8 C.F.R. § 274a.12.

[92] *Compare* DHS DACA FAQs, *supra* note 68, at Q68 ("Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship."), *with* 8 U.S.C. § 1101(a)(20) (providing that LPRs are "accorded the privilege of residing permanently in the United States"), *and id*. § 1159 (providing for the adjustment of refugees and asylees to LPR status).

[93] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility of aliens who enter without inspection); *id*. § 1227(a)(1)(C) (deportability of visa overstays).

nonimmigrants);[94] they face considerable restrictions on eligibility for federal public benefits (particularly as compared with LPRs, refugees, and asylees);[95] and, unless DHS decides to grant them advance parole, they generally cannot travel abroad with any legal basis to request re-entry to the United States (unlike all aliens with one of the four major statuses, except some nonimmigrants).[96] Strictly speaking, it is not correct to say that discretionary reprieves bestow no statutorily defined protections: TPS recipients have a statutory defense against removal, and recipients of most discretionary reprieves garner some advantages grounded in statute by virtue of DHS's authorization of their presence.[97] Generally speaking, however, the legal situation of aliens granted discretionary reprieves from removal ranks so low along the spectrum of immigration categories as to not be considered "lawful immigration status" in common parlance (even though most reprieves vitiate unlawful presence).[98]

In summary, recipients of discretionary reprieves obtain a temporary assurance against removal that varies in reliability by reprieve type. Such aliens, in most cases, are not unlawfully present in the United States during the term of the reprieve. Such aliens do not, however, possess "lawful immigration status," in the narrow sense that they remain technically removable under the INA's inadmissibility or deportability provisions and in the more general sense that they do not enjoy most of the statutorily fixed protections that come with LPR, refugee, asylee, and nonimmigrant status.

# Glossary of Discretionary Reprieves

This glossary describes the principal types of discretionary reprieves from removal granted by DHS or the Attorney General.[99] The glossary is divided into three categories: (1) reprieves

---

[94] *Compare* DHS DACA Memo, *supra* note 14, at 2 (not mentioning relief for family members of DACA recipients); *with, e.g.*, 8 U.S.C. § 1153(a)(2) (allocating immigrant visas to the "[s]pouses and unmarried sons and unmarried daughters" of LPRs), *id.* § 1159(a) (providing for the adjustment to LPR status of the spouses and children of refugees), and *id.* § 1101(a)(H) (providing for the issuance of nonimmigrant visas to the spouses and minor children of H-1B specialty occupation workers).

[95] The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), P.L. 104-193, 110 Stat. 2105, limited eligibility for many federal public benefits to "qualified aliens." *See* 8 U.S.C. §§ 1611-1613; *see generally* CRS Report RL33809, *Noncitizen Eligibility for Federal Public Assistance: Policy Overview*, coordinated by Audrey Singer. "Qualified alien" is defined to cover specific categories of aliens, such as LPRs, refugees, and asylees, but does not cover most aliens who obtain discretionary reprieves, other than aliens granted parole for at least one year. *See* 8 U.S.C. § 1641(b).

[96] *Compare, e.g.*, 8 U.S.C. § 1254a(f)(3) (providing that TPS holders "may travel abroad with the prior consent of the Attorney General"), *with* 8 U.S.C. § 1187(a)(7) (requiring possession of valid visa in order to apply for admission to the United States). Some nonimmigrants who have expired visas but still possess unexpired nonimmigrant status may not be able to leave and return to the United States without obtaining a new visa. *See* 9 FAM 403.9-4(A) ("For example, an alien whose B-1 visa may expire a month after entry into the United States, could be admitted by a Department of Homeland Security (DHS) officer at a port of entry (POE) for a stay of up to one year.").

[97] *See supra* text at notes 72-76.

[98] *See supra* note 78; Heeren, *supra* note 28, at 1132-33 (arguing that "immigration law affords a continuum of rights and privileges" and that holders of discretionary reprieves "fall in the nebulous middle of this spectrum," beneath holders of lawful status).

[99] The Attorney General, through the immigration judges of the Executive Office for Immigration Review (EOIR), administers removal proceedings and has authority to grant some discretionary reprieves from removal in those proceedings. *See* 8 U.S.C. § 1101(b)(4) (defining "immigration judge" as "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under [8 U.S.C.] § 1229a [concerning removal proceedings]"); *see, e.g.*, *infra* note 134 (discussing Attorney General authority to adjudicate TPS applications in removal proceedings); *infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing Attorney General authority to (continued...)

premised upon enforcement discretion or presidential foreign policy powers (i.e., reprieves granted without express statutory authorization); (2) reprieves premised upon statutory authorization; and (3) reprieves granted exclusively in contemplation of or in connection with the removal process. The categories overlap—most of the reprieves in category (3) have statutory foundations,[100] and the reprieves in categories (1) and (2) can be granted to aliens before or after the initiation of removal proceedings[101]—but are nonetheless useful in conceptualizing the array of discretionary reprieves from removal available under current law and executive policy.

For additional information, or for information about any type of discretionary reprieve not listed below, please contact the author.

## Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers

***Deferred Action***. DHS regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority."[102] Thus, the term serves as a generic label for a decision by DHS not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.[103] Some other types of discretionary reprieves, such as DACA, are forms of deferred action tailored to particular groups or circumstances.[104] By regulation, deferred action recipients qualify for work authorization if they show "an economic necessity for employment."[105] They are not considered unlawfully present for purposes of the three- and ten-year bars on admission to the United States that the INA imposes on aliens who depart the country after being unlawfully present for more than 180 days.[106] According to DHS employment authorization data, only a small number of people receive generic deferred action each year as opposed to DACA.[107] There does not appear to be one central, publicly available agency memorandum or policy document that governs the criteria and procedures for deferred

(...continued)

grant voluntary departure and stays of removal).

[100] *See, e.g.*, 8 U.S.C. § 1229c (voluntary departure); *id*. § 1231(a)(3) (orders of supervision).

[101] *See, e.g.*, DHS DACA Memo, *supra* note 14, at 2 (providing guidance on granting DACA to aliens in removal proceedings); 8 U.S.C. § 1229c(b)(5)(B) (requiring that TPS relief be available to aliens in removal proceedings).

[102] 8 C.F.R. § 274a.12(c)(14); *see also* USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority . . . . Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws.").

[103] *See id.*; Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999).

[104] *See* DHS DACA Memo, *supra* note 14, at 2 (describing DACA relief as "deferred action").

[105] 8 C.F.R. § 274a.12(c)(14).

[106] *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I) (establishing a three-year bar for unlawful presence for "a period of more than 180 days but less than 1 year" following departure); *id*. § 1182(a)(9)(B)(i)(II) (establishing a ten-year bar for unlawful presence "for one year or more" following departure or removal); *id*. § 1182(a)(9)(B)(ii) (exempting any "period of stay authorized" by the Secretary of Homeland Security (formerly the Attorney General) from the construction of "unlawful presence" for purposes of the three- and ten-year bars); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017) ("[D]eferred action recipients do not accrue 'unlawful presence' for purposes of calculating when they may seek admission to the United States."); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.").

[107] *See* USCIS EAD Data, *supra* note 29 (showing 8,769 employment authorization documents approved under generic deferred action in fiscal year 2017, as opposed to 360,389 approved under DACA).

action.[108] According to one agency manual, when DHS grants deferred action, it informs recipients so that they may seek employment authorization.[109] DHS apparently does not specify a particular time period for which a grant of generic deferred action is valid (unlike DACA), but DHS does periodically review each grant.[110] DHS claims authority to terminate a grant of deferred action at any time in its discretion.[111]

***Deferred Action for Childhood Arrivals (DACA).*** DACA is a type of deferred action for aliens present in violation of the INA who meet the following criteria:

- came to the United States under the age of sixteen;
- have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012;
- are in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans;
- have not been convicted of certain criminal offenses and do not pose a threat to national security or public safety; and
- were under the age of thirty-one on June 15, 2012.[112]

The Secretary of Homeland Security created DACA by memorandum in 2012.[113] As a result, DACA has clearer eligibility criteria and application procedures than generic deferred action.[114] A grant of DACA lasts two years, subject to renewal.[115] DACA generally confers the same collateral advantages as generic deferred action (eligibility for work authorization, no unlawful presence).[116] Also like generic deferred action, DHS claims authority to terminate a grant of

---

[108] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 n.8 (1999) ("Prior to 1997, deferred-action decisions were governed by internal INS guidelines . . . . These were apparently rescinded on June 27, 1997, but there is no indication that the INS has ceased making this sort of determination on a case-by-case basis."); *Compare* DROPPM, *supra* note 49, ch. 20.8 (concerning deferred action), *with* DHS Office of Inspector General, *ICE Deportation Operations*, at 8 (Apr. 17, 2017) ("Officials we interviewed said ICE considers the 2003 Detention and Removal Operations Policy and Procedure Manual (manual) 'the official guide' to operations, but ICE has not periodically reviewed the manual or revised it since 2008. For a time, ICE would affix a memo to the front of the appropriate chapter to indicate changes, rather than incorporate changes and issue a revised manual."), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-51-Apr17.pdf; *cf.* Memorandum from Secretary of Homeland Security John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action . . . .").

[109] DROPPM, *supra* note 49, ch. 20.8(c)(1).

[110] *Id*. ch. 20.8(e), (f).

[111] *Id*. ch. 20.8(f). As noted below, there is some authority for the proposition that principles of due process and administrative procedure restrict DHS's ability to terminate an individual DACA grant without good justification, and that proposition could arguably extend to generic deferred action as well. *See infra* note 119 (collecting cases concerning limits on termination of individual DACA grants); DHS DACA Memo, *supra* note 14, at 2-3 (describing DACA as conferring "deferred action" relief).

[112] DHS DACA Memo, *supra* note 14, at 1; *see generally* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno.

[113] *Id*.

[114] *See id*; *Consideration of Deferred Action for Childhood Arrivals*, *supra* note 78**Error! Hyperlink reference not valid.** (describing eligibility criteria and filing process).

[115] *Id*.

[116] *See* 8 C.F.R. § 274a.12(c)(14); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017).

DACA at its discretion,[117] although its internal Standard Operating Procedures (SOP) apparently set forth specific bases (such as fraud or criminal issues) for DACA termination.[118] There is ongoing litigation over whether the Administrative Procedure Act (APA) or the Constitution restricts DHS's ability to terminate an individual DACA grant without proper justification or in a manner that does not follow the SOP.[119] There is also ongoing litigation over the extent of DHS's authority to rescind the DACA program in its entirety. DHS announced plans to rescind the DACA program effective March 5, 2018,[120] but federal courts have enjoined the rescission in most respects on the ground that it is likely "arbitrary and capricious" under the APA.[121]

***Deferred Enforced Departure (DED)***. DHS describes DED as follows:

> [A] temporary, discretionary, administrative stay of removal granted to aliens from designated countries. Unlike TPS [which is authorized by statute], DED emanates from the President's constitutional powers to conduct foreign relations and has no statutory basis . . . . The President designates DED for nationals of a particular country through either an Executive Order or a Presidential Memorandum.[122]

DED resembles TPS in that it protects nationals of certain designated countries from removal, except that DED is rooted in inherent executive power rather than in statutory authority.[123] Eligibility criteria depend on the relevant presidential directive.[124] DED recipients are generally

[117] DHS DACA FAQs, *supra* note 68, at Q27 ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.").

[118] DEP'T OF HOMELAND SEC., DACA NATIONAL STANDARD OPERATING PROCEDURES, 132-34 (April 4, 2013); *see* Medina v. U.S. Dep't of Homeland Sec., No. C17-0218RSM, 2017 WL 5176720, at *3 (W.D. Wash. Nov. 8, 2017) ("The National Standard Operating Procedures . . . issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status.").

[119] *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (holding that a DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa" likely violates the APA); *Medina*, 2017 WL 5176720 at *9 ("[T]he Court finds that Plaintiff has alleged a plausible claim that the government violated the APA because its conduct [in terminating his DACA grant without notice] was arbitrary, capricious and an abuse of discretion, and contrary to its own operating procedures, and that claim may proceed."); Coyotl v. Kelly, 261 F. Supp. 3d 1328, 1343 (N.D. Ga. 2017) (granting preliminary injunction against the termination of an individual DACA grant on the ground DHS's "fail[ure] to present any evidence that they complied with their own administrative processes and procedures with regard to the termination" sufficed to show a likelihood of success on the claim that the termination violated the APA).

[120] Memorandum from U.S. Dep't of Homeland Sec., *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (Sept. 5, 2017).

[121] Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (holding that DHS's planned rescission of DACA program likely violates the APA because DHS based the rescission on an erroneous legal conclusion that DACA was unlawful); Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1037 (N.D. Cal. 2018) (same); *contra* Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("[T]he decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record."); *see* CRS Legal Sidebar LSB10057, *District Court Enjoins DACA Phase-Out: Explanation and Takeaways*, coordinated by Hillel R. Smith and Ben Harrington.

[122] USCIS AFM, *supra* note 48, ch. 38.2 (Deferred Enforced Departure).

[123] *See id*; Heeren, *supra* note 28, at 1131, 1140 ("Some countries, like El Salvador and Liberia, have shifted between TPS and DED designations. TPS is similar to the [Extended Voluntary Departure] and DED programs after which it was modeled, but . . . there is a specific standard for TPS set out in the statute.").

[124] *See* Presidential Memorandum, *Deferred Enforced Departure for Liberians* (Sept. 28, 2016) (setting forth DED eligibility criteria for Liberian nationals); USCIS AFM, *supra* note 48, ch. 38.2(d) ("In general, eligibility requirements and ineligibility bars are set forth in the Presidential designation of DED for each specific group of aliens.").

eligible for work authorization.[125] They do not accrue unlawful presence during the period of DED.[126] According to USCIS, an individual cannot be removed while he or she possesses DED.[127] Agency materials do not make provision for the termination of an individual's DED grant.[128] Currently, Liberia is the only country designated for DED, but the Trump Administration has decided to terminate that designation effective March 31, 2019.[129]

***Extended Voluntary Departure (EVD).*** EVD was an earlier version of DED that fell mostly into disuse with the advent of DED in 1990,[130] although DHS apparently continues to grant EVD to a small number of aliens.[131] Under EVD, the Attorney General—rather than the President—designated countries for protection due to unstable conditions.[132]

***Nonpriority Status.*** Prior to 1975, immigration authorities used the term "nonpriority status" to describe the type of reprieve now labeled deferred action.[133]

## Generally Available Reprieves Granted Pursuant to Statutory Authority

***Temporary Protected Status (TPS).*** Section 244 of the INA authorizes DHS to grant TPS to aliens who are nationals of countries that the Secretary of Homeland Security has designated as

---

[125] USCIS AFM, *supra* note 48, ch. 38.2(b); 8 C.F.R. § 274a.12(a)(11).

[126] *See* 8 U.S.C. § 1182(a)(9)(B)(ii); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (rejecting state policy that deemed individuals with employment authorization through DED and deferred action as not "authorized to be present").

[127] U.S. CITIZENSHIP & IMMIGRATION SERVS, AFFIRMATIVE ASYLUM PROCEDURES MANUAL 37 (May 2016) ("DED does not prevent DHS from obtaining a removal order. Rather, it prevents DHS from executing that order during the pendency of DED.").

[128] *See id*; DROPPM, *supra* note 49, ch. 20.10(c) ("Aliens who have been granted DED may not be removed from the United States until the designated period of DED has expired."). These agency materials do not clarify whether DHS claims authority to terminate an individual grant of DED by initiating removal proceedings—an authority that DHS claims with respect to other reprieve types. *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (describing DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa").

[129] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018).

[130] USCIS AFM, *supra* note 48, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .").

[131] Heeren, *supra* note 28, at 1138 (citing statistics obtained from DHS under the Freedom of Information Act for the proposition that the agency continued to grant "something it calls EVD to a small number of individuals" at least until 2014).

[132] *See* Hotel & Rest. Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1501 (D.C. Cir. 1988) ("While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors."); Matter of Sosa Ventura, 25 I. & N. Dec. 391, 394 (BIA 2010) (noting that EVD "had existed for decades to address humanitarian concerns"); Matter of Medina, 19 I. & N. Dec. 734, 748 n.7 (BIA 1988) (defining EVD by explaining that "[t]hrough the years, the Attorney General, ordinarily with the advice of the Secretary of State, has exercised prosecutorial discretion to temporarily suspend deportation proceedings against nationals of various, usually war-torn countries (e.g., Uganda, Ethiopia, Poland, Afghanistan).").

[133] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("'To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation . . . . This commendable exercise in administrative discretion . . . originally was known as nonpriority and is now designated as deferred action.'") (quoting 6 C. GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03 [2][h] (1998)); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.[134] A country's initial TPS designation is valid for up to 18 months and may be extended for up to 18 months, in the Secretary of Homeland Security's discretion, with no limit on the number of extensions.[135] Some countries, such as Sudan and Nicaragua, have been designated for TPS since the late 1990s, although the Trump Administration recently announced its intention not to extend those designations or the designations of Haiti and El Salvador when they expire in late 2018 and 2019.[136]

To qualify for TPS, nationals of designated countries must have resided in the United States since a specified date (usually, a date around the onset of the destabilizing conditions) and must meet certain other requirements set forth in the INA.[137] An alien granted TPS qualifies for work authorization[138] and does not accrue unlawful presence for purposes of the three- and ten-year bars to admission.[139] TPS provides statutorily based protection from removal: an alien cannot be removed while enrolled, and DHS may only withdraw the protection from an individual alien for specified statutory reasons (such as failure to maintain continuous residence in the United States or failure to comply with a yearly registration requirement).[140] Significantly, some (but not all) courts have held that a grant of TPS satisfies the lawful entry requirement for adjustment of status under INA § 245(a), such that aliens who enter the country surreptitiously and then receive TPS may adjust to LPR status if they become eligible for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[141]

---

[134] 8 U.S.C. § 1254a. DHS's authority to grant TPS is not exclusive. An immigration judge has jurisdiction to consider a TPS application from an alien in removal proceedings if DHS denied the application in the first instance. Matter of Lopez Aldana, 25 I. & N. Dec. 49, 51 (BIA 2009). Immigration judges may also have authority to consider TPS applications in the first instance in "certain limited circumstances," *id*. at 51 n.1, but in practice it appears that DHS typically considers applications in the first instance even for aliens already in removal proceedings. *See Matter of Sosa Ventura*, 25 I. & N. Dec. at 392-93 (considering docket management powers of immigration judge where DHS grants TPS during removal proceedings).

[135] *Id*. § 1254a(b)(2),(3).

[136] See CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[137] 8 U.S.C. § 1254a(a)(5); *see, e.g.*, Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010) (designating Haiti for TPS because of an earthquake that occurred on January 12, 2010, and restricting eligibility to Haitian nationals "who have continuously resided in the United States since January 12, 2010"); Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001) (designating El Salvador for TPS because of earthquakes that occurred on January 13, February 13, and February 17, 2001, and restricting eligibility to nationals of El Salvador "who have 'continuously resided' in the United States since February 13, 2001").

[138] 8 U.S.C. § 1254a(a)(1)(B).

[139] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1)(F)(iii).

[140] 8 U.S.C. § 1254(c)(3); *cf.* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (holding that it was improper for immigration judge to terminate removal proceedings against alien who was granted TPS relief because "TPS only provides a temporary protection from removal," but that any removal order issued against the alien could not be executed during the period in which the alien had TPS relief).

[141] Ramirez v. Brown, 852 F.3d 954, 964 (9th Cir. 2017) (holding that "a TPS recipient is considered 'inspected and admitted' under [8 U.S.C.] § 1255(a)" and that an alien who entered surreptitiously before obtaining TPS was therefore eligible to adjust status on the basis of his marriage to a U.S. citizen); Flores v. U.S. Citizenship & Immigration Servs., 718 F.3d 548, 554 (6th Cir. 2013) (same); *contra* Serrano v. Attorney General, 655 F.3d 1260, 1265 (11th Cir. 2011) (holding that a grant of TPS does not satisfy the lawful entry requirement of § 1255(a)). Time spent in TPS counts as time in lawful nonimmigrant status for adjustment of status purposes; the question that has divided the courts is whether TPS also satisfies the lawful entry requirement for adjustment of status purposes. *See* 8 U.S.C. § 1254a(f)(4) ("[F]or purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant"); *see Ramirez*, 852 F.3d at 957 ("Reading the TPS and adjustment statutes together, the question we confront is whether the grant of TPS allows an alien not only to avoid the [failure to (continued...)

***Parole.*** The INA authorizes DHS to "parole" inadmissible aliens into the United States, on a case-by-case basis, "for urgent humanitarian reasons or significant public benefit."[142] Paroled aliens are considered unadmitted for purposes of the INA despite their physical presence within the United States.[143] Parole offers little formal protection against removal: DHS typically grants parole for a fixed period[144] but has discretion to terminate the parole whenever it determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."[145] Paroled aliens may obtain work authorization[146] and do not accrue unlawful presence while the parole remains valid.[147] DHS interprets its parole authority to include two types of discretionary grants of parole potentially relevant to aliens present in the United States in violation of the INA:

> ***Parole in place.*** Although the parole power generally applies to aliens seeking to enter the country, DHS claims the authority to grant parole to aliens who are physically present in the United States following surreptitious entry.[148] DHS calls this exercise of the parole power "parole in place" and, as a matter of policy, appears to reserve it primarily for the immediate relatives of certain members of the U.S. Armed Forces.[149] Parole in place removes significant legal obstacles to an unlawfully present alien's ability to obtain LPR status without leaving the United States, if the alien qualifies for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[150]
>
> ***Advance Parole.*** Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already

(...continued)

maintain lawful status] bar under § 1255(c)(2) but also to meet the 'inspected and admitted or paroled' requirement in § 1255(a).").

142 8 U.S.C. § 1182(d)(5); *see* 8 C.F.R. § 212.5 (DHS regulation implementing statutory parole authority and identifying circumstances in which granting parole "would generally be justified").

143 8 U.S.C. § 1182(d)(5) ("[P]arole . . . shall not be regarded as an admission of the alien . . . .").

144 *See, e.g.*, Reganit v. Sec'y, Dep't of Homeland Sec., 814 F.3d 1253, 1255 (11th Cir. 2016) (addressing case in which alien was granted parole for one month); Chaudhry v. Holder, 705 F.3d 289, 293 (7th Cir. 2013) (addressing case in which alien was granted parole for one year).

145 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled . . . ."); 8 C.F.R. § 212.5(e)(2)(i) ("[W]hen in the opinion of [specified] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated . . . ."); Hassan v. Chertoff, 593 F.3d 785, 789 (9th Cir. 2010) ("The statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose.").

146 8 C.F.R. § 274a.12(c)(11) (with narrow exceptions, enabling parolees to apply for employment authorization).

147 8 U.S.C. § 1182(a)(9)(B)(ii); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1) ("An alien does not accrue unlawful presence . . . if he or she has been inspected and paroled into the United States and the parole is still in effect.").

148 *See* U.S. Citizenship & Immigration Servs., Policy Memorandum, *Parole of Spouses, Children, and Parents of Active Duty Members of the U.S. Armed Forces*, at 2 (Nov. 13, 2013) ("Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.").

149 *Id*. at 3 ("[P]arole in place is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.").

150 *See* 8 U.S.C. § 1255(a) (rendering aliens who were not "inspected and admitted *or paroled*" ineligible for adjustment of status); *see generally*, Margaret D. Stock, *Parole in Place and Other Immigration Benefits for Military Family Members: An Update*, 16-02 IMMIGR. BRIEFINGS 1 (2016).

approved, so as to facilitate their re-entry.[151] Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status).[152]

## Reprieves Granted Exclusively in Connection with the Removal Process

***Administrative Closure***. When Immigration and Customs Enforcement (ICE, a component of DHS responsible for interior enforcement) decides to discontinue temporarily a removal proceeding against a particular alien before the Department of Justice's Executive Office of Immigration Review (EOIR)—because ICE deems the case low-priority, because the alien has obtained or is seeking a form of discretionary relief such as DACA, or for some other reason—ICE may ask the presiding immigration judge to place the proceeding in a status called "administrative closure."[153] An immigration judge may also place removal proceedings in administrative closure upon the alien's motion and over the government's objection, although this course of events may be less common.[154] The effect of administrative closure is to suspend but not terminate the removal proceeding.[155] As such, administrative closure offers little formal protection from removal: the alien cannot be removed while the proceedings are suspended, but ICE can move to re-activate the proceedings at any time and will likely succeed in doing so if the alien is not in the midst of pursuing independent protections from removal outside of immigration court.[156] Furthermore, administrative closure does not itself confer any additional rights or

[151] *See* 8 C.F.R. § 212.5(f) ("Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."); Ibragimov v. Gonzales, 476 F.3d 125, 132 (2d Cir. 2007) ("'Advance parole' is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry . . . . Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f) . . . .").

[152] *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 274a.12(c)(11).

[153] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012) ("Administrative closure, which is available to an Immigration Judge and the Board [of Immigration Appeals], is used to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket. In general, administrative closure may be appropriate to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time.").

[154] *Id*. at 694-96 (holding that government consent to administrative closure is not required, but listing "the basis for any opposition" as a factor to consider when evaluating a closure motion and noting that the government may immediately appeal an administrative closure granted over its objection); *see also* Kristin Bohman, Avetisyan*'s Limited Improvements Within the Overburdened Immigration Court System*, 85 U. COLO. L. REV. 189, 201 (2014) ("*Avetisyan* provides that immigration judges can override an objection if they find that administrative closure is in the best interests of the immigrant and if there will be some palpable final resolution to the case in the near future.").

[155] *Matter of Avetisyan*, 25 I. & N. Dec. at 695 ("[A]dministrative closure does not result in a final order . . . . In this way, administrative closure differs from termination of proceedings, where the Immigration Judge or the Board issues a final order, which constitutes a conclusion of the proceedings and which, in the absence of a successful appeal of that decision or a motion, would require the DHS to file another charging document to initiate new proceedings.").

[156] *See id*. ("[A]t any time after a case has been administratively closed, the DHS may move to recalendar it before the Immigration Judge or reinstate the appeal before the Board . . . ."); Matter of W-Y-U-, 27 I. & N. Dec. 17, 20 (BIA 2017) ("[T]he primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits."); Matter of Pascual, No. A086-963-266, 2012 WL 1705592, at *2 (BIA Apr. 30, 2012) (unpublished) ("Immigration Judges and the Board lack the authority to decide matters of prosecutorial discretion or to decide for humanitarian reasons whether an order of removal should be entered or is in the national interest . . . . If DHS is denied its request to recalendar proceedings after action on the case has been deferred for a period of time, particularly when DHS is not contributing to any delay in resolving any petition, collateral matter or (continued...)

protections, such as work authorization or lawful presence.[157] However, administrative closure is often granted in conjunction with other discretionary reprieves that do provide additional protections.[158] For example, an alien whose removal case is placed in administrative closure may also have enrolled in DACA, which confers eligibility for work authorization and vitiates unlawful presence.[159]

***Voluntary Departure***. The INA authorizes grants of a brief discretionary reprieve called "voluntary departure" for aliens who agree to leave the United States at their own expense either before or prior to the conclusion of removal proceedings.[160] For aliens not yet in removal proceedings, DHS may grant a voluntary departure period of 120 days or less.[161] For aliens in removal proceedings, either DHS or the immigration judge may grant voluntary departure[162] for a maximum period of 120 days.[163] At the conclusion of removal proceedings, the immigration judge alone may grant voluntary departure for a maximum of 60 days.[164] Voluntary departure does not confer eligibility for work authorization[165] but does suspend the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission following the alien's departure or removal from the United States.[166] Aliens who fail to leave the country within the voluntary departure period are subject to a fine and become ineligible to receive, for a period of ten years, adjustment of status, cancellation of removal, and certain other forms of relief from removal.[167]

(...continued)

other action that formed the basis for the administrative closure, the denial of the motion could undermine DHS's ability to enforce the immigration laws.").

[157] *See* 8 C.F.R. § 274a.12 (not listing administrative closure among bases for eligibility for work authorization); Amelia Wilson et. al., *Addressing All Heads of the Hydra: Reframing Safeguards for Mentally Impaired Detainees in Immigration Removal Proceedings,* 39 N.Y.U. REV. L. & SOC. CHANGE 313, 365 (2015) (explaining, based on agency practice and guidance, that administrative closure "does not confer any legal status or give rise to an independent basis to seek work authorization").

[158] *See* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (concluding that immigration judges may properly grant administrative closure in cases where aliens have received temporary forms of protections such as TPS).

[159] *See* Memorandum from Brian M. O'Leary, Chief Immigration Judge, Executive Office of Immigration Review, Dep't of Justice, on Continuances and Administrative Closure (March 7, 2013) (encouraging immigration courts to grant administrative closure where the respondent in removal proceedings has received DACA).

[160] 8 U.S.C. § 1229c.

[161] *Id*. § 1229c(a)(2)(A).

[162] 8 C.F.R. § 240.25(d); *id*. § 1240.26(b)(1).

[163] 8 U.S.C. § 1229c(a)(1), (2)(A).

[164] *Id*. § 1229c(b)(2); 8 C.F.R. § 1240.26(c).

[165] *See* 8 C.F.R. § 274a.14(a)(iii) (providing that a grant of voluntary departure automatically terminates any employment authorization). Regulations also use the term "voluntary departure" for the relief from removal granted under the statutorily created (and now largely obsolete) Family Unity Program to spouses and children of aliens who legalized under the Immigration Reform and Control Act. 8 C.F.R. § 236.15 (implementing § 301 of the Immigration Act of 1990, 104 Stat. 4978, and authorizing "voluntary departure" for up to two years). Such aliens do qualify for work authorization. *Id*. § 236.15(d), § 274a.12(a)(13). Despite the overlapping terminology, the Family Unity Program, on the one hand, and voluntary departure under § 1229b, on the other hand, are separate and distinct forms of relief. *Compare id*. § 236.15 (governing voluntary departure under the Family Unity Program), *with id.* § 240.25 (governing voluntary departure under 8 U.S.C. § 1229b).

[166] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(H) ("Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure."); 9 FAM 302.11-3(B)(1)(b)(3).

[167] 8 U.S.C. § 1229c(d)(1).

***Stay of Removal.*** DHS, an immigration judge, or the Board of Immigration Appeals[168] may stay a final order of removal against an alien to allow him or her to pursue relief or in light of practical or humanitarian considerations.[169] A stay of removal does not confer eligibility for work authorization under DHS regulations,[170] but an order of supervision—which often accompanies a stay—does confer such eligibility in some circumstances.[171] Unlawful presence does not accrue during a stay of removal for purposes of the three- and ten-year bars on admission.[172]

***Order of Supervision*** (OSUP). If DHS does not remove an alien within ninety days of the date that a removal order becomes final—either because DHS cannot identify an appropriate destination country or because of practical or public interest-related considerations—in most cases DHS places the alien under an "order of supervision."[173] An OSUP requires the alien to check in periodically with DHS and may impose other restrictions.[174] DHS regulations provide for the grant of work authorization to aliens present pursuant to OSUPs—subject, however, to criteria stricter than those that govern work authorization for other types of discretionary reprieves.[175] An OSUP does not, by itself, suspend the accumulation of unlawful presence for purposes of the three- and ten year bars on admission.[176] At least one federal court has held that due process principles restrict the reasons and the manner in which DHS may revoke an OSUP.[177]

## Author Contact Information

Ben Harrington
Legislative Attorney
pharrington@crs.loc.gov, 7-8433

[168] The Board of Immigration Appeals (BIA) within EOIR, has administrative appellate jurisdiction over various matters decided by immigration judges in removal and other proceedings. 8 C.F.R. § 1003.1(b).

[169] *Id.* § 241.6 (DHS authority); *id*. § 1003.6 (BIA authority); *id*. § 1003.23(b)(1)(v) (immigration judge authority). A few provisions of the INA that concern discrete motions for relief or specific categories of aliens directly authorize or mandate stays of removal. *See* 8 U.S.C. § 1227(d)(2) (authorizing stays of removal for applicants for T or U nonimmigrant status); *id*. § 1229a(b)(5)(C) (providing for an automatic stay upon the filing of certain motions challenging *in absentia* removal orders); *id*. § 1231(c)(2) (authorizing stays of removal of aliens arriving at ports of entry).

[170] *See* 8 C.F.R. § 274a.12 (not listing stays of removal as a basis for granting work authorization).

[171] *Id*. § 274a.12(c)(18); *see* 8 U.S.C. § 1231(c)(3) (providing an alien who has been granted a stay of removal may be released from detention pursuant to "conditions [that the Secretary of Homeland Security] may prescribe"); Heeren, *supra* note 28, at 1147 (explaining that individuals who receive stays of removal "typically" receive orders of supervision).

[172] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(I).

[173] *See* 8 U.S.C. § 1231(a)(3) (authorizing supervision after 90-day period); 8 C.F.R. § 241.5(a) (order of supervision).

[174] 8 C.F.R. § 241.5(a).

[175] *See* 8 C.F.R. § 274a.12(c)(18).

[176] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(6) ("Unless protected by some other provision . . . an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision . . . .").

[177] Ragbir v. Sessions, No. 18-CV-236 (KBF), 2018 WL 623557, at *2 (S.D.N.Y. Jan. 29, 2018).



7/6/22, 2:55 PM Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 185 of 513
Number of unemployed persons per job opening, seasonally adjusted

The Wayback Machine - https://web.archive.org/web/20220508061922/https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm

**U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Data Tools > Charts and Applications > Charts for Economic News Releases

# Graphics for Economic News Releases

## Number of unemployed persons per job opening, seasonally adjusted

Charts related to the latest "Job Openings and Labor Turnover Survey" news release | More chart packages

PREV NEXT Choose another chart GO

Number of unemployed persons per job opening, seasonally adjusted
Click and drag within the chart to zoom in on time periods
0
1
2
3
4
5
6
7
Mar 2007
Mar 2008
Mar 2009
Mar 2010
Mar 2011
Mar 2012
Mar 2013
Mar 2014
Mar 2015
Mar 2016
Mar 2017
Mar 2018
Mar 2019
Mar 2020
Mar 2021
Mar 2022
Hover over chart to view data.
Note: Shaded area represents recession, as determined by the National Bureau of Economic Research.
Source: U.S. Bureau of Labor Statistics.

Show table

U.S. BUREAU OF LABOR STATISTICS OEUS/JOLTS, PSB Suite 4840 PSB Suite 4160 2 Massachusetts Avenue NE Washington, DC 20212-0001

Telephone:1-202-691-5870 www.bls.gov/JLT Contact JOLTS

AR2022_400185

https://web.archive.org/web/20220508061922/https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm 1/1

Hide table

Number of unemployed persons per job opening, seasonally adjusted

| Month | Number of unemployed persons per job opening |
|---|---|
| Mar 2007 | 1.4 |
| Apr 2007 | 1.5 |
| May 2007 | 1.5 |
| June 2007 | 1.4 |
| July 2007 | 1.6 |
| Aug 2007 | 1.6 |
| Sept 2007 | 1.5 |
| Oct 2007 | 1.6 |
| Nov 2007 | 1.6 |
| Dec 2007 | 1.7 |
| Jan 2008 | 1.7 |
| Feb 2008 | 1.8 |
| Mar 2008 | 1.9 |
| Apr 2008 | 1.9 |

7/6/22, 2:55 PM Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 187 of 513 Number of unemployed persons per job opening, seasonally adjusted

Hide table

| | |
|---|---|
| **Jan 2021** | 1.4 |
| **Feb 2021** | 1.3 |
| **Mar 2021** | 1.1 |
| **Apr 2021** | 1.0 |
| **May 2021** | 1.0 |
| **June 2021** | 1.0 |
| **July 2021** | 0.8 |
| **Aug 2021** | 0.8 |
| **Sept 2021** | 0.7 |
| **Oct 2021** | 0.7 |
| **Nov 2021** | 0.6 |
| **Dec 2021** | 0.6 |
| **Jan 2022** | 0.6 |
| **Feb 2022** | 0.6 |
| **Mar 2022** | 0.5 |

AR2022_400187

https://web.archive.org/web/20220508061922/https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm 1/1

BLOG

# The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants

SEPTEMBER 17, 2021 • ARTICLES

By Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas

The United States is often described as a nation of immigrants. With the exception of Native Americans, the vast majority of Americans are immigrants or the descendants of immigrants or enslaved people. This diversity has been celebrated for its contributions to American culture through cuisine, language, and the arts, among many other influences.

Immigrants also make an important contribution to the U.S. economy. Most directly, immigration increases potential economic output by increasing the size of the labor force. Immigrants also contribute to increasing productivity. Economists Gaetano Basso and Giovanni Peri find that immigrants are more mobile ↗ than natives in response to local economic conditions, perhaps because they have fewer long-standing familial and community ties, helping labor markets to function more efficiently. Economists Jennifer Hunt and Marjolaine Gauthier-Loiselle have also shown that immigrants boost innovation, a key factor in generating improvements in living standards. Specifically, they find that a 1 percentage point increase in the population share of immigrant college graduates increases patents per capita by 9 percent to 18 percent ↗.

While most immigrants residing in the United States are legally authorized to live and work here, the Department of Homeland Security (DHS) estimates the population of unauthorized immigrants to be roughly 11.4 million as of 2018. This estimate and those used by researchers include beneficiaries of Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS), even though both groups have legal authorization to live and work in the United States on a temporary basis.[1] This diverse population also includes other individuals who either entered without passing through immigration (unauthorized entry), or legally came to the United States on a temporary basis and then overstayed their visa.[2] Most of these individuals may not legally work or receive safety-net benefits—or only can under substantial restrictions.

This blog discusses the economics of legalizing unauthorized immigrants. Some critics claim that legalizing unauthorized immigrants, as proposed by the Build Back Better framework, could be costly because they would become eligible for additional social insurance benefits such as Medicaid. However, granting permanent legal status would also likely raise tax revenues, increase productivity, and have additional benefits for the children of these immigrants, generating substantial economic value for the country.

**Permanent legal status is likely to increase the effective labor supply of unauthorized immigrants.**

About 73 percent of unauthorized-immigrant adults ages 18 to 65 were employed in any given year from 2014 to 2019, roughly equal to the employment rates of non-citizen legal residents and U.S. citizens.[3] Permanent legal status would likely allow these workers to be more productive, generating gains that could be realized through a variety of channels.

Critically, permanent legal status would allow these currently unauthorized immigrants to pursue and accept jobs for which their skills are well-suited, rather than being restricted to particular sectors of the economy, such as agriculture, construction, and leisure and hospitality, where employers often do not insist on legal status and where wages are lower on average. For example, around one-half ↗ of workers in the U.S. dairy industry—which in 2018 paid between $11 and $13 an hour ↗ for general labor—are immigrants, most of whom are thought to be unauthorized.[4] Without legal status, unauthorized immigrants have limited opportunities for job mobility, a key channel ↗ by which other workers find better, more productive employment matches over their careers.

Comparisons between the earnings of authorized and unauthorized immigrants suggest that limited job opportunities cause talent to be misallocated, reducing productivity. Unauthorized-immigrant workers have been estimated to earn about 40 percent ↗ less per hour than native-born workers and about 35 percent ↗ less per hour than legal immigrants. A large part of these gaps can be explained by differences in average skills as measured by educational attainment; however, after adjusting for these and other demographic differences, this research continues to find a significant "wage penalty ↗" for unauthorized workers ranging from 4 percent ↗ to 24 percent ↗ of their hourly wage. Further, we estimate that there is no wage penalty for unauthorized-immigrant workers relative to similar legal immigrants within the same occupation and industry, which suggests the penalty arises from being confined to low-paying jobs.[5]

In addition to employment opportunities, evidence from prior legalizations in the United States and in other countries suggests that legalization also encourages immigrants to improve their language skills, induces them to complete additional education and training, and

improves their health outcomes, all of which make them more productive members of society. For example, evidence from Germany finds ↗ that faster access to citizenship led immigrant women to improve their language skills in addition to increasing their labor force attachment. In a study of U.S. teenagers born to the same immigrant families—but whose legal status varies due to the countries in which they were born—the unauthorized-immigrant teenagers were about 2.6 percentage points ↗ less likely to be enrolled in school. In addition, evidence from the Immigration Reform and Control Act of 1986 (IRCA ↗) and DACA ↗ shows these reforms increased schooling for previously-unauthorized immigrants. Finally, a recent economic study ↗ also suggests that DACA-recipients experienced improved physical and mental health, which contributes to increased productivity.

In a market economy, employees' productivity influences their pay. As a result, productivity improvements—through better job matches, investments in skills, and increases in physical and mental health—should be reflected in increased wages among the legalized immigrants. Indeed, the research evidence supports this hypothesis. For example, research finds that the wages of DACA-eligible Dreamers rose 4 to 5 percent ↗ by 2016 relative to those not eligible.[6] Another study concludes ↗ that the DACA-related gains in earnings for unauthorized workers were largest among the lowest paid workers. These results signify that even though these unauthorized immigrants may currently be working in the United States, providing them with legal permanent status would increase their effective labor supply, that is, the work their greater productivity enables them to do. Importantly, this increase in productivity is foundational for improving U.S. economic growth.

Given that providing legal status to unauthorized immigrants would increase their effective labor supply, critics of legalization argue there could be adverse labor market consequences for native and other immigrant workers. While there is not a large economics literature on the labor market effects of legalization on other workers, in a well-cited National Academies report ↗ on the economic and fiscal impact of immigration, a distinguished group of experts concludes that in the longer run, the effect of immigration on wages overall is very small.[7]

AR2022_400190

**Permanent legal status would likely have implications for costs and revenues for the Federal government.**

While granting permanent legal status to unauthorized immigrants would likely boost economic growth, some are concerned about the price tag, given that an increased number of legal immigrants could enroll in, and raise costs of, social benefit programs. However, some of this increased cost would likely be offset by higher tax contributions.[8]

Consider first the potential increase in costs to the Federal government associated with receipt of social benefits. Legal status may make undocumented immigrants more comfortable using Federal benefits for which they are already eligible ↗, such as emergency health services under Medicaid and the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). In addition, newly-legalized immigrants could take up social benefits for which they were previously ineligible due to their unauthorized status. Based on benefit use among demographically-similar, non-citizen legal immigrants, this increase in take-up could be significant. For example, many ↗ of these immigrants could become fully eligible for Medicaid.[9] Finally, granting legal status could also increase benefit take-up among citizen or authorized-immigrant relatives of undocumented immigrants; several ↗ studies ↗ find that the threat of an undocumented relative being deported discouraged benefit take-up by citizen members of the same household, even though those citizens are eligible for benefits and cannot be deported.

However, much of the direct fiscal cost of these public benefits is likely to be repaid due to increased tax contributions from the immigrants, and, in the long run, by positive fiscal contributions from their children. Anyone working in the United States is supposed to be paying taxes; however, Federal income tax compliance rates for unauthorized immigrants are unknown. Several government agencies and nongovernmental organizations estimate rates between 50 and 75 percent ↗. By comparison, tax compliance rates on ordinary wage income are close to 100 percent for the U.S. population as a whole, according to the U.S. Treasury Department ↗.

Shifts from the informal to the formal ↗ sector that are expected to result from legal status would likely increase tax compliance rates. Indeed, after the passage of IRCA, researchers found ↗ that income tax compliance rates of previously-unauthorized immigrants in California became comparable to other residents. Combined with the wage gains, gross tax revenues would increase. Moreover, undocumented immigrants are disproportionately of prime-working age (see Figure 1) and relatively younger than prime-age U.S. citizens. Therefore, they are likely to have many working years during which they will be paying these higher payroll and income taxes if they are legalized.

Finally, many children of unauthorized immigrants grow up in households below the Federal poverty level because ↗ their parents cannot secure higher-paying work due to their immigration status. Growing up poor can be harmful for child development, and providing public health insurance ↗ and nutrition assistance ↗ has been shown to improve the health of immigrant children. In general, the direct fiscal cost of public assistance for low-income children is thought ↗ to be substantially or fully offset ↗ in the long run. The costs are offset by increases in tax revenues ↗ and reductions in spending on government programs when these children grow up to become higher-earning ↗ adults than they would have had they not received assistance.[10]

**Conclusion**

Immigrants have made innumerable contributions to American business and society. However, current law confines millions of them to a life in the shadows, without the rights to be fully economically engaged or have access to foundational social protections. Such treatment inflicts harms on unauthorized immigrants themselves and their families—many ↗ of which include U.S. citizens and non-citizen legal residents—as well as to the broader economy.

Though some ↗ argue that increased take-up of social programs would generate a substantial fiscal cost to the government, the productivity of the newly-legalized would likely increase, which would benefit all in the United States by expanding economic output. Further, the

ensuing increase in wages and compliance with tax requirements would increase their contributions to public sector finances, and their children would benefit as well. Allowing currently unauthorized workers to engage fully in the labor force would not only benefit the immigrants and their families, but society as a whole.

---

[1] DHS estimates of the unauthorized immigrant population are calculated as the residual from subtracting the legally-resident, foreign-born population from the total foreign-born population. Dreamers (individuals born between 1981 and 2012 brought to the United States as children) who applied to and were accepted into the DACA program can legally work and reside in the United States, but only for two years, at which point they must apply to renew their status; the Supreme Court ruled in June 2020 that the Trump Administration could not end the program, but the U.S. District Court in Southern Texas ruled in July 2021 that the program is not lawful. While those currently in the DACA program are still protected and can reapply, new applicants are not accepted, and the case is making its way through the Federal courts. TPS is granted only until resolution of the conditions in a recipient's country of origin that make it difficult or unsafe to return.

[2] Unauthorized immigrants do not include people who have been granted asylum or refugee status or nonimmigrant residents, such as students and temporary workers, who have been granted permission to study or work in the United States for a limited period of time and for a specific purpose.

[3] CEA analysis of Current Population Survey microdata from 2014 to 2019.

[4] The average hourly wage in the United States in 2020 was about $27 an hour.

[5] Based on CEA analysis of Current Population Survey microdata from 2014 to 2019.

[6] Evidence from the wage impacts of naturalization in the United States and other countries; smaller extensions of work authorization to particular groups of unauthorized immigrants, such as those aided by the Chinese Student Protection Act of 1992; and reforms that have restricted employment options for unauthorized workers, also suggest that granting legal status would improve labor market outcomes of unauthorized workers.

[7] See also David Card's Richard T. Ely Lecture to the American Economic Association in which he argues that immigrants have had at most small impacts on wage inequality among natives.

[8] We note that the fiscal impacts of providing legal permanent status to existing unauthorized immigrants likely differ from prior analyses of the fiscal impacts of immigration generally, as unauthorized immigrants are already in the country, and many ↗ currently work, pay taxes, and receive some forms of government benefits. This existing relationship with the government makes it necessary to estimate how their rates of tax compliance and take-up of benefits would change if they gained legal status. Such calculations are not straightforward and require important assumptions, some with scarce relevant data and evidence that could inform them.

[9] Unauthorized immigrants who entered the United States after August 22, 1996—the date Federal welfare reforms were signed into law—would generally be eligible only after a waiting period of five years ↗ of legal residence for several benefits, including non-emergency health services under Medicaid and the Supplemental Nutrition Assistance Program (SNAP).

[10] At present the Congressional Budget Office (CBO) does not account ↗ for any long-run fiscal return to public benefit programs, suggesting that current approaches to "scoring" the fiscal impacts of legal status are likely to overstate their true fiscal cost.



CONGRESSIONAL BUDGET OFFICE
U.S. Congress
Washington, DC 20515

Douglas W. Elmendorf, Director

January 29, 2015

Honorable Thad Cochran
Chairman
Committee on Appropriations
United States Senate
Washington, DC 20510

*Re: Budgetary Effects of Immigration-Related Provisions of the House-Passed Version of H.R. 240, An Act Making Appropriations for the Department of Homeland Security*

Dear Mr. Chairman:

CBO and the staff of the Joint Committee on Taxation (JCT) have analyzed sections 579 through 583 of H.R. 240, the Department of Homeland Security Appropriations Act, 2015, as passed by the House of Representatives on January 14, 2015.

Sections 579 and 580 would permanently prohibit the executive branch from exempting or deferring from removal certain categories of aliens considered to be unlawfully present in the United States. Those two sections of the legislation also would prohibit the executive branch from treating the affected people as if they were lawfully present or had lawful immigration status, or providing them with the authorization to work legally.

CBO and JCT expect that enacting those sections of the House-passed legislation would reduce both revenues and outlays for direct spending programs.[1] Specifically, JCT estimates that, under those sections, revenues would be lower by $22.3 billion over the 2015-2025 period. In addition, CBO and JCT estimate that direct spending would be lower by $14.9 billion over the same period. On net, deficits would be higher by $7.5 billion over the 2015-2025 period (see enclosed table).

1. CBO has not estimated the budgetary effects that enacting sections 579 and 580 might have on future spending subject to appropriation.

We estimate that enacting sections 581, 582, and 583 of that act would have no significant budgetary effects.

**People Affected by Sections 579 and 580 of the Legislation**
From 2011 through 2014, the President announced a series of policy initiatives related to immigration that the Administration is carrying out or intends to carry out under current law. Sections 579 and 580 of H.R 240 would end or reverse many of those initiatives and would eliminate all of the programs discussed below that involve deferred action, a process where the Department of Homeland Security (DHS) delays removal proceedings for unauthorized residents who meet criteria specified in the Presidential memoranda. Deferred action grants lawful presence and potential work authorization but does not provide any other legal status, such as lawful permanent residence or the right to naturalize. Most of the budgetary effects of those sections stem from reversing the deferred action initiatives.

**Childhood Arrivals.** Under the Deferred Action for Childhood Arrivals (DACA) program, which began in August 2012, people are eligible to apply if they:

- Were under 31 years of age as of June 15, 2012,
- Were younger than 16 when they came to the United States,
- Have continuously resided in the United States since June 15, 2007, and
- Have been registered in and attending school, or graduated from high school or earned a GED certificate, or been honorably discharged from the military.

Deferred action is for an initial two-year period, but can be renewed. Based on information from DHS and research from organizations that study immigration, CBO estimates that about 2 million unauthorized residents are eligible for DACA. As of September 30, 2014, DHS had received about 700,000 initial applications and approved about 600,000 of them, and approved about 20,000 renewal applications. CBO estimates that, under current law, in 2017, about 600,000 people will be covered under this deferred action program.

**Expansion of Childhood Arrivals.** On November 20, 2014, the President made three changes to the original DACA program that allow more people to qualify and extend the term of deferred action:

- Individuals who meet all of the other requirements but were 31 years or older as of June 15, 2012, are now eligible.

- Individuals who meet all of the other requirements but who arrived between June 15, 2007, and January 1, 2010, are now eligible.

- The duration of the deferred action is increased to three years instead of two years.

For this estimate, CBO assumes that under current law, DHS will begin accepting and approving applications for the expanded eligible population in the second half of fiscal year 2015. CBO expects that the newly eligible people will apply for and be approved for deferred action at a rate similar to that of the original applicants. Based on those considerations and information about the number of people who are eligible for deferred action under the expanded eligibility criteria, CBO estimates that in 2017 about 150,000 people will have been approved for such action.

**Parents of U.S. Citizens or Lawful Permanent Residents.** On November 20, 2014, the President also announced that parents of U.S. citizens or lawful permanent residents could apply for deferred action if they:

- Have been continuously present in the country since January 1, 2010,

- Were physically present in the country on November 20, 2014, and are physically present at the time they apply for deferred action,

- Had no legal status on November 20, 2014, and

- Are not considered a priority for enforcement for DHS.

Based on information from DHS and research from organizations that study immigration, CBO estimates that about 4 million parents are eligible for deferred action through this new initiative. For this estimate, CBO assumes that DHS will begin accepting and approving applications for the eligible population in the second half of fiscal year 2015. Although DHS has not yet promulgated regulations specifying how people will prove their eligibility

for the program, CBO expects that the process will be similar to that for the DACA program. However, CBO expects that the parents who are eligible for this program will be less likely than the people who are eligible for the original program to declare their unlawful presence to the government for a three-year deferral; in addition, they may have a harder time proving eligibility. Therefore, CBO expects that the total participation rate will be somewhat lower than for DACA. CBO estimates that in 2017 about 1.5 million parents of U.S. citizens or lawful permanent residents will have been approved for deferred action.

**Citizen Children.** Although U.S. citizen children living with parents who are unauthorized residents are fully eligible for all federal benefit programs, their parents' immigration status can affect the likelihood that their parents choose to enroll them in such programs. CBO expects that granting deferred action to the parents of citizen children will increase those children's participation in benefit programs. Based on information from DHS and research from organizations that study immigration, CBO estimates that about 4.5 million U.S. citizens under the age of 18 have at least one parent who is an unauthorized resident. CBO also estimates that about 400,000 additional children will be born to parents who will receive deferred action over the next 10 years.

**Probability of Deferred Action Under a Different Administration**

Because the deferred action programs were created by administrative action and not by a new law, there is substantial uncertainty as to whether future Presidents will continue the programs. To account for that uncertainty, CBO's baseline incorporates a 50 percent chance that the programs will be continued after 2017 and a 50 percent chance that they will be discontinued after that date. As a result, CBO's estimate of the effects of eliminating those programs under H.R. 240 is also probabilistic, placing 50 percent weight on the possibility that the programs will be continued after 2017 under current law—and thus, that H.R. 240 would reverse their budgetary effects after that date—and 50 percent weight on the possibility that the programs will already have been stopped after 2017 by administrative action.

**Effects of Sections 579 and 580 of the Legislation on Revenues**

Sections 579 and 580 of H.R. 240 would affect tax revenues in a number of ways, some of which would decrease receipts and some of which would increase them. After accounting for both sets of effects, JCT estimates that enacting the legislation would reduce tax revenues by $22.3 billion over the

2015-2025 period. Over that period, JCT estimates that off-budget receipts (Social Security payroll taxes) would decrease by $17.1 billion, and that on-budget receipts would decrease by $5.2 billion.

JCT expects that the largest effect of sections 579 and 580 would be decreased reporting of employment income by people who would be legally allowed to work because of the deferred action programs under current law but would not be legally allowed to work under the act. Moreover, JCT expects that wages for affected workers would decrease relative to their wages under current law as a result of their losing legal status under the act. That decrease in reported wages would cause decreases in receipts, most of which would be from Social Security taxes, which are categorized as off-budget.

Decreased reporting of employment income also would result in decreases in tax deductions by businesses for their labor compensation, including employers' contributions for payroll taxes. As a result, corporations would report higher taxable profits and pay more in income taxes. Non-corporate businesses, such as partnerships and sole proprietorships, also would report higher taxable income, which would increase individual income taxes paid by the partners and owners.

**Effects of Sections 579 and 580 of the Legislation on Direct Spending**
Under H.R. 240, participation in several federal programs and tax provisions would decline because some people would no longer be eligible to participate or because they would choose not to participate (or choose not to have their children participate) for fear of revealing their unlawful presence. Taking into account the effect on a number of programs, CBO and JCT expect that direct spending would be reduced under the legislation by $14.9 billion over the 2015-2025 period.

**Earned Income and Child Tax Credits.** JCT estimates that H.R. 240 would decrease outlays for the earned income and child tax credits by $10.2 billion over the 2015–2025 period. The earned income tax credit and the child tax credit are refundable tax credits. Refundable tax credits reduce a taxpayer's overall income tax liability; if the credits exceed the other liability, the excess may be refunded to the taxpayer. Those refunds are classified as outlays in the federal budget.

JCT estimates that the bulk of the decrease in outlays for refundable credits projected for the 2015–2025 period would be attributable to decreases in

earned income tax credits. H.R. 240 would decrease the amount of earned income tax credits by decreasing the number of people with Social Security numbers, which are required for taxpayers and dependents to qualify for earned income tax credits.

**Social Security and Medicare.** To collect Social Security and Medicare benefits while in the United States, an individual must be lawfully present. Individuals approved for deferred action are considered lawfully present in the United States. Under the bill those individuals would no longer be lawfully present and would be ineligible to receive such benefits. Over the 2015-2025 period relatively few of the people affected by the act would have reached the eligibility ages for Social Security old-age benefits or for Medicare benefits associated with age. However, some of the affected people would have become eligible for Social Security disability benefits and for Medicare based on that disability status. CBO estimates that enacting sections 579 and 580 would reduce spending for Social Security by $0.8 billion and for Medicare by $0.3 billion over the 2015-2025 period. Spending for Social Security is off-budget.

**Other Federal Benefits.** The Administration has issued regulations that make individuals granted deferred action under the initial DACA program ineligible for subsidies for health insurance offered through exchanges under the Affordable Care Act, and it has announced that it will also exclude individuals granted deferred action under the new programs. Although the Administration has not yet published an updated regulation to that effect, CBO and JCT assume for this estimate that all of the people in the deferred action programs will be ineligible for those subsidies. Moreover, individuals approved for deferred action are generally ineligible for other federal benefit programs and the legislation would not affect their eligibility for those other programs.

However, many of the people who would be affected by the legislation have children who are natural-born U.S. citizens. Those children, like other citizens, are eligible for federal benefits if they meet the relevant eligibility criteria for particular programs. CBO expects that once their parents have been granted lawful presence under current law, they will apply for benefits on their children's behalf, so their children's participation in various programs will gradually increase for about five years before stabilizing at a higher rate. If sections 579 and 580 of H.R. 240 were enacted, CBO expects that many of those parents would opt not to apply for such benefits because

they would fear revealing their own unlawful presence. Therefore, federal spending for certain benefits would be lower:

- **Health Care Benefits.** CBO estimates that under the bill the parents of about 60,000 children per year, on average, would choose not to enroll them in Medicaid or receive subsidies for health insurance purchased through an exchange, at an average savings of about $1,600 per person in 2015 and rising to about $2,600 in 2025. Thus, CBO and JCT estimate that federal spending for Medicaid and the subsidies for insurance obtained through an exchange would be about $1.5 billion lower over the 2015-2025 period.

- **Supplemental Security Income (SSI).** CBO estimates that under the bill the parents of about 15,000 children with disabilities would choose not to enroll them in SSI, which provides monthly cash payments to individuals with disabilities and low family income. The average benefit for SSI over the period will rise from about $8,000 to about $10,000 in 2025. Thus, CBO estimates that federal spending for SSI would be about $1.1 billion lower over the 2015-2025 period.

- **Supplemental Nutrition Assistance Program (SNAP).** CBO estimates that the parents of about 40,000 children, on average, would choose not to enroll those children in SNAP, which provides monthly food assistance benefits to low-income households. CBO estimates that the average per-person benefit for those children under SNAP will rise from about $1,600 per year in 2015 to about $2,100 per year in 2025. Thus, CBO estimates that spending for SNAP would be about $0.8 billion lower over the 2015-2025 period.

- **Higher Education Benefits.** CBO estimates that under the bill, by 2025, about 15,000 students per academic year would choose not to receive Pell grants. The average award level they would forego would be about $3,800. (The bulk of that grant amount, about $3,100, will be supported with discretionary funds, and that effect is not included in this estimate.) Additionally, about 5,000 students per academic year would no longer receive federal student loans by 2025, CBO projects. Thus, CBO estimates that federal direct spending for assistance for higher education would be about $0.1 billion lower over the 2015-2025 period, with most of that difference resulting from a reduction in newly awarded Pell grants.

**Fees for Deferred Action Applications.** DHS collects fees to process new applications and renewals for the deferred action programs. Collections from those fees are classified as offsetting receipts (that is, offsets to outlays) and are available for spending by DHS without further appropriation action. Enacting sections 579 and 580 would prohibit new applications and renewals for those programs. Thus, CBO estimates that fee collections and associated spending would decrease by about $2.5 billion over the 2015–2025 period. Because of the lag between collecting and spending fees, CBO estimates that the decrease in collections would exceed the decrease in spending over that period by $26 million.

**Net Effect on the Deficit**

Under H.R. 240, as passed by the House, both revenues and direct spending would be lower than under current law. However, the drop in revenues would be greater than the drop in direct spending. Deficits for the unified budget would increase by $7.5 billion over the 2015-2025 period, as compared to projected deficits under current law. As the majority of the forgone revenue would be for Social Security payroll taxes, enacting sections 579 and 580 would increase the off-budget deficit by about $16.3 billion over that same period. In contrast, the on-budget deficit would improve by $8.8 billion over the 2015-2025 period.

If you wish further details about this analysis, we will be pleased to provide them. The CBO staff contacts are Sam Papenfuss and Melissa Merrell.

Sincerely,

Douglas W. Elmendorf

Douglas W. Elmendorf
Director

Enclosure

cc: Honorable Barbara A. Mikulski
Ranking Member

Identical letter sent to the Honorable Hal Rogers, Chairman, House Committee on Appropriations.

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 203 of 513

**Estimated Budgetary Effects of Sections 579 and 580 of H.R. 240, the Department of Homeland Security Appropriations Act, 2015, as passed by the House of Representatives on January 14, 2015** [1]

(by fiscal year, in millions of dollars)

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2015 - 2020 | 2015 - 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CHANGES IN REVENUES | | | | | | | |
| **Social Security Taxes (off-budget)** | -256 | -1,205 | -2,264 | -2,244 | -1,811 | -1,632 | -1,600 | -1,569 | -1,509 | -1,483 | -1,516 | -9,412 | -17,091 |
| **Other Taxes** | -116 | -475 | -733 | -657 | -517 | -478 | -472 | -461 | -441 | -438 | -451 | -2,976 | -5,242 |
| **Total Revenues** | **-372** | **-1,680** | **-2,997** | **-2,901** | **-2,328** | **-2,110** | **-2,072** | **-2,030** | **-1,950** | **-1,921** | **-1,967** | **-12,388** | **-22,333** |
| *On-budget* | *-116* | *-475* | *-733* | *-657* | *-517* | *-478* | *-472* | *-461* | *-441* | *-438* | *-451* | *-2,976* | *-5,242* |
| *Off-budget* | *-256* | *-1,205* | *-2,264* | *-2,244* | *-1,811* | *-1,632* | *-1,600* | *-1,569* | *-1,509* | *-1,483* | *-1,516* | *-9,412* | *-17,091* |
| | | | | | | CHANGES IN DIRECT SPENDING | | | | | | | |
| **Earned Income and Child Tax Credits** | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | -459 | -1,582 | -1,719 | -1,206 | -948 | -902 | -894 | -873 | -836 | -829 | -5,914 | -10,249 |
| Estimated Outlays | 0 | -459 | -1,582 | -1,719 | -1,206 | -948 | -902 | -894 | -873 | -836 | -829 | -5,914 | -10,249 |
| **Social Security (off-budget)** [2] | | | | | | | | | | | | | |
| Estimated Budget Authority | * | -15 | -15 | -20 | -35 | -50 | -70 | -95 | -130 | -165 | -220 | -135 | -815 |
| Estimated Outlays | * | -15 | -15 | -20 | -35 | -50 | -70 | -95 | -130 | -165 | -220 | -135 | -815 |
| **Medicare** | | | | | | | | | | | | | |
| Estimated Budget Authority | * | * | * | * | -5 | -15 | -30 | -40 | -55 | -80 | -105 | -20 | -330 |
| Estimated Outlays | * | * | * | * | -5 | -15 | -30 | -40 | -55 | -80 | -105 | -20 | -330 |
| **Health Care** [3] | | | | | | | | | | | | | |
| Estimated Budget Authority | -5 | -55 | -90 | -130 | -175 | -175 | -175 | -175 | -175 | -175 | -170 | -630 | -1,500 |
| Estimated Outlays | -5 | -55 | -90 | -130 | -175 | -175 | -175 | -175 | -175 | -175 | -170 | -630 | -1,500 |
| **Supplemental Security Income** | | | | | | | | | | | | | |
| Estimated Budget Authority | -5 | -45 | -70 | -90 | -125 | -125 | -125 | -135 | -125 | -115 | -120 | -460 | -1,080 |
| Estimated Outlays | -5 | -45 | -70 | -90 | -125 | -125 | -125 | -135 | -125 | -115 | -120 | -460 | -1,080 |
| **Supplemental Nutrition Assistance Program** | | | | | | | | | | | | | |
| Estimated Budget Authority | -1 | -30 | -55 | -80 | -100 | -95 | -95 | -95 | -90 | -85 | -85 | -361 | -811 |
| Estimated Outlays | -1 | -30 | -55 | -80 | -100 | -95 | -95 | -95 | -90 | -85 | -85 | -361 | -811 |
| **Education** [4] | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | -2 | -4 | -6 | -7 | -8 | -9 | -10 | -11 | -12 | -12 | -27 | -81 |
| Estimated Outlays | 0 | -1 | -2 | -4 | -6 | -8 | -9 | -9 | -10 | -11 | -12 | -21 | -72 |
| **Deferred Action Fees** [5] | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Estimated Outlays | 62 | 70 | -113 | 20 | -4 | 11 | -8 | -8 | 8 | -4 | -8 | 46 | 26 |
| **Total Changes in Direct Spending** | | | | | | | | | | | | | |
| Estimated Budget Authority | **-11** | **-606** | **-1,816** | **-2,045** | **-1,653** | **-1,416** | **-1,406** | **-1,444** | **-1,459** | **-1,468** | **-1,541** | **-7,547** | **-14,866** |
| Estimated Outlays | **51** | **-535** | **-1,927** | **-2,023** | **-1,656** | **-1,405** | **-1,414** | **-1,451** | **-1,450** | **-1,471** | **-1,549** | **-7,541** | **-14,857** |
| *On-budget budget authority* | *-11* | *-591* | *-1,801* | *-2,025* | *-1,618* | *-1,366* | *-1,336* | *-1,349* | *-1,329* | *-1,303* | *-1,321* | *-7,412* | *-14,051* |
| *On-budget outlays* | *51* | *-520* | *-1,912* | *-2,003* | *-1,621* | *-1,355* | *-1,344* | *-1,356* | *-1,320* | *-1,306* | *-1,329* | *-7,406* | *-14,042* |
| *Off-budget budget authority* | * | *-15* | *-15* | *-20* | *-35* | *-50* | *-70* | *-95* | *-130* | *-165* | *-220* | *-135* | *-815* |
| *Off-budget outlays* | * | *-15* | *-15* | *-20* | *-35* | *-50* | *-70* | *-95* | *-130* | *-165* | *-220* | *-135* | *-815* |
| | | | | | | NET INCREASE OR DECREASE (-) IN DEFICITS | | | | | | | |
| **Increase or Decrease (-) in the Deficit** | **423** | **1,145** | **1,070** | **878** | **672** | **705** | **658** | **579** | **500** | **450** | **418** | **4,847** | **7,476** |
| *On-budget* | *167* | *-45* | *-1,179* | *-1,346* | *-1,104* | *-877* | *-872* | *-895* | *-879* | *-868* | *-878* | *-4,430* | *-8,800* |
| *Off-budget* | *256* | *1,190* | *2,249* | *2,224* | *1,776* | *1,582* | *1,530* | *1,474* | *1,379* | *1,318* | *1,296* | *9,277* | *16,276* |

Sources: Congressional Budget Office and the staff of the Joint Committee on Taxation.

**Notes:** Components may not sum to totals because of rounding; Estimates relative to CBO's January baseline; * = between -$500,000 and $0.

1. CBO has not estimated the budgetary effects that enacting sections 579 and 580 might have on future spending subject to appropriation.
2. Includes both Old Age and Survivors Insurance Program and the Disability Insurance Program.
3. Includes outlays for Medicaid and for subsidies for health insurance purchased through an exchange.
4. Includes student loans and mandatory outlays for Pell grants. Does not include the discretionary component for Pell grants.
5. Fees collected and spent by the Department of Homeland Security for processing deferred action applications and renewals.



# Immigration Parole

October 15, 2020

Congressional Research Service
https://crsreports.congress.gov
R46570

## Summary

The parole provision in the Immigration and Nationality Act (INA) gives the Secretary of the Department of Homeland Security (DHS) discretionary authority to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

Immigration parole is official permission to enter and remain temporarily in the United States. It does not constitute formal admission under the U.S. immigration system. An individual granted parole (a parolee) is still considered an applicant for admission. A parolee is permitted to remain in the United States for the duration of the grant of parole, and may be granted work authorization.

The DHS Secretary's parole authority has been delegated to three agencies within the department: U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP). Parole can be requested by foreign nationals inside or outside the United States in a range of circumstances. Major parole categories include port-of-entry parole, advance parole, humanitarian parole, and parole-in-place.

Over the years, U.S. Administrations have used parole authority to bring in various groups of foreign nationals seeking long-term admission to the country, including Indochinese refugees, Cuban nationals, and Central American minors found ineligible for refugee status. Although created in response to specific circumstances, there are certain commonalities among these special parole programs. Many can be grouped under at least one of three headings: refugee-related parole programs, family reunification parole programs, and Cuban parole programs. Data on grants of parole under some of these programs are available from DHS.

The use of parole authority to enable designated populations abroad to enter the United States has been particularly controversial. Some policymakers have argued that such programs are an appropriate use of the DHS Secretary's statutory authority, while others see them as violations of the "case-by-case basis" requirement of the parole provision. Reflecting the latter view, President Donald Trump's Executive Order 13767 on Border Security and Immigration Enforcement Improvements directs the DHS Secretary to "take appropriate action to ensure that parole authority … is exercised only on a case-by-case basis in accordance with the plain language of the statute."

Parole does not grant, nor entitle beneficiaries to later obtain, a lawful permanent resident (LPR) status. Beginning in the mid-1950s, Congress passed measures (separate from the INA) that established processes to grant LPR status to specified groups of parolees. Since the enactment of a 1960 law, persons with parole in the United States have been able to apply for and be granted LPR status, but to do so they must be eligible to receive an immigrant visa and meet other requirements.

Bills introduced in recent Congresses illustrate differing views on the appropriate use of immigration parole authority. On the one hand, various measures have proposed utilizing parole authority as a mechanism to grant temporary immigration relief to specified populations. On the other hand, multiple bills have sought to restrict the use of parole authority; some of these bills have included language specifically to prohibit the use of parole for entire classes of people.

# Contents

Introduction ... 1
INA Parole Authority ... 2
DHS Exercise of Parole Authority ... 3
Categories of Parole ... 4
Port-of-Entry Parole ... 5
Deferred Inspection Parole ... 5
Advance Parole ... 5
Humanitarian Parole for Persons Outside the United States ... 5
Significant Public Benefit Parole for Persons Outside the United States ... 6
Parole-in-Place ... 6
Removal-Related Parole ... 6
Special Parole Programs for Persons Outside the United States ... 6
Parole Application Process ... 6
Selected Immigration Parole Programs for Persons Outside the United States ... 7
Refugee-Related Parole Programs ... 8
Family Reunification Parole Programs ... 9
Other Parole Programs for Cuban Nationals ... 11
Debate Over Parole Programs for Specified Populations ... 12
Work Authorization for Parolees ... 13
Parole and Permanent Immigration Status ... 15
Adjustment of Status Legislation ... 15
Advance Parole and Adjustment of Status ... 16
Legislation in Recent Congresses ... 18
Conclusion ... 19

## Appendixes

Appendix. INA Parole Provision (§212(d)(5)) ... 20

## Contacts

Author Information ... 21

# Introduction

Executive Order 13767 on Border Security and Immigration Enforcement Improvements, issued by President Donald Trump on January 25, 2017, is perhaps best known for its call for construction of a wall on the Southwest border. It includes a number of other provisions, however, including one on immigration parole. Section 11(d) directs the Secretary of the Department of Homeland Security (DHS) to "take appropriate action to ensure that parole authority … is exercised only on a case-by-case basis in accordance with the plain language of the statute."[1]

Immigration parole permits a foreign national to be present temporarily in the United States for humanitarian or public benefit reasons. A parole provision was included in the original Immigration and Nationality Act (INA) of 1952 and was subsequently amended.[2] It currently reads, in part:[3]

> (A) The Attorney General [now the Secretary of Homeland Security] may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.

While seemingly limited and technical, INA parole authority has been the subject of considerable debate. It gives the DHS Secretary broad, discretionary authority to allow persons who may not otherwise be admissible to the country under the immigration laws to enter and remain in the United States temporarily. Persons granted parole (parolees) can apply for work authorization. Parole is one of several authorities that allow foreign nationals to live and work in the United States without being formally admitted to the country and without having a set pathway to a permanent immigration status.

Over the years, parole authority has been used to bring in various groups of foreign nationals seeking long-term admission, including Indochinese refugees, Cuban nationals, and Central American minors found ineligible for refugee status. Parole also has been granted to individuals within the United States, including certain unauthorized family members of U.S. military service members and veterans.

This report provides a brief legislative history of the INA parole provision, describes categories of parole and the application process, explores the exercise of parole authority for groups outside the United States and related debates, discusses regulations on employment authorization, explains how parolees can obtain U.S. lawful permanent resident (LPR) status, and considers recent legislative efforts to delineate appropriate uses of parole.

---

[1] Executive Order 13767, "Border Security and Immigration Enforcement Improvements," 82 *Federal Register* 8793, January 30, 2017.

[2] The INA is Act of June 27, 1952, ch. 477, codified, as amended, at 8 U.S.C. Sections 1101 et seq. It is the basis of U.S. immigration law. The parole provision is INA Section 212(d)(5), 8 U.S.C. Section 1182(d)(5). See the **Appendix** for the full original 1952 parole provision and the current parole provision.

[3] An *alien* is defined in the INA as a person who is not a U.S. citizen or a U.S. national; it is synonymous with *foreign national.*

# INA Parole Authority

Immigration parole is official permission to remain temporarily in the United States. In the case of individuals outside the United States, it also permits entry into the country. Parole does not constitute formal admission under the U.S. immigration system. A parolee is still considered an applicant for admission and is required to leave the United States before the period of parole expires.[4]

The original INA parole provision authorized the Attorney General, head of the Department of Justice (DOJ), to grant parole "for emergent reasons or for reasons deemed strictly in the public interest."[5] The INA, as initially enacted, did not contain distinct provisions for the admission of refugees; beginning in the 1950s, U.S. Administrations used the parole provision to bring in refugees.[6]

As part of the 1965 INA Amendments,[7] a "conditional entry" provision for the admission of refugees was added to the INA. House Judiciary Committee and Senate Judiciary Committee reports on the 1965 legislation stated, in identical language, that with this addition the INA parole authority should thereafter be limited to certain situations:

> Inasmuch as definite provision has now been made for refugees, it is the express intent of the committee that the parole provisions of the Immigration and Nationality Act, which remain unchanged by this bill, be administered in accordance with the original intention of the drafters of that legislation. The parole provisions were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law.[8]

The conditional entry provision, however, was limited to the Eastern Hemisphere and was subject to other restrictions. As a consequence, the executive branch continued to use parole authority to address refugee situations. During the 1960s and 1970s, large numbers of individuals from Cuba, Indochina, and other areas, who the United States considered to be refugees, were paroled into the country.[9]

The Refugee Act of 1980[10] added language to the INA defining the term *refugee* and establishing a refugee admissions process.[11] Among its other provisions, the 1980 act amended the INA

---

[4] A parolee, however, may apply for re-parole.

[5] See the **Appendix** for the full original 1952 parole provision.

[6] In 1956, in the first use of the INA parole provision to bring in refugees, President Dwight Eisenhower directed the Attorney General to parole in 15,000 Hungarian refugees who had fled the country after the Hungarian Revolution of 1956. U.S. Congress, Senate Committee on the Judiciary, *Review of U.S. Refugee Resettlement Programs and Policies*, committee print, prepared by the Congressional Research Service, 96th Cong., 2nd sess., 66-439 O (Washington, DC: GPO, 1980), p. 9 (hereinafter cited as 1980 committee print).

[7] P.L. 89-236, §3.

[8] U.S. Congress, House Committee on the Judiciary, *Amending the Immigration and Nationality Act, and for Other Purposes*, report to accompany H.R. 2580, 89th Cong., 1st sess., H. Rept. 945, August 6, 1965, p. 15-16; U.S. Congress, Senate Committee on the Judiciary, *Amending the Immigration and Nationality Act, and for Other Purposes*, report to accompany H.R. 2580, 89th Cong., 1st sess., S. Rept. 748, September 15, 2016, p. 17.

[9] For additional information, see 1980 committee print, pp. 12-15.

[10] P.L. 96-212.

[11] The refugee definition is set forth in INA Section 101(a)(42), and the refugee admissions process in INA Section 207. For additional information about the U.S. refugee admissions program, see CRS Report RL31269, *Refugee Admissions and Resettlement Policy*.

section on parole to restrict its use for bringing in refugees. It added a second paragraph to the parole provision as INA Section 212(d)(5)(B).[12] This paragraph, which remains in law, reads:[13]

> (B) The Attorney General [now the Secretary of Homeland Security] may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 further amended the parole provision to replace the original 1952 language, "for emergent reasons or for reasons deemed strictly in the public interest," with the current language specifying "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[14] IIRIRA also included language to amend the INA provisions on the worldwide level of family-sponsored immigrants to require that long-term parolees be counted against those limits.[15]

The Homeland Security Act of 2002[16] abolished DOJ's Immigration and Naturalization Service (INS) and transferred most of its immigration functions to the new DHS as of March 1, 2003. Since then, the DHS Secretary has exercised immigration parole authority.

Parole can be compared to other statutory and non-statutory mechanisms that provide foreign nationals with temporary authorization to be in the United States.[17] Like recipients of statutory Temporary Protected Status (TPS) and executive branch-established Deferred Action for Childhood Arrivals (DACA), for example, parolees can live and work in the United States for a specified period.[18] Among the key differences, however, is that parole is subject to fewer eligibility requirements than TPS or DACA. It also can be granted to persons inside or outside the country, while both TPS and DACA are limited to persons within the United States. Parole, though, is subject to at least one restriction that does not apply under TPS or DACA. A person is not eligible for parole-in-place, which, as described below, is a term for the authorization of parole for someone inside the United States, if that person was lawfully admitted, even if his or her authorized period of stay has expired.

# DHS Exercise of Parole Authority

The DHS Secretary's parole authority has been delegated to three agencies within the Department: U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP). In 2008, the three agencies

[12] P.L. 96-212, §203(f).

[13] See the **Appendix** for the full current INA parole provision.

[14] P.L. 104-208, Division C, §602(a).

[15] P.L. 104-208, §603. For information on family-based immigration and related numerical limits, see CRS Report R43145, *U.S. Family-Based Immigration Policy*.

[16] P.L. 107-296.

[17] For further discussion, see Geoffrey Heeren, "The Status of Nonstatus," American University Law Review, vol. 64, issue 5 (June 2015).

[18] For information about TPS, see CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues*; for information about DACA, see CRS Report R45995, *Unauthorized Childhood Arrivals, DACA, and Related Legislation*.

entered into a memorandum of agreement (MOA) regarding the exercise of parole with respect to aliens outside the United States and at ports of entry.[19]

As discussed in the MOA, the phrases "humanitarian reasons" and "significant public benefit" in the current parole provision have taken on particular meanings:

> As practice has evolved, DHS bureaus have generally construed "humanitarian" paroles (HPs) as relating to urgent medical, family, and related needs and "significant public benefit["] paroles (SPBPs) as limited to persons of law enforcement interest such as witnesses to judicial proceedings.[20]

Regarding the length of a parole grant, the INA provision generally states, "when the purposes of such parole shall … have been served the alien shall forthwith return or be returned." USCIS has addressed the length of its grants of humanitarian or significant public benefit parole for individuals outside the United States (these parole categories are further discussed below). As explained by the agency, it grants parole "for a temporary period of time to accomplish the purpose of the parole," which typically is no longer than one year.[21]

In addition, according to USCIS, "Parole ends on the date the parole period expires or when the beneficiary departs the United States or acquires an immigration status, whichever occurs first. In some cases, we may place conditions on parole, such as reporting requirements." The agency also notes that it "may revoke parole at any time and without notice" upon a determination that it "is no longer warranted or the beneficiary fails to comply with any conditions of parole."[22] A parolee in the United States who needs to remain beyond his or her authorized parole period can request re-parole.[23]

## Categories of Parole

Parole can be requested by foreign nationals inside or outside the United States in a range of circumstances. Selected major parole categories are described below.[24] As late as the early 2000s, annual reports of immigration statistics published by the former Immigration and Naturalization

---

[19] U.S. Department of Homeland Security, *Memorandum of Agreement between U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP) for the Purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(s)(A) With Respect to Certain Aliens Located Outside the United States*, https://www.ice.gov/doclib/foia/reports/parole-authority-moa-9-08.pdf (hereinafter cited as DHS, MOA on parole). With respect to CBP, the MOA notes: "To the extent that this MOA largely assists ICE and USCIS apportion its parole caseloads, omission of specific reference to CBP should not be construed to detract from CBP's inherent authority to issue paroles. CBP does and will continue to exercise parole authority for both urgent humanitarian reasons and significant public benefit." (p. 3).

[20] DHS, MOA on parole, p. 2.

[21] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States," https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-individuals-outside-the-united-states (hereinafter cited as USCIS, parole). Information on length of parole appears under the "What is Parole?" tab.

[22] USCIS, parole.

[23] For additional information, see USCIS, parole (under the "Re-Parole" tab).

[24] The categories, as described here, are mutually exclusive but are not exhaustive. For example, the DHS MOA lists others, such as parole related to national intelligence, parole for participants in events held by U.S.-based international organizations, and parole under 50 U.S.C. Section 403(h), which provides for the "entry of a particular alien into the United States for permanent residence" when it "is in the interest of national security or essential to the furtherance of the national intelligence mission. DHS, MOA on parole, pp. 2-3.

Service (INS) and then DHS contained data on parole grants.[25] DHS's *2003 Yearbook of Immigration Statistics*, the last to include such data, contained annual data for FY1998 through FY2003 on six categories of parolees, including port-of-entry parolees, deferred inspection parolees, advance parolees, and humanitarian parolees (see descriptions below).[26] During this six-year period, the annual total number of parolees ranged from about 235,000 to about 300,000, with port-of-entry parolees accounting for more than half of each annual total.[27] While comparable cross-category data on parole are no longer available from DHS, there are some available USCIS statistics on particular parole programs, which are presented in the relevant sections below.

### Port-of-Entry Parole

Port-of-entry parole is authorized at the port of arrival and can be provided in a variety of situations. These include permitting the entry of an LPR returning to the United States who is not carrying proper documents. Port-of-entry parole also can be used to allow foreign nationals to enter for short stays, such as to attend a family funeral or assist in a natural disaster.

### Deferred Inspection Parole

Deferred inspection is a form of parole that is used when an alien appears at a port of entry with documentation but questions remain about his or her admissibility to the United States. In such cases, parole can be granted to enable the individual to appear at another immigration office to resolve the issue.

### Advance Parole

As suggested by its name, advance parole is authorized prior to an individual's arrival at a U.S. port of entry. The term is most commonly used to describe the issuance of a document to a foreign national (other than an LPR) residing in the United States who needs to depart and wants to return, and whose conditions of stay do not otherwise allow for re-entry into the country.

An advance parole document authorizes such an alien to appear at a U.S. port of entry to seek parole after travelling abroad. However, it does not entitle the bearer to be paroled into the United States. That remains a discretionary decision to be made when the person arrives at the port of entry. Among the categories of individuals in the United States that need to request advance parole to be able to return to the country after traveling abroad are most applicants for LPR status, holders of and applicants for TPS, and individuals with parole.

### Humanitarian Parole for Persons Outside the United States

This category of parole takes its name from the text of the INA provision and reflects the underlying reason for the grant of parole. Although all parole authorizations are required to be for urgent humanitarian reasons or significant public benefit, *humanitarian parole* is often used to describe a narrower category of parole grants. These are grants to persons residing outside the

---

[25] INS yearbooks for FY1996-FY2001 and DHS yearbooks since FY2002 are available at U.S. Department of Homeland Security, "Yearbook of Immigration Statistics," https://www.dhs.gov/immigration-statistics/yearbook.

[26] U.S. Department of Homeland Security, Office of Immigration Statistics, *2003 Yearbook of Immigration Statistics*, September 2004, pp. 81-84, https://www.dhs.gov/sites/default/files/publications/ Yearbook_Immigration_Statistics_2003.pdf (hereinafter cited as DHS, 2003 Yearbook).

[27] DHS, 2003 Yearbook.

United States who apply for parole from abroad to enter the United States temporarily for urgent humanitarian reasons, such as to receive medical treatment.

### Significant Public Benefit Parole for Persons Outside the United States

A counterpart to the humanitarian parole category, this category similarly takes its name from the text of the INA provision and reflects the underlying reason for the grant of parole. As used here, it includes parole grants to persons residing outside the United States who apply for parole from abroad to enter the country temporarily for significant public benefit, such as to participate in a legal proceeding.

### Parole-in-Place

Parole-in-place authorizes individuals who are physically present in the United States but have not been lawfully admitted to remain in the country. In accordance with a 2013 USCIS policy memorandum, parole-in-place has been granted to certain family members (spouses, children, and parents) of active duty members and former members of the U.S. Armed Forces and the Selected Reserve of the Ready Reserve. That memorandum specified that such grants of parole "should be authorized in one-year increments, with re-parole as appropriate."[28]

### Removal-Related Parole

This category of parole applies to aliens in removal proceedings or aliens who have final orders of removal, as well as aliens granted deferred action by ICE at any point after the commencement of removal proceedings.[29]

### Special Parole Programs for Persons Outside the United States

Over the years, INS and DHS established special parole programs for particular populations abroad in response to specific circumstances; these are sometimes referred to as "categorical parole" programs. Among these are parole programs—such as the Cuban lottery (described below)—established in connection with international agreements. These special parole programs are the subject of a separate section below.

## Parole Application Process

Generally, individuals applying for parole in advance, whether they are inside or outside the United States, submit USCIS Form I-131, Application for Travel Document. Depending on their location, parole applicants use this form to apply for either an advance parole document for

[28] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act §212(a)(6)(A)(i)*, policy memorandum, November 15, 2013. Reasons cited in this memorandum in support of the use of parole-in-place in such cases included that U.S military service members and veterans experience stress and anxiety due to their family members' immigration status, that this worry can affect military preparedness, and that the United States has made a commitment to support and care for veterans.

[29] For information about other types of parole requests handed by ICE, see U.S. Department of Homeland Security, *Privacy Impact Assessment for the ICE Parole and Law Enforcement Programs Case Management Systems*, DHS/ICE/PIA-049, December 3, 2018, https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-plepucms-december2018.pdf.

individuals who are currently in the United States or an advance parole document for individuals outside the United States.[30] USCIS and ICE can authorize issuance of advance parole documents, in accordance with the 2008 MOA referenced above.

The advance parole document for individuals in the United States is referenced in the "Advance Parole" section above. As noted, this document authorizes an alien to appear at a U.S. port of entry after travelling abroad to seek parole into the United States. Applicants for parole-in-place also need to submit Form I-131.

Applicants for humanitarian parole or significant public benefit parole, as described above, and applicants under some of the special parole programs described below use Form I-131 to apply for an advance parole document for individuals outside the United States. Applicants for re-parole also apply for this type of advance parole document (despite being physically present in the United States).

There are exceptions to the Form I-131 application process. For example, principal applicants under the International Entrepreneur Parole program described below must submit a different application form.[31] Applicants in removal proceedings seeking release from ICE custody must contact their local ICE office.[32] ICE is responsible for handling such parole requests.

# Selected Immigration Parole Programs for Persons Outside the United States

A number of parole programs have been established over the years to enable members of designated populations abroad to enter the United States. Although created in response to specific circumstances, there are certain commonalities among these special parole programs. Many of them can be grouped under one (or more) of three headings: refugee-related parole programs, family reunification parole programs, and Cuban parole programs.

There is at least one recently established special parole program, however, that does not fall under any of the three headings: the International Entrepreneur Parole (IEP) program. The subject of a final rule issued at the end of the Obama Administration in January 2017, this program reflects a novel use of parole. Supplementary information to the rule described the purpose of the IEP program as being "to increase and enhance entrepreneurship, innovation, and job creation in the United States." The supplementary information further stated:

> Under this final rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation.[33]

[30] Form 131 is also used to apply for other travel documents, such as a refugee travel document. See Department of Homeland Security, U.S. Citizenship and Immigration Services, "Instructions for Application for Travel Document" (USCIS Form I-131), https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf.

[31] Principal applicants file USCIS Form I-941, Application for Entrepreneur Parole, while derivative spouses and children file Form I-131. See U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services "International Entrepreneur Parole," https://www.uscis.gov/humanitarian/humanitarian-parole/international-entrepreneur-parole.

[32] See U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Instructions for Application for Travel Document [Form 1-131]," April 24, 2019, p. 6, https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf.

[33] See https://www.govinfo.gov/content/pkg/FR-2017-01-17/pdf/2017-00481.pdf.

The international entrepreneur final rule had an original effective date of July 17, 2017. Due to efforts by the Trump Administration to delay this effective date and related legal action, however, DHS did not begin accepting applications under the rule until December 2017.[34] In May 2018, DHS published a proposed rule to remove the IEP regulations.[35] According to DHS, it proposed to eliminate the final rule "because the department believes that it represents an overly broad interpretation of parole authority," among other reasons.[36] As of February 10, 2020, USCIS had received a total of 28 IEP applications. Of these, 1 was approved, 22 were denied, 3 were withdrawn, and 2 were pending.[37]

## Refugee-Related Parole Programs

Since the end of World War II, the United States has established various immigration programs for the admission of foreign nationals fleeing persecution.[38] Prior to enactment of the 1980 Refugee Act, immigration parole was the chief means used to bring in aliens considered to be refugees. From the late 1950s through the 1970s, hundreds of thousands of individuals from Cuba, Indochina, Eastern Europe, and other areas were paroled into the United States.

Parole continued to be granted to some individuals considered by the United States to be refugees after enactment of the Refugee Act. In a notable 1980 example, the Attorney General paroled in tens of thousands of Cubans and Haitians who arrived in the United States by boat in what is known as the Mariel Boatlift. Until 2017, Cuban nationals were routinely granted parole under the "wet foot/dry foot" policy. As described in a 2017 DHS fact sheet, "'wet-foot/dry-foot' generally refers to an understanding under which Cuban migrants traveling to the United States who are intercepted at sea ('wet foot') are returned to Cuba or resettled in a third country, while those who make it to U.S. soil ('dry foot') are able to request parole."[39]

In the late 1980s, denial rates for Soviet refugee applicants were increasing because of changes in U.S. refugee processing and other factors. In response, in 1989, Congress passed the Lautenberg Amendment. As subsequently amended to correct references to the Soviet Union following its dissolution, it required the Attorney General (now the Secretary of DHS) to designate categories of former Soviet and Indochinese nationals—including specified categories of religious minorities from an independent state of the former Soviet Union, or of Estonia, Latvia, or Lithuania—for whom less evidence would be needed to prove refugee status. It also provided for adjustment to permanent resident status of certain Soviet and Indochinese nationals granted parole after being denied refugee status.[40] In connection with this legislation, INS and then

---

[34] For additional details, see U.S. Department of Homeland Security, "Removal of International Entrepreneur Parole Program," 83 *Federal Register* 8793, May 29, 2018 (hereinafter cited as DHS, proposed rule to eliminate IEP program).

[35] See DHS, proposed rule to eliminate IEP program.

[36] U.S. Department of Homeland Security, International Entrepreneur Parole, https://www.uscis.gov/humanitarian/humanitarian-parole/international-entrepreneur-parole. Also see DHS, proposed rule to eliminate IEP program.

[37] Data provided by USCIS to CRS by email, September 30, 2020.

[38] For additional information, see 1980 committee print.

[39] U.S. Department of Homeland Security, *Fact Sheet: Changes to Parole and Expedited Removal policies affecting Cuban Nationals*, January 12, 2017. According to the fact sheet: "Considering the reestablishment of full diplomatic relations, Cuba's signing of a Joint Statement obligating it to accept the repatriation of its nationals who arrive in the United States after the date of the agreement, and other factors, the Secretary concluded that … the parole policies discussed above [including the "wet foot/dry foot" policy] are no longer warranted."

[40] The Lautenberg Amendment was first enacted as part of the FY1990 Foreign Operations, Export Financing, and Related Programs Appropriations Act (P.L. 101-167, §§599D, 599E). It has been regularly extended since, although

USCIS offered parole to certain religious minorities from the former Soviet Union who were denied refugee status. This parole program continued until 2011, when, according to USCIS, the agency decided to stop it "as a matter of policy."[41]

Another parole program (for unsuccessful refugee applicants) was established in 2014. It was part of the Central American Minors (CAM) program for certain minor children in El Salvador, Guatemala, and Honduras. Under the now-terminated refugee part of the CAM program, a qualifying parent in the United States could file an application for a qualifying child living in one of the three countries to be considered for admission to the United States as a refugee, along with certain accompanying family members. If the child was found *ineligible* for refugee status, the CAM program provided for the child and his/her accompanying family members to be considered for immigration parole.[42] In written testimony prepared for a 2015 Senate hearing on the CAM program, a USCIS official explained, "[T]o grant parole under this program, USCIS must find that the individual is at risk of harm in his or her country and that the applicant merits a favorable exercise of discretion." According to the official, grants of parole generally would be for an initial period of two years.[43] According to USCIS data, there were a total of 1,464 CAM parole approvals in FY2016 and FY2017 combined. The breakdown by applicant country of citizenship was El Salvador (1,108), Honduras (325), and Guatemala (31).[44]

In August 2017, DHS announced that it was terminating the parole part of the CAM program. As a result of related litigation and a court settlement, however, DHS agreed in 2019 to process cases that had been conditionally approved for parole at the time of the termination announcement.[45] This processing has resulted in the approval of 342 CAM parole cases in FY2020, as of June 2020. The breakdown by applicant country of citizenship is El Salvador (328), Guatemala (13), and Honduras (1).[46]

Parole also figured into the CAM program in another way. A qualifying parent, for purposes of the program, was an individual who was at least age 18 and was lawfully present in a specified immigration category. The specified categories included parole (provided the parent had been issued parole for at least one year).[47]

## Family Reunification Parole Programs

Family reunification is an underlying principle of the U.S. immigration system. The INA provides for U.S. citizens and LPRs to file immigrant visa petitions on behalf of certain family members. The family-based immigration system is subject to statutory preferences and numerical limits that

there have been some lapses between extensions.

[41] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Green Card for a Lautenberg Parolee*, https://www.uscis.gov/green-card/other-ways-get-green-card/green-card-lautenberg-parolee.

[42] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)," https://www.uscis.gov/CAM (hereinafter cited as USCIS, CAM).

[43] Testimony of Joseph Langlois, Associate Director, Refugee, Asylum and International Operations, U.S. Citizenship and Immigration Services, in U.S. Congress, Senate Committee on the Judiciary, Subcommittee on Immigration and the National Interest, hearing, *Eroding the Law and Diverting Taxpayer Resources: an Examination of the Administration's Central America Minors Refugee/Parole Program*, 114th Cong., 1st sess., April 2015.

[44] Data provided by USCIS to CRS by email, June 17, 2020.

[45] USCIS, CAM.

[46] Data provided by USCIS to CRS by email, June 17, 2020.

[47] USCIS, CAM.

may result in years-long waits for visas for some prospective immigrants after their petitions are approved.[48] The principle of family reunification is also reflected in various immigration parole programs.[49]

The Cuban Family Reunification Parole (CFRP) program was established in 2007, a peak year for U.S. Coast Guard interdictions of Cubans. It was seen as way to both discourage Cubans from undertaking dangerous maritime crossings and meet the U.S. commitment on legal Cuban migration levels under the 1994 U.S.-Cuban Migration Agreement (see the "Other Parole Programs for Cuban Nationals" section). The CFRP program is available to Cuban nationals who are the beneficiaries of family-based immigrant visa petitions filed by certain eligible family members in the United States. Under the program, certain U.S. citizens and LPRs who have filed immigrant visa petitions on behalf of family members in Cuba that have been approved are invited by the State Department to apply to USCIS for parole for their Cuban relatives. If parole is granted, the Cuban relatives may enter and live in the United States without having to wait for their immigrant visas to become available. Grants of parole under the CFRP program are for two years.[50] After one year of physical presence in the United States, a Cuban parolee can apply to become an LPR under the terms of the Cuban Adjustment Act (see the "Parole and Permanent Immigration Status" section). According to USCIS, the CFRP program remains in effect but all CFRP processing in Havana has been suspended for security reasons.[51]

The similar Haitian Family Reunification Parole (HFRP) program was implemented in 2015 to "provid[e] the opportunity for certain eligible Haitians to safely and legally immigrate sooner to the United States."[52] Like the Cuban program, the HFRP program is available to Haitian nationals who are the beneficiaries of family-based immigrant visa petitions filed by certain eligible family members in the United States. To be invited to apply for the HFRP program, the immigrant visa petition must have been approved by December 18, 2014, and the expected wait for an immigrant visa must be between about 18 and 42 months. If parole is granted, the Haitian relatives may enter and live in the United States while they wait for visa numbers to become available so they can apply for LPR status. Grants of parole under the HFRP program are for three years.[53]

In August 2019, USCIS announced its intention to terminate the HFRP program in accordance with Executive Order 13767.[54] Between the program's inception and December 31, 2019, the

---

[48] See CRS Report R43145, *U.S. Family-Based Immigration Policy*.

[49] Family reunification is also a feature of some refugee-related parole programs, including the CAM program and the Lautenberg Amendment (as discussed in the preceding section). To be considered for U.S. admission under the Lautenberg Amendment, a prospective refugee must have family in the United States.

[50] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Cuban Family Reunification Parole Program*, https://www.uscis.gov/sites/default/files/document/fact-sheets/CFRP_Fact_Sheet_8.26.2016.pdf.

[51] Email from USCIS to CRS, February 20, 2020. According to USCIS: "In light of the significant drawdown in U.S. government personnel from the U.S. Embassy in Cuba for security reasons and the subsequent decision to close the USCIS field office in Cuba on December 10, 2018, all CFRP processing in Havana has been suspended. The Department of Homeland Security is working with our colleagues at the Department of State to evaluate options for interviewing and processing CFRP beneficiaries in alternative locations."

[52] Remarks of Deputy Secretary of Homeland Security Alejandro Mayorkas, in U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "DHS To Implement Haitian Family Reunification Parole Program," press release, October 14, 2014.

[53] For additional information, see U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "The Haitian Family Reunification Parole (HFRP) Program," February 21, 2018, https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.

[54] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "USCIS to End Certain Categorical Parole Programs," news release, August 2, 2019 (hereinafter cited as USCIS, August 2019 news release).

agency issued 12,534 invitations (covering 23,993 beneficiaries) to petitioners to submit applications on behalf of their beneficiary relatives and accepted 10,534 applications. As of December 31, 2019, 8,313 of these applications had been approved, 2,209 had been denied, and 12 remained pending.[55]

The Filipino World War II Veterans Parole Program, implemented in 2016, makes eligible for parole certain beneficiaries of approved family-based immigrant visa petitions that were filed by Filipino veterans or their surviving spouses. If parole is granted, according to USCIS, the beneficiaries could "provide support and care to their aging veteran family members" in the United States while waiting for their visas to become available.[56] Under the family-based immigration system and its per country limits, visa waiting times for nationals of the Philippines can be particularly long. In specified circumstances, this program permits beneficiaries to seek parole on their own behalf based on an approved petition filed by an eligible veteran or surviving spouse. Grants of parole under the Filipino World War II Veterans Parole Program are for three years.[57]

In August 2019, USCIS announced its intention to terminate this parole program in accordance Executive Order 13767.[58] Between the program's inception and December 31, 2019, the agency accepted 664 applications. As of December 31, 2019, 301 of these applications had been approved, 266 had been denied, and 97 were pending.[59]

## Other Parole Programs for Cuban Nationals

Cuban nationals have been the beneficiaries of several special parole programs over the years. In addition to refugee-related grants of parole and the CFRP program, Cubans have been granted parole under programs that include the Special Program for Cuban Migration and the Cuban Medical Professional Parole (CMPP) program.

The Special Program for Cuban Migration, also known as the Cuban lottery, grew out of the 1994 U.S.-Cuban Migration Agreement. Under that accord, the United States agreed, among other things, to allow at least 20,000 Cubans to migrate legally to the United States each year, excluding immediate relatives of U.S. citizens. The Cuban lottery, which was established to help meet that target of 20,000, has been restricted to Cuban adults who meet certain basic qualifications. Interested Cubans have applied during an open season, and winners have been randomly chosen. Lottery winners have then been interviewed for consideration for parole.

---

[55] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Form I-131, Travel Document Applications for the Haitian Family Reunification Parole (HFRP) Program As of December 31, 2019," https://www.uscis.gov/sites/default/files/document/data/HFRP_performancedata_fy2020_qtr1.pdf. The latest round of invitations was issued in June 2016.

[56] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Filipino World War II Veterans Parole Program*, https://www.uscis.gov/fwvp. Also see U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "USCIS to Implement Filipino World War II Veterans Parole Program," news release, May 9, 2016, https://www.uscis.gov/news/news-releases/uscis-implement-filipino-world-war-ii-veterans-parole-program.

[57] For additional information, see U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Filipino World War II Veterans Parole Program," https://www.uscis.gov/humanitarian/humanitarian-parole/filipino-world-war-ii-veterans-parole-program.

[58] USCIS, August 2019 news release.

[59] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Form I-131, Travel Document Applications for the Filipino World War II Veterans Parole (FWVP) Program Applications Accepted, Denied, Approved, and Pending As of December 31, 2019," https://www.uscis.gov/sites/default/files/document/data/FWVP_performancedata_fy2020_qtr1.pdf.

Successful applicants could bring their spouses and minor children with them to the United States. There have been three Cuban lottery open seasons to date (in FY1994, FY1996, and FY1998).[60] According to USCIS, "since 1998, the Cuban Government has not permitted a new registration for the Special Program for Cuban Migration."[61]

The CMPP program, which was established in 2006, allowed Cuban health-care providers who were conscripted by the Cuban government to study or work in another country to apply to enter the United States on parole. Their accompanying spouses and any minor children could also be considered for parole.[62] The program was terminated in 2017 as "part of the ongoing normalization of relations between the governments of the United States and Cuba."[63] USCIS approved 9,693 applications under the CMPP program between January 1, 2006, and December 31, 2017.[64]

## Debate Over Parole Programs for Specified Populations

Over the years, the executive branch's use of its discretionary parole authority for specified classes of foreign nationals has been controversial. Objections were voiced in a 1996 House Judiciary Committee report on a predecessor bill to IIRIRA that proposed more restrictive changes to the parole provision than were ultimately enacted (see the "INA Parole Authority" section):

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States.[65]

Some House Judiciary Committee members at the time opposed the committee-approved changes to the parole provision. In a "dissenting views" section of the report, they argued against revising the language of INA Section 212(d)(5): "The current law provides the Attorney General with

[60] For additional information, see archived CRS Report R40566, *Cuban Migration to the United States: Policy and Trends*.

[61] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program," 79 *Federal Register* 75579, 75580, December 18, 2014. In this notice, USCIS cited Cuba's failure to permit a new lottery registration as a reason for the establishment of the CFRP program: "Without this pool of individuals, there was a deficiency in the number of Cubans potentially eligible for travel to the United States."

[62] For additional information, see U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Cuban Medical Professional Parole (CMPP) Program," https://www.uscis.gov/humanitarian/humanitarian-parole/cuban-medical-professional-parole-cmpp-program.

[63] U.S. Department of Homeland Security, "Statement by Secretary Johnson on the Continued Normalization of our Migration Relationship with Cuba," January 12, 2017, https://www.dhs.gov/news/2017/01/12/statement-secretary-johnson-continued-normalization-our-migration-relationship-cuba.

[64] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Electronic Reading Room, Cuban Medical Professional Parole Approvals from 2006-2017, September 02, 2019, https://www.uscis.gov/records/electronic-reading-room?ddt_mon=&ddt_yr=&query=parole&items_per_page=10. The data are available at https://www.uscis.gov/sites/default/files/document/data/Cuban_Medical_Professional_Parole_Approvals_from_2006-2017.pdf.

[65] U.S. Congress, House Committee on the Judiciary, *Immigration in the National Interest Act of 1995*, report to accompany H.R. 2202, 104th Cong., 2nd sess., H.Rept. 104-469, pt. 1, March 4, 1996, p. 140 (hereinafter cited as H.Rept. 104-469, pt. 1).

appropriate flexibility to deal with compelling immigration situations."[66] (Recent legislation related to the use of parole for classes of individuals is discussed in the "Legislation in Recent Congresses" section.)

Almost 20 years later, during the Obama Administration, then-DHS Secretary Jeh Johnson directed USCIS to issue new policies on the use of parole-in-place for individuals in the United States who had U.S. citizen and LPR family members seeking to enlist in the U.S. Armed Forces. He provided the following rationale for using parole authority for a class of individuals:

> Although parole determinations must be made on an individualized basis, the authority has long been interpreted to allow for designation of specific classes of aliens for whom parole should be favorably considered, so long as the parole of each alien within the class is considered on a discretionary, case-by-case basis.[67]

In FY2019 and FY2020 (as of June 18, 2020) combined, USCIS approved 8,952 military parole-in-place applications and denied 2,040. As of June 18, 2020, 4,943 applications were pending.[68]

The Trump Administration has acted to end some parole programs in accordance with Executive Order 13767. Citing the executive order, USCIS announced the termination of the CAM parole program in August 2017, although some cases continue to be processed (see the "Refugee-Related Parole Programs" section).[69]

In August 2019, USCIS announced its intention to end the Haitian Family Reunification Parole program and the Filipino World War II Veterans Parole program (see the "Family Reunification Parole Programs" section).[70] The news release quoted then-USCIS Acting Director Ken Cuccinelli as saying, "Under these categorical parole programs, individuals have been able to skip the line and bypass the proper channels established by Congress."[71] It further explained that USCIS continues to review the remaining categorical parole programs but will not terminate any program until it completes "required administrative changes to Form I-131, Application for Travel Document, and the form is approved for public use."[72]

# Work Authorization for Parolees

Immigration regulations providing that parolees are eligible for employment authorization date to the 1980s. In May 1981, INS amended its regulations to add new provisions on employment authorization.[73] These provisions enumerated two classes of aliens eligible to work: (1) aliens

---

66 H.Rept. 104-469, pt. 1, p. 538.

67 U.S. Department of Homeland Security, Memorandum to Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, from Jeh Charles Johnson, Secretary of Homeland Security, *Families of U.S. Armed Forces Members and Enlistees*, November 20, 2014.

68 Data provided by USCIS to CRS by email, September 30, 2020.

69 The *Federal Register* notice on the termination points out, however, that "[t]his discretionary change in policy does not preclude such individuals from applying for parole consideration independent of the … program." U.S. Department of Homeland Security, "Termination of the Central American Minors Parole Program," 82 *Federal Register* 38926, August 16, 2017.

70 USCIS, August 2019 news release.

71 USCIS, August 2019 news release. The news release describes *categorical parole* as "programs designed to consider parole for entire groups of individuals based on pre-set criteria."

72 USCIS, August 2019 news release.

73 U.S. Department of Justice, Immigration and Naturalization Service, "Employment Authorization to Aliens in the United States," 46 *Federal Register* 25079, May 5, 1981. According to the rule summary, "The new rules are necessary to codify the various Service Operations Instructions and policy statements in one place in the regulations so that the

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 220 of 513

who were authorized for employment incident to their status, and (2) aliens who had to apply for work authorization. The first class included aliens who were paroled into the United States as refugees, as described in INA Section 212(d)(5)(B) and discussed above in the "INA Parole Authority" section. Other aliens granted parole in accordance with INA Section 212(d)(5) were not listed as part of either class.

In November 1981, INS published a final rule to add INA Section 212(d)(5) parolees to the class of aliens who had to apply for work authorization, describing them as follows: "Any alien paroled into the United States temporarily for emergent reasons or for reasons deemed strictly in the public interest: *Provided*, The alien establishes an economic need to work."[74] The rule also added a new provision on criteria to establish economic necessity. The supplementary information to the rule discussed the rationale for adding the new paragraph on parolees: "Although section 212(d)(5)(A) of the Act authorizes the exercise of discretion regarding the conditions of parole for such alien, and which implies work authorization, this new class of aliens is added to Part 109 of 8 CFR to avoid any uncertainty."[75]

Current DHS regulations on employment authorization describe three classes of employment-authorized aliens: (1) "Aliens authorized employment incident to status," (2) "Aliens authorized for employment with a specific employer incident to status or parole," and (3) "Aliens who must apply for employment authorization."[76] Different parolees fall within each of these classes. As under the 1981 regulations, the first class includes aliens who are paroled in as refugees.[77] The second class includes aliens who are paroled in as entrepreneurs under the International Entrepreneur Parole program[78] (see the "Selected Immigration Parole Programs for Persons Outside the United States" section). The third class includes aliens granted parole under INA Section 212(d)(5), with some exceptions. The relevant paragraph of the regulation describing this third class reads, in part, "an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act."[79] (It does not include any language on economic necessity.) Also included in the third class, in a separate paragraph, are spouses of entrepreneur parolees.[80]

---

public may conveniently locate the rules on employment authorization for aliens and the standards which are applicable." (p. 25080).

[74] U.S. Department of Justice, Immigration and Naturalization Service, "Employment Authorization; Revision to Classes of Aliens Eligible," 46 *Federal Register* 55920, 55921, November 13, 1981 (hereinafter cited as INS rule, November 13, 1981). The "emergent reasons" and "strictly in the public interest" language reflected the text of the INA 212(d)(5)(A) at the time.

[75] INS rule, November 13, 1981, p. 55921.

[76] 8 C.F.R. §274a.12.

[77] 8 C.F.R. §274a.12(a)(4).

[78] 8 C.F.R. §274a.12(b)(37).

[79] 8 C.F.R. §274a.12(c)(11). Among the exceptions, this provision excludes asylum seekers and others requesting humanitarian relief who are paroled from custody after establishing a credible fear or reasonable fear of persecution or torture. For information about credible fear and reasonable fear, see CRS Report R45539, *Immigration: U.S. Asylum Policy*

[80] 8 C.F.R. §274a.12(c)(34).

AR2022_400220

## Parole and Permanent Immigration Status

A parolee is permitted to remain in the United States for the duration of the grant of parole, and may be granted work authorization. A parole grant, however, does not provide a set pathway to a permanent immigration status.

The INA, as originally enacted in 1952, did not allow a parolee to apply for adjustment of status, which is the standard process of obtaining LPR status while in the United States. The main adjustment of status provision in the 1952 act (INA §245(a)) provided only for the adjustment of status of an alien lawfully admitted to the United States as a nonimmigrant[81] if the alien had an immigrant visa immediately available and met other requirements.

INA Section 245(a) was amended in 1960 to provide for the adjustment of status of an alien who had been inspected and admitted or *paroled* into the United States.[82] This provision thus gives parolees a potential pathway to LPR status, but it is subject to a number of requirements and restrictions. Among the requirements, an individual must be eligible to receive an immigrant visa and must have an immigrant visa immediately available in order to adjust status. This, in turn, typically requires the individual to have either a family member or employer who can sponsor him or her under the existing family-based or employer-based permanent immigration system. To be eligible for adjustment of status, an individual also must be admissible to the United States for permanent residence. The INA enumerates grounds of inadmissibility, which are grounds upon which aliens are ineligible to receive visas or to be admitted to the United States.[83] These include health, criminal, and security grounds, among others. Some grounds of inadmissibility include exceptions, and some can be waived. In addition, adjustment of status under INA Section 245(a) is not applicable to individuals who, for example, have engaged in unauthorized employment or have failed to maintain lawful status continuously since U.S. entry, although there are exceptions to these ineligibilities for certain persons, including certain relatives of U.S. citizens.[84]

### Adjustment of Status Legislation

As noted, prior to the enactment of the Refugee Act of 1980, parole authority was one of the mechanisms used to bring refugees into the United States. Laws enacted between the mid-1950s and the late 1970s provided for the adjustment of status of specified groups of parolees, including paroled refugees from World War II, the Hungarian Revolution of 1956, and the Vietnam War.[85] Also enacted during this period, in the aftermath of the Cuban Revolution, was the Cuban Adjustment Act. Unlike the other adjustment of status measures, the Cuban Adjustment Act was not limited to a finite group of Cuban parolees and did not include an end date. In its current form, it provides for the adjustment of status "of any alien who is a native or citizen of Cuba and

[81] A nonimmigrant is a foreign national who is legally admitted to the United States for a temporary period of time and a specific purpose (e.g., tourists, students, diplomats).

[82] P.L. 86-648, §10.

[83] INA §212(a), 8 U.S.C. §1182(a).

[84] An exception applies to *immediate relatives* of U.S. citizens. INA Section 201(b)(2) (8 U.S.C. §1151(b)(2)) defines this term to mean the unmarried children under age 21, spouses, and parents of a U.S. citizen, with the U.S. citizen required to be at least age 21 in the case of parents.

[85] These laws included P.L. 85-559, July 15, 1958; P.L. 86-648, July 14, 1960; and P.L. 95-145, October 28, 1977.

who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least one year."[86]

After 1980, parole continued to be granted to particular groups of foreign nationals seeking permanent admission to the United States, and legislative provisions continued to be enacted to enable members of these groups to adjust to LPR status. One of these adjustment provisions was enacted as part of the Lautenberg Amendment, which, as amended, provided for the adjustment of status of nationals of an independent state of the former Soviet Union, Estonia, Latvia, Lithuania, Vietnam, Laos, or Cambodia who were granted parole after being denied refugee status (see the "Refugee-Related Parole" section).[87]

Most beneficiaries of the current special parole programs have an existing avenue to obtain LPR status. In the case of the Cuban programs, parolees can adjust status under the Cuban Adjustment Act. In the case of the family reunification programs, parolees can adjust status under the standard INA adjustment of status provisions once their immigrant visas become available. Individuals granted parole under the CAM program or the IEP program, however, would not necessarily have an existing pathway to LPR status and would likely require special adjustment of status legislation.

## Advance Parole and Adjustment of Status

The potential use of advance parole as a mechanism to gain access to adjustment of status has received attention in recent years. While this issue has been raised mainly in connection with the DACA initiative (and is discussed in that context here), it has broader relevance. It is also applicable to others present in the United States in a capacity that makes them eligible for advance parole but who did not enter the country lawfully—such as certain holders of TPS.[88]

DACA provides temporary protection from removal to individuals who have met a set of requirements. Among these, the individual must have been in unlawful status on June 15, 2012. It does not matter if the individual initially entered the United States legally as long as he or she no longer had lawful status on June 15, 2012. DACA recipients who entered the United States unlawfully are not eligible to adjust to LPR status (because they were never inspected and admitted or paroled into the country), even if they meet the other eligibility requirements discussed earlier in this section of the report.

During the Obama Administration, DACA recipients who initially entered the United States unlawfully could become eligible for adjustment of status if they were granted advance parole and were permitted to re-enter the country after travelling abroad. Now-archived USCIS DACA FAQs enumerated the following bases for granting advance parole: "humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative; educational purposes, such as semester-abroad programs and academic research[; or] employment purposes."[89] When DACA recipients who were granted advance parole

[86] P.L. 89-732, as amended, 8 U.S.C. §1255 note.

[87] P.L. 101-167, §599E, as amended, 8 U.S.C. §1255 note. Other post-1980 parolee adjustment of status acts include P.L. 104-208, Division C, Section 646 (Poles and Hungarians), 8 U.S.C. Section 1255 note, and P.L. 111-293 (Haitian orphans), 8 U.S.C. Section 1255 note.

[88] For additional information about this form of relief, see CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues*.

[89] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Frequently Asked Questions, DHS DACA FAQs," response to question 57, March 8, 2018 (archived content), https://www.uscis.gov/archive/frequently-asked-questions#education.

returned to the United States, they could be paroled in. They would therefore meet the threshold "inspected and admitted or paroled" requirement for adjustment of status, which could enable them to become LPRs. To do so, however, such individuals would need to meet the other applicable requirements for adjustment of status, including being eligible to receive an immigrant visa, being admissible to the United States, having an immigrant visa immediately available, and being covered by an exception that shielded the individuals from any applicable ineligibilities.[90]

According to preliminary data provided to Congress by DHS, 45,447 DACA recipients had been approved for advance parole as of August 21, 2017.[91] It is not known how many of these individuals subsequently applied for or were granted adjustment to LPR status.

When the Trump Administration acted to rescind DACA in 2017, it announced that it would no longer grant advance parole under the DACA program. As stated in the September 2017 DHS DACA rescission memorandum, DHS "will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole."[92]

In response to the June 2020 Supreme Court decision vacating the DACA rescission, acting DHS Secretary Wolf issued a memorandum in July 2020 "making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA." Regarding advance parole, the memorandum stated that it "should be granted to current DACA beneficiaries only in exceptional circumstances."[93] An August 2020 USCIS memorandum providing implementing guidance included some examples of such circumstances, among them travel in furtherance of U.S. law enforcement interests and travel for life-sustaining medical treatment not available to the individual in the United States. The USCIS memorandum further stated that "in most instances, traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad will not warrant advance parole."[94]

---

[90] For additional discussion and case examples, see Immigrant Legal Resource Center, *From Advance Parole to a Green Card for DACA Recipients*, May 17, 2016, https://www.ilrc.org/advance-parole-green-card-daca-recipients.

[91] These data were made publicly available by the Office of Senator Chuck Grassley in a September 2017 news release; see https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status.

[92] U.S. Department of Homeland Security, Memorandum to James W. McCament, Acting Director, U.S. Citizenship and Immigration Services, Thomas D. Homan, Acting Director, U.S. Immigration and Customs Enforcement, Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection, Joseph B. Maher, Acting General Counsel, Ambassador James D. Nealon, Assistant Secretary, International Engagement, Julie M. Kirchner, Citizenship and Immigration Services Ombudsman, from Elaine C. Duke, Acting Secretary, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"*, September 5, 2017, https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[93] U.S. Department of Homeland Security, Memorandum to Mark Morgan, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection, Matthew Albence, Senior Official Performing the Duties of Director, U.S. Immigration and Customs Enforcement, Joseph Edlow, Deputy Director of Policy, U.S. Citizenship and Immigration Services, from Chad F. Wolf, Acting Secretary, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"*, July 28, 2020, https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf.

[94] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Memorandum to Associate Directors and Program Office Chiefs, from Joseph Edlow, Deputy Director for Policy, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'"*, August 21, 2020, https://www.uscis.gov/sites/default/files/document/policy-alerts/DACA%20implementation%20memo%20v2%208.21.20%20final.pdf.

Some bills introduced and considered in recent Congresses directly addressed the advance parole-adjustment of status issue. The Security, Enforcement, and Compassion United in Reform Efforts (SECURE) Act of 2017 (S. 2192), as introduced in the 115th Congress, proposed to rewrite the INA parole provision. Among other changes, it would have added a definition of *advance parole* to the provision and would have stipulated that "a grant of parole into the United States based on an approved application for advance parole shall not be considered a parole for purposes of qualifying for adjustment of status to lawful permanent resident status in the United States." Similar language was included in the Solution for Undocumented Children through Careers, Employment, Education, and Defending our Nation (SUCCEED) Act (S. 1852), as introduced in the 115th Congress, and in S.Amdt. 1959, the SECURE and SUCCEED Act, as considered on the Senate floor in February 2018.[95]

# Legislation in Recent Congresses

Bills introduced in recent Congresses illustrate differing views about the appropriate use of immigration parole authority. One key area of debate is the use of parole for designated groups.

On the one hand, various legislative proposals have sought to utilize parole authority as a mechanism to grant temporary immigration relief to specified populations. For example, the Healthcare Opportunities for Patriots in Exile Act (HOPE) Act, as introduced in 116th Congress and earlier Congresses,[96] would give DHS the discretion to parole into the United States certain veterans for purposes of receiving healthcare from the Department of Veterans Affairs.

The 116th Congress has also seen the introduction of a variety of bills to grant parole to designated groups. The Families Belong Together Act (H.R. 883/S. 271) would require DHS to grant parole to certain parents and children separated by the department. The Syrian Allies Protection Act (S. 2625), which would establish a special immigrant program for certain Syrians, would direct the executive branch to "develop and implement a framework" to grant parole to applicants for special immigrant status who are at risk in their current locations.[97] In addition, at least one bill, the Cuban Family Reunification Act (H.R. 4884), seeks to resuscitate a currently inactive parole program of the same name.

On the other hand, multiple bills introduced in recent Congresses have sought to restrict the use of parole authority. Among these are similar bills ordered to be reported by the House Judiciary Committee in the 114th (H.R. 1153) and 115th (H.R. 391) Congresses, both entitled the Asylum Reform and Border Protection Act. These bills proposed to amend the text of the INA parole provision to limit the use of parole to an enumerated "urgent humanitarian reason" or "reason deemed strictly in the public interest." These bills also would have prohibited DHS from granting immigration parole to a foreign national who had applied for and been denied refugee status.

Some other recent bills that would have permitted the use of parole only for enumerated reasons also included language specifically to prohibit the use of parole for classes of people. For example, S. 2192, as introduced in the 115th Congress, would have prohibited the use of parole authority for "generalized categories of aliens or classes of aliens based solely on nationality, presence, or residence in the United States, family relationships, or any other criteria that would

[95] S.Amdt. 1959 was considered as a floor amendment to the unrelated Broader Options for Americans Act (H.R. 2579)). The Senate rejected a motion to invoke cloture on it.

[96] S. 1042 in the 116th Congress; H.R. 2761 and S. 1703 in the 115th Congress; H.R. 6092 in the 114th Congress.

[97] For information about special immigrants, see CRS Report R43725, *Iraqi and Afghan Special Immigrant Visa Programs*.

cover a broad group of foreign nationals either inside or outside of the United States."[98] In the 116th Congress, the Secure and Protect Act of 2019 (S. 1494), as reported by the Senate Judiciary Committee, would amend the INA parole provision to make it unlawful for DHS to grant parole "according to eligibility criteria describing an entire class of potential parole recipients." It also would add new language to the INA provision to prohibit DHS from using parole authority "to supplement established immigration categories without an Act of Congress."

# Conclusion

Parole authority, as currently defined in the INA, is potentially applicable to a variety of persons and circumstances. For example, the Immigrant Legal Resource Center, an immigrant advocacy organization, views it as a useful tool: "With the right advocacy, parole has the potential to become a more robust strategy to defend against deportation for those within the United States and to become a more accepted method to allow immigrants to enter the United States who do not have other means to do so."[99] On the other hand, groups that advocate for restrictions on immigration, such as the Center for Immigration Studies (CIS), see some recent uses of parole—such as for immigrant entrepreneurs—as overbroad. A 2018 CIS article characterized the IEP rule as "just one more way of wedging in an ever-increasing group of aliens who couldn't fit within the scope of the INA as enacted into law."[100] Bills in the 116th Congress can be seen as efforts to further these competing points of view on parole—by alternatively legislating the use of parole for particular groups or adding new statutory restrictions to prohibit such use. If Congress opts to enact one or more of these measures, it may in the process further define the appropriate use of parole.

[98] Similar language was included in S. 1852, as introduced in the 115th Congress, and in S.Amdt. 1959 to H.R. 2579, as considered on the Senate floor in February 2018.

[99] Immigrant Legal Resource Center, *Parole in Immigration Law*, October 2016, Chapter 1, p. 1-5, https://www.ilrc.org/sites/default/files/sample-pdf/parole-1st_ed-2016-ch_01.pdf.

[100] Dan Cadman, *Rescinding an Inappropriate Obama-Era Immigration Parole Rule*, Center for Immigration Studies, May 29, 2018, https://cis.org/Cadman/Rescinding-Inappropriate-ObamaEra-Immigration-Parole-Rule.

# Appendix. INA Parole Provision (§212(d)(5))

## Current Provision

(A) The Attorney General may, except as provided in subparagraph (B) or in section 214(f)[101], in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.[102]

## As Originally Enacted

The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

[101] INA Section 214(f)(2) places restrictions on the granting of parole to crewmembers in certain circumstances.

[102] 8 U.S.C. §1182(d)(5).

## Author Information

Andorra Bruno
Specialist in Immigration Policy

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.



# Temporary Protected Status and Deferred Enforced Departure

Updated April 9, 2021

Congressional Research Service
https://crsreports.congress.gov
RS20844

CRS REPORT
Prepared for Members and
Committees of Congress



Congressional Research Service
Informing the legislative debate since 1914

# Temporary Protected Status and Deferred Enforced Departure

SUMMARY

RS20844

April 9, 2021

**Jill H. Wilson**
Analyst in Immigration Policy

When civil unrest, violence, or natural disasters erupt in countries around the world, concerns arise over the ability of foreign nationals present in the United States who are from those countries to safely return. Provisions in the Immigration and Nationality Act (INA) provide for temporary protected status (TPS) and other forms of relief from removal under specified circumstances. The Secretary of Homeland Security has the discretion to designate a country for TPS for periods of 6 to 18 months and can extend these periods if the country continues to meet the conditions for designation. Congress has also provided TPS legislatively. A foreign national from a designated country who is granted TPS receives a registration document and employment authorization for the duration of the TPS designation.

As of March 11, 2021, approximately 320,000 foreign nationals living in the United States were protected by TPS. They are from 10 countries: El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, and Yemen. In March 2021, the Biden Administration designated two more countries for TPS: Venezuela and Burma. The Trump Administration terminated TPS for six countries—El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan—but these terminations have not taken effect due to litigation. Certain Liberians and Venezuelans currently maintain relief under a similar administrative mechanism known as Deferred Enforced Departure (DED).

Multiple measures related to TPS were introduced in the 116th Congress. They included provisions to add new TPS designations (e.g., Venezuela or Hong Kong) and prohibit gang members or those without lawful status from receiving TPS. There is ongoing debate about whether foreign nationals who have been living in the United States for long periods of time with TPS or DED should have a pathway to lawful permanent resident (LPR) status. Legislation to provide such a pathway passed the House in the 116th Congress. A provision to allow Liberians who had been continuously present in the United States since 2014 to apply for LPR status was enacted in December 2019 as part of the FY2020 National Defense Authorization Act. In the 117th Congress, legislation (H.R. 6 and H.R. 1603) that would provide a pathway to LPR status for TPS and DED recipients has passed the House.

AR2022_400229

# Contents

Background............ 1
Humanitarian Response............ 1
Temporary Protected Status............ 2
Deferred Enforced Departure............ 4
Historical Use of Blanket Relief............ 4
Current TPS and DED Designations............ 5
Countries............ 7
Burma............ 7
Central American Countries............ 8
Haiti............ 9
Liberia............ 11
Nepal............ 12
Somalia............ 13
Sudan and South Sudan............ 13
Syria............ 14
Venezuela............ 15
Yemen............ 16
State of Residence of TPS Recipients............ 17
Adjustment of Status............ 18
Selected Legislative Activity in the 116th and 117th Congresses............ 18

## Figures

Figure 1. Individuals with Temporary Protected Status by State of Residence............ 17

## Tables

Table 1. Countries Currently Designated for TPS............ 6
Table 2. Countries Currently Under a DED Grant............ 7

Table A-1. Individuals with Temporary Protected Status by State of Residence............ 20

## Appendixes

Appendix............ 20

## Contacts

Author Information............ 21

# Background

Federal law provides that all aliens[1] attempting to enter the United States must do so pursuant to the Immigration and Nationality Act (INA). The INA allows for the admission of (1) immigrants, who are admitted to the United States permanently, and (2) nonimmigrants, who are admitted for temporary durations and specific purposes (e.g., students, tourists, temporary workers, or business travelers). Foreign nationals who lack lawful immigration status generally fall into three categories: (1) those who are admitted legally and then overstay their nonimmigrant visas, (2) those who enter the country surreptitiously without inspection, and (3) those who are admitted on the basis of fraudulent documents. In all three instances, the aliens are in the United States in violation of the INA and subject to removal.

The executive branch has discretion to grant temporary reprieves from removal to aliens present in the United States in violation of the INA.[2] Temporary Protected Status (TPS), codified in INA Section 244,[3] provides temporary relief from removal and work authorization to foreign nationals—regardless of their immigration status—in the United States from countries experiencing armed conflict, natural disaster, or other extraordinary circumstances that prevent their safe return. This report begins by situating TPS in the context of humanitarian responses to migration. Another form of blanket relief[4] from removal—Deferred Enforced Departure (DED)—is also described, as is the historical use of these relief mechanisms. This report then provides data on each of the countries currently designated for TPS, including the conditions that have contributed to their designation. Past legislation to provide lawful permanent resident (LPR) status to certain TPS-designated foreign nationals is also described. The report concludes with a discussion of legislative activity in the 116th and 117th Congresses related to TPS.

# Humanitarian Response

As a State Party to the 1967 United Nations Protocol Relating to the Status of Refugees (U.N. Protocol),[5] the United States agrees to the principle of *nonrefoulement*, which asserts that a refugee should not be returned to a country where he or she faces serious threats to his or her life or freedom on account of race, religion, nationality, membership in a particular social group, or political opinion. (This is now considered a rule of customary international law.) *Nonrefoulement* is embodied in several provisions of U.S. immigration law. Most notably, it is reflected in INA

---

[1] *Alien* is the term used in law and is defined as anyone who is not a citizen or national of the United States. A U.S. *national* is a person owing permanent allegiance to the United States and includes citizens. Noncitizen nationals are individuals who were born either in American Samoa or on Swains Island to parents who are not citizens of the United States. In this report, the terms *alien* and *foreign national* are used interchangeably.

[2] For more information, see CRS Report R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others*.

[3] 8 U.S.C. §1254a.

[4] The term *blanket relief* in this report refers to relief from removal that is administered to a group of individuals based on their ties to a foreign country; this stands in contrast to asylum, which is a form of relief administered on a case-by-case basis to individuals based on their personal circumstances.

[5] The 1951 United Nations Convention Relating to the Status of Refugees, which was amended by its 1967 Protocol, defines who is a refugee and sets out the legal, social, and other kinds of protections that refugees and those seeking asylum are entitled to receive. It also states the responsibilities of nations that grant asylum. United Nations High Commission for Refugees, *Convention Relating to the Status of Refugees and Its 1967 Protocol*, Geneva, Switzerland, http://www.unhcr.org/en-us/about-us/background/4ec262df9/1951-convention-relating-status-refugees-its-1967-protocol.html.

provisions requiring the government to withhold the removal of a foreign national to a country in which his or her life or freedom would be threatened on the basis of race, religion, nationality, membership in a particular social group, or political opinion.[6]

The definition of a refugee in the INA, which is consistent with the U.N. Protocol, specifies that a refugee is a person who is unwilling or unable to return to his/her country of nationality or habitual residence because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.[7] This definition also applies to individuals seeking asylum. Under the INA, refugees and asylees differ on the physical location of the persons seeking the status: those abroad apply for refugee status while those in the United States or at a U.S. port of entry apply for asylum.[8] Those admitted as refugees or granted asylum can apply for LPR status after one year.

Other foreign nationals in the United States who might elicit a humanitarian response may not qualify for asylum because they do not meet the legal definition of a refugee; under certain circumstances these persons may be eligible for relief from removal through TPS or DED.

# Temporary Protected Status

TPS is a blanket form of humanitarian relief.[9] It is the statutory embodiment of safe haven for foreign nationals within the United States[10] who may not qualify for asylum but are nonetheless fleeing—or reluctant to return to—potentially dangerous situations. TPS was established by Congress as part of the Immigration Act of 1990 (P.L. 101-649). The statute gives the Secretary of the Department of Homeland Security (DHS),[11] in consultation with other government agencies (most notably the Department of State), the authority to designate a country for TPS under one or more of the following conditions:

(1) ongoing armed conflict in a foreign state that poses a serious threat to personal safety;

(2) a foreign state request for TPS because it temporarily cannot handle the return of its nationals due to an environmental disaster; or

(3) extraordinary and temporary conditions in a foreign state that prevent its nationals from safely returning.

A foreign state may not be designated for TPS if the Secretary of DHS finds that allowing its nationals to temporarily stay in the United States is against the U.S. national interest.[12]

---

[6] INA §208 (8 U.S.C. §1158); INA §241(b)(3) (8 U.S.C. §1231(b)(3)); and INA § 101(a)(42) (8 U.S.C. §1101(a)(42)).

[7] INA §101(a)(42) (8 U.S.C. §1101(a)(42)). In certain circumstances specified in INA §101(a)(42)(B), a refugee may be within his/her country of nationality or habitual residence.

[8] See CRS Report R45539, *Immigration: U.S. Asylum Policy*; and CRS Report RL31269, *Refugee Admissions and Resettlement Policy*.

[9] The term *blanket relief* refers to relief from removal that is administered to a group of individuals based on their ties to a foreign country; this stands in contrast to asylum, which is a form of relief administered on a case-by-case basis to individuals based on their personal circumstances.

[10] Foreign nationals outside the United States are not eligible to apply for TPS.

[11] When TPS was enacted in 1990, most immigration-related functions, including designating countries for TPS, fell under the authority of the Attorney General. With the creation of the Department of Homeland Security in 2002 (P.L. 107-296), most of the Attorney General's immigration-related authority transferred to the Secretary of DHS as of March 1, 2003.

[12] INA §244(b)(1) (8 U.S.C. §1254a(b)(1)).

The Secretary of DHS may designate a country for TPS for periods of 6 to 18 months and can extend these periods if the country continues to meet the conditions for designation.[13] Each designation specifies the date by which individuals must have continuously resided in the United States in order to qualify.[14] If a designation is extended, the arrival date may be moved forward in order to allow those who arrived later to qualify, an action referred to as *redesignation*.[15]

To obtain TPS, nationals[16] of foreign countries designated for TPS must pay specified fees[17] and submit an application to DHS's U.S. Citizenship and Immigration Services (USCIS) before the deadline set forth in the *Federal Register* notice announcing the TPS designation. The application must include supporting documentation as evidence of eligibility (e.g., a passport issued by the designated country and records showing continuous physical presence in the United States since the date established in the TPS designation).[18] The statute specifies *grounds of inadmissibility* that cannot be waived, including those relating to criminal convictions, drug offenses, terrorist activity, and the persecution of others.[19] Foreign nationals outside the United States are not eligible to apply for TPS.

Individuals granted TPS are eligible for employment authorization, cannot be detained on the basis of their immigration status, and are not subject to removal while they retain TPS.[20] They may be deemed ineligible for public assistance by a state; they may travel abroad with the prior consent of the DHS Secretary.[21] TPS does not provide a path to lawful permanent residence or citizenship, but a TPS recipient is not barred from acquiring nonimmigrant or immigrant status if he or she meets the requirements.[22] DHS has indicated that information it collects when an individual registers for TPS may be used to enforce immigration law or in any criminal proceeding.[23] In addition, withdrawal of an alien's TPS may subject the alien to exclusion or deportation proceedings.[24]

[13] There is no limit on the number of extensions a country can receive.

[14] This date is typically the same or very near to the date of the designation announcement.

[15] Redesignation is not defined in law; it also refers to cases in which a country is designated for TPS for a different or additional reason than previously designated (e.g., initially designated on the basis of armed conflict, and subsequently designated on the basis of a natural disaster).

[16] In addition to nationals of designated countries, TPS statute provides that aliens with no nationality who "last habitually resided in such designated state" are eligible to apply. INA §244(a)(1) (8 U.S.C. §1254a(a)(1)).

[17] Fees for initial applicants include a $50 application fee (may not exceed $50 per 8 U.S.C. §1254a(c)(1)(B)), a $410 filing fee for employment authorization (if applying for employment authorization and between the ages of 14 and 65), and an $85 biometrics services fee for those age 14 and over. Applicants may request a waiver of the application and biometrics fees per 8 C.F.R. §103.7(c). Re-registration does not require the $50 application fee, but the other fees apply.

[18] See 8 C.F.R. §244.9 for details on evidence that must be submitted.

[19] Section 212 of the INA specifies broad grounds on which foreign nationals are considered ineligible to receive visas and ineligible to be admitted to the United States. Section 244(c)(2) in the TPS statute lists which of these *grounds of inadmissibility* may be waived and which may not be waived.

[20] INA §244(a)(1)(A), (a)(1)(B), (d)(4) (8 USC §1254a (a)(1)(A), (a)(1)(B), (d)(4)).

[21] INA §244(f) (8 U.S.C. §1254a(f)).

[22] For purposes of adjustment to lawful permanent resident status or a change to a nonimmigrant status, an alien granted TPS is considered as being in and maintaining "lawful status as a nonimmigrant" during the period in which the alien is granted TPS. INA §244(f)(4) (8 U.S.C. §1254a(f)(4)).

[23] 8 C.F.R. §244.16.

[24] 8 C.F.R. §244.14.

## Deferred Enforced Departure

In addition to TPS, there is another form of blanket relief from removal known as deferred enforced departure (DED),[25] formerly known as extended voluntary departure (EVD).[26] DED is a temporary, discretionary, administrative stay of removal granted to aliens from designated countries. Unlike TPS, a DED designation emanates from the President's constitutional powers to conduct foreign relations and has no statutory basis. DED was first used in 1990 and has been applied to six countries (see "Historical Use of Blanket Relief"). Liberia and Venezuela are currently granted DED.

DED and EVD have been used on country-specific bases to provide relief from removal at the President's discretion, usually in response to war, civil unrest, or natural disasters.[27] When Presidents grant DED through an executive order or presidential memorandum, they generally provide eligibility guidelines and direct the Secretary of Homeland Security to allow DED-eligible individuals to apply for employment authorization. Unlike TPS, the Secretary of State does not need to be consulted when DED is granted. In contrast to recipients of TPS, individuals who benefit from DED are not required to register for the status with USCIS unless they are applying for work authorization.[28] Instead, DED is triggered when a protected individual is identified for removal.

## Historical Use of Blanket Relief

In 1990, when Congress enacted the TPS statute, it also granted TPS for 18 months to Salvadoran nationals who were residing in the United States. Since then, the Attorney General (and later, the Secretary of DHS), in consultation with the Secretary of State, granted and subsequently terminated TPS for foreign nationals in the United States from the following countries: Angola, Bosnia-Herzegovina, Burundi, Guinea, Guinea-Bissau, the Kosovo Province of Serbia, Kuwait, Lebanon, Liberia, Montserrat, Rwanda, and Sierra Leone.[29]

---

[25] DED is not to be confused with deferred action, which the Department of Homeland Security defines as "a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion." For more information, see CRS Report R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* and CRS Report R45995, *Unauthorized Childhood Arrivals, DACA, and Related Legislation*.

[26] EVD status, which was used from 1960 to 1990, was given to nationals of Iran, Lebanon, Nicaragua, Poland, and Uganda. Other countries whose nationals have benefitted in the past from a status similar to EVD include Cambodia, Chile, Cuba, Czechoslovakia, Dominican Republic, Hungary, Laos, Romania, and Vietnam.

[27] See, for example, Executive Order 12711, "Policy Implementation With Respect to Nationals of the People's Republic of China," *Public Papers of the Presidents of the United States: George Bush XLI, President of the United States: 1989-1993* (Washington: GPO, 1990); The White House (President Obama), Office of the Press Secretary, "Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of Homeland Security, September 28, 2016; The White House (President Trump), Office of the Press Secretary, "Deferred Enforced Departure for Certain Venezuelans," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, January 19, 2021.

[28] In general, the President directs executive agencies to implement procedures to provide DED and related benefits, such as employment authorization. See, for example, U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Temporary Protected Status (TPS) and Deferred Enforced Departure (DED)*, https://www.uscis.gov/sites/default/files/USCIS/About%20Us/Electronic%20Reading%20Room/Customer%20Service%20Reference%20Guide/TempProtectedStatus.pdf.

[29] For a current and historical list of TPS designations by country and links to *Federal Register* announcements, see U.S. Department of Justice, Executive Office for Immigration Review, *Temporary Protected Status*, https://www.justice.gov/eoir/temporary-protected-status. For a graph showing effective dates, bases for designation,

Rather than extending the initial Salvadoran TPS when it expired in 1992, President George H. W. Bush granted DED to an estimated 190,000 Salvadorans through December 1994. President Bush also granted DED to about 80,000 Chinese nationals in the United States following the Tiananmen Square massacre in June 1989, and these individuals retained DED status through January 1994.[30] From 1991 to 1996, DED was also granted to about 2,200 Kuwaiti Persian Gulf evacuees who were airlifted to the United States after the 1990 invasion of Kuwait. In December 1997, President Clinton instructed the Attorney General to grant DED for one year to Haitian nationals in the United States, providing time for the Administration to work with Congress on long-term legislative relief for Haitians.[31] President George W. Bush directed that DED be provided to Liberian nationals whose TPS was expiring in September 2007; Liberian DED was extended several times by President Obama.[32] President Trump terminated DED for Liberians, but provided for extended wind-down periods that lasted until January 10, 2021 (for more details, see the "Liberia" section).[33]

# Current TPS and DED Designations

As of March 11, 2021, approximately 320,000 foreign nationals from the following 10 countries were protected by TPS: El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, and Yemen.[34] Two more countries were designated for TPS since President Biden took office: Venezuela on March 8, 2021, and Burma on March 12, 2021, each for 18 months. DHS estimates that 323,000 Venezuelans and 1,600 Burmese nationals could be eligible to apply for TPS under these designations.[35]

---

and types of TPS decisions for FY1990–FY2019, see U.S. Government Accountability Office, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions*, GAO-20-134, April 2020, p. 11, https://www.gao.gov/assets/gao-20-134.pdf.

[30] Many of the beneficiaries of this DED grant were able to adjust to LPR status through the Chinese Student Protection Act of 1992 (P.L. 102-404).

[31] The Nicaraguan Adjustment and Central American Relief Act (NACARA) (Title II of P.L. 105-100) was enacted in 1997 and provided eligibility for LPR status to certain Nicaraguans, Cubans, Guatemalans, Salvadorans, and nationals of the former Soviet bloc. President Clinton, among others, argued that Haitians deserved similar statutory treatment. The Haitian Refugee Immigration Fairness Act (HRIFA) (P.L. 105-277) was enacted in 1998, allowing certain Haitian nationals who were in the United States before December 31, 1995 to adjust to LPR status. For more information, see archived CRS Report RS21349, *U.S. Immigration Policy on Haitian Migrants.*

[32] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "DED Granted Country - Liberia," https://www.uscis.gov/humanitarian/deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia.

[33] The White House (President Trump), Office of the Press Secretary, "Extending the Wind-Down Period for Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, March 30, 2020; The White House (President Trump), Office of the Press Secretary, "Extension of Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, March 28, 2019. The White House (President Trump), Office of the Press Secretary, "Expiration of Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, March 27, 2018.

[34] This number is lower than what was reported in prior versions of this report due to the fact that USCIS recently provided data on individuals with TPS only, while prior data releases included individuals with both TPS and a permanent status (i.e., LPR status or citizenship).

[35] U.S. Citizenship and Immigration Services, "Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure," 86 *Federal Register* 13574-13581, March 9, 2021. U.S. Department of Homeland Security, "Secretary Mayorkas Designates Burma for Temporary Protected Status," press release, March 12, 2021, https://www.dhs.gov/news/2021/03/12/secretary-mayorkas-designates-burma-temporary-protected-status; Michele Kelemen, "U.S. Offers Protected Status For

The Trump Administration terminated TPS for six countries (El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan). Several lawsuits were filed challenging the terminations; as a result, the terminations have not yet taken effect.[36]

**Table 1** lists the TPS-designated countries as of the date of this report, the most recent decision—to extend or terminate—by the Secretary of DHS, the date from which individuals are required to have continuously resided in the United States, and the designation's current expiration date. In addition, **Table 1** shows the number of individuals protected by TPS as of March 11, 2021.[37]

**Table 1. Countries Currently Designated for TPS**

| Country | Most Recent Decision | Required Arrival Date[a] | Expiration Date[b] | Individuals with TPS[c] |
|---|---|---|---|---|
| Burma | Initial designation | March 11, 2021 | September 12, 2022 | N/A[d] |
| El Salvador | Termination* | February 13, 2001 | September 9, 2019 | 198,420 |
| Haiti | Termination* | January 12, 2011 | July 22, 2019 | 40,865 |
| Honduras | Termination* | December 30, 1998 | January 5, 2020 | 60,350 |
| Nepal | Termination* | June 24, 2015 | June 24, 2019 | 10,160 |
| Nicaragua | Termination* | December 30, 1998 | January 5, 2019 | 3,200 |
| Somalia | Extension | May 1, 2012 | September 17, 2021 | 385 |
| South Sudan | Extension | January 25, 2016 | May 2, 2022 | 80 |
| Sudan | Termination* | January 9, 2013 | November 2, 2018 | 550 |
| Syria | Extension and redesignation | March 19, 2021 | September 30, 2022 | 3,945 |
| Venezuela | Initial designation | March 8, 2021 | September 9, 2022 | N/A[d] |
| Yemen | Extension | January 4, 2017 | September 3, 2021 | 1,385 |
| **Total** | | | | **319,465** |

**Sources:** CRS compilation of information from *Federal Register* announcements or press releases; numbers provided to CRS by USCIS.

**Note**: *Due to legal challenges, the termination has not yet taken effect. Numbers may not sum to total due to rounding.

a. The arrival date represents the date from which individuals are required to have continuously resided in the United States in order to qualify for TPS and is indicated in the most recent TPS designation for that country. Unless a country is re-designated for TPS, the required arrival date does not change. A foreign national is not considered to have failed this requirement for a "brief, casual, and innocent" absence. 8 U.S.C. §1254a(c) and 8 C.F.R. §244.1.

b. The expiration date represents the end of the most recent designation period and is subject to change based on future decisions of the Secretary of DHS.

People From Myanmar As Coup Leaders Crack Down," National Public Radio, March 12, 2021.

36 For more information on litigation related to TPS terminations, see CRS Legal Sidebar LSB10541, *Ninth Circuit Decision Allows Termination of Temporary Protected Status for Sudan, Nicaragua, and El Salvador to Go Forward*.

37 Prior USCIS data on TPS recipients included some individuals who also had LPR status and some who had become naturalized U.S. citizens. USCIS recently published data on TPS recipients who do *not* have LPR status or U.S. citizenship. Thus, the numbers used in this report are lower than those in prior versions of this report and more accurately reflect those who rely on TPS to remain in the United States.

c. These data reflect the number of individuals (rounded to the nearest five by USCIS) with an approved TPS application as of March 11, 2021, who had not obtained LPR status or U.S. citizenship. The data may include individuals who have left the country or died since their last TPS approval, and do not necessarily include all nationals from the specified countries who are in the United States and are eligible for the status.

d. Because the application period just began, data are not yet available.

In addition to the countries designated for TPS, certain nationals from Liberia and Venezuela are covered under a grant of DED (see the "Liberia" and "Venezuela" sections). **Table 2** shows the dates associated with these grants. Individuals covered by DED are not required to register for the status with USCIS unless they are applying for work authorization. As a result, USCIS does not maintain data on the total population covered by DED.

**Table 2. Countries Currently Under a DED Grant**

| Country | Required Arrival Date[a] | Expiration Date[b] |
|---|---|---|
| Liberia | October 1, 2002 | June 30, 2022 |
| Venezuela | January 20, 2021 | July 20, 2022 |

**Source:** CRS compilation of information from *Federal Register* announcements and White House press releases.

a. The arrival date represents the date from which individuals are required to have continuously resided in the United States in order to qualify for DED.

b. The expiration date represents the end of the most recent DED grant and is subject to change based on future decisions of the President.

# Countries

## Burma

On February 1, 2021, Burma's military seized control of Burma's Union Government and detained State Counselor Aung San Suu Kyi (the country's de facto civilian leader) and members of her political party. The military's action was widely condemned internationally as a blow to Burma's partial transition from military rule to democracy.[38] In subsequent weeks, the military used lethal force against peaceful protesters several times. In a press release announcing the decision to designate Burma for TPS on the basis of extraordinary and temporary conditions, Secretary Mayorkas stated, "Due to the military coup and security forces' brutal violence against civilians, the people of Burma are suffering a complex and deteriorating humanitarian crisis in many parts of the country."[39] The press release also noted, "The coup has led to continuing violence, pervasive arbitrary detentions, the use of lethal violence against peaceful protesters, and intimidation of the people of Burma. The coup has worsened humanitarian conditions in several areas by limiting access to life-saving assistance, disrupting flights carrying humanitarian and medical aid, and spurring an economic crisis."[40]

[38] CRS Insight IN11594, *Coup in Burma (Myanmar): Issues for U.S. Policy*.

[39] Department of Homeland Security, "Secretary Mayorkas Designates Burma for Temporary Protected Status," press release, March 12, 2021, https://www.dhs.gov/news/2021/03/12/secretary-mayorkas-designates-burma-temporary-protected-status.

[40] Ibid.

Burma's designation is for 18 months. Burmese nationals who can demonstrate that they were present in the United States as of March 11, 2021 are eligible. DHS estimates that 1,600 individuals may be eligible under this designation.[41]

## Central American Countries

The only time Congress has granted TPS was in 1990 (as part of P.L. 101-649, the law establishing TPS) to eligible Salvadoran nationals in the United States.[42] In the aftermath of Hurricane Mitch in November 1998, then-Attorney General Janet Reno announced that she would temporarily suspend the deportation of nationals from El Salvador, Guatemala, Honduras, and Nicaragua. On January 5, 1999, former Attorney General Reno designated Honduras and Nicaragua for TPS due to "severe flooding and associated damage" and "substantial disruption of living conditions" caused by Hurricane Mitch.[43] Prior to leaving office in January 2001, President Clinton said that his Administration would temporarily suspend deportations to El Salvador because of a major earthquake. In 2001, the George W. Bush Administration granted TPS to Salvadoran nationals following two earthquakes that rocked the country.[44]

Over the years, the George W. Bush Administration and the Obama Administration extended TPS for Central Americans from El Salvador, Honduras, and Nicaragua on the rationale that it was still unsafe for their nationals to return due to the disruption of living conditions from environmental disasters.

Beginning in late 2017, the Trump Administration announced decisions to terminate TPS for Nicaragua and El Salvador and to put on hold a decision about Honduras. In November 2017, DHS announced that TPS for Nicaragua would end on January 5, 2019—12 months after its last designation would have expired—due to "recovery efforts relating to Hurricane Mitch [that] have largely been completed."[45] On the same day, DHS announced that more information was necessary to make a determination about TPS for Honduras; as a result, statute dictates that its status be extended for six months.[46] On May 4, 2018, DHS announced its decision to terminate the TPS designation for Honduras, with an 18-month delay (until January 5, 2020) to allow for an

[41] Michele Kelemen, "U.S. Offers Protected Status For People From Myanmar As Coup Leaders Crack Down," National Public Radio, March 12, 2021; Simon Lewis and Humeyra Pamuk, "U.S. grants Myanmar nationals relief from deportation after military coup," *Reuters*, March 12, 2021; Joe Walsh, "Biden Offers Deportation Relief To Myanmar Nationals Amid Coup Chaos," *Forbes*, March 12, 2021.

[42] For historical analysis, see archived CRS Report IB87205, *Immigration Status of Salvadorans and Nicaraguans* (available to congressional clients upon request).

[43] U.S. Department of Justice, Immigration and Naturalization Service, "The Designation of Honduras Under Temporary Protected Status," 64 *Federal Register* 524-526, January 5, 1999; U.S. Department of Justice, Immigration and Naturalization Service, "The Designation of Nicaragua Under Temporary Protected Status," 64 *Federal Register* 526-528, January 5, 1999.

[44] U.S. Department of Justice Immigration and Naturalization Service, "The Designation of El Salvador Under Temporary Protected Status," 66 *Federal Register* 14214-14216, March 9, 2001.

[45] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Termination of the Designation of Nicaragua for Temporary Protected Status," 82 *Federal Register* 59636-59642, December 15, 2017.

[46] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation of Honduras for Temporary Protected Status,"82 *Federal Register* 59630-59636, December 15, 2017.

orderly transition.[47] The terminations for Nicaragua and Honduras are on hold due to a legal challenge.[48]

On January 8, 2018, DHS announced its decision to terminate TPS for El Salvador—whose nationals account for about 60% of all current TPS recipients—after an 18-month transition period. El Salvador's TPS designation was scheduled to end on September 9, 2019,[49] but the termination has not yet taken effect due to a legal challenge.[50] DHS announced in October 2019—as part of agreements with El Salvador related to information sharing and security—that it would extend the validity of work permits through January 4, 2021, for Salvadorans with TPS. (To comply with court orders, DHS has since extended TPS-related documentation through October 4, 2021, for individuals from El Salvador, Nicaragua, Honduras, and other specified countries.[51]) The October 2019 announcement also stated that Salvadorans with TPS would have "an additional 365 days after the conclusion of the TPS-related lawsuits to repatriate back to their home country."[52] These actions do not equate to a TPS extension, as defined in statute.[53]

The large number of Central Americans with TPS, along with their length of U.S. residence and resulting substantial economic and family ties, have led some to support extending TPS—or providing LPR status—for Central Americans and Salvadorans in particular. Supporters have argued that ongoing violence, political unrest, and subsequent natural disasters have left these countries unable to adequately handle the return of their nationals and that a large-scale return could have negative consequences for the U.S. economy and labor supply, American families, foreign relations, and the flow of remittances sent by Central Americans living in the United States to their relatives in Central America.[54] Opponents have argued that ending the TPS designations for these countries is consistent with its original intent—to provide *temporary* safe haven.

### Haiti

The devastation caused by the January 12, 2010, earthquake in Haiti prompted calls for the Obama Administration to grant TPS to Haitian nationals in the United States.[55] The scale of the

[47] U.S. Department of Homeland Security, "Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras," press release, May 4, 2018, https://www.dhs.gov/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

[48] For more information on litigation related to TPS terminations, see CRS Legal Sidebar LSB10541, *Ninth Circuit Decision Allows Termination of Temporary Protected Status for Sudan, Nicaragua, and El Salvador to Go Forward*.

[49] U.S. Department of Homeland Security, "Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for El Salvador," press release, January 8, 2018, https://www.dhs.gov/news/2018/01/08/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

[50] For more information on litigation related to TPS terminations, see CRS Legal Sidebar LSB10541, *Ninth Circuit Decision Allows Termination of Temporary Protected Status for Sudan, Nicaragua, and El Salvador to Go Forward*.

[51] For more information, see Department of Homeland Security, U.S. Citizenship and Immigration Services, "Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal," 85 *Federal Register* 79208-79215, December 9, 2020.

[52] U.S. Department of Homeland Security, "U.S. and El Salvador Sign Arrangements on Security and Information Sharing; Give Salvadorans with TPS More Time," press release, October 28, 2019, https://www.dhs.gov/news/2019/10/28/us-and-el-salvador-sign-arrangements-security-information-sharing-give-salvadorans.

[53] See INA §244(b)(3) (8 U.S.C. §1254a(b)(3)).

[54] For information on country conditions, see CRS Report R43616, *El Salvador: Background and U.S. Relations*; CRS Report R44560, *Nicaragua: In Brief*; and CRS Report RL34027, *Honduras: Background and U.S. Relations*.

[55] The issue of Haitian TPS had arisen several times prior, most notably after the U.S. Ambassador declared Haiti a disaster in September 2004 due to the magnitude of the effects of Tropical Storm Jeanne. A series of tropical cyclones

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 240 of 513

humanitarian crisis after the earthquake—with estimates of thousands of Haitians dead and reports of the total collapse of Port au Prince's infrastructure—led DHS to grant TPS for 18 months to Haitian nationals who were in the United States as of January 12, 2010.[56] At the time, then-DHS Secretary Janet Napolitano stated: "Providing a temporary refuge for Haitian nationals who are currently in the United States and whose personal safety would be endangered by returning to Haiti is part of this Administration's continuing efforts to support Haiti's recovery."[57] On July 13, 2010, DHS announced a six-month extension of the TPS registration period for Haitian nationals, citing difficulties nationals were experiencing in obtaining documents to establish identity and nationality, and in gathering funds required to apply for TPS.[58]

DHS extended the TPS designation for Haiti in May 2011, providing another 18 months of TPS, through January 22, 2013.[59] At the same time, DHS issued a redesignation, enabling eligible Haitian nationals who had arrived in the United States up to one year after the earthquake to receive TPS. The redesignation targeted individuals who were allowed to enter the United States immediately after the earthquake on temporary visas or humanitarian parole,[60] but were not covered by the initial TPS designation.[61] Subsequently, then-Secretary Jeh Johnson extended Haiti's designation several more times, through July 22, 2017.[62]

A May 2, 2017, letter from members of the Congressional Black Caucus to then-DHS Secretary John Kelly urged another 18-month extension of TPS for Haiti, citing continued recovery difficulties from the 2010 earthquake that killed over 300,000 people, an ongoing cholera epidemic, and additional damages from Hurricane Matthew in 2016.[63] On May 24, 2017, former Secretary Kelly extended Haiti's TPS designation for six months (the minimum allowed by statute), from its planned expiration on July 22, 2017, to January 22, 2018, and encouraged beneficiaries to prepare to return to Haiti should its designation be terminated after six months.[64] An October 4, 2017, letter from the Haitian ambassador to then-Acting DHS Secretary Elaine

---

in 2008 resulted in hundreds of deaths and led some to label the city of Gonaives uninhabitable. The George W. Bush Administration did not grant TPS or another form of blanket relief to Haitians, nor was legislation enacted that would have provided TPS to Haitians, such as H.R. 522 in the 110th Congress. For background information on Haitian migration to the United States, see archived CRS Report RS21349, *U.S. Immigration Policy on Haitian Migrants*.

[56] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Designation of Haiti for Temporary Protected Status," 75 *Federal Register* 3476-3479, January 21, 2010.

[57] U.S. Department of Homeland Security, "Statement from Secretary Janet Napolitano," press release, January 15, 2010.

[58] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Initial Registration Period for Haitians under the Temporary Protected Status Program," 75 *Federal Register* 39957, July 13, 2010.

[59] U.S. Department of Homeland Security, "Secretary Napolitano Announces Extension of Temporary Protected Status for Haitian Beneficiaries," press release, May 17, 2011.

[60] Parole allows an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be granted authorization to enter the United State for a temporary period. INA §212(d)(5) (8 U.S.C. §1182(d)(5)). For more information, see CRS Report R46570, *Immigration Parole*.

[61] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension and Re-designation of Haiti for Temporary Protected Status," 76 *Federal Register* 29000-29004, May 19, 2011.

[62] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation of Haiti for Temporary Protected Status," 80 *Federal Register* 51582-51588, August 25, 2015.

[63] For conditions following Hurricane Matthew, see CRS In Focus IF10502, *Haiti: Cholera, the United Nations, and Hurricane Matthew*.

[64] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation of Haiti for Temporary Protected Status," 82 *Federal Register* 23830-23837, May 24, 2017.

AR2022_400240

Duke requested that Haiti's designation be extended for an additional 18 months.[65] On November 20, 2017, DHS announced its decision to terminate TPS for Haiti, with an 18-month transition period. Its designation was set to terminate on July 22, 2019,[66] but the termination has not yet taken effect due to legal challenges.[67]

## Liberia

Liberians in the United States first received TPS in March 1991 following the outbreak of civil war. Although that war ended, a second civil war began in 1999 and escalated in 2000.[68] In 1999, President Clinton authorized DED for an estimated 10,000 Liberians in the United States after their TPS designation expired. DED was subsequently extended by President Clinton and President George W. Bush to September 29, 2002. On October 1, 2002, Liberia was designated again for TPS due to ongoing armed conflict.[69] In 2006, the George W. Bush Administration announced that TPS for Liberia would expire on October 1, 2007, but that covered Liberians would be eligible for DED until March 31, 2009. On March 23, 2009, President Obama extended DED for those Liberians until March 31, 2010, and several times thereafter.[70]

As a result of the 2014-2016 Ebola outbreak in West Africa, eligible Liberians were again granted TPS, as were eligible Sierra Leoneans and Guineans.[71] On September 26, 2016, DHS issued a notice terminating TPS for Liberia with an effective date of May 21, 2017; this date provided a six-month extension past when it was previously set to expire, in order to provide an "orderly transition" for beneficiaries to "prepare for and arrange their departure from the United States or … to apply for other immigration benefits for which they are eligible."[72] Similar termination notices were issued for Sierra Leone and Guinea.

For a specially designated population of Liberians who had been residing in the United States since October 2002, their DED status was extended by President Obama through March 31, 2018.[73] President Trump announced on March 27, 2018, that extending DED again for these

[65] Letter from Paul G. Altidor, Ambassador to the United States from Haiti, to Elaine C. Duke, Acting Secretary of the Department of Homeland Security, October 4, 2017.

[66] U.S. Department of Homeland Security, "Acting Secretary Elaine Duke Announcement On Temporary Protected Status For Haiti," press release, November 20, 2017, https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti.

[67] For more information on litigation related to TPS terminations, see CRS Legal Sidebar LSB10541, *Ninth Circuit Decision Allows Termination of Temporary Protected Status for Sudan, Nicaragua, and El Salvador to Go Forward*.

[68] See archived CRS Report RL32243, *Liberia: Transition to Peace*.

[69] U.S. Department of Justice, Immigration and Naturalization Service, "Designation of Liberia Under the Temporary Protected Status Program," 67 *Federal Register* 61664-61667, October 1, 2002.

[70] See, for example, U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Filing Procedures and Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure," 75 *Federal Register* 15715, March 30, 2010; The White House (President Obama), Office of the Press Secretary, "Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of Homeland Security, September 28, 2016.

[71] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Designation of Liberia for Temporary Protected Status," 79 *Federal Register* 69502-69502, November 21, 2014; and U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Initial Registration Period for Guinea, Liberia and Sierra Leone for Temporary Protected Status," 80 *Federal Register, Number 122, 36551-36552,* June 25, 2015.

[72] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status," 81 *Federal Register* 66059-66064, September 26, 2016.

[73] The White House (President Obama), Office of the Press Secretary, "Deferred Enforced Departure for Liberians,"

Liberians was not warranted due to improved conditions in Liberia, but that the U.S. foreign policy interests warranted a 12-month wind-down period.[74] A lawsuit challenging the termination was filed in federal court on March 8, 2019.[75] Three days before the effective termination date, President Trump—citing congressional efforts to provide longer-term relief for Liberians—announced a 12-month extension of the wind-down period, to last through March 30, 2020.[76] On March 30, 2020, President Trump again delayed the effective date of the termination (this time to January 10, 2021) in order to provide continuous employment authorization to Liberians eligible to adjust their status under the recently enacted Liberian Refugee Immigration Fairness provision (see next paragraph). Approximately 589 Liberians have approved employment authorization documents (EADs) under this DED directive.[77] This number does not reflect all Liberians who might be covered under this DED announcement—only those who applied for and received an EAD.[78] On January 20, 2021, his first day in office, President Biden reinstated DED for Liberians who had been covered by the prior DED grant.[79] The current DED grant is for 18 months.

The 116th Congress incorporated Liberian Refugee Immigration Fairness (LRIF) provisions into the FY2020 National Defense Authorization Act (NDAA). LRIF allows Liberians who have been continuously present in the United States since November 2014 and their family members to apply for LPR status. President Trump signed the FY2020 NDAA into law on December 20, 2019 (P.L. 116-92, Section 7611).[80]

## Nepal

Nepal was devastated by a massive earthquake on April 25, 2015, killing over 8,000 people. The earthquake and subsequent aftershocks demolished much of Nepal's housing and infrastructure in many areas. Over half a million homes were reportedly destroyed.[81] On June 24, 2015, citing a substantial but temporary disruption in living conditions as a result of the earthquake, then-DHS Secretary Johnson designated Nepal for TPS for an 18-month period.[82] TPS for Nepal was

presidential memorandum for the Secretary of Homeland Security, September 28, 2016.

74 The White House (President Trump), Office of the Press Secretary, "Expiration of Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, March 27, 2018.

75 Complaint, African Cmtys. Together v. Trump, No. 1:19-cv-10432 (D. Mass. Mar. 8, 2019).

76 The White House (President Trump), Office of the Press Secretary, "Extension of Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, March 28, 2019.

77 Numbers provided to CRS by USCIS and represent individuals with a valid EAD as of February 4, 2020.

78 Individuals who benefit from DED are not required to register for the status with USCIS unless they are applying for work authorization. In its February 25, 2021 webinar, "Liberian Refugee Immigration Fairness (LRIF) and Deferred Enforced Departure (DED) for Liberians," USCIS stated that the total number of Liberians currently covered by DED is, at most, 2,800. This number is based on the number of individuals who were eligible for the TPS designation that ended on September 30, 2007 minus those who have since adjusted to LPR status.

79 The White House (President Biden), Office of the Press Secretary, "Reinstating Deferred Enforced Departure for Liberians," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, January 20, 2021.

80 Section 901 of the Consolidated Appropriations Act, 2021 (P.L. 116-260) extended by one year the deadline to apply for LRIF (to December 20, 2021).

81 See CRS Report R44303, *Nepal: Political Developments and U.S. Relations*. For information on more recent country conditions, see CRS In Focus IF10216, *Nepal*.

82 U.S. Department of Justice, Immigration and Naturalization Service, "Designation of Nepal for Temporary Protected Status," 80 *Federal Register* 36346-36350, June 24, 2015.

extended for 18 months in October 2016.[83] On April 26, 2018, then-Secretary Kirstjen Nielsen announced her decision to terminate the TPS designation for Nepal, citing her assessment that the original conditions under which the country was designated were no longer substantial and that Nepal could adequately handle the return of its nationals.[84] A 12-month delay of the termination date to allow for an orderly transition was also announced; the TPS designation for Nepal was thus set to terminate on June 24, 2019.[85] The termination has not yet taken effect due to a legal challenge.[86]

### Somalia

Somalia has endured decades of chronic instability and humanitarian crises. Since the collapse of the authoritarian Siad Barre regime in 1991, it has lacked a viable central authority capable of exerting territorial control, securing its borders, or providing security and services to its people.[87] Somalia was first designated for TPS in 1991 based on "extraordinary and temporary conditions … that prevent aliens who are nationals of Somalia from returning to Somalia in safety."[88] Through 24 subsequent extensions or redesignations, Somalia has maintained TPS due to insecurity and ongoing armed conflict that present serious threats to the safety of returnees. In January 2020, DHS extended Somalia's designation for another 18 months through September 17, 2021.[89]

### Sudan and South Sudan

Decades of civil war preceded South Sudan's secession from the Republic of Sudan in 2011.[90] Citing both ongoing armed conflict and extraordinary and temporary conditions that would prevent the safe return of Sudanese nationals, the Attorney General designated Sudan for TPS on November 4, 1997. Since then, Sudan has been redesignated or had its designation extended 14 times.

On July 9, 2011, South Sudan became a new nation.[91] With South Sudan's independence from the Republic of Sudan, questions arose about whether nationals of the new nation would continue to be eligible for TPS. In response, then-Secretary Napolitano designated South Sudan for TPS on October 17, 2011.[92] TPS has been extended or redesignated seven times since then due to ongoing

---

[83] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extensions of the Designation of Nepal for Temporary Protected Status," 81 *Federal Register* 74470-74475, October 26, 2016.

[84] U.S. Department of Homeland Security, "Secretary Kirstjen M. Nielsen Announcement on Temporary Protected Status for Nepal," press release, April 26, 2018, https://www.dhs.gov/news/2018/04/26/secretary-kirstjen-m-nielsen-announcement-temporary-protected-status-nepal.

[85] Ibid.

[86] For more information on litigation related to TPS terminations, see CRS Legal Sidebar LSB10541, *Ninth Circuit Decision Allows Termination of Temporary Protected Status for Sudan, Nicaragua, and El Salvador to Go Forward*.

[87] See CRS In Focus IF10155, *Somalia*.

[88] U.S. Department of Justice, Immigration and Naturalization Service, "Designation of Nationals of Somalia for Temporary Protected Status," 56 *Federal Register* 46804-46805, September 16, 1991.

[89] U.S. Citizenship and Immigration Services, "Temporary Protected Status Designated Country: Somalia," https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-somalia.

[90] See CRS In Focus IF10182, *Sudan*.

[91] See CRS In Focus IF10218, *South Sudan*.

[92] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Designation of Republic of South Sudan for Temporary Protected Status," 76 *Federal Register* 63629-63635, October 13, 2011.

armed conflict and extraordinary and temporary conditions in South Sudan, including "ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country."[93] The latest extension was for 18 months and expires on May 2, 2022.[94]

Meanwhile, citing improved conditions in Sudan, including a reduction in violence and an increase in food harvests, then-Acting DHS Secretary Duke announced in September 2017 that Sudan's TPS designation would expire on November 2, 2018.[95] The termination has not yet taken effect due to a legal challenge.[96]

## Syria

The political uprising of 2011 in Syria grew into an intensely violent civil war that has led to 5.6 million Syrians fleeing the country and 6.2 million more internally displaced as of early 2020.[97] On March 29, 2012, then-Secretary of Homeland Security Janet Napolitano designated Syria for TPS through September 30, 2013, citing temporary extraordinary conditions that would make it unsafe for Syrian nationals already in the United States to return to the country.[98] In that initial granting of TPS, former Secretary Napolitano made clear that DHS would conduct full background checks on Syrians registering for TPS.[99] TPS for Syrian nationals has since been extended. The 18-month extension on August 1, 2016, was accompanied by a redesignation, which updated the required arrival date into the United States for Syrians from January 5, 2015, to August 1, 2016.[100] On January 31, 2018, then-Secretary Nielsen announced her decision to extend the TPS designation for Syria for another 18 months, citing the ongoing armed conflict and extraordinary conditions that prompted the original designation.[101] This announcement did not include a redesignation; thus, Syrians who entered the United States after August 1, 2016, remained ineligible.[102] The Trump Administration issued another 18-month extension (without

---

[93] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of South Sudan for Temporary Protected Status," 82 *Federal Register* 44205-44211, September 21, 2017.

[94] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Alert," https://www.uscis.gov/humanitarian/temporary-protected-status. (As of the date of this report, the *Federal Register* notice extending the designation had not been published.)

[95] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Termination of the Designation of Sudan for Temporary Protected Status," 82 *Federal Register* 47228-47234, October 11, 2017.

[96] For more information on litigation related to TPS terminations, see CRS Legal Sidebar LSB10541, *Ninth Circuit Decision Allows Termination of Temporary Protected Status for Sudan, Nicaragua, and El Salvador to Go Forward*.

[97] See CRS Report R43119, *Syria: Overview of the Humanitarian Response*; and CRS Report RL33487, *Armed Conflict in Syria: Overview and U.S. Response*.

[98] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Designation of Syrian Arab Republic for Temporary Protected Status," 61 *Federal Register* 19026-19030, March 29, 2012.

[99] Secretary of Homeland Security Janet Napolitano, "Temporary Protected Status (TPS) for Syrian Nationals," press release, March 23, 2012, http://www.dhs.gov/ynews/releases/20120323-napolitano-statement-syria-tps.shtm.

[100] Previously, Syrians who had arrived in the United States after January 5, 2015, were not eligible for TPS. The redesignation allows Syrians that arrived between January 5, 2015, and August 1, 2016, to be eligible for TPS. U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension and Redesignation of Syria for Temporary Protected Status," 81 *Federal Register* 50533-50541, August 1, 2016.

[101] U.S. Department of Homeland Security, "Secretary of Homeland Security Kirstjen M. Nielsen Announcement On Temporary Protected Status For Syria," press release, January 31, 2018, https://www.dhs.gov/news/2018/01/31/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

[102] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation Syria for Temporary Protected Status," 83 *Federal Register* 9329-9336, March 5, 2018.

redesignation) for Syria through March 31, 2021.[103] On January 29, 2021, the Biden Administration announced a redesignation and 18-month extension of Syria's TPS. This action enables eligible Syrian nationals to retain their TPS through September 2022 and allows approximately 1,800 additional individuals to file initial applications to obtain such status.[104]

### Venezuela

Venezuela is in a deep crisis under the authoritarian rule of Nicolás Maduro. Narrowly elected in 2013 after the death of populist President Hugo Chávez, Maduro began a second term in January 2019 that is widely considered illegitimate.[105] By most accounts, Maduro's government has mismanaged the economy and engaged in massive corruption, exacerbating the effects of a decline in global oil prices and production on the country's economy. Shortages in food and medicine, declines in purchasing power, and a collapse of social services have created a humanitarian crisis.[106]

During 2019, some Members of Congress and nonprofit organizations requested that the Trump Administration designate Venezuela for TPS,[107] and the House passed a bill that would have designated Venezuela for TPS for 18 months.[108] In response to a letter requesting TPS for Venezuela, the Acting Director of USCIS stated that USCIS would not recommend any new countries for TPS "until such time as federal courts resume following federal law," referring to court decisions to enjoin the Trump Administration's terminations of TPS designations for several countries.[109] The Trump Administration never designated Venezuela for TPS. However, on his last full day in office, President Trump granted DED for Venezuelans present in the United States as of January 20, 2021, asserting that the Maduro regime is responsible for "the worst humanitarian crisis in the Western Hemisphere in recent memory."[110]

The Biden Administration determined that Venezuela met the statutory conditions for a TPS designation on the basis of extraordinary and temporary conditions. Unlike DED, designating Venezuela for TPS allows those who qualify to obtain an immigration status and documentation thereof; it also requires that the Administration reconsider country conditions on a periodic basis and extend or terminate the status accordingly. On March 8, DHS Secretary Mayorkas announced an 18-month TPS designation for Venezuela, citing the following factors:

---

[103] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation Syria for Temporary Protected Status," 84 *Federal Register* 49751-49757, September 23, 2019.

[104] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension and Redesignation of Syria for Temporary Protected Status," 86 *Federal Register* 14946-14952, March 19, 2021.

[105] CRS In Focus IF10230, *Venezuela: Political Crisis and U.S. Policy*.

[106] Ibid.

[107] See, for example, letter from 24 U.S. Senators to President Donald J. Trump, March 7, 2019, https://www.durbin.senate.gov/imo/media/doc/March7%20Venezuela%20TPS%20Letter%20FINAL%20SIGNED.pdf; and letter from 23 U.S. Representatives to Kevin McAleenan, acting Secretary of DHS, May 10, 2019, https://www.uscis.gov/sites/default/files/document/foia/TPS_-_Venezuela_-_Representative_Mucarsel-Powell.pdf.

[108] H.R. 549, 116th Congress.

[109] Letter from Ken Cucinelli II, acting director, USCIS, to Leith Anderson, president, National Association of Evangelicals, October 24, 2019, https://www.uscis.gov/sites/default/files/document/foia/TPS_-_Venezuela_-_Anderson.pdf. For information on the TPS-related injunctions, see CRS Legal Sidebar LSB10215, *Federal District Court Enjoins the Department of Homeland Security from Terminating Temporary Protected Status*.

[110] The White House (President Trump), Office of the Press Secretary, "Deferred Enforced Departure for Certain Venezuelans," presidential memorandum for the Secretary of State and the Secretary of Homeland Security, January 19, 2021.

> economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID-19 pandemic, among other factors.[111]

USCIS estimates that approximately 323,000 individuals are eligible to file applications for TPS under the designation of Venezuela.[112]

Because Venezuela is currently designated for both TPS and DED, Venezuelans may apply for work authorization pursuant to either type of relief.[113] DHS encourages Venezuelans who are eligible for both TPS and DED to apply for TPS during the initial registration period (March 9, 2021-September 5, 2021) since they may not qualify for TPS late initial filing after DED has expired.[114]

## Yemen

On September 3, 2015, then-DHS Secretary Johnson designated Yemen for TPS through March 3, 2017, due to ongoing armed conflict in the country.[115] A 2015 DHS press release stated that "requiring Yemeni nationals in the United States to return to Yemen would pose a serious threat to their personal safety."[116] Since 2015, the war in Yemen has killed over 100,000 people, including civilians as well as combatants. According to the United Nations, Yemen is the world's worst humanitarian crisis, with 80% of the population in need of assistance. Relief efforts in the region have been complicated by ongoing violence and considerable damage to the country's infrastructure.[117] On January 4, 2017, DHS extended and redesignated Yemen's current TPS designation through September 3, 2018. The redesignation updated the required arrival date into the United States for individuals from Yemen from September 3, 2015, to January 4, 2017.[118] The *Federal Register* notice explained that the "continued deterioration of the conditions for civilians in Yemen and the resulting need to offer protection to individuals who have arrived in the United

---

[111] U.S. Department of Homeland Security, "Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure," 86 *Federal Register* 13574-13581, March 9, 2021.

[112] Ibid.

[113] Those who are approved for work authorization pursuant to their TPS application are to receive an employment authorization document (EAD) valid through September 9, 2022; if Venezuela's TPS designation is subsequently extended, such an EAD would be eligible for renewal. Venezuelans who are approved for an EAD pursuant to DED will receive an EAD valid through July 20, 2022; if the President does not extend Venezuela's DED, such an EAD would expire on July 20, 2022.

[114] In limited circumstances, an individual may apply for TPS after the initial registration period has ended. See 8 C.F.R. §244.2(f)(2).

[115] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Designation of the Republic of Yemen for Temporary Protected Status," 80 *Federal Register* 53319-53323, September 3, 2015.

[116] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "DHS Announces Temporary Protected Status Designation for Yemen," press release, September 3, 2015, http://www.uscis.gov/news/dhs-announces-temporary-protected-status-designation-yemen.

[117] See CRS Report R43960, *Yemen: Civil War and Regional Intervention*.

[118] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension and Redesignation of the Republic of Yemen for Temporary Protected Status," 82 *Federal Register* 859-866, January 4, 2017.

States after the eligibility cutoff dates" warranted the redesignation of TPS.[119] The Trump Administration twice extended Yemen's TPS designation for durations of 18 months each, but the arrival cutoff date remains the same.[120] Its current designation lasts through September 3, 2021.

# State of Residence of TPS Recipients

Individuals with TPS reside in all 50 states, the District of Columbia, and the U.S. territories. The largest populations live in traditional immigrant gateway states: California, Florida, Texas, and New York. In addition, five other states had at least 10,000 TPS recipients as of March 2021: Maryland, Virginia, New Jersey, Massachusetts, and North Carolina. See **Figure 1** and **Table A-1**.

**Figure 1. Individuals with Temporary Protected Status by State of Residence**



**Source:** CRS presentation of data provided by USCIS.

**Notes:** These data reflect the number of individuals (rounded to the nearest five) with an approved TPS application as of March 11, 2021, who had not obtained LPR status or U.S. citizenship. The data may include individuals who have moved to another state, left the country, or died since their last TPS approval, and do not necessarily include all nationals from the specified countries who are in the United States and are eligible for the status.

---

[119] Ibid.

[120] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation of Yemen for Temporary Protected Status," 83 *Federal Register* 40307-40313, August 14, 2018; U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Extension of the Designation of Yemen for Temporary Protected Status," 85 *Federal Register* 12313-12319, March 2, 2020.

## Adjustment of Status

A grant of TPS does not provide a recipient with a designated pathway to LPR status; however, a TPS recipient is not barred from acquiring nonimmigrant or immigrant status if he or she meets the requirements.[121] There are statutory limitations on Congress providing adjustment of status to TPS recipients. Section 244(h) of the INA (8 U.S.C. §1254a(h)) states that the consideration of any bill, resolution, or amendment that provides for the adjustment to lawful temporary or lawful permanent resident status for any TPS recipient requires a supermajority in the Senate (i.e., three-fifths of all Senators) voting affirmatively.

Over the years, Congress has provided for the adjustment to LPR status for groups of nationals who had been given TPS or DED. In 1992, Congress enacted legislation allowing Chinese nationals who had DED following the Tiananmen Square massacre to adjust to LPR status (P.L. 102-404). The Nicaraguan Adjustment and Central American Relief Act (NACARA) (Title II of P.L. 105-100), which became law in 1997, provided eligibility for LPR status to certain Nicaraguans, Cubans, Guatemalans, Salvadorans (some of whom were covered by TPS), and nationals of the former Soviet bloc who had applied for asylum and had been living in the United States for a certain period of time. The 116th Congress incorporated Liberian Refugee Immigration Fairness provisions into the FY2020 National Defense Authorization Act; it allows Liberians who have been continuously present in the United States since November 2014 and their family members to apply for LPR status. President Trump signed it into law on December 20, 2019 (P.L. 116-92, Section 7611).

Other legislation to allow persons with TPS to adjust to LPR status received action in past Congresses, but was not enacted. For instance, the Senate-passed comprehensive immigration reform bill in the 113th Congress (S. 744) did not include specific provisions for foreign nationals with TPS to adjust status, but many would have qualified for the registered provisional immigrant status that S. 744 would have established.[122]

## Selected Legislative Activity in the 116th and 117th Congresses

Various proposals related to TPS and DED were introduced in the 116th Congress. These included bills that would have extended current TPS designations or added new designations for TPS (e.g., Venezuela or Hong Kong),[123] prohibited federal funds from being used to remove TPS recipients,[124] made TPS or DED recipients eligible for federal financial aid for higher education,[125] or provided for adjustment to LPR status for TPS and DED recipients who had been

[121] In order to adjust to LPR status, an individual generally must have been "inspected and admitted or paroled" into the United States (INA §245(a), 8 U.S.C. §1255(a)). In recent years, some federal courts have addressed whether aliens who unlawfully entered the United States but later received TPS are considered to be "inspected and admitted" into the United States. Reviewing courts have split on this issue. For more information, see CRS Legal Sidebar LSB10554, *Are Temporary Protected Status Recipients Eligible to Adjust Status?*

[122] See archived CRS Report R43097, *Comprehensive Immigration Reform in the 113th Congress: Major Provisions in Senate-Passed S. 744*.

[123] H.R. 549, H.R. 1926, H.R. 2413, H.R. 2783, H.R. 4112, H.R. 4272, H.R. 4303, H.R. 8428, S. 636, S. 2176, and S. 2478, for example.

[124] H.R. 3931, for example.

[125] H.R. 1298, H.R. 4674, and S. 1346, for example.

living in the United States for several years.[126] Other bills introduced in the 116th Congress variously sought to limit TPS by transferring authority from DHS to Congress to designate foreign states[127] or making ineligible for TPS aliens who lack a lawful immigration status or who are members of criminal gangs.[128] The House passed H.R. 549, which would have designated Venezuela for TPS for a period of 18 months.

As noted earlier, in the 116th Congress the National Defense Authorization Act for Fiscal Year 2020 (S. 1790) included Section 7611 (Liberian Refugee Immigration Fairness), which allows certain Liberian nationals to apply for LPR status. S. 1790 was signed into law by President Trump on December 20, 2019, and became P.L. 116-92.

Two bills that would have provided LPR status to TPS recipients passed the House in the 116th Congress. Title II of the American Dream and Promise Act of 2019 (H.R. 6) would have allowed individuals who were eligible for TPS or DED as of January 1, 2017, and who had been living in the United States for at least three years before the date of enactment to become LPRs. These provisions would have applied to nationals of 13 countries. Certain individuals with TPS or DED protection would have also been covered by the legalization provisions in Title I of H.R. 6. It passed the House on June 4, 2019. The Farm Workforce Modernization Act of 2019 (H.R. 5038) would have established a process for certain farm workers in the United States to obtain a legal temporary status and then LPR status. TPS and DED recipients who met the farm work and other requirements under the bill, would have been eligible. H.R. 5038 passed the House on December 11, 2019.

Bills similar to these two were introduced in the 117th Congress (H.R. 6 and H.R. 1603, respectively) and passed the House on March 18, 2021. The 117th Congress version of H.R. 6 would allow individuals who were eligible for TPS as of January 1, 2017, or DED as of January 20, 2021, and who accumulate three years of continuous presence in the United States to become LPRs. These provisions would apply to nationals of 14 countries (the same 13 countries eligible under the version of the bill that passed the 116th Congress, plus Venezuela). The 117th Congress version adds a provision (Section 203) clarifying that TPS recipients are considered "inspected and admitted" for purposes of adjustment to LPR status.[129] The 117th Congress version of the Farm Workforce Modernization Act (H.R. 1603) is highly similar to H.R. 5038 from the 116th Congress. Like H.R. 5038, it would establish a process for certain farm workers in the United States (including those with TPS or DED) to obtain a legal temporary status and then LPR status.

---

[126] H.R. 6, H.R. 1169, H.R. 2783, S. 456, S. 874, S. 879, and S. 1790, for example.

[127] H.R. 3899, for example.

[128] H.R. 98, H.R. 574, H.R. 1106, H.R. 3899, and S. 599, for example.

[129] For more information, see CRS Legal Sidebar LSB10554, *Are Temporary Protected Status Recipients Eligible to Adjust Status?*

# Appendix.

## Table A-1. Individuals with Temporary Protected Status by State of Residence

| State | Individuals with TPS | State | Individuals with TPS |
|---|---|---|---|
| Alabama | 705 | Nevada | 3,015 |
| Alaska | 55 | New Hampshire | 270 |
| Arizona | 1,095 | New Jersey | 14,220 |
| Arkansas | 2,800 | New Mexico | 295 |
| California | 54,285 | New York | 40,855 |
| Colorado | 2,380 | North Carolina | 12,035 |
| Connecticut | 2,085 | North Dakota | 75 |
| Delaware | 600 | Ohio | 1,615 |
| District of Columbia | 2,595 | Oklahoma | 700 |
| Florida | 42,980 | Oregon | 610 |
| Georgia | 9,550 | Pennsylvania | 2,235 |
| Hawaii | 5 | Rhode Island | 605 |
| Idaho | 60 | South Carolina | 1,300 |
| Illinois | 140 | South Dakota | 180 |
| Indiana | 2,895 | Tennessee | 2,435 |
| Iowa | 2,045 | Texas | 41,945 |
| Kansas | 1,130 | Utah | 895 |
| Kentucky | 940 | Vermont | 35 |
| Louisiana | 695 | Virginia | 22,140 |
| Maine | 1,685 | Washington | 1,755 |
| Maryland | 22,760 | West Virginia | 160 |
| Massachusetts | 13,160 | Wisconsin | 490 |
| Michigan | 1,170 | Wyoming | 40 |
| Minnesota | 2,135 | U.S. Virgin Islands | 525 |
| Mississippi | 360 | Puerto Rico | 55 |
| Missouri | 1,035 | Northern Mariana Islands | 25 |
| Montana | 10 | Other/Unknown | 105 |
| Nebraska | 1,335 | **Total** | **319,465** |

**Source:** Data provided to CRS by USCIS.

**Notes:** These data reflect individuals (rounded to the nearest five) with TPS as of March 11, 2021, who had not obtained LPR status or U.S. citizenship. The data may include individuals who have left the country or died since their last TPS approval, and do not necessarily include all nationals from the specified countries who are in the United States and are eligible for the status. "Other" includes Federated States of Micronesia, Guam, Marshall Islands, and the Armed Forces.

## Author Information

Jill H. Wilson
Analyst in Immigration Policy

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.



# Deferred Action for Childhood Arrivals (DACA): By the Numbers

April 14, 2021

**Congressional Research Service**
https://crsreports.congress.gov
R46764

**CRS REPORT**
Prepared for Members and
Committees of Congress



Congressional Research Service
Informing the legislative debate since 1914

SUMMARY

R46764

April 14, 2021

**Andorra Bruno**
Specialist in Immigration Policy

# Deferred Action for Childhood Arrivals (DACA): By the Numbers

The Deferred Action for Childhood Arrivals (DACA) initiative has commanded interest and attention since its unveiling in 2012. It has provided protection from deportation and work authorization to a subset of unauthorized childhood arrivals. Often called *Dreamers*, unauthorized childhood arrivals are foreign nationals in the United States without a lawful immigration status who first entered the country as children.

DACA was established in the aftermath of unsuccessful legislative efforts to create a mechanism for certain Dreamers to obtain lawful permanent resident (LPR) status. A DACA grant, however, does not confer LPR status (or any other legal immigration status) on a beneficiary.

Several bills to establish a mechanism for DACA recipients and other Dreamers to become LPRs have been introduced in the 117th Congress. They include the American Dream and Promise Act of 2021 (H.R. 6), which was passed by the House in March 2021, the Dream Act of 2021 (S. 264), and the U.S. Citizenship Act (H.R. 1177/S. 348).

Data on the DACA population can help inform these and other DACA- and Dreamer-related legislative efforts. These data, available from several sources, include estimates of the DACA-eligible population and the DACA-recipient population as well as information on the socioeconomic characteristics of DACA recipients.

To be granted DACA, a first-time applicant must satisfy requirements related to age, immigration status, U.S. residence, education, and criminal history. Many of these requirements are tied to June 15, 2012, the date the Department of Homeland Security (DHS) issued the first DACA memorandum. An initial DACA grant is valid for two years, and can be renewed in two-year increments.

The DACA-eligible population is finite. Inclusion is based on satisfaction of the requirements for a DACA initial grant. The exact size of the DACA-eligible population is unknown, but various entities have produced estimates.

DHS's U.S. Citizenship and Immigration Services (USCIS) administers DACA. It adjudicates DACA initial and renewal applications. Since 2012, it has regularly published data on DACA application processing.

Since September 2017, when the Trump Administration announced its ultimately unsuccessful plans to rescind DACA, USCIS has published data on current DACA recipients. The USCIS reports provide approximate DACA-recipient population totals as well as data on recipients' countries of birth, U.S. states of residence, gender, age, and marital status. The most recent data indicate that there were approximately 636,390 DACA recipients as of December 31, 2020. These individuals are primarily from Mexico, and more than 1 in 4 live in California. The USCIS data also indicate DACA recipients are 53% female and largely unmarried, with a median age of 26.

Surveys of DACA recipients are another source of data about this population. While there are limitations to these surveys, they provide information on measures not available in USCIS reports. These measures include employment, earnings, and the immigration status of DACA recipients' family members.

Efforts to enact legislation to enable DACA recipients, and Dreamers more broadly, to obtain LPR status reflect the fact that there are limited avenues for unauthorized immigrants to become LPRs. Options are more limited for persons who entered the United States unlawfully than for those who initially entered lawfully (on a temporary visa, for example). According to USCIS data, about 76,000 DACA recipients had become LPRs as of July 2019.

Bills to enable Dreamers to obtain LPR status typically propose to make new immigration mechanisms available to persons who meet a set of criteria. These criteria may include DACA-like requirements concerning age and U.S. residence as well as other requirements. The criteria chosen and the mechanisms created, taken together, reflect a set of policy choices. They also determine the size of the potential beneficiary population.

# Contents

Introduction ... 1
Background ... 2
Developments Under the Trump Administration ... 3
Data on the DACA-Eligible Population ... 4
Estimates of the DACA-Eligible Population ... 5
Data on DACA Application Processing ... 7
Approval Rates ... 8
Data on the DACA-Recipient Population ... 9
USCIS Data on Active DACA Recipients ... 9
Countries of Birth ... 10
U.S. States of Residence ... 11
Demographic Characteristics ... 12
Survey Data ... 14
Survey of DACA Recipients in California ... 15
National DACA Survey ... 17
USCIS Data on Persons Ever Granted DACA ... 18
DACA and Adjustment of Status ... 19
Adjustment of Status ... 20
Adjustment Mechanisms for Unlawful Entrants ... 21
Advance Parole ... 22
Conclusion ... 23

## Figures

Figure 1. DACA Application Approval Rates ... 9
Figure 2. Ages of DACA Recipients ... 13
Figure 3. DACA Recipients' Age at Initial Entry ... 13
Figure 4. DACA-Recipient Populations ... 18
Figure 5. What Happened to the Estimated 822,000 Persons Granted DACA Between August 2012 and July 2019? ... 19

## Tables

Table 1. DACA Applications Accepted and Processed ... 7
Table 2. Top 10 Countries of Birth for DACA Recipients ... 10
Table 3. Top 10 States of Residence for DACA Recipients ... 11
Table 4. Comparison of DACA data from USCIS and Selected Surveys ... 15

Table A-1. DACA Recipients by State ... 25

## Appendixes

Appendix. States of Residence for DACA Recipients ........................................................ 25

## Contacts

Author Information ........................................................................................................ 26

# Introduction

On January 20, 2021, his first day in office, President Joe Biden issued a memorandum to the Secretary of the Department of Homeland Security (DHS) and the U.S. Attorney General on the Deferred Action for Childhood Arrivals (DACA) initiative. The presidential memorandum directed the DHS Secretary, in consultation with the Attorney General, to "take all actions he deems appropriate, consistent with applicable law, to preserve and fortify DACA."[1] On March 26, 2021, Secretary of Homeland Security Alejandro Mayorkas announced that DHS would issue a notice of proposed rulemaking "to preserve and fortify DACA."[2]

Established by executive action in 2012, DACA enables its beneficiaries—unauthorized immigrants who first entered the United States before age 16 and meet a set of requirements—to live and work in the United States on a temporary, renewable basis. DACA recipients receive protection from removal and may receive work authorization; they are not granted or put on a pathway to be granted a legal immigration status. That would require congressional action.

DACA beneficiaries are a subset of *unauthorized childhood arrivals* (or *Dreamers*), foreign nationals who came to live in the United States as children and do not currently have a lawful immigration status. Dreamers, in turn, are a subset of the U.S. unauthorized population. In remarks explaining his Administration's decision to put forth the DACA policy, then-President Obama cited unsuccessful legislative efforts to pass Dream Act legislation.[3]

A range of bills were introduced and considered in 115th and 116th Congresses to address the immigration status of DACA recipients. Some of these measures would have put DACA-type protection in statute.[4] Others would have provided limited avenues for persons who satisfied DACA-like requirements to obtain a legal immigration status.[5] Still others, often referred to as legalization proposals, would have created new statutory mechanisms for DACA beneficiaries to obtain lawful permanent resident (LPR) status.[6]

Provisions to grant LPR status to DACA recipients are included in measures before the 117th Congress. For example, the American Dream and Promise Act of 2021(H.R. 6), as passed by the House, would direct DHS to "establish a streamlined procedure" for DACA recipients to apply for LPR status. The Dream Act of 2021 (S. 264), as introduced in the Senate, would likewise single out DACA recipients for special treatment under the LPR mechanism it would establish.

---

[1] White House, *Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)*, presidential memorandum to the Attorney General and the Secretary of Homeland Security, January 20, 2021, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/preserving-and-fortifying-deferred-action-for-childhood-arrivals-daca/.

[2] U.S. Department of Homeland Security, "Statement by Homeland Security Secretary Mayorkas on DACA," March 26, 2021.

[3] White House, Office of the Press Secretary, *Remarks by the President on Immigration*, June 15, 2012, https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration (archived content). The term *Dream Act* is used to describe bills to grant lawful permanent resident (LPR) status to unauthorized childhood arrivals, regardless of the actual title of the legislation. For an overview of legislative activity on Dream Act measures since the 107th Congress, see CRS Report R45995, *Unauthorized Childhood Arrivals, DACA, and Related Legislation*.

[4] See, for example, S. 166, as introduced in the 116th Congress. Also see H.R. 4760, which was considered on the House floor in the 115th Congress. H.R. 4760 is discussed in CRS Report R45995, *Unauthorized Childhood Arrivals, DACA, and Related Legislation*.

[5] See, for example, H.R. 3400, as introduced in the 116th Congress, which would allow eligible individuals to become LPRs through military service.

[6] See, for example, House-passed H.R. 6 in the 116th Congress. This bill is discussed in CRS Report R45995, *Unauthorized Childhood Arrivals, DACA, and Related Legislation*.

Both proposals also would provide opportunities for other unauthorized childhood arrivals who meet specified requirements to become LPRs.

To help inform possible legislative activity related to DACA and Dreamers, this report considers available data on the DACA population from DHS and other sources. An initial background section provides a brief history of DACA and its current status. Three categories of data are then presented and discussed: (1) data on the DACA-eligible population, (2) data on DACA applications, and (3) data on DACA recipients. Finally, the report addresses the issue of unauthorized immigrants and LPR status, focusing in particular on DACA recipients and related data.

# Background

On June 15, 2012, DHS issued a memorandum announcing the DACA initiative.[7] The memorandum stated that certain unauthorized childhood arrivals would be considered for deferred action for two years, subject to renewal. U.S. Citizenship and Immigration Services (USCIS), the DHS agency that administers DACA, defines *deferred action* as "a type of prosecutorial discretion that allows an individual to remain in the United States for a set period of time, unless the deferred action is terminated for some reason."[8]

The eligibility criteria for an initial DACA grant[9] were (1) under age 31 on June 15, 2012; (2) under age 16 at time of entry into the United States; (3) continuously resident in the United States since June 15, 2007; (4) physically present in the United States on June 15, 2012, and at the time of requesting DACA; (5) not in lawful status on June 15, 2012; (6) in school, graduated from high school or obtained general education development certificate, or honorably discharged from the U.S. Armed Forces;[10] and (7) not convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and not otherwise a threat to national security or public safety.[11]

To be eligible for a two-year renewal, a DACA recipient had to satisfy the following criteria: (1) did not depart from the United States on or after August 15, 2012, without first obtaining permission to travel from DHS, (2) had continuously resided in the United States since submitting his or her latest approved DACA request, and (3) had not been convicted of a felony, a significant

[7] U.S. Department of Homeland Security, Memorandum to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Services, John Morton, Director, U.S. Immigration and Customs Enforcement, from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[8] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Glossary," https://www.uscis.gov/tools/glossary.

[9] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Consideration of Deferred Action for Childhood Arrivals (DACA)," February 4, 2021, https://www.uscis.gov/humanitarian/humanitarian-parole/consideration-of-deferred-action-for-childhood-arrivals-daca (hereinafter cited as "USCIS, Consideration of DACA").

[10] This DACA eligibility requirement lists honorable discharge from, but not service in, the U.S. Armed Forces. The term *Armed Forces*, as defined in 10 U.S.C. §101(a)(4), means the Army, Navy, Air Force, Marine Corps, Space Force, and Coast Guard.

[11] For information about what offenses constitute felonies, significant misdemeanors, and non-significant misdemeanors, and what qualifies as a threat to national security or public safety, see U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *DHS DACA FAQs*, response to questions 61-68, February 4, 2021, https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions (hereinafter cited as "DHS DACA FAQs").

misdemeanor, or three or more misdemeanors, and was not a threat to national security or public safety.[12]

Individuals granted DACA could receive employment authorization. According to USCIS, "under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment'."[13]

## Developments Under the Trump Administration

The Trump Administration tried unsuccessfully to terminate DACA. On September 5, 2017, DHS issued a memorandum to rescind the 2012 DACA memorandum.[14] At the time, there were an estimated 689,800 persons with DACA (see the "USCIS Data on Active DACA Recipients" section) and an estimated 800,000 persons who had ever had DACA (see the "USCIS Data on Persons Ever Granted DACA" section). As part of the rescission, the agency had planned to "execute a wind-down," under which no new DACA initial requests would have been accepted after September 5, 2017 (although initial requests accepted by that date would have been processed), and no new renewal requests would have been accepted after October 5, 2017. This wind-down did not proceed as planned, however, because DACA recipients and others filed federal lawsuits challenging the legality of the rescission.

Under the terms of subsequent federal court rulings, individuals who had never been granted DACA could not submit initial requests.[15] Individuals who had been granted DACA in the past, however, continued to be able to submit DACA requests, even if their prior DACA grants had expired or been terminated.[16] The USCIS late renewal policy, which was in effect until January 2018 (and was reinstated on August 1, 2019), required an individual whose previous DACA grant had expired more than one year prior or whose previous DACA grant had been terminated to submit an initial DACA request rather than a renewal request.[17]

---

[12] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Renew Your DACA," https://www.uscis.gov/humanitarian/renew-your-daca.

[13] DHS DACA FAQs, response to question 1.

[14] U.S. Department of Homeland Security, Memorandum to James W. McCament, Acting Director, U.S. Citizenship and Immigration Services, Thomas D. Homan, Acting Director, U.S. Immigration and Customs Enforcement, Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection, Joseph B. Maher, Acting General Counsel, Ambassador James D. Nealon, Assistant Secretary, International Engagement, Julie M. Kirchner, Citizenship and Immigration Services Ombudsman, from Elaine C. Duke, Acting Secretary, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"*, September 5, 2017, https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (hereinafter cited as "DACA rescission memo, September 2017").

[15] See CRS Legal Sidebar LSB10216, *DACA: Litigation Status Update*.

[16] According to a USCIS "July 17, 2019, Update" on DACA: "Due to federal court orders on Jan. 9, 2018 and Feb. 13, 2018, USCIS has resumed accepting requests to renew a grant of deferred action under DACA." This update is available at U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction," https://www.uscis.gov/archive/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction (archived content).

[17] Ibid. According to USCIS, this late renewal policy has been in effect throughout the life of DACA, except for the period between January 10, 2018, and July 31, 2019; during that period, "individuals whose most recent period of DACA expired on or after September 5, 2016, could still file their request as a renewal request" (USCIS email to CRS, August 29, 2019). Thus, with the exception of filings during the specified early 2018 to mid-2019 period, DACA requests from certain previous DACA recipients are recorded as initial requests in USCIS data tables on DACA applications.

On June 18, 2020, the U.S. Supreme Court vacated the DACA rescission. It ruled that DHS had not provided adequate reasons or followed proper procedures in rescinding the policy.[18] Following this ruling, then-DHS Acting Secretary Chad Wolf issued a memorandum in which he expressed "serious concerns" about DACA and announced immediate changes to the policy while he considered its future. Among these changes, he directed that "no new initial requests for DACA should be accepted" and "renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods."[19]

In a pair of rulings in November and December 2020, a federal district court vacated the Wolf memorandum and ordered DHS to reinstate the original DACA policy.[20] Effective December 7, 2020, USCIS resumed accepting DACA applications from first-time applicants. It also returned to issuing DACA grants and associated employment authorization in two-year increments.[21]

# Data on the DACA-Eligible Population

The *DACA-eligible population*, as the term is used here, refers to individuals who meet the requirements for an initial grant of DACA regardless of whether they ever applied for or received this form of relief. The DACA-eligible population is finite for the following reasons. Inclusion is based on satisfaction of the eligibility requirements for a DACA initial grant. Some of these requirements are tied directly to the date of the memorandum that established DACA, June 15, 2012. On that date, an individual must have been under age 31, physically present in the United States, and not in a lawful immigration status. The individual also must have entered the United States no later than five years before the issuance date (i.e., no later than June 15, 2007) and been continuously resident since then. In addition, the individual must have been under age 16 at the time of initial entry.

Other requirements for a DACA initial grant depend on actions or events subsequent to U.S. entry. An individual, at the time of application for DACA, must have been honorably discharged from the U.S. Armed Forces, have completed high school (or the equivalent), or be in school. For purposes of DACA, the term *school* includes "an education, literacy, or career training program (including vocational training)" as well as "an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under state law … or in passing a GED [general educational development] exam or other state-authorized exam."[22]

---

[18] See CRS Legal Sidebar LSB10497, *Supreme Court: DACA Rescission Violated the APA*.

[19] U.S. Department of Homeland Security, Memorandum to Mark Morgan, Senior Official Performing the Duties of Commissioner, U.S. Customs and Border Protection, Matthew Albence, Senior Official Performing the Duties of Director, U.S. Immigration and Customs Enforcement, Joseph Edlow, Deputy Director of Policy, U.S. Citizenship and Immigration Services, from Chad F. Wolf, Acting Secretary, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"*, July 28, 2020, https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf (hereinafter cited as Wolf memo, July 2020).

[20] Suzanne Monyak, "DHS Chief's Invalid Appointment Sinks Effort to Curb DACA," *Law360*, November 15, 2020, https://www.law360.com/articles/1329033/dhs-chief-s-invalid-appointment-sinks-effort-to-curb-daca; Dave Simpson, "Trump Admin. Must Resume DACA Program, NY Judge Rules," *Law360*, December 4, 2020, https://www.law360.com/articles/1334901/trump-admin-must-resume-daca-program-ny-judge-rules (each article includes a link to the court decision).

[21] USCIS, Consideration of DACA.

[22] To qualify as *school* for DACA purposes, "an education, literacy, or career training program (including vocational training) [must have] a purpose of improving literacy, mathematics, or English or [be] designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement." Both these types of programs and education programs assisting students in obtaining a regular high school diploma or its

Among the other eligibility requirements, an individual must not have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and must not otherwise be a threat to national security or public safety. In addition, an individual typically must be at least age 15 to apply for DACA.[23]

Given complete information, the maximum size of the DACA-eligible population could be determined by calculating the number of people who, on June 15, 2012, were physically present in the United States in an unlawful status and satisfied the age-related, entry, and residence requirements for a DACA initial grant. From this total, individuals not eligible based on criminal, security, or other public safety grounds could be subtracted. The resulting population would include both (1) individuals who could apply for DACA immediately because they were at least age 15 (or qualified for an exception to this minimum age requirement) and met the educational/honorable discharge requirement and (2) individuals who were not currently eligible because they were under age 15 (and did not qualify for an exception) and/or did not meet the educational/honorable discharge requirement but could become eligible at a later date.

This maximum number, as determined by the eligibility criteria at the time of DACA's establishment, could not increase in future years. It could decrease, however. For example, an individual who was among the eligible population on June 15, 2012, but subsequently obtained a lawful immigration status, left the United States and established residence in another country, or was convicted of a felony would no longer be eligible for DACA.

## Estimates of the DACA-Eligible Population

Available data do not permit calculating the precise number of individuals who met the DACA eligibility requirements in 2012 or who may be eligible for DACA today. Instead, different entities have produced *estimates* of the DACA-eligible population using data from the Census Bureau's American Community Survey (ACS) and other sources. The Migration Policy Institute, a self-described nonpartisan organization that "seeks to improve immigration and integration policies,"[24] has produced widely cited estimates of the DACA-eligible population since 2012.

MPI's estimates for 2013 and subsequent years are based on data from the ACS and the Survey of Income and Program Participation (SIPP), although MPI has refined its methodology over the years.[25] Due to the lack of data, the MPI estimates do not take into account all the requirements for a DACA initial grant. Regarding the educational/honorable discharge requirement, the estimates do not include individuals who may be eligible for DACA based on an honorable discharge (but do not meet the alternative educational criteria).[26] They likewise do not include

recognized equivalent or in passing a GED or other state-authorized exam "include … programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations." Other programs may qualify if they have "demonstrated effectiveness." DHS DACA FAQs, response to question 33.

[23] USCIS, Consideration of DACA. There is an exception to this age requirement for individuals who are in removal proceedings, have a final removal order, or have a voluntary departure order. DHS DACA FAQs, response to question 29. For an explanation of these removal-related terms, see CRS Report R43892, *Alien Removals and Returns: Overview and Trends*.

[24] See Migration Policy Institute, https://www.migrationpolicy.org/about/about-migration-policy-institute.

[25] See, for example, Jeanne Batalova, Sarah Hooker, and Randy Capps, *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action*, Migration Policy Institute, August 2014, pp. 5-6 (hereinafter cited as "MPI, *DACA at the Two-Year Mark*").

[26] According to MPI, "we believe this number will be very small given that military service in most cases requires legal status." Jeanne Batalova, Sarah Hooker and Randy Capps, *Deferred Action for Childhood Arrivals at the One-Year Mark: A Profile of Currently Eligible Youth and Applicants*, August 2013, p. 15 (endnote 3).

individuals who may satisfy the educational requirement based on enrollment in an adult education, literacy, or career training program. These educational/honorable discharge-related exclusions could result in an underestimation of the size of the DACA-eligible population. MPI is also not able to model the requirement for continuous residence since 2007 or the criminal conviction/security threat ineligibility ground. These exclusions could lead to an overestimation of the size of the DACA-eligible population.[27]

In its estimates of the DACA-eligible population, MPI distinguishes three subgroups based on the eligibility requirements it can model: (1) persons who meet all the requirements for a DACA initial grant and are, thus, immediately eligible; (2) persons who meet all the requirements except the educational requirement; and (3) persons who are in school and meet the other requirements but cannot yet apply for DACA because they are under age 15. MPI estimated that in 2012 there were 1,236,000 persons who were immediately eligible for DACA; 426,000 persons who met all the requirements except the educational requirement; and 473,000 children who met all the requirements and could become eligible once they turned 15.[28] Its estimates for 2016 indicated that about 1,307,000 persons were immediately eligible; about 398,000 persons met all but the educational requirements; and about 228,000 children could become eligible once they turned 15.[29] According to the MPI estimates for December 2020, these DACA-eligible population subgroups stood at an estimated 1,331,000 (immediately eligible); 384,000 (eligible except for education); and 14,000 (children under 15).[30]

The annual sum of the three eligibility subgroups decreased from 2,136,000 in 2012 to 1,932,000 in 2016 and to 1,729,000 in 2020.[31] These decreases may be due to both actual changes in the number of people eligible for DACA and data analysis-related changes.

Actual changes can also lead to changes in the subgroup numbers due to movement of individuals between the three subgroups. For example, by enrolling in a qualifying education program, a person in the eligible-except-for-education subgroup can move into the immediately eligible subgroup. Similarly, by turning 15, while continuing to meet the eligibility requirements, a person in the under-15 subgroup can move into the immediately eligible subgroup. The data suggest that both types of shifts may have occurred from 2012 to 2020, with the immediately eligible subgroup increasing in size and the other two subgroups decreasing.

The under-age-15 subgroup experienced a relatively large drop from 473,000 in 2012 to 14,000 in 2020. This reflects the fact that to be eligible for DACA, a person must have been resident in the United States by June 15, 2007. Because this date does not change, over time there will be fewer individuals in the under-age-15 subgroup as more individuals meet the minimum age criteria to apply for DACA. Someone who entered the United States on that date as a newborn would turn 15 in 2022; thus, after June 15, 2022, there can be no one in the under-age 15 subgroup.

---

[27] MPI, *DACA at the Two-Year Mark*, p. 6.

[28] Ibid., pp. 7-8.

[29] Faye Hipsman, Bárbara Gómez-Aguiñaga, and Randy Capps, *DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients*, Migration Policy Institute, August 2016.

[30] Migration Policy Institute, "National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program, December 2020," https://www.migrationpolicy.org/sites/default/files/datahub/State%20Estimates%20of%20DACA-Eligible%20Population_Dec%202020.xlsx.

[31] Numbers may not sum due to rounding.

# Data on DACA Application Processing[32]

DACA applications submitted to USCIS are another source of DACA-related data. To request an initial grant or renewal of DACA, an applicant must submit Form I-821D, "Consideration of Deferred Action for Childhood Arrivals," along with an application for employment authorization (Form I-765), a related worksheet (Form I-765WS), and associated fees.[33] USCIS began accepting DACA applications on August 15, 2012.[34]

USCIS publishes data on DACA applications on a quarterly basis. Its January 2021 report includes annual data on DACA initial and renewal requests for FY2012 through FY2020.[35] **Table 1** presents selected data from this USCIS report. It shows that during the FY2012-FY2020 period, USCIS accepted[36] a cumulative total of 914,640 initial requests and approved 827,119 of them. Regarding renewal requests, the agency accepted a cumulative total of 2,046,922 such requests and approved 1,976,108 of them.

**Table 1. DACA Applications Accepted and Processed**

FY2012-FY2020

| Fiscal Year | Type of Application | Accepted | Approved | Denied | Pending |
|---|---|---|---|---|---|
| 2012 | Initial | 152,430 | 1,684 | 0 | 150,746 |
| | *Renewal* | *N/A* | *N/A* | *N/A* | *N/A* |
| 2013 | Initial | 427,612 | 470,598 | 11,019 | 96,728 |
| | *Renewal* | *N/A* | *N/A* | *N/A* | *N/A* |

[32] This section is limited to DACA applications considered by USCIS. As such, it does not cover DACA requests by persons in immigration detention. According to USCIS:

> All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS.... Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their ICE [U.S. Immigration and Customs Enforcement] case officer or follow directions at ICE's website at www.ice.gov/daca.

See DHS DACA FAQs, response to question 7.

[33] See U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "I-821D, Consideration of Deferred Action for Childhood Arrivals," https://www.uscis.gov/i-821d. As of the date of this report, required fees total $495.

[34] U.S. Department of Homeland Security, "Deferred Action for Childhood Arrivals: Who Can Be Considered?" August 15, 2012, https://www.dhs.gov/blog/2012/08/15/deferred-action-childhood-arrivals-who-can-be-considered (archived content).

[35] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012-Sep. 30, 2020," https://www.uscis.gov/sites/default/files/document/reports/DACA_performancedata_fy2020_qtr4.pdf.

[36] *Accepted* is used here, as it is used by USCIS, to denote a received application that meets applicable regulations and policies. According to general USCIS filing information, "we will reject your form if you do not properly complete the form or include a valid signature, or if you do not submit the correct fee." U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Lockbox Filing Information," https://www.uscis.gov/about-us/organization/directorates-and-program-offices/management-directorate/office-of-intake-and-document-production/lockbox-filing-information. For comparison purposes, USCIS *received* a total of 963,831 initial DACA requests during the FY2012-FY2020 period. It rejected 49,191 of them and accepted 914,640.

| Fiscal Year | Type of Application | Accepted | Approved | Denied | Pending |
|---|---|---|---|---|---|
| 2014 | Initial | 122,474 | 135,921 | 21,068 | 62,153 |
| | *Renewal* | *116,424* | *22,234* | *D* | *94,185* |
| 2015 | Initial | 85,300 | 90,827 | 19,088 | 37,466 |
| | *Renewal* | *363,546* | *419,502* | *2,351* | *35,852* |
| 2016 | Initial | 73,347 | 52,992 | 11,527 | 45,445 |
| | *Renewal* | *187,354* | *145,821* | *3,026* | *74,332* |
| 2017 | Initial | 45,593 | 47,132 | 9,165 | 34,688 |
| | *Renewal* | *427,257* | *414,778* | *4,031* | *82,745* |
| 2018 | Initial | 2,060 | 24,382 | 8,249 | 4,105 |
| | *Renewal* | *258,060* | *294,961* | *4,288* | *41,533* |
| 2019 | Initial | 1,570 | 1,779 | 1,605 | 2,285 |
| | *Renewal* | *384,588* | *385,773* | *3,343* | *36,980* |
| 2020 | Initial | 4,254 | 1,804 | 719 | 4,011 |
| | *Renewal* | *309,693* | *293,039* | *3,293* | *50,329* |
| **2012-2020** | Initial | **914,640** | **827,119** | **82,440** | |
| | *Renewal* | ***2,046,922*** | ***1,976,108*** | ***20,335*** | |

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012-Sep. 30, 2020."

**Notes:** "Requests accepted" are requests that meet applicable regulations and policies; this is a different measure than requests received (which are not displayed in this table). Some requests approved or denied in a fiscal year may have been accepted in a previous fiscal year. "D" denotes a small number of cases; the precise number is not disclosed to protect petitioners' privacy.

As noted, not all initial requests are submitted by first-time applicants. Under the USCIS late renewal policy, a former DACA recipient whose previous DACA grant expired more than one year ago or whose previous DACA grant was terminated has to file an initial request rather than a renewal request. This policy explains why **Table 1** includes figures for initial requests in FY2018, FY2019, and FY2020, years when USCIS was not accepting DACA requests from first-time applicants. Another consequence of this late renewal policy is that the cumulative "initial requests approved" number of 827,119 in **Table 1** does *not* represent the number of unique individuals who were ever granted DACA as of September 30, 2020 (for related data, see the "USCIS Data on Persons Ever Granted DACA" section).

## Approval Rates

**Figure 1** presents approval rates for DACA requests adjudicated from FY2012 to FY2020. These rates are based on the **Table 1** data on initial and renewal requests approved and initial and renewal requests denied. As shown in **Figure 1**, the initial request approval rate ranged from a low of 53% in FY2019 to a high of 100% in FY2012. More generally, these approval rates were highest in the first two years (FY2012-FY2013) and lowest in the last three years (FY2018-

FY2020), when initial applications could be filed only by former DACA recipients. The renewal request approval rate was consistently high, topping 98% each year.

**Figure 1. DACA Application Approval Rates**

FY2012-FY2020

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012-Sep. 30, 2020."

**Notes:** There were no renewal requests in FY2012 or FY2013 because DACA initial grants are for two years. A renewal request approval rate could not be calculated for FY2014 due to data disclosure thresholds.

# Data on the DACA-Recipient Population

Information about DACA recipients is available from various sources. Since DHS's announcement of the DACA rescission in 2017, USCIS has periodically published data on the DACA-recipient population. In addition, researchers have conducted surveys of DACA recipients.

## USCIS Data on Active DACA Recipients

USCIS has published data tables on what it terms *active DACA recipients* periodically since September 4, 2017. On that date, according to USCIS, there were approximately 689,800 active (current) DACA recipients. DACA-recipient population totals are available for various dates from September 4, 2017, to April 30, 2019, and at three-month intervals for all dates from June 30, 2019, to December 31, 2020.[37] Active DACA recipients are a subset of the total number of persons ever granted DACA.

From September 2017 to December 2020, there was a general decrease in the approximate number of active DACA recipients. The totals were as follows: 689,800 (September 2017); 699,350 (August 2018); 652,880 (September 2019); and 636,390 (December 2020). The overall

[37] All these data can be accessed at U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Immigration and Citizenship Data," https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data?ddt_mon=&ddt_yr=&query=&items_per_page=10&options%5Bvalue%5D&page=1.

decrease from 2017 to 2020 may reflect a combination of factors, including 2017 DACA holders' failure to successfully renew their DACA grants, their loss of DACA protection through termination,[38] or their adjustment to lawful permanent resident status (for further information on the latter, see the "DACA and Adjustment of Status" section).

In addition to reporting DACA-recipient population totals, USCIS data on active DACA recipients have also included tables on countries of birth, U.S. states of residence, gender, age, and marital status. Data on these measures for September 2017[39] and December 2020[40] are variously discussed in the following sections of this report.[41]

## Countries of Birth

Persons who had DACA on December 31, 2020, were nationals of more than 195 different countries.[42] The overwhelming majority (81%), however, were from a single country: Mexico. **Table 2** presents data on the top 10 countries of birth for DACA recipients in 2020. These countries accounted for 94% of all DACA recipients. These same countries, in the same order, were also the top DACA countries of birth in 2017.[43] The consistency between the 2017 and the 2020 country of birth data is not surprising because these two populations included many of the same individuals.

**Table 2. Top 10 Countries of Birth for DACA Recipients**

As of December 31, 2020

| Ranking | Country | Number of Persons | % of Total |
|---|---|---|---|
| 1 | Mexico | 512,660 | 81% |
| 2 | El Salvador | 24,590 | 4% |
| 3 | Guatemala | 16,700 | 3% |
| 4 | Honduras | 15,310 | 2% |

[38] USCIS provided the following data on DACA terminations in a July 2018 letter in response to a congressional inquiry:

> From August 15, 2012 to April 30, 2018, there have been approximately 3,010 DACA requests terminated. This figure includes terminated DACA requests that were subsequently reinstated pursuant to a court order. USCIS notes that this number reflects the number of requests terminated, and not the number of unique individuals whose DACA was terminated.

This correspondence and data are available at https://www.uscis.gov/sites/default/files/document/foia/DACA_adjudication_data_-_Representative_Guitierrez.pdf.

[39] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Approximate Active DACA Recipients… As of September 4, 2017," https://www.uscis.gov/sites/default/files/document/data/daca_population_data.pdf (hereinafter cited as "Active DACA Recipients, September 2017").

[40] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Count of Active DACA Recipients … As of Dec. 31, 2020," https://www.uscis.gov/sites/default/files/document/data/Active_DACA_Recipients%E2%80%93December31%2C2020.pdf (hereinafter cited as "Active DACA Recipients, December 2020").

[41] Note that the USCIS DACA-recipient data tables prior to the December 2020 tables label the reported numbers of DACA recipients as approximate; the December 2020 data tables indicate that the DACA-recipient numbers are rounded.

[42] Active DACA Recipients, December 2020, pp. 2-4.

[43] Active DACA Recipients, September 2017, pp. 1-5.

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 266 of 513

| Ranking | Country | Number of Persons | % of Total |
|---|---|---|---|
| 5 | Peru | 6,090 | 1% |
| 6 | South Korea | 6,030 | 1% |
| 7 | Brazil | 4,950 | 1% |
| 8 | Ecuador | 4,670 | 1% |
| 9 | Colombia | 4,120 | 1% |
| 10 | Argentina | 3,280 | 1% |
| | **Total, 10 countries** | 601,590 | 94% |
| | **Total, all countries** | **636,390** | **100%** |

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** This table is limited to persons who had a valid DACA grant on December 31, 2020. The data are rounded. Percentages may not sum due to rounding.

## U.S. States of Residence

As of December 31, 2020, DACA recipients were living in all 50 states, the District of Columbia, and several U.S. territories.[44] Two states—California and Texas—were home to almost half (45%) the DACA-recipient population. **Table 3** shows the top 10 states of residence for DACA recipients in 2020. About three-quarters of the DACA-recipient population lived in these states. These same states, in the same order, were also the top states of residence in 2017.[45] (**Table A-1** provides December 2020 data for all states and the District of Columbia).

**Table 3. Top 10 States of Residence for DACA Recipients**

As of December 31, 2020

| Rank | State | Number of Persons | % of Grand Total |
|---|---|---|---|
| 1 | California | 181,660 | 29% |
| 2 | Texas | 104,820 | 16% |
| 3 | Illinois | 33,740 | 5% |
| 4 | New York | 27,550 | 4% |
| 5 | Florida | 24,530 | 4% |
| 6 | Arizona | 23,800 | 4% |
| 7 | North Carolina | 23,790 | 4% |
| 8 | Georgia | 20,380 | 3% |
| 9 | New Jersey | 16,110 | 3% |
| 10 | Washington | 16,020 | 3% |

44 Active DACA Recipients, December 2020, p. 5. A separate table (on pp. 6-7) provides data on DACA recipients by core-based statistical area.

45 Active DACA Recipients, September 2017, pp. 6-7.

AR2022_400266

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 267 of 513

| Rank | State | Number of Persons | % of Grand Total |
|---|---|---|---|
| | **Total, 10 states** | **472,400** | **74%** |
| | **Total, all jurisdictions** | **636,390** | **100%** |

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** This table is limited to persons who had a valid DACA grant on December 31, 2020. "All jurisdictions" includes the 50 states, the District of Columbia, U.S. territories, and Armed Forces locations. The data are rounded. Percentages may not sum due to rounding.

## Demographic Characteristics

The USCIS data on the gender, marital status, age, and educational attainment of DACA beneficiaries discussed here come from several sources. These include, as mentioned above, data on the DACA population as of September 4, 2017, and as of December 31, 2020. These data describe characteristics of persons who had DACA on those dates.

In addition, other USCIS data are available on some of these demographic measures for persons whose DACA initial applications were approved between the implementation of DACA in 2012 and May 2, 2018. There were approximately 817,798 such persons. These data, which provide information about such DACA recipients *at the time of their initial application for DACA,* were made available by USCIS in a May 2018 response to a congressional inquiry.[46]

### *Gender and Marital Status*

As of December 31, 2020, 53% of DACA recipients were female and 47% were male. These percentages were the same for the September 2017 DACA-recipient population.[47]

Regarding marital status, 73% of DACA recipients were single and 24% were married as of December 2020. The percentage of DACA recipients who are single has steadily decreased since September 2017 (when it stood at 83%). The percentage of DACA recipients who are married has steadily increased; in September 2017, 15% of DACA recipients were married.[48]

### *Age*

**Figure 2** presents data on the age of DACA recipients as of December 31, 2020. The median age of recipients in 2020 was 26; their average age was 27. Three years earlier, in 2017, the median age was 23; the average age was 23.8.[49]

46 The correspondence and data are available at https://www.uscis.gov/sites/default/files/document/data/DACA-Representative_King-Jan-16-2018.pdf (hereinafter cited as "USCIS response to congressional inquiry, May 2018").

47 Active DACA Recipients, December 2020, p. 8; Active DACA Recipients, September 2017, pp. 11.

48 Active DACA Recipients, December 2020, p. 9; Active DACA Recipients, September 2017, p. 12. The cited pages also report numbers for additional categories (divorced, widowed, and data not available).

49 Active DACA Recipients, December 2020, p. 10; Active DACA Recipients, September 2017, p. 11.

AR2022_400267

**Figure 2. Ages of DACA Recipients**

As of December 31, 2020

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** Figure 2 is limited to persons who had a valid DACA grant on December 31, 2020. It does not include age information for a small number (less than 10) of the approximately 636,390 DACA recipients as of that date. The data are rounded.

**Figure 3. DACA Recipients' Age at Initial Entry**

For Beneficiaries of Initial Applications Approved August 2012-May 2018

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** Figure 3 does not include age information for 11,079 of 817,798 persons whose DACA initial applications were approved between August 15, 2012, and May 2, 2018. The data in Figure 3 sum to 806,719.

**Figure 3** presents data on the age *at initial U.S. entry* of persons whose DACA initial applications were approved between August 2012 and May 2018.[50] As shown in **Figure 3**, ages 1 to 7 were the most common entry ages, accounting for more than half (54%) of all entries with available arrival age data.

### *Educational Attainment*

Limited data on educational attainment were also included in the USCIS May 2018 congressional response referenced in the preceding paragraph. They came from DACA initial applications that were approved between August 2012 and May 2018. These educational data are available for about 30% (253,695) of the approximately 817,798 persons who received DACA initial approvals.

Among the criteria for an initial grant of DACA is a requirement to be in school, to have graduated from high school or obtained a general education development (GED) certificate, or to have been honorably discharged from the U.S. Armed Forces. According to the USCIS data, 71% of the persons for whom educational attainment data were available met this requirement by being in school. Another 15% had earned a high school diploma or GED, 13% had less than one year of college credit, and less than 1% had one or more years of college or a postsecondary educational degree at the time of their initial DACA application.[51]

## Survey Data

Social scientists have studied DACA's socioeconomic impacts since its implementation. Some of this research has included surveys of DACA recipients. These surveys are relevant for the purposes of this report to the extent that they provide quantitative data on the characteristics of DACA recipients at a particular time.[52]

Surveys of DACA recipients offer data unavailable from USCIS. For example, the surveys discussed in the following sections of this report provide information about employment and earnings as well as the immigration status of family members. At the same time, DACA-related surveys, including those considered here, have certain limitations. Survey researchers commonly work with immigrant-advocacy organizations to help identify survey participants. It may be that individuals known to these organizations and/or willing to participate in surveys have higher levels of education and economic status than DACA recipients generally. Surveys conducted online may exacerbate this selectivity.[53] **Table 4** compares the survey results described in the following sections with USCIS data on DACA recipients.

---

[50] USCIS response to congressional inquiry, May 2018.

[51] Ibid.

[52] Some surveys do not report these types of results. For example, the National UnDACAmented Research Project (NURP), a longitudinal, national study started in 2013, has focused on the experiences of DACA recipients. As such, it reports largely anecdotal information. To the extent it reports quantitative data, these measures tend to describe the changes in DACA recipients' lives after receiving DACA. For information about this research project, see Roberto G. Gonzales, Sayil Camacho, Kristina Brant, and Carlos Aguilar, *The Long-Term Impact of DACA: Forging Futures Despite DACA's Uncertainty*, National UnDACAmented Research Project, Immigration Initiative at Harvard, November 2019, https://immigrationinitiative.harvard.edu/files/hii/files/final_daca_report.pdf.

[53] According to an article that reviewed past research on unauthorized students and higher education, "respondents of online surveys are self-selected and likely to be higher-achieving and more motivated than the general population of undocumented students." Amy Hsin and Francesc Ortega, "The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students," *Demography*, vol. 55, issue 4 (August 2018).

**Table 4. Comparison of DACA data from USCIS and Selected Surveys**

| | USCIS Data | California Survey 2014-2015 | National Survey 2016 | National Survey 2019 |
|---|---|---|---|---|
| Gender | 2017: 53% female; 47% male | 57% female; 43% male | 66% female; 33% male[a] | N/A |
| Average Age | 2017: 23.8 years<br>2019: 25.7 years | 24 years | 25 years | 26.5 years |
| Educational Attainment[b] | 2012-2018[c]<br>71%: in school (no HS degree)<br>15%: HS degree/GED<br>13%: < 1 year of college<br>Less than 1%: 1 or more years of college | 57%: HS degree<br>7%: vocational or trade degree<br>19%: associate's degree<br>16%: bachelor's or postgraduate degree | 26%: HS degree/ GED<br>3%: trade/technical/ vocational training<br>26%: some college<br>16%: associate's degree<br>22%: bachelor's degree<br>5%: postgraduate degree | 1%: HS degree/ GED<br>4%: Trade/technical/ vocational degree<br>13%: associate's degree<br>53%: bachelor's degree<br>29%: postgraduate degree |
| Employment (DACA recipients only) | N/A | 84% employed | 87% employed | 89% employed |
| Average hourly wage (DACA recipients only) | N/A | $11.47 | $13.96 | $19.45 |
| Family relationships to U.S. citizens | N/A | 70%: U.S. citizen family member | 41%: U.S. citizen family member age 18 or older | 70%: U.S. citizen family member |

**Source:** U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services; Caitlin Patler, Jorge A. Cabrera, and Dream Team Los Angeles, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program*, Institute for Research on Labor and Employment, University of California, Los Angeles, June 15, 2015; *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey*, 2016; *Results from Tom K. Wong et al., 2019 National DACA Study*.

**Notes:** The California survey included both DACA and non-DACA recipients; USCIS data and the national survey data are limited to DACA recipients. Confidence intervals for the survey data are not available.

a. The remaining 1% is comprised of "do not identity as male, female, or transgender" and non-responses.

b. Educational attainment categories are mutually exclusive. Percentages may not sum to 100% due to rounding and/or non-responses.

c. USCIS educational attainment data come from DACA initial applications that were approved between August 2012 and May 2018.

## Survey of DACA Recipients in California

Sociologist Caitlin Patler led a study of DACA recipients and non-recipients in 2014-2015. The findings have been published in different articles.[54] The study examined, among other topics, "the

[54] The two cited here are Caitlin Patler, Jorge A. Cabrera, and Dream Team Los Angeles, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program*, Institute for Research on Labor and Employment, University of California, Los Angeles, June 15, 2015 (hereinafter cited as "Patler, 2015"); Erin

educational and socioeconomic trajectories" of DACA recipients and "similarly situated undocumented youth" who did not have DACA. It was undertaken in collaboration with Dream Team Los Angeles, which is described in one of the publications as an organization that "aims to create a safe space in which undocumented immigrants and allies empower themselves through activism and telling of shared histories."[55]

In the study, a total of 502 young adults in Southern California were surveyed by telephone between October 2014 and February 2015. California has consistently accounted for more than 25% of the DACA population. The survey participants included a sample of attendees at "DACA workshops run by community organizations who agreed to be contacted" and "people who were referred by those who had attended the workshops."[56] Of the 502 survey participants, 452 were DACA recipients and 50 were non-DACA recipients.[57] At the time of the survey, the former had held DACA for about 1.5 years on average.

The published survey results do not include confidence intervals, which makes it difficult to evaluate how representative of the DACA-recipient population the survey group is.[58] **Table 4** allows consideration of observed differences between the California survey group[59] and the DACA-recipient population, as reported in USCIS data.

Regarding education, survey respondents had higher levels of attainment than DACA recipients (for whom such data were available) at the time of initially receiving DACA (see **Table 4**). The differences between the survey results and USCIS data suggest possible real differences between the survey sample and the DACA-recipient population. It is not known, however, to what extent these differences may also reflect actual changes in educational attainment before and after receiving DACA (such as, a person who receives DACA while in high school and subsequently graduates). Some research has found that DACA has had significant, positive effects on high school completion.[60]

The California survey collected data on employment and earnings. It found that most respondents were employed: "More than four of five survey respondents (82%) reported having a job at the time of the survey. This number was higher for those with DACA than those without it (84% vs. 68%)."[61] Additional findings related specifically to the 84% of DACA recipients (or 378 persons) who were engaged in paid employment. Many of this group (42%) worked part-time. The DACA recipients had an average hourly wage of $11.47 and a median hourly wage of $10.00. According to the survey results, 44% of employed DACA recipients were low-skilled workers and 12% were professionals. The survey also found that "three quarters of [the DACA workers] in lower-paid, less skilled occupations were enrolled in school."[62]

---

R. Hamilton, Caitlin Patler, and Robin Savinar, "Transition into Liminal Legality: DACA's Mixed Impacts on Education and Employment among Young Adult Immigrants in California," *Social Problems*, May 1, 2020 (hereinafter cited as "Hamilton, 2020").

[55] Patler, 2015, cover and p. 33.

[56] Ibid., p. 32. Additional methodological information is also available on this page.

[57] These DACA non-recipients "had either not applied, were still awaiting a response, or had been rejected." Ibid., p. 3.

[58] The results also do not include the data necessary to calculate confidence intervals.

[59] The survey results do not distinguish between DACA and non-DACA recipients on some measures.

[60] See Hamilton, 2020.

[61] Patler, 2015, p. 5. Other studies have highlighted the importance of work authorization to DACA recipients. See, for example, Roberto G. Gonzales, Basia Ellis, Sarah A. Rendón-García, and Kristina Brant, "(Un)authorized Transitions: Illegality, DACA, and the Life Course," *Research in Human Development*, vol. 15, issue 3-4 (2018).

[62] Hamilton, 2020.

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 272 of 513

The immigration status of respondents' family members was another topic addressed in the California survey. Among the related findings were:

> Respondents are overwhelmingly from mixed-status families in which members of the same immediate family have different immigration statuses: 70% of respondents have U.S. citizen family members, 44% have Lawful Permanent Resident family members, 53% have [family members with DACA], 23% have family member(s) with some other type of visa, and 77% have undocumented family members."[63]

## National DACA Survey

Each year from 2016 to 2020, political scientist Tom Wong partnered with United We Dream, the National Immigration Law Center, and the Center for American Progress[64] to conduct a national survey of DACA recipients.[65] Researchers used an online questionnaire, which was administered to more than 1,000 DACA recipients. The participants were recruited by the partner organizations and through Facebook ads. The organizations also helped design the surveys. This discussion focuses on the results of the 2016 and 2019 surveys.[66] The 2016 survey was conducted in September 2016 and had 1,308 participants.[67] The 2019 survey was conducted in August and September 2019 and had 1,105 participants.[68] Limited information about methodology accompanied the results of these surveys. As with the California survey, no confidence intervals were reported.

**Table 4** permits comparison of the national survey results with USCIS data on DACA recipients on several characteristics. As shown, the survey group had higher levels of educational attainment than the DACA-recipient population at the time of filing the DACA initial application. These results, in combination with the selectivity issues discussed above, suggest that these national surveys are providing a profile of a high-achieving segment of the DACA-recipient population.

With respect to employment, the 2019 survey found that 89% of survey respondents were working, similar to the 84% reported by the 2014-2015 California survey (for DACA recipients). The 2019 survey did not include questions about occupation; it did ask about wages. The employed respondents had an average hourly wage of $19.45 and a median hourly wage of $17.00.

---

63 Patler, 2015, p. 3.

64 United We Dream describes itself as "the largest immigrant youth-led community in the country" (https://unitedwedream.org/about/); the National Immigration Law Center (NILC) describes itself as being "dedicated to defending and advancing the rights of immigrants with low income" (https://www.nilc.org/about-us/what_we_do/); the Center for American Progress (CAP) describes itself as being "dedicated to improving the lives of all Americans, through bold, progressive ideas" (https://www.americanprogress.org/about/mission/).

65 A smaller survey was conducted in 2015 without the participation of United We Dream. See Tom K. Wong, Kelly K. Richter, Ignacia Rodriguez, and Philip E. Wolgin, *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact*, July 9, 2015, https://www.americanprogress.org/issues/immigration/news/2015/07/09/117054/results-from-a-nationwide-survey-of-daca-recipients-illustrate-the-programs-impact/.

66 The 2019 survey is used rather than the 2020 survey in an effort to avoid any COVID-19-related impacts on the results.

67 *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey*, survey fielded September 8, 2016, to September 26, 2016, https://cdn.americanprogress.org/content/uploads/2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf?_ga=2.67795990.649144387.1615127798-1656050809.1513797434.

68 *Results from Tom K. Wong et al., 2019 National DACA Study*, survey fielded August 14, 2019, to September 6, 2019, https://cdn.americanprogress.org/content/uploads/2019/09/18122133/New-DACA-Survey-2019-Final-1.pdf?_ga=2.123041420.649144387.1615127798-1656050809.1513797434.

AR2022_400272

The immigration status of family members was the subject of several questions in the 2019 survey. Among these was, "Do you have an immediate family member, meaning a parent, sibling, spouse, or child who is a U.S. citizen?" Seventy percent of respondents said yes, the same percentage that reported having U.S. citizen family members in the California survey. Of the 232 respondents to the 2019 survey who were currently married, 60% reported having a U.S. citizen spouse. Of the 211 who were parents, 99% had U.S. citizen children.

## USCIS Data on Persons Ever Granted DACA

For the most part, the USCIS data and the survey data on DACA recipients discussed in the preceding sections of this report are from individuals who held DACA as of a particular date. USCIS has separately estimated the number of persons who were *ever* granted DACA as of a particular date.[69] These ever-granted-DACA estimates include both current and former DACA recipients. They exclude "initial DACA requestors that were approved at first, but later had their initial request denied or terminated."[70] **Figure 4** presents USCIS estimates of the current DACA-recipient population and the ever-granted-DACA population as of September 4, 2017, and as of July 31, 2019. The data for July 31, 2019, which are unpublished, were provided to the Congressional Research Service (CRS) by USCIS.[71]

**Figure 4. DACA-Recipient Populations**

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** The data are estimates.

As of September 4, 2017, an estimated 800,000 persons had ever been granted DACA, and an estimated 690,000 persons were current DACA recipients (**Figure 4**). These two data points raise questions about what accounts for the difference between them. According to USCIS, the approximately 110,000 persons that had been granted DACA but were not covered by DACA as of September 4, 2017, fell into two groups. The first group consisted of approximately 70,000 DACA recipients who "either failed to renew at the end of their 2-year validity period or were denied on renewal." The second group consisted of approximately 40,000 DACA recipients who became LPRs (see the "DACA and Adjustment of Status" section).[72]

By July 31, 2019, the number of persons who had ever been granted DACA had grown to an estimated 822,000 (see **Figure 4**). Like the September 2017 ever-granted-DACA data, these July data exclude "initial DACA requestors that were approved at first, but later had their initial request terminated."[73] **Figure 5** depicts subgroups of the July 2019 ever-granted-DACA

[69] For the USCIS estimate of this population as of September 2017, see Active DACA Recipients, September 2017, Country of Birth table notes, p. 5.

[70] Ibid.

[71] Data provided by USCIS to CRS by email, August 29, 2019, and November 20, 2019 (hereinafter cited as "USCIS emails to CRS, 2019").

[72] See Active DACA Recipients, September 2017, Country of Birth table notes, p. 5.

[73] USCIS emails to CRS, 2019.

population.[74] It shows that between August 2012 and July 2019, approximately 89,000 DACA recipients either failed to request renewal of their DACA grants or were denied renewals, and approximately 76,000 DACA recipients became LPRs.[75] Reducing the ever-granted DACA population by these amounts left a July 2019 current DACA population of approximately 657,000.

**Figure 5. What Happened to the Estimated 822,000 Persons Granted DACA Between August 2012 and July 2019?**

Status as of July 31, 2019

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** The data exclude DACA initial applicants who were approved at first, but later had their initial requests denied or terminated. The "DACA expired and was not renewed" category includes both 79,000 persons who did not apply to renew their DACA grants and 10,000 persons whose applications were denied. The data are estimates.

The 2017-2020 increase in the ever-granted-DACA population reflected individuals who had pending DACA initial applications when the DACA rescission was announced (on September 5, 2017) that were subsequently approved. According to USCIS, there were approximately 36,000 pending DACA initial requests on September 5, 2017.[76] With USCIS now accepting first-time requests again, the number of persons ever issued DACA can be expected to increase further.

# DACA and Adjustment of Status

DACA grants are limited to persons who do not have a lawful immigration status. According to USCIS, "you can only request consideration of DACA … if you currently have no immigration status and were not in any lawful status on June 15, 2012" (when the initial DACA memorandum

[74] Ibid.; CRS telephone conversation with USCIS, September 29, 2020.

[75] These 76,000 persons included the 40,000 DACA recipients granted LPR status as of September 2017.

[76] USCIS emails to CRS, 2019.

was issued).[77] A person who had lawful status or parole[78] in the past can only request DACA if "any lawful immigration status or parole … obtained prior to June 15, 2012, had expired as of June 15, 2012."[79] As noted in the introduction to this report, a DACA grant does not put a recipient on a pathway to LPR status. At the same time, having DACA does not preclude a beneficiary from *adjustment of status* (the process of obtaining LPR status while in the United States), if the individual meets the applicable criteria.

As shown in **Figure 5**, approximately 76,000 DACA recipients had become LPRs as of July 31, 2019.[80] These USCIS data, as provided to CRS, included information on the pathways by which some 75,000 of these DACA recipients had adjusted status. They indicated that approximately 66,000 DACA recipients had adjusted status as the immediate relatives of U.S. citizens, the vast majority as the spouses of U.S. citizens. The data also indicated that approximately 5,000 had adjusted status based on other family relationships with U.S. citizens or LPRs. Another approximately 2,000 DACA recipients had adjusted status as crime and trafficking victims, special immigrant juveniles, or asylees.[81] These pathways to LPR status are discussed in the following sections of this report.

## Adjustment of Status

The Immigration and Nationality Act (INA)[82] provides various avenues, each subject to a particular set of requirements, through which foreign nationals in the United States can adjust their status to LPR status. For individuals who are not in a lawful immigration status, the options to adjust status are limited. For those who are not in a lawful status and entered the United States illegally (without inspection), the options are even more limited. Available data do not disaggregate the DACA-recipient population by lawful or unlawful U.S. entry.

The main adjustment of status mechanism in the INA (§245(a))[83] provides a pathway for individuals who are eligible for immigrant visas, in most cases based on family or employment ties, to obtain LPR status. However, this mechanism is not available to persons who entered the United States without inspection. With the exception of certain victims of battery or extreme cruelty,[84] adjustment of status under INA Section 245(a) is limited to persons who were "inspected and admitted or paroled into the United States." It is further restricted to persons who have

[77] DHS DACA FAQs, response to question 18. This response also clarifies that persons with Temporary Protected Status (TPS) are not eligible for DACA. For information on TPS, see CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*.

[78] Immigration parole is permission to be physically present in the United States. For additional information, see CRS Report R46570, *Immigration Parole*.

[79] DHS DACA FAQs, "What is Deferred Action for Childhood Arrivals?" (information preceding response to question 1).

[80] USCIS emails to CRS, 2019. Of the 76,000 DACA recipients granted LPR status, approximately 4,000 had become naturalized U.S. citizens as of July 2019, according to the USCIS data.

[81] The remaining approximately 2,000 persons adjusted status through various other pathways.

[82] The INA is Act of June 27, 1952, ch. 477, 66 Stat. 163. It is codified, as amended, at 8 U.S.C. §1101, et seq.

[83] 8 U.S.C. §1255(a).

[84] "VAWA [Violence Against Women Act] provisions in the INA allow certain spouses, children, and parents of U.S. citizens and certain spouses and children of permanent residents … to file a petition for themselves, without the abuser's knowledge." U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Battered Spouse, Children and Parents," https://www.uscis.gov/humanitarian/battered-spouse-children-and-parents. A person whose VAWA self-petition is approved and meets other requirements may be eligible for adjustment to LPR status. Such a person is exempt from certain INA Section 245 requirements.

maintained lawful status since entry, have not engaged in unauthorized employment, and do not fall within another disqualified category.[85] The main exception to these disqualifications applies to persons who are adjusting to LPR status based on an approved immigrant visa petition for classification as an "immediate relative" of a U.S. citizen. Immediate relatives are the spouses, minor unmarried children, and parents of U.S. citizens.[86] Immediate relatives can adjust status under INA Section 245(a) despite their failure to maintain lawful status since entry, provided they entered the United States lawfully and meet the other statutory requirements.

## Adjustment Mechanisms for Unlawful Entrants

Persons who entered the United States unlawfully have few avenues to adjust status under the INA. The avenues that do exist have humanitarian elements. For example, unlawful entry does not preclude a person from applying for and being granted asylum provided he or she is otherwise eligible.[87] After one year as an asylee, a person can apply to adjust to LPR status.[88]

Certain children may be able to obtain LPR status through a special pathway if they "have been subject to state juvenile court proceedings related to abuse, neglect, abandonment, or a similar basis under state law." These individuals may be eligible for Special Immigrant Juvenile (SIJ) classification.[89] Under a provision in INA Section 245, a person classified as an SIJ "shall be deemed, for purposes of subsection (a), to have been paroled into the United States."[90] In other words, as explained on a USCIS webpage directed at SIJ applicants for adjustment of status, "USCIS will consider you paroled when adjudicating your [adjustment of status form] regardless of how you arrived in the United States."[91] In this way, SIJ adjustment of status applicants can satisfy the INA Section 245(a) "inspected and admitted or paroled" requirement.

Unlawful entrants who are the victims of certain types of criminal activity also may be able to adjust status. The INA provides for the granting of nonimmigrant (temporary) status to (1) victims of severe forms of trafficking in persons or (2) victims of certain crimes (including rape, torture, and trafficking) who have suffered resulting physical or mental abuse if the victims have provided, or may in the future provide, assistance to law enforcement and meet other specified requirements. Trafficking victims may be eligible for "T" nonimmigrant status and victims of

---

[85] Disqualifications to adjust status under INA Section 245(a) are enumerated in INA Section 245(c) (8 U.S.C. §1255(c)).

[86] In the case of parents, the petitioning U.S. citizen must be at least age 21. INA §201(b)(2)(A)(i), 8 U.S.C. §1151(b)(2)(A)(i). For further discussion of family-based immigration, see CRS Report R43145, *U.S. Family-Based Immigration Policy*.

[87] INA Section 208(a)(1) (8 U.S.C. §1158(a)) provides that an eligible individual can apply for asylum "irrespective of such alien's status." Among the requirements, an applicant generally must file an asylum application within one year after his or her arrival in the United States. For additional information about asylum, see CRS Report R45539, *Immigration: U.S. Asylum Policy*.

[88] Asylee adjustment of status provisions are in INA Section 209 (8 U.S.C. §1159).

[89] See U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Special Immigrant Juveniles," https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fourth-preference-eb-4/special-immigrant-juveniles.

[90] INA §245(h), 8 U.S.C. §1255(h).

[91] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Green Card Based on Special Immigrant Juvenile Classification," https://www.uscis.gov/green-card/green-card-eligibility/green-card-based-on-special-immigrant-juvenile-classification.

certain crimes may be eligible for "U" nonimmigrant status.[92] A "T" or "U" nonimmigrant may be granted LPR status after three years in temporary status subject to statutory requirements.[93]

In addition, there is an older, date-restricted adjustment of status provision (INA §245(i)) that explicitly applies to certain persons who are ineligible to adjust status under Section 245(a). It applies to persons who are eligible for immigrant visas based on family or employment ties but either (1) entered the United States without inspection or (2) entered lawfully but have not maintained lawful status since entry or are otherwise disqualified. First enacted in 1994, INA Section 245(i) has been extended several times; it was last extended in 2000. It currently applies to certain applicants for adjustment of status who are the beneficiaries of either family- or employment-based immigrant visa petitions or labor certification applications (which are required under certain employment-based categories) filed by April 30, 2001. While the provision continues to be available to qualifying beneficiaries, its April 2001 cutoff date limits its applicability.[94]

## Advance Parole

There has been discussion in recent years about a possible adjustment of status avenue for otherwise eligible DACA recipients who initially entered the United States unlawfully (and, thus, are barred from adjustment of status under INA Section 245(a), as discussed above). This avenue hinges on the language in INA Section 245(a) that makes adjustment of status available to otherwise eligible persons who have been paroled into the country.

DACA, as originally established in 2012, allowed for DACA recipients to apply for a form of parole known as *advance parole* so they could travel abroad and apply to re-enter the United States afterward.[95] The departure from the United States of a DACA recipient who had not been granted advance parole would automatically terminate his or her DACA grant. Under the Obama Administration, USCIS enumerated the following bases for granting advance parole to DACA recipients: "humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative; educational purposes, such as semester-abroad programs and academic research[; or] employment purposes."[96]

The advance parole-adjustment of status logic went as follows: When DACA recipients who were granted advance parole returned to the United States after travelling abroad, they could be paroled in. As parolees, they would satisfy the "inspected and admitted or paroled" requirement for adjustment of status. Provided they had the requisite family or employment ties and met the other requirements, they could adjust to LPR status.

According to preliminary data provided by DHS in response to a congressional request, 45,447 DACA recipients were approved for advance parole as of August 21, 2017.[97] It is not known how

[92] The "T" nonimmigrant category is described in INA Section 101(a)(15)(T) (8 U.S.C. §1101(a)(15)(T)); the "U" nonimmigrant category is described in INA Section 101(a)(15)(U) (8 U.S.C. §1101(a)(15)(U)). For additional information, see CRS Report R46584, *Immigration Relief for Victims of Trafficking*.

[93] The requirements are set forth for T nonimmigrants in INA Section 245(l) (8 U.S.C. §1255(l)) and for U nonimmigrants in INA Section 245(m) (8 U.S.C. §1255(m).

[94] For additional information, see archived CRS Report RL31373, *Immigration: Adjustment to Permanent Resident Status Under Section 245(i)*.

[95] For additional information on advance parole, see CRS Report R46570, *Immigration Parole*.

[96] DHS DACA FAQs, response to question 57.

[97] These data were made publicly available by the Office of Senator Chuck Grassley in a September 2017 news release; see https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 278 of 513

many of these individuals may have subsequently applied for or been granted LPR status. In response to an earlier congressional inquiry, USCIS indicated that, as of December 31, 2015, 22,340 DACA recipients had been approved for advance parole. As of that same date, 5,068 of those recipients had applied for adjustment of status and 2,994 had been approved. In its letter transmitting this information, USCIS noted, "some among the group of 2,994 DACA recipients who were approved for advance parole and were subsequently granted adjustment of status may have been otherwise eligible for adjustment of status regardless of the grant of advance parole."[98]

When the Trump Administration acted in 2017 to rescind DACA, it announced that it would no longer grant advance parole under the DACA program.[99] In July 2020, following the Supreme Court decision vacating the DACA rescission, then-acting DHS Secretary Wolf indicated that advance parole "should be granted to current DACA beneficiaries only in exceptional circumstances."[100] In December 2020, as part of a district court-ordered reinstatement of the original DACA policy, USCIS resumed accepting advance parole applications from DACA recipients under the terms in effect prior to the September 2017 changes.[101]

# Conclusion

This report is focused on the DACA population. This subpopulation of unauthorized immigrants (whether understood to include only current recipients, current and past recipients, or a version of the DACA-eligible population) has commanded interest and attention since 2012.[102] Even in the context of broader discussions and proposals to grant lawful status to unauthorized immigrants by creating new LPR status mechanisms, the DACA population has remained a relevant, discrete subpopulation.

Dreamers who do not satisfy the 2012 DACA criteria are also the subject of legalization proposals. Because there is no single, common understanding of this population, individual measures must enumerate the eligibility criteria for their LPR mechanisms. Eligible populations may be defined using DACA-like requirements concerning age at U.S. entry, length of U.S. residence, and educational attainment.

As part of a 2021 report on legalization, MPI used the original DACA criteria as a taking-off point and estimated eligible populations under broader eligibility criteria. For example, it found that changing the required U.S. entry year from 2007 to 2016 (and leaving all the other DACA requirements in place) would increase the immediately eligible population from an estimated 1.3

---

gain-legal-status.

[98] The USCIS letter is available at https://www.judiciary.senate.gov/imo/media/doc/2016-06-29%20USCIS%20to%20CEG%20-%20DACA%20Advance%20Parole%20Program.pdf.

[99] The DHS DACA rescission memorandum stated that effective immediately, the department "will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole." DACA rescission memo, September 2017.

[100] Wolf memo, July 2020; for related USCIS guidance, see U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'"*, memorandum to Associate Directors and Program Office Chiefs, from Joseph Edlow, Deputy Director for Policy, August 21, 2020, https://www.uscis.gov/sites/default/files/document/policy-alerts/dacamemo.pdf.

[101] USCIS, Consideration of DACA.

[102] The larger Dreamer population has commanded interest and attention for a longer period. See CRS Report R45995, *Unauthorized Childhood Arrivals, DACA, and Related Legislation*.

AR2022_400278

million to an estimated 1.5 million. Changing the entry year to 2016 while simultaneously raising the allowable age at entry from under 16 to under 18 and eliminating the maximum age restriction would increase the immediately eligible population to an estimated 1.8 million.[103] On the other hand, requiring higher levels of educational attainment than are required for a DACA initial grant, as many Dreamer legalization proposals have, would reduce the immediately eligible population.

In designing legalization programs for unauthorized childhood arrivals, policymakers may opt to go beyond DACA-like criteria and, as has been done in many proposals, require such things as knowledge of the English language and U.S. civics. Legalization programs may also impose penalty fees in addition to application fees. The criteria chosen and the mechanisms created, taken together, reflect a set of policy choices that determine the size of the potential beneficiary population.

[103] Jessica Bolter, Muzaffar Chishti, and Doris Meissner, *Back on the Table: U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate*, Migration Policy Institute, February 2021, pp. 9-10.

# Appendix. States of Residence for DACA Recipients

**Table A-1. DACA Recipients by State**

As of December 31, 2020

| State | Number of Persons | % of Grand Total |
|---|---|---|
| Alabama | 3,930 | 1% |
| Alaska | 70 | 0% |
| Arizona | 23,800 | 4% |
| Arkansas | 4,400 | 1% |
| California | 181,660 | 29% |
| Colorado | 14,380 | 2% |
| Connecticut | 3,510 | 1% |
| Delaware | 1,290 | 0% |
| District of Columbia | 600 | 0% |
| Florida | 24,530 | 4% |
| Georgia | 20,380 | 3% |
| Hawaii | 350 | 0% |
| Idaho | 2,710 | 0% |
| Illinois | 33,740 | 5% |
| Indiana | 8,800 | 1% |
| Iowa | 2,420 | 0% |
| Kansas | 5,410 | 1% |
| Kentucky | 2,670 | 0% |
| Louisiana | 1,690 | 0% |
| Maine | 50 | 0% |
| Maryland | 7,810 | 1% |
| Massachusetts | 5,370 | 1% |
| Michigan | 5,200 | 1% |
| Minnesota | 5,110 | 1% |
| Mississippi | 1,300 | 0% |
| Missouri | 2,950 | 0% |
| Montana | 70 | 0% |
| Nebraska | 2,870 | 0% |
| Nevada | 12,030 | 2% |
| New Hampshire | 250 | 0% |
| New Jersey | 16,110 | 3% |
| New Mexico | 5,510 | 1% |

| State | Number of Persons | % of Grand Total |
|---|---|---|
| New York | 27,550 | 4% |
| North Carolina | 23,790 | 4% |
| North Dakota | 120 | 0% |
| Ohio | 3,810 | 1% |
| Oklahoma | 6,010 | 1% |
| Oregon | 9,590 | 2% |
| Pennsylvania | 4,500 | 1% |
| Rhode Island | 880 | 0% |
| South Carolina | 5,660 | 1% |
| South Dakota | 200 | 0% |
| Tennessee | 7,570 | 1% |
| Texas | 104,820 | 16% |
| Utah | 8,440 | 1% |
| Vermont | 30 | 0% |
| Virginia | 9,230 | 1% |
| Washington | 16,020 | 3% |
| West Virginia | 100 | 0% |
| Wisconsin | 6,490 | 1% |
| Wyoming | 500 | 0% |
| **Total, all states** | **636,280** | **100%** |
| **Total, all jurisdictions** | **636,390** | **100%** |

**Source:** CRS presentation of data from U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

**Notes:** This table is limited to persons who had a valid DACA grant on December 31, 2020. "Total, all states" includes the 50 states and the District of Columbia. "Total, all jurisdictions" includes these entities as well as U.S. territories and Armed Forces locations. The data are rounded. Percentages may not sum due to rounding.

## Author Information

Andorra Bruno
Specialist in Immigration Policy

Case 1:18-cv-00068 Document 608-4 Filed on 11/03/22 in TXSD Page 282 of 513

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

AR2022_400282

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland 21244-1850

**Center for Medicaid and CHIP Services**

**SHO# 12-002**

August 28, 2012

**Re: Individuals with Deferred Action for Childhood Arrivals**

Dear State Health Official:
Dear Medicaid Director:

This guidance is intended to inform you about the implications for Medicaid and the Children's Health Insurance Program (CHIP) of the U.S. Department of Homeland Security's (DHS) announcement on June 15, 2012, that it will consider providing temporary relief from removal by exercising deferred action on a case-by-case basis with respect to certain individuals under age 31 as of June 15, 2012 who meet certain guidelines, including that they came to the United States as children and do not present a risk to national security or public safety.[1] This process is referred to by DHS as Deferred Action for Childhood Arrivals (DACA).[2] DHS has explained that the DACA process is designed to ensure that governmental resources for the removal of individuals are focused on high priority cases, including those involving a danger to national security or a risk to public safety, and not on low priority cases.[3] DHS began accepting requests for consideration of deferred action on August 15, 2012.

Section 214 of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) gave states the option to provide Medicaid and CHIP eligibility to children and/or pregnant women who are "lawfully residing" in the United States and otherwise eligible for Medicaid or CHIP. CMS provided guidance on the definition of "lawfully residing" in a July 1, 2010 State Health Official Letter (http://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/SHO10006.pdf). Because the reasons that DHS offered for adopting the DACA process do not pertain to eligibility for Medicaid or CHIP, HHS has determined that these benefits should not be extended as a result of DHS deferring action under DACA. For this reason, individuals with deferred action under the DACA process shall not be eligible for Medicaid and CHIP under the CHIPRA state option with respect to any of the categories (1)-(9) set forth in the July 1, 2010 letter.

[1] June 15, 2012 Memorandum of Secretary of Homeland Security Janet Napolitano, available at http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.
[2] Consideration of Deferred Action for Childhood Arrivals, available at http://www.uscis.gov/childhoodarrivals.
[3] *See supra* nn. 1-2.

We hope this information will be helpful. Thank you for your commitment to the Medicaid and CHIP programs.

Sincerely,

/s/

Cindy Mann
Director

cc:

CMS Regional Administrators

CMS Associate Regional Administrators
Division of Medicaid and Children's Health Operations

Matt Salo
Executive Director
National Association of Medicaid Directors

Alan R. Weil, J.D., M.P.P.
Executive Director
National Academy for State Health Policy

Ronald Smith
Director of Legislative Affairs
American Public Human Services Association

Joy Wilson
Director, Health Committee
National Conference of State Legislatures

Heather Hogsett
Director of Health Legislation
National Governors Association

Debra Miller
Director for Health Policy
Council of State Governments

Christopher Gould
Director, Government Relations
Association of State and Territorial Health Officials

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland 21244-1850

**Center for Medicaid, CHIP and Survey & Certification**

SHO # 10-006
CHIPRA # 17

July 1, 2010

**Re: Medicaid and CHIP Coverage of "Lawfully Residing" Children and Pregnant Women**

Dear State Health Official:

This letter is one of a series that provides guidance on implementation of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA), Public Law 111-3. Section 214 of CHIPRA permits States to cover certain children and pregnant women in both Medicaid and the Children's Health Insurance Program (CHIP) who are "lawfully residing in the United States" as described in section 1903(v)(4) and 2107(e)(l)(J) of the Social Security Act (the Act). The section 214 option may be applied to pregnant women in Medicaid and CHIP and/or to children up to age 19 for CHIP or up to age 21 for Medicaid (including targeted low-income children described in section 1905(u)(2)(B) of the Act).

## Background

The enactment of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (Public Law 104-193), placed limitations on Federal funding for health coverage of immigrant families. Section 403 of PRWORA imposed a 5-year waiting period on certain groups of qualified aliens, including most children and pregnant women who were otherwise eligible for Medicaid. Medicaid coverage for individuals subject to the 5-year waiting period and for those who do not meet the definition of qualified alien was limited to treatment of an emergency medical condition as described in section 1903(v)(2)(A) of the Act. The 5-year waiting period also applied to children and pregnant women under CHIP. Note that PRWORA did not affect eligibility of undocumented aliens; people who are undocumented were not eligible for Medicaid (except for emergency services) before PRWORA, and remain ineligible under CHIPRA.

## Coverage Option Under CHIPRA

Section 214 of CHIPRA amends section 2107 of the Act to grant States the option to provide Medicaid and CHIP coverage to all children and pregnant women (including women covered during the 60-day postpartum period) "who are lawfully residing in the United States… and who are otherwise eligible for such assistance," as described in section 1903 of the Act. States may

elect to cover these groups under Medicaid only or under both Medicaid and CHIP. The law does not permit States to cover these new groups only in CHIP, without also extending the option to Medicaid.

While the phrase "lawfully residing in the United States" has not previously been used when describing individuals who could be eligible for Medicaid and CHIP, it has been used in various other contexts, such as by the United States Department of Agriculture (USDA) and the Social Security Administration (SSA).

For example, for purposes of determining whether certain individuals are eligible to receive food stamps (now called the Supplemental Nutrition Assistance Program (SNAP)), regulations at 7 CFR 273.4(a)(7) state that "lawfully residing in the U.S." means that the individual is lawfully present as defined in regulations at 8 CFR 103.12(a). Likewise, for purposes of Title II benefits under SSA, "lawfully residing in the U.S." means that an individual is "lawfully present" as defined by 8 CFR 103.12(a) and is a resident of the U.S. as defined in SSA regulations and program instructions. In both of these programs, the terms "lawfully residing" and "lawfully present" are broader than the term "qualified alien" in section 431 of PRWORA (8 U.S.C. § 1641) with respect to immigration status (the term "qualified alien" does not include residence-based criteria). We have looked to these programs to assist us in defining "lawfully residing" for purposes of implementing section 214 of CHIPRA.

In interpreting "lawfully residing," we will rely on existing immigration regulations for the purpose of defining lawful presence and longstanding Medicaid rules to establish residency. In other words, the "residing" part of the "lawfully residing" requirement is construed as synonymous with the longstanding Medicaid residency requirement, rather than as requiring a separate and redundant residency determination for the sole purpose of determining "lawful residence." For example, a nonimmigrant visitor for business or pleasure may be lawfully present under immigration regulations, but not meet Medicaid or CHIP residency requirements, and therefore will not be able to qualify for Medicaid or CHIP.

*Lawfully Present*

Children and pregnant women that fall into one of the categories below will be considered lawfully present. Therefore, these individuals are eligible for Medicaid and CHIP coverage if the State elects the new option under CHIPRA, and the child or pregnant woman meets the State residency requirements and other Medicaid or CHIP eligibility requirements.

The basis of our construction of lawful presence is the broad definition provided in DHS regulations at 8 CFR 103.12(a) for the specific purpose of Title II Social Security benefits, with some revisions necessary for updating or clarifying purposes, or as otherwise deemed appropriate for the Medicaid and CHIP programs consistent with the Act.

A child or pregnant woman shall be considered lawfully present if he or she is:

(1) A qualified alien as defined in section 431 of PRWORA (8 U.S.C. §1641);

(2) An alien in nonimmigrant status who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. §1182(d)(5)) for less than 1 year, except for an alien paroled for prosecution, for deferred inspection or pending removal proceedings;

(4) An alien who belongs to one of the following classes:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the INA (8 U.S.C. §§1160 or 1255a, respectively);

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the INA (8 U.S.C. §1254a), and pending applicants for TPS who have been granted employment authorization;

(iii) Aliens who have been granted employment authorization under 8 CFR 274a.12(c)(9), (10), (16), (18), (20), (22), or (24);

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status; or

(vii) Aliens whose visa petition has been approved and who have a pending application for adjustment of status;

(5) A pending applicant for asylum under section 208(a) of the INA (8 U.S.C. § 1158) or for withholding of removal under section 241(b)(3) of the INA (8 U.S.C. § 1231) or under the Convention Against Torture who has been granted employment authorization, and such an applicant under the age of 14 who has had an application pending for at least 180 days;

(6) An alien who has been granted withholding of removal under the Convention Against Torture;

(7) A child who has a pending application for Special Immigrant Juvenile status as described in section 101(a)(27)(J) of the INA (8 U.S.C. § 1101(a)(27)(J));

(8) An alien who is lawfully present in the Commonwealth of the Northern Mariana Islands under 48 U.S.C. § 1806(e); or

(9) An alien who is lawfully present in American Samoa under the immigration laws of American Samoa.

Under CHIPRA, a State electing to cover children or pregnant women who are considered to be lawfully residing in the U.S. must offer coverage to all such individuals who meet this definition of lawfully residing, and may not cover a subgroup or only certain groups (e.g., only the PRWORA group of qualified aliens, or only citizens of Compact of Free Association nations, or only aliens residing for a specified period, such as 3 years).

*Residency*

Children and pregnant women who meet the definition set forth above of "lawfully present" also must be residents of the State in which they are applying in order to qualify for Medicaid or CHIP. An individual would not be eligible for Medicaid or CHIP, even if he or she is considered to be lawfully present in the U.S., if the individual is not a resident of the State, as the individual would not be considered as either "lawfully residing" in the U.S. or as a State resident. At the same time, an individual would be eligible for Medicaid and CHIP if he or she is considered to be lawfully present in the U.S. and is a State resident, even if the individual's current immigration status is of a temporary nature (such as TPS). Implementing regulations at 42 CFR 435.403 specify State residence in Medicaid to mean living in a State and having the intent to remain permanently for an indefinite period. Each individual should have an opportunity to establish that he or she lives in the State and intends to remain there.

*Sponsor Deeming and "Public Charge"*

The alien sponsor deeming requirements described in section 421 of PRWORA may not be applied to individuals covered under the new CHIPRA section 214 option. A sponsor's income and resources are not considered when determining eligibility. In addition, no debt will be created for the sponsor by any services provided to such individuals who have been found eligible for Medicaid or CHIP. The cost of Medicaid or CHIP assistance will not be considered as an unreimbursed cost associated with the "public charge" provisions.

**Eligibility Determinations and Redeterminations**

Under CHIPRA, a State electing to cover children or pregnant women who are considered to be lawfully residing in the U.S. must offer coverage to all such individuals who meet this definition of lawfully residing, and may not cover a subgroup or only certain groups (e.g., only the PRWORA group of qualified aliens, or only citizens of Compact of Free Association nations, or only aliens residing for a specified period, such as 3 years).

States that elect the new option under CHIPRA must verify that the individual meets the definition of lawfully residing in the U.S. at the time of application, according to the rules established under section 1137(d) of the Act. Eligibility also must be verified at renewal. Consistent with other Medicaid requirements, the State should first rely on information provided at the time of initial application under the rules established at section 1137(d) to determine ongoing eligibility. States should only require the individual to provide further documentation or to re-verify satisfactory status if the State cannot verify continued eligibility based on the information already available to the State.

**State Plan Amendments**

A State may elect the section 214 CHIPRA option by submitting a State plan amendment (SPA) under Medicaid only or amendments under both Medicaid and CHIP. Section 214 of CHIPRA does not permit the application of this option under CHIP only. Attached are two draft State plan templates that States can use to elect the section 214 option under Medicaid and CHIP. States electing to provide CHIP coverage of children and/or pregnant women must submit concurrent CHIP and Medicaid SPAs to CMS for consideration. Also, a State must choose whether to adopt this option for children (all children up to age 19 for CHIP or up to age 21 for Medicaid), pregnant women, or both.

**Federal Financial Participation**

Because this is a new eligibility group, children up to age 19 covered under the section 214 option (at any income level) are considered targeted low-income children under section 2110(b) of the Act. As such, claims paid on behalf of children eligible under the new option created by section 214 may be matched at the enhanced title XXI match rate, regardless of whether the child is covered through Medicaid or a separate CHIP program. States also have the option under Section 115 of CHIPRA to claim regular Medicaid Federal Financial Participation (FFP) for the children enrolled in Medicaid or a CHIP-funded Medicaid expansion.

Medicaid eligible individuals for whom the State receives FFP at the CHIP enhanced rate and who would be subject to the 5-year waiting period under section 403 of PRWORA, must be claimed at the Medicaid FFP rate once these children have met the 5-year waiting period. For example, a child who entered the country on November 1, 2008 as a “qualified alien” (under section 431 of PRWORA) may be claimed at the enhanced rate until October 31, 2013, the end of the 5-year waiting period for that child. Subsequently, a State must cover this child using title XIX funds. Therefore, States that choose to claim the title XXI enhanced match must have a process for tracking these children in order to determine when the regular matching rate would come into effect. States may continue to claim enhanced title XXI enhanced matching for children under age 19 who are lawfully residing in the U.S. and who are <u>not</u> considered qualified aliens under PRWORA as described above.

For all others who obtain Medicaid coverage due to this option, which includes children ages 19 to 21, and pregnant women enrolled in Medicaid, FFP is available at the Medicaid matching rate. The increased Federal medical assistance percentage, as described under the American Recovery and Reinvestment Act of 2009, will apply to medical assistance payments for this population. Pregnant women covered under the new CHIPRA pregnant women option (section 111) under a CHIP plan will qualify for the CHIP enhanced match rate.

CMS looks forward to its continued work with States on the implementation of the CHIPRA eligibility expansion to lawfully residing pregnant women and children. Thank you for your continued commitment to providing health coverage through these critical programs. If you have questions regarding this letter, please contact Victoria Wachino, Director, Family and Children's Health Programs Group, at 410-786-5647.

Sincerely,

Cindy Mann

Enclosures
State Plan Amendment templates

cc:
CMS Regional Administrators

CMS Associate Regional Administrators
Division of Medicaid and Children's Health

Ann C. Kohler
NASMD Executive Director
American Public Human Services Association

Joy Wilson
Director, Health Committee
National Conference of State Legislatures

Matt Salo
Director of Health Legislation
National Governors Association

Page 7 – State Health Officials

Debra Miller
Director for Health Policy
Council of State Governments

Christine Evans, M.P.H.
Director, Government Relations
Association of State and Territorial Health Officials

Alan R. Weil, J.D., M.P.P.
Executive Director
National Academy for State Health Policy

AR2022_400291

**Enclosure**

**Section 4. Eligibility Standards and Methodology – Expanding Coverage to Individuals Lawfully Residing in the US**

**Section 4. Eligibility Standards and Methodology**

**4.1.10 _____ Check if the State is electing the option under section 214 of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) to provide coverage to the following otherwise eligible pregnant women and children as specified below who are lawfully residing in the United States including the following:**

A child or pregnant woman shall be considered lawfully present if he or she is:

(1) A qualified alien as defined in section 431 of PRWORA (8 U.S.C. §1641);

(2) An alien in nonimmigrant status who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. §1182(d)(5)) for less than 1 year, except for an alien paroled for prosecution, for deferred inspection or pending removal proceedings;

(4) An alien who belongs to one of the following classes:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the INA (8 U.S.C. §§1160 or 1255a, respectively);

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the INA (8 U.S.C. §1254a), and pending applicants for TPS who have been granted employment authorization;

(iii) Aliens who have been granted employment authorization under 8 CFR 274a.12(c)(9), (10), (16), (18), (20), (22), or (24);

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status; or

(vii) Aliens whose visa petition has been approved and who have a pending application for adjustment of status;

(5) A pending applicant for asylum under section 208(a) of the INA (8 U.S.C. § 1158) or for withholding of removal under section 241(b)(3) of the INA (8 U.S.C. § 1231) or under the Convention Against Torture who has been granted employment authorization, and such an applicant under the age of 14 who has had an application pending for at least 180 days;

(6) An alien who has been granted withholding of removal under the Convention Against Torture;

(7) A child who has a pending application for Special Immigrant Juvenile status as described in section 101(a)(27)(J) of the INA (8 U.S.C. § 1101(a)(27)(J));

(8) An alien who is lawfully present in the Commonwealth of the Northern Mariana Islands under 48 U.S.C. § 1806(e); or

(9) An alien who is lawfully present in American Samoa under the immigration laws of American Samoa.

**_____ The State elects the CHIPRA section 214 option for children up to age 19**
**_____ The State elects the CHIPRA section 214 option for pregnant women through the 60-day postpartum period**

**4.1.10.1_____ The State provides assurance that for individuals whom it enrolls in CHIP under the CHIPRA section 214 option that it has verified, both at the time of the individual's initial eligibility determination and at the time of the eligibility redetermination, that the individual continues to be lawfully residing in the United States. The State must first attempt to verify this status using information provided at the time of initial application. If the State cannot do so from the information readily available, it must require the individual to provide documentation or further evidence to verify satisfactory immigration status in the same manner as it would for anyone else claiming satisfactory immigration status under section 1137(d) of the Act.**

**Revision: CMS-PM-** **ATTACHMENT 2.6-A**
**Page 2**
**OMB No.:**

**STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT**
**State**

**ELIGIBILITY CONDITIONS AND REQUIREMENTS**

| Citation(s) | Condition or Requirement |
|---|---|

**42 CFR 435.406 3. Is residing in the United States (U.S.), and--**

**a. Is a citizen or national of the United States;**

**b. Is a qualified alien (QA) as defined in section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) as amended, and the QA's eligibility is required by section 402(b) of PRWORA as amended, and is not prohibited by section 403 of PRWORA as amended;**

**c. Is a qualified alien subject to the 5-year bar as described in section 403 of PRWORA, so that eligibility is limited to treatment of an emergency medical condition as defined in section 401 of PRWORA;**

**d. Is a non-qualified alien, so that eligibility is limited to treatment of an emergency medical condition as defined in section 401 of PRWORA;**

**e. Is a QA whose eligibility is authorized under section 402(b) of PRWORA as amended, and is not prohibited by section 403 of PRWORA as amended.**
**___ State covers all authorized QAs.**
**___ State does not cover authorized QAs.**

**f. State elects CHIPRA option to provide full Medicaid coverage to otherwise eligible pregnant women or children as specified below who are aliens lawfully residing in the United States; including the following:**

(1) A qualified alien as defined in section 431 of PRWORA (8 U.S.C. §1641);

(2) An alien in nonimmigrant status who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. §1182(d)(5)) for less than 1 year, except for an alien paroled for prosecution, for deferred inspection or pending removal proceedings;

(4) An alien who belongs to one of the following classes:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the INA (8 U.S.C. §§1160 or 1255a, respectively);

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the INA (8 U.S.C. §1254a), and pending applicants for TPS who have been granted employment authorization;

(iii) Aliens who have been granted employment authorization under 8 CFR 274a.12(c)(9), (10), (16), (18), (20), (22), or (24);

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status; or

(vii) Aliens whose visa petition has been approved and who have a pending application for adjustment of status;

(5) A pending applicant for asylum under section 208(a) of the INA (8 U.S.C. § 1158) or for withholding of removal under section 241(b)(3) of the INA (8 U.S.C. § 1231) or under the Convention Against Torture who has been granted employment authorization, and such an applicant under the age of 14 who has had an application pending for at least 180 days;

(6) An alien who has been granted withholding of removal under the Convention Against Torture;

(7) A child who has a pending application for Special Immigrant Juvenile status as described in section 101(a)(27)(J) of the INA (8 U.S.C. § 1101(a)(27)(J));

(8) An alien who is lawfully present in the Commonwealth of the Northern Mariana Islands under 48 U.S.C. § 1806(e); or

(9) An alien who is lawfully present in American Samoa under the immigration laws of American Samoa.

___ **Elected for pregnant women.**
___ **Elected for children under age _____.**

**g. _____ The State provides assurance that for an individual whom it enrolls in Medicaid under the CHIPRA section 214 option, it has verified, at the time of the individual's initial eligibility determination and at the time of the eligibility redetermination, that the individual continues to be lawfully residing in the United States. The State must first attempt to verify this status using information provided at the time of initial application. If the State cannot do so from the information readily available, it must require the individual to provide documentation or further evidence to verify satisfactory immigration status in the same manner as it would for anyone else claiming satisfactory immigration status under section 1137(d) of the Act.**

**TN No: _____ Approval Date _____ Effective Date ____________**
**Supersedes**
**TN No. _____**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

II

**Calendar No. 425**

107TH CONGRESS
2D SESSION

# S. 1291

To amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to permit States to determine State residency for higher education purposes and to authorize the cancellation of removal and adjustment of status of certain alien college-bound students who are long-term United States residents.

---

IN THE SENATE OF THE UNITED STATES

AUGUST 1, 2001

Mr. HATCH (for himself and Ms. CANTWELL) introduced the following bill; which was read twice and referred to the Committee on the Judiciary

JUNE 20, 2002

Reported by Mr. LEAHY, with an amendment and an amendment to the title

[Strike out all after the enacting clause and insert the part printed in italic]

---

# A BILL

To amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to permit States to determine State residency for higher education purposes and to authorize the cancellation of removal and adjustment of status of certain alien college-bound students who are long-term United States residents.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**~~SECTION 1. SHORT TITLE.~~**

~~This Act may be cited as the "Development, Relief, and Education for Alien Minors Act" or "DREAM Act".~~

**~~SEC. 2. RESTORATION OF STATE OPTION TO DETERMINE RESIDENCY FOR PURPOSES OF HIGHER EDUCATION BENEFITS.~~**

~~Section 505 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 110 Stat 3009–672; 8 U.S.C. 1623) is repealed.~~

**~~SEC. 3. CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS OF CERTAIN LONG-TERM RESIDENT STUDENTS.~~**

~~(a) SPECIAL RULE FOR CHILDREN IN QUALIFIED INSTITUTIONS OF HIGHER EDUCATION.—~~

~~(1) IN GENERAL.—Notwithstanding any other provision of law and subject to paragraph (2), the Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, subject to the conditional basis described in section 4, an alien who is inadmissible or deportable from the United States, if the alien demonstrates that—~~

~~(A) the alien has applied for relief under this subsection not later than two years after the date of enactment of this Act;~~

~~(B) the alien has not, at the time of application, attained the age of 21;~~

~~(C) the alien, at the time of application, is attending an institution of higher education in the United States (as defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001));~~

~~(D) the alien was physically present in the United States on the date of the enactment of this Act and has been physically present in the United States for a continuous period of not less than five years immediately preceding the date of enactment of this Act;~~

~~(E) the alien has been a person of good moral character during such period; and~~

~~(F) the alien is not inadmissible under section 212(a)(2) or 212(a)(3) or deportable under section 237(a)(2) or 237(a)(4).~~

~~(2) PROCEDURES.—The Attorney General shall provide a procedure by regulation allowing eligible individuals to apply affirmatively for the relief available under this paragraph without being placed in removal proceedings.~~

~~(b) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous resi-~~

dence or continuous physical presence in the United States of an alien who applies for cancellation of removal under this section shall not terminate when the alien is served a notice to appear under section 239(a) of the Immigration and Nationality Act.

(c) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsection (a) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

(d) STATUTORY CONSTRUCTION.—Nothing in this section may be construed to apply a numerical limitation on the number of aliens who may be eligible for cancellation of removal or adjustment of status under this section.

(e) REGULATIONS.—

(1) PROPOSED REGULATIONS.—Not later than 90 days after the date of the enactment of this Act, the Attorney General shall publish proposed regulations implementing this section.

(2) INTERIM, FINAL REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall publish final regulations implementing this section. Such regulations shall be effective immediately on an interim

~~basis, but are subject to change and revision after public notice and opportunity for a period for public comment.~~

**~~SEC. 4. CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN LONG-TERM RESIDENT STUDENTS.~~**

~~(a) IN GENERAL.—~~

~~(1) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of this Act, an alien whose status has been adjusted under section 3 to that of an alien lawfully admitted for permanent residence shall be considered, at the time of obtaining the adjustment of status, to have obtained such status on a conditional basis subject to the provisions of this section.~~

~~(2) NOTICE OF REQUIREMENTS.—~~

~~(A) AT TIME OF OBTAINING PERMANENT RESIDENCE.—At the time an alien obtains permanent resident status on a conditional basis under paragraph (1), the Attorney General shall provide for notice to such alien respecting the provisions of this section and the requirements of subsection (c)(1) to have the conditional basis of such status removed.~~

~~(B) AT TIME OF REQUIRED PETITION.—In addition, the Attorney General shall attempt to~~

provide notice to such an alien, at or about the date of the alien's graduation from an institution of higher education of the requirements of subsection (c)(1).

(C) EFFECT OF FAILURE TO PROVIDE NOTICE.—The failure of the Attorney General to provide a notice under this paragraph shall not affect the enforcement of the provisions of this section with respect to such an alien.

(b) TERMINATION OF STATUS IF FINDING THAT QUALIFYING EDUCATION IMPROPER.—

(1) IN GENERAL.—In the case of an alien with permanent resident status on a conditional basis under subsection (a), if the Attorney General determines that the alien is no longer a student in good standing at an accredited institution of higher education, the Attorney General shall so notify the alien and, subject to paragraph (2), shall terminate the permanent resident status of the alien as of the date of the determination.

(2) HEARING IN REMOVAL PROCEEDING.—Any alien whose permanent resident status is terminated under paragraph (1) may request a review of such determination in a proceeding to remove the alien. In such proceeding, the burden of proof shall be on

the alien to establish, by a preponderance of the evidence, that the condition described in paragraph (1) is not met.

(c) REQUIREMENTS OF TIMELY PETITION FOR REMOVAL OF CONDITION.—

(1) IN GENERAL.—In order for the conditional basis established under subsection (a) for an alien to be removed the alien must submit to the Attorney General, during the period described in subsection (d)(2), a petition which requests the removal of such conditional basis and which states, under penalty of perjury, the facts and information described in subsection (d)(1).

(2) TERMINATION OF PERMANENT RESIDENT STATUS FOR FAILURE TO FILE PETITION.—

(A) IN GENERAL.—In the case of an alien with permanent resident status on a conditional basis under subsection (a), if no petition is filed with respect to the alien in accordance with the provisions of paragraph (1), the Attorney General shall terminate the permanent resident status of the alien as of the 90th day after the graduation of the alien from an institution of higher education.

~~(B) HEARING IN REMOVAL PROCEEDING.—In any removal proceeding with respect to an alien whose permanent resident status is terminated under subparagraph (A), the burden of proof shall be on the alien to establish compliance with the condition of paragraph (1).~~

~~(3) DETERMINATION AFTER PETITION AND INTERVIEW.—~~

~~(A) IN GENERAL.—If a petition is filed in accordance with the provisions of paragraph (1), the Attorney General shall make a determination, within 90 days, as to whether the facts and information described in subsection (d)(1) and alleged in the petition are true with respect to the alien's education.~~

~~(B) REMOVAL OF CONDITIONAL BASIS IF FAVORABLE DETERMINATION.—If the Attorney General determines that such facts and information are true, the Attorney General shall so notify the alien and shall remove the conditional basis of the status of the alien effective as of the 90th day after the alien's graduation from an institution of higher education.~~

~~(C) TERMINATION IF ADVERSE DETERMINATION.—If the Attorney General determines~~

that such facts and information are not true, the Attorney General shall so notify the alien and, subject to subparagraph (D), shall terminate the permanent resident status of an alien as of the date of the determination.

(D) HEARING IN REMOVAL PROCEEDING.—Any alien whose permanent resident status is terminated under subparagraph (C) may request a review of such determination in a proceeding to remove the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that the facts and information described in subsection (d)(1) and alleged in the petition are not true with respect to the alien's education.

(d) DETAILS OF PETITION.—

(1) CONTENTS OF PETITION.—Each petition under subsection (c)(1)(A) shall contain the following facts and information:

(A) The alien graduated from an institution of higher education, as evidenced by an official report from the registrar—

(i) within six years, in the case of a four-year bachelor's degree program; or

~~(ii) within four years, in the case of the degree program of a two-year institution.~~

~~(B) The alien maintained good moral character.~~

~~(C) The alien has not been convicted of any offense described in section 237(a)(2) or 237(a)(4).~~

~~(D) The alien has maintained continuous physical residence in the United States.~~

~~(2) PERIOD FOR FILING PETITION.—The petition under subsection (c)(1)(A) must be filed during the 90-day period after the alien's graduation from a institution of higher education.~~

~~(e) TREATMENT OF PERIOD FOR PURPOSES OF NATURALIZATION.—For purposes of title III of the Immigration and Nationality Act, in the case of an alien who is in the United States as a lawful permanent resident on a conditional basis under this section, the alien shall be considered to have been admitted as an alien lawfully admitted for permanent residence and to be in the United States as an alien lawfully admitted to the United States for permanent residence.~~

~~(f) TREATMENT OF CERTAIN WAIVERS.—In the case of an alien who has permanent residence status on a con-~~

ditional basis under this section, if, in order to obtain such status, the alien obtained a waiver under subsection (h) or (i) of section 212 of the Immigration and Nationality Act of certain grounds of inadmissibility, such waiver terminates upon the termination of such permanent residence status under this section.

(g) INSTITUTION OF HIGHER EDUCATION DEFINED.—In this section, the term "institution of higher education" has the meaning given the term in section 101 of the Higher Education Act of 1965 (20 U.S.C.1001).

**SEC. 5. GAO REPORT.**

Six years after the date of enactment of this Act, the Comptroller General of the United States shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives setting forth—

(1) the number of aliens who were eligible for cancellation of removal and adjustment of status during the application period described in section 3(a)(1)(A);

(2) the number of aliens who applied for adjustment of status under section 3(a);

(3) the number of aliens who were granted adjustment of status under section 3(a); and

~~(4) the number of aliens with respect to whom the conditional basis of their status was removed under section 4.~~

***SECTION 1. SHORT TITLE.***

*This Act may be cited as the "Development, Relief, and Education for Alien Minors Act" or the "DREAM Act".*

***SEC. 2. RESTORATION OF STATE OPTION TO DETERMINE RESIDENCY FOR PURPOSES OF HIGHER EDUCATION BENEFITS.***

*Section 505 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Division C of Public Law 104–208; 110 Stat. 3009–672; 8 U.S.C. 1623) is repealed.*

***SEC. 3. CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS OF CERTAIN ALIEN HIGH SCHOOL GRADUATES WHO ARE LONG-TERM RESIDENTS OF THE UNITED STATES.***

*(a) SPECIAL RULE FOR CERTAIN ALIEN HIGH SCHOOL GRADUATES.—*

*(1) IN GENERAL.—Except as otherwise provided in paragraph (2), notwithstanding any other provision of law, the Attorney General may cancel the removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States, if the*

*alien applies for such cancellation and adjustment of status and demonstrates that—*

*(A) the alien has attained 12 years of age prior to the date of enactment of this Act;*

*(B) the alien has not, prior to the date of filing the application for cancellation of removal and adjustment of status under this subsection, attained the age of 21 years;*

*(C) the alien, prior to the date of filing an application for cancellation of removal and adjustment of status under this subsection, has received a certificate of graduation from a school providing secondary education or the recognized equivalent of such certificate;*

*(D) has maintained a continuous physical presence in the United States for a period of not less than 5 years immediately preceding the date of enactment of this Act;*

*(E) the alien is a person of good moral character; and*

*(F) is not inadmissible under section 212(a)(2) (8 U.S.C. 1182(a)(2)) or 212(a)(3) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(2) (8 U.S.C. 1227(a)(2)) or 237(a)(4) (8*

*U.S.C. 1227(a)(4)) of the Immigration and Nationality Act.*

*(2) EXCEPTIONS.—*

*(A) REHABILITATION AND HARDSHIP TO CERTAIN ALIENS.—Notwithstanding subparagraph (F) of paragraph (1), the Attorney General may cancel the removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien (other than an alien convicted of an aggravated felony, as defined in section 101(a)(43) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(43)) or an alien who is inadmissible under section 212(a)(3) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) (8 U.S.C. 1227(a)(4)) of such Act) who but for that subparagraph would qualify for cancellation of removal and adjustment of status under this section if the alien demonstrates rehabilitation and that the alien's removal will result in exceptional and extremely unusual hardship to the alien or a United States citizen or lawful permanent resident spouse, parent, or child.*

*(B) ALIENS QUALIFYING BEFORE THE DATE OF ENACTMENT.—Notwithstanding paragraph (1), the Attorney General may cancel the re-*

*moval of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien if—*

*(i) the alien would have met the requirements of paragraph (1) at any time during the 4-year period immediately preceding the date of enactment of this Act; and*

*(ii) the alien has graduated from, or is, on the date of filing an application for cancellation of removal under this subsection, enrolled in the United States in an institution of higher education, as defined by section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001).*

*(3) PROCEDURES.—*

*(A) IN GENERAL.—The Attorney General shall by regulation establish a procedure that permits aliens to apply for cancellation of removal and adjustment of status available under this subsection without being placed in removal proceedings, except that, in addition, such cancellation of removal and adjustment of status shall be available in removal proceedings. In the case of an alien in an exclusion or deportation*

*hearing, suspension of deportation on the same grounds as are provided under this subsection for cancellation of removal, together with adjustment of status, shall be available.*

*(B) TREATMENT PRIOR TO GRADUATION.—*

*(i) IN GENERAL.—Notwithstanding any other provision of law, an alien described in clause (ii) may not be removed so long as the alien continues to meet the criteria of that clause.*

*(ii) COVERED ALIENS.—An alien described in this clause is an alien who does not meet the requirements of paragraph (1)(C) but is otherwise able to demonstrate prima facie eligibility for cancellation of removal and adjustment of status under this section and has a reasonable opportunity of meeting all the requirements of cancellation of removal and adjustment of status under this section in the future.*

*(iii) WORK AUTHORIZATION.—The Attorney General shall grant an alien described in clause (ii) authorization to engage in employment in the United States.*

*(C) EXPEDITED PROCESSING OF APPLICATIONS; PROHIBITION ON FEES.—Regulations promulgated under this paragraph shall provide that applications for cancellation of removal and adjustment of status under this subsection will be considered on an expedited basis and without a requirement for the payment by the applicant of any additional fee for such expedited processing.*

*(4) CONFIDENTIALITY OF INFORMATION.—*

*(A) PROHIBITION.—Neither the Attorney General nor any other official or employee of the Department of Justice may—*

*(i) use the information furnished by the applicant pursuant to an application filed under this subsection for any purpose other than to make a determination on the application;*

*(ii) make any publication whereby the information furnished by any particular individual can be identified; or*

*(iii) permit anyone other than a sworn officer or employee of the Department of Justice or, with respect to an application filed under this subsection with a designated*

*entity, that designated entity, to examine applications filed under this subsection.*

*(B) PENALTY.—Whosoever knowingly uses, publishes, or permits information to be examined in violation of this subsection shall be fined not more than $10,000.*

*(b) TERMINATION OF PERIOD OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous physical presence in the United States of an alien who applies for cancellation of removal and adjustment of status under subsection (a) shall not terminate when the alien is served a notice to appear under section 239(a) of the Immigration and Nationality Act (8 U.S.C. 1229) or any other document notifying the alien of the initiation of immigration proceedings under that Act.*

*(c) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsection (a)(1)(D) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days, except that an alien may remain eligible for cancellation of removal and adjustment of status under this section notwithstanding a failure to maintain continuous physical presence in the United States if the alien demonstrates that failure is due to excep-*

*tional circumstances, as defined by section 240(e)(1) of the Immigration and Nationality Act (8 U.S.C. 1229a(e)(1)), or circumstances described in subparagraphs (A), (B), or (C) of section 244(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1254a(b)(1)).*

*(d) STATUTORY CONSTRUCTION.—Nothing in this section may be construed to apply a numerical limitation on the number of aliens who may be eligible for cancellation of removal under section 240A of the Immigration and Nationality Act (8 U.S.C. 1229b).*

*(e) REGULATIONS.—Not later than 180 days after the date of enactment of this Act, the Attorney General shall publish regulations implementing this section. Such regulations shall be effective immediately on an interim, final basis, but are subject to change and revision after public notice and opportunity for a period for public comment.*

***SEC. 4. ANNUAL REPORT.***

*Not later than one year after the date of enactment of this Act, and annually thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives and to the Secretary of Education setting forth—*

*(1) the number of aliens who applied for cancellation of removal and adjustment of status under section 3;*

*(2) the number of aliens who were granted cancellation of removal and adjustment of status under section 3;*

*(3) the number of aliens who applied for cancellation of removal and adjustment of status under section 3 but whose applications were denied and the basis for the denial of each application; and*

*(4) the number of pending applications for cancellation of removal and adjustment of status under section 3.*

Amend the title to read as follows: ''A bill to amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to permit States to determine State residency for higher education purposes and to authorize the cancellation of removal and adjustment of status of certain alien high school graduates who are long-term United States residents.''.

AR2022_400317

**Calendar No. 425**

107TH CONGRESS
2D SESSION

# S. 1291

## A BILL

To amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to permit States to determine State residency for higher education purposes and to authorize the cancellation of removal and adjustment of status of certain alien college-bound students who are long-term United States residents.

JUNE 20, 2002

Reported with an amendment and an amendment to the title

This report was prepared by SEARCH, The National Consortium for Justice Information and Statistics using federal funding provided by the Bureau of Justice Statistics.

Document Title: Survey of State Criminal History Information Systems, 2018

Authors: Becki R. Goggins, SEARCH
Dennis A. DeBacco, SEARCH

Document No.: 255651

Publication Date: November 5, 2020

Award No.: This project was supported by award numbers 2015-RU-BX-K001 and 2019-RU-BX-K001

Abstract:
This report presents a snapshot of criminal-history record systems and how cases were tracked through to disposition across the United States and its territories as of year-end 2018. From May 2019 to July 2019, SEARCH surveyed the administrators of criminal-history record repositories in the 50 states, the District of Columbia, American Samoa, Guam, Puerto Rico, the Northern Mariana Islands, and the U.S. Virgin Islands. This marks the fifteenth Survey of State Criminal History Information Systems that SEARCH has conducted since 1989. Caution should be used when comparing trends between surveys because shifts in a jurisdiction's fiscal priorities or technological capabilities over time may skew the status of its criminal-history records.

**Disclaimer**
The Bureau of Justice Statistics funded this third-party report. It is not a BJS report and does not release official government statistics. The report is released to help inform interested parties of the research or analysis contained within and to encourage discussion. BJS has performed a limited review of the report to ensure the general accuracy of information and adherence to confidentiality and disclosure standards. Any statistics included in this report are not official BJS statistics unless they have been previously published in a BJS report. Any analysis, conclusions, or opinions expressed herein are those of the authors and do not necessarily represent the views, opinions, or policies of the Bureau of Justice Statistics or the U.S. Department of Justice.

**U.S. Department of Justice**
Office of Justice Programs

## Bureau of Justice Statistics

# Survey of State Criminal History Information Systems, 2018

## Criminal Justice Information Policy

U.S. Department of Justice
Office of Justice Programs
810 Seventh Street, N.W.
Washington, D.C. 20531

William P. Barr
Attorney General

---

**Office of Justice Programs**

Katie Sullivan
Principal Deputy Assistant Attorney General

World Wide Web site:
http://www.ojp.usdoj.gov

---

**Bureau of Justice Statistics**

Jeffrey H. Anderson
Director
World Wide Web site:
http://www.ojp.usdoj.gov/bjs

---

For information, contact
**National Criminal Justice Reference Service**
1-800-851-3420

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

# Survey of State Criminal History Information Systems, 2018

**A Criminal Justice Information Policy Report**

**November 2020**

## Criminal Justice Information Policy

**U.S. Department of Justice**
Bureau of Justice Statistics

Jeffrey H. Anderson
Director

**Acknowledgments.** This report was prepared by SEARCH, The National Consortium for Justice Information and Statistics, Leslie Moore, Chair, and David J. Roberts, Executive Director. The project director was Becki R. Goggins, Director, Law and Policy. Ms. Goggins and Dennis A. DeBacco, Justice Information Services Specialist, Law and Policy, authored the report. Mr. DeBacco conducted the survey and compiled the results. Support was provided by Twyla R. Putt, Corporate Communications Specialist, and Christine E. Lee, Webmaster. This project was supported by Cooperative Agreement No. 2015-RU-BX-K001 awarded by the Bureau of Justice Statistics (BJS), Office of Justice Programs (OJP), U.S. Department of Justice (USDOJ) to SEARCH, The National Consortium for Justice Information and Statistics, 1900 Point West Way, Suite 161, Sacramento, California 95815. The Federal project monitor was Devon B. Adams, Chief, Criminal Justice Data Improvement Program, USDOJ/BJS. Points of view in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice.

# Contents

**List of data tables iv**

**Glossary of terms vi**

**Maps x**
- Compact States and Territories x
- Interstate Identification Index (III) – National Fingerprint File (NFF) xi

**Note to readers 1**

**Survey revisions 1**

**Introduction 2**

**Major findings 2**
- Criminal history files 2
- Level of disposition reporting 2

**Detailed findings 3**
- Status of state criminal history files 3
- Protection order information 4
- Warrants and wanted persons 4
- Flagging of records 5
- Accessibility of records and services through state repositories 6
- Record retention periods 6
- Dispositions 6
- State criminal history repository practices, technology refreshment, and equipment purchasing 9
- Noncriminal justice background checks 13
- Rap back 15

**Data tables 17**

**Survey instrument: *Survey of State Criminal History Information Systems, 2018***

# List of data tables

Table 1.      Overview of state criminal history record systems, December 31, 2018

Table 1a.     Overview of state criminal history record system functions, 2018

Table 2.      Number of subjects (individual offenders) in state criminal history file, 2014, 2016, and 2018

Table 3.      State protection order information and record counts, 2018

Table 3a.     Entry of state protection order information into FBI-NCIC and record counts, 2018

Table 4.      Warrant information and entering agencies, 2018

Table 4a.     Warrant record counts and state severity breakdowns, 2018

Table 4b.     Timeliness of warrant entry, 2018

Table 5.      Flagging of records, 2018

Table 5a.     Access to records, 2018

Table 5b.     Arrest record retention periods, 2018

Table 5c.     Court disposition record retention periods, 2018

Table 6.      Number of final dispositions reported to state criminal history repository, 2012, 2014, 2016, and 2018

Table 6a.     Disposition reporting to the Federal Bureau of Investigation (FBI), 2018

Table 6b.     Interim disposition reporting and posting of indictment information, 2018

Table 6c.     Disposition reporting by local prosecutors, 2018

Table 6d.     Matching of dispositions between prosecutors and the repository, 2018

Table 7.      Receipt of court disposition information by automated means and record matching, 2018

Table 7a.     Matching of dispositions received to specific arrest events, 2018

Table 7b.     Timeliness of receipt and entry of final felony court case disposition information, 2018

Table 8.      Arrest fingerprint cards processed, 2012, 2014, 2016 and 2018

Table 8a.     Arrest/fingerprint reporting, 2018

Table 9.      Citation file record counts; cite and release practices, 2018

Table 9a.     Fingerprinting of individuals who have been issued citations in lieu of arrest, 2018

Table 10.     Electronic fingerprint capture devices and the submission and rejection of arrest fingerprints, 2018

Table 10a.    Arrest fingerprint card backlog, 2018

Table 10b.    Electronic fingerprint capture devices and the use of livescan/cardscan for criminal and noncriminal justice purposes, 2018

Table 10c.    Electronic fingerprint capture devices and the submission of fingerprints for noncriminal justice purposes, 2018

Table 10d.    Mobile technology for capturing and transmitting fingerprints, 2018

Table 11.     Privatization of noncriminal justice fingerprint capture services, 2018

Table 12.     Felony arrests reported to repositories, livescan devices in courtrooms, and disposition backlogs, 2018

Table 13.     Date of last system replacement/significant upgrade, state fiscal yearend-date, and current repository budget, 2018

Table 13a.    State plans to replace CCH-related systems that are at or nearing the end of their respective lifespans, 2018

Table 13b.    Number of full- and part-time repository and contractual staff, and type of work contractors perform, 2018

Table 13c.    Repository conduct of routine internal and external data quality audits and frequency of audits, 2018

Table 13d.    Noncriminal justice name-based background checks, 2018

Table 14.     Noncriminal justice fingerprint-based background checks, 2018

Table 15.     Noncriminal justice background checks performed against national and state databases, 2018

Table 16.     Lights-out fingerprint processing, 2018

Table 17.     Noncriminal justice background check fees and fee allocation, 2018

Table 18.     Web-based services for noncriminal justice purposes, 2018

Table 19.   Criminal history records of Interstate
            Identification Index (III) participants
            maintained by state criminal history
            repositories and the Federal Bureau of
            Investigation (FBI), 2018

Table 20.   In-state criminal justice rap back services,
            2018

Table 21.   In-state noncriminal justice rap back services,
            2018

Table 21a.  In-state rap back services, continued, 2018

# Glossary of terms

***Automated fingerprint identification system (AFIS):*** An automated system for searching fingerprint files and transmitting fingerprint images. AFIS computer equipment can scan fingerprint impressions (or use electronically transmitted fingerprint images) and automatically extract and digitize ridge details and other identifying characteristics in sufficient detail to enable the computer's searching and matching components to distinguish a single fingerprint from thousands or even millions of fingerprints previously scanned and stored in digital form in the computer's memory. The process eliminates the manual searching of fingerprint files and increases the speed and accuracy of ten-print processing (arrest fingerprint cards and noncriminal justice applicant fingerprint cards).

AFIS equipment also can be used to identify individuals from "latent" (crime scene) fingerprints, even fragmentary prints of single fingers in some cases.

***Criminal history record information (CHRI) or criminal history record information system:*** A record (or the system maintaining such records) that includes individual identifiers and describes an individual's arrests and subsequent dispositions. Criminal history records do not include intelligence or investigative data or sociological data such as drug use history.

CHRI systems usually include information on juveniles if they are tried as adults in criminal courts. Most, however, do not include data describing involvement of an individual in the juvenile justice system. Data in CHRI systems are usually backed by fingerprints of the record subjects to provide positive identification. State legislation and practices vary widely concerning disclosure of juvenile record information and access to criminal history records for noncriminal justice purposes.

***Data quality:*** The extent to which criminal history records are complete, accurate, and timely. In addition, accessibility sometimes is considered a data quality factor. The key concern in data quality is the completeness of records and the extent to which records include dispositions, as well as arrest and charge information. Other concerns include the timeliness of data reporting to state and Federal repositories, the timeliness of data entry by the repositories, the readability of criminal history records, and the ability to have access to the records when necessary.

***Interstate Identification Index (III):*** A fingerprint-supported "index-pointer" system for the interstate exchange of criminal history records. Under III, the Federal Bureau of Investigation (FBI) maintains an identification index to persons arrested for felony and reportable misdemeanor offenses under state or Federal law. The index includes identification information (such as name, date of birth, race, and sex), Universal Control Numbers (UCN), and State Identification Numbers (SID) from each state that holds information about an individual.

Search inquiries from criminal justice agencies nationwide are transmitted automatically via state telecommunications networks and the FBI's National Crime Information Center (NCIC) telecommunications lines. Searches are made on the basis of name and other identifiers. The process is entirely automated. If a hit is made against the Index, record requests are made using the SID or UCN, and data are automatically retrieved from each repository holding records on the individual and forwarded

to the requesting agency. Currently, all 50 states and the District of Columbia participate in III. Responses are provided from FBI files when a jurisdiction, such as a U.S. territory, is not a participant in III. The III system may also be employed when responding to fingerprint-based noncriminal justice purpose record background checks.

Participation in III requires that a state maintain an automated criminal history record system capable of interfacing with the III system and also capable of responding automatically to all interstate and Federal/state record requests.

***Juvenile justice records:*** Official records of juvenile justice adjudications. Most adult criminal history record systems do not accept such records, which are frequently not supported by fingerprints and which usually are confidential under state law. The FBI accepts and disseminates juvenile records. States, however, are not required to submit such records to the FBI and may be legislatively prohibited from doing so.

***Lights-out processing:*** "Lights-out" criminal record processing occurs when fingerprint data submitted to a criminal record repository by a local justice jurisdiction for the purpose of determining an individual's identity, and frequently associated criminal history record information, is processed electronically and a response is returned electronically to the submitting jurisdiction, all without human intervention.

***Livescan:*** The term "livescan" refers to both the technique and technology used to electronically capture fingerprint and palm print images without the need for the more traditional ink-and-paper methods. Livescan devices also allow the electronic transfer of

digitized images and accompanying textual information to a criminal history repository.

***National Crime Information Center (NCIC):*** A computerized information system available to law enforcement and criminal justice agencies maintained by the FBI. The system includes records for wanted persons, missing persons, other persons who pose a threat to officer and public safety, and various property files. The III is accessible through the NCIC system. The NCIC operates under a shared-management concept between the FBI and local, state, tribal, and Federal criminal justice agencies. The FBI maintains the host computer and provides a telecommunications network to the Criminal Justice Information Services Systems Agency (CSA) in each of the 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, and Canada, as well as Federal criminal justice agencies. A CSA is a criminal justice agency that has overall responsibility for the administration and usage of NCIC within a district, state, territory, or Federal agency. NCIC data may be provided only for criminal justice and other specifically authorized purposes.

***National Crime Prevention and Privacy Compact:*** An interstate and Federal/state compact that establishes formal procedures and governance structures for the use of the III. It is designed to facilitate the exchange of criminal history data among states for noncriminal justice purposes and to eliminate the need for the FBI to maintain duplicate data about state offenders. Under the Compact, the operation of this system is overseen by a policymaking council comprised of state and Federal officials.

The key concept underlying the Compact is agreement among all signatory states that all criminal history information (except sealed records) will be provided in response to noncriminal justice requests from another state—regardless of whether the information

being requested would be permitted to be disseminated for a similar noncriminal justice purpose within the state holding the data. (That is, the law of the state that is *inquiring* about the data—rather than the law of the state that *originated* the data—governs its use.) In some cases, ratification of the Compact will have the effect of amending existing state legislation governing interstate record dissemination, since most states do not currently authorize dissemination to all the Federal agencies and out-of-state users authorized under the Compact. Noncriminal justice inquiries sent to the FBI are handled by a combination of information retrieval by the FBI from its files of voluntarily contributed state arrest and disposition records and by accessing state-held information. This requires that the FBI maintain duplicates of state records (see National Fingerprint File discussion for exception) and generally results in less complete records being provided, since FBI files of state records are not always as complete due to reporting deficiencies.

The Compact was passed by Congress and signed into law by President Clinton in October 1998. The Compact became effective in April 1999, following ratification by two state legislatures: Montana on April 8, 1999, and Georgia on April 28, 1999. As of July 2019, 32 additional states and the Federal Government have ratified the Compact: Nevada (May 1999); Florida (June 1999); Colorado (March 2000); Iowa (April 2000); Connecticut (June 2000); South Carolina (June 2000); Arkansas (February 2001); Kansas (April 2001); Alaska (May 2001); Oklahoma (May 2001); Maine (June 2001); New Jersey (January 2002); Minnesota (March 2002); Arizona (April 2002); Tennessee (May 2003); North Carolina (June 2003); New Hampshire (June 2003); Missouri (July 2003); Ohio (January 2004);

Wyoming (February 2005); Idaho (March 2005); Maryland (May 2005); Oregon (July 2005); West Virginia (March 2006); Hawaii (May 2006); Michigan (January 2009); Vermont (July 2010); New York (March 2016); Virginia (July 2017); Utah (May 2018); Louisiana (August 2018); and Delaware (July 2019).

Ten other states and territories have signed a Memorandum of Understanding (MOU) with the Compact Council indicating the state's support of the Compact and the Council. An MOU signatory state agrees to voluntarily abide by the Compact and the Council's rules, procedures, and policies regarding the noncriminal justice use of the III without actually ratifying the Compact. These MOU states and territories include American Samoa, Guam, Illinois, Kentucky, Mississippi, Nebraska, New Mexico, North Dakota, Puerto Rico, and South Dakota.

***National Fingerprint File (NFF):*** A database of fingerprints, or other uniquely personal identifying information, relating to an arrested or charged individual maintained by the FBI to provide positive identification of record subjects indexed in the III system. The NFF contains fingerprints of Federal offenders and at least one set of fingerprints on state offenders from each state in which an offender has been arrested for a felony or reportable misdemeanor offense. Disposition data on the individual is also retained at the state repository and not forwarded to the FBI. Upon receipt of the first-arrest fingerprint card (or electronic images), the FBI enters the individual's fingerprint information, name and identifiers in the III, together with a UCN and a SID for each state maintaining a record on the individual. Disposition information on state offenders are maintained only at the state level, and state repositories are required to electronically respond to all authorized record requests concerning these individuals for both criminal justice and noncriminal justice purposes. States

are required to release all data on record subjects for noncriminal justice inquiries, regardless of whether the data could legally be released for similar purposes within the state. As of March 2016, the NFF has been implemented in 20 states: Colorado, Florida, Georgia, Hawaii, Idaho, Iowa, Kansas, Maryland, Minnesota, Missouri, Montana, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Tennessee, West Virginia, and Wyoming.

***Next Generation Identification (NGI):*** The NGI system, developed over multiple years, replaced the FBI's Integrated Automated Fingerprint Identification System (IAFIS) and provides new functionality and enhanced capabilities. This technological upgrade accommodates increased information processing and sharing demands from local, state, tribal, Federal, and international agencies. The NGI system offers state-of-the-art biometric identification services and compiles core capabilities that serve as the platform for multimodal functionality.

***Positive Identification:*** Identifying an individual using biometric characteristics that are unique and not subject to alteration. In present usage, the term refers to identification by fingerprints, but may also include identification by iris images, voiceprints, or other techniques. Positive identification is distinguished from identification using name, sex, date of birth, or other personal identifiers as shown on a document that could be subject to alteration or counterfeit, such as a birth certificate, Social Security card, or driver's license. Because individuals can have identical or similar names, ages, etc., identifications based on such characteristics are not reliable.

***Rap back:*** A "rap back" or "hit notice" program will inform an employer or other designated entity when an individual who has undergone a fingerprint-based background check—and whose fingerprints are retained by a criminal history repository after the check—is subsequently arrested. His or her fingerprints, obtained after the arrest, are matched against a database that contains the fingerprints that were initially submitted. The employer or designated entity is then notified of the individual's arrest. There is a fee for the service in some states; other states provide the service free. Some states also provide "rap back" services for notifications within the criminal justice system. For example, this might involve a notification to a parole or probation officer of the arrest of a person under supervision.

***Rapid Identification (ID):*** Rapid ID devices are mobile fingerprint scanners that allow police officers, court personnel, and other criminal justice officials to positively identify subjects by scanning the subject's fingerprint and searching it against a state and/or Federal database for a positive match.

***State central repository:*** The database (or the agency housing the database) that maintains criminal history records on all state offenders. Records include fingerprint files and files containing identification segments and notations of arrests and dispositions. The central repository is generally responsible for state-level identification of arrestees. The repository agency often is the Criminal Justice Information Services Systems Agency (CSA) for contact with FBI record systems. Non-fingerprint-based inquiries from local agencies for a national records check are routed to the FBI via the central repository. Although usually housed in the Department of Public Safety, the central repository is maintained in some states by the State Police, Attorney General, or other state agency.

# Maps

Compact States and Territories
as of July 2019
AK
WA
OR
CA
NV
ID
MT
WY
UT
CO
AZ
NM
ND
SD
NE
KS
OK
TX
MN
IA
MO
AR
LA
WI
IL
MI
IN
OH
KY
TN
MS
AL
GA
FL
SC
NC
VA
WV
PA
NY
VT
NH
ME
MA
RI
CT
NJ
DE
MD
DC
HI
MK
GM
AM
PR
VI
Compact States (34)
MOU Signatory States/Territories (10)
No Known Current Action (12)
States Pending Legislation (0)



Interstate Identification Index (III)
National Fingerprint File (NFF)
Revised March 31, 2016
AK
WA
OR
ID
MT
WY
ND
SD
NB
MN
IA
WI
MI
NY
VT
NH
ME
MA
RI
CT
NJ
DE
MD
DC
PA
OH
IN
IL
WV
VA
KY
MO
KS
CO
UT
NV
CA
AZ
NM
OK
TX
AR
TN
NC
SC
GA
AL
MS
LA
FL
MK
HI
GM
AM
PR
VI
III Participation Only - 31
III Non-Participants - 5
III/NFF Participation- 20

This page left intentionally blank.

## Note to readers

This is the fifteenth survey of criminal history information systems conducted by SEARCH, The National Consortium for Justice Information and Statistics, since 1989. Some of the tables include data from previous surveys. Use caution in drawing comparisons between the results of earlier surveys and the data reported here. Over the course of the survey years, the U.S. Department of Justice, Bureau of Justice Statistics (BJS), has continued to administer assistance programs dedicated to improving criminal history records. As a result, some states focused new or additional resources on the condition of their records and, in many cases, know more about their records today than in the past. Similarly, expansion, advancement, and adoption of technology have also made a beneficial impact. Some state repositories, however, have suffered fiscal cutbacks and consequently have had to shift priorities away from certain criminal history information management tasks. For these and other reasons, trend comparisons may not as accurately reflect the status of each state's criminal history records as the current data considered alone.

## Survey revisions

Given dramatic advances in information technology, legislative and social trends that increase demand for criminal history record access, and the need for criminal record managers to respond to these developments, BJS and SEARCH conducted an in-depth review of the previous survey questions and developed a revised survey instrument for 2018.

SEARCH updated formats for easier response and collection of data and also added new questions to collect information on new and emerging information sharing practices. Many of these changes were suggested by users and respondents during the review process. Comments and suggestions focused on:

- business process time measurements on arrest and supporting fingerprint records, protection orders, wanted persons, and disposition information that is received and processed by state repositories
- flagging misdemeanor domestic violence convictions, active protection orders, and warrants within established criminal history records
- technology refreshment of computerized criminal history, automated fingerprint identification, and message switch systems
- "cite and release" in lieu of a formal jail booking, the prevalence of citation files, and record counts
- repository staffing and funding levels, data quality audits, and record retention periods.

SEARCH continues to use an online database system to collect more complete and comprehensive survey data. Features include online, password-protected reporting forms that allow respondents to complete and submit individual sections of the survey, as well as to examine/update previously submitted portions.

The *Survey of State Criminal History Information Systems, 2018* consists of 45 data tables of information and reflects the evolving criminal record management environment.

## Introduction

This report is based upon the results from a survey conducted of the administrators of the state criminal history record repositories in May–July 2019. SEARCH surveyed 56 jurisdictions, including the 50 states, the District of Columbia, American Samoa, the Territory of Guam, the Commonwealth of Puerto Rico, the Northern Mariana Islands, and the U.S. Virgin Islands.[1] All 50 states, the District of Columbia and Guam submitted survey responses. This report presents a snapshot as of December 31, 2018.

Throughout this report, the 50 states are referred to as "states"; the District of Columbia, American Samoa, Guam, Puerto Rico, the Northern Mariana Islands, and the Virgin Islands are referred to as "territories," and "Nation" refers collectively to both states and territories.

In addition, the Federal Bureau of Investigation (FBI) was the source for some of the information relating to criminal history records, including state participation in the Interstate Identification Index (III) system (the national criminal records exchange system) and the number of III records maintained by the FBI on behalf of the states; the number of records in the wanted persons file; and the protection order file of the FBI's National Crime Information Center (NCIC) database.

[1] Hereafter, these territories are referred to as the District of Columbia, American Samoa, Guam, Puerto Rico, the Northern Mariana Islands, and the Virgin Islands.

## Major findings

### Criminal history files

*Overview of state criminal history record systems, December 31, 2018 (table 1):*

- Forty-nine states, the District of Columbia, and Guam report the total number of persons in their criminal history files as 112,450,300, of which over 97 percent are automated records. (Readers should note that an individual offender may have records in more than one state and that records of deceased persons may be included in the counts provided by states. This means the number of living persons in the United States with criminal history records is less than the total number of subjects in state criminal history files.)
- Twenty-eight states, the District of Columbia, and Guam have fully automated criminal history files.

### Level of disposition reporting

When calculating the percentage of arrests with final dispositions recorded, some states consider an arrest to have a disposition if **any** final disposition can be associated with an arrest cycle. This is commonly referred to as "cycle matching." Other states do not consider an arrest to have a final disposition until **all** arrest charges are linked to a final disposition. This is commonly referred to as "charge matching."

For the first time in 2018, SEARCH asked states if they match dispositions based on arrest cycles or individual charges. Twenty-eight states, the District of Columbia, and Guam responded that they use cycle matching when calculating disposition percentages and 22 states responded that they use charge matching.

*Overview of state criminal history record systems, December 31, 2018 (table 1):*

- In 49 states and the District of Columbia, an average of 68% of all arrests in state databases have final case dispositions reported.
- In 48 states and the District of Columbia, an average of 64% of arrests in state databases within the past 5 years have final case dispositions reported.
- In 43 states, the District of Columbia and Guam, an average of 71% of felony arrests in state databases have final case dispositions reported.
- Twenty-one states report that 80% or more of all arrests within the criminal history database have final dispositions recorded.
- Fourteen states and the District of Columbia report that 80% or more arrests within the past 5 years in the criminal history database have final dispositions recorded.
- Twenty-two states and Guam report that 80% or more of all felony arrests within the criminal history database have final dispositions recorded.

*Overview of state criminal history record system functions, 2018 (table 1a):*

- Forty-nine states, the District of Columbia, and Guam processed 25,797,200 fingerprint records in 2018; of these, 10,500,600 were used for criminal justice purposes and 15,296,600 were used and submitted for noncriminal justice licensing, employment, and regulatory purposes.
- In eight states, the District of Columbia, and Guam, fingerprints processed for criminal justice purposes account for 60% or more of the state's total number of fingerprints processed.
- Forty states, the District of Columbia, and Guam retain all fingerprints processed for criminal justice purposes.
- Ten states and Guam do not retain any fingerprints processed as part of conducting noncriminal justice background checks.

## Detailed findings

### Status of state criminal history files

*Number of subjects (individual offenders) in state criminal history file, 2014, 2016, and 2018 (table 2):*

- Ninety-seven percent of the approximately 110 million criminal history records maintained by the state criminal history repositories are automated.
- Nine states (Alaska, California, Connecticut, Massachusetts, Michigan, Minnesota, New York, Rhode Island, South Dakota) and Guam report an overall decrease in the total number of subjects in manual and automated files between 2016 and 2018.
- Three states (New Hampshire, New Jersey, and Pennsylvania) report an overall increase of at least 10% in the total number of subjects in manual and automated files between 2016 and 2018.
- Forty states report an overall increase in the total number of subjects in manual and automated

files between 2016 and 2018.

*Criminal history records of Interstate Identification Index (III) participants maintained by state criminal history repositories and the Federal Bureau of Investigation (FBI), 2018 (table 19):*

- Nationwide, nearly 96.6 million criminal history records are accessible through the III. The states maintain 72% of all III records and the FBI maintains 28%.

**Protection order information**

*State protection order information and record counts, 2018 (table 3),*

*Entry of state protection order information into FBI-NCIC and record counts, 2018 (table 3a):*

- Forty states and the District of Columbia maintain a statewide protection order file; collectively, these files contain a total of over 2.2 million records.

- Agencies responsible for entering protection orders into the state file:
  - — law enforcement only (15 states)
  - — courts only (12 states and the District of Columbia)
  - — law enforcement and courts (9 states)
  - — law enforcement and prosecutors (1 state, Alabama)
  - — Other (2 states: Nevada and Rhode Island)

- Elapsed time between the issuance of a protection order and entry of its information into the state file:
  - — 1 day or less (29 states)
  - — 2–7 days (9 states and the District of Columbia)
  - — 8–30 days (Ohio)

- All states, the District of Columbia, Guam, and the Virgin Islands enter protection order records into NCIC, totaling over 1.8 million records

- Agencies responsible for entering protection orders into NCIC:
  - — law enforcement only (28 states)
  - — courts only (9 states, the District of Columbia, and Guam)
  - — law enforcement and courts (8 states)
  - — law enforcement and prosecutors (1 state, Alabama)
  - — Other (3 states: Hawaii, Massachusetts, and Rhode Island)

- Elapsed time between the issuance of a protection order and entry of its information into the NCIC Protection Order File:
  - — 1 day or less (26 states)
  - — 2–7 days (20 states, the District of Columbia, and Guam)
  - — 8–30 days (Ohio)

- In 10 states and Guam without protection order files, all indicate that law enforcement agencies and/or courts enter protection orders directly to NCIC.

**Warrants and wanted persons**

*Warrant information and entering agencies, 2018 (table 4),*

*Warrant record counts and severity breakdowns, 2018 (table 4a),*

*Timeliness of warrant entry, 2018 (table 4b):*

- Forty states, the District of Columbia, and Guam, maintain warrant files, which total over 6.6 million records. Of these, over 945,000 represent felony-level warrants and over 3.4 million represent misdemeanor-level warrants.

- Agencies responsible for entering warrants into the state file:
  - — law enforcement only (26 states)
  - — courts only (4 states, the District of Columbia, and Guam)
  - — law enforcement and courts (10 states)

- Elapsed time between the issuance of a warrant and entry of its information into the state file:
  - — 1 day or less (15 states)
  - — 2–7 days (23 states, the District of Columbia, and Guam)
  - — 8–30 days (2 states: Alabama and Ohio)
  - — Not reported or does not maintain a state warrant file (14 states)

- All states, American Samoa, the District of Columbia, Guam, Puerto Rico, and the Virgin Islands enter warrant records into NCIC, totaling over 2.4 million records as of December 2018.

- Agencies responsible for entering warrants into NCIC:
  - — law enforcement only (42 states)
  - — courts only (the District of Columbia, and Guam)
  - — law enforcement and courts (8 states)
  - — Not reported (4 jurisdictions: American Samoa, the Northern Mariana Islands, Puerto Rico and the Virgin Islands)

- Elapsed time between the issuance of a warrant and entry of its information into NCIC:
  - — 1 day or less (15 states)
  - — 2–7 days (23 states, the District of Columbia, and Guam)
  - — 8–30 days (3 states: Hawaii, Nebraska, and Ohio)
  - — 30 days or more (2 states: Massachusetts and North Dakota)
  - — Not reported (11 states)

- In states without warrant files, 10 states report that law enforcement enter warrants directly to NCIC.

**Flagging of records**

*Flagging of records, 2018 (table 5):*

- Forty-one states have felony flagging capabilities to quickly determine whether a given subject has a felony conviction.

- Thirty states have felony flagging capabilities for all subjects with felony convictions.

- Eleven states have felony flagging capabilities for some subjects with felony convictions.

- Nine states, the District of Columbia, and Guam do not have felony flagging capabilities for criminal history record subjects.

- States employ flagging to indicate:

- a sex offender registrant (37 states and Guam)
- a violent offender (12 states and Guam)
- a misdemeanor crime of domestic violence conviction (19 states) that would exclude someone from purchasing a firearm.
- an active state/NCIC protection order on file (5 states and Guam)
- an active state/NCIC warrant on file (4 states: Ohio, Pennsylvania, Texas, and Washington)
- a mental health adjudication (5 states: Arizona, California, Hawaii, Illinois, and New Jersey)
- DNA availability (33 states)
- a person ineligible for firearms purchases under Federal law (18 states)
- a person ineligible for firearms purchases under state law (16 states)

**Accessibility of records and services through state repositories**

*Access to records, 2018 (table 5a):*

- State repositories offer access to:
  - a sex offender registry (45 states and Guam)
  - orders of protection (36 states and Guam)
  - Wanted persons and warrant information (33 states and Guam)
  - retained applicant prints (19 states)
  - firearm registration information (7 states)
  - domestic violence incident reports (4 states: Delaware, Kentucky, New York, and Ohio)

**Record retention periods**

*Arrest record retention periods, 2018 (table 5b),*

*Court disposition record retention periods, 2018 (table 5c):*

- Twenty-four states, the District of Columbia, and Guam report having a law or administrative regulation that specifies retention periods for felony arrest records.
- Twenty-three states, the District of Columbia, and Guam report having a law or administrative regulation that specifies retention periods for misdemeanor arrest records.
- Twenty states, the District of Columbia, and Guam report having a law or administrative regulation that specifies retention periods for both felony and misdemeanor court disposition records.

**Dispositions**

*Number of final dispositions reported to state criminal history repository, 2012, 2014, 2016, and 2018 (table 6):*

- Forty-nine states, the District of Columbia, and Guam provided data on the number of final dispositions reported to their criminal history repositories. Respondents indicated that over 15 million final dispositions were reported in 2018—a 9% increase from that reported in 2016.

*Disposition reporting to the Federal Bureau of Investigation (FBI), 2018 (table 6a):*

- In accordance with acceptable National Fingerprint File (NFF) practices, 15 of the 20 NFF-participating states have elected not to send disposition information to the FBI on second and subsequent arrests.

- Thirty states and Guam sent over 5.1 million final case dispositions to the FBI.

- Six states sent 95% or more final case dispositions to the FBI via machine-readable data (MRD).

- Virginia and West Virginia sent 100% of their final case dispositions to the FBI via hard copy or paper.

- Fourteen states sent 98% or more of their final case dispositions to the FBI via III message key.

- Eight states and Guam forwarded a percentage of their dispositions to the FBI via a secure web portal that was first made available to states in 2016.

*Interim disposition reporting and posting of indictment information, 2018 (table 6b):*

- Twenty-eight states collect charge-tracking information (interim dispositions) to show case status through the criminal justice process.

- Sixteen states and Guam post indictment information to the criminal history record.

*Disposition reporting by local prosecutors, 2018 (table 6c):*

- Thirty-four states receive final court dispositions from local prosecutors.

- Eight states receive dispositions from local prosecutors via automated means through a centralized (statewide) prosecutors' case management system (CMS).

- Seven states receive dispositions from local prosecutors via a local prosecutors' CMS.

- Nineteen states receive dispositions from local prosecutors in paper form.

- Eleven states receive dispositions from local

prosecutors via a mix of automated and paper-based processes.

*Matching of dispositions between prosecutors and the repository, 2018 (table 6d):*

- Repositories in 15 states, the District of Columbia, and Guam do not receive automated dispositions from local prosecutors.

- Twenty states match dispositions received from prosecutors through a Process Control Number (PCN) or a Transaction Control Number (TCN) that was assigned when fingerprints were taken at the time of arrest/booking.

- Six states match dispositions received from prosecutors through a PCN or a TCN that was assigned subsequent to arrest/booking.

- Fourteen states match dispositions received from prosecutors through a comparison of the State Identification Number (SID) and 14 states match dispositions by the Arrest Number.

- Twenty-four states match dispositions received from

prosecutors by the subject's name and date of birth, and 16 states match dispositions by charge.

*Receipt of court disposition information by automated means and record matching, 2018 (table 7):*

- Forty-two state repositories and the District of Columbia receive court disposition data by automated means.
- Repositories in six states and Guam do not receive automated dispositions from the courts.
- Twenty-seven states and the District of Columbia report that 90% or more of all court dispositions are reported to repositories by automated means.
- Twenty-eight states match dispositions received from courts through the assignment of a PCN or a TCN that was assigned when fingerprints were taken at the time of arrest/booking.
- Ten states match dispositions received from courts through the assignment of a PCN or a TCN that was assigned subsequent to arrest/booking.
- Twenty-six states and the District of Columbia match dispositions received from courts through a comparison of the SID, and 20 states and the District of Columbia match dispositions by the Arrest Number.
- Thirty-one states match dispositions received from courts by the subject's name and date of birth, and 19 states match dispositions by charge.

*Matching of dispositions received to specific arrest events, 2018 (table 7a):*

- Thirteen states report that 25% or more of all dispositions received could not be linked to a specific repository arrest record.
- Some states have dispositions that cannot be matched to a specific arrest; when this occurs, 25 states place the dispositions into a suspense file for further investigation, and 8 states place the dispositions into a suspense file with no further action.
- Repository staff in 36 states conduct follow-up actions when dispositions cannot be matched to a specific arrest. In 31 states, repository staff follows-up and contacts the court to obtain additional information.
- Six states report that when a disposition cannot be matched to an arrest, the court-provided charges from the disposition are posted to the beginning/end of the subject's criminal history record.
- Nineteen states reject dispositions that cannot be matched to an arrest and 4 states (Georgia, Maryland, Nebraska, and Tennessee) use a vendor to identify and locate missing dispositions.

*Timeliness of receipt and entry of final felony court case disposition information, 2018 (table 7b):*

- Elapsed time between the occurrence of a final felony court disposition and its receipt by the repository:
  - — 1 day or less (13 states and Guam)
  - — 2–7 days (6 states)

- 8–30 days (11 states)
- 31–90 days (8 states)
- 91–180 days (North Dakota)
- More than 1 year (Indiana)

- Elapsed time between the receipt of a final court case disposition and its entry into the state's criminal history record database:
  - 1 day or less (18 states and Guam)
  - 2–7 days (12 states)
  - 8–30 days (9 states)
  - 31–90 days (3 states: California, Louisiana, and Nevada)
  - 91–180 days (New Mexico)
  - More than 1 year (2 states: Arizona and Wyoming)

**State criminal history repository practices, technology refreshment, and equipment purchasing**

*Arrest fingerprint cards processed, 2012, 2014, 2016, and 2018 (table 8):*

- During 2018, over 10.5 million arrest fingerprint cards were submitted to state criminal history repositories, a 7% decrease from that which was reported in 2016.
- Twenty-three states and Guam report an overall increase in the total number of arrest fingerprint cards submitted to the state repository.
- Seven states and Guam report an overall increase of at least 10% in the total number of arrest fingerprint cards submitted to the state repository.
- Twenty-six states report an overall decrease in the number of arrest fingerprint cards submitted to the state repository.

*Arrest/fingerprint reporting, 2018 (table 8a):*

- Forty-five states, the District of Columbia, and Guam report having a total of 13,744 law enforcement agencies that submit arrest prints via livescan. Ninety-two percent of all arrest prints submitted to the state by these agencies are via livescan.
- Cardscan technology is used by 329 law enforcement agencies to submit arrest fingerprint images to state repositories.
- More than 3,400 law enforcement agencies submit hard copy arrest fingerprint cards to state repositories.

*Citation file record counts; cite and release practices, 2018 (table 9):*

- Five states (Alabama, Minnesota, New Hampshire, New York, and Utah) maintain statewide citation files.
- Do statewide law enforcement agencies routinely cite and release individuals without fingerprinting:
  - No (4 states: Alabama, Illinois, South Dakota, and Texas, the District of Columbia, and Guam)
  - Yes, only for violations (5 states: Michigan, Mississippi, New Jersey, New York, and Rhode Island)
  - Yes, for both violations and misdemeanors (25 states)
  - Yes, for all criminal offenses, including felonies (16 states)

*Fingerprinting of individuals who have been issued citations in lieu of arrest, 2018 (table 9a):*

- Twenty-seven states report having a law in place requiring courts to order persons who have not been fingerprinted to do so prior to or after an initial court hearing.
  - For both violations and misdemeanors (5 states: Connecticut, Iowa, Kansas, Minnesota, and Virginia)
  - For all criminal offenses, including felonies (17 states)
- Four states (Arkansas, Hawaii, New Hampshire, and North Dakota) report having a state policy or administrative rule in place requiring courts to order persons who have not been fingerprinted to do so prior to or after an initial court hearing.
  - For both violations and misdemeanors (New Hampshire)
  - For all criminal offenses including felonies (3 states: Arkansas, Hawaii, and North Dakota)

*Electronic fingerprint capture devices and the submission and rejection of arrest fingerprints, 2018 (table 10):*

- Forty-nine states, the District of Columbia, and Guam report receiving over 9.8 million arrest fingerprint records by livescan.
- Over 71,000 fingerprint records were scanned and submitted to repositories using cardscan, and over 305,000 hard copy arrest fingerprint cards were submitted and received from law enforcement.
- Twenty-six states and the District of Columbia report rejecting 1% to 9% of arrest fingerprint records received for poor quality.
- Nineteen states and Guam report they did not reject any fingerprint records for poor quality.

*Arrest fingerprint card backlog, 2018 (table 10a):*

- Seven states report having a backlog of arrest fingerprint cards. Five of these states indicate there are over 828,000 records in the backlog.
- Age of backlogged arrest fingerprint card information:
  - 1 month or less (2 states: Maine and Nebraska)
  - 2–6 months (Wisconsin)
  - 7–12 months (Hawaii)
  - More than 1 year (Alabama and New Hampshire)

*Electronic fingerprint capture devices and the use of livescan/cardscan for criminal and noncriminal justice purposes, 2018 (table 10b):*

- Forty-two states, the District of Columbia, and Guam report having 10,876 livescan devices in use exclusively for noncriminal justice purposes, while 35 states, the District of Columbia, and Guam report having 5,583 livescan devices in use for both criminal justice and noncriminal justice purposes.
- Twenty-five states, the District of Columbia, and Guam report having 159 cardscan devices in use exclusively for noncriminal justice purposes, while 21 states, the District of Columbia, and Guam report having 171

cardscan devices in use for both criminal justice and noncriminal justice purposes.

*Electronic fingerprint capture devices and the submission of fingerprints for noncriminal justice purposes, 2018 (table 10c)*:

- Forty-eight states, the District of Columbia, and Guam report receiving over 10.8 million noncriminal justice fingerprints by livescan, while 32 states and the District of Columbia receive over 1 million noncriminal justice fingerprints by cardscan.

- Seventy-one percent of noncriminal justice fingerprints are submitted to state repositories using livescan, while 7% of noncriminal fingerprints are submitted electronically using cardscan.

*Mobile technology for capturing and transmitting fingerprints, 2018 (table 10d):*

- Thirty-two states and the District of Columbia use mobile technology to transmit fingerprints for identification purposes.

- One state (Missouri) uses mobile technology to transmit fingerprints for booking purposes.

- Eight states and Guam plan to implement mobile technology to capture non-fingerprint biometric information.

- Twenty-eight states and the District of Columbia employ Rapid ID and have conducted over 1.5 million searches that produced over 996,000 "hits" or positive responses.

*Privatization of noncriminal justice fingerprint capture services, 2018 (table 11):*

- Thirty-three states have privatized the capture of noncriminal justice fingerprints. In 19 of these states, a single vendor provides this service and in 14 instances, additional vendor services are provided, such as billing and collection services, verification of identification documents, photo capture, etc.

- In 32 states the vendor assesses a fee above what the state charges for the background check. These fees range from $7–$32.

*Felony arrests reported to repositories, livescan devices in courtrooms, and disposition backlogs, 2018 (table 12):*

- Over 3 million felony arrests were reported to repositories in 43 states, the District of Columbia, and Guam.

- Twelve states and Guam use livescan in the courtroom to link positive identifications with dispositions. In those states, 203 livescan devices are in use within courtrooms.

- Twenty-four states report having a backlog of over 2 million court dispositions that need to be entered into state criminal history databases.

*Date of last system replacement/significant upgrade, state fiscal year end-date, and current repository budget, 2018 (table 13):*

- Three states (Alaska, Connecticut, and South Carolina) report that their Computerized Criminal History (CCH) systems were last replaced or significantly upgraded in the 1980's, while 4 states (Arizona, Florida, Oregon, and

Washington) reported their CCH systems were significantly upgraded or replaced in 2019 or later.

- Two states (Kansas and North Dakota) report that their Automated Fingerprint Identification Systems (AFIS) were last replaced or significantly upgraded in 2007, while 5 states reported their AFIS was significantly upgraded or replaced in 2019.

- Two states (Alaska and Connecticut) report that their state message switches were last replaced or significantly upgraded in the 1980's, while 5 states report their message switches were upgraded or replaced in 2019.

- Ending date of state fiscal years:
  - — March 31 (New York)
  - — June 30 (43 states)
  - — August 31 (Texas)
  - — September 30 (Three states: Alabama, Georgia, and Michigan, and the District of Columbia and Guam)

- Thirty states, the District of Columbia, and Guam report having fiscal year operating budgets that range from $55,200 – $20 million.

*State plans to replace CCH-related systems that are at or near the end of their respective lifespans, 2018 (table 13a):*

CCH replacement status:

- — Planning (11 states and the District of Columbia)
- — Reviewing bids and/or proposals (Arizona and Maryland)
- — Implementation and testing (7 states)

AFIS replacement status:

- — Planning (11 states and the District of Columbia)
- — Reviewing bids and/or proposals (4 states: Colorado, Mississippi, North Dakota, South Dakota, and Guam)
- — Implementation and testing (10 states)

Message switch replacement status:

- — Planning (10 states and the District of Columbia)
- — Reviewing bids and/or proposals (2 states: Maryland and North Dakota)
- — Implementation and testing (7 states)

*Number of full- and part-time repository and contractual staff, and type of work contractors perform, 2018 (table 13b):*

- Four state repositories, report having 10 or fewer full-time employees while 6 state repositories and Guam report having 100 or more full-time employees.

- Seventeen state repositories employ full-time contractual staff, while 8 states report employing part-time staff to perform the following tasks:
  - — Data entry (9 states)
  - — Document scanning (7 states)
  - — Help desk support (5 states: Georgia, Hawaii, Maryland, Missouri, and Ohio)
  - — Information technology support (14 states)
  - — Software development (10 states)
  - — Researching dispositions (7 states)
  - — Other (4 states: California, Florida, Minnesota, and Nevada)

*Repository conduct of routine internal and external data quality audits and frequency of audits, 2018 (table 13c):*

- Twenty-eight states and the District of Columbia conduct internal data quality audits where the frequency of occurrence is reported as follows:
  - More than once per year (9 states and the District of Columbia)
  - Annually (Florida, New Mexico, New York, and Washington)
  - Every 2 years (Alaska)
  - Every 3 years (Arizona)
  - Other (12 states)
- Eighteen states, the District of Columbia, and Guam conduct external data quality audits where the frequency of occurrence is reported as follows:
  - More than once per year (New Jersey and Virginia)
  - Annually (Three states: Florida, Rhode Island, and Washington, and the District of Columbia and Guam)
  - Every 2 years (Alaska and Maryland)
  - Every 3 years (6 states)
  - Other (6 states)

**Noncriminal justice background checks**

*Noncriminal justice name-based background checks, 2018 (table 13d):*

- Forty-two states, the District of Columbia, and Guam performed over 23.2 million name-based noncriminal justice background check inquiries.
- Twenty-nine states and Guam performed nearly 21.8 million name-based noncriminal justice background checks that were received via the Internet.
- Thirty-six states and the District of Columbia performed over 811,000 name-based noncriminal justice background checks that were received via mail.
- Two states (Nevada and Oregon) received nearly 107,000 name-based noncriminal justice background checks via telephone.
- Fifteen states and the District of Columbia performed about 532,000 additional name-based noncriminal justice background checks that were received via other means, such as modem or public walk-in access.

*Noncriminal justice fingerprint-based background checks, 2018 (table 14):*

- Information contained in the results of a fingerprint-based noncriminal justice background check:
  - Full record (41 states, the District of Columbia, and Guam)
  - Convictions only (16 states)
  - Juvenile records (13 states)
  - Arrests without dispositions—over 1 year old (23 states)
  - Other (10 states)
- Twenty-five states and the District of Columbia report that 10% or more fingerprint-based noncriminal justice transactions are identified against arrest fingerprints.

- Twenty-three states attempt to locate missing disposition information before responding to fingerprint-based noncriminal justice inquiries.

*Noncriminal justice background checks performed against national and state databases, 2018 (table 15):*

- Thirty-two states, the District of Columbia, and Guam conduct national checks for daycare providers, 15 states conduct both national and state checks, while 2 states (Maryland and Mississippi) conduct state checks only for these providers.

- Thirty states and Guam conduct national checks for caregivers at residential facilities, 12 states and the District of Columbia conduct national and state checks, while 8 states conduct state checks only for these caregivers.

- Thirty-four states and the District of Columbia conduct national checks for schoolteachers, while 16 states conduct both national and state checks for teachers.

- Twenty-eight states conduct national checks for non-teaching school personnel, 18 states conduct both national and state checks, while 3 states (Mississippi, Nebraska, and West Virginia) and the District of Columbia conduct state checks only for these personnel.

- Twenty-six states and Guam conduct national checks for volunteers who work with children, 18 states conduct both national and state checks, while 4 states (Louisiana, Mississippi Rhode Island, and Washington) and the District of Columbia conduct state checks only for these volunteers.

- Thirty-two states conduct national checks for prospective foster care parents, 13 states and the District of Columbia conduct both national and state checks, while 5 states (Maryland, Mississippi, New York, South Dakota, and Virginia) conduct state checks only for these individuals.

- Twenty-nine states conduct national checks for prospective adoptive

parents, 15 states and the District of Columbia conduct both national and state checks, while 5 states (Maryland, Mississippi, New York, South Dakota, and Virginia) conduct state checks only for these individuals.

- Twenty-five states conduct national checks for caregivers of relatives, 10 states and the District of Columbia conduct both national and state checks, while 10 states conduct state checks only for these caregivers.

- Twenty-seven states conduct national checks for nurses and elder caregivers, 14 states and the District of Columbia conduct both national and state checks, while 5 states (Alabama, Colorado, Iowa, Louisiana, and Virginia) conduct state checks for nurses and elder caregivers.

*Lights-out fingerprint processing, 2018 (table 16):*

- Forty-three states, the District of Columbia, and Guam conduct "lights-out" fingerprint processing (an identification decision is

made without fingerprint technician intervention).

- Thirty states and Guam report 60% or more of criminal and noncriminal fingerprints received are handled using "lights-out" processing techniques.

*Noncriminal justice background check fees and fee allocation, 2018 (table 17):*

- All states, the District of Columbia, and Guam report charging a fee to conduct a search of the state's criminal history database for noncriminal justice purposes.

- Eleven states, the District of Columbia, and Guam allocate all fees collected for such purposes to their state general fund, with repositories funded by general fund allotments.

- Twenty-seven states allocate all fees collected for noncriminal justice background checks to fund their state repository.

- Ten states allocate a portion of fees collected to fund other activities/programs. These include funding of AFIS, criminal justice information system support, information sharing activities, etc.

*Web-based services for noncriminal justice purposes, 2018 (table 18):*

- Twenty-seven states provide web-based noncriminal justice background checks to the public.

- Twenty-three states collect a public access fee to conduct a background check of Internet requests. Fees charged per inquiry range from $3 in Texas to $30 in Vermont.

**Rap back**

*In-state criminal justice rap back services, 2018 (table 20):*

- Sixteen states provide in-state criminal justice rap back services.

- As of December 31, 2018, Texas is the only state participant in the FBI's Next Generation Identification (NGI) criminal justice rap back service.

- Over 251,000 in-state criminal justice rap back notifications were made by 10 states.

- Purposes for which criminal justice agencies can be notified of a subsequent inquiry and/or record posting via the in-state criminal justice rap back service:
  - — Error correction/ record management updates (5 states: California, Illinois, Maryland, Michigan, and New Jersey)
  - — Investigative leads (4 states: Florida, Hawaii, Kansas, and New Jersey)
  - — Sex offender (5 states: Florida, Hawaii, Maryland, New Jersey, and New York)
  - — Parolee (8 states)
  - — Probationer (9 states)
  - — Permit/privileged license revocation (6 states)
  - — Noncriminal justice purpose fingerprint search (4 states: Florida, New Jersey, New York, and Texas)
  - — Other, i.e., criminal justice employment, arrests, carry concealed weapon permit revocation, warrants, record updates, etc. (6 states)

*In-state noncriminal justice rap back services, 2018 (tables 21 and 21a):*

- Thirty states provide in-state noncriminal justice rap back services. In 26 of those states, rap back is authorized by state law or administrative regulation. In 19 states, state law or administrative regulation specifies the purposes in which agencies can be notified.

- Over 998,000 in-state noncriminal justice rap back notifications were made by 21 states.

- Occupational groups in which agencies can be notified for subsequent record postings:

  — Persons working with children (25 states)

  — Persons working with the elderly (22 states)

  — Healthcare providers (23 states)

  — Security guards (17 states)

  — Police, fire, and public safety personnel (19 states)

  — Other (13 states)

- Eight states charge a fee for enrolling in the state's noncriminal justice rap back service, while another 2 states (Colorado and Texas) charge a small fee upon making a rap back notification.

- Sixteen states report having in-state noncriminal justice rap back validation requirements similar to that required by NGI for all or some of its rap back subscriptions.

# Data tables

This page left intentionally blank

**Table 1. Overview of state criminal history record systems, December 31, 2018**

| | Number of subjects (individual offenders) in state criminal history file | | | Percent of arrests in database that have final case dispositions recorded | | | State performs either cycle matching or charge matching to calculate the percentage of arrests in database that have final case dispositions recorded | |
|---|---|---|---|---|---|---|---|---|
| State | Total | Automated | Manual | All arrests | Arrests within past 5 years | Felony charges with final disposition | Cycle matching | Charge matching |
| **Total** | **112,450,300** | **109,372,300** | **3,078,000** | **68** | **64** | **71** | | |
| Alabama | 2,446,300 | 2,446,300 | 0[a] | 36 | 14 | 46 | X | |
| Alaska | 276,700 | 266,600 | 10,100 | 91 | 92 | 92 | | X |
| American Samoa | nr | | | | | | | |
| Arizona | 1,988,400 | 1,846,600 | 141,800 | 31 | 63 | 62 | | X |
| Arkansas | 805,400 | 805,400 | 0 | 58 | 43 | 42 | X | |
| California | 10,546,600 | 10,497,100 | 49,500 | 63 | 56 | 64 | X | |
| Colorado | 1,902,700 | 1,902,700 | 0 | 24 | 9 | 43 | X | |
| Connecticut | 683,600 | 439,600 | 244,000[b] | 97 | 89 | unk | | X |
| Delaware | 2,686,900 | 2,686,900 | 0 | 94 | 95 | 89 | X | |
| District of Columbia | 691,900 | 691,900 | 0 | 60 | 88 | 71 | X | |
| Florida | 6,756,300 | 6,756,300 | 0 | 58 | 58 | 74[c] | | X |
| Georgia | 4,358,300 | 4,358,300 | 0 | 72 | 85 | 65 | | X |
| Guam | 1,600 | 1,600 | 0 | unk | unk | 100 | X | |
| Hawaii | 602,600 | 602,600 | 0 | 96 | 87 | 97 | | X |
| Idaho | 444,400 | 444,400 | 0 | 49 | 22 | 34 | X | |
| Illinois | 7,473,400 | 6,908,000 | 565,400 | 72 | 55 | unk | X | |
| Indiana | 1,871,800 | 1,871,800 | 0 | 56 | 58 | 63 | X | |
| Iowa | 793,100 | 787,200 | 5,900 | 98 | 92 | 93 | X | |
| Kansas | 1,617,900 | 1,193,400 | 424,500 | 55 | 43 | 60 | X | |
| Kentucky | 1,561,600 | 1,561,600 | 0 | 42 | 16 | 51 | X | |
| Louisiana | 1,743,500 | 1,600,500 | 143,000 | 26 | 22 | 35 | | X |
| Maine | 592,600 | 563,800 | 28,800 | 82 | 70 | 70 | X | |
| Maryland | 1,672,100 | 1,672,100 | 0 | 96 | 89 | 32 | X | |
| Massachusetts | 1,462,000 | 1,380,000 | 82,000 | 18 | 18 | na[d] | X | |
| Michigan | 2,688,600 | 2,688,600 | 0[e] | 81 | 79 | 81 | X | |
| Minnesota | 1,075,500 | 1,075,500 | 0 | 77 | 74 | 81 | X | |
| Mississippi | 1,057,000 | 1,057,000 | 0 | 13 | 14 | 2[f] | | X |
| Missouri | 1,706,400 | 1,567,000 | 139,400 | 67 | 57 | 67 | X | |
| Montana | 262,200 | 262,200 | 0 | 65 | 67 | 63 | X | |
| Nebraska | 464,600 | 464,600 | 0 | 80 | 75 | 88 | X | |
| Nevada | 941,900 | 941,900 | 0 | 61 | 69 | 67 | X | |
| New Hampshire | 547,000 | 524,300 | 22,700 | 85 | 83 | 85 | X | |
| New Jersey | 2,569,700 | 2,422,000 | 147,700 | 91 | 82 | 97 | X | |
| New Mexico | 634,000 | 539,000 | 95,000 | 25 | 20 | 25 | | X |
| New York | 8,227,600 | 8,227,600[b] | 0 | 91 | 91 | 92 | X | |
| North Carolina | 1,867,100 | 1,867,100 | 0 | 84 | 69 | 90 | X | [g] |
| North Dakota | 209,400 | 199,400 | 10,000 | 91 | 91 | 95 | | X |
| No. Mariana Islands | nr | | | | | | | |
| Ohio | 2,545,400 | 2,289,200 | 256,200 | 55 | 59 | 53 | | X |
| Oklahoma | 1,110,500 | 1,041,200 | 69,300 | 66 | 61 | 73 | X | |
| Oregon | 1,311,400 | 1,311,400 | 0 | 71 | 43 | 94 | | X |
| Pennsylvania | 3,404,200 | 3,153,200 | 251,000 | 76 | 69 | 95 | X | |
| Puerto Rico | nr | | | | | | | |
| Rhode Island | 901,800 | 901,800 | 0 | 85 | 83 | 80 | | X |
| South Carolina | 1,788,100 | 1,750,100 | 38,000 | 65 | unk | unk | | X |
| South Dakota | 278,300 | 278,300 | 0 | 67 | 72 | unk | | X |
| Tennessee | 2,536,000 | 2,536,000 | 0 | 50 | 75 | unk | | X |
| Texas | 15,437,500 | 15,437,500 | 0 | 85 | 95 | 84 | | X |
| Utah | 819,800 | 819,800 | 0 | 79 | 75 | 82 | X | |
| Vermont | 256,900 | 256,900 | 0 | 93 | 78 | 91 | X | |
| Virgin Islands | nr | | | | | | | |
| Virginia | 2,397,200 | 2,260,500 | 136,700 | 89 | 95 | 90 | | X |
| Washington | 1,882,000 | 1,882,000 | 0 | 87 | 70 | 86 | | X |
| West Virginia | 714,500 | 497,500 | 217,000 | nr | nr | nr | | X |
| Wisconsin | 1,617,400 | 1,617,400 | 0 | 83 | 63 | 97 | | X |
| Wyoming | 218,600 | 218,600 | 0 | 85 | 76 | 83 | | X |

**Table 1 explanatory notes:**

- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).
- unk (unknown).
- The "number of subjects (individual offenders)" in the state criminal history file for each year applies only to the criminal history file, including partially automated files, and does *not* include release by police without charging, declinations to proceed by prosecutor, or final trial court dispositions.
- The "number of subjects (individual offenders)" in the state criminal history file for each year includes persons with records in multiple states and may contain records of persons now deceased.
- The total number of subjects (individual offenders) in state criminal history files does not include Alabama, American Samoa, the Northern Mariana Islands, Puerto Rico and the Virgin Islands.

**Data footnotes:**

a. During the last three survey cycles, Alabama reported 2,021,200, 2,164,900 and 2,304,600 individual subjects in the state criminal history repository, which shows an average biennial growth rate of 141,700 records. SEARCH used this growth rate as the basis for estimating Alabama's 2018 record count.

b. Previous year counts were inflated. The figures for 2018 are correct based on new counting methodology.

c. Overall note regarding disposition rates in Florida: There are arrest records maintained within the repository for which the state reports it will never receive corresponding dispositions due to the age of the records in question, loss of hard copy data due to natural disaster prior to electronic reporting, or the fact that they are criminal traffic offenses, which are not included in the transmission of data from the Clerks of Court consistently in all counties.

d. Based on current system limitations, the state is unable to provide a response.

e. Since the last survey, Michigan conducted a project to remove arrests that were never prosecuted from the state criminal history repository. Fingerprints cannot be retained if a person is not charged with a crime. Due to this cleanup effort, the number of records in the state repository is lower than in previous surveys.

f. Low percentages are due to a number of factors: Lack of training of court clerks, turnover, illegible handwriting on manual documents, court information system not linked to criminal history repository system, updated records at local level that are not being forwarded to repository system, etc.

g. North Carolina is in the process of testing and implementing a new AFIS. Resources necessary to gather statistics for 2018 were not available to respond. Since numbers have not significantly changed from what was provided in previous cycles, the state provided estimates where it was reasonable to do so throughout this report.

**Table 1a. Overview of state criminal history record system functions, 2018**

| State | Total number of fingerprints processed | Total criminal justice purposes | Fingerprints processed for criminal justice purposes: Retained | Percent of 2018 volume | Not retained | Percent of 2018 volume | Total noncriminal justice purposes | Fingerprints processed for noncriminal justice purposes: Retained | Percent of 2018 volume | Not retained | Percent of 2018 volume |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **25,797,200** [a] | **10,500,600** | **10,182,000** | **39%** | **318,600** | **1%** | **15,296,600** | **10,743,300** | **42%** | **4,553,300** | **18%** |
| Alabama | nr | | | | | | | | | | |
| Alaska | 67,500 | 23,300 | 23,300 | 35 | 0 | 0 | 44,200 | 44,200 | 65 | 0 | 0 |
| American Samoa | nr | | | | | | | | | | |
| Arizona | 683,900 | 326,800 | 326,800 | 48 | 0 | 0 | 357,100 | 209,000 | 31 | 148,100 | 22 |
| Arkansas | 213,600 | 133,200 | 133,200 | 61 | 0 | 0 | 80,400 | 80,300 | 39 | 100 | 0 |
| California | 3,688,300 | 1,297,500 | 1,241,000 | 34 | 56,500 | 2 | 2,390,800 | 2,231,200 | 60 | 159,600 | 4 |
| Colorado | 475,900 | 251,800 | 251,800 | 53 | 0 | 0 | 224,100 | 224,100 | 47 | 0 | 0 |
| Connecticut | 183,600 | 91,500 | 91,500 | 50 | 0 | 0 | 92,100 | 92,100 | 50 | 0 | 0 |
| Delaware | 84,300 | 22,000 | 22,000 | 26 | 0 | 0 | 62,300 | 62,300 | 74 | 0 | 0 |
| District of Columbia | 69,100 | 48,500 | 48,500 | 70 | 0 | 0 | 20,600 | 800 | 1 | 19,800 | 29 |
| Florida | 2,451,400 | 762,700 | 762,700 | 31 | 0 | 0 | 1,688,700 | 965,600 | 39 | 723,100 | 30 |
| Georgia | 905,900 | 493,500 | 493,500 | 54 | 0 | 0 | 412,400 | 0 | 0 | 412,400 | 46 |
| Guam | 4,000 | 3,000 | 3,000 | 76 | 0 | 0 | 1,000 | 0 | 0 | 1,000 | 24 |
| Hawaii | 89,200 | 36,300 | 36,300 | 41 | 0 | 0 | 52,900 | 52,900 | 59 | 0 | 0 |
| Idaho | 143,200 | 57,800 | 57,800 | 40 | 0 | 0 | 85,400 | 4,600 | 3 | 80,800 | 56 |
| Illinois | 912,800 | 333,100 | 308,500 | 34 | 24,600 | 3 | 579,700 | 551,700 | 60 | 28,000 | 3 |
| Indiana | 416,900 | 207,800 | 207,800 | 50 | 0 | 0 | 209,100 | 209,100 | 50 | 0 | 0 |
| Iowa | 132,100 | 85,100 | 85,100 | 64 | 0 | 0 | 47,000 | 0 | 0 | 47,000 | 36 |
| Kansas | 186,600 | 119,500 | 119,500 | 64 | 0 | 0 | 67,100 | 67,100 | 36 | 0 | 0 |
| Kentucky | 325,200 | 212,100 | 212,100 | 65 | 0 | 0 | 113,100 | 50,700 | 16 | 62,400 | 19 |
| Louisiana | 480,100 | 285,000 | 285,000 | 63 | 0 | 0 | 195,100 | 195,100 | 41 | 0 | 0 |
| Maine | 48,900 | 27,900 | 27,900 | 68 | 0 | 0 | 21,000 | 12,600 | 60 | 8,400 | 40 |
| Maryland | 547,300 | 183,900 | 183,900 | 34 | 0 | 0 | 363,400 | 363,400 | 66 | 0 | 0 |
| Massachusetts | 377,300 | 133,600 | 132,800 | 35 | 800 | 0 | 243,700 | 243,700 | 65 | 0 | 0 |
| Michigan | 710,400 | 348,700 | 253,600 | 36 | 95,100 | 13 | 361,700 | 358,100 | 50 | 3,600 | 1 |
| Minnesota | 404,800 | 158,700 | 156,700 | 39 | 2,000 | 1 [b] | 246,100 | 0 | 0 | 246,100 | 61 |
| Mississippi | 232,000 | 69,200 | 69,200 | 30 | 0 | 0 | 162,800 | 0 | 0 | 162,800 | 9 |
| Missouri | 402,900 | 214,700 | 214,700 | 53 | 0 | 0 | 188,200 | 188,200 | 47 | 0 | 0 |
| Montana | 81,000 | 44,400 | 44,400 | 55 | 0 | 0 | 36,600 | 0 | 0 | 36,600 | 45 |
| Nebraska | 79,100 | 45,100 | 45,100 | 57 | 0 | 0 | 34,000 | 0 | 0 | 34,000 | 43 |
| Nevada | 363,900 | 104,500 | 104,500 | 29 | 0 | 0 | 259,400 | 67,700 | 19 | 191,700 | 53 |
| New Hampshire | 74,700 | 30,200 | 30,200 | 40 | 0 | 0 | 44,500 | 0 | 0 | 44,500 | 60 |
| New Jersey | 636,200 | 201,600 | 201,600 | 32 | 0 | 0 | 434,600 | 258,700 | 41 | 175,900 | 28 |
| New Mexico | 214,700 | 92,900 | 92,900 | 43 | 0 | 0 | 121,800 | 121,800 | 57 | 0 | 0 |
| New York | 1,184,000 | 508,900 | 401,700 | 34 | 107,200 | 9 | 675,100 | 637,500 | 54 | 37,600 | 3 |
| North Carolina | 597,500 [c] | 318,500 | 288,100 | 48 | 30,400 | 5 [c] | 279,000 | 119,200 | 20 | 159,800 | 27 [c] |
| North Dakota | 54,200 | 23,500 | 23,500 | 43 | 0 | 0 | 30,700 | 7,600 | 25 | 23,100 | 75 |
| No. Mariana Islands | nr | | | | | | | | | | |
| Ohio | 1,677,300 | 177,200 | 177,200 | 11 | 0 | 0 | 1,500,100 | 1,500,100 | 89 | 0 | 0 |
| Oklahoma | 265,800 | 145,700 | 145,200 | 55 | 500 | 0 | 120,100 | 117,600 | 44 | 2,500 | 1 |
| Oregon | 332,400 | 136,800 | 136,800 | 41 | 0 | 0 | 195,600 | 40,000 | 12 | 155,600 | 47 |
| Pennsylvania | 944,400 | 314,300 | 314,300 | 33 | 0 | 0 | 630,100 | 30,500 | 3 | 599,600 | 63 |
| Puerto Rico | nr | | | | | | | | | | |
| Rhode Island | 63,600 | 23,000 | 23,000 | 36 | 0 | 0 | 40,600 | 0 | 0 | 40,600 | 64 |
| South Carolina | 314,300 | 193,300 | 193,300 | 62 | 0 | 0 | 121,000 | 70,500 | 22 | 50,500 | 16 |
| South Dakota | 64,800 | 31,700 | 31,700 | 49 | 0 | 0 | 33,100 | 1,100 | 2 | 32,000 | 49 |
| Tennessee | 674,600 | 397,200 | 397,200 | 59 | 0 | 0 | 277,400 | 277,400 | 41 | 0 | 0 |
| Texas | 1,953,800 | 927,500 | 927,500 | 47 | 0 | 0 | 1,026,300 | 1,026,200 | 53 | 100 | 0 |
| Utah | 313,100 | 88,500 | 87,000 | 28 | 1,500 | 0 | 224,600 | 125,900 | 40 | 98,700 | 32 |
| Vermont | 36,800 | 14,300 | 14,300 | 39 | 0 | 0 | 22,500 | 0 | 0 | 22,500 | 61 |
| Virgin Islands | nr | | | | | | | | | | |
| Virginia | 591,800 | 267,800 | 267,800 | 45 | 0 | 0 | 324,000 | 0 | 0 | 324,000 | 55 |
| Washington | 621,800 | 241,300 | 241,300 | 39 | 0 | 0 | 380,500 | 14,700 | 2 | 365,800 | 59 |
| West Virginia | 137,200 | 50,700 | 50,700 | 37 | 0 | 0 | 86,500 | 86,500 | 63 | 0 | 0 |
| Wisconsin | 234,800 | 175,700 | 175,700 | 75 | 0 | 0 | 59,100 | 4,100 | 2 | 55,000 | 23 |
| Wyoming | 48,200 | 18,800 | 18,800 | 39 | 0 | 0 | 29,400 | 29,400 | 61 | 0 | 0 |

**Table 1a explanatory notes:**
- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).
- The total number of fingerprint-based background checks in state criminal history files does not include Alabama, American Samoa, the Northern Mariana Islands, Puerto Rico and the Virgin Islands.

**Data footnotes:**
a. The total number of fingerprints processed does not equal the sum of fingerprints processed for criminal and noncriminal justice purposes due to rounding.
b. These prints are fingerprints submitted for inquiry purposes only. They generally are received from probation and parole and/or corrections as part of a presentencing investigation or inmate classification process to receive a copy of a record matching a subject's fingerprints.
c. Estimated per Table 1, footnote "c" narrative.

**Table 2. Number of subjects (individual offenders) in state criminal history file, 2014, 2016, and 2018**

| | Number of subjects in manual and automated files | | Number of subjects in automated files, 2018 | | Percent of automated files | | | Percent change in total file | |
|---|---|---|---|---|---|---|---|---|---|
| State | 2014 | 2016 | 2018 total | Automated file | 2014 | 2016 | 2018 | 2014–2016 | 2016–2018 |
| **Total** | **105,569,200** | **110,235,200** | **112,450,300** | **106,926,000** | **95%** | **96%** | **97%** | **4%** | **2%** |
| Alabama | 2,164,900 | 2,304,600 | 2,446,300 a | nr | 100 | 100 | nr | 6 | 6 |
| Alaska | 270,400 | 278,900 | 276,700 | 266,600 | 96 | 96 | 96 | 3 | -1 |
| American Samoa | nr | nr | nr | nr | nr | nr | nr | nr | nr |
| Arizona | 1,653,400 | 1,899,300 | 1,988,400 | 1,846,600 | 100 | 92 | 93 | 15 | 5 |
| Arkansas | 712,000 | 760,200 | 805,400 | 805,400 | 100 | 100 | 100 | 7 | 6 |
| California | 11,365,000 | 10,815,500 | 10,546,600 | 10,497,100 | 84 | 91 | 100 | -5 | -2 |
| Colorado | 1,641,800 | 1,756,600 | 1,902,700 | 1,902,700 | 100 | 100 | 100 | 7 | 8 |
| Connecticut | 1,155,400 b | 1,188,400 b | 683,600 | 439,600 | 48 | 53 | 64 | 3 b | -42 b |
| Delaware | 2,380,800 | 2,468,600 | 2,686,900 | 2,686,900 | 100 | 100 | 100 | 4 | 9 |
| District of Columbia | 470,300 | nr | 691,900 | 691,900 | 100 | nr | 100 | na | na |
| Florida | 6,346,900 | 6,524,000 | 6,756,300 | 6,756,300 | 100 | 100 | 100 | 3 | 4 |
| Georgia | 3,965,200 | 4,164,900 | 4,358,300 | 4,358,300 | 100 | 100 | 100 | 5 | 5 |
| Guam | 2,100 | 1,700 | 1,600 | 1,600 | 100 | 100 | 100 | -19 | -6 |
| Hawaii | 543,800 | 560,800 | 602,600 | 602,600 | 100 | 100 | 100 | 3 | 7 |
| Idaho | 394,100 | 413,800 | 444,400 | 444,400 | 100 | 100 | 100 | 5 | 7 |
| Illinois | 6,646,200 | 7,092,400 | 7,473,400 | 6,908,000 | 91 | 92 | 92 | 7 | 5 |
| Indiana | 1,700,000 | 1,786,300 | 1,871,800 | 1,871,800 | 100 | 100 | 100 | 5 | 5 |
| Iowa | 721,100 | 750,500 | 793,100 | 787,200 | 98 | 99 | 99 | 4 | 6 |
| Kansas | 1,455,200 | 1,529,500 | 1,617,900 | 1,193,400 | 69 | 72 | 74 | 5 | 6 |
| Kentucky | 1,355,900 | 1,435,800 | 1,561,600 | 1,561,600 | 100 | 100 | 100 | 6 | 9 |
| Louisiana | 2,809,700 c | 1,698,200 | 1,743,500 | 1,600,500 | 75 | 94 | 92 | -40 c | 3 |
| Maine | 544,600 | 570,800 | 592,600 | 563,800 | 93 | 94 | 95 | 5 | 4 |
| Maryland | 1,578,800 | 1,629,000 | 1,672,100 | 1,672,100 | 100 | 100 | 100 | 3 | 3 |
| Massachusetts | 1,715,300 | 1,572,600 | 1,462,000 | 1,380,000 | 100 | 94 | 94 | -8 | -7 |
| Michigan | 2,967,900 | 3,138,400 | 2,688,600 d | 2,688,600 | 100 | 100 | 100 | 6 | -14 c |
| Minnesota | 1,080,700 | 1,135,900 | 1,075,500 | 1,075,500 | 100 | 100 | 100 | 5 | -5 |
| Mississippi | 866,600 | 1,031,500 | 1,057,000 | 1,057,000 | 100 | 100 | 100 | 19 | 2 |
| Missouri | 1,640,300 | 1,667,500 | 1,706,400 | 1,567,000 | 91 | 91 | 92 | 2 | 2 |
| Montana | 232,200 | 244,200 | 262,200 | 262,200 | 100 | 100 | 100 | 5 | 7 |
| Nebraska | 411,900 | 435,100 | 464,600 | 464,600 | 100 | 100 | 100 | 6 | 7 |
| Nevada | 823,500 | 879,200 | 941,900 | 941,900 | 100 | 100 | 100 | 7 | 7 |
| New Hampshire | 495,200 | 471,600 | 547,000 | 524,300 | 95 | 95 | 96 | -5 | 16 |
| New Jersey | 2,255,400 | 2,333,600 | 2,569,700 | 2,422,000 | 98 | 94 | 94 | 3 | 10 |
| New Mexico | 629,000 | 632,900 | 634,000 | 539,000 | 85 | 85 | 85 | 1 | <1 |
| New York | 9,289,000 | 9,941,000 | 8,227,600 e | 8,227,600 | 100 | 100 | 100 | 7 | -17 e |
| North Carolina | 1,608,900 | 1,733,200 | 1,867,100 f | 1,867,100 | 100 | 100 | 100 | 8 | 8 f |
| North Dakota | 179,800 | 195,600 | 209,400 | 199,400 | 94 | 95 | 95 | 9 | 7 |
| No. Mariana Islands | nr | nr | nr | nr | nr | nr | nr | nr | nr |
| Ohio | 2,360,800 | 2,464,700 | 2,545,400 | 2,289,200 | 86 | 89 | 90 | 4 | 3 |
| Oklahoma | 975,600 | 1,037,000 | 1,110,500 | 1,041,200 | 93 | 93 | 94 | 6 | 7 |
| Oregon | 1,225,900 | 1,268,900 | 1,311,400 | 1,311,400 | 100 | 100 | 100 | 4 | 3 |
| Pennsylvania | 2,713,000 | 2,829,800 | 3,404,200 | 3,153,200 | 90 | 91 | 93 | 4 | 20 |
| Puerto Rico | 342,200 | 363,400 | nr | nr | 100 | 100 | nr | 6 | nr |
| Rhode Island | 1,189,600 | 998,400 | 901,800 | 901,800 | 100 | 100 | 100 | -16 | -10 |
| South Carolina | 1,672,200 | 1,731,700 | 1,788,100 | 1,750,100 | 97 | 98 | 98 | 4 | 3 |
| South Dakota | 285,100 | 304,700 | 278,300 | 278,300 | 100 | 100 | 100 | 7 | -9 |
| Tennessee | 1,909,800 | 2,325,200 g | 2,536,000 | 2,536,000 | 99 | 100 | 100 | 22 g | 9 |
| Texas | 13,050,800 | 14,287,000 | 15,437,500 | 15,437,500 | 100 | 100 | 100 | 9 | 8 |
| Utah | 741,300 | 777,500 | 819,800 | 819,800 | 100 | 100 | 100 | 5 | 5 |
| Vermont | 244,700 | 250,000 | 256,900 | 256,900 | 100 | 100 | 100 | 2 | 3 |
| Virgin Islands | nr | nr | nr | nr | nr | nr | nr | nr | nr |
| Virginia | 2,230,500 | 2,339,700 | 2,397,200 | 2,260,500 | 97 | 97 | 94 | 5 | 2 |
| Washington | 1,706,900 | 1,797,000 | 1,882,000 | 1,882,000 | 100 | 100 | 100 | 5 | 5 |
| West Virginia | 654,100 | 703,900 | 714,500 | 497,500 | 64 | 68 | 70 | 8 | 2 |
| Wisconsin | nr h | 1,509,400 | 1,617,400 | 1,617,400 | na | 100 | 100 | na h | 7 |
| Wyoming | 193,400 | 204,800 | 218,600 | 218,600 | 100 | 100 | 100 | 5 | 7 |

**Table 2 explanatory notes:**
- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- nr (not reported).
- The totals for the percent of automated files and the percent change in total files represent percentages of column totals, not averages.
- The total number of subjects in manual and automated state criminal history files for 2018 does not include Alabama, American Samoa, the Northern Mariana Islands, Puerto Rico, and the Virgin Islands.
- The "number of subjects (individual offenders)" in the state criminal history file for each year applies only to the criminal history file, including partially automated files, and does not include the master name index.

**Data footnotes:**
a. Resources necessary to gather statistics for 2018 were unavailable. SEARCH estimated the number of subjects in Alabama's criminal history repository based on responses provided in the three prior survey cycles.
b. 2014 and 2016 totals are overstated. The totals included records that were purged or deleted from the database.
c. 2014 total includes both criminal and noncriminal record counts.
d. Michigan initiated an open case clean-up, as well as conducting more thorough training to law enforcement and prosecutors on the proper reporting of unauthorized charges. This has resulted in the deletion/expungement of numerous criminal SIDs/subject records that are in the state's database.
e. The number of subjects in the state repository is accurately reported for 2018. The count provided in the 2016 survey reflected the number of unique fingerprints on file and not subjects.
f. Estimated per Table 1, footnote "c" narrative.
g. The 2016 increase of individuals in Tennessee's criminal history file is thought to be attributable to better training/awareness education at contributing agencies.
h. Wisconsin's DOJ IT personnel were unable to provide this data within the timeframe requested.

**Table 3. State protection order information and record counts, 2018**

| State | State maintains a protection order (PO) file | Agencies responsible for entering protection orders into the state file: Law enforcement | Courts | Other | Elapsed time between issuance of a PO and entry of its info. into the state file: 1 day or less | 2–7 days | 8–30 days | | # of active records in state PO database as of 12/31/2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | **2,240,896** | |
| **Yes** | **41** | **25** | **22** | **3** | **29** | **10** | **1** | | | |
| **No** | **11** | | | | | | | | | |
| Alabama | Yes | X | | District Attorneys | | X | | | 13,257 | |
| Alaska | Yes | X | | | X | | | | 1,504 | |
| American Samoa | nr | | | | | | | | | |
| Arizona | Yes | X | | | | | | a | 25,978 | |
| Arkansas | No | | | | | | | | | |
| California | Yes | X | X | | X | | | | 579,212 | |
| Colorado | Yes | X | | | X | | | | 254,922 | |
| Connecticut | Yes | X | X | | X | | | | 24,386 | |
| Delaware | Yes | | X | | X | | | | 2,118 | |
| District of Columbia | Yes | | X | | | X | | | 1,944 | |
| Florida | Yes | X | | | X | | | | 190,271 | |
| Georgia | Yes | | X | | X | | | | 12,620 | |
| Guam | No | | | | | | | | | |
| Hawaii | Yes | | X | | X | | | | 7,681 | b |
| Idaho | No | | | | | | | | | |
| Illinois | Yes | | | | X | | | | 87,822 | |
| Indiana | Yes | | X | | X | | | | 115,626 | |
| Iowa | Yes | X | X | | X | | | | 31,431 | c |
| Kansas | No | | | | | | | | | |
| Kentucky | Yes | X | | | X | | | | 17,109 | |
| Louisiana | Yes | | X | | | X | | | 20,399 | |
| Maine | Yes | | X | | X | | | | 5,071 | d |
| Maryland | Yes | X | | | X | | | | 10,839 | |
| Massachusetts | Yes | | X | | X | | | | 37,104 | |
| Michigan | Yes | X | X | | | X | | | 17,056 | |
| Minnesota | Yes | | X | | X | | | | 19,263 | e |
| Mississippi | No | | | | | | | | | |
| Missouri | Yes | X | | | X | | | | 12,667 | |
| Montana | No | | | | | | | | | |
| Nebraska | Yes | X | X | | X | | | | 5,985 | |
| Nevada | Yes | | | State Repository | X | | | | 2,035 | |
| New Hampshire | Yes | X | X | | X | | | | na | |
| New Jersey | Yes | | X | | X | | | | 179,000 | |
| New Mexico | No | | | | | | | | | |
| New York | Yes | | X | | | X | | | 169,042 | |
| North Carolina | No | | | | | | | | | |
| North Dakota | Yes | X | X | | X | | | | 1,837 | |
| No. Mariana Islands | nr | | | | | | | | | |
| Ohio | Yes | X | | | | | X | | 34,643 | |
| Oklahoma | No | | | | | | | | | |
| Oregon | Yes | X | | | | X | | | na | |
| Pennsylvania | Yes | X | X | | X | | | | 13,787 | |
| Puerto Rico | nr | | | | | | | | | |
| Rhode Island | Yes | | | State Attorney General | X | | | | 46,718 | |
| South Carolina | No | | | | | | | | | |
| South Dakota | Yes | | X | | | X | | | 4,127 | |
| Tennessee | No | | | | | | | | | |
| Texas | Yes | X | | | | X | | | 49,373 | |
| Utah | Yes | X | | | X | | | | 40,130 | |
| Vermont | Yes | X | | | X | | | | 2,301 | |
| Virgin Islands | nr | | | | | | | | | |
| Virginia | Yes | X | X | | X | | | | 95,788 | |
| Washington | Yes | X | | | | X | | | 87,104 | |
| West Virginia | Yes | | X | | X | | | | 2,889 | |
| Wisconsin | Yes | X | | | | X | | | 17,136 | |
| Wyoming | Yes | X | | | X | | | | 721 | |

**Table 3 explanatory notes:**

- na (not available).
- nr (not reported).

**Data footnotes:**

a. Arizona does not track time between issuance and entry of protection orders.

b. Number of records as of 9/3/2019.

c. In Iowa, law enforcement entry of protection orders into the state file is after hours only.

d. Number of records as of 9/25/2019.

e. Number of records as of 5/31/2019.

**Table 3a. Entry of state protection order information into FBI-NCIC and record counts, 2018**

| State | Protection orders (PO) entered into NCIC | Agencies responsible for entering protection orders into NCIC: Law enforcement | Courts | Other | Elapsed time between the issuance of a PO and entry of its information into the NCIC PO File: 1 day or less | 2–7 days | 8–30 days | Number of active records in NCIC Protection Order File as of 12/31/2018 | |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | **1,848,169** | |
| **Yes** | **53** | **37** | **19** | **4** | **26** | **22** | **1** | | |
| **No** | **3** | | | | | | | | |
| Alabama | Yes | X | | District Attorneys | | X | | 6,046 | |
| Alaska | Yes | X | | | | X | | 1,169 | |
| American Samoa | No | | | | | | | 0 | |
| Arizona | Yes | X | | | | X | | 17,984 | |
| Arkansas | Yes | X | | | X | | | 17,237 | |
| California | Yes | X | X | | | X | | 280,959 | |
| Colorado | Yes | X | X | | X | | | 140,367 | |
| Connecticut | Yes | X | X | | X | | | 34,734 | |
| Delaware | Yes | | X | | X | | | 2,106 | |
| District of Columbia | Yes | | X | | | X | | 1,823 | |
| Florida | Yes | X | | | X | | | 204,216 | |
| Georgia | Yes | | X | | X | | | 11,016 | |
| Guam | Yes | | X | | | X | | 479 | |
| Hawaii | Yes | | | CSA (HI Criminal Justice Data Center) | X | | | 6,656 | |
| Idaho | Yes | X | | | X | | | 6,989 | |
| Illinois | Yes | X | | | X | | | 32,944 | |
| Indiana | Yes | | | | X | | | 112,754 | |
| Iowa | Yes | X | X | | X | | | 30,094 | a |
| Kansas | Yes | X | | | nr | | | 5,544 | |
| Kentucky | Yes | X | | | X | | | 18,765 | |
| Louisiana | Yes | | X | | | X | | 17,336 | |
| Maine | Yes | X | X | | nr | | | 4,905 | |
| Maryland | Yes | X | | | X | | | 9,702 | |
| Massachusetts | Yes | | | MA Dept. of Criminal Justice Info. Services | X | | | 19,115 | |
| Michigan | Yes | X | X | | | X | | 16,203 | |
| Minnesota | Yes | | X | | X | | | 18,314 | |
| Mississippi | Yes | X | X | | | X | | 1,086 | |
| Missouri | Yes | X | | | X | | | 15,997 | |
| Montana | Yes | X | | | | X | | 5,590 | |
| Nebraska | Yes | X | | | | X | | 3,654 | |
| Nevada | Yes | X | X | | nr | | | 143 | b |
| New Hampshire | Yes | | X | | | X | | 3,931 | |
| New Jersey | Yes | X | | | X | | | 178,193 | |
| New Mexico | Yes | X | | | | X | | 7,088 | |
| New York | Yes | | X | | | X | | 269,024 | |
| North Carolina | Yes | X | | | | X | | 13,073 | |
| North Dakota | Yes | X | | | X | | | 1,134 | |
| No. Mariana Islands | No | | | | | | | 0 | |
| Ohio | Yes | X | | | | | X | 34,495 | |
| Oklahoma | Yes | X | | | X | | | 10,438 | |
| Oregon | Yes | X | | | | X | | 18,710 | |
| Pennsylvania | Yes | X | | | X | | | 30,640 | |
| Puerto Rico | No | | | | | | | 0 | |
| Rhode Island | Yes | | | State Attorney General | X | | | 14,477 | |
| South Carolina | Yes | X | | | | X | | 3,523 | |
| South Dakota | Yes | | X | | | X | | 3,077 | |
| Tennessee | Yes | X | | | | X | | 18,635 | |
| Texas | Yes | X | | | | X | | 20,198 | |
| Utah | Yes | | X | | X | | | 12,124 | |
| Vermont | Yes | X | | | X | | | 2,289 | |
| Virgin Islands | Yes | nr | | | nr | | | 175 | |
| Virginia | Yes | X | | | X | | | 35,170 | |
| Washington | Yes | X | | | | X | | 107,260 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| West Virginia | Yes | | | X | | | X | | | 2,763 | |
| Wisconsin | Yes | | X | | | | | X | | 17,130 | |
| Wyoming | Yes | | X | | | | X | | | 695 | |

**Table 3a explanatory notes:**

- nr (not reported).

**Data footnotes:**

a. In Iowa, law enforcement entry of protection orders into NCIC is after hours only.

b. As of December 31, 2018, 143 protection orders were entered to NCIC. Nevada courts are not open 24 hours a day, 7 days a week. This causes courts not to be able to comply with the NCIC's 24x7 "hit" confirmation policy. Also, courts and law enforcement lack resources to validate the accuracy of protection orders under the NCIC validation requirement. Protection orders that meet NICS entry criteria are entered into the NICS Indices by repository (Point of Contact) staff for use in making firearm suitability determinations.

**Table 4. Warrant information and entering agencies, 2018**

| State | State maintains a warrant file | Agencies responsible for entering warrants into the state file | | | Agencies responsible for entering warrants into NCIC | | |
|---|---|---|---|---|---|---|---|
| | | Law enforcement | Courts | Other | Law enforcement | Courts | Other |
| **Total** | | | | | | | |
| **Yes** | **42** | **36** | **16** | **3** | **50** | **10** | **2** |
| **No** | **10** | | | | | | |
| Alabama | Yes | X | | | X | | |
| Alaska | Yes | X | | | X | | |
| American Samoa | nr | | | | | | |
| Arizona | Yes | X | | | X | | |
| Arkansas | No | | | | X | | |
| California | Yes | X | X | | X | X | |
| Colorado | Yes | X | | | X | X | |
| Connecticut | Yes | X | | | X | X | |
| Delaware | Yes | X | X | | X | X | |
| District of Columbia | Yes | | X | | | X | |
| Florida | Yes | X | | | X | | |
| Georgia | No | | | | X | | |
| Guam | Yes | | X | | | X | |
| Hawaii | Yes | | X | | X | | |
| Idaho | Yes | X | | | X | | |
| Illinois | Yes | X | | | X | | |
| Indiana | Yes | X | | | X | | |
| Iowa | Yes | X | | | X | | |
| Kansas | No | | | | X | | |
| Kentucky | Yes | X | | | X | | |
| Louisiana | No | | | | X | | |
| Maine | Yes | | X | | X | | |
| Maryland | Yes | X | | | X | | |
| Massachusetts | Yes | | X | | X | | |
| Michigan | Yes | X | X | | X | X | |
| Minnesota | Yes | X | | Dept. of Corrections | X | | County and State Corrections |
| Mississippi | No | | | | X | | |
| Missouri | Yes | X | | | X | | |
| Montana | Yes | X | | | X | | |
| Nebraska | Yes | X | | | X | | |
| Nevada | Yes | X | X | | X | X | |
| New Hampshire | Yes | X | X | | X | | |
| New Jersey | No | | | | X | | |
| New Mexico | No | | | | X | | |
| New York | Yes | X | X | | X | X | |
| North Carolina | Yes | X | X | | X | | |
| North Dakota | Yes | X | | | X | | |
| No. Mariana Islands | nr | | | | | | |
| Ohio | Yes | X | | | X | | |
| Oklahoma | No | | | | X | | |
| Oregon | Yes | X | | | X | | |
| Pennsylvania | Yes | X | X | | X | X | |
| Puerto Rico | nr | | | | | | |
| Rhode Island | Yes | X | X | State Attorney General | X | | State Attorney General |
| South Carolina | No | | | | X | | |
| South Dakota | Yes | X | X | Dept. of Public Safety | X | | |
| Tennessee | No | | | | X | | |
| Texas | Yes | X | | | X | | |
| Utah | Yes | X | | | X | | |
| Vermont | Yes | X | | | X | | |
| Virgin Islands | nr | | | | | | |
| Virginia | Yes | X | | | X | | |
| Washington | Yes | X | | | X | | |
| West Virginia | Yes | | X | | X | | |
| Wisconsin | Yes | X | | | X | | |
| Wyoming | Yes | X | | | X | | |

**Table 4 explanatory notes:**
- nr (not reported).

**Table 4a. Warrant record counts and state severity breakdowns, 2018**

| State | Number of active records in state warrant database as of 12/31/2018 | | Number of active records in NCIC warrant file as of 12/31/2018 | Breakdown of warrants in state warrant database: Felony warrants | Misdemeanor warrants | Other | |
|---|---|---|---|---|---|---|---|
| **Total** | **6,665,460** | a | **2,427,681** | **945,812** | **3,402,512** | **1,399,616** | a |
| Alabama | 195,309 | | 16,455 | 10,881 | 33,294 | 151,134 | |
| Alaska | 12,874 | | 623 | 2,855 | 10,010 | 9 | c |
| American Samoa | nr | | 1 | | | | |
| Arizona | 394,811 | | 78,654 | 50,288 | 297,533 | 46,990 | c |
| Arkansas | | b | 141,307 | | | | b |
| California | 470,719 | | 229,198 | 95,048 | 375,117 | 554 | c |
| Colorado | 276,436 | | 44,163 | 39,081 | 177,297 | 60,058 | c |
| Connecticut | 11,809 | | 3,389 | 6,263 | 5,546 | | |
| Delaware | 207,008 | | 2,962 | 11,660 | 162,033 | 33,315 | c |
| District of Columbia | 2,078 | | 601 | 1,242 | 836 | | |
| Florida | 253,622 | | 260,417 | 101,864 | 151,461 | 296 | c |
| Georgia | | b | 230,911 | | | | b |
| Guam | 1,320 | | 853 | 325 | 396 | 599 | c |
| Hawaii | 115,410 | | 529 | 4,153 | 111,257 | | |
| Idaho | 107 | | 28,261 | | | 107 | c |
| Illinois | 348,016 | | 42,952 | 43,972 | 304,044 | | |
| Indiana | 83,656 | | 83,860 | 31,804 | 50,261 | 1,591 | c |
| Iowa | 57,684 | | 17,736 | 8,313 | 48,373 | 998 | c |
| Kansas | | b | 47,780 | | | | b |
| Kentucky | 148,867 | | 10,630 | 49,622 | 67,163 | 32,082 | c |
| Louisiana | | b | 20,353 | | | | b |
| Maine | 37,241 | | 1,351 | na | na | na | |
| Maryland | 69,861 | | 23,252 | 15,610 | 50,717 | 3,534 | c |
| Massachusetts | 353,647 | | 15,158 | 98,947 | 293,954 | | |
| Michigan | 1,063,454 | | 92,082 | 31,545 | 218,437 | 727,772 | c |
| Minnesota | 65,349 | d | 26,146 | 20,807 | 33,175 | 11,367 | c |
| Mississippi | | b | 16,005 | | | | b |
| Missouri | 303,024 | | 33,365 | 32,457 | 106,709 | 163,858 | c |
| Montana | 20,160 | | 4,513 | na | na | na | |
| Nebraska | 4,800 | | 16,647 | 110 | 4,325 | 365 | c |
| Nevada | 323,233 | | 15,116 | na | na | na | |
| New Hampshire | 39,717 | | 3,404 | na | na | na | |
| New Jersey | | b | 54,359 | | | | b |
| New Mexico | | b | 110,322 | | | | b |
| New York | 308,050 | | 35,821 | 68,368 | 214,070 | 25,612 | c |
| North Carolina | na | e | 27,981 | na | na | na | |
| North Dakota | 37,775 | | 1,971 | na | na | na | |
| No. Mariana Islands | nr | | 0 | | | | |
| Ohio | 220,000 | | 17,859 | 45,240 | 58,779 | 115,981 | c |
| Oklahoma | | b | 23,075 | | | | b |
| Oregon | 70,598 | | 18,372 | na | na | na | |
| Pennsylvania | 101,383 | | 122,948 | 21,727 | 56,262 | 23,394 | c |
| Puerto Rico | nr | | 1,791 | | | | |
| Rhode Island | 51,000 | | 2,459 | 832 | 51,000 | | |
| South Carolina | | b | 47,528 | | | | b |
| South Dakota | nr | | 2,132 | | | | |
| Tennessee | | b | 40,816 | | | | b |
| Texas | 254,559 | | 254,181 | na | na | na | |
| Utah | 237,314 | | 1,574 | 22,061 | 183,728 | | |
| Vermont | 5,495 | | 383 | na | na | na | |
| Virgin Islands | nr | | 69 | | | | |
| Virginia | 185,148 | | 61,934 | 77,711 | 107,437 | | |
| Washington | 163,039 | | 50,809 | 36,582 | 126,459 | | |
| West Virginia | nr | | 2,508 | | | | |
| Wisconsin | 151,040 | | 39,288 | 16,444 | 82,992 | | |
| Wyoming | 19,847 | | 827 | | 19,847 | | |

**Table 4a explanatory notes:**

- na (not available).
- nr (not reported).

**Data footnotes:**

a. Felony, misdemeanor, and other warrant breakdowns do not match the total number of active warrants in state databases due to individual counts not being available (na) in Maine, Montana, Nevada, New Hampshire, North Dakota, Oregon, Texas, and Vermont.

b. State does not maintain a warrant file.

c. States reporting "Other" indicate that warrants in this category pertain to attempt to locate, civil, child support, juvenile, ordinance infractions, small claims, traffic-related, and/or matters that are not eligible for NCIC entry, etc.

d. Number of records as of 5/31/2019.

e. Not available per Table 1, footnote "c" narrative.

**Table 4b. Timeliness of warrant entry, 2018**

| | Elapsed time between the issuance of a warrant and entry of its information into the state file | | | | Elapsed time between the issuance of a warrant and entry of its information into the NCIC Wanted Person File | | | | |
|---|---|---|---|---|---|---|---|---|---|
| State | 1 day or less | 2–7 days | 8–30 days | No state warrant file / nr | 1 day or less | 2–7 days | 8–30 days | 30 days or more | nr |
| **Total** | **15** | **25** | **2** | **14** | **15** | **25** | **3** | **2** | **11** |
| Alabama | | | X | | | X | | | |
| Alaska | X | | | | X | | | | |
| American Samoa | | | | X | | | | | X |
| Arizona | | X | | | | X | | | |
| Arkansas | | | | X | X | | | | |
| California | | X | | | | X | | | |
| Colorado | X | | | | X | | | | |
| Connecticut | | X | | | | X | | | |
| Delaware | X | | | | X | | | | |
| District of Columbia | | X | | | | X | | | |
| Florida | | X | | | | X | | | |
| Georgia | | | | X | X | | | | |
| Guam | | X | | | | X | | | |
| Hawaii | X | | | | | | X | | |
| Idaho | X | | | | X | | | | |
| Illinois | | X | | | | X | | | |
| Indiana | | X | | | | X | | | |
| Iowa | | X | | | | X | | | |
| Kansas | | | | X | | | | | X |
| Kentucky | X | | | | X | | | | |
| Louisiana | | | | X | | | | | X |
| Maine | X | | | | X | | | | |
| Maryland | | X | | | | X | | | |
| Massachusetts | X | | | | | | | X | |
| Michigan | | X | | | | X | | | |
| Minnesota | | X | | | | X | | | |
| Mississippi | | | | X | | | | | X |
| Missouri | | X | | | | X | | | |
| Montana | | X | | | | X | | | |
| Nebraska | | X | | | | | X | | |
| Nevada | | X | | | | | | | X |
| New Hampshire | | X | | | | X | | | |
| New Jersey | | | | X | | X | | | |
| New Mexico | | | | X | | | | | X |
| New York | | X | | | | X | | | |
| North Carolina | X | | | | | | | | X |
| North Dakota | | X | | | | | | X | |
| No. Mariana Islands | | | | X | | | | | X |
| Ohio | | | X | | | | X | | |
| Oklahoma | | | | X | X | | | | |
| Oregon | | X | | | | X | | | |
| Pennsylvania | X | | | | X | | | | |
| Puerto Rico | | | | X | | | | | X |
| Rhode Island | X | | | | X | | | | |
| South Carolina | | | | X | | X | | | |
| South Dakota | | X | | | | | | | X |
| Tennessee | | | | X | | X | | | |
| Texas | | X | | | | X | | | |
| Utah | X | | | | X | | | | |
| Vermont | X | | | | X | | | | |
| Virgin Islands | | | | X | | | | | X |
| Virginia | X | | | | X | | | | |
| Washington | | X | | | | X | | | |
| West Virginia | X | | | | | X | | | |
| Wisconsin | | X | | | | X | | | |
| Wyoming | | X | | | X | | | | |

**Table 4b explanatory notes:**
- nr (not reported).

AR2022_400367

**Table 5. Flagging of records, 2018**

| State | Felony flagging capability | Flagging of all felony convictions | Flagging of some felony convictions | Flagging also employed to indicate: Sex offender registrant | Violent offender | MCDV conviction - firearms prohibitor | Active state/NCIC protection order on file | Active state/NCIC warrant on file | Mental health adjudication | DNA available | Ineligible for firearms purchases under Federal law | Ineligible for firearms purchases under state law | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | | |
| **Yes** | **41** | **30** | **11** | **38** | **13** | **19** | **6** | **4** | **5** | **33** | **18** | **16** | **12** |
| **No** | **11** | | | | | | | | | | | | |
| Alabama | Yes | X | | X | | | | | | | | | |
| Alaska | Yes | X | | X | | | X | | | X | X | X | |
| American Samoa | nr | | | | | | | | | | | | |
| Arizona | Yes | X | | X | | | X | | X | X | | | AZ inmate status |
| Arkansas | Yes | X | | | | | | | | X | | | |
| California | No | | | X | | | | | X | X | | | |
| Colorado | Yes | X | | X | | | | | | X | X | X | Deceased, identity theft |
| Connecticut | Yes | | X | X | | X | | | | | | | |
| Delaware | Yes | X | | X | | | X | | | X | | | |
| District of Columbia | No | | | | | | | | | | | | |
| Florida | Yes | | X | X | | | | | | X | | | All registrations |
| Georgia | Yes | X | | X | | | | | | X | X | X | |
| Guam | No | | | X | X | | X | | | | | | |
| Hawaii | Yes | X | | X | X | | | | X | X | | | Career criminal, firearm risk |
| Idaho | Yes | X | | | | | | | | X | X | X | |
| Illinois | Yes | X | | | | X | | | X | X | X | X | |
| Indiana | No | | | | | | | | | | | | |
| Iowa | Yes | | X | X | | | | | | X | | | |
| Kansas | Yes | X | | X | X | X | | | | X | | | Drug offender |
| Kentucky | Yes | | X | X | | | | | | | X | | |
| Louisiana | Yes | | X | X | X | X | | | | X | | | Felon |
| Maine | Yes | X | | X | | X | | | | | | | |
| Maryland | Yes | | X | X | X | X | | | | | | | |
| Massachusetts | No | | | X | | | | | | | | | Juvenile |
| Michigan | Yes | | X | X | | | | | | X | X | X | |
| Minnesota | Yes | | X | | | | | | | | X | X | |
| Mississippi | No | | | X | | | | | | X | | | |
| Missouri | Yes | X | | X | X | | | | | X | X | | |
| Montana | Yes | X | | X | X | | | | | X | | | |
| Nebraska | Yes | X | | X | | X | | | | | | | |
| Nevada | No | | | X | | | | | | X | | | |
| New Hampshire | No | | | | | X | | | | X | | | |
| New Jersey | Yes | X | | X | X | X | X | | X | X | | | Probationers, parolees |
| New Mexico | Yes | X | | X | X | X | | | | | | | |
| New York | Yes | X | | X | X | X | | | | X | | | |
| North Carolina | Yes | X | | | | X | | | | X | | X | |
| North Dakota | No | | | X | | | | | | | | | |
| No. Mariana Islands | nr | | | | | | | | | | | | |
| Ohio | Yes | | X | X | X | | | X | | X | | | Arson offender |
| Oklahoma | Yes | | X | | | X | | | | | X | | Crimes against children, elderly and disabled |
| Oregon | Yes | X | | X | | | | | | X | X | X | |
| Pennsylvania | No | | | X | | X | | X | | X | X | X | |
| Puerto Rico | nr | | | | | | | | | | | | |
| Rhode Island | No | | | X | | | X | | | | | | |
| South Carolina | Yes | X | | X | | X | | | | | X | X | |
| South Dakota | Yes | X | | nr | | | | | | | | | |
| Tennessee | Yes | | X | | | | | | | X | | X | |
| Texas | Yes | X | | X | | X | | X | | X | | X | |
| Utah | Yes | X | | | | | | | | X | | | Deceased, multi-state offender, need DNA |
| Vermont | Yes | X | | X | X | | | | | X | X | X | |
| Virgin Islands | nr | | | | | | | | | | | | |
| Virginia | Yes | X | | X | | | | | | | X | X | |
| Washington | Yes | X | | | | X | | X | | X | X | X | |
| West Virginia | Yes | X | | X | X | X | | | | X | | | Child abuser, bail bond enforcer, concealed weapon |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wisconsin | Yes | X | | X | | | | | | X | X | | |
| Wyoming | Yes | X | | | | X | | | | | X | | |

**Table 5 explanatory notes:**

- nr (not reported).

**Table 5a. Access to records, 2018**

| State | Beyond accessing criminal history record information, other records and services that are accessible through state repositories | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sex offender registry | Orders of protection | Wanted persons/ warrants | Retained applicant prints | Firearm registration | Domestic violence incident reports | Other |
| **Total** | **46** | **37** | **34** | **19** | **7** | **4** | **11** |
| Alabama | X | X | X | X | | | |
| Alaska | X | X | X | X | | | |
| American Samoa | nr | | | | | | |
| Arizona | X | X | X | | | | AZ Dept. of Corrections inmate status |
| Arkansas | X | X | X | | | | |
| California | | X | X | | | | |
| Colorado | X | X | X | X | | | |
| Connecticut | X | X | X | | X | | |
| Delaware | X | X | X | | | X | |
| District of Columbia | nr | | | | | | |
| Florida | X | X | X | | | | Missing persons, child support writs |
| Georgia | X | X | | | | | |
| Guam | X | X | X | | | | |
| Hawaii | X | X | | X | X | | |
| Idaho | X | X | X | | | | Concealed weapons license, no contact orders |
| Illinois | nr | | | | | | |
| Indiana | X | X | X | | | | |
| Iowa | X | X | X | | | | |
| Kansas | X | | | X | | | |
| Kentucky | X | | | X | | X | |
| Louisiana | X | | | X | | | |
| Maine | X | | | X | | | |
| Maryland | X | X | X | X | X | | |
| Massachusetts | X | | | X | | | |
| Michigan | X | X | X | X | X | | |
| Minnesota | X | X | X | | | | Domestic abuse no contact orders, MN arrest photo repository, carry permits |
| Mississippi | X | X | X | | X | | |
| Missouri | X | X | X | X | | | |
| Montana | X | | | | | | Violent Offender Registry |
| Nebraska | X | X | X | X | | | |
| Nevada | X | X | X | | | | Carry concealed weapon permits |
| New Hampshire | X | X | X | | | | |
| New Jersey | X | X | X | X | X | | |
| New Mexico | X | | | X | | | |
| New York | X | X | X | X | | X | |
| North Carolina | nr | | | | | | |
| North Dakota | X | X | X | | | | Parole and probation/supervision |
| No. Mariana Islands | nr | | | | | | |
| Ohio | X | | | | | X | Arson offender registry |
| Oklahoma | | | | X | | | |
| Oregon | X | X | X | | | | |
| Pennsylvania | X | X | X | X | | | |
| Puerto Rico | nr | | | | | | |
| Rhode Island | X | X | X | | | | |
| South Carolina | X | | | | | | Carry concealed weapon permits |
| South Dakota | X | X | | | | | |
| Tennessee | X | | | | | | |
| Texas | X | | | | | | |
| Utah | X | X | X | | | | |
| Vermont | X | X | X | | | | VT Medical Marijuana Registry |
| Virgin Islands | nr | | | | | | |
| Virginia | X | X | X | | X | | |
| Washington | X | X | X | | | | |
| West Virginia | X | X | X | X | | | Child abuser, bail bond enforcer, concealed weapon permits |
| Wisconsin | | X | X | | | | |
| Wyoming | X | X | X | | | | |

**Table 5a explanatory notes:**

- nr (not reported).

AR2022_400371

**Table 5b. Arrest record retention periods , 2018**

| State | Does the state have a law or administrative rule that specifies retention periods for felony and misdemeanor arrest records? | | | | | |
|---|---|---|---|---|---|---|
| | Felony arrest records | Retention period | | Misdemeanor arrest records | Retention period | Citation reference* |
| Alabama | nr | | | | | |
| Alaska | X | 50 yrs. | a | X | 50 yrs. | https://archives.alaska.gov/documents/ rims/schedules/dps/12-384-1.pdf |
| American Samoa | nr | | | | | |
| Arizona | X | 99 yrs. | | X | 99 yrs. | |
| Arkansas | X | Indefinite | b | X | Indefinite | |
| California | nr | | | | | |
| Colorado | nr | | | | | |
| Connecticut | X | 110 yrs. | | X | 110 yrs. | |
| Delaware | X | | | | | |
| District of Columbia | X | | | X | | |
| Florida | X | Until obsolete, superseded, or administrative value is lost. | | X | Until obsolete, superseded, or administrative value is lost. | https://dos.myflorida.com/media/ 698314/gs2-sl-2017-final.pdf |
| Georgia | nr | | | | | |
| Guam | X | Indefinite | | X | Indefinite | 5 GCA Section 20607 |
| Hawaii | nr | | | | | |
| Idaho | X | Indefinite | | X | Indefinite | |
| Illinois | X | Indefinite | c | X | Indefinite | |
| Indiana | X | | | X | | |
| Iowa | nr | | | | | |
| Kansas | X | Indefinite | d | X | Indefinite | |
| Kentucky | X | Indefinite | | X | Indefinite | KRS 17.150(4) |
| Louisiana | X | Indefinite | | X | Indefinite | |
| Maine | nr | | | | | |
| Maryland | nr | | | | | |
| Massachusetts | X | | | | | https://malegislature.gov/Laws/GeneralLaws/ PartIII/TitleI/Chapter221/Section27a |
| Michigan | nr | | | | | |
| Minnesota | nr | | | | | |
| Mississippi | nr | | | | | |
| Missouri | X | Life of systems | | X | Life of systems | |
| Montana | nr | | | | | |
| Nebraska | X | 110 yrs. | | X | 110 yrs. | |
| Nevada | X | 6 years after death or 100 yrs. old. | | X | 6 years after death or 100 yrs. old. | https://nsla.nv.gov/ld.php?content_id=39626722 |
| New Hampshire | nr | | | | | |
| New Jersey | X | Indefinite | | X | Indefinite | N.J.S.A Title 15 Chapter 3 |
| New Mexico | nr | | | | | |
| New York | nr | | | | | |
| North Carolina | nr | | | | | |
| North Dakota | X | Until 99 yrs. old | | X | | http://www.legis.nd.gov/cencode/t54c46.pdf |
| No. Mariana Islands | nr | | | | | |
| Ohio | nr | | | | | |
| Oklahoma | nr | | | | | |
| Oregon | X | 99 yrs. | | X | 99 yrs. | SOS archive special schedule 2010-0009-111 |
| Pennsylvania | nr | | | | | |
| Puerto Rico | nr | | | | | |
| Rhode Island | X | Indefinite or until expunged | | X | Indefinite or until expunged | |
| South Carolina | nr | | | | | |
| South Dakota | | | | X | 10 yrs. | http://sdlegislature.gov/statutes/Codified_laws/ DisplayStatute.aspx?Statute=23-6-8.1&Type=Statute |
| Tennessee | nr | | | | | |
| Texas | X | 125 yrs. | | X | 125 yrs. | |
| Utah | X | 75 yrs. | | X | 75 yrs. | https://axaemarchives.utah.gov/solrDetailPages/ scheduleItem/ARC/ScheduleItem_detail.html? fq=grsItemRecordId:2030 |
| Vermont | nr | | | | | |
| Virgin Islands | nr | | | | | |
| Virginia | X | 120 yrs. | | X | 120 yrs. | http://www.lva.virginia.gov/agencies/records/ sched_specific/156-050.pdf |
| Washington | nr | | | | | |
| West Virginia | nr | | | | | |
| Wisconsin | X | Indefinite | | X | Indefinite | 165.83 165.84 |
| Wyoming | nr | | | | | |

**Table 5b explanatory notes:**
▪ nr (not reported).
* Citation reference is for both felony and misdemeanor records if the state has a law or administrative rule in place
  specifying retention periods for both record types. Alternately, if the state specifies retention periods for felony records or
  misdemeanor records only, the citation applies to that particular record type.

**Data footnotes:**
a. Retention periods are currently under review for purposes of lengthening them.
b. Juvenile records, which are destroyed at age 18 or up to 10 years later upon Court Order.
c. All electronic data of arrest, state's attorney, court and corrections are kept permanently until expunged.
d. KBI retains all fingerprint cards and court dispositions indefinitely.

Table 5c. Court disposition record retention periods, 2018

| | Does the state have a law or administrative rule that specifies retention periods for felony and misdemeanor court disposition records? | | | | |
|---|---|---|---|---|---|
| State | Felony court disposition records | Retention period | Misdemeanor court disposition records | Retention period | Citation reference* |
| Total | 22 | | 22 | | |
| Alabama | nr | | | | |
| Alaska | X | 50 yrs. | X | 50 yrs. | https://archives.alaska.gov/documents/rims/schedules/dps/12-384-1.pdf |
| American Samoa | nr | | | | |
| Arizona | X | 99 yrs. | X | 99 yrs. | |
| Arkansas | X | Indefinite | X | Indefinite | |
| California | | | | | |
| Colorado | | | | | |
| Connecticut | X | 110 yrs. | X | 110 yrs. | |
| Delaware | | | | | |
| District of Columbia | X | | X | | |
| Florida | X | 10–75 yrs.   a | X | 10–75 yrs.   a | https://www.flcourts.org/content/download/217909/1973400/Florida-Rules-of-Judicial-Administration.pdf |
| Georgia | | | | | |
| Guam | X | 10 yrs. | X | 10 yrs. | Superior Court Rule 6.1 |
| Hawaii | | | | | |
| Idaho | X | Indefinite | X | Indefinite | |
| Illinois | X | Indefinite | X | Indefinite | |
| Indiana | | | | | |
| Iowa | | | | | |
| Kansas | | | | | |
| Kentucky | | | | | |
| Louisiana | X | Indefinite | X | Indefinite | |
| Maine | | | | | |
| Maryland | | | | | |
| Massachusetts | X | 10 yrs. to indefinite | X | 10 yrs. to indefinite | https://malegislature.gov/Laws/GeneralLaws/PartIII/TitleI/Chapter221/Section27a |
| Michigan | | | | | |
| Minnesota | | | | | |
| Mississippi | | | | | |
| Missouri | X | Life of systems | X | Life of systems | |
| Montana | | | | | |
| Nebraska | X | 110 yrs. | X | 110 yrs. | |
| Nevada | X | 6 years after death or 100 yrs. old | X | 6 years after death or 100 yrs. old | https://nsla.nv.gov/ld.php?content_id=39626722 |
| New Hampshire | | | | | |
| New Jersey | X | Indefinite | X | Indefinite | N.J.S.A Title 15 Chapter 3 |
| New Mexico | | | | | |
| New York | | | | | |
| North Carolina | nr | | | | |
| North Dakota | X | Until 99 yrs. old | X | Until 99 yrs. old | http://www.legis.nd.gov/cencode/t54c46.pdf |
| No. Mariana Islands | nr | | | | |
| Ohio | | | | | |
| Oklahoma | | | | | |
| Oregon | X | 99 yrs. | X | 99 yrs. | SOS archive special schedule 2010-0009-111 |
| Pennsylvania | | | | | |
| Puerto Rico | nr | | | | |
| Rhode Island | X | Indefinite or until expunged | X | Indefinite or until expunged | |
| South Carolina | | | | | |
| South Dakota | | | | | |
| Tennessee | | | | | |
| Texas | X | 125 yrs. | X | 125 yrs. | |
| Utah | X | 75 yrs. | X | 75 yrs. | https://axaemarchives.utah.gov/solrDetailPages/scheduleItem/ARC/ScheduleItem_detail.html?fq=grsItemRecordId:2030 |
| Vermont | | | | | |
| Virgin Islands | nr | | | | |
| Virginia | X | 20 yrs. | X | 10 yrs. | http://www.lva.virginia.gov/agencies/records/sched_local/GS-12.pdf |
| Washington | | | | | |
| West Virginia | | | | | |
| Wisconsin | X | Indefinite | X | Indefinite | 165.83  165.84 |
| Wyoming | | | | | |

**Table 5c explanatory notes:**

- nr (not reported).

* Citation reference is for both felony and misdemeanor records if the state has a law or administrative rule in place specifying retention periods for both record types. Alternately, if the state specifies retention periods for felony records or misdemeanor records only, the citation applies to that particular record type.

**Data footnotes:**

a. 10 years - Felony and misdemeanor cases in which no information or indictment was filed or in which all charges were dismissed, or in which the state announced a nolle prosequi, or in which the defendant was adjudicated not guilty.
75 years - All felony and misdemeanor cases not previously destroyed.

**Table 6. Number of final dispositions reported to state criminal history repository, 2012, 2014, 2016, and 2018**

| | Number of final case dispositions | | | | | | Percent change | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | 2012 | | 2014 | 2016 | 2018 | | 2012–2014 | | 2014–2016 | | 2016–2018 | |
| **Total** | **13,798,300** | | **12,223,000** | **13,760,500** | **15,043,400** | | **-11%** | | **13%** | | **9%** | |
| Alabama | 27,800 | | 31,700 | 55,600 | nr | | 14 | | 75 | a | na | |
| Alaska | 72,100 | b | 46,700 | 56,500 | 38,400 | b | -35 | b | 21 | b | -32 | b |
| American Samoa | 1,300 | | nr | nr | nr | | | | | | | |
| Arizona | 278,700 | | 370,500 | 98,900 | 174,100 | | 33 | | -73 | c | 76 | c |
| Arkansas | 42,900 | | 54,800 | 51,500 | 79,000 | | 28 | | -6 | | 53 | d |
| California | 1,565,000 | | 1,471,100 | 1,530,600 | 1,603,200 | | -6 | | 4 | | 5 | |
| Colorado | 34,300 | | 115,500 | 1,688,700 | 1,370,700 | | 237 | e | na | e | -19 | |
| Connecticut | 88,600 | | 70,200 | 67,600 | 87,400 | | -21 | | -4 | | 29 | |
| Delaware | 476,700 | | 451,600 | 420,200 | 378,700 | | -5 | | -7 | | -10 | |
| District of Columbia | nr | | 30,200 | nr | 58,400 | | na | | na | | na | |
| Florida | 2,057,400 | | 1,419,800 | 1,005,900 | 1,157,800 | | -31 | f | -29 | f | 15 | f |
| Georgia | 658,900 | | 729,100 | 612,600 | 870,600 | | 11 | | -16 | | 42 | g |
| Guam | 5,000 | | 4,300 | 1,600 | 2,300 | | -14 | h | -63 | h | 44 | |
| Hawaii | 70,400 | | 72,700 | 83,200 | 71,600 | | 3 | | 14 | | -14 | |
| Idaho | 141,200 | | 171,600 | 210,000 | 171,800 | | 22 | | 22 | | -18 | |
| Illinois | 275,000 | | 289,200 | 313,100 | 262,700 | | 5 | | 8 | | -16 | |
| Indiana | 244,400 | | 169,000 | 246,100 | 529,200 | | -31 | | 46 | i | 115 | i |
| Iowa | 305,000 | | 350,800 | 324,500 | 334,000 | | 15 | | 7 | | 3 | |
| Kansas | 229,000 | | 115,600 | 170,300 | 168,200 | | -50 | j | 47 | | -1 | |
| Kentucky | 141,000 | | 106,500 | 138,700 | 120,500 | | -24 | | 30 | k | -13 | |
| Louisiana | 42,400 | | 21,300 | 100,500 | 152,700 | | -50 | l | 372 | l | 52 | |
| Maine | 32,900 | | 33,500 | 31,000 | 31,400 | | 2 | | -7 | | 1 | |
| Maryland | 282,000 | | 239,500 | 204,100 | 257,800 | | -15 | | -15 | | 26 | |
| Massachusetts | nr | | nr | 1,000 | 52,700 | | na | | na | | | m |
| Michigan | 824,200 | | 428,100 | 300,100 | 271,700 | | -48 | n | -30 | n | -9 | |
| Minnesota | 93,400 | | 114,700 | 138,400 | 206,500 | | 23 | | 21 | | 49 | o |
| Mississippi | 15,200 | | 28,600 | 25,100 | 36,000 | | 88 | p | -12 | | 43 | |
| Missouri | 157,800 | | 172,400 | 203,600 | 265,300 | | 9 | | 18 | | 30 | |
| Montana | 26,200 | | 22,600 | 23,100 | 27,600 | | -14 | | 2 | | 19 | |
| Nebraska | 56,200 | | 72,200 | 52,400 | 41,700 | | 28 | q | -27 | q | -20 | |
| Nevada | 50,000 | | 119,800 | 119,000 | 106,800 | | 140 | r | -1 | | -10 | |
| New Hampshire | nr | | 73,800 | 93,200 | 110,800 | | na | | 26 | | 19 | |
| New Jersey | 693,200 | | 170,900 | 171,400 | 171,800 | | -75 | s | 0 | s | 0.2 | |
| New Mexico | 10,000 | | 4,900 | 3,900 | 4,600 | | -51 | t | -20 | t | 18 | |
| New York | 576,200 | | 548,700 | 470,100 | 480,500 | | -5 | | -14 | | 2 | |
| North Carolina | 256,000 | | 243,300 | 251,900 | 260,900 | | -5 | | 4 | | 4 | |
| North Dakota | nr | | 19,800 | 34,200 | 18,100 | | na | | 73 | u | -47 | u |
| No. Mariana Islands | nr | | nr | nr | nr | | | | | | | |
| Ohio | 351,800 | | 400,400 | 940,400 | 1,373,400 | | 14 | | 135 | v | 46 | v |
| Oklahoma | 75,500 | | 85,200 | 208,300 | 198,800 | | 13 | | 144 | w | -5 | |
| Oregon | 149,400 | | 87,500 | 114,000 | 104,700 | | -41 | x | 30 | | -8 | |
| Pennsylvania | 141,200 | | 172,900 | 140,300 | 153,500 | | 22 | | -19 | | 9 | |
| Puerto Rico | 18,100 | | 41,500 | 20,700 | nr | | 129 | | -50 | | na | |
| Rhode Island | 15,900 | | 17,800 | 20,900 | 36,900 | | 12 | | 17 | | 77 | y |
| South Carolina | 183,800 | | 112,100 | 226,700 | 192,100 | | -39 | | 102 | z | -15 | |
| South Dakota | nr | | 350,900 | 304,700 | 315,800 | | na | | -13 | | 4 | |
| Tennessee | 255,700 | | 258,600 | 224,900 | 210,200 | | 1 | | -13 | | -7 | |
| Texas | 1,398,300 | | 1,040,100 | 969,400 | 929,000 | | -26 | | -7 | | -4 | |
| Utah | 118,300 | | 79,900 | 148,100 | 145,300 | | -32 | | 85 | aa | -2 | |
| Vermont | 19,500 | | 19,400 | 16,100 | 14,900 | | -1 | | -17 | | -7 | |
| Virgin Islands | nr | | nr | nr | nr | | | | | | | |
| Virginia | 464,400 | | 460,800 | 420,300 | 449,300 | | -1 | | -9 | | 7 | |
| Washington | 396,800 | | 396,900 | 407,100 | 439,600 | | 0 | | 3 | | 8 | |
| West Virginia | 66,500 | | nr | 56,700 | 58,000 | | na | | na | | 2 | |
| Wisconsin | 302,400 | | 302,500 | 233,500 | 433,100 | | 0 | | -23 | | 85 | bb |
| Wyoming | 10,300 | | 11,500 | 9,800 | 13,300 | | 12 | | -15 | | 36 | |

**Table 6 explanatory notes:**

- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).
- Final dispositions include release by police without charging, declination to proceed by prosecutor, or final trial court disposition.

**Data footnotes:**

a. Final dispositions reported in 2016 include dispositions in backlog.

b. The 2012 increase in reported dispositions are due to efforts to enter case dismissals that are reported to the repository by statewide courts. This also influences the 2014 percent change notation. Counting for 2016 was for each charge, not each case. This was corrected in 2017, which explains the 2018 decrease in dispositions.

c. 2016 numbers were reported in error and corrected in this cycle to 98,900. The 2018 increase over 2016 is attributable to working with statewide courts to provide them with reports of dispositions that are missing.

d. The 2018 increase is attributable to moving from the state's legacy mainframe to a new system with upgraded statistical/counting methodologies.

e. Due to "cycle matching" not being defined in previous surveys, the number of final dispositions reported in 2012, 2014, and 2016 were significantly understated by counting arrests. In changing counting methodologies to cycle matching, the number of dispositions reported and published in the 2016 report (341,200) is revised in this report to 1,688,700. Totals for 2018 are consistent with this updated counting method.

f. Decreases in disposition receipts for 2014 and 2016 account for a change in counting methodologies from previous cycles.

g. The 2018 increase in reported dispositions is due to a change in counting methodologies and a disposition recovery project.

h. The 2012 and 2014 increases in reported dispositions are due to efforts to complete a backlog reduction project. This also caused percent change swings in subsequent years as indicated.

i. 2016 and 2018 increases in disposition receipts are due to efforts to capture missing dispositions on previously submitted arrests that are without dispositions. Working with vendors and statewide courts to improve disposition reporting going forward, an online disposition reporting portal has been developed.

j. The 2014 decrease in reported dispositions is due to a legislative change that required courts to electronically report dispositions to the repository by July 1, 2013. Prior to that date, statewide prosecutors reported dispositions; however, on the effective date of the new law, courts were not ready to report dispositions and prosecutors discontinued reporting. Prosecutors have since begun to report again and work is being done to build electronic court exchanges to report dispositions to the repository.

k. The 2016 increase is due to a reported statewide effort to emphasize the importance of fully documenting arrests with conviction data.

l. The 2014 decrease in disposition receipts is due to the clearing of a 2012 backlog of disposition reports. The 2016 increase in reported dispositions is a result of efforts made to receive electronic dispositions from the state supreme court.

m. Massachusetts Courts recently began submitting fingerprint-supported final case dispositions to the repository. A major project is underway to link court disposition data to the repository, where increases in disposition reporting totals have been realized and are anticipated into the future.

n. The 2012 increase in reported dispositions over 2010 (440,300) is due to efforts to research and enter dispositions for charges for which final dispositions were not reported. The 2014 decrease follows a 2013 legislative change making deferrals nonpublic and not subject to reporting of same to the repository. These also contributed to the decrease in 2016.

o. The 2018 increase is attributable to implementing a new CCH system and counting court cases instead of cycles.

p. The increase in reported dispositions is due to a reported educational outreach project with statewide courts.

q. In 2014, Nebraska undertook an initiative to identify and automate the reconciliation of historical records that were previously reconciled manually. By 2016, this effort was completed and the 2016 total number reflects that effort.

r. The 2014 increase in reported dispositions is due to a major outreach project and backlog reduction effort following a fall 2013 audit of criminal history records between the repository and statewide courts.

s. The 2012 increase in reported dispositions is due to implementing an automated linking and flagging process between the New Jersey State Police and statewide courts. This process went into production in 2011 and stabilized following a backlog reduction effort in 2013 and 2014. The total for 2014 was increased in this cycle by 31,700 to adjust for an error in the total number of dispositions New Jersey reported it received in 2014.

t. The 2012 and 2014 decreases in reported dispositions are due to a backlog reduction project, which was completed in 2010.

u. The 2016 increase in disposition receipts is due to efforts to capture missing dispositions on previously submitted arrests that lack dispositions. Following this effort, 2018 numbers decreased to normal levels.

v. The 2016 increase in dispositions over previous years is due to including dispositions that were received electronically from statewide courts. These were not counted in previous years. The 2018 increase follows a statewide audit of Ohio courts and a statewide campaign outlining the importance of reporting dispositions to repository- and FBI-held records.

w. The 2016 increase in reported dispositions is due to NCHIP-funded efforts to research and enter dispositions for charges for which final dispositions were not reported to the Oklahoma State Bureau of Investigation.

x. The 2014 decrease in reported dispositions is due to a change in counting methodologies from previous cycles.

y. In previous cycles, the number of final case dispositions was reported by the state's criminal history records repository. For 2018, the number of final case dispositions was reported by the state's Judiciary.

z. The increase in reported dispositions is due to a reported educational outreach project with statewide courts.

aa. In 2016, additional programming was put in place to obtain added dispositions from statewide courts.

bb. The 2018 increase is due to counting dispositions that are also in queue for processing and error resolution.

This page left intentionally blank.

AR2022_400379

**Table 6a. Disposition reporting to the Federal Bureau of Investigation (FBI), 2018**

| State | Total number of final dispositions received | Of the total number of state dispositions received, number sent to the FBI | | Of dispositions sent to the FBI, percent sent by: Machine readable data (MRD) | Hard copy or paper | Interstate Identification Index (III) Message Key | Secure web portal |
|---|---|---|---|---|---|---|---|
| **Total** | **15,043,400** | **5,182,371** | | | | | |
| Alabama | nr | | | | | | |
| Alaska | 38,400 | 35,000 | | 100 | | | |
| American Samoa | nr | | | | | | |
| Arizona | 174,100 | 174,100 | | | | 100 | |
| Arkansas | 79,000 | 79,000 | | | | 100 | |
| California | 1,603,200 | 768,300 | | | | | 100 |
| Colorado | 1,370,700 | 0 | a | | | | |
| Connecticut | 87,400 | nr | | | | | |
| Delaware | 378,700 | 26,100 | | | 2 | 98 | |
| District of Columbia | 58,400 | nr | | | | | |
| Florida | 1,157,800 | 0 | a | | | | |
| Georgia | 870,600 | 0 | a | | | | |
| Guam | 2,300 | 2,000 | | | | | 100 |
| Hawaii | 71,600 | 1,400 | a | | | | 100 |
| Idaho | 171,800 | 0 | a | | | | |
| Illinois | 262,700 | nr | | | | 100 | |
| Indiana | 529,200 | 462,900 | b | | | 100 | |
| Iowa | 334,000 | 334,000 | a | | | | |
| Kansas | 168,200 | 0 | a | | | | |
| Kentucky | 120,500 | 120,500 | | | | 5 | 95 |
| Louisiana | 152,700 | nr | | | | | |
| Maine | 31,400 | 13,200 | | | | 100 | |
| Maryland | 257,800 | 6,500 | a,g | 100 | | | |
| Massachusetts | 52,700 | 52,700 | | | | | 100 |
| Michigan | 271,700 | 271,700 | | | | 100 | |
| Minnesota | 206,500 | 0 | a | | | | |
| Mississippi | 36,000 | 36,000 | | | | 100 | |
| Missouri | 265,300 | 100 | a | | | 100 | |
| Montana | 27,600 | 0 | a | | | | |
| Nebraska | 41,700 | 40,500 | | | | 100 | |
| Nevada | 106,800 | 166,700 | c | | 1 | 99 | |
| New Hampshire | 110,800 | 0 | d | | | | |
| New Jersey | 171,800 | 0 | a | | | | |
| New Mexico | 4,600 | 3,300 | | | 84 | | 16 |
| New York | 480,500 | 0 | a | | | | |
| North Carolina | 260,900 | 0 | a | | | | |
| North Dakota | 18,100 | 18,100 | | 100 | | | |
| No. Mariana Islands | nr | | | | | | |
| Ohio | 1,373,400 | 0 | a | | | | |
| Oklahoma | 198,800 | 0 | a | | | | |
| Oregon | 104,700 | 0 | a | | | | |
| Pennsylvania | 153,500 | 144,400 | | 100 | | | |
| Puerto Rico | nr | | | | | | |
| Rhode Island | 36,900 | 36,900 | | | | | 100 |
| South Carolina | 192,100 | 192,100 | | | | | 100 |
| South Dakota | 315,800 | 315,800 | | 100 | | | |
| Tennessee | 210,200 | 0 | a | | | | |
| Texas | 929,000 | 929,000 | | | | 100 | |
| Utah | 145,300 | 57,971 | e | | | 100 | |
| Vermont | 14,900 | 12,400 | | 95 | 5 | | |
| Virgin Islands | nr | | | | | | |
| Virginia | 449,300 | 440,000 | f | | 100 | | |
| Washington | 439,600 | 439,600 | | | | | 100 |
| West Virginia | 58,000 | 2,000 | a | | 100 | | |
| Wisconsin | 433,100 | 100 | | | | 100 | |
| Wyoming | 13,300 | 0 | a | | | | |

**Table 6a explanatory notes:**

- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).

NOTE: National Fingerprint File (NFF) states are signatories to the National Crime Prevention and Privacy Compact, under which these states have agreed to provide all criminal history information when responding to requests received from the FBI in connection with national civil purpose background checks. Consequently, disposition information is made available for all inquiries received from the FBI for arrests that occurred subsequent to the state becoming an NFF participant. In some instances, an NFF state may provide information that predates NFF participation. States that do not participate in the NFF program continue to voluntarily forward disposition information to the FBI.

**Data footnotes:**

a. NFF-participating state.

b. The difference between dispositions received and submitted to the FBI is due to not having an FBI number in the state system; Indiana will not send a disposition without it.

c. While 106,768 dispositions were received, Nevada sent 166,656 dispositions to the FBI due to the ongoing disposition backfill project.

d. New Hampshire reports being in the process of implementing auto submission of final dispositions to the FBI. New Hampshire anticipates completion by end of 2019.

e. Additional programming was put in place to obtain more records from the courts.

f. The Virginia State Police is redesigning its criminal history system to include sending disposition information to the FBI via MRD or electronic posting.

g. The final disposition numbers sent to the FBI represents 10 months worth of data.

**Table 6b.  Interim disposition reporting and posting of indictment information, 2018**

| State | State collects charge-tracking information (interim dispositions) on the criminal history record to show case status through the criminal justice process | | State posts indictment information to the criminal history record | |
|---|---|---|---|---|
| **Total** | | | | |
| **Yes** | **28** | | **17** | |
| **No** | **24** | | **35** | |
| Alabama | No | a | Yes | |
| Alaska | No | | No | |
| American Samoa | nr | | nr | |
| Arizona | Yes | | Yes | |
| Arkansas | Yes | | No | b |
| California | No | | No | |
| Colorado | Yes | | Yes | |
| Connecticut | No | | No | |
| Delaware | Yes | | Yes | |
| District of Columbia | No | | No | |
| Florida | Yes | | No | |
| Georgia | Yes | | Yes | c |
| Guam | No | | Yes | |
| Hawaii | Yes | | Yes | d |
| Idaho | No | | No | |
| Illinois | Yes | | No | |
| Indiana | No | | No | |
| Iowa | No | | No | |
| Kansas | Yes | | No | |
| Kentucky | No | | No | |
| Louisiana | No | | No | |
| Maine | Yes | | No | |
| Maryland | Yes | | Yes | |
| Massachusetts | No | | No | |
| Michigan | Yes | | Yes | |
| Minnesota | Yes | | Yes | |
| Mississippi | Yes | | Yes | |
| Missouri | Yes | | Yes | |
| Montana | No | | No | |
| Nebraska | Yes | | No | |
| Nevada | Yes | | Yes | |
| New Hampshire | Yes | | Yes | |
| New Jersey | Yes | | No | |
| New Mexico | No | | No | |
| New York | Yes | | No | |
| North Carolina | No | | No | |
| North Dakota | Yes | | No | |
| No. Mariana Islands | nr | | nr | |
| Ohio | No | | Yes | |
| Oklahoma | Yes | | Yes | |
| Oregon | No | | No | |
| Pennsylvania | No | | No | |
| Puerto Rico | nr | | nr | |
| Rhode Island | Yes | | No | |
| South Carolina | No | | Yes | |
| South Dakota | Yes | | No | |
| Tennessee | No | | No | |
| Texas | Yes | | No | |
| Utah | Yes | | No | |
| Vermont | Yes | | No | |
| Virgin Islands | nr | | nr | |
| Virginia | No | | No | |
| Washington | No | | No | |
| West Virginia | No | | No | |
| Wisconsin | Yes | | No | |
| Wyoming | No | | No | |

**Table 6b explanatory notes:**

- na (not available).
- nr (not reported).

**Data footnotes:**

a. Charge tracking development is underway to use the Transaction Control Number as the arrest event tracking number.

b. Arkansas rarely uses indictments; instead, a criminal information is filed which starts the criminal proceeding. Information is obtained about the person, including arrest and status of the criminal proceeding, and posted to the record as received.

c. Indicted disposition entered at the discretion of the prosecutor.

d. Indictment information is posted to the criminal history record once the offender is served the warrant and booked.

**Table 6c. Disposition reporting by local prosecutors, 2018**

| State | Does the repository receive any final case dispositions from local prosecutors? | How dispositions are received: Automated means through a centralized (statewide) prosecutors' case management system (CMS) | Local prosecutors' CMS | Is paper-based | Mix of automated and paper-based | |
|---|---|---|---|---|---|---|
| **Total** | | | | | | |
| **Yes** | **34** | **8** | **7** | **19** | **11** | |
| **No** | **18** | | | | | |
| Alabama | No | | | | | |
| Alaska | Yes | | | X | | |
| American Samoa | nr | | | | | |
| Arizona | Yes | | | | | |
| Arkansas | Yes | | | | X | |
| California | Yes | | | | X | |
| Colorado | Yes | X | | | | |
| Connecticut | No | | | | | |
| Delaware | No | | | | | |
| District of Columbia | No | | | | | |
| Florida | No | | | | | |
| Georgia | Yes | | X | X | X | |
| Guam | No | | | | | |
| Hawaii | Yes | | X | X | X | |
| Idaho | Yes | | | X | | a |
| Illinois | Yes | | | X | | |
| Indiana | Yes | | X | | | |
| Iowa | No | | | | | |
| Kansas | Yes | X | | X | X | |
| Kentucky | No | | | | | |
| Louisiana | Yes | | | | X | |
| Maine | Yes | X | | | | |
| Maryland | No | | | | | |
| Massachusetts | Yes b | | X | | | |
| Michigan | Yes | X | X | | | |
| Minnesota | Yes | | | | X | |
| Mississippi | Yes | | | X | | |
| Missouri | Yes | | | | X | |
| Montana | Yes | | | X | | |
| Nebraska | Yes | | | X | | |
| Nevada | Yes | | | X | | |
| New Hampshire | No | | | | | |
| New Jersey | No | | | | | |
| New Mexico | Yes | | | X | | |
| New York | Yes | X | | X | X | |
| North Carolina | No | | | | | |
| North Dakota | Yes | | X | | | |
| No. Mariana Islands | nr | | | | | |
| Ohio | Yes | | | X | | |
| Oklahoma | Yes | X | X | X | X | |
| Oregon | Yes | X | | | | |
| Pennsylvania | No | | | | | |
| Puerto Rico | nr | | | | | |
| Rhode Island | Yes | | | X | | |
| South Carolina | No | | | | | |
| South Dakota | No | | | | | |
| Tennessee | No | | | | | |
| Texas | Yes | | | | X | |
| Utah | Yes | | | X | | |
| Vermont | No | | | | | |
| Virgin Islands | nr | | | | | |
| Virginia | No | | | | | |
| Washington | Yes | | | X | | |
| West Virginia | Yes | | | X | | |
| Wisconsin | Yes | X | | | | |
| Wyoming | Yes | | | X | | |

**Table 6c explanatory notes:**

- nr (not reported).

**Data footnotes:**

a. Some prosecutors send final case disposition information via email.
b. By statute, the arresting agency is required to report when charges are not authorized. However, many prosecutor's offices report this information via their case management systems.

Table 6d. Matching of dispositions between prosecutors and the repository, 2018

| State | PCN or TCN assigned at time of arrest/ booking† | PCN or TCN assigned subsequent to arrest/ booking† | State ID # | Arrest # | Name | Date of birth | Charges | Other |
|---|---|---|---|---|---|---|---|---|
| **Total** | **20** | **6** | **14** | **14** | **25** | **24** | **16** | **13** |
| Alabama | | a | | | | | | |
| Alaska | | | X | X | X | X | X | |
| American Samoa | nr | | | | | | | |
| Arizona | X | | X | | | | | |
| Arkansas | | | X | X | X | X | | X |
| California | | | X | X | X | X | X | |
| Colorado | | | | | | | | X |
| Connecticut | | a | | | | | | |
| Delaware | | a | | | | | | |
| District of Columbia | | a | | | | | | |
| Florida | | a | | | | | | |
| Georgia | X | | X | X | | | X | |
| Guam | | a | | | | | | |
| Hawaii | | | X | X | X | X | | |
| Idaho | X | | | | X | X | X | X |
| Illinois | X | | | | | | | |
| Indiana | X | | | | X | X | | X |
| Iowa | | a | | | | | | |
| Kansas | X | X | | | X | X | | |
| Kentucky | | a | | | | | | |
| Louisiana | X | | X | X | X | X | X | X |
| Maine | | | | X | X | X | | |
| Maryland | | a | | | | | | |
| Massachusetts | nr | | | | | | | |
| Michigan | X | X | | | | | | |
| Minnesota | | | | | X | X | | X |
| Mississippi | | | | X | X | X | | |
| Missouri | X | | | | X | X | | |
| Montana | | | | X | X | X | X | |
| Nebraska | | | | | X | X | | X |
| Nevada | X | | | | X | X | X | X |
| New Hampshire | | a | | | | | | X |
| New Jersey | X | | X | | X | X | X | |
| New Mexico | X | | X | | X | X | X | |
| New York | | | X | X | | | | |
| North Carolina | | a | | | | | | |
| North Dakota | X | | | | X | X | X | X |
| No. Mariana Islands | nr | | | | | | | |
| Ohio | X | | | X | X | X | X | X |
| Oklahoma | nr | | | | | | | |
| Oregon | X | X | X | | X | X | | |
| Pennsylvania | | a | | | | | | |
| Puerto Rico | nr | | | | | | | |
| Rhode Island | | | X | | X | X | X | |
| South Carolina | | a | | | | | | |
| South Dakota | | a | | | | | | |
| Tennessee | | a | | | | | | |
| Texas | X | | X | X | | | | |
| Utah | X | X | X | | X | | X | |
| Vermont | | a | | | | | | |
| Virgin Islands | nr | | | | | | | |
| Virginia | | a | | | | | | |
| Washington | X | | X | X | X | X | | |
| West Virginia | X | X | | | X | X | X | X |
| Wisconsin | | | | X | X | X | X | X |
| Wyoming | X | | | | | | | |

**Table 6d explanatory notes:**

▪ nr (not reported).

† Process Control Number (PCN), Transaction Control Number (TCN)

**Data footnotes:**

a. The repository does not receive final case dispositions from local prosecutors.

Table 7. Receipt of court disposition information by automated means and record matching, 2018

| State | Was any court disposition data reported directly to the repository by automated means? | Percentage of court dispositions reported by automated means | Total automated records received — Via a centralized (statewide) court case management system | Total automated records received — Via an individual local court case management system | PCN or TCN assigned at arrest/booking[a] | PCN or TCN assigned subsequent to arrest/booking | State ID number | Arrest number | Name | Date of birth | Charges | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | |
| **Yes** | **44** | | **5,049,805** | **4,423,696** | **28** | **10** | **27** | **21** | **34** | **32** | **19** | **17** |
| **No** | **7** | | | | | | | | | | | |
| Alabama | nr | | | | | | | | | | | |
| Alaska | No | | | | | | X | X | X | X | X | |
| American Samoa | nr | | | | | | | | | | | |
| Arizona | Yes | 34 | | 23,557 | X | X | X | X | | X | X | |
| Arkansas | Yes | 44 | 23,314 | | | | X | X | | | | Race, sex |
| California | Yes | 80 | | 909,183 | | | X | X | X | X | X | |
| Colorado | Yes | 100 | nr | nr | | | | | | | | Docket # and first 4 characters of last name |
| Connecticut | Yes | 100 | 54,743 | | | | X | X | X | | | |
| Delaware | Yes | 100 | 378,741 | nr | | | X | | | | | Date of arrest |
| District of Columbia | Yes | 100 | nr | nr | | | X | X | | | | |
| Florida | Yes | 100 | | 1,157,827 | X | | X | X | X | X | X | |
| Georgia | Yes | 93 | | 812,367 | X | X | X | X | X | | | |
| Guam | No | | | | nr | | | | | | | |
| Hawaii | Yes | 100 | 34,713 | | | | X | X | X | X | X | OTN |
| Idaho | Yes | 100 | 184,550 | | X | | | X | | | | |
| Illinois | Yes | 98 | | nr | X | | X | | | | | |
| Indiana | Yes | 96 | 506,281 | | X | | | | X | X | | Case # |
| Iowa | Yes | 100 | | | X | | | | | | | |
| Kansas | Yes | 81 | 151,994 | 13,247 | X | | | X | | | | |
| Kentucky | Yes | 30 | nr | nr | | | X | | | | | Citation # issued at arrest |
| Louisiana | Yes | 77 | 98,339 | | X | | X | X | X | X | X | |
| Maine | Yes | 100 | nr | nr | | | X | X | X | | | |
| Maryland | Yes | 61 | 158,128 | | X | X | X | | X | X | X | Court case tracking # |
| Massachusetts | Yes a | nr | nr | nr | | | | X | X | | | |
| Michigan | Yes | 89 | | 271,680 | X | X | | | | | | |
| Minnesota | Yes | 98 | 182,252 | | | | | | X | X | | Controlling agency and case # |
| Mississippi | No | | | | nr | | | | | | | |
| Missouri | Yes | 100 | | | X | | | | X | X | | |
| Montana | Yes | 7 | 2,236 | | | | X | X | X | X | | |
| Nebraska | Yes | 100 | 58,302 | | | | X | X | | | | Date of arrest/date of offense |
| Nevada | Yes | 42 | 44,849 | | X | | | X | X | X | | Date of arrest |
| New Hampshire | Yes | 100 | 110,769 | | | | X | X | X | | | |
| New Jersey | Yes | 100 | 171,800 | | X | | X | X | X | | | |
| New Mexico | No | | | | X | | X | X | X | X | X | |
| New York | Yes | 100 | 480,545 | | | | X | X | | | | |
| North Carolina | Yes | 100 | | nr | X | | X | | | | | |
| North Dakota | No | | | | X | | X | | X | X | | Date of arrest, court case # |
| No. Mariana Islands | nr | | | | | | | | | | | |
| Ohio | Yes | 96 | 857,452 | 454,862 | X | | X | | X | X | X | UCN, date of arrest, and SSN b |
| Oklahoma | No | | | | X | | | | | | | |
| Oregon | Yes | 92 | 97,002 | 19,310 | X | X | X | | X | X | | |
| Pennsylvania | Yes | 100 | 153,505 | | | | X | X | | X | | SSN |
| Puerto Rico | nr | | | | | | | | | | | |
| Rhode Island | Yes c | 83 | nr | | | | X | | X | X | X | |
| South Carolina | Yes | 79 | na | na | | | X | | X | X | X | Warrant #, date of arrest, SSN |
| South Dakota | Yes | 100 | nr | nr | | X | | | X | X | | |
| Tennessee | Yes | 70 | nr | nr | X | | | | | | | |
| Texas | Yes | 95 | | 761,663 | X | | X | X | | | | |
| Utah | Yes | 100 | 145,349 | | X | X | X | | | | | |
| Vermont | Yes | 95 | nr | nr | | | X | X | X | X | | |
| Virgin Islands | nr | | | | | | | | | | | |
| Virginia | Yes | 97 | 449,287 | | X | | | X | X | X | X | OTN |
| Washington | Yes | 63 | 271,622 | | X | | X | X | X | X | | |
| West Virginia | No | | | | X | X | | X | X | X | | Arresting agency, arrest date |
| Wisconsin | Yes | 100 | 433,100 | | X | X | X | X | X | X | X | Date of arrest and booking ORI |
| Wyoming | Yes | 7 | 932 | | X | | | | | | | |

AR2022_400388

**Table 7 explanatory notes:**

- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- na (not available).
- nr (not reported).

† Process Control Number (PCN), Transaction Control Number (TCN).

**Data footnotes:**

a. Massachusetts has a separate disposition database. Courts recently began submitting fingerprint-supported final case dispositions to the repository.

b. Matching methods selected include manual and electronic entry.

c. Rhode Island is in the planning and development phase of bringing automated dispositions online.

**Table 7a. Matching of dispositions received to specific arrest events, 2018**

| State | Percentage of all dispositions received that could not be linked to a specific arrest record | Actions taken when disposition cannot be matched to an arrest | | | | | | | State uses a vendor to identify and locate missing dispositions |
|---|---|---|---|---|---|---|---|---|---|
| | | Placed in suspense file (no further action) | Placed in a suspense file for further investigation | Disposition information is rejected | Follow-up actions are taken by repository staff | Court is contacted | Court provided charge(s) and disposition are posted to the beginning/end of record | Other | |
| **Total** | | **8** | **25** | **19** | **36** | **31** | **6** | | |
| Alabama | nr | | | | X | | | | No |
| Alaska | 6 | | | | X | X | X | | No |
| American Samoa | nr | | | | | | | | nr |
| Arizona | 0 | | X | X | X | X | X | | No |
| Arkansas | 1 | | | X | | X | | | No |
| California | 14 | X | X | X | X | X | | b | No |
| Colorado | 51 | | | | | | | c | No |
| Connecticut | 3 | X | X | | X | | | | No |
| Delaware | 0 | | | X | X | | | d | No |
| District of Columbia | nr | | | | | | | | nr |
| Florida | 45 [a] | | X | | X | X | | | No |
| Georgia | 0 | | | X | X | X | | | Yes |
| Guam | 0 | | | | | | | e | No |
| Hawaii | 10 | | X | | X | | | | No |
| Idaho | 47 | | X | | X | X | | | No |
| Illinois | 0 | | X | | X | X | | | No |
| Indiana | <1 | | X | | X | X | | | No |
| Iowa | <1 | | X | | X | X | X | | nr |
| Kansas | 40 | | X | | X | | X | | No |
| Kentucky | 9 | | | X | | | | | No |
| Louisiana | 26 | | | | X | X | | | No |
| Maine | 0 | | | X | | X | | | No |
| Maryland | 33 | | X | X | X | X | | | Yes |
| Massachusetts | 7 | X | | | | | | | No |
| Michigan | 9 | | X | | X | X | | | No |
| Minnesota | 6 | | X | | X | X | | e | No |
| Mississippi | nr | | | | X | | | | No |
| Missouri | 0 | X | | X | | | | | No |
| Montana | 0 | X | X | | X | X | | | No |
| Nebraska | 60 | | | | X | X | X | | Yes |
| Nevada | 6 | X | | X | X | X | | | No |
| New Hampshire | 43 | | | | X | | X | | No |
| New Jersey | 0 | | | | X | X | | | No |
| New Mexico | 30 | | X | | | | | | No |
| New York | 3 | X | X | X | | X | | | No |
| North Carolina | nr | | | X | | X | | | No |
| North Dakota | 11 | | X | X | X | X | | | No |
| No. Mariana Islands | nr | | | | | | | | nr |
| Ohio | 38 | | X | X | X | X | | f | No |
| Oklahoma | 2 | | X | | X | | | | No |
| Oregon | 3 | | | X | X | X | | | No |
| Pennsylvania | 28 | | | | | | | g | No |
| Puerto Rico | nr | | | | | | | | nr |
| Rhode Island | 5 | | | X | X | X | | | No |
| South Carolina | nr | | | X | X | X | | | No |
| South Dakota | 48 | | | | X | | | | nr |
| Tennessee | 5 | | X | | | | | | Yes |
| Texas | <1 | | | | | | | h | No |
| Utah | 52 | | X | | X | X | | | No |
| Vermont | 5 | | | | X | X | | | No |
| Virgin Islands | nr | | | | | | | | nr |
| Virginia | 14 | | X | X | X | X | | | No |
| Washington | nr | X | X | X | X | X | | e | No |
| West Virginia | 11 | | | | | | | e | No |
| Wisconsin | 8 | | X | | X | X | | | No |
| Wyoming | 2 | | X | | | | | | No |

**Table 7a explanatory notes:**

- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- nr (not reported).

**Data footnotes:**

a. Due to efforts to solicit historical disposition data from the Clerks of Court, several batch submissions of disposition data occurred during 2018 beyond normal volume processing. The repository was able to add many previously missing dispositions and updated numerous existing dispositions. However, many of these records also were unable to be linked to arrests within the repository because they appeared to be duplicates, etc., thus increasing the state's overall "unmatched" disposition rate compared to the last survey cycle.
b. Data corrected, if possible.
c. Added to repository as an "orphan disposition."
d. Placed in a suspense file for processing next day forward.
e. Arresting agency is notified for follow-up action.
f. Exception reports are generated and sent to applicable court for review and resubmit.
g. Held in a holding file until the arrest is received, then it is automatically posted.
h. Placed in a suspense file and checked daily for arrest information.

**Table 7b. Timeliness of receipt and entry of final felony court case disposition information, 2018**

| | | Elapsed time between the occurrence of a final felony court case disposition and its receipt by the repository | | | | | | Elapsed time between the receipt of a final felony court case disposition and its entry into the state's criminal history record database | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | | 1 day or less | 2–7 days | 8–30 days | 31–90 days | 91–180 days | > 1 year | 1 day or less | 2–7 days | 8–30 days | 31–90 days | 91–180 days | > 1 year |
| **Total** | | **14** | **6** | **11** | **8** | **1** | **1** | **19** | **12** | **9** | **3** | **1** | **2** |
| Alabama | nr | | | | | | | | | | | | |
| Alaska | | | | X | | | | | | X | | | |
| American Samoa | nr | | | | | | | | | | | | |
| Arizona | | | | | X | | | | | | | | X |
| Arkansas | | | | | | | | | | | | | |
| California | | | | X | | | | | | | X | | |
| Colorado | | X | | | | | | X | | | | | |
| Connecticut | a | | | | | | | | | | | | |
| Delaware | | X | | | | | | X | | | | | |
| District of Columbia | nr | | | | | | | | | | | | |
| Florida | | | | | X | | | X | | | | | |
| Georgia | | | | X | | | | | | X | | | |
| Guam | | X | | | | | | X | | | | | |
| Hawaii | | | | X | | | | | X | | | | |
| Idaho | | X | | | | | | X | | | | | |
| Illinois | nr | | | | | | | | X | | | | |
| Indiana | | | | | | | X | X | | | | | |
| Iowa | | X | | | | | | | | X | | | |
| Kansas | b | | | | | | | | | | | | |
| Kentucky | | | X | | | | | | X | | | | |
| Louisiana | | | | X | | | | | | | X | | |
| Maine | | X | | | | | | X | | | | | |
| Maryland | | | | | | | | X | | | | | |
| Massachusetts | | | | X | | | | | X | | | | |
| Michigan | | X | | | | | | X | | | | | |
| Minnesota | | X | | | | | | X | | | | | |
| Mississippi | | X | | | | | | | X | | | | |
| Missouri | | | | X | | | | | | X | | | |
| Montana | | | | X | | | | | | X | | | |
| Nebraska | | | X | | | | | | X | | | | |
| Nevada | | | | | X | | | | | | X | | |
| New Hampshire | | X | | | | | | X | | | | | |
| New Jersey | | | X | | | | | X | | | | | |
| New Mexico | | | | | X | | | | | | | X | |
| New York | | X | | | | | | X | | | | | |
| North Carolina | | | | | X | | | X | | | | | |
| North Dakota | | | | | | X | | | | X | | | |
| No. Mariana Islands | nr | | | | | | | | | | | | |
| Ohio | | | | | X | | | | X | | | | |
| Oklahoma | nr | | | | | | | | | | | | |
| Oregon | | X | | | | | | X | | | | | |
| Pennsylvania | nr | | | | | | | X | | | | | |
| Puerto Rico | nr | | | | | | | | | | | | |
| Rhode Island | | | X | | | | | X | | | | | |
| South Carolina | nr | | | | | | | | X | | | | |
| South Dakota | | | | X | | | | | | X | | | |
| Tennessee | | | X | | | | | | X | | | | |
| Texas | | | | X | | | | X | | | | | |
| Utah | | X | | | | | | X | | | | | |
| Vermont | | | | | | | | | | X | | | |
| Virgin Islands | nr | | | | | | | | | | | | |
| Virginia | | | | X | | | | | X | | | | |
| Washington | | | X | | | | | | X | | | | |
| West Virginia | | | | | X | | | | | X | | | |
| Wisconsin | | X | | | | | | | X | | | | |
| Wyoming | | | | | X | | | | | | | | X |

**Table 7b explanatory notes:**

- Percentages and numbers are estimates.
- Percentages have been rounded to the nearest whole percent.
- nr (not reported).

**Data footnotes:**

a. Information is not available and the program does not have sufficient staff to compile.

b. Electronic dispositions typically are received within 1 week of the judgement date if not less. Paper dispositions seem to have a significant degree of variance from judgement date to date received at KBI.

**Table 8. Arrest fingerprint cards processed, 2012, 2014, 2016, and 2018**

| | Fingerprints processed for criminal justice purposes | | | | Percent change | | |
|---|---|---|---|---|---|---|---|
| State | 2012 | 2014 | 2016 | 2018 | 2012–2014 | 2014–2016 | 2016–2018 |
| **Total** | **12,691,630** | **11,474,600** | **11,313,500** | **10,500,600** | **-10%** | **-1%** | **-7%** |
| Alabama | 265,800 | 225,000 | 223,000 | nr | -15 | -1 | na |
| Alaska | 23,300 | 22,200 | 18,200 | 23,300 | -5 | -18 | 28 |
| American Samoa | 30 | nr | nr | nr | | | |
| Arizona | 189,600 | 346,500 | 303,400 | 326,800 | 83 [a] | -12 | 8 |
| Arkansas | 118,000 | 127,500 | 136,900 | 133,200 | 8 | 7 | -3 |
| California | 1,463,700 | 1,465,700 | 1,330,500 | 1,297,500 | <1 | -9 | -2 |
| Colorado | 228,500 | 235,400 | 224,300 | 251,800 | 3 | -5 | 12 |
| Connecticut | 98,000 | 97,200 | 85,800 | 91,500 | -1 | -12 | 7 |
| Delaware | 40,400 | 34,300 | 27,400 | 22,000 | -15 | -20 | -20 |
| District of Columbia | nr | 600 | nr | 48,500 | na | na | na |
| Florida | 914,000 | 773,400 | 876,400 | 762,700 | -15 | 13 | -13 |
| Georgia | 491,200 | 503,000 | 464,300 | 493,500 | 2 | -8 | 6 |
| Guam | nr | 2,500 | 2,700 | 3,000 | nr | 8 | 11 |
| Hawaii | 42,200 | 48,200 | 43,000 | 36,300 | 14 | -11 | -16 |
| Idaho | 71,000 | 63,200 | 58,700 | 57,800 | -11 | -7 | -2 |
| Illinois | 575,800 | 503,900 | 450,200 | 333,100 | -12 | -11 | -26 |
| Indiana | 244,500 | 237,800 | 214,600 | 207,800 | -3 | -10 | -3 |
| Iowa | 92,100 | 87,100 | 79,300 | 85,100 | -5 | -9 | 7 |
| Kansas | 136,700 | 131,200 | 120,400 | 119,500 | -4 | -8 | <1 |
| Kentucky | 199,100 | 172,300 | 215,500 | 212,100 | -13 | 25 [b] | -2 |
| Louisiana | 326,900 | 327,200 | 271,300 | 285,000 | <1 | -17 | 5 |
| Maine | 28,900 | 30,700 | 31,500 | 27,900 | 6 | 3 | -11 |
| Maryland | 256,300 | 266,800 | 208,000 | 183,900 | 4 | -22 [c] | -12 [c] |
| Massachusetts | 135,100 | 150,000 | 148,200 | 133,600 | 11 | -1 | -10 |
| Michigan | 370,100 | 384,200 | 366,400 | 348,700 | 4 | -5 | -5 |
| Minnesota | 157,100 | 154,300 | 154,400 | 158,700 | -2 | <1 | 3 |
| Mississippi | 91,400 | 88,200 | 79,800 | 69,200 | -4 | -10 | -13 |
| Missouri | 223,300 | 220,400 | 218,800 | 214,700 | -1 | -1 | -2 |
| Montana | 21,200 | 21,000 | 25,700 | 44,400 | -1 | 22 [d] | 73 [d] |
| Nebraska | 49,000 | 43,600 | 43,600 | 45,100 | -11 | 0 | 3 |
| Nevada | 103,200 | 82,100 | 80,500 | 104,500 | -21 | -2 | 30 |
| New Hampshire | 45,000 | 42,000 | 38,400 | 30,200 | -7 | -9 | -21 |
| New Jersey | 205,000 | 185,100 | 212,000 | 201,600 | -10 | 15 | -5 |
| New Mexico | 107,600 | 79,800 | 74,000 | 92,900 | -26 | -7 | -5 |
| New York | 737,300 | 713,100 [e] | 626,800 | 508,900 | -3 [e] | -12 [e] | -19 |
| North Carolina | 283,900 | 270,300 | 303,300 | 318,500 | -5 | 12 | 5 |
| North Dakota | 22,800 | 25,600 | 22,700 | 23,500 | 12 | -11 | 4 |
| No. Mariana Islands | nr | nr | nr | nr | | | |
| Ohio | 426,900 | 277,300 | 264,300 | 177,200 | -35 | -5 | -33 |
| Oklahoma | 143,900 | 152,200 | 143,700 | 145,700 | 6 | -6 | 1 |
| Oregon | 120,800 | 137,500 | 133,900 | 136,800 | 14 | -3 | 2 |
| Pennsylvania | 334,100 | 335,200 | 296,800 | 314,300 | <1 | -11 | 6 |
| Puerto Rico | 586,400 | 15,400 [f] | 339,600 | nr | na [f] | na [f] | na |
| Rhode Island | 34,100 | 32,000 | 25,000 | 23,000 | -6 | -22 | -8 |
| South Carolina | 229,400 | 281,300 | 257,900 | 193,300 | 23 | -8 | -25 |
| South Dakota | 28,300 | 29,500 | 31,900 | 31,700 | 4 | 8 | -1 |
| Tennessee | 428,000 | 385,700 | 415,300 | 397,200 | -10 | 8 | -4 |
| Texas | 1,101,300 | 818,500 | 769,900 | 927,500 | -26 | -6 | 20 |
| Utah | 76,500 | 76,800 [g] | 82,500 | 88,500 | <1 | 7 | 7 |
| Vermont | 18,000 | 15,300 | 12,600 | 14,300 | -15 | -18 | 13 |
| Virgin Islands | nr | nr | nr | nr | | | |
| Virginia | 296,100 | 256,500 | 273,000 | 267,800 | -13 | 6 | -2 |
| Washington | 235,900 | 220,600 | 215,400 | 241,300 | -6 | -2 | 12 |
| West Virginia | 97,300 | 105,300 | 92,400 | 50,700 | 8 | -12 | -45 |
| Wisconsin | 162,200 | 157,900 | 161,700 | 175,700 | -3 | 2 | 9 |
| Wyoming | 14,400 | 16,200 | 17,600 | 18,800 | 13 | 9 | 7 |

**Table 8 explanatory notes:**
- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).

**Data footnotes:**

a. 2012 totals were understated, causing the 2012–2014 percent change increase.

b. Kentucky reports that the number of fingerprints processed for criminal justice purposes has increased because of statewide efforts to increase the percentage of arrested individuals being fingerprinted during the booking process or upon disposition of the case.

c. 2016 and 2018 decreases in the number of fingerprints processed for criminal justice purposes is attributable to Maryland's diversion approach for advancing criminal justice reform. Maryland's Governor signed into law the Justice Reinvestment Act with the goal to reduce prison populations. This caused many police agencies to broaden cite and release policies where arrest fingerprints are not recorded when a subject is arrested.

d. Montana reports that 2016 numbers of fingerprints processed for criminal justice purposes increased because of efforts made to capture the fingerprints of older arrest and disposition transactions, increased use of livescan, and more effective statewide training. Additionally and effective July 1, 2017, a new law took effect requiring all misdemeanor offenses to be fingerprinted and reported to the repository. This has caused a significant increase in 2018.

e. The total number of fingerprints processed by New York for criminal justice purposes was overstated by 173,800 in the 2014 report and was adjusted in the 2016 report.

f. 2014 totals were significantly understated, making the percent change between 2012 through 2016 unavailable.

g. The total number of fingerprints processed by Utah for criminal justice purposes was overstated by 40,200 in the 2014 report and was adjusted in the 2016 report.

Table 8a. Arrest/fingerprint reporting, 2018

| State | Number of law enforcement agencies that submit arrest prints via livescan | Percentage of arrest prints submitted via livescan | Number of agencies that submit arrest fingerprints via cardscan | Number of agencies that submit hard copy arrest fingerprint cards | |
|---|---|---|---|---|---|
| Total | 13,744 | 92 | 329 | 3,455 | |
| Alabama | 127 | 90 | 0 | nr | |
| Alaska | 24 | 90 | 0 | 16 | |
| American Samoa | nr | | | | |
| Arizona | 73 | 94 | 15 | 68 | |
| Arkansas | 531 | 95 | 0 | 113 | |
| California | nr | 99 | nr | nr | |
| Colorado | nr | 98 | nr | nr | |
| Connecticut | 161 | 83 | 0 | nr | |
| Delaware | 57 | 100 | 0 | 0 | |
| District of Columbia | 4 | 100 | 0 | 0 | |
| Florida | 407 | 98 | 0 | 0 | a |
| Georgia | 644 | 99 | 0 | 0 | |
| Guam | 1 | 99 | 0 | 0 | |
| Hawaii | 6 | 100 | 5 | 0 | |
| Idaho | 111 | 97 | 0 | 12 | |
| Illinois | nr | 97 | nr | nr | |
| Indiana | 1,556 | 99 | 3 | 3 | |
| Iowa | 242 | 76 | 0 | 283 | |
| Kansas | 456 | 90 | 0 | 235 | |
| Kentucky | 1,174 | 100 | 0 | 0 | |
| Louisiana | 201 | nr | 0 | 20 | |
| Maine | 122 | 45 | 0 | 22 | |
| Maryland | 164 | 99 | 0 | 3 | |
| Massachusetts | 307 | 98 | 0 | 50 | |
| Michigan | 640 | 100 | 0 | 0 | |
| Minnesota | 458 | 100 | 0 | 0 | |
| Mississippi | 172 | 94 | 0 | 54 | |
| Missouri | 317 | 87 | 0 | 500 | |
| Montana | 122 | 96 | 0 | 4 | |
| Nebraska | 36 | 91 | 0 | 84 | |
| Nevada | 90 | 100 | 1 | 0 | |
| New Hampshire | 37 | 85 | 0 | 175 | |
| New Jersey | 652 | 99 | 0 | 0 | |
| New Mexico | 140 | 80 | 0 | 42 | |
| New York | 530 | 98 | 18 | 32 | |
| North Carolina | nr | | | | |
| North Dakota | 87 | 76 | 0 | 30 | |
| No. Mariana Islands | nr | | | | |
| Ohio | 735 | 81 | 0 | 174 | |
| Oklahoma | 567 | 94 | 0 | 28 | |
| Oregon | 132 | 96 | 0 | 33 | |
| Pennsylvania | nr | 70 | 280 | 1015 | |
| Puerto Rico | nr | | | | |
| Rhode Island | 41 | 95 | 0 | 2 | |
| South Carolina | 304 | 94 | 6 | 0 | |
| South Dakota | 41 | 97 | 0 | 7 | |
| Tennessee | 400 | 98 | 0 | 0 | |
| Texas | 462 | 94 | 1 | 45 | |
| Utah | 83 | 97 | 0 | 8 | |
| Vermont | 59 | 81 | 0 | 0 | |
| Virgin Islands | nr | | | | |
| Virginia | 265 | 99 | 0 | 20 | |
| Washington | 255 | 98 | 0 | 20 | |
| West Virginia | 120 | 62 | 0 | 353 | |
| Wisconsin | 574 | 98 | 0 | 0 | b |
| Wyoming | 57 | 99 | 0 | 4 | |

**Table 8a explanatory notes:**

- nr (not reported).

**Data footnotes:**

a. All Florida Sheriff's Offices submit arrests electronically; hard copy fingerprint cards are mailed to FDLE for processing as exceptions.

b. Some agencies submit hard copy for book and release. No records are kept on the number of agencies that submit hard copies.

Table 9. Citation file record counts; cite and release practices, 2018

| State | State maintains a statewide citation file | | Number of criminal citations on file | Number of criminal citations added to file in 2018 | Do statewide law enforcement agencies routinely cite and release individuals without fingerprinting? | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | No | Yes, only for violations | Yes, for both violations and misdemeanors | Yes, for all offenses, including felonies |
| Total | | | 516,903 | 23,900 | 6 | 5 | 25 | 16 |
| Yes | 5 | | | | | | | |
| No | 44 | | | | | | | |
| Alabama | Yes | | 833 | 287 | X | | | |
| Alaska | No | a | | | | | | X |
| American Samoa | nr | | | | | | | |
| Arizona | No | | | | | | | X |
| Arkansas | No | | | | | | | X |
| California | No | | | | | | X | |
| Colorado | No | | | | | | X | |
| Connecticut | No | | | | | | X | |
| Delaware | No | | | | | | X | |
| District of Columbia | No | | | | X | | | |
| Florida | No | | | | | | X | |
| Georgia | No | | | | | | X | |
| Guam | No | | | | X | | | |
| Hawaii | No | | | | | | | X |
| Idaho | No | | | | | | X | |
| Illinois | No | | | | X | | | |
| Indiana | No | | | | | | X | |
| Iowa | nr | | | | | | X | |
| Kansas | No | | | | | | X | |
| Kentucky | No | | | | | | X | |
| Louisiana | No | | | | | | X | |
| Maine | nr | | | | | | | X |
| Maryland | No | | | | | | X | |
| Massachusetts | No | | | | | | | X |
| Michigan | No | | | | | X | | |
| Minnesota | Yes | b | nr | nr | | | | X |
| Mississippi | No | | | | | X | | |
| Missouri | No | | | | | | X | |
| Montana | No | | | | | | | X |
| Nebraska | No | | | | | | X | |
| Nevada | No | | | | | | X | |
| New Hampshire | Yes | | 14,828 | 473 | | | X | |
| New Jersey | No | | | | | X | | |
| New Mexico | No | | | | | | X | |
| New York | Yes | | 5,257 | 24 | | X | | |
| North Carolina | No | | | | | | X | |
| North Dakota | No | | | | | | | X |
| No. Mariana Islands | nr | | | | | | | |
| Ohio | No | | | | | | | X |
| Oklahoma | No | | | | | | X | |
| Oregon | No | | | | | | | X |
| Pennsylvania | No | | | | | | X | |
| Puerto Rico | nr | | | | | | | |
| Rhode Island | No | | | | | X | | |
| South Carolina | No | | | | | | X | |
| South Dakota | No | | | | X | | | |
| Tennessee | No | | | | | | X | |
| Texas | No | | | | X | | | |
| Utah | Yes | | 495,985 | 23,116 | | | | X |
| Vermont | No | | | | | | X | |
| Virgin Islands | nr | | | | | | | |
| Virginia | No | | | | | | X | |
| Washington | No | | | | | | | X |
| West Virginia | nr | | | | | | | X |
| Wisconsin | No | | | | | | X | |
| Wyoming | No | | | | | | X | |

**Table 9 explanatory notes:**

- Percentages and numbers reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- na (not available).
- nr (not reported).

**Data footnotes:**

a. All criminal citations (misdemeanor/felony) are maintained in the repository.
b. The state's criminal citation file is administered by the State Court Administrator's Office.

**Table 9a. Fingerprinting of individuals who have been issued citations in lieu of arrest, 2018**

| State | **State law** is in place requiring courts to order persons who have not been fingerprinted to do so prior to or after an initial court hearing | For both violations and misdemeanors | For all criminal offenses, including felonies | **State policy** or **administrative rule** is in place requiring courts to order persons who have not been fingerprinted to do so prior to or after an initial court hearing | For both violations and misdemeanors | For all criminal offenses, including felonies |
|---|---|---|---|---|---|---|
| **Total** | | | | | | |
| **Yes** | **27** | | | **4** | | |
| **No** | **16** | | | **16** | | |
| Alabama | No | | | No | | |
| Alaska | Yes | | X | | | |
| American Samoa | nr | | | | | |
| Arizona | Yes | | | | | |
| Arkansas | | | | Yes | | X |
| California | Yes | | | | | |
| Colorado | Yes | | X | | | |
| Connecticut | Yes | X | | | | |
| Delaware | Yes | | X | | | |
| District of Columbia | nr | | | | | |
| Florida | No | | | No | | |
| Georgia | No | | | No | | |
| Guam | nr | | | | | |
| Hawaii | | | | Yes | | X |
| Idaho | Yes | | X | | | |
| Illinois | nr | | | | | |
| Indiana | Yes | | X | | | |
| Iowa | Yes | X | | | | |
| Kansas | Yes | X | | | | |
| Kentucky | No | | | No | | |
| Louisiana | No | | | No | | |
| Maine | No | | | No | | |
| Maryland | Yes | | X | | | |
| Massachusetts | No | | | No | | |
| Michigan | No | | | No | | |
| Minnesota | Yes | X | | | | |
| Mississippi | No | | | No | | |
| Missouri | Yes | | | | | |
| Montana | Yes | | X | | | |
| Nebraska | No | | | No | | |
| Nevada | No | | | No | | |
| New Hampshire | | | | Yes | X | |
| New Jersey | Yes | | | | | |
| New Mexico | No | | | No | | |
| New York | Yes | | | | | |
| North Carolina | Yes | | X | | | |
| North Dakota | | | | Yes | | X |
| No. Mariana Islands | nr | | | | | |
| Ohio | Yes | | X | | | |
| Oklahoma | Yes | | X | | | |
| Oregon | No | | | No | | |
| Pennsylvania | No | | | No | | |
| Puerto Rico | nr | | | | | |
| Rhode Island | Yes | | X | | | |
| South Carolina | No | | | No | | |
| South Dakota | nr | | | | | |
| Tennessee | Yes | | X | | | |
| Texas | nr | | | | | |
| Utah | Yes | | X | | | |
| Vermont | Yes | | X | | | |
| Virgin Islands | nr | | | | | |
| Virginia | Yes | X | | | | |
| Washington | No | | | No | | |
| West Virginia | Yes | | X | | | |
| Wisconsin | Yes | | X | | | |
| Wyoming | Yes | | X | | | |

**Table 9a explanatory notes:**

- nr (not reported).

**Table 10. Electronic fingerprint capture devices and the submission and rejection of arrest fingerprints, 2018**

| State | Via livescan | Via cardscan | Hard copy | Total | Percentage of arrest fingerprint records rejected for poor quality |
|---|---|---|---|---|---|
| | Number of arrest fingerprints submitted to the repository by livescan, cardscan, and hard copy | | | | |
| **Total** | **9,851,200** | **71,700** | **305,700** | **10,228,600** | |
| Alabama | 183,800 | 0 | 20,000 | 203,800 | 1% |
| Alaska | 16,700 | 0 | 500 | 17,200 | 0 |
| American Samoa | nr | | | | |
| Arizona | 183,000 | 11,700 | 0 | 194,700 | nr |
| Arkansas | 126,000 | 0 | 7,300 | 133,300 | 1 |
| California | 1,206,400 | 0 | 1,000 | 1,207,400 | 0 |
| Colorado | 246,400 | 0 | 5,400 | 251,800 | nr |
| Connecticut | 75,700 | 0 | 15,800 | 91,500 | nr |
| Delaware | 21,200 | 0 | 0 | 21,200 | 8 |
| District of Columbia | 26,400 | 100 | 0 | 26,500 | 1 |
| Florida | 699,700 | 0 | 12,000 | 711,700 | 0 |
| Georgia | 484,600 | 0 | 1,200 | 485,800 | 4 |
| Guam | 3,000 | 0 | 0 | 3,000 | 0 |
| Hawaii | 36,500 | 0 | 0 | 36,500 | 0 |
| Idaho | 51,400 | 0 | 1,600 | 53,000 | 8 |
| Illinois | 314,500 | 0 | 0 | 314,500 | 0 |
| Indiana | 205,800 | 1,700 | 400 | 207,900 | 1 |
| Iowa | 67,400 | 0 | 17,700 | 85,100 | 0 |
| Kansas | 108,100 | 0 | 11,300 | 119,400 | nr |
| Kentucky | 212,100 | 0 | 0 | 212,100 | 0 |
| Louisiana | 283,100 | 0 | 2,000 | 285,100 | 0 |
| Maine | 25,800 | 0 | 2,000 | 27,800 | 7 |
| Maryland | 185,800 | 0 | 2,500 | 188,300 | 0 |
| Massachusetts | 120,700 | 0 | 1,100 | 121,800 | 1 |
| Michigan | 253,400 | 0 | 300 | 253,700 | 1 |
| Minnesota | 156,600 | 0 | 100 | 156,700 | 1 |
| Mississippi | 256,200 | 3,700 | 0 | 259,900 | 4 |
| Missouri | 384,900 | 0 | 53,000 | 437,900 | 1 |
| Montana | 31,000 | 0 | 1,100 | 32,100 | 0 |
| Nebraska | 40,900 | 0 | 4,200 | 45,100 | 1 |
| Nevada | 99,900 | 0 | 4,600 | 104,500 | 0 |
| New Hampshire | 26,400 | 4,000 | 8,100 | 38,500 | 0 |
| New Jersey | 164,200 | 0 | 200 | 164,400 | 1 |
| New Mexico | 66,100 | 26,800 | 0 | 92,900 | 3 |
| New York | 393,600 | 7,800 | 200 | 401,600 | 9 |
| North Carolina | nr | | | | |
| North Dakota | 22,400 | 0 | 1,100 | 23,500 | 0 |
| No. Mariana Islands | nr | | | | |
| Ohio | 269,900 | 0 | 16,400 | 286,300 | 0 |
| Oklahoma | 133,900 | 0 | 11,800 | 145,700 | 0 |
| Oregon | 132,600 | 0 | 4,500 | 137,100 | 1 |
| Pennsylvania | 301,900 | 0 | 13,200 | 315,100 | 2 |
| Puerto Rico | nr | | | | |
| Rhode Island | 12,600 | 100 | 0 | 12,700 | 1 |
| South Carolina | 182,400 | 11,000 | 0 | 193,400 | 0 |
| South Dakota | 30,900 | 0 | 900 | 31,800 | 5 |
| Tennessee | 397,200 | 0 | 5,000 | 402,200 | 0 |
| Texas | 773,800 | 600 | 51,600 | 826,000 | 1 |
| Utah | 98,300 | 0 | 2,900 | 101,200 | 1 |
| Vermont | 10,500 | 1,600 | 0 | 12,100 | 1 |
| Virgin Islands | nr | | | | |
| Virginia | 265,300 | 2,600 | 0 | 267,900 | 0 |
| Washington | 233,800 | 0 | 3,100 | 236,900 | 1 |
| West Virginia | 34,500 | 0 | 18,200 | 52,700 | 4 |
| Wisconsin | 171,700 | 0 | 3,200 | 174,900 | 0 |
| Wyoming | 22,200 | 0 | 200 | 22,400 | 1 |

**Table 10 explanatory notes:**
- Percentages and numbers are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- nr (not reported).

**Table 10a. Arrest fingerprint card backlog, 2018**

| State | Arrest fingerprint card backlog? | Total | Age of backlogged arrest fingerprint card information | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1 month or less | 2–6 months | 7–12 months | > 1 year | |
| **Total** | | | | | | | |
| **Yes** | **7** | **828,722** | **2** | **1** | **1** | **2** | |
| **No** | **45** | | | | | | |
| Alabama | Yes | 800,000 | | | | X | a |
| Alaska | No | | | | | | |
| American Samoa | nr | | | | | | |
| Arizona | No | | | | | | |
| Arkansas | No | | | | | | |
| California | No | | | | | | |
| Colorado | No | | | | | | |
| Connecticut | No | | | | | | |
| Delaware | No | | | | | | |
| District of Columbia | No | | | | | | |
| Florida | No | | | | | | |
| Georgia | No | | | | | | |
| Guam | No | | | | | | |
| Hawaii | Yes | na | | | X | | |
| Idaho | No | | | | | | |
| Illinois | No | | | | | | |
| Indiana | No | | | | | | |
| Iowa | No | | | | | | |
| Kansas | No | | | | | | |
| Kentucky | No | | | | | | |
| Louisiana | No | | | | | | |
| Maine | Yes | na | X | | | | |
| Maryland | No | | | | | | |
| Massachusetts | No | | | | | | |
| Michigan | No | | | | | | |
| Minnesota | No | | | | | | |
| Mississippi | No | | | | | | |
| Missouri | No | | | | | | |
| Montana | No | | | | | | |
| Nebraska | Yes | 1,200 | X | | | | |
| Nevada | No | | | | | | |
| New Hampshire | Yes | 23,900 | | | | X | |
| New Jersey | No | | | | | | |
| New Mexico | No | | | | | | |
| New York | No | | | | | | |
| North Carolina | No | | | | | | |
| North Dakota | No | | | | | | |
| No. Mariana Islands | nr | | | | | | |
| Ohio | No | | | | | | |
| Oklahoma | No | | | | | | |
| Oregon | No | | | | | | |
| Pennsylvania | No | | | | | | |
| Puerto Rico | nr | | | | | | |
| Rhode Island | No | | | | | | |
| South Carolina | No | | | | | | |
| South Dakota | No | | | | | | |
| Tennessee | No | | | | | | |
| Texas | No | | | | | | |
| Utah | No | | | | | | |
| Vermont | No | | | | | | |
| Virgin Islands | nr | | | | | | |
| Virginia | No | | | | | | |
| Washington | No | | | | | | |
| West Virginia | Yes | 1,750 | nr | | | | |
| Wisconsin | Yes | 1,872 | | X | | | |
| Wyoming | No | | | | | | |

**Table 10a explanatory notes:**

- na (not available).
- nr (not reported).

a. These include approximately 600,000 partially processed fingerprint cards which were not reported in the previous cycle.

**Table 10b. Electronic fingerprint capture devices and the use of livescan/cardscan for criminal and noncriminal justice purposes, 2018**

| | Livescan devices | | Cardscan devices | | |
|---|---|---|---|---|---|
| State | Used for noncriminal justice purposes only | Used for both criminal and noncriminal justice purposes | Used for noncriminal justice purposes only | Used for both criminal and noncriminal justice purposes | |
| **Total** | **10,876** | **5,583** | **159** | **171** | |
| Alabama | nr | 127 | 0 | 0 | |
| Alaska | 0 | 25 | 7 | 0 | |
| American Samoa | nr | | | | |
| Arizona | 36 | 0 | 2 | 0 | |
| Arkansas | na | na | 0 | 0 | a |
| California | 2,685 | 315 | 2 | 28 | |
| Colorado | nr | | | | |
| Connecticut | 65 | 150 | 0 | 0 | |
| Delaware | 8 | 3 | 2 | 2 | |
| District of Columbia | 16 | 36 | 3 | 3 | |
| Florida | 1,428 | unknown | unknown | unknown | |
| Georgia | nr | | | | |
| Guam | 2 | 3 | 1 | 2 | |
| Hawaii | 38 | 8 | 8 | 4 | |
| Idaho | 24 | 16 | 6 | 0 | |
| Illinois | 769 | 0 | 4 | 0 | |
| Indiana | 60 | nr | 1 | 0 | |
| Iowa | 3 | 64 | 0 | 0 | |
| Kansas | 18 | na | 0 | na | a |
| Kentucky | 130 | 238 | 0 | 0 | |
| Louisiana | 159 | 4 | 2 | 6 | |
| Maine | 19 | 44 | 0 | 0 | |
| Maryland | 388 | 135 | 5 | 5 | |
| Massachusetts | 30 | 292 | 0 | 0 | |
| Michigan | 138 | 564 | 2 | 2 | |
| Minnesota | 16 | 0 | 3 | 0 | |
| Mississippi | 202 | 302 | 17 | 18 | |
| Missouri | 80 | 328 | 1 | 5 | |
| Montana | 5 | 62 | 2 | 4 | |
| Nebraska | 13 | 53 | 0 | 3 | |
| Nevada | 108 | 68 | 4 | 4 | |
| New Hampshire | 8 | 43 | 0 | 3 | |
| New Jersey | 50 | 0 | 2 | 0 | |
| New Mexico | 55 | 0 | 0 | 12 | |
| New York | 364 | 442 | 50 | 32 | |
| North Carolina | nr | | | | |
| North Dakota | 19 | 50 | 0 | 0 | |
| No. Mariana Islands | nr | | | | |
| Ohio | 2,552 | 0 | 8 | 0 | |
| Oklahoma | 14 | 86 | 0 | 0 | |
| Oregon | 98 | 90 | 5 | 5 | b |
| Pennsylvania | nr | | | | |
| Puerto Rico | nr | | | | |
| Rhode Island | 6 | 82 | 11 | 11 | |
| South Carolina | 19 | 0 | 0 | 4 | |
| South Dakota | 4 | 41 | 0 | 0 | |
| Tennessee | 60 | 185 | 0 | 0 | |
| Texas | 462 | 34 | 5 | 9 | |
| Utah | 151 | 267 | 4 | 0 | |
| Vermont | 0 | 60 | 0 | 0 | |
| Virgin Islands | nr | | | | |
| Virginia | 278 | 710 | 1 | 1 | |
| Washington | 216 | 217 | nr | nr | |
| West Virginia | 44 | 130 | 0 | 2 | |
| Wisconsin | 35 | 264 | 0 | 0 | |
| Wyoming | 1 | 45 | 1 | 6 | |

**Table 10b explanatory notes:**
- na (not available).
- nr (not reported).

**Data footnotes:**
a. This information is not tracked by the state.
b. Livescan devices includes 46 Fieldprint agency locations.

**Table 10c. Electronic fingerprint capture devices and the submission of fingerprints for noncriminal justice purposes, 2018**

| State | Number of noncriminal justice fingerprints submitted to the repository by livescan and cardscan | | | Percentage of non-criminal justice fingerprints submitted via livescan | | Percentage of non-criminal justice fingerprints submitted via cardscan | |
|---|---|---|---|---|---|---|---|
| | Via livescan | | Via cardscan | | | | |
| **Total** | **10,824,500** | | **1,018,900** | **71%** | | **7%** | a |
| Alabama | 62,300 | | 0 | 77 | | 0 | |
| Alaska | 2,400 | | 17,500 | 6 | | 0 | |
| American Samoa | nr | | | | | | |
| Arizona | 94,700 | | 101,300 | 49 | | 51 | |
| Arkansas | na | b | 0 | na | | 0 | |
| California | 238,200 | | 62,500 | 97 | | 3 | |
| Colorado | 121,700 | | 102,400 | 54 | | 46 | |
| Connecticut | 35,600 | | 56,500 | 39 | | 61 | |
| Delaware | 54,200 | | 4,800 | nr | | nr | |
| District of Columbia | 20,500 | | 200 | 99 | | 1 | |
| Florida | 1,653,600 | | 3,700 | 99 | | <1 | |
| Georgia | 465,300 | | 0 | 100 | | 0 | |
| Guam | 1,000 | | 0 | 100 | | 0 | |
| Hawaii | 48,200 | | 4,900 | 91 | | 9 | |
| Idaho | 69,900 | | 26,500 | 62 | | 38 | |
| Illinois | 576,000 | | 6,000 | 99 | | 1.0 | |
| Indiana | 181,000 | | 6,600 | 99 | | 4 | |
| Iowa | 2,300 | | 0 | 5 | | 0 | |
| Kansas | 13,200 | | 0 | 20 | | 0 | |
| Kentucky | 76,500 | | 0 | 68 | | 0 | |
| Louisiana | 130,300 | | 48,700 | 73 | | 27 | |
| Maine | 19,900 | | 0 | nr | | 0 | |
| Maryland | 363,400 | | 0 | 97 | | 3 | |
| Massachusetts | 173,600 | | 0 | 73 | | 0 | |
| Michigan | 367,600 | | 4,500 | 99 | | 1 | |
| Minnesota | 189,000 | | 0 | 77 | | 0 | |
| Mississippi | 18,200 | | 8,100 | 90 | | 1 | |
| Missouri | 175,200 | | 13,000 | 93 | | 10 | |
| Montana | 12,500 | | 23,700 | 34 | | 66 | |
| Nebraska | 26,100 | | 7,900 | 77 | | 23 | |
| Nevada | 259,400 | | 39,800 | 85 | | 15 | |
| New Hampshire | 21,600 | | 22,900 | 49 | | 51 | |
| New Jersey | 434,600 | c | 11,900 | 97 | | 3 | |
| New Mexico | 119,500 | | 2,300 | 98 | | 2 | |
| New York | 650,900 | | 25,700 | 96 | | 4 | |
| North Carolina | nr | | | | | | |
| North Dakota | 7,600 | | 0 | 33 | | 0 | |
| No. Mariana Islands | nr | | | | | | |
| Ohio | 1,139,500 | | 3,600 | 99 | | 31 | |
| Oklahoma | 75,000 | | 0 | 63 | | 0 | |
| Oregon | 164,600 | | 0 | 94 | | 0 | |
| Pennsylvania | 614,600 | | 15,500 | nr | | nr | |
| Puerto Rico | nr | | | | | | |
| Rhode Island | 40,600 | | 3,100 | 92 | | 8 | |
| South Carolina | 63,000 | | 40,900 | 61 | | 39 | |
| South Dakota | 2,200 | | 0 | 6 | | 0 | |
| Tennessee | 277,400 | | 0 | 100 | | 0 | |
| Texas | 936,000 | | 90,100 | 90 | | 91 | |
| Utah | 135,500 | | 81,800 | 62 | | 38 | |
| Vermont | 19,300 | | 3,200 | 86 | | 14 | |
| Virgin Islands | nr | | | | | | |
| Virginia | 286,700 | | 150,600 | 84 | | 15 | |
| Washington | 250,500 | | 0 | 94 | | 0 | |
| West Virginia | 85,400 | | 2,000 | 98 | | 2 | |
| Wisconsin | 46,800 | | 0 | 79 | | 21 | |
| Wyoming | 1,400 | | 26,700 | 5 | | 95 | |

**Table 10c explanatory notes:**

- Percentages and numbers are estimates.
- Percentages have been rounded to the nearest whole percent.
- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).

**Data footnotes:**

a. The overall total of noncriminal justice fingerprints in this report (15,296,600) include hard copy fingerprints that were mailed to state repositories that are not included in the percentages on this table.
b. This information is not tracked by the state.
c. The State of New Jersey contract vendor operates a cardscan operation for out-of-state noncriminal justice print submissions.

**Table 10d. Mobile technology for capturing and transmitting fingerprints, 2018**

| State | Using mobile technology to transmit fingerprints | | | Plans to implement mobile technology to capture non-fingerprint biometric information | | Currently employing Rapid ID | | Rapid ID | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | For identification purposes | For booking purposes | | | a | | b | Number of searches conducted | Number of hits | |
| **Total** | **33** | **1** | | **9** | | **29** | | **1,551,089** | **996,385** | |
| Alabama | No | No | | Yes | | No | | | | |
| Alaska | No | No | | No | | No | | | | |
| American Samoa | nr | | | | | | | | | |
| Arizona | Yes | No | | Yes | | Yes | | 117,142 | 94,599 | |
| Arkansas | Yes | No | | No | | Yes | | 2,415 | 378 | |
| California | Yes | No | | No | | No | | | | |
| Colorado | Yes | No | | No | | Yes | | 68,415 | nr | |
| Connecticut | No | No | | No | | No | | | | |
| Delaware | Yes | No | | No | | Yes | | 2,431 | 1,376 | |
| District of Columbia | Yes | No | | No | | Yes | | 790 | nr | |
| Florida | No | No | | No | | Yes | | 737,189 | 513,190 | |
| Georgia | Yes | No | | No | | Yes | | 114,047 | 36,829 | |
| Guam | No | No | | Yes | | No | | | | |
| Hawaii | No | No | | No | | No | | | | |
| Idaho | Yes | No | | No | | Yes | | 0 | 0 | |
| Illinois | Yes | No | | No | | Yes | | nr | nr | |
| Indiana | No | No | | No | | No | | | | |
| Iowa | No | No | | Yes | | No | | | | |
| Kansas | Yes | No | | No | | No | | | | |
| Kentucky | Yes | No | | No | | No | | | | |
| Louisiana | Yes | No | | No | | Yes | | nr | nr | |
| Maine | Yes | No | | No | | No | | | | |
| Maryland | Yes | No | | No | | Yes | | 164,234 | 105,013 | |
| Massachusetts | Yes | No | | Yes | | Yes | | nr | | |
| Michigan | Yes | No | | Yes | | Yes | | 14,791 | 8,611 | |
| Minnesota | Yes | No | | No | | Yes | | 107,134 | 83,181 | |
| Mississippi | No | No | | No | | No | | | | |
| Missouri | Yes | Yes | | No | | Yes | | 9,466 | 6,730 | |
| Montana | No | No | | No | | No | | | | |
| Nebraska | Yes | No | | No | | Yes | | 876 | 561 | |
| Nevada | No | No | | No | | No | | | | |
| New Hampshire | No | No | | No | | No | | | | |
| New Jersey | No | No | | No | | No | | | | |
| New Mexico | Yes | No | | No | | Yes | | 1,458 | 1,053 | |
| New York | Yes | No | | No | | No | | | | |
| North Carolina | Yes | No | | No | | Yes | | nr | nr | |
| North Dakota | Yes | No | | No | | Yes | | 962 | na | c |
| No. Mariana Islands | | | | | | | | | | |
| Ohio | Yes | No | | Yes | | Yes | | 2,804 | 600 | |
| Oklahoma | No | No | | No | | No | | | | |
| Oregon | Yes | No | | Yes | | No | | | | |
| Pennsylvania | Yes | No | | No | | Yes | | 7,804 | 3,961 | |
| Puerto Rico | nr | | | | | | | | | |
| Rhode Island | No | No | | Yes | | Yes | | 11,764 | 3,773 | |
| South Carolina | Yes | No | | No | | Yes | | 8,853 | 5,589 | |
| South Dakota | No | No | | No | | No | | 9 | nr | |
| Tennessee | Yes | No | | No | | Yes | | nr | nr | |
| Texas | Yes | No | | No | | Yes | | 19,000 | 6,966 | |
| Utah | No | No | | No | | No | | | | |
| Vermont | No | No | | No | | No | | | | |
| Virgin Islands | nr | | | | | | | | | |
| Virginia | Yes | No | | No | | Yes | | 5,822 | 4,255 | |
| Washington | Yes | No | | No | | Yes | | 6,545 | 3,974 | |
| West Virginia | Yes | No | | No | | Yes | | 1,732 | 934 | |
| Wisconsin | Yes | No | | No | | Yes | | 145,406 | 114,812 | |
| Wyoming | No | No | | No | | No | | | | |

**Table 10d explanatory notes:**

- na (not available).
- na (not available).

**Data footnotes:**

a. Nonfingerprint biometric information includes the capture of scars, marks and tattoo images, facial recognition, and iris data.

b. Rapid ID technology enables authorized users to instantly search local, state, and federal databases to confirm the identity of a person via fingerprints captured using mobile or tethered fingerprint devices, and to query various criminal justice databases for additional information about the individual. Searches can include criminal history record information, outstanding warrants, sex offender status, probation and parole supervision status, caution indicators, and mugshots.

c. North Dakota does not collect statistics on Rapid ID hits, but plans to add them for collection in future surveys.

**Table 11. Privatization of noncriminal justice fingerprint capture services, 2018**

| State | Has the state privatized the taking of noncriminal justice fingerprints? | Fingerprinting service provided by single (S) vendor or multiple (M) vendors | Does the vendor assess a fee above what the state charges for the background check? | Fee | Additional vendor-provided services |
|---|---|---|---|---|---|
| **Total** | | | | | |
| **Yes** | **33** | | **32** | | |
| **No** | **19** | | **2** | | |
| **Single Vendor** | | **19** | | | |
| **Multiple Vendors** | | **14** | | | |
| Alabama | Yes | M | Yes | nr | |
| Alaska | Yes | M | Yes | nr | a |
| American Samoa | nr | | | | |
| Arizona | Yes | S | Yes | $8 | b |
| Arkansas | Yes | M | Yes | nr | |
| California | Yes | M | Yes | nr | c |
| Colorado | Yes | M | Yes | $10 | |
| Connecticut | No | | | | |
| Delaware | No | | | | |
| District of Columbia | No | | | | |
| Florida | Yes | M | Yes | Fees vary | |
| Georgia | Yes | S | Yes | $9 | d |
| Guam | No | | | | |
| Hawaii | Yes | S | Yes | $9 | |
| Idaho | Yes | M | Yes | nr | e |
| Illinois | Yes | M | Yes | nr | |
| Indiana | Yes | S | Yes | $12 | f |
| Iowa | No | | | | |
| Kansas | No | | | | |
| Kentucky | No | | | | |
| Louisiana | No | | | | f |
| Maine | Yes | S | Yes | nr | g |
| Maryland | Yes | M | Yes | nr | |
| Massachusetts | Yes | S | No | | h |
| Michigan | Yes | M | Yes | nr | i |
| Minnesota | No | | | | |
| Mississippi | Yes | M | Yes | $32 | |
| Missouri | No | | Yes | $9 | |
| Montana | No | | | | |
| Nebraska | No | | | | |
| Nevada | Yes | M | Yes | nr | |
| New Hampshire | No | | | | |
| New Jersey | Yes | S | Yes | $10 | |
| New Mexico | Yes | S | Yes | $8 | |
| New York | Yes | S | Yes | $12 | j |
| North Carolina | No | | | | |
| North Dakota | No | | | | |
| No. Mariana Islands | nr | | | | |
| Ohio | Yes | M | Yes | nr | |
| Oklahoma | Yes | S | Yes | nr | |
| Oregon | Yes | S | Yes | $13 | |
| Pennsylvania | Yes | S | Yes | $7 | |
| Puerto Rico | nr | | | | |
| Rhode Island | No | | | | |
| South Carolina | Yes | S | Yes | $14 | |
| South Dakota | No | | | | |
| Tennessee | Yes | S | Yes | $9 | i |
| Texas | Yes | S | Yes | $10 | |
| Utah | Yes | M | No | | |
| Vermont | No | | | | |
| Virgin Islands | nr | | | | |
| Virginia | Yes | S | Yes | $9 | |
| Washington | Yes | S | Yes | nr | k |
| West Virginia | Yes | S | Yes | nr | f |
| Wisconsin | Yes | S | Yes | $8 | |
| Wyoming | No | | | | |

**Table 11 explanatory notes:**

- nr (not reported).
- Fees charged have been rounded to the nearest dollar.

**Additional vendor-provided services:**

a. In some instances, the vendor delivers the fingerprint cards to the repository for processing.
b. Electronic application, fee collection, and photo capture for security guard licenses.
c. Vendors collect and remit license/certification/permit fees.
d. Vendor provides customized website registration, and electronically captures and submits applicant fingerprints to the repository.
e. Vendor transmits fingerprints electronically to the repository on behalf of authorized agency.
f. The vendor sends responses back to the requestor.
g. The vendor maintains the registration website and results portal for staff and applicant entities to view and print results.
h. The vendor manages the results portal.
i. Fee collection.
j. Verification of ID documents, photo capture and transmission.
k. Fee collection and tracking, provides reports for state agencies using their services.

**Table 12. Felony arrests reported to repositories, livescan devices in courtrooms, and disposition backlogs, 2018**

| State | Number of felony arrests reported to the repository | Livescan devices used in the courtroom to link positive identifications with dispositions | Number of livescan devices in courtrooms/ courthouses | Backlog of entering court disposition data into criminal history database (i.e., not entered within 48 hours of receipt at repository) | Number of unprocessed or partially processed court case dispositions |
|---|---|---|---|---|---|
| **Total** | **3,028,669** | | **203** | | **2,004,119** |
| **Yes** | | **13** | | **24** | |
| **No** | | **38** | | **28** | |
| Alabama | nr | No | | Yes | nr |
| Alaska | 6,396 | Yes | 1 | Yes | 3,000 |
| American Samoa | nr | | | | |
| Arizona | 73,403 | Yes | 59 | Yes | 25,151 |
| Arkansas | 48,809 | No | | No | |
| California | 468,777 | No | | Yes | 67,458 |
| Colorado | 76,886 | Yes | nr | Yes | 702,898 |
| Connecticut | 25,585 | No | | No | |
| Delaware | 9,675 | No | | No | |
| District of Columbia | 23,360 | nr | nr | No | |
| Florida | 288,305 | No | | No | |
| Georgia | 169,134 | No | | No | |
| Guam | 666 | Yes | 2 | No | |
| Hawaii | 8,613 | No | | Yes | 172,502 |
| Idaho | 22,370 | No | | Yes | 125,221 |
| Illinois | 95,124 | No | | No | |
| Indiana | 54,132 | Yes | 10 | Yes | nr |
| Iowa | 10,237 | No | | No | |
| Kansas | 25,076 | No | | Yes | nr |
| Kentucky | 54,237 | No | | No | |
| Louisiana | nr | No | | No | |
| Maine | 8,919 | No | | No | |
| Maryland | 30,649 | Yes | 5 | Yes | 20,599 |
| Massachusetts | nr | No | | No | |
| Michigan | 87,189 | Yes | 15 | No | |
| Minnesota | 35,524 | No | | No | |
| Mississippi | 19,693 | No | | No | |
| Missouri | 97,243 | No | | Yes | 7,907 |
| Montana | 8,104 | No | | Yes | 2,000 |
| Nebraska | 17,412 | No | | No | |
| Nevada | 39,551 | No | | Yes | 154,664 |
| New Hampshire | 6,214 | No | | No | |
| New Jersey | 42,775 | Yes | 8 | Yes | nr |
| New Mexico | 27,455 | No | | Yes | 1,747 |
| New York | 138,187 | No | | No | |
| North Carolina | 103,293 | No | | No | |
| North Dakota | 7,845 | No | | Yes | 2,000 |
| No. Mariana Islands | nr | | | | |
| Ohio | 108,770 | Yes | 40 | Yes | 2,574 |
| Oklahoma | 71,925 | No | | No | |
| Oregon | 42,227 | Yes | 11 | Yes | 132,349 |
| Pennsylvania | 35,964 | No | | Yes | 159,012 |
| Puerto Rico | nr | | | | |
| Rhode Island | 9,654 | No | | No | |
| South Carolina | nr | No | | No | |
| South Dakota | nr | No | | No | |
| Tennessee | nr | No | | No | |
| Texas | 268,690 | Yes | 37 | No | |
| Utah | 23,304 | No | | Yes | 237,114 |
| Vermont | 2,192 | No | | No | |
| Virgin Islands | nr | | | | |
| Virginia | 168,250 | No | | Yes | 133,963 |
| Washington | 99,320 | Yes | 3 | No | |
| West Virginia | nr | Yes | 12 | Yes | 39,042 |
| Wisconsin | 61,576 | No | | Yes | 3,918 |
| Wyoming | 5,959 | No | | Yes | 11,000 |

**Table 12 explanatory notes:**
- nr (not reported).

**Table 13. Date of last system replacement/significant upgrade, state fiscal year end-date, and current repository budget, 2018**

| State | Computerized Criminal History (CCH) system | Automated Fingerprint Identification System (AFIS) | Message Switch | Ending date of state fiscal year | | Current fiscal year's repository operating budget | |
|---|---|---|---|---|---|---|---|
| Alabama | 2007 | 2010 | 2007 | 9/30 | | nr | |
| Alaska | 1984 | 2016 | 1984 | 6/30 | | nr | |
| American Samoa | nr | | | | | | |
| Arizona | 2019 | 2015 | 2019 | 6/30 | | $7.4 M | a |
| Arkansas | 2017 | 2014 | 2008 | 6/30 | | na | |
| California | nr | 2018 | 2018 | 6/30 | | nr | |
| Colorado | 2010 | 2013 | 2010 | 6/30 | | $12.3 M | |
| Connecticut | 1980's | 2004 | 1986 | 6/30 | | nr | |
| Delaware | 2012 | 2015 | 2017 | 6/30 | | nr | |
| District of Columbia | 2016 | 2014 | 2016 | 9/30 | | $608 K | |
| Florida | 2019 | 2016 | 1999 | nr | a | nr | a |
| Georgia | 2007 | 2012 | 2006 | 9/30 | | $17 M | |
| Guam | 2011 | 2009 | 2011 | 9/30 | | $249 K | |
| Hawaii | 2015 | 2017 | 2013 | 6/30 | | $2.2 M | |
| Idaho | 2012 | 2014 | 2013 | 6/30 | | $1.3 M | |
| Illinois | 1999 | 2018 | nr | 6/30 | | $20 M | |
| Indiana | 2018 | 2018 | 2013 | 6/30 | | na | |
| Iowa | 2002 | 2017 | nr | 6/30 | | nr | |
| Kansas | 2002 | 2007 | 2018 | 6/30 | | $1 M | |
| Kentucky | 2010 | 2017 | 2010 | 6/30 | | na | |
| Louisiana | 2011 | 2016 | 2019 | 6/30 | | $625 K | a |
| Maine | nr | 2017 | nr | nr | | nr | |
| Maryland | nr | 2018 | 2005 | 6/30 | | $15 M | |
| Massachusetts | nr | 2013 | 2012 | 6/30 | | nr | |
| Michigan | 2005 | 2018 | 2018 | 9/30 | | $10 M | |
| Minnesota | 2018 | 2018 | 2018 | 6/30 | | $7 M | |
| Mississippi | 2017 | 2017 | 2017 | 6/30 | | na | |
| Missouri | 2011 | 2016 | 2011 | 6/30 | | $209 K | |
| Montana | 2002 | 2014 | 2008 | 6/30 | | $1.2 M | |
| Nebraska | 2016 | 2016 | 2013 | 6/30 | | $2.5 M | |
| Nevada | 2018 | 2014 | 2017 | 6/30 | | $19 M | |
| New Hampshire | 2018 | 2017 | 2014 | 6/30 | | $1.5 M | |
| New Jersey | 2017 | 2016 | nr | 6/30 | | na | |
| New Mexico | nr | 2017 | 2016 | 6/30 | | $2.1 M | |
| New York | 2013 | 2017 | 2009 | 3/31 | | $7.7 M | |
| North Carolina | nr | 2019 | nr | 6/30 | | nr | a |
| North Dakota | 1999 | 2007 | 2011 | 6/30 | | $66 K | |
| No. Mariana Islands | nr | | | | | | |
| Ohio | nr | nr | nr | 6/30 | | $12 M | |
| Oklahoma | 2014 | 2017 | 2017 | 6/30 | | nr | |
| Oregon | 2019 | 2019 | 2019 | 6/30 | | $8.2 M | a |
| Pennsylvania | 2015 | 2011 | 2015 | 6/30 | | nr | |
| Puerto Rico | nr | | | | | | |
| Rhode Island | 2015 | 2018 | 2014 | 6/30 | | na | |
| South Carolina | 1980's | 2016 | 2017 | 6/30 | | $2 M | |
| South Dakota | 2018 | 2019 | 2019 | 6/30 | | $353 K | a |
| Tennessee | 2018 | 2014 | 2018 | 6/30 | | $12 M | |
| Texas | 2004 | 2015 | 2002 | 8/31 | | $9 M | |
| Utah | 2014 | 2013 | 2012 | 6/30 | | $14 M | |
| Vermont | 2010 | 2017 | 2016 | 6/30 | | $2.6 M | |
| Virgin Islands | nr | | | | | | |
| Virginia | 2016 | 2014 | 2012 | 6/30 | | $1.8 M | |
| Washington | 2020 | 2014 | 2013 | 6/30 | | na | |
| West Virginia | 2017 | 2019 | 2017 | 6/30 | | $865 K | a |
| Wisconsin | 1999 | 2019 | 2019 | 6/30 | | $4.4 M | a |
| Wyoming | 2010 | 2013 | 2008 | 6/30 | | nr | |

**Table 13 explanatory notes:**

- nr (not reported).

**Data footnotes:**

a. Responses to the survey were received in 2019, and the state reported upgrades that occurred after December 31, 2018.

**Table 13a. State plans to replace CCH-related systems that are at or nearing the end of their respective lifespans, 2018**

| | CCH Replacement Status | | | AFIS Replacement Status | | | Message Switch Status | | |
|---|---|---|---|---|---|---|---|---|---|
| State | Planning | Reviewing bids and/or proposals | Implementation and testing | Planning | Reviewing bids and/or proposals | Implementation and testing | Planning | Reviewing bids and/or proposals | Implementation and testing |
| **Total** | **12** | **2** | **7** | **12** | **5** | **10** | **11** | **2** | **7** |
| Alabama | X | | | X | | | X | | |
| Alaska | X | | | | | | X | | |
| American Samoa | nr | | | | | | | | |
| Arizona | | X | | X | | | | | X |
| Arkansas | | | | | | | | | |
| California | | | | | | | | | |
| Colorado | X | | | | X | | X | | |
| Connecticut | | | X | | | X | | | |
| Delaware | | | | | | | | | |
| District of Columbia | X | | | X | | | X | | |
| Florida | | | | X | | | X | | |
| Georgia | | | | X | | | X | | |
| Guam | | | | | X | | | | |
| Hawaii | | | | | | | X | | |
| Idaho | | | | X | | | | | |
| Illinois | X | | | | | | | | X |
| Indiana | | | | | | | | | |
| Iowa | X | | | | | | | | |
| Kansas | X | | | X | | | | | |
| Kentucky | | | | | | | | | |
| Louisiana | | | | | | | X | | |
| Maine | | | | | | | | | |
| Maryland | | X | | | | X | | X | |
| Massachusetts | X | | | X | | | | | |
| Michigan | | | X | | | | | | |
| Minnesota | | | | X | | | | | |
| Mississippi | X | | | | X | | | | |
| Missouri | | | | | | | | | X |
| Montana | | | X | | | | | | |
| Nebraska | | | | | | | X | | |
| Nevada | X | | | | | | X | | |
| New Hampshire | | | | | | | | | |
| New Jersey | X | | | | | | | | X |
| New Mexico | | | | | | | | | |
| New York | | | | | | X | | | |
| North Carolina | | | | | | X | | | |
| North Dakota | | | X | | X | | | X | |
| No. Mariana Islands | nr | | | | | | | | |
| Ohio | | | X | | | X | | | |
| Oklahoma | | | | | | | | | |
| Oregon | | | X | | | X | | | X |
| Pennsylvania | | | | X | | | | | |
| Puerto Rico | nr | | | | | | | | |
| Rhode Island | | | | | | | X | | |
| South Carolina | | | | | | | | | |
| South Dakota | | | | | X | | | | |
| Tennessee | | | | X | | | | | |
| Texas | | | | | | | | | |
| Utah | | | | | | | | | |
| Vermont | | | | | | | | | |
| Virgin Islands | nr | | | | | | | | |
| Virginia | | | | X | | | | | |
| Washington | | | X | | | X | | | |
| West Virginia | | | | | | X | | | |
| Wisconsin | X | | | | | X | | | X |
| Wyoming | | | | | | X | | | X |

**Table 13a explanatory notes:**
- nr (not reported).

**Table 13b. Number of full- and part-time repository and contractual staff, and type of work contractors perform, 2018**

| | Repository employees | | | Contractual staff | | Type of work performed by contractors | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | Full-time | Part-time | | Full-time | Part-time | Data entry | Document scanning | Help desk support | Info. tech support | Software development | Researching dispositions | Other |
| Alabama | 47 | 2 | | 1 | | | | | X | | | |
| Alaska | 47 | | | | | | | | | | | |
| American Samoa | nr | | | | | | | | | | | |
| Arizona | 36 | | | | | | | | | | | |
| Arkansas | 20 | | | | | | | | | | | |
| California | 485 | | | 4 | | | | | | | | X |
| Colorado | 74 | | | na | | | | | X | X | | |
| Connecticut | 24 | | | 5 | 2 | | | | X | | | |
| Delaware | 54 | 11 | | | | | | | | | | |
| District of Columbia | nr | | | | | | | | | | | |
| Florida | nr | | | | | | | | | | | X |
| Georgia | 102 | 3 | | 10 | | X | X | X | X | X | X | |
| Guam | 150 | | a | | | | | | | | | |
| Hawaii | 41 | 2 | | 2 | 10 | | | X | X | X | | |
| Idaho | 6 | | | | 2 | | | | | | X | |
| Illinois | 71 | | | | 1 | | | | X | | | |
| Indiana | 21 | | | 3 | | X | X | | | | X | |
| Iowa | 30 | | | | | | | | | | | |
| Kansas | 28 | 2 | | | | | | | | | | |
| Kentucky | 73 | | | | | | | | | | | |
| Louisiana | 68 | | | | | | | | | | | |
| Maine | 30 | | | | | | | | | | | |
| Maryland | 116 | | | 15 | | X | X | X | X | X | X | |
| Massachusetts | nr | | | | | | | | | | | |
| Michigan | 32 | | | 3 | | | | | X | | | |
| Minnesota | 44 | 19 | | 6 | 2 | | | | X | X | | X |
| Mississippi | 4 | | | 4 | | X | | | | | | |
| Missouri | 35 | | | 10 | | | | X | X | X | | |
| Montana | 20 | | | | | | | | | | | |
| Nebraska | 59 | | | | | | X | | X | X | | |
| Nevada | 130 | | | 29 | | X | X | | | | | X |
| New Hampshire | 31 | 6 | | 3 | 2 | | | | X | X | | |
| New Jersey | 91 | | | | | | | | | | | |
| New Mexico | 20 | | | | | | | | | | | |
| New York | 120 | | | | | | | | | | | |
| North Carolina | 35 | | | | | | | | | | | |
| North Dakota | 16 | | | | | | | | | | | |
| No. Mariana Islands | nr | | | | | | | | | | | |
| Ohio | 59 | | | | | | | X | | X | | |
| Oklahoma | 49 | 3 | | | | | | | | | | |
| Oregon | 71 | | | | | | | | | | | |
| Pennsylvania | 56 | | | 15 | | | | | X | X | | |
| Puerto Rico | nr | | | | | | | | | | | |
| Rhode Island | 17 | | | | | | | | | | | |
| South Carolina | 38 | 4 | | | | | | | | | | |
| South Dakota | 9 | 1 | | | | | | | | | | |
| Tennessee | 67 | 12 | | 8 | 2 | X | | | | | X | |
| Texas | 65 | | | 2 | | X | X | | | | | |
| Utah | 100 | 3 | | | | | | | | | | |
| Vermont | 16 | | | | | | | | | | | |
| Virgin Islands | nr | | | | | | | | | | | |
| Virginia | 63 | | | 3 | | X | | | X | | X | |
| Washington | 76 | 2 | | | | | | | | | | |
| West Virginia | 35 | 5 | | | 1 | X | X | | | | X | |
| Wisconsin | 16 | | | | | | | | | | | |
| Wyoming | 3 | | | | | | | | | | | |

**Table 13b explanatory notes:**
- nr (not reported).

a.  Guam's repository is maintained by the judiciary, and this figure includes all court personnel
     in addition to criminal history repository staff.

**Table 13c. Repository conduct of routine internal and external data quality audits and frequency of audits, 2018**

| | | | Frequency | | | | | | Frequency | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | Are internal data quality audits conducted? | | More than once per year | Annually | Every 2 years | Every 3 years | Other | Are external data quality audits of contributing agencies conducted? | More than once per year | Annually | Every 2 years | Every 3 years | Other |
| **Total** | | | | | | | | | | | | | |
| **Yes** | **29** | **0** | **10** | **4** | **1** | **1** | **12** | **20** | **2** | **5** | **2** | **6** | **7** |
| **No** | **23** | | | | | | | **32** | | | | | |
| Alabama | No | | | | | | | No | | | | | |
| Alaska | Yes | | | | X | | | Yes | | | X | | Targeted audits are conducted annually. |
| American Samoa | nr | | | | | | | nr | | | | | |
| Arizona | Yes | | | | | X | | Yes | | | | X | |
| Arkansas | No | | | | | | | Yes | | | | X | |
| California | No | | | | | | | No | | | | | |
| Colorado | No | | | | | | | No | | | | | |
| Connecticut | No | | | | | | | No | | | | | |
| Delaware | No | | | | | | | No | | | | | |
| District of Columbia | Yes | | X | | | | | Yes | | X | | | |
| Florida | Yes | | | X | | | | Yes | | X | | | |
| Georgia | No | | | | | | | No | | | | | |
| Guam | No | | | | | | | Yes | | X | | | |
| Hawaii | No | | | | | | | No | | | | | |
| Idaho | Yes | | | | | | | Yes | | | | X | |
| Illinois | Yes | | | | | | Ad hoc based on operation resources. | Yes | | | | | Upon live scan device implementation. |
| Indiana | Yes | | X | | | | | No | | | | | |
| Iowa | Yes | | | | | | Quarterly III synchronization. | Yes | | | | | Each of Iowa's 99 counties will be audited every 3 to 4 years. |
| Kansas | Yes | | X | | | | | No | | | | | |
| Kentucky | No | | | | | | | No | | | | | |
| Louisiana | No | | | | | | | No | | | | | |
| Maine | Yes | | | | | | Spot check routinely on a weekly basis. | No | | | | | |
| Maryland | Yes | | X | | | | | No | | | X | | |
| Massachusetts | Yes | | | | | | | No | | | | | |
| Michigan | Yes | | | | | | Repository has system edits in place. | Yes | | | | | This is a newly implemented process. A zero cycle audit will begin in summer of 2019 and each agency will be audited every 3 years following. |
| Minnesota | Yes | | | | | | Records are reviewed for data quality whenever they are accessed for maintenance or background check. | No | | | | | |
| Mississippi | No | | | | | | | No | | | | | |
| Missouri | Yes | | | | | | III synchronization audits. | No | | | | | |
| Montana | No | | | | | | Completed SEARCH/BJS QAP review 10/17/2018 | Yes | | | | X | |
| Nebraska | Yes | | X | | | | | Yes | | | | X | |
| Nevada | Yes | | | | | | Work performed by repository data entry staff is audited every few months. All other staff work is audited annually. | Yes | | | | | |
| New Hampshire | No | | | | | | | No | | | | | |
| New Jersey | Yes | | X | | | | | No | X | | | | |
| New Mexico | Yes | | | X | | | | No | | | | | |
| New York | Yes | | | X | | | | No | | | | | |
| North Carolina | No | | | | | | | No | | | | | |
| North Dakota | No | | | | | | | No | | | | | |
| No. Mariana Islands | nr | | | | | | | nr | | | | | |
| Ohio | No | | | | | | | Yes | | | | | |
| Oklahoma | Yes | | | | | | Daily review of all fingerprint submissions. | Yes | | | | | Quarterly |
| Oregon | Yes | | | | | | Daily spot checks (approx. 3%) | No | | | | | |
| Pennsylvania | No | | | | | | | Yes | | | | X | |
| Puerto Rico | nr | | | | | | | nr | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rhode Island | No | | | | | | Yes | | X | | | |
| South Carolina | Yes | | | | | | No | | | | | |
| South Dakota | No | | | | | | No | | | | | |
| Tennessee | No | | | | | | No | | | | | |
| Texas | No | | | | | | No | | | | | In development |
| Utah | No | | | | | | No | | | | | |
| Vermont | Yes | | | | | Varies depending on area, but is generally a continual improvement process. | No | | | | | |
| Virgin Islands | nr | | | | | | nr | | | | | |
| Virginia | Yes | X | | | | | Yes | X | | | | |
| Washington | Yes | | X | | | 5% Quality Control (QC) verification conducted on all criminal history record entries. | Yes | | X | | | Annual disposition reporting compliance report. |
| West Virginia | Yes | X | | | | | Yes | | | | | |
| Wisconsin | Yes | X | | | | | No | | | | | |
| Wyoming | Yes | X | | | | | No | | | | | |

**Table 13c explanatory notes:**

- nr (not reported).

**Table 13d. Noncriminal justice name-based background checks, 2018**

| | Number of name-based noncriminal justice background checks performed | | | | |
|---|---|---|---|---|---|
| State | Total | Via Internet | Via mail | Via telephone | Other |
| **Total** | **23,249,500** [a] | **21,798,800** | **811,300** | **106,900** | **532,500** |
| Alabama | 8,600 | 7,200 | 1,400 | 0 | 0 |
| Alaska | 14,200 | 0 | 1,700 | 0 | 12,500 |
| American Samoa | nr | | | | |
| Arizona | 3,500 | 0 | 0 | 0 | 3,500 |
| Arkansas | 256,200 | 241,100 | 15,100 | 0 | 0 |
| California | 8,500 | 0 | 0 | 0 | 8,500 |
| Colorado | 393,200 | 347,600 | 45,600 | 0 | 0 |
| Connecticut | 30,100 | 0 | 30,100 | 0 | 0 |
| Delaware | 900 | 0 | 900 | 0 | 0 |
| District of Columbia | 36,400 | 0 | 2,900 | 0 | 33,500 |
| Florida | 1,309,200 | 1,094,600 | 15,500 | 0 | 199,100 |
| Georgia | 0 | 0 | 0 | 0 | 0 |
| Guam | 300 | 300 | 0 | 0 | 0 |
| Hawaii | 365,100 | 325,000 | 2,300 | 0 | 37,800 |
| Idaho | 17,400 | 0 | 17,400 | 0 | 0 |
| Illinois | 607,200 | 595,000 | 12,200 | 0 | 0 |
| Indiana | 830,500 | 817,800 | 11,000 | 0 | 1,700 |
| Iowa | 269,500 | 254,300 | 14,100 | 0 | 1,100 |
| Kansas | 375,300 | 374,400 | 900 | 0 | 0 |
| Kentucky | 14,700 | 0 | 14,700 | 0 | 0 |
| Louisiana | 130,600 | 12,800 | 1,900 | 0 | 115,900 |
| Maine | 413,900 | 410,000 | 3,900 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 1,460,600 | 1,449,900 | 10,700 | 0 | 0 |
| Michigan | 2,171,200 | 2,165,000 | 800 | 0 | 5,400 |
| Minnesota | 100,800 | 0 | 100,800 | 0 | 0 |
| Mississippi | 3,100 | 0 | 3,100 | 0 | 0 |
| Missouri | 522,500 | 435,200 | 7,000 | 0 | 80,300 |
| Montana | 141,700 | 141,000 | 700 | 0 | 0 |
| Nebraska | 35,400 | 32,300 | 2,600 | 0 | 500 |
| Nevada | 164,100 | 65,800 | 0 | 98,300 | 0 |
| New Hampshire | 165,700 | 0 | 157,200 | 0 | 8,500 |
| New Jersey | 134,600 | 63,500 | 54,000 | 0 | 17,100 |
| New Mexico | 11,800 | 0 | 7,100 | 0 | 4,700 |
| New York | 0 | 0 | 0 | 0 | 0 |
| North Carolina | nr | | | | |
| North Dakota | 30,700 | 0 | 28,300 | 0 | 2,400 |
| No. Mariana Islands | nr | | | | |
| Ohio | 0 | 0 | 0 | 0 | 0 |
| Oklahoma | 204,600 | 106,300 | 98,300 | 0 | 0 |
| Oregon | 312,700 | 302,000 | 2,100 | 8,600 | 0 |
| Pennsylvania | 1,769,100 | 1,744,700 | 24,400 | 0 | 0 |
| Puerto Rico | nr | | | | |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 583,800 | 536,200 | 47,600 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee | 232,500 | 232,500 | 0 | 0 | 0 |
| Texas | 7,102,900 | 7,100,200 | 2,700 | 0 | 0 |
| Utah | 9,600 | 9,600 | 0 | 0 | 0 |
| Vermont | 157,600 | 157,100 | 500 | 0 | 0 |
| Virgin Islands | nr | | | | |
| Virginia | 263,600 | 198,400 | 65,200 | 0 | 0 |
| Washington | 1,729,300 | 1,722,800 | 6,500 | 0 | 0 |
| West Virginia | 100 | 0 | 100 | 0 | 0 |
| Wisconsin | 856,200 | 856,200 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |

**Table 13d explanatory notes:**

- Numbers have been rounded to the nearest 100.
- na (not available).
- nr (not reported).

**Data footnotes:**

a. The total number of name-based checks received does not equal the sum of individual state background checks received via the Internet, mail, telephone, and other sources, due to rounding.

**Table 14. Noncriminal justice fingerprint-based background checks, 2018**

| State | Information contained in the results of a fingerprint-based noncriminal justice background checks | Other | Percentage of fingerprint-based noncriminal justice transactions identified against arrest fingerprints | | Repository attempts to locate missing disposition information before responding to fingerprint-based noncriminal justice inquiries |
|---|---|---|---|---|---|
| Alabama | 1,4 | Notice that a record exists | nr | | No |
| Alaska | 1,2,4 | Warrants | 17 | | No |
| American Samoa | nr | | | | |
| Arizona | 1,4 | Registered sex offender | 18 | | Yes |
| Arkansas | 1 | Sex offender, arrests with no disposition under 3 yrs. old | nr | | Yes |
| California | 1,2,4 | Registration status, sentencing information | 18 | | Yes |
| Colorado | 1 | | 15 | | No |
| Connecticut | 2 | | nr | | nr |
| Delaware | 1,2,3,4 | | 34 | | No |
| District of Columbia | 1,4 | | 11 | | No |
| Florida | 1,3 | Florida Crime Information Center/ NCIC hot file results | 15 | | No |
| Georgia | 1 | | 21 | | No |
| Guam | 1 | | 1 | | No |
| Hawaii | 1,4 | | 11 | | No |
| Idaho | 1 | | 21 | | Yes |
| Illinois | 1,2,3,4 | | 38 | | Yes |
| Indiana | 1,3,4 | | 16 | | Yes |
| Iowa | 1,3,4 | | 13 | | No |
| Kansas | 1,2,4 | | nr | | No |
| Kentucky | 1 | | nr | | Yes |
| Louisiana | 1,2,4 | | nr | | No |
| Maine | 2 | | 7 | | Yes |
| Maryland | 1,4 | | 11 | | Yes |
| Massachusetts | 1,3,4 | | 10 | | No |
| Michigan | 2,3,4 | Authorized suppressed records | 14 | | No |
| Minnesota | 1,2,3,4 | | 14 | | Yes |
| Mississippi | 1 | | 10 | | No |
| Missouri | 1 | | 5 | | Yes |
| Montana | | | nr | | Yes |
| Nebraska | | | na | | Yes |
| Nevada | 1,4 | Cleared/not cleared determinations | 8 | | No |
| New Hampshire | 1,2,4 | | nr | a | Yes |
| New Jersey | 1,2,3,4 | | 8 | | No |
| New Mexico | 1 | | na | b | No |
| New York | 1 | | 11 | | No |
| North Carolina | 1 | | nr | | No |
| North Dakota | 1 | | 18 | | Yes |
| No. Mariana Islands | nr | | | | |
| Ohio | 2,3 | | na | | Yes |
| Oklahoma | 1 | | 9 | | No |
| Oregon | 1 | | 34 | | No |
| Pennsylvania | nr | | nr | | Yes |
| Puerto Rico | nr | | | | |
| Rhode Island | 1,4 | | 0 | | Yes |
| South Carolina | 1,4 | | 15 | | No |
| South Dakota | 1,4 | | nr | a | Yes |
| Tennessee | 1 | | 15 | | No |
| Texas | 1,3 | | na | | No |
| Utah | 1,2,3,4 | | 12 | | Yes |
| Vermont | 1,2 | | 7 | | Yes |
| Virgin Islands | nr | | | | |
| Virginia | 1 | | 16 | | Yes |
| Washington | 2,3 | Sex/kidnapping offender registration information | nr | a | Yes |
| West Virginia | 1 | | na | | No |
| Wisconsin | | All adult events regardless of disposition | 12 | | No |
| Wyoming | 1 | | 9 | | No |

**Table 14 explanatory notes:**

- Percentages reported are estimates.
- Percentages have been rounded to the nearest whole percent.
- na (not available).
- nr (not reported).

**Legend: Information contained in the results for fingerprint-based noncriminal justice background checks**

1. Full record
2. Convictions only
3. Juvenile records
4. Arrests without disposition — over 1 year old

**Data footnotes:**

a. Statistics are not kept.

b. All fingerprint-based background checks are run through the state repository, which holds all applicant and criminal fingerprints. If an arrest record exists for the individual, the fingerprints should hit against the arrest record.

Table 15. Noncriminal justice background checks performed against national and state databases, 2018

| State | Daycare providers | Caregivers at residential facilities | School teachers | Non-teaching school personnel | Volunteers working with children | Prospective foster care parents | Prospective adoptive parents | Relative caregivers | Nurses/elder caregivers | Legal guardians | Hazardous materials licensees | Medical marijuana (dispensers, caregivers) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National Checks | 34 | 31 | 35 | 28 | 27 | 32 | 29 | 25 | 27 | 19 | 12 | 15 |
| State Checks Only | 2 | 8 | 0 | 4 | 5 | 5 | 5 | 10 | 5 | 11 | 3 | 5 |
| State & National Checks | 15 | 13 | 16 | 18 | 18 | 14 | 16 | 11 | 15 | 8 | 6 | 11 |
| Alabama | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | | | |
| Alaska | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | | |
| American Samoa | nr | | | | | | | | | | | |
| Arizona | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | | |
| Arkansas | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | | 1,2 |
| California | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 2 | 1,2 | 1,2 |
| Colorado | 1 | 1 | 1 | 1 | 1 | 1 | a | 1 | 2 | 2 | | 1 |
| Connecticut | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | 1,2 | | 1,2 | 1,2 |
| Delaware | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| District of Columbia | 1 | 1,2 | 1,2 | 2 | 2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | |
| Florida | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 |
| Georgia | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 |
| Guam | 1 | 1 | | | 1 | | | | | | | |
| Hawaii | 1 | 1 | | 1 | 1 | | 1 | 1 | 1 | | | 1 |
| Idaho | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | |
| Illinois | 1,2 | 2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | | 1,2 |
| Indiana | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | |
| Iowa | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 2 | 2 | 2 | | |
| Kansas | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | |
| Kentucky | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 1 | 1 | 1 | |
| Louisiana | 1,2 | 2 | 1,2 | 1,2 | 2 | 1,2 | 2 | 2 | 2 | | 1,2 | 1,2 |
| Maine | | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | | 2 |
| Maryland | 2 | 2 | 1,2 | 1,2 | 2 | 2 | 2 | 2 | 1,2 | 2 | 1,2 | 1,2 |
| Massachusetts | 1 | 1 | 1 | 1 | | 1 | 1 | | | | | |
| Michigan | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | | 1 |
| Minnesota | 1 | 1,2 | 1 | 1,2 | 1,2 | 1 | 1 | 1,2 | 1,2 | 1,2 | | 1,2 |
| Mississippi | 2 | 2 | 1 | 2 | 2 | 2 | 2 | 2 | 1 | 2 | | |
| Missouri | 1 | 1 | 1 | 1 | 1 | 1 | 1,2 | 1 | 1 | 1,2 | 1 | 1 |
| Montana | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | 1 |
| Nebraska | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 2 | 1 | 2 | | 2 |
| Nevada | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 2 | 1,2 |
| New Hampshire | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 2 | 1,2 | 2 | | 1,2 |
| New Jersey | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| New Mexico | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 2 |
| New York | 1,2 | 2 | 1,2 | 1,2 | 1,2 | 2 | 2 | | 1,2 | | 1,2 | |
| North Carolina | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | |
| North Dakota | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | | 1 |
| No. Mariana Islands | nr | | | | | | | | | | | |
| Ohio | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | 1,2 |
| Oklahoma | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 2 |
| Oregon | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | | | 1,2 |
| Pennsylvania | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 |
| Puerto Rico | nr | | | | | | | | | | | |
| Rhode Island | 1 | 1 | 1 | 1,2 | 2 | 1 | 1 | 2 | 1 | 2 | 2 | 1 |
| South Carolina | 1 | 1 | 1 | | | 1 | 1 | | 1 | | | |
| South Dakota | 1,2 | 1 | 1 | 1 | 1,2 | 2 | 2 | 2 | 1 | 1 | 1 | |
| Tennessee | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | |
| Texas | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| Utah | 1 | 1 | 1 | 1 | 1,2 | 1 | 1 | 1 | 1 | 1,2 | | |
| Vermont | 1 | 1 | 1 | 1 | 1,2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Virgin Islands | nr | | | | | | | | | | | |
| Virginia | 1 | 2 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 1 |
| Washington | 1 | 1 | 1 | 1,2 | 2 | 1 | 1,2 | 1 | 1 | 1 | | 1 |
| West Virginia | 1 | 1 | 1 | 2 | 1 | 1 | 1 | | | | | |
| Wisconsin | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1,2 | 1 | |
| Wyoming | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |

**AR2022_400428**

**Table 15 explanatory notes:**
- nr (not reported).

**Legend:**
1. Background checks are made against national criminal history record databases.
2. Background checks are made against state criminal history record databases.

**Data footnotes:**
a. National if licensed, state if private.

**Table 16. Lights-out fingerprint processing, 2018**

| State | Repository conducts lights-out processing | Percentage of fingerprints handled with lights-out processing | | |
|---|---|---|---|---|
| | | Total | Criminal | Noncriminal |
| **Total/Average** | **52** | **69** | **64** | **65** |
| **Yes** | **45** | | | |
| **No** | **7** | | | |
| Alabama | No | | | |
| Alaska | Yes | 13 | 20 | 10 |
| American Samoa | nr | | | |
| Arizona | Yes | 72 | 83 | 51 |
| Arkansas | No | | | |
| California | Yes | 80 | 77 | 82 |
| Colorado | Yes | 43 | 46 | 40 |
| Connecticut | Yes | nr | nr | nr |
| Delaware | No | | | |
| District of Columbia | Yes | 29 | 0 | 100 |
| Florida | Yes | 89 | 98 | 86 |
| Georgia | Yes | 96 | 96 | 96 |
| Guam | Yes | 100 | 100 | 100 |
| Hawaii | Yes | 80 | 84 | 77 |
| Idaho | Yes | 94 | 41 | 53 |
| Illinois | Yes | 80 | nr | nr |
| Indiana | Yes | 65 | 66 | 64 |
| Iowa | No | | | |
| Kansas | Yes | 80 | 80 | 70 |
| Kentucky | Yes | 80 | 100 | 20 |
| Louisiana | Yes | nr | nr | nr |
| Maine | Yes | 67 | 40 | 95 |
| Maryland | Yes | 99 | 54 | 44 |
| Massachusetts | Yes | 40 | 40 | 40 |
| Michigan | Yes | 65 | 70 | 60 |
| Minnesota | Yes | 100 | 100 | 100 |
| Mississippi | Yes | 95 | 95 | 95 |
| Missouri | Yes | 82 | na | na |
| Montana | Yes | 29 | 25 | 34 |
| Nebraska | Yes | 5 | 0 | 5 |
| Nevada | Yes | 36 | 47 | 30 |
| New Hampshire | No | | | |
| New Jersey | Yes | 90 | 93 | 90 |
| New Mexico | Yes | 98 | 52 | 46 |
| New York | Yes | 80 | 80 | 80 |
| North Carolina | Yes | 90 | 81 | 99 |
| North Dakota | Yes | 24 | 0 | 24 |
| No. Mariana Islands | nr | | | |
| Ohio | Yes | 93 | 94 | 93 |
| Oklahoma | Yes | 99 | 99 | 99 |
| Oregon | Yes | 16 | 18 | 15 |
| Pennsylvania | No | | | |
| Puerto Rico | nr | | | |
| Rhode Island | Yes | 100 | 100 | 100 |
| South Carolina | Yes | 100 | 100 | 100 |
| South Dakota | No | | | |
| Tennessee | Yes | 95 | 95 | 95 |
| Texas | Yes | 73 | 68 | 78 |
| Utah | Yes | 60 | 39 | 68 |
| Vermont | Yes | 84 | 81 | 86 |
| Virgin Islands | nr | | | |
| Virginia | Yes | 70 | 70 | 70 |
| Washington | Yes | 18 | 25 | 12 |
| West Virginia | Yes | 42 | 46 | 33 |
| Wisconsin | Yes | 96 | 95 | 99 |
| Wyoming | Yes | 18 | 28 | 12 |

**Table 16 explanatory notes:**
- Percentages are estimates.
- Percentages have been rounded to the nearest whole percent.
- na (not available).
- nr (not reported).

**Table 17. Noncriminal justice background check fees and fee allocation, 2018**

| State | Fee charged to conduct a search of the criminal history database for noncriminal justice purposes | How fees are allocated | Other |
|---|---|---|---|
| **Total** | **52** | | |
| Alabama | Yes | All fees go to support repository operations | |
| Alaska | Yes | All fees go to support repository operations | |
| American Samoa | nr | | |
| Arizona | Yes | | a |
| Arkansas | Yes | | b |
| California | Yes | All fees go to support repository operations | |
| Colorado | Yes | All fees go to support repository operations | |
| Connecticut | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Delaware | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| District of Columbia | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Florida | Yes | | c |
| Georgia | Yes | A percentage of fees (68%) go to support repository operations | |
| Guam | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Hawaii | Yes | All fees go to support repository operations | |
| Idaho | Yes | All fees go to support repository operations | |
| Illinois | Yes | All fees go to support repository operations | |
| Indiana | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Iowa | Yes | All fees go to support repository operations | |
| Kansas | Yes | All fees go to support repository operations | |
| Kentucky | Yes | All fees go to support repository operations | |
| Louisiana | Yes | | d |
| Maine | Yes | | e |
| Maryland | Yes | All fees go to support repository operations | |
| Massachusetts | Yes | Other | nr |
| Michigan | Yes | | f |
| Minnesota | Yes | All fees go to support repository operations | |
| Mississippi | Yes | Other | nr |
| Missouri | Yes | All fees go to support repository operations | |
| Montana | Yes | All fees go to support repository operations | |
| Nebraska | Yes | All fees go to support repository operations | |
| Nevada | Yes | All fees go to support repository operations | |
| New Hampshire | Yes | All fees go to support repository operations | |
| New Jersey | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| New Mexico | Yes | All fees go to support repository operations | |
| New York | Yes | | g |
| North Carolina | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| North Dakota | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| No. Mariana Islands | nr | | |
| Ohio | Yes | All fees go to support repository operations | |
| Oklahoma | Yes | All fees go to support repository operations | |
| Oregon | Yes | All fees go to support repository operations | |
| Pennsylvania | Yes | | h |
| Puerto Rico | nr | | |
| Rhode Island | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| South Carolina | Yes | | i |
| South Dakota | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Tennessee | Yes | All fees go to support repository operations | |
| Texas | Yes | All fees go to support repository operations | |
| Utah | Yes | All fees go to support repository operations | |
| Vermont | Yes | All fees go to support repository operations | j |
| Virgin Islands | nr | | |
| Virginia | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Washington | Yes | All fees go to support repository operations | |
| West Virginia | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |
| Wisconsin | Yes | All fees go to support repository operations | |
| Wyoming | Yes | All fees go to the state general fund, with repository funded by general fund allotment | |

**Table 17 explanatory notes:**

- nr (not reported).

**Data Footnotes:**

a. Allocated to applicant business unit fund.
b. 50% to AR Crime Information Center to maintain the Repository and 50% to the AR State Police to maintain AFIS.
c. Fees go into a trust fund; the legislature allocates the trust fund to fund criminal justice information systems.
d. Statutorily dedicated to the Criminal ID Fund for most repository operations but used elsewhere when authorized.
e. $1 of each fee collected goes to an SBI tech fund, with the remaining balance to the general fund.
f. All fees are designated for specific purposes.
g. 25% of each fee collected supports improvements to the repository, but do not support operating costs.
h. Pennsylvania State Police.
i. State general fund and SLED operations.
j. Fees collected support the costs of the program. Excess funds are returned to the state general fund.

**Table 18. Web-based services for noncriminal justice purposes, 2018**

| State | Repository provides web-based noncriminal justice background checks to the public | Are public access fees collected? | Fee | |
|---|---|---|---|---|
| **Total/Average** | **52** | **30** | **$17** | |
| **Yes** | **27** | **23** | | |
| **No** | **25** | **7** | | |
| Alabama | Yes | Yes | $25 | |
| Alaska | No | No | | |
| American Samoa | nr | | | |
| Arizona | No | No | | |
| Arkansas | Yes | Yes | 20 | |
| California | No | No | | |
| Colorado | Yes | Yes | 7 | |
| Connecticut | No | | | |
| Delaware | No | | | |
| District of Columbia | No | | | |
| Florida | Yes | Yes | 24 | |
| Georgia | Yes | Yes | 15 | |
| Guam | No | | | |
| Hawaii | Yes | Yes | | a |
| Idaho | No | | | |
| Illinois | Yes | Yes | 10 | |
| Indiana | Yes | Yes | 16 | |
| Iowa | Yes | Yes | 15 | |
| Kansas | Yes | Yes | 20 | |
| Kentucky | No | | | |
| Louisiana | No | | | |
| Maine | Yes | No | | |
| Maryland | No | | | |
| Massachusetts | Yes | Yes | nr | |
| Michigan | Yes | Yes | 10 | |
| Minnesota | Yes | No | | |
| Mississippi | No | | | |
| Missouri | Yes | No | | |
| Montana | Yes | Yes | 20 | |
| Nebraska | Yes | Yes | 16 | |
| Nevada | Yes | Yes | 20 | |
| New Hampshire | No | | | |
| New Jersey | Yes | Yes | 20 | |
| New Mexico | No | | | |
| New York | No | | | |
| North Carolina | No | | | |
| North Dakota | No | | | |
| No. Mariana Islands | nr | | | |
| Ohio | No | | | |
| Oklahoma | Yes | No | | |
| Oregon | Yes | Yes | 10 | |
| Pennsylvania | Yes | Yes | 22 | |
| Puerto Rico | nr | | | |
| Rhode Island | No | | | |
| South Carolina | Yes | Yes | 26 | |
| South Dakota | No | | | |
| Tennessee | No | | | |
| Texas | Yes | Yes | 3 | |
| Utah | No | | | |
| Vermont | Yes | Yes | 30 | |
| Virgin Islands | nr | | | |
| Virginia | No | | | |
| Washington | Yes | Yes | 12 | |
| West Virginia | No | | | |
| Wisconsin | Yes | Yes | 7 | |
| Wyoming | No | | | |

Table 18 explanatory notes:
- nr (not reported).
- Fees charged have been rounded to the nearest dollar.

**Data Footnotes:**
a. A fee of $5 is charged to conduct a search and $10 to obtain a copy of record.

**Table 19.  Criminal history records of Interstate Identification Index (III) participants maintained by state criminal history repositories and the Federal Bureau of Investigation (FBI), 2018**

(The information in this table was provided by the Criminal Justice Information Services Division, FBI - Statistics as of January 31, 2019)

| State | Total III records in state and FBI files | State-supported records | FBI-supported records | Percent supported by state repositories | Percent supported by the FBI |
|---|---|---|---|---|---|
| **Total** | **96,574,605** | **69,647,658** | **26,926,947** | **72%** | **28%** |
| Alabama | 1,430,358 | 870,013 | 560,345 | 61 | 39 |
| Alaska † | 247,389 | 166,406 | 80,983 | 67 | 33 |
| American Samoa # | 695 | 0 | 695 | 0 | 100 |
| Arizona † | 1,958,110 | 1,241,572 | 716,538 | 63 | 37 |
| Arkansas † | 819,093 | 645,271 | 173,822 | 79 | 21 |
| California | 10,348,594 | 9,105,915 | 1,242,679 | 88 | 12 |
| Colorado * † | 1,624,414 | 1,403,571 | 220,843 | 86 | 14 |
| Connecticut † | 589,446 | 412,545 | 176,901 | 70 | 30 |
| District of Columbia | 334,632 | 76,641 | 257,991 | 23 | 77 |
| Delaware † | 324,457 | 289,593 | 34,864 | 89 | 11 |
| Florida * † | 6,289,709 | 5,931,168 | 358,541 | 94 | 6 |
| Georgia * † | 4,002,187 | 3,814,769 | 187,418 | 95 | 5 |
| Guam # | 38,139 | 0 | 38,139 | 0 | 100 |
| Hawaii * † | 357,535 | 295,303 | 62,232 | 83 | 17 |
| Idaho * † | 446,971 | 408,960 | 38,011 | 91 | 9 |
| Illinois # | 3,723,078 | 2,979,753 | 743,325 | 80 | 20 |
| Indiana | 1,621,659 | 1,132,319 | 489,340 | 70 | 30 |
| Iowa * † | 775,694 | 513,847 | 261,847 | 66 | 34 |
| Kansas * † | 962,064 | 618,147 | 343,917 | 64 | 36 |
| Kentucky # | 1,123,111 | 773,316 | 349,795 | 69 | 31 |
| Louisiana † | 1,640,130 | 1,206,849 | 433,281 | 74 | 26 |
| Maine † | 213,854 | 73,008 | 140,846 | 34 | 66 |
| Maryland * † | 1,433,720 | 1,049,971 | 383,749 | 73 | 27 |
| Massachusetts | 1,086,664 | 724,590 | 362,074 | 67 | 33 |
| Michigan † | 2,404,661 | 2,148,575 | 256,086 | 89 | 11 |
| Minnesota * † | 1,043,463 | 998,490 | 44,973 | 96 | 4 |
| Mississippi # | 608,200 | 402,053 | 206,147 | 66 | 34 |
| Missouri * † | 1,652,104 | 1,346,624 | 305,480 | 82 | 18 |
| Montana * † | 240,167 | 228,424 | 11,743 | 95 | 5 |
| Nebraska # | 444,485 | 332,645 | 111,840 | 75 | 25 |
| Nevada † | 1,041,725 | 807,620 | 234,105 | 78 | 22 |
| New Hampshire † | 310,914 | 204,837 | 106,077 | 66 | 34 |
| New Jersey * † | 2,218,479 | 2,069,138 | 149,341 | 93 | 7 |
| New Mexico # | 672,345 | 383,626 | 288,719 | 57 | 43 |
| New York * † | 4,153,387 | 3,826,628 | 326,759 | 92 | 8 |
| North Carolina * † | 1,945,476 | 1,805,706 | 139,770 | 93 | 7 |
| North Dakota # | 173,796 | 138,807 | 34,989 | 80 | 20 |
| No. Mariana Islands | 4,565 | 0 | 4,565 | 0 | 100 |
| Ohio * † | 2,277,180 | 1,964,575 | 312,605 | 86 | 14 |
| Oklahoma * † | 1,011,566 | 712,041 | 299,525 | 70 | 30 |
| Oregon * † | 1,131,984 | 1,017,967 | 114,017 | 90 | 10 |
| Pennsylvania | 2,595,844 | 2,106,303 | 489,541 | 81 | 19 |
| Puerto Rico # | 204,486 | 0 | 204,486 | 0 | 100 |
| Rhode Island | 242,008 | 218,783 | 23,225 | 90 | 10 |
| South Carolina † | 1,646,029 | 1,573,281 | 72,748 | 96 | 4 |
| South Dakota # | 303,592 | 217,790 | 85,802 | 72 | 28 |
| Tennessee * † | 1,975,879 | 1,180,015 | 795,864 | 60 | 40 |
| Texas | 7,533,601 | 7,006,852 | 526,749 | 93 | 7 |
| Utah † | 677,790 | 604,371 | 73,419 | 89 | 11 |
| Vermont † | 122,458 | 83,620 | 38,838 | 68 | 32 |
| Virgin Islands | 21,399 | 0 | 21,399 | 0 | 100 |
| Virginia † | 2,259,542 | 1,914,695 | 344,847 | 85 | 15 |
| Washington | 1,666,243 | 1,378,988 | 287,255 | 83 | 17 |
| West Virginia * † | 428,611 | 276,673 | 151,938 | 65 | 35 |
| Wisconsin | 1,272,046 | 770,670 | 501,376 | 61 | 39 |
| Wyoming * † | 220,620 | 194,334 | 26,286 | 88 | 12 |
| Federal | 12,552,113 | 0 | 12,552,113 | 0 | 100 |
| Foreign | 126,144 | 0 | 126,144 | 0 | 100 |

**Table 19 explanatory notes:**
* As of March 2016, state is a participant in the National Fingerprint File (NFF).
† As of July 2019, state is a signatory of the National Crime Prevention and Privacy Compact.
# As of July 2019, state has entered into a Memorandum of Understanding with the Compact Council, indicating the state's support of the Compact and Compact Council.

FBI-supported: The FBI provides the criminal history records for persons arrested by a Federal agency and arrest data that III-participating states are unable to provide.

State-supported: A designated agency within a state referred to as a "III participant" provides records from its file upon receipt of an electronic notification from III.

(Source: FBI/CJIS, Interstate Identification Index/National Fingerprint File Operations and Technical Manual, December 2005).

**Table 20. In-state criminal justice rap back services, 2018**

| State | State provides in-state criminal justice rap back services | Number of in-state criminal justice rap back notifications made for criminal justice purposes | Purposes in which criminal justice agencies can be notified of a subsequent inquiry and/or record posting via the in-state criminal justice rap back service: Error correction/ record mgmt. updates | Investigative lead | Sex offender | Parolee | Probationer | Permit/privileged license revocation | Noncriminal justice purpose fingerprint search | Other | Currently participates in the FBI's NGI criminal justice rap back service | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **52** | **251,288** | | | | | | | | | | |
| **Yes** | **16** | | **5** | **4** | **5** | **8** | **9** | **6** | **4** | **6** | | |
| **No** | **36** | | | | | | | | | | | |
| Alabama | Yes | | | | | | | | | | No, but considering legislation | |
| Alaska | No | | | | | | | | | | No, but considering legislation | |
| American Samoa | nr | | | | | | | | | | nr | |
| Arizona | No | | | | | | | | | | | |
| Arkansas | Yes | unk | | | | | | X | | | | |
| California | Yes | | X | | | | | | | | No, but considering legislation | |
| Colorado | No | | | | | | | | | | No | |
| Connecticut | No | | | | | | | | | | No | |
| Delaware | Yes | 617 | | | | X | X | X | | Crim. justice employment | Not currently, but have passed legislation | |
| District of Columbia | No | | | | | | | | | | | |
| Florida | Yes | 19,577 | | X | X | X | X | | X | | No | a |
| Georgia | No | | | | | | | | | | No, but considering legislation | |
| Guam | No | | | | | | | | | | No | |
| Hawaii | Yes | 10,086 | | X | X | X | X | | | | No | |
| Idaho | No | | | | | | | | | | No, but considering legislation | b |
| Illinois | Yes | 5,633 | X | | | | | | | | Not currently, but have passed legislation | |
| Indiana | No | | | | | | | | | | No | |
| Iowa | No | | | | | | | | | | No | |
| Kansas | Yes | 2,546 | | X | | | | X | | Crim. justice employment | No | |
| Kentucky | No | | | | | | | | | | No | |
| Louisiana | Yes | nr | | | | X | X | X | | | nr | |
| Maine | No | | | | | | | | | | No | |
| Maryland | Yes | 1,649 | X | | X | | X | | | Subsequent arrest data | nr | |
| Massachusetts | No | | | | | | | | | | No, but considering legislation | |
| Michigan | Yes | 228 | X | | | | | | | | Not currently, but have passed legislation | |
| Minnesota | Yes | 112,423 | | | | X | X | X | | | nr | |
| Mississippi | No | | | | | | | | | | nr | |
| Missouri | No | | | | | | | | | | No | |
| Montana | No | | | | | | | | | | No | |
| Nebraska | No | | | | | | | | | | No | |
| Nevada | No | | | | | | | | | | No, but considering legislation | |
| New Hampshire | No | | | | | | | | | | No | |
| New Jersey | Yes | | X | X | X | X | X | X | X | NJ Central Drug Registry | No | |
| New Mexico | No | | | | | | | | | | No | |
| New York | Yes | nr | | | X | X | X | | X | | No, but considering legislation | |
| North Carolina | No | | | | | | | | | | No | |
| North Dakota | No | | | | | | | | | | No | |
| No. Mariana Islands | nr | | | | | | | | | | nr | |
| Ohio | No | | | | | | | | | | No | |
| Oklahoma | No | | | | | | | | | | Not currently, but have passed legislation | |
| Oregon | No | | | | | | | | | | No | |
| Pennsylvania | No | | | | | | | | | | No | |
| Puerto Rico | nr | | | | | | | | | | nr | |
| Rhode Island | No | | | | | | | | | | nr | |
| South Carolina | No | | | | | | | | | | No | |
| South Dakota | No | | | | | | | | | | No | |
| Tennessee | No | | | | | | | | | | No, but considering legislation | |
| Texas | Yes | 91,191 | | | | X | X | | X | Law enforcement agencies | Yes | |
| Utah | No | | | | | | | | | | No | c |
| Vermont | No | | | | | | | | | | nr | |
| Virgin Islands | nr | | | | | | | | | | nr | |
| Virginia | Yes | 7,338 | | | | | | | | Employee arrest | nr | |
| Washington | No | | | | | | | | | | nr | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| West Virginia | No | | | | | | | | | | nr | |
| Wisconsin | No | | | | | | | | | | No, but considering legislation | |
| Wyoming | No | | | | | | | | | | No | |

**Table 20 explanatory notes:**

- na (not available).
- nr (not reported).
- unk (unknown)

**Data footnotes:**

a. Florida has reviewed the implementation and policy guide and has programmed the necessary systems to participate in the NGI Rap Back. Florida is currently testing with the FBI.

b. Idaho used NICS Act Record Improvement Program (NARIP) funds to build the necessary infrastructure and pathways for Sheriffs to receive CCW rap back services. Idaho is currently awaiting legislative authority to implement their rap back program.

c. While Utah does not participate in NGI rap back, all criminal justice employment, CJIS user, and Peace Officer Standards and Training (POST) applicants are counted/enrolled in the noncriminal justice rap back service.

Table 21. In-state noncriminal justice rap back services, 2018

| State | State provides in-state noncriminal justice rap back service | In-state service is authorized by state law or administrative regulation | State law/regulation specifies the purposes in which agencies can be notified | Persons working with children | Persons working with the elderly | Healthcare providers | Security guards | Police, fire, public safety personnel | Other |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | |
| **Yes** | **30** | **26** | **19** | **25** | **22** | **23** | **17** | **19** | **13** |
| **No** | **22** | **4** | **11** | | | | | | |
| Alabama | Yes | Yes | Yes | X | X | X | X | | |
| Alaska | Yes | Yes | No | X | X | X | | X | |
| American Samoa | nr | | | | | | | | |
| Arizona | Yes | Yes | Yes | X | X | X | X | | |
| Arkansas | No | | | | | | | | |
| California | Yes | Yes | Yes | X | X | X | X | X | a |
| Colorado | Yes | Yes | No | X | X | | | X | b |
| Connecticut | No | | | | | | | | |
| Delaware | Yes | Yes | Yes | X | X | X | X | X | |
| District of Columbia | No | | | | | | | | |
| Florida | Yes | Yes | No | X | X | X | X | X | c |
| Georgia | No | | | | | | | | |
| Guam | No | | | | | | | | |
| Hawaii | No | | | | | | | | |
| Idaho | No | | | | | | | | |
| Illinois | Yes | Yes | Yes | X | X | X | X | X | d |
| Indiana | No | | | | | | | | |
| Iowa | No | | | | | | | | |
| Kansas | Yes | No | No | X | X | X | X | | e |
| Kentucky | Yes | Yes | No | X | X | X | | | |
| Louisiana | Yes | No | No | X | X | | X | X | |
| Maine | Yes | Yes | Yes | X | | | | | |
| Maryland | Yes | Yes | Yes | X | X | X | X | X | |
| Massachusetts | Yes | Yes | Yes | | | | | | f |
| Michigan | Yes | Yes | Yes | X | X | X | | X | g |
| Minnesota | No | | | | | | | | |
| Mississippi | No | | | | | | | | |
| Missouri | Yes | Yes | No | X | X | X | X | X | |
| Montana | No | | | | | | | | |
| Nebraska | Yes | No | No | X | | X | | X | |
| Nevada | Yes | Yes | Yes | | | X | | | h |
| New Hampshire | No | | | | | | | | |
| New Jersey | Yes | Yes | Yes | X | X | X | X | X | |
| New Mexico | Yes | Yes | Yes | X | X | X | X | X | |
| New York | Yes | Yes | Yes | X | X | X | X | X | i |
| North Carolina | No | | | | | | | | |
| North Dakota | No | | | | | | | | |
| No. Mariana Islands | nr | | | | | | | | |
| Ohio | Yes | Yes | Yes | X | X | X | X | | j |
| Oklahoma | Yes | Yes | No | X | X | X | X | X | k |
| Oregon | No | | | | | | | | |
| Pennsylvania | No | | | | | | | | |
| Puerto Rico | nr | | | | | | | | |
| Rhode Island | Yes | Yes | Yes | | | X | | | |
| South Carolina | Yes | Yes | No | | | | X | X | |
| South Dakota | No | | | | | | | | l |
| Tennessee | Yes | No | No | | | | | X | |
| Texas | Yes | Yes | Yes | X | X | X | X | X | |
| Utah | Yes | Yes | Yes | X | X | X | | X | |
| Vermont | Yes | Yes | Yes | X | | | | | |
| Virgin Islands | nr | | | | | | | | |
| Virginia | No | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Washington | No | | | | | | | | |
| West Virginia | Yes | Yes | Yes | X | X | X | | | m |
| Wisconsin | No | | | | | | | | |
| Wyoming | No | | | | | | | | |

**Table 21 explanatory notes:**

- nr (not reported).

**Legend: Other**

a. Licensing, certification, and permits
b. CCW permits; vulnerable persons; any statute approved by FBI, typically governed by state agency
c. Loan originators, professional solicitors, parimutuel wagering, school contract vendors, guardians
d. Specific license categories
e. Real Estate, Insurance Commission, Department of Revenue/Taxation
f. Pistol license, mortgage loan officer, gaming control
g. Concealed pistol license
h. CCW and Department of Education/school district employees
i. All individuals who require fingerprints for employment suitability
j. Casino employees, hazardous waste companies
k. Occupational Licenses, such as real estate, alarm licensing, etc.
l. Law enforcement officers
m. Volunteers

Table 21a. In-state rap back services, continued, 2018

| State | Total number of in-state noncriminal justice rap back notifications | In-state noncriminal justice rap back fingerprint enrollment / fee | | In-state noncriminal justice rap back notification / fee | | In-state noncriminal justice subscriptions require validation similar to NGI |
|---|---|---|---|---|---|---|
| **Total** | **998,453** | | | | | |
| Alabama | 6,571 | No | | No | | No |
| Alaska | nr | No | | No | | Yes, for all |
| American Samoa | nr | | | | | |
| Arizona | 6,565 | No | | No | | No |
| Arkansas | unk | No | | No | | |
| California | 549,059 | No | | No | | Yes, for some |
| Colorado | nr | No | | Yes/$2 | | No |
| Connecticut | | | | | | |
| Delaware | 39,411 | No | | No | | No |
| District of Columbia | | | | | | |
| Florida | 48,322 | Yes/$25 | a | No | | Yes, for some |
| Georgia | | | | | | Yes, for some |
| Guam | | No | | No | | |
| Hawaii | | | | | | |
| Idaho | | No | | No | | |
| Illinois | 67,387 | No | | No | | No |
| Indiana | | | | | | |
| Iowa | | | | | | |
| Kansas | 1,953 | Yes/nr | | No | | Yes, for all |
| Kentucky | 327 | Yes/$5 | | No | | No |
| Louisiana | nr | No | | No | | No |
| Maine | nr | No | | No | | No |
| Maryland | nr | No | | No | | Yes, for all |
| Massachusetts | 8,603 | No | | No | | Yes, for all |
| Michigan | 113,213 | No | | No | | Yes, for some |
| Minnesota | | | | | | |
| Mississippi | | No | | No | | No |
| Missouri | 1,275 | No | | No | | Yes, for all |
| Montana | | | | | | |
| Nebraska | 2,064 | No | | No | | No |
| Nevada | 514 | No | | No | | No |
| New Hampshire | | | | | | |
| New Jersey | na | b | Yes/$10 | | No | Yes, for all |
| New Mexico | 13,000 | No | | No | | Yes, for all |
| New York | nr | No | | No | | Yes, for some |
| North Carolina | | | | | | No |
| North Dakota | | | | | | No |
| No. Mariana Islands | nr | | | | | |
| Ohio | 9,881 | Yes/$5 per yr. | | No | | No |
| Oklahoma | 15,704 | No | | No | | No |
| Oregon | | | | | | |
| Pennsylvania | | | | | | |
| Puerto Rico | nr | | | | | |
| Rhode Island | 203 | Yes/nr | | No | | Yes, for all |
| South Carolina | nr | No | | No | | No |
| South Dakota | | No | | No | | |
| Tennessee | nr | No | | No | | No |
| Texas | 113,309 | No | | Yes/$1 | | Yes, for all |
| Utah | 664 | Yes/$5 | | No | | Yes, for all |
| Vermont | 28 | No | | No | | No |
| Virgin Islands | nr | | | | | |
| Virginia | | No | | No | | No |
| Washington | | | | No | | |
| West Virginia | 400 | Yes/$5 for 3 yrs. | | No | | Yes, for all |
| Wisconsin | | | | | | No |
| Wyoming | | | | | | |

AR2022_400442

**Table 21a explanatory notes:**
- na (not available).
- nr (not reported).
- unk (unknown)

**Data footnotes:**
a. Fee is for 5 years.
b. NJ does not capture the total number of rap back notifications that are made to
   agencies for noncriminal justice purposes.



OMB No. 1121-0312:  Approval Expires 03/31/2022

# Survey of State Criminal History Information Systems, 2018

Since 1989, the *Survey of State Criminal History Information Systems* has been used to collect the nation's most complete, comprehensive and relevant data on the number and status of state-maintained criminal history records and on the increasing number of operations and services involving noncriminal justice background checks provided by the state repositories.  This data collection is supported by Cooperative Agreement No. 2015-RU-BX-K001 awarded by the Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice.  **Please note: Completion of the survey is voluntary; however, doing so is a special condition placed on all National Criminal History Improvement Program (NCHIP) and NICS Act Record Improvement Program (NARIP) awards.**

If you use the online survey tool, accessible at http://www.search.org/surveys/repository/, to enter 2018 data, you can view previously submitted 2016 data for comparison purposes.  Where applicable, your state's 2016 responses are displayed in color within each section of the online survey.  It is hoped that this information will help you complete the survey more accurately and efficiently.  **The cover letter provides the password to gain access to your state's online survey**.  Direct your questions or comments to SEARCH staff Dennis DeBacco at 775-412-1950 or dennis@search.org.

If it is more convenient, you may request a PDF copy of the survey, complete it manually, and fax (916-392-8440) or e-mail it to the attention of Dennis DeBacco at dennis@search.org.  **The deadline for survey submission is June 14, 2019.**

The survey is divided into five sections. You may submit each section independently and not necessarily in the order presented.  This is done so that different people on your repository's staff may submit the data for which they are responsible.  **Repository directors are responsible to see that the survey is submitted in its entirety**.  Please note the following:

1. All reported data should be for calendar year 2018, or as of December 31, 2018.
2. The term "felony" includes any crime classified as a felony under your state's laws.  These offenses are generally punishable by a term of incarceration in excess of one year.  If your state's laws do not use the term "felony," please substitute functional equivalents, such as class 1, 2, 3 and 4 offenses in New Jersey and class A, B and C offenses in Maine.
3. Questions that seek responses based on a "legal requirement" refer *only* to a *state statute* or a *state administrative regulation having the force of law*.
4. If additional space is needed, please use the "Additional Comments" area at the end of each section.
5. Please use the "Additional Comments" area at the end of each section to provide explanatory notes for responses that require explanation or when "no data is available," and to describe significant changes between the current response and data reported in the 2016 survey.
6. If a question is not applicable to your repository, **please note the question number and indicate "NA" in the "Additional Comments" area at the end of each section**.

**Burden Statement**

Under the Paperwork Reduction Act, we cannot ask you to respond to a collection of information unless it displays a currently valid OMB control number.  The survey will be sent to criminal history repositories in 56 jurisdictions, including the 50 States, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico and the U.S. Virgin Islands.  The average time required for each agency to complete the survey is estimated at 6.75 hours.  Send comments regarding this burden estimate or any aspect of this survey, including suggestions for reducing this burden, to the Director, Bureau of Justice Statistics, 810 Seventh Street, NW, Washington DC 20531.  Do not send your completed form to this address.

# SECTION I: REPOSITORY

**This section completed by**

Name ______________________________ Title ______________________________

Agency ______________________________________________________________

Phone ______________________________ Email ______________________________

Date completed ______________________

*The following questions relate to descriptions of your state's criminal history record information and master name index databases:*

1. How many subjects (individual criminal offenders) were in your criminal history file as of December 31, 2018? **Tables 1 and 2**

   (a) Automated records __________________ *(include subjects whose records are partially automated)*

   (b) Manual records __________________

   (c) Total records __________________ (a+b)

2. Fingerprints processed in 2018: **Tables 1a and 8**

| Purpose | Number | Percentage of 2018 volume | Totals |
|---|---|---|---|
| (a) Criminal (retained) | ___________ | _________% | |
| (b) Criminal (not retained) | ___________ | _________% | (a+b)_____________ |
| (c) Noncriminal (retained) | ___________ | _________% | |
| (d) Noncriminal (not retained) | ___________ | _________% | (c+d)_____________ |

   (e) What was the total number of fingerprint-based background checks conducted during 2018? (a+b+c+d)___________

3. (a) Do you have felony conviction flagging, i.e., does your criminal history record database include a data field or flag enabling you to quickly determine whether a given record subject has a felony conviction? **Table 5**

   ❒ Yes, all subjects with felony convictions

   ❒ Yes, some subjects with felony convictions

❒ No

(b) Does your state's criminal history record employ flagging to indicate the following? *(Check all that apply.)*

❒ Sex offender registrant
❒ Violent offender
❒ Misdemeanor domestic violence conviction that would exclude someone from purchasing a firearm
❒ Active protection order on file with state justice information system and/or NCIC
❒ Active warrant on file with state justice information system and/or NCIC
❒ Mental health adjudication
❒ DNA available
❒ IFFS, indicating ineligible for firearms purchase under federal law
❒ IFFS, indicating ineligible for firearms purchase under state law
❒ Other (*describe*) ________________________________________

*The following questions refer to repository administration, procedures and practices.*

4. (a) As of December 31, 2018, did your repository conduct "lights out" processing of fingerprints (an identification decision is made without fingerprint technician intervention)? *If no, skip to question 5.* **Table 16**

❒ Yes ❒ No

(b) What percentage of fingerprints was handled with "lights out" processing? __________ %

(c) What percentage of criminal fingerprints was handled with "lights out" processing? __________ %

(d) What percentage of noncriminal applicant fingerprints was handled with "lights out" processing? __________ %

5. (a) Does your state maintain a protection order file? *If no, skip to question 6.* **Tables 3 and 3a**

❒ Yes ❒ No

(b) Which agency(s) enter protection orders onto the state file? *(Check all that apply.)*

❒ Law enforcement
❒ Courts
❒ Other (*describe*) ________________________________________

(c) How many active records were in the state protection order record database as of December 31, 2018?

_________________ records

(d) In 2018, what was the average time elapsed between the issuance of a protection order and entry of the information into the state protection order file?

- ❒ 1 day or less
- ❒ 2–7 days
- ❒ 8–30 days
- ❒ More than 30 days

(e) Are protection orders entered onto the FBI-NCIC Protection Order File? *If no, skip to question 6.*

❒ Yes ❒ No

(f) Which agency(s) enter protection order information to the FBI-NCIC Protection Order File? *(Check all that apply.)*

- ❒ Law enforcement
- ❒ Courts
- ❒ Other (describe) ________________________________________

(g) In 2018, what was the average time elapsed between the issuance of a protection order and entry of the information into the FBI-NCIC Protection Order File?

- ❒ 1 day or less
- ❒ 2–7 days
- ❒ 8–30 days
- ❒ More than 30 days

6. (a) Does your state maintain a warrant file? *If no, skip to question 7.* **Tables 4 – 4b**

❒ Yes ❒ No

(b) Which agency(s) enter warrants onto the state file? (*Check all that apply.)*

- ❒ Law enforcement
- ❒ Courts
- ❒ Other (*describe*) ________________________________________

(c) In 2018, what was the average time elapsed between the issuance of a warrant and entry of the information into the state warrant file?

- ❒ 1 day or less
- ❒ 2–7 days
- ❒ 8–30 days

❒ More than 30 days

(d) How many records were in the state warrant database as of December 31, 2018?

_________________ records

(e) Of this total, indicate the number of:

Felony warrants ______________________

Misdemeanor warrants ________________

Other (*explain*) ______________________________________________

(f) Which agency(s) enter warrant information to the FBI-NCIC Wanted Person File? *(Check all that apply.)*

❒ Law enforcement

❒ Courts

❒ Other (*describe*) __________________________________________

(g) In 2018, what was the average time elapsed between the issuance of a warrant and entry of the information into the FBI-NCIC Wanted Person file?

❒ 1 day or less

❒ 2–7 days

❒ 8–30 days

❒ More than 30 days

7. In addition to criminal history information, to what other records does your state's repository provide access? *(Check all that apply.)* **Table 5a**

❒ Sex offender registry

❒ Orders of protection

❒ Wanted persons/warrants

❒ Retained applicant prints

❒ Firearm registration

❒ Domestic violence incident reports

❒ Other (*specify*) ____________________________________________

8. (a) When were each of the following systems last replaced or significantly upgraded? **Table 13 – 13b**

❒ Computerized Criminal History (CCH) _________________________

❒ Automated Fingerprint Identification System (AFIS) ______________

❒ Message Switch ___________________________________________

(b) Does your state have plans to replace any of the following due to systems that are at or nearing the end of their lifecycle? *(Check all that apply and indicate project status.)*

- ❒ Computerized Criminal History (CCH)

  If applicable, what is the status of your CCH replacement project?
  - o Planning
  - o Reviewing bids/proposals
  - o Implementation and testing

- ❒ Automated Fingerprint Identification System (AFIS)

  If applicable, what is the status of your AFIS replacement project?
  - o Planning
  - o Reviewing bids/proposals
  - o Implementation and testing

- ❒ Message Switch

  If applicable, what is the status of your message switch replacement project?
  - o Planning
  - o Reviewing bids/proposals
  - o Implementation and testing

9. What is the operations budget for your criminal history repository for the current fiscal year? _______________

10. When does your current fiscal year end? _________________

11. How many employees does your state criminal history repository employ?

    ____________ full-time employees

    ____________ part-time employees

12. How many contractual staff does your criminal history repository employ?

    ____________ full-time contractors

    ____________ part-time contractors

13. If your repository employs contractors, what type of work do they perform? *(Check all that apply.)*

    - ❒ Data entry
    - ❒ Document scanning
    - ❒ Help desk support
    - ❒ Information technology support
    - ❒ Software development

- ❒ Researching dispositions
- ❒ Other (*briefly describe*) ______________________

14. (a) Does your repository conduct routine internal data quality audits? *If no, skip to question 15.* **Table 13c**

❒ Yes ❒ No

(b) How frequently?

- ❒ More than once per year
- ❒ Annually
- ❒ Every 2 years
- ❒ Every 3 years
- ❒ Other (*briefly describe*) ______________________

15. (a) Does your repository conduct routine external data quality audits of contributing agencies? (E.g., inspecting samples of records maintained to determine if they have been submitted to the repository and/or checking to see if the information housed by the repository matches that maintained by contributing agencies.) *If no, skip to question 16.*

❒ Yes ❒ No

(b) How frequently?

- ❒ More than once per year
- ❒ Annually
- ❒ Every 2 years
- ❒ Every 3 years
- ❒ Other (*briefly describe*) ______________________

16. Does your state have a law or administrative rule that specifies retention periods for the following? *(Check all that apply and provide information where applicable.)*

**Tables 5b and 5c**

- ❒ Felony arrest records
  - Retention period ___________
  - Citation URL ________________________________________
- ❒ Misdemeanor arrest records
  - Retention period ___________
  - Citation URL ________________________________________
- ❒ Felony court disposition records
  - Retention period ___________
  - Citation URL ________________________________________

- ❒ Misdemeanor court disposition records
  - o Retention period ___________
  - o Citation URL _______________________________________

**ADDITIONAL COMMENTS:**

# SECTION II: ARREST/FINGERPRINT REPORTING AND ENTRY

**This section completed by**

Name ______________________________ Title ______________________________

Agency ______________________________________________________________

Phone ______________________________ Email ______________________________

Date completed ______________________

1. How many felony arrests were reported to your repository during calendar year 2018?

   ____________ arrests **Table 12**

2. How many arrest fingerprints were submitted to your repository during 2018? (a+b+c = d) **Table 10**

   (a) _________________ via livescan

   (b) _________________ via cardscan

   (c) _________________ hard copy fingerprints

   (d) _________________ = total arrest fingerprints

3. (a) As of December 31, 2018, was there a backlog of arrest fingerprint cards to be entered into the AFIS database (i.e., not entered within 48 hours of receipt at repository)? *If no, skip to question 4.* **Table 10a**

   ❒ Yes ❒ No

   (b) How many arrest fingerprint cards were backlogged? ________

   ❒ Size of arrest fingerprint card backlog as of December 31, 2018, is not available

   (c) What is the age of the backlogged arrest information?

   ❒ 1 month or less
   ❒ 2–6 months
   ❒ 7–12 months
   ❒ More than 1 year

4. For the year ending on December 31, 2018, what percentage of arrest fingerprint records received by the repository were rejected for poor quality? ______________ %**Table 10**

5. Mobile technology **Table 10d**

(a) Are agencies in your state using mobile technology to transmit fingerprints for identification purposes?

❒ Yes ❒ No

(b) Are agencies in your state using mobile technology to transmit fingerprints for booking purposes?

❒ Yes ❒ No

(c) Do you have plans to implement mobile technology that captures non-fingerprint biometric information?

❒ Yes ❒ No

*Question 5(d) addresses Rapid ID technology, which enables authorized users to instantly search local, state and federal AFIS databases to confirm the identity of a person via fingerprints captured using mobile or tethered fingerprint devices, and to query various criminal justice databases for additional information about the individual. Rapid ID searches, for example, can include criminal history record information, outstanding warrants, sex offender status, probation and parole supervision status, caution indicators, and mugshots.*

(d) Does your state employ Rapid ID? *If no, skip to question 6.*

❒ Yes ❒ No

❒ Number of searches conducted in 2018 _______________

❒ Number of hits in 2018 _______________

6. Law enforcement agency submissions **Table 8a**

(a) Number of law enforcement agencies that submit arrest prints via livescan (including agencies without livescan devices that receive livescan services from agencies that do have that equipment, such as a sheriff that provides booking services for multiple local police departments) _____________

(b) Number of agencies that submit arrest fingerprints via cardscan _____________

(c) Number of agencies that submit hard copy arrest fingerprint cards _____________

(d) Percentage of arrest prints submitted via livescan during 2018 ___________ %

7. Do local law enforcement agencies in your state routinely cite and release individuals without fingerprinting? This includes issuance of a notice to appear when a person is charged with a crime, but is not fingerprinted prior to a court appearance. **Table 9**

- ❒ Yes, only for violations
- ❒ Yes, for both violations and misdemeanors
- ❒ Yes, for all criminal offenses, including felonies
- ❒ No *(skip to question 9)*

8. If local law enforcement agencies in your state routinely cite and release individuals without fingerprinting, is there a law or policy requiring the courts to order persons who have not been fingerprinted to do so prior to or after an initial court hearing? **Table 9a**

   - ❒ Yes, by law *(check all that apply)*
     - o only for violations
     - o for both violations and misdemeanors
     - o for all criminal offenses, including felonies
   - ❒ Yes, by policy or administrative rule *(check all that apply)*
     - o only for violations
     - o for both violations and misdemeanors
     - o for all criminal offenses, including felonies
   - ❒ No

9. Does your state have a statewide criminal citation file? *(Note: this does not include traffic citation files.)* **Table 9**

   - ❒ Yes
     - o Number of criminal citations contained in file as of December 31, 2018 ________
     - o Number of citation records added to file during 2018 _________
   - ❒ No

**ADDITIONAL COMMENTS:**

# SECTION III: DISPOSITIONS

**This section completed by**

Name ______________________________ Title ______________________________

Agency ______________________________________________________________

Phone ______________________________ Email ______________________________

Date completed ______________________

*The following questions seek to determine to what extent the records in your criminal history record database contain final case disposition information. ("Final case disposition" is defined as* the formal or informal conclusion of an arrest or charge at whatever stage it occurs in the criminal justice process. *(E.g., release by police after arrest without charging; decline to proceed by prosecutor; or final trial court disposition.)*

1. Does your state collect charge tracking information (sometimes referred to as "interim disposition information") on the criminal history record showing the status of a case as it moves through the justice system? (E.g., reporting of an indictment, charges filed that are different than arrest charges, etc.) **Table 6b**

   ❒ Yes ❒ No

2. (a) How many final case dispositions did your repository receive during 2018? **Tables 6 and 6a** ____________ dispositions

   (b) Of those, how many were sent to the FBI? ____________ dispositions

   *Of the dispositions forwarded to the FBI:*

   (c) What percentage was sent by Machine Readable Data (MRD), such as tape/CD/DVD? ____________ %

   (d) What percentage was sent via hard copy/paper? ____________ %

   (e) What percentage was sent by Interstate Identification Index (III) message key? ____________ %

   (f) What percentage was sent via a secure web portal? ____________ %

*Note: When calculating the percentage of arrests with final dispositions recorded, some states consider an arrest to have a disposition if* ***any*** *final disposition can be associated with an arrest cycle. This is commonly referred to as "cycle matching." Other states do not consider an arrest to have a final disposition until* ***all*** *arrest charges are linked to a final disposition. This is commonly*

*referred to as "charge matching."*

3. Does your state perform cycle or charge matching to calculate the percentage of arrests in the criminal history database with final dispositions? **Table 1**

   ❒ Cycle matching
   ❒ Charge matching

4. What percentage of all arrests in the criminal history database have final case dispositions recorded?

   (a) Arrests entered within past 5 years ____________ %

   (b) Arrests in the entire database ____________ %

   (c) Felony charges ____________ %

5. (a) Of the dispositions received at the repository during 2018, what percentage could not be linked to a specific arrest record, either because of failed matching criteria or the arrest had not been reported to the repository? **Table 7a** _______________ %

   (b) When a disposition cannot be matched to an arrest, the following action(s) is taken: *(Check all that apply.)*

   ❒ Placed in a suspense file (no further action)
   ❒ Placed in a suspense file for further investigation
   ❒ Disposition information is rejected
   ❒ Follow-up actions are taken by repository staff
   ❒ Court is contacted
   ❒ Court-provided charge(s) and corresponding disposition is posted to the beginning or end of record
   ❒ Other ______________________________________________

   (c) Is a vendor used to assist your state's repository in identifying or locating missing dispositions?

   ❒ Yes ❒ No

6. (a) As of December 31, 2018, was any court disposition data reported directly to the repository by automated means? *(Note: "automated" refers to a method by which data is transmitted by the court to the repository where it is matched against criminal history records and entered on the criminal history record, usually without manual intervention. This does not include dispositions received via fax or email, which require manual activity for criminal history record matching and data entry.)*

   ❒ Yes ❒ No *(skip to question 6d)* **Table 7**

   (b) How many court disposition records were:

  - ❒ Received via automated means through a centralized (statewide) court case management system _______________
- ❒ Received via the local courts' case management systems _______________

(c) What percentage of dispositions was reported in 2018 by automated means?

____________%

(d) How are records matched between the court system and the repository? *(Check all that apply.)* **Table 7**

- ❒ Process Control Number (PCN) or Transaction Control Number (TCN) assigned when fingerprints were taken at time of arrest/booking
- ❒ PCN or TCN assigned subsequent to arrest/booking
- ❒ State Identification Number
- ❒ Arrest Number
- ❒ Name
- ❒ Date of birth
- ❒ Charges
- ❒ Other (please explain)____________________________________________

7. In 2018, what was the average time elapsed between the occurrence of final felony court case dispositions and receipt of information concerning such dispositions by the repository? **Table7b**

- ❒ 1 day or less
- ❒ 2–7 days
- ❒ 8–30 days
- ❒ 31–90 days
- ❒ 91–180 days
- ❒ 181–365 days
- ❒ More than 1 year

8. In 2018, what was the average time elapsed between receipt of final felony court disposition information by the repository and entry of that information into the criminal history record database?

- ❒ 1 day or less
- ❒ 2–7 days
- ❒ 8–30 days
- ❒ 31–90 days
- ❒ 91–180 days
- ❒ 181–365 days
- ❒ More than 1 year

9. (a) As of December 31, 2018, was your state using any livescan devices in courtrooms/courthouses to link positive identifications with dispositions? *If no, skip to question 10.* **Table 12**

❒ Yes ❒ No

(b) How many livescan devices are in courtrooms/courthouses?

____________ Devices

10. (a) As of December 31, 2018, was there a backlog of court disposition data to be entered into the criminal history record database (i.e., not entered within 48 hours of receipt at repository, including dispositions that could not be matched to a criminal history record within 48 hours of receipt at the repository)? *If no, skip to question 11.*

❒ Yes ❒ No

(b) How many unprocessed or partially processed court case dispositions did you have?

________________

11. (a) Does the repository receive any final case disposition information (e.g., decline to proceed) from local prosecutors? *If no, skip to question 11c.* **Table 6c**

❒ Yes ❒ No

(b) This information is: *(Check all that apply.)*

- ❒ Received via automated means through a centralized (statewide) prosecutors' case management system
- ❒ Received via the local prosecutors' case management system
- ❒ Paper-based
- ❒ A mix of automated and paper-based

(c) How are records matched between prosecutors and the repository? *(Check all that apply.)* **Table 6d**

- ❒ Process Control Number (PCN) or Transaction Control Number (TCN) assigned when fingerprints were taken at time of arrest/booking
- ❒ PCN or TCN assigned subsequent to arrest/booking
- ❒ State Identification Number
- ❒ Arrest Number
- ❒ Name
- ❒ Date of birth
- ❒ Charges
- ❒ Other (please explain)______________________________________

12. Does your state post indictment information to the criminal history record? **Table 6b**

❒ Yes ❒ No

**ADDITIONAL COMMENTS:**

16
AR2022_400459

# SECTION IV: NONCRIMINAL BACKGROUND CHECKS

**This section completed by**

Name ______________________________ Title ______________________________

Agency ______________________________________________________________

Phone ______________________________ Email ______________________________

Date completed ______________________

## BACKGROUND CHECKS

1. (a) Does your state charge a fee to conduct a search of the criminal history record database for noncriminal justice purposes? *If no, skip to question 2.* **Table 17**

   ❒ Yes ❒ No

   (b) How are fees allocated?

   ❒ All fees go to the state general fund, with repository funded by general fund allotment

   ❒ A percentage of fees go to support repository operations __________ %

   ❒ All fees go to support repository operations

   ❒ Other ______________________________________________

2. Please indicate which of the following background checks are performed by your state pursuant to law. *(Check all that apply.)* **Table 15**

| | National check | State check only |
|---|---|---|
| Daycare providers | | |
| Caregivers–residential facilities | | |
| School teachers | | |
| Non-teaching school personnel (including volunteers) | | |
| Volunteers working with children | | |
| Prospective foster care parents | | |
| Prospective adoptive parents | | |
| Relative caregivers | | |
| Nurses/Elder caregivers | | |
| Legal guardians | | |
| Hazardous materials licensees | | |
| Medical marijuana (dispensers, caregivers) | | |

**FINGERPRINT-BASED SEARCHES**

3. (a) Has your state privatized the taking of fingerprints for noncriminal justice purposes? *If no, skip to question 4.* **Table 11**

   ❒ Yes ❒ No

   (b) Is this service provided by?

   ❒ A single vendor ❒ Multiple vendors

   (c) Does the vendor(s) assess a fee above what the state charges to perform the background check?

   ❒ Yes, Fee $ ________________ ❒ No

   (d) Does the vendor provide any additional services besides the fingerprint capture? (E.g., evaluating responses for the requestor, sending responses back to the requestor, etc.)

   ________________________________________________________________

   ________________________________________________________________

4. (a) Total number of noncriminal justice fingerprints submitted to the repository via livescan during 2018 **Table 10c** ____________

   (b) Total number of noncriminal justice fingerprints submitted to the repository via cardscan during 2018 ____________

   (c) Percentage of noncriminal justice fingerprints submitted via livescan during 2018 ____________%

   (d) Percentage of noncriminal justice fingerprints submitted via cardscan during 2018 ____________%

   (e) Total number of livescan devices available for noncriminal justice purposes only **Table 10b** ____________

   (f) Total number of cardscan devices available for noncriminal justice purposes only ____________

   (g) Total number of livescan devices used for both criminal and noncriminal justice purposes ____________

   (h) Total number of cardscan devices used for both criminal and noncriminal justice purposes ____________

5. What information is contained in the results for fingerprint-based noncriminal justice background checks? *(Check all that apply.)* **Table 14**

   ❒ Full record

   ❒ Convictions only

   ❒ Juvenile records

❒ Arrests without disposition–over 1 year old

❒ Other ______________________________________________

6. What percentage of fingerprint-based noncriminal justice transactions are identified against arrest fingerprints?

   _________ %

7. Does the repository attempt to locate missing disposition information before responding to a fingerprint-based noncriminal justice inquiry?

   ❒ Yes ❒ No

**NAME-BASED SEARCHES**

8. How many name-based noncriminal justice background checks did your repository perform in 2018? (a+b+c+d = e) **Table 13d**

   (a) Received via Internet ____________

   (b) Received via mail ____________

   (c) Received via telephone ____________

   (d) Other ____________

   (e) Total ____________

**INTERNET ACCESS**

9. Does your repository provide web-based noncriminal justice background checks to the public? **Table 18**

   ❒ Yes ❒ No

10. Are fees involved for Internet access for the general public (not including any registration or account fees)?

   ❒ Yes, Fee $ ____________ ❒ No

**ADDITIONAL COMMENTS:**

# SECTION V:
# IN-STATE RAP BACK SERVICES

**This section completed by**

Name ______________________________ Title ______________________________

Agency ____________________________________________________________________

Phone ______________________________ Email ______________________________

Date completed ______________________

1. Does your state currently provide an in-state criminal justice rap back service? *If no, skip to question 4.* **Table 20**

   ❒ Yes ❒ No

2. What are the purposes for which criminal justice agencies can be notified of a subsequent inquiry and/or record posting via your in-state criminal justice rap back service? *(Check all that apply.)*

   - ❒ Error correction/record management update
   - ❒ Investigative lead
   - ❒ Sex offender
   - ❒ Parolee
   - ❒ Probationer
   - ❒ Permit/privileged license revocation (i.e., CCW permit, gaming work card, etc.)
   - ❒ Noncriminal justice purpose fingerprint search
   - ❒ Other (describe) ____________________________________________

3. In 2018, how many in-state criminal justice rap back notifications were made to agencies for criminal justice purposes? ____________

4. Do you currently participate in the FBI's Next Generation Identification (NGI) rap back service for criminal justice purposes?

   - ❒ Yes
   - ❒ No
   - ❒ Not currently, but my state has passed legislation to authorize participation
   - ❒ No, but my state is considering legislation to authorize participation

5. Does your state currently provide an in-state noncriminal justice rap back service? *If no, skip to question 8.* **Table 21**

   ❒ Yes ❒ No

6. (a) Is your in-state noncriminal justice rap back service authorized by state law or administrative regulation? *If no, skip to question 7.*

   ❒ Yes ❒ No

   (b) Does the state law or administrative regulation specify the purposes in which noncriminal justice agencies can be notified of a subsequent inquiry and/or record posting?

   ❒ Yes ❒ No

7. Does your in-state noncriminal justice rap back service have a subscription validation process similar to that required for NGI rap back participation, as described in the *NGI Rap Back Noncriminal Justice Policy and Implementation Guide*? **Table 21a**

   ❒ Yes, for all subscription populations
   ❒ Yes, for some subscription populations
   ❒ No

8. What are the occupational groups in which noncriminal justice agencies can be notified of a subsequent record posting? *(Check all that apply.)* **Table 21**

   ❒ Individuals working with children
   ❒ Individuals working with the elderly
   ❒ Individuals providing healthcare
   ❒ Security guards
   ❒ Police, fire, public safety
   ❒ Other (describe) ____________________________________________

9. In 2018, how many in-state noncriminal justice rap back notifications did your repository make to agencies for noncriminal justice purposes? ____________________ **Table 21a**

10. Does your in-state noncriminal justice rap back service impose a fee to enroll a subject's fingerprints for a prescribed period of time?

    ❒ Yes $ ________
    ❒ No

11. Does your in-state noncriminal justice rap back service impose a fee for noncriminal justice rap back notifications?

    ❒ Yes $ ________

❒ No

**ADDITIONAL COMMENTS:**

# The American Presidency Project (https://www.presidency.ucsb.edu/)

You visited this Document through a legacy url format. The new permanent url can be found at the bottom of the webpage.

## GEORGE BUSH (/PEOPLE/PRESIDENT/GEORGE-BUSH)

## Statement on Signing the Immigration Act of 1990

November 29, 1990

Today I am pleased to sign S. 358, the "Immigration Act of 1990" -- the most comprehensive reform of our immigration laws in 66 years. This Act recognizes the fundamental importance and historic contributions of immigrants to our country. S. 358 accomplishes what this Administration sought from the outset of the immigration reform process: a complementary blending of our tradition of family reunification with increased immigration of skilled individuals to meet our economic needs.

The legislation meets several objectives of this Administration's domestic policy agenda -- cultivation of a more competitive economy, support for the family as the essential unit of society, and swift and effective punishment for drug-related and other violent crime.

AR2022_400466

S. 358 provides for a significant increase in the overall number of immigrants permitted to enter the United States each year. The Act maintains our Nation's historic commitment to family reunification by increasing the number of immigrant visas allocated on the basis of family ties.

At the same time, S. 358 dramatically increases the number of immigrants who may be admitted to the United States because of the skills they have and the needs of our economy. This legislation will encourage the immigration of exceptionally talented people, such as scientists, engineers, and educators. Other provisions of S. 358 will promote the initiation of new business in rural areas and the investment of foreign capital in our economy.

I am also pleased to note that this Act facilitates immigration not just in numerical terms, but also in terms of basic entry rights of those beyond our borders. S. 358 revises the politically related "exclusion grounds" for the first time since their enactment in 1952. These revised grounds lift unnecessary restrictions on those who may enter the United States. At the same time, they retain important administrative checks in the interest of national security as well as the health and welfare of U.S. citizens.

Immigration reform began in 1986 with an effort to close the "back door" on illegal immigration through enactment of the 1986 Immigration Reform and Control Act (IRCA). Now, as we open the "front door" to increased legal immigration, I am pleased that this Act also provides needed enforcement authority.

S. 358 meets several objectives of my Administration's war on drugs and violent crime. Specifically, it provides for the expeditious deportation of aliens who, by their violent criminal acts, forfeit their right to remain in this country. These offenders, comprising nearly a quarter of our Federal prison population, jeopardize the safety and well-being of every American resident. In addition, S. 358 improves this Administration's ability to secure the U.S. border -- the front lines of the war on drugs -- by clarifying the authority of Immigration and Naturalization Service enforcement officers to make arrests and carry firearms.

S. 358 also improves the antidiscrimination provisions of the IRCA. These amendments will help deter discrimination that might be related to the implementation of "employer sanctions" under the 1986 law. In this regard, S. 358 helps to remedy unfortunate side effects of this important deterrent to illegal immigration.

In signing this legislation, I am concerned with the provision of S. 358 that creates a new form of relief known as "temporary protected status." The power to grant temporary protected status would be, except as specifically provided, the "exclusive authority" by which the Attorney General could allow otherwise deportable aliens to remain here temporarily because of their nationality or their region of origin. I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases. Any attempt to do so would raise serious constitutional questions.

George Bush

The White House,

November 29, 1990.

---

*Note: S. 358, approved November 29, was assigned Public Law No. 101 - 649.*

---

George Bush, Statement on Signing the Immigration Act of 1990 Online by Gerhard Peters and John T. Woolley, The American Presidency Project https://www.presidency.ucsb.edu/node/265173

United States Government Accountability Office

Report to Congressional Requesters

January 2022

# IMMIGRATION

# Information on Deferred Action for Childhood Arrivals



Highlights of GAO-22-104734, a report to congressional requesters

## Why GAO Did This Study

In June 2012, DHS established the DACA initiative. Under DACA, DHS has the discretion to provide temporary protection from removal from the U.S. (or, deferred action) for certain noncitizens who came to the U.S. before age 16. DACA recipients are neither granted lawful immigration status nor put on a pathway to lawful status. Rather, they are considered to be lawfully present in the U.S. during the 2-year period of deferred action. USCIS has granted DACA to more than 800,000 noncitizens. In July 2021, a federal court ruled that USCIS may not approve first-time DACA requests but temporarily permitted USCIS to continue to approve renewals of previously approved requests.

GAO was asked to review the extent to which USCIS shares information on DACA requestors and recipients with immigration enforcement agencies. This report describes (1) the circumstances under which USCIS shares information on DACA requestors with immigration enforcement agencies and (2) how CBP and ICE have applied DHS's immigration enforcement priorities to DACA recipients and those who may have potentially qualified for DACA since 2012. GAO analyzed USCIS, CBP, and ICE policies and guidance; analyzed USCIS data on adjudication outcomes and the circumstances under which USCIS shared information on DACA requestors with ICE from June 2012 through June 2021; and interviewed relevant headquarters and field officials.

View GAO-22-104734. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

January 2022

# IMMIGRATION

## Information on Deferred Action for Childhood Arrivals

## What GAO Found

In 2012, U.S. Citizenship and Immigration Services (USCIS) published guidance explaining that it would not proactively provide information from Deferred Action for Childhood Arrivals (DACA) requests to immigration enforcement agencies for the purpose of immigration enforcement, unless the DACA requestor met certain criteria. For example, USCIS may refer certain DACA cases to U.S. Immigration and Customs Enforcement (ICE) for a possible criminal investigation if the requestor represents a potential public safety risk based on the individual's criminal history or to identify fraudulent claims. USCIS has shared information with ICE for immigration enforcement purposes on a small number of DACA requestors and recipients who engaged in activities that disqualified them from DACA. Specifically, of the 106,000 DACA requests that USCIS denied, it referred fewer than 900 cases (less than 1 percent) to ICE (see fig.).

**Outcomes for Deferred Action for Childhood Arrivals Requests and Approximate Number of Referrals to U.S. Immigration and Customs Enforcement, June 2012 through June 2021**

**3 million requests approved** *(800,000 initial, 2.2 million renewal)*
167,000 pending
106,000 denied
Referrals to U.S. Immigration and Customs Enforcement : 900

Source: GAO analysis of U.S. Citizenship and Immigration Services information. | GAO-22-104734

Since 2012, U.S. Customs and Border Protection (CBP) and ICE enforcement practices related to DACA recipients and individuals who might qualify for DACA have generally aligned with the Department of Homeland Security's (DHS) immigration enforcement priorities. While DHS's immigration enforcement priorities have varied since 2012, the department has generally not considered DACA recipients to be immigration enforcement priorities unless they met specific criteria, such as having engaged in certain types of fraud or activities that posed a threat to national security or public safety. While DACA recipients are to be provided temporary protection from removal, individuals who might qualify to receive DACA but who have not yet submitted a request, or are awaiting approval, do not have such protection. However, CBP and ICE officials stated that they have generally extended prosecutorial discretion considerations to individuals who may have potentially qualified for DACA as long as they had not engaged in activities that would disqualify them from a favorable exercise of such discretion.

AR2022_400470

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 6 |
| | USCIS Rarely Shares Information on DACA Requestors with Immigration Enforcement Agencies | 14 |
| | DACA Recipients Have Not Been an Enforcement Priority, and CBP and ICE Practices for Those Potentially Qualified Have Aligned with DHS Priorities | 23 |
| | Agency Comments | 30 |
| Appendix I | GAO Contact and Staff Acknowledgments | 31 |

Tables

| | |
|---|---|
| Table 1: Adjudication Outcomes of Requests for Deferred Action for Childhood Arrivals (DACA), by Fiscal Year, June 2012 through June 2021 | 13 |
| Table 2: Department of Homeland Security (DHS) Immigration Enforcement Priorities from March 2011 through September 2021 | 24 |

Figures

| | |
|---|---|
| Figure 1: Time Line of Key Deferred Action for Childhood Arrivals (DACA) Legal Challenges and Events | 9 |
| Figure 2: Deferred Action for Childhood Arrivals (DACA) Request Adjudication Outcomes, June 2012 through June 2021 | 12 |
| Figure 3: Outcomes for Deferred Action for Childhood Arrivals (DACA) Requests and Approximate Numbers of Enforcement Actions, June 2012 through June 2021 | 17 |
| Figure 4: U.S. Citizenship and Immigration Services (USCIS) Referrals to U.S. Immigration and Customs Enforcement (ICE) Involving Deferred Action for Childhood Arrivals (DACA) Requests | 21 |

AR2022_400471

**Abbreviations**

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| DACA | Deferred Action for Childhood Arrivals |
| DHS | Department of Homeland Security |
| FDNS | Fraud Detection and National Security Directorate |
| ICE | U.S. Immigration and Customs Enforcement |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



GAO
U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

January 12, 2022

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Zoe Lofgren
Chair
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

In June 2012, the Department of Homeland Security (DHS) established the Deferred Action for Childhood Arrivals (DACA) initiative. Under DACA, DHS has the discretion to provide temporary protection from removal from the U.S. (or, deferred action) for noncitizens who came to the country as children.[1] DHS's U.S. Citizenship and Immigration Services (USCIS) adjudicates initial requests for deferred action, as well as renewals, both of which are valid for 2 years. DACA recipients are neither granted lawful immigration status nor put on a pathway to lawful immigration status. Rather, they are considered to be lawfully present in the U.S. during the period of deferred action.[2] Individuals who have been granted deferred action under DACA may also receive employment authorization for the period of deferred action, provided they can demonstrate "an economic necessity for employment."[3] USCIS has granted DACA to more than 800,000 noncitizens since 2012.

Following various federal court rulings related to DACA,[4] a January 20, 2021, presidential memorandum directed the Secretary of Homeland Security, in consultation with the Attorney General, to take all action

---

[1]Specifically, to qualify for DACA, children must have arrived in the U.S. before age 16.

[2]Certain categories of noncitizens who have not been granted lawful immigration status, including noncitizens currently granted deferred action, may be considered "lawfully present" for the purposes of applying for certain federal benefits. See 8 C.F.R. § 1.3(a)(vi).

[3]USCIS adjudicates employment authorization applications, which must be submitted as part of the DACA request. See 8 C.F.R. §§ 274a.12(c)(14); 274a.13.

[4]See, e.g., Dep't of Homeland Security v. Regents of the Univ. of Cal, 140 S. Ct. 1891 (2020); Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

deemed appropriate, consistent with applicable law, to "preserve and fortify" DACA.[5] However, in July 2021, a federal court ruled that USCIS may no longer approve initial DACA requests, but temporarily permitted USCIS to continue to grant renewals of previously approved requests.[6]

USCIS's long-standing guidance states that USCIS may share information on DACA requestors with national security and law enforcement agencies if the requestor poses a risk to national security or public safety, or for assistance with the adjudication process. Members of Congress have raised concerns about U.S. Immigration and Customs Enforcement's (ICE) and U.S. Customs and Border Protection's (CBP) access to DACA requestors' personal information. In particular, such concerns include whether personal information could be used for enforcement purposes should DACA be terminated or DHS's immigration enforcement priorities change, given that DACA requestors and recipients do not have lawful status in the U.S.

You asked us to review the extent to which USCIS shares information on DACA requestors and recipients with immigration enforcement agencies and for what purpose. This report describes (1) the circumstances under which USCIS shares information on DACA requestors with immigration enforcement agencies and (2) how CBP and ICE have applied DHS's immigration enforcement priorities since 2012 to DACA recipients and those who may have potentially qualified for DACA.

To address our first objective, we analyzed USCIS documentation, including DACA request forms, policy memos, guidance documents, standard operating procedures, and training materials. These describe the information USCIS collects and uses to adjudicate DACA requests and may share with immigration enforcement agencies during the adjudication process. Further, we analyzed DHS-wide policies on information sharing, as well as CBP and ICE documentation describing

[5]On September 28, 2021, DHS published a notice of proposed rulemaking for DACA, to fortify immigration protections for DACA recipients, which included a 60-day period for public comment. 86 Fed. Reg. 53,736 (Sept. 28, 2021).

[6]Texas v. United States, No. 18-CV-00068 (S.D. Tex. July 16, 2021) (opinion). Among other motions, the government sought a stay of proceedings pending the completion of the proposed rulemaking for DACA, which was denied by the court on October 15, 2021. See Texas v. United States, No. 21-40680 (5th Cir. Oct. 4, 2021 and Oct. 15, 2021) (opposed motion of defendants-appellants to place appeal in abeyance pending completion of rulemaking); (court order). As of January 2022, this litigation was ongoing and on appeal to the Court of Appeals for the Fifth Circuit.

AR2022_400474

the nature of their respective access to USCIS databases containing information on DACA requestors and recipients.

In addition, we analyzed USCIS summary-level data from DACA's inception in June 2012 through June 2021—the most recent available data during the period of our review. Specifically, we analyzed USCIS data to determine adjudication outcomes, as well as the circumstances under which USCIS shared information on DACA requestors with immigration enforcement agencies, particularly ICE. To assess the reliability of these data, we reviewed them for reasonableness, accuracy, and consistency. We also interviewed USCIS officials responsible for maintaining the relevant data systems about the steps they took to ensure the quality and reliability of these data.[7] We determined these data were sufficiently reliable to describe the outcomes (e.g., approvals and denials) of initial DACA requests and renewals and the number of DACA-related cases USCIS referred to ICE due to national security, public safety, or fraud concerns.

Further, we interviewed headquarters officials from USCIS's Service Center Operations Directorate, which is responsible for overseeing DACA adjudications at four of USCIS's five service centers nationwide. We also interviewed USCIS officers at the Nebraska Service Center, including those from the center's background check unit.[8] We interviewed headquarters officials from USCIS's Fraud Detection and National Security Directorate, which is responsible for investigating potential immigration benefit fraud. We also interviewed officials from the ICE headquarters office that receives referrals from USCIS for potential investigation on suspected cases of fraud or national security and public safety concerns.

[7]DACA-related referrals to ICE are an estimate. According to USCIS officials, USCIS data systems track whether a referral to ICE has a DACA request form associated with it, even if the subject of the referral is not a DACA requestor. For example, USCIS may refer a case to ICE if an attorney has prepared fraudulent documents in support of multiple DACA requests. In such cases, even though the attorney is the subject of the referral, each of those DACA request forms would be associated with the referral to ICE, and ICE may have access to these requestors information.

[8]We selected the Nebraska Service Center because its officers have had responsibility for adjudicating both initial DACA requests and renewals. The other three service centers that have had responsibility for adjudicating DACA requests are in California, Texas, and Vermont.

To address our second objective, we analyzed agency documentation, including executive orders, DHS policy memos, CBP and ICE memorandums, and guidance documents on DHS's enforcement priorities. We analyzed CBP and ICE policies and guidance documents governing encounters with DACA requestors and recipients, including those who might qualify for deferred action. We also analyzed DHS and USCIS documentation on CBP's and ICE's access to and use of USCIS databases to verify the immigration status of noncitizens encountered at the border and interior checkpoints.[9] Such documentation included privacy impact assessments and user guides for each data system. We interviewed CBP and ICE headquarters officials to obtain their perspectives on agency policies and practices related to encounters with individuals who potentially qualified for, had requested, or had received DACA under various immigration enforcement priorities since DACA's inception in 2012. We also interviewed USCIS, CBP, and ICE headquarters officials to discuss CBP and ICE access to and use of USCIS databases containing information on DACA requestors and recipients.

In addition, we analyzed summary-level CBP and ICE data on DACA requestors, recipients, and potentially qualified individuals who were apprehended, detained, and subsequently released from custody. Specifically:

- Regarding ICE, we analyzed summary data from November 2014 to November 2019. In November 2014, ICE's Enforcement and Removal Operations began tracking in its case management system data on individuals whom ICE released from custody because they potentially qualified for, had requested, or had received DACA.[10] However, ICE

[9]U.S. Border Patrol (Border Patrol) deploys agents to immigration checkpoints that are generally located on highways 25 to 100 miles from the southwest border. At checkpoints, Border Patrol agents screen vehicles for noncitizens who were able to illegally cross the border undetected at or between U.S. ports of entry. Border Patrol checkpoints are located on major U.S. highways and secondary roads. This permits checkpoints to be far enough inland to detect and apprehend noncitizens in violation of U.S. immigration law, smugglers, and potential terrorists attempting to travel farther into the interior of the U.S. on ingress routes after evading detection or otherwise avoiding required inspection at the border. See GAO, *Border Patrol: Issues Related to Agency Deployment Strategy and Immigration Checkpoints*, GAO-18-50 (Washington, D.C.: Nov. 8, 2017).

[10]ICE's Enforcement and Removal Operations is responsible for managing all aspects of the immigration enforcement process, including identification and arrest, detention, removal. ICE's data field did not distinguish between DACA recipients and those who might qualify for DACA.

removed DACA from its system as a release reason in November 2019, according to ICE officials. To assess the reliability of these data, we interviewed agency officials responsible for maintaining these data about the steps they took to ensure their quality and reliability. We determined that these data were sufficiently reliable to describe the approximate number of ICE's DACA-related releases from November 2014 to November 2019.

- Regarding CBP, we analyzed summary-level U.S. Border Patrol (Border Patrol) data from June 2012 to October 2017.[11] We selected this period because officials told us that Border Patrol ceased tracking releases of potentially DACA-qualified individuals from its custody after this date, due to DACA's temporary rescission.[12] To assess the reliability of these data, we reviewed the data for obvious errors and interviewed agency officials responsible for maintaining these data about the steps they took to ensure their quality and reliability. According to Border Patrol's data, there was a significant increase in DACA-related releases over a 2-month period in one sector in Texas. Because Border Patrol officials could not determine whether this increase reflected actual releases or were data entry errors, we excluded this sector's data for these 2 months and report the number of DACA-related releases from June 2012 to October 2017 as a minimum.

We conducted this performance audit from January 2021 to January 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

[11]Within CBP, Border Patrol apprehends individuals at U.S. borders between ports of entry, and the Office of Field Operations encounters individuals who arrive at ports of entry. We included only Border Patrol data in our analysis because CBP's Office of Field Operations officials told us that CBP officers rarely encounter DACA recipients or requestors at U.S. ports of entry and that they do not collect or maintain data specific to DACA in its automated data system.

[12]In September 2017, DHS issued a memorandum rescinding DACA and directing USCIS to stop accepting initial DACA requests. This rescission of DACA was in place until June 2020.

# Background

## Deferred Action for Childhood Arrivals (DACA) Qualification Guidelines

To be considered for an initial grant of DACA, noncitizens must establish through documentation that they

- arrived in the U.S. before age 16;
- were age 30 or younger and had no legal immigration status on June 15, 2012;
- have continuously resided in the U.S. since June 15, 2007, up to the date of filing;[13]
- were physically present in the U.S. on June 15, 2012, and at the time of the DACA request;
- are in school, graduated from school, or have obtained a certificate of completion from high school, or have a discharge under honorable conditions from the military; and
- have not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors and do not otherwise pose a threat to national security or public safety.

To be considered for DACA renewal, recipients must establish through documentation that they

- did not depart the U.S. on or after August 15, 2012, without advance parole;[14]
- have continuously resided in the U.S. since receiving their approval for DACA; and

[13]According to the instructions for the DACA request form, any brief, casual, and innocent departures from the U.S. made on or after June 15, 2007, and before August 15, 2012, will not interrupt continuous residence if the absence was not the result of a removal order, the purpose of the absence was not contrary to law, and the duration of the absence was reasonable to accomplish the purpose for the absence.

[14]Advance parole allows an otherwise inadmissible noncitizen to enter the U.S. under certain safeguards and controls without applying for a visa. Generally, USCIS may grant advance parole to DACA recipients for employment, education, or humanitarian (medical, funerals, and visiting family) purposes. Travel outside the U.S. without first receiving advance parole automatically terminates deferred action under DACA.

- have not been convicted of a felony, significant misdemeanor, three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

According to USCIS officials, USCIS retains the discretion to determine whether deferred action is appropriate in any given case, even if these guidelines are met.

## Prosecutorial Discretion and Immigration Enforcement Priorities

USCIS defines deferred action as a type of prosecutorial discretion that allows an individual to remain in the U.S. for a set period, unless the deferred action is terminated.[15] Prosecutorial discretion is the longstanding authority of an agency to decide where to focus its resources and how to enforce the law against an individual. We have previously reported that, due to limited resources, DHS cannot respond to all immigration violations or remove all individuals who are determined to be in the U.S. without lawful immigration status.[16] Therefore, DHS has exercised prosecutorial discretion in the enforcement of the law. Current and prior administrations have developed various priorities for the enforcement of civil immigration laws, as well as for the exercise of prosecutorial discretion.[17]

## Time Line of DACA Legal Challenges and Key Events

Since the creation of DACA, legal challenges and evolving administration priorities have affected noncitizens' access to DACA. In June 2012, DHS issued a memorandum establishing DACA. In September 2017, DHS issued a memorandum rescinding DACA and directing USCIS to stop

[15]Such terminations may result, for example, if an individual no longer qualifies for deferred action or if the exercise of such prosecutorial discretion is no longer consistent with DHS's immigration enforcement priorities.

[16]GAO, *Immigration Enforcement: Arrests, Detentions, and Removals, and Issues Related to Selected Populations*, GAO-20-36 (Washington, D.C.: Dec. 5, 2019).

[17]Civil immigration enforcement actions include administrative arrests, detentions, and removals of noncitizens determined to be in the U.S. without lawful immigration status. In September 2021, DHS finalized the immigration enforcement priorities set forth in Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (issued Jan. 20, 2021), effective November 29, 2021. The memorandums governing these priorities were partially enjoined in an August 2021 Texas federal district court order, although the implementation of this order was temporarily stayed by the same court. See Texas v. United States, No. 21-CV-00016 (S.D. Tex. Aug. 19, 2021) (memorandum opinion and order). The Fifth Circuit Court of Appeals then granted a partial stay of the district court order on September 15, 2021, keeping the majority of the memorandums in place. See Texas v. United States, No. 21-40618 (5th Cir. Sept. 15, 2021) (order). As of January 2022, litigation related to these memorandums is ongoing.

accepting initial requests, and providing a limited timeframe for accepting renewal requests.[18] This prompted legal challenges resulting in a series of California and New York federal district court rulings throughout 2018 requiring DHS to continue accepting DACA renewal requests, but not initial requests.[19] In June 2020, the Supreme Court held that the September 2017 rescission of DACA was invalid, thereby keeping DACA in place.[20]

In July 2020, DHS directed USCIS to reduce the period of deferred action and related employment authorization from 2 years to 1 year and not to grant advance parole, absent exceptional circumstances. In December 2020, following a New York federal district court ruling that directed DHS to take a number of actions, including posting a public notice that it would be accepting first-time requests for DACA, USCIS resumed accepting initial DACA requests and granting deferred action and related employment authorization for a period of 2 years.[21] In July 2021, following a Texas federal district court ruling, USCIS may accept but no longer approve initial DACA requests and may temporarily continue approving renewals of previously approved requests.[22] Most recently, in September 2021, DHS published a notice of proposed rulemaking for DACA, which

[18]The September 2017 memorandum stated that DHS would adjudicate on a case-by-case basis properly filed pending renewal requests accepted as of the date of the memorandum and from current beneficiaries whose benefits would expire between the date of the memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

[19]See Regents of the Univ. of Cal. v. Dep't of Homeland Security, 279 F. Supp. 3d 1011 (N.D. Cal. Jan. 9, 2018); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401 (E.D.N.Y. Feb. 8, 2018).

[20]Dep't of Homeland Security v. Regents of the Univ. of Cal, 140 S. Ct. 1891 (2020) (finding that the Department of Homeland Security violated the Administrative Procedure Act in rescinding DACA).

[21]Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

[22]Texas v. United States, No. 18-CV-00068 (S.D. Tex. July 16, 2021) (opinion). Among other motions, the government sought a stay of proceedings pending the completion of the proposed rulemaking for DACA, which was denied by the court on October 15, 2021. See Texas v. United States, No. 21-40680 (5th Cir. Oct. 4, 2021 and Oct. 15, 2021) (opposed motion of defendants-appellants to place appeal in abeyance pending completion of rulemaking); (court order). As of January 2022, this litigation was ongoing and on appeal to the Court of Appeals for the Fifth Circuit.

reinforces that DACA recipients should not be a priority for removal.[23] See figure 1 for a time line of key events related to DACA.

**Figure 1: Time Line of Key Deferred Action for Childhood Arrivals (DACA) Legal Challenges and Events**

Source: GAO analysis of White House and DHS policy memorandums. | GAO-22-104734

Note: In September 2021, DHS published a notice of proposed rulemaking for DACA, to fortify immigration protections for DACA recipients, which included a 60-day period for public comment. 86 Fed. Reg. 53,736 (Sept. 28, 2021).

[a]The September 2017 memorandum stated that DHS would adjudicate on a case-by-case basis properly filed pending renewal requests accepted as of the date of the memorandum and from current beneficiaries whose benefits would expire between the date of the memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

[b]Dep't of Homeland Security v. Regents of the Univ. of Cal, 140 S. Ct. 1891 (2020).

[c]See also Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

[d]Texas v. United States, No. 18-CV-00068 (S.D. Tex. July 16, 2021) (opinion).

[23]86 Fed. Reg. 53,736 (Sept. 28, 2021). The notice of proposed rulemaking provides that, if finalized, the rule would include a number of provisions of the existing DACA policy and longstanding USCIS practice as well as make specific changes such as creating a DACA-specific regulatory provision regarding qualifying for employment authorization for DACA deferred action recipients. See 86 Fed. Reg. at 53,739-40.

## Agency Roles and Responsibilities

**USCIS.** USCIS service centers are responsible for adjudicating DACA requests. USCIS officers at the service centers adjudicate DACA requests by determining whether requestors meet established DACA guidelines. USCIS's Fraud Detection and National Security Directorate (FDNS) is responsible for researching and verifying information related to fraud concerns. Within USCIS's service centers, officers are to refer requests with fraud-related concerns to FDNS's Center Fraud Detection Operations (fraud detection units) for resolution. Also within the service centers, the Background Check Unit is responsible for reviewing and resolving any criminal, national security, or public safety concerns identified by comparing DACA requestors' information against law enforcement databases. USCIS is also generally responsible for issuing notices to appear for cases, including DACA requests, with substantiated findings of immigration fraud.[24]

**ICE.** ICE agents and officers are responsible for identifying, apprehending, detaining, litigating charges of removability against, and removing noncitizens who are in the U.S. in violation of U.S. immigration law. ICE's Homeland Security Investigations is responsible for conducting criminal investigations to prevent unauthorized noncitizens from obtaining fraudulent identity documents and immigration benefits. ICE's Enforcement and Removal Operations conducts civil immigration enforcement actions, which includes administrative arrests, detentions, and removals. In addition to arresting noncitizens for administrative violations of immigration law, it also conducts criminal arrests and assists with prosecutions related to such criminal activity. ICE is also responsible for issuing notices to appear, including those based on public safety and national security concerns related to DACA requestors and recipients. ICE officials stated they may encounter DACA recipients during routine immigration enforcement operations and that noncitizens who are already

[24]A notice to appear is a document issued to a noncitizen instructing them to appear before an immigration court on a certain date. DHS is to file the notice to appear with the immigration courts, thereby initiating removal proceedings against the noncitizen. See 8 C.F.R. §§ 208.30(f), 1239.1(a).

AR2022_400482

in ICE custody may sometimes self-identify as potentially qualified for DACA.[25]

**CBP.** Within CBP, Border Patrol is responsible for securing U.S. borders and apprehending individuals arriving at the border between U.S. ports of entry. Also within CBP, Office of Field Operations is responsible for inspecting travelers and cargo seeking to enter the U.S. through ports of entry and encounters individuals determined to be inadmissible to the country. Regarding DACA, for example, Border Patrol officials may encounter DACA recipients or individuals who may qualify for DACA at interior immigration checkpoints.

## DACA Adjudication Outcomes

Since 2012, USCIS has approved more than 3 million DACA requests and denied nearly 106,000 DACA requests, as shown in figure 2.[26] Of these, more than 800,000 were initial requests, and nearly 2.2 million were requests for renewal.

[25]According to USCIS guidance, individuals who believe they qualify for DACA, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS, subject to relevant court orders currently in effect. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their ICE case officer.

[26]A DACA request includes a DACA request form, an employment authorization form, and supporting evidence establishing that the requestor has met the guidelines. Upon receipt of a DACA request, USCIS determines whether DACA requests are complete, accepting complete requests for adjudication and rejecting incomplete requests. Since June 2012, USCIS has accepted for adjudication nearly all requests it received. Specifically, USCIS accepted 3.3 million of 3.5 million (93 percent) requests received through June 2021, including about 1 million initial and 2.5 million renewal requests. Approvals and denials do not total 100 percent, due to pending cases. As of June 2021, about 83,000 initial requests and 84,000 renewal requests were pending.

**Figure 2: Deferred Action for Childhood Arrivals (DACA) Request Adjudication Outcomes, June 2012 through June 2021**

**3 million requests approved** *(800,000 initial, 2.2 million renewal)*
**167,000 pending**
**106,000 denied**

Source: GAO analysis of U.S. Citizenship and Immigration Services (USCIS) information. | GAO-22-104734

Notes: Approving or denying a request refers to whether USCIS grants deferred action for the requestor. Pending requests are requests that have been accepted and are awaiting or undergoing adjudication by USCIS. As of June 2021, about 83,000 initial requests and 84,000 renewal requests were pending, according to USCIS data.

Numbers are rounded to the nearest thousand.

While USCIS has historically approved most DACA requests, multiple factors may result in USCIS denying a DACA request. For example, USCIS may deny a DACA request based on indications of criminality or fraud.[27] Criminal offenses associated with DACA denials include nonegregious criminality, such as driving-related offenses, immigration-related offenses, drug-related offenses, theft, and assault, among other offenses, according to a 2019 USCIS report.[28] Egregious public safety offenses include, among other offenses, murder, rape, and sexual abuse of a minor, according to USCIS guidance. USCIS may also deny a DACA request on the basis of administrative reasons, such as the abandonment of a request, multiple failures to appear for an appointment to collect biometric information, or failure to respond to a request for evidence or a notice of intent to deny a request, according to USCIS's standard

[27]According to USCIS's standard operating procedures, the decision whether to defer action in a particular case is individualized and discretionary, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns. By their very nature, felonies, significant misdemeanors, a history of other misdemeanors, and activities compromising national security and public safety are particularly serious and carry considerable weight in the totality of the circumstances analysis. As a result, it would take an exceptional circumstance to overcome the underlying criminal, national security, and public safety grounds that would otherwise result in not considering an individual for DACA, which would be rare, according to USCIS's procedures.

[28]U.S. Citizenship and Immigration Services, *DACA Requestors with an IDENT Response* (Washington, D.C.: 2019).

operating procedures.[29] USCIS also may deny a request if it finds a requestor's response to a request for evidence, or notice of intent to deny, is not sufficient to establish that the requestor meets the guidelines for DACA. Table 1 shows the number of initial and renewal requests that USCIS approved and denied from June 2012 through June 2021.

**Table 1: Adjudication Outcomes of Requests for Deferred Action for Childhood Arrivals (DACA), by Fiscal Year, June 2012 through June 2021**

| Fiscal year | Initial requests approved | Renewal requests approved | Total requests approved | Initial requests denied | Renewal requests denied | Total requests denied[a] |
|---|---|---|---|---|---|---|
| June –Sept. 2012 | 1,684 | 0 | **1,684** | 0 | 0 | 0 |
| 2013 | 470,598 | 0 | **470,598** | 11,019 | 0 | **11,019** |
| 2014 | 135,921 | 22,234 | **158,155** | 21,068 | 3 | **21,071** |
| 2015 | 90,827 | 419,502 | **510,329** | 19,088 | 2,351 | **21,439** |
| 2016 | 52,992 | 145,821 | **198,813** | 11,526 | 3,026 | **14,552** |
| 2017 | 47,132 | 414,777 | **461,909** | 9,165 | 4,031 | **13,196** |
| 2018 | 24,381 | 294,960 | **319,341** | 8,248 | 4,287 | **12,535** |
| 2019 | 1,775 | 385,670 | **387,445** | 1,605 | 3,343 | **4,948** |
| 2020 | 1,792 | 292,916 | **294,708** | 716 | 3,285 | **4,001** |
| 2021 (through June) | 5,779 | 217,626 | **223,405** | 982 | 1,923 | **2,905** |
| **Total** | **832,881** | **2,193,506** | **3,026,387** | **83,417** | **22,249** | **105,666** |

Source: U.S. Citizenship and Immigration Services (USCIS). | GAO-22-104734

Note: Since USCIS began approving DACA requests in 2012 and approves DACA for 2 years, renewals did not begin until fiscal year 2014. According to USCIS data, from June 2012 through June 2021, about 176,000 approved DACA requests expired and were not renewed.

[a]USCIS data on denials includes the number of requests that were denied, terminated, or withdrawn. According to USCIS's standard operating procedures, a DACA request may be denied if the requestor does not establish that they qualify for DACA or if they have engaged in disqualifying

[29]After receiving a DACA request, USCIS schedules an appointment to collect the requestor's biometrics, such as fingerprints, a photograph, and a signature. According to USCIS's standard operating procedures, USCIS is not to deny a DACA request solely because the requestor failed to submit sufficient evidence with the request, unless there is sufficient evidence to support a denial. Instead, USCIS is to issue a request for evidence to obtain the information needed to adjudicate the request, or a notice of intent to deny, which provides the requestor an opportunity to rebut derogatory information obtained during a background check or to address reasons for not meeting the guidelines. According to USCIS officials, USCIS may waive biometrics collection under certain circumstances such as when a requestor is unable to attend an appointment in person. In such cases, if biometrics are available, USCIS may use biometrics that were previously collected, according to USCIS officials.

activity, such as having a felony criminal conviction. USCIS may also terminate an individual's previously approved DACA for disqualifying actions committed after the request was approved.

## USCIS Rarely Shares Information on DACA Requestors with Immigration Enforcement Agencies

### USCIS Uses Information from DACA Requestors and Law Enforcement Databases to Adjudicate Requests

USCIS uses information and documentation collected from DACA requestors, along with information contained in various law enforcement databases, to adjudicate requests. According to USCIS's standard operating procedures, DACA requestors are to establish by a preponderance of the evidence that they meet the criteria for deferred action.[30] Under this standard, requestors must demonstrate that it is more likely than not that they meet the qualification guidelines. Adjudication decisions are based on the sufficiency of the evidence provided. For example, to meet the evidence standard for the education criteria, requestors may provide documentation showing that they are currently in school; or have graduated or obtained a certificate of completion from a U.S. high school, college, or university. Further, to demonstrate that they were present in the U.S. on June 15, 2012, requestors may provide employment records (such as pay stubs or tax returns); receipts (such utility bills or rent receipts); school records (such as a transcript or report card); or medical records, according to the standard operating procedures.

In addition, USCIS officers conduct background and security checks against various law enforcement databases, including those owned by immigration enforcement agencies such as CBP and ICE, to determine whether requestors have criminal records that would disqualify them from

[30]The "preponderance of the evidence" is an evidentiary legal standard. It is the burden of proof in most civil trials, in which the jury is instructed to find for the party that, on the whole, has the stronger evidence, however slight the edge may be. See Black's Law Dictionary, 11th ed. (2019) (defining "preponderance of the evidence").

being qualified.[31] As part of the adjudication process, USCIS officers may contact law enforcement agencies such as ICE or CBP, for example, to resolve questions related to a DACA requestor who is a positive match to a record in a database. USCIS officials stated that, generally, when their agency contacts ICE or CBP regarding a record match to a DACA requestor, the individual is already known, and USCIS is not disclosing new information. For example, they said that USCIS officers may determine through the background and security check process that a record in a database indicates that a DACA requestor is potentially associated with a criminal gang. USCIS officers may need additional information about the record to adjudicate a DACA request, which ICE may be able to access and provide to the adjudicating officers. In such cases, USCIS officials stated that USCIS would provide ICE or CBP with sufficient biographical information on the DACA requestors to confirm the individuals' identity and obtain the information necessary to continue with adjudication.

In addition, a record in a law enforcement database may indicate that there is an open investigation involving a DACA requestor. In such cases, USCIS officials may reach out to an investigating agency, such as ICE, to ensure that an adjudicative decision on the DACA request would not negatively affect the ongoing investigation, according to USCIS officials. Specifically, USCIS adjudicators may seek information from the investigating agency to determine whether the information is likely to result in the arrest of a requestor or whether investigators have obtained additional derogatory information on the requestor.

## USCIS Has Shared Information with ICE on a Small Number of DACA Requestors for Enforcement Purposes

Since 2012, USCIS has shared information with ICE, for immigration enforcement purposes, on a small number of DACA requestors and recipients who engaged in activities that disqualified them from DACA. In 2012, USCIS published guidance stating that it would not provide information from DACA requests to CBP and ICE for the purpose of

[31]These law enforcement databases include CBP's TECS (not an acronym) and the Federal Bureau of Investigation's Integrated Automated Fingerprint Identification System. TECS is an automated enforcement and inspection lookout system maintained by CBP that combines information from multiple agencies and databases to compile data relating to national security risks, public safety issues, current or past targets of investigations, and other law enforcement concerns. The Integrated Automated Fingerprint Identification System provides a summary of an individual's administrative or criminal record within the U.S. For the purposes of this report, we focused on USCIS's coordination and information sharing with immigration enforcement agencies—namely, CBP and ICE.

immigration enforcement, unless the requestor met certain criteria.[32] For example, consistent with DHS's information-sharing policy, USCIS may refer a case to ICE if the requestor represents a potential public safety risk based on the individual's criminal history. The guidance also states that USCIS may share information with national security and law enforcement agencies, such as ICE, for purposes other than removal. This may include for assistance with adjudication, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a crime. However, under these circumstances, USCIS is not to provide information on family members of DACA requestors to ICE for enforcement purposes, according to the guidance.[33]

When USCIS officers encounter derogatory information about a requestor during the adjudication process, they may undertake various actions, depending on the nature of such information. In particular, consistent with USCIS guidance, officers may take action if the DACA request involves (1) confirmed or suspected fraud or (2) criminality that raises concerns that an individual may pose an egregious threat to public safety. In addition, if, after approval, USCIS subsequently determines that DACA recipients no longer meet the guidelines, USCIS may terminate their deferred action.[34] Since 2012, of the 106,000 DACA requests that USCIS

[32]Such criteria are outlined in U.S. Citizenship and Immigration Services, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear in Cases Involving Inadmissible and Removable Aliens* (Nov. 7, 2011). Further, according to DHS policy, information shall be shared within DHS whenever the requesting officer or employee has an authorized purpose for accessing the information for the performance of their duties, possesses the requisite security clearance, and assures adequate safeguarding and protection of the information. Therefore, according to the policy, DHS personnel must have timely access to all relevant information they need to successfully perform their duties while providing appropriate privacy, civil rights, and civil liberties protections.

[33]USCIS includes this information-sharing policy in the DACA request form instructions and in the DACA Frequently Asked Questions section on its website. See https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions.

[34]Termination reasons may include USCIS determining that a requestor did not meet the qualification guidelines at the time DACA was granted.

denied, USCIS referred fewer than 900 cases (less than 1 percent) to ICE (see fig. 3).[35]

**Figure 3: Outcomes for Deferred Action for Childhood Arrivals (DACA) Requests and Approximate Numbers of Enforcement Actions, June 2012 through June 2021**

3 million requests approved (800,000 initial, 2.2 million renewal)
167,000 pending
106,000 denied[a]
Enforcement actions
DACA terminations : 4,661
Notices to appear[b] : 134
Referrals to U.S. Immigration and Customs Enforcement[c] : 900

Source: GAO analysis of USCIS information. | GAO-22-104734

Note: DACA-related referrals to U.S. Immigration and Customs Enforcement (ICE) are rounded to the nearest hundred. Other numbers are rounded to the nearest thousand.

[a]According to U.S. Citizenship and Immigration Services' (USCIS) standard operating procedures, requests involving issues of criminality that do not meet guidelines for DACA consideration will be denied. However, USCIS may approve cases where a requestor demonstrates through documentation that an exception is warranted.

[b]A notice to appear is a document issued to a noncitizen instructing them to appear before an immigration court on a certain date. DHS is to file the notice to appear with the immigration courts, thereby initiating removal proceedings against the noncitizen. See 8 C.F.R. §§ 208.30(f), 1239.1(a).

[c]DACA-related referrals to ICE are an estimate. According to USCIS officials, USCIS data systems track whether a referral to ICE has a DACA request form associated with it, even if the subject of the referral is not a DACA requestor. For example, USCIS may refer a case to ICE if an attorney has prepared fraudulent documents in support of multiple DACA requests. In such cases, even though the attorney is the subject of the referral, each of those DACA request forms would be associated with the referral to ICE, and ICE may have access to these requestors information.

**DACA requests involving fraud.** According to USCIS's standard operating procedures, when USCIS finds that an individual requestor committed fraud in connection with a DACA request, adjudicators are to deny the request and may issue the requestor a notice to appear before an immigration court.[36] Common document fraud includes altered or fraudulent documents, such as fraudulent educational credentials,

[35]DACA-related referrals to ICE are an estimate. According to USCIS officials, USCIS data systems track whether a referral to ICE has a DACA request form associated with it, even if the subject of the referral is not a DACA requestor. For example, USCIS may refer a case to ICE if an attorney has prepared fraudulent documents in support of multiple DACA requests. In such cases, even though the attorney is the subject of the referral, each of those DACA request forms would be associated with the referral to ICE, and ICE may have access to these requestors information.

[36]USCIS may determine that issuing a notice to appear is not appropriate if the requestor is already in removal proceedings or has already been removed from the U.S., according to USCIS officials.

according to USCIS officials. However, USCIS may also refer certain types of fraud cases to ICE's National Lead Development Center for a possible criminal investigation.[37] In particular, USCIS is to refer cases involving large-scale immigration fraud schemes, corruption involving government officials, or other aggravating circumstances.[38]

When USCIS refers a case to ICE for investigation due to fraud-related concerns, officers are to suspend other action on the DACA request, including adjudication decisions, for a period of at least 60 days while ICE determines how to proceed in response to the referral.[39] ICE may accept or decline USCIS's request for an investigation.[40] If ICE accepts and concludes its investigation with a finding of fraud and determines that the requestor is removable from the U.S., USCIS may initiate removal proceedings by issuing the requestor a notice to appear. If ICE declines a USCIS referral or does not provide a timely response to the referral, USCIS may continue adjudication on the DACA request, or FDNS may conduct further administrative investigation into the fraud concerns.

[37]According to USCIS and ICE officials, USCIS grants a small number of CBP and ICE agents and officers read-only access to its fraud case management system with a need to know this information, based on their daily responsibilities and to assist with fraud investigations. The Fraud Detection and National Security Database is USCIS's primary case management system to record requests and case determinations involving immigration benefit fraud, public safety, and national security concerns. According to USCIS officials, as of May 2021, 37 ICE officers have access to FDNS's database nationally. Three USCIS officers are embedded with ICE at the National Lead Development Center, according to ICE officials. Therefore, ICE personnel at the National Lead Development Center who need additional information about a USCIS referral to ICE typically direct requests to these embedded USCIS officers to obtain the needed information rather than directly accessing FDNS's database, according to USCIS officials. As of May 2021, no CBP personnel had access to this database because they did not have a need for this information, according to USCIS officials.

[38]Criteria for USCIS referring suspected fraud to ICE include a conspiracy or large-scale fraud scheme; corruption of a government employee; particularly egregious cases, such as those involving human trafficking; and cases that otherwise may meet USCIS referral guidelines, such as public safety or national security concerns.

[39]Typically, the National Lead Development Center receives referrals from USCIS and distributes them to ICE Special Agent-in-Charge local offices for further investigation. ICE's Homeland Security Investigations established the National Lead Development Center in August 2017 to streamline and standardize the lead referral process between USCIS and ICE. Prior to August 2017, ICE Benefit Fraud Units were co-located with USCIS's service centers.

[40]According to a 2020 memorandum of understanding between USCIS and ICE, ICE has 60 days to provide a response to a pending referral and 120 days to provide a response for an accepted referral. ICE may also request additional time in writing, if it needs more time to complete an investigation.

USCIS procedures indicate that when such an investigation results in a legally sustainable finding of fraud, USCIS is to deny the DACA request and may issue the requestor a notice to appear if ICE has not already done so.

According to USCIS data, denials due to fraud are not common and, in most cases, according to USCIS officials, denial of a DACA request does not result in USCIS issuing a notice to appear. USCIS issued 134 notices to appear related to DACA from June 2012 through June 2021, all of which USCIS data indicate were for confirmed findings of fraud.[41] Further, the vast majority of these 134 notices to appear were connected to a single, major fraud scheme in fiscal year 2018 associated with a fraudulent document preparer, according to USCIS officials.

**DACA requests involving public safety concerns.** According to USCIS guidance, when USCIS finds indications of criminality in connection with a DACA request, the case is categorized as either an egregious public safety case or a nonegregious public safety case, depending on the type of criminality.[42] For requests that raise egregious public safety concerns, USCIS officers are to refer the case to ICE's National Criminal Analysis and Targeting Center to determine the appropriate course of action.[43] USCIS officers are to suspend adjudication for 60 days but may proceed with adjudication sooner, if ICE provides notification of its action on the case. After ICE completes its review and determines whether to accept or decline the referral for additional investigation, USCIS is to continue adjudicating the DACA request. When appropriate, USCIS is to deny the request on the basis of confirmed criminality constituting an egregious

[41]In October 2021, USCIS officials told us that issuances of notices to appear by USCIS for fraud were on hold while USCIS works to align its policy for issuing notices to appear with updated DHS enforcement priorities. In September 2021, DHS issued updated immigration enforcement priorities, which took effect in November 2021.

[42]Examples of egregious public safety threats include murder, rape, sexual abuse of a minor, human or firearms trafficking, and violent crimes that carry a prison term of at least 1 year.

[43]ICE's National Criminal Analysis and Targeting Center, within Enforcement and Removal Operations, is responsible for analyzing data across law enforcement and immigration databases, developing lead and information referrals, and disseminating them to ICE field offices for follow-up enforcement action. ICE field offices use such information to locate and arrest noncitizens who pose a threat to public safety, including gang members, felons, and child predators. For certain public safety cases, including human right violators and known or suspected gang members, USCIS is to refer the case to ICE's National Lead Development Center instead of to Enforcement and Removal Operations.

public safety case, consistent with USCIS's standard operating procedures.[44]

For nonegregious public safety cases, USCIS's Background Check Unit evaluates the potentially disqualifying criminality to determine whether an exception was present that would enable the requestor to overcome the disqualifying factor. For example, where the requestor has been arrested for a potentially disqualifying criminal offense, but the court disposition is not yet available because the criminal proceedings are pending, USCIS officers may request additional information about the criminal proceedings, such as whether the charges were resolved. If the charges were resolved, USCIS officers are to evaluate the case based on the totality of the circumstances. If the charges were not resolved and are not expected to be resolved quickly, USCIS is to deny the request, according to USCIS officials. According to USCIS officials, USCIS does not refer nonegregious public safety cases to ICE that involve DACA requests.

Figure 4 outlines the DACA adjudication process and possible USCIS actions for cases involving public safety and fraud concerns.

[44]According to USCIS's standard operating procedures, requests involving issues of criminality that normally would not meet the guidelines for consideration of deferred action will be denied, unless the requestor is claiming that consideration is warranted due to exceptional circumstances and fully documents such claim. USCIS headquarters must review and concur with such an exception.

**Figure 4: U.S. Citizenship and Immigration Services (USCIS) Referrals to U.S. Immigration and Customs Enforcement (ICE) Involving Deferred Action for Childhood Arrivals (DACA) Requests**

Source: GAO analysis of USCIS documentation.  |  GAO-22-104734

[a]When USCIS refers a case to ICE for investigation due to fraud-related concerns, officers are to suspend action while ICE determines how to proceed. USCIS may continue with adjudication or conduct further investigation, if ICE declines the referral or does not provide a response within 60 days for a pending referral or 120 days for an accepted referral. ICE may also request additional time, if it needs more time to complete an investigation.

[b]If ICE declines a fraud-related referral from USCIS, USCIS may continue its administrative investigation to determine if a notice to appear is warranted. Generally, only DACA denials due to fraud result in USCIS issuing a notice to appear, according to USCIS officials.

[c]USCIS officers are to suspend adjudication for 60 days but may proceed with adjudication sooner, if ICE provides notification of its action on the case.

**DACA terminations.** USCIS may terminate DACA for recipients who no longer meet qualification guidelines, such as by traveling outside the U.S. without advance parole or engaging in disqualifying criminal activity, according to USCIS guidance.[45] Such activity may include terrorism; espionage; felony convictions; multiple misdemeanors; or a serious misdemeanor conviction, such as drug trafficking. For disqualifying criminal offenses or public safety concerns that arise after USCIS has granted DACA, USCIS is to refer the case to ICE. If ICE accepts the case and issues a notice to appear, USCIS is to terminate the recipient's DACA, which also results in the termination of their employment authorization.[46] If ICE does not accept the case, USCIS is to issue a notice of intent to terminate, which begins the termination process while giving the DACA recipient a chance to contest the termination.[47] Similarly, if it comes to USCIS's attention that a DACA recipient committed fraud in seeking DACA, USCIS is to issue a notice of intent to terminate. From June 2012 through June 2021, USCIS terminated nearly 4,700 DACA requests from individuals to whom it previously had granted deferred action.

Overall, referrals to ICE involving DACA requestors have been rare. In general, ICE officials explained that USCIS has referred a small number of cases to ICE because most do not meet ICE's acceptance criteria. Specifically, the officials said that ICE does not have the resources to investigate every referral and that its criteria for accepting referrals prioritize high-impact, complex, large-scale criminal cases, often involving large international or criminal organizations. ICE officials stated that ICE typically does not accept referrals involving a single person, unless there are aggravating factors. Such factors could include a person who poses an egregious public safety threat, such as a war criminal or a sex offender, or who has abused a position of public trust. USCIS and ICE

[45]Termination reasons may also include USCIS determining that a requestor did not meet the guidelines at the time DACA was granted.

[46]Issuance of a notice to appear by CBP also terminates an individual's deferred action.

[47]A February 2018 court ruling in *Inland Empire – Immigration Youth Collective v. Nielsen* certified a class of certain DACA recipients, who, after January 19, 2017, have had or will have their DACA grant and employment terminated without notice or an opportunity to respond, with certain exceptions. See Inland Empire v. Nielsen, No. 17-CV-2048 (C.D. Cal. Feb. 26, 2018). This decision further held that, for class members, USCIS cannot treat DACA and DACA-related work authorizations as automatically terminated based on notice to appear issuance and further cannot terminate either DACA or DACA-related work authorization without providing advance notice and an opportunity to respond, and a reasoned explanation.

officials explained that, due to their limited resources, they generally seek to resolve lower-level fraud cases with an administrative action, such as USCIS denying the DACA request. Of the approximately 900 referrals to ICE from June 2012 through June 2021, USCIS data indicate that about 820 involved public safety concerns, and about 80 involved fraud.

## DACA Recipients Have Not Been an Enforcement Priority, and CBP and ICE Practices for Those Potentially Qualified Have Aligned with DHS Priorities

### DHS Has Not Considered DACA Recipients to Be an Immigration Enforcement Priority

DHS has generally not considered DACA recipients to be immigration enforcement priorities unless they met certain criteria, such as having engaged in certain types of fraud or activities that posed a threat to national security or public safety, as previously discussed. The specific criteria that constitute DHS's immigration enforcement priorities have varied throughout the period DACA has been in effect (see table 2). From DACA's inception in 2012 to 2017, DHS policy prioritized immigration enforcement for suspected terrorists, national security threats, and individuals charged with or convicted of certain crimes for removal from the U.S. In 2017, Executive Order 13768 instructed DHS to ensure that U.S. immigration law was enforced against all removable individuals without exempting classes or categories. In accordance with this executive order and DHS implementing memorandums, although noncitizens with criminal histories were prioritized for enforcement action, the department was authorized to take action against any removable noncitizen encountered during operations. In January 2021, Executive Order 13993 revoked Executive Order 13768, and DHS issued interim civil immigration enforcement guidelines setting forth enforcement

priorities similar to those that were in effect from 2011 to 2017.[48] On September 30, 2021, DHS finalized its *Guidelines for the Enforcement of Civil Immigration Law*, which took effect on November 29, 2021.

**Table 2: Department of Homeland Security (DHS) Immigration Enforcement Priorities from March 2011 through September 2021**

| Date | Implementing program or order | Immigration enforcement priorities |
|---|---|---|
| Mar. 2, 2011- Jan. 5, 2015 | Civil Immigration Enforcement Priorities[a] | Civil Immigration Enforcement Priorities prioritized noncitizens for removal who posed a danger to national security or a risk to public safety over individuals who obstructed immigration controls.<br>• Priority one (highest priority) focused on noncitizens who pose a danger to national security or public safety, such as those who are engaged in, or suspected of, terrorism or convicted of violent crimes.<br>• Priority two consisted of recent unlawful entrants.<br>• Priority three (lowest priority) consisted of fugitive noncitizens, such as those who fail to follow an order to depart. |
| Jan. 5, 2015 – Feb. 20, 2017 | Priority Enforcement Program[b] | • Priority one (the highest priority) focused on threats to national security, border security, and public safety, directing DHS to prioritize the apprehension, detention, and removal of noncitizens who engaged in or were suspected of terrorism or espionage, or who otherwise posed a threat to national security; as well as noncitizens apprehended while attempting to unlawfully enter the United States, and noncitizens with certain serious criminal convictions (such as felonies).<br>• Priority two focused on misdemeanor crimes and new immigration violators, including noncitizens with three or more prior misdemeanor convictions (or a significant misdemeanor, such as domestic violence or drug trafficking) and those who were apprehended after unlawful entry or who have abused the visa or visa waiver programs.<br>• Priority three (the lowest priority) focused on other immigration violations that did not fall under the first two priorities. |

[48]See Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (issued Jan. 20, 2021); and DHS, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (January 20, 2021). DHS characterized these enforcement guidelines as “interim” while it finalized its new enforcement priorities. The memorandums outlining these priorities were partially enjoined in an August 2021 Texas federal district court order, although the implementation of this order was temporarily stayed by the same court. See Texas v. United States, No. 21-CV-00016 (S.D. Tex. Aug. 19, 2021) (memorandum opinion and order). The Fifth Circuit Court of Appeals then granted a partial stay of the district court order on September 15, 2021, keeping the majority of the memorandums in place. See Texas v. United States, No. 21-40618 (5th Cir. Sept. 15, 2021). As of January 2022, litigation related to these memorandums is ongoing.

| Date | Implementing program or order | Immigration enforcement priorities |
|---|---|---|
| Feb. 20, 2017 – Jan. 20, 2021 | Executive Order 13768c | Executive Order 13768 articulated broad enforcement priorities with equal consideration of potential enforcement for all classes and categories of removable individuals. It also terminated the Priority Enforcement Program and reinstated Secure Communities, allowing U.S. Immigration and Customs Enforcement to issue detainers for removable individuals charged with criminal offenses who had not yet been convicted and for individuals subject to a final order of removal whether or not they had a criminal history. |
| Issued Sept. 30, 2021 | Guidelines for the Enforcement of Civil Immigration Law[d] | Guidelines for the Enforcement of Civil Immigration Law prioritizes noncitizens for removal who pose threats to national security, public safety, and border security—specifically<br>• threats to national security, such as noncitizens who have engaged in terrorism or espionage;<br>• threats to public safety, such as noncitizens involved in serious criminal conduct; and<br>• threats to border security, such as noncitizens apprehended at a border or port of entry while attempting to unlawfully enter the U.S. or apprehended in the U.S. after unlawfully entering after November 1, 2020. |

Source: DHS documentation. | GAO-22-104734

[a]U.S. Immigration and Customs Enforcement, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011).

[b]The Secretary of Homeland Security established the Priority Enforcement Program in a November 2014 memorandum and it went into effect on January 5, 2015. See Department of Homeland Security, Secure Communities (Nov. 20, 2014).

[c]Executive Order No. 13768, §§ 5, 7, 8, 9, 82 Fed. Reg. at 8800-8801 (issued Jan. 25, 2017). The Secretary of Homeland Security subsequently issued a memorandum establishing policy and providing guidance related to Executive Order 13768. See Department of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017).

[d]Department of Homeland Security, Guidelines for the Enforcement of Civil Immigration Law (Sept. 30, 2021). These guidelines took effect on November 29, 2021. Before issuing these immigration enforcement priorities, DHS issued similar interim civil immigration enforcement priorities on January 20, 2021 (see Department of Homeland Security, Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities (Jan. 20, 2021).

## CBP and ICE Enforcement Practices for DACA Recipients and Potentially Qualified Individuals Have Aligned with DHS Immigration Enforcement Priorities

Since 2012, CBP and ICE enforcement practices related to DACA recipients and individuals who might qualify for DACA have generally aligned with DHS's immigration enforcement priorities. Specifically, CBP and ICE issued policy memorandums implementing changes in their respective enforcement practices, which included guidance on how each component was to implement the priorities. Under each set of immigration enforcement priorities, agency guidance generally directed agents and officers to release DACA recipients they encountered, once they verified that the individual was approved for DACA. However, under this guidance, CBP and ICE retained the discretion to take an appropriate enforcement action against DACA recipients if there was derogatory

information or evidence of criminal activity that would make them an enforcement priority. For example, felony convictions or serious misdemeanors, such as drug trafficking or domestic violence, would likely result in a termination of DACA. CBP and ICE officials stated that they would likely release a DACA recipient whom they encountered in the case of a lower-priority offense, such as a traffic violation, if the individual did not present a threat to public safety, consistent with long-standing agency practice.

According to DHS officials, to verify whether an individual has DACA, CBP and ICE agents and officers may examine the recipients' documentation, such as their employment authorization documents, or they may access USCIS data systems to confirm the status of any requests the individual has filed.[49] These may include a pending DACA request awaiting adjudication, an approval or denial of the request, or a termination of a previously approved request. In particular, CBP and ICE agents and officers may obtain read-only access to a USCIS data system that aggregates an individual's immigration history from multiple immigration-related data systems, including USCIS's case management system for adjudicating DACA requests.[50]

While DACA recipients are to be provided temporary protection from removal, individuals who might qualify to receive DACA but who have not yet submitted a request or are awaiting approval do not have such protection. However, officials stated that they have generally extended prosecutorial discretion considerations to those who may have potentially qualified for DACA as long as they had not committed a removable

[49]To protect DACA requestors' personal information from unauthorized use, USCIS has implemented multiple safeguards on the access and use of this information. Specifically, CBP and ICE users must request access to USCIS systems. Such requests are reviewed by supervisors and must be renewed on a recurring basis. According to USCIS officials, each approved user is then granted a specific access level, based on their role and need to know specific information to perform their duties. Officials said that USCIS also monitors the activities of non-USCIS users of its data systems to determine when to revoke access for inactive users and to detect unauthorized use of the information.

[50]USCIS uses several data systems to store immigration-related information. The Person Centric Query System is a read-only data application that pulls information from multiple other systems—including the Computer Linked Application Information Management System and the Electronic Immigration Information System —to provide a single, consolidated history of a noncitizen's immigration interactions with the Department of Homeland Security. The Computer Linked Application Information Management System stores casework documentation for several types of immigration benefit requests. The Electronic Immigration Information System is a case management system used for processing benefit request forms and adjudicating immigration benefits, including DACA.

offense that would disqualify them from a favorable exercise of such discretion, in accordance with existing immigration enforcement priorities.

**CBP practices.** According to Border Patrol officials, agents encountering DACA recipients at interior immigration checkpoints who have not committed any criminal offenses are not to take them into custody or enter them into removal proceedings. However, consistent with policy, Border Patrol agents are to apprehend and refer to ICE for removal a DACA recipient who is allegedly involved in human smuggling or smuggling drugs through an immigration checkpoint, according to Border Patrol officials. CBP's Office of Field Operations officials stated that Office of Field Operations officers rarely encounter DACA recipients, and that such encounters may involve a DACA recipient attempting to reenter the U.S. at a port of entry without having obtained advance parole. For DACA recipients who have engaged in these types of disqualifying activities, Border Patrol agents and Office of Field Operations officers are to issue a notice to appear and transfer the individual to ICE custody, as appropriate.

From June 2012 through October 2017, according to Border Patrol officials, agents were to exercise prosecutorial discretion when encountering individuals who were potentially qualified for DACA by collecting information to determine whether apprehended individuals met USCIS's DACA qualification guidelines. Border Patrol officials said that in accordance with DHS immigration priorities and prosecutorial discretion policies, agents were directed to release individuals from custody who met the qualification guidelines and instruct them to contact USCIS to apply for DACA. During this period, Border Patrol data indicate that agents apprehended and subsequently released at least 800 individuals who might have potentially qualified for DACA, mostly along the southern border, as an exercise of prosecutorial discretion.[51]

After DHS temporarily rescinded DACA in September 2017, Border Patrol no longer extended prosecutorial discretion considerations to such individuals, according to Border Patrol officials. Rather, Border Patrol processed these individuals as a standard apprehension or arrest and issued them a notice to appear, as appropriate, thereby entering them

[51]According to Border Patrol's data, there was a significant increase in DACA-related releases over a 2-month period in one sector. Because Border Patrol officials could not determine whether this increase reflected actual releases or were data entry errors, we excluded this sector's data for these 2 months and report the number of DACA-related releases from June 2012 to October 2017 as a minimum.

into removal proceedings. Specifically, Border Patrol policy stated that individuals who may have previously qualified for DACA but did not have a DACA request on file with DHS as of September 6, 2017, should be processed according to normal procedures. Officials stated that CBP implemented this policy because USCIS was no longer accepting new DACA requests. However, agents were directed to continue releasing verified DACA recipients, per existing prosecutorial discretion policy.[52] In January 2021, DHS rescinded the policy, and in September 2021, it issued *Guidelines for the Enforcement of Civil Immigration Law*, which took effect in late November 2021, as previously noted.

**ICE practices.** According to ICE officials, beginning with DACA's inception in 2012, encounters with DACA recipients and individuals who may have potentially qualified for DACA were initially governed by a 2011 ICE memorandum on exercising prosecutorial discretion. This memorandum stated that when weighing whether an exercise of prosecutorial discretion may be warranted, ICE agents and officers were to consider all relevant factors, including the agency's civil immigration enforcement priorities; the individual's length of presence in the U.S.; and the circumstances of their arrival, particularly if the individual came to the U.S. as a young child. Moreover, although this memorandum predated DACA, it specifically instructed ICE officers and agents to consider exercising prosecutorial discretion for individuals who were present in the U.S. since childhood.[53] For example, ICE's Homeland Security Investigations agents who encountered DACA recipients with approved work authorization documents during worksite enforcement operations were not to take an enforcement action against the DACA recipient, according to ICE Homeland Security Investigations officials.[54] Likewise, ICE Enforcement and Removal Operations agents taking custody of individuals apprehended by Border Patrol were to release them upon verification of their approved DACA, according to officials. Consistent with policy, ICE officials stated that agents may arrest and initiate removal

[52]U.S. Customs and Border Protection, *Guidance on the Acting Secretary's Rescission of the Memorandum of June 15, 2012, Establishing DACA* (Sept. 6, 2017).

[53]U.S. Immigration and Customs Enforcement, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011).

[54]ICE's Homeland Security Investigations conducts worksite enforcement operations, which include the criminal arrest of employers and the administrative arrest of unauthorized workers.

proceedings for any DACA recipients found to have committed removable offenses—such as drug trafficking—after being approved for DACA.

Since 2012, ICE agents have used a checklist to determine whether encountered individuals potentially met USCIS's DACA qualification guidelines, according to ICE officials. The checklist notes that anyone who might qualify for DACA should not be removed or issued a notice to appear. Officials stated that individuals who meet the qualification guidelines outlined in the checklist and who have not committed an offense that would disqualify them from a favorable exercise of prosecutorial discretion have generally been released from ICE custody and advised to contact USCIS for instructions about initiating a DACA request. From November 2014 through November 2019, ICE data indicate that ICE detained and subsequently released approximately 270 individuals who were either DACA recipients or who might have qualified for DACA.[55]

In 2017, Executive Order 13768 directed DHS to ensure that U.S. immigration law was enforced against all removal individuals without exempting classes or categories. In addition, the 2017 DHS and ICE memorandums that implemented this executive order stated that ICE was to revise or rescind any policies that conflicted with the executive order. However, the 2012 DACA memorandum was exempted from this effort and remained in effect, without modification. After DHS temporarily rescinded DACA in September 2017, ICE also temporarily suspended its practice of extending prosecutorial discretion considerations to individuals who may have potentially qualified for DACA, according to ICE officials. In addition, following the December 2020 reinstatement of DACA for initial requests,[56] ICE resumed its practice of extending prosecutorial discretion considerations to those who may have potentially qualified for DACA, as long as they had not committed a removable offense that would disqualify them from a favorable exercise of such discretion. Further, DHS's September 2021 *Guidelines for the Enforcement of Civil Immigration Law*, which took effect in late November 2021, set forth enforcement priorities similar to those that were in effect from 2011 to 2017.

[55]ICE's Enforcement and Removal Operations began tracking DACA releases in its system in November 2014. DACA was removed from this system as a release reason in 2019, according to ICE officials. ICE data do not distinguish between DACA recipients and those who might have qualified for DACA.

[56]See Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

## Agency Comments

We provided a draft of this report to DHS for review and comment. The department did not provide formal written comments, but did provide technical comments on the draft, which we incorporated as appropriate.

We are sending copies of this report to the appropriate congressional committees, the Secretary of Homeland Security, and other interested parties. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix I.

Rebecca S. Gambler
Director, Homeland Security and Justice

# Appendix I: GAO Contact and Staff Acknowledgments

## GAO Contact

Rebecca Gambler, (202) 512-8777, gamblerr@gao.gov

## Staff Acknowledgments

In addition to the contact name above, Kathryn Bernet (Assistant Director), Carissa Bryant (Analyst-in-Charge), Benjamin Crossley, Michele Fejfar, Daniel Kuhn, Ben Nelson, Heidi Nielson, and Kevin Reeves made key contributions to this report.

## GAO's Mission

The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products.

### Order by Phone

The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information.

## Connect with GAO

Connect with GAO on Facebook, Flickr, Twitter, and YouTube.
Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.
Visit GAO on the web at https://www.gao.gov.

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact FraudNet:

Website: https://www.gao.gov/about/what-gao-does/fraudnet

Automated answering system: (800) 424-5454 or (202) 512-7700

## Congressional Relations

A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548

## Strategic Planning and External Liaison

Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707
U.S. Government Accountability Office, 441 G Street NW, Room 7814,
Washington, DC 20548

Please Print on Recycled Paper.

# IMMIGRATION ACT OF 1989
# (PART 2)

## HEARINGS

BEFORE THE

SUBCOMMITTEE ON IMMIGRATION, REFUGEES, AND INTERNATIONAL LAW

OF THE

COMMITTEE ON THE JUDICIARY
HOUSE OF REPRESENTATIVES

ONE HUNDRED FIRST CONGRESS

SECOND SESSION

ON

**S. 358, H.R. 672, H.R. 2448, and H.R. 2646**

IMMIGRATION ACT OF 1989

FEBRUARY 21, 1990

**Serial No. 21**

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

27-565 WASHINGTON : 1990

H521-35

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

COMMITTEE ON THE JUDICIARY

JACK BROOKS, Texas, *Chairman*

ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, Jr., Michigan
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN, Kansas
BARNEY FRANK, Massachusetts
GEO. W. CROCKETT, Jr., Michigan
CHARLES E. SCHUMER, New York
BRUCE A. MORRISON, Connecticut
EDWARD F. FEIGHAN, Ohio
LAWRENCE J. SMITH, Florida
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
HARLEY O. STAGGERS, Jr., West Virginia
JOHN BRYANT, Texas
GEORGE E. SANGMEISTER, Illinois
MEL LEVINE, California

HAMILTON FISH, Jr., New York
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois
F. JAMES SENSENBRENNER, Jr., Wisconsin
BILL McCOLLUM, Florida
GEORGE W. GEKAS, Pennsylvania
MICHAEL DeWINE, Ohio
WILLIAM E. DANNEMEYER, California
HOWARD COBLE, North Carolina
D. FRENCH SLAUGHTER, Jr., Virginia
LAMAR S. SMITH, Texas
CHUCK DOUGLAS, New Hampshire
CRAIG T. JAMES, Florida
TOM CAMPBELL, California

William M. Jones, *General Counsel*
Robert H. Brink, *Deputy General Counsel*
Alan F. Coffey, Jr., *Minority Chief Counsel*

---

Subcommittee on Immigration, Refugees, and International Law

BRUCE A. MORRISON, Connecticut, *Chairman*

BARNEY FRANK, Massachusetts
CHARLES E. SCHUMER, New York
HOWARD L. BERMAN, California
JOHN BRYANT, Texas
ROMANO L. MAZZOLI, Kentucky

LAMAR S. SMITH, Texas
BILL McCOLLUM, Florida
D. FRENCH SLAUGHTER Jr., Virginia
HAMILTON FISH, Jr., New York

Eugene Pugliese, *Counsel*
Nora Engel, *Assistant Counsel*
Bernadette Maguire, *Legislative Assistant*
Cordia Strom, *Minority Counsel*

# CONTENTS

## HEARING DATE

| | Page |
|---|---|
| February 21, 1990 | 1 |

## OPENING STATEMENT

| | |
|---|---|
| Morrison, Hon. Bruce A., a Representative in Congress from the State of Connecticut, and chairman, Subcommittee on Immigration, Refugees, and International Law | 1 |

## WITNESSES

| | |
|---|---|
| Lyman, Princeton N., Director, Bureau for Refugee Programs, Department of State, accompanied by Jerome Ogden, Deputy Assistant Secretary for Visa Services | 19 |
| McNary, Gene, Commissioner, Immigration and Naturalization Service, Department of Justice, accompanied by Bill Cook, General Counsel | 30 |

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARINGS

| | |
|---|---|
| Lyman, Princeton N., Director, Bureau for Refugee Programs, Department of State: Prepared statement | 22 |
| McNary, Gene, Commissioner, Immigration and Naturalization Service, Department of Justice: Prepared statement | 33 |
| Morrison, Hon. Bruce A., a Representative in Congress from the State of Connecticut, and chairman, Subcommittee on Immigration, Refugees, and International Law: February 21, 1990, news release and section-by-section analysis of proposed bill | 2 |

# IMMIGRATION ACT OF 1989
## (Part 2)

---

WEDNESDAY, FEBRUARY 21, 1990

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON IMMIGRATION, REFUGEES,
AND INTERNATIONAL LAW,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:10 a.m., in room 2237, Rayburn House Office Building, Hon. Bruce A. Morrison (chairman of the subcommittee) presiding.

Present: Representatives Bruce A. Morrison, Charles E. Schumer, Howard L. Berman, John Bryant, Lamar S. Smith, and Bill McCollum.

Also present: Eugene Pugliese, counsel; Bernadette Maguire, legislative assistant; and Cordia Strom, minority counsel.

### OPENING STATEMENT OF CHAIRMAN MORRISON

Mr. MORRISON. I would like to call this hearing to order. Today we will continue with the hearings of this subcommittee on the subject of legal immigration reform. We have pending before the subcommittee a number of pieces of legislation, including two bills, one authored by Mr. Schumer and one by myself, that are in draft form and that have been made available to our witnesses, as well as the Senate-passed bill and legislation authored by Mr. Fish and Mr. Berman, also members of this subcommittee. In addition to that, the legislation dealing with special immigrant numbers authored by the ranking Republican member, Mr. Smith, is also noticed for consideration at these hearings. We will be pleased to receive the testimony of our witnesses today with respect to each and any of those provisions.

[The bills, S. 358, H.R. 672, H.R. 2448, and H.R. 2646, are in part 1 of the hearings.]

[Chairman Morrison's news release and section-by-section analysis for his proposed bill follow:]

## CHAIRMAN MORRISON'S FEBRUARY 21, 1990, NEWS RELEASE AND SECTION-BY-SECTION ANALYSIS OF PROPOSED BILL

Washington -- Congressman Bruce A. Morrison (D-Ct., 3rd), Chairman of the House Judiciary Subcommittee on Immigration, Refugees, and International Law, today outlined his major proposal for legal immigration reforms, the Family Unity and Employment Opportunity Immigration Act of 1990.

"We need to change the way the United States deals with immigration," Morrison said. "My proposal is a comprehensive package of immigration reforms, which will unify families, identify labor needs, and raise revenues to educate and train U.S. workers for the jobs of the future. The Morrison bill is intended to provide a blueprint for reforming our legal immigration system in a way that recognizes the labor implications of increasing immigration. Like a blueprint, the Morrison bill begins with a sound foundation in resolving outstanding immigration issues while including detailed plans to manage our future needs."

"The Morrison bill will reform the current family preference system by expanding the category of immediate relatives, and it will benefit many of those affected countries and groups currently excluded by our immigration laws, including the Irish, Eastern

Europeans and Africans," Morrison said. "We have not reformed our legal immigration system since 1965, and the world has changed much since then. Our immigration system has to change to meet new needs and conditions."

"I have long advocated employer-based immigration because we need to bring our labor needs and immigration policies more into line," Morrison said. "I believe that it is imperative, involving a moral obligation as well as an economic incentive, that those employers who directly benefit from increased immigration make a contribution to the education and training of those who have been left behind in the U.S. economy, which is why I am proposing the American Workers Education Trust Fund in this legislation."

"The United States has always prospered as a nation of immigrants, and there is no reason why we cannot continue to build broader prosperity for the future refreshed with immigrants in the last years of the 20th century, just as a previous generation did in the first years of this century. Such a challenge requires new thinking," Morrison said. "This legislation represents that new way of thinking about this historic opportunity for legal immigration reform. I look forward to the debate we are beginning today, with hearings and a mark-up this spring, aiming at floor action soon. This legislation will move."

An outline of the proposed Family Unity and Employment Opportunity Immigration Act of 1990 is attached.

-30-

' '20/90

**H.R. ___, by Mr. Morrison (Conn.)**
**The Family Unity and Employment Opportunity Immigration Act of 1990**

**TITLE I -- FAMILY REUNIFICATION**

**Sec. 101. Spouses and children of permanent residents and other relatives.**

(a) Provides immediate relative status to spouses and minor children of permanent residents.
(b) Changes the preference system as follows:
First Preference - unmarried sons and daughters of U.S. citizens, and their children, 55,000
Second Preference - unmarried sons and daughters of permanent residents over 21 and their children, 35,000
Third Preference - married sons and daughters of U.S. citizens and spouses and children, 30,000
Fourth Preference - brothers and sisters of U.S citizens 21 years of age and over, and their spouses and children, 65,000
(c) Provides a worldwide numerical limit of 185,000
(d) Conforming amendments.
(e) Provides effective date of October 1, 1992. Allows a transition of 100,000 visas each for FY91 and FY92 for second preference backlog. Provides that those spouses and children of permanent residents who have petitions filed prior to Oct. 1, 1992 are deemed immediate relatives on that date.

**Sec. 102. Prohibition of deportation of spouses and children of legalized aliens.**

(a) Allows a temporary stay of deportation and work authorization for the spouse and child of a legalized alien who entered the U.S. prior to Jan. 1, 1990.
(b) Defines eligible aliens.
(c) Provides that aliens eligible for visas under different provisions of law are not precluded from seeking those visas.
(d) Disqualifies derivative aliens from public assistance in the same manner as legalized aliens.

**TITLE II -- REVISION OF ADMISSION OF ALIENS ON THE BASIS OF LABOR NEEDS**

**Sec. 201 Admission of aliens on the basis of labor needs.**

**(a) General**
**(1) National Labor Shortage Determinations.**
(A) Provides that the Governor of a State, with the advice of the State Council, may request that the Secretary of Labor

establish a national labor shortage schedule for one or more occupational classifications.
(B) Determination by Secretary of Labor. Sets forth criteria for making determinations:
(i) Description of occupational classification.
(ii) Assuming payment of wages of 120% of prevailing wage and working conditions, project the need and supply of able, willing and qualified workers.
(iii) Extent of labor shortage and period of shortage.
(C) Establishment of Schedules. Requires the Secretary of Labor establish schedules for occupations, including the extent and duration of the labor shortage and the recruitment area. Provides judicial review of the schedules under chapter 7 of Title 5, U.S.C.
(D) Definitions of Labor Shortage.
(i) Defines labor shortage as the extent and timeperiod for which the projected need exceeds the projected supply.
(ii) Defines long-term labor shortage as a period lasting at least 5 years. Short-term labor shortage is any other labor shortage.
(iii) Defines occupational shortage area as the area relating to the occupation for long-term shortages on or after date of alien admission.
(iv) Defines recruitment area as a multi-state area (which may include the entire U.S.) of traditional or expected labor supply where the Secretary of Labor finds a significant number of qualified U.S. workers would, if recruited, be willing to make themselves available for work.

<u>(2) Petition for Scheduled Workers based on National Shortage</u>

(A) Petition Filing. Requires employer file a petition with the Attorney General, based on an employer attestion approved by the Secretary of Labor.
(B) Attestation.
(i) Requires the Secretary of Labor issue an approval if the employer attests that
(I) Wages will be offered to such aliens and other individuals employed in the occupation which are no less than 105% of the prevailing wage level for the occupation in the recruitment area
(II) Positive recruitment efforts have been made
(III) There is not a strike or lockout
(IV) Notice has been provided to the bargaining representative or employees at least 90 days before execution of the attestation.
(ii) Prohibits approval if a hearing has been requested on the attestation within 30 days of filing.

<u>(3) Admission</u>

(A) Provides admission for lawful temporary status or nonimmigrant status by the Attorney General.
(B) Admission cannot exceed 75% of the defined labor shortage for an occupation. Long-term labor shortage visas may not exceed 75,000 principals annually. Short term visas will be

limited on an annual basis. Sunsets both numerical limits after 5 years.
(C) Priority for Adversely Affected Countries.
(i) Provides that for the first 5 fiscal years priority for admissions shall be from adversely affected countries.
(ii) Provides waiver when the petitioner can demonstrate that aliens in the occupation are not available.
(iii) Defines adversely affected countries as those not contiguous to the U.S. and identified in sec. 314 of the Immigration Act of 1986 (IRCA), but including Romania, Bulgaria and Yugoslavia.
**(4) Fee on wages.** Provides a 15% tax on wages.
**(5) Authorized period of stay.**
(A) Provides timeperiods for authorized stay based on shortage determination.
(B) Termination of status.
(i) Provides for termination of status when alien has not been employed in the occupation during the period of admission.
(ii) Provides hardship waiver.
**(6) Adjustment of Status.** Allows adjustment of status at the end of a 5 year period if the alien has been employed over the timeperiod of the declared shortage.
**(b) Rural Regional Labor Shortages**
**(1) Determination.**
(A) Provides for a request by the Governor, upon recommendation of the Council, for a designation of a rural regional labor shortage.
(B) Determination is based on
(i) General occupational classification
(ii) Assuming wages paid at 120% of prevailing wage, the projected need and supply of qualified workers
(iii) Extent and period of shortage.
(C) Establishment of Schedules. Requires the Secretary of Labor establish schedules for occupations, including the extent and duration of the labor shortage and the recruitment area. Provides judicial review under chapter 7 of title 7 USC.
(D) Definitions.
(i) Defines labor shortage as when projected need exceeds supply.
(ii) Defines long-term labor shortage as a period of at least 5 years and short-term for any other shortage.
(iii) Defines occupational labor shortage area as the recruitment area for long-term shortage
(iv) Defines recruitment area as an area of traditional or expected labor supply
(v) Defines rural region as contiguous counties none of which is urbanized.
**(2) Petitions for Scheduled Rural Shortage**
(A) Allows petition to be filed with the Attorney General based on an attestation approved by the Department of Labor
(B) Attestation.