4

(i)  Requires approval on basis of attestation that
(I)  Petitioner will offer wages at 105% of prevailing wage
(II)  Positive recruitment has been made
(III)  There is not a strike or lockout
(IV)  Notice of intent to request approval has been provided
the bargaining representative or employees 90 days prior to
execution of the attestation.
(ii)  Prohibits approval if a hearing has been requested within
30 days of filing attestation.
(3)  Admission.    Provides admission based on long-term or
short-term shortage which cannot exceed 75% of labor shortage.
Provides priority for adversely affected countries.
(4)  Fee on wages.  Provides 15% tax on wages.
(5)  Authorized period of stay.    Provides admission for long
term and short term periods and termination of status if not
employed in the occupation during the period of admission.
Allows hardship waiver.
(6)  Adjustment of status.    Provides adjustment of status
after a 7 year period if the alien has been employed over the
timeperiod of the declared shortage.
(c)  Employer-Triggered Shortage.
(A)  Provides  for  individual  labor  certification  where
insufficient workers are able, willing and qualified and where
employment would not adversely affect the wages and working
conditions of U.S. workers.  Allows certification for short
or long term.
(B)  Provides that when 5 or more employers in a region have
filed petitions within a 1 year period for employees in a
general occupation, the Secretary of Labor shall establish a
schedule which will be effective for 2 years. Provides for
petitions in the same manner as rural shortage processing.
(C)  Defines long-term shortage of at least 5 years.
(2)  Admission.
Provides  admission  for  lawful  temporary  status  or
nonimmigrant.
(3)  Fee on wages.  Provides tax of 15% of wages.
(4)  Authorized Period of Stay.
Provides admission of long and short term workers.
(i)  Provides termination of temporary status if not employed
in the occupation for the period of admission.
(ii)  Provides hardship waiver.
(5)  Adjustment of Status. Provides adjustment of status at
the end of the 5 year period if the alien was employed in the
occupation through the 5 year period.
(d)  Classification as Exceptional Ability.
(1)  Petition.
(A)  General.
(B)   Provides  for  petitioning  the  Attorney  General  for
classification as an alien of extraordinary ability in the
sciences, arts, education, athletics, or business if the alien
has demonstrated sustained national or international acclaim,
and whose achievements have been recognized in the field, and

AR2022_400514

5

who is entering the U.S. to continue work in that area.
Provides consultation with peer groups of alien's ability.
(C) Provides processing fees.
**(2) Admission.** Allows admission as lawful temporary resident
without regard to numerical limitations, or as nonimmigrant.
**(3) Adjustment of Status.** Allows adjustment of status at any
time.
Allows accompanying aliens if they are an integral part of the
performance.
**(e) Classification for International Business.**
**(1) Executives and Managers**
(A)   Petitions.   Allows a multinational company to petition
for an executive or manager who
(i) has served for at least 7 years in that capacity with the
company or
(ii) has been with the company at least 1 year as an executive
or manager and has at least 14 years experience in marketing,
research, trading or other areas.
Provides expedited processing within 30 days.
(B)    Admission.   Provides  admission  as  lawful  temporary
resident status.
(C)  Fees.  Provides for a tax of 15% of wages.
(D)   Termination of status.   Provides termination of status
if the alien is not employed in the occupation for the period
of admission. Provides hardship waiver.
(E)  Adjustment of Status.  Allows adjustment of status after
5 years without regard to numerical limits.
**(2) Career Advancement and Specialized Knowledge.**
(A)  Petitions.  Allows petitions on behalf of an alien who
(i)   has served at least 1 year with the company, has a
foreign residence with no intention of abandoning, is seeking
career advancement, or
(ii) has served at least 5 years with the company or one year
with  10 years specialization, and has special and unique
knowledge  of the company product  and  its application  in
international markets, and seeks to enter to expand such
knowledge.
Provides expedited processing within 30 days.
(B)  Admission.  Allows admission as nonimmigrants.
(C)  Fees.  Provides tax of 15% of wages.
(D)  Period of Stay.  Authorizes period of stay not to exceed
3 years.
**(3)  Management and Marketing Trainee**
(A)  Petition.  Provides petition of an alien who
(i)  has served at least 1 year with the company
(ii) has a residence abroad and no intention of abandoning
(iii) seeks to enter the U.S. for the purpose of learning
techniques of management or marketing in the U.S.
(B)  Admission.  Provides admission as nonimmigrants.
(C)  Fees.  Provides tax of 15% of wages.
(D)   Period of Stay.   Authorizes maximum 2 year period of
stay.

6

**(4)  Definition of Multi-national.** Defines multinational as a firm, corporation or other legal entity (or an affiliate or subsidiary thereof) engaged in international trade or commerce.

**(f)  Professors and Researchers.**

(1)  Petitions.  Allows a university or institution of higher education to petition for an alien professor or researcher who

(A)  is recognized worldwide as outstanding in a specific academic area

(B)  has at least 5 years experience teaching or conducting research in the area

(C)  is coming to the U.S. for a tenured position. Provides consultation with peer groups

(2) Admission.  Allows admission as lawful temporary resident without regard to numerical limitations.

(3) Fees.  Provides a tax of 15% of wages.

(4) Termination of Status.  Provides termination of status if alien is not employed in the occupation for the period of admission. Provides hardship waiver.

(5) Adjustment of Status.  Provides adjustment of status after 5 year period.

**(g)  Investment and Job Creation.**

(1)  Petition.

(A)  General.  Requires that investment benefit the U.S. economy and create 10 jobs for U.S. citizens or permanent residents.

(B)  Amount of Capital.  Specifies amount of capital as $1 million which may be increased through regulation. Provides that investments in rural and persistently high unemployment areas may be at $500,000.  Provides for an adjustment up to 5 times $1 million for those areas where there is high employment.

(C)  Fees.  Provides processing fee.

(2)  Admission.  Provides admission as lawful temporary resident for 4,000 principal aliens.

(3)  Termination of Status.  Provides termination of status for failure to make or continue investment. Provides hardship waiver.

(4)  Adjustment of Status.  Allows adjustment of status at end of 5 year period.

