Both House bills expand the definition of "immediate relatives"
to include the spouses and children of lawful permanent residents
(the current second preference).  Because all immediate relatives
under these bills would be admitted to the United States without
limit, the way in which the term is defined is critical.  The
changes in definition contained in the House bills ensure that
the number of immediate relatives of permanent residents who are
able to immigrate each year will be far greater than that
contemplated by either the current law or by S. 358.

While the Administration supports a moderate increase in the
level of second preference immigration, we believe that these
bills go far beyond a moderate increase.  Under the House bills,
almost overnight, the vast majority of the 400,000 second
preference visa applicants currently awaiting quota numbers, plus
most of the immediate relatives legalized under the provisions of
the Immigration Reform and Control Act of 1986 (IRCA) would
become eligible for immediate issuance of immigrant visas.  This
massive influx of immigrants would significantly tax the
resources of the Immigration and Naturalization Service (INS),
and the State Department, as well as state and local governments.

Furthermore, if the spouses and children of permanent residents
are included in the definition of "immediate relatives," the
distinction between the petitioning rights of citizens and those
of resident aliens will be eliminated.  The Administration does
not think that this is desirable for two reasons.  First, we
believe that the unlimited ability to bring relatives to this

6

AR2022_400545

country without regard to numerical restrictions is a special
privilege.  In a sense, it is on a par with the right to vote and
hold political office, and should be limited to those who are
citizens of this country.  Second, the proposal could discourage
aliens from seeking naturalization and thereby assimilating into
the national mainstream.  For these reasons, we feel that these
definitional changes are detrimental to efficient administration
of the immigration and nationality laws of the United States.

INDEPENDENT IMMIGRANTS

As they do with regard to the family connection categories, each
of the reform bills being considered takes a different approach
to the independent immigrant categories.  While all three bills
provide approximately 150,000 immigrant visas for independent
immigrants, the manner in which the visas are allocated differs
with each proposal.  This volume (150,000) represents a
significant increase over the 54,000 third and sixth preference
visas currently allocated.  The Administration feels that this
increase is most desirable in that it would provide American
businesses and universities with a fresh pool of highly and, in
some cases, uniquely skilled employees to fill critical
positions.  Furthermore, the issuance of immigrant visas to these
workers would enable them to eventually become full participants
in the American work force and society and would likely relieve
some problems we now face with the nonimmigrant worker
categories.

7

AR2022_400546

S. 358, H.R. 672 and H.R. 2448 all provide about 40,000 visas for
aliens who are professionals or who have exceptional ability in
the arts, sciences, and business.  However, each bill defines the
category differently.  H.R. 2448 divides professionals into two
groups:  those aliens with doctoral level degrees and those with
bachelor's and master's degrees.  H.R. 672 maintains the current
degree level (baccalaureate) for members of the professions.  We
prefer the approach taken by the Senate bill, which more narrowly
defines the term "professional" to restrict it to those who
possess advanced degrees instead of merely baccalaureate degrees.
We feel that this more narrow definition will help ensure that
those aliens who potentially can benefit the country the most
will immigrate as expeditiously as possible.      -

H.R. 2448 and S. 358 take a preferable approach to the skilled
worker category.  These bills limit eligibility to those skilled
workers who are coming to fill jobs requiring at least two years
of training or experience.  We believe that the addition of this
provision will serve one of the major goals of the Immigration
and Nationality Act:  the protection of the American labor market
from unfair competition.  Without cost to the taxpayer, this
could encourage private industry to seek ways of providing
training to unemployed and underemployed American workers.  We
strongly support these provisions in H.R. 2448 and S. 358.

All three bills provide new visa categories for those foreign
entrepreneurs seeking to invest in job-creating enterprises in
this country.  S. 358 and H.R. 2448 both provide conditional

8

AR2022_400547

residence for such aliens who must establish two years later that their investment continues to meet the requirements of the statute.  We strongly support both the creation of the new category and the conditional residence provisions.  We believe that this constitutes a small but significant step in improving our economy.  While we are particularly enthusiastic about those provisions of S. 358 which target rural and urban areas of high unemployment for special consideration, we recognize that there may be problems in determining how to accord such special consideration.

We take no policy position with regard to the provision in H.R. 672 which creates a special independent immigrant category for retirees.  This Department defers to other agencies such as the Treasury Department and the Department of Health and Human Services as to what effect the admission of such aliens might have on our social security, medicare, and similar support systems.

The Administration would like to see the adoption of a four-year pilot program permitting the entry of a limited number of selected immigrants.  These immigrants would qualify for admission by practicing an identified "shortage" occupation and by possessing a baccalaureate degree or two years of training in a trade.  Successful applicants would be under forty years of age.  Qualified immigrants meeting the education, training and age requirements would be selected for entry in this category on the basis of a lottery administered by the Immigration and

9

Naturalization Service and funded by a user fee.  Prior to completion of the fourth year of this program, it would be evaluated as to whether it would be continued.

## NATIONAL INTEREST IMMIGRANTS

Unlike the other three bills, H.R. 2646 is rather limited in scope.  This bill, introduced by Congressman Smith, embodies an Administration proposal.  It addresses a particular problem:  the inability of the United States to issue visas to certain aliens presumptively or otherwise ineligible for admission as refugees, but whose admission is deemed to be in the national interest based on foreign policy considerations.  The bill sets aside up to 30,000 special immigrant visa numbers annually for this purpose and provides appropriate safeguards to prevent abuse of the category.  The Administration strongly supports enactment of this legislation as a most practical way of dealing with a continuing problem, such as that presented by Soviet and Vietnamese emigrants.  We look forward to working with the Subcommittee to approve this legislation.

## NONIMMIGRANT WORK VISAS

While the Administration believes that efforts should be concentrated on reform of the legal immigration system, we would also be pleased to address changes to provisions for nonimmigrant work visas at a later date.  Modifications are necessary to address the numerous problems the Department encounters in administering the existing temporary worker classifications.

10

AR2022_400549

43

My comments today have dealt only with major areas of concern with regard to legal immigration reform. Since this legislation would make substantial changes in significant provisions in the legal immigration laws, the Administration urges that careful consideration be given to the comments, suggestions, and recommendations which will be included in the detailed analyses of the bills.

This concludes my prepared statement. I will now be pleased to answer any questions you may have.

11

AR2022_400550

44

Mr. MORRISON. First, if I could just, Commissioner, focus on the overall position that you are taking, that you do support some increases in current levels of immigration, do I understand that correctly from your testimony?

Mr. MCNARY. Yes, Mr. Chairman, that is correct.

Mr. MORRISON. And is there a number attached to that statement at all?

