63

Mr. LYMAN. Symbolic, in the context of the controversy.

Mr. SCHUMER. Have we started privately pursuing other means, asking them about other means?

Mr. LYMAN. I think the Israelis are pursuing——

Mr. SCHUMER. But we aren't. As a country, we are not involved in that at this point.

Mr. LYMAN. No, I think because the arrangements have to be made directly by Israel. It is better if they make them themselves.

Mr. SCHUMER. Thank you.

The next question I have is for, I guess, Mr. Ogden or Mr. Lyman. It deals with the lottery programs that we have had in the past, the OP-1 and the NP-5 programs. What advice would you have for this committee in constructing future lottery programs? What should we keep in mind? Is there a page in that book that has that answer?

[Laughter.]

Mr. OGDEN. No. I just wanted to give you some background on them.

Mr. MORRISON. Please refer to them by their numbers, not their authors.

Mr. SCHUMER. Donnelly, and the other fellow's name I have forgotten. Levine, I think it was. Mr. Berman's bill.

Mr. OGDEN. Let me just give you some background. We have been dealing now with both programs for a little time and have some experience with both. The only advice I would have, if we had to have another program, would be that the idea of random selection rather than chronological selection has a great deal of appeal to use because it is administratively much easier to handle. That was Mr. Berman's program, the OP-1.

Mr. SCHUMER. You mean the OP-1 program, yes.

Mr. OGDEN. Yes. We had a registration period of a month. There was no need to queue up at the front of the door, as was the case in the NP-5. We had over 3 million applications during that period, and it was relatively easy to process those because we were working in cooperation with the Post Office and we had the time. It was a little bit more difficult on the NP-5 side.

Mr. SCHUMER. Do you see any problem with putting in fees to help pay for administering the program, small fees, but fees?

Mr. OGDEN. There would be some problems in terms of convertibility. It might cut out some countries where we don't have convertibility of fees, of——

Mr. SCHUMER. You mean of exchange rates?

Mr. OGDEN. Exchange rates, I mean, yes. We didn't institute a fee largely because it would have cut out some countries. We think it would have been administratively difficult to——

Mr. SCHUMER. You mean you can't get a Bangladesh—whatever the unit of currency is there, into dollars somehow or other?

Mr. OGDEN. Well, it would also require opening every one of those 3 million envelopes and converting it, so——

Mr. SCHUMER. Oh, I see. I see what you are saying.

Mr. OGDEN [continuing]. There are administrative problems with fees, and on balance we decided that it wasn't worth the effort.

Mr. SCHUMER. The red light is on.

Mr. MORRISON. The gentleman from California.

AR2022_400570

64

Mr. BERMAN. Thank you, Mr. Chairman. I was going to ask Mr. Smith whether he thought the Heritage Foundation was a scholarly institution, but——

Mr. SMITH of Texas. I certainly think it is a scholarly institution.

Mr. BERMAN. I've got my doubts.

Mr. SMITH of Texas. If you are referring to the study that they conducted, you will recall that their study that they conducted where they talked about increased numbers of immigrants was conditioned on two things: First of all, a continued robust economy, which is no guarantee unless we have a Republican President, and second——

[Laughter.]

Mr. SMITH of Texas [continuing]. And second of all, it spoke in terms——

Mr. BERMAN. I am not sure they said that.

Mr. SMITH of Texas. No, the last part was not in there, but the first part was.

Mr. BERMAN. All right. Well, there are some people who have minds both keener and less political than those of us on both sides of Mr. Morrison, who have concluded that immigration growth inherently is not bad for the economy. There are tremendous dislocations and short-term problems and crises that develop because of the failure of government to adequately deal with the impacts of immigration in particular locations, but there is also ample evidence that areas of this country that have been most impacted but those areas are not trailing other parts of this country on the economic ground. I think it is important to note that. A few of us come from those kinds of areas.

On the question of numbers, I think it is very important for everyone to understand what I think I am getting from the administration's testimony today. You are supporting an increase in immigration, but your increase in immigration comes solely from your belief in expanding some of the labor-based immigration and the independent category immigration and investor immigration. You are trying to fill some specific employment needs. You are trying to encourage diversity in immigration.

But, notwithstanding the repeated reference to the large backlogs as the basis for increased immigration, you are not supporting, at least at this point, any proposal which would meaningfully deal with those large backlogs. In reality, the 630,000 figure, when you strip everything away, and when you recognize that the group of newly legalized aliens under IRCA will soon become permanent resident aliens, there will be no growth in the family-based preferences by virtue of the Senate bill or the administration's position supporting that.

Therefore, the backlogs will not get smaller; they will get larger. So I don't think it is right to cite the demand coming from the increased backlogs as a basis for the administration's support for greater immigration, because the proposals the administration is endorsing or supporting and the specifics that you are recommending to us will have no increase in family preference immigration, either in the near term or in the long term.

AR2022_400571

I don't know if you want to disagree with that conclusion. I will give you an opportunity to, if you do, but that is what I am hearing from the sum total of your testimony.

Mr. McNARY. Only in part, Congressman. The second preference under the Kennedy-Simpson bill we think would be substantially increased. The others would not. Third and sixth preferences, skill-based, would be substantially increased, but——

Mr. BERMAN. But tell me why the Kennedy-Simpson bill will increase second preference immigration. As you get large numbers of newly legalized aliens moving into the system, why won't those numbers be eaten away? The only thing left will be the Senate floor adopted amendment of the 216,000 figure, in terms of family preference-based immigration. I don't see, unless I misunderstand. There may be a very short term, 1- or 2-year slight increase in second preference immigration, but once you have that hard cap that is only pierceable to protect 216,000 existing family-preference immigration, you are not going to get any increase. Isn't that a fair conclusion?

Mr. McNARY. Well, it is fair to say it is not going to solve the problem, but I think that would mean increased numbers.

Mr. BERMAN. Is the administration wedded to this notion of a cap?

Mr. McNARY. Pierceable caps.

Mr. BERMAN. Well, I am wedded to the notion of pierceable caps, or at least I am tolerant of them.

Mr. SCHUMER. It depends on how big the piercing and how big the cap.

Mr. BERMAN. A cap that is very pierceable could be very low, as far as I am concerned.

[Laughter.]

Mr. BERMAN. Last question here: Hong Kong. Would you support a proposal which would, whatever we decide to do in the way of country limits, make Hong Kong a country for purposes of immigration law? I guess maybe Mr. Lyman.

Mr. LYMAN. I think the analysis is that if you went all the way up to 20,000, it wouldn't have a major impact, given the type of applications backlog; if you went up to 10,000, it would.

Mr. BERMAN. Wait a second. You have to explain that one. In other words, that would be the overall cap on an individual preference category, but does that mean you would oppose the 20,000 limit? Mr. Ogden.

Mr. OGDEN. First of all, I think it would really make little difference whether it was 20,000 or 10,000, because of the way the system works. If you will let me explain, there are now more than 46,000 Hong Kong applicants currently registered. About 39,000 of these are the fifth preference. If there were a 20,000 annual limitation, the worldwide visa availability cutoff dates would be reached within a few months in the third and fourth preferences. Within about a year, the fifth preference is also liked to reach the worldwide cutoff date.

Hong Kong preference visa issuances may approach 20,000 for 1 year, but after that the worldwide preference cutoff dates would hold down visa issuances probably to less than 10,000. Although there are 39,000 fifth preference applicants currently on the wait-

66

ing list, more than 30,000 of these have priority dates which are not yet within the worldwide cutoff date. Thus, simply increasing the Hong Kong numerical limitation will not assure early visa issuance for all applicants on the Hong Kong waiting list.

Mr. BERMAN. What about the Solarz proposal? You don't have to use the visa. The elimination of the "use it or lose it" feature of present immigration law with respect to Hong Kong, what do you think of that idea? In other words, people can obtain a visa and not come now.

Mr. OGDEN. I think we would have serious reservations about that. I think Justice would be in a position to speak to that.

Mr. MORRISON. The gentleman from Texas?

Mr. MCNARY. We think the special immigrant provisions would take care of the Hong Kong situation.

Mr. MORRISON. Yes, but the gentleman's question was that Congressman Solarz has proposed that Hong Kong visas be able to be opted for but not exercised until 1997, as a kind of a safety valve, if you will, and that was the question, whether you have a position on that.

Mr. MCNARY. No, sir, no position.

Mr. MORRISON. The gentleman from Texas.

Mr. SMITH of Texas. Commissioner, let me ask a question. A while ago our chairman asked if there were studies showing that being able to bring in relatives was an incentive to becoming a citizen, implying that there was no evidence. Isn't the subcommittee's concern about family reunification an indication that it is an incentive?

Mr. MCNARY. I would think so.

Mr. SMITH of Texas. I don't have any other questions, Mr. Chairman. Thank you.

Mr. MORRISON. Put that bootstrap away there, Mr. Smith.

[Laughter.]

Mr. MORRISON. Mr. McNary, in your testimony I found a grain of hope that we could get ourselves together on my proposal with respect to employment-based admission, because down on page 9 you talk about a 4-year pilot program permitting the entry of a limited number of selected immigrants, and you talk about shortages and different training levels.

While that is just a hint of what you may have in mind, I want to urge you to take a close look at the scheme that is in my bill, which is very much keyed toward trying to walk that difficult line between the concerns which Mr. Bryant has expressed about American workers, and training American workers and using American workers, and the reality that there are a lot of jobs going begging in various parts of the country right now for the appropriate person to do those jobs. American workers are disadvantaged by that fact, too, because factories close and businesses close because they can't get the key personnel that they need to operate in a particular place or in this country at all.

But what I found curious about this is that you would, in this circumstance, choose the people by lottery if you had such a program. Well, if we are going to let job shortages be filled, and we make some definition of what a job shortage is and what kind of jobs will be declared in shortage, why wouldn't we let the employ-

67

ers pick the people? Why would we run a lottery? I would think that you would be in favor of a free market kind of approach to selection. The other two choices are lottery or government selection. It would seem, among three, that employer selection ought to be philosophically and practically right up your alley.

Mr. McNARY. Mr. Chairman, this is a new concept and it is a pilot program. It would be revisited and analyzed as to its success, but it is not family-driven, it is not employer-driven. It says to the world that, even if you don't have family connections and you don't have an employer ready to bring you in, if you meet these certain standards of a degree or 2 years' training in a trade, whatever, that you have a chance to come into this country, and then through random selection these people would be considered.

Mr. MORRISON. That leaves me really confused. I happen to think that there is a place for a work force-oriented part of our admission policy, but it only makes sense to me if it is for a job that really exists, by employers that have made, either as a group or in a region or individually, a showing that they couldn't get Americans. That seems to me the only way to walk this narrow line between displacing Americans and making sure that our economy is operating to the maximum possible level.

If you say, well, in addition to employer-based admissions, third and sixth preference, and an independent category which is some cross between a lottery and point system administered by government, then we need another system that is another lottery, but you sure don't want to expand any of the family admissions for the immediate relatives of families that are here, I find that set or that collection of positions to be hard to understand.

It seems to me that there are two principles in legal immigration that I thought that we had some agreement on: Principle number one, families; principle number two, economics, what our economy needs. We can disagree about what the economy needs, how big that is, and how we protect American workers in doing it, but I thought there was a rather broad feeling that those were the two reasons to come in.

I would think we should try to give both of them some consistency and some philosophical stature, and we could go a lot further in this reform. I would hate to see us just sort of hanging little baubles on the Christmas tree of different kinds of programs we might use in this area, rather than agreeing on a program that we should use to address the problems.

Mr. McNARY. Mr. Chairman, I don't think we are that far apart or this pilot is that much of a diversion. In my testimony I have said that these immigrants would quality for admission by practicing an identified shortage occupation, so we are talking about an occupation where there is a shortage. It is related to our economy and to the jobs that are needed.

Mr. MORRISON. Let me just conclude by saying that what seems to underlie this, leaving the details out, is the same thing that underlies my proposal, so I would hope you would keep that in mind when you read my proposal, and think that maybe we agree more than the words on the page would suggest to you on first reading.

The gentleman from Texas, Mr. Bryant.

AR2022_400574

Mr. BRYANT. I would like to ask Ambassador Lyman and also Mr. McNary to tell us what is the Hong Kong problem? That is, I know that Red China is going to take over Hong Kong here at the end of the decade, but what is the problem with that from the administration's standpoint?

Mr. LYMAN. Well, I think from the administration's point of view the immediate problem is the insecurity that is felt in Hong Kong because of the prospect in 1997 or the uncertainties related to it. Actually, I think what we would like to do is to encourage residents of Hong Kong to stay, and to do that in ways that at least allow them to believe that if things should get bad, there are alternatives for them out there at that time, but that we don't want to encourage them to leave now in large numbers. On the contrary, we think that people should stay. I think in my testimony I indicated that I saw the special immigrant legislation as a kind of an insurance policy out there, that they knew was there but would help perhaps reassure people to stay.

Mr. BRYANT. Well, so what specifically is your proposal for what we should offer them to get them to stay?

Mr. LYMAN. I think that we are looking at a variety of things, but one in H.R. 2646 allows us, in consultation with Congress, in response to a specific situation, to bring in people as immigrants who might otherwise not be able to get in, either because there weren't refugee numbers or other circumstances. That provision is there to be used if needed, and that is one way of providing a kind of reassurance.

Mr. BRYANT. Now will those people be people that have money? Is that the purpose of the bill?

Mr. LYMAN. I think that is not the way H.R. 2646 is emphasized. It is a special humanitarian——

Mr. BRYANT. But the Senate bill is written that way, and you have expressed a favorable opinion on that.

Mr. LYMAN. That is a different——

Mr. BRYANT. Well, I am asking if you support the idea that people who can invest $1 million in this economy should be allowed in over people that can't.

Mr. McNARY. Yes, the administration supports that provision in the Senate bill.

Mr. BRYANT. I don't understand the justification for that. First of all, I am not clear as to why dealing specifically with Hong Kong is the responsibility of the United States, inasmuch as it is not a part of our colonial heritage. It is a part of the responsibility of Great Britain.

Second, it is not clear to me how we could justify in any respect letting someone who has dedicated his life to making a great deal of money into this country over somebody who is perhaps a Christian minister or a Rabbi or someone who is a teacher or a social worker. Can you explain to me how we justify that?

Mr. McNARY. I don't know that I can explain it to your satisfaction.

Mr. BRYANT. Well, I would be happy to hear any rationale that meets with the value system of the American people.

Mr. McNARY. I think that what we are doing here is not sending out invitations, but instead we are trying to establish policy that

69

will control the immigration of people into our country. These people are going to leave. They are going to leave Hong Kong, and so if we establish some guidelines that will attract those who leave into our country as opposed to some other country, that will benefit our national interest, then I think that up front that makes good sense.

Mr. BRYANT. It sure seems to me to be a definite endorsement of a policy that says the rich come in. I mean, what happened to "Your tired, your poor, your huddled masses yearning to breathe free?" We don't want them. We are going to ask for the rich folks, right?

Mr. McNARY. No, we have just taken in, with legalization we have taken in a good many that aren't rich.

Mr. BRYANT. I am talking about Hong Kong, which again I am not sure why that area is our responsibility anyway, but if it is, why only the rich?

Mr. McNARY. We are not talking very many numbers. We are talking about people that are going to create jobs and really bolster the quality of life for everyone, rich and poor.

Mr. BRYANT. Not in Hong Kong, because they will be gone from Hong Kong.

Mr. McNARY. Hong Kong is pretty far ahead right now. I think they can—I don't want to get into Hong Kong. This country is enough.

Mr. BRYANT. Let me ask a final question: Why is Hong Kong our responsibility, in view of the fact that we have boat people out there floating around from Vietnam and all kinds of problems all over the world, people that have no place to go and live? They have no house to go to, nothing at all awaiting them, a totally hopeless situation. Why do we have a policy to address people that do have a house to live in?

Mr. LYMAN. Well, I wouldn't want to leave the impression that Hong Kong is our responsibility. We don't see it that way. It is one of the situations that one needs to look at, but the emphasis of many of our programs is not directed there. On the Vietnamese boat people, fully half of the refugees that we bring to the United States, or close to half, come from Southeast Asia. Most of those are Vietnamese. Protection for the people who are fleeing, the boat people, is a major priority of this administration.

Mr. BRYANT. I understand. Well, I understand, but you didn't answer my question. I can make an eloquent speech about all we have contributed to the world with regard to allowing immigrants into this country, and that speech usually ends up with a question about why is anybody proposing that we allow more in who don't necessarily need a place to live.

But my question to you was, why do we have a specific policy designed to address the yearning of people in Hong Kong to leave because they don't like the Government they are going to have at the end of the decade, in an area where we have no official responsibility really, at a time when we have people that have no place to live and are not going to have any place to live. If there is room for somebody, why don't we make the room first for those that have no place to go? That is a question.

AR2022_400576

Mr. LYMAN. I think the answer is, in looking at the range of proposals and legislation on the books, that it is not an either/or question. I think there are provisions in legislation and in immigration and in refugee to bring in lots of people that you are talking about. This particular provision in the Senate bill which is aimed at attracting investors is one of several types of immigration that are being talked about, but I don't suppose that anybody sees that as no longer being concerned about the poor or the homeless.

Mr. BRYANT. Could you address my question about why we have any policy at all toward Hong Kong in this regard? Why are we even discussing it? It is not part of our——

Mr. LYMAN. Well, I think we have a concern about the stability and success of Hong Kong. I think it is an important part of the East Asian situation.

Mr. MORRISON. The gentleman from New York.

Mr. SCHUMER. I have no further questions.

Mr. MORRISON. The gentleman from California?

Mr. BERMAN. What is the East Asian situation?

Mr. LYMAN. Well, I——

Mr. BERMAN. You mean 1997 and——

Mr. LYMAN [continuing]. I am just saying that in the context of East Asia and East Asia policy, Hong Kong is important. I don't pretend to be an expert on that policy, and would be happy to get you a statement on that from the Department, but I think our concern with Hong Kong is because it is an important element in the entire East Asian scene. I can get you a further statement on that.

Mr. BERMAN. Mr. Bryant's questions reminded me of an issue that I wanted to ask about, and I don't know, maybe it is both Justice and State Department: The Haitians—talk about people who don't have a place to go, talk about people who should meet every criteria imaginable with respect to refugees. We have a program to try to interdict people who are leaving by boat before they actually get to the mainland. While we are told that these people, before they are sent back to Haiti and all that that means, are asked if they have a well-founded fear of persecution, I think out of the thousands that have been stopped, only six have ever been allowed to come ashore and assert their claims for political asylum. How, in the context of everything that is going on and all that is being talked about, is that a justifiable policy?

Mr. McNARY. It is an enforcement. It is an enforcement policy. The difference with an appeal for asylum from coming across the border at Brownsville, as opposed to being interdicted on the high seas, is that one is deportation and the other is exclusion. It is much more effective to interdict and exclude. However, I think you would be surprised at some of the numbers on Haitians, and we will supply those. There are a number of Haitians in this country, and a number of Haitians that have been legalized.

Mr. BERMAN. Oh, no, I understand. I understand that. Some of them are unemployed while guest workers are brought in to pick sugar cane, but that is a point that neither one of you have anything to do with.

[Laughter.]

Mr. BERMAN. But the point here is, with respect to these people, I mean, this political asylum issue, when you talk about Hong

Kong and other kinds of situations, where you can have questions about it, there is something wrong with a program where only six people are actually allowed to pursue a claim for political asylum. I am not prejudging the claims, but just to pursue it, because all the thousands of others have been interdicted on the high seas. I just throw that out. I don't know if you have any specific comments.

Mr. LYMAN. I think there are two or three questions. First of all, we are reviewing that whole program in light of recent developments and in light of the facts that you mentioned, and we will get back to you on the results of that review, looking specifically as to whether people who do have a well-founded fear of persecution are indeed getting access to proper interview, et cetera.

Second, to look at the question of whether the process itself is meeting the standards of screening, as it is sometimes called, as to whether people are leaving for political reasons or not, we are looking at that as well. I hope that we can get back to you on the results of that review very shortly.

Mr. BERMAN. I guess the point is, if we want to come with clean hands as we attack the British for the way they are dealing with Hong Kong, then this is a policy worthy of review, and I am glad to see that such review is being undertaken.

Just to refresh my memory, in response to Mr. Fish's question, did the administration take a position on the shortening of the period of naturalization from 5 years to 3 years?

Mr. MCNARY. Not at this time, no, sir.

Mr. BERMAN. You have no position on that issue. And on the issue of the country limits, you have no position, either? Is that appropriate—country limits?

Mr. MCNARY. Are you talking about the——

Mr. BERMAN. The 20,000.

Mr. MCNARY [continuing]. The Presidential waiver that I testified to?

Mr. BERMAN. Oh, you support an ability for the administration to waive the country limits?

Mr. MCNARY. Yes.

Mr. BERMAN. Thank you, Mr. Chairman.

Mr. MORRISON. The gentleman from Texas.

Mr. SMITH of Texas. Thank you, Mr. Chairman. Mr. Chairman, this time I happen to agree with your sentiments of a while ago in regard to the proposed pilot program lottery that was mentioned by Commissioner McNary. To me it simply is not good government policy to have the Government play dice with people's lives. I would hope that, as you suggested, we could construct a policy based upon a rationale, common sense and economic considerations that would take into account the needs of employers in this country, as I say, on a rational basis rather than resorting to a lottery-type system that unfortunately gives a lot of people false hopes and inevitably leads to far more, greater numbers of people being disappointed by the lottery results. Just fundamentally, I just don't think we ought to play dice with people's lives when it comes to government policy.

Thank you, Mr. Chairman.

Mr. MORRISON. I would just like to follow up on the questions that Mr. Bryant and Mr. Berman raised. Once again, you are going

AR2022_400578

72

to be back and you are going to be commenting on other proposals, and you will have additional chances to say more about what you have said today.

You really can't tell us that you haven't made statements about competition between one group and another. You have said that you have to cut the fifth preference to expand the second preference because—well, just because, because of 630,000, which is just a number that somebody picked. At the same time, when you were asked about whether the investor numbers are coming from somewhere, you say they are not. They are coming out of the air. Now those two statements can't be true. I don't know if you want to comment on that, Mr. Lyman.

Mr. LYMAN. I didn't mean to say that, within some limit, that there weren't tradeoffs. What I meant to say is that it wasn't 1 to zero. That is all I meant.

Mr. MORRISON. Well, I mean, by creating a new category of admission to the country, if you are in a cap frame of mind, it has to come from somewhere. If you are not in a cap frame of mind, it still comes from somewhere, but it doesn't come quite as stringently from somewhere.

With respect to the Haitian situation, as you know, we have discussed it. The subcommittee has had hearings. Is consideration in this study being given to some form of program by which Haitians can come to the United States, either by applying within Haiti or within the Dominican Republic or some form of special immigrant relief to the Haitians, given the fact that Haiti is a God awful place at this point, has gotten worse and worse, and we continue to show compassion to almost everybody in the world with greater degree than we do to the Haitians?

We let the Cubans in routinely. We let the Central Americans in, sometimes detaining them and sometimes not. We let the Chinese stay. We want to help the people in Hong Kong who are feeling insecure about 1997. What about the Haitians, who are feeling insecure about tomorrow? We don't have any program for them, and I haven't heard a word about how—I will give you your chance now—you were going to use the special immigrant for them and that is what you had in mind when you did that, because that is the usual answer I get to these questions.

[Laughter.]

Mr. MORRISON. But in any case, I think the point about Haiti, we have discussed whether or not it is hypocracy to tell the Brits that they can't send the Vietnamese back, but we can send the Haitians back, and I do think it is hypocracy to say that, but we don't have to have that debate. My question is, are you looking to do anything for the Haitians, who really are the odd people out over and over again in our immigration policy.

Mr. LYMAN. Yes. Although I don't want to get into the hypocracy debate, I do want to say that the Indo-Chinese situation was dealt with, and everybody involved signed into an international agreement, and all we are asking is that everybody follow the agreement reached last June.

Mr. MORRISON. Yes, we fought for that agreement, and we were very adamant that we did not want forcible repatriation, while we

AR2022_400579

73

have signed an international agreement with a government, with a dictator in Haiti, that allows us forcible repatriation.

Mr. LYMAN. Well, they are in different contexts, but let me answer your second question. Yes, we are looking at those options, though some already exist. That is, there are no restrictions on Haitians applying in the Dominican Republic, for example.

Mr. MORRISON. But there is no program. They are special, individual cases, considered in Washington.

Mr. LYMAN. Yes.

Mr. MORRISON. There is no program.

Mr. LYMAN. There is no program for the admission of Haitians, no different than there are for other Central Americans.

Mr. MORRISON. There are no programs for anybody but Cubans. I mean, basically——

Mr. LYMAN. No, that is not quite true.

Mr. MORRISON. I mean in this hemisphere.

Mr. LYMAN. No, there are. There are others, if you look at our numbers under the refugee program, there are for, yes, Cubans. But let me just say that those options that you mentioned, particularly the first two, are under active consideration.

Mr. MORRISON. Does anyone have any further questions?

[No response.]

Mr. MORRISON. I want to thank the panel for its input. We look forward to a return visit, and we hope that you will be able to respond to us on these additional proposals from Mr. Schumer and myself in the 2-week period in which we hope we will be able to schedule another hearing.

The hearing will stand adjourned.

[Whereupon, at 12:20 p.m., the subcommittee adjourned, to reconvene subject to the call of the Chair.]

○





*State Education Practices (SEP)*
Compiles and disseminates data on state education practice activities

**Table 1.2. Compulsory school attendance laws, minimum and maximum age limits for required free education, by state: 2017**

| State | Age of required school attendance | Minimum age limit to which free education must be offered | Maximum age limit to which free education must be offered |
|---|---|---|---|
| Alabama | 6 to 17 | 5 [1] | 17 [2] |
| Alaska | 7 to 16 [3] | 5 | 20 |
| Arizona | 6 to 16 [4] | 6 | 21 |
| Arkansas | 5 to 18 | 5 | 21 |
| California[5] | 6 to 18 | 5 | 21 |
| | | | |
| Colorado | 6 to 17 | 5 | 21 |
| Connecticut | 5 to 18 [6] | 5 | 21 |
| Delaware | 5 to 16 | 5 | 21 |
| District of Columbia | 5 to 18 | 5 [7] | † [8] |
| Florida | 6 to 16 | 4 | — |
| | | | |
| Georgia | 6 to 16 | 5 | 19 |
| Hawaii | 5 to 18 | 5 | 20 |
| Idaho | 7 to 16 | 5 | 21 |
| Illinois | 6 to 17 | 4 | 21 [9] |
| Indiana | 7 to 18 | 5 | 22 |
| | | | |
| Iowa | 6 to 16 [10] | 5 | 21 |
| Kansas | 7 to 18 | 5 | † [11] |
| Kentucky | 6 to 18 | 5 | 21 |
| Louisiana | 7 to 18 | 5 [12] | 20 [13] |
| Maine | 7 to 17 | 5 [14] | 20 |
| | | | |
| Maryland | 5 to 18 | 5 | 21 |
| Massachusetts | 6 to 16 | 3 [15] | 22 |
| Michigan | 6 to 18 | 5 | 20 |
| Minnesota | 7 to 17 | 5 | 21 |
| Mississippi | 6 to 17 | 5 | 21 |
| | | | |
| Missouri | 7 to 17 [16] | 5 [17] | 21 |
| Montana | 7 to 16 [18] | 5 | 19 |
| Nebraska | 6 to 18 | 5 | 21 |
| Nevada | 7 to 18 | 5 | 21 [19] |
| New Hampshire | 6 to 18 | — | 21 |
| | | | |
| New Jersey | 6 to 16 | 5 | 20 |
| New Mexico | 5 to 18 | 5 | — |
| New York | 6 to 16 [20] | 5 | 21 |
| North Carolina | 7 to 16 | 5 | 21 |
| North Dakota | 7 to 16 | 5 | 21 |
| | | | |
| Ohio | 6 to 18 | 5 | 22 |
| Oklahoma | 5 to 18 | 5 [21] | 21 |
| Oregon | 6 to 18 | 5 | 19 [22] |
| Pennsylvania | 8 to 17 | 6 [23] | 21 [24] |
| Rhode Island | 5 to 18 [25] | 5 | 21 [26] |
| | | | |
| South Carolina | 5 to 17 | 5 | 22 [27] |
| South Dakota | 6 to 18 [28] | 5 | 21 |
| Tennessee | 6 to 18 | 5 | — |
| Texas | 6 to 19 | 5 | 26 |
| Utah | 6 to 18 | 5 | — |
| | | | |
| Vermont | 6 to 16 [29] | 5 | † |
| Virginia | 5 to 18 | 5 | 20 |
| Washington | 8 to 18 | 5 | 21 |
| West Virginia | 6 to 17 | 5 | 22 |
| Wisconsin | 6 to 18 | 4 | 20 |
| Wyoming | 7 to 16 [30] | 5 | 21 |

— Not available. In this state, local education agencies determine their maximum or minimum age, or the information is not available in the statute.

† Not applicable. State has not set a maximum age limit.

[1] In Alabama, the parent or legal guardian of a 6-year-old child may opt out of enrolling their child by notifying the local board of education, in writing, that the child will not be in school until he or she is 7 years old.

[2] In Alabama's city school systems, students are entitled to admission until age 19.

[3] Alaska requires that students attend until they are 16 or complete 12th grade.

[4] In Arizona, students must attend until they are 16 or complete 10th grade.

[5] In California, no school district may receive school district appropriations for independent study by students 21 years of age or older, or by students 19 years of age or older who have not been continuously involved in kindergarten, or any of the 1st to 12th grades, inclusive since their 18th birthday.

[6] In Connecticut, the parent of a 5-or 6-year-old child may opt out of enrolling their child until he or she is 7 by signing an option form.

[7] District of Columbia students who are at least 3 years old by September 30 are eligible for admission to the preK-3 program. Students who are 4 years old by September 30 are eligible for the preK-4 program. Students who are 5 years old by September 30 are eligible for kindergarten.

[8] An adult student who is a resident of the District of Columbia is eligible for free instruction in the schools, as long as the student meets all other criteria and prerequisites for admission.

**AR2022_400581**

[9] In Illinois, reenrollment is denied to any child 19 years of age or older who has dropped out of school and who cannot, because of age and lack of credits, attend classes during the normal school year and graduate before his or her 21st birthday.

[10] In Iowa, children enrolled in preschool programs (4 years old on or before September 15) are considered to be of compulsory attendance age.

[11] Adults in Kansas have access to an education if they enroll in a public school. However, school districts are not required to provide educational services in a regular school setting to anyone who has reached 19 years of age and who is not currently enrolled in a school district. If a school district elects not to provide a person with educational services in a regular school setting, the district must offer the person educational services in an alternative setting or program.

[12] Each Louisiana city and parish school board may provide for a child younger than 5 to enter kindergarten if that child has been identified as gifted by the state guidelines.

[13] In Louisiana, admission may be granted to any student who is 19 years of age or younger on September 30 or 20 years old on September 30 and has sufficient course credits that he or she will be able to graduate within one school year of admission or readmission.

[14] In Maine, students must be at least 5 years old before October 15, or 4 years old by October 15 if they are enrolled in a public preschool program prior to kindergarten (where offered).

[15] Each school committee in Massachusetts establishes its own minimum age for school attendance, provided that it is not older than mandatory minimum age established by the state.

[16] Missouri requires attendance until 17 or the completion of 16 credits toward high school graduation.

[17] A child between 5 and 7 years old in Missouri may be excused from attendance at school if a parent or guardian submits a written request.

[18] In Montana, attendance is required until students are 16 or complete 8th grade.

[19] In Nevada, students may attend a comprehensive public school until age 21; or, from age 18, they may attend an adult high school program. There is no upper age limit for adult high schools.

[20] In New York, the boards of education in the Syracuse, New York City, Rochester, Utica, and Buffalo school districts are authorized to require children who are 5 years old on or before December 1 to attend kindergarten unless the parents elect not to enroll their child until the following September, or the child is enrolled in a non-public school or home instruction. New York local boards of education may require 16-and 17-year old students who are not employed to attend school until the last day of the school year in which the student turns 17.

[21] In Oklahoma, children who are least 4 years old but not older than 5 on or before September 1 may attend either half-day or full-day programs in their district free of charge as long as the district has the physical facilities and teaching staff to accommodate the student.

[22] In Oregon, a district may admit a student who has not yet turned 21 if he or she requires additional education to receive a diploma.

[23] The board of school directors in any Pennsylvania school district may establish kindergarten programs for children between the ages of 4 and 6.

[24] In Pennsylvania, a child who reaches age 21 during the school term and who has not graduated from high school may continue to attend the public schools in their district free of charge until the end of the school term.

[25] In Rhode Island, the compulsory age is 16 if a student has an alternative learning plan for obtaining a high school diploma or its equivalent.

[26] Although some Rhode Island districts allow students to complete the school year after they turn 21, this practice is not universal and not required.

[27] In South Carolina, individuals older than 21 years old may attend night schools.

[28] In South Dakota, the compulsory age limit is 16 if a child enrolls in a general education development test preparation program that is school-based or for which a school contracts, and the child successfully completes the test or reaches the age of 18.

[29] Vermont requires students to attend school until they are 16 or complete 10th grade.

[30] Wyoming requires students to attend school until they are 16 or complete 10th grade.

SOURCE: Education Commission of the States, *Age Requirements for Free and Compulsory Education*, retrieved January 8, 2018 from https://www.ecs.org/age-requirements-for-free-and-compulsory-education/. Data Source.



IES ∴ NCES  National Center for Education Statistics

Explore the Institute of Education Sciences

IES
Home
About
Publications
Data
Funding
News

IES Centers
NCEE
NCER
NCES
  Home
  About
  Programs
  Publications
  Data
  Data Training
  School Search
  News
  Kids' Zone
NCSER

IES Policies and Standards
ED Data Inventory
IES Diversity Statement
NCES Statistical Standards
Peer Review Process
Privacy and Security Policies
Public Access Policy

Contact Us

U.S. Department of Education

Additional Resources
ERIC
Sitemap
Organizational Chart

AR2022_400582



# Topic No. 751 Social Security and Medicare Withholding Rates

Taxes under the Federal Insurance Contributions Act (FICA) are composed of the old-age, survivors, and disability insurance taxes, also known as social security taxes, and the hospital insurance tax, also known as Medicare taxes. Different rates apply for these taxes.

## Social Security and Medicare Withholding Rates

The current tax rate for social security is 6.2% for the employer and 6.2% for the employee, or 12.4% total. The current rate for Medicare is 1.45% for the employer and 1.45% for the employee, or 2.9% total. Refer to Publication 15, (Circular E), Employer's Tax Guide for more information; or Publication 51, (Circular A), Agricultural Employer's Tax Guide for agricultural employers. Refer to Notice 2020-65 PDF and Notice 2021-11 PDF for information allowing employers to defer withholding and payment of the employee's share of Social Security taxes of certain employees.

## Additional Medicare Tax Withholding Rate

Additional Medicare Tax applies to an individual's Medicare wages that exceed a threshold amount based on the taxpayer's filing status. Employers are responsible for withholding the 0.9% Additional Medicare Tax on an individual's wages paid in excess of $200,000 in a calendar year, without regard to filing status. An employer is required to begin withholding Additional Medicare Tax in the pay period in which it pays wages in excess of $200,000 to an employee and continue to withhold it each pay period until the end of the calendar year. There's no employer match for Additional Medicare Tax. For more information, see the Instructions for Form 8959 and Questions and Answers for the Additional Medicare Tax.

## Wage Base Limits

Only the social security tax has a wage base limit. The wage base limit is the maximum wage that's subject to the tax for that year. For earnings in 2022, this base is $147,000. Refer to "What's New" in Publication 15 for the current wage limit for social security wages; or Publication 51 for agricultural employers.

There's no wage base limit for Medicare tax. All covered wages are subject to Medicare tax.

*Page Last Reviewed or Updated: 20-May-2022*

**AR2022_400583**



# Prosecutorial Discretion in Immigration Enforcement: Legal Issues

**Kate M. Manuel**
Legislative Attorney

**Todd Garvey**
Legislative Attorney

December 27, 2013

**Congressional Research Service**

7-5700

www.crs.gov

R42924

**CRS REPORT**
Prepared for Members and
Committees of Congress

AR2022_400584

# Summary

The term *prosecutorial discretion* is commonly used to describe the wide latitude that prosecutors have in determining when, whom, how, and even whether to prosecute apparent violations of the law. The Immigration and Naturalization Service (INS) and, later, the Department of Homeland Security (DHS) and its components have historically described themselves as exercising prosecutorial discretion in immigration enforcement. Some commentators have recently challenged this characterization on the grounds that DHS enforces primarily civil violations, and some of its components cannot be said to engage in "law enforcement," as that term is conventionally understood. However, even agencies that do not prosecute or engage in law enforcement have been recognized as having discretion (sometimes referred to as *enforcement discretion*) in determining whether to enforce particular violations.

Federal regulation of immigration is commonly said to arise from various powers enumerated in the Constitution (e.g., naturalization, commerce), as well as the federal government's inherent power to control and conduct foreign relations. Some, although not all, of these powers belong exclusively to Congress, and courts have sometimes described Congress as having "plenary power" over immigration. However, few courts or commentators have addressed the separation of powers between Congress and the President in the field of immigration, and the executive has sometimes been said to share plenary power over immigration with Congress as one of the "political branches." Moreover, the authority to exercise prosecutorial or enforcement discretion has traditionally been understood to arise from the Constitution, not from any congressional delegation of power.

Certain decisions have been widely recognized as within the prosecutorial discretion of immigration officers. These include deciding whether to initiate removal proceedings and what charges to lodge against the respondent; canceling a Notice to Appear or other charging document before jurisdiction vests with an immigration judge; granting deferred action or extended voluntary departure to an alien otherwise subject to removal (deportation); appealing particular decisions or orders; and imposing fines for particular offenses, among other things. Enforcement priorities and resources, as well as humanitarian concerns, have typically played a role in determining whether to exercise discretion in individual cases. For example, the George W. Bush Administration temporarily suspended employer sanctions in areas affected by Hurricane Katrina, and the Obama Administration recently began granting deferred action to certain unauthorized aliens brought to the United States as children.

While the executive branch's prosecutorial or enforcement discretion is broad, it is not unfettered, and particular exercises of discretion could potentially be checked by the Constitution, statute, or agency directives. *Selective prosecution*, or prosecution based on race, religion, or the exercise of constitutional rights, is prohibited, although aliens generally cannot assert selective prosecution as a defense to removal. A policy of non-enforcement that amounts to an abdication of an agency's statutory responsibilities could potentially be said to violate the Take Care Clause. However, standing to challenge alleged violations of the Take Care Clause may be limited, and no court appears to have invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care Clause. Non-enforcement of particular laws could also potentially be challenged under the Administrative Procedure Act if a statute provides specific guidelines for the agency to follow in exercising its enforcement powers. In addition, an agency could potentially be found to have constrained its own discretion, as some courts found that the INS had done in the 1970s with its operating instruction on deferred action.

# Contents

Introduction.................................................................................................................................... 1

Federal Power to Regulate Immigration ........................................................................................ 3

Prosecutorial Discretion Generally ................................................................................................ 8

Prosecutorial Discretion in the Immigration Context .................................................................. 10

Potential Limits on the Exercise of Discretion ............................................................................ 13
    Constitution ........................................................................................................................... 15
        Selective Prosecution .................................................................................................. 15
        "Take Care" Clause ..................................................................................................... 16
    Statute .................................................................................................................................... 19
        Whether "Shall" Means Agencies Lack Discretion ..................................................... 21
        Deference to Agencies' Interpretations of Their Governing Statutes............................ 22
    Executive Branch Self-Regulation ........................................................................................ 24

Conclusion .................................................................................................................................... 26

# Contacts

Author Contact Information........................................................................................................... 28

# Introduction

The term *prosecutorial discretion* is commonly used to describe the "wide latitude" that prosecutors have in determining when, whom, how, and even whether to prosecute apparent violations of the law.[1] The Immigration and Naturalization Service (INS) and, later, the Department of Homeland Security (DHS) and its components have historically described themselves as exercising prosecutorial discretion in the enforcement of federal immigration law, which is largely contained in the Immigration and Nationality Act of 1952 (INA), as amended.[2] Some commentators have recently challenged this characterization on the grounds that DHS enforces primarily civil violations, and some of its components cannot be said to engage in "law enforcement," as that term is conventionally understood.[3] However, even agencies that do not prosecute or engage in law enforcement have been recognized as having discretion (sometimes referred to as *enforcement discretion*) in determining whether to enforce particular violations,[4] and immigration officers appear to have exercised such discretion in individual cases and on a categorical basis for decades. For example, the Kennedy Administration granted extended voluntary departure to persons from Cuba in 1960,[5] allowing many otherwise deportable Cuban nationals to remain in the United States for an extended period, while the George W. Bush Administration temporarily suspended employer sanctions on entities that employed unauthorized aliens in areas affected by Hurricane Katrina.[6]

The scope of prosecutorial discretion in immigration enforcement has recently been of interest to Congress and the public due to certain initiatives of the Obama Administration.[7] In 2011, John

---

[1] U.S. Dep't of Justice, *United States Attorneys' Manual*, §9-27.110(B) (2002), *available at* http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/27mcrm.htm#9-27.110.

[2] *See, e.g.*, Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement (ICE), Prosecutorial and Custody Detention, Nov. 7, 2007, *available at* http://niwaplibrary.wcl.american.edu/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/Myers-Memo-Custody-Discretion-11-7-07.pdf ("This memorandum serves to highlight the importance of exercising prosecutorial discretion when making administrative arrest and custody determinations for aliens who are nursing mothers."); Doris Meissner, Commissioner, INS, Exercising Prosecutorial Discretion, Nov. 7, 2000, *available at* http://niwaplibrary.wcl.american.edu/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/22092970-INS-Guidance-Memo-Prosecutorial-Discretion-Doris-Meissner-11-7-00.pdf [hereinafter "2002 INS Guidance"] ("This memorandum describes the principles with which the INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions."). INS was abolished in 2002, and most of its functions were transferred to the newly created Department of Homeland by the Homeland Security Act of 2002 (P.L. 107-296).

[3] *See, e.g.*, Crane v. Napolitano, No. 3:12-cv-03247-O, Amended Complaint (filed N.D. Tex., Oct. 10, 2012), at ¶¶ 88-89 ("U.S. Citizenship and Immigration Services is not a law enforcement agency. A non-law-enforcement agency cannot exercise prosecutorial discretion."): Robert J. Delahunty & John C. Yoo, The Obama Administration, the DREAM Act, and the Take Care Clause, at 3, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2144031 (noting that immigration laws are primarily enforced civilly).

[4] *See, e.g.*, Heckler v. Chaney, 470 U.S. 821, 831 (1985) ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'").

[5] *See, e.g.*, Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 MICH. L. REV. 152, 158 n.40 (1986).

[6] U.S. Dep't of Homeland Security, Press Release, Notice Regarding I-9 Documentation Requirements for Hiring Hurricane Victims, Sept. 6, 2005, *available at* http://v2011.nilc.org/disaster_assistance/FINAL_I-9_Press_Release.pdf.

[7] The Obama Administration has also cited prosecutorial discretion in abstaining from prosecutions for contempt of Congress and violations of the Controlled Substances Act relating to the possession of marijuana. *See* Letter from (continued...)

Morton, then Director of U.S. Customs and Immigration Enforcement (ICE), issued two memoranda addressing prosecutorial discretion, one of which identified ICE's priorities for the apprehension, detention, and removal of aliens,[8] and the other of which discussed how ICE personnel may exercise prosecutorial discretion consistent with ICE's enforcement priorities.[9] Subsequently, in June 2012, then Secretary of Homeland Security Janet Napolitano issued a memorandum "setting forth how, in the exercise of [its] prosecutorial discretion, the Department ... should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home."[10] As implemented, this initiative has come to be known as Deferred Action for Childhood Arrivals (DACA). Most recently, ICE has directed its personnel to exercise discretion in "ensur[ing] that the agency's immigration enforcement activities do not unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children."[11]

These initiatives have been challenged by some Members of Congress and commentators on the grounds that they are tantamount to "amnesty" for unauthorized aliens and are contrary to the President's constitutional responsibility to "take Care" that the laws be enforced.[12] In particular, some Members have suggested that DACA exceeds the President's authority because "it was issued after Congress specifically rejected legislation"—the Development, Relief, and Education for Alien Minors (DREAM) Act—"embodying that policy."[13] In addition, several ICE agents and the State of Mississippi filed suit in federal district court for the Northern District of Texas

---

(...continued)

James M. Cole, Deputy Attorney General, to John Boehner, Speaker of the House, June 28, 2012; Memorandum for Selected U.S. Attorneys from David W. Ogden, Deputy Attorney General, Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana, Oct. 19, 2009; CRS Legal Sidebar, *Obama Administration Will Not Challenge State Marijuana Laws That Do Not Undermine Federal Enforcement Priorities*, by Brian T. Yeh and Todd Garvey, *available at* http://www.crs.gov/LegalSidebar/details.aspx?ID=664&Source=search.

[8] John Morton, Director, ICE, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens, Mar. 2, 2011, at 1-2, *available at* http://www.ice.gov/doclib/news/releases/2011/ 110302washingtondc.pdf (aliens who have been convicted of crimes, are at least 16 years of age and participate in organized criminal gangs, are subject to outstanding criminal warrants, or "otherwise pose a serious risk to public safety" constituting the highest priorities for removal).

[9] John Morton, Director, ICE, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, June 17, 2011, *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf [hereinafter "2011 DHS Guidance"].

[10] Janet Napolitano, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, June 15, 2012, at 1, *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[11] U.S. ICE, Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities, No. 306-112-002b, Aug. 23, 2013, *available at* http://www.ice.gov/doclib/detention-reform/pdf/ parental_interest_directive_signed.pdf.

[12] *See, e.g.*, "Does Administrative Amnesty Harm Our Efforts to Gain and Maintain Operational Control of the Border?" Hearing Before the House Committee on Homeland Security, Subcommittee on Border and Maritime Security, Oct. 4, 2011; "U.S. Immigration and Customs Enforcement: Priorities and the Rule of Law," Hearing Before the House Committee on the Judiciary, Oct. 12, 2011.

[13] *See, e.g.*, Testimony of Senator Michael S. Lee Before the House Committee on the Judiciary, "The Obama Administration's Abuse of Power," Sept. 12, 2012, at 5, *available at* http://judiciary.house.gov/hearings/ Hearings%202012/Lee%2009122012.pdf; The Obama Administration, the DREAM Act, and the Take Care Clause, *supra* note 3, at 5 (noting that the DREAM Act, "in one form or other, has been before Congress since 2001").

alleging that the DACA initiative violates certain statutory requirements and impinges upon Congress's legislative powers, among other things.[14]

This report begins by discussing the sources of federal power to regulate immigration and, particularly, the allocation of power between Congress and the President in this area. It next addresses the constitutional and other foundations for the doctrine of prosecutorial discretion, as well as the potential ways in which prosecutorial discretion may be exercised in the immigration context. It concludes by addressing potential constitutional, statutory, and administrative constraints upon the exercise of prosecutorial discretion. The report does not address other aspects of discretion in immigration law, such as the discretion exercised by immigration officers in granting benefits (e.g., asylum), or by immigration judges in non-enforcement contexts (e.g., cancellation of removal).[15]

# Federal Power to Regulate Immigration

The Constitution does not directly address the sources of federal power to regulate which non-U.S. nationals (aliens) may enter and remain in the United States, or to establish the conditions of their continued presence within the country. However, several of the enumerated powers of the federal government have been construed as authorizing such regulation. The powers to establish a uniform rule of naturalization and regulate commerce are arguably the most commonly cited provisions, particularly in recent years.[16] Various authorities related to foreign affairs have also been routinely cited as providing support for particular enactments and activities in the field of immigration.[17] In addition, in some cases, the Supreme Court has suggested that federal

---

[14] *See Crane*, Amended Complaint, *supra* note 3. For further discussion of this litigation, see *infra* notes 119-120 and accompanying text. Two other suits challenging DACA were dismissed because the plaintiffs lacked standing. *See* Peterson v. President of the United States, No. 1:2012cv00257, Order Granting Motion to Dismiss (D.N.H., Oct. 22, 2012); Dutkiewicz v. Napolitano, No. 8:2012cv01447, Order Granting Motion to Dismiss (M.D. Fla., Nov. 9, 2012).

[15] *See, e.g.*, Restrepo v. Holder, 676 F.3d 10 (1st Cir. 2012) (cancellation of removal pursuant to 8 U.S.C. §1229b(a) is solely within the Attorney General's discretion absent a colorable constitutional claim or a question of law); Bo Cooper, General Counsel, INS, INS Exercise of Prosecutorial Discretion, July 11, 2000, at 4, *available at* http://niwaplibrary.wcl.american.edu/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/Bo-Cooper-memo%20pros%20discretion7.11.2000.pdf ("The doctrine of prosecutorial discretion applies to enforcement decisions, not benefit decisions. For example, a decision to charge, or not to charge, an alien with a ground of deportability is clearly a prosecutorial enforcement decision. By contrast, the grant of an immigration benefit, such as naturalization or adjustment of status, is a benefit decision that is not a subject for prosecutorial discretion.").

[16] *See, e.g.*, Nat'l Fed'n of Indep. Bus. v. Sebelius,—U.S.—, 132 S. Ct. 2566, 2600 (2012) (describing regulation of immigration as among Congress's powers under the Commerce Clause); Arizona v. United States,—U.S.—132 S. Ct. 2492, 2498 (2012) (authority to regulate immigration resting, in part, on the power to establish a uniform rule of naturalization); Henderson v. Mayor of New York, 92 U.S. 259 (1876) (striking down New York and Louisiana laws that required shipmasters to pay fees or post bonds to indemnify states if immigrants ended up on public assistance on the grounds that the laws interfered with Congress's power to regulate interstate commerce); Chy Lung v. Freeman, 92 U.S. 275 (1875) (striking down a California law regulating the entry of "lewd and debauched women" on the grounds that it interfered with Congress's power to regulate the admission of noncitizens); *The Passenger Cases*, 48 U.S. 283 (1849) (striking down New York and Massachusetts laws that levied fees on arriving immigrant passengers, in part, on the grounds that such fees constituted unconstitutional regulations of foreign commerce).

[17] *See, e.g.*, *The Chinese Exclusion Case*, 130 U.S. 581, 604 (1889) (listing the powers to "declare war, make treaties, suppress insurrection, repel invasion, regulate foreign commerce, secure republican governments to the States, and admit subjects of other nations to citizenship" as authorizing Congress to enact legislation excluding Chinese laborers); Fong Yue Ting v. United States, 149 U.S. 698, 705-09 (1893) (relying on the same sources to affirm Congress's power to deport noncitizens). *See also Arizona*, 132 S. Ct. at 2514 (Scalia, J., dissenting) (citing the Migration or Importation (continued...)

regulation of immigration is grounded in the federal government's "inherent power as a sovereign to control and conduct foreign relations."[18]

Many, although not all, of these powers belong exclusively to Congress,[19] and courts and commentators have sometimes used language which implies that Congress is preeminent in the field of immigration. For example, it has frequently been said that Congress has "plenary power" over immigration,[20] and that "over no conceivable subject is the legislative power of Congress more complete than it is over" immigration.[21] In some cases, courts have even suggested that the executive branch's authority over immigration arises from a delegation of congressional power, as is the case with other Article I powers, although Article I does not give Congress clear supremacy over immigration, as previously noted.[22] In *Sale v. Haitian Centers Council, Inc.*, for example, the Supreme Court rejected a challenge which alleged that the executive branch's procedures for screening Haitian migrants at sea, without allowing them to disembark in the United States, did not comply with statutory and treaty-based protections that enable aliens to apply for refugee status and avoid repatriation.[23] The Court did so, in part, on the grounds that "[t]he laws that the Coast Guard is engaged in enforcing when it takes to the seas under orders to prevent aliens from illegally crossing our borders are laws whose administration has been assigned to the Attorney General by Congress."[24] Similarly, in other cases, the Court has described Congress's power to exclude aliens from the United States, or prescribe the terms and conditions upon which they may enter, as being "enforced exclusively through executive officers,"[25] or opined that executive branch officials "exercise[] delegated legislative power" in taking specific actions.[26]

---

(...continued)

Clause as a source of federal power over immigration). This clause, which pertains directly to slavery, can be seen as addressing federal power to control the entry of certain persons into the United States.

[18] *Arizona*, 132 S. Ct. at 2498; Nishimura Ekiu v. United States, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.").

[19] In particular, the Constitution grants the treaty power to the President. *See* U.S. Const., art. II, §2 ("[The President] shall have [the] Power, by and with the Advice and Consent of the Senate to make Treaties ...").

[20] *See, e.g.*, Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 201 (1993) ("Congress ... has plenary power over immigration matters."); INS v. Chadha, 462 U.S. 919, 940-41 (1983) ("The plenary authority of Congress over aliens under Art. I, §8, cl. 4, is not open to question."); Boutilier v. INS, 387 U.S. 118, 123 (1967) ("The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens.'").

[21] Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909). This passage has been quoted in numerous other cases. *See, e.g.*, Reno v. Flores, 507 U.S. 292, 305 (1993); Fiallo v. Bell, 430 U.S. 787, 792 (1977); Kleindienst v. Mandel, 408 U.S. 753, 766 (1972); Hana v. Gonzales, 503 F.3d 39, 43 (1st Cir. 2007).

[22] Some commentators have suggested that the language in these cases may have been partially motivated by a desire to enforce a more robust conception of the nondelegation doctrine. *See, e.g.*, Adam B. Cox and Cristina M. Rodriguez, *The President and Immigration Law*, 119 YALE L.J. 458, 474 n.46 (2009).

[23] 509 U.S. 155 (1993).

[24] *Id*. at 201.

[25] Lem Moon Sing v. United States, 158 U.S. 538, 547 (1895) (finding that the Act of 1894, which declared that the decisions of the appropriate immigration or custom officers regarding the right of aliens to enter this country are generally final, took away the court's authority to review such decisions). *See also* Galvan v. Press, 347 U.S. 522, 531 (1954) ("In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissue of our body politic as any aspect of our government.").

[26] Mahler v. Eby, 264 U.S. 32, 43-45 (1924) (finding that certain deportation orders issued by the Secretary of Labor were void because the orders did not indicate that the Secretary had made certain findings required by statute). *See also Kleindienst*, 408 U.S. at 769 ("[W]e think the Attorney General validly exercised the plenary power that Congress (continued...)

Few courts or commentators have, however, directly addressed the separation of powers between Congress and the President in the field of immigration,[27] and in some cases, the Court has also suggested that the executive branch shares plenary power over immigration with Congress as one of the "political branches."[28] While some such cases could potentially be construed as referring to powers delegated to the executive branch by Congress, in other cases, the President has been expressly said to have inherent authority over at least some immigration-related matters. For example, in *United States ex rel. Knauff v. Shaughnessy*, the Court upheld the executive branch's decision to exclude a German "war bride," in part, on the grounds that

> The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.... When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.[29]

Similarly, in *Hampton v. Mow Sung Wong*, the Court indicated that certain rules adopted by the U.S. Civil Service Commission barring resident aliens from employment in the federal civil service impermissibly deprived these aliens of due process of law, but that such rules would be

---

(...continued)

delegated to the Executive by [certain provisions of the INA]."); Ng Fung Ho v. White, 259 U.S. 276, 280 (1922) ("Congress has power to order at any time the deportation of aliens whose presence in the country it deems hurtful; and may do so by appropriate executive proceedings."); *The Japanese Immigrant Case*, 189 U.S. 86, 98 (1903) ("As to [aliens outside the United States], the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law."); *Nishimura Ekiu*, 142 U.S. at 659 ("The supervision of the admission of aliens into the United States may be entrusted by Congress either to the Department of State, having the general management of foreign relations, or to the Department of the Treasury, charged with the enforcement of the laws regulating foreign commerce; and Congress has often passed acts forbidding the immigration of particular classes of foreigners, and has committed the execution of these acts to the Secretary of the Treasury, to collectors of customs and to inspectors acting under their authority.").

[27] *Cf. The President and Immigration Law*, *supra* note 22, at 510 ("[M]odern courts and commentators have largely ignored the question of power allocation between the President and Congress."); The Obama Administration, the DREAM Act, and the Take Care Clause, *supra* note 3, at 3 (noting that the Constitution does not explicitly allocate authority over immigration among the political branches). Only in the case of *INS v. Chadha* did the Supreme Court confront a separation of powers question touching upon immigration. 462 U.S. 919 (1983). At issue in *Chadha* was the permissibility of a statutory provision which authorized either house of Congress, by resolution, to invalidate the executive branch's determination to suspend deportation and adjust the status of aliens whose deportation would result in "extreme hardship" to the alien or the alien's family. The Court struck the statute down on separation of powers grounds, finding that it violated the constitutional requirement that legislative acts be passed by both houses of Congress and presented for the President's approval. In reaching this conclusion, the Court noted both Congress's "plenary authority" over aliens, and that the "Attorney General acts in his presumptively Article II capacity when he administers the [INA]." *Id.* at 940, 953 n.16. It is unclear, however, whether the reference to the Attorney General's "Article II capacity" means prosecutorial discretion under the Take Care Clause, or some other authority of the executive.

[28] *See, e.g.*, United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."); Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("[T]he relationship between the U.S. and our alien visitors has been committed to the political branches of the federal government. Since decisions in these matters may implicate our relations with foreign powers ... such decisions are frequently of a character more appropriate to either the Legislature or the Executive branches than to the Judiciary."); *The Chinese Exclusion Case*, 130 U.S. 581, 607-09 (1889) (rejecting the alien's assertion that the federal government lacked the power to regulate immigration, in part, because the "political department" of the United States had the responsibility for determining "who shall compose [society's] members").

[29] 338 U.S. 537, 542 (1950).

permissible if they "were expressly mandated by the Congress or the President."[30] Here, Congress had delegated authority to the President to prescribe regulations for the admission of individuals to the civil service. Accordingly, it is possible that when the *Hampton* Court referred to the President's power to limit alien eligibility for federal employment, it intended to refer only to the power which had been conferred to him by Congress. On the other hand, the Court's discussion of the interests of the President that might be sufficient to justify the exclusion of noncitizens from the civil service focused upon the President's power to negotiate treaties, suggesting recognition of some independent constitutional basis for executive branch activity in the field of immigration.[31]

The possibility of independent executive branch authority over immigration is significant in that any such authority could potentially help justify certain actions taken by the executive branch (although actions taken in reliance on such authority could also potentially raise issues if they were arguably within Congress's purview).[32] However, the executive branch's authority to exercise prosecutorial or enforcement discretion has traditionally been understood to arise from the Constitution,[33] as discussed below.

Courts have historically not required that the executive branch have specific statutory authorization for particular exercises of prosecutorial discretion. Thus, immigration officials would not necessarily be precluded from granting deferred action, or taking certain other actions that could permit otherwise removable aliens to remain in the United States, just because federal immigration statutes do not expressly authorize such actions.[34] On the other hand, Section

---

[30] 426 U.S. 88, 103 (1976). Following the Court's decision, President Ford issued an executive order reestablishing these employment restrictions. Exec. Order No. 11, 935, 41 Fed. Reg. 37301 (Sept. 2, 1976). When challenged, this order was found to be within the President's authority. Vergara v. Hampton, 581 F.2d 1281 (7th Cir. 1978). However, in so finding, the reviewing court emphasized the President's statutory authority under 5 U.S.C. §3301(1), not any inherent authority over immigration or aliens.

[31] *Hampton*, 426 U.S. at 104 ("In this case the petitioners have identified several interests which the Congress or the President might deem sufficient to justify the exclusion of noncitizens from the federal service. They argue, for example, that the broad exclusion may facilitate the President's negotiation of treaties with foreign powers by enabling him to offer employment opportunities to citizens of a given foreign country in exchange for reciprocal concessions.").

[32] Any assertion of inherent, independent, or implied constitutional presidential authority in the field of immigration may be evaluated under the rubric established by Justice Jackson's concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). The *Youngstown* framework, which the Court has characterized as bringing "together as much combination of analysis and common sense as there is in this area," has generally been applied when a President seeks to take action within an area generally considered to be within Congress's purview. *See, e.g.*, Dames & Moore v. Regan, 453 U.S. 654, 661-62 (1981). Importantly, the scope of executive authority under the Jackson analysis is judged in direct relation to congressional action in the field. When the President acts pursuant to an authorization from Congress, his power is "at its maximum." To the contrary, when the President seeks to take action that conflicts with Congress's expressed will, his power is at its "lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Where Congress is silent, "there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Youngstown*, 343 U.S. at 635-37. Any claimed constitutional authority justifying executive action in the field of immigration would, therefore, likely be evaluated in relation to the policies established by Congress in the INA and other pertinent statutes.

[33] *See, e.g.*, United States v. Armstrong, 517 U.S. 456, 464 (1996) (noting that the Attorney General and the United States Attorneys have wide latitude in enforcing federal criminal law because "they are designated by statute as the President's delegates to help him discharge his constitutional duty to 'take Care that the Laws be faithfully executed'"); *Heckler*, 470 U.S. at 831 ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'").

[34] An argument could also potentially be made that Congress has impliedly delegated the authority to exercise certain (continued...)

103(a)(3) of the INA authorizes the Secretary of Homeland Security to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," and has been construed by some as "commit[ting] enforcement of the INA to [the Secretary's] discretion."[35] The federal government recently noted its discretion under Section 103(a)(3) in seeking dismissal of a lawsuit challenging the DACA initiative.[36] The Secretary's authority under Section 103(a)(3) of the INA is, however, an authority granted to the executive branch by Congress and, as such, is distinguishable from the President's constitutional authority to "take Care" that the laws be enforced. Congress could, for example, potentially limit the discretion granted to the Secretary by Section 103(a)(3) of the INA, including by prohibiting particular exercises of discretion. In contrast, Congress probably could not directly limit the President's authority under the Constitution to "take Care" that the laws be enforced.

The INA also grants the Secretary other types of discretion which are sometimes mentioned in connection with exercises of prosecutorial or enforcement discretion, but do not themselves involve determinations regarding when, whom, how, and even whether to prosecute apparent violations of the law. In some cases, the INA expressly provides that certain determinations are within the discretion of immigration officials, such as the determination to waive the bar upon admissibility for alien spouses or children of U.S. citizens or lawful permanent residents (LPRs) who have been present in the United States without authorization for more than 180 days.[37] In other cases, the INA does not expressly mention the discretion of executive branch officials, but effectively affords them such discretion by leaving certain details of the statutory scheme to be implemented by the executive branch. Thus, the INA affords the Secretary discretion to determine which aliens are granted employment authorization by prohibiting the employment of unauthorized aliens, and defining "unauthorized alien," in part, as an alien who has not been "authorized to be ... employed by the [Secretary]."[38] Because it is conferred by Congress, this discretion, like the Secretary's discretion under Section 103(a)(3), could also be limited by Congress.

---

(...continued)

types of discretion to the executive branch since it has been aware of the practice, and could be said to have acquiesced. *See, e.g.,* Johns v. Dep't of Justice, 653 F.2d 884, 890 (5th Cir. 1981) ("Deportation is not, however, the inevitable consequence of unauthorized presence in the United States. The Attorney General is given discretion by express statutory provisions, in some situations, to ameliorate the rigidity of the deportation laws. In other instances, as the result of implied authority, he exercises discretion nowhere granted expressly.").

[35] Texas v. United States, 106 F.3d 661, 667 (5th Cir. 1997) (rejecting allegations that the Attorney General had breached his nondiscretionary duty under the INA to control immigration, in part, on the grounds that enforcement of the INA is committed to the Attorney General's discretion). *See also* Hotel & Rest. Employees Union Local 25 v. Smith, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (citing Section 103(a)(3) to support the proposition that the then-Attorney General enjoyed "broad latitude in enforcing the immigration laws," and that the decision to grant or withhold extended voluntary departure "falls within this broad mandate"), *aff'g*, 563 F. Supp. 157 (D.D.C. 1983).

[36] Crane v. Napolitano, No. 3:12-CV-3247-O, Defendants' Motion to Dismiss and Memorandum in Support (filed N.D. Tex., Nov. 13, 2012). The INS had previously expressed the view that Section 242(g) of the INA meant that it had discretion not to pursue removal against an alien because such decisions are not judicially reviewable. *See* INS Exercise of Prosecutorial Discretion, *supra* note 15, at 9. However, DHS does not appear to rely upon this argument at present.

[37] INA §212(a)(9)(B); 8 U.S.C. §1182(a)(9)(B). Any such waivers may only be granted where certain conditions are met (e.g., the refusal of admission to the alien would result in "extreme hardship" to his or her citizen or LPR relatives).

[38] INA §274a(h)(3); 8 U.S.C. §1324a(h)(3).

# Prosecutorial Discretion Generally

The judicial branch has traditionally accorded federal prosecutors "broad" latitude in making a range of investigatory and prosecutorial determinations, including when, whom, and whether to prosecute particular violations of federal law.[39] This doctrine of "prosecutorial discretion" has a long historical pedigree—the early roots of which can be traced at least to a Sixteenth Century English common law procedural mechanism known as the *nolle prosequi*.[40] In the early English legal system, criminal prosecutions were generally initiated by private individuals rather than public prosecutors. The *nolle prosequi*, however, allowed the government, generally at the direction of the Crown, to intervene in and terminate a privately initiated criminal action it viewed as "frivolous or in contravention of royal interests."[41] The discretionary device was later adopted into American common law and has been used by prosecutors to terminate criminal prosecutions that are determined to be unwarranted or which the prosecuting authority chooses not to pursue.[42]

Notwithstanding this historical background, the modern doctrine of prosecutorial discretion derives more from our constitutional structure than English common law. However, the exact justification for the doctrine does not appear to have been explicitly established. Generally, courts have characterized prosecutorial discretion as a function of some mixture of the separation of powers, the Take Care Clause,[43] or the duties of a prosecutor as an appointee of the President.[44] Moreover, both federal and state courts have ruled that the exercise of prosecutorial discretion is

---

[39] *See, e.g.*, Wayte v. United States, 470 U.S. 598, 607 (1985) ("In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute.") (citing *United States v. Goodwin*, 457 U.S. 368, 380 (1982)); United States v. Nixon, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case…") (citing the *Confiscation Cases*, 74 U.S. 454 (1869)).

[40] *See, e.g.*, Rebecca Krauss, *The Theory of Prosecutorial Discretion in Federal Law: Origins and Development*, 6 SETON HALL CIR. REV. 1, 19-26 (2009) (describing the English use of the *nolle prosequi* and its "absorb[tion]" by American law).

[41] *Id.* at 20.

[42] *See, e.g., Confiscation Cases*, 74 U.S. 454 (1869); Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967) ("Most recently, the issue of the United States Attorney's 'discretionary control of criminal prosecutions has arisen in connection with the filing of a *nolle prosequi*, and the Courts have regularly refused to interfere with these voluntary dismissals of prosecution.'") (citing Louis B. Schwartz, *Federal Criminal Jurisdiction and Prosecutors' Discretion*, 13 LAW & CONTEMP. PROB. 64, 83 (1948)). Today, judicial approval is generally required before a prosecutor may dismiss an ongoing prosecution. *See* FED. R. CRIM. P. 48(a) ("The government may, with leave of court, dismiss an indictment, information, or complaint.").

[43] U.S. Const. Art. II, §3 ("[H]e shall take Care that the Laws be faithfully executed.... ").

[44] *See, e.g., Armstrong*, 517 U.S. at 464 ("They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"); *Confiscation Cases*, 74 U.S. at 458 ("Appointed, as the Attorney General is, in pursuance of an act of Congress, to prosecute and conduct such suits, argument would seem to be unnecessary to prove his authority to dispose of these cases in the manner proposed.... "); Ponzi v. Fessenden, 258 U.S. 254, 262 (1922) ("The Attorney General is the head of the Department of Justice. He is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings and in the prosecution of offences be faithfully executed."); United States v. Cox, 342 F.2d 167, 171 (5th Cir. 1965) ("The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceedings and in the prosecution of offenses, be faithfully executed. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.") (internal citations omitted)).

an executive function necessary to the proper administration of justice. Given these precedents, prosecutorial discretion may be appropriately characterized as a constitutionally based doctrine.

Regardless of its precise textual source, courts generally will neither review nor question discretionary prosecutorial decisions, nor "coerce" the executive branch to initiate a particular prosecution. In acknowledging the discretion possessed by enforcement officials, courts have recognized that the "decision to prosecute is particularly ill-suited to judicial review," as it involves the consideration of factors—such as the strength of evidence, deterrence value, and existing enforcement priorities—"not readily susceptible to the kind of analysis the courts are competent to undertake."[45] Moreover, the executive branch has asserted that "because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has *exclusive* authority to initiate and prosecute actions to enforce the laws adopted by Congress."[46]

An agency decision to initiate an enforcement action in the *administrative* context "shares to some extent the characteristics of the decision of a prosecutor in the executive branch" to initiate a prosecution in the *criminal* context.[47] Thus, just as courts are hesitant to question a prosecutor's decisions with respect to whether to bring a criminal prosecution, so too are courts cautious in reviewing an agency's decision not to bring an enforcement action. In the seminal case of *Heckler v. Cheney*, the Supreme Court held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[48] The Court noted that agency enforcement decisions, like prosecution decisions, involve a "complicated balancing" of agency interests and resources—a balancing that the agency is "better equipped" to evaluate than the courts.[49] The *Heckler* opinion proceeded to establish the standard for the reviewability of agency non-enforcement decisions, holding that an "agency's decision not to take enforcement action should be presumed immune from judicial

---

[45] *Wayte*, 470 U.S. at 607. However, the U.S. Court of Appeals for the District of Columbia Circuit has observed that "the decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness." Med. Comm. for Human Rights v. SEC, 432 F.2d 659, 673 (D.C. Cir. 1970).

[46] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. Off. Legal Counsel 101, 114 (1984) (emphasis added). This traditional conception may, however, have been qualified in some respects following the Supreme Court's decision in *Morrison v. Olson*, in which the Court upheld a congressional delegation of prosecutorial power to an "independent counsel" under the Ethics in Government Act. In sustaining the validity of the statute's appointment and removal conditions, the Court suggested that although the independent counsel's prosecutorial powers—including the "no small amount of discretion and judgment [exercised by the counsel] in deciding how to carry out his or her duties under the Act"—were executive in that they had "typically" been performed by executive branch officials, the court did not consider such an exercise of prosecutorial power to be "so central to the functioning of the Executive Branch" as to require Presidential control over the independent counsel. 487 U.S. 654 (1988). While the ultimate reach of *Morrison* may be narrow in that the independent counsel was granted only limited jurisdiction and was still subject to the supervision of the Attorney General, it does appear that Congress may vest certain prosecutorial powers, including the exercise of prosecutorial discretion, in an executive branch official who is independent of traditional presidential controls. *But see Nixon*, 418 U.S. at 693 ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.... ").

[47] *Heckler*, 470 U.S. at 832. The Court also expressed concern that judicial review of agencies' exercise of prosecutorial discretion could impose "systemic costs" by delaying criminal proceedings, chilling law enforcement, and undermining prosecutorial effectiveness. *Id.* at 833.

[48] *Id.* at 831. Accordingly, such decisions are generally precluded from judicial review under the Administrative Procedure Act (APA). 5 U.S.C. §701 (establishing an exception to the APA's presumption of reviewability where "agency action is committed to agency discretion by law").

[49] *Heckler*, 470 U.S. at 831.

review."[50] However, the Court indicated that, in certain cases, that presumption may be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers,"[51] as is discussed below.

# Prosecutorial Discretion in the Immigration Context

In *Reno v. American-Arab Anti-Discrimination Committee*, a majority of the Supreme Court found that the various prudential concerns that prompt deference to the executive branch's determinations as to whether to prosecute criminal offenses are "greatly magnified in the deportation context,"[52] which entails civil (rather than criminal) proceedings.[53] While the reasons cited by the Court for greater deference to exercises of prosecutorial discretion in the immigration context than in other contexts reflect the facts of the case, which arose when certain removable aliens challenged the government's decision *not* to exercise prosecutorial discretion in their favor,[54] the Court's language is broad and arguably can be construed to encompass decisions to favorably exercise such discretion. More recently, in its decision in *Arizona v. United States*, a majority of the Court arguably similarly affirmed the authority of the executive branch not to seek the removal of certain aliens, noting that "[a] principal feature of the removal system is the broad discretion entrusted to immigration officials," and that "[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."[55] According to the majority, such exercises of prosecutorial discretion may reflect "immediate human concerns" and the "equities of … individual case[s]," such as whether the alien has children born in the United States or ties to the community, as well as "policy choices that bear on … international relations."[56]

---

[50] *Id.* at 832.

[51] *Id.* at 833.

[52] 525 U.S. 471, 490 (1999). *See also Shaughnessy*, 338 U.S. at 543 (noting that immigration is a "field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program").

[53] *See, e.g.*, Padilla v. Kentucky,—U.S.—, 130 S. Ct. 1473, 1481 (2010) ("We have long recognized that deportation is a particularly severe 'penalty,' but it is not, in a strict sense, a criminal sanction.") (internal citations omitted); INS v. Lopez-Mendoza, 468 U.S. 1032, 1038-39 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry.... The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws.").

[54] Specifically, the Court noted that any delays in criminal proceedings caused by judicial review of exercises of prosecutorial discretion would "merely … postpone the criminal's receipt of his just desserts," while delays in removal proceedings would "permit and prolong a continuing violation of United States law," and could potentially permit the alien to acquire a basis for changing his or her status. *Reno*, 525 U.S. at 490. The Court further noted that immigration proceedings are unique in that they can implicate foreign policy objectives and foreign-intelligence techniques that are generally not implicated in criminal proceedings. *Id.* at 491. It also found that the interest in avoiding selective or otherwise improper prosecution in immigration proceedings, discussed below, is "less compelling" than in criminal proceedings because deportation is not a punishment and may be "necessary to bring to an end *an ongoing violation* of United States law." *Id.* (emphasis in original).

[55] *Arizona*, 132 S. Ct. at 2498. Justice Scalia's dissenting opinion, in contrast, specifically cited Secretary Napolitano's memorandum regarding the exercise of prosecutorial discretion with respect to certain aliens who came to the United States as children when asserting that "there is no reason why the Federal Executive's need to allocate *its* scarce enforcement resources should disable Arizona from devoting *its* resources to illegal immigration in Arizona that in its view the Federal Executive has given short shrift." *Id.* at 2520 (Scalia, J., dissenting) (emphasis in original)).

[56] *Arizona*, 132 S. Ct. at 2499.

Going beyond such general affirmations of the executive branch's prosecutorial discretion in the immigration context, other cases have specifically noted that certain decisions are within the prosecutorial discretion of INS and, later, the immigration components of DHS. These decisions include

- whether to parole an alien into the United States;[57]

- whether to commence removal proceedings and what charges to lodge against the respondent;[58]

- whether to pursue formal removal proceedings;[59]

- whether to cancel a Notice to Appear or other charging document before jurisdiction vests with an immigration judge;[60]

- whether to grant deferred action or extended voluntary departure;[61]

- whether to appeal an immigration judge's decision or order, and whether to file a motion to reopen;[62]

- whether to invoke an automatic stay during the pendency of an appeal;[63] and

- whether to impose a fine for particular offenses.[64]

As used here, *deferred action* is "generally an act of prosecutorial discretion to suspend [taking action] against a particular individual or group of individuals for a specific timeframe; it cannot resolve an individual's underlying immigration status."[65] It is generally granted on a case-by-case

---

[57] Assa'ad v. U.S. Attorney General, 332 F.3d 1321, 1339 (11th Cir. 2003); *Matter of Artigas*, 23 I. & N. Dec. 99 (BIA 2001) (Filppu, J., dissenting). DHS grants an alien parole when it permits the alien to physically enter the United States and to remain as a matter of sufferance only, and without having made an "entry," for "urgent humanitarian reasons or significant public benefit." INA §212(d)(5)(A); 8 U.S.C. §1182(d)(5)(A).

[58] Hanggi v. Holder, 563 F.3d 378, 383 (8th Cir. 2009); Rodrigues v. Attorney General of the United States, 414 Fed. App'x 484, 488 (3d Cir. 2011); Matter *of Avetisyan*, 25 I. & N. Dec. 688 (BIA 2012); *Matter of Bahta*, 22 I. & N. Dec. 1381 (BIA 2000); *Matter of Singh*, 21 I. & N. Dec. 427 (BIA 1996); *Matter of Ruis*, 18 I. & N. Dec. 320 (BIA 1982); *Matter of Roussis*, 18 I. & N. Dec. 256 (BIA 1982); *Matter of Lennon*, 15 I. & N. Dec. 9 (BIA 1974).

[59] *Matter of Lujan-Quintana*, 25 I. & N. Dec. 53 (BIA 2009). *But see* Flores-Ledezma v. Gonzales, 415 F.3d 375, 382 (5th Cir. 2005) ("Although we decline at this juncture to equate the Attorney General's discretion to choose which proceeding a non-LPR will receive with prosecutorial discretion, it is fully convincing that the Government has highlighted a rational basis for the Attorney General's exercise of such discretion."). Section 240 of the INA provides for formal removal proceedings. However, "expedited removal," without formal proceedings, is also possible in the case of certain aliens seeking admission to the United States. INA §235(b); 8 U.S.C. §1225(b).

[60] *Matter of G-N-C*, 22 I. & N. Dec. 281 (BIA 1998). *See also* Akhtar v. Gonzales, 450 F.3d 587, 591 (5th Cir. 2006) (whether to terminate removal proceedings to allow the alien to apply for immigration benefits that may potentially be available).

[61] *Hotel & Rest. Employees Union Local 25*, 846 F.2d at 1510-11; Barahona-Gomez v. Reno, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001); Johnson v. INS, 962 F.2d 574, 579 (7th Cir. 1992); Carmona Martinez v. Ashcroft, 118 Fed. App'x 238, 239 (9th Cir. 2004); *Matter of Yauri*, 25 I. & N. Dec. 103 (BIA 2009); *Matter of Singh*, 21 I. & N. Dec. 427 (BIA 1996); *Matter of Luviano-Rodriguez*, 21 I. & N. Dec. 235 (BIA 1996); *Matter of Quintero*, 18 I. & N. Dec. 348 (BIA 1982).

[62] *Matter of Avetisyan*, 25 I. & N. Dec. 688 (BIA 2012); *Matter of York*, 22 I. & N. Dec. 660 (BIA 1999); *Matter of Joseph*, 22 I. & N. Dec. 660 (BIA 1990).

[63] *Matter of Joseph*, 22 I. & N. Dec. 660 (BIA 1999).

[64] *Matter of M/V Saru Meru*, 20 I. & N. Dec. 592 (BIA 1992); *Matter of M/V Solemn Judge*, 18 I. & N. Dec. 186 (BIA 1982).

[65] Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243, 263 (2010) (quoting a 2009 DHS press release on relief for widows of U.S. citizens). Individual aliens may request that (continued...)

basis, although the executive branch has sometimes provided that individuals who share certain characteristics (e.g., advanced or young age) are to be given particular consideration for deferred action.[66] In contrast, *extended voluntary departure*—sometimes also referred to as *deferred departure* or *deferred enforced departure*—generally involves "blanket relief" from removal to particular countries.[67]

Many of the actions that judicial and administrative tribunals have noted are within the prosecutorial discretion of immigration officers have also been mentioned in INS and, later, DHS, guidance regarding the exercise of prosecutorial discretion. Memoranda or other documents providing such guidance have been issued intermittently since at least 1976, and have suggested that officers may generally exercise discretion in

- deciding whether to issue or cancel a notice of detainer;
- deciding whether to issue, reissue, serve, file, or cancel a Notice to Appear;
- focusing administrative resources on particular violations or conduct;
- deciding whom to stop, question, or arrest for a violation;
- deciding whether to detain aliens who are not subject to "mandatory detention" pending removal, or whether to release them on bond, supervision, personal recognizance, or other conditions;
- seeking expedited removal or removal by means other than formal proceedings in immigration court;
- settling or dismissing a proceeding;
- granting deferred action or parole;
- staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings, or joining in a motion to grant relief or a benefit.[68]

---

(...continued)

they be granted deferred action (formerly known as non-priority status), or immigration officials may decide, *sua sponte*, to defer action.

[66] *See, e.g.*, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, *supra* note 10; John Morton, Director, ICE, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs, June 17, 2011, *available at* http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf; Prosecutorial and Custody Detention, *supra* note 2.

[67] *See, e.g.*, *Extended Voluntary Departure*, *supra* note 5, at 155-59.

[68] *See, e.g.*, 2011 DHS Guidance, *supra* note 9, at 2-3; Civil Immigration Enforcement, *supra* note 8, at 3; Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs, *supra* note 66, at 2; William J. Howard, Principal Legal Advisor, ICE, Prosecutorial Discretion, Oct. 24, 2005, at 2, *available at* http://niwaplibrary.wcl.american.edu/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/22092975-ICE-Guidance-Memo-Prosecutorial-Discretion-William-J-Howard-10-24-05.pdf; 2002 INS Guidance, *supra* note 2.

Often, this executive branch guidance has highlighted resource constraints,[69] as well as humanitarian considerations,[70] that may warrant a favorable exercise of prosecutorial discretion, although such guidance has generally also indicated that determinations as to whether to exercise discretion in particular cases are to be based on the "totality of the circumstances"[71] and whether a "substantial federal interest" is present.[72] The guidance may also suggest when in the process such discretion is to be exercised (generally as early in the process as possible, so as to avoid wasting government resources),[73] as well as which officers may exercise particular forms of discretion.[74] While personnel are generally instructed that they should "always consider prosecutorial discretion on a case-by-case basis,"[75] classes of individuals warranting consideration for favorable—or unfavorable—exercises of discretion have sometimes been identified (e.g., minors and elderly individuals, known gang members).[76]

# Potential Limits on the Exercise of Discretion

While prosecutorial discretion is broad, it is not "unfettered,"[77] and particular exercises of discretion could potentially be checked by the Constitution, statute, or agency directives.[78] In practice, however, persons who are neither aliens nor otherwise subject to the requirements of the INA could lack standing to challenge alleged abuses of prosecutorial discretion in the immigration context. Standing is generally limited to persons who allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."[79] Those whose sole injury is the government's alleged failure to follow the law

---

[69] *See, e.g.*, Applicability of Prosecutorial Discretion Memoranda to Certain Family Relationships, *supra* note 11 ("This and other memoranda related to prosecutorial discretion are designed to ensure that agency resources are focused on our enforcement priorities, including individuals who pose a threat to public safety, are recent border crossers, or repeatedly violate our immigration laws."); Civil Immigration Enforcement, *supra* note 8, at 1 ("ICE ... only has resources to remove approximately 400,000 aliens per year, less than 4 percent of the estimated illegal alien population of the United States."); Prosecutorial Discretion, *supra* note 68 (noting demands created by the establishment of DHS and the increasing number of immigration cases being litigated in federal courts).

[70] *See, e.g.*, 2011 DHS Guidance, *supra* note 9, at 4 (noting that factors to consider include the alien's length of presence in the United States; the circumstances of the alien's arrival in the United States; the alien's pursuit of education in the United States; the alien's ties and contributions to the community; whether the alien or the alien's spouse is pregnant or nursing, or suffers from a severe mental or physical illness; and conditions in the alien's home country); Prosecutorial Discretion, *supra* note 68 (aliens who are immediate relatives of members of the U.S. military; aliens who have citizen children with serious medical conditions or disabilities; aliens who are undergoing treatment for a potentially life-threatening illness).

[71] *See, e.g.*, 2011 DHS Guidance, *supra* note 9, at 2.

[72] *See, e.g.*, 2002 INS Guidance, *supra* note 2, at 4.

[73] *See, e.g.*, *id*. at 6.

[74] *See, e.g.*, 2011 DHS Guidance, *supra* note 9, at 3. One particular area where such policies have shifted over time is whether immigration attorneys have the authority to cancel Notices to Appear issued by immigration officers.

[75] 2011 DHS Guidance, *supra* note 9, at 4. *See also* Civil Immigration Enforcement, *supra* note 8, at 4.

[76] 2011 DHS Guidance, *supra* note 9, at 5; Prosecutorial and Custody Detention, *supra* note 2; 2002 INS Guidance, *supra* note 2, at 11.

[77] United States v. Batchelder, 442 U.S. 114, 125 (1979).

[78] *See, e.g.*, Nader v. Saxbe, 497 F.2d 676, 679 (D.C. Cir. 1974) ("It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review.").

[79] DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The requirements as to injury, causation, and redressibility refer to Article III standing. Some courts have also found that (continued...)

will generally be found to lack standing because this injury is not personal and particularized.[80] Even government officers and employees, who have taken an oath to uphold the law, will generally be found to lack standing so long as their only asserted injury is being forced to violate their oaths by implementing an allegedly unlawful policy or practice.[81] Instead, they must allege some separate and concrete adverse consequence that would flow from violating their oath, and courts have reached differing conclusions as to whether the possibility of being disciplined for obeying—or refusing to obey—allegedly unlawful orders suffices for purposes of standing, or whether such injury is "entirely speculative."[82] Courts have imposed these limitations, in part, on the grounds that recognizing standing in such cases would allow persons to sue "merely ... to ensure [that federal] law conforms to [their] *opinion* of what federal law requires," and such personal opinions could change at any time.[83]

In addition, even where standing to challenge particular exercises of prosecutorial discretion exists, plaintiffs could potentially have difficulty obtaining relief given that actions by Congress or the President in the immigration context are generally subject to a "narrow standard of

---

(...continued)

plaintiffs challenging certain actions in the immigration context lack prudential standing to enforce the INA. *See, e.g.*, Fed'n for Am. Immigration Reform v. Reno, 93 F.3d 897, 900 (D.C. Cir. 1996) (plaintiffs were not within the zone of interests protected by the INA for purposes of their claim that a "rush of immigrants adversely affects the welfare of the Federation's members by generating unemployment and wage reductions"). Recently, one federal district court did find that the ICE agents challenging the DACA initiative satisfy the prudential standing requirements because the statutory provisions which they claim are violated by DACA also govern their conduct in managing investigations and initiating removal proceedings. *See* Crane v. Napolitano, 920 F. Supp. 2d 724, 740-41 (N.D. Tex. 2013). However, this court subsequently found that the ICE agents' claims are within the exclusive jurisdiction of the Merit Systems Protection Board (MSPB), because their alleged injury was "being compelled to violate a federal statute upon pain of adverse employment action." *Crane*, No. 3:12-cv-03247-O, Order (N.D. Tex., July 31, 2013), *available at* http://www.crs.gov/ analysis/legalsidebar/Documents/Crane_DenialofMotionforReconsideration.pdf.

[80] *See, e.g.*, Lance v. Coffman, 549 U.S. 437, 439 (2007) ("A plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in [the] proper application of the Constitution and laws, and seeking relief that no more directly [or] tangibly benefits him than it does the public at large—does not state an Article III case or controversy.") (internal quotations omitted)); Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992) ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."). Individual Members of Congress also generally lack standing to challenge presidential actions. In *Raines v. Byrd*, the Supreme Court held that in order to obtain standing an individual Member must assert either a personal injury, like the loss of his congressional seat, or an institutional injury that amounts to vote nullification, which requires that no other legislative remedy exists to redress the alleged injury. *See* 521 U.S. 811 (1997).

[81] *See, e.g.*, Donelon v. La. Div. of Admin. Law ex rel. Wise, 522 F.3d 564 (5th Cir. 2008) (Louisiana Commissioner of Insurance lacked standing to challenge the constitutionality of a state law which he alleged violated the Constitution); Finch v. Miss. State Med. Ass'n, Inc., 585 F.2d 765, 773-75 (5th Cir. 1978) (governor of Mississippi lacked standing to challenge a state law whose enforcement, he believed, would cause him to violate his oath to uphold the federal and state constitutions).

[82] *Compare* Drake v. Obama, 664 F.3d 774, 780 (9th Cir. 2011) ("The notion that [the plaintiff] will be disciplined by the military for obeying President Obama's orders is entirely speculative. He might be disciplined for *disobeying* those orders, but he has an 'available course of action which subjects [him] to no concrete adverse consequences'—he can obey the orders of the Commander-in-Chief.") (emphasis in original)) *and* Crane, 920 F. Supp. 2d at 738 (finding that the ICE agents challenging DACA have "suffered an injury-in-fact by virtue of being compelled to violate a federal statute upon pain of adverse employment action," and otherwise satisfy the requirements for standing). After finding that the plaintiffs have standing, and are likely to prevail on the merits of their claim that DACA violates the INA, the court in *Crane* ultimately found that it lacks jurisdiction because the ICE agents' claims are within the exclusive jurisdiction of the MSPB. *Crane*, Order, *supra* note 79.

[83] *Donelon*, 552 F.3d at 568 (emphasis in original).

review,"[84] particularly in cases where such decisions implicate foreign affairs or national security. For example, in its recent decision in *Arizona v. United States*, a majority of the Supreme Court noted that "[s]ome discretionary decisions involve policy choices that bear on this Nation's international relations" when explaining the basis for the "broad discretion" immigration officers have in determining whether to remove unauthorized aliens.[85] The Court has similarly emphasized the potential "diplomatic repercussions" of certain decisions made by immigration officers (e.g., determining whether to grant withholding of removal or an alien's petition to reopen deportation proceedings).[86] Moreover, in some cases, courts have found that challenges to the alleged nonenforcement of immigration laws involve nonjusticiable political questions because they fundamentally entail disagreements about the proper extent of immigration enforcement.[87]

## Constitution

The U.S. Constitution can be seen as imposing two potential limitations upon the executive branch's exercise of prosecutorial discretion, one in cases where the Executive decides to enforce the law against particular individuals because of their race, religion, exercise of a constitutional right, or other impermissible factors; and the other in cases where the Executive adopts a general policy of non-enforcement "which is in effect an abdication of its statutory duty."[88]

### Selective Prosecution

In discussing the scope of the executive branch's prosecutorial discretion, courts have repeatedly noted that the determination as to whether to prosecute may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,"[89] including the exercise of protected statutory and constitutional rights.[90] Prosecutions (or other enforcement actions) that are based upon these factors could potentially be found to be impermissible, as was

---

[84] *See, e.g.*, Miller v. Albright, 523 U.S. 420, 434 n.11 (1998) (plurality opinion); *Fiallo*, 430 U.S. at 796; *Mathews*, 426 U.S. at 82.

[85] *See, e.g.*, *Arizona*, 132 S. Ct. at 2499.

[86] Negusie v. Holder, 555 U.S. 511, 517 (2009) ("The Attorney General's decision to bar an alien who has participated in persecution 'may affect our relations with [the alien's native] country or its neighbors. The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions."); INS v. Abudu, 485 U.S. 94, 110 (1988) ("Although all adjudications by administrative agencies are to some degree judicial and to some degree political ... INS officials must exercise especially sensitive political functions that implicate foreign relations.").

[87] *Texas*, 106 F.3d at 665 (dismissing a state's suit alleging that the federal government had violated the constitution and the INA by failing to control illegal immigration, in part, on the grounds that it was a political question). The political question doctrine is based on the notion that courts should refrain from deciding questions that the Constitution has entrusted to other branches of government. *See, e.g.*, Marbury v. Madison, 5 U.S. (1 Cr.) 137, 170 (1803). In determining whether a case entails a political question, courts consider whether there is "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it," among other things. Baker v. Carr, 369 U.S. 186, 217 (1962).

[88] *Adams*, 480 F.2d at 1162. *See also Heckler*, 470 U.S. at 832-33 n.4 (finding that judicial review of exercises of enforcement discretion could potentially be obtained in cases where an agency has adopted a general policy that is an "abdication of its statutory responsibilities").

[89] Bordenkircher v. Hayes, 434 U.S. 357, 364 (1977) (finding that a state prosecutor's decision to indict the defendant as habitual offender after he refused to plead guilty of a felony did not violate the defendant's constitutional rights).

[90] *Goodwin*, 457 U.S. at 372.

the case in *Yick Wo v. Hopkins*. There, the Supreme Court found that prosecutors' practice of enforcing a state law prohibiting the operation of laundries against only persons of Chinese descent ran afoul of the Equal Protection Clause.[91] In practice, however, defendants generally find it difficult to maintain a claim of selective prosecution because of the executive branch's prosecutorial discretion. Because such claims are seen as "invad[ing] a special province of the Executive," courts generally require defendants to introduce "clear evidence" displacing the presumption that the prosecutor has acted lawfully.[92] Specifically, they must show that (1) they were singled out for prosecution on an impermissible basis; (2) the government had a policy of declining to prosecute similarly situated defendants of other races, religions, etc.; and (3) the policy was motivated by a discriminatory purpose.[93]

Claims of selective prosecution can be even more difficult to maintain in an immigration context because the various prudential concerns that prompt deference to the executive branch's determinations as to whether to prosecute particular criminal offenses are "greatly magnified in the deportation context."[94] In fact, in *Reno v. American-Arab Anti-Discrimination Committee*, discussed above, the Supreme Court effectively foreclosed many claims of selective prosecution in removal proceedings by finding that "[a]s a general matter … an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."[95] The petitioners in *Reno* had alleged that they were targeted for deportation because of the exercise of their First Amendment rights. All belonged to a group that the government characterized as an "international terrorist and communist organization," and they asserted that the INS did not enforce "routine status requirements," such as were enforced against them, against aliens who were not members of similarly disfavored groups.[96] However, a majority of the Court rejected the petitioners' arguments, in part, because it viewed "selective prosecution" as unusual even in the criminal context[97] and, in part, because it considered the exercise of prosecutorial discretion to be particularly significant in the immigration context, as previously noted. However, the *Reno* Court did leave open the possibility that a decision to remove an alien could potentially be struck down in a "rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome,"[98] and subsequent cases continue to recognize the possibility of selective prosecution claims in the immigration context.[99]

## "Take Care" Clause

Article II, Section 3 of the U.S. Constitution could also potentially constrain the executive branch's prosecutorial discretion in certain cases. When discussing the scope of such discretion, some courts have suggested that situations could potentially arise where the executive branch

---

[91] 118 U.S. 356 (1886).

[92] *Reno*, 525 U.S. at 489 (quoting *Armstrong*, 517 U.S. at 463).

[93] *Armstrong*, 517 U.S. at 465.

[94] *Reno*, 525 U.S. at 490. It should be noted, however, that the *Reno* Court did not hold that discriminatory enforcement of the immigration laws does not offend the Equal Protection Clause, only that Section 242(g) of the INA (8 U.S.C. §1252(g)) deprives the courts of jurisdiction over such claims.

[95] *Reno*, 525 U.S. at 488.

[96] *Id.* at 473.

[97] *Id.* at 489 ("Even in the criminal-law field, a selective prosecution claim is a *rara avis* [rare bird].").

[98] *Reno*, 525 U.S. at 491.

[99] *See, e.g.*, *Matter of E-R-M & L-R-M*, 25 I. & N. Dec. at 522.

"expressly adopt[s] a general policy which is in effect an abdication of its statutory duty" by implementing a blanket ban on enforcement of a duly enacted statute.[100] In such situations, by refusing to enforce certain aspects of a statute, the executive branch could potentially be said to have exceeded the permissible scope of prosecutorial or enforcement discretion, and violated the President's duty that the "laws be faithfully executed."[101] However, no court appears to have invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care Clause, and one federal appellate court has opined that "[r]eal or perceived inadequate enforcement ... does not constitute a reviewable abdication of duty."[102] Rather, according to this court, to prove such an abdication, plaintiffs must show that the Executive either is "doing nothing to enforce the ... laws," or has "consciously decided to abdicate" its enforcement responsibilities.[103]

Some commentators have suggested that prosecutorial discretion policies which could result in the executive branch not enforcing the law against a large number of people constitute an abdication of statutory duty and, thus, violate the Take Care Clause.[104] This point has recently been made by some commentators with respect to the potentially 1.76 million individuals eligible to receive deferred action under DACA.[105] However, even if the INA were construed to impose a statutory duty to remove all unauthorized aliens, the fact that a large number of persons are favorably affected by a prosecutorial discretion policy might not, *per se*, suffice to prove a violation of the Take Care Clause. Courts might also consider the size of the total population against whom the law could be enforced, as well as the resources available for enforcing the law, on the theory that

> the President cannot secure full execution of the laws, if Congress denies to him adequate means of doing so. ... The President performs his full constitutional duty, if, with the means and instruments provided by Congress and within the limitations prescribed by it, he uses his best endeavors to secure the faithful execution of the laws enacted.[106]

Thus, in the case of DACA, for example, a reviewing court might note that DACA-eligible aliens represent a fraction of the estimated 11.5 million aliens who are present in the United States

---

[100] *Adams*, 480 F.2d at 1162.

[101] U.S. Const. art. II, §3. *See also* Kendall v. United States ex rel. Stokes, 37 U.S. 524, 613 ("To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible.").

[102] *Texas*, 106 F.3d at 667.

[103] *Id.*

[104] *See, e.g.*, *Crane*, Amended Complaint, *supra* note 3, at ¶ 101 ("The application of 'deferred action' to approximately 15% of aliens who are in the United States without authorization is not an exercise of executive branch discretion permitted by the Constitution."); The Obama Administration, the DREAM Act, and the Take Care Clause, *supra* note 3, at 2 ("[I]f a President can refuse to enforce a federal law against a class of 800,000 to 1.76 million, what discernible limits are there to prosecutorial discretion?").

[105] Jeanne Batalova and Michelle Mittelstadt, Migration Policy Institute, Relief from Deportation: Demographic Profile of DREAMers Potentially Eligible under the Deferred Action Policy, Aug. 2012, *available at* http://www.migrationpolicy.org/pubs/FS24_deferredaction.pdf, at 1.

[106] Myers v. United States, 272 U.S. 52, 291-92 (1926) (Brandeis, J., dissenting). *See also Heckler*, 470 U.S. at 831 (noting that, among the factors that make agency decisions to refuse enforcement generally unsuitable for judicial review, are questions as to "whether agency resources are best spent on this violation or another, ... whether the particular enforcement action requested best fits the agency's overall policies, and ... whether the agency has enough resources to undertake the action at all").

without authorization,[107] and ICE has the resources to remove annually less than 4% of the unauthorized alien population.[108]

The specific form of discretion exercised could also potentially play a role in a reviewing court's analysis of whether particular nonenforcement policies or practices constitute an abdication of a statutory duty. For example, a court could potentially distinguish between determinations to *delay enforcement actions* (e.g., granting deferred action or extended voluntary departure for a particular duration of time), and *determinations not to take enforcement actions* (e.g., determining whether to commence removal proceedings or cancel a notice for an alien to appear at removal proceedings), on the grounds that the Executive contemplates taking action in the future in the former cases.[109] Relatedly, a reviewing court might note whether the executive branch exercises its discretion on a case-by-case basis, taking into consideration the specific circumstances of the offense and the individual who committed it, or whether it has indicated its intention not to enforce particular offenses at all or against large groups of people. Such distinctions might, however, be difficult to draw with practices like the DACA initiative, in which exercises of discretion could be characterized as either individualized or categorical, depending upon how the initiative is viewed. DHS has repeatedly noted that determinations regarding whether to grant deferred action are to be made on a case-by-case basis for DACA-eligible individuals.[110] However, DHS has also established a broad category of individuals (e.g., those who came to the United States when they were under the age of 16, and are either currently in school or have graduated from high school) who are eligible to request deferred action pursuant to DACA.[111]

The existence of multiple—sometimes inconsistent—enforcement mandates from Congress might also factor into a court's analysis of whether particular nonenforcement policies or practices constitute an abdication of duty, particularly in situations where an agency elects to concentrate limited resources upon offenders (or offenses) that Congress has recently indicated are a priority. For example, following the enactment of the Illegal Immigration Reform and Immigrant

---

[107] *See, e.g.*, Michael Hoefer, Nancy Rytina, and Bryan Baker, DHS Office of Immigration Statistics, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011, *Population Estimates* (Mar. 2012), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf.

[108] Civil Immigration Enforcement, *supra* note 8, at 1 ("ICE ... only has resources to remove approximately 400,000 aliens per year, less than 4 percent of the estimated illegal alien population in the United States."); Defendants' Motion to Dismiss and Memorandum in Support, *supra* note 36, at 19 ("Deferring action for certain childhood arrivals means nothing more than that the Department will shift its limited resources to focus on its highest removal priorities, which include, per Congress's directive, a focus on criminal aliens and other aliens who threaten public safety.").

[109] The Executive could also potentially still take enforcement action in the latter cases by, for example, commencing removal proceedings against aliens whom it had previously decided not to bring proceedings against. There is no statute of limitations for the removal of unlawfully present aliens, so those who currently are removable on the grounds that they are present without authorization would generally still be removable on these grounds in the future. However, by remaining in the country for a longer period of time, aliens who are present without authorization could potentially acquire new bases for adjusting status (e.g., marrying a U.S. citizen or lawful permanent resident), as the Court noted in *Reno*. 525 U.S. at 490. In addition, at least at some times previously, the immigration agencies had policies of not taking action against persons whom they had previously determined warranted favorable exercises of prosecutorial discretion unless the alien's circumstances had changed. *See* 2002 INS Guidance, *supra* note 2, at 11-12 (noting that favorable exercises of discretion are to be "clearly documented" in the alien's file, and that an INS office should generally abide by a favorable decision taken by another office on a matter, absent new or changed circumstances).

[110] Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, *supra* note 10, at 2 ("No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.").

[111] Individuals who do not meet these criteria could still request or be granted deferred action outside of DACA.

Responsibility Act (IIRIRA), which some commentators assert amended the INA to require the removal of at least some unauthorized aliens, Congress enacted a number of measures directing DHS to give priority to the removal of "criminal aliens."[112] DHS has emphasized that its diminished focus on the removal of DACA-eligible individuals corresponds to an increased focus on criminal aliens,[113] and a reviewing court could potentially find that enforcement of later-enacted mandates (as to criminal aliens) may justify more limited enforcement of earlier enacted mandates (as to unauthorized aliens generally).

## Statute

Another potential constraint upon the executive branch's exercise of prosecutorial discretion was noted by the Supreme Court in *Heckler v. Cheney*. There, the Court rejected a challenge to the Food and Drug Administration's (FDA's) decision not to exercise its enforcement authority over the use of certain drugs on the grounds that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)" of the Administrative Procedure Act (APA).[114] Section 701(a)(2) of the APA generally bars review of "agency action [that] is committed to agency discretion by law,"[115] and the Court's statement here would suggest that it views exercises of prosecutorial discretion as generally committed to agency discretion by law. However, the *Heckler* Court also noted that this presumption of nonreviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."[116]

Determining whether a statute provides "guidelines" so as to make an agency's determination not to take enforcement action reviewable generally implicates questions of statutory interpretation. Such questions are not necessarily easily answered, though, as is illustrated by the argument that

---

[112] *See, e.g.*, Department of Homeland Security Appropriations Act, 2012, P.L. 112-74, Div. D., tit. ii, 125 Stat. 950 (Dec. 23, 2011) ("[T]he Secretary of Homeland Security shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime."); Department of Homeland Security Appropriations Act, 2010, P.L. 111-83, Div. D., tit. III, 123 Stat. 2142 (Oct. 28, 2009) (same); Department of Homeland Security Appropriations Act, P.L. 110-329, Div. D, tit. ii, 122 Stat. 3659 (Sept. 30, 2008) (same); Consolidated Appropriations Act, 2008, P.L. 110-161, 121 Stat. 2050-51 (Dec. 26, 2007) (funding to "improve and modernize efforts to identify aliens convicted of a crime, sentenced to imprisonment, and who may be deportable, and remove them from the United States"); H.R. REPT. 111-157, at 6 (2009) ("[R]ather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in making our country safer.").

[113] *See, e.g.*, Civil Immigration Enforcement, *supra* note 8, at 1-2 (aliens who have been convicted of crimes, are at least 16 years of age and participate in organized criminal gangs, are subject to outstanding criminal warrants, or "otherwise pose a serious risk to public safety" constituting the highest priorities for removal). Relatedly, Secretary Napolitano's announcement of the DACA initiative expressly excluded from consideration for deferred action under DACA persons who have been convicted of a felony, a "significant misdemeanor," or multiple misdemeanors. *See* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, *supra* note 10, at 1.

[114] *Heckler*, 470 U.S. at 832.

[115] 5 U.S.C. §701(a)(2). This presumption is an exception to the general rule that the APA "embodi[es] a 'basic presumption of judicial review.'" Lincoln v. Vigil, 508 U.S. 182, 190 (1993) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

[116] 470 U.S. at 832-33. *See also id.* at 833 ("[I]n establishing this presumption [of nonreviewability] in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.").

the executive branch lacks the discretion to grant deferred action to DACA beneficiaries because the INA requires the removal of aliens who entered the United States unlawfully.[117] This argument, which has recently been made by some commentators and litigants, rests upon three "interlocking provisions" in Section 235 of the INA that were added or amended by IIRIRA. Briefly summarized, these provisions state that

1. any alien present in the United States who has not been admitted shall be deemed an applicant for admission;

2. applicants for admission shall be inspected by immigration officers; and

3. in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for removal proceedings.[118]

Those who view these provisions as requiring the removal of aliens who entered the United States unlawfully would appear to construe "shall" as indicating mandatory agency action, and all "applicants for admission" as "aliens seeking admission."

The federal district court reviewing ICE agents' challenge to the DACA initiative initially adopted this interpretation, finding that the INA's "use of the word 'shall' imposes a mandatory duty on immigration officers to initiate removal proceedings whenever they encounter 'applicants for admission' who are not 'clearly and beyond a doubt entitled to be admitted.'"[119] However, the court subsequently found that the same alleged injury that gave the plaintiffs standing to bring their challenge—namely, their "being compelled to violate a federal statute upon pain of adverse employment action"—means that their case is within the exclusive jurisdiction of the Merit Systems Protection Board (MSPB), and cannot be heard by a federal district court.[120]

No other court has addressed the construction of these three provisions of the INA as an "interlocking" whole. Another court, if it found that it had jurisdiction, could potentially adopt an alternate interpretation, particularly given prior decisions distinguishing between aliens within the United States who have not been admitted, and aliens seeking admission at ports of entry.[121] The Supreme Court's decision in *Arizona v. United States* could also potentially be said to support an alternate construction.[122] While the majority in *Arizona* did not directly address the DACA initiative, it expressly noted the "broad discretion exercised by immigration officials" in the

---

[117] *See, e.g.*, Arizona v. United States, No. 11-182, *Amicus Curiae* Brief of Secure States Initiative in Support of Petitioners, at 8-9; *Crane*, Amended Complaint, *supra* note 3, at ¶¶ 38-40.

[118] INA §235(a)(1), (a)(3), and (b)(2)(A); 8 U.S.C. §1225(a)(1), (a)(3), and (b)(2)(A).

[119] *Crane*, No. 3:12-cv-03247-O, 2013 U.S. Dist. LEXIS 57788, at *28-*29 (N.D. Tex., Apr. 23, 2013).

[120] *Crane*, Order, *supra* note 79.

[121] *See, e.g.*, 8 C.F.R. §236.1(c) & (d); *Matter of Oseiwusu*, 22 I. & N. Dec. 19 (BIA 1998) ("According to the regulations, an Immigration Judge has no authority over the apprehension, custody, and detention of arriving aliens and is therefore without authority to consider the bond request of an alien returning pursuant to a grant of advance parole.").

[122] *See* Arizona v. United States,—U.S.—132 S. Ct. 2492 (2012). Moreover, even if a reviewing court construed Section 235 of the INA as statutorily compelling DHS to place aliens who unlawfully entered the United States into removal proceedings, DHS would not necessarily be barred from exercising certain forms of prosecutorial discretion as to DACA beneficiaries *after* these individuals have been placed into removal proceedings. *See generally Crane*, Amended Complaint, *supra* 3, at ¶ 71 ("[A]ny 'prosecutorial discretion' that Defendants exercise must be consistent with 8 U.S.C. § 1225 and can only occur after an alien has been placed into removal proceedings as required by 8 U.S.C. §1225, or under a provision of federal law expressly authorizing such 'prosecutorial discretion.'").

removal process.[123] Because such discretion would arguably be inconsistent with a statutory requirement to place in removal proceedings all aliens who entered the United States unlawfully, the majority's decision suggests that the Court does not construe the INA as legally compelling immigration officers to place all aliens who entered the United States unlawfully in removal proceedings.

Courts could also potentially construe other provisions of the INA that use "shall" differently than the district court reviewing the ICE officers' challenge to DACA construed the three provisions noted above.

## Whether "Shall" Means Agencies Lack Discretion

The argument that Section 235 of the INA requires that aliens who unlawfully entered the United States be placed in removal proceedings appears to rest on the use of "shall" in Section 235, and the view that "shall" indicates mandatory agency action. "Shall" frequently indicates required action, particularly when used in contexts that do not implicate an agency's enforcement discretion.[124] However, the use of "shall" in Section 235, or elsewhere in the INA, would not, in itself, necessarily be construed to mean that DHS is required to take particular actions, because courts have found that agencies may retain discretion even when a statute uses "shall."[125] The statute at issue in *Heckler*, for example, stated that

> [a]ny article of food, drug, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale ... after shipment in interstate commerce, or which may not ... be introduced into interstate commerce, *shall* be liable to be proceeded against.[126]

---

[123] *Arizona*, 132 S. Ct. at 2499 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal. Discretion in the enforcement of immigration law embraces immediate human concerns. … Some discretionary decisions [also] involve policy choices that bear on this Nation's international relations. ... The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.") (internal citations omitted)).

[124] *See, e.g.*, Lopez v. Davis, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory 'shall' in the very same section. Elsewhere in § 3621, Congress used 'shall' to impose discretionless obligations, including the obligation to provide drug treatment when funds are available. *See* 18 U.S.C. § 3621(e)(1) ('Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)'; *see also, e.g.*, § 3621(b) ('The Bureau shall designate the place of the prisoner's imprisonment.... In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status.'")).

[125] INS and, later, DHS has also taken the position that the use of "shall" in a statute does not, by itself, limit the ability of immigration officers to exercise prosecutorial discretion, and the agencies' views could potentially be entitled to some deference, as discussed below. *See, e.g.*, 2002 INS Guidance, *supra* note 2 ("[A] statute directing that the INS 'shall' remove removable aliens would not be construed by itself to limit prosecutorial discretion."); INS Exercise of Prosecutorial Discretion, *supra* note 15, at 8 (opining that any statutory limits on INS's prosecutorial discretion must be "clear and specific").

[126] 470 U.S. at 835 (quoting 21 U.S.C. §334(a)(1) (emphasis added)).

AR2022_400607

Nonetheless, despite its use of "shall," this statutory provision was construed by the Court as "framed in the permissive."[127] The Board of Immigration Appeals (BIA), the highest administrative body for construing and applying immigration law, has also rejected the view that "shall" means that immigration officials necessarily lack discretion as to whether to take particular actions. For example, in a 2011 decision, the BIA found that determinations as to whether to pursue expedited removal proceedings under Section 235 of the INA or formal removal proceedings under Section 240 of the INA are within DHS's discretion, notwithstanding the fact that the INA uses "shall" in describing who is subject to expedited removal.[128] In so doing, the BIA specifically noted that

> in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct "shall" be imprisoned or otherwise punished. But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute.[129]

In light of these precedents, the use of "shall," in itself, might not suffice for a court to find that an agency lacks the discretion not to enforce particular statutory requirements against certain individuals. Rather, a reviewing court might also consider the overall "statutory scheme [and] its objectives."[130] For example, in *Dunlop v. Bachowski*, the Court found that the Department of Labor's alleged nonenforcement of a statute was reviewable, unlike with the statute at issue in *Heckler*. The statute in question used the word "shall," but the Court does not appear to have accorded any special significance to this word. Instead, the Court emphasized that the statute directed the Secretary of Labor to investigate certain complaints brought by members of labor organizations challenging the validity of union elections, and bring a civil action against the labor organization within 60 days of the complaint's filing if the Secretary finds probable cause to believe a violation occurred and has not been remedied.[131] Because of these provisions, the Court viewed the Secretary's discretion as limited to determining whether there is probable cause to believe that a violation occurred.[132] Similarly, in *Adams v. Richardson*, the U.S. Court of Appeals for the District of Columbia Circuit noted that the statute in question was not "so broad" as to preclude judicial review, since it "indicates with precision the measures available to enforce the Act."[133]

## Deference to Agencies' Interpretations of Their Governing Statutes

Another potential issue that can arise in determining whether "shall" indicates mandatory agency action when used in particular statutory provisions is how the agency has construed the provision, and whether a court finds that the agency's interpretation is entitled to deference under the

---

[127] *Id. See also id.* at 842 (Marshall, J., concurring) (indicating that the Food, Drug, and Cosmetics Act is "not a mandatory statute" and, thus, the Food and Drug Administration has "significant discretion" to choose which alleged violations to prosecute).

[128] *Matter of E-R-M & L-R-M*, 25 I. & N. Dec. 520, 523 (BIA 2011).

[129] *Id.* at 522.

[130] *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975) (also considering the legislative history and the "nature of the administrative action involved").

[131] *Id.* at 563.

[132] *Id.* at 570.

[133] 480 F.2d at 1162. *See also id.* at 1163 (noting that "[t]he Act sets forth two alternative courses of action by which enforcement may be effected").

precedent of *Chevron, USA v. Natural Resources Defense Council*.[134] In *Chevron*, the Supreme Court articulated a two-part test for review of an agency's construction of a statute which it administers: (1) Has Congress directly spoken to the precise question at issue? and (2) If not, is the agency's reasonable interpretation of the statute consistent with the purposes of the statute?[135] "[I]f the statute speaks clearly 'to the precise question at issue,'" the tribunal "must give effect to the unambiguously expressed intent of Congress,"[136] regardless of what the agency regulation provides. However, where "the statute is silent or ambiguous with respect to the specific issue," the tribunal "must sustain the [a]gency's interpretation if it is 'based on a permissible construction' of the Act."[137]

In the case of Section 235 of the INA, for example, the Department of Justice (DOJ) and, later, DHS have interpreted the relevant provisions of the INA in a somewhat different manner than those who argue that DHS lacks the discretion not to remove aliens who entered the United States unlawfully. Both DOJ/DHS and those who claim it lacks discretion construe the first two provisions of Section 235 of the INA noted above—aliens present without admission being deemed applicants for admission, and applicants for admission being inspected—as applying to both (1) "arriving aliens" at a port-of-entry and (2) aliens who are present in the United States without inspection. However, DOJ and DHS have differed from proponents of the view that DHS lacks discretion in that DOJ and DHS have construed the third provision—regarding detention of certain aliens seeking admission—as applicable only to arriving aliens, not aliens who are present without inspection.[138] This difference appears to have arisen, in part, because the agencies have emphasized the phrase "aliens seeking admission" in the third provision, and have reasoned that only arriving aliens at ports-of-entry can be said to be seeking admission.[139]

---

[134] 467 U.S. 837 (1984).

[135] 467 U.S. at 842-43.

[136] Barnhart v. Walton, 535 U.S. 212, 217 (2002) (quoting *Chevron*, 467 U.S. at 842-43).

[137] *Id.* at 218 (quoting, in part, *Chevron*, 467 U.S. at 843).

[138] Specifically, the regulation implementing the third INA provision noted above—regarding the detention of aliens seeking admission—applies only to arriving aliens, not to aliens who entered without admission. *See* 8 C.F.R. §235.3(c) ("[A]ny arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act"). This has been the agency's interpretation of the provision since the initial final rule implementing this provision. *See* INS, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10357 (Mar. 6, 1997) (codified at 8 C.F.R. §235.3(c)). *See also* INS, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 444-46 (Jan. 3, 1997) (noting that the INA "distinguishes between the broader term 'applicants for admission' and a narrower group, 'arriving aliens'"). The term "arriving alien" is defined in the regulations as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States," but does not include aliens who entered without inspection. *See* 8 C.F.R. §1.2.

[139] The position of DHS and DOJ may also reflect concerns that if Section 235(b)(2)(A) were construed to apply to all applicants for admission, the statutory language regarding "seeking admission" would be superfluous, and construing statutes so as to give effect to all of their provisions is one of the fundamental principles of statutory interpretation. *See, e.g.*, Hibbs v. Winn, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."); Montclair v. Ramsdell, 107 U.S. 147, 152 (1883) (Courts should "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."). Similarly, if detention were mandatory for all applicants for admission under INA 235(b)(2)(A), then the language including inadmissible aliens under the mandatory detention provision in Section 236(c)(1)(A) and (D) of the INA would arguably be superfluous as well, since the only aliens in the United States who are subject to the grounds of inadmissibility are applicants for admission. The agencies' interpretation does not appear to have been directly adopted (continued...)

The district court reviewing ICE agents' challenge to the DACA initiative declined to grant any deference to DHS's interpretation here. The court found that this interpretation was not entitled to deference, in part, because it viewed the relevant provisions of the INA as unambiguously applying to both aliens coming (or attempting to come) into the United States at a port of entry, and aliens present in the United States without having been admitted.[140] It also found that DHS regulations did not support DHS's proposed interpretation because, while these regulations applied to arriving aliens, they were not limited to arriving aliens.[141] However, as previously noted, this court is the only court to have so reached this conclusion, and it subsequently found that it lacked jurisdiction over the ICE agents' claims.[142] It is unclear whether other courts would reach the same conclusion as to whether and how much deference should be accorded to DHS's interpretation of these three provisions of INA §235.

It should also be noted that the INS and, later, DHS have interpreted other provisions of the INA differently than §235, construing them as removing prosecutorial discretion as to certain determinations. For example, immigration authorities have long maintained that Section 236(c) of the INA—which states that immigration officials "shall take into custody" certain criminal aliens, and may release them only under narrow circumstances[143]—limits their discretion as to whether or not to release such aliens from custody.[144]

## Executive Branch Self-Regulation

An agency could also potentially be found to have imposed certain constraints upon its exercise of prosecutorial discretion through either (1) the promulgation of regulations or (2) the issuance of guidelines that the agency intends to be binding or which have been employed in such a way as to be binding as a practical matter.[145] For example, in a 1979 decision, the U.S. Court of Appeals

---

(...continued)

by any court, although it arguably has been implicitly adopted in various court and BIA rulings that have applied a DHS regulation which provides that immigration judges have jurisdiction over bond determinations for aliens present without inspection, but not for arriving aliens. *See, e.g., Matter of Oseiwusu*, 22 I. & N. Dec. 19 (BIA 1998) ("According to the regulations, an Immigration Judge has no authority over the apprehension, custody, and detention of arriving aliens and is therefore without authority to consider the bond request of an alien returning pursuant to a grant of advance parole.").

[140] *Crane*, 2013 U.S. Dist. LEXIS 57788, at *23-*24.

[141] *Id.*, at *25.

[142] *See supra* note 120 and accompanying text.

[143] INA §236(c)(1)-(2); 8 U.S.C. §1226(c)(1)-(2).

[144] *See, e.g.*, 2002 INS Guidance, *supra* note 2, at 3 (indicating that detention pursuant to Section 236(c) is mandatory because Section 236(c) "evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist"); INS Exercise of Prosecutorial Discretion, *supra* note 15, at 11. However, some commentators have noted that, notwithstanding this view, immigration agencies have released aliens subject to "mandatory detention" in order to moot lawsuits challenging the alien's detention. *See, e.g.*, Stephen H. Legomsky, *The Detention of Aliens: Theories, Rules, and Discretion*, 30 U. MIAMI INTER-AM. L. REV. 531, 534 (1999).

[145] *See, e.g.*, Pacific Molasses Co. v. Fed. Trade Comm'n, 356 F.2d 386, 389-90 (5th Cir. 1996) ("When an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously observed. This is so even when the defined procedures are '… generous beyond the requirements that bind such agency …' For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules."). *But see* Farrell v. Dep't of the Interior, 314 F.3d 584, 590 (Fed. Cir. 2002) ("The general consensus is that an agency statement, not issued as a formal regulation, binds the agency only if the agency intended the statement to be binding.").

for the Ninth Circuit ("Ninth Circuit") found that an INS Operations Instruction addressing deferred action against deportable aliens was binding upon the agency because of its "purpose and effect."[146] In reaching this conclusion, the court emphasized that the Instruction more closely resembled a substantive provision for relief than an internal procedural guideline because it "exist[ed] out of consideration for the convenience of the petitioner, and not that of the INS."[147] The court further noted that the Instruction ostensibly required INS district directors to recommend deferred or "non-priority" status in certain cases, and that this status was periodically reviewed and not subject to termination at INS's convenience.[148] In short, the court distinguished the Instruction from other intra-agency guidelines that would create no substantive rights because the Instruction's effects were "final and permanent, with the same force as that of a Congressional statute."[149] Other courts reached different conclusions as to whether this particular Operations Instruction was binding,[150] and the INS subsequently amended to it to clarify that grants of deferred action were discretionary.[151] Later, the guideline was rescinded (although INS and, later, DHS continued to grant deferred action).[152] However, the 1979 case illustrates that certain types of "cabining of an agency's prosecutorial discretion" could potentially "rise to the level of a substantive, legislative rule" in the immigration context.[153] Were that the case, DHS's exercise of prosecutorial discretion could potentially be found to have been constrained by its own guidelines.

In its recent guidance regarding the exercise of prosecutorial discretion, DHS has consistently emphasized that "there is no right to a favorable exercise of prosecutorial discretion by the agency," and that nothing in the guidelines should be construed to prohibit the apprehension, detention, or removal of aliens unlawfully present in the United States, or to limit any legal authority to enforce federal immigration law.[154] However, an agency's characterization of its own policies as non-binding is not necessarily dispositive,[155] and certain parties challenging the DACA

---

[146] Nicholas v. INS, 590 F.2d 802, 805 (1979).

[147] *Id*. at 807.

[148] *Id*.

[149] *Id*.

[150] *See, e.g.*, Vergel v. INS, 536 F.2d 755, 757-80 (8th Cir. 1976) (upholding the deportation order, but staying its mandate for a period of time to allow the alien to apply for deferred action); David v. INS, 548 F.2d 219, 223 (8th Cir. 1977) (same); Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir. 1976) (decision to grant or deny deferred action was within the "particular discretion of the INS," and the agency had the power to create and employ a category "for its own administrative convenience without standardizing the category and allowing applications for inclusion in it"); Lennon v. INS, 527 F.2d 187, 191 n.7 (2nd Cir. 1975) (describing deferred action as an "informal administrative stay of deportation").

[151] *See, e.g.*, Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases*, 41 SAN DIEGO L. REV. 819, 822 (2004).

[152] *See, e.g.*, Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, IMMIGR. L. & PROC. §72.03(2)(h) n.120 (2009) (noting that the Operating Instruction addressing deferred action was rescinded in 1997).

[153] Community Nutrition Institute v. Young, 818 F.2d 943, 948 (1987) (finding that the FDA's thresholds for aflatoxins in corn were legislative rules that should have been promulgated through notice-and-comment rulemaking because the levels "have a present effect and are binding," and marketing any food not within the levels is viewed as unlawful). *But see Heckler*, 470 U.S. at 837 (rejecting a challenge to the Food and Drug Administration's refusal to enforce alleged violations of the Food, Drug, and Cosmetic Act, in part, because the agency "policy statement" in question did not "arise in the course of discussing the agency's discretion to exercise its enforcement power" and, thus, did not limit this discretion). The Court in *Heckler* expressly left open the possibility that certain agency rules might provide adequate guidelines for informed judicial review of decisions not to enforce them. *Id*. at 836.

[154] *See, e.g.*, 2011 DHS Guidance, *supra* note 9, at 6.

[155] *See, e.g.*, Columbia Broadcasting Sys., Inc. v. United States, 316 U.S. 407, 416 (1942) ("The particular label placed (continued...)

initiative have suggested that, in "implementing the Directive, DHS has treated the Directive as if it were a rule."[156] No court appears to have addressed this argument, to date, but early in 2012—when DHS was conducting preliminary reviews of the dockets of the immigration courts in Baltimore and Denver for cases that might qualify for favorable exercises of prosecutorial discretion[157]—a panel of the Ninth Circuit ordered ICE to advise the court as to whether ICE planned to exercise prosecutorial discretion in five pending cases.[158] The court did so *sua sponte*, without such an order having been requested, and the dissenting judge expressed concern that the majority's order could portend future scrutiny of why ICE made particular decisions.[159] The dissent also asserted that judicial review of ICE's exercise of prosecutorial discretion is "sharply limited by the separation of powers."[160]

# Conclusion

Regardless of whether it is characterized as "prosecutorial discretion" or "enforcement discretion," immigration officers are generally seen as having wide latitude in determining when, how, and even whether to pursue apparent violations of the INA. This latitude is similar to that possessed by prosecutors in the criminal law enforcement context and enforcement officials in other federal agencies. Whether and how to constrain this discretion has been a recurring issue for some Members of Congress, particularly in light of the June 2011 DHS memorandum on prosecutorial discretion and the more recent DACA initiative.[161] While some Members have expressed support for the DACA initiative,[162] or called for expanded use of prosecutorial discretion by immigration authorities in other contexts,[163] others have sought to prohibit DHS

---

(...continued)

upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive."); Guardian Fed. Savings & Loan Ass'n v. Fed. Savings & Loan Ins. Corp., 589 F.2d 658, 666-67 (D.C. Cir. 1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law."). The agency's characterization could, however, potentially be entitled to some deference. *See, e.g.*, *Community Nutrition Institute*, 818 F.2d at 946.

[156] Crane v. Napolitano, No. 3:12-cv-03247-O, Brief in Support of Plaintiffs' Application for Preliminary Injunction, at 19 (filed N.D. Tex., Nov. 28, 2012). *See also* Crane v. Napolitano, No. 3:12-cv-03247-O, Affidavit of Christopher L. Crane, ¶ 8 (filed N.D. Tex., Nov. 27, 2012) (alleging that ICE has adopted a practice of not questioning individuals who assert that they could be eligible for deferred action as part of the DACA initiative, thereby effectively making all who claim deferred action entitled to it).

[157] *See, e.g.*, Julia Preston, U.S. to Review Cases Seeking Deportations, *New York Times*, Nov. 17, 2011, *available at* http://www.nytimes.com/2011/11/17/us/deportation-cases-of-illegal-immigrants-to-be-reviewed.html.

[158] Rodriguez v. Holder, 668 F.3d 670 (9th Cir. 2012); Agustin v. Holder, 668 F.3d 672 (9th Cir. 2012); Jex v. Holder, 668 F.3d 673 (9th Cir. 2012); Pocasangre v. Holder, 668 F.3d 674 (9th Cir. 2012); Mata-Fasardo v. Holder, 668 F.3d 674 (9th Cir. 2012).

[159] *Agustin*, 668 F.3d at 672 (O'Scannlain, J., dissenting).

[160] *Id*. Subsequently, in response to the DACA initiative, the U.S. Court of Appeals for the Second Circuit ("Second Circuit") established a procedure whereby pending immigration cases are tolled while the government determines whether to remand the case to the BIA for administrative closure in light of DACA and related initiatives. *In Matter of Immigration Petitions for Review Pending in the United States Court of Appeals for the Second Circuit*, No. 12-4096, 2012 U.S. App. LEXIS 21555 (Oct. 16, 2012). However, unlike the Ninth Circuit, the Second Circuit did not order ICE to inform it regarding whether ICE plans to exercise discretion in particular cases.

[161] *See supra* note 12 and accompanying text.

[162] *See, e.g.*, Durbin Statement on DREAM Act and Administrative Action to Help Young Immigrants, June 15, 2012, *available at* http://durbin.senate.gov/public/index.cfm/pressreleases?ID=070d1061-66c4-45ef-bb34-41da7e1e7d40.

[163] *See, e.g.*, Pelosi, Nadler, Honda, and 81 Members of Congress Urge Department of Homeland Security Again To (continued...)

AR2022_400612

from granting deferred action or extended voluntary departure to removable aliens except in narrow circumstances,[164] or to "nullify" particular policies regarding prosecutorial discretion that have been articulated by the Obama Administration.[165]

The extent to which Congress can constrain the Administration's exercise of discretion in the DACA context, in particular, may depend on whether a reviewing court characterizes the underlying authority for the implementation of the program as constitutionally or statutorily based. Congress has broad authority to restrict discretionary acts taken pursuant to statutory delegations, while arguably limited authority, under the doctrine of Separation of Powers, to restrict the President's exercise of constitutionally based discretion. In addition, the degree of intrusion into executive enforcement decisions may also impact a court's review of any congressional response. For example, legal precedent suggests that Congress probably cannot directly limit the President's exercise of discretion by requiring that the executive branch initiate enforcement actions against particular individuals.[166] On the other hand, Congress would appear to have considerable latitude in establishing statutory guidelines for immigration officials to follow in the exercise of their enforcement powers, including by "indicat[ing] with precision the measures available to enforce the" INA, or by prohibiting DHS from considering certain factors in setting enforcement priorities.[167]

However, the existing judicial presumption that "an agency's decision not to take enforcement action [is] immune from judicial review,"[168] and the deference potentially accorded to an agency's interpretation of its governing statute,[169] suggests that such statutory guidelines would likely need to be clear, express, and specific. The use of "shall" in a provision of the INA may not, in itself, suffice for a statute to be construed as having provided enforceable guidelines for immigration officials to follow in exercising prosecutorial discretion. Absent a substantive legislative response, Congress may still be able to influence the implementation of DACA or other discretion-based policies by the immigration authorities, including by engaging in stringent

---

(...continued)

Recognize LGBT Family Ties in Deportation Cases, (copy on file with the authors).The need for discretion in certain cases involving aliens in same-sex marriages may have been removed by DHS's response to the recent Supreme Court decision in *United States v. Windsor*. *Windsor* struck down Section 3 of the Defense of Marriage Act (DOMA), which had precluded federal agencies from recognizing same-sex marriages. Following this decision, DHS began permitting U.S. citizens and lawful permanent residents to sponsor their same-sex spouses for family-based immigrant visas and adjustment of status. *See* DHS, Implementation of the Supreme Court Ruling on the Defense of Marriage Act, *available at* http://www.dhs.gov/topic/implementation-supreme-court-ruling-defense-marriage-act.

[164] Hinder the Administration's Legalization Temptation (HALT) Act, H.R. 2497, §2(f), 113th Cong. (permitting the grant of deferred action or extended voluntary departure only for the purpose of maintaining an alien in the United States "(1) to be tried for a crime, or to be a witness at trial, upon the request of a Federal, State, or local law enforcement agency; (2) for any other significant law enforcement or national security purpose; or (3) for a humanitarian purpose where the life of the alien is imminently threatened").

[165] Prohibiting the Back-Door Amnesty Act, H.R. 5953, §2(a), 113th Cong. ("nullifying" the 2011 Morton memoranda and the 2012 Napolitano memorandum).

[166] *See Heckler*, 470 U.S. at 833 ("... Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.").

[167] *Adams*, 480 F.2d at 1162.

[168] *Heckler*, 470 U.S. at 832.

[169] *Chevron*, 467 U.S. at 842-43.

AR2022_400613

oversight over the DHS program or by exercising its "power of the purse"[170] to prohibit DHS and its components from implementing particular policies related to the exercise of prosecutorial discretion that Congress does not support.[171]

## Author Contact Information

Kate M. Manuel
Legislative Attorney
kmanuel@crs.loc.gov, 7-4477

Todd Garvey
Legislative Attorney
tgarvey@crs.loc.gov, 7-0174

---

[170] *See* U.S. Const., art. I, §9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.... ").

[171] *See, e.g.*, Department of Homeland Security Appropriations Act, 2013, H.R. 5855, as passed by the House, §581(a), 113th Cong. ("None of the funds made available in this Act may be used to finalize, implement, administer, or enforce the 'Morton Memos.'").



# Executive Discretion as to Immigration: Legal Overview

**Kate M. Manuel**
Legislative Attorney

**Michael John Garcia**
Legislative Attorney

November 10, 2014

**Congressional Research Service**

7-5700

www.crs.gov

R43782

**CRS REPORT**
Prepared for Members and
Committees of Congress

AR2022_400615

# Summary

President Obama announced in June 2014 that he would seek "to fix as much of our immigration system as I can on my own" through administrative action. Although the Obama Administration has not yet announced the specific immigration actions it intends to take, the President has stated that they will occur before the end of the year. It seems likely that such actions will prompt heated legal debate concerning the scope of the Executive's discretionary authority over immigration matters, including with respect to the enforcement of immigration-related sanctions and the granting of immigration benefits or privileges. Such debate may be similar to that which followed the 2012 launch of the executive initiative commonly known as Deferred Action for Childhood Arrivals (DACA), under which certain unlawfully present aliens who were brought to the United States as children may be granted "deferred action" (a type of relief from removal) and work authorization. While some have argued that DACA constitutes an abdication of the Executive's duty to enforce the laws and runs afoul of specific requirements found in the Immigration and Nationality Act (INA), others have argued that the initiative is a lawful exercise of the discretionary authority conferred on the Executive by the Constitution and federal statute.

Executive discretion over immigration matters is informed (and, in some instances, circumscribed) by statutory delegations of authority and constitutional considerations. In some cases, a particular immigration policy or initiative might be premised on multiple sources of discretionary authority. These sources include the following:

- ***Express delegations of discretionary authority by statute.*** In some instances, the INA grants the Executive broad discretion to provide certain forms of relief or benefits (e.g., work authorization or temporary protected status) to foreign nationals. In other instances, the INA permits immigration authorities to waive the application of requirements which would otherwise render an alien ineligible for particular immigration benefits. The INA also gives the Executive broad "parole" authority, under which immigration officials may sometimes permit aliens to physically enter or remain in the country without such entry or presence constituting "admission" for immigration purposes. Any exercises of such statutory authority must be consistent with the terms of the delegation (although the executive branch might have some discretion in interpreting the statute, as discussed below).

- ***Prosecutorial or enforcement discretion deriving from the Executive's independent constitutional authority.*** The Executive is generally recognized as possessing some degree of independent authority in assessing whether to prosecute apparent violations of federal law. However, specific statutory mandates could be seen as limiting the Executive's discretion to take particular actions (e.g., by requiring that certain aliens be detained pending removal proceedings). The express adoption of a policy that constitutes an abdication of a statutory duty could also be found to be impermissible, but it might be difficult for a court to assess the degree of nonenforcement that would entail an "abdication."

- ***Discretion in interpreting and applying immigration law.*** The Supreme Court has found that some deference may be owed to agency regulations (or adjudications) which construe statutes that are "silent or ambiguous" as to specific issues. The executive branch may also be afforded deference in less formal interpretations of statutes and in interpreting its own regulations. However, agency interpretations must conform to the "unambiguously expressed intent of Congress."

# Contents

Express Delegations of Discretionary Authority ..................................................................................... 4

  Statutory Authorization to Grant Benefits or Relief ........................................................................... 4

    Temporary Protected Status .............................................................................................................. 4

    Work Authorization ......................................................................................................................... 6

  Statutory Waivers of Restrictions on Benefits or Relief ..................................................................... 7

    Waivers of Grounds of Inadmissibility ........................................................................................... 8

    Parole .............................................................................................................................................. 11

  Potential Constraints ........................................................................................................................ 13

Discretion in Enforcement ...................................................................................................................... 14

  Determining Whether to Issue an NTA ............................................................................................ 15

  Deferred Action ................................................................................................................................ 16

  Potential Constraints ........................................................................................................................ 17

Discretion in Interpreting and Applying Statutes ................................................................................. 20

  Not Counting Derivatives ................................................................................................................. 21

  Eligibility of Aliens with TPS for Adjustment of Status ................................................................. 22

  Potential Constraints ........................................................................................................................ 22

# Contacts

Author Contact Information ..................................................................................................................... 24

In June 2014, President Barack Obama announced that he would seek "to fix as much of our immigration system as I can on my own" through administrative action.[1] While the President reiterated his intent to act before the end of the year in a November 5, 2014, press conference,[2] the Administration has not yet announced what specific measures it intends to take. Commentators have, however, suggested that the executive actions could affect significantly more unlawfully present aliens than the earlier Deferred Action for Childhood Arrivals (DACA) initiative.[3] This initiative, which began in 2012, has permitted over 500,000 aliens to obtain "deferred action" (one type of relief from removal) and, in many cases, work authorization.[4]

DACA has prompted heated legal debate about the permissibility of the executive branch's actions. Some have argued that the DACA initiative is a lawful exercise of the discretionary authority conferred on the Executive by the Constitution and federal statute.[5] However, others have argued that the initiative impinges on congressional authority to regulate immigration, constitutes an abdication of the Executive's duty to enforce the laws, or runs afoul of specific provisions of the Immigration and Nationality Act (INA).[6] It seems likely that whatever actions the Obama Administration may announce in late 2014 will prompt similar debate, particularly as to the scope of the Executive's discretionary authority over immigration matters.

This debate ultimately reflects the respective roles that Congress and the executive branch play in the nation's constitutional system of government. Article I of the Constitution expressly grants the power to legislate to Congress, and Congress has exercised this power as to immigration, in part, by enacting the INA.[7] The INA provides a comprehensive set of rules governing the admission of

---

[1] White House, Office of the Press Secretary, Remarks by the President on Border Security and Immigration Reform, June 30, 2014, *available at* http://www.whitehouse.gov/the-press-office/2014/06/30/remarks-president-border-security-and-immigration-reform.

[2] Assoc. Press, *Obama, Defiant, Vows Immigration Action This Year*, WASH. POST, Nov. 5, 2014, *available at* http://www.washingtonpost.com/politics/congress/obama-firm-on-vow-to-act-on-immigration-this-year/2014/11/05/af658b1c-652a-11e4-ab86-46000e1d0035_story.html.

[3] *See, e.g.*, *Depending on Specifics, Executive Action Could Impact Millions, MPI Report Estimates*, 8 WORKPLACE IMMIGR. REP. 606 (Sept. 11, 2014) (discussing report, Executive Action for Unauthorized Immigrants, cited *infra* note 96); *Obama Said to Be Developing Plans to Give Millions Work Authorization*, 8 WORKPLACE IMMIGR. REP. 518 (Aug. 4, 2014).

[4] *See* Dept. of Homeland Security (DHS), U.S. Citizenship & Immigr. Servs. (USCIS), Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2014, *available at* http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_fy2014_qtr3.pdf (last accessed: Oct. 27, 2014).

[5] *See, e.g.*, Shoba Sivaprasad Wadhia, *In Defense of DACA, Deferred Action, and the DREAM Act*, 91 TEX. L. REV. 59 (2013) (responding to arguments raised by Delahunty & Yoo, *infra*, note 6, and claiming that DACA is a constitutionally justified attempt by the Executive "to enforce congressionally mandated priorities" by focusing limited resources on the removal of aliens designated as a "high-priority" for removal); David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws of Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167 (2012) (arguing that DACA is consistent with the INA and with previous exercises of enforcement discretion by immigration officials).

[6] *See, e.g.*, Crane v. Napolitano, Amended Complaint, No. 3:12-cv-03247-O, filed Oct. 10, 2012 (N.D. Tex.) (lawsuit challenging DACA and arguing that the initiative is, among other things, contrary to certain provisions of the INA and the Executive's constitutional responsibility to take care that the laws are faithfully executed); Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause*, 91 TEX. L. REV. 781 (2013) (arguing that the DACA initiative is inconsistent with the Executive's constitutional duties, and that the President may not purposefully refrain from enforcing federal statutes against broad categories of persons "in ordinary, noncritical circumstances").

[7] The INA is codified in 8 U.S.C. §1101 *et seq.*

foreign nationals into the United States and the conditions of such aliens' continued presence in the country, including their eligibility to obtain employment or public benefits, adjust immigration status, and become U.S. citizens. In addition, the INA establishes various mechanisms for enforcing these rules, including by prescribing the removal of aliens found to have entered the United States without permission, or to have violated the terms governing their authorized admission into the country.[8] It also established criminal penalties for certain immigration violations.[9]

On the other hand, the INA expressly or impliedly confers some discretionary authority on the executive branch in matters of immigration enforcement.[10] For example, the INA authorizes immigration officials to grant certain types of benefits or relief to qualifying aliens who lack lawful immigration status. Moreover, the INA permits immigration officials to waive certain statutory restrictions that might otherwise render an alien ineligible to receive particular immigration benefits.[11] The exercise of these discretionary authorities may enable some unlawfully present aliens to remain in the United States—through asylum,[12] temporary protected status,[13] cancellation of removal,[14] or some other means—rather than being removed.

In other cases, however, aliens who have entered or have stayed in the United States in violation of INA requirements may be permitted to remain in the country and, in some cases, legalize their status, not as the result of the exercise of expressly delegated authority, but as a result of the executive branch's independent discretion in enforcing the law.[15] Article II of the Constitution specifically tasks the Executive to "take Care that the Laws be faithfully executed," and the executive branch has historically been seen as having some discretion (commonly known as prosecutorial or enforcement discretion) in determining when, against whom, how, and even

---

[8] Certain conduct by aliens who have not been lawfully admitted into the United States renders them inadmissible and, if found physically present within the United States, subject to removal. INA §212, 8 U.S.C. §1182. Aliens who have been lawfully admitted into the country may be subject to removal if they engage in specified conduct rendering them deportable. INA §237, 8 U.S.C. §1227.

[9] *See* CRS Legal Sidebar WSLG563, *An Overview of Immigration-Related Crimes*, by Michael John Garcia.

[10] *See* Arizona v. United States,—U.S.—, 132 S. Ct. 2492, 2499 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. ... Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal.").

[11] *See, e.g.,* INA §212(a)(9)(B)(v), 8 U.S.C. §1182(a)(9)(B)(v) (authorizing waiver of the ground of inadmissibility applicable to aliens unlawfully present for more than 180 days in specified circumstances); INA §212(h), 8 U.S.C. §1182(h) (conferring authority to waive many of the grounds of inadmissibility concerning criminal conduct).

[12] Asylum is a discretionary form of relief from removal available to qualifying aliens who are unable or unwilling to return to their home countries due to a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. Aliens who are granted asylum may be eligible to work in the United States and adjust to lawful permanent resident (LPR) status. INA §§208, 209(b), 8 U.S.C. §§1158, 1159(b).

[13] Temporary protected status (TPS) is a "temporary" form of relief from removal that the Secretary of Homeland Security may grant to nationals from a specific country due to an ongoing crisis in that country. Aliens who are granted TPS are generally eligible to work in the United States so long as they have TPS. INA §244, 8 U.S.C. §1254a.

[14] Under INA §240A, the Attorney General is authorized to cancel the removal and adjust the status of otherwise inadmissible or deportable aliens who satisfy specified criteria (e.g., having been present or resided in the country for a specified period). *See* 8 U.S.C. §1229b. No more than 4,000 aliens may be granted such relief in any fiscal year. Aliens who were subject to removal or committed a criminal offense making them removable *prior* to the enactment of the current cancellation of removal statute may be eligible for earlier forms of relief (suspension of deportation or a "§212(c) waiver," discussed, *infra*, at page 10), which are not subject to these numerical limitations.

[15] *See generally* CRS Report R42924, *Prosecutorial Discretion in Immigration Enforcement: Legal Issues*, by Kate M. Manuel and Todd Garvey.

whether to prosecute apparent violations of the law. For example, immigration officials may opt to give a lower priority to the removal of certain categories of unlawfully present aliens because the removal of other categories (e.g., those convicted of serious crimes) has been deemed a higher priority in light of resource constraints and other considerations.[16] Congressional enactments could, however, be seen as limiting the executive's discretion not to take particular actions (e.g., by mandating that certain aliens be detained pending removal proceedings).[17] The express adoption of an executive policy that is "in effect an abdication of ... statutory duty" could also be found to be impermissible,[18] but it might be difficult for a court to assess the degree of nonenforcement that would entail an "abdication."

The executive branch's discretion to interpret applicable statutes when Congress has not spoken to the precise question at issue may also afford immigration officials some flexibility in determining how INA requirements apply to a particular alien or category of aliens.[19] This discretion may be relevant in determining how particular statutory grants of discretionary authority are to be applied (e.g., what constitutes "exceptional and extremely unusual hardship" for purposes of cancellation of removal, or "extreme hardship" for purposes of certain waivers of inadmissibility).[20] It can also play a role in determining whether and how particular statutes are seen to circumscribe the Executive's enforcement discretion. That is, where a statute is silent or ambiguous as to the circumstances of its enforcement in particular cases, the Executive may have some discretion in determining its application.[21]

This report provides an overview of the three broad types of discretion that the Executive can be seen to have as to immigration: (1) express delegations of discretionary authority; (2) discretion

---

[16] *See, e.g.*, DHS, U.S. Immigration and Customs Enforcement (ICE) Director John Morton, Memorandum, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, June 17, 2011 (copy on file with the authors) (discussing the usage of prosecutorial or enforcement discretion by immigration officials, and identifying priorities that ICE agents should consider in the exercise of such discretion).

[17] *See generally* INA §236(c), 8 U.S.C. §1226(c).

[18] Heckler v. Cheney, 470 U.S. 821, 832-833 n.4 (1985) ("Nor do we have a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities.") (citing *Adams v. Richardson*, 480 F.2d 1159 (1973) (en banc)).

[19] *See* Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-843 (1984) ("[When] Congress has directly spoken to the issue, ... that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." However, where a statute is "silent or ambiguous with respect to a specific issue," courts will generally defer to an agency interpretation that is based on a "permissible construction of the statute."). *See also* INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999) ("It is clear that principles of *Chevron* deference are applicable" to immigration agencies' interpretation of INA requirements).

[20] *See, e.g.,* INA §212(a)(9)(B)(v), (h), & (*i*), 8 U.S.C. §1182(a)(9)(B)(v), (h), & (*i*) (authorizing waiver of specified grounds of inadmissibility when the alien's removal would cause "extreme hardship" to certain family members who are U.S. citizens or LPRs); INA §240A(b)(1)(D), 8 U.S.C. §1229b(b)(1)(D) (permitting cancellation of the removal of certain aliens whose removal would cause "exceptional and extremely unusual hardship" to certain family members who are U.S. citizens or LPRs).

[21] The Executive has, for example, construed provisions in INA §235 which some assert require that unlawfully present aliens be placed in removal proceedings as applying only to "arriving aliens," and not to aliens who are present within the country without inspection. *See* Dep't of Justice (DOJ), Immigr. & Naturalization Serv. (INS), Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10357 (Mar. 6, 1997) (codified at 8 C.F.R. §235.3(c)). *See also* DOJ, INS, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 444-46 (Jan. 3, 1997) (noting that the INA "distinguishes between the broader term 'applicants for admission' and a narrower group, 'arriving aliens'"). *See* "Deferred Action" for further discussion of INA §235.

in enforcement (commonly known as prosecutorial or enforcement discretion); and (3) discretion in interpreting and applying statutes. In so doing, it provides notable examples of each broad type of discretion, as well as potential constraints upon the exercise of particular types of discretion. Separate reports discuss prosecutorial discretion in immigration enforcement and the Take Care Clause in greater detail. *See generally* CRS Report R42924, *Prosecutorial Discretion in Immigration Enforcement: Legal Issues*, by Kate M. Manuel and Todd Garvey; CRS Report R43708, *The Take Care Clause and Executive Discretion in the Enforcement of Law*, by Todd Garvey.

# Express Delegations of Discretionary Authority

In several instances, the INA expressly grants immigration officials some degree of discretion over aliens' eligibility for particular immigration benefits or relief, including adjustment to legal immigration status or authorization to work in the United States. These statutory delegations sometimes provide immigration officials with broad discretion to determine whether and when aliens may be eligible for particular immigration benefits. In other instances, such delegations may permit immigration officials to waive the application of a statutory requirement that would bar otherwise-qualifying aliens from obtaining particular immigration benefits or relief.

## Statutory Authorization to Grant Benefits or Relief

In some instances, the INA expressly authorizes the executive branch to grant certain benefits or relief to aliens. In these instances, aliens are eligible for the benefit or relief not because Congress has given the executive branch discretion to waive restrictions that would otherwise bar the aliens from the benefit or relief, as discussed below (see "Statutory Waivers of Restrictions on Benefits or Relief"), but because Congress has affirmatively provided for certain benefits or relief to be granted. In some cases where Congress has delegated discretionary authority over a particular form of benefit or relief to immigration officials,[22] it has provided clear statutory guidance for when such authority may be exercised. In other cases, there are few, if any, express limits on the authority granted to the Executive, although some would argue that prior uses of particular authorities should serve to constrain subsequent uses of this authority.[23] The authority to grant benefits or relief can play a significant role in executive discretion as to immigration, as the examples below illustrate.

### Temporary Protected Status

*Temporary protected status* (TPS) is a type of relief from removal that Congress has authorized the executive branch to grant to aliens who presently cannot be safely returned to their home countries. Section 244 of the INA imposes a number of conditions upon who may be granted TPS. Specifically, aliens must:

---

[22] Not every INA provision concerning the conferral of benefits or relief is discretionary in nature. *See, e.g.*, INA §241(b)(3), 8 U.S.C. §1231(b)(3) (generally barring removal of qualifying aliens to countries where the alien's life or freedom would be threatened because of the alien's race, religion, nationality, political opinion, or membership in a particular social group). Discussion of such mandatory forms of benefits or relief is beyond the scope of this report.

[23] *See* discussion *infra* "Potential Constraints."

- be from a foreign state that the Department of Homeland Security (DHS) has designated due to an ongoing armed conflict; an earthquake, flood, drought, epidemic, or other environmental disaster; or other "extraordinary and temporary conditions" that prevent aliens' safe return;[24]

- have been "continuously physically present" in the United States since the effective date of their home country's most recent TPS designation;[25]

- have "continuously resided" in the United States since whatever date the executive may designate (generally a date that is earlier than the TPS designation date);[26]

- be generally admissible as an immigrant and not ineligible for TPS (e.g., have not been convicted of specified offenses);[27]

- register during the period prescribed for registration by the executive branch; and

- pay any registration fee required by the executive branch.[28]

In addition, Congress has provided that TPS is generally to be withdrawn if the alien proves to have been ineligible for such status; has not remained "continuously physically present" since the date he or she was first granted TPS; or fails "without good cause" to register annually.[29]

Despite these conditions, a grant of TPS can afford significant relief to individual aliens because aliens with TPS are provided identifying documentation and work authorization by the executive branch, and they cannot be removed while they have TPS.[30] TPS can also be a powerful tool for the Executive in crafting immigration policy. For example, TPS could be employed to enable aliens who are from countries where large numbers of persons have been displaced—and who are unlikely to qualify as refugees[31]—to remain in the United States.[32] Further, while TPS is

---

[24] In the case of natural disasters, INA §244 further requires "substantial, but temporary," disruption of living conditions in the affected area, and the foreign state must be temporarily unable to handle the return of its nationals and request TPS designation. INA §244(b)(1)(B)(i), 8 U.S.C. §1254a(b)(1)(B)(i). Pursuant to INA §244, country designations must be published in the *Federal Register*, and may be for periods of no less than six months and no more than 18 months. INA §244(b)(1)-(2), 8 U.S.C. §1254a(b)(1)-(2). These designations must be reviewed at least 60 days before they expire, at which point, they may be extended if the conditions that gave rise to the designation persist. Otherwise, INA §244 requires that the designation be terminated. INA §244(b)(3)(A)-(B), 8 U.S.C. §1254a(b)(3)(A)-(B).

[25] There is an exception for "brief, casual, and innocent absences." *See* INA §244(c)(4), 8 U.S.C. §1254a(c)(4).

[26] *See, e.g.*, DHS, USCIS, Extension of the Designation of El Salvador for Temporary Protected Status, 78 Fed. Reg. 32418 (May 30, 2013) (establishing a TPS designation date of March 9, 2001, and a date of continuous residence of February 13, 2001).

[27] *See* INA §244(c)(2)(A)-(B), 8 U.S.C. §1254a(c)(2)(A)-(B). Certain grounds of inadmissibility are, however, waived for aliens seeking TPS. *Id.*

[28] INA §244(c), 8 U.S.C. §1254a(c).

[29] INA §244(c)(3), 8 U.S.C. §1254a(c)(3).

[30] INA §244(a)(1), 8 U.S.C. §1254a(a)(1) (nonremoval and work authorization); INA §244(d), 8 U.S.C. §1254a(d) (documentation).

[31] In order to qualify as a "refugee" under the INA, an alien must have experienced past persecution, or have a well-founded fear of future persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. INA §101(a)(42), 8 U.S.C. §1101(a)(42). Accordingly, aliens who fear generalized lawlessness and violence in a country generally do not qualify as "refugees" under the INA.

[32] *See, e.g.*, DHS, USCIS, Extension of the Designation of Somalia for Temporary Protected Status, 78 Fed. Reg. 65690 (Nov. 1, 2013) (noting that Somalia was initially designated for TPS on September 16, 1991, "based on (continued...)

"temporary," in practice, aliens from designated countries are often able to legally remain and work in the United States for years, potentially prompting further migration from the country.[33]

---

**What Is the Relationship Between TPS and Extended Voluntary Departure and Deferred Enforced Departure?**

Legislation expressly giving the executive branch the authority to grant TPS was enacted in 1990, and is generally seen to have been in response to the Executive's prior use of extended voluntary departure (EVD) and deferred enforced departure (DED) as devices to permit aliens to avoid removal to certain countries for a period of time.

During various periods between 1960 and 1990, the executive branch granted either EVD or "nonenforcement of departure"—later known as DED—to persons from Poland, Cuba, the Dominican Republic, Czechoslovakia, Chile, Vietnam, Lebanon, Hungary, Romania, Uganda, Iran, Nicaragua, Afghanistan, Ethiopia, and China. Such grants of EVD and DED were not expressly authorized by statute, although in at least one case, Congress enacted legislation expressing its sense that the Executive ought to consider persons from a specific country (El Salvador) for EVD.

The executive branch has continued to grant DED, in particular, even after creation of TPS authority, typically to provide relief to aliens who would not qualify for TPS. For example, in 1999, President Clinton granted DED to Liberians who's TPS had expired. This grant was continued by the George W. Bush and Obama Administrations.

*See generally* P.L. 98-164, §1012, 97 Stat. 1062; S. Hrg. 99-204; Jeanne Butterfield, Former Director, Am. Immigr. Lawyers Ass'n, et al., Memorandum, Executive Branch Authority Regarding Implementation of Immigration Laws and Policies, Apr. 29, 2011 (copy on file with the authors).

---

## Work Authorization

Another example of discretionary authority to grant benefits or relief conferred by statute involves employment authorization documents (EADs) permitting aliens to legally work in the United States. In general, the INA provides that only specified categories of aliens are eligible to obtain employment in the United States, and INA §274A bars the hiring or continued employment of "unauthorized aliens."[34] The definition of *unauthorized alien* found in INA §274A describes an *unauthorized alien*, in part, as an alien who is not "authorized to be ... employed ... by the Attorney General [currently, the Secretary of Homeland Security]."[35] This language has generally been construed as giving immigration officials broad discretion to grant EADs to aliens, including those without lawful immigration status.[36] There are no express conditions contained in the INA

---

(...continued)

extraordinary and temporary conditions resulting from armed conflict").

[33] Certain aliens from Honduras have had TPS since 1999, while some from El Salvador have had it since 2001. *See* USCIS, Temporary Protected Status, Oct. 16, 2014, *available at* http://www.uscis.gov/humanitarian/temporary-protected-status-deferred-enforced-departure/temporary-protected-status. The parents of some unaccompanied alien children (UACs) recently apprehended at the U.S. border with Mexico are present in the United States pursuant to TPS. *See, e.g.*, Donald Kerwin, *The Migration of Unaccompanied Children to the United States: Stumbling Towards a Humanitarian Solution*, HUFFINGTON POST, July 20, 2014, *available at* http://www.huffingtonpost.com/donald-kerwin/the-migration-of-unaccomp_b_5512234.html (posting by the Executive Director of the Center for Migration Studies noting that "[a]n unknown, but likely substantial number of migrant children have U.S. resident parents in temporary protected status"). Some have recently suggested that TPS also be granted to these UACs in order to avoid their removal to countries where they face potential domestic or gang violence. *See, e.g.*, Pangea Legal Servs., Re: Provide Temporary Protected Status for Children from El Salvador, Guatemala, Honduras, and Mexico, July 14, 2014 (copy on file with the authors).

[34] INA §274A, 8 U.S.C. §1324a.

[35] INA §274A(h)(3), 8 U.S.C. §1324a(h)(3).

[36] *See generally* 8 U.S.C. §1324a.

regarding when the Secretary of Homeland Security may grant work authorization,[37] and the executive branch has promulgated regulations that provide for the issuance of EADs to aliens who have been granted various and often temporary forms of relief from removal, including deferred action and deferred enforced departure.[38]

Work authorization regulations promulgated by immigration agencies have played an important role in the Obama Administration's DACA initiative. Because DHS regulations had already provided for the issuance of EADs to aliens granted deferred action when such aliens establish "an economic necessity for employment,"[39] DACA beneficiaries were effectively made eligible for EADs as a corollary of receiving deferred action. Further, because many states had laws providing for the issuance of driver's licenses to aliens whose presence in the United States is "authorized" under federal law, and accepted EADs as proof that an alien's presence was so authorized, DACA beneficiaries generally also became eligible to obtain driver's licenses in the states where they were residing.[40]

## Statutory Waivers of Restrictions on Benefits or Relief

In some cases, the INA provides immigration officers with discretionary authority to waive statutory requirements that would otherwise render a particular alien ineligible to receive an immigration-related benefit or form of relief. Typically, a discretionary waiver permits immigration authorities to exempt application of some, but not all, of the eligibility requirements that an alien must otherwise satisfy. Judicial review of decisions to exercise waiver authority is typically limited and, in some cases, is largely barred by statute.[41] However, federal courts may

---

[37] When first promulgated in 1987, these regulations were challenged through the administrative process on the grounds that they exceeded the INS's authority. *See* DOJ, INS, Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46092 (Dec. 4, 1987). Specifically, the challengers asserted that the statutory language referring to aliens "authorized to be … employed by this chapter or by the Attorney General" did not give the Attorney General authority to grant work authorization "except to those aliens who have already been granted specific authorization by the Act." *Id.* Had this argument prevailed, the authority of the INS and, later, DHS to grant work authorization to beneficiaries of deferred action would have been in doubt, because the INA does not expressly authorize the grant of EADs to such persons. However, the INS rejected this argument on the grounds that the:

> only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.

*Id.* Subsequent case law has generally affirmed that immigration officials have broad discretion in determining whether to deny or revoke work authorizations to persons granted deferred action. *See, e.g.*, Perales v. Casillas, 903 F.2d 1043, 1045 (5th Cir. 1990); Chan v. Lothridge, No. 94-16936, 1996 U.S. App. LEXIS 8491 (9th Cir. 1996). These cases also appear to suggest that, by extension, immigration officials have similarly broad discretion to grant work authorization provided any requisite regulatory criteria (e.g., "economic necessity," see, *infra*, note 39) are met.

[38] *See generally* 8 C.F.R. §274a.12.

[39] 8 C.F.R. §274a.12(c)(14). Under these regulations, the "basic criteria" for establishing economic necessity are the federal poverty guidelines. *See* 8 C.F.R. §274a.12(e).

[40] *See generally* CRS Report R43452, *Unlawfully Present Aliens, Driver's Licenses, and Other State-Issued ID: Select Legal Issues*, by Kate M. Manuel and Michael John Garcia; CRS Legal Sidebar WSLG1057, *9th Circuit Decision Enables DACA Beneficiaries—and Other Aliens Granted Deferred Action—to Get Arizona Driver's Licenses*, by Kate M. Manuel.

[41] INA §242(a)(2)(B), 8 U.S.C. §1152(a)(2)(B) (generally barring judicial review of administrative judgments concerning specified forms of discretionary waivers or relief from removal, as well as "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified ... [in the INA's immigration] subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security"). (continued...)

review questions of law raised by the Executive's use of waiver authority (e.g., whether immigration authorities properly found that an alien was statutorily *ineligible* for a waiver).[42]

The parameters of any waiver authority are controlled by the terms of the relevant statute, but where that statute is silent or ambiguous, the Executive could be said to have some discretion in determining how the waiver is applied. Some Members of Congress have, for example, recently suggested that the Executive expand its interpretation of what constitutes "hardship" for purposes of certain waivers, discussed below, so as to give additional unlawfully present aliens a basis for obtaining legal status in the United States.[43]

## Waivers of Grounds of Inadmissibility

Arguably some of the most significant examples of discretionary waiver authority involve application of the grounds of inadmissibility listed in INA §212.[44] In general, an alien who has not been lawfully admitted into the United States is subject to exclusion or (if the alien is found at a U.S. port of entry or within the United States) removal from the country if the alien is inadmissible under INA §212.[45] Some grounds of inadmissibility constitute permanent bars to an alien's admission into the United States, such as those applicable to aliens who have committed specified criminal offenses or who have sought to procure an immigration benefit through fraud or misrepresentation.[46] In other cases, a ground of inadmissibility may bar an alien from being admitted into the United States for a certain period of time. For instance, an alien who was previously ordered removed from the United States, or who had been unlawfully present in the country for more than 180 days before departing the country, is thereafter inadmissible for a specified number of years.[47]

---

(...continued)

Decisions as to whether to grant an alien asylum, however, may be reviewed to assess whether they are manifestly contrary to the law and constitute an abuse of discretion. *See* INA §242(b)(4)(D), 8 U.S.C. §1152(b)(4)(D).

[42] INA §242(a)(2)(D), 8 U.S.C. §1152(a)(2)(D) (provisions barring review of discretionary actions not precluding "review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals"). Most, but not all, reviewing courts have held that this provision permits only the review of "pure" questions of law, and not "mixed" questions involving the application of the law to undisputed facts. *See* Al Ramahi v. Holder, 725 F.3d 1133, 1138 n.2 (9th Cir. 2013) (interpreting the INA to permit judicial review of mixed questions of law and fact, but observing that most other appellate courts have disagreed with this interpretation).

[43] *See, e.g.*, *Congressional Hispanic Caucus Hands DHS Recommendations for Enforcement Changes*, 8 WORKPLACE IMMIGR. REP. 261 (Apr. 14, 2014) (discussing a memorandum to DHS Secretary Jeh Johnson, which advocated that "extreme hardship" be construed to include family ties to the United States, the age of the qualifying U.S. citizen or LPR relative, and financial and educational hardships, among other things).

[44] The INA also gives immigration officials discretion to waive other statutory requirements. *See, e.g.*, INA §216(c)(4), 8 U.S.C. §1186a(c)(4) (hardship waiver applicable to certain adjustment requirements for conditional permanent resident aliens who are spouses or sons or daughters of U.S. citizens or LPRs); INA §217, 8 U.S.C. §1187 (authorizing establishment of a visa waiver program, under which certain visa requirements may be waived with respect to qualifying aliens from certain countries who seek entry into the United States as tourists for less than 90 days); INA §237(a)(1)(E), 8 U.S.C. §1227(a)(1)(E) (providing for limited waiver of the ground of deportability concerning alien smuggling).

[45] *See* 8 U.S.C. §1182. Aliens who are admitted into the United States as nonimmigrants, or who are paroled into the country, are generally barred from adjusting to LPR status if they are covered by the inadmissibility grounds of INA §245(a), 8 U.S.C. §1255(a).

[46] INA §212(a)(2), 8 U.S.C. §1182(a)(2) (criminal grounds of inadmissibility); INA §212(a)(6)(C), 8 U.S.C. §1182(a)(6)(C) (inadmissibility grounds concerning fraud and misrepresentation).

[47] INA §212(a)(9)(A), 8 U.S.C. §1182(a)(9)(A) (generally providing for a five- or 10-year bar on the admission of an (continued...)

The INA provides immigration authorities with the ability to waive application of many of these grounds in certain situations, and thereby enable otherwise-excludable aliens to be lawfully admitted into the United States. Most notably, the immigration authorities have discretion to waive most of the inadmissibility grounds with respect to applicants for *nonimmigrant visas*, so that such aliens may be permitted to enter the United States on a temporary basis.[48] An alien who obtains such a waiver remains ineligible to receive an immigrant visa allowing him or her to come to the United States on a permanent basis, and would also be unable to adjust to LPR status while present in the United States on a nonimmigrant visa.[49]

Immigration officials may also waive certain grounds of inadmissibility so that aliens may be admitted into the United States on *immigrant visas* and/or granted adjustment to LPR status in certain instances. Examples include the following:

- INA §212(a)(9)(B)(v) permits the waiver of the inadmissibility provision applicable to aliens who have been unlawfully present in the United States for more than 180 days, if immigration authorities determine that refusing to admit the alien would result in "extreme hardship" for a U.S. citizen or LPR who is the spouse or parent of the alien.[50]

- INA §212(h) generally authorizes immigration officers to waive many of the inadmissibility grounds concerning criminal activity for qualifying aliens,[51] including those (1) whose convictions for the criminal offenses rendering them inadmissible occurred more than 15 years before the date of the alien's application for a visa, admission, or adjustment of status, and who are deemed rehabilitated and not a threat to U.S. welfare, safety, and security; or (2) whose denial of admission would result in "extreme hardship" for a U.S. citizen or LPR who is the spouse, parent, or child of the alien.[52] However, the eligibility for

---

(...continued)

alien who was previously removed, with lengthier or permanent bars applicable in certain circumstances); INA §212(a)(9)(B), 8 U.S.C. §1182(a)(9)(B) (generally establishing either a three- or 10-year bar on the admission of an alien who was unlawfully present in the United States for more than 180 days).

[48] INA §212(d)(3), 8 U.S.C. §1182(d)(3).

[49] INA §245(a), 8 U.S.C. §1255(a).

[50] 8 U.S.C. §1182(a)(9)(B)(v). In 2013, USCIS promulgated regulations which permit unlawfully present alien spouses or children of U.S. citizens who are seeking admission to the United States as legal immigrants to apply for provisional waivers of the bars on admissibility before departing the United States in order to adjust to lawful status. *See generally* CRS Legal Sidebar WSLG385, *Provisional Waivers of the Three- and Ten-Year Bars to Admissibility to Be Granted to Certain Unlawfully Present Aliens*, by Kate M. Manuel.

[51] The use of such a waiver with respect to the drug-related ground of inadmissibility is statutorily limited. Moreover, the commission of certain types of criminal offenses renders an alien ineligible to obtain a waiver. INA §212(h), 8 U.S.C. §1182(h) (barring issuance of waivers to aliens who have committed, or conspired or attempted to commit, murder or acts of torture, and also barring waivers to aliens previously admitted as LPRs who thereafter were convicted of an aggravated felony). *See also* 8 C.F.R. §212.7(e) (providing that waiver authority shall generally not be exercised, "except in extraordinary circumstances," with respect to aliens who seek such a waiver on the basis of hardship caused to U.S. family members but who are inadmissible due to "violent or dangerous crimes"); *Matter of* Jean, 23 I. & N. Dec. 373 (AG 2002) (depending on the gravity of the offense rendering the alien inadmissible, even "exceptional and extremely unusual hardship" likely to be suffered by the alien's U.S. citizen or LPR family members might be inadequate grounds to justify the exercise of waiver authority).

[52] Aliens who are self-petitioners for immigration status under the terms of the Violence Against Women Act (VAWA) are not required to satisfy some of the eligibility requirements to obtain a 212(h) waiver that other classes of aliens must meet. INA §212(h)(1)(C), 8 U.S.C. §1182(h)(1)(C).

waivers of aliens who had previously been admitted as LPRs and lost such status, and thereafter seek to be readmitted as LPRs or adjust to LPR status, is circumscribed.[53]

- INA §212(i) permits the waiver of the ground of inadmissibility applicable to aliens who procured or sought to procure an immigration benefit through fraud or misrepresentation,[54] when it is determined that the denial of the alien's lawful admission would result in "extreme hardship" to a U.S. citizen or LPR who is the spouse or parent of the alien.[55]

- Former INA §212(c) gave immigration officials discretion to waive most grounds of inadmissibility with respect to LPRs who had temporarily proceeded abroad and sought reentry into the United States, provided that the LPR had been domiciled in the United States at least seven years and met certain other conditions (i.e., had not served at least five years' imprisonment for an aggravated felony conviction, and was not inadmissible on grounds relating to national security or international child abduction).[56] This waiver authority had also been construed by immigration officials and reviewing courts to apply to LPRs who were present in the United States and undergoing deportation hearings.[57] Although this waiver provision was deleted from the INA in 1996, courts have construed such authority as remaining available to immigration officials with respect to resident aliens who are removable on account of guilty pleas arising prior to the repeal of INA §212(c).[58]

---

### Hardship as a Requirement for Certain Relief from Removal

In several instances, the INA provides that, for an alien to be eligible for a particular form of relief from removal, the alien's removal must cause "hardship" to a member of the alien's immediate family who is a U.S. citizen or LPR. The nature of these hardship requirements has changed over time, and varies depending upon the particular benefit at issue. Most of the current hardship-based waivers to the grounds of inadmissibility require that the alien's exclusion or removal would cause "extreme hardship" to an immediate family member who is a U.S. citizen or LPR. On the other hand, to qualify for cancellation of removal under INA §240A(b)(1), aliens who are not LPRs must establish that their removal would cause "exceptional and extremely unusual hardship" to a spouse, parent, or child who is a U.S. citizen or LPR.

Neither "extreme hardship" nor "exceptional and extremely unusual hardship" is defined by the INA, and both terms have been subject to varying interpretations over the years. Immigration authorities have typically construed "extreme hardship" to necessitate a showing of greater harm than typically results from an alien's removal, but the elements required to demonstrate "extreme hardship" are dependent upon the facts and particularities of each case. A nonexhaustive list of factors potentially relevant to assessing whether removal would cause "extreme hardship" to a qualifying relative include: the affected family member's ties to the United States; the conditions of the country

---

[53] INA §212(h), 8 U.S.C. §1182(h) (barring waivers from being issued to former LPRs subsequently convicted of an aggravated felony, or who had not continuously and lawfully resided in the country for at least seven years prior to the initiation of removal proceedings).

[54] INA §212(i), 8 U.S.C. §1182(i) (concerning application of INA §212(a)(6)(C), 8 U.S.C. §1182(a)(6)(C)).

[55] *Id.* Somewhat different eligibility requirements apply to VAWA self-petitioners.

[56] Former INA §212(c), 8 U.S.C. §1182(c) (1994).

[57] *See, e.g.,* Francis v. INS, 532 F.2d 268 (2d Cir. 1976); *Matter of* Silva, 16 I. & N. Dec. 26 (BIA 1976).

[58] *See, e.g.,* Judulang v. Holder,—U.S.—, 132 S. Ct. 476 (2011); INS v. St. Cyr, 533 US 289, 326 (2001) (construing the amendment and subsequent repeal of INA §212(c) in 1996 as not eliminating the availability of waivers for those aliens whose pre-1996 criminal convictions "were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect").

> where the qualifying relative might relocate as a result of the alien's removal, and the relative's ties to that country; the financial impact of the qualifying relative's departure from the United States in order to join the relocated alien; and the potential implications that the alien's removal would have for the qualifying relative's health.
>
> The "exceptional and extremely unusual hardship" standard used to assess aliens' eligibility for cancellation of removal under INA §240A(b)(1) has been construed to require the alien to demonstrate a greater degree of hardship than the "extreme hardship" standard, although the alien need not show such hardship is "unconscionable."
>
> *See generally* 23 I. & N. Dec. 56 (BIA 2001); 22 I. & N. Dec. 560 (BIA 1999).

## Parole

While not typically characterized as a waiver, INA §212(d)(5) gives immigration officials broad discretion to permit aliens to enter or remain in the United States, at least temporarily, notwithstanding the fact that the alien may otherwise be inadmissible. As previously discussed, the INA authorizes immigration officials to waive certain grounds of inadmissibility, and thereby permit excludable aliens to be admitted into the United States as immigrants or nonimmigrants. In contrast, the parole of an alien into the United States does not constitute "admission" for immigration purposes. Despite the paroled alien's physical presence in the country, the alien is "still in theory of law at the boundary line" of the United States,[59] and has not been conferred with legal immigration status. Nonetheless, some aliens who obtain parole may be able to adjust to lawful permanent resident (LPR) status while present in the United States (provided they are not covered by a ground of inadmissibility, or any applicable ground of inadmissibility is waived).[60] Aliens granted parole may also, under current regulations, be granted work authorization.[61]

The use of parole authority has been authorized by statute since the INA was originally enacted in 1952. Over the years, the statutory language concerning parole authority has been amended, but the focus has remained upon those persons whose entry into the country is deemed warranted due to emergent or humanitarian concerns, or because the alien's entry is in the public interest. The INA currently permits the Secretary of Homeland Security to parole aliens into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," and further restricts the usage of parole with respect to alien crewmembers or refugees.[62]

As noted in the text box below, parole authority has been exercised by the executive branch with respect to various groups of aliens. Most routinely, "advance parole" has been used to permit certain non-LPRs (e.g., nonimmigrants whose visa does not permit readmission; aliens who lack lawful immigration status but have been permitted to remain in the country) to reenter the United

---

[59] Leng May Ma v. Barber, 357 U.S. 185, 189 (1958).

[60] INA §245(a), 8 U.S.C. §1255(a) (potentially enabling parolees to adjust to LPR status, provided that such persons are not covered by any grounds of inadmissibility in INA §212).

[61] *See* 8 C.F.R. §274a.12(a)(4) (authorizing aliens paroled into the United States as refugees to be employed for the period of time they are in that status) & (c)(11) (providing that aliens must apply for work authorization if temporarily paroled into the country "for emergency reasons or reasons deemed strictly in the public interest").

[62] INA §212(d)(5), 8 U.S.C. §1182(d)(5). Prior to the 1980 Refugee Act, which circumscribed the use of parole to facilitate the entry of refugees, parole had regularly been used with respect to persons fleeing persecution. *See* text box, "A Brief History of the Executive Branch's Parole of Aliens into the United States"; 1980 Refugee Act, P.L. 96-212, §202(f) (limiting use of parole for refugees except when there were "compelling reasons in the public interest" to require the alien to be paroled into the country rather than being admitted as a refugee).

States after a brief departure.[63] "Parole-in-place" has also been granted to some unlawfully present aliens, most notably, the spouses, children, or parents of those serving, or who previously served, on active duty in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve. [64] Once granted parole-in-place, such aliens are no longer seen as unlawfully present and are potentially eligible to adjust status pursuant to INA §245, as discussed below (see "Eligibility of Aliens with TPS for Adjustment of Status"). Most recently, some commentators have suggested that the Executive could make greater use of parole and parole-in-place to facilitate the entry of more nonimmigrant workers, or permit immediate relatives of U.S. citizens or LPRs to legalize their status.[65]

---

### A Brief History of the Executive Branch's Parole of Aliens into the United States

The executive branch's practice of paroling excludable or inadmissible aliens into the United States dates back to the early 1900s, when immigration officials adopted the practice to avoid holding aliens in custody pending their exclusion. Parole was also used to permit aliens to remain in the United States for a period of time when "the case was exceptionally meritorious and immediate deportation would be inhumane."

When the INA was adopted in 1952, it provided express statutory authority for this executive branch practice, permitting aliens applying for admission to be paroled into the United States "temporarily under such conditions as [the Executive] may prescribe for emergent reasons or for reasons deemed strictly in the public interest." The legislative history suggests that the INA's drafters intended the parole authority to be used only in limited circumstances. The initial draft of the INA reportedly would have restricted parole to aliens requiring medical treatment in the United States. Although the language adopted was not so narrow, the drafters seem to have envisioned parole being used to permit aliens to enter only for "immediate medical attention," or as "a witness or for purposes of prosecution." Subsequent statements of members of the drafting committee support this view, emphasizing that the drafters envisioned parole as applying in "unique individual cases" on a "temporary and at best conditional basis."

The executive branch, however, used its parole authority under the INA more broadly. For example, the 1953 INS annual report notes the parole into the United States of 386 natives of Estonia, Latvia, Finland, Sweden, Poland, and the Soviet Union who had initially sought refuge from Russian Communists in Sweden, and then sailed to various U.S. ports between 1945 and 1950. A subsequent Senate report similarly notes the parole of 925 orphans from Eastern Europe in 1956; 38,045 refugees from Hungary in 1957; 19,754 refugees from Eastern Europe in 1960-1965; 14,741 Chinese refugees from Hong Kong and Macao in 1962; 692,219 refugees from Cuba in 1962-1979; 35,758 refugees from the Soviet Union in 1973-1979; 208,200 Indochinese refugees in 1975-1979; 1,422 Chileans in 1975-1977; another 343 Latin Americans in 1976-1977; an estimated 1,000 Lebanese in 1978-1979; and an estimated 15,000 Cuban prisoners and family members in 1979. Later, although parole was arguably less common, it was still used with Jewish persons from the Soviet Union in 1988-1989; certain Haitians interdicted at sea and detained at Guantanamo who had medical conditions in 1991-1992; and Haitian orphans in 2010. These grants of parole generally reflected humanitarian concerns tied to the aliens' situations. However, domestic labor needs were sometimes taken into account when granting parole, as happened when Hong Kong Chinese were selected for parole based, in part, on their "possessing special skills needed in the United States" and 2,468 aliens were paroled into Guam to "support

---

[63] Advance parole requests will typically be approved only if certain criteria are met. *See, e.g.*, DHS USCIS, Frequently Asked Questions Concerning Deferred Action for Childhood Arrivals, updated Oct. 23, 2014, *available at* http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (noting that aliens who receive deferred action under the DACA initiative may be able to travel abroad if granted advance parole, and stating that parole will only be granted to enable travel for specific purposes, including a family emergency, or educational or employment purposes).

[64] DHS, USCIS, Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i), Nov. 15, 2013 (copy on file with the authors).

[65] Stuart Anderson, National Foundation for American Policy, Executive Action and Legal Immigration, NFAP Policy Brief, at 9 Sept. 2014 (copy on file with the authors) (parole of additional H1-B workers); Marshall Fitz, Center for American Progress, What the President Can Do on Immigration if Congress Fails to Act, at 21-22 (July 2014) (parole-in-place of certain family members).

defense projects" following a typhoon.

In some instances, Congress pushed back against the executive branch's broad use of its parole authority, as when a 1965 committee report stated that "it is the express intent of the committee that the parole provisions ... be administered in accordance with the original intention of the drafters ... The parole provisions were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law." However, in other cases, Congress responded to the executive branch's granting of parole to groups of refugees by enacting legislation which permitted parolees to become LPRs (e.g., P.L. 85-559 (Hungarian parolees); P.L. 89-732 (Cuban parolees)). In addition, in 1960, Congress enacted legislation (P.L. 86-648) that could be seen as having ratified (at least for a time) the executive branch's use of parole to admit refugees by temporarily authorizing the use of parole for this purpose.

*See generally* INS Annual Reports for 1949, 1950, 1962, and 1963; 2 U.S.C.C.A.N. 1653, 1706 (1952); S. Rep. No. 748, 89th Cong., 1st Sess. at 16-17; H.R. Rep. No. 96-814, at 88; S. Rep. No. 256, 96th Cong., 2d Sess. at 6; Soviet Refugees: Hearing, 101st Cong., 1st Sess. (1989); 27 Geo. Wash. L. Rev. 373, 374 n. 11 (1959); 16 In Defense of the Alien 135 (1993); 55 N.Y. L. Sch. L. Rev. 791 (2010).

## Potential Constraints

As these examples suggest, exercises of affirmative authority to grant benefits or relief, or to waive restrictions on benefits or relief, must be consistent with any statutory limitations. For example, the Executive is arguably barred from considering "hardship" to the alien, or to the alien's children, in determining whether to waive the three- and 10-year bars upon the admissibility of aliens who have accrued at least 180 days of unlawful presence in the United States because INA §212(a)(9)(B)(v) expressly refers to waivers:

> in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established ... that the refusal of admission to such [an] alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien.[66]

However, in cases where the INA is silent or ambiguous, the Executive could potentially have more discretion as to how affirmative authority to grant benefits or relief, or waive restrictions on benefits or relief, is exercised. (See "Discretion in Interpreting and Applying Statutes.")

In addition, even where there are few, if any, statutory restrictions upon the Executive's ability to grant immigration-related benefits or relief, questions might be raised about whether particular exercises of authority are consistent with historical practice, other provisions of the INA, or Congress's intent in granting the executive branch specific authority. For example, while nothing in the INA expressly prohibits the executive branch from doing so, granting EADs to every alien who comes to the United States, regardless of such alien's legal status, would be unprecedented.[67] Similarly, if the Executive hypothetically were to propose granting work authorization to all aliens coming to the United States, an argument could be made that doing so would be inconsistent with the provisions that Congress made in the INA for the protection of domestic labor in the granting of employment-based immigrant and nonimmigrant visas.[68] An argument

---

[66] *See* 8 U.S.C. §1182(a)(9)(B)(v).

[67] On the other hand, there could be cases where historical precedent could be said to support particular exercises of discretionary authority, as with the executive branch's practice of continuing to grant DED after the creation of TPS. *See* text box, *supra* page 6.

[68] *See generally* CRS Report R43223, *The Framework for Foreign Workers' Labor Protections Under Federal Law*, by (continued...)

could also be made that Congress is unlikely to have defined *unauthorized alien* and prohibited the knowing hiring or employment of such aliens if it contemplated the executive branch granting work authorization to all aliens.

# Discretion in Enforcement

The Executive is generally recognized as possessing some degree of independent authority in assessing when, against whom, how, and even whether to prosecute apparent violations of federal law; an authority generally referred to as "prosecutorial discretion" or "enforcement discretion."[69] It is generally recognized that the executive branch may exercise prosecutorial or enforcement discretion in the field of immigration,[70] including in determining:

- whether to commence removal proceedings and the nature of the particular charges to lodge against an alien;[71]

- whether to cancel a Notice to Appear (NTA) or other charging document before jurisdiction vests with an immigration judge;[72] and

- whether to appeal an immigration judge's decision or order.[73]

The granting of immigration benefits, in contrast, has historically been seen not as an exercise of prosecutorial or enforcement discretion inherent to the executive branch, but as an exercise of authority expressly delegated by Congress.[74]

---

(...continued)

Margaret Mikyung Lee and Jon O. Shimabukuro.

[69] *See generally* DOJ, United States Attorneys' Manual, §9-27.110(B) (2002). There is some debate over the basis for prosecutorial discretion; that is, whether it arises from an English common law procedural mechanism known as the *nolle prosequi*, the structure of the U.S. Constitution, or other sources. *See* "Prosecutorial Discretion Generally," in CRS Report R42924, *Prosecutorial Discretion in Immigration Enforcement: Legal Issues*, by Kate M. Manuel and Todd Garvey.

[70] *See, e.g.*, *Arizona*, 132 S. Ct. at 2498 ("A principal feature of the removal system is the broad discretion entrusted to immigration officials."); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 490 (1999) (finding that the various prudential concerns that prompt deference to the executive branch's determinations as to whether to prosecute criminal offenses are "greatly magnified in the deportation context," which involves civil (as opposed to criminal) proceedings). *See also* United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950) (noting that immigration is a "field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program.").

[71] *See, e.g.*, Hanggi v. Holder, 563 F.3d 378, 383 (8th Cir. 2009); Rodrigues v. Attorney General of the United States, 414 Fed. App'x 484, 488 (3d Cir. 2011); *Matter of* Avetisyan, 25 I. & N. Dec. 688 (BIA 2012); *Matter of* Bahta, 22 I. & N. Dec. 1381 (BIA 2000); *Matter of* Singh, 21 I. & N. Dec. 427 (BIA 1996); *Matter of* Ruis, 18 I. & N. Dec. 320 (BIA 1982); *Matter of* Roussis, 18 I. & N. Dec. 256 (BIA 1982); *Matter of* Lennon, 15 I. & N. Dec. 9 (BIA 1974).

[72] *See, e.g.*, *Matter of* G-N-C-, 22 I. & N. Dec. 281 (BIA 1998). *See also* Akhtar v. Gonzales, 450 F.3d 587, 591 (5th Cir. 2006) (recognizing immigration officials' prosecutorial discretion in determining whether to terminate removal proceedings to allow the alien to apply for any immigration benefits that may be available).

[73] *See, e.g.*, *Matter of* Avetisyan, 25 I. & N. Dec. 688 (BIA 2012); *Matter of* York, 22 I. & N. Dec. 660 (BIA 1999); *Matter of* Joseph, 22 I. & N. Dec. 660 (BIA 1990).

[74] *See, e.g.*, DOJ, INS General Counsel Bo Cooper, INS Exercise of Prosecutorial Discretion, July 11, 2000, at 4 (copy on file with the authors) ("The doctrine of prosecutorial discretion applies to enforcement decisions, not benefit decisions. For example, a decision to charge, or not to charge, an alien with a ground of deportability is clearly a prosecutorial enforcement decision. By contrast, the grant of an immigration benefit, such as naturalization or adjustment of status, is a benefit decision that is not a subject for prosecutorial discretion.").

The exercise of prosecutorial or enforcement discretion in specific cases has historically been based on humanitarian factors,[75] and/or resources constraints.[76] A "favorable" exercise of discretion (e.g., one permitting a potentially removable alien to remain in the United States) generally does not grant the alien legal status, despite the alien having legal permission to remain in the country.[77] However, by enabling the alien to remain in the United States, a favorable exercise of discretion could permit the alien to acquire a basis for legalization in the future (e.g., the establishment of ties that would provide a basis for adjustment of status under current law, or following the enactment of a legalization measure like the Immigration Reform and Control Act of 1986).[78]

## Determining Whether to Issue an NTA

One example of the Executive's prosecutorial or enforcement discretion as to immigration involves determinations as to whether to issue Notices to Appear (NTAs) or other charging documents initiating proceedings against individual aliens who are believed to be removable.[79] Such discretion has likely been used as long as there have been grounds for deporting or removing aliens, with individual immigration officers determining that humanitarian factors or resource constraints were such that action against specific individuals was not warranted. A few "large scale" examples have also been noted, such as the then-INS's determination in 1962 to permit "56,800 refugee overstay visitors [from Cuba] ... to remain in the United States for an indefinite period," rather than seeking their removal.[80] (These persons were apparently separate and apart from the 62,500 Cuban parolees, and the 6,500 Cubans in visitor status, also reported that year as having been permitted to remain in the United States indefinitely).[81]

However, there is only sporadic evidence regarding such uses of discretion until the mid-1970s, when the executive branch began issuing memoranda that elaborated on specific aspects of immigration enforcement and, particularly, its practices and priorities as to immigration enforcement. Currently, for example, these memoranda establish a general policy of not engaging

---

[75] *See, e.g.*, Exercising Prosecutorial Discretion, *supra* note 16 (noting, among the factors to be considered in determining whether a favorable exercise of discretion is warranted, the alien's length of presence in the United States and the circumstances of the alien's arrival in the United States); William J. Howard, Principal Legal Advisor, ICE, DHS, Prosecutorial Discretion, Oct. 24, 2005, at 2 (copy on file with the authors) (similar).

[76] *See, e.g.*, U.S. ICE, Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities, No. 306-112-002b, Aug. 23, 2013 (copy on file with the authors) ("This and other memoranda related to prosecutorial discretion are designed to ensure that agency resources are focused on our enforcement priorities."); DHS, ICE Director John Morton, Director, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens, Mar. 2, 2011, at 1-2 (copy on file with the authors) ("ICE ... only has resources to remove approximately 400,000 aliens per year, less than 4 percent of the estimated illegal alien population of the United States."); Prosecutorial Discretion, *supra* note 76 (noting demands created by the establishment of DHS, among other things).

[77] *Cf.* USCIS, Frequently Asked Questions, *supra* note 63 ("Deferred action does not confer lawful [immigration] status upon an individual."). However, individuals granted deferred action are seen as being lawfully present, at least for purposes of federal immigration law, while they have deferred action. *Id.*

[78] *Cf. Reno*, 525 U.S. at 490 ("Postponing justifiable deportation (in the hope that the alien's status will change–by, for example, marriage to an American citizen–or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding.").

[79] *See* sources cited *supra* note 71.

[80] INS, Annual Report of the Immigration and Naturalization Service, at 4 (1962) (copy on file with the authors).

[81] *Id.*

in arrests, interviews, searches, or surveillance for purely immigration enforcement purposes near schools or churches.[82] Conversely, the "highest priority" is given to the removal of:

> aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; aliens not younger than 16 who participated in organized criminal gangs; aliens subject to outstanding criminal warrants; and aliens who otherwise pose a serious risk to public safety.[83]

Some have recently called for changes to the executive branch guidance regarding the issuance of NTAs and, in particular, the cessation of the Secure Communities program.[84] Secure Communities relies upon information sharing between various levels and agencies of government to identify potentially removable aliens,[85] and critics have alleged that the program has resulted in the removal of aliens who are not priorities for removal under the DHS guidance quoted above.[86]

# Deferred Action

Another example of discretion in enforcing immigration law involves the granting of deferred action to removable aliens.[87] Grants of deferred action date back to at least the 1970s,[88] and are distinct from determinations not to issue NTAs or take other enforcement action. Generally, there is no record of an immigration officer's determination not to issue an NTA, and one immigration officer's determination not to issue an NTA to an individual alien is generally not seen as "binding" on other officers encountering the same alien. The situation is different as to grants of deferred action, which are documented in the alien's immigration file (commonly known as the "A file"), and have historically been seen to govern unless and until there are changes in the alien's circumstances.[89]

---

[82] DHS, ICE Director John Morton, *Enforcement Actions at or Focused on Sensitive Locations*, Oct. 24, 2011 (copy on file with the authors).

[83] Civil Immigration Enforcement: Priorities, *supra* note 76, at 1-2.

[84] *See, e.g.*, Congressional Hispanic Caucus Hands DHS Recommendations, *supra* note 43, at 5.

[85] *See* DHS, ICE, *Secure Communities: The Basics*, *available at* http://www.ice.gov/secure_communities (last accessed: Nov. 2, 2014).

[86] *See, e.g.*, Human Rights Watch, *Immigrants "Afraid to Call 911,"* May 15, 2014, *available at* http://www.hrw.org/news/2014/05/14/us-immigrants-afraid-call-911; Am. Civil Liberties Union, *Domestic Violence Victim's 911 Call for Help Results in Deportation Proceedings*, May 12, 2011, *available at* https://www.aclusocal.org/a-domestic-violence-victims-911-call-for-help-results-in-deportation-proceedings-secure-communities-program-endangers-crime-victims/. In a May 2014 interview on the PBS NewsHour, Secretary of Homeland Security Jeh Johnson said he was taking a "fresh look" at Secure Communities, in part, because of such criticisms. *See* Alex Rogers, *Obama Administration Taking "Fresh Look" at Deportation Review Program*, Time, May 16, 2014, *available at* http://time.com/102694/obama-deportation-program-reviews/#102694/obama-deportation-program-reviews/.

[87] *See, e.g.*, Hotel & Rest. Employees Union Local 25 v. Smith, 846 F.2d 1499, 1510-1511 (D.C. Cir. 1988); Barahona-Gomez v. Reno, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001); Johnson v. INS, 962 F.2d 574, 579 (7th Cir. 1992); Carmona Martinez v. Ashcroft, 118 Fed. App'x 238, 239 (9th Cir. 2004); *Matter of* Yauri, 25 I. & N. Dec. 103 (BIA 2009); *Matter of* Singh, 21 I. & N. Dec. 427 (BIA 1996); *Matter of* Luviano-Rodriguez, 21 I. & N. Dec. 235 (BIA 1996); *Matter of* Quintero, 18 I. & N. Dec. 348 (BIA 1982).

[88] *See* Lennon v. INS, 527 F.2d 187, 191 n.7 (2d Cir. 1975) (describing deferred action as an "informal administrative stay of deportation").

[89] *See generally* Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, Immigr. L. & Proc. §72.03(2)(h) (2009).

Immigration officials may grant deferred action on their own initiative, or aliens can request deferred action if they know it is an option. The Obama Administration's DACA initiative is perhaps the best known example of deferred action, although it arguably differs from other grants of deferred action in that the ability to request relief is widely known and the factors considered in granting it are explicit.[90] Additionally, grants of deferred action through DACA last for two years, with the possibility of renewal, as opposed to being open-ended like grants of deferred action outside DACA generally are.[91] Some have also said that grants of deferred action through DACA are different in that DACA applies to a "category" of aliens.[92] However, determinations as to whether to grant deferred action through DACA are made on an individual basis,[93] and the Obama Administration has repeatedly stated that no one is entitled to deferred action through DACA, not even if all "the guidelines [suggesting the alien warrants a favorable exercise of discretion] are met."[94] The Administration has also continued to grant deferred action to aliens outside the DACA initiative, although on a smaller scale.[95] Some have recently called for the extension of DACA, or a DACA-type program, for other aliens, although proposals as to which aliens should be granted deferred action through such a program have varied (e.g., parents of U.S. citizens, aliens eligible to legalize under S. 744, 113th Cong.).[96]

## Potential Constraints

The executive branch's enforcement discretion is subject to two notable limits, neither of which is necessarily judicially enforceable.[97] The first is that the express adoption of a policy that constitutes an abdication of a statutory duty could be found to be impermissible under the

---

[90] By publicizing the availability of deferred action and the criteria applied in determining whether a favorable exercise of discretion is warranted, the DACA initiative could be seen as responding to criticisms that prosecutorial discretion has historically been exercised with little accountability or oversight. *See, e.g.,* Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law*, 61 STAN. L. REV. 869, 911-916 (2009). In 2007, the USCIS Ombudsman expressly recommended that DHS post information about deferred action on its website, among other things. *See* Recommendation from the CIS Ombudsman to the Director, USCIS, Apr. 6, 2007 (copy on file with the authors).

[91] *Compare* Frequently Asked Questions, *supra* note 63 (grants of deferred action through DACA lasting two years) *with* CHARLES GORDON, STANLEY MAILMAN, & STEPHEN YALE-LOEHR, IMMIGR. L. & PROC. §72.03(2)(h) (2009) (noting "periodic reviews" of non-DACA grants of deferred action to determine whether deferred action is still warranted).

[92] *See, e.g.,* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 675 (2004) (prosecutorial discretion not extending to "entire categories" of aliens); *Dream On, supra* note 6, at 846 (similar).

[93] *See* Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, June 15, 2012, at 2 (copy on file with the authors) ("[R]equests for relief pursuant to this memorandum are to be decided on a case by case basis.").

[94] *See* Frequently Asked Questions, *supra* note 63 ("[USCIS] retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.").

[95] *See, e.g.,* Shoba Sivaprasad Wadhia, *My Great FOIA Adventure and Discoveries of Deferred Action Cases at ICE*, 27 GEO. IMMIGR. L.J. 345, 350 (2013) (reporting that ICE processed 698 deferred action cases in the first three quarters of FY2012). By contrast, USCIS reports that it granted 1,707 requests for deferred action through DACA in September 2012 alone. *See* USCIS, *Deferred Action for Childhood Arrivals Process* (Nov. 2012 reporting date), *available at* http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/2012-1116%20DACA%20Monthly%20Report.pdf.

[96] *See, e.g.,* Randy Capps & Marc R. Rosenblum, Executive Action for Unauthorized Immigrants, Migration Policy Institute Issue Brief No. 10, at 3 (Sept. 2014) (discussing how many aliens might be affected if deferred action were granted to certain segments of the population of unlawfully present aliens).

[97] For a discussion of standing, see the text box, "Who Has Standing to Challenge Exercises of Enforcement Discretion?", *infra* page 20.

rationale articulated by the Supreme Court in its 1985 decision in *Heckler v. Cheney*. The *Heckler* Court expressly recognized the possibility of an executive agency "consciously and expressly adopt[ing] a general policy [of not enforcing the law] that is so extreme as to amount to an abdication of its statutory responsibilities."[98] However, the *Heckler* Court did not elaborate upon what might constitute such an abdication,[99] and at least one federal court of appeals subsequently took the view that "[r]eal or perceived inadequate enforcement ... does not constitute a reviewable abdication of duty."[100] Instead, the appellate court opined that the plaintiffs must show that the Executive either is "doing nothing to enforce the ... laws," or has "consciously decided to abdicate" its enforcement responsibilities.[101]

---

### Does DACA Constitute an Abdication of Duty?

Some have suggested that, with DACA, the Executive has essentially adopted a general policy which is in effect an abdication of its statutory duty insofar as 1.76 million aliens are potentially eligible for relief from removal under DACA. However, the fact that a prosecutorial discretion policy favorably affects a large number of people may not – in and of itself – amount to an abdication of a statutory duty. Courts might also consider the size of the total population against whom the law could be enforced, as well as the resources available for enforcing the law, on the theory that "the President cannot secure full execution of the laws, if Congress denies to him adequate means of doing so." *Myers v. United States*, 272 U.S. 52, 291-92 (1926) (Brandeis, J., dissenting).

The existence of multiple—and sometimes inconsistent—enforcement mandates from Congress might also factor into a court's analysis of whether nonenforcement policies constitute an abdication of duty, particularly in situations where an agency elects to concentrate limited resources upon offenders (or offenses) that Congress has indicated are a priority. For example, following the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which some assert amended the INA to require the removal of at least some unauthorized aliens, Congress enacted a number of measures directing DHS to give priority to the removal of "criminal aliens." *See, e.g.*, 125 Stat. 950; 123 Stat. 2142; 122 Stat. 3659; 121 Stat. 2050-2051. DHS has emphasized that its diminished focus on the removal of DACA-eligible individuals corresponds to an increased focus on criminal aliens, and a reviewing court could potentially find that enforcement of later-enacted mandates (as to criminal aliens) may justify more limited enforcement of earlier enacted mandates (as to unauthorized aliens generally).

---

The second limitation involves the view that statutes using "shall" invariably require agency action. Some statutes using "shall" have been construed in this way.[102] Perhaps most notably, a federal district court recently found that immigration officers are required to place all aliens who have not been admitted to the United States into removal proceedings because of the use of "shall" in three purportedly "interlocking provisions" in INA §235.[103] These provisions state that:

---

[98] *Heckler*, 470 U.S. 832-833 n.4 (internal citations omitted).

[99] The *Heckler* Court cited the U.S. Court of Appeals for the District of Columbia Circuit's decision in *Adams v. Richardson* in support of its view that a policy of nonenforcement could constitute abdication, but does not otherwise attempt to define the parameters of what could be said to be abdication.

[100] *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).

[101] *Id.*

[102] *See, e.g.*, Lopez v. Davis, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' in §3621(e)(2)(B) contrasts with the legislators' use of a mandatory 'shall' in the very same section. Elsewhere in §3621, Congress used 'shall' to impose discretionless obligations, including the obligation to provide drug treatment when funds are available. *See* 18 U.S.C. §3621(e)(1) ('Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)'); *see also, e.g.*, §3621(b) ('The Bureau shall designate the place of the prisoner's imprisonment.... In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status.'").

[103] Crane v. Napolitano, No. 3:12-cv-03247-O, 2013 U.S. Dist. LEXIS 57788, *27-*39 (N.D. Tex., Apr. 23, 2013).

1. any alien present in the United States who has not been admitted shall be deemed an applicant for admission;

2. applicants for admission shall be inspected by immigration officers; and

3. in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for removal proceedings.[104]

Thus, the district court concluded that DACA runs afoul of the INA because many of the aliens granted deferred action through DACA had never been placed in removal proceedings as required, in the court's view, by INA §235. (This same court, however, later ruled that it lacked jurisdiction over the case.[105] That decision has been appealed, and it is presently unclear whether and how its earlier decision construing INA §235 could be seen to restrain any future grants of deferred action.[106])

On the other hand, not all statutes using "shall" have been construed to eliminate executive discretion, particularly not in cases where the statute prescribes that persons be sanctioned for particular violations.[107] For example, in a 2011 decision, the Board of Immigration Appeals (BIA), the highest administrative body for construing and applying immigration law, found that immigration officers have discretion as to whether to pursue expedited removal proceedings under INA §235 or formal removal proceedings under INA §240, notwithstanding the fact that the INA uses "shall" in describing who is subject to expedited removal.[108] In so doing, the BIA specifically noted that:

> in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct "shall" be imprisoned or otherwise punished. But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute.[109]

---

[104] *See* INA §235(a)(1), (a)(3), & (b)(2)(A), 8 U.S.C. §1225(a)(1), (a)(3), & (b)(2)(A).

[105] *Crane*, No. 3:12-cv-03247-O, Order (N.D. Tex., July 31, 2013) (copy on file with the authors).

[106] Moreover, even if the district court's interpretation were adopted, an argument could be made that the provisions of the INA discussed by the district court require only that arriving aliens be placed in removal proceedings, not that removal proceedings be pursued to a decision on the merits or, if the alien is found removal, until he or she is removed.

[107] The statute at issue in *Heckler*, for example, stated that "[a]ny article of food, drug, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale ... after shipment in interstate commerce, or which may not ... be introduced into interstate commerce, *shall be liable to be proceeded against*." 470 U.S. at 835 (quoting 21 U.S.C. §334(a)(1) (emphasis added)). Nonetheless, despite its use of "shall," this statutory provision was seen by the Court as "framed in the permissive." *Id.*

[108] *Matter of* E-R-M & L-R-M, 25 I. & N. Dec. 520, 523 (BIA 2011).

[109] *Id.* at 522.

### Who Has Standing to Challenge Exercises of Enforcement Discretion?

Standing requirements are concerned with who is a proper party to seek judicial relief from a federal court. Standing requirements derive from Article III of the Constitution, which confines the jurisdiction of federal courts to actual "Cases" and "Controversies." The case-or-controversy requirement has long been construed to restrict Article III courts to the adjudication of real, live disputes involving parties who have "a personal stake in the outcome of the controversy." Parties seeking judicial relief from an Article III court must generally show three things in order to demonstrate standing: (1) they have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) the injury is likely to be redressed by a favorable decision.

Standing can be difficult to show in cases involving an Executive's policy or practice of not enforcing the law in particular cases. Those whose sole injury is the government's alleged failure to follow the law will generally be found to lack standing because this injury is not personal and particularized.

Government officers and employees, who have taken an oath to uphold the law, will also generally be found to lack standing so long as their only asserted injury is being forced to violate their oaths by implementing an allegedly unlawful policy or practice. Instead, they must allege some separate and concrete adverse consequence that would flow from violating their oath, and courts have reached differing conclusions as to whether the possibility of being disciplined for obeying—or refusing to obey—allegedly unlawful orders suffices for purposes of standing, or whether such injury is "entirely speculative" and, therefore, lacking imminence. In the case of the ICE officers who brought suit to challenge the Obama Administration's DACA initiative, the reviewing district court found that the plaintiffs had standing because of the possibility of such discipline. However, because such discipline constitutes an adverse employment action, this court subsequently found that the plaintiff's case is within the jurisdiction of the Merit Systems Protection Board, rather than that of the court.

Individual Members of Congress also generally lack standing to challenge presidential actions. In *Raines v. Byrd*, the Supreme Court held that in order to obtain standing an individual Member must assert either a personal injury, like the loss of his or her congressional seat, or an institutional injury which cannot be addressed by an extant legislative remedy.

*See* CRS Report R42924, *Prosecutorial Discretion in Immigration Enforcement: Legal Issues*, by Kate M. Manuel and Todd Garvey; CRS Report R43712, *Article III Standing and Congressional Suits Against the Executive Branch*, by Alissa M. Dolan.

# Discretion in Interpreting and Applying Statutes

Another type of discretion that the executive branch may exercise as to immigration law involves the interpretation and application of statutes. As the Supreme Court articulated in its 1984 decision in *Chevron U.S.A. v. Natural Resources Defense Council*, when "Congress has directly spoken to the issue, ... that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[110] However, where a statute is "silent or ambiguous with respect to a specific issue," courts will generally defer to an agency interpretation that is based on a "permissible construction of the statute,"[111] on the grounds that the executive branch must fill any "gaps" implicitly or explicitly left by Congress in the course of administering congressional programs.[112] The degree of deference afforded to particular executive branch interpretations can vary depending upon the facts and circumstances of the case, including whether the interpretation is a "formal" one adopted through notice-and-comment rulemaking or case-by-case adjudication.[113] There are a number of places where the INA is silent or ambiguous

---

[110] 467 U.S. 837, 842-43 (1984).

[111] *Id.* at 843.

[112] *See, e.g.*, Morton v. Ruiz, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.").

[113] *See, e.g.*, Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters - (continued...)

on particular issues, and the executive branch has—expressly or practically—adopted an interpretation that significantly affects the implementation of immigration law. As some commentators have suggested,[114] these executive branch interpretations could potentially be changed to expand (or restrict) aliens' ability to enter or remain in the United States without the enactment of additional legislation.

## Not Counting Derivatives

One recently proposed change in the Executive's interpretation of the INA involves the counting of so-called "derivatives"—or noncitizen spouses or children of alien beneficiaries of family- or employment-based visa petitions, who are not themselves the subject of such petitions.[115] Derivatives can immigrate with the so-called "principal" whom they accompany,[116] but the INA does not expressly address whether derivatives are to be counted against the annual caps on the number of immigrants (other than "immediate relatives" of U.S. citizens) who may be admitted to the United States each year. Section 203(d) of INA states only that:

> A spouse or child as defined in subparagraph (A), (B), (C), (D), or (E) of section 1101(b)(1) of this title shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c) of this section, be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.[117]

The executive branch has historically counted derivatives against the annual caps on the number of immigrants, with the result that 78,089 of the 143,998 total employment-based immigrant visas issued in FY2012 reportedly went to derivatives.[118] Because the counting of derivatives can thus be seen as diminishing the number of aliens who may immigrate each year for employment reasons, and as delaying family-based immigration, some have recently suggested that the executive branch cease counting derivatives against the annual caps as a way to permit additional employment- or family-based immigration without congressional action (e.g., the adoption of legislation increasing the annual caps provided in INA §201).[119] Other provisions of the INA

---

(...continued)

like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law - do not warrant *Chevron*-style deference."). Instead, such "informal" interpretations may be afforded a lesser degree of deference that depends upon various factors including "the degree of the agency's care, its consistency, formality, and relative expertness, and … the persuasiveness of the agency's position," as well as the "writer's thoroughness, logic, and expertise, its fit with prior interpretations, and any other source of weight." United States v. Mead Corp., 533 U.S. 218, 228, 235 (2001); *see also* Skidmore v. Swift, 323 U.S. 134 (1944).

[114] *See supra* note 43.

[115] Executive Action and Legal Immigration, *supra* note 65; Gary Endelman & Cyrus D. Mehta, The Family That Is Counted Together Stays Together: How to Eliminate Immigrant Visa Backlogs, Sept. 15, 2014, *available at* http://blog.cyrusmehta.com/2014/09/the-family-that-is-counted-together.html; American Immigration Lawyers Ass'n, Letter to Cecilia Muñoz, Assistant to the President and Director of the Domestic Policy Council, Aug. 6, 2014, at 2 (copy on file with the authors).

[116] *See* INA §203(d), 8 U.S.C. §1153(d) (providing that derivatives are entitled to the "same status, and the same order of consideration," as the principals they accompany (or follow to join) in immigrating).

[117] 8 U.S.C. §1153(d).

[118] Executive Action and Legal Immigration, *supra*, note 65, at 3.

[119] *See* sources cited, *supra* note 115.

could, however, potentially be said to be inconsistent with such an interpretation,[120] and might factor into any Executive determination as to whether to adopt this interpretation.

## Eligibility of Aliens with TPS for Adjustment of Status

Another recently proposed change in the executive branch's interpretation of the INA concerns whether aliens granted TPS under INA §244 are eligible for adjustment of status under INA §245.[121] Section 245 permits adjustment of status for aliens who were "inspected and admitted and paroled" and are "admissible for permanent residence," among other things.[122] However, the executive branch has historically taken the view that aliens granted TPS are neither "admitted or paroled" nor "admissible" as those terms are defined by INA §101.[123] Thus, in DHS's long-standing view, they are ineligible for adjustment of status.

On the other hand, neither INA §245 nor INA §101 expressly addresses whether unlawfully present aliens granted TPS are eligible for adjustment of status or are admitted/admissible, and a draft memorandum sent by several USCIS employees to the Director of USCIS in 2010 noted that changing DHS's interpretation to permit adjustment of status under INA §245 for aliens with TPS would "promote family unity" and "reduce the threat of removal for certain individuals present in the United States without authorization."[124] DHS has generally not adopted such an interpretation to date. However, it has adopted the interpretation within the territorial jurisdiction of the U.S. Court of Appeals for the Seventh Circuit[125] following a 2013 decision wherein that court found that INA §244—which governs the granting of TPS—requires that those with TPS be seen as admissible.[126]

## Potential Constraints

Although these examples illustrate that the executive branch may have some discretion in interpreting and applying immigration law when the INA is silent or ambiguous on particular issues, this discretion is not unlimited. As previously noted, the executive branch's interpretation

---

[120] In particular, under INA §201(b), 8 U.S.C. §1151(b), immediate relatives of U.S. citizens, special immigrants, or aliens granted cancellation of removal are expressly exempted from being counted against the annual limits on the number of immigrants admitted, but derivatives of immigrants admitted on employment- or family-based visas are not. Because Congress clearly identified parties who should not be counted, an argument could be made that the statute precludes the Executive from using its discretion not to count derivatives, as Congress did not list them among the persons exempted from counting.

[121] *See, e.g.*, Letter to Cecilia Muñoz, *supra* note 115, at 3.

[122] INA §245(a), 8 U.S.C. §1255(a).

[123] *See, e.g.*, Flores v. USCIS, 718 F.3d 548 (6th Cir. 2013) ("USCIS argues that Mr. Suazo and other TPS beneficiaries who initially entered the United States without inspection and have an independent basis for a visa can never satisfy the threshold requirement of being 'admitted or paroled' or 'admissible.' The USCIS argues that Suazo is only allowed protection under TPS as long as the designation is conferred upon him. USCIS argues that he is unable to adjust to LPR under the independent basis—through his wife's application—because he was not admitted."); Denise A. Vanison, Policy and Strategy, USCIS, et al., Memorandum to Alejandro N. Mayorkas, *Administrative Alternatives to Comprehensive Immigration Reform*, undated (copy on file with the authors) ("Individuals in TPS continue to be deemed ineligible to adjust or change status in the U.S. based on legal opinions rendered in the early 1990s by a General Counsel of the former Immigration and Naturalization Service (INS).").

[124] Alternatives to Comprehensive Immigration Reform, *supra* note 123, at 1.

[125] *See, e.g.*, Letter to Cecilia Muñoz, *supra* note 115, at 3.

[126] *See Flores*, 718 F.3d at 553.

may be constrained if Congress has directly spoken to the precise question at issue.[127] Moreover, even if Congress has not spoken on the question, the executive branch's interpretation must still be seen as constituting a "permissible" and "reasonable" interpretation of the underlying statute in order to be afforded deference by the courts.[128]

---

### How Does the Executive Branch Change Its Interpretation?

How the executive branch changes its interpretation of an immigration statute depends, in part, upon the degree of formality surrounding the issuance of its current interpretation. There are two primary ways to change *formal interpretations* (i.e., regulations, adjudication). One involves the promulgation of changes to regulations through notice-and comment rulemaking. Such rulemaking can be expedited in limited circumstances (e.g., direct final rules, interim final rules). Alternatively, a BIA decision could be certified to the Attorney General (AG).

DOJ regulations implementing the INA, rather than the INA itself, provide for the *certification* of BIA decisions to the AG for his review. Specifically, these regulations require that the Board refer to the AG for review all cases that: (i) the AG directs the Board to refer; (ii) the Chairman or a majority of the BIA believes should be referred; or (iii) the Secretary of Homeland Security, or specific DHS officials designated by the Secretary with the concurrence of the AG, refers for review. These regulations also require that the decisions of the AG in certified cases be in writing and transmitted to the BIA or DHS for forwarding to the aliens or parties affected.

However, the regulations impose no other requirements, leaving the AG with discretion to certify any BIA decision he wishes, and to address any issues he chooses in a decision that is certified to him. Historical example suggests that the BIA decisions which are certified to the Attorney General need not be published or precedential ones, and that their certification to the Attorney General may occur many months after the BIA decision. In addition, prior AGs have characterized their power of review in certified cases as "plenary", in that they may engage in *de novo* review of law and facts, unconstrained by the regulations that bind the BIA in their consideration of cases.

*Informal interpretations* are generally more quickly and easily changed, for example, by withdrawing or modifying informal guidance. For example, in January 2014, the Department of State (DOS) announced changes in its interpretation of the term *parent* in INA §§301 & 309, which govern the acquisition of citizenship at birth for persons born abroad. It did so through a policy memorandum noting that it had formerly construed *parent* to require there be a genetic link between the U.S. citizen parent(s) and the child, but would hereafter recognize gestational ties as well. DHS subsequently announced the issuance of a similar policy in October 2014.

*See generally* 8 C.F.R. §1003.1(h)(1)(i)-(iii) & (2); *Matter of* J-S-, 24 I. & N. Dec. 520, 531 (AG 2008); *Matter of* D-J-, 23 I. & N. Dec. 572, 575 (AG 2003).

---

Concerns could also be raised about the deference to be accorded to new agency interpretations that are inconsistent with a long-standing interpretation of the agency, particularly an interpretation that third-parties have relied upon. The Supreme Court rejected the view that "inconsistency" in agency regulations is a "basis for declining to analyze the agency's interpretation under the *Chevron* framework" in its 2005 decision in *National Cable & Telecommunications Association v. Brand X Internet Services*.[129] However, in so doing, it noted that any "[u]nexplained inconsistency" could be a "reason for holding a regulatory interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act."[130] More recently, questions have been raised about changes in certain informal interpretations of agency regulations. Several federal courts of appeals have found that agencies cannot substantively change rules interpreting agency regulations that parties have relied upon without providing formal public notice and requesting comment under the APA.[131] Other courts

---

[127] *See supra* note 110 and accompanying text.

[128] *See supra* note 111 and accompanying text.

[129] 545 U.S. 967, 981 (2009).

[130] *Id.*; *see also* Motor Vehicle Manufacturers Ass'n v. State Farm Ins., 463 U.S. 29 (1983).

[131] *See, e.g.*, Mortgage Bankers Ass'n v. Harris, 720 F.3d 966 (D.C. Cir. 2013); Alaska Professional Hunters Ass'n v. FAA, 177 F.3d 1030 (D.C. Cir. 1999).

have adopted a different view,[132] and the Supreme Court is scheduled to hear oral arguments on the issue in December 2014.[133]

Some may also argue that certain executive actions as to immigration implicate the "major policy" exception to the general principle of *Chevron* deference in cases where the Executive's interpretation could be said to mark a significant change in policy that Congress arguably did not directly contemplate. Such an exception is generally grounded in the Supreme Court's statement, in its 2000 decision in *FDA v. Brown & Williamson* that "Congress could not have intended to delegate a decision of such economic and political significance [as whether to regulate tobacco pursuant to delegated authority to regulate 'drugs'] to an agency."[134] The *Brown & Williamson* Court also suggested there may be reason to deny deference in all "extraordinary cases" that involve "major questions."[135] However, the Supreme Court's 2007 decision in *Massachusetts v. EPA* is generally seen to have limited, if not vitiated, the "major policy" exception by requiring the Executive to implement an arguably major policy adopted by the Environmental Protection Agency through regulations rather than by statute.[136]

# Author Contact Information

Kate M. Manuel
Legislative Attorney
kmanuel@crs.loc.gov, 7-4477

Michael John Garcia
Legislative Attorney
mgarcia@crs.loc.gov, 7-3873

---

[132] Miller v. California Speedway Corp., 536 F.3d 1020 (9th Cir. 2008), *cert. denied*, 555 U.S. 1208 (2009); Warder v. Shalala, 149 F.3d 73, 75-79 (1st Cir. 1998), *cert. denied*, 526 U.S. 1064 (1999).

[133] *See Perez v. Mortgage Bankers Association* & *Nickols v. Mortgage Bankers Association*, 134 S. Ct. 2820 (2014).

[134] 529 U.S. 120, 133 (2000).

[135] *Id*. at 159. *See also id*. at 133 ("In addition, we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."). *See also MCI v. AT&T*, 512 U.S. 218 (1994) (rejecting the Federal Communications Commission's (FCC's) interpretation of a statutory provision permitting it to "modify" requirements under a specific provision of its governing act to eliminate a tariff requirement on the grounds that de-tariffing was a "major" and "fundamental" change, which would eliminate a "crucial provision of the statute for 40% of a major sector of the industry" regulated by the FCC).

[136] *See, e.g.*, Abigail R. Moncrieff, Reincarnating the "Major Questions" Exception to *Chevron* Deference as a Doctrine of Non-Interference (Or Why Massachusetts v. EPA Got It Wrong), Harvard Law School Faculty Scholarship Series Paper 12 (2008), at 1 (copy on file with the authors). At least one commentator has taken issue with the view that this exception forecloses recent Obama Administration actions. *See* Dan Farber, Is It Unconstitutional for the President to Implement Major New Policies by Regulation?, Feb. 3, 2014, *available at* http://blogs.berkeley.edu/2014/02/03/is-it-unconstitutional-for-the-president-to-implement-major-new-policies-by-regulation/.




DATE DOWNLOADED: Fri Jul 30 09:27:31 2021
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202 (1987).

ALWD 6th ed.
. Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202 (1987).

APA 7th ed.
(1987). Legislative History of Making Further Continuing Appropriations For The
Fiscal Year 1988 P.L. 100-202. Washington, D.C., Arnold & Porter.

Chicago 17th ed.
Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202. Washington, D.C., Arnold & Porter.

McGill Guide 9th ed.
Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202 (Washington, D.C.: Arnold & Porter., 1987)


AGLC 4th ed.
Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202 (Arnold & Porter., 1987)

MLA 8th ed.
Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202. Washington, D.C., Arnold & Porter. HeinOnline.

OSCOLA 4th ed.
Legislative History of Making Further Continuing Appropriations For The Fiscal Year
1988 P.L. 100-202. Washington, D.C., Arnold & Porter.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

**AR2022_400642**

approve any such request. President Arias referred to the Contras as "the problem and not the solution." He said the Reagan administration "still thinks that supporting the Contras is the best way to get the Sandinistas to comply. I believe to the contrary."

A vote by this Congress for further aid to the Contras, at a time when we are being called upon to do exactly the opposite, is a direct slap in the face to the peace process and to our allies in Central America who are struggling to implement this agreement. It is not up to us unilaterally to declare Nicaragua not to be in compliance with the peace plan. The Central Americans set up their own verification commission to investigate compliance. The Central American Presidents will meet in Costa Rica on January 15 to receive the commission's report. Let us hear from them. If the Central Americans wanted the United States to act as the sole verifiers of the agreement, they would have asked us.

Many of my colleagues will be making their decision on this vote based on recent statements by a Sandinista defector and by the Sandinista Defense Minister. We have seen many sensational revelations like this over the past several years, usually just before a Contra aid vote. In all that time, one central reality has not changed: the only way to deal with the problems that Nicaragua poses for us and for Central America is through a regional settlement. Even if the Sandinistas are serious about creating a 600,000-man army, army reserve, and militia force, do we seriously believe that 10,000 Contras are going to stop them? Or 20,000 Contras? Or 50,000 Contras? Even if the Soviets were seriously prepared to give the Nicaraguans Mig's—which I do not believe—do we believe the Contras are going to stop that?

Of course they won't. The only way to stop Nicaragua's military buildup is through a verifiable and enforceable agreement—the Arias way, not the Reagan way. The situation in Nicaragua is not going to be changed for the better by the administration's policies; the situation in Nicaragua is a product of the administration's policies. Maybe the Sandinistas will stop building up their army when we stop saying we are out to destroy them. We should try it and find out. These recent revelations argue against Contra aid, not for it.

While every country in the region—and several from outside the region—are making serious proposals to advance the peace process, the administration and its supporters in the Congress are the only group still talking about Contra aid.

We should all be clear on one point: The United States—and this Congress cannot continue to aid the Contras and cooperate with the peace process at the same time. I urge my colleagues to support the Central American peace process by opposing any further assistance of any kind to the Contras.

Mrs. MORELLA. Mr. Speaker, it is with some reluctance that I will vote for the continuing resolution, a $600 billion measure which will provide funding for the rest of fiscal year 1988 for Government programs normally funded by the 13 regular appropriations bills.

This continuing resolution is a necessary component of the so-called "leadership agreement," needed both to overturn sequestration under Gramm-Rudman and to make some progress toward deficit reduction. The bill achieves $7.6 billion in deficit reductions required by the budget summit—$5 billion in defense spending and $2.6 billion in domestic discretionary spending. This legislation, together with the budget reconciliation package, is expected to reduce the deficit by $30 billion in fiscal year 1988.

I am opposed to several provisions of the final version: I am opposed to the provision of the continuing resolution that appropriates an additional $8.1 million in nonmilitary aid for the Nicaraguan Contras. To authorize such funding at this point in the progress of the Guatemala accord is unfortunate. I am disappointed that there was no opportunity to vote on an amendment to strike this provision from the resolution; I was one of eight Republicans to sign a letter asking conferees to oppose the inclusion of aid to the Contras in the final version.

I am disappointed that this continuing resolution contains only a 2-percent pay raise for Federal workers; the original House continuing resolution, for which I voted, contained a 3-percent pay raise for Federal employees. While I agree that a pay raise for Members of Congress should not be paid in 1988, it is unfortunate that the pay raise is also eliminated for the Senior Executive Service and Federal judges.

But, without passage of a continuing resolution, there would be no paychecks at all for Federal employees, 60,000 of whom live in Maryland's Eighth Congressional District, and essential Government services would soon grind to a halt.

It is unfortunate that Government funding should be decided by one omnibus bill. All too often in recent years, Congress has failed to pass appropriations bills in a timely fashion and has had, instead, to pass omnibus spending bills outside of the normal, careful funding process. As a result, individual items are not given the consideration which is their due, but are instead wrapped into a large spending package which must be approved to keep the Government operating.

This agreement is preferable to the across-the-board cuts required under the Gramm-Rudman and currently in effect. It is the responsibility of Congress to choose its priorities for Federal spending, and while I disagree with some of the provisions, this package is the best plan possible at this time. Its broad outlines were developed in the budget summit, negotiated between the congressional leadership and the President. It is the only option which we have to consider today. And, immediate action is necessary to reduce the deficit. Thus, I will be voting in favor of the continuing resolution.

Mr. ROYBAL. Mr. Speaker, I want my colleagues to know what occurred with the family unity amendment I added to the continuing resolution (H.J. Res. 395). The House Appropriations Committee accepted that amendment by 27–11, and the full House adopted the continuing resolution with the family unity amendment intact by a vote of 248–170. The Senate did not include such a provision in its version of the bill, and the House conferees receded to that position.

The amendment was designed to provide critical protection to wives, husbands, and children of persons who have received or will receive legal immigration status under the Immigration Reform and Control Act of 1986. That critical protection was a moratorium on deportations of these family members until the person granted legal status could petition for his or her spouse or child to receive legal status as well. That adjustment to legal status would not be under the so-called amnesty program, but under the immigration laws applicable to everyone else.

Despite the obvious humanitarian and practical appeal of such a provision, vocal critics began to look for flaws in the family unity measure. Rather than offering constructive alternatives, they chose to completely sidestep addressing the very real concerns of immigrant families. They cast the good and hard-working people who merely want assurance that their families can live in peace without fear of separations in the worst possible light. They suggested hair-raising scenarios of criminals—convicted murderers, rapists, and drug dealers—Cuban Marielitos, and AIDS-infected persons being provided blanket protection from deportation.

These detractors knew very well that it was a simple matter to perfect the amendment to avoid the possibility of such occurrences, by explicitly exempting persons who are inadmissible. In fact it was so simple, that the substitute I developed with Chairman RODINO of the Judiciary Committee to address concerns that had been raised dealt with that problem in less than a dozen words. It was also a simple matter to address the two or three other concerns that had been raised. It won't do for any Member of Congress to claim that immigration law is too complex for him or her to have decided whether the amendment deserved support. The potential for officially condoned family separations is far too serious for that sort of abdication.

The issue has been put to rest for this year, but I can assure you it will be raised again in the next Congress. Therefore, I think it is important to assess why it was that the amendment was not accepted by the conferees. In my opinion, the conferees' attention was deflected to irrelevant concerns about whether or not these immigrant families were being treated better or worse than would-be immigrants. Misleading comparisons were made by the Senator from Wyoming [Mr. SIMPSON], who took it upon himself to address the conferees, and, tragically, succeeded in overriding the broad support the substitute family unity amendment had from other immigration experts and legislators. The House and Senate Judiciary Committees chairmen, Mr. RODINO and Mr. BIDEN, and the Senate chairman of the Subcommittee on Immigration and Refugee Affairs, Mr. KENNEDY, were leading supporters. I want to thank them and all my colleagues in the House and Senate who assisted in our efforts.

I would like to make clear what the amendment was not and what it would not do. It is not another legalization program, as those who opposed it in conference suggested. It

would not have conferred legal immigration status on anyone who did not qualify for the amnesty program. It would not have allowed anyone to immigrate to this country who is not now here. It would not have given anyone the right to petition for their relatives to immigrate to this country. It would not have affected those currently waiting to immigrate to this country, or put anyone ahead of anyone else within the family preference system.

It is specious and mean-spirited to focus on "special privileges" being accorded former illegal aliens, when what is meant by "special privileges'" is an accommodation to keep immigrant families together. That accommodation was limited to family members of immigrants who have resided continuously in this country for 5 years or more, and was merely a narrowly drawn proposal protecting ineligible family members from deportation, applicable only if they, themselves had resided continuously in the country since November 6, 1986, or June 26, 1987, if the qualifying family member were legalized under the special agricultural worker program. Moreover, it applied only if the ineligible family member satisfied many of the requirements of the legalization program, including the admissibility provisions.

Compare that limited protection from forced family separations caused by deportation to the special privileges of permanent resident aliens.

Amnesty does not confer on illegal immigrants one of the most important privileges of permanent residence: a benefit that is automatically granted to anyone immigrating to this country from abroad, and that is derivative legal status for spouses and children accompanying or "following to join" immigrants. Thus, someone granted an immigrant visa abroad, with no ties to this country whatsoever, could bring in his or her spouse and children as permanent residents immediately.

This derivative status does not apply to the person adjusting to legal status while in this country; but those granted permanent resident status under normal channels would be able to petition immediately for their spouses and children to adjust to legal status. The comparable relative of the amnesty-legalized person, on the other hand, will have to wait years to even begin the adjustment process, since the legalized person cannot petition for his or her spouse or child until permanent resident status is actually conferred. Moreover, the spouse and child of the legalized person would be far more vulnerable to deportation in the meantime.

It is not only with regard to immigration laws that permanent resident aliens are granted privileges denied legalized immigrants and their families. For purposes of Federal benefits, for example, permanent residents are treated almost identically to citizens. Legalized persons, on the contrary, are specifically exempted from receiving many Federal benefits for 5 years after being granted legal status. There can be no question that the so-called amnesty program confers a second-class immigration status, with far more stringent requirements than those that apply to permanent resident status.

I am including copies of the Royal-Rodino family unity proposal, letters of support, which were distributed to the conferees, favorable editorials on the issue of family unity, and the President's Executive order on the family, issued in September to guide executive departments and agencies in the formulation and implementation of their policies. I ask all of you to review them. Then, with regard to Congress'' failure to maintain the family unity amendment, ask yourselves the following question, included in the Executive order criteria for family policymaking: "What message, intended or otherwise, does this action send to the public concerning the status of the family?"

### AMENDMENT OFFERED BY MR. ROYBAL

SEC. 110. No funds appropriated in this or any other Act may be used to deport or otherwise require departure from the United States of an alien who is, and has been since on or before November 6, 1986, the spouse or child of a an alien who, after that date, becomes a legalized person: *Provided,* That—

(1) such alien has resided continuously in the United States since before November 6, 1986, or since before June 26, 1987 in the case of an alien who is the spouse or child of an alien granted lawful resident status under section 210 of the Immigration and Nationality Act;

(2) such alien satisfies the requirements of Section 245A(a)(4) of such Act;

(3) the Attorney General shall terminate the benefits of this section in the event that the legalized alien's lawful resident status is terminated;

(4) the provisions of sections 210(f) and 245A(h) of such Act shall apply to the alien during the same period in which they apply to the legalized person;

(5) the terms "spouse" and "child" shall have the meanings given such terms in section 101 of such Act, and the term "legalized person" means an alien who has been granted lawful resident status under section 210 or 245A of such Act; and

(6) nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for the benefits of this section.

### CONFERENCE REPORT LANGUAGE OFFERED BY MR. ROYBAL

The conferees have retained the House provision providing protection from deportation for ineligible spouses and children of persons eligible for legal immigration status under Sections 210 or 245 of the INA. There was agreement that humane and practical purposes were served by such protection. However, the conferees were of the opinion that the coverage of the House provision was too broad and needed clarification.

Therefore, limitations were included in the bill to narrow the class of individuals protected from deportation, and to make clear which persons are intended to be included in that class.

First, the protection is statutorily made contingent on the continued familiar relationship with the qualifying family member.

Second, persons must have resided in the United States since the date of enactment of IRCA, or, if the qualifying family member qualifies for legal status as an agricultural worker under Section 210, must have resided in this country since June 26, 1987.

Third, the spouse or child must not be inadmissible, under the same grounds for exclusion applicable to the qualifying, family member.

Fourth, the family member loses protection from deportation if the qualifying alien's lawful status is terminated.

Fifth, eligibility for federal benefits is limited to that of the qualifying family member.

Finally, it is made clear that the provision does not authorize admission to the United States.

The conferees direct the Attorney General to provide for the same authorized employment and travel as apply with respect to the legalized person during the qualifying family member's period of temporary resident status. With respect to the requirement of continuous residence, the same treatment should be accorded brief, casual and innocent absences from the United States as that given the qualifying family member's absences after November 6, 1986 (for purposes of continuous physical presence).

COMMITTEE ON THE JUDICIARY,
*Washington, DC, December 17, 1987.*
Hon. JAMIE WHITTEN, M.C.,
*Chairman, Committee on Appropriations,*
*U.S. House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: This is to express our strong support for the Roybal amendment which you are now considering in the course of your conference deliberations on the Continuing Resolution, H.J. Res. 395.

We also strongly support the modifications to the original amendment which are now being proposed by Mr. Roybal to restrict the coverage contained in the original amendment.

It should be emphasized that the amendment would merely prevent the separation of family members of qualified legalization applicants. It does not create a new legalization program and does not provide any immigrant visas to these family members ahead of those visa applicants who are patiently waiting in line in their home countries. As noted, it merely allows these families to remain intact and to reside in the United States until their immigrant visas become available under the regular immigration law.

We do not believe INS resources, at this time, should be expended in locating and deporting these family members. Instead, these already limited resources should be spent on implementing the employer sanctions provision and the other significant provisions contained in the Immigration Reform and Control Act of 1986.

We strongly urge your support of the Roybal amendment with the clarifying language that is being proposed.

Sincerely,
PETER W. RODINO, JR.,
*Chairman.*
HAMILTON FISH, JR.,
*Ranking Minority Member.*

HOUSE OF REPRESENTATIVES,
*Washington, DC, December 17, 1987.*

### SUPPORT THE FAMILY UNITY AMENDMENT

DEAR CONFEREE: We are writing to express our strong support for inclusion in the Continuing Resolution for Fiscal Year 1988 of language providing that no funds may be used to deport or otherwise require departure from the United States of the children or spouses of persons who become legalized through the Immigration Reform and Control Act of 1986.

Congress enacted the legalization program because we determined that it was in the national interest to do so. We are troubled that the legalization program is being undermined by the refusal of the Immigration and Naturalization Service to announce an across-the-board policy that parents and children, and husbands and wives, will not be separated.

In the absence of such a policy, we are concerned that fear has kept many persons

who are eligible for legalization from applying. We understand that people are reluctant to risk exposing spouses and children who may not be eligible for legalization, even though the information on legalization applications is required to be kept confidential.

The House version of the CR includes the Roybal family unity amendment, which we strongly support. That amendment has now been modified and improved to reflect valid concerns. There is now a continuous residence requirement making clear that the amendment does not extend to children and spouses who have only recently arrived in the U.S. The spouse and child must not be inadmissible, under the same grounds for exclusion (such as commission of crimes) applicable to the qualifying family member. The spouse or child loses protection from the amendment if for any reason the qualifying alien's legal status is terminated.

We feel strongly that this amendment is essential to the fair, humane, and effective implementation of the Immigration Reform and Control Act of 1986. We urge your support in conference today.

Sincerely,

Howard L. Berman, Bruce A. Morrison, Charles E. Schumer, Barney Frank, Hamilton Fish, Jr., John Bryant, *Members, Subcommittee on Immigration.*

---

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC, December 17, 1987.*

DEAR CONFEREES: The Conference Committee on the Continuing Resolution may be deciding to lay on a provision in the House version related to certain unqualified spouses and children of persons legalized under the Immigration amnesty—the so-called "family fairness" issue. This provision would, under specified conditions, stay the deportation of those family members. It has our unequivocal support.

The crux of the issue is this: An applicant for the immigration amnesty must have been in the U.S. since before January 1, 1982 to qualify. But many applicants have spouses or children who came here after that cut-off date. Their legalized family member qualifies them for eventual permanent residence here. In the meantime, what do we do with them?

Before the Congress passed the amnesty, the Immigration Service would consider status for undocumented family members in only the most extraordinary of cases. However, in enacting the legalization program last year, we were admitting that the lawful system had not worked, and that the normal rules of the game should be put aside for a brief period while we put our immigration house in order.

In our recent experience with the legalization program, we have concluded that most immigration officers in the field reflect this spirit and will not deport these unqualified family members. However, the prospect of such deportation still exists for these families, creating a life of fear and furtiveness for them, until such time as they can eventually receive permanent residence.

Current law provides the Immigration Service with ample authority to provide any of a number of interim legal statuses to such persons. Because of the adequacy of current law in this area, we did not feel legislation to be necessary. Rather, the Immigration Service could have solved this administratively.

However, it has become abundantly clear in recent weeks that the Immigration Service leadership would prefer to stifle, rather than unleash, the humane instincts toward this issue which we have witnessed among immigration officials in the field. INS will

act to protect children where both parents have qualified for legalization. But statements from INS headquarters suggest that it will be the rare case that spouses or children will receive favorable consideration beyond that.

Unfortunately, this makes Congressional action necessary.

This is a difficult issue—one which under ideal circumstances would be thoroughly considered and debated in the Judiciary Committee. But time is running out. The legalization program ends in May, and these families need the security that Congressman Roybal's provision would offer.

Thank you for your assistance on this important matter.

Sincerely,

JOSEPH R. BIDEN, Jr.,
*Chairman.*
EDWARD M. KENNEDY,
*Chairman, Subcommittee on Immigration and Refugee Affairs.*

---

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC, December 16, 1987.*
Senator ERNEST F. HOLLINGS.
*Chairman, Subcommittee on Commerce, Justice, State, the Judiciary, and Related Agencies, U.S. Senate, Washington, DC.*

Dear Fritz: I wish to thank you for your leadership on the legalization "family unity" provision contained within the House version of the continuing resolution.

I just want to let you know that you have my full support for any compromise on this issue which may be acceptable to Congressman Roybal and Chairman Rodino.

Best wishes, and thank you for all your help.

Sincerely,

EDWARD M. KENNEDY,
*Chairman, Subcommittee on Immigration and Refugee Affairs.*

---

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC, December 10, 1987.*
DEAR COLLEAGUE: As you consider H.J. Res. 395 (the Continuing Resolution) in conference, we urge you to support Section 110, the Roybal Amendment, to prohibit the use of Immigration & Naturalization Service funds to deport immediate family members of qualified legalization applicants.

This provision is urgently needed to insure that families are not separated and that non-qualifying family members are permitted to stay in the United States until visas are available to them.

The Roybal provision is a reasonable limitation and modification of what many of us in the Senate have sought to accomplish for the spouse and children of those persons scheduled to be granted temporary status under the Immigration Reform and Control Act. It confers no special immigration status on the spouses or children but provides sufficient protection from deportation to permit the legalization program to go forward. It applies solely to the spouse and children of those individuals who we already know satisfy the requirements for legalization.

We are aware that some of our colleagues are convinced that this problem has been adequately addressed by INS Commissioner Nelson's most recent announcement of a family fairness plan. Yet the evidence from throughout the nation suggests that widespread fear and uncertainty among the undocumented population, especially families, is continuing to deter them from filing legalization applications.

Under the Roybal Amendment, the INS is required to treat spouses and children uniformly and humanely by granting them administrative protection from deportation. This amendment in no way tampers with the carefully crafted compromise that produced the Immigration Reform and Control Act.

After six months of the legalization program with offices operating at less than half of capacity, it is clear that the mixed messages from INS have not solved the family unity problem. Therefore, it is time now for Congress to speak. We urge you to support retention of the Roybal Amendment and work for its inclusion in the final version of the Continuing Resolution.

Sincerely,

John H. Chafee, Daniel P. Moynihan, Spark Matsunaga, Arlen Specter, Timothy E. Wirth, Alan Cranston, Robert T. Stafford, Albert Gore, Jr., Dennis DeConcini, Paul Simon, Barbara Mikulski, Mark O. Hatfield, Lowell P. Weicker, Jr.

---

U.S. SENATE,
*Washington, DC, December 15, 1987.*
Hon. ERNEST F. HOLLINGS,
*U.S. Senate,*
*Washington, DC.*

DEAR FRITZ: I understand that you have been contacted by several senators and leaders of the Hispanic community urging your support for the Roybal amendment to the Continuing Resolution. The intent of the amendment is to keep together the families of qualified legalization applicants and ensure that the general well-being of the applicants' families is protected. I, too, am concerned that the families of legalization applicants may be separated if Congress does not make clear its commitment to maintain family unity.

Specifically, Congressman Roybal's amendment to Section 110 of H.J. Res. 395 would prohibit the use of Immigration and Naturalization Service funds to deport immediate family members of qualified legalization applicants who entered the United States before November 6, 1986. The amendment appears to be consistent with INS regulations which allow deferred action status to be applied to immediate family members of qualified legalization applicants. The amendment is certainly consistent with Executive Order 12606, signed by President Reagan on September 2, 1987, which ensures "that the autonomy and rights of the family are considered in the formulation and implementation of policies by Executive departments and agencies . . . to the extent permitted by law."

I am well aware of technical arguments against the Roybal amendment; however, my interest is to ensure that we employ the available legal latitude and Executive mandate to avoid jeopardizing the integrity of the families of legalization applicants. I hope that the Continuing Resolution will include language to protect family unity for qualified legalization applicants.

Sincerely,

ORRIN G. HATCH,
*U.S. Senator.*

---

AMERICAN BAR ASSOCIATION
GOVERNMENTAL AFFAIRS OFFICE,
*Washington, DC, December 17, 1987.*

DEAR CONFEREE: On behalf of the American Bar Association, we are writing to urge support for the Roybal amendment, Section 110 of H.J. Res. 395, which promotes the concept of family unity in the implementation of the Immigration Reform and Control Act of 1986.

Little more than one year ago, Congress passed a legalization program which the American Bar Association enthusiastically endorsed. However, during the program's first seven months, it has become increasingly apparent that the effective implementation of the program is endangered because the statute fails to protect from deportation the spouses and minor children of legalized aliens whose continuous residence cannot be proven or who arrived after the January 1, 1982 cut-off date.

For many persons who are eligible for legalization, the new law forces a cruel choice between remaining lawfully in the United States while sending away ineligible family members, most often minor children, or foregoing this once-in-a-lifetime opportunity rather than endure the trauma of family separation. A third, equally unsatisfactory option is for eligible persons to become legalized without resolving the status of their ineligible family members, who would remain outside the scope and protection of our law.

The success of this one-time legalization program rests upon maximum participation by the eligible population. Conversely, the absence of a national policy which ensures that family members will not be deported currently deters the participation of eligible family members. The Roybal amendment would establish a clear and humane national policy to keep families together, rather than divide them.

On behalf of the American Bar Association, we urge you to retain this provision in the Continuing Resolution.

Sincerely,

ROBERT D. EVANS.

THE AMERICAN JEWISH COMMITTEE,
INSTITUTE OF HUMAN RELATIONS,
*New York, N.Y., December 15, 1987.*
Hon. ERNEST HOLLINGS,
*Washington, D.C.*

DEAR SENATOR HOLLINGS: We are writing in support of Section 110 of H.J. Res. 395 (Continuing Resolution). This provision, sponsored by Congressman Edward Roybal (D-CA), would prevent the deportation of family members of persons eligible for legalization under the Immigration Reform and Control Act. Congressman Peter Rodino (D-NJ), House Judiciary Committee Chairman and the Immigration Act's chief House sponsor, has endorsed the Roybal provision.

The separation of families of legalization applicants remains an unresolved issue of critical importance to the success of the legalization program. Under current law ineligible family members of persons who qualify for legalization can be deported. This frightening prospect has persuaded many qualified persons not to apply for legalization.

Thus far, the Immigration Service has rejected appeals from members of Congress as well as members of the general public to issue clear guidelines ensuring that spouses and children of qualified applicants would not be deported.

The undersigned organizations are committed to the success of the legalization program. We believe that a clear, positive national policy is needed to ensure that spouses and children of eligible applicants will not be deported and will be authorized to work. Congressman Roybal's provision would establish such a clear policy by waiving the continuous residency requirement for the spouses and children of qualified legalization applicants.

We urge your support for Section 110 of H.J. Res. 395.

Thank you for your consideration of these views.

Sincerely,

American Jewish Committee, American Civil Liberties Union, American Council for Nationalities Service, American Immigration Lawyers Association, AFL-CIO, Association of Farmworker Opportunity Programs, International Ladies' Garment Workers' Union, League of United Latin American Citizens, Lutheran Immigration and Refugee Service, Mexican American Legal Defense and Educational Fund; National Coalition for Haitian Refugees, National Council of La Raza, National Urban League, United States Catholic Conference Migration, and Refugee Services.

[From the Los Angeles Times, Oct. 23, 1987]

AMNESTY AND THE FAMILY

The Immigration and Naturalization Service has been left with a difficult job: by the vagaries of some elements of the new immigration legislation. That is evident in the effort to draw up regulations regarding details of the amnesty program. There is no easy way to satisfy conflicting demands that seek both to protect the undocumented aliens who have lived for many years in the United States and to treat equitably those who want to emigrate legally to the United States under provisions of the regular immigration program.

But there are some fundamental principles of human rights that must be respected—none more important than respect for the sanctity of the family.

Under new regulations reported to a congressional subcommittee this week, alien children who do not otherwise qualify for residence will be subject to deportation unless both parents qualify. And the spouse of a person qualifying for amnesty will also be subject to deportation. This already is triggering the breakup of families.

Alan C. Nelson, commission of the Immigration service, told members of Congress that the immigration legislation gives the service discretion in handling children, but he said that it does not permit the INS to provide special protection for a spouse who fails to qualify. His views on the limitations of authority regarding spouses has been challenged by other experts. Clearly, if the legislation is that ambiguous, Nelson needs to ask Congress for a clarification, and in the meantime suspend any action that breaks up families.

The United States has long made the sanctity and unity of the family central in its own immigration laws. And the United States has been a consistent advocate of family unity in supporting international refugee and human-rights programs. Each year in its review of the Helsinki accords on European security and cooperation, to which the United States is a party, Congress devotes a special section to family reunification. In its appeals to the Soviet Union and the nations of Eastern Europe on family reunification, the United States has gone beyond the nuclear family of parents and children to argue for reunification of other family members as well. The dispute over immigration amnesty affects only the nuclear family.

Principle as well as compassion must rule the amnesty program.

[From the Los Angeles Times, Nov. 5, 1987]

A BETTER FATE FOR SPLIT FAMILIES

(By Doris M. Meissner)

"Family fairness" is what the Reagan Administration calls its policy for immigration amnesty decisions where some members of a family are eligible and others are not.

In such cases ("family" means: spouses, parents and minor children), those members who are ineligible will not be granted legal status, thereby remaining subject to deportation. Exceptions are to be allowed for illegal minor children whose parents are both eligible, but not the reverse—relief is not available to ineligible parents of legally resident or citizen children. "Certain compelling or humanitarian factors" may allow exceptions for spouses, but not if the "only claim to . . . relief is by virtue of the marriage itself."

The policy announced in congressional testimony last month, responds to a problem that has been vexing the amnesty program ever since it began in May. The amnesty application form requires information on all immediate family members, including those who are ineligible for amnesty and, therefore, deportable. Although the federal statute authorizing the program prohibits the use of information provided on amnesty applications for deportation purposes, many believe they will put their loved ones at risk.

No one knows how many potential applicants fit the split-eligibility category, but it is reasonable to guess that the number is significant, based on what we know about migration patterns. Typically, one family member comes to the United States to find work, often intending to be away only temporarily, but after time sends for family members. This was happening long before and after the 1982 cutoff date for amnesty.

The dilemma that this has brought is both legal and emotional. Critics of the Administration's policy argue that there would be a broader base of applicants if immediate relatives of amnesty applicants received sympathetic treatment. But the Immigration and Naturalization Service on its own can grant amnesty only to eligible aliens. The dispute, therefore, is whether the attorney general should exercise his discretionary authority to stay the deportation of immediate family members for humanitarian reasons. Immediate family members, in any case, will qualify for immigrant status in 18 months, when the original applicant obtains permanent resident status.

Such discretion has been available to local immigration officials and, sympathetically applied in family cases for years. It is variously known as deferred action, indefinite voluntary departure or deferred deportation. For the current legalization effort, the Administration has now arrived at a tighter regimen, but it has not yet spelled out the humanitarian factors that must exist in addition to the family relationship to obtain discretionary relief.

The Immigration service's rationale for the tighter policy goes so far as to note that the aliens had already separated their families by leaving them behind; the inference being that separating them again would be no different. Furthermore, the INS argues, leniency could act as a magnet for others to enter illegally to marry a qualified applicant and obtain benefits.

The Administration is basing this on the proposition that fairness in the legalization program's policy must follow the "same concepts of fairness that underlie the lawful immigration system." In that system, immigrants file petitions that establish visa eligibility for their spouses or children to come to the United States. These family members must wait their turn, about 18 months at present for most countries. Due to backlogs, the wait is much longer for a few countries, with Mexico, at about 10 years, having the longest. As a result, the overwhelming majority of visa-eligible relatives of Mexican

immigrants are already in the United States when their eligibility date arrives, returning to Mexico solely to pick up their immigrant visas. If the concepts of the "lawful immigration system" were applied to legalization, the waiting period for families could only increase, at least for Mexican cases, which are now about 70% of the legalizing population.

But the flaw in the Administration position is more fundamental than just the folly of its practical effect. The very essence of any amnesty is the admission that the lawful system has not worked and must be abandoned for a period. The legalization program is a unique act of forgiveness intended to wipe the slate clean in the belief that order can be restored through improved immigration controls in the future. The program should be administered with that as the guiding principle.

The pity is that immediate relatives are probably not at much actual risk at all. INS will not move to deport them unless they are discovered in employment checks, and local officials are likely to make generous decisions because they do not relish this fight. But split-eligibility families *believe* that they're at risk.

This is family fairness? No, this is a preseason reminder that the spirit of Ebenezer Scrooge is alive and well.

(Doris M. Meissner is a senior associate at the Carnegie Endowment for International Peace in Washington.)

[From the Dallas Times Herald, Oct. 8, 1987]

### INS: Don't Split Families

Although easing the immigration law to permit families to stay together seems warranted, the Senate sustained an amendment offered by Sen. John H. Chafee, R-R.I., and eight of his colleagues saying continuous residency since Jan. 1, 1982, would not be required for spouses and children of qualified amnesty applicants.

Sen. Chafee described the amendment as "a humane remedy for those immigrant families who find themselves in the excruciating position of having to choose between family unity and living freely in the United States." The idea of this country offering amnesty with one hand while using the other to disrupt families is repugnant.

It is a common procedure for an immigrant—legal or not—to come to this country alone, then send for his family after finding a job and establishing minimal security. The problem comes when the alien arrived prior to the cutoff date for amnesty, rendering him eligible for the program, but wasn't joined by his family until after that date—rendering his wife and children ineligible.

Sen. Chafee says thousands of immigrants are reluctant to seek amnesty for fear their families will face deportation. Vanna Slaughter, of Catholic Charities in Dallas, says 20 percent of the amnesty applicants counseled by that agency have at least one immediate family member who arrived after the cutoff date.

But Immigration and Naturalization Service Commissioner Alan C. Nelson says the law passed by Congress last October gives his agency no option.

Mr. Nelson's assurance that his agency will not seek out ineligible family members for deportation surely provides scant comfort to immigrants who are in that situation. After all, those ineligible for amnesty would have no legal right to remain and work in the United States. Of course, they would live in fear of deportation. Some families will be reluctant to make themselves

known to a government that might split them up.

The Chafee amendment was tightly structured. Only spouses and children of an eligible amnesty appliant were exempted from the cutoff date—and they still had to meet other legal provisions, such as having no felony records or welfare history.

The point of amnesty is to bring illegals into the mainstream and eventually to have them become productive citizens. Attacking family ties is not the way to go about it. Although the amendment failed, perhaps the INS will acknowledge this signal that uniform guidelines to prevent would-be citizens and their families from living in illegal limbo are mandatory.

[From the Dallas Times Herald, Nov. 5, 1987]

### INS Policy Is Inhumane Toward Families

(By Fernando Dubove and Norma Almanza)

The Immigration Reform and Control Act of 1986, the new "amnesty" law, contains no provisions for ineligible immediate family members (spouse and children) of persons who are legalized. However, as Sen. John Chafee points out, "In devising the amnesty program, Congress did not mean for families to be separated."

Members of Congress, along with religious and civil rights groups, called on INS to allow ineligible spouse and children to stay in the United States while legalized family members applied through legal immigration channels for their family. The INS, however, has taken the position that protection from deportation generally should not be granted to ineligible spouses or children of legalized aliens.

This means INS can deport the wife of a legalized alien if she does not meet, or cannot prove she meets, the requirements for legalization. Further, for an ineligible child to escape the threat of deportation, both parents must qualify for legalization.

Unfortunately, this is a common situation—a man who crossed the border in 1981, leaving his family behind while he secured a job and saved enough money to support his family. The wife and children cross six months later, but after the Jan. 1, 1982, deadline required by INS for legalization eligibility.

It is inconceivable that our government would advocate a policy that disrupts the sanctity of the family. But that is the corner the United States Immigration Naturalization Service has painted itself into. Surely President Reagan will object.

The legal burden of proof to keep families from separation is equally unfair. An eligible alien must prove that "certain compelling or humanitarian factors exist, in addition to the . . . hardship caused by separation." What is more compelling or humane than a person fighting to keep a family together? Courts seem to agree. A 1981 ruling held "Separation from family alone may establish extreme hardship."

Pursuing current INS policy both harms innocent families and undermines the purpose of immigration reform. Eligible people will remain away from legalization, fearful of INS intentions. Already we see this in the low numbers of applicants, and the pace is dropping. Current trends suggest two million will apply for legalization, half of the 3.9 million original INS estimate.

For eligible people, the choices are agonizing.

Alan Nelson, commissioner of the U.S. Immigration and Naturalization Service, suggests a third idea to maintain family unity,

"for the family unit to return to the home country." Is this the actual INS intention, to drive people away rather than legalize them?

Norma Plascencia Almanza and Fernando Dubove are Southwest coordinators for the National Immigration Refugee and Citizenship Forum.

[From the Washington Post, Oct. 26, 1987]

### Amnesty Families

The Commissioner of the Immigration and Naturalization Service is on the spot. He is being portrayed as the heavy in a situation that is complicated by competing equities and terrible human problems. A very fragile bargain, crafted after much turmoil in Congress, is being strained, and the time available for finding a solution is running out.

Last year's immigration reform legislation authorized the granting of amnesty to illegal aliens who have been in this country since 1982. The bill, however, contains no specific language about those aliens' close relatives who do not qualify for amnesty in their own right. The basic amnesty provision was extremely controversial; the House passed it by a slim margin of seven votes. And the Senate Judiciary Committee stated in its report that it "is the intent of the Committee that the families of legalized aliens will obtain no special petitioning right by virtue of the legalization. They will be required to 'wait in line' in the same manner as immediate family members of other new resident aliens."

That looks fine on paper and is indeed fair to those would-be immigrants who have obeyed our law and waited—with their families—for visas in their home countries. But now, INS is beginning to encounter cases in which one spouse—or two out of four children in a family—does not qualify for the benefit and is therefore subject to deportation. This means that the aliens have to return home and wait for 18 months until they can petition for visas as relatives of a permanent resident of the United States. This is a terrible prospect, but Congress is unmoved. On Oct. 7, Sen. John Chafee's proposal to extend amnesty to spouses and minor children was defeated in the Senate 55 to 45. The program expires next May and the senator still hopes to convince his colleagues at least to stop deportations. But for now, it is clear, the ball is in the INS's court.

Commissioner Alan Nelson told a House subcommittee last week that the service will take no action against minor children if both parents have qualified for amnesty. In addition, INS will not move to deport spouses on the basis of information received in the amnesty application process. Finally, Commissioner Nelson promised to use the discretionary powers given by law to the attorney general to suspend deportation of family members if, in individual cases, there are specific humanitarian reasons for doing so. We hope he is generous in using this discretion. Yes, there is merit in holding the line as Congress intended so those awaiting visas outside the country are not displaced. But the reality of breaking up families, even temporarily, is unthinkable. If Congress will not be moved, the INS should have a heart.

[Executive Order 12606, Sept. 2, 1987]

### The Family

The PRESIDENT. By the authority vested in me as President by the Constitution and laws of the United States of America, and in order to ensure that the autonomy and rights of the family are considered in the

AR2022_400647

formulation and implementation of policies by Executive departments and agencies, it is hereby ordered as follows:

Section 1. *Family Policymaking Criteria.* In formulating and implementing policies and regulations that may have significant impact on family formation, maintenance, and general well-being, Executive departments and agencies shall, to the extent permitted by law, assess such measures in light of the following questions:

(a) Does this action by government strengthen or erode the stability of the family and, particularly, the marital commitment?

(b) Does this action strengthen or erode the authority and rights of parents in the education, nurture, and supervision of their children?

(c) Does this action help the family perform its functions, or does it substitute governmental activity for the function?

(d) Does this action by government increase or decrease family earnings? Do the proposed benefits of this action justify the impact on the family budget?

(e) Can this activity be carried out by a lower level of government or by the family itself?

(f) What message, intended or otherwise, does this program send to the public concerning the status of the family?

(g) What message does it send to young people concerning the relationship between their behavior, their personal responsibility, and the norms of our society?

Sec. 2. *Governmentwide Family Policy Coordination and Review.*

(a) Executive departments and agencies shall identify proposed regulatory and statutory provisions that may have significant potential negative impact on the family well-being and provide adequate rationale on why such proposal should be submitted. The head of the department or agency, shall certify in writing that, to the extent permitted by law, such measure has been assessed in light of the criteria in Section 1 of this Order and how such measures will enhance family well-being. Such certification shall be transmitted to the Office of Management and Budget. Departments and agencies shall give careful consideration to family-related concerns and their impact in notices of proposed rulemaking and messages transmitting legislative proposals to the Congress.

(b) The Office of Management and Budget shall, to the extent permitted by law, take action to ensure that the policies of the Executive departments and agencies are applied in light of the criteria set forth in Section 1 of this Order.

(c) The Office of Policy Development shall assess existing and proposed policies and regulations that impact family well-being in light of the criteria established by Section 1 of this Order, provide evaluations on those measures that have significant potential impact on the family to the Office of Management and Budget, and advise the President on policy and regulatory actions that may be taken to strengthen the institutions of marriage and family in America.

Sec. 3. *Report.* The Office of Policy Development shall submit preliminary reports including specific recommendations to the Domestic Policy Council and shall submit a final report to the President no later than 180 days from the date of this Order. Each year thereafter, a report, including recommendations shall be submitted, through the Domestic Policy Council to the President.

Sec. 4. *Judicial Review.* This Order is intended to improve the internal management of the Executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

RONALD REAGAN.

THE WHITE HOUSE, *September 2, 1987.*

Mr. PANETTA. Mr. Speaker, I would like to express my appreciation to the conferees on the Commerce, Justice, State, and Judiciary portion of the fiscal year 1988 continuing resolution for accepting an important provision related to the California Coastal Commission.

That provision requires the Secretary of Commerce to release the administrative portion of the State's Fiscal Year 1987 coastal zone management grant and prohibits the Department from using any funds in the bill to initiate withdrawal of approval proceedings against the State Coastal Management Program before February 1, 1988.

This is an extremely important provision. The Department has withheld most of the portion of the fiscal year 1987 coastal zone grant which goes directly to the Commission, despite the fact that we are already well into fiscal year 1988 and despite the fact that the Department actually approved the State's fiscal year 1987 grant application on September 30, 1987. Without these funds, the State has been forced to cut back many critical administrative functions.

The Department's action has no basis in law and, equally importantly, it flouts the will of Congress in establishing a system of coastal zone management grants and in providing annual appropriations for such grants. By directing the Department to release the State's administrative funds, the provision accepted by the conferees ensures that congressional intent will be honored and that the integrity of the appropriations process will be preserved.

Since the release of the Department's evaluation of the California coastal plan and of a set of proposed grant conditions on November 23, 1987, the Coastal Commission and the Department have engaged in a series of lengthy negotiations over the terms of both the administrative portion of the State's grant and the significant improvement portion of the grant. Last week, the Coastal Commission notified the Department that full agreement had been reached on the administrative conditions proposed on November 23 and I understand that agreement with respect to two additional administrative grant conditions which the Department proposed on December 15, 1987, has also been reached.

It is my expectation that, pursuant to the language in the continuing resolution, the Department will immediately release to the Coastal Commission its fiscal year 1987 administrative funds. It is also my expectation that the Department will not seek to impose conditions on the use of those funds to which the parties have not previously agreed. It is further my expectation that the department will not link release of the administrative grant to agreement on significant improvement grant conditions.

Release of these funds under the terms which I have described will allow the Commission to continue its important responsibilities under the Coastal Zone Management Act.

Again, I commend the conferees for agreeing to include this provision in the continuing resolution.

Mr. Speaker, I am further pleased that this continuing resolution for fiscal year 1988 contains provisions representing a compromise between the Immigration and Naturalization Service and the Congress on a number of important issues involving the Special Agricultural Worker Program. I want to express my thanks to INS Commissioner Alan Nelson for his cooperation and assistance on these issues. Because of his willingness to consider our concerns and agree on certain policies I believe the SAW Program can continue on the positive course it has followed since its enactment.

The SAW Program was established in the Immigration Reform and Control Act of 1986 to provide a legalization program for aliens who have worked in U.S. agriculture. Its goals were to ensure an adequate supply of laborers for this critical sector of the American economy and to protect the rights of those who have worked in agriculture. The program provides that aliens who can present evidence that they have worked in U.S. agriculture for at least 90 days can obtain legal status under the new immigration law.

The agreements reached in this continuing resolution. represent another step in a long process of negotiation between the INS and Congress on how the SAW Program should be implemented.

Last spring reports of agricultural worker shortages in Oregon and Washington raised deep concerns about the INS interpretation of the immigration law. Representatives from those States, the three authors of the SAW Program, myself, Representative HOWARD BERMAN and Representative CHUCK SCHUMER, and other interested members met with the Commissioner of the INS and representatives of the State and Labor Departments to explore ways to improve the performance of the Service in terms of processing SAW applications.

We focused on three primary areas where improvements were needed. First we asserted that the INS policy of requiring a full SAW application before entry into the United States and work authorization was granted was directly contrary to the clear intent of the immigration law. Furthermore, congressional negotiators questioned how a SAW applicant could collect evidence that he or she worked in U.S. agriculture without physically entering the United States.

Second, we felt strongly that the law did not support the INS policy of deporting any potential SAW applicant who could not prove he had been in the United States since before May 1, 1987. This practice presented a serious obstacle to many qualified SAW applicants.

Third, the INS policy at that time was to accept SAW applications only at the U.S. Embassy in Mexico City. This posed enormous inconveniences to potential applicants who lived some distance from the capital.

After negotiations with the Commissioner of the INS, Alan Nelson, it was agreed that the Service acept less than a full application before granting entry into the United States and work authorization papers. Second, the Service agreed to open three new application



**Office of the Attorney General**
**Washington, D. C. 20530**

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

**AR2022_400649**



**Office of the Attorney General**
**Washington, D. C. 20530**

June 30, 2020

The Honorable Chad F. Wolf
Acting Secretary of Homeland Security
Washington, DC 20528

Dear Acting Secretary Wolf:

On September 4, 2017, then-Attorney General Jefferson B. Sessions sent a letter to then-Acting Secretary of Homeland Security Elaine Duke that, among other things, expressed his view that the Department of Homeland Security (DHS) policy known as Deferred Action for Childhood Arrivals (DACA) was unlawful. Acting Secretary Duke expressly considered that letter, among other factors, in reaching her decision on September 5, 2017, that the DACA policy should be rescinded.

On June 18, 2020, the U.S. Supreme Court affirmed a lower court judgment vacating Acting Secretary Duke's rescission of the DACA policy. See *Department of Homeland Security v. Regents of the University of California*, Nos. 18-587, 18-588, 18-589. The Supreme Court noted that "[a]ll parties agree" that "DHS may rescind DACA," slip op. at 9, but held that Acting Secretary Duke's decision failed to provide a reasoned explanation as to both the scope of her discretion to rescind DACA and the manner in which she exercised it, *id.* at 29. Accordingly, the Court remanded the matter to DHS so that the agency may consider the issue anew. *Id.*

In order to facilitate that consideration, I am hereby withdrawing Attorney General Sessions's September 4, 2017, letter to Acting Secretary Duke. Without regard to whether I agree with the views expressed in that letter, I withdraw it because I do not wish to maintain a determination as the Attorney General regarding DACA that might constrain the discretion you otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA. In other words, I wish to wipe the slate clean to make clear beyond doubt that you are free to exercise your own independent judgment in considering the full range of legal and policy issues implicated by a potential rescission or modification of DACA, as contemplated by the Supreme Court. For the same reason, I also have directed the Office of Legal Counsel at the Department of Justice to withdraw an opinion that addressed the legality of DACA and related deferred-action policies, see *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op O.L.C. __ (Nov. 19, 2014), as well as any other guidance it has provided to DHS on that topic.

Sincerely,

William P. Barr
Attorney General

AR2022_400650

# Circular A-4

### September 17, 2003

**TO THE HEADS OF EXECUTIVE AGENCIES AND ESTABLISHMENTS**

**Subject:**     **Regulatory Analysis**

This Circular provides the Office of Management and Budget's (OMB's) guidance to Federal agencies on the development of regulatory analysis as required under Section 6(a)(3)(c) of Executive Order12866, "Regulatory Planning and Review," the Regulatory Right-to-Know Act, and a variety of related authorities.  The Circular also provides guidance to agencies on the regulatory accounting statements that are required under the Regulatory Right-to-Know Act.

This Circular refines OMB's "best practices" document of 1996 (http://www.whitehouse.gov/omb/inforeg/riaguide.html), which was issued as a guidance in 2000 (http://www.whitehouse.gov/omb/memoranda/m00-08.pdf), and reaffirmed in 2001 (http://www.whitehouse.gov/omb/memoranda/m01-23.html).  It replaces both the 1996 "best practices" and the 2000 guidance.

In developing this Circular, OMB first developed a draft that was subject to public comment, interagency review, and peer review.  Peer reviewers included Cass Sunstein, University of Chicago; Lester Lave, Carnegie Mellon University; Milton C. Weinstein and James K. Hammitt of the Harvard School of Public Health; Kerry Smith, North Carolina State University; Jonathan Weiner, Duke University Law School; Douglas K. Owens, Stanford University; and W. Kip Viscusi, Harvard Law School.  Although these individuals submitted comments, OMB is solely responsible for the final content of this Circular.

## A.     Introduction

This Circular is designed to assist analysts in the regulatory agencies by defining good regulatory analysis – called either "regulatory analysis" or "analysis" for brevity – and standardizing the way benefits and costs of Federal regulatory actions are measured and reported. Executive Order 12866 requires agencies to conduct a regulatory analysis for economically significant regulatory actions as defined by Section 3(f)(1).  This requirement applies to rulemakings that rescind or modify existing rules as well as to rulemakings that establish new requirements.

### *The Need for Analysis of Proposed Regulatory Actions*[1]

Regulatory analysis is a tool regulatory agencies use to anticipate and evaluate the likely consequences of rules.  It provides a formal way of organizing the evidence on the key effects –

---

[1] We use the term "proposed" to refer to any regulatory actions under consideration regardless of the stage of the regulatory process.

AR2022_400651

good and bad – of the various alternatives that should be considered in developing regulations. The motivation is to (1) learn if the benefits of an action are likely to justify the costs or (2) discover which of various possible alternatives would be the most cost-effective.

A good regulatory analysis is designed to inform the public and other parts of the Government (as well as the agency conducting the analysis) of the effects of alternative actions. Regulatory analysis sometimes will show that a proposed action is misguided, but it can also demonstrate that well-conceived actions are reasonable and justified.

Benefit-cost analysis is a primary tool used for regulatory analysis.[2]  Where all benefits and costs can be quantified and expressed in monetary units, benefit-cost analysis provides decision makers with a clear indication of the most efficient alternative, that is, the alternative that generates the largest net benefits to society (ignoring distributional effects).  This is useful information for decision makers and the public to receive, even when economic efficiency is not the only or the overriding public policy objective.

It will not always be possible to express in monetary units all of the important benefits and costs.  When it is not, the most efficient alternative will not necessarily be the one with the largest quantified and monetized net-benefit estimate.  In such cases, you should exercise professional judgment in determining how important the non-quantified benefits or costs may be in the context of the overall analysis.   If the non-quantified benefits and costs are likely to be important, you should carry out a "threshold" analysis to evaluate their significance.  Threshold or "break-even" analysis answers the question, "How small could the value of the non-quantified benefits be (or how large would the value of the non-quantified costs need to be) before the rule would yield zero net benefits?"  In addition to threshold analysis you should indicate, where possible, which non-quantified effects are most important and why.

### *Key Elements of a Regulatory Analysis*

A good regulatory analysis should include the following three basic elements:  (1) a statement of the need for the proposed action, (2) an examination of alternative approaches, and (3) an evaluation of the benefits and costs—quantitative and qualitative—of the proposed action and the main alternatives identified by the analysis.

To evaluate properly the benefits and costs of regulations and their alternatives, you will need to do the following:

- Explain how the actions required by the rule are linked to the expected benefits.  For example, indicate how additional safety equipment will reduce safety risks.  A similar analysis should be done for each of the alternatives.
- Identify a baseline. Benefits and costs are defined in comparison with a clearly stated alternative.  This normally will be a "no action" baseline:  what the world will be like if the proposed rule is not adopted.  Comparisons to a "next best" alternative are also especially useful.

---

[2] See Mishan EJ (1994), *Cost-Benefit Analysis*, fourth edition, Routledge, New York.

2

- Identify the expected undesirable side-effects and ancillary benefits of the proposed regulatory action and the alternatives. These should be added to the direct benefits and costs as appropriate.

With this information, you should be able to assess quantitatively the benefits and costs of the proposed rule and its alternatives. A complete regulatory analysis includes a discussion of non-quantified as well as quantified benefits and costs. A non-quantified outcome is a benefit or cost that has not been quantified or monetized in the analysis. When there are important non-monetary values at stake, you should also identify them in your analysis so policymakers can compare them with the monetary benefits and costs. When your analysis is complete, you should present a summary of the benefit and cost estimates for each alternative, including the qualitative and non-monetized factors affected by the rule, so that readers can evaluate them.

As you design, execute, and write your regulatory analysis, you should seek out the opinions of those who will be affected by the regulation as well as the views of those individuals and organizations who may not be affected but have special knowledge or insight into the regulatory issues. Consultation can be useful in ensuring that your analysis addresses all of the relevant issues and that you have access to all pertinent data. Early consultation can be especially helpful. You should not limit consultation to the final stages of your analytical efforts.

You will find that you cannot conduct a good regulatory analysis according to a formula. Conducting high-quality analysis requires competent professional judgment. Different regulations may call for different emphases in the analysis, depending on the nature and complexity of the regulatory issues and the sensitivity of the benefit and cost estimates to the key assumptions.

A good analysis is transparent. It should be possible for a qualified third party reading the report to see clearly how you arrived at your estimates and conclusions. For transparency's sake, you should state in your report what assumptions were used, such as the time horizon for the analysis and the discount rates applied to future benefits and costs. It is usually necessary to provide a sensitivity analysis to reveal whether, and to what extent, the results of the analysis are sensitive to plausible changes in the main assumptions and numeric inputs.

A good analysis provides specific references to all sources of data, appendices with documentation of models (where necessary), and the results of formal sensitivity and other uncertainty analyses. Your analysis should also have an executive summary, including a standardized accounting statement.

**B.      The Need for Federal Regulatory Action**

Before recommending Federal regulatory action, an agency must demonstrate that the proposed action is necessary. If the regulatory intervention results from a statutory or judicial directive, you should describe the specific authority for your action, the extent of discretion available to you, and the regulatory instruments you might use. Executive Order 12866 states that "Federal agencies should promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling need, such as material

3

AR2022_400653

failures of private markets to protect or improve the health and safety of the public, the environment, or the well being of the American people ... ."

Executive Order 12866 also states that "Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem." Thus, you should try to explain whether the action is intended to address a significant market failure or to meet some other compelling public need such as improving governmental processes or promoting intangible values such as distributional fairness or privacy.  If the regulation is designed to correct a significant market failure, you should describe the failure both qualitatively and (where feasible) quantitatively.  You should show that a government intervention is likely to do more good than harm.  For other interventions, you should also provide a demonstration of compelling social purpose and the likelihood of effective action.  Although intangible rationales do not need to be quantified, the analysis should present and evaluate the strengths and limitations of the relevant arguments for these intangible values.

### *Market Failure or Other Social Purpose*

The major types of market failure include: externality, market power, and inadequate or asymmetric information.  Correcting market failures is a reason for regulation, but it is not the only reason.  Other possible justifications include improving the functioning of government, removing distributional unfairness, or promoting privacy and personal freedom.

1.      Externality, common property resource and public good

An externality occurs when one party's actions impose uncompensated benefits or costs on another party.  Environmental problems are a classic case of externality.  For example, the smoke from a factory may adversely affect the health of local residents while soiling the property in nearby neighborhoods.  If bargaining were costless and all property rights were well defined, people would eliminate externalities through bargaining without the need for government regulation.[3]  From this perspective, externalities arise from high transactions costs and/or poorly defined property rights that prevent people from reaching efficient outcomes through market transactions.

Resources that may become congested or overused, such as fisheries or the broadcast spectrum, represent common property resources.  "Public goods," such as defense or basic scientific research, are goods where provision of the good to some individuals cannot occur without providing the same level of benefits free of charge to other individuals.

2.      Market Power

Firms exercise market power when they reduce output below what would be offered in a competitive industry in order to obtain higher prices.  They may exercise market power collectively or unilaterally.  Government action can be a source of market power, such as when regulatory actions exclude low-cost imports.  Generally, regulations that increase market power

---

[3] See Coase RH (1960), *Journal of Law and Economics*, 3, 1-44.

AR2022_400654

for selected entities should be avoided.  However, there are some circumstances in which government may choose to validate a monopoly.  If a market can be served at lowest cost only when production is limited to a single producer – local gas and electricity distribution services, for example – a natural monopoly is said to exist.  In such cases, the government may choose to approve the monopoly and to regulate its prices and/or production decisions.  Nevertheless, you should keep in mind that technological advances often affect economies of scale.  This can, in turn, transform what was once considered a natural monopoly into a market where competition can flourish.

3.      Inadequate or Asymmetric Information

Market failures may also result from inadequate or asymmetric information.  Because information, like other goods, is costly to produce and disseminate, your evaluation will need to do more than demonstrate the possible existence of incomplete or asymmetric information.  Even though the market may supply less than the full amount of information, the amount it does supply may be reasonably adequate and therefore not require government regulation.  Sellers have an incentive to provide information through advertising that can increase sales by highlighting distinctive characteristics of their products.  Buyers may also obtain reasonably adequate information about product characteristics through other channels, such as a seller offering a warranty or a third party providing information.

Even when adequate information is available, people can make mistakes by processing it poorly.  Poor information-processing often occurs in cases of low probability, high-consequence events, but it is not limited to such situations.  For instance, people sometimes rely on mental rules-of-thumb that produce errors.  If they have a clear mental image of an incident which makes it cognitively "available," they might overstate the probability that it will occur.  Individuals sometimes process information in a biased manner, by being too optimistic or pessimistic, without taking sufficient account of the fact that the outcome is exceedingly unlikely to occur.  When mistakes in information processing occur, markets may overreact.  When it is time-consuming or costly for consumers to evaluate complex information about products or services (e.g., medical therapies), they may expect government to ensure that minimum quality standards are met.  However, the mere possibility of poor information processing is not enough to justify regulation.  If you think there is a problem of information processing that needs to be addressed, it should be carefully documented.

4.      Other Social Purposes

There are justifications for regulations in addition to correcting market failures.  A regulation may be appropriate when you have a clearly identified measure that can make government operate more efficiently.  In addition, Congress establishes some regulatory programs to redistribute resources to select groups.  Such regulations should be examined to ensure that they are both effective and cost-effective.  Congress also authorizes some regulations to prohibit discrimination that conflicts with generally accepted norms within our society.  Rulemaking may also be appropriate to protect privacy, permit more personal freedom or promote other democratic aspirations.

5

### *Showing That Regulation at the Federal Level Is the Best Way to Solve the Problem*

Even where a market failure clearly exists, you should consider other means of dealing with the failure before turning to Federal regulation.  Alternatives to Federal regulation include antitrust enforcement, consumer-initiated litigation in the product liability system, or administrative compensation systems.

In assessing whether Federal regulation is the best solution, you should also consider the possibility of regulation at the State or local level.  In some cases, the nature of the market failure may itself suggest the most appropriate governmental level of regulation.  For example, problems that spill across State lines (such as acid rain whose precursors are transported widely in the atmosphere) are probably best addressed by Federal regulation.  More localized problems, including those that are common to many areas, may be more efficiently addressed locally.

The advantages of leaving regulatory issues to State and local authorities can be substantial.  If public values and preferences differ by region, those differences can be reflected in varying State and local regulatory policies.  Moreover, States and localities can serve as a testing ground for experimentation with alternative regulatory policies.  One State can learn from another's experience while local jurisdictions may compete with each other to establish the best regulatory policies.  You should examine the proper extent of State and local discretion in your rulemaking context.

A diversity of rules may generate gains for the public as governmental units compete with each other to serve the public, but duplicative regulations can also be costly.  Where Federal regulation is clearly appropriate to address interstate commerce issues, you should try to examine whether it would be more efficient to retain or reduce State and local regulation.  The local benefits of State regulation may not justify the national costs of a fragmented regulatory system.  For example, the increased compliance costs for firms to meet different State and local regulations may exceed any advantages associated with the diversity of State and local regulation. Your analysis should consider the possibility of reducing as well as expanding State and local rulemaking.

The role of Federal regulation in facilitating U.S. participation in global markets should also be considered.  Harmonization of U.S. and international rules may require a strong Federal regulatory role.  Concerns that new U.S. rules could act as non-tariff barriers to imported goods should be evaluated carefully.

### *The Presumption Against Economic Regulation*

Government actions can be unintentionally harmful, and even useful regulations can impede market efficiency.  For this reason, there is a presumption against certain types of regulatory action.  In light of both economic theory and actual experience, a particularly demanding burden of proof is required to demonstrate the need for any of the following types of regulations:

- price controls in competitive markets;

AR2022_400656

- production or sales quotas in competitive markets;
- mandatory uniform quality standards for goods or services if the potential problem can be adequately dealt with through voluntary standards or by disclosing information of the hazard to buyers or users; or
- controls on entry into employment or production, except (a) where indispensable to protect health and safety (e.g., FAA tests for commercial pilots) or (b) to manage the use of common property resources (e.g., fisheries, airwaves, Federal lands, and offshore areas).

## C.    Alternative Regulatory Approaches

Once you have determined that Federal regulatory action is appropriate, you will need to consider alternative regulatory approaches.  Ordinarily, you will be able to eliminate some alternatives through a preliminary analysis, leaving a manageable number of alternatives to be evaluated according to the formal principles of the Executive Order.  The number and choice of alternatives selected for detailed analysis is a matter of judgment.  There must be some balance between thoroughness and the practical limits on your analytical capacity. With this qualification in mind, you should nevertheless explore modifications of some or all of a regulation's attributes or provisions to identify appropriate alternatives.  The following is a list of alternative regulatory actions that you should consider.

### *Different Choices Defined by Statute*

When a statute establishes a specific regulatory requirement and the agency is considering a more stringent standard, you should examine the benefits and costs of reasonable alternatives that reflect the range of the agency's statutory discretion, including the specific statutory requirement.

### *Different Compliance Dates*

The timing of a regulation may also have an important effect on its net benefits.  Benefits may vary significantly with different compliance dates where a delay in implementation may result in a substantial loss in future benefits (e.g., a delay in implementation could result in a significant reduction in spawning stock and jeopardize a fishery).  Similarly, the cost of a regulation may vary substantially with different compliance dates for an industry that requires a year or more to plan its production runs.  In this instance, a regulation that provides sufficient lead time is likely to achieve its goals at a much lower overall cost than a regulation that is effective immediately.

### *Different Enforcement Methods*

Compliance alternatives for Federal, State, or local enforcement include on-site inspections, periodic reporting, and noncompliance penalties structured to provide the most appropriate incentives.  When alternative monitoring and reporting methods vary in their benefits and costs, you should identify the most appropriate enforcement framework.  For example, in

AR2022_400657

some circumstances random monitoring or parametric monitoring will be less expensive and nearly as effective as continuous monitoring.

### Different Degrees of Stringency

In general, both the benefits and costs associated with a regulation will increase with the level of stringency (although marginal costs generally increase with stringency, whereas marginal benefits may decrease).  You should study alternative levels of stringency to understand more fully the relationship between stringency and the size and distribution of benefits and costs among different groups.

### Different Requirements for Different Sized Firms

You should consider setting different requirements for large and small firms, basing the requirements on estimated differences in the expected costs of compliance or in the expected benefits.  The balance of benefits and costs can shift depending on the size of the firms being regulated.  Small firms may find it more costly to comply with regulation, especially if there are large fixed costs required for regulatory compliance.  On the other hand, it is not efficient to place a heavier burden on one segment of a regulated industry solely because it can better afford the higher cost.  This has the potential to load costs on the most productive firms, costs that are disproportionate to the damages they create.  You should also remember that a rule with a significant impact on a substantial number of small entities will trigger the requirements set forth in the Regulatory Flexibility Act.  (5 U.S.C. 603(c), 604).

### Different Requirements for Different Geographic Regions

Rarely do all regions of the country benefit uniformly from government regulation.  It is also unlikely that costs will be uniformly distributed across the country.  Where there are significant regional variations in benefits and/or costs, you should consider the possibility of setting different requirements for the different regions.

### Performance Standards Rather than Design Standards

Performance standards express requirements in terms of outcomes rather than specifying the means to those ends.  They are generally superior to engineering or design standards because performance standards give the regulated parties the flexibility to achieve regulatory objectives in the most cost-effective way.  In general, you should take into account both the cost savings to the regulated parties of the greater flexibility and the costs of assuring compliance through monitoring or some other means.

### Market-Oriented Approaches Rather than Direct Controls

Market-oriented approaches that use economic incentives should be explored.  These alternatives include fees, penalties, subsidies, marketable permits or offsets, changes in liability or property rights (including policies that alter the incentives of insurers and insured parties), and required bonds, insurance or warranties.  One example of a market-oriented approach is a

AR2022_400658

program that allows for averaging, banking, and/or trading (ABT) of credits for achieving additional emission reductions beyond the required air emission standards.  ABT programs can be extremely valuable in reducing costs or achieving earlier or greater benefits, particularly when the costs of achieving compliance vary across production lines, facilities, or firms.  ABT can be allowed on a plant-wide, firm-wide, or region-wide basis rather than vent by vent, provided this does not produce unacceptable local air quality outcomes (such as "hot spots" from local pollution concentration).

### *Informational Measures Rather than Regulation*

If intervention is contemplated to address a market failure that arises from inadequate or asymmetric information, informational remedies will often be preferred.  Measures to improve the availability of information include government establishment of a standardized testing and rating system (the use of which could be mandatory or voluntary), mandatory disclosure requirements (e.g., by advertising, labeling, or enclosures), and government provision of information (e.g., by government publications, telephone hotlines, or public interest broadcast announcements).  A regulatory measure to improve the availability of information, particularly about the concealed characteristics of products, provides consumers a greater choice than a mandatory product standard or ban.

Specific informational measures should be evaluated in terms of their benefits and costs. Some effects of informational measures are easily overlooked.  The costs of a mandatory disclosure requirement for a consumer product will include not only the cost of gathering and communicating the required information, but also the loss of net benefits of any information displaced by the mandated information.  The other costs also may include the effect of providing information that is ignored or misinterpreted, and inefficiencies arising from the incentive that mandatory disclosure may give to overinvest in a particular characteristic of a product or service.

Where information on the benefits and costs of alternative informational measures is insufficient to provide a clear choice between them, you should consider the least intrusive informational alternative sufficient to accomplish the regulatory objective.  To correct an informational market failure it may be sufficient for government to establish a standardized testing and rating system without mandating its use, because competing firms that score well according to the system should thereby have an incentive to publicize the fact.

### D.    Analytical Approaches

Both benefit-cost analysis (BCA) and cost-effectiveness analysis (CEA) provide a systematic framework for identifying and evaluating the likely outcomes of alternative regulatory choices. A major rulemaking should be supported by both types of analysis wherever possible.  Specifically, you should prepare a CEA for all major rulemakings for which the primary benefits are improved public health and safety to the extent that a valid effectiveness measure can be developed to represent expected health and safety outcomes.  You should also perform a BCA for major health and safety rulemakings to the extent that valid monetary values can be assigned to the primary expected health and safety outcomes.  In undertaking these analyses, it is important to keep in mind the larger objective of analytical consistency in

9

estimating benefits and costs across regulations and agencies, subject to statutory limitations. Failure to maintain such consistency may prevent achievement of the most risk reduction for a given level of resource expenditure.  For all other major rulemakings, you should carry out a BCA.  If some of the primary benefit categories cannot be expressed in monetary units, you should also conduct a CEA.  In unusual cases where no quantified information on benefits, costs and effectiveness can be produced, the regulatory analysis should present a qualitative discussion of the issues and evidence.

### *Benefit-Cost Analysis*

A distinctive feature of BCA is that both benefits and costs are expressed in monetary units, which allows you to evaluate different regulatory options with a variety of attributes using a common measure.[4]  By measuring incremental benefits and costs of successively more stringent regulatory alternatives, you can identify the alternative that maximizes net benefits.

The size of net benefits, the absolute difference between the projected benefits and costs, indicates whether one policy is more efficient than another.  The ratio of benefits to costs is not a meaningful indicator of net benefits and should not be used for that purpose.  It is well known that considering such ratios alone can yield misleading results.

Even when a benefit or cost cannot be expressed in monetary units, you should still try to measure it in terms of its physical units.  If it is not possible to measure the physical units, you should still describe the benefit or cost qualitatively.  For more information on describing qualitative information, see the section "*Developing Benefit and Cost Estimates.*"

When important benefits and costs cannot be expressed in monetary units, BCA is less useful, and it can even be misleading, because the calculation of net benefits in such cases does not provide a full evaluation of all relevant benefits and costs.

You should exercise professional judgment in identifying the importance of non-quantified factors and assess as best you can how they might change the ranking of alternatives based on estimated net benefits.  If the non-quantified benefits and costs are likely to be important, you should recommend which of the non-quantified factors are of sufficient importance to justify consideration in the regulatory decision.  This discussion should also include a clear explanation that support designating these non-quantified factors as important.  In this case, you should also consider conducting a threshold analysis to help decision makers and other users of the analysis to understand the potential significance of these factors to the overall analysis.

### *Cost-Effectiveness Analysis*[5]

---

[4] Mishan EJ (1994), *Cost-Benefit Analysis*, fourth edition, Routledge, New York.
[5] For a full discussion of CEA, see Gold, ML, Siegel, JE, Russell, LB, and Weinstein, MC (1996), *Cost Effectiveness in Health and Medicine:  The Report of the Panel on Cost-Effectiveness in Health and Medicine*, Oxford University Press, New York.

AR2022_400660

Cost-effectiveness analysis can provide a rigorous way to identify options that achieve the most effective use of the resources available without requiring monetization of all of relevant benefits or costs.  Generally, cost-effectiveness analysis is designed to compare a set of regulatory actions with the same primary outcome (e.g., an increase in the acres of wetlands protected) or multiple outcomes that can be integrated into a single numerical index (e.g., units of health improvement).

Cost-effectiveness results based on averages need to be treated with great care.  They suffer from the same drawbacks as benefit-cost ratios.  The alternative that exhibits the smallest cost-effectiveness ratio may not be the best option, just as the alternative with the highest benefit-cost ratio is not always the one that maximizes net benefits. Incremental cost-effectiveness analysis (discussed below) can help to avoid mistakes that can occur when policy choices are based on average cost-effectiveness.

CEA can also be misleading when the "effectiveness" measure does not appropriately weight the consequences of the alternatives.  For example, when effectiveness is measured in tons of reduced pollutant emissions, cost-effectiveness estimates will be misleading unless the reduced emissions of diverse pollutants result in the same health and environmental benefits.

When you have identified a range of alternatives (e.g., different levels of stringency), you should determine the cost-effectiveness of each option compared with the baseline as well as its incremental cost-effectiveness compared with successively more stringent requirements.  Ideally, your CEA would present an array of cost-effectiveness estimates that would allow comparison across different alternatives.  However, analyzing all possible combinations is not practical when there are many options (including possible interaction effects).  In these cases, you should use your judgment to choose reasonable alternatives for careful consideration.

When constructing and comparing incremental cost-effectiveness ratios, you should be careful to determine whether the various alternatives are mutually exclusive or whether they can be combined.  If they can be combined, you should consider which might be favored under different regulatory budget constraints (implicit or explicit).  You should also make sure that inferior alternatives identified by the principles of strong and weak dominance are eliminated from consideration.[6]

The value of CEA is enhanced when there is consistency in the analysis across a diverse set of possible regulatory actions.  To achieve consistency, you need to carefully construct the two key components of any CEA: the cost and the "effectiveness" or performance measures for the alternative policy options.

With regard to measuring costs, you should be sure to include all the relevant costs to society – whether public or private.  Rulemakings may also yield cost savings (e.g., energy savings associated with new technologies).  The numerator in the cost-effectiveness ratio should reflect net costs, defined as the gross cost incurred to comply with the requirements (sometimes

---

[6] Gold ML, Siegel JE, Russell LB, and Weinstein MC (1996), *Cost Effectiveness in Health and Medicine:  The Report of the Panel on Cost-Effectiveness in Health and Medicine*, Oxford University Press, New York, pp. 284-285.

AR2022_400661

called "total" costs) minus any cost savings.  You should be careful to avoid double-counting effects in both the numerator and the denominator of the cost-effectiveness ratios.  For example, it would be incorrect to reduce gross costs by an estimated monetary value on life extension if life-years are already used as the effectiveness measure in the denominator.

In constructing measures of "effectiveness", final outcomes, such as lives saved or life-years saved, are preferred to measures of intermediate outputs, such as tons of pollution reduced, crashes avoided, or cases of disease avoided.  Where the quality of the measured unit varies (e.g., acres of wetlands vary substantially in terms of their ecological benefits), it is important that the measure capture the variability in the value of the selected "outcome" measure.  You should provide an explanation of your choice of effectiveness measure.

Where regulation may yield several different beneficial outcomes, a cost-effectiveness comparison becomes more difficult to interpret because there is more than one measure of effectiveness to incorporate in the analysis.  To arrive at a single measure you will need to weight the value of disparate benefit categories, but this computation raises some of the same difficulties you will encounter in BCA.  If you can assign a reasonable monetary value to all of the regulation's different benefits, then you should do so.  But in this case, you will be doing BCA, not CEA.

When you can estimate the monetary value of *some* but not all of the ancillary benefits of a regulation, but cannot assign a monetary value to the primary measure of effectiveness, you should subtract the monetary estimate of the ancillary benefits from the gross cost estimate to yield an estimated net cost.  (This net cost estimate for the rule may turn out to be negative – that is, the monetized benefits exceed the cost of the rule.)  If you are unable to estimate the value of some of the ancillary benefits, the cost-effectiveness ratio will be overstated, and this should be acknowledged in your analysis.  CEA does not yield an unambiguous choice when there are benefits or costs that have not been incorporated in the net-cost estimates. You also may use CEA to compare regulatory alternatives in cases where the statute specifies the level of benefits to be achieved.

### The Effectiveness Metric for Public Health and Safety Rulemakings

When CEA is applied to public health and safety rulemakings, one or more measures of effectiveness must be selected that permits comparison of regulatory alternatives.  Agencies currently use a variety of effectiveness measures.

There are relatively simple measures such as the number of lives saved, cases of cancer reduced, and cases of paraplegia prevented.  Sometimes these measures account only for mortality information, such as the number of lives saved and the number of years of life saved. There are also more comprehensive, integrated measures of effectiveness such as the number of "equivalent lives" (ELs) saved and the number of "quality-adjusted life years" (QALYs) saved.

The main advantage of the integrated measures of effectiveness is that they account for a rule's impact on morbidity (nonfatal illness, injury, impairment and quality of life) as well as premature death.  The inclusion of morbidity effects is important because (a) some illnesses (e.g.,

12

asthma) cause more instances of pain and suffering than they do premature death, (b) some population groups are known to experience elevated rates of morbidity (e.g, the elderly and the poor) and thus have a strong interest in morbidity measurement[7], and (c) some regulatory alternatives may be more effective at preventing morbidity than premature death (e.g., some advanced airbag designs may diminish the nonfatal injuries caused by airbag inflation without changing the frequency of fatal injury prevented by airbags).

However, the main drawback of these integrated measures is that they must meet some restrictive assumptions to represent a valid measure of individual preferences.[8] For example, a QALY measure implicitly assumes that the fraction of remaining lifespan an individual would give up for an improvement in health-related quality of life does not depend on the remaining lifespan.  Thus, if an individual is willing to give up 10 years of life among 50 remaining years for a given health improvement, he or she would also be willing to give up 1 year of life among 5 remaining years.  To the extent that individual preferences deviate from these assumptions, analytic results from CEA using QALYs could differ from analytic results based on willingness-to-pay-measures.[9]  Though willingness to pay is generally the preferred economic method for evaluating preferences, the CEA method, as applied in medicine and health, does not evaluate health changes using individual willingness to pay.  When performing CEA, you should consider using at least one integrated measure of effectiveness when a rule creates a significant impact on both mortality and morbidity.

When CEA is performed in specific rulemaking contexts, you should be prepared to make appropriate adjustments to ensure fair treatment of all segments of the population.  Fairness is important in the choice and execution of effectiveness measures.  For example, if QALYs are used to evaluate a lifesaving rule aimed at a population that happens to experience a high rate of disability (i.e., where the rule is not designed to affect the disability), the number of life years saved should not necessarily be diminished simply because the rule saves the lives of people with life-shortening disabilities.   Both analytic simplicity and fairness suggest that the estimated number of life years saved for the disabled population should be based on average life expectancy information for the relevant age cohorts.  More generally, when numeric adjustments are made for life expectancy or quality of life, analysts should prefer use of population averages rather than information derived from subgroups dominated by a particular demographic or income group.

OMB does not require agencies to use any specific measure of effectiveness.  In fact, OMB encourages agencies to report results with multiple measures of effectiveness that offer different insights and perspectives.  The regulatory analysis should explain which measures were selected and why, and how they were implemented.

The analytic discretion provided in choice of effectiveness measure will create some inconsistency in how agencies evaluate the same injuries and diseases, and it will be difficult for

---

[7] Russell LB and Sisk JE (2000), "Modeling Age Differences in Cost Effectiveness Analysis", *International Journal of Technology Assessment in Health Care*, 16(4), 1158-1167.

[8] Pliskin JS, Shepard DS, and Weinstein MC (1980), "Utility Functions for Life Years and Health Status," *Operations Research*, 28(1), 206-224.

[9] Hammitt JK (2002), "QALYs Versus WTP," *Risk Analysis*, 22(5), pp. 985-1002.

AR2022_400663

OMB and the public to draw meaningful comparisons between rulemakings that employ different effectiveness measures.  As a result, agencies should use their web site to provide OMB and the public with the underlying data, including mortality and morbidity data, the age distribution of the affected populations, and the severity and duration of disease conditions and trauma, so that OMB and the public can construct apples-to-apples comparisons between rulemakings that employ different measures.

There are sensitive technical and ethical issues associated with choosing one or more of these integrated measures for use throughout the Federal government.  The Institute of Medicine (IOM) may assemble a panel of specialists in cost-effectiveness analysis and bioethics to evaluate the advantages and disadvantages of these different measures and other measures that have been suggested in the academic literature.  OMB believes that the IOM guidance will provide Federal agencies and OMB useful insight into how to improve the measurement of effectiveness of public health and safety regulations.

### *Distributional Effects*

Those who bear the costs of a regulation and those who enjoy its benefits often are not the same people.  The term "distributional effect" refers to the impact of a regulatory action across the population and economy, divided up in various ways (e.g., income groups, race, sex, industrial sector, geography).  Benefits and costs of a regulation may also be distributed unevenly over time, perhaps spanning several generations.  Distributional effects may arise through "transfer payments" that stem from a regulatory action as well.  For example, the revenue collected through a fee, surcharge in excess of the cost of services provided, or tax is a transfer payment.

Your regulatory analysis should provide a separate description of distributional effects (i.e., how both benefits and costs are distributed among sub-populations of particular concern) so that decision makers can properly consider them along with the effects on economic efficiency.  Executive Order 12866 authorizes this approach.  Where distributive effects are thought to be important, the effects of various regulatory alternatives should be described quantitatively to the extent possible, including the magnitude, likelihood, and severity of impacts on particular groups.  You should be alert for situations in which regulatory alternatives result in significant changes in treatment or outcomes for different groups.  Effects on the distribution of income that are transmitted through changes in market prices can be important, albeit sometimes difficult to assess.  Your analysis should also present information on the streams of benefits and costs over time in order to provide a basis for assessing intertemporal distributional consequences, particularly where intergenerational effects are concerned.

### E.       Identifying and Measuring Benefits and Costs

This Section provides guidelines for your preparation of the benefit and cost estimates required by Executive Order 12866 and the "Regulatory Right-to-Know Act."  The discussions in previous sections will help you identify a workable number of alternatives for consideration in your analysis and an appropriate analytical approach to use.

AR2022_400664

***General Issues***

1. Scope of Analysis

Your analysis should focus on benefits and costs that accrue to citizens and residents of the United States. Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately. The time frame for your analysis should cover a period long enough to encompass all the important benefits and costs likely to result from the rule.

2. Developing a Baseline

You need to measure the benefits and costs of a rule against a baseline. This baseline should be the best assessment of the way the world would look absent the proposed action. The choice of an appropriate baseline may require consideration of a wide range of potential factors, including:

- evolution of the market,
- changes in external factors affecting expected benefits and costs,
- changes in regulations promulgated by the agency or other government entities, and
- the degree of compliance by regulated entities with other regulations.

It may be reasonable to forecast that the world absent the regulation will resemble the present. If this is the case, however, your baseline should reflect the future effect of current government programs and policies. For review of an existing regulation, a baseline assuming "no change" in the regulatory program generally provides an appropriate basis for evaluating regulatory alternatives. When more than one baseline is reasonable and the choice of baseline will significantly affect estimated benefits and costs, you should consider measuring benefits and costs against alternative baselines. In doing so you can analyze the effects on benefits and costs of making different assumptions about other agencies' regulations, or the degree of compliance with your own existing rules. In all cases, you must evaluate benefits and costs against the same baseline. You should also discuss the reasonableness of the baselines used in the sensitivity analyses. For each baseline you use, you should identify the key uncertainties in your forecast.

EPA's 1998 final PCB disposal rule provides a good example of using different baselines. EPA used several alternative baselines, each reflecting a different interpretation of existing regulatory requirements. In particular, one baseline reflected a literal interpretation of EPA's 1979 rule and another the actual implementation of that rule in the year immediately preceding the 1998 revision. The use of multiple baselines illustrated the substantial effect changes in EPA's implementation policy could have on the cost of a regulatory program. In the years after EPA adopted the 1979 PCB disposal rule, changes in EPA policy -- especially allowing the disposal of automobile "shredder fluff" in municipal landfills -- reduced the cost of the program by more than $500 million per year.

In some cases, substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action. In these cases,

AR2022_400665

you should use a pre-statute baseline.  If you are able to separate out those areas where the agency has discretion, you may also use a post-statute baseline to evaluate the discretionary elements of the action.

3.      Evaluation of Alternatives

You should describe the alternatives available to you and the reasons for choosing one alternative over another.  As noted previously, alternatives that rely on incentives and offer increased flexibility are often more cost-effective than more prescriptive approaches.  For instance, user fees and information dissemination may be good alternatives to direct command-and-control regulation.  Within a command-and-control regulatory program, performance-based standards generally offer advantages over standards specifying design, behavior, or manner of compliance.

You should carefully consider all appropriate alternatives for the key attributes or provisions of the rule.  The previous discussion outlines examples of appropriate alternatives. Where there is a "continuum" of alternatives for a standard (such as the level of stringency), you generally should analyze at least three options: the preferred option; a more stringent option that achieves additional benefits (and presumably costs more) beyond those realized by the preferred option; and a less stringent option that costs less (and presumably generates fewer benefits) than the preferred option.

You should choose reasonable alternatives deserving careful consideration.  In some cases, a regulatory program will focus on an option that is near or at the limit of technical feasibility.  In this case, the analysis would not need to examine a more stringent option.  For each of the options analyzed, you should compare the anticipated benefits to the corresponding costs.

It is not adequate simply to report a comparison of the agency's preferred option to the chosen baseline.  Whenever you report the benefits and costs of alternative options, you should present both total and incremental benefits and costs.  You should present incremental benefits and costs as differences from the corresponding estimates associated with the next less-stringent alternative.[10]  It is important to emphasize that incremental effects are simply differences between successively more stringent alternatives.  Results involving a comparison to a "next best" alternative may be especially useful.

In some cases, you may decide to analyze a wide array of options.  In 1998, DOE analyzed a large number of options in setting new energy efficiency standards for refrigerators and freezers and produced a rich amount of information on their relative effects.  This analysis -- examining more than 20 alternative performance standards for one class of refrigerators with top-mounted freezers -- enabled DOE to select an option that produced $200 more in estimated net benefits per refrigerator than the least attractive option.

---

[10] For the least stringent alternative, you should estimate the incremental benefits and costs relative to the baseline. Thus, for this alternative, the incremental effects would be the same as the corresponding totals.  For each alternative that is more stringent than the least stringent alternative, you should estimate the incremental benefits and costs relative to the closest less-stringent alternative.

16

AR2022_400666

You should analyze the benefits and costs of different regulatory provisions separately when a rule includes a number of distinct provisions.  If the existence of one provision affects the benefits or costs arising from another provision, the analysis becomes more complicated, but the need to examine provisions separately remains.  In this case, you should evaluate each specific provision by determining the net benefits of the proposed regulation with and without it.

Analyzing all possible combinations of provisions is impractical if the number is large and interaction effects are widespread. You need to use judgment to select the most significant or relevant provisions for such analysis.  You are expected to document all of the alternatives that were considered in a list or table and which were selected for emphasis in the main analysis.

You should also discuss the statutory requirements that affect the selection of regulatory approaches.  If legal constraints prevent the selection of a regulatory action that best satisfies the philosophy and principles of Executive Order 12866, you should identify these constraints and estimate their opportunity cost.  Such information may be useful to Congress under the Regulatory Right-to-Know Act.

4.  Transparency and Reproducibility of Results

Because of its influential nature and its special role in the rulemaking process, it is appropriate to set minimum quality standards for regulatory analysis.  You should provide documentation that the analysis is based on the best reasonably obtainable scientific, technical, and economic information available.  To achieve this, you should rely on peer-reviewed literature, where available, and provide the source for all original information.

A good analysis should be transparent and your results must be reproducible.  You should clearly set out the basic assumptions, methods, and data underlying the analysis and discuss the uncertainties associated with the estimates.  A qualified third party reading the analysis should be able to understand the basic elements of your analysis and the way in which you developed your estimates.

To provide greater access to your analysis, you should generally post it, with all the supporting documents, on the internet so the public can review the findings.  You should also disclose the use of outside consultants, their qualifications, and history of contracts and employment with the agency (e.g., in a preface to the RIA).  Where other compelling interests (such as privacy, intellectual property, trade secrets, etc.) prevent the public release of data or key elements of the analysis, you should apply especially rigorous robustness checks to analytic results and document the analytical checks used.

Finally, you should assure compliance with the Information Quality Guidelines for your agency and OMB's "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies" ("data quality guidelines") http://www.whitehouse.gov/omb/fedreg/reproducible.html.

AR2022_400667

***Developing Benefit and Cost Estimates***

1.    Some General Considerations

The analysis document should discuss the expected benefits and costs of the selected regulatory option and any reasonable alternatives.  How is the proposed action expected to provide the anticipated benefits and costs?  What are the monetized values of the potential real incremental benefits and costs to society?  To present your results, you should:

- include separate schedules of the monetized benefits and costs that show the type and timing of benefits and costs, and express the estimates in this table in constant, undiscounted dollars (for more on discounting see "*Discount Rates*" below);
- list the benefits and costs you can quantify, but cannot monetize, including their timing;
- describe benefits and costs you cannot quantify; and
- identify or cross-reference the data or studies on which you base the benefit and cost estimates.

When benefit and cost estimates are uncertain (for more on this see "*Treatment of Uncertainty*" below), you should report benefit and cost estimates (including benefits of risk reductions) that reflect the full probability distribution of potential consequences.  Where possible, present probability distributions of benefits and costs and include the upper and lower bound estimates as complements to central tendency and other estimates.

If fundamental scientific disagreement or lack of knowledge prevents construction of a scientifically defensible probability distribution, you should describe benefits or costs under plausible scenarios and characterize the evidence and assumptions underlying each alternative scenario.

2.  The Key Concepts Needed to Estimate Benefits and Costs

"Opportunity cost" is the appropriate concept for valuing both benefits and costs.  The principle of "willingness-to-pay" (WTP) captures the notion of opportunity cost by measuring what individuals are willing to forgo to enjoy a particular benefit.  In general, economists tend to view WTP as the most appropriate measure of opportunity cost, but an individual's "willingness-to-accept" (WTA) compensation for not receiving the improvement can also provide a valid measure of opportunity cost.

WTP and WTA are comparable measures under special circumstances.  WTP and WTA measures may be comparable in the following situations: if a regulation affects a price change rather than a quantity change; the change being evaluated is small; there are reasonably close substitutes available; and the income effect is small.[11]  However, empirical evidence from experimental economics and psychology shows that even when income/wealth effects are "small", the measured differences between WTP and WTA can be large.[12] WTP is generally

---

[11] See Hanemann WM (1991), *American Economic Review*, 81(3), 635-647.
[12] See Kahneman D, Knetsch JL, and Thaler RH (1991), "Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias," *Journal of Economic Perspectives* 3(1), 192-206.

AR2022_400668

considered to be more readily measurable.  Adoption of WTP as the measure of value implies that individual preferences of the affected population should be a guiding factor in the regulatory analysis.

Market prices provide rich data for estimating benefits and costs based on willingness-to-pay if the goods and services affected by the regulation are traded in well-functioning competitive markets.  The opportunity cost of an alternative includes the value of the benefits forgone as a result of choosing that alternative.  The opportunity cost of banning a product -- a drug, food additive, or hazardous chemical -- is the forgone net benefit (i.e., lost consumer and producer surplus[13] ) of that product, taking into account the mitigating effects of potential substitutes.

The use of any resource has an opportunity cost regardless of whether the resource is already owned or has to be purchased.  That opportunity cost is equal to the net benefit the resource would have provided in the absence of the requirement.  For example, if regulation of an industrial plant affects the use of additional land or buildings within the existing plant boundary, the cost analysis should include the opportunity cost of using the additional land or facilities.

To the extent possible, you should monetize any such forgone benefits and add them to the other costs of that alternative.  You should also try to monetize any cost savings as a result of an alternative and either add it to the benefits or subtract it from the costs of that alternative.  However, you should not assume that the "avoided" costs of not doing another regulatory alternative represent the benefits of a regulatory action where there is no direct, necessary relationship between the two.  You should also be careful when the costs avoided are attributable to an existing regulation.  Even when there is a direct relationship between the two regulatory actions, the use of avoided costs is problematic because the existing regulation may not maximize net benefits and thus may itself be questionable policy.  (See the section, "Direct Use of Market Data," for more detail.)

Estimating benefits and costs when market prices are hard to measure or markets do not exist is more difficult.  In these cases, you need to develop appropriate proxies that simulate market exchange.  Estimates of willingness-to-pay based on revealed preference methods can be quite useful.  As one example, analysts sometimes use "hedonic price equations" based on multiple regression analysis of market behavior to simulate market prices for the commodity of interest. The hedonic technique allows analysts to develop an estimate of the price for specific attributes associated with a product.  For instance, a house is a product characterized by a variety of attributes including the number of rooms, total floor area, and type of heating and cooling.  If there are enough data on transactions in the housing market, it is possible to develop an estimate of the implicit price for specific attributes, such as the implicit price of an additional bathroom or for central air conditioning.  This technique can be extended, as well, to develop an estimate for

---

[13] Consumer surplus is the difference between what a consumer pays for a unit of a good and the maximum amount the consumer would be willing to pay for that unit.  It is measured by the area between the price and the demand curve for that unit. Producer surplus is the difference between the amount a producer is paid for a unit of a good and the minimum amount the producer would accept to supply that unit.  It is measured by the area between the price and the supply curve for that unit.

AR2022_400669

the implicit price of public goods that are not directly traded in markets. An analyst can develop implicit price estimates for public goods like air quality and access to public parks by assessing the effects of these goods on the housing market. Going through the analytical process of deriving benefit estimates by simulating markets may also suggest alternative regulatory strategies that create such markets.

You need to guard against double-counting, since some attributes are embedded in other broader measures. To illustrate, when a regulation improves the quality of the environment in a community, the value of real estate in the community generally rises to reflect the greater attractiveness of living in a better environment. Simply adding the increase in property values to the estimated value of improved public health would be double counting if the increase in property values reflects the improvement in public health. To avoid this problem you should separate the embedded effects on the value of property arising from improved public health. At the same time, an analysis that fails to incorporate the consequence of land use changes when accounting for costs will not capture the full effects of regulation.

3.      Revealed Preference Methods

Revealed preference methods develop estimates of the value of goods and services -- or attributes of those goods and services -- based on actual market decisions by consumers, workers and other market participants. If the market participant is well informed and confronted with a real choice, it may be feasible to determine accurately and precisely the monetary value needed for a rulemaking. There is a large and well-developed literature on revealed preference in the peer-reviewed, applied economics literature.

Although these methods are well grounded in economic theory, they are sometimes difficult to implement given the complexity of market transactions and the paucity of relevant data. When designing or evaluating a revealed preference study, the following principles should be considered:

- the market should be competitive. If the market isn't competitive (e.g., monopoly, oligopoly), then you should consider making adjustments such that the price reflects the true value to society (often called the "shadow price");
- the market should not exhibit a significant information gap or asymmetric information problem. If the market suffers from information problems, then you should discuss the divergence of the price from the underlying shadow price and consider possible adjustments to reflect the underlying shadow price;
- the market should not exhibit an externality. In this case, you should discuss the divergence of the price from the underlying shadow price and consider possible adjustments to reflect the underlying shadow price;
- the specific market participants being studied should be representative of the target populations to be affected by the rulemaking under consideration;
- a valid research design and framework for analysis should be adopted. Examples include using data and/or model specifications that include the markets for substitute and complementary goods and services and using reasonably unrestricted functional forms. When specifying substitute and complementary goods, the analysis should preferably be

20

AR2022_400670

based on data about the range of alternatives perceived by market participants. If such data are not available, you should adopt plausible assumptions and describe the limitations of the analysis.

- the statistical and econometric models employed should be appropriate for the application and the resulting estimates should be robust in response to plausible changes in model specification and estimation technique; and
- the results should be consistent with economic theory.

You should also determine whether there are multiple revealed-preference studies of the same good or service and whether anything can be learned by comparing the methods, data and findings from different studies. Professional judgment is required to determine whether a particular study is of sufficient quality to justify use in regulatory analysis. When studies are used in regulatory analysis despite their technical weaknesses (e.g., due to the absence of other evidence), the regulatory analysis should discuss any biases or uncertainties that are likely to arise due to those weaknesses. If a study has major weaknesses, the study should not be used in regulatory analysis.

a.      Direct Uses of Market Data

Economists ordinarily consider market prices as the most accurate measure of the marginal value of goods and services to society. In some instances, however, market prices may not reflect the true value of goods and services due to market imperfections or government intervention. If a regulation involves changes to goods or services where the market price is not a good measure of the value to society, you should use an estimate that reflects the shadow price. Suppose a particular air pollutant damages crops. One of the benefits of controlling that pollutant is the value of the crop yield increase as a result of the controls. That value is typically measured by the price of the crop. However, if the price is held above the market price by a government program that affects supply, a value estimate based on this price may not reflect the true benefits of controlling the pollutant. In this case, you should calculate the value to society of the increase in crop yields by estimating the shadow price, which reflects the value to society of the marginal use of the crop. If the marginal use is for exports, you should use the world price. If the marginal use is to add to very large surplus stockpiles, you should use the value of the last units released from storage minus storage cost. If stockpiles are large and growing, the shadow price may be low or even negative.

Other goods whose market prices may not reflect their true value include those whose production or consumption results in substantial (1) positive or negative external effects or (2) transfer payments. For example, the observed market price of gasoline may not reflect marginal social value due to the inclusion of taxes, other government interventions, and negative externalities (e.g., pollution). This shadow price may also be needed for goods whose market price is substantially affected by existing regulations that do not maximize net benefits.

b.      Indirect Uses of Market Data

Many goods or attributes of goods that are affected by regulation--such as preserving environmental or cultural amenities--are not traded directly in markets. The value for these

AR2022_400671

goods or attributes arise both from use and non-use.  Estimation of these values is difficult because of the absence of an organized market.  However, overlooking or ignoring these values in your regulatory analysis may significantly understate the benefits and/or costs of regulatory action.

"Use values" arise where an individual derives satisfaction from using the resource, either now or in the future.  Use values are associated with activities such as swimming, hunting, and hiking where the individual makes use of the natural environment.

"Non-use values" arise where an individual places value on a resource, good or service even though the individual will not use the resource, now or in the future.  Non-use value includes bequest and existence values.

General altruism for the health and welfare of others is a closely related concept but may not be strictly considered a "non-use" value.[14]  A general concern for the welfare of others should supplement benefits and costs equally; hence, it is not necessary to measure the size of general altruism in regulatory analysis.  If there is evidence of selective altruism, it needs to be considered specifically in both benefits and costs.

Some goods and services are indirectly traded in markets, which means that their value is reflected in the prices of related goods and services that are directly traded in markets.  Their use values are typically estimated through revealed preference methods.  Examples include estimates of the values of environmental amenities derived from travel-cost studies, and hedonic price models that measure differences or changes in the value of real estate.  It is important that you utilize revealed preference models that adhere to economic criteria that are consistent with utility maximizing behavior.  Also, you should take particular care in designing protocols for reliably estimating the values of these attributes.

4.      Stated Preference Methods

Stated Preference Methods (SPM) have been developed and used in the peer-reviewed literature to estimate both "use" and "non-use" values of goods and services.  They have also been widely used in regulatory analyses by Federal agencies, in part, because these methods can be creatively employed to address a wide variety of goods and services that are not easy to study through revealed preference methods.

The distinguishing feature of these methods is that hypothetical questions about use or non-use values are posed to survey respondents in order to obtain willingness-to-pay estimates relevant to benefit or cost estimation.  Some examples of SPM include contingent valuation, conjoint analysis and risk-tradeoff analysis.  The surveys used to obtain the health-utility values used in CEA are similar to stated-preference surveys but do not entail monetary measurement of value.  Nevertheless, the principles governing quality stated-preference research, with some obvious exceptions involving monetization, are also relevant in designing quality health-utility research.

---

[14] See McConnell KE (1997), *Journal of Environmental Economics and Management*, *32*, 22-37.

AR2022_400672

When you are designing or evaluating a stated-preference study, the following principles should be considered:

- the good or service being evaluated should be explained to the respondent in a clear, complete and objective fashion, and the survey instrument should be pre-tested;
- willingness-to-pay questions should be designed to focus the respondent on the reality of budgetary limitations and alerted to the availability of substitute goods and alternative expenditure options;
- the survey instrument should be designed to probe beyond general attitudes (e.g., a "warm glow" effect for a particular use or non-use value) and focus on the magnitude of the respondent's economic valuation;
- the analytic results should be consistent with economic theory using both "internal" (within respondent) and "external" (between respondent) scope tests such as the willingness to pay is larger (smaller) when more (less) of a good is provided;
- the subjects being interviewed should be selected/sampled in a statistically appropriate manner.  The sample frame should adequately cover the  target population.  The sample should be drawn using probability methods in order to generalize the results to the target population;
- response rates should be as high as reasonably possible.  Best survey practices should be followed to achieve high response rates.  Low response rates increase the potential for bias and raise concerns about the generalizability of the results.  If response rates are not adequate, you should conduct an analysis of non-response bias or further study.  Caution should be used in assessing the representativeness of the sample based solely on demographic profiles.  Statistical adjustments to reduce non-response bias should be undertaken whenever feasible and appropriate;
- the mode of administration of surveys (in-person, phone, mail, computer, internet or multiple modes ) should be appropriate  in light of the nature of the questions being posed to respondents and the length and complexity of the instrument;
- documentation should be provided about the target population, the sampling frame used and its coverage of the target population, the design of the sample including any stratification or clustering, the cumulative response rate (including response rate at each stage of selection if applicable); the item non-response rate for critical questions; the exact wording and sequence of questions and other information provided to respondents; and the training of interviewers and techniques they employed (as appropriate);
- the statistical and econometric methods used to analyze the collected data should be transparent, well suited for the analysis, and applied with rigor and care.

Professional judgment is necessary to apply these criteria to one or more studies, and thus there is no mechanical formula that can be used to determine whether a particular study is of sufficient quality to justify use in regulatory analysis.  When studies are used despite having weaknesses on one or more of these criteria, those weaknesses should be acknowledged in the regulatory analysis, including any resulting biases or uncertainties that are likely to result.  If a study has too many weaknesses with unknown consequences for the quality of the data, the study should not be used.

AR2022_400673

The challenge in designing quality stated-preference studies is arguably greater for non-use values and unfamiliar use values than for familiar goods or services that are traded (directly or indirectly) in market transactions.  The good being valued may have little meaning to respondents, and respondents may be forming their valuations for the first time in response to the questions posed.  Since these values are effectively constructed by the respondent during the elicitation, the instrument and mode of administration should be rigorously pre-tested to make sure that responses are not simply an artifact of specific features of instrument design and/or mode of administration.

Since SPM generate data from respondents in a hypothetical setting, often on complex and unfamiliar goods, special care is demanded in the design and execution of surveys, analysis of the results, and characterization of the uncertainties.  A stated-preference study may be the only way to obtain quantitative information about non-use values, though a number based on a poor quality study is not necessarily superior to no number at all.  Non-use values that are not quantified should be presented as an "intangible" benefit or cost.

If both revealed-preference and stated-preference studies that are directly applicable to regulatory analysis are available, you should consider both kinds of evidence and compare the findings.  If the results diverge significantly, you should compare the overall size and quality of the two bodies of evidence.  Other things equal, you should prefer revealed preference data over stated preference data because revealed preference data are based on actual decisions, where market participants enjoy or suffer the consequences of their decisions.  This is not generally the case for respondents in stated preference surveys, where respondents may not have sufficient incentives to offer thoughtful responses that are more consistent with their preferences or may be inclined to bias their responses for one reason or another.

5.    Benefit-Transfer Methods

It is often preferable to collect original data on revealed preference or stated preference to support regulatory analysis.  Yet conducting an original study may not be feasible due to the time and expense involved.  One alternative to conducting an original study is the use of "benefit transfer" methods.  (The transfer may involve cost determination as well).  The practice of "benefit transfer" began with transferring existing estimates obtained from indirect market and stated preference studies to new contexts (i.e., the context posed by the rulemaking).  The principles that guide transferring estimates from indirect market and stated preference studies should apply to direct market studies as well.

Although benefit-transfer can provide a quick, low-cost approach for obtaining desired monetary values, the methods are often associated with uncertainties and potential biases of unknown magnitude.  It should therefore be treated as a last-resort option and not used without explicit justification.

In conducting benefit transfer, the first step is to specify the value to be estimated for the rulemaking.  You should identify the relevant measure of the policy change at this initial stage.  For instance, you can derive the relevant willingness-to-pay measure by specifying an indirect utility function.  This identification allows you to "zero in" on key aspects of the benefit transfer.

24

AR2022_400674

The next step is to identify appropriate studies to conduct benefit transfer.  In selecting transfer studies for either point transfers or function transfers, you should base your choices on the following criteria:

- The selected studies should be based on adequate data, sound and defensible empirical methods and techniques.
- The selected studies should document parameter estimates of the valuation function.
- The study context and policy context should have similar populations (e.g.,  demographic characteristics).  The market size (e.g., target population) between the study site and the policy site should be similar.  For example, a study valuing water quality improvement in Rhode Island should not be used to value policy that will affect water quality throughout the United States.
- The good, and the magnitude of change in that good, should be similar in the study and policy contexts.
- The relevant characteristics of the study and the policy contexts should be similar.   For example, the effects examined in the original study should be "reversible" or "irreversible" to a degree that is similar to the regulatory actions under consideration.
- The distribution of property rights should be similar so that the analysis uses the same welfare measure.  If the property rights in the study context support the use of WTA measures while the rights in the rulemaking context support the use of WTP measures, benefit transfer is not appropriate.
- The availability of substitutes across study and policy contexts should be similar.

If you can choose between transferring a function or a point estimate, you should transfer the entire demand function (referred to as benefit function transfer) rather than adopting a single point estimate (referred to as benefit point transfer).[15]

Finally, you should not use benefit transfer in estimating benefits if:

- resources are unique or have unique attributes.  For example, if a policy change affects snowmobile use in Yellowstone National Park, then a study valuing snowmobile use in the state of Michigan should not be used to value changes in snowmobile use in the Yellowstone National Park.
- If the study examines a resource that is unique or has unique attributes, you should not transfer benefit estimates or benefit functions to value a different resource and vice versa.  For example, if a study values visibility improvements at the Grand Canyon, these results should not be used to value visibility improvements in urban areas.
- There are significant problems with applying an *"ex ante"* valuation estimate to an *"ex post"* policy context.  If a policy yields a significant change in the attributes of the good, you should not use the study estimates to value the change using a benefit transfer approach.
- You also should not use a value developed from a study involving, small marginal

---

[15] See Loomis JB (1992), *Water Resources Research*, *28*(3), 701-705 and Kirchoff, S, Colby, BG, and LaFrance, JT (1997), *Journal of Environmental Economics and Management*, *33*, 75-93.

AR2022_400675

changes in a policy context involving large changes in the quantity of the good.

Clearly, all of these criteria are difficult to meet. However, you should attempt to satisfy as many as possible when choosing studies from the existing economic literature.  Professional judgment is required in determining whether a particular transfer is too speculative to use in regulatory analysis.

6.      Ancillary Benefits and Countervailing Risks

Your analysis should look beyond the direct benefits and direct costs of your rulemaking and consider any important ancillary benefits and countervailing risks.  An ancillary benefit is a favorable impact of the rule that is typically unrelated or secondary to the statutory purpose of the rulemaking (e.g., reduced refinery emissions due to more stringent fuel economy standards for light trucks) while a countervailing risk is an adverse economic, health, safety, or environmental consequence that occurs due to a rule and is not already accounted for in the direct cost of the rule (e.g., adverse safety impacts from more stringent fuel-economy standards for light trucks).

You should begin by considering and perhaps listing the possible ancillary benefits and countervailing risks.  However, highly speculative or minor consequences may not be worth further formal analysis.   Analytic priority should be given to those ancillary benefits and countervailing risks that are important enough to potentially change the rank ordering of the main alternatives in the analysis.  In some cases the mere consideration of these secondary effects may help in the generation of a superior regulatory alternative with strong ancillary benefits and fewer countervailing risks. For instance, a recent study suggested that weight-based, fuel-economy standards could achieve energy savings with fewer safety risks and employment losses than would occur under the current regulatory structure.

Like other benefits and costs, an effort should be made to quantify and monetize ancillary benefits and countervailing risks.  If monetization is not feasible, quantification should be attempted through use of informative physical units.  If both monetization and quantification are not feasible, then these issues should be presented as non-quantified benefits and costs.  The same standards of information and analysis quality that apply to direct benefits and costs should be applied to ancillary benefits and countervailing risks.

One way to combine ancillary benefits and countervailing risks is to evaluate these effects separately and then put both of these effects on the benefits side, not on the cost side. Although it is theoretically appropriate to include disbenefits on the cost side, legal and programmatic considerations generally support subtracting the disbenefits from direct benefits.

7.      Methods for Treating Non-Monetized Benefits and Costs

Sound quantitative estimates of benefits and costs, where feasible, are preferable to qualitative descriptions of benefits and costs because they help decision makers understand the magnitudes of the effects of alternative actions.  However, some important benefits and costs (e.g., privacy protection) may be inherently too difficult to quantify or monetize given current

26

data and methods.  You should carry out a careful evaluation of non-quantified benefits and costs.  Some authorities[16] refer to these non-monetized and non-quantified effects as "intangible".

a.      Benefits and Costs that are Difficult to Monetize

You should monetize quantitative estimates whenever possible.  Use sound and defensible values or procedures to monetize benefits and costs, and ensure that key analytical assumptions are defensible.  If monetization is impossible, explain why and present all available quantitative information.  For example, if you can quantify but cannot monetize increases in water quality and fish populations resulting from water quality regulation, you can describe benefits in terms of stream miles of improved water quality for boaters and increases in game fish populations for anglers.  You should describe the timing and likelihood of such effects and avoid double-counting of benefits when estimates of monetized and physical effects are mixed in the same analysis.

b.      Benefits and Costs that are Difficult to Quantify

If you are not able to quantify the effects, you should present any relevant quantitative information along with a description of the unquantified effects, such as ecological gains, improvements in quality of life, and aesthetic beauty.  You should provide a discussion of the strengths and limitations of the qualitative information.  This should include information on the key reason(s) why they cannot be quantified.  In one instance, you may know with certainty the magnitude of a risk to which a substantial, but unknown, number of individuals are exposed.  In another instance, the existence of a risk may be based on highly speculative assumptions, and the magnitude of the risk may be unknown.

For cases in which the unquantified benefits or costs affect a policy choice, you should provide a clear explanation of the rationale behind the choice.  Such an explanation could include detailed information on the nature, timing, likelihood, location, and distribution of the unquantified benefits and costs.  Also, please include a summary table that lists all the unquantified benefits and costs, and use your professional judgment to highlight (e.g., with categories or rank ordering) those that you believe are most important (e.g., by considering factors such as the degree of certainty, expected magnitude, and reversibility of effects).

While the focus is often placed on difficult to quantify benefits of regulatory action, some costs are difficult to quantify as well.  Certain permitting requirements (e.g., EPA's New Source Review program) restrict the decisions of production facilities to shift to new products and adopt innovative methods of production.  While these programs may impose substantial costs on the economy, it is very difficult to quantify and monetize these effects.  Similarly, regulations that establish emission standards for recreational vehicles, like motor bikes, may adversely affect the performance of the vehicles in terms of driveability and 0 to 60 miles per hour acceleration.  Again, the cost associated with the loss of these attributes may be difficult to quantify and monetize.  They need to be analyzed qualitatively.

---

[16] Mishan EJ (1994), *Cost-Benefit Analysis*, fourth edition, Routledge, New York.

AR2022_400677

8.      Monetizing Health and Safety Benefits and Costs

We expect you to provide a benefit-cost analysis of major health and safety rulemakings in addition to a CEA.  The BCA provides additional insight because (a) it provides some indication of what the public is willing to pay for improvements in health and safety and (b) it offers additional information on preferences for health using a different research design than is used in CEA.  Since the health-preference methods used to support CEA and BCA have some different strengths and drawbacks, it is important that you provide decision makers with both perspectives.

In monetizing health benefits, a WTP measure is the conceptually appropriate measure as compared to other alternatives (e.g., cost of illness or lifetime earnings), in part because it attempts to capture pain and suffering and other quality-of-life effects.  Using the WTP measure for health and safety allows you to directly compare your results to the other benefits and costs in your analysis, which will typically be based on WTP.

If well-conducted revealed-preference studies of relevant health and safety risks are available, you should consider using them in developing your monetary estimates.  If appropriate revealed-preference data are not available, you should use valid and relevant data from stated-preference studies.  You will need to use your professional judgment when you are faced with limited information on revealed preference studies and substantial information based on stated preference studies.

A key advantage of stated-preference and health-utility methods compared to revealed preference methods is that they can be tailored to address the ranges of  probabilities, types of health risks and specific populations affected by your rule.  In many rulemakings there will be no relevant information from revealed-preference studies.  In this situation you should consider commissioning a stated-preference study or using values from published stated-preference studies.  For the reasons discussed previously, you should be cautious about using values from stated-preference studies and describe in the analysis the drawbacks of this approach.

a.      Nonfatal Health and Safety Risks

With regard to nonfatal health and safety risks, there is enormous diversity in the nature and severity of impaired health states.  A traumatic injury that can be treated effectively in the emergency room without hospitalization or long-term care is different from a traumatic injury resulting in paraplegia.  Severity differences are also important in evaluation of chronic diseases. A severe bout of bronchitis, though perhaps less frequent, is far more painful and debilitating than the more frequent bouts of mild bronchitis.  The duration of an impaired health state, which can range from a day or two to several years or even a lifetime (e.g., birth defects inducing mental retardation), need to be considered carefully.  Information on both the severity and duration of an impaired health state is necessary before the task of monetization can be performed.

When monetizing nonfatal health effects, it is important to consider two components:  (1) the private demand for prevention of the nonfatal health effect, to be represented by the

AR2022_400678

preferences of the target population at risk, and (2) the net financial externalities associated with poor health such as net changes in public medical costs and any net changes in economic production that are not experienced by the target population.  Revealed-preference or stated-preference studies are necessary to estimate the private demand; health economics data from published sources can typically be used to estimate the financial externalities caused by changes in health status.  If you use literature values to monetize nonfatal health and safety risks, it is important to make sure that the values you have selected are appropriate for the severity and duration of health effects to be addressed by your rule.

If data are not available to support monetization, you might consider an alternative approach that makes use of health-utility studies.  Although the economics literature on the monetary valuation of impaired health states is growing, there is a much larger clinical literature on how patients, providers and community residents value diverse health states.  This literature typically measures health utilities based on the standard gamble, the time tradeoff or the rating scale methods.  This health utility information may be combined with known monetary values for well-defined health states to estimate monetary values for a wide range of health states of different severity and duration.  If you use this approach, you should be careful to acknowledge your assumptions and the limitations of your estimates.

b.      Fatality Risks

Since agencies often design health and safety regulation to reduce risks to life, evaluation of these benefits can be the key part of the analysis.  A good analysis must present these benefits clearly and show their importance.  Agencies may choose to monetize these benefits. The willingness-to-pay approach is the best methodology to use if reductions in fatality risk are monetized.

Some describe the monetized value of small changes in fatality risk as the "value of statistical life" (VSL) or, less precisely, the "value of a life."  The latter phrase can be misleading because it suggests erroneously that the monetization exercise tries to place a "value" on individual lives.  You should make clear that these terms refer to the measurement of willingness to pay for reductions in only small risks of premature death.  They have no application to an identifiable individual or to very large reductions in individual risks.  They do not suggest that any individual's life can be expressed in monetary terms.  Their sole purpose is to help describe better the likely benefits of a regulatory action.

Confusion about the term "statistical life" is also widespread.  This term refers to the sum of risk reductions expected in a population.  For example, if the annual risk of death is reduced by one in a million for each of two million people, that is said to represent two "statistical lives" extended per year (2 million people x 1/1,000,000 = 2).  If the annual risk of death is reduced by one in 10 million for each of 20 million people, that also represents two statistical lives extended.

The adoption of a value for the projected reduction in the risk of premature mortality is the subject of continuing discussion within the economic and public policy analysis community. A considerable body of academic literature is available on this subject.  This literature involves either explicit or implicit valuation of fatality risks, and generally involves the use of estimates of

29

VSL from studies on wage compensation for occupational hazards (which generally are in the range of $10^{-4}$ annually), on consumer product purchase and use decisions, or from an emerging literature using stated preference approaches.  A substantial majority of the resulting estimates of VSL vary from roughly $1 million to $10 million per statistical life.[17]

There is a continuing debate within the economic and public policy analysis community on the merits of using a single VSL for all situations versus adjusting the VSL estimates to reflect the specific rule context.  A variety of factors have been identified, including whether the mortality risk involves sudden death, the fear of cancer, and the extent to which the risk is voluntarily incurred.[18]  The consensus of EPA's recent Science Advisory Board (SAB) review of this issue was that the available literature does not support adjustments of VSL for most of these factors.  The panel did conclude that it was appropriate to adjust VSL to reflect changes in income and any time lag in the occurrence of adverse health effects.

The age of the affected population has also been identified as an important factor in the theoretical literature.  However, the empirical evidence on age and VSL is mixed.  In light of the continuing questions over the effect of age on VSL estimates, you should not use an age-adjustment factor in an analysis using VSL estimates.[19]

Another way that has been used to express reductions in fatality risks is to use the life expectancy method, the "value of statistical life-years (VSLY) extended."  If a regulation protects individuals whose average remaining life expectancy is 40 years, a risk reduction of one fatality is expressed as "40 life-years extended."  Those who favor this alternative approach emphasize that the value of a statistical life is not a single number relevant for all situations.  In particular, when there are significant differences between the effect on life expectancy for the population affected by a particular health risk and the populations studied in the labor market studies, they prefer to adopt a VSLY approach to reflect those differences.  You should consider providing estimates of both VSL and VSLY, while recognizing the developing state of knowledge in this area.

Longevity may be only one of a number of relevant considerations pertaining to the rule.  You should keep in mind that regulations with greater numbers of life-years extended are not necessarily better than regulations with fewer numbers of life-years extended.  In any event, when you present estimates based on the VSLY method, you should adopt a larger VSLY estimate for senior citizens because senior citizens face larger overall health risks from all causes and they may have accumulated savings to spend on their health and safety.[20]

The valuation of fatality risk reduction is an evolving area in both results and methodology.  Hence, you should utilize valuation methods that you consider appropriate for the

---

[17] See Viscusi WK and Aldy JE, *Journal of Risk and Uncertainty* (forthcoming) and Mrozek JR and Taylor LO (2002), *Journal of Policy Analysis and Management*, *21*(2), 253-270.

[18] Distinctions between "voluntary" and "involuntary" should be treated with care.  Risks are best considered to fall within a continuum from "voluntary" to "involuntary" with very few risks at either end of this range.  These terms are also related to differences in the cost of avoiding risks.

[19] Graham JD (2003), Memorandum to the President's Management Council, Benefit-Cost Methods and Lifesaving Rules.  This memorandum can be found at http://www.whitehouse.gov/omb/inforeg/pmc_benefit_cost_memo.pdf

[20] Office of Information and Regulatory Affairs, OMB, Memorandum to the President's Management Council, ibid.

AR2022_400680

regulatory circumstances.  Since the literature-based VSL estimates may not be entirely appropriate for the risk being evaluated (e.g., the use of occupational risk premia to value reductions in risks from environmental hazards), you should explain your selection of estimates and any adjustments of the estimates to reflect the nature of the risk being evaluated.  You should present estimates based on alternative approaches, and if you monetize mortality risk reduction, you should do so on a consistent basis to the extent feasible.  You should clearly indicate the methodology used and document your choice of a particular methodology.  You should explain any significant deviations from the prevailing state of knowledge.  If you use different methodologies in different rules, you should clearly disclose the fact and explain your choices.

c.      Valuation of Reductions in Health and Safety Risks to Children

        The valuation of health outcomes for children and infants poses special challenges.   It is rarely feasible to measure a child's willingness to pay for health improvement and an adult's concern for his or her own health is not necessarily relevant to valuation of child health.  For example, the wage premiums demanded by workers to accept hazardous jobs are not readily transferred to rules that accomplish health gains for children.

        There are a few studies that examine parental willingness to pay to invest in health and safety for their children.  Some of these studies suggest that parents may value children's health more strongly than their own health.   Although this parental perspective is a promising research strategy, it may need to be expanded to include a societal interest in child health and safety.

        Where the primary objective of a rule is to reduce the risk of injury, disease or mortality among children, you should conduct a cost-effectiveness analysis of the rule.  You may also develop a benefit-cost analysis to the extent that valid monetary values can be assigned to the primary expected health outcomes.  For rules where health gains are expected among both children and adults and you decide to perform a benefit-cost analysis, the monetary values for children should be at least as large as the values for adults (for the same probabilities and outcomes) unless there is specific and compelling evidence to suggest otherwise.[21]

### Discount Rates

        Benefits and costs do not always take place in the same time period.  When they do not, it is incorrect simply to add all of the expected net benefits or costs without taking account of when the actually occur.  If benefits or costs are delayed or otherwise separated in time from each other, the difference in timing should be reflected in your analysis.

        As a first step, you should present the annual time stream of benefits and costs expected to result from the rule, clearly identifying when the benefits and costs are expected to occur.  The beginning point for your stream of estimates should be the year in which the final rule will begin to have effects, even if that is expected to be some time in the future.  The ending point should be far enough in the future to encompass all the significant benefits and costs likely to result from the rule.

---

[21] For more information, see Dockins C., Jenkins RR, Owens N, Simon NB, and Wiggins LB (2002), *Risk Analysis*, 22(2), 335-346.

AR2022_400681

In presenting the stream of benefits and costs, it is important to measure them in constant dollars to avoid the misleading effects of inflation in your estimates.  If the benefits and costs are initially measured in prices reflecting expected future inflation, you can convert them to constant dollars by dividing through by an appropriate inflation index, one that corresponds to the inflation rate underlying the initial estimates of benefits or costs.

1.  The Rationale for Discounting

Once these preliminaries are out of the way, you can begin to adjust your estimates for differences in timing.  (This is a separate calculation from the adjustment needed to remove the effects of future inflation.)  Benefits or costs that occur sooner are generally more valuable.  The main rationales for the discounting of future impacts are:

(a) Resources that are invested will normally earn a positive return, so current consumption is more expensive than future consumption, since you are giving up that expected return on investment when you consume today.

(b) Postponed benefits also have a cost because people generally prefer present to future consumption. They are said to have positive time preference.

(c) Also, if consumption continues to increase over time, as it has for most of U.S. history, an increment of consumption will be less valuable in the future than it would be today, because the principle of diminishing marginal utility implies that as total consumption increases, the value of a marginal unit of consumption tends to decline.

There is wide agreement with point (a).  Capital investment is productive, but that point is not sufficient by itself to explain positive interest rates and observed saving behavior.  To understand these phenomena, points (b) and (c) are also necessary.  If people are really indifferent between consumption now and later, then they should be willing to forgo current consumption in order to consume an equal or slightly greater amount in the future.  That would cause saving rates and investment to rise until interest rates were driven to zero and capital was no longer productive.  As long as we observe positive interest rates and saving rates below 100 percent, people must be placing a higher value on current consumption than on future consumption.

To reflect this preference, a discount factor should be used to adjust the estimated benefits and costs for differences in timing.  The further in the future the benefits and costs are expected to occur, the more they should be discounted.  The discount factor can be calculated given a discount rate.  The formula is $1/(1+ \text{the discount rate})^t$ where "t" measures the number of years in the future that the benefits or costs are expected to occur.  Benefits or costs that have been adjusted in this way are called "discounted present values" or simply "present values".  When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits.

32

AR2022_400682

2.      Real Discount Rates of 3 Percent and 7 Percent

OMB's basic guidance on the discount rate is provided in OMB Circular A-94 (http://www.whitehouse.gov/omb/circulars/index.html).  This Circular points out that the analytically preferred method of handling temporal differences between benefits and costs is to adjust all the benefits and costs to reflect their value in equivalent units of consumption and to discount them at the rate consumers and savers would normally use in discounting future consumption benefits.  This is sometimes called the "shadow price" approach to discounting because doing such calculations requires you to value benefits and costs using shadow prices, especially for capital goods, to correct for market distortions.  These shadow prices are not well established for the United States.  Furthermore, the distribution of impacts from regulations on capital and consumption are not always well known.  Consequently, any agency that wishes to tackle this challenging analytical task should check with OMB before proceeding.

As a default position, OMB Circular A-94 states that a real discount rate of 7 percent should be used as a base-case for regulatory analysis.  The 7 percent rate is an estimate of the average before-tax rate of return to private capital in the U.S. economy.  It is a broad measure that reflects the returns to real estate and small business capital as well as corporate capital.  It approximates the opportunity cost of capital, and it is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector.  OMB revised Circular A-94 in 1992 after extensive internal review and public comment.  In a recent analysis, OMB found that the average rate of return to capital remains near the 7 percent rate estimated in 1992.  Circular A-94 also recommends using other discount rates to show the sensitivity of the estimates to the discount rate assumption.

Economic distortions, including taxes on capital, create a divergence between the rate of return that savers earn and the private rate of return to capital.  This divergence persists despite the tendency for capital to flow to where it can earn the highest rate of return.  Although market forces will push after-tax rates of return in different sectors of the economy toward equality, that process will not equate pre-tax rates of return when there are differences in the tax treatment of investment.  Corporate capital, in particular, pays an additional layer of taxation, the corporate income tax, which requires it to earn a higher pre-tax rate of return in order to provide investors with similar after-tax rates of return compared with non-corporate investments.  The pre-tax rates of return better measure society's gains from investment.  Since the rates of return on capital are higher in some sectors of the economy than others, the government needs to be sensitive to possible impacts of regulatory policy on capital allocation.

The effects of regulation do not always fall exclusively or primarily on the allocation of capital. When regulation primarily and directly affects private consumption (e.g., through higher consumer prices for goods and services), a lower discount rate is appropriate.  The alternative most often used is sometimes called the "social rate of time preference."  This simply means the rate at which "society" discounts future consumption flows to their present value.  If we take the rate that the average saver uses to discount future consumption as our measure of the social rate of time preference, then the real rate of return on long-term government debt may provide a fair approximation. Over the last thirty years, this rate has averaged around 3 percent in real terms on a pre-tax basis.  For example, the yield on 10-year Treasury notes has averaged 8.1 percent since

33

1973 while the average annual rate of change in the CPI over this period has been 5.0 percent, implying a real 10-year rate of 3.1 percent.

For regulatory analysis, you should provide estimates of net benefits using both 3 percent and 7 percent. An example of this approach is EPA's analysis of its 1998 rule setting both effluent limits for wastewater discharges and air toxic emission limits for pulp and paper mills. In this analysis, EPA developed its present-value estimates using real discount rates of 3 and 7 percent applied to benefit and cost streams that extended forward for 30 years. You should present a similar analysis in your own work.

In some instances, if there is reason to expect that the regulation will cause resources to be reallocated away from private investment in the corporate sector, then the opportunity cost may lie outside the range of 3 to 7 percent. For example, the average real rate of return on corporate capital in the United States was approximately 10 percent in the 1990s, returning to the same level observed in the 1950s and 1960s. If you are uncertain about the nature of the opportunity cost, then you should present benefit and cost estimates using a higher discount rate as a further sensitivity analysis as well as using the 3 and 7 percent rates.

3.      Time Preference for Health-Related Benefits and Costs

When future benefits or costs are health-related, some have questioned whether discounting is appropriate, since the rationale for discounting money may not appear to apply to health. It is true that lives saved today cannot be invested in a bank to save more lives in the future. But the resources that would have been used to save those lives can be invested to earn a higher payoff in future lives saved. People have been observed to prefer health gains that occur immediately to identical health gains that occur in the future. Also, if future health gains are not discounted while future costs are, then the following perverse result occurs: an attractive investment today in future health improvement can always be made more attractive by delaying the investment. For such reasons, there is a professional consensus that future health effects, including both benefits and costs, should be discounted at the same rate. This consensus applies to both BCA and CEA.

A common challenge in health-related analysis is to quantify the time lag between when a rule takes effect and when the resulting physical improvements in health status will be observed in the target population. In such situations, you must carefully consider the timing of health benefits before performing present-value calculations. It is not reasonable to assume that all of the benefits of reducing chronic diseases such as cancer and cardiovascular disease will occur immediately when the rule takes effect. For rules addressing traumatic injury, this lag period may be short. For chronic diseases it may take years or even decades for a rule to induce its full beneficial effects in the target population.

When a delay period between exposure to a toxin and increased probability of disease is likely (a so-called latency period), a lag between exposure reduction and reduced probability of disease is also likely. This latter period has sometimes been referred to as a "cessation lag," and it may or may not be of the same duration as the latency period. As a general matter, cessation lags will only apply to populations with at least some high-level exposure (e.g., before the rule

34

AR2022_400684

takes effect).  For populations with no such prior exposure, such as those born after the rule takes effect, only the latency period will be relevant.

Ideally, your exposure-risk model would allow calculation of reduced risk for each year following exposure cessation, accounting for total cumulative exposure and age at the time of exposure reduction.  The present-value benefits estimate could then reflect an appropriate discount factor for each year's risk reduction.  Recent analyses of the cancer benefits stemming from reduction in public exposure to radon in drinking water have adopted this approach.  They were supported by formal risk-assessment models that allowed estimates of the timing of lung cancer incidence and mortality to vary in response to different radon exposure levels.[22]

In many cases, you will not have the benefit of such detailed risk assessment modeling. You will need to use your professional judgment as to the average cessation lag for the chronic diseases affected by your rule.  In situations where information exists on latency but not on cessation lags, it may be reasonable to use latency as a proxy for the cessation lag, unless there is reason to believe that the two are different.  When the average lag time between exposures and disease is unknown, a range of plausible alternative values for the time lag should be used in your analysis.

4.      Intergenerational Discounting

Special ethical considerations arise when comparing benefits and costs across generations. Although most people demonstrate time preference in their own consumption behavior, it may not be appropriate for society to demonstrate a similar preference when deciding between the well-being of current and future generations.  Future citizens who are affected by such choices cannot take part in making them, and today's society must act with some consideration of their interest.

One way to do this would be to follow the same discounting techniques described above and supplement the analysis with an explicit discussion of the intergenerational concerns (how future generations will be affected by the regulatory decision).  Policymakers would be provided with this additional information without changing the general approach to discounting.

Using the same discount rate across generations has the advantage of preventing time-inconsistency problems.  For example, if one uses a lower discount rate for future generations, then the evaluation of a rule that has short-term costs and long-term benefits would become more favorable merely by waiting a year to do the analysis.  Further, using the same discount rate across generations is attractive from an ethical standpoint.  If one expects future generations to be better off, then giving them the advantage of a lower discount rate would in effect transfer resources from poorer people today to richer people tomorrow.

Some believe, however, that it is ethically impermissible to discount the utility of future generations.  That is, government should treat all generations equally.  Even under this approach,

---

[22] Committee on Risk Assessment of Exposure to Radon in Drinking Water, Board on Radiation Effects Research, Commission on Life Sciences (1996), *Risk Assessment of Radon in Drinking Water*, National Research Council, National Academy Press, Washington, DC.

AR2022_400685

it would still be correct to discount future costs and consumption benefits generally (perhaps at a lower rate than for intragenerational analysis), due to the expectation that future generations will be wealthier and thus will value a marginal dollar of benefits or costs by less than those alive today.  Therefore, it is appropriate to discount future benefits and costs relative to current benefits and costs, even if the welfare of future generations is not being discounted.  Estimates of the appropriate discount rate appropriate in this case, from the 1990s, ranged from 1 to 3 percent per annum.[23]

A second reason for discounting the benefits and costs accruing to future generations at a lower rate is increased uncertainty about the appropriate value of the discount rate, the longer the horizon for the analysis.  Private market rates provide a reliable reference for determining how society values time within a generation, but for extremely long time periods no comparable private rates exist.  As explained by Martin Weitzman[24], in the limit for the deep future, the properly averaged certainty-equivalent discount factor (i.e., $1/[1+r]^t$) corresponds to the minimum discount rate having any substantial positive probability.  From today's perspective, the only relevant limiting scenario is the one with the lowest discount rate – all of the other states at the far-distant time are relatively much less important because their expected present value is so severely reduced by the power of compounding at a higher rate.

If your rule will have important intergenerational benefits or costs you might consider a further sensitivity analysis using a lower but positive discount rate in addition to calculating net benefits using discount rates of 3 and 7 percent.

5.      Time Preference for Non-Monetized Benefits and Costs

Differences in timing should be considered even for benefits and costs that are not expressed in monetary units, including health benefits.  The timing differences can be handled through discounting.  EPA estimated cost-effectiveness in its 1998 rule, "Control of Emissions from Nonroad Diesel Engines," by discounting both the monetary costs and the non-monetized emission reduction benefits over the expected useful life of the engines at the 7 percent real rate recommended in OMB Circular A-94.

Alternatively, it may be possible in some cases to avoid discounting non-monetized benefits.  If the expected flow of benefits begins as soon as the cost is incurred and is expected to be constant over time, then annualizing the cost stream is sufficient, and further discounting of benefits is unnecessary.  Such an analysis might produce an estimate of the annualized cost per ton of reduced emissions of a pollutant.

6.      The Internal Rate of Return

The internal rate of return is the discount rate that sets the net present value of the discounted benefits and costs equal to zero.  The internal rate of return does not generally

---

[23] Portney PR and Weyant JP, eds. (1999), *Discounting and Intergenerational Equity*, Resources for the Future, Washington, DC.
[24] Weitzman ML In Portney PR and Weyant JP, eds. (1999), *Discounting and Intergenerational Equity*, Resources for the Future, Washington, DC.

AR2022_400686

provide an acceptable decision criterion, and regulations with the highest internal rate of return are not necessarily the most beneficial.  Nevertheless, it does provide useful information and for many it will offer a meaningful indication of regulation's impact.  You should consider including the internal rate of return implied by your regulatory analysis along with other information about discounted net present values.

***Other Key Considerations***

1.      Other Benefit and Cost Considerations

You should include these effects in your analysis and provide estimates of their monetary values when they are significant:

- Private-sector compliance costs and savings;
- Government administrative costs and savings;
- Gains or losses in consumers' or producers' surpluses;
- Discomfort or inconvenience costs and benefits; and
- Gains or losses of time in work, leisure and/or commuting/travel settings.

Estimates of benefits and costs should be based on credible changes in technology over time.  For example, retrospective studies may provide evidence that "learning" will likely reduce the cost of regulation in future years.  The weight you give to a study of past rates of cost savings resulting from innovation (including "learning curve" effects) should depend on both its timeliness and direct relevance to the processes affected by the regulatory alternative under consideration.  In addition, you should take into account cost-saving innovations that result from a shift to regulatory performance standards and incentive-based policies.  On the other hand, significant costs may result from a slowing in the rate of innovation or of adoption of new technology due to delays in the regulatory approval process or the setting of more stringent standards for new facilities than existing ones.  In some cases agencies are limited under statute to consider only technologies that have been demonstrated to be feasible.  In these situations, it may be useful to estimate costs and cost savings assuming a wider range of technical possibilities.

When characterizing technology changes over time, you should assess the likely technology changes that would have occurred in the absence of the regulatory action (technology baseline).  Technologies change over time in both reasonably functioning markets and imperfect markets.  If you assume that technology will remain unchanged in the absence of regulation when technology changes are likely, then your analysis will over-state both the benefits and costs attributable to the regulation.

Occasionally, cost savings or other forms of benefits accrue to parties affected by a rule who also bear its costs.  For example, a requirement that engine manufacturers reduce emissions from engines may lead to technologies that improve fuel economy.  These fuel savings will normally accrue to the engine purchasers, who also bear the costs of the technologies.  There is no apparent market failure with regard to the market value of fuel saved because one would expect that consumers would be willing to pay for increased fuel economy that exceeded the cost

AR2022_400687

of providing it.  When these cost savings are substantial, and particularly when you estimate them to be greater than the cost associated with achieving them, you should examine and discuss why market forces would not accomplish these gains in the absence of regulation.  As a general matter, any direct costs that are averted as a result of a regulatory action should be monetized wherever possible and either added to the benefits or subtracted from the costs of that alternative.

2.  The Difference between Costs (or Benefits) and Transfer Payments

Distinguishing between real costs and transfer payments is an important, but sometimes difficult, problem in cost estimation.  Benefit and cost estimates should reflect real resource use. Transfer payments are monetary payments from one group to another that do not affect total resources available to society.  A regulation that restricts the supply of a good, causing its price to rise, produces a transfer from buyers to sellers.  The net reduction in the total surplus (consumer plus producer) is a real cost to society, but the transfer from buyers to sellers resulting from a higher price is not a real cost since the net reduction automatically accounts for the transfer from buyers to sellers.  However, transfers from the United States to other nations should be included as costs, and transfers from other nations to the United States as benefits, as long as the analysis is conducted from the United States perspective.

You should not include transfers in the estimates of the benefits and costs of a regulation. Instead, address them in a separate discussion of the regulation's distributional effects.  Examples of transfer payments include the following:

- Scarcity rents and monopoly profits
- Insurance payments
- Indirect taxes and subsidies

*Treatment of Uncertainty*

The precise consequences (benefits and costs) of regulatory options are not always known for certain, but the probability of their occurrence can often be developed.  The important uncertainties connected with your regulatory decisions need to be analyzed and presented as part of the overall regulatory analysis.  You should begin your analysis of uncertainty at the earliest possible stage in developing your analysis.  You should consider both the statistical variability of key elements underlying the estimates of benefits and costs (for example, the expected change in the distribution of automobile accidents that might result from a change in automobile safety standards) and the incomplete knowledge about the relevant relationships (for example, the uncertain knowledge of how some economic activities might affect future climate change).[25]  By assessing the sources of uncertainty and the way in which benefit and cost estimates may be affected under plausible assumptions, you can shape your analysis to inform decision makers and the public about the effects and the uncertainties of alternative regulatory actions.

---

[25] In some contexts, the word "variability" is used as a synonym for statistical variation that can be described by a theoretically valid distribution function, whereas "uncertainty" refers to a more fundamental lack of knowledge. Throughout this discussion, we use the term "uncertainty" to refer to both concepts.

AR2022_400688

The treatment of uncertainty must be guided by the same principles of full disclosure and transparency that apply to other elements of your regulatory analysis. Your analysis should be credible, objective, realistic, and scientifically balanced.[26] Any data and models that you use to analyze uncertainty should be fully identified. You should also discuss the quality of the available data used. Inferences and assumptions used in your analysis should be identified, and your analytical choices should be explicitly evaluated and adequately justified. In your presentation, you should delineate the strengths of your analysis along with any uncertainties about its conclusions. Your presentation should also explain how your analytical choices have affected your results.

In some cases, the level of scientific uncertainty may be so large that you can only present discrete alternative scenarios without assessing the relative likelihood of each scenario quantitatively. For instance, in assessing the potential outcomes of an environmental effect, there may be a limited number of scientific studies with strongly divergent results. In such cases, you might present results from a range of plausible scenarios, together with any available information that might help in qualitatively determining which scenario is most likely to occur.

When uncertainty has significant effects on the final conclusion about net benefits, your agency should consider additional research prior to rulemaking. The costs of being wrong may outweigh the benefits of a faster decision. This is true especially for cases with irreversible or large upfront investments. If your agency decides to proceed with rulemaking, you should explain why the costs of developing additional information—including any harm from delay in public protection—exceed the value of that information.

For example, when the uncertainty is due to a lack of data, you might consider deferring the decision, as an explicit regulatory alternative, pending further study to obtain sufficient data.[27] Delaying a decision will also have costs, as will further efforts at data gathering and analysis. You will need to weigh the benefits of delay against these costs in making your decision. Formal tools for assessing the value of additional information are now well developed in the applied decision sciences and can be used to help resolve this type of complex regulatory question.

"Real options" methods have also formalized the valuation of the added flexibility inherent in delaying a decision. As long as taking time will lower uncertainty, either passively or actively through an investment in information gathering, and some costs are irreversible, such as the potential costs of a sunk investment, a benefit can be assigned to the option to delay a decision. That benefit should be considered a cost of taking immediate action versus the alternative of delaying that action pending more information. However, the burdens of delay—including any harm to public health, safety, and the environment—need to be analyzed carefully.

1.     Quantitative Analysis of Uncertainty

---

[26] When disseminating information, agencies should follow their own information quality guidelines, issued in conformance with the OMB government-wide guidelines (67 FR 8452, February 22, 2002).
[27] Clemen RT (1996), *Making Hard Decisions: An Introduction to Decision Analysis*, second edition, Duxbury Press, Pacific Grove.

AR2022_400689

Examples of quantitative analysis, broadly defined, would include formal estimates of the probabilities of environmental damage to soil or water, the possible loss of habitat, or risks to endangered species as well as probabilities of harm to human health and safety. There are also uncertainties associated with estimates of economic benefits and costs, such as the cost savings associated with increased energy efficiency. Thus, your analysis should include two fundamental components: a quantitative analysis characterizing the probabilities of the relevant outcomes and an assignment of economic value to the projected outcomes. It is essential that both parts be conceptually consistent. In particular, the quantitative analysis should be conducted in a way that permits it to be applied within a more general analytical framework, such as benefit-cost analysis. Similarly, the general framework needs to be flexible enough to incorporate the quantitative analysis without oversimplifying the results. For example, you should address explicitly the implications for benefits and costs of any probability distributions developed in your analysis.

As with other elements of regulatory analysis, you will need to balance thoroughness with the practical limits on your analytical capabilities. Your analysis does not have to be exhaustive, nor is it necessary to evaluate each alternative at every step. Attention should be devoted to first resolving or studying the uncertainties that have the largest potential effect on decision making. Many times these will be the largest sources of uncertainties. In the absence of adequate data, you will need to make assumptions. These should be clearly identified and consistent with the relevant science. Your analysis should provide sufficient information for decision makers to grasp the degree of scientific uncertainty and the robustness of estimated probabilities, benefits, and costs to changes in key assumptions.

For major rules involving annual economic effects of $1 billion or more, you should present a formal quantitative analysis of the relevant uncertainties about benefits and costs. In other words, you should try to provide some estimate of the probability distribution of regulatory benefits and costs. In summarizing the probability distributions, you should provide some estimates of the central tendency (e.g., mean and median) along with any other information you think will be useful such as ranges, variances, specified low-end and high-end percentile estimates, and other characteristics of the distribution.

Your estimates cannot be more precise than their most uncertain component. Thus, your analysis should report estimates in a way that reflects the degree of uncertainty and not create a false sense of precision. Worst-case or conservative analyses are not usually adequate because they do not convey the complete probability distribution of outcomes, and they do not permit calculation of an expected value of net benefits. In many health and safety rules, economists conducting benefit-cost analyses must rely on formal risk assessments that address a variety of risk management questions such as the baseline risk for the affected population, the safe level of exposure or, the amount of risk to be reduced by various interventions. Because the answers to some of these questions are directly used in benefits analyses, the risk assessment methodology must allow for the determination of expected benefits in order to be comparable to expected costs. This means that conservative assumptions and defaults (whether motivated by science policy or by precautionary instincts), will be incompatible with benefit analyses as they will result in benefit estimates that exceed the expected value. Whenever it is possible to characterize quantitatively the probability distributions, some estimates of expected value (e.g., mean and

AR2022_400690

median) must be provided in addition to ranges, variances, specified low-end and high-end percentile estimates, and other characteristics of the distribution.

Whenever possible, you should use appropriate statistical techniques to determine a probability distribution of the relevant outcomes. For rules that exceed the $1 billion annual threshold, a formal quantitative analysis of uncertainty is required. For rules with annual benefits and/or costs in the range from 100 million to $1 billion, you should seek to use more rigorous approaches with higher consequence rules. This is especially the case where net benefits are close to zero. More rigorous uncertainty analysis may not be necessary for rules in this category if simpler techniques are sufficient to show robustness. You may consider the following analytical approaches that entail increasing levels of complexity:

- Disclose qualitatively the main uncertainties in each important input to the calculation of benefits and costs. These disclosures should address the uncertainties in the data as well as in the analytical results. However, major rules above the $1 billion annual threshold require a formal treatment.
- Use a numerical sensitivity analysis to examine how the results of your analysis vary with plausible changes in assumptions, choices of input data, and alternative analytical approaches. Sensitivity analysis is especially valuable when the information is lacking to carry out a formal probabilistic simulation. Sensitivity analysis can be used to find "switch points" -- critical parameter values at which estimated net benefits change sign or the low cost alternative switches. Sensitivity analysis usually proceeds by changing one variable or assumption at a time, but it can also be done by varying a combination of variables simultaneously to learn more about the robustness of your results to widespread changes. Again, however, major rules above the $1 billion annual threshold require a formal treatment.
- Apply a formal probabilistic analysis of the relevant uncertainties – possibly using simulation models and/or expert judgment as revealed, for example, through Delphi methods.[28]  Such a formal analytical approach is appropriate for complex rules where there are large, multiple uncertainties whose analysis raises technical challenges, or where the effects cascade; it is required for rules that exceed the $1 billion annual threshold. For example, in the analysis of regulations addressing air pollution, there is uncertainty about the effects of the rule on future emissions, uncertainty about how the change in emissions will affect air quality, uncertainty about how changes in air quality will affect health, and finally uncertainty about the economic and social value of the change in health outcomes. In formal probabilistic assessments, expert solicitation is a useful way to fill key gaps in your ability to assess uncertainty.[29]  In general, experts can be used to quantify the probability distributions of key parameters and relationships. These solicitations, combined with other sources of data, can be combined in Monte Carlo simulations to derive a probability distribution of benefits and costs. You should

---

[28] The purpose of Delphi methods is to generate suitable information for decision making by eliciting expect judgment. The elicitation is conducted through a survey process which eliminates the interactions between experts. See Morgan MG and Henrion M (1990), *Uncertainty: A Guide to Dealing with Uncertainty in Quantitative Risk and Policy Analysis*, Cambridge University Press.

[29] Cooke RM (1991), *Experts in Uncertainty: Opinion and Subjective Probability in Science*, Oxford University Press.

AR2022_400691

pay attention to correlated inputs. Often times, the standard defaults in Monte Carlo and other similar simulation packages assume independence across distributions. Failing to correctly account for correlated distributions of inputs can cause the resultant output uncertainty intervals to be too large, although in many cases the overall effect is ambiguous. You should make a special effort to portray the probabilistic results—in graphs and/or tables—clearly and meaningfully.

New methods may become available in the future. This document is not intended to discourage or inhibit their use, but rather to encourage and stimulate their development.

2.      Economic Values of Uncertain Outcomes

In developing benefit and cost estimates, you may find that there are probability distributions of values as well for each of the outcomes. Where this is the case, you will need to combine these probability distributions to provide estimated benefits and costs.

Where there is a distribution of outcomes, you will often find it useful to emphasize summary statistics or figures that can be readily understood and compared to achieve the broadest public understanding of your findings. It is a common practice to compare the "best estimates" of both benefits and costs with those of competing alternatives. These "best estimates" are usually the average or the expected value of benefits and costs. Emphasis on these expected values is appropriate as long as society is "risk neutral" with respect to the regulatory alternatives. While this may not always be the case, you should in general assume "risk neutrality" in your analysis. If you adopt a different assumption on risk preference, you should explain your reasons for doing so.

3.      Alternative Assumptions

If benefit or cost estimates depend heavily on certain assumptions, you should make those assumptions explicit and carry out sensitivity analyses using plausible alternative assumptions. If the value of net benefits changes from positive to negative (or vice versa) or if the relative ranking of regulatory options changes with alternative plausible assumptions, you should conduct further analysis to determine which of the alternative assumptions is more appropriate. Because different estimation methods may have hidden assumptions, you should analyze estimation methods carefully to make any hidden assumptions explicit.

**F.      Specialized Analytical Requirements**

In preparing analytical support for your rulemaking, you should be aware that there are a number of analytic requirements imposed by law and Executive Order. In addition to the regulatory analysis requirements of Executive Order 12866, you should also consider whether your rule will need specialized analysis of any of the following issues.

AR2022_400692

### Impact on Small Businesses and Other Small Entities

Under the Regulatory Flexibility Act (5 U.S.C. chapter 6), agencies must prepare a proposed and final "regulatory flexibility analysis" (RFA) if the rulemaking could "have a significant impact on a substantial number of small entities."  You should consider posting your RFA on the internet so the public can review your findings.

Your agency should have guidelines on how to prepare an RFA and you are encouraged to consult with the Chief Counsel for Advocacy of the Small Business Administration on expectations concerning what is an adequate RFA.  Executive Order 13272 (67 FR 53461, August 16, 2002) requires you to notify the Chief Counsel for Advocacy of any draft rules that might have a significant economic impact on a substantial number of small entities.  Executive Order 13272 also directs agencies to give every appropriate consideration to any comments provided by the Advocacy Office.  Under SBREFA, EPA and OSHA are required to consult with small business prior to developing a proposed rule that would have a significant effect on small businesses.  OMB encourages other agencies to do so as well.

### Analysis of Unfunded Mandates

Under the Unfunded Mandates Act (2 U.S.C. 1532), you must prepare a written statement about benefits and costs prior to issuing a proposed or final rule (for which your agency published a proposed rule) that may result in aggregate expenditure by State, local, and tribal governments, or by the private sector, of $100,000,000 or more in any one year (adjusted annually for inflation).  Your analytical requirements under Executive Order 12866 are similar to the analytical requirements under this Act, and thus the same analysis may permit you to comply with both analytical requirements.

### Information Collection, Paperwork, and Recordkeeping Burdens

Under the Paperwork Reduction Act (44 U.S.C. chapter 35), you will need to consider whether your rulemaking (or other actions) will create any additional information collection, paperwork or recordkeeping burdens.  These burdens are permissible only if you can justify the practical utility of the information for the implementation of your rule.  OMB approval will be required of any new requirements for a collection of information imposed on 10 or more persons and a valid OMB control number must be obtained for any covered paperwork.  Your agency's CIO should be able to assist you in complying with the Paperwork Reduction Act.

### Information Quality Guidelines

Under the Information Quality Law, agency guidelines, in conformance with the OMB government-wide guidelines (67 FR 8452, February 22, 2002), have established basic quality performance goals for all information disseminated by agencies, including information disseminated in support of proposed and final rules.  The data and analysis that you use to support your rule must meet these agency and OMB quality standards.  Your agency's CIO should be able to assist you in assessing information quality.  The Statistical and Science Policy

AR2022_400693

Branch of OMB's Office of Information and Regulatory Affairs can provide you assistance.  This circular defines OMB's minimum quality standards for regulatory analysis.

### Environmental Impact Statements

The National Environmental Policy Act (42 U.S.C. 4321-4347) and related statutes and executive orders require agencies to consider the environmental impacts of agency decisions, including rulemakings.  An environmental impact statement must be prepared for "major Federal actions significantly affecting the quality of the human environment."  You must complete NEPA documentation before issuing a final rule.  The White House Council on Environmental Quality has issued regulations (40 C.F.R. 1500-1508) and associated guidance for implementation of NEPA, available through CEQ's website (http://www.whitehouse/gov/ceq/).

### Impacts on Children

Under Executive Order 13045, "Protection of Children from Environmental Health Risks and Safety Risks," each agency must, with respect to its rules, "to the extent permitted by law and appropriate, and consistent with the agency's mission," "address disproportionate risks to children that result from environmental health risks or safety risks."  For any substantive rulemaking action that "is likely to result in" an economically significant rule that concerns "an environmental health risk or safety risk that an agency has reason to believe may disproportionately affect children," the agency must provide OMB/OIRA "an evaluation of the environmental health or safety effects of the planned regulation on children," as well as "an explanation of why the planned regulation is preferable to other potentially and reasonably feasible alternatives considered by the agency."

### Energy Impacts

Under Executive Order 13211 (66 FR 28355, May 22, 2001), agencies are required to prepare and submit to OMB a Statement of Energy Effects for significant energy actions, to the extent permitted by law.  This Statement is to include a detailed statement of "any adverse effects on energy supply, distribution, or use (including a shortfall in supply, price increases, and increased use of foreign supplies)" for the action and reasonable alternatives and their effects.  You need to publish the Statement or a summary in the related NPRM and final rule.  For further guidance, see OMB Memorandum 01-27 ("Guidance on Implementing Executive Order 13211", July 13, 2001), available on OMB's website.

### G.    Accounting Statement

You need to provide an accounting statement with tables reporting benefit and cost estimates for each major final rule for your agency.  You should use the guidance outlined above to report these estimates.  We have included a suggested format for your consideration.

AR2022_400694

*Categories of Benefits and Costs*

To the extent feasible, you should quantify all potential incremental benefits and costs. You should report benefit and cost estimates within the following three categories: monetized quantified, but not monetized; and qualitative, but not quantified or monetized.

These categories are mutually exclusive and exhaustive. Throughout the process of listing preliminary estimates of benefits and costs, agencies should avoid double-counting. This problem may arise if more than one way exists to express the same change in social welfare.

*Quantifying and Monetizing Benefits and Costs*

You should develop quantitative estimates and convert them to dollar amounts if possible. In many cases, quantified estimates are readily convertible, with a little effort, into dollar equivalents.

*Qualitative Benefits and Costs*

You should categorize or rank the qualitative effects in terms of their importance (e.g., certainty, likely magnitude, and reversibility). You should distinguish the effects that are likely to be significant enough to warrant serious consideration by decision makers from those that are likely to be minor.

*Treatment of Benefits and Costs over Time*

You should present undiscounted streams of benefit and cost estimates (monetized and net) for each year of the analytic time horizon. You should present annualized benefits and costs using real discount rates of 3 and 7 percent. The stream of annualized estimates should begin in the year in which the final rule will begin to have effects, even if the rule does not take effect immediately. Please report all monetized effects in 2001 dollars. You should convert dollars expressed in different years to 2001 dollars using the GDP deflator.

*Treatment of Risk and Uncertainty*

You should provide expected-value estimates as well as distributions about the estimates, where such information exists. When you provide only upper and lower bounds (in addition to best estimates), you should, if possible, use the 95 and 5 percent confidence bounds. Although we encourage you to develop estimates that capture the <u>distribution</u> of plausible outcomes for a particular alternative, detailed reporting of such distributions is not required, but should be available upon request.

The principles of full disclosure and transparency apply to the treatment of uncertainty. Where there is significant uncertainty and the resulting inferences and/or assumptions have a critical effect on the benefit and cost estimates, you should describe the benefits and costs under plausible alternative assumptions. You may add footnotes to the table as needed to provide documentation and references, or to express important warnings.

AR2022_400695

In a previous section, we identified some of the issues associated with developing estimates of the value of reductions in premature mortality risk.  Based on this discussion, you should present alternative primary estimates where you use different estimates for valuing reductions in premature mortality risk.

### Precision of Estimates

Reported estimates should reflect, to the extent feasible, the precision in the analysis.  For example, an estimate of $220 million implies rounding to the nearest $10 million and thus a precision of +/-$5 million; similarly, an estimate of $222 million implies rounding to the nearest $1 million and thus, a precision of +/-$0.5 million.

### Separate Reporting of Transfers

You should report transfers separately and avoid the misclassification of transfer payments as benefits or costs.  Transfers occur when wealth or income is redistributed without any direct change in aggregate social welfare.  To the extent that regulatory outputs reflect transfers rather than net welfare gains to society, you should identify them as transfers rather than benefits or costs.  You should also distinguish transfers caused by Federal budget actions -- such as those stemming from a rule affecting Social Security payments -- from those that involve transfers between non-governmental parties -- such as monopoly rents a rule may confer on a private party.  You should use as many categories as necessary to describe the major redistributive effects of a regulatory action.  If transfers have significant efficiency effects in addition to distributional effects, you should report them.

### Effects on State, Local, and Tribal Governments, Small Business, Wages and Economic Growth

You need to identity the portions of benefits, costs, and transfers received by State, local, and tribal governments.  To the extent feasible, you also should identify the effects of the rule or program on small businesses, wages, and economic growth.[30]  Note that rules with annual costs that are less than one billion dollars are likely to have a minimal effect on economic growth.

---

[30] The Regulatory Flexibility Act (5 U.S.C. 603(c), 604).

AR2022_400696

**OMB #:**   **Agency/Program Office:**
**Rule Title:**
**RIN#:**   **Date:**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation (RIA, preamble, etc.) |
|---|---|---|---|---|
| *BENEFITS* | | | | |
| monetized benefits | | | | |
| Annualized quantified, but unmonetized, benefits | | | | |
| unquantified) benefits | | | | |
| *COSTS* | | | | |
| Annualized monetized costs | | | | |
| Annualized quantified, but unmonetized, costs | | | | |
| Qualitative (unquantified) costs | | | | |
| *TRANSFERS* | | | | |
| Annualized monetized transfers: "on budget" | | | | |
| from whom to whom? | | | | |
| Annualized monetized transfers: "off-budget" | | | | |
| From whom to whom? | | | | |

| Category | Effects | | | Source Citation (RIA, preamble, etc.) |
|---|---|---|---|---|
| Effects on State, local, and/or tribal governments | | | | |
| Effects on small businesses | | | | |
| Effects on wages | | | | |
| Effects on growth | | | | |

AR2022_400697

**H.     Effective Date**

The effective date of this Circular is January 1, 2004 for regulatory analyses received by OMB in support of proposed rules, and January 1, 2005 for regulatory analyses received by OMB in support of final rules.  In other words, this Circular applies to the regulatory analyses for draft proposed rules that are formally submitted to OIRA after December 31, 2003, and for draft final rules that are formally submitted to OIRA after December 31, 2004.  (However, if the draft proposed rule is subject to the Circular, then the draft final rule will also be subject to the Circular, even if it is submitted prior to January 1, 2005.)  To the extent practicable, agencies should comply earlier than these effective dates.  Agencies may, on a case-by-case basis, seek a waiver from OMB if these effective dates are impractical.

AR2022_400698

58 FR 38142-01, 1993 WL 261371(F.R.)

NOTICES

OFFICE OF MANAGEMENT AND BUDGET

Circular A-25, "User Charges"

Thursday, July 15, 1993

**\*38142** AGENCY: Office of Management and Budget, Executive Office of the President.

ACTION: Revision of Circular No. A-25, "User Charges"

SUMMARY: Circular No. A-25 establishes guidelines for Federal agencies to assess fees for Government services and for the sale or use of Government property or resources.

EFFECTIVE DATE: July 15, 1993.

FOR FURTHER INFORMATION CONTACT: Deborah Saunders, Budget Analysis Branch, Room 6025, New Executive Office Building, Office of Management and Budget, Washington, DC 20503.

SUPPLEMENTARY INFORMATION: The authority for charging user fees is provided by Title V of the Independent Office Appropriations Act of 1952 (IOAA), codified at 31 U.S.C. 9701. Circular No. A-25 was last issued in 1959. This revision is consistent with the authority provided in Title V of the IOAA, as interpreted by the courts, and is not intended to expand this authority. Rather the revision seeks only to clarify Federal policy in light of thirty years of experience and to update the procedures by which agencies are to institute charges.

With the printing of this Circular in final form, the Office of Management and Budget (OMB) expects agencies to develop regulations and/or legislation, as appropriate, implementing its guidance in setting new user fees or revising existing fees.

**Changes Adopted in the Final Revision**

This document makes the following changes and revisions to Circular A-25, last published in September 1959:

1. Charges should be set based on market conditions for products and services provided by business-type activities while charges for all other government services or products should be based on full-cost recovery. Section 6a(2)(b), which provides for market prices for business-type activities, is based on section 3b of the 1959 Circular, which provided for market prices for the sale or lease of federally owned resources or property. Such pricing was upheld in Yosemite Park and Curry Co. v. United States, 686 F.2d 925, 932-35 (Ct. Cl. 1982).

2. Whenever possible, charges should be set as rates rather than fixed dollar amounts in order to reflect changes in costs to the Government or changes in market prices of the property, resource or service provided.

3. As has always been the case, user charges should be assessed when a service provides special benefits to an identifiable recipient beyond those that accrue to the general public. Compare section 6a(1), (4) of the revised Circular with Section 3a(1)-(2) of the 1959 Circular. This revision to the Circular adds language—in section 6a(3)—to make explicit several principles that have been inherent in this general test. For example, the update makes clear that, when the general public also receives "incidental" benefits, the user charge should recover full cost rather than a prorated amount. Section 6a(3) is discussed further below (see Comments Received).

4. The number of specified exceptions Federal agencies can grant to the general guidelines is reduced. However, agencies may recommend additional exceptions subject to OMB approval.

5. This revision encourages agency review of specific statutory authority, in addition to the generic Independent Offices Appropriations Act, to determine whether the authority for implementation of any desired fee exists.

6. A new section is included on developing legislation when legal impediments to user charges exist. This section also includes a discussion of the conditions under which the appropriate legislative proposal would be an excise tax rather than a user charge.

8. Agencies are directed to review charges biennially and update them as necessary.


**Comments Received**

Notice of the proposed revision was published for comment in the Federal Register on January 21, 1992 (57 FR 2293). Comments from concerned parties were due by February 15, 1992. OMB received 15 comments from Federal agencies, interest groups and private industry.

1. Several commenters objected to proposed section 6a(3). They contended that it departs from the test in the 1959 Circular for when user charges should be assessed (section 3a(1)-(2)). They also contended that it sets forth an inappropriate standard under which a user charge would be assessed for a service that not only provides a special benefit to identifiable recipients but also provides incidental benefits to the general public.

Contrary to the commenters' objections, section 6a(3) does not depart from the traditional test in the Circular for when user charges should be assessed, and it does not establish an inappropriate standard for assessing user charges. Rather, as explained below, section 6a(3) states explicitly principles that have been inherent in the Circular, been applied by agencies over the years in assessing user charges, and been upheld by the courts when those user charges were challenged. Accordingly, we have adopted section 6a(3) in this revision to the Circular.

Foremost among the principles stated in section 6a(3) is that agencies shall assess a user charge for services that provide special benefits to an identifiable recipient even when those services also provide incidental benefits to the general public. This principle proceeds from the general test for when user charges should be assessed, which had been in section 3a(1)-(2) of the 1959 Circular and is now in section 6a(1), (4). Under this test, a charge will be assessed when a service provides special benefits to an identifiable recipient beyond those that accrue to the general public, but will not be assessed when the identification of the specific beneficiary is obscure and the service can be considered primarily as benefitting broadly the general public. This test was upheld by the Supreme Court in FPC v. New England Power Co., 415 U.S. 345, 349-51 (1974) (citing Circular No. A-25).

Applying this test, agencies over the years have assessed numerous user charges for services that not only provide special benefits to identifiable recipients, but also provide incidental benefits to the public. This is evident from the number of court cases in which a party challenged a user charge and in so doing advanced the argument offered by the commenters, namely, that—as one court characterized the challengers' argument—"the public interest in these activities is so strong that it is unfair to assess any of their cost against any private party." Electronic Industries Ass'n v. FCC, 554 F.2d 1109, 1113 (D.C. Cir. 1976). As the courts have recognized, if this argument were valid, **\*38143** it "would mean that no federal agency could assess any fees, since all public agencies are constituted in the public interest." Mississippi Power & Light Co. v. NRC, 601 F.2d 223, 229 (5th Cir. 1979), cert. denied, 444 U.S. 1102 (1980).

Since such a result would be plainly inconsistent with Congress' authorization of user charges in the IOAA and other statutes, the courts have consistently rejected the argument. See Ayuda, Inc. v. Attorney General, 848 F.2d 1297, 1300 (D.C. Cir. 1988) ("Such fees may be assessed even when the service redounds in part to the benefit of the public as a whole."); Phillips Petroleum Co. v. FERC, 786 F.2d 370, 376 (10th Cir.), cert. denied, 479 U.S. 823 (1986) ("where an agency performs a service from which a regulated entity derives a 'special benefit,' it may charge a fee, even though the public also benefits"); Mississippi Power

& Light Co. v. NRC, 601 F.2d at 227-29; Electronic Industries Ass'n v. FCC, 554 F.2d at 1114 n.12, 1115-16; National Cable Television Ass'n, Inc. v. FCC, 554 F.2d 1094, 1103 (D.C. Cir. 1976).

Section 6a(3) also states the related principle that, for a service that provides incidental benefits to the public, the agency should not pro-rate the user charge by allocating any part of it to the public, but instead should charge those identifiable recipients who receive the special benefit the full cost of rendering the service. This principle follows from the direction in section 3a(1) of the 1959 Circular that "a charge should be imposed to recover the full cost to the Federal Government of rendering that service."

This principle of full-cost recovery is essential to achieving the aim of user charge statutes such as the IOAA. As one court explained, requiring an allocation of costs "would saddle agencies with the impossible task of sorting out public from private benefits, with the likely result that most agency fees would be reduced to mere tokens." Mississippi Power & Light Co. v. NRC, 601 F.2d at 230. Accordingly, the courts have upheld user charges implementing the Circular's principle of full-cost recovery. See Central & Southern Motor Freight Tariff Ass'n v. United States, 777 F.2d 722, 732 (D.C. Cir. 1985) ("If the asserted public benefits are the necessary consequence of the agency's provision of the relevant private benefits, then the public benefits are not independent, and the agency would therefore not need to allocate any costs to the public."); Mississippi Power & Light Co. v. NRC, 601 F.2d at 230 ("the NRC may recover the full cost of providing a service to an identifiable beneficiary, regardless of the incidental public benefits flowing from the provision of that service"); Electronics Industries Ass'n v. FCC, 554 F.2d at 1115 ("the Commission is not prohibited from charging an applicant or grantee the full cost of services rendered to an applicant which also result in some incidental public benefits"). In cases where, under section 6a(2)(b), the charge would be the market price, rather than the cost of rendering the service, the full market price is charged.

Finally, section 6a(3) states a third principle that has been inherent in the Circular and has been upheld by the courts. If a service provides the public a benefit that is independent from—rather than incidental to—the special benefit that the service provides an identifiable recipient, then the cost to the Federal Government of providing that independent public benefit is not included in the user charge. See Central & Southern Motor Freight Tariff Ass'n v. United States, 777 F.2d at 729-30; Mississippi Power & Light Co. v. NRC, 601 F.2d at 230; Electronics Industries Ass'n v. FCC, 554 F.2d at 1115.

In addition to objecting to section 6a(3) on general grounds, commenters also objected to the specific examples found in that provision of activities for which a user charge would be appropriate. Those examples were of processing a new drug application and inspecting farm products (the latter example was also used in the proposed section 6a(1)(b)). The commenters contended that these activities, in particular, should not be subject to user charges. To support their position, the commenters offered factual and legal arguments that were specifically addressed to each of those activities.

As the preamble to the proposal noted, examples were included in the Circular to clarify its intent and scope. 57 FR at 2294. However, given the comments we have received concerning those two particular examples, and since the agencies themselves are in the best position to apply the Circular's principles to the specific factual situations presented by their various activities, we have omitted those two examples from the revision of the Circular. We emphasize, however, that this omission does not express any view, one way or the other, as to whether a user charge should be assessed for those activities. Rather, as will be the case with any activity not specifically mentioned as an example in the Circular, the pertinent agencies will assess these activities on an individual basis and, in so doing, will apply the Circular's general principles and be guided by the extensive case law concerning user charges that has developed since the Circular was issued in 1959. We have also decided not to include in the text of the Circular other examples to illustrate the principles in section 6a(3). Instead, agencies seeking examples of how those principles are applied in practice can look to the court cases discussed above, in which the courts applied those principles to specific user charges. In addition, when questions arise as to the appropriateness of assessing a user charge for a particular activity, agencies may consult with OMB.

2. All the Federal agencies submitted comments suggesting the Circular conform with the Chief Financial Officers Act of 1990 (Pub. L. 101-576), which requires an agency CFO to biennially review fees, royalties, rents and other charges. The circular has been so revised to require biennial review of user charges by the CFO.

AR2022_400701

3. More detailed direction in estimating fringe benefit costs was requested. The Circular now directs each agency to estimate retirement costs as specified in Circular No. A-11 (Preparation and Submission of Budget Estimates).

4. The stated timing of collections for user charges in legislative proposals was questioned. The belief is that requiring collection of fees prior to or simultaneously with the provision of service is inconsistent with standard business practice. This requirement is included to conform to basic appropriations law which precludes fee collections other than prior to or simultaneously with provision of service unless appropriations and authority are provided in advance to allow reimbursable services.

5. It was suggested that agency heads or their designee be permitted to make user charge exceptions for activities with estimated annual collections under $10 million. Further, it was suggested, for such exceptions agency heads or their designee should be permitted to extend the exception. OMB will continue to review all user charge exceptions and extensions. OMB has reviewed exceptions and extensions, and has the mechanisms in place to continue to do so.

A suggestion was also made that the exception extension period be lengthened from four years to six years, to allow more time where legislative action is required. OMB believes the current four year extension period is sufficiently long to provide for any legislative action.

6. Certain comments contained specific questions regarding  **\*38144**  interpretation of the Circular. The question was raised whether OMB intends the provisions of Circular A-25 be applied to "special benefits" provided to other Federal establishments. Circular A-25 is intended to apply to the provision of Government goods and services to the public, not other Federal establishments.

One commenter asked if, in the section where charging user fees based on market price is discussed, the example of leasing space in federally owned buildings was intended to restrict possible interpretations of services rendered. Market price should be charged in all circumstances in which the Government is not acting in its capacity as sovereign. The example used is just that, an example of a situation in which the Government, not acting in its capacity as sovereign, is providing a service under business-type conditions.

Again regarding market pricing, the question was asked whether a user fee should be assessed if the market price is less than full cost. The Circular states when the Government provides goods or services under business-type conditions, market price should be charged. When the Government, acting in its capacity as sovereign, provides a good or service, the user charge should be sufficient to cover the full cost to the Federal Government to provide the good or service. Exceptions may be granted for agencies to charge fees below market price or full cost. These exceptions will be granted by OMB on a case by case basis.


**To the Heads of Executive Departments and Establishments**

**Subject: User Charges**

1. Purpose. The Circular establishes Federal policy regarding fees assessed for Government services and for sale or use of Government goods or resources. It provides information on the scope and types of activities subject to user charges and on the basis upon which user charges are to be set. Finally, it provides guidance for agency implementation of charges and the disposition of collections.

2. Rescission. This rescinds Office of Management and Budget Circular No. A-25, dated September 23, 1959, and Transmittal Memoranda 1 and 2.

3. Authority. Title V of the Independent Offices Appropriations Act of 1952 (31 U.S.C. 9701; 31 U.S.C. 1111; and Executive Orders No. 8248 and No. 11,541.

4. Coverage.

a. The provisions of this Circular cover all Federal activities that convey special benefits to recipients beyond those accruing to the general public. The Circular does not apply to the activities of the legislative and judicial branches of Government, or to mixed-ownership Government corporations, as defined in 31 U.S.C. 9701.

b. The provisions of the Circular shall be applied by agencies in their assessment of user charges under the IOAA. In addition, this Circular provides guidance to agencies regarding their assessment of user charges under other statutes. This guidance is intended to be applied only to the extent permitted by law. Thus, where a statute prohibits the assessment of a user charge on a service or addresses an aspect of the user charge (e.g., who pays the charge; how much is the charge; where collections are deposited), the statute shall take precedence over the Circular. In such cases (e.g., sale or disposal under Federal surplus property statutes; or fringe benefits for military personnel and civilian employees), the guidance provided by the Circular would apply to the extent that it is not inconsistent with the statute. The same analysis would apply with regard to executive orders that address user charges.

c. In any case where an Office of Management and Budget circular provides guidance concerning a specific user charge area, the guidance of that circular shall be deemed to meet the requirements of this Circular. Examples of such guidance include the following: OMB Circular No. A-45, concerning charges for rental quarters; OMB Circular No. A-130, concerning management of Federal information resources; and OMB Circular No. A-97, concerning provision of specialized technical services to State and Local governments.

5. Objectives. It is the objective of the United States Government to:

a. Ensure that each service, sale, or use of Government goods or resources provided by an agency to specific recipients be self-sustaining;

b. Promote efficient allocation of the Nation's resources by establishing charges for special benefits provided to the recipient that are at least as great as costs to the Government of providing the special benefits; and

c. Allow the private sector to compete with the Government without disadvantage in supplying comparable services, resources, or goods where appropriate.

6. General policy. A user charge, as described below, will be assessed against each identifiable recipient for special benefits derived from Federal activities beyond those received by the general public. When the imposition of user charges is prohibited or restricted by existing law, agencies will review activities periodically and recommend legislative changes when appropriate. section 7 gives guidance on drafting legislation to implement user charges.

a. Special benefits.

(1) Determining when special benefits exist. When a service (or privilege) provides special benefits to an identifiable recipient beyond those that accrue to the general public, a charge will be imposed (to recover the full cost to the Federal Government for providing the special benefit, or the market price). For example, a special benefit will be considered to accrue and a user charge will be imposed when a Government service:

(a) Enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those that accrue to the general public (e.g., receiving a patent, insurance, or guarantee provision, or a license to carry on a specific activity or business or various kinds of public land use); or

(b) Provides business stability or contributes to public confidence in the business activity of the beneficiary (e.g., insuring deposits in commercial banks); or

(c) Is performed at the request of or for the convenience of the recipient, and is beyond the services regularly received by other members of the same industry or group or by the general public (e.g., receiving a passport, visa, airman's certificate, or a Custom's inspection after regular duty hours).

(2) Determining the amount of user charges to assess.

(a) Except as provided in section 6c, user charges will be sufficient to recover the full cost to the Federal Government (as defined in section 6d) of providing the service, resource, or good when the Government is acting in its capacity as sovereign.

(b) Except as provided in section 6c, user charges will be based on market prices (as defined in section 6d) when the Government, not acting in its capacity as sovereign, is leasing or selling goods or resources, or is providing a service (e.g., leasing space in federally owned buildings). Under these business-type conditions, user charges need not be limited to the recovery of full cost and may yield net revenues.

(c) User charges will be collected in advance of, or simultaneously with, the rendering of services unless appropriations and authority are **\*38145** provided in advance to allow reimbursable services.

(d) Whenever possible, charges should be set as rates rather than fixed dollar amounts in order to adjust for changes in costs to the Government or changes in market prices of the good, resource, or service provided (as defined in section 6d).

(3) In cases where the Government is supplying services, goods, or resources that provide a special benefit to an identifiable recipient and that also provide a benefit to the general public, charges should be set in accordance with paragraph (2) of section 6a. Therefore, when the public obtains benefits as a necessary consequence of an agency's provision of special benefits to an identifiable recipient (i.e., the public benefits are not independent of, but merely incidental to, the special benefits), an agency need not allocate any costs to the public and should seek to recover from the identifiable recipient either the full cost to the Federal Government of providing the special benefit or the market price, whichever applies.

(4) No charge should be made for a service when the identification of the specific beneficiary is obscure, and the service can be considered primarily as benefiting broadly the general public.

b. Charges to the direct recipient. Charges will be made to the direct recipient of the special benefit even though all or part of the special benefits may then be passed to others.

c. Exceptions.

(1) Agency heads or their designee may make exceptions to the general policy if the provision of a free service is an appropriate courtesy to a foreign government or international organization; or comparable fees are set on a reciprocal basis with a foreign country.

(2) Agency heads or their designee may recommend to the Office of Management and Budget that exceptions to the general policy be made when:

(a) The cost of collecting the fees would represent an unduly large part of the fee for the activity; or

(b) Any other condition exists that, in the opinion of the agency head or his designee, justifies an exception.

(3) All exceptions shall be for a period of no more than four years unless renewed by the agency heads or their designee for exceptions granted under section 6c(1) or the Office of Management and Budget for exceptions granted under section 6c(2) after a review to determine whether conditions warrant their continuation.

(4) Requests for exceptions and extensions under paragraphs (2) and (3) of section 6c shall be submitted to the Director of the Office of Management and Budget.

d. Determining full cost and market price.

(1) "Full cost" includes all direct and indirect costs to any part of the Federal Government of providing a good, resource, or service. These costs include, but are not limited to, an appropriate share of:

(a) Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement. Retirement costs should include all (funded or unfunded) accrued costs not covered by employee contributions as specified in Circular No. A-11.

(b) Physical overhead, consulting, and other indirect costs including material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment. If imputed rental costs are applied, they should include:

(i) Depreciation of structures and equipment, based on official Internal Revenue Service depreciation guidelines unless better estimates are available; and

(ii) An annual rate of return (equal to the average long-term Treasury bond rate) on land, structures, equipment and other capital resources used.

(c) The management and supervisory costs.

(d) The costs of enforcement, collection, research, establishment of standards, and regulation, including any required environmental impact statements.

(e) Full cost shall be determined or estimated from the best available records of the agency, and new cost accounting systems need not be established solely for this purpose.

(2) "Market price" means the price for a good, resource, or service that is based on competition in open markets, and creates neither a shortage nor a surplus of the good, resource, or service.

(a) When a substantial competitive demand exists for a good, resource, or service, its market price will be determined using commercial practices, for example:

(i) By competitive bidding; or

(ii) By reference to prevailing prices in competitive markets for goods, resources, or services that are the same or similar to those provided by the Government (e.g., campsites or grazing lands in the general vicinity of private ones) with adjustments as appropriate that reflect demand, level of service, and quality of the good or service.

(b) In the absence of substantial competitive demand, market price will be determined by taking into account the prevailing prices for goods, resources, or services that are the same or substantially similar to those provided by the Government, and then adjusting the supply made available and/or price of the good, resource, or service so that there will be neither a shortage nor a surplus (e.g., campsites in remote areas).

7. Implementation.

a. The general policy is that user charges will be instituted through the promulgation of regulations.

b. When there are statutory prohibitions or limitations on charges, legislation to permit charges to be established should be proposed. In general, legislation should seek to remove restraints on user charges and permit their establishment under the guidelines provided in this Circular. When passage of this general authority seems unlikely, more restrictive authority should be sought. The level of charges proposed should be based on the guidelines in section 6. When necessary, legislation should:

(1) Define in general terms the services for which charges will be assessed and the pricing mechanism that will be used;

(2) Specify fees will be collected in advance of, or simultaneously with, the provision of service unless appropriations and authority are provided in advance to allow reimbursable services;

(3) Specify where collections will be credited (see section 9). Legislative proposals should not normally specify precise charges. The user charge schedule should be set by regulation. This will allow administrative updating of fees to reflect changing costs and market values. Where it is not considered feasible to collect charges at a level specified in section 6, charges should be set as close to that level as is practical.

c. Excise taxes are another means of charging specific beneficiaries for the Government services they receive. New user charges should not be proposed in cases where an excise tax currently finances the Government services that benefit specific individuals. Agencies may consider proposing a new excise tax when it would be significantly cheaper to administer than fees, and the burden of the excise tax would rest almost entirely on the user population (e.g., gasoline tax to finance highway construction). Excise taxes cannot be imposed through administrative action but rather require legislation. Legislation should meet the same criteria as in section 7b; however, it is necessary to state explicitly the rate of   **\*38146**   the tax. Agency review of these taxes must be performed periodically and new legislation should be proposed, as appropriate, to update the tax based on changes in cost. Any excise tax proposals must be approved by the Assistant Secretary for Tax Policy at the Department of the Treasury.

d. When developing options to institute user charges administratively, agencies should review all sources of statutory authority in addition to the Independent Offices Appropriations Act that may authorize implementation of such charges.

e. In proposing new charges or modifications to existing ones, managers of other programs that provide special benefits to the same or similar user populations should be consulted. Joint legislative proposals should be made, and joint collection efforts designed to ease the burden on the users should be used, whenever possible.

f. Every effort should be made to keep the costs of collection to a minimum. The principles embodied in Circular No. A-76 (Performance of Commercial Activities) should be considered in designing the collection effort.

g. Legislative proposals must be submitted to the Office of Management and Budget in accordance with the requirements of Circular No. A-19. To ensure the proper placement of user fee initiatives in the budget account structure, agencies are encouraged to discuss proposals with OMB at an early stage of development.

8. Agency responsibility. Agencies are responsible for the initiation and adoption of user charge schedules consistent with the policies in this Circular. Each agency will:

a. Identify the services and activities covered by this Circular;

b. Determine the extent of the special benefits provided;

c. Apply the principles specified in section 6 in determining full cost or market price, as appropriate;

d. Apply the guidance in section 7 either to institute charges through the promulgation of regulations or submit legislation as appropriate;

e. Review the user charges for agency programs biennially, to include: (1) Assurance that existing charges are adjusted to reflect unanticipated changes in costs or market values; and (2) a review of all other agency programs to determine whether fees should be assessed for Government services or the user of Government goods or services. Agencies should discuss the results of the biennial review of user fees and any resultant proposals in the Chief Financial Officers Annual Report required by the Chief Financial Officers Act of 1990;

f. Ensure that the requirements of OMB Circular No. A-123 (Internal Control Systems) and appropriate audit standards are applied to collection;

g. Maintain readily accessible records of:

(1) The services or activities covered by this Circular;

(2) The extent of special benefits provided;

(3) The exceptions to the general policy of this Circular;

(4) The information used to establish charges and the specific method(s) used to determine them; and

(5) The collections from each user charge imposed.

(6) Maintain adequate records of the information used to establish charges and provide them upon request to OMB for the evaluation of the schedules and provide data on user charges to OMB in accordance with the requirements in Circular No. A-11.

9. Disposition of collections. a. Unless a statute provides otherwise, user charge collections will be credited to the general fund of the Treasury as miscellaneous receipts, as required by 31 U.S.C. 3302.

b. Legislative proposals to permit the collections to be retained by the agency may be appropriate in certain circumstances. Proposals should meet the guidelines in section 7b.

Proposals that allow agency retention of collections may be appropriate when a fee is levied in order to finance a service that is intended to be provided on a substantially self-sustaining basis and thus is dependent upon adequate collections.

(1) Generally, the authority to use fees credited to an agency's appropriations should be subject to limits set in annual appropriations language. However, it may be appropriate to request exemption from annual appropriations control, if provision of the service is dependent on demand that is irregular or unpredictable (e.g., a fee to reimburse an agency for the cost of overtime pay of inspectors for services performed after regular duty hours).

(2) As a normal rule, legislative proposals that permit fees to be credited to accounts should also be consistent with the full-cost recovery guidelines contained in this Circular. Any fees in excess of full-cost recovery and any increase in fees to recover the portion of retirement costs which recoups all (funded or unfunded) accrual costs not covered by employee contributions should be credited to the general fund of the Treasury as miscellaneous receipts.

Case 1:18-cv-00068   Document 609-2   Filed on 11/04/22 in TXSD   Page 139 of 245

10. New activities. Whenever agencies prepare legislative proposals for new or expanded Federal activities that would provide special benefits, the policies and criteria set forth in this Circular will apply.

11. Inquiries. For information concerning this Circular, consult the Office of Management and Budget examiner responsible for the agency's budget estimates.

Leon E. Panetta,

Director, Office of Management and Budget.


(FR Doc. 93-16753 Filed 7-14-93; 8:45 am)

BILLING CODE 3110-01-P

---

**End of Document**                                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# National Drug Control Strategy

**THE WHITE HOUSE**
**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF NATIONAL DRUG CONTROL POLICY**



AR2022_400709



# Table of Contents

Glossary ............................................................................................................ 1

To the Congress of the United States ............................................................... 5

Preface from Dr. Gupta, Director ..................................................................... 6

Introduction: Saving Lives is Our North Star .................................................. 8

Prevention and Early Intervention .................................................................. 17

Harm Reduction .............................................................................................. 30

Substance Use Disorder Treatment ................................................................ 45

Building a Recovery-Ready Nation ................................................................ 60

Reduce the Supply of Illicit Substances through Domestic Collaboration ... 76

Reduce the Supply of Illicit Substances through International Engagement .. 85

Criminal Justice and Public Safety ................................................................ 98

Data Systems and Research ........................................................................... 106

Appendix A—Developing a Data Plan .......................................................... 123

Works Cited ................................................................................................... 126

**AR2022_400710**


# Glossary

AAMC: American Association of Medical Colleges

ACEs: Adverse Childhood Experiences

ACF: Administration for Children and Families

ADAM: Arrestee Drug Abuse Monitoring

AML: Anti-Money Laundering

APG: Alternative Peer Group

ARTS: Addiction and Recovery Treatment Services

ASPE: Assistant Secretary on Planning and Evaluation

BIPOC: Black, Indigenous, and People of Color

BJA: Bureau of Justice Assistance

BOP: Federal Bureau of Prisons

BSA: Bank Secrecy Act

CADCA: Community Anti-Drug Coalitions of America

CBP: United States Customs and Border Protection

CCDB: Consolidated Counterdrug Database

CDC: Centers for Disease Control and Prevention

CDEWS: Community Drug Early Warning System

CICAD: Organization of American States Inter-American Drug Abuse Control Commission

CMS: Centers for Medicare & Medicaid Services

CoP: Community of Practice

CRP: Collegiate Recovery Program

DAWN: Drug Abuse Warning Network

DEA: Drug Enforcement Administration

DFC: Drug-Free Communities

DHS: United States Department of Homeland Security

DIO: Drug Intelligence Officer

DOD: United States Department of Defense

DOI: United States Department of the Interior

DOJ: United States Department of Justice



DOL: United States Department of Labor

DOS: Department of State

DOT: United States Department of Transportation

EBPRC: Evidence-Based Practices Resource Center

EBT: evidence-based treatment

ED: United States Department of Education

EDR: electronic death registration

EDWG: Equitable Data Working Group

EMCDDA: European Monitoring Centre of Drugs and Drug Addiction

EMS: Emergency Medical Services

EPA: United States Environmental Protection Agency

FDA: Food and Drug Administration

FTS: fentanyl test strips

HHS: United States Department of Health and Human Services

HIDTA: High Intensity Drug Trafficking Area

HRSA: Health Resources and Services Administration

HUD: U.S. Department of Housing & Urban Development

ICD: International Classification of Diseases

IHS: Indian Health Service

INCB: International Narcotics Control Board

INL: Bureau of International Narcotics and Law Enforcement Affairs

IRS: Internal Revenue Service

LGBTQ: lesbian, gay, bisexual, transgender, queer

ME/C: medical examiner or coroner

MEXK-54: Monitoring System of Illicit Crops in Mexico Program

MOUD: medications for opioid use disorder

N-SSATS: National Survey of Substance Abuse Treatment Services

NADCP: National Association of Drug Court Professionals

NADD: North America Drug Dialogue

NARR: National Alliance for Recovery Residences

NASADAD: National Association of Alcohol and Drug Abuse Directors



NCHS: National Center for Health Statistics

NDCI: National Drug Court Institute

NIAAA: National Institute on Alcohol Abuse and Alcoholism [1]

NIC: National Institute of Corrections

NIDA: National Institute on Drug Abuse[1]

NIH: National Institutes of Health

NIJ: National Institute of Justice

NIOSH: National Institute on Occupational Safety and Health

NPS: U.S. National Park Service

NRC: National Research Council

NREPP: National Registry of Evidence-based Programs and Practices

NRO: National Reconnaissance Office

NSDUH: National Survey on Drug Use and Health

NSS: National Seizure System

NTBI: National Prescription Drug Take Back Initiative

NHTSA: National Highway Traffic Safety Administration

OCDETF: Organized Crime Drug Enforcement Task Forces

ODMAP: Overdose Map Detection Program

OIG: Office of Inspector General

OJJDP: Office of Juvenile Justice and Delinquency Prevention

OJP: Office of Justice Programs

ONDCP: Office of National Drug Control Policy

ORS: Overdose Response Strategy

OTP: opioid treatment program

OUD: opioid use disorder

PHA: Public Health Analyst

PRC: People's Republic of China

PRSS: peer recovery support services

---

[1] The FY2023 Budget proposes to change the name of the National Institute on Alcohol Abuse and Alcoholism to the National Institute on Alcohol Effects and Alcohol-Associated Disorders, the name of the National Institute on Drug Abuse to the National Institute on Drugs and Addiction, and the name of the Substance Abuse and Mental Health Services Administration to the Substance use And Mental Health Services Administration.


PWUD: people who use drugs

RCC: recovery community center

RCO: recovery community organization

SAMHSA: Substance Abuse and Mental Health Services Administration[1]

SAPs: Student Assistance Programs

SAPT: Substance Abuse Prevention and Treatment

SBHCs: school-based health centers

SCM: specialized case management

SDOH: Social determinants of health

SSP: Syringe Services Program

SUD: Substance Use Disorder

TCO: Transnational Criminal Organization

TEDS: Treatment Episode Data Set

TTHY: Talk. They Hear You.

UCR: Uniform Crime Reporting/ Uniform Crime Reports

UNODC: United Nations Office of Drugs and Crime

USAID: United States Agency for International Development

USDA: United States Department of Agriculture

USFS: United States Forest Service

USFWS: United States Fish and Wildlife Service

USPIS: United States Postal Inspection Service

USSC: United States Sentencing Commission

VA: United States Department of Veterans Affairs

VHA: Veterans Health Administration

WBE: wastewater-based epidemiology

WONDER: Wide-ranging Online Data for Epidemiologic Research

YRBS: Youth Risk Behavior Survey



# To the Congress of the United States:

I am pleased to transmit the 2022 *National Drug Control Strategy*. This inaugural *Strategy* proposes bold, targeted, and consequential actions to bend the curve on overdose deaths in the immediate term and reduce drug use and its damaging consequences over the longer term. These actions are based on the best science, evidence, and data available.  Through them, we strive to usher in a new era of drug policy centered on individuals and communities.

This *Strategy* is the product of a rigorous process led by the Office of National Drug Control Policy in close collaboration with the 18 National Drug Control Agencies. In developing this *Strategy*, my Administration sought the input of more than 2,000 leaders and stakeholders including the entirety of the Congress; all 50 Governors; and advocates representing public safety, public health, community groups, local governments, and Tribal communities.

In my State of the Union Address, I identified addressing the opioid epidemic as part of a unity agenda for the Nation – something that could bring Americans together in service of a goal we all share. As this *Strategy* lays out, there is so much more we can do to expand access to evidence-based prevention, harm reduction, treatment, and recovery services, while also working to reduce the supply of harmful drugs in our communities.

I look forward to working with the Congress as well as State, local, and Tribal leaders as we implement this *Strategy*. Together, we can create safer and healthier communities for everyone.

President Joseph R. Biden

The White House

AR2022_400715



# Preface from Dr. Gupta, Director

The overdose epidemic affects all Americans, and in his first State of the Union, President Biden called on all Americans to work together to address it as part of a unity agenda for the Nation. As the President said, "Let's beat the opioid epidemic."

This call to action comes at a critical moment. For the first time in our Nation's history we have passed the tragic milestone of 100,000 deaths resulting from drug overdoses in a 12-month period. Since 1999, drug overdoses have killed approximately 1 million Americans. These are sons and daughters, parents and grandparents, neighbors and friends, and classmates and coworkers. This level of loss is heartbreaking and frankly, unacceptable. As we continue to lose an American life to drug overdose every five minutes around the clock, we find ourselves at an inflection point where we, as a Nation, must commit ourselves to doing what we know will help us triumph over this crisis.

As a practicing physician, I have seen firsthand the barriers that prevent people from obtaining the substance use treatment they need. As a researcher, I have observed the pervasive biases that have enabled ineffective drug policy approaches to be repeated over and over with the same results. And as a policymaker, I have encountered the roadblocks to progress in our legal and medical systems. This is part of the reason why I have seen too many succumb to their disease. Too often, stigma hinders Americans from seeking and receiving the help they need.

People with substance use disorder are in need of compassion and care. With the proper treatment and recovery support services, individuals go on to overcome addiction and lead successful lives.

Every family in America, regardless of their background or beliefs, has been impacted by addiction in some way. This is the reality we are facing today. The epidemic has taken a devastating toll on public health as well as the economy. Addiction prevents someone from reaching their full potential and contributing to their families and communities in a productive manner. Previous research has estimated that the economic costs of the epidemic are roughly $1 Trillion per year. If this trend continues, our national security and prosperity may be compromised considerably in the long-term.

Because the destruction caused by this epidemic in recent years is unrivaled, and the Biden-Harris Administration is determined to take unprecedented steps. There is a complex interplay between the availability of drugs in the United States and their use. Our *Strategy* will focus on two critical drivers of the overdose epidemic: untreated addiction and drug trafficking profits.

We are changing how we help people when it comes to drug use, by meeting them where they are with high-impact harm reduction services and removing barriers to effective treatment for addiction, while addressing the underlying factors that lead to substance use disorder head on. We are also striking drug trafficking organizations where it hurts them the most, in their wallets, by disrupting the operating capital they need to sustain their criminal enterprise. We need to apply both elements of this approach together, so we can disrupt the trafficking of drugs into the United States while allowing our historic investments in public health interventions to take hold. If it is easier to get illicit drugs in America than it is to get treatment, we will never bend the curve.



We can change this. We can make sure people get the help they need while also making our communities safer. President Biden's inaugural *National Drug Control Strategy* lays out our plans to achieve just that. It is based on the best science, evidence, and data available, and strives to usher in a new era of drug policy centered on individuals and communities.

As a Nation we must consider the legacy we are leaving behind for future generations. When it comes to drug policy, the Biden-Harris Administration is determined that our legacy will be healthier people and safer communities. This means building a better addiction infrastructure for preventing and treating substance use disorder, supporting recovery, and embracing evidence-based harm reduction strategies that keep people alive. This means building a better way of addressing addiction in the criminal justice system, reducing crime and making our communities safer while also making sure people get the help they need. And this means reducing the supply of illicit substances entering our communities. Every time one of our law enforcement professionals seizes illicit fentanyl, cocaine, or methamphetamine, they are helping to save lives and are cutting into the profits of the criminal organizations that fuel violence, breed corruption, and destabilize our partner nations, which makes our country and the world safer.

Our mandate from President Biden is clear: Reduce the number of drug overdose deaths, put quality public health services within reach for people with substance use disorder, and stop the drug trafficking organizations that seek profits by harming Americans. Working together, we can build healthy, safe and resilient communities where we have reduced the adverse experiences that can lead to substance use disorder, where public health services are available to everyone who needs them, and where the millions of Americans living in recovery have their health, their home, their community, and their purpose in life.

As President Biden said in his State of the Union, "If you're suffering from addiction, you should know you're not alone. I believe in recovery, and I celebrate the 23 million Americans in recovery… Now is our moment to meet and overcome the challenges of our time together. And we will." Our work cannot wait because every five minutes is a chance to save and transform a life.

Dr. Rahul Gupta
Director of National Drug Control Policy

AR2022_400717



# Introduction: Saving Lives is Our North Star

The drug overdose epidemic has taken a heartbreaking toll on Americans and their families. Provisionally, in the 12-months ending October 2021, an historic 105,752 persons are predicted to have died from a drug overdose; a 71-percent increase over this time period in 2016.[1] This was a greater rate of increase than for any other type of injury-related death in the United States.[2] Synthetic opioids, including illicit fentanyl, has been involved in 66-percent of these overdose deaths.

Saving lives is our North Star, and the 2022 *National Drug Control Strategy* calls for immediate actions that will save lives in the short term and outlines long-term solutions to reduce drug use and its associated harms, including overdose.

## The Biden-Harris Administration's Drug Policy Priorities for Year One

The passage and signature of the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities (SUPPORT) Act in 2018 required the Office of National Drug Control Policy to produce a statement of drug policy priorities by April 1 of the first year of an Administration and an inaugural *National Drug Control Strategy* in the second year.

President Biden understood the urgency of the issue when he took office and the Biden-Harris Administration submitted its first-year drug policy priorities to Congress on April 1, 2021.

These seven priorities proposed specific and targeted actions to reduce overdoses and promote recovery, including expanding access to quality treatment, reducing an increasingly lethal supply of illicit substances, and enhancing harm reduction services that engage and build trust with people who use drugs, among others.

The seven Biden-Harris Administration drug policy priorities for the first year were:

1. Expanding access to evidence-based treatment, particularly medication for opioid use disorder.
2. Advancing racial equity in our approach to drug policy.
3. Enhancing evidence-based harm reduction efforts.
4. Supporting evidence-based prevention efforts to reduce youth substance use.
5. Reducing the supply of illicit substances.
6. Advancing recovery-ready workplaces and expanding the addiction workforce.
7. Expanding access to recovery support services.

ONDCP worked closely with agencies, Congress, and other partners in support of these priorities.



# Significant Actions Taken to Save Lives

The Biden-Harris Administration has taken several actions that support the first-year drug policy priorities:

- President Biden signed the American Rescue Plan into law, which invested nearly $4 billion in expanding access to vital mental health and substance use disorder services.

- The Department of Health and Human Services (HHS) released a new Overdose Prevention Strategy that supports substance use prevention by expanding research of new and improved prevention efforts, investing in community resources to help prevent harms related to substance use, increasing access to high-quality pain management to reduce preventable suffering, and promoting responsible prescription of medications to protect patient safety.

- The Administration made it easier for health care providers to prescribe buprenorphine to treat more patients with opioid use disorder; Thousands of providers signed up to do this within a few months.

- The Administration also announced rulemaking intentions to extend pandemic related treatment flexibilities to allow:

- people with opioid use disorder to begin buprenorphine treatment by telehealth, including through phone consultation; and

- patients receiving methadone to receive a higher amount of take-home e medication instead of visiting a clinic every day.

- The DEA revised regulations to allow treatment providers to operate mobile methadone vans, bringing treatment to rural, incarcerated, and underserved communities.

- President Biden announced two Executive Orders to counter transnational criminal organizations and illicit drug trafficking, first by formally establishing the U.S. Council on Transnational Organized Crime, and second, by modernizing and expanding the U.S. Government's ability to target drug trafficking organizations, their enablers, and financial facilitators through sanctions and other related actions.

These key actions represent a fraction of the total. For a comprehensive list, visit White House Releases List of Actions Taken by the Biden-Harris Administration Since January 2021 to Address Addiction and the Overdose Epidemic | The White House.

# The Administration's Inaugural *National Drug Control Strategy:* A Comprehensive Path Forward

The first-year policy priorities served as the basis for President Biden's inaugural *National Drug Control Strategy*, which builds upon the significant actions taken during the Administration's first year to reduce overdose deaths and improve the way this Nation approaches drug use and its harms.

Specifically, this *Strategy* seeks to build the foundation for the Nation's work to reduce drug overdose deaths by addressing both the demand and supply sides of drug policy. This includes



building a stronger substance use disorder treatment infrastructure and reducing the supply of illicit substances through targeted law enforcement actions and commercially disrupting criminal organizations by undermining the illicit finance networks that make drug trafficking both possible and profitable. Additional top priorities include expanding evidence-based harm reduction strategies to meet people where they are, preventing drug use from beginning, building a recovery-ready Nation, addressing drug policy challenges in criminal justice, and improving data systems and research that guide drug policy development.

This *Strategy* charts a comprehensive path forward beyond what past federal drug policies have attempted. The increased focus on improving racial equity, which has been a longstanding problem in drug policy affecting both public health and public safety, is long overdue. The new focus on evidence-based harm reduction addresses a historic gap in past U.S. drug policy. The renewed focus on collaboration across public health and public safety has implications for every community in the Nation.

Each chapter of this *Strategy* supports saving lives with specific principles and action items for Federal agencies and departments to lead:

## Prevention and Early Intervention

Adolescence is a critical risk period for substance use initiation and adverse outcomes related to substance use, particularly as drug use has been found to escalate between ages 12 and 19.[3] The goal of substance use prevention efforts is to prevent and/or delay the first use of substances. Research shows that early age of onset is an important predictor for the development of a substance use disorder later in life.[4,5] Further, research shows that prevention interventions can have positive long-term effects in reducing substance use.[6,7] Recognizing that preventing or delaying initiation of substance use can confer important health and social benefits, the Biden-Harris Administration is focused on addressing the social factors that put some youth at increased risk for substance use, preventing use before it starts, and avoiding the escalation of use during the most critical period for substance use initiation.

## Harm Reduction

Harm reduction is an approach that emphasizes working directly with people who use drugs to prevent overdose and infectious disease transmission, improve the physical, mental, and social wellbeing of those served, and offer flexible options for accessing substance use disorder treatment and other health care services. In other words, harm reduction is people-centered. It means helping people who use drugs access services they need to stay alive. It means building trust with them so that when they wish to seek help, they know where to turn.

> **Focus Area:** Expanding access to naloxone, an opioid overdose reversal medication, which could save tens of thousands of lives in a short period of time.

Specifically, the Biden-Harris Administration's focus on harm reduction includes naloxone, drug test strips, and syringe services programs. Syringe services programs are community-based programs that can provide a range of services, including links to substance use disorder treatment; access to and disposal of sterile syringes and injection equipment; and vaccination, testing, and links to care and treatment for infectious diseases. Syringe services programs can be a critical intervention to reduce overdose deaths and communicable disease. Access to these


proven, lifesaving interventions[8] should not depend on where someone lives and instead should be available to all who need them. The types of interventions proposed in this *Strategy* will save lives, improve health, and likely have a favorable economic benefit to society.

## Substance Use Disorder Treatment

According to the 2020 National Survey on Drug Use and Health (NSDUH), nearly all of the almost 20 million people living in the United States who need treatment are not currently receiving addiction treatment services.[9] People with SUD face prejudice, stigma, and discrimination, and this may especially be true for Black individuals seeking treatment.[10] Stigmatizing attitudes towards drug use and people who use drugs exist throughout our society, including in health care.[11] It is vital that the Nation reduces the barriers to substance use treatment so everyone who needs it can access it. Similarly, important is building a system of care that proactively seeks, diagnoses, and treats those who need it rather than waiting until they interact with the criminal justice system or experience an overdose. Treatment works and tens of millions of people in this country are in recovery.[12] However, additional work is necessary to meet the *Strategy*'s stated treatment goals of increasing access to quality treatment, reducing stigma, ensuring dedicated interventions for the most vulnerable, and building a trained addiction workforce.

> **Focus Area:**
> Expanding access to high-quality treatment, including medications for opioid use disorder (MOUD), to prevent overdoses and put recovery within reach.

## Building a Recovery-Ready Nation

The four major dimensions of recovery prioritized in the *Strategy* are home, health, purpose, and community.[13] Recovery is measured as a positive—by what it brings, including quality of life, a sense of self-efficacy and purpose, and improvements in social and emotional functioning and wellbeing. Americans follow diverse trajectories from SUD to recovery or remission. In 2020, an estimated 29.2 million Americans perceived ever having a substance use problem.[14] Of these, 21 million (72-percent) identified as in recovery or recovered from a substance use problem.[15] A 2017 study found that, among people who reported having resolved an alcohol or other drug program, the most common recovery supports included mutual aid groups (45-percent), treatment (28-percent), and emerging recovery support services (22-percent).[16] Reaching recovery is more important than the specific path taken to it.

The Administration will work to increase scientific understanding of recovery, foster adoption of more consistent certification and accreditation standards nationally, expand the peer recovery support services (PRSS) workforce and the organizational infrastructure that supports it, address stigma and misunderstanding, and eliminate barriers to safe and supportive housing, employment, and education for people in recovery.

## Domestic Supply Reduction

Law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat domestic cultivated and synthetic drug production and trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques of distributing drugs throughout our communities.


Responding effectively to the illicit production, trafficking, and distribution methods of domestic criminal organizations and Transnational Criminal Organizations (TCOs) is a significant challenge and remains a Biden-Harris Administration priority. Four principal lines of effort are necessary to improve domestic collaboration, reduce the supply of illicit substances, and decrease the harms caused by these substances in the United States and abroad:

- Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking;

- Deny and disrupt domestic production, trafficking, and distribution of illicit substances;

- Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly; and

- Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

## International Supply Reduction

The majority of illicit drugs consumed in the United States are produced abroad by TCOs and smuggled into the country. Large TCOs, wherever they are based, threaten the health and safety of our communities by exposing our citizens to illicitly manufactured substances. These include synthetic drugs, such as opioids like fentanyl and stimulants like methamphetamine, and cultivated drugs like heroin and cocaine. The plentiful supply and widespread availability of high potency illicit drugs fuel drug consumption across all sectors of American society.

> **Focus Area:** Disrupting illicit finance networks to commercially disrupt drug trafficking operations and prevent illicit substance from reaching communities in the United States.

Large and influential TCOs pose a threat to national security and effectively responding to their illicit manufacturing, trafficking and distribution methods is an Administration priority. Countering corruption and its deleterious impact, including its role in facilitating transnational crime, is a core national security interest of the U.S. government.

The U.S. must strengthen international partnerships and foster bilateral exchanges to collaboratively address drug-related problems as a shared responsibility. The increasingly dynamic and complex nature of the international illicit drug trade demands enhanced cooperation with international partners that reflects the reality of a globalized supply chain for illicit drugs and their precursor chemicals. In addition to confronting TCOs' illicit drug manufacturing and trafficking activities directly, the U.S. must also pursue the financial enablers of this illicit activity to deny TCOs their ill-gotten proceeds and to disrupt their ability to transfer working capital to fund their range of illicit activities including procuring precursor ingredients, trafficking, bribery, and corruption. A global approach is essential since traffickers exploit national boundaries to insulate their operations and limit the impact of any single nation's control efforts.[17]

## Criminal Justice and Public Safety

Americans with undiagnosed or untreated substance use disorders too often end up interacting with the justice system, creating severe consequences for individuals, their families and communities, society, and taxpayers. Further, attaching criminal penalties to substance use alone


has contributed to lost lives, hope and opportunity. Untreated substance use disorder is overrepresented in the prison population; A study published in 2010 estimated that 65-percent of persons incarcerated had an active SUD.[18] The impact begins at arrest and continues through incarceration and after release back into the community. Arrest and incarceration for crimes related to substance use and possession disproportionately affect *Black, Indigenous and People of Color (BIPOC)* communities. According to an analysis of National Registry data through mid-October of 2016, African Americans may be nearly five times as likely to go to prison for drug possession as Whites, and data on exoneration outcomes suggest innocent Black people are about 12 times more likely to be convicted of drug crimes than innocent White people.[19]

The arrest and incarceration of people who use drugs (PWUD) has not only led to significant harms in BIPOC communities, but it increases risks of overdose as well. Upon release, incarcerated individuals are at a meaningfully elevated risk to die from an overdose than the general population.[20,21] It is clear that the criminal justice system must play an important role in ensuring that people within its custody or supervision and upon reentry who use drugs do not overdose and instead have access to the continuum of services and support.

## Data and Research

The Biden-Harris Administration is committed to employing a multi-faceted and evidence-based approach to policy-making as directed in the Presidential Memorandum on scientific integrity and evidence-based policymaking.[22] This is particularly significant in the area of drug policy where the ultimate impact is typically measured in American lives. Timely and accurate data are essential to grasp the extent and evolving nature of the drug problem, guide policy, assess the effectiveness of our nation's efforts, and continually improve these efforts over time. Data systems and research to generate this information must be maintained, enhanced, and supplemented so drug control practitioners, researchers, and policy-makers are continually informed by the most up to date and accurate information, while also protecting privacy and confidentiality. Further, when well communicated, such data can help inform the American public as to the types of policies and programs most likely to successfully address substance use challenges in their own communities.

> **Focus Area:** Improving data collection, particularly for non-fatal overdoses, to obtain a full picture of overdoses in America and identify people who need substance use treatment.

Considering the costs of drug use to society, which have vastly increased due to the opioid epidemic over the past decade, our data systems lack the timeliness, scope and precision required for the most impactful national response. As we assess the data and research landscape to address the Administration's commitment to implementing evidence-based drug policy, we have much more work to do to close information and knowledge gaps. This chapter focuses on three themes: strengthening existing data systems, establishing new data systems and analytical methods to fill gaps, and enhancing the utility of drug data for policymakers, program developers and administrators, practitioners, and researchers. It concludes with recommendations for sustaining data systems and research to inform drug control policy.



# Specific Goals and Measuring Federal Performance

Accountability is critical to success. With a Federal Drug Control Budget of $40 billion, it is vital to the national interest that the *Strategy's* policies and plans are evaluated as they progress. To evaluate the effectiveness of the Nation's drug policy efforts, and assess the progress in implementing the *Strategy*, the Biden-Harris Administration established seven goals to be achieved by 2025. These goals, measured against a baseline of 2020, across the gamut of drug policy issues, including a general goal to reduce illicit substance use and enhance public health and safety, as well as other specific public health and supply reduction issues. Each of these long-range, comprehensive goals is accompanied by quantifiable and measurable objectives, with specific annual targets. Please refer to the *National Drug Control Strategy: Performance Review System (PRS) Report* for a detailed discussion of these goals, objectives and targets.

The following are the specific strategic goals and objectives for the Nation to reduce the demand for and availability of illicit drugs and their consequences:

1. **Illicit substance use is reduced in the United States.**

   o *Objective 1:* The number of drug overdose deaths is reduced by 13-percent by 2025.

   o *Objective 2:* The percentage of people meeting criteria for each of cocaine, opioid, and/or methamphetamine use disorders are reduced by 25-percent by 2025.

2. **Prevention efforts are increased in the United States.**

   o *Objective 1:* Past 30-day alcohol use among young people aged 12-17 is reduced by 10-percent by 2025.

   o *Objective 2:* Past 30-day use of any vaping among youth aged 12-17 is reduced by 15-percent by 2025.

3. **Harm Reduction efforts are increased in the United States.**

   o *Objective 1:* The number of counties with high overdose death rates which have at least one Syringe Service Program (SSP) is increased by 85-percent by 2025.

   o *Objective 2:* The percentage of SSPs that offer some type of drug safety checking support service, including, but not limited to Fentanyl Test Strips, is increased by 25-percent by 2025.

4. **Treatment efforts are increased in the United States.**

   o *Objective 1:* Treatment admissions for the populations most at risk of overdose death is increased by 100-percent by 2025.

   o *Objective 2:* The projected shortfall in the qualified workforce of behavioral health providers (including addiction professionals) funded by federal programs in the United States is reduced by 70-percent by 2025.

5. **Recovery efforts are increased in the United States.**

   o *Objective 1:* The number of states operating a recovery-ready workplace initiative is increased 75-percent by 2025.



- o *Objective 2:* The number of peer-led recovery community organizations is increased by 25-percent by 2025.

- o *Objective 3:* The number of recovery high schools is increased by 10-percent by 2025.

- o *Objective 4:* The number of collegiate recovery programs is increased by 25-percent by 2025.

- o *Objective 5:* The number of certified recovery residences is increased by 25-percent by 2025.

6. **Criminal Justice reform and public safety efforts in the United States include drug policy matters.**

- o *Objective 1:* Eighty percent of all treatment courts will be trained and will implement practices to increase equity by 2025.

- o *Objective 2:* The percentage of Federal Bureau of Prisons (BOP) inmates diagnosed with an opioid use disorder who are given access to medications for opioid use disorders (MOUD) is increased to 100-percent by 2025; the percentage of both state prison programs and local jail facilities offering MOUD is increased by 50-percent.

7. **The supply of illicit substances into the United States is reduced.**

- o *Objective 1:* The number of targets identified in counternarcotics Executive Orders and related asset freezes and seizures made by law enforcement is increased by 365-percent by 2025.

- o *Objective 2:* The number of defendants convicted in active OCDETF investigations that incorporate FinCEN/SAR data is increased by 14-percent by 2025.

- o *Objective 3:* The percentage of active priority OCDETF investigations linked to the Sinaloa or Jalisco New Generation (CJNG) cartels, or their enablers (such as illicit financiers) disrupted or dismantled is increased by 25-percent by 2025.

- o *Objective 4:* Potential production of cocaine is decreased by 10-percent, and heroin is decreased by 30-percent by 2025.

- o *Objective 5:* The number of incident reports for precursor chemicals sourced from China or India reported by North American countries increases by 125-percent by 2025.

## *Consultation for the National Drug Control Strategy*

The Office of National Drug Control Policy is statutorily required to consult with and solicit input for the *National Drug Control Strategy* from a variety of parties affected by federal drug policy, including federal agencies and departments charged with carrying out these policies, members of Congress and congressional committees, states, local, Tribal, and territorial governments, nongovernmental organizations and community activists, and foreign governments, among others.



The consultation process for the 2022 *National Drug Control Strategy* began in May 2021 and ONDCP received significant input from a wide range of interested parties. While the COVID-19 pandemic prevented in-person consultation in communities across the Nation as was done in years past, ONDCP held virtual meetings and received written input from the individual National Drug Control Program agencies while developing this *Strategy*. Following publication, ONDCP will lead the interagency process to implement this *Strategy*. Thank you to all partners who provided input for the Biden-Harris Administration's inaugural *Strategy,* and thank you for your commitment to addressing addiction and the overdose epidemic.

***

Addiction and the overdose epidemic are urgent issues facing the Nation. Our country has never seen substance use disorder cause such devastation, and the Biden-Harris Administration is determined to stop it. An overdose is a cry for help and for too many people that cry goes unanswered. With this *National Drug Control Strategy,* the Biden-Harris Administration is working to ensure these cries are not just heard but answered as well. This vision for the United States' drug policy is based on science, evidence, and the best data available. Saving lives is our North Star, and this *Strategy* supports this goal on every page.

AR2022_400726

# Prevention and Early Intervention

Adolescence is a critical risk period for substance use initiation and adverse outcomes related to substance use. Data from the National Survey on Drug Use and Health (NSDUH) show a rapid escalation of drug use associated with an increase in age, particularly among youth ages 12-19 (see Figure to left).[23] This trajectory speaks to the need to understand what drives youth drug use, identify current and emerging trends, and match programs and policies with local conditions so as to effectively reduce youth substance use.



There are simultaneous conditions that converge to create a particularly dangerous circumstance for adolescents – drug use increases during a period of time when the brain is especially vulnerable to damage from drug use.[24] During adolescence there is a significant reorganization of brain regions necessary for intellectual function, memory, emotional regulation, and decision-making.[25,26] Drug use often disrupts normal brain development and can result in long-lasting negative consequences, including reduced academic achievement and increased risk of depression, anxiety, suicide, and substance use disorder (SUD) later in life.[27,28,29,30,31] Adolescent drug use can also cause persistent changes in brain[32] structure and function.[33]

A range of factors influence mental, emotional, and behavioral development in children and adolescents.[34] These include societal, environmental, familial, and genetic dynamics. Social determinants of health (SDOH) play a critical role in overall health status[35] and substance use, including opioid use.[36] The Department of Health and Human Services (HHS) describes SDOH as the conditions in which people are born, grow, live, work and age, all of which affect a wide range of health risks and outcomes.[37] Prevention initiatives, couples with social needs interventions, can be impactful across the lifespan, including and in particular for the prenatal period and throughout adulthood.

More generally, social determinants include factors such as food and housing security, access to services and supports, income, lack of transporation, stable employment, education, and social inclusion. Studies suggest that roughly 30-percent to 55-percent of health outcomes are driven by SDOH,[38] and experiencing these social factors may increase levels of stress experienced which can elevate the risk of substance use.[39] Peers are often identified as an influence to youth substance use, but SDOH also contribute to youth substance use trends and negative health outcomes associated with substance use. Parental influence can deter youth use or unintentionally enable youth use. For example, strong parental monitoring, and communicating


clear expectations about risk and positive role modeling, can reduce use in youth. Conversely, parents can unintentionally enable underage alcohol use and/or youth drug use by not securing alcohol and prescription drugs.[40,41] Unstable housing is associated with higher rates of substance use among youth, while some families and caregivers who receive income supplements see a significant decrease in adolescent substance use.[42,43,44] Addressing SDOH is necessary to help improve health and reduce inequities in health outcomes—including in youth substance use, and this effort will require all sectors of Government and society to identify and improve factors that influence health outcomes.

Another factor to consider in understanding the origins of substance use among youth is the impact of adverse childhood experiences (ACEs), their connection to SDOH, and equity. ACEs are potentially traumatic events that occur during childhood and adolescence (between the ages of 0-17 years). Large scale population based studies have shown that individuals with more ACEs are likely to have health problems later in life. Types of ACEs include abuse and neglect, experiencing or witnessing violence, experiencing divorce of parents, a family member in jail, parental mental health or SUD, having a family member or caregiver attempt or die by suicide, and chronic poverty.[45,46,47] Recently, researchers have included experiences with racism, bullying, and community violence as traumatic experiences that can impact health and wellbeing.[48] While nearly 61 percent of adults surveyed report they experienced at least one type of ACE, women and most racial minority groups were more likely to have experienced four or more ACEs.

The link between ACEs and illicit substance use has been identified in a number of studies.[49,50] The more ACEs a child experiences, the more likely the child is to d develop a chronic disease, poor academic achievement, and/or illicit substance use.[51] Compared with people with no ACEs, individuals with more than five ACEs were seven to ten times more likely to report problems with illicit drug use.[52,53] It is possible to prevent youth exposure to ACEs, and to reduce the harms associated with ACEs among individuals who have already experienced them.[54] A coordinated effort to address SDOH will improve individual and population health, advance health equity, and decrease youth exposure to ACEs.

The goal of substance use prevention efforts is to prevent and/or delay the first use of substances. Research shows that early age of onset is an important predictor for the development of SUD later in life.[55,56] Research also indicates that the majority of individuals who have SUD started using substances before age 18 and are relatively more likely to have developed SUD by age 20.[57] The age of onset is therefore an important predictor for the development of SUD later in life.[58,59,60] Youth substance use is also often accompanied by other factors such as low academic attainment, health-related issues (including a mental health diagnosis and risky sexual behavior), involvement with the juvenile justice system, and overdoses. Youth who engaged in drug use are more likely to experience violence, are at greater risk for mental illness and suicidal ideation and/or suicide, and more likely to engage in risky sexual behavior such as not using a condom and having multiple partners.[61] These health behaviors put youth at risk for sexually transmitted infections like HIV, and unintended pregnancy. Youth

> **DFC & Youth Vaping**
>
> Approximately three quarters of Drug-Free Communities (DFC) Support Program coalitions are engaged in activities to address vaping. Of those coalitions, 94-percent reported addressing nicotine/tobacco and 84-percent reported addressing marijuana.


engaging in substance use and sexual behavior at an early age are also linked to poor test scores and lower educational attainment.[62,63]

Alcohol, marijuana, and tobacco are the substances most commonly used by adolescents.[64] In 2019, almost 14-percent of high school students reported binge drinking within the past month. Seven- percent reported past month prescription opioid misuse[65]—most often drugs that were not prescribed to them.[66] In 2020, one in five high school students surveyed reported past month e-cigarette use. From 2017 to 2019, the percentage of eighth graders who said they vaped nicotine in the past 12 months roughly doubled from 7.5-percent to 16.5-percent.[67] Among lifetime use measures from 2009 to 2019, marijuana use was reported by 36.8-percent of high school students surveyed, followed by misuse of prescription opioids (14.3-percent) and use of synthetic marijuana (7.3-percent). The prevalence of youth use of cocaine (3.9-percent), methamphetamine (2.1-percent), or heroin (1.8-percent) is much smaller and they are not commonly drugs of first use.

In 2020, there were 783 opioid overdose deaths in youth 5-18 years old and 1,022 overdose deaths involving all drugs in youth 5-18 years old.[68] Between 2016-2019, suspected overdoses involving all drugs increased by 2-percent for youth between the ages of 0-10 years and a 2.3-percent for youth between the ages of 11-14 years. Delaying age of initiation and addressing SUDs from a life stage perspective with assessment and treatment approaches incorporating co-occurring disorders are necessary to successfully impact overall health.[69] There is a strong relationship between ACEs and early initiation of youth substance use.[70] The estimated nonmedical use of prescription drugs increases by 62% for each additional ACE.[71,72]

Prevention interventions can have positive long-term effects in reducing substance use.[73,74] While alcohol remains the primary substance of abuse for youth, rates of use have decreased substantially over time. Successful youth substance use prevention works by targeting at least two areas of the childhood experience: reducing risk factors that increase the likelihood of substance use, and enhancing protective factors that prevent or decrease the impact of a negative experience.[75] Universal prevention focuses on an entire population (e.g., school or community) and are not

> **Universal Prevention Interventions and Positive Impacts Across Generations**
>
> A study looked at the impact on the offspring of children who received a universal prevention intervention. The original prevention intervention was implemented in public elementary schools serving high-crime areas in Seattle, Washington. The initial Raising Healthy Children intervention provided social and emotional training to some children while others did not receive the training. A recent analysis found that the intervention not only helped the children who received the initial social and emotional skills training, but their children benefited as well. These offspring had less substance use, fewer behavior issues, and better academic skills than the children whose parents had not received the training.
>
> The persistent impact of these positive effects of the universal prevention intervention speaks to the potential to prevent adverse childhood experiences and counter the impact and of negative social determinants of health.
>
> Reference: Hill K, Bailey J, Steeger C, et al. Outcomes of Childhood Preventive Intervention Across 2 Generations - A Nonrandomized Controlled Trial.



directed at a specific risk group.[76] There is evidence that universal prevention interventions provide sustained positive impacts on general health and behavioral outcomes years after the end of the intervention, including for youth in disadvantaged environments.[77,78,79,80] A recent analysis of the Raising Healthy Children intervention indicated positive outcomes including less substance use, fewer behavioral issues, and better academic skills into the third generation.[81]

Early childhood interventions that enhance protective factors, such as fostering self-control and successful coping strategies, and minimize risk factors can bring persistent benefits.[82,83] For example, a family history of substance use increases a child's risk for substance use but nurturing that child in an environment with clear messaging that substance use is potentially harmful, and helping the child spend time with peers who do not use substances can offset the original risk.[84,85] In addition, prevention interventions that are universal (e.g., target populations regardless of risk or use status) can reduce prescription drug misuse and have positive effects on other health risk behaviors, including misuse of prescription drugs to include opioid medications.[86,87] When interventions are appropriately matched to address identified problems, they can reduce substance use, reduce the impact of ACEs, and counter the potential impact of SDOH.[88,89,90]

Prevention is not only effective, it is also cost effective approach to prevent later SUD have been identified as an underutilized response to the opioid crisis.[91] The 2016 Surgeon General's Report on Alcohol, Drugs, and Health[92] also noted that prevention science demonstrates that effective prevention interventions exist, can markedly reduce substance use, and evidence-based programs and policies are underutilized. There are multiple examples of cost effective prevention programs. For example, the average effective school-based prevention program is estimated to save $18 per dollar invested.[93] There are also cost-benefit assessments of individual programs. Too Good for Drugs, a school-based prevention program for students in kindergarten through 12th grade, was designed to increase social competencies (e.g., develop protective factors) and diminish risk factors associated with alcohol, tobacco, and other drug use. It has a benefit-to-cost ratio of + $8.74 and it is estimated that there is a 94-percent chance that benefits will exceed costs.[94] Other effective and cost-effective programs include Botvin Life Skills[95] which has benefit-to-cost ratio of $13.49, and the Good Behavior Game with a benefit-to-cost ratio of $62.80.[96]

Implementing evidence-based policies, environmental strategies, and programs requires an understanding of a community's challenges and knowing which strategies will effectively address a community's specific challenges. There are three approaches that help communities identify their local substance use problems, identify the appropriate evidence-based interventions to address their unique local conditions, and assess the effectiveness of the intervention. These three approaches are Drug-Free Communities (DFC) Support Program, Promoting School University Community Partnerships to Enhance Resilience (PROSPER), and Communities that Care (CTC).[97,98,99,100,101] All three of these approaches have demonstrated the ability to reduce substance use among youth years after the initial intervention.

Prevention works best when there is an infrastructure to support it, for example, approaches used by DFC, CTC, PROSPER and the presence of community norms that create an environment that support youth and allows them to thrive. Interventions should cross stages of child development and levels of prevention (e.g., universal, selective, indicated). Addressing substance use should parallel approaches as seen in treating other health conditions such as cancer or heart disease. To effect lasting change there should be support for a wide range of efforts—from promoting a



healthier environment, healthier living patterns, to population screening, to identifying individuals at risk or with early/treatable disease, as well as those requiring more intensive treatment, recovery support, and rescue approaches.

Recognizing that preventing or delaying initiation of substance use can confer important health and social benefits, the Biden-Harris Administration is focused on addressing the social factors that put some youth at increased risk for substance use, preventing use before it starts, and avoiding the escalation of use during the most critical period for substance use initiation. The following principles identify specific prevention interventions that can effectively address youth substance use.

## Principle 1: Preventing Substance Use Among School-Aged Children is Effective

Delaying the age of initiation for substance use, providing skills for children that build resilience, and addressing co-occurring substance use and mental health disorders are necessary to successfully improve overall health and social outcomes for school-aged children.[102] Investments in research have identified effective strategies to strengthen the mental and emotional development of young people to prevent initial use. Ensuring that school-aged children have access to universal prevention programs designed to prevent use before it starts, prevention services that focus on children at higher risk for use or those that have started using drugs, and when necessary provide referral to treatment and recovery support is essential to support the health, well-being, and futures of the Nation's 74 million children.

A. **Provide technical assistance and guidance to help K-12 schools increase the reach of and access to substance use prevention supports and services.** *(Agencies Involved: DOJ/ OJP; ED; HHS/CDC, HRSA, NIH, SAMHSA)*

Schools are uniquely positioned to provide services that promote student health and optimal wellness as well as decrease barriers to learning. A number of school systems are already working to build systems that can help prevent youth initiation of substance use, identify children at risk for use or those who are already using, and, as needed, refer youth to appropriate interventions and/or treatment, and provide recovery support.

Providing technical assistance to schools on evidence-based approaches and programs can dramatically expand the number of children provided access to effective prevention efforts. One key approach is establishing school-based Student Assistance Programs (SAPs), which can play a key role in these efforts. SAPs are flexible in that they can support a range of efforts tailored to the unique demographics, socioeconomic challenges, and cultural context of the students they serve. SAPs can be structured to address the specific needs of a school. They can focus on ACEs, or children who live in poverty or who may be homeless. These programs also support the teachers and educational staff by providing access to trained professionals to address emotional and behavioral issues among the students. Federal agencies should increase efforts to provide technical assistance to schools on effective, comprehensive approaches to screen, prevent, intervene, and support recovery for substance use in school-based settings, including guidance on how to establish, expand, and continuously evaluate the success of SAPs in schools.



**B. Provide technical assistance and guidance to organizations interested in establishing and expanding Student Assistance Programs to include evidence-based practices and available federal funding mechanisms.** *(Agencies Involved: ED; HHS/SAMHSA)*

Enlist federal agencies to provide technical expertise regarding effective comprehensive approaches to prevent use before it starts (universal prevention), prevent initiation of use among children with an elevated risk for use (selective prevention), prevent progression to SUD for children who have started to use drugs (indicated prevention), refer students to substance use treatment as deemed clinically appropriate, and provide support for recovery from substance use in school-based settings. Federal agencies should also be actively engaged in providing guidance on how federal funding can be used to support SAPs. These efforts should include expanding understanding of effective prevention programs and approaches for all school-aged children with a special emphasis on preventing initiation with universal prevention interventions. The assistance should also include information about federal funding mechanisms that can support SAPs, provide examples of effective programs, as well as, strategies for practical, ongoing assessments.

**C. Expand research on effective screening approaches for school age children in health care settings and expand efforts to translate research findings into clinically and culturally appropriate tools.** *(Agencies Involved: DOJ/OJP; ED; HHS/CDC, CMS, HRSA, NIH, SAMHSA)*

To expand the use of clinically effective and culturally appropriate screening tools expanded research is needed. The American Academy of Pediatrics (AAP) notes that adolescents are at the highest risk compared to any other age group for experiencing health issues related to substance use, and that the potential benefits of identifying substance use and intervening to reduce or prevent use are substantial.[103] Results from a 2014 needs assessment conducted by the AAP indicated that only 23% of pediatricians used a validated screening tool, although 88% were screening for substance use. AAP also noted that by using clinical impressions alone there is a tendency to focus on late stage of signs of use and suggested that this is an area for practice improvement. AAP's Substance Use Screening and Implementation Guide reported that pediatric providers tend to underestimate the prevalence of adolescent substance use, so it is important for health care providers to discuss substance use with all patients.

A key area for expanded research focuses on screening for adolescents aged 12 to 17. The US Preventive Services Task Force (USPSTF) recommends screening for unhealthy drug use in adults 18 year or older. The data for the 12 to 17 age group is currently insufficient.[104] NIDA's and NIAAA's research on screening for substance use has been critical in identifying effective screening approaches for this age group.[105] NIDA and NIAAA are supporting a range of research studies focused on adolescents including looking at: addressing teen substance use during primary care visits, providing interventions for adolescents with substance use undergoing oral surgery, screening for stimulant use disorder in a primary care setting. It's important to note as well that screening can lead to treatment, but also screening can lead to more enhanced prevention services in school-based settings. Another area for additional research surrounds screening for ACEs and trauma. ACEs are known risk factors for health issues in a population but the accuracy of screening tools in predicting an individual's risk for health problems later in life is an area worthy of further research.[106,107]

AR2022_400732



Translating research findings into clinically effective and culturally appropriate tools is also important. Several federal agencies can play a key role in ensuring that the investment in research will help the Nation's youth. The Substance Abuse and Mental Health Services Administration (SAMHSA) through its knowledge, experience, and close relationships with State and local substance use organizations and governmental agencies is well placed to help in developing effective, appropriate screening tools. The Centers for Medicare & Medicaid Services (CMS), through its Early and Periodic Screening, Diagnostic and Treatment benefit, can ensure that children who qualify for the benefit receive effective and culturally appropriate screening for substance use.

The Health Resources and Services Administration (HRSA) currently supports 3,257 school-based health centers and can serve an important role in reaching children and adolescents who live in underserved communities.[108] The Department of Justice can ensure it provides effective and appropriate screening for substance use for youth in juvenile justice settings. The Centers for Disease Control and Prevention (CDC), working in collaboration with the NIH and other federal agencies, can draw on its experience in developing and disseminating guidance to K-12 schools on childhood diseases to help schools implement effective substance use screening that is appropriate for a school's population. The Department of Education (ED) also has an important role to play in ensuring close collaboration between substance use prevention efforts and Multi-tiered System of Supports (MTSS) programs.

Through these collective efforts there is great potential to reach millions of children in schools and in office-based health care settings.



**Right Service, Right Time, for the Right Child:**
**How a Washington State School District Provided**
**Comprehensive Behavioral Health Services for Students**

In 2012, the Capital Region Educational Service District 113 in Washington State faced a challenge with substance use and behavioral issues among high school students. Tenth grade current alcohol use rates for one identified district were at 36-percent, compared to the state average of 23-percent according to the state's Healthy Youth Survey. Additionally, problem behaviors and suspensions were at troubling levels, as were school attendance rates. These problems were compounded by a lack of access to clinically appropriate treatment and recovery support services for youth. To respond, the district established a Student Assistance Program (SAP) in 2013. Under the SAP model, a trained and credentialed behavioral health professional was brought onsite and the entire school staff was engaged to identify and help prevent substance use and address behavioral challenges among students. This made the entire team responsible for the behavioral health of the students. Under the SAP, the spectrum of services available to students was expanded and included: prevention services, behavioral health screening and early intervention of youth at high risk of substance use or mental health issues, referral and care management to substance use and/or mental health treatment and comprehensive recovery support services. The program also engaged parents/caregivers and the community.

The SAP's comprehensive approach had overwhelmingly positive outcomes. From 2013 to 2018, the comprehensive approach adopted under the SAP was associated with a reduction in past 30-day alcohol use from a peak of 36% in 2012 to just 10% in 2018. Comparatively, statewide alcohol use rates only changed from 25% to 18% in that same time frame. But most compelling were the stories from the students themselves. The students described how an adult at the school saw they were struggling and referred them to someone who could figure out what was going on, understand their unique situation, and could figure out how to help them in their unique situation. The adoption of the SAP philosophy created a school environment where an individual focus on the needs of each student was possible.

*Source: Data provided by Capital Region Educational Service District 113, Washington State.*

## Principle 2: Preventing Substance Use Among Young Adults Promotes Overall Health

Young adults experience a different set of risk factors specific to the developmental challenges of transitioning to adulthood.[109] Coping skills developed during early adolescence to reject substance use may no longer be effective during this transition to adulthood. These challenges set the stage for a critical time in which young adults are likely to initiate or increase substance use.

Among young adults between the ages of 18-25 years, the number of past year initiates of alcohol use doubled from 1.2 million people in 2002 to 2.4 million people in 2019. In addition, national survey data show higher prevalence rates of illicit drug use including marijuana, amphetamine, cocaine, hallucinogens, and MDMA, among young adults in comparison to youth


(ages 12-17 years) and adults (26 years and older). Further analysis shows significantly different rates of substance use among specific categories of young adults, including those with mental health conditions, LGBTQ youth, and collegiate vs non-collegiate young adults.

Prevention efforts addressing the needs of young adults must consider that young adults have their own unique patterns of substance use behaviors, an array of social determinants of these behaviors. This age cohort requires prevention services in multiple modalities and settings including colleges and universities, workplaces, vocational training programs, military services, homeless and runaway programs, correctional facilities (e.g., college health centers, primary care centers), and general health care settings.

**A. Encourage mental health and substance use and misuse screening for young adults in health care settings.** *(Agencies Involved: HHS/CMS, HRSA, SAMHSA)*

Providing information and technical assistance to health care providers, colleges and universities, employee assistance programs, and other providers that serve young adults can expand awareness and access to critical screening. The Affordable Care Act (ACA) required plans and issuers that offer dependent child coverage to make the coverage available until the adult child reaches the age of 26. In addition, ACA expanded coverage via expanded Medicaid and the ACA marketplaces for young adults unable to stay on their parents plan. This expands coverage for many young adults to access important screening, care, and referral to services. Given the high prevalence of SUD among young adults, as well as co-occurring mental illness, it is important for health professionals to: conduct regular screenings to identify substance use and misuse; assess mental health disorder(s); and refer individuals to clinically appropriate prevention and treatment interventions in a timely manner. HHS should assess its current support for behavioral health screening and explore opportunities to expand its efforts.

**B. Educate newly licensed drivers on the risks and harms of substance use.** *(Agencies Involved: DOT/NHTSA; HHS/CDC, SAMHSA)*

Age requirements for obtaining a driver's license differ from state to state. According to the Governors Highway Safety Association, most states grant full driver's licensure between the ages of 16-18 years. This graduated license process provides opportunities to disseminate information, tools, and resources to teens and young adults about the harms of substance use.[110] Partnerships between state Departments of Health and Motor Vehicle Agencies can ensure up to date information about the risks and harms of substance use are disseminated to applicants in preparation for licensure, as well as when full driver's licenses are issued. Federal agencies should encourage states to leverage Substance Abuse Prevention and Treatment Block Grant (SAPT) funds to partner with the Department of Motor Vehicles to reach a majority of young adults with information and messages to prevent substance use.

**C. Encourage evidence-based employer-based wellness programs.** *(Agencies Involved: HHS/ACF, CDC, SAMHSA; Labor; Treasury/IRS)*

According to the Department of Labor, a Drug-Free Workplace program consist of several core components: written policy; employee education; supervisor training; employee assistance program (EAP); and drug testing. Although drug testing receives significant attention in federal policy, employee education and assistance are equally important. Given the unique patterns of substance use among the young adult population,



tailoring efforts to address this group's substance use and mental health needs is especially important. Wellness programs offer tools to foster healthy nutrition, physical activity, stress management, lifestyle coaching, incentive programs, counseling, and a myriad of other services to address risk and resiliency factors among employees.[111] In addition to outlining employer's rules and expectations, a program focused on nurturing employee wellness can help increase productivity, morale, and overall safety of the workplace. The Society for Hunan Resource Management provides guidance to employers on developing wellness programs to promote overall wellness. SAMHSA also provides resources to assist employers in establishing Drug-Free Workplace programs. Federal agencies should encourage public and private sector employers to adopt federally-funded workplace wellness programs via on-line classes or expand wellness programs, especially making assertive efforts where young adults enter the workforce. SAMHSA's Wellness Initiative highlights several dimensions of a multifaceted approach to improving overall wellness that can be integrated into workplace programs.[112] Apprenticeship, fellowship, and college internship programs have particular opportunities to target young adults for information and services to prevent substance use and promote health and wellness.

**D. Raising awareness of substance use harms in the collegiate community.** *(Agencies Involved: ED; HHS/NIH, SAMHSA)*

Each year, millions of students begin their collegiate journey away from the routines and oversight of parents or caregivers. In addition to promoting policies to discourage underage drinking and tobacco use, many colleges and universities incorporate information about the dangers of substance use into student orientation. Several federal resources are available to assist colleges and universities in raising awareness among students. SAMHSA provides a resource guide to Substance Misuse Prevention for Young Adults with elements to guide initiatives to reach college-aged youth.[113] Resources to support adoption of evidence-based campus programs are available through the Higher Education Center for Alcohol and Drug Misuse Prevention and Recovery (HECAOD) and NIAAA's College Alcohol Intervention Matrix to help schools identify effective policies and programs.[114] Additionally, college health centers can integrate screening for mental health and/or substance use among college student populations and provide connections to community-based resources. HECAOD can also provide guidance on strategies for institutions of higher education to continually evaluate their programs over time, and to continually make refinements to achieve increasingly better outcomes. Federal partners should assess evidence-based programs and explore opportunities to expand reach among the collegiate community.

# Principle 3: Preventing Youth Substance Use Requires Community-Level Interventions

Public health strategies and interventions aimed at preventing and reducing youth substance use must also address the environmental conditions that can often facilitate and/or establish substance use as normative behavior. Grounded in public health research, the implementation of environmental prevention strategies that focus on the broader physical, social, cultural, and institutional factors that contribute to local substance use are effective in creating positive



behavior change. The section that follows highlights opportunities across the federal government to strengthen evidence-based efforts aimed at addressing a wide range of environmental and societal factors to create healthy, safe, and drug-free communities.

**A. Augment youth substance use prevention coalitions implementation of evidence-based prevention strategies across the country.** *(Agencies Involved: DOJ/OJP; HHS/CDC, SAMHSA)*

Community coalitions, such as those funded and trained by the Drug-Free Communities (DFC) Support Program, are well positioned to address local risk factors associated with youth substance use and strengthen protective factors. Community coalitions are best suited to establish and strengthen collaboration among various sectors of their communities to implement a comprehensive mix of evidence-based prevention strategies that will address their local needs. By supporting the development of local drug-free community coalitions and establishing collaboration among various sectors of a community, coalitions are capable of achieving long-term sustainable success in preventing local youth substance use. The flexibility and locally-driven nature of community coalitions allow a range of successful responses to local youth substance use issues. Federal agencies should highlight evidence-based youth substance use prevention programs and ensure federal funding opportunities require the implementation of evidence-based prevention strategies.

**B. Establish a community of practice (CoP) for evidence-based youth substance use prevention and adverse childhood experiences (ACEs).** *(Agencies Involved: HHS/CDC, SAMHSA)*

Communities of practice provide a collaborative framework for public health professionals to work together and gather input and perspectives from community partners in an effort to identify and leverage best practices and set standards. Through these evolving collaborative efforts and sharing of lessons learned in the community building process, the community of practice approach is being implemented in many public health areas as a model for how public health partners can be most effective together. As communities seek opportunities to implement data driven prevention strategies that focus on the broader physical, social, cultural and institutional factors that contribute to local substance use, a greater focus on ACEs provides youth within these communities' an environment that promotes their overall health and safety. Federal agencies should work towards the establishment of a CoP for evidence-based youth substance use prevention and adverse childhood experiences and identify specific goals to be accomplished.

**C. Expand "Talk. They Hear You" to address youth alcohol use and other drugs, including marijuana.** *(Agencies Involved: DOJ/OJP; DOT/ NHTSA; ED; HHS/ACF, CDC, FDA, NIH, SAMHSA)*

SAMHSA's "Talk. They Hear You." (TTHY) Underage Drinking Prevention National Media Campaign empowers parents and caregivers to talk with children early about alcohol and other drug use. High rates of youth alcohol use, shifting state laws regarding marijuana, and the nation's overdose epidemic are prevalent health concerns that directly affect America's parents and caregivers. Parents have a significant influence in their children's decision to experiment with alcohol, tobacco, and other drugs. The TTHY


campaign aims to accomplish the following: Increase parents' awareness of the prevalence and risk of underage drinking and substance use; equip parents with the knowledge, skills, and confidence to prevent underage drinking and substance use. The TTHY campaign involves a complex interplay of formative, process, and outcomes evaluation efforts. Evaluation findings to date suggest that SAMHSA has met many markers for early success, including strongly resonating with intended TTHY audiences. The growing body of evidence presented in the most recent Report to Congress on the Prevention and Reduction of Underage Drinking supports that key campaign messages serve as important cues to action that increase both the plans and actions of parents to talk with their children about underage drinking and other substance use. There is further evidence to suggest that TTHY increases parents' confidence not only in talking with their children about underage drinking and other substance use but also in the behavioral efficacy of their efforts. Federal partners should explore opportunities to expand the reach of the TTHY National Media Campaign among communities.

---

### Drug-Free Communities (DFC) Support Program: Local Problems, Local Solutions

The Drug-Free Communities (DFC) Support Program, created by the Drug-Free Communities Act of 1997, mobilizes communities to prevent youth substance use. Led by the Office of National Drug Control Policy (ONDCP) in partnership with the Centers for Disease Control and Prevention (CDC), the DFC Program provides grants to community coalitions to strengthen the infrastructure among local partners needed to reduce local youth substance use. Recognizing that local problems need local solutions, DFC coalitions engage multiple sectors of the community and employ a variety of environmental strategies to address local substance use problems. Through the National Coalition Institute (NCI) grant program, DFC and non-DFC funded community coalitions are trained to use the Strategic Prevention Framework (SPF) and the Seven Strategies for Community Change. These frameworks acknowledge that environmental contexts impact the risk of youth substance use.

An estimated 57 million (18-percent of the U.S. population) lived in communities served by DFC coalitions receiving funding in FY 2019. This included approximately 2.3 million middle school students ages 12 to 14 and 3.2 million high school students ages 15 to 18. As demonstrated by the National Cross Site Evaluation, DFC funded community coalitions are effective in reducing youth substance use. Across all DFC coalitions ever funded, past 30-day use of alcohol, tobacco, marijuana, and prescription drug misuse among middle schoolers declined by 25-percent, 34-percent, 13-percent, and 10-percent respectively from 2002 to 2020. High school past 30-day use of alcohol, tobacco, marijuana, and prescription drugs declined by 21-percent, 31-percent, 7-percent, and 28-percent respectively. All reductions in past 30-day prevalence of use for this sample were significant.

In addition to the substances listed above, almost all currently funded DFC coalitions have identified opioids—including prescription drugs, heroin, and synthetic opioids like fentanyl—as one of their top five substances of focus. Source: Drug-Free Communities Support Program National Cross-Site Evaluation, End-of-Year 2020 Report.



**D. Ensure guidance for the safe disposal of unused prescription medication is consistent across the interagency to support communities across the country.**
*(Agencies Involved: DOJ/DEA; EPA; HHS/CDC, FDA)*

Prescription drug misuse, the consumption of prescription medication inappropriately such as taking prescription medication not prescribed to you or taking prescription medication in a way other than prescribed, remains a significant problem for communities across the country. The 2020 National Survey on Drug Use and Health estimates that approximately 9.3 million people misused prescription pain relievers, 5.1 million people misused prescription stimulants, and 6.2 million people misused prescription tranquilizers or sedatives in 2020.[115] The availability of prescription medications found in the home and the misconception that because these medications are prescribed they are therefore safer than illicit substances, increase risk for youth substance use. The Drug Enforcement Administration's (DEA) National Prescription Drug Take-Back Initiative (NTBI) affords communities the opportunity to raise awareness about the dangers of having unused or expired prescription medications easily accessible to youth, and the need to safely secure drugs in the home. As a complement to DEA's NTBI, FDA's Remove the Risk campaign helps communities understand the important role they play in removing and properly disposing of unused prescription medications when a take back location is not immediately available. Consistent guidance around safe and environmentally responsible disposal methods to remove unused medications from the home is needed. This action is necessary to reduce availability and prevent misuse of these dangerous substances by youth and young adults.



# Harm Reduction

Harm reduction is an approach that emphasizes working directly with people who use drugs (PWUD) to prevent overdose and infectious disease transmission, improve the physical, mental, and social wellbeing of those served, and offer low-threshold options for accessing substance use disorder (SUD) treatment and other health care services. In the context of the nation's overdose epidemic, the Office of National Drug Control Policy (ONDCP) currently defines harm reduction as a public health approach designed to advance policies and programs for PWUD, based on the principles of Care/Support/Connect/Respect. For additional background on this, please see text box on Defining Harm Reduction Principles, page 32. A comprehensive harm reduction program consists of initiatives and measures aimed at mitigating the adverse public health and social consequences of drug use, which are an integral part of a continuum of care. The programs must be evidence-based and person-centered.

Policy and program changes are required to reach PWUD—central to this effort must be increased adoption of a harm reduction approach. As was highlighted by the bipartisan *Commission on Combating Synthetic Opioid Trafficking*, harm reduction programs not only offer protection from elevated risks posed by today's drug supply, but often serve as points of entry for long-term treatment.[116] Harm reduction programs build trust and engagement between outreach workers, including peers with lived experience, and PWUD. These individuals, including people experiencing unstable housing or homelessness, are at high risk of overdose and of contracting or transmitting infectious diseases, such as hepatitis B, hepatitis C or HIV, and can benefit from harm reduction services to improve their health, build linkages to physical and mental health services, and provide low-threshold, flexible opportunities to initiate substance use disorder treatment.

Not all of those who use drugs have SUD, which is a chronic medical disease that is driven by a host of biological and environmental factors. However, for many PWUD, whether they have been formally diagnosed with an SUD or not, regular substance use is difficult to stop, even when negative consequences mount. These individuals are often caught between substance use that both fuels and impedes their daily life and a health care system that lacks the engagement capacity to meet them where they are and fails to engage them in health and social services.

According to the 2020 National Survey on Drug Use and Health (NSDUH), the vast majority of the over 40 million living in the United States who need treatment for SUD are not currently receiving addiction treatment services.[117] This means that while some with SUD, as well as the larger group of PWUD, seek and receive care, there are far more who have not yet received the support they need. The reason why most of those with SUD have not received treatment is that they did not seek it. Harm reduction programs have the potential to proactively reach out to these individuals and offer them the level of care they are ready to accept. Many people with SUD also face stigma from public and health care professionals which may result in hesitation to seek treatment.[118] PWUD are at increased risk of fatal overdose, particularly from knowingly or unknowingly consuming substances containing illicitly manufactured fentanyl and its analogues. Early interventions are necessary to provide harm reduction services and offer treatment and health services to prevent loss of life.

Harm reduction programs enable PWUD to access services which reduce overdose risk and enhance health and safety. Trust developed between harm reduction outreach workers and PWUD often facilitates a range of potentially life-saving options including adequate supplies of



naloxone, sterile injection supplies such as syringes, and fentanyl test strips (FTS); linkage to evidence-based treatment, including medication for opioid use disorder (MOUD); screening for HIV and Hepatitis C infection; and access to health and social services that address social determinants.

Research shows harm reduction programs produce results. For example:

- People who use heroin and others who inject drugs who regularly utilize a syringe services program (SSP)—which provide sterile syringes and other health and social services—are five times more likely to initiate SUD treatment, compared with those who have never used an SSP.[119]

- SSPs can be effective platforms to motivate people with opioid use disorder (OUD) to enroll in substance use treatment and, over time, to reduce drug use and number of drug injections—according to a local study.[120]

- Expanded buprenorphine treatment and linkage to social services have been identified as major contributors to the success of a Philadelphia SSP.[121]

- SSPs have also been shown to substantially reduce HIV and Hepatitis C infection among people who inject drugs.[122]

- In addition to saving lives and improving health, harm reduction programs that include providing clean syringes and medications for OUD—are highly cost-effective, both when these services are provided separately and even more so when combined.[123]

- Using FTS and receiving a positive test result has been associated with changes in drug use behavior and perceptions of the risks of an overdose.[124]

- Analysis also indicates that distribution of naloxone to counter the effects of an opioid overdose not only saves lives but also produces a significant return on investment.[125]

We must continue to conduct research on the optimal ways to deliver, expand, and continuously improve the health of PWUD, especially through supporting and evaluating harm reduction programs. With an increase of public health resources being committed to support harm reduction programs, there is opportunity to evaluate current approaches and offer recommendations for improving services in collaboration with PWUD and the programs that support them. Harm reduction programs are vital, as they provide resources and connection to people who are at highest risk for overdose and poor health outcomes, including conditions often associated with injection drug use such as blood-borne diseases and heart conditions (such as endocarditis).[126] The types of interventions proposed in this chapter, such as SSPs, distribution of naloxone, FTS, and expanded opportunities to initiate low-threshold treatment with buprenorphine (e.g., without preconditions of any kind[127]) will save lives, improve health, and likely have a favorable economic benefit to society.



## ONDCP's Guiding Principles on Harm Reduction

Research and experience have shown how and why harm reduction approaches are effective. The following principles are integrated into harm reduction programs.

**1. Care.** Staff and peer outreach workers must support individuals in accessing the care they need and to overcome obstacles. This can include: naloxone and overdose prevention strategies and tools; sterile syringes and other injection equipment; medications for opioid use disorders and other SUD treatment; and physical health and mental health services. Entry into different types of low-threshold group support and mentoring relationships, including through peer workers, also must be supported.

**2. Support.** Ongoing support is often required after harm reduction or SUD treatment services are initiated. People who are in SUD treatment or have completed an episode of substance use disorder treatment may resume or continue to use substances. This can be addressed through ongoing support provided by harm reduction programs, or other evidence-based interventions. Substance use should not be a reason for punishment or to limit access to health or social services. PWUD accessing services through harm reduction organizations also need access to housing, nutritious food, education or training, and employment.

**3. Connection.** PWUD, especially those who inject drugs, those who are experiencing homelessness, or those who experience social marginalization, must have regular access to harm reduction services and the opportunity to connect with staff or volunteers—without preconditions. All PWUD in the United States deserve the opportunity to forge a personal connection with a caring non-judgmental individual as part of receiving health and social services. PWUD deserve support not just in reducing drug or alcohol use, but also in improving any aspect of their lives they want to work on.

**4. Respect.** PWUD are often in psychological or physical pain. They are generally aware of the negative consequences of their substance use on themselves and others, including family members. This knowledge can cause shame, despair, and embarrassment and create additional obstacles to treatment entry to someone who wishes to do so. Research finds that individuals who have a voice in when and how they will receive help, who establish their own harm reduction, treatment, or recovery goals, and who are treated with respect, dignity, and a recognition of their autonomy, are more receptive to receiving help and achieve better outcomes.

# Principle 1: Integrating Harm Reduction into the U.S. Substance Use Disorder System of Care Is Necessary to Save Lives and Increase Access to Treatment

It is vital that the entire SUD system of care meet people where they are and offer individuals the help that will save their lives, improve their health, and enable them to access a full menu of prevention, treatment and recovery support services on terms they will accept. Harm reduction



services are an essential part of the continuum of care for PWUD and should be linked to SUD treatment and to the larger health care system.

**A. Federal harm reduction efforts to support state and local partners.** *(Agencies Involved: AmeriCorps; DOD; DOJ/OJP; HHS/CDC, HRSA, SAMHSA; USDA; VA/VHA)*

To address SUDs and related problems effectively, health care systems, including those in correctional settings, need to be comprehensive and complementary, with all key components adequately funded. Because it helps prevent overdoses, provides opportunities for low-threshold treatment, and creates pathways into other health and social services, harm reduction is becoming a critical part of the system of care. However, it remains underfunded[128] and even where there have been some program increases, there are still too many individuals and regions of the country[129] that lack basic harm reduction services such as access to low-cost, accessible, life-saving naloxone and FTS. Federal funding must continue to support comprehensive community-based harm reduction efforts, just as they must fund traditional brick and mortar treatment centers and office-based treatment for OUD (discussed in Substance Use Disorder Treatment chapter), recovery support services (discussed in Building a Recovery-Ready Nation chapter), and prevention (discussed in Prevention and Early Intervention chapter). Public health systems, which are supported by federal behavioral health grants, should collaborate with harm reduction organizations. These organizations work directly with PWUD, helping to keep them alive and safe, building trust and connection, and creating access points to treatment and recovery services that otherwise would not exist. Congress took an important step when it appropriated dedicated federal harm reduction funding through the American Rescue Plan. These ARP funds, comprising $30 million, should complement existing funding streams that support harm reduction services. States should also consider opportunities for braiding together federal funds with existing ongoing initiatives to enhance the impact of harm reduction programs. Further, it is necessary to build and sustain community-based organizational and service capacity that will scale high quality comprehensive harm reduction efforts. Agencies should review, and as necessary, update their strategic planning documents, grant programs, and training and technical assistance efforts to ensure that harm reduction approaches are appropriately emphasized in all of their SUD and behavioral health work.

**B. Ensure that harm reduction organizations have a plentiful supply of naloxone.** *(Agencies Involved: HHS/CDC, CMS, FDA, HRSA, IHS, SAMHSA; ONDCP; VA/VHA)*

To fully address the rising overdose death rates, it is imperative that the supply and distribution of naloxone is robust and continuous, without interruption. Although naloxone formulations and prices vary, they are an extremely cost-effective life-saving intervention. Harm reduction organizations, working on the frontlines of the overdose epidemic, need a steady supply of naloxone to ensure continuity of service. Similarly, first responders and law enforcement officers need a robust supply of naloxone to save lives. One international study suggests the need for 20 times as many naloxone kits to be publicly distributed as annual opioid-related deaths per year.[130] The Department of Health and Human Services (HHS) should assess and provide recommendations on how to address bottlenecks and increase state and local availability of naloxone, especially as distributed by harm reduction organizations and also including other supply chain



concerns, such as pharmacies that do not carry naloxone or make it easily and discretely accessible to PWUD and their family and friends.

**C.  Consider allowing coverage for harm reduction services.** *(Agencies Involved: DOD; HHS/CDC, CMS, HRSA, IHS, SAMHSA; ONDCP; VA/VHA)*

Public payers and private insurance companies could consider broadening coverage of harm reduction services. The Centers for Medicare & Medicaid Services (CMS) has approved Medicaid coverage for harm reduction services in New York State.[131] Although this effort is limited in scope, it demonstrates the potential to incorporate harm reduction as a public health approach at a state's option into the Medicaid program. Additional services could be considered for coverage. States may develop a comprehensive work plan for coverage opportunities for these critical services under Medicaid and Medicare, including steps to move this priority forward in the next year. Outcomes would surely be enhanced through consultation with harm reduction and public health providers and individuals with lived experience and their representatives to accommodate the unique challenges in developing a workable reimbursement/ billing approach. Covered services through harm reduction programs could incorporate direct services, care coordination, and managing transitions between different service providers. Critical services include: intake and comprehensive risk assessment; harm reduction counseling/ psychotherapy; client navigation; referrals; support groups; wellness services; peer training; opioid overdose prevention training; monitoring and follow-up; crisis intervention; reassessment; case closure; coordination activities; nutrition support; / wellness care; medication management; and supervisory oversight/ case-specific supervision. States may wish to consider services and supports to address social determinants of health, including housing, transportation, and job training as part of harm reduction. HHS could work to increase coverage of harm reduction related health care services, while protecting patient privacy. HHS should also make a special effort to bring these harm reduction services to Tribal and urban Indian communities.

**D.  Comprehensively assess current evidence base on harm reduction strategies, and develop a plan for additional translational research.** *(Agencies Involved: DOJ; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP; USDA; VA/VHA)*

There is a substantial evidence base[132] for the effectiveness and cost-effectiveness[133] of some harm reduction services, such as SSPs and naloxone distribution. Other strategies of engagement may be shown to be effective as research continues. Funders and service providers need access to more research about the harm reduction services that work well, and those that could be refined or adapted as they are delivered at the local level to meet the needs of specific communities. Research should include consultation with PWUD, as appropriate, in order to understand how to design programs that will best meet their needs and enhance their health. A focus must be on saving lives. Over the past five years there has been a significant expansion of naloxone distribution and utilization, nonetheless fatal overdoses have continued to increase. Research is needed to inform public health and public safety agencies how to best maximize the life-saving impact of naloxone through more robust and impactful individual and community distribution through pharmacies, health care providers, and community organizations of all kinds.

The National Institute on Drug Abuse (NIDA), in partnership with other federal partners, including the CDC, could convene a gathering of public health and harm reduction


researchers, practitioners, policy makers, and those with lived experience to chart out a "next generation" harm reduction research agenda that builds on the strong empirical foundation that exists for some interventions. This work can be aided by HRSA's Federal Office of Rural Health Policy. Critical to this effort will be concurrent work to identify and address barriers to research on harm reduction interventions, including statutory and regulatory impediments. The federal government should launch and study more harm reduction initiatives as a public health approach, and ensure that these efforts (and the evaluation of these efforts), which all involve working directly with people who currently use drugs, are not unreasonably impeded or constrained by laws, policies, or practices. The Department of Justice (DOJ) should continue to serve as an active partner in this type work by HHS and other federal partners in developing plans to ensure that this critically important research can go forward and legislative and other barriers to harm reduction research are addressed.

E. **Conduct a national harm reduction needs assessment.** *(Agencies Involved: DOD; DOJ/OJP; HHS/CDC, HRSA, SAMHSA; USDA/ORD; VA/VHA)*

There has never been a comprehensive national assessment of the country's unmet need for harm reduction services for PWUD. Harm reduction providers often struggle to meet the needs of the people they service due to resource limitations. Staff is generally underpaid and many programs rely heavily on volunteers. As programs scale up to meet the need, total staffing, as well as the capacity of the programs to provide a broader array of services, will have to grow as well. The challenge of adding to the harm reduction work force, with widespread demand for labor, can be mitigated by utilizing the millions of Americans with lived experience and providing them with training and mentoring. Data systems to support program delivery (as discussed below), while protecting patient privacy, are also under-resourced. Harm reduction initiatives provide an ideal platform both to initiate low-threshold treatment services, as well as to link people to treatment and recovery support service providers. SSPs, with additional resources, could potentially expand these efforts significantly and provide ongoing care coordination. Some states (e.g., New York,[134] Missouri,[135] and Washington[136]) have already established health hubs or other initiatives to provide harm reduction and low-threshold treatment services under one roof, a model ripe for studying and replicating. Organizations and agencies that provide peer support and health system navigation could be a part of this initiative. It will be critical to promote collaboration and avoid unnecessary duplication to the maximum extent possible. Federal agencies should assess the issue, conduct a national workforce study to provide an accurate picture of those now delivering harm reduction services, and project needs required to provide comprehensive high-quality harm reduction services wherever they are needed. This work should be completed in coordination with the National HIV/AIDS Strategy[137] and the National Viral Hepatitis Strategy.[138]

F. **Support harm reduction training and education for the treatment workforce.** *(Agencies Involved: AmeriCorps; HHS/CDC, HRSA, SAMHSA; USDA; VA/VHA)*

Current unmet needs for staffing harm reduction programs should primarily be addressed by recruiting and training new staff to serve as peer support workers and addiction counselors. In addition, many of those who work in existing treatment programs would benefit from short courses on harm reduction. In both cases, lived experience is an important asset in successfully doing this work. Because states currently certify peer



support workers under different systems an effort to develop a consistent approach and to allow for reciprocity agreement among states would provide increased flexibility and resilience to the workforce. HHS and ONDCP should engage on how to increase the availability and transferability of certification with state partners. A variety of training and academic programs can be updated, with the support of HHS, the Department of Agriculture (USDA), and VA, to more fully incorporate comprehensive harm reduction approaches into public health guidance or trainings they provide relating to PWUD. In addition, as the harm reduction work force grows, those trained in public health and traditional treatment methodology should receive short courses to supplement their pre-existing knowledge base. Many peer support workers are well-suited to work in harm reduction and can earn receive harm reduction and other relevant training as they continue to work as peers. Skepticism about harm reduction within the prevention, treatment field and recovery support services communities can be addressed through dissemination of science- and evidence-based practice and training materials, dialogue, site visits, and other appropriate mechanisms supported by HHS. All sectors of the SUD field would benefit from updated evidence-based knowledge regarding how and why harm reduction programs are reducing overdoses, addressing stigma, improving the health and safety of PWUD, and providing valuable new entry points to treatment. HHS operating divisions should integrate comprehensive harm reduction training into their work, in coordination with other federal partners, relevant NGOs, and technical assistance and training providers.

**G. Facilitate low barrier buprenorphine induction through harm reduction organizations.** *(Agencies Involved: HHS/CDC, HRSA, SAMHSA; VA/VHA)*

The emerging evidence suggests that harm reduction programs are well suited to initiate use of buprenorphine.[139,140] Because of the less formal setting of harm reduction programs, and the reality that some who initiate buprenorphine through an SSP may still be using drugs, specialized guidance should be developed by HHS. Buprenorphine was found to significantly reduces overdose risks in a local study[141] and improves health outcomes even if the patient is not fully abstinent.[142,143] Ideally, medication is supplemented by counseling and recovery support services. HHS and VA should consider

how to increase use of oral and extended-release injectable buprenorphine at harm reduction sites. Community-based harm reduction organizations are also well-suited to work with local public health departments, hospitals, emergency medical services (EMS), community health clinics, and law enforcement to follow up after non-fatal overdoses to initiate buprenorphine if individuals are not already engaged in an ongoing SUD treatment program. HHS agencies could incorporate clearer language on support for low-threshold buprenorphine induction in their notice of funding announcements for appropriate grant programs and work with harm reduction nongovernmental organizations, interested recovery community organizations, local public health departments and state drug and alcohol directors to increase the resources available for this important work, while tracking results with regard to overdose rates and retention in SUD treatment. Departments and agencies should work to incentivize research and clinical work around the field of harm reduction and substance use treatment in general. Federally funded provider and research supplemental reimbursement should be considered.



**The Promise and Challenge of Reimbursable Harm Reduction Services**

Harm reduction programs provide urgently needed health services and support to a vulnerable population and save money for governments by preventing disease transmission, lowering reliance on emergency room visits and hospitalization, and decreasing arrests, prosecutions, and incarcerations. Nonetheless, the nature of harm reduction work complicates standard reimbursement approaches and may require new mechanisms.

Building trust takes time and repeated contact. This is true both for individuals and within communities. Ways must be found to develop community-level partnerships, reimburse harm reduction organizations for this effort and to encourage program participants to accept care. In addition, some important interactions between PWUD and harm reduction staff can be very brief, while others can be quite lengthy.

Many SSPs may have never offered any health care services that could be billed to Medicaid. They can lack the infrastructure for Medicaid billing, comprehensive set of evidence-based harm reduction services or the sufficient volume of services/claims to build a self-supporting billing department or they may not operate a facility that is eligible for enrollment as a Medicaid provider. Part of making harm reduction programs sustainable is exploring reimbursement models that accommodate these challenges. Without this added support and infrastructure, it will be difficult for SSPs to develop into comprehensive, high-quality, sustainable services that promote PWUD health and safety. In addition, many harm reduction services are provided by peers, but those services provided by peers that Medicaid supports are reimbursed at lower rates.

Finally, the array of harm reduction billable services needs to be significantly expanded to benefit SSPs and their participants. Some services are not billable under Medicaid and CMS should explore changes and/or demonstrations to permit federal funds to support these services. An initial list of proposed services that could be considered for reimbursement is included in the Action Item on the next page. We note that although Medicaid support for SSPs and other harm reduction programs will be extremely important, these programs will also continue to require other federal, state, local, and private funds to fulfill their mission.

# Principle 2: Collaboration on Harm Reduction with Public Safety Agencies

Law enforcement can and should be an essential partner for harm reduction programs. For example, the North Carolina Harm Reduction Coalition, working with the Law Enforcement Assisted Diversion program (LEAD), has worked with police and sheriffs to redirect low-level offenders to community-based services, rather than incarceration.[144] Additional studies of LEAD supported initiatives find that these collaborations reduce criminal justice costs without negatively impacting public safety.[145] Critical to the success of pre-arrest diversion and deflection programs involving harm reduction programs is good communication and coordination between law enforcement agencies and program staff in order to identify appropriate cases for diversion and deflection based upon the fact-specific characteristics of each individual and situation.



**A. Conduct National-level dialogue on harm reduction with law enforcement associations.** *(Agencies Involved: DOJ/OJP; HHS; ONDCP)*

National law enforcement associations, as well as representatives of first responder organizations and state and local justice system officials, are critical partners for state and local communities in both increasing knowledge about harm reduction programs and policies and providing practical feedback about how to ensure harm reduction programs are collaborating effectively with law enforcement. Law enforcement agencies also have unique knowledge about drug markets that impact harm reduction work. This two-way dialogue is a critical element to ensure support for the further development of harm reduction initiatives to reduce overdoses and improve access to health services, while also ensuring that law enforcement officers can fulfill their public safety responsibilities. To a significant degree, the success of harm reduction programs depends on good working relationships with state and local law enforcement agencies. All Americans, whatever their background, deserve a fair opportunity to benefit from health services instead of punishment. Stigmatized populations and minority groups have often been denied access to compassionate alternatives to arrest and incarceration.[146,147,148] Voices from these communities need to be included in the development of initiatives that impact them. Dialogue at a national level between federal policy makers, law enforcement associations, and harm reduction organizations will help to strengthen positive relationships. These conversations at the national level should be designed to support and spur follow on harm reduction discussions with law enforcement and community groups at the state and local level since that is where so many critical public health and public safety decisions are made. ONDCP, in cooperation with the Office of Justice Programs (OJP), should convene a meeting about harm reduction with national law enforcement associations and advocacy groups and, based on the dialogue, produce a document for public release highlighting key principles to foster effective cooperation between law enforcement and harm reduction organizations that advance public health and public safety goals.

**B. Develop guidance on pre-arrest diversion and deflection to harm reduction programs.** *(Agencies Involved: DOJ/COPS, OJP; HHS/ASPE, CDC, HRSA, SAMHSA; ONDCP)*

State and local police departments and sheriff's offices are already critical partners with harm reduction organizations in many parts of the country. Officers often encounter individuals with SUD in their daily work, or in response to calls for assistance. When no arrest is made, officers are increasingly facilitating pre-arrest diversion or deflection into available programs when appropriate and without negatively impacting public safety. In order to produce the best outcome, referrals to service providers to the maximum extent possible should include a discussion between the individual and a clinician about what type of care is the best fit. The individual should have the opportunity to choose a harm reduction program. Often, the success of a harm reduction program in a community is directly related to the existing community partnerships, including those with local law enforcement officials. To foster this effort, law enforcement officers can help agencies identify best practices and appropriate criteria, in collaboration with public health and public safety agencies including DOJ and HHS, for referrals based upon a fact-specific



evaluation of the characteristics of the individual and situation without negatively impacting public safety.

**C. Support use of specialized case management for PWUD.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, SAMHSA; ONDCP)*

Recognized by SAMHSA as one of the eight principles of community-based behavioral health services for justice-involved individuals,[149] specialized case management (SCM) incorporates treatment, social services, and social supports that address prior and current involvement with the criminal justice system and reduce the likelihood of recidivism, which enhances public safety. SCM promotes collaboration in the delivery of effective SUD, mental health, and medical treatment, as well as recovery support and social services. Comprehensive assessments identify individual needs, strengths, clinical diagnoses, and corresponding levels of care. This information serves as the foundation for an individualized care plan devised with each client. SCM, originally developed by Treatment Alternatives for Safe Communities (TASC)[150] nearly 50 years ago, is a critical element for pre-arrest alternatives to incarceration or deflection through harm reduction programs. The clinical focus, client engagement and navigation skills, and the safety net it provides help to keep individuals from falling between the cracks. It also provides a partner for police departments making the decision to avoid an arrest. Funding for case management is available through HHS grants, as well as through the Medicaid program. The potential return on investment for these monies may be substantial, since programs that reduce incarceration can produce significant savings for counties and cities. HHS and DOJ should work to ensure their current technical assistance and grant programs support SCM in harm reduction settings and consult with providers and harm reduction organizations to determine if new guidance or initiatives are required.

**D. Reduce fatal overdoses through data-driven efforts to get naloxone to where it is most urgently needed.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP; VA/VHA)*

All PWUD need access to naloxone, since much of the drug supply (including stimulants such as methamphetamine and cocaine) now contain synthetic opioids. It is, however, especially urgent that a focused and comprehensive effort is made to get naloxone to those who are at the highest risk of a fatal overdose. This population includes those who: have previously had a non-fatal overdose; recently visited an emergency room for a drug related health problem; were just released from prison or jail and have a history of drug use; or have recently left a treatment program without completing the program. State and local public health and safety agencies must pool their available data and provide help to those that need better access to naloxone. These same data will reveal geographic areas with a pattern of overdoses where vulnerable populations may live. This knowledge can empower a much more efficient distribution of naloxone and can guide harm reduction programs' outreach. Federal departments, especially HHS and DOJ, should ensure their grant funds support these types of data-driven collaborations, as well as the collection and dissemination of best practices information. The experience of the Veterans Health Administration's Overdose Education and Naloxone Distribution Program[151] should inform this work. HHS should saturate geographic regions with high overdose rates with naloxone in order to experiment with dissemination models which ensure convenient, low cost, high volume access.



# Principle 3: Foster Changes in State Laws and Policies to Support Harm Reduction

Harm reduction programs reduce overdoses,[152] improve the health of PWUD,[153,154] and, as referenced in the chapter introduction above, increase treatment entry. Federal, state, and local agencies must identify obstacles to expansion of harm reduction programs and address them. Grantees cannot use most annual Federal funding to purchase syringes. However, grantees may use funding from Section 2706 of the American Rescue Plan ($30 million) appropriated to support harm reduction programs, including to purchase syringes. Sterile syringes are a critical function of SSPs and purchasing the syringes can be costly, especially for small programs with few resources. Often the need for sterile syringes draws PWUD into initial contact with health workers, providing an opportunity for programs to connect PWUD with other services, including low-threshold SUD treatment with buprenorphine.

In addition to ensuring better access to harm reduction supplies and services, there are other changes required to ensure harm reduction programs have what they need to help their participants. At a time when much of the U.S. supply of illicit drugs, as well as black-market prescription medications, contain deadly synthetic opioids such as fentanyl, PWUD are at a high risk of overdose. In order to keep people safe, it is necessary for states to update drug paraphernalia laws to allow for distribution of FTS. Further, harm reduction programs are strengthened when they are empowered to connect those they serve to stable housing, services, and resources to address challenges related to the social determinants of health. Further, because data analytics both help inform harm reduction workers who is at highest risk of overdose and assist in program management, tailored knowledge management systems are needed to support harm reduction programs, while protecting participant privacy.

A. **Work with states to strengthen and expand Good Samaritan laws.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP)*

Research studies conducted prior to the COVID-19 pandemic suggest there is a pattern of lower rates of opioid-related overdose deaths among states that have enacted Good Samaritan laws.[155] These laws can increase the likelihood that individuals will call 911 to seek medical assistance when they see an overdose. However, not all of these laws are equal; they differ, for example, in which offenses they cover and the level of protection they offer. While some state laws provide full criminal immunity from arrest, charges, and prosecution for those who contact law enforcement to prevent a fatal overdose, others mandate criminal charges. In some places, without such explicit protections, health service providers who seek to disseminate sterile syringes and work closely with PWUD are unable to operate an SSP, or must operate in a very limited fashion in order to avoid criminal prosecution. In order to establish a science-based, public health approach to reducing overdose deaths and the transmission of disease via injection drug use, Good Samaritan laws should be expanded, promoted, and fully utilized to protect harm reduction program staff—working every day to save lives—from inappropriate entanglement with legal systems. ONDCP should work with DOJ and HHS to assess current state Good Samaritan laws, develop best practices and work to educate law enforcement and the public about the laws. Research from a local study indicate that even PWUD who do live a state with strong legal protections sometimes do not know that they will not be arrested[156] if they report an overdose. Thus, it is equally important for federal


agencies to provide technical assistance to states on development and implementation of strong laws, and to make sure PWUD know about how they are protected.

**B. Address obstacles to the expansion of drug checking, syringe services programs, and buprenorphine induction at harm reduction programs.** *(Agencies Involved: DOJ; HHS; ONDCP)*

Federal and/ or state restrictions on urgently needed supplies for harm reduction programs (including syringes, drug checking equipment and oral and injectable treatment medications) impair program effectiveness, impose unreasonable burdens on harm reduction programs, and limit their ability to serve a vital public health function. These harm reduction programs work with a population facing serious threats to their health and safety and can benefit from increased access to syringes or other equipment, such as mass spectrometers[157] that can detect potentially deadly fentanyl in drug supplies, puts lives at risk. The use of FTS is becoming increasingly common. For example, in Massachusetts and Maine, 21 police departments are participating in the One2One initiative which supports police officers and community partners in distributing FTS kits.[158] Many more people can be served and many more lives saved if restrictions are identified and eliminated. In addition to updating Good Samaritan laws (as highlighted above), federal agencies need to examine current drug-related laws, policies, and grant and research programs, to better integrate harm reduction. HHS should review its substance use programs department-wide to identify policies or practices that may impede SSPs and other harm reduction services and studies. ONDCP will work with federal partners to identify obstacles to the safe, legal, and efficient operation of harm reduction programs and develop proposals for consideration.

**C. Promote access to services and supports addressing social determinants of health for those receiving harm reduction services.** *(Agencies Involved: AmeriCorps; DOD; HHS/CDC, HRSA, NIH, SAMHSA; HUD; USDA; VA/VHA)*

Emerging evidence indicates that social determinants of health impact outcomes for PWUD.[159] This may be especially true for people experiencing unstable housing or homelessness and who have had repeated encounters with law enforcement. Access to nutritious food, showers, lockers, laundry, transportation, communications, social activities, employment and education are also valuable. Harm reduction outreach workers know the clients they work with, what their challenges are, and which services they could benefit from. Empowering harm reduction staff to connect people they serve to appropriate assistance helps to further build rapport between client and program staff, create opportunities for treatment initiation, and foster improved health outcomes. HHS should collect and disseminate emerging evidence on the intersection of harm reduction, social determinants of health and substance use outcomes, and identify promising public health practices. SAMHSA should collaborate with CDC to encourage grantees to address social determinants to improve the health and treatment engagement of PWUD, emphasizing the importance of consolidating an array of evidence-based practices and services to enable "one stop shopping." NIDA and CDC should support research in this area.

**D. Identify knowledge management tools and conduct implementation science research to foster efficient delivery of harm reduction services while protecting privacy.** *(Agencies Involved: DOJ; HHS/CDC, NIH; ONDCP)*



Harm reduction programs face significant challenges staying in touch with those they serve, delivering requested services and supplies, maintaining engagement, and following up. A variety of communications and data management tools should be available to harm reduction programs to facilitate sustained service delivery and to help build connectivity between program and participants, while allowing for the creation of privacy protected records, to ensure people do not 'fall through the cracks' due to staff turnover or changes in behavior patterns by PWUD. Analysis of emergency and social service utilization (e.g., contacts with hospitals, EMS, or law enforcement) may aid programs in identifying and proactively reaching out to those at high risk of overdose. As always with harm reduction programs, all services are voluntary and at the discretion of the person seeking services. However, it is critical to recognize that the person being served may be suffering from addiction, a chronic brain disorder. Therefore, proactively checking in on a person, expressing concern and encouraging them to drop by a mobile clinic, or offering naloxone and support services can save lives while still fully respecting the autonomy and agency of PWUD. New innovations in connecting to PWUD, through street outreach and distribution of supplies, developed during the pandemic should be made permanent. Federal agencies should develop and disseminate data management practice guidelines that help harm reduction staff provide services while protecting the privacy interests of patients. HHS, DOJ, and ONDCP should consult with data science experts in government, non-profits, and the private sector to identify the most effective tools and approaches to put them in the hands of those working in direct service to reduce overdoses and improve the health and safety of PWUD. This work should inform the publication of guidance documents, the provision of technical assistance and the updating of substance-related grant guidance by DOJ, HHS, and ONDCP to ensure such technological support is an allowable use for federal funds.

# Principle 4: Support Partnerships on Harm Reduction

Key partners in public health, other SUD system and drug policy stakeholders may have important questions, as well as insights and suggestions for harm reduction administrators and staff. ONDCP will seek to foster dialogue, surface key issues, and use what is learned to both enhance mutual understanding, improve communications strategies, and to identify additional opportunities to better meet the needs of Americans impacted by SUD.

A. **Consult with experts on harm reduction.** *(Agencies Involved: DOJ/OJP; DOS; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP; VA/VHA)*

Given that the majority of people with SUD are not engaged in treatment, harm reduction is a valuable and under-utilized public health tool. It is critically important to identify ways to better integrate harm reduction services with other health initiatives, to continue research and data collection, and to further improve existing harm reduction initiatives. ONDCP, in collaboration with other agencies listed above will seek, through ad hoc meetings and exchanges, to learn from the experiences of federal, state, and local officials and harm reduction organizations to ensure we understand the state of harm reduction programs today around the country and the challenges they, and their partners in government face.


**B. Facilitate increased dialogue among prevention, treatment, public health, and harm reduction communities.** *(Agencies Involved: DOJ; HHS; ONDCP)*

Dialogue between groups and individuals with different perspectives can identify areas of common ground and potential options for improved collaboration. People with SUD often move back and forth between harm reduction programs and SUD programs. Dialogue between administrators from both groups can make this experience smoother for program participants, wherever they are provided. During the overdose epidemic, a range of health and social service providers, peer recovery support organizations, first responders, and hospitals launched innovative pilot programs. The last five years have seen the expansion of recovery community organizations and a variety of treatment providers engaging with PWUD at different stages of their SUD and recovery journeys. At the same time, the connectivity between incarceration settings and behavioral health providers is growing. These experiences should inform the dialogue. ONDCP, HHS, and DOJ should organize discussions between harm reduction, treatment, and recovery groups and disseminate principles highlighting where common ground was identified.

> *"Abstinence isn't wrong, and it is a deeply desired goal for many drug users, but there are changes a person can accomplish whether they stop using or not. The hallmark of harm reduction models is a combination of respect for the customer, non-judgmental stances, compassion, empathy and practicality."*
>
> —Edith Springer[1]
>
> Springer E. No. 15 - Winter 2003, Harm Reduction Communication. Issuu. https://issuu.com/harmreduction/docs/hrc_2003_winter_editedtoc. Published January 1, 2003. Accessed September 2, 2021.

**C. Encourage the coordinated use of federal grant funds for harm reduction.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, SAMHSA; ONDCP)*

Many harm reduction services are eligible for federal funding through states. However, most states have, to date, dedicated only limited amounts of their prevention and treatment federal grant funds to SSPs and other harm reduction initiatives. There may be obstacles to such funding, such as record-keeping or other federal or state laws that impede distributing grant funds to harm reduction organizations. HHS and DOJ should identify and address federal barriers and issue guidance to improve comprehensive community-based harm reduction programs' access to federal grant funds, including for health screening and linkage to care not just for SUD treatment both for any identified health issue. Further, HHS and DOJ should review existing technical assistance and training programs to ensure that they have the expertise and capacity to serve those interested in expanding comprehensive harm reduction services, including both non-profit groups and state and local agencies. HHS should also assess how to better understand the share of federal grant funds that are dedicated to harm reduction.

**D. Consult with international partners on harm reduction programs.** *(Agencies Involved: DOS; ONDCP; USAID)*

In addition to the important work and research conducted inside the United States, the international community has learned much about harm reduction initiatives over the past two decades or more. It is important to highlight that just as within the United States



there is a wide range of variation in defining what is described as harm reduction, this is also true internationally. Some countries have a strong public posture against harm reduction, yet may widely distribute naloxone. Although U.S. laws and traditions may differ from those of international partners, consultations with those partners and a review of the research literature associated with their efforts can inform the development of U.S. programs, including by identifying barriers to program expansion and fair and equitable access to services. The United States should learn what we can from the successes and challenges associated with developing and sustaining international harm reduction initiatives. The Department of State, ONDCP and HHS should collaborate on a consultation process to hear the views of international partners and share existing international resources as appropriate.



# Substance Use Disorder Treatment

According to the 2020 National Survey on Drug Use and Health (the National Survey),[2] 40.3 million people aged 12 or older had a past-year substance use disorder (SUD).[160] Among these, 70.3-percent (or 28.3 million people) had a past year alcohol use disorder, 45.7-percent (or 18.4 million people) had a past year illicit drug use disorder, and 16-percent (or 6.5 million people) had both an alcohol use disorder and an illicit drug use disorder.[161] This survey also shows that, in 2020, among the 41.1 million people who needed treatment only 2.7 million (6.5-percent) of received treatment received treatment at a specialty treatment facility in the past year.[162] This disparity in unmet needs of SUD is known as the "treatment gap."

Substantial federal funding in recent years has expanded and improved treatment services; however, access to diagnostic and treatment opportunities do not exist in the same manner that they do for other chronic illnesses (e.g., the rate of undiagnosed diabetes is about 39-percent).[163] Research shows that more than 95-percent of people identified in the 2020 National Survey as meeting criteria for SUD who did not seek treatment felt they did not need treatment.[164] Another 3-percent of those individuals thought they should get treatment but did not try to get it.[165]

SUDs including alcohol, prescription and illicit drug use disorders are medical conditions[166] that respond to evidence-based treatments (EBTs).[167,168,169] EBTs have scientific evidence supporting the effectiveness of the treatments, and may be pharmacotherapies, such as methadone (for opioid use disorder, or OUD) or naltrexone (used for both OUD and alcohol use disorder), or evidence-based therapies, such as contingency management. It is clear that if we were to appropriately screen, diagnose, and treat individuals with SUD similarly to chronic conditions we would be able to significantly reduce mortality and several aspects of morbidity associated with substance use. As such, the more people who are treated, the fewer lives will be lost. Treating more people who have SUD is one of the highest drug policy priorities.

Certain factors are associated with an elevated risk of overdose for people with cocaine, methamphetamine, other stimulant, or OUD (or a combination of these) such as experiencing homelessness,[170] injecting drugs,[171] having a prior history of non-fatal overdose,[172] using non-prescribed benzodiazepines,[173] and detoxification without follow-up medication treatment (in people who use opioids ).[174] Additionally, overdose is the highest risk factor for death among people leaving incarceration.[175,176] Geographic and other barriers to accessing services can confer vulnerability and even differ based on race.[177] Studies have shown racial disparity in naloxone prescribing and delivery is a health inequity that must be addressed.[178] Treatment for high-risk populations is especially important. Evidence-based treatments have been shown to reduce overdose risk and mortality.[179] However, people of color, pregnant people and individuals with children may find it difficult to access or complete treatment due to the barriers erected by some social determinants of health.[180,181,182] Pregnant and postpartum individuals experience additional barriers given the lack of integration between OB/Gyn care and SUD treatment. Some individuals live in treatment deserts without any treatment at all or with treatment too distant to be accessible via available or affordable transportation.[183] Finally, while the recent overdose epidemic began as a problem predominately in White people related to the oversupply of prescription opioids, overdose rates have begun climbing in people of color.[184,185]

---

[2] These numbers do not include people in institutional settings like prisons, jails, dormitories, or hospitals, and they also do not count individuals who are experiencing homelessness, leading to an undercount of people who may benefit from treatment



Neighborhoods with smaller White populations may have less access to certain treatments (e.g., buprenorphine).[186] Other underserved areas include rural counties, Tribal communities, and states that thus far have chosen not to expand Medicaid.[3]

EBTs can improve outcomes but are not as widely available as they need to be.[187] Research has shown that for OUDs, the U.S. Food and Drug Administration (FDA) approved medications most effectively reduce overdose mortality, increase abstinence, and improve quality of life.[188] Research with office-based buprenorphine has shown that adding additional behavioral therapy sometimes does not improve outcomes.[189,190] For OUDs related to prescription opioids, research reported that medicine managed by a prescriber can produce abstinence outcomes as good as medication plus a very robust psychosocial evidence-based treatment.[191] Recognizing the overall effectiveness of FDA approved MOUD, they should be accessible to any individual with an OUD regardless of the availability of, or their willingness to participate in, additional therapy except where that participation is mandated by regulation.

People with SUD often face prejudice, stigma, and discrimination, and this especially affects Black individuals.[192] Stigmatizing attitudes towards drug use and people who use drugs (PWUD) exist throughout our society, including in health care.[193] One study found that PWUD were discouraged from accessing medical care because they do not trust health care providers to maintain their privacy from law enforcement.[194] We must continue to ensure privacy protections for people in treatment while removing stigma in health care to enhance patient engagement in treatment.[195,196] Systems engineering and behavioral health research suggest that a focus on validation and elements of process improvement science are critical for engagement in treatment.[197,198,199]

Research shows that people with SUD are viewed more negatively than people with physical or other mental disorders.[200,201] When the subject of a vignette was referred to as a "substance abuser" rather than as a "person having a substance use disorder," even highly trained SUD and mental health clinicians were significantly more likely to assign blame and believe that an individual should be subjected to punitive (e.g., jail sentence) rather than therapeutic measures.[202] Blame is counterproductive because many factors other than individual decision-making impact whether a person tries a drug or develops SUD. Adverse Childhood Experiences (ACEs), like growing up in a home with a parent with SUD increases the risk for developing SUD.[203] To increase the number of people in treatment, societal attitudes towards people with SUD must change. The U.S Preventive Services Task force recently recommended screening adults for unhealthy substance use as a Grade B recommendation.[204] Members of the health, child welfare and justice systems should receive training to recognize SUD as a medical condition like diabetes or cancer. Practitioners and support staff should receive training to serve these individuals. Finally, attitudes more broadly about people in need of treatment can change but this likely only will happen if individuals feel safe to speak up.

Treatment is effective and an estimated 23 million people in this country are in recovery.[205] However, additional work is necessary to eliminate the unmet need for evidence-based SUD treatment. To meet the *Strategy*'s stated treatment goals, including increased access to quality treatment, reduced stigma, dedicated interventions for the most vulnerable, and a trained

---

[3] The Patient Protection and Affordable Care Act (ACA, P.L. 111-148, as amended) extended Medicaid eligibility to all adults under age 65 with incomes below 133 percent of the federal poverty level. However, the June 2012 National Federation of Independent Business (NFIB) v. Sebelius Supreme Court decision effectively made the expansion optional for states.



workforce are necessary. In addition, novel approaches such as the use of technology[206] to facilitate entrance and retention in treatment must also be supported. Federal agencies must support efforts nationwide to identify people most at risk of overdose, expand access to evidence-based treatments, improve reimbursement models, and build the workforce and infrastructure needed so more people can enter long term recovery.

## Principle 1: Improve Treatment Engagement by Meeting People Where They Are

It is imperative to find ways to identify and engage people with SUD into treatment that will benefit them. Medical practitioners routinely screen for and treat other conditions that have few if any obvious symptoms (e.g., diabetes), and SUD should be no different. Primary care providers should be at the forefront of screening for SUD. To do that they must be equipped to routinely screen, assess, and treat SUD. Technological supports (such as screening reminders) can be of help as providers incorporate and deliver such services.

Engagement opportunities in locations where people who use drugs (PWUD) spend time is essential. Hospitals, syringe services programs (SSPs, discussed in detail in the previous chapter), infectious disease clinics, and health departments are all ideal locations to conduct screening and improve engagement rates. People with SUD encounter law enforcement in multiple settings. Programs that partner with law enforcement to divert and deflect appropriate individuals away from the justice system and into treatment and prevent incarceration without negatively impacting public safety are important.

Making treatments more accessible for people with different needs is essential to increasing treatment engagement. For example, housing for people with SUD who are experiencing homelessness, or providing childcare for children of a parent in treatment may decrease barriers to treatment participation and ultimately help more individuals enter recovery.[207,208] Transportation is also a significant barrier to treatment, particularly in rural areas, where treatment services may not exist and individuals must travel distances for treatment but lack public or reliable transportation.

The "Treatment Cascade" concept suggests that the more individuals are successfully diagnosed, entering treatment and receiving tailored evidence-based treatment, the more people who will enter long term recovery.[209] Unfortunately, as the figure below demonstrates, the U.S. has gaps in these rates and needs to radically increase them starting with the percentage diagnosed.

AR2022_400757

Figure: Hypothetical substance use disorders cascade of care for US population 12+, 2020. SUD = substance use disorders[210],[211]



Source: SAMHSA, 2021

### A. Implement a national case-finding initiative. *(Agencies Involved: DOD; HHS/CMS, HRSA, SAMHSA; VA/VHA; ONDCP)*

A medical provider screening, assessing, and then recommending treatment to a patient especially coupled with feedback concerning the health effects and risks of ongoing use can raise awareness and motivation for change. All sectors should be involved including state, county and city health departments; clinics that offer testing for HIV/Hepatitis C and sexually transmitted diseases; crisis centers, emergency departments; and hospital trauma units. All patients who meet screening thresholds should have an assessment and efforts should be made to engage that patient in appropriate treatment. Agency principals should engage with national stakeholder organizations and establish this as a standard of practice, and all federal agencies that include providers who treat SUD should fully implement case-finding, assessment, and primary care feedback in their primary care patient population by 2024.

### B. Scale up primary care screening technology and computerized brief interventions to promote treatment entry. *(Agencies Involved: DOD; DOJ/BOP; HHS/HRSA, IHS, NIH; VA/VHA)*

During the COVID-19 pandemic many of us have gotten used to being screened for symptoms by providers at the start of medical visits. Use of screening including tech-enabled screening tools and non-judgmental brief interventions like the National Institute on Drug Abuse's (NIDA) "Video Doctor"[212] program and other technology assisted motivational interviewing (TAMI) tools can help screen people with SUD and may motivate some to attend treatment. These approaches may reduce the need to train providers to do screening. Approaches like these should be widely deployed.[213]Providers should link those who screen positive to substance use disorder assessment and then treatment if they have substance use disorders.



**C. Support engagement through "low-threshold" or "low barrier to entry" settings.**
*(Agencies Involved: HHS/SAMHSA; DOD, VA/VHA)*

"Low-threshold" programs that make it relatively easy to get started or participate in treatment can include hospital clinics, telemedicine treatment initiation, mobile methadone programs or other programs which do not require people to "jump through hoops" to start in care. Although drug use has been historically grounds for dismissal from some treatment programs, providers are learning that flexibility can be offered to accommodate a person who might be willing to stop opioid use but not all other drugs. Education about other drug use and the need to take precautions when using benzodiazepines and buprenorphine, for example, may be an area that a provider negotiates with a patient because the benefits of being on buprenorphine outweigh the risks of co-use. Agencies should review their policies to allow greater flexibility and site treatment access where people already live or spend time such as in health care for the homeless programs or in SSPs.

# Principle 2: Improving Treatment Quality Including Payment Reform

Ample research shows that people with cocaine and methamphetamine use disorder respond to specific psychosocial and behavioral treatments.[214,215,216,217] Also, research shows that the Food and Drug Administration (FDA) approved MOUD save lives[218] and can outperform treatment without medication.[219,220] Thus, they should be accessible to any individuals with OUD regardless of whether that individual has access to, or chooses to participate in psychosocial or behavioral treatment unless the behavioral treatment is required by regulation.

A number of policy barriers prevent access to the most efficacious treatments for SUD. To vastly increase the percentage of people needing treatment who participate in evidence-based treatment in a given year, it is important to make evidence-based treatment as accessible and available as primary care. It is also essential that we prioritize utilizing treatment dollars efficiently by recognizing treatment dollars are limited, but the need is vast. Wherever possible, inexpensive oral methadone and sublingual buprenorphine should be the backbone of our treatment system for caring for people with opioid use disorder, and selected far more often because of their relative safety, efficacy, and low cost.

In addition, approaches such as motivational incentives, which utilize tangible rewards to reinforce positive behaviors such as abstinence from opioids and to motivate and sustain treatment adherence in patients who suffer from SUD, should be more widely available. These incentives are an integral part of protocol-driven and evidenced-based contingency management programs and can be offered through smartphone applications and smart debit card technology designed to provide comprehensive and personalized treatment for SUD (including, for opioid, stimulant, alcohol, and nicotine use disorders). These programs include tools that enable, for example, automated appointment reminders and attendance verification, automated medication reminders, drug, alcohol, and tobacco/nicotine testing, self-guided cognitive behavioral therapy, and recovery coaching.

In addition, prescription digital therapeutics are software-based disease treatments intended to prevent or treat a disease that are regulated by the US Food and Drug Administration. For



example, one prescription digital therapeutic authorized in 2018 delivers cognitive behavioral therapy for individuals receiving buprenorphine for opioid use disorder. [221] Further exploration of such digital therapeutics and other health technology in the form of digital screening, assessment and treatment could help increase services for a wide array of patients.

Payment reform is also essential. Insufficient insurance coverage, provider reimbursement rates that do not cover activities required to sustain a practice, and non-compliance with federal parity laws requiring certain insurance plans to provide comparable coverage of physical and behavioral health services all may impact access to treatment as well as whether people can succeed in treatment. Research shows lower overdose rates in Medicaid expansion states.[222] Although the Substance Abuse Prevention and Treatment Block Grants (Block Grant) as well as new money from Congress through the 21st Century Cures Act and State Opioid Response (SOR) provide for certain services in all States (Medicaid expansion and non-expansion), these sources of funding do not replace the more comprehensive access to care through Medicaid which would otherwise be offered if all States expanded coverage via opportunities offered through the Affordable Care Act. Reform is needed so that those treating groups most at risk receive funding, and so providers can make a business case for treating more of these patients and for accepting insurance.

A. **Provide technical assistance and support to Congress to remove outdated requirements that limit access to MOUD.** *(Agencies Involved: HHS/FDA, SAMHSA; DOJ/DEA; ONDCP)*

The Office of National Drug Control Policy (ONDCP) will work with interagency partners to provide technical assistance and support to Congress in order to eliminate the outdated requirements and overregulation that prevents widespread use of buprenorphine products for OUD treatment by licensed medical treatment providers.

B. **Explore linkages to training on controlled substance prescribing to DEA registration or another prescriber requirement.** *(Agencies Involved: DOJ/DEA; HHS/FDA, SAMHSA; ONDCP)*

ONDCP will work with interagency partners to explore linkages to training on the use of controlled substances for both pain and addiction treatment by exploring options to either (1) require minimum training as part of the Drug Enforcement Administration (DEA) registration or (2) create a requirement for training through the Opioid Analgesic Risk Evaluation Mitigation Strategy (REMS), pursuing a legislative solution if necessary.

C. **Explore reimbursement for evidence-based motivational incentives such as contingency management, and explore emerging evidence for digital screening, assessment, and treatment (digital therapeutics).** *(Agencies Involved: HHS/ASPE, CMS; VA/VHA, DOD)*

Coverage for the provision of motivational incentives could be considered within health plans. This will require considering billing codes and setting reimbursement parameters. Coverage should be explored for the incentives themselves, as well as for the provider costs for administering them and the digital tools that help enable the treatment (including FDA-cleared and evidence-based approaches). Revisions to existing payment bundles could be assessed by the Department of Health and Human Services (HHS) payers to include these programs alongside MOUD and psychotherapy, as patients with OUD and other SUDs may need concurrent treatment. If needed, HHS, VHA, and DOD



should request authority from Congress to cover the costs of motivational incentives and reimburse providers who work with patients using incentives and digital services for contingency management.

**D. Incentive-Based Treatment using section 1115 Medicaid Demonstration Authority.** *(Agencies Involved: HHS/ASPE, CMS, NIH, SAMHSA)*

States may apply to the Centers for Medicare & Medicaid Services (CMS) for Medicaid section 1115 demonstration programs to test innovative programs that may not otherwise be eligible for Medicaid reimbursement.

**E. Treatment Navigation and Entry Assistance.** *(Agencies Involved: HHS/CMS, NIH, SAMHSA; ONDCP)*

Parents, caregivers, and family members may not understand how to access care. To help individuals navigate options, providers and health care systems can be helpful in making referrals. However, these services are often not reimbursable under most plans. Requiring primary care providers to be responsible for ensuring patients access care without reimbursement to support care coordination and management can result in referrals to treatment that patients do not ultimately access without a navigator to hand a patient off to a treatment provider. For these reasons, insured patient's insurance plans should take a more active role in treatment access navigation, and monitor this coverage by virtue of their awareness of in- and out-of-network participation by providers in their plans. Federal agencies and external stakeholders, including state governments and national organizations, should engage with insurance companies to discuss the increased involvement of insurance case managers to help patients navigate treatment options and arrange for care. Reimbursement for patient navigation services should be researched.

**F. Review Medicare reimbursement rates.** *(Agencies Involved: DOJ/ DEA; HHS/CMS,)*

The level of reimbursement can affect providers' decision to furnish services to patients covered under Medicare.[223] At least one study of commercial claims databases shows that psychiatrists receive lower reimbursement relative to other medical specialists in network but higher reimbursement when out of network for patients with private insurance.[224] Moreover, people with SUD may have more medically complex conditions that require more time and resources to treat. Standard reimbursement models centered around a 15-minute office visit may be unlikely to adequately reflect the resources needed for treating patients with SUD, many of whom have comorbid conditions, and few resources. The federal government should evaluate the most effective strategies for addressing concerns regarding reimbursement rates in order to encourage maximum participation among SUD treatment providers in health plans.

**G. Make methadone more accessible for patients in federal health care systems.** *(Agencies Involved: DOJ/BOP; HHS/IHS; VA/VHA)*

Many federal treatment providers are ineligible to offer methadone to treat their patients with OUD because they do not work in federally regulated opioid treatment programs (OTPs). However, these systems should be able to offer the full complement of medication to treat OUD. Federal health service providers should not be hampered by regulations meant for the public and private sectors, especially when federal departments have direct control over the health care professionals they employ. The Administration



should explore changes to the Controlled Substances Act to permit federal health service practitioners to offer opioid treatment with all forms of MOUD outside the OTP system.

**H. Review and update withdrawal management programs and policies to be followed by treatment programs and services.** *(Agencies Involved: DOD; DOJ/DEA; HHS/CMS, IHS, SAMHSA; VA/VHA)*

Research shows that withdrawal management programs (formerly referred to as a "detoxification" programs for OUD) can actually raise the risk of overdose death because the patient participates in treatment only for a short period of time, loses opioid tolerance, and is not protected by medication in the event of relapse.[225] Withdrawal management should never be considered a complete episode of care. If patients do not desire to be on maintenance medication, withdrawal should be managed according to standards of care using medications to help wean patients from the drugs on which they are dependent, and the patient should be transitioned to appropriate additional treatment services. Withdrawal management service provider should arrange for additional care as needed including scheduling appointments, arranging transportation and other "warm handoff" type of logistics arrangements, as well as overdose education and naloxone access. Agencies should review and update their policies to include these services in an effort to decrease fatalities associated with withdrawal management programs.

**I. Review and revise regulations to support low-barrier buprenorphine programs.** *(Agencies Involved: HHS/SAMHSA)*

Low-barrier to entry buprenorphine programs are controversial in part because they involve letting patients start treatment without complete abstinence from other drugs.[226,227] To help mitigate this risk, the regulations and guidance to providers for buprenorphine treatment outside of Federal Opioid Treatment Programs should be revised to address needed risk mitigation like issuing naloxone, educating the patient about the dangers of benzodiazepines, and recommending monitoring to prevent overdose.



**Veteran Health Administration's Contingency Management "Incentives" Intervention**

Contingency management interventions use incentives in the form of tangible goods or services for completing certain treatment related activities or for maintaining abstinence. They are among the most effective treatments for stimulant use disorder but they are rarely used outside of research settings.[1,2] The Department of Veterans Affairs supports contingency management (CM) incentive interventions by offering incentives linked to drug negative urine samples which patients enrolled in treatment can then spend in the VA hospital canteen.[3] To be effective at engaging patients with anhedonia, a condition of disinterest similar to depression that can occur following stimulants cessation, contingency management interventions should offer incentives at values shown effective in research trials or risk failure.. Much developmental research has been conducted on ways to decrease the overall cost of incentives while maintaining the effects and new models like prize drawing protocols have been shown to be cost-effective.[4] The VA is the first organization to implement this evidence-based treatment on a wide-scale. Its experience can serve as a model for other health care systems interested in using incentives to treat stimulant use disorder, particularly its training and supervision.

Sources:
[1.] Higgins ST, Kurti AN, Davis DR. Voucher-Based Contingency Management is Efficacious but Underutilized in Treating Addictions. Perspect Behav Sci. 2019;42(3):501-524. Published 2019 Jul 29. doi:10.1007/s40614-019-00216-z
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6768932/pdf/40614_2019_Article_216.pdf
[2.] Rash CJ, DePhilippis D. Considerations for Implementing Contingency Management in Substance Abuse Treatment Clinics: The Veterans Affairs Initiative as a Model. Perspect Behav Sci. 2019;42(3):479-499. Published 2019 Jun 26. doi:10.1007/s40614-019-00204-3
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6768930/pdf/40614_2019_Article_204.pdf
[3.] Petry NM, DePhilippis D, Rash CJ, Drapkin M, McKay JR. Nationwide dissemination of contingency management: the Veterans Administration initiative. Am J Addict. 2014;23(3):205-210. doi:10.1111/j.1521-0391.2014.12092.xhttps://www.ncbi.nlm.nih.gov/pmc/articles/PMC3986725/pdf/nihms507133.pdf
[4.] Olmstead TA, Petry NM. The cost-effectiveness of prize-based and voucher-based contingency management in a population of cocaine- or opioid-dependent outpatients. Drug Alcohol Depend. 2009;102(1-3):108-115. doi:10.1016/j.drugalcdep.2009.02.005 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2679219/pdf/nihms99385.pdf

**J.   Review and update opioid treatment program regulations.** *(Agencies Involved: DOJ/DEA; HHS/SAMHSA)*

Existing federal regulations for opioid treatment with methadone pose barriers like requiring people under 18 to "fail first" on non-medication treatment before starting methadone.[228] They also do not require overdose prevention education, access to naloxone, or training on naloxone's use. ONDCP is currently supporting a review of these regulations by an independent organization. Once that is completed, and if warranted and approved by the interagency, Federal Opioid Treatment Program regulations should be updated to permit safer and better access to methadone treatment for OUD, and to require overdose prevention education and naloxone training. Regulators should consider allowing methadone dispensing from pharmacies as is done in the United Kingdom because of their greater accessibility in most communities relative to OTPs.



# Principle 3: Supporting At-Risk Populations

To substantially decrease overdose deaths and the burden from SUD, we must strategically address the barriers for treatment among those groups that are most at risk for overdose deaths and other negative consequences. One example is individuals who are incarcerated or reentering after incarceration- a disproportionate number of whom are Black, Indigenous or People of Color (BIPOC).[229] Although it would be ideal to treat people before or, where appropriate, as an alternative to arrest, bringing treatment "behind the walls" is an underutilized opportunity to treat people with SUD.

Certain populations could benefit from treatment but it may be close to impossible for them to participate without first having met their needs for shelter, childcare, or other health issues resulting from drug use like overdose or infections. We also must continue to maintain strong privacy protections for people with SUD as we reform treatment so people who need care will attend without fear of shame, nor social or legal repercussions. Research has shown that people avoided treatment over concerns that providers might turn them into law enforcement.[230, 231] Pregnant people[232] and parents may avoid seeking care and assistance out of fear of being reported to child welfare.[233]

A. **Utilize federal grant mechanisms to support people most in need of treatment to include reimbursing for wrap around services.** *(Agencies Involved: DOJ/OJP; HHS/CMS, NIH, SAMHSA; HUD; USDA)*

The Substance Abuse Prevention and Treatment Block Grant and other relatively new grant programs provide money to states to offer payment to certain non-profit treatment providers to care for the uninsured or under-insured, as well as to implement prevention services. But treatment needs often extend beyond simply provider reimbursement and should include support and reimburse for wrap around services. The Administration should examine ways existing grant mechanisms may be better utilized to best serve people most in need of treatment through the provision of safe, child-friendly housing or by widening access to cover care of people who are incarcerated. Use of federal grant dollars by for-profit treatment providers who have significant capacity to provide services also should be considered as a more widely utilized option. Changes should consider availability of state Medicaid dollars, opioid litigation settlement dollars, and the behavioral health infrastructure so economically vulnerable and people with stimulant, opioid, and cocaine use disorders always receive evidence-based treatment and wrap around social support services.

B. **Expand mobile units for MOUD including to prisons and jails.** *(Agencies Involved: DOJ/BOP, DEA, OJP; HHS/SAMHSA; VA/VHA; ONDCP)*

The DEA recently published a rule entitled "Registration Requirements for Narcotic Treatment Programs with Mobile Components"[234] that enables OTPs to deliver MOUD treatment to clients who are unable to access brick and mortar OTPs nearby. States and federal agencies that have not been able to start their own OTPs should be encouraged to invest in these units so they may offer treatment with MOUD to incarcerated individuals and people with limited transportation options. ONDCP should encourage states to consider whether state laws concerning mobile units hamper clinic's ability to use this service so they may determine if changes are needed in the state.

AR2022_400764



**C. Arrange for treatment funding for people who are incarcerated.** *(Agencies Involved: HHS/ASPE, CMS, SAMHSA; DOJ/BOP)*

Currently by law, states generally[4] may not spend federal Medicaid dollars on health care for individuals who are incarcerated, under the "inmate exclusion." The federal government could convene an interagency working group to identify the best way to provide SUD services for people in state prisons and jails, and then work to advance policies that address the lack of access for SUD services for incarcerated individuals.

**D. Expand evidence-based treatment in federal prison.** *(Agencies Involved: DOJ/BOP, DEA; ONDCP)*

The federal prison system needs to expand its treatment programming so evidence-based behavioral therapy and all medications to treat addiction are available to incarcerated persons who use drugs. Choice of treatment should be based on provider and patient agreement, and medication access should not be contingent on additional therapy participation (as medication alone may be lifesaving). The federal government should work to help coordinate treatment options so the Federal Bureau of Prisons (BOP) may offer all evidence-based treatments, including all MOUDs approved by the FDA. It also should work to support individuals in its custody so that they may participate meaningfully in treatment, which may include providing MOUD, individual psychotherapy or counseling appointments in lieu of group counseling, or implementing other measures to enhance their privacy and confidentiality.

**E. Pilot methadone programs in federal prisons to leverage telemedicine and bureau of prison pharmacists.** *(Agencies Involved: DOJ/BOP, DEA; HHS/NIH; ONDCP)*

The BOP is a unique treatment environment because patients reside in prisons, and much of the practice of medicine in these facilities involves dispensing chronically-needed medication to patients on the premises under close observation. The BOP permits pharmacists to perform duties that advanced practice nurses and physicians complete outside of federal prison. However, these pharmacists are not allowed to store and dispense methadone to treat addiction. The executive branch could explore options to allow BOP pharmacists to dispense methadone prescribed by BOP physicians using telemedicine visit induction as an exception to the Controlled Substances Act statute requiring dispensing in OTPs.

**F. Arrange for treatment for people leaving incarceration.** *(Agencies Involved: DOJ/BOP, OJP; HHS/ASPE, CMS, HRSA, SAMHSA; VA/VHA)*

The Department of Veterans Affairs (VA) allows reimbursement for transportation to treatment for eligible veterans enrolled in the VA health care system. However, few other health programs, systems, or insurers provide a similar benefit. Having treatment available and transportation to that treatment upon release from incarceration is a common-sense way to help prevent overdose deaths among people leaving incarceration.[235] Case management to connect people to treatment and transportation upon release should be an allowable cost for program services reimbursement.

---

[4] The exceptions are that Medicaid dollars are available for an inmate experiencing an inpatient stay of 24 hours or more at a health care facility. See https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/sho16007.pdf



# Principle 4: Build the Treatment Workforce and Infrastructure

Government estimates suggest the nation's behavioral health, including the SUD, workforce will continue to experience staffing shortages,[236] and we need to address future workforce needs for several behavioral health occupations.[237] Racial disparities in health care utilization may be partially explained by the lack of providers of similar race and ethnicity as the populations being served.[238] Hiring diverse practitioners who reflect the people and cultures they serve is an important workforce issue.[239] Research has shown that PWUD may avoid health systems, particularly people who inject drugs,[240] because they are often treated poorly. Fear of discrimination and stigmatization discourages people with SUD from seeking care and compromises the care they receive when they do seek it. Training all health professionals about SUD as a medical condition could improve the health care experience for PWUD, and integrating health services into organizations frequented by PWUD could increase use of health services by this population.[241,242] As depicted in the HHS map[243] below (Exhibit 1), the majority of counties in the United States are experiencing shortages of mental health professionals. The second HHS map[244] below (Exhibit 2) highlights areas with low or no access to buprenorphine treatment for OUD at doctors' offices.

**EXHIBIT 1**          **EXHIBIT 2**

SUD treatment providers in criminal justice settings are also severely lacking. According to the Bureaus of Justice Statistics, in 2019 the US federal and state prison population was 1,430,800[245] and local jails reported about 734,500 inmates at midyear 2019.[246] According to the National Center on Addiction and Substance Abuse, this is a population in which an estimated 65-percent has an active SUD, most of whom go untreated.[247]

A. **Expand Certified Community Behavioral Health Clinics (CCBHCs) and SUD services in Federally Qualified Health Centers (FQHCs).** *(Agencies Involved: HHS/ASPE, HRSA, SAMHSA)*

Multiple points of entry to treatment in communities are required to increase access to treatment services. States should explore establishing additional Certified Community Behavioral Health Clinics in places with greatest need to ensure local 24-hour access to SUD treatment services or linkage to services. Federal agencies should work with stakeholders to raise awareness and help improve uptake of these services, including access for law enforcement drop off and referral. Also, Federally Qualified Health Centers (FQHCs), a core provider of health services to underserved populations, should



work to provide the full spectrum of SUD services. Federal agencies should work with stakeholders to raise awareness and help improve uptake of these services.

**B. Continue low-interest Federal loans for treatment program initiation in Rural Areas.** *(Agencies Involved: Treasury; USDA)*

Hospitals and treatment programs wishing to start or expand SUD treatment services programs in rural areas may need low-interest loans for brick and mortar expansion and program start-up funding. USDA Rural Development can provide support for infrastructure, equipment, and start-up costs for treatment services in rural areas through a variety of programs. Rural Development provides guaranteed loans through lenders to public bodies, non-profit organizations, federally recognized American Indian Tribes, and for-profit businesses in communities with populations of 50,000 or less through the Rural Development Community Facilities and Business and Industry Guaranteed Loan programs covered under the OneRD Guarantee Program. Direct loans and grants are available for government, non-profit, and tribal entities for projects in communities with populations of 20,000 or less through the Rural Development Community Facilities programs.

Other support for treatment services includes funding for equipment and startup costs for treatment and workforce development through the Distance Learning and Telemedicine Program in communities of 20,000 or less. Additionally, utilities can obtain zero interest loans from the Rural Economic Development Loan and Grant program to relend to local businesses to support projects that create and retain employment in rural areas with a population of 50,000 or less. Funding for hospitals and other types of care facilities are common uses of this program. Rural Development also administers the Delta Health Care Services Grant program that funds consortiums in the 252 counties and parishes in Alabama, Arkansas, Illinois, Kentucky, Louisiana, Mississippi, Missouri, and Tennessee in the Delta Region to develop healthcare services, health education programs, healthcare job training programs and the development and expansion of public health-related facilities. Additionally, the cooperative model provides a unique approach for healthcare and SUD treatment, and Rural Development provides both financial and technical assistance support for cooperative development. For example, the Rural Cooperative Development Grant Program offers grants to nonprofit corporations and institutions of higher education to operate Rural Cooperative Development Centers that serve communities with a population of 50,000 or less. The Socially Disadvantaged Group Grants Program also supports technical assistance to socially disadvantaged groups through cooperatives and Cooperative Development Centers serving rural communities of 50,000 or less.

With the variety of programs that can support treatment services and infrastructure, federal agencies should work with stakeholders to raise awareness and help increase use of these programs to support treatment services.

**C. *Prioritize Efforts to Build Capacity in the behavioral health workforce.*** *(Agency Involved: HHS/CDC, HRSA, SAMHSA)*

The Department of Health and Human Services should prioritize efforts to advance capacity building in the behavioral health workforce to be responsive to the increasing mental health and SUD workforce needs through programs that provide scholarships,



loan reimbursement, and fellowships in the behavioral health professions to increase workforce capacity. This should include continued support of the Addiction Medicine Fellowship program. All workforce recruitment efforts should be designed to address equity, diversity inclusion and accessibility.

**D.   Develop addiction curriculum for medical, public health, and nursing schools.** *(Agencies Involved: HHS/HRSA, SAMHSA)*

The Substance Abuse and Mental Health Services Administration (SAMHSA) and HRSA—in collaboration with the American Association of Medical Colleges (AAMC), the Association of Schools and Programs of Public Health, and the American Nurses Association—should establish a core curriculum on SUD studies for all medical, public health, and nursing schools so that every student is educated on SUD and has basic knowledge of strategies to identify, assess, intervene, and treat addiction, as well as support recovery. This will build on work started by AAMC in 2019 working with medical schools to develop core curriculum to advance educational content related to pain and addiction. To the extent practicable, HRSA should consider including this core curriculum as a requirement for schools applying for fellowships and grants for licensed practitioners.

**E.   Train nurses, psychologists, pharmacists and social workers to care for people with substance use disorders.** *(Agencies Involved: HHS/HRSA, SAMHSA; ONDCP)*

The federal government should work with leadership of these disciplines to request that they set goals for tracking their workforce's engagement in SUD treatment and training for it. These professionals engage with people who have SUD regularly. With training, nurses, pharmacists and psychologists who prescribe may also be in position to offer quality treatment—including MOUD—as part of workforce expansion although new authorities would be needed for these prescriber categories.

**F.   Examine models for office-based buprenorphine treatment to address financial disincentives.** *(Agency Involved: HHS)*

Research suggests some office-based buprenorphine models do not reimburse providers enough to make a business case for delivering care.[248] Research reinforces that persistent provider workforce barriers to buprenorphine provision include insufficient training and education on opioid use disorder treatment, lack of institutional and clinician peer support, poor care coordination, provider stigma, inadequate reimbursement from private and public insurers, and regulatory hurdles to obtain the waiver needed to prescribe buprenorphine in non-addiction specialty treatment settings.[249] The Administration should examine this research and consider developing models that improve incentives to provide care.

**G.   Extend telemedicine flexibilities across state lines.** *(Agency Involved: DOJ/DEA; HHS)*

During the COVID-19 pandemic, the DEA temporarily waived the requirements that providers be licensed in the same state as a patient whom they serve via telemedicine. Now, many providers offer treatment via telemedicine to patients who live nearby but in another state. However, at the end of the pandemic, this may change. Federal agencies should work with Congress to establish a mechanism with appropriate safeguards for providers to engage in controlled substance prescribing across state lines by telemedicine,



and address licensing and payment obstacles across state lines for professionals and paraprofessionals through federal guidance/oversight/incentives to encourage states to allow interstate licensing reciprocity which would require collaboration with states.

**H. Pursue opportunities to advocate for global capacity to respond to substance use disorders and related health needs by prioritizing training of the global drug prevention, treatment and recovery workforce.** *(Agencies Involved: DOS; HHS; ONDCP)*

Executive branch agencies should advocate through multinational organizations for increasing global capacity to respond to SUD and related unmet health needs including by prioritizing training of the global workforce consisting of drug prevention, treatment and recovery professionals. Federal agencies will work with international partners to finalize the development of a universal accreditation system, and encourage adoption of the international standards on prevention and treatment.



# Building a Recovery-Ready Nation

In 2010, the Substance Abuse and Mental Health Services Administration (SAMHSA) convened diverse recovery stakeholders to develop the following consensus working definition of recovery from mental illness and SUD: "Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential." Participants identified four major dimensions of recovery: home; health; purpose; and community.[250] These dimensions can be viewed as the four corners of the foundation upon which a life in recovery is built.

Because recovery is a process, and not an event, it generally begins before substance use is stopped, continues after the cessation of use, can be sustained through a return to use, and may accommodate reduced levels of use when these permit improvements in health, wellness, and functioning. Recovery is measured as a positive—by what it brings, including improved quality of life, a sense of self-efficacy and purpose, and improvements in social and emotional functioning and wellbeing. It is distinct from both abstinence and remission, which are measured by the absence of symptoms.

> Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential.
>
> - SAMHSA, 2010

Recovery may be best understood as the process of building recovery capital, the internal and external resources upon which individuals can draw to pursue, achieve, sustain, and enhance a life in recovery.[251,252,253] Examples of internal recovery capital include knowledge, coping skills, resilience, hope, and perseverance. External recovery capital includes assets such as family, a supportive community of recovering peers, treatment, mutual aid meetings (e.g., A.A., N.A., SMART Recovery, Women for Sobriety), transportation, housing, employment, and income. Discrimination, inequitable access to resources and opportunities, and social determinants of health all intersect with recovery capital and should be considered concurrently.

Americans follow diverse trajectories from SUD to recovery or remission. In 2020, an estimated 29.2 million Americans aged 18 or older reported a lifetime alcohol or other drug (AOD) problem. Of these, 21.2 million (72 percent) identified as in recovery or recovered from a substance use problem.[254] A national study found that, among people who reported having resolved an alcohol or other drug program, 45 percent participated in mutual aid groups, 28-percent had received treatment, and 22-percent had received recovery support services (RSS), including from recovery community centers.[255] A smaller percentage of participants in this study (46-percent) described themselves as "in recovery." These data suggest that it is critical not only to expand access to treatment, but to understand the diverse characteristics, trajectories and needs of those whose journey from addiction to recovery or remission does not include treatment. We must understand these trajectories and their intersections with various systems in order to identify engagement and other intervention opportunities and develop strategies to increase the percentage of Americans with SUD who achieve recovery, to shorten the duration and severity of SUD, and to save lives.

RSS can be instrumental in engaging individuals with SUD and helping them navigate the early stages of recovery. Non-clinical services provided to individuals with or in recovery from SUD, RSS are distinct from treatment and can be more flexibly sequenced and delivered. These services are most commonly provided by individuals who have lived experience of addiction and



recovery. When that occurs, these services are referred to as peer recovery support services (PRSS).

While clinical services are based primarily on the specialty training and expertise of the practitioner, PRSS are anchored in experience of SUD and recovery that is supplemented by training. Peer specialists work in diverse settings where they engage, link, and otherwise serve both those in recovery and those with active SUD, including overdose survivors and others with SUD in emergency departments, those who can be reached through inpatient hospital and primary care settings, and through SSPs, street outreach programs, mobile clinics, drug court programs, and elsewhere.

> Peers play diverse roles across systems, sectors, and settings, providing a vital connective tissue linking diverse points on the intervention continuum.

While they can be valuable components of clinical, medical, or other teams, when working through peer-led organizations such as recovery community organizations (RCOs), peers are not limited to serving the patients of a specific treatment provider, can serve individuals who are not in and have not received treatment, and are not limited by the length of reimbursable treatment episodes. Peer workers employed by RCOs provide a bi-directional bridge between formal systems (e.g., SUD treatment, health care, child welfare, or criminal justice systems) and community-based resources such as family, mutual aid groups, housing, employment, faith groups, and the broader recovery community. Across systems, sectors, and settings, peers play varied roles, serving as vital connective tissue linking diverse points on the intervention continuum.

Recovery takes place at the family/caregiver and community levels as well as the individual level. A recovery-ready community recognizes the unique humanity and potential contributions of every person affected by addiction, not only those who are currently in or seeking recovery. Such communities embark on a community-wide healing and recovery process reducing the toll of substance use and helping more of their members achieve recovery and become productive, contributing citizens. By building recovery-ready communities, schools, and workplaces, and by fostering increased public health/ public safety partnerships, we will build a healthier, more equitable, and more resilient nation. This is a key goal of Biden-Harris Administration drug policy in both the supply and demand reduction arenas.

We are steadily learning more about recovery's dimensions and diverse trajectories, how recovery relates to remission and abstinence, what kinds of RSS may be effective, and whom they may most benefit. However, our scientific understanding in this domain is still emerging. Targeted, actionable research is needed to inform policy and resource allocation decisions in the recovery domain.

Available scientific evidence suggests that common forms of RSS can be beneficial. For example, positive outcomes are associated with receipt of services through recovery community centers (RCCs), local peer service hubs that can serve as drop-in centers for people in or seeking recovery, and through which recovery coaching and other services are available. RCCs can offer a range of services, including relapse prevention, housing and employment support, social and recreational activities, and other services.[256] One study found that receipt of services at an RCC is associated with greater recovery duration and improved psychological well-being and quality of life. The authors noted that RCCs played a unique role that differed from those of treatment and mutual aid groups: They facilitated recovery capital acquisition, "thereby enhancing

AR2022_400771


functioning and quality of life." This study found that RCCs served people facing multiple challenges; nearly half of RCC participants had a high school diploma or less, close to half had an annual household income of $10,000 or less, over 80-percent reported use of multiple substances, and close to half reported a lifetime psychiatric diagnosis. Notably, participants often remained engaged with the RCC for an extended period of time and over 35-percent of study participants had been receiving services at the RCC for over one year with some having remained engaged over multiple years. [257] Given the chronic nature of SUD, this extended engagement—which is typically not attainable in treatment—is invaluable.

Evidence of the effectiveness of recovery coaching is also emerging. One study found that parents with SUD who were involved in the child welfare system and who were randomly assigned to receive recovery coaching were significantly more likely to achieve and maintain reunification with their children than parents randomly assigned to usual services.[258] Other studies found that recovery coaches benefit those they serve by improving relationships with providers and social supports,[259] increasing treatment utilization[260] and retention,[261] and reducing relapse rates.[262,263] Additionally, compared to a control group receiving treatment as usual, pregnant and post-partum people receiving services from a peer counselor in a treatment program were found to more strongly recommend the program at which they received services than members of the control group. They described their peer counselors as empathic, identifying them as the most helpful aspect of their treatment. [264]

> "The CCAR philosophy is that 'our tent is big enough for everyone.' We don't really pay attention to what your illness is, your drug of choice, your recovery support, the medication you may be on (or not on), etc. 'You are in recovery if you say you are' and you are welcome. Our thriving all-recovery groups support this notion. As a result, we have become an incredibly diverse organization."
>
> —Phil Valentine
>
> Source: https://doi.org/10.1007/978-1-60327-960-4_14

RCOs operate many, but not all, RCCs. RCOs lead or coordinate recovery-focused policy advocacy activities and recovery-focused community education and outreach programs and often provide PRSS—typically through one or more RCCs. Serving a broad recovery community that includes not only people in or seeking recovery, but their families, friends and allies, RCOs may be local or statewide. They share an overarching mission: mobilizing people and resources to increase the prevalence and quality of long-term recovery from alcohol and other SUDs. [265]

Ideally, the peers who staff RCCs should have the knowledge and skills needed to help individuals find and follow pathways to recovery that may differ from theirs. Connecticut Communities for Addiction Recovery (CCAR) captured this inclusive vision in one oft-quoted statement: "You are in recovery if you say you are."[266,267] This reminds peer workers that there are many pathways to recovery and that their role is not to judge, exclude, or promote a specific pathway, but rather to help those they serve find and follow a pathway that works for them.

Research on Collegiate Recovery Programs (CRPs) is limited, but is growing as well. As of February 2022, the association representing CRPs had over 150 members throughout the United States and one member in the United Kingdom.[268] A survey of 29 CRPs found that annual


abstinence rates among participating students ranged from 75- to 100-percent, averaging 92-percent. Across these sites, most CRP members had not used substances for several years, while 5 percent reported past month alcohol or other drug use. This is a much lower rate than is found among age group peers in the first year following treatment.[269,270] CRP members also have been found to have higher grade-point averages than the student population as whole.[271] For example, students participating in the Texas Tech CRP had a consistently higher average GPA from 2002 through 2005 than the student body as a whole, averaging 3.181 over that period compared to the overall average of 2.926.[272]

> A survey of 29 CRPs found that annual abstinence rates among CRP students ranged from 75 to 100-percent and averaged 92-percent. Across these sites, 5-percent of students reported past year alcohol or other drug use, a much lower rate than is found among youth in the first year following treatment. CRP members also have higher retention and graduation rates and higher grades than the student population as whole.

Additionally, research suggests that CRPs may be an effective marketing tool for colleges and universities. For example, 34-percent of CRP participants responding to one survey indicated that they would not have been in college were it not for a CRP and 20-percent reported that they would not have enrolled at their institution if it had not offered a CRP.[273]

Racial and ethnic minority students appear to be underrepresented in CRPs. The survey of 29 CRPs cited above found that 91-percent of participants identified as White.[274] An earlier study involving one of the 29 CRPs observed that 95% of CRP members were non-Hispanic Whites while 81% of the larger student body were non-Hispanic Whites. The authors hypothesized that the disproportionately low representation of minorities may reflect lower rates of access to treatment and to four-year universities due to historic inequities.[275]

Nationally, there are over 40 recovery high schools (RHS) in operation across 21 states as of May 2021.[276] Most RHS have licensed counselors or other clinical staff and require students to participate in mutual aid groups. Recovery high schools are small, with enrollment ranging from six to 50 students.[277] Some RHS have dedicated facilities and others share space as part of public high schools.[278,279] One study found that RHS students tend to reflect the racial and ethnic composition of the communities in which they



Finch, AJ. Recovery high schools growth chart: 1979-2021. Association of Recovery Schools. 2021. Retrieved at https://recoveryschools.org/rhs-growth-chart/

are located and have more risk factors for substance use and relapse relative to youth completing treatment locally who did not enroll in a recovery high school. These students also had more risk



factors than a national sample of their peers exiting treatment. RHS students also had higher rates of mental illness than members of both the local and national comparison groups. Additionally, they tended to have greater substance use problem severity than members of the two control groups.[280] Another study found that RHS students were more likely than age-group controls who had received treatment but were not enrolled in a RHS to be abstinent from alcohol and drugs and more likely to graduate from high school than members of the control group. The authors estimated that increased graduation rates associated with RHS attendance resulted in mean net savings per student from $16,000 to $52,000, a benefit-to-cost ratio of 3.0 to 7.2.[281] One study noted that young people of color often did not have access to treatment before enrolling in an RHS[282] and another suggested the RHS model could be well suited to serving Hispanic communities as the schools can be customized to meet local needs, such as reducing stigma, which was cited as an important barrier to help-seeking among Hispanics.[283] While small, the number of RHSs has been climbing slowly over the past 30 years as shown in the chart, above.[284]

Like an RHS, an Alternative Peer Group (APG) combines clinical and peer recovery support. APGs adopt a family-centered model, offering a supportive community of recovering peers and a broader positive social environment. They combine these with counseling and case management services.[285] APGs differ from RHSs in that they are community- rather than school-based. APGs are also small in number but growing. There were 24 established APGs in 16 states in 2019. At that time, 20 more were in development.[286] APGs can become key components of integrated youth service networks, linking with adolescent SUD treatment programs, RHSs, and other youth-serving organizations. While APGs incorporate many practices and elements associated with positive outcomes, effectiveness research is currently lacking.

Recovery housing is the most widely available form of recovery support infrastructure in the United States. In 2020, it was estimated that there may be more than 17,500 recovery residences nationally.[287] Research on Oxford Houses—rented homes jointly operated by residents who share a lease and other costs—found that residents who stay for six months or more are less likely to return to substance use than those who remain a shorter period of time.[288] A study of recovery residences found that residents achieved significant improvements in alcohol and drug use, employment, psychiatric symptoms, and criminal justice system involvement.[289] Further, an experiment in which participants with OUD were randomly assigned to usual care, abstinence-contingent recovery housing, or a combination of reinforcement-based treatment and recovery housing found that abstinence-contingent recovery housing was associated with higher rates of abstinence and that the addition of intensive reinforcement-based treatment (RBT) further improved outcomes.[290] A subsequent study with a similar population yielded similar results.[291]

Sustainable financing for PRSS is indispensable. While time-limited discretionary grants have been instrumental in initiating, expanding, or enhancing peer services and RCOs, reliable long-term revenue streams are essential to developing a sustainable RSS infrastructure. The Administration's call for an expanded Substance Abuse Prevention and Treatment Block Grant (Block Grant) with a 10-percent RSS set-aside, included in the President's budget, represents an important step in this direction. In addition, Medicaid—can play a role in funding PRSS, including in the context of accountable care organizations, chronic care models, and alternative payment mechanisms focusing on outcomes or values-based purchasing, which can offer flexible options for covering the cost of this service. Medicare may also be able to play a role in reimbursing PRSS.

AR2022_400774



Virtually all of our efforts to address substance use and SUD—from primary prevention and harm reduction, to law enforcement, treatment, and recovery support—are impeded, to a greater or lesser degree, by still pervasive stigma. A phenomenon most acutely experienced by people with SUD and those in recovery, stigma is a cross-cutting concern that requires significant coordinated efforts to address. The stigma associated with substance use manifests in many ways and intersects with a range of factors, including race, gender, and socio-economic status. Social stigma is embodied in negative attitudes and beliefs about substance use and people with SUD and can be reflected in discriminatory policies and practices based on or influenced by those negative attitudes and beliefs. When embodied in policies and practices that limit the opportunities, access to resources, and wellbeing of stigmatized groups, social stigma is sometimes referred to as structural stigma.[292] Finally, people with SUD apply the negative attitudes and beliefs reflected in social stigma to themselves, resulting in a phenomenon known as self-stigma. As this occurs individuals may blame themselves for having SUD and/or may believe that their SUD is the result of inherent moral weakness on their part. This leads to shame and fear of social exclusion or other negative results if their condition is exposed. This can result in individuals avoiding treatment or other services.[293,294,295] The Administration's planned activities to address stigma are discussed throughout this chapter.

As part of its effort to build back better following the COVID-19 pandemic, the Administration will work to increase our scientific understanding of recovery, foster adoption of more consistent certification and accreditation standards for peer workers and the organizations that employ them nationally, expand the PRSS workforce and the organizational infrastructure that supports it, address stigma and misunderstanding, and eliminate barriers to safe and supportive housing, employment, and education for people in recovery. In all of these efforts, the Administration will continue to solicit input from and build partnerships with the recovery community and others directly impacted by substance use, keeping in mind the recovery community dictum, "Nothing about us without us."

## Principle 1: Expand the Science of Recovery.

*(Agencies Involved: DOJ/BOP, OJP; ED/IES; HHS/ASPE, AHRQ, CDC, CMS, HRSA, NIH, SAMHSA; HUD/OPDR; ONDCP; VA/VHA; DOD)*

Given the need to continually expand our scientific understanding of the recovery process, RSS, and the many factors that mediate outcomes, further targeted, actionable research is needed to guide policy and resource allocation decisions in the recovery domain. To prioritize and stage such translational research, ONDCP will partner with the National Institute on Drug Abuse (NIDA), and the National Institute on Alcohol Abuse and Alcoholism, the National Institute on Justice (NIJ), the National Institute on Corrections (NIC), and the Department of Health and Human Services (HHS) Assistant Secretary on Planning and Evaluation (ASPE) to convene a cross-agency workgroup to develop, prioritize, and coordinate the implementation of a federal recovery agenda. The findings and recommendations of this group will be transmitted to the drug data interagency workgroup, described in the Data Systems and Research chapter. In addition, they will be used to identify federal recovery research priorities and suggest specific existing or proposed funding streams that could support studies on prioritized topics.

A. **Establish a federal recovery research agenda to support the development of science-based policy in relation to recovery.** *(Agencies Involved: DOD/CDMRP;*


*DOL/ETA/DRE; DOJ/NIC, OJP; ED/IES; HHA/AHRQ, ASPE, CMS, CDC, NIH, SAMHSA; HUD/OPDR; OMB; ONDCP; VA/VHA)*

In partnership with key federal research agencies, ONDCP should convene the research and evaluation components of other drug control agencies to: (1) summarize the current scientific knowledge of the recovery process and RSS; (2) catalogue current federally-funded research and evaluation efforts germane to these topics, and; (3) identify key areas where additional research is needed to inform policy and resource allocation decisions. This interagency team should assess the extent to which current federal research and program evaluation portfolios address identified priorities and will recommend research to inform policy development and resource allocation decisions. To prepare for an initial convening of the *Recovery Research Workgroup*, ONDCP and NIDA should jointly coordinate the efforts of participating agencies as they: (1) catalogue current and recent federally-funded research with a SUD recovery nexus, and; (2) identify, list, and prioritize areas of research that will support the development of evidence-based policy and programs in the recovery domain. Subsequently, ONDCP and NIDA should: (1) summarize the findings of the group and provide specific recommendations regarding the prioritization and funding of relevant research and evaluation efforts by agency; and, (2) obtain interagency clearance of a document summarizing these recommendations and secure the commitment of agency leaders to implement the recommendations as feasible, given resource availability and broader research priorities.

**B. Establish targets and monitor progress.**

Following approval of the research priorities by Administration leadership, NIDA and ONDCP should coordinate a process through which participating agencies would identify: (1) prioritized research they would undertake with existing resources, and; (2) additional research they would undertake subject to the availability of resources. ONDCP, in partnership with participating agencies, should monitor progress toward meeting recovery research commitments and share progress through the interagency workgroup.

**C. Incorporate identified recovery research needs in the President's budget.**

To ensure that agencies have the resources needed to support priority recovery research, ONDCP, in consultation with NIDA and other participating agencies, will continue to recommend relevant research funding priorities and funding levels annually for the President's Budget through the Drug Control Budget.

# Principle 2: Make Recovery Possible for More Americans

People with SUD follow many pathways to recovery or remission and interact with diverse sectors, including law enforcement and other first responders, the criminal justice and child welfare systems, primary care, hospitals, harm reduction programs, housing and homeless services, and SUD treatment. It is critical not only that we understand the many trajectories to recovery, but that we adopt flexible, responsive approaches for helping people with SUD navigate the many challenges they encounter and both find and follow a pathway to recovery or remission that works for them. Our nation's emerging PRSS infrastructure, supported by a growing number of peer-led organizations, is essential to developing and implementing such



strategies. Therefore, sustainable financing for PRSS and for the organizations through which they are offered is critically important. Consistent standards are also needed to ensure quality and safety, to facilitate reimbursement from payers operating in multiple jurisdictions, and to permit reciprocity of credentials for peer recovery specialists.

Training and technical assistance, including through SAMHSA's National Peer-Run Training and Technical Assistance Center for Addiction Recovery Peer Support, are also indispensable to efforts to develop capacity and help states, organizations, and peer recovery support workers adopt more consistent standards nationally. Accessible and affordable training for individuals seeking to become peer specialists is essential to developing the peer workforce. More consistent standards for peer workers and for organizations through which PRSS are offered will also improve quality, create opportunities for reciprocity of credentials from one jurisdiction to another, and facilitate funding from public and private insurers with national or multi-state regional coverage areas.

When provided by an institution of higher education, training to become a peer specialist can be reimbursed under the Health Resources and Services Administration (HRSA) Substance Use Disorder Treatment and Recovery Loan Repayment Program. While this is a valuable resource that should be expanded, training provided by an institution of higher education may not be accessible or culturally appropriate to all those seeking to become a peer support worker. For many prospective peer workers, educational loans may be inaccessible, and, to them, higher education settings may seem far removed from the world in which they will operate and the experience they will bring to bear in their work. A broader array of training and technical assistance will be needed to develop the peer workforce.

A. **Expand PRSS capacity and foster the adoption of more consistent standards for the peer workforce, RCCs, RCOs, and similar peer-led organizations.** *(Agencies Involved: HHS/CMS, HRSA, IHS, SAMHSA; Labor/ETA, ODEP; VA/VHA)*

SAMHSA, with support from ONDCP, CMS, and HRSA, should convene key federal partners and external stakeholders with a role in developing peer workforce and RCO/ RCC capacity and applicable credentialing and accreditation standards. Examples of external stakeholders germane to this effort include: the International Society of Substance Use Professionals (ISSUP); the International Certification and Reciprocity Consortium (IC&RC); the Association for Addiction Professionals (NAADAC) and its certification arm, the National Certification Commission for Addiction Professionals (NCC-AP); the Association of Recovery Community Organizations (ARCO); the Council on Accreditation of Peer Recovery Support Services (CAPRSS); the Global Centre for Credentialing and Certification (GCCC); and, the National Association of Alcohol and Drug Abuse Directors (NASADAD)

Through this process, SAMHSA should develop recommendations for: (1) expanding the capacity of the existing workforce and peer organizational infrastructure through training, technical assistance, and related efforts; and, (2) promoting the adoption of more consistent credentialing and accreditation standards and improving quality across states nationally, taking into consideration existing national peer certification and recovery support service provider organization accreditation standards. Recommendations could include support to states, RCCs, RCOs, and other entities through existing federally-funded training and technical assistance providers, such as the Addiction Technology Transfer Network, the technical assistance contracts for various federal discretionary



grant programs, and the National Peer-Run Training and Technical Assistance Center for Addiction Recovery Peer Support.

Upon approval of the plan, SAMHSA should spearhead efforts to implement recommendations, reporting periodically on progress. Capacity-building through training, technical assistance, and adoption of more consistent credentials and standards for peer workers, recovery community centers, and other entities providing PRSS could allow for expanded public and private insurance coverage, improved quality overall, and permit greater reciprocity of credentials across state lines to support increased workforce mobility in response to evolving needs.

**B. Foster the adoption of more consistent recovery housing standards.** *(Agencies Involved: DOJ/CRD, OJP; HHS/ASPE, HRSA, SAMHSA; HUD; ONDCP; USDA/RD)*

More consistent recovery housing standards across states would help prevent exploitation of residents and funders by unscrupulous operators, better ensure quality across states, and help consumers, addiction professionals, and payers identify quality recovery residences.

SAMHSA and the Department for Housing and Urban Development (HUD) should co-lead efforts to promote adoption of nationally recognized recovery residence standards, engaging stakeholders such as National Alliance for Recovery Residences (NARR), Oxford House, NASADAD, the National Conference of State Legislatures (NCSL), the National Governors' Association (NGA), the National Association of Counties (NACO), and the ONDCP Model State Drug Law contractor, Legislative Analysis and Public Policy Association (LAPPA), which convened a consultative process through which a Model State Recovery Residence Certification Act was developed in 2021.[296] Standards should ensure that people following all recovery pathways, including those receiving medications for opioid use disorder (MOUD), have access to quality recovery housing. Recovery housing does not replace Housing First resources which provide low-/no-barrier housing coupled with wrap around services. Ideally, recovery housing should be linked to Housing First resources, complementing them and permitting a bi-directional flow of residents between the two settings based on resident need and desires and the fit of residents within the respective housing contexts. Outside of federally-subsidized housing settings, the standards that govern recovery housing are set at the state level. Moreover, local zoning laws and building codes can facilitate, hinder, or prevent the establishment of recovery housing and may even represent violations of applicable federal civil rights laws such as the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act. SAMHSA and HUD should work to support state and local governments and standards organizations in developing and implementing recovery housing standards that will ensure access to recovery housing to protect the rights of individuals in or seeking recovery from SUD. Additionally, SAMHSA and HUD should develop recommendations for policy, training and technical assistance. These recommendations should include guidance related to recovery housing through the HUD Continuum of Care and in the context of other federally-subsidized housing programs. Additionally, SAMHSA and HUD may elect to publish a guidance document developed in collaboration with these stakeholders.


C. **Expand and sustain funding for recovery support services and recovery housing.**
*(Agencies Involved: AmeriCorps, HHS/CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

As discussed in the introduction to this chapter, multiple strategies will be needed to flexibly and sustainably finance PRSS. No single approach will work in every state, locality, or service system. SAMHSA and CMS, with support from VA, HRSA, IHS, and AmeriCorps, should review current federal, state, and local financing mechanisms for PRSS, and develop recommendations for these services. Additionally, they should work with states, tribes, local governments, and peer organizations to highlight and promote the adoption of effective PRSS financing solutions. As part of this process, CMS should update the guidance provided under State Medicaid Director Letter number 07-011, which provided guidance to states interested in coverage of PRSS under Medicaid. Additionally, it should explore the feasibility of supporting innovation in the reimbursement and utilization of PRSS under Medicaid.

A clearer definition of PRSS under Medicaid, information on promising reimbursement models under the program, and updated guidance to states on the supervision and reimbursement of PRSS could facilitate more consistency in approaches and could help support the use of Medicaid to reimburse PRSS. Additionally, with support from ONDCP, HRSA, IHS, the Department of Agriculture (USDA)/ Office of Rural Development (RD), AmeriCorps, and SAMHSA, and CMS should identify potential mechanisms for financing for PRSS and for peer-led organizations.

    *a)* **Financing for PRSS and Peer-led Organizations** *(HHS/CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

    CMS and SAMHSA, with support from IHS, HRSA, and other federal agencies, should work with states, Tribes, local governments, and peer organizations to identify, highlight, and promote the adoption of effective financing solutions. As part of this process, CMS, with support from these agencies, should develop and disseminate guidance to state Medicaid programs, including in relation to organizational homes for peer recovery support specialists, their supervision, various models for sustainably funding this service under state plans. In addition, in partnership with SAMHSA, CMS should offer technical assistance to states seeking to initiate, expand, or change mechanisms for covering PRSS under Medicaid. SAMHSA, with support from CMS, HRSA, IHS, and other agencies, should provide guidance to states on a broader range of financing mechanisms, including the Block Grant and state and local funding, as well as mechanisms for braiding these funding streams with Medicaid. With support from ONDCP, HRSA, IHS, and USDA/RD, AmeriCorps, SAMHSA and CMS should identify and provide recommendations on potential mechanisms for financing for PRSS, including through peer-led organizations.

    b) **Financing for Recovery Housing.** *(HHS/ASPE, CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

    Sustainable financing streams for recovery housing are also needed. Financing approaches will need to align with and complement self-pay funding models



under which residents seek and obtain employment and pay for their room and board, but may also need to accommodate models that serve individuals with greater levels of impairment who may require support for a longer period of time. Transitional payment approaches can cover the cost of recovery housing during an initial pre-employment period. Such approaches may need to have flexible provisions to account for limitations in employment opportunities in certain communities or the need for extended support among individuals with high levels of problem severity and complexity and low recovery capital. For more impaired individuals, the period of time during which such reimbursement is allowable may need to be extended.

The HUD Continuum of Care program represents another potential source of funding for recovery housing, provided regulatory and policy barriers to permanent housing associated with stays in recovery residences, which are typically classified as a form of transitional housing, can be resolved. Finally, the HUD Recovery Housing pilot program, authorized under the SUPPORT Act, helps those in recovery from SUD achieve stable housing through grants to states and the District of Columbia that provide assistance for individuals' recovery housing for up to two years.

HUD and HHS (both SAMHSA and CMS) should identify legal, regulatory, and policy barriers to increasing access to recovery housing and tenancy supports. They should consult with key stakeholders, including recovery housing associations, NASADAD, and the National Association of Medicaid Directors (NAMD).

c) **Financing of Recovery Support Services for Adolescents and Young Adults**

Services for adolescents and young adults in or seeking recovery are especially limited and require development as well as sustainable financing mechanisms. These include recovery high schools, alternative peer groups, and collegiate recovery programs. SAMHSA, the Department of Education (ED), and the Administration for Children and Families (ACF) should jointly develop and implement a plan for seeding the development of these critical services, including through grant funding and technical assistance, and should work with school districts, colleges and universities, and other stakeholders to develop and implement plans for sustaining these critical RSS. In developing this plan, they should consult with key stakeholders, including the Association of Recovery in Higher Education, the Association of Recovery Schools, and the Association of Alternative Peer Groups.

Competitive grants may offer an effective mechanism for seeding and developing these entities with a goal of securing sustainable funding from school districts, higher education institutions, state and local governments. Additionally, it may be possible to identify ongoing funding streams within current ED programs.

AR2022_400780



# Principle 3: Eliminate Barriers and Increase Opportunities

Developing and implementing evidence-based policies and programs to increase the number of Americans who can achieve and sustain recovery is essential to building a recovery-ready nation. However, in the absence of effective educational and stigma reduction efforts, policies and programs will not be not enough. As NIDA Director Nora Volkow has noted, "as a society, we still keep addiction in the shadows, regarding it as something shameful, reflecting lack of character, weakness of will, or even conscious wrongdoing, not a medical issue."[297]

Additionally, we must redouble our efforts to eliminate the myriad social, cultural, linguistic, legal, and regulatory barriers people in recovery confront as they attempt to rejoin and contribute to their communities, remembering that people with illicit drug use disorders confront the dual stigma of being both a "drug user" and as someone engaged in criminal activity by virtue of the fact that their SUD involves substances that are illegal to possess, purchase, or sell. To be effective in these undertakings, we must change how we think and talk about substance use and recovery, replacing the inconsistent, and often misleading and stigmatizing terminology we continue to use with neutral, science-based terminology.

A. **Ensure the adoption of consistent, neutral, science-based language regarding substance use and related topics across the federal supply and demand control functions.** *(Agencies Involved: DOD, DOL/ETA, ODEP; DOJ/DEA, OJP; DOS; HHS/CDC, CMS, FDA, HRSA, IHS, NIH, OASH, SAMHSA; ONDCP; VA/VHA).*

Research has shown that the terminology we use can affect our perceptions of people with or in recovery from SUD and our judgements about them. One notable study, touched upon briefly in the Substance Use Disorder Treatment chapter, demonstrated that even highly-trained mental health and substance use clinicians are susceptible to this influence. When randomly assigned to groups responding to case vignettes that were identical with the exception that one referred to the subject as a "person with a substance use disorder" while the other referred to him as a "substance abuser," those exposed to the second version were more likely to assign blame to the subject and to agree that punishment was appropriate.[298]

Similar studies conducted with other groups further demonstrate the power of language to subconsciously influence perceptions and judgments about people with SUD and those in or seeking recovery.[299,300,301,302] Among health professionals, negative attitudes toward people with SUD is widespread and is associated with routinized care, reduced empathy, and poor outcomes.[303] Internalized stigma is associated with reduced willingness to seek help for a behavioral health condition,[304] while social stigma (negative attitudes and beliefs about people with SUD) is associated with increased support for punitive polices, and reduced support for public health policies, such as expanding access to treatment.[305] An analysis of language used in U.S. news media found stigmatizing language and framing were not only highly prevalent, but had increased substantially from 2008 to 2018. The authors argued that development of non-stigmatizing language standards for journalism was a public health priority.[306] While experts agree that the opioid overdose epidemic is first and foremost a public health challenge, research has found that the issue is most often framed in news media as a public safety issue. Accordingly, law enforcement solutions related to the arrest and prosecution of individuals responsible for supplying illicit opioids were predominantly mentioned in the media.[307] Even within the



federal government, inconsistency in terminology and stigmatizing terms remain a pervasive problem. The federal government should therefore work across the public health and public safety sectors to ensure use of consistent, neutral, and science-based language and person-first framings.

Building on the January 9, 2017 memorandum from the ONDCP Director to the heads of departments and agencies entitled *Changing Federal Terminology Regarding Substance Use and Substance Use Disorder,* ONDCP, NIDA, SAMHSA, NIAAA, and the Department of Justice (DOJ)/ Office of Justice Programs (OJP) should co-convene a workgroup that will develop and publicly release a plan for adopting consistent, neutral, science-based language regarding substance use and SUD across the federal government. The plan should identify actions that will be undertaken immediately, such as development and adoption of a guide to support uniform terminology and framing in relation to substance use among Executive Branch agencies, and an audit of websites and frequently updated documents. It should also include actions the Executive Branch can take independently but that cannot be completed immediately, and actions that are beyond the purview of the Executive Branch and would require Congressional input such as changes in the terminology, definitions, and framing regarding substance use and SUD in statute (e.g., in the Controlled Substance Act and federal housing law) or changes to the names of agencies that currently include stigmatizing and potentially misleading terms, such as substance, drug, or alcohol "abuse". The workgroup should publicly release brief annual updates on progress toward accomplishing the objectives and broader goals outlined in the plan. This guidance should be shared with professional journals, media outlets, and other key communicators so as to provide best practices in use of substance use related terms.

**B. Expand, enhance, and improve the coordination of federal anti-stigma efforts related to SU/SUD.** *(Agencies Involved: DOD; DOL/ETA, ODEP; HHS/CMS, CDC, HRSA, IHS, NIH, OASH, SAMHSA; VA/VHA)*

The adoption of neutral, science-based terminology in relation to substance use and SUD is a critical and necessary first step. However, it alone will not adequately address widespread social stigma and its devastating impact. Effective stigma reduction campaigns targeting the general public, health professionals, law enforcement and other first responders, and policymakers must be developed and strategically deployed in partnership with state and local governments and the private sector.

CDC, with support from SAMHSA, NIH, and ONDCP should catalogue existing federal stigma reduction campaigns with a substance use nexus, summarize the scientific literature on stigma reduction in relation to substance use and SUD, identify key lessons that can be learned from the mental health, HIV/AIDS, and other stigma reduction literature, and develop recommendations for a coordinated federal stigma reduction strategy.



**C. Expand employment opportunities and promote Recovery-Ready Workplace policies.** *(Agencies Involved: Commerce; DOL/ETA, ODEP; EEOC; HHS/ASPE, CDC, SAMHSA; OPM; VA/VHA)*

Employment is a critically important part of the recovery journey for many and is also recognized as a key form of recovery capital.[308] Indeed, employment not only offers stabilizing supports to the individual and the larger community, but also reduces recidivism among people involved in the criminal justice system thereby enhancing public safety. However, a history of substance use or related criminal justice system involvement constitutes a significant barrier to meaningful employment for the individual. A crucial form of recovery capital, employment is associated with enhanced rehabilitative outcomes for the individual and public safety outcomes for the greater community. ONDCP should contribute to and coordinate with the

> To improve outcomes over the long-term, we must recommit to shifting the focus of drug policy from punishment and social exclusion to healing and community reintegration. That is how we will begin to turn the tide, building recovery-ready communities that can effectively respond to and heal from drug use, addiction, and overdose.

Administration's existing interagency process to expand employment opportunities for formerly incarcerated persons so that it may share its expertise on how to support individuals in recovery. ONDCP should also continue to co-lead a working group focused on recovery-ready workplace policies, such as those detailed through CDC/National Institute for Occupational Safety and Health's (NIOSH) Workplace Supported Recovery initiative and New Hampshire's Recovery-Friendly Workplace initiative, which was launched with funding from the Department of Labor and has been adopted by a number of states. Participants in that working group include SAMHSA, the Departments of Commerce, the Department of Labor, NIOSH, and the VA. This existing interagency process works to develop and implement plans for establishing, expanding, and enhancing employment-related initiatives for people in recovery and people with active SUD, including through broader adoption of approaches such as the Individual Placement and Support (IPS) supported employment model. In addition, with support from the Office of Personnel Management (OPM), the Equal Opportunity Commission (EEOC), the Department of Commerce, the Chief Human Capital Officers Council (CHCOC), and selected other agencies, it will explore opportunities to promote the adoption of recovery-ready workplace policies within the federal government. ONDCP should also apply these insights to the Administration's interagency process on expanding employment opportunities for formerly incarcerated persons.

Recognizing that the majority of Americans with SUD are employed,[309] it is essential that more employers adopt recovery-ready workplace policies to prevent substance use in the workforce, encourage help seeking by employees with SUD, provide needed accommodations and workplace supports for those in treatment and recovery, and build recovery-supportive workplace cultures—all of which enhance public health and public safety.

**D. Reduce legal, regulatory, policy, and practice barriers to recovery.** *(Agencies Involved: DOL/ETA, ODEP; DOJ/DEA, OJP; HHS/ASPE, CMS, IHS, OASH, SAMHSA; HUD; VA/VHA)*



In today's interconnected world, even criminal charges that are dropped and convictions that are vacated can leave an indelible electronic record. Beyond that, drug-related criminal convictions can carry unique, often lifelong penalties that go above and beyond one's sentence. Known as collateral consequences of conviction, these add-on restrictions or penalties are common in both state and federal law. Examples include bans on access to public housing or public assistance, ineligibility to vote or to serve on a jury, temporary or permanent ineligibility for federal student aid, ineligibility for employment in health care facilities or within a state government, or ineligibility to obtain a professional license—even in a field in which one had long practiced as a licensed professional. Additionally, a wide range of barriers associated with rules, policies, practices, and attitudes that do not meet the definition of collateral consequences of conviction can create substantial barriers to rejoining and fully contributing to the community.[5]

As noted in the Criminal Justice and Public Safety chapter, collateral consequences may serve a necessary public safety function when there is a nexus between the restriction and a harm to be prevented, such as barring convicted sex offenders from employment where they may have unsupervised interactions with children or other vulnerable individuals. However, as the United States Commission on Civil Rights has noted, when they do not serve a necessary public safety function and are not narrowly tailored, they undermine public safety by preventing successful community reintegration.[310] Specific actions to address collateral consequences of conviction are described in the criminal justice chapter.

SAMHSA, HUD, OJP, ED, DOL, and ONDCP will co-lead an interagency workgroup that would identify legal, regulatory, and policy barriers to treatment, housing, employment, health care, education, and public accommodations and develop and implement and action plans to address them. The workgroup would report annually to interagency partners on progress toward the objectives identified in its plan and shall develop recommendations, including, potential statutory changes.

---

[5] For example, *42 U.S. Code § 13661, Screening of applicants for federally assisted housing,* makes individuals determined to have manufactured, sold, distributed, used or possessed a controlled substance ineligible for public housing for a period of three years and prohibits admission of households to federally assisted housing or federally assisted housing programs if the housing agency or property owner has reasonable cause to believe that any member of the household's "illegal use (or pattern of illegal use) of a controlled substance, or abuse (or pattern of abuse) of alcohol, may interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents." The statute does not require conviction in a court of law for such perceived offenses. *See* https://www.govinfo.gov/content/pkg/USCODE-2015-title42/pdf/USCODE-2015-title42-chap135-subchapV-sec13661.pdf.



## Building Recovery-Ready Workplaces

The Biden-Harris Administration is committed to promoting the adoption of recovery-ready workplace policies, including in the federal government. A growing number of states is developing initiatives that encourage hiring of people in recovery and the adoption of recovery-ready workforce policies, which encourage help-seeking among workers, seek to prevent substance use in the workforce, and develop recovery-supportive policies and cultures to help employees achieve and sustain recovery. The states of New Hampshire and Indiana are among the pioneers in this domain. New Hampshire established the Recovery-Friendly Workplace initiative, which other states have replicated, and the Hoosier State launched Indiana Workforce Recovery. Additionally, the National Institute for Occupational Safety and Health (NIOSH), part of the CDC makes resources available to employers through its Workplace Supported Recovery Program.











# Reduce the Supply of Illicit Substances through Domestic Collaboration

Law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat domestic cultivated and synthetic drug production and trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques distributing drugs throughout our communities. Responding effectively to the illicit production, trafficking, and distribution methods of domestic criminal organizations and Transnational Criminal Organizations (TCOs) is a significant challenge and remains a Biden-Harris Administration priority.

Substantial improvement in collaboration and cooperation between agencies at the federal level and among federal, state, local, Tribal, and territorial agencies is necessary in order to effectively confront the present domestic illicit drug trafficking landscape. The near continual year-on-year rise in American overdose deaths between 1999[311] and 2021[312] culminated in the unprecedented and somber milestone in April 2021 when the 12-month provisional overdose deaths exceeded 100,000[313] for the first time in our history. This is the clearest indicator yet that, while individual agency efforts to confront the TCOs responsible for bringing drugs into our communities may be laudable, collectively, the U.S. Government (USG) is dedicated to stemming the flow of illicit drugs or to impose costs sufficient to deter TCOs from trafficking illicit drugs into the United States and distributing them into our communities and could do more.

Additionally, considerable additional domestic effort is needed to improve our data collection and policy and program assessments so we are clear on what efforts are working, and which need to be improved or replaced with alternatives.

Four principal lines of effort are necessary to improve domestic collaboration, reduce the supply of illicit substances, and decrease the harms caused by these substances in the United States and abroad:

- Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking;

- Deny and disrupt domestic production, trafficking, and distribution of illicit substances;

- Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly; and

- Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

These domestic lines of effort are complemented by the activities outlined in the Southwest, Northern, and Caribbean Border Counternarcotics Strategies, and by the National Interdiction Command and Control Plan, which collectively serve as companions to the *National Drug Control Strategy*. The three border strategies provide strategy guidance linking international supply reduction efforts with domestic efforts.

AR2022_400786



# Principle 1: Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking.

Law enforcement capacity cannot be static in a dynamic drug threat environment. Improving information- and intelligence-sharing across the federal government and with state, territorial, local, and Tribal partners to target drug traffickers and their networks is essential to addressing the public health threat posed by TCOs. Successful seizures, or interdictions, of illicit drugs, illicit proceeds, and weapons, and the dismantling of TCOs require building the tools, relationships, and capacity to address a constantly evolving set of criminal networks that adapt their methods, change their tactics and techniques, and employ new technologies to avoid detection, interdiction, arrest, and prosecution.

A. **Leverage information-sharing structures to deepen a collective understanding of the drug trafficking and distribution environments and enhance investigations.**
*(Agencies Involved: DHS/CBP, ICE, USCG; DOJ/ATF, DEA, FBI, OCDETF; IC; Treasury/FINCEN, IRS, TFFC; DOD; USPIS)*

Agencies' structural and cultural impediments to sharing information hinder public safety and public health entities' ability to fully understand and respond to drug trafficking threats and substance use in our communities. Mitigating these impediments requires a fresh, open, and collaborative agency-agnostic approach. Public safety, public health, and regulatory agencies, the U.S. Intelligence Community (IC), and the national security community will coordinate development of policies and systems that provide the strategic drug intelligence elements necessary access to domestic public safety and aggregate public health information and appropriate national security information in a way that preserves the individual privacies and civil liberties of American citizens.

Robust strategic drug intelligence, synthesized by elements charged, resourced, and governed to provide federal, state, local, Tribal, territorial, and private/public sector agencies with meaningful information to shape proactive, coordinated, whole-of-government counternarcotics and counter-TCO planning and resourcing is a priority. Drug trafficking organizations exploit information gaps and seams among agencies and jurisdictions. For example, along the Southwest border, many agencies—including those at the federal level—are currently unable to share data captured by automated license plate readers that could provide information on drug traffickers moving into the United States, impeding our collective ability to conduct the intelligence-driven interdictions of illicit drugs. Additionally, perceived and actual obstacles to information sharing between the intelligence and law enforcement communities result in gaps exploitable by TCOs and inhibit the ability to develop and synthesize strategic intelligence on the global drug threat.

Consistent with the Constitution and statutes enshrining civil rights and civil liberties, the Office of the Director of National Intelligence (ODNI), Department of Homeland Security (DHS), and Department of Justice (DOJ) should prioritize coordinated efforts to eliminate real and perceived barriers to intelligence and information sharing between federal law enforcement and intelligence agencies. ODNI, DHS, and DOJ should ensure that federal law enforcement agencies have adequate resources to review law

**AR2022_400787**



enforcement reporting for foreign intelligence value and disseminate that intelligence to relevant agencies in a manner that protects law enforcement sensitivities. ODNI and individual intelligence agencies should proactively review foreign intelligence on drug and threat finance issues that may be relevant to or actionable by federal law enforcement agencies and ensure that information is appropriately downgraded in classification to permit passage to law enforcement partners.

Information fusion centers are crucial to bridging information gaps, but they are effective only if agencies commit to addressing the corresponding institutional and jurisdictional barriers that too often plague these efforts. Agencies challenged by information gaps should thoroughly examine systems and mechanisms across the interagency environment for solutions prior to embarking on individual agency initiatives, which tend to result in duplication and, ultimately, additional gaps and seams. Duplication of initiatives and activities across the interagency community inhibits the U.S. Government's ability to reduce overdose deaths. The Office of National Drug Control Policy (ONDCP) will prioritize funding recommendations for agencies demonstrating strategic effects through systematized sharing of information at enterprise levels.

Consideration should be given to leveraging the United States Council on Transnational Organized Crime (USCTOC), established on December 15, 2021 by Executive Order 14060 to improve the U.S. Government's ability to carry out strategic drug intelligence functions. Sustainable funding for strategic drug intelligence efforts is crucial.

**B. Improve information sharing, vertically and horizontally, between public safety and public health entities to improve health outcomes and build health equity.** *(Agencies Involved: DFC; DHS/ICE; DOJ/DEA, OCDETF, OJP; HHS/FDA, HHS; ONDCP)*

While there are several individual examples of initiatives that bring together public safety and public health, often in states or locally, government at all levels can do more. Public safety and public health agencies collect vast quantities of data, which they should share and integrate across both disciplines to inform whole-of-government responses to the problem.[6] This can and should be done if feasible while still protecting the privacy of individuals with all affected persons and maintaining trust and confidence in the health care system. The most effective public safety and public health collaboration and mechanisms are those that enable pursuit of the criminals trafficking illicit substances in our communities while enhancing the support structure for people who use drugs or have SUD.

Federal public safety and public health agencies within DOJ, DHS, and Department of Health and Human Services (HHS), and state governments should pursue common and interoperable information systems to enable more efficient synthesis and analysis of data at a national level. For example, standardized reporting criteria for drug-related deaths and contraband seizures, combined with mechanisms to integrate Tribal, local and state agencies, would provide a comprehensive, national picture of the effects of illicit drugs on our communities. This would enable tailored, meaningful responses, such as those

---

[6] An example of one such successful collaboration is DEA's NFLIS-TOX program. More information about the program can be found at, https://www.nflis.deadiversion.usdoj.gov/tox.xhtml

AR2022_400788



> ## HIDTA Overdose Response Strategy
>
> *Public Health and Public Safety Collaboration Success*
>
> The Overdose Response Strategy (ORS) is an unprecedented and unique collaboration between public health and public safety sectors, created to help local communities reduce overdoses by sharing timely data and innovative drug overdose prevention strategies.
>
> The mission of the ORS is to help communities reduce fatal and nonfatal overdoses by developing and sharing information about heroin, fentanyl, methamphetamine, and other drugs across agencies and by offering evidence-based intervention strategies. The ORS is implemented by state teams made up of Drug Intelligence Officers (DIOs) and Public Health Analysts (PHAs) who swiftly exchange data, building the evidence for overdose prevention and response initiatives and allowing for earlier warnings and informed decision-making. DIOs working in the ORS track and relay information regarding sentinel arrests, seizures, and other incidents to law enforcement agencies at all levels of government. PHAs form a critical link across public health entities to share actionable information to identify and stop overdose events.
>
> Annual ORS Cornerstone Projects leverage this network to gather new information about emerging trends or promising strategies. One such project focused on overdose prevention services in jails. PHAs and DIOs implemented surveys and interviews with justice professionals in 36 jails across 20 states to examine services in jails serving the counties most affected by the opioid overdose crisis. To increase the uptake of findings from this project, ORS teams worked directly with local partners on the development of jail-based overdose prevention programs to discuss best practices, helpful resources, and challenges. Teams also hosted webinars featuring how local champions from across the country built and implemented their own overdose prevention programs. This effort engaged more than 30 agencies and organizations about implementing or expanding local jail-based overdose prevention programs. These partners include sheriff's offices, harm reduction groups, state substance use authorities, and state criminal justice agencies. At least 12 local jails are currently working with ORS teams to build naloxone distribution into their overdose prevention programming.

achieved through the High Intensity Drug Trafficking Area's (HIDTA) Overdose Response Strategy.[314]

C. **Strengthen HIDTAs and other multi-jurisdictional task forces to disrupt and dismantle drug trafficking organizations.** *(Agencies Involved: DHS/CBP, ICE; DOJ/ATF, DEA, FBI, OCDETF; IC; DOD; Treasury/FINCEN, IRS, OFAC, TFFC; USCG; USPIS)*

Drug trafficking organizations rely on networks of facilitators such as money laundering organizations, complicit financial institutions, money service businesses (MSBs) and corrupt government officials to traffic illicit drugs into the United States, conceal and launder their illicit proceeds, purchase and distribute firearms, and move them across and out of the United States. Effectively countering this broad network of facilitators requires





an approach combining the expertise, perspectives, and authorities of federal, state, local, Tribal, and territorial agencies, as well as foreign partners.

Multi-jurisdictional task forces, such as the HIDTA task forces, bring together the resources, expertise, and authorities of federal, state, local, Tribal, and territorial agencies. These task forces mitigate jurisdictional challenges for law enforcement, such as investigations on Tribal lands and Tribal Trust lands that straddle international borders with Mexico and Canada, where criminal organizations exploit the gaps and seams between jurisdictions to ply their trade.

Agencies within DOJ, DHS and the U.S. Postal Inspection Service (USPIS) will prioritize participation in multi-agency task forces aligned against the manufacture and trafficking of illicit drugs; including the Organized Crime Drug Enforcement Task Forces (OCDETF) Strike Forces and Task Forces, DEA's Special Operations Division (SOD), and HSI Border Enforcement Security Task Forces (BESTs), to disrupt and dismantle the most dangerous transnational criminal organizations. Drug interdiction agencies at all levels should seek opportunities to participate in interagency task forces and information-sharing initiatives to maximize the impact of finite interdiction resources. National Drug Control Program Agencies must develop processes and mechanisms to enable intelligence-driven interdictions targeted against organizations of interest. It is crucial that task forces work with their assigned interdicting agencies to develop robust and effective mechanisms to exploit information gleaned from interdiction events in a timely manner in pursuit of criminal organizations. Further, developing national standards for information systems on which federal agencies rely, such as license plate readers, will


improve the efficiency of coordinated efforts within and between task forces and help enable intelligence-driven interdiction activities supporting investigations of criminal networks. Robust policy development and oversight will also be necessary to ensure that these systems are not misused and that individuals' privacy and civil liberties are protected. DOJ, DHS, and USPIS should collaborate with each other and with industry partners to identify and pursue systems suitable for common systems standards development.

## Principle 2: Deny and disrupt domestic production, trafficking, and distribution of illicit substances.

Drug traffickers exploit our highways, railways, airspace, and our mail and express consignment systems inside the United States to distribute illicit drugs across the nation and move illicit proceeds and other contraband, such as weapons. Criminal organizations beyond the border possess well-established distribution networks within the United States developed by partnering with or coopting local criminal organizations in order to expand distribution capacity and capability. The National Interdiction Command and Control Plan (NICCP) outlines the Administration's approach to interdiction beyond the borders, in the border regions, and inside the borders. The activities described in the NICCP should complement the actions below.

A. **Focus investigations on priority TCOs engaged in drug trafficking.** *(Agencies Involved: DOJ; DHS; USPIS)*

The Consolidated Priority Organizational Target (CPOT) and Regional Priority Organizational Target (RPOT) Lists, administered by OCDETF, represent the greatest transnational criminal threats to the United States. Departments and Agencies should evaluate how to use the full breadth of their authorities and capabilities to support enterprise investigations to disrupt and dismantle these priority organizations and their distribution networks within the United States. Agencies conducting interdictions should develop the capability to target interdictions against CPOTs and RPOTs and to assess the impacts of interdictions on CPOTs and RPOTs. All federal agencies should support targeted interdictions against CPOTs and RPOTS. The effectiveness of our limited interdiction, investigative, and prosecutorial resources should be evaluated and assessed through the lens of defeating these most deleterious organizations. ONDCP, in consultation with the interagency, will recommend funding priorities for initiatives that demonstrably disrupt and degrade CPOTs and RPOTs.

B. **Collaborate with the express consignment shipping industry and the U.S. Postal Service to deny drug traffickers success with those services.** *(Agencies involved: DHS/CBP; ICE; USPIS)*

Drug traffickers exploit the mail system and express consignment carriers to cheaply, efficiently, and reliably distribute illicit drugs, illicit cash, and other contraband across the nation. This includes delivering illicit drugs directly into the hands of those with SUDs. Addressing the use of the mail system and express consignment carriers by drug traffickers is therefore both a public safety and a public health imperative. Appropriate federal agency collaboration with express consignment carriers will enable analyses of large quantities of national data in order to develop and standardize algorithms for



identifying and interdicting suspect parcels while safeguarding individual privacy and proprietary carrier information.

# Principle 3: Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly.

Evaluating the efficiency and effectiveness of supply reduction efforts and policies will highlight what approaches are most impactful and enable a reprioritization of resources towards the most promising programs, policies, and innovations. We must collaboratively examine programs across our various international and domestic lines of effort, such as eradication of illicit coca and poppy plants, the raw materials for cocaine and heroin, respectively; initiatives to bolster interdiction capabilities in drug source and transit countries, whether the narcotics are moved by land, sea, or air; the results of programs designed to incentivize and strengthen licit economies within partner nations; measures to combat drug-related money laundering; and programs to combat drug sales on the internet. We must also use this process to assess new threats and future changes in the illicit drug market to ensure that programs and initiatives effectively and accurately combat the evolving threat.

A. **Strengthen assessments of supply reduction initiative outcomes against measurable goals.** *(Agencies Involved: DHS/CBP, ICE, USCG; DOD; DOJ/DEA, FBI, OCDETF; DOS; IC; Treasury/FINCEN, IRS, OFAC, TFFC)*

Supply reduction initiatives typically require substantial investments in personnel, funds, and material. Thorough and pragmatic assessment of the outcomes achieved by these initiatives is necessary to assess the extent to which investment of finite resources produces meaningful impacts. Intelligence Community and law enforcement information and analysis are vital to our understanding of the 'start-to-finish' drug production, movement, and international consumption processes, which is crucial to assessing effectiveness of supply reduction initiatives. The intelligence activities of the IC and federal law enforcement need to be well integrated with the work of select overseas Embassies, Combatant Commanders (especially US Indo-Pacific Command, US Northern Command and US Southern Command), state and local entities, HIDTAs, and other fusion centers. Federal agencies should further develop their capacity to critically assess the effectiveness of supply reduction initiatives and programs, in addition to monitoring activity performance. Resources should be prioritized for initiatives demonstrating strategic effects.

B. **Enhance supply reduction efficiency.** *(Agencies Involved: DHS/CBP, ICE, USCG; DOD; DOJ/DEA, FBI, OCDETF; DOS; IC; Treasury/FINCEN, IRS, OFAC, TFFC)*

We must ensure that we account for efficiency in our evaluation and selection of supply reduction efforts in addition to effectiveness, prioritizing demonstrably efficient efforts over others when effectiveness and outcomes are otherwise equal. This may require developing new metrics and tools for comparing supply reduction programs and activities or combining those that exist in different ways to provide a more complete picture of the return on investment in the continuum of supply reduction activities.



# Principle 4: Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

The abundant supply of illicit substances is costing too many American lives and causing far too much damage to vulnerable communities in the United States and around the world. Global drug trafficking sustains a vast domestic and international criminal ecosystem that enables corruption and destabilizes partner nations abroad. These illicit substances and corresponding criminality contribute to a crisis with considerable national security, public safety and public health implications in the United States, the western hemisphere, and beyond. Furthermore, we recognize the full scope of damaging activities related to illicit drug trafficking includes disproportionately detrimental effects on vulnerable and underrepresented populations at home and abroad and considerable harm to the environment.

**A. Address the criminal destruction of our protected natural resources due to domestic marijuana grows on public land.** *(Agencies Involved: DHS; DOD/NGB, NRO; DOI/BLM, NPS, USFWS; DOJ/DEA; EPA; USDA/USFS)*

Illegal outdoor marijuana cultivation on public and private lands causes substantial harm to the environment and threatens public safety.[315] To procure the water needed for the crops, illegal growers dam and divert rivers, streams, and creeks, and tap springs, altering the watershed and depriving the habitat and communities downstream of water. The use of fertilizers, herbicides, and pesticides by illegal marijuana growers is also a serious threat to wildlife, habitat, and humans encountering these toxic substances and can complicate eradication and reclamation and remediation efforts.[316]

Some of these substances are so toxic that they are banned or unavailable in the United States, but Homeland Security Investigations, the Environmental Protection Agency (EPA), and other federal and state agencies report they are smuggled into the country by trafficking organizations from abroad. Environmental analyses of lands within national parks and forests that had been used for marijuana grow operations show significant environmental degradation stemming from chemical pollution and poor waste management and that contaminants from these operations are poisoning native animal species, including several endangered species.[317]

To protect the environment and preserve our nation's public lands and forests, federal, state, local agencies must continue to act against the criminal destruction of our protected natural resources through eradication missions, investigations and prosecutions, and reclamation efforts. We must also improve our ability to identify grow sites under cultivation before the illegal growers can spray them with extremely toxic chemicals. This will enable law enforcement officers to avoid exposure to chemicals such as carbofuran, improve the efficiency of eradication efforts, and reduce the negative environmental impacts of illegal marijuana grows.

ONDCP and partner agencies will strongly encourage prosecutors to seek appropriate federal penalties for illegal marijuana grow operations on public lands, especially those involving firearms violations, environmental violations, export of prohibited toxicants, and endangerment of wildlife based upon the fact-specific characteristics of the offender and the offense. ONDCP will also continue to convene the Public Lands Drug Control



Committee (PLDCC), the only federal interagency group that coordinates programs to support marijuana eradication operations and investigations on public lands, as well as related intelligence and information sharing. Additionally, agencies must reduce the backlog of reclamation sites, including increasing reclamation of previous season grow sites.

We must leverage the full capabilities of the U.S. Government to reduce the supply of illicit substances. This requires fresh thinking, as well as the adoption of evidence-based approaches to improve our whole-of-government approach to drug trafficking, and its direct and indirect effects on communities at home and abroad. The complexity and diffusion of illicit drug supply chains, criminal drug trafficking organizations, and their networks of facilitators demands a renewed commitment by agencies to pool resources and work collaboratively to maximize the effects of our limited resources against drug manufacturing and trafficking organizations with nearly limitless resources. This includes taking greater risks by more openly sharing information across federal, state, local, Tribal, and territorial agencies and prioritizing resources for those agencies that do so. It also means prioritizing resources for programs that incentivize information sharing and that enhance collaboration vertically and horizontally across agencies as it is clear that the volume and pace of TCO activity far exceeds the pace presently achievable by individual public safety and public health mechanisms. The United States must set an example as a leader in world efforts to counter these criminal organizations and their facilitators and reduce the harms associated with illicit drugs.



# Reduce the Supply of Illicit Substances through International Engagement

National Security and law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat drug trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques for delivering illicit drugs to our communities. The majority of illicit drugs consumed in the United States are produced abroad by TCOs and smuggled into the country. Large TCOs, wherever they are based, threaten the health and safety of our communities by exposing our citizens to illicitly manufactured substances. These include synthetic drugs, such as fentanyl and methamphetamine, and cultivated drugs like heroin and cocaine. The plentiful supply and widespread availability of high potency illicit drugs fuel drug consumption across all sectors of American society. Large scale national drug markets, especially those containing synthetic opioids, lead to increased overdose deaths and drug use—impacting millions of American families. This drug use also contributes to significant economic costs for individuals and employers. Moreover, drug trafficking sustains vast domestic and international criminal enterprises that fund a range of illicit activities, enable corruption, undermine governance, and have a destabilizing effect on partner nations, as well as create opportunities for malign actors to gain footholds in fragile states and among vulnerable populations. The organization Global Financial Integrity estimated that, in 2014, the manufacture and trafficking of illicit drugs generated some $426-652 billion dollars for TCOs worldwide, more than a third of the total value of transnational organized crime.[318] Large and influential TCOs pose a threat to our national security and effectively responding to their illicit manufacturing, trafficking and distribution methods is an Administration priority.[7] Countering corruption and its deleterious impact, including its role in facilitating transnational crime, is a core national security interest of the U.S. government.

The U.S. must strengthen international partnerships and foster bilateral exchanges to collaboratively address drug-related problems as a shared responsibility. The increasingly dynamic and complex nature of the international illicit drug trade demands enhanced cooperation with international partners that reflects the reality of a globalized supply chain for illicit drugs and their precursor chemicals. In addition to confronting TCOs' illicit drug manufacturing and trafficking activities directly, the U.S. must also pursue the financial enablers of this illicit activity to deny TCOs their ill-gotten proceeds and to disrupt their ability to transfer working capital to fund their range of illicit activities including procuring precursor ingredients, trafficking, bribery, and corruption. A global approach is essential since traffickers exploit national boundaries to insulate their operations and limit the impact of any single nation's control efforts.[319] These international initiatives will also include a revitalized effort to leverage the significant capabilities of multilateral organizations and frameworks that are able to accomplish actions that no single government can achieve alone. This is true across all drug threats, but

---

[7] See E.O. on Establishing the United States Council on Transnational Organized Crime, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/12/15/executive-order-on-establishing-the-united-states-council-on-transnational-organized-crime/ and Fact Sheet on Establishing the Fight Against Corruption as a Core U.S. National Security Interest, https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/03/fact-sheet-establishing-the-fight-against-corruption-as-a-core-u-s-national-security-interest/


particularly for the challenge posed by the synthetic opioids supply chain that stretches around the globe.

Four principal lines of international effort are necessary to reduce the supply of illicit substances and decrease the harms caused by these substances in the United States and abroad:

- Strengthen foreign partnerships to address drug production and trafficking as a common and shared responsibility.

- Obstruct and disrupt financial activities of TCOs that manufacture illicit drugs and traffic them into the United States, including by countering corruption.

- Leverage the influence of multilateral organizations and other bilateral relationships to tackle shared challenges related to synthetic drugs.

- Protect individuals and the environment abroad from criminal exploitation by those associated with drug production and trafficking.

These lines of international effort are complemented by the activities outlined in the Southwest, Northern, and Caribbean Border Counternarcotics Strategies, and by the National Interdiction Command and Control Plan, which collectively serve as companions to the *National Drug Control Strategy*. This compendium of documents provides strategic guidance linking international efforts with domestic efforts to reduce the supply of illicit substances within our communities.

# Principle 1: Strengthen foreign partnerships to address drug production and trafficking as a common and shared responsibility.

Strengthening foreign partnerships is a crucial element in our efforts to reduce the supply of illicit substances in America's communities. Analyses indicates that criminal organizations in Mexico supply most of the cocaine (after sourcing it from Colombia), methamphetamine, heroin and illicitly manufactured fentanyl smuggled into the United States[320] and have increased their production of fentanyl and its analogues, using precursor chemicals sourced primarily from the PRC.[321] Additionally, over 90 percent of the cocaine seized and tested in the United States is produced in Colombia.[322]

TCOs remain the greatest criminal threat to the United States: they control lucrative smuggling corridors across the region to bring tons of illicit drugs across our borders every year.[323] Once in the United States, the drugs are delivered to consumer markets using vast transportation and distribution routes those criminal organizations oversee and control.[324] Consistent with the Administration's National Security Strategic Guidance, we will engage with key partners and collaborate on tangible and sustainable efforts to combat drug production and trafficking from all its global sources. We will expand our approach beyond capacity building by advancing economic opportunity for the most vulnerable within these countries, providing state presence and security that adheres to the rule of law and human rights, combatting transnational criminal networks, countering corruption, and reducing illicit drug production consistent with partner nation and United States law. We will prioritize Asian and Latin American countries with the most direct effect on drug trafficking and use in the United States and will draw upon long-



standing relationships with like-minded partners in Asia, the Western Hemisphere, and Europe, along with supporting the work of multilateral organizations, to address the changing dynamics and increasing sophistication of the global drug trade.

**A. Develop holistic approaches for engaging with Asian and Latin American countries with a direct effect on drug trafficking in the United States.** *(Agencies Involved: DHS; DOD; DOJ; DOS; HHS; IC/NSC; Treasury; USAID; USPIS)*

Within drug producing countries, there is a substantial correlation between areas lacking in development programs that reach the most vulnerable and impoverished citizens and the presence of TCOs.[325] The United States Agency for International Development (USAID) focuses on strengthening legal economies in rural, underdeveloped, and post-conflict areas via projects that focus on expanding land titling, increasing the competitiveness of licit goods, and establishing agricultural value chains through market analyses and development assistance. USAID also offers technical assistance to rural producers and organizations to improve the productivity of licit crops and increase rural smallholder sales. These efforts have helped local organizations become effective and reliable partners in the planning and implementation of sustainable socio-economic development initiatives and have helped provide former coca growers with a viable and licit income source.[326] The Department of State leads the United States government's efforts to reduce the production of drugs outside the United States by pursuing partnerships to disrupt the flow of drugs into the United States, and help mitigate the consequences of drug trafficking such as violence, criminality, corruption, and human exploitation in our global partner nations.

**B. Support Mexico's efforts to strengthen its counter-drug institutions and initiatives.** *(Agencies Involved: DHS/CBP, USCG, ICE; DOJ/ATF, DEA, FBI, OCDETF; DOD; DOS; TREASURY)*

Mexico is a primary source country for the cultivation, production, and shipment of heroin and illicit marijuana, as well as a key country in the production and movement of synthetic drugs and the movement of cocaine into the United States.[327] The Governments of the United States and Mexico have developed a common understanding of the negative economic, security, and public health impact of transnational criminal organizations in the production and trafficking of illicit substances. With Mexico, we must continue to expand cooperation to address common threats. Both governments agree that reducing the supply of illicit drugs is a shared responsibility.

Mexico is working to eradicate poppy fields more effectively, destroy clandestine laboratories, and interdict heroin and other illicit drugs before they reach the U.S. border. ONDCP will continue to use the Heroin/Fentanyl Working Group (HFWG) as a means to coordinate Embassy Mexico City and U.S. interagency efforts in Mexico. Despite challenges stemming from Mexico's 2020 national security law, the interagency will leverage our partnership with Mexican law enforcement officers, analysts, chemists, investigators, prosecutors, and military personnel to identify and safely dismantle clandestine drug laboratories and bring those responsible to justice.[328] In particular, we will work to establish an agreed United States-Mexico poppy eradication program, a shared eradication goal, and a joint strategy for intelligence-driven eradication in Mexico.



The Department of State, ONDCP, and other federal agencies have also been working with the Government of Mexico to address maritime port security, including through the NADD. Improving port security would curtail the diversion of imported of chemicals used to make illicit drugs, thus inhibiting synthetic drug production. Steps to improve port security include professionalizing security forces, reducing corruption and criminality at key ports, increasing awareness of the types of chemicals that authorities should seize, and improving insight into the evolving nature of the precursor environment.[329] Improving port security can also mitigate the movement of illicit weapons and proceeds, ultimately denying operational resources to the TCOs. Respecting the sovereignty of Mexico, we will continue to pursue efforts beyond capacity-building initiatives with Mexico to address shared responsibility to foster equitable regional development. The Bicentennial Framework modernizes U.S.-Mexico security cooperation to confront existing and new challenges, including the accelerating drug overdose deaths in the United States driven by illicit drugs and associated violence and criminality in Mexico. Through the Framework, the U.S. and Mexican interagencies will increase joint efforts to combat synthetic drugs and other illicit drug production, better understand and reduce drug demand in the United States and Mexico, increase interdiction of drugs, pursue TCO prosecutions and illicit finance, and reduce the number of illicit firearms crossing the U.S.-Mexico border, among other issues.

**C. Work with the PRC to strengthen control of the production, diversion, and transshipment of illicit synthetic drugs and their precursors.** *(Agencies Involved: DHS; DOD; DOJ; DOS; HHS; IC/NSC; Treasury; USAID; USPIS)*

A significant volume of non-fentanyl opioids and precursor chemicals used to produce fentanyl, fentanyl analogues, and other synthetic drugs originate in the People's Republic of China (PRC). This assessment is supported by seizure evidence, law enforcement investigations, internet sales information, and judicial actions in the United States, PRC, and Mexico.[330] Increased collaboration with the PRC on shared drug priorities can disrupt drug trafficking networks, along with the corrupt or compromised systems that support them, and reduce the availability of dangerous synthetic drugs in the United States. The United States will continue engagement with the PRC to reduce diversion of uncontrolled precursor chemicals to the illicit production and trafficking of synthetic drugs destined for markets in the United States, while also working with impacted third countries.

**D. Work with Colombia to reduce production and trafficking of cocaine while increasing alternative economic opportunities.** *(Agencies Involved: DOD; DOJ/DEA, OCDETF; DOS; IC/NSC; Treasury, USAID, USCG, WHA)*

Colombia remains a stalwart partner of the United States and one of our strongest and most reliable allies in the region. Recent data suggest that the current level of effort of manual eradication alone is insufficient to reverse the coca cultivation that provides the raw material for cocaine production in Colombia. In fact, both raw coca production and estimated total cocaine production in Colombia have more than tripled since 2012.[331] To reverse this upward trend, the U.S. government, in partnership with the Colombian government, will implement an integrated counterdrug plan that supports stability, prosperity, capacity-building, and a strong bilateral partnership. This whole of government effort will support and emphasize increases in environmentally-safe illicit



crop eradication, alternative development, interdiction, rural security, environmental protection, investigations and prosecutions, judicial support, and public health cooperation. Since coca fields differ in their level of productivity, this approach will be most successful if we focus in areas of high-yield coca cultivation. [332] Unfortunately, these areas generally have limited government services and lingering security concerns, and will require concerted effort over several years to reverse the continued rise in cocaine production. Consequently, U.S. government efforts must be closely tied to measurable outcomes, sustainable over the long term and designed to complement Colombia's national counterdrug strategy.

**E. Foster improved international drug control and alternative development in Peru.** *(Agencies Involved: DOD; DOJ/DEA, OCDETF; DOS; IC; Treasury; USAID; WHA)*

Peru, despite being the world's second largest producer of cocaine, is a steady partner in the fight against coca cultivation and illicit drug trafficking. [333] The Biden-Harris Administration will apply a comprehensive approach, working with the Government of Peru. Eradication remains a valuable tool in reducing coca cultivation in Peru, but the root causes of illicit crop cultivation must also be addressed. In addition to supporting eradication, U.S. efforts will focus on bringing security and state services, transportation infrastructure, and alternative livelihoods to the coca-growing regions of Peru, providing incentives for rural farmers to leave the often-dangerous work of coca cultivation in favor of safe and profitable licit livelihoods. Much of this work will be done through INL and USAID programming in the country, as well as continued support for Peru's National Commission for Development and Life without Drugs (DEVIDA).

**F. Strengthen Ecuador's drug control, law enforcement, and developmental initiatives.** *(Agencies Involved: DOD; DOJ/DEA, OCDETF; DOS; IC; Treasury; USAID; USCG; WHA)*

Ecuador, although not a cocaine producing country, constitutes one of the primary cocaine trafficking regions in South America. Cocaine is transported from Colombia and across Ecuador's porous borders to Ecuador's coast for illegal maritime smuggling. [334] In Ecuador, we will also seek to engage the Ecuadorian government and collaborate in developing a comprehensive counterdrug plan. This approach will focus on augmenting Ecuador's capacity and capability to surveil, monitor and interdict the illicit movement of drugs over land, air, and sea. It is the U.S. Government's goal to help Ecuador diminish illicit drug trafficking by increasing seizures in the Ecuadorian Economic Exclusion Zone (EEZ), [8] on the country's coasts and inland by 50-percent over the next three years.

**G. Intensify cooperation with India to preemptively address precursor chemical and illicit pharmaceutical diversion, production, and trafficking.** *(Agencies Involved: DHS; DOD; DOJ; DOS; HHS/FDA; IC/NSC; Treasury; USAID; USPIS)*

India represents a potential source for precursor chemicals used to make synthetic drugs. India is the leading generic drug manufacturer in the world. This commercial

---

[8] Exclusive Economic Zone (EEZ) as defined by United Nations Convention on the Law of the Sea (UNCLOS), Part V. https://www.un.org/depts/los/convention_agreements/texts/unclos/unclos_e.pdf. Based on United Nations Educational, Scientific and Cultural Organization UNESCO, the Ecuador EEZ covers approximately 1,150,000 squared km, which is approximately 200nm off the contiguous coast of Ecuador and the area surrounding the Galapagos (approximately 600nm off the coast). http://msp.ioc-unesco.org/world-applications/americas/ecuador/



infrastructure, and the combination of technical expertise and chemical source supplies in India, is exploited by drug traffickers to source synthetic drugs and precursor chemicals destined for markets in the United States and other regions globally.

The United States Government and the Government of India (GOI) understand the importance of counternarcotics engagement and regular consultation on narcotics matters. The creation of the Counternarcotics Working Group (CNWG) and the development of a bilateral framework demonstrates our shared commitment to strengthening meaningful partnership and engagement between our two nations.

This bilateral framework will allow the USG and the GOI to work together on curtailing the production of narcotics, reducing drug related crime, expanding the awareness of the dangers of illicit substance and its associated harms, and will build on the existing bilateral relationship between both countries.

**H. Support international partners as they address drug production and interdiction issues across the global drug market.** *(Agencies Involved: DHS; DOD; DOJ; DOS; IC)*

The global illicit drug market has resulted in an increasingly large number of countries that are not directly involved in drug trafficking into, and use in the United States, but which play substantial roles in the global flow of illicit drugs and precursor chemicals. The illicit drug industries in these nations, be it manufacturing or trafficking and transshipment, provide substantial illicit operating capital to TCOs that affect the United States directly and indirectly by their range of illegal activities, including bribery and corruption of government officials. We must be mindful of the transshipment roles played by Guatemala, Honduras, and El Salvador, forming the Northern Triangle, along with the destabilizing effects drug trafficking organizations have in these countries. [335] Similarly, Golden Triangle nations Thailand, Laos, and Burma and countries like Afghanistan serve as points of origin and transshipment for drugs including heroin, hashish, and methamphetamine bound for markets worldwide. It is also imperative that we maintain a vigilant eye on illicit narcotics flows throughout the Middle East, Africa, Europe, and Asia, as well as the possible emergence of new TCOs. For example, the new Afghan government's ultimate posture on illicit drug production and trafficking remains to be seen, which leave open the possibility that a permissive environment for TCOs will develop.

The United States must identify and engage like-minded nations as partners to confront illicit drug manufacturing and trafficking world-wide and deny TCOs safe havens from which to ply their trade. Bilateral agreements that enhance coordination and cooperation amongst law enforcement agencies of partner nations should be prioritized. Moreover, the United States should work with like-minded partners to amplify mutually held priorities in multilateral fora. Organizations such as The Interdiction Committee (TIC) should leverage the authorities and capabilities of its member agencies to enhance interdiction and capacity-building initiatives within transshipment nations for drugs bound for the United States. Support provided to international partners should be complemented by robust assessments of effectiveness and accountability for measurable outcomes. The United States will also work with multilateral organizations, such as the UNODC and the International Narcotics Control Board (INCB), to shed light on and respond to trafficking trends and enhance international cooperation.

AR2022_400800



# Principle 2: Obstruct and disrupt financial activities of transnational criminal organizations that manufacture illicit drugs and traffic them into the United States.

The ingenuity of drug traffickers is undeniable: from smuggling drugs across the southwest border on rail cars using well-engineered ventilated tunnels, to capitalizing on the massive volume of traffic flowing through the ports of entry in order to obscure contraband, to building semi-submersibles in the jungles of South America. However, the traffickers' ultimate goal is not getting drugs to market in the United States, but getting usable profits back to fund the illicit activities of the TCOs. The vast quantities of illicit drugs smuggled throughout the world generate enormous revenue, which must be moved and laundered so that traffickers can perpetuate the illicit enterprise. While bulk cash smuggling remains one of the predominant methods for moving illicit proceeds, trade-based money laundering (TBML) such as Black-Market Peso Exchanges, and mirror transfers via informal networks are also used. Additionally, TCOs are growing more comfortable with darknet markets and the use of virtual assets to launder funds, although the size and scope of drug proceeds generated on the darknet and laundered via virtual assets remain low in comparison to cash-based retail street sales.[336]

TCOs require funds to operate their illicit supply chains and exert their transnational corruptive influence. We must use and strengthen every available tool and seek new tools to uncover financial networks and obstruct and disrupt the illicit financial activities that fund TCOs that traffic illicit drugs into the United States.

A. **Enhance international partners' financial tools to target trafficking groups and deny them illicit drug proceeds.** *(Agencies Involved: DOJ/OCDETF; DOS, Treasury/ IRS, TFI)*

TCOs generate tens of billions of dollars in illicit proceeds through control of the drug trade that puts dangerous illicit drugs onto streets in the United States. While the revenue is generated from the sale of illicit drugs in the United States, illicit proceeds generated by wholesalers or larger transnational drug trafficking organizations must ultimately be moved and laundered out of the United States and back to the TCOs where they are used to fund the cycle of illicit activity and facilitate corruption and malign influence. We must work with our international partners to deny TCOs the illicit proceeds that fund their operations by enhancing anti-money laundering regulations and international standards. By working with vulnerable nations to enhance these regulations we can make it more challenging for TCOs, and the money laundering organizations that support them, to launder illicit proceeds and turn illicit drug revenue into operating capital. By denying TCOs the operating capital to purchase precursor chemicals we would impact the illicit drug trade far upstream of the street retail environment. As per Strategic Objective 5.8 of the U.S. Strategy on Countering Corruption, we must also consider the role of third-party enablers of illicit finance such as complicit lawyers and law firms, accountants, realtors/real estate firms, title insurers, art dealers, and other commercial enterprises and individuals that facilitate the illicit economy in source and transshipment countries.[9]

---

[9] "The U.S. Government will prioritize the development of a common understanding of corruption risks through joint analyses that outline corruption dynamics, networks, and nodes; consider enablers and drivers of corrupt behavior; examine the potential impact of providing foreign assistance (including security sector assistance); and



**B. Combat Transnational Criminal Organizations' financial structures and target their illicit proceeds.** *(Agencies Involved: DHS/CBP, ICE; DOJ/ATF, DEA, FBI, HIDTA, OCDETF; DOS; IC; DOD; Treasury/FINCEN, OFAC, TFFC, IRS)*

Street-level sales of illicit drugs are largely conducted with cash.[337] The manufacture, transport, and sale of illicit drugs involve multiple transactions that require the laundering of illicit finances across national, regional, and international boundaries via multiple methodologies.[338] These methodologies can include tax amnesties, casinos and gambling, transaction laundering, bank capture, shell companies and trusts, structuring, cash-intensive businesses, trade-based money laundering (TBML), commodity investment, round-tripping, cyber-laundering, and bulk cash smuggling (BCS). Tax amnesties, round-tripping, shell companies and trusts, and investments in commodities are often conducted in countries or regions with weak anti-money laundering regimes. TCOs take advantage of these weak jurisdictional controls and are able to move illicit finances with little scrutiny by law enforcement. BCS remains the primary illicit finance transfer of choice among TCOs, though due to the COVID-19 pandemic law enforcement personnel have witnessed an increase in TBML and an increased use of virtual currency and other digital assets to launder illicit funds. Reports from program implementation partners and law enforcement personnel that are part of DOS managed programs have shown a movement towards TBML and virtual currency transfers. TCOs have been stockpiling cash due to travel restrictions affecting their ability to move currency across international borders. TCOs use a variety of means to transfer value across international borders' including traditional BCS couriers, passenger vehicles, shipping containers, and high value gems, minerals, and metals shipped via mail or express consignment. Virtual currencies continue to grow in popularity with TCOs, but their use is still relatively nascent compared to BCS and other money laundering methods. Virtual currencies are mainly traded via private investors; yet, due to the relative ease in trading these currencies, TCOs often use this form of transaction as a mechanism to move money quickly and then shift it back to cash.[339]

The Bank Secrecy Act (BSA) underlies the federal government's role in working to inhibit TCOs and their financial structures.[340] The Anti-Money Laundering (AML) Act of 2020 is one of the most significant pieces of legislation enacted in recent years to thwart illicit financial actors.[341] In addition to the 2020 National Strategy to Combat Terrorism and other Illicit Financing,[342] the AML Act seeks to strengthen, modernize, and streamline the existing AML regime by promoting innovation, regulatory reform, and industry engagement through forums, such as the Bank Secrecy Act Advisory Group (BSAAG) and FinCEN Exchange. The 2021 U.S. Strategy to Counter Corruption incorporates a similar focus. Public-private partnerships are key tools in addressing the illicit finance threat. The Department of the Treasury should continue to engage with the private sector via public-private partnerships as they implement the AML Act.

**C. Enhance public-private partnership frameworks to more effectively combat the 21st Century Drug Market.** *(Agencies Involved: DHS/ICE; DOJ/DEA, DOS, HIDTA, OCDETF; Treasury/FINCEN)*

---

identify possible entry points or levers to shift the dynamics of corruption in order to incentivize reform." U.S. Strategy on Countering Corruption, Strategic Objective 5.4


Drug trafficking into the United States is a long and complex process involving manufacture, concealment, movement, purchase, and delivery that often starts and ends outside the United States with procurement of raw materials and the return of illicit proceeds, respectively. In 2019, FinCEN worked with ONDCP and 11 federal partners to release a series of advisories to crack down on international synthetic opioid trafficking and increase information sharing with the private sector to disrupt the synthetic opioid supply chain. These private-sector advisories allow domestic and foreign businesses to better protect themselves and their supply chains from inadvertently supporting drug trafficking, explain how fentanyl traffickers exploit their businesses and their supply chains to move and market deadly drugs, and foster deeper public-private collaboration to curb the production and sale of illicit fentanyl, fentanyl analogues, and other synthetic opioids.[343] Each advisory addresses one of four critical stages of illicit drugs trafficking:

- o **Manufacturing:** Aims to broaden the public and private sectors' awareness of various indicators of potential illicit fentanyl manufacturing and distribution;[344]

- o *Marketing:* Provides information for digital private sector partners about marketing and sale tactics of illicit fentanyl via social media, online forums, and e-commerce platforms;[345]

- o **Movement:** Identifies methods of intercepting illicit transportation of fentanyl and other illicit synthetic opioids; and [346]

- o **Money:** Focuses on financial institutions and their role in detecting and reporting illicit financial schemes aimed to disguise opioid trafficking activities.[347]

The DEA e-commerce outreach program is intended to reduce the availability of dangerous and often fatal counterfeit prescription drugs in the United States by educating retailers about the sale of pill presses and components used in the production of illicit and often deadly counterfeit pills.[348]

## Principle 3: Leverage the influence of multilateral organizations to tackle shared challenges from synthetic drugs.

The illicit drug trade is a global transnational problem that harms the citizens of source countries, transshipment countries, and consuming destination countries in varied and unique ways. All agencies and the international community need to continuously monitor and evaluate the effectiveness of efforts to combat drug trafficking and the direct and indirect effects of the illicit drug trade on communities at home and abroad.

A.  **Utilize international fora to strengthen drug control cooperation and address international drug policy priorities, especially pressing threats related to the manufacturing and trafficking of synthetic drugs.** *(Agencies Involved: DHS/CBP; DOJ; DOS; DOD; HHS; ONDCP; USPIS)*

The rapidly shifting global drug market confirms the importance of working with international partners to respond to pressing drug issues. Bilateral efforts are effective in addressing more limited situations, but in recent years, the United States has increasingly turned to multilateral fora to help reduce the international manufacturing and trafficking



of dangerous synthetic drugs. These multilateral drug policy fora bring together a wider community of partners willing to work in concert to address global drug policy issues and improve the health and welfare of communities around the world. To support the objectives of the *National Drug Control Strategy,* harness the collective power of the global community, and promote effective outcomes, the Department of State should continue leveraging key international organizations to promote sharing of data on emerging trends, exchange best practices to address the broad range of issues associated with the illicit global drug market, and press for an enhanced focus on addressing the proliferation of synthetic drugs. In particular, the Department of State should use the Commission on Narcotic Drugs, the decision-making body for anti-drug efforts by the United Nations, to promote U.S. drug control priorities and hold our international partners accountable for their responsibility to help stem the flow of illicit synthetic drugs. The Department of State, with support from federal partners, should also accelerate efforts in these multilateral fora to place new psychoactive substances and uncontrolled or designer precursor chemicals under international control and urge the Expert Committee on Drug Dependence (ECDD) and the INCB to rapidly review priority substances and chemicals of concern for international control on a regular basis.

**B. Draw upon long-standing relationships with like-minded partners in Asia, the Western Hemisphere, and Europe to address the changing dynamics and increasing sophistication of the global drug trade, through regional multilateral fora.** *(Agencies Involved: DHS/CBP, ICE; DOJ/ATF, DEA, FBI; DOS; Treasury; USPIS)*

Regional multilateral fora provide important venues to advance U.S. policy priorities with likeminded partners in key regions such as Asia, the Western Hemisphere, and Europe and ensure effective implementation of international drug control conventions. This includes engagement through the NADD, OAS/CICAD, the U.S.-EU Political Dialogue on Drugs, and the Five Eyes.

During the June 2016 North American Leaders Summit (NALS), the heads of government from the United States, Mexico, and Canada agreed to establish the trilateral NADD to address current and emerging drug threats facing North America.[349] In 2021, members to NALS reaffirmed their commitment, pledging to continue the NADD and establish objectives defining a comprehensive approach to address the global illicit drug environment.[350] The annual meetings are held at the Assistant Secretary level, and throughout the year trilateral trainings, study tours, and information exchanges occur at the subject matter expert level. The NADD brings together law enforcement and health officials from all three countries to address the many facets of the transnational opioid overdose epidemic, illicit psychostimulant threats facing each country, and the broader drug crisis facing North America. Because of its composition and collaborative nature, the NADD has proven able to respond to the dynamics of the

> The U.S.-Canada Joint Action Plan on Opioids is a key mechanism to address the changing dynamics of the drug trade affecting both countries. Agreed to by the President and Prime Minister, the Action Plan was formally launched in Washington, D.C. January 31, 2020 and establishes a bilateral steering committee and three working groups focused on law enforcement, border security, and health.



illicit drug marketplace and produce results in a timely manner, and the leaders of all three countries have spoken about its value.

The US-EU Political Dialogue on Drugs is a bi-annual mechanism to coordinate and advance drug policy priorities, including in advance of multilateral meetings; share emerging issues of concern; and coordinate technical assistance to third countries. [351] Topics covered in 2021 included preparation for the 64th Commission on Narcotic Drugs, addressing new psychoactive substances and synthetic drugs, the impacts of the evolving situation in Afghanistan on drug trafficking, along with alternative development in Peru. The U.S. will continue to utilize this partnership to deepen cooperation and collaboration, especially related to the production and trafficking of synthetic drugs and precursor chemicals.

The Organization of American States anti-drug component (OAS/CICAD) works to address the hemisphere's drug problems by translating global treaty and policy frameworks for drug control into practical action at the regional level through mutual accountability frameworks, policy debates and dialogues, law enforcement information sharing, and technical assistance programs. As its primary benefactor, the United States supports CICAD to address the top drug supply threats and demand issues affecting the western hemisphere. The United States will continue to support CICAD efforts to reduce the trafficking of precursor chemicals, maritime drug trafficking, and the production and smuggling of drugs throughout the region. The United States will also continue to improve its assessments of returns on investments in these efforts.

> The abundant supply of illicit substances is costing too many American lives and causing far too much damage to vulnerable communities in the United States and around the world. Global drug trafficking sustains a vast domestic and international criminal ecosystem that enables corruption and destabilizes partner nations abroad.

Finally, our partners Australia, Canada, New Zealand, and the United Kingdom, colloquially named the "Five Eyes", are critical to worldwide law enforcement and intelligence sharing, and to our understanding of the drug threat globally. They face many of the same challenges as the United States, including international precursor shipments and the growing influence of Mexican drug trafficking organizations. Representatives of our Five Eye partners attend monthly classified meetings, hosted by ONDCP, with the full spectrum of interagency partners to share critical information, trends, and leads. Our Five Eye partners help facilitate law enforcement cooperation and information sharing. They also provide ships and aircraft to our interdiction missions in several critical locations around the globe. We will continue to expand these relationships to better understand drug trafficking not just in our countries, but around the world.

**C. Encourage international organizations to develop tools and offer capacity building to help countries address pressing threats related to the manufacturing and trafficking of illicit drugs, including emerging synthetic drugs.** *(Agencies involved: DHS/CBP; DEA; DOJ; DOS; Treasury; USPIS)*

International organizations offer opportunities to mobilize countries globally to share information about emerging trends, develop best practices, and strengthen capacity to



address the broad range of issues associated with the illicit global drug market. These efforts help countries around the world develop the skills and tools necessary to take measures independently and collectively to combat the illicit drug trade and improve global health and stability. Many organizations also offer tools that help monitor global trends, improve cross-border collaboration, and offer guidance and best practices to improve governments capacities to address drug challenges. For example, UNODC's Global SMART improves the capacity of targeted countries to generate, manage, and use information on illicit synthetic drugs through early warning advisories; the International Narcotics Control Board's Pre-Export Notification (PEN) Online tool helps track the global movement of chemicals used in the manufacture of substances of interest; the Precursor Incident Communication System (PICS) and International Operations on NPS Incident Communication System (IONICS) facilitate information sharing to support law enforcement investigations and collaboration; and the UN Toolkit on Synthetic Drugs offers countries a suite of programmatic and policy solutions to strengthen their national response to emerging threats. The United States should continue leveraging these and other tools offered by international and regional organizations to mobilize a global response to drug challenges.

## Principle 4: Protect individuals and the environment abroad from criminal exploitation by those associated with drug production and trafficking.

The cultivation and manufacture of illicit substances abroad produces tremendous collateral damage to the environment. However, the full scope of damaging activities carried out by TCOs engaged in drug trafficking also includes illicit crop cultivation and illegal mining which result in deforestation and pollution of watersheds and other sensitive habitats. Activities related to illegal drug production in the Western Hemisphere have disproportionately detrimental effects on vulnerable populations ill equipped to confront these activities on their own.

A. **Work with Western Hemisphere partners to address the criminal destruction of natural resources due to illicit drug production.** *(Agencies Involved: DOS; EPA; USAID)*

In Colombia, large areas of forest are clear cut to make room for coca cultivation and clandestine runways to support aerial trafficking operations. Deforestation leaves communities more vulnerable to erosion and landslides that displace populations. In Mexico, environmental pollution by the illicit synthetic drug trade is well documented; the high acidity of drug wastewater and harsh chemicals damage sensitive environments. The United States must engage with partner nations in the Western Hemisphere to prioritize the protection of their natural resources from environmentally damaging activities carried out by TCOs engaged in illicit drug manufacture and trafficking. Engagements must emphasize the range of approaches to address environmental destruction including investigations, prosecutions, and reclamation efforts.

The abundant supply of illicit substances is costing too many American lives and causing far too much damage to vulnerable communities in the United States and around the world. Global drug trafficking sustains a vast domestic and international criminal ecosystem that enables corruption



and destabilizes partner nations abroad. These illicit substances and corresponding criminality contribute to a crisis with considerable national security, public safety and public health implications in the United States, the western hemisphere, and beyond. We recognize the full scope of damaging activities related to illicit drug trafficking includes disproportionately detrimental effects on vulnerable and underrepresented populations at home and abroad, and our understanding of the illicit industry's negative environmental effects continues to grow.

We must leverage the full capabilities of the U.S. Government and our international partners to reduce the global supply of illicit substances to reduce the availability of these substances in the United States. The complexity and diffusion of illicit drug supply chains, criminal drug trafficking organizations, and their networks of facilitators demands a renewed commitment by agencies to identify opportunities to engaged with nations and organization world-wide to objectively characterize the issues and identify holistic solutions that increase the risk and cost of illicit activity and incentivize and enhance access to licit alternatives. This requires identifying shared responsibilities between nations and working with international partners to effectively counter transnational illicit supply chains. The United States will set an example as a leader in world efforts to counter these criminal organizations and their facilitators and reduce the harms associated with illicit drugs.

AR2022_400807



# Criminal Justice and Public Safety

Arrest and incarceration of persons with substance use disorder (SUD) has had severe consequences for individuals, their families and communities, society, and taxpayers. Further, attaching criminal penalties to substance use alone has contributed to lost lives, hope and opportunity. Untreated substance use disorder is overrepresented in the prison population. It is estimated that 65 percent of persons incarcerated have an active SUD.[352] The impact begins at arrest and continues through incarceration, after release, and during reentry to communities. Arrest and incarceration for crimes related to substance use and possession disproportionately impact *Black, Indigenous and People of Color (BIPOC) and other historically marginalized* communities. In fact, Black persons are nearly five times more likely to be incarcerated for drug possession than White persons.[353]

The arrest and incarceration of people for possession of drugs for personal use – and the high number of people arrested and incarcerated for other reasons while also experiencing substance use disorders - has not only led to significant harms in BIPOC and other historically marginalized communities, but it increases risks of overdose. Upon release, incarcerated individuals are at a meaningfully elevated risk to die from an overdose than the general population.[354,355] It is clear that the criminal justice system, while improving public safety, must also play an important role in ensuring that people within its custody or supervision and upon reentry who use drugs do not overdose and instead have access to the continuum of services and support. Ensuring meaningful rehabilitation and successful reentry advances public health and public safety goals.

We need to ensure that those with SUD who are involved with the juvenile and criminal justice systems receive the services and support they need while in jail or prison, under community supervision, upon release, and during reentry. Entities along the justice continuum system must screen people for SUD, offer appropriate treatment, and provide effective reentry services pre- and post-release. We also must develop comprehensive, cross-system collaborations and services to divert people interacting with the criminal justice system due to drug use alone from that system without negatively impacting public safety and to link them to appropriate services.

We must invest in programs that provide evidence-based treatment and support at all points in the criminal justice system. We must build upon the growing support for this evidence-based approach among the criminal justice system and law enforcement stakeholders to rapidly scale up these efforts nationwide.[356]

## Principle 1: Improve access to MOUD for incarcerated and reentry populations

Medication for opioid use disorder (MOUD) programs in criminal justice settings, when administered properly by trained professionals, dramatically reduce mortality post-release and increase the likelihood that an individual will stay in treatment, rejoin their communities successfully, and reduce their risk of recidivism—all of which enhance individual and community public health and public safety outcomes.[357,358] Research has shown that for incarcerated individuals with OUD, treatment with MOUD corresponded to a reduction in the risk of death by 85-percent for drug overdoses in the month following their release.[359] We also



know that people with OUD are up to 50-percent less likely to die when they are treated long term with methadone or buprenorphine.[360] We must work to make low-threshold access to MOUD throughout the criminal justice system the norm. Evidence has shown that these medications when administered properly are safe, highly effective, and save lives.[361] Low-threshold programs prioritize providing MOUD quickly and with minimal barriers to eligibility, which expands access to more vulnerable populations and reduces overdose risk. Screening individuals at intake and ensuring individuals on MOUD are, at a minimum, maintained on their medication is essential. However, complex medical assessment should not hinder rapid initiation of treatment. All three Food and Drug Administration (FDA) approved medications (methadone, buprenorphine, and naltrexone) should be made available with medically appropriate dosing.[362] Although behavioral interventions may also be beneficial for people with OUD, providers should not withhold medications from people with OUD when behavioral interventions are not available or when individuals decline them, but will accept MOUD. Evidence has shown that MOUD when administered properly by trained professionals decreases the risk of opioid-related overdose and death, decreases illicit opioid use, and likewise improves health outcomes. They are also more effective in reducing illicit opioid use and retaining individuals in treatment than behavioral interventions and treatments alone.[363]

Although MOUD when administered properly by trained professionals has a strong evidence-base and saves lives, as of August 2021, only about 12 percent (602 out of 5,000) of correctional facilities offer any form of MOUD.[364] Few facilities maintain treatment for individuals receiving MOUD at arrest and even fewer initiate MOUD for untreated individuals.[365] Regulations surrounding the provision of methadone and buprenorphine are one reason for limited MOUD programs.[366] However, The Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder, were issued in April 2021 to assist in increasing access to buprenorphine[367] and proposed federal regulations that will permit opioid treatment programs (OTPs) to provide methadone through mobile components means will also assist expanding access in correctional facilities where there are barriers to establishing an OTP behind the walls.

The criminal justice system is a critical touchpoint for people with SUD today. However, we envision a future where these individuals are diverted from the criminal justice system when appropriate and without negatively impacting public safety and do not lose access to the continuum of care.

**A. Expand access to MOUD in state and local correctional facilities and community corrections.** *(Agencies Involved: DOJ/OJP, BOP, NIC; HHS/ASPE, NIH)*

As noted previously, very few jails and prisons continue treatment with methadone or buprenorphine for those receiving these medications prior to incarceration, and even fewer initiate OUD treatment with these medications. Jurisdictions wanting to continue or initiate OUD treatment with medication may need to develop approaches that are customized for their facility and population. Courts and community corrections agencies also play a large role in determining the type of treatment available to individuals with SUD in the criminal justice system.[368] When appropriate, individuals should be allowed to continue MOUD while on pretrial release, probation, or parole, and court-ordered treatment should not ban or discourage the use of MOUD—nor should it mandate or encourage use of one medication over another. Requiring persons to change medications or discontinue MOUD as a condition of criminal justice supervision is associated with poor criminal justice and health outcomes, and a lower likelihood of participating in



substance use treatment or MOUD in the future.[369,370,371] Worse, because physiological tolerance to opioids declines during abstinence, persons required to withdraw involuntarily from methadone or buprenorphine face a substantially increased risk of overdose and death if they use opioids even once.[372,373] Best practices have been published by leading organizations including the Substance Abuse and Mental Health Services Administration (SAMHSA)[374] and the National Association of Drug Court Professionals (NADCP).[375,376] NADCP suggests that medication decisions, including the decision to reduce or discontinue a medication, should be made by patients in consultation with a legally authorized and competently trained medical practitioner. As such, nonmedically-trained criminal justice professionals should consider medication decisions relating to participants' psychosocial needs made by duly trained and credentialed clinicians and supervision officers in conjunction with the individual.[377,378] Additionally, fewer than one in 21 youth 17-years-old and younger have access to MOUD.[379] Juvenile justice detention centers must also ensure access to MOUD and defer to trained medical professionals regarding medical decisions, such as the need for and mode of SUD treatment.

It has been reported that some judges direct participants to specific treatment providers and express a preference for a particular medication.[380] However, deference should be given to the treatment recommendations of medical professionals when appropriate. Communication and coordination among jails, prisons, courts, and community corrections regarding treatment plans can help ensure continued access to MOUD throughout transitions within the correctional system and upon release. As mentioned previously, the recently issued guidelines around buprenorphine prescribing and proposed regulations for mobile methadone will alleviate some barriers to providing MOUD in criminal justice settings. Still, working groups and discussions with corrections officials should convene to facilitate peer-learning, including lessons learned implementing and funding MOUD in various criminal justice settings.

In coordination with ongoing work of the NIDA's Justice Community Innovation Network and the National Institute of Corrections (NIC), ONDCP will survey state and local corrections systems to learn more about the MOUD landscape to better inform policy. ONDCP will also convene with BOP, NIC, and NIDA correctional leadership to develop and disseminate best practices for fully adopting MOUD in correctional settings.

Although roughly 2.3 million persons are incarcerated in prisons annually, roughly 8 to 10 million persons cycle through short-term incarceration in jails each year, many of whom are experiencing SUD and could benefit from access to MOUD administered properly by trained professionals.[381] ONDCP will leverage initiatives, such as OJP's Comprehensive Opioid, Stimulant, and Substance Abuse Program (COSSAP),[382] to expand the use of MOUD in jails. ONDCP also will work with OJP to prioritize MOUD in jails for grantee applications and awards.

**B. Expand funding for SUD treatment in the criminal justice system.** *(Agencies Involved: DOJ; HHS/ASPE, CMS, SAMHSA)*

Current federal Medicaid law generally prohibits federal Medicaid matching funds for otherwise reimbursable services for individuals when they are incarcerated, referred to as the Medicaid Inmate Exclusion Policy.[383] Section 5032 of the SUPPORT Act created demonstration opportunities for states to expand services to beneficiaries transitioning



from incarceration to the community, and states should work with CMS to incorporate SUD treatment best practices in their programs.

The Biden-Harris Administration is making significant investments in the SUD system with the potential to expand existing grant programs to provide services to incarcerated individuals, such as the Supplemental Substance Abuse Block Grant, State Opioid Response, and the Medication Assisted Treatment-Prescription Drug and Opioid Addiction grants.

Funding MOUD programs was a barrier found in a study of medical staff and wardens providing opioid agonist treatments in jails and prisons.[384] Many funding sources are not secure from year-to-year, leading to uncertainty about longer-term programming. ONDCP will explore sustainable opportunities to fund MOUD in jails, where the largest number of people with untreated SUD cycle in and out of the criminal justice system, and ensure its proper administration by trained professionals. Opioid litigation settlement proceeds will be among the potential funding sources ONDCP will recommend.

C. **Simplify the regulation of methadone and buprenorphine to create the necessary flexibility for jails and prisons to offer MOUD.** *(Agencies Involved: DOJ/DEA; HHS/SAMHSA)*

Regulatory changes are needed to offer these services in jails and prisons in a safe and legal way. SAMHSA should continue its efforts to adopt a more flexible "take home" medication rules for people in jail or prison when appropriate, and make the COVID-19 pandemic emergency regulations permanent, including allowing for remote prescribing. While HHS released updated buprenorphine prescribing guidelines expanding access to treatment,[385] it is important to recognize that many jail providers serve both facility- and community-based populations, leading to issues when prescribers have a patient limit. ONDCP should work to resolve this issue. ONDCP should also work with DEA to clarify the application of the "72-hour rule" to providers in the criminal justice system and explore the possibility of increasing the time length that allows trained practitioners to administer MOUD properly in the criminal justice setting when appropriate. The 72-hour rule, or three-day rule, allows practitioners to administer methadone (or other Schedule II medication approved for the treatment of OUD) for a 72-hour period while arranging referral to treatment through an OTP.[386]

# Principle 2: Advance racial equity in investigation, arrest, and sentencing for drug related offenses

As noted previously, BIPOC and other historically marginalized communities have experienced harmful disparate impacts throughout all aspects of the criminal justice system, leading to the disruption of families and communities. President Biden has emphasized the need to eliminate racial and other inequities in the criminal justice system while improving public safety and has stated that people should not be incarcerated for substance use alone but offered treatment instead.[387,388]

A. **Use data to identify racial inequities and to assist in driving policy changes.** *(Agencies Involved: DOJ/FBI, OJP)*



The Federal Bureau of Investigation (FBI) Uniform Crime Reporting (UCR) program data, and many other federal datasets, do not disaggregate data reporting for individuals of Latino heritage individuals by race.[389] Because they are not identified as a distinct ethnic group, disparities cannot be examined. The FBI should ensure that its criminal justice data captures racial and ethnic data for the broadest number of groups practicable. Although it is well-known that there are racial disparities in the criminal justice system, it is vital to follow the data to identify where disparities exist to evaluate and develop appropriate data-driven policy proposals.

**B. Engage prosecutors and judges to ensure equitable treatment for individuals involved in the criminal justice system. Expand training for staff in drug court programs to reduce the role of personal biases in screening out eligible nonviolent drug court program candidates.** *(Agencies Involved: DOJ/OJP, BOP)*

Evidence exists to suggest that standardized criminal justice policies that improve access to drug treatment may reduce some of the disparities between Black and White referrals to treatment.[390] Expanding training for staff in drug court programs will work towards creating a more standardized process for screening drug court candidates and prevent personal biases from impacting the decision-making process. A survey of 600 courts found that less than 4 percent of the arrestee population at risk of SUD entered treatment.[391] This is likely a reflection of the fact that many jurisdictions rely on the discretion of prosecutors, defense attorneys, and judges to make drug court referrals on a case-by-case basis. To create a more equitable process, we support the implementation of a universal, systematic screening process of arrestees which would work to prevent biases from impacting treatment referral decisions. Universal screening of persons entering he criminal justice should work to quickly process every defendant for eligibility and be integrated into regular case processing.[392]

**C. Allow courts to exercise sound judicial discretion and independence.** *(Agency Involved: DOJ)*

Mandatory minimum sentencing allows no room for courts to exercise sound judicial discretion and independence, and thus judges are required to impose punishments that they may not otherwise given the individualized facts and circumstances of each case. These sentences are commonly triggered by the weight of the drug, with the weight corresponding to specific sentences. If weight and monetary thresholds were raised, fewer individuals would be subjected to mandatory minimum sentences.[393] In 2009, Rhode Island eliminated mandatory minimum sentences and allowed courts to exercise judicial independence for nonviolent drug offenses. While the prison population decreased, its violent crime rate decreased as well.[394,395] These long and harsh sentences disproportionately affect poor people, BIPOC, and other historically marginalized groups.[396] In consultation and collaboration with DOJ, ONDCP will identify opportunities to amend federal statutes that impose mandatory minimum sentences for drug-related offenses—as warranted and where appropriate without negatively impacting public safety—allowing courts to exercise sound judicial discretion and independence based upon the mitigating and aggravating factors in each case.



# Principle 3: Promote Alternatives to Incarceration

Those committing drug-related offenses are serving longer sentences than before,[397] even as research shows that more time in prison does not reduce drug use or drug arrests.[398] While we support the work in states that are updating their criminal laws as they relate to substance use and possession, programs that divert non-violent individuals from the criminal justice system and juvenile justice system without negatively impacting public safety and offer them services to address their SUD must be supported when appropriate. Many of these programs can be found on the Annals of Research and Knowledge (ARK), an ONDCP-funded online, user-friendly database describing evidence-based and promising programs based on the risk level and needs of an individual at each stage of interaction with the criminal justice system.[399]

An example of a program in which alternatives to incarceration are promoted is occurring in Richmond County (Staten Island) in New York led by their District Attorney (DA) Michael McMahon. DA McMahon has witnessed the impact of addiction in his county and worked with the New York Police Department (NYPD) and the court system to create the Heroin Overdose Prevention & Education (HOPE) program where individuals who would be arrested for crimes related to their substance use are offered the opportunity to meaningfully engage in social and medical services (peer support, harm reduction, SUD treatment), prior to the processing of the arrest. If the individual does engage, their arrest is not processed. Since program inception, approximately 94-percent of the individuals who complete an assessment to participate in the program meaningfully engage in services and have their cases withdrawn and these participants are considerably less likely to be rearrested.[400]

A. **Work with federal, state, and local partners to support pre-arrest diversion programs for non-violent individuals when appropriate and without negatively impacting public safety.** *(Agencies Involved: DOJ/OJP, BOP; HHS/ASPE, SAMHSA)*

Diversion programs work to target the underlying problems that lead to crime and effective diversion programs can enhance long-term public safety and reduce recidivism while saving tax-payer dollars.[401,402] As previously discussed, law enforcement officers often encounter individuals with SUD in their daily work, or in response to calls for assistance. When no arrest is made, officers are increasingly facilitating pre-arrest diversion or deflection into available programs. Such pre-arrest diversion is a harm reduction approach. A number of states have worked to implement pre-booking jail diversion programs as a result of the opioid epidemic. Many jurisdictions describe the importance of shifting police culture towards community policing and community collaboration to quickly identify people who are high-risk and would particularly benefit

Another resource to assist drug courts to divert individuals to MOUD services is available in the NDCI MOUD Toolkit. This toolkit offers practical resources to help drug courts implement MOUD in accordance with scientific knowledge, drug court best practices, and emerging legal precedent. This tool kit includes three model memoranda of understanding, two letter templates, and an informational brochure for drug court participants and their loved ones. Additional information is available here: https://www.ndci.org/resource/training/medication-assisted-treatment/moud-toolkit



from diversion.[403] ONDCP will work to enhance their efforts and share the lessons learned and best practices. DOJ and HHS should also work to identify opportunities to expand funding for implementing, sustaining, and evaluating appropriate criteria for pre-arrest diversion programs that allow for a fact-specific evaluation of the characteristics of non-violent offenders and the offense and would not negatively impact public safety.

**B. Expand screening to divert non-violent individuals to the appropriate community-based services at the point of arrest, arraignment, and sentencing when appropriate and without negatively impacting public safety.** *(Agencies Involved: DOJ/BOP, OJP)*

The National Drug Court Institute (NDCI) identifies, trains, coaches, and connects drug court programs with addiction specialty physicians, physician assistants, and nurse practitioners. This allows expanded relationships with medical providers to assist in developing treatment protocols and individualized treatment plans. Early in 2022, NDCI, in partnership with the American Society of Addiction Medicine (ASAM), will also pilot a three-day virtual training series to train physicians, physician assistants, and nurses in the system. Agencies need to continue such efforts.

Federal grant-making agencies, such as HHS and DOJ, support drug court programs by including language in their awards ensuring participants cannot be compelled to cease use of MOUD when administered properly by trained professionals. Agencies must ensure that this language is maintained in current and future grant awards, and compliance with it should be monitored by the grant-making agencies.

**C. Assess impact on those with SUDs on Drug Delivery Resulting in Death Charge under state laws.** *(Agencies Involved: DOJ; HHS; ONDCP)*

Drug traffickers and violent drug dealers who sell drugs for profit deserve punishment for their crimes, especially when their products result in a fatal overdose. It is important that laws designed to punish drug traffickers harshly are not inadvertently applied to those with SUD who are not significant drug traffickers, but essentially are purchasing drugs with another user. Individual characteristics and the circumstances surrounding the commission of the offense matter in terms of determining the appropriate and proportional penalty. DOJ and HHS should assess how states are using these laws and provide recommendations to the Attorney General, Secretary of HHS and Director of ONDCP with regard to necessary changes.

## Principle 4: Improve reentry—Expand and remove barriers to support services

Individuals reentering the community benefit from support services to reintegrate them into society and connect them to stabilizing social services.[404] Individuals need assistance with gainful employment, housing and educational opportunities, and connection to benefits and health care coverage.[405] Individuals with SUD face additional challenges, from heightened risk of overdose post-release to connecting with community providers for treatment.[406,407,408] Planning for release and reentry is critical and should involve the individual and relevant community partners, and begin at intake and continue throughout the individual's incarceration.[409] Warm hand-offs to providers also increase the likelihood of engagement in