

services and improves treatment outcomes, particularly when there is an established relationship with the provider.[410,411]

**A. Ensure evidence-based in reentry support, improving linkages to the community and reentry and recovery outcomes.** *(Agencies Involved: DOJ/BOP, OJP; DOL; HHS/ASPE, CMS, SAMHSA)*

Release and reentry are critical times for ensuring a safe and stable transition into the community and providing a linkage to treatment. Individuals should leave the facility with state-issued identification, Medicaid (if applicable), and other benefits. Individuals should also be provided with naloxone and naloxone training upon release. Individuals on MOUD should be provided with a bridge prescription or take-home medication, along with an appointment with a community provider and a warm handoff to the provider. Providing these linkages will improve outcomes and save lives. ONDCP should work with federal partners at DOJ and HHS to ensure that federal funding opportunities support and promote community reentry.

**B. Eliminate collateral consequences that do not serve to protect the public.** *(Agencies Involved: DOJ/BOP, OJP)*

Drug-related criminal convictions can carry unique lifelong penalties that go above and beyond one's sentence, including an indelible electronic record. Known as collateral consequences of conviction, these penalties are common in both state and federal law and can be lifelong. Examples include bans on access to public housing, public assistance, ineligibility to vote, serve on a jury, temporary or permanent ineligibility for federal student aid, ineligibility for employment in health care facilities or within a state government, or ineligibility to obtain a professional license—even in a field in which one had long practiced as a licensed professional.

Collateral consequences severely limit one's ability to have a successful reentry process and carry lifelong penalties. It is "no wonder, then, that approximately 60-percent of formerly incarcerated individuals remain unemployed one year after incarceration."[412] While collateral consequences are narrowly tailored and serve a necessary public function in some cases, such as by forbidding prohibiting employment of individuals convicted of Medicaid fraud at health care facilities receiving federal funding, in other cases, they serve principally to impede or prevent successful reintegration and recovery. Moreover, the United States Commission on Civil Rights has noted that the impact of collateral consequences of conviction extends beyond the individual to the family and community and that, while certain collateral consequences of conviction serve to safeguard the public, others are unrelated to the crime for which a person was convicted and do not serve a public safety purpose.[413]

Moreover, the Commission noted that both the public and the judiciary lack awareness of collateral consequences of conviction, undermining any hypothesized deterrent effect. Consequently, the Commission recommended that collateral consequences of conviction only be imposed when they serve to protect the public, noting that when such a function is absent such provisions actually undermine public safety by hindering successful community reintegration.[414] We must continue to advance such efforts.



# Data Systems and Research

The Biden-Harris Administration is committed to employing a multi-faceted and evidence-based approach to policy-making as directed in the Presidential Memorandum on scientific integrity and evidence-based policymaking.[415] This is particularly significant in the area of drug policy where the ultimate impact is typically measured in American lives. Timely and accurate data are essential to grasp the extent and evolving nature of the drug problem, guide policy, assess the effectiveness of our nation's efforts, and continually improve these efforts over time. Data systems and research to generate this information must be maintained, enhanced, and supplemented so drug control practitioners, researchers, and policy-makers are continually informed by the most up to date and accurate information, while also protecting privacy and confidentiality. Further, when well communicated, such data can help inform the American public as to the types of policies and programs most likely to successfully address substance use challenges in their own communities.

Development of effective drug policy requires timely and rigorous data covering the full range of trends and activities: consumption patterns and drug use consequences, such as drug morbidity and mortality; prevention, harm reduction, treatment, and recovery; drug production, transportation and distribution by drug trafficking organizations; economic consequences of substance use; eradication and interdiction operations, and related investigations and prosecutions, by law enforcement and national security organizations at home and abroad. Further, such data must be sufficiently robust to inform questions about health disparities in substance use and service delivery, as well as provide insights as to how to build health equity related to the alleviation of substance use challenges. This is a tremendous undertaking that requires data collection by diverse stakeholders, robust information systems and analytical capabilities to adapt as the situation evolves.

Curating a knowledge base of various policy and intervention tools is another important aspect of a science-centered modus. This too requires reliable data along with sound analytical techniques that ensures that policy and program decisions are grounded in science. By building an awareness of drug-related issues and creating a compendium of evidence-based solutions, policy makers and practitioners can select proven policies and interventions that are appropriate for contexts and populations to which they are applied.

Two decades ago, ONDCP commissioned the National Research Council (NRC) to review data sources and research needs to inform drug policy.[10] Some of the NRC report findings remain relevant today:

> *"Overall the committee finds that the existing drug use monitoring systems and programs of research are useful for some important purposes, yet they are strikingly inadequate to support the full range of policy decisions that the nation must make. The central problem is a woeful lack of investment in programs of data collection and empirical research…".[416]*

---

[10]At that time, ONDCP had a budget line item for policy research which enabled the commissioning of such a study. The policy research budget line was last authorized in FY 2011 for approximately $1.3 million.



Considering the costs of drug use to our society, which have vastly increased due to the opioid epidemic over the past decade, our data systems have not kept up and lack the timeliness, scope and precision required for the most impactful national response. As we assess the data and research landscape to address the Administration's commitment to implementing evidence-based drug policy, we have much more work to do to close information and knowledge gaps. This chapter focuses on three themes: strengthening existing data systems, establishing new data systems and analytical methods to fill gaps, and enhancing the utility of drug data for policymakers, program developers and administrators, practitioners, and researchers. It concludes with recommendations for sustaining data systems and research to inform drug control policy.

## Principle 1: Strengthen existing data systems

Data on drug use and its correlates typically consist of primary data collected through mechanisms such as the federally-funded periodic national surveys, administrative data that contain drug-relevant information collected by government agencies in the course of performing their respective missions; and synthesized data, where information from multiple sources are compiled and analyzed together to answer specific research or policy questions. These data form the foundation of what we know about trends, activities, and outcomes and how we know it. They also determine the limitations of our quantitative knowledge and understanding. Data also allow us to measure how patterns and consequences change over time. Hence, they are critical indicators of the extent to which policies may or may not be making progress on their goals. The *Strategy's Performance Review System (PRS) report*—with its own specific requirements— utilizes specific measures to track progress, and these are subject to the same challenges in data availability, quality, and timeliness as outlined in this chapter. In addition, there is a statutory requirement for a Data Plan,[11] the development of which is addressed separately (see Appendix A).

We envision a future where drug use behavior and its consequences, including overdoses, drug arrests, drug-related communicable diseases, drugged driving and workplace drug use, and the availability and use of prevention, treatment, harm reduction and recovery support services are tracked in real time or as near to real time as possible, while protecting individual liberty and privacy. Only in this way can we be able to continually inform an addiction management infrastructure that is transparent, accountable and responsive in making the important changes needed to save lives. During the COVID-19 pandemic several organizations demonstrated that with the proper policies and resources, national, and even global, data on the numbers and rates of infections, deaths, and vaccinations could be collected, analyzed, and shared in near real time while safeguarding personal information. The same approach can be applied to monitoring, reporting on, and addressing drug use and its consequences by implementing policies that improve the timeliness and completeness of data such as making drug overdose a reportable condition.

Additionally, we envision a future that more fully exploits the data we currently collect. In particular, the intelligence community and law enforcement at the federal, state and local levels collect volumes of data and, while these data are gathered for specific purposes, when combined they can illuminate criminal networks and support targeted interdictions and investigations to

---

[11] 21 U.S.C. § 1705(c)(1)(M), *National Drug Control Strategy*


disrupt and dismantle drug trafficking networks. Mechanisms for information sharing across the intelligence community and law enforcement is necessary along with resources devoted to aggregating and communicating these data in real time. When appropriate, actionable intelligence should also be shared with public health agencies. Together, these will help reduce the availability of illicit drugs and enable health care practitioners and public safety personnel to stay ahead of potential drug overdose outbreaks.

**A. Identify and address shortcomings in existing data systems.** *(Agencies Involved: DOT/NHTSA; HHS/ASPE, SAMHSA, NIH, CDC, FDA; DOJ/DEA, OJP; OMB/OIRA; OSTP)*

*Primary data* collected by federal surveys provide a window into the prevalence of drug use and associated behaviors, and lend themselves to extensive analysis to address specific policy questions, such as how many persons use specific drugs, how many need treatment, how similar or different are drug use patterns for racial or ethnic sub-groups, rural or urban populations, parolees and probationers, older adults, and other demographic sub-populations. The *National Survey on Drug Use and Health* (NSDUH) provides nationally representative data on much of this information on persons living in households.[417] The school-based *Monitoring the Future* study and, to a more limited extent, the *Youth Risk Behavior Survey*, measure prevalence among youth who are attending school.

Other surveys include the new *Drug Abuse Warning Network* (DAWN), reconstituted in 2018 and anticipated to yield its first full-year, nationally representative data on drug-involved admissions to U.S. emergency departments for calendar year 2020. Prisoner and jail inmate surveys are conducted by the Bureau of Justice Statistics, although less frequently, with the most recent prison inmate survey conducted in 2016.[418] Besides primary data from individual respondents, facilities also are surveyed. For example, the *National Survey of Substance Abuse Treatment Services* (N-SSATS) collects data from substance abuse treatment facilities in the United States on facility location, scope, and characteristics.

Many nationally representative household and school surveys lack coverage for populations at high risk of drug use that are outside the realm of their survey universe – such as youth who have quit school, people experiencing homelessness, sex workers, or arrestees. These subgroups are generally smaller, more hidden, and harder to access, and therefore would require more resources and novel approaches to data collection. One limitation of many drug surveys is that they rely on self-report without the resources to obtain additional corroborating information. Because behaviors associated with drug use are illicit, self-reporting can result in under-reporting of use. Ideally self-reporting should be complemented by corroborating data sources, such as measurements relying on biological samples, when these are feasible and can detect use during the period of time targeted by the survey (e.g., past year, past month, past week). Thus far, the prohibitive cost and logistical issues posed by collecting such specimens has limited their routine use. Maintaining existing primary data collection systems is a continuing endeavor in the face of limited or shrinking resources. The discontinuation of the Arrestee Drug Abuse Monitoring (ADAM) program and DAWN, followed by the recent resurrection of the latter are examples of the disruptions that can plague previously established data



collection systems. In the long run, it is necessary to retain and improve existing data resources by ensuring that they are adequately funded and appropriately staffed.

*Administrative data*, while not necessarily tailored to drug information needs, are utilized as indicators to inform and monitor drug policy. One example is the use of death certificate data; while such information is collected for many health-related purposes, death certificate data can provide insight into substance use related overdose deaths and patterns among such deaths. Such administrative data are repurposed to extract information on patterns and consequences pertaining to drugs. Many of our existing data sources originate from administrative records (see box below).

Administrative data are rich but tend to be narrowly focused on the collecting agency's mission and drug information is limited to their existing coding structures. For example, death certificate data use the *International Classification of Diseases* (ICD) standard developed by the World Health Organization to code all causes of death and includes a narrow range of codes specific to causes of death involving drugs. The need for more detail on specific drugs in death data will need to rely on additional information obtained from medical examiner or coroner (ME/C) reports. ME/C reports are a separate process

---

### Major Drug Data Sets Originating from Administrative Sources:

*Treatment Episode Data Set* (TEDS) from reporting by treatment facilities receiving public funds to their single State agency (SSA), compiled by SAMHSA into a national dataset to provide characteristics of admissions to and discharges from substance abuse treatment.

*Death certificate data* from States compiled and coded by the National Center for Health Statistics (NCHS), made available from Centers for Disease Control and Prevention's (CDC) Wide-ranging Online Data for Epidemiologic Research (WONDER) database for data on drug deaths and the involvement of specific drugs.

*Healthcare Cost and Utilization Project* (HCUP) from records of emergency department admissions and inpatient hospital stays from participating States compiled by the Agency for Healthcare Quality and Research (AHRQ) to provide data on drug overdoses and neonatal abstinence syndrome.

*National Forensic Laboratory Information System* (NFLIS) from reporting by local, State, and Federal forensic laboratories to the Drug Enforcement Agency on drugs identified in seizure samples.

*National Seizure System* (NSS) from reporting by law enforcement agencies to the El Paso Intelligence Center (EPIC) on drug seizures.

OCDETF Management Information Systems (MIS) from drug seizure activity reported by law enforcement agencies working OCDETF investigations, cases, and initiatives.

*Uniform Crime Reports* (UCR) from reporting by law enforcement agencies to the Federal Bureau of Investigation (FBI) on crime data.

*Consolidated Counterdrug Database* (CCDB) from U.S. agencies and foreign partners involved in transit zone cocaine interdiction and trafficking events to a curated interagency database on cocaine.


in death investigation, and improving their integration with death certificate information is currently undergoing development. In addition, technological solutions are also an option, for example, using computer code to review the literal text[419] in death certificates for specific mention of drugs like fentanyl or methamphetamine that do not have their own ICD codes. Additionally, the Treatment Episode Data Set (TEDS) collects data on specialty SUD treatment admissions, transfers, and discharges, including diagnoses, demographic information, and type of care received. These data are reported to states by publicly funded SUD treatment providers, compiled by states and, in turn, reported to the Substance Abuse and Mental Health Services Administration (SAMHSA).

In addition to the federally funded data sources noted above, there are underutilized or still developing data systems that need to be mined for drug content. For example, the *National Emergency Medical Services Information System* (NEMSIS)[420] can be harnessed for drug overdose data (see Inset box), and the *Fatality Analysis Reporting System* (FARS)[421] can provide data on drug involvement in fatal traffic crashes. The Centers for Disease Control and Prevention's (CDC) *Web-based Injury Statistics Query and Reporting System* (WISQARS)[422] contains fatal and non-fatal injury data. In addition, the *National Electronic Injury Surveillance System-Cooperative Adverse Drug Event Surveillance Project* (NEISS-CADES) by the Consumer Product Safety Commission and CDC, began to include the involvement of drugs or alcohol in its tracking of injuries and adverse drug events.[423] The *Overdose Map Detection Program* (ODMAP),[424] currently covering specific areas, can be used for tracking non-fatal overdoses in some local areas. This is similarly true for infectious disease data sets such as the National HIV Behavioral Surveillance (NHBS) collected by CDC which periodically assesses HIV-related information from persons who inject drugs.

### Emergency Medical Services Data in Near-Real Time

Nationwide emergency medical services (EMS) reporting, such as that aggregated and maintained by NHTSA's NEMSIS, have standardized patient care reporting across more than 11,000 EMS agencies in 49 US states, which represented 87-percent of all EMS activations nationally in 2020. EMS data have been used as a source of near real time drug environment surveillance information. Characteristics of 911 caller complaints, EMS providers' impressions, patients' primary symptoms, and receipt of naloxone correlate strongly with trends in drug overdose deaths. Data from EMS patient encounters are submitted electronically in near real time, allowing for rapid surveillance of trends that can be stratified by characteristics such as race/ethnicity, geography, urbanicity, and neighborhood poverty level. ONDCP has engaged with NHTSA to determine how EMS databases may be better utilized at state and national levels in an early warning capacity to give public health and law enforcement officials rapid and current information regarding changing overdose trends.

Some of these reporting systems are voluntary and rely upon the contributing partners for timely and accurate reporting. These then require statistical adjustments by the collecting agency for missing reports in order to yield data that are nationally representative. Some



data systems, such as Consolidated Counterdrug Database (CCDB) and National Seizure System (NSS), also have to deconflict reports where more than one enforcement agency is involved in the same interdiction event or seizure incident.

To strengthen these systems, a strong partnership with the States or other parties that collect and contribute data is essential. The federal government does not have the authority to make reporting mandatory for state, local, and Tribal governments, but can make reporting a necessary condition for organizations receiving High Intensity Drug Trafficking Area (HIDTA) or other federal funding. Increased use of in-kind incentives to improve data quality, such as training, hardware, and software solutions to augment limited local resources, can be harnessed to improve accuracy and timeliness of these data that are not under the full control of the federal agencies compiling them.

*Data synthesis to inform specific drug policy issues* relies upon data collections, both primary and administrative, and array more than one data source to develop more complete answers to policy questions in real time. Triangulating multiple data sources can mitigate some of the limitations found in any single data source. Aggregated data from multiple sources are not an issue, however, when individual records are linked between agencies, an equally important consideration is maintaining confidentiality and privacy.

The study commissioned by ONDCP, *What America's Users Spend on Illicit Drugs,* provides an example of an analytical product using multiple data sources.[425] Policy-relevant estimates of economic costs of drug use to society, or of chronic users, are needed and will require periodic use of multiple data sources and tailored analytical methods. Other less transparent data syntheses generate annual estimates of heroin or cocaine production[426] based on a combination of crop survey data, laboratory analyses, and other factors. While the methodologies for these are usually classified, the resulting estimates are released to the public.

At present, our ability to conduct analytical studies is largely constrained by data availability, limited staffing and access to new technology, and the absence of a dedicated budget line for drug policy research and efforts to fill drug data gaps. While the reconstitution of the Data IWG will help guide the policy focus of analytical studies by data scientists in the drug agencies, ONDCP will need to take the lead in research that cuts across agency boundaries. In order to do this, ONDCP needs to revitalize its research staff capabilities and obtain contract research resources so that the agency can perform these analyses directly, or design and supervise such studies when the research is contracted out.

**B. Work collaboratively with federal partners.** *(Agencies Involved: DOJ/BJS, DEA; DOT/NHTSA; HHS/CDC, FDA, NIH, SAMHSA; OMB/OIRA)*

In 2021, ONDCP re-established the Drug Data Interagency Working Group (Data IWG) to enhance collaboration in addressing drug policy data needs. The Data IWG meets approximately quarterly, or as needed, to update other drug agencies on planned, ongoing, or completed research and data collection efforts, and, at each meeting, to focus on a specific theme or topic area of policy research that needs attention and could benefit from interagency input. Specific topics to address include, among others, meeting statutory requirements for the NDCS, pursuing measures of equity in drug data,



measurement of polydrug use, developing a recovery research agenda, and acquiring data on underserved populations. The Drug Data IWG will complement ongoing ONDCP engagement with individual agencies at the leadership and staff levels.

C. **Complement federal data systems with state, local, Tribal, international, and commercial sources in real time or near real time.** *(Agencies Involved: DOS; HHS/CDC; OSTP; ONDCP; private sector, Tribal and local government)*

As noted earlier, many of the existing data systems already rely on reporting from States. Some States are more proactive than others in their data collection and reporting systems. In these instances, it is helpful for analytical studies to include additional data they may make available. For example, Florida, New Hampshire, and Virginia regularly update their drug mortality statistics and routinely include supplementary data from their medical examiners.

Limited data is available at the local and Tribal level, although there are some local data collection efforts. A rare example of comparable data collected at the local level are the school district-based Youth Risk Behavior Surveys (YRBS) conducted every other year in approximately two dozen participating school districts or counties and two Tribal areas sites in 2019.[427] These local efforts use the same standardized survey questionnaire modules that are applied to State and national samples, providing comparison points. The YRBS model can be applied to other data collection efforts, resources permitting.

Private sector data also complements federal data. Although commercial data are based on convenience samples, their coverage is typically very large and, because of this, they can provide useful insights into drug use trends. One example is workforce drug testing results from Quest Diagnostics.[428] These data have to be purchased, but they are often timelier than public data and may be collected with greater geographic granularity. Quest data, for example, are collected, monthly and can be disaggregated at the three-digit ZIP code level. Other commercial data sources (e.g., IQVIA, Symphony Health) can also provide data on dispensing patterns for opioid prescriptions with granular information on drug, strength, and quantities dispensed. These data can be used to provide insight into dispensing patterns throughout the US and can be used to calculate estimates of morphine milligram equivalents. Because these sources tend to be costly subscription services with data sharing restrictions, ONDCP obtains summarized dispensed prescription data from CDC and shares summarized Quest data with federal partners. This type of summary data sharing needs to be encouraged, particularly when government funds are used to purchase data from commercial sources.

Research engagement with the United Nations Office of Drugs and Crime (UNODC), the Organization of American States Inter-American Drug Abuse Control Commission (CICAD), and the European Monitoring Centre on Drugs and Drug Addiction (EMCDDA), as well as bilateral research agreements or collaborative efforts with specific countries also provide opportunities to expand or refine our own existing systems. Data exchange platforms managed by the International Narcotics Control Board (INCB) can identify emerging drug production trends and threats while supporting law enforcement investigations and customs operations. These collaborative efforts with international partners need to be re-invigorated, expanded and maintained.

AR2022_400822



Harnessing data relationships with local, Tribal, and state partners can be facilitated by Organizations that build relationships at the state and local levels, which can help facilitate data sharing. For example, the Community Anti-Drug Coalitions of America (CADCA)[429] represents over 5,000 community coalitions in the United States and in some 30 countries. While it is not a data collection organization, it has contacts at the community level that might be leveraged when local information is needed. Likewise, the National Association of State Alcohol and Drug Abuse Directors (NASADAD),[430] which represents Single State Substance Use Authorities, and whose mission is "to foster and support the development of effective alcohol and other drug abuse prevention and treatment programs throughout every state," could also facilitate collaboration and timely information exchange with States.

Along with frequent consultation with the research community through regular attendance at professional meetings and conferences, these strategies are critical for augmenting federal data systems to inform drug policy.

**D. Prioritize data and analytic efforts to support advancing equity for traditionally underserved populations.** *(Agencies Involved: DOT/NHTSA; HHS/CDC, HRSA, NIH, SAMHSA; DOJ/DEA, OJP)*

The Administration has identified advancing equity for underserved populations as a government-wide priority and has established the *Equitable Data Working Group* (EDWG)[431] of federal agencies to address data relevant issues. ONDCP participates in the EDWG to ensure that our drug-specific data collection and analysis efforts are aligned with efforts to advance equity. In the drug arena, we need to be able to identify drug use patterns and trends among specific subpopulations in addition to the major age, sex, and race categories. These data are in the very early stages of development. Additionally, we need to continue to monitor treatment admission data and drug-related arrests, convictions, sentences, and incarceration rates for marginalized groups to ensure equitable access to care and fair treatment under drug laws. Further, we need to monitor health outcomes to ensure that we go beyond identifying health disparities and actually implement policies and programs that achieve health equity.

Often, data cannot be disaggregated in ways that permit analysis of trends or outcomes among marginalized groups. For example, while research shows that sexual minorities are at greater risk for substance use, datasets that include gender identity and/or sexual orientation are limited. For example, 2015 was the first year NSDUH collected sexual orientation information, finding that 39-percent of persons aged 18 or older who identified as lesbian, gay or bisexual reported illicit drug use in the past year compared to 17-percent of those who did not identify as such.[432] YRBS also added questions on sexual orientation and found similar results.[433] The LGB group, however, combines heterogeneous smaller groups and may conceal different drug use patterns between lesbian, gay, or bisexual subgroups that may require different interventions. These initial findings demonstrate that there are clear differences that warrant further investigation.

Major ethnic group labels also can conceal diversity—for example, the large group name of "Hispanic" includes Cuban and Puerto Rican persons, and these communities have widely diverging drug use prevalence rates. Few studies of such subgroups have been conducted; one important study by NIDA[434] is now dated as it was last updated two



decades ago. As the need to examine subgroups with greater granularity grows, new data collection strategies and analytic approaches will need to be developed.

Other groups of interest include persons with disabilities, older adults, persons who live in rural areas, and persons adversely affected by persistent poverty or inequality. At the very least, we need to inventory already existing but underutilized data sources for information on underserved populations, and to routinely analyze drug data in more fine-grained categories when feasible. When such data are not available, federal data collection agencies need to expand demographic categories in existing surveys and administrative data collection tools so that comparable data can be collected on diverse populations. Finally, when surveys and administrative records do not furnish adequate information on some underserved subpopulations, alternative methods for developing this information should be used.

E. **Improve the timeliness of drug data.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

Timeliness of data is essential because drug use trends, production, and trafficking patterns can shift quickly in response to changes, such as the introduction of more powerful or less expensive products or new regulatory, interdiction, and law enforcement strategies and shifting financial incentives for traffickers. New drugs and new ways of combining them hit the streets, existing drugs fall in and out of favor, new markets pop up and others fade away. As traffickers seek to circumvent the system or subgroups of people who use drugs modify their behaviors, it is critical that policy makers are equipped with the most current data possible to ensure that policies remain relevant and resources are effectively deployed.

Existing federal drug data systems do not collect real-time data. Nationally representative surveys take time to administer and require post-collection data cleaning, weighting, analysis, and summary as well as clearance before publication. When state administrative data are compiled by the federal government, the task can only be completed after the slowest state has submitted data. Moreover, the overall quality of the data may be affected by inconsistencies in practices from state-to-state. Much remains to be done to improve timeliness and, in some cases, quality.

However, there has been some progress, as seen in national mortality data. A decade ago, the reporting lag for final mortality data was two to three years. To address this lag, CDC's National Center for Health Statistics began implementing electronic death registration (EDR) systems in the states some 20 years ago. In the long run, as the EDR systems matured, they became the primary driver of improved timeliness, reducing the reporting lag to about one year. While it is possible to further reduce the lag, factors at the state and local levels, such as limitations in resources available to conduct death investigations, are likely to confound this effort. Lessons learned from this example could be applied to similar data systems that rely on states or local governments to collect the underlying data to improve timeliness and quality.

Nationally representative drug data systems need to be supplemented with more timely and complementary data sources, such as the limited, but near real-time data available from sources such as Quest and IQVIA. Additionally, agencies should maximize cross-agency sharing of analytical products from commercial sources where possible. Finally,



as ODMAP coverage expands, it will provide near-real time information for an increasing number of local jurisdictions.

# Principle 2: Establish new data systems and analytical methods

To ensure data-driven policy, the Administration needs to identify gaps in the current data systems and identify and implement strategies for capturing needed data in a timely and cost-effective manner. This may involve adopting new data collection, analysis, and reporting methodologies. It is also critical that the government adopt cutting-edge analysis approaches utilizing multiple data sources to inform policy. As data collection improves, so too will computational requirements for analyzing it. While existing resources like the Department of Energy's supercomputing capabilities might be leveraged, assessments are needed to determine if current funding and staffing levels are sufficient to implement these new activities.

A. **Identify and recommend promising drug data sources and methods not currently employed.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, FDA, NIH, SAMHSA)*

In consultation with the Drug Data IWG and other data partners, ONDCP should re-invigorate a systematic and ongoing review of research for new developments and methods in drug surveillance. This should include federal agencies, professional organizations, international counterparts, and other public, nonprofit and private sector drug researchers and will require ongoing effort. Specifically, ONDCP recommends that overdoses be added to CDC's list of notifiable conditions, under the *National Notifiable Diseases Surveillance System* (NDSS) as a non-infectious disease.[435] COVID-19 was added last year, and a similar effort for drug overdose is needed. The use of electronic health records (EHR) and recent enhancements with Electronic Laboratory Reporting (ELR) that incorporate data improvements—such as faster electronic transmission, increased accuracy, more complete reports, and improved consistency—will enable near real time monitoring of drug overdoses.

B. **Utilize alternative, novel, and complementary data collection techniques.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

There are a number of potential sources of drug data that are not utilized fully in the United States. Some of these are discussed in this section for illustrative purposes. While broad implementation of any of these would require resources, they have the potential to complement existing sources and bridge gaps in our knowledge.

One of these methods, pilot tested by ONDCP, is the re-testing of already collected biological samples for a broader array of drugs. The *Community Drug Early Warning System* (CDEWS) methodology, which is a rapid and low-cost system for identifying emerging drugs at the local level, has been used for studying people on probation and parole, youth involved in the juvenile justice system, individuals in treatment, and people served in emergency departments at about a dozen sites.[436] These re-tested specimens are not labeled with personally identifiable information (PII) and cannot be used to target specific individuals. CDEWS data reveal that these high-risk populations commonly used multiple drugs that would not be detected using a traditional toxicology panel. Although



the utility of this method has been established, large-scale implementation would require broader data collection and sustained support.

Wastewater-based epidemiology (WBE) is a non-invasive and cost-effective way of monitoring drug use trends in local areas. Utilized to monitor trends in a growing number of countries over the past 20 years, it has yet to be widely adopted in the U.S. More recently, public health applications of WBE have gained prominence because of its application in COVID-19 testing.[437] The National Science Foundation (NSF) began funding WBE through the *Coronavirus Aid, Relief, and Economic Security* (CARES) Act,[438] and has included wastewater testing to detect COVID-19 outbreaks early and projects to validate the technique for this purpose. The National Institutes of Health (NIH) and, specifically, NIDA, are funding a small number of WBE research grants for drug monitoring. The National Institute of Justice also recently funded a WBE research grant.[12] While in the initial stages, much more remains to be done to address major knowledge gaps in the United States. To expand application of this technique, we can learn from the international community, particularly the experience of the EMCDDA[439] and Sewage Analysis CORe group Europe (SCORE).[440]

For 'hard-to-reach' sub-populations such as people experiencing homelessness, street-level drug dealers, sex workers, and the chronically unemployed, rapid assessment ethnography and focus group interviews can be employed at the local level, and these methods can yield insights on respondents' attitudes and experiences which cannot be obtained from structured sample surveys. This type of qualitative data can inform the selection and development of group-appropriate quantitative research methods to produce generalizable results. Existing community connections with sub-populations should be leveraged to ensure socially disadvantaged groups are properly represented in our efforts to understand drug issues in these communities; such efforts are central to building health equity. Extending harm reduction, treatment, and recovery support services can help establish and reinforce these connections and enable a more comprehensive knowledge of how drugs impact all Americans. NIDA should research and develop methods of collecting data on high-risk and 'hard-to-reach' sub-populations to better inform policy making. The Washington, DC Metropolitan Area Drug Study (DC*MADS) series, an early NIDA effort to do this for a local jurisdiction,[441] examined household and non-household populations in the early 1990s. It included a *Homeless and Transient Population Study* and a study of drug use among women delivering livebirths in DC hospitals. We recommend that a similar effort be considered to inform policies that affect other high-risk sub-populations that are difficult to fully engage with conventional survey methods.

