pears on its face to be either (1) a document which establishes both employment authorization and identity, including the employee's U.S. passport, certificate of U.S. citizenship, certificate of naturalization, unexpired foreign passport with an appropriate, unexpired endorsement of the Attorney General, or a resident alien card or other alien registration card (if it contains the individual's photograph and evidence of employment authorization), or (2) a combination of (i) a document which establishes employment authorization, including the employee's Social Security card, certificate of birth in the United States or establishing U.S. nationality, which the Attorney General finds acceptable by regulation, or other documentation acceptable to the Attorney General, and (ii) a document which establishes identity, including a driver's license or other State identification card, or (for those under 16 or in States that do not issue identification documents) another type of document which the Attorney General finds, by regulation, to be a reliable means of identification.

Subsection (b) of the new INA section 274A also requires the employee to attest on the same form that the employee is a citizen or permanent resident alien, or is otherwise authorized to be so employed.

The employer is required to retain the completed form, and make it available for inspection by the Immigration and Naturalization Service, for 3 years after hiring or 1 year after the date the employment is terminated, whichever is later.

Subsection (c)(1) of the new INA section requires the President to implement such changes in or additions to the verification system as may be necessary to establish a secure system to verify employment eligibility.

Subsection (c)(2) places certain restrictions on any changes in the verification system which the President may implement. Any new system must reliably verify that an applicant is the person he claims to be and that such a person is eligible to work. If the new system will involve examination by an employer of any document, that such document must be in a form which is resistant to counterfeiting and tampering. The Committee intends that the phrase "form which is resistant to counterfeiting and tampering" be interpreted to mean a form specially designed to be so resistant, through the use of fine engraving, special material, magnetic or other coding, or otherwise. Personal information concerning an individual may be made available to Government agencies, employees, and other persons only to the extent necessary to verify that the individual is authorized to be employed. Such verification may be withheld for only one reason: because the individual is an alien not authorized to be employed. The new verification system may not be used for law enforcement, other than as related to enforcement of the INA or several provisions of title 18 of the United States Code relating to false or fraudulent statements or documents. If a new system were to involve presentation of a new card or other document designed specifically for use in the verification system, such document could not be required to be carried on the person or to be presented for any other purpose (expect in connection with the enforcement of several provisions of title 18 of the

United States Code relating to false or fraudulent statements or documents).

Subsection (c)(3) of the new INA section 274A requires that the President give notice to Congress before implementing any changes in the worker verification system. Two years notice would be required in the case of a "major change" in the verification system, such as creation of a new card or other document designed specifically for this purpose, or establishment of a telephone verification system. Sixty days notice would be required for other than major changes. These would include, for example, improvements in the present Social Security card.

The subsection also states that a "major change" may not be implemented unless Congress specifically provides funds for implementation of the change.

Subsection (c)(4) authorizes the President to undertake demonstration projects of different changes in the verification system. Such projects would have to conform to the restrictions set forth in paragraph (2), and could not last more than 3 years.

Identification fraud is a staggering problem. A May 12, 1983, report of the Senate Permanent Subcommittee on Investigations dealing with Federal identification fraud estimated that the cost of fraudulent schemes involving Federal, State, and local entitlement programs alone exceeds $24 billion annually. Hearings on this issue during the 98th Congress by Senator Dole's Senate Judiciary Committee's Subcommittee on Courts also found that, at present, there is easy access to counterfeit identification documents such as Social Security cards, birth certificates, and driver's licenses. Counterfeit documents can be obtained readily and inexpensively anywhere in the United States or neighboring countries from illegal commercial vendors or can be fashioned by "do it yourself" techniques.

Last October, as part of the Comprehensive Crime Control Act, Congress required that agencies operating identification systems use identification documents, insofar as possible, with common descriptive terms and formats so as to reduce redundancy and duplication and to facilitate positive identification. In addition, the Congress required that within 3 years the President make recommendations to the Congress for the enactment of comprehensive legislation concerning Federal identification systems taking into account: (1) the protection of privacy, (2) appropriate civil and criminal sanctions for the misuse or unauthorized disclosure of personal identification information, and (3) the exchange of personal identification information authorized by Federal or State law.

The Committee expects that the President and the Attorney General will take the identification fraud considerations expressed in the Comprehensive Crime Control Act into account, including the results of the President's study, when available, when decisions are made about the type of identification and employment authorization documents which should be relied upon by employers to make determinations under section 121 and about the improvements which should be made therein.

Furthermore, the Committee believes that the President and the Attorney General, in conjunction with other interested Departments and agencies, should work with State and local identification document-issuing authorities to develop demonstration projects and

AR2022_400900

programs to improve the reliability and validity of identification documents. Efforts should be made to bring State and Federal document-issuing authorities together to deal with the problems of document fraud and abuse and to develop common strategies to deal with them. Document formats could be standardized and software developed for the exchange of document information for the purposes of update, correction, and verification. For example, one of the most prevalent forms of document fraud involves the use of duplicate copies of birth certificates of deceased individuals to obtain new identification documents for an individual who then assumes the identity of the deceased individual. Unless some systematic means is developed for annotating the birth certificate with death information, the potential for fraudulent misuse will remain great.

Subsection (d)(1) of the new INA section requires that the Attorney General establish complaint and investigation procedures. The new procedure must provide for individuals to file written, signed complaints concerning potential violations; for INS to investigate the complaints which have a substantial probability of validity; for INS or other Department of Justice entities to investigate violations on their own initiative; and for designation of a specific unit in INS which will handle the prosecution of cases of violation of INA section 274A.

The Committee intends the written, signed complaint procedure to enhance compliance with subsection (a) by providing a mechanism to inform the INS of violations of the law. The Committee is concerned, however, that such a mechanism could be used for harassment purposes against innocent employers. Furthermore, an excessive amount of INS time and resources might be expended in the investigation of spurious complaints.

Specific protections have been included to minimize the risk of these undesirable results. For example, any complaint under this subsection must be in writing and must be signed by the person or entity filing the complaint. In addition, the subsection requires that any signed, written complaint must have a substantial probability of validity. The Committee intends that determinations by the INS to take no action with respect to complaints filed pursuant to this subsection shall be final and are not subject to further review. The Committee also expects that the procedures developed by the Attorney General will provide additional protections for innocent employers against unwarranted investigations and additional measures to avoid wasteful use of INS time and resources. Finally, the Committee notes that the penalties provided for in section 1001 of title 18 of the United States Code (relating to false or fraudulent statements) would be available in certain cases of deliberately false statements.

Subsection (d)(2) of the new INA section 274A sets forth the penalties available against persons or entities which knowingly employ or recruit or refer for a fee or other consideration an unauthorized alien, as prohibited in subsection (a) of the new INA section. If, after notice and the opportunity for a hearing, if requested, an immigration judge determines, upon a preponderance of the evidence, that the person or entity has violated subsection (a), the judge shall state his findings of fact and cause to be served on the person or

entity a cease-and-desist order. In addition to the order, the violator shall be assessed a civil penalty of $100 to $2,000 per alien for the first offense, $2,000 to $5,000 per alien for subsequent offenses, and $3,000 to $10,000 per alien for a "pattern or practice" of violations. The judge may also require the violator to comply for up to 3 years with the verification procedure or take other appropriate remedial action.

Criminal penalties are available in the case of a person or entity which engages in a "pattern or practice" of violations after having previously been assessed a civil penalty for a "pattern or practice" of violations. Fines of up to $3,000 per unauthorized alien, or imprisonment of up to 6 months for the entire "pattern or practice" of violations, or both, may be assessed. The presumption of knowing hiring in subsection (a)(3) of the new INA section shall not apply in the case of a criminal prosecution.

Subsection (d)(3) provides that immigration officers and immigration judges shall have reasonable access to examine evidence of any person or entity being investigated. Immigration judges, by subpoena, may compel the attendance of witnesses and the production of evidence at any designated place or hearing. The Attorney General may seek a court order from a U.S. District Court to enforce such subpoena.

Subsection (d)(4) of the new INA section provides that in applying the compliance provisions of subsection (d) to a person or entity composed of distinct, physically separate subdivisions, each such subdivision shall, under certain conditions, be considered a separate person or entity. Such conditions are that the hiring, or recuiting or referring for employment, by each subdivision be conducted separately, without reference to the practices of another subdivision, and not under the control of or under common control with another subdivision.

Subsection (d)(5) authorizes the Attorney General to provide for administrative appellate review of the determination of an immigration judge under this subsection.

Subsection (e) of the new INA section 274A requires that, with certain specified exceptions, judicial review of an order under this subsection shall be in the appropriate Federal judicial circuit and shall proceed according to chapter 158 of title 28, United States Code—the statute currently used for judicial review of an order of deportation. The exceptions include the following: petitions for review must be filed no later than 45 days after the date of the final order; review shall be in either the Federal judicial circuit in which the administrative proceedings before the immigration judge were conducted, or in which the residence of the petitioner is located, but not both; the review shall be based solely upon the administrative record; and the immigration judge's findings of fact shall be conclusive if supported by substantial evidence.

Subsection (f) of the new INA section provides that if a violator fails to comply with a final order issued under subsection (d), the Attorney General shall file suit to seek compliance in the appropriate U.S. District Court. The subsection also provides that in any such suit the validity and appropriateness of the order shall not be subject to review.

Subsection (g) requires that in any documentation or endorsement of an alien's authorization of employment in the United States the Attorney General conspicuously indicate on such documentation or endorsement any limitations with respect to period or type of employment or employer. The subsection also provides that the section preempts State and local laws imposing civil or criminal sanctions for the employment, or the recruitment or referral for a fee or other consideration for employment, of aliens not authorized to be employed in the United States.

Section 121(b) of the bill provides that, with certain specified exceptions, the requirements of section 274A take effect immediately. The exceptions include the following: subsection (a) of the new INA section 274A will apply only to illegal aliens hired, or recruited or referred, after enactment; during the first 6 months notice will be given as to apparent violations of subsection (a), but no penalty shall be assessed; and during the subsequent 6-month period the first apparent offense will result only in a warning.

Section 121(c) requires interim or final regulations implementing this section be issued no later than the first day of the seventh month after enactment. The subsection also provides that during the first year after enactment, the Attorney General, in cooperation with the Secretary of Commerce, the Secretary of Health and Human Services, the Secretary of the Treasury, the Secretary of Labor, the Secretary of Agriculture, and the Administrator of the Small Business Administration, must disseminate forms and information to employers, employees, and the public concerning the provisions of the new INA section 274A.

*Section 122—Temporary agricultural worker program*

Section 122(a) amends the definition of "nonimmigrant" to distinguish aliens coming temporarily to the United States to perform temporary or seasonal agricultural services, described in subparagraph (N) of INA section 101(a)(15) as amended by this bill, from aliens coming temporarily to perform other temporary services or labor, described in subparagraph (H) of such amended section.