**(h)&(i)&(j) Entertainers and Athletes.**

Allows entertainers admission as part of an internationally recognized group who have had a sustained and substantial relationship.  Allows entertainers and artists based on reciprocity or cultural uniqueness.  Provides processing fees and consultations with labor for certain entertainers and athletes.  Allows athletes who perform at an international level.  Allows admission as nonimmigrants.

**(k)  Religious Occupations.**

(1)  Petitions.  Allows petitions for aliens in a religious occupation or religious functionaries if the alien

(A) has been a member of a religious denomination for two

AR2022_400516

7

years having a bona fide nonprofit religious organization in the U.S.
(B) seeks to enter
(i) as a minister of religion
(ii) to work in a professional capacity
(iii) to work in another capacity
(C) and has been carrying on such vocation or work 2 years prior to admission
(2) Admission.
(A) Provides admission for ministers and religious occupations as lawful temporary residents.
(B) Provides admission of religious functionaries as nonimmigrants.
 3) Adjustment of Status. Provides adjustment of status for ministers and religious occupational aliens without regard to numerical limitations.
(4) Period of Stay. Provides a period of stay for religious functionaries not to exceed 5 years.
**(l) General Provisions.**
(1) Petitions.
(A) Provides that the Attorney General prescribe forms with respect to petitions.
(B) Enforcement.
(i) Provides complaint process with respect to attestations and petitions.
(ii) Requires Secretary of Labor and Attorney General determine, within 180 days, whether or not a basis exists for a complaint. Provides hearing within 60 days of determination.
(iii) Provides sanctions for failure to meet conditions.
(iv) Provides backpay in the case of wage violations.
(2) Derivatives.
(A) Allows derivative status of spouse or child.
(B) Provides termination of status of derivatives based on principal unless hardship.
(C) In those cases involving long-term shortages the derivative may be adjusted in the case of divorce or death of the principal.
(3) Waives numerical limitations.
(4) Authorizes travel and employment during periods of long-term shortages. Provides liability for cost of return transportation in case of discontinued employment for nonimmigrants.
(5) Provides that nothing in the section affects the Attorney General's ability to deport.
(6) Allows up to 4 years in long-term shortages to count towards naturalization.
(7) Provides notice of denials for petitions.
(8) Provides annual registration of nonimmigrants and immigrants.

AR2022_400517

8

(m)  Authorization of Appropriations for Bureau of Labor Statistics.  Provides such sums as necessary for the BLS. Requires appropriations prior to issuance of schedules.

Sec. 202. Changes in Nonimmigrant classifications.
(a) Nonimmigrant Visitors.  Prohibits nonimmigrant visitors from employment for hire.  Allows installation of new equipment if the alien has specialized knowledge and the services are performed over a period not to exceed 2 weeks beginning within 30 days of the delivery of equipment.
(b)  Treaty Traders.  Expands treaty trader status to include transfer of technology.  Defines substantial trade.  Limits to executives and managers.  Provides that nationals of GATT countries may be entitled to treaty trader status if reciprocal privileges are extended U.S. nationals.  Provides that treaties which involve scheduling of occupations be reported to the Committees of Judiciary of the House and Senate.
(c) Sunset of H visas.  Rescinds H regulations promulgated Jan. 26, 1990.
(d) Exchange visitors.  Eliminates training for business as purpose for entry under exchange visa.  Establishes an au pair program.
(e)  Elimination of L visas.
(f)  Conforming amendments.

Sec. 203. Conforming amendments.

Sec. 204.  Crewmember status.  Provides that no alien shall be entitled to crewman status during a labor dispute where there is a strike or lockout.  Prohibits parole of crewmen unless in the interests of national security.

Sec. 205.  Effective dates and transition.

Sec. 211.  Employment admissions fees for labor shortages
Provides 15% tax on admission of aliens for labor shortage for each calendar year of admission not to exceed 5 years or 7 years, depending on the period of admission.  Includes nonimmigrant admissions.

Sec. 212.  American Workers Education Trust Fund.
Establishes Trust Fund for deposits in the U.S. Treasury for the education and training of U.S. workers.

Sec. 221.  Educational Assistance and Training.
(a)  Use of Trust Funds.  Provides that funds in the Trust Fund shall be available to the Secretary of Labor in consultation with the Department of Education for use in providing educational assistance and training for individuals for which scheduled occupations have been established, occupations in rural areas, and occupations which are the

AR2022_400518

9

subject of individual attestations.

**(b)  Allocation of Funds.**  Provides that funds are allocated among the States based on a formula established jointly by the Secretaries of Labor and Education taking into consideration
(A) the location of foreign workers admitted under the bill
(B) the location of individuals in the U.S. desiring education and training
(C) the location of unemployed and underemployed individuals
(D) the amount of matching funds made available by the States.
**(c)  Disbursement to States.**  Provides for disbursement in accordance with grant applications approved jointly by the Secretaries of Labor and Education under which not more than 5% shall be available for expenses of the State Advisory Council and other administrative expenses.

**Sec. 222.  State labor needs development plan.**

**(a)  General.**  Provides that in order for a State to request the establishment of a scheduled occupation or receive funds it must establish and maintain a State labor needs development plan, provide sufficient funds for the operation of an Advisory Council, and provide for the monitoring and assisting of employers in recruitment.

**(b) Development Plan.**  Provides that the plan assess the needs and supply of labor for employment in the State, educational assistance and training programs required to meet shortages, and the manner in which funds will be disbursed. Requires consultation with the Advisory Council.

**(c)  State Advisory Council.**  Provides that State Advisory Councils be composed of members appointed by the Governor and represent employers, workers in the State including labor organizations, and entities involved in education and training.  Provides that the Council advise concerning the State labor needs development plan and requests for establishment of labor shortage schedules. Allows the Council to establish fees for services to employers.

**TITLE III -- OTHER IMMIGRANT VISA PROVISIONS**

**Sec. 301.  Transition for aliens from adversely affected countries.**
Provides 25,000 visas each year for FY92-94 for aliens from adversely affected countries who have entered the U.S. prior to January 1, 1990 and who have an employment commitment for one year. Allows the Attorney General to discontinue accepting applications after 250,000.