Mr. MCNARY. Well, we are supporting the cap of 630,000.

Mr. MORRISON. And are you testifying that you want such a cap? Our current system doesn't have a cap. It is the addition of various building blocks, some of which are capped and some of which are not, and the Senate bill imposes a specific cap on top of all of that and then some complicated floors as well as ceilings. What position are you taking with respect to those details? Are you saying that you want a cap, or just that 630,000 as a number is something that is within the reasonable level of increases that you find acceptable?

Mr. MCNARY. We are supporting S. 358 substantially, Mr. Chairman. That does carry a floor, but in general I suppose there is no particular commitment to 630,000. It is something that has been set forth, and in general we are supporting S. 358.

Mr. MORRISON. And you also are supporting the concept of an expanded employment-based system of some sort. Obviously I understand that you are fundamentally supporting at this point the Senate bill, but you think the idea of employment-based admissions makes sense, on a greater level than we have currently under the third and sixth preference?

Mr. MCNARY. Yes, sir.

Mr. MORRISON. Now I am trying to understand whether you and the State Department are in a different position about the fifth preference. Mr. Lyman's testimony is that he essentially doesn't see any need for a change in the fifth preference, and you said the emphasis should be more on those closely related than those more distantly related. Are you proposing a change in the fifth preference?

Mr. MCNARY. Yes. Well, we are proposing additional visas for the second preference.

Mr. MORRISON. So what that statement means is, you are for expanding the number under second preference, as opposed to restricting the rules or the numbers under fifth preference?

Mr. MCNARY. I don't think so, Mr. Chairman. I believe that our position is and would have to be that that would necessarily mean less visas in the fifth preference, to be moved to the second preference.

Mr. MORRISON. So you want to move them from fifth to second?

Mr. MCNARY. Yes, sir.

Mr. MORRISON. Why is that? I mean, what is driving that decision? In other words, why do you think it is a tradeoff? What is the magic number, the empirical magic that would cause you to say, "In order to increase second preference, we will have to take it from fifth preference," as opposed to just, "Well, we will increase second preference because we think that those backlogs ought to be cleared more expeditiously?"

Mr. MCNARY. I don't know that it is a matter of magic numbers. I think it is a matter of concept, in that we are supporting the nu-

AR2022_400551

clear family and there is a backlog. We can accomplish more by increasing the visas in the second preference and recognizing, with the fifth preference, that we just can't accommodate everyone who wants to come to this country.

Mr. MORRISON. Well, I guess that any number is, in some sense, a shot in the dark, but I wonder if you would comment on the difference between 630,000 and 750,000, for instance, as numbers in my proposal. Our projection of the numbers that would come in under all of the categories is approximately 750,000, including a provision with respect to the second preference which you have expressed disagreement with, and that is allowing immediate entry but phasing in those immediate entries for those who are already in the backlog. Does the Service have something specific to say about that extra 120,000 admissions per year, that that will have some particular impact that we should be aware of?

Mr. MCNARY. Mr. Chairman, we don't have anything to say at this time. We will. I haven't had the opportunity to digest and review your bill. I know that you are knowledgeable and thoughtful, and I want to do that before commenting on the difference in numbers.

Mr. MORRISON. Yes. Well, we are going to try to schedule an opportunity for you to come back and talk about Mr. Schumer's bill and my bill, and more about these bills, if you choose to. I would just urge that there are two things going on here.

One is the concept of whether there ought to be an overall numerical cap, as opposed to our kind of building-block system that we currently have, and the other is whether there is any particular virtue to a specific number. I think those are two different questions, and I think that it would be useful, as you analyze the other bills and as we come back again, for you to comment on those as two separate matters and why you feel more or less strongly about one or the other.

The gentleman from Texas.

Mr. SMITH of Texas. Thank you, Mr. Chairman.

Ambassador Lyman, I appreciate your comments on H.R. 2646. To me, one of the attractions of that particular bill is that it is not nation-specific. It does not put one group at the head of the line to the disadvantage of others, and it seems to me that our policy needs to be consistent and evenhanded and not show favoritism. Would you agree that that should be our policy in those matters?

Mr. LYMAN. Yes, Congressman, and in the particular legislation, H.R. 2646, we are trying to respond to special humanitarian considerations. That in any one year may involve one country much more than another, but it allows the President, in consultation with the Congress, to determine where those needs are.

Mr. SMITH of Texas. It gives a little bit more flexibility, as well.

Commissioner McNary, a couple of questions: One, did I understand you correctly to say a few minutes ago that you did support a cap on immigration, when you were referring to legal immigration?

Mr. MCNARY. We support, and it is in my testimony, the 630,000 that is in S. 358.

As to the concept of a cap, I don't have an answer to that. Whether a cap or a piercable cap is the way to go is something I think this committee is going to have to decide.

AR2022_400552

Mr. SMITH of Texas. You don't have a position on that right now, then?

Mr. McNARY. No.

Mr. SMITH of Texas. In regard to legal immigration policy, do you think that we can devise a comprehensive legal immigration policy without getting better control of the illegal alien problem that we have?

Mr. McNARY. Yes, I think we can. Certainly they go hand-in-hand, but our legal immigration system needs to be revised and reformed and I think it can be improved. I understand what you are saying, that how are we going to know what the total numbers are coming into this country until we get a handle on illegal immigration? I believe that we just have to give IRCA some time and see if that is going to work, but I believe we can address legal immigration at this time.

Mr. SMITH of Texas. Do you feel that illegal immigration is a problem?

Mr. McNARY. Yes, sir.

Mr. SMITH of Texas. And does it have to be part of the mix? Does it have to be part of the picture of dealing with legal immigration?

Mr. McNARY. Well, I think they work in tandem but I don't believe that we have to address reform measures, one dependent upon the other. I think they can be addressed separately.

Mr. SMITH of Texas. What percentage of individuals in Federal prisons today are criminal aliens?

Mr. McNARY. I am told approximately 20 percent.

Mr. SMITH of Texas. Do you have any idea what the number would be, what that 20 percent would equal in real numbers?

Mr. McNARY. No. It would be a lot.

Mr. SMITH of Texas. Let me see if we are getting that from the back. Do you have an answer?

Mr. McNARY. We will find that figure and supply it for you.

Mr. SMITH of Texas. That figure, 20 percent, by the way, is roughly five times their proportion in the population as a whole.

Let me ask one last question, and that is that the Senate bill, Kennedy-Simpson, prohibits the giving of Federal benefits to illegal aliens. That provision is now found in Kennedy-Simpson. Would you recommend that the House include that provision in any legal immigration bill that we craft?

Mr. McNARY. Would you state that again?