The Administration will also prioritize continued research on drug detection devices, including fentanyl test strips (FTS),[442] for identifying the presence of concealed substances in drug samples. These can be life-saving when deployed by people who use drugs. Using an artificial intelligence data mining interface, systematic monitoring of

---

[12] The Wastewater Epidemiology To Examine Stimulant Trends (weTEST) project will implement a wastewater-based epidemiology (WBE) approach for comprehensive, non-invasive monitoring of drug flows in communities in near real-time, effectively developing a novel drug surveillance strategy to identify specific stimulant drugs and their concentrations in samples taken from wastewater systems, and extrapolating to population-level use estimates. https://nij.ojp.gov/funding/awards/2020-r2-cx-0013



online drug fora like Bluelight, Reddit, and Erowid may shed light on the substances current drug users seek and purchase on the Internet. Other methods used internationally that may be useful in the U.S. include scraping the web or the darknet, analysis of used syringes, and indirect measures of drug use, de-identified data such as "patient questionnaires, patient self-reports, pill counts, rates of prescription refills, assessment of patient's clinical response, electronic medication monitors, measurement of physiologic markers".[443]

Geospatial analysis is not new, but is currently underutilized in relation to drug use data and drug policy. Such analyses can shed light on the relationships between drug use patterns, demographic attributes, and geographic location. For example, rural-urban differences provide a useful lens for examining patterns of substance use, morbidity and mortality along with the distribution and accessibility of treatment and other services,[444] such as harm reduction and peer recovery support services, relative to underserved populations.

**C. Develop methods for identifying emerging drug use trends in real time or near real time.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; OSTP)*

New drugs and new patterns of use are, by definition, difficult to identify because one has to know what to look for. This is where studying individuals at high risk of drug use can give a warning of what new drugs are on the horizon. The rationale for the now-defunct ADAM was to study a high-risk population (male arrestees shortly after booking) with interviews (self-report) and a biological specimen (urine sample) to corroborate self-report. This was done at the local level because drug use patterns vary with geography and the logistics of data collection were better organized at the local level. At present, there is no system in place to collect these data from high-risk populations and we continue to have a blind spot in this area.

Along these lines, the *National Drug Early Warning System* (NDEWS), a system of 18 sentinel sites across the country designed to provide early warning is funded by NIDA. NDEWS was developed through the Community Epidemiology Work Group (CEWG). NDEWS assembles traditional surveillance data for local areas from treatment admissions, poison control reports, hospital and emergency department records, mortality data from medical examiners, and laboratory sampling of seized drugs. Another example is the NIJ-funded *NPS Discovery*, a research program that works in collaboration with law enforcement, public health, and public safety agencies to rapidly identify emerging drugs, also known as Novel Psychoactive Substances (NPS), associated with intoxications and adverse events. The information, trend reports, and resources consolidated here by *NPS Discovery* allow for the rapid dissemination of information to stakeholders and affected communities. Additional novel surveillance methods are planned, including machine learning to study online drug markets and social media content, drug checking, rapid street reporting, and, potentially, wastewater-based epidemiology.

**D. Develop methods to evaluate the impact of supply reduction efforts on public health and public safety outcomes.** *(Agencies Involved: DOJ/DEA; HHS/ASPE, CDC, NIH, SAMHSA; IC)*



New research and data sets are needed in order to draw definitive conclusions about the effects of the spectrum of supply reduction activities—such as eradication, interdiction, investigations, alternative development—on public health and public safety outcomes so that we can better understand the return on supply reduction investments and develop more outcome focused interventions. For example, existing data sets and analyses are inadequate to determine whether reductions in cultivation resulting from eradication, or changes in maritime and airborne interdiction in the transit zone are associated with changes in drug use prevalence of the number of drug overdoses in the United States. Research is required to better understand how drug production, transport, and distribution respond to interdiction and domestic enforcement activities, and to develop a formal model of the complex dynamics connecting supply reduction efforts to domestic drug prices and consumption.[445] Such a model will improve our ability to anticipate and assess the impact of supply reduction policy and resourcing decisions on public health and safety.

**E. Establish systems to collect and analyze data on subpopulations at high risk of drug use for which data is inadequate.** *(Agencies Involved: DOJ/DEA; HHS/CDC, NIH, SAMHSA)*

As noted earlier, there is a need to establish systems to collect and analyze data on subpopulations at high risk of drug use that are not adequately covered by existing data systems. This includes data on racial, ethnic, and other minority groups needed to address equity issues.

The data collection involving arrestees conducted under ADAM provides an example of such a targeted data collection effort, covering a subpopulation of male arrestees and providing a window into emerging drug use trends based on self-reported use corroborated with biological samples. Additionally, data could be disaggregated at the local level, and the results used in the synthetic estimation of broader drug indicators, such as drug consumption and estimations of the amount of money people who use drugs in America spend on illegal drugs.

Other populations at high risk of drug use that are outside the realm of survey samples include people experiencing homelessness, sex workers, and institutionalized populations. The rural population is also under-represented in many data systems. Reaching these groups requires labor-intensive and costly efforts. Nonetheless, without such efforts the U.S. is at significant risk of missing large pockets of problematic drug use within our population. The Data IWG can be harnessed to focus these activities for this type of research.

**F. Support data collection practices that enhance standardization, accuracy, timeliness and relevance to policy.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; OSTP)*

Data and reporting standards are necessary to ensure the timeliness, accuracy and relevance of data utilized to develop drug policy. Existing data collection efforts, particularly at the State and local levels, can be strengthened by developing and improving guidance that standardizes the measurement of key variables that are ultimately necessary for describing and comparing drug behaviors and outcomes. Such standards can also enhance collection by non-governmental organizations. While such



standards do not currently exist in the drug arena, a growing effort, such as that embodied in the National Information Exchange Model (NIEM) [446] can inform this process of standardization and interoperability. Federal data collection agencies can promote such efforts in their ongoing work with their data partners. In addition, to facilitate geospatial analysis, U.S. *Federal Information Processing Standards* (FIPS) codes should be included in datasets except in cases where it may compromise privacy.

# Principle 3: Enhance the utility of drug data for practitioners, researchers, and policy-makers

Data must be accurate, timely and relevant to the decisions made by practitioners, researchers, and policymakers. Of course, data is only useful if it is accessible by those who need it. Expanded mechanisms for compiling, analyzing and sharing the outputs of drug-related research and data collection activities with potential users must be established, maintained, and improved to support a more comprehensive, multi-faceted, and evidence-based approach to drug control efforts. To the extent possible, data must be useful at the community level, although such granular data is rarely available at this time.

A. **Improve data accessibility.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

While the information systems discussed above are useful for collecting and managing data, additional capabilities are required to make information easily accessible to diverse end users. In particular, two forms of accessible data are necessary: summary data in an online data dashboard, and public use data for analysis by data users.

a) *Summary data* can be made available in a searchable online data dashboard that consolidates drug-related data from multiple information systems along with data on other factors relevant to drug control (e.g. demographic, geospatial, socio-economic, supply, interdiction indicators). ONDCP's reauthorization language requires such a dashboard,[447] and it is currently in development. Upon implementation, the dashboard should be searchable, user-friendly, and transparent, not unlike some already in use elsewhere, such as the United Nations World Drug Report.[448] ONDCP is mandated to maintain and update the *Drug Control Data Dashboard* with data obtained from federal agencies and other authoritative sources.

b) *Public use data* need to be accessible for analysis by diverse stakeholders. Summary data published by reporting agencies are only the tip of the information iceberg. Many federal data systems track a plethora of variables that can be analyzed by researchers or others to address more specific policy questions. Some data systems generate readily accessible public use data that can be mined to explore a wide array of research questions, including, to a limited extent, questions on underserved populations.

For example, NSDUH public use data files typically become available around the same time that SAMHSA releases the annual summary findings. Similarly, NCHS makes record-level death certificate data available for further analysis through WONDER (Wide-ranging Online Data for Epidemiologic Research),



a menu-driven online system of the CDC that provides access to a wide array of public health information.

However, other data systems do not routinely make primary data available for analysis. Some provide restricted access (e.g., NSS, NFLIS), and others provide limited (e.g., N-SSATS) or no access beyond what is published in summary form. Not all data systems provide adequate documentation for analysts to utilize the data fully, and there is a need to improve access to primary data for analysts.

**B.** **Increase access to searchable compendia of evidence-based interventions.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

In addition to data, states, local governments, provider organizations, and others need the knowledge and skills to identify and implement evidence-based interventions. The *Strategy*'s priority areas rely heavily on the adoption of evidence-based approaches for prevention, harm-reduction, treatment, recovery support, criminal justice reform, and interventions supporting drug policy.

Agencies have approached the task of disseminating evidence-based practices in various ways, from published reports to online resources or combinations of both. The CDC publication, *Overdose: What's working in the United States,* an overview of evidence-based strategies for preventing drug overdose[449] includes the scientific basis, how and why the strategy works, and examples of organizations that have put the practice to work. Similarly, SAMHSA's longstanding Treatment Improvement Protocol (TIP) series provides guidelines for implementing various evidence-based approaches.

Online resources continue to evolve, and SAMHSA is a case in point. In 2017, it discontinued its longstanding *National Registry of Evidence-based Programs and Practices* (NREPP), replacing it in 2018 with the *Evidence-Based Practices Resource Center* (EBPRC). NREPP compiled and updated effective, science-based behavioral health interventions, including for the prevention and treatment of SUD. Besides proven interventions that were independently audited, the registry also began to include programs to avoid because they had not been shown to work sufficiently.[450] Its successor, EBPRC was established with the same goals."[451] ONDCP will work with SAMHSA, NIDA, NIAAA, NIC, NIJ, CDC, and other federal agencies to further clarify the process for identification or external submission of practices for consideration, and the criteria for inclusion in the new resource.

Other agencies also have searchable databases. For example, the National Institute of Justice maintains the *Crime Solutions* website,[452] a topical repository that assists practitioners and policy makers in decision making and program implementation by providing information on justice-related programs and practices meeting standard evidentiary criteria of effectiveness. Inclusion and evaluation criteria are clearly described and included practices are reviewed by two experts using objective scoring criteria to rate the strength of the evidence supporting the practice.

Despite these and other federal resource repositories, the evidence base, in general, is not easy to access, and the quality of existing resources is uneven. Unintended consequences are not typically included in these assessments. Search filters often include sub-populations with specific needs (such as females or major racial groups), but do not



currently include other underserved populations such as ethnic or sexual minorities, or rural populations. Besides the need to expand the underlying research base to address equity issues, there is also a strong need to improve access to and the utility of evidence that already exists. This is true not only for databases collected specifically around substance use purposes, but also more general health and population data sets of relevance to substance use (such as databases of the medical literature which are not devoted solely to substance use issues but certainly contain key information about substance use; the challenge is how to withdraw that information from the more general data sets).

It is not necessary to have a single centralized government repository for evidence-based interventions. Moreover, the breadth of such a portal might limit its utility. ONDCP recommends that agencies curate their respective knowledge base materials or enter into selected interagency partnerships for this purpose. Agencies should provide clear criteria for determining what interventions or programs to include, identifying research supporting the evidence, describing the sub-populations to which practices apply, and indicating any known unintended consequences or potential complications. Such repositories should be searchable and should be continually updated.

**C. Expand datasets and data collection processes to permit greater disaggregation by subpopulations, including marginalized or underserved groups.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

Prevalence, treatment access, outcome or other drug data can rarely be disaggregated by group other than by age, gender, races other than Black or White, and Hispanic ethnicity. For example, while NSDUH has released a series of slides focused on smaller subpopulations such as American Indians and Alaska Natives; Asians/Native Hawaiians and Other Pacific Islanders; veterans; and lesbian, gay, transgender, and bisexual adults, these standalone statistics are not routinely included in their published tables. As we proceed with this effort, we also need to routinely perform disclosure risk analysis as the sample sizes get smaller for minority subgroups to protect individual privacy.

An inventory of the subpopulations identified in existing surveys is necessary. In addition to racial or ethnic minorities, these should include sexual or religious minorities, rural residents, migrants, and other groups. While annual analysis may not be possible due to small numbers, aggregating data for multiple years for the subpopulation in question can still provide a picture that can inform policy. Multiple years of data will need to be aggregated to yield stable estimates, unless additional resources are expended to oversample such subpopulations. As an alternative, researchers may determine that certain purposive sampling strategies targeting minority populations can be adopted as a complement to the primary sampling mechanism.

**D. Expand law enforcement and intelligence community information sharing and strengthen information sharing framework across departments.** *(Agencies Involved: DHS/CBP, ICE, USCG; DOJ/ATF, DEA, FBI; OCDETF; DOD; ONDCP/HIDTA; IC; Treasury/FINCEN, IRS)*

Transnational criminal organizations (TCOs) are a complex and constantly evolving threat that requires a comprehensive and flexible approach. Multiple National Drug Control Program agencies and intelligence community entities collect useful data that can



be used to target, disrupt, dismantle, and degrade TCO operations and drug trafficking efforts. Additional resources should be devoted to aggregating these numerous datasets and information systems for timely analysis to thwart the threat of TCOs. While intelligence and law enforcement evidence is gathered with unique end goals in mind, both methods produce volumes of data that can illuminate criminal networks and support targeted interdictions and investigations to disrupt and dismantle TCOs, affiliates, and local street gangs involved in the illicit drug trade.

Current developments, including those in information technology and geospatial analysis, have permitted advances in some areas of drug research, but many challenges remain. In order to develop a robust and timely data system to support the *National Drug Control Strategy*, we recommend the following:

- Facilitate a regular periodic review of drug data needs and data access requirements *(Lead Agency: ONDCP through Data IWG)*

- Engage and motivate data partners, especially State and local collectors that contribute to national data compilations *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

- Advance the analytical integration of multiple sources of data to mitigate weaknesses inherent in single data sources while maintaining privacy and confidentiality *(Agencies Involved: DOJ, DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; DOD; ONDCP)*

- Support the establishment of new data sources and analyses to fill data gaps (Agencies Involved: DOJ/DEA, OJP; DOD; HHS/CDC, NIH, SAMHSA)

- Accelerate and streamline access to data, findings, and evidence-based interventions *(Agencies Involved: DOD; DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; ONDCP)*.

In addition to monitoring specific *Strategy* goals and objectives, it is necessary to pursue a sustained long-term effort to revitalize our drug data systems in order to measure progress in the *Strategy's* priority areas.



# Appendix A—Developing a Data Plan

The SUPPORT Act includes a statutory requirement for developing a "systematic plan for increasing data collection to enable real time surveillance of drug control threats, developing analysis and monitoring capabilities, and identifying and addressing policy questions related to the National Drug Control Strategy and Program."[*]

The Biden-Harris administration also has articulated seven drug policy priorities, specifically the following:

- Expanding access to evidence-based treatment

- Advancing racial equity in our approach to drug policy

- Enhancing evidence-based harm reduction efforts

- Supporting evidence-based prevention efforts to reduce youth substance use

- Reducing the supply of illicit substances

- Advancing recovery-ready workplaces and expanding the addiction workforce

- Expanding access to recovery support services.

These priority areas are folded into the 2022 *National Drug Control Strategy*. We envision a data plan to be developed that blends the statutory requirements and the Administration's priorities. The plan will be multi-faceted and informed by regular consultation with our interagency partners, and development will continue into next year.

## Background

The previous Administration published a Data Plan, appended to the 2020 NDCS, that was opaque in terms of how it was formulated and how it would be pursued. This Administration is in the process of reformulating such a data plan that is aligned with the current drug control priority areas and that undergoes a transparent process of development, with the involvement of subject matter experts in drug control agencies to formulate key policy questions pertaining to the *National Drug Control Strategy*. Such an interagency effort, led by ONDCP through the Drug Data Interagency Working Group (Data IWG), will recommend options, including resources required, for obtaining data in near-real-time to address such questions. Specific elements specified by statute are listed in the inset box below.

---

[*******] 21 U.S.C. § 1705(c)(1)(M), *National Drug Control Strategy*.



**Items to include in the Data Plan**

  ''(i) a list of policy-relevant questions for which the Director and each National Drug Control Program Agency intends to develop evidence to support the National Drug Control Program and Strategy;

  ''(ii) a list of data the Director and each National Drug Control Program Agency intends to collect, use, or acquire to facilitate the use of evidence in drug control policymaking and monitoring;

  ''(iii) a list of methods and analytical approaches that may be used to develop evidence to support the National Drug Control Program and Strategy and related policy;

  ''(iv) a list of any challenges to developing evidence to support policymaking, including any barriers to accessing, collecting, or using relevant data;

  ''(v) a description of the steps the Director and the head of each National Drug Control Program Agency will take to effectuate the plan; and

  ''(vi) any other relevant information as determined by the Director.

*Source: 21 U.S.C. § 1705(c)(1)(M), National Drug Control Strategy.*

## Process

The Data Plan development process began with the reconstitution of the Data IWG in December 2021 and is systematically proceeding with identifying policy questions, and then addressing such questions with relevant data.

Topical areas for potential policy questions to be developed with interagency input would likely include the following: drug overdose, treatment, resource tracking, drug supply reduction, illicit financing, and emerging drug threats.

We anticipate that as the iterative work proceeds, sub-committees of the Data IWG will be focusing on specific topical areas. For example, a sub-committee focusing on fatal and non-fatal overdoses could include agencies compiling data from forensic laboratories, emergency medical services, death certificates, hospital admissions, and visits to emergency departments. Similarly, a sub-committee focusing on drug supply issues could include the intelligence community, law enforcement and drug interdiction agencies, and forensic laboratories.

We also anticipate that the timing of the data plan development process will be coordinated with the budget cycle so that recommendations can be incorporated into the agency budget requests so we can obtain the resources needed to execute planned improvements or new activities.



A robust Data Plan can lead to real-time or near-real-time surveillance tools for monitoring drug-related causes and consequences in the public health, public safety, and drug supply arenas. In addition, data for tracking progress towards stated goals, as documented in the *Strategy's PRS report*,[13] can be improved in quality and timeliness.

## Outlook

A rigorous Data Plan is expected to take approximately one year to develop fully, with consideration of budget cycle timing. The plan's successful implementation will depend largely on the availability of resources, including staff and funding to improve existing data or to establish new sources or methods of utilizing data.

---

[13] The *PRS report* is a separate document that is part of the *National Drug Control Strategy* requirements.



# Works Cited

1 NCHS, National Vital Statistics System. Estimates for 2020 are based on provisional data. Estimates for 2015-2019 are based on final data (available from: https://www.cdc.gov/nchs/nvss/mortality_public_use_data.htm).

2 From 2016 to 2020, numbers of U.S. injury deaths by firearms increased by 17 percent, those by suicide increased by two percent, homicide by 27 percent, and those by motor vehicle crash increased by five percent. Injury death categories are not mutually exclusive. For example, 4,329 suicides in 2020 were by drug overdose. [Source: Centers for Disease Control and Prevention, National Center for Health Statistics, Multiple Cause of Death, 1999-2020 on CDC WONDER Online Database, released December 2021. Extracted by ONDCP on December 22, 2021.]

3 Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health 2019. Unpublished Special Tabulation by the Center for Behavioral Health Statistics & Quality (June 2021).

4 Odgers C, Caspi A, Nagin D, et al. Is It Important to Prevent Early Exposure to Drugs and Alcohol Among Adolescents? Psychol Sci. Oct 2008; 19(10):1037–1044. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3664402/

5 Newcomb M, Felix-Ortiz M. Multiple protective and risk factors for drug use and abuse: Cross-sectional and prospective findings. *Journal of Personality and Social Psychology, 1992; 63(2),* 280–296. Accessed July 23, 2021. https://doi.org/10.1037/0022-3514.63.2.280

6 Preventing Drug Use Among Children and Adolescents. A Research-Based Guide for Parents, Educators, and Community Leaders. Second Edition. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. NIH Publication No. 04-4212(A). Second Edition October 2003. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/preventingdruguse_2.pdf

7 Principles of Substance Abuse Prevention for Early Childhood: A Research-Based Guide. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. March 2016. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/early_childhood_prevention_march_2016.pdf

8 Holly Hagan, James P McGough, Hanne Thiede, Sharon Hopkins, Jeffrey Duchin, E.Russell Alexander, Reduced injection frequency and increased entry and retention in drug treatment associated with needle-exchange participation in Seattle drug injectors, Journal of Substance Abuse Treatment, Volume 19, Issue 3, 2000, Pages 247-252, ISSN 0740-5472, https://doi.org/10.1016/S0740-5472(00)00104-5.

9 SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 5.32A Classified as Needing Illicit Drug Use Treatment. https://www.samhsa.gov/data/sites/default/files/reports/rpt35323/NSDUHDetailedTabs2020/NSDUHDetailedTabs2020/NSDUHDetTabsSect5pe2020.htm

10 Hall OT, Jordan A, Teater J, et al. Experiences of racial discrimination in the medical setting and associations with medical mistrust and expectations of care among black patients seeking addiction treatment [published online ahead of print, 2021 Jun 25]. J Subst Abuse Treat. 2021;108551. doi:10.1016/j.jsat.2021.108551

11 van Boekel LC, Brouwers EPM, van Weeghel J, Garretsen HFL. Stigma among health professionals towards patients with substance use disorders and its consequences for healthcare delivery: Systematic review. *Drug and Alcohol Dependence*. 2013;131(1-2):23-35. doi:10.1016/j.drugalcdep.2013.02.018

12 SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 6.36A Perceived Recovery from a Substance Use Problem. https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables

13 Substance Abuse and Mental Health Services Administration. SAMHSA's Working Definition of Recovery. 2010. Retrieved by ONDCP on May 24, 2021 at https://store.samhsa.gov/sites/default/files/d7/priv/pep12-recdef.pdf

14 SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 6.35A Perceived Ever Having Had a Substance Use Problem.https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables

15 SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 6.36A Perceived Recovery from a Substance Use Problem. https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables



[16] Kelly JF, Bergman B, Hoeppner BB, Vilsaint C, White WL. Prevalence and pathways of recovery from drug and alcohol problems in the United States population: Implications for practice, research, and policy. *Drug Alcohol Depend.* 2017;181:162-169.

[17] U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 2.

[18] Columbia University. National Center on Addiction and Substance Abuse. *Behind Bars II : Substance Abuse and America's Prison Population.* New York, NY: National Center on Addiction and Substance Abuse at Columbia University; 2010.

[19] Gross, S., R., Possley, M., & Stephens, K. (2017). *Race and Wrongful Convictions in the United States.* The National Registry of Exonerations, Newkirk Center for Science and Society. http://www.law.umich.edu/special/exoneration/Documents/Race_and_Wrongful_Convictions.pdf

[20] Binswanger IA, Stern MF, Deyo RA, et al. Release from prison — a high risk of death for former inmates. *The new england journal of medicine.* 2007;356(2):157-165. doi:10.1056/NEJMsa064115.

[21] Ranapurwala SI, Shanahan ME, Alexandridis AA, et al. Opioid overdose mortality among former north carolina inmates: 2000–2015. *American journal of public health.* 2018;108(9):1207-1213. doi:10.2105/AJPH.2018.304514

[22] The White House. Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking. January 27, 2021. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/. Accessed on January 6, 2022.

[23] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health 2019. Unpublished Special Tabulation by the Center for Behavioral Health Statistics & Quality (June 2021).

[24] Compton W, Thomas Y, Stinson F, et al. Prevalence, Correlates, Disability, and Comorbidity of DSM-IV Drug Abuse and Dependence in the United States: Results From the National Epidemiologic Survey on Alcohol and Related Conditions. Archives of General Psychology, 2007 May;64(5):566-76. Accessed November 2021 https://pubmed.ncbi.nlm.nih.gov/17485608/

[25] Huttenlocher PR, Dabholkar AS. Regional differences in synaptogenesis in human cerebral cortex. J Comp Neurol. 1997 Oct 20;387(2):167-78. doi: 10.1002/(sici)1096-9861(19971020)387:2<167::aid-cne1>3.0.co;2-z. PMID: 9336221.

[26] Petanjek Z, Judaš M, Šimic G, Rasin MR, Uylings HB, Rakic P, Kostovic I. Extraordinary neoteny of synaptic spines in the human prefrontal cortex. Proc Natl Acad Sci U S A. 2011 Aug 9;108(32):13281-6. doi: 10.1073/pnas.1105108108. Epub 2011 Jul 25. PMID: 21788513; PMCID: PMC3156171.

[27] Arria, A , Caldeira, K, Bugbee B, et al. The academic opportunity costs of substance use during college. College Park, MD: Center on Young Adult Health and Development. 2013. Accessed November 2021. www.cls.umd.edu/docs/AcadOppCosts.pdf

[28] Gobbi G, Tobias A, Zytynski T, et al., Association of Cannabis Use in Adolescence and Risk of Depression, Anxiety, and Suicidality in Young Adulthood: A Systematic Review and Meta-analysis, JAMA Psychiatry. 2019;1;76(4):426-434. Accessed November 2021. https://pubmed.ncbi.nlm.nih.gov/30758486/

[29] Tice, P, Lipari, R, and Van Horn, S. Substance use among 12th grade aged youths, by dropout status. The CBHSQ Report: August 15, 2017. Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration, Rockville, MD. Accessed November 2021. https://www.samhsa.gov/data/sites/default/files/report_3196/ShortReport-3196.html

[30] Grant BF, Dawson DA. Age of onset of drug use and its association with DSM-IV drug abuse and dependence: results from the National Longitudinal Alcohol Epidemiologic Survey. J Subst Abuse. 1998;10(2):163-73. doi: 10.1016/s0899-3289(99)80131-x. PMID: 9854701.

[31] Kessler RC, Aguilar-Gaxiola S, Berglund PA, Caraveo-Anduaga JJ, DeWit DJ, Greenfield SF, Kolody B, Olfson M, Vega WA. Patterns and predictors of treatment seeking after onset of a substance use disorder. Arch Gen Psychiatry. 2001 Nov;58(11):1065-71. doi: 10.1001/archpsyc.58.11.1065. PMID: 11695954.

[32] Salmanzadeh H, Ahmadi-Soleimani SM, Pachenari N, Azadi M, Halliwell RF, Rubino T, Azizi H. Adolescent drug exposure: A review of evidence for the development of persistent changes in brain function. Brain Res Bull. 2020 Mar;156:105-117. doi: 10.1016/j.brainresbull.2020.01.007. Epub 2020 Jan 8. PMID: 31926303.

[33] Monti P, Miranda R, Nixon K, et al. Adolescence: Booze, Brains, and Behavior. Alcohol Clin Exp Res, Vol 29, No 2, 2005: pp 207–220. Accessed November 2021. http://georgicounseling.com/wp-content/uploads/2009/07/Adolescence-booze-brains-behavior-2005.pdf

[34] National Academies of Sciences, Engineering, and Medicine. Fostering healthy mental, emotional, and Behavioral development in children and youth. The National Academies Press. 2019. doi:10.17226/25201


[35] U.S. Department of Health and Human Services, Office of Disease Prevention and Health Promotion. Social Determinants of Health Workgroup. Healthy People 2030. Accessed July 2021. https://health.gov/healthypeople/about/workgroups/social-determinants-health-workgroup

[36] Bohler R, Thomas C, Clark T, Horgan C. Addressing the Opioid Crisis through Social Determinants of Health: What Are Communities Doing? 2021. Opioid Policy Research Collaborative at Brandeis University.

[37] U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. About Social Determinants of Health (SDOH). Accessed July 23, 2021. https://www.cdc.gov/socialdeterminants/about.html.

[38] Chung E, Siegel B, Garg A, et al. Screening for Social Determinants of Health Among Children and Families Living in Poverty: A Guide for Clinicians. Curr Probl Pediatr Adolesc Health Care. 2016; 46(5): 135–153. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6039226/. Accessed September 1, 2021.

[39] Allen,J, et al. 4, Social determinants of mental health. International *Review of Psychiatry*, 2014; Vol. 26, pp. 392-407.

[40] Rusby, J. C., Light, J. M., Crowley, R., & Westling, E. Influence of parent–youth relationship, parental monitoring, and parent substance use on adolescent substance use onset. Journal of Family Psychology, 2018;32(3), 310–320.

[41] Monitoring the Future Study. Monitoring the Future is an annual drug use survey of eighth, 10th and 12th grade students conducted by researchers at the University of Michigan, Ann Arbor, and funded by the National Institute on Drug Abuse. https://www.drugabuse.gov/drug-topics/trends-statistics/monitoring-future.

[42] Boardman JD, Finch BK, Ellison CG, Williams DR, Jackson JS. Neighborhood disadvantage, stress, and drug use among adults. J Health Soc Behav. 2001 Jun;42(2):151-65. PMID: 11467250.

[43] Housing Instability and Concurrent Substance use and Mental Health Concerns: An Examination of Canadian Youth. Smith, T, et al. 3, 2017, J Can Acad Child Adolesc Psychiatry, Vol. 26, pp. 214-223.

[44] Association of family income supplements in adolescence with development of psychiatric and substance use disorders in adulthood among an American Indian population. Costello, E J, et al. 19, 2010, JAMA, Vol. 303, pp. 1954-1960.

[45] Centers for Disease Control and Prevention. Adverse Childhood Experiences Prevention Strategy. National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. Accessed July 23, 2021. https://www.cdc.gov/injury/pdfs/priority/ACEs-Strategic-Plan_Final_508.pdf

[46] Powell, T. M., & Davis, J. P. (2019). Addressing the social emotional needs of children in chronic poverty: A pilot of the Journey of Hope. *Children and Youth Services Review*, 98, 319-327. https://doi.org/10.1016/j.childyouth.2018.11.010

[47] Huang Y, Liu H, Masum M. Adverse Childhood Experiences and Physical and Mental Health of Adults: Assessing the Mediating Role of Cumulative Life Course Poverty. Am J Health Promot. 2021 Jun;35(5):637-647. doi: 10.1177/0890117120982407. Epub 2020 Dec 24. PMID: 33356410.