Section 122(b) requires the Attorney General to consult with the Department of Agriculture, as well as the Department of Labor, before he determines whether to admit any temporary agricultural worker under 101(a)(15)(N). The Committee wishes to emphasize that the decision whether to issue a labor certification, as required in new INA section 216 (see below), must be made by the Department of Labor.

Section 122(c) creates a new section 216 in the INA, "Admission of Temporary Agricultural Workers."

Subsection (a) of the new INA section 216 provides that a petition to import an alien as an "N" worker cannot be approved by the Attorney General unless the petitioner has applied for a certification from the Secretary of Labor that (i) there are not sufficient U.S. citizen and authorized alien workers who are able, willing, qualified, and who will be available at the time and at the place needed to perform the required services, and (ii) the employment of aliens in such services will not adversely affect the wages and working conditions of workers in the United States similarly employed. The present requirement that in every case employers must

make a nationwide recruitment and hiring effort has been deleted as excessively burdensome and because it is not currently required by the Department of Labor. However, the Committee intends that in making its certification decision with respect to particular employment, the Department of Labor will continue to consider U.S. citizen and permanent resident alien migrant workers and U.S. citizens from Puerto Rico who are "able, willing, qualified and available" workers for such employment. The requirement that the employment of aliens not adversely affect the wages and working conditions of workers similarly employed in the United States is not intended to require the Department of Labor to change its existing practice of determining adverse effect wage rates on a State-by-State basis.

Subsection (a) of the new INA section 216 also provides that the Secretary of Labor may impose a fee as a condition of applying for the labor certification, for the purpose of recovering the reasonable costs of processing.

Subsection (b) of the new INA section provides that the Secretary of Labor may not issue a labor certification for an employer if such employer during the previous 2 years substantially violated an essential term or condition of a labor certification or did not pay every penalty which has been assessed by the Secretary of Labor for a violation of a term or condition of such labor certification. However, such an employer may not be denied certification for more than 1 year for any such violation. An employer shall also be denied labor certification if he does not provide the Secretary of Labor with adequate assurances that insurance will be provided to "N" workers which will provide benefits at least equal to the applicable State's worker compensation program (unless the employment is covered by the State program).

Subsection (b) of the new INA section also provides that the Secretary may not issue a labor certification for an employer if there is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification. Current regulations promulgated by the Department of Labor state:

20 CFR Sec. 655.203(a): *Assurances*. As part of the temporary labor certification application, the employer shall include assurances, signed by the employer, that:

(a) The job opportunity is not:

(1) Vacant because the former occupant is on strike or being locked out in the course of a labor dispute; or

(2) At issue in a labor dispute involving a work stoppage.

Furthermore, current regulations promulgated by the Immigration and Naturalization Service state:

8 CFR Sec. 214.2(h)(11):

*Effect of strike* (i)—A petition to classify an alien as a nonimmigrant as defined in section 101(a)(15)(H) of the Act shall be denied if the Secretary of Labor or his designee certifies to the Commissioner of Immigration and Naturalization or his designee that a strike or other labor dispute involving a work stoppage of workers is in progress in the occupation and at the place the beneficiary is to be employed or trained and that the employment or training of the beneficiary would adversely

affect the wages and working conditions of U.S. citizen or lawful resident workers.

It is the Committee's view that the regulations of the Immigration and Naturalization Service and the Department of Labor now in force with respect to strikes and lockouts together establish appropriate standards. If such regulations are changed, the statutory reference to "regulations" is to be interpreted to refer to the new regulations.

Subsection (c) of the new INA section 216 provides that the Secretary of Labor may not require employers to file an application for a labor certification for a temporary agricultural worker more than 65 days before the worker's services are required. Subsection (c) of the new section also provides that the application of the employer shall be considered to have met the wage and working conditions requirements in new INA section 216(a)(1)(B), unless the Secretary of Labor informs the employer within 14 days of the application that such requirements have not been met. The Secretary of Labor is directed to make the labor certification at least 20 days before the date the "N" worker's services are first required if the employer has complied with the requirements for certification and if the employer has not found or been referred U.S. citizens or authorized aliens who have agreed to perform the needed services on the terms and conditions of a job offer which meets the requirements of the regulations. In order for the certification to remain effective, the employer must continue to accept U.S. citizens or authorized aliens who apply or are referred until the date the "N" workers depart for work with the employer. In addition, subsection (c) of the new section allows agricultural employers to comply with the regulations concerning the furnishing of worker housing by payment to the "N" worker of a reasonable housing allowance in lieu of furnishing actual housing, but only when suitable housing is available close to the location of employment.

Subsection (d) of the new INA section 216 clarifies the role of agricultural associations in the program. The petition for admission of an "N" worker and the application for a labor certification may be filed by an association representing agricultural producers. Subsection (d) provides that the labor certification issued to such associations may be used for the certified job opportunities of any of its producer members. Furthermore, joint or sole employer associations may transfer their "N" workers among their members for certified job opportunities. In the case of a violation under subsection (b)(2) of the new INA section 216 (which results in temporary disqualification from receiving subsequent labor certifications), an individual member's violation would not be counted against the joint or sole employer association of which he was a member (or against the other producer members individually), unless the Secretary of Labor found that the association or other members participated in, or had knowledge of and derived benefit from, the violation. In the case of such a violation where the joint or sole employer association was involved, the violation would not be counted against the individual producer members unless the Secretary of Labor found that such member or members participated in, or had knowledge of and derived benefit from, the violation. The Committee intends that more than mere membership in an association be

established before an individual member may be found to have "participated" in a violation by the association or by another producer member.

Subsection (e) of the new INA section 216 provides for the following expedited appeal and petitioning procedures for agricultural employers: (1) If labor certification is denied, the Secretary of Labor shall provide an expedited review of the denial, or at the applicant's request, a de novo hearing on the issues involved in the denial. In the case of an application with respect to "N" workers who are sought to perform services in the production of "perishable commodities" (as defined by the Secretary of Agriculture), the expedited review shall occur within 72 hours. (2) If an employer asserts that referred eligible domestic workers are not able, willing, or qualified for employment-related reasons, the Secretary of Labor shall make a new determination on such an employer's certification application within 72 hours of such employer's request. The employer has the burden of establishing that workers referred are not actually able, willing, or qualified because of employment-related reasons. (3) If a labor certification has been denied because of the availability of U.S. citizens and authorized aliens, and the U.S. citizens and authorized aliens who have agreed to perform the services do not report for work at the time and place of need, the Attorney General shall provide for the entry of an appropriate number of "N" workers if necessary. (4) If an employer faces a critical need for workers due to unforseen circumstances—for example, an unexpected change in climatic conditions—the Secretary of Labor shall permit the employer to amend the application for certification or make a new application and may waive some or all of the recruitment period normally required. In such cases of new or amended applications, the Secretary shall make a new determination of the need for workers no later than 20 days before the date of need, provided that if the amended or new application is made later than 3 days before the date of need the Secretary shall make the determination within 72 hours of its submission.

Finally, subsection (e) of the new INA section 216 provides that if the Secretary of Labor denies a labor certification or fails to act on the application, the Attorney General may permit the applicant to present counterveiling evidence with respect to the availability of domestic workers and the observance of Department of Labor employment policies.

Subsection (f) of the new INA section restricts the duration of an "N" worker's visa to the aggregate period (or periods) which the Attorney General establishes by regulation. An exception to this authority is granted where the Secretary of Labor has recognized before enactment of S. 1200 that certain agricultural labor or services require stays which may exceed 1 year. This exception pertains to the particular historical case of the sheep-raising industry. Aliens have been admitted under the H-2 provisions of the Act to work as range sheepherders since 1958. They have been allowed to stay for 3-year periods without mandatory return to their country of origin. This provision will allow the continuation of that practice under the new law.

Subsection (f) also provides that any alien admitted in the previous 5 years under the "N" program who violated a term or condi-

tion of that admission would not be allowed to enter as an "N" worker. Finally, the new subsection clarifies that an employer with an approved petition for an "N" worker may hire for a certified job opportunity such a worker who has completed a labor contract with another employer. The Attorney General is directed to provide a procedure which would allow "N" workers who have completed a work contract and are otherwise not deportable to remain in the United States for brief periods in order to seek and accept employment with employers who are authorized to employ such workers. The Committee does not intend, however, that "N" workers be unrestricted in their movement during those brief periods.

Subsection (g) of the new INA section 216 authorizes the Secretary of Labor to take such actions as may be necessary to assure employer compliance with the terms and conditions of employment under this new INA section. Subsection (g) also requires the Attorney General to provide for the endorsement of entry and exit documents of "N" workers as may be necessary to carry out new INA section 274A, added by section 121(a) of this bill. Finally, subsection (g) provides that the provisions of the new INA section 216 and of subsections (a) and (c) of INA section 214 (relating to the admission of nonimmigrants generally) preempt State and local laws regulating admissibility of nonimmigrant aliens.

Section 122(d) authorizes the appropriation to the Department of Labor of $10 million for each fiscal year (beginning with fiscal year 1987) for the purpose of recruiting domestic workers for jobs which "N" alien workers might otherwise perform and monitoring terms and conditions of employment of "N" workers and U.S. workers employed by the same employers. Subsection (d) also authorizes such sums as are necessary to enable the Secretary of Labor to make the determinations and certifications required under the "N" program, and to enable the Secretary of Agriculture to carry out his duties under the program.

Section 122(e) prohibits an alien who entered the United States as an "N" worker, other than an "immediate relative" (as defined in INA section 201(a) and (b)) of a U.S. citizen, from adjusting his status under INA section 245 or 248.

Section 122(f) provides that the amendments contained in subsections (a), (b), and (c) of this section of the bill will apply to petitions and applications filed under INA sections 214(c) and 216 on or after the first day of the seventh month beginning after enactment.

Section 122(g) requires the Attorney General, in consultation with the Secretary of Labor and the Secretary of Agriculture, to approve all regulations implementing INA sections 101(a)(15)(N) and 216, added by this bill, before they are issued. The Committee believes that the Attorney General, as the final nonjudicial authority on the proper interpretation of immigration laws, should approve all regulations relating to "N" workers. The Committee intends that the Secretary of Labor continue to issue all regulations relating to labor certification, but believes that the Department of Agriculture should have a meaningful advisory role in formulating regulations for the "N" program, since these will be concerned with the particular needs of agriculture.