**Sec. 302.  Transition for Eastern European Displaced Persons**.
Allows 25,000 visas each year for FY92-94 for natives of Eastern European countries who since before October 1, 1989 have been residing in another foreign state but are not firmly resettled.  First preference is given to aliens who before October 1, 1989 had filed an application for refugee status

AR2022_400519

13

10

with the Immigration Service or with a voluntary agency.

**Sec. 303.   Transition for African immigrants.**
Provides 25,000 visas each year for FY92-94 for natives of Africa with no country exceeding 3,000.

**Sec. 304.   Treatment of Hong Kong as separate nation.**
Allows Hong Kong to be treated as a foreign state for purposes of allocation of 20,000 visas.

**Sec. 305.   Conforming amendments.**

**TITLE IV -- OTHER IMMIGRATION PROVISIONS**

**Sec. 401.    Battered Spouse or child waiver of conditional residence.**
Allows the Attorney General to remove the conditional basis of permanent resident status if an alien can demonstrate that the marriage was entered into in good faith and through credible evidence that the alien spouse was battered by, or was the subject of extreme mental cruelty perpetrated by, his or her spouse.

**Sec. 402.   Marriage Fraud.**
Provides that marriages which are bona fide and not entered into for purposes of procuring entry to the U.S. are not subject to prohibitions on adjustment of status.

**Sec. 411.   Application of anti-discrimination provisions to terms and conditions of employment.**
Provides that it is an unfair immigration-related employment practice to discriminate against an individual with respect to the "terms and conditions" of employment because of such individual's national origin or citizenship status.

**Sec. 412.   Elimination of requirement of filing a Declaration of Intent to Become a Citizen.**
Eliminates the current requirement that, as a condition precedent to the filing of a discrimination complaint under IRCA, the complainant file a declaration that he/she intends to become a citizen.

**Sec. 421.   One year deadline for filing application for adjustment of status for legalized aliens.**
Extends the deadline from one year to two for IRCA temporary residents to file for permanent residence.

AR2022_400520

27-565 - 90 - 2

14

11

**Sec. 422.  Permitting extended application period as court-ordered remedy.**   Provides that nothing in sec. 245A of IRCA is construed as preventing judicial review of practices under that section or preventing a court from ordering remedies of the Attorney General without regard to application periods.

**Sec. 423.   Clarification of disqualification of legalized aliens from cash welfare programs.**
Deletes reference to financial assistance and replaces as "cash assistance" those programs which legalized aliens are prohibited from receiving.

**Sec. 431.   Elimination of paperwork for recruiters and referrers.**
Eliminates paperwork requirement for recruiters and referrers for employer sanctions.

**Sec. 441.   Special immigrant status for aliens dependent on juvenile court.**
Provides immigration status to aliens who have been declared a dependent of the juvenile court and deemed eligible by that court for long-term foster care.

**Sec. 442. Statistical Information.**
Requires the Attorney General to gather statistical information on an annual basis.

**Sec. 443.  Exemption of Belize for user fees.**  Exempts Belize from user fees.

15

Mr. MORRISON. As chairman of this subcommittee, I made a commitment at the beginning of this Congress that we would spend the first year of this Congress focused on certain refugee-related issues, and we would spend the second year focused on accomplishing the task of passing legal immigration reform. We have stuck to that schedule and we are on that schedule, and these hearings are part of that.

There is no question that there is a significant interest, a broad interest, in comprehensive reform of our legal immigration system, and we have the various proposals before us that demonstrate the member interest in moving in that direction.

I believe that there are some areas of quite specific agreement that ought to be noted. There is agreement that our basic family unity system for legal immigration is sound, and that it ought to be essentially retained, and that there may be some adjustments that need to be done at the margin. There is certainly an interest among several of us in removing the bar that currently exists for the spouses and minor children of permanent resident aliens here in the United States to immediate entry.

Beyond that, there is also a consensus that we need to expand those who are permitted to come to the United States for the purpose of employment, and there are varying approaches as to how to accomplish that goal. But, once again, the important point in the process is that there seems to be a broad view that there is an appropriateness to, beyond family admissions, thinking about the admission of individuals on the basis of employment skills or actual employment offers.

I hope that we will be able to learn from these hearings about where we agree and where we disagree, and promote a climate in which accommodations can be made, improvements in drafts can be undertaken, and our markup process can be a constructive one toward reaching a bill with broad support that can be taken through the process expeditiously.

With that said, I want to welcome our witnesses, but first I want to give an opportunity to the gentleman from Texas, the ranking member, for an opening statement.

Mr. SMITH of Texas. Thank you, Mr. Chairman.

I, too, welcome our witnesses today to this hearing on labor-related provisions of proposed legal immigration legislation and on my bill, H.R. 2646, on special immigrants.

The administration's witnesses from the Immigration and Naturalization Service, the State Department, and the Department of Labor, will be testifying on labor-related immigration, but not on the chairman's draft bill nor on my colleague Mr. Schumer's bill. It is my understanding that the administration received the draft copies of these two bills too late for an analysis to be made today.

I might say in the introductions, Mr. Chairman, that Gene McNary, who is the Commissioner of INS, is making his first appearance before this subcommittee, and we want to give a special welcome to him.

To go on, in my judgment we cannot realistically make sound immigration law and policy on legal immigration without considering the effect of illegal immigration. We do not yet have control over

illegal immigration, nor do we fully know the impact that illegal immigrants have on the U.S. labor market.

Also, we are carrying the burden of criminal aliens who are not being deported quickly, if they are deported at all. Taxpayers are paying dearly for the fact that 20 percent of our Federal prison inmates are criminal aliens. Taxpayers are forced to support the cost of their detention and to suffer the consequences of their eventual release into society.

It is more important to deal with illegal immigration and criminal aliens now than to change our legal immigration law. While our current legal immigration law is not perfect, at least it is a known entity. The impact of resulting numbers of immigrants allowed by the proposed bills, in combination with illegal immigration numbers, is an unknown. The problems of illegal immigration and criminal aliens must take priority over legal immigration reform.