Mr. SMITH of Texas. Under the Kennedy-Simpson bill that has passed the Senate, there is a provision in that bill that prohibits Federal benefits going to illegal aliens. Would you favor that provision for any House bill that would emerge about legal immigration?

Mr. McNARY. Yes.

Mr. SMITH of Texas. Thank you, Mr. Chairman. I don't have any other questions.

Mr. MORRISON. The gentleman from New York, Mr. Schumer.

Mr. SCHUMER. Thank you, Mr. Chairman.

My first few questions are to Mr. Lyman. It is on a related subject, since you spoke about the special immigrants. I have been very concerned about reports from Moscow about direct flights, in-

47

creased anti-Semitism in the Soviet Union, et cetera, so I have a few questions I would like to ask you.

First, the articles in the New York Times and other papers seem to indicate that direct flights are pretty much out, as far as the Soviets had stated. Did the Soviets give you any window, any timetable, any concern, any notion that things might change?

Mr. LYMAN. Most of these discussions, Mr. Congressman, have gone on between the Soviet and the Israeli Governments. We have not been given any particular timetable in which that decision might be changed. There are, however——

Mr. SCHUMER. What is your view? Are they immutably locked in?

Mr. LYMAN. I don't think they are immutably locked in. I think their decision was influenced by the controversy that arose over the possibility of Soviet emigrants settling in the West Bank and the outcry that that produced. Perhaps, as that issue is developed, perhaps their position will be modified.

Mr. SCHUMER. It was not simply in response to the campaign by some of the Arab countries that, wherever these people are settled, that it is a danger to them? I mean, I have seen the statements that some of the countries have made, and they don't seem to make the distinction very much between where the immigrants are settled. They just don't want them.

Mr. LYMAN. Everything I have seen is that the Soviets intend to continue to allow the liberalized emigration that they have started.

Mr. SCHUMER. What leverage do we have, if any, to try and get the agreement that had been virtually worked out between Aeroflot and El Al for direct flights?

The reason I feel this so strongly—and I will get to this in a minute—is it is estimated that three times the number of people would come out if there were direct flights, than the present situation where emigrants and—they have to find their way, to Bucharest and Budapest to leave. Tell me if you agree with that. Second, there have been reports, and I have seen a few that have just been compiled, of serious increases in anti-Semitism in the Soviet Union.

So my three questions are, one, would direct flights greatly increase the number who came out? What is your view of the status of anti-Semitism in the Soviet Union? Three, what pressures can our Government exert to get this agreement consummated and get the planes flying?

Mr. LYMAN. I really don't have a specific answer to the numbers relative to direct flights. There are alternative ways, including the ones you mentioned and other ones that are being considered, so I don't have exact figures. Obviously it would facilitate the movement.

Mr. SCHUMER. It is true, just on that question, that when we closed Rome and the Rome processing center, that that was based on the fact that was told to me by you and other State Department people—maybe it wasn't you, but certainly other State Department people, I remember Under Secretary Eagleberger—that direct flights would occur within a short amount of time.

Mr. LYMAN. Let me correct the record somewhat on this.

Mr. SCHUMER. Go ahead.

AR2022_400554

48

Mr. LYMAN. We made our decisions on the Vienna-Rome pipeline and improving processing in Moscow, not based on the implications for emigration to Israel. We did it to improve and increase the processing to the United States. We were encouraged by the negotiations that were going on in terms of the general process of freedom of emigration, but it was not a premise of our own decisions.

To answer your second question, we also are very disturbed about the signs of anti-Semitism. It is of great concern. It has been written about now in the press, et cetera, and it has been raised in our conversations with the Soviet Government, and I think it is a major factor in the increased applications for immigration that we are seeing, as well as Israel and other countries.

Mr. SCHUMER. Right.

Mr. LYMAN. Now as to the question of leverage——

Mr. SCHUMER. Just let me—and I'm sorry—but just to follow up on that second question, have we asked the Soviet Government? Mr. Gorbachev has been somewhat silent—not "somewhat," strike "somewhat"—silent on this issue. As I understand it, there have been very few of the Soviet leadership who have simply spoken out against anti-Semitism. The emigrees and others in the Soviet Union say that speaking out would be very important because everything is in such a state of flux. When Pamyat and these other organizations do what they are doing, no one is sure if this is OK or not OK, et cetera. Have we asked the Soviet Government, in whatever diplomatic way is appropriate, to speak out on this issue?

Mr. LYMAN. Yes.

Mr. SCHUMER. What was the answer?

Mr. LYMAN. I don't know if they gave us a specific answer at the time, but we have made this point more than once.

Mr. SCHUMER. OK, and finally the third, if you could just answer the third question.

Mr. LYMAN. I think that, first and foremost, we have been encouraging and pressing the Soviet Union to continue its liberalization of emigration. A very important law is up now for final passage, and we want to see that law passed which will put into final form the freedom of emigration. We think that is critically important.

Mr. SCHUMER. So do I.

Mr. LYMAN. We have also made clear the distinction, on the point you have made, which is the distinction between the right to emigrate, and indeed for people to emigrate to Israel, and the settlement on the West Bank which we have come out against also. We have made that distinction very important.

We think, in terms of the specifics as to how the arrangements ought to go, that the negotiations going on between the Israel Government and the Soviet Union may be the best way to address this for the time being, and those discussions continue.

Mr. SCHUMER. So, in sum, you feel at this point that pressure from the United States or the State Department will not help?

Mr. LYMAN. Additional pressure I don't think will help.

Mr. SCHUMER. Thank you, Mr. Chairman.

Mr. MORRISON. For the information of the subcommittee, we will be called back into joint session shortly to hear the remarks of the President of Czechoslovakia. We have to make a decision on wheth-

AR2022_400555

er we are going to proceed with the hearing or whether we are going to take a break.

I am prepared to go either way. We do have a hearing at 1 o'clock, jointly with the Education and Labor Committee, with the Labor Department, so that we are operating under some time constraints. I don't know. The gentleman from Texas expressed the hope we might take a break. If people are here and want to continue, and don't plan to go to the floor, what is the pleasure of the membership?

Mr. McCOLLUM. I am here and I would like to continue, at least for my questions.

Mr. MORRISON. I think then we will, if there is no objection to our continuing, continue. Members that wish to go, we will keep going, and when and if they return, assuming we are still going, they can ask questions at that point.

The gentleman from Florida.

Mr. BERMAN. It is safe to say that we will be going. One would not risk not having the hearing continuing when one came back, I think.

Mr. MORRISON. One can make no commitments as to how long members will ask questions.