[48] Kim, H. G., Kuendig, J., Prasad, K., & Sexter, A. (2020). Exposure to Racism and Other Adverse Childhood Experiences Among Perinatal Women with Moderate to Severe Mental Illness. Community mental health journal, 56(5), 867–874. https://doi.org/10.1007/s10597-020-00550-6

[49] Felitti V, Anda R, Nordenberg D, et al. Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study. *American Journal of Preventive Medicine.* 1998; (1) 4: 245-258. Accessed July 23, 2021. https://www.ajpmonline.org/article/S0749-3797(98)00017-8/fulltext

[50] Anda R, Dube S, Felitti V, et al. Childhood Abuse, Neglect, and Household Dysfunction and the Risk of Illicit Drug Use: The Adverse Childhood Experiences Study. *Pediatrics.* 2003;111;564. Accessed July 23, 2021. https://www.icmec.org/wp-content/uploads/2015/10/ACE-and-Illicit-Drug-Use-Pediatrics-2003.pdf

[51] Centers for Disease Control and Prevention (2019). Preventing Adverse Childhood Experiences: Leveraging the Best Available Evidence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

[52] Substance Abuse and Mental Health Services Administration. SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach. HHS Publication No. (SMA) 14-4884. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2014. https://ncsacw.samhsa.gov/userfiles/files/SAMHSA_Trauma.pdf



53 Centers for Disease Control and Prevention (2019). Preventing Adverse Childhood Experiences: Leveraging the Best Available Evidence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. https://www.cdc.gov/violenceprevention/pdf/preventingACES.pdf

54 Centers for Disease Control and Prevention (2019). Preventing Adverse Childhood Experiences: Leveraging the best available evidence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. https://www.cdc.gov/violenceprevention/pdf/preventingACES-508.pdf

55 Odgers C, Caspi A, Nagin D, et al. Is It Important to Prevent Early Exposure to Drugs and Alcohol Among Adolescents? Psychol Sci. Oct 2008; 19(10):1037–1044. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3664402/

56 Newcomb M, Felix-Ortiz M. Multiple protective and risk factors for drug use and abuse: Cross-sectional and prospective findings. *Journal of Personality and Social Psychology, 1992; 63(2),* 280–296. Accessed July 23, 2021. https://doi.org/10.1037/0022-3514.63.2.280

57 Dennis M, Clark H, Huang, L. The need and opportunity to expand substance use disorder treatment in school-based settings. *Advances in School Mental Health Promotion.* 2014; 7:2, 75-87. Accessed July 22, 2019. http://dx.doi.org/10.1080/1754730X.2014.888221

58 Odgers C, Caspi A, Nagin D, et al. Is It Important to Prevent Early Exposure to Drugs and Alcohol Among Adolescents? Psychol Sci. Oct 2008; 19(10):1037–1044. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3664402/

59 Newcomb M, Felix-Ortiz M. Multiple protective and risk factors for drug use and abuse: Cross-sectional and prospective findings. Journal of Personality and Social Psychology, 1992; 63(2), 280–296. Accessed July 23, 2021. https://doi.org/10.1037/0022-3514.63.2.280

60 Grant BF, Dawson DA. Age of onset of drug use and its association with DSM-IV drug abuse and dependence: results from the National Longitudinal Alcohol Epidemiologic Survey. J Subst Abuse. 1998;10(2):163-73. doi: 10.1016/s0899-3289(99)80131-x. PMID: 9854701.

61 Clayton HB, Bohm MK, Lowry R, Ashley C, Ethier KA. Prescription opioid misuse associated with risk behaviors among adolescents. American Journal of Preventive Medicine, 2019;57(4), 533–539. https://doi.org/10.1016/j.amepre.2019.05.017

62 Carlson SA, Fulton JE, Lee SM, Maynard M, Drown DR, Kohl III HW, Dietz WH. Physical education and academic achievement in elementary school: data from the Early Childhood Longitudinal Study. American Journal of Public Health2008;98(4):721–727.

63 Rasberry CN, Tiu GF, Kann L, McManus T, Michael SL, Merlo CL, Lee SM, Bohm MK, Annor F, Ethier K. Health-related behaviors and academic achievement among high school students—United States, 2015. MMWR Morb Mortal Wkly Rep2917;66:922-927.

64 Monitoring the Future Study. Monitoring the Future is an annual drug use survey of eighth, 10th and12th grade students conducted by researchers at the University of Michigan, Ann Arbor, and funded by the National Institute on Drug Abuse. https://www.drugabuse.gov/drug-topics/trends-statistics/monitoring-future.

65 Jones C, Clayton H, Deputy N. et al. Prescription Opioid Misuse and Use of Alcohol and Other Substances Among High School Students — Youth Risk Behavior Survey, United States, 2019. Supplements / August 21, 2020 / 69(1);38–46. https://www.cdc.gov/mmwr/volumes/69/su/su6901a5.htm

66 Jones C, Clayton H, Deputy N. et al. Prescription Opioid Misuse and Use of Alcohol and Other Substances Among High School Students — Youth Risk Behavior Survey, United States, 2019. Supplements / August 21, 2020 / 69(1);38–46. https://www.cdc.gov/mmwr/volumes/69/su/su6901a5.htm

67 Wang TW, Neff LJ, Park-Lee E, Ren C, Cullen KA, King BA. E-cigarette Use Among Middle and High School Students — United States. Morbidity and Mortality Weekly Report 2020;69:1310–1312. DOI: http://dx.doi.org/10.15585/mmwr.mm6937e1.

68 Centers for Disease Control and Prevention (CDC), Wide-Ranging Online Data for Epidemiologic Research (WONDER). Data provided by CDC. February 2022.

69 Substance Use and Associated Health Conditions throughout the Lifespan. Public Health Rev. 2014; 35(2). Accessed July 23, 2021. https://web-beta.archive.org/web/20150206061220/http://www.publichealthreviews.eu/upload/pdf_files/14/00_Schulte_Hser.pdf

70 Dube SR, Felitti VJ, Dong M, Chapman DP, Giles WH, Anda RF. Childhood abuse, neglect, and household dysfunction and the risk of illicit drug use: the adverse childhood experiences study. Pediatrics. 2003 Mar;111(3):564-72. doi: 10.1542/peds.111.3.564. PMID: 12612237


[71] Rothman, E. F., Edwards, E. M., Heeren, T., & Hingson, R. W. (2008). Adverse childhood experiences predict earlier age of drinking onset: results from a representative US sample of current or former drinkers. Pediatrics 122(2), e298–e304.

[72] Forster, M., Gower, A. L., Borowsky, I. W., & McMorris, B. J. (2017). Associations between adverse childhood experiences, student-teacher relationships, and non-medical use of prescription medications among adolescents. Addictive Behaviors 68, 30–34. doi:10.1016/j.addbeh.2017.01.004

[73] Preventing Drug Use Among Children and Adolescents. A Research-Based Guide for Parents, Educators, and Community Leaders. Second Edition. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. NIH Publication No. 04-4212(A). Second Edition October 2003. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/preventingdruguse_2.pdf

[74] Principles of Substance Abuse Prevention for Early Childhood: A Research-Based Guide. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. March 2016. Accessed July 23, 2021.
https://www.drugabuse.gov/sites/default/files/early_childhood_prevention_march_2016.pdf

[75] Hawkins J, Catalano R, Miller J. Risk and Protective Factors for Alcohol and Other Drug Problems in Adolescence and Early Adulthood: Implications for Substance Abuse Prevention. Psych. Bulletin. 1992: 112(1)64-105. PDF: Risk_and_Protective_Factors_for_Alcohol_20161117-21667-1i3ln4w-with-cover-page-v2.pdf (d1wqtxts1xzle7.cloudfront.net) Accessed September 1, 2021.

[76] There are 3 generally accepted categories of prevention: Universal prevention which focuses on an entire population (e.g., school or community) and is not directed at a specific risk group. Selective prevention interventions focus on those at higher-than-average risk for substance use. And indicated prevention intervention concentrate on those already using or engaged in other high-risk behaviors to prevent heavy or chronic use. Source: National Academies of Sciences, Engineering, and Medicine. Fostering healthy mental, emotional, and Behavioral development in children and youth. The National Academies Press. 2019. doi:10.17226/25201

[77] Hill K, Bailey J, Steeger C, et al. Outcomes of Childhood Preventive Intervention Across 2 Generations - A Nonrandomized Controlled Trial. AMA Pediatr. 2020;174(8):764-771.
doi:10.1001/jamapediatrics.2020.1310
https://jamanetwork.com/journals/jamapediatrics/fullarticle/2766307?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamapediatrics.2020.1310

[78] Olds D, Henderson CR Jr, Cole R, et al. Long-term effects of nurse home visitation on children's criminal and antisocial behavior: 15-year follow-up of a randomized controlled trial. JAMA. 1998;280 (14):1238-1244.doi:10.1001/jama.280.14.1238

[79] Kellam SG, Wang W, Mackenzie ACL, et al. The impact of the Good Behavior Game, a universal classroom-based preventive intervention in first and second grades, on high-risk sexual behaviors, and drug abuse and dependence disorders into young adulthood. Prev Sci. 2014;15(suppl 1):S6-S18. doi:10.1007/s11121-012-0296-z

[80] Reynolds AJ, Temple JA. Extended early childhood intervention and school achievement: age thirteen findings from the Chicago Longitudinal Study. Child Dev. 1998;69(1):231-246. doi:10.1111/j. 1467-8624.1998.tb06145.x https://srcd.onlinelibrary.wiley.com/doi/abs/10.1111/j.1467-8624.1998.tb06145.x?sid=nlm-percent3Apubmed

[81] Hill K, Bailey J, Steeger C, et al. Outcomes of Childhood Preventive Intervention Across 2 Generations - A Nonrandomized Controlled Trial. AMA Pediatr. 2020;174(8):764-771.
doi:10.1001/jamapediatrics.2020.1310
https://jamanetwork.com/journals/jamapediatrics/fullarticle/2766307?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamapediatrics.2020.1310

[82] Hawkins J, Oesterle S, Brown E., et al. Youth problem behaviors 8 years after implementing the Communities That Care prevention system. A community-randomized trial. JAMA Pediatrics. 2014; 168(2),122-129.

[83] Spoth R, Trudeau L, Redmond C, et al. PROSPER Partnership Delivery System: Effects on Adolescent Conduct Problem Behavior Outcomes Through 6.5 Years Past Baseline. J Adolescence. 2015; Dec; 45: 44–55. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4674368/

[84] Preventing Drug Use Among Children and Adolescents. A Research-Based Guide for Parents, Educators, and Community Leaders. Second Edition. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. NIH Publication No. 04-4212(A). Second Edition October 2003. Accessed July 23, 2021.
https://www.drugabuse.gov/sites/default/files/preventingdruguse_2.pdf



[85] Risk and protective factors for alcohol and other drug problems in adolescence and early adulthood: Implications for substance abuse prevention. By Hawkins, J. David,Catalano, Richard F.,Miller, Janet Y. Psychological Bulletin, Vol 112(1), Jul 1992, 64-105. https://psycnet.apa.org/buy/1992-40647-001

[86] Spoth R, Trudeau L, Shin C, et al. Longitudinal Effects of Universal Preventive Intervention on Prescription Drug Misuse: Three Randomized Controlled Trials with Late Adolescents and Young Adults. *American Journal of Public Health.* March 8, 2013. Accessed July 23, 2021. https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301209?prevSearch=spoth&searchHistoryKey=

[87] *Compton W, Jones C, Baldwin GT,* et al. Targeting Youth to Prevent Later Substance Use Disorder: An Underutilized Response to the US Opioid Crisis. American Journal of Public Health. *2019*;109:2185-*S189*.

[88] A Guide to SAMHSA's Strategic Prevention Framework. Center for Substance Abuse Prevention, Substance Abuse and Mental Health Services Administration, U.S. Department of Health and Human Services. 2019. Accessed July 23, 2021.https://www.samhsa.gov/sites/default/files/20190620-samhsa-strategic-prevention-framework-guide.pdf

[89] Mullany, B., Barlow, A., Neault, N. et al. The Family Spirit Trial for American Indian Teen Mothers and Their Children: CBPR Rationale, Design, Methods and Baseline Characteristics. Prev Sci 13, 504–518 (2012). https://doi.org/10.1007/s11121-012-0277-2

[90] The nurse–family partnership: An evidence-based preventive intervention. David L. Olds. First published: 23 February 2006 https://doi.org/10.1002/imhj.20077

[91] Compton W, Jones C, Baldwin G, et al. Targeting Youth to Prevent Later Substance Use Disorder: An Underutilized Response to the US Opioid Crisis. Am J Public Health. 2019 Jun;109(S3):S185-S189. Accessed November 2021. https://pubmed.ncbi.nlm.nih.gov/31242006/

[92] U.S. Department of Health and Human Services (HHS), Office of the Surgeon General, Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health. Washington, DC: HHS, November 2016. Accessed November 2021. https://www.ncbi.nlm.nih.gov/books/NBK424857/pdf/Bookshelf_NBK424857.pdf

[93] Miller T, Hendrie D. Substance Abuse Prevention Dollars and Cents: A Cost-Benefit Analysis. 2008. DHHS Pub. No. (SMA) 07-4298. Rockville, MD: Center for Substance Abuse Prevention, Substance Abuse and Mental Health Services Administration. Accessed July 23, 2021. https://www.samhsa.gov/sites/default/files/cost-benefits-prevention.pdf

[94] Washington State Institute for Public Policy. Too Good for Drugs Program Cost-Benefit Analysis. Accessed July 27, 2021. http://www.wsipp.wa.gov/BenefitCost/Program/413

[95] Washington State Institute for Public Policy. Life Skills Training. Accessed November 2021. https://www.wsipp.wa.gov/BenefitCost/Program/37

[96] Washington State Institute for Public Policy. Good Behavior Game. Accessed November 2021. http://www.wsipp.wa.gov/BenefitCost/Program/82

[97] Spoth, Trudeau, Redmond, Shin, Greenberg, Feinberg, & Hyun (2015). PROSPER partnership delivery system: Effects on conduct problem behavior outcomes through 6.5 years past baseline. Journal of Adolescence, 45, 44-55. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4674368/

[98] Spoth, Redmond, Clair, Shin, Greenberg, & Feinberg (2011). Preventing substance misuse through community-university partnerships: Randomized controlled trial outcomes 4½ years past baseline. American Journal of Preventive Medicine, 40(4), 440-447. https://pubmed.ncbi.nlm.nih.gov/21406278/

[99] Hawkins, J. David, Oesterle, Sabrina, Brown, Eric C., Abbott, Robert D., & Catalano, Richard F. (2014). Youth problem behaviors 8 years after implementing the Communities That Care prevention system. A community-randomized trial. JAMA Pediatrics, 168(2), 122-129. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3946405/

[100] Spoth R, Redmond C, Shin C, Greenberg MT, Feinberg ME, Trudeau L. PROSPER delivery of universal preventive interventions with young adolescents: long-term effects on emerging adult substance misuse and associated risk behaviors. Psychol Med. 2017 Oct;47(13):2246-2259. doi: 10.1017/S0033291717000691. Epub 2017 Apr 12. PMID: 28399955; PMCID: PMC5963524.

[101] ICF (2021). Drug-Free Communities Support Program National Cross-Site Evaluation End-of-Year 2020 Report. Washington, DC: Office of National Drug Control Policy. https://www.whitehouse.gov/wp-content/uploads/2021/08/FINAL_DFC-Eval-Report_2021_march12_508.pdf

[102] Substance Use and Associated Health Conditions throughout the Lifespan. Public Health Rev. 2014; 35(2). Accessed July 23, 2021. https://web-



beta.archive.org/web/20150206061220/http://www.publichealthreviews.eu/upload/pdf_files/14/00_Schulte_Hser.pdf

[103] American Academy of Pediatrics Substance Use Screening and Implementation Guide. 2015. Accessed July 23, 2021. https://www.aap.org/en-us/Documents/substance_use_screening_implementation.pdf

[104] Screening for Unhealthy Drug Use: US Preventive Services Task Force Recommendation Statement. JAMA. 2020;323(22):2301-2309. doi:10.1001/jama.2020.8020 Accessed February 17, 2022.

[105] Patnode CD, Perdue LA, Rushkin M, et al. Screening for Unhealthy Drug Use in Primary Care in Adolescents and Adults, Including Pregnant Persons: Updated Systematic Review for the U.S. Preventive Services Task Force [Internet]. Rockville (MD): Agency for Healthcare Research and Quality (US); 2020 Jun. (Evidence Synthesis, No. 186.) Available from: https://www.ncbi.nlm.nih.gov/books/NBK558174/, Accessed February 17, 2022.

[106] Baldwin JR, Caspi A, Meehan AJ, Ambler A, Arseneault L, Fisher HL, Harrington H, Matthews T, Odgers CL, Poulton R, Ramrakha S, Moffitt TE, Danese A. Population vs Individual Prediction of Poor Health From Results of Adverse Childhood Experiences Screening. JAMA Pediatr. 2021 Apr 1;175(4):385-393. doi: 10.1001/jamapediatrics.2020.5602. PMID: 33492366; PMCID: PMC7835926.

[107] Anda RF, Porter LE, Brown DW. Inside the adverse childhood experience score: strengths, limitations, and misapplications. Am J Prev Med. 2020;59(2):293–295

[108] Love H, Schlitt J, Soleimanpour S, et al. Years of School-Based Health Care Growth And Expansion *Health Affairs* 2019;38, NO. 5 (2019): 755–764. Accessed July 23, 2021. https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2018.05472

[109] Substance Abuse and Mental Health Services Administration (US); Office of the Surgeon General (US). Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health [Internet]. Washington (DC): US Department of Health and Human Services; 2016 Nov. Table 3.1, Risk Factors for Adolescent and Young Adult Substance Use. Available from: https://www.ncbi.nlm.nih.gov/books/NBK424850/table/ch3.t2/

[110] National Research Council (US), Institute of Medicine (US), and Transportation Research Board (US) Program Committee for a Workshop on Contributions from the Behavioral and Social Sciences in Reducing and Preventing Teen Motor Crashes. Preventing Teen Motor Crashes: Contributions from the Behavioral and Social Sciences: Workshop Report. Washington (DC): National Academies Press (US); 2007. 4, Strategies to Improve Safety. Available from: https://www.ncbi.nlm.nih.gov/books/NBK9669/

[111] Anderko, L., Roffenbender, J. S., Goetzel, R. Z., Howard, J., Millard, F., Wildenhaus, K., Desantis, C., & Novelli, W. (2012). Promoting prevention through the affordable care act: workplace wellness. *Preventing chronic disease*, 9, E175. https://doi.org/10.5888/pcd9.120092

[112] SAMHSA. 2016. Promoting Wellness: A Guide to Community Action. https://store.samhsa.gov/sites/default/files/d7/priv/sma16-4957.pdf

[113] Substance Abuse and Mental Health Services Administration: Substance Misuse Prevention for Young Adults. Publication No. PEP19-PL-Guide-1 Rockville, MD: National Mental Health and Substance Use Policy Laboratory. Substance Abuse and Mental Health Services Administration, 2019.

[114] Planning Alcohol Interventions Using NIAAA's College Aim Alcohol Intervention Matrix. NIH Publication No. 19-AA-8017. Updated December 2019.

[115] SAMHSA. 2021. 2020 NSDUH Detailed Tables (online). Available at https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables, accessed on April 9, 2022. (Table 1.1A).

[116] Commission on Combating Synthetic Opioid Trafficking Final Report, February 2022. Accessed on April, 4 2022. https://www.rand.org/hsrd/hsoac/commission-combating-synthetic-opioid-trafficking.html

[117] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Accessed from https://www.samhsa.gov/data/, accessed on March 29, 2022.

[118] Yang, Lawrence H et al. "Stigma and substance use disorders: an international phenomenon." Current opinion in psychiatry vol. 30,5 (2017): 378-388. doi:10.1097/YCO.0000000000000351.

[119] Holly Hagan, James P McGough, Hanne Thiede, Sharon Hopkins, Jeffrey Duchin, E.Russell Alexander, Reduced injection frequency and increased entry and retention in drug treatment associated with needle-exchange participation in Seattle drug injectors, Journal of Substance Abuse Treatment, Volume 19, Issue 3, 2000, Pages 247-252, ISSN 0740-5472, https://doi.org/10.1016/S0740-5472(00)00104-5.



120 Kidorf M, King VL, Neufeld K, Pierce J, Kolodner K, Brooner RK. Improving substance abuse treatment enrollment in community syringe exchangers. Addiction. 2009; 104:786–795.

121 Open Society Foundations. Harm Reduction at Work: A GUIDE FOR ORGANIZATIONS EMPLOYING PEOPLE WHO USE DRUGS. Retrieved from https://www.opensocietyfoundations. org/uploads/170e646d-bcc0-4370-96d7-7cf2822a1869/workharmreduction-20110314.pdf.

122 Abdul-Quader, A.S., Feelemyer, J., Modi, S. et al. Effectiveness of Structural-Level Needle/Syringe Programs to Reduce HCV and HIV Infection Among People Who Inject Drugs: A Systematic Review. AIDS Behav 17, 2878–2892 (2013). https://doi.org/10.1007/s10461-013-0593-y. Accessed 10/31/2021.

123 Cost-effectiveness of syringe service programs, medications for opioid use disorder, and combination programs in hepatitis C harm reduction among opioid injection drug users: a public payer perspective using a decision tree Stephen C Ijioma, PharmD, BA; Vasco M Pontinha, MPharm, MA; David A Holdford, PhD, MS, BSPharm; and Norman V Carroll, PhD, MS, BSPharm. Manag Care Spec Pharm. 2021;27(2):137-46. Accessed 10-31-21.

124 Nicholas C. Peiper, Sarah Duhart Clarke, Louise B. Vincent, Dan Ciccarone, Alex H. Kral, Jon E. Zibbell, Fentanyl test strips as an opioid overdose prevention strategy: Findings from a syringe services program in the Southeastern United States, International Journal of Drug Policy, Volume 63, 2019, Pages 122-128, ISSN 0955-3959, https://doi.org/10.1016/j.drugpo.2018.08.007. (https://www.sciencedirect.com/science/article/pii/S0955395918302135).

125 Mahip Acharya, Divyan Chopra, Corey J. Hayes, Benjamin Teeter, Bradley C. Martin, Cost-Effectiveness of Intranasal Naloxone Distribution to High-Risk Prescription Opioid Users, Value in Health, Volume 23, Issue 4, 2020, Pages 451-460, ISSN 1098-3015, https://doi.org/10.1016/j.jval.2019.12.002. (https://www.sciencedirect.com/science/article/pii/S1098301519352192)

126 Thakarar K, Rokas KE, Lucas FL, Powers S, Andrews E, et al. (2019) Mortality, morbidity, and cardiac surgery in Injection Drug Use (IDU)-associated versus non-IDU infective endocarditis: The need to expand substance use disorder treatment and harm reduction services. PLOS ONE 14(11): e0225460. https://doi.org/10.1371/journal.pone.0225460.

127 Aronowitz, Shoshana V., Behrends, Czarina Navos, Lowenstein, Margaret, Schackman, Bruce R., Weiner, Janet (2021). Lowering the Barriers to Medication Treatment for People with Opioid Use Disorder: Evidence for a Low- Threshold Approach, The Center for Health Economics of Treatment Interventions for Substance Use Disorder, HCV, and HIV (CHERISH). Accessed February 9, 2022.

128 Dita Broz, Neal Carnes, Johanna Chapin-Bardales, Don C. Des Jarlais, Senad Handanagic, Christopher M. Jones, R. Paul McClung, Alice K. Asher, Syringe Services Programs' Role in Ending the HIV Epidemic in the U.S.: Why We Cannot Do It Without Them, American Journal of Preventive Medicine, Volume 61, Issue 5, Supplement 1, 2021, Pages S118-S129, ISSN 0749-3797, https://doi.org/10.1016/j.amepre.2021.05.044. (https://www.sciencedirect.com/science/article/pii/S0749379721003895).

129 See SSP locations and regional gaps at: SEP Locations: NASEN Directory. Available at https://www.nasen.org/map/. Accessed on February 17, 2022.

130 Bird, Sheila M., Parmar, Mahesh K. B., and Strang, John (2015). Take-home naloxone to prevent fatalities from opiate-overdose: Protocol for Scotland's public health policy evaluation, and a new measure to assess impact. Informa Healthcare, Drugs Educ Prev Pol, 2015; 22(1): 66–76, Published by Taylor & Francis. DOI: 10.3109/09687637.2014.981509.

131 New York State Department of Health. Medicaid Harm Reduction Services Benefit. Available at https://www.health.ny.gov/diseases/aids/consumers/prevention/medicaid_harm_reduction.htm#:~:text=The %20federal%20Centers%20for%20Medicare%20and%20Medicaid%20Services,to%20offer%20reimburse ment%20for%20specific%20Harm%20Reduction%20Services Published 2018. Accessed September 2, 2021.

132 Javed, Z., Burk, K., Facente, S., Pegram, L., Ali, A. & Asher, A. (2020). Syringe Services Programs: A Technical Package of Effective Strategies and Approaches for Planning, Design, and Implementation. Atlanta, GA: US Department of Health and Human Services, National Center for HIV/AIDS, Viral Hepatitis, STD and TB Prevention, Centers for Disease, Control and Prevention; 2020. Retrieved from Syringe Services Programs Technical Package (cdc.gov).

133 David P. Wilson, Braedon Donald, Andrew J. Shattock, David Wilson, Nicole Fraser-Hurt, The cost-effectiveness of harm reduction, International Journal of Drug Policy, Volume 26, Supplement 1, 2015, Pages S5-S11, ISSN 0955-3959, https://doi.org/10.1016/j.drugpo.2014.11.007. (https://www.sciencedirect.com/science/article/pii/S0955395914003119). Accessed February 9, 2022.



[134] New York State Department of Health. Drug User Health. health.ny.gov. Published 2021. Available at: https://www.health.ny.gov/diseases/aids/consumers/prevention/. Accessed on September 2, 2021.

[135] Missouri Department of Health & Senior Services. MO Stays Safe - Safer Drug Use and Risk Reduction. health.mo.gov. Available at https://health.mo.gov/living/healthcondiseases/communicable/hivaids/saferdruguse.php. Accessed September 2, 2021.

[136] Washington State Health Care Authority. Washington State Hub and Spoke Project. hca.wa.gov. Available at https://www.hca.wa.gov/about-hca/behavioral-health-recovery/washington-state-hub-and-spoke-project Accessed on September 2, 2021.

[137] The White House. 2021. National HIV/AIDS Strategy for the United States 2022–2025. Washington, DC. Accessed February 9, 2022: National HIV/AIDS Strategy for the United States 2022–2025 (hivgov-prod-v3.s3.amazonaws.com).

[116] U.S. Department of Health and Human Services. 2020. Viral Hepatitis National Strategic Plan for the United States: A Roadmap to Elimination (2021–2025). Washington, DC. Accessed on October 31, 2021: Viral Hepatitis National Strategic Plan for the United States: A Roadmap to Elimination (2021-2025) (hhs.gov).

[139] Crowley, D., Delargy, I. A national model of remote care for assessing and providing opioid agonist treatment during the COVID-19 pandemic: a report. *Harm Reduct J* **17**, 49 (2020). https://doi.org/10.1186/s12954-020-00394-z.

[140] Aronowitz, Shoshana V., Behrends, Czarina Navos, Lowenstein, Margaret, Schackman, Bruce R., Weiner, Janet (2021). Lowering the Barriers to Medication Treatment for People with Opioid Use Disorder: Evidence for a Low- Threshold Approach, The Center for Health Economics of Treatment Interventions for Substance Use Disorder, HCV, and HIV (CHERISH). Accessed February 9, 2022.

[141] Burke, Mary A. and Sullivan, Riley and Carman, Katherine Grace and Wen, Hefei and Wharam, James and Yu, Hao, Who Gets Medication-assisted Treatment for Opioid Use Disorder, and Does It Reduce Overdose Risk? Evidence from the Rhode Island All-payer Claims Database (April 22, 2021). FRB of Boston Working Paper No. 21-3, Available at SSRN: https://ssrn.com/abstract=3832267.

[142] Carrieri MP, Amass L, Lucas GM, Vlahov D, Wodak A, Woody GE. Buprenorphine use: the international experience. Clin Infect Dis. 2006 Dec 15;43 Suppl 4:S197-215. doi: 10.1086/508184. PMID: 17109307.

[143] Substance Abuse and Mental Health Services Administration: Principles of Community-based Behavioral Health Services for Justice-involved Individuals: A Research-based Guide. HHS Publication No. SMA19-5097. Rockville, MD: Office of Policy, Planning, and Innovation. Substance Abuse and Mental Health Services.

[144] LEAD - NC Harm Reduction Coalition (nchrc.org). Accessed on February 25, 2022.

[145] Collins, S.E., Lonczak, H.S. & Clifasefi, S.L. Seattle's law enforcement assisted diversion (LEAD): program effects on criminal justice and legal system utilization and costs. J Exp Criminol 15, 201–211 (2019). https://doi.org/10.1007/s11292-019-09352-7.

[146] Substance Abuse and Mental Health Services Administration: Principles of Community-based Behavioral Health Services for Justice-involved Individuals: A Research-based Guide. HHS Publication No. SMA19-5097. Rockville, MD: Office of Policy, Planning, and Innovation. Substance Abuse and Mental Health Services.