*Section 123—Agricultural labor transition program*

Section 123(a) requires the Attorney General, in consultation with the Secretary of Labor and the Secretary of Agriculture, to establish an agricultural labor transition program. The purpose of the program is to assist agricultural employers in shifting from the employment of unauthorized aliens to the employment of U.S. citizens and authorized aliens. The program will become effective on the first day of the seventh month after the date of enactment, and will remain in effect for 3 years.

Subsection (b) provides that during the first year of the program, an agricultural employer will be able (except as provided in subsections (c), (d), and (e), described below) to meet up to 100 percent of his need for nondomestic seasonal agricultural labor with transition workers, up to 67 percent of that need during the second year of the program, and up to 33 percent of that need during the third year. Because agricultural employers currently rely on an unauthorized workforce whose exact size is unknown, the Committee believes that the Attorney General, in determining the number of transition workers to be available to agricultural employers, should adopt flexible guidelines.

Subsection (c) provides that nothing in this section permits transitional workers to replace U.S. workers or other legal alien workers.

Subsection (d) provides that transitional workers will be covered by all Federal and State laws and regulations governing migrant and seasonal agriculture workers. This includes, but is not limited to, the Migrant and Seasonal Agricultural Worker Protection Act.

Subsection (e) provides that an undocumented alien in the United States will be eligible to be a transitional worker if he was employed on the date of enactment as a seasonal agricultural worker in the United States or has been employed as such a worker for at least 90 days during a period of time after January 1, 1980, and before the date of enactment. An alien will not be eligible to participate if he is deportable on any ground except those relating to illegal entry, visa overstay, or lack of possession of proper documents. An alien who qualifies as a transitional worker may not adjust status, unless he is an immediate relative as described in INA section 201(b), but he is not ineligible for the legalization program of title II of this bill.

Subsection (f) provides that an employer must perform the following in order to participate in the transition program: (1) notify the Attorney General of his intention to use the program within 12 months of the beginning of the program, and (2) provide such information as the Attorney General may specify on his seasonal agricultural worker needs in past and future years.

Subsection (g) provides that after an employer begins to participate in the transition program, the employer must submit, at the Attorney General's request, a report on the number of transition workers employed, as well as the number of domestic and foreign seasonal agricultural workers employed.

Subsection (h) provides that any eligible employer who uses the transition program and the "N" worker program under section 216

of the INA must provide the wages and working conditions required by the "N" program to all similarly employed workers.

Subsection (j) provides that the Attorney General may require a fee of participants in the transition program, in order to recover the reasonable costs of processing registrations under the program.

Subsection (k) provides that a work permit or other documentation provided to a transitional worker shall, in accordance with regulations of the Attorney General, be considered documents evidencing employment authorization for purposes of INA section 274A(b)(1)(C), as added by this bill. An alien employed as a transitional worker and in possession of a properly endorsed such work permit or other documentation shall, for purpose of INA section 274A, be considered to be authorized by the Attorney General to be so employed during the period of time indicated on such documentation.

*Section 124—Commission on temporary agricultural worker programs*

Subsection (a) establishes a 12-member commission on temporary agricultural worker programs: two to be appointed by the Attorney General, two to be appointed by the Secretary of Labor, two to be appointed by the Secretary of Agriculture, three to be appointed by the Speaker of the House, and three to be appointed by the President pro tempore of the Senate. The commission is intended to be comprised of experts in the field of agricultural and labor issues. The subsection requires that appointments be made in a way which produces a balanced representation of the interests involved in temporary agricultural worker programs. Those appointed shall include more than one individual representing labor organizations for temporary agricultural workers and more than one representing employers of nondomestic temporary agricultural workers.

Subsection (b) provides that the commission shall study and review the "N" temporary agricultural worker program in section 122 and the 3-year agricultural labor transition program in section 123—paying particular attention to the impact of those programs on the labor needs of U.S. agricultural employers and on the wages and working conditions, and job opportunities of U.S. agricultural workers. The commission is also directed to study and review the following in connection with the "N" program, as provided in INA section 216, added by section 122(c) of the bill: (1) the standards for the labor certification required by subsection (a)(1) of INA section 216, (2) whether there should be a statutory or other specific limit on the number of workers admitted under the program, (3) whether payments equivalent to Social Security and unemployment taxes (FICA and FUTA) should be made by employers of "N" workers, and, if so, what use should be made of these funds, (4) the duration and manner of recruitment for U.S. workers which should be required, (5) whether "N" workers which should be contractually restricted to employment with specific employers, (6) whether current labor standards offer adequate protection for domestic and foreign agricultural workers, and (7) whether certain geographical regions of the country need special provisions or special programs to meet their needs.

Subsection (c) requires the commission to report to Congress not later than 2 years after the effective date of the "N" program and the transition program (the first day of the seventh month beginning after the date of enactment). The report must include recommendations for improvements in the "N" program, including specific legislative recommendations concerning: (1) the seven issues referred to in the last paragraph above, (2) improving the timeliness of administrative decisions made under the "N" program, (3) removing any current economic disincentives to hiring U.S. workers where temporary foreign agricultural workers have been requested, and (4) improving cooperation among government agencies, employer associations, workers, labor unions, and other worker associations, to end the dependence of any industry on a constant supply of temporary foreign agricultural workers.

The Committee intends that the commission report to Congress at that time, which is before the final year of the 3-year transition program, so that any changes in the "N" temporary agricultural worker program may be made before agricultural employers are prohibited from using any of their original undocumented workers, if hired after enactment, which will occur when the transition program expires and the employment of such aliens becomes subject to INA section 274A, added by section 121(a) of the bill.

Subsection (i) provides that the commission shall cease to exist 27 months after the effective date.

## Title II—Legalization

### Section 201—Legalization Commission

Section 201(a) provides for the establishment of a Select Commission on Legalization to be composed of 9 members appointed by the President—4 from a list of 12 names submitted by the Speaker of the House of Representatives, 4 from a list of 12 names submitted by the President pro tempore of the Senate, and 1 additional member to be Chairman, who need not be selected from either list. The subsection provides that at least five members of the Legalization Commission must be sitting or retired Federal judges, former members of the Select Commission on Immigration and Refugee Policy, former Members of Congress, or former Attorneys General of the United States.

The individuals on each such list submitted to the President, as well as the individual chosen by the President to be Chairman, must support the concept of the legalization program described in section 202. At least seven of the individuals on each list must be sitting or retired Federal judges, former members of the Select Commission on Immigration and Refugee Policy, former Members of Congress, or former Attorneys General of the United States. At least two of the remaining individuals on each list must be representatives of religious organizations, voluntary agencies, civil rights organizations, or organizations representing minority or ethnic groups.

Subsection (b) describes the duties of the Legalization Commission. Such duties will include the monitoring and review of the border patrol and other Federal enforcement programs intended to curtail illegal entry into the United States and violation of the

terms of legal entry, as well as the programs intended to curtail the employment of aliens not authorized to work in the United States. The subsection expressly requires that the Commission monitor and review the amount of resources devoted to such programs and their effectiveness, and provides that the Commission may study ways to improve such effectiveness.

Subsection (c) requires the Legalization Commission to report to Congress on its activities not later than 1 year after the date a majority of its members are first appointed, and at least annually thereafter. Each report must contain a finding of whether certain conditions have been met. Section 202(a) (described in more detail below) provides that the legalization program becomes effective when a finding is made that these conditions have been met, or 3 years after enactment, whichever is earlier. The conditions which must be met include the following: (A) effective enforcement measures have been instituted by the Federal Government and have adequate resources to curtail illegal immigration (such measures include the penalties for knowing employment, or recruitment or referral for employment, in the United States of unauthorized aliens, as provided in the new INA section 274A, added by section 121 of this bill); (B) there is a reasonable likelihood that these measures will continue in effect and will continue to have adequate resources after the legalization program described in section 202; (C) enforcement has become effective enough to prevent the legalization program from serving as a stimulus to further illegal entry.

### Section 202—Legalization of status

Section 202(a) gives the Attorney General discretion to adjust the status of certain aliens to that of aliens lawfully admitted for temporary residence if they apply within 12 months of the date designated by the Attorney General as the beginning of the application period. Such date must be no later than 90 days after the effective date of the program, which is the date the Legalization Commission makes the finding referred to in section 202, or 3 years after enactment, whichever is earlier.

In order to qualify for such temporary resident status, an alien must show that either (i) he arrived in the United States before January 1, 1980, and has continuously resided in the United States in an unlawful status since such date, or (ii) he is a "special Cuban or Haitian entrant" (described below) and has continuously resided in the United States since December 31, 1980. An alien who entered the United States as a nonimmigrant must show either that his period of authorized stay expired before January 1, 1980, through the passage of time, or that his unlawful status was known to the Government as of that date.

Any alien applying for such temporary resident status must also show that he has been physically present in the United States continuously since the date of enactment. Finally, the alien must establish that he is otherwise admissible as an immigrant. He must show that he is not excludable under INA section 212, unless, pursuant to subsection (d) of this bill (see below), such ground of exclusion does not apply or is waived by the Attorney General; that he has not been convicted of any felony (crime punishable at the time of conviction by imprisonment for a term of more than 1 year, re-

gardless of the term such alien actually served, if any) or three or
more misdemeanors (crimes each of which was punishable at the
time of conviction by imprisonment for a term of 1 year or less, re-
gardless of the term such alien actually served, if any) committed
in the United States; that he has not assisted in the persecution of
any person on account of race, religion, nationality, or membership
in a particular social group, or political opinion; and that he is reg-
istered or registering under the Military Selective Service Act, if
required to be so registered.

Subsection (a) defines "special Cuban or Haitian entrant" to in-
clude:

(1) Two categories of Cuban nationals: (a) those who on December
31, 1980, had an application for asylum pending with the INS, and
(b) those who arrived in the United States and presented them-
selves for inspection between April 20, 1980, and January 1, 1981,
and were physically present on December 31, 1980; and

(2) Three categories of Haitian nationals: (a) those who on De-
cember 31, 1980, had an application for asylum pending with the
INS, (b) those who on December 31, 1980, were the subject of exclu-
sion or deportation proceedings, including those who on that date
were under an order of exclusion and deportation or an order of
deportation which had not yet been executed, and (c) those who
before December 31, 1980, were paroled into the United States
under INA section 212(d)(5) or granted voluntary departure, and
were physically present in the United States on that December 31,
1980.

Any alien who has at any time been a nonimmigrant exchange
alien as defined in INA section 101(a)(15), must show that the 2-
year foreign residence requirement of INA section 212(e) has been
satisfied or waived.

Extended voluntary departure is not a legal nonimmigrant
status. All aliens granted voluntary departure or extended volun-
tary departure prior to January 1, 1980, will be eligible for legaliza-
tion if otherwise admissible (as discussed above), and if they did not
later receive a legal status.