When it is time to consider legal immigration reform, Congress must, in my view, use three guiding principles in formulating our immigration policy. First, Congress, not special interest groups, must determine what our level of immigration must be. Congress must set a national level of immigration. We cannot take in all those persons who desire to come to this country, and those desirous of coming should not be allowed to determine our immigration policy.

Second, we must look first to the needs of the United States. This means that we should increase the proportion of the independent or skilled immigrants to the number of family-related immigrants.

Third, we must be sure that our immigration laws and policies are consistent and evenhanded. We must not discriminate for or against any country or ethnic group.

Today we are here to talk about the legal immigration of persons who fall outside of the family preference categories. The proposals in the bills before us range from a point system to a complicated system tied to labor shortages.

When considering independent or labor-related immigrants, Congress must recognize that our first priority is to our own citizens. In my own mind, high numbers of immigrants, both legal and illegal, necessarily displace American workers. Those Americans displaced vary, depending on the industry and location, but they are nonetheless displaced.

Those Americans most affected by high levels of immigration are our own underclass, particularly minorities. A Rand Corp. study of immigrants found that even if immigrants stimulate employment growth overall, they may do so at the cost of native-born workers. Also, the Urban Institute report stated that the fact that wages of unskilled workers declined in the 1980's was, little doubt, related to the presence of immigrant labor.

We must realize that our first duty must be to our own poor. Instead of importing foreign workers, we must try to use our own workers, and if necessary train U.S. citizens capable of taking those jobs. Foreign workers are a "quick fix" and no solution.

If we allow our free market system to work, the market will force new technological advances, increased wages, and improved

AR2022_400523

working conditions. These advances will encourage and ultimately promote U.S. workers to fill the perceived labor shortages.

United States workers are not the only victims of high levels of immigration. State and local governments face severe financial problems because of legal and illegal immigration. There is an increased demand on schools, hospitals, housing, and other social services. Taxpayers are becoming increasingly concerned about this drain on their hard-earned dollars.

Mr. Chairman, that concludes my remarks, and I yield back.

Mr. MORRISON. The gentleman from New York.

Mr. SCHUMER. Thank you, Mr. Chairman. Once again, I want to commend you for not only holding these hearings but also for your leadership in legal immigration and for putting forth such a thoughtful and provocative piece of legislation.

I, too, have a draft of an employment-related immigration bill circulating which I intend to introduce next week. I am for expansion of family immigration but my bill doesn't address that. I defer to the leadership of the gentleman from California on that issue.

I believe that immigrants are great for America. At a time of increasing labor shortages, the influx of new blood, new ideas, and new skills are critical to maintaining a competitive work force in the United States.

At the same time, I believe that we in the United States must nurture our own work force. We can't turn our backs on the unemployed, the unskilled, and the disadvantaged. Impending labor shortages will create unique opportunities for women and minorities, and we have to ensure that our immigration policies don't create obstacles to these individuals.

Increased but controlled growth in employment-related immigration will not deprive these underrepresented sectors in our work force of jobs. I disagree, I guess, with the gentleman from Texas head-on on this issue. Immigrants can create more opportunities for others, as they have done in the past.

My bill provides for measured growth in employment-sponsored immigration, which now comprises less than 10 percent of immigration to our country. The bill also addresses some of the nonimmigrant categories by making them more useful to business and providing necessary labor protections for the U.S. work force.

The bill also establishes a diversity lottery that provides visas to countries that are underrepresented in the pool of immigrants coming to the United States. Not only does this lottery address current disparities, but it will continue to respond to whatever inequities may arise in the future flow of immigrants. Expediting and streamlining the process where necessary, creating work force protections where warranted, and opening up our doors to stimulate our economic growth, is the crux of the bill.

I look forward to hearing from our witnesses today.

Mr. MORRISON. The gentleman from Florida, Mr. McCollum. Do you have an opening statement?

Mr. McCOLLUM. I have no opening statement, Mr. Chairman. Thank you.

Mr. MORRISON. The gentleman from California.

Mr. BERMAN. I have no opening statement, Mr. Chairman. I guess I have a couple of opening comments. I don't think——

AR2022_400524

18

Mr. MORRISON. We don't allow those——

Mr. SCHUMER. Under the rules, no comments.

Mr. MORRISON [continuing]. Opening comments, only statements, please.

[Laughter.]

Mr. BERMAN. We can recess for 30 minutes and I will have a statement.

Mr. MORRISON. Go ahead.

Mr. BERMAN. Just to try to join issue with the gentleman from Texas, I think you have to be careful in how you look at this whole question of immigration. There have undoubtedly been all kinds of situations where "foreign workers" were used and manipulated to try to depress wages, displace U.S. workers. They have become, particularly in the context of controlled guest worker programs or recruitment of undocumented workers, objects of exploitation with very negative results for both the workers and for the U.S. workers that they displace.

But I certainly think that you have a tremendous burden of proof, because of the clear, empirical evidence to the contrary, that immigration in and of itself and growth that results from immigration is bad for U.S. workers and bad for this country. I think our own history repudiates that so clearly and so solidly.

My legislation of course focuses on what I think is the most important aspect or part of immigration, that concept of family reunification. Everyone talks a lot about families, but in the end I think the test of our commitment to that is the extent to which our immigration policies reflect the principle of family reunification.

Study after study shows that people who migrate to this country to come onto a citizenship track based on their family relationships constitute some of the finest workers in a growing economy that results in growth in jobs for U.S. workers as well as the new immigrants. I think the bill that I have introduced, and in many cases the bill the chairman is talking about introducing in the area of family-based immigration, reflect that philosophy. It is consistent with our approach, particularly in the last 20 years, in immigration.

Mr. MORRISON. The gentleman from New York, Mr. Fish.

Mr. FISH. Thank you, Mr. Chairman.

I think the time has come to revise our legal immigration procedures. If anything, we are behind. The Senate has acted twice on this issue. The reform of legal immigration is the remaining issue which we inherited from the Select Commission on Immigration and Refugee Policy.