Mr. BERMAN. But a judgment of a typical hearing of this subcommittee in the recent——

Mr. MORRISON. Oh, but this is a new year, however. You never know.

[Laughter.]

Mr. MORRISON. The gentleman from Florida.

Mr. McCOLLUM. Thank you very much, Mr. Chairman.

Mr. MORRISON. Mr. Berman has waived his right to question.

[Laughter.]

Mr. McCOLLUM. I want to be sure of these legal technicalities with regard to rights. You have to listen very carefully.

Mr. McNary, I want to pursue some of the questions that were raised in your testimony and in some of the earlier questioning about the immediate family relatives. I am interested particularly in seeing if we can put some data on the record that is sort of implied but not in detail here in your testimony.

You say that under the House bills, almost overnight, if we convert the second preference to immediate relatives, the vast majority of the 400,000 second preference visa applicants currently awaiting quota numbers would be immediate relatives. They would be immediately brought in, plus most of the immediate relatives legalized under the provisions of the Immigration Reform and Control Act of 1986 would be come eligible for immediate issuing of immigrant visas.

Do you have any idea, any estimates of how many people we are talking about who are the immediate relatives legalized under the IRCA Act? You know, we are talking about 400,000 under the second preference right now. What kind of numbers are we talking about in addition to that?

Mr. McNARY. Well, we are talking about 1.5 million under IRCA. We have roughly 20 million green cards out.

Mr. McCOLLUM. That sounds like a lot of people.

AR2022_400556

50

Mr. McNary. That must be with families. It is 7.5 million, actually.

Mr. Schumer. Only 150,000 people but 20 million green cards.

[Laughter.]

Mr. McCollum. The data over there is from Schumer & Co.

The point is, though, that you are talking about a larger group by quite a few numbers, at least multiples, than simply the 400,000 that are backlogged in the second preference, who would become immediately eligible under the immediate relative category if we passed a law changing it in the fashion that is suggested by some of these bills. That is correct.

Mr. McNary. Yes, sir.

Mr. McCollum. I am also interested in obtaining some further amplification and clarification on your comments regarding the changing of the fifth preference. I am a little confused about that, and I don't think we ought to let the record go without it being very clear what the administration is proposing in that regard.

You are talking about reducing some of the visas assigned to the fifth preference, and you say during fiscal year 1987 only 34 percent of fifth preference visas were issued to brothers or sisters of citizens, while 66 percent of them were issued to immediate family members of these brothers and sisters—that is, brothers-in-law, nieces, nephews, those sort of folks. Now are you envisioning that we whack away, somehow, in whatever law we pass, at that 66 percent of the brothers-in-law, the nieces and the nephews? I mean, that seems to be what you are implying here when you say that the reduction of fifth preference ought to be where we gain some of the numbers for new second preference or for immediate relatives.

Mr. McNary. Yes, sir. We believe that it is more important to focus on the nuclear family and the immediate family relatives, rather than these distant relations.

Mr. McCollum. Well, would you propose we specifically write that in the law, or give you at INS discretion, or how would we go about doing that?

Mr. McNary. Well, you could control the numbers that are available in the fifth preference and just move those numbers to second preference. That would take care of it, by and large—or even eliminate the fifth preference.

Mr. McCollum. Well, the thing maybe I am not clear on—and maybe that is what we would be doing under this— would we take the 34 percent that are issued currently under fifth preference to brothers or sisters of citizens and move them to second preference? In other words, you want to put some emphasis on the brothers and sisters of citizens. Are you proposing we move out of fifth preference those who are brothers and sisters of citizens? See, I am not clear on how——

Mr. McNary. I guess we are—you know, these are very nebulous numbers, but no, I suppose that offhand we would move the 66 percent that are going to brothers and sisters-in-law to the second preference, but we are not locked into any particular numbers.

Mr. McCollum. In other words, it is a concept you are expressing rather than any specific proposal. I want to be sure of that.

AR2022_400557

51

One other thing, you only allude again in a vague way to it, but am I to gather that you don't care much for the point system that is in the Senate bill?

Mr. McNARY. Yes, that is the administration's position.

Mr. McCOLLUM. OK, and I understand, though it is still not formulated in detail, you have some proposal in the works, yet to come to us, perhaps, as an alternative to this. Is that correct?

Mr. McNARY. That is correct.

Mr. McCOLLUM. We will be waiting on it with interest. Thank you very much, Mr. McNary.

Thank you, Mr. Chairman.

Mr. MORRISON. The gentleman from California, Mr. Berman.

Mr. BERMAN. Thank you very much, Mr. Chairman. I have questions in a number of different areas. Let's see how many I can get out in this period.

I would like to follow up again on this fifth preference issue. I am just not clear on what the administration's position is. I heard Mr. Lyman indicate that the administration does not support a change either in the fifth preference or in the definition of fifth preference. Mr. Lyman, perhaps you want to clarify that. And were you speaking for the administration or just the State Department?

Mr. LYMAN. No, I think we are all together on this.

Mr. BERMAN. It doesn't quite sound like that.

Mr. LYMAN. There are two points that are related: Not to shift the category of spouses and minor children of legal resident aliens to the unlimited category, keeping that in second preference; and, second, a reduction, as the Commissioner mentioned, in the number, the percentage of available numbers from fifth preference to second preference, so that one would increase the numbers available for second preference by something of a reduction in those for fifth preference.

Mr. BERMAN. All right, so then you are both saying, "We aren't asking for a change in the definition. Just take numbers away from the fifth preference, shift them to the second preference." That is a way to deal with the backlog, rather than this idea of taking immediate family, spouses and minor children of second preference people, and giving them immediate petitioning rights.

Mr. LYMAN. That is correct.

Mr. BERMAN. But is that really, when you are thinking through it, a rational position? Wouldn't it be more straightforward to say, "We want to limit the definition of fifth preference," because if you keep the same definition and then limit the numbers, you are not making any of the distinctions Mr. McCollum mentioned between nephews and sisters-in-law and brothers and sisters. You are not drawing any priorities within the fifth preference.

Aren't you indirectly trying to do that which some people on this subcommittee and some people in the Congress have been trying to do directly, which is to change the nature of the fifth preference? And if so, why not come right out and do it, propose it?

Mr. LYMAN. May I ask Mr. Ogden to respond?

Mr. OGDEN. Well, Mr. Berman, the only problem with changing the definition of fifth preference at this point would be, what do you do with the people already on the waiting list? If you are going to grandfather them in——

AR2022_400558

Mr. BERMAN. Wait, wait, wait. You are going to reduce the numbers. You are talking about shifting numbers. You are talking about in some countries very, very lengthy waiting lists. Limiting the numbers is going to extremely extend those already heavily backlogged preferences. I mean, this is not coming out of concern for the backlogged people, to take the numbers away from the fifth preference, is it?