[147] Mukku VK, Benson TG, Alam F, Richie WD, Bailey RK. Overview of substance use disorders and incarceration of african american males. Front Psychiatry. 2012 Nov 12;3:98. doi: 10.3389/fpsyt.2012.00098. PMID: 23162480; PMCID: PMC3495267.

[148] Gross, S., R., Possley, M., & Stephens, K. (2017). *Race and Wrongful Convictions in the United States.* The National Registry of Exonerations, Newkirk Center for Science and Society. Available at http://www.law.umich.edu/special/exoneration/Documents/Race_and_Wrongful_Convictions.pdf. Accessed February 25, 2022.

[149] Substance Abuse and Mental Health Services Administration: Principles of Community-based Behavioral Health Services for Justice-involved Individuals: A Research-based Guide. HHS Publication No. SMA19-5097. Rockville, MD: Office of Policy, Planning, and Innovation. Substance Abuse and Mental Health Services Administration, 2019.

[150] TASC (Treatment Alternatives for Safe Communities). Specialized Case Management Model. https://www.tasc.org/TascBlog/images/documents/TASC-Clinical-Case-Mgt-Model.pdf. Published January 2019. Accessed September 2, 2021.

[151] Elizabeth M. Oliva, Melissa L.D. Christopher, Daina Wells, Mark Bounthavong, Michael Harvey, Julianne Himstreet, Thomas Emmendorfer, Michael Valentino, Mariano Franchi, Francine Goodman, Jodie A. Trafton, Opioid overdose education and naloxone distribution: Development of the Veterans Health



Administration's national program, Journal of the American Pharmacists Association, Volume 57, Issue 2, Supplement, 2017, Pages S168-S179.e4, ISSN 1544-3191.

[152] Carroll JJ, Green TC, Noonan RK. Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States: An Introduction for Public Health, Law Enforcement, Local Organizations, and Others Striving to Serve Their Community. Available at https://www.cdc.gov/drugoverdose/pdf/pubs/2018-evidence-based-strategies.pdf. f. Accessed on September 2, 2021.

[153] Ashford RD, Curtis B, Brown AM. Peer-delivered harm reduction and recovery support services: Initial evaluation from a hybrid recovery community drop-in center and syringe exchange program. Harm Reduct J. 2018;15(1). doi:10.1186/s12954-018- 0258-2. Retrieved on September 2, 2021.

[154] David P. Wilson, Braedon Donald, Andrew J. Shattock, David Wilson, Nicole Fraser-Hurt, The cost-effectiveness of harm reduction, International Journal of Drug Policy, Volume 26, Supplement 1, 2015, Pages S5-S11, ISSN 0955-3959, https://doi.org/10.1016/j.drugpo.2014.11.007. (https://www.sciencedirect.com/science/article/pii/S0955395914003119).

[155] Chandler McClellan, Barrot H. Lambdin, Mir M. Ali, Ryan Mutter, Corey S. Davis, Eliza Wheeler, Michael Pemberton, Alex H. Kral, Opioid-overdose laws association with opioid use and overdose mortality, Addictive Behaviors, Volume 86, 2018, Pages 90-95, ISSN 0306-4603.

[156] Schneider KE, Park JN, Allen ST, Weir BW, Sherman SG. Knowledge of Good Samaritan Laws and Beliefs About Arrests Among Persons Who Inject Drugs a Year After Policy Change in Baltimore, Maryland. Public Health Rep. 2020 May/Jun;135(3):393-400. doi: 10.1177/0033354920915439. Epub 2020 Apr 7. PMID: 32264789; PMCID: PMC7238711.

[157] Bebinger M. Built for Counterterrorism, This High-Tech Machine Is Now Used To Detect Fentanyl. Kaiser Health News. https://khn.org/news/built-for-counterterrorism-this-high-tech-machine-is-now-used-to-detect-fentanyl/. Published December 4, 2019. Accessed September 2, 2021.

158 PERF Daily Critical Issues Report: PAARI Fentanyl test strip program and other strategies for reducing opioid overdoses. Available at https://paariusa.org/2021/03/19/perf-daily-critical-issues-report-paari-fentanyl-test-strip-program-and-other-strategies-for-reducing-opioid-overdoses/. Accessed on September 2, 2021.

[159] Sulley S, Ndanga M. Inpatient Opioid Use Disorder and Social Determinants of Health: A Nationwide Analysis of the National Inpatient Sample (2012-2014 and 2016-2017). Cureus. 2020;12(11):e11311. Published 2020 Nov 3. doi:10.7759/cureus.11311. Retrieved on September 2, 2021.

[160] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

[161] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

[162] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

[163] Xia PF, Pan XF, Li Y, et al. Trends in Diagnosed and Undiagnosed Diabetes Among Adults in the U.S., 2005-2016 [published online ahead of print, 2021 Jul 14]. Diabetes Care. 2021;dc211156. doi:10.2337/dc21-1156.

[164] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data.

[165] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health


Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data.

[166] American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Arlington, VA. American Psychiatric Association, 2013.

[167] Magill, Molly et al. "A meta-analysis of cognitive-behavioral therapy for alcohol or other drug use disorders: Treatment efficacy by contrast condition." Journal of consulting and clinical psychology vol. 87,12 (2019): 1093-1105. doi:10.1037/ccp0000447

[168] Maisel, Natalya C et al. "Meta-analysis of naltrexone and acamprosate for treating alcohol use disorders: when are these medications most helpful?." Addiction (Abingdon, England) vol. 108,2 (2013): 275-93. doi:10.1111/j.1360-0443.2012.04054.x

[169] Mattick, Richard P et al. "Buprenorphine maintenance versus placebo or methadone maintenance for opioid dependence." The Cochrane database of systematic reviews ,2 CD002207. 6 Feb. 2014, doi:10.1002/14651858.CD002207.pub4

[170] Bauer LK, Brody JK, León C, Baggett TP. Characteristics of Homeless Adults Who Died of Drug Overdose: A Retrospective Record Review. J Health Care Poor Underserved. 2016;27(2):846-859. doi:10.1353/hpu.2016.0075

[171] Darke S, Hall W. Heroin overdose: research and evidence-based intervention. J Urban Health. 2003;80(2):189-200. doi:10.1093/jurban/jtg022
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3456279/pdf/11524_2006_Article_206.pdf

[172] Darke S, Hall W. Heroin overdose: research and evidence-based intervention. J Urban Health. 2003;80(2):189-200. doi:10.1093/jurban/jtg022
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3456279/pdf/11524_2006_Article_206.pdf

[173] Darke S, Hall W. Heroin overdose: research and evidence-based intervention. J Urban Health. 2003;80(2):189-200. doi:10.1093/jurban/jtg022
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3456279/pdf/11524_2006_Article_206.pdf

[174] Strang J, McCambridge J, Best D, et al. Loss of tolerance and overdose mortality after inpatient opiate detoxification: follow up study. BMJ. 2003;326(7396):959-960. doi:10.1136/bmj.326.7396.959

[175] Joudrey, P.J., Khan, M.R., Wang, E.A. *et al.* A conceptual model for understanding post-release opioid-related overdose risk. *Addict Sci Clin Pract* **14,** 17 (2019). https://doi.org/10.1186/s13722-019-0145-5

[176] Au VYO, Rosic T, Sanger N, et al. Factors associated with opioid overdose during medication-assisted treatment: How can we identify individuals at risk?. *Harm Reduct J.* 2021;18(1):71. Published 2021 Jul 8. doi:10.1186/s12954-021-00521-4

[177] Forati AM, Ghose R, Mantsch JR. Examining Opioid Overdose Deaths across Communities Defined by Racial Composition: a Multiscale Geographically Weighted Regression Approach [published online ahead of print, 2021 Jul 6]. *J Urban Health.* 2021;1-12. doi:10.1007/s11524-021-00554-x

[178] Forati AM, Ghose R, Mantsch JR. Examining Opioid Overdose Deaths across Communities Defined by Racial Composition: a Multiscale Geographically Weighted Regression Approach [published online ahead of print, 2021 Jul 6]. *J Urban Health.* 2021;1-12. doi:10.1007/s11524-021-00554-x

[180] Saloner B, Cook BL. Blacks and Hispanics Are Less Likely Than Whites To Complete Addiction Treatment, Largely Due To Socioeconomic Factors. *Health Affairs.* 2013;32(1):135-145. doi:10.1377/hlthaff.2011.0983

[181] Phillippi JC, Schulte R, Bonnet K, et al. Reproductive-Age Women's Experience of Accessing Treatment for Opioid Use Disorder: "We Don't Do That Here" [published online ahead of print, 2021 May 17]. Womens Health Issues. 2021;S1049-3867(21)00033-5. doi:10.1016/j.whi.2021.03.010

[182] Boeri M, Lamonica AK, Turner JM, Parker A, Murphy G, Boccone C. Barriers and Motivators to Opioid Treatment Among Suburban Women Who Are Pregnant and Mothers in Caregiver Roles. Front Psychol. 2021;12:688429. Published 2021 Jul 1. doi:10.3389/fpsyg.2021.688429
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8280285/pdf/fpsyg-12-688429.pdf

[183] Hyder A, Lee J, Dundon A, Southerland LT, All D, Hammond G, et al. (2021) Opioid Treatment Deserts: Concept development and application in a US Midwestern urban county. PLoS ONE 16(5): e0250324. https://doi.org/ 10.1371/journal.pone.0250324

[184] Armoon B, SoleimanvandiAzar N, Rostami M, et al. Drug type and risk behaviors associated with non-fatal overdose among people who use drugs: a systematic review and meta-analysis [published online ahead of print, 2021 Jul 21]. J Addict Dis. 2021;1-12. doi:10.1080/10550887.2021.1950262



185 Lippold KM, Jones CM, Olsen EO, Giroir BP. Racial/Ethnic and Age Group Differences in Opioid and Synthetic Opioid–Involved Overdose Deaths Among Adults Aged ≥18 Years in Metropolitan Areas — United States, 2015–2017. MMWR Morb Mortal Wkly Rep 2019;68:967–973. DOI: http://dx.doi.org/10.15585/mmwr.mm6843a3external icon.

186 Goedel WC, Shapiro A, Cerdá M, Tsai JW, Hadland SE, Marshall BDL. Association of Racial/Ethnic Segregation With Treatment Capacity for Opioid Use Disorder in Counties in the United States. *JAMA Netw Open.* 2020;3(4):e203711. doi:10.1001/jamanetworkopen.2020.3711 https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2764663?resultClick=3

187 Haffajee RL, Lin LA, Bohnert ASB, Goldstick JE. Characteristics of US Counties With High Opioid Overdose Mortality and Low Capacity to Deliver Medications for Opioid Use Disorder. *JAMA Netw Open*. 2019;2(6):e196373. Published 2019 Jun 5. doi:10.1001/jamanetworkopen.2019.6373

188 National Academies of Sciences, Engineering, and Medicine. 2019. Medications for opioid use disorder save lives. Washington, DC: The National Academies Press. doi: https://doi.org/10.17226/25310

189 Moore BA, Fiellin DA, Cutter CJ, et al. Cognitive Behavioral Therapy Improves Treatment Outcomes for Prescription Opioid Users in Primary Care Buprenorphine Treatment. J Subst Abuse Treat. 2016;71:54-57. doi:10.1016/j.jsat.2016.08.016 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5119533/pdf/nihms-814533.pdf

190 Weiss RD, Potter JS, Fiellin DA, et al. Adjunctive counseling during brief and extended buprenorphine-naloxone treatment for prescription opioid dependence: a 2-phase randomized controlled trial. *Arch Gen Psychiatry*. 2011;68(12):1238-1246. doi:10.1001/archgenpsychiatry.2011.121 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3470422/pdf/nihms307513.pdf

191 Weiss RD, Potter JS, Fiellin DA, et al. Adjunctive counseling during brief and extended buprenorphine-naloxone treatment for prescription opioid dependence: a 2-phase randomized controlled trial. *Arch Gen Psychiatry*. 2011;68(12):1238-1246. doi:10.1001/archgenpsychiatry.2011.121

192 Hall OT, Jordan A, Teater J, et al. Experiences of racial discrimination in the medical setting and associations with medical mistrust and expectations of care among black patients seeking addiction treatment [published online ahead of print, 2021 Jun 25]. J Subst Abuse Treat. 2021;108551. doi:10.1016/j.jsat.2021.108551

193 van Boekel LC, Brouwers EPM, van Weeghel J, Garretsen HFL. Stigma among health professionals towards patients with substance use disorders and its consequences for healthcare delivery: Systematic review. *Drug and Alcohol Dependence*. 2013;131(1-2):23-35. doi:10.1016/j.drugalcdep.2013.02.018

194 Ellis K, Walters S, Friedman SR, et al. Breaching Trust: A Qualitative Study of Healthcare Experiences of People Who Use Drugs in a Rural Setting. *Front Sociol*. 2020;5:593925. Published 2020 Nov 10. doi:10.3389/fsoc.2020.593925

195 Howard KP, Altenburger EM, Cheavens JS. Validation predicting premature drop-out from treatment provided in training clinics. *Behav Cogn Psychother*. 2020;48(1):116-120. doi:10.1017/S1352465819000420

196 Hoffman KA, Green CA, Ford JH 2nd, Wisdom JP, Gustafson DH, McCarty D. Improving quality of care in substance abuse treatment using five key process improvement principles. J Behav Health Serv Res. 2012;39(3):234-244. doi:10.1007/s11414-011-9270-y

197 Howard KP, Altenburger EM, Cheavens JS. Validation predicting premature drop-out from treatment provided in training clinics. *Behav Cogn Psychother*. 2020;48(1):116-120. doi:10.1017/S1352465819000420

198 Hoffman KA, Green CA, Ford JH 2nd, Wisdom JP, Gustafson DH, McCarty D. Improving quality of care in substance abuse treatment using five key process improvement principles. J Behav Health Serv Res. 2012;39(3):234-244. doi:10.1007/s11414-011-9270-y

199 National Academy of Engineering (US) and Institute of Medicine (US) Committee on Engineering and the Health Care System; Reid PP, Compton WD, Grossman JH, et al., editors. Building a Better Delivery System: A New Engineering/Health Care Partnership. Washington (DC): National Academies Press (US); 2005. Crossing the Quality Chasm. Available from: https://www.ncbi.nlm.nih.gov/books/NBK22857/

200 Corrigan, P.W., Kuwabara, SA., O'Shaughnessy, J. (2009). *The public stigma of mental illness and druaddiction: findings from a stratified random sample.* Journal of Social Work. (9)(2): 139-147.

201 Barry, C.L., McGinty, E.E., Pescosolido, B.A., Goldman, H.H. (2014). *Stigma, discrimination, treatment, effectiveness, and policy: public views about drug addiction and mental illness.* Psychiatric Services. (65)(10): 1269-1272.

202 Kelly, J.F., Westerhoff, C.M. (2010). *Does it matter how we refer to individuals with substance-related conditions? A randomized study of two commonly used terms.* International Journal of Drug Policy. 21(3):202-7.

[203] Choi NG, DiNitto DM, Marti CN, Choi BY. Association of adverse childhood experiences with lifetime mental and substance use disorders among men and women aged 50+ years. *Int Psychogeriatr*. 2017;29(3):359-372. doi:10.1017/S1041610216001800

[204] US Preventive Services Task Force. Unhealthy Drug Use: Screening: Final Recommendation Statement. https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/drug-use-illicit-screening. Accessed on April 18, 2022.

[205] White House. State of the Union Address, March 1, 2022. https://www.whitehouse.gov/state-of-the-union-2022/. Accessed April 18, 2022.

[206] Johnston DC, Mathews WD, Maus A, Gustafson DH. Using Smartphones to Improve Treatment Retention Among Impoverished Substance-Using Appalachian Women: A Naturalistic Study. *Subst Abuse*. 2019;13:1178221819861377. Published 2019 Jul 8. doi:10.1177/1178221819861377

[207] Milby JB, Schumacher JE, McNamara C, et al. Initiating abstinence in cocaine abusing dually diagnosed homeless persons. *Drug Alcohol Depend*. 2000;60(1):55-67. doi:10.1016/s0376-8716(99)00139-8

[208] Frazer Z, McConnell K, Jansson LM. Treatment for substance use disorders in pregnant women: Motivators and barriers. *Drug Alcohol Depend*. 2019;205:107652. doi:10.1016/j.drugalcdep.2019.107652

[209] Socías ME, Volkow N, Wood E. Adopting the 'cascade of care' framework: an opportunity to close the implementation gap in addiction care?. Addiction. 2016;111(12):2079-2081. doi:10.1111/add.13479 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5321168/pdf/nihms-850611.pdf

[210] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data

[211] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data

[212] Gerbert B., Berg-Smith S., Mancuso M., Caspers N., McPhee S., Null D., Wofsy J. Using innovative video doctor technology in primary care to deliver brief smoking and alcohol intervention. *Health Promot. Pract.* 2003;4(3):249–261.

[213] Shingleton R.M., Palfai T.P. Technology-delivered adaptations of motivational interviewing for health-related behaviors: a systematic review of the current research. *Patient Educ. Couns.* 2016;99(1):17–35.

[214] Dugosh K, Abraham A, Seymour B, McLoyd K, Chalk M, Festinger D. A Systematic Review on the Use of Psychosocial Interventions in Conjunction With Medications for the Treatment of Opioid Addiction. Journal of Addiction Medicine. 2016;10(2):93-103. doi:10.1097/ADM.0000000000000193

[215] Petry NM, Peirce JM, Stitzer ML, Blaine J, Roll JM, Cohen A, et al. Effect of prize-based incentives on outcomes in stimulant abusers in outpatient psychosocial treatment programs: A national drug abuse treatment clinical trials network study. *Arch Gen Psychiatry* 2005. ; 62:1148 -56.

[216] Rawson R, Glasner S, Brecht ML, Farabee D. A randomized comparison of 4 vs. 16 weeks of psychosocial treatment for stimulant users. J Subst Abuse Treat. 2021;124:108274. doi:10.1016/j.jsat.2020.108274

[217] Kiluk BD, Nich C, Buck MB, et al. Randomized Clinical Trial of Computerized and Clinician-Delivered CBT in Comparison With Standard Outpatient Treatment for Substance Use Disorders: Primary Within-Treatment and Follow-Up Outcomes. Am J Psychiatry. 2018;175(9):853-863. doi:10.1176/appi.ajp.2018.17090978 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6120780/pdf/nihms970623.pdf

[218] Sordo, Barrio, Bravo, Indave, Degenhardt, Wiessing, Ferri, Pastor-Barriuso, Mortality Risk During and After Opioid Substitution Treatment: Systematic Review and Meta-analysis of Cohort Studies (Apr. 2017), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5421454/

[219] Weiss RD, Potter JS, Fiellin DA, et al. Adjunctive counseling during brief and extended buprenorphine-naloxone treatment for prescription opioid dependence: a 2-phase randomized controlled trial. Arch Gen Psychiatry. 2011;68(12):1238-1246. doi:10.1001/archgenpsychiatry.2011.121

[220] Campbell ND, Lovell AM. The history of the development of buprenorphine as an addiction therapeutic. Ann N Y Acad Sci. 2012;1248:124-139. doi:10.1111/j.1749-6632.2011.06352.x

[221] Luderer H, Chiodo L, Wilson A, Brezing C, Martinez S, Xiong X, Gerwien R, Imbert B, Deeg M, Maricich Y, Campbell A, Patient Engagement With a Game-Based Digital Therapeutic for the Treatment of Opioid Use Disorder: Protocol for a Randomized Controlled Open-Label, Decentralized Trial



JMIR Res Protoc 2022;11(1):e32759
doi: 10.2196/32759

222 Kravitz-Wirtz N, Davis CS, Ponicki WR, et al. Association of Medicaid Expansion With Opioid Overdose Mortality in the United States. JAMA Netw Open. 2020;3(1):e1919066. doi:10.1001/jamanetworkopen.2019.19066
https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2758476

223 United States Government Accountability Office, States' Changes to Payment Rates for Substance Use Disorder Services, https://www.gao.gov/assets/gao-20-260.pdf, accessed on March 3. 2022.

224 Mark TL, Olesiuk W, Ali MM, Sherman LJ, Mutter R, Teich JL. Differential Reimbursement of Psychiatric Services by Psychiatrists and Other Medical Providers. Psychiatr Serv. 2018;69(3):281-285. doi:10.1176/appi.ps.201700271

225 Strang J, McCambridge J, Best D, et al. Loss of tolerance and overdose mortality after inpatient opiate detoxification: follow up study. *BMJ*. 2003;326(7396):959-960. doi:10.1136/bmj.326.7396.959
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC153851/pdf/959.pdf

226 Carter, J., Zevin, B. & Lum, P.J. Low barrier buprenorphine treatment for persons experiencing homelessness and injecting heroin in San Francisco. Addict Sci Clin Pract 14, 20 (2019). https://doi.org/10.1186/s13722-019-0149-1

227 Strike, C., Millson, M., Hopkins, S., & Smith, C. (2013). What is low threshold methadone maintenance treatment?. The International journal on drug policy, 24(6), e51–e56.
https://doi.org/10.1016/j.drugpo.2013.05.005

228 (66 FR 4076) 01/17/2001 Opioid Drugs in Maintenance and Detoxification Treatment of Opiate Addiction Services. https://www.govinfo.gov/content/pkg/FR-2001-03-19/pdf/01-6745.pdf

229 Motivans, M. (2021) Federal Justice Statistics 2017-2018. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/fjs1718.pdf

230 Ellis K, Walters S, Friedman SR, et al. Breaching Trust: A Qualitative Study of Healthcare Experiences of People Who Use Drugs in a Rural Setting. *Front Sociol*. 2020;5:593925. Published 2020 Nov 10. doi:10.3389/fsoc.2020.593925

231 Proulx D, Fantasia HC. The Lived Experience of Postpartum Women Attending Outpatient Substance Treatment for Opioid or Heroin Use. J Midwifery Womens Health. 2021;66(2):211-217. doi:10.1111/jmwh.13165

232 Laura J. Faherty, MD, MPH, MS; Ashley M. Kranz, PhD; Joshua Russell-Fritch, MS; Stephen W. Patrick, MD, MPH, MS; Jonathan Cantor, PhD; Bradley D. Stein, MD, PhD, Association of Punitive and Reporting State Policies Related to Substance Use in Pregnancy With Rates of Neonatal Abstinence Syndrome, *JAMA Netw Open*. 2019;2(11):e1914078. doi:10.1001/jamanetworkopen.2019.14078. Accessed May 5, 2022

233 Proulx D, Fantasia HC. The Lived Experience of Postpartum Women Attending Outpatient Substance Treatment for Opioid or Heroin Use. J Midwifery Womens Health. 2021;66(2):211-217. doi:10.1111/jmwh.13165

234 86 FR 3386. Final Rule. Registration Requirements for Narcotic Treatment Programs With Mobile Components. Available at https://www.govinfo.gov/content/pkg/FR-2021-06-28/pdf/2021-13519.pdf

235 Sugarman OK, Bachhuber MA, Wennerstrom A, Bruno T, Springgate BF (2020) Interventions for incarcerated adults with opioid use disorder in the United States: A systematic review with a focus on social determinants of health. PLoS ONE 15(1): e0227968. https://doi.org/ 10.1371/journal.pone.0227968.

236 U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis. State-Level Projections of Supply and Demand for Behavioral Health Occupations: 2016-2030, Rockville, Maryland, https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/state-level-estimates-report-2018.pdf , 2018, accessed May 25, 2021.

237 U.S. Department of Health and Human Services, Health Resources and Services Administration. Behavioral health workforce projections, 2017-2030: HRSA health workforce factsheet. Rockville, MD. Accessed at https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/bh-workforce-projections-fact-sheet.pdf, 2020, accessed May 25. 2021.

238 Ma, A., Sanchez, A., & Ma, M. The Impact of Patient-Provider Race/Ethnicity Concordance on Provider Visits: Updated Evidence from the Medical Expenditure Panel Survey. *Journal of racial and ethnic health disparities, 6(5), 1011–1020.* https://doi.org/10.1007/s40615-019-00602-y, 2019, accessed May 25, 2021.

239 Ma, A., Sanchez, A., & Ma, M. The Impact of Patient-Provider Race/Ethnicity Concordance on Provider Visits: Updated Evidence from the Medical Expenditure Panel Survey. *Journal of racial and ethnic health disparities*, 6(5), 1011–1020. https://doi.org/10.1007/s40615-019-00602-y, 2019, accessed May 25, 2021.



240 Biancarelli, D. , et.al., Strategies used by people who inject drugs to avoid stigma in healthcare settings, 2019, *Drug Alcohol Depen*. 2019, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6521691/pdf/nihms-1524548.pdf

241 Biancarelli, D. , et.al., Strategies used by people who inject drugs to avoid stigma in healthcare settings, 2019, *Drug Alcohol Depen*. 2019, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6521691/pdf/nihms-1524548.pdf

242 Adams, J., Volkow, N. , Ethical imperatives to Overcome Stigma Against People with substance Use Disorders, *Journal of Ethics*, American Medical Association, 2020, https://journalofethics.ama-assn.org/article/ethical-imperatives-overcome-stigma-against-people-substance-use-disorders/2020-08

243 U.S. Department of Health and Human Services, Health Resources and Services Administration, Health Professional Shortage Areas for Mental Health map, HRSA provided directly May 27,2021.

244 U.S. Department of Health and Human Services, Office of Inspector General, Disparities Affect Access to Buprenorphine Services for Opioid Use Disorder, https://oig.hhs.gov/oei/reports/oei-12-17-00240.asp, accessed May 25, 2021.

245 Source: Bureau of Justice Statistics, National Prisoner Statistics, 1989-2019; and U.S. Census Bureau, post-censal resident population estimates for January 1 of the following calendar year

246 Source: Bureau of Justice Statistics, Annual Survey of Jails, 2006-2018; and Census of Jails, 2005 and 2019 https://www.bjs.gov/content/pub/pdf/ji19_sum.pdf

247 National Center on Addiction and Substance Abuse: Behind Bars II: Substance Abuse and America's Prison Population, 2010, https://issuu.com/nibbana/docs/5313_behind-bars-ii

248 Hodgkin D, Horgan C, Bart G. Financial sustainability of payment models for office-based opioid treatment in outpatient clinics. Addict Sci Clin Pract. 2021;16(1):45. Published 2021 Jul 5. doi:10.1186/s13722-021-00253-7

249 Haffajee RL, Bohnert ASD, Lagisetty PA. Policy Pathways to Address Provider Workforce Barriers to Buprenorphine Treatment, Am J Prev Med. 2018 Jun; 54(6 Suppl 3): S230–S242. doi: 10.1016/j.amepre.2017.12.022.

250 Substance Abuse and Mental Health Services Administration. SAMHSA's Working Definition of Recovery. 2010. Retrieved by ONDCP on May 24, 2021 at https://store.samhsa.gov/sites/default/files/d7/priv/pep12-recdef.pdf

251 Granfield R, Cloud W. Coming clean: overcoming addiction without treatment. New York University Press, New York. 1999.

252 Hennessy EA. Recovery capital: a systematic review of the literature. *Addiction Research & Theory*. 2017;25(5):349-360.

253 Sahker E, Ali S, Arndt S. Employment recovery capital in the treatment of substance use disorders: Six-month follow-up observations. *Drug and Alcohol Dependence*. 2019;205:107624.

254 Center for Behavioral Health Statistics and Quality. (2021). Results from the 2020 National Survey on Drug Use and Health: Detailed tables. Rockville, MD: Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/, 2021:1062-63. (Tables 6.37A to 6.37B)

255 Kelly JF, Bergman B, Hoeppner BB, Vilsaint C, White WL. Prevalence and pathways of recovery from drug and alcohol problems in the United States population: Implications for practice, research, and policy. *Drug Alcohol Depend*. 2017;181:162-169.

256 Kelly JF, Stout RL, Jason LA, Fallah-Sohy N, Hoffman LA, Hoeppner BB. One-Stop Shopping for Recovery: An Investigation of Participant Characteristics and Benefits Derived From U.S. Recovery Community Centers. *Alcohol Clin Exp Res*. 2020;44(3):711-721.

257 Kelly JF, Stout RL, Jason LA, Fallah-Sohy N, Hoffman LA, Hoeppner BB. One-Stop Shopping for Recovery: An Investigation of Participant Characteristics and Benefits Derived From U.S. Recovery Community Centers. *Alcohol Clin Exp Res*. 2020;44(3):711-721.

258 Ryan JP, Victor BG, Moore A, Mowbray O, Perron BE. Recovery coaches and the stability of reunification for substance abusing families in child welfare. *Children and Youth Services Review*. 2016;70:357-363.

259 Andreas D, Ja DY, Wilson S. Peers Reach Out Supporting Peers to Embrace Recovery (PROSPER): A Center for Substance Abuse Treatment Recovery Community Services Program. *Alcoholism Treatment Quarterly*. 2010;28(3):326-338.

260 Deering KN, Kerr T, Tyndall MW, et al. A peer-led mobile outreach program and increased utilization of detoxification and residential drug treatment among female sex workers who use drugs in a Canadian setting. *Drug Alcohol Depend*. 2011;113(1):46-54.


[261] Tracy K, Burton M, Nich C, Rounsaville BJ. Utilizing Peer Mentorship to Engage High Recidivism Substance-Abusing Patients in Treatment. *The American Journal of Drug and Alcohol Abuse.* 2011;37:525 - 531.

[262] Boisvert RA, Martin LM, Grosek M, Clarie AJ. Effectiveness of a peer-support community in addiction recovery: participation as intervention. *Occupational therapy international.* 2008;15(4):205-220.

[263] Reif S, Braude L, Lyman DR, et al. Peer recovery support for individuals with substance use disorders: assessing the evidence. *Psychiatric services (Washington, DC).* 2014;65(7):853-861.