Subsection (b) gives the Attorney General discretion to adjust the
status of certain aliens previously adjusted to lawful temporary
resident status pursuant to subsection (a) to that of aliens lawfully
admitted for permanent resident status. In order to qualify, an
alien must apply during the 12-month period beginning 30 months
after the alien received lawful temporary resident status, and must
show that he has continuously resided in the United States since
being granted such temporary resident status. Certain brief and
casual trips abroad during the period of such temporary status may
be permitted by the Attorney General if determined to be consist-
ent with an intention to adjust to lawful permanent resident
status. The alien must also show that he is otherwise admissible as
an immigrant (see discussion in last paragraph above, in connec-
tion with applications for lawful temporary resident status). Finally,
the alien must show that he either (a) has the ability to read,
write, and speak words in ordinary usage in the English language,
and the knowledge and understanding of the fundamentals of the
history and of the principles and form of government of the United
States, which is required before aliens may be naturalized as citi-

AR2022_400912

zens of the United States, or (b) is satisfactorily pursuing a course of study, approved by the Attorney General, to achieve such ability, knowledge, and understanding.

Subsection (b) also provides that any temporary resident status granted to an alien pursuant to subsection (a) shall terminate after 42 months unless such alien has filed an application for adjustment of status to permanent resident status as provided in subsection (b) and such application has not been denied.

Subsection (c) provides that an application for lawful temporary resident status under subsection (a) may be filed either with the Attorney General or with a "qualified designated entity," which is an organization or State or local government designated by the Attorney General as qualified for the purpose of this section. Each qualified designated entity must agree to forward applications to the Attorney General if the applicant consents, but not to do so if the applicant withholds consent. The purpose of this provision is to assure applicants that they may apply to such entities without fearing that their applications will be forwarded to the INS even if in the view of such entities they do not qualify for legalization.

Subsection (c) also provides that the Attorney General shall prescribe an application fee of at least $100 to meet the costs of the legalization program. The figure is based on the cost of obtaining a "green card," and the experience with the legalization program in the Virgin Islands. The subsection also provides that these fees shall be collected and placed in a separate account and shall be available without fiscal year limitations to cover administrative expenses in connection with the review of applications filed under this section. The Committee intends that the Federal administrative costs of the legalization program be in large part financed by such fees.

Subsection (d) provides that certain grounds of exclusion set forth in INA section 212(a) shall not apply to applicants for legalization, specifically those in paragraphs (14) (labor certification requirement), (20) and (21) (relating to lack of proper documentation), (25) (relating to illiteracy), and (32) (requirements for certain graduates of unaccredited medical schools). Other grounds may be waived by the Attorney General for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, except paragraphs (9) and (10) (relating to certain criminals); (23) (relating to drug offenses), except as it relates to a single offense of simple possession of 30 grams or less of marijuana; (27), (28), and (29) (relating to national security and membership in certain organizations); and (33) (relating to those who assisted in persecutions by Nazis). In addition, the Attorney General may not, in connection with applications for adjustment from temporary resident status to permanent status pursuant to section 202(b) of this bill, waive paragraph (15) (relating to aliens likely to become public charges). Furthermore, the Committee intends that waivers of INA section 212(a)(15) in connection with applications for temporary resident status be granted only in unusual circumstances involving extreme hardship. Finally, the Committee wishes to state that although it is aware that the State Department and INS have interpreted "public charge" to exclude persons receiving assistance through such pro-

AR2022_400913

grams as "food stamps" and "rent subsidies," it does not concur with this interpretation.

Subsection (e) provides that the Attorney General may not deport an alien who, during the application period for temporary legalization, submits an application for such legalization which establishes a prima facie case of eligibility, until a final administrative determination has been made. This subsection also provides that the Attorney General must grant such alien the authorization to work in the United States until such determination has been made.

Subsection (f) limits judicial and administrative review. A legalization program of the magnitude provided for in this section of the bill is unique in history. The program will provide a substantial benefit to large numbers of persons throughout the United States who are now unknown to government authorities. A major managerial effort will be required to review the applications and assure that applicants qualified to be legalized will actually receive this benefit and that other applicants will not. The Committee is concerned that efforts will be made, on behalf of many persons who are ineligible for the legalization program, to delay the final determinations of their applications. This would prevent not only their own deportation but the expeditious operation of the program for others.

It is for the purpose of helping to insure reasonably prompt final determinations that subsection (f) provides that there will be no judicial review of a decision or determination made with respect to the legalization program. Moreover, an alien denied adjustment of status under the legalization program may not raise a claim concerning such adjustment in any proceeding of the United States or any State involving the status of such alien. Subsection (f) also provides that there may be no administrative review of a decision or determination made with respect to the legalization program, except that which the Attorney General is required to establish, namely, a single level of administrative appellate review of final determinations concerning applications for legalization.

Subsection (g) provides in part that the continuous residence and physical presence requirements of the legalization program must be established through documents, with independent corroboration of the relevant information in such documents. Such documents must be employment related if available to the alien. The Committee realizes that some applicants may not have employment-related documents, for example many alien spouses, children, and students.

Subsection (h) provides that, with the exception of "special Cuban and Haitian entrants," aliens granted the temporary resident status under the legalization program will not be eligible for 6 years (including the initial several years after they have been granted permanent resident status) for programs of federally funded financial assistance granted on the basis of financial need. During the same period, State or local governments are authorized to provide that such aliens are ineligible for State or local welfare assistance programs. Adjustments of status under this section will not affect the provision of assistance under section 501 of the Refugee Education Assistance Act of 1980 (Public Law 96–122).

In addition, subsection (h) expressly states that unless otherwise specifically provided by law, an alien in such temporary resident status shall not be considered, for purposes of any State or local law which provides for welfare assistance, to be permanently residing in the United States under color of law.

Subsection (i) in part provides that the retirement or retainer pay of a member or former member of the Armed Forces or the annuity of a retired employee of the Federal Government shall not be reduced during a period of up to 18 months while such individual is temporarily employed by the INS to assist in the administration of the legalization program.

Subsection (j) provides that section 1 of Public Law 89–739, which authorizes the Attorney General to adjust the status of certain Cuban nationals to lawful permanent resident, shall not apply to aliens who are first inspected and admitted or paroled into the United States after the date of enactment of this bill.

Finally, the Committee would like to discuss a question which has been posed several times during the consideration of S. 1200: What will happen to illegal aliens who satisfy the residence and other requirements for legalization but who are apprehended by the INS before that date? The answer is that such illegal aliens will be treated as they are at the present time. If they are apprehended by the INS, they will be offered the choice of immediately leaving the United States or being placed in deportation proceedings. The Committee notes that in the last fiscal year for which complete data are available, 1983, over half of the interior apprehensions were of illegal aliens who had been present in the United States for 1 year or less—not long enough to satisfy the residence requirement for legalization. The proportion which this group represents of the total illegal population is unknown.

The additional funds authorized by S. 1200 will enable INS to increase the level of interior investigators and interior border patrol officers. These personnel will be assigned primarily to the effort to enforce the bill's prohibition of knowing employment of illegal aliens, not to engage in residential searches for illegal aliens.

The increased funds authorized by the bill will not enable the INS to conduct massive residential area "sweeps" in an effort to deport illegal aliens. This is consistent with the intention of the Committee and with the policy of the administration as it has been stated to the Committee.

The Committee emphasizes that the report referred to in section 202(a)(1)(C) of the bill should be made as soon as the conditions set forth in section 201(c)(3) are met, without regard to the automatic legalization provision. When enforcement reaches the required level of effectiveness, as found by the Commission, or 3 years after enactment, whichever occurs first, the legalization program will go into effect. Applications for legalization will be accepted within 90 days thereafter. An alien who has submitted an application for legalization during the authorized application period, if such application establishes a prima facie case of eligibility for legalization, may not be deported and must be granted authorization to work in the United States.

*Section 203—State legalization impact-assistance grants*

The Committee notes the concern expressed by State and local governments regarding the potential fiscal impact arising from participation in public assistance programs by the legalized population. The Committee believes that legalization is a shared Federal/State responsibility because each level of government both incurs costs and receives revenue because of the presence of illegal aliens. However, it is likely that some State or local governments face a net revenue deficit due to the presence of illegal aliens who are likely to be legalized. Therefore, a program of legalization impact-assistance grants to States has been provided. The Committee wishes to emphasize that the program is not meant to provide "100 percent Federal reimbursement" for the costs incurred by State or local governments, but to offset the reasonably anticipated *net* costs.

Section 203(a) authorizes the appropriation of $600 million for each of 3 fiscal years to provide payments to States, beginning with the fiscal year in which the application period described in section 202(a)(1)(A) ends.

Section 203(b) requires the Secretary of Health and Human Services, in accordance with the authorization, to provide for payment to each State with an approved application for reimbursement of costs resulting from the participation of "eligible legalized aliens" (defined in section 203(i)(3)) in "programs of public assistance" (defined in section 203(i)(2)) for which they were not disqualified under section 202(h) at the time of such participation, or resulting from imprisonment of illegal aliens convicted of a felony.

The subsection provides that payments must be based on a formula established by the Secretary. Such formula must take into account: (i) the number of "eligible legalized aliens" residing in the State in a particular fiscal year, (ii) the ratio of the number of "eligible legalized aliens" in the State to the total number of residents in the State and to the total number of such aliens in all the States in that fiscal year, (iii) the amount of expenditures the State is likely to incur in that fiscal year in providing assistance for "eligible legalized aliens" under "programs of public assistance," and (iv) the ratio of the amount of expenditures referred to in clause (iii) in the State to the total amount of such expenditures in all of the States.

Subsection (b) also provides that to the extent that all funds provided in this section are not allotted to States in a particular fiscal year because all States have not qualified or because one or more States have indicated that they do not intend to use, in that fiscal year or the following fiscal year, the full amount allotted to them in that fiscal year, the excess funds shall be allotted to the other qualifying States in proportion to the amounts otherwise allotted to them.

Subsection (c) provides that no State will be eligible for payment in a fiscal year unless the State has filed with the Secretary of Health and Human Services an application for such fiscal year, which contains, among other things, information on the number of "eligible legalized aliens" residing in the State and the likely costs for "programs of public assistance" and for the imprisonment re-

51

ferred to in subsection (b). Participating States must also transmit to the Secretary a statement of assurances, certifying in part that reimbursement funds will only be used to carry out the purposes described in subsection (d).

Subsection (d) provides that a State may only use such funds (1) to provide assistance to "eligible legalized aliens" under "programs of public assistance" for which such aliens are not disqualified under section 202(h) at the time of such assistance, but only to the extent such assistance is otherwise available to citizens residing in the State, and (2) to pay the cost of imprisonment of aliens described in subsection (b)(1)(B).