But while I appreciate the concern expressed by my colleague from Texas that work on the problem of illegal entrance is not over, the nineties must be the decade in which we turn to the problems and deficiencies of our legal immigration laws, laws that have not been changed for nearly 25 years. I think it is also important to come to a consensus on the way in which to change our legal immigration laws and policies, and that must reflect the needs and circumstances of our country.

One pressing need is the extended separation of members of immediate families. Another is the lack of immigration opportunities

AR2022_400525

for those without immediate family ties; and yet another the needs of our work force.

I hope that our work product will, like my legal migration bill, H.R. 2448, promote family unity by giving immediate relatives of permanent resident aliens a similar treatment as immediate relatives of U.S. citizens, and also provide a vehicle by which independent immigrants may come to the United States. I welcome this morning's distinguished panel, and am very interested in the administration's analysis of the merits and potential problems of the various proposals for independent and labor-based migration.

Thank you very much.

Mr. MORRISON. Thank you very much. I would like to call the first panel, and ask the members of the panel to please stand to be placed under oath.

Ambassador Princeton Lyman is Director of the Bureau of Refugee Programs, Department of State. He is accompanied by Mr. Jerome Ogden, Deputy Assistant Secretary for Visa Services from the Department of State. The Honorable Gene McNary, Commissioner of the Immigration and Naturalization Service, Department of Justice, is accompanied by Mr. Bill Cook, General Counsel for the Service.

[Witnesses sworn.]

Mr. MORRISON. Thank you very much. Please be seated.

Commissioner McNary, I want to join my colleague from Texas in welcoming you to your first appearance before the subcommittee, and we will try to be gentle.

Mr. McNARY. Thank you.

Mr. MORRISON. I know that we are going to enjoy a productive working relationship, and I appreciate your being here today.

Ambassador Lyman, if you would proceed first with your statement, your written statement will be made part of the record in its entirety, and if you would please try to summarize the major points within 5 minutes, we would appreciate it. Thank you.

## STATEMENT OF PRINCETON N. LYMAN, DIRECTOR, BUREAU FOR REFUGEE PROGRAMS, DEPARTMENT OF STATE, ACCOMPANIED BY JEROME OGDEN, DEPUTY ASSISTANT SECRETARY FOR VISA SERVICES

Mr. LYMAN. Thank you very much, Mr. Chairman, and I welcome this opportunity. I would like to make a brief summary of the Department of State's views on reform of legal immigration—the Commissioner will go into more detail on that—and I would like to address much of my remarks to H.R. 2646, introduced by Congressman Smith last year.

On general immigration, the Department supports maintaining the importance of family reunification, a principle which is retained under all the bills under consideration, and we also subscribe to the general goal of increasing skill-based immigration to benefit U.S. national interests, provided it is accommodated within reasonable overall levels of immigration and consistent with the priority to family reunification.

The Department firmly believes that in any new legislation, the President should have authority to waive the 20,000 per country

AR2022_400526

limit to permit the United States to address immediate international crises when this is in the national interest of the United States, and so we propose that upon notification of Congress, individual country limits could be raised to a total worldwide number of 20,000 additional immigrant visas in any given year.

The Department supports the continuation of the current second and fifth preferences. We do not favor limiting fifth preference to only unmarried brothers and sisters, nor do we favor transferring to the immediate relative category the spouses and children under 21 of legal immigrant residents.

Finally, the Department of State is concerned that the necessary additional resources be provided to administer whatever immigration system may be enacted into law. For any increases in the immigration ceiling, a substantial portion would consist of additional applicants at consular offices abroad. Only a minority would consist of applicants for adjustment of status in the United States. We would be happy to work directly with the subcommittee on this issue before any legislation is marked up.

Let me turn now to the special humanitarian immigration legislation, H.R. 2646, which was introduced by Congressman Lamar Smith and is supported by the administration. This proposes a special category of immigration to be offered to applicants in whom the United States has a humanitarian interest.

The original idea for this bill lay in the conditions of the Soviet refugee program. As you know, over the last year we have improved that system considerably. We have moved most of the Soviet applicants from Vienna and Rome to the United States, and will complete that in this spring, and we are now admitting Soviet refugees to the United States at an average monthly rate of 5,000, far past any of our previous experience. I am also pleased to announce that last week we signed a memorandum of understanding with two Jewish organizations to provide private funding for up to 8,000 of the Soviet refugees.

But at the same time our experience is that the number of refugees and other applicants from the Soviet Union will exceed greatly the numbers that we have in the refugee program. We believe that the United States must make every effort to ensure that we can continue to respond generously to certain groups in the Soviet Union who are acutely threatened during this period of ethnic strife and disturbing manifestations of anti-Semitism. H.R. 2646 would enable us to do so.

Southeast Asia provides another striking illustration of the potential use of special humanitarian immigrant legislation. We have agreed last June to take 40 percent of those Vietnamese refugees in camps who have been there over a long period of time, and we have expanded our orderly departure program from Vietnam.

But our purpose in such programs is to reunite these persons with their family members in the United States, and to the extent that the refugee definition does not cover all such persons, the only mechanism available to us up until now has been the use of the Attorney General's parole authority. This legislation would allow us an alternative which we think is more suitable.

AR2022_400527

21

And Hong Kong represents another potential example for the use of such legislation and a means to encourage people that such alternatives would exist if needed.

In summary, Mr. Chairman, we think that H.R. 2646 provides the means to respond to these types of situations. We do not believe that the statute needs to specify nationalities nor numbers. Rather, as in the bill, we think the consultation process would allow us to work out with Congress each year the appropriate uses. If there is one lesson we have learned in the last 6 months, it is that the direction and pace of change in the world is quite unpredictable, even to the experts.

Mr. Chairman, this concludes my testimony and I would be happy to answer any questions.

Mr. MORRISON. Thank you, Ambassador Lyman.

[The prepared statement of Mr. Lyman follows:]

AR2022_400528

22

PREPARED STATEMENT OF PRINCETON N. LYMAN, DIRECTOR, BUREAU FOR REFUGEE
PROGRAMS, DEPARTMENT OF STATE

Mr. Chairman, members of the Committee, I welcome the
opportunity to present the Department's views on pending
immigration legislation.  I will address certain aspects of the
immigration system, then turn to H.R. 2646, a bill concerning
special humanitarian immigrant legislation proposed by the
Administration and introduced by Rep. Smith.