Mr. OGDEN. No, sir, it is not coming out of concern for the backlog. The backlog is there. It is, at one point, 5 million now. It will take decades to clear it out at present levels.

Mr. BERMAN. Centuries, under an effort to shift numbers.

Mr. OGDEN. It may take a little longer under—right.

[Laughter.]

Mr. BERMAN. But the problem—well, I will just make the point that in reality, when you say we want to take numbers from fifth preference to shift into second preference, and then affirmatively state the point that we don't want to change the definition of the fifth preference, in reality you are, perhaps not even in the most rational fashion possible, affecting the fifth preference very dramatically, even as you say you don't want to change the definition of it, and in a way that may not be the most sensible way because it doesn't deal with the most compelling priorities even within that preference.

I will just leave that at that rhetorical point, and ask you to search your souls, but on the second preference I do think it is important to reiterate a point that the chairman made earlier. His proposal with respect to second preference, immediate family relatives, phases in. You have reserved comment on that specific proposal. Phasing in would have a different impact, in terms of an immediate rush of numbers, than the proposals that Mr. Fish or I have introduced.

Isn't it fair to say also, though, that a large number of the second preference numbers and people who will be in those second preference numbers are people who you have, I think, very sensitively and appropriately dealt with in enunciating a new family unity and family fairness policy? They are people already in this country, large numbers of them, so that any effort to discuss numbers has to take into account the fact that many of these people are already here.

Let me ask you to respond to that one, and continue on my next round of questions.

Mr. MCNARY. I think that is true.

Mr. BERMAN. So that any number, any numerical calculation of new immigrants, would have to take into consideration to some extent that a large number of the second preference people are already here.

Mr. MCNARY. Well, they are already permanent residents.

Mr. BERMAN. Well, no. The second preference people, the spouses and minor children of permanent resident aliens, in many cases are people who are here in undocumented status.

Mr. MCNARY. Yes.

Mr. BERMAN. As recognized in your family fairness policy, in part, and in a variety of other categories, as well.

Mr. MCNARY. Yes, that is true.

AR2022_400559

Mr. Morrison. The gentleman from New York, Mr. Fish.

Mr. Fish. Thank you, Mr. Chairman.

Ambassador Lyman, I would like to start out by congratulating you on the steps that you have taken in the last several months to clear up this backlog of Soviet Jewish refugees outside of the Soviet Union, and also for the position you and the Department are taking with respect to prospective forced repatriation in Southeast Asia. It is very commendable.

While we are at it, Commissioner, I would like to commend for your actions in granting spouses and children of legalized aliens deferred deportation with a work authorization and ultimately the ability to adjust. It has been a matter of great concern to me for a couple of years.

Commissioner, on page 3 of your testimony you deal with the current level of immigration. I would just like to clarify what we are talking about. I gather that the current level of immigration to this country is approximately 490,000. This is numerically limited, numerically unlimited, no cap, not counting refugees. Is that correct?

Mr. McNary. That is correct.

Mr. Fish. And what you are proposing is, that goes up to 630,000, again, numerically limited, unlimited, no cap, excluding refugees?

Mr. McNary. Yes. I misstated earlier. The administration is supporting the pierceable cap.

Mr. Fish. The what cap?

Mr. McNary. The pierceable cap as it is set forth in S. 358.

Mr. Fish. A pierceable cap?

Mr. McNary. Pierceable. There is no limit on the admission of immediate relatives, and yet there is the floor of 216,000, so that eventually under the provisions and the terms of that bill it could exceed 630,000.

Mr. Fish. Good, so you are avoiding the risk of the numerically unlimited gobbling up all the available numbers.

On the Presidential waiver authority, on the next page of your testimony, you talk about this in reference to the per country limit of 20,000. Some have proposed raising that per country limit to 25,000. Do you have any position on that?

Mr. McNary. We don't have a position.

Mr. Fish. On this question that we have been laboring here, but I think is worthwhile since it is a matter of great interest to us, the second preference, you have stated that the administration opposes the numerically unlimited admission for immediate family of permanent residents. One of the reasons you gave was that this would discourage naturalization.

One of the ideas I picked up from your predecessor and put in my bill was to reduce the period of time from 5 years to 3 years, under which you become eligible for naturalization. It seems to me that other ideas could be thought of, but I agree with you, we should do nothing to discourage naturalization in our policies. I would hope that as we approach this issue of the backlog in the second preference and what to do about it in the future, that you will seek suggestions as to how we can encourage naturalization.

The bill by the chairman of this subcommittee, perhaps realistically, as distinct from my bill, recognizes that you should have a

AR2022_400560

phased-in admissions of the backlog in the second preference. I ask you to look at that and not just take an opposing view—we are still talking about families and we are talking about enormous backlogs that really will render them just meaningless—unless it is addressed over a period of years.

I don't know if you have thought about this, so I am not going to ask you to answer it now, but I would ask you to think about what is the difference, whether historically in our laws, our immigration laws, or today, between the family of a citizen and the family of a permanent resident, in terms of U.S. policy? I fail to see whether there is a distinction. Perhaps there was historically a distinction on the basis that people were not going to stay here; they came over to work and then were leaving. But I would like to know if there is really any distinction there.

Finally, Ambassador Lyman, since my time is out, in the discussion about the fifth preference, I was interested in your position that you took. You know there is a backlog in the fifth preference that I attempted to address in my legislation. I think you make it worse, if you take numbers away from fifth preference to give them to second, but could you just tell us briefly if we have been wrong for the last several years in thinking that there was this problem with the fifth preference including married and unmarried brothers and sisters, that there was this enormous potential for growth of new family structures that are unrelated to the sponsoring family?

Mr. LYMAN. There is, of course, an enormous backlog. Over the time that people wait, often people by the time their numbers come up could be married, that they weren't at the beginning. I mean, there is a long waiting period here.

In our position of reducing somewhat the percentage of fifth preference and emphasizing second, we realized that we weren't addressing the backlog question. Obviously not. It would stretch it out somewhat, even more. The question was, where do you want to address the backlog the most, and our feeling was that we would rather address the backlog on second preference and therefore somewhat reduce the numbers on fifth preference. It does not solve the fifth preference backlog problem.

Mr. FISH. Have you ever thought of, in view of this long list and the long length of time in the backlog, of having our missions in countries which have a high fifth preference backlog simply send out a notice to people who have been on the waiting list and ask if they are still interested, so we could have a firm figure as to what we are talking about?

Mr. LYMAN. I will ask Mr. Ogden to address that.