[264] Sanders LM, Trinh C, Sherman BR, Banks SM. Assessment of client satisfaction in a peer counseling substance abuse treatment program for pregnant and postpartum women. *Evaluation and Program Planning.* 1998;21(3):287-296.

[265] Valentine P, White, W.L., Taylor, P. The Recovery Community Organization: Toward A Working Definition and Description. *Connecticut Community for Addiction Recovery.* 2007. Retrieved by ONDCP on June 28, 2021 at: https://facesandvoicesofrecovery.org/wp-content/uploads/2019/06/The-Recovery-Community-Organization-Toward-A-Working-Definition-and-Description.pdf

[266] Valentine, P. Peer-Based Recovery Support Services Within a Recovery Community Organization: The CCAR Experience. In: Kelly J., White W. (eds) Addiction Recovery Management. Current Clinical Psychiatry. 2010. Humana Press, Totowa, NJ. https://doi.org/10.1007/978-1-60327-960-4_14

[267] Best D. *Addiction Recovery: A movement for social change and personal growth in the UK.* Brighton, UK: Pavilion Publishing (Brighton) Ltd; 2012.

[268] Association of Recovery in Higher Education (ARHE). *Collegiate recovery programs.* ARHE website. 2021. https://collegiaterecovery.org/crps-crcs

[269] Laudet, A.; Harris, K.; Winters, K.; Moberg, P.; Kimball, T. Nationwide survey of collegiate recovery programs: Is there a single model?; Paper presented at the 75th Annual Meeting - College on Problems of Drug Dependence; San Diego, CA. 2013;

[270] Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. Characteristics of students participating in collegiate recovery programs: a national survey. *Journal of substance abuse treatment.* 2015;51:38-46.

[271] Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. In college and in recovery: Reasons for joining a Collegiate Recovery Program. *Journal of American college health: J of ACH.* 2016;64(3):238-246.

[272] Harris KS, Baker AK, Kimball TG, Shumway ST. Achieving Systems-Based Sustained Recovery: A Comprehensive Model for Collegiate Recovery Communities. *Journal of Groups in Addiction & Recovery.* 2008;2(2-4):220-237.

[273] Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. In college and in recovery: Reasons for joining a Collegiate Recovery Program. *Journal of American college health: J of ACH.* 2016;64(3):238-246.

[274] Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. Characteristics of students participating in collegiate recovery programs: a national survey. *Journal of substance abuse treatment.* 2015;51:38-46.

[275] Cleveland HH, Harris KS, Baker AK, Herbert R, Dean LR. Characteristics of a collegiate recovery community: maintaining recovery in an abstinence-hostile environment. *J Subst Abuse Treat.* 2007;33(1):13-23.

[276] Association of Recovery in Higher Education. Find a school. ARS website. 2021: Retried by ONDCP on May 27. 2021 at: https://recoveryschools.org/find-a-school/

[277] Finch AJ, Moberg DP, Krupp AL. Continuing Care in High Schools: A Descriptive Study of Recovery High School Programs. *J Child Adolesc Subst Abuse.* 2014;23(2):116-129.

[278] Tanner-Smith EE, Finch AJ, Hennessy EA, Moberg DP. Who attends recovery high schools after substance use treatment? A descriptive analysis of school aged youth. *J Subst Abuse Treat.* 2018;89:20-27.

[279] Moberg DP, Finch AJ. Recovery high schools: A descriptive study of school programs and students. *J Groups Addict Recover.* 2008;2:128-161.

[280] Finch AJ, Moberg DP, Krupp AL. Continuing Care in High Schools: A Descriptive Study of Recovery High School Programs. *J Child Adolesc Subst Abuse.* 2014;23(2):116-129.

[281] Weimer DL, Moberg P, French F, Tanner-Smith EE, Finch AJ. Net Benefits of Recovery High Schools: Higher Cost but Increased Sobriety and Educational Attainment. *The journal of mental health policy and economics.* 2019;22(3):109-120.

[282] Oser R, Karakos HL, Hennessy EA. Disparities in Youth Access to Substance Abuse Treatment and Recovery Services: How One Recovery School Initiative is Helping Students "Change Tracks". *Journal of Groups in Addiction & Recovery.* 2016;11(4):267-281.

[283] Glaude M, Torres LR. Hispanic Perspectives on Recovery High Schools: If We Build Them, Will They Come? *Journal of groups in addiction & recovery.* 2016;11(4):240-249.

[284] Finch, A, Recovery High Schools Growth Chart: 1979-2021. Association of Recovery Schools. Retrieved by ONDCP on. August 18, 2021at https://recoveryschools.org/rhs-growth-chart/



285 Nash A, Collier C. The Alternative Peer Group: A Developmentally Appropriate Recovery Support Model for Adolescents. *Journal of addictions nursing.* 2016;27(2):109-119.

286 Smith NZ, Vasquez PJ, Emelogu NA, Hayes AE, Engebretson J, Nash AJ. The Good, the Bad, and Recovery: Adolescents Describe the Advantages and Disadvantages of Alternative Peer Groups. *Substance Abuse: Research and Treatment.* 2020;14:1178221820909354.

287 Jason LA, Wiedbusch E, Bobak TJ, Taullahu D. Estimating the Number of Substance Use Disorder Recovery Homes in the United States. *Alcoholism treatment quarterly.* 2020;38(4):506-514.

288 Jason LA, Davis MI, Ferrari JR. The need for substance abuse after-care: longitudinal analysis of Oxford House. *Addict Behav.* 2007;32(4):803-818.

289 Polcin DL, Korcha RA, Bond J, Galloway G. Sober living houses for alcohol and drug dependence: 18-month outcomes. *Journal of substance abuse treatment.* 2010;38(4):356-365.

290 Tuten M, DeFulio A, Jones HE, Stitzer M. Abstinence-contingent recovery housing and reinforcement-based treatment following opioid detoxification. *Addiction.* 2012;107(5):973-982.

291 Tuten M, Shadur JM, Stitzer M, Jones HE. A Comparison of Reinforcement Based Treatment (RBT) versus RBT plus Recovery Housing (RBT(RH)). *J Subst Abuse Treat.* 2017;72:48-55.

292 Hatzenbuehler ML. Structural stigma: Research evidence and implications for psychological science. *The American psychologist.* 2016;71(8):742-751.

293 Browne T, Priester MA, Clone S, Iachini A, Dehart D, Hock R. Barriers and facilitators to substance use treatment in the rural south: a qualitative study. *J Rural Health.* 2016;32(1):92–101.

294 Copeland J. A qualitative study of barriers to formal treatment among women who self-managed change in addictive behaviours. *J Subst Abuse Treat.* 1997;14(2):183–190.

295 Cellucci T, Krogh J, Vik P. Help seeking for alcohol problems in a college population. *J Gen Psychol.* 2006;133(4):421–433.

296 Legislative Analysis and Public Policy Association. Model Recovery Residence Certification Act. 2021: Retrieved by ONDCP on May 28, 2021 at https://legislativeanalysis.org/model-recovery-residence-certification-act/.

297 Volkow N. To End the Drug Crisis, Bring Addiction Out of the Shadows. In AAMC News, November 8, 2021.

298 Kelly JF, Westerhoff CM. Does it matter how we refer to individuals with substance-related conditions? A randomized study of two commonly used terms. *Int J Drug Policy.* 2010;21(3):202-207.

299 Kelly JF, Dow SJ, Westerhoff C. Does Our Choice of Substance-Related Terms Influence Perceptions of Treatment Need? An Empirical Investigation with Two Commonly Used Terms. *Journal of Drug Issues.* 2010;40(4):805-818.

300 Ashford RD, Brown AM, Curtis B. Substance use, recovery, and linguistics: The impact of word choice on explicit and implicit bias. *Drug Alcohol Depend.* 2018;189:131-138.

301 Ashford RD, Brown AM, McDaniel J, Curtis B. Biased labels: An experimental study of language and stigma among individuals in recovery and health professionals. *Substance use & misuse.* 2019;54(8):1376-1384.

302 Barry CL, McGinty EE, Pescosolido B, Goldman HH. Stigma, Discrimination, Treatment Effectiveness and Policy Support: Comparing Public Views about Drug Addiction with Mental Illness. *Psychiatric services (Washington, DC).* 2014;65(10):1269-1272.

303 van Boekel LC, Brouwers EPM, van Weeghel J, Garretsen HFL. Stigma among health professionals towards patients with substance use disorders and its consequences for healthcare delivery: Systematic review. *Drug and Alcohol Dependence.* 2013;131(1):23-35.

304 Benuto LT, Casas J, Gonzalez F, Newlands R. The Behavioral Model of Health: Education, Behavioral Health Factors, and Stigma as Predictors of Help-Seeking Attitudes. *Community Mental Health Journal.* 2020;56(7):1275-1283.

305 Kennedy-Hendricks A, Barry CL, Gollust SE, Ensminger ME, Chisolm MS, McGinty EE. Social Stigma Toward Persons With Prescription Opioid Use Disorder: Associations With Public Support for Punitive and Public Health-Oriented Policies. *Psychiatric services (Washington, DC).* 2017;68(5):462-469.

306 McGinty EE, Stone EM, Kennedy-Hendricks A, Barry CL. Stigmatizing language in news media coverage of the opioid epidemic: Implications for public health. *Preventive Medicine.* 2019;124:110-114.

307 McGinty EE, Kennedy-Hendricks A, Baller J, Niederdeppe J, Gollust S, Barry CL. Criminal Activity or Treatable Health Condition? News Media Framing of Opioid Analgesic Abuse in the United States, 1998-2012. *Psychiatric services (Washington, DC).* 2016;67(4):405-411.

308 Walton MT, Hall MT. The Effects of Employment Interventions on Addiction Treatment Outcomes: A Review of the Literature. *Journal of Social Work Practice in the Addictions.* 2016;16(4):358-384.



[309] Substance Abuse and Mental Health Services Administration. Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). 2021. Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/

[310] U.S. Commission on Civil Rights. Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities. In. Washington, DC, 2019.

[311] The International Classification of Diseases, Version 10 (ICD-10) was implemented in 1999 following conventions defined by the World Health Organization to replace Version 9 (ICD-9), in use since 1979.

[312] Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death, 1999-2019 on CDC WONDER Online Database, released December 2020. Extracted by ONDCP from http://wonder.cdc.gov/mcd-icd10.html on December 22, 2020.

[313] Centers for Disease Control and Prevention, National Center for Health Statistics. Vital Statistics Rapid Release: Provisional Drug Overdose Death Counts. Available at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm, Accessed on November 19, 2021.

314 National HIDTA Program Office. The Overdose Response Strategy Annual Report. 2019. Available at https://www.hidtaprogram.org/pdf/ors_report_2019.pdf. Accessed on August 23, 2021.

[315] National Park Service, *Dangerous Marijuana Grow Site Discovered in Jail Canyon.;* 2021. Available at: https://www.nps.gov/deva/learn/news/dangerous-marijuana-grow-site-discovered-in-jail-canyon.htm. Accessed July 22, 2021.

[316] Thorsen, Kim. Exploring the Problem of Domestic Marijuana Cultivation. Statement for the Record, U.S. Senate Caucus on International Narcotics Control. Available at https://www.doi.gov/ocl/hearings/112/MarijuanaCultivation_120711. Accessed August 23, 2021.

[317] Thorsen, Kim. Exploring the Problem of Domestic Marijuana Cultivation. Statement for the Record, U.S. Senate Caucus on International Narcotics Control. Available at https://www.doi.gov/ocl/hearings/112/MarijuanaCultivation_120711. Accessed August 23, 2021.

[318] May C. *Transnational Crime and the Developing World*. Global Financial Integrity, March 2017. Accessed August 19, 2021. https://secureservercdn.net/45.40.149.159/34n.8bd.myftpupload.com/wp-content/uploads/2017/03/Transnational_Crime-final.pdf?time=1629315967.

[319] U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 2.

320320 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 2.

[321] U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 17.

322 Counternarcotics Center. 2019 Global Cocaine Trafficking (sanitized). 2019; 1911-23987: 8.

[323] The White House. National Strategy to Combat Transnational Organized Crime. July 2011. Available at https://obamawhitehouse.archives.gov/sites/default/files/Strategy_to_Combat_Transnational_Organized_Crime_July_2011.pdf. Accessed on August 23, 2021.

[324] U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21.

[325] United Nations Office on Drugs and Crime. Alternative Development: A Global Thematic Evaluation Final Synthesis Report. 2005. Available at https://www.unodc.org/pdf/Alternative_Development_Evaluation_Dec-05.pdf. Accessed on August 23, 2021.

[326] U.S. International Development Finance Corporation. United States – Colombia Growth Initiative Executive Summary: A Bilateral Investment Initiative to Advance Rural Development and Realize a Drug Free Colombia. Available at https://www.dfc.gov/sites/default/files/media/documents/USCGI%20Executive%20Summary.pdf. Accessed on August 31, 2021.

[327] U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21.

[328] Library of Congress. Mexico: Amendment Reforming National Security Law Approved. January 25, 2021. Available at Mexico: Amendment Reforming National Security Law Approved | Library of Congress (loc.gov). Accessed on August 13, 2021.



329 Adriana Ávila-Zúñiga-Nordfjeld, Dimitrios Dalaklis. CHAPTER 3 - Enhancing Maritime Security in Mexico: Privatization, Militarization, or a combination of both? Available from https://hal.archives-ouvertes.fr/hal-01792131/document. Accessed on August 22, 2021.

330 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21.

331 The White House. UPDATED: ONDCP Releases Data on Coca Cultivation and Potential Cocaine Production in the Andean Region. July 16, 2021. Available at https://www.whitehouse.gov/ondcp/briefing-room/2021/07/16/ondcp-releases-data-on-coca-cultivation-and-potential-cocaine-production-in-the-andean-region/. Accessed on August 23, 2021.

332 United Nations Office on Drugs and Crime. Colombia Coca Cultivation Survey, 2020. https://www.unodc.org/documents/crop-monitoring/Colombia/Colombia_2020_Coca_Survey_FactSheet_ExSum.pdf. Accessed on August 25, 2021.

333 U.S. Department of State. 2020 International Narcotics Control Strategy Report. Volume 1. Drug and Chemical Control. March 2021: 33. Available at https://www.state.gov/wp-content/uploads/2021/02/International-Narcotics-Control-Strategy-Report-Volume-I-FINAL-1.pdf. Accessed August 23, 2021.

334 U.S. Department of State. 2020 International Narcotics Control Strategy Report. Volume 1. Drug and Chemical Control. March 2021: 130. Available at https://www.state.gov/wp-content/uploads/2021/02/International-Narcotics-Control-Strategy-Report-Volume-I-FINAL-1.pdf. Accessed August 23, 2021.

335 U.S. Department of State. 2020 International Narcotics Control Strategy Report. Volume 1. Drug and Chemical Control. March 2021. Available at https://www.state.gov/wp-content/uploads/2021/02/International-Narcotics-Control-Strategy-Report-Volume-I-FINAL-1.pdf. Accessed August 23, 2021.

336 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 85.

337 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 121.

338 Finklea, Kristin. Illicit Drug Flows and Seizures in the United States: What Do We [Not] Know?. Congressional Research Service. July 3, 2019.

339 U.S. Department of the Treasury Financial Crimes Enforcement Network. *Advisory on Illicit Activity Involving Convertible Virtual Currency.* May 9, 2019; FIN-2019-A003. Available at https://www.fincen.gov/sites/default/files/advisory/2019-05-10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf. Accessed on August 24, 2021.

340 Department of Treasury, Bank Secrecy Act. https://www.fincen.gov/resources/fincens-mandate-congress.

341 Department of Treasury, Financial Crimes Enforcement Center. https://www.fincen.gov/anti-money-laundering-act-2020

342 Department of Treasury, Financial Crimes Enforcement Center. National Strategy to Combat Terrorism and other Illicit Financing. 2020; Available at https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf. Accessed on August 23, 2021.

343 The White House. 21st Century Drug Trafficking: Advisories on Fentanyl and Other Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/White-House-Fentanyl-Advisories-Summary.pdf. Accessed on August 24, 2021.

344 The White House. Advisory to the Chemical Manufacturing Industry on Illicit Activity and Methods Related to the Manufacturing of Fentanyl and Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Manufacturing-Tab-A.pdf. Accessed on August 24, 2021.

345 The White House. Advisory to Digital Private Sector Platforms on Illicit Activity and Methods Related to the Marketing of Fentanyl and Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Marketing-Tab-B.pdf. Accessed on August 24, 2021.

346 The White House. Advisory to the Shipping Industry on the Illicit Movement Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Movement-Tab-C.pdf. Accessed on August 24, 2021.

347 The White House. Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids. August 21, 2019. Available at



https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Money-Tab-D.pdf. Accessed on August 24, 2021.

348 U.S. Department of Justice. Drug Enforcement Administration. *DEA implements ecommerce outreach program to combat counterfeit drug production*. August 2020. Available at, https://www.dea.gov/press-releases/2020/08/04/dea-implements-ecommerce-outreach-program-combat-counterfeit-drug. . Accessed on August 20, 2021.

349 The White House. United States Key Deliverables for the 2016 North American Leaders' Summit. June 29, 2016. Available at https://obamawhitehouse.archives.gov/the-press-office/2016/06/29/fact-sheet-united-states-key-deliverables-2016-north-american-leaders. Accessed on August 24, 2021.

350 The White House. FACT SHEET: Key Deliverables for the 2021 North American Leaders' Summit. November 18, 2021. Available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/18/fact-sheet-key-deliverables-for-the-2021-north-american-leaders-summit/. Accessed on March 3, 2022.

351 U.S. Department of State. Press Briefing on U.S.-EU political dialogue on drugs as well as U.S.-EU cooperation to address the opioid crises, cocaine trafficking. November 9, 2017. Available at https://2017-2021.state.gov/telephonic-press-briefing-with-james-a-walsh-das-for-international-narcotics-law-enforcement-affairs/index.html. Accessed on August 23, 2021.

352 Columbia University. National Center on Addiction and Substance Abuse. *Behind Bars Ii : Substance Abuse and America's Prison Population*. New York, NY: National Center on Addiction and Substance Abuse at Columbia University; 2010.

353 Nellis. A. *The Color of Justice: Racial and Ethnic Disparity in State Prisons*. The Sentencing Project, October 2021. https://www.sentencingproject.org/wp-content/uploads/2016/06/The-Color-of-Justice-Racial-and-Ethnic-Disparity-in-State-Prisons.pdf; accessed February 20, 2022.

354 Binswanger IA, Stern MF, Deyo RA, et al. Release from prison — a high risk of death for former inmates. *The new england journal of medicine*. 2007;356(2):157-165. doi:10.1056/NEJMsa064115.

355 Ranapurwala SI, Shanahan ME, Alexandridis AA, et al. Opioid overdose mortality among former north carolina inmates: 2000–2015. *American journal of public health*. 2018;108(9):1207-1213. doi:10.2105/AJPH.2018.304514

356 Kubic, M. W., Pendergrass, T. (2017). Diversion programs are cheaper and more effective than incarceration. Prosecutors should embrace them. Retrieved from https://www.aclu.org/blog/smart-justice/diversion-programs-are-cheaper-and-more-effective-incarceration-prosecutors; and Ziedenberg, J, Schiraldi, V, & McVay, D., Treatment or Incarceration: National and State Findings on the Efficacy and Cost Savings of Drug Treatment Versus Imprisonment. Open Society Foundation and Justice Policy Institute. 2004. Treatment Versus Incarceration (opensocietyfoundations.org)

357 Green, T. C., Clarke, J., Brinkley-Rubinstein, L., Marshall, B. D. L., Alexander-Scott, N., Boss, R., & Rich, J. D. (2018). Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System. *JAMA Psychiatry, 75*(4), 405-407. 10.1001/jamapsychiatry.2017.4614

358 Marsden J, Stillwell G, Jones H, et al. Does exposure to opioid substitution treatment at prison release reduce the risk of death? a prospective, observational study in england. *The lancet*. 2016;388:11. doi:10.1016/S0140-6736(16)32247-4

359 Marsden, J., Stillwell, G., Jones, H., Cooper, A., Eastwood, B., Farrell, M., Lowden, T., Maddalena, N., Metcalfe, C., Shaw, J., & Hickman, M. (2017). Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death after Release? A National Prospective Observational Study in England. *Addiction (Abingdon, England), 112*(8), 1408-1418. 10.1111/add.13779 [doi]

360 National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for Opioid Use Disorder Save Lives*. (Consensus Study Report). Washington, DC: The National Academies Press. https://doi.org/10.17226/25310

361 National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for Opioid Use Disorder Save Lives*. (Consensus Study Report). Washington, DC: The National Academies Press. https://doi.org/10.17226/25310

362 National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for Opioid Use Disorder Save Lives*. (Consensus Study Report). Washington, DC: The National Academies Press. https://doi.org/10.17226/25310

363 Wyse JJ, Morasco BJ, Dougherty J, et al. Adjunct interventions to standard medical management of buprenorphine in outpatient settings: a systematic review of the evidence. *Drug and alcohol dependence*. 2021. doi:10.1016/j.drugalcdep.2021.108923

364 Jail and Prison Opioid Project. (2021). Explore the Data. Retrieved from http://dev.prisonopioidproject.org/



[365] Wakeman SE, Rich JD. Addiction treatment within u.s. correctional facilities: bridging the gap between current practice and evidence-based care. *Journal of addictive diseases.* 2015;34(2-3):220-225. doi:10.1080/10550887.2015.1059217

[366] Bandara, S., Kennedy-Hendricks, A., Merritt, S., Barry, C. L., & Saloner, B. (2021). Methadone and buprenorphine treatment in United States jails and prisons: lessons from early adopters. *Addiction (Abingdon, England)*, 10.1111/add.15565. Advance online publication. https://doi.org/10.1111/add.15565

[367] Health and Human Services Department. (2021). *Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder.* Federal Registrar. Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder

[368] Knight K, Farabee D, editors. *Treating Addicted Offenders: A Continuum of Effective Practices.* Kingston, NJ: Civic Research Institute; 2004; and Leukefeld CG, Tims F, Farabee D, editors. *Treatment of Drug Offenders: Policies and Issues.* New York, NY: Springer; 2002.

[369] Maradiaga JA, Nahvi S, Cunningham CO, Sanchez J, Fox AD. "I Kicked the Hard Way. I Got Incarcerated." Withdrawal from Methadone During Incarceration and Subsequent Aversion to Medication Assisted Treatments. *J Subst Abuse Treat.* 2016;62:49-54. doi:10.1016/j.jsat.2015.11.004

[370] National Institute on Drug Abuse. (2017). *Treating opioid addiction in criminal justice settings.* Bethesda, MD. https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/policybrief-cj.pdf

[371] Rich, J. D., McKenzie, M., Larney, S., Wong, J. B., Tran, L., Clarke, J. et al. (2015). Methadone continuation versus forced withdrawal on incarceration in a combined US prison and jail: A randomised, openlabel trial. *The Lancet, 386,* 350-359.

[372] Green, T. C., Clarke, J., Brinkley-Rubinstein, L., Marshall, B. D., Alexander-Scott, N., Boss, R. et al. (2018). Postincarceration fatal overdoses after implementing medications for addiction treatment in a statewide correctional system. *JAMA Psychiatry,* 75, 405-407. doi: 10.1001/jamapsychiatry.2017.4614

[373] National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for opioid use disorder save lives.* Washington, DC: National Academies Press. https://www.ncbi.nlm.nih.gov/books/NBK538936/

[374] Substance Abuse & Mental Health Services Administration. (2019). *Use of medication-assisted treatment for opioid use disorder in criminal justice settings* (HHS Pub. No. PEP19-MATUSECJS). Rockville, MD. https://store.samhsa.gov/product/Use-of-Medication-Assisted-Treatment-for-Opioid-Use-Disorder-in-Criminal-Justice-Settings/PEP19-MATUSECJS

[375] National Association of Drug Court Professionals. (2013). *Adult Drug Court Best Practice Standards* (Vol. I-Text Revision). Alexandria, VA.

[376] National Association of Drug Court Professionals. (2015). *Adult Drug Court Best Practice Standards* (Vol. II-Text Revision). Alexandria, VA.

[377] Nordstrom BR, Marlowe DB, National Drug Court Institute (U.S.). *Medication-Assisted Treatment for Opioid Use Disorders in Drug Courts : Ensuring the Safe, Effective, and Responsible Use of Addiction Medications for Drug Court Participants.* Alexandria, VA: National Drug Court Institute; 2016.

[378] Legal Action Center. (2009). *Know your rights: Rights for individuals on medication-assisted treatment.* (Rep. No. SMA-09-4449). Rockville, MD: Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration

[379] US Department of Justice. Coordinating Council on Juvenile Justice and Delinquency Prevention Meeting. https://juvenilecouncil.ojp.gov/sites/g/files/xyckuh301/files/media/document/march-14-2019-coordinating-council-meeting-summary.pdf. Accessed on April 18, 2022.

[380] Kennedy-Hendricks, A., Bandara, S., Merritt, S., Barry, C. L., & Saloner, B. (2021). Structural and organizational factors shaping access to medication treatment for opioid use disorder in community supervision. *Drug and alcohol dependence, 226,* 108881. Advance online publication. https://doi.org/10.1016/j.drugalcdep.2021.108881

[381] Bureau of Justice Statistsics, U.S. Department of Justice. Jail Inmates in 2020 – Statistical Tables. Available at: https://bjs.ojp.gov/content/pub/pdf/ji20st.pdf.

[382] Comprehensive Opioid, Stimulant, and Substance Abuse Program. (2021). The Building Bridges Initiative. Retrieved from https://bridges.cossapresources.org/

[383] 42 U.S.C. 1396d, §1905, Social Security Act. Note that there is a limited exception to this policy; Medicaid dollars are available for an inmate experiencing an inpatient stay of 24 hours or more. *See* https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/sho16007.pdf.

[384] Bandara, S., Kennedy-Hendricks, A., Merritt, S., Barry, C. L., & Saloner, B. (2021). Methadone and buprenorphine treatment in United States jails and prisons: lessons from early adopters. *Addiction (Abingdon, England)*, 10.1111/add.15565. Advance online publication. https://doi.org/10.1111/add.15565



[385] U.S. Department of Health & Human Services. (2021). HHS Releases New Buprenorphine Practice Guidelines, Expanding Access to Treatment for Opioid Use Disorder. Retrieved from https://www.hhs.gov/about/news/2021/04/27/hhs-releases-new-buprenorphine-practice-guidelines-expanding-access-to-treatment-for-opioid-use-disorder.html#:~:text=Practitioners-percent20who-percent20do-percent20not-percent20wish-percent20to-percent20practice-percent20under,drugs-percent2C-percent20covered-percent20under-percent20the-percent20CSA-percent2C-percent20such-percent20as-percent20buprenorphine.

[386] U.S. Department of Justice, Drug Enforcement Administration. (2001). Emergency narcotic addiction treatment. Retrieved from https://www.deadiversion.usdoj.gov/pubs/advisories/emerg_treat.htm

[387] The Biden-Harris Administration's Statement of Drug Policy Priorities for Year One. The White House. https://www.whitehouse.gov/wp-content/uploads/2021/03/BidenHarris-Statement-of-Drug-Policy-Priorities-April-1.pdf?fbclid=IwAR2TBk34U_XRqlqK_pAYnUd_9f7zY3IbCQI9KxI6S5eYeRJdFzl9B09hZ84. Published April 1, 2021. Accessed September 2, 2021.

[388] The Biden Plan for Strengthening America's Commitment to Justice. Joe Biden's Criminal Justice Policy/Joe Biden. https://joebiden.com/justice/. Published July 23, 2019. Accessed September 2, 2021.

[389] American Civil Liberties Union. (2020). *A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform.* American Civil Liberties Union. https://www.aclu.org/sites/default/files/field_document/tale_of_two_countries_racially_targeted_arrests_in_the_era_of_marijuana_reform_revised_7.1.20_0.pdf

[390] Nicosia, N., Macdonald, J. M., & Arkes, J. (2013). Disparities in Criminal Court Referrals to Drug Treatment and Prison for Minority Men. *American Journal of Public Health, 103*(6), e77-e84.

[391] Bhati AS, Roman J, Chalfin A, Justice Policy Center. *To Treat or Not to Treat : Evidence on the Prospects of Expanding Treatment to Drug-Involved Offenders*. Washington, D.C.: Urban Institute, Justice Policy Center; 2008. http://www.urban.org/UploadedPDF/411645_treatment_offenders.pdf. Accessed September 2, 2021.

[392] Arnold, A., Benally, P., Friedrich, M. (2020). Drug Courts in the Age of Sentencing Reform. Center for Court Innovation.

[393] Criminal Justice Policy Foundation. (n.d.). Mandatory minimum and sentencing reform. Retrieved from https://www.cjpf.org/mandatory-minimums.

[394] Eisen, L.B. (2015). Mandatory Minimum Sentences – Time to End Counterproductive Policy. Retrieved from https://www.brennancenter.org/our-work/analysis-opinion/mandatory-minimum-sentences-time-end-counterproductive-policy.

[395] Report on the Rhode Island Department of Corrections' Population FY 1976 - FY 2016. State of Rhode Island and Providence Plantations - Planning & Research Unit. http://www.doc.ri.gov/docs/RIDOC's%20Population%20FY1976%20-%20FY2016.pdf. Published June 2017. Accessed September 2, 2021.