Subsection (e) provides that each participating State must submit to the Secretary annual reports on its activities under this section. Subsection (e) also refers to the audit requirements of chapter 75 of title 31 of the United States Code. Each State is required to repay all funds not expended in accordance with the statute.

The subsection also requires the Secretary to report annually to the Congress on activities funded under this section, and transmit a copy of such report to each State. Each State must make copies of the reports and audits required under this section available for public inspection within the State. Finally, subsection (e) provides that the Secretary and the Comptroller General shall have access to certain records related to the assistance granted under this section.

Subsection (g) provides for the enforcement of certain antidiscrimination laws with respect to activities funded in whole or in part under this section.

Subsection (h) requires the Secretary to consult with representatives of State and local governments in establishing the regulations and guidelines to implement this section.

Subsection (i) defines "programs of public assistance" to include programs which (A) provide for cash, medical, or other assistance (as defined by the Secretary) intended to meet the basic subsistence or health needs of individuals or required in the interest of public health, (B) are generally available to needy individuals residing in the State or locality, and (C) receive funding from units of State or local government.

The term "eligible legalized alien" is defined to be an alien who has been granted lawful resident status under section 202(a) but only during the 6-year period beginning on the date the alien was granted such status.

### TITLE III—OTHER CHANGES IN THE IMMIGRATION LAW

*Section 301—Change in colonial quota*

Section 301 increases the number of visas available for colonies from 600 to 3,000 per year.

In recent history, a number of former colonies have obtained independence, and have thereby become eligible for the 20,000 per country annual ceiling on numerically limited immigration. The few remaining colonies experience severe backlogs in visa issuance because of the small allocations of visas. The Committee is of the opinion that an increase in visa allocation for colonies will benefit

52

general immigration policy and will not significantly reduce the visas available for other areas of the world.

*Section 302—Visa waiver for certain visitors*

Subsection (a) creates a new section 217 of the INA. Subsection (a) of the new INA section authorizes the Attorney General and the Secretary of State jointly to establish a 3-year pilot program for the admission without a visa of certain foreign tourists and business visitors. The program would permit the entry of an alien for no more than 90 days, and would only apply to an alien who is a national of one of the eight countries selected by the Secretary of State and the Attorney General from among those which extend or agree to extend reciprocal privileges to U.S. citizens and which satisfy certain other criteria (see below). Before admission to the United States the alien would be required to complete a new immigration form and a waiver of certain review and appeal rights. The alien would also be required to have a round-trip, nonrefundable, nontransferable, open-dated transportation ticket issued by a qualified carrier (see below). No alien could be admitted under the program unless such alien has been determined not to represent a threat to the welfare, safety, or security of the United States. Any alien who previously was admitted under this section but who failed to comply with the conditions of any such previous admission would not qualify. Furthermore, all aliens seeking admission under this section would be subject to the exclusion provisions of INA section 212(a).

Subsection (b) of the new INA section 217 provides that the program may not be put into operation until 30 days after the Attorney General has certified to Congress that an automated data arrival and departure system is operational and effective, and a visa waiver form has been produced. The automated system is to be developed and established by the Attorney General in cooperation with the Secretary of State, for the purpose of screening and monitoring the arrival and departure of foreign visitors receiving a visa waiver under the pilot program. The subsection provides that the visa waiver form shall be developed by the Attorney General and must be consistent with the automated control system. The form must contain a summary description of the conditions for excluding nonimmigrants under INA section 212(a) and under the pilot program, describe the terms and conditions of entry under the visa waiver program and the consequences of failure to comply, and include questions concerning any previous denial of a visa application.

An alien may not receive a visa waiver under the pilot program unless such alien has waived any right to review or appeal of an immigration officer's determination of such alien's admissibility at the port of entry, or to contest, other than on the basis of an application for asylum, any deportation action against such alien.

Subsection (c) of the new INA section provides that a country may not qualify as a pilot program country for the "initial period" (see below) unless in the 2 previous full fiscal years the average number of nonimmigrant visitor visa refusals constituted less than 2 percent of the total number of nonimmigrant visitor visas issued or denied to nationals of the country and the average number of

such refusals in either of the 2 previous full fiscal years was less than 2.5 percent of such total number. The "initial period" is the period beginning after the required 30-day period for notice to Congress and ending after the first fiscal year beginning thereafter.

For each fiscal year after the "initial period," new countries must meet this test. Countries previously designated will continue to qualify for the program unless in the prior fiscal year the sum of (i) the number of nationals of that country who were excluded from admission or withdrew their application for admission as nonimmigrant visitors, and (ii) the number of nationals of that country who were admitted as nonimmigrant visitors and violated the terms of such admission, exceeded 2 percent of the total number of nationals of that country applying for admission as nonimmigrant visitors to the United States.

Subsection (d) of the new INA section 217 provides that the required round-trip ticket referred to above must be issued by a carrier which has agreed (i) to indemnify the United States against any costs of transporting from the United States certain nonimmigrant visitors who have received visa waivers, namely those who are refused admission or who unlawfully remain in the United States after the 90-day period, and (ii) to submit daily any immigration forms received with respect to nonimmigrant visitors who have been provided a visa waiver. The Attorney General is authorized to terminate such an agreement with 5 days notice if a carrier fails to fulfill the terms of the agreement.

Section 302(b) amends section 214(a) of the INA to prohibit extension of period of stay for visa waiver visitors.

Section 302(c) amends INA section 245(c) to prohibit visa waiver visitors from adjusting to permanent resident status.

Section 302(d) amends INA section 248 to prohibit visa waiver visitors from adjusting to another nonimmigrant status.

*Section 303—G–iv special immigrants*

Section 303 adds a new category of "special immigrant" to those already included in INA section 101(a)(27). This new category would include, first, an immigrant who is the unmarried son or daughter of an officer or employee, or former officer or employee, of an international organization such as the United Nations or World Bank, if such immigrant (i) while in the status of a nonimmigrant under INA section 101(a)(15)(G)(iv) or 101(a)(15)(O) has resided and been physically present in the United States for periods totaling at least one-half of the 7 years before the date of application for a visa or for adjustment to special immigrant status, and for at least 7 years (in the aggregate) between the ages of 5 and 21, and (ii) applies no later than his 25th birthday or 6 months after enactment, whichever is later.

Special immigrant status is also provided to the surviving spouse of an officer or employee of such an international organization who (i) while in G–iv or O status has resided and been physically present in the United States as such a spouse for periods totaling at least half of the 7-year period prior to the date application for the visa or for adjustment to special immigrant status is made, and for at least 15 years (in the aggregate) before the death of his or

AR2022_400919

her spouse, and (ii) applies no later than 6 months after the spouse's death or 6 months after enactment, whichever is later.

Finally, special immigrant status is provided to a retired officer or employee of such an international organization who (i) while in G–iv or O status has resided and been physically present in the United States for periods totaling at least half of the 7-year period prior to the date application for the visa or for adjustment to special immigrant status is made, and for at least 15 years (in the aggregate) before the date of his retirement from such organization, and (ii) applies no later than 6 months after such retirement or 6 months after enactment, whichever is later. The spouse of such a retired officer or employee who receives special immigrant status, if such spouse is accompanying or intending to join such retired officer or employee as a member of his immediate family, also will receive special immigrant status.

With respect to the "physically present" requirement, the Committee intends that an absence caused by the need to inspect overseas projects or a customary leave shall not be subtracted from the required aggregate period of physical presence, provided that the immigrant continues to reside in the United States during such absences and continues to have his duty station in the United States and, with respect to an immigrant who is the unmarried son or daughter of an officer or employee, provided that the unmarried son or daughter is not enrolled in school outside the United States during such absences.

Section 303(b) amends sections 101(a)(15) of the INA to create a new "O" nonimmigrant status for (i) parents of a child who is given special immigrant status, while the qualifying child remains a child (defined in INA section 101(b)(1)), (ii) the other children of such parents, and (iii) the children of surviving spouses or retired officers or employees (or their spouses) given special immigrant status under this section. The Committee intends that parents receiving such nonimmigrant status will receive work authorization.

## TITLE IV—REPORTS

### Section 401—Triennial comprehensive report on immigration

Subsection (a) requires the President to transmit to Congress not later than January 1, 1987, and not later than January 1 of every third year thereafter, a comprehensive immigration impact report.

Subsection (b) provides that each report shall include with respect to the relevant period (described in subsection (c)): (1) the number and classification of aliens admitted, paroled, or granted asylum, (2) an estimate of the aliens who entered without visas or became deportable under INA section 241, and (3) a description of the impact of immigrants, refugees, asylees, and parolees.

Subsection (c) provides that the information contained in each report shall be described for the preceding 3-year period and projected for the succeeding 5-year period.

Subsection (d) provides that the President may also include recommendations on changes in numerical limitations or other policies bearing on the admission and entry of aliens.

*Section 402—Reports on unauthorized alien employment and discrimination in employment*

Subsection (a) requires the President to transmit to Congress annual reports on the implementation of INA section 274A, added by section 121(a) of the bill, which makes it unlawful knowingly to employ or for a fee to recruit or refer illegal aliens. Each report must include: (1) an analysis of the adequacy of the employment verification system, (2) a description of the status of the development and implementation of changes in that system, and (3) an analysis of the impact of the enforcement of the new INA section 274A on the employment, wages, and working conditions of U.S. workers and the U.S. economy, and on the number of illegal entrants or visa abusers.

Subsection (b) requires the Comptroller General to prepare a report each year for 5 years, beginning 1 year after enactment. The report must describe the results of a review of the implementation and enforcement of new INA section 274A during the preceding year, including whether such provisions have been carried out satisfactorily, whether a pattern of discrimination on the basis of national origin has resulted against U.S. citizens or aliens authorized to work in the United States, and whether an unnecessary regulatory burden has been created for employers hiring such workers. The report must include a specific determination of whether such pattern of discrimination has resulted. If it has, the report must include a description of the scope of the discrimination and may include recommendations for legislation. Such report must be submitted to Congress and to the task force described in subsection (c).

Subsection (c) requires the Attorney General, jointly with the Chairman of the U.S. Commission on Civil Rights and the Chairman of the Equal Employment Opportunity Commission, to establish a task force to review each such report of the Comptroller General. If such report contains a determination that a pattern of discrimination on the basis of national origin has resulted, the task force is required to transmit to Congress recommendations for legislation to deter or remedy such discrimination, taking into consideration any recommendations in the report itself. Subsection (c) also requires the House and Senate Judiciary Committees to hold hearings within 60 days of receiving a report from such task force.