Let me begin with a summary of the Department of State's
views on reform of legal immigration.  INS Commissioner McNary,
representing the Department of Justice, and the Department of
Labor witness at the afternoon panel will address many of the
specific elements raised by the several legislative proposals.

The Department supports maintaining the importance of
family reunification, a principle which is retained in all the
bills under consideration.  We also subscribe to the general
goal of increasing skill-based immigration to benefit U.S.
national interests, provided it is accommodated within
reasonable overall levels of immigration and consistent with
priority given to family reunification.

## Waiver Authority

The Department firmly believes that in any new legislation
the President should have authority to waive the 20,000 per
country limit to permit the United States ·to address immediate

AR2022_400529

23

- 2 -

international crises when this is in the national interest of
the United States.  The Department proposes that, upon
notification of Congress, individual country limits can be
raised up to a total worldwide number of 20,000 additional
immigrant visas in any given year.  The numbers could be
allocated to any specified countries or dependencies and to any
preference category or combination of categories within the
beneficiary countries/dependencies.

Treatment of Extended Family Connection Immigration

     The Department supports the continuation of the current
second and fifth preferences.  We do not favor limiting fifth
preference to only unmarried brothers and sisters.  Nor do we
favor transferring to the immediate relative category the
spouses and children (under 21) of legal permanent residents.

Resource Implications

     Finally, the Department of State is concerned that the
necessary additional resources be provided to administer
whatever immigration system may be enacted into law.  For any
increases in the immigration ceiling, a substantial portion
would consist of additional applicants at consular offices
abroad; only a minority would consist of applicants for
adjustment of status in the United States.  Existing resources
-- both personnel and facilities -- would simply not permit the

AR2022_400530

24

- 3 -

timely and orderly processing of the additional applicants who
would become eligible under any of the bills under
consideration.  We would hope to be able to work directly with
the Subcommittee on this issue before any legislation is
marked-up.

    With these brief comments on legal immigration, I will now
turn to the question of special humanitarian immigrant
legislation.

Special Humanitarian Immigration

    H.R. 2646, the bill proposed by the Administration and
introduced by Congressman Lamar Smith, proposes a category of
special immigration to be offered to applicants in whom the
United States has a humanitarian interest.  The need for this
legislation is all the more relevant today as we look at
situations in several parts of the world where such legislation
could be applicable.

    The original idea for this bill over a year ago lay in the
conditions of the Soviet refugee program.  As you know, last
September we decided that the liberalization of Soviet
emigration practices had reached a stage permitting us to move
to full processing of refugee applicants in the Soviet Union.
The large numbers of Soviet applicants building up in Vienna

AR2022_400531

- 4 -

and Rome had stretched our refugee processing capabilities
there to their absolute limits.  The U.S. Government was
bearing a heavy financial and humanitarian burden assisting
these people while they waited to meet the paperwork demands of
the refugee program.

     To replace the overburdened systems in Vienna and Rome, we
established new mechanisms and capabilities in Washington and
Moscow enabling the U.S. Government to respond more generously
and systematically to a continuing high rate of refugee
applications from groups in the Soviet Union who were of
special humanitarian interest to the U.S.

     Today these new procedures are fully in place and operating
even beyond our expectations of last September.  The new
application process in Moscow has made it possible for all
interested Soviets to register for the program.  At the same
time, it has enabled us to focus our processing resources and
energy on family reunification and on those ethnic and
religious groups with the strongest claim to refugee status, as
identified in the legislation passed by Congress in November.
We have increased our refugee processing capacity in Moscow
four-fold and will continue to expand it over the coming
months.  We are now in the final stages of eliminating the
costly backlogs in Soviet refugee processing through Vienna and

AR2022_400532

- 5 -

Rome.  During this fiscal year we have been admitting Soviet
refugees to the U.S. at an average monthly rate of 5,000.  This
far surpasses our past capabilities.

You will recall that the Presidential Determination on
refugee admissions for FY 90 included 10,000 extra admissions
numbers for private sector sponsorship, as a supplement to the
40,000 fully-funded numbers in the Soviet refugee program.  I
am pleased to announce that last week we signed a Memorandum of
Understanding with the American Jewish community to provide
private funding for up to 8,000 of these 10,000 additional
numbers.  We are extremely pleased with the very generous
response of the Jewish community to the Soviet refugee
program.  Between the more than 40,000 Soviet refugees entering
the U.S. through Western Europe and those coming directly from
Moscow this year, we expect our Soviet refugee admissions to
reach an all-time high.

At the same time, our vastly expanded capacity for
processing applications through the new Washington Processing
Center tells us that the Soviet refugee demand is continuing to
grow.  There are far more legitimate refugees in the Soviet
Union than there are numbers.  It is clear that the United
States must make every effort to ensure that we can continue to
respond generously to certain groups in the Soviet Union who

AR2022_400533

27

- 6 -

are acutely threatened during this period of ethnic strife and
disturbing manifestations of anti-Semitism.  The need surpasses
the likely resources we will have for the refugee program.
Moreover, we have learned from our experience with unfunded
numbers in FY 90 that the demands upon the private community
organizations, while ably and generously met this year, cannot
be expected to be expanded to serve much larger numbers of the
kind we should be addressing.

   Southeast Asia provides another striking illustration of
the potential use of special humanitarian immigrant
legislation.  Last June, at the International Conference on
Indochinese Refugees, the United States entered into a
multilateral commitment with other western nations to resettle
all of the longstayer Vietnamese asylum seekers.  The United
States agreed to resettle a specific target number of the
longstayers -- 40 percent of the regional total, or about
18,500 persons.

   Longstayers are truly people of humanitarian concern.  They
have suffered years in austere camp conditions.  Many have been
separated from other members of their families.  However, not
all qualify as refugees under U.S. law.