Mr. FISH. I mean, some of these brothers and sisters might well have given up by now.

Mr. OGDEN. Mr. Fish, last year we did ask all of the high-volume posts that are currently processing oversubscribed fifth preference applicants to give us a readout on their waiting lists, and the result was that without exception the posts felt that 90 percent of the people on their waiting lists were serious applicants.

Mr. FISH. Ninety percent?

Mr. OGDEN. Ninety percent, at least 90 percent. In some countries——

AR2022_400561

Mr. BERMAN. Say that again. Ninety?

Mr. OGDEN. Ninety percent. We did send a letter to the committee with that result last year, at some point.

Mr. BERMAN. What is the 90-percent figure?

Mr. OGDEN. Ninety percent of the people on the waiting list are seriously pursuing their immigrant visas.

Mr. FISH. Thank you, Mr. Chairman.

Mr. MORRISON. Just a comment, as we get into these numbers: In the absence of any real rationale for what the number is or ought to be, other than that is what the number has been for the last 25 years, it is very hard to take seriously this kind of a movement, that we have to clamp down a little bit on fifth preference.

I mean, if it is a demand-driven situation, obviously the demand on the fifth preference is overwhelming compared to the availability. If it is demand-driven, the demand on the second preference is very large compared to what we can do.

If it is not demand-driven, if it is in some sense driven by a capacity of the United States to absorb these individuals in some way, we are certainly not hearing any data on that. I mean, most of the data that has been coming out lately would suggest that the United States is way under its capacity to absorb immigrants.

That is not necessarily the political wisdom out there, but it seems to be the scholarly wisdom out there for the most part, that there are small pockets of impact that need to be worried about but the general impact of immigration on the United States is positive with respect to economic growth and the like, and that immigrants on the whole do very well here and contribute more than they take by a long shot.

So it seems to me that if you are going to start saying, beyond that the Senate made a politically acceptable judgment at 630,000, that there is some substantive merit to these numbers, you are going to have to come forward with something more than, "We support S. 358." S. 358 is a political judgment that the Senate made under a set of circumstances. It may be that the House would make a similar judgment or a somewhat different judgment, but you are not really helping—I mean, we are the politicians. You guys are the ones who have the obligation of implementing the law, and having also some expertise at your disposal in terms of running the departments.

I would hope that we would hear something more. Otherwise I think that you are not giving us anything on the numbers. This is sort of shuffling deck chairs on the *Titanic* with respect to the backlog. This is really something we ought to avoid.

Commissioner McNary, if I could just focus your attention again a little bit on this second-preference issue, let me underscore what Congressman Fish said. In my draft I have a 2-year phase-in at this point, but basically the point of all of that is, I am proposing that we move the minor children and the spouses from second preference to uncapped, and then that we find some way to phase that in so it doesn't swamp the system. I am open to some suggestions, and I would hope you would look at that proposal in that light, rather than draw a line that says 2 years is too short and we are not interested in it at all.

AR2022_400562

56

You are using the number 400,000. Four hundred thousand is all of the second preference backlog, as I understand it. Is that right, Mr. Ogden?

Mr. OGDEN. Yes. I have a——

Mr. MORRISON. Do you know, out of that 400,000, how many of those are minor children and spouses, as opposed to children of age, adult children?

Mr. OGDEN. Yes, Mr. Chairman. About 58 to 60 percent of current second preference immigrants qualify as spouses or children. About 125,000 applicants are now being registered annually in the second preference. Thus, if 58 to 60 percent of those qualified as immediate relatives, this would add about 72,000 or 75,000 immigrants to the IR category each year.

Mr. MORRISON. And is the backlog, the 400,000, is that a correct number for it?

Mr. OGDEN. Well, yes. Out of that about 235,000 would be moved immediately into the category——

Mr. MORRISON. So the number is not 400,000. The number is 235,000.

Mr. OGDEN. Two hundred and thirty-five thousand, approximately.

Mr. MORRISON. And about 75,000 a year thereafter.

Mr. OGDEN. About that.

Mr. MORRISON. Now, Mr. McNary, you used the number 1.5 million IRCA relatives who are undocumented but who are covered by your family fairness policy. Do I have that number right?

Mr. McNARY. Yes.

Mr. MORRISON. Under your recent administrative order, these 1.5 million people essentially are here to stay, with work and travel privileges. Isn't that right?

Mr. McNARY. We think you are right as to the 1.5 million being here. There is an estimate of another 1.5 million that would come as a result of this change in definition.

Mr. MORRISON. There is another 1.5 million who you think would be eligible to come?

Mr. McNARY. Yes.

Mr. MORRISON. So that would be a concern about any kind of a phase-in. You are saying there are another 1.5 million who are IRCA relatives who do not currently have petitions pending?

Mr. McNARY. That is correct. They are not here. They are——

Mr. MORRISON. Well, I know they are not here and they haven't applied yet, but many of them haven't become permanent residents, so they haven't had a right to petition.

I wonder if Mr. Ogden has any knowledge to share on that score, on those numbers?

Mr. OGDEN. No, sir. I don't think we have seen any large surge of petitions, particularly in Mexico.

Mr. MORRISON. Just with respect to the 1.5 million who are here, if that is the number, they are essentially here to stay. What is it, other than fairness to those people who haven't come yet, which I understand is an issue here—we sort of can get ourselves in a catch-22—other than the question of these people's right to stay who are here already, who we have granted this quasi-legal status, why is it that we don't want them to be able to legalize? Is it only

AR2022_400563

57

because we don't want them to get ahead in line, ahead of the second preference people who are waiting outside the country?

Mr. McNARY. Mr. Chairman, I think that is certainly an important consideration. It seems to me that we create an incentive or a disincentive to naturalize. We tend to separate those people. There is no incentive to become a citizen in order to bring relatives in, and it is a difficult fine line between the two, because I believe that not to follow your line of thinking is to encourage violations of the law. No question about it. They go ahead and live here anyway. At the same time, if we go completely overboard and include all these people in the definition, then I think we almost create a subculture with millions of people who have no interest in naturalizing, no interest in mainstreaming and becoming American citizens.

Mr. MORRISON. Let me just examine that for a minute. First, that goes to the question of whether you change the second preference people over to the uncapped. That doesn't go to the question of what the reason is for the people you have given this quasi-legal status under the family fairness provision, why you don't want them to be able to have the full permit. That has nothing to do with citizenship.

Or are you saying that you think that 5 years from now when the permanent residents, the IRCA people who are moving from temporary to permanent then will be in a position to become citizens—that is, if we can get administrative naturalization please so that they could be processed in some reasonable amount of time, rather than 2 or 3 more years on top of that—that at that point they will then be able to get these people in immediately? I mean, is that the logic? That seems, to me, pretty tortured.