[396] American Civil Liberties Union. (n.d.). Sentencing Reform. Retrieved from https://www.aclu.org/issues/smart-justice/sentencing-reform

[397] The Pew Charitable Trusts, "Time Served: The High Cost, Low Return of Longer Prison Terms" (2012), 19, http://www.pewtrusts.org/~/media/assets/2012/06/06/time_served_report.pdf

[398] The Pew Charitable Trusts. (2018). *More Imprisonment Does Not Reduce State Drug Problems.* https://www.pewtrusts.org/-/media/assets/2018/03/pspp_more_imprisonment_does_not_reduce_state_drug_problems.pdf

[399] National Association Of Drug Court Professionals. (2021). Welcome To The ARK. Retrieved from https://ark.nadcp.org/

[400] Criminal Justice Knowledge Bank. (2018). Richmond County: HOPE Program. Retrieved from https://knowledgebank.criminaljustice.ny.gov/system/files/documents/2021/08/criminal-justice-knowledge-bank-program-profile_richmond-co-hope_082021.pdf

[401] Kubic, M. W., Pendergrass, T. (2017). Diversion programs are cheaper and more effective than incarceration. Prosecutors should embrace them. Retrieved from https://www.aclu.org/blog/smart-justice/diversion-programs-are-cheaper-and-more-effective-incarceration-prosecutors

[402] Zarkin, G. A., Cowell, A. J., Hicks, K. A., Mills, M. J., Belenko, S., Dunlap, L. J., & Keyes, V. (2015). Lifetime Benefits and Costs of Diverting Substance-Abusing Offenders From State Prison. *Crime & Delinquency*, *61*(6), 829–850. https://doi.org/10.1177/0011128712461904



[403] U.S. Department of Health and Human Services Assistant Secretary for Planning and Evaluation Office of Disability, Aging and Long-Term Care Policy. (2019). Approaches to Early Jail Diversion: Collaborations & Innovations. Retrieved from https://aspe.hhs.gov/system/files/pdf/262096/EarlyJail.pdf

[404] Duwe G. Evaluating the minnesota comprehensive offender reentry plan (mcorp): results from a randomized experiment. *Justice quarterly*. 2012;29(3):347-383. doi:10.1080/07418825.2011.555414

[405] Amy E. Hirsch et al., *Every Door Closed: Barriers Facing Parents with Criminal Records*, Center for Law and Social Policy and Community Legal Services, 2002

[406] Marlow E, White MC, Chesla CA. Barriers and facilitators: parolees' perceptions of community health care. J Correct Health Care. 2010 Jan;16(1):17-26. doi: 10.1177/1078345809348201. Epub 2009 Oct 26.

[407] Joudrey, Paul J. et al. "A Conceptual Model for Understanding Post-Release Opioid-Related Overdose Risk." Addiction Science and Clinical Practice. Vol. 14. Published April 15, 2019, https://ascpjournal.biomedcentral.com/articles/10.1186/s13722-019-0145-5.

[408] Merrall EL, Kariminia A, Binswanger IA, et al. Meta-analysis of drug-related deaths soon after release from prison. *Addiction*. 2010;105(9):1545-1554. doi:10.1111/j.1360-0443.2010.02990.x

[409] Substance Abuse and Mental Health Services Administration. (2021). *Intercept 4: ReEntry*. https://www.samhsa.gov/criminal-juvenile-justice/sim-overview/intercept-4

[410] Miller, Terry; Lauer, Aaron; Mihok, Briana; and Karlie Haywood. A Continuum of Care Approach; Western Pennsylvania's Response to the Opioid Epidemic. Pittsburgh, PA: University of Pittsburgh Institute of Politics, 2016, http://d-scholarship.pitt.edu/29950/1/IOPOpioidReport2016.pdf. P. 26

[411] Warm Hand-Offs in Pennsylvania. A Task Force and Advisory Committee Report. Joint State Government Commission. Retrieved at: http://www.jsg.legis.state.pa.us/resources/documents/ftp/publications/2020-12-29%20(2019HR216)WARM%20HAND-OFFS%20REPORT%2012.28.20.pdf. Published December 2020. Accessed September 2, 2021.

[412] Hubbard, William C. (2015) "Remarks on Collateral Consequences of Mass Incarceration," *Criminal Law Practitioner*: Vol. 2 : Iss. 2 , Article 3.

[413] U.S. Commission on Civil Rights. Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities. In. Washington, DC. 2019.

[414] U.S. Commission on Civil Rights. Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities. In. Washington, DC. 2019.

[415] The White House. Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking. January 27, 2021. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/. Accessed on January 6, 2022.

[416] National Research Council. *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us*. Washington, DC: The National Academies Press. 2001. (Page 2)

[417] In addition to official NSDUH reports, a detailed history of NSDUH and drug policy is available in Gfroerer,J. War Stories from the Drug Survey – How Culture, Politics, and Statistics Shaped the National Survey on Drug Use and Health. New York: Cambridge University Press. 2019.

[418] Maruschak LM, Bronson J, Alper M. Alcohol and Drug Use and Treatment Reported by Prisoners. Bureau of Justice Statistics. July 2021. Available at https://www.ojp.gov/library/publications/alcohol-and-drug-use-and-treatment-reported-prisoners-survey-prison-inmates. Accessed on July 13, 2021.

[419] Hedegaard H, Bastian BA, Trinidad JP, Spencer M, Warner M. Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2011-2016, National Vital Statistics Reports Vol. 67, No. 9 (December 12, 2018). Available at https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_09-508.pdf . Accessed on December 13, 2018.

[420] National Highway Traffic Safety Administration. NEMSIS overview. Available at https://nemsis.org/. Accessed on April 18, 2022.

[421] National Highway Traffic Safety Administration. Fatality Analysis Reporting System. Available at https://www.nhtsa.gov/research-data/fatality-analysis-reporting-system-fars. Accessed on April 18, 2022.

[422] Centers for Disease Control and Prevention. WISQARS – Web-based Injury Statistics Query and Reporting System. Available at https://www.cdc.gov/injury/wisqars/index.html. Accessed on April 18, 2022.

[423] United State Consumer Product Safety Commission. National Electronic Injury Surveillance System. Available at https://www.cpsc.gov/Research--Statistics/NEISS-Injury-Data. Accessed on April 18, 2022.

[424] Washington/Baltimore High Intensity Drug Trafficking Area (HIDTA). ODMAP overview. Available athttps://www.hidta.org/odmap/. Accessed April 18, 2022.

[425] ONDCP. *The Economic Costs of Drug Abuse in the United States 1992-2002*. Washington, DC: 2004.



426 ONDCP press release, UPDATED: ONDCP Releases Data on Coca Cultivation and Potential Cocaine Production in the Andean Region. July 16, 2021. Available at https://www.whitehouse.gov/ondcp/briefing-room/2021/07/16/ondcp-releases-data-on-coca-cultivation-and-potential-cocaine-production-in-the-andean-region/. Accessed on July 21, 2021.

427 Centers for Disease Control and Prevention. Youth Risk Behavior Surveillance – United States, 2019. MMWR 69(SS-01) August 21, 2020. Available at https://www.cdc.gov/healthyyouth/data/yrbs/reports_factsheet_publications.htm#anchor_1596725978. Accessed on August 24, 2020.

428 Quest Diagnostics. Marijuana Workforce Drug Test Positivity Continues Double-Digit Increases to Keep Overall Drug Positivity Rates at Historically High Levels, Finds Latest Quest Diagnostics Drug Testing Index Analysis. May 26, 2021. Available at https://www.questdiagnostics.com/dms/Documents/Employer-Solutions/DTI-2021/quest-drug-testing-index-press-release-2021/2021-quest-diagnostics-drug-testing-index-report-press-release.pdf. Accessed on May 27, 2021.

429 Community Anti-Drug Coalitions of America (CADCA). Building Drug-Free Communities overview.  Available at https://www.cadca.org/. Accessed on April 18, 2022.

430 National Association of State Alcohol and Drug Abuse Directors. Overview. Available at https://nasadad.org/. Accessed on April 18, 2022.

431 Section 9 of the *Executive Order on Advancing Racial Equity and Support for Underserved Communities through the Federal Government*. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/. Accessed on July 22, 2021.

432 Medley G, Lipari RN, Bose J. Sexual Orientation and Estimates of Adult Substance Use and Mental Health: Results from the 2015 National Survey on Drug Use and Health. NSDUH Data Review, SAMHSA. October 2016. Available at https://www.samhsa.gov/data/sites/default/files/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015.pdf. Accessed on May 31, 2021.

433 Jones CM, Clayton HB, Deputy NP, Roehler DR, Ko JY, et al. Prescription Opioid Misuse and Use of Alcohol and Other Substances Among High School Students – Youth Risk Behavior Survey, United States, 2019. *MMWR* 69(1):38-46 August 21, 2020. Available at https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2019/su6901-H.pdf. Accessed on June 2, 2021.

434 National Institute on Drug Abuse. *Drug Use Among Racial/Ethnic Minorities* (Revised). U.S. Department of Health and Human Services, National Institutes of Health. 2003.

435 Centers for Disease Control and Prevention. *National Notifiable Diseases Surveillance System.* https://www.cdc.gov/nndss/index.html. Accessed on November 30, 2021.

436 University of Maryland Center for Substance Abuse Research. Community Drug Early Warning System. Available at https://cesar.umd.edu/landing/CDEWS. Accessed on May 31, 2021.

437 A narrative account of where the United States is on wastewater-based epidemiology is found in: Weiss M. Sewage Has Stories to Tell. Why Won't U.S. listen? Smithsonian Magazine. April 26, 2021. (reprint from Undark). Available at https://www.smithsonianmag.com/science-nature/will-us-finally-embrace-sewage-analysis-improve-public-health-180977570/?utm_source=smithsoniandaily&utm_medium=email&utm_campaign=20210426-daily-responsive&spMailingID=44870393&spUserID=NzQwNDU1MzQzNzcS1&spJobID=1984111673&spReportId=MTk4NDExMTY3MwS2. Accessed on May 31, 2021.

438 National Science Foundation. Covid-19 Response Funding Update. January 19, 2021. Available at https://www.nsf.gov/about/congress/funding-percent20updates/COVID_update_Jan19.pdf. Accessed on May 31, 2021.

439 European Monitoring Centre for Drugs and Drug Addiction. Wastewater-based epidemiology and drugs topic page. Available at https://www.emcdda.europa.eu/topics/wastewater_en. Accessed on May 31, 2021.

440 Sewage Analysis CORe group Europe (SCORE). https://score-cost.eu/. Accessed on May 31, 2021.

441 A brief description of this series is available at https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021.

442 Green, TC, Park JN, Gilbert M, McKenzie M, Struth E, et al. An assessment of the limits of detection, sensitivity, and specificity of three devices for public health-based drug checking of fentanyl in street-acquired



samples. *International Journal of Drug Policy* 77. 2020. Available at https://doi.org/10.1016/j.drugpo.2020.102661. Accessed on June 24, 2021.

443 Anghel LA, Farcas AM, Oprean RN. An overview of the common methods used to measure treatment adherence. *Med Pharm Rep.* 2019;92(2):117-122.

444 Caces MF, Delaney PJ, Cala MA. The impact of prescription pain reliever misuse and heroin use on morbidity and mortality by level of urbanicity: 2002-2004, *Contemporary Rural Social Work Journal* Volume 11, Number 1, Article 7. 2019.

445 National Research Council. *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us.* Washington, DC: The National Academies Press. 2001. Available https://doi.org/10.17226/10021.

446 National Information Exchange Model. Available at https://www.niem.gov/. Accessed on January 5, 2022.

447 *The SUPPORT for Patients and Communities Act*, 21 U.S.C. 21 U.S. Code § 1705 -Development, submission, implementation, and assessment of National Drug Control Strategy, Section (f).

448 United Nations. *World Drug Report 2021.* Available online at https://wdr.unodc.org/wdr2021/index.html. Accessed on June 24, 2021.

449 Centers for Disease Control and Prevention (CDC). *Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States.* National Center for Injury Prevention and Control, CDC, U.S. Department of Health and Human Services. Available at https://www.cdc.gov/drugoverdose/pdf/pubs/2018-evidence-based-strategies.pdf, accessed on April 1, 2021.

450 The Washington Post. "Trump administration freezes database of addiction and mental health treatments." January 10, 2018. Available at https://www.washingtonpost.com/national/health-science/trump-administration-freezes-database-of-addiction-and-mental-health-programs/2018/01/10/ed421654-f577-11e7-beb6-c8d48830c54d_story.html, accessed on May 28, 2021.

451 SAMHSA. *Evidence-Based Practices Resource Center.* Available at https://www.samhsa.gov/resource-search/ebp, accessed on May 28, 2021.

452 National Institute of Justice. *Crime Solutions*. Available at https://crimesolutions.ojp.gov/. Accessed on May 12, 2021.

67 No. 8 Interpreter Releases 201

**Interpreter Releases**

February 26, 1990

PRESIDENT SIGNS STATE DEPARTMENT AUTHORIZATION BILL

Copyright (c) 1990 Federal Publications Inc.

President Bush has signed into law a State Department authorization bill that, among other things, permanently prohibits the government from barring foreigners from visiting the U.S. because of **\*202** their political beliefs. The legislation, H.R. 3792, was enacted on February 16, 1990. Pub. L. No. 101-246, 104 Stat. 15. Overall, the new law authorizes $4.7 billion in fiscal year (FY) 1990 and $5 billion in FY 1991 for the State Department, the U.S. Information Agency and several other related agencies.

Immigration-related provisions of the new law include funding for refugees, adding a new ground of inadmissibility to INA §212(a) for certain diplomats who commit crimes, and making changes to some consular post locations. Most importantly, §128 of H.R. 3792 makes two changes to the current temporary prohibition on excluding or deporting nonresident aliens because of their ideological beliefs. Under §901 of the Foreign Relations Authorization Act for fiscal years 1988 and 1989, as amended, the U.S. government cannot deport, exclude or deny visas to nonimmigrant aliens because of their past or current political beliefs, statements or associations which, if engaged in by a U.S. citizen in this country, would be protected by the U.S. Constitution. Section 128 of the new law clarifies that nonimmigrants granted protection under §901 cannot be subject to conditions or restrictions on their entry. More importantly, the bill also repeals §901(d), the sunset provision, thereby making §901's protections permanent. Section 901 does not apply to immigrants. [2]

In signing the bill, President Bush said that he was not bound by several provisions that limit his authority to conduct foreign relations. A senior official told the Washington Post that the administration is considering suing Congress to test the constitutionality of some provisions. Conversely, the President might be sued for essentially issuing a line-item veto-a refusal to abide by some but not all provisions of the law. [3]

Three of the provisions cited by the President are immigration-related. They are:

§128. One issue that arose in congressional deliberation of H.R. 3792 was whether §128 was a permanent substantive limitation on the Executive's authority to exclude or deport certain nonimmigrants, or simply required waivers to be granted to such people under INA §212(d)(3). Sens. Alan K. Simpson (R-Wyo.) and Jesse Helms (R-N.C.) claimed that the State Department's current waiver process would continue after enactment of §128; Sen. Daniel P. Moynihan (D-N.Y.) and Rep. Howard L. Berman (D-Cal.) argued that under §128, persons will no longer be required to go through a burdensome waiver process. [4] President Bush sided with the Republican lawmakers, commenting that "it is my understanding that section 128 has no effect on the substance of section 901 or on the way the executive branch has applied it since its enactment."

§407. This section directs the President to deny an individual's admission to the U.S. as a United Nations representative if the President determines that the person has engaged in espionage and poses a threat to U.S. national security interests. President Bush said that this provision interferes with his authority to receive or reject foreign ambassadors and, as such, violates his prerogatives as president. "I therefore shall construe section 407 to be advisory," he said.

§134. This provision allows the Soviet Union to occupy a consulate in New York only upon certification that the U.S. mission in Kiev can occupy an interim facility. While that exchange is administration policy, President Bush said he objected as a matter of presidential prerogative. The president makes such agreements, not Congress, he said. Therefore, "I shall also treat this section as advisory."

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Relevant portions of the President's February 16, 1990 statement upon signing H.R. 3792 are reproduced in Appendix I of this Release.

## Footnotes

2       The new law's immigration-related provisions are reproduced at 66 Interpreter Releases 1304-05 (Nov. 20, 1989).

3       Washington Post, Feb. 17, 1990, at A23, col. 4.

4       See 67 Interpreter Releases 173 (Feb. 12, 1990); 66 Interpreter Releases 1287 (Nov. 20, 1989).

End of Document                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Calendar No. 282

| 99TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>99–132 |
|---|---|---|

# IMMIGRATION REFORM AND CONTROL ACT OF 1985

---

# REPORT

together with

## MINORITY VIEWS

OF THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

ON

## S. 1200, as amended



AUGUST 28, 1985.—Ordered to be printed

Filed under authority of the order of the Senate of August 1 (legislative day, July 16), 1985

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1985

51-567 O

AR2022_400863

## COMMITTEE ON THE JUDICIARY

STROM THURMOND, South Carolina, *Chairman*

| | |
|---|---|
| CHARLES McC. MATHIAS, Jr., Maryland | JOSEPH R. BIDEN, Jr., Delaware |
| PAUL LAXALT, Nevada | EDWARD M. KENNEDY, Massachusetts |
| ORRIN G. HATCH, Utah | ROBERT C. BYRD, West Virginia |
| ALAN K. SIMPSON, Wyoming | HOWARD M. METZENBAUM, Ohio |
| JOHN P. EAST, North Carolina | DENNIS DeCONCINI, Arizona |
| CHARLES E. GRASSLEY, Iowa | PATRICK J. LEAHY, Vermont |
| JEREMIAH DENTON, Alabama | HOWELL HEFLIN, Alabama |
| ARLEN SPECTER, Pennsylvania | PAUL SIMON, Illinois |
| MITCH McCONNELL, Kentucky | |

Dennis W. Shedd, *Chief Counsel and Staff Director*
Diana L. Waterman, *General Counsel*
Deborah G. Bernstein, *Chief Clerk*
Mark H. Gitenstein, *Minority Chief Counsel*

————

### Subcommittee on Immigration and Refugee Policy

ALAN K. SIMPSON, Wyoming, *Chairman*

| | |
|---|---|
| CHARLES E. GRASSLEY, Iowa | EDWARD M. KENNEDY, Massachusetts |
| JEREMIAH DENTON, Alabama | PAUL SIMON, Illinois |

Richard W. Day, *Chief Counsel and Staff Director*
Charles O. Wood, *Special Counsel*
Carl W. Hampe, *Counsel*
Jerry M. Tinker, *Minority Counsel*

(II)

AR2022_400864

# CONTENTS

|  | Page |
|---|---|
| I. Purpose and summary | 1 |
| II. General statement | 2 |
| A. Introduction | 2 |
| B. The national interest | 3 |
| C. Current problems | 4 |
| D. The solution—S. 1200 | 7 |
| (1) Title I—Control of illegal immigration | 7 |
| a. Reducing the incentive of employment | 7 |
| b. Enforcement and fees | 13 |
| c. Agricultural labor | 13 |
| (2) Title II—Legalization | 15 |
| (3) Title III—Other changes | 16 |
| (4) Title IV—Reports to Congress | 17 |
| (5) Title V—U.S.-Mexico Commission | 18 |
| III. Recent immigration studies and reform efforts | 18 |
| A. History, 92d–96th Congresses (1971–1980) | 18 |
| B. Ford administration proposals | 20 |
| C. Carter administration proposals | 20 |
| D. Select Commission on Immigration and Refugee Policy | 21 |
| E. Reagan administration proposals | 23 |
| F. 97th Congress (1981–1982) | 24 |
| G. 98th Congress (1983–1984) | 25 |
| IV. Committee proceedings | 26 |
| V. Section-by-section analysis | 29 |
| VI. Cost estimate | 57 |
| VII. Regulatory impact evaluation | 68 |
| VIII. Changes in existing law | 68 |
| Minority views of Mr. Kennedy | 103 |
| Minority views of Mr. Simon | 107 |

(III)

AR2022_400865

AR2022_400866

Calendar No. 282

| 99TH CONGRESS 1st Session | SENATE | REPORT 99–132 |

# IMMIGRATION REFORM AND CONTROL ACT OF 1985

---

AUGUST 28, 1985.—Ordered to be printed

Filed under authority of the order of the Senate of August 1 (legislative day, July 16), 1985

---

Mr. THURMOND, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## MINORITY VIEWS

[To accompany S. 1200, as amended]

The Committee on the Judiciary, to which was referred the bill (S. 1200) to amend the Immigration and Nationality Act, and for other purposes, having considered the same, reports favorably thereon, with amendments, and recommends that the bill as amended do pass.

## I. PURPOSE AND SUMMARY

The Committee bill is intended to increase control over illegal immigration.

The primary incentive for illegal immigration is the availability of U.S. employment. In order to reduce this incentive, the bill makes unlawful the knowing employment, or the recruitment or referral for a fee, of illegal aliens; provides for a system to verify work eligibility; and establishes appropriate penalties for violations. In addition, the bill establishes new crimes for certain activities involving fraudulent documents and for bringing illegal aliens to the United States; states the sense of Congress that resources for conventional enforcement and immigration services should be increased; allows the imposition of fees for immigration services and for the use of Immigration and Naturalization Service border and other facilities; and prohibits adjustments of status by visa abusers.

51–567 O

(1)

AR2022_400867

2

S. 1200 also makes several changes in the system of legal immigration. Special immigration benefits are provided for four categories of individuals who have resided in the United States for many years: certain children of employees of international organizations, surviving spouses of deceased such employees, and retired such employees and their spouses. The colonial quota is increased from 600 to 3,000 visas per year. While no changes are made in the current immigrant preference system, the Committee strongly believes that changes should be considered after the provisions of this bill have been enacted into law.

The bill also amends certain provisions of the law relating to nonimmigrants. The H–2 temporary worker program is revised in order to assist agricultural employers in adjusting to the reduced availability of illegal foreign workers. In addition the bill establishes a 3-year transition program for employers of agricultural labor, and creates a commission to further study agricultural labor issues. A pilot visa waiver program is authorized for up to eight countries with low rates of visa denial, exclusion, and visa abuse.

The bill further provides that under certain circumstances illegal aliens who entered the United States prior to January 1, 1980, may obtain temporary legal resident status. Such aliens will have an opportunity to adjust to permanent status after 3 years if they have satisfied certain conditions, including the presentation of evidence that they have some knowledge of U.S. history, government, and the English language, or have enrolled in a program to acquire such knowledge. The legalization program will not begin until 3 years after enactment unless a presidentially appointed commission, whose members support the concept of legalization in the bill, finds that Federal programs to enforce the immigration laws are in place and are effective enough to prevent legalization from encouraging more illegal immigration. If such finding is made within 3 years after enactment, legalization will begin at the earlier time.

Finally, the bill requires certain reports from the President to Congress with respect to the employer sanctions and employment verification provisions, legal and illegal immigration, the legalization program, and the visa waiver program. A report is also required from the Comptroller General of the United States with respect to the implementation of employer sanctions provisions, including whether a pattern of discrimination on the basis of national origin has resulted against citizens or aliens authorized to work in the United States.

## II. GENERAL STATEMENT

### A. INTRODUCTION

No other country in the world attracts potential migrants as strongly as the United States of America. No other country approaches the United States in the number of legal immigrants accepted or refugees permanently resettled. The Committee believes that most Americans are proud of both the reputation and the history of this country as a land of opportunity and refuge. We believe that this reputation and this history have generally had a positive effect on America.

However, current U.S. immigration policy is no longer adequate to deal with modern conditions, including the growing immigration pressure on the United States. Immigration to the United States is "out of control" and it is perceived that way at all levels of government and by the American people—indeed by people all over the world.

The Committee believes that reform is imperative. This does not mean the United States must isolate itself from the rest of the world. Immigration can continue to serve the national interest, but only if the law is reasonably amended to be appropriate for contemporary conditions, and only if the law can be enforced. This will in no way be inconsistent with American tradition. Immigration to the United States has been limited in various ways for more than a century and has been subject to forms of numerical limitation for over 60 years.

The moving words on the Statue of Liberty are cited in nearly all discussions of U.S. immigration policy and are certainly consistent with the traditional hospitality and charity of the American people. It is imperative, however, that Americans perceive that this great country is no longer one of vast, undeveloped space and resources, with a relatively small population.

In an earlier time, the Nation could welcome millions of newcomers, many of whom brought few skills, but did bring a willingness to work hard. In a smaller America with a simpler, labor-intensive economy and a labor shortage, that was often quite enough—that, plus their intense drive to become Americans.

Immigrants can still greatly benefit America, but they should be limited to an appropriate number and selected within that number on the basis of immediate family reunification and skills which would truly serve the interest of a highly developed nation. The major purpose of this bill is to make progress toward the day when the American people can be assured that the limitations and selection criteria contained in the immigration statutes are actually implemented through adequate enforcement.

## B. The National Interest

The Committee believes that the paramount obligation of any nation's government, indeed the very reason for its existence and the justification for its power, is to promote the national interest—the long-term welfare of the majority of its citizens and their descendants.

Consequently, we believe that the formulation of U.S. immigration policy must involve a judgment of what would promote the interests of American citizens—as they are at the present time and as they and their descendants are likely to be in the foreseeable future. An immigration policy which would be detrimental to the long-term well-being of the American people should not be adopted.

We certainly do not mean to suggest that charity and compassion should not play a role in U.S. immigration policy. Even if a particular charitable policy would not promote the national interest, as long as it would not be harmful to that interest and was supported by a majority of the American people, then it should of course be adopted.

Because the well-being of individuals is affected by both economic and noneconomic circumstances, an immigration policy which serves the national interest should be based on an analysis of both the economic and noneconomic impacts of immigration. Economic variables include unemployment, wages, working conditions, productivity and per capita gross national product (GNP). Noneconomic matters include population size, other demographic phenomena, and such cultural elements as values, customs, institutions, and degree of unity or of tension between subcultures.

There is an additional component of the national interest which a realistic analysis must not ignore. This is related to the ability of human beings to experience change without discomfort and it exists regardless of whether any objectively adverse impacts occur. Although the desire of immigrants from other lands to change their lives totally by coming to the United States is obviously greater than their reluctance to leave their homes, the ability of the American people to welcome aliens into their day-to-day life experiences has limits. These limits depend in part on the degree and kind of change which will be caused in their lives. We see evidence that if the newcomers to a community do not excessively disrupt or change the attributes of the community which make it familiar to its residents and uniquely their "home" (as compared with foreign areas, which they may respect highly but are not "home" to them), then the newcomers may well be welcome, especially if they make positive contributions to the community's economic and general well-being. On the other hand, it is seen that if the newcomers remain "foreign," they may not be welcome, especially if they seek to carve out separate enclaves to embrace only their own language and culture and if their numbers and the areas of the community which they directly affect are great. Perhaps this should not be so in the "ideal" world, but it is real.

## C. Current Problems

In the last 9 years, total legal permanent admission to the United States increased from a little over 450,000 in 1976 to 510,000 in 1984. A level of 800,000 was reached in 1980 (if the 145,000 Cubans and Haitians entering that year are counted). As recently as 1965, the total was under 300,000.

During the same 9-year period, the category of "immediate relatives" of U.S. citizens grew 56 percent, from 114,000 to 177,000. Under present law there are no numerical limits on this type of family reunification. In this same period, refugee admissions have ranged from 5,000 in 1977 to a high of over 200,000 in 1980 (excluding the Cubans and Haitains entering that year), to 68,000 in 1984. It should be noted that the United States continues to take more legal immigrants and refugees for permanent resettlement than the rest of the world combined. It is because of these two categories, "immediate relatives" and refugees, neither of which is subject to firm annual numerical limits, that immigration to the United States has increased to such a large extent.

The level of refugee admissions is set by the President after consultation with this Committee and with the Committee on the Judiciary of the House of Representatives. As a result of the maturing

of the consultation process which has occurred in the period since the enactment of the Refugee Act of 1980, the Committee believes that the process provides an appropriate degree of control over this category of entrants not subject to firm statutory limits.

In addition, hundreds of thousands of illegal immigrants now enter the United States every year. Some estimate the net annual inflow at 500,000. The present inflow appears to have become substantially higher in recent years. At least some indication of this can be found in the dramatically increased number of apprehensions. In 1965 the number was just over 100,000. By 1972 it had reached one-half million. Today it is over 1 million.

The number of illegal aliens already in the country is unknown. The Select Commission on Immigration and Refugee Policy used the figure of 3.5 to 6 million as the best guess for 1978. Whatever the number 7 years ago, there are surely many more now.

Immigration—legal plus illegal—now appears to be accounting for 30 to 50 percent of our annual population growth of about 2 million.

At the present time, net immigration—legal plus illegal—probably exceeds 750,000 per year. A net annual immigration of 750,000 would lead to a U.S. population in 100 years of 300 million, if it is assumed that the fertility rate of the existing population remains at its present low level—which seems unlikely—and the fertility rate of the new immigrants immediately declines to that of the present population as a whole—which is even less likely, given the high fertility rates of the less developed countries from which most of the immigrants come. One-third of this 300 million would consist of immigrants arriving after 1980 and their descendants.

Indeed, these figures actually underestimate the impact of immigration. Since it is concentrated in only a few regions of the country, the impact on these regions is of much greater significance than the overall figure suggests. For example, under the same assumptions and assuming continuance of existing settlement patterns, the population of California would double by 2080. Over one-half of that State's population would consist of post-1980 immigrants and their descendants.

The problems which may be caused by excessive population growth are well known and we shall not discuss them here.

Not only is there a very large number of legal and illegal immigrants, but only a small fraction of them are individually selected on the basis of labor market skills which have been determined to benefit the Nation as a whole rather than primarily the interests of the immigrants themselves or their U.S. relatives.

As a result of this and of the fact that the present labor certification process may be of limited effectiveness, we believe there have been adverse job impacts, especially on low-income, low-skilled Americans, who are the most likely to face direct competition, even though we also preceive a degree of short-term economic advantage from the use of "cheap" labor. Such adverse impacts include both unemployment and less favorable wages and working conditions. Not only does this cause economic harm to the directly affected Americans and their families, and in many cases a burden on the taxpayers, but it may also affect society as a whole in the form of social problems associated with unemployment and poverty.