*Section 403—Report on visa waiver pilot program*

Subsection (a) requires the Attorney General and the Secretary of State jointly to monitor the pilot visa waiver program established under new INA section 217, added by section 302(a) of the bill, and to report to Congress no later than 2 years after the beginning of the program.

Subsection (b) provides that the report must include an evaluation of the program, including its impact on the control of alien visitors to the United States, on consular operations in the designated countries and in other countries in which additional consular personnel have been relocated as a result of the implementation of the program, and on the U.S. tourist industry. The report must also include recommendations on whether to extend the duration

of the program and on whether to increase the number of countries which may be designated.

### Section 404—Presidential reports on any legalization program

Subsection (a) requires the President to transmit to Congress two reports after the legalization program has been established under section 202.

Subsection (b) provides that the first report shall contain a description of the legalized population, including their geographical origins and manner of entry into the United States, demographic characteristics, and general profile. This report is required no later than 18 months after the end of the application period for lawful temporary resident status under the program.

Subsection (c) provides that the second report must include a description of (1) the impact of the program on State and local governments and on public health and medical needs of individuals in the different regions of the United States, (2) the patterns of employment of the legalized population, and (3) the participation of legalized aliens in social service programs. This second report is required no later than 3 years after the transmittal of the first report.

### Section 405—Report on the Immigration and Naturalization Service

This section requires the Attorney General within 90 days after enactment to prepare and transmit to the Congress a report describing the type of equipment and personnel resources required to improve the capability of the INS with respect to service and enforcement activities.

### TITLE V—COMMISSION FOR THE STUDY OF COOPERATIVE UNITED STATES-MEXICAN ENDEAVORS TO IMPROVE ECONOMIC CONDITIONS

### Section 501—Commission

Subsection (a) establishes a Commission for the Study of Cooperative U.S.-Mexican Endeavors to Improve Economic Conditions. The Commission is to be composed of 12 members, 4 Members of the House of Representatives, to be appointed by the Speaker, upon recommendation of the majority leader and the minority leader; 4 members of the Senate, to be appointed by the President pro tempore of the Senate, upon the recommendation of the majority leader and the minority leader; and 4 members to be appointed by the President, not more than 2 from any one political party. Members will serve for the life of the Commission (see below). The Chairman of the Commission shall be elected by the members, by majority vote.

Subsection (b) requires the Commission to examine how the United States and Mexico can work together to improve the economy of Mexico and the economy of the United States.

Subsection (c) requires the Commission, within 180 days after the appointment of the members, to prepare and transmit to the President and to Congress a report describing what steps the United States should take to work with Mexico to improve economic conditions in the two countries.

Subsection (e) describes the method of compensation of members, meetings, staff, authority of the Commission, authorization of appropriation, and quorum requirement.

Subsection (f) provides that the Commission shall terminate on the date on which the report referred to in subsection (c) is due, except that the Commission may continue to function for up to 30 days in order to conclude its activities.

## VI. COST ESTIMATE

In accordance with section 252(a) of the Legislative Reorganization Act (2 U.S.C. 190(j)), the Committee estimates that there will be added costs due to this act and adopts the cost estimate prepared by the Congressional Budget Office (CBO), set forth below.

On August 20, 1985, the following opinion was received from CBO:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, August 20, 1985.*

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the attached cost estimate for S. 1200, the Immigration Reform and Control Act of 1985.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,
    Sincerely,

ERIC HANUSHEK
(For Rudolph G. Penner, Director).

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: S. 1200.
2. Bill title: Immigration Reform and Control Act of 1985.
3. Bill status: As ordered reported by the Senate Committee on the Judiciary, July 30, 1985.
4. Bill purpose: S. 1200 makes some major revisions and reforms to the Immigration and Nationality Act. Title I focuses on the control of illegal immigration. Part A authorizes the appropriation of $840 million for 1987 and $830 million for 1988 for enforcement and service activities of the Immigration and Naturalization Service (INS), and such sums as may be necessary for the Wage and Hour Division and the Office of Federal Contract Compliance Programs in the Department of Labor. It also allows the Attorney General to impose fees on aliens, reflecting the cost of their use of border facilities. Part B clarifies law regarding harboring or transporting of an unauthorized alien to or within the United States; seizure and forfeiture procedures regarding vehicles or property used for the purpose of violating immigration law; and fraud or misuse of visas, permits or other documents. Part C makes it unlawful to employ unauthorized aliens and outlines requirements for employers to verify good faith attempts at compliance with this

AR2022_400923

law; authorizes Presidential monitoring and improvements in the verification system; directs the Attorney General to establish enforcement procedures; provides a new nonimmigrant classification for temporary agricultural workers; creates a new program for admission of temporary agricultural workers (including an authorization for the Secretary of Labor to establish a user fee to recover costs of processing applications for certification to import temporary agricultural workers); and directs establishment of an agricultural labor transition program during the three-year period beginning in the seventh month following enactment of this bill. Part C also establishes a commission to study and review the temporary agricultural worker program and the agricultural labor transition program during the 27 months following enactment.

Title II of the bill governs the legalization of unauthorized aliens already in the country. It establishes a Legalization Commission, which would be required to report at least annually on whether effective enforcement measures had been instituted and backed up by adequate resources, so as to curtail entry and stay of unauthorized aliens. Legalization could begin only after the commission found that more effective enforcement measures had been instituted with adequate resources or 3 years after enactment, whichever is earlier. The Attorney General is then empowered to adjust the status of unauthorized aliens to that of lawfully admitted aliens eligible for temporary residence if they apply, meet certain conditions, can establish that they entered the United States prior to January 1, 1980, and have been residing here continuously since then. After 2½ years in temporary status, the Attorney General can adjust their status to that of permanent resident. In addition, Title II precludes the aliens from receiving Federal assistance programs based on "financial need" for a period of 6 years from their date of legalization. At the same time, it authorizes the appropriation of funds for grants to States to cover their public assistance costs for the legalized aliens and their imprisonment costs for unauthorized aliens. A sum of $600 million is authorized for this purpose in each of 3 fiscal years, beginning with the year in which applications for legalization would end. Further, the bill requires the Attorney General to prescribe a fee of at least $100 for each application for adjustment of status filed under the provisions of this title. Funds received from these application fees are to be deposited into a separate account, to be available only to cover administrative expenses incurred in reviewing the applications filed under this section.

Title III of the bill makes other changes to immigration law. This title raises the quota of immigrant visas available to residents of dependent areas of foreign states; authorizes the establishment of a visa waiver pilot program; and amends the immigration laws regarding G–iv special immigrants.

Title IV requires the President, the Attorney General, and the U.S. Comptroller General to submit a number of reports to Congressional committees within set periods of time. Title V establishes a commission to study cooperative United States-Mexican endeavors to improve economic conditions.

5. Estimated cost to the Federal Government:

59

[By fiscal year, in millions of dollars]

| | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|
| Direct spending provisions: | | | | | |
| Required budget authority: [1] | | | | | |
| Function 570 ................................ | | | | (¹) | (¹) |
| Function 600 ................................ | | | | (¹) | (¹) |
| Function 650 ................................ | | | | (¹) | (¹) |
| Estimated outlays: | | | | | |
| Function 570 ................................ | | | | (¹) | 5 |
| Function 600 ................................ | | | | (¹) | 15 |
| Function 650 ................................ | | | | (¹) | 10 |
| Amounts subject to appropriation action: | | | | | |
| Estimated authorization level: | | | | | |
| Function 350 ................................ | | 3 | 3 | 3 | 3 |
| Function 500 ................................ | | 51 | 53 | 53 | 55 |
| Function 600 ................................ | | | | 600 | 600 |
| Function 750 ................................ | | 238 | 218 | 130 | 135 |
| Estimated outlays: | | | | | |
| Function 350 ................................ | | 3 | 3 | 3 | 3 |
| Function 500 ................................ | | 51 | 53 | 53 | 55 |
| Function 600 ................................ | | | | 80 | 140 |
| Function 750 ................................ | | 110 | 135 | 325 | 150 |
| Estimated offsetting receipts: | | | | | |
| Function 750 ................................ | −25 | −50 | −50 | −50 | −50 |
| Total spending (net of receipts): | | | | | |
| Estimated authorization level/required budget authority.................. | −25 | 242 | 224 | 736 | 743 |
| Estimated outlays .................. | −25 | 114 | 141 | 411 | 328 |
| Estimated Revenues ................................ | | 15 | 15 | 70 | ............ |
| Net budget impact: Estimated net increase or decrease (−) in the deficit ................................ | −25 | 99 | 126 | 341 | 328 |

[1] Less than $2.5 million.

## Basis of Estimate:

*Function 750.* The table below shows the estimated budget authority and outlays required to perform the tasks required by the bill that fall under function 750 (Administration of Justice).

ESTIMATED BUDGET IMPACT—FUNCTION 750

[By fiscal year, in millions of dollars]

| | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|
| Authorization level: | | | | | |
| Specifically authorized ................................ | | 840 | 830 | ............ | ............ |
| Estimated ................................ | | 4 | 2 | 130 | 135 |
| Less: Baseline ................................ | | −606 | −614 | | |
| Less: New offsetting receipts................................ | −25 | −50 | −50 | −50 | −50 |
| Net additional authorization................................ | −25 | 188 | 168 | 80 | 85 |
| Estimated outlays ................................ | −25 | 60 | 85 | 275 | 100 |

Section 101 of the bill amends the Immigration and Nationality Act to authorize the appropriation of $840 million in fiscal year 1987 and $830 million in fiscal year 1988 for additional inspection and service activities of the Immigration and Naturalization Service (INS). This replaces an authorization for "such sums as may be necessary" currently in law. For the purpose of this estimate, the

**AR2022_400925**

60

existing authorization is represented by the Senate Budget Committee baseline used for the 1986 first budget resolution, and the impact of the bill is shown as the authorized increase over the baseline level. The increased authorization level for the INS specified in the bill is meant to provide funds for increased enforcement activities, including enforcement of employer sanctions, and additional processing of applications and adjudication primarily resulting from the legalization and temporary worker programs outlined by the bill. Assuming that the full amounts authorized are appropriated and that applications for legalization are all received in fiscal year 1989, CBO estimates that the increase in outlays resulting from this authorization language would be approximately $108 million in fiscal year 1987, $133 million in 1988, $194 million in 1989, and $15 million in 1990. For 1989 and 1990, CBO has estimated the costs of activities required by the bill over and above baseline levels. It is assumed that the enforcement and adjudication activity levels after 1988 would remain relatively constant at about the 1988 level. Thus, CBO estimates additional costs of about $130 million in fiscal year 1989 and $135 million in 1990. Subsequently, in 1991 and 1992, additional funds would be needed for the processing of applications for permanent residency from those who were made temporary residents in 1989. Some of these funds would be available from monies collected in fiscal year 1989 (during the period assumed for applications for temporary status); however, CBO anticipates that additional appropriations would be necessary for this purpose.