AR2022_400534

- 7 -

Our humanitarian purpose is to reunite the longstayers with their family members in the United States. To the extent that the refugee definition does not cover such persons, the only mechanism available to the United States to address this situation is a large-scale use of the Attorney General's parole authority. As we have said, and as I believe Congress agrees, the large-scale use of parole is highly undesirable. We would much prefer to have the authority of special humanitarian immigrant legislation with which to respond to this situation. Similar circumstances arise in the Orderly Departure Program which permits legal departure directly from Vietnam and which is also an important element in the agreement reached at the Conference.

Hong Kong represents another example of where special humanitarian immigration could be important. Our objective is to encourage Hong Kong residents to remain in Hong Kong and continue to contribute to its economic and political processes. H.R. 2646 provides the U.S. with the means, however, to respond to situations of special need should it become necessary. The existence of that capability in turn may act to reassure Hong Kong residents and thus make it easier for them to stay.

AR2022_400535

29

- 8 -

H.R. 2646 provides the means to respond to these situations. The Department does not believe that the statute should stipulate either specific nationalities or specific numbers of beneficiaries in particular categories. Rather, as in H.R. 2646, we believe that the exact use of these numbers should be developed in annual consultation with the Congress. This would allow the U.S. flexibility to respond, as necessary, to changes in the Soviet Union, Eastern Europe, Southeast Asia -- or elsewhere. If there is one lesson to be learned from the last six months, it is that the direction and pace of change in the world is unpredictable even to the experts.

This concludes my testimony. I would be happy to answer any questions from the Committee.

27-565 - 90 - 3

AR2022_400536

30

Mr. MORRISON. Commissioner McNary.

## STATEMENT OF GENE McNARY, COMMISSIONER, IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE, ACCOMPANIED BY BILL COOK, GENERAL COUNSEL

Mr. McNARY. Mr. Chairman and members of the subcommittee, I welcome the opportunity to comment on the various immigration reform proposals now under consideration by this committee. These four pieces of legislation, H.R. 672, H.R. 2448, H.R. 2646, and S. 358, all demonstrate the commitment of the Congress toward reform of the current legal immigration laws. The administration shares this commitment.

Today we address legal immigration reform as another significant element in the reform of our immigration laws. Congress has already dealt with two elements, U.S. refugee and asylum policy and the problem of illegal immigration. It is now appropriate to turn our attention to reforming and correcting the inadequacies of the current legal immigration system.

I would like to note four important policy goals that the administration has identified which should guide legal immigration reform:

First, preserving the value of family reunification while at the same time providing greater opportunity for the entry of those who may not have close relatives in this country but who do have the job skills, education, and other characteristics that would promote the national interest.

Second, preserving and promoting diversity in sources of immigration, so that this country will receive the benefit of significant contributions from a wide variety of cultures.

Third, preserving the value of citizenship and ensuring that new citizens develop an understanding of and appreciation for the institutions and values of the United States.

And, finally, addressing U.S. economic needs through the structure of the U.S. immigration system.

The administration has explored the various legislative options on legal immigration reform and has concluded that modifications are necessary to these bills in order to strike a balance among the variety of competing factors that must be taken into account in adopting sensible immigration reform.

Concerning the level and balance of immigration, the administration endorses the concept of separate categories for family and independent immigrants. This approach enables us to ensure the longstanding commitment to an adequate number of visas for unification of families, while providing a sufficient proportion of visas for the independent immigrant group. While we support carefully reasoned increases in the annual level of total immigrants, efforts should be made to direct those visas primarily to categories which either promote nuclear family unity or provide needed employees for U.S. businesses, universities, and other institutions.

The current level of immigration to this country, approximately 490,000, not counting refugees, registry cases, and certain other categories outside the purview of legal immigration reform, is well within the ability of the country to absorb newcomers. The admin-

AR2022_400537

istration urges some caution, however, when increasing an overall limit on the level of immigration to the United States.

With regard to the per country limit, the current legal immigration system provides for limits of 20,000 immigrants per country. Dependencies such as Hong Kong receive 5,000 immigrant visas. The Department believes that the issue of per country limits should be the subject of further examination by the Congress and the executive branch, in order to ascertain the best way to preserve a desirable level of diversity in the immigration population.

As to family-based immigration, the administration believes that the immediate relatives of U.S. citizens should receive the primary priority in immigrating to the United States. In striving to achieve a more desirable level and balance of immigration, the administration recommends that visas be allocated among family preferences to promote nuclear family unity by shifting visas from more distant relatives to closer relatives—that is spouses and unmarried children. The current law does not promote unification of nuclear families when it reserves visa numbers for more distant relationships.

We oppose an expanded definition of "immediate relatives" to include the spouses and children of lawful permanent residents, the current second preference. Because all immediate relatives would be admitted to the United States without limit, the way in which the term is defined is critical.

A change in definition to include immediate relatives of permanent residents would result in dramatic increases in the number of aliens able to immigrate each year. The result would go far beyond a moderate increase in overall immigration. Such a massive influx of immigrants would significantly tax the resources of the Federal Government and likely overburden the social services provided by various agencies.

My time is up. I will address independent immigrants——

Mr. MORRISON. Please go ahead and complete your statement, if there is no objection from any members of the panel.

Mr. MCNARY. That is very cordial. I appreciate it.

Furthermore, if the spouses and children of permanent residents are included in the definition of "immediate relatives," the distinction between the petitioning rights of citizens and those of resident aliens will be eliminated. The administration does not think this is desirable, for two reasons.

First, we believe that the unlimited ability to bring relatives to this country without regard to numerical restrictions is a special privilege. In a sense it is on a par with the right to vote and to hold political office, and should be limited to those who are citizens of this country.

Second, the proposal could discourage aliens from seeking naturalization and thereby assimilating into the national mainstream. For these reasons, we feel that such a change in definition is detrimental to the efficient administration of the immigration and nationality laws of the United States.

With regard to independent immigrants, we generally support the overall direction in the independent preference coverage of these bills. The division of the occupational preferences into those with advanced degrees or exceptional ability and those who qualify

AR2022_400538

32

as skilled workers is a definite improvement over the current system.

We also support adding new visa categories for those foreign entrepreneurs seeking to invest in job-creating enterprises in this country, and providing residence on condition such aliens establish subsequently that their investment continues to meet the requirements of the statute. We believe that this constitutes a small but significant step in improving our economy.