Is there some evidence, I mean empirical evidence, that this permanent resident/citizenship distinction is a driving force for naturalization of a significant sort? Has a study been done on that? Do we know that is true? There is a slender reed we have here that is holding up an awful lot of weight, and if there is nothing out there but somebody's opinion, that is a little bit of a problem.

Mr. McNARY. Well, we will look into that to determine something more substantive, but I think it is fairly certain that if you broaden that definition, that there are going to be some definite repercussions that are going to be adverse.

Mr. MORRISON. Well, there are big numbers, and that is why I said please consider the phase-in issue, as well. There is a lot of support on the subcommittee, as you know, on both sides of the aisle. Certainly Mr. Fish has been pressing this matter, and there are a number on our side of the aisle who are interested in doing something about the second preference situation. We don't know whether we will have your support for anything, but we would certainly like to have your input for those things that are more problematic and less problematic to you.

Mr. McNARY. Well, the administration's position is to increase those numbers in the second preference. We are addressing that, but by moving the numbers from the fifth preference rather than just unlocking the door and including permanent residents as citizens.

Mr. MORRISON. My last comment on that: "Unlocking the door," those are awfully grudging terms. I mean, your very generous and

AR2022_400564

58

very appropriate family fairness expansion, this speaks to the human reality of these things. These are families. They are spouses and they are children, and we would all think it would be better if they could be together, I think. If they were us, we would want them to be together, if they were our family, and I think we ought to keep that in mind.

Your very point about the importance of these immediate families as compared to the brothers and sisters, the nuclear family and the importance that really argues for the position that maybe we should have a different rule, that maybe this is the wrong incentive to get naturalization. Maybe there are things we should do to promote naturalization, but is keeping families apart what we really would like to tell the world is the way that we promote naturalization? Aren't there more positive kinds of values that would promote naturalization? I just would hope you would think of those.

The gentleman from Texas.

Mr. SMITH of Texas. Mr. Chairman, I am going to disagree with you on your comments a while ago in regard to the impact of immigration. You mentioned that you felt it was the politicians that wanted to limit the increase in immigration and it was the scholarly studies that wanted to increase it.

I think it is just the opposite. I think it is the politicians that want to increase the numbers. Witness the bills that have been introduced by the members of this subcommittee, and I think it is the scholarly, dispassionate, objective studies that in fact point out the possible adverse impact of immigration.

Mr. BERMAN. Would the gentleman yield?

Mr. SMITH of Texas. Let me finish my statement, and I will be happy to yield.

I want to say again, for instance, the Urban Institute, which is not exactly known for its conservative principles, stated that the fact that wages of unskilled workers declined in the 1980's was "little doubt related to the presence of immigrant labor." In point of fact, almost every study that has been conducted has pointed to the need for greater numbers of skilled workers. In point of fact, also, the greatest number of immigrants are unskilled. It is approximately 85 percent, so there is a mix, a wrong mix, a mismatch, if you will, of the type of skills that immigrants have or may not have.

The point is here that if we are going to have to train someone, in this case train someone to fill a skilled job in the United States, to me we should spend our time and effort and money training American workers, American citizens, rather than training an individual who is not in this country for the same job. Right now, as we sit here, the unemployment rate among blacks is 11 percent; among Hispanics, 7 percent. To me, that is a reservoir of talent that has not been tapped and should be tapped. It is a great potential, and if we are going to train individuals, we should be training those individuals who need the jobs.

Another situation is that many individuals say that we need to import more immigration because that somehow is going to make us more competitive, but you can't have it both ways. You can't say more immigrants are going to make us more competitive and de-

AR2022_400565

press wages, and at the same time say that immigrants don't have an adverse impact on wages.

It is also said that history shows that we can absorb more and more immigrants. In point of fact, at the turn of the century when there were a large number of immigrants coming to this country, around 9 million during the first decade—of course, there is about 10 million in the last decade of the 1980's—as John F. Kennedy said himself, in his book "A Nation of Immigrants," we were a virgin country to a large extent. The economy was expanding more rapidly than it is today, and that is why he came out for limited immigration, as well.

Finally, there is the almost hard to anticipate cost of immigration upon the American taxpayer. Right now we spend billions of dollars upon immigrants and refugees. A study that was reported yesterday said the cost to the American taxpayer is $3,100 per immigrant. The study also pointed out that that is probably low, because of the immigrants' demands on hospitals and schools and social services in general, such as housing.

My point is that there is a finite number of individuals that we can admit to the United States, I believe, that we can absorb. To the extent that individuals need to be trained to meet the demands of the type of jobs that are going to be required in the United States in the future, to me those individuals should be U.S. citizens who are already in this country. We already have, unfortunately, an underclass that I think can be largely eradicated through greater training and education, and I think that is where we should put our resources.

Thank you, Mr. Chairman.

Mr. MORRISON. The gentleman from Texas, Mr. Bryant.

Mr. BRYANT. Thank you, Mr. Chairman.

Mr. McNary and Ambassador Lyman, I would like to ask you to perhaps re-visit something you might have explained during my absence for a few minutes, a few moments ago. I am curious as to the philosophical and practical basis for your statements here today that the administration supports an increase in immigration. I am not sure I see why the administration has taken this position. I don't think that is a widely-held view among the public, except to promote family unification or otherwise address a humanitarian need. Mr. McNary, could you give us the basis of that opinion?

Mr. McNARY. I think the administration supports a measure of the increase in immigration because of the backlogs that we find in the various preferences, both family relationships as well as the skill-based preferences; the backlogs, the waiting time. The administration believes that, especially with skill-based, that this can improve our economic base and our competitive position in the world.

Mr. BRYANT. Is there empirical data to suggest that there are a measured number of people out there with particular skills that will fit into a particular area of deficit, skill deficit, in the United States? Or is this just a general opinion, and a general feeling that the administration has?

Mr. McNARY. I think it is a general concept that the skill base is employer-driven, and that if we are going to be competitive, we need to put American business in a position where they can get

people into the country that they deem necessary to be competitive, in a timely fashion.

Mr. BRYANT. Well, wouldn't it be better to train an unskilled American, rather than to leave him untrained and increase the quota to allow someone who is skilled to come in from outside the country?

Mr. MCNARY. I think that we should train Americans. I just believe that there is a world full of talent out there, and that it is not going to hurt us to train our own American engineers or whatever and to look around for those who can bring something to American business that we don't have.

Mr. BRYANT. Ambassador Lyman, do you wish to comment on that?