6

Opponents of more effective measures to enforce the immigration laws have claimed that Americans will not take certain "menial" jobs. The Committee believes that this claim has been overstated.

First, many illegal aliens are working in nonmenial jobs which unemployed, underemployed, or less well-paid Americans would clearly take. This will be increasingly true if Federal and State support for various public assistance programs continue to be reduced.

Second, there is evidence that the recruitment policies of firms which rely on illegal aliens for "menial" jobs effectively exclude U.S. workers through limiting access to information about job vacancies. If no information is available concerning vacancies in such jobs, it is unlikely that U.S. workers will apply for them.

Third, many other jobs, which are not now attractive to a sufficient number of qualified Americans, could be made so if employers were to offer higher wages, better working conditions, or a reasonable training program. If a job cannot be filled by Americans at an affordable cost, then if possible it should be mechanized through additional capital investment and more advanced technology. Alternatively, a business might relocate some labor-intensive production overseas or the product or service might be imported from a foreign firm or simply forgone.

The Committee believes that bringing in foreign labor should be a very last resort. Even when no direct displacement of Americans occurs and even when there are short-term economic benefits to a majority of the current population, such action will frequently reduce this country's average productivity and per capita gross national product (GNP), a commonly used measure of a nation's prosperity.

In any case, if it is concluded that the use of foreign labor is beneficial under certain circumstances, then the law should allow this use under the appropriate limitations and conditions. Obviously, however, if the necessary limitations and conditions cannot be enforced, then no beneficial results can be assured.

Although population and direct economic impacts are of great significance, we think most people would agree that the national interest of the American people also includes certain even more important and fundamental aspects, such as the preservation of freedom, personal safety, and political stability—as well as the public cultural qualities and the political institutions which are their foundation.

No one seeking to enter the United States is now barred because of race, color, or religion, as has sometimes happened in the past. This Nation does have a right, however, to expect that anyone wishing to obtain the freedom and opportunity which have been created by the American people will apply lawfully for entry and that those who are selected to immigrate will seek to assimilate into American society, adopting and supporting the public values, beliefs, and customs underlying America's success, and not seek to recreate their homeland here in America.

In the past several years over 80 percent of the new legal immigrants joining American citizens and permanent residents in the United States have come from Latin America, Asia, and the Caribbean area. With respect to illegal immigrants, it is estimated that

Mexico is the source of at least 50–60 percent of the total, other parts of Latin America 10–15 percent, and the Caribbean area 5–10 percent.

To a large extent, the effect of such patterns will depend upon the degree and the pace at which immigrants and their descendants follow the historical pattern of earlier immigrant groups in assimilating into American society and culture.

A desire to assimilate is often reflected by the rate at which an immigrant completes the naturalization process necessary to become a U.S. citizen. There is considerable variation in the naturalization rates of immigrants from different countries of origin. A sample of those granted permanent resident status in 1971 was examined by the staff of the Select Commission on Immigration and Refugee Policy. Of those of Mexican origin who remained in the United States at the end of 7 years, only 5 percent had naturalized. For the entire region of South America the rate was 24.6 percent, for Europe 42.6 percent, for Asia 80.3 percent (excluding China, India, Korea, and the Philippines, whose rates were, respectively, 73.8 percent, 67.8 percent, 80.9 percent, and 67.6 percent). Interestingly, the naturalization rate of immigrants from Canada, who in most cases already share our language and much of our way of life, was 3.4 percent.

If immigration is continued at a high level, yet a substantial portion of these new persons and their descendants do not assimilate into the society, they have the potential to create in America a measure of the same social, political, and economic problems which exist in the countries from which they have chosen to depart. Furthermore, if language and cultural separatism rise above a certain level, the unity and political stability of the Nation will—in time—be seriously diminished. Pluralism, within a united American nation, has been the single greatest strength of this country. This unity comes from a common language and a core public culture of certain shared values, beliefs, and customs which make us distinctly "Americans."

## D. The Solution—S. 1200

### (1) Title I—Control of Illegal Immigration

Most importantly, S. 1200 contains provisions intended to reduce the problem of illegal immigration.

Obviously, the potential benefits and protections sought under even the most carefully designed statutory standards for determining who may enter the United States, as well as for how long and under what conditions they may remain, will not be available in practice if those statutory standards cannot be enforced.

### a. Reducing the incentive of employment

There are only two types of solutions available to the problem of illegal immigration.

The first is direct enforcement:

(A) To physically prevent illegal entry into the United States, for example through border control, fences, and interdiction, and

**AR2022_400873**

(B) To find and deport those who are successful in entering illegally, as well as those who enter legally and then violate the terms of their visa.

The second type of solution involves reducing the incentives to enter.

All objective, comprehensive studies of the problem of illegal immigration, including those by the Ford, Carter, and Reagan administrations, as well as the Select Commission on Immigration and Refugee Policy, have concluded that adequate enforcement of U.S. immigration laws cannot be achieved by direct enforcement alone. The Committee agrees.

Reliance on direct enforcement alone would require massive increases in enforcement in the interior—in both neighborhoods and work places—as well as at the border. This would be more costly and intrusive, as well as less effective, than a program which combines direct enforcement at reasonable levels with a reduction in the incentives to enter the United States.

At the present time there is a substantial disparity in job opportunity between the United States and Third World countries—a disparity which may well continue or even widen as a result of political and social conditions in those countries. Such disparity exists not only in rates of unemployment, but also in wages and working conditions. Even if the unemployment rates were reduced, a difficult task in light of the high birth rates in these countries, the disparity in wages and working conditions would remain.

As long as greater job opportunities are available to foreign nationals who succeed in physically entering this country, intense illegal immigration pressure on the United States will continue. This pressue will decline only if the availability of U.S. employment is eliminated, or the disparity in wages and working conditions is reduced, through improvement in the Third World or deterioration in the United States.

The United States should, of course, assist Third World development, but the achievement of substantially higher living standards there is a propsect only for the long run, and probably depends more than anything else on political and cultural change not in the control of the United States. Furthermore, in the short run, Third World development may actually increase migration to the United States. Since deterioration in the United States is certainly not an attractive resolution, only one approach remains: to prohibit the knowing employment of illegal aliens.

S. 1200 provides for penalties against employers who knowingly employ illegal aliens and also against persons who knowingly and for a fee or other consideration recruit or refer for employment such illegal aliens.

In order to protect both the persons subject to penalties and the members of minority groups legally in this country, the bill provides a system to verify that employees and potential employees are eligible to work in the United States. A formal, effective verification system combined with an affirmative defense for those who in good faith follow the proper procedure is imperative. Otherwise, the system cannot both be effective and avoid discrimination. If employers, recruiters, and referrers are given no protection, they will feel insecure and seek to avoid penalties by avoiding persons

who they suspect might be illegal aliens, in other words, those who "look or sound foreign" to them. If, on the other hand, they are given protection by utilizing a verification system which is easily defeated, then very little screening is likely to occur, even if the vast majority of employers, recruiters, and referrers seek to obey the law, which we believe will be the case.

Concern has been expressed that the employer sanctions provisions of S. 1200 will cause some employers to discriminate on the basis of natural origin against certain U.S. citizens or aliens authorized to work in the United States. The Committee does not believe that such discrimination will occur. No convincing evidence or argument has been presented that it will occur, and the evidence that is available to the Committee indicates that it will not.

An innocent employer is protected by the verification system and will have no reason to discriminate. This will be more fully explained below. An employer who wants to avoid hiring certain persons because of their race or national origin could continue to try to do so, but he would be subject to a suit under title VII of the Civil Rights Act of 1964. The employer sanctions law would provide no protection for such an employer. Such an employer might allege that his decision not to hire was motivated by a fear of employer sanctions. If, however, the plaintiff were to show by a preponderance of the evidence that the employer did not actually have such fear, then such allegation would not have helped the defendant's case. The most likely form of such evidence would be a sworn statement that documents had been presented to the employer showing that the applicant was authorized to be so employed, along with the documentary evidence itself (which would of course be in the possession of the applicant). If the documents appeared on their face to be genuine and to belong to the applicant, and if the employer were unable to present equally convincing evidence that such documents had not been presented or that despite the documents the employer had reasonable grounds for believing the applicant to be an alien ineligible to be so employed, then the judge or jury would conclude that the employer's reason for deciding against hiring the applicant was something other than a fear of employer sanctions.

The best evidence that is available—that derived from the experience of several European countries, including France, which is a multiracial society—shows that increased discrimination on the basis of race, ethnicity, or national origin does not result from employer sanctions.

Existing documents will be used for the verification system. It will involve examination of either—

(a) A U.S. passport, certificate of citizenship, certificate of naturalization, unexpired foreign passport with appropriate, unexpired endorsements authorizing U.S. employment, or certain forms of resident alien card or other alien representation card; or

(b) Two other documents, one to verify that the applicant is presenting his true identity, such as State drivers license, or State identification card, and one to verify that he is authorized to work, such as certain forms of the social security account number card, or certificate of birth in the United States.

10

The user of the system will then sign under penalty of perjury a statement that the required documents have been examined, and obtain the signature of the prospective employee on a written statement that he is a U.S. citizen, permanent resident alien, or alien authorized to perform the particular work. In many cases existing application forms or something very similar could be used. In addition, the employer will be responsible for retaining these signed forms for 3 years or until 1 year after the employment ends, whichever is later. The Committee emphasizes that the user of the system will not be responsible for the genuineness of the documents, only that such documents reasonably appear on their face to be genuine.

The bill requires the executive branch to monitor and evaluate the verification system in order to make it more secure against fraudulent use. To the extent that existing documents are found not to be secure, the President is directed to implement such changes as are necessary to make the system secure in determining employment eligibility. For example, if an improved system were based on a card or other document or on a verifying telephone call to a government office, it would have to be resistant to use by imposters. If the system were to utilize a card or other document, such document would have to be resistant to counterfeiting and tampering. In an improved system, any underlying nonsecure documents, such as current forms of the birth certificate, would be examined by immigration experts. Users would utilize only the more secure system based upon them.

The President is required to give notice to Congress before implementing an improved system. If a minor change is involved (such as improvements in the current Social Security card), 60 days' notice is required. If a major change is involved (such as the creation of a new card or a telephone verification system), 2 years' notice is required, and funds must be specifically provided by Congress before the change is implemented. The President is authorized to undertake demonstration projects consistent with the statutory requirements for any new system. The project may not, however, last longer than 3 years.

Use of the verification system will not be mandatory. However, any employer who uses the system for all applicants will have an affirmative defense against the penalties. Furthermore, if an employer of four or more employees does not use the system, and an illegal alien is found in his employ, the employer will be presumed to have knowingly hired the alien. Such employer could rebut this presumption by "clear and convincing evidence."

It has been claimed that a new verification system would be too costly and that it would pose a threat to privacy and civil liberties.

On the cost issue the Committee believes that several points should be made. First, there are also tremendous costs in inadequate enforcement. The Congressional Budget Office has estimated that each unemployed person in the United States receives an average of about $7,000 per year in unemployment and welfare benefits. If the number of illegal aliens in the United States today is estimated at 6 million and if even 1 percent hold jobs which unemployed Americans would take, then the savings would be $420 million per year; if the displacement is 2 percent, the figure would

AR2022_400876

be $840 million per year, etc. Actual displacement is probably substantially higher.

The Social Security Administration recently estimated that the cost of replacing all Social Security cards with a tamper- and counterfeit-resistant version would be $108 million per year for 10 years. The actual cost of this option should be lower since replacement of all cards would not be necessary. The Department of Labor has estimated the cost of a verification system utilizing telephone calls to a government data bank as averaging $333 million per year for the first 5 years and about $200 million per year thereafter. Doubling the number of interior Immigration and Naturalization Service investigators would add $25–$30 million per year. Thus, a new system to verify work eligibility may well not exceed in cost the amount directly saved as a result of reduced public assistance alone, not even considering the value of the other benefits of reducing illegal immigration. Furthermore, a small fee could be utilized to raise the necessary revenue.

With respect to civil liberties, the Committee has given considerable thought to the question of how, for example, changing the form of the Social Security card, which is one of the alternatives that is available, could pose risks to liberty.

That question was asked of many witnesses at the hearings of the Subcommittee on Immigration and Refugee Policy—from the American Civil Liberties Union to Arthur Flemming of the U.S. Commission on Civil Rights. No one has yet given a satisfactory answer. Others never known for their neglect of civil and human liberties agree with us, including Father Ted Hesburgh, former Chairman of the Select Commission on Immigration and Refugee Policy and of the U.S. Commission on Civil Rights, as well as the editorial writers of the New York Times, Washington Post, Los Angeles Times, Boston Globe, and other major newspapers across the country, and former Attorneys General Elliot Richardson and Benjamin Civiletti.

We wish to emphasize that no likely future verification system would require personal data that is not already available in other government data banks. Thus, an improved verification system would either utilize a preexisting data bank or a new one with less information.

Furthermore, the bill contains specific safeguards intended to minimize the risk of undue invasion of privacy and the risk of government abuse in connection with any improved verification system:

(1) Personal information utilized by the system would not lawfully be available to government agencies, employers, and other persons except to the extent necessary for the purpose of verifying work eligibility.

(2) A withholding of verification would not be lawful except on the basis that the employee or prospective employee had failed to show that he was a U.S. citizen, an alien lawfully admitted for permanent residence, or an alien authorized to be so employed by the immigration law or the Attorney General.

(3) The system would not lawfully be available for law enforcement except to enforce the immigration laws or several

statutory provisions relating to false or fraudulent statements or documents.

(4) If the system required individuals to present a card or other document, then such document could not lawfully be required to be presented for any purpose other than verification of employment eligibility or the enforcement of several statutory provisions relating to false or fraudulent statements or documents, and could not lawfully be required to be carried on the person.

The Committee is most emphatically not requiring or permitting the development of an "internal passport" or "national I.D. card." The 2-year notice to Congress requirement adds an additional safeguard.

In addition to the protective provisions in the bill, there are far stronger protections already in place. The most important safeguard of the civil liberties of Americans is not "the law," which can always be changed, but rather the public cultural elements which underlie the law, including the values and traditions of our form of government, which are part of the American character. As long as the American people themselves do not come to accept and adopt forms of government like those of nations more willing to tolerate repression in their political system and leaders, then no danger exists. There is no "slippery slope" toward loss of liberties, only a long staircase where each step downward must be tolerated by the American people and by their leaders. The Committee does not believe that the system being proposed, or the improved systems which the safeguards would permit, would involve any form of a step toward loss of civil liberties.

With respect to the penalties for knowing employment or knowing recruitment or referral for employment, the bill's provisions are, in the view of the Committee, quite reasonable. Indeed, no penalty at all will be imposed during the first 6 months after enactment, nor will any violation during that period be counted for purposes of determining the level of penalty for later violations. Even in the second 6 months after enactment, the initial violation will be subject only to a warning and will not be counted for the purpose of determining the level of penalty later. For this first year of enactment the bill directs various government agencies to cooperate in disseminating forms and information to employers and other Americans, and otherwise educating the public about the requirements of the program.

Under the normal penalty structure, which becomes effective 12 months after enactment, the first assessment of penalties will include a cease-and-desist order issued by an immigration judge and a fine of between $100 and $2,000 per illegal alien. This will be a civil, not a criminal, penalty. For a violation occurring after at least one prior penalty has been assessed and opportunity for a hearing has been provided, a civil penalty of between $2,000 and $5,000 per illegal alien may be imposed, as well as the cease-and-desist order.

For a "pattern or practice" of violations, a fine of between $3,000 and $10,000 per illegal alien is available. In addition, the Attorney General is instructed to seek compliance with the cease-and-desist orders in Federal district court. Failure to so comply could result in

13

"contempt of court" penalties—fines and imprisonment—for the offending employer.

If there is a pattern or practice of violations subsequent to the imposition of a penalty for a prior pattern or practice of violations, a criminal penalty may be imposed—a fine of no more than $3,000 per alien, a term of imprisonment of no more than 6 months for the entire pattern or practice, or both.

Stiff criminal penalties are provided for the fraudulent production, sale, distribution, or use of any document which may be presented to satisfy a requirement of the immigration laws.

### b. Enforcement and fees

S. 1200 states the sense of Congress that there are two essential elements in the program of immigration control established by the bill:

> (1) An increase in border patrol and other inspection and enforcement activities of the INS and other appropriate Federal agencies; and
> (2) An increase in the examinations and service activities of the INS and other agencies.

The bill authorizes $840 million in fiscal year 1987 and $830 million in fiscal year 1988 for the INS. This includes approximately $125 million per year for the 2 years for administration of the legalization program. The authorization level of INS for fiscal year 1985 is $584 million.

The bill also authorizes additional sums for enforcement activities in connection with the bill by the Wage and Hour Division and the Office of Federal Contract Compliance Programs of the Department of Labor.

In addition, S. 1200 provides authority to the Attorney General, in consultation with the Secretary of State, to impose fees for use of border and other INS facilities and services in an amount commensurate with cost.

The bill also creates a new criminal offense for bringing an alien to the United States with knowledge or in reckless disregard of the fact that the alien has not received *prior* official authorization to enter. No intent to smuggle is required.

### c. Agricultural labor

The bill amends the H–2 temporary worker program to establish a special procedure for seasonal workers in agriculture:

> Employers may not be required by the Secretary of Labor to apply for a "labor certification" more than 65 days in advance of need;
> The application must show—
>> (A) That there are not sufficient U.S. workers who are able, willing, and qualified and who will be available at the time and place needed to perform the work required; and
>> (B) That employment of the requested alien workers will not adversely affect the wages and working conditions of U.S. workers similarly employed.

If the Secretary of Labor does not notify the employer within 14 days of the filing of the application that the application does not

meet the requirements, then it shall be considered to have met such requirements.

The Secretary of Labor is directed to make the certification at least 20 days in advance of need if requirements for the certification have been complied with and the employer does not have alternative employees.

Special, expedited procedures will be available to agricultural employers in the following instances:

(1) Certification is denied;

(2) U.S. workers appear to perform agricultural labor, but are not qualified;

(3) U.S. workers are referred to agricultural employers, but do not show up on the day of need; and

(4) Unforeseen circumstances create a critical need for agricultural labor.

The bill provides that all regulations implementing the program must be approved by the Attorney General after consultation with the Secretary of Labor and Secretary of Agriculture.

The Secretary of Labor is authorized to monitor and enforce terms and conditions of the program. There is $10 million authorized for such monitoring and enforcement, and for the recruitment of U.S. workers.

A 3-year transition program is made available to agricultural employers for the purpose of enabling them to phase out their illegal labor and phase in legal workers. An employer will be allowed to use 100 percent of his prior alien work force in the first year, 67 percent in the second year, and 33 percent in the third year. Domestic workers or lawful temporary agricultural workers must be used thereafter.

In addition, a 12-member commission on agricultural worker programs is created to further examine the many issues surrounding temporary workers. Members will be appointed by the House, Senate, Departments of Labor and Agriculture, and the Attorney General. The Commission is required to report within 2½ years after enactment with specific legislative recommendations.

The Committee rejected proposals to adopt a massive new temporary or "guestworker" program. Such a program would create significant dangers, including adverse impacts on U.S. workers, especially if the temporary workers were not limited to the particular job or job category where they were allegedly needed.

Many of the temporary workers could choose to stay permanently, as they have in Europe, where significant social problems resulted, and where there is now widespread doubt that the guestworker program had been a beneficial idea. Permanent stays are especially likely if the workers may bring in their family, if they have U.S. citizen children, if they are not restricted to a particular job or job category, or if they are authorized to stay for long periods in the United States. Such long periods of stay increase ties to the United States, and also the likelihood that the workers will bring in their family even if it is illegal, or, if they have no family, that they will start a family in the United States.

To the extent that temporary workers believe that they will be returning to their home country, they will tend not to learn English and otherwise integrate into American life. They will tend to

AR2022_400880

form foreign enclaves, with associated social problems, and may even delay the integration of lawful permanent residents from the same country of origin.

### (2) TITLE II—LEGALIZATION

The United States has become home for millions of illegal aliens, a large number of whom have been here for many years. The Committee strongly believes that those with the deepest roots should be allowed to stay, but also that no program to legalize these individuals should be adopted which would encourage new waves of illegal immigrants. As stated by the Select Commission on Immigration and Refugee Policy:

> Without more effective enforcement than the United States has had in the past, legalization could serve as a stimulus to further illegal entry. The Select Commission is opposed to *any* program that could precipitate such movement. [Emphasis in the original.]

If legalization occurs before more effective enforcement has been achieved, the illegal population will immediately begin to grow again. This will create pressure for additional legalizations. Periodic legalizations would in effect be a repeal of U.S. immigration law. Furthermore, legalization in the absence of more effective enforcement is likely to *increase* the illegal flow by encouraging illegal entries in anticipation of further legalizations.

Because of these risks and because of significant public and congressional opposition to prior legalization proposals, the Committee believes that a legalization program should not go into effect for 3 years unless a presidentially appointed legalization commission determines that enforcement has become effective enough to prevent legalization from encouraging more illegal immigration.

In order to insure that this statutory requirement is not interpreted by an unsympathetic legalization commission in a way which unduly delays legalization, S. 1200 requires that members of the commission "support the concept of legalization in section 202." The details of the selection of the commission are explained below in the section-by-section analysis.

The bill provides for the legalization, once the program begins, of two categories of illegal aliens who have been physically present in the United States since enactment and are otherwise admissible:

> (1) Illegal aliens who arrived in the United States before January 1, 1980, and have continuously resided in the United States in an unlawful status since that date; and
>
> (2) "Special Cuban or Haitian entrants" (defined in section 202(a)(2)(D) of the bill) who have continuously resided in the United States since January 1, 1981.

Such aliens will qualify for temporary resident status. An alien in either group may adjust to permanent status after 3 years if the alien has or is acquiring the understanding of U.S. history, government, and the English language required for naturalization.

Federally funded public assistance will not be available to those granted the temporary status for 6 years (including the initial several years after they have received permanent resident status), pro-

vided, however, that certain Cuban and Haitian nationals who are covered by the legalization will continue to qualify for existing special benefits.

The bill provides for Federal payment to States of up to $600 million per year for 3 years, in the form of a capped entitlement program, for the purpose of reimbursing them for the cost of public assistance expended as a result of the legalization program and for the cost of incarcerating certain illegal aliens convicted of a felony.

Persons convicted of certain crimes, Nazis and other persons who have persecuted others, Communists, anarchists, saboteurs, and those seeking to overthrow the government, and persons likely to become public charges, will be excluded from each category of legalization. Most other classes of excludable aliens will also not qualify, unless a waiver is obtained. For further details see the section-by-section analysis relating to section 202.

We seek two major goals through legalization:

The first is to avoid wasteful use of the Immigration and Naturalization Service's limited enforcement resources. The United States is unlikely to obtain as much enforcement for its dollar if the Immigration and Naturalization Service attempts to locate and deport those who have become well settled in this country, rather than to prevent new illegal entry or visa abuse.

The second is to eliminate the illegal subclass now present in our society. Not only does their illegal status and resulting weak bargaining position cause these people to depress U.S. wages and working conditions, but it also hinders their full assimilation and, through them, that of legal residents from the same country of origin. Thus they remain a fearful and clearly exploitable group within the U.S. society.

It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning rights by virtue of the legalization. They will be required to "wait in line" in the same manner as immediate family members of other new resident aliens.

The Committee reiterates that legalization will be a "one-time only" program to address a problem resulting from the large-scale illegal immigration of the past. Illegal immigration on the same scale should be prevented from occurring in the future by the employer sanctions and increased enforcement provisions of the bill.

### (3) TITLE III—OTHER CHANGES

The annual legal immigrant quota for dependent colonies is increased from 600 to 3,000. This will help reduce the substantial backlog of approved petitions for preference status held by persons born in Hong Kong.

The bill authorizes the Attorney General and the Secretary of State jointly to establish a 3-year pilot visa waiver program subsequent to the implementation of an automated nonimmigrant entry and exit control system. Under the program the requirement of a visitor's visa would be waived for the nationals of up to eight countries selected from those which extend or agree to extend reciprocal privileges to U.S. citizens and for whose nationals the rate of visa denial, exclusion, and visa abuse is very low. In order to qualify, such persons would be required to have a round trip, nonre-

fundable, nontransferable transportation ticket. This change would allow the Secretary of State to transfer resources to consular offices where the need to screen visitors is greater. Furthermore, the beneficial entry of desirable business and tourist visitors would be facilitated.

Finally, the bill provides special immigration benefits to certain holders of the G–iv visa if they have resided in the United States for many years, specifically certain retired employees of international organizations, such as the United Nations and the World Bank, and their spouses, surviving spouses of deceased employees of such organizations, and children of employees of such organizations.

### (4) TITLE IV—REPORTS TO CONGRESS

The President is required to report to the Congress on:
> (1) The employer sanctions provisions, including an analysis of the verification system and of the impact of such provisions on illegal immigration and on U.S. workers.
> (2) Legalization.
> (3) Legal immigration.
> (4) Illegal immigration.

In addition the Attorney General and Secretary of State are directed jointly to monitor the visa waiver program and report to the Congress within 2 years of the beginning of the program.

The Attorney General is also required to transmit a report to Congress on the equipment and personnel resources which would improve the service and enforcement capabilities of the INS.

Finally, the Comptroller General is required to report to the Congress annually for 5 years on the implementation of the employer sanctions provisions, on whether such provisions have resulted in any pattern of discrimination against eligible workers seeking employment, and on whether an unnecessary regulatory burden has been created for employers.

The Attorney General, jointly with the Chairman of the Equal Employment Opportunity Commission and the Chairman of the Commission on Civil Rights, is required to establish a task force to review the reports of the Comptroller General. If a report of the Comptroller General states that a pattern of discrimination has resulted from employer sanctions, then the task force is directed to make specific remedial legislative proposals to Congress, taking into account any recommendations in such report. The Judiciary Committees of the House and Senate are required to hold hearings on any such proposals within 60 days.

The Committee emphasizes that the Commission on Civil Rights has full authority under current law to study employment discrimination based on race or national origin, to collect and evaluate reports on such discrimination, and to report to the Congress on any such discrimination.

In addition to the reports to Congress required in title IV, the bill provides, as indicated above, that a report must be submitted by the Commission on Temporary Agricultural Worker programs within 2½ years of enactment.

The Committee encourages State and local governments, and other interested public and private sector organizations, to form regional and local implementation task forces. These task forces could facilitate fair and effective implementation of this act by:

(1) Reviewing and commenting on proposed regulations and procedures;

(2) Monitoring and evaluating the implementation of the act as it proceeds; and

(3) Recommending necessary actions to the Federal implementing agencies.

##### (5) TITLE V—U.S.–MEXICO COMMISSION

A 12-member commission is created to study how the United States and Mexico can work together to improve the economies of the two countries. The commission is required to report to Congress within 180 days. After submitting its report the commission will terminate.

## III. RECENT IMMIGRATION STUDIES AND REFORM EFFORTS

The Immigration Reform and Control Act of 1985 represents the most comprehensive immigration reform effort in the United States in 20 years. The most recent complete revision of the Immigration and Nationality Act occurred in 1952. It is popularly known as the McCarran-Walter Act. The 1952 statute has been modified through the years by a series of amendments, most notably those of 1965 and 1976. These amendments provided primarily for reform of the system for admitting legal immigrants to this country.

While the amendments to the Immigration and Nationality Act ("INA") in the Immigration Reform and Control Act of 1985 would make a few changes in the legal immigration system, the major portion of the legislation is directed toward improving control of illegal immigration to the United States. During the past decade, the principles embodied in these provisions have been the subject of substantial study by the executive branch, as well as by the Congress.

The reports and legislative activity generated during this period have focused on the basic components of the immigration reform package of S. 1200: employer sanctions, legalization, and increased enforcement.

### A. HISTORY, 92D–96TH CONGRESSES (1971–1980)

In 1971, during the 92d Congress, the House Judiciary Subcommittee charged with immigration matters and chaired by Representative Peter W. Rodino, Jr., initiated a lengthy series of hearings pertaining to the control of illegal aliens. Mr. Rodino's subcommittee reported in 1975, that:

The basic conclusion reached by the majority of the members of the subcommittee as a result of the hearings was that the adverse impact of illegal aliens was substantial, and warranted legislation both to protect U.S. labor

and the economy, and to assure the orderly entry of immigrants into this country.[1]

The legislation resulting from these hearings consisted of two bills which provided for the imposition of graduated administrative, civil, and criminal penalties on employers who knowingly employed illegal aliens. The House Judiciary Committee explained its choice of employer sanctions as the principal means of curbing illegal immigration as follows:

> The committee believes that the primary reason for the illegal alien problem is the economic imbalance between the United States and the countries from which aliens come, coupled with the chance of employment in the United States. Consequently, it is apparent that this problem cannot be solved as long as jobs can be obtained by those who enter this country illegally and by those who enter legally as nonimmigrants for the sole purpose of obtaining employment.
>
> The committee, therefore, is of the opinion that the most reasonable approach to this problem is to make unlawful the "knowing" employment of illegal aliens, thereby removing the economic incentive which draws such aliens to the United States as well as the incentive for employers to exploit this source of labor.[2]

The House Judiciary Committee's employer sanctions legislation was endorsed by both the Nixon and Ford administrations and passed the House of Representatives twice, during the 92d Congress (H.R. 16188) and the 93d Congress (H.R. 982). No Senate action on these or similar bills was taken in either Congress.

During the 93d Congress a related measure was passed by both Houses and signed into law by the President. This law (Public Law 93–518) amended the Farm Labor Contractor Registration Act of 1963 to establish criminal penalties for certain farm labor contractors who knowingly hire illegal workers.