Section 102 of the bill authorizes the Attorney General, in consultation with the Secretary of State, to impose fees on aliens entering the United States at border facilities to recover the cost of their use of the facilities. Based on information provided by the INS, CBO estimates that an average of 200 million aliens will enter the United States by land, sea, or air in each of the next 5 years, at a total cost to the INS of about $50 million a year. The INS would be able to recover this cost by imposing a fee of about $0.25 per entry.

Part B of title I increases penalties for immigration-related violations and part C outlines employer penalties for illegal employment of unauthorized aliens. Part C also directs the President to monitor and evaluate the degree to which the employment verification system outlined by the bill is effective and authorizes the President to require changes to the system, as necessary. This section authorizes the President to undertake a demonstration project over 3 years and subsequently to require changes to the system, if the current method were found to be ineffective. Such change could involve establishing a new system to determine employment eligibility in the United States. The new system could involve the use of tamper-resistant Social Security cards or the presentation of a new form of identification. The President would have to report such a proposed change to the Congress 2 years prior to implementation. Thus, CBO anticipates that a new system would not be implemented prior to fiscal year 1991. (Implementation of such a system could cost more than $500 million per year.)

Title II of the bill establishes and authorizes funds for a Select Commission on Legalization beginning in fiscal year 1987. The com-

AR2022_400926

mission would review activities of the INS in controlling illegal entry of aliens into the United States and in eliminating illegal employment of unauthorized aliens, and report to the Congress within 1 year of appointment of a majority of members of the commission and annually thereafter. Based on information from INS and on the cost of similar commissions, CBO estimates that enactment of this section would cost $2 million in fiscal year 1987 and $2 million in 1988. The costs falling in function 750 associated with legalization are included in the specific authorization levels in title I. They are estimated to be about $20 million in fiscal year 1988, $190 million in 1989, and $15 million in 1990.

Title IV requires the preparation of several reports: a triennial comprehensive immigration-impact report; an annual presidential report on the system designed to prevent unlawful employment of aliens; and an annual GAO report on the impact of the employer sanction programs on discrimination in hiring and the regulatory burden of employers. In addition, the INS is to report on resources needed not later than 90 days after enactment of the bill. Based on information from the INS, the cost of preparation of these reports would be a total of approximately $2 million in 1986, $12 million in 1987, $10 million in 1988, $8 million in 1989, and $6 million in 1990. Title V establishes a commission beginning in fiscal year 1987, to report on possible United States-Mexican joint endeavors to improve economic conditions. Outlays of the commission are expected to be about $2 million in fiscal year 1987.

*Functions 500 and 350.* Several provisions of the bill would result in Federal outlays in functions 500 (Education, Training, Employment, and Social Services) and 350 (Agriculture). CBO estimates that additional outlays would be $54 million in 1987, rising to $58 million by 1990.

The bill authorizes such sums as may be necessary to enable the Department of Labor (DOL) to make determinations and issue certifications under the H–2 worker program. The H–2 worker program allows foreign workers to enter the United States temporarily to work in jobs which employers cannot find domestic workers to fill. In making this estimate, it is assumed that the combination of employer sanctions and a strengthened INS would act as effective deterrents to the hiring of illegals to perform agricultural labor. It is further assumed that the H–2 worker program would expand to fill the otherwise unmet demand for agricultural labor, thereby increasing the administrative costs of DOL.

According to the Department of Agriculture (USDA), if employer sanctions were effectively enforced, growers would need between 250,000 and 500,000 guest workers. The DOL is currently receiving about 800 applications per year for H–2 agricultural workers, and each application requests an average of 25 workers. Administrative costs are about $3 million in 1985, or $3,750 per application, for the agricultural part of the H–2 worker program, and they are estimated to increase by about 5 percent per year.

Currently, those illegal immigrants who work in agriculture are located primarily in the West and Southwest, while most H–2 workers are employed in the East. Since western agricultural concerns tend to be far larger than eastern, it is assumed that future applications would be for about 40 workers on average.

AR2022_400927

5

62

Using a projected cost per application of about $4,100, CBO estimates that administrative costs would be $39 million in 1987. This figure is based on an estimated 9,375 applications: 375,000 guest workers—the midpoint of the estimated range noted above—and an estimated 40 workers per application. Because the bill would establish a transitional labor program which would permit growers to fill all their labor needs by hiring illegals for 1 year, no additional costs would be incurred until 1987.

The bill also authorizes such sums as may be necessary for the USDA to provide expertise and assistance to the DOL with regard to the temporary agricultural worker program. These costs, including the cost of producing a quarterly farm wage rate survey, are estimated to be about $3 million annually.

In addition, the bill requires the Federal Government to establish a program to (a) recruit domestic workers to perform services that might otherwise be performed by temporary foreign nonimmigrant laborers, and (b) monitor the terms and conditions under which temporary agricultural workers are employed in the United States. A total of $10 million per year beginning in 1987 is authorized for these purposes. The bill also authorizes such sums as may be necessary to fund the establishment of a 2-year commission to study and review the temporary agricultural worker program and the agricultural labor transition program, resulting in estimated costs of $2 million in 1987 and 1988.

The estimated budget impact of S. 1200 in functions 500 and 350 is summarized in the following table.

ESTIMATED BUDGET IMPACT—FUNCTIONS 500 AND 350

[By fiscal year, in millions of dollars]

|  | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|
| Function 500: |  |  |  |  |  |
| H–2 worker program: |  |  |  |  |  |
| Estimated authorization level |  | 39 | 41 | 43 | 45 |
| Estimated outlays |  | 39 | 41 | 43 | 45 |
| Other: |  |  |  |  |  |
| Estimated authorization level |  | 12 | 12 | 10 | 10 |
| Estimated outlays |  | 12 | 12 | 10 | 10 |
| Function 350: |  |  |  |  |  |
| Estimated authorization level |  | 3 | 3 | 3 | 3 |
| Estimated outlays |  | 3 | 3 | 3 | 3 |

*Functions 570, 600 and 650.* Title II ("Legalization") would increase Federal outlays in functions 570 (Medicare), 600 (Income Security), and 650 (Social Security). First, title II authorizes the appropriation of funds to reimburse States for costs of public assistance provided to eligible legalized aliens and for the imprisonment costs of unauthorized aliens. A sum of $600 million is authorized in each of 3 fiscal years, beginning with the year in which applications for legalization would end, which would be fiscal year 1989 under CBO's assumptions.

Second, legalization of unauthorized aliens would entitle the aliens to receive benefits from a number of Federal assistance programs for which they are currently ineligible. Toward the end of

**AR2022_400928**

the projection period shown in this estimate—1986 to 1990—additional costs would result in the Unemployment Compensation, Disability Insurance, and Medicare programs. Assuming full compliance with the law, no additional costs would result during this period in Federal assistance programs based on "financial need" (Aid to Families with Dependent Children, Food Stamps, Medicaid, and Supplemental Security Income), because legalized aliens would be precluded from receiving benefits for 6 years from their date of legalization. Based on CBO assumptions concerning the timing of the application period, no alien could receive benefits from these programs based on financial need until fiscal year 1995.

Additional outlays in functions 570, 600, and 650 as a result of legalizing unauthorized aliens are estimated to be $80 million in 1989 and $170 million in 1990. They are shown in the following table:

ESTIMATED BUDGET IMPACT—FUNCTIONS 570, 600, AND 650

[By fiscal year, in millions of dollars]

|  | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|
| **Unemployment compensation (Function 600):** | | | | | |
| Required budget authority | | | | | |
| Estimated outlays | | | | (¹) | 15 |
| **Disability insurance (Function 650):** | | | | | |
| Required budget authority | | | | (¹) | (¹) |
| Estimated outlays | | | | (¹) | 10 |
| **Medicare (Function 570):** | | | | | |
| Required budget authority | | | | (¹) | (¹) |
| Estimated outlays | | | | (¹) | 5 |
| **Grants to States (Function 600):** | | | | | |
| Authorization level | | | | 600 | 600 |
| Estimated outlays | | | | 80 | 140 |
| **Subtotal: Direct spending provisions:** | | | | | |
| Required budget authority | | | | (¹) | (¹) |
| Estimated outlays | | | | (¹) | 30 |
| **Subtotal: Amounts subject to appropriation action:** | | | | | |
| Authorization level | | | | 600 | 600 |
| Estimated outlays | | | | 80 | 140 |
| **Total Functions 570, 600, and 650:** | | | | | |
| Authorization level/required budget authority | | | | 600 | 600 |
| Estimated outlays | | | | 80 | 170 |

¹ Less than $2.5 million.

This estimate is very uncertain, particularly because of the four problems discussed below. First, this estimate includes Federal outlays for the grants to States that are large enough to cover the full estimated costs to States for public assistance to the legalized aliens and for imprisonment costs. Less than the full costs, however, might be appropriated. Second, the timing of legalization is unclear because it depends on a finding by the Legalization Commission, established under title II, that more effective enforcement measures had been instituted with adequate resources to curtail the entry and stay of unauthorized aliens. The CBO estimates are based on the assumption that the commission would find toward the end of its second year that legalization could begin. Thus, the application period for legalization is assumed to begin on October

**AR2022_400929**

1, 1988 and end on September 30, 1989, in accordance with the 12-month application period specified in the bill. As a result, outlays would not begin until fiscal year 1989.

Third, this estimate depends importantly on the number of unauthorized aliens in the United States, for which little hard evidence exists. It has been generally accepted that there were 3 to 6 million unauthorized aliens in the United States in the late 1970s. The CBO estimate uses 4.5 million aliens in 1977, the midpoint of the range. Even less is known about how the numbers of unauthorized aliens in the United States may have changed in recent years, although anecdotal evidence indicates there has been some net inflow. Based on conversations with persons knowledgeable about the unauthorized alien population, CBO assumes a net increase of 150,000 in each year beginning in 1980. By 1986, then, CBO assumes that there will be 5.6 million unauthorized aliens in the United States.

Of the 5.6 million unauthorized aliens, CBO estimates that 17 percent have resided continuously in the United States since January 1, 1980, making them eligible for legalization under this bill. This figure is based on percentages from Immigration and Naturalization Service (INS) studies, which have been adjusted upward to reflect the assumption that some unauthorized aliens are aware of the possibility of legalization because of legislative activity in recent years. Among those eligible, we assume—again based on conversations with experts—that approximately 60 percent would apply for and be granted resident status. The resulting number of unauthorized aliens who would be granted resident status is estimated to be 565,000.