This concludes my statement, and I will be pleased to answer any questions you may have.

[The prepared statement of Mr. McNary follows:]

AR2022_400539

33

PREPARED STATEMENT OF GENE MCNARY, COMMISSIONER, IMMIGRATION AND
NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE

Mr. Chairman and Members of the Subcommittee:

I welcome the opportunity to comment on the various immigration
reform proposals now under consideration by this committee.
These four pieces of legislation, H.R. 672, H.R. 2448, H.R. 2646,
and S. 358, all demonstrate the commitment of the Congress toward
reform of the current legal immigration laws.  The Administration
shares this commitment.

Today we address legal immigration reform as another significant
element in the reform of our immigration laws.  Congress has
already dealt with the first two elements: U.S. refugee and
asylum policy, and the problem of illegal immigration.  Great
strides in refugee and asylum policy were made in establishing
the world-wide standard of the Refugee Act of 1980.  Substantial
progress was also made in dealing with illegal immigration
through the passage of the Immigration Reform and Control Act of
1986 three years ago.  It is now appropriate to turn our
attention to reform of the legal immigration system of this
country.  Statutory reform is needed to correct the inadequacies
of the current system and to determine the future direction of
our immigration policy.

Before expressing the specific views of the Administration on the
proposed bills, I would like to note four important policy goals
that the Administration has identified which should guide legal
immigration reform.

1

AR2022_400540

34

(1) Preserving the value of family reunification, while
at the same time providing greater opportunity for the entry
of those who may not have close relatives in this country,
but who do have the job skills, education, and other
characteristics that would promote the national interest;

(2) Preserving and promoting diversity in sources of
immigration, so that this country will receive the benefit
of significant contributions from a wide variety of cul-
tures;

(3) Preserving the value of citizenship, and ensuring
that new citizens develop an understanding of and
appreciation for the institutions and values of the United
States; and

(4) Addressing U.S. economic needs through the
structure of the U.S. immigration system.

As you know, the Administration has expended considerable effort
exploring the range of legislative options on legal immigration
reform.  After a careful review of the various alternatives,
however, the Administration concluded that many of our goals were
reflected in S. 358, passed by the Senate last year.  While we
would recommend several modifications to that bill, on the whole
we regard its approach as sound.  On balance, we believe that
S. 358 strikes a better balance among the variety of competing
factors that must be taken into account in adopting sensible
immigration reform, than do any of the other bills presently
before this Subcommittee.

2

AR2022_400541

Now, Mr. Chairman, I would like to turn to the ways in which
S. 358 could be made even stronger.

LEVEL AND BALANCE OF IMMIGRATION

The Administration endorses the concept of separate categories
for family and independent immigrants.  This approach enables us
to ensure the longstanding commitment to an adequate number of
visas for unification of families, while providing a sufficient
proportion of visas for the independent immigrant group.  These
vital newcomers, who may not have family members in the United
States but who do have skills or other characteristics that would
promote the national interest, are also of great importance to
our country.  While we support carefully reasoned increases in
the annual level of total immigrants -- the so-called "cap" --
efforts should be made to direct those visas primarily to
categories which either promote nuclear family unity or provide
needed employees for U.S. businesses, universities, and other
institutions.

We support increases in the level of immigration to this country.
The current level of immigration to this country, approximately
490,000 (not counting refugees, registry cases, and certain other
categories outside the purview of legal immigration reform), is
well within the ability of the country to absorb newcomers.
While the Administration urges a certain amount of caution when
increasing an overall limit on the level of immigration to the
U.S., we are confident that a moderate increase in the level of

3

immigration, such as the 630,000 level contained in S. 358, can
be accommodated.

S. 358 sets a limit of 150,000 for independent immigration (the
majority of which are employment-based) and a limit of 480,000
for family connected immigrants.  No limit is placed on the
admission of immediate relatives of U.S. citizens.  The worldwide
limit for other family connected immigrant visas is established
by subtracting from the worldwide level the number of visas
granted to immediate relatives of U.S. citizens during the prior
year.  S. 358 also provides a "floor" of 216,000 to preserve the
present level of other family-connected immigration.  The
Administration supports this arrangement, including the Senate's
provision that the worldwide cap be "pierced" when the floor
number (216,000) plus the immediate relative visas go above the
family-connected ceiling of 480,000.

PRESIDENTIAL WAIVER AUTHORITY

The current legal immigration system provides for limits of
20,000 immigrants per country.  Dependencies, such as Hong Kong,
receive fewer immigrant visas (5,000).  Based on the need to
address certain immediate international crises through the U.S.
immigration system, the Administration believes the President
should have the authority to waive the per country limit.  Since
neither S. 358, nor any of the pending House bills address this
waiver authority, the Administration urges addition of such
language to any bill approved by this Subcommittee.  This
authority should provide discretion to the President, upon

4

AR2022_400543

37

notification of Congress, to raise any per country limitation
beyond the level currently set.  The total number of immigrant
visas issued under this authority will not exceed 20,000
worldwide per year.  Additionally, we believe the President
should have the discretion to allocate the additional visas to
any specified countries or dependencies, and to any preference
category or combination of categories within those beneficiary
countries or dependencies.


FAMILY-BASED IMMIGRATION

The Administration believes that the immediate relatives of U.S.
citizens should receive the primary priority in immigrating to
the United States.  In striving to achieve a more desirable level
and balance of immigration, the Administration recommends
reducing the visas assigned to the current fifth preference.
Reduction of this category would make visa numbers immediately
available for reallocation to other family-based immigrant
categories.  During fiscal year 1987, only 34% of fifth
preference visas were issued to brothers or sisters of citizens,
while 66% of them were issued to immediate family members of
those brothers and sisters (i.e., brothers- and sisters-in-law or
nieces and nephews).  These more distant relatives are an
important part of our immigrant pool, but we believe that closer
relatives deserve priority.  This re-allocation would shift visas
from more distant relatives to closer relatives.


The two House legal immigration reform bills, H.R. 672 and H.R.
2448, provide less control over the flow of overall immigration.

5

AR2022_400544