Mr. LYMAN. Well, I concur with what the Commissioner said.

Mr. BRYANT. I would like to ask another question, as well. Isn't there some question about, or shouldn't there be a question raised about the wisdom of encouraging through the immigration policy—some of which is embodied in the Senate bill and some of which you have enunciated ought to be included—the admission of highly-trained people from other countries, or the admission of people with capital from other countries?

That is to say, isn't there a question or shouldn't there be a question raised about the wisdom of encouraging a brain drain or a capital drain from areas of the world which we are going to turn right back around and support through our foreign policies, foreign aid, and trade policies, that are designed to support, shore up those countries and allow them to improve? Why would we invite their capital here and invite their well-educated people here, and then turn right around and spend money trying to make them a social success?

Mr. MCNARY. I think that, by and large, many people are going to leave regardless. It is not up to us. It will be there decision. Hong Kong may be the best example of a reservoir of talent that may be available, and I would think that some of those people would be welcome here to improve our business capability.

Mr. BRYANT. Well, let's set Hong Kong aside for just a moment and come back to it. Let's take another country. Let's take Mexico, or Eastern Europe, or the Philippines, areas that we hope to see develop on their own, for our own benefit as well as for theirs. Why would we want to see the physicists and the doctors and other highly-trained people leave there to come here for the good life, when what we want is to develop exactly that kind of a person in those countries?

Mr. MCNARY. I think we will have both. I think that you are asking me to speculate about a fast-changing world, but I see many of those people staying in their country, and with travel and communications it is probably possible to stay where you are and still be a part of a business, wherever it is located.

Mr. BRYANT. Ambassador Lyman, did you want to comment?

Mr. LYMAN. If I could comment on that briefly, Congressman, I think you have raised a very important point. I think in fashioning immigration legislation, one wants to keep in mind a balance between being a magnet for brain drain on the one hand, and on the other hand meeting U.S. interests and needs in a world in which

AR2022_400567

many people are going to be moving and in a world in which there is a good deal of migration.

I think that kind of balance ought to be in the bill or bills that are looked at, and I think in developing the numbers and the types, et cetera, one ought to keep that in mind. I think you have raised a good point, and as a general matter we don't want to encourage such massive brain drain from countries that are important to us in terms of their own development.

Mr. BRYANT. Well, then, why encourage any brain drain from those countries?

Mr. LYMAN. I think there are two reasons. I think, as the Commissioner has said, there are needs in the United States and opportunities in the United States, and we can benefit. These are people who might move anywhere, or whose own skills are not being well-used in their own countries and might not be. I think in that context for the United States, which has both the opportunities and the benefits to be gained, there is a reasonable rationale for bringing those people, allowing them to come here. I think the balance is important, but there are people who are going to be moving for a variety of circumstances from their countries, or their countries simply may not have the political and economic framework to make good use of them.

Mr. BRYANT. Would you give me an example of the latter category?

Mr. LYMAN. Well, I think there are countries whose policies, for example, have not encouraged entrepreneurship, who have not given opportunity to some of their own skilled people, or who out of discrimination or otherwise have not given those people opportunities.

Mr. BRYANT. Well, then, why don't we make this policy specific to those countries and base this on empirical data, rather than make it general?

Mr. LYMAN. Well, you run the danger—two reasons, one of having an immigration program based on national origin, which opens up other problems. Second, I think these situations change. Countries change policies. Countries change circumstances.

Mr. BRYANT. Well, it just occurs to me that it is the most pernicious form of selfishness for us to encourage the most talented and educated and entrepreneurial people in a country to leave there, where they are most badly needed, and then invite them to come here, where we already have an abundance of those kinds of people. We definitely should be about the business of training those kinds of people. I think we are not doing a good job of that, and we should be.

Second, I wonder if it is in our own interest to continue to draw them out and then spend money trying to make those countries better?

Third, if you are just going to be selfish about it, I think we ought to be taking a look at this hemisphere. If we are going to be addressing our own selfish needs, we ought to be looking at the enormous difficulty and need to create jobs in Mexico. Mexico cannot keep up with the growth of its population in terms of job creation. Inviting people in just because they have money in their pocket is certainly not consistent with the American tradition and

AR2022_400568

62

I have serious doubts from a moral standpoint as well as from a practical standpoint, about inviting people in who have already used the resources of their nation to become educated, and therefore come here and give us the benefit of the education their own country paid for.

I see the red light is on. I should cease. I would like to leave one example with you. This policy seems strange to me, inasmuch as we have had a very good example right on our shores, of Cuba, where all of the entrepreneurial people, all of the democratically oriented people, all of the people that had the education, have left. What we have seen is a 30-year reign of a communist government. It occurs to me that if those people had stayed, either because they couldn't get out or because they were patriotic enough not to leave, it may very well be that we could have seen some changes.

I hear a colleague to my left saying they would be dead, but Vaclav Havel is over making a speech right now in the Chamber of the U.S. House of Representatives, and he is not dead, and he didn't leave Czechoslovakia.

I yield back my time.

Mr. MORRISON. The gentleman from New York.

Mr. SCHUMER. Thank you.

Just to follow up with Mr. Lyman from my last round of questioning, what I am basically hearing you saying is, in terms of the situation in the Soviet Union, there is nothing much more that our Government can do. Is that unfair?

Mr. LYMAN. Well, that may not—yes. In a general sense, there are several things. One of course is, as I mentioned in my testimony, that the legislation, H.R. 2646, would allow us to expand the number that we could take into the United States.

Mr. SCHUMER. It wouldn't do much, though, given the numbers we have. There might 10,000——

Mr. LYMAN. Second, I think we will continue to point to this problem in our whole range of dialog with the Soviet—now a very broadened dialog—the problem of anti-Semitism. As I indicated to you, it is on that agenda.

Third, we will continue to support and encourage the liberalization of the right to emigrate, including the right to emigrate to Israel, and I am hoping that the facilities will be worked out, frankly, to allow that to come as fast as——

Mr. SCHUMER. With or without direct flights.

Mr. LYMAN. With or without direct flights. If there are alternatives, then let them be worked out.

Mr. SCHUMER. Do you envision any alternatives that——

Mr. LYMAN. I think there are a variety of increased transportation possibilities that could be worked out.

Mr. SCHUMER. Do you think the Soviets would be willing to do that?

Mr. LYMAN. I won't speak for them. I am hoping——

Mr. SCHUMER. I am not asking you to speak for them. I am asking what you think. You know more than I do about it.

Mr. LYMAN. Well, I really don't know. We will have to look at that. The issue that came up was the direct flights, and I think they were rather symbolic.

Mr. SCHUMER. They were——