During the 94th Congress an identical bill to H.R. 982 was introduced in the House and additional hearings were held by the House Judiciary Subcommittee on Immigration, Citizenship, and International Law. These hearings resulted in a new version of the bill, H.R. 8713, which included, in addition to employer sanctions, a legalization provision for those illegal immigrants who had resided in the United States since July 1, 1968, and a provision intended to prevent discrimination against citizens and legal aliens on the basis of national origin. This bill was reported out of the full Judiciary Committee in September 1975, but received no further action.

During the 95th Congress a similar bill, H.R. 1663, was introduced by Representative Joshua Eilberg, chairman of the House Judiciary Committee's Subcommittee on Immigration, Citizenship, and International Law, but received no further action.

The principal legislative activity on this issue in the Senate during the 94th Congress focused on S. 3074, an omnibus reform

---

[1] H. Rept. 94–506, 94th Congress, 1st session, Sept. 24, 1975, p. 5.
[2] Ibid., p. 6.

**AR2022_400885**

bill introduced by Senator James O. Eastland, chairman of the Senate Judiciary Committee and the Subcommittee on Immigration and Naturalization. This bill included employer sanctions (civil penalties as well as an injunctive remedy) for the knowing employment of illegal workers, a legalization program with a July 1, 1968, cutoff date for eligibility, and a revision of the H-2 temporary worker program to allow for the admission of foreign workers to perform certain permanent as well as temporary jobs. Subcommittee hearings were held on S. 3074, but the bill was not reported to the full committee.

## B. Ford Administration Proposals

In January 1975, President Gerald Ford established, under the chairmanship of Attorney General Edward Levi, a Cabinet-level Domestic Council Committee on Illegal Aliens. This committee's report, which was dated December 1976, stressed that control of illegal immigration will only result from a multifaceted approach:

> The Committee does not believe any single element among its recommendations can solve the illegal alien problem. It does believe that the cumulative effect of implementing the recommendations which follow will be to slow the flow of illegal aliens significantly and to take major strides toward the development of a more effective immigration policy.[3]

The Committee's recommendations included employer sanctions, a legalization program with a July 1, 1968, eligibility date, increased enforcement resources, increased penalties against smugglers, an evaluation of the H-2 program to make it more responsive to legitimate labor shortages, a revision of immigrant labor certification provisions to eliminate individual certifications, and a broad-based research effort to determine the nature and scope of immigration-related problems.

## C. Carter Administration Proposals

The Carter administration, under the leadership of Attorney General Griffin Bell, Secretary of Labor Ray Marshall, and Immigration and Naturalization Service Commissioner Leonel Castillo determined early in its term that the problem of illegal immigration was a critical national issue:

> These proposed actions are based on the results of a thorough Cabinet-level study and on the groundwork which has been laid, since the beginning of the decade, by Congressmen Rodino and Eilberg and Senators Eastland and Kennedy * * *
> Each of these actions will play a distinct, but closely related, role in helping to solve one of the most complex domestic problems. In the last several years, millions of undocumented aliens have illegally migrated to the United States. They have breached our nation's immigration laws,

---

[3] Preliminary report, p. 240.

AR2022_400886

displaced many American citizens from jobs, and placed an increased financial burden on many States and local governments.[4]

After a task force study of the issue, a comprehensive immigration reform bill was drafted by the Carter administration, the "Alien Adjustment and Employment Act of 1977," and introduced in October 1977 as H.R. 9531 and S. 2252.

The Carter proposal contained five basic provisions:

(1) Civil penalties (injunctions and fines of $1,000 per illegal alien) against those employers who knowingly hire illegal aliens;

(2) Increased enforcement of the Fair Labor Standards Act and the Federal Farm Labor Contractor Registration Act, targeted to areas with high illegal employment;

(3) Permanent resident status for eligible illegal aliens who had resided in the United States since January 1, 1970, and a 5-year temporary resident status for those who had resided continuously since January 1, 1977;

(4) Substantially increased resources for enforcement at the Southern border and ports-of-entry; and

(5) Continued cooperation with source countries in their effort to improve their economies and improve control over alien smuggling activities.

While President Carter rejected any new temporary worker program, he did recommend reviews of the existing H-2 temporary worker program and U.S. immigration policy as a whole.

The Senate Judiciary Committee held hearings on S. 2252 in May 1978, but the Carter administration bill received no further action during the 95th Congress.

The Carter proposals were attacked by some vocal public interest groups and Members of Congress who claimed that the package was not sufficiently grounded in factual studies and that other alternatives to curb illegal immigration had not been adequately examined. It was this desire for a comprehensive review of U.S. immigration policy which led to the establishment of the bipartisan Select Commission on Immigration and Refugee Policy during the 95th Congress.

## D. Select Commission on Immigration and Refugee Policy

Legislation enacted in 1978 (Public Law 95–412) established a 16-member Select Commission on Immigration and Refugee Policy consisting of 4 members of the Senate Judiciary Committee (Senators Mathias, Simpson, Kennedy, DeConcini), 4 members of the House Judiciary Committee (Representatives Rodino, Holtzman, McClory, Fish), 4 Cabinet Secretaries (from the Departments of Justice, State, Labor, and Health and Human Services), and 4 public members appointed by President Carter, plus its Chairman, the Reverend Theodore M. Hesburgh. Its mandate was—

---

[4] "Undocumented Aliens, Message from the President of the United States," U.S. House of Representatives, 95th Congress, 1st session, Doc. No. 95–202, Aug. 4, 1977, p. 1.

AR2022_400887

To study and evaluate * * * existing laws, policies, and procedures governing the admission of immigrants and refugees to the United States and to make such administrative and legislative recommendations to the President and to the Congress as are appropriate.

To fulfill this mandate the Select Commission "sought the most reflective, authoritative information from individuals, groups and studies through a variety of methods," including contracting social science and legal research, and conducting 12 regional public hearings and several site visits across the Nation. Consulations were held with experts inside and outside the Government, including scholars, representatives from State and local governments, Hispanic and other ethnic organizations, environmental and population groups, international organizations, church organizations, civil liberties groups, organized labor, employers' associations, and immigration lawyers.

After 2 years of study and deliberation, the Select Commission issued its final report, entitled "U.S. Immigration Policy and the National Interest" on March 1, 1981. The Commission noted that of all the issues related to immigration and refugee policy, the most critical was illegal immigration.

The Select Commission recommended "immediate action" to control illegal immigration and enumerated the key elements of their program:

(1) Increased funding, training, and manpower for border and interior enforcement;

(2) Enactment of legislation making it illegal for employers to hire illegal or undocumented aliens (such sanctions would be combined with some form of system to verify eligibility to work in the United States);

(3) Increased enforcement of wage and working standards legislation; and

(4) Legalization of status for certain aliens who entered the United States before January 1, 1980, and have resided here for a minimum number of years to be set by Congress (legalization to begin after a level of enforcement had been achieved which would prevent a legalization program from serving as a stimulus to further illegal entry).

The Select Commission rejected any new temporary worker program, but did recommend improving the existing H–2 program as a means for addressing temporary labor shortages without adversely affecting American workers.

Although the Select Commission did not reach a consensus as to the specific type of identification that should be required for verification of employment eligibility under employer sanctions laws, they did agree on the principles that should underlie a verification system: reliability, protection of civil rights and civil liberties, and cost-effectiveness. They state that without a reliable verification system, employer sanctions laws—the cornerstone of an effective program to reduce illegal immigration—would be very difficult to implement fairly and effectively:

(The Commission) acknowledges the criticism leveled at previous employer sanctions legislation on the basis of the

AR2022_400888

vague, and therefore unenforceable, requirement that employers must knowingly hire undocumented workers. It holds the view that an effective employer sanctions system must be based on a reliable means of verifying employment eligibility. Lacking a dependable mechanism for determining a potential employee's eligibility, employers would have to use their discretion in determining that eligibility. The Select Commission does not favor the imposition of so substantial a burden on employers and fears widespread discrimination against those U.S. citizens and aliens who are authorized to work and who might look or sound foreign to a prospective employer. Most Commissioners, therefore, support a means of verifying employee eligibility that will allow employers to confidently and easily hire those persons who may legally accept employment. . . . To be nondiscriminatory, they believe, any employee eligibility system must apply equally to each member of the U.S. workforce—whether that individual be an alien authorized to work in this country or a U.S. citizen.

The Select Commission's recommendations were reviewed at special joint congressional hearings and by the Reagan administration.

## E. Reagan Administration Proposals

Following the submission of the final report of the Select Commission on Immigration and Refugee Policy on March 1, 1981, President Reagan appointed Attorney General William French Smith to chair a Cabinet-level task force to review the Commission's findings and recommendations and to develop a comprehensive immigration reform strategy.

On July 30, 1981, President Reagan announced the basic provisions of his proposals for immigration and refugee policy reform. Although he pledged that "America's tradition as a land which welcomes people from other countries" would continue, he emphasized that immigrants must be accepted "in a controlled and orderly fashion." The proposals were principally directed toward improving control of illegal immigration generally, as well as mass arrivals of undocumented aliens claiming asylum.

President Reagan's proposals relating to the general problem of illegal immigration included the following features:

(1) Sanctions against employers of four or more employees who knowingly hire illegal aliens, with civil penalties ranging from $500–$1,000 per violation;

(2) Verification of employment eligibility would be based on a combination of existing identification documents which would be required of all American workers at the time of seeking employment;

(3) Legalization of status of otherwise admissible aliens present in the United States as of January 1, 1980, as well as Cubans and Haitians here since January 1, 1981, on a 3-year renewable temporary basis. After 10 years residency (5 years for Cubans and Haitians), such persons could apply for permanent residence provided they demonstrated minimal English proficiency;

**AR2022_400889**

24

(4) A 2-year pilot temporary worker program to admit up to 50,000 Mexican nationals to perform jobs lasting 9–12 months in States and occupations where the Governor had certified a shortage of U.S. workers; and

(5) Increased resources for enforcement of existing immigration and labor laws.

President Reagan's proposal to handle future mass arrivals included:

(1) Increased enforcement measures, including legislation to strengthen penalties for the transporting of undocumented aliens to the United States, to prohibit U.S. residents from traveling to designated foreign countries during presidentially declared emergencies, and to strengthen existing law relating to the seizure and forfeiture of vessels used in violation of the law;

(2) Interdiction by the Coast Guard of certain vessels, and budget authority for additional detention facilities for undocumented aliens awaiting further legal proceedings;

(3) Legislation to expedite exclusion and asylum proceedings; and

(4) Contingency planning for future mass arrivals by sea.

Legislation implementing these and other Reagan administration proposals was introduced on October 22, 1981, as S. 1765/H.R. 4832, the Omnibus Immigration Control Act. This bill was introduced by request by the chairmen of the Senate and House Judiciary Committees, Senator Strom Thurmond and Representative Peter W. Rodino, Jr., and subsequently referred to the Senate and House Judiciary Committees. Hearings were held by the appropriate subcommittees.

## F. 97TH CONGRESS (1981–1982)

On March 17, 1982, Senator Simpson, on behalf of himself, Senator Grassley, and Senator Huddleston, introduced S. 2222, the Immigration Reform and Control Act of 1982. The bill was a result of the 14 hearings and 5 consultations held by the Subcommittee on Immigration and Refugee Policy, the recommendations of the Select Commission on Immigration and Refugee Policy, and President Reagan's proposals. S. 2222 was subsequently examined during the 2 days of joint hearings with the House Subcommittee on Immigration, Refugees and International Law.

The Subcommittee on Immigration and Refugee Policy favorably reported the bill on May 6, 1982, by a vote of 4 to 0. The Committee on the Judiciary reported the bill, with amendments, by a vote of 16 to 1, recommending that it be passed by the Senate. Eleven amendments were accepted by the Committee on the Judiciary, the more important of which advanced the legalization date, eliminated an amendment added to the bill in subcommittee relating to the enforcement of immigration laws by local law enforcement agencies, and changed the standards for admitting foreign workers under the H–2 temporary worker program.

The bill was considered on the floor of the Senate on August 12, 13, and 17, 1982. Twelve amendments were accepted, the more important of which reinstated the legalization date of January 1,

1980, established a block grant program to reimburse State costs of benefits provided to legalized aliens, required reports on the discrimination and recordkeeping impacts of employer sanctions, and expressed the sense of the Congress that English is the official language of the United States. On August 17, 1982, the Senate passed S. 2222, 80 to 19.

The House Committee on the Judiciary considered its version of the bill, H.R. 5872, on September 14, 15, 16, 21, and 22, 1982, and favorably reported it on September 22, 1982. H.R. 5872 was debated on the House floor on December 16, 17, and 18, 1982, but was not brought to a vote. The bill died with the end of the 97th Congress.

During the 97th Congress, the Subcommittee on Immigration and Refugee Policy conducted 16 public hearings and 5 consultations on subjects related to reform of the Immigration and Nationality Act.

*Hearings*                                                                                   *1981*

1. Joint Senate and House subcommittee hearings on the final report of the Select Commission on Immigration and Refugee Policy ..................... May 5, 6, 7
2. Administration policy on immigration and refugees ................................ July 30
3. United States as a country of mass first asylum ....................................... July 31
4. Employer sanctions ...................................................................................... Sept. 30
5. Systems to verify authorization to work in United States....................... Oct. 2
6. Asylum adjudication .................................................................................... Oct. 14
7. Adjudication procedures ............................................................................. Oct. 16
8. Temporary workers....................................................................................... Oct. 22
9. Legalization .................................................................................................. Oct. 29
10. Preference System ...................................................................................... Nov. 23
11. H-2 temporary workers and nonimmigrants ........................................... Nov. 30
12. Nonimmigrant business visas and adjustment of status .......................... Dec. 11

                                                                                                 *1982*

13. Population and immigration policy ........................................................... Jan. 25
14. G-iv relief proposals.................................................................................... Feb. 1
15. Joint Senate and House subcommittee hearing on S. 2222/H.R. 5872—House side ............................................................................................ Apr. 1
16. Joint Senate and House subcommittee hearing on S. 2222/H.R. 5872—Senate side .......................................................................................... Apr. 20

*Consultations:*

1. Systems to verify authorization to work in the United States        Sept. 10, 1981
2. Asylum .......................................................................................        Nov. 16, 1981
3. Foreign immigration laws ..........................................................        Dec. 7, 1981
4. Adjudication procedures ............................................................        Apr. 14, 1982
5. H-2 provisions ............................................................................        Apr. 15, 1982

## G. 98TH CONGRESS (1983–1984)

On February 17, 1983, during the last Congress, Senator Simpson introduced S. 529, the Immigration Reform and Control Act of 1983. The bill was referred to the Subcommittee on Immigration and Refugee Policy, which held 4 days of public hearings. The Subcommittee favorably reported the bill on April 7, 1983, by a vote of 4 to 0.

On April 19, 1983, the Committee on the Judiciary met in excutive session to consider and discuss S. 529. Two substantive and four technical amendments were accepted. The substantive amendments were:

(1) An amendment to require the General Accounting Office to investigate the effects of employer sanctions, including whether unlawful discrimination or unnecessary regulatory burdens had resulted; and

**AR2022_400891**

(2) An amendment to restore the fifth preference for unmarried brothers and sisters of U.S. citizens.

The Committee then voted 13 to 4 to favorably report the bill.

The bill was considered on the floor of the Senate on April 28 and May 16, 17, and 18, 1983. Eighteen amendments were adopted, the more important of which created a 3-year transitional labor program for agricultural employers, deleted the investor preference, required a search warrant for open-field searches of agricultural operations, provided for Federal reimbursement of the incarceration costs of illegal aliens, provided for congressional review of any presidentially proposed change in the worker verification system, and created a compromise system of asylum adjudication that allowed for limited judicial review. On May 18, 1983, the Senate passed S. 529, 76 to 18.

The House Committee on the Judiciary considered its version of the bill, H.R. 1510, on May 3, 4, and 5, 1983, and favorably reported it on May 5, 1983. The bill was then sequentially referred to the House Committees on Agriculture, Energy and Commerce, Education and Labor, and Ways and Means, and either reported or discharged on or before June 28, 1983. H.R. 1510 was considered by the House of Representatives on June 11, 12, 13, 14, 18, 19, and 20, 1984. The bill was passed on June 20, 1984, by a vote of 216 to 211.

House and Senate conferees began to meet on September 13, 1984, in order to resolve the differences between the two bills. Ten days of deliberation were held. However, conferees were unable to resolve the remaining differences at the final meeting of October 9, 1984. The bill died with the end of the 98th Congress.

## IV. COMMITTEE PROCEEDINGS

Senator Simpson introduced S. 1200, the Immigration Reform and Control Act of 1985, on May 23, 1985. The bill was referred to the Subcommittee on Immigration and Refugee Policy.

The Subcommittee on Immigration and Refugee Policy conducted 3 days of public hearings on the bill on June 17, 18, and 24, 1985. The Subcommittee was discharged from further consideration of the bill on July 10, 1985.

The Committee on the Judiciary considered and discussed the bill on July 18, 23, 25, and 30. Several technical and other amendments were considered, as discussed below. On July 30, 1985, by a vote of 12 to 5, the Committee ordered the amended bill reported out with the recommendation that it be passed by the Senate. The rollcall vote was as follows:

| YEAS (12) | NAYS (5) |
|---|---|
| Thurmond | Biden* |
| Mathias* | Kennedy* |
| Laxalt* | DeConcini |
| Hatch | Heflin* |
| Simpson | Simon |
| East | |
| Grassley | |
| Denton* | |
| Specter | |
| McConnell | |
| Metzenbaum | |
| Leahy* | |

*By proxy.

**AR2022_400892**

The following amendments were adopted by voice vote:

1. Simpson amendment to ensure that members of the Legalization Commission support the concept of the kind of legalization program contained in the bill, and to conform the finding required to "trigger" legalization to recommendations of the Select Commission on Immigration and Refugee Policy.

2. Simpson amendment to allow reimbursement payments to States for incarceration costs only with respect to illegal aliens convicted of a felony.

3. A package of technical amendments offered by Senator Simpson.

4. Simon amendment to require INS to report to Congress in 90 days on management improvements which would improve agency efficency.

5. Simon amendment to create a United States-Mexico Commission to determine methods to promote long-term Mexican economic growth.

6. Metzenbaum amendment to impose a criminal penalty of up to $3,000 per alien, 6 months imprisonment per violation, or both, for a "pattern or practice" of violations after a civil penalty for a "pattern or practice" had already been assessed.

The following amendment was adopted by rollcall vote as indicated:

Metzenbaum amendment to insure that the effective date of the legalization program is no later than 3 years from enactment.

| YEAS (10) | NAYS (4) |
|---|---|
| Thurmond | Hatch |
| Mathias* | Kennedy* |
| Laxalt* | DeConcini |
| Simpson | Simon |
| East | |
| Grassley | |
| Denton* | |
| Specter | |
| McConnell | |
| Metzenbaum | |

*By proxy.

The following amendments were defeated by rollcall vote, as indicated:

1. Kennedy amendment to delete the legalization commission requirement and advance the cutoff date from January 1, 1980, to January 1, 1981.

| YEAS (6) | NAYS (8) |
|---|---|
| Biden | Thurmond |
| Kennedy | Laxalt |
| Metzenbaum | Hatch |
| DeConcini* | Simpson |
| Leahy* | East |
| Simon | Grassley |
| | Denton |
| | Specter* |

*By proxy.

**AR2022_400893**

28

2. Kennedy amendment to require expedited procedures on any joint resolution introduced to "sunset" employer sanctions in 3 years, if the GAO finds that such sanctions have resulted in a widespread pattern of discrimination.

| YEAS (7) | NAYS (8) |
|---|---|
| Mathias* | Thurmond |
| Biden | Laxalt |
| Kennedy | Hatch |
| Metzenbaum | Simpson |
| DeConcini* | East |
| Leahy* | Grassley |
| Simon | Denton |
| | McConnell* |

*By proxy.

3. Kennedy amendment to delete the temporary agricultural worker ("N") provisions and the agricultural labor transition program, thus retaining only the present H–2 temporary worker program.

| YEAS (4) | NAYS (13) |
|---|---|
| Biden | Thurmond |
| Kennedy | Laxalt* |
| Metzenbaum | Hatch |
| Simon | Simpson |
| | East |
| | Grassley |
| | Denton |
| | Specter |
| | McConnell* |
| | Byrd* |
| | DeConcini* |
| | Leahy* |
| | Heflin* |

*By proxy.

4. Metzenbaum amendment to sunset the bill's temporary agricultural worker ("N") program in 3 years, and to impose a limit of 100,000 persons per year during the 3 years.

| YEAS (4) | NAYS (10) |
|---|---|
| Biden | Thurmond |
| Kennedy | Laxalt* |
| Metzenbaum | Hatch |
| Simon | Simpson |
| | East |
| | Grassley |
| | Denton |
| | McConnell* |
| | DeConcini* |
| | Byrd* |

*By proxy.

# V. SECTION-BY-SECTION ANALYSIS

## TITLE I—CONTROL OF ILLEGAL IMMIGRATION

### PART A—FUNDING FOR IMPROVED ENFORCEMENT

*Section 101—Authorization of appropriations for enforcement and service activities of the Immigration and Naturalization Service and wage and hour enforcement*

Subsection (a) expresses the sense of Congress that an increase in Immigration and Naturalization Service (INS) border patrol and other inspection and enforcement activities, and in INS examinations and service activities, are essential elements of the program of immigration control established in the legislation.

Subsection (b) authorizes $840 million in fiscal year 1987 and $830 million in fiscal year 1988 for the INS, in part for these purposes.

Subsection (d) authorizes the appropriation to the Department of Labor of additional sums as may be necessary for enforcement activities of the Wage and Hour Division and the Office of Federal Contract Compliance Programs.

*Section 102—User fees*

Section 102 provides that the Attorney General, in his discretion, may impose fees for an alien's use of border or other Immigration and Naturalization Service facilities and services, in an amount commensurate with the costs attributable to such use.

### PART B—INCREASED PENALTIES FOR IMMIGRATION-RELATED VIOLATIONS

*Section 111—Unlawful transportation of aliens to the United States*

Section 111 of the bill amends INA section 274, which provides for criminal penalties and seizure of property in connection with the transportation of illegal aliens to or within the United States and the concealing, harboring, or shielding from detection of such aliens. First, it modifies the "Texas Proviso" (the proviso located at the end of subsection (a) of current INA section 274), which under current law provides that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." This section of the bill provides that for purposes of the harboring offense, as amended by the bill (see below), "employment (including the usual and normal practices incident to employment) *by itself* does not constitute harboring." (Emphasis added.) By this modification the Committee intends to make clear that although employment does not by itself constitute harboring, employment and employers are not exempt from coverage. Employment (including the usual and normal practices incident to employment) in combination with other activities or other circumstances, or employment practices which are not usual and normal, may constitute harboring. For example, if an employer, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, engages in, or attempts to engage in, activities which are not the "usual and normal practices incident to employment," knowing or in reckless

**AR2022_400895**

disregard of the fact that this will have a substantial probability of harboring such illegal alien, i.e., substantially facilitating such alien's remaining in the United States, then such employer may be in violation of this section. In the view of the Committee, "usual and normal practices incident to employment" excludes, among other things, activities which have as a major purpose such harboring, regardless of how frequent such activities are in the industry or kind of business in which such employer is engaged. Such usual and normal practices would, however, include the furnishing of housing or other services which are required by State or Federal law, or any regulation thereunder. The Committee intends that the modified language be interpreted literally. The language is a clarification of the meaning of "harbors." It does not pertain to the meaning of "conceals" or "shields from detection."

Second, the section clarifies and expands the coverage of INA section 274(a). The state of mind required for an offense is expressly stated to be knowledge or reckless disregard of the relevant facts. With respect to the offenses pertaining to illegal aliens within the United States, a violation requires that a person act "knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."

With respect to the offense of subparagraph (A) of paragraph (a)(1), a violation requires that a person act "knowing or in reckless disregard of the fact that a person is an alien." This offense does not require that the alien not have received prior official authorization to come to, enter, or reside in the United States, merely that the person bring to or attempt to bring to the United States the alien "at a place other than a designated port of entry or place other than as designated by the Commissioner."

This is in contrast to the offense of paragraph (a)(2), which also relates to a person who "brings to or attempts to bring to the United States in any manner whatever" an alien, but which requires for a violation that a person act "knowingly or in reckless disregard of the fact that an alien has not received *prior* official authorization to come to, enter, or reside in the United States" (emphasis added) and does not require that the bringing to the United States be at a place other than a designated port of entry or place other than as designated by the Commissioner (the paragraph does provide, however, that the penalty may be increased if "the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry"). No intent to smuggle is required. Penalties may also be increased for a second or subsequent offense, for an offense done for the purpose of commercial advantage or private financial gain, and for an offense during which either the offender or the alien with the knowledge of the offender makes any false or misleading statement or engages in any act intended to mislead any officer, agent, or employee of the United States.

Third, the section increases the fines which may be imposed for violations of INA section 274(a) and strengthens the provisions allowing for the seizure or forfeiture of conveyances used in the commission of such acts.

### Section 112—Fraud and misuse of certain documents

Subsection (a) extends the coverage of 18 U.S.C. 1546, which provides for criminal penalties for the use or manufacture of counterfeit or altered entry documents or entry documents relating to another individual, to include all documents which may be used to show authorized stay or authorized employment in the United States.

Subsection (b) provides for a criminal penalty for using a false document, a document not lawfully issued to the possessor, or a false attestation, for the purpose of satisfying the employment verification system requirements of INA section 274A(b) or 274A(c) or any regulation thereunder.

The Committee intends that the new coverage of INA section 274 enable the prosecution of the procurers and purveyors of false, altered, or fraudulently obtained documents and the aliens who use such documents to remain in the United States in violation of law or to obtain unauthorized employment. The Committee also intends that the INS prosecute aliens who present any application, affidavit, or other document required for legalization under section 202 of the bill, knowing that it contains a false statement with respect to a material fact, in violation of current INA section 274, or who, in connection with a legalization application, violate sections 1001 and 1028 of the United States Code (relating to false or fraudulent statements or documents and to fraud in connection with identification documents).

### Section 113—Restrictions on adjustment of status

Subsection (a) amends section 245(c) of the INA to provide that aliens who have failed for any reason to maintain continuously a legal status since entry in the United States will not be eligible to adjust to permanent resident status under INA section 245. The present statutory provision prohibits such adjustment only if the failure to maintain legal status is due to unauthorized employment. The new subsection also provides that special immigrants described in INA section 101(a)(27)(H) will not be subject to the prohibition. Current law exempts only immediate relatives of U.S. citizens.

It is the intention of the Committee to make adjustment of status a much less frequently used method of obtaining permanent resident status in the United States. Furthermore, the Committee expects that the administration will continue to implement immigration entry as before and not respond to the new limitations on adjustment of status by making special arrangements enabling aliens who are not nationals of countries which border on the United States to obtain immigrant visas in such countries.

#### PART C—CONTROL OF UNAUTHORIZED EMPLOYMENT OF ALIENS

### Section 121—Making knowing employment of unauthorized aliens unlawful

Section 121(a)(1) inserts a new section 274A into the Immigration and Nationality Act. Subsection (a) of that new section makes it unlawful for anyone (1) after enactment to hire, or for a fee or

other consideration to recruit or refer, for employment in the United States an alien knowing that such alien is unauthorized to be so employed, and (2) to continue to employ an alien hired after enactment, knowing that the alien is not authorized to be so employed. The phrase "to recruit or refer for a fee or other consideration" is intended to include the activities of employment agencies, executive search firms, and labor union hiring halls. The phrase "for a fee or other consideration" was inserted so that such activities as referrals by friends or recruitment by corporations with respect to their own employees would be excluded.

This subsection of the new INA section 274A is intended to be broadly construed with respect to coverage. With the exception of the categories noted, all employers, recruiters, and referrers are covered: individuals, partnerships, corporations and other organizations, nonprofit and profit, private and public, who employ, recruit, or refer persons for employment in the United States.

The subsection provides that any employer, recruiter, or referrer which has uniformly complied in good faith with the employment verification system described in subsection (b) has an affirmative defense in any civil or criminal proceeding in connection with an alleged violation of subsection (a)(1). Subsection (a) also establishes a presumption that an employer of four or more persons has knowingly hired an alien not authorized to work in the United States if such employer is found to have in fact hired such an alien and has not uniformly followed in good faith the employment verification procedures. Similarly, a person or entity which recruits or refers for a fee or other consideration more than four individuals in any 12-month period and who is found to have in fact recruited or referred an unauthorized alien shall be presumed to have knowingly done so unless such person or entity has uniformly complied in good faith with the employment verification system. These presumptions may be rebutted by presentation of "clear and convincing" evidence that such an employer, recruiter or referrer did not knowingly hire (or recruit or refer) an unauthorized alien. An employer who has not complied with the verification procedure in subsection (b) may, for example, rebut the presumption if it can demonstrate that its employment procedures as applied are reasonably likely to avoid the employment of unauthorized aliens. An employer may not merely plead ignorance—willful or unwillful—in order to overcome the presumption. The Committee believes that the affirmative defense which results from compliance and the presumption which results from noncompliance will encourage the majority of employers to elect to comply with the optional worker verification system.

Small businesses are not made subject to the presumption. The Committee seeks to avoid placing an undue burden on such businesses, which are estimated to represent 50 percent of employers but only 5 percent of employees.

Subsection (b) of the new section INA 274A sets forth a procedure for the verification of work eligibility which must be used if such affirmative defense is to be obtained and such presumption is to be avoided. It requires that an employer (or recruiter or referrer) attest, under penalty of perjury, on a form approved by the Attorney General that such employer has examined what reasonably ap-