Finally, the number of legalized aliens who would qualify for government assistance programs is uncertain. In large part, this reflects a lack of data on the economic and demographic characteristics of unauthorized aliens—for example, their employment status and wages or their age and marital status. In developing the estimates of numbers of legalized aliens who would receive benefits from government programs, CBO assumes that the unauthorized aliens would have to show at the time of their application for residency that they had not been nor would they be likely to be "public charges," as specified in section 212 of the Immigration and Nationality Act. Thus, at the time the aliens would become residents, they would presumably be working. Over time, however, they could be expected to resemble the U.S. population as to receipt of benefits from entitlement programs. By 1992, CBO assumes that the percentage of unauthorized aliens receiving government benefits would resemble that of the U.S. population for similar age, sex, ethnic origin, and income groupings. In the interim years, CBO assumes that a growing fraction would in fact receive benefits: 5 percent in 1989, 30 percent in 1990, and 75 percent in 1991.

In addition to the general basis of these estimates, each individual program estimate entailed specific procedures and assumptions. The details for each program are discussed below.

The Unemployment Compensation program provides weekly cash benefits to workers who are involuntarily unemployed and who have had at least a moderate amount of work experience during a 1-year period prior to losing their jobs. Under this bill, Unemploy-

ment Compensation costs for newly legalized alien workers are estimated to rise from an insignificant amount in 1989 to $15 million in 1990. This estimate is based on several assumptions for newly legalized alien workers. Consistent with recent labor force data on young Hispanics, CBO assumes that 80 percent of these workers would participate in the labor force, a higher rate than the average of the U.S. population. Because most probably work in service industries, which are less prone to cyclical unemployment, and because even low-wage jobs in this country probably appear attractive when compared to those in the country of origin, CBO assumes that the newly-legalized population would have unemployment rates one percentage point lower than those in effect for the rest of the U.S. population. Further, assuming, as some evidence indicates, that these individuals' earnings are about 60 percent of those of comparable U.S. production or nonsupervisory workers (and assuming a 50 percent wage replacement rate), CBO estimates that the average weekly benefit amount for these workers would be about $105 in 1989, one-fourth lower than that for the remainder of the population.

The Disability Insurance (DI) program covers persons who are totally disabled (whose disability is expected to last at least 12 months or result in death) and who have sufficient work histories in covered employment. Costs in DI of the legalized aliens are estimated to rise from an insignificant amount in 1989 to $10 million in 1990. Because the evidence indicates that unauthorized aliens are relatively young on average, they would be less likely to be disabled than the U.S. population as a whole. Also, because they have been in the United States for relatively short periods of time, they might not qualify for DI, which requires for most workers covered earnings during 20 out of the last 40 calendar quarters. For all of these reasons, their DI recipiency rate would be less than that of the U.S. population; CBO estimates the rate to be about 0.1 percent in 1989, with this rate rising to about 0.4 percent in 1990. Their benefit levels would also be less, reflecting lower than average wages and shorter work histories. The CBO estimates average benefits to be about $4,365 in 1990 for aliens who entered before 1980.

Costs in the Medicare program, which provides health care coverage to the aged and disabled covered by Social Security, would rise slightly beginning in 1989, but would not exceed $5 million through 1990. These costs would be for those aliens who would receive DI.

Grants to States, which would not begin until 1989 (the year the application process is assumed to end), are estimated to cost $80 million in 1989 and $140 million in 1990. Of this total, $10 million in 1989 and $70 million in 1990 would be for public assistance costs—cash and medical—and $70 million in each year would be for costs of imprisoning unauthorized aliens.

Grants for public assistance are based on costs in State and local General Assistance (GA) programs. These programs are fully-funded by States and localities and provide benefits to low-income persons and families who do not qualify for the federally-funded cash welfare programs. GA provides both cash payments and medical coverage. Two groups of aliens would qualify for GA: those who would never be eligible for Federal welfare programs (for example,

low-income working two-parent families with children, and non-aged, non-disabled couples or single persons without children) and those who would be made ineligible for AFDC or SSI by the bill for a period of 6 years.

Among the first group, CBO estimates that 1.3 percent of the aliens would receive an average annual cash GA benefit of $1,850 in 1989. This estimate is based on current recipiency rates and benefit levels in GA programs. Among the second group, CBO's estimate for families who would have qualified for AFDC is based on the assumption that 52 percent of the aliens given permanent resident status would be married men and women, reflecting demographic data on unauthorized aliens, which show about 79 percent to be adults and the majority to be young and male, and marital rates in the United States. Of the married men and women, 4.5 percent of those not of Spanish origin and 17.0 percent of those of Spanish origin are estimated to receive AFDC. These rates of AFDC recipiency are those which currently exist in the program. The average annual cash benefit for these alien families is estimated to be $2,300 in 1989. The CBO estimate for aliens who would have qualified for SSI is based on a recipiency rate of 0.90 percent of the alien population for the aged and 0.94 percent for the blind and disabled. The recipiency rate for the aged is based on Census data which show 1.80 percent of illegal aliens to be aged, and assumed income eligibility of 100 percent, and a participation rate for the eligible of 50 percent. The recipiency rate for the blind and disabled is based on the current recipiency rate for the U.S. population. Their average annual cash benefit is estimated to be $1,850 in 1989.

These aliens would also receive medical GA. Their average annual medical benefits are estimated to be $940 in 1989.

Grants for imprisonment costs are based on an estimated 5,000 unauthorized aliens in State prisons. The prison costs per alien are estimated to be $14,000 annually.

*Revenues.* The bill would require the Attorney General to collect a fee of at least $100 for each application submitted by an alien for permanent or temporary residency under the legalization provisions in title II. The funds received from these application fees would be deposited into a separate account to be made available to cover only administrative expenses incurred in connection with the review of applications filed under this section. CBO estimates that approximately 700,000 aliens would apply for legal temporary residency in fiscal year 1989. Assuming a fee of $100 per application, the lower limit specified in the bill, CBO estimates that the Government would receive approximately $70 million in fiscal year 1989 from legalization application fees. Applications for permanent residency resulting in additional fees would occur beyond the estimating period in fiscal years 1991 and 1992. More money could be collected as a result of this provision if the Attorney General imposed a fee of more than $100 per application.

In addition, the bill allows the Attorney General to impose a fee on employers participating in the agricultural labor transition program to recover reasonable costs of processing registrations. If this fee were imposed, it would increase revenues by $10 million to $20 million in fiscal years 1987 and 1988. The bill also allows the Secre-

tary of Labor to imposed a fee on employers importing temporary agricultural workers to recover the costs of processing applications for certification. It has not yet been determined whether the Secretary of Labor would impose such a fee and CBO is unable at this time to estimate how much money would be collected as a result of this fee.

Part B of title I increases penalties for immigration-related violations and part C outlines employer penalties for illegal employment of unauthorized aliens. No estimate can be made of the fines that would be collected by the Federal Government as a result of these sections.

In addition to the above effects on Federal revenues, there are potential effects on individual income tax revenues and social insurance contributions. Revenues would increase if some of the aliens who are not having taxes withheld from their wages at present were to have taxes withheld as a result of this legislation. Revenues would decrease if aliens who currently have taxes withheld and are entitled to refunds that they do not claim would claim refunds as a result of this bill. Given the uncertainties concerning characteristics of illegal aliens, and rough estimates showing the two effects above to be approximately offsetting, CBO shows no effect of the bill on these revenue sources.

6. Estimated cost to State and local governments: By legalizing certain unauthorized aliens currently residing in the United States, this bill could have sizable effects on State and local government budgets. Unauthorized aliens are not eligible for welfare programs that are partially- or fully-funded by States and localities. When legalized, these aliens would be eligible for such programs—immediately in the case of State programs and after 6 years in the case of programs financed by Federal and State governments jointly. Based on the CBO estimates, there would be no measurable effect on State and local budgets until 1989, when legalization would begin. In 1989 through 1992, States are estimated to save $70 million a year; the grants to States authorized by the bill are estimated to cover all of the States' additional public assistance costs, as well as their existing costs—$70 million a year—for imprisonment of illegal aliens. Beyond 1992, when the grants would no longer be available, States and localities would have higher expenditures in their public assistance programs, particularly until 1995 when the aliens would first become eligible for Federal programs based on financial need; CBO estimates these increased expenditures to be $225 million to $250 million a year.

A number of factors make these estimates uncertain. For purposes of this estimate, it is assumed that funds for the grants to States would be appropriated in full, or at least at a level that would cover fully State and local public assistance costs generated by the bill. If less than this amount were appropriated, States and localities would be faced with higher expenditures. Also, States and localities might have added costs if the public assistance expenditures generated by the bill were more than the $600 million limit on grants; this appears unlikely, but given the uncertainty surrounding the estimates, it is still a possibility. On the other hand, with a full appropriation, savings to States and localities would be higher than CBO has estimated. Certain current expenditures by

AR2022_400933

States and localities would be covered under the grant: free health care provided to unauthorized aliens in public hospitals, assistance to Cuban and Haitian entrants, and any public assistance being received illegally by unauthorized aliens. However, CBO does not have sufficient information to estimate these potential savings.

In addition, other titles of the bill could affect State and local budgets. If the provisions of the bill that provide for employer sanctions and other means of reducing the flow of unauthorized aliens into the United States are effective, there would be some associated savings to State and local governments. For example, there would be fewer alien children to educate. The CBO cost estimate does not include such savings, given the uncertainties concerning flows of unauthorized aliens into the United States and the potential effectiveness of the bill's sanction provisions. It is also unknown to what extent State and local government budgets might be affected by any involvement of States and localities in the legalization application process, as provided for in title II.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Janice Peskin, Debra Goldberg, Neil Fisher, Paul Cullinan, Richard Hendrix, and Anne Manley.

10. Estimate approved by: C. G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

## VII. REGULATORY IMPACT EVALUATION

In compliance with subsection (b) of paragraph 11 of rule XXVI of the Standing Rules of the Senate, it is hereby stated that the only significant regulatory impacts that will result from the enactment of S. 1200 arise from certain requirements of sec. 101(a) of the bill, namely certain mandatory procedures for the verification of employment eligibility and recordkeeping in connection therewith. The impact of these requirements is discussed in the first section of part D of the General Statement, and in the portion of the Section-by-Section Analysis which describes sec. 101(a) of the bill. Any further discussion of such impacts would be impracticable, and, therefore, is omitted in accordance with clause (2) of such subsection (b), since details of the required forms and procedures will be developed only after enactment, by regulations of the Department of Justice and other executive agencies.

## VIII. CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing laws proposed to be made by S. 1200 are shown as follows: Existing law to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman.

## UNITED STATES CODE ANNOTATED

\*        \*        \*        \*        \*        \*        \*